**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

| | | |
|---|---|---|
| **Jonathan R., minor, by Next Friend, Sarah DIXON; Anastasia M., minor,  by Next Friend, Cheryl ORD; Serena S., minor, by Next Friend, Sarah DIXON; Theo S., minor, by Next Friend, L. Scott BRISCOE; Garrett M., minor by Next Friend, L. Scott BRISCOE; Gretchen C., minor, by Next Friend, April FLOWERS; Dennis R., minor, by Next Friend, Debbie STONE; Chris K., Calvin K. and Carolina K., minors, by Next Friend, Katherine HUFFMAN; Karter W., minor, by Next Friend, L. Scott BRISCOE; Ace L., minor, by Next Friend, Isabelle SANTILLION; and individually and on behalf of all others similarly situated,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:19-cv-00710 |
| Plaintiffs, | ) ) | |
| **v.** | ) ) | |
| **Jim JUSTICE, in his official capacity as the Governor of West Virginia; Bill CROUCH, in his official capacity as the Cabinet Secretary of the West Virginia Department of Health and Human Resources; Jeremiah SAMPLES, in his official capacity as the Deputy Secretary of the Department of Health and Human Resources; Linda WATTS, in her official capacity as the Commissioner of the Bureau for Children and Families; and WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** |
| Defendants. | ) ) ) ) ) ) ) ) ) | |

1

## PRELIMINARY STATEMENT
## INTRODUCTION

1.      For years, West Virginia's child welfare system has operated in a state of crisis. During this time, West Virginia and its Department of Health and Human Resources ("DHHR"), the legal guardian of children in the state's foster care system, and Bureau for Children and Families ("BCF"), which is responsible for the fostering and adoption of West Virginian children, have repeatedly failed the children they are charged with protecting.

2.      On Defendants' watch, Plaintiffs, children in West Virginia's foster care system, have been abused and neglected, put in inadequate and dangerous placements, institutionalized and segregated from the outside world, left without necessary services, and forced to unnecessarily languish in foster care for years. Defendants, well aware of these problems, have answered with empty promises and unfulfilled initiatives. Today, West Virginia continues to infringe upon the rights of its foster children, jeopardizing their most basic needs.

3.      Federal data and reports paint a grim picture of how vulnerable West Virginian children fare compared to those in the rest of the country. In 2017, the rate of child deaths related to abuse and neglect per 100,000 children in West Virginia was more than double the national average. Similarly, the rate of child victims of maltreatment was double the national average. The rate of referrals to DHHR for abuse and neglect was over one-and-a-half times the national average. And the rate of child abuse and neglect investigations or assessments was more than triple the national average. Moreover, near fatalities of children known to DHHR due to abuse or neglect rose by more than 20 percent per year for four years between 2014 and 2018.

4.      The number of youth entering the broken West Virginia foster care system has skyrocketed in recent years. Between 2013 and 2017, the foster care population swelled by 67 percent—substantially higher than the national average increase of 11 percent during the same

years. A variety of factors played a role in causing this spike. For one, the opioid crisis disproportionately affected West Virginia, the 47th poorest state in the nation.

5.      West Virginia suffers from the highest age-adjusted rate of drug overdose deaths involving opioids in the nation. Caregiver addiction and deaths stemming from substance abuse have driven more and more children into the system.

6.      In 2018, West Virginia led the nation in the number of removals performed by its child welfare agency, stretching the limits of an already overburdened system. A significant portion of these children were teens. As of 2017, the state had the highest rate of foster care entries for youth ages 14 to 17 at 14.2 per 1,000 children, as compared to the national average of 2.8 per 1,000 children.

7.      But Defendants fail to maintain an adequate number of appropriate placements for youth entering foster care in West Virginia. As a result, they resort to quickly placing children into kinship placements that are not sufficiently vetted, supported, or monitored to ensure children's safety and wellbeing while in those placements, or institutionalizing them. DHHR increased their reliance upon kinship caregivers by more than 30 percentage points over the last five years. In West Virginia, a disproportionate number of adolescents in foster care are sent to residential facilities: 71 percent of youth between the ages of 12 and 17 are institutionalized. Many of these teens are sent to out-of-state facilities that are far from their families and communities. As of June 2019, DHHR placed 327 foster children in out-of-state institutions. In-state, DHHR placed 588 youth in residential care and 83 in psychiatric facilities.

8.      West Virginia's child welfare system is fraught with significant administrative problems that hinder its ability to operate effectively. Although a state-run model, there are regional variations in interpretation of policy and practice. A number of staffing challenges also

compromise DHHR's ability to perform essential child welfare functions, such as case management and permanency planning. For instance, West Virginia has averaged a 23 percent vacancy rate for CPS positions—nearly a quarter of its workforce—in recent years.

9.     Defendants' response to identified problems in the child welfare system has been slow, indecisive and inadequate. Defendants have failed to strategically address issues facing the child welfare system, thus causing further harm to children while in Defendants' custody. Specifically:

a.     West Virginia lacks a sufficient number of foster care placements. As a result, DHHR is in a perpetual state of crisis when it has to find placements for children. Defendants regularly match children with any available placement regardless of its appropriateness.

b.     Upon information and belief, West Virginia's foster care system is so overwhelmed, and there is such an acute shortage of adequate foster home placements, that DHHR has segregated children in institutions, lodged children in temporary shelter care well past the standard time frames, refrained from removing children from known abusive or neglectful homes, temporarily housed children in overcrowded general foster care homes, or placed children in poorly screened kinship foster homes.

c.     DHHR relies indiscriminately on institutional care for children despite extensive evidence and guidance in the child welfare field about the importance of minimizing institutional care for children as well as federal prohibitions on segregating people with disabilities from their homes and communities.

4

d.      West Virginia routinely fails to ensure that children achieve placement stability while in foster care. DHHR shuffles children, many of whom have complex needs, from placement to placement without engaging in thoughtful placement matching. This instability further traumatizes these children.

e.      West Virginia is also losing track of an alarming number of foster children. In 2018, West Virginia had 791 reported runaways from its foster care system, and the state is on track to exceed that number in 2019.

f.      West Virginia fails to employ and retain a sufficient number of appropriately trained caseworkers. DHHR is plagued by high caseworker turnover.  DHHR fills the increasing vacancies with unqualified applicants, who have little experience in the field, resulting in diminished caseworker continuity and inconsistencies in policy interpretation and practice. Further, DHHR fails to adequately screen their applicants for criminal backgrounds or drug use.

g.      Defendants fail to engage in timely and meaningful assessments and case planning, and this all but ensures that the limited resources West Virginia makes available are not used well.

h.      Many children in foster care do not receive necessary services. Further, many caseworkers have inappropriately heavy caseloads that preclude them from either developing appropriate case plans or ensuring that necessary services are provided.

i.      West Virginia has failed to develop a sufficient array of in-home and

community-based mental health services. Instead, the entire children's mental health system is centered around placement in segregated residential treatment facilities.

j.      DHHR fails to engage in critical permanency planning, leaving children to languish in foster care for years.

k.      Adolescents in foster care are often forgotten. Upon information and belief, caseworkers view their permanency planning efforts as futile and make insufficient efforts to develop and implement permanency plans for this population. Instead, West Virginia abruptly discharges most of these youth from institutional care without proper planning or any connections to supportive adult programs. These children lack sufficient educational or vocational training that would enable them to achieve a sustainable and safe adulthood.

10.      The named Plaintiffs bring this lawsuit as a civil rights action on behalf of all children who are now, or will be, in the custody of DHHR. Plaintiffs seek declaratory and injunctive relief against the Defendants, the state agency and state officials responsible for operating West Virginia's foster care system, for violating Plaintiffs' rights under the U.S. Constitution and federal laws. Defendants' actions and inactions have caused chronic and system-wide failures in West Virginia's foster care system—a system intended to protect the state's most vulnerable children.

## PARTIES

### I.    Plaintiffs[1]

11.    Jonathan R. of Wayne County is a 15-year-old boy who is in the custody of DHHR. He has spent the last three years in institutional care in West Virginia's foster care system and has not received services necessary to address his serious problems. Jonathan appears through his next friend, Sarah Dixon.

12.    Anastasia M. of Cabell County is an 11-year-old girl who is in the custody of DHHR. She has been in foster care twice. She has experienced at least 10 placement disruptions, waited nearly three years in foster care before she was adopted only to have her adoption fail, was placed into a detention facility at the age of 11, and is currently in an out-of-state institution notorious for child abuse. Anastasia appears through her next friend, Cheryl Ord.

13.    Serena S. of Cabell County is a 11-year-old girl who is in the custody of DHHR. She entered foster care a year ago, has experienced multiple placements, was separated from her sibling, and is at risk of institutionalization. Serena appears through her next friend, Sarah Dixon.

14.    Theo S. of Boone County is a seven-year-old boy who is in the custody of DHHR, was freed for adoption, has undergone multiple foster home moves, is institutionalized in an out-of-state placement, and does not have a current plan to re-integrate into the community. He appears through his next friend, L. Scott Briscoe.

15.    Garrett M. of Boone County is a 17-year-old boy who is in the custody of DHHR, was freed for adoption, has experienced multiple placements, primarily in institutional settings both in West Virginia as well as out of state, and will soon age out of foster care completely. He is unprepared to live independently. Garrett appears through his next friend, L.

---

[1] The children's names are pseudonyms, but their actual first and last initials are used.

Scott Briscoe.

16.     Gretchen C. of Wood County is a 15-year-old girl who is in the custody of DHHR, has experienced multiple placements, and was segregated in institutional settings both in and out of the state of West Virginia. Gretchen appears through her next friend April Flowers.

17.     Dennis R. of Roane County is a 16-year-old boy who is in the custody of DHHR. He has been in foster care for five years, experienced multiple placements, and was not provided necessary services. He is currently institutionalized. Dennis appears through his next friend Debbie Stone.

18.     Chris K., Calvin K., and Caroline K. of Barbour County are siblings and ages four, three, and two, respectively. They have been in the custody of DHHR for nearly three years, were freed for adoption, and have experienced multiple placements, including failed adoptions. Chris, Calvin, and Caroline appear through their next friend Katherine Huffman.

19.     Karter W. of Boone County is a 13-year-old boy who is in the custody of DHHR, was freed for adoption, and has undergone multiple placement changes, primarily in institutional settings, both in West Virginia and other states. Karter appears through his next friend, L. Scott Briscoe.

20.     Ace L. of Fayette County is a 12-year-old boy who is in the custody of DHHR. He has been in foster care for three years, during which time he was abused, overmedicated, and experienced multiple placements, including in institutional and hospital settings. Ace appears through his next friend Isabelle Santillion.

## II.     Defendants

21.     Defendant Jim Justice is the Governor of West Virginia and is sued solely in his official capacity. He is the chief executive of West Virginia and charged with faithfully executing

the laws of West Virginia as well administering the daily affairs of the state. Governor Justice appoints the Director of DHHR, who serves on his cabinet. He is responsible for ensuring that West Virginia executive departments comply with all applicable laws and has the power to issue executive orders to shape the functions and coordination of DHHR.

22.     Defendant West Virginia DHHR is a state agency created and authorized under the laws of the State of West Virginia. DHHR is the principal human services agency in West Virginia. It is authorized by law to maintain and has ultimate responsible for maintaining the overall Department, and the BCF, which acts as DHHR's agent in the area of protecting the safety and welfare of children. DHHR has responsibility for BCF, which is a subdivision of DHHR.

23.     Defendant Bill Crouch is the Cabinet Secretary of the West Virginia DHHR and is sued solely in his official capacity. Defendant Crouch is responsible for DHHR's policies, practices, and operations, and for ensuring that DHHR complies with all applicable federal and state laws.

24.     Defendant Jeremiah Samples is the Deputy Secretary of the West Virginia DHHR and is sued solely in his official capacity. Defendant Samples is also responsible for DHHR's policies, practices, and operations, and for ensuring that DHHR complies with all applicable federal and state laws.

25.     Defendant Linda Watts is the Commissioner of the BCF, a subdivision within DHHR, and is sued solely in her official capacity. She oversees programs including safety, wellbeing and permanency, and is responsible for BCF's policies, practices, and operations, and for ensuring that BCF complies with all applicable federal and state laws.

## JURISDICTION AND VENUE

26.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 et. seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations.

27.      This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

28.      Venue in the Huntington Division of the Southern District of West Virginia is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims herein occurred in the Huntington Division of the Southern District of West Virginia, and three of the named Plaintiffs' child welfare cases were filed within the jurisdiction of the Huntington Division of the Southern District of West Virginia.

## CLASS ACTION ALLEGATIONS

29.      This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

30.       This action consists of one major class and three subclasses:

a.      All children for whom DHHR has or will have legal responsibility and who are or will be in the legal and physical custody of DHHR , ("the General Class"); and, as subclasses:

i.      Children who are or will be in kinship placements, or who were in kinship placements that unnecessarily disrupted, for whom DHHR

is required to provide initial home safety assessments, case management and other services, and permanency planning ("the "Kinship Subclass").

ii.   Children who have or will have physical, intellectual, cognitive, or mental health disabilities (the "ADA Subclass").

iii.   Children who are or will be 14 years old and older, who are eligible to receive age-appropriate transition planning but are not provided the necessary case management and services and are therefore at risk of aging out of foster care without a proper plan to transition successfully and safely into adulthood (the "Aging Out Subclass").

31.   Each class is sufficiently numerous to make joinder impracticable.

a.   The General Class consists of approximately 6,800 children who currently are in the foster care custody of the West Virginia DHHR.

b.   The Kinship Subclass consists of at least 3,400 children who are currently in the custody of the West Virginia DHHR. Approximately half of the state's foster children are placed with relatives or fictive kin.

c.   The ADA Subclass consists of over 25 percent of children currently in foster care who experience physical, intellectual, cognitive, or mental health conditions and nearly 950 children who have been segregated in congregate care or psychiatric institutions both in and out of the state.

d.   The Aging Out Subclass consists of at least 1,600 youth, all of whom are 14 years of age or older, are in foster care, and to whom DHHR is required to provide Transitional Living Services.

32.     The questions of fact and law raised by named Plaintiffs are common to and typical of those of each putative member of the class and subclasses whom they seek to represent.

33.     The named Plaintiffs rely on Defendants for foster care services in West Virginia and wholly depend on DHHR for provision of those services.

34.     Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm, and violations of legal rights suffered by the named Plaintiffs and the class and subclasses they represent.

35.     Questions of fact common to the classes include:

> a.     whether Defendants fail to protect the General Class from physical, psychological, and emotional harm, and risk of harm;
>
> b.     whether Defendants deprive Plaintiffs of the Kinship Subclass of necessary home safety assessments, case management and other services, and permanency planning;
>
> c.     whether Defendants deprive Plaintiffs of the ADA Subclass of necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
>
> d.     whether the Defendants offer supports and caseworker resources adequate to ensure that foster children 14 years or older receive transition planning such that children that age out of the system into adulthood have adequate planning and resources to meet future housing, employment, educational, and other social needs.

  e.  whether the Defendants operate a system that promptly and adequately assesses the individual needs of members of the class;

  f.  whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the class and subclasses;

  g.  whether the Defendants operate a system that provides an adequate diversity of placements to permit the members of the class to reside in the most integrated, least restrictive, and most family-like environment;

  h.  whether the Defendants provide adequate caseworker resources to ensure that members of the class can routinely meet with caseworkers face-to-face and engage in individual services; and

36.  Questions of law common to the classes include:

  a.  whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse, and trauma through unnecessary and too-frequent moves;

  b.  whether Defendants' systemic failures violate Plaintiffs' right to all reasonable efforts to achieve permanency, under the First, Ninth, and Fourteenth Amendments to the United States Constitution, including by separating them unnecessarily from their families and siblings, and segregating them in institutions;

  c.  whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the

Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like home and their right to all reasonable efforts to achieve permanency; and

d.      whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the respective implementing regulations, including by unnecessarily placing youth with disabilities in institutional settings and denying them access to community-based treatment.

37.     The violations of law and resulting harms alleged by Plaintiffs are typical of the legal violations and harms and/or risk of harms experienced by all of the children in the class and subclasses.

38.     The named Plaintiffs will fairly and adequately protect the interests of the class and subclasses that they seek to represent.

39.     Defendants have acted or failed to act on grounds generally applicable to all members of the class or, where appropriate, subclasses, necessitating class-wide declaratory and injunctive relief.

40.     Counsel for Plaintiffs know of no conflict among the class members.

41.     The named Plaintiffs are represented by the following attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation:

- Attorneys from A Better Childhood, Inc., a non-profit legal advocacy organization, including the Executive Director, Marcia Robinson Lowry, who has extensive experience and expertise in federal child welfare class

actions throughout the United States, Deputy Director Dawn J Post, who has over 16 years of experience in child welfare practice and litigation, and staff attorneys Allison Mahoney and Valerie McLaughlin;

- Attorneys from Shaffer and Shaffer, PLLC, a full-service West Virginia law firm with extensive experience in class action litigation and matters involving child abuse and neglect, the ADA, and Section 504 of the RA, including senior associate Richard W. Walters, associate attorney J. Alexander Meade, and partner Brian L. Ooten;

- Attorneys from Disability Rights of West Virginia, the designated protection and advocacy agency for the state of West Virginia pursuant to the Developmental Disabilities Assistance and Bill of Rights Act, who have extensive experience and expertise representing individuals with disabilities, to cause substantial, systemic changes to improve access and services for West Virginians with a disability, including Legal Director Jeremiah J. Underhill and staff attorneys Erin Snyder and Lori Waller.

## **FACTS**

### I.    **The Plaintiff Children**

**Jonathan R.**

42.    Jonathan R. is a 15-year-old boy who has spent most of the last seven years in institutional care. Jonathan is a member of the General Class, the Kinship Subclass, the ADA Subclass, and the Aging Out Subclass. He appears through his next friend, Sarah Dixon. Ms. Dixon has been Jonathan's *guardian ad litem* for one year. Since she has assumed his case, Ms. Dixon has visited Jonathan, remains in regular communication with him, and is committed to representing

his best interests in this case.

43.     Jonathan's biological parents physically, sexually, and emotionally abused him. CPS received a referral and DHHR opened an investigation. While DHHR was conducting their investigation, Jonathan's parents relinquished their parental rights through a private adoption they arranged with a family friend. Upon information and belief, DHHR never verified the suitability of the adoptive parents and abruptly closed the incomplete investigation.

44.     As a result, DHHR never provided Jonathan or his caregivers with supportive services. Jonathan began struggling with severe depression, suicidal ideations, and aggression towards others. He also began starting fires.

45.     In 2013, when Jonathan's suicidal ideations became particularly acute, his adoptive family had him admitted into Highland Psychiatric Hospital. Upon information and belief, DHHR paid for these institutionalizations but never opened a formal investigation into Jonathan's adoptive home.

46.     In March of 2015, when Jonathan was 11 years old, a mandatory reporter at his school called CPS to report that she believed Jonathan was being emotionally and physically abused by his adoptive mother. Jonathan reported that the adoptive mother hit him with various items including a vacuum attachment, a broom handle, and a switch so hard that it broke. On one occasion, Jonathan told his adoptive mother that he would call the cops on her to which she replied, "before the cops get here you will be dead." DHHR failed to open an investigation, and Jonathan remained in the adoptive home.

47.     Jonathan continued to suffer in the home and his behaviors worsened. In January 2016, another mandatory reporter at Jonathan's school made a referral alleging ongoing physical and emotional abuse of Jonathan in his home. Once again, DHHR failed to open an investigation.

48.      In May 2016, Jonathan's adoptive parents had him admitted into Highland Psychiatric Hospital due to allegations that he had sexual contact with another child. They refused to allow Jonathan to return to their home, indicating that they had only adopted him because he had been "left on their doorstep."

49.      That month DHHR finally took custody of Jonathan. Upon information and belief, DHHR made no effort to place Jonathan into a foster home and instead placed him in an out-of-state institutional care facility in Savannah, Georgia, called Coastal Harbor Treatment Center.

50.      DHHR later moved Jonathan from Coastal Harbor Center to Heritage Home, an out-of-state institutional care facility located in Nashville, Tennessee. Heritage Home has a targeted treatment program for adjudicated juvenile sex offenders. West Virginia never adjudicated Jonathan to be sex offender, let alone charged him with committing a crime. Nevertheless, DHHR forced Jonathan to remain at Heritage Home and participate in their six-month program as a pre-condition to his discharge.

51.      Following Jonathan's discharge from Heritage Home, DHHR failed to locate a foster home placement for Jonathan and placed him at Stepping Stones Boys Home in West Virginia, yet another residential care facility. Upon information and belief, he remained there for over two-and-a-half years.

52.      In August 2019, DHHR placed Jonathan with his biological grandmother, but, upon information and belief, DHHR failed to thoroughly vet this placement and has failed to provide the family with any services or financial supports.

53.      Jonathan is diagnosed with post-traumatic stress disorder, attention-deficit/hyperactivity disorder, and reactive attachment disorder.

54.     As a direct result of Defendants' actions and inactions, Jonathan has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Jonathan's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Jonathan has suffered while in the custody of the DHHR.

**Anastasia M.**

55.     Anastasia is an 11-year-old girl who has been in foster care twice. She is a member of the General Class and the ADA Subclass. She appears through her next friend, Cheryl Ord. Ms. Ord was Anastasia's pre-school teacher and is a long-time foster mother. Ms. Ord remained in contact with Anastasia and her adoptive mother over the years. Ms. Ord has fostered over 200 children between 1976 and 2006, has taught foster parent training classes, and is committed to advocating for the best interests of Anastasia.

56.     Anastasia entered foster care in West Virginia for the first time when she was four years old. She was adopted but, following her mother's incarceration, re-entered foster care for the second time at the age of 10 along with her younger half-brother.

57.     After her first removal, DHHR placed Anastasia and her brother with a foster mother ("AM) who, at the time, was a single mother of five, including four adopted children. Anastasia lived with AM for 18 months. AM planned to petition for adoption once the mother's parental rights were terminated.

58.     CPS opened an internal investigation on AM after her son, who, upon information and belief, had behavioral issues, made a report to CPS. Upon information and belief, DHHR did not substantiate those allegations yet DHHR removed Anastasia and her brother from

AM's home. All AM's other children, including the son who alleged abuse, remained in the home.

59.     Over the next six months, upon information and belief, DHHR shuffled Anastasia and her brother between seven different placements, including four foster homes and three respite care placements. DHHR eventually placed Anastasia and her brother back into AM's care. Approximately seven months later, just before Anastasia's seventh birthday, AM adopted the children. In total, Anastasia was in out-of-home care for 31 months.

60.     After three-and-a-half years the placement disrupted, and DHHR removed Anastasia and placed her back in foster care. While in AM's care, Anastasia was admitted to Highland Psychiatric Hospital because she was at risk of harming herself. AM had also sent Anastasia to a six-month program at ChildHelp East, a residential facility in Virginia. After returning, in February 2019, Anastasia and her adopted sister were caught shoplifting, and DHHR removed both girls from AM.

61.     DHHR placed Anastasia in an emergency shelter in Clarksburg. Upon information and belief, after approximately 60 days DHHR moved Anastasia to another temporary shelter in Cabell County. Upon information and belief, she was abruptly discharged from the Cabell County Shelter because she sprayed Lysol on a staff member. Anna was charged with assault and, just before her 11th birthday, she was sent to the Robert L. Shell Juvenile Detention Center. Most of the residents were over 15 years old. Upon information and belief, Anastasia remained there for over three months and slept on a mattress on the cement floor in a single-room cell. Anastasia has said, "I don't think I need help, I need love."

62.     Upon information and belief, DHHR wanted  to send Anastasia to an out-of-state residential facility but the charges pending against her were a barrier to admission. As a result, upon information and belief, DHHR worked with the court to have the charges dropped.

63.     Upon information and belief, Anastasia is currently residing at the Lighthouse Care Center of Augusta in Augusta, Georgia, a residential treatment facility for children and teens with psychiatric issues. The facility has been in the news for wrongdoing on multiple occasions. In 2017, their admissions coordinator was charged with child molestation, sexual battery, and sexual assault, among other charges, for the attack of a 14-year-old, suicidal, female patient. That same year, an on-campus mental health provider was arrested for the sexual assault of a 16-year-old patient. In May 2019, it was reported that a teenage patient was accused of sexually abusing another teenage patient at the facility. The facility also has a history of violating regulations: in 2012, the Georgia Healthcare Facility Regulation Division cited Lighthouse Care Center for failure to staff a registered nurse on more than 25 percent of night shifts within a three-month period.

64.     Anastasia is exceptionally bright and has an IQ of 130. As a result of her early childhood trauma and subsequent traumas related to her multiple placement disruptions, Anastasia suffers from the symptoms of attention-deficit/hyperactivity disorder, reactive attachment disorder, and other psychological issues.

65.     As a direct result of Defendants' actions and inactions, Anastasia has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Anastasia's case, and not acted with deliberate indifference to her legal rights, Defendants may well have prevented additional trauma Anastasia has suffered while in the custody of the DHHR.

**Serena S.**

66.     Serena is an 11-year-old girl who has Down syndrome. She is verbal but dependent on others to perform daily activities such as maintaining basic hygiene. Serena is a

member of the General Class, the Kinship Subclass, and the ADA Subclass. She appears through her next friend, Sarah Dixon. Ms. Dixon has been Serena's *guardian ad litem* for over a year, visits her regularly, remains in regular communication with her, and is truly dedicated to Serena's best interests.

67.    Serena came into foster care in December 2018, because she had missed an excessive amount of school.  Prior to entering care, she was the subject of several child protective referrals based on educational neglect. During the 2018 – 2019 school year, Serena's parents stopped sending her to school altogether after truancy proceedings were initiated. Serena's parents claimed that the symptoms of her Down syndrome made it difficult to get her to school, even though door-to-door transportation services were provided to Serena.

68.    Serena's parents were convicted of educational neglect and sentenced to serve time in prison, but, upon information and belief, they never reported to the state to serve their sentences.

69.    At the behest of the truancy judge, DHHR filed an abuse or neglect petition, and took Serena and her three-year-old brother into the custody of the state. Serena's parents have only appeared in court once and refused to submit to drug screenings. It is unknown whether their parental rights were terminated.

70.    Serena and her younger brother were first placed together in the home of their maternal aunt, whose four biological children also lived in the home. DHHR did not certify the aunt as a foster parent and failed to provide her with financial supports or, upon information and belief, services, to help care for Serena and her brother. After only five weeks, the placement disrupted.

71.    After DHHR removed the children from their aunt's home, DHHR placed

Serena in a regular non-kinship foster home and separated her from her brother. Upon information and belief, DHHR recognized that Serena requires a special needs foster home. These homes receive specialized training and supports and are meant to provide for children with severe developmental disabilities. But, upon information and belief, DHHR claimed that they could not locate a special needs home for Serena. Further, upon information and belief, DHHR claimed that they could not find a home that would accept both Serena and her brother given Serena's special needs. Serena was distraught over the separation from her little brother. Even worse, DHHR did not put a formal sibling visitation plan in place and did not otherwise arrange visits between Serena and her brother for, upon information and belief, months.

72.     In April 2019, Serena's non-kinship foster placement disrupted, and DHHR placed Serena in yet another regular non-kinship foster home without her brother. She remains there today. Serena's current foster home is not pre-adoptive. DHHR plans to eventually send Serena to an institutional care facility called The Potomac Center—altogether skipping any intermediate levels of care in less restrictive settings, such as a specialized or therapeutic foster home.

73.     Upon information and belief, the Potomac Center is marked by a low staff-to-resident ratio, poor training and oversight of their staff, and abuse and neglect from staff towards the residents. In 2017, formal allegations were filed against the facility claiming that, among other abuses, the disabled residents did not receive the services the facility claimed to offer and they failed to hire, train, and supervise their employees adequately. Separately, as a result of an ongoing criminal investigation, state police have claimed that Potomac Center staff abused 12 children, ages seven to 17, subjecting them to physical, sexual, and psychological abuse, including "inhumane and degrading treatment by some employees of the Potomac Center, Inc. facility." Four

senior administrators were charged with failing to report the abuse.

74.       Serena's current foster parent has begged the caseworker to leave Serena in her care indefinitely to avoid the unnecessary institutionalization of Serena, even though she does not plan on adopting Serena. To date, DHHR has provided no information concerning their efforts to find Serena a pre-adoptive home or to develop a long-term plan involving a less restrictive placement option than an institution.

75.       As a direct result of Defendants' actions and inactions, Serena has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Serena's case, and not acted with deliberate indifference to her legal rights, Defendants may well have prevented additional trauma Serena has suffered while in the custody of the DHHR.

**Theo S.**

76.       Theo S. is a seven-year-old boy who is currently placed in an out-of-state institution. He is a member of the General Class and the ADA Subclass. Theo appears through his next friend, L. Scott Briscoe. Mr. Briscoe has been Theo's *guardian ad litem* for over two years, visits him regularly, remains in regular communication with him, and is truly dedicated to Theo's best interests.

77.       Theo first came to DHHR's attention on June 14, 2012, three days after his birth. Theo was born suffering from opioid withdrawal. His withdrawal symptoms were severe enough to necessitate pharmacologic treatment, such as morphine. Despite this, DHHR declined to open a case.

78.       Three years later, on July 9, 2015, CPS observed Theo's mother to be under the

influence of drugs. Theo's mother admitted to the DHHR caseworker that she had a long-term substance abuse issue. During DHHR's investigation, the mother was arrested on a warrant related to a domestic assault altercation.

79.     Theo's maternal aunt agreed to watch Theo for a week and have no contact with Theo's mother until DHHR put a protective plan in place. Theo's mother subsequently participated in an in-home safety plan and services and Theo returned to her care. But, in the following months, she missed many drugs screens.

80.     On January 29, 2016, the mother informed the caseworker that there was domestic violence in the home involving Theo's father.  She called the police but declined to press charges. DHHR implemented another protective plan, removed Theo from the home, and again placed him with his maternal aunt.

81.     On February 4, 2016, during a home visit, the caseworker smelled urine in the mother's home. The caseworker observed a bucket near the window that Theo had been using to relieve himself. The mother's hands were covered in black and the caseworker saw a syringe lying on the table. Theo informed the caseworker that his mother took shots provided by the doctor.

82.     DHHR filed a petition for abuse and neglect on February 5, 2016, and the following day placed Theo in foster care. DHHR placed him in two non-kinship homes before placing Theo with his paternal aunt and uncle.

83.     On February 8, 2016, the mother admitted to neglecting Theo due to substance abuse and domestic violence, and the court adjudicated Theo a neglected child. The father failed to appear in court and was subsequently adjudicated neglectful.

84.     Between March 2016 and December 2016, Theo's mother failed to engage in her DHHR service plan. Theo's father neither appeared in court nor availed himself of services.

On December 19, 2016, Theo's parents' rights were terminated.

85.     On March 20, 2017, DHHR submitted a report to the court for a permanency review. DHHR indicated that the permanency plan was for Theo's paternal aunt and uncle to adopt him, which the court approved.

86.     Three months later, on June 21, 2017, DHHR submitted another report to the court indicating that Theo was doing well in his placement, and DHHR was transferring his case to the adoption unit. The court again approved the permanency plan of adoption.

87.     But, soon thereafter, on September 25, 2017, Theo's caseworker testified in court that the aunt had indicated that Theo was "too much" in her home. Therefore, the caseworker was searching for another relative to take Theo.

88.     The following day DHHR removed Theo from his pre-adoptive placement and placed him with his maternal aunt—his fourth placement in less than two years.

89.     On January 12, 2018, less than four months later, the maternal aunt gave her 10-day notice to have Theo removed. DHHR placed Theo in a non-kinship foster home on January 22, 2018, but, upon information and belief, they also asked DHHR to remove Theo.

90.     On February 16, 2018, DHHR moved Theo to a relative's home, where he remained for only a week, before they also gave notice, stating that they could not handle Theo's behaviors.

91.     DHHR moved Theo to his seventh placement, a non-kinship foster home over four hours away from his home county.

92.     Between February 2018 to June 2018, Theo was placed in four different non-kinship placements. During a May 29, 2018 multi-disciplinary team ("MDT") meeting, the caseworker indicated that Theo's most recent placement was pre-adoptive.

93.     On September 20, 2018, it was reported that six-year-old Theo had been discharged from his fifth daycare and had attacked his foster mother.  Theo was taken to the Ohio Valley emergency room, where he remained for a week. On September 27, 2018, Ohio Valley indicated that Theo was discharge ready and recommended that he be placed at Highland-Clarksburg Hospital, which had an acute program for children with intellectual or developmental disabilities who also had a mental health disorder.

94.     On October 4, 2018, Theo was transferred to Highland-Clarksburg Hospital's acute unit while it was determined whether he qualified for their intellectual or developmental disabilities program.

95.     Upon information and belief, DHHR could not find a suitable placement for Theo in West Virginia following his hospitalizations. Therefore, on December 13, 2018, DHHR moved six-year-old Theo to ChildHelp Treatment Facility in Virginia, which is located over five hours away from his home county. At the time of admission, Theo was diagnosed with reactive attachment disorder, disruptive mood dysregulation disorder, chronic post-traumatic stress disorder, and attention-deficit/hyperactive disorder. Theo was also confirmed to have a history of physical and psychological abuse as well as neglect. A diagnosis was later added for fetal alcohol syndrome. Moreover, he was at an early kindergarten level when assessed educationally.

96.     Theo's initial medication regimen consisted of three drugs for the treatment of attention-deficit/hyperactivity disorder (Guanfacine, Clonidine, and Focalin XR), one drug for the treatment of insomnia (Clonidine) and a fifth drug for mood-stabilization (Risperdal, later replaced with Trileptal). These medications all have seemingly conflicting side-effects.

97.     As for Theo's medical visits, his weight frequently concerned clinicians. A side-effect of taking both antipsychotics and antidepressants (which are prescribed to Theo) include

weight-gain and weight-retention. Theo was noted to have a high body mass index, placing him at the 97th percentile for his age group.

98.        Theo has frequently visited the nurse's office due to injuries sustained from other residents, who have punched Theo in the forehead and right eye, kicked his ribs, and hit his elbow with a thrown chair.

99.        While at ChildHelp, Theo exhibited symptoms that were clinically significant for depression. Theo said that when he feels sad, he will "color and be safe" or will hug his bear. To work on his anger, Theo has stated that "hugs might help" and he would "use [his] coping skills like hug[ging] [his] hedgehog."

100.        ChildHelp estimates that Theo will be discharged in December 2019, but this is contingent on DHHR finding an appropriate foster home placement. ChildHelp has recommended family engagement with a prospective foster family before Theo's discharge. But, upon information and belief, DHHR is not making sufficient efforts to locate an alternative and less restrictive placement for Theo.

101.        As a direct result of Defendants' actions and inactions, Theo has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Theo's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Theo has suffered while in the custody of DHHR.

**Garrett M.**

102.        Garrett M. is 17 years old and has been in the custody of DHHR since 2012. Garrett is a member of the General Class, the ADA Subclass, and the Aging Out Subclass. Garrett

appears through his next friend L. Scott Briscoe. Mr. Briscoe has been Garrett's *guardian ad litem*
for over seven years, visits him regularly, remains in regular communication with him, and is truly
dedicated to Garrett's best interests.

103.     Garrett was born in Staten Island, New York, where he lived with his mother,
father, two younger sisters, and two older brothers. Garrett's mother had a significant child
protective history in New York and died of an overdose in January 2011. At the time, his father
was mentally unstable and could no longer provide for the children. Eight-year-old Garrett and his
two younger sisters were sent to live with a paternal aunt and uncle in West Virginia.

104.     Garrett and his sisters remained in their relatives' care for almost two years.
During this time, the children were physically and emotionally abused. Almost daily, the children
had their hands tied behind their backs while they were struck with a belt. Any attempt to block
the blows by moving their hands earned them each five more strikes. Eventually, teachers at the
children's school, who noticed marks on the children, made a report to DHHR.

105.     DHHR removed the children and placed them in a non-kinship foster home. A
few months later, the foster parents expressed a preference for the younger sisters over Garrett.
Upon information and belief, they did not like that Garrett was protective over his sisters, and this
created an uneasiness between Garrett and his new foster father. Upon information and belief, the
uneasiness led to a physical altercation between Garrett and his foster father one evening when the
foster father found Garrett sleeping outside of the girls' bedroom.

106.     Soon thereafter, the foster parents accused Garrett of inappropriately touching
his sisters, and DHHR removed him from the home. Garrett maintains that he was wrongfully
accused. DHHR conducted an investigation but there were never any formal charges against
Garrett. Furthermore, Garrett disclosed at the time of the investigation as well as later during

several multi-disciplinary team (MDT) meetings that his older brother sexually abused him when he was young. Garrett suspects this brother abused his sisters as well. Upon information and belief, Garrett's allegations against his brother were never investigated, and DHHR treated Garrett like a sexual offender. Upon information and belief, this has hindered Garrett's ability to find a permanent placement.

107.     In September 2015, the court granted DHHR's request to separate Garrett and his sisters and entered a no-contact order. The foster parents adopted Garrett's sisters, and Garrett lost all contact with them.

108.     After leaving the foster home, DHHR placed Garrett at Sam's House, a temporary shelter located four hours away from his community. Sam's House accepts residents between 15 and 17 years old. Garrett was only 11 years old and subject to daily ridicule from the older residents. He felt overwhelmed and depressed. In a moment of despair, Garrett devised a noose out of a leather belt. A staff member discovered him hanging in his room gasping for air.

109.     After his suicide attempt, Garrett was admitted to Hillcrest Psychiatric Hospital for a six-month treatment program. Upon his discharge, DHHR again placed him in a temporary shelter where his fellow residents were older, attended an off-site public school, and enjoyed family visits—privileges that Garrett was unable to enjoy. Once again, staff discovered Garrett in his room hanging from a rope around his neck.

110.     Garrett spent the next six months at River Park Psychiatric Hospital where he was treated with heavy dosages of mostly off-label psychotropic drugs, which made him feel like "a walking zombie." Even his attorney described him during his stay at River Park as "unrecognizable, and completely out of it."

111.     After his discharge from the hospital, DHHR sent then 12-year-old Garrett to an

institutional residential placement for male sex offenders called Cedar Grove in Tennessee. Most residents were over the age of 15 and had charges pending against them for sex offenses, including rape. Garrett was forced to participate in group therapy, which required the participants to identify as sex offenders and disclose the details of their offenses to the group. Garrett tried to refuse therapy and hide in his room but he was punished by the loss of hard-to-come-by privileges. As a result, Garrett felt pressured into making an admission to get out of the program.

112.     Garrett begged his caseworker to move him. He told her that he was not a sex offender and felt uncomfortable at the facility.  But DHHR left Garrett in Tennessee for 18 months.

113.     DHHR moved Garrett back to West Virginia in 2015. In West Virginia, DHHR bounced him amongst multiple placements, primarily residential facilities.

114.     In 2018, during a juvenile delinquency proceedings, Garrett  admitted to the charge of "terroristic threats" and was sentenced to probation. The charge arose out of a jealously induced online argument Garrett had with a peer over a girl. West Virginia placed Garrett at the Donald R. Kuhn Detention Center. At the detention center, Garrett attended an online school and slept on a mattress on a cement floor in a single-occupancy locked cell.

115.     In late 2018, upon information and belief, Garrett's caseworker placed Garrett into another residential program for sex offenders at River Park Psychiatric Hospital. At an emergency hearing challenging the placement, the judge stated "[Garrett] came into State's custody because he was a victim in an abuse and neglect case. I think calling a child a rapist when he's never been judicially determined to be a rapist goes too far. So, I am going to order a new worker. I want the order to reflect that [Garrett] has never been adjudicated as a sex offender, and there has never been any evidence introduced at any hearing of any type of sex offense." Further, the judge acknowledged that "the state's improper labeling of [Garrett] as a sex offender has

wrongfully made his placement options more difficult."

116.    DHHR failed to identify a foster home placement for Garrett, so they moved Garrett back to the Donald R. Kuhn Detention Center, where he spent his 17th birthday.

117.    In May 2019, DHHR finally moved Garrett to a residential facility that was supposed to offer him transitional living skills and vocational training. Garrett ran away from the facility.

118.    Garrett is currently placed at the Rubenstein facility, which is a secure group home. At the group home, Garrett is working towards a high school diploma through an online self-guided educational "click-through" program. He is not receiving any vocational training.

119.    Garrett is increasingly nervous about his upcoming 18th birthday, because he will age-out of the system. He has no plans to attend college, and DHHR has failed to provide him with any type of vocational training or other life skills. Moreover, Garrett has no adults whom he can turn to when he leaves foster care. He is afraid that when he ages out in less than a year, he will become homeless. Garrett does not trust that DHHR, which has failed him so many times, will help him even if he remained in care. He dreams of possibly finding family in New York who will take him in.

120.    As a direct result of Defendants' actions and inactions, Garrett has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Garrett's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Garrett has suffered while in the custody of the  DHHR.

**Gretchen C.**

121.     Gretchen C. is 15 years old and has been in the care and custody of DHHR since April 2015. She is a member of the General Class, the ADA Subclass, and the Aging Out Subclass. Gretchen appears through her next friend April Flowers. Ms. Flowers is Gretchen's paternal aunt and has known her since birth. Ms. Flowers is a mother to seven children, Gretchen's cousins, and is very committed to serving her best interests in this action.

122.     DHHR removed Gretchen from her biological mother when she was 11 years old due to her mother's drug abuse. DHHR had received several reports about domestic disturbances in the home before removing Gretchen. DHHR placed Gretchen in a temporary shelter, and the court granted Gretchen's mother an improvement period during which she was required to complete parenting classes.

123.     During the pendency of the neglect case, Gretchen's mother failed to cooperate with DHHR or visit Gretchen. It is unknown whether her parental rights were ever terminated. DHHR has failed to form a reunification plan and, instead, left Gretchen to linger in the custody of the state without a path to permanency.

124.     During the past four years, DHHR has never placed Gretchen in a foster home. Instead, she has spent time in in temporary shelters, four different West Virginia group homes, and one large out-of-state institution, where she currently resides.

125.     Gretchen was first placed at the Gutske Child Center, a temporary shelter in West Virginia. DHHR then moved her to another temporary shelter called the Helinski Child Shelter.  After this, DHHR moved Gretchen to the Burlington United Methodist Family Services Residential Program. And, after this, DHHR placed her in yet another residential facility.

126.     Since Gretchen entered care over four years ago, her paternal grandmother has asked to care for Gretchen. She is a certified foster mother. But, upon information and belief, the

caseworker refuses to place Gretchen with the grandmother because Gretchen is a child who "doesn't listen" and has gotten into physical altercations in residential facilities.

127.      In September 2018, DHHR placed Gretchen in the Children's Center of Ohio, a private residential treatment center for boys and girls who are considered "troubled." This 60-bed facility located in rural Patriot, Ohio, is referred to in the media as a "youth corrections facility." Upon information and belief, the Children's Center fails to meet Gretchen's therapeutic, educational, and other developmental needs. Many of the residents at this facility are adjudicated for violent offenses or are currently receiving treatment for aggression. Gretchen in contrast, a neglected youth, has never been adjudicated as a delinquent.

128.      Gretchen has been diagnosed with anxiety, depression, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder and is prescribed Adderall, Trazodone, and Celexa. According to her grandmother, Gretchen did not need medication prior to entering foster care. Upon information and belief, the Children's Center only provides group therapy and Gretchen is uncomfortable sharing her thoughts in front of a group. She has repeatedly asked her caseworker for one-on-one therapy, but DHHR has failed to arrange it. Upon information and belief, the daily cost of residing at The Children's Center of Ohio is approximately $800.

129.      Upon information and belief, the Children's Center engages in controversial therapeutic practices such as peer shaming. Research shows that these aversion techniques have long lasting adverse impacts on children's psychological wellbeing. Shaming is proven to be ineffective, anger-inducing, and often results in social withdrawal and in some cases mental illnesses. Historically, this form of behavior control has been used at larger residential facilities with a low staff-to-resident ratio, like the Children's Center.

130.      The Children's Center of Ohio also requires children to perform unusual forms

of manual labor. The residents are frequently required to reap the surrounding undeveloped acreage, including a steep hillside, using a scythe, a farming tool with a long blade attached to a wooden handle. Requiring children, many of whom suffer from behavioral and mental health issues or have committed violent offenses, to handle these farming tools is especially dangerous. Further, the requirement to reap the fields does not exclude residents who are on psychotropic medications with common side effects such as drowsiness, lightheadedness, and blurred vision.

131.     DHHR has transferred Gretchen to five schools over the past four years, and she struggles to remain at a peer-appropriate level. At her current placement, Gretchen is bused to a nearby university to complete online classes. There is no live instructor, rather, there is a teacher who is "in the building" during class time.  If Gretchen needs help, she sends him an email and he either responds via email or comes to the classroom from another floor. The program is completely self-guided, and it is unknown if Gretchen will obtain any transferable credits.

132.     The program at the Children's Center of Ohio is strict, regimented, and punitive. Upon information and belief, privileges are hard to come by but easy to lose. One privilege is residents' ability to decorate their personal space with family photos. Visitation rights are another privilege but are commonly revoked. The facility has denied Gretchen permission to return to West Virginia to see her grandmother and cousins for Christmas, Easter, and her birthday due to her "mistakes" within the program, including rolling her eyes at a staff member.

133.     Recently, Gretchen was sent home to visit her grandmother. That was her first time home in approximately seven months. During the visit, family members noticed an unusual quietness about Gretchen. Gretchen observed, "I have no social skills."

134.     Gretchen also has discomfort about some of the Children's Center staff. Upon information and belief, a male staff member told her, "I should restrain you," and when she asked

why, he responded "no reason."  Later, the same male staff member said, "I would like for you to try to restrain me."

135.     Upon information and belief, DHHR has no permanency plan in place for Gretchen, and DHHR is not providing her with independent living skills as an alternative to permanency. Gretchen feels hopeless and states, "I know that they have given up on me, they think I am manipulative and lazy." She believes she will be stuck in the system forever. Gretchen would like to return home to West Virginia and live with her grandmother, finish high school, and then attend college to study interior design.

136.     As a direct result of Defendants' actions and inactions, Gretchen has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Gretchen's case, and not acted with deliberate indifference to her legal rights, Defendants may well have prevented additional trauma Gretchen has suffered while in the custody of DHHR.

**Dennis C.**

137.     Dennis is 16 years old and has been in the custody of DHHR since he was 11. He is a member of the General Class, the Kinship Subclass, the ADA Subclass, and the Aging Out Subclass. Dennis appears through his next friend, Debbie Short, his step-grandmother. She has known Dennis his entire life and is committed to representing his best interests in this case.

138.     Dennis's parents abused him from a young age. He is diagnosed with cerebral palsy, which is likely a result of shaken baby syndrome. His condition causes his entire body to shake and his left arm is underdeveloped and atrophied. Dennis missed school frequently and when he did go to school, staff bathed him and gave him clean clothes because his home lacked

electricity.

139.     Despite these obvious signs of abuse and neglect, CPS did not become involved in Dennis's life until he was 11 years old, when a school official called in a report. But, upon information and belief, Debbie Short and Dennis's biological grandmother began reporting the abuse to CPS at least a year prior to this incident. During that year, DHHR took no action.

140.     After conducting an investigation, DHHR removed Dennis and his 17-year-old brother from their home and filed a neglect petition against their parents. Dennis's biological parents' rights were eventually terminated due to the abuse and neglect.

141.     Originally, DHHR placed the brothers together in a foster home. Shortly thereafter, Dennis was removed from the foster home but his brother remained in that placement until his graduation from high school. Dennis has not talked to his brother since his removal.

142.     In addition to this original foster placement, Dennis has experienced four other failed foster home placements. Dennis has specialized needs due to his history of trauma and his cerebral palsy diagnosis and requires a therapeutic or special needs foster home. But DHHR has never provided Dennis a therapeutic or special needs placement. Such foster homes are supposed to be specially prepared to deal with a child, such as Dennis, who has special needs, difficulty in school, and behavioral risks. As part of the licensing requirements the foster parents should receive special training to successfully deal with the particular child's issues, and the number of other biological or foster children in the home is limited.

143.     Not only has Dennis never been placed into a therapeutic or special needs foster home, but he has gone long periods of time without receiving therapy because of his multiple placement moves. After multiple failed placements, DHHR began placing him into group homes and other institutional settings.

36

144.     At the time of his original removal, Dennis's step-grandmother went to the Roane County DHHR office to request that Dennis be placed with her. After changing her residence and completing the vetting process and foster parent training, DHHR approved her for placement and moved Dennis moved into her home. Almost immediately, the placement became strained because Dennis began displaying challenging behaviors at home and at school. Dennis needed mental health, behavior health and educational supports, but DHHR failed to provide them to the family.

145.     When Dennis began threatening to harm himself, Ms. Short felt she had to report this to his caseworker. Dennis was sent to Highland-Clarksburg Hospital for short-term mental health support. After returning home from the hospital, Dennis continued acting out. He was expelled from school, and Ms. Short felt she could no longer keep Dennis absent receiving further support from DHHR. DHHR removed Dennis from her home and placed him in a shelter in Morgantown.

146.     Dennis has had to attend many different schools over the years due to his multiple placements and, as such,  his education is disjointed. Dennis needs special education services and supports, but DHHR has failed to ensure he receives these. Dennis has received good grades in school but does not know how to read or write despite his good grades.

147.     On August 16, 2019, DHHR moved Dennis to the Potomac Center in West Virginia. Upon information and belief, many of the residents at this facility are disabled, low functioning, and have demanding therapeutic needs. Further, the residents are isolated on campus and do not integrate into the surrounding community. This is a higher level of care than Dennis requires.

148.     The Potomac Center runs a youth program as well as an adult program. Upon

information and belief, DHHR's long-term plan for Dennis is for him to graduate from the youth program straight into the adult residential care program. DHHR's placement of Dennis at the Potomac Center undermines all of the years of hard work that Dennis put into physical therapy, school, and behavioral therapy.

149.     Dennis dreams of graduating high school, getting a driver's license, living with his step-grandmother, getting a job, saving enough money to secure his own apartment, and ultimately living independently. DHHR, however, has fallen back on the incorrect assumption that because Dennis is disabled, he requires institutionalization for the rest of his adult life.

150.     Worse still, the Potomac Center, discussed *infra* ¶ 73, serves children and adults with disabilities. As previously mentioned, the facility lost its license in 2014 following allegations that the staff had sexually and emotionally abused several children in its care. Further, due to the highly regimented program, minimal engagement with the surrounding community, and other institutional approaches to caretaking, the Potomac Center has the reputation of being the "last stop" before placement into a state hospital.

151.     As a direct result of Defendants' actions and inactions, Dennis has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Dennis's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Dennis has suffered while in the custody of the DHHR.

**Calvin D., Chris D., and Caroline D.**

152.     Calvin entered foster care when he was 14 months old due to his parents' drug addiction and related neglect. His siblings, Chris and Caroline, entered foster care at birth. They

are now ages four, three and two, respectively. The siblings are all members of the General Class. They appear through their next friend Katherine Huffman. Ms. Huffman first met the children approximately three years ago through a close network of local foster parents and children in Barbour County, West Virginia. She had regular contact with them during their almost two-year placement in Barbour County and, as a former foster mother herself, and is committed to representing their best interests in this case.

153.     Shortly after the children's entry into foster care their parents' rights were terminated and they were freed for adoption. DHHR initially placed all three children together in a pre-adoptive home. The foster parents expressed their interest in adoption, but DHHR, upon information and belief, repeatedly delayed the adoption process for unknown reasons.

154.     Unexpectedly, the foster parents were relocated for work to New Hampshire. DHHR told the foster parents they could not take the children with them. Upon information and belief, DHHR did not submit an Interstate Compact on the Placement of Children to allow the children to remain with the pre-adoptive parents out of state pending the adoption. As a result, DHHR removed Caroline and Calvin from the only home they had ever known and Chris from the home in which he had lived for the majority of his young life.

155.     DHHR struggled to find a new placement for all three children. Eventually, they turned to a local foster mother and advocate ("RK"), who organizes support groups for foster families. This foster mother taught foster parent training classes on behalf of DHHR.

156.     RK was knowledgeable about the foster families in her network, and DHHR frequently turned to her for assistance in locating homes with open beds when children entered foster care.

157.     At the time of the siblings' placement disruption, RK and her husband had seven

children in their care, ages one through 10 years old. Despite this, DHHR asked RK and her husband, who were still actively licensed to foster, to take the siblings. And, in July 2017, Calvin, Chris, and Caroline were placed with the family. Less than a year later, in April 2018, RK and her husband applied to adopt them.

158.     In August 2018, while the adoption was pending, RK was diagnosed with uterine cancer, and in late September 2018, she had surgery to remove the cancer. On October 4, 2018, two weeks after RK's surgery, a DHHR employee visited the house to check on the children. Upon information and belief, the house was in disarray as RK was unable to maintain organization in the house during her recovery.

159.     Only a few months after RK's diagnosis, on October 29, 2018, DHHR removed Calvin, Chris, and Caroline from RK's home on allegations that they were in "imminent danger." RK's seven other children remained in the home. Upon information and belief, Calvin, Chris, and Caroline were inconsolable, and the DHHR caseworker did not attend the removal. Rather, a CPS supervisor sent the new foster mother to retrieve the children from RK. No one from DHHR accompanied her to RK's home, and the children did not know the new foster mother.

160.     In May 2019, during a grievance hearing, the court ruled that DHHR failed to establish that the siblings were in imminent danger at the time of their removal from RK's home and directed that DHHR reopen RK's home. RK requested that DHHR return the siblings, but, upon information and belief, DHHR refused to place the siblings back with RK and her family—claiming it was over-capacity, even though no new children were in the home.

161.     Calvin, Chris, and Caroline came into the DHHR's care and custody as babies. Because Defendants have failed to properly manage their cases, the children have experienced two unnecessary placement disruptions from pre-adoptive homes.

162.    After their removal from RK and her husband, DHHR placed Calvin, Chris, and Caroline into a foster home one town over, where they currently remain.

163.    As a direct result of Defendants' actions and inactions, Calvin, Chris, and Caroline have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Calvin, Chris, and Caroline's case, and not acted with deliberate indifference to their legal rights, Defendants may well have prevented additional trauma Calvin, Chris, and Caroline have suffered while in the custody of the DHHR.

**Karter W.**

164.    Karter W. is 13 years old. He has been in the care and custody of DHHR since July 2016. Karter is a member of the General Class and the ADA Subclass. Karter appears through his next friend, L. Scott Briscoe. Scott Briscoe is an attorney licensed in the state of West Virginia where he regularly serves as a *guardian ad litem* on abuse and neglect cases. He has represented Karter since he first entered care in 2016. Scott visits with Karter at least monthly and maintains regular contact by phone or email in between visits.

165.    Before entering foster care, Karter lived with his mother and two older half-sisters. When Karter was nine years old, Karter's teacher reported to CPS suspected child abuse in Karter's home. CPS conducted an investigation, which revealed that Karter's mother was using drugs and her boyfriend was physically abusive towards her and Karter. The DHHR caseworker put an in-home safety plan in place that required Karter's mother to submit to routine drug screens and have no contact with her boyfriend.

166.    Karter's mother failed several drug screens over the next two months, and as a

result, DHHR referred her to an in-patient treatment facility. She completed a six-day detox treatment, but soon thereafter, stopped appearing for her drug screens. Additionally, the DHHR caseworker discovered that her abusive boyfriend was back in the home. DHHR filed a petition seeking the removal of Karter and his two sisters.

167.     DHHR placed Karter's two older siblings with their biological father and placed Karter in a non-kinship foster home. DHHR was unable to locate Karter's estranged biological father, and the court eventually terminated his paternal rights.

168.     Karter's non-kinship foster home had five other foster children living in it. Moreover, the foster mother viewed Karter as a "bad kid" and treated him differently from the other children. She forced Karter to sleep and spend his free time in the basement while the other children roamed freely about the house and yard. In the basement, Karter was isolated and unsupervised. He was only permitted to leave the basement for dinner and to attend school. He did not interact with the other children in the home, who were forbidden from entering the basement.

169.     Karter's living conditions violated DHHR's homefinding policy which requires that bedrooms have windows, children not be housed in unapproved rooms, foster children be supervised, and children be disciplined with kindness and understanding.

170.     DHHR removed Karter from the placement but did not revoke the foster mother's license. DHHR failed to locate another foster home for Karter and placed him in a temporary shelter where he remained for the next three months. All the while, Karter believed he would be returned to his mother as soon as she was drug-free.

171.     During this time, Karter attended a court hearing related to his case. He was shocked when his mother testified that she wished to voluntarily relinquish her parental rights. Karter laid down on the courtroom floor and sobbed uncontrollably, pleading with his mother to

change her mind. Karter's caseworker did not prepare him in advance for this news, and upon information and belief, failed to obtain any therapeutic supports for Karter afterwards.

172.     Karter's non-kinship foster home was his only community placement since entering foster care. For the past three years, DHHR has shuffled Karter between at least three temporary shelters and institutional care settings. Karter's stay at each of the temporary shelters exceeded DHHR's 30-day limit.

173.     Emergency shelter care is supposed to be a short-term placement while DHHR conducts an organized search for an appropriate, long-term placement for the child. It is possible to request an extension for another 30 days, but anything beyond that violates DHHR policy.

174.     Karter does not like living in emergency shelters or residential facilities. He prefers to be in a foster home. Karter stated, "I only got one chance for a foster home and then I was never given another chance."

175.     Karter is diagnosed with disruptive mood dysregulation disorder and attention-deficit/hyperactivity disorder. Further, he struggles with depression and self-harming behaviors. He benefits from behavioral therapy but has experienced many interruptions in his treatment due to DHHR's lack of appropriate placement planning. Upon information and belief, DHHR has secured an array of psychotropic medications for him but has not offered treatment to address the root causes of his mental health problems through therapy. Notably, while at the Paul Miller Temporary Shelter, he was prescribed 32 pills per day.

176.     While in the state's custody, Karter was placed into at least two psychiatric residential treatment facilities: Highland Hospital and River Park Hospital. At each placement, he was prescribed multiple psychotropic medications that made him feel "numbed and flat."

177.     Karter is currently placed at ChildHelp, a 61-bed private psychiatric residential

treatment center, in Virginia. This is located more than five hours away from Karter's home. He is educated on campus and must obtain permission every time he wants to go outside.

178.     At ChildHelp, Karter has engaged in self-harming behaviors twice. One time he banged his head against the wall repeatedly and another he stabbed himself in the wrist with a mechanical pencil. In a report, Karter's therapist indicated that she believed that this was the result of Karter feeling that his caseworker had given up on him and that he would never be placed in a foster home. Upon information and belief, when Karter has called his caseworker, she has taken weeks to return his calls.

179.     Karter has often told his caseworker that he wants to have a connection with his grandfather. This past spring, Karter learned that his grandfather had a terminal illness and was about to pass away. Desperate to connect with him, Karter left several urgent voice messages and emails for his caseworker. Upon information and belief, staff at ChildHelp also attempted to contact the caseworker without success. Karter's caseworker never responded to either Karter or the staff at the facility, and his grandfather passed away before Karter had the chance to speak with him.  At the next court appearance Karter explained his feelings to the court with the support of staff from ChildHelp, and the judge removed Karter's caseworker from his case. Yet, upon information and belief, DHHR continues to employ her.

180.     This was not the first caseworker the judge removed from Karter's case. Upon information and belief, the judge removed Karter's original caseworker, who displayed a callous disregard for Karter and spoke disparagingly about him. Upon information and belief, DHHR continues to employ that caseworker also.

181.     Karter yearns for a normal childhood: "I want a loving home, I want to attend a normal school. I want to be able to go outside without needing to ask permission every time, and

I want to know friends and school kids my age." Upon information and belief, DHHR is making no efforts to return Karter to his home community let alone to West Virginia.

182.     As a direct result of Defendants' actions and inactions, Karter has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Karter's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Karter has suffered while in the custody of DHHR.

**Ace L.**

183.     Ace L. is 12 years old and has been in the care and custody of DHHR since 2016. This is Ace's second episode in foster care. Ace is a member of the General Class and the ADA Subclass. Ace appears through his next friend Isabelle Santillion. Ms. Santillion is Ace's adult sister and has known him his entire life. She has maintained close contact with her brother during his time in foster care, and she is committed to representing his best interests in this case.

184.     Ace and his family have had multiple interactions with DHHR over the course of his life, resulting in two removals and placements into foster care. When Ace was four years old, DHHR placed him and his 13-year-old sister into foster care based on allegations that his mother and stepfather were physically and sexual abusive towards the children. DHHR initially placed the siblings together in a foster home, where they remained for 18 months.

185.     Ace suffers from encopresis, which is frequently related to physical and sexual trauma. When Ace had accidents the foster parents "whooped" Ace with their hands or with a belt. Upon information and belief, Isabelle reported this to the caseworker, but the caseworker did nothing. Upon information and belief, Ace received no therapeutic interventions to address the

underlying abuse or his encopresis.

186.     DHHR returned Ace and his sister to their mother's home after she completed an improvement period and agreed to exclude the stepfather from the home.

187.     But the child abuse soon resumed. Ace's mother abused drugs and, over the years, left him at home in the care of her boyfriends and Ace's stepfather. During those times a number of people physically, sexually, and emotionally abused Ace.

188.     In 2016, DHHR again removed nine-year-old Ace and his sister. This time DHHR immediately separated Ace and his sister. Ace relied on his sister as the only stable "adult" and protector in his life.

189.     During Ace's second episode in foster care, his mother relinquished her parental rights to him. Ace was abused in his new foster home and ridiculed almost daily at school for his encopresis.

190.     His placement disrupted, and in the following years, DHHR bounced Ace from placement to placement. Upon information and belief, Ace's placements often disrupted due to his encopresis; other foster children taunted and made fun of Ace, and he, in turn, isolated himself and became depressed or acted out in anger. Foster parents have indicated that they are unwilling to deal with Ace's "hygiene issues." With each disrupted placement, Ace has felt rejected and his perception is that he is  broken and unwanted.

191.     When Ace was 11 years old, he started suffering from depression and anxiety. DHHR placed him at Highland Psychiatric Hospital in their 'Bound for Success' program. A fellow resident relentlessly made fun of Ace for his encopresis. The hospital staff did not effectively shield Ace from the daily torment, and Ace acted out with bursts of anger. Ace was placed on a cocktail of off-label medications that made him drowsy and "out of it" during most of

his waking hours. The hospital routinely experimented with Ace's medications and dosages trying different combinations for trial periods, leaving Ace without a consistent pharmaceutical plan.

192.     During Ace's 10-month stay at Highland Hospital he only attended a non-accredited learning program that consisted of a couple of hours of teaching instruction per day, alongside other residents of various ages and academic capabilities.

193.     Over the years, DHHR has also placed Ace in a number of institutional or group home placements, including Greenbrier Valley Children's Home, Highland's Bound for Success program, Child Help East, Inc., and New River Ranch.

194.     After Ace's stay at Highland Hospital, he lived with his 20-year-old sister Isabelle.  However, she was provided little support, despite requesting it from the caseworker, and struggled to provide the care that Ace needed when she was also parenting an infant.

195.     Ace left his sister's home and is currently placed at a temporary shelter in Charleston called the Davis Child Shelter. Although his placement has already exceeded the 60-day limit, DHHR has failed to find another placement for him.

196.     Ace has completed the sixth grade but feels that he is significantly behind his peers. He has been in so many different schools and placements that he has been unable to keep up educationally.

197.     While on paper Ace's permanency plan is adoption, DHHR has made no efforts to effectuate the plan even though Ace has been freed for adoption for approximately three years. Ace believes that his future only holds institutional placements that do not meet his needs.

198.     As a direct result of Defendants' actions and inactions, Ace has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching,

not acted in disregard of professional standards as to the management of Ace's case, and not acted with deliberate indifference to his legal rights, Defendants may well have prevented additional trauma Ace has suffered while in the custody of the DHHR.

### Federal and State Requirements for Child Protection Systems

I.     **The United States Constitution and Federal Law Impose Certain Requirements for the West Virginia Child Welfare System.**

199.     The Due Process Clause of the United States Constitution imposes an affirmative obligation upon state and local child welfare officials to:

a.     ensure that each child placed in foster care is free from the foreseeable risk of physical, mental, and emotional harms;

b.     ensure that each child placed in foster care receives the services necessary to ensure their physical, mental, intellectual, and emotional wellbeing in the least restrictive environment;

c.     provide each child placed in foster care with conditions, treatment, and care consistent with the purpose and assumption of custody;

d.     ensure that each child placed in foster care is not maintained in custody longer than is necessary to accomplish the purpose of custody; and

e.     provide each child placed in foster care with reasonable efforts to obtain an appropriate permanent home and family within a reasonable period of time.

200.     Federal law requires that state and local child welfare officials:

a.     Place each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b.     Provide for each child placed in foster care a written case plan that includes a plan to provide safe, appropriate, and stable foster care placements and

implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c.      Provide for each child placed in foster care, where reunification is not possible or appropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d.      Provide for each child placed in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

e.      Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f.      Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

g.      Maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, the responsible child welfare agency files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C.

§§ 671(a)(16), 675(5)(B), 675(5)(E); and

h.      Provide to each child in foster care quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22).

201.    In addition, the American with Disabilities Act requires that DHHR provide children who experience physical, mental, intellectual or cognitive disabilities, with an array of community-based placements and services to ensure access to the least restrictive environment. *See* 42 U.S.C. § 12131(2), 29 U.S.C. § 794, and the respective implementing regulations; 42 U.S.C. § 622(b)(8)(A)(iii); and 42 U.S.C. § 675(5)(A).

## II.     West Virginia's Laws Also Impose Requirements on the Child Welfare System.

202.    The West Virginia State Legislature has committed itself to ensuring that every child in the state's foster care system "grow[s] to reach his or her potential . . . ." W.Va. Code § 49-2-126. In doing so, the state statutorily recognizes children's rights to a family; a safe home free of violence, abuse, neglect, and danger; an education; and participation in extracurricular activities and community events. *See id.*

203.    The West Virginia State Legislature has enacted laws to provide a coordinated system of child welfare and juvenile justice for children in the state. The goals of these laws are, among other things, to "assure each child care, safety and guidance; [s]erve the mental and physical welfare of the child; [p]reserve and strengthen the child's family ties; [and] [r]ecognize the fundamental rights of children and parents . . . ." W.Va. Code § 49-1-1.

204.    DHHR is the custodian of and responsible for the safety and wellbeing of children in West Virginia's child welfare system. *See* W.Va. Code § 49-2-1. DHHR is charged with advising, assisting, and supervising all child welfare agencies which care for neglected children. *See* W.Va. Code § 49-2-3. DHHR is an umbrella agency that operates through several different

bureaus, each responsible for specific programs and services related to public health and the wellbeing of the citizens of West Virginia.

205.    The Bureau of Children and Families (BCF), a subdivision of DHHR, is responsible for administering the State's child welfare system, including the fostering and adoption of West Virginia children. *See* W.Va. Code § 49-1-105. BCF ensures that children in out-of-home care and their families receive adequate and appropriate services that meet their needs for safety, permanency, and wellbeing to help them achieve their "maximum potential and improve their quality of life." W.Va. CPS Policy § 1.3. Also, BCF is responsible for developing all policies and programs pertaining to child welfare and conducts ongoing research and evaluation of the system to identify areas in need of improvement.

206.    BCF divides the state into four regions that it serves: Region I, Region II, Region III, and Region IV.

207.    BCF operates a Centralized Intake Unit, available 24 hours per day, to receive reports of suspected child abuse or neglect. The intake worker assesses whether there is reasonable cause to believe that child abuse or neglect exists. If so, a referral is made to a CPS worker who will investigate the allegations. The worker will then meet with the family and conduct a Family Functioning Assessment to determine if the child is safe. DHHR has 30 days from the date of the report to complete the Family Functioning Assessment.

208.    If the Family Functioning Assessment reveals that the child is in need of protection and cannot safely remain in the home, the caseworker files a petition with the appropriate circuit court alleging that the child is abused or neglected and requests permission to take custody of the child pursuant to an out-of-home safety plan. The safety plan must identify an appropriate placement and the length of time the child is to remain there. In addition, the caseworker must

conduct a child assessment prior to placement to determine the child's needs.

209.    A removal may occur on an emergency basis, before the filing of a petition, if the CPS worker believes the child would be in imminent danger if left in the home.

210.    After placing a child into foster care, the caseworker is required to conduct a diligent search for relatives who may be able to provide kinship care, or take steps to involve known relatives in the child's life while he or she is in placement. Also, the caseworker must schedule an initial health check appointment immediately.

211.    West Virginia's child welfare system is further required to adopt procedures and programs that are family-focused and involve the child and family caregiver in the planning and delivery of such programs and to provide early intervention to respond to and prevent child abuse and neglect. W.Va. Code § 49-1-5,6, 8.

212.    The State, through DHHR must provide services that are "community-based, in the least restrictive settings that are consonant with the needs and potentials of the child and his or her family." W.Va. Code § 49-1-7.

213.    West Virginia recognizes the need to provide appropriate placements that will offer "the best care possible for every child who is in the custody of the state" by placing the child in the "least restrictive (most family-like) setting" able to accommodate, among other things, that child's medical needs, educational needs, psychological and emotional characteristics, and family visitation requirements. W.Va. Foster Care Policy §§ 1.16, 2.1.2.

214.    For every child involved in an abuse and neglect case, West Virginia law recognizes the critical importance of well-informed planning for treatment, placement, and permanency and requires court orders to be informed by multidisciplinary team (MDT) meetings. *See* W.Va. Code § 49-4-405. The MDTs are critical and serve as the "Central Point for decision making during the

life of a case." DHHR Foster Care Policy § 4.1. They must be arranged within 30 days of filing an abuse and neglect petition. *See id.* Importantly, the participants must approve the caseworker's case plan that will be submitted to the court. *See id.* The case plan includes the service and permanency plan. *See id.* These meetings are supposed to be held at least every 90 days or in advance of every major decision. *See id.*

215.   Each child must also receive a monthly in-person visit with DHS caseworker staff, and the staffer must determine if the child's needs are being met and determine if their needs have changed. *See* W.Va. Foster Care Policy §§ 5.2.1-3.

216.   In 2005, the West Virginia legislature created the Commission to Study Residential Placement of Children after finding that the state's current system of serving children and families in need of or at risk of needing social, emotional and/or behavioral health services was fragmented, resulting in financial waste, duplication of efforts, and poor collaboration among functional programs. The Commission was intended to bring transparency to the issues plaguing the system, including practices of placing children, the adequacy, capacity, availability and utilization of placements, staffing issues, oversight of multidisciplinary team meetings, availability of community-based alternatives to residential placements, methods to reduce out-of-state placements, and many more critical components of a child welfare system.

217.   In 2010, a Senate Bill was passed to reconstitute the Commission. *See* W.Va. Code § 49-2-125.  However, the Commission has taken little to no action beyond organizing working groups.

### Systemic Deficiencies Plague West Virginia's Child Welfare System

### I.   Child and Family Service Reviews & State Audit

218.   Since the early 2000s, the Children's Bureau of the United States Department of

Health and Human Services has conducted audits of each state's child welfare system. These audits are called Child and Family Service Reviews ("CFSRs"). West Virginia has been evaluated three times through the CFSR process: October 2002, May 2009 and late 2017.

219.    The CFSRs evaluate seven "outcomes" of the safety, wellbeing and permanency of children in foster care—the three objectives of all child welfare systems, pursuant to federal statutory law. The CFSRs also report on seven "systemic factors," which are practices and structures that affect the delivery of foster care services. Taken together, these fourteen metrics are meant to provide a comprehensive analysis tool for each state; by identifying areas of weakness, states can work towards implementing corrective actions to ultimately improve outcomes for children.

220.    Outcomes for West Virginia's children have not improved since the CFSR process was initiated. Rather, West Virginia's performance has worsened in each subsequent CFSR. In the initial October 2002 CFSR, West Virginia did not achieve any of the "outcomes" relating to the permanency, safety or wellbeing of children in foster care, but notably was in substantial conformity with six of the seven "systemic factors." In the subsequent May 2009 audit, West Virginia had not improved; the state still did not achieve any of the "outcomes" and was in substantial conformity with just four of the "systemic factors."

221.    West Virginia received its worst audit on the 2017 CFSR; the state again did not achieve any of the "outcomes" relating to the permanency, safety and wellbeing of children in care, and was in substantial conformity with only three of the seven "systemic factors." The Children's Bureau conducted a review of 65 cases to make its determinations for the achievement of its safety, permanency and wellbeing "outcomes." In the area of safety, the Children's Bureau decided that "children are, first and foremost, protected from abuse and neglect" in only 56 percent

of applicable cases in its review. The Children's Bureau determined that just 20 percent of the children in the case review had "permanency and stability in their living situations." DHHR is also struggling to provide for the wellbeing of children in its care; the Children's Bureau determined that families had "enhanced capacity to provide for children's needs" in just 26 percent of the cases reviewed. For all of these three "outcomes," 95 percent of cases would have needed to meet the metric in order to be in "substantial conformity."

222.    West Virginia struggles on many of its "systemic factors," which are measures of how the child welfare structure functions. For example, the state did not achieve conformity with the Children's Bureau's requirements for its Case Review System. For the "Written Case Plan" item, interviews revealed that case plans are "generally not developed jointly with parents"; interviewees reported that although the "intent" is often there, large caseloads prevent parental involvement in case planning.

223.    The 2017 CFSR also indicated that West Virginia was not in conformity with the "Service Array and Resource Development" item. The Children's Bureau noted: "the two areas of greatest need for which services and resources are lacking are substance abuse treatment and the availability of foster homes." The agency also struggles to provide support in the following areas: mental health services for children, kinship family support services and housing. Ultimately, services in West Virginia do not meet the needs of children and families.

224.    The "Diligent Recruitment of Foster and Adoptive Homes" was marked as an area that "needed improvement" in the 2017 CFSR. DHHR had no "statewide coordinated efforts" to recruit new resource homes for the increasing foster care population; rather, the agency relies on kinship homes and re-evaluation. The reviewers were told that "the shortage of homes has resulted in children sometimes sleeping in offices and being placed in shelter care."

225.    State reviews have also highlighted significant issues in child welfare.

226.    In a February 2013 Legislative Audit Report, the Performance Evaluation and Research Division ("PERD") of the West Virginia Legislative Auditor's Office expressed concern over West Virginia having the highest and second highest incidence of child deaths related to abuse and neglect in the nation for six of the 12 years between 2000 and 2011. The audit found that the data collected on child fatalities in West Virginia was poorly documented. Moreover, no statewide performance data was being gathered to determine the state's needs for training, policy, or field improvements that could reduce future child fatalities and near fatalities.

227.    In recent years, West Virginia has continued to have higher rates of abuse and/or neglect-related child fatalities. In 2016, the national average was 2.36 deaths per 100,000; West Virginia had an average of 5.33, approximately double the national average, surpassed only by Mississippi. Near fatalities of children known to DHRR due to abuse or neglect have steadily risen.

**II.    West Virginia Has an Inadequate Array of Appropriate Foster Placements**

228.    There are nearly 6,800 children in out-of-home placements in West Virginia. But West Virginia suffers a shortage of foster homes and other placement types to handle the rising number of children who are removed from their homes and placed in foster care.

229.    This problem is specifically acute for children with disabilities, who have higher therapeutic needs. Indeed, children who are diagnosed with physical, mental, intellectual, or cognitive disabilities often find their health conditions worsen while in foster care.

230.    Because DHHR does not have enough placements for children, when they are first removed DHHR will often force them to sleep in DHHR offices or hotels until placements are identified.

231.    DHHR contracts with private foster care agencies who perform foster home inspections, training, licensing, and monitoring of foster homes. These agencies are also

responsible for recruiting foster parents. Recruiting foster families can be a difficult task, but is even more challenging in West Virginia because DHHR has a reputation for treating foster families poorly and retaliating against them. Upon information and belief, DHHR caseworkers routinely exclude foster parents from MDT meetings, verbally threaten to remove children from foster parents' care when they engage in any sort of advocacy that challenges the caseworkers' orders, are difficult to contact in crisis situations (such as when consent is needed for medical or behavioral health care), and often speak disrespectfully towards foster parents.

232.    The  Office of Health Facility Licensure and Certification, a subdivision within DHHR, licenses and monitors residential and congregate care facilities.

233.    DHHR places children in foster care in a number of different placement types, including, but not limited to, licensed kinship care; unlicensed kinship care; non-kinship care; group residential care, which includes residential treatment facilities; psychiatric residential treatment facilities, and psychiatric hospitals; emergency shelter care; transitional living; and out-of-state placements.

234.    In total, there are approximately 70 congregate care facilities in West Virginia, including 50 residential facilities, ranging amongst three different service levels, 15 emergency shelters, five psychiatric residential treatment facilities, three facilities for mentally disabled youth, and two transitional living facilities.

235.    As of August 2019, DHHR reported that it had placed only 246 (less than four percent) of children in foster care in agency foster homes and approximately 25 percent of children in therapeutic foster care. But DHHR divides its therapeutic program into three tiers, and tier one is simply traditional foster family care, which draws into question how it categorizes its data.

236.    Additionally, nearly 20 percent of children were placed in unlicensed kinship

care; approximately 30 percent were placed in licensed kinship care; and approximately 13 percent were placed in group residential facilities, including long-term psychiatric facilities, both in and out of state. Notably, of those placed in group residential facilities, nearly 30 percent were sent out of state.

237.     Upon information and belief, West Virginia's foster care system is so overwhelmed, and there is such an acute shortage of adequate foster home placements, that DHHR routinely shuffles children from temporary placement to temporary placement, disregarding their unique needs. For instance, DHHR has resorted to placing and leaving children in emergency shelters past the permitted time frames, and when forced to move them elsewhere has merely moved them to new shelters to start the clock anew. In other instances, DHHR has refrained from removing children from known abusive or neglectful homes; temporarily housed children in overcrowded foster homes; placed children in poorly screened kinship homes; and indiscriminately institutionalized children, especially those with disabilities, in violation of federal prohibitions on segregating people with disabilities away from their homes and communities.

238.     These actions are direct violations of federal law and widely accepted professional standards, which  require West Virginia to ensure that each child in its custody is placed in the most appropriate, least restrictive placement available, consistent with the child's needs.

239.     The lack of appropriate placements and lack of placement matching ultimately result in additional placements for children in foster care in West Virginia, despite clear goals in the child welfare field to minimize the number of placements and moves that children experience.

240.     Moreover, children placed in temporary placements often lose continuity of schooling, are often not placed with siblings, and often experience disruption of, or unavailability

of, mental, medical, behavioral, and other health services they need.

241.     What is more, Defendants are losing hundreds of foster children each year. Indeed, in 2018, West Virginia reported that 791 children had run away from its foster care system. In 2019, 651 foster children have run away from their placements thus far. Most of these runaways are boys between the ages of 13 and 17 who DHHR had placed in group homes or emergency shelters.

242.     Defendant Samples voiced concerns about possible sex trafficking of these missing children in testimony, stating, "when we talk about sex trafficking and dangers of the modern world—it's just an alarming number that we have to find some solutions to."

243.     West Virginia's lack of foster care placements, and resulting over-reliance on temporary placements and institutional care, substantially departs from widely accepted professional standards, violates federal law prohibiting discrimination, and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

### III.          Placement Instability Harms Children.

244.     West Virginia subjects foster children to multiple placement moves exacerbating the trauma that the children are already experiencing as a result of their removals. Defendants have acknowledged they have an insufficient placement array, an insufficient number of placement resources, and an insufficient number of homes that are willing to accept older children, children with severe behavioral issues, and large sibling groups. Moreover, there is no mechanism in place to accurately and appropriately match children who are coming into the foster care system with foster care providers.

245.     This results in a significant number of unnecessary and harmful placement changes for foster children. In 2017, 59 percent of foster children who had spent 24 months or

more in foster care had three or more placements.

246.     For instance, DHHR has placed seven year-old Theo S., one of the Named Plaintiffs, in at least a dozen foster care placements. DHHR shuffled another Named Plaintiff, Karter W., amongst at least three temporary shelters and residential facilities as well as two psychiatric residential treatment facilities. And DHHR has placed Gretchen C. in multiple temporary shelters, four group homes, and an out-of-state institution.

247.     Even kinship placements, which historically have shown to have greater stability, are not immune. A recent study concluded that "it is not unusual that a relative/kinship caregiver will not see a caseworker after the original placement." One consequence is disruptions in placements.

248.     It is agreed among behavioral therapists, policy makers, and child welfare advocates that permanency is the most important factor affecting a foster child's wellbeing. The negative implications of placement instability for permanency goals are compounded because each new placement delays permanency, and statistically, there is a direct correlation between the amount of time a child spends in foster care and the number of placements that child will experience.

249.     Continuous movement has a substantial and immeasurable negative effect on a child's outcomes related to their psychological, emotional, behavioral, social, cognitive, and mental wellbeing as well.

250.     Placement instability poses a greater risk of harm toward young children due to the fragility of their developing brains. Neuroscientists have found that placement instability can fundamentally and permanently alter the functioning of key neural systems involved in learning, memory, and self-regulation. One study examining the performance in neuropsychological tasks

of a group of preschool-aged foster children found that those with multiple placements performed significantly worse than those with stable placements.

251.     West Virginia's own case law touches upon this. In *In re R.J.M*, 164 W.Va. 496 (1980), Chief Justice Neely stated that, "numerous placements [at an early age] may severely retard the child's ability to form lasting attachments."

252.     Placement stability also plays a critical role in the development of adolescent-aged foster children. Problems linked to a lack of placement stability in adolescent children include substance abuse, juvenile arrests, failing out of school, social network disruption, and mental health issues. Research shows that children who age out of foster care systems are more likely to experience negative life outcomes, such as premature pregnancy, incarceration and homelessness. Further, placement instability in adolescent children greatly inhibits academic achievement.

253.     DHHR acknowledges that "frequent moves to new placements left many children with little sense of stability or continuity in their lives." DHHR Foster Care Policy § 1.1. The three most pressing goals of any child welfare agency—safety, permanency, and wellbeing—are negatively impacted when a child is not provided placement stability. Frequent moves while in foster care are associated with maltreatment, delays in permanency, poorer educational outcomes, and increased mental health issues. Even worse, sex traffickers target children who have unstable home lives, particularly foster children, and who are unattached to caring adults.

254.     Yet, the 2017 CFSR federal auditors continue to find that "the needs of foster parents [in West Virginia] are not consistently assessed," and service provision is often inadequate, "potentially adversely affecting a child's placement stability." According to that same report, West Virginia was in "substantial conformity" with only "20% of the 40 applicable cases reviewed" for the item "Children have permanency and stability in their living situations."

255.     DHHR subjects children in West Virginia's foster care system to the harm, and risk of harm, of placement instability, and has long known the negative consequences of doing so, yet has failed to take action to address this issue, which substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**IV.     Defendants Fail to Properly Support Foster Children in Kinship Placements, Putting Them at Increased Risk of Harm.**

256.     West Virginia relies heavily on kinship placements, with nearly half of the State's foster care population residing with relatives—20 percent of whom are unlicensed.

257.     But West Virginia fails to keep kinship-placed children free from harm or the risk of harm. Instead, Defendants operate a kinship program that regularly allows for short-cuts and side-steps of many of the child protective policies and practices. West Virginia fails to ensure that the kinship homes are safe, children in kinship placements receive critical services, kinship caregivers are properly trained, and sufficient monetary supports are provided.

258.     Kinship caregivers are a critical component of West Virginia's foster care system. Over the last five years, the number of children taken into custody by DHHR through removals as a result of abuse and neglect has increased significantly—by approximately 67 percent. Because West Virginia has been unable to secure an adequate supply of foster homes and kinship placements are generally favored over stranger foster parents by child welfare advocates, the state heavily relies on kinship caregivers to help absorb this influx of foster children. But Defendants are not managing the kinship program safely.

259.     As of August 31, 2019, West Virginia reported that 6,796 children were in foster care. Of these, 49 percent (3,347) were placed in kinship homes, as compared to five years ago when only 15 percent (663 out of a total of 4,299 foster children) were placed in kinship homes.

Indeed, West Virginia has significantly increased its reliance upon kinship caregivers to help manage the dramatic increase in their foster care population. Child welfare experts generally prefer kinship placements over stranger foster home placements but it is critical to the child's wellbeing, safety, and permanency that the homes and caregivers are properly vetted and that children are properly supported in the placements. In West Virginia, because approximately 50 percent of the total foster care population are in kinship homes, a well-functioning kinship program is essential. But in West Virginia, policies and rules designed to protect the kinship-placed child population are routinely disregarded, resulting in harm or risk thereof to these children.

260.     To ensure the safety of children placed with relatives, kinship homes must meet the same standards as certified foster homes. West Virginia, however, does not require all kinship placements to be certified and a significant portion of children are placed in uncertified homes. Upon information and belief, DHHR regularly discourages kinship caregivers from seeking foster home certification by either failing to inform them of their option to become certified, or by "warning" them that they will likely not meet the certification requirements and may instead risk losing the foster children if they seek certification.

261.     According to DHHR policy, uncertified kinship homes are required to complete the same home study as certified foster homes. However, this policy is not enforced. Upon information and belief, the home study is often waived or significantly abridged.  Caseworkers routinely submit waiver requests to the Regional Home Finding Supervisor in FACTS , DHHR's data system that it shares with the foster care agencies, and approval of the waivers are  often rubber stamped. This means that caregiver qualifications are not critically evaluated and little if any effort is made to assess the safety or adequacy of the homes or the ability of the placements to meet the needs of vulnerable children.

262.     Under DHHR's Home Finding Policy, before a child is placed in a home, DHHR must complete background checks for all adult occupants in the home. Upon information and belief, in practice DHHR fails to conduct a diligent search aimed at identifying all of the adults who either reside in the home or have unrestricted access to the home. Instead, DHHR focuses their background checks narrowly on only the intended caregiver. DHHR's limited-scope background check practice places all kinship-placed children at risk of exposure to further abuse and neglect.

263.     To ensure the safety of kinship-placed children, kinship caregivers should complete the same training as certified foster parents. Upon information and belief, although West Virginia's policy requires kinship caregivers to complete the requisite training, they often do not. Instead, DHHR either routinely approves caseworkers' requests to waive the important requirement or cherry-picks a limited set of trainings for the kinship caregiver to attend based on a cursory review of their skills.

264.     The needs and challenges faced by kinship families are oftentimes more demanding or intense than those faced by unrelated foster caregivers for two reasons: (1) generally, they are grandparents, and, thus, an older generation who have not parented in a long time, and (2) unlike those who voluntarily become foster parents, they did not expect to face such a stressful and life-altering event. DHHR places these children at risk of harm by placing them with caregivers who are ill-prepared or not properly supported by DHHR to care for trauma-exposed children.

265.     All children in state custody should receive financial support to help cover the unplanned costs for food, clothing, and other necessities. Under West Virginia policy, children in uncertified kinship placements receive less funding than is provided to children in certified foster homes. Certified foster parents, whether kinship or non-kinship, receive a monthly subsidy of

$600, a Medicaid card for the child, clothing vouchers, and other reimbursements. On the other hand, uncertified kinship caregivers must rely on public assistance, and many have few financial resources to begin with. Uncertified kinship homes frequently struggle to provide even the bare necessities for an unexpected dependent child even when the child is in state foster care custody.

266.     Studies show that when a child experiences stress about the provision of basic necessities, it negatively impacts the child's health, cognitive development, social and emotional development, and academic outcomes. Also, where the placement poses such a financial strain on the caregiver, the placement is at risk of disrupting, and thereby further exposing the child to trauma.

267.     Further, DHHR is failing to provide kinship placements, both certified and uncertified, with adequate casework. The casework requirements are the same for all children placed into foster care, which "includes, but is not limited to, placements in foster family homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and pre-adoptive homes." DHHR Foster Care Policy § 5.2.1.

268.     When a child is placed in a kinship home it is the responsibility of the DHHR caseworker to maintain regular contact with the child to ensure that the placement is meeting the child's needs and that the child is safe. The visits must satisfy the requirements under the Child and Family Services Improvement Act, which includes face-to-face visits at least once per month with a majority of those visits occurring in the placement. *See* 42 U.S.C. § 624(f)(1)(A); *see also* DHHR Foster Care Policy §§ 5.2.2-3. Further, the caseworker is required to provide adequate case engagement and planning to ensure that the child is receiving necessary therapeutic services, that there is a plan for permanency in place, visits with biological family are provided where appropriate, and educational needs are met.

269.     West Virginia fails to satisfy the casework standards required for their kinship-placed population. Upon information and belief, there is an apparent lower-tier regard for the kinship-placed foster children reflected in the lack of effort and time spent by caseworkers to manage these cases as compared to children in traditional foster placements. There is less caseworker contact, loose or non-existent permanency planning, and the provision of fewer services. Put simply, DHHR fails to afford children in kinship placements the protections that they are entitled to receive under the Constitution and federal laws.

270.     For example, DHHR placed Dennis C. with his step-grandmother but failed to provide supportive services to the family, which caused the kinship placement to unnecessarily disrupt.

271.     Due to a lack of caseworker engagement, kinship caregivers must figure out children's diagnoses, required services, and how to obtain those services on their own. As a result, many children go without supports and services, which are often critical to their wellbeing.

272.     In March 2019, A Second Chance, Inc., a nationally-recognized kinship care agency, released an assessment of West Virginia's kinship care program concluding that although the state has shown a commitment to increasing reliance upon kinship caregivers, the state's ability to properly administer a kinship program is hindered by significant systemic failures that include high caseloads, high turnover, varied interpretations of policy by region, and other administrative challenges. The assessment noted that while complexities in a welfare system are to be expected, West Virginia's particular issues posed a threat to the functionality and consistency of the kinship system—a system that is responsible for nearly 50 percent of the total population of foster children in the state.

273.     The report found that West Virginia lacks data to support key decisions; has

inadequate casework to provide much-needed services and supports in homes; has inaccessible caregiver training and education; and employs DHHR staff who struggle with a lack of understanding about state laws and policy that govern kinship care placements. The report also pointed to significant regional variations in key elements of a kinship foster program, including interpretations of critical timelines and the use of placement waivers, resulting in a total lack of cohesion from within DHHR around such policies and practices. And the report further found that "it is not unusual that a relative/kinship caregiver will not see a caseworker after the original placement." A SECOND CHANCE, INC., KINSHIP CARE STRENGTHS ASSESSMENT (Presented to West Virginia Department of Health and Human Resources, March 2019).

274.     Defendants maintain lower standards for accountability, casework engagement, oversight and adherence to policies, and side-step vetting requirements for kinship placements, all of which substantially depart from widely accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiff children brought into and placed in kinship foster care.

**V.     Defendants are Overly Reliant on Institutional Placements, both in West Virginia and Other States.**

275.     West Virginia institutionalizes 71 percent of foster children between the ages of 12-17 and sends a substantial number of foster children to out-of-state residential facilities, many of which are for-profit. As of August 31, 2019, DHHR placed 314 West Virginia children in out-of-state institutions, 245 of which were in group residential care and 69 were in long-term psychiatric facilities. In the same month, DHHR placed 630 youth in in-state institutions, 573 of which were in group residential care and 57 were in long-term psychiatric facilities.

276.     DHHR placed several of the Named Plaintiffs in institutional care. For instance, DHHR placed Theo S., a seven-year-old boy, in at an institutional facility in Virginia; Karter W., a 13-year-old boy, in two in-state and one out-of-state psychiatric residential treatment facilities;

and Gretchen C., a 15-year-old girl, in an out-of-state institution.

277.     Out-of-state, for-profit facilities have repeatedly demonstrated ineffective management practices, lack of staff training, misuse of physical restraints, and deceptive marketing practices. Indeed, federal and local governments have called for enhanced oversight of such facilities that deal with children with emotional disabilities.

278.     Moreover, most of these out-of-state facilities are located far from any population centers. They are generally locked or secure facilities. Children are so distant from their families, friends, or other West Virginian ties that maintaining those connections is virtually impossible.

279.     Youth, during their time at these facilities, have no contact with the community outside of other segregated children and staff. Meaningful integration with the community is rarely possible.

280.     Many of these out-of-state placements, have been the subject of criminal and licensure investigations. By way of example:

    a.     In 2018, at Abraxas Academy in Morgantown, Pennsylvania, an employee pled guilty to sexually harassing and twice sexually assaulting a female resident. The facility ignored the girl's complaints even though staff members filed a number of "unusual incident reports" detailing his inappropriate behavior. One supervisor "became so concerned with [his] behavior that she refused to allow him on the girls' side of the housing area during her periods of supervision." At that same facility, another employee was terminated after being caught on video assaulting a child. The employee stated that, "[a] lot of other stuff staff members did was worse and they were

able to keep their jobs because it wasn't on video." As of June 2019, West

Virginia housed 10 children at Abraxas Academy at a daily rate of $373.40

per child.

b.      Last year, at the Devereux Behavioral Health Facility located in Viera,

Florida, a male employee was terminated after being accused of becoming

sexually involved with a recently discharged resident of the facility. This

incident was one of 14 incidents that constituted "sex crimes" reported at

the facility between January and August of 2017. As of June 2019, DHHR

had placed 15 children at this facility with a daily rate of $409.91 per child.

c.      In 2017, at a separate Devereaux facility in Kennesaw, Georgia, a male

therapist was arrested on charges of both possessing and distributing child

pornography and admitted to "grooming" two teenage boys for the purpose

of engaging in sexual intercourse with them. There are five West Virginian

foster children at this facility, with the state paying a daily rate of $349.67

per child.

281.    As of June 2019, West Virginia was spending $112,826.78 per day or

approximately $41,181,775 per year to place their children in out-of-state congregate care facilities

that are too frequently the subject of investigations that confirm rampant sexual, physical, and

emotional abuse at the hands of employees who are undertrained and not properly screened. Not

only do innocent foster children fall victim to staff, they are also subject to victimization at the

hands of other residents—including juvenile delinquents—due to improper placement, poor

supervision, and outright negligence.

282.    West Virginia's oversight of the children placed at these facilities is limited at

best and substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

VI.    **West Virginia Fails to Employ and Retain a Sufficient Number of Properly Trained Caseworkers and its Caseworkers Carry Unreasonably High Caseloads.**

283.    DHHR and BCF struggle with high caseworker turnover. And, the caseworkers the agency does employ are poorly trained, ill-equipped to help West Virginian families, and carry unmanageable caseloads. Caseworkers are consistently unprepared to participate in critical meetings in which permanency plans will be developed or recommendations made on residential placements. This combination of high turnover and lack of proper training places West Virginia children at a serious disadvantage compared to children in states with robust and comprehensively trained caseworker networks.  Defendants have known about these issues for over a decade yet have failed to take meaningful action.

284.    The 2008 federal audit noted that West Virginia's low performance in regard to the CFSR outcomes was likely attributed to, at least in part, the fact that DHHR experienced a high rate of turnover in the caseworker position, which accounted for inconsistency in practice throughout the child welfare system.

285.    In August 2013, the West Virginia Performance Evaluation and Research Division (PERD) issued an audit related to BCF.  The audit concluded that BCF needed to improve its management of child protective services caseworkers by developing a long-term work-force plan, crafting retention goals and reliable labor management measures in order to have timelier investigations, and improving recruitment and retention given the high turnover rates.

286.    PERD observed that BCF lacked a sense of urgency around these critical issues that had been known for some time and remained unaddressed. According to the PERD audit, BCF

lacked a clear picture of its own workforce and struggled to respond to requests for the total number of allocated CPS positions both statewide and by region.

287.     In the PERD audit, the turnover rate for CPS trainees at the state level was 55.35 percent, 24.23 percent for CPS workers, and 11.39 percent for supervisors.  PERD concluded that such high turnover, particularly among trainees, likely created functional difficulties for BCF and placed West Virginia children at risk of further harm.

288.     In 2014, DHHR employees, including child welfare caseworkers, picketed outside the agency's Fayette County office to raise awareness over what they called large, unmanageable caseloads, which they claimed placed children at risk. They stated that the employees at the area office had caseloads that were two or three times larger than the recommended standard. Upon information and belief, the recommended standards are not public.

289.     In January 2015, PERD audited BCF and determined that its recommendations from the 2013 audit related to caseworker retention had not been addressed.

290.     At the time the audit was issued, some county-level human services and social workers employed by DHHR were handling twice as many cases as those deemed appropriate by the agency's own caseload standards outlined years before, despite promises from the agency to alleviate the heavy caseloads.

291.     In May 2019, a DHHR manager explained during a child welfare collaborative meeting that retention continued to be a significant problem for BCF and that DHHR had plans to develop an exit interview and survey protocol in order to find out why caseworkers were leaving. Significantly, six years earlier, the 2013 PERD audit specifically recommended exit interviews and noted that properly designed exit interviews could offer significant insight for the reasons CPS workers and trainees were voluntarily leaving their jobs. DHHR ignored this recommendation.

292.     Because West Virginia caseworkers remain overburdened, BCF continues to have alarmingly high caseworker turnover and is struggling to fill the vacancies. While 48 new positions were added in March 2018 to address increasing caseloads, as of May 2018, 108 of 472 (approximately 23 percent of) child welfare positions across the state were vacant. In January 2019, 213 positions were vacant, amounting to, upon information and belief, a 45 percent vacancy rate amongst caseworkers.

293.     West Virginia's high caseworker turnover exacerbates problems throughout its child protection system. In fact, West Virginia allows graduates with Bachelor of Arts degrees to apply for provisional social work licenses where critical shortages exist at DHHR. Upon information and belief, DHHR outsources supervision of these employees with provisional licenses to social workers who have a degree and license but are not employed by DHHR. These external supervisors report that while this was originally intended to apply to individuals with a Bachelor of Arts in a field related to social work, they have observed that DHHR now includes individuals with completely unrelated degrees. This practice puts West Virginia children at risk of harm—these foster children need caseworkers who have the relevant education necessary to perform the highly specialized child welfare work they are required to perform.

294.     In addition to West Virginia's lax standards for job applicants' professional qualifications, DHHR fails to properly screen potential employees for criminal or drug-related history. The West Virginia job application for CPS workers specifies that it "may include" looking into criminal records, driving records, abuse registry records, employment history, and education and training, among other things. In 2018, a CPS employee, Dustin Kinser was arrested and charged with contributing to the delinquency of a minor. Upon information and belief, Mr. Kinser gained information about a 17-year-old girl using the DHHR FACTS system, and then used that

information to connect with her over social media. She was reported missing for days during which it was reported that she stayed with him in a hotel room and his home. At the time that DHHR hired Mr. Kinser, he was listed on an abuse registry for a domestic violence but DHHR failed to check the registry when hiring him.

295.     High turnover also results in a failure to ensure that caseworkers maintain regular contact with children, parents, and foster parents. Foster children have and will continue to suffer harm because their assigned caseworkers are unable to meaningfully assess their safety and wellbeing and to facilitate the provision of services that are necessary to reunite them with their parents or to place them into a safe, permanent home.

296.     Additionally, West Virginia has failed for years to ensure that its caseworkers carry caseloads consistent with reasonable professional standards.

297.     Child welfare research has clearly demonstrated that high caseworker caseloads negatively impact children in foster care. Specifically, caseworkers with high caseloads have less time to interact with children, families, and service providers or to provide meaningful and appropriate case plans, necessary services, and timely casework and decision-making around issues such as permanency planning. It is therefore critical that caseworkers have manageable caseloads.

298.     The Child Welfare League of America, a coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice, has established nationally recognized standards for caseworker caseloads.  Those standards governing foster care caseworkers limit caseloads to between 12 and 15 children in foster care per worker. Yet, West Virginia caseworkers carry far higher caseloads.

299.     In 2005, West Virginia Code Section   9-2-6a was passed, directing the

Commissioner of Human Services to develop caseload standards based on the actual duties of employees in each program area of the department, taking into consideration existing professional caseload standards in order to ensure standards are reasonable and achievable. Upon information and belief, the commissioner never developed such caseload standards.

300.    Upon information and belief, it is not uncommon for caseworkers to carry a caseload of up to 50 cases, for DHHR managers to go beyond the scope of their managerial role and actually carry an active caseload and, as a result of both, for cases to languish unserviced.

301.    Upon information and belief, West Virginia contracts with private agencies to assist with their backlog of open pre-custodial investigations to bring them to closure.

302.    Upon information and belief, foster parents, kinship caregivers, and foster children consistently report inadequate communication with their caseworkers citing long periods of time during which they never hear from them despite multiple attempts to communicate and multiple messages requesting a return call.

303.    In 2012, UE Local 170, the union representing DHHR caseworkers, reached an agreement with DHHR for the agency to comply with Section 9-2-6a of the West Virginia Code, regarding the development of reasonable and achievable caseload standards for its program areas. In July 2013, caseload standard recommendations, developed by workgroups compromised of members of the UE Local 170, the West Virginia Chapter of the National Association of Social Workers, and DHHR, were given to then DHHR Secretary Bowlin.

304.    Upon receipt of the recommendations, BCF indicated that the results were of limited value given that the study included five classifications of social workers and should have had a work group assigned to study and provide detailed recommendations for implementation. Upon information and belief, the recommendations were never implemented and no further studies

took place.

305.    The 2017 federal audit noted that DHHR was experiencing higher caseloads and greater demand on limited resources. Specifically, the findings included that DHHR had experienced limited success in its efforts to recruit and retain DHHR staff which continued to adversely affect outcomes for children and families served by the agency and the delivery of services.

306.    Defendant Crouch has acknowledged that child protective caseworkers should have no more than 15 cases.  Yet, he confirmed in an interview in 2018 that in some areas of the state, caseworkers were carrying as high as 25 to 30 cases per caseworker.

307.    Ultimately, West Virginia's failure to employ and retain a sufficient number of caseworkers and ensure that caseworkers carry reasonable caseloads substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent. West Virginia has done little to address the need for more caseworkers in the state other than continually request waivers for professional qualifications for caseworkers.

## VII.    DHHR Performs Inadequate Assessments and Case Planning

308.     Before the foster care system can provide the services a child needs, it must understand a child's needs and create an individualized plan for delivering services that meet those needs. West Virginia routinely fails to timely assess children entering the foster care system. The state also fails to create meaningful and informed service plans.

309.    The 2017 federal audit found that West Virginia has a poorly functioning case review system, in part, because of the state's failure to engage in effective assessments and case planning.

310.     The 2017 audit revealed that DHHR was "not consistently completing quality comprehensive assessments of the needs of children and parents." The completion of ongoing assessments was an  especially challenging area—both for in-home and foster care cases.

311.     Moreover, the same federal audit found that "appropriate services are not consistently provided to address the identified needs."

312.     Federal auditors reported that DHHR failed to consistently address the needs of foster parents and provide appropriate services. This, in turn, could adversely affect a child's placement stability.

313.     The audit also determined that West Virginia failed to ensure quality caseworker visits with children and parents in order to complete comprehensive assessments. Indeed, DHHR engaged in insufficient contact with families to achieve case goals. Moreover, "[v]isits often occurred during a court hearing or multi-disciplinary team meeting, which may not facilitate quality engagement with parents. It was also found that children and parents are not consistently involved in the case planning process. In a number of cases reviewed, a case plan had not been developed."

314.     MDTs, discussed *supra* ¶ 213, are supposed to include the DHHR caseworker, parents or other family (unless rights have been terminated), foster or pre-adoptive parents, attorneys for any attendees, the prosecuting attorney, the child's *guardian ad litem*, members of the child advocacy center involved in the case, other professionals who may assist in providing recommendations for the child's best interests, and possibly the child if he or she is old enough. But, upon information and belief, in West Virginia integral participants are either not included or parties, such as the attorneys or caseworkers, are unprepared and lack necessary information to hold a productive meeting.

315.     This is significant, because, during MDTs, the group is supposed to assess the child's safety, wellbeing, and permanency. MDT members monitor the progress of adult respondents as well and ensure they are on track to successfully satisfy the terms of their improvement period if reunification is the permanency plan.

316.     What is more, caseworker visits with parents, essential parties in the case planning process, are regularly held in public forums rather than in private settings more appropriate for these often sensitive and personal conversations.

317.     West Virginia's failure to appropriately plan for the children in its custody substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

## VIII.   DHHR Routinely Fails to Obtain Timely Mental Health Assessments and Services and Fails to Ensure that There is an Adequate Array of Mental Health Services Available to Foster Children

318.     Defendants are well aware that West Virginia's child welfare system lacks a sufficient array of mental and behavioral health services and professionals needed to administer those services.

319.     In the 2017 federal audit, "[s]takeholders consistently reported that the two areas of greatest need for which services and resources are lacking are substance abuse treatment and the availability of foster homes. Other necessary services for children and families that were also noted as lacking included mental health services for children, sex offender treatment, batterer offender treatment, autism support services, postadoption services, kinship family support services, and housing."

320.     Although federal law requires that services must be provided, children often remain

on waiting lists for services; accurate and necessary information about children's circumstances, both medical and social history, as well as special needs requirements are withheld from foster parents; and biological parents are referred to services that exist in such small numbers that they never become available within the limited timeframe the parents have to comply with their case plans.

321.     The need for timely and appropriate therapeutic interventions cannot be overstated given the prevalence of mental health conditions in the foster care population, such as reactive attachment disorder, adjustment disorder, bipolar disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder.

322.     In 2012 the Bureau of Business and Economic Research College of Business and Economics at West Virginia University provided a report to the West Virginia State Legislature entitled *Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities*. The report concluded, *inter alia*, that timely identification and effective treatment to meet mental and behavioral needs of foster children was critical and issued a series of recommendations, including the implementation of a state-wide treatment-focused foster care model, development of a state-wide plan to meet the behavioral needs of West Virginia children and families, allocation of resources to prevention and early intervention services, and reduction of barriers to accessing necessary services in the communities. Upon information and belief, Defendants failed to implement these recommendations.

323.     The  Department of Justice conducted a subsequent investigation in 2015, discussed further, *infra* Part XI, A, and found that intensive mental health services were offered almost exclusively in institutional settings rather than in the community. Children tended to remain in residential placements for longer than necessary because there were not community-based

services to support their return to home.

324.     The 2017 CFSR indicated that the lack of available and accessible quality services statewide precluded the individualization of services for children. Individualized services are critical to support the unique needs of each child.

325.     In January 2019, Deputy Secretary Samples testified before the Senate Finance Committee that West Virginia lacked the basic mental and behavioral health infrastructure to provide treatment to foster children, including basic services such as counseling for girls who suffered through sexual abuse, even though 39 percent of foster children had a mental health diagnosis in the last year.

326.     Moreover, West Virginia lacks adequate community-based support services that would enable children to be placed in community-based, family-like settings appropriate to the emotional and behavioral needs of West Virginian youth. The required number of therapeutic family foster homes, with foster parents who have adequate experience and training in dealing with emotional and behavioral needs, simply does not exist. This is especially relevant to members of the ADA Subclass.

327.     All of these failures have been well known to Defendants, and all of them constitute a significant departure from reasonable professional standards and deliberate indifference to the substantial harm and risk of harm to the Plaintiffs and the classes they represent.

**IX.     DHHR Has Inadequate Permanency Planning for Youth in Foster Care**

328.     Defendants fail to engage in necessary permanency planning for children in foster care. As a result, children are forced to languish in the foster care system for years.

329.     For instance, Theo S. and Ace L. were freed for adoption nearly three years ago yet have not achieved permanency. DHHR has also left Gretchen C. in foster care for

approximately four-and-a-half years and Garrett M. in foster care for seven years.

330.    Defendants' failure to ensure children in foster care receive appropriate case plans and services and habit of shuffling children from placement to placement or segregating them in institutions add up to an overwhelming failure to ensure children achieve permanency.

331.    Upon information and belief, West Virginia's failure to provide necessary services to children and parents substantially impedes reunification efforts because reunification often is not possible, legally and practically, in the absence of such services. In the alternative, children often are returned to the care of their parents even though the conditions underlying the removal of the children have not been addressed.

332.    Research has shown that the longer a child remains in care the less likely they are to be adopted.  Similarly, children who have previously been placed in congregate care often fail to receive adoption services. Defendants routinely create permanency plans that do not even include adoption as a goal for foster children who need specialized mental health or medical services, even when adoption might be a reasonable concurrent plan. This happens with even greater frequency to those foster children with physical, emotional, or cognitive disabilities.

333.    Only a small fraction of those foster children who are freed for adoption are currently listed on West Virginia's adoption page which helps DHHR find adoptive homes for children.  As of August 2019, only 49 children are listed for adoption, 23 of whom were added between 2011 and 2017.

334.    For older teens who may express the view that they do not want to be adopted, DHHR often fails to explore non-adoptive options that nevertheless would be conducive to the child's long-term stability, such as facilitating the child's connection with a non-adoptive kinship resource who will maintain a stable, long-term relationship with the child after they age out of the

system.

335.     Upon information and belief, West Virginia is quick to terminate parental rights, frequently within months of the initial placement.  This has resulted in an almost doubling of the size of the population whose parents' rights have been terminated, from 1,040 in 2013 to 1,988 in 2017.

336.     Adoption numbers have not kept pace with the number of terminations, leading to more children becoming legal orphans, frequently left in institutional settings. According to the Adoption and Foster Care and Analysis Reporting System, which collects case-level information from states on children in foster care, data that runs through 2017, West Virginia terminates parental rights in 25.8 percent of cases of children waiting for adoption, compared to a national average of 14.75 percent. West Virginia is the sixth worst state under this metric.  Although not inclusive of children with emancipation as their permanency goal, termination of parental rights petitions are utilized in 9.35 percent of the cases, more than double the national average of 4.4 percent. It also ranks sixth highest in this category overall.

337.     Even those children who have been adopted in West Virginia have not necessarily received true permanency. As of March 2018, 14 percent of West Virginian children that were placed in out-of-state institutions had been previously adopted.

338.     This number suggests that while DHHR may technically guide the children to permanency through to adoption, little to no consideration may be given to whether or not the adoptive placement is a good match for the children, later resulting in adopted children returning to placement. This is particularly true when assessments as to the appropriateness of adoptive placements and the future needs of the child and adoptive parents are made by inexperienced and overworked caseworkers.

339.     These failures have been well known to the Defendants and constitute a significant departure from reasonable professional standards and deliberate indifference to the substantial harm and risk of harm to the Plaintiffs and the classes they represent.

**X.     Defendants Fail to Engage in Transition Planning and Thoughtful Discharge from Foster Care**

340.     Adolescents in the West Virginia foster care system are not prepared for successful transitions to adulthood and, as a result, are aging out into either unstable situations or directly into homelessness. In addition to homelessness, youth aging out of foster care experience high rates of incarceration, unemployment, early parenthood, and earnings below the poverty line. Once they age out, these victims of the child welfare system lack education, life skills, and supportive adult relationships to help them overcome these debilitating barriers. Even high-functioning aging-out youth find themselves having to make difficult decisions such as choosing between attending school or working to pay their rent, thus limiting their opportunities. Economically impaired and alone, aging-out youth are also frequently the targets of predatory crime recruitment involving prostitution and drugs.

341.     As a critical part of their responsibility to develop youth into self-sufficient adults, DHHR caseworkers are required by federal law to provide age appropriate case planning to youth who are age 14 or older by assessing each youth for eventual independence, developing a detailed learning and transition plan, ensuring the youth are exposed to positive adult role models, and providing necessary services to assist youth in achieving independence. Such preparations should include vocational and other educational services such as money management, household maintenance, transportation, legal issues, health, community resources, housing options, personal hygiene, employment readiness, and educational assistance. But DHHR fails to engage in such case planning for older youth.

342.     DHHR fails to prepare youth who are aging out of the child welfare system for adulthood and life on their own. Upon information and belief, caseworkers do not engage in timely transitional planning with youth. Rather, caseworkers attempt to plan for the transition out of foster care when youth are on the verge of aging out, sometimes as late as weeks before a teen's 18th birthday. Without any plan in place, young people are being dropped off at homeless shelters.

343.     For instance, Garrett M. is 17 years old, but DCS has not prepared him for his transition out of foster care. DHHR merely enrolled him in an educational "click-through" program. DHHR has failed to provide him with any vocational training.

344.     In the 2017 federal audit, it was determined that West Virginia did not make concerted efforts to place youth with a goal of Another Planned Permanent Living Arrangement in a viable permanent arrangement.

345.     Historically, West Virginia has claimed that 73 percent of all the youth who were in care on their 18th birthday achieved permanency—primarily through reunification with parent/primary caretaker. Although reunification is the preferred permanency option for children under the age of 18, 18-year-olds who are discharged from foster care to a parent that they may not have had contact with in years and/or could not be reunited with while they were a minor is not reunification. This is an improper classification of youth who were abandoned by West Virginia.

346.     This is a particularly critical demographic for West Virginia because, as of 2017, the state had the highest rate in the country of foster care entries for youth ages 14 to 17 per 1,000 at 14.2, as compared to the national average of 2.8 per 1,000.

347.     In West Virginia 71 percent of foster children between the ages of 12 and 17 are institutionalized. The most recent placement before exiting foster care for the majority of these

youth is a group home or institution. They are never given the opportunity to develop consistent and nurturing relationships with adults who will support them beyond their adolescence and through their transition to adulthood; aging-out youth lack a "safety net" as they begin to navigate life on their own.

348.    Outside of education, other relevant outcomes for youth who will age out of the foster care system are devastating. National data shows that over 20 percent will become homeless shortly after aging out or will age out directly into homelessness; 71 percent of women will be pregnant by 21; 50 percent of the youth will remain unemployed by the age of 24; less than three percent will have completed college; and 25 percent will suffer from post-traumatic stress disorder.

349.    A longitudinal study following youth who have aged out released in 2015 found that of West Virginia youth who spent time in foster care, by age 19, 18 percent experienced homelessness in the previous two years and, by age 21, 28  percent experienced homelessness.  At age 19, only 33 percent had a full or part-time job and by age 21, only 43 percent were employed.

350.    DHHR's failure to develop and implement meaningful case and transitional planning for youth who are aging out of foster care substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

**XI.    Defendants' Failure to Keep Foster Children Safe has Resulted in Action by Federal Regulators and the State Legislature**

**A.    The United States Department of Justice has Found West Virginia in Violation of the ADA with Regard to how the State Cares for Children in Need of Mental Health Services**

351.    In April 2014, the Civil Rights Division of the United States Department of Justice ("USDOJ"), launched an investigation into West Virginia's system of care for children in need of mental health services. Upon completion of the year-long investigation, the USDOJ found

that West Virginia was causing psychological, developmental, and other harm to children by unnecessarily placing them into segregated residential treatment facilities instead of providing the federally-required in-home and community-based services. The USDOJ declared the State to be in violation of Title II of the ADA due to their failure to provide services to children with significant mental health conditions in the most integrated settings appropriate to their needs.

352.     The scope of the investigation included the mental health services available to children in the child welfare system, the juvenile justice system, or who were Medicaid dependent. In their findings report dated June 1, 2015, the USDOJ concluded that the entire children's mental health system was built around placement in segregated residential treatment facilities such that, for children with serious mental health conditions, the "*default service in West Virginia is institutionalization.*" Letter from Dep't of Justice, Civil Rights Div., to Office of the Governor, State of West Virginia (June 1, 2015) (emphasis added). This included group residential care, psychiatric residential treatment facilities, and psychiatric hospitals. Such care facilities provided structured 24-hour group care, highly-regimented programs with invasive therapeutic interventions including seclusion, and physical and chemical restraint of children by staff members.

353.     The USDOJ stated that West Virginia "*needlessly segregated thousands of children far from family and other people important in their lives*" even though they could successfully treat these children in their homes and communities. *Id.* (emphasis added). The report specified that West Virginia failed to establish even the most basic service provisions that were considered the "standard of care" for children with mental health needs; they failed to develop community-based wraparound supports and in-home crisis response services, they did not take full advantage of Medicaid support for such services, and they failed to reallocate existing resources

effectively.

354.     Ten years prior to the issuance of the DOJ findings report, Defendants released a strategic plan to build-out community-based services in order to prevent the harms of institutionalization, but it was never implemented. Instead, in the years leading up to the USDOJ investigation, DHHR licensed new in-state facilities, increased bed capacity at existing facilities, and increased the number of children they sent out of state to private, for-profit, residential care facilities. Currently, there are approximately 50 residential treatment facilities across the state of West Virginia into which foster children are regularly placed. These consist of Level I, II, and III facilities and psychiatric treatment centers. Generally, the specific program levels reflect differences in level of care, therapeutic approaches, and security. Additionally, there are 53 out-of-state facilities that have a contract to receive placements from DHHR, as of April 30, 2019.

355.     Studies show that segregated residential treatment facilities cause psychological and emotional harm to children. Children that have spent time in a facility may become socially withdrawn, develop attention-seeking behaviors including self-harming, have difficulty learning and concentrating, and lose the ability to form emotional attachments with caregivers and peers. Children may lose the ability to make ordinary life decisions because facilities control all daily activities.  Due to the high turnover of residential staff and therapists, and poor contact with other adult caregivers, children are deprived of opportunities to establish stable and continuous relationships.  Such relationships are critical to a child's development and success in their treatment, especially for the children in care who have experienced trauma. Further, residential treatment facilities are associated with higher rates of maltreatment, exposing the residents to new and additional trauma.

356.     The USDOJ's investigation revealed that West Virginia's children in segregated

residential treatment facilities were required to complete "arbitrary" behavioral goals that did not relate to their individual treatment needs or provide the children with the life or social skills necessary to establish relationships or navigate everyday social encounters. They described the programs as restrictive and rigid, stating that "*these goals can be very difficult to achieve due to the combined effect of their disabilities.*" *Id.* (emphasis added). The behavioral goals, which refused to yield to a specific child's limitations, slowed their transition back to community living and placement with their families, thereby maintaining them in a restrictive and isolated setting for reasons that had nothing to do with their treatment needs.

357.     Segregated residential treatment facilities are expensive and impede the state's ability to develop community-based mental health services, thereby perpetuating the resulting harms to the children dependent upon state-provided mental health care. The USDOJ's report estimated that the average cost of in-state placement in segregated residential treatment facilities ranged from $5,623 to $9,088 per month per child. DHHR spent over $67.5 million dollars on residential care in fiscal year 2012 and the number of children entering custody has significantly increased since 2012.

358.     In May 2019, West Virginia and the USDOJ entered into a Memorandum of Understanding ("MOU"). The MOU is limited in scope and unlikely to be successfully implemented by DHHR. Specifically, it covers only children under the age of 21 who have a serious emotional or behavioral disorder or disturbance that results in a functional impairment, and (i) who are placed in a residential mental health treatment facility or (ii) who reasonably may be expected to be placed therein and have their mental health services provided or paid for by DHHR. The MOU fails to capture the pressing needs of a significant portion of foster children who do not fit into these tightly defined parameters yet are in need of mental health services.

359.     For children with serious mental health conditions, DHHR is required to implement in-home and community-based mental health services and to limit the use of segregated residential treatment facilities to children for whom residential placement qualifies as the most appropriate setting given their individualized service plan; provisions that were already legally required. Under the MOU, a Subject Matter Expert, chosen by DHHR, will periodically monitor the state's compliance.

360.     As specified in the agreement, the goal is that by 2024, 10 years after the commencement of the initial DOJ investigation, every child in residential care will be in their most appropriate setting and West Virginia will offer mental health services to the defined target population in the most integrated setting possible.

361.     But the goals in the agreement modestly call for a 25 percent reduction of the June 2015 number of children in out-of-state placement by 2022. An even more glaring flaw in the agreement is that it does not explicitly require West Virginia to reduce the number of children placed into in-state residential treatment facilities, which threatens their developmental progress and overall wellbeing just as much as placement in an out-of-state facility. Lastly, the MOU is self-enforcing and there is little to no oversight.

### B.     The West Virginia Legislature Recently Enacted a Bill to Improve One Aspect of the Foster Care System, but it Fails to Address the Major Components of the System that are Dysfunctional and Cause Harm to Plaintiffs

362.     The foster care system in West Virginia had become so dysfunctional that the state legislatures have begun to demand action. Under scrutiny, representatives from DHHR made public statements blaming their failures entirely on the drug crisis. Such statements grossly misrepresent DHHR's performance history and the state of the department leading up to the crisis. West Virginia's foster care system was already strained and mismanaged prior to the opioid

epidemic. The drug epidemic was not the root of the problem but rather toppled an already fractured system. The public statements display a lack of accountability but nonetheless, clearly acknowledge that the system is in fact in crisis.

363.     In March 2019, the Defendant Governor Jim Justice signed into law House Bill 2010, widely referred to as the "Foster Care Reform Bill." Despite what the encompassing name indicates, this bill does not provide the kind of reform that the foster children of West Virginia, and the Plaintiffs in this lawsuit, desperately need.

364.     The primary purpose of the bill is to convert the existing fee-for-service Medicaid-based system of reimbursement to a private for-profit managed care organization ("MCO"). Transition to a single MCO is to be completed by January 1, 2020.  The chosen MCO will oversee medical health services, pharmacy services, dental care, behavioral health services, wraparound services, residential-care services, and socially necessary services for West Virginia's vulnerable youth populations.

365.     This provision was met with strong opposition by organized foster family groups, child welfare advocates, and other stakeholders as it made its way through the legislature. Their chief concern was that medically vulnerable groups, such as foster children who often have multiple diagnoses due to a history of trauma, are notoriously underserved by private managed care systems with profit motives.  Further, the MCO will cost the state $200 million per year; money which could have been spent to improve the existing system.

366.     Despite the opposition, Defendant Jeremiah Samples justified the legislation by stating, ". . . doing anything is better than doing nothing."  Yet, Defendants are doing little more than nothing to effectively address the most pressing shortcomings which contribute to the current foster care crisis, and render Defendants unable to safely care for their growing foster care

population.

367.     West Virginia's foster care system is in desperate need of thoughtful well-crafted reform to address the many long-standing systemic deficiencies including: a severe shortage of foster care homes, which results in children sleeping in DHHR offices, staying in emergency shelter care for extended periods of time, living in delinquency facilities, and experiencing multiple placement disruptions due to inappropriate or overcrowded placements; kinship homes that are not properly vetted or supported, such that children are placed into homes that put them at risk of maltreatment or cannot provide for their wellbeing; an over-reliance on segregated residential care facilities, such that children are needlessly institutionalized or sent out of state; a lack of uniformity in DHHR policy and practice across the state; egregiously high caseworker caseloads and high caseworker turnover that renders proper case management impossible; a lack of service providers and other critical infrastructure that would allow children with mental health service needs to remain in their communities; a failure to ensure children achieve timely or lasting permanency or have their in-placement needs met; and a failure to properly prepare older youth for aging out, and therefore placing them at risk of experiencing homelessness, drug addiction, or recruitment into crime. The Foster Care Reform Bill addresses none of these issues.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Substantive Due Process under the U.S. Constitution**
**(On Behalf of the General Class and All Subclasses Against All Defendants)**

368.     Each of the foregoing allegations is incorporated as if fully set forth herein.

369.     A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care, to and to protect from harm, a child with whom it has formed a special relationship, such as a child in foster care.

370.     The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the General Class.

371.     Defendants are well aware of the policies and practices that prevent these class members from receiving adequate protection from harm after the State has formed a special relationship with them.

372.     As a result, the named Plaintiffs and all of the members of the General Class and subclasses of children to whom the state owes a special duty, children in foster care, have been, and are, at risk of being deprived of substantive due process rights conferred upon them by the United States Constitution.

373.     These substantive due process rights include, but are not limited to:

a.     the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State;

b.     the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child;

c.     the right to services necessary to prevent unreasonable risk of harm;

d.     the right to conditions and duration of foster care reasonably related to the purpose of government custody;

e.     the right to treatment and cares consistent with the purpose and assumptions of government custody;

f.     the right not to be maintained in custody longer than is necessary to

accomplish the purpose to be served by taking a child into government custody; and

g.      the right to services in the least restrictive, most family-like setting.

374.      Moreover, the named Plaintiffs and all of the members of Kinship, ADA, and Aging Out Subclasses have been, and are, at risk of being deprived of substantive due process rights conferred upon them by the United States Constitution.

a.      With respect to the Kinship Subclass of children, the substantive due process rights include, but are not limited to:

i.      The right to placement in the least-restrictive most family-like setting that is properly assessed to determine whether it is a safe and appropriate placement;

ii.      The right to supportive and case management services to ensure placement stability and ensure the child is free from harm; and

iii.      The right to a plan and corresponding services for a permanent home.

b.      With respect to the ADA subclass of children, the substantive due process rights include, but are not limited to:

i.      The right to be free from discrimination by reason of disability;

ii.      The right to services in the most integrated setting appropriate to the person's needs;

iii.      The right to be free from unnecessary institutionalization and to be placed in least restrictive setting; and

iv.       The right to ensure access to an array of community-based

placements and services to ensure access to the least restrictive alternative.

c.     With respect to the Aging Out Subclass of children, the substantive due process rights include, but are not limited to:

i.     The right to independent living services to prepare to exit foster care successfully including, but not limited to, vocational and other educational services; money management, household maintenance, transportation, legal issues, health, community resources, housing options, personal hygiene, employment readiness, and educational assistance;

ii.    The right to assistance to find lawful, suitable permanent housing that will not result in homelessness upon exit from foster care; and

iii.   The right to a connection with an adult resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system.

**SECOND CAUSE OF ACTION**
**First, Ninth and Fourteenth Amendments to the U.S. Constitution**
**(On Behalf of the General Class and All Subclasses Against All Defendants)**

375.   Each of the foregoing allegations is incorporated as if fully set forth herein.

376.   Plaintiffs and the class members they represent are in Defendants' custody or guardianship and are wholly dependent on Defendants to provide for their basic physical, psychological, and emotional needs, and to protect them from physical, psychological, and emotional harm.

377.   Children frequently and foreseeably suffer physical, psychological, and

emotional harm in DHHR custody. They suffer harm in part because, in sharp contrast with the ideal of a stable and permanent home and family, they are continually shuttled between temporary and often non-familial custodial arrangements. Professional judgment and standards of conduct require the Defendants to make reasonable efforts toward placing children in their care in stable, permanent homes and families.

378.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutional rights of Plaintiffs and the members of the General Class and Subclasses.

379.    By failing to take all reasonable efforts towards fostering familial association and securing a permanent home and family for the named Plaintiffs and the class members they represent, Defendants have failed to protect them from psychologically and emotionally harmful temporary living arrangements.

380.    As a result, the named Plaintiffs and all of the members of the General Class and Subclasses have been, and are at risk of being, deprived of the right to familial association and reasonable protection from psychological and emotional harm while in Defendants' custody, in violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

### THIRD CAUSE OF ACTION
**The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq*.**
**(On Behalf of the General Class and All Subclasses Against All Defendants)**

381.    Each of the foregoing allegations is incorporated as if fully set forth herein.

382.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the

rights contained in the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

a.   a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

b.   placement in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

c.   a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

d.   a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e.   a written case plan that ensures provision of services to parents, children and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

f.   a written case plan that ensures the educational stability of the child while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

g.   a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home

community, 42 U.S.C. §§ 671(a)(16), 675(5)(A), and;

h.   a case review system in which the status of the child is reviewed no less frequently than every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, continuing necessity and appropriateness of the placement, extent of compliance with their permanency plan and projected date of permanency, 41 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C).

383.    These provisions of the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, are clearly intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous sch to strain judicial competence; and the statute imposes a binding obligation on the states, 42 U.S.C. § 1983; *see also Henry A. Wilden,* 678 F.3d 991, 1008-09 (9th Cir. 2012).

## FOURTH CAUSE OF ACTION
### Americans with Disabilities Act
### (On Behalf of the ADA Subclass Against All Defendants)

384.    Each of the foregoing allegations is incorporated as if fully set forth herein.

385.    Title II of the ADA, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 *et seq.*, prohibit discrimination against individuals with disabilities.

386.    Plaintiffs have physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2). They meet the essential eligibility requirements for the receipt of foster care services provided by DHHR.

387.    Defendants are public entities, or are public officials of a public entity, subject to the provisions of the ADA, 42 U.S.C. § 12131(1)(A).

388.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of disability.

389.     Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. . . ." 28 C.F.R. § 35.130(b)(1)(iii).

390.     Accordingly, DHHR must provide children with disabilities an equal opportunity to access foster care services as it provides to children without disabilities in its custody.

391.     Moreover, defendants have an affirmative duty, to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

392.     As set forth above, the regulatory hallmark and guiding force of disability law requires the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs.  28 C.F.R. § 35.130(d); *Olmstead v. L.C.*, 527 US 581, 602 (1999).

393.     As a result of the foregoing, named Plaintiffs in the ADA Subclass and the members they represent have, and are at risk of being, deprived of their statutory right to access additional mental health services to make them as able as their non-disabled peers to access a stable, family-like foster placement and for appropriate placement in the most integrated setting

appropriate to their needs.

394.     As a direct and proximate result of defendants' violations of Title II of the ADA, plaintiffs have been or are at risk of being injured as set forth above and will continue to suffer injury until defendants are required to, and have, come into compliance with the requirements of the ADA.

### FIFTH CAUSE OF ACTION
**Rehabilitation Act**
**(On Behalf of the ADA Subclass Against All Defendants)**

395.     Each of the foregoing allegations is incorporated as if fully set forth herein.

396.     Plaintiffs have physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities within the meaning of the Rehabilitation Act. *See* 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DHHR.

397.     DHHR receives substantial federal funding to support its child welfare operations and thus must comply with the Rehabilitation Act. *See* 29 U.S.C. § 794(b); 34 C.F.R. 104.51. The individually-named Defendants are all agents for the state of West Virginia sued in their official capacities. Their respective agencies and offices all receive substantial federal funding.

398.     Like the ADA, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. *See* 29 U.S.C. § 794(a); 34 C.F.R. 104.4.

399.     Like the ADA, the Rehabilitation Act also requires an "equal opportunity" for people with disabilities to benefit from the services of a public entity. 34 C.F.R. 104.4(b)(1)(ii) & (b)(2); 34 C.F.R. 104.52(a)(2).

400.     Like the ADA, the Rehabilitation Act requires federal funds recipient to provide services in the most integrated setting appropriate. *See* 34 C.F.R. 104.4(b)(2).

401.     Defendants, in actions and omissions described above, fail to give children with disabilities an equal opportunity to succeed in remaining in a family home, reunifying with their parents, finding a permanent home, receiving necessary health care, and receiving appropriate placement in the most integrated, community-based setting appropriate to their needs.

402.     As a direct and proximate result of Defendants' violations of Rehabilitation Act, Plaintiffs have been or are at risk of being injured as set forth above and will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the Rehabilitation Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the named Plaintiffs, on behalf of themselves and the classes, respectfully request that this Court:

403.     Order that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

404.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

a.     Defendants' violation of Plaintiffs' and class members' right to be free from harm under the Fourteenth Amendment to the United States Constitution;

b.     Defendants' violation of Plaintiffs' and class members' rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c.     Defendants' violation of Plaintiffs' and class members' rights under the Adoption Assistance and Child Welfare Action of 1980, as amended by the Adoption and

Safe Families Act of 1997, 42 U.S.C. § 670 et seq.; and

d.      Defendants' violation of Plaintiffs' and class members' rights under ADA, 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations.

405.    Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights, including:

a.      With regard to all children in the General Class:

i.      Require DHHR to contract with an appropriate outside entity to complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgement, to determine the full range and number of appropriate foster care placements and services for all children needing foster care placement, including the development of a plan, with timetables, within which such placements and services shall be secured, and ensure that DHHR shall comply with those timetables;

ii.     Require that DHHR ensure that all children who enter foster care placement receive within 30 days of entering care a complete and thorough evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be re-evaluated as the child's needs and the information available to DHHR change;

iii.    Require that DHHR ensure that all children who enter foster care

placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs; describe a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves towards a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in DHHR's custody.

iv.     Require that DHHR ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

v.      Require that DHHR shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards;

vi.     Require that DHHR shall hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers, and ensure that caseloads do not exceed 15 children per-worker for children in placement, with caseloads adjusted for caseworkers who carry mixed caseloads including children not in foster care custody; and

vii.    Require DHHR to develop an adequate statewide plan, to be approved by the Monitor referred to below, for recruiting and retaining foster and adoptive homes, including recruitment goals

and timetables for achieving those goals, with which DHHR shall comply.

b.      For all children in the Kinship Subclass:

   i.     Require DHHR to develop an adequate statewide kinship placement plan, to be approved by the Monitor referred to below, for assessing, overseeing, and monitoring kinship homes, including training requirements and regular caseworker contact, and timetables for achieving those goals, with which DHHR shall comply;

   ii.    Require that DHHR shall ensure caseworkers conduct background and safety assessments of kinship placements as required by reasonable professional standards;

   iii.   Require that DHHR shall ensure that kinship placements receive foster parent training as required by reasonable professional standards;

   iv.    Require that DHHR shall ensure that all children in kinship placements shall receive foster care services to meet the child's needs, including, in as many instances as is required by reasonable professional standards, supportive services; and

   v.     Require that DHHR shall ensure all children who are placed in kinship placement receive permanency planning as required by reasonable professional standards.

c.      For all children in the ADA Subclass:

   i.     Require that DHHR shall ensure that all children with physical,

mental, intellectual, or cognitive disabilities shall receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

ii.    Require that DHHR ensure that an adequate array of community-based therapeutic services are available to children with disabilities; and

iii.    Require that DHHR ensure that it develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities.

d.    For all children in the Aging Out Subclass:

i.    Require that DHHR, when a child turns 14 years old while in its custody and is not imminently likely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, shall engage in transition planning to meet the health care, educational, employment, housing, and other social needs of the children in transitioning to adulthood;

ii.    Require that DHHR shall ensure youth be placed in the least-restrictive, most-family like setting possible with appropriate, necessary and individualized services; and

iii.    Prohibit DHHR from refusing to place a young person in a foster care placement because the child is 14 or older.

406.   The Court shall appoint a neutral Monitor, paid for by the Defendants, to monitor the terms of this Order. The Monitor shall have access to all relevant documents and information necessary and shall conduct record reviews as necessary to ensure compliance with its terms.

407.   Award reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

408.   Grant such other and further relief as the Court deems just, necessary, and proper to protect Plaintiffs and the class members from further harm.

Dated: October 1, 2019

*/s/ Marcia Robinson Lowry*
A BETTER CHILDHOOD
Marcia Robinson Lowry (*pro hac vice pending*)
mlowry@abetterchildhood.org
Dawn J. Post (*pro hac vice pending*)
dpost@abetterchildhood.org
Allison Mahoney (*pro hac vice pending*)
amahoney@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456
Fax: (212) 692-0415
***Attorneys for Plaintiffs***

*/s/ Richard W. Walters*
Shaffer & Shaffer, PLLC,
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net
Brian L. Ooten, WVSB #9358
booten@shafferlaw.net
Shaffer & Shaffer, PLLC,
2116 Kanawha Boulevard, East
Post Office Box 3973

Charleston, West Virginia  25339-3973
Tel: (304) 369-0511
Fax: (304) 369-5431
***Attorneys for Plaintiffs***

*/s/  Jeremiah Underhill*
Disability Rights of West Virginia
Jeremiah Underhill, WVSB #13094
junderhill@drofwv.org
Erin Snyder, WVSB #12596
esnyder@drofwv.org
Lori Waller, WVSB #11303
lwaller@drofwv.org
1207 Quarrier Street, Suite 400
Charleston, WV 25301
Tel: (304) 346-0847
Fax: (304) 346-0687
***Attorneys for Plaintiffs***

Valerie McLaughlin
vmclaughlin@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456
Fax: (212) 692-0415
***Of Counsel for Plaintiffs***