# Tab 4

**AGREEMENT**
**BETWEEN**
**UNITED STATES DEPARTMENT OF JUSTICE**
**AND**
**THE STATE OF WEST VIRGINIA**

## I.   INTRODUCTION

1. This matter involves the services, programs, and activities offered to children with serious mental health conditions through the West Virginia Department of Health and Human Resources ("DHHR") and other state agencies, including the Department of Education and the Department of Military Affairs and Public Safety.

2. In April 2014, the United States Department of Justice ("the United States") initiated an investigation under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and its implementing regulations, of West Virginia's service system for children with serious mental health conditions. The United States interviewed complainants and stakeholders in West Virginia, visited numerous treatment facilities, and reviewed documents over the course of its investigation.

3. On June 1, 2015, the United States notified West Virginia of its conclusion that West Virginia does not comply with Title II of the ADA, as interpreted in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999).  This agreement between the United States and DHHR ("the Parties") addresses the United States' allegations regarding DHHR's service system for children with serious mental health conditions.

4. The United States recognizes that DHHR is committed to reforming West Virginia's child welfare system and to ensuring that children can receive mental health services in their homes and communities.  The parties agree that through mutual cooperation these efforts can be enhanced, and successful reforms can be implemented in a timely manner to reduce the number of children unnecessarily placed in Residential Mental Health Treatment Facilities and the length of stay for children at these facilities, where appropriate.

5. The Parties are committed to full compliance with the ADA. This agreement is intended to memorialize the commitment of DHHR that services, programs, and activities offered by DHHR to qualified children with disabilities will be provided in the most integrated setting appropriate to meet their needs.

6. DHHR is committed to preventing children with serious mental health conditions from being needlessly removed from their family homes in order to obtain treatment, to prevent those children from unnecessarily entering Residential Mental Health Treatment Facilities, and to transition children who have been placed in these settings back to their family homes and communities. DHHR is committed to providing in-home and community-based services including Wraparound Facilitation, Children's Mobile Crisis Response, Therapeutic Foster Family Care, and Assertive Community Treatment to children in the target population. Through these programs, children will receive services in the most integrated setting appropriate to their needs. It is the goal of DHHR to ensure that children covered by this agreement receive sufficient community-based services to prevent unnecessary institutionalization.

7. The policies, procedures, and services of the programs outlined in this agreement will be guided by the principles set forth by the Administration for Children and Families, a division of the United States Department of Health and Human Services ("ACF"). Accordingly, these programs will be family-driven, youth-guided, and culturally and linguistically competent and include a broad and diverse array of community-based services that are individualized and strengths- and evidence-based.

8. All services and programs listed herein are necessary to comply with the agreement. The Parties may jointly agree to make changes, modifications, and amendments to this agreement and any services listed herein, upon a determination by the Parties that changes to the agreement would further DHHR's compliance with the ADA.

9. The "Effective Date" will be the date upon which both Parties have executed this agreement.

## II. DEFINITIONS

10. "Assertive Community Treatment" (ACT), is a treatment model in which a multidisciplinary team assumes accountability for a small, defined caseload of individuals and provides the majority of direct services to those individuals in the individual's community environment and that operates with high fidelity to an assessment tool, such as the Dartmouth Assertive Community Treatment Scale (DACTS).

11. "Behavioral Support Services" are services that address a child's behaviors that interfere with successful functioning in the home and community. These services include mental health and behavioral assessments; development and implementation of a positive behavioral support plan as part of the treatment plan; modeling for the family and other caregivers on how to implement the behavioral support plan; and skill-building services.

12. "Child and Family Team" is a group of people, chosen with the family and connected to them through natural, community, and formal support relationships, that develops and implements the Individualized Service Plan. The Child and Family Team is led by the Wraparound Facilitator.

13. "Children's Mobile Crisis Response" is a crisis response program for children that includes a hotline and mobile crisis response teams that assess and evaluate the presenting crisis, provide interventions to stabilize the crisis, and provide timely supports and skills necessary to return children and their families to routine functioning and maintain children in their home, whenever possible. These services are delivered in a non-clinical setting. Mobile crisis response teams consist of a clinical supervisor and crisis specialists who will provide the direct services to children and families.

14. "DHHR" is the West Virginia Department of Health and Human Resources and includes those bureaus with the responsibility for providing services to the target population.

15. "In-Home and Community-Based Services" or "In-Home and Community-Based Mental Health Services" are mental health services provided in the child's family home (or foster or kinship care home, where applicable) and in the community.

16. "Individualized Service Plan" is the comprehensive plan developed by the Child and Family Team that is person-centered and includes the child's treatment goals and objectives, methods of measurement, the timetables to achieve those goals, a description of the services to be provided, the frequency and intensity of each service, and which service providers will provide each service.

17. "Residential Mental Health Treatment Facility" is a structured 24-hour group care treatment and diagnostic setting for children with serious emotional or behavioral disorders or disturbances. These facilities include the following provider types as listed on DHHR's Legislative Foster Care Placement Report:  Group Residential Care,

Psychiatric Facilities (Long Term), and Psychiatric Hospital (Short Term). The Parties acknowledge that the names and/or functions of these provider types may change as the requirements of the Family First Prevention Services Act are implemented in West Virginia, and the Parties agree to meet and confer as necessary to address the impact of those changes on this agreement.

18. "Serious Emotional or Behavioral Disorder or Disturbance" is the presence of a diagnosable mental, behavioral, or emotional disorder that results in functional impairment, which substantially interferes with or limits the child's role or functioning in family, school, or community activities.

19. "Serious Mental Health Condition" is a serious emotional or behavioral disorder or disturbance.

20. "Therapeutic Foster Family Care" is a trauma-informed clinical intervention that is an alternative to residential placement for children and youth who have severe emotional and behavioral needs. This service is provided to children who exhibit mild to significant levels of trauma or behavioral or emotional issues, and this service includes placement of a child in a home with specially-trained foster parents.

21. "Wraparound Facilitation" is a service that facilitates care planning and coordination for children in the target population. The core components of the service are:

   a. Meetings of Child and Family Teams that drive the service delivery process;

   b. Interagency collaboration to develop the supports to help the child succeed in the community; and

   c. Strengths-based planning and facilitation to assist the child and family team to meet the child's needs.

22. "Wraparound Facilitator" is the leader of the Child and Family Team and is responsible for coordinating provision of services for children under this agreement. Wraparound Facilitators have knowledge of in-home and community-based services and experience serving children with Serious Emotional Behavioral Disorders or Disturbances.

### III.   IDENTIFICATION OF TARGET POPULATION AND COMMUNITY-BASED SERVICES

A.   <u>TARGET POPULATION</u>

23. The target population of this agreement shall include all children under the age of 21 who:

    a.  Have a Serious Emotional or Behavioral Disorder or Disturbance that results in a functional impairment, and (i) who are placed in a Residential Mental Health Treatment Facility or (ii) who reasonably may be expected to be placed in a Residential Mental Health Treatment Facility in the near future; and

    b.  Meet the eligibility requirements for mental health services provided or paid for by the Department of Health and Human Resources.

B.   <u>COMMUNITY-BASED SERVICES</u>

24. For every child in the target population for whom community-based services are appropriate and whose family or guardian does not oppose community-based services or in the case of children aged 18 or over, the individual does not oppose community-based services, DHHR shall ensure timely access to In-Home and Community-Based Services sufficient to meet the individual's needs including Wraparound Facilitation, Behavioral Support Services, Children's Mobile Crisis Response, Therapeutic Foster Family Care, and Assertive Community Treatment.  These services will be provided in a manner that enable the child to remain with or return to the family (or foster or kinship care family or an independent living setting, where applicable) whenever possible. DHHR shall ensure statewide access to these programs to prevent crises and promote stability in the family home (or foster or kinship care home, where applicable).

25. These in-home and community-based services offered to the target population are intended to advance the state's compliance with the ADA for the target population and to ensure these services, programs, and activities are provided to the target population in the most integrated setting appropriate to meet their needs.

26. In-home and community-based services will be delivered at times and locations mutually agreed upon by the provider and the child and family (or foster or kinship care

family, where applicable), to assist the child in practicing skill development in the context of daily living.

27. Nothing in this agreement shall override the right of a child in the target population, or his or her guardian for a child under 18, to refuse offered services.

28. DHHR shall ensure the timely provision of mental health services to address any immediate or urgent need for services.  Such services will be provided through consultation with the child and family (or foster or kinship parent, where applicable) and include needed in-home and community-based services and linkage to other service providers.

29. Children's Mobile Crisis Response shall be available to all children, regardless of eligibility, to prevent unnecessary institutionalization of children with serious mental health crises.  Children's Mobile Crisis Response shall provide toll-free crisis hotline services and Crisis Response Teams that are available throughout the state and staffed 24-hours per day, seven days per week.  Callers will be directly connected to a trained mental health professional with experience or competency-based training in working with children in crisis.

30. DHHR shall develop criteria in its implementation plan to guide decisions by crisis hotline staff whether to attempt to resolve the crisis by phone or dispatch a Crisis Response Team.  At a minimum, the implementation plan will contain:

    a. Criteria for how the hotline staff will assist with immediate stabilizations;

    b. Requirements that hotline staff have access to needed information regarding the child and family when the family provides consent (including any existing crisis plans and the Individualized Service Plan);

    c. Guidelines for hotline staff to assess the crisis to determine whether it is appropriate to resolve the crisis through a phone intervention or a face-to-face intervention;

    d. A requirement that each region of the state has sufficient Crisis Response Team(s) to serve the entire region and to respond face-to-face to a call within an average time of one hour; and

    e. Data collection to assess and improve the quality of crisis response, including the timeliness of the crisis response and subsequent intake process, and effectiveness of engaging families in home and community based services following the crisis.

31. DHHR shall ensure that all children who are eligible to receive mental and physical health care and services through DHHR are screened to determine if they should be referred for further mental health evaluation or services. DHHR shall adopt a standardized set of mental health screening tools for use in identifying who may be in the target population. A mental health screen shall be completed for any child not already known to be receiving mental health services when: the child enters DHHR Youth Services, the child welfare system, or the juvenile justice system; or the child or family (or foster or kinship care family, where appropriate) requests mental health services or that a screen be conducted. In addition, DHHR shall conduct outreach and training on the use of the screening tools to physicians who serve children who are Medicaid-eligible. Fifty-two percent of Medicaid-eligible children who are not in the Youth Services, child welfare, or juvenile system systems shall be screened with the mental health screening tool annually.

32. For a child whose screening indicates a need for further evaluation or services, for whom placement in a Residential Mental Health Treatment Facility is recommended or has been made, or who has received mental health crisis intervention, DHHR shall timely provide an intake and assessment process which includes a face-to-face meeting with a community provider, the child, and family (or foster or kinship parent, where applicable), to identify the child's need for in-home and community-based services. It is presumed that all children who reside in a Residential Mental Health Treatment Facility on the Effective Date, or who are placed in a Residential Mental Health Treatment Facility after the Effective Date, need in-home and community-based services.

33. DHHR shall ensure statewide access to Wraparound Facilitation for each child identified as needing in-home and community-based services, per paragraph 32, to allow for meaningful family involvement and timely provision of services. In Wraparound Facilitation, the Child and Family Team shall manage the care of the child, and the Wraparound Facilitator shall lead the Child and Family Team.

34. DHHR shall ensure that each Child and Family Team operates with high fidelity to the National Wraparound Initiative's model.

35. DHHR will use the Child and Adolescent Needs and Strengths (CANS) tool (or similar tool approved by both parties) to assist the Child and Family Team in the development

of Individualized Service Plans for each child who has been identified as needing in-home and community-based services, per paragraph 32. A qualified individual, as further determined by the Parties and defined in the implementation plan, shall conduct an assessment of the child's needs with the CANS. The Wraparound Facilitator shall lead the development of the Individualized Service Plan. For children who are in Residential Mental Health Treatment Facilities, the Individualized Service Plan shall include discharge planning.

36. For any child who has a Multidisciplinary Treatment Team (MDT), DHHR shall provide the child's screening, assessments, and Individualized Service Plans to the MDT.

37. DHHR, in cooperation with the Department of Education and the Department of Military Affairs and Public Safety, shall provide services in the child's family home (or foster or kinship care home, where applicable) and in the community. The services that may be necessary for children in the target population include:

   a. Family support and training services that provide education and training for the child's family (or foster or kinship care, where applicable) about the child's condition and how the family can best support the child in the home and community;

   b. Behavioral Support Services; and

   c. In-home therapy that provides a structured, consistent, strengths-based therapeutic relationship between a licensed clinician, the child, and family (and foster or kinship care family, where applicable) for the purpose of effectively addressing the child's mental and behavioral health needs.

38. DHHR shall expand Therapeutic Foster Family Care statewide. DHHR shall develop Therapeutic Foster Family Homes and provider capacity in all regions and shall ensure that all children who need this service are timely placed in a Therapeutic Foster Family Home with specially trained therapeutic foster parents, in their own community whenever possible.

39. DHHR shall ensure ACT, which DHHR began providing in 2003, is available statewide, and that members of the target population between the ages of 18 to 20 who need ACT receive it timely. ACT teams may substitute for the Child and Family Team under the terms of this agreement. Where the ACT teams substitute for the Child and

Family Teams, the ACT teams shall develop the Individualized Service Plan; and provide or ensure access to needed in-home and community-based services.

40. DHHR shall provide high quality in-home and community-based mental health services that are timely and individualized to the child's needs. DHHR shall ensure that children receive, as needed, all of the in-home and community-based services described in this agreement. DHHR shall ensure that each of these services is available and accessible statewide to children in the target population in the necessary amount, location, and duration. DHHR shall provide families and children with accurate, timely, and accessible information regarding the available in-home and community-based services in their communities.

41. DHHR shall create an implementation plan that describes the actions it will take to ensure that the programs described herein are sustainable, statewide, and available to children in the target population.  Specifically, the plan shall contain the steps DHHR will take to:

    a.  Ensure statewide access to the programs and services in this agreement;

    b.  Evaluate the adequacy of crisis response and address any inadequacies;

    c.  Evaluate the fidelity of child and family teams to the National Wraparound model;

    d.  Address workforce shortages relating to services under this agreement;

    e.  Evaluate the provider capacity needed to address the agreement;

    f.  Develop outreach tools for medical professionals who treat Medicaid-eligible children;

    g.  Develop quality assurance and performance improvement measures; and

    h.  Achieve the reduction in the number of children unnecessarily placed in Residential Mental Health Treatment Facilities described in paragraph 52c..

42. Within 120 days of the Effective Date, DHHR shall provide a draft of its implementation plan to the United States, which shall provide comments within 30 days of receipt.  The State shall timely revise its implementation plan to address comments from the United States, and the Parties shall meet and consult as necessary.  After the State has revised the implementation plan, it shall invite and consider public comment before finalizing the implementation plan.  The state shall make its implementation plan publicly available.  At least annually, the State shall review its implementation plan and submit any revisions to DOJ and to the public for comment before making the revised

plan publically available, following the same process outlined above. The
implementation plan shall outline the necessary steps so that all programs are available
statewide by October 1, 2020.

43. The implementation plan and all supplements and schedules shall become enforceable
provisions of this agreement.

## IV.    TECHNICAL ASSISTANCE AND QUALITY ASSURANCE

44. Semi-annually, a person or entity with subject matter expertise in the design and
delivery of children's mental health services shall provide technical assistance to help
DHHR reach compliance with the agreement, prepare an assessment of the State's
compliance with this agreement, and provide any recommendations to facilitate
compliance. Ex parte contact between the subject matter expert and each Party is
permitted.

45. DHHR will retain the subject matter expert. The parties shall confer and agree on the
subject matter expert as allowable by West Virginia laws and regulations regarding the
purchase of services and contracts. Pursuant to W.Va § 148 C.S.R. 1-4(a), DHHR shall
request an exception to the competitive bid requirements within 10 days of the
Effective Date. If approved, DHHR will execute a contract with the subject matter
expert within 60 days of the approval by the Purchasing Division. If the exception is
not approved, DHHR shall submit a request for proposals utilizing criteria that has been
approved by the United States within 30 days of the decision by the Purchasing
Division. The United States shall serve as an advisor to the Request for Proposals
Evaluation Committee. (*See* West Virginia Purchasing Division, Procedures
Handbook, revised April 11, 2019, Section 6.2.2.10). In the event that the subject
matter expert resigns or the Parties agree to replace the subject matter expert, the
Parties will meet and confer within ten (10) days to agree upon a replacement or to
agree to a request for proposals using the process described above.

46. During an initial meeting within 60 days of the Effective Date and, semi-annually
thereafter, the Parties will meet and confer to discuss the status of compliance. Thirty
days prior to each semi-annual meeting, the subject matter expert will draft and submit
to the Parties a comprehensive report on DHHR's compliance including

recommendations, if any, to facilitate or sustain compliance. The first report will be a baseline report containing the expert's preliminary observations and recommendations. DHHR and the United States will have two weeks to provide comments to each report. The expert will consider these comments and provide a final report a week prior to each meeting. DHHR shall post these reports on its website.

47. The subject matter expert will prepare and submit an annual proposed budget, not to exceed One hundred twenty five Thousand Dollars ($125,000.00) in year one, to DHHR for approval. The United States is committed to assisting the State in identifying potential sources of additional technical assistance on matters associated with this agreement.

48. Within 18 months of the Effective Date, DHHR shall develop a Quality Assurance and Performance Improvement System that facilitates an assessment of service delivery that will provide notification of potential problems warranting further review and response, and enhance DHHR's ability to deploy resources effectively and efficiently. This system will include a data dashboard, which is a compilation of discrete data points that can be used for performance analysis. This system will measure the implementation of this agreement and whether children are being unnecessarily institutionalized. This system will be used to develop and produce semi-annual reports to the United States. Reports shall include:

   a. Analysis across child serving agencies of the quality of mental health services funded by the state, measured by improved positive outcomes, including: remaining with or returning to the family home; and decreased negative outcomes, including: failure of foster home placement, institutionalization, arrest or involvement with law enforcement and the juvenile or criminal courts;

   b. Analysis of the implementation of the agreement across and between all child-serving agencies, including the DHHR's Bureau for Children and Families, the Bureau for Medical Services, and the Bureau for Behavioral Health, the Bureau of Juvenile Services of the Division of Corrections and Rehabilitation of the Department of Military Affairs and Public Safety, and the Department of Education, and any barriers to effective coordination between these agencies and the steps taken to remedy these barriers; and

   c. Analysis of data described in paragraph 49 below.

49. The data to be collected and analyzed to assess the impact of this agreement on children in the target population shall be specified in the implementation plan. At a minimum it shall include data regarding:

   a. All children receiving services under this agreement, including the types and amount of services they are receiving;

   b. All children screened pursuant to paragraph 31, including the dates of screening and the dates of engagement in services;

   c. All children living in a Residential Mental Health Treatment Facility, including admission dates, length of stay, and number of prior placements in Residential Mental Health Treatment Facilities;

   d. The outcomes of children in the target population, including: whether they have been arrested or detained without being charged, have been committed to the custody of the Division of Juvenile Services or the Department of Health and Human Resources, have been suspended or expelled from school, and have been prescribed three or more anti-psychotic medications;

   e. Changes in functional ability of children in the target population, both statewide and by region, including data from the CANS assessment and the quality sampling review process;

   f. The fidelity of Child and Family teams to the National Wraparound Initiative model; and

   g. Data from the Crisis Response Team encounters, including timelines of response and data on connection to services.

50. At least annually, the State shall conduct quality sampling reviews of a statistically valid sample of children in the target population. The State shall use data from the quality sampling reviews to identify strengths and areas for improvement, and shall include the steps taken to improve services in response to the analysis of quality sampling review data in its semi-annual reports to the United States.

51. DHHR shall develop and take remedial actions to address problems identified through its analysis of data.

52. The Parties anticipate that implementation of services described in paragraphs 24 through 40 will be phased in regionally across the state, according to a timeline detailed

in the implementation plan.  DHHR may specify reducing out-of-state placements as a priority in its implementation plan.  DHHR will implement statewide reforms as follows:

a. Implementation of the provisions of this agreement regionally across the state by dates identified in the implementation plan, with initial statewide implementation by October 1, 2020;

b. As in-home and community-based services developed pursuant to this agreement expand to new regions of the state, DHHR will assess the strengths and needs of children in residential placement from those regions, identify services children need to return to those communities, and develop a plan to address any barriers to accessing those in-home and community-based services, including gaps in services;

c. DHHR shall include in the implementation plan a plan for the reduction of the unnecessary use of Residential Mental Health Treatment Facilities for children relative to the number of children living there on June 1, 2015.  The expected goal by December 31, 2022 is a 25% reduction from the number of children living in Residential Mental Health Treatment Facilities as of June 1, 2015.  Based on the assessment described in paragraph 52.b, by June 30, 2020, the parties shall meet and confer to determine expected percentage goals for reduction of children living in Residential Mental Health Treatment Facilities in subsequent years.  DHHR shall include these goals in its implementation plan.  In determining these expected goals, the parties may reference the Adoption and Foster Care Analysis and Reporting System or similar national reporting database agreed upon by the parties.   If the State has not met its interim or final goals for a reduction in the use of Residential Mental Health Treatment Facilities, the State will assess the reasons why it has not met these goals and create an action plan to meet these goals.

d. Any children residing in a Residential Mental Health Treatment Facility on December 31, 2024 must have been assessed by a qualified professional and determined to be in the most integrated setting appropriate to their individual needs.

53. The Parties shall meet semi-annually to discuss the status of implementation of the terms of the agreement.

54. As part of its implementation plan described in paragraph 41 above, the State shall develop a plan for outreach and education of stakeholders in the state of West Virginia

on the importance of the stated reforms prescribed in this agreement. The United States will make a good faith effort to participate in joint education efforts described in the plan.

55. Nothing in this agreement shall preclude DHHR from seeking authority from the Centers for Medicare and Medicaid Services at the United States Department of Health and Human Services for approval of coverage of Medicaid services under a different name than that used in this agreement. In the event that the provisions of this agreement create any barrier to using funding from any federal, state, or private source or violate any state or federal statute, rule or regulation, the Parties agree to meet and confer about a modification to that provision.

56. This agreement shall constitute the entire integrated understanding of the Parties. Any modification of this agreement shall be executed in writing by the Parties.

57. The United States and DHHR shall each bear the cost of its own fees and expenses incurred in connection with this case.

## V.    ENFORCEMENT AND TERMINATION

58. The United States shall provide West Virginia with written notice of any asserted breach, and shall engage in good faith discussions to resolve the dispute before seeking judicial enforcement. For conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this agreement, DHHR shall have seven (7) days from the date of the United States giving notice to cure the asserted breach. For all other conditions or practices, West Virginia shall have up to 60 days from the date of the notice to cure the asserted breach.

59. If the Parties are unable to reach a resolution of any asserted breach, the United States may file a lawsuit for breach of this agreement, or any provision thereof, in the United States District Court for the Southern District of West Virginia. In any action filed under this Paragraph, West Virginia agrees not to contest the exercise of personal jurisdiction over it by this Court and not to raise any challenge on the basis of venue.

60. In the event the United States files a lawsuit for breach of this agreement as contemplated by paragraph 59, above, the United States may seek, and the Court may grant as relief the following: 1) an order mandating specific performance of any term or provision in this agreement; 2) an order entering this agreement as an order of the Court

and enforceable by the Court; and 3) any additional relief that may be authorized by law or equity.

61. Should the United States file a lawsuit for breach of this agreement, West Virginia expressly agrees not to count the time during which this agreement is in place, or use the terms or existence of this agreement to plead, argue or otherwise raise any defenses under theories of claim preclusion, issue preclusion, statute of limitations, estoppel, laches, or similar defenses.

62. The Parties acknowledge that monetary damages will be an inadequate remedy for breach of this agreement and consequently agree that this agreement shall be enforceable by specific performance and the United States shall be entitled to compel and DHHR and the other parties hereto acknowledge and agree with such right to compel specific performance of the obligations of the State of West Virginia under this agreement. The remedy of specific performance shall be cumulative of all the rights and remedies at law or in equity of the Parties under this agreement.

63. The agreement shall terminate on December 31, 2024, if the Parties agree that DHHR has attained substantial compliance with all substantive provisions and maintained that compliance for one year. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.

64. West Virginia may seek early termination regarding development of any home and community-based service described in section III.B. The burden will be on West Virginia to demonstrate that it has attained and maintained its substantial compliance as to that section for at least one year.

65. Regardless of this agreement's specific requirements, this agreement will terminate, or substantive sections as described in paragraph 63 may terminate, upon a showing by the State that it has come into compliance with the requirements of the ADA that gave rise to this agreement and maintained that compliance for one year.

66. This agreement shall constitute the entire integrated agreement of the Parties. Any modification of this agreement shall be executed in writing by the Parties.

67. DHHR, the Department of Education, and the Department of Military Affairs and Public Safety agree that all appropriate agencies, bureaus, or divisions within those Departments shall take all actions necessary to comply with provisions of this

agreement and shall collaborate to coordinate care for members of the target population as indicated.

68. If DHHR fails to obtain necessary appropriations to comply with this agreement, the United States has the right to withdraw its consent to this agreement and revive any claims otherwise barred by operation of this agreement.

69. The Parties agree that, as of the date of entry of this agreement, litigation is not "reasonably foreseeable" concerning the matters described in paragraph 3.  To the extent that either Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in paragraph 3, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves either Party of any other obligations imposed by this agreement.

## VI.  GENERAL PROVISIONS

70. This agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of DHHR to implement the terms of this agreement.

71. DHHR agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation.  DHHR agrees that it shall timely and thoroughly investigate any allegations of retaliation in violation of this agreement and take any necessary corrective actions identified through such investigations.

72. Failure by any Party to enforce this entire agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including its right to enforce other deadlines and provisions of this agreement.

73. The Parties shall promptly notify each other of any court or administrative challenge to this agreement or any portion thereof and shall defend against any challenge to the agreement.

74. The Parties represent and acknowledge that this agreement is the result of extensive, thorough, and good faith negotiations.  The Parties further represent and acknowledge that the terms of this agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in the United States' letter of findings under the ADA dated June 1,

2015. Each Party to this agreement represents and warrants that the person who has signed this agreement on behalf of a Party is duly authorized to enter into this agreement and to bind that Party to the terms and conditions of this agreement.

75. Nothing in this agreement shall be construed as an acknowledgement, an admission, or evidence of liability of DHHR under the Constitution of the United States or federal or state law, and this agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

76. This agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

77. The performance of this agreement shall begin immediately upon the Effective Date.

78. Within one month of the Effective Date of this agreement, DHHR shall identify an employee to serve as a point of contact for the United States.

79. DHHR shall provide to the United States the data collected as part of the requirements of the ACF and as otherwise required under the terms of this agreement. Other than to carry out the express functions as set forth herein, the United States shall maintain the confidentiality of any confidential information to the greatest extent permitted by law.

80. In order to determine compliance with this agreement, and to the extent they are within DHHR's custody or control, the subject matter expert and the United States and its agents shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, data, and materials that are necessary to assess DHHR's compliance and/or implementation efforts with this agreement. The United States shall provide reasonable notice of any visit or inspection. Access shall continue until this agreement is terminated. Access is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information.

81. "Notice" under this memorandum agreement shall be provided by overnight courier to the signatories below or their successors:

FOR THE UNITED STATES:

_____

MICHAEL B. STUART
United States Attorney
Southern District of West Virginia

LISA G. JOHNSTON
First Assistant United States Attorney
FRED B. WESTFALL, JR.
Civil Chief
JENNIFER MANKINS
Assistant United States Attorney
Southern District of West Virginia
300 Virginia Street
Charleston, WV  25301
PHONE: 304-345-2200
fwestfall@usa.doj.gov

Dated: __5/14/2019__

FOR THE UNITED STATES:

WILLIAM J. POWELL
United States Attorney
Northern District of West Virginia

HELEN CAMPBELL ALTMEYER
Civil Chief
Northern District Of West Virginia
1125 Chapline Street Suite 3000
P.O. BOX 591
Wheeling WV 26003
PHONE: 304-234-0100
helen.altmeyer@usdoj.gov

Dated: May 14, 2019

FOR THE UNITED STATES:


_Eric Dreiband_

ERIC DREIBAND
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

MARY R. BOHAN
Deputy Chief, Special Litigation Section


_Haley Van Erem_

HALEY VAN EREM
RYAN C. WILSON
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
PHONE: 202-514-0579
haley.vanerem@usdoj.gov


Dated:  5/14/2019

FOR WEST VIRGINIA

GOVERNOR:

JIM JUSTICE
State of West Virginia
Office of the Governor
1900 Kanawha Boulevard East
Building 1
Charleston, West Virginia 25305
PHONE: 304-558-2000

Dated:   5/14/2019

FOR WEST VIRGINIA

DEPARTMENT OF HEALTH AND HUMAN RESOURCES:

BILL J. CROUCH
CABINET SECRETARY
One Davis Square, Suite 100E
Charleston, West Virginia 25301
PHONE: 304-558-0684
Bill.J.Crouch@wv.gov

Dated:     5/14/19

FOR WEST VIRGINIA

DEPARTMENT OF MILITARY AFFAIRS AND PUBLIC SAFETY:

_____
JEFF S. SANDY
CABINET SECRETARY
1900 Kanawha Boulevard East
Building 1, Room 400 W
Charleston, West Virginia 25305
PHONE: 304-558-2930
Jeff.Sandy@wv.gov
                5/13/19

Dated: _____

FOR WEST VIRGINIA

DEPARTMENT OF EDUCATION:

STEVEN L. PAINE
STATE SUPERINTENDENT OF SCHOOLS
1900 Kanawha Boulevard East
Building 6, Room 358
Charleston, West Virginia 25305
PHONE: 304-558-2681

Dated: 5/9/19