# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

JONATHAN R., *et al.*,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
*Plaintiffs*,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Case No. 3:19-cv-00710
JIM JUSTICE, in his official capacity as　)
Governor of West Virginia, *et al.*,　　　)
　　　　　　　　　　　　　　　　　　)
*Defendants*.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

---

Steve R. Compton (St. Bar # 6562)
Deputy Attorney General
West Virginia Attorney General's Office
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

Doug P. Buffington, II (St. Bar # 8157)
Sr. Deputy Attorney General
West Virginia Attorney General's Office
State Capitol Complex
Bldg. 1, Room E-26
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

Philip J. Peisch (pro hac vice)
Caroline M. Brown (pro hac vice)
Rebecca E. Smith (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258

*Attorneys for Defendants Jim Justice, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION .......................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 4

ARGUMENT ................................................................................................................ 4

I.    THE COURT DOES NOT HAVE, OR SHOULD NOT EXERCISE,
      JURISDICTION OVER CHILD WELFARE DECISIONS OF WEST VIRGINIA
      STATE COURTS. ................................................................................................ 4

      A.    West Virginia's Circuit Courts Have Exclusive and Ongoing Jurisdiction
            Over Child Welfare Proceedings. ............................................................ 5

      B.    The *Rooker-Feldman* Doctrine Bars Federal Court Review of State Court
            Decisions. ................................................................................................. 7

      C.    The *Younger* Doctrine Likewise Requires Abstention from Interference in
            Ongoing State Court Proceedings. ......................................................... 10

II.   EVEN IF THE COURT DOES EXERCISE JURISDICTION, THE
      COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A
      CLAIM FOR WHICH RELIEF CAN BE GRANTED. ................................... 14

      A.    The Substantive Due Process Claims (Count I) Fail as a Matter of Law. .............. 14

      B.    The Constitutional "Familial Association" Claims (Count II) Fail as a
            Matter of Law. ........................................................................................ 20

      C.    The Child Welfare Act Claims (Count III) Fail as a Matter of Law ...................... 21

            1.    The Cited Provisions Do Not Meet the *Blessing/Gonzaga* Standard. ........ 23

            2.    The Court Is Not Bound by the Fourth Circuit's 1988 *L.J. II*
                  Decision. ...................................................................................... 27

            3.    Many Children in the Putative Class Are Not the Intended
                  Beneficiaries of the Cited Provisions. ........................................... 29

      D.    The ADA and Rehabilitation Act Claims (Counts IV and V) Fail as a Matter
            of Law. .................................................................................................... 31

            1.    Plaintiffs' Allegations Do Not Constitute a Claim of Discrimination
                  Remediable Under the ADA. ......................................................... 31

            2.    Even If the ADA Requires the State to Develop Community Services
                  and Placements, the State has a Robust Plan to Do So. ................ 34

CONCLUSION .......................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) ........................................... 10, 25, 27

*Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982) ............................................................. 4

*Alexander v. Choate*, 469 U.S. 287 (1985) .................................................................. 32

*Allstate Insurance Co. v. West Virginia State Bar,* 233 F.3d 813 (4th Cir. 2000) ....................... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 4

*B.H. v. Johnson,* 715 F. Supp. 1387 (N.D. Ill. 1989) ...................................................... 18

*Baby Neal v. Casey,* 821 F. Supp. 320 (E.D. Pa. 1993) ..................................................... 18

*Barricelli v. City of New York*, 2016 WL 4750178 (S.D.N.Y. 2016) ..................................... 25, 26

*Bell Atlantic Corp. v. Twombley,* 550 U.S. 544 (2007) ..................................................... 19

*Berry v. South Carolina Dept. of Soc. Servs.*, 121 F.3d 697 (table), 1997 WL 499950 (4th

    Cir. 1997) (unpublished) ............................................................................ 8, 10, 11

*Blessing v. Freestone*, 520 U.S. 329 (1997) ............................................................ 23, 24, 27

*Brian A. v. Sundquist*, 149 F. Supp.2d 941 (M.D. Tenn. 2000) .............................................. 26

*Brinkley v. Hill,* 981 F. Supp. 423 (S.D. W. Va. 1997) .................................................... 27

*Carson P. ex rel. Foreman v. Heinman*, 240 F.R.D. 456 (D. Neb. 2007) ..................................... 25

*Charlie H. v. Whitman*, 83 F. Supp. 2d 476 (D.N.J. 2000) .......................................... 18, 21, 25

*City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113 (2005) .............................................. 23

*Clark K. v. Guinn*, 2007 WL 1435428 (D. Nev. 2007) (unpublished) ......................................... 17

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ..................................................... 15, 19

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ................................................... 16

*Condon v. Haley*, 21 F. Supp. 3d 572 (D.S.C. 2014) ....................................................... 29

*Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45 (1st Cir. 2014) ................................................. 14

*Connor B. v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011) ....................................................... 26

*Czura v. Supreme Court of South Carolina*, 813 F.2d 644 (4th Cir. 1987) ................................... 8

*D.G. ex rel. Stricklin v. Henry,* 594 F. Supp. 2d 1273 (2009) ..................................................... 25

*Daniel H. ex rel. Hardaway H. v. City of New York*, 115 F. Supp. 2d 423 (S.D.N.Y. 2000) ....... 25

*Del A. v. Roemer*, 777 F. Supp. 1297 (E.D. La. 1991) ................................................................. 27

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189 (1989) ....................... 15, 16, 20

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) ................................. 7, 8

*Doe v. South Carolina Dep't of Health & Human Services,* 597 F.3d 163 (4th Cir. 2010) ... 15, 19

*Duby v. Moran*, 901 F.Supp. 215 (S.D. W.Va. 1995) (unpublished) ............................................ 7

*Eric L. By and Through Schierberl v. Bird*, 848 F. Supp. 303 (D.N.H. 1994) ........................... 18

*Gonzaga v. Doe,* 536 U.S. 273 (2002) ................................................................................... 23, 27

*Goodpaster v. City of Indianapolis*, 736 1060 (7th Cir. 2013) .................................................. 20

*Guess v. Bd. of Med. Examiners of State of N.C.*, 967 F.2d 998 (4th Cir. 1992) .......................... 8

*Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2011) ........................... 31

*Hardway for Hardway v. Lemmon*, 2006 WL 8438638 (S.D. W. Va. 2006) (unpublished) ........ 21

*Harper v. Pub. Serv. Comm'n of WV*, 396 F.3d 348 (4th Cir. 2005) ........................................... 12

*Henry A. v. Willden,* 2010 WL 4362809 (D. Nev. 2010) ........................................................... 25

*Henry A. v. Willden,* 678 F.3d 991 (9th Cir. 2012) .................................................................... 25

*In Interest of Renae Ebony W.*, 452 S.E.2d 737 (W. Va. 1994) ................................................. 13

*In re Elizabeth F.*, 696 S.E.2d 296 (W. Va. 2010) .................................................................... 13

*In re K.L.*, 826 S.E.2d 671 (W. Va. 2019) ................................................................................. 13

*In re S.W.*, 779 S.E.2d 577 (W. Va. 2015) ............................................................................... 13

*In re T.M. and S.M.*, No. 19-0068, 2019 WL 5875222 (W. Va. 2019) .......................................... 10

*J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999) ................................................. 10, 12

*Jensen v. Conrad,* 747 F.2d 185 (4th Cir. 1984)......................................................................... 20

*John B. v. Goetz*, 626 F.3d 356 (6th Cir. 2010) .......................................................................... 26

*Johnson v. Texas Bd. of Criminal Justice*, 281 Fed. App'x 319 (5th Cir. 2008)
(unpublished) .......................................................................................................................... 20

*Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253 (10th Cir. 2002) ........................................... 11

*K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990) ................................................ 17

*Kenny A. v. Purdue*, 218 F.R.D. 277 (N.D. Ga. 2003) ................................................................ 26

*Kugler v. Helfant*, 421 U.S. 117 (1975)...................................................................................... 14

*L.J. by and through Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988)......................................... 28

*L.J. v. Wilbon*, 633 F.3d 297 (4th Cir. 2011) .............................................................................. 28

*M.B. by Eggemeyer v. Corsi*, 2018 WL 327767 (W.D. Mo. 2018) .............................................. 25

*M.D. by Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018) ..................................................... 19

*M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013)............................................................................ 21

*Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) ........................................ 21

*Mark G. v. Sabol*, 717 N.E.2d 1067 (N.Y. 1999) ....................................................................... 18

*Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir. 1995) ........................................................ 16

*Martin v. Taft,* 222 F. Supp. 2d 940 (S.D. Ohio 2002)............................................................... 34

*Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017)...................................................................... 4

*Matter of Scottie D.*, 406 S.E.2d 214 (W. Va. 1991) .................................................................. 13

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) ............. 10, 12, 13

*Milburn v. Anne Arundel Cnty. Dep't of Soc. Services*, 871 F.3d 474 (4th Cir. 1989)................ 15

iv

*Moore v. City of Asheville, N.C.*, 396 F.3d 386 (4th Cir. 2005) .................................................. 13

*Moore v. Sims*, 442 U.S. 415 (1979)................................................................................. 4, 12

*Morgan v. Logan Cty. Comm'n*, 2019 WL 1748534 (S.D. W. Va. 2019) (unpublished)............ 21

*Norfolk S. Ry. Co. v. McGraw*, 71 F. App'x 967 (4th Cir. 2003) ............................................... 13

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .......................................................................... 10, 11

*Occean v. Kearney*, 123 F. Supp. 2d 618 (S.D. Fla. 2000).......................................................... 26

*Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543 (S.D. Miss. 2004)........................... 25

*Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999).............................................. 32, 33, 34, 37

*Papasan v. Allain,* 478 U.S 265 (1986) ..................................................................................... 19

*Patten v. Nichols*, 274 F.3d 829 (4th Cir. 2001) ....................................................................... 15

*Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89 (1984).................................... 20, 23

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).......................................................................... 13

*Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176 (4th Cir. 2009)......................................... 2

*Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995) ....................................................................... 15

*Planned Parenthood South Atlantic v. Baker*, No. 18-2133, 2019 WL 5555641 (4th Cir.

   2019) (unpublished) ......................................................................................................... 23, 28

*Reno v. Flores*, 507 U.S. 292 (1993) ......................................................................................... 17

*Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765 (4th Cir. 1991) .................. 4

*Rios v. City of Del Rio, Tex.*, 444 F.3d 417 (5th Cir. 2006)........................................................ 15

*Robinson v. Thomas*, 855 F.3d 278 (4th Cir. 2017)................................................................... 14

*Rodriguez v. City of New York,* 197 F.3d 611 (2d Cir. 1999)...................................................... 32

*Rooker v. Fidelity Trust Co.,* 263 U.S. 412 (1923)....................................................................... 7

*Sam M. v. Chafee,* 800 F. Supp. 2d 363 (D.R.I. 2011) ............................................................... 26

*Santosky v. Kramer*, 455 U.S. 745 (1982) .............................................................................. 12

*Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146 (10th Cir. 2006) ............................................ 16

*State ex rel. Aaron M. v. W. Virginia Dep't of Health & Human Resources*, 212 W. Va. 323 (2001) ............................................................................................................................... 9

*Stewart v. Logan Ct.y Dept. of Health & Human Servs.*, 2013 WL 3821282 (S.D. W.Va. 2013) (unpublished) ......................................................................................................... 7

*Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986) ...................................................... 20

*Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*, 521 Fed. App'x 278 (4th Cir. 2013) (unpublished) ....................................................................................................................... 7

*Strickland v. U.S.*, 423 F.3d 1335 (Fed. Cir. 2005) .................................................................... 29

*Sucampo Pharm., Inc. v. Astellas Pharma, Inc.,* 471 F.3d 544 (4th Cir. 2006) ........................... 4

*Suggs v. Brannon*, 804 F.2d 274 (4th Cir. 1986) ....................................................................... 11

*Suter v. Artist M.,* 503 U.S. 347 (1992) .................................................................. 22, 24, 27, 28

*T.F. by Keller v. Hennepin County,* 2018 WL 940621 (D. Minn. 2018) ..................................... 25

*Tacza v. Martin*, 2019 WL 3928658 (S.D. W.Va. 2019) (unpublished) .................................. 7, 8

*TWFS, Inc. v. Franchot,* 572 F.3d 186 (4th Cir. 2009) ............................................................... 29

*U.S. v. Cobbs*, 274 F. Supp. 3d 390 (S.D. W. Va. 2017) ........................................................... 29

*United States v. Florida,* 938 F.3d 1221 (11th Cir. 2019) ......................................................... 37

*Weller v. Dep't of Soc. Servs. for Baltimore,* 901 F.2d 387 (4th Cir. 1990) .............................. 20

*White ex rel. White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997) .................................. 15, 25, 28

*Whitley v. New Mexico Children, Youth & Families Dept.,* 184 F. Supp. 2d 1146 (2001) .......... 25

*Youngberg v. Romeo,* 457 U.S. 307 (1982) ............................................................................... 18

*Younger v. Harris,* 401 U.S. 37 (1971) ...................................................................................... 10

**Statutes**

42 U.S.C. § 671 ................................................................................. 22, 30

42 U.S.C. § 672 ................................................................................. 22, 30

42 U.S.C. § 675 ................................................................................. 22, 26

42 U.S.C. § 1320a-2 ................................................................................ 24

42 U.S.C. § 12132 ................................................................................... 31

W. Va. Code § 9-5-27 ............................................................................... 1

W. Va. Code § 49-2-107 ............................................................................ 1

W. Va. Code § 49-4-110 ............................................................................ 6

W. Va. Code § 49-4-303 ............................................................................ 5

W. Va. Code § 49-4-405 ......................................................................... 5, 6

W. Va. Code § 49-4-406 ......................................................................... 6, 7

W. Va. Code § 49-4-601 ........................................................................ 5, 13

W. Va. Code § 49-4-602 ..................................................................... 5, 9, 13

W. Va. Code § 49-4-608 ...................................................................... 33, 35

W. Va. Code § 49-4-701, *et seq.* .............................................................. 7

W.Va. Const. Art. 8. § 6 ....................................................................... 13

**Federal Rules**

28 C.F.R. § 35.130 ................................................................................. 32

28 C.F.R. § 35.172 ................................................................................. 37

45 C.F.R. § 1355.33 ................................................................................. 2

## INTRODUCTION

Caring for children in foster care is one of the State of West Virginia's most important, solemn responsibilities.  The State's child welfare system is the last hope for children who have been physically abused, sexually abused, or neglected and left to fend for themselves, or all of the above.  And it is undisputed that the opioid crisis has made the State's task considerably harder: the number of children in foster care in West Virginia has increased by a staggering 80 percent, from approximately 4,000 in 2010 to 6,633 in 2017.[1]

The Defendants have met these challenges head-on, with transparency, determination, and innovation.  For example, in 2015, the State implemented the *Safe at Home West Virginia* demonstration to provide intensive behavioral health services to adolescent children at risk of residential treatment to keep them in their homes and communities.  Earlier this year, the legislature enacted H.B. 2010, which creates a comprehensive managed care program specifically designed to improve the availability and coordination of community health services and social services for foster children; establishes a Foster Care Ombudsman to advocate for foster children and foster parents, investigate complaints, and monitor compliance with state and federal law and policies, among other things; and mandates the creation of new minimum standards for certifying foster homes.  *See* W. Va. Code § 9-5-27; W. Va. Code § 49-2-107.  In addition, as noted in the Complaint, the State recently signed a Memorandum of Understanding ("MOU") with the U.S. Department of Justice ("DOJ") in which the State commits to significantly expand community

---

[1] *See* Annie E. Casey Foundation, *Children in Foster Care in West Virginia*, Kids Count Data Center (table) https://datacenter.kidscount.org/data/tables/6243-children-in-foster-care#detailed/2/50/false/871,870,573,869,36,868,867,133,38,35/any/12987 (updated Oct. 2019).

mental health services for children with serious mental health or behavioral disorders, many of whom end up in the State's custody.

Many of the State's efforts are reflected in the most recent Child and Family Service Plan that the State has submitted to the Children's Bureau within the U.S. Department of Health and Human Services, which closely supervises state child welfare programs receiving federal funds.[2] The State and the Children's Bureau are also in the process of finalizing West Virginia's "Performance Improvement Plan" arising out of its most recent Child and Family Services Review, which is a periodic review undertaken by state and federal officials, working together, to rigorously evaluate the strengths and need for improvement in every state's child welfare program, 45 C.F.R. § 1355.33(b)(1).

Prior to initiating this litigation, Plaintiffs' counsel never once contacted Department of Health and Human Resources ("DHHR") leadership to learn about the State's efforts to improve the child welfare system or to discuss their apparent concerns with that system. Instead, Plaintiffs' counsel filed a Complaint to seize control of the foster care program from state officials and hand it over to a court-appointed monitor. This Complaint follows the template of the two other complaints Plaintiffs' counsel has filed in the last eight months against two other States: heart-rending allegations regarding individual children; system-wide allegations based on frank public assessments by state officials that are then used against them; cookie-cutter causes of action that bear little or no relationship to the facts alleged; and virtually identical prayers for relief, all of

---

[2] A copy of the Child and Family Service Plan is publicly available at: https://dhhr.wv.gov/bcf/Reports/Documents/West%20Virginia%20Child%20and%20Family%20Service%20Plan%20%28CFSP%29%202019-2024.pdf. "In reviewing a Rule 12(b)(6) dismissal, [the court] may properly take judicial notice of matters of public record." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). For the convenience of the Court, this public document is reproduced in the Appendix.

which call for appointing a third-party monitor to oversee the program. *See* Complaint, *Wyatt B. v. Brown*, No. 19-cv-00556 (D. Or. Apr. 16, 2019); Complaint, *Ashley W. v. Holcomb*, 19-cv-00129 (S.D. Ind. June 25, 2019).

In West Virginia's case, some of the allegations in the Complaint are wrong, some display a lack of familiarity with West Virginia's child welfare system, and some are true but wholly devoid of context. But Defendants do not believe this Court will need to sort out which is which, because Plaintiffs' claims do not belong in federal district court. First, principles of federalism and comity mandate that this Court abstain from ongoing oversight of child welfare decisions over which the state courts have exclusive and continuous jurisdiction. Second, the federal laws upon which Plaintiffs premise their claims do not provide a basis for the relief that they are seeking.

Dismissing the Complaint does not mean the Plaintiffs are without a remedy. Each of the named Plaintiffs (like all children in foster care) has an ongoing matter in state circuit court, in which the child's placement, service plan, and permanency plan are reviewed every 90 days by a circuit court judge. Every child in foster care in West Virginia also has an attorney acting as a Guardian ad Litem who is obligated to represent the child's best interests before the court.

Administration of the child welfare program in West Virginia is challenging, complex, and dynamic, requiring DHHR to work closely not only with state legislators and state judges, but also with its federal counterparts at the Children's Bureau and now with DOJ. All of these state and federal officials are already working together to achieve the system-wide improvements that Plaintiffs now ask this Court to order, oversee, and monitor. The Court does not have jurisdiction to do so, nor do Plaintiffs make a legally cognizable claim for the relief they seek. The Complaint should be dismissed.

# STANDARD OF REVIEW

When a Rule 12 motion is based on more than one ground, the court should consider the 12(b)(1) challenge first because, if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot. *See Sucampo Pharm., Inc. v. Astellas Pharma, Inc.,* 471 F.3d 544, 548 (4th Cir. 2006). Under Rule 12(b)(1), the party asserting federal jurisdiction has the burden of proving subject matter jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Under Rule 12(b)(6), the court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

# ARGUMENT

## I. THE COURT DOES NOT HAVE, OR SHOULD NOT EXERCISE, JURISDICTION OVER CHILD WELFARE DECISIONS OF WEST VIRGINIA STATE COURTS.

The complaint should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). Plaintiffs' claims and requested relief seek federal court review and ongoing oversight of West Virginia's courts. The issues raised are ones that could be, should be, and in some cases have been raised in state court. As the U.S. Supreme Court has explained, under principles of comity and federalism, federal courts should not "conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation." *See Moore v. Sims*, 442 U.S. 415, 435 (1979).

### A. West Virginia's Circuit Courts Have Exclusive and Ongoing Jurisdiction Over Child Welfare Proceedings.

In West Virginia, the circuit courts exercise continuous oversight over every foster child's interests throughout the duration of their time in the custody of DHHR. This jurisdiction extends to children removed from their families due to abuse or neglect, youths who have committed status offenses, and youths who have been adjudicated as delinquent.

For abuse and neglect cases, circuit court jurisdiction begins the moment a petition is filed to remove a child from the home. W. Va. Code § 49-4-303.[3] Once such a petition is filed, "the court may order that the child" be removed only if it finds that the child is in "imminent danger" with "no reasonably available alternatives," and that "continuation in the home is contrary to the best interests of the child." *Id.* § 49-4-602. The court must also determine whether DHHR "made reasonable efforts to preserve the family" or whether an "emergency situation made those efforts unreasonable or impossible." *Id.* § 49-4-602(a).

After the petition is filed, the circuit court appoints counsel for the child to serve as a Guardian ad Litem; a court-appointed special advocate representative for the child (if available in that county); and additional counsel for any parent, guardian, or custodian named in the petition. W. Va. Code § 49-4-601; West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings (hereinafter "WV Rule"), WV Rule 52. In addition, a multi-disciplinary treatment team – which includes case managers, parents, foster parents, attorneys, counsel, the child, and anyone else "who may assist in providing recommendations for" the child's needs – is assigned to the child's case and must be convened within 30 days of removal. W. Va. Code § 49-4-405; WV

---

[3] This section sets forth a truncated description of West Virginia court process. A fuller description is detailed in the West Virginia "Judicial Benchbook," which is a public document available at http://www.courtswv.gov/public-resources/2017-AandN-Benchbook.pdf. For the convenience of the Court, this public document is reproduced in the Appendix.

Rule 51(a).  The multi-disciplinary treatment team is required to meet at least quarterly, during the duration of the time the child is in the custody of DHHR, "to assess, plan and implement a comprehensive, individualized service plan," and "advise the court" through "written reports" as to the "types of services" and "type of placement" "which will best serve" the child's needs.  § 49-4-405.

If a multi-disciplinary treatment team determines that an out-of-home placement will best serve the needs of the child, the team must first consider placement with appropriate relatives, also called a "kinship" placement.  If the team determines there is no appropriate kinship placement, then it will consider foster care homes, facilities, or programs located within the State.  § 49-4-406.  The team may only recommend placement in an out-of-state facility if it concludes, after considering the best interests and overall needs of the child, that there is no available and suitable in-state placement.  *Id.*

The multi-disciplinary treatment team's placement determination is effectively only a recommendation to the circuit court, which must approve all placements as in the best interests of the child and may order "modification" of a case plan "by reason of [its] findings."  WV Rule 35(b)(1).  In addition, the circuit court's role does not end after it approves of the initial placement and plan.  At least every 90 days, for the duration of the child's time in DHHR custody, the circuit court must hold a hearing or otherwise review, and issue an order regarding, "the safety of the child," "the continuing necessity for and appropriateness of the placement," "compliance with the case plan," and the "progress . . . toward alleviating or mitigating the causes necessitating placement in foster care," and "a likely date" for permanent placement.  § 49-4-110(a).  "The court retains exclusive jurisdiction over placement of the child . . . as well as over any subsequent requests for modification."  WV Rule 6; WV Rule 36(e); § 49-4-606.

Similar processes for court oversight of placement and treatment exist for children adjudicated to the custody of DHHR and placed into foster care on the basis of status or juvenile offenses. W. Va. Code § 49-4-701, *et seq.*

## B. The *Rooker-Feldman* Doctrine Bars Federal Court Review of State Court Decisions.

Under *Rooker v. Fidelity Trust Co.,* 263 U.S. 412 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), a federal district court cannot directly review a state court decision or entertain a claim that is "inextricably intertwined" with a state court decision, unless Congress has specifically authorized it. *Feldman,* 460 U.S. at 483-84 n. 16.

As this Court and others have repeatedly held, the *Rooker-Feldman* limitation on federal court jurisdiction applies to review of state court child welfare decisions. Those decisions present issues of a "highly sensitive" and "delicate" nature that "[w]ithout question . . . are first and foremost the concerns of state courts." *Stewart v. Logan Cty. Dep't. of Health & Human Servs.*, 2013 WL 3821282, at *2 (S.D. W.Va. 2013) (unpublished); *see also Stratton v. Mecklenburg Cty. Dep't. of Soc. Servs.*, 521 Fed. App'x 278, 288–89 (4th Cir. 2013) (unpublished); *Tacza v. Martin*, 2019 WL 3928658, at *3 (S.D. W.Va. 2019) (unpublished); *Duby v. Moran*, 901 F.Supp. 215, 216-217 (S.D. W.Va. 1995).

The gravamen of Plaintiffs' Complaint is that West Virginia foster children are in inappropriate placements (*e.g.*, residential treatment instead of family homes; foster family homes instead of kinship placements; kinship that do not meet all certification standards). But placement decisions are ultimately state court decisions, not the decision of DHHR or any of the Defendants. *See* § 49-4-606; Rule 6; Rule 36(e) ("The circuit court . . . has exclusive jurisdiction over placement of the child."). In *Tacza*, this Court recently dismissed a plaintiff's suit challenging her granddaughter's placement with a foster family, concluding that the alleged injuries "derive[] not

from the actions of Defendants but from the state court's order." 2019 WL 3928658, at *2. ("[T]he ultimate injury Plaintiff alleges – that her granddaughter was placed with a foster family instead of with her – is the result of the state court's order," and "the state court – not Defendants – ultimately found that it was appropriate to separate siblings."). *Id.* That is also true in this case: the placements about which the Plaintiffs complain "derive not from the actions of the Defendants but from the state court's order[s]."

The *Rooker-Feldman* analysis does not change simply because there are several plaintiffs in this case instead of one, or because the relief sought is system-wide. As the Fourth Circuit has held, "review of a state court decision . . . cast . . . in general constitutional terms" must still be dismissed under *Rooker-Feldman,* because the plaintiff's broader challenges to the state's practices are "inextricably intertwined with the specific adjudications already made by the state court" in a specific case. *Berry v. South Carolina Dept. of Soc. Servs.*, 121 F.3d 697 (table), 1997 WL 499950, at *2 (4th Cir. 1997) (unpublished); *see also Feldman*, 460 U.S. at 486–87; *Guess v. Bd. of Med. Examiners of State of N.C.*, 967 F.2d 998, 1002-04 (4th Cir. 1992); *Czura v. Supreme Court of South Carolina*, 813 F.2d 644, 646 (4th Cir. 1987).

There is no question here that Plaintiffs seek federal court oversight of circuit court placement decisions. For example, the Plaintiffs seek a court order requiring an "outside entity" to "determine the full range and number of appropriate foster care placements"; requiring that "outside entity" to monitor that "all children . . . are placed in a safe home or facility"; and requiring "all children with physical, mental, intellectual, or cognitive disability . . . receive foster care services in the most integrated setting appropriate." Compl. ¶ 405. The result would be the same as that presented in *Tacza*, only writ large: federal court review of existing and future state

court child placement decisions for the named plaintiffs and, if a class is certified, for all West Virginia foster children.

Further, even the relief the Plaintiffs seek apart from court oversight of child placement involves decisions over which the state circuit court has jurisdiction and issues orders. The multi-disciplinary treatment teams are convened under the authority of the court; the child's service and permanency plans are provided to and approved by the court; and the court must determine, among other things, the child or family's need for services or treatment, and issue any necessary orders for examinations and evaluations. *See* W. Va. Code § 49-4-602(a)(1)(B), § 49-4-602(b)(1), (b)(5); *State ex rel. Aaron M. v. W. Virginia Dep't of Health & Human Resources*, 212 W. Va. 323, 324 (2001) (reviewing court's order of "medical care, treatment, and services"); Judicial Benchbook, Ch. 2, pp. 7, 14 (disposition hearing and case plan checklist; permanency hearing and permanency plan checklist). Yet, under the requested relief, the Plaintiffs are asking this Court – through an outside monitor – to also review all of those plans and resulting court orders to determine if each child had an "an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs." *See* Comp. ¶ 405(a)(iii).

Even Plaintiffs' claims for relief that are not directly related to the placement, plans, and services of individual children – for example, the request that this Court order DHHR to "hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers" – interfere with the decisions of the West Virginia state courts. These courts of general jurisdiction are able to hear, and in some cases have heard, challenges to DHHR's staffing at CPS and its training of CPS workers.

## C. The *Younger* Doctrine Likewise Requires Abstention from Interference in Ongoing State Court Proceedings.

To the extent Plaintiffs contend that *Rooker-Feldman* does not apply because they are not asking this Court to review *existing* state court decisions, but rather seek oversight only of *future* placement decisions, the line of cases beginning with *Younger v. Harris,* 401 U.S. 37 (1971), also requires abstention.

Stemming from principles of "comity and federalism," and "from a recognition that state courts are as capable as federal courts of deciding federal and constitutional issues," the *Younger* doctrine requires a federal court to abstain from exercising jurisdiction when the relief sought would: (1) enjoin or interfere with a state proceeding; (2) that "implicate[s] important state interests" and (3) "offer[s] an adequate opportunity for presentation of the federal and constitutional claims." *Berry*, 1997 WL 499950, at *3; *see Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *O'Shea v. Littleton*, 414 U.S. 488 (1974); *31 Foster Children v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999).

This case satisfies each of the three requirements under *Younger*.

First, Plaintiffs seek relief that would enjoin and interfere with West Virginia circuit court's ongoing state child welfare proceedings. *See* Section I.A., *supra* (describing circuit court's continuous oversight of child welfare proceedings); *In re T.M. and S.M.*, No. 19-0068, 2019 WL 5875222, at *6 (W. Va. 2019) ("[T]he circuit court retains jurisdiction to oversee the custodial placement of children subject to abuse and neglect proceedings . . . as well as any future custody, visitation, or support proceedings"). Federal courts have repeatedly held that state child welfare proceedings are "ongoing state proceedings" for purposes of *Younger*. *See 31 Foster Children*, 329 F.3d at 1277; *J.B. ex rel. Hart*, 186 F.3d at 1291 (holding that "the continuing jurisdiction of

the [juvenile] court to modify a child's disposition . . . coupled with the mandatory six-month periodic review hearings . . . constitutes an ongoing state judicial proceeding"); *Berry*, 1997 WL 499950, at *4 (holding that since "the Family Courts retain jurisdiction over the … children" in "the child custody and welfare proceedings," "were the [federal] court to grant the injunctive relief requested by [Plaintiff] it would plainly be violating the doctrine of [*Younger*] abstention").

In *O'Shea,* class plaintiffs sought to enjoin allegedly discriminatory practices by state courts in setting bond, sentencing, and imposing jury fees "that might take place in the course of future state criminal trials."  414 U.S. at 500.  The defendant objected under *Younger* "to unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts," *id.*, and the Supreme Court agreed, holding that such an injunction "'would require for its enforcement the continuous supervision by the federal court over the conduct' of the state judicial officers." *Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir. 1986) (quoting *O'Shea*, 414 U.S. at 501).  In other words, "*Younger* governs whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly." *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002).

Such "unwarranted anticipatory interference" is precisely Plaintiffs' objective here. *O'Shea*, 404 U.S. at 500.  Plaintiffs seek a federal court order handing supervision of what has long been handled in West Virginia circuit court proceedings to this Court and an outside "monitor" tasked with overseeing placement and treatment decisions.  Under this relief, all circuit court orders – relating to the placement of a child, the provision of treatment and services, or planning for the child's permanency – would be subject to review by the monitor, and the circuit court's decision about what is in the best interest of the child could very well conflict (and

presumably will conflict in many instances) with the views of that monitor. As in *O'Shea,* this enforcement would require nothing less than "an ongoing federal audit of state [child welfare] proceedings which would indirectly accomplish the kind of interference that *Younger* . . . sought to prevent." *Id.* As the Supreme Court has stated regarding a state's child welfare system:

> The breadth of a challenge to a complex state statutory scheme has traditionally militated in *favor* of abstention, not *against* it . . . reflect[ing] the same sensitivity to the primacy of the State in the interpretation of its own laws and the cost to our federal system of government inherent in federal-court interpretation and subsequent invalidation of parts of an integrated statutory framework.

*Moore*, 442 U.S. at 427.

Second, the interference with the state circuit court proceedings pursued by Plaintiffs "implicate[s] important state interests." *Middlesex*, 457 U.S. at 432; *Moore*, 442 U.S. at 416, 423; *J.B. ex rel. Hart*, 186 F.3d at 1291. The relief requested by Plaintiffs is particularly inconsistent with *Younger's* principles of comity and federalism given the State's historic and compelling interest in ensuring proper care of its own children, including those most vulnerable. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("State has an urgent interest in the welfare of the child . . . the State's goal is to provide the child with a permanent home."); *Moore*, 442 U.S. at 435 ("Family relations are a traditional area of state concern."); *Harper v. Pub. Serv. Comm'n of WV*, 396 F.3d 348, 354 (4th Cir. 2005) ("Interests like … family law… lie at the heart of state sovereignty, and a failure to abstain in the face of ongoing state proceedings would disrespect the allocation of authority laid in place by the Framers.").

Third, state circuit court proceedings "afford an adequate opportunity to raise the constitutional claims" and the federal statutory claims. *Middlesex*, 457 U.S. at 432; *see Moore*, 442 U.S. at 416, 430; *J.B. ex rel. Hart*, 186 F.3d at 1291. "Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the [federal or]

12

constitutional claims." *Middlesex*, 457 U.S. at 424. That is not the case in West Virginia, as the circuit courts are courts of general jurisdiction competent to hear questions of federal and constitutional law. *See* W.Va. Const. Art. 8. § 6; *Allstate Insurance Co. v. West Virginia State Bar,* 233 F.3d 813, 815 n.1 (4th Cir. 2000) ("A West Virginia circuit court is a court of general jurisdiction."). Furthermore, at every stage of a child welfare proceeding, the child is represented by a court-appointed attorney (referred to as a "Guardian ad Litem" or "GAL") who "thoroughly understand[s] and investigate[s] the case."[4] This includes "formulat[ing] meaningful arguments and written recommendations to the court" and "actively participat[ing] in all aspects of litigation." *Id.*; W. Va. Code §§ 49-4-601, 49-4-602. Guardians ad Litem can, and often do, challenge circuit court orders in abuse and neglect proceedings, and appropriately do so in state court. *Matter of Scottie D.*, 406 S.E.2d 214, 221 (W. Va. 1991) (Guardian ad Litem's "duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian ad litem, an appeal is necessary"); *see, e.g., In re K.L.*, 826 S.E.2d 671 (W. Va. 2019); *In re S.W.*, 779 S.E.2d 577 (W. Va. 2015); *In re Elizabeth F.*, 696 S.E.2d 296 (W. Va. 2010); *In Interest of Renae Ebony W.*, 452 S.E.2d 737 (W. Va. 1994). Here, however, there is no allegation in the Complaint that Plaintiffs' Guardians ad Litem ever raised any of their claims before the circuit courts. *See, e.g.*, *Moore v. City of Asheville, N.C.*, 396 F.3d 386, 394 (4th Cir. 2005) ("[A] necessary concomitant of *Younger* is that a party . . . must exhaust his state appellate remedies before seeking relief in the District Court." (internal citations omitted)); *Norfolk S. Ry. Co. v. McGraw*, 71 Fed. App'x 967, 972 (4th Cir. 2003) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987)) ("[W]hen a litigant has

---

[4] W. Va. Judiciary, Rules of Procedure for Child Abuse & Neglect Proceedings, *Appendix A: Guidelines for Children's Guardians ad Litem in Child Abuse and Neglect Cases*, http://www.courtswv.gov/legal-community/court-rules/child-abuse/appendixA.html (last visited Nov. 21, 2019).

not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.").

A "federal court may disregard *Younger's* mandate to abstain from interfering with ongoing state proceedings only where 'extraordinary circumstances' exist." *Robinson v. Thomas*, 855 F.3d 278, 286 (4th Cir. 2017) (quoting *Kugler v. Helfant*, 421 U.S. 117, 124 (1975)). This exception does not apply here, as Plaintiffs allege neither "bad faith or harassment by state officials" nor that state law is "flagrantly and patently violative of express constitutional prohibitions." *Id.* (quoting *Kugler*, 421 U.S. at 124). Plaintiffs had (and have) "adequate opportunit[ies]" in the circuit court proceedings to raise their claims.

## II. EVEN IF THE COURT DOES EXERCISE JURISDICTION, THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

Even if the Complaint is not dismissed for lack of jurisdiction, none of the counts state a claim for which relief can be granted, and therefore the Complaint should be dismissed under Rule 12(b)(6).

### A. The Substantive Due Process Claims (Count I) Fail as a Matter of Law.

Plaintiffs' Complaint takes "aspirational statutory, regulatory, and private standards as to a variety of topics within the overall complex of foster child care" and attempts to "convert each of them to constitutional requirements." *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014). But that is not the scope of the Fourteenth Amendment Due Process protections. *See id.* ("The district court correctly rejected that attempt, as do we.").

As the Fourth Circuit has explained, "as a general rule, 'the Due Process Clause works only as a negative prohibition on state action.'" *Doe v. South Carolina Dep't of Health & Human*

*Services,* 597 F.3d 163, 170 (4th Cir. 2010) (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir.1995) (en banc)).  Accordingly, substantive due process "serves 'as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security,' and 'does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by private third parties.'"  *Id.* at 171 (quoting *Patten v. Nichols*, 274 F.3d 829, 836 (4th Cir. 2001); *Pinder*, 54 F.3d at 1174).

However, in certain circumstances, "when a state involuntarily removes a child from her home, thereby taking the child into its custody and care," *id.* at 175, substantive due process may impose some obligation on the State to "'provide for [the child's] basic human needs.'"  *Id.* at 171 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989)).  *But see Milburn v. Anne Arundel Cty. Dep't of Soc. Services*, 871 F.3d 474 (4th Cir. 1989) (holding that substantive due process did not impose legal duty on State with respect to child whose biological family placed the child in foster care); *White ex rel. White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997) (*Milburn* not limited to "situations where parents had voluntarily placed their children in foster care" because "the state ha[s] no affirmative constitutional obligation to protect individuals against private violence").

To survive a motion to dismiss on a substantive due process claim, including a claim that the State violated substantive due process in its treatment of children in foster care, a plaintiff must allege facts that show: (1) deprivation of a cognizable constitutional right; (2) the defendants' policies and practices about which the plaintiffs complain "shocked the conscience" and constituted "deliberate indifference"; and (3) the defendants' conscious-shocking deliberate indifference caused the constitutional deprivation.  *See, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998); *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 422-24, 426-27 (5th Cir. 2006)

(citing *Collins v. City of Harker Heights*, 503 U.S. 115 (1992)); *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149 (3d Cir. 1995).

This is a very high bar, and Plaintiffs in this case have failed to allege facts that satisfy any of the three prongs of this test.

With respect to the first prong, in the context of foster care, a child has the right to "basic human needs"; that is, once a State takes a child into custody, the State becomes responsible for providing "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney,* 489 U.S. at 200. West Virginia state law and policy appropriately demand that Defendants provide foster children with much more than their "basic human needs," and Defendants are deeply devoted to doing so. However, the *constitutional* protections of substantive due process apply only to the narrow band of "basic human needs."

Plaintiffs' Complaint does not allege that they have been deprived of "basic human needs." Instead, they assert a litany of rights, purportedly secured by the U.S. Constitution, to a certain type or length of custodial arrangement or placement,[5] to certain types of social services,[6] and to

---

[5] *See, e.g.*, Compl. ¶¶ 373(d); 373(f); 373(g); 374(b)(ii) ("the right to conditions and duration of foster care reasonably related to the purpose of government custody"; "the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody"; "the right to services in the least restrictive, most family-like setting;" "the right to services in the most integrated setting appropriate to the person's needs").

[6] *See, e.g.*, Compl. ¶¶ 373(c); 373(e); 373(g); 374(a)(ii); 374(a)(iii); 374(b)(iv); 374(c)(i); 374(c)(ii) ("the right to services necessary to prevent unreasonable risk of harm"; "the right to treatment and cares consistent with the purpose and assumptions of government custody;" "the right to services in the least restrictive, most family-like setting;" "the right to supportive and case management services to ensure placement stability and ensure the child is free from harm;" "the right to a plan and corresponding services for a permanent home;" "the right to ensure access to an array of community-based placements and services;" "the right to independent living services to prepare to exit foster care;" "the right to assistance to find lawful, suitable permanent housing.")

certain types of non-familial relationships.[7]  While many of the asserted "rights" are sound policy – indeed, many reflect the laws and policies of West Virginia – they are not constitutionally mandated rights of children in state custody.

The Supreme Court has rejected the notion that substantive due process extends to the type of placement decisions that form the crux of the Plaintiffs' complaint.  In *Reno v. Flores*, detained migrant children asserted a substantive due process right to be placed with a non-relative custodian rather than a child-care institution.  507 U.S. 292, 302 (1993).  In rejecting that claim, the Court expressly addressed the consequences that a contrary holding would have for state child welfare systems:

> If there exists a fundamental right to be released into what respondents inaccurately call a "noncustodial setting," . . . we see no reason why it would apply only in the context of government custody incidentally acquired in the course of law enforcement.  It would presumably apply to state custody over orphans and abandoned children as well, giving federal law and federal courts a major new role in the management of state orphanages and other child care institutions. . . . The mere novelty of such a claim is reason enough to doubt that "substantive due process" sustains it[.]

*Id.*

Not surprisingly, a number of courts have similarly rejected substantive due process claims that the type and duration of foster care placement is subject to review under substantive due process principles.  *See, e.g.*, *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990) (rejecting substantive due process claim to a "stable foster-home environment"); *Clark K. v. Guinn*, 2007 WL 1435428, at *11 (D. Nev. 2007) (no right "to placement in the least restrictive, most family-like setting") (unpublished); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J.

---

[7] *See, e.g.*, Compl. ¶ 373(c)(iii) ("the right to connection with an adult resource who will maintain a stable, long-term relationship with the child").

2000) (no "substantive due process right to 'not remain in state custody unnecessarily,' or 'be housed in the least restrictive, most appropriate and family-like placement while in state custody" (citations omitted)); *Eric L. By and Through Schierberl v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994) (rejecting substantive due process claim to placement stability); *B.H. v. Johnson,* 715 F. Supp. 1387, 1397-987 (N.D. Ill. 1989) (substantive due process does not extend to "stable placements in the least restrictive setting").

As for the Plaintiffs' claims that the Constitution entitles them to certain services, the Supreme Court has concluded that "substantive due process" requires the State to provide only the "minimally adequate care and treatment" required to assure personal safety. *Youngberg v. Romeo,* 457 U.S. 307, 319 (1982). "Even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities," and the Court has cautioned that a State need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Id.* at 317. Applying this standard to state child welfare class actions, courts have rejected the argument that a State can be constitutionally liable for the "alleged failure to provide [an] array of social services." *Mark G. v. Sabol*, 717 N.E.2d 1067 (N.Y. 1999); *see also Baby Neal v. Casey,* 821 F. Supp. 320, 335-39 (E.D. Pa. 1993) (no right to broad array of foster care services), *rev'd on other grounds,* 43 F.3d 48 (3d Cir. 1994); *B.H.,* 715 F. Supp. at 1397 (rejecting due process claim of entitlement to "family reunification" services, "parental and sibling visitation," and "adequate caseworkers").

Only two of the 17 due process "rights" that the Plaintiffs assert even arguably relate to the "basic human need" of physical safety.[8] But for these, the allegations in the Complaint fail to

---

[8] *See* Compl. ¶¶ 373(a); 373(c) ("the right to freedom from maltreatment and repeated maltreatment"; the right to services "necessary to prevent unreasonable risk of harm").

satisfy the second and third prongs of the substantive due process test because the Plaintiffs have not alleged facts sufficient to show the Defendants' policies and practices constitute "deliberate indifference" that is "conscience shocking" and caused a constitutional deprivation. *See Lewis*, 523 U.S. at 850. As applied in the foster care context, the Fourth Circuit has articulated the State's duty as being one "not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security." *Doe,* 597 F.3d at 175. That duty, according to the Court of Appeals, does not extend to protection against "unknown harm or dangers," "incidental injuries," "infrequent acts of abuse," or acts of "negligence . . . even carelessness." *Id.*

As a matter of *state policy*, every injury or act of maltreatment for a child in state custody – including those that are unknown, infrequent, incidental, or negligent – is intolerable. But as a matter of *constitutional law*, Plaintiffs have failed to identify a single policy or practice that resulted in Defendants making foster care placements that were deliberately indifferent to every child's right to personal safety and security. *See M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) ("Incidental psychological injury that is the natural, if unfortunate consequence of being a ward of the state does not give rise to the level of a substantive due process violation.").

Generic and rote allegations in the Complaint that Defendants "may well have prevented additional trauma" if they "had made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards . . . and not acted with deliberate indifference to [the named plaintiffs'] legal rights" are not sufficient to survive a motion to dismiss. "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombley,* 550 U.S. 544, 555 (2007); *see also Papasan v. Allain,* 478 U.S 265, 286 (1986) (on a motion to dismiss, courts "are not bound to

accept as true a legal conclusion couched as a factual allegation"). Plaintiffs do not identify a single action by a single defendant that could possibly establish "deliberate indifference" to the basic needs of children in foster care that "shocks the conscience."

The Complaint's extended discussion of West Virginia law and policy (Compl. ¶¶ 202-17), and the suggestions that Defendants are not following it, only confirms the point. Violation of state laws is not a constitutional violation. "A State may, through its courts and legislatures, impose such affirmative duties of care . . . as it wishes." *DeShaney,* 489 US. at 202. But not all "duties owed by government actors . . . [are] constitutionalized by the Fourteenth Amendment," *id.,* and "it is well settled that violations of state law cannot provide the basis for a due process claim." *See Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 134 (1984); *Weller v. Dep't of Soc. Servs. for Baltimore,* 901 F.2d 387, 392 (4th Cir. 1990); *Jensen v. Conrad,* 747 F.2d 185, 195 n.12 (4th Cir. 1984).

For these reasons, the substantive due process claims should be dismissed.

### B. The Constitutional "Familial Association" Claims (Count II) Fail as a Matter of Law.

Plaintiffs also assert a vague right to "familial association" secured by the First and Ninth Amendments and applicable to the States through the Fourteenth Amendment Due Process Clause. These claims, too, should be rejected.

No court has recognized the Ninth Amendment "as independently securing any constitutional right, for the purposes of pursuing a civil rights claim." *Strandberg v. City of Helena*, 791 F.2d 744, 748-49 (9th Cir. 1986); *see also, Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013); *Johnson v. Texas Bd. of Criminal Justice*, 281 Fed. App'x 319, 320 (5th Cir. 2008) (unpublished); *Morgan v. Logan Cty. Comm'n*, 2019 WL 1748534, at *4 n.3

(S.D. W. Va. 2019) (unpublished); *Hardway for Hardway v. Lemmon*, 2006 WL 8438638, at *3 (S.D. W. Va. 2006) (unpublished).

While the First Amendment may protect some aspects of the parent-child relationship, it has not been found to extend to more extended kinship relationships, and it does not "impose a constitutional obligation on the state to ensure a particular type of family life or to create such an obligation 'through the penumbral constitutional … right to family privacy.'" *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 676 (S.D.N.Y. 1996) (quoting *B.H. v. Johnson*, 715 F. Supp. at 1397); *Charlie H.*, 83 F. Supp. 2d at 513-14 ("The so-called right to family integrity will not be extended to situations where a plaintiff … alleges limited familial contact, as compared to no contact."). Nor is there a First Amendment right to a permanent home and family, *see M.D. v. Perry*, 294 F.R.D. 7, 97 (S.D. Tex. 2013) ("plaintiffs cite no legal authority in support" of claimed "right to family integrity, derived primarily from the First Amendment"); *B.H. v. Johnson*, 715 F. Supp. at 1396-98 (dismissing substantive due process claims alleging that the state failed to provide training necessary to reunite children with their families or to ensure sufficient parental and sibling visitation).

### C. The Child Welfare Act Claims (Count III) Fail as a Matter of Law.

Plaintiffs' third cause of action alleges violations of the Adoption Assistance and Child Welfare Act, as amended. Specifically, Plaintiffs assert violations of 42 U.S.C. § 671(a)(10) and (a)(16), together with several defined terms set forth at 42 U.S.C. § 675. All of these sections appear in Title IV-E of the Social Security Act.[9]

---

[9] Most Spending Clause legislation involving federal assistance programs, including the ones at issue in the Complaint, are made as amendments to different titles of the Social Security Act. By convention, the federal and state agencies administering these programs refer to the provisions by their placement in the Social Security Act, not by the codified section in the U.S. Code, and the

Section 671(a) provides that in order for a State to be eligible for federal payments under Title IV-E, it must have a plan approved by the Secretary that includes certain features.  *Suter v. Artist M.,* 503 U.S. 347, 351 (1992).   Plaintiffs claim a cause of action under two of the requirements in Section 671(a).  First, Section 671(a)(10) requires that a State be responsible for "establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations" and "that the standards established . . . . shall be applied by the State to any foster family home or child care institution."  Second, Section 671(a)(16) provides that the State plan must

> Provide[ ] for the development of a case plan (as defined in section 675(a) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provide[] for a case review system meets the requirements described in sections 675(5) and 675a of this title with respect to each such child[.]

The rest of the statutory provisions cited in the Complaint are definitional.  Section 675(1) sets forth a definition of "case plan," to include various components, including that the plan include a discussion of placement, need for services, and consideration of educational stability.  Complaint ¶ 382 (citing Section 675(1)(A), (B), (G)).  Section 675(5) includes a definition of a "case review system," which requires a review of the child's placement at least every six months, including a plan for permanency at the end of 12 months.  *Id.* (citing Section 675(5)(A)-(C)).

---

numbering of the two sources is different.  For the provisions relevant in this case, which are codified in Title IV of the Social Security Act, the Social Security Act cite is numerically 200 less than the U.S. Code cite, so that Section 471 of the Social Security Act is codified at 42 U.S.C. § 671, Section 472 is codified at 42 U.S.C. § 672, and so forth.

Plaintiffs refer to their claims as arising under the Adoption Assistance and Child Welfare. Federal and state officials, however, would refer to these provisions as being part of the "Title IV-E" program, because they are found in Title IV-E of the Social Security Act.  Most of the decisions addressing similar challenges to those at issue have referred to the U.S. Code numbering, which is the format followed here.

None of these provisions create a private cause of action enforceable under Section 1983.

### 1. The Cited Provisions Do Not Meet the *Blessing/Gonzaga* Standard.

Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119 (2005). Rather, a plaintiff seeking redress "must assert the violation of a federal *right*, not merely a violation of federal *law.*" *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). "If Congress is silent or ambiguous, courts may not find a cause of action 'no matter how desirable that may be as a policy matter.'" *Planned Parenthood South Atlantic v. Baker*, 2019 WL 5555641, at *5 (4th Cir. 2019) (citations omitted) (not yet published).

Three requirements must be met for a statute to create a private right enforceable under Section 1983. *Id.* at *6. "First, Congress must have intended that the provision in question benefit the plaintiff." *Blessing,* 520 U.S. at 340. "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340-41. "Third, the statute must unambiguously impose a binding obligation on the States" by speaking "in mandatory, rather than precatory, terms." *Id.* at 341.

The Supreme Court further clarified the first prong of the *Blessing* test in *Gonzaga v. Doe,* 536 U.S. 273, 282-83 (2002). *Gonzaga* held that the Family Educational Rights and Privacy Act ("FERPA") created no private right of action for students whose data was disclosed in violation of the act. "[U]nless Congress 'speaks with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Id.* at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 28 n.21 (1981)). The Court held that FERPA's focus on the policies and procedures of educational

institutions, rather than the individuals impacted by such policies, made it "two steps removed from the interests" of those individuals and "clearly [did] not confer the sort of '*individual* entitlement' that is enforceable under § 1983." *Id.* at 287 (quoting *Blessing*, 520 U.S. at 343). In sum, where statutes have an "aggregate focus," rather than an individualized focus on "whether the needs of any particular person have been satisfied," such laws do not confer individual rights enforceable under § 1983. *Id.* at 288–90.

None of the statutory provisions cited by Plaintiffs meet the *Blessing/Gonzaga* standard. All are focused on actions that the State must take to secure federal funds, not on the rights of the individuals qualifying for Title IV-E payments. Indeed, even before its decision in *Blessing,* the Supreme Court held that provisions in Title IV-E, substantially similar to those at issue here, were not privately enforceable. Specifically, in *Suter* the Court held that Section 671(a)(15), which requires that "reasonable efforts shall be made" to achieve permanency for a child, was not privately enforceable. 503 U.S. at 358. With "[n]o further statutory guidance . . . as to how 'reasonable efforts' are to be measured," the Court concluded that the phrase would "obviously vary with the circumstances of each individual case," providing insufficient guidance for federal court enforcement. *Id.* at 360. The Court similarly held that Section 671(a)(9) – which requires an agency to refer suspected cases of abuse or neglect to law enforcement – was not privately enforceable. *Id.* at 359 n.10.[10]

---

[10] The *Suter* decision also suggested that Section 671(a) as a whole "only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features." 503 U.S. at 358. That portion of the opinion had implications for many public assistance programs beyond Title IV-E, including Medicaid, all of which are framed in terms of provisions to be included in a federally-approved "state plan." Congress legislatively overruled that aspect of the opinion, but affirmed the holding of *Suter* that "section [42 U.S.C. § 671(a)(15)] is not enforceable in a private right of action." 42 U.S.C. § 1320a-2.

The logic in *Suter*, *Blessing,* and *Gonzaga* forecloses Plaintiffs' statutory causes of action. With respect to Plaintiffs' claim for relief under Section 671(a)(10), the law in this Circuit is clear: "Section 671(a)(10) does not create an enforceable right." *White by White*, 112 F.3d at 739. The Court of Appeals reached this determination after reviewing the Supreme Court's decision in *Suter,* and concluded that "[t]he requirement that a state's plan be 'reasonably in accord with recommended standards of national organizations,' is no more specific than section 671(a)(15)'s "reasonable efforts" requirement." *Id.* That holding has been echoed in cases throughout the country.[11]

The same analysis requires dismissal of Plaintiffs' claims under the "case plan" and the "case review" provision of Section 671(a)(16) (and the corresponding definitions at Section 675(1) and (5)). Prior to the Supreme Court's *Blessing* decision in 1997, some courts (including the Fourth Circuit, *see infra* Section II.C.2.) found this section to be privately enforceable. After *Blessing,* however, the great majority of courts that have addressed the issue have concluded that Section 671(a)(16) does not contain sufficient "rights-creating" language to satisfy the first prong of the *Blessing* test.[12]

---

[11] *See Barricelli v. City of New York*, 2016 WL 4750178 (S.D.N.Y. 2016); *Henry A. v. Willden,* 2010 WL 4362809, at *10 (D. Nev. 2010), *rev'd in part on other grounds*, 678 F.3d 991 (9th Cir. 2012); *Clark K.*, 2007 WL 1435428 at *8-9; *Carson P. ex rel. Foreman v. Heinman*, 240 F.R.D. 456, 541 (D. Neb. 2007); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 562 (S.D. Miss. 2004); *Whitley v. New Mexico Children, Youth & Families Dept.,* 184 F. Supp. 2d 1146, 1164 (2001); *Daniel H. ex rel. Hardaway H. v. City of New York*, 115 F. Supp. 2d 423, 427 (S.D.N.Y. 2000); *Charlie H.*, 83 F. Supp. 2d at 490-92.

[12] *See 31 Foster Children v. Bush,* 329 F.3d 1255 (11th Cir. 2003); *T.F. by Keller v. Hennepin County,* 2018 WL 940621 (D. Minn. 2018); *M.B. by Eggemeyer v. Corsi*, 2018 WL 327767 (W.D. Mo. 2018); *D.G. ex rel. Stricklin v. Henry,* 594 F. Supp. 2d 1273 (2009); *Carson P.*, 240 F.R.D. at 544; *Olivia Y. v. Barbour,* 351 F.Supp.2d 543, 562 (S.D. Miss. 2004); *Whitley,* 184 F.Supp.2d at 1164; *Daniel H. ex rel. Hardaway H. v. City of New York*, 115 F.Supp.2d 423, 428 (S.D.N.Y. 2000); *Charlie H.,* 83 F. Supp.2d at 489-90. The minority of courts that have concluded the opposite include *Henry A. v. Willden,* 678 F.3d 991, 1006-07 (9th Cir. 2012); *Sam M. v. Chafee,*

The text of Section 671(a)(16) itself does not "unambiguously confer" any individual enforcement right for Plaintiffs. *See John B. v. Goetz*, 626 F.3d 356, 363 (6th Cir. 2010) ("We easily conclude that the statute, which requires the state to develop a 'case plan' and a 'case review system' for each child, does not create enforceable rights."). Plaintiffs do not allege that a case plan has not been developed for any of the Named Plaintiffs or that there is not a system of case review. Rather, Plaintiffs' claims are that the case plans and case review system do not produce the desired results described in the definitions set forth in Section 675. Among other things, those definitions provide that the case plan is intended to "discuss" "the safety and appropriateness of the placement;" "assure" that the child "receives safe and proper care" and "appropriate[ ] . . . services;" and "takes into account" "educational stability." *See* 42 U.S.C. § 675(1)(A), (B), (G). Likewise, the "case review system" is defined to mean "a procedure for assuring . . . placement in a safe setting that is the least restrictive . . . and most appropriate setting available . . . consistent with the best interest and special needs of the child," and periodic review by a court or administrative agency. *See* 42 U.S.C. § 675(5)(A), (B), (C).

While the case plan and case review system serve an important function, nothing in the statutory language creates an individually-enforceable right to implementation of the particulars of the plan, much less successful achievement of all the desired outcomes. As in *Gonzaga*, "references to individual children and their placements are made in the context of describing what the procedure is supposed to ensure," not how it will be ultimately implemented. *31 Foster*

---

800 F. Supp. 2d 363, 386-88 (D.R.I. 2011); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 170-72 (D. Mass. 2011); *Clark K.*, 2007 WL 1435428, at *10; *Kenny A. v. Purdue*, 218 F.R.D. 277, 292-93 (N.D. Ga. 2003); *Occean v. Kearney*, 123 F. Supp. 2d 618, 625 (S.D. Fla. 2000); *Brian A. v. Sundquist*, 149 F. Supp.2d 941, 946-49 (M.D. Tenn. 2000). At least one Court has found that some of the definitions in Section 675 are rights-creating, while others are not. *See Barricelli v. City of New York*, 2016 WL 4750178 (S.D.N.Y. 2016).

*Children*, 329 F.3d at 1272 (citing *Gonzaga*, 536 U.S. at 289). *See Brinkley v. Hill,* 981 F. Supp. 423 (S.D. W. Va. 1997) (distinguishing between statutes "which prescribe a specific course of conduct to be followed by the State" and those enforceable under Section 1983 "which specifically enumerate that an individual plaintiff is to receive a personally precise benefit.").

Plaintiffs' claim to a private enforcement right under Section 671(a)(16) also fails under *Blessing's* second prong: the asserted right is "vague and amorphous," such that its enforcement would "strain judicial competence." 520 U.S. at 340–41. Far from providing an "objective benchmark" for federal judicial enforcement, Section 671(a)(16)'s guidance for States is "couched in broad, goal-oriented terms," referencing amorphous concepts such as "proper care," "facilitating return of the child to his home or the permanent placement of the child," and "discussing the appropriateness of the services that have been provided to the child." *Del A. v. Roemer*, 777 F. Supp. 1297, 1309 (E.D. La. 1991). Such generalized terms, like the "reasonable efforts" language addressed in *Suter*, provide a federal court with little, if any, meaningful guidance to determine whether a State's actions comply. 503 U.S. at 363. The simple truth is that "there is no way to measure the normal or average needs of a child in foster care." *Roemer*, 777 F. Supp. at 1309. The statutes cited do not meet the standards for creating a private cause of action.

### 2. The Court Is Not Bound by the Fourth Circuit's 1988 *L.J. II* Decision.

In 1988, prior to *Suter*, *Blessing*, and *Gonzaga*, the Fourth Circuit summarily concluded, in upholding a preliminary injunction against the City of Baltimore's foster care program, that the case plan and case file review provisions of Section 671(a)(16), "taken together" with the "recommended standards" provision of Section 671(a)(10) and the referral requirements of Section 671(a)(9) "spell out a standard of conduct, and as a corollary rights in plaintiffs" that were privately enforceable under Section 1983, despite the fact that "the statutes are largely statutes relating to

appropriations." *L.J. by and through Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (later cases refer to this decision as "*L.J. II*").

That analysis – the sum total of which is spelled out above – does not survive *Suter, Blessing* and *Gonzaga*. At the time *L.J. II* was decided, the Supreme Court had not yet made it clear that a cause of action only arises out of a federal statute when the "statute itself unambiguously 'confers an individual right' on the plaintiff"; rather, the law at the time was that it sufficed for plaintiffs to "[fall] 'within the general zone of interest' of a federal statute" in order to state a federal claim. *Planned Parenthood*, 2019 WL 5555641, at *5.

In fact, a few years after *L.J. II* was decided, the Supreme Court in *Suter* concluded that one of the three provisions on which *L.J. II* relied – Section 671(a)(9) – did not create a cause of action. *Suter,* 503 U.S. at 359 n.10. Shortly thereafter, the Fourth Circuit reached a similar conclusion with respect to the second provision, Section 671(a)(10). *See White by White*, 112 F.3d at 739. Therefore, the actual holding of *L.J. II* that the three provisions "taken together" create a cause of action has been abrogated by these later cases.

The Court of Appeals had occasion to revisit *L.J. II* in 2011, when the Baltimore defendants sought to vacate the consent decree that had been negotiated after the court's initial *L.J. II* decision. *L.J. v. Wilbon*, 633 F.3d 297 (4th Cir. 2011) ("*L.J. III*"). In upholding the district court's denial of that motion, the Fourth Circuit held that its prior decision regarding the enforceability of Section 671(a)(16) was the "law of the case," and must apply unless that decision had been "directly overruled" or was "clearly erroneous and would work manifest injustice." *Id.* at 308. The holding in *L.J. II* with respect to Section 671(a)(16) had not been directly overruled by *Suter*, and the court concluded that it did not qualify for the "clearly erroneous" exception to the "law of the case" doctrine. The court explained that under the "clearly erroneous" standard, a prior decision could

not be "just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Id.* (quoting *TWFS, Inc. v. Franchot,* 572 F.3d 186, 194 (4th Cir. 2009)). Applying that odiferous standard, the court concluded that the Baltimore defendants had not carried their burden of establishing that the decision in *L.J. II* was so "dead wrong" as to require vacatur of the consent decree. In so holding, the court emphasized that "we do not now hold that § 671(a)(16) provides a private right of action." *Id.*

Fortunately, this Court is not faced with law-of-the-case issues and thus need not accept the holding of *L.J. II* under the "five-week-old, unrefrigerated dead fish" standard. Rather, the question for this court is simply whether *L.J.II* is still good law, in light of: the intervening case law in *Suter, Blessing,* and *Gonzaga;* the fact that two of the provisions which the court considered "together with" Section 671(a)(16) have been determined not to be privately enforceable; and the Fourth Circuit's most recent pronouncement that it "[does] not hold that Section 671(a)(16) provides a private right of action." For the reasons explained above, the reasoning in *L.J. II* has clearly been abrogated by later case law and is not binding on this Court. [13]

### 3. Many Children in the Putative Class Are Not the Intended Beneficiaries of the Cited Provisions.

Even if the Court finds that Section 671(a)(16) is privately enforceable (or believes that it is bound by *L.J. II*), that provision can only be enforced by a child receiving federally supported benefits under Title IV-E.

---

[13] Though ordinarily "a district court is bound by the precedent set by its Circuit Court of Appeals," an exception to this rule is if "such precedent is overruled by the appellate court or the United States Supreme Court." *See Strickland v. U.S.,* 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005); *U.S. v. Cobbs,* 274 F. Supp. 3d 390, 394 (S.D. W. Va. 2017); *Condon v. Haley,* 21 F. Supp. 3d 572, 587 (D.S.C. 2014).

As explained above, the statutory provisions cited in the Complaint are all part of Title IV-E of the Social Security Act. Title IV-E is a federal matching program in which the federal government agrees to fund a portion of state expenditures on "maintenance" payments (essentially, room and board) and certain administrative costs for foster care and adoption assistance, but only for children who meet eligibility criteria set forth in the statute.

In order for a child to be Title IV-E eligible, the statute requires that he or she must have been removed from their family pursuant to a judicial determination that continuation in the home would be "contrary to [their] welfare" and that there have been "reasonable efforts to prevent removal," 42 U.S.C. § 672(a)(2)(A); (2) that the family from which the child was removed would have qualified for assistance under the former Aid to Families with Dependent Children program as it existed before it was repealed, 42 U.S.C. § 672(a)(1)(B); (3) that the child is placed in a fully licensed foster family home or childcare institution, 42 U.S.C. § 672(b), (c); and (4) that the State has performed required background checks on the caregivers of children placed in foster care, 42 U.S.C. § 671(a)(20)(A).

The percentage of children in a State's child welfare program who meet these requirements (and thus are eligible for federal funded assistance) is known as the Title IV-E "coverage rate" or "penetration rate." West Virginia's current penetration rate is approximately 60%; that is, 40% of children in foster care are *not* eligible for Title IV-E benefits.

Although West Virginia does not distinguish between Title IV-E eligible children and those who are not for purposes of administering its program, children who are not Title IV-E eligible would not be "receiving foster care maintenance payments under the State plan" within the meaning of Section 671(a)(16). For these children, there is no possible argument that Congress intended the statute to create an enforceable right.

### D. The ADA and Rehabilitation Act Claims (Counts IV and V) Fail as a Matter of Law.

Counts IV and V should be dismissed because Plaintiffs have failed to state a cause of action for which relief can be granted under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., and the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq*.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act has "different language" but imposes "similar requirements." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461 (4th Cir. 2011). To prove a violation of either the ADA or the Rehabilitation Act, "the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's program, and (3) he was excluded from the program on the basis of his disability." *Id.*

Plaintiffs do not contend that DHHR has excluded members of the purported "ADA Subclass" from the foster care program on the basis of their disability; indeed, Plaintiffs repeatedly allege that there are numerous children in DHHR custody who have a variety of physical, intellectual, and psychiatric disabilities. Compl. ¶ 31(c). Rather, the Plaintiffs assert that Defendants have violated the ADA and the Rehabilitation Act by not placing them in the "most integrated setting available," and ask the Court to order DHHR to "develop" an "adequate array" of "additional" community placements and services. Compl. ¶¶ 393, 405(c).

#### 1. Plaintiffs' Allegations Do Not Constitute a Claim of Discrimination Remediable Under the ADA.

Plaintiffs' claim fails as a matter of law for the simple reason that they have not alleged facts that show actual discrimination on the basis of disability. Plaintiffs allege a dearth of

community-based services and placements for foster children with disabilities in West Virginia, and the State does not dispute that its community-based behavioral health infrastructure is in need of significant improvement. That is why it created the *Safe at Home West Virginia* demonstration, enacted legislation creating a managed care program specifically targeted at increasing community-based services for foster children, and agreed to an MOU with the DOJ that requires the State to improve the availability of these services. But shortcomings in the State's community-based mental health care system – which are not unique to foster care but are a problem statewide – do not constitute *discrimination* under the ADA and the Rehabilitation Act. To the contrary, the Supreme Court has expressly held that these statutes do not "require[] States to 'provide a certain level of benefits to individuals with disabilities,'" *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 603 n.14 (1999); *see also Alexander v. Choate*, 469 U.S. 287, 303 (1985) (holding that the Rehabilitation Act "does not require the State to alter [its] definition of the benefit being offered simply to meet the reality that the handicapped have greater medical needs"); *Rodriguez v. City of New York,* 197 F.3d 611, 619 (2d Cir. 1999) ("*Olmstead* reaffirms that the ADA does not mandate the provision of new benefits.").

Even if Plaintiffs could pursue an ADA or Rehabilitation Act claim based on an alleged lack of community behavioral health services, their claim in this case would still fail. Plaintiffs rely on a regulation promulgated by the DOJ, which provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), and the Supreme Court's decision in *Olmstead*, which held that "unjustified isolation of persons with disabilities is a form of discrimination." 527 U.S. at 597. Citing the DOJ regulation and *Olmstead*, Plaintiffs ask the

Court to order that children in the custody of DHHR must be placed in the "most integrated setting." Compl. ¶¶ 393, 405(c).

Plaintiffs' reliance on Section 35.130(d) and *Olmstead* is misplaced. With respect to the former, Section 35.130(d) should not be interpreted – and was not intended – to automatically trump the specific "best interests of the child" standard that is applied by West Virginia Circuit Courts in determining an appropriate placement for a child. *See* W. Va. Code § 49-4-608(e). Section 35.130(d) does not require the State to place all children with disabilities in the "most integrated setting" regardless of the individual circumstances of the case, and it does not require the State to create settings that do not exist. Section 35.130(d) allows for consideration of what settings are in fact available to the State, and it allows the State to consider which setting is "appropriate to the needs of qualified individuals with disabilities," which is what the state circuit court does in West Virginia. If one of the Plaintiffs seeks a more "integrated" setting, there is no question Plaintiff (or Plaintiff's Guardian ad Litem) may raise that issue in state circuit court, *see* W. Va. Code § 49-4-608(e)(3) (requiring the circuit court to make findings as to "the appropriateness of the child's current placement, including its distance from the child's home and whether or not it is the least restrictive one (most family-like one) available").

Nor does *Olmstead* support the Plaintiffs' claim. *Olmstead* had nothing to do with foster care placement, but involved a State's alleged refusal to provide two Medicaid enrollees with community-based services that the State provided to other people. In holding that "unjustified" placement in an institution could give rise to a discrimination claim under the ADA, the Supreme Court made clear that its decision did not "require[] States to 'provide a certain level of benefits to individuals with disabilities,'" *Olmstead,* 527 U.S. at 603 n.14, which is exactly what Plaintiffs in this case seek. Further, in this case, there is no "unjustified" institutional placement: each and

every placement has been approved by a state circuit court as in the best interest of the child. W. Va. Code § 49-4-110; § 49-4-601. This is in stark contrast to *Olmstead*, where the treatment team believed community-based placement was most appropriate for both plaintiffs.

> **2. Even If the ADA Requires the State to Develop Community Services and Placements, the State has a Robust Plan to Do So.**

In *Olmstead*, the Supreme Court held there is not an ADA violation if a State has "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." 527 U.S. at 605-06; *see Martin v. Taft,* 222 F. Supp. 2d 940, 984 (S.D. Ohio 2002) ("If the defendant [has a plan to move individuals to a less restrictive setting], it has essentially proven that it has *already reasonably accommodated* the plaintiff's request for participation in a community-based program." (emphasis in original)). West Virginia has such a "comprehensive, effectively working plan."

The State's Child and Family Services Plan reflects West Virginia's "comprehensive, effectively working plan" to ensure children with disabilities are placed in the least restrictive settings that are appropriate for them, including two recent developments. First, in March 2019, the West Virginia Legislature enacted H.B. 2010, which made a number of changes to the state foster care system, including a number of provisions directed to improved access to community services and reduced use of institutional care:

- Ordering the provision of Medicaid services to foster children through managed care in a manner that: delivers needed supports and services in the most integrated, appropriate, and cost-effective way possible; offers a continuum of acute care services, which includes an array of home and community-based options; and includes a comprehensive quality approach across the entire continuum of care

services. H.B. 2010, W. Va. Leg., 2019 Reg. Sess. (Mar. 8, 2019) (codified as W. Va. Code § 9-5-27).[14]

- Providing for the Office of Inspector General to employ an independent Foster Care Ombudsman, with experience as a former foster parent or experience in the area of child welfare, whose duties are to advocate for the rights of foster children and foster parents, and participate in any procedure relating to action, inaction of decisions of providers of managed care services. *Id.* (codified as W. Va. Code § 9-5-27(i)). DHHR hired its first Foster Care Ombudsman effective Oct. 29, 2019.

- Requiring residential child care centers discharging a child who does not meet the residential treatment level and target population to request a multi-disciplinary treatment team and work toward alternative placement. *Id.* (amending W. Va. Code § 49-2-113(j)).

- Prohibiting a court from ordering a child to be placed in an out-of-state facility unless the child is diagnosed with a health issue that no in-state facility or program serves. *Id.* (amending W. Va. Code § 49-4-608(d)).[15]

Second, in May 2019, the State entered into a MOU with DOJ as a result of an investigation and findings by the DOJ raising issues virtually identical to the issues alleged in the Complaint.[16] The MOU targets all children under the age of 21 who have a serious emotional or behavioral disorder or disturbance that results in a functional impairment who are placed (or reasonably may

---

[14] This transition is scheduled to occur on January 1, 2020. DHHR issued a Request for Proposal to select a single, state-wide qualified contractor on July 1, 2019, and announced the award on November 5, 2019. The RFP and resulting contract include numerous requirements regarding the provision of a robust array of community-based services. A draft of the RFP can be found at: https://dhhr.wv.gov/bcf/Documents/Draft%20Managed%20Care%20for%20Vulnerable%20Youth%20and%20Families%20RFP_1-3-19.pdf.

[15] H.B. 2010 is available on the West Virginia' legislature's website here: http://www.wvlegislature.gov/bill_Status/bills_text.cfm?billdoc=HB2010%20SECOND%20SUB%20ENR.htm&yr=2015&sesstype=RS&billtype=B&houseorig=H&i=2010.

[16] The DOJ's findings are in a publicly available document available at https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf. The MOU is a publicly available document available at https://www.ada.gov/olmstead/documents/wv_agreement.pdf. Both are referenced throughout the Complaint. For the convenience of the Court, both of these public documents are reproduced in the Appendix.

be expected to be placed) in a Residential Mental Health Treatment Facility. Under the MOU, the State has agreed to:

- Screen children within the target population to determine if they should be referred for further mental health evaluation or services.

- Ensure that every child for whom community-based services is deemed appropriate receives timely access to these services in a convenient location and in the intensity and duration that they need them.

- Expand and develop community-based services so that children throughout the State have access to treatment. These services include: wraparound facilitation, behavioral support services, family support and training services, in-home therapy, children's mobile crisis response, therapeutic foster care, and Assertive Community Treatment. All in-home and community-based mental health services must be available statewide by October 1, 2020.

- Eliminate the unnecessary use of residential mental health treatment facilities. By the end of 2024, a qualified professional must have assessed all children living in a facility and determined that this setting is the most appropriate setting for each individual child.

- Develop a Quality Assurance and Performance Improvement system to allow the State to assess the quality of its mental health services and timely address gaps in services across the State.

The State has also agreed to develop an implementation plan to explain the steps it will take to create mental health services that are sustainable, statewide, and available to children in the target population, and to hire a subject matter expert to provide technical assistance and recommendations for attaining compliance with the agreement. The subject matter expert will prepare a comprehensive report on the status of the State's compliance with the agreement twice a year, which will be posted publicly. If the State fails to comply with the provisions in the agreement, DOJ may file a lawsuit for breach. *See* MOU, *supra* note 18.

The MOU "addresses the United States' allegations regarding DHHR's service system" and reflects the belief of both parties that "successful reforms can be implemented in a timely manner." MOU, *supra* note 18. In that context, DOJ's determination that the MOU suffices to

address the alleged noncompliance with the ADA and its own regulation is an agency decision to which this Court should grant significant deference. *See Olmstead*, 527 U.S. at 597-98 ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect."). Even though Plaintiffs rely on DOJ's "most integrated setting" regulation, they are effectively asking this Court to overrule DOJ's decision that the MOU suffices to remedy the noncompliance that they allege. And Plaintiffs did not even give Defendants a chance to implement that MOU, filing their Complaint within three months of it being signed, alleging simply that it is "unlikely to be successfully implemented by DHHR." Complaint ¶ 358.[17]

Defendants acknowledge that the MOU does not eliminate the right of a private party to bring his or her own action against the State, *see* 28 C.F.R. § 35.172(d). However, this action is not an individual suit alleging a discrete discriminatory act and seeking a tailored remedy. Rather, it is a purported class action demanding broad and sweeping institutional reforms on the grounds that such changes are required by the ADA, even though West Virginia has just entered into an agreement with DOJ.

Given that "Congress envisioned that . . . the Federal Government would take a central role in enforcing the standards" of the ADA to "address the major areas of discrimination faced day-to-day by people with disabilities," *United States v. Florida,* 938 F.3d 1221, 1226 (11th Cir. 2019), it would be inappropriate to allow this action to interfere with the MOU at this stage. At the very least, any claim by Plaintiffs that the ADA requires more than what the MOU provides must

---

[17] Plaintiffs also allege that the MOU is too "limited in scope," because it is targeted to children in residential mental health facilities, or at risk of placement in such a facility. But Defendants understand that to be the substance of Plaintiffs' claim under the ADA and Section 504 of the Rehabilitation Act. If it is not, then Defendants ask that the Court treat this motion as including a motion under Rule 12(e) and order Plaintiffs to file a more definite statement as to their ADA and Section 504 claims to which the Defendants can reasonably prepare a response.

specify the additional modifications that Plaintiffs believe are both reasonable and necessary to enforce the DOJ regulations on which they rely.

## CONCLUSION

For all of the reasons set forth above, the Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

Respectfully submitted,

*/s/* Philip J. Peisch
Philip J. Peisch, DC Bar # 1005423 (pro hac vice)
Caroline M. Brown, DC Bar # 438342 (pro hac vice)
Rebecca E. Smith, DC Bar # 166610 (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258
E-mail: ppeisch@brownandpeisch.com

*/s/* Steven R. Compton
Steven R. Compton, WV St. Bar # 6562
West Virginia Attorney General's Office
812 Quarrier Street
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

*/s/* Doug P. Buffington, II
Doug P. Buffington, II, WV St. Bar # 8157
West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

*Attorneys for Defendants Jim Justice, et al.*

**CERTIFICATE OF SERVICE**

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants'

Memorandum of Law in Support of the Motion to Dismiss to be delivered to counsel for Plaintiffs

via ECF notification.


November 26, 2019

/s/ Philip J. Peisch
Philip J. Peisch, DC Bar # 1005423 (pro hac vice)
Caroline M. Brown, DC Bar # 438342 (pro hac vice)
Rebecca E. Smith, DC Bar # 166610 (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258
E-mail: ppeisch@brownandpeisch.com

/s/ Steven R. Compton
Steven R. Compton, WV St. Bar # 6562
West Virginia Attorney General's Office
812 Quarrier Street
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

/s/ Doug P. Buffington, II
Doug P. Buffington, II, WV St. Bar # 8157
West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

*Attorneys for Defendants Jim Justice, et al.*