UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **Jonathan R., minor by Next** | ) | |
| **Friend Sarah DIXON, *et. al.*,** | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 3:19-cv-00710 |
| *Plaintiffs,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Jim JUSTICE, in his official capacity as** | ) | |
| **the Governor of West Virginia, *et al.*,** | ) | |

*Defendants.*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

West Virginia's foster care system is in a state of chaos. The opioid epidemic toppled what was already a collapsing system. The state's foster care population skyrocketed 67 percent between 2013 and 2017, and by 2018, West Virginia's Department of Health and Human Resources ("DHHR") led the nation in removals. Defendants institutionalize 71 percent of youth between the ages of 12 and 17, send over 300 children to out-of-state facilities, and leave children in shelter care, hotels, and DHHR offices. Defendants rely heavily on kinship placements, 20 percent of which are unlicensed, but fail to vet, support and monitor those kinship homes. Defendants fail to engage in effective permanency planning, leaving children in foster care for years and rendering many legal orphans. In 2015, the Civil Rights Division of the United States Department of Justice ("USDOJ") launched an investigation into West Virginia's system of care for children in need of mental health services and found West Virginia was in violation of Title II of the Americans with Disabilities Act ("ADA") due to its widespread practice of institutionalizing children with disabilities.

Disarray within DHHR only compounds these problems: Defendants maintain high caseworker vacancy rates; employ caseworkers who are underqualified, undertrained, and carry excessive caseloads; and fail to screen applicants for criminal backgrounds and drug use.

By willfully disregarding the continuing failures of West Virginia's child welfare system, Defendants have jeopardized the safety and well-being of the 6,800 foster children in DHHR custody.

In light of these critical problems, Defendants have recently settled a five-year-old complaint with the USDOJ, in an attempt to resolve the state's aforementioned ADA violations, and entered into an exceedingly weak, unenforceable agreement, under which Defendants have no obligation to reduce the number of children placed in in-state residential facilities. Defendants also have adopted a plan to change the way medical care is provided—Defendants' faith in that plan is exemplified by Defendant Jeremiah Samples' remark that "doing anything is better than doing nothing."

Defendants have ignored countless pleas for change, prompting Plaintiffs to bring suit. In their Motion to Dismiss, Defendants once again attempt to skirt responsibility, claiming that this Court lacks jurisdiction to hear Plaintiffs' claims and compel Defendants to adequately care for West Virginia foster children. *See* Defs' Mem., ECF No. 18 ("ECF No. 18."). Defendants further attack each of Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6). But as countless federal courts across the country have held, neither the *Rooker-Feldman* doctrine nor abstention principles preclude foster care Plaintiffs from bringing federal class action claims challenging state executive branch actors and agencies. Further, Plaintiffs' Complaint sufficiently alleges Defendants' violated Plaintiffs' rights under the First, Ninth, and Fourteenth Amendments by depriving Plaintiffs of the opportunity to be placed in safe and secure placements and to maintain family relationships. *See*

Compl., ECF No. 1 ("ECF No. 1."). Additionally, federal courts have consistently held foster children have individually enforceable rights to case plans and to nationally acceptable placement standards under the federal Adoption Assistance and Child Welfare Act of 1980 ("AACWA"). Plaintiffs have also adequately pled Defendants violated the ADA and Section 504 of the Rehabilitation Act by failing to provide services in the least restrictive and most integrated setting and failing to offer reasonable accommodations and individualized services for disabled foster youth. *See id.*

Plaintiffs' allegations demonstrate the serious need for the equitable relief, including enjoining Defendants from carrying caseloads that exceed acceptable standards, unnecessarily institutionalizing children, failing to assess and provide services to children in foster care, and failing to engage in appropriate permanency planning. For the reasons set forth herein, the Court should deny Defendants' Motion to Dismiss in its entirety and allow Plaintiff Children's claims to proceed.

## FACTUAL BACKGROUND

The Named Plaintiffs, through their Next Friends and on behalf of the proposed Class and Subclasses they represent (collectively, "Plaintiffs" or "Plaintiff Children"), seek declaratory and injunctive relief enjoining Defendants from violating federal law or infringing upon Plaintiffs' rights under the United States Constitution or federal law. Plaintiffs allege a number of severe deficiencies permeating the very system designed to protect them:

- Jonathan R. is 15 years old and has spent the last seven years in DHHR custody. He was abused by his birth parents and his adoptive parents. DHHR failed to investigate numerous complaints it received. DHHR initially placed Jonathan in a facility in Georgia and then moved him several times, including to another residential facility and a kinship placement, which DHHR failed to vet or provide supportive services. *See* ECF No. 1 ¶¶ 42-54.

- Anastasia M. is 11 years old and has been in foster care twice. DHHR shuffled her through seven placements, including emergency shelters, a detention center, and a dangerous out-

of-state facility. She now suffers from symptoms of attention-deficit/hyperactivity disorder, reactive attachment disorder, and other psychological issues. *See id.* at ¶¶ 55-65.

- Serena S. is an 11-year-old girl who has Down syndrome. Serena's parents were sentenced to prison due to educational abuse. DHHR separated Serena from her siblings, failed to locate a special needs foster home, and placed her in multiple foster homes and a residential facility that has been the subject of criminal investigations. *See id.* at ¶¶ 66-75.

- Theo S. was born addicted to opioids, but DHHR did not remove him for several years. He is seven years old and has experienced 12 foster care placements. Theo is now living in an out-of-state institution where Theo frequently visits the nurse's office due to injuries sustained from other residents and exhibits signs of depression. *See id.* at ¶¶ 76-101.

- Garrett M. is 17 years old and has been in foster care since 2012. DHHR has placed Garrett in group homes, residential centers, and a juvenile detention center, where he slept on a mattress on a cement floor in a locked cell. He is depressed and has made several suicide attempts. DHHR has over-medicated Garrett, failed to refer to him to appropriate services, and failed to prepare him for his transition out of foster care. *See id.* at ¶¶ 102-20.

- Gretchen C. is 15 years old and has been in foster care for over five years. She has lived in temporary shelters, four group homes, and an out-of-state institution. DHHR has ignored her requests for individual therapy, instead leaving her in a facility that engages in peer shaming and requires children to reap land with sharp farming tools. *See id.* at ¶¶ 121-36.

- Dennis C. is 16 years old and has been in foster care for over five years. As a likely result of shaken baby syndrome, Dennis was diagnosed with cerebral palsy. He has been in five foster homes and requires a therapeutic foster home. DHHR instead placed Dennis in a facility that has had reports of physical and sexual abuse. *See id.* at ¶¶ 137-51.

- Calvin, Chris, and Caroline K. entered foster care when they were babies and are now four, three, and two years old. DHHR placed them in a pre-adoptive home but delayed the adoption process, causing it to be dismissed for failure to prosecute. These young children have since moved through two additional homes. DHHR has failed to develop appropriate case plans for these young children. *See id.* at ¶¶ 152-63.

- Karter W. is 13 years old and has been in foster care for over three years. He has moved repeatedly but had only one foster home placement. DHHR has otherwise bounced Karter between shelters, residential facilities, hospitals, and, now, an out-of-state facility. At one point, Karter was prescribed 32 pills a day to control his behavior. *See id.* at ¶¶ 164-82.

- Ace L. is 12 years old and entered foster care in 2016 after his stepfather sexually and physically abused him. Ace is diagnosed with encopresis. Because of this, Ace has faced further abuse in his foster placements. DHHR has failed to provide him therapeutic services and has placed Ace in many foster homes, a psychiatric hospital, institutional and group home settings, and a temporary shelter, where he currently resides. *See id.* at ¶¶ 183-98.

Named Plaintiffs' stories are illustrative of well-known, systematic issues within DHHR. Defendants' deliberate indifference to these dire circumstances expose all children in foster care to harm, in violation of their federal and constitutional rights.

## ARGUMENT

## I.   This Court Has Subject Matter Jurisdiction to Hear Plaintiffs' Claims and Should Not Abstain from Exercising It.

Plaintiffs do not, as Defendants assert, seek federal court review and oversight of West Virginia's state courts. Plaintiffs simply seek a constitutionally adequate child welfare system that conforms with federal law. Accordingly, this Court has subject matter jurisdiction to hear Plaintiff Children's claims.

### A.   The *Rooker-Feldman* Doctrine is Inapplicable to this Case.

The *Rooker-Feldman* doctrine prohibits federal courts from sitting "in direct review of state court decisions." *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). A federal district court lacks authority to review final judgments of state court judicial proceedings or hear claims that are "inextricably intertwined" with state court decisions unless Congress has specifically authorized it. *See id.*; *Rooker v. Fidelity Trust Co.*, 263 U.S. 412 (1923). However, because Plaintiffs do not ask this Court for "direct review" or, indeed, for any review at all, of state court decisions, *Rooker-Feldman* does not bar this Court from exercising jurisdiction over Plaintiffs' claims.

The Supreme Court has confined *Rooker-Feldman* to "cases brought by state court losers complaining of injuries caused by state-court judgments rendered before district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Davani v. Va. DOT*, 434 F.3d 712, 718 (4th Cir. 2006). "In other words, the doctrine applies where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Adkins v.*

*Rumsfeld*, 464 F.3d 456, 463 (4th Cir. 2006) (internal quotations omitted); *see also Vicks v. Ocwen Loan Servicing, LLC*, 676 Fed. Appx. 167, 168-69 (4th Cir. 2017).

Because Plaintiffs do not challenge any state-court decisions, the *Rooker-Feldman* doctrine does not apply. *See Davani*, 434 F.3d at 718. Courts deciding analogous claims brought by foster children challenging statewide policies and practices consistently have rejected similar attempts by defendants to deny jurisdiction. *See S.W. v. City of New York*, 46 F. Supp. 3d 176, 201-03 (E.D.N.Y. 2014) (holding *Rooker-Feldman* did not bar plaintiff children's claims regarding agency defendants' failure to properly screen foster mother or monitor them while in her care); *A v. Nutter*, 737 F. Supp. 2d 341, 360 (E.D. Pa. 2010) (holding *Rooker-Feldman* did not bar plaintiff children and their parents' claims that defendants violated their Fourteenth Amendment rights due to their unsafe child welfare policies); *Kenny v. Perdue*, 218 F.R.D. 277, 289 (holding *Rooker-Feldman* did not deprive the court of jurisdiction to hear plaintiff children's claims regarding systemic foster care deficiencies) (N.D. Ga. 2003); *Bonnie v. Bush*, No. 00-2116, 2001 U.S. Dist. LEXIS 23600, at *37-38 (S.D. Fla. Apr. 20, 2001) (holding *Rooker-Feldman* and abstention did not bar plaintiff foster children's federal claims against executive branch state officials). Moreover, "the mere fact that a ruling favorable to the federal plaintiff may call into question the correctness of a state court judgment has no bearing on the federal court's jurisdiction over the plaintiff's claims under *Rooker-Feldman*." *Vicks*, 676 Fed. Appx. at 169.

Defendants' Motion to Dismiss relies on a passel of outdated, pre-*Exxon* cases, which embrace a more expansive application of the *Rooker-Feldman* doctrine than is currently allowed for in the Fourth Circuit.[1] Defendants' misapply settled law, and argue that Plaintiffs' broad

---

[1] *Berry v. South Carolina Dep't of Soc. Servs.*, No. 95-2678, 1997 U.S. App. LEXIS 22647 (4th Cir. Aug. 25, 1997); *Guess v. Bd. of Medical Examiners of State of N.C.*, 967 F.2d 998 (4th Cir. 1992); *Czura v. Supreme Court of South Carolina*, 813 F.2d 644, 646 (4th Cir. 1987).

challenges to the state's practices are "inextricably intertwined" with state court adjudications. ECF No. 18 at 8. Such misapplication has never been applied in a case like this one, raising systemic challenges to foster practices. *See Sam M. v. Chafee*, 800 F. Supp. 2d 363, 383 (D.C. R.I. 2011) (children's "requested remedy is limited to injunctive and prospective relief to address what they allege to be systemic shortcomings of the Rhode Island child welfare system"—plaintiffs do not "seek to reverse or modify existing judgments rendered by the Family Court").

The Fourth Circuit has unequivocally stated that if plaintiffs in federal court do not seek review of state court judgments but instead present independent claims, as is the case here, the federal court has jurisdiction to hear the claims. *Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016). Indeed, West Virginia state courts issue a variety of orders in individual child welfare cases.[2] But Plaintiffs do not challenge *any* of those state court orders. Plaintiffs assert *separate* claims, against the executive branch, challenging DHHR's systematic failures, and challenging executive action.

###### i.        Plaintiffs' Claims Challenge Executive Actions

Because Plaintiffs challenge executive actions, not West Virginia circuit court judicial decisions, the *Rooker-Feldman* doctrine is inapplicable. The Supreme Court and Fourth Circuit have recognized that state administrative and executive actions, including state administrative agency determinations, are not covered by the *Rooker-Feldman* doctrine. *See Thana*, 827 F.3d at 320 (citing *Verizon Md. Inc. v. PSC*, 535 U.S. 635 (2002)); *see also Morgantown Energy Assocs. v. PSC*, No. 2:12-cv-6327, 2013 U.S. Dist. LEXIS 140220, at *42 (S.D. W. Va. Sept. 30, 2013).

---

[2] *Inter alia*, authorizing DHHR to take emergency custody of a child; authorizing placement of a child in an out-of-home setting; determining whether a child is abused or neglected; terminating parental rights; and granting legal guardianship or adoption. W.V. Code §§ 49-4-302; 49-4-404(a); 49-4-601(h)(i); 49-4-114(a); 49-4-112(b)(1).

Defendants mischaracterize and greatly understate the nature of Plaintiffs' claims when they assert the "gravamen of Plaintiffs' Complaint is that the West Virginia foster children are in inappropriate placements" that derive from state court orders. ECF No. 18 at 7-8. Plaintiffs indisputably do not seek to alter state court judgments and have not pleaded or requested relief concerning the abuse and neglect cases brought against their caregivers. Rather, Plaintiffs request equitable relief regarding executive action under Defendants' watch, including "[r]equir[ing] that DHHR ensure that all children whose case plan identifies a need for a service…timely receive those services…;" "[r]equir[ing] that DHHR shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards;" and "[r]equir[ing] that DHHR ensure an adequate array of community-based therapeutic services are available to children with disabilities". ECF No. 1 ¶ 405. Because Plaintiffs' claims target systemic deficiencies and executive action—which do not call for review of state court rulings—Defendants' subject matter jurisdiction arguments must fail.

Even if, as Defendants insist, Plaintiffs' allegations are reduced to claims of inappropriate placements, this Court still has subject matter jurisdiction. Pursuant to both federal and state law, placement decisions are made by the executive branch, not the judiciary. For instance, according to federal statute, a state child welfare agency must develop a case plan that includes "a discussion of how the case plan is designed to achieve a safe placement for the child in the least restrictive (most family-like) setting available…" 45 C.F.R. § 1356.21(g)(3). This provision later states federal funding is "*not available when a court orders a placement*…." *Id.* (emphasis added). Ultimate responsibility for placement decisions is vested, by statute, in the hands of West Virginia's child welfare agency—not West Virginia's state courts. DHHR policies also spell out placement requirements and require caseworkers to develop a placement plan. *See* DHHR CPS

Policy § 7.10; DHHR Foster Care Policy § 2.6.2 (explaining the caseworker "participate[s] in the actual placement…."); *see also id.* at § 2.1.2 (discussing DHHR's selection of placement for foster children and issues caseworkers must consider "when making a placement decision") and § 5.5 (the caseworker develops a "post-termination placement plan"). Placement decisions are the role of Defendant executive branch officials and caseworkers—not state courts. State courts merely review those decisions.

The cases cited by Defendants are inapplicable, as they concern challenges to West Virginia circuit court judicial decisions with regard to *individual* children.[3] This case, in contrast, is about systemic issues. None of Defendants' cited cases involve plaintiffs bringing federal statutory and constitutional claims seeking systemic, injunctive relief, like Plaintiff Children here.

### ii.    Plaintiffs Have Not had a Reasonable Opportunity to Raise Their Federal Claims in State Court Proceedings.

Defendants' challenge to jurisdiction further fails because Plaintiffs do not have a reasonable opportunity to raise their claims in their state court proceedings. Plaintiffs abuse or neglect cases are not appropriate proceedings in which to litigate complex, class action claims related to Defendants' systematic failings, and therefore are no substitute for the federal jurisdiction sought here. *See*, *e.g.*, *LaShawn A. v. Kelly*, 990 F.2d 1319, 1322-23 (D.C. Cir. 1993) ("Neglect proceedings are designed to focus on the special problems surrounding the neglect or

---

[3] *See Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*, 521 Fed. App'x 278 (4th Cir. 2013) (termination of plaintiff parents' parental rights and custodial issues regarding their children were resolved by North Carolina courts and barred by *Rooker-Feldman*); *Duby v. Moran*, 901 F. Supp. 215 (S.D. W. Va. 1995) (district court lacked subject matter jurisdiction to hear the plaintiff mother's action against DHHR employees seeking the return and custody of her son, as plaintiff was "essentially…asking the [c]ourt to review and enjoin the state court judgment"); *Stewart v. Logan Cty. Dep't of Health and Human Servs.*, No. 2:12-cv-06644, 2013 U.S. Dist. LEXIS 10192, at *6-9 (S.D. W. Va. July 22, 2013) (involving a direct challenge to the validity of the circuit court's interlocutory orders concerning the removal of plaintiffs' children); *Tacza v. Martin*, No. 2:18-cv-01330, 2019 U.S. Dist. LEXIS 139909, at *5-7 (S.D. W. Va. Aug. 19, 2019) (finding "the state court judgment was the source of the plaintiff's harm").

abuse of a child by his or her parent…. [T]hese proceedings are not suitable arenas in which to grapple with broad issues external to the parent-child relationship….").

Here, Plaintiffs' claims relate to systematic issues in West Virginia's foster care system. Plaintiffs do not challenge circuit court decisions, for example, that children who are in imminent danger be removed from their homes. Nor do Plaintiffs challenge circuit court decisions regarding whether DHHR made reasonable efforts to preserve the family. Nor are Plaintiffs "losers" who are challenging circuit court orders approving case plans in connection with circuit court proceedings.

Indeed, while West Virginia circuit courts might make orders authorizing out-of-home placement generally, they do not make orders regarding whether DHHR maintains a sufficient placement array. Moreover, DHHR, not the judiciary, is responsible for "the selection of the placement resource (relative home, foster/adoptive home, group home, residential facility, or institution)." DHHR Foster Care Policy § 2.1.2. Similarly, circuit courts do not enter orders regarding caseworker caseloads, the quality of caseworker training, or caseworker qualifications. Nor do they enter orders requiring Defendants to properly vet and oversee the state's foster care placements.

Because Plaintiffs challenge executive branch action, not the results of West Virginia judicial proceedings, and Plaintiffs do not have the opportunity to raise their claims seeking class-wide relief during those state court proceedings, the *Rooker-Feldman* doctrine is inapplicable. As such, Defendants' jurisdictional argument fails.

## B.    This Court Should Not Abstain From Hearing Plaintiffs' Claims

Defendants also argue this Court should abstain from hearing plaintiffs' claims.  However, a long line of cases has ruled otherwise. *See*, *e.g.*, *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 570 (S.D. Miss. 2004) (stating the court would be "hard-pressed to conclude that

any specific relief plaintiffs seek in this action would necessarily interfere with ongoing youth court proceedings"); *see also M.D. v. Perry*, 799 F. Supp. 2d 712, 726 (S.D. Tex. 2011) (denying motion to dismiss based upon *Younger* abstention); *Kenny A. v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) (no interference because "the declaratory and injunctive relief plaintiffs seek is not directed and their [periodic juvenile court] review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at executive branch defendants to remedy their alleged failures as plaintiffs' custodians"); *Nicholson v. Williams*, 203 F. Supp. 2d 153, 231 (E.D.N.Y. 2002) (declining to abstain pursuant to *Younger* in case challenging child welfare agency's policy of finding children neglected where parent was victim of domestic violence and finding no interference where "the injunctive relief this court grants targets general [agency] practices"); *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (observing "nothing about this litigation seeks to interfere with or enjoin" ongoing state family court proceedings); *L.H. v. Jamieson*, 643 F.2d 1351, 1354 (9th Cir. 1981) (*Younger* abstention unwarranted because relief sought did not "have the wholly disruptive consequences associated with enjoining a state judicial proceeding"); *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1043-44 (D. Ariz. 2015) (*Younger* abstention unwarranted where proposed relief was not directly aimed at the functioning of juvenile courts).

As such, this Court should not abstain from exercising jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* established the principle that federal courts should not intervene in state court proceedings. But abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976); *see also Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (stressing "[circumstances fitting within the *Younger* doctrine…are

'exceptional'). The Fourth Circuit adopted the Supreme Court's view that "[a]bstention is the exception, not the rule." *Teleco Communications, Inc. v. Carbaugh*, 885 F.2d 1225, 1228 (4th Cir. 1989). Moreover, parallel state-court proceedings do not detract from federal courts' obligation. *See Sprint*, 571 U.S. at 77.

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them. *Colorado River*, 424 U.S. at 817. As such, the Supreme Court has identified only three "exceptional circumstances" warranting abstention, none of which is present here. *See Sprint*, 571 U.S. at 78 (the three exceptional circumstances involve "intrusion into ongoing state criminal prosecutions," "certain civil enforcement proceedings," and "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions" [internal quotations omitted]). Defendants do not allege any of these exceptional circumstances is present, and, instead, skip ahead to the factors laid out in *Middlesex Cty. Ethics Comm. V. Garden State Bar Ass'n*, 457 U.S. 423 (1983).

Under *Middlesex*, abstention is required where (1) there is an ongoing state judicial proceeding that (2) implicates important, substantial, or vital state interests, and (3) provides adequate opportunity to raise constitutional challenges. *Id.*; *see also U.S. v. Bynum*, 83 Fed. Appx. 533, 534 (4th Cir. 2003); *Hazbun v. Rodriguez*, 52 Fed. Appx. 207, 208 (4th Cir. 2002). But 30 years later, in *Sprint*, the Supreme Court clarified that these are merely "additional factors" to be considered if a proceeding fits into one of the three "exceptional circumstances" laid out above— they are not dispositive. 571 U.S. at 81; *see also Malhan v. Sec'y United States Dep't of State*, 938 F.3d 453, 462 (3d Cir. 2019) (noting "*Sprint* narrowed *Younger's* domain…the three *Middlesex* conditions are no longer the test for *Younger* abstention."); *Peters v. Neroni*, 598 Fed. Appx. 797,

798 (2d Cir. 2015) (explaining the Supreme Court, in determining *Younger* abstention, rejected the *Middlesex* three-part test "in favor of a categorical approach").[4]

However, even if this case did fit into one of the three exceptional circumstances—which it does not—*Younger* does not apply because the three *Middlesex* factors are not met.

**First**, Plaintiffs are not asking this Court to interfere with or enjoin their ongoing state judicial proceedings. This in itself dispenses with Defendants' abstention argument. Nor are Plaintiffs seeking the kind of "anticipatory interference" or "piecemeal interruptions of state proceedings" directed at "state judicial officers" described in *O'Shea v. Littleton*, 414 U.S. 488 (1974). Plaintiffs seek a judicial declaration and injunction, directing Defendants—West Virginia executive branch agencies and officials—to comply with federal law and the Constitution. *See supra* Section I.A.i.

*O'Shea* is an outgrowth of *Younger* and is inapplicable to Plaintiffs' claims. Under *O'Shea*, a federal court may not issue an injunction which would result in an "ongoing federal audit" of state court proceedings that would "indirectly accomplish the kinds of interference that *Younger*…and related cases sought to prevent." *O'Shea*, 414 U.S. at 500. The interference with state court proceedings must be explicit in order to warrant *O'Shea* abstention. In *O'Shea*, plaintiffs alleged widespread race discrimination in the administration of state court criminal prosecutions, and sought a federal injunction limiting the state courts' discretion to set bail and sentence criminals. *Id.* at 491-92. The Supreme Court found the federal injunction was "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future criminal trials." *Id.* at 500. Because the injunction "contemplate[d] interruption of state proceedings to adjudicate assertions of noncompliance" with a federal order, it amounted to

---

[4] *Moore v. Simms*, 442 U.S. 415 (1979), is simply a federal court effort to make a collateral attack on a decision in a state court proceeding; it was unsuccessful and the federal court abstained.

"nothing less than an ongoing federal audit of state proceedings" that would be "intrusive and unworkable." *Id.*

The relief Plaintiffs seek is directed at state-level executive agencies, not state courts, and therefore would not result in an "ongoing federal audit" of state court proceedings. *See Tinsley*, 156 F. Supp. 3d at 1043 (declining to abstain under *O'Shea* because "although juvenile courts play a significant role in overseeing the care of [foster] children…the courts are not involved in adjudicating and remedying the types of claims raised here").

Here, Plaintiffs are not asking the Court to issue any injunction that would directly or indirectly interrupt any West Virginia circuit court proceeding. Defendants misconstrue Plaintiffs' requested relief by suggesting, for example, that the neutral monitor who might ultimately be appointed to monitor compliance with any system-wide injunction would simultaneously be reviewing, modifying, and approving plans for individual children. ECF No. 18 at 11. That is incorrect. It is axiomatic that federal courts may and do appoint monitors or special masters to ensure that state officials comply with federal remedial orders without running afoul of *O'Shea*. *See Sukumar v. Direct Focus, Inc.*, 349 Fed. Appx. 163, 165 (citing *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138 (9th Cir. 2002) ("The district court has discretion to appoint a special master and to decide the extent of his duties."); *Hook v. Ariz. Dep't of Corrections*, 107 F.3d 1397 (9th Cir. 1997) (district court did not err in declining to modify an injunction appointing a special master when doing so was necessary to uphold prisoners' constitutional rights); *M.D. v. Abbott*, 152 F. Supp. 3d 684, 823-24 (S.D. Tex. 2015) (appointing special master to help "craft the [foster care system] reforms and oversee their implementation").

**Second**, Plaintiffs could not have raised these constitutional claims in their individual circuit court proceedings. *See supra* Section I.A.ii. Courts must consider not only whether it was

possible for the plaintiffs to raise their federal claims in the state proceeding, but also whether the "state proceeding is an inadequate or inappropriate forum for pursuing [those] claims." *LaShawn*, 990 F.2d at 1322-23. Courts have repeatedly held the state court system is an inadequate forum for class-action plaintiffs to present a challenge to a state's foster care system. *See id.* (family court proceedings are not appropriate forums for a "multi-faceted class-action challenge to the District of Columbia's administration of its entire foster-care system"). Indeed, state proceedings address issues involving the care of a child by his or her parent, and "are not suitable arenas in which to grapple with broad issues external to the parent-child relationship." *Id.* West Virginia circuits courts are tasked with adjudicating questions of family law, not with crafting broad-based injunctive relief concerning an executive agency. *See id.* (family courts do not afford plaintiffs an adequate opportunity to seek relief for the systematic failure of the foster care system).

Defendants also assert Plaintiffs can raise their federal claims in West Virginia circuit courts via their appointed *guardian ad litems*. *See* ECF No. 18 at 13. But the duty of *guardian ad litems* in a child abuse and neglect proceeding is "to represent the best interests of the child." W. Va. Code Appendix A § A. This form of advocacy is distinct from advocacy for a child's federal rights, as required here. Tellingly, Defendants fail to point to a single West Virginia case in which a *guardian ad litem* asserted violations of a child's federal rights. *See* ECF No. 18 at 13.[5]

**Third**, there is a significant need for federal equitable relief because the safety and welfare of West Virginia's foster children are at stake. *See Nicolson*, 203 F. Supp. 2d at 164, 232. This is

---

[5] *See In re Scottie D.*, 406 S.E.2d 214 (W. Va. 1991) (*guardian ad litem* sought review of order concluding that father had not neglected or abused his children); *In re K.L.*, 826 S.E.2d 671 (W. Va. 2019) (*guardian ad litem* and others appealed circuit court order awarding custody of children to their aunt and uncle); *In re S.W.*, 779 S.E.2d 577 (W. Va. 2015) (*guardian ad litem* and grandparents appealed order terminating grandparents' legal guardianship of grandchild); *In re Elizabeth F.*, 696 S.E.2d 296 (W. Va. 2010) (*guardian ad litem* appealed preference given to grandparents to adopt their grandchildren); *In re Renae Ebony W.*, 452 S.E.2d 737 (W. Va. 1994) (*guardian ad litem* appealed judgment ordering return of child to the parents' custody for a three-month improvement period).

especially the case where the parties from whom Plaintiffs seek protecting are the state agencies and officials charged with caring for them.

Finally, the Defendants rely on inapposite case law that should not guide this Court's abstention determination. *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), for instance, is easily distinguished; plaintiffs there sought a federal panel that would have "authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida." *Id.* at 1278-79. No such federal interference is sought here. *See Kenny A. ex rel. Winn*, 218 F.R.D. at 287-88 (finding *31 Foster Children* inapplicable where "plaintiffs do not ask the Court to make individualized determinations with respect to particular foster children" and instead "seek relief mandating, on a system-wide basis, that State Defendants institute reforms to ensure that deprived children's constitutional and statutory rights are not violated" and noting "the relief requested in *31 Foster Children* went beyond what is sought here").

Moreover, *31 Foster Children* is no longer good law. That court did what the Supreme Court held ten years later in *Sprint Communications* is forbidden: it applied the *Middlesex* factors without first determining whether any of the three exceptions applied. The same is true of *Berry v. South Carolina Dep't of Social Servs.*, No. 95-2678, 1997 U.S. App. LEXIS 22647, at *11 (4th Cir. Aug. 25, 1997) and *Suggs v. Brannon*, 804 F.2d 274 (4th Cir. 1986).

For the foregoing reasons, the system-wide relief requested will in no way interfere with any of the ongoing child abuse and neglect proceedings, and abstention is not warranted.

## II.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR CONSTITUTIONAL AND STATUTORY CLAIMS

"[T]o survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts which, if true, state a claim to relief that is *plausible* on its face." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 403 (4th Cir. 2014). "A plaintiff fails to state a claim only when he offers

'labels and conclusions' or formulaically recites the elements of his…cause of action." *Id.* "[T]he Court must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable factual inferences from those facts in the plaintiff's favor." *Ali v. Raleigh Cty.*, No. 5:17-cv-03386, 2018 U.S. Dist. LEXIS 52733, at *10 (S.D. W. Va. Mar. 29, 2018). "[T]he issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims he or she makes." *Brown v. Mason Cty. Comm'n*, No. 3:18-1496, 2019 U.S. Dist. LEXIS 210003, at *7 (S.D. W. Va. Dec. 5, 2019). "Finally, we bear in mind that a complaint is to be construed liberally so as to do substantial justice." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) ("when, as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, we must be especially solicitous of the wrongs alleged").

### A.   Defendants' Child Welfare Policies and Practices Violate Plaintiff Children's Constitutional Rights

Defendants have proven themselves incapable of providing protection to children in their custody and care. Defendants' Motion to Dismiss further attempts to derogate those children's constitutional protections. Courts in the Fourth Circuit and across the country have recognized that deficient and inadequate child welfare systems implicate the constitutional rights of foster children.[6] But according to Defendants, West Virginia foster children are constitutionally entitled to no more than their "basic human needs", like food, clothing, and shelter. *See* ECF No. 18 at 16. Defendants' position is regressive, outdated, and ultimately, unsupported. Plaintiffs do not seek an

---

[6] *See, e.g. Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("tak[ing] a broad view of the concept of harm in the context of plaintiffs' substantive due process claims", finding "custodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being"); *Brian A. by Brooks v. Sundquist*, 149 F. Supp. 2d 941, 954 (M.D. Tenn. 2000); *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 556 (S.D. Miss. 2004) ("plaintiffs' pleading is sufficient to allege a violation of their substantive due process right to adequate care and treatment while in state custody"); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 161 (D. Mass. 2011).

"aspirational" child welfare system, *see* ECF No. 18 at 14, but merely a constitutionally adequate one. *See M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) (explaining foster children have the constitutional right to "personal security and reasonably safe living conditions" and the right to be free from unreasonable risk of harm, which includes protection from both psychological and physical abuse), *aff'd in part*, 907 F.3d 237 (5th Cir. 2018). Plaintiffs do not seek protection from violence from "private third parties", *see* ECF No. 18 at 15, but from the State of West Virginia itself. Accepting the allegations in Plaintiffs' Complaint as true, Plaintiffs have adequately alleged that Defendants' policies and practices jeopardize the safety and well-being of children in their custody and care, in violation of the children's rights under the Constitution.

### i.   Defendants Have Violated Plaintiffs' Substantive Due Process Rights Under the Fourteenth Amendment

"Section 1983 provides a private cause of action for the deprivation of rights, under color of state law, secured by the Constitution and laws of the United States." *Brown v. Mason Cty. Comm'n*, No. 3:18-1496, 2019 U.S. Dist. LEXIS 210003, at *10-11 (S.D. W. Va. Dec. 5, 2019). "A federal civil rights claim based upon § 1983 has two essential elements: A plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011). The Fourth Circuit has categorically confirmed that "when a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause". *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010); *see also Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) ("The specific source of an affirmative duty to protect…is the custodial nature of a 'special relationship.'"). While ordinarily, violative government action "encompasses only the most

18

egregious official conduct, namely that which 'shocks the conscience'…a lower level of culpability may amount to a substantive due process violation in those situations where the government is required to take care of those who have already been deprived of their liberty". *Slaughter v. Mayor of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012). "In those circumstances, the Court has held that the government's *deliberate indifference* to the care of persons in its custody can shock the conscience for purposes of finding a substantive due process violation." *Slaughter v. Mayor of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012). Put another way, "where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child, liability may be imposed." *Doe*, 597 F.3d at 175.

Defendants, unsurprisingly, insist their constitutional responsibilities begin and end at the bare minimum: that they need only provide West Virginia children removed from their homes and placed in state care with "basic human needs". *See* ECF No. 18 at 16. It is a stubborn assertion that requires ignoring—as Defendants do—the last thirty years of child welfare jurisprudence, including the ever-growing precedent set by courts across the country recognizing the constitutional implications of child welfare policies and practices that jeopardize foster children's safety and well-being. Defendants themselves admit that "the number of children in foster care in West Virginia has increased by a staggering 80 percent" between 2010 and 2017, *see* ECF No. 18 at 1. And yet, Defendants rely almost exclusively on case law from the 1980s and 1990s to evade their legal responsibilities to those children. *See id.* at 14-20. Defendants cannot have it both ways. As recent decisions in the Fourth Circuit and beyond affirm, and as Plaintiffs have alleged, child welfare policies and practices that place children at risk of harm, in deliberate indifference to their safety and well-being, violate those children's constitutional rights.

The Fourteenth Amendment's due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests" and operates "to protect the people from the State". *Doe*, 597 F.3d at 170. The plaintiff in *Doe* alleged violations of such rights when she was involuntarily removed from her home and placed in foster care settings with her brother, who the state knew to be sexually abusing her. *See id.* at 168. The Fourth Circuit found the "affirmative act" of removing a child from his or her home and taking the child into state custody and care "trigger[ed] the protections of the Due Process clause", imposing responsibilities "for the child's safety and general well-being…includ[ing] a duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security". *Id.* at 175.

Other circuit courts, consistent with the Fourth Circuit's finding in *Doe*, have elaborated on the substantive rights of children in a "special relationship" with the state. The Fifth Circuit, for instance, recently found that defendants had violated foster children's "substantive right to personal security and reasonably safe living conditions", including the "right to be free from certain forms of psychological harm", through policies and practices that "cause[d] all [foster] children to be exposed to a serious risk of physical and psychological harm". *M.D. v. Abbott*, 907 F.3d 237, 264 (5th Cir. 2018); *see also Olivia Y.*, 351 F. Supp. 2d at 556 (denying motion to dismiss constitutional claims because plaintiffs had sufficiently alleged "a violation of their substantive due process right to adequate care and treatment while in state custody"). The Seventh Circuit similarly held—in a case cited by Defendants—that "the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically." *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990). The Seventh Circuit only "rejected substantive due process claims", as Defendants assert, *see* ECF No. 18 at 17, for

*damages*: however, "some or perhaps even all of the defendants may have violated K.H.'s constitutional rights" by "formulat[ing] and approv[ing] the departmental policies" that caused "mindless shuttling of the Department's wards" between placements. *Id.* at 849-50.

Despite clear directives from the Fourth Circuit and beyond, however, Defendants maintain their constitutional obligations are limited to "the narrow band of 'basic human needs.'" ECF No. 18 at 16. Defendants reach that mistaken conclusion by misappropriating the Supreme Court's "simple" observation in *Deshaney* that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Defendants, mistakenly and improperly, convert the floor of constitutional protection into its ceiling—and then call for dismissal, because "Plaintiffs' Complaint does not allege that they have been deprived of 'basic human needs'." ECF No. 18 at 16.

That is not the law. Defendants' misunderstanding of the law is obvious from their argument, which depends on outdated, unexamined case law, *see* ECF No. 18 at 17-18, including inapposite dicta from an immigration case involving the detention of unaccompanied alien minors. *See Reno v. Flores*, 507 U.S. 292 (1993).[7] The cases presented by Defendants are indeed more a time capsule. *See* ECF No. 18 at 17-18. None, of course, contemplate the Fourth Circuit's 2010 holding in *Doe*, let alone interpret it. Several further stand for inapposite propositions, rejecting claims for "a stable foster-home environment" or "placement stability" that Plaintiffs do not make.

---

[7] *See also Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 809 F. Supp. 2d 754, 775-76 (N.D. Ohio 2011) ("The *Flores* case has no application in the context of removal of children *from their parents or custodial guardians*.") (emphasis in original).

*See* ECF No. 18 at 17-18. That Defendants must rely almost exclusively on decades-old cases making unrelated conclusions speaks to the strength of their underlying position.

The facts alleged in Plaintiffs' Complaint, taken as true, demonstrate Defendants' policies and practices toward children in their care systematically evinces deliberate indifference to their safety and general well-being. Defendants regularly place foster children in residential treatment facilities publicly accused of, and criminally investigated for, child molestation and other abuses of children. ECF No. 1 ¶ 63, 73, 150. Defendants place foster children who have never been adjudicated as delinquents in residential treatment facilities housing violent juvenile offenders, where children are made to perform manual labor. *Id.* at ¶ 127-130. Defendants place young, vulnerable children in institutional settings full of older children. *Id.* at ¶ 95, 108-109. Defendants place victims of child sex abuse in residential programs meant for sex *offenders*. *Id.* at ¶ 111, 115. Defendants place children in abusive foster homes, where children are confined to the basement or "whooped" for displaying disabilities, and fail to revoke licenses for such homes. *Id.* at ¶ 168-170, 185. Defendants routinely place children in kinship homes that are not properly vetted, *id.* at ¶ 52, 70, and leave children in emergency shelters for extended periods of time, shuttling them from shelter to shelter, *id.* at ¶ 61, 125, 172, 195.

As alleged in Plaintiffs' Complaint, Defendants' conduct rises above mere "negligence" or "carelessness", constituting deliberate indifference to the safety, security, and well-being of the children in their custody and care. *See Slaughter*, 682 F.3d at 321 ("the government's *deliberate indifference* to the care of persons in its custody can shock the conscience for purposes of finding a substantive due process violation"); *Doe*, 597 F.3d at 175 (deliberate indifference met where "defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice"). Plaintiffs' Complaint contains allegations of the extreme risks and

severe harms children in the West Virginia foster care system are routinely exposed to as a result of Defendants' systematic and deliberate indifference to their safety and well-being. Defendants' practice, as Plaintiffs have alleged, of placing foster children in inadequately investigated kinship homes results in systemic, not isolated, harms. Defendants' practice of placing foster children in inappropriate institutional settings, similarly, results in systemic, not isolated, harms. Defendants' deliberate indifference is not contained to a single child, or even only to the Named Plaintiffs in this action, but indeed results in constitutional harm to *every* child in West Virginia's foster care system.

Taken as true, Plaintiffs' allegations clearly demonstrate Defendants' policies and practices are deliberately indifferent to Plaintiffs' constitutional rights to safety, security, and general well-being. Plaintiffs' allegations are not simply a matter of "sound policy", as Defendants blithely assert. *See* ECF No. 18 at 16. They are a matter of dire constitutional harm affecting all children in the West Virginia foster care system.

Defendants make a second but similarly outdated argument that constitutionally, they must "provide only the 'minimally adequate care and treatment' required to assure personal safety". ECF No. 18 at 18. Again, this argument plucks cases exclusively from the 1980s and 1990s, and again, the propositions are inapposite. Defendants cite a New York state court case, for instance, that rejects "any substantive due process right to *monetary redress* for the defendants' alleged failure to provide the array of social services", while noting that "this Court has never had occasion to deal with the contours of the substantive component of the Due Process Clause in the context of a child welfare case". *See Mark G. v. Sabol*, 93 N.Y.2d 710, 726 (1999) (emphasis added). But Defendants fail to cite a much more relevant holding from New York federal court: that foster children "have a substantive due process right to be free from unreasonable and unnecessary

intrusions into their emotional well-being", and that "the right to be free from harm encompasses the right alleged by plaintiffs to appropriate conditions and duration of foster care." *Marisol A. by Forbes*, 929 F. Supp. at 676. Defendants' suggestion that "[o]nly two of the 17 due process 'rights' that the Plaintiffs assert even arguably relate to the 'basic human need' of physical safety" is rebuked by Defendants' own authorities. ECF No. 18 at 18; *see B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989) ("[W]e adopt [the] holding that a child who is in the state's custody has a substantive due process right to be free from unreasonable and unnecessary intrusions on both its physical and emotional well-being. Our conclusion is grounded in common sense: A child's physical and emotional well-being are equally important. Children are by their nature in a developmental phase of their lives and their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries.").

Defendants ultimately overlook the clear evolution of child welfare jurisprudence towards more robust constitutional protections for foster children alleging statewide policies and practices that place them at risk of harm. Since 1989, when the Supreme Court decided *Deshaney*, courts across the country have denied motions seeking dismissal of foster children's constitutional claims, finding that plaintiff-children had adequately alleged constitutional violations stemming from defendants' policies and practices.[8] This evolution appropriately coincides with the progression of child welfare standards and challenges—as Defendants themselves admit, *see* ECF No. 18 at 1.

_____

[8] *See, e.g. Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("tak[ing] a broad view of the concept of harm in the context of plaintiffs' substantive due process claims", finding "custodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being"); *Brian A. by Brooks v. Sundquist*, 149 F. Supp. 2d 941, 954 (M.D. Tenn. 2000); *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 556 (S.D. Miss. 2004) ("plaintiffs' pleading is sufficient to allege a violation of their substantive due process right to adequate care and treatment while in state custody"); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 161 (D. Mass. 2011).

### ii. Defendants' Child Welfare Policies and Practices Violate Plaintiff Children's Familial Association Rights Under the Constitution

Defendants incorrectly characterize Plaintiffs' constitutional right to familial association as "a vague right". "The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (internal citations omitted). Accordingly Plaintiffs do not, as Defendants contend, rely on the Ninth Amendment as "independently" securing plaintiffs' constitutional rights—making most of the cases and propositions cited by Defendants inapposite. *See* ECF No. 18 at 20-21. The Supreme Court has also held that "certain intimate human relationships must be secured against undue intrusion by the State" and protected as "a fundamental element of personal liberty". *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). Here, Plaintiffs allege that as children in state custody and care, Plaintiffs' "intimate human relationships" with their parents, siblings, and other family members are systematically and improperly intruded upon by Defendants' policies and practices. Therefore, Plaintiffs have adequately alleged violations of their right to familial association as protected by the Constitution.

Courts have found, precisely in the child welfare context, that "once the state has removed a child from his or her family, it cannot deliberately and without justification deny that child the services necessary to facilitate reunification with his or her family, when safe and appropriate, without violating the child's right to family integrity". *Kenny A. v. Perdue*, 218 F.R.D. 277, 297 (N.D. Ga. 2003) (plaintiffs "state a viable claim by alleging that State Defendants have systematically failed to facilitate their prompt reunification with their families whenever safe and appropriate"). This is because "once state officials remove a child from his or her home, they have a constitutional duty to protect the child from harm," including the duty to provide "safe and

25

appropriate placements and services that…do not unnecessarily interfere with the child's rights of family association". *Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS, 2004 U.S. Dist. LEXIS 27025, at *25 (N.D. Ga. Dec. 11, 2004). *See also Brian A. by Brooks v. Sundquist*, 149 F. Supp. 2d 941, 956 (M.D. Tenn. 2000) (refusing to dismiss foster children's claim "that Defendants' systematic actions and inactions have violated their rights under the First and Ninth Amendments not to be deprived of family relationships absent compelling reasons")

Here, Plaintiffs allege after removing children from their homes and taking them into state custody and care, thereby forming a "special relationship" with the children, Defendants routinely intrude upon their right to familial associations. Defendants, for example, regularly place children in inappropriate institutional settings, where "intimate human relationships" are wholly absent. ECF No. 1 ¶ 50-51, 63; 108-116; 124-127, 172. Defendants shuffle children through foster placements without regard for their right to "enter into and maintain" such relationships. ECF No. 1 ¶ 59, 92 142. Defendants unnecessarily separate siblings when making placement decisions, and do not even arrange for visitation between separated siblings. ECF No 1 ¶ 71-72, 107, 141, 167, 188. Defendants even denied a child the ability to make contact with a dying grandfather. ECF No. 1 ¶ 179. Plaintiffs' allegations, taken as true, firmly establish Defendants' continuing violations of Plaintiffs' constitutional right to familial association.

The authorities produced by Defendants themselves confirm the propriety of Plaintiffs' claims. Defendants note the court's reluctance, in *Marisol*, to protect the right to "a particular type of family life"—a right never asserted by Plaintiffs and thus inapposite. *See* ECF No. 18 at 21; 929 F. Supp. at 676. But the *Marisol* court went on to hold that "Plaintiffs' family integrity claims are closely related to those pertaining to the duration of foster care and, by extension, fall within the concept of harm for substantive due process purposes"; plaintiffs had demonstrated that defendants

"unnecessarily place children in foster care and allow children properly in foster care to languish without taking steps to reunite them with their biological family where appropriate", thereby stating a constitutional claim for "defendants' failure to provide reasonable services and placements that protect custodial plaintiffs' right of association with their biological family members". *Marisol*, 929 F. Supp. at 677.

Because Plaintiffs have adequately established Defendants' violation of their constitutional right to familial association, Defendants' attempts to dismiss their claim must be denied.

**B.    The Right to an Adequate Case Plan and Case Review System Under the AACWA is Individually Enforceable**

**i.    Foster Children Have a Private Right of Action Under AACWA Enforceable through 42 U.S.C. § 1983.**

Section 1983 creates a federal remedy against anyone who, under color of state law, deprives a person "of any rights privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In accordance with the Supreme Court's holding in *Blessings v. Freestone*, § 1983 safeguards rights conferred by federal statutes, provided a violation of a federal right is asserted. 520 U.S. 329, 340 (1997).

AACWA confers federal rights on Plaintiffs that are privately enforceable under §1983. AACWA is intended to benefit Plaintiff Children, and, in enacting AACWA, Congress declared that the purpose of the Act is to "enable [] each State to provide, in appropriate cases, foster care and transitional independent living programs for children". 42 U.S.C. § 670; *see also Marisol,* 929 F. Supp. at 683. Indeed, in addressing the issue of whether AACWA creates privately enforceable rights by foster children under § 1983, the majority of courts deciding the issue subsequent to the

holdings of *Suter* (1992)*, Blessings* (1997)*, and Gonzaga* (2002) found that it does. *See D.O. v. Glisson*, 847 F.3d 374, 381 (6th Cir. 2017)*, cert. denied*, 138 S. Ct. 316, 199 L. Ed. 2d 233 (2017).[9] The Fourth Circuit recognizes a private right of action under AACWA. *See L.J. v. Massinga,* 838 F.2d 118, 123 (4th Cir. 1988) (hereinafter "*L.J. II*") (holding, after examining the elements of several sections within AACWA, that "taken together we think that these statutory provisions spell out a standard of conduct, and as a corollary rights in plaintiffs…th[at] are privately enforceable").

Defendants argue the 1988 *L.J.II* decision does not survive the subsequent holdings in *Suter, Blessing, and Gonzaga,* and therefore, does not bind this Court.[10] *See* ECF No. 18 at. 27-29. However, in 2011, the Fourth Circuit reviewed the merits of the *L.J.II* holding after *Suter, Blessing, and Gonzaga* were decided and held that "the burden of showing that this court's decision in *L.J. II* has been overruled by *Suter*" that "a private right of action to enforce the relevant provisions of AACWA" has not been met. *L.J v. Wilbon,* 633 F.3d 297, 307 (4th 2011). Accordingly, the Fourth Circuit is bound by the *L.J.II* decision which recognizes a privately enforceable right under AACWA.

### ii. The *Blessing* Standard for Private Rights of Action is Satisfied.

A statute provides privately enforceable federal rights that are actionable under § 1983 where Congress "intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002). In considering whether a statutory provision gives rise to a federal right, the following factors are considered: (1) Congress must have intended that the

---

[9] *See also Cal. St. Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 982 (9th Cir. 2010); *Chong v. McManaman*, 154 F. Supp. 3d 1043, 1050 (D. Hawaii 2015); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 172 (D. Mass. 2011); *C.H. v. Payne,* 683 F. Supp.2d 865, 878 (S.D. Ind. 2010); *Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1042 (W.D. Mo. 2003); *but see Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1203 (8th Cir. 2013) (no private right); *New York State Citizens' Coal. For Children v. Carrion*, 31 F. Supp. 3d 512, 527 (E.D.N.Y. 2014) (no private right); *Carson v. Heineman*, 240 F.R.D. 456, 541 (D. Neb. 2007) (no private right).

[10] *Suter*, held that there is no privately enforceable right conferred by §§ 671(a)(9), and 671(a)(15). Plaintiffs here do not make any claims pursuant to these sections at issue in *Suter*.

provision in question benefit the plaintiff; (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the States. *See Blessing,* 520 U.S. at 340-41. In addition, Congress must not have expressly or impliedly specifically foreclosed a remedy under § 1983 "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* At 341.

### 1.   Plaintiffs Have a Privately Enforceable Right to Written Case Plans and a Case Review System with Certain Features.

Sections 671(a)(16), 675(1), and 675(5) satisfy the first prong of the *Blessing* test because their provisions specifically benefit plaintiffs. *See*, *e.g.*, *Sam M.,* 800 F .Supp. 2d at 387-88 ("the requirement[] for a case plan with respect to 'each child'…indicate[s] that the plaintiff children are the intended beneficiaries of th[is] provision[]").[11] Section 671(a)(16), as defined in § 675, requires the "development of a case plan…for each child receiving foster care maintenance payments…and…a case review system which meets the requirements described in section [] 675(5)…with respect to *each such child*." (emphasis added). This provision communicates a benefit to "each… child" showing an "unmistakable focus on the benefited class." *Gonzaga Univ.,* 536 U.S. at 287.  Likewise, § 675 outlines specific case plan guidelines and "concrete requirements for the content and timing of the case plans and case review systems" including, for example, "the health and education records of the child", and documentation of "the reasons why a [specific]

---

[11] *See also Connor B.,* 771 F. Supp. 2d at 171 (concluding that § 671(a)(16) "discusses how the state must distribute benefits to *each child*…[so that] [p]lainly, these directives are…unmistakably focused on the benefitted class, i.e., foster children); *Henry A. v. Willden*, 678 F.3d 991, 1006 (9th  Cir. 2012) ("Section 671(a)(16) unambiguously requires the State to provide for the development of a case plan 'for each child'"); *Kenny A.,* 218 F.R.D. at 292 (concluding that §§ 675(1) and 675(5) confer privately enforceable rights when §675(1) "defin[es] 'case plan' in terms of documents regarding 'each child'" and §675(5) "defin[es] 'case review system' in terms of procedures regarding 'each child'").

permanent placement…is [selected]". *L.J. v. Wilbon,* 663 F.3d at 310 (finding §§ 671(a)(16), 675(1), and 675(5)(B), contain the "concrete requirements" that were not included in the sections of AACWA reviewed under *Suter*). The plan is to ensure the child receives "safe and proper care" and that services are provided to the parties to facilitate the return of the child to the home or other permanent placement. *See* 42 U.S.C. §§ 675(1)(A)-(G).

Defendants argue Plaintiffs' dissatisfaction with their foster care outcomes is asking too much because there is at least the existence of a case plan and a system for case review. *See* ECF No. 18 at 26. Defendants' argument that any case plan or case review system, regardless of its efficacy, is adequate under the law, must fail. Congress included this section to define the precise requirements for an adequate case plan and case review system and would not have done so if it intended them to be illusory. Every Named Plaintiff has experienced multiple failed placements, has suffered from a lack of necessary services, and has been exposed to trauma while in West Virginia's care. Moreover, all of the Named Plaintiffs alleged injuries that naturally occur as a result of the lack of a case plan or case review. [12]

Defendants further argue that there is no privately enforceable right under § 671(a)(16), § 675(1), and § 675(5) by analogizing the AACWA sections discussed in *Suter*—specifically, § 671(a)(15) and § 671(a)(9))—to the different AACWA sections under which Plaintiffs bring their claims. *See* ECF No. 18 at 24. In 2011, defendants in *L.J.* made an identical argument, but the Fourth Circuit found they "failed to establish that *Suter* forecloses a private plaintiff's ability to bring an action pursuant to 42 U.S.C. § 671(a)(16)" and further stated "whether a plaintiff has a

---

[12] *See e.g.* ECF No. 1 ¶ 49 (alleging facts in support of the conclusion that Defendants made "no effort" to find appropriate placement for Plaintiff in proper out-of-home care); ECF No. ¶ 194 (facts alleged in support of Defendants' failure to provide efforts to prevent removal); ECF No.¶ 71, 142 - 143 (alleging facts to support case plan failed to conform to Plaintiffs' special needs); ECF No. ¶ 72 (alleging facts in support of placement standards violations); ECF No.¶ 123, 172, 197 (alleging facts in support of complete failure to provide case planning).

right to bring an action under a particular provision of AACWA requires a section-specific inquiry." *L.J. v. Wilbon,* 633 F.3d at 309; *see also Blessing* 520 U.S. 320, 342 (1997). [13]

Sections 671(a)(16), 675(1)(A) and 675(1)(B) satisfy the second prong of the *Blessing* test because they are neither vague nor amorphous, but rather contain specific criteria necessary for a state to comply with the statutory requirements therein. *See Blessing*, 520 U.S. 329, 340-41 (1997). Courts have found "the requirements needed to form a case plan are fairly specific in that a judge can determine whether a state plan contains such a [compliant] system" and those rights conferred are intended to benefit each child in the foster care system. *Clark K. v. Guinn*, No. 2:06-CV-1068, 20007 U.S. Dist. LEXIS 35232, at *32 (D. Nev. May 9, 2007); *see also Sam v. Chafee,* 800 F. Supp. 2d 363, 387-88 (D.R.I. 2011) (finding "neither [its] mandatory character nor the intended benefit to each child in the foster care system are ambiguous" and "AACWA language with respect to 671(a)(16)…is explicitly mandatory"). As the Fourth Circuit held in *L.J. ex rel Darr v. Massinga,* 838 F.2d 118 (4th Cir. 1988), the case plan along with the case review provisions of the AACWA "spell out a standard of conduct" and "this requirement is repeated and amplified in 42 U.S.C. § 671 (a)(16)." For example, the case plan must be a written document, must be prepared within 60 days, and must include a description of the services offered and provided to prevent removal of the child from the home. Also, the case review system must assure that each child has a case plan consistent with his special needs, that the child's case is either judicially or administratively reviewed at least every six months, and that the child's parents' rights are terminated if the child has remained in foster care for 15 of the most recent 22 months. The

---

[13] Following the *Suter* decision, Congress passed a law which provides that simply because a provision of the act is included in section of the act requiring a State plan or specifying the required contents of a State plan it is "not to be deemed unenforceable…", indicating that provisions of AACWA are enforceable. 42 U.S.C. 1320a-10, *§* 1130A.

specificity of these mandates renders them not so vague and amorphous such that they run the risk of straining judicial competence. *See Blessings*, 520 U.S. at 341.

Furthermore, §§ 671(a)(16), 675(1)(A) and 675(1)(B) satisfy the third prong of the *Blessing* test to unambiguously impose a "binding obligation" on the state. This is clear through its use of mandatory language and active voice. *See Blessings v. Freestone*, 520 U.S. 329, 332 (1997); *see also D.O. v. Glisson*, 847 F.3d 374, 379 (6th Cir. 2017), *cert. denied*, 2017 WL 2869916 (U.S. Oct. 10, 2017) (stating "laws phrased in the active voice, with the state as the subject, confer individually enforceable rights."). As is here, §§ 671(a)(16), 675(1), and 675(5) state, for example, that "the state shall file a petition to terminate the parental rights", and "shall have a [case] plan…for each child". The use of the word "shall" couches Congress' requirements to the State "in mandatory, not precatory terms". *Blessings*, 520 U.S. at 341; *see also For Special Needs Trust Admin., v. Olson,* 676 F.3d 688, 700 (8th Cir. 2012).

Finally, AACWA does not contain an express exclusion of a remedy under § 1983. Nor has Congress implicitly foreclosed a remedy. Further, there is no comprehensive scheme that would be incompatible with individual enforcement. In fact, following the holding in *Suter*, Congress passed a law to clarify their position that "a provision of the Social Security Act…is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan" indicating congressional intent to provide individual enforcement, which Congress felt may have been misinterpreted by the *Suter* Court. *See supra* Footnote 14.

> **2.    Plaintiffs Have a Privately Enforceable Right to Foster Placements that Conform to Nationally Recommended Professional Standards.**

Section 671(a)(10) of AACWA requires that "foster family homes and child care institutions" be "reasonably in accord with recommended standards of national organizations

concerned with the standards for the institutions or homes". 42 U.S.C. § 671(a)(10). Moreover, foster family homes must meet "standards relating to admission policies, safety, sanitation, and protection of civil rights". 42 U.S.C. § 671(a)(10)(A).

Section 671(a)(10) satisfies the *Blessing* test.  The text clearly supports the conclusion that this section is intended to protect individual children in foster care. Indeed, § 671(a)(10) provides for the safety, cleanliness, and protection of civil rights, not to be waived except on a "case-by-case basis…for specific children". 42 U.S.C. § 671(a)(10)(D). Also, the requirement that states "shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations" satisfies the final two prongs of the *Blessing* test. *See Blessing* 520 U.S. at 332. It is not so vague and amorphous that it is beyond the competence of the judiciary to determine when a state is non-compliant with the statutory requirements as they are directed to make a compliance determination based on the "recommended standards of national organizations". 42 U.S.C. § 671(a)(10)(A). Furthermore, by use of the word "shall", *see supra* Section C.ii.2, Congress makes clear that this is a "binding obligation". *Blessings*, 520 U.S. at 341.

Defendants argue that the reference to 'recommended standards of national organizations' renders this section fatally vague by likening it to § 671(a)(15)'s "reasonable efforts" standard, which was declared privately unenforceable in *Suter*. But the criteria provided in § 671(a)(10) goes far beyond a formless "reasonable efforts" standard. First, Congress dictates which "national organizations" should be looked to for compliance standards. Second, Congress qualifies the resulting selection by allowing only those national organizations "which shall permit use of the reasonable and prudent parenting standard". 42 U.S.C. § 671(a)(10)(A). There are two major standard-setting organizations in operation, the Child Welfare League of America and the Council

on Accreditation. Recommendations by these organizations are made by well-researched experts, after expansive, relevant data has been carefully considered and analyzed.

Because the specific criteria produces only a very limited number of highly specialized "national organizations" to reference for compliance standards, § 671(a)(10) is neither vague nor amorphous.

### 3.   Plaintiff Children Sufficiently Allege that They are Beneficiaries of the Cited Provisions.

Defendants also argue that because less than all putative class members are entitled to relief, the AACWA claims must be dismissed. However, this is not an appropriate consideration in a 12(b)(6) motion because it asks the court to make a factual finding. *See*, *e.g.*, *EEOC v. Alford,* 142 F.R.D. 283, 288 (E.D. Va., 1992).

Nevertheless, Defendants' argument that the state's Title IV-E penetration rate accurately reflects the number of children eligible for the protections of the federal statute is wrong. ECF No. 18 at 30. Defendants overlook the fact that a controlling factor in determining a state's penetration rate is the state's ability to properly assesses, categorize, and track children in their child welfare system and to submit a timely application for reimbursement of Title IV-E funding. Generally, a dysfunctional child welfare system, as Plaintiffs allege is the case in West Virginia, poorly maintains data and lacks a sophisticated data system—two critical elements for a state to obtain Title IV-E funding.[14] Accordingly, the level of funding is not an accurate gauge of how many children are Title IV-E eligible and to whom Congress intended to extend protection. Further, Defendant's argument invites the court into a data-intensive line of inquiry, which is not appropriate at the pleading stage.

---

[14] (ECF No. 1 ¶273 (an outside entity called A Second Chance, Inc. after conducting an assessment on Defendant's kinship program found that their data system is lacking and "lacks data to support key decisions."); ECF No. 1 ¶ 235; ECF No. 1 ¶ 345.

**C.      Plaintiffs Have Sufficiently Alleged that Defendants' Systematic Failures Violate the ADA and Rehabilitation Act**

Title II of the ADA and Section 504 of the Rehabilitation Act forbid child welfare agencies from discriminating against children with disabilities.[15] As alleged in Plaintiffs' Complaint, Defendants routinely deny children with disabilities in their care and custody the services, treatment, and placements to which they are entitled under federal law. Defendants' Motion to Dismiss misunderstands both Plaintiffs' factual allegations and Defendants' own obligations under federal law.

**i.      Plaintiffs' Complaint Sufficiently Alleges Facts Showing Discrimination on the Basis of Disability.**

To state a claim for a violation of the ADA or the Rehabilitation Act, a plaintiff "must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). Plaintiffs allege that members of the ADA Subclass—all of whom have a disability, and are otherwise qualified to receive all child welfare services, programs, and activities, including assessments, case planning and service planning, and foster care—are nevertheless excluded from participation in or denied the benefits of those services, programs, and activities. Courts across the country have refused to dismiss similar allegations under the ADA and Rehabilitation Act brought by foster children with disabilities.[16]

---

[15] 42 U.S.C. § 12132; 29 U.S.C. § 794.

[16] *See, e.g. Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 685 (S.D.N.Y. 1996) (denying defendants' motion to dismiss plaintiff's ADA and Rehabilitation claims because "a disabled individual is entitled to meaningful access to the benefits and services provided by a public agency or an agency receiving federal funds", and "the agency's failure to provide meaningful access to child welfare services is evident"; the child welfare agency "failed to assess promptly [plaintiff's] medical status, transferred him from one inappropriate placement to another including a group home that lacked the medical staff needed to monitor his condition", and provided case-planning inconsistent with

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) is the guiding force of disability law and, contrary to Defendants' assertions, applicable here. *Olmstead* requires the provision of services, including a child's placement, in the most integrated setting appropriate to the child's needs. *Id.*; 28 C.F.R. § 35.130(d). The Fourth Circuit similarly prohibits unjustifiably institutionalizing individuals with disabilities or putting them at the risk thereof. *See*, *e.g.*, *Pashby v. Delia*, 709 F.3d 307, 321-22 (4th Cir. 2013); *see also*, *M.J., et al. v. District of Columbia*, No. 1:18-cv-1901, 2019 U.S. Dist. LEXIS 124108, at *20 (D.D.C. July 25, 2019) (*Olmstead* claim where plaintiffs allege "that because defendants have failed to provide required services in their homes, or in the community, they are unnecessarily institutionalized"). This mandate extends to all government services. *See Lane  v. Kitzhaber*, 841 F. Supp. 2d 1199, 1205 (D. Or. 2012).

Defendants suggest the integration mandate is somehow in conflict with the "best interest" standard utilized in West Virginia circuit courts, and assert the integration mandate "should not be interpreted" to "trump" that standard. *See* ECF No. 18 at 33. Defendants are wrong. Discrimination on the basis of disability and unnecessary institutionalization cannot be in a child's "best interest". To the extent Defendants argue they do not administer services, programs, and activities in the most integrated setting, as required by 28 C.F.R. § 35.1.130(d) and *Olmstead*, they admit to violating federal law.

Defendants also appear to argue that they do not discriminate against children with disabilities because the system as a whole, as it relates to all foster children, lacks the full array of necessary community-based services and placements. But Defendants misconstrue the ADA's requirements. While Defendants' failure to provide adequate services harms all foster children,

---

his medical needs, "rais[ing] serious questions as to whether [the child welfare agency] has fulfilled even its most fundamental obligation to provide meaningful access as required by the ADA and the Rehabilitation Act." *Id.*

children with disabilities are disproportionately affected by a lack of adequate resources, especially a deficit in disability-specific services. Defendants' argument, moreover, was squarely rejected by the Supreme Court: an ADA integration mandate claim need not demonstrate "similarly situated individuals" without disabilities are "given preferential treatment." *Olmstead,* 527 U.S. at 598. "Congress had a…comprehensive view of the concept of discrimination advanced in the ADA," and intended not only to "require[] all public entities to refrain from discrimination," but also to thwart "unjustified 'segregation' of persons with disabilities." *Id.* at 600.

Taking Plaintiffs' factual allegations as true, Plaintiffs have demonstrated that Defendants' disproportionally place disabled foster children in institutional settings, converted detention cells, isolated out-of-state placements, and otherwise in less integrated settings, when, with adequate services and supports in the community, they could often avoid such restrictive placements. Moreover, Defendants' suggestion that "Plaintiff (or Plaintiff's Guardian ad Litem) may raise that issue in state circuit court", ECF No. 18 at 33, completely misunderstands the thrust of Plaintiffs' allegations: that Defendants so systematically violate the ADA and Rehabilitation Act that an individual West Virginia child with disabilities cannot "raise that issue" in state circuit court.

### ii. Defendants' Legal Argument is Inconsistent with Federal Guidance and Established Federal Law Requiring More than Mere Equal Treatment.

Defendants next seek dismissal of Plaintiffs' ADA claims by arguing they are not required to provide a certain level of benefits to foster children with disabilities, create settings that do not exist, or provide new benefits. *See* ECF No. 18 at 32-33. However, the ADA requires provision of auxiliary services to ensure a person can benefit from existing services, short of a demand for a "substantial benefit." U.S. Dep't of Justice, *ADA Title II Technical Assistance Manual*, at II-3.4000 ("Separate programs are permitted where necessary to ensure equal opportunity."), *available at*

https://www.ada.gov/taman2.html; *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008) (blind litigants did not seek "substantively different benefit than is already provided by the U.S. currency system" by requesting the alteration of currency's size, color, and texture). In other words, courts distinguish between accommodations to access existing services— which is required by the ADA—and additional services that create separate programs for the sole purpose of eliminating general disparities inherent in disability status.

When considering whether an ADA litigant demands prohibited "additional services" or permissible accommodations, courts should broadly construe the existing service. *See Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (reversing district court's narrow definition of state services); *Am. Council of the Blind*, 525 F.3d at 1268 (nature of public service was the program of currency and "engag[ing] in economic activity" generally). And courts frequently require state authorities to provide accommodations that do not currently exist. *See Townsend*, 328 F.3d at 517.

Here, Plaintiffs request appropriate mental health services and disability supports within the foster care system, because those services are necessary to ensure full access to the benefits of the foster care system. *See* ECF No. 1 at ¶ 318-327. West Virginia is responsible for providing needed medical and mental health care to all foster children, with and without disabilities. The ADA requires the state to provide those services in a manner that enables foster youth with disabilities to participate in, and enjoy the full benefits of, the child welfare system generally.

Defendants unpersuasively claim that West Virginia does not have any "unjustified" institutional placements, because the circuit courts approve each placement. ECF No. 18 at 33-34. But it is Defendants, not the judiciary, who are responsible for developing a sufficient array of placements and community-based services to comply with federal law, as well as for selecting where to place a child—all of which Defendants have systematically failed to do for disabled

youth. As the USDOJ concluded, the "default service in West Virginia is institutionalization", with Defendants "needlessly segregat[ing] thousands of children far from families and other people important in their lives" even though DHHR could have treated those children in their communities. ECF No. 1 ¶¶ 352-53.

Finally, Defendants' recent efforts do not absolve them of liability under the ADA and Rehabilitation Act. Defendants toy with case law and language, declaring that "a plan" to remedy the state's discrimination against disabled foster children is enough. But *Olmstead* held that "[i]f, for example, the State were to demonstrate that it had a comprehensive, *effectively working* plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace…the reasonable-modification standard would be met." *Olmstead*, 527 U.S. at 597-98 (emphasis added).[17] The Supreme Court was not referring to just any plan—but rather to a plan that is *working*, which Defendants lack.

In any event, Defendants make factual arguments regarding the state's Child and Family Services Plan, citing House Bill 2010 and the Memorandum of Understanding the state entered into with the USDOJ in 2019. But, as Plaintiffs' assert in their Complaint, these efforts fall flat.[18]

---

[17] Notably, *Martin v. Taft*, an Ohio district court decision cited by Defendants, which is not controlling law, stated that "[i]f the defendant fits this example, it has essentially proven that it has *already reasonably accommodated* the plaintiffs' request for participation in a community-based program." 222 F. Supp. 2d 940, 984 (S.D. Ohio 2002) (finding that plaintiffs adequately pled the availability of a reasonable accommodation); *compare with* ECF No. 18 at 34 ("If the defendant [has a plan to move individuals to a less restrictive setting], it has essentially proven that it has *already reasonably accommodated* the plaintiff's request….").

[18] *See* ECF No. 1 ¶ 358 ("The MOU is limited in scope and unlikely to be successfully implemented….it covers only children…who have a serious emotional or behavioral disorder or disturbance that results in a functional impairment," and who are placed in a residential facility or "reasonably may be expected" to be placed in such a facility. The MOU fails to capture the pressing needs of a significant portion of foster children who…are in need of mental health services."); ¶ 361 ("But the goals in the [MOU] modestly call for a 25 percent reduction of the …number of children in out-of-state placement" and "it does not explicitly require West Virginia to reduce the number of children placed into in-state residential treatment facilities…. Lastly, the MOUS is self-enforcing and there is little to no oversight."); ¶ 365 (noting House Bill 2010's managed care provision "was met with strong opposition by organized foster family groups, child welfare advocates, and other stakeholders…. Their chief concern was that medically vulnerable groups, such as foster children who often have multiple diagnoses…are notoriously underserved by private managed care systems with profit motives.").

Plaintiffs do not ask the Court to "overrule DOJ's decision that the [Memorandum of Understanding] suffices to remedy the noncompliance" with the ADA. *See* ECF No. 18 at 37. Plaintiffs allege that agreement does not go far enough. Plaintiffs have sufficiently alleged discrimination on the basis of disability, and, at the very least, Defendants have pointed to disputed facts regarding the impact of the recent attempts to reform the foster care system, which are not proper grounds to warrant dismissal at this stage of the pleading.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss in its entirety and allow Plaintiffs' constitutional and statutory claims to proceed to resolution on their merits.

Dated: December 20, 2019

Respectfully submitted,

*/s/ Marcia Robinson Lowry*
Marcia Lowry, *admitted pro hac vice*
mlowry@abetterchildhood.org
Allison Mahoney, *admitted pro hac vice*
amahoney@abetterchildhood.org
Dawn Post, *admitted pro hac vice*
dpost@abetterchildhood.org
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415

*/s/ Richard W. Walters*
Shaffer & Shaffer, PLLC
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net

Brian L. Ooten, WVSB #9358
booten@shafferlaw.net
2116 Kanawha Boulevard East
Charleston, WV 25311
Charleston, WV 25339
Tel: (304) 344-8716
Fax: (304) 344-1481

*/s/ Jeremiah Underhill*
Disability Rights of West Virginia
Jeremiah Underhill, WVSB #13094
junderhill@drofwv.org
Erin Snyder, WVSB #13094
esnyder@drofwv.org
Lori Waller, WVSB #11303
lwaller@drofwv.org
1207 Quarrier Street, Suite 400
Charleston, WV 25301
Tel: (304) 346-0847
Fax: (304) 346-0687

**Attorneys for Plaintiffs**