# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:19-cv-00710 |
| JIM JUSTICE, in his official capacity as | ) | |
| Governor of West Virginia, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

---

## DEFENDANTS' REPLY IN SUPPORT OF THE MOTION TO DISMISS

---

Steve R. Compton (St. Bar # 6562)
Deputy Attorney General
West Virginia Attorney General's Office
812 Quarrier Street, 2nd Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

Doug P. Buffington, II (St. Bar # 8157)
Sr. Deputy Attorney General
West Virginia Attorney General's Office
State Capitol Complex
Bldg. 1, Room E-26
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

Philip J. Peisch (pro hac vice)
Caroline M. Brown (pro hac vice)
Rebecca E. Smith (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258

*Attorneys for Defendants Jim*
*Justice, et al.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.     This Court is Without Subject Matter Jurisdiction Under Federal Court Abstention
Doctrines. ................................................................................................................. 2

     A.    Plaintiffs' Assertion that West Virginia Law Does Not Vest Responsibility for
Child Placement Decisions In Its Circuit Courts Is Demonstrably False. ................. 2

     B.    Plaintiffs' Assertion That They Do Not Seek Review or Interference with Circuit
Court Decisions Is Belied by Their Complaint. ......................................................... 5

     C.    Plaintiffs' Assertion That Their "Structural Reform" Claims Cannot Be Advanced
in Circuit Court Is Wrong. ..................................................................................... 11

II.    Alternatively, Plaintiffs' Claims Should be Dismissed for Failure to State a Cause of
Action. .................................................................................................................... 13

     A.    Plaintiffs Do Not Cite a Single Case that Supports Their Expansive View of
Substantive Due Process. ....................................................................................... 13

     B.    Plaintiffs Rely on Cases That Do Not Support Their "Familial Association" Claims.
.......................................................................................................................... 15

     C.    Plaintiffs Use Inapposite Case Law To Support Their Child Welfare Act Claims.  16

     D.    Plaintiffs' Claims Under the ADA and Rehabilitation Act are Similarly
Unprecedented. ..................................................................................................... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Children v. Bush*, 329 F.3d 1255, 1277 (11th Cir. 2003) ........................................ 8, 13

*Brian A. ex rel. Brooks v. Sundquist,* 149 F. Supp. 2d 941 (M.D. Tenn. 2000) .................... 16, 17

*Carson P. ex rel. Foreman v. Heinemann,* 240 F.R.D. 456 (D. Neb. 2007) ........................... 8, 13

*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 155-56 (D. Mass. 2011) ...................... 3

*Courthouse News Serv. v. Brown,* 908 F.3d 1063, 1071-72 (7th Cir. 2018) ............................... 10

*Courthouse News Serv. v. Planet,* 750 F.3d 776, 790 (9th Cir. 2014) ......................................... 10

*Disability Rights New York v. New York,* 916 F.3d 129, 135 n.3 (2d Cir. 2019) ........................ 10

*Doe v. South Carolina Dep't of Health & Human Servs.,* 597 F.3d 163, 180 (4th Cir. 2010) ..... 14

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ................................. 6

*In re Brandon H.S.*, 218 W. Va. 724 (2006) ................................................................................. 12

*In re Carlita B.,* 185 W. Va. 613, 624 (1991) ............................................................................... 12

*In re Edward B.*, 2010 W.Va. 621, 631 (2001).............................................................................. 11

*In re Jonathan G.*, 198 W. Va. 716, 723, 731 (1996) ................................................................... 12

*In re K.L.*, 241 W.Va. 546, 556-58 (2019).................................................................................... 19

*J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1292 (10th Cir. 1989)................................................ 12

*Joseph A. ex rel. Wolfe v. Ingram,* 275 F.3d 1253, 1272 (10th Cir. 2002) ................................... 13

*Kenny A. ex rel. Winn v. Perdue,* 218 F.R.D. 277, 288 (N.D. Ga. 2003) ................................. 3, 16

*Kristopher O. v. Mazzone*, 227 W. Va. 184, 192 (2011) ............................................................... 11

*L.J. by and through Darr v. Massinga,* 838 F.2d 118 (4th Cir. 1988).......................................... 18

*LaShawn A. v. Kelly,* 990 F.2d 1319, 1322-23 (D.C. Cir. 1993)............................................. 3, 11

*Laurie Q. v. Contra Costa Cnty.*, 304 F. Supp. 2d 1185, 1204 (N.D. Cal. 2004).......................... 8

*Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) .......................... 14, 19

*Moore v. Sims*, 442 U.S. 415 (1979)........................................................... 9

*New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 368 (1989)

    ("*NOPSI*")............................................................................ 9

*O'Shea v. Littleton,* 414 U.S. 488 (1974) .................................................... 10

*Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 612 (8th Cir. 2018).............................. 10

*Sam M. v. Chafee,* 800 F. Supp .2d 363, 383 (D.R.I. 2011) .................................... 7, 13

*Spokeo v. Robins,* 136 S.Ct. 1540, 1547 (2016) ............................................. 6

*Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013)................................. 8, 9, 10

*State ex rel. Aaron M. v. DHHR*, 212 W. Va. 323 (2001) .................................... 12

*State ex rel. DHHR v. Dyer*, 2019 WL 6258415, at *9 (W. Va. Nov. 21, 2019)................. 12

*State ex rel. S.C. v. Chafin*, 191 W. Va. 184, 196 (1994) ................................. 11

*State ex rel. Silver v. Wilkes*, 213 W. Va. 692, 696 (2003)............................... 11

*State v. Michael M.*, 202 W. Va. 350, 359 (1998) ......................................... 12

*Tacza v. Martin*, 2019 WL 3928658, at *1 (S.D. W.Va. Aug. 19, 2019)....................... 6

*Taylor v. Randolph*, 594 Fed. App'x 578, 580 (11th Cir. 2014) ............................ 6

*Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016)...... 6

*White ex rel. White v. Chambliss,* 112 F.3d 731 (4th Cir. 1997) ........................... 17

### Statutes

42 U.S.C. § 671(a)(10)................................................................. 1, 17

42 U.S.C. § 671(a)(16)................................................................. 17

45 C.F.R. § 1356.21 ................................................................... 4

W. Va. Code § 49-4-606 ................................................................................................. 3, 5

W.Va. Code § 49-2-101 ................................................................................................. 3

W.Va. Code § 49-4-405 ................................................................................................. 3

## INTRODUCTION

Plaintiffs' Opposition to the Motion to Dismiss confirms a recent observation that legal claims in child welfare class actions tend to be "chaotic, wide-ranging and of questionable relevance to the facts." *See* Zach Strassburger, *Crafting Complaints and Settlements in Child Welfare Litigation,* 21 U. PA. J. L. & SOC. CHANGE 219, 219 (2018). That article nonetheless encourages advocates to focus on "sympathetic plaintiffs" to attract media attention to "force institutional defendants to settle even when the legal claims are weak." *Id.*[1]

Plaintiffs' opposition follows that playbook: they describe distressing allegations about individual plaintiffs, coupled with sweeping statements as to the State's constitutional and statutory obligations, but they put forward scant legal authority to support their position that the facts they allege give rise to the constitutional and statutory claims they advance or the relief they request. For example, Plaintiffs:

- Do not cite any circuit court or Supreme Court case finding a constitutional "familial association right" to a permanent home;

- Do not cite a single case of any kind holding that substantive due process protects "the right to services in the least restrictive, most family-like setting," "the right to supportive and case management services to ensure placement stability," or "the right to a plan and corresponding services for a permanent home";

- Ignore Fourth Circuit case law holding that 42 U.S.C. § 671(a)(10) does not create a private cause of action, *see White v. Chambliss,* 112 F.3d 731 (4th Cir. 1997); and

- Do not cite any case holding that a foster care placement decision violated *Olmstead v. L.C.* or the Department of Justice's ("DOJ") "integration" regulation at 28 C.F.R. § 35.130(d).

The case does not belong in federal court and should be dismissed.

---

[1] *See also id.* at 220 ("[L]awyers in child welfare institutional reform litigation have been able to use the media to convince defendants to settle despite a lack of clear legal claims."); *id* ("Child welfare reform litigation has been based on limited legal authority coupled with dramatic facts.").

**ARGUMENT**

I.  **This Court is Without Subject Matter Jurisdiction Under Federal Court Abstention Doctrines.**

Plaintiffs' arguments that their claims are not barred by federal court abstention doctrines are based on misstatements of state and federal law, as well as misrepresentations regarding the claims asserted in their complaint.  Plaintiffs' claims related to placement type and placement "instability"– which form the crux of their Complaint – directly implicate current and ongoing orders of West Virginia's state courts.  Their other claims, to the extent they can be discerned, are "inextricably intertwined" with those decisions, and counsel in favor of abstention.

A.  **Plaintiffs' Assertion that West Virginia Law Does Not Vest Responsibility for Child Placement Decisions In Its Circuit Courts Is Demonstrably False.**

Plaintiffs do not dispute that their claims and requests for relief implicate placement decisions.  Instead, Plaintiffs deny that West Virginia's circuit courts make those determinations, asserting that "placement decisions are made by the executive branch, not the judiciary" and that "[u]ltimate responsibility for [foster care] placement decisions is vested, by statute, in the hands of West Virginia's child welfare agency—not West Virginia's state courts."  Pl. Opp. at 8.  Remarkably, Plaintiffs' statement referencing a "statute" is unaccompanied by citation to any law and, in fact, the statutes in West Virginia Code confirm that state circuit courts (not the executive branch) have ultimate responsibility for all placement decisions.  Plaintiffs' arguments to the contrary reflect a misunderstanding of how West Virginia's child welfare system works and how it differs from other jurisdictions in which Plaintiffs' counsel have litigated.

As explained in Defendants' Memorandum in Support of their Motion to Dismiss ("Def. Mem."), while the Department of Health and Human Resources ("DHHR") is "authorized to provide care, support and protective services" for abused and neglected children, W.Va. Code

2

§ 49-2-101, the state circuit courts have "exclusive jurisdiction over the placement of the child," § 49-4-606.  To be sure, DHHR staff make recommendations for placement to the court through their participation on the multi-disciplinary team, W.Va. Code § 49-4-405, but the ultimate decision lies solely with the circuit court.  West Virginia Rule of Procedure for Child Abuse and Neglect Proceedings 6; 36(e); *see also*, W. Va. Code § 49-4-606.  Moreover, that jurisdiction is ongoing, as the circuit court must issue an order as to "the continuing necessity for and appropriateness of the placement" every 90 days.  § 49-4-110(a); *see also* Doc. 17-4, App'x Tab No. 2, Judicial Benchbook, Ch. 2, pp. 15-21.

The role of the circuit courts in placement decisions distinguishes West Virginia from other states, including those states involved in the decisions which Plaintiffs rely on for the proposition that abstention is not appropriate.  *See, e.g., Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 155-56 (D. Mass. 2011) (in Massachusetts, state agency has "virtually free rein" to make placement, visitation, and permanency decisions and the court may only offer "guidance" as to placement decisions); *Kenny A. ex rel. Winn v. Perdue,* 218 F.R.D. 277, 288 (N.D. Ga. 2003) (in Georgia, juvenile court's orders "are merely exhortatory and not binding on" the state agency); *LaShawn A. v. Kelly,* 990 F.2d 1319, 1322-23 (D.C. Cir. 1993) (describing limited role of D.C. Family Division courts).[2]

Nor is there any merit to Plaintiffs' suggestion that the state legislature's decision to vest placement decisions solely in state circuit court somehow violates federal law.  *See* Pl. Opp. at 8.

---

[2] *See also, e.g.,* Minn. Stat., § 260C.201, subd. 1(a)(2)(ii) (county social services agency responsible for making placement decisions); Tex. Family Code § 264.107 (department of family and protective services responsible for making placement decisions); 20 Ill. Comp. Stat. § 505/7 (department of children and family services primarily responsible for placement of children in its custody).

3

In support of that statement, Plaintiffs truncate a parenthetical included in a federal regulation at 45 C.F.R. § 1356.21(g)(3), which is a provision governing when federal funding is available in maintenance payments to foster children under Title IV-E.[3]   The regulation provides that a state agency seeking Title IV-E federal funding must issue policies regarding a development of a case plan, and that the case plan must:

> Include a discussion of how the case plan is designed to achieve a safe placement for the child in the least restrictive (most family-like) setting available and in close proximity to the home of the parent(s) when the case plan goal is reunification and a discussion of how the placement is consistent with the best interests and special needs of the child.  ([Federal financial participation] is not available when a court orders a placement with a specific foster care provider).

§ 1356.21(g)(3).

In guidance issued to state foster care agencies, the federal Children's Bureau explains that the regulatory prohibition on court-ordered placement with a specific foster care provider – which in any event affects only the availability of federal funding – applies only in a situation where the court "tak[es] placement and care responsibility away from the agency and assum[es] placement and care responsibility by choosing the child's placement **without bona fide consideration of the agency's recommendation regarding placement**." Children's Bureau, Child Welfare Policy Manual, § 8.3A.12 ("Title IV-E, Foster Care Maintenance Payments Program"), Q3 (emphasis added).  The Children's Bureau further explains that "[t]his does not mean that the court must always concur with the agency's recommendation in order for the child to be eligible for title IV-E foster care payments."  The federal position is that "[a]s long as the court hears the relevant

---

[3] As explained previously, Title IV-E is a program that reimburses state governments for certain foster care expenses, but only for children who meet specified eligibility requirements and for whom the State has followed specified procedures.  *See* Def. Mem. at 29-30.  About 60% of West Virginia's foster care children qualify for Title IV-E federal funding.  *Id.*

4

testimony and works with all parties, including the agency with placement and care responsibility, to make appropriate placement decisions, we will not disallow the payments." *Id.* To the extent West Virginia seeks federal funding for foster care maintenance payments, its system is fully compliant with this federal regulatory regime.

### B. Plaintiffs' Assertion That They Do Not Seek Review or Interference with Circuit Court Decisions Is Belied by Their Complaint.

Plaintiffs acknowledge that the *Rooker-Feldman* doctrine prohibits federal court review of state court decisions as well as claims that are "inextricably intertwined" with those decisions. Pl. Opp. at 5. However, they contend that the doctrine is inapplicable to this case because their complaint challenges "executive actions, not West Virginia circuit court decisions." *Id.* at 7. That statement is belied by their Complaint, which repeatedly alleges harms arising from what they incorrectly describe as "DHHR place[ments]" for the named plaintiffs and members of the purported class. *See, e.g.*, Complaint ¶ 7 (alleging that "DHHR placed" children in out-of-state facilities and psychiatric institutions); *id.* ¶ 52 (alleging "DHHR placed" Jonathan R. in a kinship placement that was not thoroughly vetted); *id.* ¶ 71 (alleging "DHHR placed" Serena S. in a non-kinship foster home and separated her from her brother); *id.* ¶ 82 (alleging "DHHR placed" Theo S. in two non-kinship foster homes); *id.* ¶ 108 (alleging "DHHR placed" Garrett M. in a temporary shelter); *id.* ¶ 127 (alleging "DHHR placed" Gretchen C. in the Ohio Children's Center); *id.* ¶ 184 (alleging "DHHR placed" Ace L. into an abusive foster home). The Complaint further alleges harms arising out of "placement instability" and "unnecessary and harmful placement changes," *id.* ¶¶ 244-255.

Because those placements are circuit court decisions, § 49-4-606, Plaintiffs are not challenging "executive action" but instead "complaining of injuries caused by state court judgments" and "inviting district court review and rejection of those judgments," *Exxon Mobil*

*Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Indeed, this Court recently found that *Rooker-Feldman* barred jurisdiction over a claim arising out of a foster care placement decision, recognizing that the alleged injuries "derive[] not from the actions of Defendants [DHHR and its employees] but from the state court's order." *Tacza v. Martin*, 2019 WL 3928658, at *1 (S.D. W.Va. Aug. 19, 2019). The same is true in this case. *See also Taylor v. Randolph*, 594 Fed. App'x 578, 580 (11th Cir. 2014) (unpublished) ("Officers and other government personnel acting pursuant to, or in concert with, child-custody or child well-being proceedings fall within the *Rooker-Feldman* doctrine because their acts are inextricably intertwined with state court judgment.").

Defendants readily acknowledge that if "plaintiffs in federal court do not seek review of state court judgments but instead present independent claims," Pl. Opp. at 7, *Rooker-Feldman* is not a bar to jurisdiction. *See Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016). But Plaintiffs do not – and cannot – explain why their "systemic" claims involving placement of foster care children are "independent" or "separate" from the individual state court judgments that ordered those placements. While Plaintiffs may seek to advance "systemic" claims on behalf of a class, a class representative has no standing to pursue such a claim absent a showing of a concrete and particularized injury, *see Spokeo v. Robins,* 136 S.Ct. 1540, 1547 (2016), and the injuries of the named Plaintiffs allegedly arise out of their own current and previous placements as ordered by the state circuit courts. Federal court review of these claims is thus barred by jurisdictional principles outlined in *Rooker, Feldman*, and *Exxon*.

For the same reasons, Plaintiffs' assertions that they do not seek to interfere with circuit court decisions on an ongoing basis, in violation of *Younger* abstention principles, is inconsistent with their request for relief. Among other things, Plaintiffs seek a declaration that they have "[t]he

right to placement in the least-restrictive most family-like setting" "that is properly assessed to determine whether it is a safe and appropriate placement," Complaint ¶ 374(a)(i), and to "placement in a foster placement that conforms to nationally recommended professional standards," *id.* ¶ 382. They seek an order requiring Defendants to ensure, among other things, that "all children who are placed in foster care are placed in a safe home or facility," *id.* ¶ 405(a)(v), and that "youth be placed in the least-restrictive, most-family like setting possible," *id.* ¶ 405(d)(2). And they ask for appointment of a monitor to review placements to ensure that Defendants are in compliance with such an order, *id.* ¶ 406.

The allegations in the Complaint make clear that Plaintiffs intend to provide a mechanism for this Court, through the outside monitor, to review placements that Plaintiffs believe to be inappropriate, including in residential treatment centers, psychiatric hospitals, out-of-state institutions, and non-certified kinship homes. *See, e.g.,* Complaint ¶¶ 382(b), 392, 401, 405(a)(v). But these are decisions made by the circuit courts, and any challenge to the appropriateness of such a decision must be made in that court (or on appeal to the Supreme Court of Appeals of West Virginia), not federal court.

Plaintiffs' claim that Defendants seek a "misapplication" of abstention doctrine and that "such misapplication has never been applied in a case like this one, raising systemic challenges to foster practices," citing *Sam M. v. Chafee,* 800 F. Supp .2d 363, 383 (D.R.I. 2011). Pl. Opp. at 7. In fact, *Sam M.* held quite the contrary. The court in that case concluded that the Rhode Island Family Court "has exclusive original jurisdiction in proceedings concerning abused and neglected children and adoption of children" and that "the Family Court retains considerable authority and involvement in the placement and care of children who are in the same circumstances as the

plaintiffs." *Id.* at 378-79.  Consequently, while the court found that *some* of plaintiffs' claims did

not interfere with the court's exclusive jurisdiction, it found that:

> with respect to the requested increase in the rate of adoptions, the
> decrease in the number of placements per child, as well as the
> decrease in institutionalization and length of time in foster care, such
> proceedings and related determinations are subject to the continuing
> jurisdiction of the Family Court. **Any remedy fashioned by this
> Court would constitute an interference with orders generally
> issued by the Family Court in consideration of the best interest
> of the child and would, therefore, implicate abstention
> under *Younger.***

*Id.* at 379 (emphasis added).  In so holding, the court rejected the plaintiffs' statements that "they

do not and will not seek to reverse, amend, modify, or otherwise change any ruling of the Family

Court," holding that the request for relief indicated otherwise.  *Id.*; *see also 31 Foster Children v.

Bush,* 329 F.3d 1255, 1277 (11th Cir. 2003) (applying *Younger* abstention to case seeking systemic

reform of state child welfare system); *Carson P. ex rel. Foreman v. Heinemann,* 240 F.R.D. 456

(D. Neb. 2007) (applying *Younger* abstention because "injunctive orders by this court which

attempt to impose parameters . . . for determining where a child should be placed," and "if and

how often a child should be moved to another placement," "would both directly and indirectly

interfere with the plenary jurisdictional and decision-making authority of the Nebraska juvenile

courts"); *Laurie Q. v. Contra Costa Cnty.,* 304 F. Supp. 2d 1185, 1204 (N.D. Cal. 2004) (applying

*Younger* abstention to case seeking systemic reform because "[w]ere this court to assume the role

plaintiffs intend, it would be forced to pass judgment upon the Juvenile Court's approval (or

disapproval) of certain case plans").

Plaintiffs suggest that these and other cases applying *Younger* to abstain from systemic

child welfare challenges are no longer good law in light of the Supreme Court's 2013 decision in

*Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).  But all that *Sprint* did was reaffirm the

Court's holding in *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 368 (1989) ("*NOPSI*"), that the Supreme Court has applied *Younger* to three categories of cases: state criminal prosecutions, "civil enforcement proceedings," and "certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 73 (holding, "in accord with *NOPSI*," that these three categories define *Younger's* scope); *NOPSI,* 491 U.S. at 368.

State court child welfare decisions fit neatly within the "civil enforcement" category that *Sprint* and *NOPSI* recognize as a category appropriate for *Younger* abstention. Indeed, the Supreme Court has already so held: In *Moore v. Sims*, the Supreme Court ruled that it was error for a federal district court to entertain constitutional challenges to a state's abuse and neglect procedures when there were ongoing proceedings in which the claims could be raised. 442 U.S. 415, 422-23 (1979) ("We are unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation"). *Moore v. Sims* is cited in both *Sprint* and *NOPSI* as an example of the "civil enforcement" category of *Younger* abstention. *See Sprint*, 571 U.S. at 78; *NOPSI*, 491 U.S. at 368.

Although *Sims* involved a child's removal from the home, the same rationale applies to state court proceedings placing the child after removal. As *Sprint* explained, the "civil enforcement" category involves cases in which "a state actor is routinely a party to the state proceeding and often initiates the action." *Sprint,* 571 U.S. at 592 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619 (1986) (state-initiated administrative proceedings to enforce state civil rights law); *Huffman v. Pursue,* 420 U.S. 592, 604 (1975) (enforcement of state nuisance law); *Trainor v. Hernandez,* 431 U.S. 434 (1977) (civil proceeding

"brought by the State in its sovereign capacity" to recover public assistance payments allegedly obtained by fraud)).

In West Virginia child abuse and neglect cases, the State (DHHR) is always "a party in the state proceeding and often initiates the action," even after the child has been removed from the home and parental rights have been terminated. Thus, these are not cases like that in *Sprint,* in which the state case is brought by a private party, but rather ones that are "initiated by the State in its sovereign capacity." Thus, *Sprint* in no way changed the longstanding understanding of *Younger's* application to ongoing child welfare cases.

But even if *Sprint* did have the limiting effect that Plaintiffs ascribe to it, abstention would still be proper under the corollary abstention doctrine of *O'Shea v. Littleton,* 414 U.S. 488 (1974), which "*compels* abstention where the plaintiff seeks an 'ongoing federal audit' of the state judiciary, whether in criminal proceedings or in other respects." *Courthouse News Serv. v. Planet,* 750 F.3d 776, 790 (9th Cir. 2014) (quoting *O'Shea,* 414 U.S. at 499) (emphasis added); *see also Courthouse News Serv. v. Brown,* 908 F.3d 1063, 1071-72 (7th Cir. 2018) (noting that *O'Shea* is an "extension" of *Younger*); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 612 (8th Cir. 2018) (abstention under *O'Shea* warranted where "the relief requested would interfere with state judicial proceedings by requiring defendants to comply with numerous procedural requirements" and "failure to comply with the district court's injunction would subject state officials to potential sanctions for contempt of court, and place the district court in the position of conducting an ongoing 'federal audit' of [the state's] temporary custody proceedings"). The *Sprint* decision does not mention, much less limit, the import of *O'Shea*, and "courts have continued to apply *O'Shea* even after *Sprint.*" *Disability Rights New York v. New York,* 916 F.3d 129, 135 n.3 (2d Cir. 2019) (compiling cases).

### C. Plaintiffs' Assertion That Their "Structural Reform" Claims Cannot Be Advanced in Circuit Court Is Wrong.

Plaintiffs also assert that federal court jurisdiction is appropriate because they do not have a reasonable opportunity to raise their federal claims in their state court proceedings, citing *LaShawn A.,* 990 F.2d at 1322-23. But in *LaShawn A.*, the state court had conclusively held that "anything broader" than individual cases of neglect was outside the family court's jurisdiction. *See id.* at 1322 (quoting *In the Matters of N.P. and L.W.*, Nos. 404–79, 418–79 (D.C. Super. Ct. June 14, 1982)).

In West Virginia, by contrast, the circuit courts are courts of general jurisdiction and do hear claims exactly of the type pressed here. *See State ex rel. Silver v. Wilkes*, 213 W. Va. 692, 696 (2003) ("Circuit courts are courts of general jurisdiction and have power to determine all controversies that can possibly be made the subject of civil actions."). The Supreme Court of Appeals has long "recognized the constitutional dimensions of abuse and neglect proceedings under both the federal and state constitutions" and "has expressed an unwavering interest in providing comprehensive and fair procedures for . . . the rights of the innocent children" involved in abuse and neglect proceedings. *In re Edward B*., 2010 W.Va. 621, 631 (2001). West Virginia's highest court has also addressed applicable federal law when it has arisen in the context of child abuse and neglect cases. *See Kristopher O. v. Mazzone*, 227 W. Va. 184, 192 (2011) (discussing placement considerations required under 42 U.S.C. § 671(a)(19)).

West Virginia state courts have repeatedly addressed systemic issues in child abuse and neglect cases, including issues and claims similar to those raised by the Plaintiffs in their Complaint. For example, in the 1990s, West Virginia state courts issued a series of opinions in abuse and neglect cases ordering DHHR to improve its case plans and case plan review system. In *State ex rel. S.C. v. Chafin*, the Supreme Court of Appeals ordered the formation of a committee

11

"to conduct a statewide inventory of all children who have been in the foster care system of this state for more than one year so as to identify barriers to obtaining permanent homes for those children and to make recommendations to [the court] for eliminating or reducing those barriers." 191 W. Va. 184, 196 (1994). The court also ordered the development of a "uniform reporting format to be used by CPS workers in preparing . . . case plans, so as to promote uniformity and clarity . . . " *Id.*; *see also, e.g., State v. Michael M*., 202 W. Va. 350, 359 (1998) (directing DHHR to provide court with a comprehensive report on children legally free for adoption); *In re Jonathan G.*, 198 W. Va. 716, 723, 731 (1996) (upholding circuit court's decision to hold DHHR in contempt of prior orders regarding preparation of a case plan and appointment of "an agency independent of DHHR to assist in case management"); *In re Carlita B.,* 185 W. Va. 613, 624 (1991) (directing development of a system to monitor the status and progress of child neglect and abuse cases in the courts).[4]

As the Supreme Court of Appeals recently commented, child abuse and neglect cases "now constitute at least twenty-five percent of [its] docket," meaning both the court and any child covered by Plaintiffs' class allegations have repeated opportunities to address any system-wide issues that may arise. *State ex rel. DHHR v. Dyer*, 2019 WL 6258415, at *9 (W. Va. Nov. 21, 2019).

In light of the range of issues that can be considered in state court, Plaintiffs cannot meet their "burden of proving that state procedural law bar[s] presentation of their claims" in state circuit court. *See J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1292 (10th Cir. 1989) (citing *Pennzoil Co.*

---

[4] *Cf., e.g.*, *In re Brandon H.S.*, 218 W. Va. 724 (2006) (holding that circuit courts have the authority to direct DHHR to hire additional personnel to fill CPS vacancies); *State ex rel. Aaron M. v. DHHR*, 212 W. Va. 323 (2001) (holding that circuit courts have the authority to order the provision of therapeutic services).

*v. Texaco, Inc.,* 481 U.S. 1, 14-15 (1987)); *Sims,* 442 U.S. at 432 ("Certainly, abstention is appropriate unless state law clearly bars the interposition of the [federal statutory] and constitutional claims.").

In sum, this Court lacks jurisdiction to hear this case because all of the Plaintiffs claims either directly implicate, or are "inextricably intertwined" with, circuit court orders placing children in specific placements. But even if the Court determines that some of the Plaintiffs' claims and requests for relief do not involve circuit court placement orders, there is no dispute that at least some of their claims do, and thus the Court should at least partially grant the motion and dismiss the Plaintiffs' claims to the extent they directly challenge or are "inextricably intertwined" with circuit court placement orders. *See, e.g., Joseph A. ex rel. Wolfe v. Ingram,* 275 F.3d 1253, 1272 (10th Cir. 2002) (remanding for analysis on a claim-by-claim basis); *Sam M.,* 800 F. Supp. at 379-80 (analyzing abstention on a claim-by-claim basis); *Carson P.*, 240 F.R.D. at 524 (assessing the specific allegations and requests for relief in plaintiffs' complaint in conducting abstention analysis); *see also 31 Foster Children*, 329 F.3d at 1276-79 & n.11 (noting that the court should examine the relief requested and consider the realistic effect of such relief on state-court proceedings).

## II. Alternatively, Plaintiffs' Claims Should be Dismissed for Failure to State a Cause of Action.

### A. Plaintiffs Do Not Cite a Single Case that Supports Their Expansive View of Substantive Due Process.

Contrary to Plaintiffs' suggestions, Defendants do not claim that they have no constitutional due process responsibility towards children in their care, and they recognize the standard in the Fourth Circuit that a foster care placement cannot be "deliberately indifferent to the child's right to personal safety and security." *Doe v. South Carolina Dep't of Health & Human*

*Servs.,* 597 F.3d 163, 180 (4th Cir. 2010).  But the scope of what Plaintiffs claim to be protected by the Due Process clause goes well beyond that standard, including, among other things:

- a constitutional "right to connection with an adult resource who will maintain a stable, long-term relationship with the child";

- a constitutional "right to assistance to find lawful, suitable permanent housing" upon exiting foster care;

- a constitutional "right to a plan and corresponding services for a permanent home";

- a constitutional "right to conditions and duration of foster care reasonably related to the purpose of government custody";

- a constitutional "right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody";

- a constitutional "right to services in the least restrictive, most family-like setting"; and

- a constitutional "right to supportive and case management services to ensure placement stability".

*See* Complaint ¶ 373.

While criticizing Defendants for citing "outdated" cases as to the scope of due process protections, Plaintiffs do not cite a single case – *of any vintage* – adopting such an expansive view of the rights protected under the Due Process Clause.  Nor do Plaintiffs show any developments in the case law that would make the case law cited by Defendants obsolete.  The case that Plaintiffs appear to believe is most helpful – *Marisol A.* – is more than twenty years old.  *See Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996).

Indeed, Plaintiffs' principal argument as to why Defendants' case law is "outdated" appears to be that constitutional protections should expand with the size of the foster care population.  Pl. Opp. at 19 (criticizing defendants for "having it both ways" by relying on cases from the 1980s and 1990s when the size of the foster care population has increased substantially since 2010). Defendants are not aware of any constitutional principle that makes the scope of the Due Process

Clause coextensive with the size of the population it protects; if there is one, Plaintiffs do not cite it.

Curiously, in response to Defendants' citation to cases finding that foster home placement stability is not protected by substantive due process, Plaintiffs assert that these cases are "inapposite" because Plaintiffs are not making claims for "a stable foster-home environment" or "placement stability." Pl. Opp. at 21. That statement cannot be reconciled with multiple allegations in the Complaint or the relief sought. *See* Complaint ¶ 9 ("DHHR shuffles children, many of whom have complex needs, from placement to placement without engaging in thoughtful placement matching. This instability further traumatizes these children"); *id.* ¶¶ 244-255 ("Placement Instability Harms Children"). Indeed, the allegations of the named Plaintiffs repeatedly refer to injuries caused by multiple placements. *See, e.g.*, *id.* ¶¶ 36(a); 59; 91; 113; 142; 172; 190.

### B. Plaintiffs Rely on Cases That Do Not Support Their "Familial Association" Claims.

Plaintiffs' opposition provides no clarity as to their claims that Defendants have violated a right to "familial association" in violation of the First, Ninth, and Fourteenth Amendments. One Supreme Court case that they cite involves whether unmarried fathers can be presumed unfit to raise their children. *See* Pl. Opp. at 25 (quoting *Stanley v. Illinois,* 405 U.S. 645, 653 (1972)). The second addresses whether a state law requiring a civic association to accept women unduly interfered with the male members' freedom of intimate association. *Id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)).

In their opposition, Plaintiffs assert that their "intimate human relationships" with "parents, siblings, and other family members are systematically and improperly intruded upon by Defendants' policies and practices." *Id.* The two district court cases that Plaintiffs cite both

15

involve alleged state policies interfering in relationships with the child's family of origin. *See Kenny A.,* 2004 WL 5503780, at *7; *Brian A. ex rel. Brooks v. Sundquist,* 149 F. Supp. 2d 941 (M.D. Tenn. 2000).

But nothing in the Complaint's causes of action or prayer for relief suggests that Plaintiffs are challenging Defendants' policies or practices involving removal from or reunification with families of origin. Rather, the claim they assert in Count II is of a very different sort: that the State has a constitutional duty towards children in state custody to develop *new* familial associations with a *new* family. *See, e.g.,* Complaint ¶ 379 (Defendants must make "reasonable efforts towards fostering familial association and securing a permanent home and family"). While that is unquestionably the Defendants' goal for every child whose parents' rights have been terminated, no case holds that a new, permanent family is constitutionally mandated under the First, Ninth, and Fourteenth Amendments, or any other provision of the Constitution.[5]

### C. Plaintiffs Use Inapposite Case Law To Support Their Child Welfare Act Claims.

As Defendants have previously explained, Plaintiffs' claims under the Child Welfare Act must be analyzed under a series of Supreme Court decisions in order to determine whether they create a private right of action. *See* Def. Mem. at 23-25 (discussing *Gonzaga v. Doe* , 536 U.S.

---

[5] In their opposition, Plaintiffs also refer to two allegations in the Complaint involving visitation with siblings and with a grandparent, but the Complaint seeks no relief involving visitation rights. In any event, no court has found a constitutional right for visitation with grandparents, *see Troxel v. Granville,* 530 U.S. 57 (2000) (state cannot mandate visitation with grandparent over parent's objection), and only the unpublished *Kenny A.* case includes any reference to siblings. *See Adeyomo v. Kerry,* 2013 WL 498169 (D. Md. 2013) (noting that the "Fourth Circuit's willingness to acknowledge [a constitutional right to familial association] does not extend to familial association with one's siblings." (citing *Shaw v. Stroud,* 13 F.3d 791, 805 (4th Cir. 1994))).

273 (2002); *Blessing v. Freestone,* 520 U.S. 329 (1997); and *Suter v. Artist M.,* 503 U.S. 347 (1992)).  This Supreme Court precedent requires analysis of the specific statutory provision in question to determine if Congress intended that the provision benefit the plaintiff; whether the right asserted is not so "vague and amorphous that it's enforcement would strain judicial competence"; and whether the statutory provision "unambiguously impose[s] a binding obligation on the States."  *Id.*

Plaintiffs assert causes of action under two statutory provisions, 42 U.S.C. § 671(a)(10) and 42 U.S.C. § 671(a)(16), both which are found in the Child Welfare Act.  Rather than analyze the two specific provisions on which they rely, they claim that "the majority of courts deciding the issue subsequent to the holdings of *Suter* (1992), *Blessings* (1997), and *Gonzaga* (2002)" find that "the Child Welfare Act" creates a cause of action.  This reference to the Child Welfare Act as a whole is misleading and does not address the actual questions in this case: whether Section 671(a)(10) or Section 671(a)(16) specifically create a cause of action.  As set forth in Defendants' memorandum, the overwhelming majority of courts – **<u>including the Fourth Circuit</u>** – that have addressed the issue since the Supreme Court's decision in *Suter* have concluded that Section 671(a)(10) does not create an enforceable right.  *See* Def. Memo. at 25; *White ex rel. White v. Chambliss,* 112 F.3d 731 (4th Cir. 1997).  *But, cf. Brian A.*, 149 F. Supp. 2d at 948.  And *most* courts have concluded that Section 671(a)(16) does not create an enforceable right.  *See* Def. Mem. at 25 n.12.

Plaintiffs' contrary suggestion that "the majority" of cases favor them is based on decisions that address different sections of the Child Welfare Act, not Section 671(a)(10) or Section 671(a)(16).  *See* Pl. Opp. at 28 (citing *D.O. v. Glisson*, 847 F.3d 374, 381 (6th Cir. 2017) (involving right to foster care maintenance payments that cover certain enumerated costs under Section

17

672(a)); *Cal. St. Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 982 (9th Cir. 2010) (same); *Chong v. McManaman*, 154 F. Supp. 3d 1043, 1050 (D. Hawaii 2015) (involving right to periodic review of foster care maintenance payments under Section 671(a)(11)); *C.H. v. Payne,* 683 F. Supp.2d 865, 878 (S.D. Ind. 2010) (involving right to foster care payments under Section 672); *Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1042 (W.D. Mo. 2003) (same)).  These cases have absolutely no bearing on the question whether the provisions that Plaintiffs sue under – Sections 671(a)(10) and 671(a)(16) – create an enforceable right.

The Fourth Circuit has already held that there is no right under Section 671(a)(10).  And, for the reasons given in Defendants' Memorandum at pp. 27 - 29, this Court is not bound by the Fourth Circuit's decision in *L.J. by and through Darr v. Massinga,* 838 F.2d 118 (4th Cir. 1988) – which precedes *Suter, Blessing,* and *Gonzaga* – and it should follow the majority of courts in holding that there is no private right of action to enforce Section 671(a)(16).

In any event, the Child Welfare Act claims cannot be asserted on behalf of the purported class or any subclass, as not all children meet the eligibility requirements for federal funding that would make the Child Welfare Act applicable.  *See* Def. Mem. at 29-30.[6]

### D. Plaintiffs' Claims Under the ADA and Rehabilitation Act are Similarly Unprecedented.

Plaintiffs seek to break new ground by arguing that the Americans with Disabilities Act ("ADA") and the Rehabilitation Act require that a foster care placement be "in the most integrated setting" and that, if additional services are necessary to support a foster child in that setting, then the State must provide those services.  No court has so held.  Plaintiffs cite only one case in support

---

[6] For example, of the five named Plaintiffs whose identities have been disclosed to Defendants, two do not meet Title IV-E eligibility requirements, and one was not in a Title IV-E qualifying setting at the time the complaint was filed.

of their claims, and that case is a 23-year-old district court decision that involved the provision of medically necessary services, not an attempt to graft the "most integrated setting" rules into child placement. *See* Pl. Opp. at 35 n.16 (citing *Marisol A.*, 929 F. Supp. at 685).

The Plaintiffs' position puts the ADA on a collision course with the principle of child welfare law that the circuit court should determine the placement that is "in the best interest of the child," which in some cases will be residential treatment in an institutional, less integrated setting. *See* W. Va. Code § 49-4-604; *In re K.L.*, 241 W.Va. 546, 556-58 (2019) ("[I]f allegiance to a preferential placement does not promote the children's best interests, such preference must yield to the placement that is most beneficial to the children."). The potential conflict between the outside monitor's determination of the "most integrated setting" and the circuit court's judgment as to the best interests of the child is one of several reasons highlighting why abstention is necessary and proper.

To the extent that Plaintiffs claim that Defendants must increase access to community-based mental health treatment for children, DOJ – the federal agency that Congress has charged with implementing the ADA – has already determined that the steps the State has agreed to take pursuant to its Memorandum of Understanding ("MOU") with DOJ resolves any potential ADA violations. *See* Doc. 17-6, App'x Tab No. 4. Plaintiffs contend that the MOU does not obligate Defendants to reduce the number of children placed in in-state residential facilities (not correct: the obligations are not limited to out-of-state, *see* MOU ¶ 52(c)); that it is not enforceable (not correct: DOJ may seek specific performance, *see* MOU ¶ 60), and that it is "exceedingly weak." In addition to being factually inaccurate, Plaintiffs' view of the MOU is at odds with the position

of DOJ, which has called the MOU "a substantial, landmark agreement" whose "impact will be felt for generations to come."[7]

## CONCLUSION

For the reasons set forth above and in Defendants' Memorandum in Support of the Motion to Dismiss, the complaint should be dismissed.

Respectfully submitted,

*/s/* Philip J. Peisch
Philip J. Peisch, DC Bar # 1005423 (pro hac vice)
Caroline M. Brown, DC Bar # 438342 (pro hac vice)
Rebecca E. Smith, DC Bar # 166610 (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258
E-mail: ppeisch@brownandpeisch.com

*/s/* Steven R. Compton
Steven R. Compton, WV St. Bar # 6562
West Virginia Attorney General's Office
812 Quarrier Street
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

*/s/* Doug P. Buffington, II
Doug P. Buffington, II, WV St. Bar # 8157
West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

*Attorneys for Defendants Jim Justice, et al.*

---

[7]    *See* Press Release, https://www.justice.gov/opa/pr/department-justice-reaches-agreement-resolve-americans-disabilities-act-investigation-west

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants' Reply in Support of the Motion to Dismiss to be delivered to counsel for Plaintiffs via ECF notification.

January 13, 2020

*/s/* Philip J. Peisch
Philip J. Peisch, DC Bar # 1005423 (pro hac vice)
Caroline M. Brown, DC Bar # 438342 (pro hac vice)
Rebecca E. Smith, DC Bar # 166610 (pro hac vice)
Brown & Peisch PLLC
1233 20th Street NW
Washington, DC 20036
Telephone: 202-499-4258
E-mail: ppeisch@brownandpeisch.com

*/s/* Steven R. Compton
Steven R. Compton, WV St. Bar # 6562
West Virginia Attorney General's Office
812 Quarrier Street
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

*/s/* Doug P. Buffington, II
Doug P. Buffington, II, WV St. Bar # 8157
West Virginia Attorney General's Office
State Capitol Complex, Bldg. 1
Charleston, WV 25305
Telephone: 304-558-2021
Fax: 304-558-0140
Email: Doug.P.Buffington@wvago.gov

*Attorneys for Defendants Jim Justice, et al.*