UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| ASHLEY W. and Betty W, minors, by Next Friend, Denise Durnell, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:19-cv-00129-RLY-MPB |
| ERIC HOLCOMB, in his official capacity as the Governor of Indiana, TERRY STIGDON, in her official capacity as the Director of the Indiana Department of Child Services, and DEPARTMENT OF CHILD SERVICES, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION TO DISMISS**

Federal courts have a duty to decide cases before them. Sometimes they refrain from exercising jurisdiction when doing so would interfere with ongoing state proceedings or would upset state-court judgments. But those exceptions are just that: exceptions. Federal courts cannot refuse to entertain cases, even when the subject matter involves parallel state-court proceedings.

This case tests the limits. This proposed class action concerns Indiana's child welfare system and its purported shortcomings. The plaintiffs are all children under the custody of Indiana's Department of Child Services ("DCS"). They bring this lawsuit against DCS; the director of DCS, Terry Stigdon; and the Governor of Indiana, Eric Holcomb. Plaintiffs allege Defendants violated their constitutional rights by failing to

1

protect them from harm and failing to honor their right to familial integrity when placing them into foster care. Plaintiffs also allege Defendants violated their rights to a case plan and case review system under the Adoption Assistance and Child Welfare Act. And a sub-class of Plaintiffs contend Defendants discriminated against them in violation of the Americans with Disabilities Act.

Defendants urge this court to dismiss Plaintiffs claims altogether. They insist the court lacks jurisdiction because resolving Plaintiffs' claims would interfere with the children's state court cases. They also say Plaintiffs fail to state a claim under any of their theories. The court agrees with respect to Plaintiffs' claim under the Adoption Assistance and Child Welfare Act but disagrees with respect to the rest of Defendants' assertions. Accordingly, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part.**

## I.     Background

The court takes the facts from the complaint in the light most favorable to Plaintiffs, accepting all well-pleaded facts as true and drawing all reasonable inferences in their favor. *Viamedia, Inc. v. Comcast Corporation*, 951 F.3d 429, 454 (7th Cir. 2020).

The named Plaintiffs—Ashley W., Betty W., Milo S., Thomas M., Jaidyn R., James M., Logan S., Sara O., Desmond C., and Braxton F.—are all children under the custody of DCS. (Filing No. 16-1, Amended Class Action Complaint ("Complaint") ¶¶ 14 – 27). Some currently reside in foster homes pursuant to a court order, (*id.* ¶¶ 14 –

2

19), while others reside in private facilities. (*Id.* ¶¶ 20 – 27). All but two Plaintiffs[1] have next friends who have appeared on their behalf. (*Id.* ¶¶ 14 – 27). And all Plaintiffs have pending Child in Need of Services (CHINS) proceedings in state court. (*See generally* Filing No. 40, Docket Sheets related to CHINS cases).[2]

A little more about Defendants. Governor Holcomb and Director Stigdon are both sued in their official capacity. (*Id.* ¶¶ 28, 30). Governor Holcomb appoints the director of DCS and has the authority to shape the policies and coordination of DCS. *See* Ind. Code § 31-25-1-1; *see also* Ind. Exec. Order No. 05-15 (2005). Director Stigdon administers DCS. Ind. Code § 31-25-1-1(b). DCS is the state agency responsible for providing child and family services, including abuse and neglect prevention services. *See generally* Ind. Code § 31-25-2-7 (describing the powers and duties of DCS).

Plaintiffs allege a laundry list of failures by Defendants. They contend Defendants failed to protect Indiana's foster children from physical, psychological, and emotional harm; failed to place them in appropriate homes within a reasonable period of time; failed to provide foster care placements and individualized services that ensure their well-being; and failed to take reasonable steps to ensure the success of trial home visits. (Complaint ¶ 42). Plaintiffs also maintain Defendants unnecessarily separate siblings when placing

---

[1] The court recently dismissed next friends for Desmond C. and Braxton F. (Filing No. 99).

[2] The court considers this document and subsequent exhibits only as evidence that each child has a pending CHINS proceeding. Any other use is irrelevant at this point in the proceedings. Plaintiffs maintain the court cannot consider this evidence, but documents from court dockets are subject to judicial notice. *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *see also Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018) (Easterbrook, J., in chambers).

3

children into homes and fail to take steps to ensure siblings have contact with one another after they are placed. (*Id.*). A subclass of Plaintiffs also allege Defendants have discriminated against them on account of their disabilities. (*Id.*). These Plaintiffs assert Defendants deprived them of the necessary services and treatments to ensure a stable, family-like foster placement; denied them the benefit of Indiana's services, programs, or activities in an appropriate environment; and failed to reasonably modify the system to accommodate children with disabilities. (*Id.*).

## II.    Discussion

This lawsuit commenced on June 25, 2019. Plaintiffs assert Defendants' actions violated (1) Plaintiffs' right to be free from harm under the Due Process Clause of the Fourteenth Amendment; (2) their right to familial association under the First, Ninth, and Fourteenth Amendments; and (3) their right to a developed case plan and case review system under the Adoption Assistance and Child Welfare Act of 1980 (the "Adoption Act"), 42 U.S.C. § 670 *et seq.* (*Id.* ¶ 78). A subclass of Plaintiffs allege Defendants violated their right to be free from discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (*Id.*).

Defendants offer two general reasons why Plaintiffs' Complaint should be dismissed. First, Defendants argue the court lacks subject matter jurisdiction to consider Plaintiffs' claims because two abstention doctrines bar them. Second, even if the court has jurisdiction, Defendants insist Plaintiffs have failed to state a claim under any of their theories.

4

## A. Dismissal for Lack of Subject Matter Jurisdiction

Defendants first challenge this court's jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts have a duty to interpret the law and apply it to cases before them. *Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018) (plurality opinion); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2437 (2019) (Gorsuch, J. concurring in the judgment). This obligation to exercise jurisdiction is "virtually unflagging," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and continues even when parallel state court proceedings exist. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).

But federal courts sometimes decline to exercise jurisdiction even when they are otherwise authorized to proceed. *See Browder v. City of Albuquerque*, 787 F.3d 1076, 1084 (10th Cir. 2015) (Gorsuch, J. concurring) (citation omitted) ("Federal courts often abstain when they otherwise might proceed out of respect for comity and federalism and the absence of any compelling need for their services."). This is known as abstention. *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 303 (3d. Cir. 2004) ("Abstention is a judicially created doctrine under which a federal court will decline to exercise its jurisdiction so that a state court or agency will have the opportunity to decide the matters at issue.") (citations and internal quotations omitted). Although there are a number of circumstances when it is appropriate, abstention remains the exception to the general rule of exercising jurisdiction. *Colorado River*, 424 U.S. at 813 (noting abstention is the exception); *Hi Tech Trans, LLC*, 382 F.3d at 303 (noting abstention is appropriate in only certain circumstances).

5

Defendants contend this court lacks jurisdiction under the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)—known as *Rooker-Feldman* abstention. Defendants also argue this court lacks jurisdiction under the Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971)—known as *Younger* abstention. The court rejects both arguments.

### 1. *Rooker-Feldman* Does Not Bar Plaintiffs' Claims

Under *Rooker-Feldman*, courts decline to exercise jurisdiction over cases when doing so would interfere with state-court orders. *Bauer v. Koester*, 951 F.3d 863, 866 (7th Cir. 2020). *Rooker-Feldman* prevents state court losers from challenging state court judgments in federal court. *Swartz v. Heartland Equine Rescue*, 940 F.3d 387, 392 (7th Cir. 2019). Abstention under *Rooker-Feldman* is appropriate when the injury complained of flows directly from the state court order. *Bauer*, 951 F.3d at 866 ("*Rooker-Feldman* bars review of claims that allege injury caused by a state-court order.") (citing *Swartz*, 940 F.3d at 391).

*Rooker-Feldman* does not apply here. Plaintiffs are not challenging the state-court custody orders themselves; they are challenging Defendants' actions and policies that led to those orders. *See Brokaw v. Weaver*, 305 F.3d 660, 662 (7th Cir. 2002) (holding district court erred in abstaining under *Rooker-Feldman* when a federal plaintiff challenged the actions of the people involved with a state court decision, not the decision itself); *Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018) (*Rooker-Feldman* does not apply when the federal plaintiff does not seek to alter the state court's judgment).

6

*Brokaw* illustrates the point. There, the plaintiff—three years old at the time—was removed from her parents' home based on allegations of child neglect. *Brokaw*, 305 F.3d at 662. When she turned eighteen, the plaintiff sued her paternal grandfather, aunt and uncle, and several other state actors and agencies for violating her constitutional rights. *Id.* The district court dismissed the suit under *Rooker-Feldman*, and the Seventh Circuit reversed. *Id.* The Seventh Circuit said the plaintiff could challenge the actions of the defendants because she alleged the defendants' actions violated her rights, independently of the state court decision. *Id.* at 665; *see also Long v. Shorebank Development Corp.*, 182 F.3d 548, 555 – 56 (7th Cir. 1999) (quoting *Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995)) (*Rooker-Feldman* bars a claim that a state court decision was incorrect or violated the Constitution; it does not bar a claim that the people involved in the decision violated some independent rights).

Like in *Brokaw*, Plaintiffs here are challenging the actions of the state defendants, not the state courts. *Brokaw*, 305 F.3d at 665. Other courts facing similar allegations have reached the same conclusion. *See, e.g., Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 522 – 23 (D. Neb. 2007) (*Rooker-Feldman* did not apply in children's challenge to foster care system because children sought prospective relief and did not seek reversal of prior juvenile proceedings); *see also Henry A. v. Willden*, 678 F.3d 991, 996 (9th Cir. 2012) (plaintiffs who alleged county officials violated their constitutional rights as foster children stated a claim under the Constitution and federal statutes).

Defendants argue several cases support abstention under *Rooker-Feldman*, but all of those cases primarily involve challenges to the custody orders themselves—not the

7

actions of DCS and executive branch officials. *See T.W. by Enk v. Brophy*, 124 F.3d 893, 898 (7th Cir. 1997) (federal suit attacking state court judgement related to custody was barred by *Rooker-Feldman*); *Bates v. Ohio*, 715 F. App'x 554, 554 – 55 (7th Cir. 2018) (same); *Liedel v. Juvenile Court of Madison Cnty., Ala.*, 891 F.2d 1542, 1545 – 46 (11th Cir. 1990) (same); *Pettit v. Ind. Dep't of Child Servs.*, No. 1:14-cv-00531-RLY-DKL, 2015 WL 133736, at *1 (S.D. Ind. Jan. 9, 2015) (same); *Garcia v. Fox*, No. 18-CV-04205, 2019 WL 2371718, at *2 (N.D. Ill. June 5, 2019) (same).

*Rooker-Feldman* therefore does not apply.

### 2.    *Younger* Likewise Does Not Bar Plaintiffs' claims

Under *Younger*, courts decline to exercise jurisdiction to avoid interfering with ongoing state proceedings. *Mulholland v. Marion County Election Board*, 746 F.3d 811, 815 (7th Cir. 2014) (citation omitted) (noting *Younger* reflects the concern that federal interference with certain types of state proceedings is unwise and unnecessary). *Younger* abstention applies when exercising jurisdiction would interfere with ongoing (1) state criminal proceedings; (2) certain judicial or administrative proceedings akin to criminal proceedings; or (3) civil proceedings that implicate a state's interest in enforcing its judgments or orders. *Sprint Communications,* 571 U.S. at 78; *Mulholland*, 746 F.3d at 815. These categories are narrow; exercising jurisdiction remains the preferred course. *Sprint*, 571 U.S. at 78 ("We have not applied *Younger* outside these three 'exceptional' categories . . . ."); *Mulholland*, 746 F.3d at 816 ("Outside these three 'exceptional' situations, *Younger* abstention is not appropriate even when there is a risk of litigating the same dispute in parallel and redundant state and federal proceedings.") (citation omitted).

8

Although a much closer call, *Younger* does not apply for two reasons. First, the resolution of Plaintiffs' claims—construing the complaint in their favor—would not interfere with the state court litigation—the pending CHINS cases. *See Bice v. Louisiana Public Defender Bd.*, 677 F.3d 712, 717 (5th Cir. 2012) (a prerequisite for the application of *Younger* is whether the federal lawsuit will interfere with the ongoing state proceeding); *31 Foster Children v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003) (same); *see also Jacobson v. Village of Northbrook Municipal Corp.*, 824 F.2d 567, 569 (7th Cir. 1987) (noting *Younger* abstention is appropriate when any ruling from the federal court would seriously interfere with state enforcement proceedings). Plaintiffs are not seeking to enjoin the state court CHINS cases; they are challenging Defendants' conduct.

Consider some of the relief sought. *See Bush*, 329 F.3d at 1276 ("In order to decide whether the federal proceeding would interfere with the state proceeding, [the court] look[s] to the relief requested and the effect it would have on the state proceedings.") (citation omitted). Plaintiffs seek an injunction requiring DCS to maintain caseloads and accepted professional standards for all workers providing direct supervision and planning for children as well as an order requiring DCS to periodically verify and report that it is meeting those standards. (Complaint at 82 ¶ IV). They also ask this court to order DCS to conduct an emergency evaluation of all children who enter foster care within 72 hours and a comprehensive placement evaluation of their needs within 30 days after they enter foster care. (*Id.* at 83 ¶ IV). And finally, they request that Defendants conduct an annual DCS case record review to ensure DCS is timely placing and caring for children. (*Id.* at 84 ¶ IV). None of those requests would interfere with the

Plaintiffs' CHINS cases or the courts adjudicating those proceedings; they would only require DCS to make changes. Other cases have found *Younger* inapplicable in similar situations. *See Connor B. ex rel. Vigurs v. Patrick*, 771 F.Supp.2d 142, 154 – 58 (D. Mass. 2011) (finding *Younger* inapplicable because children's federal challenge to state agency's systematic deficiencies would not interfere with pending state court cases); *T.F. by Keller v. Hennepin Cnty.*, No. 17-1826, 2018 WL 940621, at *3 (D. Minn. Feb. 16, 2018) (same); *but see Carson P.*, 240 F.R.D. at 524 – 30 (finding federal challenge to State's child welfare policies would interfere with the state proceedings).

True, some of the relief sought may be problematic. For example, enjoining DCS from separating siblings when they enter foster care unless it is in the best interests of the child would likely interfere with the state court litigation. But just because some of the relief may not be available does not mean the court should abstain altogether. *Olivia Y. ex rel. Johnson v. Barbour*, 351 F.Supp.2d 543, 570 (S.D. Miss. 2004) (declining to abstain under *Younger* even though some of the relief sought might be unavailable). That can be worked out at summary judgment or at trial. The better course of action is to retain jurisdiction and sort the rest out at a later stage—especially since complaints need only plead grievances, not legal theories. *See Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020).

*Younger* does not bar this suit for a second reason. Plaintiffs lack a reasonable opportunity to raise their claims in their CHINS proceedings. *Cf. Swartz*, 940 F.3d at 394 (*Younger* applied where plaintiffs were represented by counsel and participated in state court hearings); *see also Brokaw*, 305 F.3d at 668 (abstention inappropriate where federal

10

plaintiff did not have a reasonable opportunity to raise her constitutional claims) (internal quotations and citation omitted).[3]  All of the children in this case are minors, and unlike parents, minors are not entitled to legal representation during CHINS proceedings.  *See* Ind. Code § 31-32-4-1; § 31-32-4-2.  Defendants point out that parties to a CHINS proceeding are able to bring constitutional claims.  But they do not dispute that Plaintiffs here are minors and did not have legal representation during their CHINS proceedings.  It is true Plaintiffs each had a court-appointed Guardian Ad-Litem (GAL) or a Court Appointed Special Advocate (CASA) to represent their interests.  *See* Ind Code § 31-34-10-3.  But the role of these advocates—who are often non-lawyers—is narrow: they are equipped to represent the child's best interest in CHINS proceedings, not to bring class-wide relief against DCS for constitutional violations.  *See Brokaw*, 305 F.3d at 668.  Plaintiffs here simply did not have a realistic opportunity to present their claims earlier in state court.

*Milchtein* does not say otherwise.  *See Milchtein v. Chisholm*, 880 F.3d 895 (7th Cir. 2018).  There, the Seventh Circuit held *Younger* barred a federal suit brought by parents challenging the state agency's placement and education of their children.  *Id.* at 899.  The parents argued the state discriminated against them and failed to accommodate their religious views by placing their children in foster homes.  *Id.* at 897.  The Seventh Circuit held *Younger* applied because challenging the placement of children would interfere with the ongoing state court proceedings, particularly those related to custody.

---

[3] Although the court was discussing *Rooker-Feldman*, its analysis is equally persuasive with respect to *Younger*.

*Id.* at 899.  But unlike in *Milchtein*, the challenge here does not interfere with the state court proceedings because Plaintiffs are not requesting this court modify the underlying custody orders or foster care placements.  To the extent they are, Defendants can always present their argument at summary judgment—when Plaintiffs must define their legal theories and present supporting evidence.[4]  On top of that, the plaintiffs here did not have the same opportunity as the plaintiffs in *Milchtein* to present their claims in state court because they are minors and do not receive the benefit of counsel under Indiana law.  *See* Ind. Code § 31-32-4-1; § 31-32-4-2.  *Milchtein* therefore does not apply.[5]

Since neither abstention doctrine bars this court from exercising jurisdiction, the court proceeds to the merits.

**B.    Dismissal for Failure to State a Claim**

Defendants next challenge whether Plaintiffs have plausibly stated claims under any of their theories.  Rule 12 authorizes courts to dismiss complaints that fail to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "A complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That means it must contain enough "'factual

---

[4] It is not uncommon for courts to continue past a motion to dismiss and then abstain at summary judgment.  In fact, *Milchtein* itself, was an appeal from the grant of summary judgment—not a motion to dismiss.  *Milchtein v. Chisholm*, No. 13-c-0940, 2017 WL 414251, at *1 (E.D. Wis. Jan. 31, 2017).

[5] These two reasons are why Defendants' other cases likewise do not apply.  *See Moore v. Sims*, 442 U.S. 415, 435 (1979); *Brunken v. Lance*, 807 F.2d 1325, 1330 – 31 (7th Cir. 1986); *Rangel v. Reynolds*, No. 4:07-cv-20-AS, 2007 WL 1189356, at *2 (N.D. Ind. Apr. 18, 2007).

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court considers each of Defendants' challenges.

### 1. Plaintiffs Have Stated a Claim that Defendants Failed to Protect Them Under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving someone's life, liberty, or property without due process of law. *Reed v. Palmer*, 906 F.3d 540, 551 (7th Cir. 2018) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Although the state ordinarily does not have any duty to protect individuals from harm by third parties, *DeShaney*, 489 U.S. at 195, an exception exists when the state has a "special relationship" with the individual. *Reed*, 906 F.3d at 552. Children who are in DCS custody are in a special relationship with the state. *Id.*; *Henry A.*, 678 F.3d at 1000. The state, thus, has a duty to protect children in its custody, which includes placing them with foster parents who are competent and safe. *Reed*, 906 F.3d at 552.

Plaintiffs have sufficiently alleged Defendants failed to protect them from dangerous foster placements. Plaintiffs allege generally that Defendants have failed to provide safe and appropriate foster care placements; failed to provide the children appropriate services to allow for family reunification; failed to timely pursue termination of parental rights; and failed to seek safe and secure homes. (Complaint ¶¶ 3 – 4). For example, Plaintiffs say DCS caseworkers would approve safety plans with substance-abusing parents and caregivers in which the parents would merely promise to refrain

13

from using drugs in the child's presence.  (*Id.* ¶ 227).  Another example, Plaintiffs

contend, is that DCS often places children in need of services in homes with other youth

on probation, which causes a potentially harmful environment.  (*Id.* ¶ 238).  Plaintiffs

assert too that DCS over-relies on emergency shelter care and will often keep children

there much longer than the 20-day period required by law.  (*Id.* ¶ 254 – 59).

Specific allegations reinforce Plaintiffs' claims.  For example, Ashley W. and

Betty W. are four- and five-year-old girls in the custody of DCS.  (*Id.* ¶¶ 60 – 86).  In

2016, DCS received a report that the girls' stepfather had sexually abused them, but DCS

did not remove them from the home.  (*Id.* ¶¶ 62, 63).  Only after several weeks, when

DCS received a report that their parents were abusing methamphetamines in the home,

did DCS decide to intervene and file a CHINS petition.  (*Id.* ¶ 65).  Unfortunately, things

did not improve.  Over the next two years, DCS placed the girls more than fourteen times

and failed to develop any kind of treatment plan for either girl.  (*Id.* ¶¶ 67 - 70).  One of

the placements was in an emergency shelter for months which violated multiple DCS

policies.  (*Id.* ¶ 67).  Another placement was with their biological father, even though

DCS had numerous concerns about the safety of his home.  (*Id.* ¶ 73).  That placement

only lasted two months after DCS found the girls neglected: they were dirty, had

contracted lice, had contracted ringworm, and showed unexplained bruises and injuries

on their bodies (among other injuries).  (*Id.* ¶77).  As of October 2018, Ashley (age four)

had been moved to her seventeenth different foster home.  (*Id.* ¶ 80).  DCS has now

separated the girls making it unlikely that they will get adopted together.  (*Id.* ¶ 82).  This

14

example reinforces Plaintiffs' allegations that Defendants have failed to protect them from harm.  (*See also* Complaint ¶¶ 156-169) (allegations specific to Sara O.).

All that said, Plaintiffs have sufficiently stated a claim Defendants failed to protect them from harm under the substantive due process clause.  *See Connor B.*, 771 F.Supp.2d at 163 (children who alleged government officials placed them in foster homes presenting known risks stated a claim under the substantive due process clause); *Charlie H. v. Whitman*, 83 F.Supp.2d 476, 507 (D. N.J. 2000) (children who alleged state defendants failed to protect them stated a claim under the substantive due process clause).

     **2.**     **Plaintiffs Have Plausibly Alleged that Defendants Violated Their Right to Familial Association Under the First, Ninth, and Fourteenth Amendments.**

The Constitution also recognizes a right to familial integrity anchored in the First, Ninth, and Fourteenth Amendments.  *See Connor B.*, 771 F.Supp.2d at 163 – 64 (collecting cases); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 296 (N.D. Ga. 2003) ("The Supreme Court has recognized a right to family integrity derived from the First Amendment's broad right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.").  At a minimum, this right includes the right of children to have meaningful contact with their family—both parents and siblings.  *Kenny A.*, 218 F.R.D. at 296 (citing *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1005 – 1006 (N.D. Ill. 1989)).  It also includes the right to adequate treatment and services that allow children to be reunited with their family. *Kenny A.*, 218 F.R.D. at 297.

Plaintiffs have likewise sufficiently alleged Defendants violated their rights to familial integrity. They allege Defendants failed to take reasonable efforts to secure permanent homes for the them and failed to protect them from psychological and emotional harm by shuttling them between temporary placements and separating them from their siblings. (*Id.* ¶¶ 226, 311, 313). They also contend DCS has a strong policy of involuntary removal and encourages removal instead of other options that might keep the child with his or her family. (*Id.* ¶ 226). Whether the evidence bears this out is for another day, but Plaintiffs have sufficiently alleged a plausible claim for now. *See Kenny A.*, 218 F.R.D. at 296 – 97 (plaintiffs who alleged state defendants systematically denied them meaningful visitation with their parents and siblings stated a claim under the First, Ninth, and Fourteenth Amendments).

### 3. The Subclass of Plaintiffs Have Plausibly Alleged Defendants Violated Their Rights Under the ADA and Rehabilitation Act

Congress enacted the ADA in 1990 to curb discrimination against people with disabilities. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999). Title II of the ADA directs that "'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *King v. Hendricks County Commissioners*, 954 F.3d 981, 988 (7th Cir. 2020) (quoting 42 U.S.C. § 12132). To establish a violation under Title II of the ADA, the sub-class of Plaintiffs must allege (1) they were "qualified" individuals with a disability under the Act; (2) they were denied the benefit of a program, service, or activity by a public

16

entity; and (3) such denial was because of their disability. *See Ashby v. Warrick County School Corp.*, 908 F.3d 225, 230 (7th Cir. 2018) (internal quotations and citations omitted). Plaintiffs' Rehabilitation Act claims rise or fall with their ADA claims, so the court will analyze them together as just their "ADA" claims. *King*, 954 F.3d at 988 (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (noting Rehabilitation Act and Title II claims are treated as "functionally identical").

Plaintiffs have sufficiently alleged violations of the ADA. They allege Defendants failed to accommodate Plaintiffs' disabilities by failing to ensure children with disabilities in the foster care system have access to medical and mental health support services. (Complaint ¶¶ 240 – 45). Plaintiffs also allege many children with disabilities are subject to blanket treatment while in foster care, and Defendants fail to coordinate supportive care particularized to each child with a disability. (*Id.*). The allegations specific to Desmond C. are an illustrative example:

> 171. Desmond was born on May 14, 2003 and has a twin brother and younger sister. Desmond has limited verbal skills and requires a wheelchair. Desmond is diagnosed with autism spectrum disorder, cerebral palsy, developmental delay, and dysphasia. Desmond also suffers seizures.
>
> . . .
>
> 178. When DCS removed the children in September 2012, DCS initially placed them together in a non-kinship foster home. Upon information and belief, the foster home was not a therapeutic foster home, and DCS failed to inform the foster parents of Desmond's disabilities, only telling them that Desmond required a wheelchair for traveling long-distances.
>
> 179. DCS did not tell the foster parents that Desmond was non-verbal, incontinent (requiring a diaper), or that he needed a wheelchair anytime he left the house. Upon information and belief, DCS provided no assistance in arranging transportation for Desmond to and from school. In addition, upon

information and belief, the foster parents were forced to take it upon themselves to reach out to Desmond's prior school to determine what accommodations he required at his new school. Upon information and belief, they also spoke with his past teachers to find out Desmond's history—they needed to know how to meet his basic needs.

. . .

181. Upon information and belief, Desmond was moved to a new foster home after a week because his first placement was unable to meet his needs, especially without assistance from DCS. Upon information and belief, Desmond's siblings were later split up into two separate foster homes.

182. Upon information and belief, Desmond lived at his second foster home, the home of his Next Friend, Mr. Foreman, for approximately four-and-a-half years. Upon information and belief, DCS again failed to provide the Foremans with his complete medical history and refused to assist in transporting Desmond to his medical appointments, many of which were several hours away. Upon information and belief, Desmond underwent five surgeries in Indianapolis while he lived in this foster home, one of which resulted in his legs being placed in full casts for several weeks. Upon information and belief, DCS failed to monitor or check in on Desmond while he was hospitalized for his surgeries.

. . .

185. Upon information and belief, Desmond's foster parents, who were left without support from DCS, were forced to put in their notice, seeking to have Desmond moved from their home. In response, DCS, upon information and belief, sent out a referral stating that Desmond required a higher than necessary level of care.

186. As a result, two years ago, on March 17, 2017, DCS placed Desmond at a nursing facility—on the adult wing.

(Complaint ¶¶ 171 – 86).   These allegations along with Plaintiffs' specific examples suffice to state a claim under the ADA (and in turn the Rehabilitation Act).

Defendants urge this court to find the ADA does not require them to accommodate special requests or provide adequate medical treatment to Plaintiffs with disabilities:

> ADA Subclass Plaintiffs do not claim they were excluded from Indiana's foster-care system, or refused any services available to non-disabled children. They claim instead that they are entitled to *different* care or placements within that system to accommodate their special needs as disabled children. This states no valid claim under either the ADA or the Rehabilitation Act.

(Filing No. 43, Defendants' Brief in Support at 28); *see also id.* at 27 ("Neither the ADA nor the Rehabilitation Act imposes a special obligation on the part of the state to accommodate special requests or provide adequate medical treatment."); *id.* ("Simply put, disabled individuals are not entitled to additional services (e.g., medical treatment) not offered to non-disabled individuals.").

That argument misses the mark—entirely. The whole purpose of the ADA is to allow individuals with disabilities to enjoy the same services, programs, or activities as individuals without disabilities. To that end, Title II prohibits discrimination and requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . . ." 28 C.F.R. § 35.130(b)(7)(i). That may require *differential* treatment:

> The most straightforward way to view [the reasonable modification requirement] is as an affirmative obligation to take the steps that are necessary to bring the services available to the disabled up to the level that the nondisabled enjoy, *which in one sense will require giving some benefits to the disabled that are unnecessary for their more fortunate fellow citizens.* A person with no mobility problem would never miss a wheelchair ramp; a person with 20/20 vision has no need for an audible signal in an elevator that the desired floor has been reached. But those accommodations are essential for the disabled person to enjoy equal access to public services.

*Wisconsin Community Servs., Inc. v. City of Milwaukee, Wisconsin*, 413 F.3d 642, 649 (7th Cir. 2005) (Wood J., dissenting) (emphasis added), *rev'd* 465 F.3d 737, 756 (7th Cir.

19

2006) (en banc) (adopting dissenting opinion).  This is also reinforced by the fact that a public entity may be liable for discriminating indirectly such as "'through contractual, licensing, or other arrangements.'"  *Ashby*, 908 F.3d 232 (quoting 28 C.F.R. § 35.130(b)(1)).

Defendants rely on *Hutchinson v. Spink*, 126 F.3d 895, 901 (7th Cir. 1997) for the proposition that Plaintiffs are not entitled to any special treatment under the ADA, but they read *Hutchinson* too broadly.  In *Hutchinson*, a mother sued county social workers and foster parents after her son died in the custody of the foster parents.  *Id.* at 896 – 97.  She alleged the defendants violated her son's ADA rights because they placed him in foster care instead of a hospital.  *Id.* at 901.  But the complaint did "not allege that he was excluded from some program, activity, or benefit because of his disability."  *Id.*  Here, the complaint alleges Defendants failed to accommodate Plaintiffs' disabilities and support reasonable modifications so that Plaintiffs can receive the same level of care and treatment provided to children without disabilities.   That was the missing link in *Hutchinson*, and so this case presents no problem.

Relying on a footnote in *Olmstead v. L.C. ex rel. Zimring*, Defendants next argue the ADA does not impose any standard of care as to what medical services they are required to provide.  527 U.S. at 603 n. 14.  But the *holding* of *Olmstead* was that a state may violate the ADA when it continues to treat persons with mental disabilities in an institutional setting after they qualify for community placement—which directly cuts against Defendants' position.  *Id.* at 607.  And even if it is true generally that the ADA does not impose a "standard of care" requirement on Defendants, it still applies and

requires them to make reasonable accommodations or modifications to avoid discrimination. At least that is the rule with prisons, *see Cassidy v. Indiana Dep't of Corrections*, 199 F.3d 374, 375 (7th Cir. 2000) (ADA applies to prisoners), and schools, *CTL ex Rel. Trebatoski v. Ashland School Dist.*, 743 F.3d 524, 529 (7th Cir. 2014) (ADA applies to students), and Defendants have not offered any compelling reason why foster homes should be treated differently. Defendants reliance on *Olmstead* is simply misplaced.

For those reasons, the Subclass of Plaintiffs have plausibly alleged violations of both the ADA and the Rehabilitation Act.

### 4. Plaintiffs Have Failed to State a Claim Under the Adoption Act

Congress passed the Adoption Act in 1980. *See Suter v. Artist M.*, 503 U.S. 347, 350 (1992), *superseded by statute on other grounds*, 42 U.S.C. §§ 1320a–2. Enacted under the Spending Clause, the Act "establishes a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services." *Suter*, 503 U.S. at 350 – 51; *see also Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002). Much like other Spending Clause legislation, states are eligible for reimbursement only if they comply with the program's requirements. *Cross*, 294 F.3d at 1036 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "To participate in the program, States must submit a plan to the Secretary of Health and Human Services for approval. . . ." *Suter*, 503 U.S. at 351; 42 U.S.C. § 671(a). The plan must satisfy thirty-seven different conditions in order to be approved by the Secretary. 42 U.S.C. § 671(a)(1) – (37). One of those conditions is that the state's

plan must provide for the development of a case plan and a case review system for each child. *Id.* § 671(a)(16); *see also Charlie H.*, 83 F.Supp.2d at 485 – 89.

The parties disagree over whether that condition—the development of a case plan and case review system—creates a federal right enforceable through section 1983. And they are not alone. Many courts have spilled ink trying to figure out whether Congress "intended to create a federal right" with that condition. *Gonzaga University v. Doe*, 536 U.S. 273, 283 – 84 (2002). The majority[6] of those courts say yes. *E.g., Henry A.*, 678 F.3d at 1006; *see also Sam M. ex rel. Elliott v. Chafee*, 800 F.Supp.2d 363, 387 (D. R.I. 2011); *Connor B.*, 771 F.Supp.2d at 172. Others, however, say no. *See, e.g., 31 Foster Children*, 329 F.3d at 1271 – 74; *see also Carson P.*, 240 F.R.D. at 544; *Olivia Y.*, 351 F.Supp.2d at 564 – 65; *Charlie H*, 83 F.Supp.2d at 489.

The court agrees with those courts that say no. Congress creates an enforceable federal right only when it speaks in "clear and unambiguous" terms, *Gonzaga*, 536 U.S. at 290, and the court cannot say it did so with sections 671(a)(16) and 675(1).

Start with the text. Section 671(a)(16) lists a requirement for states to include in their plans submitted to the Secretary:

(a) Requisite features of State plan

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which--

. . .

---

[6] Several of these decisions, however, came down well before the Supreme Court clarified the personal rights jurisprudence in *Gonzaga*.

22

(16) provides for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child.

42 U.S.C. § 671(a)(16). Section 675(1) defines what "case plan" means. 42 U.S.C. § 675(1). But neither of these sections show an intent to create a right in clear and unambiguous terms: nowhere in Section 671(a)(16) does it say an aggrieved child may bring an action for a violation of that section, and Congress seldom uses definitional sections to create enforceable rights. *31 Foster Children*, 329 F.3d at 1271 (definitional sections do not supply a basis for conferring rights); *see also B.H. v. Johnson*, 715 F.Supp. 1387, 1401 (N.D. Ill. 1989) ("It would be strange for Congress to create enforceable rights in the definitional section of a statute.").

Some courts have emphasized Congress's use of "shall" and "each child" in section 671(a)(16) when describing the case plan and review requirement shows Congress intended to create a federal right for children because "shall" is a mandatory term and "each child" shows an unmistakable focus on children. *See, e.g., Connor B.*, 771 F.Supp.2d at 171 (citing § 671(a)(16)) (noting the statute requires that states "shall" have a plan approved by the Secretary which provides for the development of a case plan "for each" child). But the use of those words is hardly a "clear and unambiguous" expression of intent. For starters, "shall" does not just modify section 671(a)(16); it also modifies *other* sections, including section 671(a)(15)—*for which there is no federal right. See Suter*, 503 U.S. at 364 (holding section 671(a)(15) does not create an enforceable right

23

through section 1983).[7]  And while the use of "each child" undoubtedly shows that children are the intended *beneficiaries* of the statute, section 1983 only provides a remedy for *rights*, not broader *benefits* or *interests*.  *Gonzaga*, 536 U.S. at 283.

The structure of the Act only reinforces the conclusion Congress did not clearly and unambiguously create an enforceable right in section 671(a)(16).  Another part of the act *explicitly* creates a cause of action for a violation of a different one of those thirty-seven conditions:

> Any individual who is aggrieved by a violation of section 671(a)(18) of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court.

42 U.S.C. § 674(d)(3)(A); *see also Charlie H.*, 83 F.Supp.2d at 489 (the absence of explicit rights creating language is strong evidence Congress did not intend to create an enforceable right in section 671(a)(16)).  That one section explicitly creates an enforceable right does not necessarily foreclose finding an enforceable right in another section, but it is evidence that Congress knows how to create a right in unambiguous

---

[7] Congress passed a statute after *Suter* overturning that decision in part:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. §§ 1320a–2.  However, the statute explicitly says it is not intended to alter *Suter's* holding.

24

terms and chose not to do so with respect section 671(a)(16).  That only bolsters the conclusion that Congress did not create an enforceable right under section 671(a)(16).

## III.  Conclusion

As fully explained above, Defendants' motion to dismiss (Filing No. 38) is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** with respect to Count III because the Adoption Act does not create any enforceable rights.  The motion is **DENIED** with in all other respects.

**SO ORDERED** this 12th day of May 2020.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.