**Reflecting on a Relative/Kinship Care Practice Model
Through the Perceptions of Its Stakeholders**

**KINSHIP CARE STRENGTHS ASSESSMENT** ✓ Professional Version

Key Findings and Recommendations

Presented to:

West Virginia Department of Health and Human Resources

March 2019

 

**Corporate Office**

8350 Frankstown Avenue • Pittsburgh, PA 15221

412.342.0600 • asecondchance-kinship.com

Sharon L. McDaniel, MPA, Ed.D.

President & CEO

Report Contact: Jay Kadash

Sr. Executive Vice President of Communications, Content
and Systems Engagement

**Regional Office**

1341 North Delaware Avenue, Suite 504 • Philadelphia, PA 19125

215.563.0790

1

## Table of Contents

**Background** ........................................................................................................................... **3**

**Introduction** ......................................................................................................................... **3**

   Relative/Kinship Care: A National Perspective ................................................................. 3

   West Virginia: The Role of Relative/Kinship Care in Realizing a Transformation of Child Welfare ..... 4

**Executive Summary** ............................................................................................................... **5**

   Method ............................................................................................................................... 5

   Overarching Strengths of the System ............................................................................... 5
      Functional strengths observed: .............................................................................................................. 6
      Behavioral strengths observed: .............................................................................................................. 6
      System perception strengths observed: ................................................................................................. 6
      Feedback and communication strengths observed: ............................................................................... 7

   Principle Recommendations .............................................................................................. 7
      Work Effort 1: Develop an Outcomes-Based Kinship/Relative Practice Model .................................... 7
      Work Effort 2: Kinship/Relative Training and Support Program ............................................................ 7

   Conclusions ........................................................................................................................ 8

**Scope** ...................................................................................................................................**12**

**Objectives** ...........................................................................................................................**12**

**Stakeholders** .......................................................................................................................**13**

**Methodology Employed** ......................................................................................................**13**

**Developing the Thematic Report** ........................................................................................**13**

**The Gap Analysis** .................................................................................................................**14**

   Overarching Contemplation on Strengths and Gaps in the System .................................15
      Area 1: System Function .........................................................................................................................15
      Area 2: System Behavior.........................................................................................................................16
      Area 3: System Complexity......................................................................................................................17
      Area 4: Information Feedback System (Communication).......................................................................18

**Summary** ..............................................................................................................................**19**

**Appendix A** ...........................................................................................................................**21**

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

**D139303**

## Background

This report summarizes discovery sessions, focus groups and desk review findings conducted as part of the Kinship Strengths Assessment – Professional Version™ (KSA-PV) of the West Virginia Department of Health and Human Resources (DHHR). Coordination of this process is being conducted by A Second Chance, Inc. (ASCI). Based in Pittsburgh, Pennsylvania, ASCI has been a recognized leader for over 24 years in the use of pure kinship care practices. The model is nationally recognized and is currently being used successfully in both Allegheny and Philadelphia counties.

The findings from the study are important for multiple reasons.

- o They show the system's perceptions of relative/kinship care amid the opioid epidemic.
- o They identify regional similarities and points of distinction in the interpretation of relative/kinship care policy into process.
- o They provide multiple stakeholder perspectives on system strengths and challenges.

## Introduction

### Relative/Kinship Care: A National Perspective

When a state or county takes custody of a child but a relative becomes the caregiver for that child, child welfare systems define it as "kinship care." Kinship care policies and practices vary greatly by jurisdiction, and while somewhat guided by federal law and policy, much of them are interpreted at state and county levels regarding issues such as the definition of relative, licensing/certification requirements, training and supports, both financial and otherwise. Varying interpretation of these policies and practices can further obscure the basic value that children have a moral right to be with family. Furthermore, data supports that when compared to traditional foster care, kinship care has the potential to provide better safety, well-being and permanency.

Whether its systemic use is formal or informal, kinship (relative) care has long been a force driving the foster care system. Relative caregivers are very much relied upon by the child welfare system to maintain balance in regard to child welfare placements. Yet paradoxically, it often relies on kinship arrangements to be made with limited supports and/or without formal associations to the system.

As a response to and process for the system, kinship care continues to adapt to political climates, economic conditions and social influences. As the nation confronts a prescription drug epidemic, the interconnections between that crisis and child welfare is apparent. Systems are overburdened by the rising number of children requiring out-of-home placements, sadly a reversal of downward trends in foster care prior to the epidemic. For families to successfully exit the system, relative/kinship care has demonstrated success in the concurrent addressing of a child's safety and well-being and a parent's recovery. It is a strategy and practice further strengthened when practiced as a community-based response. Here, the system must recognize that a

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

family's resilience is strengthened by building upon their existing and potential kinship networks.

## West Virginia: The Role of Relative/Kinship Care in Realizing a Transformation of Child Welfare

In West Virginia, there has been a dedicated and concerted effort to build a resilient relative/kinship care response to child welfare needs. The strength of this response, we believe, can be attributed in part to a strong sense of community and family, evident in every region of the state. The state has emphasized the need to examine policies and practices that are not only advantageous to best practices in relative/kinship care, but also respectful and reflective of a value for family.

It is also evident that DHHR is guided by a posture that relative/kinship care is the best option for an out-of-home placement. It is a value proposition that is driving their process to transform the system. DHHR approached this study with transparency, candor and a mindset open to change. Leadership and staff were highly engaged, focused on improvement over frustration and dedicated to using the information obtained from this study to strengthen their relative/kinship practice model. Rather than a fixation on what is wrong with the system, DHHR approached the study from a perspective of growth and change.

The environmental scan conducted with DHHR was administered from a values-based orientation. In this frame, information is sought out to uncover how the system arrives at decisions that are not merely alternatives, but best options based on a value for relatives/kin in the system.

For example, when caregiver trainings are only scheduled during the day or on a weekend, there is a disconnect in the system's empathy in understanding that caregivers may work or have other commitments during the day. When the system provides values-based options, it understands that the value is expressed by assessing alternatives in how it contributes to safety, well-being and permanency outcomes for the family. Thus, providing weekend and evening trainings is based on an assigned value for family as opposed to a mere alternative. More training options provide a family-friendly path to licensing. Training is part of the licensing process and not separated from it. Because this approval provides financial and social supports, there is a value add. DHHR was able to illustrate this "value add" in several areas, including training and the homestudy.

During the focus groups, DHHR staff was transparent in communicating areas of strength and challenge, in moving to a more values-based practice model for relatives/kin. Clearly, line staff reflected on the frustrations and challenges of high caseloads, which is honest and realistic. They did, however, augment comments that identified how a value could improve a decision.

For example, many staff referenced the importance of the home-finder in the continuum of care. Most indicated that this position was the needed support that would or could specifically meet the needs of the relative/kinship caregiver. The option of using the home-finder in this capacity speaks to an understanding that specific support for the

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139305

caregiver will impact well-being and increase the probability of placement stability. It is an option based on a value, not just a tactical alternative.

Barriers to transformation were identified as regulations, system fragmentation, policy alignment, staff turnover and demographic challenges. Point-in-time communications for this report also revealed the need to consider more data to better determine state and regional child welfare needs. We believe it is essential to have this data due to overlapping roles, scopes of practice and skills/knowledge that impact how the workforce engages relative/kinship families. It is important to point out that despite these challenges and barriers, DHHR provided insight into how it continues to pursue and develop a relative/kinship care practice model that is culturally, socially and economically sustainable for families in West Virginia.

# Executive Summary

## Method

The KSA-PV is a tool that reveals opportunities and challenges in addressing how we engage and work with family/kin as a best practice in response to the children and families who come to the attention of child welfare.

An environmental scan is like a SWOT (Strengths, Weaknesses, Opportunities and Threats) analysis. It involves meeting with various stakeholders to gain a better understanding of how philosophy, policies and practices respond to and advocate for kinship care. Central to the scan are in-person conversations. These conversations are conducted either as focus groups where two facilitators meet with groups of 5–10 stakeholders or through one-to-one interviews with identified stakeholders.

The scan is guided by a kinship care readiness rubric. The rubric is a measurement tool that articulates expectations that are reflective of best practices in kinship care. The best practices are categorized so that they construct criteria that can be used to express levels of competency and quality in kinship care. Numerical values are assigned to competencies to guide conversation around a common denominator. The rubric examines macro-criteria such as family value but utilizes a micro-lens to assess criteria such as licensing and permanency.

The discovery period encompassed business-process-mapping sessions to reveal key content, reducing any confusion around practice standards, process and outcomes. Focus groups explored stakeholder experiences with relative/kinship care. The findings highlight the complex and dynamic role of culture, both family and office, in relative/kinship care and its impact on intake, placement, case management and permanency.

## Overarching Strengths of the System

Strengths discovered during the engagement are outlined below, according to four areas:

- Functional: observations on behaviors that motivate and move the system.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

- Behavioral: how the functions are seen in events, process and response.
- System perceptions: observations reflected in an awareness that is interconnected to behavior.

Feedback and communication: use of perceptions to facilitate responsiveness.

Functional strengths observed:

- A commitment to a reliance on relative/kinship care as a needed process in the system.
- Knowledge and comprehension that regional and local customs and traditions influence process and policy execution and interpretation.
- Processes have been adapted to accommodate the specific needs relative/kinship care.
- Attention to enhancing child and family well-being and resilience through supervision of line staff.
- Consideration of *how* the role of the homefinder worker, and other line workers operate, in addressing the specific needs of the relative/kinship caregiver.
- Transparent response regarding the need for a more comprehensive continuum of care to support family that goes beyond fiscal necessity and spans intake through post-permanency.

Behavioral strengths observed:

- Efforts to increase the number of children placed with relative/kinship families.
- Efforts to improve the home assessment process for relatives/kin.
- Goal setting to advance how relatives/kin are engaged, assisted and compensated.
- Attentiveness to CPS investigation and home-finding timelines to reduce backlogs.
- Remaining educated and informed on the court's role in impacting relative/kinship care goals.

System perception strengths observed:

- A developed awareness that goals concerning permanency with relatives/kin are influenced greatly by individual, regional and department views on reunification, the definition of permanency for kin and the role of adoption.
- A developed awareness that goals concerning normalcy, as it pertains to reasonable and prudent parenting standards, are being met with varying degrees of flexibility.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

6

**D139307**

Feedback and communication strengths observed:

- Verbal and behavioral attendance to facilitating faster and consistent response times when communicating with relatives/kin.
- Attentiveness to regional differences in the use of communication channels in the relative/kinship response.
- Identified communication structures for coordination between program management and staff management.
- Monitoring and evaluating of relative/kinship care practices are in place.

## Principle Recommendations

Two work efforts are identified that we believe can impact the system. Each effort is synchronized to a goal that can be assessed through projected outcomes.

### Work Effort 1: Develop an Outcomes-Based Kinship/Relative Practice Model

Goal: Identify current practices and desired future practices that will strengthen relative/kinship practice for frontline, management, community and system stakeholders.

Projected outcomes:

- A specific relative/kinship practice model in West Virginia will lead to a consistent strategy for frontline and administrative decision-making that is assessed by identified outcomes.
- A relative/kinship practice model in West Virginia will lead to faster and more efficient homestudy approvals through by establishing a Gold Standard Process (GSP). GSP refers to the engagement processes of approving relative/kinship families within designated timeframes organized by benchmarks. These timeframes and benchmarks are then measured for accuracy and punctuality via corresponding outcomes.
- A relative/kinship practice model in West Virginia will set staff-performance expectations and create a structure for accountability and due diligence, measurable through outcomes.
- An internal communications plan will address resistance to change and increase staff buy-in and commitment to any relative/kinship practice-model enhancements or changes.
- A pilot of the practice model, training and support structure in Kanawah County will provide a study of the feasibility and viability in moving the work statewide.

### Work Effort 2: Kinship/Relative Training and Support Program

Goal: Enhance the current kinship training and support programs so families and critical staff are supported and well-trained in the nuances of relative/kinship care.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139308

Projected outcomes (for work effort 2):

- A *caregiver* relative/kinship training model in West Virginia will lead to improved client satisfaction between DHHR and relative/kinship caregivers.
- A supportive supervisory structure that addresses reflection, secondary trauma and burnout will lead to a more stable workforce, including higher rates of retention.
- A case capacity structure that facilitates predictive analysis will lead to a more stable workforce, including higher retention rates and hiring to address natural attrition.
- A *staff* relative/kinship training model (pre-service, in-service and professional development) linked to relative/kinship care practice outcomes will lead to a more stable workforce, including higher retention rates.

## Conclusions

Overarching themes cover a range of strengths, as well as areas for improvement regarding practice experiences with relative/kinship care in the state system.

The elements of the system were identified through the consideration of system function, behavior, complexity and feedback. Functionally, there is a commitment to the use of relative/kinship care, however, the roles to fulfil that commitment are hindered by high caseloads, overlapping assignments (such as with the home-finder) and varied interpretations of policy by region and challenging the administration in maintaining system consistency. The system's behavior is characterized by events. Here, we observed conflicting response to these events by different stakeholders. There are clear gaps between DHHR and the court system in how relative/kinship families should be engaged in areas such as visitation and birth family relationships, the use of waivers in approving relative/kinship homes and absence of data driving decision-making between the courts and the system. This lack of data is most noticeable in that case-capacity does not factor into intake.

Complexities in a system are to be expected, however, here again we see many functions or events adding to the complexities of system process. For instance, the issue of new hires and staff turnover yields a high level of complexity regarding casework and supervision, where many supervisors are remediating basic social work skills. Permanency planning is also made more complex by anticipation of the court, GALs or the prosecutor's influence on the caregiver and how it may be counterintuitive to what the family wants.

The feedback channels were also examined, with the biggest gap being the lack of consistent and formalized monitoring and evaluating channels. It was noted that confirmation of work is signaled more verbally than in written documentation. Very little documentation was identified as going into a database. Feedback loops for relative/kinship caregivers were not evident. If the relative/kinship caregiver does not self-advocate, or advised on how to self-advocate, there is a lack of opportunity for the relative/kinship caregiver to seek assistance or supports.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139309

These findings can be used to inform stakeholders about the use of relative/kinship care as a practice, strategy and program to confront several challenges the West Virginia child welfare system faces. Lastly, the information can educate the system and community on how to implement a value for family—demonstrated in relative/kinship care—to better serve children and their families in rebuilding stability.

Focus group responses are organized within the critical elements of the readiness rubric. The focus group findings lead to the following conclusions:

1. *Stakeholder perspectives influence engagement strategies with relatives and kin that are not consistent or formalized.* Viewpoints vary greatly on the use of relative/kinship care as a means of addressing the shortage of non-relative foster care available. This appears to be influenced by position, experience and education. For instance, newer workers see it only as process, whereas some seasoned workers question its ability to meet safety needs for the child. There is a need for a communication plan that directly addresses the cultural shift needed to successfully use relative/kinship care as the preferred placement outside of capacity need.

2. *Relative/kinship engagement is ranked and assessed predominantly through placement and permanency outcomes.* The casework engagement that should occur in-between placement and permanency is less developed in thought and action. This gap may be reflected in disruptions to relative/kinship placements, lack of support for the caregiver, and no planned interaction between the relative/kinship caregiver and birth family, which can impact reunification goals. For instance, it is not unusual that a relative/kinship caregiver will not see a caseworker after the original placement.

3. *The rich diversity of regional and county supportive services contributes greatly to the impact of relative/kinship care.* While this enriches the relative/kinship care response, it also creates gaps in service. Regional variations need to be further examined to explain in more detail underlying causes in dispersity between regions and if they are warranted when examined against state policy. For instance, waivers and court orders can vary greatly by region. What is waived for the homestudy in one county may be upheld in another.

The focus group format indicated regional variations that need further exploration to identify. Further exploration can occur in workgroup sessions and add credence to whether the responses revealing regional differences were more reflective of individual views or the collective voice of the subgroup (home-finders, CPS workers, etc.)

Use of waivers:

- o Regions 2 and 4 communicated very liberal use of waivers to approve relative/kinship homes.
- o Region 2 communicated that there are vast inconsistencies among counties in what can be waived in a homestudy.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139310

- o Region 3 communicated that there is confusion on what is now able to be waived and it is highly interpretive.
- o Region 1 did not mention waivers until prompted by the moderator.

Use of PRIDE training:

- o Only region 2 indicated that relative/kinship caregivers can get waived "out of training."

CPS backlog:

- o Only region 4 to indicated that a backlog did existed.

Demand payment:

- o Regions 1 and 4 communicated that they understood and used demand payments.
- o Region 3 communicated that caseworkers do not know how to use demand payments.
- o Region 2 did not discuss demand payments, even when prompted by the moderator.

Although we can point out regional variation, the focus group format is stronger in facilitating the fact that there are more disparities than similarities.

4. *The quality of relative/kinship care from interpretation of policy across the state is uneven and inconsistent, leading to potentially incomplete, inaccurate and precarious communication with relatives/kinship care families.* Whether through training, supervision or immersion into an office culture, staff is reflective of gaps in the understanding of engagement between members of the triad (child, birth family and caregiver) and to what is deemed appropriate or inappropriate when facilitating communication between family members. For instance, relative/kinship caregivers are informed that if any communication occurs with the birth family, the child/children will be removed.

5. *Practical and financial ramifications of poor communication are evident in missed IV-E reimbursements. Incidents of court orders for relative/kinship care placement were frequently mentioned.* In most reported incidences, this was in response to a homestudy denial based on a non-safety licensing standard. Additionally, there was no data available on how diversionary tactics are impacting IV-E reimbursements.

6. *Regional practices are conflicting with state policy; engagements with relatives/kin are more process than policy. Although regional differences are to be expected, gaps were noticed in that the office process was being misconstrued as the policy.* For instance, caseworkers are not aware when the 45-day timeline to licensing begins as it varies by region. For some it is intake, for another, placement.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139311

Timelines are essential in relative/kinship casework because they are part of the chronology of child welfare. The 45-day licensing timeline is not an independent component, but part of the continuum of care. When responding to the 45-day timeline, there were variations in response, and they varied within regions depending on location and position. Variations included:

- o Lack of awareness that the 45-day timeline exists.
- o Clarification of when the timeline clock begins—at intake or when assigned?
- o Belief that the 45-day timeline is not achievable.
- o Belief that the 45-day timeline is just a guide.

7. *The lines and cycles of communication do not align with role, accountability and case management.* There is a gap in who is the lead communicator when engaging with the relative/kinship caregiver. This gap is leading to missing or replicated information provided to the family. For instance, there is an assumption that the contracted home-finder should provide information when that is not always the case.

8. *System communication processes, for both relatives/kin and their caseworkers, are not clear or consistent, resulting in duplicate and/or contradictory information for all stakeholders.* Building on conclusion No. 7, the stream of communication also impacts engagement between staff. For instance, the ongoing CPS worker moves a case to adoption with an incomplete homestudy or the contracted home-finder is not sharing all information with the DHHR home-finder.

9. *Relative/kinship care is practiced, but without an exact model of how it should operate in the system.* There is a clear realization that relative/kinship care must be a system response to child welfare in the state, however, there is not a concrete example of what the model looks like. For example, the KSA-PV team worked with administration to create a flowchart from intake to placement. Lack of a concrete model results in staff using mental models that may not reflect policy and process.

10. *The "service culture" is often more involved than engaged, which speaks more to timelines for the homestudy than case management.* Engagement with relative/kinship families tends to be completed in a checklist format, which does not facilitate a case-by-case approach to the homestudy. Checklists are reminders but should not take the place of understanding and knowledge. For instance, during a homestudy, misunderstanding the use of waivers can lead to a denial.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139312



*Business Map of DHHR Casework Flow (see appendix A for enlarged version)*

## Scope

The purpose of the environmental scan of the KSA-PV™ was to learn more specifically what the regional areas/offices are processing and implementing, regarding the use of relative/kinship care in the state's child welfare system. The objectives included: 1) identifying user stories and detailed descriptions of relative/kinship care engagement in the mindset, implementation and use of group-home care; and 2) identifying workflow and methods applicable to relative/kinship care.

## Objectives

- To provide a framework for visualizing the organizational and environmental factors that operate in the state's relative/kinship care system. This visualization was used to site the level of correspondence between actual and perceived execution of relative/kinship care policy.

- To engage DHHR in the examination of their current relative/kinship care situation with the intent of improving it through the strengthening of current best practices and gaining awareness of service gaps to improve policy and process.

- To differentiate between the child welfare system's interrelated and interlinking subsystems to identify how one subset is impacting another. Central to this was the subsystem of relative/kinship care. By identifying the relationships, the subsystems' communication channels can be strengthened, replaced or removed.

- To classify how stakeholders in the subsystems take accountability for the system's outcomes and if the outcomes lead to improvements in relative/kinship care process.

- The assessment was conducted in the four regions DHHS identifies in the administration of the child welfare system.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

## Stakeholders

DHHR identified key stakeholders through the business-mapping conversations. The stakeholder list remained fluid throughout the process, with new groups added as needed.

| Stakeholder category | Job types |
|---|---|
| Frontline staff | • CPS workers over 3 years<br>• CPS workers under 3 years<br>• Home-finders over 3 years<br>• Home-finders under 3 years<br>• Adoption workers<br>• Youth services worker |
| Supervisory | • CPSS over 3 years<br>• CPSS less than 3 years<br>• Home-finders over 3 years<br>• Home-finders under 3 years |
| Administrative | • Program manager<br>• Regional program manager |
| Training | • PRIDE trainers<br>• Staff trainers |
| Clients | • Relative/kinship caregivers<br>• Youth<br>• Biological family |
| Legal | • Judges<br>• CASA<br>• GAL |

## Methodology Employed

The project team followed a three-step approach: 1) identification of key staff for focus groups; 2) a broad, comprehensive desk review; and 3) a comprehensive literature search of the state's existing child welfare reform efforts. The ASCI team employed a snowball technique*, as focus groups would often refer to other stages in the continuum of care, as well as issues related to a value for family and kinship care. These issues can all be connected to relative/kinship usage in the four offices.

## Developing the Thematic Report

Through qualitative data analysis, ASCI categorized focus group responses according to the nine critical items on the readiness rubric. Following each critical item, systematic

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139314

inferences on patterns were made to draw on any common themes that emerged. Through these theme(s), ASCI arrived at conclusions to illuminate broader critical-item questions pertaining to relative/kinship care. Application of the conclusions is demonstrated under recommendations and additional data needed.

To be considered:

- Responses were collected over the course of six weeks. Participation was solicited and voluntary. Although the information is not representative of all groups, focus groups do provide real-life and in-time data in communal settings, which is difficult to obtain in any other methodology, such as surveys and one-on-one interviews. The jurisdiction and/or agency have insight as to what information may be generalized.

- Because this is a qualitative analysis, the focus group team process does reflect elements of selectivity that involve a combination of deductive and inductive analysis. While initial categorizations under the critical items were shaped by pre-established questions, the qualitative analyst was open to drawing new meanings from the data available.

- Interesting stories emerged from the responses. These stories were considered for their content response and how they could illuminate the broader study question of relative/kinship care. Also, deviations from themes and conclusions in this study were coded as:
  - F (Few)
  - S (Some)
  - M (Many)
  - MO (Most)
  - A (All)

  Codes were added to address possible regional and county differences that may be considered atypical to the state. The regions and/or county should revisit what may be considered atypical.

- This report collected quantitative data to reflect different stakeholder voices. There was no weight assigned, as the data was not categorized by voice (position), knowledge or experience. Instead, this approach relies on the comprehensive integration of voices. Precautions were taken to ensure objective results.

## The Gap Analysis

This report is framed from the lens of system thinking, which leads to system reform. By looking at DHHR systemically, ASCI can better identify the dynamics and interdependence of the elements that set into motion the system's functions, behaviors and complexities that respond to children and families. It is important to note that ASCI

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139315

considers staff to be part of the system and how it functions (i.e., how the system behaves and communicates).

## Overarching Contemplation on Strengths and Gaps in the System

While relatives/kin should be held to high standards for the safety of children, it is important that each region and county—working to push the state into a more kinship-specific model of care—considers the very different way relatives enter the foster care system.

### Area 1: System Function

System function is reliant on its elements and how those elements are interconnected. When elements change, the subsequent changes to relationships and purpose may impact function.

Framed by these critical elements from the readiness rubric:

- Evidence that families are valued, engaged in processes throughout the organization and have an impact on decision-making.
- State's current values and practices align, reflecting best practices in (relative)/kinship care case management.
- Evidence of ethical frameworks and culturally responsive practices in organizational decision-making regarding (relative)/kinship care.

In the relative/kinship continuum of care, these functional strengths were observed:

- A commitment to a reliance on relative/kinship care as a needed process in the system.
  - *Challenge: An overemphasis on process is impacting engagement, thus limiting interaction with families to activity, outreach and charity.*
- Knowledge and comprehension that regional and local customs and traditions influence process and policy execution and interpretation.
  - *Challenge: Knowledge and comprehension do not progress to analysis and application.*
- Processes have been adapted to accommodate the specific needs relative/kinship care.
  - *Challenge: Adaptations should improve function; however, understanding the crisis-based, traumatic nature of relative/kinship care is a prerequisite for understanding the adaptions.*
- Attention to enhancing child and family well-being and resilience through supervision of line staff.
  - *Challenge: Resilience in relative/kinship care must consider the implicit bias embedded in identifying risk factors.*

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

- ▪ *Here, resilience refers to flexibility. To recognize the strengths of relative/kinship care means appreciation that a risk (safety) factor that was once considered universal in traditional foster care approval, requires individual examination under a relative/kinship care practice model. The standard is safety within an existing family structure as opposed to an imposed system prerequisite.*
  - ○ *Challenge: Case capacity and worker turnover impact the predictability the system can assume in meeting the goals of the case plan.*
- Consideration of *how* the role of the homefinder worker, and other line workers operate, in addressing the specific needs of the relative/kinship caregiver.
  - ○ *Challenge: Currently staff is operating with line demarcations of accountability in working through process with relatives/kin.*
- Transparent response regarding the need for a more comprehensive continuum of care to support family that goes beyond fiscal necessity and spans intake through post-permanency.
  - ○ *Challenge: Unintended consequences, resulting from oscillating levels of support for relatives and kin, are not being defined systemically, and therefore impact practice standards.*

## Area 2: System Behavior

System behavior reveals itself over a course of events. Here, behaviors (or sometimes intended behaviors) were preceded by events, and their outcomes were contingent on structure.

Current best-practice behavior and intent solicited:

- Efforts to increase the number of children placed with relative/kinship families.
  - ○ *Observed status: Lack of data-informed responses that provide level of service qualifications for the relative/kinship placements.*
    - ▪ *Although the data exists, staff did not refer back to that data to support or query any decision-making processes. For example, although most discussions reflected a need to improve timelines for the homestudy, the percentage of cases currently meeting and/or exceeding the 45-day requirement could not be substantiated by data. Regarding permanency, there was no reference to percentages of reunifications, adoptions and guardianship. This data is needed to inform program enhancement and/or improvements.*
- Efforts to improve the home assessment process for relatives/kin.
  - ○ *Observed status: Inconsistencies in allocating time and attention to explain the approval process and work with kinship families to complete the paperwork.*

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139317

- Attentiveness to CPS investigation and home-finding timelines to reduce backlog.
  - o *Observed status: Case capacity is not allowing for adherence to timelines, which is compromising compliance.*
- Goal setting to advance how relatives/kin are engaged, assisted and compensated.
  - o *Observed status: Goals are known, however there is no systematic tool in place that outlines due diligence measures to meet those goals.*
- Remaining educated and informed on the court's role in impacting relative/kinship care goals.
  - o *Observed status: Areas of distinction between the court and child welfare systems result in a wide range of regional experiences, which impact how relatives/kin, birth families and children/youth are involved regarding engagement, support and permanency.*

### Area 3: System Complexity

In complex systems, subsystems will typically have functions and behaviors that compete with or diverge from the goals of the overall system. Here, consider the overarching themes that speak to these complexities.

Specifically, in the context of goals:

- A developed awareness that goals concerning permanency with relatives/kin are influenced greatly by individual, regional and department views on reunification, the definition of permanency for kin and the role of adoption.
- A developed awareness that goals concerning normalcy, as it pertains to reasonable and prudent parenting standards, are being met with varying degrees of flexibility.

Possible reasons for the gaps:

- Some workers and contractors are unskilled in serving relative/kinship clients.
- Basic preparation to work with relatives/kin in a systems structure is not adequate.
- Specific competences in social work delivery are not required for employment.
- In-service training opportunities are absent.
- Basic training curriculum in relative/kinship care is deficient.
- Units, regions, etc., have contradictory approaches.
- Key framers of relative/kinship care have different aims.
- Contrasting perspectives on practice guided by law, and practice guided by value and best interests of families.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139318

The process revealed there is a need for relative/kinship capacity-building at the regional, DHHR and state levels, specifically addressing:

- Engagement skills with the kinship triad throughout the continuum of care.
- Developing a knowledge base of relative/kinship care beyond response.
- Tools to be developed or refined for relative/kinship care.
- The advancement of partnerships and community development to support relative/kinship service delivery.
- Examination of legal and policy frameworks to see where the system is inhibiting access to relative/kinship supports and process.
- Resolving challenges surrounding difference in perspectives between the legal community and child welfare system.
- Developing objective measures for reporting the quality of relative/kinship care.

## Area 4: Information Feedback System (Communication)

In complex systems, feedback loops are how the system runs itself. Consistent behaviors, responses, protocols, etc., create feedback systems that either propel or inhibit movement through the system for all stakeholders.

Noted feedback channels:

- Verbal and behavioral attendance to facilitating faster and consistent response times when communicating with relatives/kin.
  - o Strength: Verbal and behavioral attendance to family value are differentiated via appreciation of regional differences in a relative/kinship response.
  - o Gap inhibitor: An ad hoc approach to relative/kinship care, rather than a systemic one; CPS' ongoing approach to relative/kinship care is different than that in adoption.
    - Conversations were reflective of using an "as-needed" approach in the homestudy and subsequent casework with relatives/kin. Individual regions have been innovative as a result of this approach, but in the process, successful engagement strategies are not documented or put into systemwide practice.
    - In conversation, the engagement approach to working with relatives/kin was different between the two groups. CPS staff work from a values proposition that relatives/kin are needed at this time because of strains to the system. As such, they are more open to waivers and adjustments to practice to accommodate relatives/kin. Adoption staff work from a values proposition that engages relatives/kin more from the perspective of working with traditional adoptive-foster parents. For some, this perspective come across as

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139319

> antagonistic in supporting kinship guardianship and adoption.
> Together, these two engagement tactics facilitate a practice model
> that is not aligned in its value-based engagement tactics.
>
>   o Recommendation: Evolve strategies that are more effective in rural
>     settings and can be applied as the foundation for casework.

- Attentiveness to regional differences in the use of communication channels in the relative/kinship response.
  - o Strength: A relative/kinship response is apparent on the front end of the continuum.
  - o Gap inhibitor: CPS is becoming a distinct sector of relative/kinship work that is less apparent in ongoing and permanency work.
  - o Recommendation: Build relative/kinship ownership into each practice by establishing outcomes for accountability.
- Identified communication structures for coordination between program management and staff management.
  - o Strength: Dedicated relative/kinship-oriented programming is in place.
  - o Gap inhibitor: Regular professional development and staff retention are negatively impacting program management when working with relatives/kin, which prevents accurate data from being collected on the capacity-building of relative/kinship work.
  - o Recommendation: Investigate staff salary increases and caseload reduction.
    - We would recommend getting data from exit interviews to see if there are any correlations between salary and caseload in retaining staff. Data can also come from rejected job offers to see if salary or caseload played a role.
- Monitoring and evaluating of relative/kinship care practices are in place.
  - o Strength: The intentions of home-finding and CPS work with relative/kinship care were compared in each region, regarding quality and outputs.
  - o Gap inhibitor: There are no monitoring tracks to note program objectives, which prevents strategy evaluation.
  - o Recommendation: Incorporate daily outcomes into the database dashboard.

## Summary

The environmental scan produced many user stories and scenarios relevant to workflow analysis and assessment of relative/kinship care. A unifying theme across all references is that practices must be better coordinated, and communication improved, to facilitate a

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139320

sense of personal responsibility in assuring that the kinship triad—child/youth, caregiver and birth family—is at the center and intimately involved in their case management. ASCI asserts that this triad-centric involvement will lead to a higher level of relative/kinship engagement, which can be quantified in outcome measures.

The KSA-PV™ process has provided a more comprehensive understanding of how various work is performed in the regional and/or county work environments, and how these processes may be informed and/or modified with the integration of a more inclusive relative/kinship care plan. Presently, DHHR is aware of the value of family and how it manifests in kinship care, however, challenges remain in addressing the specific practices that impede movement across the continuum of care as it responds to relatives and kin.

DHHR is to be commended for their willingness to engage in this process and in self-reflection regarding the role of kinship care culture in the service delivery process. Undertaking this evaluative work speaks to a commitment to creating a system of care that is responsive to the cultural values and needs of all families. This same commitment will likely fuel next steps to build on system strengths and improve the cultural responsiveness of kinship care and its impact on group-home use.


*Snowballing technique or snowball sample: Snowball samples begin from a core of known elements and are then increased by adding new elements given by members of the original sample. The term is based on the analogy of the increasing size of a snowball when rolled down a snow-covered slope.

©Copyright 2019 A Second Chance, Inc. d/b/a/ Kinship Insight Solutions LLC

D139321

## Appendix A



D139322