**Marcia Lowry** (*admitted pro hac vice*)
mlowry@abetterchildhood.org
**Allison Mahoney** (*admitted pro hac vice*)
amahoney@abetterchildhood.org
**Dawn Post** (*admitted pro hac vice*)
dpost@abetterchildhood.org
**Valerie McLaughlin** (*admitted pro hac vice*)
vmclaughlin@abetterchildhood.org
**Tavi Unger** (*admitted pro hac vice*)
tunger@abetterchildhood.org
**A Better Childhood**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
**Richard W. Walters**, WVSB #6809
rwalters@shafferlaw.net
**J. Alexander Meade**, WVSB #13021
ameade@shafferlaw.net
**Brian L. Ooten**, WVSB #9358
booten@shafferlaw.net
**Shaffer & Shaffer, PLLC**
2116 Kanawha Boulevard, East
Post Office Box 3973
Charleston, WV 25339
Tel.: (304) 344-8716
**Lori Waller**, WVSB #11303
lwaller@drofwv.org
**Disability Rights of West Virginia**
1207 Quarrier Street, Suite 400
Charleston, WV 25301
Tel: (304) 346-0847

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

| | | |
|---|---|---|
| **Jonathan R., minor, by Next Friend, Sarah DIXON, *et al.,*** | ) | |
| | ) | |
| Plaintiffs, | ) | Class Action |
| | ) | 3:19-cv-00710 |
| v. | ) | |
| **Jim JUSTICE, in his official capacity as the Governor of West Virginia, *et al.,*** | ) | |
| | ) | |
| Defendants. | ) | |

**Expert Report of Nisha Sachdev**

I, Nisha Sachdev, declare under penalty of perjury that the following is true and correct:

1.  I have been retained by the Plaintiffs as an expert in this matter.

2.  If called as a witness, I would offer testimony as those matters set forth in my report, which is attached to this declaration. My report contains a complete statement of my opinions in this case and the basis and reasons for them; the facts or data I considered in forming them; my qualifications, including a list of all publications I authored in the last ten years; a list of all other cases in which, during the last four years, I testified an expert at a trial or by deposition; and a statement of the compensation I am being paid for my work in this case.

Executed on: August 11, 2020          _____

                                      Nisha Sachdev

1

Expert Report of Nisha Sachdev

## I.    Introduction and Summary of Opinions

I was retained by counsel for the Plaintiffs in the matter of *Jonathan R., et al., v. Jim Justice, et al.,* to provide expert opinions regarding the provision of physical, intellectual, cognitive, and mental health services to children with disabilities in the legal custody of West Virginia's Department of Health and Human Resources ("DHHR"), the state agency and included bureaus responsible for the care of these children. In reaching my opinions, I reviewed approximately 207 documents, including DHHR policies and procedures, data and audit reports, and internal and external reviews such as federal monitoring reports. I also referred to professional research provided by the American Academy of Pediatrics, Annie E. Casey Foundation, and the Child Welfare League of America. This Report summarizes my findings and opinions regarding DHHR's provision of services to foster children with disabilities.

The United States Constitution and federal laws mandate that child welfare systems provide quality supports and services to children in their care who have or will have physical, intellectual, cognitive, or mental health disabilities.[1] This includes ensuring children in foster care receive adequate and timely screenings, assessments, and treatment; quality services, supports and placements in the least restrictive environment; and programs, services, and activities that meet the specific individualized and unique needs and potentials of these children.[2]

Drawing upon my own expertise, and after conducting the aforementioned research, it is my opinion that DHHR violates reasonable professional standards in its provision of care and

---

[1] *See, e.g.,* Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(s).; Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. §794.

[2] U.S. Department of Health and Human Services (DHHS) & U.S. Department of Justice (DOJ), Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, *available at* https://www.hhs.gov/sites/default/files/disability.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

services to West Virginia foster children with disabilities. As a result, DHHR fails to meet the needs of children with disabilities who are in the state's custody, putting them at substantial risk of harm beyond the trauma they have already experienced.

## II.    Relevant Professional Background and Expertise

As a Child and Adolescent Psychologist (PsyD) and Public Health Practitioner (DrPH) matriculating from the George Washington University, I have studied best practices and implemented clinical services focusing on social, emotional, intellectual, and physical health behavior of vulnerable children, youth and families. During my tenure, I have not only developed and evaluated programs and strengthened the capacity of youth serving agencies, but also provided clinical care to court-involved youth, including youth with disabilities.

For the past seventeen years, I have guided families, schools, community-based organizations, and local and national governmental agencies, in building their capacity to support children's social, emotional, and behavioral development. This includes assessing the capacity of providers and organizations and providing technical assistance to case managers, administrators, clinicians, and teachers to ensure quality social, behavioral, and mental health services were provided to the children and families they serve. This work aimed to connect, design, and culturally adapt evidence-based practices to meet individualized child, family, and community needs.

In addition, I have provided independent consultation for public and private mental health service providers, local and global health and education agencies, and foundations supporting programming, specifically in the areas of designing and delivering quality mental health services and supports. I have provided consultation to agency personnel from other cities and countries (Washington, DC; Buffalo, NY; and Trinidad and Tobago) to develop comprehensive, sustainable systems that address children with social, emotional, behavioral, and mental health needs. Further,

3

**Expert Report of Nisha Sachdev**

I have provided thought-leadership and advising; created cross-sector collaborations to ensure efficient use of public and private resources; informed policy needs; developed behavioral health needs assessments; and developed resources and materials in support of implementing quality school- and community-level behavioral health approaches.

I serve on the Board of Children, Youth, and Families for the National Academies of Sciences, Engineering, and Medicine. I am also a Stakeholder Advisory Board Member for the Patient-Centered Outcomes Research Institute, and an expert committee member for the National School Mental Health Working Group led by U.S. Department of Health and Human Services Substance Abuse and Mental Health Services Administration, Health Resources and Services Administration, and the National Center for School Mental Health. In these roles I guide local, state, and national research, policy, and practices to ensure quality and equitable services, supports, and programs for vulnerable children and families.

## III.   Compensation

I am being compensated at a rate of $150 per hour for my work on this matter.

## IV.   Testimony

I have not testified as an expert at trial or deposition in any matter during the previous four years.

## V.   Publications

My curriculum vitae, which is attached to this report, includes a list of all my publications in the last ten years.

## VI.   Methodology

The expert opinions in this report are based on my more than fifteen years of experience in clinically treating youth as well as designing, developing, implementing, managing and monitoring

**Expert Report of Nisha Sachdev**

school-based and community-based services and supports for youth involved with the child welfare, behavioral health, and/or juvenile justice systems. I reviewed documents the attorneys for the Plaintiffs provided me, including policies, data, and reports produced by the Defendants. I also consulted professional literature in the field. This report is rendered at a point at which Plaintiffs have not completed discovery,  and is submitted in support of Plaintiffs' motion for class action status.  However, the information I do have makes it highly likely that my conclusions are correct. A complete list of my considered materials is contained in Appendix A.

## VII.    Summary of Opinion

It is my opinion, based on the information that I have reviewed, that DHHR has not effectively implemented their programs, policies, procedures, and practices to afford children with disabilities in their care with fair and equal access to services and supports. The state has also consistently failed this population by not only violating reasonable professional standards but also failing to adhere to legal mandates per Section 504 of the Rehabilitation Act of 1973 ("RA") and Title II of the Americans with Disabilities Act of 1990 ("ADA"). Specifically, DHHR fails to provide the necessary and appropriate services and treatment to children in its care who have or will have physical, intellectual, developmental, cognitive, or mental health disabilities in the following ways:

(1)    DHHR fails to provide adequate assessments, case planning, and case management to ensure children with disabilities are receiving the appropriate supports, services, and accommodations to meet their needs;

(2)    DHHR fails to provide access to an adequate array of community-based services, programs, and activities that are readily accessible to and usable by children with disabilities; and

**Expert Report of Nisha Sachdev**

(3)  DHHR has failed to ensure availability of and placements in the most integrated, least restrictive setting appropriate to the needs, safety, and well-being of children with disabilities, and instead unnecessarily relies on institutional settings.

These failures create a substantial risk of harm to the health and well-being of foster children with disabilities.

### A.  West Virginia's Foster Children with Disabilities

As of December 2019, approximately 7,000 children were in foster care[3] in West Virginia.[4] Data from the Child Welfare Outcomes, an annual report to Congress published by the U.S. Department of Health and Human Services ("DHHS"), shows that in Fiscal Year 2017, 64.7% of the total child victims in West Virginia experienced emotional abuse, 41.5% percent experienced neglect, and 80.9% experienced physical abuse.[5] These adverse childhood experiences[6] can negatively impact education and health outcomes and are linked to chronic health problems, mental illness, substance misuse in adulthood and put children at risk of suffering developmental delays, cognitive difficulties, and long-term behavioral and emotional disabilities.[7] It is therefore not surprising that studies suggest that at least one-third, and up to 80% of youth in foster care,

---

[3] Foster care refers to a comprehensive, complex array of services for children who, for any number of reasons, cannot live with their families; *see* D001303, DHHR, West Virginia Foster Care Policy, 2019, Provision 1.1.

[4]  DHHR,  Legislative  Foster  Care  Placements  Report,  *available  at* https://WVWVDHHR.wv.gov/bcf/Reports/Documents/2020%20January%20Legislative%20Foster%20Care%20Report.pdf (last visited June 4, 2020).

[5] DHHS, Administration for Children and Families (ACF), Child Welfare Outcomes State Data Review, *available at* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020).

[6]  Adverse childhood experiences, or ACEs, are potentially traumatic events that occur in childhood (0-17 years) including experiencing violence, abuse, or neglect. *See* Centers for Disease Control and Prevention, Preventing Adverse  Childhood  Experiences,  *available  at* https://www.cdc.gov/violenceprevention/childabuseandneglect/aces/fastfact.html (last visited June 4, 2020).

[7] European Child & Adolescent Psychiatry, The Role of Adverse Childhood Experiences and Mental Health Care Use In  Psychology  Dysfunction  of  Male  Multi-Problem  Young  Adults,  *available  at* https://link.springer.com/article/10.1007/s00787-018-1263-4 (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

suffer from moderate to severe disabilities ranging from developmental delays to mental health problems, including socio-emotional, behavioral, and psychiatric issues warranting treatment.[8]

Children's early experiences, including episodes in foster care, play a critical role in their development. In Fiscal Year 2017, 16.4% of children in West Virginia's foster care were age one or younger, 29.4% age three or younger, and 40.4% age five or younger.[9] As early years mark a time period that is integral for brain development (with brains developing at the fastest rate between birth and three years and by age five a child's brain is 90% developed), during which children develop a sense of attachment and security and the ability to respond to stress and trauma, these young children are at higher risk for serious physical health, mental and behavioral health, or developmental problems.[10] In addition, children at a young age, especially infants, are extremely vulnerable as their livelihood is completely dependent upon their caregivers.[11]

Foster care can also significantly impact the well-being and development of older youth. In West Virginia in Fiscal Year 2017, 31.9% of children in foster care were twelve to seventeen years old, a critical period of identity development, social growth, and further brain development.[12]

---

[8] American Academy of Pediatrics (AAP), Health Care Issues for Children and Adolescents in Foster Care and Kinship Care, *available at* https://pediatrics.aappublications.org/content/136/4/e1142 (last visited June 4, 2020).; American Journal of Public Health, Mental Health Services for Youths in Foster Care and Disabled Youths, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1446701/ (last visited June 4, 2020).; Center for Health Care Strategies, Inc., Children in the Child Welfare System: Physical and Behavioral Health Needs, *available at* http://www.chcs.org/media/Physical_and_Behavioral_Health_Needs.pdf (last visited June 4, 2020).

[9] DHHS ACF, Child Welfare Outcomes State Data Review, *available at* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020).

[10] AAP, Developmental Issues for Young Children in Foster Care, *available at* https://pediatrics.aappublications.org/content/pediatrics/106/5/1145.full.pdf (last visited June 4, 2020).; Neuropsychology Review, Early Brain Development in Preschool Years, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3511633/ (last visited June 4, 2020).

[11] AAP, Developmental Issues for Young Children in Foster Care, *available at* https://pediatrics.aappublications.org/content/pediatrics/106/5/1145.full.pdf (last visited June 4, 2020).

[12] DHHS ACF, Child Welfare Outcomes State Data Review, *available at* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020).; Child Trends, Older Youth in Foster Care Need Support to Make a Successful Transition into Adulthood, *available at* https://www.childtrends.org/older-youth-in-foster-care-need-support-to-make-a-successful-transition-to-adulthood (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

These children are also at elevated risk of negative outcomes. According to Child Trends, a national child and youth research organization, normal adolescent development involves increased risk-taking and self-discovery, and a lack of stable and supportive attachments that foster youth experience, may make it harder for them to successfully transition into adulthood.[13]

Research shows that providing appropriate prevention and treatment services for children with disabilities can help lessen these negative long-term effects.[14] This includes providing an effective system of care for children with disabilities with accessibility for early assessment, diagnosis and treatment; a qualified workforce; a continuum of services; and services and placements in the least restrictive, community-based setting.[15] As needs and challenges faced by children with disabilities vary depending on the nature of the disability and the child's age, efforts must be individualized, instead of taking a "one size fits all approach."[16]

### B.    Federal and State Requirements

#### i.    ADA and RA

The ADA and RA protect children with disabilities from unlawful discrimination in the administration of child welfare programs, activities, and services.[17] Both of these mandates require

---

[13] Child Trends, Older Youth in Foster Care Need Support to Make a Successful Transition into Adulthood, *available at* https://www.childtrends.org/older-youth-in-foster-care-need-support-to-make-a-successful-transition-to-adulthood (last visited June 4, 2020).

[14] Annie E. Casey Foundation (AECF), Improving Conditions for Children with Special Needs, *available at* https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020).

[15] AECF, Improving Conditions for Children with Special Needs, *available at* https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020).

[16] AECF, Improving Conditions for Children with Special Needs, *available at* https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020).; The National Resource Center for Diligent Recruitment, Assessing the Needs of Children and Youth in Adoption, Foster Care, and Kinship Care and Their Families, *available at* http://www.nrcdr.org/_assets/files/NRCDR-org/support-matters-chapter-2.pdf (last visited June 4, 2020).; National Association of School Psychologists, Foster Care for Children, *available at* http://fostercarechildren.pbworks.com/w/file/fetch/63728545/Foster%20Care%20for%20Children-%20Information%20for%20Teachers.pdf (last visited June 4, 2020).

[17] According to the DHHS & DOJ, both ADA and Section 504 define an individual with a disability as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a

8

Expert Report of Nisha Sachdev

states to provide adequate care for children with disabilities who are in their custody and make child welfare agencies responsible for the programs and activities of private and non-profit agencies that provide services to children and families on behalf of the state or municipality.[18] Ultimately, these mandates require that child welfare systems such as DHHR modify their policies, practices, or procedures to avoid discrimination of individuals with disabilities unless the modification would fundamentally alter the nature of their services, programs, or activities.[19] In addition, they require child welfare agencies to provide children with disabilities with full and equal access to meaningful and usable programs, services, and activities, including, but not limited to, investigations into allegations of child abuse and neglect, assessments, case and service planning, provision of in-home and out-of-home services, and foster care placement.[20]

### ii.    West Virginia's Laws and Policies

DHHR and its Bureau for Children and Families ("BCF") are responsible for the administration of services, supports, and placements to children in legal custody of the state of West Virginia in a manner consistent with each child's best interests.[21] The mission of BCF is to

---

[18] DHHS & DOJ, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, *available at* https://www.hhs.gov/sites/default/files/disability.pdf (last visited June 4, 2020).

[19] DHHS & DOJ, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, *available at* https://www.hhs.gov/sites/default/files/disability.pdf (last visited June 4, 2020).

[20] DHHS & DOJ, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, *available at* https://www.hhs.gov/sites/default/files/disability.pdf (last visited June 4, 2020).

[21] West Virginia Code §49-2-101.; West Virginia Department of Education, West Virginia Students with Disabilities in Out-of-State Facilities Report FY17, *available at* https://wvde.us/wp-content/uploads/2019/01/FY2017outofstate_facilitiesrep.pdf (last visited June 4, 2020).

9

**Expert Report of Nisha Sachdev**

provide, "an accessible, integrated, comprehensive quality service system for West Virginia's children, families, and adults to help them achieve maximum potential and improve their quality of life."[22]

Chapter 49 of the West Virginia Code indicates that for all children in the state's care, including children with disabilities, the child welfare system must "[s]erve the mental and physical welfare" of the children and "[p]rovide community-based services in the least restrictive settings that are consistent with the needs and potentials of [each] child and his or her family", among other things.[23] As the agency administering the state's child welfare system, DHHR has the authority to secure suitable placements with persons or facilities having the appropriate qualifications and services to ensure the mental and physical well-being of children.[24] DHHR has many written policies, manuals, and reports, that provide a framework for doing this.

For example, West Virginia's 2019 Foster Care Policy establishes an underlying philosophy for state practice that ensures compliance with federal law. According to the policy, DHHR shall make reasonable modifications in their program policies, practices, or procedures when the modifications are necessary to avoid discrimination based on disability. This includes conducting individualized assessments of qualified individuals with disabilities before making decisions and considering, on a case-by-case basis, individual requests for reasonable modifications.[25] In addition, DHHR's 2018 Child Protective Services Policy and 2019 Foster Care Policy indicate the need to continually assess the behavioral, mental, social and physical needs of a child in case planning and placement review and selection. They also communicate the need to

---

[22] *See* DHHR, BCF's Mission, Vision, and Values Statements, *available at* https://WVWVDHHR.wv.gov/bcf/About%20Us/Pages/default.aspx (last visited June 4, 2020).
[23] West Virginia Code § 49-1-105.
[24] D001010, -021-025.
[25] D001010, -221-222; D001299, -538.

**Expert Report of Nisha Sachdev**

gather, discuss and include a child's needs, strengths, talents, disabilities, special needs, behaviors and weaknesses when planning and making placement decisions.[26]

Despite these policies, DHHR and BCF have failed to implement, modify when necessary, and in some cases develop necessary policies, practices, and procedures to afford children with disabilities fair and equal treatment.

> ### iii. Federal and Internal Quality Reviews Reveal West Virginia's Failure to Provide the Appropriate Supports and Services to Meet the Needs of Children with Disabilities.

The Children's Bureau, part of the Office of the Administration for Children and Families at the DHHS, conducts Child and Family Services Reviews ("CFSRs"). CFSRs are periodic reviews of state child welfare systems to help states identify strengths and areas needing improvement in their child welfare practices and programs as well as institute systemic changes that will improve child and family outcomes.[27] Specifically CFSRs (1) measure states' conformity with federal child welfare requirements; (2) determine what is happening to children and families as they are engaged in state child welfare services; and (3) assist states in helping children and families achieve positive outcomes.[28]  The reviews guide the states' Child and Family Services Plan ("CFSP")[29] for the upcoming years. In addition, if a state is not in substantial conformity with a CFSR review category, it must develop a Program Improvement Plan ("PIP") describing the actions it will take to achieve conformity.

---

[26] D000924, -942-943, -967.

[27] D003776, -778.

[28] *See* DHHS, ACF, Child and Family Services Review (CFSR), *available at* http://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews (last visited June 4, 2020).

[29] CFSP is the strategic plan that sets forth a state's or tribe's vision and goals to strengthen its child welfare system and outlines initiatives and activities they will carry out over the next five years to administer and integrate programs and services to promote the safety, permanency, and well-being of children and families. *See* DHHS, ACF, CFSP, *available at* https://www.acf.hhs.gov/cb/programs/state-tribal-cfsp (last visited June 4, 2020).

11

**Expert Report of Nisha Sachdev**

The findings of West Virginia's past three CFSRs (conducted in 2002, 2008, and 2017) indicate that the state did not achieve substantial conformity with any of the seven safety, permanency[30], and well-being outcomes. Of specific interest to children with disabilities, the most recent CFSR findings shows that of the cases reviewed, DHHR:

- Made concerted efforts to assess the needs of children, parents, and foster parents to identify the services necessary to achieve case goals and adequately address the issues relevant to the agency's involvement with the family and provide the appropriate services only 35% of the time;[31]

- Ensured that that children had received adequate services to meet their physical needs only 75% of the time;[32]

- Ensured that children had received adequate services to meet their mental/behavioral needs only 59% of the time; and

- Ensured children receive appropriate services to meet their educational needs only 73% of the time.[33]

In addition, West Virginia received a rating of "Needing Improvement" in ensuring that:

- Each child has a written case plan that is developed jointly with the child's parent(s) and includes the required provisions;[34]

- Ongoing training is provided for staff that addresses the skills and knowledge base needed to carry out their duties about the services included in the CFSP; and[35]

---

[30] Per West Virginia Code §49-4-608 Permanency options include: return to the parent; adoption; legal guardianship; permanent placement with a fit and willing relative; and another planned permanent living arrangement.
[31] D003776, -778.
[32] D003776, -791.
[33] D003776, -790.
[34] D003776, -793.
[35] D003776, -798.

**Expert Report of Nisha Sachdev**

- The following array of services are accessible in all political jurisdictions and can be can be individualized to meet the unique needs of children and families: (1) services that assess the strengths and needs of children and families and determine other service needs, (2) services that address the needs of families in addition to individual children in order to create a safe home environment, (3) services that enable children to remain safely with their parents when reasonable, and (4) services that help children in foster and adoptive placements achieve permanency.[36]

Additionally, DHHR's Division of Planning and Quality Improvement conducts district-level reviews modeled on the federal CFSR process in all jurisdictions throughout the state. Findings from these reviews share similar results to the federal CFSRs over the past decade. Based on the most recent data and findings, it was indicated that in Fiscal Year 2018 only 60.7% of children had received adequate services to meet their mental and behavioral health needs.[37] Also, only 76.5% of children received appropriate services to meet their educational needs.[38] Lastly, it was found that DHHR lacked the ability to assess the needs of children, parents and foster parents and to identify the services necessary to achieve case goals and adequately address the issues relevant to the agency's involvement with the family in 55% of the cases reviewed.[39]

Moreover, in 2014, the DOJ launched an investigation of West Virginia's provision of mental health services for children with disabilities per ADA.[40] It findings released in 2015

---

[36] D003776, -797.
[37] D003816, -864.
[38] D003816, -862.
[39] D003987, -4021.
[40] In April 2014, the United States Department of Justice initiated an investigation under Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. and its implementing regulations, of West Virginia's service system for children with serious mental health conditions. The DOJ interviewed complainants and stakeholders in West Virginia, visited numerous treatment facilities, and reviewed documents over the course of its investigation. On June 1, 2015, the DOJ notified West Virginia of its conclusion that West Virginia does not comply with Title II of the ADA, as interpreted in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *See* DOJ, Investigation of the West Virginia

Expert Report of Nisha Sachdev

indicated that West Virginia was acting in violation of the ADA and the RA, and DHHR was failing to provide services to children with significant mental health conditions in the most integrated settings appropriate to their needs in violation of the ADA.[41]

    **C.**    **DHHR Fails to Ensure Adequate Assessment, Case Planning, and Case Management to Ensure Children are Receiving the Appropriate Supports or Services to Meet Their Individualized Needs.**

A thorough assessment of the child and his or her situation is vital to ensuring placement stability, timely permanency, and appropriate services that identify, manage, and treat disabilities.[42] DHHR notes in their Foster Care Policy that all children entering foster care should be thoroughly assessed to understand their unique needs and to ensure their case planning is appropriate to meet those needs.[43] In addition, a case plan informed by assessments developed by a multidisciplinary team ("MDT") that includes permanency provisions must be documented within sixty days of a child entering care.[44] The child's caseworker is also required to maintain regular contact with the child while they are in placement.[45] Lastly, each child in foster care should be reviewed quarterly by the court, with DHHR presenting information regarding the child's case, until the child achieves his or her permanency plan.[46]

---

Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[41] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[42] Scientific World Journal, Challenges of Assessing Maltreated Children Coming into Foster Care, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4736566/ (last visited June 4, 2020).

[43] D001299, -396.

[44] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[45] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[46] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

In the 2008 CFSR it was noted that West Virginia experiences a high rate of delayed assessments and investigation backlogs, resulting in compromised safety for children and delays in service provision. The report also found that DHHR does not consistently assess or engage parents in case planning. In the most recent CFSR, eight years later, it was noted that DHHR is still out of compliance in these areas.[47] It was stated in the review:

> The agency is not consistently completing quality comprehensive assessments of the needs of children and parents. Although improvement is needed for both initial and ongoing assessments, the completion of quality ongoing assessments is most challenging. While this was found to be a concern in both in-home and foster care cases, comprehensive assessments are less likely to be completed for the children and parents served in their own homes. Additionally, appropriate services are not consistently provided to address the identified needs. The needs of foster parents are not consistently assessed, and services provided as appropriate, potentially adversely affecting a child's placement stability.[48]

Additionally, appropriate case planning and case management services are not consistently provided to address the identified needs.[49] In the Fiscal Year 2018 Division of Planning and Quality Improvement Review, cases that were internally reviewed showed concerning trends, including lack of regular quality contact with children and families, failure to regularly assess for child and family service needs throughout the life of the case, less than optimal service provision to address identified needs, lack of establishment of case plans/goals through engagement of family members, and failure to close cases timely.[50]

As explained in more detail below, DHHR staffing and workforce issues perpetuate these problems, as well as others, and adversely affect outcomes for children and families served by the agency and the delivery of services.[51] This creates a risk of harm for children with disabilities.

---

[47] D003776, -782.
[48] D003776, -782.
[49] D003776, -782.
[50] D003816, -860.
[51] D003776, -781.

15

Expert Report of Nisha Sachdev

       i.       **DHHR Workforce Issues Result in Inadequate Assessments, Case Planning, and Case Management.**

DHHR lacks a quality workforce with the necessary knowledge, skills, and capacity to serve children with disabilities. High turnover, child welfare workers overburdened with high caseloads, and staff inexperience negatively impact the ability of the agency to assess children's safety, ensure appropriate assessments and service provision, and engage families in the casework process.[52] Although DHHR has well-intentioned written policies and procedures for assessment, case planning, and case management, the shortage of qualified and experienced staff, high turnover, and high caseloads, result in the failed implementation of these policies and procedures. As a result, DHHR faces a backlog of assessments, engages in inadequate case planning, and has failed to ensure caseworkers visit children and their families at necessary and regular intervals and address safety concerns in a timely manner.[53]  In some instances, DHHR has altogether failed to complete quality comprehensive assessments of the needs of children and their parents.[54]  In addition, West Virginia's most recent PIP noted that the lack of contact negatively impacts safety-related timeframes, placement stability, achievement of permanency, and well-being outcomes for children and families.[55]  These issues place children with disabilities at risk of harm.

As indicated in the most recent CFSR, DHHR has experienced limited success in recruiting, screening, hiring, training, and retaining a qualified and sufficient workforce comprised of staff who understand the unique needs of this population and who can adequately and timely assess, manage and place children with individualized supports, services, and placements that meet

---

[52] Quality Improvement Center for Workforce Development, Recent Research to Build Knowledge of the Child Welfare Workforce, *available at* https://www.qic-wd.org/blog/recent-research-build-knowledge-child-welfare-workforce (last visited June 4, 2020).
[53] D003987, -4069; D003776, -793.
[54] D003776, -797-798.
[55] DHHR, West Virginia CFSR Program Improvement Plan (PIP), *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

their needs.[56] Stakeholders attributed many of the challenges in assessments and case management to high caseloads and frequent staff turnover.[57]

West Virginia's 2019 Child Protective Services Policy and Foster Care Policy state that the Child Protective Services ("CPS") caseworker is the primary staff member who is in contact with a child from the time DHHR substantiates a case for abuse or neglect through the time the child achieves permanency. These policies indicate that CPS's role is to gather, study, and analyze child and family information and serve as a problem identifier, case manager, and treatment provider.[58] Given this integral role and the increased number of substantiated child abuse and neglect cases, it is alarming that at the end of Fiscal Year 2019, there were eighty six vacant caseworker positions, with only 82% of CPS worker positions filled.[59] In addition, the available caseworkers on staff carried excessive caseloads decreasing their quality of services. The Child Welfare League of America, a coalition of private and public agencies and partners that advance policies, best practices and collaborative strategies for foster children, recommends that that foster care caseworkers have caseloads of twelve to fifteen children.[60] The average functional caseload[61] for West Virginia caseworkers is eighteen cases, with the range seventeen to twenty two depending

---

[56] D003781, DHHS ACF, West Virginia CFSR Final Report 2017.; DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020).
[57] D003776, -782.
[58] D001010, -020; D001299, -306-311.
[59] DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020).
[60] Child Welfare League of America (CWLA), West Virginia's Children at a Glance, 2017, *available at* https://www.cwla.org/wp-content/uploads/2017/04/WEST-VIRGINA-revised-1.pdf (last visited June 4, 2020).
[61] Functional caseload is the number of cases per available worker. It subtracts vacant positions, staff in training and staff on extended leave who are not available to work. The functional caseload is not necessarily reflective of the actual caseloads caseworkers in West Virginia carry.

**Expert Report of Nisha Sachdev**

on the districts.[62] In some instances, caseworkers had a functional caseload of thirty three cases.[63] This issue has been ongoing in West Virginia.

To mitigate workforce shortages, in 2015, the West Virginia legislature passed a law that allowed CPS caseworkers who were hired by DHHR to have a degree that was not in social work or a related field, provided they take additional training to obtain an active social work license.[64] To obtain a license, one must have graduated with at least a four-year degree in social work and pass a licensure exam. For those individuals who do not have a social work license, or are not license eligible under the traditional method, there are two options. If a candidate has a related degree, such as a bachelor's degree in psychology or criminal justice, they can take an additional, specified twelve hours of college credit to become license eligible with the Board of Social Work. The twelve hours can be obtained after being hired; however, the candidate will work under a Provisional Social Work License until they meet the standard. Additionally, a candidate with a non-related degree can work under a Restricted Provisional Social Work License but must undergo an extensive four-year training program coordinated by BCF. In 2018, 18% of staff hired by DHHR had a degree in social work, 52% had a related degree, and 30% had an unrelated degree.[65]

According to the Association of Social Work Boards, the association that developed and maintains a model practice act that offers regulatory bodies a resource for developing their own laws and regulations, the purpose of licensing and certification in social work is to assist the public

---

[62] D003776, -783; West Virginia Office of the Legislative Auditor, 2019 Legislative Audit Report of DHHR Child Protective Services, *available at* https://www.wvlegislature.gov/legisdocs/reports/agency/PA/PA_2019_698.pdf (last visited June 4, 2020); D137153 (It is unclear from Average Caseloads by District cited in D137153 whether West Virginia counts its cases by child or family.).

[63] D137153.

[64] West Virginia Office of the Legislative Auditor, 2019 Legislative Audit Report of DHHR Child Protective Services, *available at* https://www.wvlegislature.gov/legisdocs/reports/agency/PA/PA_2019_698.pdf (last visited June 4, 2020).

[65] D003816, -874.

**Expert Report of Nisha Sachdev**

through identification of standards for the safe professional practice of social work.[66] Although West Virginia requires that any person practicing social work have an active license, BCF does not have a formal procedure in place to monitor social work licensing status.[67] In the 2019 Legislative Audit Report of DHHR CPS, it was found that less than 14% of the DHHR caseworker files reviewed had proof of a current social work license.[68] Without a process in place, and the fact that 82% of staff did not have a formal degree in social work, it is not guaranteed that caseworkers have the necessary qualifications or knowledge on how to effectively perform their duties.

Even when sufficient staff is available, DHHR faces issues with retention. Turnover rates at approximately 10% are optimal in any agency, but in Fiscal Year 2018, the CPS turnover rate was 38%, which represents a 13% increase from the previous two years.[69] This is higher than the national child welfare turnover rate of 22%.[70] Caseworker turnover has negative outcomes for children, including those with disabilities, in the child welfare system. High turnover results in increased caseloads for remaining staff, decreased time available to appropriately assess and manage each case, and disrupted relationships with the child.[71] This turnover may have a direct correlation to the number of youth who have not had a face-to-face monthly visits with their DHHR

---

[66] Association of Social Workers Board, About Licensing and Regulations, *available at* https://www.aswb.org/licensees/about-licensing-and-regulation/ (last visited June 4, 2020).

[67] West Virginia Office of the Legislative Auditor, 2019 Legislative Audit Report of DHHR Child Protective Services, *available at* https://www.wvlegislature.gov/legisdocs/reports/agency/PA/PA_2019_698.pdf (last visited June 4, 2020).

[68] West Virginia Code §30-30-1(a); West Virginia Office of the Legislative Auditor, 2019 Legislative Audit Report of DHHR Child Protective Services, *available at* https://www.wvlegislature.gov/legisdocs/reports/agency/PA/PA_2019_698.pdf (last visited June 4, 2020).

[69] D003783, DHHS ACF, West Virginia CFSR Final Report 2017.; D003943, DHHR, West Virginia CFSP 2019.; DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020).

[70] Quality Improvement Center for Workforce Development, Recent Research to Build Knowledge of the Child Welfare Workforce, *available at* https://www.qic-wd.org/blog/recent-research-build-knowledge-child-welfare-workforce (last visited June 4, 2020).

[71] D003776, -783; D003816, -943; DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.Program ImprovementPlan.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

caseworker.[72] In addition, high turnover also means lower quality relationships between children and families and their caseworkers.[73] This negatively effects the child's ability to build trust and share vulnerable information that could assist in the assessment and placement of the child.

Although DHHR notes that ongoing training is provided for staff that addresses the skills and knowledge base needed to carry out their duties, findings from reviews note that while DHHR provides a comprehensive pre-service training, DHHR also has limited resources left with which to spend on enhanced skills training for tenured workers. It should be noted that this pre-service training does not include any training specific to children with disabilities.[74] Given that many staff come to the workforce with an unrelated degree, and without experience working with children with disabilities, this might increase the likelihood of underreporting, inappropriate placement decisions and inadequate provision of services for children and youth with disabilities in foster care. In addition, the CFSR noted that ongoing training fails to provide staff with the skills and knowledge necessary to carry out their duties and there is no process to identify ongoing training topics to support staff's professional development and provide the skills/knowledge needed to enhance their job performance.[75]

ii. **Inadequate Case Planning and Case Management Results in DHHR Failing to Ensure Children are Receiving the Appropriate Supports or Accommodations to Meet Children's Needs.**

The United States DHHS indicates the best practice in case planning and management is to engage family members throughout the case to ensure services are tailored to best address the

---

[72] D001299, -433-434.

[73] Quality Improvement Center for Workforce Development, *Recent Research to Build Knowledge of the Child Welfare Workforce*, *available at* https://www.qic-wd.org/blog/recent-research-build-knowledge-child-welfare-workforce (last visited June 4, 2020).

[74] D003776, -787, -798; DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR. ProgramImprovementPlan.pdf (last visited June 4, 2020).

[75] D003776, -796.

**Expert Report of Nisha Sachdev**

family's strengths and needs.[76] To do this well, DHHS indicates that ongoing case management requires frequent, planned contact with the family to assess progress toward goals.[77] DHHS also notes that quality caseworker visits require engagement and relationship building and is essential to the completion of comprehensive assessments and the case planning/management process.[78] In addition, thorough assessments that define the child's strengths and needs are necessary for the development of a case plan.[79] This helps identify the specific needs of the child and allow placements to be customized to meet each child's needs.[80]

It is therefore not surprising that research by CWLA shows that the more time a caseworker spends with a child and family, the better the outcomes for those children and families as it allows for observing, understanding, and detecting a child's behavioral and emotional issues which cannot be done during brief, infrequent meetings.[81] The Child and Family Services Improvement Act of 2006 (P.L. 109-288) now requires states to demonstrate that a caseworker has face-to-face contact with children in care at least once every thirty days.[82]

DHHR also recognizes that regular contact between caseworkers and families and children is integral to effective delivery of services.[83] While DHHR policies establish the requirements for

---

[76] DHHS ACF, Family-Centered Case Planning and Case Management, *available at* https://www.childwelfare.gov/topics/famcentered/caseworkpractice/caseplanningmgmt/ (last visited June 4, 2020).

[77] DHHS ACF, Family-Centered Case Planning and Case Management, *available at* https://www.childwelfare.gov/topics/famcentered/caseworkpractice/caseplanningmgmt/ (last visited June 4, 2020).

[78] D003776, -782.

[79] D001299, -410-420.

[80] AAP, Health Care Issues for Children and Adolescents in Foster Care and Kinship Care, *available at* https://pediatrics.aappublications.org/content/136/4/e1142 (last visited June 4, 2020).; American Journal of Public Health, Mental Health Services for Youths in Foster Care and Disabled Youths, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1446701/pdf/11441737.pdf (last visited June 4, 2020).

[81] CWLA, West Virginia's Children at a Glance, 2017, *available at* https://www.cwla.org/wp-content/uploads/2017/04/WEST-VIRGINA-revised-1.pdf (last visited June 4, 2020).

[82] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[83] D003307, -401.

**Expert Report of Nisha Sachdev**

the minimum number of contacts between worker and child, it is recognized that each case is unique. In this regard, the DHHR Adoption Policy, reads in part: "The frequency and intensity of contacts between the child's worker, the child and the foster family will be determined by the individual needs and problems of the child and family."[84] According to DHHR's Foster Care Policy and Adoption Policy, when it becomes necessary to place a child into foster care, DHHR will select the placement based upon the individual child's needs and DHHR will ensure the child is placed in the least restrictive environment, in close proximity to family and school.[85] For example, the Foster Care Policy indicates that the child's psychological and emotional characteristics and development, medical needs, capacity to live in a community setting must be considered.[86]

However, DHHR caseworkers have experienced difficulty in making all the contacts that the standards of good practice require, placing children with disabilities at risk of harm.[87] Findings in the most recent CFSR indicate there was a consistent lack of or only limited meaningful caseworker contact with children and families, which means families and children were often not involved in case planning.[88] West Virginia's most recent PIP noted that in Fiscal Year 2018, in only 5.74% of the cases reviewed, caseworkers visits with caregivers met the frequency and quality requirements, and 31.2% of caseworker visits with children were sufficient to ensure the safety, permanency, and well-being of the children and promote the achievement of case goals.[89] When caseworker visits were made, it was noted that they often occurred during a public forum such as

---

[84] D000924, -973.
[85] D001299, -335-336.
[86] D001299, -415-416; D000924, -943.
[87] D003307, -401.
[88] D003776, -782.
[89] D003776, -789-790; DHHR, West Virginia CFSR PIP, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR. ProgramImprovementPlan.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

a court hearing or multi-disciplinary team meeting, which may not facilitate quality engagement with parents.[90]

DHHR policy also requires that each child have a written case plan that is developed jointly with the child's parent(s) within sixty days of a child entering care.[91] However, The Fiscal Year 2018 Division of Planning and Quality Improvement review indicated that West Virginia continues to struggle with written case plans developed jointly with the child's parent(s).[92] It was noted that in the cases reviewed, there was insufficient contact with families to achieve case goals and, in a number of the cases, DHHR failed to develop a case plan.[93] More alarming is that in 50% of the cases, DHHR did not establish permanency goals for the child in a timely manner.[94] Furthermore, DHHR failed to make concerted efforts to involve parents and children (if developmentally appropriate) in the case planning process on an ongoing basis in only 40% of the cases that were reviewed.[95] Although DHHR received a rating of "Strength" for ensuring a case review system was implemented statewide that allows for a periodic review of the appropriateness of the permanency goal and case progress for each child at least once every six months, and more typically every three months, the lack of implementation and quality case plans still does not ensure children's needs were being met.[96]

The MDT process is the state's cornerstone strategy for ensuring that each child has an appropriate treatment and permanency plan. Information gathered by the caseworker is used by the MDT to develop a placement plan and compile the Child, Youth and Family Case Plan and/or

---

[90] D003776, -782.
[91] D001299, -416.
[92] D003816, -867.
[93] D003776, -782.
[94] D003776, -785.
[95] D003776, -782, -789-790.
[96] D003776, -782, -793.

**Expert Report of Nisha Sachdev**

Youth Services Case Plan.[97] Although the MDT is required to convene at least once every ninety

days to provide allow discussion of progress, it was found that the implementation of this policy

varies considerably across the state.[98] The DOJ investigation also found that MDTs often fail to

consider or recommend the mental health services needed to avoid removal from the home and

instead routinely recommend segregated residential treatment.[99] It was noted that:

> The propensity of Multidisciplinary Teams to recommend segregation undermines their
> potential to ensure that the State serves children in the most integrated setting appropriate
> to their needs. During our meetings across the state, multiple stakeholders reported that the
> MDT process largely fails to consider in-home and community-based services.

In addition, Virginia Code § 49-2-907 provides that the MDT team should consist of an

"appropriate school official or representative."[100] In addition to West Virginia statutes, the

mandatory invitation and attendance of an education official at MDT meetings is also cited within

the Foster Care Policy Manual.[101] This is important as educators have consistent contact with

children and have unique opportunity to advocate for and assist in providing programs and services

for these children and their families.[102] However, in 2018 it was found that inconsistent practices

across West Virginia have resulted in the absence of education officials at MDT, which disrupted

the planning of educational services for children in care of DHHR.[103] This could result in the fact

---

[97] D001299, -396.

[98] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[99] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[100] West Virginia Code § 49-2-907.

[101] D001299, -411.

[102] DHHR, Notification and Participation of School Officials at Multidisciplinary Team Meetings 2018, *available at* http://www.wvdhhr.org/oos_comm/reports/Notification.pdf (last visited June 4, 2020).

[103] DHHR, Notification and Participation of School Officials at Multidisciplinary Team Meetings 2018, *available at* http://www.wvdhhr.org/oos_comm/reports/Notification.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

mentioned above that that children receive appropriate services to meet their educational needs only 73% of the time.[104]

> **D.      DHHR Has Failed to Provide Children with Disabilities Access to an Array of Quality Community-Based Services, Programs, and Activities that are Individualized to Meet their Needs.**

Studies have shown that intensive community-based services[105] effectively address the needs of children with mental illness while maintaining their connection to their families and communities.[106] Research by the Annie E. Casey Foundation shares that the extent to which children with disabilities are able to reach their potential and enjoy full participation in their community is related to a number of factors, including access to an array of services that meet their unique health, education and socio-emotional needs.[107] A sufficient array of community-based services incorporates several discrete clinical interventions and generally fall into four categories: intensive care coordination, crisis response and stabilization services, direct services available in the child's home or community, and therapeutic foster care.[108] As such, states are required to provide community-based treatment for qualified persons with mental health conditions where such treatment is appropriate.[109]

---

[104] D00376, -790.

[105] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[106] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[107] AECF, Improving Outcomes for Children with Special Needs, *available at* https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020).; DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[108] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[109] *See* Olmstead, 527 U.S. at 601-02.

**Expert Report of Nisha Sachdev**

Despite this, West Virginia has continued to struggle to provide children high quality and timely community-based mental health services that are individualized to meet their needs, thereby placing them at significant risk of harm. In a study conducted by West Virginia University, it was noted that there is a great need to address the behavioral health needs of children and lack of appropriate community-based services in West Virginia.[110] The DOJ investigation noted that, to be effective, services must be individualized and provided in a flexible manner with sufficient duration, intensity, comprehensiveness, and frequency to address the child's mental health needs.[111]

Over the years, reports have pointed out specific areas of service deficiencies. For example, as noted in the 2008 CFSR, key community-based services were not accessible to all families and children, the services were provided based on what was available and not the family's needs, and West Virginia did not consistently individualize services to meet the unique needs of the children and families they serve.[112] In addition, the most recent CFSR pointed to the same problem and indicated that although the agency has made efforts to better individualize services, the lack of available and accessible quality services statewide precludes the individualization of services.[113] This lack of comprehensive services pushes DHHR to rely on what is available instead of tailoring services to meet the unique needs of the child.[114]

---

[110] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[111] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[112] D003428, -444.

[113] D003776, -798.

[114] National Center for Youth Law, Most States Fail to Meet the Mental Health Needs of Foster Children, *available at* https://youthlaw.org/publication/most-states-fail-to-meet-the-mental-health-needs-of-foster-children/ (last visited June 4, 2020).

Expert Report of Nisha Sachdev

The DOJ investigation also indicated that while West Virginia has many of the critical community-based services necessary to support children in the community, many of those services are neither accessible to children who need them nor available in sufficient quantity.[115] A report to the West Virginia legislature by West Virginia University stated,

> Caseworkers offered examples of calling agency after agency, provider after provider, in search of outpatient community-based mental and behavioral health services for children and parents. The community service gap was emphasized from all levels (e.g. CPS caseworkers, local and statewide DHHR administrators, and residential providers).[116]

West Virginia University's study also stated that there is a severe shortage of child psychiatrists, psychologists, and other child-focused providers (e.g. social workers and counselors) across the state.[117] Moreover, West Virginia's Fourth Annual Progress Report cited additional gaps in services, including no services or placements for children with severe mental health issues, very limited services for youth with intellectual disabilities, and limited availability of counseling services for children who have been sexually abused.[118] Limited mental health services for children, sex offender treatment, autism support services, post-adoption services, kinship family support services, and housing services were also noted.[119] Reports also indicated barriers even if

---

[115] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[116] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, available at: https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[117] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[118] D004703, -747.
[119] D003816, -888; West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).; D004707, -747; D003987, -4029.

**Expert Report of Nisha Sachdev**

some services are available, such as Medicaid reimbursement limitations, poor or minimal transportation, and long waitlists.[120]

Substance abuse treatment is also especially needed yet lacking in West Virginia. In DHHR's Advancing Outcomes 2019 Report, it was noted that about 85% of children in foster care come from homes with substance abuse.[121] However, there is a lack of quality substance abuse treatment programs for youth and a lack of ongoing community-based support groups for those who remain in the community or are returning home after treatment.[122] It was noted in the DOJ investigation that West Virginia has implemented a network of Youth Service Centers that will improve access to services for children with a substance abuse disorder. However, the CFSP reported that even when specific substance abuse and behavioral and mental health services are available, children, families and caseworkers are unaware of them.[123] This is a major impediment to addressing family safety issues and facilitating reunification.

West Virginia also lacks necessary respite care for caregivers, which puts children with disabilities at increased risk of placement disruptions and institutionalization. Research suggests that parents of children with disabilities experience more stress, and increased parental stress is associated with an increased risk of maltreatment.[124] One factor in this stress may be the lack of

---

[120] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[121] D003816, -888; West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020); D004703, -747; D003987, -4029; D005555, -560.
[122] D004703, -747.
[123] DHHR, West Virginia CFSR Program Improvement Plan (PIP), *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020).
[124] DHHS, ACF, The Risk and Prevention of Maltreatment of Children With Disabilities, *available at* https://www.childwelfare.gov/pubPDFs/focus.pdf (last visited June 4, 2020).

Expert Report of Nisha Sachdev

respite.[125] Professional standards recognize this and require the child welfare agency provide respite services as needed to treatment foster parents to prevent and reduce foster parent stress and crises.[126] Federal law now specifically includes respite care as part of the core family support services for the prevention of child abuse and neglect authorized under the 2003 amendments to the Child Abuse Prevention and Treatment Act, and adds it to the litany of services for parents adopting children with special needs from foster care.[127] Utilizing a fit and willing relative or other supportive adult for short respite out-of-home interventions are preferred to placement of the youth in a foster care setting. However, West Virginia lacks sufficient levels of respite care.[128]

To help draw more in-state resources, DHHR implemented the Safe at Home program.[129] This program focuses on children ages twelve to seventeen years and was developed using a wraparound approach to facilitate supports and services with the goal of maintaining children in their home, or in communities in family-like settings if placement is necessary.[130] An evaluation of the program showed initial positive gains in academic, behavioral, and emotional outcomes in the general participants. However, further analysis found that children with an Axis 1 diagnosis are at higher risk of not achieving these favorable outcomes compared to youth without a diagnosis.[131] The evaluation also highlighted challenges including the overall lack of service availability throughout much of the state, timeliness issues and high volumes of referrals, and

---

[125] United Cerebral Policy & Children's Rights, Forgotten Children: A Case for Action for Children and Youth with Disabilities in Foster Care, *available at* https://www.childrensrights.org/wp-content/uploads/2008/06/forgotten_children_children_with_disabilities_in_foster_care_2006.pdf (last visited June 4, 2020).
[126] CWLA, Standards of Excellence for Child Welfare Services, *available at* https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services/ (last visited June 4, 2020).
[127] CWLA, Standards of Excellence for Child Welfare Services, *available at* https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services/ (last visited June 4, 2020).
[128] CWLA, Standards of Excellence for Child Welfare Services, *available at* https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services/ (last visited June 4, 2020).
[129] D006751.
[130] D003776, -781.
[131] D007614, -668.

**Expert Report of Nisha Sachdev**

difficulties finding appropriate services for youth with severe mental or behavioral health needs.[132] In addition, stakeholders expressed concerns that West Virginia does not have the resources to properly sustain this program due to the conclusion of the Title IV-E waiver in September 2019.[133]

> **E.**   **The Lack of Adequate Community-Based Mental Health Services Perpetuates DHHR's Failure to Ensure Placements in the Most Integrated, Least Restrictive Setting Appropriate to the Needs of Children with Disabilities, and DHHR Relies Unnecessarily on Institutional Settings.**

Prevention and early intervention, accessible community-based mental health and substance abuse treatment, therapeutic foster care, and respite services are key factors in preventing youth residential placement.[134] Therefore, children who live in the community and need, but do not receive in-home and community-based services, are at risk of unnecessary placement in segregated residential treatment facilities, group homes, psychiatric hospitals, and detention centers.[135] Research shows that nationally more than 40% of children in congregate care placements do not have a mental health diagnosis, medical disability, or behavioral problem that might warrant such a restrictive setting.[136] West Virginia failure to provide in-home and community-based services places children with mental health conditions who currently live in the community at risk of unnecessary institutionalization.[137]

---

[132] D007614, -652.

[133] D005555, -570.

[134] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[135] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[136] AECF, Policy Report: Kids Count, *available at* https://www.aecf.org/resources/every-kid-needs-a-family/ (last visited June 4, 2020).

[137] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

Despite having a systems of care approach,[138] DHHR has not ensured access to placements in integrated and least restrictive environments, and instead unnecessarily and overly relies on institutional settings.[139] The DOJ investigation found that DHHR provides intensive mental health services to children almost exclusively in segregated residential treatment facilities, yet these children are qualified for community placement.[140] As a result of this, West Virginia has a higher percentage of youth in segregated residential treatment facilities than 46 other states.[141] In December 2014, there were 1,017 children with mental health conditions residing in segregated residential treatment facilities – 25% of all children in DHHR custody. This rate of institutionalization is well above the national average of 15%.[142] In addition, the DOJ noted 71% of children between ages twelve and seventeen in DHHR custody were placed in segregated residential treatment facilities.[143] Moreover, the DOJ noted there is little evidence to suggest that DHHR has reduced its commitment to segregated residential treatment programs.[144]

Such unnecessary, overly restrictive placement in institutional settings puts children at significant risk of harm. The DOJ provided research indicating that compared to foster children

---

[138] A systems of care approach refers to a spectrum of effective, community-based services and supports for children and youth with or at risk for mental health or other challenges and their families that is organized into a coordinated network; builds meaningful partnerships with families and youth; addresses their cultural and linguistic needs; and helps to improve outcomes at home, in school, in the community, and throughout life.

[139] D001010, -018-019.

[140] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[141] AECF, Policy Report: Kids Count, *available at* https://www.aecf.org/resources/every-kid-needs-a-family/ (last visited June 4, 2020).

[142] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[143] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[144] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

living with families, those housed in institutionalized settings are more likely to drop out of high

school, commit crimes and develop mental health problems.[145] As cited in the DOJ investigation,

> unnecessary placement in segregated residential treatment facilities, and removal from
> their families and communities, can harm children. Children frequently lose the ability to
> make everyday decisions about their lives because facilities regiment all daily activities.
> The harms of unnecessary placement can also include the use of seclusion, and chemical
> and manual restraint by facility staff members. Children unnecessarily segregated into
> these residential treatment facilities frequently engage in additional disruptive behaviors,
> leading to further segregation and isolation from their communities.[146]

In addition, the DOJ found,

> predictable consequences of under-treated mental health conditions – acting out behaviors,
> problems at school, sexualized behaviors, and threats to self or others – become the primary
> issues that lead to placement" and "parents report that their children could have remained
> in the home if they had been able to access needed mental health services in their
> community, if services had been available earlier, if they had access to qualified
> professionals, and if care had been better coordinated.[147]

The DOJ also cited research that children with comparable levels of need who receive

intensive services in their natural settings have improved school attendance and performance,

increased behavioral and emotional strengths, improved clinical and functional outcomes, reduced

suicide attempts, and decreased contacts with law enforcement when compared to children who

received such care in segregated residential treatment facilities.[148]

---

[145] AECF, Policy Report: Kids Count, *available at* https://www.aecf.org/resources/every-kid-needs-a-family/ (last visited June 4, 2020).
[146] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[147] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[148] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

Expert Report of Nisha Sachdev

Not only do congregate care placements have detrimental effects on a child, they also cost seven to ten times more than the cost of placing a child with a family.[149] The DOJ investigation indicated that West Virginia continues to fund expensive placement in segregated residential treatment facilities both within the state and out of state, but neglects to develop sufficient community-based services as seen above. In Fiscal Year 2012, West Virginia spent $47.2 million dollars in-state and over $20 million in out-of-state placements.[150] National data and local providers report the cost of providing in-home and community-based mental health services ranges from $2,500-$3,500 per month. By contrast, the average cost of in-state placement in segregated residential treatment facilities ranges from $5,623 to $9,088 per month.

     i.    **Lack of Sufficient Family-Based and Therapeutic Placements Results in Children with Disabilities Being Placed in Unstable and/or Overly Restrictive Placements That Do Not Meet Their Needs.**

Under the ADA, a child welfare agency, cannot deprive a youth of independent living services, permanency planning, or family-based placements because the youth has a disability.[151] However, West Virginia does. A West Virginia University study found the shortage of community-based services to be a significant barrier to the state's ability to successfully support high-need children so they can remain in family-based foster care.[152] The need for more day-

---

[149] AECF, Improving Conditions for Children with Special Needs, *available at* https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020).
[150] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[151] Juvenile Law Center, A Powerful Tool For Change in the Child Welfare and Justice Systems: The Americans with Disabilities Act, *available at* https://jlc.org/news/powerful-tool-change-child-welfare-and-justice-systems-americans-disabilities-act (last visited June 4, 2020).
[152] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

treatment and home-based services as well as more placement options were also reoccurring themes communicated by stakeholders in evaluation reports of the Safe at Home program.[153]

According to the most recent CFSR, the number of quality foster and adoptive homes in West Virginia was consistently noted to be insufficient to meet the placement needs of children coming into foster care. Moreover, a West Virginia progress report and system of care end of year report found there was an insufficient number of foster care homes to care for children with mental health issues or significant emotional and behavioral needs.[154] In addition West Virginia has a lack of homes that are willing to accept older children, children with severe behavioral issues, and large sibling groups.[155]

The DOJ investigation indicated therapeutic foster care is only available to limited populations in a few areas of the state.[156] Treatment foster care serves children who exhibit mild to moderate levels of trauma or behavioral or emotional dysregulation in settings such as school, the home and/or the community. If the child experiences more severe needs, intensive treatment foster care or therapeutic foster care are available. These serve children who require significant support and exhibit moderate to significant indicators of trauma or behavioral or emotional dysregulation and display high-risk behaviors.[157]

It was reported that the number of children entering foster care in West Virginia has risen, but the number of foster homes has not matched the increase in need. This shortage of homes has resulted in children sometimes sleeping in offices, hotels, being placed in shelter care, and

---

[153] D007614, -636.
[154] D004703, -740; D005893, -897.
[155] D004703, -923
[156] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[157] D003816, -949.

**Expert Report of Nisha Sachdev**

inconsistencies in ensuring that children's current foster care placements are stable.[158] These practices place children with disabilities at risk of harm. The most recent CFSR data revealed that 45% of cases reviewed revealed placement instability.[159] In 2019, there were five children on average each month who stayed in a hotel, with as many as twelve children sleeping in hotels some months.[160] The data on reasons for the hotel stays show themes of case workers who were unable to find an appropriate placement due to a lack of availability as well as placements unwilling to accept children due to their behaviors or special needs.[161] West Virginia University also found that DHHR holds children in emergency shelters where they can wait for months for a more appropriate placement because of the state's dependence on residential treatment.[162] As children wait for placements, they often do not receive the intensive mental health treatment needed to address their mental health needs and avoid institutionalization.[163]

In addition, with the enactment of the Adoption Assistance and Child Welfare Act of 1980 (P.L. 96-272), states were mandated to promote permanency planning for all children in out-of-home care and for children at risk of removal from their homes.[164] States were also required to make reasonable efforts to prevent the out-of-home placement of children and to reunify children already removed from their homes.[165] If retuning home is not a possibility, placing a child who needs out-of-home care with a relative is the least restrictive alternative living arrangement.[166] This

---

[158] D003776, -800.
[159] D0037776, -785.
[160] D023537.
[161] D023537.
[162] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[163] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[164] D000924, -930-931.
[165] D000924, -930-931.
[166] D000924, -938.

**Expert Report of Nisha Sachdev**

placement allows for more interaction with the child's own family and relatives and often results in a less traumatic separation.[167] However, according the most recent CFSR, concerted efforts were made to place the child with relatives when appropriate in only 68% of the cases reviewed in West Virginia.[168] At the end of Fiscal Year  2017, 31.9% of children had been waiting twelve or more months for reunification.[169] Of total children adopted in 2017, 93.7% had waited twelve or more months, and 15.1% were one year or younger.[170]  In addition, 20% of the children that exited care had a diagnosable disability.[171]

ii. **Insufficient Availability of Family-Care and In-State Placements Results in DHHR Unnecessarily Relying on Out-of-State Institutional Settings for Lengthy Times.**

West Virginia's Foster Care Policy has three levels of non-family foster care which children should only be placed into when there is a clear and compelling therapeutic reason:[172]

1. Group care is structured twenty four-hour group care for children with needs that range from adjustment difficulties in school, home, and/or community to those in need of highly structured programs with formalized behavioral programs and therapeutic interventions.[173]

2. Residential treatment facilities provide on-site therapeutic interventions to meet the child's learning, social, or motor skill needs and provides on campus educational programs to deal with severe learning deficits and acting out behaviors. The Foster

---

[167] D000924, -938.
[168] D003776, -787.
[169] D003776, -787.
[170] DHHS ACF, Child Welfare Outcomes State Data Review, *available at* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020).
[171] DHHS ACF, Child Welfare Outcomes State Data Review, *available at* https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020).
[172] D001299, -341-342.
[173] D001299, -345.

**Expert Report of Nisha Sachdev**

Care Policy details specific characteristics that are required for residential placement, including, but not limited to, severe emotional disturbance requiring comprehensive, intensive treatment and services; serious behavior deviations (i.e., severe aggression, sexual acting out, chronic truancy, drug usage, etc.); impaired thought or affect disorders; the child is a danger to himself or others; and pre-psychotic or psychotic symptoms that require a closed setting.[174]

3. Psychiatric Residential Treatment is the most restrictive type of care and reserved for children who have been diagnosed with a psychiatric, emotional, or behavioral disorder so severe that it constitutes a danger to the child or others.[175]

DHHR recognizes that extended stays in out-of-home care can have negative and lasting developmental effects on child development, multiple placements increase the likelihood of having a negative impact on the ability of the child to achieve his or her permanency plan, and children placed close to their own families and communities are more likely to have parent visitation and to return home.[176] However, according to the DOJ investigation, children who depend on DHHR for mental health services experience high rates of placement in segregated residential treatment facilities, including out-of-state placement, because DHHR has not developed a sufficient array of in-home and community-based services.[177] The DOJ indicated that this has resulted in needlessly segregated thousands of children far from their families and other people important in their lives, and that with adequate services, West Virginia could successfully treat these children in their

---

[174] D001299, -346-347.
[175] D001299, -347- 348.
[176] D001299, -420-421.
[177] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

homes and communities.[178] This creates a significant risk of harm for children in foster care with disabilities.

      If there are no suitable placement alternatives in the state, then the MDT must consider out-of-state options, but out-of-state placement should be the last option. There are advantages to serving children in-state, including the opportunity for better oversight by state officials, continuity of educational curriculum, and the potential for a smoother transition back to the child's home community at the conclusion of the residential stay.[179] However, a lack of appropriate placements results in children being placed out-of-state and in settings that are not remotely designed to meet their needs and do not allow for inclusive classroom learning and schooling.[180]

      In the 2002 CFSR, it was found that a substantial number of the out-of-state placements of children were caused by a lack of in-state behavioral health services.[181] Even though in 2004 DHHR set a goal of reducing children placed in out-of-state facilities to 3% by 2006, as of May 2020, 4.3% of children were placed out-of-state.[182] In 2017-2018, 501 children were placed out-of-state.[183] This number is one of the highest in the state since 2013 (see Table 1 below).

Table 1: Annual and Average Monthly Numbers of Children in Out-of-State Care[184]

| Fiscal Year | 2017-2018 | 2016-2017 | 2015-2016 | 2014-2015 | 2013-2014 |
|---|---|---|---|---|---|
| Number of Children in Out-of-State Care | 501 | 415 | 425 | 477 | 492 |

[178] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[179] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

[180] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[181] D003307, -404.

[182] DHHR, A Comprehensive Clinical Review of Youth In Out-of-State Placements June 2006, *available at* http://www.wvdhhr.org/oos_comm/reports/final_version_oos.pdf (last visited June 4, 2020).

[183] D005555, -583.

[184] D00555, - 584.

**Expert Report of Nisha Sachdev**

| Average Monthly Children in Out-of-State Care | 268 | 199 | 204 | 270 | 292 |
|---|---|---|---|---|---|

The increase in youth placed out of state indicates that West Virginia still has significant gaps in in-state services to meet certain youth's needs.[185] For example, West Virginia's System of Care End of Year Report cited gaps in in-state placements, including:

- No in-state level three facilities that can handle youth who are aggressive and have intellectual and developmental disabilities (IDD) diagnoses and no in-state residential programs that address trauma with youth who have IDD diagnoses;[186]

- No in-state programs for sex offenders;[187]

- No programs in-state that addresses only trauma for children age twelve or older;[188]

- Few group home residential facilities that accept younger children;[189] and

- No in-state PRTFs for children twelve years or younger or youth who are already age eighteen.[190]

Because there are limited placement options for specific populations, such as, sex offenders, or children who experience trauma, substance abuse or severe mental health issues, children are placed out of state. This is especially disturbing given that in 2019, 12% of children in out-of-state placements were identified sex offenders, 25% exhibited sexual behaviors, and 26% engaged in substance use.[191] The lack of placements can lead to a lack of treatment congruence between the youth's diagnostic presentation and the placement. For example, in a 2006 DHHR

---

[185] D005555, -584.
[186] D005893, -903.
[187] D005893, -903.
[188] D005893, -903.
[189] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).
[190] D005893, -903..
[191] D005555, -585.

**Expert Report of Nisha Sachdev**

review of clinical placements, it was found that youth with an identified need for a substance treatment intervention were placed in an out-of-state facility that only provided substance education services.[192]

Children who have been diagnosed with both IDD and mental illness are at increased risk for placement in segregated residential treatment facilities far from home.[193] This encompasses all age ranges and can include youth experiencing trauma, displaying sexual behaviors and aggressive behaviors, or diagnosed with other mental health issues.[194] In West Virginia, 22% children placed in out-of-state facilities had both a mental illness diagnosis and an IDD.[195] And in 2019, and 15% had a IDD, 8% had autism, 11% had borderline intellecual functioning.[196] Despite these numbers, West Virginia has not provided in-state services to address youth with an IDD that includes autism or youth age 10 or younger requiring intense treatment.[197] These practices put foster children with disabilities at serious risk of harm.

<blockquote>

a. **Length of Time in Restrictive Placements Violates Reasonable Professional Standards.**
</blockquote>

Not only are children unnecessarily being placed in restrictive settings, the length of time children spent in these placements exceed best practices and violates reasonable professional standards. West Virginia children with mental health conditions who are placed in restrictive

---

[192] DHHR, A Comprehensive Clinical Review of Youth In Out-of-State Placements June 2006, *available at* http://www.wvdhhr.org/oos_comm/reports/final_version_oos.pdf (last visited June 4, 2020).

[193] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[194] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[195] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[196] D005555, -585.

[197] D005477, -509.

**Expert Report of Nisha Sachdev**

settings remain in those settings for reasons unrelated to their individual mental health conditions. Research show that even those young people who need specialized residential treatment should not be there for longer than three to six months.[198] According to the DOJ investigation, segregated residential treatment facility providers stated that children spend up to a year in their facilities. In Fiscal Year 2017, 76% of children placed out-of-state have stayed in the placement for more than six months and 30% for over a year.[199] The average length of stay in out-of-state placements was 332 days (over eleven months).[200] This prolonged institutionalization is partly the result of regimented, non-individualized requirements that create programmatic barriers to discharge.[201]

The DOJ investigation identified numerous examples of lengths of stay tied to program requirements and not to children's treatment needs.[202] In addition, requirements for discharge did not link to children's individual treatment needs, especially to needs related to family relationships or the ability to navigate in everyday school and social settings in their home communities.[203] Furthermore, for children with both intellectual disabilities and a mental health condition, these goals can be very difficult to achieve due to the combined effect of their disabilities. In addition, children placed out of state often do not return to in-home or to community-based settings after discharge. The DOJ investigation stated that because of the lack of in-home and community-based services in West Virginia, many of children placed out-of-state are discharged to yet another

---

[198] AECF, Policy Report: Kids Count, *available at* https://www.aecf.org/resources/every-kid-needs-a-family/ (last visited June 4, 2020).
[199] D005893, -901.
[200] D005893, -901.
[201] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[202] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).
[203] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

segregated residential treatment facility.[204] This places children with disabilities at significant risk of harm. In contrast, children from the state where the facility is located leave the program sooner and return home with in-home and community-based services.

> **b.    DHHR has Failed to Effectively Vet, Support, and Monitor Placements to Ensure the Needs, Safety, and Well-being of Children with Disabilities are Addressed in a Timely Manner.**

Additionally, the quality of these out-of-state placements is lacking. The West Virginia Interagency Consolidated Out-of-State Monitoring process is supposed to ensure children in foster care who are placed outside of the state of West Virginia are in a safe environment and provided behavioral health treatment and educational services commensurate with DHHR and West Virginia Department of Education standards.[205] Serious violations were noted, however, including educational weaknesses, lack of structure leading to excessive restraints, no continuum of services for students with disabilities, expired IEPs, teacher certification issues, and lack of support and planning with the home counties in West Virginia.[206]

What is even more alarming is that the diagnoses reported for placements were not always accurate, therefore increasing the likelihood for misplacement of children.[207] Indeed, DHHR places youth in residential settings based on misdiagnoses or one main diagnosis, but without taking context and the trauma they experienced into account.[208] By failing to monitor children,

---

[204] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[205] D005555, -575.

[206] D005555, -625-626.

[207] West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).; DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

[208] D005555-577; West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities, *available at* https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

DHHR leaves children with disabilities in wrong placements for extended periods of time, perpetuating their issues and creating a significant risk of harm.

## XIII.   Conclusion

Based on the information summarized above, it is my opinion that DHHR has violated reasonable professional standards and failed to develop and implement procedures, practices, resources, and programs to afford children with disabilities equal opportunities, thus putting them at substantial risk of harm. It is evident from the information cited above that the actions taken by DHHR would not result in undue financial and administrative burdens, but would instead lower costs. Community integration with core services and supports will permit the state to support children in their homes and in their communities in a lawful, effective, and cost-efficient manner.[209]

Failing to provide these opportunities puts children with disabilities at substantial risk of harm. These are children who are already at a heightened risk for unsuccessful outcomes. The lack of qualified child welfare staff, inadequate case planning and management, and lack of community-based services result in children with disabilities facing institutionalized placements that do not fit their needs. As mentioned in the DOJ investigation, DHHR should ensure the availability of voluntary, comprehensive services and supports in the community to divert children from segregated residential placement and provide families, children and youth with accurate,

---

[209] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

**Expert Report of Nisha Sachdev**

timely, and accessible information regarding the services available in their communities that can

meet the individual needs of children and their families in the most integrated setting.[210]

---

[210] DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act, *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020).

Expert Report of Nisha Sachdev

## APPENDIX A. Considered Materials.

| Document | Document Bates No. (if applicable) |
|---|---|
| 29 U.S.C. § 794 | |
| 42 U.S.C. § 12131(s) | |
| AAP, Developmental Issues for Young Children in Foster Care | https://pediatrics.aappublications.org/content/pediatrics/106/5/1145.full.pdf (last visited June 4, 2020) |
| AAP, Health Care Issues for Children and Adolescents in Foster Care and Kinship Care | https://pediatrics.aappublications.org/content/136/4/e1142 (last visited June 4, 2020) |
| AECF, Improving Conditions for Children with Special Needs | https://www.aecf.org/m/resourcedoc/RIKC-ImprovingOutcomesforChildrenwithSpecialNeeds-2003.pdf (last visited June 4, 2020) |
| AECF, Policy Report: Kids Count | https://www.aecf.org/resources/every-kid-needs-a-family/ (last visited June 4, 2020) |
| American Journal of Public Health, Mental Health Services for Youths in Foster Care and Disabled Youths | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1446701/ (last visited June 4, 2020) |
| 1Association of Social Workers Board, About Licensing and Regulations | https://www.aswb.org/licensees/about-licensing-and-regulation/ (last visited June 4, 2020) |
| Center for Health Care Strategies, Inc., Children in the Child Welfare System: Physical and Behavioral Health Needs | http://www.chcs.org/media/Physical_and_Behavioral_Health_Needs.pdf (last visited June 4, 2020) |
| Centers for Disease Control and Prevention, Preventing Adverse Childhood Experiences | https://www.cdc.gov/violenceprevention/childabuseandneglect/aces/fastfact.html (last visited June 4, 2020) |
| Child Trends, Older Youth in Foster Care Need Support to Make a Successful Transition into Adulthood | https://www.childtrends.org/older-youth-in-foster-care-need-support-to-make-a-successful-transition-to-adulthood (last visited June 4, 2020) |
| CWLA, Standards of Excellence for Child Welfare Services | https://www.cwla.org/our-work/cwla-standards-of-excellence/standards-of-excellence-for-child-welfare-services/ (last visited June 4, 2020) |
| CWLA, West Virginia's Children at a Glance, 2017 | https://www.cwla.org/wp-content/uploads/2017/04/WEST-VIRGINA-revised-1.pdf (last visited June 4, 2020) |
| DHHR Foster Care Policy 2017, Provision 5.2 | D001433 |
| DHHR Foster Care Policy, 2017, Provision 3.1 | D001396 |
| DHHR West Virginia System of Care End of Year Report July 1, 2016 - June 30, 2017 | D005897 |

45

Expert Report of Nisha Sachdev

| Document | Document Bates No. (if applicable) |
|---|---|
| DHHR West Virginia System of Care End of Year Report July 1, 2016 - June 30, 2017 | D005901 |
| DHHR West Virginia System of Care End of Year Report July 1, 2016 - June 30, 2017 | D005903 |
| DHHR, A Comprehensive Clinical Review of Youth In Out-of-State Placements June 2006 | http://www.wvdhhr.org/oos_comm/reports/fin al_version_oos.pdf (last visited June 4, 2020) |
| DHHR, Adoption Policy 2018, Provision 8.2 | D000967 |
| DHHR, Adoption Policy 2019, Provision 4.6 | D000943 |
| DHHR, Adoption Policy 2019, Provision 9.5 | D000973 |
| DHHR, Adoption Policy, 2018, Provision 1.3.1 | D000930 |
| DHHR, Adoption Policy, 2018, Provision 4.3 | D000938 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2016 | D005509 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005555 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005560 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005570 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005575 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005583 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005584 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005585 |
| DHHR, Advancing New Outcomes: Findings, Recommendations, and Actions 2019 | D005625 |
| DHHR, Average Caseloads by District | D137153 |
| DHHR, BCF's Mission, Vision, and Values Statements | https://WVWVDHHR.wv.gov/bcf/About%20 Us/Pages/default.aspx (last visited June 4, 2020) |
| DHHR, Child Protection Policy 2019, Provision 1.5 | D001021 |
| DHHR, Child Protective Services Policy, 2018, Provision 6.1 | D001221 |
| DHHR, Child Protective Services Policy, 2019, Provision 1.2 | D001018 |
| DHHR, Child Protective Services Policy, 2019, Provision 1.2 | D001019 |

46

**Expert Report of Nisha Sachdev**

| Document | Document Bates No. (if applicable) |
|---|---|
| DHHR, Child Protective Services Policy, 2019, Provision 1.4 | D001020 |
| DHHR, Child Protective Services Policy, 2019, Provision 1.6.1 | D001085 |
| DHHR, Foster Care Policy 2019, Provision 2.1 | D001336 |
| DHHR, Foster Care Policy 2019, Provision 2.4 | D001341 |
| DHHR, Foster Care Policy 2019, Provision 2.4.5 | D001345 |
| DHHR, Foster Care Policy 2019, Provision 2.4.7 | D001346 |
| DHHR, Foster Care Policy 2019, Provision 2.4.8 | D001347 |
| DHHR, Foster Care Policy 2019, Provision 4.3 | D001416 |
| DHHR, Foster Care Policy 2019, Provision 8.5.3 | D001538 |
| DHHR, Foster Care Policy, 2017, Provision 4.4 | D001420 |
| DHHR, Foster Care Policy, 2019, Provision 1.5 | D001306 |
| DHHR, Legislative Foster Care Placements Report | https://WVWVDHHR.wv.gov/bcf/Reports/Documents/2020%20January%20Legislative%20Foster%20Care%20Report.pdf (last visited June 4, 2020) |
| DHHR, Notification and Participation of School Officials at Multidisciplinary Team Meetings 2018 | http://www.wvdhhr.org/oos_comm/reports/Notification.pdf (last visited June 4, 2020) |
| DHHR, Safe at Home Program Overview | D006751 |
| DHHR, Safe at Home Semi-Annual Progress Report October 1, 2018 - April 30, 2019 | D007636 |
| DHHR, Safe at Home Semi-Annual Progress Report October 1, 2018 - April 30, 2019 | D007652 |
| DHHR, Safe at Home Semi-Annual Progress Report October 1, 2018 - April 30, 2019 | D007668 |
| DHHR, Totals for Youth in Offices or Hotels per Month | D023537 |
| DHHR, West Virginia CFSP 2015-2019 | D003987 |
| DHHR, West Virginia CFSP 2015-2019 | D004021 |
| DHHR, West Virginia CFSP 2015-2019 | D004029 |
| DHHR, West Virginia CFSP 2015-2019 | D004069 |
| DHHR, West Virginia CFSP 2019 | D003800 |

**Expert Report of Nisha Sachdev**

| Document | Document Bates No. (if applicable) |
|---|---|
| DHHR, West Virginia CFSP 2019 | D003860 |
| DHHR, West Virginia CFSP 2019 | D003862 |
| DHHR, West Virginia CFSP 2019 | D003888 |
| DHHR, West Virginia CFSP 2019 | D003943 |
| DHHR, West Virginia CFSP 2019 | D003949 |
| DHHR, West Virginia CFSR Program Improvement Plan (PIP) | https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf (last visited June 4, 2020) |
| DHHR, West Virginia Child and Family Services Plan (CFSP) 2019 | D003864 |
| DHHR, West Virginia Foster Care Policy, 2019, Provision 1.1 | D001303 |
| DHHR, West Virginia Fourth Annual Progress Report | D004740 |
| DHHR, West Virginia Fourth Annual Progress Report | D004747 |
| DHHR, West Virginia Fourth Annual Progress Report | D004782 |
| DHHR, Youth Services Policy 2019, Provision 8.3 | D001889 |
| DHHS & DOJ, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act | https://www.hhs.gov/sites/default/files/disability.pdf (last visited June 4, 2020) |
| DHHS ACF, CFSR Final Report 2009 | D003444 |
| DHHS ACF, CFSR Final Report 2017 | D003782 |
| DHHS ACF, CFSR Final Report 2017 | D003787 |
| DHHS ACF, Family-Centered Case Planning and Case Management | https://www.childwelfare.gov/topics/famcentered/caseworkpractice/caseplanningmgmt/ (last visited June 4, 2020) |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003778 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003781 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003783 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003785 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003789 |

Expert Report of Nisha Sachdev

| Document | Document Bates No. (if applicable) |
|---|---|
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003790 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003791 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003793 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003796 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003797 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003798 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003867 |
| DHHS ACF, West Virginia CFSR Final Report 2017 | D003874 |
| DHHS ACF, West Virginia CFSR Statewide Assessment 2002 | D003401 |
| DHHS ACF, West Virginia CFSR Statewide Assessment 2002 | D003404 |
| DHHS, ACF, CFSP | https://www.acf.hhs.gov/cb/programs/state-tribal-cfsp (last visited June 4, 2020) |
| DHHS, ACF, Child and Family Services Review (CFSR) | http://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews (last visited June 4, 2020) |
| DHHS, ACF, Child Welfare Outcomes State Data Review | https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited June 4, 2020) |
| DHHS, ACF, The Risk and Prevention of Maltreatment of Children With Disabilities | https://www.childwelfare.gov/pubPDFs/focus.pdf (last visited June 4, 2020) |
| DOJ, Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act | https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (last visited June 4, 2020). |
| European Child & Adolescent Psychiatry, The Role of Adverse Childhood Experiences and Mental Health Care Use In Psychology Dysfunction of Male Multi-Problem Young Adults | https://link.springer.com/article/10.1007/s00787-018-1263-4 (last visited June 4, 2020) |
| Juvenile Law Center, A Powerful Tool For Change in the Child Welfare and Justice Systems: The Americans with Disabilities Act | https://jlc.org/news/powerful-tool-change-child-welfare-and-justice-systems-americans-disabilities-act (last visited June 4, 2020) |
| National Association of School Psychologists, Foster Care for Children | http://fostercarechildren.pbworks.com/w/file/fetch/63728545/Foster%20Care%20for%20Ch |

Expert Report of Nisha Sachdev

| Document | Document Bates No. (if applicable) |
|---|---|
| | ildren-%20Information%20for%20Teachers.pdf (last visited June 4, 2020) |
| National Center for Youth Law, Most States Fail to Meet the Mental Health Needs of Foster Children | https://youthlaw.org/publication/most-states-fail-to-meet-the-mental-health-needs-of-foster-children/ (last visited June 4, 2020) |
| Neuropsychology Review, Early Brain Development in Preschool Years | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3511633/ (last visited June 4, 2020) |
| *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) | |
| Quality Improvement Center for Workforce Development, Recent Research to Build Knowledge of the Child Welfare Workforce | https://www.qic-wd.org/blog/recent-research-build-knowledge-child-welfare-workforce (last visited June 4, 2020) |
| Scientific World Journal, Challenges of Assessing Maltreated Children Coming into Foster Care | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4736566/ (last visited June 4, 2020) |
| The National Resource Center for Diligent Recruitment, Assessing the Needs of Children and Youth in Adoption, Foster Care, and Kinship Care and Their Families | http://www.nrcdr.org/_assets/files/NRCDR-org/support-matters-chapter-2.pdf (last visited June 4, 2020) |
| United Cerebral Policy & Children's Rights, Forgotten Children: A Case for Action for Children and Youth with Disabilities in Foster Care | https://www.childrensrights.org/wp-content/uploads/2008/06/forgotten_children_children_with_disabilities_in_foster_care_2006.pdf (last visited June 4, 2020) |
| 1West Virginia Code § 30-30-1(a) | |
| West Virginia Code § 49-1-105 | |
| West Virginia Code § 49-2-101 | |
| West Virginia Code § 49-2-907 | |
| West Virginia Code § 49-4-608 | |
| West Virginia Department of Education, West Virginia Students with Disabilities in Out-of-State Facilities Report FY17 | https://wvde.us/wp-content/uploads/2019/01/FY2017outofstate_facilitiesrep.pdf (last visited June 4, 2020) |
| West Virginia Office of the Legislative Auditor, 2019 Legislative Audit Report of DHHR Child Protective Services | https://www.wvlegislature.gov/legisdocs/reports/agency/PA/PA_201 (last visited June 4, 2020) |
| West Virginia University, Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities | https://researchrepository.wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be (last visited June 4, 2020) |

**Nisha A. Sachdev, DrPH, PsyD**

734-358-0151 ● nasachde@umich.edu ● www.linkedin.com/in/nishasachdev

## SUMMARY OF QUALIFICATIONS

Public health strategist and senior clinical psychologist with over 15 years of experience leading multi-million programs within foundations to address social issues in underrepresented communities. Skilled at cross-collaboration with public and private partners, developing capacity building and high-impact, system-level interventions locally, nationally and globally.

## PROFESSIONAL EXPERIENCE

**THE CENTER FOR HEALTH AND HEALTH CARE IN SCHOOLS AT THE GEORGE WASHINGTON UNIVERSITY MILKEN INSTITUTE OF PUBLIC HEALTH – Washington, DC**
*Consultant*                                                                                                                    2019 – Present
- Provide high quality capacity building, technical assistance, training, consultation, and coaching to schools, agencies, and organizations to advance school and organization level behavioral health services and supports.
- Provide thought-leadership and advising on Center initiatives and projects including the School Mental Health initiative in partnership with the Bainum Family Foundation and Social Systems Design work.
- Oversee the cross-sector learning community launched by the Bainum Family Foundation to understand structural barriers to child mental health and create system dynamics models to inform policy needs and gaps.
- Developed and manage local level comprehensive school behavioral health needs assessments involving data surveillance, asset mapping, stakeholder voice, and systems perspectives to understand the gaps and understand needs to ultimately create a sustainable behavioral health supports and services for children.
- Identify and develop resources and materials in support of understanding and implementing school and community level behavioral health approaches including trauma-informed care and multi-tiered systems of supports.

**BAINUM FAMILY FOUNDATION – Bethesda, MD**
*Senior Director of School Mental Health*                                                                                        2019
- Developed, launched, and staffed a $5 million School Mental Health initiative in partnership with local, national and federal agencies and schools that leveraged local and federal dollars to scale research, practice and policy efforts to expand access to quality school mental health services and supports.
- Launched a cross-sector learning community involving 15 local stakeholders to engage in systems design thinking to understand the domains of a quality school mental health system in the District.
- Implemented a local funders collaborative to examine equitable philanthropic approaches across settings such as schools, primary care settings, and hospitals and develop strategic solutions that address needs.
- Convened national partners including the National Center for School Mental Health and Substance Abuse and Mental Health Administration to design the domains of a quality school mental health system and disseminate synthesized best practices.
- Developed and implemented individualized technical assistance plans for school leaders and staff to increase quality school mental health supports and services from a universal to tertiary prevention level.

*Senior Director of Evaluation*                                                                                            2016 – 2019
- Built the Foundation evaluation infrastructure including creating evaluation plans, collecting, storing and analyzing data, and disseminating results to stakeholders about the impact of investments, allowing for data-decision making efforts to guide equitable future investments.
- Managed a budget of $1 million to evaluate the District's Quality Improvement Network evaluation, a citywide initiative to increase the availability of quality childcare options in underserved areas in DC.
- Supported the Foundation's strategy and operations teams to track success across all departments and teams.

**HEALTH SERVICES AND RESOURCES ADMINISTRATION – Rockville, MD**                                     2019 – Present
**DEPARTMENT OF EDUCATION – Washington, DC**                                                         2015 – Present
**CORPORATION FOR NATIONAL COMMUNITY SERVICE – Washington, DC**                               2015 – Present
**DEPARTMENT OF LABOR – Washington, DC**                                                             2012 – Present
*Federal Grant Reviewer*
- Reviewed grant proposals to provide recommendations for funding and ensure applicants meet the criteria of the proposed target population, program design, administrative and fiscal administration, and evaluation plan.
- Served as chair for the debrief process for the Department of Education i3 grant competition.
- Provided specific feedback and recommendations within one week for funding for grant competitions including i3, Serving Young Adult Ex-Offenders through Training and Service-Learning, Youth Build, Upward Bound, Opioid Workforce Expansion, Face Forward-Serving Juvenile Offenders, and AmeriCorps State and National Competition.

**Nisha A. Sachdev, DrPh, PsyD**

**BREAKING THE CYCLE – Washington, DC**                                                                 **2005 – Present**
*Founder, Board Chair*
- Launched a non-profit using a community-based participatory research approach with the mission of providing educational and social services and supports for youth to successfully transition into adulthood.
- Oversaw all strategy and implementation using best practices and needs assessment results, communication, administration, and budget and finances.
- Provided academic, behavioral and social services and supports to 100 youth and their families.
- Formed networks with over 50 organizations to improve services for DC youth.
- Continued to support follow-up services for over 100 youth and families from birth through adulthood.

**DC TRUST – Washington, DC**                                                                          **2010 – 2016**
*Research and Evaluation Manager*
- Developed and managed $12 million, 100+ grantee three-year capacity building initiative including the RFP development, grant review process, and evaluation oversight.
- Managed evaluation efforts for grantees and District agency's grantees including providing external evaluation and program development technical assistance, training and mentoring to grantees.
- Advised District about strategic, youth development-related funding decisions impacting out-of-school time programming including the development of a comprehensive participant and analytics citywide data system.
- Directed local and national research, evaluation, training and technical assistance projects on out-of-school time programming including instrument and resource development, data collection, analysis, and synthesis.
- Developed launched, and managed a citywide initiative bringing together 27 DC agencies and 100 community-based programs to coordinate programming and evaluation efforts for children and families in DC.
- Created District-wide social, emotional, and behavioral goals and indicators for District-funded programs and agencies including DC Public Schools, Department of Behavioral Health, Department of Parks and Recreation, Department of Employment Services, and DC Public Libraries serving over 60,000 children, youth, and families.
- Collected and analyzed data across the education, justice, health and workforce sectors to guide the launch of DC's Boys and Men of Color Initiative (part of My Brother's Keeper) to decrease social and health disparities.
- Oversaw the preparation of reports for council hearings and funders to meet all reporting requirements.
- Cultivated relationships with grantees, regional partners, policymakers, funders and other stakeholders to stay abreast of current issues, new trends, and collaboratively develop strategic solutions.

**LATIN AMERICAN YOUTH CENTER UPWARD BOUND PROGRAM – Washington, DC**                          **2008 – 2012**
*Curriculum and Evaluation Specialist*
- Oversaw all quantitative and qualitative evaluation activities including tracking program and student outcomes and communicating findings to a variety of stakeholders.
- Provided technical assistance and professional development to staff on using data to monitor student progress, including the completion of an Annual Performance Report for the Department of Education.
- Successfully tracked for 95 students and 75 alumni over a period of 4 years to assess short and long-term impact of program activities in in LAYC's performance management software (ETO).
- Utilized evaluation framework and findings to improve the services provided to LAYC's clients by deepening understanding of LAYC's programmatic interventions and foster the use of data analytics to inform decision making and strategic planning.
- Promoted a culture of reflection, learning, and data informed decision-making in the organization through the regular sharing of internal and external data with LAYC staff and partners.
- Oversaw the preparation of reports and responses for LAYC funders to meet all reporting requirements related to outputs, outcomes, and evaluation results.

**COACHING FOR COLLEGE – Washington, DC**                                                               **2006 – 2010**
*Executive Director*
- Created and implemented an organizational strategic plan for a local non-profit serving middle and high school students, including preparation of annual reports, fundraising activities, and program evaluation efforts.
- Initiated and oversaw program expansion and built networks with organizations and DC schools.
- Hired, trained, and supervised staff and recruited and maintained contact with 70 youth participants, parents, and 100 volunteers.
- Oversaw a budget of $500,000 including reporting to board, internal and external stakeholders.
- Managed communications of the program strategy, activities, and outcomes to internal and external stakeholders including creating and disseminating annual reports.
- Developed, piloted, and evaluated a Girls and Boys Curriculum to increase youth mental and physical health.

**Nisha A. Sachdev, DrPh, PsyD**

**MINISTRY OF HEALTH – Port of Spain, Trinidad and Tobago**                                    **2005 – 2006**
*Adolescent Health  Consultant*
- Conducted an adolescent health needs assessment to guide the strategic plan of a youth development initiative for youth in Trinidad and Tobago.
- Researched, developed, and implemented a comprehensive Adolescent Health Policy for Trinidad and Tobago based on the Behavior Change Model.
- Engaged stakeholders from the health and education sections to create a sustainable plan and continuous monitoring of implementation activities.

**UNICEF – Latin American Region**
*Evaluation  Consultant*                                                                        **2005**
- Conducted external evaluation of a youth anti- violence program in Latin America and the Caribbean.
- Utilized quantitative and qualitative methods including interviews and focus groups to country and community leaders in seven Caribbean countries including the Ministries of Health and local Non-Governmental Organizations.

## CLINICAL EXPERIENCE

**CONNECTED PSYCHOLOGY – Washington, DC**                                                       **2015 – 2016**
*Child and Adolescent Clinical Psychology Doctoral Intern*
- Provided over 2,000 hours of community and school therapeutic services for children and their families suffering trauma and social/emotional disorders utilizing Greenspan's developmental model.
- Created and implemented a school mental health model to provide therapeutic services in 8 DC Public Schools.
- Conducted and supervised psychological assessments for children and youth ages 2-18 exposed to chronic trauma and play therapy for children ages 2-5 at a therapeutic childcare center.
- Led multi-disciplinary care coordination team meetings and provided clinical consultation for families, staff, and teachers.
- Conducted psychoeducational assessments for children ages 2-18 for special education requirements and recommendations for social and emotional supports and services.

**DC SUPERIOR COURT CHILD GUIDANCE CLINIC – Washington, DC**                                    **2013 – 2015**
*Child and Adolescent Forensic Psychology Doctoral Extern*
- Conducted over 2,600 hours of comprehensive psychological, psycho-educational, competency, and risk assessments and provided therapy for court-involved youth.
- Culturally adapted and implemented a curriculum to increase anger management in court-involved youth.
- Co-facilitated a Girls Anger Management group utilizing a culturally adapted evidence-based manual.
- Supervised assessment cases for incoming externs.

**OAKLAND AND WASHTENAW COUNTY CHILDREN'S DETENTION CENTER – Pontiac, MI**                       **2001 – 2003**
*Youth Specialist*
- Provided therapeutic services to victims of child abuse and neglect as well as children involved with criminal activities.
- Participated in treatment teams and provided group and individual counseling and educational needs to youth in the shelter care, secure detention, and residential treatment programs.

## TEACHING EXPERIENCE

| | |
|---|---|
| **TRINITY UNIVERSITY – Washington, DC** | **2020 – Present** |
| **GEORGE WASHINGTON UNIVERSITY MILKEN INSTITUTE OF PUBLIC HEALTH – Washington, DC** | **2009 – Present** |
| **UNIVERSITY OF DISTRICT OF COLUMBIA COMMUNITY COLLEGE – Washington, DC** | **2014 – 2016** |
| **GEORGE MASON UNIVERSITY – Fairfax, VA** | **2011** |

*Adjunct Professor*
- Prepared and delivered course instruction and grading for Prevention of Health Disparities and Community Engagement and Advocacy (master's level online course size 15 students), Management and Leadership in Public Health (master's level size 80 students), Culminating Experience/Advising (master's level course), Qualitative Research and Biostatistics (master's level 15 students), and Introduction to Youth Development (associate's level size 20 students).
- Advised students on their master's thesis on a variety of clinical and social topics.
- Co-created the inception of the Community Engagement and Advocacy course and Prevention of Health Disparities at the George Washington University Milken Institute of Public Health.
- Consistently received ratings above 4.7 and positive feedback on course feedback from students.

Nisha A. Sachdev, DrPh, PsyD

**NEW BEGINNINGS YOUTH DEVELOPMENT CENTER – Washington, DC**                                  2013
**LATIN AMERICAN YOUTH CENTER UPWARD BOUND PROGRAM – Washington, DC**                    2007 – 2011
**GEORGE WASHINGTON MEDICAL CENTER UPWARD BOUND PROGRAM – Washington, DC**        2004 – 2007
*Science, Math, SAT Prep, and Foreign Language Instructor*
- Created and implemented weekly academic lesson plans.
- Provided academic resources and counseling for low income, first generation college and incarcerated youth throughout their high school career.
- Assisted students with the college application process.
- Developed, piloted, and evaluated a SAT, math, and life skills course for high school students.

**FROST SCHOOL (SHEPPARD PRATT) – Rockville, MD**                                                          2003 – 2006
*Special Education Math  Teacher*
- Provided academic lessons at a therapeutic day school serving youth with emotional and behavioral needs.
- Created and implemented individualized educational plans.
- Co-led small group and family therapy groups. Provided transition services to youth and their families.
- Teamed with special education teachers and therapy staff to coordinate classroom and therapeutic interventions.

## EDUCATION

**THE GEORGE WASHINGTON UNIVERSITY – Washington, DC**
**Doctor of Psychology**                                                                                                        2016
**Master of Psychology**                                                                                                        2014
Major Area Paper: Application of the Theory of Planned Behavior to Aggressive Behaviors in Adolescents
Specialization: Child and Adolescent Clinical Psychology

**MILKEN INSTITUTE SCHOOL OF PUBLIC HEALTH AT THE GEORGE WASHINGTON UNIVERSITY – Washington, DC**
**Doctor of Public Health**                                                                                                      2012
Dissertation: An Evaluation of the DC Summer Youth Employment Program
Specialization: Health Behavior

**Master of Public Health**                                                                                                      2006
Thesis: A Landscape Analysis of Adolescent Health Needs in Trinidad and Tobago
Specialization: Global Health Promotion

**THE UNIVERSITY OF MICHIGAN – Ann Arbor, MI**                                                            2003
**Bachelor of Science**
Major: Psychology, Minor: Spanish and Criminal Justice

**UNIVERSIDAD DE SALAMANCA – Salamanca, Spain**                                                        2000
**Certificate of Completion**
Specialization: Spanish

## PUBLICATIONS AND PRESENTATIONS (PAST 7 YEARS)

- **Sachdev, N**. & Sheriff, L. (2020). Improving Mental Health Access and Support for Youth: Niagara County Public Schools, New York Public Schools. Washington, DC Center for Health and Health Care in Schools.
- Sheriff, L., Acosta Price, O., & **Sachdev, N.** (2019). Effectively Integrating School Behavioral Health Frameworks to Promote Student Success. Washington, DC. Center for Health and Health Care in Schools.
- Hoover, S., Lever, N., **Sachdev, N.,** Bravo, N., Schlitt, J., Acosta Price, O., Sheriff, L., & Cashman, J. (2019*). Advancing Comprehensive School Mental Health: Guidance from the Field.* Washington, DC. National Center for School Mental Health.
- Acosta Price, O., **Sachdev, N.,** Sadlon, R., & Sheriff, L. (2019). *Assessing schoolwide capacity to implement a comprehensive school mental health system*. Presentation at the Annual Conference on Advancing School Mental Health, Austin, TX. (accepted)
- **Sachdev, N.**, & Acosta Price, O. (2019). *Strategies to enhance teacher well-being.* Panel presentation to the Superintendent's Teacher Advisory Council on Office of the State Superintendent of Education, Washington, DC.
- **Sachdev, N**. & Sadlon R. (2019). *Assessing schoolwide capacity to implement a comprehensive school mental health system.* Breakout Session at A Call to Action: Transforming School Culture and Climate Conference for the District of Columbia's Office of the State Superintendent of Education, Washington, DC.

**Nisha A. Sachdev, DrPh, PsyD**

- **Sachdev, N.**, Acosta Price, O., & Bravo, N. (2018). *Advancing a citywide school mental health initiative: Lessons from a university public-private partnership.* Presentation at the Advancing School Mental Health Conference,  Las Vegas, NV.
- **Sachdev, N.**, Price, O. & Bravo, N. (2017). *Bridging research, practice, policy, and philanthropy to build capacity of school mental health initiatives.* Presentation at the Advancing School Mental Health Conference, Washington, DC.
- **Sachdev, N.** (2014). *State system of support for youth development outcomes.* Presentation at Office of the State Superintendent for Education It Takes a City conference, Washington, DC.
- **Sachdev, N.** (2013). *A community approach to aligning and measuring youth developments.* Presentation at Society of Community Action and Research Midwest ECO Conference, Chicago, IL.
- **Sachdev, N.** (2013). *One city summer initiative summary of findings summer 2013.* DC Trust: Washington, DC.
- **Sachdev, N.** (2013). *Bullying prevention and intervention research brief.* DC Trust: Washington, DC.
- **Sachdev, N.** (2013). *The DC high school dropout crisis. Americas* Graduate, WETA and DC Trust: Washington, DC.
- **Sachdev, N.** (2013). *Needs assessment of DC youth.* Presentation at One City Strategy Conference, Washington, DC.
- **Sachdev, N.** (2013). *Program evaluation: Best practices for measuring success and communicating results.* Non-Profit Advancement Workshops, Washington, DC.

## PROFESSIONAL SERVICE

| | |
|---|---|
| Board Member, DC Psychology Association | 2020 – Present |
| Board Member, Frost Family Foundation | 2019 – Present |
| Board Member, Mi Casa | 2019 – Present |
| Stakeholder Advisory Board Member, Patient-Centered Outcomes Research Institute | 2018 – Present |
| Faculty Ambassador, George Washington University | 2018 – Present |
| Board Member, National Academies of Science and Medicine, Division of Children, Youth, & Families | 2018 – Present |
| Member, Washington Evaluators | 2012 – Present |
| Board Member, Independent Grounds | 2011 – Present |
| Member, American Evaluation Association | 2011 – Present |
| Board Member, George Washington Delta Omega Honors Society | 2009 – Present |
| Adopt-a-School High School Program Ambassador, University of Michigan | 2005 – Present |
| Student Representative, George Washington University DrPh Committee | 2011 – 2012 |
| DC Citizens Review Panel Member, Government of the District of Columbia | 2011 – 2012 |
| Measles Initiative Chair and Youth Task Force Advisor, American Red Cross | 2004 – 2007 |
| President, George Washington University School of Public Health Student Association | 2004 – 2006 |

## SKILLS

- Proficient in Microsoft Office Suite, Adobe Professional
- Grants Management Software: nFocus, Efforts to Outcomes (ETO), Micro Edge (GIFTS)
- Social Media: Twitter, Facebook, LinkedIn, Instagram
- Languages: Spanish (conversational)
- Data software: SPSS, SAS, NVIVO, Tableau, Survey Monkey, Microsoft Forms
- Online Learning Platforms: Blackboard, 2U, Zoom, Moodle, and BanWeb platforms.

## AWARDS

| | |
|---|---|
| George Washington University Distinguished Alumni Award | 2012 and 2018 |
| Department of Labor Employment and Training Administration Research Award | 2011 |
| George Washington University Capital Connection Fund Award | 2011 |
| Mayor's Office Strengthening Partnership Initiative | 2007 |
| American Red Cross International Services Volunteer of the Year Award | 2005 and 2006 |
| Capital One Service Grant Award | 2006 and 2007 |
| Freddie Mac Service Grant Award | 2005, 2006 and 2007 |
| Serve DC National Youth Service Day Award | 2005, 2006 and 2007 |
| President's Volunteer Service Award | 2005, 2006 and 2007 |
| American Red Cross Volunteer of the Year Award | 2005 |
| Father Gil Community Service Award | 2005 |
| Youth Venture Service Grant Award | 2005 |
| George Washington University Medical Center Community Award | 2005 |