**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

| | | |
|---|---|---|
| **Jonathan R., minor, by Next Friend, Sarah DIXON, *et al.,*** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Class Action |
| | ) | 3:19-cv-00710 |
| v. | ) | |
| | ) | |
| **Jim JUSTICE, in his official capacity as the Governor of West Virginia, *et al.,*** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## I.   INTRODUCTION[1]

Foster children face severe and ongoing harm in West Virginia—a harm that Defendants appear to ignore or, worse, condone. The State has long known about the grievous constitutional deficiencies that beleaguer its foster care system. Yet, with each passing year, Defendants have chosen to leave the deficiencies firmly in place. Foster children still suffer through inadequate and unsafe placements. The State still fails to provide medical, behavioral, mental health, and other health services. And overworked caseworkers are still largely unable to meet their case planning responsibilities, upon which children depend to achieve any modicum of stability. Although the

---

[1] All cited exhibits will be references at "Ex. _" and are attached to the Declaration of Marcia Robinson Lowry (hereinafter "Lowry Dec."), filed with this Memorandum with a citation to the relevant pages.

West Virginia foster care population expanded from 2013 through early 2020, Defendants have continued to ignore the urgent need to address the long-standing crisis that is its foster care system.[2]

This putative class action is brought on behalf of the foster children who suffer injuries resulting from Defendants' inaction. These foster children seek to enjoin Defendants, the State actors charged with protecting them, from continuing to subject them to substantial risk of harm from statewide policies, both written and unwritten,[3] and practices that degrade their worth and well-being. The aforementioned policies and practices include a shortage of placements, the near abandonment of timely assessments and case plans, chronically high caseloads, and an insufficient number of caseworkers.[4] The harms, which affect all foster children in West Virginia, especially endanger those foster children belonging to the subclasses of this action: children with disabilities, children in kinship care, and older teens "aging out" of foster care.

Defendants appear to appreciate that the West Virginia foster care system has fallen apart. An internal email from 2016 reveals the panic of Nancy Exline, the Commissioner for the Bureau for Children and Families, over the severe shortage of caseworkers. She writes, "[w]e need to declare this as a crisis & send up a white flag to the feds & others . . . I truly no longer know how we can do CPS as we are required."[5] In 2017, DHHR took a more measured tone: "[T]he way we

---

[2] *See* Bureau for Children and Families, Legislative Foster Care Reports, *available at* https://dhhr.wv.gov/bcf/Reports/Pages/Legislative-Foster-Care-Reports.aspx (documenting general increase in West Virginia foster care population from 2013 through July 2020).

[3] Defendants' policies, which Plaintiff Children allege violate their constitutional and federal statutory rights, are not always written policies. (*See, e.g.*, ex. 1 at D139302, 310-11 (Kinship Care Strengths Assessment, *A Second Chance, Inc.* (March 2019)) (hereinafter "Kinship Care Strengths Assessment")). Defendants maintain both formal and informal policies that guide the agency's action and decisions, and that place Plaintiff Children at risk of harm.

[4] Ex. 2 at D003776, 782 (Child and Family Services Reviews: West Virginia Final Report, *U.S. Dep't of Health and Human Resources* (2017) (hereinafter "2017 CFSR") (noting, "caseworkers are not adequately assessing and addressing safety and risk initially or on an ongoing basis. . . . Contributing to these and other findings in the CFSR was a consistent lack of or only limited contact with children and families. . . . The agency is not consistently completing quality comprehensive assessments of the needs of children and parents. . . . [T]he completion of quality ongoing assessments is most challenging.").

[5] Ex. 3 at D062426 (Email from Nancy Exline to Tina Mitchell (Aug. 3, 2016)).

have traditionally practiced may not always result in the best possible outcomes for our children and families."[6]

Yet even the unabashed failures of foster care in West Virginia have not driven Defendants to undertake wholehearted reform. For example, DHHR has continuously opted out of creating long-term retention plans for its overly shaky workforce and has done little to ensure that workers develop plans and deliver services to children in its custody. One report observed, "[t]here is not a sense of urgency by the BCF in achieving a CPS workforce capable of conducting timelier investigations of child abuse allegations."[7] Similarly, West Virginia has lacked an adequate array of foster homes since as early as 2002.[8] Nonetheless, as of 2017, Defendants had not yet developed and implemented "[a]n effective recruitment plan . . . to meet the increased need for quality homes in the state,"[9] according to a federal audit.

Class action is the only remaining avenue to rouse Defendants from the stupor that enables an openly injurious foster care system to continue crippling children without reserve. Plaintiffs now seek class certification on behalf of a general class of foster children, and three subclasses, to redress the federal statutory and constitutional violations that have come to define West Virginia's child welfare system.

## II.   STATEMENT OF FACTS

### A.   West Virginia's Foster Care System Has a Long Record of Common Failures

The evidentiary record developed thus far establishes that the practices and policies of Defendants expose the children in DHHR custody to a substantial risk of harm, in violation of their

---

[6] Ex. 4 at D057473, 476 (Semi-Annual Progress Report, *West Virginia Dep't of Health & Human Resources* (Oct. 31, 2017)).
[7] Ex. 5 at D055679, 680 (Summary of Child Welfare & CPS Audits, *Dep't of Health & Human Resources* (April 10, 2018)).
[8] Ex. 6 at D003152, 183 (Final Report, West Virginia Child and Family Services Review, *U.S. Dep't of Health and Human Services Administration for Children and Families* (October 2002) (hereinafter "2002 CFSR")).
[9] Ex. 2 at D003776, 782 (2017 CFSR)).

constitutional and federal statutory rights.[10] The practices and policies incontrovertibly promote this risk of harm by (1) failing to maintain an adequate array of foster care placements, both in number and type; (2) failing to engage in adequate and appropriate case planning; and (3) failing to maintain appropriate staffing, which results in high caseloads and over-extended workers. Critically, these practices and policies affect all foster children in DHHR custody—whether they entered foster care due to a child abuse or neglect proceeding or a juvenile justice proceeding.

The case files that Defendants have produced for the Named Plaintiff Children prove woefully deficient. Expert witnesses for Plaintiffs did not hesitate in avowing that "[a]ll nine cases lacked even the rudimentary organization that child welfare case records require. Documents were organized neither by chronological date nor by categories."[11] The failure of Defendants to maintain accessible records has undoubtedly forced "DHHR workers and supervisors [to] reckon with a resource that resembles a giant, disassembled jigsaw puzzle rather than a professionally organized, legal case record."[12] As a result, these records could not have "be[en] used for supervisory review, continuous quality improvement, safety assessment, safety planning or critical decision-making review."[13]

Yet even fragmentary documentation cannot conceal the systemic failures and ensuing injuries that pervade foster care in West Virginia. The case files of the nine Named Plaintiffs— who entered foster care in different counties, for different reasons, and at different times—reveal that DHHR committed the same chronic failures despite repeated warnings of the need for significant improvement. Indeed, Plaintiffs' expert witnesses have concluded, "[w]hile some

---

[10] *Cf. M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013) ("Individuals in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions.").

[11] Ex. 7, Declarations and Expert Report of Jan Flory, M.S.W., Susan Getman, M.S.W., and Elsa Popchak, L.S.W. (Aug. 2020) (hereinafter "Flory, Getman, and Popchak Report") at p. 31.

[12] *Id.* at p. 31.

[13] *Id.* at p. 69.

themes are evident in 100% of the reviewed cases, . . . each remaining theme amounts to a major shortfall evident in 44% - 89% of the reviewed cases."[14]

First, every child suffered the consequences of Defendant's failure to assign them to stable placements. This failure followed from both a haphazard placement process and an inadequate placement array that has driven numerous foster children into out-of-state institutions.[15] "The trauma of multiple placements for [the Named Plaintiff] children was not only immediate but cumulative over many disruptions, resulting in behavior that was increasingly difficult to manage for caregivers."[16] Plaintiffs' experts thus concluded, "DHHR moved the children in these nine cases quickly from one placement to another, mostly without evidence of any pre-placement activities to help them adjust to new living environments."[17]  Indeed, in 2017, DHHR placed over nine percent of children in custody for less than a year in three or more placements. DHHR also placed over twenty-eight percent of children in custody between twelve and twenty-four months in three or more placements.[18]

Second, Plaintiffs' experts also determined that Defendants consistently disregarded the case planning necessary for any foster child to achieve stability. That is, "DHHR caseworkers do not appear to engage in sufficient case planning so as to anticipate and strategize about beneficial interventions to avoid foster care disruptions when a child has an outburst of negative behavior or a mental health crisis."[19] And "caseworkers who were aware of a child's pending discharge date

---

[14] *Id.* at p. 2.
[15] *See* ex. 8, Declaration and Expert Report of Nisha Sachdev, Psy.D.,_(Aug. 11, 2020) (hereinafter "Expert Report on ADA Subclass") at p. 39 ("The increase in youth placed out of state indicates that West Virginia still has significant gaps in in-state services to meet certain youth's needs.").
[16] Ex. 7, Flory, Getman, and Popchak Report at p. 15.
[17] *Id.* at p. 21.
[18] Ex. 9 at D137680, 689 (West Virginia AFCARS Context Data).
[19] Ex. 7, Flory, Getman, and Popchak Report at p. 25.

for a specific treatment program did not engage in sufficient planning regarding where the child would be placed next."[20]

And, third, the case files of the Named Plaintiffs demonstrate that DHHR has not sustained a workforce capable of ensuring the children's safety and wellbeing. Instead, "[t]he casework practice that was documented in these records raises serious concerns regarding the knowledge and skill of frontline workers and supervisors."[21] Relatedly, "the shortage of qualified and experienced staff, high turnover, and high caseloads, result in the failed implementation of [DHHR] policies and procedures."[22]

### B.     Defendants' Policies and Practices Expose Named Plaintiffs to Actual, Substantial Harm

The Named Plaintiff Children have suffered actual injuries. Defendants' common policies and practices place the General Class at substantial risk of suffering as well. In the Fourth Circuit, such exposure to a substantial risk of harm establishes a constitutional injury.

#### 1.     Theo S.[23]

Theo S. is eight years old and has been in foster care for over four years. Although Theo was born with a high drug withdrawal score, DHHR screened out the report and released him to his mother. Over the following years, DHHR received eight additional reports of suspected child abuse and neglect relating to drug abuse, domestic violence, housing instability, and inappropriate living conditions. DHHR finally removed Theo from his parents at the age of three.

Over the past four years, DHHR has placed Theo in eleven different placements, including eight foster or kinship placements, two psychiatric hospitals, and an out-of-state residential treatment program where he still remains. Throughout these placements, caregivers have reported

---

[20] *Id.* at p. 22.
[21] *Id.* at p. 32.
[22] Ex. 8, Expert Report on ADA Subclass at p. 16.
[23] Ex. 7, Flory, Getman, and Popchak Report at pp. 36-79.

to DHHR Theo's escalating and alarming behaviors, including threats to kill himself. Despite the obvious signs of his need for help, DHHR did not try to implement individualized treatments to address his behavioral needs until his tenth placement. Moreover, the record does not specify Theo's permanency plan or the steps that DHHR has taken to move him towards permanency.

### 2.    Serena S.[24]

Serena is eleven years old. She was born with both Down Syndrome and congenital heart disease. In January 2019, DHHR removed ten-year-old Serena and her brother from their home due to educational neglect and her parents' failure to provide safe and adequate living arrangements. Although DHHR set Serena's permanency goal as reunification, the record does not reflect any efforts by the Department to arrange for parental visits. In September 2019—nine months after her removal—the court terminated her parents' parental rights.

Since Serena entered foster care, DHHR has placed her in four foster homes and one kinship placement. Notably, in each placement, caseworker contact notes are sparse and sometimes occur months apart. DHHR also failed to arrange visits between Serena and her brother, and sibling visits did not occur until her foster parents arranged visits in August 2019. Additionally, Serena has consistently displayed sexually inappropriate behavior and disclosed that a bearded monster would "eat her down there". Despite these remarks, DHHR has not conducted an investigation or evaluated Serena for possible sexual abuse. Her entire record is "extraordinarily poorly documented" and "out of compliance with . . . DHHR's policies [and] its very foundational principles."

### 3.    Anastasia M.[25]

---

[24] *Id.* at pp. 80-132.
[25] *Id.* at pp. 134-75.

Anastasia M. is a twelve-year-old girl. She has been in DHHR's custody twice. When Anastasia was four years old, DHHR removed her from her parents and placed her brother and her with a foster mother, Ann M. Shortly thereafter, DHHR investigated and closed Ann's foster home and removed the children. Over the next several months, Anastasia cycled through multiple placements until DHHR returned Anastasia to Ann. Ann later adopted Anastasia.

DHHR received multiple reports of Ann's abuse towards Anastasia and her adoptive siblings, including reports of extreme disciplinary practices. Finally, in February 2019, DHHR removed eleven-year-old Anastasia, as well as the other children in Ann's care, and placed her in foster care. Since she re-entered state custody, DHHR has placed Anastasia in at least five different placements. She currently resides in a congregate care facility in Georgia. The court, meanwhile, has issued a no-contact order between Anastasia and her adoptive mother. Despite the order, DHHR's current permanency plan for Anastasia remains reunification with Ann.

### 4.   Ace L.[26]

Ace L. is a thirteen-year-old boy who has been in DHHR custody twice. DHHR first removed Ace, along with his older sister, from his mother's care when he was three years old due to allegations of  neglect, drug abuse, and exposure to physical and sexual abuse. Following an improvement period, DHHR returned the children to their mother. Over the next four years, Ace and his sister suffered continued abuse and neglect. In 2016, DHHR again removed the children.

Over the past four years, DHHR has placed Ace in nineteen different placements, which have included foster homes, emergency shelters, psychiatric hospitals, and in-state and out-of-state group care facilities. During this time, DHHR has failed to provide Ace with adequate services to address, among other issues, his encopresis, a disorder that frequently results from sexual abuse.

---

[26] *Id.* at pp. 177-219.

It has also shuffled Ace from placement to placement and, as a result, he has lost most of his familial and community connections. Still further, Defendants have failed to search for a family-like placement that would accommodate his specialized needs.

### 5. Karter W.[27]

Karter W. is fourteen years old and has been in foster care in West Virginia for four years. Before placing Karter in foster care, DHHR received twenty-two reports of suspected abuse or neglect, several of which occurred during the first two years of his life. Nonetheless, DHHR did not remove Karter from his mother's care until he was ten years old. Shortly after his removal, his mother voluntarily relinquished her parental rights. Despite his young age, DHHR never looked for a permanent home for Karter. Instead, DHHR set his permanency goal as independence.

In the four years that Karter has been in foster care, DHHR has placed him in eight different placements, including four emergency shelters, one temporary therapeutic foster home, in-state and out-of-state long-term psychiatric facilities, and an out-of-state congregate care facility. DHHR moved Karter from his seventh placement, a psychiatric facility in Virginia, after staff allegedly used excessive force to restrain him. He currently resides in a residential treatment facility in Pennsylvania.

### 6. Gretchen C.[28]

Gretchen C. is sixteen years old. She first came to the attention of DHHR when she was eight months old. Over the years that followed, DHHR received many reports of alleged abuse and neglect of Gretchen, including reports of sexual abuse, parental drug use, and exposure to domestic violence. Still, DHHR did not remove her. Eventually, Gretchen began exhibiting her own extreme behaviors. And, in March 2016, she entered foster care pursuant to a delinquency proceeding. Over

---

[27] *Id.* at pp. 220-66.
[28] *Id.* at pp. 267-322.

less than four years, DHHR cycled Gretchen through sixteen different placements. Her placements included a detention center, five emergency shelters, four short-term psychiatric hospitals, and six residential facilities, one of which was out of state. In December 2019, Gretchen was placed in the custody of her grandmother and exited DHHR custody.

### 7.    Jonathan R.[29]

Jonathan R. is seventeen years old. DHHR has had custody of him for roughly four years. His biological parents physically, mentally, and sexually abused Jonathan and struggled with drug addictions. When Jonathan was seven years old, they consented to a private adoption of Jonathan and his younger brother. From April 2010 until May 2016, Jonathan remained with his adoptive parents. Throughout these six years, DHHR received numerous reports about Jonathan's safety in the home, and, in May 2016, removed Jonathan from his adoptive home.

During four years in foster care, Jonathan has experienced twelve placements, including three emergency shelters, three psychiatric hospitals, two out-of-state residential care facilities, two in-state residential care facilities, and one kinship placement.[30] Several different DHHR caseworkers have been assigned to his case. Jonathan became increasingly depressed while in DHHR custody, and, in December 2018, he was hospitalized after threatening to harm himself and staff. Jonathan's mother reportedly was present for his hospital admission. She petitioned the court to reinstate her parental rights, but the court denied her petition. In February 2019, DHHR placed Jonathan with his maternal grandmother, who later became certified as a foster parent.

### 8.    Dennis C.[31]

Dennis C. is seventeen years old and has been in DHHR custody twice. In 2003, DHHR removed him from his family when he was six months old because he suffered a brain injury and

---

[29] *Id.* at pp. 323-60.
[30] DHHR failed to document one of Jonathan's 2018 placements.
[31] *Id.* at pp. 361-402.

stroke from Shaken Baby Syndrome. As a result of the injuries, Dennis experiences cognitive delays, an intellectual disability, a weakened left hand and arm, and other mental health disorders. DHHR soon returned Dennis to his family. Between 2013 and 2014, DHHR received seven reports of alleged abuse and neglect. In 2014, DHHR again removed Dennis, along with his older brother.

Since Dennis re-entered foster care, DHHR has moved him between ten different placements. DHHR has placed Dennis in three foster homes (two of which were therapeutic), with relatives on three separate occasions, in three emergency shelter care placements, and in one residential facility. DHHR has also set various permanency goals for Dennis that ranged from adoption and guardianship with relatives to independent living. Although Dennis was legally freed for adoption in 2015 and has stated that he wants to live with his grandmother, his case file contains minimal, if any, record of permanency planning by DHHR. Dennis currently resides at a residential facility in West Virginia. From this facility, DHHR plans to transition him to assisted living in the community. Dennis's functioning renders this goal unlikely to succeed.

### 9.   Garrett M.[32]

In April 2020, Garrett M. turned eighteen years old. He had been in DHHR custody for seven years. Garrett was born in New York, where he lived with his biological parents and siblings. New York's Administration for Children's Services became involved with his family after his youngest sister was born testing positive for opiates. Garrett's father and other family members physically and sexually abused Garrett and his younger sisters. In January 2011, Garrett's mother died of a drug overdose. His father subsequently lost custody of the children.

Garrett and his sisters were sent to live in West Virginia with their aunt and uncle. In May 2013, DHHR removed the children from their aunt and uncle's home following investigations of

---

[32] *Id.* at pp. 404-56.

physical abuse. DHHR moved Garrett to at least eighteen different institutional placements during his time in its custody. Garrett, severely depressed, attempted suicide at least twice while in foster care. His placements included only two therapeutic foster homes, several emergency shelters, several detention centers, a placement with his father, at least two congregate care facilities, and a kinship placement in Ohio. DHHR failed to prepare him for adulthood, and ultimately discharged him to a relative with whom he had not visited during his entire seven years in foster care.

### 10.     Calvin K., Chris K., and Carolina K.[33]

Calvin K., Chris K., and Carolina K. are siblings, over whom DHHR maintained custody at the time Plaintiffs filed their Complaint. They were subsequently adopted, and, on February 2, 2020, Defendants moved to dismiss their claims. (*See* ECF No. 56.) Plaintiffs opposed Defendants' motion, noting that, in their Complaint, Plaintiffs alleged that Chris and Calvin had been in foster care for three years, Carolina had been in foster care for two years, and DHHR had placed all three in multiple foster homes. (*See* ECF No. 61.)

## III.   LEGAL STANDARD OF REVIEW

### A.     The Legal Standard for Class Certification

Class certification is proper where a proposed class satisfies the four prerequisites of Fed. R. Civ. P. 23(a) and fits into one of the three types of class actions described in Rule 23(b). *See, e.g.*, *Berry v. Schulman,* 807 F.3d 600, 608-609 (4th Cir. 2015).[34] Rule 23(a) requires a plaintiff to show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties

---

[33] Defendants have refused to produce the case files of Calvin K., Chris K., and Carolina K. Thus, Plaintiffs' experts were unable to prepare a report analyzing their experiences in foster care.

[34] *Cf.* The Fourth Circuit acknowledges that "certification as a class action serves important public purposes," including "promoting judicial economy and efficiency" and "afford[ing] aggrieved persons a remedy . . . not economically feasible . . . through the traditional framework of multiple individual damage actions." *Gunnells v. Healthplan Servs.,* 348 F.3d 417, 424 (4th Cir. 2003) (quoting Moore's Fed. Practice §23.02 (3d ed. 1999)).

are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Moreover, Rule 23(b)(2), commonly used to certify civil rights class actions, is satisfied where "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

While conducting a "rigorous analysis" to ensure Rule 23's requirements have been met, *Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338, 351 (2011), courts may consider merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied", and may not "engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013).

At the same time, in determining whether proponents of certification have met their burden, district courts have "wide discretion." *Id.* at 424. Indeed, precedent has directed federal courts to "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will . . . 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Gunnells*, 348 F.3d at 424  (quoting *In re A.H. Robins,* 880 F.2d 709, 740 (4th Cir. 1989)).[35]

Courts especially favor class certification, when, as here, the named plaintiffs allege civil rights violations that can be addressed on a class-wide basis. Nonetheless, the Fourth Circuit has held that the decision of whether or not to certify a class must factor in the nature of the allegations. *Brown*, 785 F.3d at 921 (vacating district court's decision denying certification to proposed plaintiff class alleging discriminatory work-place policies and practices and noting, "the nature of

---

[35] *See also Brown v. Nucor Corp.,* 785 F.3d 895, 921 (4th Cir. 2015) (holding "Rule 23 provides wide discretion to district courts, in part, to promote the systemic class action virtues of efficiency and flexibility. The realization of such benefits, however, requires that a district court exercise its judgment in a reasoned and expeditious manner.").

the allegations, the evidentiary support . . . and the inherent cohesiveness of the class all demonstrate that the court's failure to certify was an error.").

Significantly, courts within the Fourth Circuit have consistently certified classes that, like the proposed class and subclasses, are comprised of individuals in state custody whose rights defendants' policies and practices violate. *See*, *e.g.*, *Scott v. Clarke,* 61 F. Supp. 3d 569, 583 (W.D. Va. 2014) (certifying class of approximately 1,200 female prisoners alleging that the policies and practices at the correctional facility subjected them to substandard medical care in violation of their constitutional rights).[36] In the foster care context, federal courts across the country have granted class certification where plaintiff children allege that state child welfare agencies, through their policies and practices, subjected class members to harm, or a substantial risk thereof, in violation of their constitutional rights. *See*, *e.g.*, *B.K. v. Snyder,* 922 F.3d 957 (9th Cir. 2019), *cert. denied*, No. 19-765, 2020 U.S. LEXIS 1731, at *1 (Mar. 23, 2020).[37]

In this instance, Plaintiffs have satisfied the four Rule 23(b) prerequisites. Because Plaintiffs' requested injunctive relief aims at correcting Defendants' unconstitutional conduct, the class action is therefore properly maintained under Rule 23(b)(2).[38] *See Wal-Mart Stores, Inc.,* 564

---

[36] *See also Buffkin v. Hooks,* No. 1:18-CV-502, 2018 U.S. Dist. LEXIS 202875, at *44 (M.D.N.C. Nov. 30, 2018) (certifying a class of "all current and future prisoners in [the Department of Public Safety's custody] who have or will have chronic Hepatitis C virus and have not" received proper treatment); *Bumgarner v. NCDOC,* 276 F.R.D. 452 (E.D.N.C. 2011) (certifying "a class of all present and future disabled inmates of the [Department of Corrections] 'who have been, and may in the future be, . . . denied the benefits of the DOC's sentence reduction credit program by reason of their disabilities.'").

[37] *See also M.D. v. Abbott,* 907 F.3d 237, 271 (5th Cir. 2018); *DG v. Devaugh,* 594 F.3d 1188, 1194 (10th Cir. 2010); *Marisol A. by Forbes v. Giuliani,* 126 F.3d 372, 380 (2d Cir. 1997); *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994).

[38] Plaintiffs are not required to establish ascertainability under Rule 23(b)(2) in the instant action. While "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable,'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654-55 (4th Cir. 2019), the implicit "ascertainability" requirement does not apply to Rule 23(b)(2) class actions seeking only injunctive and declaratory relief, as Plaintiffs do here, because Rule 23(b)(2) class actions do not require notice as do (b)(3) class actions. *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("The decisions of other federal courts and the purpose of Rule 23(b)(2) persuade us that ascertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Shelton v. Bledsoe,* 775F.3d 554, 561 (3d Cir. 2015) ("a judicially created implied requirement of ascertainability—that the members of the class be *capable* of specific enumeration—is inappropriate for (b)(2) classes."); *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("while the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule

14

U.S. at 360 (stating Rule 23(b)(2) is appropriate when "a single injunction or declaratory judgment would provide relief to each member of the class.").

## IV. THE COURT SHOULD CERTIFY THE GENERAL CLASS AND ALL THREE SUBCLASSES BECAUSE PLAINTIFF CHILDREN MEET THE REQUIREMENTS OF RULE 23(A)

### A. The Plaintiff Class Is So Numerous that Joinder Is Impracticable

Under Fed. R. Civ. P. 23(a)(1), the proposed class is sufficiently numerous to make joinder impracticable. "[A]pplication of the Rule is to be considered in light of the particular circumstances of the case". *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n.,* 375 F.2d 648, 653 (4th Cir. 1967). Generally, "where [] knowledge and common sense would indicate that [the proposed class] is large, the numerosity requirement is satisfied." *Mitchell-Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551, 556 (D. Md. 2006).

Although "[n]o specified number is needed to maintain a class action," *Cypress,* 375 F.2d at 145, "a class of as few as twenty-five to thirty members raises a presumption that joinder would be impracticable," *Rodger v. Elec. Data Sys. Corp.,* 160 F.R.D. 532, 535 (E.D.N.C. 1995).[39] In fact, the Fourth Circuit has affirmed certification for putative classes with as few as eighteen members. *See Cypress,* 375 F.2d at 653. Additionally, "where the relief sought for the class is injunctive and declaratory in nature, more speculative representations as to the size of the class suffice as to the numerosity requirement." *L.S. by and through Ron S. v. Delia,* No. 5:11-CV-354-FL, 2012 WL 12911052, *22 (E.D.N.C. Mar. 29, 2012).

In this instance, the General Class and each Subclass easily satisfy the numerosity requirement. The General Class consists of approximately 6,970 children currently in the custody

---

23(b)(2)."); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) ("Notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited.").
[39] *See also Dameron v. Sinai Hosp. of Baltimore, Inc.,* 595 F. Supp. 1404, 1407 (D. Md. 1984) (certifying "class consist[ing] of at least 47 to 51 persons.").

of DHHR.[40] The ADA Subclass and the Kinship Subclass each consists of thousands of children currently in foster care.[41] Similarly, the Aging Out Subclass includes roughly 2,000 youth.[42] These classes are clearly large enough to make joinder impracticable. They also far exceed the thresholds of twenty-five to thirty named plaintiffs at which joinder remains presumptively impracticable. Therefore, Plaintiffs easily satisfy the numerosity requirement.

**B.    The Putative Classes and Subclasses Share Common Questions of Law and Fact**

**1.    The commonality standard**

"[F]or purposes of Rule 23(a)(2), even a single common question will" satisfy the requirement for class certification of questions of law or fact common to the class. *Wal-Mart Stores, Inc.*, 564 U.S. at 359 (internal quotation marks and alterations omitted). The "common contention . . . must be of such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. While class members must have suffered "a shared injury . . . spring[ing] forth from the same 'common contention,'" *Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 304 (4th Cir. 2013), "the commonality requirement does not require that all class members share identical factual histories," *Clarke*, 61 F. Supp. at 586.[43] Rather, "[d]espite the presence of individual factual questions, the

---

[40] Foster Care Placements Report, *West Virginia Dep't of Health & Human Resources* (July 31, 2020) (hereinafter "2020 Placements Report"), *available at* https://dhhr.wv.gov/bcf/Reports/Documents/2020%20August%20 Legistlative%20Foster%20Care%20Placements%20Report.pdf). This number includes children who entered foster care as the result of a child abuse or neglect proceeding as well as children who entered foster care pursuant to a juvenile justice proceeding.

[41] *See* 2020 Placements Report; *see also* ex. 8, Expert Report on ADA Subclass at pp. 6-7.

[42] *See* ex. 10, Declaration and Expert Report of Elizabeth Aparicio, Ph.D. (Aug. 10, 2020) (hereinafter "Expert Report on Aging Out Subclass") at p. 6.

[43] *Wal-Mart Stores, Inc.*, 564 U.S. at 586 ("[T]he commonality requirement does not require that all class members share identical factual histories.").

commonality criterion . . . is satisfied by . . . common questions of law presented." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984).[44]

Questions of law or fact prove sufficiently common "[w]here the injuries complained of by named plaintiffs allegedly result from the same unlawful pattern, practice, or policy of the defendants." *Parker v. Asbestos Processing, LLC*, No. 0:11-cv-01800-JFA, 2015 U.S. Dist. LEXIS 1765, at *19 (D.S.C. Jan. 8, 2015).[45] For "[b]oth the existence and the 'common reach' of such objectively applied patterns or practices are likely to be indisputable from the outset, so that no real commonality problems for class action maintenance ever arise in this regard." *Stastny v. S. Bell Tel. & Tel. Co*., 628 F.2d 267, 274 n.10. (4th Cir. 1980). Moreover, the commonality element is more easily established in proposed class actions that, like this action, seek injunctive or declaratory relief. *See Clarke*, 61 F. Supp. 3d at 585.[46]

The Supreme Court has compared commonality to the "glue" holding together plaintiffs' claims. *See Wal-Mart, Inc.*, 564 U.S. at 352. For instance, statistical and anecdotal evidence can provide the "glue" of commonality that *Walmart* requires. *Brown*, 785 F.3d at 915. Indeed— although "[c]ertification is only concerned with the commonality (not the apparent merit) of the claims," *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 332-33 (4th Cir. 1983)—the necessary inference, statistical data, and direct evidence within this Motion establish the system-wide practice that both fulfills the commonality requirement for class certification and furthermore harms all class members or exposes them to a substantial risk of harm. *See Stastny, 628 F.*2d at

---

[44] *See Neal*, 43 F.3d at 59 ("[M]any . . . lawsuits challenging the provision of services to foster children have been certified despite the varieties of factual differences that characterize the plaintiffs in each case and despite the variety of legal claims any one class may make.").

[45] *See also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) ("A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees.").

[46] *See also McGlothlin v. Connors*, 142 F.R.D. 626, 633 (W.D. Va. 1992) ("[S]uits for injunctive relief by their very nature present common questions of law or fact"); *Twyman v. Rockville Hous. Auth.*, 99 F.R.D. 314, 321 (D. Md. 1983) (same).

278 (recognizing that commonality "might conceivably be shown by necessary inference from evidence of a sufficient number of instances . . . by statistical data . . . Or, of course, it may be shown by direct evidence or by admission that there is in fact such a system-wide practice.").

At the same time, *Wal-Mart Stores, Inc.* reversed certification of the plaintiffs' class when they could not demonstrate that class members had "suffered the same injury."[47] In *Wal-Mart*, 1.5 million female employees had argued that local store supervisors had violated Title VII by discriminating against them on the basis of sex. *Id.* at 343. Specifically, the plaintiffs alleged that supervisors, who exercised wide discretion over such individual decisions, had issued employee pay increases and promotions on a discriminatory basis. *Id.* at 344-45. Nonetheless, as the Supreme Court responded, class certification requires more than "merely that [class members] have all suffered a violation of the same provision of law." *Id.* at 350. Rather, "[t]heir claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Id.* Clearly, the plaintiff employees had not satisfied the standard.

The Fourth Circuit has noted that "*Wal-Mart* did not set out a per se rule against class certification where subjective decision-making or discretion is alleged. Rather, where subjective discretion is involved, *Wal-Mart* directs courts to examine whether . . . discretion [is exercised] in a common way with some common direction." *Scott v. Family Dollar Stores, Inc.,* 733 F.3d 105, 113 (4th Cir. 2013) (internal quotation marks omitted).[48] Similarly, "[o]ther district courts have recognized . . . that [*Wal-Mart's*] analytical regime concerning 'commonality' does not serve as a

---

[47] *Wal-Mart, Inc.*, 564 U.S. at 350.

[48] For instance, in *Family Dollar Stores*, similarities between the proposed class and the class in *Wal-Mart* did not stop the Fourth Circuit from holding, on review, that, "[t]he district court's denial of leave to amend the complaint on grounds that it was foreclosed by *Wal-Mart* is erroneous and based on a misapprehension of the applicable law." 733 F.3d at112. *Family Dollar Stores* concerned fifty-one named plaintiffs seeking to represent a putative class of female store managers. *Id.* at 108. The plaintiffs alleged that Defendants violated Title VII of the Civil Rights Act of 1964 and the Equal Pay Act by paying plaintiffs less than their male counterparts. *Id*. At the time, Family Dollar operated approximately 7,000 stores across forty states. *Id.*

barrier to the certification of class actions in cases involving . . . claims alleging a pattern and practice of conduct resulting in unconstitutional conditions of confinement." *Clarke.* at 587

Under the existing precedent, Plaintiffs—a class of West Virginian foster children in the custody of a single state agency—clearly fulfill the requirements for class certification. As the Plaintiff Children allege harms stemming from Defendants' unconstitutional policies and practices, their claims depend upon a "common contention." That is, the approximately 7,000 class members, who generally reside in West Virginia, all allege harms that stem from statewide policies and practices and are therefore capable of resolution in "one stroke" as *Wal-Mart* requires.[49]

### 2. Substantial evidence of commonality exists with respect to the General Class

The General Class[50] identifies common questions of fact and law, each of which satisfies the commonality requirement and are capable of resolution in "one stroke" on a classwide basis.

Questions of fact common to the classes include:

- whether Defendants fail to protect the General Class from physical, psychological, and emotional harm, and risk of harm;
- whether Defendants deprive Plaintiffs of the Kinship Subclass of necessary home safety assessments, case management and other services, and permanency planning;
- whether Defendants deprive Plaintiffs of the ADA Subclass of necessary and appropriate services and treatment to make them as able as their non- disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
- whether the Defendants offer supports and caseworker resources adequate to ensure that foster children fourteen years or older receive transition planning such that children that age out of the system into adulthood have adequate planning and resources to meet future housing, employment, educational, and other social needs.

---

[49] *See e.g., M.D. v. Perry, C.A.* No. C-11-84, 2011 U.S. Dist. LEXIS 152121, at *5-6 (S.D. Tex. July 21, 2011) ("Whereas 'the respondents [in *Wal-Mart*] wish[ed] to sue about literally millions of employment decisions at once,' which occurred all around the nation, here Plaintiffs' claimed injuries result from the common alleged deficiencies in the Texas foster care system. Those alleged deficiencies are the 'glue' holding the claims together here. Plaintiffs have much more in common than did the million-plus, nation-wide class at issue in *Wal-Mart*." (internal citation omitted)).
[50] In West Virginia, children enter foster care, and therefore DHHR custody, through both dependency and juvenile justice proceedings. *See* DHHR Foster Care Police § 1.8 (describing seven avenues through which children may enter foster care, which include, *inter alia*, CPS taking a child into emergency custody after filing a petition alleging abuse/neglect, a status offense bringing the child to the attention of the juvenile court, or a child being charged and/or adjudicated as a delinquent). All such children belong to Plaintiffs' General Class.

- whether the Defendants operate a system that promptly and adequately assesses the individual needs of members of the class;
- whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the class and subclasses;
- whether the Defendants operate a system that provides an adequate diversity of placements to permit the members of the class to reside in the most integrated, least restrictive, and most family-like environment; and
- whether the Defendants provide adequate caseworker resources to ensure that members of the class can routinely meet with caseworkers face-to-face and engage in individual services.

Questions of law common to the classes include:

- whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse, and trauma through unnecessary and too-frequent moves;
- whether Defendants' systemic failures violate Plaintiffs' right to all reasonable efforts to achieve permanency, under the First, Ninth, and Fourteenth Amendments to the United States Constitution, including by separating them unnecessarily from their families and siblings, and segregating them in institutions;
- whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like home and their right to all reasonable efforts to achieve permanency; and
- whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the respective implementing regulations, including by unnecessarily placing youth with disabilities in institutional settings and denying them access to community-based treatment.

As Plaintiffs allege that Defendants' system-wide policies and practices expose all members of the General Class to a substantial risk of harm, in violation of their constitutional and federal statutory rights, "defendant's allegedly standardized practices . . . support a finding of commonality." *Hoffman v. First Student, Inc.*, No. AMD 06-1882, 2008 U.S. Dist. LEXIS

130923, at *16 (D. Md. Dec. 9, 2008).[51]  Plaintiffs identify a number of such practices and policies, including:

### a.    Inadequate array of appropriate placements

As of July 31, 2020, roughly 6,970 children in the West Virginia foster care system remain in out-of-home placements.[52] Over only the past three years, the number of West Virginia children in foster care has risen by around 1,000.[53] In fact, the number of youth in the custody of the State has steadily increased since 2014.[54] As a result, West Virginia has the highest per capita rate of children in State custody in the country.[55] While the foster care population continues to rise,[56] Defendants have failed to implement any meaningful statewide effort to recruit new resource homes. A severe shortage of foster homes now faces DHHR.[57]

---

[51] *See also Lambertz-Brinkman v. Reisch*, No. CIV 07-3040, 2008 U.S. Dist. LEXIS 89017, at *5-6 (D.S.D. Oct. 31, 2008) ("All members of the class seek a declaration that an illegal policy and practice exists and an injunction should be issued prohibiting such practice. This is sufficient to establish the requisite commonality.").

[52] 2020 Placements Report.

[53] Foster Care Placements Report, *WV Dept. of Health and Human Resources* (July 2017), *available at* https://dhhr.wv.gov/bcf/Reports/Documents/2017%20August%20Legislative%20Foster%20Care%20Report.pdf.

[54] *See* Bureau for Children and Families, Legislative Foster Care Reports, *available at* https://dhhr.wv.gov/bcf/Reports/Pages/Legislative-Foster-Care-Reports.aspx (documenting general increase in West Virginia foster care population from 2013 through July 2020).

[55] Debbie Cenziper, Emily Corio, Kelly Hooper & Douglas Soule, *the Opioid Files*, WASHINGTON POST (Oct. 18, 2019), *available at* https://www.washingtonpost.com/graphics/2019/investigations/west-virginia-opioid-legal-battle-foster-care/.

[56] *See* ex. 2 at D003776, 800 (2017 CFSR)) ("It was reported that the number of children entering foster care has risen while the number of homes has not matched the increase in need, and that the shortage of homes has resulted in children sometimes sleeping in offices and being placed in shelter care."); *Roxy Todd*, Inside West Virginia's Overwhelmed Foster Care System, *West Virginia Public Broadcasting* (Oct. 9, 2019), *available at* https://www.wvpublic.org/post/inside-west-virginia-s-overwhelmed-foster-care-system#stream/0 ("In West Virginia, the foster care system has been hit particularly hard; roughly 6,700 children in the state are in foster care, an increase of almost 70% in six years.").

[57] *See* ex. 11 at D003987, 4015 (Child and Family Services Plan, 2015 - 2019, *West Virginia Dep't of Health & Human Resources* (2014) (hereinafter, "2015-2019 CFSP")) ("All Districts interviewed over the course of the two year period state that they struggle with the lack of foster care placement options."); ex. 12 at D065304, 304 (Email from Chuck Kleine to Amanda McCreary (Oct. 3, 2018)) ("West Virginia is currently experiencing a drastic shortage of foster homes that are able to meet the needs of the children being placed in care.  There is often difficulty matching certain child needs with foster parent specifications. Children of certain ages, specialized treatment requirements, or even large sibling groups can be harder to place."); ex. 13 at D068521, 522 (Email from Jessica Holstein to Janie Cole (Jan. 28, 2019)) (a spokeswoman for the Department of Health and Human Resources acknowledged in early 2019 that "West Virginia is currently experiencing a drastic shortage of foster homes that are able to meet the needs of the children being placed in care. ").

The lack of sufficient placements for foster children has caused Defendants to engage in a haphazard placement process that embraces a total disregard for individualized care.[58] DHHR has exhibited "an overreliance on shelter care,"[59] and leaves children in temporary shelter care for months on end.[60] West Virginia also has a long history of relying on out-of-state care.[61] Indeed, of the 724 children living in group residential care as of July 2020, DHHR sent over thirty percent of those children to out-of-state facilities.[62] Alternatively, Defendants place children in overcrowded foster homes on an emergency basis—or force children to stay overnight in hotels and DHHR offices.[63] Many children find themselves in inappropriate and often dangerous institutions. In fact, the Department of Justice ("DOJ") found in 2015 that DHHR institutionalizes seventy-one percent of foster youth between the ages of twelve and seventeen.[64] By 2018, DHHR had made little headway in ameliorating the problem and conceded that West Virginia "rank[s] in the top six in the country" in terms of placing children in congregate care.[65] Ultimately, DHHR admitted, "[t]here is no mechanism in place to accurately and appropriately match children that are coming into the foster care system with already existing foster care providers."[66] As the DOJ had already warned in 2015, placements were recommended "based on which segregated residential treatment

---

[58] *See* ex. 7, Flory, Getman, and Popchak Report at p. 21 ("For the Named Plaintiff [C]hildren, . . . DHHR used the first available placement . . . [F]requent placement changes primarily resulted from the inability of the placements secured by DHHR to meet the children's individualized therapeutic needs.").

[59] WV Child and Family Services Review, Program Improvement Plan, *West Virginia Dep't of Health & Human Resources* (December 13, 2019) (hereinafter "PIP Review"), at p. 23, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf.

[60] Ex. 7, Flory, Getman, and Popchak Report at pp. 21, 25.

[61] Ex. 14 at D058224, 228 (Initial Design and Implementation Report, 2nd Quarter, *West Virginia Dep't of Health and Human Resources* (May 14, 2015) (hereinafter "2015 2Q *Safe at Home* Report").

[62] 2020 Placements Report.

[63] Ex. 15 at D023537, 537 (Offices or Hotels per Month); Roxy Todd, *Inside West Virginia's Overwhelmed Foster Care System*, MARKETPLACE (Oct. 9, 2019), *available at* https://www.marketplace.org/2019/10/09/inside-west-virginias-overwhelmed-foster-care-system/.

[64] Letter from Dep't of Justice, Civil Rights Div., to Office of the Governor, State of West Virginia, p. 6 (June 1, 2015), *available at* https://www.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (hereinafter "DOJ letter").

[65] Ex. 16 at D004703, 061 (Fourth Annual Progress Report, *West Virginia Dep't of Health and Human Resources* (2018)) (hereinafter "2018 Progress Report.").

[66] Ex. 11, 2015-2019 CFSP at D004010.

facility has a bed."[67] Ultimately, Plaintiffs' expert witnesses have concluded that "significant overuse of congregate care in West Virginia [continues] despite a widespread acceptance amongst child welfare experts and child welfare systems that congregate care is generally a poor environment in which children should grow up."[68]

Defendants relegate a large number of children to out-of-state care. As of July 31, 2020, DHHR had placed 300 children in out-of-state institutions.[69] Approximately seventy-eight percent of these children live in group residential care.[70] Roughly twenty-one percent stay in long-term psychiatric facilities,[71] which amount to "the most restrictive type of care for children in foster care."[72] Ineffective management practices at out-of-state facilities have ensured that these children rarely receive adequate supervision and care. Many facilities have faced criminal investigations into sexual, physical, and emotional abuse of children by undertrained employees.[73] Other investigations have uncovered the misuse of physical and chemical restraints as methods of oversight.[74] Yet, according to a 2015 DHHR report, "[w]orkers in some areas of our state have

---

[67] DOJ letter at p. 7.
[68] Ex. 10, Expert Report on Aging Out Subclass at p. 19.
[69] 2020 Placements Report.
[70] *Id.*
[71] *Id.*
[72] *See* DHHR Foster Care Policy, § 2.4.7, Aug. 2020, *available at* https://dhhr.wv.gov/bcf/policy/Documents/ Foster%20Care%20Policy%20August%202020.pdf (hereinafter "Foster Care Policy")).
[73] *See, e.g.*, Lee Rood, *Police Report Details Fights, Sex Crimes at Iowa Academy for Troubled Youth*, Des Moines Register (Nov. 26, 2018), *available at* https://www.desmoinesregister.com/story/news/investigations/readers-watchdog/2018/11/26/clarinda-academy-iowa-begins-probe-fights-sex-crimes-found/2057894002/; Harold Brubaker, *Woods Service Disputes Rape Allegations in Lawsuit*, Philadelphia Inquirer (Aug. 7, 2018), *available at* https://www.inquirer.com/philly/business/woods-services-lawsuit-20-year-old-woman-alleged-rape-20180807.html; Kelly Wiley, *Lighthouse Care Center Sued over Sexual Misconduct Allegations*, News 12 NBC (July 24, 2018), *available at* https://www.wrdw.com/content/news/Lighthouse-Care-Center-sued-over-sexual-misconduct-allegations--489057271.html; Samantha Manning, *Woman Says Behavioral Facility Didn't Protect Daughter from Worker Accused of Sexual Battery*, WFTV (Nov. 3, 2017), *available at* https://www.wftv.com/news/9-investigates/woman-says-behavioral-facility-didnt-protect-daughter-from-worker-accused-of-sexual-battery/638177911/.
[74] *See, e.g.*, Lee Rood, *Clarinda Students Were Restrained and Injured as Punishment, Records Show,* Des Moines Register (Dec. 22, 2018), *available at* https://www.desmoinesregister.com/story/news/investigations/readers-watchdog/2018/12/22/clarinda-academy-iowa-students-restrained-injured-punishment-investigation-woodward-academy/2387163002/; Lee Rood, *Police Report Details Fights, Sex Crimes at Iowa Academy for Troubled Youth*, Des Moines Register (Nov. 26, 2018), *available at* https://www.desmoinesregister.com/story/news/investigations/

23

become so used to accessing services outside of the community and/or placement in residential care, that it is considered the norm."[75]

But inadequate placements also pose a more general harm to children in the foster care system. Since problematic placements often do not last, DHHR has conceded that "[t]he stability in foster care placements is directly related to the availability of homes."[76] As the Department has previously explained, with each move, "treatment is not consistent, nor are services uniform."[77] Rather, "treatment begins anew, time is lost, and progress starts all over."[78] Thus, DHHR has concluded, the "lack of continuity and level of services hampers the child's progress,"[79] and "[m]ultiple placements decrease the likelihood of a child achieving his permanency plan."[80] Experts have also linked placement instability to substance abuse, juvenile arrests, poor school performance, social network disruption, mental health issues, and other executive functioning.[81]

Nevertheless, internal reviews by DHHR have found that "[d]ifficult and 'hard-to-place' children [in particular] are frequently placed in multiple foster homes, multiple potential adoptive

---

readers-watchdog/2018/11/26/clarinda-academy-iowa-begins-probe-fights-sex-crimes-found/2057894002/;      James Sparvero, *Staffer Fired from Behavioral School for Scratching, Bruising 16-Year-Old Girl, Deputies Say*, CLICKORLANDO.COM (Sep. 25, 2018), *available at* https://www.clickorlando.com/news/2018/09/25/staffer-fired-from-behavioral-school-for-scratching-bruising-16-year-old-girl-deputies-say/; Rick Neale, *Devereux Viera Staffer Accused of Striking Girl, 14*, FLORIDA TODAY (Nov. 5, 2016), *available at* https://www.floridatoday.com/story/news/2016/11/05/devereux-viera-staffer-charged-striking-girl-14/93343094/.

[75] Ex. 17 at D006753, 782 (Initial Design and Implementation Report, 3rd Quarter, *West Virginia Dep't of Health and Human Resources* (Aug. 2015) (hereinafter "3rd Quarter Report")).

[76] Ex. 16, 2018 Progress Report at D004783;  *id.* at D004782 (linking "[t]he decline in foster care placement stability . . . to the use of shelter care and the unavailability of foster care beds").

[77] Ex. 18 at D005399, 404 (2015 Annual Progress Report, *West Virginia Dep't of Health & Human Resources* (hereinafter "2015 Progress Report")).

[78] *Id.*

[79] *Id.*

[80] DHHR Adoption Policy, § 4.10, Aug. 2020, *available at* https://dhhr.wv.gov/bcf/policy/Documents/Adoption%20Policy%20August%202020.pdf (hereinafter "Adoption Policy").

[81] *See* ex. 19, at D065690, 849-850 (Follow-Up to the Rural Child Welfare Leaders Meeting, May 2017, *Rural Child Welfare Practice* (June 9, 2017) (hereinafter, "Rural Child Welfare Follow-Up")); Philip A. Fisher, Anne M. Mannering, Amanda Van Scoyoc & Alice M. Graham, *A Translational Neuroscience Perspective on the Importance of Reducing Placement Instability Among Foster Children*, 92 CHILD WELFARE J. 9, 9-10 (2013*); Perry*, 294 F.R.D. at 43 ("This sort of shuttling of foster care children through a number of placements can cause psychological harm.").

homes, and multiple residential treatment facilities."[82] The instability resulting from Defendants' failure to secure adequate placements has hounded the named Plaintiffs. While Gretchen has stayed in a juvenile detention center, five emergency shelter-care settings, four short-term psychiatric placements, and six group residential care settings,[83] Karter has passed through four emergency shelters, one temporary therapeutic foster home, two long-term psychiatric facilities, and an out-of-state congregate care facility.[84] DHHR has placed Theo, meanwhile, in at least eleven placements.[85]

The urgency of securing more placements could not be lost on Defendants. As the Washington Post recently reported, "[f]or more than a decade, foster homes and emergency shelters have been short of beds."[86] In fact, as early as 2002, "the CFSR process indicated that most children in the foster care cases reviewed did not have permanency and stability in their living situations."[87] The report specified that the instability followed from "(1) a scarcity of specialized placements for children with behavioral problems or special care needs and, (2) an inconsistency in matching children with appropriate foster families or placement settings."[88] Even then, "children often [were] placed in shelters because there [was] nowhere else to put them and some children remain[ed] in shelters for long periods of time."[89] After fifteen years, at the time of the next federal review, Defendants still had not remedied the problem. The 2017 CFSR labeled "the availability

---

[82] Ex. 18 at D005399, 404 (2015 Progress Report); ex. 8, Expert Report on ADA Subclass at p. 34 ("West Virginia has a lack of homes that are willing to accept older children, children with severe behavioral issues, and large sibling groups.").

[83] Ex. 7, Flory, Getman, and Popchak Report at p. 268.

[84] *Id.* at p. 233.

[85] *Id.* at p. 49.

[86] Debbie Cenziper, Emily Corio, Kelly Hooper & Douglas Soule, *the Opioid Files*, WASHINGTON POST (Oct. 18, 2019), *available at* https://www.washingtonpost.com/graphics/2019/investigations/west-virginia-opioid-legal-battle-foster-care/.

[87] Ex. 6 at D003152, 180 (2002 CFSR)).

[88] *Id.* at D003183.

[89] *Id.*

of foster homes" as one of the "areas of greatest need for which services and resources are lacking."[90] The report called West Virginia's inactivity to the forefront by observing that "[a]n effective recruitment plan has not been developed and implemented to meet the increased need for quality homes in the state."[91] As recently as December 2019, DHHR was not recruiting or approving new foster homes.[92] At the same time, a 2019 Memorandum of Understanding ("MOU") between Defendants and the DOJ called only for "a 25 percent reduction from the number of children living in residential mental health treatment facilities as of June 1, 2015" by 2022.[93] Nor did it require West Virginia to reduce the number of children in in-state residential treatment facilities.

DHHR only makes matters worse by effectively discouraging families from volunteering for the foster care system. Foster care providers have "reported not being treated with respect and not having their opinions heard or considered."[94]

Of course, Defendants already know that DHHR does not respect foster parents in the agency process. A 2015 investigation by the DOJ informed the State that "[f]amilies perceive their interactions with DHHR as more punitive than supportive, undermining the potential to develop strengths in the home and keep children in the community."[95] Likewise, "many parents report[ed] that the state did not treat them as a partner in the treatment decision-making process."[96] The 2017 CFSR reached an analogous conclusion: "the needs of foster parents [in West Virginia] are not consistently assessed and services provided as appropriate."[97]

---

[90] Ex. 2, 2017 CFSR at D003797-98.
[91] *Id.* at D003782.
[92] PIP Review at p. 36.
[93] Ex. 20 at D066935, 938-939 (2019 Memorandum of Understanding Between the State of West Virginia and the United States Department of Justice (May 9, 2019)).
[94] PIP Review at p. 38.
[95] DOJ letter at p. 3.
[96] *Id.* at p. 11.
[97] Ex. 2, 2017 CFSR at D003782.

Whether Defendants' statewide failure to recruit and retain an adequate array of appropriate foster placements exposes all West Virginia foster children to a substantial risk of harm is a common question of law and fact suitable for class treatment, and thus satisfies commonality.

### b.    Lack of appropriate case planning

Child welfare policy in West Virginia recognizes that "[t]he likelihood of achieving outcomes [in child welfare] is directly related to the appropriateness of case planning."[98] Thus, "permanency planning efforts should begin as soon as a child enters care"[99] and "concurrent planning should be utilized in an effort to expedite the achievement of permanency for these children."[100] In practice, however, DHHR has all but abandoned State policy. The Department does not engage in critical permanency planning or effective case review for the majority of children in the West Virginia foster care system.

Defendants avoid proper case planning in part by excluding integral participants from the placement process, including from participation in multidisciplinary team ("MDT") meetings.[101] As "[c]aregivers have rights related to privacy and due process . . . includ[ing] being informed and involved,"[102] State policy requires that "[s]pecial attention be placed on engaging the family and the foster parents in the MDT process."[103] Yet, in a 2017 survey, only "28% of foster parents indicated that they were always notified of MDTs" and only nineteen percent of foster parents indicated that they "participate[d] with the development of case planning."[104] Thus, DHHR fails

---

[98] DHHR Youth Services Policy, § 6.1, July 2020, *available at* https://dhhr.wv.gov/bcf/policy/Documents/Youth%20Service%20Policy%20July%202020.pdf.
[99] Foster Care Policy at § 1.1; *see also* Adoption Policy at § 1.2.
[100] Ex. 11, 2015-2019 CFSP at D004013; *see also* Adoption Policy at § 4.11.
[101] *See* ex. 21 at D003816, 948 (West Virginia 2019 Child and Family Services Plan (hereinafter "2019 CFSP")).
[102] DHHR Child Protective Services Policy, § 1.2, July 2020, *available at* https://dhhr.wv.gov/bcf/policy/Documents/CPS%20Policy%20July%202020%202nd%20Version.pdf.
[103] Adoption Policy at § 4.9.1.
[104] Ex. 21, 2019 CFSP at D003922.

to consistently notify "resource parents (foster parents, pre-adoptive parents, and relative caretakers) . . . about reviews or hearings with respect to a child in their care and their right to be heard."[105]

Likewise, the 2017 CFSR found that "concurrent plans are viewed too often as consecutive plans and are not pursued concurrently,"[106] and "concurrent goals are not being worked until after the primary permanency plan has failed."[107] By depriving foster children of adequate case planning, West Virginia has forced them to move through the system without safe ends in sight. Children with complex needs suffer most acutely from this failure as addressing their needs generally depends upon methodical preparation.

Defendants further evade case planning through inaction outside of the MDT process. Caseworkers neglect to complete quality comprehensive assessments of the needs of children and their parents.[108] Nor does DHHR contact families to review the progress of case goals.[109] Predictably, foster parents have expressed an extreme dissatisfaction with the lack of appropriate and informational communication between case workers and foster parents.[110] This lack of meaningful contact between caseworkers and families amounts to an underlying cause of poor performance for child and family involvement in case planning.[111]

The Named Plaintiffs have moved through the West Virginia foster care system without any cogent plan in place. DHHR engaged in minimal permanency planning for Serena and

---

[105] Ex. 2, 2017 CFSR at D003794.
[106] Ex. 11, 2015-2019 CFSP at D004013.
[107] Ex. 22 at D049769, 769 (Annual Progress Services Report 2015, *West Virginia Dep't of Health and Human Resources*).
[108] PIP Review at p. 15.
[109] *See* ex. 11, 2015-2019 CFSP at D004006 (observing "a lack of contact with the family afterwards to [e]nsure that the safety plan was effective."); *id.* at D004025 ("Reviews indicated a low level of contact with parents.").
[110] PIP Review at p. 39.
[111] *Id.* at p. 5.

Dennis.[112] These children have shuffled between placements for years without any real possibility of permanency.[113] DHHR has explored permanency plans of adoption for Theo S. and Ace L. but has failed to take the necessary steps to support and implement those plans.[114]

Repeated warnings have not inspired Defendants to change course. For almost two decades, the Children's Bureau has cautioned West Virginia against negligent case planning and against excluding families from the case planning process. The 2002 CFSR identified "a lack of clear documentation and identification of permanency goals" and "a need for more focus on diligent efforts to achieve permanency for children."[115] More generally, the same report noted, "DHHR had not appropriately involved parents or children in the case planning process."[116] The 2009 CFSR also concluded that "[t]he agency did not consistently facilitate the involvement of children and families in case planning, contrary to State policy."[117] By 2017, "[t]he agency [still] struggled to make concerted efforts for the goals of timely reunification, discharge to guardianship, and timely adoption,"[118] and "permanency goals were not established timely for children in foster care in a significant number of cases."[119] The West Virginia 2019 Child and Family Services Plan most recently observed a "lack of establishment of case plans/goals through engagement of family members."[120]

All class members are at substantial risk of harm due to Defendants' failure to engage in adequate case planning. Indeed, Defendants often fail to include key participants in the MDT

---

[112] Ex. 7, Flory, Getman, and Popchak Report, at pp. 110, 362.
[113] *Id.* at p. 110; *id* at pp. 391-92.
[114] *Id.* at pp. 63-64; *id* at pp. 192, 217-18.
[115] Ex. 6, 2002 CFSR at D003157.
[116] *Id.* at D003160, D003164.
[117] Ex. 23 at D003428, 438 (West Virginia Child and Family Services Review, *U.S. Dep't of Health and Human Services Administration for Children and Families* (May 2009) (hereinafter "2009 CFSR")).
[118] Ex. 2, 2017 CFSR at D003781.
[119] *Id.*
[120] Ex. 21, 20219 CFSP at D003860.

process, prepare concurrent plans, perform necessary assessments, or even develop consistent and reasonable permanency plans. An absence of consistent caseworker contact only aggravates these deficiencies. Whether Defendants' policies and practices related to case-planning thus expose children to a substantial risk of harm, in violation of their constitutional rights, is a common question of law and fact that satisfies the commonality requirement.

### c.    High caseloads and chronic understaffing

Excessive caseloads prevent caseworkers from ensuring the safety and wellbeing of foster children.[121] DHHR, which has not established a caseload standard,[122] counts the cases that a caseworker carries by family.[123] It counts the cases that a caseworker carries by child only after the termination of parental rights.[124]

While the Child Welfare League of America recommends that caseworkers carry between twelve and fifteen cases, and, for in-custody children, requires that cases be counted by child,[125] Defendants have disregarded both standards. As of April 2020, caseworkers across the State carried eighteen cases on average and also counted cases by family rather than by child in many instances.[126] In some counties, caseworkers carried more than thirty cases on average.[127] Such high caseloads cripple caseworkers from effectively doing their jobs.[128]

---

[121] *See* ex. 8, Expert Report on ADA Subclass at p. 16 ("High turnover, child welfare workers overburdened with high caseloads, and staff inexperience negatively impact the ability of the agency to assess children's safety, ensure appropriate assessments and service provision, and engage families in the casework process.").
[122] Ex. 24 at p. 2 (Email from Philip Peisch to Marcia Lowry, et al. (June 19, 2020)).
[123] Ex. 25, Traci Dean Data Dep. Tr. at pp. 297-98.
[124] *Id.* at pp. 297-98.
[125] Sean Hughes & Suzanne Lay, *Direct Service Workers' Recommendations for Child Welfare Financing and System Reform*, CHILD WELFARE LEAGUE OF AMERICA (Jan. 2012), at p. 5.
[126] Ex. 26 at D137153, 153 (Average Caseloads by District (April 10, 2020)).
[127] *Id.*
[128] Ex. 27 at D060617 (Email from Cheryl Salamacha to Tina Mitchell (April 1, 2016)).

The continual understaffing at DHHR has rendered high caseloads inevitable.[129] In recent years, Defendants have averaged an eighteen percent vacancy rate for CPS positions—almost a fifth of its workforce.[130] As of June 2019, the turnover rate for CPS workers remained at twenty-seven percent.[131] And, from 2015 to 2018, caseloads in West Virginia increased by thirty-four percent.[132]

Indisputably, turnover and caseloads have interfered with the ability of staff to act as primary supports for foster children and families[133] and so, according to the 2017 CFSR, "continue[] to adversely affect outcomes for children and families served by the agency and the delivery of services."[134] For one, DHHR's own 2019 Program Improvement Plan concluded, "[i]nsufficient staff levels directly impact the ability of the agency to assess child safety, ensure appropriate assessment and service provision, and engage families in the casework process."[135] Excessive turnover and caseloads also deprive children of opportunities to establish stable and continuous relationships.[136] Overwhelmed caseworkers cannot be reached by foster parents,

---

[129] *See* ex. 8, Expert Report on ADA Subclass at p. 19 ("High turnover results in increased caseloads for remaining staff, decreased time available to appropriately assess and manage each case, and disrupted relationships with the child.").

[130] Ex. 28 at D005788, 802 (Legislative Audit Report, *Dep't of Health & Human Resources', Child Protective Services* (Nov. 19, 2019) (hereinafter, "Legislative Audit Report").

[131] *Id.*

[132] *DHHR to Add 48 Child Protective Services Positions*, DEP'T OF HEALTH & HUMAN RESOURCES (March 29, 2018), *available at* https://dhhr.wv.gov/News/2018/Pages/DHHR-to-Add-48-Child-Protective-Services-Positions.aspx.

[133] *Id.*; *see also* ex. 29 at D064813, 819 (Performance Update, *Dep't of Health & Human Resources* (January 2015) (hereinafter "2015 PERD") ("Retention goals are important because they can help secure an experienced and knowledgeable workforce."); *Neal*, 43 F.3d at 62 ("Because of the dearth of trained caseworkers, . . ., DHS (allegedly) fails to investigate reports of abuse and neglect promptly or adequately and fails to reliably provide the children in its care with written case plans, with appropriate placements, with proper care while in custody, and with periodical dispositional hearings."); *Perry*, 294 F.R.D. at 42 ("a higher caseload means that a caseworker can devote less time and energy to each case, and naturally class members' safety is affected by the amount of time and energy their caseworkers can devote to their respective cases."); *Perry*, 294 F.R.D. at 44 ("A caseworker that is so overburdened that she cannot visit the children she is responsible for to keep apprised of their well-being, or if she cannot build enough of a rapport to do so effectively, cannot fulfill this function.").

[134] Ex. 2, 2017 CFSR at D003781.

[135] PIP Review at p. 13.

[136] Ex. 19, Rural Child Welfare Follow-Up at D065728; ex. 8, Expert Report on ADA Subclass at p. 20 ("high turnover . . . means lower quality relationships between children and families and their caseworkers").

kinship caregivers, or foster children. In November 2019, a post audit report by DHHR noted that "CPS only met the required time frame for a face-to-face meeting with a child involved in alleged abuse or neglect cases approximately 50% of the time."[137] The report concluded, "it is apparent that CPS has struggled for over 20 years with meeting statutory time frames for making initial contact with alleged child victims of abuse and/or neglect."[138] Indeed, the case file of Karter W. "contains no case record or information about [him] during this period including no record of caseworker visits."[139] And, the 2019 Program Improvement Plan stated, "[t]he lack of contact negatively impacts safety related timeframes, placement stability, achievement of permanency, and well-being outcomes."[140] More broadly, the CFSR had emphasized to DHHR as far back as 2009, high turnover leads to "inconsistency in practice throughout the child welfare system."[141]

Defendants have long known about the need to reduce caseloads and expand the caseworker workforce. A 2008 assessment of DHHR concluded that "[s]taff retention in all regions is an ongoing issue within the Department, and the resulting staff shortages have negatively impacted worker visits with children."[142] Audits in 2013 likewise found that "turnover rates approaching or exceeding 50 percent for the trainee position [were] likely creating functional difficulties for the agency,"[143] and the high rate was "likely inhibiting the agency from achieving

---

[137] Ex. 28, Legislative Audit Report at D005792.

[138] *Id.* at D005800.

[139] Ex. 7, Flory, Getman, and Popchak Report at p. 241.

[140] PIP Review at p. 15; ex. 21, 2019 CFSP at D003860 ("[N]either the quality nor the quantity of caseworker contacts with children and parents is sufficient to ensure child safety and achieve case goals."); ex. 8, Expert Report on ADA Subclass at p. 22 ("DHHR caseworkers have experienced difficulty in making all the contacts that the standards of good practice require, placing children with disabilities at risk of harm.").

[141] Ex. 23, 2009 CFSR at D003431.

[142] Ex. 30 at D003566, 682 (WV Statewide Assessment, Dep't of Health & Human Resources (2008)) (hereinafter, "2008 Assessment"); ex. 31, Declaration and Expert Report of Beverly Johnson, L.C.S.W., (Aug. 12, 2020) (hereinafter "Expert Report on Kinship Subclass") at p. 17 ("High staff turnover rates lead to inconsistency in worker contact and case management for families that can adversely affect placement stability and timeliness to permanency").

[143] Ex. 32 at D060062, 080 (*Agency Review*, West Virginia Legislative Auditor Performance Evaluation & Research Division (Aug. 2013)) (hereinafter "2013 PERD").

an effective child protective services workforce."[144] In 2019, a State study repeated the warning: "[w]ithout manageable caseloads, agencies cannot produce positive outcomes for the majority of their children and families."[145]

Defendants, deliberately disregarding these findings, have failed to take meaningful steps to strengthen their workforce. The 2013 PERD had indicated that Defendants do "not have retention goals for CPS workers for the State, regional or district levels,"[146] and "[t]here is not a sense of urgency by the BCF in achieving a CPS workforce capable of conducting timelier investigations of child abuse allegations."[147] And, as "the agency still has not addressed th[ese] primary concerns,"[148] "[d]uring both federal fiscal years 2015 and 2016, districts continue[d] to list staff turnover as a barrier to achieving better outcomes for children and families."[149]

The minor "efforts [in West Virginia] to recruit and retain DHHR staff" have "experienced limited success."[150] For example, West Virginia created forty-eight additional positions for caseworkers in March 2018.[151] As of January 2018, 213 child welfare positions remained vacant.[152] DHHR also accepts new caseworkers without field experience or education beyond a Bachelor of Arts degree. A 2019 review identified only thirty-one percent of a sample of CPS workers as holding a four-year social work degree.[153] While DHHR does offer training, excessive workloads frequently prevent staff from attending.[154] Defendants also do not screen applicants for

---

[144] *See* ex. 32, 2013 PERD at D060069.
[145] Ex. 33 at D005828, 835 (Study of Kinship Care Families, Oct. 2019 (hereinafter "2019 Kinship Study.")).
[146] Ex. 32, 2013 PERD at D060078.
[147] *Id.* at D060069.
[148] Ex. 29, 2015 PERD at D005643.
[149] Ex. 16, 2018 Progress Report at D004750.
[150] Ex. 2, 2017 CFSR at D003781.
[151] *DHHR to Add 48 Child Protective Services Positions*, *supra* n. 132.
[152] Hannah Graham, *Lawmakers Eye Foster Care Improvements*, WRAP-UP (Jan. 25, 2019), *available at* http://www.wvlegislature.gov/Wrapup/2019/issue_02/wrapup.cfm.
[153] Ex. 28, Legislative Audit Report at D005802.
[154] Ex. 2, 2017 CFSR at D003796.

criminal backgrounds or drug use.[155] And, a 2019 Legislative Audit found, "[b]y not repeating the criminal background check every five years, DHHR increases its risk of continuing to employ a person that is not appropriate to be working with children and youth, and therefore, not suitable for the position of CPS worker."[156] Indeed, State policy recognizes that "[t]he evaluation and background investigation of facilities and people who care for adults and children is one of the most important functions of the West Virginia Department of Health and Human Resources."[157]

All class members depend upon caseworkers for safety and security. The failure to support, train, and retain caseworkers risks the safety and security of all class members. Accordingly, Defendants' system-wide policies and practices place all children in West Virginia's child welfare system at a substantial risk of harm. Such common questions of law and fact satisfy the commonality requirement.

### 3. Substantial evidence of commonality exists with respect to the ADA Subclass

The common questions of fact and law raised by all members of the ADA Subclass, each of which alone satisfies the commonality requirement for the ADA Subclass, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants deprive Plaintiffs of the ADA Subclass necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
- Whether Defendants have a practice of unnecessarily placing youth with disabilities into institutional settings and denying them access to community-based treatment; and
- Whether Defendants have a practice of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of ADA Subclass members.

---

[155] Ex. 28, Legislative Audit Report at D005794, D005815.
[156] *Id.* at D005816.
[157] Ex. 34 at D023195, 197 (Crime Identification Bureau (CIB) Background Checks, Policy Manual, *Bureau for Children and Families* (March 15, 2015)).

Plaintiffs allege that Defendants' policies and practices expose all members of the ADA Subclass to a substantial risk of harm, in violation of their rights under the Constitution and the ADA. While each child in the ADA Subclass may have unique physical and mental health needs, placement needs, or safety needs, "[i]n a lawsuit wherein individuals with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality." *Bumgarner*, 276 F.R.D. at 456.[158]

Federal law forbids child welfare agencies from discriminating against children with disabilities.[159] The United States Department of Health and Human Services ("DHHS") and the DOJ unambiguously require that children with disabilities have meaningful and equal access to *all* child welfare services, programs, and activities, including assessments, case planning and service planning, provision of in-home services, and foster care.[160]

Protecting children with disabilities begins with timely and thorough assessments of their needs.[161] According to the DOJ, "[t]he child welfare agency's obligation to ensure individualized assessments applies at the outset and throughout any involvement that an individual with a disability has with the child welfare system."[162] The ADA requires that "assessments be individualized"; "[a]n individualized assessment is a fact-specific inquiry that evaluates the strengths, needs, and capabilities of a particular person with disabilities based on objective

---

[158] *See also Holsey*, 743 F.2d at 217 ("Despite the presence of individual factual questions, the commonality criterion . . . is satisfied by the common questions of law presented.").

[159] 42 U.S.C. § 12132.

[160] *U.S. Dep't of Health & Human Servs., U.S. Dep't of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (August 2015), *available at* https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref12.

[161] Ex. 8, Expert Report on ADA Subclass at p. 14 ("A thorough assessment of the child and his or her situation is vital to ensuring placement stability, timely permanency, and appropriate services that identify, manage, and treat disabilities.").

[162] *Protecting the Rights of Parents and Prospective Parents with Disabilities*, *supra* n. 160.

evidence, personal circumstances, demonstrated competencies, and other factors that are divorced from generalizations and stereotypes regarding people with disabilities."[163] While, as DHHR has already recognized, "[e]ven youth with special needs thrive when their needs can be safely met in a family setting with people who care about them,"[164] children with disabilities remain especially vulnerable within the child welfare system. DHHR has found them at least three times more likely than peers to suffer from abuse or neglect.[165] Foster children with disabilities are also more likely to experience sexual abuse because isolating placements (such as group homes, residential facilities, and hospitals), allow easy access by others.[166]

While DHHR policies conform with the requirements of federal law, statewide practices in West Virginia routinely violate the rights of children in the ADA Subclass.[167] Defendants fail to assess adequately their needs, engage in appropriate case planning, maintain placement arrays with sufficient therapeutic options, or provide timely and adequate access to medical, behavioral, mental and other health services.

Primarily, foster children in West Virginia do not have ready access to community-based mental and behavioral health services and professionals.[168] The DOJ has already notified Defendants that "the State does not inform [foster families] how or where to access services; there are not enough services or qualified staff available; or services are not available unless the child is

---

[163] *Id.*

[164] Ex. 17, 3rd Quarter Report at D006756.

[165] The Risk and Prevention of Maltreatment of Children with Disabilities, *U.S. Department of Health and Human Services, Children's Bureau* (Jan. 2018), at p. 1., *available at* https://www.childwelfare.gov/pubPDFs/focus.pdf.

[166] *Id.*

[167] *See* ex. 8, Expert Report on ADA Subclass at p. 5 ("DHHR has not effectively implemented their programs, policies, procedures, and practices to afford children with disabilities in their care with fair and equal access to services and supports.").

[168] DOJ Letter at pp. 2-3; ex. 8, Expert Report on ADA Subclass at p. 5 ("DHHR fails to provide access to an adequate array of community-based services, programs, and activities that are readily accessible to and usable by children with disabilities").

in DHHR custody."[169] In 2018, a mere ten percent of counties reported that Intensive Home-Based Services remained sufficiently available.[170] Therapeutic foster homes, which specialize in caring for children with emotional and behavioral needs, are scant.[171] Moreover, foster children with a mental health diagnosis must remain on long waiting lists for services.[172] Here, an expert witness for Plaintiffs observed, "[a]s children wait for placements, they often do not receive the intensive mental health treatment needed to address their mental health needs."[173]

Ultimately, the flaws plaguing West Virginia have rendered institutionalization as the sole source of plausible mental health treatment for its foster children.[174] Thus, for mental health treatment, the "default service in West Virginia is institutionalization."[175] Unsurprisingly, as of 2015, the percentage of West Virginia youth in segregated residential treatment facilities surpassed the numbers of forty-six other states.[176]

Defendants substantially risk the wellbeing of foster children with disabilities through institutionalization. DHHR's own policy admits that "[e]xtended stays in out of home care can have negative and lasting developmental effects on child development."[177] The DOJ has likewise alerted Defendants that **"**[u]nnecessary confinement in a segregated residential treatment facility 'severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural

---

[169] *Id.* at p. 14.
[170] Ex. 16, 2018 Progress Report at D004983.
[171] *Id.* at D004988; ex. 17, 3rd Quarter Report at D006855 ("West Virginia does have a need for more treatment or therapeutic foster care providers as well as traditional foster care homes.").
[172] Ex. 16, 2018 Progress Report at D004866.
[173] Ex. 8, Expert Report on ADA Subclass at p. 35.
[174] DOJ Letter at p. 8.; ex. 8, Expert Report on ADA Subclass at p. 30 ("West Virginia's failure to provide in-home and community-based services places children with mental health conditions who currently live in the community at risk of unnecessary institutionalization."); ex. 8, Expert Report on ADA Subclass at p. 6 ("DHHR has failed to ensure availability of and placements in the most integrated, least restrictive setting appropriate to the needs, safety, and well-being of children with disabilities, and instead unnecessarily relies on institutional settings.").
[175] DOJ Letter at p. 8.
[176] *Id.* at p. 6.
[177] Adoption Policy at § 4.10.

enrichment.'"[178] The State has itself recognized that "[c]ongregate care [should] be understood and utilized only as a short-term intervention."[179] For, the DOJ advised, **"**[t]he unnecessary segregation of children with mental health conditions violates their civil rights and wastes the State's fiscal resources."[180]

DHHR also violates the ADA by failing to individualize services for children with disabilities.[181] This failure follows chiefly from the lack of available and accessible quality services statewide.[182] Indeed, MDTs often select placements based on which segregated residential treatment facility has an available bed.[183] It is not surprising that an internal review by DHHR found that "[m]any youth are [also] placed into congregate care due to a lack of a comprehensive universal assessment early after initial referral/contact."[184] Foster children with mental health conditions placed in restrictive settings remain in those settings for reasons unrelated to their individual mental health conditions.[185] The DOJ concluded that such "prolonged institutionalization is partly the result of regimented, non-individualized requirements that create programmatic barriers to discharge."[186]

---

[178] DOJ letter at p. 17 (*citing Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 (1999)).

[179] Ex. 14, *2015 2Q Safe at Home* Report at D058227.

[180] DOJ Letter at p. 3; *Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir. 2004) ("[A] State may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting.").

[181] Ex. 8, Expert Report on ADA Subclass at p. 26 ("This lack of comprehensive services pushes DHHR to rely on what is available instead of tailoring services to meet the unique needs of the child").

[182] Ex. 2, 2017 CFSR at D003798.

[183] DOJ Letter at p. 7.

[184] Ex. 35 at D055066, 074 (Initial Design and Implementation Report, 3rd Quarter, *West Virginia Dep't of Health and Human Resources* (Aug. 14, 2015)).

[185] *Id.* at p. 12; ex. 8, Expert Report on ADA Subclass at p. 38 ("[A] lack of appropriate placements results in children being placed out-of-state and in settings that are not remotely designed to meet their needs and do not allow for inclusive classroom learning and schooling."); ex. 8, Expert Report on ADA Subclass at pp. 40-41 ("West Virginia children with mental health conditions who are placed in restrictive settings remain in those settings for reasons unrelated to their individual mental health conditions."). In fact, "the diagnoses reported for placements [are] not always accurate, therefore increasing the likelihood for misplacement of children." Ex. 8, Expert Report on ADA Subclass at p. 42.

[186] DOJ Letter at p. 12.

The named Plaintiffs in the ADA Subclass have not received the necessary mental and behavioral health services. For example,  Karter—who suffers from disruptive mood dysregulation disorder, attention-deficit/hyperactivity disorder, depression, and self-harming behaviors—has yet to experience "implementation of effective treatment to meet his needs for stability and permanency."[187]

On at least seven separate occasions, Defendants have received formal warnings that DHHR does not adequately serve foster children with disabilities. The 2002 CFSR identified "shortages of mental health services in many areas of the State,"[188] and "lack of specialized placement resources for children with special needs."[189] The shortage of services required children to remain on long waiting lists.[190] Like now, "[c]hildren requiring placements to address [mental health] problems usually [needed to] be placed outside of the State."[191] A 2008 assessment later indicated that West Virginia had disregarded the earlier criticisms. The assessment determined that "[m]eeting the children's mental health needs [was] a challenge throughout West Virginia as there continue[d] to be deficiencies in the array, quality and quantity of treatment services."[192] As "recruitment of specialized foster homes remain[ed] an issue,"[193] the evaluators found that "children [with disabilities were] often placed out of state to meet their treatment goals."[194] Only two years later, the CFSR likewise found "that there are children with mental health needs who are not receiving services due in part to a lack of adequate assessment and a lack of available services."[195] In 2015, the DOJ concluded that West Virginia violated the ADA by failing to provide

---

[187] Ex. 7, Flory, Getman, and Popchak Report  at p. 248.
[188] Ex. 6, 2002 CFSR at D003162.
[189] *Id.* at D003166.
[190] *Id.* at D003226.
[191] *Id.*
[192] Ex. 30, 2008 Assessment at D003695.
[193] *Id.* at D003630.
[194] *Id.* at D003639.
[195] Ex. 23, 2009 CFSR at D003513.

"services to children with significant mental health conditions in the most integrated settings appropriate to their needs."[196] The investigation had found that "high rates of placement in segregated residential treatment facilities, including out-of-state placement, [existed] because DHHR ha[d] not developed a sufficient array of in-home and community-based services."[197] A 2018 audit also "noted a lack of homes that are willing to accept children with severe behavioral issues, [or] developmental disabilities."[198] West Virginia's 2019 Child and Family Service Plan most recently recited the failings that have endured in Defendants' care of foster children with disabilities. The audit listed the "[b]arriers to children receiving behavioral health assessments and/or services [as]: lack of contact by agency staff with children in non-placement cases, lack of mental health providers within a district, the focus on one child and failing to assess all children in the home, and limited follow-up on behavioral health issues when a child is reunified."[199] As of at least May 2015, BCF had already "identified the lack of treatment foster care and in-home services and a weak children's mental health system as contributing factors to the high use of congregate care."[200]

 The uniformity of the criticisms over almost twenty years establishes that Defendants have not taken meaningful action to correct their failures regarding the treatment of foster children with disabilities. Any modifications to the system have been trivial, and "have not significantly reduced the number of children unnecessarily placed in segregated residential treatment facilities."[201] For example, the DOJ has found, "pilot programs, small initiatives or programs targeted at sub-groups . . . do not adequately ensure that all children who rely on DHHR for mental health care are not

---

[196] DOJ Letter at p. 2.
[197] Id.
[198] Ex. 16, 2018 Progress Report at D004783.
[199] Ex. 21, 2019 CFSP at D003864.
[200] Ex. 14, 2015 2Q *Safe at Home* Report at D058236.
[201] DOJ Letter at p. 17.

unnecessarily placed in segregated residential treatment facilities."[202] On these grounds, the federal agency stated, **"the State has failed to use these reports to develop a comprehensive, cross-system plan to address high levels of unnecessary institutionalization."**[203] In particular, DHHR "has not developed comprehensive, community-based services for children with mental illness, including wraparound supports that are the standard of care for children with significant mental health needs."[204] In fact, "[d]ata indicates that the agency declined [between 2011 and 2015] in providing for the mental health needs of children."[205]

Defendants' system-wide policies and practices place all members of the ADA Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.[206]

### 4. Substantial evidence of commonality exists with respect to the Kinship Subclass

The common questions of fact and law raised by all members of the Kinship Subclass, each of which alone satisfies the commonality requirement for the Kinship Subclass, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants deprive Plaintiffs of the Kinship Subclass of necessary home safety assessments, case management and other services, and permanency planning.

Plaintiffs allege that all members of the Kinship Subclass are exposed to a substantial risk of harm as a result of Defendants' policies and practices, in violation of their rights under the Constitution and State policy.

---

[202] *Id.* at p. 19.
[203] *Id.* at p. 18.
[204] *Id.* at pp. 2-3.
[205] Ex. 16, 2018 Progress Report at D004867.
[206] Ex. 8, Expert Report on ADA Subclass at pp. 2-3 ("DHHR violates reasonable professional standards in its provision of care and services to West Virginia foster children with disabilities. As a result, DHHR fails to meet the needs of children with disabilities who are in the state's custody, putting them at substantial risk of harm beyond the trauma they have already experienced.").

West Virginia depends upon kinship placements to care for around fifty percent (3,713) of the State's foster care population,[207] although only sixty percent of these placements are licensed by DHHR.[208] Indeed, the total number of kinship placements in West Virginia rose 136 percent between 2011 and 2017.[209] In 2017, DHHR observed that "DHHR is not recruiting or approving new foster homes but rather is focused on kinship homes and re-evaluations."[210] The typical foster care stipend is available only to kinship caregivers who become licensed.[211] By contrast, uncertified kinship placements only receive TANF funding, "which is usually one-third to one-half the foster care payment."[212] The licensing process for kinship caregivers is identical to the licensing process for traditional foster homes.[213] For example, caregivers must participate in training,[214] and "the child's worker is still required to complete a general safety and well-being check of the relative home."[215] When kinship caregivers choose not to become licensed, "the child's worker is still required to complete a general safety and well-being check of the relative home."[216] In either instance, caseworkers must contact the child on a regular basis to ensure the child's safety and wellbeing.[217]

---

[207] 2020 Placements Report.
[208] *Id.*
[209] Taylor Stuck, *With Kinship Care Rising, More Support Needed*, Coal Valley News (Nov. 20, 2019), *available at* https://www.coalvalleynews.com/news/with-kinship-care-rising-more-support-needed/article_e356712f-b563-5033-9555-e6d7a99f1a33.html.
[210] Ex. 2, 2017 CFSR at D003800.
[211] Ex. 33, 2019 Kinship Study at D005833.
[212] Ex. 31, Expert Report on Kinship Subclass at p. 14; *see also* ex. 36, Kendra Boley-Rogers Kinship Dep. Tr., 105:9 – 24 (noting that blood relatives receive TANF funding, but kinship providers who have no blood relation receive the TANF rate, "but it is issued to the family through a demand payment each month").
[213] Ex. 33, 2019 Kinship Study at D005833. Under State policy, "all relative caretakers must meet the same certification standards as all foster/adoptive parents." Adoption Policy at § 4.3; *see also* Foster Care Policy at § 2.5.2.
[214] Ex. 33, 2019 Kinship Study at D005840.
[215] *Id.* at D005833.
[216] *Id.*
[217] Foster Care Policy at § 5.2.

Yet Defendants regularly provide foster children in kinship placements with care well below the formal guidance.[218] For one, a 2019 external report found, "[e]ngagement with relative/kinship families tends to be completed in a checklist format, which does not facilitate a case-by-case approach to the homestudy."[219] For another, as a corporate designee of DHHR testified, DHHR sometimes waives the training requirement for kinship caregivers. [220]

It is also "not unusual that a relative/kinship caregiver will not see a caseworker after the original placement."[221] Plaintiffs' expert on the Aging Out Subclass reports that around "50% of 627 certified kin and foster caregivers in West Virginia had been visited by a DHHR worker monthly, and more than 40% were first visited after three months or longer, with 40% of these visits completed after six months."[222] However, as Plaintiffs' expert witness on the ADA subclass has stated, "without caseworker contact, the child's safety and well-being are not regularly monitored, the child's needs are not adequately and regularly assessed, and the child is less likely to be referred to necessary services."[223] And so, "[i]f the relative/kinship caregiver does not self-advocate, or [is not] advised on how to self-advocate, there is a lack of opportunity for the relative/kinship caregiver to seek assistance or supports."[224]

---

[218] Ex. 21, 2019 CFSP at D003888 ("Other necessary services for children and families that were also noted as lacking included . . . kinship family support services."); ex. 31, Expert Report on Kinship Subclass at p. 9 ("there is concern regarding whether DHHR is conducting these required homestudies and safety checks on a consistent basis across the state.").

[219] Ex. 1, Kinship Care Strengths Assessment at D139312.

[220] Ex. 36, Kendra Boley-Rogers Kinship Dep. Tr., 93:21 – 94:6; 147:22-148:14. This designee further testified that DHHR regularly uses waivers when certifying kinship placements – although the use of waivers differs from region to region. Ex. 36, Kendra Boley-Rogers Kinship Dep. Tr., 199:16 – 21; 200:20-201:5; 202:22 – 203:2; 145:9-15 (explaining that results of a criminal background check can be waived in order to certify a kinship placement); *see also* ex. 31, Expert Report on Kinship Subclass at p. 9 (stating that the March 2019 Kinship Care Strengths Assessment, which evaluated DHHR's kinship practices, "noted inconsistent use of waivers in approving kinship homes").

[221] *Id.* at D139310.

[222] Ex. 31, Expert Report on Kinship Subclass at p. 10.

[223] *Id.*

[224] Ex. 1, Kinship Care Strengths Assessment at D128938.

Children in uncertified kinship homes especially suffer a heightened risk of substandard care. As of December 2019, 1,447 children remained in uncertified homes.[225] As Plaintiffs' expert has emphasized, "[t]here is growing concern that this practice of diverting children to uncertified foster homes denies them similar services, especially financial supports, and exposes them to [more] potential safety risks than those in certified foster families."[226]

Overall, kinship caregivers have identified a number of needs that DHHR has failed to meet. For example, the 2019 CFSP found that DHHR issues caregiver payments inconsistently, fails to meet the needs of both the families and children, and does not adequately link caregivers to appropriate services.[227] A 2019 internal study also warned that DHHR failed to provide sufficient training to kinship caregivers. The study specifically noted that "[t]raining locations and schedules are restrictive in meeting the needs of relative/kinship caregivers within the licensing time period," the available training is "designed . . . for traditional foster parents" rather than kinship caregivers, and no "clearly defined coordination of the training between DHHR and the Social Worker Education Consortium" existed.[228] Dennis C. especially suffered the second-rate care that has defined kinship placement in West Virginia. Upon placing Dennis with his step-grandmother, DHHR neglected to offer supportive services. Without supportive services, the kinship placement soon disrupted.[229]

Defendants' system-wide policies and practices place all members of the Kinship Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

---

[225] Ex. 31, Expert Report on Kinship Subclass at p. 7.
[226] *Id.*
[227] Ex. 21, 2019 CFSP at D003922.
[228] Ex. 33, 2019 Kinship Study at D005855.
[229] Ex. 7, Flory, Getman, and Popchak Report, at pp. 381-82, 397-98.

5.      **Substantial evidence of commonality exists with respect to the Aging-Out Subclass**

The common questions of fact and law raised by all members of the Aging Out Subclass, each of which alone satisfies the commonality requirement for the Aging Out Subclass, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants deny members of the Plaintiffs' Aging Out Subclass skills and resources necessary to learn to live independently, and providing them with necessary training, skills, and assistance in securing appropriate housing upon discharge; and
- Whether Defendants offer supports and case worker resources adequate to ensure that foster children fourteen years or older receive transition planning to ensure children that age out of the system into adulthood have adequate planning and resources to meet future housing, employment, educational, and other social needs.

The Aging Out Subclass seeks to represent "transition-aged" youth, who are exposed to a substantial and disproportionate risk of harm by Defendants' policies and practices toward older children in their care as a whole. Adolescents compose an increasing portion of the foster care population in West Virginia. As of 2019, the State's rate for entry of adolescents ages fourteen to seventeen amounts to 14.2 per 1,000 children.[230] This rate significantly surpasses the national average of 2.8 per 1,000 children.[231] Plaintiffs allege that all members of the Aging Out Subclass are exposed to a substantial risk of harm as a result of Defendants' policies and practices, in violation of their rights under the Constitution and federal law.

Federal law and State policy each require DHHR to provide distinct services to youth age fourteen or older.[232] Youths "must be taught the skills needed to become a successful, self-

---

[230] Kristin Sepulveda & Sarah Williams, *Older Youth in Foster Care Need Support to Make a Successful Transition to Adulthood*, CHILD TRENDS (May 7, 2019), *available at* https://www.childtrends.org/older-youth-in-foster-care-need-support-to-make-a-successful-transition-to-adulthood.

[231] *Id.*

[232] Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, 122 Stat. 3949 (2008); Foster Care Independence Act of 1999, Pub. L. No. 106-169, 113 Stat. 1822 (1999); *Youth Transitioning, Social Services Manual* (August 2020) (hereinafter "Youth Transitioning"), *available at* https://dhhr.wv.gov/bcf/Documents/YTPolicy.pdf.

45

sufficient adult,"[233] and caseworkers must design individualized learning and transition plans to ensure that the youth receives the services necessary to achieve independence.[234] Necessary services include both vocational services and training such as in money management, household maintenance, transportation, legal issues, health, community resources, housing options, personal hygiene, employment readiness, and educational assistance.[235]

DHHR appears to have abandoned its obligation to prepare adolescents to age out of the foster care system. Caseworkers "generally lack the knowledge and/or time to explore available resources such as free computers for foster children who are graduating from high school."[236] Studies have also "noted both an abundance of inappropriate concurrent permanency plans and a lack of preparation for independence for older children."[237] Instead, Defendants often resort to "Independent Living" as "the 'catch all' for all older youth, whether or not the goal was appropriate."[238] Ultimately, DHHR institutionalizes seventy-one percent of foster children between the ages of twelve and seventeen.[239] A DHHR corporate designee nonetheless testified that she did not know whether the institutions provide independent living services.[240] The designee also testified that, while DHHR encourages agencies to recruit foster parents specifically for transition age youth, she was unable to determine whether the efforts were successful.[241]

---

[233] Foster Care Policy at § 1.6; *see also* Adoption Policy at § 10.9.

[234] *See* Youth Transitioning at p. 2.

[235] *Id.* at pp. 10-12; ex. 11, 2015-2019 CFSP at D004130.

[236] Ex. 30, 2008 Assessment at D003650.

[237] *Id.* at D003635.

[238] Ex. 11, 2015-2019 CFSP at D004013.

[239] DOJ Letter at p. 6. DHHR also admits to institutionalizing at least half of youth over the age of thirteen. Ex. 37, Carla Harper Aging Out Dep. Tr., 268:6 – 12; 268:16 – 22 (noting "we are all concerned about" institutionalizing so many adolescents). The Department places the remaining half of youth over the age of thirteen in kinship care – where, DHHR admits, "support in those kinship homes is not great." Ex. 37, Carla Harper Aging Out Dep. Tr., 272:11 – 13.

[240] Ex. 37, Carla Harper Aging Out Dep. Tr., 182:10 – 18; 183:5 – 10 (admitting it is "possible" that none of the out-of-state residential facilities provide independent living services); 189:3 – 19 (stating that she does not know whether out-of-state facilities provide career preparation services); 192:15 – 193:8 (stating that she does not know if institutional providers provide transition age youth financial management services).

[241] Ex. 37, Carla Harper Aging Out Dep. Tr., 266:22 – 267-4.

West Virginia's failure to prepare children to age out of foster care has both immediate and long-term consequences.[242] Youth adjust to adulthood without education, life skills, or supportive adult relationships. The statistics and studies demarcating their fates are stark. In 2020, the National Conference of State Legislatures reported that, upon aging out of care, twenty percent of youth were immediately homeless, only fifty-eight percent had graduated high school by age nineteen, twenty percent still did not have a GED or high school diploma by age twenty-six, twenty-five percent were involved in the criminal justice system within two years of leaving care, and nearly eighty percent of women became pregnant by age twenty-six.[243] The National Foster Youth Institute similarly reported in 2017 that only fifty percent of foster children who age out of care "will have some form of gainful employment by the age of 24," twenty-five percent of children who age out of care suffer from Post-Traumatic Stress Disorder, and "[t]here is less than a 3% chance for children who have aged out of foster care to earn a college degree at any point in their life."[244]

The Named Plaintiffs have suffered irreparable harm from Defendants' failure to prepare them to transition out of the foster care system. For education, Gretchen relies on self-guided programs that progress without a teacher at her side.[245] DHHR has also taken few steps to ensure that she acquires any independent living skills.[246] Garret likewise has not had vocational or life skills training.[247] Numerous moves have caused Ace and Dennis to receive similarly fragmented

---

[242] *See* ex. 10, Expert Report on Aging Out subclass at p. 19 ("Given DHHR's heavy reliance on congregate care and congregate care's documented poor outcomes, it is not surprising that West Virginian foster system alumni would be ill-prepared for adulthood when they age out of care.").
[243] Older Youth Housing, Financial Literacy and Other Supports, *National Conference of State Legislatures* (last visited Aug. 26, 2020), *available at* https://www.ncsl.org/research/human-services/supports-older-youth.aspx.
[244] Aging Out of Foster Care, *National Foster Youth Institute* (May 26, 2017), *available at* https://www.nfyi.org/51-useful-aging-out-of-foster-care-statistics-social-race-media/.
[245] Ex. 7, Flory, Getman, and Popchak Report at p. 312.
[246] *See generally id.* at pp. 267-322.
[247] *Id.* at 455.

and ineffectual educations.[248] Dennis, who is seventeen years old, reads at a third grade level, and DHHR has not equipped either youth to achieve stable and sustaining lives upon aging out into adulthood.[249]

Defendants' system-wide policies and practices place all members of the Aging Out Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.[250]

### C. The Claims of Named Plaintiff Children Are Typical

#### 1. The typicality standard

Named Plaintiffs' assertions in this action are "typical of the claims . . . of the class" as required by the Federal Rules. Fed. R. Civ. P. 23(a)(3). "The threshold requirements of . . . typicality are not high". *Brown,* 576 F.3d at 153 ("Fed. R. Civ. P. 23(a) requires only that resolution of the common questions affect all or a substantial number of the class members. Allegations of similar discriminatory [] practices . . . satisfy the . . . typicality requirements of Rule 23(a)"). Here, "[t]he essence of the typicality requirement is captured by the notion that, as goes the claim of the named plaintiff, so go the claims of the class." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006) (internal quotation marks omitted); *see also In re NII Holdings, Inc. Sec. Litig.,* 311 F.R.D. 401, 406 (E.D. Va. 2015) (typicality is "designed to ensure that the class representative[s'] interests are sufficiently aligned with those of the other class members."). In other words, by prosecuting their own case, the class representatives "tend to advance the interests of the absent class members." *Deiter,* 436 F.3d at 466.

---

[248] *Id.* at p. 198, 208; *id.* at pp. 378, 386-87.
[249] *Id.* at p. 389.
[250] Ex. 10, Expert Report on Aging Out Subclass at p. 22 ("Based on current policies, practices, and outcomes, West Virginia DHHR operates a system that fails to meet its stated goals for children, with its pattern of failing to address safety, permanency, and well-being of transition age youth.").

In the Fourth Circuit, class representatives establish typicality by belonging to the class in question "and possess[ing] the same interest and suffer[ing] the same injury as the class members." *In re Titanium Dioxide Antitrust Litig.,* 284 F.R.D. 328, 339 (D. Md. 2012) (quoting *Deiter,* 436 F.3d at 466). This standard does not require "members of the class [to] have identical factual and legal claims in all respects." *In re BearingPoint, Inc. Sec. Litig.,* 232 F.R.D. 534, 538 (E.D. Va. 2006) (quoting *Broussard v. Meineke Disc Muffler Shops,* 155 F.3d 331, 344 (4th Cir. 1998)). Rather, variations among class members' injuries do not defeat typicality as long as the members' claims challenge the same course of conduct and make similar legal arguments to prove the defendants' liability. *Clarke,* 61 F. Supp. 3d at 589 ("It does not matter that the named plaintiffs . . . suffered varying injuries . . . Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned . . . to every other class member" (quoting *Parsons,* 754 F.3d at 686)). In the context of certifying a class of foster children alleging constitutional violations by State policy, *"*even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.

## 2.    Plaintiffs have satisfied the typicality requirement

Plaintiffs have satisfied the typicality requirement. The histories of the Named Plaintiff Children do present factual variations: the Named Plaintiffs come from seven different counties across the State, suffered a variety of different kinds of trauma or were involved in juvenile justice proceedings before entering DHHR custody, and have differing mental health diagnoses and placement histories. But such differences do not pertain to determinations of typicality. Here, Named Plaintiffs' claims all rest on the same legal theory as the members of the putative class— their exposure to a substantial risk of serious harm caused by Defendants' policies and procedures.

Caselaw within the Fourth Circuit supports this conclusion. In *Clarke*, for example, the named plaintiffs satisfied the typicality standard when, as here, they asserted that various State policies and practices violated their constitutional rights by placing them at risk of harm. 61 F. Supp. 3d at 587. For the plaintiff inmates suffered from a "broad variety of medical problems" since coming into the care of the state, all of which allegedly resulted from the state prison's substandard medical care policies. *Id.* at 589. The *Clarke* court looked to the "essential question" to determine whether typicality existed: if, "by demonstrating the facts necessary to establish . . . their claims with respect to the systemic deficiencies . . . and Defendants' deliberate indifference to Plaintiffs' serious medical needs, 'would also prove the claims of the absent class members.'" *Id. (quoting Dieter,* 436 F.3d at 467). As the various medical problems were "representative of the adverse health issues experienced by the entire prison population," the answer to the question was yes. *Id.* Additionally, if the challenged policies "fail[ed] to pass constitutional muster[,] . . . the resulting declaratory and injunctive relief would doubtless benefit the named Plaintiffs and all other [] prisoners alike." *Id.*

Similarly, the Named Plaintiffs all remained in Defendants' custody at the time of filing the Complaint, their claims are identical to the claims of each class member, and their claims all arise from the same course of conduct. Here, Plaintiffs' Complaint alleges specific DHHR policies and practices violate Plaintiffs' constitutional and federal statutory rights. For instance, they allege that Defendants have long failed to maintain a sufficient number of foster homes, operate dysfunctional kinship care and transition-age youth programs, create inadequate case plans, maintain insufficient community-based services, and overly rely upon out-of-state congregate care placements. Plaintiffs further allege that DHHR caseworkers carry unreasonably high caseloads, are inadequately trained, and that high vacancy rates pervade DHHR offices. Although the

Complaint only details the irreversible impact of these policies and practices on the twelve Named Plaintiffs, such systemic deficiencies harm every child in DHHR custody. The Named Plaintiffs have not received any unusual treatment that would render their claim atypical. Moreover, the relief that the Named Plaintiffs seek would benefit all class members in an identical manner. Accordingly, the Named Plaintiffs' claims are typical of the claims of the class as they clearly satisfy the "same class," "same interest" and "same injury" criteria for typicality required by the Fourth Circuit. Proving their claims would also prove the claims of the absent class members.

### D. The Named Plaintiff Children Will Adequately Represent the Class

#### 1. The adequacy standard

The Named Plaintiffs also satisfy the final prerequisite under Rule 23(a), which mandates that "the representative parties [ ] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts have developed a two-pronged test to determine whether Plaintiffs satisfy the adequacy requirement: "(1) the named plaintiffs must not have interests antagonistic to those of the class; and (2) the plaintiffs' attorneys must be qualified, experienced, and generally able to conduct the litigation." *In re Serzone Products Liab. Litig.,* 231 F.R.D. 221, 238 (S.D. W. Va. 2005). "The burden is on the defendant to demonstrate that the representation will be inadequate." *Haywood v. Barnes,* 109 F.R.D. 568, 579 (E.D.N.C. 1986).

#### 2. Plaintiffs have satisfied the adequacy requirement

The adequate representation inquiry "serves to uncover conflicts of interest between named parities and the class they seek to represent." *In re Serzone Prods. Liab. Litig.,* 231 F.R.D. at 238 (internal quotation marks omitted). Minor conflicts between named plaintiffs and the putative class members will not render the representatives inadequate. "To defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative or hypothetical.'" *Gunnells,* 348 F.3d

at 430 (quoting *5 Moore's Federal Practice* § 23.25[4][b][ii] (2002)). Only a "fundamental" conflict that "go[es] to the heart of the litigation" will suffice to defeat adequacy. *See id.* at 430-31. No such fundamental conflict exists when "all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir. 2010) (internal quotation marks omitted). "The principal factor in determining the adequacy of class representatives is whether the plaintiffs have the ability and commitment to prosecute the action vigorously." *Thomas v. La.-Pacific Corp.,* 246 F.R.D. 505, 509 (D.S.C. 2007).

The Named Plaintiffs satisfy the adequacy requirements of 23(a)(4) as no conflict—let alone a fundamental one—exists between them and other class members. The Named Plaintiffs also share a common objective with the putative class members: to pursue claims common to the class as a whole and to advance the common interest of reforming Defendants' constitutionally deficient foster care system on the basis of the same factual and legal positions.[251] In seeking injunctive relief to alter Defendants' conduct and improve West Virginia's child welfare practices for all class members, they share the same interest in establishing the liability of Defendants. The requested relief does not include money to be divvied up between class members to form potential conflicts, and no competition exists to achieving a foster care system in compliance with the Constitution and federal law. Accordingly, "Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole." *Clarke,* 61 F. Supp. at 590.[252]

---

[251] *See supra*, Sections IV.B, C (discussing commonality and typicality).

[252] *See also Thomas v. La.-Pacific Corp.,* 246 F.E.D. 505, 509 (D.S.C. 2007) (finding Rule 23(a)(4) was satisfied because there was no conflict between plaintiffs and the class). *Clarke* further clarified that "Plaintiffs do not have any interests in conflict with the interests of the members of the class they seek to represent . . . [because] . . . Plaintiffs seek a declaratory judgment and an injunctive order requiring the Defendants to provide the constitutionally-required level of care sufficient to meet the serious medical needs of all [] prisoners." *Clarke,* 61 F. Supp. at 590.

Also, Plaintiffs' attorneys are amply qualified, experienced, and able to conduct this litigation. As discussed in Section V, *infra*, Plaintiffs' counsel have both the experience and expertise in handling class action and civil rights litigation, particularly in matters relating to foster care, disability rights, and unconstitutional governmental policies and practices. "Courts generally hold that the employment of competent counsel assures vigorous prosecution." *Thomas,* 246 F.E.D. at 509 (quoting *S.C. Nat'l Bank v. Stone,* 139 F.R.D. 325, 331 (D.S.C. 1991)).

Named Plaintiffs are appropriate and adequate class representatives as they do not have any interests antagonistic to the class as a whole, and counsel who satisfies the standards set forth in Rule 23(g) represents them. Named Plaintiffs will therefore "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

### E.   The Named Plaintiff Children Satisfy the Requirements of Rule 23(b)

#### 1.   The Rule 23(b) Standard

In addition to satisfying the prerequisites of Rule 23(a), the proposed class in this case satisfies Rule 23(b)(2). Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) has been "liberally applied in the area of civil rights." *Bumgarner*, 276 F.R.D. at 457. Notably, a West Virginia district court observed that both the Supreme Court and the Fourth Circuit had made "affirmative statements . . . that suits brought for injunctive relief alleging civil rights violations are precisely the type of suit for which Rule 23(b)(2) was intended to provide class certification." *Harris v. Rainey*, 299 F.R.D. 486, 494 (W.D. Va. 2014) (citing *Amchem Prods., Inc.,* 521 U.S at 614).[253]

---

[253] *See also Thorn*, 445 F.3d at 331 ("[C]ertification under Rule 23(b)(2) is improper when the predominant relief sought is not injunctive or declaratory, even if the relief is equitable in nature."); *Clarke,* 61 F. Supp. 3d at 591

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." *Wal-Mart Stores, Inc.,* 564 U.S. at 360 (internal quotation marks omitted). Under this requirement, class members must share a certain cohesiveness with respect to their injuries. The Fourth Circuit has expressly stated that "Rule 23(b)(2)'s categorical exclusion of class actions seeking primarily monetary relief . . . ensures that the class is sufficiently cohesive [such] that the class-action device is properly employed." *Harris,* 299 F.R.D. at 497 (citing *Thorn,* 445 F.3d at 330). After all, "because of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group with few conflicting interests among its members." *Berry*, 807 F.3d at 608-11 (internal quotation marks omitted). "The essential consideration is whether the complaint alleges that the plaintiffs have been injured by defendants' conduct which is based on policies and practices applicable to the entire class." *Bumgarner,* 276 F.R.D. at 457-58. Certification is thus appropriate where, as here, final injunctive relief is sought and will "settl[e] the legality of the behavior with respect to the class as a whole." *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.,* No. 3:11-CV-754, 2014 U.S. Dist. LEXIS 124415, at *34 (E.D. Va. Sep. 5, 2014) (citing *Thorn,* 445 F.3d at 329) (internal quotation marks omitted).

Numerous courts across the country have certified classes of foster care children under Rule 23(b)(2) where the relief sought is injunctive and would benefit all class members. In *DG v. Devaughn,* the Tenth Circuit affirmed the district court's ruling[254] to certify a plaintiff class of

---

[254] (granting motion for class certification and recognizing "Rule 23(b)(2) was drafted specifically to facilitate relief in civil rights suits"); *Olvera-Morales v. Int'l Labor Mgmt. Corp.,* 246 F.R.D. 250, 252 (M.D.N.C. 2007) (granting motion for class certification of temporary foreign workers alleging discriminatory recruitment practices by employment agency).

[254] Defendants in *Devaughn* challenged the lower court's ruling by providing evidence that caseloads were not excessive in rural areas and arguing that plaintiffs failed to show sufficiently similar injuries. In rejecting defendants' argument, the court explained that (1) Rule 23(b)(2) does not require named plaintiffs to prove actual harm or exposure to risk of harm as to every class member at the certification stage;  and (2) the injuries alleged were sufficiently similar if they could "be addressed in a single injunction that need not differentiate between class members." *Id.* 594 F.3d at

foster children who sought relief in the form of an injunction both setting limits on caseworker caseloads and mandating that caseworkers visit the children on their caseloads more frequently. 594 F.3d 1188, 1201 (10th Cir. 2010). The court reasoned that all class members, by virtue of being in defendants' custody, were subject to defendants' practice of assigning excessive caseloads and failing to ensure that caseworkers adequately monitored the children on their caseloads. *Id.* Furthermore, the named plaintiffs alleged the same injury—an impermissible risk of harm—on behalf of all class members as a result of these deficient practices. *Id.* On these grounds, the court found that the proposed class satisfied the requirements of Rule 23(b)(2). *Id.*

Similarly, in *Connor B v. Patrick,* the court certified a class of Massachusetts foster children alleging constitutional harms and seeking several forms of injunctive relief including "stricter limits on caseworker caseloads and increased visitation by caseworkers of children in foster homes." 272 F.R.D. 288, 297 (D. Mass. 2011). The court held that such "relief would benefit the entire class" and was "fully consistent with Rule 23(b)(2). *Id.* Defendants in *Connor B.* argued that Plaintiffs' allegations required "highly-individualized determination[s]" and therefore were not proper for class-wide treatment. *Id* at 297. In dismissing the argument, the court explained, "the existence of differences among members of the Plaintiff class does not make certification improper. In fact, it is not uncommon for courts . . . to certify class actions in which alleged systemic deficiencies resulted in harms that manifested themselves differently among different segments of the plaintiff class." *Id. M.D. v. Perry* likewise certified a proposed class of Texas foster children under Rule 23(b)(2) who sought injunctive relief requiring defendants to assign a caseworker to all class members and to establish caseload standards. 294 F.R.D. at 46-47. As the court reasoned, "Plaintiffs have alleged a unified harm to class members—an unreasonable risk of

---

1201 (internal quotation marks omitted). The court held that imposing caseload limits and increasing monitoring could sufficiently mitigate the risk of harm suffered by all class members. *Id.*

harm due to ineffective monitoring and planning because caseworkers are overburdened." *Id* at 47. Plaintiffs' claim also proved "susceptible to common, specific relief . . . such as: setting maximum caseloads [or] hiring more caseworkers"—although "[t]he Court need not, at this stage, determine what remedy Plaintiffs would be entitled to if they prevailed on the merits of their claim." *Id*. "Critically, injunctions of this sort would require no additional individual assessments." *Id.*

The Fourth Circuit has embraced the preceding principles. In other words, the Circuit routinely certifies classes under Rule 23(b)(2) when plaintiffs in state custody allege systemic failures. *See*, *e.g.*, *Clarke*, 61 F. Supp. 3d at 590-91.[255]

## 2. Plaintiffs have satisfied the Rule 23(b)(2) requirement

Named Plaintiffs easily satisfy the requirements of Rule 23(b)(2). Defendants, through the policies, practices, and procedures that compose their foster care program, have acted or refused to act on grounds generally applicable to each of the class members. For all class members are children in the custody of Defendants at the time of filing and so, despite differences in individual histories and circumstances, all class members are equally subject to these deficient policies and practices and associated risks. Accordingly, Defendants' conduct "is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.,* 564 U.S. at 360.

---

[255] In *Clarke*, the court found the Rule 23(b)(2) standard was met where the proposed class of prisoner plaintiffs alleged the defendants provided deficient medical care "on a systemic basis that jeopardize[d] the continuing health . . . of all other prisoners" in their facility and "[i]f Plaintiffs ultimately prevail[ed] on the merits of their claims, the resulting declaratory and injunctive relief [would] apply to and benefit all members of the proposed class." *Scott*, 61 F. Supp. 3d at 590-91; *see also Bumgarner*, 276 F.R.D. at 457-58 (holding declaratory and injunctive relief was appropriate because the harm alleged by plaintiffs—a proposed class of inmates in the custody of defendants—derived from the policies and practices of defendants' sentence reduction program, which excluded disabled inmates from certain benefits and therefore satisfied the requirements under Rule 23(b)(2)); *Buffkin*, 2018 U.S. Dist. LEXIS 202875 at *21 (granting certification of a proposed class of inmates diagnosed with Hepatitis C, who, under prison policy, were not treated with anti-viral drugs, and stating that "it is the policy itself that Plaintiffs are challenging and because [the policy] applies to all members of the class, the requested relief would benefit all members.").

Indeed, Plaintiffs seek to cure system-wide failures rather than to adjudicate any individual child's case. Their Complaint identifies the need for an injunction that will increase caseworker staffing, increase mental health services, ensure each child has a written case plan that provides for permanency or reunification, and improve the quality and quantity of foster care placements throughout the State of West Virginia. (*See* ECF No. 1, ¶ 405.) Such injunctive and declaratory relief would clearly benefit all class members.

Here, Plaintiffs' claims cannot receive meaningful relief without the relief proceeding on a class-wide basis. For instance, an order granting relief with respect to only one child, without addressing the system shortfalls, would "rob Peter to pay Paul"[256] by shifting resources to benefit one child away from another. Accordingly, the court would be playing a zero-sum game. Moreover, granting relief to a particular child may provide temporary relief, but, as that child's needs change over time, the child will once again be subject to Defendants' policies and practices which failed to provide for their needs in the first place. Accordingly, the court should certify the class under Rule 23(b)(2) because Defendants' unconstitutional practices apply generally to the class and only final injunctive and declaratory relief will "settle the legality of the behavior with respect to the class as a whole". *Thorn*, 445 F.3d at 329 (internal quotation marks omitted).

Each subclass similarly seeks broad, uniform injunctive relief to redress the additional, particularized harms that each subclass of children suffers as a result of Defendants' policies and practices: the Kinship Subclass seeks injunctive relief requiring Defendants to develop adequate

---

[256] *Braggs v. Dunn,* 317 F.R.D. 634, 667-69 (M.D. Ala. 2016). *Braggs* certified a class of prisoners under Rule 23(b)(2) who alleged system-wide deficiencies in Defendants' mental health system. *Id.* at 674. The court explained that, "[a]lthough the court could order . . . that a particular prisoner who currently requires psychiatric care be seen by a psychiatrist, it cannot order that adequate staffing be provided to the extent necessary to address any one particular prisoner's mental-health care needs as they develop in the future . . . Moreover, any order remedying a systemic deficiency with respect to only one prisoner would rob Peter to pay Paul; the court would be playing a zero-sum game, shifting mental-health care resources from one prisoner to another." *Id.* at 668.

statewide kinship placement plans, provide adequate funding to unlicensed kinship caregivers, properly monitor kinship placements, and ensure the proper execution of background checks and home safety inspections; the ADA Subclass seeks injunctive relief requiring Defendants to develop and maintain an adequate array of therapeutic services and foster placements, and to provide services to children with disabilities "in the most integrated setting appropriate to the child's needs"; and the Aging-Out Subclass seeks injunctive relief requiring DHHR to implement transition planning for youth over fourteen who are not imminently likely to achieve permanency, and prohibiting the refusal of a foster placement on the grounds of the youth being over fourteen years of age. These subclasses satisfy the requirements of Rule 23(b)(2) because the requested relief for each responds to conduct of Defendants that generally affects all subclass members and "would provide relief to each member of the class." *Wal-Mart Stores, Inc.,* 544 U.S. at 360.

## V.  THE COURT SHOULD APPOINT CLASS COUNSEL

Federal Rule of Civil Procedure 23(g) requires that the Court appoint class counsel for any certified class. Class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (g)(4). In determining whether a proposed class satisfies this requirement, courts "must consider (i) the work counsel has done in identifying and investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). "[A]n essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation." *Barton v. Constellium Rolled Prods. Ravenswood, LLC*, No. 2:13-cv-03127, 2014 U.S. Dist. LEXIS 57703, at *12 (S.D. W. Va. Apr. 25, 2014) (internal quotation marks omitted).

With respect to the requirements and considerations under Rule 23(g), Plaintiffs' counsel are fully qualified and prepared to pursue this action on behalf of the proposed Classes. Proposed class counsel consists of attorneys from A Better Childhood, Inc. ("ABC"),  Shaffer and Shaffer PLLC, and Disability Rights of West Virginia.[257] Counsel have dedicated substantial efforts to develop the class allegations in this matter. Indeed, over the course of ten months, counsel made multiple trips to various parts of West Virginia to meet with dozens of key stakeholders, and spent hundreds of hours compiling and analyzing relevant data.[258] Counsel have extensive experience and expertise in handling class action and civil rights litigation, particularly in matters relating to foster care, disability rights, and unconstitutional governmental policies and practices.[259] For instance, Marcia Robinson Lowry, Executive Director of ABC, has litigated class action child welfare reform cases alleging system-wide deficiencies for over forty years; Disability Rights of West Virginia has extensive experience and expertise representing individuals with disabilities pursuant to the Developmental Disabilities Assistance and Bill of Rights Act; and Shaffer and Shaffer is a full-service West Virginia law firm with extensive experience in class action litigation and matters involving child abuse and neglect, the ADA, and Section 504 of the Rehabilitation Act, as well as other complex litigation matters.[260] Finally, in addition to knowledge of the applicable laws and the nuances of the claims raised thereunder, proposed class counsel have sufficient financial and human resources dedicated to litigating this matter.[261]

Proposed class counsel also has the ability to represent the class fairly and adequately. *See* Fed. R. Civ. P. 23(g)(1)(B), (g)(4). "Adequacy of counsel is generally presumed in the absence of

---

[257] The Declarations of Marcia Robinson Lowry and Richard W. Walters, filed concurrently with this Memorandum, contain detailed descriptions of class counsels' qualifications. *See generally* Lowry Dec.; Declaration of Richard W. Walters (hereinafter "Walters Dec.").
[258] *See* Lowry Dec. at ¶ 10; *see also* Walters Dec. at ¶¶ 9-11.
[259] *See* Lowry Dec. at ¶¶ 4-11; *see also* Walters Dec. at ¶¶ 2-8, 13.
[260] *See* Lowry Dec. at ¶¶ 4-6; *see also* Walters Dec. at ¶¶ 2-8, 13.
[261] *See* Lowry Dec. at ¶¶ 4-11; *see also* Walters Dec. at ¶¶ 3, 8, 10-11.

specific proof to the contrary." *Hutson v. CAH Acquisition Co. 10, LLC,* No. 1:15-cv-742, 2016 U.S. Dist. LEXIS 107329, at *14 (M.D.N.C. Aug. 15, 2016) (internal quotation marks omitted).[262] Plaintiffs' counsel do not have conflicts of interest with the Named Plaintiffs or with any known individuals within the putative classes. As Plaintiffs have established that proposed class counsel is "qualified to vigorously prosecute this action on behalf of the proposed class and subclasses," Plaintiffs respectfully request that this Court appoint the proposed class counsel. *Beaulieu v. EQ Indus. Servs.,* No. 5:06-cv-400-BR ALL, 2009 U.S. Dist. LEXIS 133023, at *45 (E.D.N.C. Apr. 20, 2009).

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask that the Court grant Plaintiffs' Motion and certify the General Class and each subclass, because the defined classes meet the requirements of Rule 23(a) and 23(b)(2).

Respectfully submitted,

*/s/ Marcia Robinson Lowry*
Marcia Lowry, *admitted pro hac vice*
mlowry@abetterchildhood.org
Allison Mahoney, *admitted pro hac vice*
amahoney@abetterchildhood.org
Dawn Post, *admitted pro hac vice*
dpost@abetterchildhood.org
Tavi Unger, *admitted pro hac vice*
tunger@abetterchildhood.org
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415

---

[262] *Huston* held that class counsel was capable of fairly and adequately representing the class, because "counsel ha[d] investigated, and pursued the class claims diligently, has experience ligating class actions, and has knowledge of [applicable] laws." 2016 U.S. Dist. LEXIS 107329, at *18.

*/s/ Richard W. Walters*
Shaffer & Shaffer, PLLC
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net
Brian L. Ooten, WVSB #9358
booten@shafferlaw.net
2116 Kanawha Boulevard, East
P.O. Box 3973
Charleston, WV 25339
Tel: (304) 344-8716
Fax: (304) 344-1481

*/s/ Lori Waller*
Disability Rights of West Virginia
Lori Waller, WVSB #11303
lwaller@drofwv.org
1207 Quarrier Street, Suite 400
Charleston, WV 25301
Tel: (304) 346-0847
Fax: (304) 346-0687

**Attorneys for Plaintiffs**