Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| JIM JUSTICE, in his official capacity as | ) | **Case No.** 3:19-cv-00710 |
| Governor of West Virginia, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF LINDA WATTS**

1.     My name is Linda Watts.  I am the Commissioner of the West Virginia Bureau of Children and Families ("BCF") within the Department of Health and Human Resources ("DHHR").  I am submitting this declaration in support of the Defendants' opposition to the Plaintiffs' motion for class certification in order to provide background information about some of BCF's operations as they relate to the allegations brought in this lawsuit.

2.     The information contained in my declaration is based on my personal knowledge, my review of cited documents, and communication with my staff.

**<u>BCF Offices and Personnel</u>**

3.     The Bureau for Children and Families is responsible for the operation of a number of programs to support families and children in West Virginia, including family assistance (financial assistance, Supplemental Nutrition Assistance Program, emergency assistance), adult protective services, early childhood education services, child protective services, and foster care and adoption.  Staff are assigned to every county in West Virginia.

4.      DHHR administrative offices are divided into four regions, each of which is headed by a Regional Director who oversee the counties within their Region.  Counties are grouped to create 29 districts, each of which is supervised by a Community Services Manager. I have two Deputy Commissioner of Field Operations each of whom oversees two regions.

5.      With respect to West Virginia's child welfare program, every district has Child Protective Services ("CPS") caseworkers; Youth Service ("YS") caseworkers; Homefinding Specialists; and Adoption caseworkers, as well as supervisors for each category of caseworker.

      a.   CPS caseworkers are responsible for investigating allegations of abuse and neglect, working with families in crisis, petitioning for removal of children from the home when necessary, overseeing and monitoring the safety and wellbeing of the children in foster care, and developing a permanency plan for children who cannot be safely reunited with their families.

      b.   YS caseworkers provide similar services as CPS caseworkers, except YS caseworkers generally work with foster care children in DHHR custody as a result of a juvenile justice proceeding.

      c.   Homefinding Specialists are responsible for ensuring that a child's placement is safe and for working with kinship/relative families to obtain certification.

      d.   Adoption caseworkers work to facilitate the adoption process and find permanent homes for children whose parents have had their parental rights terminated.

6.      Each region also has Child Welfare Consultants, Adoption Consultants, and Homefinding Consultants who have years of experience in the field and who provide support and advice to the districts as needed.

7.     We currently have approximately 7,000 children in DHHR custody, which represents a 75 percent increase over the last five years.  *See* Att. A; Att. B.  In 2018, 83 percent of all CPS cases involved parental substance abuse. Att. C.

8.     This is a dynamic population.  Every year thousands of children enter and leave our custody.  For example, in 2018 approximately 5,000 children entered DHHR custody, and approximately 4,500 left, either through reunification with their families or through other permanency arrangements, including adoption, guardianship, or independent living.

9.     The first goal of foster care is to safely reunite a child with their birth family as soon as possible.  Over half of foster children in West Virginia are reunited with their birth families.

### Child Placement Agencies

10.     BCF contracts with 12 Child Placing Agencies throughout the State to recruit, train, license or certify, and provide case management to foster family homes for children in the custody of DHHR.

11.     Non-kinship foster families are generally certified by a Child Placing Agency, though there are some that are certified by DHHR.  As of November 2020, there were a total of 1675 traditional foster families certified by either a Child Placing Agency or DHHR.  Over 250 of those certified foster families are not currently caring for a foster child.

12.     In addition to their CPS or YS caseworker, children who are in family foster care homes licensed by Child Placing Agencies also have a caseworker through their Child Placing Agency.

### Foster Care Entries

13.     By law, there are three pathways to a child coming into DHHR custody.  The first, and most common, is that a child is removed from the home due to an abuse and neglect petition. W. Va. Code § 49-4-405.  The second is that a circuit court orders a child who is charged or adjudicated in the juvenile justice system – as a juvenile delinquent or juvenile status offender – into DHHR custody for placement and services in a residential treatment program, instead of into the custody of the Bureau of Juvenile Services.  W. Va. Code § 49-4-701.  At any given time, approximately 9 percent of West Virginia's foster children are in our custody as a result of a status offense or juvenile delinquency proceeding ("juvenile justice youth"). The third way in which children enter DHHR's custody is by voluntary relinquishment by their parents. (Only a small number of children in care entered custody through this pathway).

14.     DHHR is committed to providing similar services and opportunities to juvenile justice youth in our custody as other foster children.  However, we have found that the cases of juvenile justice youth tend to be more complicated, because of there are often serious behavioral and mental health issues that resulted in the juvenile justice charge.

## Placement Types

15.     In West Virginia, each child in foster care has a Multidisciplinary Treatment Team, which consists of the child's custodial parent or guardian and their attorney, other immediate family members, the prosecuting attorney, the Guardian Ad Litem, the child if he or she is over the age of 12, a school official, the child or family's DHHR caseworker, the child's foster parent, and any other professional or service provider who may be helpful to the Team's work. The Multidisciplinary Treatment Team is responsible for developing and implementing a comprehensive and individualized service plan for children involved in a court proceeding.

16.     In West Virginia, child placements recommendations are made by the child's Multidisciplinary Treatment Team, child placements are generally arranged by the DHHR caseworker, and the circuit courts are required by state law to review, approve, and order the placement. W. Va. Code § 49-4-110(a).   Those placements are re-reviewed and approved by the circuit court every 90 days. *Id.* In my experience, while the circuit court often agrees with the placement recommendations of the Multidisciplinary Treatment Team and/or child's caseworker, it is not uncommon that the court will override those recommendations and order the child to a specific placement that the circuit court believes is more appropriate and in the child's best interests.

17.     BCF has a variety of placement types for children in its custody depending on the unique needs and situation of each child.  West Virginia law and DHHR policy provide that a child must be placed in the "least restrictive" setting appropriate for their needs.  W. Va. Code § 49-4-608(e)(3); DHHR, *Foster Care Policy*, at 123; *Judicial Benchbook*, ch. 3, at 23.[1]  Below are the various placement types, from least restrictive to most restrictive:

a) Kinship/Relative home: This is a placement either with a blood relative or another adult with a close connection to the child.

b) Family Foster Home: This is a private residence under contract with a Child Placing Agency or DHHR in which the foster parents care for no more than six children who are unrelated by blood, marriage or adoption to any adult member of the household.  Many foster parents are trained to provide therapeutic services to the children in their care.

c) "Medley" Specialized Care Home: These are foster family homes specially trained to foster children with developmental disabilities.

---

[1]  A copy of the *Foster Care Policy* is publicly available at: https://dhhr.wv.gov/bcf/policy/Documents/Foster%20Care%20Policy%20August%202020.pdf. A copy of the *Judicial Benchbook* is publicly available at: http://www.courtswv.gov/public-resources/CAN/ABBenchBook/2020Benchbook11-2-20.pdf.

d) Emergency Foster Family Care: Emergency care is for children entering custody on an emergency basis or after hours, and in the absence of an appropriate kinship or relative, or temporary foster care placement. Emergency placement is generally limited to a period of 48 hours. Emergency care foster parents must meet the same basic qualifications as other foster care providers.

e) Group Residential Care: Group care provides the structure necessary for some children whose early experiences and relationships make it difficult to accept a surrogate parent/child relationship, even temporarily.  There are three levels of group care, each of which provides increasing levels of structure and routine.  A child is only recommended for group residential care after a rigorous assessment and evaluation.

f) Emergency Shelter Care Facility: Shelter care is for older children entering foster care on an emergency basis or those who are between placements. This placements type is designed to meet the child's emergency needs for food, housing and supervision and is intended to be a temporary placement. These placements provide for mental and behavioral health assessment, crisis planning services and needs assessment, stabilization services and access to schooling.

g) Qualified residential treatment program: A QRTP is a program that has a trauma-informed treatment model designed to address needs of children/youth with serious emotional or behavioral disorders or disturbances.  The target population is limited to children between the ages of 12 and 21 who have demonstrated an inability to function in foster homes or less restrictive forms of residential care due to significant lack of behavioral control and have specified diagnoses that require 24-hour treatment and intervention to prevent hospitalization.  Currently, there are no QRTPs in West Virginia.

h) Psychiatric Residential Treatment Facility or psychiatric hospital: This is the most restrictive type of care for children in foster care, used for treatment of children who have been diagnosed as having a psychiatric, emotional, or behavioral disorder that is so severe the child is a danger to himself or others.  The evaluation and recommendation for this placement is not done by DHHR; rather it is done by independent mental health professionals.

18.     Because of our small size, West Virginia does not have as wide range a of residential treatment options for children who require intensive behavioral treatment as some States.  As a result, for some children, there are better options out of state.  However, by law, a circuit court may only place a child in an out-of-state residential treatment program if there is no

in-state alternative available.  W. Va. Code § 49-4-608(d).  DHHR will only recommend an out-of-state placement if there are no equivalent in-state options available.

19.     The West Virginia legislature pays close attention to the placement of children in DHHR custody, including the number placed out of state.  We are required to report placements, including out-of-state placements, to the legislature in monthly reports.  A copy of our September 2020 report is included as Att. A.

20.     While our reports to the legislature do not distinguish between children in our custody as a result of an abuse-and-neglect proceeding and children in our custody as a result of a juvenile justice proceeding, we have internal reports tracks the number of children in different placement types, including in-state and out-of-state, by YS and CPS case type.

21.     I review these reports monthly and closely monitor both the number of children in residential treatment programs and the number of children out-of-state.

## Residential Treatment Programs

22.     DHHR has long been concerned about the number of children who are placed in residential treatment programs rather than foster families.  The primary driver of these types of placements is that some foster children have serious behavioral or mental health needs that require intensive treatment.

23.     DHHR has taken a number of steps over the last several years to improve the availability of community mental health services to children in foster care to maximize the extent to which children with these serious behavioral and mental health needs can be placed in family homes.

24.     In 2014, West Virginia applied for and secured funding from the federal government for a program to provide comprehensive "wrap-around" behavioral and mental health

treatment to youth aged 12 to 17 who were in or at risk of placement in residential treatment programs, and their families.  We call this the "Safe at Home" program. *See* Att. D.

25.     As part of the Safe at Home application, DHHR highlighted the number of youth in residential treatment programs in West Virginia.  While the Administration for Children and Families approved our program, it appears that our application also launched an investigation by the U.S. Department of Justice ("DOJ").  Shortly after our submission, we received a letter from DOJ opening an investigation into the availability of community-based mental health services for children.

26.     In June 2015, the DOJ informed DHHR of its findings that the State was in violation of the Americans with Disabilities Act ("ADA") because some children with mental illness were not receiving supports and services in the most integrated setting appropriate to their needs. Although DHHR disagreed the DOJ's finding, in 2019, DHHR determined that it was in the best interest of the State and its foster children to enter into a Memorandum of Understanding ("MOU") with the DOJ that committed the State to further develop its children's mental health infrastructure and to reduce the number of children in residential treatment programs over five years.

27.     Specifically, under the MOU, the State must, among other things:

    a.   Develop and expand in-home and community based mental health services, including ensuring statewide access to wraparound facilitation; behavioral support services; family support services and training services; in-home therapy; mobile crisis response and Assertive Community Treatment.

    b.   Eliminate any unnecessary placements in residential mental health treatment facilities and decrease the percentage of children in residential treatment programs by specific benchmarks.

c. By the end of 2024, ensure that a qualified professional has re-assessed all children living in a facility and determined that this setting is the most appropriate setting for each individual child.

28.    The MOU requires the State to hire a subject matter expert to provide technical assistance and recommendations for attaining compliance.  The subject matter expert must prepare a comprehensive report on the status of the State's compliance with the agreement twice a year. The State has engaged the University of Maryland School of Social Work ("UMSSW").  UMSSW has recently finished its second report.  *See* Att. E.

29.    The MOU also requires the State to develop an implementation plan, which must be approved by the DOJ and may be modified annually, to detail the steps it will take to create mental health services that are sustainable, statewide, and available to children in the target population (children under the age of 21 with a serious emotional or behavioral disorder who are in a residential mental health treatment facility or at risk of such placement).  DOJ approved DHHR's implementation plan in 2019.

30.    Work pursuant to the implementation plan is being conducted consistent with eight dynamic work plans developed by DHHR staff and Berry Dunn, and overseen by several DHHR "working groups."  *See* Att. F.  Over the last year, DHHR staff and Berry Dunn have spent hundreds of hours working to implement the MOU.

31.    Recently, in light of the COVID-19 pandemic, some of the initial timeframes in the 2019 implementation plan were pushed back, and DHHR is working with the DOJ to adjust those timeframes accordingly.  However, we believe we are on track to achieve the goals of the MOU within the agreed-upon timeframes.

32.     DHHR also recently implemented two programs that will significantly expand and improve services to children with serious mental and behavioral health needs, which I discuss in more detail below: (1) a managed care program through which a single entity will manage and coordinate all services to children; and (2) the Medicaid Children with Serious Emotional Disorder Waiver program.

### Support for Older Youth

33.     DHHR provides youth in foster care who fourteen years and older with supports and service to assist in transitioning to adulthood and independence.

34.     For over 30 years we have partnered with West Virginia University's Center for Excellence in Disabilities ("CED") to provide these services to transition aged youth.   The Mentoring and Oversight for Developing Independence for Foster Youth ("MODIFY") program within the CED collaborates with DHHR to promote self-directed decisions and skills regarding educational and professional goals, living arrangements and independence in daily living for transition aged youth.

35.     MODIFY works to ensure that transition aged youth are provided education, training, financial supports, and other needed transitioning services; supports and serves youth between 18 and 23 years of age to achieve self-sufficiency and engage with their responsibilities in preparing to make the transition from adolescence to adulthood; and providing youth who leave foster care at 18 or older with Educational and Training Vouchers ("ETV") to enroll in a post-secondary educational or vocational program.

36.     ETV funds can be used to cover tuition, including related expenses such as computers, housing, and transportation.

37.     The MODIFY program awarded 239 ETVs during the 2018 to 2019 school year, and 256 ETVs during the 2019 to 2020 school year.

38.     Between January 2018 and September 2020 MODIFY served a total of 1,598 youth.

39.     Many older adolescents prefer and benefit from independent living.

### Kinship Placements

40.     We have two types of kinship homes:  certified and uncertified.  A certified kinship home is one that either meets the standards for a regular foster family home (e.g., home safety and caregiver training), or has had requirements individually waived so that the child can stay with adults with whom they are familiar.  Waivers are done at the regional level.  An uncertified home is one in which the family complies with all safety requirements but has elected not to go through the certification process.  Most of our uncertified kinship placements are in the process of obtaining certification.  A few families elect never to get certified, generally because they do not need the extra financial supports that comes with certification and not want to spend the time going through the certification process.

41.     A certified kinship placement receives the same payment for maintenance of the foster child as other foster families.  Currently, this is $790 per month, per child.  An uncertified kinship family is eligible to receive a payment through the Temporary Assistance to Needy Families ("TANF") program or, if the placement is not a relative amount, an equivalent amount paid with state-only funds.  Currently, this ranges from $288 per month for one child, to $599 per month for eight children.

42.     Last year, the West Virginia legislature directed us to conduct a pilot program in which uncertified families would receive an increase in payment.  We expect that pilot to begin in January 2021, pending federal approval.

43.     Other than the difference in payment amounts, foster children in uncertified kinship, certified kinship, or foster families are eligible for the same services and supports from BCF.  The only differences are that certified kinship and foster families receive more financial support than uncertified kinship families, and kinship families (certified and uncertified) have only a DHHR caseworker, while children in agency foster families have both a Child Placing Agency caseworker and a DHHR caseworker.

44.     For many years it has been a priority of the federal government to support placement of foster children with kin.  Among other things, the federal government encourages the use of waivers to allow kinship families to become certified foster families.  However, until recently, the federal government has not made funding available to provide specific support to kinship families.

45.     In 2018, that changed: Congress enacted the federal Family First Prevention Services Act ("FFPSA"), which gives child welfare agencies the option to receive federal funding for "kinship navigator" programs to provide support to kinship foster families.

46.     West Virginia immediately applied for a grant and engaged a nationally recognized entity, A Second Chance, Inc., to help it evaluate gaps in our current kinship program and the types of support that would be most meaningful to its kinship families.

47.     A Second Chance conducted a comprehensive assessment of West Virginia kinship families, which it released in March 2019.  The legislature then asked for a recommendation of best practices and recommended next steps, which A Second Chance completed in October 2019.

48.     We are in the process of implementing the recommendations included in October 2019 report.

49.    In August 2019, we launched a "Kinship Navigator" program which provides support to kinship and relative caregivers by assessing and addressing their unique and individual needs. DHHR has developed a needs assessment tool used by the Navigator to help identify areas extra assistance would support the caregiver. The assessment is then used by the Navigator working one-on-one with the kinship caregivers to facilitate access to the services and supports identified.

50.    We are also in the process of restructuring the Homefinding unit, developing a Gold Standard process for best practices with kinship and relative caregivers, and designing a kinship and relative-specific caregiver training model.

### Reporting

51.    BCF is required by our federal and state partners to collect data and produce regular reports regarding the children in our care and custody.

52.    The Administration of Children and Families, within the U.S. Department of Health & Human Services ("ACF"), provides substantial funding to state child welfare programs through block grant funds under Title IV-B of the Social Security Act, as well as matching funds in maintenance payments and administrative activities for certain children pursuant to Title IV-E.  As a condition of funding, DHHR must regularly collect and provide extensive data to ACF, including the following:

- Adoption and Foster Care Analysis and Reporting System ("AFCARS").  ACF collects extensive case-level information from State child welfare agencies on all children in foster care and those who have been adopted with agency involvement.   Examples of data reported in AFCARS include demographic information on every foster child as well as the foster and adoptive parents, the number of removal episodes a child has experienced, the number of placements in the current removal episode, and the current placement setting.  BCF and other Title IV-E agencies are required to submit the AFCARS data twice a year based on two 6-month reporting periods.

- The National Child Abuse and Neglect Data System ("NCANDS"). NCANDS annually collects and analyzes data on child abuse and neglect known to child protective services agencies in the United States. BCF and other child welfare agencies across the country submit data to NCANDS annually. ACF then compiles the data submitted by the various States to examine trends in child abuse and neglect across the country, and key findings are published in annual Child Welfare Outcomes Reports to Congress as well as annual Child Maltreatment reports. The most recent annual report is for 2018.

- Caseworker face-to-face visit reporting. Section 479A of the Social Security Act requires States to submit to ACF data regarding the percentage of cases in which a caseworker visits a child in state custody at least monthly. The reporting population subject to the caseworker visits requirements includes all children under age 18 for at least the first day of the federal fiscal year (October 1) who have been in foster care for at least 1 full calendar month during the fiscal year. BCF submits this information to ACF each December. Our most recent reporting is attached as Att. G, and shows that children were visit by their caseworkers on a monthly basis 93 percent of their time in care.

- National Youth in Transition Database ("NYTD"). ACF requires States to collect information on each youth who receives independent living services and to collect demographic and outcome information on certain youth who are expected to, or who have, aged out of foster care. The State must track this information for youth who are in foster care on their 17th birthday, and then must survey them at age 19 and age 21. The survey assesses six outcomes: financial self-sufficiency, experience with homelessness, educational attainment, positive connections with adults, high-risk behavior, and access to health insurance. States must collect and report outcome information on a new baseline population cohort every three years.

53.    In addition to the above required federal reports, BCF submits regular reports to the state legislature. These include:

- Foster Care Placement Reports on the number of children in DHHR custody, the type of placement they are in, and the number of children in out-of-state facilities. These are provided to the legislature monthly.

- A Youth Services Annual Report, which provides a yearly review of programs and services provided to youth who are at risk of becoming involved with the juvenile

justice system, as well as youth who are charged or adjudicated as status offenders or juvenile delinquents and committed by the court to the care or custody of DHHR.

- A Critical Incident Report, which provides information collected and reviewed by an internal team tasked with investigating critical incidents resulting in a fatality or near fatality of a child with a known history with DHHR. The Report also includes the Plan of Action to improve case work practices and outcomes for children based on the findings and recommendations of the teams' investigations. This is also provided annually.

### Audits

54.     BCF also undergoes regular operational and outcome audits at both the federal and state level.

55.     The most extensive of these is the federal Child and Family Reviews ("CFSR"). ACF conducts CFSR reviews every few years. The CFSR is designed to evaluate the State's compliance with seven "outcomes" related to safety, permanency, and child and family well-being, as well as seven "systemic factors" related to the state agency's capacity to deliver services leading to improved outcomes for children and families. 45 C.F.R. § 1355.34.

56.     The CFSR has several different components:

a.     "Statewide Data Indicators," which are pulled from the State's AFCARS reporting. ACF also calculates a "national performance indicator" based on reporting from all of the States.

b.     A statewide self-assessment conducted by staff of the state child welfare agency and various stakeholders, as agreed upon by the state child welfare agency and ACF.

c.     An onsite review of a random sample of foster care cases, which includes case record reviews and; case-related interviews for the purpose of determining performance on the seven outcomes. In order to be found in "substantial

15

conformity" with an outcome, the State must have achieved that outcome in 95% of the cases reviewed.

57.     ACF also conducts title IV-E Foster Care eligibility reviews to determine whether children in foster care meet the federal eligibility requirements for foster care maintenance payments claimed on their behalf. During these reviews, ACF examines child and provider case records, as well as payment documentation, to validate the accuracy of a Title IV-E agency's reimbursement claims of foster care payments. Each Title IV-E Foster Care Eligibility Review (IV-E Review) details the strengths and weaknesses of a Title IV-E agency's program and identifies technical assistance that may be needed for program improvement.

58.     At the state level, BCF also is subject to audit by the Performance Evaluation and Research Division ("PERD") of the West Virginia Legislative Auditor's Office. In the last several years, PERD has conducted the following audits of the child welfare system: a review of the CPS workforce in August 2013 and a corresponding performance update in June 2016; a review of worker safety in October 2013; a review of Youth Services in November 2013 and a corresponding performance update in June 2016; and a review of DHHR in 2018.

59.     The Legislative Auditor's Post Audit Division completed its audit of Child Protective Services in November 2019 and issued a report to the legislative Post Audits Subcommittee.

60.     In addition, BCF conducts its own internal auditing through the Division of Planning and Quality Improvement ("DPQI"), which conducts review throughout DHHR districts on a rotating basis.  DPQI replicates the CFSR methodology, by randomly selecting a set of cases to carefully review for compliance with performance metrics.  The goal is that every district will be audited every two years.

61.     The Commission to Study Residential Placement of Children was created in 2005 by the legislature to continuously study, make recommendations, and improve West Virginia's integrated system of care for foster children in, or at risk of being placed in, a residential treatment program.  W. Va. Code § 49-2-125. The Commission meets quarterly to discuss goals, engage in cross-sector collaboration with other ongoing projects and initiatives impacting the children in foster care, such as the Safe at Home program, and the West Virginia Court Improvement program, and develop recommendations. The Commission reports on its progress, findings and recommendations to the Legislative Oversight Commission on Health and Human Resources Accountability annually.

## Continuous Quality Improvement

62.     BCF, as well as our federal and state partners, are dedicated to continuous quality improvement.  Thus, every audit will result in a "performance improvement plan" or a "corrective action plan" with concrete steps to be undertaken in a defined time period to address the deficiencies that were found.

63.     After every CFSR, States are required to develop and implement a program improvement plan ("PIP") addressing any areas in which the State did not achieve "substantial conformity."  45 C.F.R. § 1355.35.  ACF is involved in both the development of PIPs through consultation and technical assistance, and also monitors implementation.  45 C.F.R. § 1355.35(a). PIPs must describe goals and action steps for the State in improving upon the identified areas, and "identify the technical assistance needs and sources of technical assistance, both Federal and non-Federal, which will be used to make the necessary improvements identified in the [PIP]."  *Id.*  The State must provide ACF with quarterly reports detailing its progress on PIP goals.  § 1355.35(d)(4).

If a State is unable to successfully complete within two years, the federal government can withhold a portion of the State's Title IV-B and IV-E funding. 45 C.F.R. § 1355.36.

64.    West Virginia has successfully implemented its PIPs following the first two CFSR rounds. In December 2019, it obtained approval for its PIP related to Round 3. *See* Att. H. Our Round 3 PIP has focused on the following:

a.  Goal 1: Creating and supporting a Healthy Workforce

b.  Goal 2: Increase Family Support Services and Family Resource Homes to meet the needs of children and Families Community Support and Family Resources

c.  Goal 3: Transforming the culture of child welfare management to increase competency, skill and accountability of our child welfare practice

d.  Goal 4: Increase effectiveness and efficiency and create a prevention-focused organizational culture in order to ensure the needs of children and families are addressed throughout the life of the case. Various strategies to reach the goals are being developed.

65.    Concrete, measurable steps have been agreed upon with ACF to address each of these goals. For example, in order to meet Goal 2 of increasing family support services and family resource homes to meet the needs of children and families, BCF identified five strategies: (1) examine previous foster care providers and relative foster care providers for possible reopening of closed resource homes and expansion of relative foster homes; (2) develop standards and implement performance-based contracts to include standards in order to improve outcomes for foster children; (3) increase foster parent notice of permanency hearings and engagement in the case planning process; (4) identify needs and collaborate with agency partners and courts in the development of service availability and substance abuse services to improve outcomes for children

and families; and (5) improve staff knowledge regarding available services to meet the needs of children and families.

66.     Each strategy is then broken down into specific activities that BCF has committed to undertake.  For example, for Goal 2, Strategy 4 – identify needs and collaborate with agency partners and courts in the development of service availability and substance abuse services to improve outcomes for children and families – BCF identified five activities: (1) partner with the ACF Capacity Building Center to develop a service array map of available substance abuse services throughout the State, and examine existing barriers to accessing these services; (2) meet monthly to collect information and develop service array map; (3) develop and execute a formal statewide communication plan to improve cross-system service provision; (4) use the communication plan to identify and address service gaps; and (5) develop and implement Family Treatment Courts in five counties across West Virginia.

67.     Many activities are then further broken down to determine our progress in completing that activity.  For example, Goal 2, Strategy 4, Activity 5 – develop and implement Family Treatment Courts – has eleven different sub-activities.

68.     In June 2020, we submitted our first progress report to ACF summarizing our work implementing the PIP.  *See* Att. I. While BCF has completed many of the steps outlined within in the original timeframe laid out in the PIP, implementing or completing some of the activities had been delayed due to the COVID-19 pandemic.  *See id*.

69.     As with the CFSR reports, after each PERD Audit by the State Auditor's office, BCF develops a plan to implement the recommendations of the PERD auditors.  For example, in August 2013, PERD issued an audit of BCF in which it provided three recommendations: (1) to improve management of CPS workforce resources by developing a long-term workforce plan,

retention goals, and reliable labor management issues; (2) to move forward with plans to develop and implement a centralized intake system to improve the consistency, efficiency, and effectiveness of CPS investigations; and (3) to take a state-level responsibility to review, analyze and publicly report annually on CPS fatalities and near fatalities data.  The PERD auditors made a total of 14 specific recommendations for BCF implementation.

70.     Subsequently PERD conducted follow-up audits in 2015 and 2016 to determine BCF's progress in addressing each of these recommendations.   These follow-up audits assess BCF's performance and determine if BCF is either in full compliance, partial compliance, or planned compliance with each of the recommendations.  The 2015 performance review found that BCF was in full compliance with five of the fourteen specific recommendations from PERD's initial audit.  Of the remaining nine specific recommendations, PERD found that BCF was in full compliance with another five recommendations during the 2016 performance review. In its most recent follow-up audit, PERD concluded that BCF: (1) continues to improve management of CPS workforce resources and was in the process of completing a long-term workforce management plan; (2) has developed and implemented a centralized intake system to improve the CPS investigation process; and (3) has taken state-level responsibility to review, analyze and publicly report annually on CPS fatalities and near fatalities data.

71.     Likewise, after every internal DPQI audit, DPQI will identify a district's strengths and areas for improvement. The review data is used at the district level to create a corrective action plan. DPQI compiles the exit summary data report and corrective action plan for each district and distributes the findings to the district's management staff, the Regional Program Manager, Regional Director, Director of Training, Policy Program Specialists, and BCF leadership.

72.     DPQI completed 129 CFSR-style case reviews during FFY 2019. The review was comprised of 67 foster care and 62 in-home social service cases. DPQI staff conducted 684 interviews during FFY 2019. Of the interviews completed, 91 were with children, 151 were with parents, 57 were with foster parents, and 112 were judicial staff such as attorneys, guardian-ad-litem, juvenile probation officers, and Court Appointed Special Advocates, and the remainder were with other parties who may have information relative to the case review. Case reviews conducted were reflective of practice that occurred approximately 12 months prior to the date of the review. CFSR style case reviews were completed in each of the four regions of the state and included the following districts: Barbour/Preston/Taylor, Lincoln/Boone, Nicholas/Webster, Mercer, Cabell, Logan, Hampshire/Mineral, Kanawha, Marshall/Wetzel/Tyler, Wayne, Harrison, and Raleigh.

### Third Party Consultants

73.     In recent years, BCF has used a number of expert consultants to assist in designing or improving various aspects of our child welfare program.

74.     As mentioned above, we have contracted with A Second Chance, Inc. to conduct a "Kinship Strengths Assessments" to acquire a better understanding of the trends impacting its current kinship care program, and to make recommendations for improvement. A Second Chance, based in Pittsburgh, is a national leader in kinship programming.

75.     We have engaged Casey Family Programs for in depth technical assistance in a number of areas, including implementation of a "reflective supervision" initiative designed to improve workforce retention and supervisory support for workers through relationship-focused, collaborative consultation between a caseworker and supervisor. Casey Family Program is also working with us to assess and implement improvements to our kinship program.

76.     We are working with the ACF Capacity Center for States on identifying issues with respect to our intake process and implementing strategies to improve that process.

77.     Our MOU with DOJ requires us to engage a consultant to provide technical assistance and monitoring of our implementation of the MOU.  We have contracted with the University of Maryland School of Social Work ("UMSSW"). In addition to monitoring our compliance and submitting bi-annual reports to the DOJ, UMSSW provides BCF with technical assistance and guidance in expanding community-based services to children pursuant to the DOJ MOU.

78.     We have also contracted with Berry Dunn, a nationally recognized consulting firm, to assist us in implementing the DOJ MOU, as well as our ongoing efforts to redesign the Safe at Home program.

**<u>Health Care and Other Services</u>**

79.     In March 2020, DHHR launched is a statewide managed care program for foster children that is designed to improve access and coordination of health care benefits and socially necessary services for foster children.   Through this program, every child is undergoing a comprehensive assessment to identify physical, mental health, and behavioral health needs, and every child has a care coordinator who is responsible for assuring the children are connected with appropriate providers to address those needs.  The care coordinator is required to work closely with the child's DHHR caseworker, as well as with the child's Multidisciplinary Treatment Team as the care coordinator works to provide and coordinate services for the child.

80.     Also in March 2020, DHHR launched the new Medicaid Children with Serious Emotional Disorder Waiver program to serve up to 2,000 children.  Under this program, children with mental illness, including foster children in family homes, receive a broad range of

community-based services, including: comprehensive community-based treatment, including case management; crisis services; day services; independent living/skills building; supported employment; specialized therapy; and in-home family therapy and support.

81.    Most recently, as part of its implementation of the MOU with the DOJ, DHHR has contracted with Marshall University and Dr. John Lyons to perform a cluster study using the Child and Adolescent Needs and Strengths ("CANS") assessment, which is a nationally-recognized comprehensive trauma-informed behavioral health evaluation tool, and was developed by Dr. Lyons.  The purpose of the cluster study is to gather information about the strengths and needs of the target population in order to better evaluate the need for services that will help the child and family.

82.    From September 2019 through August 2020, 5,839 foster children (most of whom are living in the community) received Medicaid mental health or behavioral health services;  152 foster children with intellectual disabilities received community-based services through the Medicaid I/DD Waiver Program; and 52 foster children with disabilities received Medicaid community-based personal care services.  *See* Att. J.

### Caseworkers

83.    Every child in the custody of DHHR has a CPS or YS caseworker, who is required to visit with the child at least monthly.  DHHR, *Foster Care Policy*, at 44; DHHR *Youth Services Policy*, at 34.[2]

84.    The job of a caseworker may be the hardest job in BCF.  Our workers are confronted with difficult, sometimes dangerous, often traumatic situations every day.  Over the last several

---

[2]    A copy of the *Youth Services Policy* is publicly available at: https://dhhr.wv.gov/bcf/policy/Documents/Youth%20Service%20Policy%20July%202020.pdf.

years, DHHR focused significant attention and resources on increasing the number of qualified caseworkers and decreasing their caseloads. This has been a priority of Secretary Crouch since his appointment, and is a subject of regular meetings with the Secretary and DHHR leadership.

85.    In 2017, DHHR implemented a $1,500 one-time recruitment bonus for Child Protective Service workers in certain counties with high vacancy rates.

86.    In 2018, we instituted a career ladder structure to increase incentives for caseworks to remain with the agency.

87.    In 2018, DHHR added 48 caseworker positions and reallocated 12 caseworker positions from other areas of DHHR to the foster program.

88.    In August 2018, DHHR implemented an across-the-board pay increase of 2 percent for all caseworkers.

89.    In September 2018, DHHR increased its case worker retention incentive payment from 3 percent to 5 percent.

90.    In 2019, DHHR partnered with Casey Family Programs to implement a "reflective supervision" program for caseworker supervisors and the caseworkers they oversee supervisors and their staff. Reflective supervision involves structured coaching sessions designed to guide and support the employee.

91.    In April 2019, DHHR implemented a 5 percent across-the-board pay increase for all caseworkers.

92.    In August 2019, DHHR implemented another 3 percent across-the-board increase for most caseworkers.

93.    Our Division of Training has worked closely with the West Virginia Social Work Education Consortium, which includes representatives from accredited schools of social work

throughout the State, including West Virginia University, Marshall University, Concord University, West Virginia State University, Shepard University, and West Liberty State University, to develop a curriculum for pre-service and in-service training for staff who do not have a degree in social work or a related field, in addition to the training that already exists for all caseworkers.

94.    In response to findings in our 2017 CFSR, West Virginia implemented a comprehensive training program for new supervisors that incorporates job-related training and management training provided by the West Virginia Division of Personnel and the WVDHHR Office of Human Resource Management. When new supervisors are hired, they are identified in the onboarding process and enrolled in the next series of "Putting the Pieces Together," a nine-day curriculum for Child Welfare supervisors that was adapted from a training developed by the University of Colorado. The training consists of three three-day modules: Administrative Supervision, Supportive Supervision, and Educational Supervision and is directly related to their jobs as Child Welfare supervisors.

95.    From March 2018 to August 2020, the total number of funded caseworker positions at DHHR increased by over 25 percent, from 424 to 533, and the number of filled positions increased by 10 percent.  As a result, the average statewide caseload decreased substantially, from 26-cases-per-worker in June 2018 to 18-cases-per-worker in April 2020.

### Case Records

96.    DHHR caseworkers, supervisors, and managers use an automated system known as the Families and Children Tracking System ("FACTS") to enter and collect information related to the children with which they come into contact, including those investigated for abuse and neglect as well as children in DHHR custody.  In essence, the system has a screen for each child, with a

series of tabs pulling up sub-screens in which information can be filled in, including tabs for service plans, youth transitioning, and assessments, and a virtual "file cabinet" in which documents can be uploaded.  When a caseworker or supervisor reviews a child's case in FACTS, the caseworker is able to view and access the child's case history and information, organized by subject (e.g., via the tabs and sub-screens).

97.    While FACTS includes a lot of information related to every child, it does not produce a "case file" in the traditional sense that can be re-produced or reviewed outside of FACTS.  As a result, in response to Plaintiffs' document request for the "case files" of the named Plaintiffs, DHHR staff had to manually open and take a screenshot of each of the various entries and documents in FACTS.

98.    FACTS is over 20 years old and is scheduled to be replaced with a single integrated eligibility system, called Peoples Access to Help ("PATH"), which will also connect with Medicaid.  PATH will also be able to interface with external stakeholders such as the circuit courts and the West Virginia Department of Education. In November 2017, the State awarded the PATH contract – with a potential value of approximately $308 million over ten years – to an outside vendor, which has been working on the project ever since.  Conversion of the child welfare system to PATH is expected to begin in July 2021.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this    13    day of November 2020, in Charleston (Kanawha County), West Virginia.


*Linda Watts*
_____

Linda Watts