Attachment A

**STATE OF WEST VIRGINIA**
Department of Health and Human Resources

# Foster Care Placements Report



| | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | Feb 2020 | Mar 2020 | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| In state clients | 6644 | 6654 | 6622 | 6703 | 6840 | 6855 | 6948 | 6780 | 6611 | 6567 | 6494 | 6494 |
| Out of state clients | 470 | 470 | 459 | 473 | 480 | 475 | 462 | 461 | 450 | 455 | 459 | 441 |
| Total clients | 7114 | 7124 | 7081 | 7176 | 7320 | 7330 | 7410 | 7241 | 7061 | 7022 | 6953 | 6935 |
| % Out of state clients | 6.61% | 6.60% | 6.48% | 6.59% | 6.56% | 6.48% | 6.23% | 6.37% | 6.37% | 6.48% | 6.60% | 6.36% |

**In state and Out of state clients by Provider type for the month of Sep 2020**

| Provider Type | In state clients | Out of state clients | Total clients | % Out of state clients |
|---|---|---|---|---|
| Agency Emergency Shelter | 136 | 0 | 136 | 0.00% |
| Agency Foster Family Care | 155 | 6 | 161 | 3.73% |
| Certified Kinship/Relative Home | 2223 | 79 | 2302 | 3.43% |
| Department Adoptive Home | 11 | 8 | 19 | 42.11% |
| Detention Centers | 20 | 0 | 20 | 0.00% |
| Group Residential Care | 442 | 231 | 673 | 34.32% |
| Kinship/Relative | 1386 | 47 | 1433 | 3.28% |
| Medical Hospital | 6 | 1 | 7 | 14.29% |
| Psychiatric Facilities (Long Term) | 55 | 62 | 117 | 52.99% |
| Psychiatric Hospital (Short Term) | 17 | 0 | 17 | 0.00% |
| Specialized Family Care Home-(Medley) | 24 | 0 | 24 | 0.00% |
| Therapeutic Foster Care | 1945 | 6 | 1951 | 0.31% |
| Transitional Living Client | 74 | 1 | 75 | 1.33% |
| **Summary** | **6494** | **441** | **6935** | **6.36%** |

Report refresh frequency: Monthly(last day of the month)

Attachment B

**STATE OF WEST VIRGINIA**
Department of Health and Human Resources

## Foster Care Placements Report



| | Oct 2014 | Nov 2014 | Dec 2014 | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Jul 2015 | Aug 2015 | Sep 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| In state clients | 4118 | 4088 | 3964 | 4045 | 4135 | 4235 | 4325 | 4384 | 4316 | 4327 | 4299 | 4319 |
| Out of state clients | 347 | 350 | 331 | 331 | 341 | 354 | 354 | 348 | 327 | 316 | 293 | 284 |
| Total clients | 4465 | 4438 | 4295 | 4376 | 4476 | 4589 | 4679 | 4732 | 4643 | 4643 | 4592 | 4603 |
| % Out of state clients | 7.77% | 7.89% | 7.71% | 7.56% | 7.62% | 7.71% | 7.57% | 7.35% | 7.04% | 6.81% | 6.38% | 6.17% |

**In state and Out of state clients by Provider type for the month of Sep 2015**

| Provider Type | In state clients | Out of state clients | Total clients | % Out of state clients |
|---|---|---|---|---|
| Agency Emergency Shelter | 172 | 0 | 172 | 0.00% |
| Agency Foster Family Care | 1364 | 28 | 1392 | 2.01% |
| Department Adoptive Home | 117 | 20 | 137 | 14.60% |
| Detention Centers | 18 | 0 | 18 | 0.00% |
| Group Residential Care | 650 | 133 | 783 | 16.99% |
| Kinship/Relative | 837 | 15 | 852 | 1.76% |
| Medical Hospital | 3 | 1 | 4 | 25.00% |
| Psychiatric Facilities (Long Term) | 56 | 79 | 135 | 58.52% |
| Psychiatric Hospital (Short Term) | 19 | 0 | 19 | 0.00% |
| Specialized Family Care (Medley) | 2 | 0 | 2 | 0.00% |
| Specialized Family Care Home-(Medley) | 26 | 0 | 26 | 0.00% |
| Therapeutic Foster Care | 980 | 7 | 987 | 0.71% |
| Transitional Living Client | 75 | 1 | 76 | 1.32% |
| **Summary** | **4319** | **284** | **4603** | **6.17%** |

Report refresh frequency: Monthly(last day of the month)
7:30:00 AM

**D003101**

Attachment C



# Housekeeping

- Who am I?

- Data presented from state submitted AFCARS and NCANDS.

- Pay attention to Y-axis range (vertical)

- X-axis (Horizontal)
  - File Period A:  Counts as of 03/31 of year
  - File Period B:  Counts as of 09/30 of year
  - Fiscal Years
    - 04/01 – 03/31
    - 10/01 – 09/30

casey family programs | casey.org

# What I would like from you…

- Data is just a starting point of a story!
- As we move through the presentation, be critical thinkers
- Ask yourself…
  - what else is needed to fill in the story?
  - Why might I be seeing this trend?
  - What might I be able to do, or put in place, to change the trend?
  - Are there differences in pre- and post- 2015 data (waiver)

casey family programs | casey.org



## what you'll learn today...

· overall trends across the country
· seeing data to identify opportunities in Family First







prevention     use of congregate care     use of kin

# Several year increase nationwide



casey family programs | casey.org

# In West Virginia, the number of children in care has increased dramatically



Number of children in care (under age 18)

4,309

7,210

67% increase since 2013,
compared to 11% nationally

casey family programs | casey.org

# What does the distribution of kids **in care** look like in West Virginia?



Percent of children in care, by Age (under age 18)

40% of children in care on 09/30/18 are between 0 and 5 years of age

28% of children in care on 09/30/18 are between 13 and 17 years of age

casey family programs | casey.org

# A ratio is another way to represent West Virginia's change in children in care



Ratio of children exiting care to entering care

1.05

goal > 1.0

the **goal** is to have more children exiting care then entering

2018 increase indicates a **slowing** of the increase in number of children in care, not a decrease

0.86

Ratio = # of kids exiting care / # of kids entering care

2010   2011   2012   2013   2014   2015   2016   2017   2018

Fiscal year AB

**casey** family programs | casey.org

# So how is West Virginia doing on the ratio compared to other states?



# What drives West Virginia increase in number of children **in care**?



Numbers of children exiting and entering care

# How does the entry rate of West Virginia compare to other states?



# What does the distribution of kids **entering** care look like in West Virginia?



Percent of children entering care, by Age (under age 18)

43% of children entering care on 09/30/18 are between 0 and 5 years of age

28% of children entering care on 09/30/18 are between 13 and 17 years of age

Entries during 2018AB

casey family programs | casey.org

# Recall West Virginia's high entry rate?  Could these 3% have been prevented from entry?



Of all children entering care, what percent achieve permanency within 30 days

Nationally, about 7% of children entering care exit to permanency within 30 days

3% = 72 children

12b    13a    13b    14a    14b    15a    15b    16a    16b    17a    17b    18a

Entry cohorts

casey family programs | casey.org





casey family programs   |   casey.org

# Prevention is critical given increasing West Virginia children reported for assessment



change over the **last 5 years**

**49% increase**
in the number of
children screened in
for an investigation
or assessment

**41% decrease**
in the number of
children involved in a
substantiated report
of maltreatment

**47% increase**
in the number of children
entering care

Fiscal year 2012 and 2017AB

**casey** family programs  |  casey.org

# What does the age distribution of children entering care look like nationally?



Percent of children entering care, by age

■ 2012
■ 2017

Infants comprise an increasing percent of children removed from their homes

Fiscal year AB

casey family programs | casey.org

# More infants and less adolescents are the take-a-ways when comparing 2012 and 2018 entries



# Beyond age of entry, why are West Virginia children entering care?



# Specifically, why are West Virginia children entering?



# In West Virginia, a pattern of increasing substance abuse consistent across ages



Reasons children enter care, by age

casey family programs | casey.org





opportunities regarding the use of congregate care

# In West Virginia, Congregate care use is down and kinship care up



Percent of children in care, by placement type

casey family programs | casey.org

# There is variation in use of congregate care by state



# When looking at just teens (13-17 years) in congregate care there is even greater variance



Fiscal year 2017AB

# In West Virginia, first placement for 13-17 year olds entering care is often congregate care



Percent of children entering care, by initial placement type*
(proxy for first placement: placement at end of first 6 months, or at discharge, whatever comes first)

casey family programs | casey.org



 opportunities regarding the use of kin

# There is variation in use of kinship care by state



# West Virginia children ages 1-12 years have a higher rate of first placement in kinship care



Percent of children entering care, by initial placement type*
(proxy for first placement: placement at end of first 6 months, or at discharge, whatever comes first)

casey family programs | casey.org

# In West Virginia, if first placement is kinship care you spend less time in care



Children entering care during 2012 – 2016AB

# And now a few take-away thoughts…

- Entries high, and increasing

- Nearly half of entries are children 0-5 years of age (16% being <1)

- Exits not keeping pace with entries. Timeliness of exits is above nation, just not keeping pace

- Prevention opportunities at the front door: large increases in children being screened in for investigation

- Over 50% of entries have a reason of substance abuse

- Congregate care use is down and kinship care is up, but still room for improvement

# Thank you!

Questions?

Steve Ellis

Casey Family Programs

Sellis@Casey.Org

206.270.4978

casey family programs | casey.org

Attachment D



# Safe at Home West Virginia
# Title IV-E Waiver Application
## West Virginia Department of Health and Human Resources
## Bureau for Children and Families

*2014*

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

**Table of Contents**

Page

Introduction…………………………………………………………………… 2

1.   Purpose ……………………………………………………………. 3

2.   Goals …………………………………………………………… 4

3.   Target Population ………………………………………………. 5

4.   Geographic Area…………………………………………………. 9

5.   Service Interventions……………………………………………. 10

6.   Time Period………………………………………………………. 14

7.   Proposed Outcomes………………………………………………. 14

8.   Evaluation………………………………………………………… 15

9.   Estimation of Cost or Savings…………………………………… 16

10.  Measuring Cost Neutrality……………………………………….. 17

11.  Similar Projects…………………………………………………. 22

12.  Investments……………………………………………………….. 24

13.  Assurance of Annual Accounting………………………………… 24

14.  Requirements Waived……………………………………………. 24

15.  Automated Information System………………………………….. 25

16.  Agency Readiness for Demonstration…………………………… 25

17.  Collaboration……………………………………………………. 30

18.  West Virginia Child and Family Service Review (CFSR)…..……………… 32

19.  Court Orders……………………………………………………. 34

20.  Public Input……………………………………………………….. 35

21.  Health Insurance Assurance……………………………………… 35

22.  Program Improvement Policies…………………………………… 36

Conclusion …….………………………………………………………… 36

### INTRODUCTION

***Government alone neither has the answer nor is the answer.***

*"We must change the paradigm of how we develop and deliver services to a proactive, collaborative, prevention based model. Any improvements in the well-being of our state will take commitment of individuals, the community, and government. The Department of Health and Human Resources must engage citizens and organizations from both the public and private sector to achieve our common mission."*

*"Mapping a New Strategic Vision"*
*Karen Bowling, Cabinet Secretary*
*West Virginia Department of Health and Human Resources, December 2013*

West Virginia's IV-E Child Welfare Demonstration Project, **Safe at Home West Virginia**, focuses on providing a full continuum of supports to strengthen our children and families. By fortifying and enhancing our community-based services, youth currently in congregate care, and those at risk of going into care, can safely remain in their home community experiencing improved well-being outcomes. As a result of our efforts, we will achieve the outcomes identified in Chart 1. West Virginia will implement individualized plans that are trauma-informed utilizing evidence-informed or promising practice wraparound services for children and families. This framework will ensure we are successful in transforming our system to better meet the needs of our children and families and ultimately, improving their safety, permanency, and well-being.

Chart 1 below depicts the timeframe, target population, proposed interventions, and outcomes of **Safe at Home West Virginia**. Further detail is included in the remainder of the application.

| Timeframe | Target Population and Geography | Proposed Intervention(s) | Outcome(s) |
|---|---|---|---|
| Initial Implementation | Youth 12-17 in congregate care in 11 counties | Trauma-informed assessments for youth and their families to identify their needs (Specific assessment instruments to be determined) | Improved identification of strengths and needs; Better alignment with appropriate interventions |
| | | Trauma-informed wraparound services available in the community (Specific services to be determined) | Reduced use of congregate care, as measured by both proportion in care and duration of stay in congregate settings |
| | | | Reduced reliance on out-of-state congregate care facilities |
| | | | Improved youth and family functioning; including educational attainment outcomes for older youth |
| | | | Improved timeliness and likelihood of reunification for youth in congregate care |
| | | | Reduced re-entry into out of home care |
| Phase 2 | Youth 12-17 in Congregate Care in additional counties (statewide rollout) | Creation of statewide model using interventions described in initial implementation | Same as initial implementation |
| | Children and youth of all ages at risk of entering out of home care and their families (statewide rollout) | Enhancement of strategies to address the needs of younger children and provide preventive services | Reduced entry rate (likelihood of entering out of home care) |
| | | | Improved timeliness and likelihood of reunification for children of all ages who do enter care |
| | | | Reduced re-entry into out of home care |

*1.* **PURPOSE**

West Virginia is the only state that is located entirely within the Appalachian region, and most of our citizens live in rural areas.  Our culture is family oriented with strong ties to home and community.  Beginning with the Program Improvement Plan that was developed as a result of the Children and Families Service Review (CFSR) of 2008, the state began bolstering our services to assist our staff in engaging and supporting families and youth across the state. The Bureau for Children and Families recognizes that in order to improve the lives of the children and families, we must embrace our culture and help families build on their strengths and overcome challenges.  We will develop community-based solutions to address the often distinct problems that the citizens in many rural areas face. We will have the ability to not only identify children at risk for neglect and abuse, but also provide the support necessary to for a safe and nurturing environment for the child in his/her home or within his/her community.  By creating a practice model that builds on the principles of family engagement and equitable treatment at a community level, we will help the families we serve to use their untapped strengths and resources to create a plan for their futures.

The vision of the West Virginia Department of Health and Human Resources is:

- Our children and families will be safe.
- Our children will have a strong, permanent connection with family and community. While reunification, adoption, and legal guardianship are ultimate goals, all children will have caring adults in their lives.
- Our children and families will be successful in their lives and have enhanced well-being.
- Our children and families will be mentally and physically healthy.
- Our children and families will be supported, first and foremost, in their homes and communities and by receiving the appropriate services to meet their needs.
- Our child-serving systems will be transformed to meet the needs of children and families.

Our transformed system will be called ***Safe at Home West Virginia***.

West Virginia has made significant strides in improving the measurement for safety and well-being for children in placement through improvements made in response to the 2008 CFSR. However, the state continues to struggle with the rate by which children are entering care and the rate by which children are placed in congregate care settings.

West Virginia's fiscal year 2013 data shows that we had 3,263 children ages 0 through 17 who entered care. Of the 1,488 children 12-17 years of age, 71 percent of those youth were placed in congregate care. Recognizing the way we have traditionally practiced may not always result in the best possible outcomes for our children and families, we are now engaging in a process that creates a new perspective. In partnership with youth and families, we will collaborate with both public and private stakeholders, including service providers, school personnel, behavioral health services, probation, and the judicial system to demonstrate that children currently in congregate care can be safely and successfully served within their communities. By providing a full continuum of supports to strengthen our families and fortifying our community-based services, we can demonstrate that youth currently in congregate care can achieve the same or higher indicators for safety and well-being while remaining in their home communities.

We believe that by providing evidence-informed, trauma-informed support services that wrap around the identified youth and their families within the community, we will see a decline in children in congregate care and an increase in youth successfully remaining with their families as they transition into adulthood.

With services and supports in place at a community level, West Virginia can expect to:

- Reduce the length of stay in out-of-home placement;

- Reduce the rate in which children are placed in congregate care; and

- Allow for the youth to achieve permanency in a more timely manner.


*2.* **GOALS**

This project intends to accomplish the goals of well-being and safety.

- West Virginia will increase positive outcomes for infants, children and youth, and families in their homes and communities and improve the safety and well-being of infants, children, and youth.

- West Virginia will prevent child abuse and neglect and the re-entry of infants, children, and youth into foster care.

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

### 3. TARGET POPULATION

Our state continues to have an increase in the number of children entering care. According to the National Profile, West Virginia's children are more likely to enter out-of-home care during the year than those in other states. During FFY 2013, 3,263 children ages 0 through 17 entered care. In FY12, the entry rate in West Virginia was 8.6 per 1,000 children in the population. This is nearly three times the National entry rate of 3.3.



West Virginia has a long history of reliance on out-of-state care. While the trend of children placed in out-of-state care had shown a steady decrease over several years, the numbers increased in 2013.  Based on data from the National profile (FY11), West Virginia has one of the highest percentages of children placed in congregate care settings.



West Virginia data indicates that 61 percent of youth ages 12-17 who were in care on September 30, 2013, were in congregate care.  This is an increase from the proportion in group care in FY12, and is considerably higher than the national indicator.



The chart below demonstrates West Virginia's use of kinship care versus congregate care.  As is indicated from the comparison, younger children are more likely to be placed in kinship care while older youth are more likely to enter placement in congregate care.



By wrapping trauma-informed, comprehensive community services around youth and their families we can   accomplish three things, keep children from entering care, reunite children in care with the families, and keep children in their community.  The initial focus of the West Virginia waiver demonstration project will be on youth 12-17 years of age who are placed in out-of-state or in-state congregate care.  The demonstration will start in the 11 counties in Region II and the identified counties of Berkeley, Jefferson, and Morgan in Region III.  These two identified areas were selected due to their need and readiness.  Region II has been identified as an area that has extensive partnerships and services with the ability to provide the necessary supports.  The three counties located in the Eastern Panhandle of Region III have a large number of children in congregate care and a lack of services.  Service development will be necessary in those counties.  By developing the necessary services and demonstrating success in the counties of Berkeley, Jefferson, and Morgan then we will be able to systemically replicate *Safe at Home West Virginia* successfully throughout the state.

The Bureau for Children and Families' goal is to develop a model that will eventually allow financial and service resources to be focused on preventative measures with **all of** West Virginia's children and families.

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

**Data Shift:**

FFY 2013 CFSR case review data reflects safety and well-being measures were "Substantially Achieved" more often in placement cases than in-home cases. West Virginia plans to enhance in-home services in order to improve well-being outcomes in all areas of our lives of our children and families.



Safety One – Children are first and foremost protected from abuse and neglect.

Safety Two – Children are safely maintained in their homes whenever possible and appropriate.

Well-Being  One – Families have enhanced capacity to provide for their children's needs.

Well-Being  Two – Chldren receive appropriate services to meet their educational needs.

Well-Being Three – Children receive adequate services to meet their physical and mental health needs.

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

*4.* **GEOGRAPHIC AREA**

While it is the goal of the Bureau for Children and Families to implement *Safe at Home West Virginia* statewide, we propose to begin the demonstration in 11 counties in Region II and three counties in the Eastern Panhandle.  The counties that will be included in the initial demonstration will be Kanawha, Boone, Cabell, Wayne, Jackson, Mason, Roane, Lincoln, Putnam, Logan, Mingo, Berkeley, Jefferson, and Morgan.



Due to the rural nature of our state and the vast difference in the availability of partners, a planned, county-by-county implementation will be facilitated through a structured, phased approach.  Our experience working with the National Implementation Center through Atlantic Coastal Child Welfare Implementation Center and the National Resource Center on Child Protective Services for the successful implementation of the Safety Assessment Management System (SAMS) provided us with the knowledge, experience, and understanding of the importance of having a detailed, community-centric plan for a strategic implementation process.

The demonstration will be phased in based upon need as reflected by the counties' data as well as readiness and community service availability.  The demonstration model can be readily instituted in counties with multiple providers, but will require start up time in more rural areas where capacity is not as well developed.  The Bureau for Children and Families will work with offices in each county and their stakeholders prior to implementation to outline a well-defined strategy.

5. **SERVICE INTERVENTION(S)**

The West Virginia Department of Health and Human Resources' vision for our children and families is:

- Our children and families will be safe.
- Our children will have a strong, permanent connection with family and community. While reunification, adoption, and legal guardianship are ultimate goals, we need to make sure that all children have caring adults in their lives.
- Our children and families will be successful in their lives and have enhanced well-being.
- Our children and families will be mentally and physically healthy.
- Our children and families will be supported, first and foremost, in their homes and home communities, and by receiving the correct services to meet their needs.
- Our child-serving systems will be transformed to meet the needs of children and families.

With our vision as our guiding light, the Bureau for Children and Families intends to implement a wraparound model as the core component for *Safe at Home West Virginia* based on the "National Wraparound Initiative Model."

*Safe at Home West Virginia* will be a multi-faceted approach that will be based on the "National Wraparound Initiative" engaging community support and providing services individually designed to meet the complex needs of children and families.

*Safe at Home West Virginia* will be focused on a single coordination plan for the child and family.  Elements of the service model will include assessments, care coordination, planning and implementation, and transitioning families to self-sufficiency.  This will require true partnership between the Bureau for Children and Families, families, and our community partners.

*Safe at Home West Virginia* will require the commitment of the Bureau for Children and Families and our stakeholders to transform the way we serve families.  We will collaborate with youth, families, and public and private stakeholders, such as school personnel, probation officers, and the judicial system.  Our hope is that everyone involved in protecting and ensuring the well-being of our children will expand their thinking beyond our current walls and limitations to embrace the concept of providing community based wraparound services for our children and their families.

*Safe at Home West Virginia* will capitalize on our cultural commitment to families and communities by using community partners to provide the individualized services needed to foster improved well-being, with a particular focus on developing youth into successful, productive citizens.

The Bureau for Children and Families' vision for our wraparound service model is that *Safe at Home West Virginia* will look at all existing information and data to determine any additional assessments needed for the child and family.  A team will assure the development or revision of a treatment plan for the child and family that utilizes a family conferencing approach.  A Care Coordinator will implement and manage the new treatment plan utilizing community-based services that integrate Results Based Accountability (RBA).  The team will continue to manage and monitor outcomes and work towards family self-sufficiency.

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

*Service Framework- **Safe at Home West Virginia***



Services may include:

- Trauma-informed assessments for youth and their families to identify their needs:
  - Comprehensive Assessment and Planning;
  - Child and Adolescent Needs and Strengths (CANS);
  - Family Functioning Assessment;
  - Youth Behavioral Evaluation;
  - Health Checks for children; and
  - Any other assessments that are found to be appropriate.
- Evidence-informed and evidence-based services and supports.
- Appropriate treatment planning that involves children and families.

All services will be developed using a Results Based Accountability focused approach to establish, monitor, and evaluate a detailed and measureable child-based treatment plan for each youth and family.  Services that are developed will have specific timeframes and measurable outcomes.

The Bureau for Children and Families will implement a wraparound model as the core component for *Safe at Home West Virginia*.  The model will utilize information from the National Wraparound Initiative (NWI).  According to NWI, "wraparound is an intensive, holistic method of engaging with individuals with complex needs so they can live in their homes and communities and realize their hopes and dreams."  It is a team-based planning process intended to provide individualized and coordinated family-driven care.  Wraparound is designed to meet the complex needs of children who are at risk of placement in institutional settings due to emotional, behavioral, or mental health difficulties and who are involved with several child and family-serving systems such as behavioral health, child welfare, juvenile justice, and special education.

West Virginia's wraparound service model will utilize an evidence-informed, promising practice approach coordinating services for children and youth with complex problems and their families who are involved in multiple systems.  The model recognizes the importance of family, school, and community and seeks to promote the full potential of every child by addressing his/her physical, emotional, intellectual, cultural, legal, educational, and social needs.  Further, it overcomes problems related to fragmentation by providing coordinated services and supports in the home, school, and community.  The model replicates the "California Evidence Based Clearinghouse for Child Welfare" which demonstrates promising research evidence in the area of placement stabilization, Prevention of out-of-home care and reunification reduce trauma to the child and family.

13

***Safe at Home West Virginia*** will further the Bureau for Children and Families' mission of fostering partnerships to keep our children and families safe; assisting our children in developing strong, permanent connections; and aiding our children and families in becoming successful and healthy.  This will be achieved by building organizational and community capacity, improving access to and quality of services, and enhancing how the Bureau for Children and Families works with families.

***Safe at Home West Virginia*** will be the blueprint for accomplishing our goals of well-being and safety:

- West Virginia will increase positive outcomes for infants, children, youth, and families in their homes and communities and improve the safety and well-being of infants, children, and youth.

- West Virginia will prevent child abuse and neglect and the re-entry of infants, children, and youth into foster care.

## 6. TIME PERIOD

The proposed demonstration project will begin by March 1, 2015, subject to any required federal approval.  The Bureau for Children and Families anticipates utilizing the time between terms and conditions and March 1 as an implementation planning period.  The demonstration is proposed for five years (20 fiscal quarters) and progress towards project goals will be measured throughout the life of the five-year project with annual assessment of overall status.

## 7. PROPOSED OUTCOMES

West Virginia's waiver request to redirect foster care maintenance payments to an enhanced array of wraparound services to strengthen families will promote improved performance on all federal safety and well-being measures while also improving permanency.

The goals of the demonstration are to:

- Increase the number of children staying in their home communities.
- Reduce initial foster care entry rates.
- Improve well-being of children 12-17 years of age as demonstrated through educational achievement and increased numbers graduating high school.
- Improve academic progress of children 12-17 years of age by keeping them in the same school.
- Reduce the reliance on congregate care.
- Decrease the length of stay in congregate care for children 12-17 years of age.
- Improve family functioning to support reunification.
- Reduce the number of children re-entering any form of foster care.

14

*8.* **EVALUATION**

West Virginia is prepared to complete an outcomes evaluation, process evaluation, and fiscal analysis as required. The Bureau for Children and Families intends to use Results Based Accountability (RBA) within the design of the demonstration to assist with measuring the impact of the services and to ensure effective service delivery throughout the demonstration. RBA is a cross-cutting initiative aimed at looking at the agency's current data on key measures and then working with our staff and providers to understand these measures so that this framework can be used to develop outcomes, indicators, and strategies. RBA will be the standard for each provider the agency uses for interventions and services for children and families. RBA will be the evaluation tool used by the agency and its partners to determine how key measures change over time. At present, these are still being developed and refined.

The Bureau for Children and Families proposes to demonstrate the effectiveness of the proposed intervention by defining a set of expected outcomes and measuring the achievement of those outcomes over the life of the project. The Bureau for Children and Families is looking at three different evaluation theories as we determine which is best for our purposes: Historical Trend, Interrupted Time Theory, and Comparison Counties vs. Implemented Counties. The evaluation process will also look at process evaluation and include a cost study.

The Bureau for Children and Families will contract with a third party evaluator to develop and then carry out an appropriate evaluation design. The state has a procurement process that is outlined in West Virginia law and the Bureau for Children and Families, with oversight by the West Virginia Department of Health and Human Resources, will follow the required request for proposal (RFP) process in order to secure a third party evaluator. Our goal is to have the most rigorous evaluation method possible as long as it is consistent with our proposed intervention model.

To ensure a rigorous evaluation design, during the planning year, the third party evaluator will take part in the design of the interventions for the expressed purpose of understanding the theory of change; its relationship to investments in program input such as process, quality, and capacity investments; expected outputs for children and families served; and system level change and program costs.

The Bureau for Children and Families has developed a Continuous Quality Improvement (CQI) process out of an intent to improve the overall service delivery quality and effectiveness. We will take the outcomes identified by the third party evaluator to our Regional Continuous Quality Improvement Councils in order to address systemic issues. If the issues identified are larger than a regional issue, the state level Continuous Quality Improvement Council will review and determine the best way to address the systemic issues identified.

The Bureau for Children and Families will seek technical assistance from the Children's Bureau in developing our evaluation process. We will also involve our third party evaluator in the determination of appropriate processes and measurements, therefore, we do not plan to finalize our evaluation process until we have secured our third party evaluator.

In an ongoing effort to promote transparency, the Bureau for Children and Families will put all pertinent information regarding outcomes on our web site for public viewing.

9. **ESTIMATION OF COST OR SAVINGS**

While the specifics of the West Virginia wraparound model are still under development, our initial projections indicate that the wraparound intervention will be cost-neutral to the state by virtue of the overall reduction in out-of-home congregate care placement costs.

Comparable to the **3 Rivers Wraparound** program in Washington and the **High Fidelity Wraparound** program in Ohio, West Virginia estimates that service costs for the wraparound program in West Virginia will be approximately $70 per day for each family served. Assuming an average of three months of service, the total estimated cost per family served is approximately $6,440.

The average current daily rate for children in in-state congregate care is approximately $162.25/day, and these rates have increased 1.56 percent over the last five years. The average current daily rate for children in out-of-state congregate care is approximately $465.05/day, which includes medical costs for some facilities that are not covered under the state's Medicaid program and, therefore, paid with all state dollars. In addition, the West Virginia Department of Health and Human Resources pays educational costs for some children that are placed in an out-of-state facility without a previous individualized education plan. These costs are paid with state dollars as well. The educational costs alone have averaged $120.95/day over the last three years. The state is currently in the process of developing reports to determine the average length of stay for the various placement settings so that a cost savings can be projected. However, for every child who is prevented from entering out-of-home congregate care due to wraparound interventions, the state anticipates saving money and using these savings to pay for in-home interventions.

The capped allocation structure of the waiver allows the state to receive Title IV-E funding on the front end of each reporting period, rather than waiting for retroactive reimbursement. This will allow West Virginia to use Title IV-E funds to expand wraparound services, using any additional savings to facilitate expansion of services to additional regions of the state.

### *10.* MEASURING COST NEUTRALITY

To ensure cost neutrality, West Virginia proposes a capped allocation of Title IV-E funds.  The capped allocation will be statewide and will include all children in out-of-home care.  However, as previously stated, we will begin with the initial demonstration in two regions and phase in the rest of the population.  The allocation will include foster care maintenance and all administrative expenditures and will not include the adoption assistance and subsidized legal guardianship programs or will it include Statewide Automated Child Welfare Information System (SACWIS and training costs. The state has opted to extend IV-E foster care to age 21 but has not implemented the provisions to incorporate this population into our IV-E claiming.  Current project estimates are based upon implementation in early 2015, and at that time it will be very difficult to segregate the administrative cost for this small percentage of the foster care population.   As a result, we plan to include them within the scope of this wavier application.

In light of the various efforts completed in the past year and those that will be completed in the near future, we request that the considerations that follow be taken into account when setting the allocation amount.  With so much improvement occurring in a short time, we submit these factors merit consideration beyond our recent claim history.

The chart below shows the Title IV-E maintenance and administrative costs for federal fiscal years 2009 – Quarter 1, 2014.  The chart reflects total, computable costs and prior quarter adjustments.



### Recent changes to the IV-E program

It is important to note when demonstrating the West Virginia Department of Health and Human Resources' Title IV-E claiming percentages, commonly known as the penetration rate (P-rate), the agency has just emerged from a year-long project to revamp the operations of the Title IV-E eligibility unit, including the administration, determination rules and processes, and policies and procedures. The project was initiated by Governor Earl Ray Tomblin and placed under the direction of his Chief of Staff after declining federal revenue and increasingly large reconciliatory adjustments created budgetary shortfalls in the foster care and adoption assistance programs. The program hit an all-time low in the percentage of children deemed eligible for the federal claiming in the quarter ending December 2012. In the year since the program intervention was initiated, the claiming rate has tripled. The trend of higher claiming percentages is expected to continue with more refinements and improvements pending in the upcoming year.

In the past year, the Department of Health and Human Resources has made significant changes to their IV-E state plan, the Department's Cost Allocation Plan (CAP) and processes, all aimed at maximizing the agency's ability to draw federal funding for their foster care program. Through the course of the project, many changes were made to foster care policies, eligibility determination procedures, foster care provider certifications, claiming processes, and court functions that have already improved the IV-E penetration rate. Some specific changes that made the biggest impact are as follows:

- Changing the definition of employment from an attachment to the work force definition to the more easily demonstrated and verified less than 100 hours definition that has been in place for the agency's Title XIX eligibility for over a decade.

- Enhancing the ability of the IV-E unit to access data within the State's IV-A and Unemployment Compensation systems, which allowed for better integration of the data into the SACWIS system and the determination process.

- Implementing a statewide effort to modify the procedures used by the staff to document the certification of foster care and adoptive families. The Department of Health and Human Resources also established compliance reporting to allow executive and managerial oversight of the provider's reimbursability status.

- Addressing numerous issues with the court functions that unnecessarily made children ineligible for Title IV-E funding. This included not only the language and formatting of court orders but the rules the eligibility specialists applied to determination.

As reflected below, not only are these efforts showing a very promising trend toward a greater number of children found eligible and reimbursable, but also demonstrate that claiming in the past was significantly lower than it should have been.



### Operational Penetration Rate

Another effect of all these programmatic and procedural changes is that the children currently in care and those coming into care are showing a higher percentage of IV-E eligibility. This is demonstrated in our "operational penetration rate" data.  The operational P-rate is a performance metric that was created to gauge the effectiveness of the determination program.  It is based on the foster care population in the current Adoption and Foster Care Analysis and Reporting System (AFCARS) period, essentially showing all the children in care during the six-month AFCARS submission period. This measure of the percentage of children eligible differs from the quarterly claiming samples used in the federal claiming.  The quarterly claiming uses a sample of the children in care (all children in care the last day of the quarter) and a much greater time period (all children in care within an 8-quarter claiming window).  This is an important metric to consider when figuring the agency's projected eligibility percentages because it shows that more children will be eligible so newer children become a higher percentage of the overall foster care population. The reason for this is twofold: as a project objective, it was determined that more effort should be placed on gathering the necessary eligibility information of the children in open active cases.  This was necessary because the agency was still involved with the family and the courts and had better access to the information and the ability to verify that information.

State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

Conversely, it was found that many of the older cases were incorrectly determined but now lack the necessary information to correctly process their eligibility. Many of these cases were now wards of the state with all ties to their biological parents terminated, all but eliminating the agency's ability to backfill the necessary data. The chart below shows the progress of the operational P-rate. Note that the current percentages are over ten percent greater than the actual claiming percentage.



State of West Virginia
Title IV-E Demonstration Waiver
Federal Fiscal Year 2014 Application

**Retroactive Claims**

The extremely low federal financial participation rates were not an accurate reflection of the actual foster care population's eligibility. This is evidenced by the recent claim adjustment history. The West Virginia Department of Health and Human Resources was trending higher reconciliations and lower retroactive claims right up to the start of the program intervention. The chart below shows that with the corrected eligibility rules and improved processes, the state was able to recoup a significant portion of the revenue lost due to incorrect and incomplete determinations. Accordingly, it demonstrates that many of the children were incorrectly reconciled during the previous claim adjustments. This resulted in the low participation rates and penetration rates that are not fairly indicative of the state's true eligibility percentages.



### Kinship Care

The last consideration on the agency's penetration rate projections is the expected impact of certifying our kinship providers as full foster homes.  With this demonstration wavier, an emphasis will be placed on keeping children in their local communities and the use of kinship care will be a major component.  This focus on family is very consistent with traditional West Virginia values that place great importance on familial ties and supportive kinship connections. As shown in the chart below, the percentage of the foster care population placed in relative care has steadily risen over the past five years and is now approaching 20 percent of the foster care population.  Since these placements have always been considered categorically non-reimbursable, these children have always had the effect of lowering our foster care penetration rate.  With the recent state plan, policy and practice changes aimed at waving non-safety issues with these families, we can demonstrate that the inclusion of the eligible children within this population will have an immediate positive impact on the foster care penetration rate.



### 11. SIMILAR PROJECTS

There are several projects underway in West Virginia that will either support the demonstration or partner with it.

The Building Bridges Initiative (BBI) provides a framework for achieving positive outcomes for youth and families served in residential and community programs.  Founded on core principles, an emerging evidence base, and acknowledged best practices, the BBI emphasizes collaboration and coordination between providers, families, youth, advocates, and policymakers to achieve its aims.  Examples of successful state, community, and provider practice changes and available tools and resources are shared to support all constituencies for process improvement and achieving positive outcomes.

The Building Bridges Initiative's <u>Readily at Hand</u> interactive checklist was created in 2011 working with those engaged in the best practice work centered on youth in transition.  Stepping Stones, a West Virginia residential facility, led the design and implementation of this web-based checklist.  Full background about the <u>Readily at Hand</u> checklist will be built into the Comprehensive Assessment Planning System.

The State Court Improvement Program (CIP) was created as part of the Omnibus Budget Reconciliation Act of 1993, and designated federal funding beginning in fiscal year 1995 for grants to state court systems to conduct assessments of their foster case laws and judicial processes, and to develop and implement a plan for system improvement.

The West Virginia Supreme Court initiated the Court Improvement Program in January 1995, and formed the CIP Oversight Board as the advisory group and task force to implement the program.  The Supreme Court and the Oversight Board have continued to obtain federal grant funding and actively participate in the CIP every year since its inception.

The mission of the West Virginia Supreme Court's CIP is to create, identify, and promote initiatives that make the Court system more responsible and efficient in achieving safety, permanence, well-being, due process, and timely outcomes for children and families in child welfare system.

The Bureau for Children and Families is an active member of the CIP workgroups in partnering for systemic change.  Some of their workgroups focus on Multi-Disciplinary Treatment Teams, Youth Service Interventions, Cross Training, and Data Collection and Management.

The Court Improvement Program has instituted the New View Project.  In January 2013, the New View project was created to mirror Georgia's Cold Case process.  The New View reports will be used to help provide pertinent information regarding moving youth to permanency.

*12.* **INVESTMENTS**

The West Virginia Department of Health and Human Resources currently covers a portion of the services proposed under the waiver via Federal TANF funding.  This funding is utilized for reunification functions as well as services authorized under prior AUPL law (Emergency assistance services that the state authorized during one period of 30 consecutive days), which for West Virginia includes:

|  | Reunification | AUPL |
|---|---|---|
| **FY 2011** | $8.3 M | $19 M |
| **FY 2012** | $0 | $13.4 M |
| **FY 2013** | $4.5 M | $18.1 M |

Attached to this application is the information regarding investments using the template developed by the Children's Bureau.

*13.* **ASSURANCE OF ANNUAL ACCOUNTING**

The West Virginia Department of Health and Human Resources Title IV-E agency is committed to continuing to provide accounting for comparable spending for each year of the demonstration period.

*14.* **REQUIREMENTS WAIVED**

Waivers of the following provisions of the Social Security Act and Program Regulations as outlined in the terms and conditions for the proposed demonstration project include the following:

- Section 472(a): Expanded Eligibility: To allow the State to expend Title IV-E funds for children and families who are not normally eligible under Part E of title IV of the Act as described in the Terms and Conditions.

- Section 474(a) (1): Expanded Claiming: To allow the State to claim at the Federal medical assistance percentage and allowable expenditures of foster care maintenance payment cost savings.

- Section 474(a) (3) (E) and 45 CFR 1356.60(c) (3): Expanded Services: To allow the State to make payments for services that will be provided that are not normally covered under Part E of title IV of the Act; and to allow the State to use Title IV-E funds for these costs and services as described in the Terms and Conditions.

## 15. AUTOMATED INFORMATION SYSTEM

The effects of the demonstration wavier on West Virginia's SACWIS, the Families and Children Tracking System (FACTS), is largely unknown at this time.   While the general concept of diverting children away from foster care through the use of expanded assessments and services is currently supported, it is possible that a need to modify or enhance the system will present at a later date.  The current functionality around foster care removal and placement is not expected to change, and there are no foreseen impacts to AFCARS or NYTD (National Youth in Transitions Database) reporting.

What is anticipated is the need for more detailed reporting around the intervention services, the target population, and the fiscal outcomes of both the service provision and foster care costs.  The data used to supply these reports would be sourced from the SACWIS and either directly queried from the transactional database or transformed and loaded into the FACTS data warehouse where the FACTS business intelligence solution Cognos can be used to present and analyze the data.  Several reports will be developed to measure the intervention effectiveness against the stated outcomes of reducing the number of children in care; the number of children in congregate care; lessoning the duration of time spent in care; and the reduction of foster care re-entries.  The existing structure of the SACWIS will provide the data necessary to produce these reports, but the data will have to be extracted and processed and the reporting interface created to access the data.

If at some point during the wavier period it is found that the SACWIS requires modification, an Operation Advance Planning Document (OAPD) will be prepared and sent to the Administration for Children and Families (ACF) to describe the change and propose the work required to accomplish the change.

## 16. AGENCY READINESS FOR DEMONSTRATION

Since 2001, the West Virginia Department of Health and Human Resources has had five Cabinet Secretaries, and the Bureau for Children and Families has had six Commissioners which has caused a stalling of past efforts.  At present, we have strong leadership with laser focus and the support of the other branches of government.  Our structure, the vision and support of leadership, our partnerships, and past success demonstrate that the West Virginia Department of Health and Human Resources, Bureau for Children and Families, has the ability and initiative to successfully proceed with the IV-E demonstration.

Karen L. Bowling was appointed Cabinet Secretary of the West Virginia Department of Health and Human Resources on July 1, 2013.  Prior to taking the helm of one of the state's largest agencies, Bowling held a variety of direct care and leadership positions in the health care and education arena.

The West Virginia Department of Health and Human Resources has more than 6,000 employees in 55 counties and provides a comprehensive range of programs and services to improve the health and well-being of the citizens of our state.

One of the department's five bureaus, **The Bureau for Children and Families,** provides an accessible, integrated, comprehensive service system and financial assistance for the state's children, families, and adults to help them improve their quality of life by achieving self-sufficiency and maximum potential.  The Bureau for Children and Families administers services through 54 human service district offices.

In addition to the Bureau for Children and Families, the West Virginia Department of Health and Human Resources is also home to:

**The Bureau for Behavioral Health and Health Facilities** which ensures that programs and services are available to serve people with mental illness, chemical dependency, and developmental disabilities. The bureau provides supports for families, providers, and communities in assisting citizens to achieve their potential and gain greater control over the direction of their futures.  The bureau also oversees the operation of our seven state-owned and operated hospitals that include two psychiatric hospitals, four long-term care facilities, and one acute care/long-term care hospital.

**The Bureau for Child Support Enforcement** which is charged with fulfilling duties assigned to the state pursuant to Title IV-D of the Social Security Act; establishing paternity for children born out of wedlock; and establishing and enforcing child support payments and medical support for any families that request services.

**The Bureau for Medical Services** which supports an enhanced quality of life for Medicaid members by facilitating access to appropriate, high quality, cost-effective medical services.  The bureau administers the state's Title XIX Medical Assistance Program and subcontracts with other state agencies to provide services and oversight of programs.

**The Bureau for Public Health** which provides programs and services to improve the health of our citizens and our communities by assessing and monitoring the health status of the population, promoting healthy lifestyles; reducing the incidence of preventable diseases; protecting the public from adverse environmental factors; and assuring the state has a health care delivery system that has adequate resources to provide a full continuum of care.

Together, these five bureaus work cooperatively to provide a full continuum of services to meet the needs of the citizens of the state with a large focus being on the safety and care of children. Secretary Bowling's vision clearly outlines her expectations for all bureaus to move to Results Based Accountability.

In May 2013, the state was selected to participate in the Three Branch Institute on Child Social and Emotional Well-Being. The purpose of the Three Branch Institute is for participating states to improve social and emotional well-being for children in foster care through an integrated and comprehensive approach that aligns the work of the state's executive, legislative, and judicial branches of government. Each state selected developed a state-specific plan to consider evidence-based and research-informed strategies that would have a positive impact on children's social and emotional well-being along the permanency continuum. West Virginia's Core Team consists of Cabinet Secretary Bowling; the Honorable Gary Johnson, Circuit Court Judge, Nicholas County and Chair WV Court Improvement Program (CIP) Board; the Honorable John R. Unger II, Senate Majority Leader, WV Senate; the Honorable Don C. Perdue, Co-Chair for Health and Human Resources, WV House of Delegates; Cindy Largent-Hill, Juvenile Justice Monitor, Supreme Court Administrative Office; Cynthia Beane, Deputy Commissioner of Policy, Bureau for Medical Services; and Sue Hage, Deputy Commissioner of Programs, Bureau for Children and Families. The Three Branch team includes more than 70 public and private stakeholders who are actively participating in work groups to address many issues that are facing our children at the state and community level.

Through the participation at the Three Branch Institute, the West Virginia Core Team was introduced to Results Based Accountability (RBA). The decision was made to bring speakers from organizations and states that practice RBA to West Virginia to share the management system with our stakeholders. In early fall, more than 60 stakeholders, including members of the Three Branch Core Team and Home Team, were introduced to RBA. At the session, Secretary Bowling declared that she would be utilizing RBA in all aspects of the administration of West Virginia Department of Health and Human Resources.

On October 1, 2013, Secretary Bowling appointed Nancy Exline as Commissioner for The Bureau for Children and Families. Ms. Exline's vision and exuberance to embrace Results Based Accountability and change the way we do business has furthered this vision.

In response to the 2002 CFSR, the Bureau for Children and Families developed a Program Improvement Plan (PIP) that included a comprehensive assessment of needs and strengths for children and families. The Comprehensive Assessment Planning System (CAPS) is a comprehensive assessment of needs and strengths for children and families. CAPS is the assessment protocol that is used to meet the treatment planning requirements established in WV Code, Section 49-5D-3.

Built within the CAPS is the Child and Adolescent Needs and Strengths assessment (CANS). West Virginia previously adopted the WV CANS and has conducted comprehensive statewide training and certification. The WV CANS is an assessment tool adapted from Dr. John Lyon's Child and Adolescent Needs and Strengths assessment.  The CANS provides information regarding the child and family's service need for use during system planning and/or quality assurance monitoring.  A cross-disciplinary team of professionals worked cooperatively with Dr. Lyons to adapt this tool for use in West Virginia to support our efforts in delivering individualized, results-oriented care that includes wraparound services.  As part of ***Stay at Home WV***, we will provide additional training opportunities for stakeholders to encourage and facilitate state-wide use of the WV CANS.

 In 2005, the West Virginia Legislature formed the Commission to Study Residential Placement of Children in an effort to effectively reduce the number of West Virginia children in out-of-state placement.  Its charge is to achieve systematic reform for children at risk of out-of-home residential placement and to establish an integrated system of care for these children and their families.  In its original report, the Commission identified 13 recommendations which its members have committed to see through implementation.  It has taken a hard look at progress on its original 13 recommendations and has now prioritized ten goals that will make the most significant difference in improving outcomes for children and their families.

During the past eight years, the Commission, its workgroups, and its members through their own agencies have seen outcomes as a result of their commitment and partnerships, including:

1. A 36 percent reduction in the number of new youth being placed outof state in group residential, acute psychiatric facilities, psychiatric residential care facilities, and specialized foster family care settings from 2007-2013.

2. The use of the West Virginia System of Care's Clinical Review Teams in successfully preventing/diverting 127 children from being placed out of state.

3. Development of the West Virginia Child Placement Network which is a resource to track the daily availability of treatment beds in West Virginia.

4. Completion of a comprehensive, statewide Service Array Assessment process to help communities identify, evaluate, and improve services and supports to provide for the safety, permanency, and well-being of children and their families.

5. Improvement of the Comprehensive Assessment and Planning System (CAPS) to include timely completion, incorporating the West Virginia Child and Adolescent Needs and Strengths (CANS) assessment. This has included extensive training of the WV CAPS and WV CANS.

6. A review of out-of-state provider requirements and comprehensive on-site monitoring of out-of-state residential facilities where West Virginia children are placed to ascertain that services offered meet standards of licensure, certification and expected rules of operation consistent with in-state expectations of the West Virginia Department of Health and Human Resources (Bureau for Children and Families and Bureau for Medical Services-Medicaid) and the West Virginia Department of Education.

Through the Three Branch Institute, the Commission to Study the Residential Placement of Children, Regional Clinical Review Teams, Service Delivery Workgroup, and the Court Improvement Project, we have developed a dedicated and comprehensive team of stakeholders who work with us in addressing systemic issues regarding the youth and families of West Virginia. The system of collaboration, coordination, and communication that is already established among these partnerships validates how we are poised to move forward with this demonstration.

West Virginia has a large population of children in out-of-home care, both in-state and out-of-state, and in settings that are far from their homes and communities. The agency's mission, vision, and policies already support the need to keep families together and children in their homes whenever possible. If keeping the child in the home is not possible, we maintain that those children should be close to their homes, schools, and communities so they can remain in contact with people that are important in their lives. This vision is shared at all levels of the West Virginia Department of Health and Human Resources, from the Cabinet Secretary to the field staff, to our community and our many stakeholders. The waiver would provide the financial means to develop a system that will allow children to return to their homes and communities and to prevent children in the future from being away from their families. It is our goal to further improve practice and services around this issue and, in the future, to reduce the number of children leaving their homes and communities.

Again, the Bureau for Children and Families purports that all of the provided information supports our readiness to successfully move forward with our proposed demonstration.

## *17.* **COLLABORATION**

In 2005, the West Virginia Legislature formed the Commission to Study Residential Placement of Children in an effort to effectively reduce the number of West Virginia children in out-of-state placement. The charge of the Commission was to establish a mechanism to achieve systemic reform by which all of the state's child-serving agencies involved in the residential placement of at-risk youth jointly and continually study and improve upon this system and make recommendations to their respective agencies and to the Legislature regarding funding and statutory, regulatory, and policy changes. This bill contained 13 topics of study including current placement practices with special emphasis on out-of-state placements and ways to certify out-of-state providers to ensure that children who must be placed out of state receive high quality services consistent with this state's standards. As part of this charge, the West Virginia Department of Health and Human Resources and the West Virginia Department of Education (WVDE) have joined efforts to develop and implement a collaborative monitoring system to review out-of-state facilities providing treatment and educational services to West Virginia youth.

The existing framework of partnerships will be used in the development of the membership for the IV-E Demonstration Committee.

The Bureau for Children and Families' valuable partnerships within Three Branch, The Court Improvement Project, local community collaboratives and summits, and its Service Array partners have assisted in conceptualizing this demonstration.  Ongoing communication and work within these collaborative groups as well as the formation of several cross-discipline workgroups specific to the project have and will assist in the development and success of this demonstration.

West Virginia System of Care is a public, private consumer partnership dedicated to building and maintaining effective community-based services and supports for children and youth with, or at-risk for behavioral health related challenges, and their families. The population focus is children and adolescents at risk of or placed in an out of home treatment setting.

West Virginia System of Care is:

1. *Family Driven*: Families have a primary decision-making role in the care of their own children, as well as the policies and procedures governing care for all children in their communities and state.

2. *Youth Guided*: Young people have the right to be empowered, educated, and given a decision-making role in their own lives as well as in the policies and procedures governing care for all youth in their communities and state.

3. *Culturally Competent*: Children and families of diverse cultures and language proficiency have comparable access to services; service providers learn about and demonstrate respect for family culture (including attitudes and beliefs about services, child rearing, expression of sympathy, coping strategies, and help-seeking behavior); and diverse families achieve similarly successful outcomes from services.

4. *Array of Community-Based Services*: There is a broad and diverse array of community-based services and supports that are consistent with the system of care approach and improve outcomes.

5. *Best Practice in Service Delivery*: Creating or expanding an individualized, strength-based approach to service planning and delivery practices that have been shown to be effective and/or evidence-based, such as trauma-informed and trauma-specific services.

6. *Quality Assurance*: Meaningful outcomes are measured and play an important role in improving the quality of care to children and their families at a system level, service level, and family/child level.

7. *Government Accountability*: All agencies that serve children, youth, and families take the lead for System of Care goals and are responsible for policy, funding, system management, and oversight to achieve them.

8. *Interagency Collaboration*: Interagency structures, agreements, and partnerships are maintained that coordinate funding, resources, and data to build the System of Care.

Overall, collaboration reflects the dynamic nature of interconnection among both public and private entities engaged in improving West Virginia's child welfare system.  From state agencies to children-based associations, the magnitude of resources, people, and funding dedicated to operating and improving the system is remarkable. The Commission to Study Residential Placement of Children has worked diligently to tap into the various professionals, organizations, and initiatives that directly correlate to accomplishing its mission. Importantly, the cross-membership on commissions, special initiatives (court improvement), advisory committees (WVDE's Education of Children in Out-of-Home Care Advisory Committee), and joint working groups (Expanded School-based Mental Health, Service Array Project) enhances communication, fosters a greater knowledge base, and sustains long-term working relationships. The Commission truly believes that this collaborative approach will lead to better understanding, more breakthrough improvements, and most vital, more children remaining in their homes or their communities.

### 18. **West Virginia Child and Family Services Review (CFSR)**

West Virginia Child and Family Services Review (CFSR) was conducted in 2008.  As a result of the 2008 CFSR review, West Virginia was found to have strengths in the following items:

- Item 5:  Foster care re-entry;

- Item 11:  Placing children in close proximity to their parents; and

- Item 12:  Placing children with siblings.

However, the state's overall ratings of strength for these items did not achieve substantial conformity.

The 2008 CFSR also identified the following areas of concern in achieving outcomes for children and families.

- Permanency Outcome 1:  *Children have permanency and stability in their living situations.*  This was substantially achieved in only 27.5 percent of the 65 cases reviewed. West Virginia's lowest rating was for Item 9, adoptions, which was rated as strength in 31 percent of the cases reviewed, and Item 8, reunification, guardianship, and placement with relatives, which was rated as strength in 59 percent of the cases reviewed.

- Well-Being Outcome 1:  *Families have enhanced capacity to provide for children's needs.*  This was substantially achieved in only 36.9 percent of the cases.

- Safety Outcome 2:  *Children are safely maintained in their homes when possible and appropriate.*  This was only substantially achieved in 56.9 percent of the cases.

The CFSR final report issued on May 7, 2009, indicates West Virginia's low performance in regard to the CFSR outcomes may be attributed in part to the state's inconsistencies in providing for the well-being of families and children in in-home services cases, as evidenced by significantly lower outcomes for in-home cases.

Based on the results of the 2008 CFSR Federal Review, West Virginia was required to enter into a program improvement plan to improve the state's performance in the areas of safety, permanency, and well-being.

Our Program Improvement Plan (PIP) was submitted for approval on April 1, 2010, and received approval from the Children's Bureau on June 10, 2010.  The Children's Bureau authorized the state to begin implementation of its PIP on July 1, 2010.

West Virginia submitted data and evidence of completion to address the following CFSR measures:

- **Item 1**: Timeliness of initiating investigations of reports of maltreatment
- **Item 3**: Services to family to protect child(ren) in home and prevent removal
- **Item 4**: Risk of harm to child(ren)
- **Item 7**: Permanency goal for child
- **Item 10**: Permanency goal of other planned permanent living arrangement
- **Item 17**: Needs and services of child, parents, foster parents
- **Item 18**: Child and family involvement in case planning
- **Item 19**: Worker visits with child
- **Item 20**: Worker visits with parents

The Administration of Children, Youth and Families determined that West Virginia had successfully completed its Program Improvement Plan as of October 2013.

West Virginia's proposed IV-E Waiver demonstration will build upon the foundation established through the work completed during our program improvement plan.  The CFSR data and West Virginia's program improvement plan have been instrumental in informing our waiver approach and will continuously support improvement strategies.  West Virginia acknowledges the need to reduce the use of congregate care and provide for health, safety, and well-being of youth within their communities.  West Virginia's continued development of community-based resources and partnership will create an improvement in the performance indicators for children and families in in-home cases.

### 19. COURT ORDER(S)

West Virginia is not under a court order where a determination has been made that the child welfare program failed to comply with state child welfare laws or Title IV-B, IV-E or the U.S. Constitution. The West Virginia Department of Health and Human Resources is under a consent Decree known as the Gibson Decree.

In the late 1970's, a class action lawsuit was filed in federal court. One of the plaintiffs in that lawsuit was named Gibson. The lawsuit was settled by a consent decree, an agreement between the West Virginia Department of Health and Human Resources and the plaintiffs, in 1984. The decree has always been referred to as the Gibson Decree.

The essence of the lawsuit was the allegation that the West Virginia Department of Health and Human Resources did not explore alternatives to the removal of children when there were allegations of child abuse and/or neglect. The West Virginia Department of Health and Human Resources agreed in the consent decree to explore the provision of certain services as an alternative to removal. The West Virginia Department of Health and Human Resources decided at a later date to also consider certain services to facilitate the reunification of children with their family. Collectively, these services have become known as Gibson services and the payments associated with them as Gibson payments. With the adoption of the West Virginia Child Protective Services System in 1992, the process for safety evaluation and planning and the provision of in-home safety services replaced the Gibson Policy.

As a result of the Gibson decree, the West Virginia Department of Health and Human Resources may purchase services for families in which:

- Their child is unsafe and will be removed from the home if a particular service is not obtained; and

- Their child has been removed but will be returned home if a particular service is obtained.

The service that is to be purchased must be part of either a documented safety plan or a documented permanency plan for reunification. Gibson payments are restricted only to those Child Protective Services cases that will be opened for on-going services, or are already opened for on-going services. No other services shall be approved as a Gibson-type payment.

This court order should not have an impact on the waiver since the services provided will continue to be provided and additional services added to assist in this effort.

## 20. PUBLIC INPUT

West Virginia is recognized for a collaborative, highly responsive quality child welfare system built on the safety, well-being, and a permanency of every child. Through our partnerships and collaboration with the Court Improvement Project, the Commission to Study Residential Placement of Children, and the Three Branch Institute, initial discussions and support for the IV-E project have occurred.  These collaborations provide an integral means for obtaining public input. The Bureau for Children and Families' partners share the vision around this demonstration design.  West Virginia Bureau for Children and Families plans to continue to seek public input during implementation and to work closely with all of our partners.  We also anticipate our third party evaluator's assistance with customer surveys.

## 21. HEALTH INSURANCE ASSURANCE

West Virginia will continue to provide health insurance coverage for all special needs children for whom the Title IV-E agency has entered into an adoption assistance agreement or a legal guardianship agreement (including those not supported by Title IV-E funds).

Children in the custody of the West Virginia Department of Health and Human Resources and in placement are eligible for a Medicaid card up to the age of 21 based on the Medicaid Plan for the State of West Virginia.   The majority of children up to the age of 21, who come into the custody of the WVDHH and are placed in foster care, may be eligible for continued Medicaid coverage upon discharge from a foster care placement.

Children in the following placement types may be eligible for continued Medicaid coverage:

- DHHR foster/adoptive homes;
- Therapeutic foster/adoptive homes;
- Specialized family care (Medley);
- Group residential;
- Psychiatric hospitals;
- Psychiatric treatment facilities;
- Medical hospitals;
- Trial adoptive homes;
- Transitional living;
- Emergency shelter care;
- Family emergency shelter care; and
- Schools for children with special needs such as the Romney School for the Deaf and Blind.

A child's eligibility for continued Medicaid coverage is initially determined by placement in one of the above-mentioned settings and how they are discharged from care.  They are eligible for continued Medicaid coverage from the date of placement for a continuous period of 12 months, whether or not they remain in placement.  Eligibility will be re-determined during the child's one-year anniversary month, which is the child's initial placement month.  For a child to be eligible for another 12-month episode, they must be in a foster care placement and in the custody of the West Virginia Department of Health and Human Resources.

For children who come back into the care and custody of the West Virginia Department of Health and Human Resources during a continued Medicaid Eligibility episode, a new eligibility episode will not start.  The original eligibility episode will continue until the child's anniversary month and then be re-determined for another 12 month period.  Children who are discharged from foster care permanently will be eligible for continued Medicaid coverage, unless the exit reason chosen is "death" or "runaway."  Children who are discharged from foster care on a temporary basis will only be eligible for continued Medicaid coverage if the exit reason is "trial return to caretaker/parents of removal."

### 22. PROGRAM IMPROVEMENT POLICIES

West Virginia has implemented a number of Child Welfare Improvement Policies and Practices, statewide, in particular, the Title IV-E Guardianship Assistance Program.

In addition to existing statewide policies and practices, within three years of the implementation of the demonstration, The Bureau for Children and Families will implement an additional Child Welfare Policy Improvement, namely, Preparing Youth in Transition.


### CONCLUSION

West Virginia is fully prepared for the revitalization of our services to children and families.  Recognizing that this application for the IV-E Waiver is a competitive process, we state with confidence that *Safe at Home West Virginia* will come to be recognized as a best practice model for full continuum supports in a community setting.  Our demonstration project will indeed be a full-fledged "demonstration" of the effectiveness of well-planned project management, well-focused analysis, well-utilized resources and well-structured collaboration.

Our children will be **safe at home**.