Attachment E



UNIVERSITY *of* MARYLAND
SCHOOL OF SOCIAL WORK
THE INSTITUTE FOR INNOVATION
AND IMPLEMENTATION

# Agreement between the State of West Virginia and the United States Department of Justice:
## Report By Subject Matter Expert

## June 2020

Integrating Systems • Improving Outcomes



D142036

## Table of Contents

Introduction ......................................................................................................................................... 2

   Implications to the Agreement Timelines Resulting from the COVID-19 Pandemic ............................ 2

Implementation: Community-Based Services ...................................................................................... 3

   Wraparound Facilitation ..................................................................................................................... 3

   Children's Mobile Crisis Response ..................................................................................................... 9

   Behavioral Support Services ............................................................................................................. 11

   Therapeutic Foster Care (TFC) .......................................................................................................... 13

   Assertive Community Treatment ...................................................................................................... 17

   Screening and Assessment ............................................................................................................... 19

   Reductions in Placement .................................................................................................................. 22

   Outreach and Education .................................................................................................................... 23

   Quality Assurance and Program Improvement (QAPI) ..................................................................... 24

Conclusion ......................................................................................................................................... 26

Appendices ........................................................................................................................................ 29

   Appendix A – Documents Reviewed ................................................................................................. 29

   Appendix B – Contacts with West Virginia and the Department of Justice ...................................... 32

   Appendix C – Summary of Recommendations and Information Sought ........................................... 33

D142037

## Introduction

In April 2014, the United States Department of Justice (DOJ) launched an investigation into the State of West Virginia's system for delivering services and supports to children with serious mental health conditions. The DOJ found that West Virginia has not complied with Section II of the Americans with Disabilities Act (ADA) and, as a result, many children with serious mental health conditions are needlessly removed from their homes to access treatment. In a May 14, 2019 Memorandum of Agreement (Agreement), DOJ recognized West Virginia's commitment to providing services, programs, and activities to qualified children in the most integrated, least restrictive environment. The Agreement requires West Virginia to build upon this commitment by offering home- and community-based services (HCBS) to all qualified children and to reduce the number of children in residential mental health treatment facilities.

As part of the Agreement, the State was required to obtain a subject matter expert (SME) in the design and delivery of children's mental health services to provide technical assistance to help the State reach compliance with the Agreement, prepare an assessment of the State's compliance with the Agreement, and provide recommendations to facilitate compliance. Through a competitive procurement, the State contracted with The Institute for Innovation & Implementation (The Institute) at the University of Maryland School of Social Work to provide this subject matter expertise. In accordance with the Agreement, this contract requires that every six months, The Institute draft and submit to both the State and DOJ a comprehensive report on West Virginia's compliance with the Agreement, including recommendations to facilitate or sustain compliance. The first report was delivered December 2019.

Information reflected in this second SME report is derived from multiple calls with State leadership and team leads, including calls with topical workgroup leads, and a review of information provided by the State (detailed in Appendices A and B). This report describes the State's progress since December and provides recommendations for the coming six months of work and beyond. Particular focus is given to the actions of workgroups to review available data, consider their interdependencies as the State and its partners begin developing a quality assurance and program improvement plan, and review initial results of their evaluation approach, as each becomes available. The Institute acknowledges the willingness of West Virginia to make team leads and staff available, even during this unprecedented time in response to the COVID-19 pandemic.

This second SME report benefitted from receipt of the State's implementation work plans, which were not available at time of the first report and were provided to The Institute in February. These work plans describe the State's planned tasks, activities, deliverables, and timelines to fulfill the Agreement. The recommendations in this report reflect a careful examination of the specific tasks, activities, deliverables and timelines outlined in these February work plans. As with all work plans, it is anticipated that the State will continuously revise these plans based on the review of data, quality improvement efforts, challenges, and lessons learned and that future reports will reflect those changes.

### Implications to the Agreement Timelines Resulting from the COVID-19 Pandemic

The Institute wishes to recognize that this second report was produced in cooperation with the State under unprecedented circumstances. Governor Justice declared a state of emergency for all 55

D142038

counties on March 16, 2020 in response to COVID-19; the state's public schools were ordered closed March 27, 2020. As of this writing in late May 2020, the State has just over 1,900 confirmed[1] cases of COVID-19 and has experienced the loss of 74 residents. COVID-19 has created historic financial pressures for hospitals, health systems, and child- and family-serving agencies and organizations. Simultaneously, COVID-19 has led to job losses, increasing the number of uninsured and increasing those eligible for Medicaid. Amid these challenges, we note that West Virginia has issued several memoranda expanding access to services via telehealth, and that the Centers for Medicare & Medicaid Services (CMS) approved the State's application for Appendix K related to its 1915(c) waivers, including the relatively new Children with Serious Emotional Disorder Waiver, and a Section 1135 Waiver to grant additional flexibility in administering its Medicaid program. These urgent changes to existing policies and programs demanded the time of staff and leadership, who in turn paused some of the activities and work discussed in this report. In addition, all in-person meetings, trainings, and educational and stakeholder engagement sessions were cancelled and are now in the process of being rescheduled for later in the year, or will be held virtually. We note that the State was able to shift its Child Welfare Collaborative to a virtual format, and the session provided updated information to stakeholders on May 12, 2020, including information specific to the status of this Agreement. We note that these COVID-19-specific initiatives described are but a few of the activities carried out by West Virginia and should not be read as the complete array of activities the State has and will continue to undertake to protect the public health and safety of its residents.

## Implementation: Community-Based Services

### Wraparound Facilitation

*Agreement Requirements*: The Agreement requires the West Virginia Department of Health and Human Resources (WVDHHR) to ensure statewide access for each child identified as needing in-home and community-based services, with a child and family team (CFT) managing the care of each child. Further, the Agreement requires that each CFT operate with high fidelity to the National Wraparound Initiative's (NWI) model, and use the Child and Adolescent Needs and Strengths (CANS) assessment or other assessment tool to develop an individualized service plan (ISP). Additionally, for any child who has a multidisciplinary treatment team (MDT), the screening and assessment and ISP must be made available to the MDT.

*Activities:* West Virginia's Children with Serious Emotional Disorder 1915(c) (CSED) Waiver was approved by CMS on December 19, 2019 and became effective March 1, 2020 for three (3) years. The waiver provides Wraparound (called "case management" in the waiver), in-home family support and therapeutic services, independent living/skill building, supported employment, in- and out-of-home respite care, children's mobile crisis response (CMCR), non-medical transportation, parent peer support, and other specialized services for children aged three (3) through 17 with serious emotional disturbance and youth and young adults aged 18 to 21 with serious mental illness. The waiver noted the State would contract with an Administrative Service Organization (ASO) and psychological practice as the Medical Eligibility Contracted Agent (MECA) to address program eligibility, enrollment, provider contracting (providers are also required to enroll with the State's Medicaid Management Information System (WVMMIS)), utilization management, and data analysis and reporting.

---

[1] West Virginia Department of Health and Human Resources. Coronavirus Disease 2019 (COVID-19). https://dhhr.wv.gov/COVID-19/Pages/default.aspx

D142039

The State entered into a contract with Aetna Better Health to create Mountain Health Promise (MHP), a specialized managed care organization (MCO) to serve children and youth in foster care; individuals receiving adoption assistance (effective March 1, 2020); and children aged three (3) through 21 eligible for the CSED Waiver and enrolled in the MCO, as waiver slots are available. The waiver specified the unduplicated number of participants as 500 in year one, 1,000 in year two, and 2,000 in year three. During a virtual meeting of the West Virginia Child Welfare Collaborative, the State announced that it had received 73 applications to participate in the waiver; it had approved 11 members and enrolled 24 providers, even as COVID-19 seriously affected business processes for the State and its partner organizations. At the same virtual meeting, the State announced it had entered into a contract with West Virginia University (WVU) for evaluation activities, including developing logic models for each program component and identifying the specific data collection methods and systems required to produce meaningful program evaluation.

Leadership from the three separate Wraparound programs, *Safe at Home* (SAH, a Title IV-E child welfare program), the Bureau of Behavioral Health's (BBH) Children's Mental Health Wraparound program, and the CSED Waiver, completed an initial review of programmatic fidelity using the Wraparound Implementation Standards–State (WISS) and Wraparound Implementation Standards–Program (WISP) following a call with the SME Team and Kim Estep, Director of the National Wraparound Implementation Center.

The Institute received copies of the approved waiver and a draft MCO contract from the State. As reflected in the first SME report, and based on previous technical assistance provided, the State developed a client pathway flow to demonstrate a child pathway through the service for each of the three Wraparound programs,  including being deemed eligible for services, receiving services consummate with need, and experiencing discharge or transition to another level of care. In addition, The Institute received a work plan from the West Virginia Wraparound workgroup outlining its goals and enumerating specific tasks through 2022; this section draws upon that work plan content to provide an assessment of the state's compliance with the Agreement and recommendations for the next six months of work to advance the State's efforts to comply with the DOJ agreement.

### Recommendations

- In addition to the evaluation data required in the Agreement, discussed in the Quality Assurance and Program Improvement (QAPI) section later in this report, which encompasses and assesses the impact of the State's efforts to reduce residential placement, is the need for real-time or near real-time program-specific data. Such data are necessary to assist agency staff in understanding the demographic characteristics of children and youth served, referral patterns, wait times, discharge planning, patterns of discharge, and provider-level hiring and full-time equivalent (FTE) staffing patterns. Such data are necessary to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels.

  o The Institute is aware that each of the three programs have access to data and use it to guide program activities (e.g., the presentation of CSED Waiver data during the Child Welfare Collaborative call in May describing initial referrals and enrollment into the waiver). As the evaluation design being carried out in partnership with WVU will not be finalized until January 2021, with the development of a data dashboard and reports to occur after that, The Institute

recommends that the State incorporate into its current workgroup meetings a review of available data across the three programs, the themes and issues it has identified across the three programs, and how it is responding to themes and issues as they are identified. This will further support the State's goal for a more unified West Virginia Wraparound, allow the State staff to identify opportunities to collaborate on addressing provider needs or issues across the three agencies, and support the State's commitment to continuous quality improvement.

o  Data recommended for review include: the diagnostic and demographic differences between applicants and approved members to ensure those accepted and those denied are consistent with the eligibility criteria; wait times for services; referral sources for Wraparound, including from CMCR and for children who are being considered for residential services; and provider applicants versus accepted providers to ensure that the approved providers are sufficient to meet the need.

o  Additionally, through the programs' coordinated review of current data, the program leads will be able to more fully inform WVU's Evaluation Design Team on their program-specific ongoing data needs for the data dashboard and future reports.

- The State initially set a goal of "develop[ing] written policies and procedures for West Virginia Wraparound that incorporates the NWI's model, CSED Waiver requirements, and programmatic goals set forth above" by June 2020. We note that development of these policies has been delayed by the response to COVID-19. To achieve that goal, we recommend the following:

o  In developing workflows, policies, and procedures for West Virginia Wraparound, we recommend that the State address how other services refer potentially eligible children to Wraparound services and how the service is expected to share information with other services. For example, how do providers know if they should refer to BBH Wraparound, Safe at Home Wraparound or the CSED Waiver Wraparound. Regarding sharing information, for example, identify how the State is ensuring that screening, assessment, and the ISP are available to a child's Multidisciplinary Treatment Team (MDT).

o  In the workflows, policies, and procedures, we recommend that the State address how children in the population of focus, including those enrolled in West Virginia Wraparound, are being diverted actively from residential placement.

o  In the workflows, policies, and procedures, we recommend that the State address how children and families that access CMCR (whether a team was dispatched or the call was resolved via telephonic or virtual means) are being connected to High Fidelity Wraparound (HFW), CSED, and other Medicaid services. We note that the State indicated a formal referral process was under development in late February and that efforts to finalize may have been delayed by COVID-19.

o  In the workflows, policies, and procedures, we recommend that the State establish timeframes for referral to evaluation, program acceptance or denial (and

grievance and appeals processes), ISP development, and initiation of services so each step on the client pathway has a clear standard for timely access.

o   In the workflows, policies, and procedures, we recommend that the State adopt unified terminology and definitions for services. For example, the Safe at Home and BBH workflows use the term "Wrap Facilitator" but the workflow and Chapter 502 provider manual for the CSED Waiver uses "case management" and "person-centered service planning team." While these differences may seem merely semantic, the effectiveness of HFW is maximized when communications and language is well-integrated and consistent.[2]

o   Similarly, we recommend that the State ensure that grievance and appeals processes are consistently defined. The BBH workflow mentions denials but does not include any detail or a related timeline, whereas the CSED workflow provides additional detail and includes a fair hearings process to access a second medical examination.

  ▪   Standard language also is important for consistent adoption of the values of HFW, with the terms incorporating and reinforcing principles such as collaboration (e.g., Child and Family Team) and family voice and choice (by using "facilitator" rather than "manager" to reinforce the structure of decision-making such that family members can select from among various options).

  ▪   Such standardization will also assist with data collection by emphasizing consistency across programs and regions within the State. Similarly, unification will assist the State in delivering consistent technical assistance to all HFW providers and across all programs (BBH, SAH, and CSED).

o   We recommend that the State continue its efforts to resolve differences in its three Wraparound programs' fidelity to the NWI standards in order to establish policies and programmatic requirements consistent with NWI.  Through its initial review using NWI's WISS and WISP implementation support tools, the State has identified areas where it is making progress in its alignment with HFW, and areas to address for consistency HFW. The areas for resolution fall into three categories:

  ▪   aligning policy and programmatic requirements to be consistent with HFW;

  ▪   providing provider training and coaching on content and skills development, including the use of fidelity tools to support provider practice and skill-building to align with HFW; and

---

[2] See Sather, A. & Bruns, E.J. (2016). National Trends in Implementing Wraparound: Results of the State Wraparound Survey, 2013. *Journal of Child and Family Studies*,25. Doi:10.1007/s10826-016-0469-7 and Coldiron J.S., Bruns, E.J., & Quick, H. (2017). A Comprehensive Review of Wraparound Care Coordination Research, 1986–2014. *Journal of Child and Family Studies, 26*. Doi:10.1007/s10826-016-0639-7.

- establishing accountability measures to ensure practice is delivered consistent with HFW, and data are used routinely to ensure alignment with to HFW.

The Institute anticipates that the State could complete this review, develop programmatic changes, and begin to roll out training to providers by September 2020, to align with its current work plan timeline.

- o Once the State has established its programmatic and policy standards for all three programs consistent with NWI, the State agencies responsible for the current Wraparound programs need to select and implement a provider-level fidelity assessment tool. The Institute recommends that the State review the available provider monitoring fidelity tools and select at least one to implement. The Document Assessment and Review Tool (DART) was suggested by the SME as an initial starting point for the system.  While NWI and its implementation center, NWIC, have a suite of fidelity monitoring tools available that the State may find helpful, the DART is relatively easy and affordable to implement. It is a record review tool used to assess Wraparound provider and practice adherence to components of Wraparound such as referral processes, timeliness of engagement, use of strengths, quality of needs statements, progress monitoring, safety planning, etc. The DART would provide the State with immediate actionable information on its progress towards fidelity and the training needs of its providers, as well as engage providers in practice change through sharing results of the tool. Once the State has selected a tool or tools, it will need to:

  - develop the infrastructure to implement the tool(s);
  - receive training in the tool(s) selected;
  - introduce the tool(s) to providers and select an implementation date; and
  - identify a plan to collect and use data from the tool(s) to inform further training and coaching, technical assistance, supervision, and programmatic and policy standards.

- We recommend that the State continue developing onboarding, training, and coaching plans and content for Wraparound Facilitators based on NWI's model. In addition to training on HFW, providers need to receive training on the differences between the State's various funding streams and their respective connections to programmatic eligibility. Relevant topics include how/when to refer to which program; billing requirements, including Medicaid and MCO enrollment processes; each program's referral pathway for children and families; and the specific clinical and demographic reporting requirements for each program. The Institute recognizes that all training has been delayed due to COVID-19; as such, we encourage the State to revise its timeline to reflect training occurring later in 2020, and opportunities for virtual training, as appropriate.

  - o As part of the training and coaching protocols, The Institute recommends that the State develop a set of metrics related to training and coaching. These metrics should be incorporated into the QAPI approach.

D142043

- Metrics for training and coaching could include (1) the timing of key events in the Wraparound process (i.e., days to first team meeting, days to the implementation phase, graduation); (2) the frequency of team meetings, contacts with family members, and natural and professional supports; (3) comparison points for fidelity and satisfaction data; and (4) prevention and crisis planning. Such data will be useful in revealing early patterns of participation in training and coaching, including any geographic disparities that will need to be remedied to ensure statewide availability of services.

- We encourage the State to consider including MDT conveners in the training and coaching for Wraparound Facilitators. As the MDT will retain care coordination responsibility for children in child welfare, it is imperative that such individuals develop and refine the skills to oversee the case plan process in conjunction with local law enforcement, a child advocacy center representative, physical and behavioral health care providers with pediatric and child abuse expertise, and an educator.[3] Common training and coaching will ease the transition for children and families as they exit child welfare and accrue to HFW provided in the CSED Waiver, as applicable. Mirroring the metrics collected by the MDT and Wrap Facilitator/CFT will assist the State and its partners in evaluating the success of care coordination across child-serving agencies.

  - The Institute recommends that the State develop and share a timeline with the SME for the drafting of proposed programmatic and policy changes, training and coaching protocols, and implementation planning related to the above recommendations so that the SME can offer review, comment, and input on these drafts.

- The State entered into a contract with WVU for evaluation planning that began April 15, 2020 and will continue into early 2021. We recommend that the SME be given the opportunity to review and provide comment on evaluation activities, including having discussions with the WVU Evaluation Team, prior to any finalization on the initiative logic model, program-specific logic models, draft evaluation overview, and draft WVU evaluation plans—all scheduled for completion by September 2020—to ensure consistency with the principles of HFW, the training and coaching protocols, programmatic workflows, and the goals of the Agreement itself.

  - The Institute recommends that the State explicitly define the data sets and specific indicators and/or elements that will be collected and analyzed to demonstrate that children and their families in the population of focus are receiving appropriate education and outreach and are being referred to and evaluated for enrollment in Wraparound; that families found not eligible for services receive timely, clear, and consistent guidance on the appeals process; how children recommended for higher levels of care such as residential treatment are being successfully diverted to, and utilizing, HFW and other HCBS; that a CFT is managing the ISP of each child

---

[3] West Virginia Code § 49-4-402

and operating with high fidelity; that the CANS assessment is being used consistently to develop an ISP for each child; and how transition and discharge, including early discharge, from HFW is occurring. Such data should be regularly reported and disaggregated by age (i.e., 0-5, 6-10, 11-13, 14-17, and 18-21), race, ethnicity, gender, custody status, and county or region of origin to demonstrate the statewide availability of HFW.

- The Institute recommends that the State educate stakeholders regarding the referral process and the eligibility standards for Wraparound and continue to work through the established outreach and education workgroup to ensure that stakeholders and families receive timely information about the referral process and eligibility for Wraparound. Given the Wraparound workgroup's efforts to align the three programs with NWI and establish a consolidated West Virginia Wraparound approach, the outreach and education workgroup will need to understand the timelines, client pathway, and policies in order to ensure the timeliness and accuracy of their communications.

### Children's Mobile Crisis Response

**Agreement Requirements**: The Agreement requires the State to develop Children's Mobile Crisis Response (CMCR) statewide for all children, regardless of eligibility, to prevent unnecessary acute care. The CMCR must operate 24/7, via a toll-free number, and must have plans to respond to crises by telephone or in-person and to report data related to timeliness and engaging families in HCBS following a crisis.

**Activities**: The State released an Announcement of Funding Availability (AFA) for Children's Mobile Crisis Response and Stabilization Teams to serve Region 1 (Hancock, Brooke, Ohio, Marshall, and Wetzel Counties) and Region 2 (Pendleton, Grant, Hardy, Mineral, Hampshire, Morgan, Jefferson, and Berkeley Counties) in December 2019; with the selection of vendors, this AFA expands CMCR statewide. The documents provided by the State indicate that it is actively weighing its options for a single, statewide call line with a plan forthcoming, including using existing infrastructure to support the call line (e.g., the State's 211 line).

Children's mobile crisis response is also included in the State's relatively new CSED Waiver. Services are available in 15-minute increments to waiver participants, up to 14 hours per week. The State notes, "Waiver participants who max out on waiver mobile response units will be able to leverage traditional state plan services, as well as comparable services through BPH's [Bureau of Public Health] Children with Special Healthcare Needs and BBH's Mobile Crisis Response. However it is not likely participants will max out on units due to the MCO stratification of services and providers. Units will also be monitored closely for high utilization by the MCO and reported to BMS monthly to best determine if the current services, provider, and level of care are being provided efficiently and effectively."

In addition to the AFA, the State conducted a two-day training for providers on CMCR in September 2019 and developed a Scope of Work (SOW) with the Regional Youth Service Centers (RYSCs). The SoW requires that RYSCs enter in a Memorandum of Understanding (MOU) with a local Comprehensive Behavioral Health Center (CBHC) or a Licensed Behavioral Health Provider (LBHP).

Other duties specified in the SOW include using memoranda of understanding (MOUs) to "build collaborations within the community to ensure awareness and coordination of services" for youth aged 12 to 17 and young adults aged 18 to 25. The State also developed a client pathway workflow for its CMCR program. In addition, the State has been utilizing technical assistance available under the Substance Abuse and Mental Health Services Administration (SAMHSA) System of Care grant to begin developing standardized training, process, and protocols across various payers; developing public information sharing/dissemination strategies; building infrastructure (i.e., a statewide call line); and engaging in social marketing. Finally, The Institute wishes to acknowledge that the State is continuing to provide on-site CMCR services to families despite the current public health crisis by employing a crisis assessment to determine the level of risk/safety for all incoming calls.

*Recommendations:*

- The State met its work plan goal to expand CMCR services statewide. With that expansion comes the need for standardized training materials, as well as a plan for ongoing training and staffing the hotline itself. We recommend the SME be given the opportunity to review the training materials used in September 2019 and any further iterations of onboarding, training, and staffing protocols. Given the nature of CMCR, we recommend the training materials be inclusive of, and specific to, law enforcement who may respond with CMCR.

- The State should continue its efforts to develop a statewide hotline which connects to, and builds upon, well-established local expertise in delivering CMCR, including past success in diverting children from high levels of care, successful practices for training and responding with local law enforcement, and culturally and linguistically responsive localized education and outreach strategies.

- The Institute recommends that the State revise or develop a client pathway flow for CMCR funded via the CSED Waiver in order to clarify how clients will access and receive the service, its connections to the statewide hotline, processes for safety assessment(s) (i.e., when to involve local law enforcement in the response), and the procedures for timely screening, assessment, and referral to waiver and other services following a crisis.

- In addition to the evaluation data required in the Agreement, which encompasses and assesses the impact of the State's efforts to reduce residential placement, there is a need for real-time or near real-time program-specific data. Such data are necessary to assist agency staff in understanding the demographic characteristics of children and youth served, timeliness of referral and referral patterns, wait times, discharge planning, patterns of discharge, and provider-level hiring and FTE staffing patterns, and to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels.

  - While the evaluation plan requires the development of a data dashboard, the evaluation design will not be finalized until January 2021, and the development of a data dashboard and reports will follow. In the interim, we recommend that the State incorporate into its current workgroup meetings a review of available CMCR data across the three funding agencies, the themes and issues it has identified, and how it is responding to the identified themes and issues. This practice will further allow State staff to identify opportunities to collaborate on addressing provider needs, and

D142046

reinforce the State's commitment to continuous quality improvement. Additionally, through the programs' coordinated review of current data, the program leads will be able to more fully inform WVU's Evaluation Design Team on their program-specific ongoing data needs for the data dashboard and future reports.

o   The Institute recommends that the State use data to continue refining CMCR's place within the continuum of care to demonstrate that families are appropriately referred to HCBS services following a crisis, as required by the Agreement, including in regions with pre-existing CMCR services (e.g., BBH-funded services), the relatively new CSED services, behavioral support services, assertive community treatment, respite, etc.

o   The Institute recommends that the State monitor the CMCR services for timeliness and ability to safely divert children from inpatient and other residential settings. This process includes monitoring CSED enrollees for high utilization to determine if their current service plan, provider(s), and level of care are effective before leveraging other state-funded CMCR services.

o   As the State develops its evaluation plan in conjunction with WVU, such data should include metrics to demonstrate that CMCR (1) is available statewide regardless of financial eligibility; (2) is preventing unnecessary acute care (i.e., aversion/diversion from residential care, emergency department, etc.); (3) is responding to all calls within the allotted time frame, including after the statewide line goes live; (4) is recording how CMCR teams are responding to calls (i.e., telephonically, virtually, in-person, with a law enforcement officer) and the outcome of each call to ensure connection to HCBS, post-crisis; (5) is evaluating the efficacy of the onboarding and training protocol(s). As the State employs multiple funding streams to operate CMCR, it is critical that the State and its evaluator contractors plan for identical data reporting across programs.

•   The Institute recommends that the SME be given an opportunity to review and provide feedback on draft documents detailing proposed programmatic and policy changes, training and coaching protocols, and implementation planning related to the above recommendations for review, comment, and discussion with the team, as needed.

### Behavioral Support Services

*Agreement Requirements*: The Agreement requires the State to implement statewide Behavioral Support Services (BSS), which include mental and behavioral health assessments, development and implementation of a positive behavioral support plan as part of the individualized treatment plan, modeling for the family and other caregivers on how to implement the behavioral support plan, and skill-building services.

*Activities*: The State released an Announcement of Funding Availability (AFA) for the Positive Behavior Support (PBS) Program in October 2019 and entered into a contract with the WVU Center for Excellence in Disabilities for activities that will commence on July 1, 2020.

The State's approved CSED Waiver includes in-home family therapy, which encompasses some aspects of Behavioral Support Services (BSS): "developing and enhancing the family's problem-solving skills,

coping mechanisms, and strategies for the member's symptom/behavior management." Independent Living/Skills Building is also available via the CSED Waiver and includes "building positive social behavior." In addition, the State requested technical assistance from The Institute on how other states certify PBS programs and providers, bill for Medicaid services, and align Medicaid and non-Medicaid services. The Institute provided the State with examples of Medicaid service descriptions, medical necessity criteria, and provider qualifications from Georgia, Maryland, Oklahoma, and Virginia.

*Recommendations*

- The State has fulfilled its work plan goal of procuring a PBS program coordinator grantee via competitive process and has developed a SOW with West Virginia University (WVU). The SOW provided indicates that BSS will be delivered as a discrete program called PBS, and that WVU will work with programs to provide coaching and training, support Regional Clinical Coordinators, enhance service sustainability through technical assistance on billing, and collaborate with Wraparound and CMCR to "develop plans for youth accessing those service systems as needed."

  o The Institute recommends that the State specify whether BSS and PBS are both direct services, and, if so, the service specifications necessary to bill for each, especially for children and youth not eligible for CSED Waiver services but in the population of focus specified in the Agreement. However, if BSS and PBS are intended as a framework for how other billable services are to be provided (akin to the inclusion of Motivational Interviewing, which is an approach used during the course of providing an individual therapy service), we recommend that the State specify how it will know (e.g., data gathered, training to providers) that providers are using this required framework while delivering billable services, particularly those services required under the Agreement.

- The work plan notes that the State must assess the availability of PBS services to ensure statewide access and anticipated doing so by January 2020. As this item remains in-progress, we recommend the State identify a process and timeline by which the SME will receive drafts of the analysis, have an opportunity to review and provide comments, and discuss with the workgroup prior to finalization. As the Agreement notes that BSS is more than a service intervention and also includes assessments, service planning, and skill-building, this assessment must include indicators which regularly and consistently measure the referral, provision, and inclusion of these related services in the ISPs of children and youth in the population of focus.

- In a work plan from February 2020, the State anticipated developing an evaluation plan for PBS that ensures statewide quality training opportunities for therapists who treat the population of focus June 2020. The SOW with WVU includes training, beginning July 1, 2020, an understandable delay given the difficulty of in-person training amid COVID-19. The Institute recommends that the State include the performance measures in the SOW in its evaluation plan, and expand upon them (e.g., include county of residence or a similar indicator to demonstrate statewideness, clearly define "timeliness," etc.).

  o Additionally, the February 2020 work plan includes the provision of technical assistance to providers. We recommend the SME be provided the opportunity to review and comment on the technical assistance plan and materials before they are

finalized and after any amendments are made based on field evaluation data/feedback to ensure they assist the State in meeting one of the expected outcomes in its SOW with WVU (increase knowledge and the ability of individuals, families, providers, and agencies to manage behaviors and the challenges associated with those behaviors by 75%).

o The Institute wishes to clarify if the State will create a specific billing code or codes for BSS and/or PBS apart from those included in the CSED Waiver (e.g., H2033 is included in the waiver for skill building); that is, how does the State anticipate tracking and ensuring the provision of BSS and/or PBS to children in the population of focus who do not qualify for the services in the CSED Waiver in order to meet with outcomes in the WVU SOW (increase by 50% PBS services to children, youth, young adults, and their families through both direct implementation and training in homes)? This issue will be an important one to clarify for the QAPI plan and WVU's evaluation design to ensure that the appropriate details are included in the dashboard and reports.

## Therapeutic Foster Care (TFC)

**Agreement Requirements:** The Agreement requires the State to develop therapeutic foster family homes and provider capacity in all regions, and to ensure that children who need therapeutic foster care are placed in a timely fashion with trained foster parents, ideally in their home community.

**Activities:** As noted above, the State contracted with Aetna Better Health to develop Mountain Health Promise (MHP), a specialized managed care plan for 1) children and youth who are in foster care; 2) individuals receiving adoption assistance (effective March 1, 2020); and 3) children from age three (3) to age 21 eligible for the CSED waiver and enrolled in the MCO, as waiver slots are available. MHP began operations March 1, 2020. The State developed workflows for existing and new service lines that included children in foster care. It also developed a white paper, *An Analysis of West Virginia's Treatment Foster Care Model*, and provided written responses to questions related to the MCO's role in care management (as separate and distinct from the those of the Wraparound Facilitator/case manager described in the CSED Waiver, and the MDT) and whether TFC, as a service, is available to all children in the population of focus or only to children in state custody. In addition, The Institute notes the passage of H.B. 4092, which takes effect June 5, 2020 and "expand[s] a tiered foster care system that provides higher payments for foster parents providing care to, and child placing agencies providing services to, foster children who have severe emotional, behavioral, or intellectual problems or disabilities, with particular emphasis upon removing children in congregate care and placing them with suitable foster parents."

### Recommendations

- In reviewing this first analysis, from the white paper dated May 14, 2020, we note that the State is "currently developing" a deeper analysis of Tier III capacity and need. Similarly, a clinical and behavioral analysis of children in residential placement and at-risk of placement is reported as underway. The Institute wishes to clarify when the State anticipates completing those analyses and recommends that the SME and the team conducting the next set of analyses

D142049

convene one (1) or two (2) technical assistance calls to discuss specific data elements that could further assist the State in its understanding of system capacity, gaps, and needs.

- o For example, it appears this initial TFC analysis may only be reporting on the number of children in residential care within the state, or reporting on a shorter period, or both, rather than incorporating all children in the target population. In particular, the TFC white paper does not include a time period for the number of children in residential placement, making it difficult to compare it to two earlier reports (the Children's Residential Services and PRTF Review, Aug. 19, 2019 and Children's Residential Services and PRTF Review, State Wards, Aug. 20, 2019). This type of cross-referencing and linking of data is necessary to further illuminate opportunities for the State.

- o The Institute recommends that the State incorporate a methodology section in all future analyses detailing:
  - the source(s) the data were drawn from (i.e., Medicaid authorization and claims, claims only, state-funded services, bed census, etc.);
  - the period(s) of time (i.e., calendar year, state fiscal year, federal fiscal year, etc.);
  - the children and youth (i.e., in-state, out-of-state, all children in the target class, all Medicaid-eligible children, etc.); and
  - disaggregation of data by narrower age ranges (i.e., 0-5, 6-10, 11-12, 13-17, 18-21) as the largest share of children and youth in residential placement are 13 or older.[4]

- o The Institute recommends developing a plan for a discussion and analysis of the regional or county-specific differences in the availability of TFC. Future analyses should include region-specific information and data on:
  - the development of bed availability since 2016;
  - past recruitment strategies and their successes, including a review of institutional and organizational policies that may be overly restrictive in approving foster parents based on criminal histories;[5]
  - how the characteristics of TFC parents (race, primary language spoken, zip code) align with the children and youth in foster care;
  - utilization of TFC beds stratified by the age, race, and primary permanency plan of the child;
  - use of TFC as an automatic "step-down" from more restrictive placements rather than because a child cannot have their clinical needs met in a regular family home (birth or foster) with the availability of HCBS;
  - approaches utilized by TFC programs to support shared parenting with birth families or other identified caregivers when there is a plan for reunification or guardianship;

---

[4] FFY2019 Residential Placements by Facility and Age, prepared by BCF-OPRE-DOJ Implementation Plan/BerryDunn. This document records 2075 total residential placements. Of those, 1770 (85.3%) are 13-18.
[5] See Raimon, M.L., Weber, K., & Esenstad, A. (2015). *Better outcomes for older youth of color in foster care*. Available from the Center for the Study of Social Policy website: www.cssp.org.

D142050

- workforce development activities to support TFC providers to meaningfully engage and partner with birth families and youth and to provide customized support to meet the individual needs of youth;
- how the State intends to prioritize counties with what appear to be service mismatch (a large number of children in residential placement with a relatively low or no TFC beds (e.g., Kanawha, Cabell, and Randolph counties)) to fulfill the Agreement; and
- occupancy rates; that is, does the system have high demand in some counties or regions and/or for certain agency placements with simultaneous bed vacancies in other counties or regions, and what factors might contribute to supply and demand.

- The State should prioritize its examination of the regional distribution of need versus supply, and within that, the average length of stay for children in Tier III. The fiscal note for H.B. 4092 reported that as of December 2019, there were 1,361 children in Tier I, 476 in Tier 2, and 59 in Tier III, meaning 47% of the available intensive beds were unfilled even as 804 children were in residential care, 127 were in psychiatric facilities (long term), and 18 were in psychiatric facilities (short term) in the same month. It would appear that there is unused TFC capacity in the system. While TFC may not be appropriate for all children in residential or psychiatric facilities, it is likely that the development of a diversion strategy and, if appropriate and necessary for some children, a step-down strategy could be instituted immediately to begin to reduce numbers and lengths of stay. Use of TFC could be coupled with other HCBS—even short-term use of one-on-one in-home support for stabilization purposes—to enable the youth to live in a family setting. To that end, The Institute recommends that future analyses identify the specific diagnostic, functional, and other characteristics of children who are ready for discharge from more restrictive levels of care but who are unable to return home or complete a timely transition to a less restrictive level of care so that the State may make appropriate use of its existing TFC bed availability and consider what additional training current or new TFC families may need.

  o Given Tier III beds are used for three populations of children—children with SED, children who are medically frail, and infants who are drug exposed—it is difficult to know what number/percentage of the Tier III beds are available to meet the needs of children with SED. We recommend that the State implement a data specific approach to differentiating this capacity by labeling available beds by population and use of a modifier to the claim code to differentiate populations that received the service. Specifically, given that it appears there is Tier III capacity available in the State, it would be helpful to quantify this availability by population.

  o We understand that potential therapeutic foster parents and the child placing agency undergo a thorough matching process which entails an interactive evaluation of the developmental, social and medical/behavioral health needs of existing children within the home (biological, adoptive (if any), and foster) to ensure the safety and well-being of all. When children cannot be matched, Tier III beds may be unfilled. To understand the matching process, and factors that may prevent match, we request:

D142051

- The policy or other manuals related to the matching process for children and potential foster care families;

- How the State and child placing agencies collect and analyze data on failure to match a child to an open, Tier III foster care bed. Such data could include the primary or secondary diagnosis of the foster child; age; number and/or type of previous placements; geographic location (that is, if the foster child is geographically distant from the open Tier III bed); spoken language (that is, does the foster child require a family with fluency in a language other than English); sexual orientation or gender identity; medical condition(s) (i.e. medically fragile); and/or history of trauma (e.g., history of commercial sexual exploitation).

- Understanding the conditions and factors that prevent a match by the child placing agency will be critical to reducing residential placement. In addition, the State will need to understand regional differences in matching so it is able to recruit and retain TFC parents with the expertise and support to successful serve all children in the population of focus.

- The State's work plan had anticipated (1) increasing TFC capacity by modifying existing contracts with child placing agencies or by executing a competitive procurement process and (2) assessing child placing agencies' performance with creating TFC capacity to ensure adherence to the work plan and Agreement goal by March 2020. We understand that these activities may have been delayed as the State agencies needed to respond first to legislative activities and later to COVID-19. However, given the particular threat of COVID-19 to individuals living in institutional settings, The Institute recommends continuing to prioritize this work. Contract modifications, competitive procurement processes, and capacity assessments can be reviewed by the SME prior to their respective finalization to assist the State in ensuring they encompass the requirements of the Agreement for children in the population of focus. These steps will assist the State in assessing child placing agencies' performance (planned for September 2020) and conducting an evaluation to modify capacity, as needed, (planned for October 2020) ahead of the next reporting period.

- The Institute understands that the MCO will provide "case management and oversight for medical, mental, and behavioral health services to all children in foster care, including those in TFC. Completion of planned logic models outlining the various care manager roles, and their presence throughout the life of a child's interactions with the various systems and services, should occur as soon as possible to support the MCO as it commences its new work and to inform the QAPI.
    - In addition to the evaluation data required in the Agreement, which encompasses and assesses the impact of the State's efforts to reduce residential placement, there is a need for real-time or near real-time program-specific data. Such data are necessary to assist agency staff in understanding the demographic characteristics of children and youth served, timeliness of referral and referral patterns, wait times, discharge planning, patterns of discharge, and provider-level hiring and FTE staffing patterns.

Such data also are necessary to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels. Additionally, through the current, coordinated review of data, the program leads will be able to more fully inform WVU's Evaluation Design Team on their program specific data needs for the data dashboard and future reports.

## Assertive Community Treatment

**Agreement Requirements:** The Agreement requires the State to ensure that Assertive Community Treatment (ACT) is available statewide to members of the target population aged 18-20. The Agreement permits ACT teams to substitute for CFTs, provided they develop an ISP and ensure access to HCBS, as appropriate.

**Activities:** The State provided The Institute with Medicaid claims data in January 2020 for individuals aged 18-20 who accessed ACT, including the provider and primary diagnosis. In addition, The Institute received a workflow showing the referral process for ACT and a written response to a clarifying question regarding eligibility for the service itself.

**Recommendations**

- The State's work plan anticipated completion in June 2020 of an assessment of current ACT capacity in order to determine where additional providers and/or increased awareness regarding the availability of the service are needed. As the Agreement requires the State to ensure availability of ACT and to substitute ACT for CFT, we recommend that the State's assessment consider:
  - o the current capacity of ACT providers;
  - o the projected need for ACT based on demographic data (i.e., how many young adults are likely to qualify for services under the current guidelines of three or more hospitalizations in a psychiatric inpatient unit or psychiatric hospital in the past 12 months; five or more hospitalizations in a psychiatric inpatient unit, psychiatric hospital, or Community Psychiatric Supportive Treatment Program in the past 24 months; 180 days total length of stay in a psychiatric inpatient unit or psychiatric hospital within the past 12 months; or via clinical necessity);
  - o how young adults will be offered the choice between ACT and HFW; and
  - o how young adults will successfully and seamlessly transition between HFW and ACT given the differences in care ratios (1:10 for ACT, up to 1:20 for HFW).

- The Medicaid data pull from January 2020 reveals three important considerations: (1) that current ACT providers served fewer than 30 unduplicated individuals in the target population (aged 18-20) between January and October 2019; (2) of the 14 listed providers who billed H0040 between January and October 2019, less than half (United Summit Center, Prestera Center, FRMS Health Systems, Logan-Mingo Area Mental Health, Southern Highlands Community Mental Health Center, and Valley Health Care System) served 50 or more unique individuals of any age (including those 21 and older), during the 10 month period; and (3) the services are not available statewide. We recommend the forthcoming assessment include the

D142053

historical and current barriers to expanding services statewide, as required by the Agreement, and proposed strategies to ameliorate them, along with corresponding indicators to demonstrate which strategies prove successful.

- o   In addition to the evaluation data required in the Agreement, which encompasses and assesses the impact of the State's efforts to reduce residential placement, there is a need for real-time or near real-time program-specific data. Such data are necessary to assist agency staff in understanding the demographic characteristics of children and youth served, timeliness of referral and referral patterns, wait times, discharge planning, patterns of discharge, and provider-level hiring and FTE staffing patterns. Such data are necessary to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels. In particular for ACT, real-time management of continuity of care is critical to transitioning youth and young adults from pediatric systems to adult systems without requiring they "fail up" to access appropriate care.[6] Additionally, through a coordinated review of data, the program leads will be able to more fully inform WVU's Evaluation Design Team on their program specific data needs for the data dashboard and future reports.

- As the State plans to create ACT capacity by modifying existing behavioral health center contracts or through a competitive procurement process ahead of its internal October 2020 deadline, The Institute wishes to clarify what planning has already been undertaken.

- The Institute recommends the SME be provided the opportunity to review, comment, and meet with the ACT workgroup to discuss drafts of proposed programmatic and policy changes—including any changes to the State's current limit of 120 members per ACT team,[7] training and coaching protocols, contract or procurement related documents, and implementation planning related to the above recommendations.

- The Institute recognizes that the State's March 2020 goal to "educate stakeholders to increase awareness of the ACT program" was likely delayed by COVID-19. We recommend the SME be provided an opportunity to review modified plans for stakeholder engagement and education before outreach and education efforts begin or resume this summer and into the fall,

---

[6] *Cf.* Fernandes-Alcantara AL. (2018). Vulnerable Youth: Background and Policies. Congressional Research Report No. RL33975. Retrieved from https://fas.org/sgp/crs/misc/RL33975.pdf; Lindgren E, Söderberg S, Skär L. (2013). The gap in transition between child and adolescent psychiatry and general adult psychiatry. *J Child Adolesc Psychiatr Nurs* 26(2):103-109. Doi:10.1111/jcap.12027; Naert J, Roose R, Rapp RC, Vanderplasschen W. (2017). Continuity of care in youth services: A systematic review. *Children and Youth Services Review* 75: 116-126 Doi:10.1016/j.childyouth.2017.02.027; Munson, M.R., Lox, J.A. (2012). Clinical Social Work Practice with Former System Youth with Mental Health Needs: Perspective of Those in Need. *Clin Soc Work J* 40, 255–260. doi:10.1007/s10615-012-0381-6; Rachas A, Lefeuvre D, Meyer L, Faye A, Mahlaoui N, et al. (2016). Evaluating Continuity During Transfer to Adult Care: A Systematic Review. *Pediatrics* 138(1): e20160256; Doi: 10.1542/peds.2016-0256

[7] See West Virginia Department of Health and Human Services, Bureau of Medical Services. (2018, July 1). Provider Manual, Chapter 503 Licensed Behavioral Health Center (LBHC) Services. https://dhhr.wv.gov/bms/Public%20Notices/Documents/Chapter_503_LBHC_Services%20%28002%29.pdf

D142054

especially given the State's October 2020 goal of "modifying capacity or increasing stakeholder education, as needed, based on data from the assessment."

- In March 2020, the State was in the process of assessing current awareness via a survey, examining training practices, and evaluating provider capacity examination of training, and provider capacity. The Institute recommends that the SME be provided the opportunity to review the survey instrument while it is under development and to meet with the Team as indicated, in order to ensure questions are specific to the foci of the Agreement, including specific knowledge of families on accessing ACT for youth and young adults. Similarly, the SME would benefit from the opportunity to review the State's protocols for tracking data on ACT training and other dissemination methods, as well as the process for identifying performance and process indicators while under development.

### Screening and Assessment

**Screening Agreement Requirements:** The Agreement requires the State to ensure that all eligible children are screened to determine if they should be referred for mental health evaluation or services and that WVDHHR adopt a standardized set of mental health screening tools. Additional provisions require the screening of children entering child welfare and juvenile justice, as well as outreach and training on the use of the screening tools for physicians of children who are Medicaid eligible.

**Assessment Agreement Requirements:** The Agreement requires the State to use the CANS tool (or a similar tool approved by both parties) to assist CFTs in the development of ISPs for each child who has been identified as needing HCBS. It further requires a qualified individual to conduct an assessment of the child's needs and strengths with the CANS and for the State to report on changes in functional ability of children in the population of focus, both statewide and by region, including data from the CANS assessment.

**Activities:** West Virginia's CSED Waiver was approved by CMS in December 2019 and became effective in March 2020. As noted above, the State entered into a contract with Aetna Better Health to create Mountain Health Promise (MHP), a specialized managed care organization (MCO) to serve children and youth who are in foster care; individuals receiving adoption assistance (effective March 1, 2020); and children from age three (3) to age 21 eligible for the CSED Waiver and enrolled in the MCO, as waiver slots are available. The MCO draft contract that was available for review (Version 23, dated Jan. 9, 2020) included mandatory physical and health behavioral health screening, with a periodicity schedule. In addition, a mental health screening workflow draft was also received and reviewed, as well as a written response from the State to an SME question regarding the role of the specialty MCO in screening and assessment.

The written response included the federal regulations governing the MCO under the Omnibus Budget Reconciliation Act of 1989 and a reference to Section 5.11 of the contract, which requires a report due 45 days after the end of each quarter identifying performance on EPSDT outreach/enabling services, screening and referral rates, well-care child visit rates, dental visits, and immunization rates. The State's goal is to "ensure that a mental health screening, using an approved screening tool, is completed for any child not already known to be receiving mental health services when the child

enters DHHR [Department of Health and Human Resources] Youth Services, the child welfare system, or the juvenile justice system; or when the child or family requests mental health services or that a screen be conducted." The Institute notes that the State's work plan clarifies that "ensure means that the EPSDT is 'offered' to the families. Cannot enforce that every child is screened."

*Recommendations Specific to Screening:*

- Given that the State's original March 2020 timeline was impacted by COVID-19, The Institute recommends that the State revise its work plan and timeline for completing its assessment of the current system to identify any gaps where children entering youth services, the child welfare system, or the juvenile justice system are not currently receiving timely mental health screenings and to modify policy and practice, as needed, based on data from the assessment in order to meet its internal goals and the overarching goals in the Agreement.

- As the State resumes these tasks, The Institute recommends that the SME be provided an opportunity to review, comment, and discuss drafts of proposed programmatic and policy changes, training and coaching protocols for the use of standardized screening tools, methods for collecting baseline data, and implementation planning related to the above recommendations.

- While youth placed in correctional facilities through the Bureau of Juvenile Justice receive the MAYSI-2 screening and assessment, a document provided to The Institute noted that juvenile probation does not use a standardized screening or assessment tool. An email from Ms. Laura Barno received on May 28, 2020 noted that the Screening and Assessment workgroup is "in the process of working through the development of a standardized screening and assessment process for youth receiving juvenile probation services." As this is a known gap in the current system, we recommend the workgroup coordinate with the Bureau of Juvenile Justice and Judiciary's Division of Probation Services to (1) finalize a timeline for selecting a tool, (2) add that timeline and any related tasks to its work plan, and (3) begin planning or the training of probation officers to use it, in accordance with the specifications in the Agreement.

*Recommendations Specific to Assessment:*

- The Institute acknowledges that the State provided contractual and statutory language regarding the provision of screening and assessment by the MCO and that the State receives monthly or quarterly reporting by the MCO. Given the responsibilities of the MCO to perform certain functions, we recommend the following:
  - The State should incorporate a review of available data, the themes and issues it has identified, and how it is responding to themes and issues as they are identified into its current workgroup meetings.

  - While the MCO contract requires submission of a report to the Bureau for Medical Services (BMS) 45 calendar days after the end of each quarter identifying its performance regarding EPSDT outreach/enabling services, screening and referral rates, well-care child visit rates, dental visits, and immunization rates, the contract does not specific how it will report on the mental health component of the HealthCheck screening form. The Institute recommends the State clarify how it is monitoring that the MCO identifies and assesses gaps in the mental health

D142056

component of the HealthCheck screening form and/or protocols by health care providers who serve Medicaid-eligible children.

- The workflow provided to the Institute indicates that planning for children not in foster care will occur through a separate goal (Goal II). We also note that the workflow incorporates screening but not assessment. To assist the work in the months ahead on screening and assessment, we request:
    - o clarification on how processes and data across Goals I (children in custody) and II (children not in custody) will be consistently defined across different processes used by state agencies and Medicaid screening requirements, gathered and analyzed in order to provide a comprehensive statewide screening rate of all eligible children under the Agreement;
    - o clarification on the role of primary care providers and schools in the screening and assessment processes, as neither is included in the current workflow;
    - o information on how the State is currently providing or plans to provide outreach, education, and technical assistance to primary care providers on screening and assessing Medicaid-eligible children; and
    - o how the screening and assessment results of children in child welfare and juvenile justice are shared once children exit those systems in order to provide continuity of care and ensure access to home- and community-based services.

- The Agreement requires the State to report on changes in functional ability of children in the population of focus, both statewide and by region, including data from the CANS assessment. It also requires that by 2022, no less than 52% of Medicaid-eligible children who are not in youth services, child welfare, or juvenile justice receive trauma-informed psychosocial screening. We recommend the State develop a methodology, in conjunction with the MCO, WVU (as screening and assessment is included in their Scope of Work), and other partners to identify, maintain, and track a process to ensure that standardized mental health screening is occurring for each child, including those in state custody, and how those children with a positive screen will be assessed in a timely way and monitored for service delivery. The SME expects to comment on the methodology for screening and assessment (as separate and distinct processes) as it is developed and to review any baseline data used by the State and/or its partners in its development. Once the methodology is finalized, The Institute recommends revising the State's workflow to clearly illustrate where, when, and how data collection is occurring and being verified, including the measurement of timely referral to other services following a psychological or psychiatric evaluation.
    - o We further recommend that the methodology include sentinel indicators and other quantitative or qualitative measures to regularly and consistently ensure that all children are screened and that positive screens are followed by assessments soon after, including statewide and regional data on CANS delivered by a qualified assessor.

D142057

## Reductions in Placement

*Agreement Requirements*: The Agreement requires the State to reduce the unnecessary use of residential mental health treatment facilities for children relative to the number of children living there on June 1, 2015. The expected goal by December 31, 2022 is a 25% reduction from the number of children living in residential mental health treatment facilities as of June 1, 2015, with additional benchmarks to be established and met over time.

*Activities*: As previously mentioned, CMS approved the State's CSED Waiver, and the State then contracted with Aetna Better Health to create Mountain Health Promise (MHP), a specialized MCO. In addition, the SME received the workflows and work plans for the services enumerated in the Agreement, as they are designed to avert and divert children from residential placement, as well as the State's white paper on TFC.

*Recommendations*

- The State should develop a logic model that links some of the sentinel indicators in each category to reductions in residential placement. For example, an increase in CMCR services is commonly associated with reductions in (1) emergency department usage, acute care, and residential placement and (2) calls to law enforcement that might lead to referral to juvenile justice. Regular and well-defined (i.e., internally consistent, with a data dictionary) data collection across providers will assist the State in identifying differences between regions, including early successes that might be strengthened and replicated across the State over time.

- The Institute recommends that the State form a workgroup focused on (1) the immediate diversion of children from residential placement, to include review of all referrals and admissions, and (2) developing a process to review all children currently authorized for a residential placement for immediate step-down to lower levels of care. (Note: just as children and youth should not "fail up" through services, they should not have to move sequentially through a continuum of placements of lesser restrictiveness. Many children and youth can return to a family setting after receiving treatment in a residential setting with appropriate discharge planning that builds natural supports, and timely access to in-home supports and services."[8]

  - Specifically, as part of reviewing information regarding children in residential, we recommend the State examine length of stay to determine county and regional factors, and if there are particular areas of challenge, such as for children of color, youth identified as LGBTQ,[9] and older youth. Marginalized populations can be disproportionally represented in residential care.[10]

---

[8] Urban T.H., Jordan N., Kisiel C.L., Fehrenbach T. (2019). The association between strengths and post-residential treatment needs of youth in the child welfare system. *Children and Youth Services Review*, 99: 226-234. Doi:10.1016/j.childyouth.2019.02.013

[9] Fish, J. N., Baams, L., Wojciak, A. S., & Russell, S. T. (2019). Are sexual minority youth overrepresented in foster care, child welfare, and out-of-home placement? Findings from nationally representative data. *Child Abuse & Neglect*, 89, 203–211. Doi:10.1016/j.chiabu.2019.01.005

[10] Howze, K.A. & McKeig A.K. (2019). The Greenbook and the Overrepresentation of African American, Hispanic, and Native American Families in the Child Welfare System. Juvenile and Family Court Journal 70(4): 103-118.

o   Additionally, this workgroup could establish transition reviews, reviewing each child individually to identify children who can return to a family setting with appropriate supports.

## Outreach and Education

*Agreement Requirements*: The Agreement requires the State to (1) conduct outreach to and training for physicians who serve children who are Medicaid-eligible on the use of the screening tools; (2) develop outreach tools for medical professionals who treat Medicaid-eligible children; and (3) develop an outreach and education plan for stakeholders in the state of West Virginia on the importance of the stated reforms prescribed in this agreement.

*Activities:* The State contracted with Aetna Better Health to create Mountain Health Promise (MHP), a specialized MCO; its work plan reflects plans to partner with the State to identify and provide program-specific educational materials regarding the new CSED and other HCBS services available to children and families. The State developed an "initial list of family stakeholders for outreach." The list is dated January 2, 2020; the Institute received the list May 15, 2020.

The State created a listserv (CHILDWELFARE_WV-L@LISTSERV.WVNET.EDU) to announce upcoming meetings and related events. BBH also developed and released a survey in early April, which was disseminated through a variety of community partners and social media outlets. The survey was originally planned to be disseminated through the public school system for broader, county-level reach, but this was not feasible due to the onset of the COVID-19 pandemic. The State recorded 709 valid responses, with 95% of respondents indicating a child, youth, or young adult 0-24 living in the home. Of those respondents, 49% indicated that at least one of the young people has or had a behavioral health challenge or disorder. The State also hosted a virtual meeting of the West Virginia Child Welfare Collaborative on May 12, 2020.

### Recommendations

- The Agreement does not enumerate the specific methods by which the State must conduct outreach and education to stakeholders; instead it requires the State develop a plan to do so. The State's work plan notes that the State intended to develop a website to share important updates with stakeholders. As of February 2020, the creation of the website was listed as "in-progress." The Institute seeks to clarify if the State still plans to develop a website, and its revised timeframe.

- We commend the State's intended plan to convene the Child Welfare Collaborative in various locations across the State to increase engagement and participation by local entities and families. Recognizing that COVID-19 impacted the State's ability to implement this approach, we look forward to learning about its plans moving forward. Further, it is anticipated that the State will continue to work with the Department of Justice to establish regional meetings with

Doi:10.1111/jfcj.12154 and Heaton, L.L. (2018). Race and ethnic differences in mental health need and services received in justice-involved youth. *Children and Youth Services Review*, 90:54-65. Doi.org/10.1016/j.childyouth.2018.04.043

D142059

stakeholders regarding children's mental health services and that the agendas for all meetings will facilitate dialogue with local stakeholders to surface needs, priorities, gaps, and challenges. The Institute recommends that the State continue to implement this regional approach, even through virtual meetings if necessary due to the COVID-19 response.

- The State's work plan included the creation of an "educational toolbox" that could be updated regularly and used across multiple disciplines to keep stakeholders informed. The item was "in progress" in February 2020. Recognizing that this timeline was impacted by COVID-19, The Institute wishes to clarify the revised timeline and the content that will be included.

- The State entered into a contract with the specialized MCO, MHP, in March 2020, just as COVID-19 was beginning to disrupt public health systems, so it is understandable that the plan to develop targeted education on HCBS for those children who may be eligible is delayed and will need revision. The Institute recommends that the State formalize a timeline and approach for this targeted education.

- As the State works to establish a communication plan among DHHR, the Department of Education, and the Department of Military Affairs and Public Safety to ensure implementation of the Agreement and identify any barriers to effective communication and the steps needed to remedy them ahead of its internal October 2020 deadline, we recommend the SME be provided the opportunity to review and comment on the draft communication plan before it is finalized.

## Quality Assurance and Program Improvement (QAPI)

*Agreement Requirements:* The Agreement requires the State, within 18 months of the effective date, to develop a QAPI system that facilitates an assessment of service delivery, provides notification of potential problems warranting further review and response, and enhances the State's ability to deploy resources effectively and efficiently.

The State must develop a data dashboard that can be used for performance analysis and for developing and producing semi-annual reports to the United States. These reports must include:

(1) analysis across child-serving agencies of the quality of mental health services funded by the state, measured by improved positive outcomes, including remaining with or returning to the family home, and decreased negative outcomes, including failure of foster home placement, institutionalization, and arrest or involvement with law enforcement and the juvenile or criminal courts;

(2) an analysis of the implementation of the agreement across and between all child-serving agencies, and any barriers to effective coordination between these agencies and the steps taken to remedy these barriers;

(3) data to be collected and analyzed to assess the impact of the Agreement on children in the target population, including the types and amount of services they are receiving, dates of screening, service engagement dates, admission and length of stay in residential placements, arrest, detention, commitment to the custody of the State, suspension or expulsion from school, prescription of three or more anti-psychotic medications, changes in functional ability

of children in the population of focus (statewide and by region) based on the CANS assessment the quality sampling review process, fidelity of CFTs to the NWI model, and data from the CMCR team encounters on the timelines of response and data on connection to services; and

(4) annual quality sampling of a statistically valid sample of children in the target population to identify strengths and areas for improvement, as well as the steps taken to improve services in response to the quality sampling review. The Agreement requires the State to take remedial actions to address problems identified through its analysis of data.

*Activities*: In March 2020, the State sent The Institute an Excel spreadsheet with three tabs (Children in RHMTF, Children at Risk for RHMTF, and MH Provider Capacity) with a number of indicators represented on the X axis, indicating the data the State is planning to collect and analyze to fulfill the requirements in the Agreement. In addition, the State entered into a contract with WVU for evaluation planning to commence July 1; The Institute reviewed the Scope of Work, which includes details for the timing to develop program-level logic models, identify data sources and collection methods, and engage stakeholders. The State has provided a listing of available reports that the Bureau of Children and Families uses for oversight, management, and monitoring of its system (e.g., the COGNOS and FREDI lists of reports, supplied May 26, 2020). Additionally, the State began work on a requested data analysis of its home and community-based services, including analysis of services pre and post residential stays in order to understand the types of services children received prior to and immediately following residential placement.

### Recommendations

- In reviewing the WVU Scope of Work (SOW), the tasks focus on developing a comprehensive evaluation approach and collaboration between WVU and ICF Macro, Inc. ("ICF") in the performance of this work. The Institute wishes to clarify (1) how the evaluation approach will be used to fulfill the requirements of the Agreement and (2) how WVU will collaborate with ICF to perform the work, which includes logic models, scanning internal data systems, and developing recommendations for data system integration, analysis, and interpretation, including availability of a SOW for ICF.
    - o For example, we note that the SOW did not reference the development of a data dashboard, which is required in the Agreement. The Institute wishes to clarify whether the plan for the required data dashboard is included in the current WVU SOW or whether the State intends for it to be part of a Phase II plan that will be documented in subsequent or other SOWs.

- The timelines in the WVU SOW indicate that program-specific logic models will be developed by August 2020, and program-specific evaluation elements will be developed by September 2020. To ensure that these logic models and program-specific evaluation plans will provide useful evaluation data into the future, program-level requirements, policies, and standards will need to be finalized prior to or shortly after WVU begins its work.
    - o For example, the three Wraparound programs will need to finalize the Wraparound fidelity review, define programmatic standards, select a fidelity monitoring tool, and identify accountability measures for the evaluation to accurately reflect the standards and elements. This issue—the need for the evaluation plan to accurately encompass

programmatic standards—will need to be established for Wraparound, and all of the
other services, in order for the evaluation to fully capture all service components.

o The Institute recommends that each workgroup's timeline be reviewed to identify
these interdependencies and to ensure that any revisions or amendments to the
SOW's evaluation process and deliverables are adjusted, as necessary, so that all
programmatic details are accurately incorporated.

o The Institute recommends that the State update the work plans and related timelines,
to reflect both changes as a result of COVID-19 response and the interdependencies
across work plans as described above, and share these updates with the SME.

o The Institute recommends that workgroup-specific recommendations made
throughout this report regarding use of data, metrics to consider, and quality
improvement approaches be reviewed by the WVU Evaluation Design Team, and ICF,
for inclusion in the evaluation design and forthcoming data dashboard and reporting.

- In reviewing the WVU SOW, the timeline calls for a final evaluation plan by January 2021. We
recommend that the SME be provided opportunities to review and provide input into the logic
models; data elements, sources, and collection and verification processes; annual analysis and
sampling plan; and draft evaluation plan. The review and feedback process should include calls
between the SME, the State, and the evaluation team.

- In reviewing the WVU SOW, we commend plans for stakeholder engagement. The Institute
recommends that stakeholder engagement include providers; children, youth and families;
and representatives from child welfare and juvenile justice. We further recommend that the
stakeholder engagement process include opportunities for broader public comment and
discussion.

## Conclusion

As The Institute reflects upon its work with the State over the past six months and begins to plan for
the remainder of 2020, we commend the State's efforts and responsiveness as they continued working
toward the goals of the Agreement—even as staff and leadership contended with the demands of the
State's legislative session and the unprecedented public health emergency of COVID-19. These steps
include the release of Announcements of Funding Availability, entrance into a contract with Aetna
Better Health to operate the specialized MCO, the completion of program-specific work plans, the
mapping of existing business processes and workflows for the programs and services identified in the
Agreement, completion of an initial analysis of children in therapeutic foster care, and development
of SOWs with WVU for Positive Behavior Supports and planning an evaluation approach. In addition,
the State demonstrated its commitment to stakeholder engagement, as evidenced by prioritizing the
virtual meeting of the West Virginia Child Welfare Collaborative, and its development and distribution
of the stakeholder survey.

The next six months will require a great attention to detail and the interdependencies across
workgroups and among contractual partners as the State finalizes an evaluation plan that will guide
work in the coming years, including modifications of programs, policies, and practices necessary to
demonstrate its fulfillment of the Agreement. The Institute anticipates that staff will likely have to

increase their time and attention in service of meeting forthcoming milestones. Given competing operational priorities, we wish recognize the need to provide the workgroups with a sufficient team to fulfill their respective tasks, and work in concert to fulfill the State's vision for a high-quality behavioral health delivery system.

There are four (4) critical areas in the coming six (6) months that serve as the foundation for the State's ability to achieve success:

1. Updating work plans and timelines to reflect changes due to COVID-19 response. These updates are critical to transparently communicating changes and determining further interdependencies across workgroup activities, particularly the projected January 2021 timeline for a final evaluation plan.

2. Finalizing critical service decisions noted in the report, including revising client flows and determining final policies and procedures for all of the services, in order to achieve work plan milestones and to develop an evaluation plan that fully captures and reflect all service elements.

3. Developing and finalizing an evaluation plan. The evaluation plan will form the basis for the State's informed decision-making on children's behavioral health service capacity; funding prioritization; data collection, management, and analysis; workforce development, training, and coaching; and selection of health outcomes to improve quality. The evaluation plan should assist the State and its partners in answering critical questions such as "Where is there unused system capacity and how might it be tapped to address unmet need? What gaps in the continuum of care reinforce a cycle of crisis response that create costly inefficiencies, and what are the resultant opportunities to repurpose those funds?"

4. Fast-tracking efforts to unify the Wraparound programs to align with NWI standards. The State plans to align its three Wraparound programs by October 2020 to meet NWI standards. In addition to the understandable delay due to the COVID-19 response, there are other factors slowing the progress of this work. First, the work is particularly complex, and the State is simultaneously having to educate itself about the NWI Fidelity standards it has committed to, and then apply those NWI standards to its work flows, policies, and procedures. Second, there is no one agency in charge of making decisions about how to align each Wraparound program to the NWI standards; three different agencies purchase Wraparound, and each has a different level of knowledge of NWI standards, has different mandates that HFW needs to be incorporated into, and has differing levels of infrastructure to successfully implement HFW. As such, engaging senior leadership across agencies to support the shared work, address cross-agency differences, and find resolution on areas needing alignment, particularly areas where agencies can jointly share or implement approaches, is necessary for the State to achieve its vision and timelines. An emerging body of research demonstrates the importance of adhering to specific activities and key practice elements of Wraparound, including caseload standards and training coaching, to achieve favorable outcomes such as a reduction in suspensions, increased use of HCBS, reduced use of residential and higher levels of care, and increased rates of

D142063

permanency.[11] To achieve the goals in the Agreement for the population of focus, the State must ensure its BBH, SAH, and CSED Wraparound programs operate with high fidelity to the model, and must incorporate related measures of fidelity into its evaluation plan.

---

[11] National Wraparound Initiative. (2017, Oct.). Rigorous Research on Wraparound's Effective, Summary Document. https://nwi.pdx.edu/pdf/rigorous-research-on-wrap-effectiveness.pdf

D142064

# Appendices

## Appendix A – Documents Reviewed

Child Trends
  Adoption From Foster Care, Federal Fiscal Year 2017
  Child Maltreatment, Federal Fiscal Year 2017
  Child Welfare Agency Spending in West Virginia, State Fiscal Year 2016
  Foster Care, Federal Fiscal Year 2017
  Kinship Caregiving, Federal Fiscal Year 2017

KEYPRO
  Community/Behavioral Health Groups, Annual Youth Stakeholder Focus Group Summary, 2018-2019
  Foster Care Utilization Management Guidelines, March 20, 2017
  Out of State Residential Facilities, Annual Youth Stakeholder Focus Group Summary, 2018-2019
  Residential Facilities, Annual Youth Stakeholder Focus Group Summary, 2018

Supreme Court of Appeals of West Virginia
  2017 Data, Published Feb. 2018
  Division of Children and Juvenile Services, Court Improvement Program Overview, Sept. 30, 2019
  Statewide Trends, 2010-2017, Published Feb. 2018

U.S. Department of Health and Human Services, Child and Family Services Reviews, Onsite Instrument and Instructions, Jan. 2016

Via BerryDunn
  ACT [Assertive Community Treatment] Statement SME 20200515
  ACT Workflow 20200512 SME 20200515
  Clarifying Linkages Report DRAFT 20200513 SME 20200515
  CMCR [Children's Mobile Crisis Response] Children Service Flyer 20200421 SME 20200515
  CMCR Mobile Crisis Fall Training SME 20200515
  CMCR and Stabilization AFA [Announcement of Funding Availability] SME 20200515
  CMCR SOW [Scope of Work] 2020 SME 20200515
  CMCR Workflow 20200514 SME 20200515
  CMH [Children's Mental Health] Wraparound_Process_Final_20200514_SME_20200515
  COGNOS Catalog V-11 with Descriptions SME 20200526
  CSEDW [Children with Serious Emotional Disorder Waiver] Workflow 20200429 SME 20200515
  December 2019 CPS Caseloads Report, Revised SME 20200601
  FCYS Caseload Report 2019 (staff numbers not current) SME 20200601
  FFY2019 Residential Placements by Facility and Age
  FREDI Report List 11242019 SME 20200526
  MHS [Mental Health Screening] MCO [Managed Care Organization] Contract Language SME 20200515
  MHS Summary of Workflow DRAFT SME 20200515

OUT [Outreach] Family Stakeholders Initial List 20200102 SME 20200515
OUT Family Survey Progress Report SME 20200515
OUT Survey protocol email L_Hunt SME 20200515
OUT SurveyMonkey_Family_202004 SME 20200515
PBS [Positive Behavior Support] AFA [Announcement of Funding Availability] 20191010 SME 20200515
PBS Family Outreach Survey flyer April 2020 SME 20200515
PBS FY2021 SOW Final SME 20200515
PM Work Plan DHHR DOJ Eval_finalv3_042020 SME 20200522
Questions-SME for Semi-Annual Report due June 2020 clc 20200522
Regional Youth Service Center SOW SME 20200522
RYSC DATA 20200529 SME 20200601
SAH [Safe at Home] Workflow 20200507 SME 20200515
SME [Subject Matter Expert] DOJ [Department of Justice] RTM 20200515
SME DOJ RTM 20200526
TFC [Treatment Foster Care] MCO role response SME 20200515
TFC White Paper 20200514 SME 20200515
TFC_SME report question_20200512 SME 20200515
WVU Evaluation SOW FINAL SME 20200526
WVU PPT 20200518 SME 20200522

West Virginia Governor's Advisory Council on Substance Abuse Report, 2016

West Virginia, Juvenile Justice Commission, 2017 Annual Report

West Virginia Family Resource Networks
        Annual Report, 2017-2018
        Reference Manual, July 2018
        Statement of Work (undated)

West Virginia Office of Drug Control Policy, Semi-Annual Report, November 2019

West Virginia Department of Health and Human Resources
Bureau for Behavioral Health
        Announcement of Funding Availability, Children's Mobile Crisis Response and Stabilization
        Teams, May 16, 2019
        Announcement of Funding Availability Positive Behavior Support (PBS) Program, Oct. 2, 2019
        Children's Mental Health Wraparound Referral Form 2018
        Children's Mobile Crisis Response and Stabilization, SFY 2020
        New Provider Agreement for Socially Necessary Services Agencies Memorandum, June 29,
        2019
        Regional Youth Service Centers (email from Annie Messinger to SME Team, Jan. 14, 2020)
        Local Coordinating Agencies Wraparound Facilitation Agreement, April 2017
        Wraparound Review Team Decision Form, June 2018

Bureau of Medical Services
        Assertive Community Treatment Data Pull (Ad Hoc 330), Jan. 9, 2020
        Children with Serious Emotional Disturbance 1915(c) Waiver

D142066

Creating a Continuum of Care for Medicaid Enrollees with Substance Use Disorders, Section 1115 Waiver, (Project Number: I I- W-00307/3)

Model Purchase of Service Provider Agreement for Mountain Health Promise (v22)

Provider Manual, Chapter 502, Children with Serious Emotional Disorder Waiver, March 1, 2020

Provider Manual, Chapter 503, Licensed Behavioral Health Center Services, July 15, 2018

State Wards and PRTF, 150-390 Day Episode Comparison

Targeted Case Management State Plan Amendment, 15-007

Bureau of Children and Families

Child Protective Services Policy, Feb. 2019

Children and Family Services Plan, 2015-2019

Children's Residential Services and PRTF Review, Aug. 19, 2019

Children's Residential Services and PRTF Review, State Wards, Aug. 20, 2019

Federal Fiscal Year 2019 Vacant and Allocated Positions Data

Legislative Foster Care Placement Report, Sept. 2019

Multidisciplinary Treatment (MDT)

Case Plan Report Template

Journey Observation Report

Case Profiles, Activities 1-3

Desk Guide, Revised April 6, 2015

MDT Teams, Bureau of Children and Families, Division of Training, June 2015 (Powerpoint)

Training Case Scenario

Requirements for Case Plan

Safe at Home West Virginia, West Virginia's Title IV-E Waiver Initiative

Final Evaluation Report, Nov. 2019

Semi-Annual Progress Report, October 1, 2018 – April 30, 2019

Socially Necessary Services (SNS) Code of Conduct (undated)

Socially Necessary Services Monthly Report Desk Guide, July 1, 2018

D142067

## Appendix B – Contacts with West Virginia and the Department of Justice

| State Workgroups | Dates |
|---|---|
| Wraparound | Jan. 17, 2020; Feb. 13, 2020 (Kim Estep); Feb. 21, 2020 (Kim Estep); Feb. 21, 2020; May 12, 2020 |
| Therapeutic Foster Care | Jan. 8, 2020; Feb. 25, 2020; June 1, 2020 |
| Children's Mobile Crisis Response | Jan. 17, 2020 and Feb. 14, 2020 |
| Positive Behavior Supports | Jan. 21, 2020 |
| Assertive Community Treatment | Jan. 22, 2020 |
| Screening and Assessment | Jan. 15, 2020 and Feb. 14, 2020 |
| Outreach and Education | Jan. 21, 2020 |
| **Department of Justice** | |
| Department of Justice | Dec. 17, 2019; Jan. 3, 2020; Jan. 31, 2020; March 9, 2020; March 26, 2020; April 13, 2020; April 23, 2020; May 5, 2020 |
| **State Leadership** | |
| The State's Implementation Plan & Priority Setting | Jan. 2 2020; Jan. 6, 2020; Jan. 24, 2020; Jan. 31, 2020 and with leadership on Jan. 8, 2020; March 4, 2020; April 9, 2020; and April 20, 2020 |
| **State Staff** | |
| Ms. Laura Barno | Feb. 26, 2020 |
| **Stakeholder** | |
| West Virginia Child Welfare Collaborative (virtual meeting) | May 12, 2020 |
| **Agreement Implementation Team** | |
| Preview the Finding and Themes in this Report | May 26, 2020 |

D142068

## Appendix C – Summary of Recommendations and Information Sought

| | Wraparound Facilitation | |
|---|---|---|
| | Recommendation | Status Updates |
| 1 | Collect and utilize real-time or near real-time program-specific data (e.g., diagnostic and demographic differences between applicants and approved members; wait times for services; referral sources for Wraparound, including from CMCR and for children who are being considered for residential services; and provider applicants versus accepted providers) to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels. | |
| 2 | Incorporate into current workgroup meetings a review of available data across the three Wraparound programs, the themes and issues it has identified across the three programs, and how it is responding to themes and issues as they are identified | |
| 3 | Inform WVU's Evaluation Design Team on program-specific ongoing data needs for the data dashboard and future reports based on this coordinated review of current data | |
| 4 | In developing workflows, policies, and procedures, address how other services refer potentially eligible children to Wraparound services and how the service is expected to share information with other services. | |
| 5 | Within workflows, policies, and procedures, address how children in the population of focus, including those enrolled in West Virginia Wraparound, are being diverted actively from residential placement. | |
| 6 | Within workflows, policies, and procedures, address how children and families that access CMCR (all resolution types) are being connected to High Fidelity Wraparound (HFW), CSED, and other Medicaid services (including but not limited to a formal referral process). | |
| 7 | Within workflows, policies, and procedures, establish timeframes for referral to evaluation, program acceptance or denial (and grievance and appeals processes), ISP development, and initiation of services to ensure that each step on the client pathway has a clear standard for timely access. | |

D142069

| 8 | Within workflows, policies, and procedures, adopt unified terminology and definitions for services. | |
|---|---|---|
| 9 | Ensure that grievance and appeals processes are consistently defined (e.g., with respect to denials, fair hearing processes, timelines). | |
| 10 | Use standard language that is consistent with the values of HFW, including collaboration (e.g., "Child and Family Team") and family voice and choice (e.g., "facilitator" rather than "manager"). | |
| 11 | Continue efforts to resolve differences in the three Wraparound programs' fidelity to the NWI standards in order to establish policies and programmatic requirements consistent with NWI. The areas for resolution fall into three categories: (1) aligning policy and programmatic requirements to be consistent with HFW, (2) providing provider training and coaching on content and skills development, including the use of fidelity tools to support provider practice and skill-building to align with HFW, and (3) establishing accountability measures to ensure practice is delivered consistent with HFW, and data are used routinely to ensure alignment with to HFW. | |
| 12 | Review the available provider monitoring fidelity tools and select at least one to implement. | |
| 13 | After selecting a tool or tools: (1) develop the infrastructure to implement the tool(s), (2) receive training in the tool(s) selected, (3) introduce the tool(s) to providers and select an implementation date, and (4) identify a plan to collect and use data from the tool(s) to inform further training and coaching, technical assistance, supervision, and programmatic and policy standards. | |
| 14 | Continue developing onboarding, training, and coaching plans and content for Wraparound Facilitators based on NWI's model. Training should include content both on HFW and on the differences between the State's various funding streams and their respective connections to programmatic eligibility. | |
| 15 | Develop a set of metrics related to training and coaching and incorporate these metrics into the QAPI approach. | |
| 16 | Develop and share with the SME a timeline for the drafting of proposed programmatic and policy changes, training and coaching protocols, and | |

D142070

| | | |
|---|---|---|
| | implementation planning related to the above recommendations. | |
| 17 | Provide the SME with an opportunity to review and provide comment on evaluation activities, including having discussions with the WVU Evaluation Team, prior to any finalization on the initiative logic model, program-specific logic models, draft evaluation overview, and draft WVU evaluation plans. | |
| 18 | Explicitly define the data sets and specific indicators and/or elements that will be collected, regularly reported, disaggregated, and analyzed to demonstrate:<br><br>• that children and their families in the population of focus are receiving appropriate education and outreach and are being referred to and evaluated for enrollment in Wraparound<br>• that families found not eligible for services receive timely, clear, and consistent guidance on the appeals process<br>• how children recommended for higher levels of care such as residential treatment are being successfully diverted to, and utilizing, HFW and other HCBS<br>• that a CFT is managing the ISP of each child and operating with high fidelity<br>• that the CANS assessment is being used consistently to develop an ISP for each child<br>• how transition and discharge, including early discharge, from HFW is occurring | |
| 19 | Educate stakeholders regarding the referral process and the eligibility standards for Wraparound and continue to work through the established outreach and education workgroup to ensure that stakeholders and families receive timely information about the referral process and eligibility for Wraparound. | |
| **Children's Mobile Crisis Response** | | |
| | *Recommendation* | *Status Updates* |
| 1 | Provide the SME with the opportunity to review the training materials used in September 2019 and any further iterations of onboarding, training, and staffing protocols. | |
| 2 | Ensure that training materials are inclusive of, and specific to, law enforcement who may respond with CMCR. | |

D142071

| | | |
|---|---|---|
| 3 | Continue efforts to develop a statewide hotline which connects to, and builds upon, well-established local expertise in delivering CMCR. | |
| 4 | Revise or develop a client pathway flow for CMCR funded via the CSED Waiver in order to clarify how clients will access and receive the service, its connections to the statewide hotline, processes for safety assessment(s) (i.e., when to involve local law enforcement in the response), and the procedures for timely screening, assessment, and referral to waiver and other services following a crisis. | |
| 5 | Collect and utilize real-time or near real-time program-specific data (e.g., demographic characteristics, timeliness of referral and referral patterns, wait times, discharge planning, patterns of discharge, and provider-level staffing patterns) to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels. | |
| 6 | Incorporate into current workgroup meetings a review of available CMCR data across the three funding agencies, the themes and issues it has identified, and how it is responding to the identified themes and issues. | |
| 7 | Use data to continue refining CMCR's place within the continuum of care to demonstrate that families are appropriately referred to HCBS services following a crisis, including in regions with pre-existing CMCR services (e.g., BBH-funded services), the relatively new CSED services, behavioral support services, assertive community treatment, respite, etc. | |
| 8 | Monitor CMCR services for timeliness and ability to safely divert children from inpatient and other residential settings, including monitoring CSED enrollees for high utilization. | |
| 9 | In developing an evaluation plan in conjunction with WVU, include metrics to demonstrate certain aspects of CMCR (see page 11 of the full report for details) and plan for identical data reporting across programs. | |
| 10 | Provide the SME with an opportunity to review and provide feedback on draft documents detailing proposed programmatic and policy changes, training and coaching protocols, and implementation planning related to the above | |

D142072

| | recommendations for review, comment, and discussion with the team, as needed. | |
|---|---|---|
|  | **Behavioral Support Services (BSS)** |
| | *Recommendation* | *Status Updates* |
| 1 | Specify whether BSS and PBS are both direct services.<br><br>• If yes, clarify the service specifications necessary to bill for each, especially for children and youth not eligible for CSED Waiver services but in the population of focus specified in the Agreement.<br>• If no, and BSS and PBS are intended as a framework for how other billable services are to be provided, specify how it will be determined (e.g., data gathered, training to providers) that providers are using this required framework while delivering billable services, particularly those services required under the Agreement. | |
| 2 | Identify a process and timeline by which the SME will receive drafts of the analysis of the availability of PBS services, have an opportunity to review and provide comments, and discuss with the workgroup prior to finalization. | |
| 3 | Include the performance measures in the WVU SOW in the evaluation plan for PBS, and expand upon them (e.g., include county of residence or a similar indicator to demonstrate statewideness, clearly define "timeliness," etc.). | |
| 4 | Provide the SME with the opportunity to review and comment on the technical assistance plan and materials before they are finalized and after any amendments are made based on field evaluation data/feedback. | |
| 5 | Clarify if the State will create a specific billing code or codes for BSS and/or PBS apart from those included in the CSED Waiver and how the State anticipates tracking and ensuring the provision of BSS and/or PBS to children in the population of focus who do not qualify for the services in the CSED Waiver. | |
|  | **Therapeutic Foster Care (TFC)** |
| | *Recommendation* | *Status Updates* |
| 1 | Clarify anticipated completion of the (1) analysis of Tier III capacity and need and (2) clinical and behavioral analysis of children in residential placement and at-risk of placement. Convene one or two technical assistance calls among the SME | |

D142073

| | | |
|---|---|---|
| | and the team conducting the next set of analyses to discuss specific data elements that could further assist the State in its understanding of system capacity, gaps, and needs. | |
| 2 | Incorporate a methodology section in all future analyses detailing: (1) the source(s) the data were drawn from, (2) the period(s) of time, (3) the children and youth included (e.g., all, those in state custody only, etc.), and (4) disaggregation of data by narrower age ranges. | |
| 3 | Develop a plan for a discussion and analysis of the regional or county-specific differences in the availability of TFC. (See pages 14-15 of the full report for a list of information and data that should be included.) | |
| 4 | In future analyses, identify the specific diagnostic, functional, and other characteristics of children who are ready for discharge from more restrictive levels of care but who are unable to return home or complete a timely transition to a less restrictive level of care. | |
| 5 | Implement a data specific approach to differentiating Tier III bed capacity by labeling available beds by population (i.e., children with SED, children who are medically frail, and infants who are drug exposed) and use of a modifier to the claim code to differentiate populations that received the service. | |
| 6 | Provide the following information to the SME in order to understand the process to match children to Tier III foster care beds, and factors that may prevent match:<br><br>• The policy or other manuals related to the matching process for children and potential foster care families;<br>• Information regarding how the State and child placing agencies collect and analyze data on failure to match a child to an open, Tier III foster care bed (e.g., diagnosis, age, geographic location, medical conditions).<br>• Information to better understand the conditions and factors that prevent a match by the child placing agency and regional differences in matching. | |
| 7 | Continue prioritizing efforts to expand TFC capacity (including through contract modifications, competitive procurement processes, and capacity assessments) | |
| 8 | Complete planned logic models outlining the various care manager roles, and their presence throughout the life of a child's interactions with | |

| | the various systems and services, as soon as possible to support the MCO as it commences its new work and to inform the QAPI. | |
|---|---|---|
| 9 | Collect and utilize real-time or near real-time program-specific data to assist agency staff in identifying patterns, to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels, and to more fully inform WVU's Evaluation Design Team on their program specific data needs for the data dashboard and future reports. | |

| Assertive Community Treatment (ACT) | | |
|---|---|---|
| | Recommendation | Status Updates |
| 1 | Within the State's assessment of current ACT capacity, consider: (1) the current capacity of ACT providers; (2) the projected need for ACT based on demographic data; (3) how young adults will be offered the choice between ACT and HFW; and (4) how young adults will successfully and seamlessly transition between HFW and ACT given the differences in care ratios. | |
| 2 | Within the assessment, include the historical and current barriers to expanding services statewide, as required by the Agreement, and proposed strategies to ameliorate them, along with corresponding indicators to demonstrate which strategies prove successful. | |
| 3 | Collect and utilize real-time or near real-time program-specific data to assist agency staff in understanding patterns and to ensure the ongoing alignment of policy and practice reforms with efforts to build and retain service capacity at regional and local levels. | |
| 4 | Provide information describing or demonstrating that extent to which the State undertaken planning to create ACT capacity by modifying existing behavioral health center contracts or through a competitive procurement process. | |
| 5 | Provide the SME with the opportunity to review, comment, and meet with the ACT workgroup to discuss drafts of proposed programmatic and policy changes—including any changes to the State's current limit of 120 members per ACT team, training and coaching protocols, contract or procurement related documents, and implementation planning related to the above recommendations. | |
| 6 | Provide the SME with the opportunity to review modified plans for stakeholder engagement and | |

D142075

| | | |
|---|---|---|
| | education before outreach and education efforts begin or resume this summer and into the fall. | |
| 7 | Provide the SME with the opportunity to review the survey instrument used to assess current awareness while it is under development and to meet with the Team as indicated. | |
| 8 | Provide the SME with the opportunity to review the State's protocols for tracking data on ACT training and other dissemination methods, as well as the process for identifying performance and process indicators while under development. | |
| **Screening and Assessment** | | |
| | *Recommendation* | *Status Updates* |
| 1 | [Screening] Revise the work plan and timeline for completing assessment of the current system and modifying policy and practice, as needed, based on data from the assessment. | |
| 2 | [Screening] Provide the SME with the opportunity to review, comment, and discuss drafts of proposed programmatic and policy changes, training and coaching protocols for the use of standardized screening tools, methods for collecting baseline data, and implementation planning related to the above recommendations. | |
| 3 | [Screening] Within the workgroup, coordinate with the Bureau of Juvenile Justice and Judiciary's Division of Probation Services to (1) finalize a timeline for selecting a tool, (2) add that timeline and any related tasks to the work plan, and (3) begin planning or the training of probation officers to use it, in accordance with the specifications in the Agreement. | |
| 4 | [Assessment] Incorporate into current workgroup meetings a review of available data, the themes and issues it has identified, and the response to themes and issues as they are identified. | |
| 5 | [Assessment] Clarify how it is being monitored that the MCO identifies and assesses gaps in the mental health component of the HealthCheck screening form and/or protocols by health care providers who serve Medicaid-eligible children. | |
| 6 | [Assessment] Provide the following information:<br>• Clarification on how processes and data across Goals I (children in custody) and II (children not in custody) will be consistently defined across different processes used by state agencies and Medicaid screening requirements, gathered, and analyzed in order to provide a comprehensive statewide | |

D142076

|   | | |
|---|---|---|
| | screening rate of all eligible children under the Agreement<br>• Clarification on the role of primary care providers and schools in the screening and assessment processes<br>• Information on how the State is currently providing or plans to provide outreach, education, and technical assistance to primary care providers on screening and assessing Medicaid-eligible children<br>• Information on how the screening and assessment results of children in child welfare and juvenile justice are shared once children exit those systems | |
| 7 | [Assessment] Develop a methodology, in conjunction with the MCO, WVU, and other partners to identify, maintain, and track a process to ensure that standardized mental health screening is occurring for each child, including those in state custody, and how those children with a positive screen will be assessed in a timely way and monitored for service delivery. | |
| 8 | [Assessment] Following finalization of the methodology, revise the State's workflow to clearly illustrate where, when, and how data collection is occurring and being verified, including the measurement of timely referral to other services following a psychological or psychiatric evaluation. | |
| 9 | [Assessment] Within the methodology, include sentinel indicators and other quantitative or qualitative measures to regularly and consistently ensure that all children are screened and that positive screens are followed by assessments soon after, including statewide and regional data on CANS delivered by a qualified assessor. | |

### Reductions in Placement

|   | Recommendation | Status Updates |
|---|---|---|
| 1 | Develop a logic model that links some of the sentinel indicators in each category to reductions in residential placement. | |
| 2 | Form a workgroup focused on (1) the immediate diversion of children from residential placement, to include review of all referrals and admissions, and (2) developing a process to review all children currently authorized for a residential placement for immediate step-down to lower levels of care. | |
| 3 | Examine length of stay to determine county and regional factors, and if there are particular areas of challenge, such as for children of color, youth identified as LGBTQ, and older youth. | |

D142077

| | Outreach and Education | |
|---|---|---|
| | Recommendation | Status Updates |
| 1 | Clarify if there is still a plan to develop a website to share important updates with stakeholders and the revised timeframe (if applicable). | |
| 2 | Continue to implement a regional approach to meetings with stakeholders (virtual if necessary) regarding children's mental health services and based on an agenda to facilitate dialogue with local stakeholders and surface needs, priorities, gaps, and challenges. | |
| 3 | Clarify the revised timeline and content for an "educational toolbox" that could be updated regularly and used across multiple disciplines to keep stakeholders informed. | |
| 4 | Formalize a timeline and approach for targeted education on HCBS for those children who may be eligible. | |
| 5 | Provide the SME with the opportunity to review and comment on the draft communication plan before it is finalized. | |
| | Quality Assurance and Program Improvement (QAPI) | |
| | Recommendation | Status Updates |
| 1 | Clarify (1) how the evaluation approach will be used to fulfill the requirements of the Agreement and (2) how WVU will collaborate with ICF Macro, Inc. to perform the work, which includes logic models, scanning internal data systems, and developing recommendations for data system integration, analysis, and interpretation, including availability of a SOW for ICF. | |
| 2 | Clarify whether the plan for the required data dashboard is included in the current WVU SOW or whether the State intends for it to be part of a Phase II plan that will be documented in subsequent or other SOWs. | |
| 3 | To ensure that the evaluation will fully capture all service components, finalize program-level requirements, policies, and standards prior to or shortly after WVU begins its work on program-specific logic models and evaluation elements. | |
| 4 | Review each workgroup's timeline to identify these interdependencies and to ensure that any revisions or amendments to the SOW's evaluation process and deliverables are adjusted, as necessary, so that all programmatic details are accurately incorporated. | |
| 5 | Update the work plans and related timelines, to reflect both changes as a result of COVID-19 | |

D142078

| | | |
|---|---|---|
| | response and the interdependencies across work plans as described above, and share these updates with the SME. | |
| 6 | The WVU Evaluation Design Team and ICF review workgroup-specific recommendations made throughout this report regarding use of data, metrics to consider, and quality improvement approaches, for inclusion in the evaluation design and forthcoming data dashboard and reporting. | |
| 7 | Provide the SME with opportunities to review and provide input into the logic models; data elements, sources, and collection and verification processes; annual analysis and sampling plan; and draft evaluation plan, including calls between the SME, the State, and the evaluation team. | |
| 8 | Include providers, children, youth and families, and representatives from child welfare and juvenile justice in stakeholder engagement efforts. | |
| 9 | Include opportunities for broader public comment and discussion in the stakeholder engagement process. | |