Attachment H



**WEST VIRGINIA**
**Department of**

# Health & Human Resources

# WV Child and Family Services Review Program Improvement Plan

Bureau for Children and Families

350 Capitol St., Room 730

Charleston, WV 25301

Jim Justice, Governor

Bill Crouch, Cabinet Secretary

Submitted: 3/7/18, 8/1/19, 9/23/19, 12/3/19

Approved:

PIP Effective Date:

End of PIP Implementation Period:

End of Non-Overlapping Year:

**Executive Summary**

The West Virginia Department of Health and Human Resources (the Department) is a cabinet level agency of state government created by the Legislature and operating under the general direction of the Governor  The Department operates under the direction of a Cabinet Secretary with the major programs assigned to different Bureaus. Each Bureau operates under the direction of a Commissioner. The Commissioner of the Bureau for Children and Families is Linda Watts.

West Virginia began the round 3 Child and Family Services Review (CFSR) in January 2017 with the submission of the Statewide Assessment. The information and analysis provided in the Statewide Assessment included information obtained from external stakeholders through their participation in workgroups, committees, surveys, focus groups, and other activities. External stakeholders involved in the collaboration included the Court Improvement Program, youth in foster care, foster and adoptive parents, service providing agencies, government agencies serving the same families, and others. The Administration for Children and Families (ACF) Children's Bureau approved the Department of Health and Human Resources Bureau for Children and Families existing case review process, employing the federal onsite review instrument, for the purpose of the CFSR. The Bureau for Children and Families Division of Planning and Quality Improvement staff reviewed 40 foster care cases and 25 in-home cases between April 2017 and September 2017; the Children's Bureau conducted secondary oversight of all 65 cases to ensure the accuracy of the ratings. Stakeholder interviews of Bureau for Children and Families key partners were also completed by the Children's Bureau in April 2017; the results of those interviews, together with the statewide assessment, were used to determine substantial conformity of systemic factors rated by the CFSR (45 CFR 1355.34(c).

West Virginia's CFSR Final Report was received from the Children's Bureau in December 2017. West Virginia did not meet substantial conformity levels on the seven CFSR Outcomes and four of the seven CFSR Systemic Factors. The state was found to be in

2

substantial conformity with three of the seven systemic factors assessed by the CFSR: Quality Assurance System, Staff and Provider Training, and Agency Responsiveness to the Community. West Virginia utilized the CFSR findings to begin a multi-faceted approach to gathering and analyzing information upon which to lay the foundation for systemic change within the child welfare system with the long-range goal of improving outcomes for WV children and families.

**Understanding Root Causes to Develop Strategies:**

The Department reviewed the final report, consulted with external stakeholders and key partners, and identified underlying issues contributing to the CFSR findings.

An onsite meeting was convened with the Children's Bureau in April 2018, to provide guidance on the PIP development.  Feedback was provided by the Children's Bureau based on its review of the Program Improvement Plan to all the workgroup leads and agency leadership.  It was advised that the root cause of the CFSR findings, and other data sources, be analyzed to make a cohesive plan that helps to improve outcomes for children and families.

After careful review of the final report and examination of other state data, including Division of Planning and Quality Improvement case reviews, key reports from the Child Welfare Oversight Committee which include data provided from AFACRS and NCANDS and other key sources, a root cause analysis was conducted with key stakeholders. This process included multiple teleconferences and a weeklong onsite meeting with key partners in collaboration with the Children's Bureau in September 2018.

The key stakeholders that participated in this extensive root cause analysis included:
- Court Improvement Program (CIP) (including the CIP Director and Data Analyst)
- Judges

D137383

- Management Information System from the Department of Health and Human Services
- Division or Program and Quality Improvement for the West Virginia Bureau for Children and Families (including the Director of Division of Planning and Quality Improvement and Associate Commissioner for Data Research and Evaluation)
- Agency Leadership (including Commissioner and Deputy Commissioners for Field Operations)
- Child Welfare Director
- Members of Service Array Community (including Mission West Virginia)
- State Training Director
- Agency Supervisor and Community Service Managers
- Guardian Ad Litem (GAL)
- Capacity Building Center for States Practice Improvement Consultant
- Data Analyst Consultant (through the Center for States)
- Children's Bureau (Regional Program Specialist, Program Manager, and CFSR Central Office Program Specialist)

An item-by-item analysis was conducted to discuss what key factors were that contributed to practice in the state rated as either a strength or area needing improvement.

In discussion around safety outcomes for children, performance data, vacancy rates, caseload data and worker exit, and satisfaction surveys were reviewed and determined to potentially be impacting practice. Key contributing factors to performance included caseworker staffing shortages.

In discussion around permanency, performance data was reviewed, and WV data sources identifying the number of children in placement by county was considered.   For Permanency Outcome 1: Children have permanency and stability in their living situations, contributing factors for stability of foster care placement (item 4), permanency goal for child (item 5) and achieving reunification, guardianship, adoption or other planned living arrangements (item 6) were discussed.  Possible contributing factors for stability of foster

4

care placement (item 4) were noted as a lack of resource homes. Data reviewed included a 2018 foster care analysis report and "specialized home by county" data sheets. For permanency goal for child (item 5) it was found there was confusion about how WV permanency goals align with federal goals. However, it was noted during discussions that there had been clarification regarding appropriate goal, resulting in improved performance for this measurement during the baseline. It was also noted that achievement of item is trending up during the baseline. It was discussed that Other Planned Permanent Living Arrangement (OPPLA) achievement is potentially impacting this item; further analysis of OPPLA cases was conducted due to the none of the eight OPPLA cases in the review being rated positively. The analysis revealed the majority of cases rated negatively due to the goal being inappropriate given the age of the child and circumstances of the case. Of the seven CFSR cases for CFSR Item 5 with an OPPLA permanency goal (primary or concurrent), three cases rated positively, and four cases rated negatively. Three of the negatively rated cases were due to the goal being inappropriate given the age of the target child.

For Well-Being Outcome 1: Families have enhanced capacity to provide for their children's needs, contributing factors for needs and services of children families and foster parents (item 12), child and family involvement in case planning (item 13), caseworker visits with child (item 14) and caseworker visits with parents (item 15) were discussed. A discrepancy between performance for foster care and in-home cases was identified; it was suggested that the workforce/workload could be contributing to the achievement of this item. It was found that the outcomes with parents was the lowest performing aspect of this item. It was also discussed that an inadequate array of services and challenges accessing services in rural areas adversely impacts the ability to provide quality services. It was determined that the awareness of available resources driving the provision of services and not the individualized needs of families may be adversely impacting performance for this item. A lack of caseworker meaningful contact with families was identified as an underlying cause for performance for child and family involvement in case planning (item 13). Understaffing and a positive understanding of meaningful engagement was discussed as also contributing to a lack of achievement for

5

this item.  Caseworker visits with children (items 14) and caseworker visits with parents (item 15) root causes were attributed to staffing challenges.  Additionally, it was noted the prioritization of foster care cases impacted negatively on in-home case performance.

In addition, the Center for States provided the services of a Program Improvement Consultant (PIC) and Data Analyst from August 2018 through April 2019.  Focus groups were conducted with front line staff to gain a better understanding of underlying issues currently impacting performance.  This in-depth analysis provided a better understanding of the underlying causes impacting practice in the state.

The major factors impacting practice in West Virginia were identified through the review of the CFSR Final Report, through WV's CFSR style social service review data, data from the State's Statewide Automated Child Welfare Information System (SACWIS), the Supreme Court of Appeals of West Virginia Child Abuse and Neglect (CAN) database, and consultation with external stakeholders. The cross-cutting barriers to higher outcome achievement identified include the inability to attract and retain qualified staff, failure to establish foster care resource homes at a rate sufficient to the rate of foster care entry, a lack of engagement with families to ensure child safety, identification of service needs, ensuring appropriate service provision, and the lack of services sufficient to address identified customer needs.

The Department used existing and newly formed workgroups to develop strategies to address these fundamental areas of practice believed to contribute to the CFSR findings. These workgroups are: Worker Recruitment and Retention, Information Systems, Service Array including Foster Parent Recruitment and Retention, Field Support-Meaningful Contact, and the Court Improvement Program-Data Group. Representation in the workgroups includes youth, parents, foster parents, Department leadership such as deputy and assistant commissioners, program directors, as well as field level staff, Mission WV specializing in the recruitment of foster homes, in-home service providers, the Bureau for behavioral Health and Health Facilities, community based behavioral health providers, and stakeholders from oversight groups and advisory committees

D137386

including the Court Improvement Program. The workgroups were tasked with developing strategies for improvement and establishing timelines for completion of key activities associated with the strategies. The drafted strategies were combined and reviewed by agency leadership members to ensure consistency. Stakeholders including Court Improvement Program members and Children's Bureau staff reviewed the combined document during onsite meetings held in September 2018, May 2019, and July 2019. Some of the workgroups were reorganized with some data analysis and goals appropriately moved to the state's five-year Child and Family Services Plan (CFSP) rather than the PIP. In developing this Program Improvement Plan consideration was given on how to best utilize West Virginia's existing continuous quality improvement process and incorporate strategies that complement the goals of the CFSP. West Virginia views the Program Improvement Plan as an opportunity to go beyond compliance with federal requirements to achieve lasting positive change for children and families involved in the child welfare system. Bureau for Children and Families practice values include the belief that the safety of children, adults, and families is paramount and should be the driving force behind every decision. Safety and well-being are not only physical elements, but equally include mental and emotional elements as well.

The PIP development process has focused on addressing the underlying conditions that hold the highest potential to positively impact WV children and families while aligning with the current child welfare reform initiatives. These current initiatives include negotiations to expand the current statement of work with administrative services organizations, implementation of Public Law 115-23 Family First Prevention Services Act (Family First), the implementation of West Virginia House Bill 2010 which transitions the foster care population to a managed care organization and creates a foster care ombudsman program, signing a Memorandum of Understanding between the State of West Virginia and the Department of Justice to ensure provision of mental health services to children in the most integrated setting appropriate by continuing to expand community-based mental health services and reducing the number of children in residential health treatment facilities over time; expanding the *Safe at Home WV* wraparound services program, developing qualified residential treatment programs, and applying for the Children with

7

Serious Emotional Disorders (CSED) waiver. These initiatives are focused on transforming the child welfare system in West Virginia.

Monitoring of PIP strategies will be completed using the state's existing Continuous Quality Improvement (CQI) process. The Division of Planning and Quality Improvement case review and resulting exit report begin the CQI process at the district and regional levels. This process continues through the state level utilizing the Child Welfare Oversight Team to monitor child welfare data by state, region and district. The regional Quality Councils meet on a quarterly basis and have staff that represent each district and each level of management including; child protective workers, supervisors, coordinators, youth service workers, community services managers, and child welfare consultants. Mutual areas of concern may be brought forward by key stakeholders. The Child Welfare Oversight team is comprised of individuals on the state level, and key external stakeholders, that can impact child welfare in a way that the district and regions may not.

**Overarching Factors Impacting Practice**

<u>Addiction & Drug Abuse</u>

Although there are many societal factors that contribute to child abuse and neglect in West Virginia, the co-occurrence between drug use disorders and child maltreatment related behaviors by caregivers is the most prevalent factor. Addiction places ever increasing demands on the limited child welfare resources of the state. Addiction impacts children directly through caregiver abuse and neglect and indirectly through lack of agency and provider staff, services, and resource homes. West Virginia has been heavily impacted by the opioid epidemic as indicated by multiple data sources. One is the Supreme Court of Appeals of West Virginia Child Abuse and Neglect (CAN) database chart below.

D137388



Between 2011 and 2017, there were 15,865 court cases with one or more risk factors indicated. The above chart shows a breakdown of these cases and which risk factors were indicated in the original petition. This research assumes all cases include one or more risk factors; therefore, cases without an indicated risk factor are considered underreported.

Out of the 15,865 cases that indicated one or more risk factors, 81.85% of the cases have indicated that substance abuse was at least one of the risk factors that led to the filling of the petition. Domestic violence was indicated in 40.85% of the cases, and mental health was indicated in 10.54% of the cases.

According to the Centers for Disease Control and Prevention (CDC), West Virginia was found to be one of the states in which the rate of death due to opioids doubled from 2015 to 2016. During this same period West Virginia had a significant increase in the death rate involving heroin and prescription opioid drugs. West Virginia was also listed by the CDC as a state with statistically significant increase in drug overdose death rates from 2016 to 2017. In 2017 West Virginia had the highest rates of death due to drug overdose with 57.8 per 100,000 deaths.

9

D137389

(https://www.cdc.gov/drugoverdose/data/statedeaths.html)
(https://www.cdc.gov/media/releases/2018/p0329-drug-overdose-deaths.html)

The addiction epidemic has caused an increase in the number of child maltreatment reports received and accepted for further assessment, the number of ongoing child maltreatment cases opened for services, and the number of children entering foster care. Since 2015, when the Department began tracking substance abuse findings, there has been a steady increase in the number of substantiated maltreatment findings related to substance abuse by caregivers. This is indicated in the following charts.



Source: COGNOS Statewide Referrals Report

D137390



Substantiated Findings of Alcohol and/or Substance Abuse by a Caregiver

Source: COGNOS Disposition Report



5 Year Out of Home Placement Trend

Source: Cognos Out of Home Report

In response to the addiction crisis in the state, and the impact on children and families, the state has begun a pilot project of Family Treatment Drug Courts. While only being explored in a few counties, the goal is to expand the project if it is successful. The state

11

D137391

is also examining a Sobriety Treatment and Recovery Team (START) Model designed to meet the needs of young children with substance-abusing parents involved with the child welfare system. It uses an intensive intervention model that integrates addiction services, family preservation, community partnerships, and best practices in child welfare and substance abuse treatment. The program aims to reduce recurrence of child abuse and neglect, improve substance abuse disorder (SUD) treatment rates, build protective parenting capacities, and increase the state's capacity to address co-occurring substance abuse and child maltreatment.

<u>Workforce Stability</u>

Another barrier impacting the ability of West Virginia to improve outcomes for children and families is the continual struggle to attract and retain qualified staff. The issue is not only the ability to retain staff once hired, but also to have applicants who meet the job requirements apply for vacant positions. West Virginia is a state with a declining and aging population with limited educational achievement. According to the U.S. Census Bureau West Virginia ranks fourth in population median age and fifty-first in the number of those twenty-five years of age and older with a bachelor's or higher-level degree. West Virginia registered a decline in population for the sixth straight year in 2018. The state was second behind Puerto Rico for population loss that year. (FFIS Issue Brief 19-01) These demographics contribute to the difficulty in attracting and retaining high-quality workers. (American Fact Finder ACS 2013-2017)

Building capacity to maintain an adequately skilled workforce is critical. For SFY 2018 the CPS turnover rate was 38%, and this percentage of staff turnover represents a 13% increase within two years, as shown in the chart below.

12

D137392



Source: Personnel Systems HRIS (2016), WVOASIS 2017,2018

The continual loss of staff increases the workload of remaining staff and leads to job dissatisfaction, low morale, and burnout. The constant churning of staff stresses the Department's limited fiscal resources for overtime and increases training costs. The bureau's training resources are continually spent on pre-service training of new workers which limits the availability of enhanced skills training for tenured workers. The cost of hiring and training a single CPS worker was estimated to be \$28,286.48 in FFY 2016.

Insufficient staffing levels impact performance for all CFSR items and outcomes. Division of Planning and Quality Improvement staff have observed, and CFSR findings confirm, outcome performance is directly linked to staffing levels in the district during the period under review. Insufficient staff levels directly impact the ability of the agency to assess child safety, ensure appropriate assessment and service provision, and engage families in the casework process. Lack of staffing creates a backlog of Family Functioning Assessments which in turn creates a reduction in the timeliness of investigations. This leads to failure to identify and address safety concerns in a timely manner. All of which impacts child safety and CFSR Safety Outcomes One and Two. The following charts indicate the backlog of Family Functioning Assessments in 2017 and 2018.

13



Source: Cognos Initial Assessment Report



Source: Cognos Initial Assessment Report

Turnover coupled with higher caseloads resulting from the increase in the number of investigations and children entering care due to the adverse impact of the opioid epidemic leads to decreased caseworker contact and negative outcomes for children and families. The lack of contact negatively impacts safety related timeframes, placement stability,

14

D137394

achievement of permanency, and well-being outcomes. Cases also tend to remain open after safety concerns are resolved due to the inability of staff to complete case closure requirements.

Lack of quality visits directly contributed to findings that the agency is not consistently completing quality comprehensive assessments of the needs of children and their parents. Although, improvement is needed for both the initial and ongoing assessments, the completion of quality ongoing assessments is most challenging. While this was found to be a concern in both in-home and foster care cases, comprehensive assessments are less likely to be completed for the children and parents being served in their own homes. This is indicated in the charts below.



**Risk and Safety Assessment and Management by Case Type (CFSR Item 3-Strength Percentages)**

|  | FFY 2016 | FFY 2017 | FFY 2018 |
|---|---|---|---|
| Placement | 36.10% | 46.50% | 44.62% |
| In Home | 9.90% | 15.10% | 10.00% |

Division of Planning and Quality Improvement Case Review Data FFY 2016-2018

Additionally, the appropriate services are not consistently provided to address the identified needs. As stated above a contributing factor to these findings was the consistent lack of or limited contact with the child's parents and the availability of services to stabilize the family and maintain the child safely in their home. Stakeholders attributed many of the challenges in this practice area to high caseloads and frequent staff turnover.

15



Source: FFY Division of Planning and Quality Improvement Case Review Data



Source: Division of Planning and Quality Improvement FFY Case Review Data

16

D137396



Source: Division of Planning and Quality Improvement FFY Case Review Data



Source: Division of Planning and Quality Improvement FFY Case Review Data

The Department has been working to resolve this issue by forming an internal recruitment and retention team in 2013. At the recommendation of the team, in 2015 the agency engaged the Capacity Building Center for States to assist in the development of a methodology for calculating the rate of staff turnover and to identify the root causes of why staff leave employment with the agency. Using the tools developed during the

17

**D137397**

Capacity Center's engagement, the Bureau for Children and Families established a workgroup to develop strategies to improve the agency's ability to attract and retain a qualified child welfare workforce. The previous strategies were based upon feedback from staff during exit surveys as well as a 2016 survey of CPS staff. The surveys consistently indicated high workloads, low wages, and job-related stressors as the key reasons given for separation from employment. Recent activities to address the recruitment and retention of staff includes: one-time sign-on bonuses, a new worker mentoring program, and retention bonuses for staff after two and five years of service. Preliminary reports on the effectiveness of sign-on bonuses for staff have been mixed; however, data has not been collected long enough for a good conclusion to be reached on their overall effectiveness.  There have been reports both of staff choosing to leave before the end of their work requirement and paying back the funds and of staff choosing not to accept the bonus because they have no intention of staying.  The effectiveness of the sign-on bonus has also hampered by the excessive amount of taxes that were withheld which significantly reduced the amount of money received by the employee.  The mentoring program was implemented in 2018 but no additional resources were assigned to the project and existing staff who were already carrying high caseloads were supposed to be assigned as mentors.  Although managers and staff seemed to like the idea of a mentoring program it was not effective when it was an added assignment and it was an additional source of stress.  The retention bonuses are in the process of implementation now.  The Bureau for Children and Families Recruitment & Retention Committee is working on a plan for additional recruitment/retention activities.

The Department also initiated the implementation of the reflective supervision project in 2018 as a workforce retention strategy. Reflective supervision can be defined as regular, collaborative reflection between an employee and supervisor that builds on the supervisee's use of thoughts, feelings, and values within a service encounter. Reflective supervision is specifically designed to improve supervisory support for workers through relationship-focused, collaborative time between them. Unlike a more task-centered approach to supervision, reflective supervision meetings examine work-life balance, secondary trauma, and learning needs in a parallel process. Many academic sources

18

generally support reflective supervision as an effective, trauma-informed means to build strong, supportive relationships between practitioners and supervisors. For adults to learn effectively opportunities must be provided to think, feel and process the stresses, and reflective supervision provides the opportunity for this to occur. The Bureau for Children and Families believes that workforce retention will improve through the increased availability of support that reflective supervision will offer. Casey Family Programs has agreed to provide training and technical assistance on implementation and sustainability.

Community Resources and Service Array:

CFSR findings through case reviews and stakeholder interviews indicate the service array system in WV is not meeting the needs of customers. Services necessary to meet the needs of children and families are not consistently available or accessible statewide. Most notably, it was determined that the lack of adequate substance abuse treatment services, both inpatient and outpatient for parents and youth, negatively impacts child and family outcomes in the state. Providers of addiction services often have wait lists and limited availability in more rural portions of the state.

Additionally, behavioral and mental health services for both children and adults are also limited across the state. The Bureau for Children and Families has made efforts to ensure services are individualized to meet the unique needs of each customer. However, in most areas service availability and accessibility are the priority. [CFSR Items 2 (Services to protect child(ren) in their home and prevent removal or re-entry into foster care), 12 (Needs and services of child, parents, and foster parents), 18 (Mental/Behavioral health of child), 29 (Array of services)].

During the CFSR, Service Array PIP Workgroup meetings, it was determined that West Virginia citizens do not know what specific substance abuse, behavioral health and mental health services are available, and when they are available, transportation to some of these services is a barrier. Caseworkers and other Bureau for Children and Families

D137399

staff are also not consistently aware of the services available for children and families across the state. The importance of information dissemination is vital to service delivery.

The Opioid Response Plan for the State of West Virginia (January 2018) states that "West Virginia suffers from the highest rate of drug overdose mortality in the United States, with more than 880 deaths in 2016". "On November 30, 2017, the West Virginia Department of Health and Human Resources announced an effort to develop an Opioid Response Plan for the State of West Virginia through public engagement and consultation with regional and national experts.   More than 350 people responded to a call for public comments.  More than 100 state residents attended a public meeting on December 21, 2017." According to the WV Health Statistics Center, Vital Surveillance System and CDC data in 2001 the Resident Drug Overdose Mortality Rate in West Virginia was 11.5%, (212 overdose deaths) with the average in the United States at 6.8%.  By 2016, West Virginia continued to have the highest overdose rate in the nation with the Resident Drug Overdose Mortality Rate in West Virginia at 52.0% (884 overdose deaths) with the average in the United States at 19.8%.  The report also indicated that in 2016, 81% of decedents interacted with one or more systems and 40% interacted with only one system.

West Virginia is trying to address this issue.  HELP4WV offers a 24/7 call, chat, and text line that provides immediate help for any West Virginian struggling with an addiction or mental health issue.  Many of those answering the accredited helpline are peer-support specialists or recovery coaches. This means that they have personal experience in recovery from a mental health or substance abuse issue. This initiative, funded by the Department of Health and Human Resources, is designed to streamline the process of seeking help for behavioral health issues.  The helpline staff offers confidential support and resource referrals, including self-help groups, out- patient counseling, medication-assisted treatment, psychiatric care, emergency care, and residential treatment.

A Service Array Gap Analysis was conducted in 2006. A state plan with over one hundred strategies was developed following this analysis. Due to the plan covering the whole state and having so many strategies it was never fully implemented statewide. There were

20

additional barriers to continuing the process such as a decline in collaborative group membership due to members feeling overwhelmed by the amount of work. Through this failure the Department learned to focus on a few key strategies and to ensure the appropriate member agencies are part of the development as well as the implementation of the strategies. Currently, service gap analysis is part of the overall Continuing Quality Assurance process. Data from the Division of Planning and Quality Improvement social services case reviews, Community Collaboratives, Regional Summits, and Family Resource Networks are used to determine service gaps within the communities and assist in the development of necessary services.

West Virginia is addressing the lack of services to address addiction through the implementation of a Family Treatment Court pilot program. Family Treatment Courts' main purpose is to enhance the overall wellbeing of the entire family. During the initial milestones, the Family Treatment Courts will focus on the participants' addiction and preparing them to properly care for their children when sober. While in foster care / kinship care, the needs of the children will be met by the Bureau for Children and Families. As the participant progresses through the milestones, safe family reunification and the skills to do so are to be provided to all. Strategies related to the Family Treatment Court pilot program can be viewed under PIP Goal 2, Strategy 4.

Pursuant to West Virginia State Code §62-15B-1, participation in Family Treatment Court is voluntary, post-adjudication, and with a written agreement by and between the adult respondent, and the Bureau for Children and Families with concurrence of the Court. Family Treatment Court programs will be as inclusive as resources and community support will allow. Family Treatment Courts will adhere to the following criteria when making decisions on accepting participants to FTC:

- Target Population, Objective Eligibility, and Exclusion Criteria
- Standardized Systematic Referral, Screening, and Assessment Process
- Use of Valid and Reliable Screening and Assessment Instruments
- Valid, Reliable, and Developmentally Appropriate Assessments for Children

D137401

- Identification and Resolution of Barriers to Treatment and Reunification Services

The Family Treatment Court will collect and review data to monitor participant progress, engage in a process of continuous quality improvement, monitor adherence to best practice standards, and evaluate outcomes using scientifically valid and reliable procedures. The Family Treatment Court will establish performance measures for shared accountability across systems, encourage data quality, and foster the exchange of data and evaluation results with multiple stakeholders. The Family Treatment Court will use this information to improve policies and practices in addition to monitoring the strengths and limitations of various service components. Evaluation results and data are also critical components of effective stakeholder outreach and sustainability helping the Family Treatment Court "tell its story" of success and needs.

Pursuant to West Virginia Code, §62-15B-1(f), The Local Family Drug Treatment Court Advisory Committee shall include the following individuals or their designees: The Family Treatment Court Judge, who shall serve as chair, the Prosecuting Attorney of the County, the Public Defender or a member of the county bar who represents individuals in child abuse and neglect case, the Community Services Manager of the Bureau for Children and Families of the Department of Health and Human Resources, a court appointed special advocate (CASA) as applicable, and any such other person or persons the chair deems appropriate. This advisory committee shall be staffed by the local Family Treatment Court Case Coordinator with the FTC-CPSW.

**Current Performance**

The CFSR round 3 West Virginia Final Report contains detailed information about the state's performance during the CFSR period under review. Since the 2017 CFSR, the Bureau for Children and Families Division of Planning and Quality Improvement continues to complete monthly CFSR-style case reviews; 125 cases were reviewed during federal fiscal year (FFY) 2018 (October 1, 2017 to September 30, 2018) comprised of 65 foster

D137402

care and 60 in-home social service cases. The state-conducted case review data from December 1, 2017 through November 30, 2018 was used to establish a baseline for PIP measurement; 65 placement and 60 in-home cases were reviewed in 12 districts/27 counties. The largest metropolitan area was represented in the baseline by the inclusion of five in-home and ten placement cases for a total of fifteen cases. The baseline and measurement plan were subsequently reviewed by the Children's Bureau measurement and sampling committee (MASC), and approved by the Children's Bureau.

Through the state's ongoing case reviews, improvement was observed between the completion of the CFSR case reviews and the establishment of the baseline in meeting the measure in all three CFSR Items related to Permanency Outcome 1: Children have permanency and stability in their living situations. Placement stability (Item 4) increased 18.85% between the two timeframes. As indicated in the West Virginia CFSR final report, an overreliance on shelter care and a lack of resource homes in the state contributes to instability of foster care placements. The achievement of timely and appropriate permanency goals for children (Item 5) showed a 13.08% increase between finalization of the CFSR cases reviewed and completion of the baseline. The item often historically rated negatively due to the selection of inappropriate permanency goals. West Virginia has taken steps to educate staff on the selection of appropriate permanency goals, as well as actively and effectively implementing concurrent planning. Agency leadership discussed the issue with supervisors during management meetings. Following these meetings, the supervisors and Child Welfare Consultants addressed the topic with staff during monthly unit and individual meetings. The efforts appear to have been successful based upon the case review data. The achievement of a child's permanency goal (Item 6) increased by 11.73% during the same time period. The selection of appropriate permanency goals and actively working toward achievement of those goals assisted in the overall increase of achievement on this item. Overall, Permanency Outcome 1 increased by 15.38% from 20% during the CFSR case reviews to 35.38% at the completion of the baseline.

D137403

Rating decreases were observed in all four CFSR items related to Well-Being Outcome 1 when the CFSR case review data is compared to the baseline. Performance in completing quality assessments and service provision for children, parents, and foster parents (Item 12) decreased 16.2% between the two timeframes. Performance for family and child involvement in case planning (Item 13) showed a 12.06% decrease between finalization of the CFSR cases reviewed and completion of the baseline. The frequency and quality of caseworker contact with families heavily impacts all CFSR items. Caseworker visits with child (Item 14) decreased by 11.9% and caseworker visits with parents (Item 15) decreased by 13.56% during the period of time between completion of the CFSR and establishment of the baseline. Overall, Well-Being Outcome 1 decreased by 16.6% from 26.2% during the CFSR case reviews to 9.6% during completion of the baseline. In-home cases rated lower on all Well-Being Outcome I items when compared to foster care cases.

| CFSR Item/Outcome | CFSR Cases (4/2017-9/2017) | FFY 2017 (10/1/2016-9/30/2017) | FFY 2018 (10/1/2017-9/30/2018) | Baseline (12/1/17-11/30/18) |
|---|---|---|---|---|
| Item 1: Timeliness of initiating investigation of reports of maltreatment | 55.9% | 54.9% | 55.56% | 61.9% |
| Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect | 55.9% | 54.9% | 55.56% | 61.9% |
| Item 2: Services to protection children in the home and prevent removal or re-entry into foster care | 73.3% | 54.7% | 40.74% | 37.25% |
| Item 3: Risk and Safety Assessment and Management | 41.5% | 33.1% | 28% | 29.6% |

| CFSR Item/Outcome | CFSR Cases (4/2017-9/2017) | FFY 2017 (10/1/2016-9/30/2017) | FFY 2018 (10/1/2017-9/30/2018) | Baseline (12/1/17-11/30/18) |
|---|---|---|---|---|
| Safety Outcome 2: Children are safely maintained in their homes whenever possible and appropriate | 41.5% | 32.25% | 27.2% | 28% |
| Item 4: Stability of foster care placement | 55% | 57.5% | 67.69% | 73.85% |
| Item 5: Permanency goal for child | 50% | 43.7% | 67.69% | 63.08% |
| Item 6; Achieving reunification, guardianship, adoption, or other planned permanent living arrangement | 57.5% | 54.9% | 72.31% | 69.23% |
| Permanency Outcome 1: Children have permanency and stability in their living situations. | 20% | 21.12% | 35.38% | 35.38% |
| Item 12: Needs and services of child, parents, and foster parents | 35.4% | 25% | 21.6% | 19.2% |
| Item 13: Child and family involvement in case planning | 39.7% | 35.5% | 27.64% | 27.64% |
| Item 14: Caseworker visits with child | 41.5% | 36.3% | 31.2% | 29.6% |
| Item 15: Caseworker visits with parents | 19.3% | 15.9% | 5.74% | 5.74% |
| Well-Being Outcome 1: Families have enhanced capacity to provide for their children's needs. | 26.2% | 17.74% | 12% | 9.6% |

25

Root conditions negatively impacting practice in West Virginia as identified through workgroup analysis of the data, including data from CFSR style social service reviews, using data from the State's Statewide Automated Child Welfare Information System (SACWIS), and agency staff focus groups. These conditions include the inability to attract and retain qualified staff, failure to establish foster care resource homes at a rate sufficient to the rate of foster care entry, a lack of engagement with families to ensure child safety, identification of service needs, ensuring appropriate service provision, and the lack of services sufficient to address identified customer needs.

**Approach to the Development of PIP Strategies and Goals:**

West Virginia seeks to address many of the key findings of the CFSR in the PIP as indicated above, but more importantly truly change outcomes for children and families by transforming the child welfare system in the state while keeping true to our West Virginia values.  The three main areas of focus led to the establishment of four goals that will address multiple key findings. This approach will impact the most significant areas for improvement. Most importantly, Bureau for Children and Families strives for positive outcomes for children and families that reflect the vision, "West Virginia's children, families, and adults have achieved well-being, safety and independence." And the Mission of the agency: "The Bureau for Children and Families provides an accessible, integrated, comprehensive quality service system for West Virginia's children, families and adults to help them achieve maximum potential and improve their quality of life." Addressing these key areas aligns the important work of the PIP with both the Vision and Mission.

The West Virginia Department of Health and Human Services, Bureau for Children and Families established a robust focus on continuous quality improvement prior to the 2017 CFSR.  The findings of the CFSR reinforced many of the existing concerns for practice in the state, areas where Bureau for Children and Families has been prioritizing our work with children and families.

26

We believe that by addressing and improving our practice through the following four goals in partnership with our key stakeholders, most critically the courts, we will begin our agency transformation to one that empowers families and moves us toward a new culture that puts families first, keep families together by building on families' strengths, and moves us toward a prevention focused system:

- Creating and supporting a healthy workforce
- Community support and family resources
- Changing how we support families through positive supervision
- Creating an efficient, effective and prevention focused system

D137407

**PIP Goals, Strategies, and Key Activities**

Creating and Supporting a Healthy Workforce
Root Cause Analysis

Recruitment and retention of quality staff effects every aspect of practice in Bureau for Children and Family's child welfare programs. In the Children and Family Services Review (CFSR 2017) final report the Children's Bureau (CB) noted that the state has experienced limited success in its efforts to recruit and retain child welfare staff. The current 38% turnover rate among child welfare staff continues to adversely affect the delivery of services and the outcomes for children and families served by the agency. High turnover increases the workload for remaining staff, leading to job dissatisfaction, low morale, and burnout.

Data reflects West Virginia struggles to recruit and retain qualified staff. Staff recruitment and retention continue to be barriers to the agency because of the difficulty both with 1) recruiting qualified staff for child welfare positions; and 2) retaining staff over the long term in order to both keep expertise within the agency and maintain manageable caseloads for staff. Strengthening capacity to build and maintain an adequate, highly skilled workforce is critical for improving workloads and working conditions for Bureau for Children and Families staff, making them more likely to remain in their positions. Addressing these barriers will produce positive outcomes in Safety, Permanency, and Well-Being for children and families.

The constant churning of staff stresses the bureau's limited fiscal resources for overtime and increases training costs. The bureau's training resources are continually spent on pre-service training of new workers which limits the availability of enhanced skills training for tenured workers. In 2016 Bureau for Children and Families worked with the Capacity Center for States to calculate the cost of staff turnover and found that the cost of hiring and training a single CPS worker was $28,286.48. Based on these figures, in 2018 the Bureau for Children and Families hired and trained 242 new child welfare workers with a

28

D137408

cost of $6,845,328.00. The trend shows no evidence of slowing down; by the end of 2018 there were 17 workers hired in 2018 that had already left the agency within a few weeks or months, costing the agency $480,870.00 in expenses for staff that never became productive.

Along with these factors, Federal AFCARS reporting has repeatedly shown that West Virginia has the largest number of children in care per capita in the nation. On June 30, 2018 there were 6,655 of West Virginia's children in out of home care. Of these children 2,279 are under the age of 5. The increasing number of children in care has caused increased workloads and job stress for child welfare staff, contributing to the high turnover rates.

In April 2019 West Virginia worked with the Capacity Center for States to conduct focus groups of caseworkers (YS and CPS), supervisors, and managers with the objective of gathering and compiling perceptions, practices, and behaviors regarding the workforce, case management practices, and the culture and climate of the organization. The retention questions addressed motivations to work in child welfare, local retention efforts, factors that influence thinking about quitting, and recommendations for retaining staff. On the positive end staff reported that they were motivated to work and stay in child welfare because of intrinsic rewards such as a deep caring for children and families and desire to make a difference. However, the focus group report also brought out several areas of concern related to workforce recruitment and retention. Two themes that were evident in the report were around secondary trauma and supervisor and agency support.

There were many comments regarding secondary trauma in the report. Secondary trauma was reported as being a source of stress and burnout for staff as well as a factor that influenced thoughts of leaving the agency. Staff reported that the agency secondary trauma process existed but was not helpful because it was a "cookie cutter process" and was not readily available. They reported that workers cannot "tolerate the trauma" and that there were no official mechanisms to help them. Addressing worker trauma will require longer term action and therefore will be addressed in the CFSP.

D137409

Supervisor and agency support were also frequently mentioned in the report. Staff stated that they were being told to "make better use of your time" instead of getting actual support and guidance. Some reported that they got no support, guidance, or direction at all from their supervisors, and 23% reported that they would benefit from job coaching from their supervisors or from mentors. Several staff reported issues with supervisors located in a different office than their own, limiting interaction and availability of the supervisors. Caseworkers also noted salary and a lack of career ladder for advancement as needs. Court was discussed at all levels as being a high-level stressor due to feelings of not being able to "do anything right in their eyes" and the feelings of anxiousness around going to Court. Staff requested guidance on how to prepare for court. This is being addressed through the development of a revised caseworker court standard operating procedures document and check list to ensure staff are properly prepared and feel supported during court hearings. The standard operating procedures document will provide guidance to agency staff on how to prepare for court hearings. Caseworkers indicated a need to be appreciated; have a voice that is heard and help to "dig out of the mess."

The Division of Juvenile Services, with the support of the Court Improvement Program, is facilitating circuit court juvenile stakeholder meetings around West Virginia.  The vision is to involve any professional, provider, or person who might be attending a multidisciplinary team meeting or juvenile court proceeding to better integrate or coordinate agency efforts to improve outcomes for children and families.   The goal is to conduct stakeholder meetings in 50% of the 31 Circuit Court Judicial Circuits.

Beginning in September 2019, Division staff partnered with the juvenile circuit judges in certain circuits to provide information on state-wide system happenings.  Some of those include:

- Family First Prevention Services Act
- Department of Justice Findings and Agreement
- Managed Care Organization

30

**D137410**

- Seriously Emotional Disturbed Waiver
- New Legislation, Policy and/or Rules
- Court Improvement Program Projects
- Multidisciplinary Teams
- Missing From Care
- Community Outreach
- Juvenile Data and Outcomes

A portion of the meeting also focuses on local practice. The circuit's judges establish those discussion items specific to the needs, concerns and or services within that locality.

Thus far, three meetings have occurred with attendance ranging from 70 to 130 people. The audience has been represented by Prosecuting Attorneys, appointed/parent Attorneys, Public Defenders, Guardian ad Litem Attorneys, Law Enforcement, Prevention Resource Officers, Service Providers (community based and congregate care), Probation Officers, Psychologists, and DHHR personnel. Feedback from the meetings was very positive.

These stakeholder meetings will continue to occur on a regular (at least annually) basis, encouraging collaboration and conversation between those entities affecting and impacting children and families within each circuit.

West Virginia will improve its performance on outcomes safety 1, safety 2, permanency 1 and well-being 1 by addressing the state's ability to recruit and retain a quality child welfare workforce. As illustrated in the information above, West Virginia must look at both recruitment and retention of staff along with staff and supervisor support to address the continuing workforce shortages in the state and improve performance on its outcomes. Goal 1 will address recruitment and retention of staff to reduce workloads, significantly decrease the backlog of assessments and open CPS cases without a contact in 90 days or more and create a more supportive environment to ensure a healthy staff who feel valued.

31

**Goal 1: Creating and supporting a Healthy Workforce.**

Safety Outcome 1, Safety Outcome 2, Permanency Outcome 1, Permanency Outcome 2, Well-Being Outcome 1, Well-Being Outcome 2, Well-Being Outcome 3

**Strategy 1: Build and reinforce mentoring, peer support, and job supports for child welfare workers through regional and statewide meetings and building the capacity of new positions in the CPS career ladder.**

**Strategy 2: Strengthen Judicial rapport through collaborative processes and improve preparation of Bureau for Children and Families staff for court**

**Strategy 3: Conduct exit interviews and retention surveys with staff to inform and develop strategies to reduce turnover and retain staff.**

*Strategy 1: Build and reinforce mentoring, peer support, and job supports for child welfare workers through regional and statewide meetings and building the capacity of new positions in the CPS career ladder.*

|  | Projected Completion dates: |
|---|---|
| 1.1.1 Implement regional and statewide meetings for child welfare workers, supervisors, and managers for professional development and peer support, two times per year. The regional and statewide meetings will contain activities such as morale boosters, small group discussions on self-care and dealing with trauma, how peers can support new staff, positive reinforcement for improvements in outcomes, district to district structured interactions and networking, and discussions on why they do the work they do in addition to professional development activities. | Recruitment & Retention Committee/Director of Training Q2 |
| 1.1.2 Implement a formal mentoring program for new child CPS staff using the new CPS Senior positions as mentors. | Recruitment & Retention Committee Q2 |
| 1.1.2a Establish mentoring guidelines for CPS seniors to use when acting as mentors including a manual outlining the purpose, expectations, and goals for mentoring. | Recruitment & Retention Committee Q2 |

32

D137412

|  | Projected Completion dates: |
|---|---|
| 1.1.2b Create tools for CPS seniors to use when acting as mentors including a mentorship partner agreement, goal-setting templates, conversation starters, sample meeting agendas, progress check-in templates, and a relationship closure plan. | Recruitment & Retention Committee Q2 |
| 1.1.2c Create and implement a training plan for new CPS seniors that includes training on their mentoring role including completing an initial online orientation and introduction to mentoring, attending new supervisor training on educational and supportive supervision, and completing additional training on facilitation, communication, and teambuilding. | Recruitment & Retention Committee /Training Director Q2 |
| 1.1.2d Create and implement a professional development plan for CPS seniors that includes necessary skills to propel mentoring forward and includes a yearly meeting for mentors to build relationships and reinforce and build mentoring skills. | Recruitment & Retention Committee /Training Director Q2 |
| 1.1.2e Provide a library of readily available content for CPS seniors to use that explains and demonstrates mentoring skills and concepts and can be accessed whenever a mentor is challenged in his or her mentoring relationship or as a means of preparing for mentoring conversations. | Recruitment & Retention Committee /Training Director Q2 |
| 1.1.3 Develop the capacity of and utilize the new CPS Case Coordinator positions to support CPS workers and facilitate the casework process. | Recruitment & Retention Committee /Deputy Commissioners Q2 |
| 1.1.3a Develop, approve, and distribute a list of specific tasks that CPS Case Coordinators can perform to support CPS case workers and facilitate the casework process. | Recruitment & Retention Committee /Deputy Commissioners Q2 |
| 1.1.3b Create and implement a training plan for new CPS Case Coordinators that focuses on knowledge and skills required for their role of supporting CPS caseworkers. | Recruitment & Retention Committee /Training Director Q2 |
| 1.1.3c Create and implement a professional development plan for CPS case coordinators that builds their knowledge, skills, and abilities around the casework process and their role of supporting CPS caseworkers. | Recruitment & Retention Committee /Training Director Q2 |
| 1.1.3d Review and update the list of approved tasks yearly and when new policies or programs are implemented to keep the document current. | Deputy Commissioners Ongoing |

D137413

*Strategy 2: Strengthen Judicial rapport through collaborative processes and improve
preparation of Bureau for Children and Families staff for court.*

|  | Projected Completion dates: |
|---|---|
| 1.2.1 Build and expand upon circuit level stakeholder meetings that include stakeholders involved in child welfare cases. This may include multi-disciplinary team members such as case workers, supervisors, regional attorneys, other Bureau for Children and Families staff and the judicial system including judges and prosecutors, service providers, education providers, probation officers, attorneys for parents and children, parents, youth, foster parents, and behavioral health providers. | CIP/Division of Children and Juvenile Services Q1-Ongoing |
| 1.2.1 a. Expansion of the above indicated meetings will reach 50% of the 31circuit court judicial circuits | CIP/Division of Children and Juvenile Services Q8 |
| 1.2.1 b. Circuit court judicial circuits who had an initial stakeholders meeting will be encouraged to have at least annual meetings following the initial meeting. | CIP/Division of Children and Juvenile Services Q8 |
| 1.2.2 The Community Services Managers have been directed by agency leadership to request quarterly meetings with the circuit court judges who hear juvenile cases to discuss areas of mutual interest and concern. | Community Services Managers/Judges/Regional Directors Q1-Ongoing |
| 1.2.2a-Division of Children and Juvenile Services will reach out to the circuit court judges who hear juvenile court cases to encourage participation in requested meetings. | Division of Children and Juvenile Services Q1 |
| 1.2.2.b-Develop a reporting mechanism for 1.2.2 that includes the areas of mutual interest and concern. | Regional Directors Q1 |
| 1.2.2c-Regional Directors will oversee 1.2.2 and provide feedback to Child Welfare Oversight Meeting which includes membership from the Division of Children and Juvenile Services. | Regional Directors Q1-Ongoing |
| 1.2.2d-Child Welfare Oversight will develop a plan to address issues identified in meetings with Community Services Managers and judges (in 1.2.2.) | Child Welfare Oversight Q1-Ongoing |
| 1.2.3 Update the Bureau for Children and Families Standard Operating Procedures for court proceedings to include the CPS Court check list and a process for the supervisor, coordinator or designee to prepare staff prior to court hearings. The revised Standard Operating Procedures will include a process to elevate specific case concerns to the regional attorney. This may include concerns related to worker skill and knowledge. | General Counsel/Regional Attorneys/Regional Directors Q1-Ongoing |

D137414

|  | Projected Completion dates: |
|---|---|
| 1.2.3a The revised Standard Operating Procedures and the CPS Court checklist will be distributed via email and placed on the intranet and discussed at a quarterly Regional Social Services Supervisor Meetings. | Deputy Commissioners/Regional Program Managers Q2 |
| 1.2.3b Monitoring of 1.2.3 will be through surveys of prosecuting attorneys and judges and case experiences of workers. (pre and post) | CIP/Division of Planning and Quality Improvement Q1 pre and Q7 post |
| 1.2.4 Develop and implement an ongoing process between General Counsel and Regional Attorneys to discuss areas of mutual interest and concern and use the CQI process for unresolved issues through the Child Welfare Oversight meetings. | Bureau for Children and Families General Counsel/Regional Attorneys Q-1 develop/ongoing |

*Strategy 3: Conduct exit interviews and retention surveys with staff to inform and develop strategies to reduce turnover and retain staff.*

|  | Projected Completion dates: |
|---|---|
| 1.3.1 Develop and implement exit interview Standard Operating Procedures and form to use with child welfare staff who are leaving the agency so that information can be used in retention strategies. | Worker Recruitment & Retention Workgroup (Recruitment and Retention Committee) Q2/ongoing |
| 1.3.2 Conduct staff satisfaction surveys with new hires at the end of new worker training, nine months, and 18 months to identify retention issues with new workers and use information to inform retention strategies. | Recruitment and Retention Committee Q2/ongoing |
| 1.3.3 Conduct localized surveys with all child welfare staff to identify why they stay and build on their strengths to identify targeted ways to improve retention locally, and feed back to the Recruitment and Retention Committee to analyze the results and address identified issues. | Recruitment and Retention Committee Q3/Ongoing |
| 1.3.4 The results will be analyzed, and action plans developed to address identified issues at a subsequent meeting of the Worker Recruitment and Retention Workgroup. | Recruitment and Retention Committee Q4/Ongoing |

D137415

|  | Projected Completion dates: |
|---|---|
| 1.3.5 Develop a system to track a cohort of staff to see if strategies are working to retain staff. | Assistant Commissioner of Planning and Resource Development/Director of Training Q4/ongoing |

## Community Support and Family Resources
### Root Cause Analysis:

Information in the statewide assessment and collected during interviews with stakeholders showed that West Virginia does not have a statewide coordinated effort to recruit foster and adoptive homes for the children needing placement. DHHR is not recruiting or approving new foster homes but rather is focused on kinship homes and re-evaluations. The recruitment plan and primary focus of Mission West Virginia is on processing referrals and not necessarily recruiting new homes, and specialized agencies are no longer involved in the recruitment of foster homes for special-needs children. It was reported that the number of children entering foster care has risen while the number of homes has not matched the increase in need, and that the shortage of homes has resulted in children sometimes sleeping in offices and being placed in shelter care.

West Virginia is experiencing an influx of children entering the foster care system due to the nationally recognized opioid epidemic. Between FFY 2015 and 2017, there was an overall 23.2% increase of children entering foster care. Bureau for Children and Families data reflects that 51.8% of removals for FFY 2017 were due to substance abuse according to federal reporting requirements. However, Bureau for Children and Families internal reporting, which includes more components than federal reporting requirements, reflects that 85.2% of removals for FFY 2017 were substance abuse related. As a result of these numbers, Bureau for Children and Families has compiled and analyzed data relating to foster children currently placed and separated that data according to county of removal and age of the child, to determine the number of foster homes needed based on

36

D137416

the county of removal and ages of children. March 2019 placement data reflects that over 1,042 children and youth are placed in group residential or emergency shelter foster care placements. Recent survey results yielded concern from foster parents relating to the reluctance to accept placement of older children and youth due to specialize agencies not allowing foster children to partake in normalcy activities such as sleepovers or day trips with friends without background checks, no ATV riding, lack of permission for extra-curricular activities, etc., which results in idle time for older foster children and youth that leads to misbehavior. WV House Bill 2010 requires performance-based contracts with each private and specialized agency to ensure rules and requirements are being adhered to. The performance-based contracts will require the following:

- safety outcomes;
- permanency outcomes;
- well-being outcomes;
- incentives earned;
- recruitment and retention of foster parents

Performance measured outcomes will be collected through performance-based contracts with each agency.

In June of 2017, approximately 4,062 surveys were mailed to foster parents, kinship relative placement providers, as well as group residential and shelter facilities. There were two survey types, Parent Resources for Information, Development, and Education (PRIDE) Training, and MDT/Court Notification and Attendance. The purpose of the PRIDE training surveys was to capture the efficiency of PRIDE and additional foster parent training and their effectiveness in preparing individuals to become foster parents. The purpose of the MDT/Court notification and attendance surveys was to determine whether foster parents and kinship/relative providers were being given notification for MDTs and court hearings and if they were being permitted to participate in the proceedings as allowed in WV State Code and federal law. There were approximately 2,031 surveys of each of the two types mailed. All private/specialized agency foster homes received the survey, while 50% of Bureau for Children and Families kinship/relative providers received the survey, and each licensed group residential facility

D137417

and shelter received the MDT/Court survey for 50% of the children in their facilities. The PRIDE Training survey had a response rate of 21% while the MDT/Court survey had a response rate of 32%. The comments and reported survey questions yield communication and collaboration barriers between the foster care providers and the MDT as well as the Courts. Many foster care providers reported not being treated with respect and not having their opinions heard or considered. Other comments from foster parents indicated that the treatment of foster care providers is one reason for the lack of retention. Though the surveys were conducted nearly two years ago, the problems identified in the MDT/Court survey are still very much an issue as the identified problems have yet to be corrected.

In West Virginia's child welfare statute, there is a lack of clarity related to noticing of hearings for caretakers. Furthermore, language is absent that outlines the format for the notice or who is responsible for serving the notice. This ambiguity has prevented any one agency from taking ownership and standardizing the process. Before anything stronger than a DHHR policy can be enforced, clearer statutory or court rule guidance must be available.

The comprehensive survey in 2017 was sent to all foster parents, relative/kinship parents, and pre-adoptive parents to determine the degree of engagement they felt with the system in their role as a caretaker. The surveys were anonymous to encourage participation. Data was collected on the following question:

How often do you receive notice of court hearing?

| Value | Response | Frequency | Percent |
|-------|----------|-----------|---------|
| 1 | Never | 174 | 26.73% |
| 2 | Sometimes | 118 | 18.13% |
| 3 | Often | 52 | 7.99% |
| 4 | Almost Always | 93 | 14.29% |
| 5 | Always | 179 | 27.50% |
| 0 | Blank | 35 | 5.38% |
| **Total number of Responses** | | **651** | **100.00%** |

D137418



There are activities in the PIP designed to increase notice of hearings to increase the quality of hearings by ensuring parties are present, know their rights, and have clear concise information on their role in child welfare proceedings. (CFSR Item 24)

The result of the MDT/Court survey yielded results showing that there is an extreme dissatisfaction of foster parents due to a lack of appropriate and informational communication between case workers and foster parents. Many comments from the surveys yielded specific instances and case information regarding the lack of communication between the foster care providers and the case workers as well as the foster children and the case workers. There is an additional PIP workgroup developing action items to address meaningful contact from case workers with clients and foster care providers to improve the communication between case workers and those on their caseloads and providing services to foster children, including foster and kinship/relative providers.

Region IV is developing an initiative to transitions kinship/relative providers to traditional foster care providers to increase resource home capacity. This initiative is a result of the expressed desire of numerous kinship/relative care providers to become traditional foster care providers yet are reluctant to change from the DHHR to a child placing agency due to the already acquired rapport with Bureau for Children and Families Homefinding Specialists. This initiative will allow specific dates and times for certified kinship/relatives who are willing and express a desire to transition to traditional foster care to meet staff from the child placing agencies within their regions to express their questions and concerns and begin building rapport with agency case workers and staff. This initiative

D137419

will be an ongoing process and will aid kinship/relative care providers in the selection of a child placing agency that is right for their family and needs. This initiative will be duplicated in the three additional regions upon the determination of its success and palpable increase of resource homes.

The Child and Family Services Review (CFSR) in 2017 found that there was a lack of substance abuse services in West Virginia. The national substance abuse epidemic has significantly affected families in West Virginia. The CFSR noted some of the challenges to goal achievement in permanency cases may also be related to service array issues. The lack of adequate substance abuse services negatively impacts child and family outcomes in the state. It was also found that providers of addiction services often have wait lists and limited service availability in more rural portions of the state.

The Supreme Court of Appeals of West Virginia Child Abuse and Neglect (CAN) database was created to collect and track the status and timeliness of all West Virginia child abuse and neglect cases. The Court Services Division has trained staff to indicate which risk factors were present and mentioned in the original petition as a reason for filing the abuse and neglect petition. These cases may have more than one risk factor indicated. The data presented in the following risk-factor analysis was pulled from the CANS Database.

D137420

| Year | Total count of cases with one or more risk factors indicated | All cases with Substance Abuse indicated | | All cases with Domestic Violence indicated | | All cases with Mental Health indicated | |
|---|---|---|---|---|---|---|---|
| | | Count | Percent | Count | Percent | Count | Percent |
| 2011 | 1,026 | 808 | 78.75% | 448 | 43.66% | 94 | 9.16% |
| 2012 | 1,559 | 1,234 | 79.15% | 771 | 49.45% | 220 | 14.11% |
| 2013 | 1,776 | 1,400 | 78.83% | 761 | 42.85% | 254 | 14.30% |
| 2014 | 2,495 | 1,996 | 80.00% | 1,026 | 41.12% | 289 | 11.58% |
| 2015 | 2,558 | 2,101 | 82.13% | 1,083 | 42.34% | 223 | 8.72% |
| 2016 | 2,997 | 2,516 | 83.95% | 1,151 | 38.41% | 263 | 8.78% |
| 2017 | 3,454 | 2,930 | 84.83% | 1,241 | 35.93% | 329 | 9.53% |
| Total of All Years | 15,865 | 12,985 | 81.85% | 6,481 | 40.85% | 1,672 | 10.54% |

Out of the 15,865 cases that indicated one or more risk factors, 81.85% of the cases have indicated that substance abuse was at least one of the risk factors that led to the filling of the petition. Domestic violence was indicated in 40.85% of the cases, and mental health was indicated in 10.54% of the cases.

Qualitative data from focus groups facilitated by the Capacity Building Center for States found there is an uneven distribution of services and accessibility to services across the state. Workers report socially necessary services are not available in all counties. Providers do not want to drive several hours for one referral for services in an area. Mental health clinics are "putting on band-aides, but they don't even have band-aides". There was a lack of confidence expressed by focus group participants about the mental health services and substance abuse treatment services that are being provided. Transportation, the need for intensive outpatient services for children and parents, as well as residential treatment that accepts parents and their children was reported lacking. There were concerns expressed about courts ordering drug screenings on almost every case, and drug screening times being only 8am-11am. Focus group participants said placement and treatment services are needed for young children with "extreme behaviors".

41

In March 2017, the DHHR, Bureau for Behavior Health developed "Need" maps and "Treatment/Recovery" maps using 2016 data. The Need maps provide the ranking of the county (from 1 to 55) for Drug Exposed Infants; Children Removed Due to Substance Abuse; Overdose Deaths; EMS Runs with Naloxone Administration; and Opioid Prescriptions. The "Treatment/Recovery" maps show the rates (beds per 100,000 population) per GASCA Region (which is also the BBH Regions) for Detoxification, Treatment Beds; Recovery Beds: and Doctors That Prescribe Buprenorphine to Medicaid Patients.

The Service Array workgroup determined that DHHR staff and stakeholders do not know about services availability across the state, or how to access services. The members with the Bureau for Behavioral Health (BBH) and Bureau for Medical Services (BMS) have developed multiple new "Response for Application" (RFA) with a focus on substance abuse, over the past several months. West Virginia has a 24-hour helpline (Help4WV) staff and other stakeholders may need to know specifically how to assist those needing help with addiction or mental illness. Help4WV provides free help securing a referral or placement for treatment https://www.help4wv.com.

The Division of Planning and Quality Improvement process and the West Virginia Community Collaborative Groups (Collaboratives) identify and address service gaps in their communities. The Collaboratives were originally formed in the late 1990s with the purpose of continuous community assessment over specified geographical areas. In 2014, West Virginia was federally approved by the Administration for Children and Families to develop the IV-E demonstration project (known as Safe at Home WV). As part of Safe at Home WV, Community Collaborative groups play a key role in identifying these community-based services and, if needed, assist in developing services based on the needs of the children and families in their community. The Collaboratives have a sense of "community ownership" for children at-risk of being placed in out-of-home care and keeping children closer to their families and home communities when they must be placed out-of-home.

42

D137422

The Collaboratives are expected to provide bi-annual reports to the Department of Health and Human Resources (DHHR), Bureau for Children and Families.  However, not all Collaboratives provide these reports, they are not always provided consistently, and the reports are not reviewed through a formal service development plan. The DHHR, Bureau for Children and Families does not have a Memorandum of Understanding that formalized this relationship, and the information is not included in a formal service delivery and development plan for identifying service needs and gaps.

Although the Collaboratives continue to meet, some Collaboratives do not consistently provide community data reports on the service needs and gaps. Additionally, when information is provided, there is no formal process to provide these needs for service development at a statewide level.

Furthermore, there is no formal process that includes a communication/dissemination process for notification of service needs and gaps to decision makers, service development and decisions, and providing service availability to DHHR staff and other stakeholders when services are available and/or developed.  To address the issue for communication/dissemination, West Virginia needs a central location to provide information about services in a community.

The Family Resource Networks (FRNs), currently develop the Family Resource Directories for each of the fifty-five counties in West Virginia annually.  The FRNs support and promote the collaboration of all citizens in order to develop strategies for communities to succeed. Recently, the FRNs began putting their directories on a central website.  This website was possible due to a Benedum grant that was awarded to the Marshall County FRN. The Bureau for Children and Families recently required, as a part of the FRN Contract, the FRNs to utilize the central website as their resource directory. WV does need to develop a standardized process for the FRN's that will address how the information is to be gathered and how often the website needs to be updated and monitored.

D137423

In conclusion, the Service Array Workgroup found:  1. a lack of substance abuse services in some areas exist and there are barriers to some existing services (i.e., wait lists); 2. DHHR staff and stakeholders may not know where to find service availability for substance abuse and other services an individual or family might need (Help4WV for substance abuse and Family Resource Directories for all services); 3. DHHR staff need a formal communication process to notify DHHR staff and stakeholders when substance abuse and other needed services are made available in their communities; 4. A Memorandum of Understanding between the Department of Health and Human Resources and the Community Collaboratives needs to be developed and the reports need to reviewed through a formal service development process.

**GOAL 2: Increase Family Support Services and Family Resource Homes to meet the needs of children and Families Community Support and Family Resources**
Safety Outcome 2, Permanency Outcome 1, Well-Being Outcome 2, Well-Being Outcome 3, Systemic Factors: Case Review (Item 20), Notice to Caregivers (Item 24), Array of Services (Item 29), Individualizing Services (Item 30), Diligent Recruitment of Foster and Adoptive Homes (Item 35)

**Strategy 1: Examine previous foster care providers and relative foster care providers for possible reopening of closed resource homes and expansion of relative foster homes.**

**Strategy 2: WV will develop standards and implement performance-based contracting to include the standards in order to improve the outcomes for foster care children.**

**Strategy 3: Increase foster parent notice of permanency hearings and engagement in the case work process.**

**Strategy 4: Identify needs and collaborate with agency partners, and courts, in the development of service availability and substance abuse services to improve outcomes for children and families.**

D137424

**Strategy 5: Improve staff's knowledge regarding available services to meet needs of families and children.**

*Strategy 1: Examine previous foster care providers and relative foster care providers for possible reopening of closed resource homes and expansion of relative foster homes.*

|  | Projected Completion dates: |
|---|---|
| 2.1.1 Each kinship/relative care provider will be directed to Mission WV to receive further information regarding the private agencies in their county or region that they deem would be the best fit for them. | Homefinding Supervisors Q1-8/ongoing |
| 2.1.2 Bureau for Children and Families Homefinding Specialists will discuss with appropriate kinship/relative care providers six months post-certification, to determine their interest in becoming traditional foster care providers and provide informational packets to those who are interested. | Program manager over Licensing/Bureau for Children and Families Executive Team/Homefinding Supervisors Q2-8/ongoing |
| 2.1.3 Transition appropriate and willing certified kinship/relative care providers to traditional foster care providers.<br>• Provider information packets regarding child placing agencies and the process of transitions to kinship/relative providers who have expressed interest in becoming traditional resource homes<br>• Replicate initiative from Region IV to build rapport and relationships with child placing agencies to ensure successful transition from kinship/relative to traditional resource homes<br>• Bureau for Children and Families Homefinding Specialists to follow-up monthly with kinship/relative providers to provide support during the transition process until it is completed. | Homefinding Supervisors/Specialists Q2-8/ongoing |
| 2.1.4 Replicate initiative in region IV to ensure the transition from kinship/relative to traditional foster care providers is a smooth and successful transition. | Homefinding Supervisors/Bureau for Children and Families Executive Team Q1-8/ongoing |

45

D137425

|  | Projected Completion dates: |
|---|---|
| 2.1.5 Bureau for Children and Families will provide to the WV legislature a study of kinship/relative foster care homes as required by WV House Bill 2010. The study will include:<br>• A review of best practices in other states;<br>• Proposal for an alternative system of regulation for kinship/relative foster care that included the same reimbursement as other foster care families as well as a reasonable time period for obtaining certification; and,<br>• An evaluation of what training and supports are needed to ensure that kinship care homes are successful. | Commissioner/Policy Specialist<br>Q1 |

*Strategy 2: WV will develop standards and implement performance-based contracting to include the standards in order to improve the outcomes for foster care children.*

|  | Projected Completion dates: |
|---|---|
| 2.2.1 Bureau for Children and Families will enter data reporting performance-based contracts with agencies no later than December 2020 required by WV House Bill 2010. The performance-based contracts will require the following:<br>• safety outcomes;<br>• permanency outcomes;<br>• well-being outcomes;<br>• incentives earned;<br>• recruitment and retention of foster parents | Specialized Agencies/Program managers for licensing/licensing specialists/Policy/Deputy Commissioners over Field Operations<br><br>Q6/ongoing |
| 2.2.2 Meet bi-monthly with child placing agencies to have targeted conversations around available homes and children's need and supports.<br>• Child placing agencies will provide up-to-date lists of available homes<br>• Bureau for Children and Families staff will provide lists of children requiring current placement<br>• Child placing agencies and Bureau for Children and Families staff will work collaboratively to ensure placement for waiting and difficult to place children and youth | Child Placing Agencies/ Licensing Program Manager/ Regional Social Service Program Managers/ Policy Program Manager/ & Policy Specialist<br><br>Q3/Ongoing |

*Strategy 3: Increase foster parent notice of permanency hearings and engagement in the case work process.*

|  | Projected Completion dates: |
|---|---|
| 2.3.1 Select pilot counties for implementation of notice of hearings utilizing the percentage of notification of hearings being generated from FACTS. (Two low and two high generation rates) | Deputy Commissioners Q1 |
| 2.3.2 Review current policies and desk guides concerning notifications of hearings and modify as needed to meet expectations. | Policy Unit Q1 |
| 2.3.3 Meet with pilot counties to review policy, FACTS desk guides, the value of foster parents' engagement, and set expectations. Revise guides and policies if needed based upon practice and observations from the pilot counties. | Deputy Commissioners/ Regional Program Managers Q2 |
| 2.3.4 Conduct random sample of foster parents in pilot counties to determine if notification occurred. | Division of Planning and Quality Improvement Q3 & 4 |
| 2.3.5 Convene meetings with pilot counties to discuss quantitative data and qualitative impressions. | Deputy Commissioners/ Regional Program Managers Q4 |
| 2.3.6 Analyze and summarize data collected for discussion at Child Welfare Oversight and develop a plan to expand the project statewide, including training or policy or procedure revisions. | Office of Planning Research Evaluation/Commissioner Q5 |
| 2.3.7 Implement the notification process statewide | Commissioner Q8 |

47

D137427

|  | Projected Completion dates: |
|---|---|
| 2.3.8 Implement training for child welfare staff surrounding the importance, as well as the steps in building supportive relationships with foster parents by emphasizing the need to improve foster parent involvement and improving meaningful communication. Trainings will be provided in each county or district, by the specialized/private agency trainers. (The private foster care agencies have developed a training curriculum for child welfare staff based on the barriers as they have been identified by foster parents. This curriculum has been approved by Bureau for Children and Families and is waiting implementation in the field by the private agencies. The agencies will report to Bureau for Children and Families when all counties/districts have received the foster parent training. (Training began in each county/district in April 2019) Community service managers/regional directors are responsible for scheduling their counties/districts with the agencies for implementation. Private/specialized child placing agencies are responsible for monitoring the training and reporting to Bureau for Children and Families the counties/districts which have received the foster parent training as training is completed. | RD/Community Services Managers/Specialized Foster Care Agencies Q1-Q3 |
| 2.3.9 Bureau for Children and Families training division has been given the training curriculum and will implement this training in new child welfare worker training for newly hired staff to ensure that all workers understand how to build supportive relationships with foster parents and understand how to effectively communicate and incorporate foster parents in the process as well. | Director of Training Q1/ongoing |

*Strategy 4: Identify needs and collaborate with agency partners, and courts, in the development of service availability and substance abuse services to improve outcomes for children and families*

|  | Projected Completion dates: |
|---|---|
| 2.4.1 Partner with the Capacity Building Center to develop a Service Array map of available substance abuse services throughout the state (utilizing work of the DHHR, Bureau for Behavioral Health (ranking)), and what barriers exist. Map development completed and will include:<br>• Identify type of services needed<br>• Barriers for substance abuse services are identified | Community Partnership Program Manager/Service Array Workgroup Q1 |

D137428

| | Projected Completion dates: |
|---|---|
| 2.4.2 Service Array Workgroup will meet at least monthly to collect information to develop map of service availability. | Community Partnership Program Manager Q1-8 |
| 2.4.3 WV DHHR will develop and execute a formal statewide communication plan that will include all DHHR Bureaus (and others as needed) to improve cross-system service provision (identifying service availability, accessibility, barriers, and service development).<br><br>The Child Welfare Reform Oversight Team will include Commissioner's or Deputy Commissioners or proxy's with decision making authority from all the DHHR Bureaus. | Community Partnership Program Manager/Bureau for Children and Families Executive Team Q4/Ongoing |
| 2.4.3 a. Memorandum of Understanding between DHHR and Community Collaborative Groups | Management Team (DHHR Bureau's)<br><br>Community Partnership Program Community Collaboratives Members/Division of Planning and Quality Improvement Q4 |
| 2.4.3 b. Standardize communication process that:<br>• Provides for input from community partners and feedback from Child Welfare Oversight (i.e., Community Collaborative Group reports for evaluation of service development and expansion and Division of Planning and Quality Improvement reports).<br>• Community Collaboratives include system partners that can address issues in: Economic/Poverty; Child Safety & Wellbeing; and Alcohol, Tobacco, Drug Abuse.<br>• Applies Service Identification and Needs Map when developing new services. | Management Team (DHHR Bureau's)<br><br>Community Partnership Program Community Collaboratives Members/ Division of Planning and Quality Improvement Q4 |

D137429

| | Projected Completion dates: |
|---|---|
| 2.4.4 The Service Communication Plan will include:<br>• Regional Summits (with oversight/attended by the Regional Directors) will address children placed out of home and provide data on service gaps (including Division of Planning and Quality Improvement) to the Community Collaboratives;<br>• The Community Collaboratives (with oversight/attended by the Community Service Managers) will address service needs and gaps and provide two reports annually to the Community Partnership Program;<br>• The Community Partnership Program will be provided the Community Collaborative Reports on service availability and needs from the Community Collaboratives and provide to the Bureau for Children and Families Commissioner;<br>• The Bureau for Children and Families Commissioner will take information to the DHHR Child Welfare Reform Oversight meeting to discuss gaps in services.  The DHHR Child Welfare Reform Oversight will discuss and address service gaps and provide information back to the Community Partnership Program;<br>• The Community Partnership Program will disseminate information on service development to the Community Collaboratives and DHHR staff.<br><br>* The Family Resource Networks will be members of the Community Collaboratives and will provide service availability and service needs to their Community Collaborative and update the electronic Service Directory. | Bureau for Children and Families Commissioner<br><br>All DHHR Bureau Commissioners<br><br>Community Partnership Program<br><br>Regional Directors<br><br>Community Service Managers<br><br>Ongoing |
| 2.4.5 Develop and implement Family Treatment Courts in five counties across West Virginia. | Supreme Court of Appeals/ Division of Probation Services/ Bureau for Children and Families Q1-Ongoing |
| 2.4.5a Selection of Family Treatment Court counties (Boone, Ohio, Roane, Randolph, and Nicholas) | Supreme Court of Appeals/ Division of Probation Services/ Bureau for Children and Families Completed |

D137430

|  | Projected Completion dates: |
|---|---|
| 2.4.5b Develop the Family Treatment Court policy and procedures manual including development of a data collection tool. | Family Treatment Court State Advisory Committee Completed |
| 2.4.5c Hire local Family Treatment Court Coordinators and CPS workers in the five pilot counties. | Director of Probation Services/Deputy Commissioners Q1 |
| 2.4.5d Complete training for the county specific treatment team on Family Treatment Court. | Division of Probation Services/Family Treatment Court State Coordinator Q1 |
| 2.4.5e Complete training for Bureau for Children and Families staff on Family Treatment Court model. | Division of Probation Services/Family Treatment Court State Coordinator Q1 |
| 2.4.5f Complete training on Family Treatment Court model as needed and requested in the five pilot counties. | Division of Probation Services/Family Treatment Court State Coordinator Ongoing |
| 2.4.5g Implement the Family Treatment Court model in the five pilot counties. | Division of Probation Services/Family Treatment Court State Coordinator Q2 |
| 2.4.5h Local case coordinators collect information on the data collection tool which is monitored by the Family Treatment Court State Coordinator and the grantors for fidelity with the policy and procedures manual as well as outcomes. | Division of Probation Services/Family Treatment Court State Coordinator/Family Treatment Court Advisory Committee Q2/ongoing |

51

|  | Projected Completion dates: |
|---|---|
| 2.4.5i CPS supervisors will communicate with Family Treatment Court CPS workers to monitor fidelity to the Family Treatment Court model policy and procedures manual. | CPS Supervisors Q2/ongoing |
| 2.4.5j Family Treatment Court State Advisory Committee receives data and information on the program and will make adjustments as necessary. | Family Treatment Court State Advisory Committee Q2/ongoing |
| 2.4.5k Family Treatment Court Data Committee will evaluate data and information on the program | CIP/Family Treatment Court Data Committee Q5/ongoing |

*Strategy 5: Improve staff's knowledge regarding available services to meet needs of families and children.*

|  | Projected Completion dates: |
|---|---|
| 2.5.1 West Virginia will partner with the Family Resource Networks to provide Service Directories of available services on the FRN website that can be accessed by all DHHR staff and stakeholders. The electronic directories will be updated annually (per current Contract). | Community Partnership Program Manager Q4<br><br>Family Resource Network Directors |
| 2.5.2 Add link on the BUREAU FOR CHILDREN AND FAMILY's website to the FRN directory of available services.<br><br>http://wvfrn.org/counties/ | Assistant Commissioner Office of Planning Research and Evaluation<br><br>Community Partnership Program Manager Q4 |

D137432

| | Projected Completion dates: |
|---|---|
| 2.5.3 Provide information on accessing website for Service Resource Directories and notice of new resources to DHHR staff and community stakeholders via e-mail; DHHR News/Facebook; Announcements to staff; and Community Collaborative Group meetings.<br><br>New Worker Training will include information on accessing website for Service Resource Directories.<br><br>1. The Community Partnership will send e-mail messages to the Commissioner, Deputy Commissioners, Regional Directors, Office Directors, Regional Program Managers, Child Welfare Consultants, Child Protective Services Supervisors, Child Protective Services Workers, Social Services Coordinators, Youth Services Supervisors and Youth Services Workers, Division of Training Trainers and Program Managers;<br><br>2. The Community Partnership will send e-mail messages regarding available services to the Director of Social Services to provide at Supervisors meetings who will then discuss at staff meetings. | Community Partnership Program Manager Q4<br><br>Family Resource Network Directors<br><br>Director of Social Services<br><br>Social Service Supervisors<br><br>Director of Training Q4 |

## Changing How We Support Families Through Positive Supervision
## Root Cause Analysis:

Safety Outcome 1- (Timeliness of initiating investigations of reports of child maltreatment) CFSR and Division of Planning and Quality Improvement case reviews indicate alleged victims on child maltreatment reports accepted for further assessment are not being seen within designated timeframes. WV rated 56% strength on meeting assigned time frames on accepted referrals. The data supports that caseworkers are much less likely to meet this time frame if the family has an ongoing child welfare case open. Of the timeframes met, 73% were met on intakes on family's unknown to the agency versus 26% of referrals on already open cases.

Division of Planning and Quality Improvement case review data indicates the measurement for CFSR Item 1 has steadily decreased over the last four FFYs as indicated by the chart below. The FFY 2018 data indicates the agency is meeting the

53

assigned timeframes for face to face contact with alleged child victims 55.56% of the time as indicated in the chart below.



Division of Planning and Quality Improvement case review data FFY 2015-2018



Division of Planning and Quality Improvement case review data FFY 2018

Also, of concern is the rise in the number of accepted new child maltreatment reports versus the percentage of child maltreatment substantiations. The current referral acceptance is based on WV Code and policy and is 66% for the 2018 calendar year while the child maltreatment substantiation rate is 18% for the same time period. Further analysis is needed regarding the new referral acceptance rate versus the substantiation rate of child maltreatment on new intakes.

D137434

Focus groups were conducted by the Capacity Building Center for States with field staff, supervisors, and management staff. Division of Planning and Quality Improvement staff interview case managers during the case review process. The qualitative data gathered through both processes indicates child safety is not driving how case managers prioritize their work. Court involved cases receive highest priority due to court oversight. High caseloads and backlog of referrals are also indicated to impact the quality of case management provided. Workers state concern for the safety of children remaining in the family homes while indicating an inability to maintain regular contact with these families. There was strong commentary from case managers regarding supervisory support, availability, and accountability. Supervisors reported a need for better tracking of intakes in order to ensure timeframes are met. Focus group participants raised concerns about Centralize Intake, specifically the quality of intake documentation, the appropriateness of screening decisions, and duplicate client identification numbers for the same child.

Safety Item 3 – (Risk and safety assessment and management) CFSR data reflects Item 3 a strength at 42% overall with 53% for foster care and 24% for in-home cases. Division of Planning and Quality Improvement case review data findings indicate a lack of improvement in level of achievement on Safety Outcome 2 when CFSR data and federal fiscal year 2018 are compared. During FFY 2018 Division of Planning and Quality Improvement data reflects strength in 28% of cases reviewed overall, with 45% strength in foster care cases and 10% strength for in-home cases. The failure to have regular face to face contact with families and children negatively impacts the ability to assess and address safety concerns. Case reviews indicate that in many instances the agency fails to develop safety plans in a timely manner that adequately address identified safety threats in the home. The safety plans are not reviewed regularly or updated as circumstances in the case warrant.

Focus group participants reported they are documenting less. Participants stated they are not receiving feedback on the quality of the documentation they complete. They also said that although they are encouraged by supervisors to enter contacts in the electronic case record, they receive no direction on entering documentation.

D137435

While most children in placement entered foster care to ensure their safety, Division of Planning and Quality Improvement case reviews find child welfare staff are missing opportunities to impact family risks before they become safety threats necessitating removal. In-home safety plans are often not adequate to control the factors negatively impacting child safety. The plans often rely solely on formal services that are used due to availability and are not designed to address the identified safety concerns. In addition, the safety plans are often not implemented timely or monitored and updated as circumstances within the family change.

**Goal 3: Transforming the culture of child welfare management to increase competency, skill and accountability of our child welfare practice.**
Safety Outcome 1, Safety Outcome 2, Permanency Outcome 1, Permanency Outcome 2, Well-Being Outcome 1, Systemic Factors: Statewide Information System (Item 19), Case Review (Item 20)

**Strategy 1: Empower supervisors to act as change agents through reflective supervision.**

**Strategy 2: Increase supervisor and manager skills through ongoing training and peer support to address their ability to support staff and provide direct supervision.**

**Strategy 3: Creating structure and accountability to support supervisors to ensure that face to face contact with alleged child victims will occur timely.**

**Strategy 4: Creating structures to support staff so face to face, meaningful monthly contact, visits with families and children will occur.**

**Strategy 5: Bureau for Children and Families will provide support to supervisors to ensure risk and safety assessments are adequate initially and on an ongoing basis throughout the life of the case.**

D137436

*Strategy 1: Empower supervisors to act as change agents through reflective supervision.*

|  | Projected Completion dates: |
|---|---|
| 3.1.1 Utilize the reflective supervision survey results to identify strengths and barriers of use of reflective supervision. | Recruitment & Retention Committee Q1 |
| 3.1.2 Partner with Casey Family Programs to revitalize the reflective supervision model through training and technical support. | Director of Training Q1/ Ongoing |
| 3.1.3 Revise Standard Operating Procedures and the documentation form based on information from the surveys to improve reflective supervision. | Director of Training / Recruitment & Retention Committee Q2 |
| 3.1.4 Partner with Social Work Education Consortium to develop on-line (blackboard) initial training for new supervisors. | Director of Training/ Recruitment & Retention Committee Q2 |
| 3.1.5 Partner with Casey to provide ongoing training to tenured supervisors on reflective supervision including dealing with sensitive topics like secondary trauma and work/life balance and on time management to incorporate reflective supervision into ongoing practice, as well as other barriers identified in surveys, two times per year. | Director of Training/ Recruitment & Retention Committee Q1 |
| 3.1.6 Conduct peer to peer learning opportunities between multiple districts, reviewing case narratives and scenarios, to build skills using reflective supervision, two times per year. | Director of Training/ Recruitment & Retention Committee Q3 |

*Strategy 2: Increase supervisor and manager skills through ongoing training and peer support to address their ability to support staff and provide direct supervision.*

|  | Projected Completion dates: |
|---|---|
| 3.2.1 All child welfare supervisors and managers who have been in their positions over one year and have not attended the Putting the Pieces Together new supervisor training since January 2017 will attend a modified version of Putting the Pieces Together new supervisor training that eliminates the sections only relevant to new supervisors and modifies other sections as necessary. | Director of Training Commissioner Q2 |

D137437

|  | Projected Completion dates: |
|---|---|
| 3.2.2 Implement a peer review program to gather supervisors together to do case reviews between districts, two times per year. Supervisors will review redacted cases do an analysis of casework performed including decisions made and adherence to policy. Peer reviews will be conducted as part of the agenda at existing regional and statewide meetings | Commissioner Q2 |
| 3.2.3 Provide structured ongoing supervisor training through regional supervisor meetings and manager meetings, four times per year. This training will be coordinated with existing regional and statewide meetings, with common agendas and topics for all the meetings. CEUs will be provided as appropriate to help supervisors meet licensure requirements. | Director of Training Q2/ongoing |

*Strategy 3: Creating structure and accountability to support supervisors to ensure that face to face contact with alleged child victims will occur timely.*

|  | Projected Completion dates: |
|---|---|
| 3.3.1 A Standard Operating Procedure will be developed to:<br>  a. instruct supervisors on how to log, assign and track accepted referrals on both new and ongoing cases.<br>  b. communicating the assignment between supervisor and worker<br>  c. track referrals to ensure time frames are met.<br>  d. create tool to track referrals assigned and timeframe assigned<br>  e. guide weekly planning meetings between workers and supervisors; supervisors and Community Services Managers and RD's.<br>  f. describe use of COGNOS reports to aid in ensuring documentation of contacts have occurred.<br>  g. Assessment of missed contacts versus caseload and development of action plans. | Meaningful Contact Group Q1 |
| 3.3.2 Commissioner will release a memo to inform Regional Directors, Community Services Managers, Social Services Coordinators, and workers of the revised Standard Operating Procedures. The Procedures, tracking tool and instructions will be distributed to supervisors and Community Services Managers. | Commissioner Q2 |

58

|  | Projected Completion dates: |
|---|---|
| 3.3.3 Regional Directors will discuss plans for action at Child Welfare Oversight meetings. | Regional Directors<br>Q4 |

*Strategy 4: Creating structures to support staff so face to face, meaningful monthly contact, visits with families and children will occur*

|  | Projected Completion dates: |
|---|---|
| 3.4.1 Meaningful contact guide will be revised to give examples of meaningful contacts and how to document those contacts.<br>   a.  Meaningful contact guide will be distributed by supervisors to staff<br>   b.  Instructions where to document in FACTS | Meaningful Contact Workgroup/Supervisors<br>Q1 |
| 3.4.2 The guide and expectations will be discussed and explained at the regional Social Service Supervisor meetings and regional Community Services Managers meetings. | Regional Program Managers<br>Q1 |
| 3.4.3 At each monthly unit meeting, Supervisors will discuss meaningful contacts and cases that have not had contact for the month. | Supervisors<br>Q2-Ongoing |
| 3.4.4 During monthly reflective supervision supervisors will discuss cases with contact for the month as well as cases that have had no contact. | Workers/Supervisors<br>Q2-Ongoing |
| 3.4.5 Community Services Managers will receive the report from Supervisor and will discuss plan for cases who have not had contact the previous month and review plan for addressing contacts missed. | Community Services Managers /Supervisor<br>Q2 |
| 3.4.6 Community Services Managers to Regional Directors with ideas/solutions to make visits to children and parents. | Community Services Managers /Regional Directors<br>Q2 |
| 3.4.7 Regional Directors will inform Deputy Commissioners of ideas/solutions | RDs<br>Q2 |
| 3.4.7 Child Welfare Oversight Committee will receive report and discuss successful implementations as well as address barriers to making face to face contact with children and families. | Child Welfare Oversight<br>Q2 |
| 3.4.8 Regional Directors will inform supervisors of Child Welfare Oversight actions/suggestions, supervisors will inform workers of Child Welfare Oversight action/suggestions | Child Welfare Oversight /Regional Directors/Supervisors<br>Q2 |

59

D137439

*Strategy 5: BCF will provide support to supervisors to ensure risk and safety assessments are adequate initially and on an ongoing basis throughout the life of the case.*

| | Projected Completion dates: |
|---|---|
| 3.5.1 Refresher training for all workers on safety planning emphasizing the control of safety threats. | Director of Training Q2 |
| 3.5.2 Advanced safety planning training for all supervisors to make them proficient in guiding workers to effective safety planning. | Director of Training Q2 |
| 3.5.3 A Standard Operating Procedure for supervisory case review will be developed to:<br>a. Implement case review tool on SharePoint to capture whether safety plans are current, case plans completed, at least monthly contact is occurring, MDT's are occurring, current permanency plans, etc.<br>b. instruct supervisors on how to perform case reviews and document on tool.<br>c. instruct how to use the information gathered to guide monthly supervisory meetings with workers.<br>d. Direct use of information to PMs, CSMs, RDs and Deputy Commissioners to guide best practice.<br>e. Assist districts in developing action plans as needed | Meaningful Contact Group Q1 |
| 3.5.4 Standard Operating Procedure for supervisory case review will be distributed via email and discussed during Regional Supervisor meeting. | Deputy Commissioners/ Regional Program Managers Q2 |
| 3.5.5 Supervisors will be monitoring ongoing risk and safety assessments utilizing case review tool as per 3.5.3. | Supervisors Q3 |
| 3.5.6 Supervisors will monitor quality of ongoing safety assessments and ensure safety is being assessed for all the children in the home utilizing case review tool as per 3.5.3. | Supervisors Q3 |
| 3.5.7 During monthly reflective supervision supervisors will discuss the information gathered from the case reviews. | Supervisors Q3 |

**Creating an Efficient, Effective, and Prevention-Focused System:**

**Root Cause Analysis**

D137440

Well-Being Outcome 1 (families have enhanced capacity to provide for their children's needs) is measured by performance on Items 12 (Needs and services of child, parents, and foster parents), 13 (Child and parent involvement in case planning), 14 (Caseworker visits with child), and 15 (Caseworker visits with parents) on the 2016 Federal CFSR Onsite Review Instrument. During CFSR 26% of the cases reviewed were substantially achieved. Division of Planning and Quality Improvement case review data found that during federal fiscal year 2018 Well-Being Outcome 1 was substantially achieved in 12% of the cases reviewed. Rating decreases were observed during FFY 2018 in all four CFSR items related to Well-Being Outcome 1 when compared to CFSR data. Review data indicates placement cases scored higher on the measure than in-home cases. The difference is concerning because the trends show how substantially lower the outcome is for in-home versus placement cases. MDT and court oversight of the case has a positive impact on placement cases in relation to Well-Being Outcome 1. The inability to have frequent and quality contacts with children and parents by caseworkers has a direct impact on Well-Being Outcome 1. The following charts indicates quality and frequency of contact with children and parents (CFSR Items 14 and 15) during FFY 2018 based upon Division of Planning and Quality Improvement case reviews.



Division of Planning and Quality Improvement case review FFY 2018

D137441



Division of Planning and Quality Improvement case reviews FFY 2018

Qualitative data gathered from focus groups of caseworkers, supervisors, and management staff conducted by the Capacity Building Center for States indicate court involved cases receive the highest priority. Staff also discussed having large caseload, long distances to travel for home visits, and lack of supervisor support and oversight as impacting the quality of case management activities. There is a general sense of helplessness and eventuality. Division of Planning and Quality Improvement case reviews show similar findings from caseworker and supervisor interviews. Caseworkers reported that there are cases that could be closed but staff do not have the time to make the visits and do the paperwork to close the cases. "For non-custody cases, we have cases where families haven't been seen in months, but we don't have time to close them." Other reasons for lack of contacts with families and children reported by caseworkers were lack of parents' cooperation, parents being considered a lowercase management priority ("on the backburner"), and a tendency to work with parents who are "doing well".

Staff feel that they understand what a quality visit is and how to complete quality documentation; however, neither is emphasized in practice. The message that staff receive is to do the bare minimum to get off the "naughty list." Often times, caseworkers are not aware of the gaps in their visits with families until they are shown the data. Using the data, setting goals and monitoring them would help increase performance per focus group participants.

62

In July 2014, WV established a centralized intake system. Statewide implementation was phased in starting in July 2014 with full statewide implementation by February 2015. The COGNOS Statewide Referrals report indicates the number of intakes received and the number assigned were higher in 2018 than in previous years. During Division of Planning and Quality Improvement case reviews staff often voice concerns about the quality of the intakes received and the volume accepted. The threshold analysis of Centralized Intake may assist agency leaders in determining how to best ensure accepted reports are meeting investigative criteria while also determining how to best meet the needs of families when reports are made which do not meet investigative criteria but there are factors needed prevention/community services.

**Goal 4: Increase effectiveness and efficiency and create a prevention-focused organizational culture in order to ensure the needs of children and families are addressed throughout the life of the case.**
Safety Outcome 1, Well-Being Outcome 1

**Strategy 1: CQI of Centralized Intake and a threshold screening analysis to further inform the Bureau for Children and Families screening and intake process.**

**Strategy 2: Safely close cases that have had no contact and develop and support practice to ensure backlog does not re-occur.**

*Strategy 1: CQI of Centralized Intake and a threshold screening analysis to further inform the Bureau for Children and Families screening and intake process.*

| | Projected Completion dates: |
|---|---|
| 4.1.1 Threshold analysis-number of duplicate intakes on the same family/child accepted/assigned and appropriateness of screening. Effectiveness of intake process intakes versus recidivism rate. | Centralize Intake Director/Deputy Commissioner over Field Operations/ Capacity Center for States Q1 |

63

| | Projected Completion dates: |
|---|---|
| 4.1.2 Analyze data from Division of Planning and Quality Improvement reviews to determine themes and to highlight notable patterns. | Deputy Commissioners over Field Operations/ Division of Planning and Quality Improvement / Assistant Commissioner over Office of Planning, Research and Evaluation Q1 |
| 4.1.3 Review the analysis of the data and make recommendations to the executive Team. | Centralized intake oversight team. |
| 4.1.4 Leadership will make decisions based on recommendations including alternative response and assigning intakes. Implementation decisions will be based on the ability of the agency to implement according to WV Code. This may include recommendations to the WV legislature. | Bureau for Children and Families Executive Team Q2 |

Strategy 2:   Safely close cases that have had no contact and develop and support practice to ensure backlog does not re-occur.

| | Projected Completion dates: |
|---|---|
| 4.2.1 Data will be collected and reviewed on number of cases (Court, Non-Court and YS) that have not had contact. | FACTS data representative Q1 |
| 4.2.2 Develop Standard Operating Procedures for closure of cases using providers. | Deputy Commissioners over Field Operations Q1 |
| 4.2.3 Develop Standard Operating Procedures for administrative closure of cases with no contact when a provider is not available. | Deputy Commissioners over Field Operations Q1 |
| 4.2.4 Executive committee will review and approve the Standard Operating Procedures. | Bureau for Children and Families Executive Committee Q2 |

D137444

|  | Projected Completion dates: |
|---|---|
| 4.2.5 Implement the case closure process developed in 4.2.2. | Deputy Commissioners over Field Operations Q4 |
| 4.2.6 Monthly Supervisory Conferences will include discussing caseload and determine case status for closure. As a part of the monthly conference, the worker and supervisor will discuss case progress and need for continued case management or case closure. | Supervisors Q4-Ongoing |
| 4.2.7 Develop Standard Operating Procedures a formal process for case transfer/closure when staff resign or are on extended leave. | Deputy Commissioners over Field Operations Q6 |
| 4.2.8 Expand the use of case coordinators to assist with case closures. | Supervisors Q6-Ongoing |

65