# Exhibit 15

Page 1

1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
2                  HUNTINGTON DIVISION
3    _____
     Jonathan R., minor, by Next    :
4    Friend, Sarah Dixon, et al.,   :
                                    :
5         Plaintiffs,               :  Class Action
                                    :
6    v.                             :  3:19-cv-00710
                                    :
7    Jim Justice, in his official   :
     capacity as the Governor of    :
8    West Virginia, et al.,         :
                                    :
9         Defendants.               :
     ------------------------------
10
11       VIDEOCONFERENCE DEPOSITION OF ELSA POPCHAK
12   DATE:         October 16, 2020
13   TIME:         8:53 a.m. to 11:50 a.m.
14   LOCATION:     Witness Location
15
16   REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
              Veritext Legal Solutions
21         1250 Eye Street, N.W., Suite 350
                Washington, D.C. 20005
22

Page 22

1  (Popchak Deposition Exhibit Number 1
2  marked for identification.)
3  BY MR. PEISCH:
4      Q   Okay.  I'm going to turn your
5  attention to what I believe is a 456-page entitled,
6  "Child Welfare Case Review Expert Opinion of Susan
7  Getman, Janet Flory, & Elsa Popchak."
8      Do you have that document in front of
9  you?
10     A   Yes.
11     Q   And what is this document?
12     A   This is the report that we prepared
13  for this proceeding.
14     Q   When were you hired by plaintiffs'
15  counsel in this case?
16     A   I was hired the last day of April of
17  2020.
18     Q   And when did you start work on this
19  report?
20     A   That same -- that same time.
21  Probably the last Friday, I believe it was, in
22  April.  I'm sorry, I don't know the exact date.

Page 23

1      Q   No, that's all right.
2          Can you estimate how many hours you
3  spent working on the report?
4      A   On the report --
5      Q   Both -- I'm sorry, both, everything,
6  so reviewing the case files, writing the report,
7  consulting with your colleagues.
8      A   Sorry.  My math is not -- I know that
9  on the -- each individual case was approximately
10  120 hours was the average for each case that I
11  reviewed of the three, and then probably another 80
12  hours working on the summary, between the three of
13  us.
14     Q   A lot of hours?
15     A   A lot of hours.
16     Q   And when did you finish your work on
17  the report?
18     A   I finished my work probably about the
19  third week, second week, third week of August of
20  2020.
21     Q   Okay.  And other than your
22  co-authors, did anyone assist you in writing the

Page 24

1  report?
2      A   No.
3      Q   Did anyone assist you in reviewing
4  the case files?
5      A   No.
6      Q   Did anyone assist you with any other
7  research relating to the report?
8      A   No.
9      Q   Which parts of the report did you
10  write?
11     A   Of the overall report, the whole
12  binder?
13     Q   Yes.
14     A   I'm sorry.  I was --
15     Q   No, that's okay.  That's okay.  Yeah,
16  absolutely.
17     A   I was responsible for the cases of
18  Jonathan R., Ace L., and Gretchen C.  And then
19  worked collaboratively with Susan Getman and Jan
20  Flory on the executive summary.
21     Q   Did you read all the papers of all of
22  the case files of Ace?

Page 25

1      A   Everything that was presented to me,
2  yes.
3      Q   Same for Gretchen?
4      A   Yes.
5      Q   And same for Jonathan?
6      A   Yes.
7      Q   By the way, you have a cute cat in
8  the background.
9      A   Oh, I'm so sorry.
10     Q   No, that's fine.  We have -- one of
11  our colleagues has a -- one of our colleagues has a
12  cat that climbs on the desk during calls, so I am
13  totally used to it.
14     A   I'm sorry.  He's the one that can't
15  get up to the -- he's a little on the chubby side.
16     Q   Okay.
17     A   But there are some that potentially
18  could.
19     Q   Well, no problem if he or she does.
20     A   I'm sorry.
21     Q   No, no, no, not at all.
22         What was your assignment in drafting

7 (Pages 22 - 25)

Page 30

1 was a different acronym used in one of the reports
2 that I was writing and it was in reference to a
3 multidisciplinary team that takes place through
4 juvenile court.
5     Q   Okay. Did you review any of the DHHR
6 training materials?
7     A   No, I did not.
8     Q   Did you review any ACF reports
9 relating to West Virginia's child welfare system?
10     A   No, I did not.
11     Q   Did you review any data relating to
12 West Virginia's child welfare system?
13     A   No, I did not.
14     Q   Did you review the 2019 Kinship
15 Strengths Assessment?
16     A   No, I did not.
17     Q   When you wrote the report, were you
18 aware that West Virginia had a kinship navigator
19 program?
20     A   No.
21     Q   Did you read West Virginia's
22 Memorandum of Understanding with the U.S.

Page 31

1 Department of Justice?
2     A   No.
3     Q   Were you aware when you wrote the
4 report that West Virginia had a Memorandum of
5 Understanding with the U.S. Department of Justice?
6     A   No, I did not.
7     Q   When you wrote --
8     A   I'm sorry. Can I make one very fast
9 break? I have one cat attacking another cat.
10     Q   Yes. Absolutely. Let's come back in
11 five minutes.
12     A   Literally one minute.
13     Q   We'll just stay on. That's fine.
14 Take your time. No rush.
15     A   I am so sorry.
16     Q   Not a problem at all. I have had
17 plenty of calls interrupted by toddlers wandering
18 in, crying, and my dog barking, so I --
19     A   One cat was attacking another cat,
20 which they normally do not do.
21     Q   Yeah. Okay. So did you review
22 any -- I'm sorry. Strike that.

Page 32

1       When you reviewed the cases and
2 produced your report, were you aware that West
3 Virginia had implemented a managed-care program for
4 healthcare delivery services for foster children?
5     A   No, I did not.
6     Q   Did you review any of the transcripts
7 of the depositions in this case?
8     A   I don't -- no. I don't know what you
9 mean "transcripts of depositions".
10     Q   Oh, okay. That's fine.
11     A   I'm sorry.
12     Q   No, that's fine.
13       So your review was primarily focused
14 on just the case file documents, other than
15 reviewing briefly a few policies here and there.
16 Is that an accurate description?
17     A   Yes, it is.
18     Q   Okay. I'd like to ask you about a
19 few specific statements in the expert report. And
20 mostly just some clarifying questions. So I'm
21 going to ask you to turn to a couple of pages. So
22 first, if you could turn to page 1.

Page 33

1     A   Okay.
2     Q   So the first paragraph, the last
3 sentence of the first paragraph reads, "Such a
4 review of West Virginia Department of Health and
5 Human Resources cases provides a snapshot of
6 practice patterns that adhere neither to DHHR's own
7 policies, nor to reasonable professional standards
8 in the child welfare system field."
9       Do you see that?
10     A   Yes.
11     Q   And then further down on page 1,
12 under methodology --
13     A   Yes.
14     Q   -- it says, "After conducting
15 extensive reviews of the DHHR cases of the nine
16 plaintiffs children, the expert reviewers
17 collaborated to identify the practice patterns and
18 themes of concern across the reviewed cases."
19       Do you see that?
20     A   Yes.
21     Q   So the practice patterns identified
22 in this expert report, they're only practice

9 (Pages 30 - 33)

Page 34

1  patterns with respect to the nine named plaintiffs.
2  Is that correct?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  Yes.  That is what we
5  were asked to look at, was the nine cases.
6  BY MR. PEISCH:
7      Q   You didn't find any patterns that
8  applied to -- across the foster care program to all
9  7,000 children, did you?
10         MS. MAHONEY:  Objection.
11         THE WITNESS:  We were only asked to
12 look at these specific cases.
13 BY MR. PEISCH:
14     Q   Okay.  You mentioned this earlier,
15 but can you describe the process for how the
16 executive summary was written?
17     A   In reading the -- in reading each of
18 the cases, each of us started to outline or make
19 notes of things that we saw that we noticed in our
20 cases as we were reading the documents and writing
21 our reports.
22         From there, we would have

Page 35

1  conversations with each other, meaning Ms. Flory,
2  Ms. Getman, and myself.  We would have
3  conversations and we would say, "Oh, yeah, and such
4  and such, I saw this happening.  And in this one, I
5  saw this happening."  And from there, we developed
6  a chart that started listing out each of the themes
7  that we saw.  And they were very prevalent types of
8  things that were, in my professional opinion,
9  fairly basic types of things as well.
10     Q   And did one person take the lead in
11 drafting the whole executive summary or did you
12 each do sections?
13     A   Each of us took shots at sections,
14 and then we kind of collaborated and sent things
15 back and forth with each other.
16     Q   Did plaintiffs' counsel make any
17 edits to the executive summary?
18         MS. MAHONEY:  Objection.
19         THE WITNESS:  I would say mostly from
20 my end, or my point of view, grammatical and
21 technical kinds of things.  But grammatical, the
22 cleaning up and making sure it looked pretty.

Page 36

1          MS. MAHONEY:  And I'm going to
2  instruct the witness to not disclose any
3  conversations that happened with counsel --
4          THE WITNESS:  Okay --
5          MS. MAHONEY:  -- in relation to
6  regarding drafts.
7  BY MR. PEISCH:
8      Q   Did you take the lead in drafting the
9  permanency section of the executive summary?
10     A   Yes.
11     Q   And did the permanency section
12 reflect a summary of the totality of you and your
13 colleagues' views on permanency issues that you
14 identified in the nine named cases?
15     A   In the nine cases, correct.
16     Q   All right.  I would like to turn your
17 attention to a sentence on page 5.  So could you
18 turn to page 5?
19     A   Yes.
20     Q   Okay.  So on page 5 -- and this is
21 not in the -- this is not in the permanency
22 section, so I'm going back to -- I apologize for

Page 37

1  jumping around a little bit here.
2          So under Subheading A, the second
3  sentence of that paragraph reads -- or I'm going to
4  read two sentences, "This total lack of critical
5  thinking and analysis is especially evident in the
6  cases of the Serena S. and Theo S.  For them,
7  DHHR's gravely in-completed investigation and
8  family functioning assessments were further
9  compromised by confirmation bias of DHHR workers
10 and supervisors, which materialized through their
11 inaction as they adopted an unchallenged set of
12 beliefs that formed at the onset of services."
13         Do you see that --
14     A   Yes.
15     Q   -- those two sentences?
16     A   Yes.
17     Q   Okay.  You did not write those
18 sentences, correct?
19     A   No, I did not.
20     Q   And given that you didn't review the
21 case files of Serena S. and Theo S., you don't
22 personally know whether those statements are true,

10 (Pages 34 - 37)

Page 62

1  some of the things that we talked about were
2  dealing with the types of training, the types of
3  supervisory guidance, the types of, you know, what
4  policies are there, specifically and how clear are
5  those policies and how are they're reflected, what
6  are the caseloads, what are the
7  worker-to-supervisor ratios, what are the overall
8  numbers that workers are dealing with.
9      Q    And what do you mean by these causes
10 are beyond the scope of this summary and review?
11     A    We were not -- we were hired to look
12 at these nine cases, and from these cases that we
13 looked at, we were able to kind of extrapolate an
14 overall picture of what we believe is happening
15 within the system.  It is a small sample.  We were
16 not there to make an overall judgment of all of
17 West Virginia's child welfare system.
18     Q    Okay.  All right.  Now might be a
19 good time for a break.  It's been a little bit over
20 an hour.
21     A    Not quite.
22     Q    Do you want to take maybe a

Page 63

1  ten-minute break and we'll reconvene at 10:10?
2         (Recess from 10:00 a.m. to 10:10 a.m.)
3  BY MR. PEISCH:
4      Q    I just want to ask you a couple of
5  follow-up questions.  Your conclusions in this
6  report are based only on the review of the nine
7  named plaintiffs, correct?
8      A    They are based on the cases that
9  were -- they are based on the cases that we
10 reviewed; however, the themes that we talk about
11 are things that I believe can apply to more than
12 just these nine cases.
13     Q    Did you conclude that the themes that
14 you talk about do apply in the West Virginia foster
15 care system be on the nine named plaintiffs?
16     A    Do I know factually that they apply?
17 No.  Do I believe that it is something that needs
18 further investigation and looking at, yes.
19     Q    Okay.  So you used the word
20 "extrapolate" before.  You didn't extrapolate
21 actual conclusions from the nine named plaintiffs
22 on the system, but reviewing the nine named

Page 64

1  plaintiffs gave you some areas that you would want
2  to know more about and follow up on.  Is that
3  right?
4      A    With the nine named plaintiffs --
5  man, I don't know what the heck is wrong with my
6  speaking.
7           With the nine named plaintiffs, we
8  were able to say, this is what we saw in these
9  cases.  And from there, based on -- that we saw
10 these things in all nine of these cases or in the
11 majority of the cases, we would then be able to
12 say, this is probably a bigger issue or a problem.
13     Q    So that's what I really want to drill
14 down on that.  I'm not sure I'm understanding.  Are
15 you making conclusions about the entire West
16 Virginia foster care system based on these nine
17 named plaintiffs?
18          MS. MAHONEY:  Objection.  Counsel,
19 the witness has testified that she was hired to
20 review the nine cases, and I just want to make note
21 that she was hired at the class certification
22 stage.

Page 65

1  BY MR. PEISCH:
2      Q    So I will repeat the question.  Are
3  you making conclusions -- in this expert report,
4  are you making conclusions about the entire West
5  Virginia foster care system or just the nine named
6  cases?
7      A    We make some specific conclusions on
8  the nine named cases that could be indicative of
9  the overall system.
10     Q    But just could be indicative, not
11 definitively -- you're not definitively concluding
12 that they do exist?
13          MS. MAHONEY:  Objection.  Asked and
14 answered.
15          THE WITNESS:  I don't know based upon
16 my limited review that they -- that these, in fact,
17 do exist.
18 BY MR. PEISCH:
19     Q    So I would like to switch gears to
20 something that -- well, it seemed that in your
21 report that there was some frustration with the
22 case file organization, I guess would be.  Is that

Page 66

1 correct to say?
2  A  Oh, that would be pretty correct,
3 yes.
4  Q  Okay. And I want to ask some
5 questions about that. In what format did you
6 review the case files?
7  A  It was an electronic format that was
8 provided to us.
9  Q  What was the name of that electronic
10 system?
11  A  Lexbe.
12  Q  Lexbe, like L-E-X-B-Y, something like
13 that?
14  A  L-E-X-B-E.
15  Q  Do you know if that's the same
16 electronic system that West Virginia caseworkers
17 review the case files in?
18  A  I believe that West Virginia provided
19 all of the files into the system, that they made
20 copies or whatever of all of their case files and
21 that that was put into the system for our review.
22  Q  And do you know --

Page 67

1  A  I don't know that fact.
2  Q  Do you know what the West Virginia
3 Families and Children Tracking System is, or the
4 FACTS system? You might have seen the acronym.
5  A  That's their computer system. That's
6 their SACWIS system.
7  Q  You did not review the case files in
8 the FACTS system, did you?
9  A  No, I did not. But we have printouts
10 of pages upon pages upon pages upon pages of
11 documentation from the FACTS system.
12  Q  But you didn't log in to FACTS and
13 look at the case files as they were organized in
14 FACTS?
15      MS. MAHONEY: Objection. The witness
16 didn't have access to FACTS. And the witness
17 viewed the documents as they were -- supposedly as
18 they were ordinarily kept.
19      THE WITNESS: We did not have access
20 to FACTS. And it is my understanding that the
21 documents were organized as a worker would look at
22 them.

Page 68

1 BY MR. PEISCH:
2  Q  So is it -- do you agree that there's
3 a difference between looking at printouts of a
4 screenshot and actually logging into a system and
5 looking at the records?
6      MS. MAHONEY: Objection. Calls for
7 speculation.
8      THE WITNESS: I'm kind of old school
9 and I would rather have a piece of paper in front
10 of me.
11 BY MR. PEISCH:
12  Q  You're not alone.
13  A  I actually sometimes believe it to be
14 easier to look at a printout of something.
15  Q  But are you aware that West Virginia
16 uses an electronic system for case files? Correct?
17  A  Every jurisdiction across the country
18 uses an electronic system.
19  Q  And you did not -- yeah. Okay.
20      Do you think it's possible that the
21 case -- well, let me ask it this way: Do you know
22 when a West Virginia caseworker logs in to FACTS,

Page 69

1 do you know how the documents are organized?
2  A  No, I do not.
3  Q  When a West Virginia caseworker logs
4 in to FACTS, do you know if they are organized
5 chronologically?
6  A  I do not.
7  Q  In your expert report, when you
8 expressed frustration with the case file
9 organization, let's say, is that frustration with
10 the case file organization as they were reviewed by
11 you?
12      MS. MAHONEY: Objection. Again, I
13 just want to note that Defendants were obligated to
14 produce these documents as they were ordinarily
15 kept and maintained.
16      MR. PEISCH: Is that -- how is that
17 an objection?
18      MS. MAHONEY: I'm making that note
19 for the record. I uphold the objection.
20      THE WITNESS: I would say -- I would
21 say that I have less issue with like a
22 chronological way of looking at the cases than I

18 (Pages 66 - 69)

Page 70

1  did with the sheer volume of blank documents. And
2  when I say "blank documents," blank screenshots, or
3  documents that were generated that had only a
4  child's name and identification number and maybe an
5  address on them, but nothing else. Those were more
6  of, I think, frustrating to me because there would
7  be multiple copies of some of those in some cases.
8  BY MR. PEISCH:
9      Q    Do you know if FACTS keeps blank
10 template forms for caseworkers to access in the
11 FACTS system?
12     A    I do not, but I would assume that
13 they have -- when the worker calls it up, that they
14 need whatever the form may be, Form A, B, or C,
15 that then they are able to fill in that form and
16 then generate it.
17     Q    And do you know if the defendants
18 producing these documents to the plaintiffs, they
19 produced all of the blank template forms that were
20 accessible in FACTS for each child?
21     A    I do not know what they produced for
22 us. I just know what we were given.

Page 71

1      Q    Would you say that there was missing
2  information in the case files that you would have
3  liked to have seen in the case files?
4      A    There were things that made it very
5  challenging to know what happened or occurred. I
6  don't know if they were missing or if they were not
7  completed. And when I say "not completed," I mean
8  never done. Things like that.
9      Q    Are there -- were there notes of
10 meetings that you found superficial and short?
11     A    Yes.
12     Q    And some caseworker notes that you
13 found superficial and short?
14     A    Yes.
15     Q    Given that, would it have been useful
16 in analyzing these cases to talk to the caseworker
17 to get more information?
18         You laugh.
19     A    We were asked to review the case
20 files and the case records, so that was all I had
21 to go on. And one of the foundations of child
22 welfare, and I know at least throughout the state

Page 72

1  of Ohio, I'm not just talking Cuyahoga County, is,
2  if it's not written down, it didn't happen.
3      Q    Okay. You know, I -- I'm not
4  necessarily taking issue with that premises, or
5  challenging it. I guess I'm just asking, if you
6  wanted to understand what actually happened in the
7  case, given the superficial nature that you allege
8  in the case files, some of the case documents, do
9  you think it would have been helpful to understand
10 what happened in that case, to talk to the
11 caseworker?
12     A    I -- I think that a new caseworker
13 coming into the agency doesn't always have the
14 luxury of talking to a former caseworker to know
15 what happened on a case, so having it written down
16 is critical.
17     Q    I understand that, but that's a
18 documentation issue that I'm not challenging. I'm
19 just asking you, in you trying to figure out what
20 happened retrospectively, whether it would be
21 useful for you to talk to the caseworker?
22         MS. MAHONEY: Objection. Asked and

Page 73

1  answered.
2          THE WITNESS: I will say perhaps.
3  BY MR. PEISCH:
4      Q    Let's turn back to the report. Can I
5  ask you to go back to page 18?
6      A    Okay.
7      Q    Okay. I would like to talk a little
8  bit about settings. At the top of -- well, at the
9  beginning of subheading A. So Subheading A is
10 "DHHR failed" -- it starts, "DHHR failed." It
11 says -- the first sentence says, "In the nine cases
12 reviewed, DHHR failed to secure least restrictive,
13 family-like settings for children."
14         Do you see that?
15     A    Yes.
16     Q    Do you agree with that statement?
17     A    Yes.
18     Q    Okay. Did DHHR always fail to secure
19 the -- the most -- least restrictive, family-like
20 setting?
21     A    In the cases that we reviewed, yes.
22     Q    All settings for all children in the

Page 78

1  placements as the least restrictive placement for
2  her?
3      A   I know that in Gretchen's case, she
4  was ordered to complete specific programs based
5  upon what was presented to the court as her
6  behavioral issues.
7      Q   Okay. Do you know if the circuit
8  court made a least restrictive placement finding
9  for any of her placements?
10     A   I know that journal entries contain
11 that as a statement of finding.
12     Q   But you didn't see any court orders
13 that actually -- that actually made a finding of
14 least restrictive placement?
15     A   I don't recall that information.
16     Q   And do you know if the circuit court
17 made any least restrictive findings for the
18 placement of Jonathan R.?
19     A   I don't recall that information.
20     Q   And do you know if the circuit court
21 made any least restrictive findings for the
22 placements of Ace?

Page 79

1          MS. MAHONEY: Objection. Asked and
2  answered.
3          THE WITNESS: Yeah, I --
4  BY MR. PEISCH:
5      Q   Is it that you don't recall?
6      A   As I said before, the judges and
7  cases are generally listening to what the worker
8  and other participants in the hearing are saying
9  as, "This is the placement we have found, this is
10 the one." And when the journal entry is completed,
11 the least restrictive type of format, there's a
12 check box. So I don't know --
13     Q   What's your basis of that statement?
14         Have you ever been to a West Virginia
15 circuit court hearing?
16     A   No, I have not.
17     Q   So whether the circuit court
18 decisions were accurate or correct or informed or
19 not, do you know if the circuit court made a least
20 restrictive finding with respect to Ace?
21         MS. MAHONEY: Argumentative. I also
22 want to remind Counsel that the witness is not a

Page 80

1  lawyer.
2  BY MR. PEISCH:
3      Q   Is the least restrictive setting the
4  same for all children?
5          Let me rephrase that. Is the kinship
6  placement the least restrictive placement for every
7  child?
8      A   In child welfare, when you start to
9  look for a placement for a child, you are looking
10 for what we term as least restrictive, most
11 family-like setting, for that child that is best
12 able and best suited to meet their needs.
13     Q   And in some circumstances that might
14 be a congregate care setting for some period of
15 time. Is that right?
16     A   For some period of time. And you are
17 always looking at the shortest period of time.
18     Q   Okay. So for some children, a
19 kinship placement is not the least restrictive
20 setting?
21     A   With appropriate services, a kinship
22 placement could be the least restrictive and most

Page 81

1  appropriate setting.
2      Q   With appropriate services, are all
3  children, literally all, all could be appropriately
4  placed in a kinship placement?
5          MS. MAHONEY: Objection. Confusing.
6          THE WITNESS: I don't -- I don't like
7  to go with the all-or-none kind of thing. For the
8  majority of children, with the appropriate
9  services, if there is a kinship provider, that
10 child could be maintained in a least restrictive,
11 family-like setting.
12 BY MR. PEISCH:
13     Q   December of 2019, is it correct that
14 Gretchen has been in the custody of her grandmother
15 in her grandmother's home?
16     A   The last information that I had was
17 that she was terminated to the custody of her
18 grandmother in December 2019.
19     Q   And would her grandmother's home be
20 the least restrictive setting for Gretchen?
21     A   Yes.
22     Q   And is it true that since

21 (Pages 78 - 81)

Page 86

1  caseloads in Cuyahoga County violated reasonable
2  professional standards?
3      MS. MAHONEY: Objection. Relevance.
4  Outside the scope.
5      THE WITNESS: I believe that those
6  caseload numbers were on par with what happens
7  throughout much of the country.
8  BY MR. PEISCH:
9      Q    And so you do not believe that those
10 caseload standards violated reasonable professional
11 standards?
12     A    No.
13     MS. MAHONEY: Objection.
14 BY MR. PEISCH:
15     Q    Turning back to the report, page 18.
16 Sorry, we were just looking at page 18. So I just
17 wanted to -- sorry, if you'll just give me a
18 minute.
19     So the last sort of -- last full
20 sentence on page 18 reads, "The case record reviews
21 completed in this process indicated that DHHR
22 workers seemed to ignore relatives or fictive kin."

Page 87

1      Do you see that?
2      A    Yes.
3      Q    Do you agree with that statement?
4      A    Yes.
5      Q    Okay. So you didn't see any evidence
6  that DHHR is inappropriately diverting family --
7  children to certified or uncertified kin, did you?
8      MS. MAHONEY: Objection.
9      THE WITNESS: I don't understand.
10 BY MR. PEISCH:
11     Q    You didn't see -- you didn't see any
12 evidence in your review that DHHR was
13 inappropriately diverting children to kinship
14 families when that wouldn't be appropriate for the
15 child, did you?
16     MS. MAHONEY: Objection.
17     THE WITNESS: No.
18 BY MR. PEISCH:
19     Q    Now, Ace was placed for a very short
20 period of time with his half-sister. Is that
21 right?
22     A    Correct.

Page 88

1      Q    And that placement quickly disrupted.
2  Is that right?
3      A    Yes, two weeks.
4      Q    Jonathan R. has been placed with his
5  grandmother, correct?
6      A    Correct.
7      Q    So given that two of the three case
8  files that you reviewed, the children were placed
9  either for a long period of time, or albeit very
10 briefly, with kin, what do you mean by DHHR ignored
11 kin?
12     A    In the case -- in those cases the
13 kinship providers are the ones who came to DHHR and
14 said, "We want to be considered," versus DHHR at
15 the onset of their involvement going out to seek
16 and locate and find kin providers for the children.
17     Q    Okay. Okay. Could we turn to page
18 22 of the report? Okay. The bottom paragraph -- I
19 would like to ask you some questions about the
20 bottom paragraph, which --
21     MS. MAHONEY: I apologize, which page
22 are we on?

Page 89

1      MR. PEISCH: Twenty-two.
2      MS. MAHONEY: Okay. Twenty-two.
3  BY MR. PEISCH:
4      Q    So this paragraph, I think it's
5  actually one sentence, but it's long, it reads --
6  I'm sorry, I'm just going to read the last
7  sentence. It reads, "DHHR appears to have failed
8  to use either general, targeted, child-specific or
9  family-finding recruitment strategies to avoid the
10 institutional placement of these children or, once
11 the children are institutionalized, to move them to
12 appropriate kin."
13     Do you see that?
14     A    Yes.
15     Q    And then the sentence above it says,
16 "The root of this problem lay in the fact that
17 caseworkers who were aware of the child's pending
18 discharge for a specific treatment program did not
19 engage in sufficient planning regarding where the
20 child would be placed next."
21     Do you see that?
22     A    Yes.

23 (Pages 86 - 89)

Page 114

1  A    The worker had very regular contact
2  with Gretchen. I don't know that it was always
3  helpful or beneficial. I don't know necessarily
4  what they did. When I said earlier about the
5  length of time for the reunification planning with
6  her biological parents, I don't know that a worker
7  sat down with Gretchen to really talk about, "Hey,
8  if your parents don't ever get themselves together,
9  where is it that you want to be? What do you want
10 to do?"
11         Those are the pieces that I thought
12 were missing. So they -- they went out and they
13 saw her, which I -- that's a good thing, but I
14 don't know really what they did beyond that to help
15 her prepare for the inevitable, which was her
16 parents are not getting themselves together to be
17 able to take her back.
18 Q    And she was in a -- would you agree
19 that she was in a little bit of a different
20 circumstance than the other two children that you
21 reviewed, because at that point she was in DHHR's
22 custody because of a juvenile delinquency

Page 115

1  adjudication?
2  A    But once she came in, she was a
3  foster kid like any other foster kid.
4  Q    Right.
5         But do you know if --
6  A    There really was no difference in
7  that aspect when she came into custody.
8  Q    Do you know if West Virginia law
9  applies different standards for DHHR and circuit
10 court judges with respect to juvenile
11 delinquencies -- delinquents as opposed to abuse
12 and neglect?
13 A    I do not.
14 Q    Do you -- in your report I believe
15 you made some positive comments about the
16 Children's Center of Ohio, or at least some aspects
17 of it. Do you agree that Gretchen was well served
18 in the Children's Center of Ohio?
19 A    I -- not just because it's Ohio, but
20 I -- I'm sorry. I actually --
21 Q    You're not biased.
22 A    No, no biases here. I never heard of

Page 116

1  the place.
2         I actually think that Gretchen did
3  well with the structure that she had provided to
4  her there. But also some of that -- I'm not sure
5  how much of that can be attributed to Gretchen
6  herself in her growth in maturing.
7  Q    Causation is hard to prove.
8  A    Right. Going through puberty is
9  really hard for girls and girls in that kind of a
10 setting. And some of it could just be that
11 Gretchen finally kind of made her way through some
12 of that. But some of that, I do think, was the
13 structure, the boundaries, and the guidance that
14 she received in that placement.
15 Q    And in your review of the case files,
16 did you identify any concerns about the Children's
17 Center of Ohio or the services they were providing
18 Gretchen?
19 A    Not to my knowledge.
20 Q    So going back to reunification. At
21 some point Gretchen's reunification -- sorry, going
22 back to permanency. At some point Gretchen's

Page 117

1  permanency plan was switched from her biological
2  parents to her grandmother. Is that right?
3  A    Correct.
4  Q    Okay. And is Gretchen now living
5  with her grandmother?
6  A    In December 2019, she was in -- the
7  custody of her grandmother was terminated. I don't
8  know where she is now.
9  Q    Yeah. Fair enough. Sorry, I didn't
10 mean to ask you to speculate about that.
11        Do you know in DHHR, as last you
12 reviewed the case files, was providing services to
13 Gretchen and her grandmother?
14 A    Actually, in the file that I received
15 and reviewed, it kind of just stopped the day that
16 she goes home. Like, I don't really recall --
17 Q    Okay.
18 A    -- seeing or reading anything else
19 and -- and in some ways, because I'm a person, I'm
20 like, I would like to know what happened. Like has
21 Gretchen been successful? You know, I would --
22 Q    Right.

30 (Pages 114 - 117)