# Exhibit 16

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF WEST VIRGINIA
2                    HUNTINGTON DIVISION
3    _____

     Jonathan R., minor, by Next    :
4    Friend, Sarah Dixon, et al.,   :
                                    :
5         Plaintiffs,                :   Class Action
                                    :
6    v.                              :   3:19-cv-00710
                                    :
7    Jim Justice, in his official   :
     capacity as the Governor of    :
8    West Virginia, et al.,         :
                                    :
9         Defendants.                :
     _____

10

11        VIDEOCONFERENCE DEPOSITION OF SUSAN GETMAN
12   DATE:          October 15, 2020
13   TIME:          9:02 a.m. to 2:01 p.m.
14   LOCATION:      Witness Location
15
16   REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
              Veritext Legal Solutions
21         1250 Eye Street, N.W., Suite 350
                Washington, D.C. 20005
22

Page 58

1 organizations, so -- and I would say that in some
2 cases, while there are interviews in the process of
3 a review, an audit is a very specific term, so if
4 I'm not bound by the language of audit --
5    Q    You're not bound by the language of
6 audit.
7    A    Yeah, because that's a whole --
8 that's a whole other kind of review.
9         The case records can be reviewed, and
10 there may be interviews, but not about the case.
11 So I think it's important to differentiate that.
12         So, for instance, you could come in
13 and have someone review cases and then interview
14 staff about what is it like to be a staff person
15 there and what are the HR policies and what's the
16 culture.  And so one would need to be careful.  And
17 that's why I'm not going to kind of put a hard
18 stake in the ground on this, because there are
19 procedures around accreditations, for instance,
20 that, of course, has lots of interviews, but they
21 aren't necessarily regarding the cases, per se,
22 that are reviewed as a component and as a section

Page 59

1 of that overall process.
2    Q    Well, let's talk a little bit about
3 the case records and then, in particular, the
4 format in which up had to review them, which if I
5 am reading the report correctly, there was some
6 frustration with how the records were organized.
7 Was that your experience?
8    A    Yes.
9    Q    And what's your understanding of how
10 the records are -- those records would actually be
11 accessed by West Virginia caseworkers?
12         MS. LOWRY:  Objection.
13         THE WITNESS:  I wouldn't have a way
14 of knowing that.
15 BY MS. BROWN:
16    Q    Do you -- is it your understanding
17 that they are also looking at screenshots?
18         MS. LOWRY:  Objection.
19         THE WITNESS:  No.
20 BY MS. BROWN:
21    Q    Do you think that the manner in which
22 you had to review the case records affected your

Page 60

1 analysis of what occurred in a particular case?
2    A    No.  I think it affected the amount
3 of time it took to get there, but I don't think it
4 affected the conclusion.
5    Q    And there were a number of instances
6 in which you noted that there was not documentation
7 of something.  Is that correct?
8    A    That is correct.
9    Q    And are those circumstances where it
10 would have been helpful to talk to a caseworker or
11 a family or a child to try to fill in those gaps?
12    A    It would have helped -- been helpful
13 to have a document.
14    Q    Helpful to have the document or
15 helpful to have the information?
16    A    The information that would have been
17 contained in the document.
18    Q    Is it your opinion that all
19 information must be set forth in the document?
20    A    It is my belief and my training that
21 if something is not written in a case record, one
22 cannot assume that it happened.  And that's a

Page 61

1 pretty standard, you know, if it's not written, it
2 didn't happen, kind of standard.
3    Q    And so that's the conclusion, if it
4 didn't -- if it's not written, it didn't happen, or
5 if it's not written, I need to find out if it
6 happened?
7    A    I had the case record solely
8 accessible to me.  That's what I had.  I looked and
9 I looked for things and there were places that it
10 would say, "See file cabinet."
11    Q    Do you know what the file cabinet is?
12    A    I do not.
13    Q    Did you ask what it is?
14    A    Yes, I did.
15    Q    And did you get an answer?
16         MS. LOWRY:  Objection.
17         THE WITNESS:  I just want to make
18 sure her objection was noted.
19 BY MS. BROWN:
20    Q    Yeah.
21    A    Our understanding was that we were
22 given everything that there was that was available.

Page 66

1  recalled it. I don't recall.
2      Q   Okay. Would you describe the three
3  children whose case records you looked at as
4  relatively easy or relatively complicated cases?
5          MS. LOWRY: Objection.
6          THE WITNESS: Can I get out of this
7  exhibit?
8  BY MS. BROWN:
9      Q   Yes. Yeah, you can close it. And I
10 don't think I'm going to have another one.
11     A   All right. So I can close Exhibit
12 Share entirely?
13     Q   Well, why don't you minimize it. I
14 don't think I'll have another exhibit.
15     A   Okay. Let's see here. Okay. Sorry,
16 I just -- I'm not a technical person, so I didn't
17 want to disconnect you.
18     Q   Believe me, why do you think I am
19 having Julie do everything. I feel your pain.
20         So my question was: Would you
21 describe the three children whose case records you
22 looked as relatively easy or relatively complicated

Page 67

1  cases?
2          MS. LOWRY: And I objected.
3          THE WITNESS: I think that at the
4  onset, they were pretty typical cases. They are
5  the kind children in family situations that come to
6  the attention of a Child Protective Service agency.
7  I think they didn't need to become so complicated.
8  I think they did become more complicated as time
9  went on because multiple placements are trauma
10 events for children.
11         All of these children had multiple
12 traumas before they came into care. So with each
13 placement and the way in which the placements
14 occurred, additional traumas were heaped on and
15 their behaviors certainly reflected the trauma
16 that they were experiencing and the dislocation
17 they were experiencing.
18         So I guess my answer is both.
19 Right? You know, that I think these were pretty
20 typical kinds of cases. There wasn't anything
21 highly unusual at the outset of these cases.
22

Page 68

1  BY MS. BROWN:
2      Q   How about from the time that they
3  came into care, putting aside the pre-placement
4  investigation time period?
5      A   Uh-huh. Well, let me stop and think.
6  I don't think my answer would change. I think that
7  for each of these children, when they came into
8  care, you know, that initial placement is a crisis.
9  The details obviously vary between the three, but I
10 think as children coming into care, again, I think
11 they evidence sort of typical worries and concerns
12 and behaviors that with appropriate services and
13 supports could have been managed such that they
14 didn't need to become escalated behaviors, multiple
15 placements, et cetera.
16     Q   What evaluation did you do to
17 determine if the three cases you looked at had
18 common issues with all foster children in West
19 Virginia?
20         MS. LOWRY: Objection.
21         THE WITNESS: I have -- I don't have
22 access to that kind of information.

Page 69

1  BY MS. BROWN:
2      Q   Turning to the executive summary.
3  What was the process for putting that together?
4      A   The three expert witnesses
5  collaborated on it because it needed to be an
6  executive summary of all nine. So there was no
7  single author. We each took different sections.
8  And in the end, I assumed responsibility for making
9  sure there was coherence and a good flow and that
10 sort of thing.
11         But there were, by my recollection,
12 eight sections. And each of us had responsibility
13 for doing the initial drafting and then each of us
14 had responsibility for contributing to each other's
15 sections. And part of the contribution was case
16 examples, examples from the children that we
17 reviewed that we thought were good examples of the
18 dynamic that was being discussed.
19     Q   So did you -- did you first discuss
20 the case examples or did you first draft the --
21 your different sections?
22     A   So the very first thing we did was

18 (Pages 66 - 69)

Page 126

1  that we really thought would benefit from sort of
2  taking a look at as an area for improvement.
3      Q   So I don't think it says, we think
4  that this is something that requires more inquiry.
5      A   Let me get to that.  If you want me
6  to find the place, I will just need a few minutes.
7      Q   Yeah.  The paragraph is on page 30.
8      A   Yeah, I think this is couched in, you
9  know, if you have certain elements in place in a
10 culture, in an organizational culture, then you
11 would expect to see the consistency of practice,
12 you would expect to see some things that we did
13 not.
14     Q   In these nine case?
15     A   In these nine cases.
16     Q   But you didn't speak to any
17 supervisors and any caseworkers and you didn't
18 review any training materials, correct?
19     A   Yes.  You've asked that.  Correct.
20     Q   So is this a conclusion as to
21 organizational culture or it's a, "I would like to
22 know more about the organizational culture"

Page 127

1  statement?
2      A   This is a statement that there was
3  not evidence of the kinds of resources and cultural
4  practices that would reasonably expect to avoid
5  some of the problems that we saw.
6      Q   That's what this paragraph is
7  intended to say?
8      A   Yes.  It's not explicit, you're
9  right.  We didn't review a binder of training
10 materials that was empty.  We saw a practice that
11 we felt was reflective of the need for more
12 supports.
13     Q   Turning to the second concern.  "The
14 case record failed to be an effective case
15 management tool, neither containing a coherent
16 history, nor serving to support critical thinking
17 interventions and planning."
18         I think I have already asked this and
19 you already answered it, but that is based on your
20 review of the documents as they came to you, not
21 your understanding of how they may be accessed in
22 real -- in their native state by the caseworkers

Page 128

1  and supervisors.  Is that right?
2      A   The only thing we had to form an
3  opinion on was what we were given.
4      Q   And the third item that is noted as a
5  systemic concern is, "The knowledge and skill of
6  frontline workers and supervisors"?
7      A   Uh-huh.
8      Q   What do you mean by that?
9      A   We mean that -- and I will say "we,"
10 this was jointly written -- this wasn't the section
11 that I wrote, but I did review, is that there
12 are --
13     Q   You reviewed and it's your sworn
14 testimony, correct?
15     A   Yeah, no, I -- I'm just saying I'm
16 using the pronoun "we" as opposed to "I."
17         There were repeated examples of where
18 I would have expected a social worker charged with
19 the safety and well-being of a child to have more
20 knowledge about family dynamics, more knowledge
21 about interviewing and motivational interviewing,
22 more knowledge about child development and why a

Page 129

1  child might change their story, more knowledge
2  about sexual victimization.  And that was just
3  really repeatedly absent in the case notes and in
4  the actions and in the planning of the cases that I
5  reviewed.
6      Q   You don't actually know what their
7  knowledge is, you know what was put into the case
8  record.  Is that right?
9      A   No, I don't think that's what I mean.
10 How can anyone know what one's knowledge is except
11 through one's behavior.  And the behavior, the
12 professional behavior and practice -- and I'm not
13 going to use the word "conduct," because that
14 sounds more personal to the individual, but their
15 behavior, their practice, had they had knowledge of
16 child development, trauma, family dynamics,
17 substance abuse, it is reasonable to assume that
18 that knowledge would have been reflected in a
19 different professional behavior than what was
20 evident in case notes written by these individuals,
21 and in the actions that they took when confronted
22 with a situation.

Page 130

1  Q   So earlier we spoke about some
2  actions that Garrett's caseworker took with respect
3  Garrett, advocacy to get him into a program that
4  she thought was appropriate for him.  Do you
5  believe that that case record from that caseworker
6  reflected a lack of knowledge and skill, failure to
7  understand Garrett?
8  A   Actually, I will say two things about
9  that example.  One is this woman went above and
10 beyond in advocating for him, it is true.  She, by
11 her own writing, says that she believed he needed
12 another chance, that he had skills, that he should
13 have a chance to express and to take on -- to be
14 nurtured in that way.
15      One could say, and there was no point
16 in me going into it at the time, that such
17 advocacy, while, well placed and well meaning and
18 heartfelt, was also naive.  He lasted less than a
19 week in the placement.  And the amount of freedom,
20 which she so desperately wanted him to be able to
21 use productively, was well beyond his ability at
22 that point in his -- his life experience to manage.

Page 131

1  And she later went back to him and said she felt he
2  had used her, that he had set her up.
3       Now, you know, I -- it is far beyond
4  the extent of this review to say, you know, should
5  she have known?  Might she have had a supervisor
6  that said, "Hey, I hear that you really want to go
7  to bat for this kid and really want the best for
8  him, but let's take a look at the history.  Let's
9  take a look at how he has dealt with things.  Is he
10 really ready for this?"
11 Q   Should he be in a more restrictive
12 setting?
13 A   Should he be in a different setting.
14 That was -- I wouldn't put it in restrictive and
15 not restrictive.  I think that the place that he
16 was -- now, mind you, this is after years and years
17 of being in placements and not getting out of
18 placements when he was ready to be discharged and
19 when the residential providers were ready to
20 discharge him, but there was no -- no place for
21 them to go.  DHHR did not have a discharge
22 placement and he decompensated.  So yes, at that

Page 132

1  point he needed a different kind of placement than
2  what this particular placement was.
3       And I -- I would, thinking back at
4  her case notes, I don't recall her talking with
5  other people.  I don't recall her having a
6  supervisor who said, you know, "Can we think about
7  this? Can we think about what other supports he's
8  going to need in order to be successful there?"
9       She was a new worker to him at the
10 time and she really did -- she didn't take no for
11 an answer and really advocated admirably for him,
12 but perhaps not with all the information that was
13 needed.
14 Q   Is it a reasonable professional
15 standard to note in a case record when there has
16 been a discussion between two caseworkers or a
17 caseworker and a supervisor?
18 A   Around key decisions, it is not
19 uncommon.
20 Q   Is it required as a matter of
21 standard practice?
22 A   Well, required varies from

Page 133

1  jurisdiction to jurisdiction.  So there's some
2  jurisdictions -- apparently New York being one --
3  that the supervisors are expected to make entries
4  actually into the record.  Not all jurisdictions
5  have that, so I can't answer the question.
6  Q   Do you know of any other jurisdiction
7  that operates like New York?
8  A   I don't.  I do know that other
9  jurisdictions have -- have meetings in which
10 supervisors are present and the attendance at those
11 meetings is noted in the record.
12 Q   There's no reason it has to be noted
13 in the record, however, as long as the meeting
14 takes place?
15      MS. LOWRY:  Objection.
16      THE WITNESS:  It depends on the
17 jurisdiction and their policies.
18 BY MS. BROWN:
19 Q   Just to confirm the comments on the
20 organizational culture of DHHR is based mostly on
21 what's not in the record, not what is.  Is that
22 correct?