# Exhibit 17

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

_____

Jonathan R., minor, by Next          :
Friend, Sarah Dixon, et al.,         :
                                     :
        Plaintiffs,                  :   Class Action
                                     :
v.                                   :   3:19-cv-00710
                                     :
Jim Justice, in his official         :
capacity as the Governor of          :
West Virginia, et al.,               :
                                     :
        Defendants.                  :
_____

VIDEOCONFERENCE DEPOSITION OF JANET FLORY

DATE:           October 23, 2020
TIME:           9:01 a.m. to 2:59 p.m.
LOCATION:       Witness Location

REPORTED BY:    Felicia A. Newland, CSR

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

Page 66

1  if there are concerns about the safety or the risk
2  of harm to a child, you're leaving that child in
3  that situation until you decide or until somehow
4  these reports came to some conclusion.
5      Q    So when you say "for any reasonable
6  professional standard not in good practice," is
7  that based on your experience?
8      A    Absolutely.
9      Q    Is that based -- go ahead.
10     A    And it's also based on -- in every
11 state, in every jurisdiction, there are specific
12 regulations about the length of time that cases
13 should take and different actions within an
14 investigation of a case, how long they should take.
15     Q    And what are West Virginia's
16 regulations on that?
17     A    I'm not recalling exactly, but I did
18 have that -- it -- it's within -- it certainly is
19 not seven or eight months apart, but it's within
20 reasonable lengths of time.  And there are
21 different -- there are different time frames for
22 different pieces of the report of an investigation.

Page 67

1      Q    So you didn't have any concerns with
2  West Virginia's regulations in this area?
3      A    They seemed in line with other
4  systems that I am aware of.
5      Q    So your concerns are whether or not
6  those regulations were complied with?
7           I'm sorry.  You just froze, I'm not
8  sure --
9      A    Yes.  Yes, to that specific issue,
10 timelines were not adhered to.  But I think in this
11 theme, we also talk about the state of the records
12 themselves, it was very, very difficult to piece
13 together the different elements of an investigation
14 or conclusions of a report.  It was impossible in
15 most of these cases to follow along and to
16 understand what the trajectory and what the time
17 frames and what the compliance was.
18     Q    So despite that it was almost
19 impossible to do so, you were still able to draw
20 these conclusions from the case file?
21     A    Personally, I had stickies all over
22 my bedroom wall with the dates of specific

Page 68

1  incidents to try to reconstruct what had happened
2  to a particular child.  That's how I ended up
3  making sense of it.
4      Q    Would it have been helpful for you to
5  interview the caseworkers involved in these cases?
6      A    That would have been another dynamic
7  or another element of what we were asked to do.
8      Q    Did you ask if you could speak with
9  any caseworkers?
10     A    I'm sorry, am I frozen or are you
11 frozen?
12     Q    I think you're frozen on my screen.
13          MS. MAHONEY:  Yes, you're frozen on
14 my screen as well.
15          THE WITNESS:  Am I -- is it me?  Can
16 you hear me?
17          MS. SMITH:  I can hear you now.
18          THE WITNESS:  Okay.
19          MS. MAHONEY:  Can you repeat the
20 question, please?
21 BY MS. SMITH:
22     Q    I had asked if it would be helpful

Page 69

1  for you to interview caseworkers to help you figure
2  out what went on in this case.  And I didn't hear,
3  I think you had said -- just -- you cut out when
4  you answered that question.
5      A    Okay.  Interviewing caseworkers would
6  have added another dynamic to this report that
7  is -- that was beyond the scope of what we were
8  asked to do.  I -- I would say because I have --
9  it's -- it was clear to me that if a caseworker
10 were looking at these records, a new caseworker
11 assigned to a case as I did, they would have great,
12 great difficulty figuring out what the history was
13 and what the trajectory of a family was within the
14 system as well.
15     Q    And did you -- did you -- strike
16 that.
17          So are you aware of how West Virginia
18 caseworkers review case records in their day-to-day
19 work?
20     A    Specifically, no, I am not aware of
21 how that happens.  I can -- I could only see how
22 the record was organized or not organized that I

18 (Pages 66 - 69)

Page 70

1 reviewed.
2  Q  So you don't know how the records are
3 organized for the West Virginia caseworkers?
4  A  No, I do not.  I do know that at
5 least in two of the cases, a great number of
6 documents were dumped into the system that I
7 reviewed at the end of last year.  I don't know
8 what the West Virginia SACWIS system looks like, I
9 only know what I saw.
10  Q  So you don't know if the organization
11 of the records as the West Virginia caseworker
12 reviews it, you don't know if it's different than
13 how you reviewed it?
14      MS. MAHONEY:  Objection.  Asked and
15 answered.
16      THE WITNESS:  Well, maybe this is not
17 politic to say, but if what the caseworker sees is
18 different and the organization of the record is
19 different than what we saw, I would wonder why we
20 saw it in the state that we saw it and whether that
21 was perhaps deliberate or not.
22

Page 71

1 BY MS. SMITH:
2  Q  Well, have you worked with SACWIS
3 systems in your prior roles?
4  A  I have.
5  Q  And how are case files organized in
6 those systems?
7      MS. MAHONEY:  Objection.  Relevance.
8      THE WITNESS:  It depends very much on
9 the state and the -- and you may or may not know
10 that SACWIS systems have evolved and devolved and
11 revolved over the last 20 or 30 years, but most
12 case systems, whether SACWIS or some combination of
13 SACWIS and hard-copy case records, have some sense
14 of organization to them:  Here are the
15 investigations, here are the placement, here's the
16 placement history, here are the assessments that
17 have been done.
18      One can pull that out and look at
19 it and see what has happened from -- from the
20 time that the case came in until the current
21 time.  These records were totally disorganized.
22 Even the -- even -- all the records related to

Page 72

1 one report or one placement were not in one
2 place.
3 BY MS. SMITH:
4  Q  Are you aware that you were looking
5 at screenshots from West Virginia's FACTS system?
6  A  Oh, yes.
7  Q  So you were not actually accessing
8 the system as the case -- as the West Virginia
9 caseworkers access them?
10      MS. MAHONEY:  Objection.
11      THE WITNESS:  I can't know that.
12 Sorry.
13 BY MS. SMITH:
14  Q  Did you access the system on
15 plaintiffs' document review platform?
16  A  Yes.
17  Q  Okay.  I'd like to turn to the next
18 theme, which is also on page 8.  It says, "The
19 reviewed cases demonstrated a lack of information
20 from key collateral sources that resulted in weak
21 investigations" --
22      MS. MAHONEY:  Ms. Smith, you're

Page 73

1 breaking up pretty bad.
2      MS. SMITH:  Is that better?
3      MS. MAHONEY:  It is.
4 BY MS. SMITH:
5  Q  Okay.  So what's the foundation for
6 this theme?
7  A  The reviews that showed the lack of
8 using key collateral sources.  There were -- and we
9 go through some of the examples here.  In -- in
10 Anastasia, which happened to be one of my cases,
11 doctors and school personnel did -- and this was in
12 the record, they pointed out the abuse, they
13 pointed out patterns.  There was no attempt or no
14 recording of any work to try to reconcile what they
15 were saying versus what the adoptive mother was
16 saying.
17      In another case, collaterals are
18 listed on the screenshots.  But that's all.
19 There's no information about any interviews, about
20 any way in which they were used to -- to really
21 understand what was going on in the case situation.
22  Q  So I understand that it's -- that

19 (Pages 70 - 73)

Page 102

1  pillars, of how this system is built and what the
2  expectations are.
3  BY MS. SMITH:
4      Q    And how would you see examples of
5  this in a child's case record?
6      A    Repeated reports of some -- some form
7  of neglect or abuse that appears on the face of it
8  to stem from either the child's behavior or the
9  parent's behavior and ability to parent that child
10 that may -- based on knowledge about mental health,
11 may relate back to mental illness.  And then seeing
12 no sort of assessment or recognition of that and
13 closing the case with no further action about it
14 until the next time that you see it.
15          And in at least one instance, one
16 case, the parent was accessing lots of mental
17 health evaluation treatment, but it wasn't
18 effective at all.  And I think, in general, we did
19 not see the spectrum, if you thought about the
20 continuum of the kinds of interventions that can
21 happen with children and with their parents in the
22 mental health area, we did not see a range of

Page 103

1  different options or resources available to -- to
2  these cases.
3      Q    And how would you expect to see those
4  options reflected in a case record?
5      A    From both the assessment that was
6  going on about the family, about the nature of the
7  report that came in and then the services, the
8  range of services that was being provided to either
9  the parents or the child, if whatever was
10 appropriate.
11          There was an overreliance on
12 psychiatric hospitalization and long lengths of
13 stay in psychiatric hospitals, which in many places
14 these days, the attempt is to use that only as a
15 diagnostic and a very short-term intervention.  I
16 didn't see any day-treatment efforts or programs.
17          I mean, this -- this deals with
18 perhaps the question that you raised earlier about
19 what is available in West Virginia in terms of the
20 system.
21     Q    And are you talking about
22 pre-placement services?

Page 104

1      A    Both, but more pre-placement.
2      Q    So this theme is actually in the
3  permanency section, so do you -- what's your
4  opinion about how DHHR failed to understand the
5  debilitating effect of mental illness relating to
6  post-placement services?
7      A    Well, not many of these kids are
8  post-placement, frankly -- or I -- well,
9  post-placement -- I'm sorry.  Let me back up.
10          This really gets into the question of
11 the appropriateness of the placements and the kind
12 of mental health services that were available or
13 not available.  And the overuse of psychiatric
14 hospitalizations certainly is one piece of that,
15 but this is also -- this particular statement, when
16 a child is in placement as long as the goal is
17 reunification of the family, there's a
18 responsibility to provide the appropriate services
19 to the family, the parents, so that the child can
20 go back home.  And I think that's more of the issue
21 here.
22     Q    And what's your understanding of the

Page 105

1  availability of those services in West Virginia?
2      A    My understanding is only to the
3  extent that I reviewed case records and could see
4  what happened and what didn't happen with the kids
5  that we reviewed.
6      Q    And so you're talking about what
7  happened or didn't happen in your review of the
8  three case records?
9          MS. MAHONEY:  Objection.  Asked and
10 answered.
11          THE WITNESS:  Yeah, I'm specifically
12 talking about that, but this was a -- an
13 observation that all three of us saw in all -- in
14 the nine cases that we reviewed.
15 BY MS. SMITH:
16     Q    Okay.  And do you -- is it your -- do
17 you think that the case record can show a failure
18 to understand?  Is that right?
19         MS. MAHONEY:  Objection.
20 BY MS. SMITH:
21     Q    The failure to understand a
22 debilitating effect of mental illness?

27 (Pages 102 - 105)

Page 122

1  BY MS. SMITH:
2  Q   So on page 18 it says, "DHHR failed
3  to utilize least restrictive family-like placement
4  for children."  Is that something that's required
5  in DHHR policy?
6  A   Yes.
7  Q   And did you conclude that DHHR failed
8  to use the least restrictive family-like placements
9  for the three case files that you reviewed?
10 A   In two instances, absolutely, yes.
11 In one instance there were -- in the middle of
12 Dennis' ten placements, did have placements with
13 his grandparents, but it was both long after he had
14 been removed and then they were not -- they did not
15 end up being the permanent placement for him.
16 Q   So is it -- is it your opinion that
17 the caseworkers violated DHHR policy with respect
18 to the least restrictive placement for those three
19 case files that you reviewed?
20 A   Yes.
21 Q   And what does -- how do -- what does
22 least restrictive mean?

Page 123

1  A   Least restrictive means just what it
2  says in the federal law.  When a child is removed
3  from his or her own family, the system has an
4  obligation to find the most family-like least
5  restrictive setting possible.  And if you look at
6  the continuum of placements, kinship would be the
7  most family-like because presumably the children
8  know the kin that they're living with.
9      A regular foster home would be a
10 little bit more restrictive but still a family-like
11 setting.  Therapeutic foster homes.  And then you
12 go on up until you reach the far end of the
13 spectrum, which would be residential placement in
14 psychiatric hospitalization.
15 Q   And can residential placements in a
16 psychiatric hospital ever be a least restrictive
17 placement?
18 A   Ever be what?  I'm sorry.
19 Q   Ever be a least restrictive placement
20 for a child?
21 A   In some limited instances for limited
22 periods of time.  It's not just the setting, it's

Page 124

1  the length of stay.
2  Q   And do you know what percentage of
3  foster children in West Virginia are in kinship
4  placement?
5  A   I do not.
6  Q   Do you know what percentage of foster
7  children in West Virginia are in foster family
8  settings?
9  A   I do not.
10 Q   Are you aware that the West Virginia
11 Circuit Court has to make a -- has to order
12 child -- children to residential placements in the
13 least restrictive finding?
14     MS. MAHONEY:  Objection.
15     THE WITNESS:  Yes, in general, I am
16 aware of that.
17 BY MS. SMITH:
18 Q   So you disagree with those court
19 orders?
20     MS. MAHONEY:  Objection.
21 Mischaracterizes testimony.
22     THE WITNESS:  Well, court orders are

Page 125

1  generally the result of a department's assessment
2  and recommendation to the court.  It is the
3  department's responsibility to do that work, not
4  the court's.
5  BY MS. SMITH:
6  Q   But the court doesn't have to go
7  along with the recommendation?
8      MS. MAHONEY:  Objection.
9      THE WITNESS:  I'm sorry.  Yes, of
10 course, they can override.
11 BY MS. SMITH:
12 Q   Let's go to the next theme on page
13 21.  It says, "DHHR failed to adequately address
14 child specific placement needs."
15     So does this -- what reasonable
16 professional standard does this theme relate to?
17     MS. MAHONEY:  Objection.  Asked and
18 answered.
19     THE WITNESS:  There are several
20 standards that this relates to.  One is that a plan
21 should always be specific to a child in his or her
22 own specific needs as much as possible.  A second