Exhibit 1

Page 1

1          UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF WEST VIRGINIA
2                HUNTINGTON DIVISION

3     _____

      Jonathan R., minor, by Next   :
4     Friend, Sarah Dixon, et al.,  :
                                     :
5          Plaintiffs,              :   Class Action
                                     :
6     v.                            :   3:19-cv-00710
                                     :
7     Jim Justice, in his official  :
      capacity as the Governor of   :
8     West Virginia, et al.,        :
                                     :
9          Defendants.              :
      _____

10

11       VIDEOCONFERENCE DEPOSITION OF SUSAN GETMAN

12    DATE:          October 19, 2020

13    TIME:          11:52 a.m. to 7:17 p.m.

14    LOCATION:      Witness Location

15

16    REPORTED BY:  Felicia A. Newland, CSR

17

18

19

20

                  Veritext Legal Solutions
21         1250 Eye Street, N.W., Suite 350
                  Washington, D.C. 20005

22

Page 18

1   a collaborative process. There's so much work that
2   has to be done on the public side in terms of it
3   could be training, practice changes, philosophical
4   changes in the way they approach, and I'll say
5   specifically, kinship care. There's a lot of bias,
6   so there's a lot of cooperative things that we're
7   doing in terms of the types of services and
8   programs that we would be bringing.
9          Ideally we would be providing a lot
10  of the service, however, it is very much
11  tangential and it's a cooperative sort of
12  arrangement. It's not like we just do the
13  service and leave it alone, there are a lot of
14  things on the public side that has to happen.
15  BY MS. SIEGENBERG:
16     Q    Okay. So I know we've been speaking
17  quite a bit about Lilliput Families. But just to
18  confirm for the record, you are currently employed
19  at Lilliput Families. Is that correct?
20     A    Yes.
21     Q    Okay. And could you describe
22  Lilliput for me?

Page 19

1      A    Lilliput has been around for the past
2   40 years. We started out as a foster care agency
3   and we were serving 300 youth child welfare and
4   have probation youth, and then we branched out into
5   adoptions and basically began working throughout
6   the state with counties across the -- you know, 58
7   counties.
8          And we were one of the first adoption
9   licensed providers in the state. And that happened
10  in 1991. And so we were helping to assess families
11  for the readiness and preparation of adoption of
12  children out of the foster care system. We served
13  thousands and thousands of children. We still hold
14  a foster care license.
15         We branched out into -- well, we
16  began to say that in our adoptions arena, the
17  families that we served, there were -- you know,
18  over 50 percent were kinship families. So we began
19  to develop an expertise in that. And I -- I was
20  around at the time. And then we started our
21  kinship support services programming back in 2007.
22  And then that began to implement those kinds of

Page 20

1   programs, supporting kinship families. And we
2   currently have six counties that we serve families,
3   kinship families.
4      Q    Okay. So just to confirm, Lilliput
5   is a private agency that's contracted with by the
6   State, correct?
7      A    Yes.
8      Q    Okay. So Lilliput has their own
9   child welfare caseworkers?
10     A    Can you explain that question?
11     Q    So when you were speaking about all
12  the services that you provide, in providing those
13  services does Lilliput have your own child welfare
14  workers or caseworkers who are directly --
15  providing direct services to the families that you
16  work with?
17         MS. UNGER: Objection. Confusing.
18         THE WITNESS: We don't call them
19  child welfare workers, that they work within our
20  child welfare partners. But yes, we employ our own
21  master's-level social workers, some bachelor-level
22  staff to conduct the work.

Page 21

1   BY MS. SIEGENBERG:
2      Q    Okay. So how do those -- I'm sorry.
3   You said you don't call them child welfare workers.
4   How should I refer to them in conversation?
5      A    I only say that because it's more --
6   it sounds more public, so we would say our social
7   work staff.
8      Q    Okay. So how does your social work
9   staff interact with -- or what is their role with
10  respect to the state or local public child welfare
11  workers?
12     A    To -- the role of your social workers
13  assist with providing a level of service, whatever
14  they're contracting us for, it could be case
15  management, it could be family finding, it could be
16  a variety of things to help impact the outcomes of
17  children in that particular county that we're
18  contacting with or permanency stability and
19  well-being.
20     Q    And in providing those services, do
21  you create your own records for the children and
22  families that you're working with or do you enter

1  information directly into the child or family's
2  case file or record that's maintained by the local
3  public agency?
4      MS. UNGER:  Objection.
5      THE WITNESS:  With keep our own
6  files.
7  BY MS. SIEGENBERG:
8      Q    Okay.  And so I think you mentioned
9  that Lilliput primarily is in Northern California.
10  Is that correct?
11      A    Yes.
12      Q    Okay.  Anywhere outside of
13  California?
14      A    No.
15      Q    Okay.  So you have spoken a little
16  bit about some kinship-specific services that
17  Lilliputs provides.  What other besides -- I think
18  you said kinship services and support program.  Is
19  that right?
20      A    Kinship support services.
21      Q    Okay.  Besides those services, what
22  other kinship-specific services does Lilliput

1  provide?
2      A    So family finding would be considered
3  under the kinship.  So we provide a level of
4  intensive family finding beyond sort of the county
5  efforts to find -- identify and locate relatives
6  for youth who are either in a group home care, so
7  we can step them down, or at the front-end, so
8  their first time entering care.  We also have
9  kinship support services programming in six
10  counties where we operate of like a resource center
11  for families to get information referral, get
12  corrected to vital supports that they need.  And
13  then we also foster certify kinship families.
14      Q    So you mentioned that the kinship
15  support services program is available in six
16  counties.  How many counties is the Family Finding
17  Services available in?
18      MS. UNGER:  Objection.  Beyond the
19  scope.
20      THE WITNESS:  We don't always have a
21  kinship support services program alongside our
22  family finding unfortunately.  But in four of the

1  counties, we provide family finding and the kinship
2  support services programming and then also then
3  certify kinship families.
4  BY MS. SIEGENBERG:
5      Q    So how many counties do you provide
6  the certification services to kinship families?
7      MS. UNGER:  Objection.  Beyond the
8  scope.
9      THE WITNESS:  We provide it
10  throughout California for any county that would
11  need that service.  So, for instance, there are
12  counties in say, LA County who find and identify
13  relatives in Sacramento County and then we would
14  certify that home or that family.
15  BY MS. SIEGENBERG:
16      Q    Okay.  Is Lilliput involved in
17  investigating allegations of abuse and neglect?
18      MS. UNGER:  Objection.  Beyond the
19  scope.
20      THE WITNESS:  No.
21  BY MS. SIEGENBERG:
22      Q    Is Lilliput involved in removing

1  children from homes?
2      MS. UNGER:  Same objection.
3      THE WITNESS:  No.
4  BY MS. SIEGENBERG:
5      Q    Is Lilliput involved in participating
6  in abuse and neglect court proceedings?
7      MS. UNGER:  Same objection.
8      THE WITNESS:  It would depend on our
9  involvement.
10  BY MS. SIEGENBERG:
11      Q    Could you explain what it might
12  depend on?
13      A    If it was a certified family under
14  our license for foster care, then yes, we could
15  definitely be, or if we were engaged in any other
16  program or service where they needed information
17  from one of our workers who was involved.
18      Q    And is Lilliput involved in making
19  placement decisions for children?
20      A    No.
21      Q    Could you describe the population
22  that Lilliput serves?

Page 26

1      MS. UNGER: Objection. Irrelevant.
2      THE WITNESS: So we have six
3  different programs, so it would be hard to -- I
4  would say the majority of the children that we
5  serve are in the foster care system.
6  BY MS. SIEGENBERG:
7      Q    Uh-huh. And what about the
8  demographics of those children and families that
9  you work with?
10      A    So beyond the six counties, I mean we
11  work throughout Northern California, we have a
12  post-adopt services program that spans 19 counties
13  throughout California. So I would say about
14  60 percent of the families that we serve are in
15  rural area and then we have urban environments that
16  we serve, like the Bay Area. We have 12 offices
17  throughout -- scattered throughout Northern
18  California. So we have some rural counties that we
19  serve and obviously urban areas like Sacramento.
20      Q    Okay. And so you -- you mentioned
21  the six counties that you provide the kinship
22  support services to. Would you characterize those

Page 27

1  as rural or urban or mixed?
2      A    They're mixed. I mean, some are more
3  rural. So Butte County is an example of where, you
4  know, you have a city with lots of different
5  communities around it that it's -- it's rural. So
6  yeah, it would be a mix.
7      Q    Okay. And do you -- in your opinion,
8  do you think there are any unique challenges that
9  face child welfare programs or services in rural
10  areas?
11      MS. UNGER: Objection.
12      THE WITNESS: Yes.
13  BY MS. SIEGENBERG:
14      Q    What are some of those challenges, in
15  your opinion?
16      MS. UNGER: Same objection.
17      THE WITNESS: Just access to
18  resources is huge. Lots of, you know, rural
19  communities don't have even a medical center to go
20  to. So internet connectivity, that can be a
21  challenge, so if you're trying to do telehelp or
22  something like that, it's very difficult. And it's

Page 28

1  just a lot of travel time for families if they have
2  to come in or out for services.
3  BY MS. SIEGENBERG:
4      Q    And do you think local
5  characteristics, like if it's rural or urban or the
6  poverty of a district, should be taken into account
7  when accessing the performance of a child welfare
8  system?
9      MS. UNGER: Objection.
10      THE WITNESS: Yes.
11  BY MS. SIEGENBERG:
12      Q    How do you think those
13  characteristics should be taken into account?
14      A    I don't know if I can answer that.
15  It's very challenging.
16      Q    So when did you first start working
17  at Lilliput?
18      A    1997.
19      Q    Wow, that's a long time at the same
20  place.
21      So turning to page 3 of your expert
22  report. So under, "Relevant Professional

Page 29

1  Background and Expertise," I think it's the second
2  sentence, you say, "I have specialized in the
3  design and implementation of kinship services
4  programming, including intensive family finding and
5  engagement, kinship support services and
6  navigation, and kinship foster care."
7      Do you see that?
8      A    Yes.
9      Q    Could you tell me a bit about your
10  experience in designing and implementing kinship
11  programming?
12      A    I think some of these are outlined in
13  this section. I would say one of my first huge
14  projects on this was on conducting a three-year
15  federal demonstration project on family finding and
16  kinship support services and how that would support
17  kinship families in maintaining placement,
18  stability, and permanency for youth placed in their
19  care.
20      Before that, though, we started
21  our -- I was involved in the implementation of the
22  kinship support services programming, so some of

8 (Pages 26 - 29)

Page 30

1   the resource centers. One of the first ones
2   started in Sacramento County in 2007. Then quickly
3   in 2008, we secured another grant contract for Napa
4   County. And then we built in Eldorado County. And
5   then just Butte County and just a couple of other
6   counties in California. So Contra Costa County,
7   which is a big urban environment.
8          Does that answer your question?
9      Q   Yes. That's helpful.
10         So starting on the very last line of
11  that page, you say, "I implemented kinship
12  navigation programs with an emphasis on supports to
13  informal or noncertified kinship caregivers, with
14  the primary goal of keeping children from entering
15  the child welfare system and/or supporting
16  certified kinship foster caregivers."
17         So is that the resource centers that
18  you were referring to or is that something
19  different?
20     A   Yes, it's the resource centers.
21     Q   The resource centers. Okay.
22         And when you say -- you describe the

Page 31

1   supports to informal or non-certified kin
2   caregivers here, what are informal kinship
3   caregivers?
4      A   So informal caregivers, which I think
5   I used the term more non-certified kinship
6   caregivers, are those families who don't go through
7   the child welfare process and the kids are placed
8   with them. And they either opt out or they just
9   don't have enough information on what that process
10  entails. And so the programs were designed to
11  address the supports and resources that were needed
12  for informal as well as formal.
13     Q   So when you say that informal are
14  really part of the child welfare system, what do
15  you mean by that?
16         That they're not formally in custody
17  of the department?
18         MS. UNGER: Objection.
19         THE WITNESS: Yes.
20  BY MS. SIEGENBERG:
21     Q   So you when say informal or
22  non-certified, are those two different things or is

Page 32

1   that the same thing?
2      A   I don't know if I understand your
3   question.
4      Q   So you say in this statement,
5   "Supports to informal or non-certified kinship
6   caregivers." And you just described to me kind of
7   what an informal caregiver is. I'm not familiar
8   with that term. But I just wasn't sure if informal
9   caregiver is the same thing as non-certified
10  caregiver or if informal is different, a different
11  thing, defined differently than non-certified.
12     A   I would define them the same.
13     Q   You would define them the same.
14         For California?
15     A   Yes.
16     Q   Okay. Do you have any experience
17  designing or implementing kinship programs outside
18  of Lilliput?
19     A   No.
20     Q   Do you have any experience designing
21  or implementing kinship programs on behalf of a
22  public agency?

Page 33

1      A   Yes.
2      Q   Could you tell me a bit about that?
3      A   So as I was speaking about Sacramento
4   County was one of the first kinship support
5   services programming that we developed in
6   Sacramento County with a clear understanding of
7   what the needs were for those particular families
8   in that particular county. So the design part
9   comes in where, you know, you're evaluating the
10  system with which you're working with. And there's
11  58 counties throughout California, so every county
12  operates a little bit differently. So that's
13  where, you know, the design part comes in.
14     Q   Okay. And what about any experience
15  designing or implementing kinship programming
16  outside of California?
17         MS. UNGER: Objection.
18         THE WITNESS: No.
19  BY MS. SIEGENBERG:
20     Q   And do you have any other firsthand
21  experience assessing a kinship program and then
22  recommending how public or a private agency can

9 (Pages 30 - 33)

Page 46

1  local child welfare agency currently?
2      A   Can you ask that again, please?
3      Q   Sure.
4          Have you ever directly worked for a
5  state or local child welfare agency?
6          MS. UNGER: Objection.
7          THE WITNESS: No.
8  BY MS. SIEGENBERG:
9      Q   Okay.  So would you agree that the
10 majority of your experience with kinship care is in
11 California?
12         MS. UNGER: Objection.
13         THE WITNESS: I don't know it I can
14 answer that.  I don't know if I understand how to
15 answer that.
16 BY MS. SIEGENBERG:
17     Q   When you say the majority -- what
18 state would you say you have the majority of your
19 experience of kinship care in?
20     A   I think the programs that I've
21 developed and ran were in California, but a lot of
22 my experience was gleaned from other colleagues

Page 47

1  that lived out of state as well, comparing
2  practices.  And Dr. Crumbley, who referred me to
3  ABC, he's a kinship -- renowned kinship expert.
4  And I've worked with them for the past 20 years.
5      Q   What is Dr. Crumbley's full name?
6      A   Dr. Joseph Crumbley.
7      Q   Okay.  And where does he work?
8      A   I don't think he's working anymore.
9  He's semiretired.
10     Q   Good for him.
11     A   It is.
12     Q   How do you know Dr. Crumbley?
13     A   We worked together.  We would bring
14 him out for training to our staff and teams early
15 on in our kinship work.  So I would say back in
16 maybe early 2000.  And so he conducted a lot of
17 trainings and consultation when we were developing,
18 you know, some of our programming.  I've seen him
19 at national conferences.  Yeah, he's -- he's a
20 colleague, and I consider him a great friend as
21 well.
22     Q   So when you -- would it be fair to

Page 48

1  say that the majority of your practical experience
2  with kinship care is in California?
3          MS. UNGER: Objection.
4          THE WITNESS: I don't know if I can
5  answer that.
6  BY MS. SIEGENBERG:
7      Q   Okay.  Where would you say the
8  majority of your practical experience is?
9      A   Practical, meaning -- can you just
10 explain what --
11     Q   Your working experience.
12     A   My direct experience?
13     Q   Yes, your director experience.
14     A   Has been predominantly in California.
15     Q   Okay.  Did you have any knowledge or
16 experience with West Virginia's child welfare
17 system before working on this case?
18     A   No.
19     Q   Okay.  So what you learned about West
20 Virginia's child welfare system, you learned
21 through your work on this case?
22     A   I'm sorry.  Ask that again.

Page 49

1      Q   Strike that.  That's fine.
2          What about West Virginia as a state
3  generally, did you have any familiarity with West
4  Virginia before working on this case?
5          MS. UNGER: Objection.
6          THE WITNESS: No.
7  BY MS. SIEGENBERG:
8      Q   Have you ever been to West Virginia?
9      A   No.
10     Q   Okay.  So could you tell me a bit
11 about your understanding of kinship care in West
12 Virginia?
13         MS. UNGER: Objection.  Confusing.
14         THE WITNESS: Can you ask that again?
15 I'm sorry.
16 BY MS. SIEGENBERG:
17     Q   Sure.
18         Could you tell me a bit about your
19 understanding of kinship care in West Virginia?
20 For example, how is kinship care defined in West
21 Virginia?
22         MS. UNGER: Objection.

13 (Pages 46 - 49)

1            THE WITNESS:  I don't -- I don't
2    know.  I was limited to the documents that I was
3    privy to in this case.
4    BY MS. SIEGENBERG:
5            Q    What do you mean by the documents
6    that you were privy to in this case?
7            A    As I was saying in the beginning, the
8    70-or-so documents that I had access to on West
9    Virginia child welfare policy, practice, and
10   whatever was noted in terms of kinship care within
11   those documents.
12           Q    So starting on page 22 of your report
13   is Appendix A, which has a list of considered
14   materials.  Are those the 70 documents that you're
15   referring to?
16           A    Yes.
17           Q    So how did you decide to include
18   those documents in this report?
19           MS. UNGER:  Objection.
20           THE WITNESS:  They were all materials
21   that I considered in forming my opinion about this
22   case.

1    BY MS. SIEGENBERG:
2            Q    And were they -- were all of the
3    documents that are listed here provided to you by
4    plaintiffs' counsel?
5            A    Yes.
6            Q    So you didn't go out and do any
7    independent research to find any of these
8    materials?
9            A    No.
10           Q    Did you do any independent research
11   on kinship care in West Virginia generally?
12           MS. UNGER:  Objection.
13           THE WITNESS:  Yes.
14   BY MS. SIEGENBERG:
15           Q    And is what you found in that
16   independent research included in this Appendix A?
17           A    Yes.
18           Q    So going back to my initial question:
19   What is your understanding of how kinship care is
20   defined in West Virginia?
21           Can you answer that question?
22           MS. UNGER:  Objection.  Vague.

1            THE WITNESS:  I don't know that I
2    could answer that question.
3    BY MS. SIEGENBERG:
4            Q    Because it wasn't in any of the
5    material that you reviewed?
6            MS. UNGER:  Objection.  Misstates the
7    witness' testimony.
8            THE WITNESS:  Can you repeat the
9    question again?  I don't know if I understand it
10   correctly.
11   BY MS. SIEGENBERG:
12           Q    Sure.
13           So why do you feel like you don't
14   have an understanding of how kinship care is
15   defined in West Virginia?
16           MS. UNGER:  Objection.
17           THE WITNESS:  I don't know that I can
18   answer that.
19   BY MS. SIEGENBERG:
20           Q    When you did your own independent
21   research in preparing this report, did you read
22   anything that provided a definition of kinship care

1    in West Virginia?
2            A    My opinion from what I have read,
3    that West Virginia was starting to develop
4    programming specific to kinship care and kinship
5    support services or kinship navigation program
6    through Mission, I think, West Virginia started in
7    2018.  So it seems relatively new in terms of their
8    practice and philosophy on movement towards, you
9    know, a really robust kinship programming.  So I
10   wouldn't want to comment on that.
11           Q    And was there a particular document
12   that you can think of that is the basis for your
13   opinion?
14           A    I know the kinship assessment that
15   was conducted by 2nd Chance actually gave a lot of
16   really good information on -- or feedback, I guess,
17   to West Virginia on the current state.
18           Q    And any -- any other documents that
19   you reviewed that kind of spoke about kinship care
20   in West Virginia?  How kinship is defined in West
21   Virginia?  West Virginia's history --
22           MS. UNGER:  Objection.

Page 54

1   BY MS. SIEGENBERG:

2     Q  -- providing kinship care

3  programming?

4       MS. UNGER: I just want to note that

5  there's a list of documents at the end of Beverly's

6  report. And she's identified them already as the

7  documents that she considered in reaching her

8  opinion.

9  BY MS. SIEGENBERG:

10    Q  Can you still answer my question?

11    A  Yes. I would say that -- I can't

12  list all of the documents. I mean, they are listed

13  in my report, but there were a number in of -- you

14  know, like the survey that they did for foster care

15  providers and feedback that they were given from

16  caregivers --

17    Q  So --

18    A  -- on kinship.

19    Q  So just to make sure that I

20  understand your opinion or your understanding of

21  where West Virginia is at right now, kinship. In

22  your review you saw material, documents, evidence

Page 55

1  speaking about semi-recent, maybe from 2018

2  forward, steps that West Virginia was taking to

3  improve and develop its kinship programming. Does

4  that sound right?

5       MS. UNGER: Objection.

6       THE WITNESS: Yes.

7  BY MS. SIEGENBERG:

8    Q  Did you see any documents or

9  information from before 2018 that spoke to West

10  Virginia's kinship programming?

11       MS. UNGER: Objection. I would just

12  note again for the record that if you look at the

13  list of documents, there are plenty of documents

14  stated to before 2018.

15  BY MS. SIEGENBERG:

16    Q  Can you still answer my question,

17  please?

18    A  Can you ask that again?

19    Q  Sure.

20      So are there any documents or

21  information that you reviewed from before 2018 that

22  spoke to what West Virginia's kinship programming

Page 56

1  looked like before 2018?

2    A  No.

3    Q  Okay. So I have a few more questions

4  about kind of your understanding of kinship care in

5  West Virginia. So to the best that you can, if you

6  could answer how you understand or what you know

7  about kinship care in West Virginia.

8      So, just to confirm, you do not know

9  how kinship care is defined in West Virginia. Is

10  that correct?

11       MS. UNGER: Objection.

12       THE WITNESS: No.

13  BY MS. SIEGENBERG:

14    Q  Do you know if there were different

15  types of kinship placements in West Virginia?

16    A  Yes.

17    Q  Okay. What are the different types

18  of kinship placements in West Virginia?

19    A  Certified and non-certified.

20    Q  Yep.

21      So how would you describe certified

22  kinship in West Virginia?

Page 57

1    A  From my understanding, certified

2  would be those families who received the same

3  access to services as families that are

4  non-related.

5    Q  Okay. And what about uncertified?

6    A  And uncertified would not get the

7  same types of supports, such as financial,

8  uncertified.

9    Q  Why do you think that uncertified

10  caregivers don't receive the same supports?

11    A  Well, it's noted in -- it's noted in

12  different places that they don't. And it's noted

13  in my report the difference.

14    Q  Can you think of any specific

15  examples off the top of your head or if you would

16  like to take a minute to review your report, you

17  can do that, too.

18       MS. UNGER: I want to note one more

19  time for the record that Beverly has said that at

20  the end of her report has all of the documents that

21  she considered in reaching the conclusions in the

22  report, which, you know, include the conclusions

15 (Pages 54 - 57)

Page 58

1    that you are now asking her about.
2         THE WITNESS: It's -- in my opinion,
3    it's kind of common knowledge that a certified
4    family gets more services than an uncertified
5    family.
6    BY MS. SIEGENBERG:
7         Q    So you mentioned financial as an
8    example of that. Can you think of any other
9    examples for West Virginia?
10        A    Training. Uncertified families are
11   not required to go through any kind of training on
12   the care and welfare of the child in their home.
13        Q    Is the training available to
14   uncertified families in West Virginia?
15        A    I don't know.
16        Q    Do you think if the training was
17   available to uncertified families, that would
18   change your opinion?
19        MS. UNGER: Objection. Calls for
20   speculation.
21        THE WITNESS: No.
22

Page 59

1    BY MS. SIEGENBERG:
2         Q    When you say that it's common
3    knowledge that uncertified caregivers receive fewer
4    supports and services, what do you mean by "common
5    knowledge"?
6         A    So I'll take it kind of back to the
7    report. In my review of the policies that West
8    Virginia had certified -- or uncertified families
9    are not required to go through the same licensing
10   standards as a certified family.
11        Q    Off the top of your head, can you
12   think of which policies you reviewed that said
13   that?
14        MS. UNGER: I want to note again for
15   the record once more, there's a list of documents
16   at the end of the report. And Beverly has already
17   stated that she based all these conclusions and
18   opinions on those reports.
19        THE WITNESS: I reviewed numerous
20   policies on adoption and foster care, so it's
21   contained in one of those documents.
22

Page 60

1    BY MS. SIEGENBERG:
2         Q    Okay. So when you say "common
3    knowledge," you mean it's publicly available
4    knowledge contained in the policies that you
5    reviewed?
6         A    I think I was -- I was speaking of my
7    knowledge about more on the national and also
8    California.
9         Q    Okay. And so you mentioned earlier
10   when you were talking about kinship services that
11   you provided in California, you mentioned that
12   there are informal kinship caregivers. And you
13   said that they were the same thing as non-certified
14   kinship.
15        Is it your understanding that West
16   Virginia has informal kinship caregivers?
17        A    Yes.
18        Q    Why is that your conclusion?
19        MS. UNGER: I want to note once more
20   that all of the documents as Beverly mentioned upon
21   which she based her conclusion are at the list at
22   the end of this report.

Page 61

1         THE WITNESS: I don't know if I can
2    answer that.
3    BY MS. SIEGENBERG:
4         Q    Is it your understanding that
5    uncertified kinship caregivers in West Virginia are
6    the same thing as -- or the equivalent of informal
7    kinship caregivers that you've spoken about and had
8    experience with in California?
9         MS. UNGER: Objection. Confusing.
10        THE WITNESS: I don't know.
11   BY MS. SIEGENBERG:
12        Q    Do you think that knowing whether or
13   not there's a distinction between those two types
14   of caregivers would be important in assessing West
15   Virginia's kinship program?
16        MS. UNGER: Objection.
17        THE WITNESS: Yes.
18   BY MS. SIEGENBERG:
19        Q    Why do you think it would be
20   important or helpful?
21        A    Well, it serves as one of the areas
22   I'm looking at as far as the types of services and

16 (Pages 58 - 61)

Page 66

1 documents that begin with the letter D, and then it
2 looks like there's one beginning with the letter P,
3 did get all of those from plaintiffs' attorneys to
4 help you in preparing your report?
5 　　　A　　Yes.
6 　　　Q　　And did you get these documents based
7 on what you requested or information you asked for
8 from them?
9 　　　　　MS. UNGER: I just want to put on the
10 record that ABC provided all of the available
11 information on kinship care of our own volution and
12 decision, I think.
13 BY MS. SIEGENBERG:
14 　　　Q　　Can you answer the question for me,
15 please, Ms. Johnson?
16 　　　A　　Can you say the question again?
17 　　　Q　　Sure.
18 　　　　　So were these documents, the ones
19 that are Bates-numbered, were they provided to you
20 based on information you asked for?
21 　　　A　　No.
22 　　　Q　　Were any of these documents provided

Page 67

1 to you in response to your request for some
2 specific piece of information you felt like you
3 were missing?
4 　　　　　MS. UNGER: I just want to put on the
5 record that ABC provided all of the documents at
6 the start of Ms. Johnson's assignment and there
7 wasn't sort of a go back and forth and provide more
8 documents throughout. You know, this is one lump
9 sum.
10 BY MS. SIEGENBERG:
11 　　　Q　　Okay. Strike that question then.
12 　　　　　Were you specifically asked to
13 include any of these documents that are listed in
14 Appendix A?
15 　　　A　　No.
16 　　　Q　　Okay. And what is your understanding
17 of your assignment in this case from the
18 plaintiffs' attorney?
19 　　　A　　To do a review of the considered
20 materials in forming my opinion and bringing in any
21 research or expertise that I had about the subject
22 of kinship care.

Page 68

1 　　　Q　　And what were you asked to provide an
2 opinion on?
3 　　　A　　West Virginia's handling of specific
4 kinship cases as part of this subclass.
5 　　　Q　　And when you say specific kinship
6 cases or when you say handling of specific kinship
7 cases, what do you mean by that?
8 　　　A　　Just my review was looking at the
9 process for which the -- is it DHHR? Sorry.
10 　　　Q　　Yes. That's fine, it's DHHR.
11 　　　A　　-- DHHR, the types of services and
12 supports that they were providing these children in
13 this particular class.
14 　　　　　MS. UNGER: I just want to jump in
15 and add something to something that I put on the
16 record before. So ABC provided this sort of lump
17 sum of documents to Ms. Johnson at the start and we
18 did supplement it a little bit throughout, but it
19 wasn't in response to Ms. Johnson's request.
20 BY MS. SIEGENBERG:
21 　　　Q　　Did you ask plaintiffs' counsel for
22 any documents or any information at any point in

Page 69

1 your process of preparing the report?
2 　　　A　　No.
3 　　　Q　　Sorry, I was asking a line of
4 questioning and then I lost track of where I was.
5 　　　　　So when you said when I asked you
6 about how -- what you meant by handling specific
7 kinship cases, and you said something along the
8 lines of children being in a specific subclass.
9 Does that sound right?
10 　　　A　　Yes.
11 　　　Q　　How would you define the subclass
12 that you're referring to?
13 　　　A　　So in my review I was asked to look
14 at the specific cases involving kinship care for
15 the children in West Virginia as part of this
16 review.
17 　　　Q　　When you say "specific cases," do you
18 mean individual children's case?
19 　　　A　　No.
20 　　　Q　　Okay. So what do you mean by
21 specific cases?
22 　　　A　　I was asked to review the kinship

18 (Pages 66 - 69)

Page 70

1    practices and policies at this time -- at the time
2    of this and provide my expertise to that.
3        Q    And when you say you were also asked
4    to provide your opinion as to the practices and
5    policies currently in place with respect to kinship
6    care in West Virginia?
7            MS. UNGER:  Objection.
8            THE WITNESS:  Yes.
9    BY MS. SIEGENBERG:
10       Q    Were you asked to provide -- strike
11   that.
12           Were you asked to look at what West
13   Virginia was doing well or just to look at what
14   they could be improving?
15           MS. UNGER:  Objection.
16           THE WITNESS:  I was asked to look at
17   it all from an objective standpoint.
18   BY MS. SIEGENBERG:
19       Q    Okay.  So can you walk me through
20   your process of preparing this report?
21       A    So I did a lot of reading and
22   reviewing of material and taking my own notes.  It

Page 71

1    was very laborious in a lot of ways, culling
2    through, you know, just probably thousands of --
3    of -- maybe more hundreds.  I didn't do a -- I
4    couldn't do that, but hundreds of pages of
5    documents, noting kind of what the -- you know, the
6    overall children welfare policy was.
7            So my process was doing a lot of
8    review and then tying that back to my own knowledge
9    base about what I know is effective kinship
10   practice for child welfare population.  So it
11   was -- and so I did a lot of writing and then I
12   would bring in other research that I know about
13   confirming what is involved in the expert report
14   that I prepared.
15       Q    And did you review any of the other
16   expert reports for this case?
17       A    No.
18       Q    You mentioned earlier that you
19   reviewed the complaint in this case.
20           Besides reviewing the complaint, do
21   you know anything about the individual named
22   plaintiffs in this case?

Page 72

1            MS. UNGER:  Objection.
2            THE WITNESS:  No.
3    BY MS. SIEGENBERG:
4        Q    So what did you do specifically to
5    learn about West Virginia's policies and practices
6    regarding kinship care?
7            MS. UNGER:  Objection.  Asked and
8    answered.
9            THE WITNESS:  Can you ask that
10   question again?
11   BY MS. SIEGENBERG:
12       Q    Sure.
13           What did you do specifically to learn
14   about West Virginia's policies and practices
15   regarding kinship care?
16       A    I reviewed the documents that were
17   available to me provided by ABC.  And then I did a
18   little bit of research on -- well, I don't know.
19   In comparison, I -- I Googled kinship care of West
20   Virginia, and was kind of surprised I didn't see a
21   lot actually out there.  And some of those
22   documents and references are obviously in the list

Page 73

1    of considered materials, in Appendix A.
2        Q    Are any of those West
3    Virginia-specific documents or information that you
4    found through your own independent Googling, are
5    those all reflected in the Bates-numbered documents
6    in Appendix A or are any of those the other
7    non-Bates-numbered sources that you have here?
8        A    They are the other -- the non-Bates
9    would be my research that I brought in.
10       Q    Okay.  And are any of these
11   non-Bates-numbered sources -- strike that.
12           Are any of these non-Bates-numbered
13   sources provided to you by plaintiffs' counsel?
14       A    No.
15       Q    So just to confirm, all of the
16   non-Bates-numbered sources you found through your
17   own experience and your own research?
18           MS. UNGER:  Objection.  Asked and
19   answered.
20           THE WITNESS:  Okay.  Can you ask that
21   again --
22

19 (Pages 70 - 73)

Page 90

1  to kinship needs, the availability of funding,
2  supports that are necessary for kinship caregivers,
3  having a kinship first philosophy from all levels,
4  and being able to provide a level of emergency
5  funding respite care, and understanding the unique
6  needs of kin caregivers, would all be encompassed
7  in best practices, like FTTA spells out.
8      Q    Where do they spell those best
9  practices out?
10     A    In -- in their licensing -- foster
11  care licensing standards.
12     Q    Is that the Program Standards for
13  Treatment Foster Care 5th Edition that you cite to
14  Note 4 on page 4?
15     A    Yes.
16     Q    In your opinion, is there a
17  difference between best practices and program
18  standards or are they the same thing in your mind?
19         MS. UNGER:  Objection.
20         THE WITNESS:  They're the same thing
21  in my mind.
22

Page 91

1  BY MS. SIEGENBERG:
2      Q    Okay.  And so the -- the Program
3  Standards for Treatment Foster Care 5th Edition,
4  that you refer to here, are those standards
5  specific to kinship programs?
6      A    It's a general overview for all
7  foster care placements, which would apply to
8  kinship caregivers, but then it culls out in each
9  of the sections the uniqueness of kinship care and
10  how you need to alter your practice to consider the
11  unique needs of kinship caregivers.
12     Q    Okay.  So were you only relying on
13  those kinship-specific portions of the program
14  standards when you were applying these standards in
15  evaluating West Virginia?
16     A    No.  I relied also on my own
17  knowledge base and expertise in running effective
18  programming for kinship caregivers that are
19  carrying for kids in the childcare welfare.
20     Q    Okay.  And in this statement in your
21  report, you also refer to the Model Family Foster
22  Home Licensing Standards.  Are those -- and those

Page 92

1  are the non-referenced standards that we were
2  talking about, right?
3      A    Yes.
4      Q    And are those standards specific to
5  kinship programs?
6      A    There is some specificity applied in
7  the foster home licensing standards from NARA.
8      Q    What do you mean by some specificity?
9      A    Just as in the FFTA's best practices
10 or the treatment -- I can't remember the exact name
11 of that document you just referred to from the
12 FFTA, sorry, treatment standards -- best treatment
13 standards for foster care.  It culls out
14 information that you need to know specifically for
15 kinship families when applying, depending on the
16 area that you're looking at.
17     Q    And how are the NARA standards
18 similar or different from the national model
19 standards adopted by the federal government?
20     A    I don't know that I can answer that.
21     Q    How come?
22     A    Because the Children's Bureau, the

Page 93

1  U.S. Department of Health and Human Services,
2  relied on NARA's foster home licensing standards to
3  base their model off of.  So I don't know that it
4  would be very much different.  And I think, again,
5  it speaks to kind of the general -- the general
6  guidelines because they're looking at across the
7  nation, right, and states.  And county entities
8  could have their own sort of ways of approaching
9  the standards.
10     Q    Are those local ways of approaching
11 the standards reflected in the NARA model
12 standards?
13     A    No, not to my knowledge.
14     Q    Are you aware that the October 2019
15 kinship study done by 2nd Chance found that West
16 Virginia meets the federal model standards for home
17 studies and caregiver training with respect to
18 kinship programming?
19     A    I -- I wasn't aware.  If they are,
20 it's October of 2019, so I would believe that
21 they're just kind of getting on that road to do
22 that, in terms of creating a strong kinship care

24 (Pages 90 - 93)

Page 94

1    program for the kids in West Virginia.

2        Q    What do you mean by that?

3        A    It's my opinion that West Virginia

4    responded kind of later in the game of kinship care

5    practices that were really prevalent nationally.

6    There was a lot going on. And it's pulled out in

7    my report, or identified in my report. So

8    that's -- that's great, 2019. And I did review

9    that report, but there were also some deficiencies

10   noted in that report.

11       Q    Okay. So when you say that West

12   Virginia -- in your opinion, based on your review,

13   West Virginia was late in the game, can you give me

14   some examples of policies or practices that you

15   think they should have adopted sooner?

16           MS. UNGER: Objection. Misstates the

17   witness' testimony.

18           THE WITNESS: I -- I -- I think in

19   2008, was when there was the Federal Opportunities

20   To Success Act -- and I probably have that -- it's

21   pointed out in my report -- to basically look at

22   removing kids -- increasing family connections and

Page 95

1    moving kids to permanent permanency. So with that

2    legislation in 2008, a lot of funding came out for

3    kinship navigation programming and ways to find

4    family.

5            So that's when the Federal

6    Administration Project began on our end in

7    California, the Lilliput Families. So there was

8    a lot of, I guess, noise about that and funding

9    available for states nationally to provide a

10   kinship support in some way.

11   BY MS. SIEGENBERG:

12       Q    Through the federal kinship

13   navigation programs --

14       A    Yes.

15       Q    -- which West Virginia now does do as

16   of today. Is that your understanding?

17       A    I believe so.

18       Q    Okay. So as of now you would agree

19   that they are involved in and working on and

20   implementing new policies and best practices for

21   kinship?

22           MS. UNGER: Objection.

Page 96

1            THE WITNESS: It appears so. Yes.

2    BY MS. SIEGENBERG:

3        Q    Okay. So going back to that sentence

4    that we were just talking about on the bottom of

5    page 4, you said that you referred to professional

6    literature in the field. What does that mean?

7        A    Research on kinship care that's

8    prevalent and provided in my list of references.

9        Q    When you say "prevalent," what do you

10   mean?

11       A    The -- the available research that's

12   available.

13       Q    On kinship programming?

14       A    On kinship -- yes, on kinship

15   programming. And the benefits and outcomes of

16   children and families in kinship care.

17       Q    And how did you decide what

18   professional literature in the field to consult?

19       A    Well, I would look at who is

20   routinely doing research on kinship care and on the

21   types of studies that are out there and whether or

22   not there are -- there's a good enough population

Page 97

1    or relevant enough population to make, you know,

2    some associations in terms of that research. So

3    whether it was robust or not.

4        Q    Okay. And on the top of page 5 you

5    say, "At this stage of the matter, plaintiffs have

6    not completed discovery and, therefore, I do not

7    have access to all of the relevant information."

8            Do you see that?

9        A    Yes.

10       Q    What relevant information did you

11   feel like you were missing?

12       A    Information on how the department is

13   tracking compliance to procedures and policies that

14   they're implementing to ensure that services and

15   programs are running to benefit the children and

16   their.

17       Q    Did you ask if plaintiffs' counsel

18   had that information?

19           MS. UNGER: I just want to put on the

20   record, again, that we provided Ms. Johnson with

21   all relevant documents that defendants had

22   produced. So if there was some document from the

25 (Pages 94 - 97)

Page 110

1    developing these programs and working with county
2    systems and doing trainings and consulting, we look
3    at, is the department doing enough to actually find
4    a family, because if we're not finding a family to
5    place, then it's kind of a moot point.  We need
6    family.  So what are the placement rates with
7    kinship?  Is there a philosophy of kin first?
8                You know, that kinship caregiving is
9    a value and that we have all levels, the courts,
10   the whole entire system wrapping themselves around
11   the practices and policies that support a strong
12   kinship system.
13               A streamlined licensing process, it's
14   very different than unmatched families coming
15   through.  Many caregivers are, at a moment's
16   notice, asked to take in a child.  They clear kind
17   of their perspective safety, we do that.  And then
18   we go back to the home and follow up with, you
19   know, a study on them and then try to connect them.
20               If we don't have that process down,
21   it's not streamlined enough, they don't really
22   understand what's going on.  It's a very traumatic

Page 111

1    situation for the family.  And it brings up a lot
2    of family dynamics.
3                So it has to include a process for
4    recognizing that we need to do some things to waive
5    sort of those non-safety regulations that would
6    ordinarily have an unmatched or a non-related
7    family opt-out.
8                Training on, you know -- to our staff
9    in the field that explores bias.  There's a lot of
10   bias that I think needs to be addressed in many,
11   many cultures of organizations and agencies.  And
12   without that, the programs, the policies,
13   procedures that we have, really are for not, if we
14   don't have a really strong training component on
15   the differences between kinship and unmatched
16   families.
17               Pre-service training for our families
18   that take into account their special needs as
19   kinship families.  Making sure we have trainings
20   that are in the evenings.  Waiting maybe certain
21   trainings on having available funding for our
22   families, such as emergency funding, just basic

Page 112

1    emergency funding available to help them with those
2    initial costs that are -- that an unmatched family,
3    or a non-related family, in foster care doesn't
4    even have to consider.  They have all this prep
5    time in going through training, kinship caregivers
6    don't normally have that.
7                And then I think a strong
8    community-based services environment where there
9    are either agencies in the community, family
10   resource centers that were connecting and linking
11   these families to.
12        Q    Did you evaluate each of these eight
13   areas for West Virginia?
14               MS. UNGER:  Objection.  Asked and
15   answered.
16               THE WITNESS:  I did what I could with
17   the available information that was provided to me.
18   BY MS. SIEGENBERG:
19        Q    Okay.  So I'm going to go through
20   each of the eight bullet point -- each of these
21   areas and ask you some questions about them.
22               So the first one is kinship placement

Page 113

1    rates.  Is a higher kinship placement rate a good
2    thing or a bad thing?
3                MS. UNGER:  Objection.
4                THE WITNESS:  It depends.  It depends
5    on the types of services and supports that are
6    available to families.  So placing with relatives
7    and -- and I will use the uncertified and not
8    certifying them and having them knowledgeable about
9    the kinds of resources and supports they can get
10   through a certification process, even though it
11   seems like a barrier to many kinship families or
12   they don't have all the information, would then --
13   that's where I would decide, "Okay.  Yeah, I think
14   that they have a good" -- it depends on the level
15   of supports that you provide families.
16   BY MS. SIEGENBERG:
17        Q    So let me just see if I'm
18   understanding you correctly.  A high or a low
19   kinship rate could be a positive or negative sign,
20   depending on the other supports that are available?
21        A    Yes.
22        Q    Okay.  Did you evaluate West

29 (Pages 110 - 113)

Page 114

1  Virginia's kinship placement rate?
2      A   I looked at that.  I had information
3  about that.
4      Q   So would that --
5      A   Yeah, I mean, over half of their
6  children are in kinship care.
7      Q   So is that a positive sign?
8      A   I see that as a positive sign.
9      Q   So the next bullet point says, "Kin
10 first philosophy that drives organizational culture
11 and subsequent practices and policies that support
12 such a philosophy."  So am I correct in
13 understanding that in your opinion having a kin
14 first philosophy or a kin first policy is a good
15 thing?
16     A   Yeah.
17     Q   Okay.  How would you generally define
18 a kin first philosophy?
19     A   I think in a nutshell it's about
20 always considering the family first regardless of
21 how difficult and complex these families are and
22 how challenging it might be to get them the

Page 115

1  supports and resources that they need, but that
2  family is considered first in the placement of a
3  child when you're looking at home care, because of
4  all the research indicating that it minimizes
5  trauma, leads to placement stability, keeps
6  children in their communities.  Especially when
7  we're looking at the disproportionately of
8  African-American and Hispanic children in the
9  system.
10     Q   Do you mean on a national scale?
11     A   Yes.
12     Q   Okay.  And what do you mean by saying
13 that this kin first philosophy should drive
14 organizational culture?
15         What does that look like?
16     A   It's -- there's a lot to it.  So I
17 don't know that I can speak completely about that.
18 But it's got to be driven from the top.  I mean, it
19 has to be administration takes a stance and they
20 are, A, listening to their constituents, listening
21 to their caregivers and relatives, and doing things
22 like, you know, applying that to the funding

Page 116

1  streams that families have access to, having
2  gatekeepers for ensuring that the policies and
3  practices for kinship care are followed through.
4          And I think having availability of a
5  system that can do checks and balances and can
6  check on the work of -- you know, of the
7  caseworkers that are involved in the direct work
8  with these families.
9      Q   So did you evaluate this bullet
10 point, this area, with respect to West Virginia?
11     A   I looked at it from that angle with
12 what I had available to me to make that evaluation.
13     Q   Okay.  So is it your understanding
14 that West Virginia and DHHR has in place a kin
15 first philosophy?
16     A   I -- I don't know that I can answer
17 that.
18     Q   Why not?
19     A   I would say it looks like, and
20 appears, that they're moving in that direction.
21     Q   What makes you say that?
22     A   Because of some of the recent

Page 117

1  policies and movement.  I mean, I think the kinship
2  care assessment was good to get some feedback from
3  an expert agency, 2nd Chance, to change things in
4  the system that needed to be changed for the better
5  of the children placed in kinship care.
6      Q   And so once you're -- strike that.
7          Am I understanding you correctly,
8  then, that your opinion is that DHHR does not
9  currently have in place a kin first philosophy, but
10 instead it's moving towards having one?
11     A   Yes.
12     Q   And just to confirm, you described,
13 in a nutshell, a kin first philosophy has meaning
14 having in place a policy where the family or
15 fictive kin, if that's an option, are always
16 considered as the first placement.  Is that right?
17     A   Yes.
18     Q   And in your review of West Virginia's
19 policies and practices, you did not see any --
20 anywhere a written policy that is the case?
21     A   No.
22     Q   Okay.  And then kind of the second

30 (Pages 114 - 117)

Page 118

1  part of this area was an organization culture.  Did
2  you evaluate that -- the organization -- whether or
3  not a kin first, or moving towards a kin first
4  philosophy, was impacting or driving organizational
5  culture in West Virginia?
6         MS. UNGER:  Objection.  Vague.
7  Confusing.
8         THE WITNESS:  Can you ask that again,
9  please?
10  BY MS. SIEGENBERG:
11     Q    Sure.
12         Basically I'm asking, did you
13  evaluate the organizational culture aspects of this
14  point bullet for West Virginia?
15     A    No.
16     Q    Okay.  Why not?
17     A    I don't know that I could.  I think
18  it was limited to what was required of me to
19  prepare this expert witness report and to review
20  the materials --
21     Q    How so?
22     A    -- that were available to me.

Page 119

1     Q    So just to make sure I understand.
2  You felt like the material that was available to
3  you were not sufficient for you to adopt that for
4  West Virginia?
5     A    Yes.
6     Q    Okay.  So when you were describing
7  for me how having a kin first philosophy would
8  drive organizational culture, you mentioned how
9  that would look.  You gave us as an example of the
10  administration taking a firm position, listening to
11  stakeholders, applying funding streams to
12  supporting caregivers.
13         Are those accurate examples of what
14  you said?
15     A    Yes.
16     Q    Okay.  Did you see evidence of any of
17  those things happening in West Virginia based on
18  the documents that you reviewed?
19         MS. UNGER:  Objection.
20         THE WITNESS:  Can you say what those
21  things were that you just talked about?
22

Page 120

1  BY MS. SIEGENBERG:
2     Q    Sure.  Maybe I'll break them up.
3         So the administration taking a firm
4  position.  Did you see that?
5     A    No.
6     Q    Listening to stakeholders?
7     A    I guess I would say I see evidence
8  that the system is moving towards that, it appears.
9     Q    Okay.
10     A    From the documents that I had access
11  to.
12     Q    Would it be accurate to say that, in
13  your opinion, you see West Virginia taking steps
14  towards putting this organizational culture in
15  place?
16     A    Yes.
17     Q    Are those steps that -- in your
18  opinion, are those steps that DHHR is taking
19  positive steps?
20         MS. UNGER:  Objection.  Confusing.
21         THE WITNESS:  I would say yes.
22

Page 121

1  BY MS. SIEGENBERG:
2     Q    Okay.  So I think before I keep going
3  on the eight bullet points, because we have quite a
4  few more of them, I wanted to see if you wanted to
5  take a short break?
6     A    Yes, that would be great.
7     Q    Okay.  So how about since it's been a
8  while, how about a 15-minute break this time?
9         MS. UNGER:  That's fine.
10         MS. SIEGENBERG:  Okay.  I'm just
11  going to round up, from 2:30 Eastern from --
12         THE WITNESS:  11:00.
13         MS. SIEGENBERG:  -- which is 11:30
14  Pacific, to 11:45 Pacific, and to 2:45 Eastern.
15         THE WITNESS:  All right.
16         (Recess from 2:27 p.m. to 2:45 p.m.)
17  BY MS. SIEGENBERG:
18     Q    So returning to where we were on your
19  list of eight factors on page 5.  The next one, I
20  think, is a streamlined licensing process for
21  kinship families.  And it includes non-safety
22  waivers.

31 (Pages 118 - 121)

Page 122

1     So in your opinion is having a
2  streamlined licensing process for kinship families
3  a good thing?
4     A   Yes.
5     Q   And is having a licensing process for
6  kinship families that includes the use or the
7  availability of non-safety waivers a good thing?
8     A   Yes.
9     Q   And, generally, when you say a
10  streamlined licensing process, what do you mean by
11  that?
12     A   That there's maybe one worker
13  involved kind of throughout that cycle.  That you
14  don't have, you know, numerous workers involved so
15  that you can engage families in an effective way,
16  that you're simplifying the process for families
17  increasing their understanding of the process of
18  which they're going to be going through.  Those are
19  a couple of things that I think would be very
20  helpful in a streamline process.
21     Q   What are some examples of simplifying
22  the process relative to kinship caregivers?

Page 123

1     A   You know, I'm going to shut my door
2  over here.  Thank you.
3     So you were asking -- again, could
4  you ask again?
5     Q   Sure.
6     So what are some examples of
7  streamlining, or simplifying, I think, was the word
8  you used, the process for relative or kinship
9  caregivers?
10     A   I think I mentioned two things.  I
11  mean, I think those are the major things.
12  Streamlining, I think, effectively recognizes the
13  emergent nature of the placement itself.  So it
14  wraps that family immediately with the emergency
15  supports and services that they usually require as
16  a kinship family.
17     Q   And did you evaluate this area with
18  respect to West Virginia?
19     A   No.  I don't know that I had enough
20  information.
21     Q   So is it your understanding that West
22  Virginia has a streamlined licensing process for

Page 124

1  kinship families?
2     MS. UNGER:  Objection.
3     THE WITNESS:  I don't know.
4  BY MS. SIEGENBERG:
5     Q   Is it your understanding that West
6  Virginia's licensing process for kinship families
7  includes the availability or the use of non-safety
8  waivers?
9     A   I don't know.
10     Q   And just to confirm, when you say you
11  don't know, is that because you haven't formed an
12  opinion on this or because you didn't have
13  information available to assess that?
14     A   I don't know that I had enough
15  information to assess that.
16     Q   Okay.  Moving on to the next bullet,
17  "Staff training on kinship care that explores bias
18  and emphasizes the distinct differences between
19  kinship/unmatched families."
20     Did you evaluate this for West
21  Virginia?
22     A   I didn't have access to what their

Page 125

1  staff training was.
2     Q   So you didn't have any information
3  about the training that caseworkers go through?
4     A   No.
5     Q   Okay.
6     MS. UNGER:  I want to put on the
7  record that Ms. Johnson didn't have access to that
8  information because defendants never produced such
9  information.
10  BY MS. SIEGENBERG:
11     Q   Moving on to the next bullet, which
12  says, "High quality, pre-service training that
13  takes into account specific kinship needs."  When
14  you say pre-service training here, are you
15  referring to training for caregivers or training
16  for caseworkers?
17     A   The training provided to the
18  caregivers.
19     Q   Okay.  I just want to make sure I
20  understood you.  What do you mean by, "takes into
21  account specific kinship needs"?
22     A   I think I referred to this the last

32 (Pages 122 - 125)

1  time, but just the emergency nature of kinship
2  families', like, inability to just prepare because
3  it's -- kids are placed usually in an emergency
4  situation.  So even just the -- the training
5  provided to kinship families and making it amenable
6  to their current needs, a lot of them are working.
7  So, I mean, I guess that's an example of what I'm
8  talking about.
9       Q    And did you evaluate if West
10 Virginia's pre-service training takes into account
11 specific kinship needs?
12      A    No.  I didn't have enough information
13 to make that assessment.
14      Q    Okay.  So you didn't review any
15 caregiver training materials?
16      A    No.
17      Q    And you didn't speak with anyone who
18 provides caregiver training?
19      A    No.
20      Q    So you don't have an opinion on how
21 West Virginia is doing with respect to pre-services
22 for caregiver training?

1       A    No.  I -- I just recall in the
2  kinship assessment that 2nd Chance did in the two
3  reports, they identified some areas that I don't
4  not exactly spoke to pre-service training, but just
5  kind of an overall consensus was not favorable in
6  terms of the practices and policies that the
7  department was adhering to in terms of supporting
8  kinship caregivers.
9       Q    But you don't have an opinion about
10 that?
11      A    No.
12      Q    Okay.  Did you know that DHHR has
13 engaged university members of the local social work
14 education consortium to develop kinship-specific
15 foster parent training?
16      A    No, I did not know that.
17      Q    Do you think that's a good thing that
18 they're doing?
19          MS. UNGER:  Objection.
20          THE WITNESS:  I don't know if I can
21 comment on that.  I -- anytime there is -- I don't
22 know -- I would have to see the university's

1  training to really be able to evaluate that.
2  BY MS. SIEGENBERG:
3       Q    Okay.  But just kind of broadly, do
4  you think it's a positive step?
5          MS. UNGER:  Objection.
6          THE WITNESS:  Again, I don't know
7  that I could answer that because I think it depends
8  on the quality of that university they're working
9  with.
10 BY MS. SIEGENBERG:
11      Q    Okay.  Moving on to the next bullet
12 point, which says, "Availability of funding to
13 support families before and after placement."  So
14 what is availability of funding before placement
15 look like for kinship caregivers?
16      A    So this is in terms of certification,
17 families that are going through the certification
18 process, so the availability of funding to support
19 that emergency placement.  So often in systems,
20 there isn't an availability to start that Title 4E,
21 foster care funding, for that child until the
22 certification is approved.

1          So this before funding is the funding
2  that would help to support the family even though
3  the child is already placed in the home.  This is
4  very different from a non-related foster care
5  environment where they have all this prep
6  beforehand, usually 9 to 12 months, then take in
7  the child for placement.
8          So you can imagine a family who, you
9  know, an aunt or a grandmother who's taking in a
10 child or relative into their home and have -- to go
11 through training for certification, and then all of
12 these myriad of need of licensing requirements,
13 including addressing the needs of the child in the
14 home.  So that's the before funding, before
15 certification, and other funding streams can be
16 accessed.
17      Q    So you are talking about availability
18 of funding to support families before and after
19 certification.  That's what this bullet point is
20 really talking about?
21      A    Yes.
22      Q    Okay.  So what is availability of

33 (Pages 126 - 129)

Page 134

1    know that I can really answer that.
2    BY MS. SIEGENBERG:
3        Q    How come?
4        A    I feel like you're asking me to
5    speculate, and I don't know that I can on that. It
6    depends, I guess, on the amounts of supports and
7    services that are provided. I mean, it's not just
8    funding, it's part of it. It's access to mental
9    health, it's access to health care, it's access to
10   support groups. It's just access to a system
11   that -- that helps to wrap services around families
12   that -- kinship families that are often
13   impoverished and not in a very good state, you
14   know, to provide and care for children and youths
15   that come from traumatic environments and
16   backgrounds.
17       Q    So in March of this year, 2020, the
18   state legislature passed a bill that provides DHHR
19   with extra funding, specifically targeted at
20   increasing payments to uncertified kinship parents.
21   Is that a positive step in your opinion?
22       MS. UNGER: Objection.

Page 135

1        THE WITNESS: I don't know that I
2    could answer that.
3    BY MS. SIEGENBERG:
4        Q    How come?
5        A    I think you're asking me to speculate
6    again on whether this infusion of funding is going
7    to lead to improvements in the system. I think
8    there are a lot of different factors that need to
9    be in place.
10       Q    Leaving aside those factors, is it a
11   good thing or not a good thing?
12       MS. UNGER: Objection.
13       THE WITNESS: Again, I don't know
14   that I could answer that.
15   BY MS. SIEGENBERG:
16       Q    Okay. Going to the next bullet
17   point, "Access to a kinship navigation program and
18   other community networks." Is having a kinship
19   navigator program a good thing?
20       A    Yes.
21       Q    And what do you mean here by "other
22   community networks"?

Page 136

1        A    One of the big stretches of a kinship
2    navigation program, across the country, if you look
3    at sort of the model, there's some aspects of that
4    model that include information referral to link
5    families to their community supports, that could be
6    a family resource center, it could be a church.
7    It's to raise awareness and to connect the dots for
8    families on vital services and supports.
9        Q    And could having a kinship navigator
10   program in place be one way that a child welfare
11   agency could facilitate that?
12       A    Yes.
13       Q    Okay. So moving to the last bullet
14   point, "Provision of other supports: Emergency
15   funding, support groups, childcare, et cetera." So
16   what do you mean by emergency funding?
17       A    Emergency funding for families, you
18   know, often I would see families who would need
19   their electricity bill paid for because there is an
20   increase number of kids in their home and it's
21   just -- so that's an example. Food, you know, kids
22   arrive, you know, you don't have the extra income

Page 137

1    to provide food, clothing, so it's -- it just makes
2    it very hard and very difficult for families to
3    really truly, you know, support those needs that
4    kids have coming in just on their basic physical
5    needs.
6        Q    Did you evaluate whether or not
7    emergency funding is available to kinship
8    caregivers in West Virginia?
9        A    I looked for it, and I don't know
10   that I could answer that question.
11       Q    How come?
12       A    I don't know that I had enough
13   information to glean that. I did numerous searches
14   on the programming and the fact that their kinship
15   navigation program just kind of recently launched.
16   So it seems fairly new. And, again, I don't know
17   that I had any access to any information that would
18   help me answer that question that was provided to
19   me in the documents.
20       Q    So when you said you did numerous
21   searches, what do you mean by that?
22       A    In my research on my own, not the

35 (Pages 134 - 137)

Page 138

1  documents that provided to me by ABC.
2      Q    Okay.
3      A    Just in terms of, you know, kinship
4  navigation, what's out there.
5      Q    So for emergency funding?
6      A    And for emergency funding.
7          So what kinds of supports and
8  services via the Mission, West Virginia, I believe
9  it's called, has taken on the kinship navigation
10 programming there.  And how easily accessible is
11 that information to families, kinship families.
12     Q    What about emergency funding that's
13 available -- that's offered directly by DHHR?
14     A    I don't -- I can't answer that
15 because I don't know that I had information
16 available to me --
17     Q    Okay.
18     A    -- to be able to do that.
19     Q    And what about childcare?
20     A    Can you ask what you're asking?
21     Q    Sure.
22          So this bullet says, "Provision of

Page 139

1  other supports."  Emergency funding is one example
2  that you list and then another example is
3  childcare.  So, I guess, what do you mean by
4  childcare?
5      A    So if we're placing with a kinship
6  relative and they happen to be working -- and I saw
7  this in a lot of cases -- you don't have the child
8  in school yet, so you're trying to basically set up
9  this child for success, and needing to take time
10 off from work, and so the availability of childcare
11 is very much a priority in many, many cases.  These
12 are working parents and they're trying to like do
13 the best they can.  And, oftentimes, childcare is a
14 barrier to kinship families being able to
15 successfully be a resource for, you know, the
16 relative that's placed with them, emergence, you
17 know, in an emergent situation.
18     Q    So what are some of the ways in which
19 a child welfare agency can help address that need?
20     A    Just funding available for them, even
21 while, you know, in the first several months of
22 that, while the family sort of adjusts, you know,

Page 140

1  their income to adjust for the child in their home.
2  Having partnerships with other childcare
3  organizations.  You know, the list for children in
4  the child welfare system who might qualify for
5  subsidized childcare is very limiting.  And so I
6  think we need to do a better job as a system in
7  helping those families identify those options.
8      Q    And did you evaluate whether or not
9  those kind of support, childcare, is available to
10 kinship caregivers in West Virginia?
11     A    I want to say I -- I tried to see
12 what was available to me, but I was limited to what
13 was available to me.
14     Q    Okay.  And then you -- going back to
15 the bullet point it says, "Provision of other
16 supports."  And you list three, "Emergency funding,
17 support groups, and childcare."  Could you give me
18 some other examples of other kinds of supports that
19 you would look for in assessing this area?
20     A    Just the tangible supports that are
21 needed, especially on the emergency basis.  If you
22 think about in the middle of the night you have a

Page 141

1  toddler and a newborn come into your home, and how
2  do you even get them some basic food.  So like the
3  availability of just an emergency response is
4  really a requirement.
5          And that doesn't always happen
6  effectively in systems.  We've set up through our
7  kinship programs an emergency response, that I
8  think has been very helpful to families, where we
9  can actually go to the store, grab the car seats,
10 you know, and provide the family with some basic
11 items that would help them in the initial stages of
12 the placement.
13     Q    Is it your understanding that DHHR's
14 written policies account for these kind of
15 emergency supports that are needed by kinship
16 caregivers?
17          MS. UNGER:  Objection.
18          THE WITNESS:  I don't recall seeing
19 anything in the materials that I reviewed specific
20 to that.
21 BY MS. SIEGENBERG:
22     Q    Okay.  So, in your opinion, does DHHR

36 (Pages 138 - 141)

Page 170

1    although, the total number of children in state
2    custody was like 46 percent up from 2014. That
3    seems like a very large number.
4            So yes, it appears that it is
5    trending in the direction of having more certified
6    families, kinship families, but I guess I question
7    how that is so given that they -- it appears that
8    there were more than 800 fewer kids being served in
9    foster care placements in 2014.
10       Q    Why does that make you question that
11   it's trending upwards for placement with certified
12   kinship relatives?
13       A    I am questioning, I guess, the data,
14   and my knowledge of how systems can take kinship
15   families and they're not in the certified or
16   uncertified, they're, what I would term, informal.
17   So the case is closed by the child welfare system.
18       Q    Okay. And so what about that leads
19   you to question that there is an increasing trend
20   of placing children with certified kinship
21   relatives?
22       A    I don't know that I had enough

Page 171

1    information to glean that for that statement in the
2    2017 report I refer to that noted that 800 fewer
3    kids were being served in foster care placements.
4        Q    In 2017 as compared to 2014. Is that
5    the statement here?
6        A    Yes.
7        Q    Okay. And so what about that
8    statement makes you question the data?
9        A    I'm trying to recall actually. It's
10   the note the West Virginia System of Care director,
11   which notes more than 800 fewer kids are being
12   served in foster care placements in October of
13   2017. Although the total number of children in
14   state custody was up 46 percent from 2014. It's
15   still a sizable percentage that are going the
16   non-certified route.
17       Q    In 2017 and 2019, it's your opinion
18   that there's a sizeable percentage that are --
19       A    That are non-certified.
20       Q    That are non-certified.
21           But going back to my initial
22   question, would you agree that if we compared the

Page 172

1    number of certified placements in 2017 to the
2    number of certified placements in 2019, that shows
3    an increasing trend of children placed in certified
4    kinship care?
5        A    Yes, it appears so.
6            Sorry, I'm trying to recollect my
7    memory on this.
8        Q    That's fine.
9        A    And I think this has to do with my
10   orientation of the California system in regards to
11   families who don't go through the certification
12   process doesn't mean that the case stays open in
13   child welfare. They can close that case out.
14       Q    Okay. So how does that relate to the
15   concern that this statement in the 2017, about 800
16   less kids being served compared to 2017 -- or,
17   excuse me, between 2017 and 2016?
18       A    I needed more information on that. I
19   wasn't given access to information that I think
20   needed to confirm that.
21       Q    To confirm what?
22       A    Sorry. I'm sorry, what are you

Page 173

1    asking?
2        Q    So you said that you were concerned
3    about the statement, which is on page 3 of Exhibit
4    No. 2, that over 800 less kids were being served in
5    foster care placements in October of 2017 than were
6    in October of 2016. Is that right?
7        A    So as I'm reviewing this paragraph,
8    this is really my statement about diverting
9    children to uncertified foster care, which is not
10   giving them similar services as of the certified
11   families receive.
12       Q    Okay. I understand that, but I'm
13   trying to kind of walk through this paragraph and
14   each of these kind of statements that you made in
15   this paragraph to better understand your
16   conclusion.
17           And so I think we established, and
18   correct me if I'm wrong, that we can agree that
19   looking at the number of children placed in
20   certified care in 2017 compared to the number of
21   children placed in certified care in 2019, there
22   does appear to be an increasing trend of placement

44 (Pages 170 - 173)

Page 174

1    in certified care.  Is that right?
2        A    But not by much.
3        Q    Okay.  But we agree that there is an
4    increase?
5        A    A slight one, yes.
6        Q    Okay.  So going back to your
7    report -- sorry, before we go back to your report,
8    so even though in your opinion it is a slight
9    increase, you would agree that an increase in the
10   number of children who are placed -- or an increase
11   in the percentage of the number of children who are
12   placed in certified care is a positive sign?
13       MS. UNGER:  Objection.
14       THE WITNESS:  Yeah, I don't know if I
15   have enough information to form an opinion on that,
16   but I certainly had enough information that I
17   reviewed -- in the documents that I reviewed that
18   West Virginia had some serious improvements to make
19   in their system in terms of supporting kinship
20   families.
21   BY MS. SIEGENBERG:
22       Q    Okay.  But specifically speaking

Page 175

1    about the number of the percentage of children who
2    are placed in certified care, which is increasing,
3    though, in your opinion it's not -- maybe not as a
4    big of an increase as you would have liked to see,
5    but increase nonetheless is a positive indicator.
6    Is that correct?
7        MS. UNGER:  Objection.
8        THE WITNESS:  Again, I don't know
9    that I have enough information to form an opinion
10   on that.
11   BY MS. SIEGENBERG:
12       Q    Okay.  So I'm going back to the same
13   paragraph on page 2.  Right after noting that, "As
14   of December 2019, 31 percent of children are in
15   certified kinship homes and 21 percent of children
16   are in uncertified kinship placements."
17       In the next sentence you state, "This
18   trend of placing children in uncertified kinship
19   care is identified in the summary of findings of
20   youth and foster care placement reporting prepared
21   by the West Virginia System of Care Director, which
22   notes that more than 800 hundred fewer kids were

Page 176

1    being served in foster care placements in October
2    of 2017 than were in October 2016."
3        Do you see that statement in your
4    report?
5        A    Yes.
6        Q    Okay.  So when you say this trend of
7    placing children in uncertified kinship care, what
8    do you mean by trend?
9        A    I think I'm just meaning the practice
10   of placing children in uncertified homes.
11       Q    Okay.  And what do you mean by
12   practice?
13       A    It kind of goes back to the services
14   and supports that are necessary in homes, and my
15   general opinion based on my professional experience
16   that families who are going to go through the
17   certification process have greater access to
18   services and supports.
19       Q    Okay.  When you have say that there's
20   a trend, or you just clarified a practice, of
21   placing children in uncertified kinship care, what
22   do you mean by that?

Page 177

1        A    I don't know if I understand what
2    you're trying to ask.
3        Q    So in your opinion, is there a trend
4    or practice of placing children in uncertified
5    kinship care in West Virginia?
6        A    There are almost an equal number of
7    certified and uncertified kinship families in their
8    system, so yes.  I would say yes.
9        Q    So going back to the numbers that you
10   gave for December 2019, there are -- as of
11   December 2019, there was 31 percent of children in
12   certified kinship homes and 21 percent in
13   uncertified homes.  Is that correct?
14       A    I'm sorry, can you please repeat what
15   you just said?
16       Q    Sure.
17       So based on the percentages for
18   December 2019, that you give in your report, as of
19   December 2019, there were 31 percent of children
20   placed in certified kinship homes and 21 percent in
21   uncertified.  Is that right?
22       A    Yes.

45 (Pages 174 - 177)

1       Q    So in total, that would be 52 percent
2   of children in West Virginia are placed in some
3   kind of kinship placement.  Is that right?
4       A    Yes.
5       Q    Isn't it about -- of the 50 percent
6   of children who are placed in some kind of kinship
7   placement in December 2019, isn't -- aren't the
8   majority of them placed in certified placements?
9       MS. UNGER:  Objection.
10      THE WITNESS:  It appears that is the
11  case.
12  BY MS. SIEGENBERG:
13      Q    So then can you explain why, in your
14  opinion, there is a trend or a practice of placing
15  children in uncertified kinship care when the
16  majority of the children who are in some kind of
17  kinship placement are in a certified kinship
18  placement?
19      MS. UNGER:  Objection.
20      THE WITNESS:  I think -- again, this
21  is about my perspective and experience working
22  within the California system, and uncertified --

1   the word uncertified, you know, what does that
2   truly mean, because there are definitely relatives
3   under the radar of child welfare that basically opt
4   out of the system entirely.
5   BY MS. SIEGENBERG:
6       Q    Okay.  And would those be -- would
7   those be the informal kinship caregivers that you
8   described to us earlier?
9       A    Yes.
10      Q    Okay.  But --
11      A    So -- sorry.
12      Q    Go ahead.
13      A    It gives me pause when I see this
14  certified and uncertified, and uncertified in West
15  Virginia.  Like, I don't know that I had enough
16  information to kind of form an opinion about that
17  to really differentiate what they really mean by
18  uncertified.
19      Q    So would you say that your concern
20  comes from not being able to verify that
21  uncertified kinship caregivers are different and
22  distinct from the informal caregivers that you have

1   experience with in California?
2       MS. UNGER:  Objection.  Vague.
3       THE WITNESS:  I would say yes.
4   BY MS. SIEGENBERG:
5       Q    So if I told you that all children
6   who are placed in uncertified placements are
7   formally within the custody of DHHR, would that
8   help your understanding of what uncertified kinship
9   means in West Virginia?
10      MS. UNGER:  Objection.
11      THE WITNESS:  I don't know that I
12  would have enough information to answer that.
13  BY MS. SIEGENBERG:
14      Q    Okay.  I'm going to introduce another
15  document.  We've been speaking about it already,
16  but it is the December -- it's the document that
17  you relied on for the December 2019 placement
18  rates.  If you refresh your Exhibit Share window,
19  you should be able to see it.  It's Exhibit 3.
20      A    Yes, I see it.
21      (Johnson Deposition Exhibit Number 3
22       marked for identification.)

1   BY MS. SIEGENBERG:
2       Q    Okay.  So is this the document that
3   you relied on for the number of 21 percent of
4   children being placed in uncertified placements?
5       A    Yes.
6       Q    Okay.  And that's based on the
7   numbers that are reported in this document for the
8   uncertified kinship placement type.  Is that right?
9       MS. UNGER:  Objection.
10      THE WITNESS:  That's what I'm
11  assuming that is.
12  BY MS. SIEGENBERG:
13      Q    Okay.  Is it your understanding that
14  all of these uncertified placements are permanently
15  uncertified, that they will remain uncertified?
16      A    I don't know that I could answer
17  that.  I don't know.
18      Q    Do you know how many of these
19  uncertified placements are in the process of going
20  through certification?
21      A    I don't know.
22      Q    Is it your understanding, generally,

Page 182

1 that it takes some amount of time to become
2 certified, it's not just an immediate or a
3 few-day-long process, right?
4      MS. UNGER: Objection.
5      THE WITNESS: I don't know how long
6 that process takes in West Virginia.
7 BY MS. SIEGENBERG:
8      Q    How long does the process take in
9 California?
10      A    We are required to have a 90-day
11 turnaround from -- at the point of referral.  And
12 in our agency's case, we're dealing within 45-
13 to-60 day.
14      Q    Okay.  But even if -- even if it --
15 even if certification could happen in three days,
16 magically, it would still take some amount of time
17 to become certified.  Is that right?
18      MS. UNGER: Objection.
19 BY MS. SIEGENBERG:
20      Q    Some period of time where the
21 caregiver is going through the certification
22 process?

Page 183

1      A    I don't know that I can answer that.
2 It's kind of a point of reference.
3      Q    Okay.  Is it your understanding in
4 West Virginia, that during the time the caregiver
5 is going through the process of becoming certified,
6 that caregiver is an kinship placement?
7      A    I'm sorry, can you please repeat that
8 again?
9      Q    Sure.
10      Is it your understanding that in West
11 Virginia, while the caregiver is going through the
12 process of becoming certified, that caregiver is an
13 uncertified kinship placement?
14      MS. LOWRY: Objection.  Confusing.
15      THE WITNESS: I don't know.  I
16 actually don't know how to answer that question.  I
17 don't know that I have enough information to answer
18 that question.
19 BY MS. SIEGENBERG:
20      Q    What information would be helpful to
21 have in answering that question?
22      A    Well, I wasn't given access to that

Page 184

1 type of information, so I couldn't answer you.
2      Q    What type of information?
3      A    It would be information that
4 particular had on that report -- had on the
5 timeline on that process and what that involved.
6      Q    Okay.  So like how long it takes in
7 West Virginia for a caregiver to become certified.
8 Is that the kind of information that you're
9 thinking of?
10      A    Yes.
11      Q    Okay.  And isn't that an important
12 piece of information in forming an opinion?
13      MS. UNGER: Objection.
14      THE WITNESS: I don't know that I
15 have enough information to form -- I did form an
16 opinion, and I had enough information to come to a
17 conclusion that is provided in my expert witness
18 report that confirmed, I think, the serious, like,
19 improvements that needed to be made in terms of the
20 provision of services to kinship families in West
21 Virginia.
22

Page 185

1 BY MS. SIEGENBERG:
2      Q    But that opinion is based, in part,
3 on this document that we're reviewing, which is
4 where you got the 21 percent of uncertified -- of
5 children being placed in uncertified placements.
6      I'm asking, do you think it would be
7 important to know how long it takes for a caregiver
8 to become certified and whether or not during that
9 time they are in an uncertified kinship placement
10 and being able to draw a conclusion or form an
11 opinion based on the number at 21 percent of
12 children are placed in uncertified kinship
13 placements?
14      MS. UNGER: Objection.  Vague.
15 Confusing.
16      THE WITNESS: I was only given access
17 to the information I had, so I don't know if I can
18 answer that question.
19 BY MS. SIEGENBERG:
20      Q    But you feel that even though you
21 didn't have access to that information, you were
22 still able to form an opinion and come to a

47 (Pages 182 - 185)

Page 186

1  conclusion based on this document that we're
2  looking at on the number of children being placed
3  in uncertified placements?
4       MS. LOWRY: Objection. Misstates the
5  witness' testimony.
6       THE WITNESS: Can you clarify what
7  you're asking, please?
8  BY MS. SIEGENBERG:
9       Q    Why do you feel that you had enough
10  information available to you to form an opinion
11  based on the document that we're looking at, which
12  states that 21 percent of children are placed in
13  uncertified kinship placements if you are not sure
14  how uncertified kinship placement is defined and
15  whether or not it includes caregivers who are in
16  the process of becoming certified?
17       MS. UNGER: Objection.
18       THE WITNESS: Yeah, I don't know how
19  to answer that question.
20  BY MS. SIEGENBERG:
21       Q    I'm just trying to determine the
22  basis for the opinion that you've stated.

Page 187

1       A    Again, I mean, I was only given the
2  information that I had to review, so I'm unsure, I
3  think, of what you're asking.
4       Q    So if we were to say that 90 percent
5  of these uncertified kinship placements in this
6  document that we're looking at are in the process
7  of becoming certified and did not intend to remain
8  uncertified, would that change your opinion?
9       MS. UNGER: Objection. Calls for
10  speculation.
11       THE WITNESS: I don't know that I
12  could answer that.
13  BY MS. SIEGENBERG:
14       Q    How come?
15       A    Again, I think I'll just refer back
16  to my report and the documents that I did review,
17  and that I had to form an opinion based on what was
18  available to me at the time and also bringing in
19  the decades of work that I've done in kinship care
20  on the types of services necessary for both
21  certified and non-certified kinship. They're all
22  kind of the same families.

Page 188

1       Q    I guess, I'm just asking, in your
2  opinion, if you had a document or a piece of
3  evidence that indicated that 90 percent of these
4  uncertified kinship placements are in the process
5  of becoming certified and do not intend to remain
6  certified, and you factored that into your review,
7  would it change your opinion?
8       MS. UNGER: Objection. Hypothetical.
9       THE WITNESS: I couldn't answer that.
10  You're asking me to speculate on something. I
11  couldn't answer that.
12  BY MS. SIEGENBERG:
13       Q    Why can't you answer that?
14       MS. UNGER: Asked and answered.
15       THE WITNESS: I don't have a crystal
16  ball. I couldn't -- I couldn't -- I don't know. I
17  couldn't answer that in an intelligent way.
18  BY MS. SIEGENBERG:
19       Q    I guess I'm just trying to figure
20  out, it seems that you were willing to speculate
21  and draw a conclusion based on the 21 percent
22  that's represented in the chart despite not having

Page 189

1  more information about whether or not any of these
2  caregivers were in the process of becoming
3  certified, how many of them were in the process of
4  becoming certified, whether or not caregivers who
5  are in the process of becoming certified are
6  reflected in that number. And you came to a
7  conclusion even though you didn't have that
8  information.
9       So now I'm posing the question asking
10  you -- I am asking you to speculate and to come --
11  have an opinion about if I were to tell you that 90
12  percent of these uncertified kinship placements
13  were in the process of becoming certified and do
14  not intend to remain certified, what would your
15  opinion be then?
16       MS. UNGER: Objection. Calls for
17  speculation.
18       THE WITNESS: Again, I don't know how
19  I could intelligently answer that question.
20  BY MS. SIEGENBERG:
21       Q    How come?
22       A    I didn't have access to information

48 (Pages 186 - 189)

Page 190

1    in which to glean an opinion.

2       Q   But you were able to form an opinion

3    based on this document without that information

4    when you wrote this report.  Are you saying that

5    that was not an intelligent or informed opinion?

6       MS. UNGER: Objection. Misstates the

7    witness' testimony.

8       THE WITNESS:  I'm trying to

9    understand what you're asking me right now.  So I

10    don't know if you want to repose what you said.

11    BY MS. SIEGENBERG:

12       Q   I think let's move on.

13       So going back to your report, the

14    next sentence after the one that we were talking

15    about dealing with a while ago, states that,

16    "There's a growing concern that this practice of

17    diverting children to uncertified foster homes

18    denies them similar services, especially financial

19    supports and exposes them to potential safety risks

20    than those in certified foster families."

21       Do you see that statement?

22    A   Yes.

Page 191

1       Q   Okay.  What do you mean by diverting

2    children to uncertified foster homes?

3       A   I provided testimony earlier on the

4    options available to kinship families right at

5    placement that really informed them of the routes,

6    you know, the types of services and supports given

7    the different, I guess, channels and options.

8       So for certification and

9    non-certification, and then in many cases -- many,

10    many cases, families are not informed, they attest

11    to that, that had they known that they could go

12    through certification, had they had a system that

13    was pro-kin in its approach, that they would have

14    better services for their kids that they are trying

15    to support in their home.

16       Q   Okay.  That's helpful.

17       So if I'm understanding you

18    correctly, when you speak of diverting children,

19    you mean that if the caregiver was provided more

20    understanding -- provided more information about

21    certification, the process, the benefits of

22    certification, then they would not be uncertified.

Page 192

1    Does that sound right?

2       A   Yes.  That they might actually

3    consider going through a certification process.

4    And I think also tandem to that is, you know, a

5    worker who's trained in engaging the family in that

6    capacity to really have an understanding of what

7    kinds of supports they're going to receive to even

8    get through that certification process.

9       Q   Okay.  And is it your opinion that

10    this practice of diverting children to uncertified

11    foster homes is happening in West Virginia?

12       MS. UNGER: Objection.

13       THE WITNESS:  I don't know -- I don't

14    know that I have enough information to form an

15    opinion on that.

16    BY MS. SIEGENBERG:

17       Q   Okay.  So this growing concern that

18    you reference, that's just, generally speaking,

19    about foster care in general, it's not specific to

20    West Virginia?

21       MS. UNGER: Objection.

22       THE WITNESS:  Yeah, I don't know.  I

Page 193

1    don't know that I would answer that.

2    BY MS. SIEGENBERG:

3       Q   Because you didn't have the documents

4    available to you or because you haven't drawn a

5    conclusion about it with respect to West Virginia?

6       A   I think I've drawn some conclusion to

7    that based on my own professional expertise in this

8    area, but I -- California is kind of my

9    perspective, in what we do here, and I don't know

10    that I had enough information regarding West

11    Virginia specifically that I could form an opinion.

12       Q   Okay.  So what -- what is the basis

13    for your conclusion that the placement of children

14    in uncertified kinship homes exposes them to

15    potential safety risks compared to placement in a

16    certified kinship home?

17       A   I think it's based on not only

18    caregiver feedback, but, you know, I have documents

19    that I referred to in regards to specifically in

20    West Virginia, but I think it is global, of the

21    lack of services and supports for uncertified

22    families as compared to certified families.

49 (Pages 190 - 193)

1    Q    Okay.  So, in your opinion, is the
2  placement of children in uncertified kinship homes
3  exposing them to potential safety risks as compared
4  to a placement in a certified kinship home in West
5  Virginia?
6    A    Yes.
7    Q    Okay.  What specifically is that
8  opinion based on?
9    A    You know, as I studied the CFSRs and
10  all of the different documents that I've had access
11  to, if certified kinship families are saying, "Yes,
12  I didn't see my caseworker," and making allegations
13  that they did not have services and supports, and
14  the fact that, you know, all three years that I
15  looked at for the CFSRs, the outcomes were very
16  poor in West Virginia, then I could make some of
17  the same inferences with this population of
18  kinship.
19    Q    So is it your conclusion about how
20  uncertified kinship -- how children in uncertified
21  kinship placements, is that based on information
22  and data that you have about how children --

1  information and data that you have about the
2  outcomes for children who are placed in certified
3  or traditional foster homes?
4    A    I don't know that I had enough
5  information provided, but I certainly had, you
6  know, enough to form an opinion.  Perhaps it's
7  globally when you're looking at kinship care across
8  the country.
9    Q    Okay.  But I just asked you if you
10  had drawn that conclusion specifically with respect
11  to West Virginia, and you said yes.  And then you
12  said that you drew a number of inferences based on
13  the performance of West Virginia in outcomes for
14  children who are placed in certified and
15  traditional homes.  Is that right?
16    A    Yes.
17    Q    Okay.  Did you see any data or
18  information specifically about how children are
19  doing who are placed in uncertified kinship care?
20      MS. UNGER:  Objection.
21      THE WITNESS:  No.  I wasn't given
22  access to that type of information.

1  BY MS. SIEGENBERG:
2    Q    And why, in your opinion, do you feel
3  like it's reasonable to be able to draw that
4  conclusion from data and information that is
5  reported on outcomes for all children in the West
6  Virginia foster care system, not just children
7  specifically in kinship placements or in
8  uncertified kinship placements?
9    A    I would say because my opinion was
10  based on a thorough review of documents, such as a
11  kinship care strengths assessment that was
12  conducted in 2019, a caregiver served a -- that had
13  created a response rate where kinship caregivers
14  were reporting what some of the deficits were in
15  the kinds of supports and services that they
16  received.
17    Q    Okay.  So was there any information
18  reported in that survey about the outcomes of
19  children who are in certified or uncertified
20  kinship placements?
21    A    No.  And I would say from my
22  experience in systems I have worked in, it is

1  oftentimes difficult to tease that out.  So I
2  didn't have access to that information, no.
3    Q    Okay.  Looking at the report, going
4  to page of 8 of the report.
5    A    Sorry.  Are you referring to a page
6  number right now?
7    Q    Sorry.  Page 8 of your report.
8    A    Okay.  Thanks.
9    Q    So you say that, "Relative caregivers
10  often are not given complete information about the
11  process with which they are about to embark and the
12  services available to them if they become
13  certified."
14      Do you see that?
15    A    Yes.
16    Q    Okay.  Is that your opinion about
17  kinship generally or was that your conclusion about
18  West Virginia kinship programs specifically?
19    A    Generally.
20    Q    Okay.  And then, I think, the next
21  sentence you say, "In many cases families feel
22  compelled to use the informal route out of fear

Page 198

1 that the department will not place children with
2 them if they decide to become certified."
3     Do you see that statement?
4     A   Yes.
5     Q   Is that your opinion about kinship
6 care generally or is that your conclusion about
7 West Virginia's kinship program specifically?
8     A   It's a general statement.
9     Q   Okay.  And then the next sentence you
10 say, "This practice of diversion often greatly
11 limits families' access to necessary services and
12 supports, which is detrimental to children's
13 stability and permanency."
14     Do you see that statement?
15     A   Yes.
16     Q   Is that your opinion about kinship
17 care generally or is that your conclusion about
18 West Virginia's kinship program specifically?
19     A   It's general based on numerous
20 studies and caregiver feedback via surveys and the
21 references I provided in my report.
22     Q   Then at the end of page 8, and then

Page 199

1 going into the beginning of page 9, you state that
2 you did not have access to records of a safety
3 screen.  Do you see where you say that?
4     A   Yes, I do.
5     Q   Did you ask to see a safety screen?
6     A   I might have asked to see a safety
7 screen.  I don't recall.  I mean, the basis of my
8 expert witness report really was on the documents
9 that were provided to me and any that were added
10 along the way.  It was, you know, a conversation
11 about, "Hey, we uploaded ten new documents for you
12 review."  And then I went in and reviewed.
13     Q   Okay.  Would it have been helpful to
14 your analysis if you had been able to see a copy of
15 a safety screen?
16     MS. UNGER:  Objection.
17     THE WITNESS:  Yes.
18 BY MS. SIEGENBERG:
19     Q   Okay.  You state on page 9, "There is
20 a concern regarding whether DHHR is conducting
21 these required home studies and safety checks on a
22 consistent basis across the state."

Page 200

1     Do you see that statement?
2     A   Yes.
3     Q   What do you mean by a concern
4 regarding whether or not these home studies and
5 safety checks are being conducted?
6     MS. UNGER:  Sorry, you guys are on
7 page 9, you said?
8     MS. SIEGENBERG:  Yes, we're on page
9 9.
10     THE WITNESS:  I'm sorry, can you
11 restate your question, please?
12 BY MS. SIEGENBERG:
13     Q   Sure.
14     I guess I'm just trying to understand
15 what you meant by this statement.
16     A   If you look at the entire paragraph,
17 I think it's -- because I did not have information
18 to really assess that, I questioned whether home
19 studies and safety checks were done on a consistent
20 basis based on, you know, the independent agency
21 that evaluated and provided feedback on practices
22 and policies and noting inconsistencies in unit

Page 201

1 workers' use of policies and practices, such as
2 approving waivers.  And then also the testimony
3 provided by Ms. Boley-Rogers, that confirms there's
4 really little to no systemic or systematic data
5 reporting to track compliance on policy.
6 BY MS. SIEGENBERG:
7     Q   Is it your understanding that in West
8 Virginia, the home study or safety check itself can
9 be waived?
10     A   I'm sorry, I didn't hear that.  Say
11 that again.
12     Q   Is it your understanding that in West
13 Virginia, the kinship home study or safety
14 assessment itself can be waived?
15     A   No.  I'm not aware that a safety
16 check could be waived.  I'm not sure about the home
17 study though.
18     Q   Okay.  So I guess I'm trying to
19 understand, you mentioned waivers when you were
20 explaining the concern about these home studies and
21 safety checks being performed on a consistent
22 basis.  I'm just trying to understand where that

Page 214

BY MS. SIEGENBERG:

Q   But you were able to draw a conclusion that DHHR is not monitoring compliance with policy even though you did not have that information available to you?

A   Again, I could only base that on the information that was presented to me provided in this testimony as well as, I believe, the kinship care strengths assessment in March of 2019 addressed that as well.

Q   Did you see have any evidence that DHHR is not tracking compliance at all?

MS. UNGER:  Objection.

THE WITNESS:  I don't think I can answer that question.

BY MS. SIEGENBERG:

Q   How come?

A   I'm limited to the information that I was asked to review.

Q   So did you review any evidence that indicated that DHHR is not tracking compliance at all?

Page 215

A   Well, I think I noted what was in Ms. Boley-Rogers' testimony.

Q   You noted that Ms. Boley-Rogers confirmed that there is little to no systematic data reporting to track compliance.  And we just looked at the deposition testimony that you based your conclusion on, which described manual tracking.  And I asked if manual tracking is an effective way of monitoring policy compliance, and you told me that it depends on information that you did not have available to you.

Does that sound like an accurate summary?

A   I don't want to profess that I am an expert on tracking information and data, but if you look at outcomes reporting, there's got to be a systematic way that you're reporting this information that you'll able to cull results in a very quick way.  I think manual reporting probably isn't the most effective way to do that.

Q   Why do you think it's not the most effective way -- or strike that.

Page 216

Do you think it is an effective way, even if it is not the most effective way?

MS. UNGER:  Objection.  Ambiguous.

THE WITNESS:  I can't answer that.

BY MS. SIEGENBERG:

Q   So besides for this deposition testimony that we just discussed, is there anything else that supports your conclusion that there's no systematic data reporting to track compliance?

A   I don't -- I don't recall.  I don't think so.  I have a note not in my expert witness report on the kinship strengths assessment, I'm just trying to find where that was noted.

Sorry, I'm just looking at the report on the study of kinship care families, October 2019, and that there's a wide range of policy and practice on interpretation among and within the regions.

Q   And how does that support your conclusion that there is not effective systematic reporting or compliance with policy.

A   In my mind, I think it adds to the

Page 217

argument that there -- it's already known that policies and practices are not being followed and adhered to and that there's no way of really assessing that through some kind of a tracking mechanism.

Q   So in your opinion, regional supervision of caseworkers and of casework is not an effective way of monitoring policy compliance?

MS. UNGER:  Objection.

THE WITNESS:  I guess I would say yes, that is my opinion.

BY MS. SIEGENBERG:

Q   How come?

Why is regional supervision not an effective way of monitoring policy compliance?

A   I'm sorry.  I don't know if I understood regional supervision.  What -- what does that mean?

Q   The local supervisor of the caseworkers supervising, reviewing, monitoring their casework.  Is that an effective way of ensuring that policy is complied with?

55 (Pages 214 - 217)

Page 218

1      A    I work in a smaller system, and I
2  would have to say that we have supervisors and
3  directors in distinct regions and there's always a
4  drift.  There's always a drift, so you have to
5  maintain some kind of oversight to compare and to
6  have something systematically to measure data and
7  ensure adherence to policies and procedures.
8          And this is an agency with 150, I
9  can't remember imagine any systems where there are
10 many, many, many more regions and population of
11 child welfare workers.
12     Q    Do you know how many regions there
13 are in West Virginia?
14     A    I believe there are four, from what I
15 reviewed in the report.  And lots of counties.
16 Lots more counties than I expected.
17     Q    So in your opinion, having oversight
18 located at each of those regions, supervising
19 supervisors and then those supervisors overseeing
20 caseworkers, would that be an effective way to
21 ensure compliance with policy?
22          MS. UNGER:  Objection.

Page 219

1          THE WITNESS:  I want to make sure
2  that I am answering what you're asking me, so can
3  you please repeat the question?
4  BY MS. SIEGENBERG:
5      Q    I think I'm just trying to understand
6  the basis for your opinion that local supervision
7  of a direct supervisor overseeing casework and that
8  direct supervisor having to report up the chain to
9  higher management does not provide adequate
10 oversight to ensure compliance with policy?
11     A    I don't believe it would be
12 effective.  How is that information being
13 translated?  I mean, there's just so many variables
14 that I don't think I could answer that question.
15     Q    Okay.  So turning back to your
16 report, back to page 9, right after where we left
17 off.  You state, "After children are placed, these
18 uncertified kinship homes, which are not under the
19 same licensing and training requirements as
20 certified foster homes, received fewer services,
21 including regular contact with caseworkers and
22 other service providers to assess safety and risk."

Page 220

1          Do you see that statement?
2      A    Yes.
3      Q    Is that conclusion regarding
4  uncertified foster care generally or is that your
5  opinion specifically about West Virginia?
6      A    It's general.
7      Q    Okay.  And then starting -- you start
8  discussing this at the end -- right on the end of
9  the last two lines of page 9, and then continuing
10 on to page 10.  You say that, "Caseworkers are not
11 complying with the monthly face-to-face visit
12 policy for children in kinship placements."
13          Do you see that?
14     A    Yes.
15     Q    What's the basis for that opinion?
16     A    It's based on the caregiver's survey
17 that I reviewed and the report back from the 627,
18 or so, kids and foster caregivers in West Virginia
19 who reported how many times they seen their DHHR
20 worker -- I'm sorry, department worker, either
21 monthly.  So it was -- it was based on that.
22     Q    Okay.  Anything else or just that?

Page 221

1      A    That's it.
2      Q    Okay.  I'm going to introduce on
3  Exhibit Share as Exhibit No. 5, the Foster Parent
4  Survey that you were just referring to.
5          (Johnson Deposition Exhibit Number 5
6  marked for identification.)
7  BY MS. SIEGENBERG:
8      Q    If you could let me know when you see
9  that on your end.
10     A    I see it.
11     Q    Okay.  And just to confirm for the
12 record, this is the Foster Parent Survey that you
13 were referring to?
14     A    Yes.
15     Q    Okay.  And could you direct me to
16 where in this document, I think on this page, what
17 the basis is for your conclusion that these workers
18 are not meeting the monthly face-to-face visit
19 policy.
20     A    Well, if you look at page -- Exhibit
21 5, the first page --
22     Q    Okay.

56 (Pages 218 - 221)

Page 238

1      Q    Was the caregiver survey that is
2   Exhibit 5, does that reflect the quality of the --
3   of the visits that parents are receiving?
4      A    Not to my knowledge, it doesn't speak
5   to that.
6      Q    Okay.  So turning back to your
7   report, on page 11 of your report, you say that,
8   "In 2011, West Virginia had some of the most
9   stringent standards as compared to federal
10  regulations and/or the Council on Accreditation."
11          Do you see that statement?
12     A    What page are you on?
13     Q    Page 11.
14     A    I'm sorry, I'm having a hard time
15  finding that.
16     Q    So on the top of page 11, the second
17  sentence.  "In 2011, West Virginia had some of the
18  most stringent standards as compared to federal
19  regulations and/or the Council on Accreditations."
20     A    I know that's in there, but I
21  don't -- this is the August 11th.  Okay.  Yes, I
22  see it.  I see it.

Page 239

1      Q    Okay.  So what are the standards that
2   you're referring to there that you're describing as
3   stringent in 2011?
4      A    This is a report that I reviewed on
5   West Virginia and the use of waivers for
6   non-safety-related requirements.  So, you know, my
7   research of West Virginia's use of waivers, this
8   came up in the creation of a committee to explore
9   how to simplify that process, which, in my opinion,
10  is a good thing to do.
11     Q    Okay.  So in your opinion, the
12  stringent standards for licensing kinship
13  caregivers and the stringent standards for waivers
14  was a good thing or a bad thing?
15         MS. UNGER:  Objection.
16         THE WITNESS:  The stringent
17  standards, from my recall of that document that I
18  reviewed, was that that it was -- it was too
19  difficult, okay, too difficult for relative
20  caregivers to get through that, that they weren't
21  waiving a lot of non-safety.  So they needed to
22  take a look at that in 2011.  So it prompted them

Page 240

1   to address it.
2   BY MS. SIEGENBERG:
3      Q    Okay.  So the use of non-safety
4   waivers in sort of licensing kinship caregivers is
5   a good thing?
6          MS. UNGER:  Objection.
7          THE WITNESS:  It can be.
8   BY MS. SIEGENBERG:
9      Q    Okay.  So then when you continue on
10  in the sentence and you say that West Virginia
11  created a committee to explore the avenues for
12  which to simplify the process for relatives, that
13  was a positive step in your opinion?
14     A    Back in 2011 when they formed that
15  committee.
16     Q    Okay.
17     A    But I go on to say, you know, I would
18  love to see more information on the data on the
19  non-safety-related waivers that they had issued for
20  relatives.  Because increasing the number of
21  services to certified families is really key, but
22  the -- the increase that they had was not a

Page 241

1   significant enough effect on increasing certified
2   families.
3          So, you know, I don't know that it
4   changed the numbers on in an effective way of more
5   families being waived -- you know, more certified
6   families having that waived so that they could
7   become certificated and have greater access.
8      Q    And what's your basis for that
9   opinion?
10     A    Well, I think I mentioned that I
11  don't know that I have information to show me.  I
12  don't have enough access to information on the
13  number of non-safety waivers at the department,
14  conducted, I guess, or issued or approved from
15  2011.
16     Q    Okay.  And on page 11, the last
17  sentence of this in your report, you state,
18  "Presently absence of data on kinship placement
19  stability and well-being in uncertified homes
20  across the field limits this reviewer's ability to
21  evaluate policies regarding this practice of
22  diversion to uncertified kinship homes."

61 (Pages 238 - 241)

Page 242

1          Do you see that statement?
2      A    Yes.
3      Q    What do you mean by absence of data?
4      A    This is speaking to kinship
5  placements stability in uncertified homes and that
6  departments across, you know, the nation, we can do
7  studies and conduct research on the certified
8  families, because we have access to them, but,
9  generally speaking, for uncertified families,
10  that's not the case in the kinship arena.  So it's
11  that informal that I am referring to, which is a
12  combination, I think, of what West Virginia, I
13  think, would term uncertified and then just
14  completely, like, on your own, not in -- you know,
15  that the child does not have a dependency case.
16     Q    So this statement, is this your
17  opinion about the child welfare system generally or
18  is this your opinion specifically about West
19  Virginia?
20     A    It's general.
21     Q    Okay.  Turning to page 14 of your
22  report, towards the bottom of page 14, you state,

Page 243

1  "Families are not given information regarding the
2  options and additional supports from which they
3  could benefit."
4          Do you see that statement?
5      A    Yes, I do.
6      Q    Is that your opinion about foster
7  care and kinship caregivers generally or is that
8  your conclusion specifically with respect to West
9  Virginia?
10     A    General.
11     Q    Okay.  And then on page 15 of your
12  report, towards the end of the only full paragraph
13  on this page, you say, "The supports provided to
14  certified kinship caregivers such as enhanced
15  financial and case management supports are
16  generally superior as compared to the supports
17  provided to uncertified kinship homes."
18          Do you see that statement?
19     A    Yes.
20     Q    Is that your opinion about kinship
21  care generally or is that your conclusion
22  specifically with respect to West Virginia?

Page 244

1      A    Again, I'm -- I think I wasn't given
2  access to information I think would have helped me
3  form that connection to West Virginia.  But that is
4  a general statement at this point.
5      Q    Okay.  Turning to page 17 of your
6  report, so starting on page 17, you have a section
7  in your report about staff turnover.  Is that
8  accurate?
9      A    Yes.
10          Are you referring to a certain
11  sentence in that?
12     Q    No.  Just that, you know, on page 17,
13  there's the beginning of a new section and it's --
14  this section refers to page 17, is about caseworker
15  turnover.  Is that correct?
16     A    Yes.
17     Q    Generally speaking, why do you
18  include this section in your report about kinship
19  care?
20     A    I think because it seemed very
21  prominent in all of the research I did regarding
22  West Virginia on my own and in the documents that I

Page 245

1  reviewed, such as the 2020 West Virginia Child and
2  Family Services Plan.  It's a huge problem.  And it
3  does affect a department's ability to provide
4  quality service to those children and families that
5  they serve.
6      Q    Did you see this when you were seeing
7  information about caseworker turnover in West
8  Virginia coming up in your review, was that
9  specifically about the impact it has on kinship
10  care in West Virginia or just the impact on the
11  child welfare system in West Virginia generally?
12          MS. UNGER:  Objection.
13          THE WITNESS:  It has applications to
14  kinship families that are being served by the
15  department.
16  BY MS. SIEGENBERG:
17     Q    Do you have any professional
18  experience assessing caseworker retention and
19  turnover in public agencies?
20          MS. UNGER:  Objection.
21          THE WITNESS:  No.
22

62 (Pages 242 - 245)

BY MS. SIEGENBERG:

1  Q  Do you think you are qualified to
3  give expert opinion on DHHR's caseworker retention
4  and turnover?
5      MS. UNGER:  Objection.
6      THE WITNESS:  I'm sorry, I don't know
7  what you're asking me.
8  BY MS. SIEGENBERG:
9  Q  So you have included in your expert
10  report on the kinship class, you have included a
11  section that assesses and speaks to caseworker
12  retention and turnover, and I'm asking, do you
13  think you're qualified to give an expert opinion on
14  DHHR's caseworker retention and turnover?
15  A  No.
16  Q  Then why do you include this section
17  in your report?
18  A  I included it because, again, I've
19  stated it has an effect on kinship children who are
20  placed with caregivers that are being served by the
21  department.
22  Q  How do you go about assessing

1  caseworker retention and turnover in West Virginia?
2  A  I was given access to the information
3  I had and I looked at a number of documents,
4  including other research I did.  And it's all
5  contained in my report.
6  Q  Turning to page 20 of your report,
7  the last sentence, the section on caseworker
8  retention and turnover, you state, "These workforce
9  issues have a direct and negative impact on the
10  kinship program in that families do not receive the
11  vital services they need to provide the complex
12  needs of the children in their care."
13      Do you see that statement?
14  A  Yes.
15  Q  What is your basis for that
16  conclusion?
17  A  So it's based on the information that
18  I gleaned from the evidence that I reviewed and
19  other research on workforce turnover in --
20  specifically in the child welfare field and what a
21  direct negative impact that is on overall quality
22  of care.  So Casey Family Programs has had a

1  research, they have numerous documents that I
2  referred to.
3  Q  And those are all -- I know we've
4  been over it a few times, but those are all
5  included in the appendix of your report?
6  A  Yes.
7  Q  Okay.  And how did you determine that
8  those were the best sources of information to rely
9  in assessing caseworker turnover and retention?
10  A  I think there's a Harvard business
11  review article in here as well, but I think it has
12  to do with my experience working for numerous
13  decades in systems where I can see where a turnover
14  in the workforce creates -- it hinders the
15  streamline process that we want families to have,
16  it also hinders the engagement that you can have
17  with families to continue to work on the
18  interventions that you have, that will affect
19  positive outcomes for children and families.
20  Q  Okay.  Going back to page 11 of your
21  report.  So the heading of this section states,
22  "Defendants failed to properly support foster

1  children in kinship placements, violating
2  reasonable professional standards and putting them
3  At increased risk of harm."
4      Do you see that?
5  A  Yes.
6  Q  What do you mean by professional
7  standards here?
8  A  I think it really applies to just
9  good social work practice and how we engage
10  families, how we apply our skills in working with
11  families to lead to better outcomes overall.
12  Q  So when you say --
13  A  Like, you know, NESW, and I don't
14  know that I made a reference here, but the National
15  Association of Social Work, has ethics that are
16  spelled out in multiple phases of program work.
17  Like referring to the amount and frequency of
18  caseworker contact in the home, the ways that you
19  do engage with families so that you can really
20  truly have a context for providing, you know, very
21  adequate and accurate assessments on families so
22  you can get them the resources and supports they