# Exhibit 2

Page 1

1                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
2                     HUNTINGTON DIVISION
3    _____

     Jonathan R., minor, by Next    :
4    Friend, Sarah Dixon, et al.,   :
                                    :
5          Plaintiffs,              :   Class Action
                                    :
6    v.                             :   3:19-cv-00710
                                    :
7    Jim Justice, in his official   :
     capacity as the Governor of    :
8    West Virginia, et al.,         :
                                    :
9          Defendants.              :
     _____
10
11       VIDEOCONFERENCE DEPOSITION OF NISHA SACHDEV
12   DATE:          October 26, 2020
13   TIME:          8:55 a.m. to 2:29 p.m.
14   LOCATION:      Witness Location
15
16   REPORTED BY:   Felicia A. Newland, CSR
17
18
19
20
                   Veritext Legal Solutions
21            1250 Eye Street, N.W., Suite 350
                   Washington, D.C. 20005
22

Page 10

1  Q   What is it?
2  A   It's an operating foundation, which
3  means that unlike many foundations that are
4  grant-making, an operating foundation operates
5  programs. So they fund and operate their own
6  programs through partners in whichever area that
7  their mission seeks to assist the public.
8  Q   And were you an employee of the
9  foundation or a contractor?
10  A   I was an employee of the foundation.
11  Q   And were there any programs that
12  Bainum operated or funded that you worked on that
13  served children with disabilities?
14  A   Yes. So the School Mental Health
15  Program, so let me start with the evaluation role.
16  It was in the early childhood with Early Head
17  Start, which incorporated all kids 0 to 3 that were
18  receiving the services, many of which had
19  disabilities.
20       And then with the School Mental
21  Health Program in the District, the four schools
22  that we piloted, most -- many of the kids that had

Page 11

1  disabilities, but specifically one school was
2  serving all kids with social/emotional behavioral
3  disorders, including a majority being foster youth
4  or kids in the child welfare system.
5  Q   Okay. And then the -- so at Bainum,
6  the Head Start program that you mentioned and then
7  the School Mental Health Program you mentioned, any
8  other programs that served children with
9  disabilities at Bainum that you worked on?
10  A   So it was the Early Head Start, not
11  Head Start. So Early Head Start --
12  Q   Oh, I'm sorry.
13  A   -- prior to three. And those were
14  the two main programs. They did have some side
15  funding and global programming they did, but the
16  majority of my work were in those two areas.
17  Q   And the School Mental Health Program,
18  was that program operated throughout District
19  public schools or was it a pilot program?
20  A   So it started as a pilot program for
21  D.C. program and funding with Bainum, and after a
22  year, it scaled to all D.C. charter schools and

Page 12

1  public schools in the District, including what we
2  used from the pilot. And it was supplemented with
3  local dollars to roll that out to all schools.
4  Q   And you mentioned a school that
5  serves foster children. What school was that?
6  A   Monument Academy.
7  Q   And did Monument serve exclusively
8  foster children?
9  A   So it was set up to serve exclusively
10  foster kids or children in the child welfare
11  system, as they say; however, as the need in the
12  community grew, it served more -- and as their
13  enrollment was able to be increased, they served
14  more students, but all students came in with some
15  type of disability. It's a boarding program.
16  Q   Okay. So besides Monument, were
17  there any schools involved in the School Mental
18  Health Initiative that were residential programs?
19  A   No. Monument.
20       MS. POST: Objection to the term
21  "residential." Residential can mean different
22  things in child welfare and perhaps that can be

Page 13

1  clarified.
2  BY MR. PEISCH:
3  Q   Were there any programs where
4  children served by the Mental Health Initiative --
5  School Mental Health Initiative where services were
6  delivered in settings in which the children lived?
7  A   So Monument was, they say,
8  residential. As you know, there's broad terms. It
9  was a school that the students would reside four
10  days of the week to reserve family care. And the
11  parents were heavily involved in the care.
12       In the school, they were called care
13  parents that lived with the children. And they
14  would come on the weekends, so it was integrating
15  with the families. And there was no other school
16  other than that that had a program that was like
17  that.
18  Q   And am I reading your resume
19  correctly, that your work on the School Mental
20  Health Initiative continued when you transitioned
21  over to the Center for Health and Health Care in
22  Schools at George Washington University?

Page 26

1 Before your work on this case, had
2 you ever read a CFSR?
3   A   I have not read a complete one, but I
4 definitely have referred to them in understanding
5 different communities and different services.
6   Q   What is your understanding -- well,
7 let me back up a little bit.
8       When you say you've referred to them,
9 in what context have you referred to CFSRs?
10   A   When writing literature reviews
11 and/or assisting and designing and implementing a
12 program.
13   Q   What is your understanding of what it
14 means when a CFSR reviews an item as a strength?
15   A   It means that in the majority of the
16 cases, that it has been found that they are in
17 conformity, so that's the strength. And they are
18 following the federal and national guidelines.
19   Q   And what is your understanding of
20 what it means when a CFSR reviews an item as needs
21 improvement?
22   A   It's that they are not in full

Page 27

1 conformity of that guideline and -- or whatever
2 the -- the section is and that they need
3 improvement in that area.
4   Q   And if a service-related CFSR item is
5 rated as needs improvement, is it your
6 understanding that that means no services were
7 provided in the case reviewed -- the cases
8 reviewed?
9   A   No. As I mentioned, it means that
10 not all -- that there wasn't a majority.
11   Q   Do you consider yourself an expert on
12 child welfare policy?
13       MS. POST:  Objection.
14       You can answer.
15       THE WITNESS:  I'm not an expert on
16 child welfare policy. I would say on child policy
17 with child welfare included. It depends on the
18 policies within child welfare.
19 BY MR. PEISCH:
20   Q   So you wouldn't be an expert on all
21 child welfare policies?
22       MS. POST:  Objection.

Page 28

1       You can answer.
2       THE WITNESS:  Could you clarify
3 because policies can be very broad, like
4 operational versus --
5 BY MR. PEISCH:
6   Q   Sure.
7       You mentioned in your answer to my
8 question that it would depend on what area of child
9 welfare, I think.
10   A   Yes.
11   Q   So I'm just trying to clarify, you
12 wouldn't consider yourself an expert on all areas
13 of child welfare policy and practice?
14   A   Yeah, I just want to make sure we're
15 thinking of all in the same way, like operational
16 or budgeting or data, system engineering design
17 versus the actual programming and practice and
18 ensuring the quality and the safety and welfare of
19 the children, so I just want to clarify.
20   Q   Sure.
21       Let me phrase it this way:  What
22 areas of child welfare would you consider yourself

Page 29

1 not to be an expert?
2       MS. POST:  Objection.
3       You can answer.
4       THE WITNESS:  I guess in the
5 operational section and the data system engineering
6 and technology section. And with regard to those,
7 the finances on the operational.
8 BY MR. PEISCH:
9   Q   Okay. So let me dive into that a
10 little bit. Before this case, had you ever
11 studied -- I think I'm diving into the operational
12 side.
13       So before your work on this case, had
14 you ever studied or analyzed child welfare
15 caseworker practices?
16   A   So in the work that I've done, I have
17 been trained on and have helped with these
18 programming that I've discussed prior in ensuring
19 that children's needs are met and if they have a
20 caseworker, how to effectively utilize their
21 caseworker.
22   Q   So in what professional or

Page 42

1  groups.
2      Q   Have you ever written any articles
3  about services provided to children in any
4  congregate care settings?
5      A   Not specifically in a specific
6  setting.
7      Q   Okay. Before your work on this case,
8  did you have any experience studying or analyzing
9  licensing requirements for congregate care
10 facilities?
11     A   Like the -- can you explain what you
12 mean by "licensing requirements"?
13         MS. POST: I'm going to object to
14 this question and ask that can't Counsel clarify
15 whether he's speaking to federal or state specific,
16 because states have different licensing standards.
17 BY MR. PEISCH:
18     Q   Have you ever analyzed any licensing
19 standards at all relating to congregate --
20 governing congregative care facilities?
21     A   So do you mean like the way they're
22 built and how many children can stay and their food

Page 43

1  and nutrition safety, like those standards?
2      Q   Well, what is your understanding of
3  what the requirements -- of licensing requirements
4  in congregate care facilities?
5          MS. POST: Objection. Ambiguous. As
6  previously, if Counsel could clarify as to which
7  standard he's referring to, whether it's state or
8  federal.
9          MR. PEISCH: I would remind opposing
10 Counsel that objections under Rule 30 need to be
11 stated concisely and in a non-suggestive manner.
12         MS. POST: Well, certainly, Counsel,
13 I will keep that in mind. However, I understand
14 you don't understand child welfare policy, and
15 you're asking questions that are quite confusing.
16 And if you could help clarify, that will certainly
17 help the witness, I think, answer you.
18 BY MR. PEISCH:
19     Q   Are congregative care facilities
20 licensed?
21     A   They should be.
22     Q   Okay. And who creates the licensing

Page 44

1  standards for congregate care facilities?
2          MS. POST: Objection. Broad.
3  Ambiguous. Again, state or federal? Counsel,
4  please, if you could be specific.
5  BY MR. PEISCH:
6      Q   I asked who.
7      A   Well, I guess that's where it's
8  confusing because there's not just one -- it's not
9  a one state -- it's not a one entity answer, so
10 that's why I'm a little bit confused. I'm just
11 asking in what context.
12         Licensing goes across many different
13 areas, so I'm just asking to clarify -- like, I
14 don't know -- like, it includes, like, the
15 Department of Public Works and different -- so I
16 don't know their water main piping, that's part of
17 licensing. So there's like a whole broad area. So
18 if you mean the programming part or like -- that's
19 why I'm asking, if you could just clarify, I could
20 probably answer that.
21 BY MR. PEISCH:
22     Q   Can you -- what is your understanding

Page 45

1  of what agencies create licensing standards for
2  congregate care facilities? Can you --
3          MS. POST: Objection. Broad and
4  ambiguous.
5  BY MR. PEISCH:
6      Q   You can't answer that question?
7      A   I'm not understanding the --
8          MS. POST: Counsel, argumentative.
9  Again, you're not asking questions that are
10 specific to child welfare in the sense that the
11 witness can answer. So to state that she's
12 refusing to answer or that she is somehow not
13 answering has really to do with your questioning,
14 not with the witness. So please be specific.
15         MR. PEISCH: I would again remind
16 Counsel of Rule 30.
17 BY MR. PEISCH:
18     Q   In D.C., do you know what agencies
19 create licensing standards for congregate care
20 facilities?
21     A   So the licensing -- creates a
22 licensing standards or monitor?

Page 66

1  Q  And are those training materials
2  listed in Appendix A?
3  A  Yes. And most of the training
4  materials were -- that were provided were within
5  one of, like, the West Virginia reports or plans.
6  Like the CFPS plans and those. So there was, like,
7  information. So there wasn't a specific separate
8  training document that was provided, but that was
9  included in their training method and the trainings
10  were included in the document.
11  Q  Okay. So you didn't have available
12  to you any of the DHHR training modules or
13  PowerPoints?
14  A  There were some PowerPoints that had
15  training, but it wasn't like the -- the entire,
16  like, however many trainings. They didn't give the
17  entire, because that would be -- I don't know how
18  they would even do that. But that wasn't provided,
19  but it was the -- the names and descriptions of the
20  trainings were provided.
21  Q  Okay. And relatedly, did you review
22  the DHHR training specific to caseworkers serving

Page 67

1  children with disabilities?
2  A  So like the PowerPoint, I don't know
3  even if there is a PowerPoint, but they didn't give
4  any materials directly to, like, a direct training
5  curriculum or they didn't give any of those. There
6  were two trainings that, I believe, are posted on
7  the website that were available to caseworkers and
8  to parents. And I can't recall exactly which
9  training that was, but that was the only one that
10  there were PowerPoints for.
11  Q  Is it your understanding that DHHR
12  does not provide training to caseworkers specific
13  to working with children with disabilities?
14  A  Yes. From the materials reviewed,
15  including the interviews specific to children with
16  disabilities. It's not a required training --
17  required training.
18  Q  Did you review any of the case files
19  of specific children?
20  A  No.
21  Q  Did you review any assessments of
22  children in DHHR custody?

Page 68

1  A  No.
2  Q  Did you review any template
3  assessments that DHHR uses for children in foster
4  care?
5      MS. POST:  Objection. Ambiguous.
6  BY MR. PEISCH:
7  Q  Let me ask it this way: Did you
8  review any, like, blank assessments?
9  A  Well, there's a lot of assessments,
10  that's why I guess -- like, if you can be more
11  specific to the -- there are -- as mentioned in the
12  policies, there's different assessments at
13  different periods that are -- the templates
14  reference. I don't know exactly what you're
15  referring to.
16  Q  Okay. Well, did you review -- okay,
17  so let me just ask it this way: Did you review any
18  assessment done by providers of children in DHHR
19  custody?
20      MS. POST:  Objection. Ambiguous.
21  Speculative.
22

Page 69

1  BY MR. PEISCH:
2  Q  So you don't know if you were --
3  A  I'm saying, for example, the medical
4  assessment, which it has an acronym, like EP --
5  it's an acronym, that template was there for each
6  developmental stage. So, like, I'm just saying
7  there's just different assessments for different
8  periods --
9  Q  Okay.
10  A  -- so I don't -- I don't -- I'm just
11  asking which one you're asking about.
12  Q  Okay. Let me -- but you didn't
13  review any files of specific children?
14  A  No.
15  Q  Okay. Did you review DHHR's
16  Memorandum of Understanding with the U.S.
17  Department of Justice?
18  A  Yes.
19  Q  And did you review DHHR's
20  Implementation Plan for that Memorandum of
21  Understanding?
22  A  I believe so, but I don't know if

Page 70

1  that's what it was called.  But I remember the one
2  with the most recent information from the
3  Department of Justice that was provided -- or that
4  was available.
5      Q    When you say that was provided or
6  that was available, do you mean that was given to
7  you by plaintiffs' counsel?
8      A    I believe that this was not given and
9  it was -- and it wasn't given, but it was available
10 on the DHHR website.  I believe that's where I got
11 it.
12     Q    And the implementation is what you're
13 talking about?
14     A    Yes.  So I know that they have --
15 they have an open forum to review the MOU and the
16 implementation with community stakeholders.  And I
17 think they were finalized early 2019, and then they
18 were developing and -- oh, yes, they did develop an
19 implementation plan.
20          So there's a lot of implementation
21 plans.  That's why I am trying to suss out which
22 one was specific to which.  And so -- and from

Page 71

1  that, they developed an implementation plan.  And
2  then there was a period in which the implementation
3  plan should be executed, which is like around now
4  that this should start or a little bit before the
5  start.
6      Q    And your recollection is that you did
7  review that implementation plan?
8      A    Yes, my recollection is I did.
9  Because there were a lot of implementation plans
10 that -- and a lot of them had similarities that
11 overlapped, so I was trying to look at them
12 specific, but as in one implementation plan for the
13 state.
14     Q    Did you review any of the University
15 of Maryland School of Social Work's biannual
16 reviews relating to the DoJ Memorandum of
17 Understanding?
18     A    No.
19     Q    What is your understanding of what
20 DHHR is currently doing pursuant to the DoJ MOU --
21 the DOJ Memorandum of Understanding?
22     A    So mainly it's specifically around

Page 72

1  expanding their array of community-based services
2  for children with disabilities.  And so working to
3  understand what the services are needed and
4  implement them essentially in a broad sense.
5      Q    And do you know who the target
6  population for that Memorandum of Understanding is
7  or what --
8      A    Children with disabilities.
9      Q    Any specific group within children
10 with disabilities?
11     A    So I believe -- I didn't -- like I
12 believe that it was generally around children with
13 disabilities, and then there is the subgroup, like,
14 really ensuring children with substance needs are
15 provided that or intellectual disabilities are
16 provided that.
17          Is that what you mean by --
18     Q    Yes, that's what I meant.
19     A    Yeah.  So it's really ensuring like
20 within children with disabilities are receiving the
21 community-based services they need.
22     Q    Okay.  In your review of the DoJ

Page 73

1  Memorandum of Understanding documents, did you see
2  that DHHR is required to ensure statewide access to
3  therapeutic foster care?
4      A    Yes.  I don't remember if it says
5  treatment of foster care was therapeutic, I don't
6  have --
7      Q    I mean --
8      A    I can -- and I didn't -- I didn't
9  memorize it and so this is one that I would need to
10 refer back to be sure that I am stating the correct
11 thing.  But I did review it in detail, I just
12 didn't memorize it.
13     Q    Do you think that ensuring statewide
14 access to therapeutic foster care will help address
15 some -- would help address some of the concerns
16 that you've identified in your expert report?
17     A    I don't have an opinion.  I wasn't
18 asked to review whether therapeutic foster care
19 would.
20     Q    Okay.  So do you have an opinion
21 about whether the DoJ Memorandum of Understanding
22 will address the concerns about -- the concerns

19 (Pages 70 - 73)

Page 74

1  identified in your expert report?
2        MS. POST:  Objection.  Calls for a
3  legal conclusion.
4  BY MR. PEISCH:
5     Q    Well, the DoJ MOU and the
6  implementation plan called for DHHR to do a number
7  of things.  Do you have an opinion as to whether if
8  DHHR does those things, it will address your
9  concerns, the concerns that you've identified in
10 your expert report?
11       MS. POST:  Objection.
12       THE WITNESS:  I -- I wasn't asked to
13 come up with an implementation plan of DoJ.
14 BY MR. PEISCH:
15    Q    Are you aware that the DoJ
16 implementation plan calls for DHHR to implement
17 certain community-based services for children with
18 disabilities?
19    A    Yes.
20    Q    Do you know what those services are?
21    A    It's a variety of services, from
22 screening to therapeutic services to support groups

Page 75

1  to family in care, to case coordination.  It
2  depends.  It's an array, I think they use the word.
3     Q    And do you think ensuring statewide
4  access to those -- that array of services will help
5  address the concerns that you've identified in your
6  expert report?
7     A    Again, I don't have an opinion.  I
8  wasn't asked to provide a capacity building or
9  technical assistance plan or implementation plan to
10 the deficiencies.
11    Q    Okay.  And do you know anything about
12 the progress DHHR has made to date in implementing
13 that DoJ Memorandum of Understanding?
14    A    So it's my understanding that the
15 plan was put in place mid last year, and so -- and
16 imposed for quite a while.  So there hasn't been a
17 formal -- as of August 11, a formal update that I
18 am aware of.
19    Q    Okay.  In your work on this expert
20 report, did you become familiar with the Bureau for
21 Medical Services within DHHR?
22    A    Bureau for Medical?  I -- I don't

Page 76

1  think so.  I don't remember the exact -- like every
2  state has a different name, so I'm not sure if
3  that's the name that they linked with or Medicaid
4  or came up with those.  Sorry.  I don't know if
5  that's the agency specifically.
6     Q    Did you review any Medicaid -- West
7  Virginia Medicaid policies or manuals in developing
8  your expert report?
9     A    No.  That was out of the scope.  I
10 will say that I did -- there were around Medicaid,
11 that's the only place it was reviewed, was in the
12 recommendations and/or in some of the coordination
13 material, but not specific.
14    Q    Okay.  Given that it was outside the
15 scope, do you -- is it fair to say that you don't
16 have an understanding of what the package of
17 Medicaid benefits are provided to foster children
18 in West Virginia?
19    A    I -- from what was stated in the
20 documents that were received, I have that
21 understanding, but I did not explore specifically
22 Medicaid reimbursement if the reimbursements are

Page 77

1  made, filing all of those insurance-type policies.
2     Q    Do you know if West Virginia Medicaid
3  offers any community-based services to children
4  with disabilities in foster care in West Virginia?
5     A    I don't know which specific ones, but
6  I know that in the report, there was some
7  discussion on how to have some of the service
8  reimbursable, but the linkages needed to be -- and
9  the coordination needs to be there, for Medicaid on
10 that end.
11    Q    So you don't know the specific
12 community-based services that West Virginia
13 Medicaid provides to children -- foster children
14 with disabilities?
15    A    Not in that array that we talked
16 about.  It -- they could call it something else.  I
17 don't know specifically.
18    Q    Okay.  Do you know anything about the
19 availability of Medicaid providers to serve
20 children -- strike that.
21       Do you know anything about the
22 availability of providers of Medicaid

Page 78

1  community-based services to serve foster children
2  in West Virginia?
3       A    No.  That was out of the scope of
4  analyzing Medicaid and the pathways with Medicaid.
5       Q    Okay.  Are you familiar with West
6  Virginia's HealthCheck Program?
7            MS. POST:  Objection.  Outside the
8  scope.
9            You can answer.
10           THE WITNESS:  So the -- my
11  understanding of the HealthCheck Program, again, it
12  was -- it was out of the scope of really analyzing
13  the HealthCheck Program, but that's the linkages on
14  how foster care children received their medical
15  examination.
16  BY MR. PEISCH:
17       Q    Okay.  And when you say outside the
18  scope, do you mean that you did not analyze the
19  extent to which Medicaid community-based services
20  are provided to West Virginia foster children?  Is
21  that right?  Am I understanding that right or am I
22  misunderstanding that?

Page 79

1            MS. POST:  Objection.  Misstatement.
2  BY MR. PEISCH:
3       Q    It's okay if I'm misunderstanding.
4       A    Yeah.  I -- I -- again, so Medicaid
5  is a huge agency and so they don't necessarily
6  break down their reimbursements directly for foster
7  care.  It's more, again, services, and so they
8  might -- you know, some states have partnership
9  with Medicaid for certain agencies.  So when you
10  say that, it's difficult for me to answer because I
11  would have to review all of Medicaid's
12  reimbursements and then separate out which is
13  not -- was not available.  And I don't know if this
14  is available to the children that are specifically
15  in the foster care, and so that's why I'm having
16  difficulty answering the question.
17       Q    Do you know -- do you know if West
18  Virgina foster care children are entitled to all
19  Medicaid benefits that other children in West
20  Virginia are entitled to?
21       A    Yes.  And -- it's my understanding
22  from the documents reviewed, that the Bureau of

Page 80

1  Children and Families have a partnership -- or I
2  don't want to say partnership, but loosely, let's
3  say, collaborates with Medicaid, including TANF and
4  other kind of social services funding.
5            And so that's an area that they're
6  working to strengthen, but they do have the
7  partnerships.  So that's all I can really say to
8  that; meaning that there are -- because there is
9  some type of collaborations from funding, but I
10  again, that's a completely -- not completely, but
11  it's a different field to really analyze Medicaid
12  and reimbursements and funding streams.
13       Q    Okay.  Are you familiar with the
14  Birth to Three Program in West Virginia?
15           MS. POST:  Objection.  Outside the
16  scope.
17           THE WITNESS:  No.
18  BY MR. PEISCH:
19       Q    I'm sorry, did you say no?  I'm
20  sorry, I didn't hear.
21       A    Oh, sorry.  So the Birth to Three
22  Program, where I am familiar, is in the context of

Page 81

1  this report and how the BCF -- can we just say the
2  Bureau of Children and Families?  I'm going to
3  refer to them as BCF.
4       Q    Yes, that's fine.
5       A    That will make it easier.
6            It is linked with kind of their Birth
7  to Three policy.  I did explore a little bit just
8  out of interest of the Birth to Three, but only as
9  it relates to specifically BCF.
10      Q    Okay.  And what is your understanding
11  of the benefits that are provided in the Birth to
12  Three Program?
13           MS. POST:  Objection.  Outside the
14  scope.
15           THE WITNESS:  Again, I didn't explore
16  specifically the Birth to Three policies, because
17  that wasn't what I was asked to do.  So I don't
18  have an opinion on what the Birth to Three policy
19  is.
20  BY MR. PEISCH:
21      Q    Are you familiar with the West
22  Virginia Medicaid Personal Care Services Benefit?

21 (Pages 78 - 81)

Page 82

1       MS. POST: Objection. Outside the
2   scope.
3       BY MR. PEISCH:
4       Q   You can answer. Sorry.
5       A   Okay. So as I mentioned, I only -- I
6   don't have an opinion on anything that wasn't
7   related specific to the documents provided and
8   Medicaid in relation to the report.
9       Q   So are you familiar with West
10  Virginia Medicaid's Children With Serious Emotional
11  Disorder Waiver?
12      A   I'm aware they're there. I don't
13  know the intricacies of that, no.
14      Q   Do you know any of the benefits that
15  are provided under that waiver program?
16      A   I have not memorized the benefits.
17  But upon looking at it, I could give you a
18  synopsis, but I don't want to speak out of the
19  specific terminology.
20      Q   Did you review the waiver document
21  for the Children With Serious Emotional Disorder
22  Waivers?

Page 83

1       MS. POST: Objection. Outside the
2   scope.
3       THE WITNESS: I'm sorry?
4   BY MR. PEISCH:
5       Q   Let me rephrase that. Did you
6   review -- did you review the document -- the waiver
7   document that outlines the services in the Children
8   With Serious Emotional Disorder Waiver in producing
9   that report?
10      MS. POST: Objection. Outside the
11  scope. Counsel, as you're well aware, you turned
12  over the documents that were provided to --
13      THE WITNESS: Yeah.
14      MS. POST: -- to the witness.
15  BY MR. PEISCH:
16      Q   Do you know what the waiver document
17  is?
18      When I say "waiver document," does
19  that mean anything to you?
20      A   No, I did not receive a waiver
21  document.
22      Q   Okay. And did you review any DHHR

Page 84

1   policies governing the Children With Serious
2   Emotional Disorder Waiver?
3       MS. POST: Objection.
4       You can answer if you understand.
5       THE WITNESS: Okay. As I stated,
6   around Medicaid and these waivers, I was not
7   provided those documents, so there -- if it was
8   mentioned in one of the documents review, I did a
9   Google search, but I wasn't provided. And I did
10  the Google search to make sure I was understanding
11  specifically what it meant in relation to West
12  Virginia. And so if it was mentioned, but it was
13  not provided.
14  BY MR. PEISCH:
15      Q   Did you review any DHHR policies
16  relating to the Medicaid Individuals With
17  Intellectual Disabilities Waiver?
18      A   I was not provided that.
19      Q   Are you -- were you aware that DHHR
20  had a Medicaid waiver program for Children -- for
21  Individuals With Intellectual Disabilities?
22      A   Yes. I believe upon a Google search

Page 85

1   around waivers for disabilities in West Virginia,
2   that did come up. However, it was not provided and
3   I did not know how to up to date the websites were,
4   so they were not -- it was taken at face value.
5       Q   And do you know what services are
6   provided through that Intellectual -- Individuals
7   with Intellectual Disabilities Waiver Program?
8       MS. POST: Objection.
9       You can answer.
10      THE WITNESS: Did you say to answer?
11  I'm sorry, I couldn't hear that.
12      MS. POST: You can answer.
13      THE WITNESS: Okay.
14      So, again, broadly speaking, I
15  would have to look specifically at it again. It
16  wasn't one of the in-depth documents reviewed
17  because it wasn't provided. Therefore, it was a
18  Google search just to make sure when I was
19  referring to it or reading a sentence here and
20  there that was provided, that I was understanding
21  the context of West Virginia. So it wasn't
22  studied extensively. And outside the scope of

22 (Pages 82 - 85)

|   | Page 122 |   | Page 124 |
|---|---|---|---|
| 1 | And so -- and that's why I would need | 1 | West Virginia to me, it was publicly available on a |
| 2 | a minute to look up which exactly I -- when I look | 2 | search. |
| 3 | at the information, I look at it as a whole, and so | 3 | Q   Okay.  So going back to this sentence |
| 4 | I don't look at source, because they all are | 4 | about DHHR faces a backlog of assessments. |
| 5 | validated sources that were provided.  And so | 5 | A   Uh-huh. |
| 6 | that's why it's difficult for me to separate out | 6 | Q   Do you agree that that conclusion is |
| 7 | which word from which. | 7 | based on data that's at least several years old? |
| 8 | Q   Okay.  When you said the CFSP, do you | 8 | A   So it's not several years old. |
| 9 | mean the DHHR's 2015 to 2019 Child and Family | 9 | It's -- at this point, depending on -- what, in |
| 10 | Services Plan? | 10 | 2017, like, two and a half to three years old, and |
| 11 | A   If that's -- yes, the Child and | 11 | that's not -- so that's still relevant.  And, in |
| 12 | Family Services Plan. | 12 | addition, we have to be mindful that this has been |
| 13 | Q   Okay.  So do you recall what year the | 13 | a consistent problem every time there was an |
| 14 | most recent CFSR was published? | 14 | assessment. |
| 15 | A   2017. | 15 | So where there's been improvement, it |
| 16 | Q   And do you know what -- do you know | 16 | would have been noted in a report; however, it's |
| 17 | what year's data and interviews those CFSR findings | 17 | been a consistent failure across all of the CFSRs |
| 18 | were based on? | 18 | and reports reviewed consistently that were up to |
| 19 | A   It was based on -- so the CFSR was | 19 | what was provided by the State of West Virginia. |
| 20 | open from, I believe, 2015 to 2018, depending on | 20 | Q   But you don't actually know that this |
| 21 | what the state -- what cycle they fell in.  And so | 21 | statement about backlog of assessments is true |
| 22 | that was -- I would have to see the exact month and | 22 | today in West Virginia, do you? |
|   | Page 123 |   | Page 125 |
| 1 | period that it was -- it was provided.  I look at | 1 | A   I would have to review the -- again, |
| 2 | it as a fiscal year because we know they have | 2 | this was stated by the information that was |
| 3 | reports written, so around that year. | 3 | provided by the State of West Virginia to me, |
| 4 | Q   Okay.  But no data in the CFSR -- | 4 | therefore, I'm unable to review anything that was |
| 5 | nothing in the CFSR was based on data after 2017. | 5 | not provided. |
| 6 | Is that right? | 6 | Again, there has been consistent |
| 7 | A   No; however, the -- the states did | 7 | backlog since as early as the CFSR 2002, and so I |
| 8 | plan -- and I believe the state was maybe 2018, I | 8 | just -- again, had there been improvement -- even |
| 9 | mean, they do their own review -- case review also, | 9 | if there was still a backlog and had there been |
| 10 | and so I took into account all the relative data | 10 | improvement, it would have been noted.  So, |
| 11 | that was provided by the State of West Virginia I | 11 | therefore, there consistently has been a backlog of |
| 12 | need to review.  And so I used whatever the current | 12 | assessments. |
| 13 | information was that was provided. | 13 | Q   Where would it have been noted? |
| 14 | Q   Okay.  And the 2015 to 2019 CFSP, | 14 | A   In the -- in the reports that were |
| 15 | that was published in 2014.  Is that right? | 15 | reviewed.  They'd note if there was an increase or |
| 16 | A   I would have to go look at the exact | 16 | changes in trends or -- it's just not a static year |
| 17 | publication date.  I -- I know it wasn't provided | 17 | report. |
| 18 | to me, but publicly available was the updated that | 18 | Q   So for this sentence here, what I'm |
| 19 | was released in early, I think, 2020.  And so for | 19 | just trying to get at is, I understand -- well, I |
| 20 | the CFSP, where information -- I utilized that to | 20 | understand you were limited in what data you had to |
| 21 | make sure that there was consistency on what was | 21 | review, but this sentence here, "DHHR faces a |
| 22 | said in the past, that wasn't provided directly by | 22 | backlog" -- I won't read the whole thing -- that is |