# Exhibit 3

```
                                                         Page 1

 1            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
 2                 HUNTINGTON DIVISION
 3    ------------------------------:
      JONATHAN R., minor, by Next   :
 4    Friend, Sarah Dixon, et al.   :
                                    :
 5            Plaintiffs            :
                                    :
 6         vs.                      : Class Action
                                    : 3:19-cv-00710
 7    JIM JUSTICE, in his official  :
      capacity as the Governor of   :
 8    West Virginia, et al.         :
                                    :
 9            Defendants            :
      ------------------------------:
10
11
12      DEPOSITION OF ELIZABETH M. APARICIO, PH.D.
13
14    DATE:           October 30, 2020
15    TIME:           8:58 a.m.
16    LOCATION:       Rockville, Maryland
17    REPORTED BY:    Shari R. Broussard, RPR, CSR
                      Reporter, Notary
18
19
20
21
22
```

Page 30

1 mental health and sexual health intervention with
2 youth experiencing homelessness and then if you
3 turn the page to page four, you state that
4 "Approximately 40 percent of the homeless youth in
5 my studies are former foster youth"; is that
6 right?
7    A   Correct.
8    Q   How many foster youth are you referring
9 to when you say 40 percent?
10    A   Give me a moment.
11    Q   Sure.
12    A   So those studies are referring to -- let
13 me back up and just answer what you said.
14 Twenty-seven youths.
15    Q   And is that 27 youths, that's the
16 40 percent of the homeless youth or is that the
17 total number in the studies?
18    A   So the studies that you're referring to
19 are a series of studies from a development of a
20 sexual health program. This is what I was
21 starting to say earlier. We had 68 youths go
22 through the program and so the 27 youths I'm

Page 31

1 referring to are part of that sample of 68 youths
2 who have received that program.
3    Q   Okay.
4    A   Does that answer your question?
5    Q   Yeah, that's helpful. Thank you.
6    A   Okay.
7    Q   Where were those 27 youths in custody?
8        MS. POST: Objection. Basis of
9 knowledge, ambiguous.
10        Are you referring to a state? Are you
11 referring to a program, an agency?
12 BY MS. SMITH:
13    Q   What state foster care program were
14 these homeless youth in foster care in?
15    A   The question that we -- the question
16 that we asked -- the question that we asked them
17 was whether or not they had ever been in foster
18 care, so I do not have that information as to
19 which system they were involved with.
20    Q   Do you know if any were in custody due
21 to a juvenile justice adjudication?
22    A   I do not.

Page 32

1    Q   Could you turn to page five of your
2 report, please.
3    A   Yes, I'm there.
4    Q   So the first sentence under the heading
5 "Summary of Opinion" it says, "Upon careful
6 review, it is my opinion that the West Virginia
7 Department of Health and Human Resources and the
8 Bureau for Children and Families have failed to
9 provide sufficient care for youth in foster care
10 aged 14 and older who are preparing to age out of
11 foster care."
12        Did I read that correctly?
13    A   Yes, you did.
14    Q   Before this project, had you ever
15 reviewed a child welfare program to determine if
16 it provides sufficient care for youth in foster
17 care aged 14 and older who are preparing to age
18 out of foster care?
19    A   I have not formally done so.
20    Q   Have you done so informally?
21    A   I'm pausing because perhaps as part of
22 my regular work as a social worker I'd prefer if

Page 33

1 systems were more responsive generally. I think
2 we all want for our systems to work well. But no,
3 I have not informally or formally passed judgment
4 that an organization has failed to provide
5 sufficient care for youth in foster care aged 14
6 or older who are preparing to age out of the
7 foster care system.
8    Q   And before this project, had you ever
9 reviewed any type of program that serves foster
10 youth aged 14 or older to determine if the program
11 provides sufficient care for youth in foster care
12 aged 14 and older?
13        MS. POST: Objection. Ambiguous, "type
14 of program."
15        THE WITNESS: Can you say more about
16 what you mean?
17 BY MS. SMITH:
18    Q   So besides the child welfare program,
19 have you reviewed a type of program that serves
20 foster youth or that provides services to foster
21 youth regarding whether or not they provide
22 sufficient care for youth in foster care aged 14

Page 34

1  and older?
2      MS. POST: Objection. Ambiguous.
3  Again, perhaps if counsel can clarify what you
4  mean. Agency, community-based program, non-foster
5  care related, foster care related. That's a wide
6  variety and your question is very ambiguous.
7      THE WITNESS: I'm nodding to say yes, I
8  don't understand the question that you're asking
9  me.
10 BY MS. SMITH:
11     Q   Do you have any basis to compare West
12 Virginia's child welfare program with another
13 child welfare program?
14     A   I have not conducted another expert
15 witness review of a child welfare system if that's
16 your question, so I have not done this same
17 process with another system if that's what you're
18 asking me.
19     Q   Besides an expert witness review, have
20 you otherwise reviewed another child welfare
21 system?
22     MS. POST: Objection. Ambiguous. With

Page 35

1  respect to aging out, with respect to some other
2  form of inquiry? Perhaps counsel can be more
3  specific.
4      THE WITNESS: Yes, can you be more
5  specific, please?
6  BY MS. SMITH:
7      Q   Sure. I mean, do you have any basis to
8  compare West Virginia to another state's child
9  welfare program?
10     MS. POST: Objection.
11     You can answer.
12     THE WITNESS: Yes.
13 BY MS. SMITH:
14     Q   And what is that?
15     A   That is based on the evidence that's
16 provided in my report as I've cited through the
17 Annie E. Casey Foundation that compared the
18 outcomes of youth who are transition age youth
19 who've aged out of care actually in West Virginia
20 compared to national outcomes, and those details
21 are cited in my report.
22     Q   So besides the Casey report that you

Page 36

1  cite, have you done any type of review or research
2  on your own regarding a specific state child
3  welfare program?
4      MS. POST: I'm going to object and ask
5  that counsel please be specific as to the question
6  being asked. It was the Annie E. Casey program,
7  not to be confused with Casey Family programs.
8  And if you simply state in your question "Casey,"
9  that can result in confusion, so I would just ask
10 counsel to be specific. Now with that clarity --
11 BY MS. SMITH:
12     Q   You can answer, Dr. Aparicio.
13     A   So are you asking me if I have done the
14 same process with another organization before, the
15 same thing that I've done here? The answer is no
16 to that.
17     If you would like to know if I have
18 worked with child welfare community-based
19 organizations or state level child welfare
20 organizations, the answer is yes.
21     As you'll see in my curriculum vita, I
22 have worked to oversee a pipeline training program

Page 37

1  for child welfare in Hawaii, for example, and that
2  involved collaborating with the department there
3  to see what kinds of skills they would like their
4  social workers to have, so preparing them for
5  being able to provide service to youth in care,
6  including transition age youth in care.
7      Does that answer your question?
8      Q   Yes, thank you.
9      A   Okay.
10     Q   On page, let's see, on page two of your
11 report -- could you turn to that page, please?
12     A   Yes, I'm there.
13     Q   The second sentence says, "I was asked
14 to provide my opinion concerning West Virginia's
15 policies and practices for the provision of
16 services to transition age foster youth."
17     Before this project, had you ever been
18 asked to provide an opinion concerning a state's
19 policies and practices for the provision of
20 services to transition age foster youth?
21     A   In what context?
22     Q   In any context.

10 (Pages 34 - 37)

Page 38

1   A   Not formally.  I would say in the course
2   of my work as a social worker I was asked to
3   provide guidance on how to better serve youth in
4   foster care and specifically my own clients.  I,
5   as a peer, was asked how to better -- you know,
6   just based on a peer-case review, how to better
7   serve other people/clients without revealing their
8   identifying details.
9       Let's see.  I have not conducted a
10  policy manual review as detailed as what I've done
11  for you all in West Virginia previously, but I
12  gave that a very thorough review and noted many of
13  your policy and procedure manuals.  I have read
14  many as a social worker and followed them myself
15  but not have had to comment on -- on them in
16  this -- in the level of detail that I've done for
17  you.
18  Q   And was the advice that you mentioned
19  that you've given more informally, was any of that
20  advice to child welfare agencies?
21  A   I'm thinking.  Not to state level child
22  welfare agencies but certainly to community-based

Page 39

1   organizations that are providing care to
2   transition age foster youth as in foster youth are
3   placed with those organizations.  I have provided
4   support to those organizations in how to deliver,
5   for example, trauma informed care to that
6   population that they're serving.
7   Q   And you mentioned that you've reviewed
8   other states' -- correct me if I'm wrong.  I think
9   you mentioned you've reviewed other states' child
10  welfare policies and practice manuals before; is
11  that right?
12      MS. POST:  Objection.  Misstates the
13  testimony.
14      THE WITNESS:  Can you be more specific
15  about what you mean?
16  BY MS. SMITH:
17  Q   Yeah.  I think you have said -- please
18  correct me, but I thought you had said you have
19  reviewed other states' child welfare policies and
20  practice manuals, but you had never reviewed them
21  to the level of detail that you have with West
22  Virginia.  Am I wrong about that?

Page 40

1   A   What I said was that as a social worker,
2   I had read my own organization's practice and
3   policy manuals.
4   Q   Okay.  So have you read any other child
5   welfare system -- agency or state agency or county
6   agency child welfare policies before?
7   A   As a social worker, yes.
8   Q   And which --
9   A   Not as an expert witness.
10  Q   And which --
11  A   Which is helpful.
12  Q   No, yeah, thank you.  I appreciate that.
13      And which child welfare programs, state
14  or county, have you reviewed their policies?
15  A   Montgomery County, Maryland.
16  Q   Any others?
17  A   No.
18  Q   And what was the context of your review
19  of Montgomery County, Maryland's policies?
20  A   Can you be more specific?
21  Q   Why were you reviewing the policies of
22  Montgomery County, Maryland?

Page 41

1       What was the purpose of your review?
2   A   The purpose of my review was I had
3   started as an intern there initially and was
4   reading policy and procedure manuals to be able to
5   get up to speed on expectations of me as a social
6   work intern both as an undergraduate student and
7   as a graduate student.  I had two internships with
8   Montgomery County Child Welfare.
9   Q   And do you have an opinion as to whether
10  Montgomery County, Maryland's child welfare
11  policies are done well with respect to transition
12  age youth?
13  A   I do not have an --
14      MS. POST:  Objection.  Outside of the
15  scope.
16      THE WITNESS:  I do not have an opinion
17  on that.
18  BY MS. SMITH:
19  Q   Of the child welfare systems that you're
20  familiar with, are there any that you think have
21  done well with respect to the provision of
22  services to transition age foster youth?

11 (Pages 38 - 41)

Page 54

1  Q   And do you have an opinion about DHHR's
2  (inaudible) policies that you reviewed?
3  A   Can you repeat that?  We had a little
4  interference.
5  Q   Yeah, sorry about that.  I heard that
6  too.
7     Do you have an opinion -- I'm sorry, it
8  might be me.  Do you have an opinion regarding
9  DHHR's child welfare policies that you reviewed?
10 A   My opinion is that the policies and the
11 listing of services that are provided are
12 extensive.  The long list looks very good, as I
13 stated in my report, but the evidence for those --
14 the effectiveness of those policies and procedures
15 and services is unknown based on the data that
16 you're making available to the -- the plaintiff as
17 well as the data that is available nationally
18 other than to say that the outcomes of the youth
19 who are leaving care in West Virginia are much
20 poorer compared to what we would expect based on
21 national averages.
22 Q   So you don't have any concern with the

Page 55

1  policies themselves, it's the implementation of
2  the policies; is that right?
3  A   That's a broad statement to say that
4  there's no concern with any policy anywhere, so I
5  would hesitate to say that.  I haven't reviewed
6  every single policy that you have, so there may be
7  some room for improvement.  But I would say in
8  general the -- the structure is there, but it
9  seems, again, as you know, the implementation
10 and -- and, you know, all kinds of challenges
11 related to that seem to be where the majority of
12 the issues lie.  But I would hesitate to say that
13 there are no issues of any policy within West
14 Virginia for transition age youth.
15 Q   Did you identify any concerns that you
16 had with any of DHHR's child welfare policies?
17 A   Give me a moment.
18 Q   Sure.
19 A   Can you restate your question, please?
20 Q   Were there any DHHR foster care policies
21 that you reviewed that you were concerned with?
22 A   I'm pausing because I think the

Page 56

1  distinction between policy and implementation is a
2  bit muddy here, but one thing that concerned me
3  was the overuse of congregate care among West
4  Virginia foster youth and also the recruitment of
5  foster homes that were specific for -- for youth
6  who are in the sensitive developmental period,
7  which was confirmed by Ms. Harper in her
8  deposition.  So those may not be policies, but
9  they are practices certainly.
10 Q   So did you see any policies, for
11 example, regarding congregate care that gave you
12 concern?
13 A   I would say they were not policies that
14 put a ceiling on expectations of how many youth,
15 for example, are going --
16     THE REPORTER:  I'm sorry.  I'm sorry,
17 something is cutting out.  Could you start that
18 again?  I don't know what's going on here.
19     (The reporter read the record
20      as requested.)
21     THE REPORTER:  Just hold on.  Dawn, are
22 you on?  Dawn?  I think that's what the problem

Page 57

1  is, I think she's frozen.  Yeah, she's frozen.
2     THE WITNESS:  It's been an hour.  Should
3  we take a break?
4     THE REPORTER:  Yeah, that's a good idea.
5     MS. SMITH:  Sure.
6     (Brief recess 10:15 a.m. to 10:17 a.m.)
7     (The reporter read the record
8      as requested.)
9     THE WITNESS:  Would you like me to pick
10 that up?
11 BY MS. SMITH:
12 Q   Yes, I would.  Thank you.
13 A   Okay.  So what I was saying was that
14 it's more the lack of written policy about
15 expectations regarding congregate care or
16 regarding recruitment of foster homes that I found
17 concerning.  So less of what's there and much more
18 of what's not there that gave me pause for
19 concern.
20 Q   And did you review the policy regarding
21 the least restrictive settings?
22 A   I did, yes, and I found that that -- I

15 (Pages 54 - 57)

Page 58

1  felt that that policy was not being followed in
2  practice and so thank you for pointing that out to
3  me. That is a policy that I see is there but
4  seems not to be being followed.
5      In Ms. Harper's deposition she was not
6  able to distinguish between, in congregate care,
7  for example, how many of their youth and what
8  proportion of the youths who are in congregate
9  care were justice involved and court ordered to
10 actually be in that placement versus how many
11 youths were in foster care and there because that
12 was determined to be the least restrictive and
13 most appropriate environment for them per what you
14 all use in your team decision-making model versus
15 how many youths in foster care who were there
16 simply because there was an unavailability of an
17 appropriate foster home, which would have been
18 the -- the most appropriate least restrictive
19 environment. So that's what I mean when I say
20 that there are issues with implementation that I
21 see.
22   Q   And have those distinctions that

Page 59

1  Ms. Harper was not able to identify, would those
2  have been helpful for you in your review?
3    A   Yes, they would have been helpful and I
4  think they would be helpful to the organization
5  too, to be thinking through what are the issues
6  and how can we address them. So that was -- I'm
7  sure we'll talk more about additional concerns,
8  but that was a concern as well, the review
9  process -- the continuous quality review process.
10   Q   And is it your understanding that the
11 department does not have the information regarding
12 those distinctions?
13   A   I don't know whether or not the
14 department has that information. I would hope
15 that they would have it. They should have. But
16 it wasn't provided in the deposition and it wasn't
17 provided in any of the documents the -- the
18 defendants provided to the plaintiffs, so I'm not
19 able to comment fully on that.
20   Q   Do you know what topics Ms. Harper was
21 asked to testify on in her deposition?
22       MS. POST: Objection. Basis of

Page 60

1  knowledge, outside the scope.
2       THE WITNESS: I was not privy to those
3  conversations, no.
4  BY MS. SMITH:
5    Q   Did you ask the plaintiffs for that
6  information?
7       MS. POST: Objection. Calls for a legal
8  conclusion as well.
9       THE WITNESS: Did I ask the plaintiffs
10 for the information in terms of those
11 distinctions?
12 BY MS. SMITH:
13   Q   Yes.
14   A   No, I did not.
15   Q   And why not?
16      MS. POST: Objection.
17      THE WITNESS: So why didn't I ask for
18 that specific statistic? It doesn't seem like
19 they had that information, so if you give me a
20 moment and I'll quote Ms. Harper.
21      Thank you for your patience. I don't
22 want to misquote her.

Page 61

1  BY MS. SMITH:
2    Q   No problem.
3    A   I'm looking for the point where she was
4  talking about the sense of overwhelm within the --
5  the system.
6    Q   So I know what you're talking about. I
7  don't think I need you to find it right now. But
8  did you review the defendants' motion to clarify
9  the class definition which has this information in
10 it?
11      MS. POST: Objection. Calls for a legal
12 conclusion, outside of the scope and I believe
13 that was also filed after class certification.
14      And for point of clarification, the
15 quote that you were looking for is page 17, the
16 top of page 18.
17 BY MS. SMITH:
18   Q   Dr. Aparicio, is it your opinion that
19 the number of juvenile justice youths is relevant
20 to assessing DHHR's use of congregate care?
21      MS. POST: Objection.
22      THE WITNESS: Yes, it's relevant in the

Page 62

1  sense that we would want to know how many of your
2  youth are being put in congregate care because
3  they're court ordered to be there, as I stated
4  earlier.
5      And I'd like to circle back to what we
6  were talking about earlier with Ms. Harper's
7  report. In my -- my report page 18, it states at
8  the top, "Ms. Harper affirmed the sense of
9  overwhelm within the system multiple times,
10 stating, 'There's many reports I could have run.
11 But at this point we have not enough staff to
12 manage the data we're working with now, so I don't
13 know who would do that.'"
14 BY MS. SMITH:
15     Q    And what question of mine was that in
16 response to?
17     A    You were asking me earlier about being
18 able to -- to pull those numbers and have
19 available data to inform -- what I would do is to
20 use that to inform practice within the child
21 welfare system and policy reform as it was
22 necessary and managed within the system. And I'm

Page 63

1  pointing that out because it seems like there is
2  that sense of overwhelm of -- of just trying to
3  manage the children who are already in care
4  without being able to reform -- or even evaluate
5  and then reform those services or policies or
6  programs that are not serving your youth the way
7  that -- that West Virginia's hoping that they
8  would.
9      Q    And in that language that you quoted
10 from Ms. Harper's testimony, is she referencing
11 the distinction between the juvenile justice
12 population and the foster care population and
13 congregate care when she made that statement?
14     A    I'd have to go back to her deposition to
15 confirm exactly what she was responding to at that
16 moment.
17     Q    But is that what you think she was
18 referencing or are you quoting that testimony of
19 hers more generally?
20     A    I'm quoting it as an example of one of
21 the many times that she indicated throughout her
22 testimony that the West Virginia child welfare

Page 64

1  system is overwhelmed with the children that they
2  are serving, they're overwhelmed with all
3  different kinds of things, so it's just been a
4  challenge. And so that's what I'm referring to.
5      So she may not have been -- that
6  particular quote may not be attached to number of
7  youths in congregate care per se. I think
8  actually she was talking about how many youths are
9  successfully transitioned into receiving the adult
10 system with Medicaid, which is another important
11 thing we would want for our youth as they're
12 transitioning out of -- of care. And I know, I'm
13 sure, that -- that anybody in the system would say
14 they would want that to happen. She may have been
15 talking about that, but I'm referring to more just
16 an overall sense of overwhelm and not being able
17 to have the staff to be able to prepare those
18 kinds of numbers and -- yeah, that's what I'm
19 referring to.
20     Q    So her overwhelm is in regards to the
21 data in reports; is that right? Is that what your
22 understanding is?

Page 65

1      A    I would not say that it's limited to the
2  data in reports, I would say that it also related
3  to the -- the day-to-day operations of the child
4  welfare system in West Virginia.
5      Q    Well, in the quote that you cited is she
6  referring to data in reports?
7      A    That's true, she's reporting -- she's
8  referring to data in reports there, yeah.
9      I think I have other quotes from her
10 where she talks about other points of overwhelm.
11     Q    In your role as an expert witness in
12 this case, were you asked to identify areas that
13 DHHR has done well with respect to foster youth
14 aged 14 and older?
15     A    I was asked to provide an overall
16 opinion and so, yes, of course I looked at those
17 areas as well and commented on those in my report.
18     I'm a social worker and so it's -- I am
19 by nature trained to look at both strengths and
20 challenges and so I thought myself at many points
21 wanting to highlight the things that you all are
22 trying to do and have attempted to do. Those --

17 (Pages 62 - 65)

Page 78

1  MS. SMITH: Sure.
2  (Brief recess 10:43 a.m. to 10:47 a.m)
3  (The reporter read the record
4   as requested.)
5  BY MS. SMITH:
6  Q   So the first full paragraph on there, it
7  says, "However, none of the seven child outcomes
8  across domains of safety, permanency, and
9  well-being were found to be in substantial
10  conformity in West Virginia."
11  Did I read that correctly?
12  A   Yes.
13  Q   And what is your understanding of what
14  it means when a CFSR review says that a state is
15  not in substantial conformity with an outcome?
16  A   So that's based on the data that I
17  collected for that particular outcome, which again
18  includes multiple indicators, and the expectation
19  is that they have achieved that 95 percent --
20  it's, you know, it's a little bit different on
21  what exactly that means for each of the different
22  outcomes, but that 95 percent of the cases

Page 79

1  reviewed, for example, indicates that children
2  are, for Safety Outcome One, children are first
3  and foremost protected from abuse and neglect.
4  Q   And do you know how those outcomes are
5  measured?
6  A   So they have -- each of them has
7  multiple indicators. I would have to pull up the
8  CFSR to tell you the specific indicators for each
9  of the outcomes, but there are -- each of the
10  outcomes is a composite measure of several
11  different indicators that are based on a review
12  of -- of the system.
13  Q   And I believe you said that the
14  expectation was a 95 percent substantial
15  conformity.
16  What do you mean by "expectation"?
17  A   That's the standard threshold that the
18  CFSR reports that they want for child welfare
19  systems to achieve.
20  Q   And what's your basis for saying that
21  it's an expectation?
22  A   That's what it states in the CFSR

Page 80

1  reports when it explains their methods.
2  Q   Okay. So on page nine we have Safety
3  Outcome One, "Children are first and foremost
4  protected from abuse and neglect."
5  Do you know how many states were found
6  to be in substantial conformity with Safety
7  Outcome One in the 2017 CFSR?
8  A   I don't.
9  Q   Would it surprise you that only four
10  states were found to be in substantial conformity?
11  A   It would not because 95 percent is a
12  high percentage, but how does West Virginia
13  compare to other states in terms of percentage of
14  substantial conformity?
15  Q   And then the same page number two
16  states, "Safety Outcome Two: Children are safely
17  maintained in their homes whenever possible and
18  appropriate."
19  Do you know how many states were found
20  to be in substantial conformity with Safety
21  Outcome Two?
22  A   I do not.

Page 81

1  Q   Would it surprise you that no state was
2  found to be in substantial conformity?
3  A   Again, perhaps no, because 95 percent is
4  a really high bar that we're working to achieve.
5  What I did in my report was to look at
6  your percentage of substantial conformity and look
7  at trends over time. So it's less that did you
8  meet the mark or not and more how are you doing
9  relative -- relatively doing on this particular
10  outcome.
11  Q   So on this particular outcome how did
12  West Virginia compare with other states?
13  A   I did not review other states' CFSRs, so
14  I can't answer that question for you.
15  Q   And then number three is "Permanency
16  Outcome One: Children have permanency and
17  stability in their living situations."
18  Do you know how many states were found
19  to be in substantial conformity with Permanency
20  Outcome One?
21  A   No.
22  Q   So you don't know if West Virginia was

21 (Pages 78 - 81)

Page 82

1  better or worse than other states on this outcome?
2    A  No. I looked at multiple CFSRs for West
3  Virginia and it was more based on the report of
4  trends over time within your own state that I
5  looked at as well as the, again, the -- the
6  strengths and weaknesses that were presented in
7  that report in terms of what West Virginia was
8  trying to do and what they had not -- not yet
9  attained that they were working towards.
10    Q  And you looked at the 2008 CFSR and the
11  2017 CFSR; is that right?
12    A  Yes.
13    Q  And do you know what years were reviewed
14  for those two CFSRs?
15    A  I believe it's the prior 12 months and
16  I'm not sure what the cutoff point is, so it's not
17  an exact, you know...
18    Q  So it would be like 2016 for the 2017
19  CFSR and then 2007 for the 2008 CFSR; is that your
20  understanding?
21    A  I would hate to say exactly what the --
22  the time was and which month was drawn and all of

Page 83

1  that, so -- but yes, it's -- it's slightly before
2  because they need to collect the information and
3  then present it in order for the report to be
4  written.
5    Q  And then Permanency Outcome Two, which
6  is -- we're still on page nine --
7    A  Uh-huh.
8    Q  -- "The continuity of family
9  relationships and connections in preserved for
10  children."
11       "In preserved for children," it seems a
12  bit of an odd phrasing, but do you know how many
13  states were found to be in substantial conformity
14  with Permanency Outcome Two?
15    A  No.
16    Q  Would it surprise you that no state was
17  found to be in substantial conformity?
18    A  No.
19    Q  Is that for the same reasons as the
20  other outcomes that we've discussed?
21    A  Correct.
22    Q  And then if we turn the page to page

Page 84

1  ten, we have Well-Being Outcome One. "Families
2  have enhanced capacity to provide for their
3  children's needs."
4       Do you know how many states were found
5  to be in substantial conformity with Well-Being
6  Outcome One?
7    A  No.
8    Q  Would it surprise you that only six
9  states were found to be in substantial conformity?
10    A  No.
11    Q  And is that for the same reason as the
12  other outcomes?
13    A  That's correct.
14    Q  Well-Being Outcome Two is next. It
15  says, "Children receive appropriate services to
16  meet their educational needs."
17       Do you know how many states were found
18  to be in substantial conformity with Well-Being
19  Outcome Two?
20    A  No.
21    Q  Would it surprise you that no state was
22  found to be in substantial conformity?

Page 85

1    A  No.
2    Q  Is that for the same reasons that we've
3  discussed for the other outcomes?
4    A  Yes.
5    Q  And then the last, Well-Being Outcome
6  Three, says, "Children receive adequate services
7  to meet their physical and mental health needs."
8       Do you know how many states were found
9  to be in substantial conformity with Well-Being
10  Outcome Three?
11    A  No.
12    Q  Would it surprise you that no state was
13  found to be in substantial conformity?
14    A  No.
15    Q  And is that for the same reason as the
16  other outcomes?
17    A  That's correct.
18    Q  And then on the same page, page ten, you
19  talk about the CFSR systemic factors?
20    A  Uh-huh.
21    Q  And the last sentence in that middle
22  paragraph, it says, "The areas in which West

Page 86

1  Virginia failed to meet substantial conformity
2  included," and then it lists those. So the first
3  one is Statewide Information System.
4      Do you know how many states were found
5  to be in substantial conformity with that systemic
6  factor, the Statewide Information System?
7    A  No.
8    Q  Do you know the age of West Virginia's
9  current Statewide Information System?
10   A  The age of the Statewide Information
11 System?
12   Q  Yeah.
13   A  Is that what you're asking?
14   Q  Yes.
15   A  I read in your documents that you're
16 implementing a new system and I could not recall
17 the exact start date of that new system. My
18 recollection is it's within the last five years.
19   Q  For the new system; is that what you're
20 saying?
21   A  For the new system, um-hm, but I'm not
22 sure of the exact date.

Page 87

1    MS. POST: Counsel, could we take a
2  ten-minute break at this point?
3    MS. SMITH: Sure. Should we come back
4  at 11:05? Is that okay? I guess it's now 10:57.
5  We can do 11:07.
6    MS. POST: Okay. Thank you.
7    MS. SMITH: Okay. Yeah.
8    (Brief recess 10:57 a.m. to 11:05 a.m.)
9  BY MS. SMITH:
10   Q  Okay. So we are on page ten of your
11 report and we're looking at the systemic factors
12 from the 2017 CFSR.
13   Do you know how many states were found
14 to be in substantial conformity with the Case
15 Review System?
16   A  No.
17   Q  Would it surprise you that only two
18 states were found to be in substantial conformity?
19   A  No. I think that's -- well, I think
20 that's information technology -- like information
21 technology is a challenge, this is a lot of data
22 to manage and often our systems need to be updated

Page 88

1  to collect both the items that we need to be
2  looking at as child welfare systems as well as be
3  able to process that amount of information, not to
4  mention have people who are able to analyze that
5  data and produce recommendations. So that does
6  not surprise me.
7    Q  And then for the Service Array and
8  Resource Development systemic factor, do you know
9  how many states were found to be in substantial
10 conformity?
11   A  No.
12   Q  Would it surprise you that only three
13 states were found to be in substantial conformity?
14   A  No.
15   Q  Okay. And why is that?
16   A  So I think -- that alarm was for the end
17 of our break but we're already back.
18   This is a challenging area, having a
19 service array that is not only a good looking
20 list -- as I mentioned in my report, West Virginia
21 has that -- but it is also one that is really
22 attuned to the needs of the population and is

Page 89

1  actually producing outcomes that we want to see
2  among those populations and so it does not
3  surprise me to hear that. This is a challenging
4  area to be -- to be sure.
5    Q  The next systemic factor is the Foster
6  and Adoptive Parent Licensing, Recruitment, and
7  Retention.
8    Do you know how many states were found
9  to be in substantial conformity with that systemic
10 factor?
11   A  No.
12   Q  Do you know what efforts DHHR has made
13 since this report was published to improve Foster
14 and Adoptive Parent Licensing, Recruitment, and
15 Retention?
16   A  I know that that has been a focus and
17 interest of the department. In Ms. Harper's
18 deposition she was asked about some of those
19 specifics and it was difficult to -- to say how
20 many, for example, foster homes had been recruited
21 that were specific to transition age foster youth.
22 So I'm aware that there are -- there's mention in

23 (Pages 86 - 89)

Page 90

1  the reports rather that there is efforts to change
2  this, but I am not able to comment on the specific
3  efforts and how rigorous they've been or anything
4  like that.
5     Q   And would it surprise you that only 14
6  states were found to be in substantial conformity
7  with the Foster and Adoptive Parent Licensing,
8  Recruitment, and Retention systemic factor?
9     A   No.
10    Q   And why is that?
11    A   So foster care recruitment is a
12 challenging area we know across the nation and so
13 it doesn't surprise me.  But I would point us,
14 again, to your rate of congregate care use among
15 youth in -- in West Virginia compared to other
16 child welfare systems though and that even with
17 the national challenges with recruitment of foster
18 parents that West Virginia appears to be
19 particularly struggling with this for transition
20 age foster youth.
21    Q   So did you compare West Virginia's
22 percentage in response to the Foster and Adoptive

Page 91

1  Parent Licensing Recruitment and Retention
2  systemic factor, did you compare that with other
3  states to see how they did?
4     A   I didn't compare that specifically, no.
5     Q   Did you --
6     A   I was basing --
7     Q   Go ahead.
8     A   I was basing my -- my conclusions based
9  on the reports that were provided specific to West
10 Virginia.  So no, I didn't compare it -- I didn't
11 compare that particular piece to the national
12 average or to other states.
13    Q   So your opinion is that the 95 percent
14 expectation of the CFSR is very high, but you're
15 not surprised that potentially very few states
16 were in substantial conformity with these outcomes
17 and systemic factors.  But you said you were
18 looking at West Virginia's percentages to make
19 your conclusion, but you didn't compare West
20 Virginia's percentages to another state; is that
21 right?
22       MS. POST:  Objection.  Misstates the

Page 92

1  testimony.
2       THE WITNESS:  So to be clear, this is
3  not my expectation, this is a federal expectation
4  that 95 percent substantial conformity be met, and
5  so my opinion of that is perhaps irrelevant, but
6  it's a high bar.  However, what I'm looking at is
7  trends over time within West Virginia and the
8  struggles over time that West Virginia has had on
9  both child outcomes and on systemic factors.  So
10 it's less about whether or not West Virginia has
11 hit that 95 percent mark and more about the
12 percent -- percent substantial conformity rate
13 that you've had across now many, many, many years.
14 BY MS. SMITH:
15    Q   Do you know if the CFSR compares
16 children who are currently in care with children
17 who are in their homes?
18    A   My understanding is that it's -- if I
19 recall correctly, so my understanding is that the
20 CFSR is child welfare related -- or child welfare
21 involved youth, so not just youth who are placed
22 in foster care at the time of the review.

Page 93

1     Children come in and out of foster care
2  placement at times and are placed in different
3  types of -- of placements and so I believe that
4  it's child welfare involved youth.
5     Q   Do you know the percentage of youth
6  reviewed that are in care versus the percentage of
7  youth reviewed that are not in care?
8     A   I do not.
9     Q   So on page ten, the second sentence in
10 that paragraph says, "This is worse than in the
11 prior evaluation, which included failure to meet
12 substantial conformity in three of the seven
13 systemic factors (report year 2008)."
14       Did I read that correctly?
15    A   Correct.
16    Q   Why do you feel it's appropriate to
17 compare outcomes and systemic factors between the
18 2008 CFSR and the 2017 CFSR?
19    A   That's a typical way of looking at the
20 typical methodology and typical way of looking at
21 trends over time to compare changes over time
22 within a particular outcome.

24 (Pages 90 - 93)

Page 98

1  yes. So if I recall correctly, there are
2  narratives that are included as part of that
3  review. I didn't -- again, as you questioned me
4  earlier did I interview people myself. I didn't
5  do that, but I did look at the state-level reviews
6  and the efforts to continue to improve in between
7  CFSRs.
8      Q   So on page 22 of your report, which I
9  believe is the last page, if you could turn to
10 that, please.
11     A   Yes, I'm here.
12     Q   Okay. The last sentence says, "Based on
13 current policies, practices and outcomes, West
14 Virginia DHHR operates a system that fails to meet
15 its stated goals for children, with its pattern of
16 failing to address safety, permanency, and
17 well-being of transition age youth."
18         When you say "pattern," what's your
19 basis for that?
20     A   So that includes not only the CFSRs but
21 also the state-level reviews that occur in between
22 the CFSRs, those reports. It includes -- this is

Page 99

1  an overall statement, so it includes really
2  everything that I reviewed. It includes those
3  outcomes that we were talking about earlier of the
4  youth who are -- who are aged out of the system in
5  West Virginia compared to --
6      Q   Are those the Annie E. --
7      A   Sorry.
8      Q   Are those the Annie E. Casey outcomes?
9      A   That's correct. That's correct.
10     Q   And --
11     A   It also includes the Safe Home Reports,
12 Evaluation Reports, and any other -- any other
13 reports that are in the -- the appendix there.
14 That really is an ominous statement of a review of
15 the evidence, so it is not only related to the
16 CFSRs.
17     Q   I guess when you say "pattern," I guess
18 I think of pattern as something that occurs
19 multiple times over the years. So besides the
20 CFSRs, what measures are repeated in the reports
21 that you reviewed?
22     A   So patterns are over time, but they're

Page 100

1  also patterns that are across multiple data points
2  and types of data that are collected, so I mean it
3  in that sense, is that with all of the different
4  data sources that I looked at all signs pointed to
5  transition age youth in foster care in West
6  Virginia not experiencing outcomes that we would
7  expect relative to other foster youth across the
8  nation and that they are, for example, being
9  placed in congregate care at very high rates.
10         Those -- that's what I mean by patterns,
11 is that it's not just comparing CFSRs across years
12 but it's looking at CFSRs, it's looking at the
13 state-level reviews, and looking at the other --
14 the other pieces of evidence that I considered.
15         THE REPORTER: All right. We're going
16 to have to hold on a second because Dawn got
17 knocked off again. She's not on.
18         MS. SMITH: Yeah. Okay.
19         (Brief recess 11:21 a.m. to 11:28 a.m.)
20         (Whereupon, Ms. Post left the
21         proceedings.)
22 BY MS. SMITH:

Page 101

1      Q   So we were talking about your last
2  sentence on page 22 about DHHR's patterns.
3          What did you look at that was specific
4  to transition age youth other than the Annie E.
5  Casey Report?
6      A   Everything that I reviewed is in the
7  appendix that starts on page 23. So I could read
8  all of that out, but I read everything that's
9  related to transition age youth in all of your
10 manuals, in all of your PIPs, in all of your
11 state-level reports, and the Safe at Home Reports.
12         So that's what I mean when I say that
13 there's a pattern, is that it's across different
14 reports, across years, across data points, across
15 people reporting it. To reiterate, not just
16 between the two CFSRs but across multiple data
17 points and multiple points of time.
18     Q   Are there any reports that you looked at
19 besides the Annie E. Casey one that has specific
20 data information related to transition age youth?
21         MS. MAHONEY: Objection. Asked and
22 answered.

26 (Pages 98 - 101)

Page 146

1  attend West Virginia University?
2    A   I don't.
3    Q   I think you said a very small number.
4    A   Yeah, I don't have that number.
5    Q   Okay.  Do you know how many foster care
6  youth are in college from West Virginia?
7    A   I don't have that specific statistic,
8  no, but it is -- nationally we know that it's a
9  pretty low percentage and that's why I'm saying
10 that youth would need additional things in
11 addition to something like a House Program that's
12 going to serve such a tiny margin of your youth
13 who are transitioning from the foster care system.
14 You really need something that's going to help
15 those who are going to community college or those
16 who are going to technical schools.  Those are the
17 kinds of -- at the point where they're preparing
18 to transition to adulthood, those are the kinds
19 of, let's say, array of educational supports that
20 would be important.
21       So all of this is to say -- we got into
22 this conversation because you're talking about

Page 147

1  MODIFY being a great idea but poorly implemented
2  because of -- it seems like being under resourced
3  and putting folks who are the case workers there
4  in a very tough position to be able to serve that
5  many youth.
6       This House Program is another example of
7  something that is a wonderful idea, but in
8  practice it's not really making, I would think,
9  the impacts that West Virginia is hoping that it
10 will be making.  But again, that is, you know,
11 just based on simply the information of -- of how
12 many youths are going to college typically, to a
13 four-year college.
14   Q   Do you know how many foster care youth
15 from West Virginia are in technical schools?
16   A   I don't.  I do know -- I can tell you
17 that only 72 percent of West Virginia foster youth
18 have a high school diploma by age 21, so...
19   Q   And that's from the Casey report?
20       MS. POST:  Annie E.
21       THE WITNESS:  Right, Annie E. Casey,
22 yeah, Foundation Report.

Page 148

1       So that would suggest to me that they --
2  first, you know, you would need to have them
3  completing high school or a GED, you know, high
4  school equivalent program, and then being able to
5  move on to other -- other training that will
6  prepare them economically to be independent as
7  adults.
8       MS. POST:  Counsel, to prevent confusion
9  it appears about the MODIFY Program, it's on page
10 13 of the report if that would be helpful to you.
11 It's 5 workers per 2700 children.
12      THE WITNESS:  Which page did you say
13 that was on?
14      MS. POST:  Thirteen.
15      THE WITNESS:  Uh-huh.  Thank you.
16      MS. POST:  Anything else I can help
17 direct you.
18 BY MS. SMITH:
19   Q   So I had a few more questions about the
20 Annie E. Casey Profile.
21      Could you turn to page four of that
22 document, please.

Page 149

1    A   Yes, I'm there.
2    Q   Okay.  So the top of page four has a
3  "Services" title and it shows that West Virginia
4  does better than the U.S. population with
5  70 percent receiving educational financial
6  assistance compared to 23 percent in the United
7  States; is that right?
8    A   Yes.
9    Q   And then also with room and board
10 assistance, West Virginia does better than the
11 United States population with 23 percent compared
12 with 19 percent nationally; is that right?
13   A   Yes.
14   Q   And you didn't cite these statistics in
15 your report, right?
16   A   I don't think that I talked about these
17 three.
18      Part of it was because there is
19 insufficient data for employment programs and
20 vocational training.  I was mostly looking at the
21 outcomes -- using this for the outcomes and then
22 kind of talking about the services that were being

38 (Pages 146 - 149)

Page 150

1  provided through the information that was -- that
2  was given in the -- the state-level reports. So
3  yes, there is -- there is this information here.
4         And part of what made me pause on this
5  is that I couldn't tell if this was at age 21 or
6  if this was among transition age youth, for
7  example. So part of it was that I wanted to make
8  sure I was very clear on everything that I was
9  giving you in the report and I'm just not certain
10 that this is at age 21 just like the other -- see
11 how the other ones are listed very clearly at what
12 point that was evaluated? I wasn't sure it was
13 like all 14 to 18 year olds in -- in West
14 Virginia. I wasn't sure.
15     Q   Well, the title of the report says,
16 Transition-Age Youth in Foster Care," right?
17     A   It does and then the different
18 indicators are pretty clear about which part of
19 that group they're talking about. This one just
20 says "Services," so I wasn't sure what that was
21 about.
22        It also says here that it would be less,

Page 151

1  so the N/A under "Employment Programs/Vocational
2  Training," it says that it cannot publish due to a
3  sample size under ten young people. And so that
4  suggested to me that we may be talking about a
5  very small group of youth. I wasn't confident in
6  what exactly they were saying and so that's why I
7  didn't cite it there.
8         As I stated before, I really tried to
9  look for strengths within the West Virginia
10 system. I think that's very important to do. And
11 it wasn't because I wasn't trying to highlight
12 strengths in your services, it just wasn't there.
13     Q   So was this information considered in
14 concluding that there was a pattern of failing to
15 serve West Virginia's aging out population?
16     A   The services that are being provided,
17 yes, okay, first, and the services that are being
18 provided in West Virginia are not creating the
19 kinds of outcomes that we would want to see among
20 youth. And so without saying, for example, which
21 specific programs were being offered and to how
22 many youths, it was hard for me to get a handle on

Page 152

1  how to incorporate what this meant like
2  specifically for West Virginia, so...
3      Q   So I'm sorry, I'm confused. Did you
4  consider this information or not in making your
5  conclusion?
6      A   I considered --
7      Q   Did you consider the Educational
8  Financial Assistance and the Room and Board
9  Assistance? I understand the Employment Programs
10 has a small sample.
11     A   I read this, but I didn't cite it in my
12 report because, as I said, I couldn't figure out
13 which subgroup they were talking about, if it was
14 after youth had aged out or, you know, this was at
15 age 21 or if this was 14 or 18 year olds. So I
16 considered it while I was reading through the
17 document, but I didn't include it in my report
18 because, again, I wasn't sure how to -- to frame
19 those -- those details.
20     Q   I have a similar question on page three
21 of the Annie E. Casey 2018 West Virginia Profile.
22        There's "Placement Type" listed at the

Page 153

1  top of the page and it shows that West Virginia
2  has a rate of 2 percent of runaways and the United
3  States has double that at 4 percent of runaways.
4      A   Uh-huh.
5      Q   Why did you not include this in your
6  report?
7      A   So to me runaway is not a placement.
8  That is not a formal placement, that is just what
9  happens if people leave their placement. So I
10 didn't include it for that reason.
11     Q   Okay. And then could you please turn to
12 page two of the report.
13     A   Yes.
14     Q   So the top right chart it lists "Number
15 of Placements During Most Recent Foster Care
16 Episode." So it shows that in 2018, 44 percent of
17 West Virginia foster youth experienced one
18 placement during their most recent foster care
19 episode while only 30 percent of foster youth
20 nationally experienced one placement during their
21 most recent foster care episode."
22        Do you see that?

Page 154

1    A    Uh-huh.
2    Q    Then it also shows, if you combine those
3    first two columns, that in West Virginia
4    67 percent of foster youth experienced two or
5    fewer placements during their most recent foster
6    care episode while only 50 percent of foster youth
7    nationally experienced two or fewer placements
8    during their most recent foster care episode.
9         Why did you decide not to include these
10   data points?
11   A    This is not evidence of anything that's
12   going well in West Virginia. This confirms to me
13   the congregate care use.
14        So when youth are placed in congregate
15   care, they are sometimes in a locked or a
16   semi-locked facility. That could also explain the
17   lower (inaudible) rates that are happening. But
18   they are less likely to have a disruptive
19   placement because they're in a place that has a
20   very high --
21   Q    I'm sorry, can you explain that?
22   A    Yeah.

Page 155

1    Q    How do you get that from this chart?
2    A    Yeah. So you can't see it directly from
3    the chart of course. What I'm putting that
4    information together with is that it simply would
5    have confirmed the concerns about congregate care
6    because of the low numbers of foster parents
7    versus congregate care usage and congregate care
8    placements. That to me is in -- is completely
9    consistent with what we would see with an overuse
10   of congregate care, is that you would have fewer
11   placements because once you send youth there, they
12   are less likely to have a disruptive placement.
13   They're not having to adjust --
14   Q    So you're saying -- go ahead.
15   A    They're not having to adjust to a new
16   home, they're not having to -- you know, it's
17   just -- anyway, I think I've stated my point.
18   Q    So is it your understanding that this
19   number of placements is only referring to
20   congregate care placements?
21        MS. POST: Objection.
22        THE WITNESS: That's not what I said.

Page 156

1    BY MS. SMITH:
2    Q    Okay. So where did you pull out the
3    congregate care piece of this?
4    A    I'm saying that this data is consistent
5    with what we would expect with a child welfare
6    system that has an overreliance on congregate
7    care, that youth would have less transitions and
8    numbers of placement if they're in congregate care
9    because once you're there, it's harder to run away
10   and it's less likely that you're going to have a
11   placement disruption because you are already in a
12   highly restrictive environment.
13   Q    Could this also refer to the number of
14   placements in a foster family home?
15   A    It's possible, but again, with the low
16   number -- and again Ms. Harper was not able to say
17   how many foster parents there are specific to
18   this -- to this population, but what we assume is
19   a low number based on -- well, it's difficult,
20   these are reported across reports, in recruiting
21   and retaining and training those foster parents.
22   We would expect that -- that these numbers are

Page 157

1    consistent with -- with -- with a high use of
2    congregate care. So did I answer your question?
3    Q    I think we're getting there. Not quite
4    yet.
5         I mean, wouldn't this also be consistent
6    with use of -- I mean, only placing kids in any
7    foster care placement?
8         Like I'm not sure how you pulled out
9    congregate care when this is number of placements
10   during most recent foster care episode and it's
11   across all placements.
12        MS. POST: Objection.
13   Mischaracterization of the testimony. Again, this
14   is harassing in terms of counsel deliberately
15   misstating testimony where she indicated she
16   was -- crossover in terms of analysis of reports
17   in comparison and not taking that in isolation.
18        THE WITNESS: Think about it this way.
19   If a youth comes into care, they're 14 or older
20   and if you have a higher percentage of those youth
21   who were going into a congregate care versus a
22   foster home placement, those -- we would expect

40 (Pages 154 - 157)

Page 158

1  that, when a -- when a system has those practices
2  of overusing congregate care, that there would be
3  lower disruptions of placement. So I'm putting
4  together the pieces. That is only -- that
5  information is consistent with what we would
6  expect to see.
7      If you were, for example, having a lot
8  of foster homes that were really -- like, let's
9  say, you have recruited a lot of foster homes but
10 not -- not trained them well and not supported
11 them well, then -- and you had reduced your number
12 of congregate care placements, you might see
13 higher disruptions of placements. That -- that is
14 not what's happening in West Virginia though. We
15 know that that -- that West Virginia is overusing
16 its congregate care facilities.
17 BY MS. SMITH:
18    Q   And what's your basis for that
19 statement?
20    A   That's reported in multiple places. I
21 can pull the specific statistic if you need it.
22 It's in my report.

Page 159

1    Q   Sure.
2    A   Okay. Give me a minute.
3        MS. POST: Just to be helpful, so we
4  don't lose time, I believe the whole discussion is
5  on page 18 if that will help counsel.
6        THE WITNESS: On page 18, the second
7  section, "West Virginia" -- well, it's Part VIII.
8  "West Virginia Relies Heavily on Congregate Care,
9  Despite Evidence of it Being More Expensive and
10 More Harmful for Foster Youth."
11       "Another major shortcoming" -- I'll give
12 you a minute to get there.
13 BY MS. SMITH:
14    Q   I'm there.
15    A   Thank you. "Another major shortcoming
16 in DHHR's provision of services to transition age
17 foster youth is its heavy reliance on congregate
18 care, which places transition age foster youth at
19 significant risk" --
20       THE REPORTER: I'm sorry, can you slow
21 down when you read because I'm not looking at the
22 document.

Page 160

1        THE WITNESS: I'm so sorry.
2        Let me start again.
3        THE REPORTER: Thank you.
4        THE WITNESS: So this is on page 18,
5  Section VIII. The title of that section is "West
6  Virginia Relies Heavily on Congregate Care,
7  Despite Evidence of it Being More Expensive and
8  More Harmful to Foster Youth."
9        "Another major shortcoming in DHHR's
10 provision of services to transition age foster
11 youth is its heavy reliance on congregate care,
12 which places transition age foster youth at
13 significant risk of harm. More than half
14 (57 percent) of transition age foster youth are
15 placed in congregate care in West Virginia
16 compared to 34 percent nationally. By comparison,
17 approximately one-third (30 percent) of West
18 Virginian transition age youth are placed in a
19 family-based setting," which includes
20 pre-adoptive, relative and non-relative homes,
21 "versus approximately half (47 percent) of
22 transition age youth nationally."

Page 161

1        So that's what I mean when I say that
2  there is a pattern of overreliance on congregate
3  care and why these numbers of lower placement
4  disruptions are consistent with that pattern of
5  overuse of congregate care.
6  BY MS. SMITH:
7    Q   So do you know what percentage of foster
8  youth in congregate care are juvenile justice
9  youth mandated to treatment by West Virginia
10 Circuit Courts?
11       MS. POST: Objection.
12       THE WITNESS: No.
13 BY MS. SMITH:
14    Q   And do you have an opinion on whether
15 that population experiences the same kind of
16 trauma as children in DHHR custody because of
17 abuse and neglect?
18       MS. POST: Objection. Outside the
19 scope, ambiguous.
20       THE WITNESS: Can you restate your
21 question?
22 BY MS. SMITH:

Page 170

1  asked this question probably 25 different times in
2  different ways and I'm not going to instruct the
3  witness not to answer it, but it's becoming
4  harassing.
5       THE WITNESS: Okay. So it would be
6  helpful for me to know not what you stated but
7  actually the percentage of youth who are in
8  congregate care in West Virginia, who are placed
9  in congregate care because they are justice
10 involved and they have been court ordered to be
11 placed there, versus those youth who are foster
12 youth, who are -- come in because of child abuse
13 and neglect, and that is deemed to be the most
14 appropriate placement for them versus youth who
15 are in foster care and only placed in that
16 congregate care setting because there's no other
17 space for them, right? Those are the kinds of
18 things that I was saying would be helpful for me
19 to know. It is not particularly important for me
20 to know the percentage of justice involved versus
21 child welfare, child abuse and neglect involved
22 youth.

Page 171

1       Thank you for -- for asking about that
2  and for -- for offering that, but that does not
3  change my conclusion that this system is not doing
4  what it's supposed to be doing to serve transition
5  age youth.
6       And it's 12:50. It's time for a break.
7       MS. SMITH: Okay. Thank you.
8       THE WITNESS: You're welcome.
9       MS. SMITH: Can we resume at 1:50?
10      THE WITNESS: Yes.
11      (Whereupon, at 12:51 p.m., a
12      luncheon recess was taken.)
13         * * * * *

Page 172

1               A F T E R N O O N   S E S S I O N
2                      (1:50 p.m.)
3  Whereupon,
4       ELIZABETH M. APARICIO, PH.D.
5  was called for continued examination, and having
6  been previously duly sworn, was examined and
7  testified further as follows:
8       RESUMED EXAMINATION BY COUNSEL FOR
9       DEFENDANTS
10 BY MS. SMITH:
11    Q   Okay. Dr. Aparicio, can you please tell
12 me everything you did to get ready for this
13 deposition?
14    A   So I prepared for 6 hours and 15
15 minutes. Two hours of that was with ABC and four
16 hours and 15 minutes was on my own.
17      So in that time I read and reread my
18 report and annotated it for what was going to come
19 up in the deposition to try to prepare for your
20 questions today so I would be able to answer them
21 as well as I could. And I reviewed my notes from
22 what I had reviewed in Lexbe as well and -- yeah.

Page 173

1  If there's anything more specific you would like
2  to know, let me know.
3     Q   Did you review the complaint in this
4  case to prepare for the deposition?
5     A   I had read the complaint some time ago,
6  but I didn't reread it before the deposition, no.
7     Q   What about did you read plaintiffs'
8  brief in support of their motion for class
9  certification?
10    A   Not as part of preparation for the
11 deposition. I think I may have read that earlier
12 on, I think, but I did not read it in preparation
13 for today.
14    Q   Did you review any of the other expert
15 reports that plaintiffs filed with their motion
16 for class certification?
17    A   I did not, no.
18    Q   And did you speak with anyone else
19 besides plaintiffs' attorneys in preparation for
20 this deposition?
21    A   I did not, no.
22    Q   Did you do anything else to prepare that

Page 178

1  statewide information systems?
2     A   Other than yours, no.
3     Q   Would you say you were an expert on
4  statewide information systems?
5     A   I'm an expert --
6         MS. POST:  Objection.
7         THE WITNESS:  I'm an expert on aging out
8  foster youth.
9  BY MS. SMITH:
10    Q   You can answer.
11    A   Yeah.  I'm an expert on aging out foster
12 youth, so that means that -- that includes
13 tracking youth but not in a statewide system
14 specifically.
15 BY MS. SMITH:
16    Q   Okay.  So then further down -- let's
17 see.  The last sentence that begins on page five,
18 it again says, "This is evidenced yet again by
19 multiple years in which DHHR failed to meet
20 federal benchmarks for expectations in these areas
21 for care."
22        So for that specific piece of that

Page 179

1  sentence are you referring to the statewide
2  information systemic factor in the 2008 and 2017
3  CFSRs?
4     A   So this sentence is preceded by a
5  sentence that has all of the different factors in
6  it, so it's more of an omnibus statement that
7  there have been multiple years of failure to meet
8  federal benchmarks in these different areas.
9         So it's not saying specifically only
10 statewide systems -- information systems have been
11 an issue, but there have been multiple issues that
12 have been driving the system's inadequacies.
13    Q   And are all of those four factors that
14 precede that sentence, are those the four systemic
15 failures that we went over this morning in the
16 2017 CFSR?
17    A   Yes, that's correct.
18    Q   So for that kind of the second factor on
19 line three of paragraph numbered two, the failure
20 to meet case review and planning standards, what
21 case review and planning standards are you
22 referring to?

Page 180

1     A   Those are the case review and planning
2  standards that are part of the CFSR review.  I can
3  detail them and pull that up if you'd like.
4     Q   No, that's okay.
5         Do you have any experience evaluating
6  case review and planning standards for foster
7  youth aged 14 and older?
8     A   I would say it's the same part of the
9  system of trying to create adequate case records
10 and planning standards.  So as an individual
11 social worker, sure, but not at a system level of
12 evaluating how those go.  I know what it means to
13 put together an appropriate case though.
14    Q   So would you say that you're an expert
15 on a foster care system case review and planning
16 standards for foster youth aged 14 and older?
17        MS. POST:  Objection.
18        THE WITNESS:  Again, as stated, I'm an
19 expert in aging out foster youth and not in this
20 factor in particular.  So I'm a content expert in
21 aging out foster youth, not in specifically and
22 only case review and planning standards

Page 181

1  evaluation.  My comments that are drawn based on
2  those are based on your own reviews as well as the
3  CFSRs.
4  BY MS. SMITH:
5     Q   And by our own reviews, which reviews
6  are you referring to?
7     A   Those are the state-level reviews that
8  occurred between CFSRs.
9     Q   Are you talking about the Program
10 Improvement Plan?
11    A   The Program Improvement Plans come out
12 of the CFSRs and then you're reporting on those
13 Program Improvement Plans, or PIP, throughout your
14 own review to see how you're doing over time.
15        So if you look at my appendix, it has
16 there the -- it should have the reviews.  Yeah,
17 I'm looking for the program improvement --
18 improvement review so that I can see which one it
19 was and what the date was.
20        But anyhow, as you know, the state
21 evaluates its own progress towards meeting those
22 federal benchmarks over time.

Page 190

1  Q   So let's see.  We're still on page five.
2  The last kind of clause in that sentence that
3  we've been looking at refers to DHHR's failure to
4  develop adequate foster and adoptive parent
5  licensing, recruitment, and retention practices to
6  the benefit of older foster youth.
7       A   Uh-huh.
8       Q   Do you have any experience with foster
9  and adoptive parent licensing practices?
10      A   So I have experience with supporting
11 community-based organizations, not in the
12 licensing per se, but in recruiting and retaining
13 their foster parents and really supporting them to
14 be able to provide adequate services to transition
15 age youth.  So service more on the community-level
16 side of implementation of that, uh-huh.
17      Q   Okay.  The community-level side of
18 recruitment and retention but not licensing; is
19 that what you said?
20      A   I'm pausing because I'm thinking back to
21 service -- any examples of supporting them with
22 licensing.

Page 191

1       That's correct.  Much more in the
2  recruitment and retention, training and
3  trauma-informed care, that sort of thing.
4       Q   So would you consider yourself an expert
5  in regards to foster and adoptive parent licensing
6  practices?
7           MS. POST:  Objection.  Also calls for a
8  legal conclusion, what is required by state and
9  federal law, and calls -- well.
10          THE WITNESS:  Well, as I stated earlier,
11 I am an expert in aging out youth -- foster youth
12 and that may included some licensing and parent
13 retention -- recruitment and retention, foster
14 parent recruiting and retention, but not
15 specifically about licensing and not specifically
16 in that area, no.
17 BY MS. SMITH:
18      Q   And what specifically about recruitment
19 and retention?
20      A   I would consider myself an expert in
21 that, yes, in the way that I just described to
22 you.

Page 192

1       Q   So could you please turn to page 20 of
2  your report?
3       A   Yes, I'm there.
4       Q   Okay.  Thank you.
5           So the first full sentence on that page
6  says, "Substance use has clearly been identified
7  as a driver of foster care entry, yet development
8  of evidence-based prevention of and treatment for
9  substance use among parents does not appear to
10 have been a major focus in West Virginia."
11          What's the basis for that statement?
12      A   The basis for that statement is that as
13 I say, "It would appear to an outside observer
14 that reducing substance use would be a priority in
15 order to stabilize foster care entries, yet for
16 years this has not been the case" to quote from my
17 report.
18          If it were me -- if it were my child
19 welfare system, I would have been doing everything
20 that I could to build those services out and there
21 simply is a lack of evidence that that has
22 happened.

Page 193

1           So as we were talking about before,
2  sometimes the evidence is in what's stated and
3  sometimes it's in what's absent.  And the lack
4  of -- lack of discussion about what's being done
5  related to substance use and -- and just -- first
6  of all, for initial entires but also then for
7  transition age youth who then may become parents
8  and are stressed and have trauma and then thinking
9  about that intergenerational cycle, I -- it was
10 surprising and -- to me that that was not the
11 number one priority on, for example, the PIPs --
12 or, you know, it was just -- it just --
13      Q   Have you seen responding to substance
14 use as a number one priority in other child
15 welfare systems that you have familiarity with?
16      A   So addressing substance use is always a
17 priority in child welfare, it's an issue that is a
18 struggle.  So I -- I would say that yes, most
19 child welfare systems are working to address
20 substance use in one way or another.
21          And, again, with it being such a
22 pernicious issue in West Virginia, I was expecting