Exhibit 4

Page 1

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
2                HUNTINGTON DIVISION
3   _____
        Jonathan R., minor, by Next     :
4       Friend, Sarah Dixon, et al.,    :
                                        :
5            Plaintiffs,                :   Class Action
                                        :
6       v.                              :   3:19-cv-00710
                                        :
7       Jim Justice, in his official    :
        capacity as the Governor of     :
8       West Virginia, et al.,          :
                                        :
9            Defendants.                :
    _____
10
11         VIDEOCONFERENCE DEPOSITION OF SUSAN GETMAN
12      DATE:          October 15, 2020
13      TIME:          9:02 a.m. to 2:01 p.m.
14      LOCATION:      Witness Location
15
16      REPORTED BY:   Felicia A. Newland, CSR
17
18
19
20
                    Veritext Legal Solutions
21              1250 Eye Street, N.W., Suite 350
                    Washington, D.C. 20005
22

Page 46

1  relied on my own experience in public child welfare
2  and worked with the federal government
3  representatives, their regional, around case
4  standards.
5  BY MS. BROWN:
6      Q   Anything else that you recall you
7  might have looked at in the context of preparing
8  the report?
9      A   I think we've covered it.
10     Q   Did you interview any of the children
11 or youth whose files you were reviewing?
12     A   I did not.
13     Q   Did you interview any caseworkers?
14     A   I did not.
15     Q   Did you interview any supervisors?
16     A   I did not.
17     Q   Did you interview any families?
18     A   I did not.
19     Q   Did you interview any child placement
20 agencies?
21     A   No.
22     Q   Did you interview any providers?

Page 47

1      A   No.
2      Q   Did you interview any guardian ad
3  litem?
4      A   No.
5      Q   Did you talk to any staff at DHHR?
6      A   No.
7      Q   Did you look at any provider case
8  files?
9      MS. LOWRY:  Objection.
10     THE WITNESS:  No.  I looked at what
11 was available to us.  And I guess I should say that
12 in some cases, they were not complete, but there
13 were some reports from providers.
14 BY MS. BROWN:
15     Q   Did you look at case records of any
16 child placement agency?
17     A   No.  Again, not the records, but
18 there were oftentimes pieces of reports.
19     Q   In your work at Walker or Casey or
20 the department, was there any time in which you
21 recall making a judgment based on what was in the
22 case record without talking to anybody?

Page 48

1      MS. LOWRY:  Objection.
2      THE WITNESS:  It was a different
3  circumstance, people were on my team and so cases
4  were discussed.
5  BY MS. BROWN:
6      Q   Can you recall any circumstance at
7  Walker or Casey or at the department when you would
8  have been comfortable making a judgment based
9  solely on the review of the case record without
10 talking to anybody?
11     MS. LOWRY:  Objection.
12     THE WITNESS:  You know, that's really
13 hard to say because the environment was so
14 different.  You know, I -- I wouldn't get into a
15 case record without having contact with someone who
16 had knowledge of it, so...
17 BY MS. BROWN:
18     Q   Would you agree that talking to
19 someone with direct knowledge can give context to a
20 case record that might otherwise be hard to
21 interpret?
22     A   Yes.

Page 49

1      Q   Are you aware of any state or federal
2  audits that look only at case records without
3  interviews?
4      A   The CFSR is basically a record
5  review.  And while the reviewers talk with various
6  individuals, my recollection is that it tends to be
7  more about systems issues and not case specific.
8  So the case records, again, my recollection is the
9  case records follow a pretty formulaic paper
10 review.
11     Q   By CFSR, you mean the Child and
12 Family Services Reviews that are conducted by ACF?
13     A   Yes.
14     Q   Together with the states?
15     A   Yes.
16     Q   And in those cases, do you know if
17 the cases are randomly selected or judgmentally
18 selected?
19     MS. LOWRY:  Objection.
20     THE WITNESS:  At least when I was
21 involved, they were randomly selected.
22

Page 70

1  developed an outline for the report, scaffolding,
2  you know, the sections that we thought would
3  provide a reasonable flow and the headers of those
4  sections speaking to common practice areas.  So for
5  instance, investigation and assessment, placement,
6  pre- and post-placement services and such.
7      Q   So I think the sections are, right,
8  investigations --
9      A   Well, it starts with introduction --
10 what I have is introduction, methodology,
11 reviewers, then investigation, and pre-placement --
12     Q   Yes.
13     A   -- post-placement services,
14 permanency, systems, and conclusion.
15     Q   Systems and conclusions.  So which
16 sections did you take the lead on drafting?
17     A   I took the lead on the introduction
18 and methodology, the post-placement services, the
19 organizational culture and conclusion.
20     Q   Is organizational culture the same as
21 system and concerns?
22     A   It was a subsection.

Page 71

1      Q   I'm sorry.  I'm going to have to ask
2  you repeat that.  Post-placement services?
3      A   So I did introduction, methodology.
4      Q   Yep.
5      A   Post-placement services.
6      Q   Okay.
7      A   Organizational culture, which was one
8  of the three subsections of systems, systemic, and
9  then I drafted a conclusion.
10     Q   And how -- how was it that those were
11 your sections?
12     A   In part, we each picked sections that
13 we felt either were reflected in our cases and we
14 had some -- some thoughts about it, or it was
15 something that, in terms of our own experience, we
16 felt comfortable writing about.  And then,
17 honestly, I was the one that had some time.  Both
18 the other executive reviewers had competing
19 priorities and so -- so I took responsibility for
20 it.
21     Q   Okay.  Who took the lead on the
22 investigations and pre-placement?

Page 72

1      A   That was Ms. Flory.
2      Q   And who took the lead on the
3  permanency?
4      A   Ms. Potchak.
5      Q   And then for the -- I guess there
6  were two other systemic concerns, one on --
7      A   Case record, and Ms. Flory took
8  skills frontline workers.
9      Q   Okay.  And so did you all agree in
10 advance what was going to be in each section or did
11 each person draft their section based on the three
12 cases that they reviewed and then you commented on
13 each other's pieces?
14     A   So we discussed what we saw
15 thematically first to have a -- to be able to
16 determine what the sections were.
17         I keep reminding myself that it's not
18 what I just said.
19     Q   No, that's why I wanted to warn you.
20     A   No, I appreciated your earlier
21 warning.
22         And so we had an agreement

Page 73

1  essentially that, yes, that is what we saw.  We
2  also had a methodology where we listed out, I don't
3  know, maybe 20 or 25 different areas of concern and
4  sort of indicated for each of our cases whether
5  that was -- whether that was really an ongoing
6  concern in the case so that we weren't writing
7  about something as if it was cross-cutting, when it
8  was really something that was a major dynamic in
9  one case, but really not evident in the other
10 cases.  So we did have part of our methodology
11 before we started writing of taking a look at that
12 and seeing whether that comported with our
13 impressions.
14     Q   And so did each -- did you each sort
15 of present your case reviews or did you each
16 present your conclusions of what the case reviews
17 indicated?
18         MS. LOWRY:  Objection.
19         THE WITNESS:  I didn't read anyone
20 else's case review, nor did they read mine, so it
21 was a discussion.
22

Page 114

1 that.
2 And the other thing --
3 Q You wonder, but not conclude?
4 A We couldn't conclude, right. And I
5 think we -- I think we used language around that,
6 that it would be an area for inquiry and possible
7 improvement, I think was the language that we used.
8 The other thing that was really quite
9 notable, that I don't know that I have seen in my
10 practice before, is supervisors and social workers
11 signing off on forms that in and of themselves,
12 they are declarative. They had -- you know, they
13 are declarative in their nature. You know, this is
14 a screen-in, this is a screen-out, et cetera, et
15 cetera, that were virtually blank, except for their
16 signatures. And that came up time after time.
17 Q And you don't know why that might be
18 the case as a -- as a technical matter. Is that
19 correct?
20 A That is correct. So the child's name
21 was on it or a parent's name was on it. And after
22 that, there was nearly blank forms. And what

Page 115

1 was -- what was notable were the ones that were
2 actually signed.
3 Q And because you -- you don't have any
4 insight into how the system actually works in
5 realtime. Is that correct?
6 MS. LOWRY: Objection.
7 THE WITNESS: Of course.
8 BY MS. BROWN:
9 Q For the reasonable professional
10 standards, how did you and Ms. Flory and
11 Ms. Potchak sort of come to agreement as to what
12 those were?
13 A I think between us, we have, you
14 know, some hundred years of professional
15 experience. And, you know, speaking for myself,
16 it's all been within child welfare -- well, Child
17 and Family Services and largely within child
18 welfare, either in the nonprofit side or the public
19 side. And also, having gone to other states
20 personally and seen how those states work, having
21 been in a variety of settings whereby policies and
22 policy improvements were being discussed, having

Page 116

1 read documents that come out of the Children's
2 Bureau and COA and other associations.
3 Q And in your experience with other
4 states, whether it's Massachusetts or when you were
5 working at Casey or whatever, in any of those, did
6 your understanding of the -- did your conclusions
7 as to the system derive solely from a review of
8 three case records?
9 MS. LOWRY: Objection.
10 THE WITNESS: I was not involved in
11 reviewing case records, with the exception -- and,
12 again, I think we spoke of it earlier -- it wasn't
13 the full case record, but when I did permanency
14 roundtables, I did review relevant information.
15 BY MS. BROWN:
16 Q But in general, that's not how you
17 would approach an evaluation of a child welfare
18 program.
19 A Oh, I'm not so sure that's the case.
20 I mean, I do think that reviewing case records and
21 looking for patterns and evaluating training and
22 supervision is certainly a very important component

Page 117

1 of evaluating a child welfare system.
2 Q But it's not how you had done it
3 before?
4 A Not -- not quite literally the same,
5 correct.
6 Q It was a component, but it wasn't the
7 sole component?
8 A Correct. The goal was also
9 different. We were in the process of considering
10 revisions to policy and practice.
11 Q When you say "we," that would be
12 Massachusetts or are you talking about --
13 A Yes.
14 Q -- Casey or both? All of the above?
15 A In the "we" were the public child
16 welfare leaders, judges, Casey folks, birth
17 parents.
18 Q So there's a -- in the methodology,
19 there is a statement that, "Each reviewer holds a
20 wide range of experience with adopting systemwide
21 child welfare standards of practice."
22 So can you confirm what your own

30 (Pages 114 - 117)

Page 130

1  Q  So earlier we spoke about some
2  actions that Garrett's caseworker took with respect
3  Garrett, advocacy to get him into a program that
4  she thought was appropriate for him.  Do you
5  believe that that case record from that caseworker
6  reflected a lack of knowledge and skill, failure to
7  understand Garrett?
8  A  Actually, I will say two things about
9  that example.  One is this woman went above and
10  beyond in advocating for him, it is true.  She, by
11  her own writing, says that she believed he needed
12  another chance, that he had skills, that he should
13  have a chance to express and to take on -- to be
14  nurtured in that way.
15       One could say, and there was no point
16  in me going into it at the time, that such
17  advocacy, while, well placed and well meaning and
18  heartfelt, was also naive.  He lasted less than a
19  week in the placement.  And the amount of freedom,
20  which she so desperately wanted him to be able to
21  use productively, was well beyond his ability at
22  that point in his -- his life experience to manage.

Page 131

1  And she later went back to him and said she felt he
2  had used her, that he had set her up.
3       Now, you know, I -- it is far beyond
4  the extent of this review to say, you know, should
5  she have known?  Might she have had a supervisor
6  that said, "Hey, I hear that you really want to go
7  to bat for this kid and really want the best for
8  him, but let's take a look at the history.  Let's
9  take a look at how he has dealt with things.  Is he
10  really ready for this?"
11  Q  Should he be in a more restrictive
12  setting?
13  A  Should he be in a different setting.
14  That was -- I wouldn't put it in restrictive and
15  not restrictive.  I think that the place that he
16  was -- now, mind you, this is after years and years
17  of being in placements and not getting out of
18  placements when he was ready to be discharged and
19  when the residential providers were ready to
20  discharge him, but there was no -- no place for
21  them to go.  DHHR did not have a discharge
22  placement and he decompensated.  So yes, at that

Page 132

1  point he needed a different kind of placement than
2  what this particular placement was.
3       And I -- I would, thinking back at
4  her case notes, I don't recall her talking with
5  other people.  I don't recall her having a
6  supervisor who said, you know, "Can we think about
7  this?  Can we think about what other supports he's
8  going to need in order to be successful there?"
9       She was a new worker to him at the
10  time and she really did -- she didn't take no for
11  an answer and really advocated admirably for him,
12  but perhaps not with all the information that was
13  needed.
14  Q  Is it a reasonable professional
15  standard to note in a case record when there has
16  been a discussion between two caseworkers or a
17  caseworker and a supervisor?
18  A  Around key decisions, it is not
19  uncommon.
20  Q  Is it required as a matter of
21  standard practice?
22  A  Well, required varies from

Page 133

1  jurisdiction to jurisdiction.  So there's some
2  jurisdictions -- apparently New York being one --
3  that the supervisors are expected to make entries
4  actually into the record.  Not all jurisdictions
5  have that, so I can't answer the question.
6  Q  Do you know of any other jurisdiction
7  that operates like New York?
8  A  I don't.  I do know that other
9  jurisdictions have -- have meetings in which
10  supervisors are present and the attendance at those
11  meetings is noted in the record.
12  Q  There's no reason it has to be noted
13  in the record, however, as long as the meeting
14  takes place?
15       MS. LOWRY:  Objection.
16       THE WITNESS:  It depends on the
17  jurisdiction and their policies.
18  BY MS. BROWN:
19  Q  Just to confirm the comments on the
20  organizational culture of DHHR is based mostly on
21  what's not in the record, not what is.  Is that
22  correct?