# Exhibit 5

Page 1

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
 2                 HUNTINGTON DIVISION
 3      _____
        Jonathan R., minor, by Next    :
 4      Friend, Sarah Dixon, et al.,   :
                                       :
 5            Plaintiffs,              :  Class Action
                                       :
 6      v.                             :  3:19-cv-00710
                                       :
 7      Jim Justice, in his official   :
        capacity as the Governor of    :
 8      West Virginia, et al.,         :
                                       :
 9            Defendants.              :
        -------------------------------
10
11         VIDEOCONFERENCE DEPOSITION OF ELSA POPCHAK
12      DATE:         October 16, 2020
13      TIME:         8:53 a.m. to 11:50 a.m.
14      LOCATION:     Witness Location
15
16      REPORTED BY:  Felicia A. Newland, CSR
17
18
19
20
                    Veritext Legal Solutions
21            1250 Eye Street, N.W., Suite 350
                    Washington, D.C. 20005
22
```

Page 34

1  patterns with respect to the nine named plaintiffs.
2  Is that correct?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  Yes.  That is what we
5  were asked to look at, was the nine cases.
6  BY MR. PEISCH:
7      Q    You didn't find any patterns that
8  applied to -- across the foster care program to all
9  7,000 children, did you?
10         MS. MAHONEY:  Objection.
11         THE WITNESS:  We were only asked to
12 look at these specific cases.
13 BY MR. PEISCH:
14     Q    Okay.  You mentioned this earlier,
15 but can you describe the process for how the
16 executive summary was written?
17     A    In reading the -- in reading each of
18 the cases, each of us started to outline or make
19 notes of things that we saw that we noticed in our
20 cases as we were reading the documents and writing
21 our reports.
22         From there, we would have

Page 35

1  conversations with each other, meaning Ms. Flory,
2  Ms. Getman, and myself.  We would have
3  conversations and we would say, "Oh, yeah, and such
4  and such, I saw this happening.  And in this one, I
5  saw this happening."  And from there, we developed
6  a chart that started listing out each of the themes
7  that we saw.  And they were very prevalent types of
8  things that were, in my professional opinion,
9  fairly basic types of things as well.
10     Q    And did one person take the lead in
11 drafting the whole executive summary or did you
12 each do sections?
13     A    Each of us took shots at sections,
14 and then we kind of collaborated and sent things
15 back and forth with each other.
16     Q    Did plaintiffs' counsel make any
17 edits to the executive summary?
18         MS. MAHONEY:  Objection.
19         THE WITNESS:  I would say mostly from
20 my end, or my point of view, grammatical and
21 technical kinds of things.  But grammatical, the
22 cleaning up and making sure it looked pretty.

Page 36

1          MS. MAHONEY:  And I'm going to
2  instruct the witness to not disclose any
3  conversations that happened with counsel --
4          THE WITNESS:  Okay --
5          MS. MAHONEY:  -- in relation to
6  regarding drafts.
7  BY MR. PEISCH:
8      Q    Did you take the lead in drafting the
9  permanency section of the executive summary?
10     A    Yes.
11     Q    And did the permanency section
12 reflect a summary of the totality of you and your
13 colleagues' views on permanency issues that you
14 identified in the nine named cases?
15     A    In the nine cases, correct.
16     Q    All right.  I would like to turn your
17 attention to a sentence on page 5.  So could you
18 turn to page 5?
19     A    Yes.
20     Q    Okay.  So on page 5 -- and this is
21 not in the -- this is not in the permanency
22 section, so I'm going back to -- I apologize for

Page 37

1  jumping around a little bit here.
2          So under Subheading A, the second
3  sentence of that paragraph reads -- or I'm going to
4  read two sentences, "This total lack of critical
5  thinking and analysis is especially evident in the
6  cases of the Serena S. and Theo S.  For them,
7  DHHR's gravely in-completed investigation and
8  family functioning assessments were further
9  compromised by confirmation bias of DHHR workers
10 and supervisors, which materialized through their
11 inaction as they adopted an unchallenged set of
12 beliefs that formed at the onset of services."
13         Do you see that --
14     A    Yes.
15     Q    -- those two sentences?
16     A    Yes.
17     Q    Okay.  You did not write those
18 sentences, correct?
19     A    No, I did not.
20     Q    And given that you didn't review the
21 case files of Serena S. and Theo S., you don't
22 personally know whether those statements are true,

10 (Pages 34 - 37)

Page 38

1  correct?
2     A   Those -- in working with Ms. Getman
3  and Ms. Flory, I trust their judgment on what it
4  was that they presented in each of their cases, so
5  I am going with the -- my belief and assumption
6  that those are true and accurate statements.
7     Q   So you have faith in your colleagues,
8  but you don't personally know those statements to
9  be true?
10         MS. MAHONEY:  Objection.  Asked and
11  answered.
12         You can answer.
13         THE WITNESS:  Oh, I'm sorry.  I
14  didn't know.
15  BY MR. PEISCH:
16    Q    It's very common, yeah.
17    A    I'm sorry.  I -- I believe that these
18  are true statements.
19    Q    And what's your basis for believing
20  they're true statements?
21    A    Because I trust in the professional
22  credibility of my colleagues.

Page 39

1     Q   And they told you those were true
2  statements?
3     A   Correct.
4     Q   And would you agree there's dozens of
5  statements in this executive summary that are based
6  on things that your colleagues told you about their
7  case reviews, not your personal review of those
8  case reviews?
9     A   I was only hired to review three
10 cases.  So in writing the executive summary, of
11 course I had to utilize their judgment and their
12 credibility and their statements and believe those
13 as being the truth.
14    Q   Okay.  I would like to turn back to
15 your -- what you just talked about, your three
16 kids.
17         Okay.  So in analyzing the cases of
18 Ace, Gretchen, and Jonathan, did you interview
19 anyone?
20    A   No.
21    Q   You didn't interview the children?
22         MS. MAHONEY:  Objection.  Asked and

Page 40

1  answered.
2          THE WITNESS:  No.
3  BY MR. PEISCH:
4     Q   Okay.  At any point did you interview
5  anyone at DHHR?
6          MS. MAHONEY:  Objection.  Asked and
7  answered.
8          THE WITNESS:  No, I did not.
9  BY MR. PEISCH:
10    Q   Do you know if the three children
11 that you reviewed, do you know if they were
12 randomly selected?
13    A   I do not know how they were selected.
14    Q   We talked earlier about how you
15 reviewed the case files.  In that review process,
16 did you use any standard tool or form to analyze
17 the cases?
18          MS. MAHONEY:  Objection.  Vague.
19 Confusing.
20          THE WITNESS:  Yeah, I don't know what
21 you mean.
22

Page 41

1  BY MR. PEISCH:
2     Q   Do you know what a standardized
3  review tool is?
4          Does that term mean anything to you?
5     A   Are you referring to like one of the
6  tools used in the CFSRs or --
7     Q   Yes.  That would be an example, yes.
8     A   No, I did not use that type of a
9  tool.
10    Q   So you actually answered my next
11 question.  Are you familiar with ACF's CFSRs?
12    A   The whole country does them so --
13    Q   Okay.  Can you describe what ACF's
14 CFSR is, as you understand it?
15          MS. MAHONEY:  Objection.  Relevance.
16          THE WITNESS:  They are to look -- I'm
17 sorry.
18          MS. MAHONEY:  Go ahead.
19          THE WITNESS:  I'm sorry.
20          They are to look at the basic
21 reasonable professional standards being met by
22 each jurisdiction throughout the country.  They

11 (Pages 38 - 41)

Page 42

1  lay out benchmarks as outlined by the federal
2  government and every jurisdiction in child
3  welfare has to adhere to those standards.
4  BY MR. PEISCH:
5      Q    And is it your understanding that the
6  ACF in the CFSR uses a standardized tool to do
7  those assessments?
8      A    Yes, they do.
9      Q    Do you know if ACF reviews individual
10 cases when it does the CFSR?
11     A    They do a random selection.
12     Q    Do you know if ACF interviews people
13 when they do the CFSR?
14          MS. MAHONEY:  Objection.
15          THE WITNESS:  I do not know
16 specifically of interviewing people outside of a
17 worker involved if there were questions about
18 something that was done.
19 BY MR. PEISCH:
20     Q    Okay.  So I understand that you had a
21 specific assignment here that, you know, was -- you
22 had a specific assignment here, but if it was up to

Page 43

1  you and you were reviewing performance in the West
2  Virginia child welfare system, would you have used
3  a random sample?
4           MS. MAHONEY:  Objection.
5           THE WITNESS:  Yes.
6  BY MR. PEISCH:
7      Q    And, similarly, if you were reviewing
8  performance in cases and it was up to you, would
9  you use a standardized tool similar to the tool
10 used in the CFSR?
11          MS. MAHONEY:  Objection.
12          THE WITNESS:  I don't know that I
13 believe that to be necessary all the time.
14 BY MR. PEISCH:
15     Q    Okay.  And, similarly, again, if it
16 was up to you and you were reviewing performance on
17 cases, would you have interviewed people involved
18 in those cases?
19          MS. MAHONEY:  Objection.
20          THE WITNESS:  Within our -- within
21 Cuyahoga County, when we reviewed cases, we did not
22 review -- we did not speak to other people, we did

Page 44

1  not interview other people, we simply looked at the
2  totality of the case.
3  BY MR. PEISCH:
4      Q    So in Cuyahoga County, when you
5  reviewed the performance in a specific case, you
6  never talked to a caseworker?
7      A    In our CQI unit, our quality control
8  unit, they only looked at the case.
9      Q    And when they were doing that
10 analysis, were they reviewing overall performance
11 in the case or were they reviewing compliance with
12 specific -- you know, a specific regulation or a
13 specific policy?
14     A    I believe that those two go hand in
15 hand.
16     Q    Do you believe it would have been
17 useful -- do you believe it's useful in analyzing
18 the performance of a case to interview people
19 involved in that case?
20          MS. MAHONEY:  Objection.  Vague.
21 Confusing.
22          THE WITNESS:  What do you mean by

Page 45

1  "people involved in the case"?
2  BY MR. PEISCH:
3      Q    A caseworker, child, foster parents,
4  biological parents, anyone.
5           MS. MAHONEY:  Objection.
6           THE WITNESS:  I would say no, I don't
7  believe that's always useful.
8  BY MR. PEISCH:
9      Q    Okay.  Do you believe it's ever
10 useful?
11     A    I don't know.
12     Q    So just to make sure I've got this
13 right, so the -- in reviewing -- in determining
14 how -- in determining the performance in an
15 individual case, you do not think it's useful to
16 talk to the caseworker, correct?
17          MS. MAHONEY:  Objection.
18 Mischaracterizes the testimony.
19          THE WITNESS:  There are some times
20 when you might need to do that, but if it's not
21 written down in that case in a way that somebody
22 can tell what happened, it didn't happen.

12 (Pages 42 - 45)

Page 46

1  BY MR. PEISCH:
2  Q  Is that the assumption you made in
3  reviewing these cases?
4  A  Yes.
5  Q  Other than in Cuyahoga County, are
6  you aware of any person or entity, such as the
7  federal government or a state or a jurisdiction,
8  that does case file reviews without interviewing
9  people?
10  MS. MAHONEY:  Objection.
11  THE WITNESS:  I'm not aware of that.
12  I don't know what other entities do.
13  BY MR. PEISCH:
14  Q  And outside of Cuyahoga County, are
15  you aware of any person or entity that analyzes
16  case file performance without a standardized tool?
17  A  I don't specifically know of what
18  practices other jurisdictions use.
19  Q  And in Cuyahoga County that -- what
20  was it, QI -- I'm sorry, what was the QI?  Did they
21  use a standardized tool in evaluating performance?
22  MS. MAHONEY:  Objection.  What is

Page 47

1  the -- what is QI?  Can you clarify?
2  THE WITNESS:  The CQI unit was our
3  quality control unit, and they sometimes simply
4  read a case and took notes on that case and looked
5  at the facts of the case and what was documented or
6  not documented.  And at other times, they did use
7  tools similar to the CFSR tools.
8  BY MR. PEISCH:
9  Q  Did your -- did the Cuyahoga County
10  quality -- CQI, sorry, did -- when they were
11  reviewing cases, did they randomly select the
12  cases?
13  A  Sometimes.
14  Q  Okay.  Let's see.  Sorry.  I think I
15  told you I was going to ask questions about Ace,
16  Gretchen, and Jonathan, and I got sidetracked so
17  let me go back to that.
18  Would you agree that Ace, Jonathan,
19  and Gretchen, when they came into DHHR custody,
20  were complex cases?
21  A  They were pretty normal child welfare
22  cases, in my opinion.

Page 48

1  Q  Why did Gretchen come into the
2  custody of DHHR?
3  A  Gretchen came into the custody of
4  DHHR on some of her unruly behaviors or delinquent
5  behaviors following years of neglect and potential
6  emotional abuse in her home.
7  Q  Was she adjudicated abused and
8  neglected?
9  A  I believe that she was adjudicated as
10  delinquent.
11  Q  So she came into DHHR custody because
12  she was adjudicated delinquent, correct?
13  A  Yes.
14  Q  Did you analyze whether the three
15  named plaintiffs that you reviewed were typical of
16  the West Virginia population as a whole -- West
17  Virginia foster population as a whole?
18  A  I only looked at the cases that I was
19  looking at, so I don't know anything about the
20  whole system.
21  Q  Okay.  You mentioned earlier where
22  you applied reasonable professional standards.  And

Page 49

1  we see that in your report.  How did you develop --
2  where did those reasonable professional standards
3  come from?
4  A  Reasonable professional standards
5  are, you know, basically those things that are
6  recognized in our profession.  They are things that
7  are set out as kind of a national standard, you
8  know, when you were talking about the CFSRs and
9  things like that.  You know, so they are based off
10  of federal rules, federal law, recognized child
11  welfare expert type of things.  I also utilized,
12  you know, some of my own training and background
13  and knowledge of child welfare.
14  Q  Are all of the reasonable
15  professional standards written down somewhere?
16  A  I don't know that I would say that
17  they're written down, per se, as saying these are
18  reasonable professional standards.  I mean, there's
19  benchmarks that we look at in child welfare.
20  Q  Okay.  Did you and your co-authors
21  discuss what the reasonable professional standards
22  would be that you're applying?

13 (Pages 46 - 49)

|  | Page 50 |
|---|---|
| 1 | A   I think when we went through our |
| 2 | cases and in our discussions and we looked at |
| 3 | things such as, you know, supervisory conferences |
| 4 | with workers and documentation of such, |
| 5 | documentations of thorough, complete |
| 6 | investigations, you know, documentations of what |
| 7 | took place and happened on home visits, service |
| 8 | provision. Those are kinds of the reasonable |
| 9 | professional standards that we talked about and |
| 10 | that we looked at. |
| 11 | Q   Did you and your co-authors agree to |
| 12 | a set of reasonable professional standards that you |
| 13 | used as a benchmark for this report? |
| 14 | A   When we would talk, we would kind of |
| 15 | start making notes on each of the things that we |
| 16 | saw as patterns within each of our cases and then |
| 17 | created a little spreadsheet, kind of, chart that |
| 18 | said, you know, "Hey, we all saw this in our case |
| 19 | and is this something that you guys saw in your |
| 20 | case." |
| 21 | Q   Okay. Did you -- but did you |
| 22 | actually write down, like, the reasonable |

|  | Page 51 |
|---|---|
| 1 | professional standards that you were applying? |
| 2 | A   They are basically the things that we |
| 3 | wrote down in the executive summary. |
| 4 | Q   Okay. So is it fair to say that all |
| 5 | of the reasonable professional standards are in the |
| 6 | executive summary? |
| 7 | A   The standards that we saw that were |
| 8 | of concern to us creating our -- in completing our |
| 9 | analysis, those are what we cited. |
| 10 | Q   Right. They were reasonable |
| 11 | professional standards that might not have been |
| 12 | involved in these cases, you didn't write those |
| 13 | down in the executive summary, right? |
| 14 | A   Correct. |
| 15 | Q   Okay. In discussing and developing |
| 16 | these reasonable professional standards, did you |
| 17 | look at West Virginia state law at all? |
| 18 | A   I did not, no. |
| 19 | Q   And did you look at the -- any |
| 20 | standards from the West Virginia Board of Social |
| 21 | Work? |
| 22 | A   No, I did not. |

|  | Page 52 |
|---|---|
| 1 | Q   Do you know if any of the casework -- |
| 2 | well, strike that. |
| 3 | Okay. Can I turn your attention back |
| 4 | to the actual document to page 2? And I want to |
| 5 | ask you about another sentence. |
| 6 | A   Okay. |
| 7 | Q   The sentence just above subparagraph |
| 8 | 3, there's a sentence that reads, "Well, some |
| 9 | themes are evident in 100 percent of the reviewed |
| 10 | case. The reviewers determined that each remaining |
| 11 | theme amounts to a major shortfall evident as a |
| 12 | pattern in 44 percent to 89 percent of the reviewed |
| 13 | cases." |
| 14 | Do you see that? |
| 15 | A   Yes. |
| 16 | Q   Okay. This report does not indicate |
| 17 | which themes map to which percentages referenced in |
| 18 | that sentence, does it? |
| 19 | A   No. No, it does not. |
| 20 | Q   And which theme or themes apply to |
| 21 | only 44 percent of the named plaintiffs' cases? |
| 22 | A   I would have to go back and look at |

|  | Page 53 |
|---|---|
| 1 | notes. I don't know that information. |
| 2 | Q   Okay. Were there themes that applied |
| 3 | to, you know, 50 or 75 percent of the cases, but |
| 4 | not all of them? |
| 5 | MS. MAHONEY: Objection. Confusing. |
| 6 | BY MR. PEISCH: |
| 7 | Q   What I'm trying to understand -- let |
| 8 | me back up. I understand why that might be |
| 9 | confusing. |
| 10 | So, you know, 44 to 89 percent, from |
| 11 | my perspective, is kind of a broad range. And I'm |
| 12 | trying to figure out, like, were there themes that |
| 13 | applied. So it sounds like the statement says |
| 14 | there were themes that applied to 44 percent and |
| 15 | themes that applied to 89 and themes that applied |
| 16 | to 100 percent. Are those the only three |
| 17 | percentages or were there some themes that applied |
| 18 | to something between 44 and 89 percent? |
| 19 | A   I would have to look back at the |
| 20 | charts that we created or -- we looked at each of |
| 21 | our cases and, you know, lined up the themes and |
| 22 | then had our kids and said, "Hey, was this |

### Page 54

1   something that you saw in yours?"
2   So there were themes that we talked
3   about. Some of them applied to all of our cases.
4   And when I say "all of our cases," some of them
5   applied to all three of my cases --
6   Q   Right.
7   A   -- some of them applied to two of my
8   cases, some of them applied to one of my cases.
9   You know, it varied. And it varied for each of us.
10  Q   Why didn't you put that chart showing
11  which kids and which theme in the report?
12  A   It was kind of our scrap kind of
13  thinking chart. I don't know.
14  Q   And when we're talking about -- I
15  guess I should have asked this earlier. When we're
16  talking about the themes that you identified, are
17  those the headings on pages 5 to 32 of the -- of
18  the executive summary? Is what the themes are?
19  A   Yes, I believe so.
20  Q   Okay. So, for example, if we just --
21  if we go to page 5, where we previously were, one
22  theme would be: "The reviewed case records reflect

### Page 55

1   a lack of critical thinking throughout the
2   investigative and assessment process." Is that
3   right, that would be one theme?
4   A   Yes.
5   Q   And do you know what percentage of
6   the nine kids that one theme applied to?
7   A   I don't have my notes in front of me
8   no.
9   Q   Do you believe that West Virginia
10  caseworkers lacked critical thinking?
11  Let me rephrase that. Do you believe
12  that in the three cases that you reviewed, the
13  caseworkers lacked critical thinking?
14  A   In the three cases that I reviewed,
15  yes, there was a lack of critical thinking.
16  Q   And you feel you can make that
17  judgment even without talking to the caseworkers?
18  A   Based on what I read and what I
19  reviewed, I believe there was a lack of critical
20  thinking.
21  Q   Okay. Okay. Can I turn your
22  attention to page 30 of -- still staying in the

### Page 56

1   executive summary -- actually, I'm sorry, let's
2   just stay on page 5.
3   A   Okay.
4   Q   This page 5 is the section where it
5   starts, "Investigations and Pre-placement
6   Services." It appears that you and your colleagues
7   found a lot of issues relating to investigations
8   and pre-placement services. Would you agree with
9   that?
10  A   There were a lot of issues that were
11  found in those areas, yes.
12  Q   In your opinion, is the
13  investigations and pre-placement services area the
14  area where DHHR made mistakes that caused the most
15  harm to children, the children in the cases that
16  you reviewed?
17  MS. MAHONEY: Objection.
18  THE WITNESS: I think it's where a
19  lot of the harm started and then continued on and
20  snowballed from there.
21  BY MR. PEISCH:
22  Q   Can I turn your attention to page 17?

### Page 57

1   A   Am I really turning this time?
2   Q   Oh, yeah. Yes, actually.
3   A   All right. I don't mean to be a
4   smart aleck.
5   Q   That's fine. I earned it. And I
6   will probably have five or ten more questions and
7   then maybe we can take a break.
8   A   Okay.
9   Q   So on page 17, at the top of page 17,
10  there's a sentence that reads, "However, DHHR
11  appears ill-equipped to achieve permanency in a
12  timely manner for children in its custody."
13  Do you see that?
14  A   Yes.
15  Q   And did you write that sentence?
16  A   Yes.
17  Q   That sentence is -- you know, uses
18  the word "appears." Is that because the sentence
19  means that it appears DHHR is ill-equipped based on
20  your review of the three named plaintiffs' case
21  files?
22  A   It was based on the review of all

15 (Pages 54 - 57)

Page 62

1  some of the things that we talked about were
2  dealing with the types of training, the types of
3  supervisory guidance, the types of, you know, what
4  policies are there, specifically and how clear are
5  those policies and how are they're reflected, what
6  are the caseloads, what are the
7  worker-to-supervisor ratios, what are the overall
8  numbers that workers are dealing with.
9      Q    And what do you mean by these causes
10 are beyond the scope of this summary and review?
11     A    We were not -- we were hired to look
12 at these nine cases, and from these cases that we
13 looked at, we were able to kind of extrapolate an
14 overall picture of what we believe is happening
15 within the system.  It is a small sample.  We were
16 not there to make an overall judgment of all of
17 West Virginia's child welfare system.
18     Q    Okay.  All right.  Now might be a
19 good time for a break.  It's been a little bit over
20 an hour.
21     A    Not quite.
22     Q    Do you want to take maybe a

Page 63

1  ten-minute break and we'll reconvene at 10:10?
2          (Recess from 10:00 a.m. to 10:10 a.m.)
3  BY MR. PEISCH:
4      Q    I just want to ask you a couple of
5  follow-up questions.  Your conclusions in this
6  report are based only on the review of the nine
7  named plaintiffs, correct?
8      A    They are based on the cases that
9  were -- they are based on the cases that we
10 reviewed; however, the themes that we talk about
11 are things that I believe can apply to more than
12 just these nine cases.
13     Q    Did you conclude that the themes that
14 you talk about do apply in the West Virginia foster
15 care system be on the nine named plaintiffs?
16     A    Do I know factually that they apply?
17 No.  Do I believe that it is something that needs
18 further investigation and looking at, yes.
19     Q    Okay.  So you used the word
20 "extrapolate" before.  You didn't extrapolate
21 actual conclusions from the nine named plaintiffs
22 on the system, but reviewing the nine named

Page 64

1  plaintiffs gave you some areas that you would want
2  to know more about and follow up on.  Is that
3  right?
4      A    With the nine named plaintiffs --
5  man, I don't know what the heck is wrong with my
6  speaking.
7          With the nine named plaintiffs, we
8  were able to say, this is what we saw in these
9  cases.  And from there, based on -- that we saw
10 these things in all nine of these cases or in the
11 majority of the cases, we would then be able to
12 say, this is probably a bigger issue or a problem.
13     Q    So that's what I really want to drill
14 down on that.  I'm not sure I'm understanding.  Are
15 you making conclusions about the entire West
16 Virginia foster care system based on these nine
17 named plaintiffs?
18         MS. MAHONEY:  Objection.  Counsel,
19 the witness has testified that she was hired to
20 review the nine cases, and I just want to make note
21 that she was hired at the class certification
22 stage.

Page 65

1  BY MR. PEISCH:
2      Q    So I will repeat the question.  Are
3  you making conclusions -- in this expert report,
4  are you making conclusions about the entire West
5  Virginia foster care system or just the nine named
6  cases?
7      A    We make some specific conclusions on
8  the nine named cases that could be indicative of
9  the overall system.
10     Q    But just could be indicative, not
11 definitively -- you're not definitively concluding
12 that they do exist?
13         MS. MAHONEY:  Objection.  Asked and
14 answered.
15         THE WITNESS:  I don't know based upon
16 my limited review that they -- that these, in fact,
17 do exist.
18 BY MR. PEISCH:
19     Q    So I would like to switch gears to
20 something that -- well, it seemed that in your
21 report that there was some frustration with the
22 case file organization, I guess would be.  Is that

17 (Pages 62 - 65)