# Exhibit 7

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

_____

Jonathan R., minor, by Next    :
Friend, Sarah Dixon, et al.,   :
                               :
       Plaintiffs,             :  Class Action
                               :
v.                             :  3:19-cv-00710
                               :
Jim Justice, in his official   :
capacity as the Governor of    :
West Virginia, et al.,         :
                               :
       Defendants.             :
_____

VIDEOCONFERENCE DEPOSITION OF JANET FLORY

DATE:          October 23, 2020
TIME:          9:01 a.m. to 2:59 p.m.
LOCATION:      Witness Location

REPORTED BY:   Felicia A. Newland, CSR




                Veritext Legal Solutions
           1250 Eye Street, N.W., Suite 350
                  Washington, D.C. 20005

Page 18

1     MS. MAHONEY:  Objection.
2     THE WITNESS:  It depended on the
3  position I was in and the period of time.  The
4  times that I did review cases most often had to do
5  with fatalities or critical incidents.
6  BY MS. SMITH:
7     Q    And when was that?
8          What role were you in when you were
9  doing that?
10    A    That happened -- again, are we
11 talking just about the '90s or more recently?
12    Q    Let's talk first about your time in
13 Hamilton County.
14    A    In Hamilton County, in my position, I
15 did review cases most often with -- where there
16 were fatalities or there were highly unusual or
17 serious critical incidents.
18    Q    And when you were reviewing the
19 cases, were you serving in the role as a
20 caseworker?
21    A    I was not.
22    Q    Were you serving in the role as a

Page 19

1  supervisor?
2     A    No.
3     Q    What role were you serving in?
4     A    I was the deputy director responsible
5  for children services within the department.
6     Q    And so when you were -- when you were
7  reviewing these case files, what were you looking
8  for?
9     A    I was looking for, first of all,
10 whether or not a particular case had been conducted
11 within the practice and policy guidelines of the
12 department.  I was looking for individual worker
13 actions, supervisory actions.  I was also looking
14 for systemic issues that might be present and
15 relevant in the case.
16    Q    So when you were reviewing those case
17 files, did you also interview people involved with
18 those cases?
19    A    I did.
20    Q    Who did you interview?
21    A    Most often it would have been the
22 caseworker, the supervisor, and perhaps the

Page 20

1  manager.
2     Q    Was there a time that you would speak
3  with the child?
4     A    Well, again, many of these were
5  fatalities.
6     Q    Okay.  Would you speak with the
7  providers of the child?
8     A    There were times when that would
9  happen, yes.
10    Q    Are -- how many cases a year would
11 you say that you reviewed?
12         MS. MAHONEY:  Objection.  Vague.
13         THE WITNESS:  I can't really --
14 again, this is a very long time ago and I can't
15 really give an estimate.
16 BY MS. SMITH:
17    Q    When you were in Cuyahoga County, did
18 you also review case files?
19    A    I'm not remembering.  I was in a
20 different role.  As a member of the executive team,
21 I would have been involved in reviews of some
22 cases, but not in the same way as in Hamilton

Page 21

1  County.
2     Q    And when you say "involved in the
3  reviews of some kind of cases," what was your --
4  what was your role or why were you reviewing those
5  cases?
6     A    Most often, again, because they were
7  high-profile cases or they were fatalities or they
8  were critical incident cases, or it could have been
9  that there was a particular issue that had come up
10 and we were looking at a sample of cases.
11    Q    And when you did those case reviews
12 in Cuyahoga County, did you interview people
13 involved with the case?
14    A    I don't remember.
15    Q    When was the last time that you made
16 an entry in a child's case file?
17    A    I can't remember that I have.
18    Q    Did you make entries in children's
19 case files when you were a foster care worker in
20 Detroit?
21    A    I imagine I did.  As you might guess,
22 those were days of paper files.

Page 22

1  Q   Okay. But since then you don't
2  remember -- you don't remember making an entry?
3  A   I do not.
4  Q   Why did you leave Ohio?
5      MS. MAHONEY: Objection. Vague.
6      THE WITNESS: There was a change of
7  leadership in Cuyahoga County. I was recruited to
8  take a position with a private agency in New York
9  City. It was a very exciting opportunity, and I
10 left Ohio to go to New York City.
11 BY MS. SMITH:
12 Q   You served as the deputy commissioner
13 for Child Protection Services for the New York City
14 Administration for Children's Services. Is that
15 right?
16 A   Correct.
17 Q   And how large was that system when
18 you were there?
19 A   Very large. I was responsible for
20 the division of child protection. We had
21 approximately 60,000 reports of child abuse and
22 neglect a year.

Page 23

1  Q   And did you review children's case
2  files when you were in that role?
3  A   I did.
4  Q   And what was the purpose of your
5  review?
6  A   Again, as in Ohio, I certainly was
7  involved in case reviews when there were fatalities
8  or serious critical incident cases. I also --
9  these were summaries of case files, but we
10 instituted something called ChildStat. And once a
11 week we reviewed and discussed two cases every
12 week.
13 Q   And I'm sorry, were these 60,000
14 children you mentioned, were they in custody?
15 A   I --
16     MS. MAHONEY: Objection. Misstates
17 prior testimony.
18     THE WITNESS: Sorry.
19     MS. MAHONEY: You can answer, Jan.
20     THE WITNESS: No. These were -- the
21 60,000 were reports that came to the department
22 that required an investigation or an assessment.

Page 24

1  BY MS. SMITH:
2  Q   And so you were reviewing case files
3  when you were at the New York City Administration
4  for Children's Services, did you also interview
5  individuals involved with those cases?
6  A   There were times when I did, yes.
7  Q   And who would you interview?
8  A   Well, it was a part of the protocol
9  that we set up to review such cases, so there were
10 times when the caseworker, the supervisor,
11 managers, private providers were a part of those
12 interviews.
13 Q   And so did you use that as a
14 standardized review tool when you were reviewing
15 those cases?
16 A   Not as such, no.
17 Q   What did you use when you were
18 reviewing the cases or how did you go about
19 reviewing the cases?
20     MS. MAHONEY: Objection.
21     THE WITNESS: I would review the case
22 record. I would review other documents that had to

Page 25

1  do with the case. I would look at data that were
2  related to the case in question. And we had a
3  process whereby we would meet with the staff
4  involved with the case. And there were -- you're
5  saying interview, I would say we had discussions
6  with the staff who were responsible for that case
7  and questions were raised and discussed during
8  those meetings.
9  BY MS. SMITH:
10 Q   Were there times that you reviewed
11 case files where you did not discuss the case with
12 individuals involved with that case?
13     MS. MAHONEY: Objection.
14     THE WITNESS: Yes, probably so.
15 BY MS. SMITH:
16 Q   What were the circumstances when you
17 would not discuss the case with other individuals
18 involved in the case?
19 A   Well, the -- the incident that comes
20 to mind would be when employees were terminated or
21 put on leave as a result of actions that they had
22 taken on a case.

7 (Pages 22 - 25)

Page 42

1  BY MS. SMITH:
2  Q  I'm going to introduce that on
3  Exhibit Share. And do you have your report in
4  front of you?
5  A  I do.
6  Q  Okay. And this is titled, "The Child
7  Welfare Case Review, Expert Opinions, Susan Getman,
8  Janet Flory, & Elsa Popchak." Is that right?
9  A  Yes.
10  Q  And you recognize this report?
11  A  I do.
12  Q  Are you aware that last week we spoke
13  with both Ms. Getman and Ms. Popchak?
14  A  I am.
15  Q  So they answered a lot of our
16  questions about the process that you used to
17  prepare this report, so I don't think we need to go
18  over all of that again today with you, but I would
19  like to confirm some of what we've learned with
20  them.
21      So you reviewed three case files,
22  correct?

Page 43

1  A  Yes.
2  Q  You reviewed Anastasia's case file,
3  Karter's case file and Dennis' case file?
4  A  Correct.
5  Q  Okay. And you were asked to write
6  reports summarizing and drawing conclusions about
7  each of those three case files. Is that right?
8  A  Yes.
9  Q  And in the executive summary, you,
10  Ms. Getman, and Ms. Popchak summarized your
11  collective conclusions on the case files of the
12  nine children. Is that right?
13      MS. MAHONEY: Objection.
14      THE WITNESS: Can you rephrase the
15  question, please?
16  BY MS. SMITH:
17  Q  In the executive summary, you,
18  Ms. Getman, and Ms. Popchak, you summarized your
19  conclusions about your reviews of the nine case
20  files. Is that right?
21  A  Yes.
22  Q  And you did not review the case file

Page 44

1  report written by your co-authors of the other six
2  children, did you?
3  A  No.
4  Q  So there's approximately 300 pages of
5  this report that you have not read?
6      MS. MAHONEY: Objection.
7      THE WITNESS: I -- yes, I did not
8  read them prior to having this entire document.
9  BY MS. SMITH:
10  Q  Have you read them since having the
11  entire document?
12  A  I have scanned some of them, yes.
13      MS. MAHONEY: I just want to clarify,
14  are you asking about her review of the case files
15  of the other six children or of the pages of the
16  expert report?
17      MS. SMITH: The pages of the expert
18  report.
19      THE WITNESS: The summary or the
20  actual cases?
21  BY MS. SMITH:
22  Q  So my first -- I thought we had -- I

Page 45

1  had asked -- my question earlier was, did you
2  review the case files of the other six children,
3  and you -- I believe you said you did not. Is that
4  right?
5  A  Correct.
6  Q  Did you review the reports that
7  Ms. Popchak and Ms. Getman wrote regarding their
8  review of the case files?
9  A  No.
10  Q  And you wrote the sections in the
11  executive summary on investigations and
12  pre-placement, which is pages 5 through 11. Is
13  that right?
14  A  Yes, with input from my colleagues.
15  Q  And you also wrote the section
16  headed, "The casework practice that was documented
17  in these records raises serious concerns regarding
18  the knowledge and skills of frontline workers and
19  supervisors" on pages 32 to 34?
20  A  Let me just look at that.
21  Q  Sure.
22  A  I had -- I think I did a first draft.

12 (Pages 42 - 45)

Page 50

1  of expertise and background and experiences.
2  BY MS. SMITH:
3      Q    But you don't actually know that that
4  sentence on page 7, about Serena and Theo, you
5  don't know that that's factual, correct?
6          MS. MAHONEY:  Objection.
7          THE WITNESS:  I did not review that
8  case file to verify it myself.
9  BY MS. SMITH:
10     Q    Isn't it true that there are dozens
11 of similar sentences in this executive summary for
12 which you didn't verify yourself?
13         MS. MAHONEY:  Can I interrupt for a
14 second?  You're breaking up.
15        (Discussion had off the record.)
16 BY MS. SMITH:
17     Q    Okay.
18     A    So you're asking whether there are, I
19 think as you put it -- so maybe you could say the
20 question again, please.
21     Q    Sure.
22          So isn't it true that there are

Page 51

1  dozens of similar sentences in this executive
2  summary that you did not verify that they were
3  accurate because they were in the case files of the
4  other six children?
5          MS. MAHONEY:  Objection.  Vague.
6  Confusing.
7          THE WITNESS:  The three of us
8  reviewed, as you know, each -- we each reviewed
9  three cases.  We collectively put this report
10 together based on each of our experiences.  And so
11 yes, we did not personally review nine case files.
12 BY MS. SMITH:
13     Q    And so because you didn't personally
14 review nine case files, you don't have personal
15 knowledge of the accuracy of the statements in the
16 executive summary about the files that you did not
17 review?
18         MS. MAHONEY:  Objection.  Asked and
19 answered.
20         THE WITNESS:  I have relied, and I
21 think quite well, relied well, on the -- what my
22 colleagues have brought to this report.

Page 52

1  BY MS. SMITH:
2      Q    Had you worked with Ms. Getman or
3  Ms. Popchak before you worked with them on this
4  report?
5      A    Ms. Getman, no.  Ms. Popchak, I knew
6  her in the '90s.  She was -- I don't know if she
7  was a worker or a supervisor at that time.  More
8  recently I worked with her in my consulting role
9  with On the Frontline and worked with her on an
10 initial -- an initial review of the fatality panel
11 that I chaired in Cuyahoga County.
12     Q    Did you know that you would be
13 working together on this project?
14         MS. MAHONEY:  Objection.
15         THE WITNESS:  At what -- I don't -- I
16 don't -- at what point?
17 BY MS. SMITH:
18     Q    You didn't -- you didn't -- you
19 didn't ask for her to be brought on.  Is that
20 right, to work on this project?
21     A    No.  No.
22         MS. SMITH:  So we've been going for

Page 53

1  about an hour, is now a good time for a break?
2          MS. MAHONEY:  That's fine with me.
3          Ms. Flory, is that okay with you?
4          THE WITNESS:  That's good.
5          MS. SMITH:  All right.  So can we
6  take a ten-minute break?
7          THE WITNESS:  Sure.
8          MS. SMITH:  Okay.  So we can come
9  back at 10:11 a.m.
10       (Recess from 10:02 a.m. to 10:14 a.m.)
11 BY MS. SMITH:
12     Q    Okay.  So you, Ms. Getman, and
13 Ms. Popchak applied reasonable professional
14 standard in the child welfare field in conducting
15 your reviews and writing the report.  Is that
16 right?
17     A    Yes.
18     Q    And when we spoke with Ms. Getman and
19 Ms. Popchak, they said that the 20 or so themes
20 that you identified in the executive summary
21 reflect the reasonable professional standard that
22 satisfied as concerns in the nine case files.

14 (Pages 50 - 53)

Page 54

1  Do you agree with that?
2  A    I do.
3  Q    So we didn't have time to go over all
4  of the themes with Ms. Getman and Ms. Popchak, so I
5  would like to go over them with you now.  Could you
6  please turn to the first theme, which is on page 5?
7       Okay.  So on page 5, the theme says,
8  "The reviewed case records -- the reviewed case
9  records reflect a lack of critical thinking
10 throughout the investigation and assessment
11 process."  Is that right?
12 A    Yes.
13 Q    Is that theme based on any written
14 federal guideline?
15 A    I think you will not find a specific
16 federal guideline about critical thinking, but I
17 think that in the field, this area of critical
18 thinking is a major, major issue for all of public
19 child welfare and, frankly, for all the social work
20 field.
21 Q    What do you mean by "major issue"?
22 A    There is a lot of work being done

Page 55

1  about the way in which large systems work and
2  bureaucracies work.  And that's not just in child
3  welfare.  That the training and the way in which
4  workers do their work is to learn the rules, and
5  that large systems then rely on adherence to rules
6  that can be measured quantitatively by data.
7       That leaves out the very essence of
8  what is expected and is taught, but then not
9  implemented often or -- or routinely -- I should
10 say routinely, not often -- not implemented
11 routinely in that the coddling together and the --
12 particularly in the investigative side of things
13 of, "Okay.  I've heard this story, now I've heard
14 her story and the two don't jive.  What do I do
15 with this," rather than simply recording, "Well,
16 mom said this, the child said this, and maybe a
17 teacher or somebody else said something else."
18      And there's no attempt to think
19 through actually a problem-solving process.  And --
20 and we found many, many examples of conflicting
21 information being given, but never dealt with.
22 There was no attempt to say, "Wait a minute.  We've

Page 56

1  got two stories here, or more than two stories."
2  Q    So would you say that this is based
3  on your experiences in the child welfare field?
4  A    Yes.
5  Q    And is there any written standard
6  that you would say that this is based on?
7  A    Well, there's a great deal of
8  academic work about critical thinking.  It's not
9  all specific to child welfare, but in my work with
10 On the Frontline, and particularly with ShadowBox,
11 which I don't think -- I won't go into a whole lot,
12 we are working to infiltrate critical thinking more
13 heavily into both the training and the daily
14 practice of caseworkers.
15 Q    So it sounds like this is an area
16 that's still developing?
17      MS. MAHONEY:  Objection.  Misstates
18 testimony.
19      THE WITNESS:  It's an area that's
20 developing in child welfare.  And as I said, it's
21 not new in other domains.
22

Page 57

1  BY MS. SMITH:
2  Q    But besides the literature on
3  critical thinking, there's not any kind of
4  published child welfare standard that you're basing
5  this theme on.  Would you agree?
6       MS. MAHONEY:  Objection.
7       THE WITNESS:  Well, I think there are
8  plenty of professional standard kind of guidance
9  documents that talk about this, whether it's called
10 critical thinking or not.  And I believe that your
11 own West Virginia policies really lay out a good
12 foundation for this kind of work.  And it's not
13 really -- it's developing in some ways, in other
14 ways it's like it was always expected that as a
15 part of an investigation, you dig to find out
16 what's going on.  And that's what we did not see in
17 these cases.
18 BY MS. SMITH:
19 Q    So I didn't see a citation to the
20 critical thinking guidelines.  Are those ACS
21 guidelines that you are referring to?
22      MS. MAHONEY:  Objection.  Asked and

Page 62

1  BY MS. SMITH:
2      Q    Okay.  So let's -- what documents are
3  you referring to?
4           MS. MAHONEY:  Objection.  I don't
5  believe the witness testified she was referring to
6  any specific document in the context of reasonable
7  professional standards.
8           THE WITNESS:  I think that we did not
9  have time, nor were we asked, to review the
10 totality of documents that supported our themes.
11 These were from our collected experience and our
12 agreed-upon observations of the cases that we saw.
13 And these themes reflect what we know about the
14 field and what we know from our -- our collected
15 experience.
16 BY MS. SMITH:
17     Q    So I guess my question is:  If I
18 wanted to look up what reasonable professional
19 standards are in the child welfare field, where
20 would I find documents that has those?
21          MS. MAHONEY:  Objection.
22          THE WITNESS:  I think you would start

Page 63

1  with the federal law.  I think you would look at
2  regulations.  I think you would look at documents
3  state by state that give training and guidance.
4  And it will vary from state to state where those
5  documents are and how -- how complete they are, and
6  how current they are with the current kind of
7  thinking that's going on these days in child
8  welfare.
9  BY MS. SMITH:
10     Q    So that's what I'm trying to figure
11 out, which federal laws, which federal regulations
12 are these themes based on?
13          MS. MAHONEY:  Objection.  I also just
14 want to note that the witness has testified that
15 she's basing -- part of these things are based upon
16 her experience.
17          THE WITNESS:  I'm not able to answer
18 your question.
19 BY MS. SMITH:
20     Q    Why not?
21          MS. MAHONEY:  Objection.
22 Argumentative.

Page 64

1           THE WITNESS:  I think I said in
2  several different ways, there is -- there -- how we
3  arrived at these themes, what we used to arrive
4  with and in the scope of what we were asked to do.
5  We did not do a research paper on the totality and
6  the origin of the conclusions that we reached.
7  BY MS. SMITH:
8      Q    So I'm not asking for a -- what the
9  totality of the conclusions are and what the
10 background research is.  I'm just trying to figure
11 out what the laws and regulations and state laws
12 that these themes that you have come up with are --
13 what they're based on.
14          MS. MAHONEY:  Objection.  Asked and
15 answered.
16          THE WITNESS:  I feel like I already
17 answered that.  And I don't have more to add.
18 BY MS. SMITH:
19     Q    So you don't -- you can't point to
20 any federal law or regulation or city law that
21 these themes were based on?
22          MS. MAHONEY:  Objection.  Asked and

Page 65

1  answered.  And objection.  Misstates prior
2  testimony.
3           Ms. Flory, you can answer.
4           THE WITNESS:  I have nothing else to
5  add to this.
6  BY MS. SMITH:
7      Q    Sorry, I missed that.  My computer
8  just broke up.  What did you say?
9      A    I have nothing else to add to things
10 that I previously said.
11     Q    Okay.  Let's turn to the next theme
12 then on page 8.  "In the reviewed cases, accounts
13 of an investigation/assessment were often
14 incomplete, with missing determinations, and
15 recorded out of chronological order."
16          What's the foundation for this theme?
17     A    Our review of the cases where we
18 could not follow from one action to the next, where
19 there were reports that had missing determinations
20 and -- and investigation conclusions that were
21 filed months apart, which is, in any reasonable
22 professional standard, not good practice.  Because

Page 66

1 if there are concerns about the safety or the risk
2 of harm to a child, you're leaving that child in
3 that situation until you decide or until somehow
4 these reports came to some conclusion.
5     Q    So when you say "for any reasonable
6 professional standard not in good practice," is
7 that based on your experience?
8     A    Absolutely.
9     Q    Is that based -- go ahead.
10    A    And it's also based on -- in every
11 state, in every jurisdiction, there are specific
12 regulations about the length of time that cases
13 should take and different actions within an
14 investigation of a case, how long they should take.
15    Q    And what are West Virginia's
16 regulations on that?
17    A    I'm not recalling exactly, but I did
18 have that -- it -- it's within -- it certainly is
19 not seven or eight months apart, but it's within
20 reasonable lengths of time.  And there are
21 different -- there are different time frames for
22 different pieces of the report of an investigation.

Page 67

1     Q    So you didn't have any concerns with
2 West Virginia's regulations in this area?
3     A    They seemed in line with other
4 systems that I am aware of.
5     Q    So your concerns are whether or not
6 those regulations were complied with?
7          I'm sorry.  You just froze, I'm not
8 sure --
9     A    Yes.  Yes, to that specific issue,
10 timelines were not adhered to.  But I think in this
11 theme, we also talk about the state of the records
12 themselves, it was very, very difficult to piece
13 together the different elements of an investigation
14 or conclusions of a report.  It was impossible in
15 most of these cases to follow along and to
16 understand what the trajectory and what the time
17 frames and what the compliance was.
18    Q    So despite that it was almost
19 impossible to do so, you were still able to draw
20 these conclusions from the case file?
21    A    Personally, I had stickies all over
22 my bedroom wall with the dates of specific

Page 68

1 incidents to try to reconstruct what had happened
2 to a particular child.  That's how I ended up
3 making sense of it.
4     Q    Would it have been helpful for you to
5 interview the caseworkers involved in these cases?
6     A    That would have been another dynamic
7 or another element of what we were asked to do.
8     Q    Did you ask if you could speak with
9 any caseworkers?
10    A    I'm sorry, am I frozen or are you
11 frozen?
12    Q    I think you're frozen on my screen.
13         MS. MAHONEY:  Yes, you're frozen on
14 my screen as well.
15         THE WITNESS:  Am I -- is it me?  Can
16 you hear me?
17         MS. SMITH:  I can hear you now.
18         THE WITNESS:  Okay.
19         MS. MAHONEY:  Can you repeat the
20 question, please?
21 BY MS. SMITH:
22    Q    I had asked if it would be helpful

Page 69

1 for you to interview caseworkers to help you figure
2 out what went on in this case.  And I didn't hear,
3 I think you had said -- just -- you cut out when
4 you answered that question.
5     A    Okay.  Interviewing caseworkers would
6 have added another dynamic to this report that
7 is -- that was beyond the scope of what we were
8 asked to do.  I -- I would say because I have --
9 it's -- it was clear to me that if a caseworker
10 were looking at these records, a new caseworker
11 assigned to a case as I did, they would have great,
12 great difficulty figuring out what the history was
13 and what the trajectory of a family was within the
14 system as well.
15    Q    And did you -- did you -- strike
16 that.
17         So are you aware of how West Virginia
18 caseworkers review case records in their day-to-day
19 work?
20    A    Specifically, no, I am not aware of
21 how that happens.  I can -- I could only see how
22 the record was organized or not organized that I

18 (Pages 66 - 69)

Page 74

1  this theme is based on your review of the case
2  records, but I'm actually asking, when you were
3  reviewing the case records, how did you make
4  conclusions about what you were reviewing to come
5  up with the theme?
6         What -- is the theme -- what did you
7  rely on in making conclusions about the case
8  records related to this theme?
9         MS. MAHONEY: Objection. Vague.
10 Confusing. Asked and answered.
11        THE WITNESS: I don't know how to
12 make this clearer, but in a record, if I read that
13 there were collateral sources who had information
14 or who were cited in the case record, but then
15 there either is no information about any interviews
16 or any information that they provided, which was in
17 some cases.
18        Or there is information from
19 collateral sources, but it is -- and it directly
20 is relevant to the safety and the risk of harm to
21 a child, but it's not used in any way to draw
22 conclusions, you know, that's how we reached this

Page 75

1  theme. Because we saw it over and over and over
2  again in different kinds of ways.
3  BY MS. SMITH:
4     Q    So where would I find that
5  professional standard on collateral contacts?
6         MS. MAHONEY: Objection. Asked and
7  answered.
8         THE WITNESS: Yeah, this one you're
9  going to find in textbooks about child welfare and
10 how to conduct an investigation.
11 BY MS. SMITH:
12    Q    And when you said you saw this theme
13 over and over again, do you mean that you saw it
14 over and over again in these nine case files?
15    A    Yes.
16    Q    And did you cite to any of those
17 textbooks on collateral context in the theme?
18    A    Clearly not.
19    Q    And why not?
20    A    For the same reason that I gave on
21 the other themes, I -- I, we, were not writing a
22 document that did -- that included thorough

Page 76

1  research about all of the sources of the reasonable
2  professional standards that we saw.
3     Q    I understand you weren't citing all
4  of the sources, but I'm trying to figure out if
5  there are any written sources that you relied on?
6         MS. MAHONEY: Objection. Asked and
7  answered.
8         THE WITNESS: I'm not a researcher,
9  I'm not an academic. I have been in this field for
10 over 40 years, and there are things that I know
11 that at one time I did read all that information.
12 But at this point in my career, these are things
13 that I -- I accept as basic principles about the
14 way in which child welfare cases should be
15 conducted. And that was used in these reports.
16 BY MS. SMITH:
17    Q    And did Ms. Getman and Ms. Popchak
18 rely on the -- rely on the same reasonable
19 professional standard?
20        MS. MAHONEY: Objection.
21        THE WITNESS: We thoroughly discussed
22 every one of these and we agreed -- we have

Page 77

1  different backgrounds and we have different
2  experiences, but we agreed on these themes based on
3  our review of the nine cases.
4  BY MS. SMITH:
5     Q    And Ms. Popchak reviewed her own
6  cases using her professional experiences, correct?
7         MS. MAHONEY: Objection. Asked and
8  answered.
9         THE WITNESS: Yes.
10 BY MS. SMITH:
11    Q    And the same with Ms. Getman?
12        MS. MAHONEY: Objection.
13        THE WITNESS: Yes.
14 BY MS. SMITH:
15    Q    Okay. The next theme is on page 9.
16 It says, "The reviewed cases exhibited a failure by
17 DHHR to access key components of any alleged
18 abuse." And what is the foundation for this?
19        MS. MAHONEY: Same objection.
20        THE WITNESS: What's the foundation?
21 I'm sorry, the foundation for our theme or the
22 foundation for our conclusion?

20 (Pages 74 - 77)

Page 174

1  Q   To confirm, you did not interview
2  anyone involved with either Anastasia's case,
3  Karter's case, and Dennis' case, correct?
4       MS. MAHONEY:  Objection.  Asked and
5  answered.
6       THE WITNESS:  I did not interview
7  anyone, correct.
8  BY MS. SMITH:
9  Q   And you didn't otherwise speak to
10 anyone else involved in their case?
11      MS. MAHONEY:  Objection.  Asked and
12 answered.
13      THE WITNESS:  I did not.
14 BY MS. SMITH:
15 Q   Did you have any reservations about
16 drawing conclusions on these case records based on
17 your limited review?
18 A   No.  As has been stated, I was hired
19 to do a case review, which I did.  I was also --
20 part of that was looking at themes and patterns
21 across not just my cases, but with my colleagues
22 across the nine cases.  And remarkably we pretty

Page 175

1  much quickly found that there were very common
2  themes in all of these nines cases.
3  Q   Did either Ms. Getman or Ms. Popchak
4  express any reservations about basing their reviews
5  on just the case records?
6  A   I'm not remembering any.
7  Q   Do you have an opinion as to whether
8  reviewing a case record is sufficient to
9  understanding a particular case?
10      MS. MAHONEY:  Objection.  Confusing.
11      THE WITNESS:  Do you want to ask the
12 question again?
13 BY MS. SMITH:
14 Q   Is it your opinion -- do you have an
15 opinion if reviewing a case record is enough to
16 understand a particular case?
17 A   Given my experience, as I talked
18 about it earlier, and particularly as I think about
19 my experience with the process of ChildStat in New
20 York City, looking at only two cases out of
21 thousands of cases every week, and then using those
22 case reviews as a springboard to look at potential

Page 176

1  systemic issues, I think that a case review gives
2  you a very, very good beginning sense of what is
3  happening, not just with that case, but potentially
4  can point you to where there are other issues that
5  go beyond that one case, one or two cases.
6  Q   Do you think interviews are
7  unnecessary to accurately evaluate a case file?
8  A   Well, again, I was contracted to
9  review the case record, first and foremost.  This
10 was not an overall review of every single factor
11 that might impact on the veracity of what we found,
12 but, of course, an interview would add some
13 information.  Some of it might be useful and some
14 of it might not be useful, some of it might be
15 redundant.  There are other things, including
16 interviews, to do if you were doing an overall
17 system review.
18 Q   What other kinds of things would you
19 do for an overall system review?
20      MS. MAHONEY:  Objection.  Asked and
21 answered.
22      THE WITNESS:  Well, I think you would

Page 177

1  look at the context within which a case existed,
2  you would look at data, you would look at a number
3  of things about how the system operated.
4  BY MS. SMITH:
5  Q   And you didn't do that here?
6       MS. MAHONEY:  Objection.  Asked and
7  answered.
8       THE WITNESS:  Okay.  I -- I sort of
9  think this is a bit unfair.  I was asked to do a
10 task based on my background and my experience, I
11 did that.
12 BY MS. SMITH:
13 Q   I believe you testified earlier that
14 this is not an academic paper.  Is that right?
15 A   Yes.  No, I believe I testified that
16 I'm not an academic or a researcher.
17 Q   Oh.
18 A   That was not the purpose of this
19 paper for these reviews.
20 Q   You published papers in books before,
21 right?
22 A   A few, very few.