**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| JIM JUSTICE, in his official capacity as | ) | **Case No.** 3:19-cv-00710 |
| Governor of West Virginia, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT TESTIMONY**

Defendants move to exclude the testimony set forth in Plaintiffs' four expert reports filed in support of their motion for class certification. Three of the reports opine on features of West Virginia's foster care program related to the putative subclasses, the "kinship subclass," the "aging out subclass," and the "Americans with Disabilities Act ("ADA") subclass." The fourth report reflects three experts' reviews of the case files of nine of the 12 named Plaintiffs.

The "expert" testimony on the three subclasses is glaringly deficient: each "expert" opines on areas well beyond their expertise, using a "methodology" that consists of selectively summarizing findings from a confined set of preexisting reports, most of which are outdated. All confirmed in their depositions that it was "beyond the scope" of their assignment to ask for additional or updated information, and all lack a basic understanding of important features of West Virginia's child welfare system, such as the role of the circuit courts, the intersection with the juvenile justice system, benefits available to children through Medicaid, how West Virginia defines a kinship caregiver, or the difference between a certified and uncertified placement.

In contrast to the subclass "experts," Plaintiffs' three case file reviewers have significant experience with child welfare systems. However, their methodology is unsound: they rely entirely on case file documents, without talking to anyone involved in the cases; they each reviewed only

1

three case files, without even reading the full 456-page report to which they signed their name; and they use unspecified and vague "reasonable professional standards."

Most importantly, none of the reports are relevant to class certification. The case file reviewers – and Plaintiffs' counsel – confirmed that they were not asked to make conclusions about absent class members, and the subclass "experts" did not render any opinions about the named Plaintiffs. These reports do not say anything, either individually or collectively, about whether the named Plaintiffs' claims are common with, or are typical of, absent class members' claims. The only meaningful overlap between the case file review and the subclass reports is their critique of the State's use of residential treatment programs for a small percentage of foster children, but none of the "experts" address or know anything about the recent Memorandum of Understanding with the Department of Justice on this precise topic; the substantial decrease in the percentage of children in residential treatment programs from 2015 to 2020; Medicaid services available to foster children living in the community; or the role of the circuit courts in ordering juvenile justice youth into residential treatment programs. To the contrary, one of Plaintiffs' "experts" testified that the one piece of information she thought would be important to know, but did not have, was the percentage of children in residential treatment programs that were ordered there by a court. (*All* children in such settings are ordered there for treatment by a circuit court). For the foregoing reasons, Plaintiffs' expert testimony should be excluded or, alternatively, given little weight.

## STANDARD OF REVIEW

The burden is on the proponent of the expert testimony to prove admissibility. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.10 (1993).

As set forth in *Daubert*, expert testimony is governed by Federal Rule of Evidence 702, which provides that such testimony is admissible only if it is based on: "scientific, technical, or

other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue;" "sufficient facts or data;" and "reliable principles and methods" that are "reliably applied." Fed. R. Evid. 702. *See Daubert,* 509 U.S. at 588; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Under Rule 702, the district court has a "gatekeeping responsibility" to ensure the testimony is both reliable and relevant. *See, e.g.*, *Nease v. Ford Motor Company*, 848 F.3d 219, 229 (4th Cir. 2017). In making this determination, courts should consider whether the methodology "can be (and has been) tested," "has been subjected to peer review and publication," and has "general acceptance" in the field. *Daubert*, 509 U.S. at 593-94.

Several circuits have held that expert testimony proffered at class certification is subject to *Daubert*.[1] Even the circuits that do not demand a "full" *Daubert* analysis of class experts require a thorough probing of the reliability of their testimony. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 612–14 (8th Cir. 2011). While the Fourth Circuit has not squarely confronted the issue, it has suggested that district courts should conduct a thorough analysis of class certification experts, *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 358-59, 366 (4th Cir. 2004), and district courts in the Fourth Circuit regularly apply *Daubert* to such expert testimony, *see, e.g., Good v. American Water Works Co. Inc.*, 310 F.R.D. 274, 284-85 (S.D. W. Va. 2015).

---

[1] *See, e.g.*, *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (stating that the Court "doubt[s]" that *Daubert* does not apply to class certification testimony).

## ARGUMENT

**I.    Plaintiffs Have Not Satisfied Their Burden of Proving that the "Expert Testimony" is Reliable.**

The testimony of Plaintiffs' six "experts" fails to satisfy *Daubert* or any other standard for admissibility, as the "methodologies" used are *not* reliable, are *not* consistent with generally accepted practices, and will *not* help the Court understand the evidence.

### a.  The Kinship Subclass "Expert" Testimony is Not Reliable.

Plaintiffs' kinship subclass "expert" Beverly Johnson is a social worker who has spent most of her career at Lilliput Families, an organization serving foster children in northern California.

Ms. Johnson lacks the qualifications to opine on a kinship program or the kinship placement decisions made by the public child welfare agency (the Department of Health and Human Resources ("DHHR")) in West Virginia.  Ms. Johnson's experience with kinship services is limited to family finding and support service programing, and she does not have any experience with caseworker or caseload issues or making kinship placement decisions for foster children, Ex. 1, Johnson Dep. 22:8-25:20, 29:9-30:20; 32:16-19, 245:17-246:15.  Further, outside of one consulting job in Georgia, Ms. Johnson's professional experience is based entirely on her years working with the same private adoption and foster care entity in northern California, which offers limited kinship services in a handful of counties, *see, e.g.*, *id.* at 20:4-7, 48:7-14, 192:17-193:11.

Ms. Johnson also did not use a reliable methodology in forming her opinions.  To begin with, Ms. Johnson lacked sufficient information to assess West Virginia's kinship program.  To form her opinions, Ms. Johnson reviewed documents provided by Plaintiffs' counsel and did "a little bit" of "Googl[ing] kinship care of West Virginia," *id.* at 72:13-73:1, but repeatedly admitted that she "did not have enough information" to draw conclusions about various aspects of West Virginia's kinship care program, *see, e.g.*, *id.* at 178:1-180:12, 185:2-187:22.  For example, Ms.

4

Johnson admitted she does not know how DHHR defines kinship care, which is the very subject of her testimony, or how DHHR defines uncertified kinship care, even though her report offered opinions about that topic. *See id.* at 51:18-52:18, 56:5-58:22, 170:10-180:12. Ms. Johnson incorrectly assumed that uncertified kinship care in West Virginia is the same as "informal" kinship care in California, which apparently is a term used to describe a practice in California of placing children in relatives' homes without formally bringing the children into state custody. *Id.* at 60:15-61:17. Based on this incorrect assumption, Ms. Johnson testified that children in uncertified kinship placements in West Virginia do not have access to the same services as those in certified homes. *Id.* at 57:5-60:8, 193:3-22; Doc. 130-43, at 7-9. This is completely inaccurate. In West Virginia, foster children in uncertified kinship homes are in state custody and have access to the exact same services as children in foster homes and certified kinship homes.[2] In part because of her lack of information, Ms. Johnson admitted that she did not even evaluate six of the eight areas she herself identified as important in assessing kinship practices, Doc. 130-31, at 5. Ex. 1, Johnson Dep. 112:12-17, 116:9-20, 118:12-22, 123:17-125:4, 126:9-127:21, 137:6-140:13.

Despite having limited knowledge and information, Ms. Johnson offered sweeping opinions about West Virginia's kinship program, primarily based on two reports from A Second Chance, Inc.: the March 2019 Kinship Strengths Assessment and the October 2019 Kinship Study.

But summarizing third party reports is not a reliable methodology that will help the Court in this case, as the Court can read and evaluate the two kinship reports without assistance from an

---

[2] DHHR, *Foster Care Policy*, at 70-71, 104-09, 115-17, 159-61, 163-70 (Aug. 2020), https://dhhr.wv.gov/bcf/policy/Documents/Foster%20Care%20Policy%20August%202020.pdf; DHHR, *Homefinding Policy*, at 43-46, 99-108 (Aug. 2020), https://dhhr.wv.gov/bcf/policy/Documents/Homefinding%20Policy%20August%202020.pdf; *see also* Doc. 130-49, at 82:10-21, 217:24-218:2.

intermediary.[3]  Further, Ms. Johnson does not even accurately represent the findings in the two reports, omitting virtually all of their positive findings from her analysis.  For example, the March 2019 Kinship Strengths Assessment found that "in West Virginia, there has been a dedicated and concerted effort to build a resilient relative/kinship care response to child welfare needs," and that "overarching strengths of the system" included the "process [that] ha[s] been adapted to accommodate the specific needs [of] relative/kinship care," "efforts to improve the home assessment process for relatives/kin", and "goal setting to advance how relatives/kin are engaged, assisted and compensated."  Doc. 130-2, at 4-7.  And the October 2019 Kinship Study applauded DHHR's "addition of homefinders to alleviate case overload; reflective supervision practices to improve case management with relative/kinship caregivers; incorporation of relative/kinship care in preservice training for caregivers; and use of 'demand payments' for fictive kin."  Doc. 130-45, at 5.  None of these findings are acknowledged, let alone addressed, by Ms. Johnson in her report.

Ms. Johnson also does not consider the purpose of the A Second Chance reports or DHHR's response to those reports.  In August 2018, DHHR hired A Second Chance, a national leader in kinship care, to evaluate and develop recommendations to strengthen its kinship program, resulting in the March 2019 Kinship Strengths Assessment and the October 2019 Kinship Study. Defendants made several improvements as a result of these reports, including implementing the Kinship Navigator program; engaging the West Virginia Social Work Education consortium to develop a kinship-specific parent training model;[4] and providing additional kinship training and

---

[3] See, e.g., United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995) (affirming exclusion because the expert's work "is something that can sufficiently be done by the jury without help from an expert"); Hines v. Wyeth, No. 04-0690, 2011 WL 2680814, at *6 (S.D.W. Va. July 8, 2011) (unpublished) (holding that summarizing the findings of a study, "without further analysis, does little to sustain [the expert's] testimony against a Daubert attack.").

[4] 2021 Annual Programs and Services Review, at 104, https://dhhr.wv.gov/bcf/Reports/Documents/West%20Virginia%20APSR%202021.pdf.

financial support, W. Va. Code § 49-2-111c.  But Ms. Johnson's analysis does not consider these recent steps by DHHR, brushing them off as too "late", even though federal funding for these programs did not become available until October 1, 2018, *see* Family First Prevention Services Act, Pub. L. No. 115-123, § 50713.  *See* Ex. 1, Johnson Dep. 93:14-96:1. (Ms. Johnson incorrectly testified that federal funding for kinship navigator programs became available in 2008.).

Finally, Ms. Johnson's testimony also lacks credibility.  Ms. Johnson misconstrues the findings in the A Second Chance reports, as explained above; offered opinions on caseworker issues, despite admitting that she is not qualified to give an expert opinion such issues, *id*. at 245: 17-246:15; and misleadingly included statements in her reports (including headings) that could be read as critiques of West Virginia's kinship program, but which she confirmed actually do not pertain to West Virginia at all, *id*. at 197:9-198:21, 219:15-220:6.

### b.  The ADA Subclass "Expert" Testimony is Not Reliable.

In support of certifying the ADA subclass, Plaintiffs offer the testimony of Nisha Sachdev, who received her Psych.D. in 2016 and since then has held two positions overseeing grant awards for programs serving children with mental health needs.  Doc. 130-10, at 52.

Dr. Sachdev is not qualified to opine on Defendants' provision of services to foster children with physical, intellectual, cognitive, and mental health disabilities.  While Dr. Sachdev has some experience with services for children with *mental health* needs, she has no experience working with children with *physical* disabilities who do not have co-occurring mental health diagnoses and could not remember if she had experience working with children with *intellectual* disabilities who do not have co-occurring mental health diagnoses.  Doc 130-10, at 52-56; Ex. 2, Sachdev Dep. 44:5-45:19.  Nevertheless, Dr. Sachdev opines on (and the ADA subclass includes) DHHR's treatment of children with physical and intellectual disabilities.  Further, Dr. Sachdev has little experience with child welfare systems: she has never been an employee of a child welfare agency,

7

and she has never held any position where she worked full-time with a child welfare agency. *See* Doc. 130-10, at 52-56; Ex. 2, Sachdev Dep. 13:18-14:2.

Given the gaps in her experience, it is not surprising that Dr. Sachdev did not use a reliable methodology in arriving at her conclusions. Dr. Sachdev's report is essentially a regurgitation of *some* of the findings in three outdated third party reports: (1) a 2012 West Virginia University report, "Identifying and Meeting Children's Behavioral Health Needs"; (2) the U.S. Department of Justice's ("DOJ") 2015 findings relating to West Virginia's mental health system; and (3) the Administration for Children & Families' 2017 Child and Family Services Review ("CFSR"). *See* Doc. 130-10 (citing these three reports over 80 times).

As explained above, simply summarizing third party reports is not a reliable methodology that will help the Court in this case, because the Court can read and evaluate these three reports without assistance from Dr. Sachdev. *See supra* note 3. Further, the three reports on which Dr. Sachdev's opinions are based use data from 2010 through 2016, rendering them irrelevant to the questions in this case about DHHR's *current* program.

Dr. Sachdev does not even accurately summarize the reports, and instead cherry-picks information that support her opinions, ignoring that which does not. For example, Dr. Sachdev – who had little experience with CFSRs before her work in this case, Ex. 2, Sachdev Dep. 26:1-5 – declines to mention that the 2017 CFSR found "improved collaboration with other key child-serving agencies," including with respect to behavioral health and other services providers, and that "West Virginia is enhancing its efforts to serve children in their communities and meet their needs for permanency and well-being in family settings through the title IV-E waiver demonstration project, *Safe at Home*," which "has proven instrumental in positively affecting the permanency and well-being of youth participating in the program, as evidenced through the case

record reviews and stakeholder interviews." Doc. 130-3, at 3-4. In addition, Dr. Sachdev erred in suggesting that findings in the 2017 CFSR, which reviewed a sample of 40 cases randomly selected from the foster care population as a whole, can be used to evaluate DHHR's performance with respect to the sub-population of foster children with disabilities (the ADA subclass). Doc 130-10, at 11-16, 22, 26, 34-35. Extrapolating findings based on a sample from a population onto a sub-population is inconsistent with basic principles of statistics. Doc. 160-19, at 5. Dr. Sachdev's analysis is akin to opining that, because a political poll shows that 60 percent of all registered voters support Candidate X, 60 percent of voters age 18-24 support Candidate X.

Dr. Sachdev's methodology is also flawed because of the information Dr. Sachdev did *not* consider. To begin with, Dr. Sachdev did not review or consider any policies or other information relating to West Virginia's Medicaid program, because it was "out of the scope" of her assignment. *See, e.g.*, Ex. 2, Sachdev Dep. 69:16-70:10, 70:21-72:1, 75:19-79:20, 80:12-81:14, 81:22-82:17; Doc. 130-10, at 45-50 (listing the documents Dr. Sachdev considered). This is a stunning oversight, because Medicaid is the primary program through which foster children with disabilities receive the community-based health care services that Dr. Sachdev claims DHHR does not provide.[5] Due to this oversight, Dr. Sachdev knew little about the services provided to foster children with disabilities through the Medicaid Individuals with Intellectual Disabilities ("I/DD") Waiver program; the Medicaid Children with Serious Emotional Disorders Waiver program; the Medicaid personal care benefit; or the Medicaid counseling or therapy benefits. Ex. 2, Sachdev Dep. 70:21-72:1; *id.* at 75:19-79:20; *id.* at 80:12-81:14. For example, Dr. Sachdev incorrectly

---

[5] *See, e.g.*, Ctr. for Health Care Strategies, *How can Medicaid-funded services support children, youth, and families involved with child protection?* (Aug. 10, 2020), available at https://www.casey.org/medicaid-funded-services/ ("Nearly all children and youth involved with a child protection agency are eligible for Medicaid, which is their primary source of funding for physical, behavioral, and dental health care.").

believed that "West Virginia has not provided in-state services to address youth with an IDD," Doc. 130-10, at 40, when in reality hundreds of foster children with I/DD have received community-based services and supports through the Medicaid I/DD Waiver program in the last several years, Doc. 160-1, at ¶ 82. Dr. Sachdev also did not review any information about West Virginia's Birth-to-Three program, which provides extensive services to developmentally delayed children (including foster children). Ex. 2, Sachdev Dep. 74:11-75:17; Doc. 130-10, at 45-50 (listing the documents Dr. Sachdev considered).

Dr. Sachdev also fails to consider recent data and developments in forming her conclusions. For example, in developing her opinion about the State's use of residential treatment programs, Dr. Sachdev relied on the DOJ's finding that "[i]n December 2014, there were 1,017 children with mental health conditions residing in segregated residential treatment facilities – 25% of all children in DHHR custody," Doc 130-10, at 31, even though Dr. Sachdev had 2020 data showing that West Virginia had cut in half the percentage of children in residential treatment settings from December 2014 to January 2020, from 25 percent to 13 percent, Doc. 130-10, at 6 fn.4, 47; Doc. 160-2, at 2. Dr. Sachdev's report gives DHHR no credit for this dramatic decline in the use of residential placement, let alone explain how such a decline is consistent with her opinion that DHHR is not doing enough to keep foster children in family homes.[6] In addition, Dr. Sachdev did not develop any opinion about DHHR's 2019 Memorandum of Understanding ("MOU") with DOJ, even

---

[6] When asked about this, Dr. Sachdev responded that the 2014 data were specific to "children with mental health conditions" whereas the 2020 data represented all foster children, and thus it is not an "apples to apples" comparison. Ex. 2, Sachdev Dep. 127:5-133:3. But that is wrong. Dr. Sachdev's report and the DOJ finding explicitly states that 25 percent of "all children in DHHR custody" were in residential treatment programs, *see* Doc. 17-5 (DOJ Findings, 2015); Doc. 130-10, at 1, and the Legislative Foster Care Report shows that number had decreased to 13 percent by January 2020, Doc. 160-2, at 2. In fact, if Dr. Sachdev had looked carefully at the DOJ finding, she would have realized that it was actually pulled from the December 2014 Legislative Foster Care Report, and thus the data is exactly "apples to apples." *See* Doc. 17-5.

though the MOU is designed to address the precise issues about which Dr. Sachdev is testifying. Ex. 2, Sachdev Dep. 68:2-69:15; *see also* Doc. 130-10, at 45-50 (showing that Dr. Sachdev did not rely on the implementation plan for the DOJ MOU or the bi-annual reports analyzing the status of implementation of the DOJ MOU).   In fact, Dr. Sachdev did not even know that the DOJ MOU was designed to expand services to children with serious behavioral health needs, testifying that she believed it related to services to all children with disabilities.  Ex. 2, Sachdev Dep. 66:1-17.

Finally, Dr. Sachdev's testimony is not credible.  As explained above, Dr. Sachdev's report relies extensively on old information, such as the 2012 West Virginia University report.  Yet, in citing these documents, Dr. Sachdev used an unusual citation format that conveniently omitted those documents' publication date.  *See, e.g.*, Doc. 130-10, n.44-46.  Although Dr. Sachdev cited the 2012 West Virginia University report 20 times throughout her report, she never once mentioned it was published in 2012.  *See generally* Doc. 130-10.  Similarly, as explained above, Dr. Sachdev used 2014 data regarding the percentage of foster children in residential treatment programs when she had 2020 data (which is much more favorable to Defendants) available to her, Doc. 130-10, at 6 fn.4, 47; Doc. 160-2, at 2. When pressed in her deposition about her use of old data, Dr. Sachdev refused to acknowledge the limits of using such data.  *See, e.g.*, Ex. 2, Sachdev Dep. 122:15-123:13; *id.* at 125:13-21.  This is not the work of an unbiased, credible expert.

### c.  The Aging-out Subclass "Expert" Testimony is Not Reliable.

Plaintiffs' aging out subclass "expert" Dr. Elizabeth Aparicio is an assistant professor at the School of Public Health at the University of Maryland, where she  focuses on "informing and testing interventions in adolescent sexual health, teen pregnancy, and parenting; early childhood intervention; and child maltreatment prevention,"  *see* Univ. of Maryland Sch. of Public Health, https://sph.umd.edu/CommunityTHRIVES (last visited, Nov. 11, 2020).

While Defendants acknowledge that Dr. Aparicio is an expert in adolescent sexual health and teen parenting, that topic overlaps only slightly with the claims that Plaintiffs have raised with respect to the "aging out" subclass, and it is not an area of concern that has been identified with respect to any of the named Plaintiffs. Dr. Aparicio spent only the first two of her nine years as a social worker with foster children, and during those two years she worked exclusively with teenage mothers in foster care. Beyond that, Dr. Aparicio has no experience evaluating child welfare agencies' provision of services to transition-age youth, Ex. 3, Aparicio Dep. 32:14-33:7, and has never evaluated any "policies and practices for the provision of services to transition age foster youth," *id.*, at 37:13-41:8. As a result, Dr. Aparicio is not qualified to provide expert testimony about the transition services West Virginia provides to older foster children (except perhaps with respect to sexual health or early parenthood).

Dr. Aparicio also did not use a reliable methodology to form her opinions. Like the other subclass "experts," Dr. Aparicio's opinion is based almost exclusively on old information and data in third party reports: (1) West Virginia's 2017 CFSR; and (2) a four-page "2018 West Virginia Profile" on "Transition-Age Youth in Foster Care" from the Annie E. Casey Foundation. And, like the other subclass "experts," Dr. Aparicio does not accurately summarize these reports, instead cherry-picking picking information that support her opinions, ignoring that which does not, and making illogical inferences from limited information contained therein.

For example, Dr. Aparicio's report fails to mention that the Casey Foundation profile found that 70 percent of transition-age foster youth in West Virginia receive educational financial assistance, compared to just 23 percent nationally, or that West Virginia's runaway rate for such children is half the national average. *See* Doc. 130-12; Ex. 3, Aparicio Dep. 149:2-153:10; *see also id.* at 153:14-155:13 (acknowledging that her report did not note that, in 2018, 44 percent of

West Virginia foster youth ages 14-17 experienced only one placement during their most recent foster care episode, compared to only 30 percent nationally).

Dr. Aparicio repeatedly suggests that Defendants' actions have caused former foster youth to experience "poor outcomes" at age 21, based entirely on the Casey Foundation's 2018 comparison of West Virginia's data on four "young adult outcomes by age 21" with the United States foster care population as a whole:

- Full/Part Time Employment:    WV (43%), US (49%)
- High School Diploma/GED+:    WV (72%), US (76%)
- Stable Housing:    WV (54%), US (70%)
- Young Parents:    WV (38%), US (31%)

Doc. 130-12, at 7, 14, 16-17, 21. But the Casey Foundation profile does not even suggest that these young adult outcome metrics were modestly worse in West Virginia than the national averages *because of* Defendants' policies or practices, and Dr. Aparicio did not identify a single policy or practice that she believed might have caused outcomes that were less than the national average. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

In addition, Dr. Aparicio's heavy reliance on the 2017 CFSR is deeply flawed. Dr. Aparicio admitted she is not an expert in the overwhelming majority of the CFSR "outcomes" she comments on, Ex. 3, Aparicio Dep. 178:11-14, 180:18-20, 191:10-16, and she was unaware that almost *no* States have met the federal benchmarks she faults West Virginia for failing to meet, *id.* at 80:2-92:13; Doc. 160-9. Dr. Aparicio also relies on the 2017 CFSR as evidence that the State's performance either "remained relatively unchanged" or was "worse than in the prior [2008 CFSR] evaluation," Doc. 130-12, at 9-10; *see also id.* at 15-17, even though the Administration for

Children & Families has stated that it is inappropriate to compare a State's results in the 2008 and 2017 review rounds, due to changes made to the review metrics after 2008, Doc. 130-3, at 2. Further, Dr. Aparicio's analysis assumes that the 2017 CFSR findings, which reviewed cases randomly selected from the foster care population as a whole, can be extrapolated to arrive at conclusions about DHHR's performance with respect to the aging-out sub-population. But, as explained above, this is inconsistent with basic principles of statistics. Doc. 160-19, at 5.

Dr. Aparicio repeatedly stated in her deposition that one of her primary concerns regarding the "transition-age" group was that a large number were in residential treatment programs, *see, e.g.*, Ex. 3, Aparicio Dep. 55:22-56:9, 90:11-20, 99:22-100:9, but she did not appear to know that *all* children in residential treatment are ordered to those placements by circuit courts, almost half of them as the result of a juvenile delinquency or juvenile status charge, *see id*. at 161:7-12. In fact, Dr. Aparicio testified that the one piece of information she thought would be important to know, but did not have, was the percentage of children in residential treatment programs that were ordered there by a court. *Id*. at 61:18-63:8, 170:5-19.

As with the other two subclass "experts," Dr. Aparicio's "methodology" of selectively regurgitating out-of-date reports written by third parties is not reliable or helpful to the Court, which is capable of reading the two reports that Dr. Aparicio reviewed and drawing its own conclusions. *See supra*, note 3.

Finally, Dr. Aparicio's testimony is riddled with speculation, confirming that she has *not* identified a policy or practice of the type necessary for class certification. *See, e.g.*, Doc. 130-12, at 21 ("[I]t is *questionable* whether caseworkers are engaging in the necessary case management and referring transition age youth to these services." (emphasis added)); *id.* at 7-8 ("Such a discrepancy *suggests that there may* be a rush to place transition aged youth in permanent homes,

when, unfortunately, the availability and quality of services provided to families in these homes *may be* poor." (emphasis added)); *id.* at 5 (opining that DHHR's alleged failures "*create[] a risk of harm*" (emphasis added)). But an expert's testimony is reliable under Rule 702 only when it is "'based on scientific, technical, or other specialized knowledge *and not on belief or speculation.*'" *Nease*, 848 F.3d at 229 (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)) (emphasis added). Dr. Aparicio's opinions clearly fail this test.

### d. The Case File "Expert" Testimony is Not Reliable.

Plaintiffs offer one expert case file review report ("Case Report"), totaling 456 pages, written by three child welfare experts: Susan Getman, Janet Flory, and Elsa Popchak. Doc. 130-9. Plaintiffs' counsel asked each expert to review the case files of three named Plaintiffs and prepare a report on each child's experience in DHHR custody. None of the three experts reviewed the case files of all nine named Plaintiff children. *See, e.g.*, Ex. 4, Getman Dep. 16:9-10; *id.* at 73:19-21; Ex. 5, Popchak Dep. 26:2-4; *id.* at 27:19-28:3.

The overwhelming majority of the Case Report consists of the three experts' individual reports on each of the three case files they reviewed, but the first 35 pages is an "Executive Summary," which presents 23 "themes" the experts jointly identified. While some of the themes are allegedly "apparent in all nine case files," the reviewers allegedly found others in four to eight of the case files reviewed, Doc. 130-9, at 2, though the report does not specify which themes were found in which cases, *see generally id.* at 1-35; Ex. 5, Popchak Dep. 52:16-55:8.

Courts frequently reject expert case studies under *Daubert*, often because they are "regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack control." *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411 (D. Or. 1996); *see also, e.g.*, *Willert v. Ortho Pharm. Corp.*, 995 F. Supp. 979, 981 (D. Minn. 1998). But even in circumstances where an expert case study may be admissible, it must use a reliable methodology

consistent with *Daubert* and Rule 702. That is, the methodology must be based on sufficient facts and use a generally accepted methodology, *see* Fed. R. Evid. 702(b); *Daubert*, 509 U.S. at 593-94.

In this case, the methodology fell well short of that standard, because: (1) the case file reviewers did not talk to anyone involved in the cases (or review deposition transcripts of such individuals); (2) the case file reviewers did not use standardized criteria to evaluate the cases; and (3) not one of the reviewers even read the entire report to which they each signed their name.

While the three subclass "experts" each rely heavily (and incorrectly) on CFSR findings, the case file reviewers did not even try to adhere to the CFSR standards for drawing conclusions about individual foster care cases. In the CFSR, the Administration for Children & Families randomly selects cases, which are evaluated using a standardized federal case review instrument on which the reviewers are trained. Doc. 160-9. The case review component of the CFSR includes not only a review of all case file documents, but also extensive interviews with the children, families, and workers involved. As the Administration for Children & Families explains in its case review instructions:

> It is ***critical*** to obtain information from a variety of sources before making initial determinations about outcomes. Case-related interviews with key individuals involved in the case serve as an opportunity to determine what has occurred in the case, confirm case record documentation, collect information that might be missing from the record, and obtain input about case participants' experiences. ***The interview information is weighed equally with information obtained from the case file documentation.***[7]

---

[7] Administration for Children & Families, *Child and Family Services Reviews, Case-Related Interview Guides and Instructions*, at 1 (2014), https://www.acf.hhs.gov/sites/default/files/cb/case_interview_guides.pdf (emphasis added) (hereinafter "ACF, *Case-Related Interview Guide*").

DHHR's Division of Planning and Quality Improvement follows the federal CFSR standards – including conducting interviews and using the federal review instrument – in evaluating a random sample of cases each year in several counties, to help measure performance and outcomes in in the West Virginia child welfare system.  Ex. 6, at 6, 8-9.

Unlike the federal CFSR and DHHR's own internal case reviews, Plaintiffs' Case Report is based exclusively on a review of the case file documents.  Plaintiffs' reviewers did not interview, and Plaintiffs' counsel did not depose, *any* individuals involved in any of the cases, such as the caseworker, the caseworker's supervisor, the service provider(s), the biological parent(s), the foster parent(s), the child, the guardian ad litem, or even the Next Friend representing the child in this case.  Ex. 4, Getman Dep. 46:10-47:6; Ex. 5, Popchak Dep. 39:17-40:8; Ex. 7, Flory Dep. 174:1-7.  Without the additional information and context that can be provided by talking to people involved in the case, Plaintiffs' reviewers repeatedly assumed that if something was not written in the case file documents "it didn't happen."  *See, e.g.*, Ex. 5, Popchak Dep. 45:12-46:4.  But, as the federal Administration for Children & Families recognizes, that is not a fair or correct assumption. *See* ACF, *Case-Related Interview Guide*.  While caseworkers should document important events and meetings in the case file, they are not required to document every conversation or every effort to connect a child to services.  Further, caseworkers may fail, on occasion, to document even important events or services.  Such a documentation error may be a violation of DHHR policy, but that does not mean the service or event did not occur or should not be considered in analyzing the experience of the child.  As the federal Administration of Children & Families explains, interviews with individuals involved in the case is necessary to "collect information that might be missing from the record, and obtain input about case participants' experiences."  ACF, *Case-Related Interview Guide*.

The Plaintiffs' case reviewers also did not use or develop a standardized review tool to assure consistency and a rigorous evaluation of the nine cases. Instead, the reviewers applied vague "reasonable professional standards," which they admitted are not published (or even written down) anywhere, vary from jurisdiction to jurisdiction, and are based in part on the experience of each individual reviewer, none of whom have any experience with the West Virginia child welfare system. Ex. 4, Getman Dep. 115:9-116:2, 132:14-133:17; Ex. 5, Popchak Dep. 49:1-51:22; Ex. 7, Flory Dep. 53:18-54:2l, 51:7-11, 56:2-14, 62:8-63:16, 66:5-22, 76:17-77:9. As a result, the Court and Defendants cannot review the standards used by the reviewers, determine if the case reviewers applied the same standards across all cases, or otherwise test the case reviewers' conclusions.

A foster care case review lacking interviews and standardized assessment criteria is not a "generally accepted" methodology "based on sufficient facts" for developing opinions and conclusions about the handling of a specific child's case. *See* Fed. R. Evid. 702(b); *Daubert*, 509 U.S. at 593-94. In fact, while one of Plaintiffs' experts steadfastly insisted that interviews are not necessarily helpful, Ex. 5, Popchak Dep. 44:16-45:11, another of acknowledged that she generally did conduct interviews for case reviews in the past, and that interviews "would add some information" and should be done "if you were doing an overall system review." Ex. 7, Flory Dep. 19:16-20:1, 24:2-12, 176:6-17; *see also id.* at 68:4-69:14.

Finally, not one of the case reviewers reviewed the case files of all nine named Plaintiffs; rather, they each reviewed only three of the nine cases. Ex. 4, Getman Dep. 16:9-10; *id.* at 73:19-21; Ex. 5, Popchak Dep. 26:2-4; *id.* at 27:19-28:3. Even more surprisingly, not one reviewer even read their co-authors' individual case file reports summarizing the reviews of the other six case files. Ex. 4, Getman Dep. 73:19-21; Flory Dep. 43:22-44:8. That is, each reviewer failed to read approximately 300 pages of their 456-page report. Ex. 7, Flory Dep. 44:4-9. The "Executive

Summary" identifies 23 "themes" that the case reviewers assert apply to between four and nine of the cases, but since each reviewer only has knowledge of three case files, not one of them has personal knowledge about the accuracy of the Case Report's assertions regarding the number of cases to which the "themes" apply, Ex. 5, Popchak Dep. 37:2-39:13; Ex. 7, Flory Dep. 50:22-51:22. The report should be excluded on this basis alone. *See Daubert*, 509 U.S. at 590 ("[T]he adjective 'scientific' implies a grounding in the methods and procedures of science, and *the word 'knowledge' connotes more than subjective belief or unsupported speculation*." (internal quotations omitted) (emphasis added)).

## II. Plaintiffs Have Not Satisfied Their Burden of Showing that Any of the "Expert" Testimony is Relevant to Class Certification.

In addition to evaluating reliability, the Court is also charged with ensuring that expert testimony is "relevant to the task at hand." *Daubert,* 509 U.S. at 597. The "task at hand" here is Plaintiffs' motion for class certification, and key questions for class certification are whether the named Plaintiffs share "common" questions with the absent members of the putative class or subclass; have claims "typical" of those absent class members; and are "adequate" representatives of those absent members. Fed. R. Evid. 23; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Neither the subclass reports nor the Case Report are relevant to those inquiries, and thus the testimony should be excluded as irrelevant.

The subclass "expert" reports do not even purport to speak to commonality, typicality or adequacy, as the subclass "experts" did not review any information relating to any of the named Plaintiffs. *See* Doc. 130-10, at 45-50; Doc. 130-12, at 23-24; Doc. 130-43, at 22-26. Further, while the subclass "experts" criticize Defendants' *performance* and the *outcomes* for some foster children, they do not identify any common "policy" or "practice" that applies to *all* children in the

putative class or subclasses. In addition, as explained above, each subclass "expert" relies on outdated information, even though this lawsuit is about DHHR's *current* practice, not past practice.

While the Case Report discusses the named Plaintiffs at great length, it does not provide any link between their experiences and the experiences of the absent class members. Plaintiffs' counsel admitted that the experts were "retained to do a case file review, not a diagnosis of the entire West Virginia foster care system," Ex. 7, Flory Dep. 173:2-5, and the reviewers confirmed that they merely analyzed the nine named Plaintiffs' case files and they "were not there to make an overall judgment of all of West Virginia's child welfare system" or opine on the experiences of absent class members. *See* Ex. 5, Popchak Dep. 62:15-16; *see also* Ex. 7, Flory Dep. 176:8-1017. But conclusions about the case files of the nine named Plaintiffs alone—an unrepresentative and indisputably "small sample"—say nothing about whether those nine Plaintiffs share injuries in "common" with, or have claims that are "typical" of, the other 7,000 children in DHHR custody. *Cf., e.g.*, *Wal-Mart*, 564 U.S. at 356 (explaining that named plaintiff's discriminatory experiences are "insufficient to infer" class-wide discrimination). In fact, outside of the Statement of Facts, Plaintiffs barely mention the named Plaintiffs in their brief, belying their position that the 456-page Case Report is relevant to the motion for class certification.

## CONCLUSION

For the foregoing reasons, this Court should exclude the testimony of Ms. Johnson, Dr. Sachdev, Dr. Aparicio, Ms. Getman, Ms. Popchak, and Ms. Flory.

Respectfully submitted,

November 16, 2020

/s/ Philip J. Peisch
Philip J. Peisch (WVSB #24403)
Caroline M. Brown
Rebecca E. Smith
Julia M. Siegenberg
Brown & Peisch PLLC
1233 20th Street NW, Suite 505
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 2nd Floor
Charleston, WV 25301

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants'

Memorandum in Support of Defendants' Motion to Exclude Plaintiffs' Expert Testimony to be

delivered to the following via ECF notification:

> Marcia Robinson Lowry
> Dawn J. Post
> Allison Mahoney
> Tavi Unger
> A Better Childhood
> 355 Lexington Ave. Floor 16
> New York, NY 10017
>
> Richard W. Walters
> J. Alexander Meade
> Brian L. Ooten
> Shaffer & Schaffer, PLLC
> 2116 Kanawha Blvd East
> P.O. Box 3973
> Charleston, WV 25304
>
> Lori Waller
> Disability Rights of West Virginia
> 1207 Quarrier Street, Suite 400
> Charleston, WV 25301

November 16, 2020

> /s/ Philip J. Peisch
> Philip J. Peisch (WVSB #24403)
> Caroline M. Brown
> Rebecca E. Smith
> Julia M. Siegenberg
> Brown & Peisch PLLC
> 1233 20th Street NW, Suite 505
> Washington, DC 20036
>
> /s/ Steven R. Compton
> Steven R. Compton (WVSB #6562)
> West Virginia Attorney General's Office
> 812 Quarrier Street, 2nd Floor
> Charleston, WV 25301

22