IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JONATHAN R., et al.,

                      Plaintiffs,

v.                                        CIVIL ACTION NO.   3:19-cv-00710

JIM JUSTICE, et al.,

                      Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Jim Justice, Bill Crouch, Jeremiah Samples, Linda Watts, and the West Virginia Department of Health and Human Resources' (collectively "Defendants") Motion to Dismiss, (ECF No. 17); Defendants' Motion to Dismiss the Claims of Named Plaintiffs Chris K., Calvin K., and Carolina K., (ECF No. 55); Defendants' Motion to Dismiss the Claims of Named Plaintiff Garrett M., (ECF No. 88); Defendants' Motion to Clarify Plaintiffs' Proposed Class Definition and to Dismiss Named Plaintiff Gretchen C., (ECF No. 107); and Defendants' Motion to Dismiss the Claims of Named Plaintiff Serena S., (ECF No. 167.) Also pending is Plaintiffs Jonathan R., Anastasia M., Serena S., Theo S., Garrett M., Gretchen C., Dennis R., Chris K., Calvin K., Carolina K., Karter W., and Ace L.'s (collectively "Plaintiffs") Motion for Class Certification and Appointment of Class Counsel, (ECF No. 130); Plaintiffs' Motion for Extension of Time to Reply, (ECF No. 153); Defendants' Motion to Stay Discovery, (ECF No. 156); Defendants' Unopposed Motion to Exceed Page Limit, (ECF No. 159);

1

Defendants' Motion for Leave to File Under Seal, (ECF No. 161); Defendants' Motion to Exclude Plaintiffs' Expert Testimony, (ECF No. 163); Plaintiffs' Unopposed Motion for Extension of Page Limit, (ECF No. 166); Plaintiffs' Motion to Exclude Defendants' Expert Testimony, (ECF No. 180); and Defendants' Motion for Leave to File Sur–Reply, (ECF No. 182).   For the reasons discussed more fully below, the Court **GRANTS** Defendants' Motions to Dismiss, (ECF Nos. 17, 55, 88, 107, 167).

## I.   BACKGROUND

Plaintiffs filed this proposed class action on behalf of all children who are currently in or will be placed in the custody of West Virginia's foster care system.   (ECF No. 1 at 6, ¶ 10.)   The proposed class consists of one General Class and three subclasses.   The proposed Kinship Subclass consists of children who are or will be placed in kinship placements.[1]   (*Id.* at 10–11, ¶ 30(a)(i).)   The proposed ADA Subclass consists of children who have or will have physical, intellectual, cognitive, or mental health disabilities, and the proposed Aging Out Subclass consists of children aged 14 years and older who are eligible for transition planning but have not been provided the necessary case management and services.   (*Id.* at 11, ¶ (30(a)(ii–iii).)

The twelve named Plaintiffs are children in the custody of West Virginia's Department of Health and Human Resources ("DHHR").   (*Id.* at 2, ¶ 1.)   Plaintiffs allege that West Virginia's foster care system has operated in a state of crisis for years and that the DHHR and the Bureau for Children and Families ("BCF") have failed to protect the children in their care.   (*Id.* ¶ 1.)

---

[1] West Virginia law defines "kinship placement" as "the placement of the child with a relative of the child, as defined herein, or a placement of a child with a fictive kin, as defined herein."   W. Va. Code § 49–1–206.   Further, "relative of the child" is defined as "an adult of at least 21 years of age who is related to the child, by blood or marriage, within at least three degrees" and "fictive kin" is defined as "an adult of at least 21 years of age, who is not a relative of the child, as defined herein, but who has an established, substantial relationship with the child, including but not limited to, teachers, coaches, ministers, and parents, or family members of the child's friends."   *Id.*

2

Defendants, all sued in their official capacities, are Governor Jim Justice, Cabinet Secretary of the West Virginia DHHR Bill Crouch, Deputy Secretary of the DHHR Jeremiah Samples, Commissioner of the BCF Linda Watts, and the West Virginia DHHR.  Plaintiffs allege Defendants are aware of the following systematic deficiencies within West Virginia's foster care system: a lack of foster care placements; an overwhelmed system that leads to inadequate, temporary, and overcrowded foster home placements; an overreliance on institutional care for children; a failure to ensure placement stability; a failure to track foster children; a failure to employ and retain a sufficient number of case workers; a failure to provide and develop services; a failure to engage in permanency planning; and a failure to properly plan for the children's future. (*Id.* at 4–6, ¶ 9.)   Plaintiffs allege Defendants have failed to address these issues, which has caused further harm to the children in their care.   (*Id.* at 4, ¶ 9.)

Plaintiffs seek both declaratory and injunctive relief against Defendants for these alleged systematic deficiencies.   Plaintiffs seek injunctive relief which would require Defendants to implement the following reforms:

a. With regard to all children in the General Class:

i. Require DHHR to contract with an appropriate outside entity to complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgement, to determine the full range and number of appropriate foster care placements and services for all children needing foster care placement, including the development of a plan, with timetables, within which such placements and services shall be secured, and ensure that DHHR shall comply with those timetables;

ii. Require that DHHR ensure that all children who enter foster care placement receive within 30 days of entering care a complete and thorough evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with

disabilities under the ADA and that the child be re-evaluated as the child's needs and the information available to DHHR change;

iii. Require that DHHR ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs; describe a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves towards a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in DHHR's custody.

iv. Require that DHHR ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

v. Require that DHHR shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards;

vi. Require that DHHR shall hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers, and ensure that caseloads do not exceed 15 children per-worker for children in placement, with caseloads adjusted for caseworkers who carry mixed caseloads including children not in foster care custody; and

vii. Require DHHR to develop an adequate statewide plan, to be approved by the Monitor referred to below, for recruiting and retaining foster and adoptive homes, including recruitment goals and timetables for achieving those goals, with which DHHR shall comply.

b. For all children in the Kinship Subclass:

i. Require DHHR to develop an adequate statewide kinship placement plan, to be approved by the Monitor referred to below, for assessing, overseeing, and monitoring kinship homes, including training requirements and regular caseworker contact, and timetables for achieving those goals, with which DHHR shall comply;

4

ii. Require that DHHR shall ensure caseworkers conduct background and safety assessments of kinship placements as required by reasonable professional standards;

iii. Require that DHHR shall ensure that kinship placements receive foster parent training as required by reasonable professional standards;

iv. Require that DHHR shall ensure that all children in kinship placements shall receive foster care services to meet the child's needs, including, in as many instances as is required by reasonable professional standards, supportive services; and

v. Require that DHHR shall ensure all children who are placed in kinship placement receive permanency planning as required by reasonable professional standards.

c. For all children in the ADA Subclass:

i. Require that DHHR shall ensure that all children with physical, mental, intellectual, or cognitive disabilities shall receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

ii. Require that DHHR ensure that an adequate array of community based therapeutic services are available to children with disabilities; and

iii. Require that DHHR ensure that it develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities.

d. For all children in the Aging Out Subclass:

i. Require that DHHR, when a child turns 14 years old while in its custody and is not imminently likely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, shall engage in transition planning to meet the health care, educational, employment, housing, and other social needs of the children in transitioning to adulthood;

ii. Require that DHHR shall ensure youth be placed in the least

5

restrictive, most-family like setting possible with appropriate,
necessary and individualized services; and

iii. Prohibit DHHR from refusing to place a young person in a foster
care placement because the child is 14 or older.

(*Id.* at 100–105, ¶ 405.)   Plaintiffs also ask this Court to appoint a neutral monitor to oversee

implementation of and compliance with these reforms.   (*Id.* ¶ 406.)

### A.  Individual Allegations

Named Plaintiffs Chris K., Calvin K., and Carolina K. are siblings under the age of six.

(ECF No. 56 at 2.)   When the Complaint was filed, the siblings were living with foster parents

who were in the process of adopting them.   (*Id.*)   On December 10, 2019, during the pendency

of this case, Chris, Calvin, and Carolina were adopted.   (*Id.*)   Plaintiffs do not dispute that this

fact.   (ECF No. 61 at 3.)   As a result of their adoption, these children are no longer in the custody

of the DHHR and are instead in the legal custody of their adoptive parents.   (ECF No. 56 at 2.)

Additionally, named Plaintiff Serena S., a twelve-year-old girl with Down Syndrome and

a congenital heart defect, was placed with a family that notified the DHHR during the pendency

of this case that they wanted to adopt her.   (ECF No. 172 at 3.)   On September 3, 2020, Serena

S. was adopted and is also no longer in the custody of the DHHR.   (ECF No. 168 at 1.)   This

adoption also occurred during the pendency of this case, and Plaintiffs, again, do not dispute this

fact.   (ECF No. 173 at 2.)

Next, Defendants allege that named Plaintiffs Garrett M. and Gretchen C. are also no longer

in the custody of the DHHR.   Both Garrett and Gretchen were involved in juvenile delinquency

proceedings, and the circumstances surrounding their involvement with the DHHR is slightly

different than the other Plaintiffs.   West Virginia law authorizes the DHHR to "accept children

6

for care from their parent or parents, guardian, custodian or relatives and to accept the custody of children committed to its care by courts." W. Va. Code § 49–2–101(a). Children typically enter DHHR custody through either abuse and neglect petitions or in connection with juvenile delinquency proceedings or juvenile status offense proceedings. *See* W. Va. Code § 49–4–601; W. Va. Code § 49–4–701(e). West Virginia law allows its circuit courts to place these juvenile offenders in DHHR custody as an alternative to placement in a Bureau of Juvenile Services ("BJS") secure detention facility. W. Va. Code § 49–2–901. Further, some children may come into DHHR custody through an abuse and neglect proceeding and may also be the subject of a juvenile delinquency or juvenile status offense proceeding. (ECF No. 109–1 at 4.)

The parties dispute whether named Plaintiff Garrett M. was in the custody of the DHHR at the time the Complaint was filed. The parties agree that Garrett originally came into the legal and physical custody of the DHHR in 2013 in connection with an abuse and neglect case. (ECF No. 97 at 3; ECF No. 98 at 4.) In March of 2018, Plaintiffs argue that the BJS filed a delinquency petition against Garrett and that he was then undergoing both dependency and delinquency proceedings at the same time. (ECF No. 98 at 4.) Plaintiffs further argue that Garrett remained in the custody of the DHHR even after his parent's parental rights were restored in 2018, and that Garrett was in the custody of the DHHR when the Complaint was filed. (*Id.* at 5.)

On the other hand, Defendants argue that the DHHR was no longer Garrett's guardian after his parental rights were restored, which occurred well over one year before the Complaint was filed. (ECF No. 97 at 5.) Defendants argue Garrett was solely in the custody of the BJS at the time the Complaint was filed and that he resided at a juvenile detention facility as a result of a juvenile delinquency adjudication. (ECF No. 97 at 2.) Defendants argue that Garrett was in the

7

custody of the BJS from June of 2019, until his release in December of 2019.   (*Id.* at 3.)
However, the parties agree that Garrett left the custody of the DHHR during the pendency of this
case because he turned 18 years of age.   (ECF No. 97 at 3; ECF No. 98 at 1.)

Named Plaintiff Gretchen C. was never removed from her family as a result of abuse and
neglect proceedings but was placed in an institution solely as a result of an adjudicated delinquency
proceeding for a violent offense.   (ECF No. 109–1 at 2.)   The Complaint states that Gretchen
entered foster care as a result of abuse and neglect proceedings, but Plaintiffs admit that the
Complaint is incorrect.   (ECF No. 116 at 2.)   Further, Gretchen was released to the custody of a
family member in December of 2019 and is no longer in the custody of the DHHR or the BJS.
(ECF No. 109–1 at 14.)   Plaintiffs acknowledge that Gretchen was released from DHHR custody
and is no longer in its care.   (ECF No. 116 at 9.)

On November 26, 2019, Defendants filed their first Motion to Dismiss.   (ECF No. 17.)
Plaintiffs timely responded, (ECF No. 29), and Defendants timely replied, (ECF No. 35).   Further,
on January 29, 2020, the Court granted Plaintiffs' Motion for Leave to file Sur–Reply in Response
to Defendants' Reply.   (ECF Nos. 51, 52.)   Next, on February 7, 2020, Defendants filed their
second Motion to Dismiss.   (ECF No. 55.)   Plaintiffs timely responded, (ECF No. 61), and
Defendants timely replied, (ECF No. 65).   On June 4, 2020, Defendants filed their third Motion
to Dismiss.   (ECF No. 88.)   Plaintiffs timely responded, (ECF No. 98), and Defendants timely
replied, (ECF No. 103).   On July 31, 2020, Defendants filed their fourth Motion to Dismiss.
(ECF No. 107.)   Plaintiffs timely responded, (ECF No. 116), and Defendants timely replied, (ECF
No. 129).   Finally, on November 19, 2020, Defendants filed their fifth Motion to Dismiss.   (ECF

No. 167.)   Plaintiffs timely responded, (ECF No. 172), and Defendants timely replied, (ECF No. 219).   As such, these motions are fully briefed and ripe for adjudication.

## II.    DISCUSSION

Plaintiffs' Class Action Complaint alleges the following five causes of action: (1) violations of substantive due process under the United States Constitution; (2) violations of the First, Ninth, and Fourteenth Amendments to the United States Constitution; (3) violations of the Adoption Assistance and Child Welfare Act of 1980; (4) violations of the Americans with Disabilities Act; and (5) violations of the Rehabilitation Act.   (ECF No. 1.)   Defendants argue this Court lacks subject matter jurisdiction over Plaintiffs' claims and requested relief because they seek federal review and ongoing oversight over West Virginia state court decisions.[2]   (ECF No. 18 at 12.)   Specifically, Defendants argue the principles of federalism and comity require this Court to abstain from oversight of West Virginia's child welfare system because its state courts have exclusive and continuous jurisdiction over such determinations.   (*Id.* at 11.)   Additionally, Defendants challenge all five counts of the Complaint for failure to state a claim and argue that the federal laws upon which Plaintiffs base their claims do not support the relief they seek.   (*Id.*)   Defendants also allege that named Plaintiffs Chris K., Calvin K., Carolina K., Garrett M., Gretchen C., and Serena S. are no longer in DHHR custody, are no longer in the putative class, and that their claims are now moot.

---

[2] Despite Defendants' arguments to the contrary, the Court's decision to abstain under the *Younger* abstention doctrine is not based on a finding that it lacks subject matter jurisdiction over this case.   *See Nivens v. Gilchrist*, 444 F.3d 237, 247 n.7 (4th Cir. 2006).   *Younger* abstention "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced."   *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 626 (1986).

First, the Court must address the threshold question of whether the six challenged Plaintiffs' claims present a justiciable claim or controversy.   Then, it will consider Defendants' arguments related to abstention.   Both questions must be decided before this Court can address the merits of Plaintiffs' claims.

### A.  Mootness

First, the Court will address Defendants' motions to dismiss named Plaintiffs Chris K., Calvin K., Carolina K., Garrett M., Gretchen C., and Serena S.   (ECF Nos. 55, 88, 107, 167.) Article III of the United States Constitution limits a federal courts' jurisdiction to cases and controversies.   U.S. Const. art. III, § 2, cl.1.   "The doctrine of mootness originates in Article III's 'case' or 'controversy' language."   *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)) (internal quotation marks omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come."   *Incumaa*, 507 F.3d at 286 (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).   Further, "even if a plaintiff has standing when he or she files a complaint, subsequent events can moot the claim."   *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013).   Thus, "[t]o remain a justiciable controversy, a suit must remain alive throughout the course of litigation, to the moment of final appellate disposition."   *Catawba Riverkeeper Found. v. N. Carolina Dep't of Transportation*, 843 F.3d 583, 588 (4th Cir. 2016) (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1088 (4th Cir. 1991) (internal quotation marks omitted). "A case that becomes moot at any point during the proceedings is 'no longer a "Case" or "Controversy" for purposes of Article III,' and is outside the jurisdiction of the federal courts."

*United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

Plaintiffs Chris K., Calvin K., Carolina K., and Serena S. were adopted during the pendency of this litigation.   (ECF No. 56 at 2; ECF No. 61 at 3.)   In addition, Plaintiff Garrett M. reached the age of eighteen during the pendency of this case and is also no longer in the custody of the DHHR.   (ECF No. 97 at 3; ECF No. 98 at 1.)   Finally, Gretchen C. completed her juvenile delinquency rehabilitation and is also no longer in the custody of the DHHR.   (ECF No. 109–1 at 14; ECF No. 116 at 9.)   There is no dispute that these six Plaintiffs are no longer in the custody of the DHHR or in the foster care system.

Plaintiffs' Complaint seeks injunctive and declaratory relief against Defendants to prevent future harm to the children in their custody due to an alleged deficient child welfare system. Because these Plaintiffs have all left Defendants' legal or physical custody, they can neither be further harmed by Defendants alleged illegal practices nor do they have a current claim for injunctive relief against Defendants arising from the operation of its child welfare system.   With regard to these six Plaintiffs, they now "lack a legally cognizable interest in the out-come" of this case and no live controversy exists between the parties.   *Incumaa*, 507 F.3d at 286.   Courts considering similar system wide challenges to a state's foster care system have held the same. *See, e.g.*, *31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003) (dismissing adopted plaintiffs' claims as moot because "they are no longer in the defendants' legal or physical custody and therefore cannot be further harmed by the defendants' alleged illegal practices"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 (10th Cir. 1999) (dismissing plaintiffs "because they have reached the age of majority or otherwise fallen outside of state custody and their claims are now

moot"); *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 510–11 (D. Neb. 2007) (dismissing plaintiffs' claims as moot because they aged out of the foster care system). Accordingly, Plaintiffs Chris K., Calvin K., Carolina K., Garrett M., Gretchen C., and Serena S. have no legally cognizable interest in the outcome of this litigation and their claims are moot.

### a. *Wrongs Capable of Repetition Yet Evading Review*

Plaintiffs argue that the claims brought by all six of these Plaintiffs fall within the "exception to the mootness doctrine for a controversy that is capable of repetition, yet evading review." [3] *Kingdomware Technologies, Inc. v. United States*, 136 S.Ct. 1969, 1976 (2016) (internal quotation marks omitted). This doctrine has been applied where "the apparent absence of a live dispute is merely a temporary abeyance of a harm that is capable of repetition, yet evading review." *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006) (internal quotations omitted). "A dispute qualifies for that exception only if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Sanchez–Gomez*, 138 S. Ct. at 1540 (internal quotations omitted). The second prong of this test requires "a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same

---

[3] Plaintiffs' briefing demonstrates a lack of understanding between the very different standards for the "capable of repetition yet evading review" and "voluntary cessation" mootness exceptions. Plaintiffs rely on a quote from *Am. Civil Liberties Union of Massachusetts v. Sebelius*, 821 F. Supp. 2d 474, 481 (D. Mass. 2012), a decision vacated by the First Circuit Court of Appeals, to argue that Defendants bear a heavy burden here. (ECF No. 61 at 5.) Plaintiffs further argue that it is "predictable" that children will be discharged from the foster care system over the course of this litigation because Defendants control this process and it is in Defendants' "best interest to pick off named plaintiffs with the goal of dismissing the entire case as moot." (*Id.* at 7.) In this regard, Plaintiffs' argument invokes the voluntary cessation exception. In these types of cases, a defendant voluntarily ceases the alleged improper behavior but is free to return to it at any time. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953). Here, Plaintiffs' insinuation that Defendants are removing children from their care simply to get this case dismissed is absurd and contrary to the undisputed facts. The Plaintiffs' adoption date, birth date, and completion date for rehabilitation were well known before this case was filed and are beyond the manipulation of Defendants. Accordingly, Plaintiffs' voluntary cessation exception arguments are easily rejected.

complaining party." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotations omitted). Supreme Court precedent holds that "the same controversy [is] sufficiently likely to recur when a party has a reasonable expectation that it 'will again be subjected to the alleged illegality,' or 'will be subject to the threat of prosecution' under the challenged law.'" *Id.* (internal citations omitted). Finally, this exception applies "only in exceptional situations." *Kingdomware*, 136 S.Ct. at 1976.

The parties dispute both prongs of this test. First, Plaintiffs argue "that foster care is intended to be a short–term, temporary stay for children." (ECF No. 61 at 7.) However, as Defendants argue, this argument is in direct conflict with Plaintiffs' continuing arguments that children in West Virginia's foster care system "languish" for years. (ECF No. 1 at 79, ¶ 328; ECF No. 29 at 1.) Further, the allegations contained within the Complaint itself contradict Plaintiffs' argument. For example, Plaintiffs allege that named Plaintiff Johnathan R. has spent the last seven years in institutional care and describes alleged failures in his case that go back to 2013. (ECF No. 1 at 16 ¶¶ 42, 45.) Next, Plaintiffs allege that Gretchen C. has been in the custody of the DHHR since April of 2015, which means she was in custody for over four years before she was placed in the custody of her grandmother. (*Id.* at 32, ¶ 121.) Plaintiffs also allege that named Plaintiff Dennis C. has been in DHHR custody for over five years, (ECF No. 1 at 35, ¶ 137), that named Plaintiffs Karter W. and Ace L. have both been in DHHR custody since 2016, (*Id.* at 41, 45 ¶ 164, 183), and that Garrett M. has been in custody since 2012, (*Id.* at 27, ¶ 102.) In fact, the majority of the named Plaintiffs have been in DHHR custody for significant periods of time which undermines Plaintiffs' argument that the children's time in DHHR custody is too short to allow this action to be fully litigated.

13

Next, Plaintiffs argue that Chris K., Calvin K., Carolina K., Serena S., and Gretchen C. all face "some likelihood of reentering the West Virginia foster care system in the future." (*See, e.g.*, ECF No. 61 at 6.)   Again, this argument is contradicted by the facts of this case.   Chris K., Calvin K., and Carolina K were legally adopted on December 10, 2019, Serena S. was legally adopted on September 3, 2020, and Gretchen C. was placed in the custody of her grandmother in December of 2019.   None of these Plaintiffs returned to the custody of the DHHR or the BJS, which does not support a conclusion that there is a "reasonable expectation" that these six Plaintiffs "will be subjected to the same action again."   Plaintiffs have presented no other evidence to allow this Court to conclude that there is "a reasonable expectation or a demonstrated probability" that these children will return to West Virginia's foster care system and be subject to harm.

Finally, Garrett M. has reached the age of majority and is not now and can never again be in the custody of the DHHR or involved in West Virginia's foster care system.   Garrett M. has neither a current nor future claim for relief against Defendants arising from its deficient child welfare system.   Thus, there is no "reasonable expectation" that he will again be subjected to the actions that lead to this Complaint.   Accordingly, Plaintiffs have failed to carry their burden and have not presented evidence to allow this Court to conclude that these six Plaintiffs' claims fit within the definition of claims that are capable of repetition, yet evading review.

### b.  *Class Action Context*

Next, Plaintiffs argue that these six Plaintiffs' claims are "inherently transitory" and that this Court should still retain jurisdiction over these claims and allow these Plaintiffs to assert claims on behalf of the putative class members.   (*See, e.g.*, ECF No. 172 at 8.)   Generally, in the class action context, a named plaintiff's claims must be dismissed if the claim becomes moot prior

14

to the certification of the class.   *See, e.g.*, *Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) ("Normally a class action would be moot if no named class representative with an unexpired claim remained at the time of class certification.").   However, the United States Supreme Court has carved out an exception to this mootness doctrine in particular types of class actions and has held that the mootness of a named plaintiff's claim after the class action has been properly certified does not render the action moot.   *See Sosna v. Iowa*, 419 U.S. 393 (1975).   The Supreme Court has made clear that it has "never adopted a flat rule" that certification of the class alone is sufficient to allow a court to determine the merits of a case once the claims of the named parties are moot. *Kremens v. Bartley*, 431 U.S. 119, 130 (1977).   This exception is not applicable here because this Court has not yet considered Plaintiffs' pending motion for class certification and no class currently exists.

Plaintiffs' argument here relies on a separate but related line of cases established in actions like here, where the claims of named plaintiffs are mooted prior to the certification.   In *Sosna*, the Supreme Court

> suggested that, where a named plaintiff's individual claim becomes moot before the district court has an opportunity to rule on the certification motion, and the issue would otherwise evade review, the certification might "relate back" to the filing of the complaint.   The Court has since held that the relation-back doctrine may apply in Rule 23 cases where it is "certain that other persons similarly situated" will continue to be subject to the challenged conduct and the claims raised are "'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'"

*Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75–76 (2013).   "The 'inherently transitory' rationale was developed to address circumstances in which the challenged conduct was effectively

unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." *Genesis Healthcare Corp.*, 569 U.S. at 76.

As discussed above in relation to Plaintiffs' "capable of repetition yet evading review" argument, Plaintiffs have failed to show that these children have been moved so quickly in and out of DHHR custody that their claims are effectively unreviewable.   In fact, the facts alleged in the Complaint are likewise contrary to Plaintiffs' arguments here.   Further, unlike in the majority of cases that apply this narrow exception, the dismissal of these six named Plaintiffs is not a dispositive determination and this action is not being dismissed because of this determination.   In fact, six other named Plaintiffs remain and Plaintiffs have not argued that dismissal of Chris K., Calvin K., Carolina K., Garrett M., Gretchen C., and Serena S. would moot any of their claims. Thus, this exception is inapplicable here.   Accordingly, Plaintiffs Chris K., Calvin K., Carolina K., Garrett M., Gretchen C., and Serena S. have no legally cognizable interest in the outcome of this litigation, and they are **DISMISSED** as parties to this action.

> *B.*  Younger *Abstention*

Next, Defendants argue that abstention is appropriate under *Younger v. Harris*, 401 U.S. 37 (1971).   The Supreme Court has stated that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."   *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).   Quite simply, "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred."   *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358 (1989).   There are, however, circumstances under which a federal court must withhold relief to prevent interference with state court proceedings.   *Id.* at 359.   The Supreme Court has cautioned that these exceptions are "carefully

defined" and "remain the exception, not the rule." *Id.* (internal quotations omitted) (citing *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236 (1984)).

In *Younger* and its progeny, the Supreme Court has reiterated "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). The reason for restraining federal courts from exercising jurisdiction in these types of actions is the notion of "comity," which includes

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Younger*, 401 U.S. at 44. "The [Younger abstention] doctrine recognizes that state courts are fully competent to decide issues of federal law and has as a corollary the idea that all state and federal claims should be presented to the state courts." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993).

Although *Younger* involved state criminal proceedings, the Supreme Court has expanded its application to "noncriminal judicial proceedings when important state interests are involved." *Middlesex*, 457 U.S. at 432. "Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the constitutional claims." *Id.* (internal quotations omitted) (quoting *Moore v. Sims*, 442 U.S. 415, 426 (1979)). In *Middlesex*, the Supreme Court articulated the following three–part test: "first, do [these proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional

challenges." *Id.* at 432; *see also Martin Marietta Corp. v. Maryland Comm'n on Human Relations*, 38 F.3d 1392, 1396 (4th Cir. 1994).

*Younger* abstention applies only to "three exceptional categories" of cases: (1) "parallel, pending state criminal proceeding[s]"; (2) "state civil proceedings that are akin to criminal prosecutions"; and (3) "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). These three categories of cases define the scope of *Younger*. *Id.* at 82.

The ongoing state court proceeding must be "the type of proceeding to which *Younger* applies." *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367 (1989). Plaintiffs argue that this case does not fit within any of these exceptional circumstances. (ECF No. 29 at 13.) However, this argument is easily dismissed. This case is perhaps best classified as a hybrid of both the second and third categories of cases. Not only does this action involve state-initiated abuse and neglect proceedings like in *Moore v. Sims*, 442 U.S. 415 (1979), but Plaintiffs are also asking this Court to issue an injunction "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state" abuse and neglect proceedings, like in *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974).

After a petition is filed, the state of West Virginia initiates the abuse and neglect proceeding and is a party throughout the case. W. Va. Code § 49–4–501 ("The prosecuting attorney shall render to the Department of Health and Human Resources . . . the legal services as the department may require."). The Supreme Court has held that the principles of *Younger* and *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) apply to civil proceedings where the state is a party. *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977). Further, in *Moore v. Sims*, the Texas

18

Department of Human Resources removed children from their parents, who were suspected of child abuse, and the state then initiated child abuse proceedings.   442 U.S. at 418.   The parents filed suit in federal court challenging the constitutionality of Texas' laws relating to the authority of the Department of Human Resources to protect children.   *Id.*   The Supreme Court held that *Younger* applied and stated that Texas "was a party to the state proceedings, and the temporary removal of a child in a child-abuse context is, like the public nuisance statute involved in *Huffman*, 'in aid of and closely related to criminal statutes.'"   *Id.* at 423.   The Court further held that "[t]he existence of these conditions, or the presence of such other vital concerns as enforcement of contempt proceedings or the vindication of 'important state policies such as safeguarding the fiscal integrity of [public assistance] programs' determines the applicability of *Younger-Huffman* principles as a bar to the institution of a later federal action."   *Id.*

In addition, in *O'Shea*, the proposed class of plaintiffs filed a lawsuit alleging that a state municipal court system intentionally discriminated against black citizens in various patterns and practices in its criminal justice system.   414 U.S. at 490.   The Supreme Court ultimately dismissed the case due to ripeness but suggested that the principles of *Younger* should be applied to prevent federal court review.   *Id.* at 498–499.   The plaintiffs sought to challenge criminal prosecutions "brought under seemingly valid state laws" and, in essence, sought an order that "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance" by the defendants."   *Id.* at 500.   The Court held that such a system seemed to be "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris*, *supra*, and related cases sought to prevent."   *Id.* Thus, the proposed relief contemplated in *O'Shea* appears quite similar to Plaintiffs' request here.

19

Further, other courts have similarly held that *Younger* applies to system–wide challenges to a state's foster care system.  *See, e.g.*, *31 Foster Children v. Bush*, 329 F.3d 1255, 1260 (11th Cir. 2003); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999).   Accordingly, *Younger* has been found to apply to "exceptional categories" of cases which present factual issues very similar to the case at hand.

> a.   First *Middlesex* Factor

This Court must first determine whether there is an ongoing state court proceeding and whether Plaintiffs' required relief would interfere with those proceedings.   Some courts have required an additional finding be made before the three–part test established in *Middlesex* can be applied. [4]   Specifically, these courts require a determination that the federal relief sought would interfere directly with state court litigation.   Here, Plaintiffs have not acknowledged that the remaining Plaintiffs, as children in the custody of West Virginia, are currently, or were, subject to abuse and neglect proceedings or other ongoing proceedings before West Virginia's Circuit Courts.   However, the factual allegations contained in the Complaint allow this Court to infer as much.[5]   Further, these ongoing state court abuse and neglect proceedings involving each of the

_____

[4] In *31 Foster Children*, the Eleventh Circuit joined its "sister circuits in explicitly stating that an essential part of the first *Middlesex* factor in *Younger* abstention analysis is whether the federal proceeding will interfere with an ongoing state court proceeding."   329 F.3d at 1276.   While the Fourth Circuit has not expressly held that the first *Middlesex* factor requires such interference with the state court proceeding, it seems to have implicitly assumed as much.   *See, e.g.*, *Beam v. Tatum*, 299 F. App'x 243, 246 (4th Cir. 2008) ("We consider first whether there is an ongoing state proceeding."); *Norfolk S. Ry. Co. v. McGraw*, 71 F. App'x 967, 970 (4th Cir. 2003) (same).   Further, the majority of circuits which have considered this issue have required the same.   *See 31 Foster Children*, 329 F.3d at 1276; *Green v. City of Tucson*, 255 F.3d 1086, 1097 (9th Cir. 2001) (en banc); *J.B.*, 186 F.3d at 1291; *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 843 (3d Cir. 1996).

[5] The Court has dismissed the six named Plaintiffs who are no longer in the custody of the DHHR.   (*See* Section III.A.)   Further, Plaintiffs do not argue that any of the remaining named children are not involved with West Virginia's state courts such that decisions about their welfare would not be subject to review by these courts.   For some named Plaintiffs, the Complaint alleges they were subject to abuse and neglect proceedings or that their parents had their parental rights terminated.   For the others, sufficient information is not provided, and Plaintiffs have failed to present any evidence or arguments to the contrary.

In addition, the Court has also dismissed Gretchen C., who appears to be the only named plaintiff who was

plaintiffs are ongoing proceedings for the purposes of the *Middlesex* analysis.   *See J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) (holding that continuing jurisdiction of juvenile court and six-month periodic review hearings constituted an ongoing state judicial proceeding); *see also 31 Foster Children v. Bush*, 329 F.3d 1255, 1275 (11th Cir. 2003).   Once an abuse and neglect petition is filed, that child remains subject to the continuing jurisdiction of the state circuit courts until they reach eighteen years of age or find a permanent placement.   W. Va. Code § 49–4–608.   Further, the state is required by law to hold mandatory, periodic review of these cases.   *Id.*   Thus, these proceedings constitute ongoing judicial proceedings for the purposes of *Younger*.

Next, this Court must determine whether the relief sought here would result in interference with ongoing state proceedings.   This inquiry depends on the way in which West Virginia's Circuit Courts oversee these cases.   According to the factual allegations contained in the Complaint, all the remaining named Plaintiffs were the subject of either abuse and neglect proceedings or their parents had their parental rights terminated, which would have put them under jurisdiction of West Virginia's Circuit Courts.   (ECF No. 1 at 15–48, ¶¶ 42–198.)   Thus, each of

---

in the custody of the DHHR as a result of a juvenile delinquency proceeding and not an abuse and neglect proceeding. Plaintiffs admit that the Complaint misstates that Gretchen C. entered foster care as a result of an abuse and neglect proceeding.   (ECF No. 116 at 2.)   In fact, Gretchen C. was never removed from her family as a result of an abuse and neglect proceeding but was in DHHR custody solely as a result of a juvenile delinquency petition.   (ECF No. 121 at 7.)   Further, the parties dispute whether juvenile justice youth who came into DHHR custody through juvenile delinquency or juvenile stats offenses should be considered within the proposed class definition.   (ECF No. 121.) The Court does not consider the merits of this issue.   However, Plaintiffs do not argue that any of the remaining named children are in the custody of the DHHR solely because of a juvenile delinquency or juvenile status offense proceeding.   For some named Plaintiffs, the Complaint alleges they were subject to juvenile delinquency proceedings but also alleges that they suffered some type of abuse.   Sufficient information is not provided to determine if these remaining children are in DHHR custody solely the result of a juvenile delinquency proceeding, and Plaintiffs have failed to present any evidence or arguments to the contrary.   Accordingly, the Court focuses its analysis here on West Virginia's abuse and neglect proceedings system.

the named Plaintiffs and every child adjudicated under the West Virginia Child Welfare Act are subject to the continuing jurisdiction of West Virginia's Circuit Courts. *See* W. Va. Code § 49–1–101.

West Virginia's Circuit Courts play an important role in child abuse and neglect proceedings from the outset of the child's case. After a petition is filed, the state court will issue an initial order either granting temporary custody of the child to the DHHR or not. *Id.* § 49–4–602. Depending on whether temporary custody is granted, the court is required to hold a preliminary hearing within a certain time period. *Id.* At the preliminary hearing, the court will review the petition and take evidence regarding the status of the child; determine whether the DHHR has made reasonable efforts to preserve the family; and determine whether imminent danger requires the removal of the child from the custody of the parents or whether emergency custody should continue. *Id.* § 49–4–105. Next, the court is required to hold an adjudicatory hearing within a certain time, depending on what was ordered at the preliminary hearing. *Id.* § 49–4–601. At the adjudicatory hearing, the court is required to determine whether the child has been abused and neglected. *Id.* § 49–4–602.

Next, a disposition hearing must occur within forty–five days of the entry of the adjudicatory order. W. Va. R. Child and Abuse and Neglect Proceedings 32(a). If the child is found to be abused and neglected, the DHHR is required to provide the court with a copy of the child's case plan which includes the following: a permanency plan which documents efforts to ensure that the child is returned home in the appropriate time or efforts to place the child for adoption or with a legal guardian and, if applicable, states why reunification is not possible and details the alternative permanent placement; a family case plan; a description of the type of home

22

or institution where the child will be placed, including a discussion of the appropriateness of that placement and how the agency will ensure that the child receives proper care and services and accommodations as required under the Americans with Disabilities Act; "[a] plan to facilitate the return of the child to his or her own home or the concurrent permanent placement of the child"; and a plan to address the needs of the child while in kinship or foster care, which must include a discussion of the appropriateness of the services that have already been provided for that child. W. Va. Code § 49–4–604(a)(1–2). The state court is required to make findings of fact and conclusions of law, which includes, among others, dismissing the petition; returning the child to his or her own home; referring the child and parent to a community agency for assistance; committing the child to the care of the DHHR, a private child welfare agency, or an appointed guardian; or terminating parental rights and permanently committing the child to the custody of the non-abusing parent, the DHHR, or a child welfare agency. *Id.* § 49–4–604(c)(1–6).

Finally, the state court will hold a permanency hearing where the court will determine the permanency plan and what efforts are being made to provide the child with a permanent home. *Id.* § 49–4–608. "The court has exclusive jurisdiction to determine the permanent placement of a child." W. Va. R. P. Child Abuse and Neglect Proceedings 36(e). The court also makes the determination as to whether the DHHR is required to make reasonable efforts to preserve the family. *Id.* § 49–4–608(a). Further, the court is required to have a permanency hearing every 12 months until permanency is achieved. *Id.* § 49–4–608(b). The DHHR is required to file "a progress report with the court detailing the efforts that have been made to place the child in a permanent home and copies of the child's case plan, including the permanency plan . . . ." *Id.* Under the statute, the purpose of these hearings is to "review the child's case, to determine whether

23

and under what conditions the child's commitment to the department shall continue, to determine what efforts are necessary to provide the child with a permanent home, and to determine if the department has made reasonable efforts to finalize the permanency plan." *Id.*

In addition, within thirty days of the original filing of the petition, the state court is required to convene a meeting of a multidisciplinary treatment team[6] ("MDT") and the MDT is required to submit written reports to the court and will meet with the court at least every three months until permanency is achieved and the child's case is dismissed.   W. Va. Code §§ 49–4–405, 602.   Once the court finds that a permanent placement has been achieved, the court may dismiss the case.   W. Va. R. P. Child Abuse and Neglect Proceedings 42(b).

West Virginia Circuit Courts are required to make additional determinations.   They are responsible for determining what services are needed to help children make the transition from foster care to adulthood and independent living.   *Id.* § 49–4–608(c).   Further, "[a] court may not order a child to be placed in an out of state facility unless the child is diagnosed with a health issue that no in-state facility or program serves, unless a placement out of state is in closer proximity to the child's family for the necessary care, or the services are able to be provided more timely." *Id.* § 49–4–608(d).   In addition, the DHHR is required to file a disclosure stating its determinations as to whether any relatives or family members are appropriate placement options for the child.   *Id.* § 49–4–601a(4).   This document must be filed with the court within forty–five days of the filing of the petition.   *Id.*

---

[6] The MDT is established by the prosecuting attorney of the county where the case is initiated and consists of the prosecuting attorney, a caseworker from the DHHR, a local law enforcement officer, a child advocacy center representative, a health care provider, a mental health professional, an educator, and a representative from a licensed domestic violence program.   W. Va. Code § 49–4–402(a)(1–8).

It is clear that West Virginia's state courts are heavily involved in abuse and neglect proceedings and are required to oversee and approve the majority of the determinations related to the child's care and placement.   A ruling favorable to Plaintiffs would interfere with and disrupt these ongoing state court proceedings.   Plaintiffs' request that this Court enjoin the executive Defendants from actions that West Virginia's Circuit Courts are currently responsible for overseeing and approving.   Specifically, Plaintiffs request oversight of needs assessments of foster children; case plans; placement decisions; and plans for reunification.   Further, Plaintiffs request that this Court ensure children receive services and treatments; ensure that foster care placements are safe or adequately monitored; oversee kinship placements; properly assess kinship placements; ensure children and families in kinship placements receive services; ensure that kinship placements receive permanency planning; and ensure that disabled children receive services.   (ECF No. 1 at 100–104, ¶¶ 405(a)(i)–(d)(iii)).   Plaintiffs further request that both this Court and a neutral monitor oversee the implementation of these reforms.   (*Id.* at 104, ¶ 406.) Thus, this Court would be tasked with ensuring that West Virginia's state courts comply with its mandate.   Such an order would essentially be taking decisions that are now in the hands of state courts and placing them under the supervision of a federal district court.   Issuing Plaintiffs the declaratory and injunctive relief they seek would undoubtedly interfere with state court proceedings.   There is a possibility that this Court and the state court could issue conflicting orders concerning which placement decision or which services were best for a child.   Such determinations are left to the state courts under West Virginia law, but this Court's order would reassign these responsibilities, likely leading to confusing and conflicting results.

Plaintiffs emphasize in their briefing that they are seeking relief from West Virginia's executive agencies and the DHHR and any order entered by this Court would be enforced against these Defendants.   (ECF No. 29 at 14.)   However, West Virginia law is clear that its state courts, not the DHHR, have the ultimate decision-making authority over whether to approve the child's case plan and to ensure that that plan is followed.   W. Va. Code § 49–4–608.   Plaintiffs ask this Court to permanently enjoin Defendants from a long list of practices that they argue violates their rights.   They further request that a neutral monitor be appointed to implement and oversee an order issued by this Court.   Removing discretion from West Virginia's state courts and implementing federal court review over these decisions is highly problematic.   It makes no difference that this case is directed at the state's executive agencies because the practical effects in enforcing an order reforming West Virginia's foster care system would undoubtedly impact the state's circuit courts.   Even though Plaintiffs have not framed their request as a direct review of state court judgments, that would be the result.   As the Supreme Court articulated in *O'Shea*,

> [t]he objection is to unwarranted anticipatory interference in the state . . . process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts; the object is to sustain "(t)he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."

*O'Shea*, 414 U.S. at 500 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)).   The relief Plaintiffs seek would interfere extensively with ongoing state court proceedings for each of the named Plaintiffs. [7]   Accordingly, the first *Middlesex* factor is satisfied.

---

[7] The majority of Plaintiffs arguments in opposition demonstrate a misunderstanding of the *Younger* abstention doctrine and its purpose as well as a misunderstanding of how abuse and neglect proceedings are conducted in the State of West Virginia.   Plaintiffs argue that "West Virginia circuit courts, like other state courts, review agency placement decisions" and "the state circuit courts do not identify placements or place children in specific foster care setting."   (ECF No. 52 at 3.)   However, this argument is contradicted expressly by Rule 36 of West Virginia's Rules of Procedure for Child Abuse and Neglect Proceedings.   W. Va. R. P. Child Abuse and Neglect Proceedings 36(e)

b.   Second *Middlesex* Factor

Next, the Court must determine if the ongoing state court proceedings implicate important state interests.   Plaintiffs do not dispute that the state has an important interest in the care, disposition, and welfare of the children in its custody.   While Plaintiffs do not address this factor in their arguments, they repeatedly emphasized the importance of West Virginia's role in protecting the children in its custody.   (ECF No. 1 at 2, ¶ 1.)   There can be little dispute that the protection of abused and neglected children is a vital and important state interest.   Accordingly, the second *Middlesex* factor is satisfied.

c.   Third *Middlesex* Factor

Finally, for abstention to be appropriate, Plaintiff must have an adequate opportunity to raise and litigate their constitutional claims in the state court proceedings.   *Middlesex*, 457 U.S. at 432.   "The question is whether that challenge can be raised in the pending state proceedings subject to conventional limits on justiciability."   *Moore v. Sims*, 442 U.S. at 425.   The plaintiff has the burden to show "that state procedural law barred presentation of their claims."   *Id.* at 432. Further, "when a litigant has not attempted to present his federal claims in related state–court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."   *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

In the present case, Plaintiffs did not give West Virginia's state courts an opportunity to consider their constitutional claims, and they cannot demonstrate that West Virginia's courts were

---

("The court has exclusive jurisdiction to determine the permanent placement of a child.").   Further, Plaintiffs' arguments ignore the fact that West Virginia's Circuit Courts are involved from the moment an abuse and neglect petition is filed and retain continuous jurisdiction over the case as it proceeds.

unavailable.   Child abuse and neglect proceedings are handled by West Virginia's Circuit Courts, which are trial courts of general jurisdiction.   *See* Syl. Pt. 2, *State ex rel. Rose L. v. Pancake*, 544 S.E.2d 403, 404 (W. Va. 2001) ("A circuit court has jurisdiction to entertain an abuse and neglect petition and to conduct proceedings in accordance therewith as provided by W. Va. Code § 49–6–1, et seq."); *see also State ex rel. Silver v. Wilkes*, 584 S.E.2d 548, 552 (W. Va. 2003) ("Circuit courts are courts of general jurisdiction and have power to determine all controversies that can possibly be made the subject of civil actions.").   Plaintiffs argue that the West Virginia Supreme Court of Appeals did not contemplate state circuit courts considering claims arising under federal law or the United States Constitution.   (ECF No. 52 at 8.)   This argument is completely baseless. The United States Supreme Court has been clear that "[m]inimal respect for the state processes . . . precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex*, 457 U.S. at 431.   As courts of general jurisdiction, West Virginia's Circuit Courts are capable of hearing federal claims.

The law is clear that Plaintiffs bear the burden here, and Plaintiffs have presented no "unambiguous authority to the contrary" to prove that West Virginia's Circuit Courts lack the jurisdiction or ability to adjudicate their federal statutory and constitutional claims during abuse and neglect proceedings.   In fact, this factor is what separates this case from other child welfare class actions where *Younger* abstention was denied.   *See, e.g.*, *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 158 (D. Mass. 2011); *M.D. v. Perry*, 799 F. Supp. 2d 712, 723 (S.D. Tex. 2011); *LaShawn A. by Moore v. Kelly*, 990 F.2d 1319, 1323 (D.C. Cir. 1993); *but see 31 Foster Children*, 329 F.3d at 1281; *J.B.*, 186 F.3d at 1292–93; *Carson P*, 240 F.R.D. at 532. Accordingly, the Court finds that Plaintiffs have failed to prove that West Virginia's Circuit Courts

prevent the presentation of these claims during the periodic review proceedings conducted as a part of these children's ongoing abuse and neglect proceedings.   The third and final prong of the *Younger* analysis is satisfied.

### d. *Exceptions to* Younger

The Supreme Court has established three exceptions to *Younger* abstention: (1) "'there is a showing of bad faith or harassment by state officials responsible for the prosecution'; (2) 'the state law to be applied in the criminal proceeding is flagrantly and patently violative of express constitutional prohibitions'; or (3) 'other extraordinary circumstances' exist that present a threat of immediate and irreparable injury." *Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006) (quoting *Kugler v. Helfant*, 421 U.S. 117, 124 (1975)).   The Supreme Court has recognized that a federal court may disregard *Younger*'s requirements only under these circumstances.   Plaintiffs have made no showing that would allow this Court to conclude that any of these exceptions should be applied here.   Accordingly, there is no basis to support the conclusion that *Younger* abstention is inappropriate, and all three *Middlesex* factors are satisfied.   This Court is barred from consideration of this case under *Younger* and its progeny.

### III.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' five Motions to Dismiss. (ECF Nos. 17, 55, 88, 107, 167.)   The following six named Plaintiffs are removed from this action: Serena S., Garrett M., Gretchen C., Chris K., Calvin K., and Carolina K.   Further, it is **ORDERED** that this civil action is **DISMISSED** and retired from the docket of this Court.   The Court **DIRECTS** the Clerk to remove this matter from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          July 28, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE