**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1868**

---

JONATHAN R., minor, by Next Friend, Sarah Dixon; ANASTASIA M., minor, by Next Friend, Cheryl Ord; SERENA S., minor, by Next Friend, Sarah Dixon; THEO S., minor, by Next Friend, L. Scott Briscoe; GARRETT M., minor, by Next Friend, L. Scott Briscoe; GRETCHEN C., minor, by Next Friend, Cathy L. Greiner; DENNIS R., minor, by Next Friend, Debbie Stone; CHRIS K., CALVIN K., and CAROLINA K., minors, by Next Friend, Katherine Huffman; KARTER W., minor, by Next Friend, L. Scott Briscoe; ACE L., minor, by Next Friend, Isabelle Santillion; and individually and on behalf of all others similarly situated,

        Plaintiffs - Appellants,

      v.

JIM JUSTICE, in his official capacity as the Governor of West Virginia; BILL CROUCH, in his official capacity as the Cabinet Secretary of the West Virginia Department of Health and Human Resources; JEREMIAH SAMPLES, in his official capacity as the Deputy Secretary of the Department of Health and Human Resources; LINDA WATTS, in her official capacity as the Commissioner of the Bureau for Children and Families; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,

        Defendants - Appellees.

--------------------------------

WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; NATIONAL ASSOCIATION OF COUNSEL FOR CHILDREN; CHILDREN'S ADVOCACY INSTITUTE; ADVOKIDS; YOUTH LAW CENTER; NATIONAL CENTER FOR YOUTH LAW; MOUNTAIN STATE JUSTICE; NATIONAL CENTER ON ADOPTION AND PERMANENCY; CHILD AND DISABILITY NON-GOVERNMENTAL ORGANIZATIONS,

        Amici Supporting Appellants.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Thomas E Johnston, Chief District Judge.  (3:19-cv-00710)

---

Argued:  March 9, 2022                              Decided:  July 20, 2022

---

Before HARRIS and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Affirmed in part, reversed in part, and remanded by published opinion.  Senior Judge Floyd wrote the opinion, in which Judge Harris joined.  Judge Rushing wrote a separate opinion dissenting in part and concurring in the judgment.

---

**ARGUED:**  Marcia Robinson Lowry, A BETTER CHILDHOOD, New York, New York, for Appellants.  Philip Peisch, BROWN & PEISCH PLLC, Washington, D.C., for Appellees.  **ON BRIEF:**  Richard W. Walters, J. Alexander Meade, SHAFFER & SHAFFER, PLLC, Charleston, West Virginia, for Appellants.  Steven R. Compton, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia; Caroline M. Brown, Julia M. Siegenberg, Kendra Doty, BROWN & PEISCH PLLC, Washington, D.C., for Appellees.  Tobias S. Loss-Eaton, Mark P. Guerrera, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Washington Lawyers' Committee for Civil Rights and Urban Affairs, National Association of Counsel for Children, Children's Advocacy Institute, Advokids, Youth Law Center, National Center for Youth Law, Mountain State Justice, and the National Center for Adoption and Permanency. Jonathan M. Smith, Kaitlin Banner, Marja Plater, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C., for Amicus Washington Lawyers' Committee for Civil Rights and Urban Affairs.  Amy C. Harfield, Children's Advocacy Institute, UNIVERSITY OF SAN DIEGO SCHOOL OF LAW, San Diego, California, for Amicus Children's Advocacy Institute.  Lydia C. Milnes, MOUNTAIN STATE JUSTICE, INC., Morgantown, West Virginia, for Amicus Mountain State Justice.  J. Michael Showalter, James D. Cromley, SCHIFF HARDIN LLP, Chicago, Illinois, for Amici Child and Disability Non-Governmental Organizations.

---

FLOYD, Senior Circuit Judge:

This case brought on behalf of thousands of West Virginia's foster children challenges the State's administration of child welfare services.  Plaintiffs describe an ineptly structured program, beleaguered city employees trying their best to provide necessities while plagued with unmanageable caseloads, staff shortages, and budgetary constraints, and the resultant tragedies for West Virginia's children relegated to entire childhoods in foster-care drift.  But this appeal is not about any of that.  Invoking *Younger v. Harris*, 401 U.S. 37 (1971), the court below abstained from hearing the case in deference to parallel state-court proceedings.  Because West Virginia courts retain jurisdiction over foster children until they leave state custody, the court reasoned, any federal intervention into that process would undermine our fundamental notions of comity and federalism and reflect negatively upon the state court's ability to enforce constitutional principles.

We reverse.  In this case, principles of federalism not only do not preclude federal intervention, they compel it.  Plaintiffs bring federal claims, and federal courts "are obliged to decide" them in all but "exceptional" circumstances.  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72, 73 (2013) (citation omitted).  And this case presents none of those circumstances.

But our decision is based on more than mere syllogism.  *Younger*'s narrow scope safeguards Plaintiffs' rights, bestowed on them by Congress in the Judiciary Act of March 3, 1875, to present their claims to a federal tribunal.  28 U.S.C. § 1331.  Plaintiffs allege that a federal class action is the most—if not the only—effective way to achieve the kind of systemic relief they seek.  And history builds out those allegations.  For years, West

Virginia's response to any foster-care orders entered as part of the individual state hearings seems to have been to shuffle its money and staff around until the orders run out, entrenching rather than excising structural failures. *See In re Carlita B.*, 408 S.E.2d 365, 375 (W. Va. 1991) (lamenting, as far back as 1991, the foster children "left to languish in a limbo-like state during a time most crucial to their human development"); *State v. Michael M.*, 504 S.E.2d 177, 186 (W. Va. 1998) (reiterating the court's "frustration over any unwarranted delays caused by the" State (emphasis omitted)); *In re Brandon H.S.*, 629 S.E.2d 783, 786, 789–90 (W. Va. 2006) (still deploring the State's inability to "solv[e] the staffing crisis"). Forcing Plaintiffs to once more litigate their claims piecemeal would get federalism exactly backwards.

I.

A.

West Virginia entrusts to its Department of Health and Human Resources (DHHR or the Department) the care of all children in the custody of the State. W. Va. Code Ann. § 49-4-113(a)–(b). Roughly 90% of those children come to the Department by way of traditional abuse-and-neglect proceedings following parental maltreatment. J.A. 210–11, 13. But 10% are adjudicated into its custody through juvenile delinquency and status-offense hearings, the state courts possessing authority to place children in the Department's care when they require a middle ground between in-home supervision and full-fledged imprisonment. *See* W. Va. Code Ann. §§ 49-4-706(a)(3), 49-4-708(a)(4).

But regardless of how a child becomes a ward of the Department, the State bears the same responsibility to "determine the safety of the child, the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care." *Id.* § 49-4-110(a); *see also id.* §§ 49-4-406(a), (b), (d)(2)(4), 49-4-712(a), 49-4-714(f).  That is, as far as the State is concerned, all children within the Department's guardianship are "foster children" and the Department must mete out appropriate care to them all.  *See* Resp. Br. 4 & n.1 (citing DHHR, *Foster Care Policy* (Aug. 2021), https://dhhr.wv.gov/bcf/policy/Documents/Foster%20Care%20Policy%20 August%202021%20%281%29.pdf).

But the buck does not stop with the Department; state circuit courts conduct "quarterly status reviews" to ensure the Department places children "in the least restrictive setting available" and generally acts in their "best interests."  W. Va. Code Ann. §§ 49-4-110(a), 49-4-404(a), 49-4-604(a)(2), 49-4-714(b).  Broadly speaking, the courts "examine the proposed case plan," "determine if the department has made reasonable efforts to finalize the permanency plan," approve out-of-state placements, and review "[t]he appropriateness of the current educational setting" and any "[s]ervices required to meet the child's needs."  *Id.* §§ 49-4-108, 49-4-408(b), 49-4-608(b), (d)–(e).

To sum up, the Department maintains responsibility for planning and delivering the care, the circuit courts for supervising it.

However effective this arrangement appears on paper, Plaintiffs assert the Department has made a mockery of it in practice.  Rather than take children away from

abuse and neglect, Plaintiffs charge, the Department only compounds it.  It houses children in inadequate and outright dangerous environments, deprives them of badly-needed social and mental-health services, and, when all else fails—which it often does in West Virginia—simply institutionalizes the children for years, segregating them from the outside world at the time socialization matters most.

Take just two of the named Plaintiffs.  Jonathan, fifteen at the time of filing, had suffered repeated physical, sexual, and emotional abuse at the hands of his biological parents.  When he became suicidal and aggressive, they voluntarily gave him up for adoption.  And though the Department was aware of the circumstances, it did nothing to vet their decision—or the adoptive parents who soon committed Jonathan to a psychiatric hospital.  When Jonathan returned from the hospital, so did the abuse, prompting several calls from mandatory school reporters.  Still, the Department did not intervene.  Only when Jonathan was locked away in the psychiatric hospital for the second time—now, on his adoptive parents' accusations that he had sexual contact with another child—did the Department step in.  But it made no effort to place Jonathan in a foster home, simply parking him at an out-of-state facility in Georgia.  After Georgia came Nashville and its mandatory treatment for adjudicated juvenile sex offenders, never mind that no one had investigated the adoptive parents' claims or that the State had never even *charged* Jonathan with a crime.  And after three years, the Department sloughed him off to yet another facility, for a total of seven years behind closed and locked institutional doors.  Finally, the Department delivered Jonathan to his biological grandmother.  But it offered no social or financial services or any other meaningful support that would aid in her care for the post-

6

traumatic-stress, attention-deficit, and reactive-attachment disorders Jonathan had developed along the way. *See* J.A. 90–93.

Anastasia, eleven when Plaintiffs filed the complaint, first entered foster care at four years of age. The Department placed her in a foster home with five other children but removed her shortly after upon allegations of abuse. Anastasia spent the next six months shuttled between seven different placements, only to be returned to her original foster mother—who promptly deposited her in a psychiatric hospital. After some months, Anastasia returned to her foster home, but at age ten was caught shoplifting with her foster sister. The Department immediately took custody of both girls, placed Anastasia in a succession of emergency shelters, and, when Anastasia sprayed Lysol on a staff member, handed her over to the police to be charged with assault. The result: three months at a juvenile detention center that Anastasia spent sleeping on a bare mattress on a cement floor among adolescents aged fifteen and older. Abruptly, the charges were then dropped, and Anastasia was shipped off to an out-of-state facility for children with psychiatric issues. She resides there still, even as the facility has made several less-than laudable appearances in the news, including when its admissions coordinator was charged with sexual assault of a suicidal, fourteen-year-old patient. Anastasia suffers from several psychological disorders. *See id.* at 93–95.

These stories are shocking and yet, according to Plaintiffs, shockingly common among West Virginia's foster children. The Department, of course, does not bear responsibility for it all. Plaintiffs observe West Virginia is the fourth poorest state in the Nation. *Id.* at 78. In 2017, its rate of child deaths related to abuse and neglect was more

than double the national average. *Id.* at 77. And since 2017, the State has had the highest rate of foster-care entries for youths between fourteen and seventeen years of age (1.4% as compared to the 0.3% national average). *Id.* at 78. But the crux of Plaintiffs' complaint is that the Department has failed to do anything meaningful to stave off this crisis. For years, it has been leaving almost a quarter of its positions unstaffed, has failed to recruit anywhere near enough foster-care families, and has not bothered to educate the families it had, turning instead to institutionalization to manage the case load. *Id.* at 77–79 (reporting that 71% of youth between ages twelve and seventeen have been institutionalized, with 327 children sent out of state). And while these problems undeniably trickle down to each child's individual case, Plaintiffs insist they can only be remedied through systematic, structural change. Plaintiffs accordingly bring this class action, seeking to represent the nearly 7,000 foster children in the Department's care.

For their one General Class, Plaintiffs seek, among others: increases in staffing so that caseloads do not exceed fifteen children per case worker, development of detailed plans for recruiting foster homes, and prompt submissions of individualized case plans to the appropriate state court. *See id.* at 174–77. Plaintiffs also propose three subclasses, to reflect foster populations they believe require more nuanced reform: a Kinship Subclass for children placed with relatives who lack resources and general know-how of raising children with developmental difficulties, an ADA Subclass for children with physical and mental disabilities, and an Aging-Out Subclass for children approaching adulthood and in need of special transition planning. *Id.* at 177–78. Plaintiffs also request a neutral monitor to oversee the Department's compliance with district-court orders. *Id.* at 179.

To be clear, Plaintiffs do not challenge any state statutes or any state-court judgments. They object only to Department practices that have allegedly resulted in severe delays, inadequate care, and outright abuse on grounds that they violate the Due Process Clause, the First Amendment "right to familial association," the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 670 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. §§ 705(20), 794. J.A. 165–74.

B.

Plaintiffs filed their complaint on September 30, 2019, and West Virginia moved to dismiss on November 26 of that same year. The State urged two procedural grounds: lack of subject-matter jurisdiction under *Rooker-Feldman*[1] and *Younger* abstention, both on the theory that Plaintiffs impermissibly "seek federal review and ongoing oversight over" West Virginia's courts' quarterly foster-care hearings. *Jonathan R. v. Justice*, No. 3:19-CV-00710, 2021 WL 3195020, at *5 (S.D. W. Va. July 28, 2021); J.A. 256. West Virginia also argued that, substantively, all five of Plaintiffs' counts failed to state a claim. *Jonathan R.*, 2021 WL 3195020, at *5. Soon after West Virginia filed its motion, COVID-19 arrived in the United States. By the time the district court picked the motion back up in July 2021, six of the named Plaintiffs had left foster care, and West Virginia had filed additional motions to dismiss their claims as moot.

---

[1] *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), prohibit federal district courts from sitting in actual or constructive appeal of state-court judgments. *See infra* Part IV.

The district court sided with West Virginia. Starting with mootness, the court found "no dispute that these six Plaintiffs are no longer in the [Department's] custody" and so concluded they "lack a legally cognizable interest in the outcome of this case." *Id.* at *5– 6 (cleaned up) (quoting *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007)). Plaintiffs asked the court to consider the capable-of-repetition-yet-evading-review exception, but on court's view, the marginal probability that the six Plaintiffs would reenter foster care was not enough to qualify the claims as such. *Id.* at *6–7. The court also rejected the special class-action exception whereby eventual class certification may "relate back" to the filing of the complaint. *Id.* at *8. That exception concerns only "inherently transitory" claims, the court reasoned, but "Plaintiffs have failed to show that these children have been moved so quickly in and out of [Department] custody that their claims are effectively unreviewable." *Id.* (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). The court thus dismissed the six Plaintiffs' claims as moot.

Because six other Plaintiffs remained, the court then turned to West Virginia's *Younger* contentions. It found this case to resemble *Moore v. Sims*, 442 U.S. 415 (1979), where the Supreme Court abstained from resolving a foster-care dispute over parental rights. *See id.* at *9. Like *Moore*, this case concerns "state civil proceedings that are akin to criminal prosecutions," the court explained. *Id.* (quoting *Sprint*, 571 U.S. at 78). And beyond the mere similarity in form, the district court found traditional justifications for abstention—risk of interfering with state-court decisions, substantial state interest, and adequate opportunity to present those same challenges in the state proceedings, *see Middlesex Cnty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982)—

10

compelled it to follow *Moore*'s course.  The court thus granted West Virginia's motion to dismiss, without reaching the State's arguments about *Rooker-Feldman* or failure to state a claim and without ruling on class certification.

Plaintiffs now appeal both rulings; the State defends the district court's judgment and once more presses *Rooker-Feldman* in alternative.  We think Plaintiffs have the better of the argument on all three grounds.  We reverse and remand so that the district court can consider West Virginia's substantive arguments for dismissal and, if appropriate, Plaintiffs' motion for class certification.

## II.

Like the district court, we begin with mootness.  The parties relegate this issue to the backburner, believing the case can go on so long as *some* named Plaintiffs continue to have a personal stake in the dispute.  But since the district court's ruling, two more named Plaintiffs have aged out of foster care.  And without them, no Plaintiff can represent either the Kinship or the Aging Out Subclass.  So if we affirm the district court's reasoning, Rule 23(a) will preclude certification of those Subclasses.  *See E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (explaining that a named plaintiff must belong to the class); Fed. R. Civ. P. 23(c)(5) (explaining that the subclasses "are each treated as a class" and must meet the same certification requirements).  True, the Plaintiffs' dismissal would not necessarily end the suit—their counsel could supplement the complaint—but it would needlessly slow the resolution of their essential and urgent claims, perhaps several times over.  So we think it more prudent to resolve mootness up front.  Because "the

relevant jurisdictional facts are not in dispute," we consider the issue de novo. *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017).

Mootness doctrine is grounded in Article III's "case-or-controversy limitation on federal judicial authority," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000), which requires a cognizable interest in the outcome of the action to bring suit. But its demands extend past the filing of the complaint, insisting on "an actual controversy . . . at all stages of review." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). Still, the doctrine is "flexible," recognizing several settled exceptions. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980). Plaintiffs invoke two of them: the general "capable of repetition yet evading review" and the class-action specific "relation back."

Plaintiffs cannot succeed on the first, for it applies only when "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (cleaned up) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990)). Plaintiffs posit there is about a 7.5% chance one of the adopted children will return to state custody. Reply Br. 25 n.10. But even if accurate, 7.5% simply does not convey a sense of "reasonable expectation." *Spencer*, 523 U.S. at 17. Not to mention that the now-adult Plaintiffs can never reenter foster care again. The district court appropriately declined to apply this first exception.

It was wrong, however, to reject the second. Where a named plaintiff's individual claim becomes moot before the district court has an opportunity to certify the class, the certification may "relate back" to the filing of the complaint if *other* class members "will

12

continue to be subject to the challenged conduct and the claims raised are . . . inherently transitory." *Genesis*, 569 U.S. at 76 (cleaned up) (citation omitted).

The State objects Plaintiffs' claims are not so transitory: Plaintiffs themselves complain that children languish in foster care for years. But that misapprehends the exception. As the Court explained in *Gerstein v. Pugh*, what matters most is that the lifespan of state guardianship "cannot be ascertained at the outset," that "[i]t is by no means certain that any given individual, named as plaintiff, would be in . . . custody long enough for a district judge to certify the class." 420 U.S. 103, 110 n.11 (1975). Circuit courts, too, find "the essence of the exception" in the "uncertainty about whether a claim will remain alive." *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010) (finding Indiana prisoners eligible for conditional release fairly within the exception); *see also Unan v. Lyon*, 853 F.3d 279, 287 (6th Cir. 2017) (Medicaid recipients); *Thorpe v. D.C.*, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (nursing-home residents). And courts find the exception particularly fitting when *defendants* create "a significant possibility that any single named plaintiff would be [dismissed] prior to certification." *Olson*, 594 F.3d at 582 (quoting *Zurak v. Regan*, 550 F.2d 86, 92 (2d Cir. 1977)); *see also Unan*, 853 U.S. at 287. As well as when the court may "safely assume that [counsel] has other clients with a continuing live interest in the case." *Gerstein*, 420 U.S. at 110 n.11.

All of these principles apply with full force here. Foster-care placements are exceedingly unpredictable. Even if *some* children will spend a long-enough period in the system, requiring Plaintiffs to predict *which* child will asks too much. And as in *Gerstein*, "the constant existence of a class of persons suffering the deprivation is certain" on the

facts alleged. *Id.* Finally, as with the prisoners in *Olson*, "[t]he duration of" Plaintiffs' claims remains largely "at the discretion of the" State. 594 F.3d at 583. Just like Indiana was able to move its prisoners to a different facility, West Virginia can push through adoption and family reunification. But unlike prison transfers (presumably to better-equipped facilities), unsuitable adoptions or premature reunification with parents unprepared to take on the responsibility can devastate entire childhoods. We decline to create such perverse incentives for the States.

The State leans heavily on *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), and *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999), as holding similar foster-care claims moot. But *31 Foster Children* never considered relation back. 329 F.3d at 1263. And *J.B.* declined to certify the class. 186 F.3d at 1290. Nor does this case involve a dilatory plaintiff, which might dictate a different outcome. *E.g.*, *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 874 (7th Cir. 2012). We find nothing abnormal in waiting several months to move for class certification—especially in light of the pandemic. *Cf. Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1366 n.3 (11th Cir. 2021) (noting that "between 2000 and 2018, the median time from the filing of the initial complaint to the class certification decision" in certain complex class actions spanned "two-and-a-half years"); Thomas E. Willging et al., *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71 N.Y.U. L. Rev. 74, 103 (1996) (reporting that in 75% of class actions surveyed, "the time from the filing of the complaint to the filing of a motion to certify ranged from more than 6.5 to more than 16.3 months").

14

We hold Plaintiffs' claims fit comfortably within *Gerstein*'s inherently transitory exception. If, on remand, the district court decides to certify the class, the certification will "relate back to the filing of the complaint," preserving Plaintiffs' class claims. *Genesis*, 569 U.S. at 76 (cleaned up) (citation omitted).[2]

## III.

The parties' main disagreement centers on abstention. *Younger*, the pathmaking case here, required federal courts to stay their hand when criminal prosecution was pending in state court. 401 U.S. at 41. In keeping with "the basic doctrine of equity jurisprudence," *Younger* reasoned federal injunctions improper "when the moving party has an adequate

---

[2] Our dissenting colleague suggests we have improperly employed the "inherently transitory" exception because it applies only where "*no* plaintiff possesse[s] a personal stake in the suit long enough for litigation to run its course." *See infra* p. 44 (emphasis added) (quoting *Genesis*, 569 U.S. at 76). While that is certainly one circumstance where the exception applies, it is not the only one. As we explain, *Gerstein* allowed relation back where it was "by no means certain that any given individual, named as plaintiff," would suffer a deprivation "long enough for a district judge to certify the class." 420 U.S. at 110 n.11. *Genesis*, for its part, reaffirms *Gerstein* and itself notes the exception may be appropriate where a deprivation "*likely* would end prior to the resolution" of plaintiffs' claims, so long as "it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct." 569 U.S. at 76 (emphasis added) (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)). True, *Genesis* rejected the exception in the end, but it did so only because "respondent's complaint" in that case "requested statutory damages" and not "injunctive relief"—a claim that "cannot evade review." *Id.* at 77. We accordingly read *Genesis* to continue to apply *Gerstein*'s "inherently transitory" exception as it has always been understood, allowing relation back whenever the "nature of the challenged conduct" creates a significant probability that "a named plaintiff's individual claim [will] become[ ] moot before the district court has an opportunity to rule on the certification motion," *Genesis*, 569 U.S. at 75–76—even where it "cannot be ascertained at the outset *which* individual plaintiff would need to drop out, *Gerstein*, 420 U.S. at 110 n.11. The mere fact that *some* named plaintiffs remain three years into this litigation, then, does not defeat the exception.

remedy at law and will not suffer irreparable injury." *Id.* at 43–44.  But "an even more vital consideration" prompting abstention was "the notion of 'comity,' that is, a proper respect for state functions" and a corresponding recognition that our Nation "will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44.  In the years following *Younger*, the Court has extended the doctrine to certain civil proceedings where federal interference is "likely to be every bit as great as" in criminal ones.  *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).  At the same time, the Court stayed resolute that "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter."  *Sprint*, 571 U.S. at 72.  "Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds."  *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (*NOPSI*).  And federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."  *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).

West Virginia and the district court both view this case as falling on the abstention side of the scale because state circuit courts "retain[ ] exclusive jurisdiction over the setting in which the child is placed and over any subsequent requests for modification to that placement" through the individual periodic hearings.  Resp. Br. 25 (cleaned up) (citations omitted).  Any federal relief, they alert, would interfere with those hearings and, worse, would demand near-constant supervision of state courts.

Reviewing de novo, *see VonRosenberg v. Lawrence*, 781 F.3d 731, 734 (4th Cir. 2015), we cannot agree.[3]  Whether we look to their form or their function, the quarterly state-court hearings are simply not "of the sort entitled to *Younger* treatment."  *Sprint*, 571 U.S. at 79 (cleaned up) (citation omitted).  They do not fit any historical precedent applying the doctrine.  And abstaining here would forward none of the comity interests our federalist system holds dear.  But more than that, we see no reason to dismiss the case en masse before the district court has even had the opportunity to sketch out potential contours of relief.  If Plaintiffs succeed on the merits, the court can draw careful lines so as not to interfere with individual state-court decisions.  But for now, we reverse.

## A.

In *Younger*'s formative years, the Court entertained a variety of arguments about when federal courts should abstain, probing the bounds of the doctrine and the wisdom of discarding the jurisdiction Congress prescribed.  It considered the type of state proceeding and the magnitude of state interest and sifted through functional arguments like whether plaintiffs had a genuine opportunity to raise the same claims before the state court—all

---

[3] Both parties suggest we review the district court's decision for abuse of discretion.  But Plaintiffs do not challenge the court's exercise of discretion, they argue this case does not "satisf[y] the basic requirements of abstention."  *E.g.*, *VonRosenberg*, 781 F.3d at 734. That is to say, Plaintiffs question whether the district court had authority *to* abstain—a legal inquiry courts always conduct "de novo."  *Cedar Shake & Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 622 (9th Cir. 1993); *see also Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (explaining that the court's "review of whether [*Younger* conditions] have been met is de novo"); *see generally Sprint*, 571 U.S. 584 (applying *Younger* without deference to the courts below).

with an eye toward understanding precisely when a federal disposition would "unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44.

Cases like *Huffman*, *Juidice*, and *Middlesex*, exemplify this early era. In *Huffman*, the Court debated whether to extend *Younger* past the criminal context to civil matters "in aid of and closely related to criminal statutes" such as a civil enforcement proceeding to abate the showing of obscene movies. 420 U.S. at 604. The Court's majority found abstention appropriate because federal injunctions in such quasi-criminal cases would disrupt "the very interests which underlie [state] criminal laws." *Id.* at 605. Building on those deliberations, *Juidice v. Vail* then applied *Younger*'s principles to federal challenges of state contempt orders because the contempt process is how the State "vindicates the regular operation of its judicial system"—another critical state interest. 430 U.S. 327, 335–36 (1977). In *Middlesex*, too, the Court found the State retained an "extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses" and, perhaps even more importantly, that the federal plaintiff could easily have "raise[d] his federal constitutional challenge" "in the state disciplinary proceedings" but chose not to. 457 U.S. at 434–35. Fundamental "principles of comity and federalism" thus called out for abstention. *Id.* at 436; *see also Moore*, 442 U.S. at 423; *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10–16 (1987) (all working through similar considerations).

But by 2013, the lay of the land had been established. Having surveyed dozens of cases, the Court could now map out *Younger*'s heartland: "criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders uniquely in

furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (cleaned up) (citations omitted). Unanimously, the Court held those three categories "define *Younger*'s scope," for capping abstention to those "exceptional circumstances" appropriately harmonized the comity interest *Younger* originally espoused with the federal courts' "obligation" to adjudicate federal questions. *Id.* at 77–78 (citation omitted).[4]

*Sprint* thus recast the earlier cases. Rather than establish anew in each case whether federal proceedings threaten important state interests or may interfere with state proceedings or whether litigants could have easily raised their federal claims in those state proceedings—the so-called *Middlesex* factors—*Sprint* directs courts to a rule of thumb: if the case falls into one of the three settled categories, courts should go on to determine if federal involvement will in fact put comity at risk, but if the case does not, courts need go no further, they can properly entertain their federal-question jurisdiction without worrying about stepping on state toes. *See id.* at 81 (describing the early *Younger* jurisprudence as providing "*additional* factors" courts consider); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018) (announcing, after *Sprint*, that *Younger* "counsels federal-court abstention when there is a pending state proceeding of a certain type" and assessing whether "South Dakota's temporary custody proceedings are civil enforcement proceedings to which *Younger* principles apply" (citation omitted)).

---

[4] *Sprint* itself concerned a lawsuit over a local telecommunications carrier's authority to charge for calls made via the Internet under the 1996 Telecommunications Act. *See* 571 U.S. at 73–74. Holding up the suit against the categories it had just identified, the Court found it did not fit them and reversed the lower courts' decision to abstain. *Id.* at 79–81.

Applying this heuristic here, we conclude the quarterly state hearings do not require the district court to stand aside. West Virginia concedes the hearings are not criminal trials, but argues they are close enough so that we can shelve them alongside other civil enforcement proceedings. *Sprint* has characterized civil enforcement proceedings as cases "brought by the State in its sovereign capacity" following an "investigation" and upon "the filing of a formal complaint or charges." 571 U.S. at 79–80 (citations omitted). And West Virginia suggests that describes this case because children do not enter foster care unless courts find their parents abusive or neglectful or find the children themselves delinquent— either way, a process that requires investigation and a formal complaint by the State. As proof, the State points to *Moore*, which declined to hear a constitutional challenge to several Texas Family Code provisions undergirding the state court's decision to strip parents of custody. *See* 442 U.S. at 418–19.

We easily reject this comparison as to the children who have suffered abuse and neglect. *Moore* concerned the other side of the foster-care process: parental rights. No surprise, then, that the Court equated the *initial* child-removal proceeding with the public-nuisance adjudication in *Huffman. Id.* at 423; *see also Sprint*, 571 U.S. at 79 (explaining that "decisions applying *Younger* to instances of civil enforcement have generally concerned state proceedings" "initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act"). By contrast, the *ongoing* individual hearings here serve to protect the children who would be plaintiffs in federal court. That is why they proceed in a "conciliatory" manner, engaging, in addition to State representatives, "parents, relatives, foster parents, shelter care facility personnel and

others." *Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1034 (D. Ariz. 2015) (discussing analogous foster-care hearings); *see* W. Va. Code Ann. § 49-4-110 (mandating participation of "the multidisciplinary treatment team"). It would turn decades of Supreme-Court jurisprudence—and logic—on its head to put these foster children in the shoes of the abusive parents in *Moore*, 442 U.S. at 423, the obscene-theater director in *Huffman*, 420 U.S. at 604–05, or the asset-concealing fraudsters in *Trainor*, 431 U.S. at 444.

We also have our doubts that *Moore* applies to claims involving the roughly 10% of children who arrive to state custody through the delinquency and status-offender proceedings, but both parties acknowledge the issue is not properly before us: The district court declined to resolve it because it lacked "[s]ufficient information" to determine if any named Plaintiffs were in those 10%, which is to say, the court could not determine if this constitutes a live issue in the case. *Jonathan R.*, 2021 WL 3195020, at *10 n.5. We leave that factfinding to the district court on remand.[5] We note, however, that West Virginia treats all foster children the same, whether they end up in foster care "as a result of a juvenile proceeding or as a result of a child abuse and neglect proceeding." W. Va. Code Ann. § 49-4-110; *see also id.* § 49-4-103 (no child may "be deemed a criminal by reason of the adjudication [under this chapter], nor may the adjudication be deemed a conviction"). So the operative "pending" state court proceedings likely do not encompass the initial (settled) orders adjudicating children into state custody. *See Tinsley*, 156 F. Supp. 3d at

---

[5] All the more so because this question closely intertwines with class certification and may resolve itself if the district court concludes no named Plaintiff can adequately represent children who enter the system as part of delinquency proceedings and Plaintiffs choose to go ahead with the Class as is rather than amend their complaint.

1033–34.  And in any event, the exercise of federal jurisdiction here would not threaten any of our comity obligations.  *See infra* Part III.B.

West Virginia alternatively proffers the third category, which *Sprint* defined as orders "uniquely in furtherance of the state courts' ability to perform their judicial functions."  571 U.S. at 78 (citation omitted).  But it still misses the mark.  As discussed, the Court first introduced this category in *Juidice*, declining to review a state contempt order so as not to intervene with a process that "lies at the core of the administration of a State's judicial system" and ensures the courts' "orders and judgments are not rendered nugatory."  430 U.S. at 335, 336 n.12.  Neither *Sprint* nor *Juidice* defined this category further, and the Court has invoked it just one other time, in *Pennzoil*, 481 U.S. at 12–14, to reject a federal challenge to the constitutionality of Texas's appeal-bond provisions. *Pennzoil*, the Court explained, was like *Juidice* in that it "involve[d] challenges to the processes by which the State compels compliance with the judgments of its courts."  *Id.* at 13–14.  And enjoining that process would not only "interfere with the execution of state judgments, but . . . do so on grounds that challenge the very process by which those judgments were obtained."  *Id.* at 14.

The foster-care periodic hearings, of course, are nothing of the sort.  The state court's usual rulings during these hearings involve approving foster-care plans, ordering payments for medical or mental-health services, affirming out-of-state transfers, and generally ensuring the children's placements continue to be in their best interest.  *See* W. Va. Code Ann. §§ 49-4-108, 49-4-110, 49-4-404.  Nothing about that implicates "the administration" of West Virginia's judiciary.  *Juidice*, 430 U.S. at 335.  To be sure, West

Virginia's courts have the authority to hold the Department in contempt when it fails to abide those rulings. But this lawsuit does not challenge that authority—it does not challenge any state-court order at all. It asks instead to enjoin *the Department's* actions.[6] And settled jurisprudence teaches *Younger* does not "require[ ] abstention in deference to a state judicial proceeding reviewing legislative or executive action." *NOPSI*, 491 U.S. at 368; *accord Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 70 (1st Cir. 2005) (holding abstention improper where the state and federal lawsuits challenged "the Secretary of Health's failure to implement a [payment system], as federal law requires").

Determined, West Virginia insists the "90-day status hearings further 'the state courts' ability to perform their judicial function' of overseeing compliance with their initial orders in the abuse-and-neglect case"—that is, the original dispositions regarding children's placements. Resp. Br. 33–34. Note the general tenor of this argument. West Virginia points to no specific pending contempt orders this suit would undermine; it argues only that federal jurisdiction here would undermine the state courts' "ability" to issue them. But if that sufficed to cram state-court proceedings into *Younger*'s third category, we would

---

[6] Plaintiffs' proposed relief includes requests to "[r]equire DHHR [to] ensure" that children are "placed in the least-restrictive, most-family like settings possible" or that children belonging to the ADA Subclass "receive foster care services in the most integrated setting appropriate to the child's needs." J.A. 177–78. We take Plaintiffs at their word, as requesting the district court to direct such relief at the Department only. The Department, for example, may need to increase the number of less-restrictive placements available or train existing caregivers to provide care for children with disabilities, as the district court sees fit. But such relief would not impact the determinations of state circuit courts with respect to any particular children, except to the extent that the state court may have more family-like placements to choose from if the Department changes its policies. *See* W. Va. Code Ann. § 49-4-404 ("*the court* shall review the proposed service plan to determine if implementation of the plan is in the child's best interests" (emphasis added)).

be hard pressed to find an order that would *not* do.  Certainly, the same rationale would apply to any partial summary judgment.  Or even a mine-run discovery dispute.  A party resisting federal litigation would always be able to claim that future state orders *might* be necessary to "oversee[ ] compliance" with initial ones and that any parallel federal litigation *might* inhibit state authority to do so.  Fortunately, we do not run our judicial system on maybes and what-ifs.  We presume court orders will be obeyed.  And only in the rare cases they are not—where a State's power to ensure "compliance with the judgments of its courts," *Pennzoil*, 481 U.S. at 13–14, or "vindicate[ ] the regular operation of its judicial system," *Juidice*, 430 U.S. at 335, is in jeopardy—do we abstain.  That explains why, in *Younger*'s entire history, the Court has invoked this category just twice.

At day's end, siding with West Virginia, at least when it comes to the 90% of children who enter foster care through the abuse-and-neglect process, would mean expanding the bounds of either the civil-enforcement or the judicial-process categories— exactly what *Sprint* said we may not do.  The district court was wrong to abstain.

## B.

West Virginia falls back on five out-of-circuit cases that have abstained from foster-care challenges, urging us to avoid a split.  But those concerns are misplaced.  *Oglala*, 904 F.3d at 606, fit neatly into the quasi-criminal category:  It was brought by parents whose children were taken into state custody and challenged in federal court the very decision to take them away.  Quite reasonably, the Eighth Circuit saw "no meaningful distinction between the custody proceedings in *Moore*" and the case before it.  *Id.* at 610.  And the

other cases, *31 Foster Child.*, 329 F.3d at 1274–82, *J.B.*, 186 F.3d at 1291–92, *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1268–69 (10th Cir. 2002), and *Ashley W. v. Holcomb*, 34 F.4th 588, 591–94 (7th Cir. 2022), relied on the *Middlesex* factors alone, without determining whether the state periodic hearings were the type of proceedings *Younger* has traditionally applied to.[7]

After *Sprint*, we believe it is enough that the quarterly foster-care hearings lie outside the three "exceptional categories" the Court identified—*Younger* abstention is "the exception, not the rule."  571 U.S. at 79, 82 (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)).  But we would decline to abstain just the same even if we looked beyond that categorical analysis.  Federal orders going to the Department simply do not interfere with how *the courts* conduct individual periodic hearings (*Middlesex* factor I). And on the flip side, the individual periodic hearings do not afford an adequate opportunity for Plaintiffs to press their systemic claims (factor III).  So abstention is not warranted even assuming West Virginia has a particular state interest in the administration of its foster system (factor II)—an assumption that may not be altogether warranted in light of the substantial federal foster-care funds West Virginia accepts.

---

[7] *31 Foster Child.*, *J.B.*, and *Joseph A.* were all decided before *Sprint*, understandably delving straight into the *Middlesex* factors.  *Ashley*, decided this very term, summarily concluded *Moore* applies to all "state-initiated child-welfare litigation."  34 F.4th at 591– 92 (citing *Brunken v. Lance*, 807 F.2d 1325 (7th Cir. 1986); *Milchtein v. Chisholm*, 880 F.3d 895 (7th Cir. 2018)).  We are not persuaded, for the reasons already discussed, and the Seventh Circuit evinces no authority for such a sweeping proposition.  Quite the contrary, both cases *Ashley* cites follow directly from *Moore*, with parents seeking to overturn a State's adverse custody determination in federal court.  *See Brunken*, 807 F.2d at 1330 (stressing "the context of the instant case—a hearing to determine the custody of a child"); *Milchtein*, 880 F.3d at 899 (abstaining from "the sort of arguments the Milchteins seek to present").

1.

*Younger*'s main concern has always been whether federal jurisdiction will "unduly interfere" with pending state proceedings. *Younger*, 401 U.S. at 44. Most plaintiffs run afoul of *Younger* by asking federal courts to void the basis for an unfavorable state decision—usually, a statute that allowed the suit against them in the state court. *Huffman* provides a prototypical example. Recall that the case concerned a state judgment closing an adult theater for playing obscene movies in violation of an Ohio nuisance statute. 420 U.S. at 596–98. "Rather than appealing that judgment within the Ohio court system," the theater owner filed suit in the district court alleging the nuisance statute "constitute[d] an overly broad prior restraint on First Amendment rights." *Id.* at 598–99. The district court agreed, permanently enjoining a "portion of the state court's judgment." *Id.* at 599. Plaintiffs took a similar tack in *Trainor*, where a state court allowed the Illinois Department of Public Aid to freeze their assets upon allegations of fraudulent concealment. 431 U.S. at 435–36. They "never filed an answer either to the [writ of] attachment or to the underlying complaint," instead asking a district court to declare unconstitutional the statute supplying the basis for the writ. *Id.* at 437. The district court "ordered the clerk of the court and the Sheriff" to return the property. *Id.* at 439; *see also Moore*, 442 U.S. at 422–23 (faulting the district court for granting "a temporary restraining order addressed to the Montgomery County Juvenile Court" as well as "a preliminary injunction enjoining the Department and other defendants from filing or prosecuting any state suit").

It is easy to see how federal adjudication in such cases directly interferes with the pending state proceeding. In the best case, the State confronts "a choice of engaging in

duplicative litigation, thereby risking a temporary federal injunction, or of interrupting its enforcement proceedings pending decision of the federal court at some unknown time in the future." *Trainor*, 431 U.S. at 445. In the worst, federal courts abruptly and "permanently" end "legitimate activities of the States." *Huffman*, 420 U.S. at 599, 601 (citation omitted).

West Virginia's foster-care proceedings differ in both form and function. Plaintiffs do not suggest they were harmed in any way *by* the state-court hearings. They acknowledge the state courts are doing everything in their power to create a safe foster-care environment and instead find fault in the Department's failure to give the courts enough to work with: enough in-state institutional placements, enough foster homes, enough case workers to file the plans on time. None of this is to ignore the role West Virginia's courts play in the administration of foster care—the State has set up a "coordinated" child welfare system for a reason, *see* W. Va. Code Ann. § 49-1-401(a)(1). But it is to recognize the Department and the courts "*both*" have their own statutory obligations in administering care. *State ex rel. S.C. v. Chafin*, 444 S.E.2d 62, 70 (W. Va. 1994). While the courts must approve the case plan, the Department must "develop" it. W. Va. Code Ann. § 49-4-408(a). While the courts must finally accept medical and social services, the Department must "establish" them. *Id.* §§ 49-2-101; 49-4-408(c). While the courts must confirm placements, the Department must "visit," "inspect," and "certif[y]" each foster home and actually "place[ ]" children for adoption. *Id.* §§ 49-2-106; 49-2-107, 49-4-608(b). And so on.

Unlike the plaintiffs in *Huffman*, or *Trainor*, or *Moore*, then, Plaintiffs here do not seek to pause—much less to end—any state proceedings. They ask the district court to

27

bring the inner workings of the executive branch in compliance with federal law. So the state quarterly hearings will proceed as they always have, albeit with more placement and services options if Plaintiffs succeed. Nor will this lawsuit "stop the state court from proceeding independently against" the Department if it, too, finds the Department's practices deficient. *Rio Grande*, 397 F.3d at 71. It is true, of course, that the district court might find a violation where the state court would not. But "[n]ormal res judicata effects of federal actions" do not "trigger *Younger*." *Id.* (discussing *NOPSI*, 491 U.S. at 373). Otherwise, the *Younger* doctrine would overrun the usual rule that "the pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Sprint*, 571 U.S. at 73 (cleaned up) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). But nothing here risks the kind of interference *Younger* seeks to forestall: an interruption, an injunction, an end to the pending state proceedings.

Even so, West Virginia protests, the federal relief Plaintiffs seek—particularly the appointment of the monitor—will occasion "an ongoing federal audit of" the state periodic hearings, à la *O'Shea v. Littleton*, 414 U.S. 488 (1974). *See* Resp. Br. 49. But *O'Shea* does not resemble this case in any way that matters. There, plaintiffs complained that various judicial and prosecutorial officials colluded to curtail their civil rights, and the only two defendants before the Supreme Court were a magistrate and a county circuit judge. 414 U.S. at 500. So right from the start we observe that any relief in *O'Shea* would necessarily run against the courts. But even setting that difference aside, what troubled the Court most in *O'Shea* was "how compliance might be enforced if the beneficiaries of the

28

injunction were to charge that it had been disobeyed." *Id.* at 501. Plaintiffs complained that officials set bond in criminal cases without regard to the facts of individual cases and as punishment and that state courts imposed higher sentences on African American citizens. *Id.* at 492. And the only way the Court believed it could change those practices was by "controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials"—which would require both an "interruption of state proceedings" and "an ongoing federal audit of" them. *Id.* at 500. None of that is true here. The district court can offer meaningful relief solely by monitoring executive action.

This case instead resembles *Gerstein*, which challenged Florida's practice of detaining defendants before trial on a prosecutor's information alone, without judicial determination of probable cause. 420 U.S. at 105–06. As the Court explained, any injunction in that case would not be "addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves." *Moore* 442 U.S. at 431 (discussing *Gerstein*, 420 U.S. at 108 n.9). And so it is here.

But above all, halting the litigation on this record would be premature. Should the district court determine that certain specific relief would overstep *Younger*'s bounds, it can always reject it to secure our comity interests. *See O'Shea*, 414 U.S. at 510 (Douglas, J., dissenting) (proposing courts "cross the bridge of remedies only when the precise contours of the problem have been established after a trial"); *Ashley*, 34 F.4th at 592 (instructing lower courts to "figure out which, if any, of [plaintiffs' foster-care] requests should be submitted to the [state] court under *Younger* and which remain for federal adjudication"); *Joseph A.*, 275 F.3d at 1274 (declining to categorically abstain and remanding "so that the

29

district court may determine whether any of the [consent decree's] provisions may be enforced in light of *Younger*").  West Virginia's approach, by contrast, would deny all foster children all resort to federal courts.  Unlike criminal defendants, whose claims are litigated and done with, and who can then ask for postconviction review in federal courts, *see Huffman*, 420 U.S. at 606–07, foster children are always within the jurisdiction of state courts—until they are not, because they have left foster care and their cases have become moot.  We cannot endorse such a limitless theory of abstention.  *See Sprint*, 571 U.S. at 72 (warning that federal courts may not abstain merely "because a pending state-court proceeding involves the same subject matter").

## 2.

Another practical question courts often ask is whether plaintiffs' federal claims "could have been raised in the pending state proceedings," for denying state courts an opportunity to adjudicate federal questions is simply another way of questioning the courts' competency to resolve them.  *Moore*, 442 U.S. at 425, 430.  West Virginia takes that question literally, requiring abstention anytime "state procedures" allow plaintiffs to bring the claim and allow state courts to enter appropriate relief.  Resp. Br. 42.  And because "West Virginia's circuit courts have general jurisdiction" as well as "authority to issue injunctive relief," the State concludes Plaintiffs had an "adequate opportunity" to raise their federal claims before state courts.  *Id.* (quoting *Jonathan R.*, 2021 WL 3195020, at *13).

We think that reads *Moore* right out of its context.  As explained, the federal plaintiffs there wished a singular outcome: to avert an unfavorable custody ruling in the

Texas courts. And yet, instead of answering Texas's charge in the state court, they filed their own suit in federal court, asking to halt the state proceedings as violative of the Constitution. 442 U.S. at 422. So when the Supreme Court observed the plaintiffs faced "no procedural barriers" in raising their constitutional arguments in the pending state proceedings, it was speaking of arguments that naturally presented themselves in the course of that litigation. *Id.* at 430. The state court easily could have decided the statute's validity first and, if the statute passed muster, gone on to apply it in the plaintiffs' case—all in the same proceeding. *Id.* at 431. What is more, no injunction was "necessary to obtain the release of the children, for they had already been placed in the custody of their parents," meaning the Texas court had adequate time to mull over the constitutional issues. *Id.*

But here, the individual periodic hearings zero in on the immediate circumstances in front of the court: is the foster home safe? Have the medical expenses been paid? Is the child being taught the skills that will enable her to successfully enter adulthood? All of these the state courts must resolve "promptly," acting within the existing parameters of the foster-care system. *Carlita B.*, 408 S.E.2d at 374. After all, when no foster placements are available, the courts *must* approve a residential facility; they cannot pause to ponder the constitutionality of their absence. By definition, then, Plaintiffs would have to raise their constitutional and statutory claims outside the "normal course of the pending judicial proceeding," much like the pretrial detainees in *Gerstein*, where the Court declined to abstain. *See Moore*, 442 U.S. at 431 (distinguishing *Gerstein*, 420 U.S. at 108 n.9); *accord Huffman*, 420 U.S. at 602–03 ("the relevant principles of equity, comity, and federalism

have little force in the absence of a pending state proceeding" (cleaned up) (citation omitted)).[8]

West Virginia argues for a more expansive interpretation of "pending" state-court proceedings. Though each individual hearing focuses on the minutia of the moment, the State reasons, the hearings are continuing and repeating. That iterative nature makes it so the state courts can enact large systemic changes in between the individual hearings and then react to them in later ones. That may be true, but even a broad take on "pending" can only carry West Virginia so far. Even *Moore* cautioned that abstention may not be appropriate where confining plaintiffs to state courts would in practice "den[y them] an opportunity to be heard that was theirs in theory." 442 U.S. at 431.

Forcing Plaintiffs to litigate their claims in the state foster-care proceedings would amount to just such an empty promise, for at least four reasons. But before we go through those reasons, we must be clear on one thing: Plaintiffs assert wide-reaching, intertwined, and "systemic" failures that cannot be remedied through piecemeal orders. *See* J.A. 79–

---

[8] The same can be said about *Pennzoil*, the case the district court invoked for the proposition that "a federal court should assume that state procedures will afford an adequate remedy" "when a litigant has not attempted to present his federal claims in related state-court proceedings." *Jonathan R.*, 2021 WL 3195020, at *13 (quoting *Pennzoil*, 481 U.S. at 15). *Pennzoil* was simply responding to the facts before it. The plaintiff there "argue[d]" that "no Texas court could have heard [its] constitutional claims within the limited time available" for it to post the bond pending appeal. 481 U.S. at 15. But the state court plainly "could suspend the bond requirement," allowing the plaintiff to challenge the bond's constitutionality. *Id.* at 16 n.15 (citing Tex. R. Civ. P. 364). In light of that statutory authority, the Court reasoned, the plaintiff would have to have demonstrated it attempted to "secure the relief sought" in the Texas courts and was denied. *Id.* at 14. Because the plaintiff had not, he could not prove state-court inadequacy. *Id.* at 16 (concluding the plaintiff's submission "that the Texas courts were incapable of hearing its constitutional claims [was] plainly insufficient"). But nothing in *Pennzoil* precludes plaintiffs from demonstrating a state forum's inadequacy in other ways, as Plaintiffs have done here.

81, 165.  Reforming foster care case-by-case would be like patching up holes in a sinking ship by tearing off the floorboards.  So when we assess the adequacy of the state proceedings, we must measure them against those plausible allegations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint need only "raise a right to relief above the speculative level"); *Sofer v. State of N.C. Hertford Police Dep't*, 935 F.2d 1287, at *2 (4th Cir. 1991) (the "basis for *Younger* abstention" must be "clear from the face of the complaint") (unpublished table decision).

Having set that ground rule, the first-order problem presents itself: an individual foster child is unlikely to have standing to ask for systemic changes not tied directly to her own maltreatment.  *See, e.g.*, *Brandon H.S.*, 629 S.E.2d at 788 (wrestling with the Department's argument that "extensive staffing directives [were] unrelated to" the case immediately before the court).

And on the flip side of standing, there is mootness.  As we saw in this very case, West Virginia stands ready and waiting to request dismissal of any plaintiff who leaves foster care.  But how is systemic reform to be achieved under such circumstances?  Without a class action to fall back on, individual cases will be mooted out long before a state court issues any orders, let alone before the Department institutes appropriate changes to comply with them.  West Virginia suggests litigation could still proceed if *the court* wishes to hold the Department in contempt.  But that says nothing about the opportunity "*plaintiffs*" have (or do not) to raise their claims.  *Moore*, 442 U.S. at 430 (emphasis added).

And if individual foster children can somehow master these standing and mootness hurdles, it is far from clear they could mount sufficient evidence to secure systemic relief.

The periodic hearings proceed under seal, *see* W. Va. R. of Proc. for Child Abuse and Neglect Proc. 6(a), and acting alone, a foster child can hardly appreciate the universe of interrelated deficiencies that may plague the system.  Suing as a class, however, Plaintiffs can share their insider knowledge and identify the most productive structural changes to pursue.

Beyond these procedural difficulties lie the more mundane, monetary concerns.  Shoring up sufficient evidence to demonstrate the need for systemic relief requires a lot of capital—capital most foster children neither have nor can hope to amass through litigation that seeks only declaratory and injunctive relief.  As the Court has many times expressed, where such "individual suits" are not "economically feasible," "aggrieved persons may be without any effective redress unless they may employ the class-action device" to "allocate[e the] costs among all members of the class."  *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 n.9, 339 (1980).

All of this means that Plaintiffs' only real choice is between a federal and a state class (or some other collective) action, not between a federal class action and the individual periodic hearings.  But the *Younger* doctrine aspires to minimize interference with pending state proceedings, not to select the most appropriate forum for plaintiffs' claims.  Plaintiffs' right "to choose a Federal court where there is a choice cannot be properly denied."  *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 40 (1909) (citations omitted); *accord LaShawn A. by Moore v. Kelly*, 990 F.2d 1319, 1322–23 (D.C. Cir. 1993) (questioning "the need or wisdom of extending *Younger* to all constitutional claims that *might* be adjudicated in state as well as federal courts" (citation omitted)).  And indeed, the choice of federal tribunal is

not irrational here—the federal government arguably has just as much at stake as West Virginia, having invested significant federal sums into the State's foster-care system. *See* 42 U.S.C. §§ 671, 672 (setting out detailed eligibility criteria states must abide to receive federal funds, like personnel standards and time frames for case-plan submissions); *M.D. v. Perry*, 799 F. Supp. 2d 712, 725 (S.D. Tex. 2011) (reasoning that a State's "voluntary submission to such federal oversight greatly lessens the force of any complaints regarding unwarranted federal intrusion on state sovereignty").[9]

### 3.

Our conclusions about interference and adequacy rest on more than theory and supposition; the cases West Virginia itself relies on bear them out. At the outset, we note West Virginia can only muster seven state decisions from 1991 to the present that have purportedly ordered the Department to change its ways. That sparsity alone signals the difficulty of bringing structural challenges during the periodic individual hearings—and a concomitant lack of interference with state proceedings when federal courts take up the task. But a closer look at each of those cases reveals that none, in fact, comes close to offering the kind of systemic relief Plaintiffs ask for here.

Three of West Virginia's cases do not contemplate revision of any Department policies or practices at all, adjudicating only the case-specific arguments the parties brought

---

[9] And because Plaintiffs challenge only executive action, their suit also does not undercut the State's authority to interpret its own laws. *See Moore*, 442 U.S. at 429–30 (citing "the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes" as a leading reason for abstention (citation omitted)); *Pennzoil*, 481 U.S. at 11 (same); *Trainor*, 431 U.S. at 445 (same).

before the court. *See State ex rel. Aaron M. v. W. Va. Dep't of Health & Hum. Res.*, 571 S.E.2d 142, 144 (W. Va. 2001) (directing the Department to pay for a particular child's mental-health treatment); *In re Jonathan G.*, 482 S.E.2d 893, 908 (W. Va. 1996) (replacing the Department—in just the one case—with an outside entity because the Department refused to obey the "court's repeated directive to develop and follow a case plan for the purpose of reunifying" the family), *modified on other grounds by State ex rel. C.H. v. Faircloth*, 815 S.E.2d 540 (W. Va. 2018); *State v. Michael M.*, 504 S.E.2d 177, 185 (W. Va. 1998) (finding "an adoptive home," rather than foster care, to constitute "the preferred permanent out-of-home placement"). If anything, these cases only highlight the state courts' reluctance to order deep structural changes within the Department. *Jonathan G.* gave the court a perfect opening to hold the Department in contempt and order reform, yet it did not follow through; it simply replaced the Department with an outside organization. And *Michael M.*, though it determined the children's "best interests" required adoption, stopped short of actually ordering the Department to do anything to ensure that outcome. *See* 504 S.E.2d at 186 (directing the Department only to "include within its report to this Court a report on the status of all children legally free for adoption").

As for *Carlita B.*, the only systemic problem the court addressed in that case was the "long procedural delays" in the state courts themselves. 408 S.E.2d at 375. Correspondingly, the court limited its relief to instructing "the Administrative Director of this Court . . . to work with the clerks of the circuit court to develop systems to monitor the status and progress of child neglect and abuse cases in the courts." *Id.* at 376. At no point did *Carlita B.* contemplate *Department* changes, not even after observing that the plaintiff-

caseworker relationship deteriorated to the point of physical confrontation and that the State failed to meet its "obligation to consider changing assigned workers." *Id.* at 379. Instead, "recogniz[ing] that the steady erosion of child protective services resources has created an enormous unmet need," the court expressed its "hope the Legislature and [the Department] will address this crisis." *Id.* at 379–80.

That leaves *Brandon H.S.* and *S.C.*, the only two cases that took a stab at correcting the executive's shortcomings. *Brandon H.S.* ordered the Department to fill its staffing vacancies. 629 S.E.2d at 786–87. And *S.C.* directed it to develop uniform procedures for preparing case plans and reporting those plans to the circuit courts. 444 S.E.2d at 74. But even these cases do not support West Virginia in the way it claims, for they both limit relief to the circumstances immediately before the court. *Brandon H.S.* justified its staffing orders on grounds that "the unfilled positions played a part in the delayed assignment of *Brandon's* case to a Child Protective Services worker." 629 S.E.2d at 789 (emphasis added). And *S.C.* directed a committee to "develop a uniform reporting format" "*[a]s a result* of the circumstances of S.C.'s case." 444 S.E.2d at 74 (emphasis added). That the courts saw the need to so limit the remedies only underscores the standing difficulties discussed above. More important still, neither plaintiff asked for Department reform; it was the court that deemed it necessary after observing the problem repeat itself over several cases—which validates our concerns (again discussed above) over how *individual* child plaintiffs are to collect sufficient evidence to justify wide-ranging relief.[10]

---

[10] West Virginia offers one other, sealed case, *In re E.B.*, Aug 28 and Sept. 4, 2019 Show Cause Hearing Order, No. CC-02-2019-JA-53 (W. Va. Cir. Ct., Berkeley Cnty. Sept. 6,

In short, though West Virginia correctly observes that state circuit courts have the authority to order injunctive relief against the Department, not one case it cites has acted upon that authority to order the kind of systemic changes Plaintiffs seek here.

Unsurprisingly, against that backdrop, "the overwhelming majority of cases have rejected *Younger* abstention in similar lawsuits challenging foster care systems, both at the circuit and district court level." *Perry*, 799 F. Supp. 2d at 723 (collecting cases); *see, e.g.*, *Kelly*, 990 F.2d at 1320–21; *L.H. v. Jamieson*, 643 F.2d 1351, 1352 (9th Cir. 1981); *Tinsley*, 156 F. Supp. 3d at 1041; *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *5–7 (E.D. Mich. Apr. 17, 2007); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003); *People United for Child., Inc. v. City of New York*, 108 F. Supp. 2d 275, 291 (S.D.N.Y. 2000); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 514 (D.N.J. 2000); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 688–89 (S.D.N.Y. 1996).

The animating principles behind all of these cases are rather straightforward: individual periodic hearings cannot provide "an appropriate forum for [a] multi-faceted class-action challenge" because they are "intended merely to reassess periodically the disposition of the child." *Kelly*, 990 F.2d at 1323. And federal reform of systemic deficiencies in the executive branch simply does not asperse the "competency" of state courts to conduct periodic individual foster-care hearings or to independently correct any structural problems state courts themselves identify. *L.H.*, 643 F.2d at 1354. And if any particular request of Plaintiffs' threatens to do so, the district court can always decline to

---

2019), but it fails to persuade us still. Like *Brandon H.S.* and *S.C.*, the court in *E.B.* offered narrow injunctive relieve tied to the factual circumstances of the individual case.

order it. *Joseph A.*, 275 F.3d at 1274. Because all of these principles find sure footing in

our facts, as well, we reverse.[11]

IV.

All that remains is West Virginia's argument under the *Rooker-Feldman* doctrine,

which strips federal courts of subject-matter jurisdiction when "state-court losers

complain[ ] of injuries caused by state-court judgments" in district courts. *Exxon Mobil

Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Because the district court

believed it must abstain under *Younger*, it never reached *Rooker-Feldman*, and the "general

rule" would dictate we "not consider an issue not passed upon below." *Singleton v. Wulff*,

428 U.S. 106, 120 (1976). But even the most generous analysis of the State's contentions

cannot be squared with this Court or the Supreme Court's precedent, an analysis we would

in any event conduct de novo, *see Hulsey v. Cisa*, 947 F.3d 246, 249 (4th Cir. 2020). So

to avoid further procedural delays, and to settle any lingering questions over what kind of

claims pose a *Rooker-Feldman* issue, we think it desirable to resolve this issue today.

West Virginia posits Plaintiffs' claims here are " 'inextricably intertwined' with an

existing state court decision" and that *Rooker-Feldman* bars federal jurisdiction in such

circumstances "as long as the claim could have been brought in the state court action."

---

[11] As discussed, we leave it to the district court to decide the claims of children who enter
the foster system as part of the delinquency and status-offence proceedings. But even if
their claims can be made to fit one of the *Sprint* categories, West Virginia will still need to
persuade the district court that federal relief would effect a greater intrusion on those
children's periodic hearings and that those children have a better opportunity to present
systemic grievances during their individual hearings.

Resp. Br. 51 (first citing *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482–84 n.16 (1983); then citing *Guess v. Bd. of Med. Exam'rs of N.C.*, 967 F.2d 998, 1002–03 (4th Cir. 1992)).  The rub for West Virginia is that *Exxon*, decided in 2005, "significantly altered this circuit's interpretation of the *Rooker-Feldman* doctrine."  *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 713 (4th Cir. 2006).  We no longer ask whether a federal plaintiff "is attempting to litigate claims he either litigated or could have litigated before the state court."  *Id.* at 718.  And we take "*Feldman*'s 'inextricably intertwined' language" to "merely state[ ] a conclusion," "not create an additional legal test."  *Id.* at 719.  That is, "if the state-court loser seeks redress in the federal district court for the injury caused by the state-court decision, his federal claim is, by definition, 'inextricably intertwined' with the state-court decision."  *Id.*  But where the federal complaint presents an "independent claim," even "one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."  *Exxon*, 544 U.S. at 293 (cleaned up) (citation omitted).  This axiom, which our Court has reiterated many times over since *Exxon*, entirely forecloses West Virginia's legal theory.  *See Thana v. Bd. of License Comm'rs for Charles Cnty.*, 827 F.3d 314, 319–22 (4th Cir. 2016) (observing that "since *Exxon*, we have never, in a published opinion, held that a district court lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine," an observation that remains true today).

Indeed, we have contemplated that *Exxon* goes even further, "restrict[ing] the doctrine to cases whose procedural postures mirrored those in the *Rooker* and *Feldman* cases themselves," where "the losing party in state court filed suit in federal court after the

state proceedings ended . . . seeking review and rejection of that judgment." *Id.* at 320 (quoting *Exxon*, 544 U.S. at 291). Plaintiffs' complaint plainly does not fit that mold. "First and foremost," Plaintiffs do not complain "of an injury caused by a state-court judgment" but by the Department. *Hulsey*, 947 F.3d at 250; *see supra* p. 22 n.5. But "state administrative and executive actions are not covered by the doctrine," *Thana*, 827 F.3d at 320—even where " 'ratified, acquiesced in, or left unpunished by' a state-court decision," *Hulsey*, 947 F.3d at 250 (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). Nor is this "a case in which 'the process for appealing a state court judgment to the Supreme Court . . . has been sidetracked by an action filed in district court *specifically* to review that state court judgment.' " *Id.* at 251 (quoting *Thana*, 827 F.3d at 320). Finally, Plaintiffs' suit does not "invite district court review and rejection of a state-court judgment." *Id.* (cleaned up) (quoting *Exxon*, 544 U.S. at 284). As already articulated in the *Younger* context above, even if Plaintiffs succeed in reforming Department practices, they would at most affect future state-court decisions. *But see Manning v. Caldwell for Roanoke*, 930 F.3d 264, 270 n.4 (4th Cir. 2019) (*Rooker-Feldman* had no force where "Plaintiffs d[id] not challenge their specific *interdiction orders*" but "only the Virginia scheme's *application* to them in the *future*"); *Jones v. McBride*, No. 21-6218, 2022 WL 670873, at *1 (4th Cir. Mar. 7, 2022) ("the *Rooker-Feldman* doctrine applies to state court decisions, not ongoing state court proceedings" (footnote omitted) (citing *Hulsey*, 947 F.3d at 250)).

Tellingly, West Virginia does not engage with any of that binding precedent, aside from a superficial citation to *Hulsey*. But as *Exxon* reminds us, the *Rooker-Feldman*

doctrine "merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction" that "does not authorize district courts to exercise appellate jurisdiction over state-court judgments." 544 U.S. at 292 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002)). And federal courts should not employ it to "supersed[e] the ordinary application of preclusion law." *Id.* at 283. Nor, for that matter, should litigants be permitted to turn it into a backdoor to comity and abstention principles. West Virginia in essence argues Plaintiffs should have brought their constitutional objections before the state court. But we have already considered and rejected these same contentions under *Younger*. And we staunchly decline to (re)consider them here, dressed in *Rooker-Feldman* clothing.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED.*

RUSHING, Circuit Judge, dissenting in part, and concurring in the judgment:

I agree with the majority's conclusion in Part III–A that, because this case does not "fall[] into one of the three settled categories" specified in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), "[t]he district court was wrong to abstain." *Supra*, at 19, 24. In *Sprint*, the Supreme Court clarified that *Younger* abstention extends to "three exceptional categories" of cases, "but no further." 571 U.S. at 79, 82. Those categories are: (1) "ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings," and (3) "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 78 (internal quotation marks and ellipsis omitted). If a parallel state proceeding belongs to one of these categories, the court should go on to consider the so-called *Middlesex* factors in evaluating whether to abstain. *See id.* at 81. But if—as here—the state proceeding "does not fall within any of the three exceptional categories" described in *Sprint*, it "therefore does not trigger *Younger* abstention." *Id.* at 79.

Having determined that the state proceedings here do not belong to any of *Sprint*'s three categories, we "need go no further," as the majority aptly puts it. *Supra*, at 19. Yet the majority does go further—fifteen pages further. *See supra*, at 25–39. Across this span, the majority theorizes how it would resolve this case "even if" *Sprint* were not the law. *Supra*, at 25. I do not join this extended dictum.

Nor do I think it "prudent" to resolve mootness at this juncture. *Supra*, at 11. "The parties," as the majority points out, "relegate[d] this issue to the backburner." *Supra*, at 11. Indeed, at oral argument, Plaintiffs stated that, if this Court reversed on *Younger*

43

grounds, they were "not sure" the mootness issue mattered because they can supplement their complaint on remand.  Oral Arg. at 14:31–15:03.  The majority finds the parties' proposed resolution inefficient.  I would follow the parties' lead.  Indeed, because Plaintiffs can supplement the complaint on remand to avoid mootness, any discussion of *exceptions* to the mootness doctrine is unnecessary.

Nevertheless, considering the issue, the majority is right that the "capable of repetition yet evading review" exception is inapplicable because Plaintiffs have not shown "'a reasonable expectation'" that they will be "'subject to the same action again.'"  *Supra*, at 12 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).  It errs, however, in determining that the "relation back" exception applies because Plaintiffs' claims are "inherently transitory."  *Supra*, at 12–13 (internal quotation marks omitted).

The Supreme Court has clarified that the "'inherently transitory' rationale was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course."  *Genesis Healthcare Corp. v. Symcyzk*, 569 U.S. 66, 76 (2013). Indeed, the doctrine is available only when the claims raised are "'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'"  *Id.* (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)).  Given that these proceedings have been pending for nearly three years and multiple Plaintiffs remain, I cannot say that no plaintiff will possess a personal stake in the litigation long enough for the district court to rule on class certification.  And the complaint's allegations regarding the length of time Plaintiffs

44

have resided in the foster system undermine any suggestion that the challenged conduct is fleeting.  Consequently, this case falls outside the bounds of the "relation back" exception to mootness.  I respectfully dissent from the majority's opinion concluding otherwise.