**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JONATHAN R., et al.,

       Plaintiffs,

v.            CIVIL ACTION NO.   3:19-cv-00710

JIM JUSTICE, et al.,

       Defendants.

**ORDER**

   Pending before the Court is Defendants Jim Justice, Bill Crouch, Jeremiah Samples, Linda Watts, and the West Virginia Department of Health and Human Resources' (collectively "Defendants") Motion to Dismiss Plaintiffs' Complaint.  (ECF No. 17.)   For the reasons more fully explained below, the Motion is **GRANTED** in part and **DENIED** in part.

*I.  BACKGROUND*

   Plaintiffs are children in the West Virginia foster care system.  (ECF No. 1 at 2, ¶ 2.) They allege this system, as run by Defendants, is structurally inept, in violation of their constitutional and statutory rights.  (*Id.* at 6, ¶ 10.)   Seeking system-wide reform, Plaintiffs brought this putative class action on behalf of all children who are, or will be, placed in West Virginia foster care.  (*See id.*)

   Plaintiffs' Complaint describes a legion of shortcomings in the foster care system.   For instance, Plaintiffs allege that the West Virginia Department of Health and Human Resources

1

("DHHR") "lacks a sufficient number of foster care placements." (*Id.* at 4, ¶ 9(a).) This, in turn, leads to DHHR "segregate[ing] children in institutions," placing some in temporary shelters for indefinite stints of time, leaving others in "known abusive or neglectful homes," or placing them in poorly vetted and overcrowded foster homes. (*Id.* at 4, ¶ 9(b).) Among this slate of improper placements, Plaintiffs allege DHHR has a go-to: institutions. (*Id.* at 4, ¶ 9(c).) Nearly three-quarters of the children in DHHR custody between the ages of 12 and 17 are institutionalized. (*Id.* at 3, ¶7.) Plaintiffs allege these institutions run "rampant [with] sexual, physical, and emotional abuse," (*Id.* at 69, ¶ 281), and are more akin to "youth corrections facilit[ies]" than foster placements. (*See e.g.*, *id.* at 33, ¶ 127.) Worse yet, Plaintiffs allege many of these institutions are outside West Virginia, which all but isolates foster children from their families and communities. (*Id.* at 69, ¶ 278.) Even when DHHR keeps foster children in-state, they are routinely separated from their siblings, and DHHR fails to arrange any visitation or communication between them. (*Id.* at 21–22, ¶ 71.) Plaintiffs further allege that all these placements, institutions and foster homes alike, are unstable, and that DHHR oftentimes shuttles them from one placement to another rather than securing them a permanent home. (*Id.* at 59–62, ¶¶ 244–55.)

Staff shortages also plague the foster care system. DHHR, according to Plaintiffs, "fails to employ and retain a sufficient number of appropriately trained caseworkers." (*Id.* at 5, ¶ 9(f)). This leaves caseworkers swamped with "unmanageable caseloads," sometimes "two or three times . . . the recommended standard." (*Id.* at 71, ¶ 288.) DHHR unsurprisingly has an "alarmingly high caseworker turnover" rate. (*Id.* at 72, ¶ 292.) Unfortunately, DHHR's hiring practices only make matters worse: it routinely fills vacancies with unqualified applicants that have no training or education in social work. (*Id.* at 72, ¶ 293.) These shortcomings, Plaintiffs allege, have

resulted in DHHR employing caseworkers that are "poorly trained [and] ill-equipped to help West Virginian families."  (*Id.* at 70, ¶ 283.)

Unqualified, overworked caseworkers lead to other deficiencies in West Virginia's foster care system.   High caseloads prevent caseworkers from "timely assess[ing] [the needs of] children entering the foster care system."  (*Id.* at 75, ¶ 308.)   Without timely assessments, DHHR cannot properly develop a foster child's individualized case plan.   (*Id.*)   Caseworkers are often unable to engage in meaningful visits with foster children, which further impedes case plan development.  (*Id.* at 76, ¶ 313.)   Unsurprisingly, individualized case plans are sometimes never developed.  (*Id.*)   DHHR then adds insult to injury by "fail[ing] to engage in necessary permanency planning for [foster] children."  (*Id.* at 79, ¶ 328.)   These failures, Plaintiffs allege, force foster children to "languish in the foster care system for years."  (*Id.*)

Similar shortcomings permeate the foster care system, further exacerbating an already difficult situation.   For example, a considerable number of foster children—Plaintiffs included— have mental health disabilities, ranging from attention deficit hyperactivity disorder ("ADHD") to post-traumatic stress disorder ("PTSD").  (*Id.* at 78, ¶ 321.)   Yet DHHR has failed to create sufficient community or home-based mental health services to treat foster children; institutionalization is the only option.  (*Id.* at 78–79, ¶¶ 323–24.)   DHHR does not provide certain foster parents with much-needed services, such as financial assistance and training for how to raise foster children with disabilities.  (*Id.* at 62–67, ¶¶ 256–74.)   When it comes time for a foster child to age out of the system, DHHR all but abandons them—caseworkers "sometimes [wait until] as late as weeks before a teen's 18th birthday" to develop any sort of transitional plan for adulthood.

(*Id.* at 83, ¶ 342.)   Plaintiffs allege these last-minute efforts are futile, and foster children are inevitably thrust "into either unstable situations or directly into homelessness."   (*Id.* at 82, ¶ 340.)

Plaintiffs filed suit in this Court on September 30, 2019.   (ECF No. 1.)   The Complaint proposes one General Class, consisting of all children who are will be in West Virginia foster care, and three subclasses.   (*Id.* at 10–11, ¶ 30.)   The proposed Kinship Subclass consists of children who are, will be, or have been placed in kinship placements.[1]   (*Id.* at 10–11, ¶ 30(a)(i).)   The proposed ADA Subclass consists of children who have or will have physical, intellectual, cognitive, or mental health disabilities.   (*Id.* at 11, ¶ 30(a)(ii).)   The proposed Aging Out Subclass consists of children who are or will be 14 years old and older, who are eligible to receive age-appropriate transition planning but have not been provided the necessary case management and services.   (*Id.* at 11, ¶ 30(a)(iii).)

The Complaint includes five causes of action.   First, the General class and each subclass allege violations of their substantive due process rights under the Fourteenth Amendment.   (*Id.* at 90–93, ¶¶ 368–74.)   Second, each class asserts violations of their right to familial association under the First, Ninth, and Fourteenth Amendments.   (*Id.* at 93–94, ¶¶ 375–80.)   Third, all classes allege violations of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA").   (*Id.* at 94–96, ¶¶ 381–83.)   Fourth, the ADA subclass alleges violations of the Americans with Disabilities Act ("ADA").   (*Id.* at 96–98, ¶¶ 384–94.)   Fifth, the ADA subclass asserts a claim for violations of the Rehabilitation Act.   (*Id.* at 98–99, ¶¶ 395–402.)

---

[1] West Virginia law defines "kinship placement" as "the placement of the child with a relative of the child, as defined herein, or a placement of a child with a fictive kin, as defined herein."   W. Va. Code § 49–1–206.   Further, "relative of the child" is defined as "an adult of at least 21 years of age who is related to the child, by blood or marriage, within at least three degrees" and "fictive kin" is defined as "an adult of at least 21 years of age, who is not a relative of the child, as defined herein, but who has an established, substantial relationship with the child, including but not limited to, teachers, coaches, ministers, and parents, or family members of the child's friends."   *Id.*

4

Plaintiffs sued Defendants, Governor Jim Justice, then-Cabinet Secretary of the DHHR Bill Crouch, Deputy Secretary of the DHHR Jeremiah Samples, Commissioner of the Bureau for Children and Families Linda Watts, in their official capacity, as well as the DHHR.  (*Id.* at 8–9, ¶ 21–25.)  Plaintiffs seek declaratory and injunctive relief against Defendants for the alleged deficiencies in the foster care system they oversee.  (*Id.* at 99–104, ¶ 403–08.)  Boiled down, Plaintiffs seek three things.  First, a declaration that these systematic deficiencies are unlawful.  (*Id.* at 99–100, ¶ 404.)  Second, injunctive relief that would require Defendants to overhaul the West Virginia foster care system.  (*Id.* at 100–03, ¶ 405.)  Third, a court-appointed Monitor to oversee Defendants' compliance with the injunction.  (*Id.* at 104, ¶ 406.)

Defendants moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[2]  (ECF No. 17.)  The matter has since been fully briefed and is now ripe for adjudication.  (ECF Nos. 18, 29, 35, & 52.)

## II.    *LEGAL STANDARD*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.  Fed. R. Civ. P. 12(b)(6).  A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).  A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."

---

[2] In their motion, Defendants also moved to dismiss the case for lack of subject-matter jurisdiction under Rule 12(b)(1), arguing that abstention was appropriate under *Younger v. Harris*, 401 U.S. 37 (1971), or, alternatively, the *Rooker-Feldman* doctrine.  (ECF No. 18 at 4–14.)  The Court previously granted this motion and abstained from exercising jurisdiction under *Younger*.  (ECF No. 258.)  Plaintiffs appealed, and the Fourth Circuit reversed. *Jonathan R. by Dixon v. Justice*, 41 F.4th 316 (4th Cir. 2022).  In doing so, the Fourth Circuit held that both *Younger* and *Rooker-Feldman* abstention were inapplicable.  *Id.* at 339, 341.  Now, on remand, the Court must turn to the merits and determine whether Plaintiffs have stated a claim for relief.

*Id.* at 570.   In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged."   *Id.*   Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).   A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible."   *Twombly*, 550 U.S. at 555, 570.

## III.   DISCUSSION

As stated above, Plaintiffs allege violations of their substantive due process rights, right to familial association, AACWA, ADA, and Rehabilitation Act.   Defendants urge the Court to dismiss each for failure to state a claim.   Against this backdrop, the Court turns to the task at hand.

### A.   Count I – Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."   U.S. CONST. amend. XIV, § 1.   This Clause has two distinct components.   The first, procedural due process, guarantees citizens "fair procedure[s]" before being deprived of life, liberty, or property.   *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).   The second, substantive due process, "provides heightened protection against government interference with certain fundamental rights

and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (The Due Process Clause "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." (internal quotation marks omitted)).

The Due Process Clause typically functions "as a negative prohibition on state action." *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (en banc). It serves, by and large, "as a limitation on the State's power to act," thereby "prevent[ing] government from abusing [its] power, or employing it as an instrument of oppression." *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195–96 (1989) (alteration in original) (internal quotation marks omitted). Thus, the Due Process Clause ordinarily "does not require governmental actors to affirmatively protect life, liberty, or property." *Pinder*, 54 F.3d at 1174.

But there are exceptions to this general rule. One exception exists when the government takes an individual into government custody, thereby creating a custodial relationship between the two. *Id.* at 1174–75. During this custodial relationship, substantive due process imposes an affirmative duty on the government to care for the individual. *Id.* Plaintiffs allege Defendants have failed to carry out this constitutional command. The affirmative duty to care for another is best understood by reviewing the cases developing it. The Court will first discuss a trilogy of Supreme Court opinions, and then look to Fourth Circuit precedent applying this affirmative duty in the foster care context. Once this is done, the Court will analyze Plaintiffs' claims.

a. Governing Law

The Supreme Court first found an affirmative duty to act in *Estelle v. Gamble*, 429 U.S. 97 (1976). In *Estelle*, the prisoner-plaintiff was working when a cotton bale fell, struck him, and

injured his back.  *Id.* at 99.   Despite receiving medical attention for his injury, the plaintiff's pain never subsided.  *Id.* at 99–101.   He later sued, claiming he received inadequate medical treatment, which subjected him to cruel and unusual punishment.[3]  *Id.* at 101.   When analyzing his claim, the Court recognized that the government has an "obligation to provide medical care for those whom it is punishing by incarceration."  *Id.* at 103.   This affirmative duty exits because "inmate[s] *must* rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met."  *Id.* (emphasis added).

The Court built on this reasoning in *Youngberg v. Romeo*, 457 U.S. 307 (1982), where it outlined the substantive due process rights guaranteed to those involuntarily in state custody for non-penal reasons.   Romeo was 33-year-old man with an IQ of between 8 and 10.  *Id.* at 309. His mother was unable to care for him or control his violence, so she sought his institutionalization. *Id.*   She was successful, and Romeo was involuntarily committed to a mental institution.  *Id.* at 310.   Once there, "Romeo was injured on numerous occasions, both by his own violence and by the reactions of other residents to him."  *Id.*   The infirmary doctor then ordered that Romeo be restrained to protect both himself and other patients.  *Id.* at 310–11.   Romeo's mother challenged his living conditions, arguing the institution "failed to [provide] appropriate preventive procedures" and "appropriate treatment or programs for his mental retardation."  *Id.* (internal quotation marks omitted).   These failures, she claimed, violated her son's substantive due process rights.  *See id.* at 311, 314–15, 316.

The Court held that the state unquestionably owed citizens "wholly dependent" on it several rights.  *Id.* at 317.   For instance, the state must "provide adequate food, shelter, clothing,

---

[3] Notably, the prisoner-plaintiff brought a § 1983 action for an Eight Amendment violation, not substantive due process.  *Id.* at 101.

and medical care," as well as "reasonable safety [to] all residents." *Id.* at 324. Those, it held, were "the essentials." *Id.* The Court further held that the state must provide some individuals with training or habilitation when necessary to protect the individuals' substantive due process rights, such as their right to safety or freedom from bodily restraint. *See id.* Importantly, however, states "necessarily ha[ve] considerable discretion in determining the nature and scope of [their] responsibilities."[4] *Id.* at 317. They need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Id.*

Then, in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Court explained when this affirmative duty is triggered. In *DeShaney*, the county's department of social services ("DSS") knew that Randy DeShaney was abusing his son, but it failed to intervene.[5] *Id.* at 192. Randy finally beat his boy into a coma, and although the boy survived, he was expected to live out the remainder of his days in an institution for the feeble minded. *Id.* at 192–93. The boy's mother filed suit against Winnebago County, DSS, and various DSS employees, alleging they violated her son's substantive due process right to protection from a "risk of violence at his father's hands," about which they knew or shown have known. *Id.* at 193. Specifically, the mother argued that, notwithstanding there generally being no duty to protect, DSS stood in a "special relationship" to her boy because it knew of his danger. *Id.* at 197. The Court rejected this argument because the boy was in his father's custody, not the State's, when

---

[4] The Court held that when deciding whether training or habilitation should be provided, "courts must show deference to the judgment exercised by a qualified professional." *Id.* at 322. A decision made by a professional is thus "presumptively valid" and will not be interfered with by courts unless "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

[5] The boy had previously been hospitalized from what was suspected child abuse, and DSS had obtained a court order granting temporary custody to the hospital. *Id.* at 192. However, the county determined there was insufficient evidence of child abuse to retain custody, so the boy was returned to his father. *Id.*

9

the harm occurred, and the State played no part in creating the danger.  *Id.* at 201.  In doing so, the Court offered the following explanation for when—and why—this affirmative duty arises:

> Taken together, [*Estelle* and *Youngberg*] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.  The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 199–200. (footnotes omitted) (internal citations omitted).

The Fourth Circuit then applied *DeShaney* to the foster care context in *Doe ex rel. Johnson v. South Carolina Department of Social Services*, 597 F.3d 163 (4th Cir. 2010).  There, state social workers removed two siblings, Jane and Kameron, from their home after receiving reports of sexual abuse.  *Id.* at 166.  Once in state custody, the social worker placed Jane in a foster home with Kameron, despite knowing Kameron had sexually abused Jane.  *Id.* at 166–68.  This sexual abuse continued in foster care.  *Id.* at 168.  Jane's adoptive parents sued on her behalf, arguing that the social worker violated Jane's substantive due process rights by placing her in a foster home the social worker knew was dangerous.  *Id.*  The Court agreed.  *Id.* at 175.  It reasoned that "the state ha[d] taken [the] affirmative act" of "involuntarily remov[ing] [Jane] from her home," thereby restraining her liberty.  *Id.* at 175.  This affirmative act triggered substantive due process protections and thus imposed "some responsibility for [Jane's] safety and general well-being." *Id.* (internal quotation marks omitted) (quoting *DeShaney*, 489 U.S at 200).  Children involuntarily placed in foster care therefore enjoy those substantive due process rights guaranteed by *Youngberg*

and *DeShaney*.   *Id.*   Before concluding, the Fourth Circuit also held that state actors cannot be deliberately indifferent these substantive due process rights.   *Id.*

b.   Plaintiffs' Claims

The proposed General Class and every subclass assert various substantive due process rights, all of which they allege Defendants have violated.   The General Class asserts the following seven substantive due process rights: (1) the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State; (2) the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child; (3) the right to services necessary to prevent an unreasonable risk of harm; (4) the right to conditions and duration of foster care reasonably related to the purpose of government custody; (5) the right to treatment and care consistent with the purpose and assumptions of government custody; (6) the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and (7) the right to services in the least restrictive, most family-like setting.   (ECF. No. 1 at 91–92, ¶ 373(a)–(g)).

The proposed Kinship Subclass asserts the following three substantive due process rights: (1) the right to placement in the least-restrictive most family-like setting that is properly assessed to determine whether it is a safe and appropriate placement; (2) the right to supportive and case management services to ensure placement stability and ensure the child is free from harm; and (3) the right to a plan and corresponding services for a permanent home.   (*Id.* at 92, ¶ 374(a)(i)–(iii)).

The proposed ADA Subclass claims four substantive due process rights: (1) the right to be free from discrimination by reason of disability; (2) the right to services in the most integrated

11

setting appropriate to the person's needs; (3) the right to be free from unnecessary institutionalization and to be placed in the least restrictive setting; and (4) the right to ensure access to an array of community-based placements and services to ensure access to the least restrictive alternative.  (*Id.* at 92–93, ¶ 374(b)(i)–(iv)).

The proposed Aging Out Subclass claims three substantive due process rights: (1) the right to independent living services to prepare to exit foster care successfully including, but not limited to, vocational and other educational services; money management, household maintenance, transportation, legal issues, health, community resources, housing options, personal hygiene, employment readiness, and educational assistance; (2) the right to assistance to find lawful, suitable permanent housing that will not result in homelessness upon exit from foster care; and (3) the right to a connection with an adult resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system.  (*Id.* at 93, ¶ 374(c)(i)–(iii)).

c.  Analysis

Defendants take issue with most of Plaintiffs' substantive due process claims.  Although Defendants concede that they owe Plaintiffs the "basic human needs" that *Youngberg* and *DeShaney* demand, they argue nothing is owed beyond that.  (ECF No. 18 at 16.)  Defendants maintain that Plaintiffs are trying to take the "aspirational statutory, regulatory, and private standards" applicable to the West Virginia foster care system and "convert each of them [in]to constitutional requirements."  (*Id.* at 14) (quoting *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014)).  Plaintiffs, however, counter that they do not seek "an aspirational child welfare system, but merely a constitutionally adequate one."  (ECF No. 29 at 17–18) (internal quotation marks and citation omitted.)  Plaintiffs believe Defendants are pulling a slight of hand,

using precedent to "convert the floor of constitutional protection into its ceiling." (*Id.* at 21.) With these arguments in mind, the Court must now parse through each asserted substantive right, testing the legal basis for each.

i.   General Class

Looking first at the proposed General Class, Defendants do not dispute that the Due Process Clause requires them to protect against maltreatment and repeated maltreatment. (*See* ECF No. 18 at 18 n.8.)   Instead, Defendants argue that Plaintiffs have not adequately alleged Defendants' deliberate indifference to this duty. (*Id.* at 18–19.)   The Court disagrees.   Plaintiffs' Complaint adequately alleges that Defendants have placed Plaintiffs in placements known to be dangerous. For example, Plaintiffs allege that Defendants placed Anastasia M., an 11-year-old girl, in a facility with a history of child molestation, sexual battery, and sexual assault by patients and employees alike. (ECF No. 1 at 20, ¶ 63.)   Plaintiffs further allege that Defendants placed a then-12-year-old Garrett M. in "an institutional residential placement for male sex offenders." (*Id.* at 29–30, ¶ 111.)   Garrett is not a sex offender, nor has he ever been charged with a sex offense. (*Id.* at 30, ¶ 115.)   Nevertheless, Defendants placed 12-year-old Garrett among sex offenders, many of whom were 15 years of age and older. (*Id.* at 29–30, ¶ 111.)   These claims adequately allege that Defendants turned a blind eye to a known danger that Plaintiffs would be mistreated and abused while in State custody. *Doe*, 597 F.3d at 176 ("[S]tate officials responsible for [placement] decisions ha[ve] a corresponding duty to refrain from placing [children] in a known, dangerous environment in deliberate indifference to [their] right to personal safety and security.").

Defendants next seek dismissal of Plaintiffs claim for the right to protection from unnecessary intrusions into the child's emotional wellbeing while in State custody. The Court

13

declines to do so.   As outlined above, the Due Process Clause requires Defendants to protect foster children's well-being.   *See, e.g.*, *DeShaney*, 489 U.S. at 200; *Doe*, 597 F.3d at 175.   The only issue here is whether this duty extends to protecting a foster child's *emotional* well-being.   The Court believes it does.   As another district court aptly put it, this "conclusion is grounded in common sense."   *B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989).   Children's physical and emotional well-being are equally important.   *Id.*   Although physical injuries mend, emotional trauma inflicted during a child's tender years has "an indelible effect" from which they may never recover.   *Id.*   It would be an odd result for the Fourteenth Amendment to require Defendants to protect against possible short-term injuries, while at the same time providing no protection against lifelong harm.   This is hardly a novel idea, and the Court readily accepts it.   *See e.g.*, *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 250 (5th Cir. 2018) (holding that substantive due process ensures the right "to be free from *severe* psychological abuse and emotional trauma") (emphasis in original); *Wyatt B. by McAllister v. Brown*, No. 6:19-cv-00556, 2021 WL 4434011, at *8 (D. Or. Sept. 27, 2021); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 161 (D. Mass. 2011); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996); *B.H.*, 715 F. Supp. at 1395.

Defendants next take aim at Plaintiffs' third claimed right—the right to services necessary to prevent unreasonable risk of harm.   Like the right to prevent maltreatment, Defendants concede this right "arguably relate[s] to the basic human need of physical safety," but contend Plaintiffs have not plead deliberate indifference to the right.   (ECF No. at 18 n.8) (internal quotation marks omitted).   The Court rejects, at this juncture, Defendants' position that Plaintiffs have failed to allege deliberate indifference here.   The Complaint includes a host of allegations that Plaintiffs

14

have not been provided the services necessary to ensure their reasonable safety.   (*See e.g.*, ECF No. 1, at 17, 21, ¶¶ 52, 70.)   For example, Plaintiffs allege that Defendants do not conduct background checks on potential foster parents before placing children in their care; Plaintiffs also allege that Defendants do not always inspect foster homes before placing Plaintiffs in them.   (*Id.*) Taking these allegations as true, which the Court must at the pleading stage, one could reasonably infer that Defendants were deliberately indifferent to Plaintiffs' rights.   *Iqbal*, 556 U.S. at 678.

Next, the Court addresses two overlapping rights: the right to conditions and duration of foster care reasonably related to the purpose of government custody, and the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.   Defendants assert that, although these rights are "sound policy," they are "not constitutionally mandated."   (ECF No. 18 at 17.)   The Court disagrees.   In *Jackson v. Indiana*, 406 U.S. 715 (1972), the Supreme Court said that "due process requires that the *nature and duration* of [custody] bear some reasonable relation to the purpose for which the individual is [in custody]."   *Id.* at 738 (emphasis added).   Plaintiffs are in Defendants' custody largely because they have been abused or neglected by their parents.   These terrible conditions justify Defendants "intru[ding] on [the] family relationships" that are "ranked as of basic importance in our society." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (internal quotation marks omitted) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971).   Once these conditions cease, so do the justifications for removal.

The Court now turns to the right to treatment and care consistent with the purpose and assumptions of government custody.   Once more, Defendants urge the Court to dismiss this claim, believing it is a matter of state policy, not constitutional law.   (ECF No. 18 at 16–17.)   *Jackson*,

and *Doe* say otherwise.   As previously discussed, substantive due process requires that the nature of custody reasonably relate to its purpose. *Jackson*, 406 U.S. at 738.   Here, Plaintiffs are in Defendants' custody because Defendants sought to prevent Plaintiffs' abuse and neglect.   Due process imposes a corresponding duty on Defendants to ensure that Plaintiffs are neither abused nor neglected while in their custody.   *Doe* confirms this: "when a state involuntarily removes a child from her home" to prevent abuse and neglect," due process imposes "some responsibility for [the child's] safety and general well-being.'"   *Doe*, 597 U.S. at 175 (alteration in original) (quoting *DeShaney*, 489 U.S. at 200).   The Court notes, however, that substantive due process does not demand optimal treatment, *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000), and the State need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Youngberg*, 457 U.S. at 317.   Defendants need only provide for Plaintiffs' basic human needs and prevent further abuse and neglect.   Thus, to the extent Plaintiffs have alleged Defendants failed to uphold this constitutional duty, they have stated a claim for relief.

Finally, the Court addresses the General Class's last asserted right: the right to services in the least restrictive, most family-like setting.   The Court is unconvinced that substantive due process goes this far.   Plaintiffs' fail to cite a *single* case where *any* court has stretched substantive due process *this* far.   The Court is unsurprised that no court has found this right since *Youngberg* and *DeShaney* merely impose a duty to provide for an individual's basic human needs.   Plaintiffs claim that limiting substantive due process protections to their basic human needs—as *Youngberg* and *DeShaney* instruct—is "regressive" and "outdated."   (ECF No. 29 at 17.)   However, that is the law as it exists today, and the Court declines to "turn[] any fresh furrows in the 'treacherous field' of substantive due process." *Troxel v. Granville*, 530 U.S. 57, 76 (2000) (Souter., J.,

concurring in the judgment) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 502 (1977) (opinion of Powell J.)).

ii.     Kinship Subclass

The Court now turns to the proposed Kinship subclass, beginning with their second asserted right.   Substantive due process, according to this Subclass, guarantees them the right to supportive and case management services to ensure placement stability and ensure the child is free from harm.   As noted above, due process requires Defendants to provide for foster children's reasonable safety.   *Doe*, 597 F.3d at 175.   This, in turn, requires Defendants to implement the services necessary to ensure that the Subclass is free from harm.   However, substantive due process goes no further.   It simply does not provide a right to stability while in foster care. *Abbott*, 907 F.3d at 268; *Eric L. By and Through Schierberl v. Bird*, 848 F. Supp 303, 307 (D.N.H. 1994) (finding that "[t]he complaint pleads no facts tending to establish that [social services'] placement of children with successive foster parents is so devoid of justification as to give rise to a substantive violation of the Due Process Clause.").

The first and third rights claimed by this Subclass have no basis in substantive due process. The Court has previously explained that substantive due process does not protect the right to the least-restrictive, most family-like setting available while in foster care; the conditions of foster care need only to relate to its purpose.   *Jackson*, 406 U.S. at 738.   Similarly, substantive due process does not require Defendants to do more than provide for foster children's basic human needs.   *DeShaney*, 489 U.S. at 200.   While it would certainly be sound policy for Defendants to adopt, that is a matter for West Virginia's elected officials to address, not the federal judiciary. *Accord Connor B.*, 774 F.3d at 48.

17

iii.     ADA Subclass

The Court can dispose of the proposed ADA subclass' claims in short order.   First, there is no substantive due process right to be free from discrimination by reason of disability.   That right is protected by the ADA, not the Fourteenth Amendment.   *See generally* 42 U.S.C. § 12101, *et seq*.   As *DeShaney* explained, not "every [statutory violation] committed by a state actor [is] a constitutional violation."   *DeShaney*, 489 U.S. at 202.   Second, there is no right to services in the most integrated setting appropriate to the person's needs.   *Jackson*, 406 U.S. at 738; *Wyatt B.*, 2021 WL 4434011, at *8–9.   Third, the Fourteenth Amendment does not protect against unnecessary institutionalization, nor does it guarantee placement in the least restrictive setting. *Wyatt B.*, 2021 WL 4434011, at *8–9.   That, too, is a claim cognizable under the ADA rather than substantive due process. *Compare Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), *with Youngberg*, 457 U.S. 307 (1982).   Fourth, "the right to ensure access to an array of community-based placements and services to ensure access to the least restrictive alternative" is a far cry from the basic human needs *DeShaney* requires.   Substantive due process does not extend this far.

iv.     Aging Out Subclass

Substantive due process also does not protect any of the rights claimed by the proposed Aging Out subclass.   Although the services they seek "would obviously . . . benefit . . . the child[ren] and . . . society," *Wyatt B.*, 2021 WL 4434011, at *9, not every laudable goal is enshrined in the Fourteenth Amendment.   Each proposed right instead goes well beyond *DeShaney*, and the Court declines to wander into that uncharted territory.   This decision comes not from a lack of compassion for Plaintiffs, but instead from a mindfulness that each time the Court "break[s] new ground in this [area of substantive due process]," it strips the West Virginia Legislature of its

18

ability to decide the matter on behalf of the people of West Virginia.  *Glucksberg*, 521 U.S. at 720.  Cognizant that "the Due Process Clause does not empower the judiciary to sit as a superlegislature," *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124 (1978) (internal quotation marks omitted) (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 731 (1963)), the Court faithfully applies precedent to reach this conclusion.  For these reasons, Defendants' Motion to Dismiss Count I is **GRANTED** in part and **DENIED** in part.

> B.  *Count II – Familial Association*

The Court now turns to Count II, wherein Plaintiffs allege Defendants violated their right to familial association under the First, Ninth, and Fourteenth Amendments.  The Court will first review each amendment and pertinent case law before analyzing Plaintiffs' claims.

> a.  Governing Law

> i.   Fourteenth Amendment

The Supreme Court first recognized that the Fourteenth Amendment's Due Process Clause protects the family unit a century ago.  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (finding the Fourteenth Amendment guarantees the right "to marry, establish a home and bring up children."). The Court has since created a "private realm of family life which the state cannot enter."  *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).   In these cases, the Court has applied substantive due process to stave off government interference in two aspects of family life: the parent-child relationship, *Santosky v. Kramer*, 455 U.S. 745 (1982), and particularly intimate family decisions, such as marriage and childbearing.  *See e.g.*, *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974); *Loving v. Virginia*, 388 U.S.1 (1967).

The lone instance where the Court applied substantive due process beyond these two

categories was in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (plurality opinion), where it held that family members may live together free from undue government interference.[6]   There, the city enacted an ordinance restricting many homes to single-family use.   *Id.* at 495–96.   The ordinance included a narrow definition of "family," however, which criminalized a grandmother and grandchild living together.   *Id.* at 496–97.   Outlawing the grandmother's decision to live with her grandson was "no mere incidental result of the ordinance."   *Id.* at 498.   Instead, the city intended to "regulate the occupancy of" households, deciding for itself "who may live together and [who] may not."   *Id.* at 498–99.   The Court struck down the ordinance as an "intrusive regulation" that "slic[ed] deep[] into the family itself."   *Id.* at 498.   Substantive due process prevents the government from regulating family living arrangements, the Court explained, because "this Nation[] [has a long] history and tradition" of extended kin "sharing a household" and "major responsibilit[ies] for the rearing of . . . children."   *Id.* at 503–05.   In light of this tradition, the Court found that extended family have a constitutional right to reside together.   *Id.* at 504.   While the Court acknowledged "the family is not beyond regulation," the city had no compelling interest that justified the ordinance.   *Id.* at 499–500.

ii.    First Amendment

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for

---

[6] Justice Powell, joined by three other Justices, authored the lead opinion.   *Moore*, 431 U.S. at 495.   Justice Stevens concurred in the judgment but on somewhat different grounds. He reasoned that the States cannot constitutionally interfere with a residential property owner's right "to determine the internal composition of his household," unless done to ensure that those homes "remain nontransient, single-housekeeping units."   *Id.* at 518–19 (Stevens, J., concurring in the judgment).   In other words, Justice Stevens would extend the constitutional right to cohabitate to unrelated individuals, so long as there was no "transient occupancy."   *Id.* at 516–19.   Seeing how Justice Powell's opinion is the narrower of the two, it must be treated as controlling.   *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002) ("[W]hen a decision of the [Supreme] Court lacks a majority opinion, the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding.").

a redress of grievances." U.S. CONST. amend. I. The Supreme Court has "long understood as implicit" in these First Amendment guarantees "a corresponding right to associate with others." *Ams. For Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).

In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Court recognized that this right to association includes the right to intimate, or familial, association. There, the Jaycees, a non-profit organization, limited full-fledged membership to men. *Id.* at 613. A state statute, however, required the Jaycees to provide women equal membership. *Id.* at 614–15. The Jaycees challenged the statute, arguing that requiring women's equal membership violated its members' First Amendment right to freedom of association. *Id.* at 615.

When analyzing this intimate association claim, the Court explained that the First Amendment protects "certain kinds of highly personal relationships" because "individuals draw much of their emotional enrichment from close ties with others." *Id.* at 618–19. The Court looked to its substantive due process cases, such as *Moore* and *Loving v. Virginia*, 388 U.S. 1 (1967), for examples of intimate relationships worthy of "constitutional shelter." *Id.* at 618–20. From these intimate relationships, the Court found a common thread: each "attend[ed] the creation and sustenance of a family," such as marriage, childbirth, raising children, and living with relatives. *Id.* at 619. These constitutionally protected relationships differ from others, the Court reasoned, because they "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 619–20. However, the Court cautioned against extending protection to other relationships, saying that its substantive due process cases "suggest[ed] some

21

relevant limitations" on First Amendment protection.   *Id.* at 619.   As for the Jaycees, they lacked many of these traits.   They were "large and basically unselective."   *Id.* at 621.   The Jaycees were also anything but intimate and secluded—in fact, "much of the activity central to the formation and maintenance of the [Jaycees] involve[d] the participation of strangers."   *Id.*

### iii.     Ninth Amendment

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."   U.S. CONST. amend. IX.   The Framers adopted the Ninth Amendment because they "believed that there are additional fundamental rights . . . which exist alongside those fundamental rights specifically mentioned" in the Bill of Rights.   *Griswold v. Connecticut*, 381 U.S. 479, 488 (1965) (Goldberg, J., concurring).   The Ninth Amendment thus stands for a simple proposition—the first eight amendments are a non-exhaustive list of constitutionally protected rights.   *Id.* at 490.   Importantly, however, the Ninth Amendment does not confer any individual rights.   *See id.* at 493.   It merely "lends strong support to the view that" individual liberty, as protected by the Fourteenth Amendment, "is not restricted to rights specifically mentioned in the first eight amendments."   *Id.*

### b.   Analysis

Having now reviewed the First, Ninth, and Fourteenth Amendments, the Court can glean a few principles from each.   First, the Ninth Amendment does not confer a right to familial association; it simply provides that the right may exist alongside those included in the Bill of Rights.   Second, the First and Fourteenth Amendments each protect the right to familial association, and the two seemingly complement one another.   *Roberts*' reliance on the Court's Fourteenth Amendment cases when describing the First Amendment doctrine proves that the two

are one and the same.  *See Roberts*, 468 U.S. at 619–20 (citing *Loving v. Virginia*, 388 U.S. 1 (1967), for the proposition that the First Amendment "imposes constraints on the State's power to control the selection of one's spouse.").  Put differently, those familial relationships worthy of substantive due process protection always have the distinguishing attributes *Roberts* found worthy of First Amendment protection.  Third, not every government action that interferes with the family is unconstitutional.  The government may, in certain circumstances, have a sufficiently compelling interest, such that the intrusion is not "undue" in the constitutional sense.  *Roberts*, 468 U.S. at 617–18; *see also Moore*, 431 U.S. at 499.  With these principals in mind, the Court now turns to Plaintiffs' allegations.

Plaintiffs allege that Defendants have violated their right to familial association "[b]y failing to take all reasonable efforts towards fostering familial association and securing [them] a permanent home and family."  (ECF No. 1 at 94, ¶ 379.)  Plaintiffs further allege that Defendants have "systematically and improperly intruded upon" their "'intimate human relationships' with their parents, siblings, and other family members."  (ECF No. 29 at 25.)  Defendants concede that the constitution "may protect some aspects of the parent-child relationship," but contend those protections do not apply "to more extended kinship relationships."  (ECF No. 18 at 21.) Defendants also argue that the constitution does not require them "to ensure a particular type of family life," nor does it guarantee the "right to a permanent home and family."  (*Id.*)  The Court agrees.

For starters, nothing in the First or Fourteenth Amendments require Defendants to nurture Plaintiffs' familial relationships.  *Marisol A.*, 929 F. Supp. at 676 ("[C]ourts . . . have been loathe to impose a constitutional obligation on the state to ensure a particular type of family life.").

These Amendments instead work as negative prohibitions on the government, providing "constitutional shelter" "against undue intrusion by the State." *Roberts*, 468 U.S. at 617–18, 619. Plaintiffs resist this conclusion with an implicit reliance on *DeShaney*. Specifically, Plaintiffs argue that Defendants have "remov[ed] [Plaintiffs] from their homes," "thereby forming a 'special relationship' with [Plaintiffs]." (ECF No. 29 at 26.) Because of this "special relationship," Plaintiffs believe they are constitutionally entitled to services that "foster[] [their] familial association" and "secur[e] [them] a permanent home and family." (ECF No. 1 at 94, ¶ 379.) Negative prohibitions on state action afford no such entitlement.[7] Neither the Supreme Court nor the Fourth Circuit have broached—much less recognized—this affirmative duty. The Court declines to do so today.

Plaintiffs have also failed to allege that Defendants improperly intruded on their parent-child relationships. To be clear, "[t]he bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994). The Supreme Court has said, however, that States' "*parens patriae* interest in preserving and promoting the welfare of the child" is a sufficiently compelling reason to justify State interference. *Santosky v. Kramer*, 455 U.S. 745, 766 (1982). Such is the case here. Defendants, acting according to state law, properly removed Plaintiffs from their parents' care to prevent further abuse and neglect. Plaintiffs do not contend otherwise, so the Court is left with the inevitable conclusion that their removal was

---

[7] Even if *DeShaney* did impose some affirmative duty on Defendants—a proposition the Court seriously doubts—*Youngberg* makes clear that Defendants need not "choose between attacking every aspect of a problem or not attacking the problem at all." *Youngberg*, 457 U.S. at 317. Thus, Defendant's decision to remove a child to prevent abuse and neglect would not create a corresponding constitutional duty to ensure that the child is later provided a permanent home.

constitutional.   The only lingering issue then is whether Defendants have "improperly intruded upon" "Plaintiffs' 'intimate human relationships' with their parents" post-removal.   (ECF No. 29 at 25.)   Interestingly enough, not a single Plaintiff wishes to be placed back in their parents' custody.   The 105-page Complaint is *entirely* devoid of a *single* allegation that *any* Plaintiff was *ever* denied contact with, or access to, their parents.   Plaintiffs have thus failed to allege a violation of their right to familial association with their parents.

Nor have Plaintiffs adequately alleged that Defendants violated their right to familial association with their siblings.   Plaintiffs make a compassionate argument that Defendants unnecessarily separate Plaintiffs from their siblings, oftentimes failing to arrange any visitation or communication between them.   (ECF No. 1 at 21–22, ¶ 71.)   Unfortunately for Plaintiffs, the constitution does not, in the foster care context, protect the sibling-sibling relationship.   While mapping out the boundaries of the "constitutional shelter" afforded to "certain intimate . . . relationships," the *Roberts* Court said that its precedent "suggest[s] some relevant limitations on" the right.   *Roberts*, 468 U.S. at 617, 619.   And that precedent does not extend to the relationship between siblings.   Nearly all the cases *Roberts* cited, many of which were substantive due process cases, involved relationships far more intimate than that between siblings—namely, marriage and the parent-child relationship.   *Id.* at 618–20 (collecting cases).   The lone case *Roberts* cited that went further was *Moore*, which simply allowed a grandmother to live with her grandson because grandparents—much like parents—have traditionally played a vital role in childrearing.   *Moore*, 431 U.S. at 504–05.   The Court thinks *Moore* is too thin a reed to justify extending constitutional protection beyond its current, fixed boundaries.[8]

---

[8] While *Roberts* did provide factors to consider when determining whether to extend First Amendment protection to different relationships, *Roberts*, 468 U.S. at 619–20, the Court is unconvinced that the sibling-sibling relationship

Even if the Constitution did generally protect the relationship between siblings, that protection would not apply in the foster care context. *Roberts* and *Moore* both recognized that states may have a sufficiently compelling interest that justifies interference with familial relationships. *Roberts*, 468 U.S. at 617–18; *Moore*, 431 U.S. at 499. Here, West Virginia has a compelling *parens patriae* interest in preventing Plaintiffs' abuse and neglect. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981) ("State[s] ha[ve] an urgent interest in the welfare of the[ir] child[ren]."); *Stanley v. Illinois*, 405 U.S. 645, 649 (1972) ("The State[] [has a] right—indeed, duty—to protect [its] minor children."). West Virginia's compelling interest in protecting Plaintiffs' well-being thus justifies any disruption to Plaintiffs' relationships with their siblings. In other words, even if the constitution did apply to the sibling-sibling relationship, intruding on that relationship in the foster care context would not be "undue" given the State's compelling, countervailing interest. *Roberts*, 468 U.S. at 617–18; *Moore*, 431 U.S. at 499.

Finally, Plaintiffs' claim for interference with their grandparent-grandchild relationships is foreclosed by *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion). In *Troxel*, a mother sought to limit visitation time between her children and their paternal grandparents. *Id.* at 60–61. When the grandparents petitioned for more visitation time than the mother permitted, the Court squarely rejected their efforts to override the mother's decision. *Id.* at 61, 72. The Court, citing *Pierce*, explained that "parents *and guardians*" of young children have a constitutional right "to direct the upbringing . . . of children *under their control*." *Id.* at 65 (emphasis added). This

---

meets this criteria. Siblings certainly have "deep attachments" to one another, but they lack other critical attributes *Roberts* found necessary for constitutional protection. For instance, siblings are not secluded from others in critical aspects of their relationship in the same way as spouses, nor do they share distinctively personal aspects of their lives as a parent does with their child. *Roberts* explained that only *certain* intimate relationships receive constitutional protection, and the Court is unpersuaded that the sibling-sibling relationship is sufficiently similar to those the Supreme Court has previously protected. *Roberts*, 468 U.S. at 617–18.

includes the right "to make decisions concerning the care, custody, and control of their children." *Id.* at 66.   In light of this well-established precedent, the Court concluded that the grandparents had no right to challenge the mother's decision.   *Id.* at 69–70.

*Troxel* is persuasive, if not controlling.   Plaintiffs' biological parents would typically be the ones to decide every aspect of Plaintiffs' relationships with their grandparents.   Everything from whether Plaintiffs would live with their grandparents—or have no communication at all— would normally be their parents' decision alone.   But their parental rights have been judicially terminated, and Defendants have stepped into their shoes as Plaintiffs' legal guardians. Defendants thus have "the right, coupled with the high duty," to nurture Plaintiffs and "direct the[ir] upbringing."   *Troxel*, 530 U.S. at 65 (quoting *Pierce*, 268 U.S. at 535).   This includes the right to restrict contact with their grandparents.   Make no bones about it, however—cutting off all contact between foster children and their grandparents during this low point in their young lives is unfathomable.   But it is not unconstitutional.   The Court **GRANTS** Defendants' Motion to Dismiss Count II.

### C.  *Count III – Adoption Assistance and Child Welfare Act*

In Count III, Plaintiffs bring a § 1983 claim, alleging Defendants violated the Adoption Assistance and Child Welfare Act ("AACWA").   "Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws."   *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (internal quotation marks omitted).   Importantly, litigants invoking § 1983 "must assert the violation of a federal *right,* not merely a violation of federal *law.*"   *Id.* (emphasis in original).   This distinction gives rise to the parties' next disagreement: Plaintiffs allege Defendants violated their rights under

27

certain sections of the AACWA; Defendants counter that those sections do not confer privately enforceable rights.

a.   An Overview of the AACWA

Enacted pursuant to the Spending Clause, the AACWA created "a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services." *Suter v. Artist M.*, 503 U.S. 347, 350–51, 356 (1992).   States become eligible for reimbursement by satisfying certain requirements.   As relevant here, States must submit to the Secretary of Health and Human Services a plan for foster care and adoption assistance.   42 U.S.C. § 671(a).   This plan must include 16 different features before the Secretary will approve it.   *Id.* Plaintiffs' claim focuses on two.   First, § 671(a)(10) requires the plan to

> establish[] and maintain[] standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for the institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and which shall permit use of the reasonable and prudent parenting standard.

Second, § 671(a)(16) requires the plan to

> provide[] for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in sections 675(5) and 675a of this title with respect to each such child.

The cross-references in § 671(a)(16) are definitional, none of which are particularly relevant to the current dispute.   Section 675(1) defines "case plan," § 675(5) defines "case review system," and § 675a further defines the requirements for case plans and case review systems.

The State is not home free once the Secretary approves its plan.   Following approval, the Secretary continues to monitor the State's compliance with § 671(a).   42 U.S.C. § 1320a-2a.

28

Should the Secretary find that the State is not upholding its end of the bargain, he must withhold funding. *Id.*; 45 C.F.R. §§ 1355.35(c)(4), 1355.36(b). Importantly, the State is not required to be perfect; it need only "substantial[ly] conform[]" to § 671(a)'s requirements. 42 U.S.C. § 1320a-2a.

    b.   Fourth Circuit Precedent

The Fourth Circuit has previously considered whether § 671(a)(10) and § 671(a)(16) create privately enforceable rights, so the Court finds it best to begin there.

    i.     Section 671(a)(10)

The Fourth Circuit addressed § 671(a)(10) in *White by White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997). There, a mother was suspected of child abuse, so the Department of Social Services ("DSS") took her children into protective custody. *White*, 112 F.3d at 734. Once in protective custody, DSS placed the children in various foster homes. *Id.* One placement proved tragic—the child died at the hands of her foster parents. *Id.* at 735. The mother sued DSS officials, claiming they violated her daughter's "right to protection" under § 671(a)(10). *Id.* at 738. The Fourth Circuit disagreed. *Id.* Relying on *Suter*, a then-recent Supreme Court opinion that analyzed other subsections of § 671(a), the panel held that § 671(a)(10) does not create a privately enforceable right. *Id.* at 739.

Plaintiffs ignore *White* entirely, urging the Court to nevertheless find a privately enforceable right under § 671(a)(10). (ECF No. 29 at 32–34.) The Court is not at liberty to do so. *United States v. Cobb*, 274 F. Supp. 3d 390, 394 (S.D. W. Va. 2017) ("[A] district court is bound by the precedent set by its Circuit Court of Appeals, until such precedent is overruled by the appellate court or the United States Supreme Court."). Plaintiffs offer no reason to believe

that *White* is no longer good law.   As such, the Court concludes that § 671(a)(10) does not create a privately enforceable right.

    ii.      Section 671(a)(16)

    The Fourth Circuit's jurisprudence on § 671(a)(16) is anything but cut-and-dry.   The Court first grappled with § 671(a)(16) in *L.J. by and Through Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988) (*L.J. II*).   *L.J. II* involved a class action of children in Baltimore's foster care system.   *Id.* at 119.   The plaintiffs alleged the city's poor administration of the foster care system resulted in their abuse.   *Id.*   On appeal, the Baltimore defendants argued that §§ 671(a)(9), (10), and (16) of the AACWA were not privately enforceable.[9]   *Id.* at 123.   The Fourth Circuit disagreed, reasoning that "[t]aken together . . . these statutory provisions spell out a standard of conduct, and as a corollary rights in plaintiffs, which plaintiffs have alleged have been denied."   *Id.*   Thus, it originally appeared that § 671(a)(16) was privately enforceable.

    Subsequent decisions soon began eroding *L.J. II*'s holding.   In *Suter*, the Supreme Court considered whether certain portions of the AACWA were privately enforceable.   *Suter*, 503 U.S. at 350–51.   The Court spent the bulk of its analysis determining that § 671(a)(15) was not privately enforceable, but its conclusion on § 671(a)(9) was equally clear—§ 671(a)(9) "does not afford a cause of action."   *Id.* at 259 n.10.   Then, in *White*, the Fourth Circuit further undermined *L.J. II* when it held that "[§] 671(a)(10) does not create an enforceable right."   *White*, 112 F.3d at 739.   *Suter* and *White* thus eliminated two of the three sections *L.J. II* relied on when it concluded that §§ 671(a)(9), (10), and (16)—when "taken together"—create a privately enforceable right. *See L.J. II*, 838 F.2d at 123.

---

[9] Section 671(a)(9) requires States to "report to an appropriate agency or official, known or suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment or maltreatment of a child."

The Fourth Circuit then revisited § 671(a)(16) in *L.J. v. Wilbon*, 633 F.3d 297 (4th Cir. 2011).   This time, the Baltimore defendants tried to invalidate a consent decree they entered following the *L.J. II* decision.   *Id.* at 301–02.   The Baltimore defendants attacked the consent decree by arguing that *Suter* had overruled *L.J. II*, thereby eliminating any legal basis for the consent decree.   *Id.* at 308.   This argument relied on *dicta* from *Suter* that suggested the States need only "have a plan approved by the Secretary which contains the 16 listed features."   *Suter*, 503 U.S. at 358.   So long as the States had cleared that low bar, the AACWA as a whole was not privately enforceable.   *See id.*   There were only two problems.   First, Congress rejected this *dicta* following *Suter*.   42 U.S.C. 1320a-2 (rejecting the notion that a statute is "unenforceable because of its inclusion in a section . . . requiring a State plan or specifying the required contents of a State plan.").[10]   Second, the Court applied the "law of the case doctrine," which requires prior decisions to govern the same issues at all stages of the case, unless they had been overruled or proven clearly wrong.   *Wilbon*, 633 F.3d at 308.   The Fourth Circuit thus rejected the Baltimore defendants' argument because they "failed to meet the[ir] burden of showing that . . . *L.J. II* ha[d] been overruled by *Suter.*"   *Id.*   Notably, the Court did not reaffirm its prior holding in *L.J II*.   The Court instead made "clear [that it did] not [then] hold that § 671(a)(16) provides a private right of action."   *Id.* at 312.

The parties here dispute whether the Court is bound by *L.J. II*.   Defendants argue that *Suter* and *White* "clearly . . . abrogated" *L.J. II* such that it does not bind the Court.   (ECF No. 18 at 29.)   Plaintiffs, on the other hand, contend that *Wilbon*'s refusal to hold that "*L.J. II* has been overruled

---

[10] Importantly, however, Congress did not "alter the holding in [*Suter*] that [§] 671(a)(15) . . . is not enforceable in a private right of action."   *Id.*

by *Suter*" compels the Court to apply *L.J. II*.   (ECF No. 29 at 28.)   Plaintiffs also claim that

Defendants are making "an identical argument" to the one *Wilbon* rejected.   (*Id.* at 30.)   Not so.

Defendants' position here is easily distinguishable from the Baltimore defendants in

*Wilbon*.   As noted above, the Baltimore defendants argued that *Suter* overruled *L.J. II* when it said

that a plan need only satisfy § 671(a)'s 16 requirements.   The Fourth Circuit, following Congress'

lead, rejected this argument.   Here, Defendants are making a fundamentally different one: that

*L.J. II* does not bind the Court since *Suter* and *White* eliminated two of three provisions *L.J. II*

found, "taken together," create a privately enforceable right.   And that, coupled with the Fourth

Circuit making "clear [that the Court] do[es] not now hold that § 671(a)(16) provides a private

right of action," *Wilbon*, 633 F.3d at 312, proves that *L.J. II* did not survive those later cases.   The

Court agrees.   Just as a milking stool cannot stand having lost two of its three legs, *L.J. II*'s

conclusion that § 671(a)(16) creates a privately enforceable right cannot stand in light of *Suter* and

*White*.[11]   The Court must therefore start from scratch, determining for itself whether § 671(a)(16)

is privately enforceable.

c.   § 671(a)(16) is not privately enforceable

"[U]nless Congress speak[s] with a clear voice, and manifests an unambiguous intent to

create individually enforceable rights, federal funding provisions provide no basis for private

enforcement by § 1983."   *Hensley v. Koller*, 722 F.3d 177, 181 (4th Cir. 2013) (alteration in

original) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002)).   In *Blessing v. Freestone*,

520 U.S. 329 (1997), the Supreme Court articulated a three-factor test to determine whether

---

[11] This conclusion is only bolstered by *Wilbon*'s recognition that, rather than finding a right by cobbling different sections together, courts must instead perform "a section-specific inquiry" to determine whether that particular section is privately enforceable.   *Wilbon*, 633 F.3d at 309.

Congress unambiguously intended "a particular statutory provision [to create] a federal right" privately enforceable under [] § 1983. *Id.* at 340. The *Blessing* test caused confusion in the lower courts and, for a moment, established "a relatively loose standard for finding rights enforceable by § 1983." *Gonzaga*, 536 U.S. at 282. The Supreme Court promptly rejected this laxed standard in *Gonzaga* when it held that nothing "short of an unambiguously conferred right" can support a § 1983 claim. *Id.* at 283. *Gonzaga* instructs courts to analyze the "text and structure of [the] statute" to discern whether "Congress intend[ed] to create new individual rights." *Gonzaga*, 536 U.S. at 286. When doing so, courts should consider whether the statute uses "rights-creating language," has an aggregate, rather than individual, focus, and whether Congress provided a federal review mechanism. *See id.* at 287–88, 289–90.

Plaintiffs here contend that § 671(a)(16)'s focus on "each child" unambiguously creates a privately enforceable, one the Court should not render "illusory." (ECF No. 29 at 29–30.) Defendants, on the other hand, argue that § 671(a)(16) speaks in terms of institutional practices and lacks rights-creating language, which precludes a finding of private enforceability. (ECF No. 18 at 24–25.)

None of the three considerations *Gonzaga* used to determine whether Congress unambiguously conferred a right weigh in Plaintiffs' favor. First, § 671(a)(16) does not feature the rights-creating language Congress typically uses when creating privately enforceable rights. The Supreme Court has explained that rights-creating language focuses on "the individuals protected" instead of "the person regulated." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). Put differently, rights-creating language is "individually focused." *Gonzaga*, 536 U.S. at 287. Here, § 671(a)(16) clearly focuses on Defendants, who it regulates, rather than Plaintiffs, who

33

stand to benefit.   Section 671(a)(16) does nothing more than tell Defendants what their plan must include before the Secretary can approve it.   If Defendants' plan "provides for the development of a case plan" and "a case review system" for "each child" in West Virginia's foster care system, Defendants will receive federal funding.   If not, they will not.

Section 671(a)(16) stands in stark contrast to statutes that *do use* rights-creating language. Take Title VI for instance.   It provides that "[n]o person . . . shall, on the ground of race, color, or national origin . . . be subjected to discrimination."   42 U.S.C. § 2000d.   Title IX uses near-identical language: "No person . . . shall, on the basis of sex . . . be subjected to discrimination." 20 U.S.C. § 1681(a).   Congress could have easily written § 671(a)(16) in a similar fashion, using an individual focus.   Congress could have said, for example, that "each child shall have a case plan and a case review system."   Such "individually focused terminology," "phrased in terms of the person[] benefitted," would have shown congressional intent to create an individual right. *Gonzaga*, 536 U.S. at 284, 287.   But Congress chose not to focus on the individual.   And since Congress "knows how to . . . expressly" "create a private cause of action" when it wants, *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020), § 671(a)(16)'s focus on the person regulated is telling.

Plaintiffs resist this conclusion, arguing that § 671(a)(16)'s requirement of a case plan and case review system for "each child" shows an unmistakable focus on the individual.   (ECF No. 29 at 29.)   Plaintiffs essentially ask the Court to read the phrase "each child" out of context, which the Court cannot do.   When interpreting statutes, the Court cannot "construe statutory phrases in isolation." *United States v. Morton*, 467 U.S. 822, 828 (1984).   The Court must instead read the statutory provision as a whole. *Id.*   When the Court reads § 671(a)(16) as whole, as it did above, there is but one conclusion: the statute focuses on the person regulated, not the individual

34

benefited.   Plaintiffs' reading may very well hold water when done "in a vacuum," *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016), but it becomes simply "untenable in light of [§ 671(a)(16)] as a whole." *King v. Burwell*, 576 U.S. 473, 497 (2015) (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 343 (1994)).

Second, § 671(a)(16) focuses on the aggregate, not the individual.   Statutes with an "aggregate," rather than individual, focus "cannot 'give rise to individual rights.'"   *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 344).   The tell-tale sign of a statute with an aggregate focus is one that is "not concerned with 'whether the needs of *any particular person* have been satisfied.'"   *Id.* at 288 (emphasis added) (quoting *Blessing*, 520 U.S. at 343).   The Supreme Court has twice dealt with statutes that, like § 671(a)(16), did not require perfect performance by the States.   Neither conferred an individual right.   In *Blessing*, the statute at issue required "substantial compliance."   *Blessing*, 520 U.S. at 335.   The *Blessing* Court said that "[f]ar from creating an *individual* entitlement to services, the [substantial compliance] standard is simply a yardstick . . . to measure the *systemwide* performance."   *Id.* (emphasis in original).   Likewise in *Gonzaga*, the Court found that a similar "substantial compliance" requirement was concerned with "polic[ies] and practice[s], not individual[s]."   *Gonzaga*, 536 U.S. at 288.   Section 671(a)(16) is no different.   While § 671(a)(16) imposes a clear obligation on Defendants, they need not comply with it in every individual case—they need only substantially conform to § 671(a)(16) to receive funding. 42 U.S.C. § 1320a-2a.   Put differently, so long as Defendants' system—as an aggregate—substantially complies with § 671(a)(16), the Secretary has no cause for concern.   The Court is therefore satisfied that § 671(a)(16) has an aggregate, rather than individual, focus.

Third, § 671(a)(16) provides a federal review mechanism to enforce its requirements, which further cuts against private enforceability. Congress required the Secretary to promulgate regulations to review AACWA programs implemented by the States. 42 U.S.C. § 1320a-2a. The Secretary has done so. 45 C.F.R. §§ 1355.35(c)(4), 1355.36(b). This review mechanism, as previously explained, exists to ensure substantial compliance. Should a State fail to substantially comply, the Secretary withholds funding. This, too, is a night-and-day difference from the few Spending Clause statutes the Supreme Court has concluded confer individual rights. *See Wilder v. Va. Hosp. Ass'n.*, 496 U.S. 498 (1990); *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987). In each case, the Court relied in large part on the fact that the statute lacked sufficient means of enforcement. *Wilder*, 496 U.S. at 522–23; *Wright*, 479 U.S. at 426; *see also Gonzaga*, 536 U.S. at 289–90 (noting that Congress' decision to provide a federal review mechanism "counsel[s] against . . . finding a congressional intent to create individually enforceable private rights."). But here, Congress enabled the Secretary to withhold federal funding, thereby ensuring that § 671(a)(16) is anything but "a dead letter." *Suter*, 503 U.S. at 360–01.

Since Congress has not "spok[en] with a clear voice" and "manifest[ed] an 'unambiguous' intent to confer [an] individual right[]," *Gonzaga*, 536 U.S. at 280, the Court finds that § 671(a)(16) is not privately enforceable. Defendants' Motion to Dismiss Count III is **GRANTED**.

   *D.  Counts IV & V – Americans with Disabilities Act and Rehabilitation Act*

Plaintiffs' Counts IV and V allege violations of the Americans with Disabilities Act and the Rehabilitation Act, respectively. The parties address the two claims as one, and the Court follows suit. *See e.g., Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (construing "the ADA and Rehabilitation Act to impose similar requirements.").

a. Governing Law

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[12]   42 U.S.C. § 12132.   Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program" that receives federal funds.[13]   29 U.S.C. § 794.

Title II and § 504 do more than share similar language—they also impose similar requirements.   *Halpern*, 669 F.3d at 461.   One such requirement is the "integration mandate." Public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals."   28 C.F.R. § 35.130(d); *see also* 34 C.F.R. § 104.4(b)(2) (imposing a similar integration requirement).   Federal regulations define the "most integrated setting appropriate to the needs of [the] individual[]" as one that "enables individuals

---

[12] A "public entity" is defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State . . . or local government."   42 U.S.C. § 12131(1)(A)–(B).   Also, a "qualified individual with a disability" "means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."   *Id.* § 12131(2).   Defendants do not dispute that they are covered by the ADA and Rehabilitation Act, nor do they challenge whether Plaintiffs are qualified individuals under the statutes.

[13] The Fourth Circuit has interpreted these to require a three-part showing by litigants bringing Title II and Rehabilitation Act claims.   *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).   Plaintiffs must show that they (1) have a disability; (2) are otherwise qualified to receive the benefits of the government program; and (3) were excluded from the program because of their disability.   *Id.*   Defendants concede Plaintiffs meet the first two requirements, but argue Plaintiffs have not alleged discrimination on the basis of their disabilities.   (*See* ECF No. 29 at 31.)   As such, the Court cabins its inquiry to whether Plaintiffs have alleged disability-based discrimination.   The Court also notes that Title II and § 504 have different causation standards, *Halpern*, 669 F.3d at 461–62, but believes that this is a non-issue here, as Plaintiffs' Complaint easily meets both standards.

with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, app. B.  Public entities must also abide by the "reasonable modification" requirement. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7)(i).  This latter command has a caveat.  A modification is not required if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id.*

The Supreme Court interpreted these requirements in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), where it held that the unnecessary institutionalization of individuals with mental disabilities is discrimination under Title II.  In *Olmstead*, the plaintiffs, two mentally disabled women, were institutionalized for psychiatric treatment.  *Id.* at 593.  Their condition later improved, but they remained institutionalized, despite being approved for treatment in community-based settings.  *Id.*  The plaintiffs alleged that defendants' "failure to place [them] in a community-based program" violated the integration mandate, thus constituting discrimination under Title II.  *Id.* at 594.  The defendants fought this, arguing that the plaintiffs had not been discriminated against because "no similarly situated individuals [were] given preferential treatment" in placement decisions.  *Id.* at 598.

The Court rejected the defendants' narrow reading of Title II because "Congress had a more comprehensive view . . . of discrimination" when it enacted the ADA.  *Id.* at 598.  Title II is not, as the defendants believed, limited to only those instances of "uneven treatment [among] similarly situated individuals."  *Id.*  Title II instead encompasses the unjustified institutionalization of the mentally disabled.  *See id.*  The Court reasoned that unjustified

institutionalization creates "[d]issimilar treatment" because the mentally disabled must "relinquish [their ability to] participat[e] in community life" "to receive needed medical services." *Id.* at 601. "[P]ersons without mental disabilities," on the other hand, "can receive the medical services they need without similar sacrifice." *Id.* Title II thus requires public entities to provide individuals with mental disabilities community-based treatment when appropriate.[14] *Id.* at 600.

The integration mandate, however, is not an immediate, unyielding command. The Court recognized that "States [may] resist modifications that entail a "fundamenta[l] alter[ation]" of the States' services and programs." *Id.* at 603 (some alterations in original). This "fundamental-alteration" defense, the Court said, "allow[s] . . . State[s] to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable" because of prior commitments to the many other mentally disabled individuals to whom the State must provide care. *Id.* at 604. This standard would be met, for instance, if a "State [could] demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace." *Id.* at 605–06. If so, "court[s] would have no warrant" to bump "persons at the top of the community-based treatment waiting list" in favor of "individuals lower down who commenced civil actions." *Id.* at 606.

b. Analysis

Plaintiffs allege Defendants have discriminated against them in two ways. First, Defendants offer "intensive mental health services" "almost exclusively in institutional settings rather than in the community." (ECF No. 1 at 78–79, ¶ 323.) This, in and of itself, Plaintiffs say

---

[14] When determining whether community-based care is appropriate for any particular individual, the Court held that "State[s] generally may rely on the reasonable assessments of [their] own professionals in determining whether an individual" should be placed in a community-based setting. *Id.* at 602. "Absent such [a finding], it would be inappropriate to remove a patient from the more restrictive setting." *Id.*

is discriminatory because it results in Plaintiffs' unnecessary institutionalization.   (*See id.*)
Second, Plaintiffs allege Defendants do not provide sufficient mental health services and disability
supports—in other words, reasonable accommodations—necessary for Plaintiffs to receive the full
benefits of the foster care system.   (*Id.* at 77–79, ¶ 318–27.)   Defendants launch a litany of attacks
at these claims.   First, Defendants say they never discriminated against Plaintiffs because
"shortcomings in the State's community-based mental health care system" affect everyone equally.
(ECF No. 18 at 31–32.)   Second, Defendants argue they are not required to "provide a certain
level of benefits" or services to Plaintiffs.   (*Id.*)   Third, Defendants claim that the integration
mandate is inapplicable here because the best-interest-of-the-child standard trumps federal law
when it comes to determining Plaintiffs' placements.   (*Id.* at 33.)   Fourth, Defendants claim there
are no unjustified placements because "each and every placement has been approved by a state
circuit court as in the best interest of the child."   (*Id.* at 33–34.)   Fifth, and finally, Defendants
say that even if the integration mandate does apply, they have a "'comprehensive, effectively
working plan' to ensure children with disabilities are placed in the least restrictive settings."   (*Id.*
at 34–38.)   Defendants' efforts fall flat.

    *Olmstead* rejected Defendants' first argument.   Discrimination under Title II is not limited
to the "uneven treatment of similarly situated individuals."   *Olmstead*, 527 U.S. at 598.   Instead,
Title II discrimination includes the "unjustified institutional[ization]" of persons with mental
disabilities.   *Id.* at 600.   Defendants' argument is thus beside the point: it does not matter that
*everyone* in their custody is needlessly institutionalized.   Title II simply requires a showing that
Plaintiffs have been "unjustifi[ably] institutional[ized]" when a less restrictive placement would
have been appropriate.   *Id.* at 598.   The Complaint is riddled with these claims.

Defendants' second argument rests on a faulty reading of *Olmstead*. Specifically, they hone in on language from a footnote where the Court said that the ADA does not require states to "provide a certain level of benefits to individuals with disabilities." (ECF No. 18 at 32–33) (quoting *Olmstead*, 527 U.S. at 603 n.14.) The very next sentence in that footnote, however, says, "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Olmstead*, 527 U.S. at 603 n.14. Defendants here offer a service—the foster care system—to Plaintiffs. And when offering this service, Defendants must make reasonable modifications so that Plaintiffs can fully participate in it. Requiring Defendants to provide Plaintiffs with mental health services and disability supports is entirely consistent with this mandate—these services are necessary for Plaintiffs to participate in the foster care system, and they are not entirely new, stand-alone programs. *Compare Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003), *with Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999).

Defendants' third argument is even less persuasive. Defendants claim that Plaintiffs are putting Title II and § 504 "on a collision course with" child welfare jurisprudence by asking for placements in less restrictive settings. (ECF No. 35 at 19.) This argument relies on a cherry-picked reading of the integration mandate: that "plac[ing] all children with disabilities in the 'most integrated setting' regardless of the individual circumstances of the case" would be contrary to the child's best interest. (ECF No. 18 at 33.) Defendants conveniently ignore the integration mandate's qualifying language—"the most integrated setting *appropriate to the needs of [the] qualified individual*[]." 28 C.F.R. § 35.130(d) (emphasis added). Nothing in this mandate conflicts with the best-interest-of-the-child standard; the two exist in perfect harmony. The integration mandate simply requires Defendants to make available "a range of facilities for the

care and treatment of persons with diverse mental disabilities." *Olmstead*, 527 U.S. at 597. From this range of placement options, state court judges select the one they determine is in the child's best interest. *See* W. Va. Code § 49-4-608(e). The integration mandate does not, as Defendants believe, force anyone to place Plaintiffs in "an inappropriate setting." *Olmstead*, 527 U.S. at 605; *see also* 28 C.F.R. 35.130(e)(1) (allowing qualified individuals to decline benefits conferred by the ADA). It merely requires Defendants to make available placements that would truly be in the child's best interest.

Defendants' fourth argument fares no better. Defendants claim that Plaintiffs have not been unjustifiably institutionalized because "each and every placement has been approved by a state circuit court as in the best interest of the child." (ECF No. 18 at 33–34.) This turns a blind eye to Plaintiffs' allegations. The Complaint details a foster care system in utter disarray, where institutionalization is the default. (ECF No. 1 at 85, ¶ 352.) This is not because institutionalization is the answer to Plaintiff's problems; Defendants have simply failed to create in-home and community-based treatment settings. Thus, when placing Plaintiffs, state courts had no choice but to institutionalize them. To the extent Defendants think these placements were in any way "justified" under *Olmstead*, they are wrong.

Defendants' fifth and final argument is nothing more than a last-ditch effort to convince the Court that they have the "comprehensive, effectively working plan" that *Olmstead* demands. (ECF No. 18 at 34–38.) Maybe so, but that is a factual determination, which the Court cannot make at the pleading stage. *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009). The Court's current task is to determine whether the Complaint states a claim for relief. Fed. R. Civ. P. 12(b)(6). The Complaint portrays a broken foster care system where

children are "institutionalized and segregated from the outside world," leaving them to languish

for years on end.   (ECF No. 1 at 2, ¶ 2.)   This is anything but a "comprehensive" and "effectively

working" plan.   *Olmstead*, 527 U.S. at 605.   Defendants' Motion to Dismiss Counts IV and V is

**DENIED**.

*IV.*     *CONCLUSION*

For the foregoing reasons, Defendants' Motion to Dismiss, (ECF No. 17), is **GRANTED**

in part and **DENIED** in part.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

ENTER:          January 13, 2023

_____

THOMAS E. JOHNSTON, CHIEF JUDGE

43
