UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| Jonathan R., minor, by Next Friend, Sarah DIXON, *et al.,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Class Action |
| | ) | 3:19-cv-00710 |
| v. | ) | |
| | ) | |
| Jim JUSTICE, in his official capacity as the Governor of West Virginia, *et al.,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED MOTION FOR CLASS CERTIFICATION**

## I.     INTRODUCTION[1]

As Plaintiffs stated in their Motion for Class Certification ("Initial Motion") filed on September 2, 2020 (ECF No. 131), foster children face severe and ongoing harm in West Virginia—a harm that Defendants appear to ignore or, worse, condone.[2] The State has long known about the grievous constitutional deficiencies that beleaguer its foster care system and have done little or nothing to address them. Indeed, this Court found that "Plaintiffs' Complaint describes a legion of shortcomings in the foster care system." *Jonathan R. v. Justice*, No. 19-cv-00710, 2023 U.S. Dist. LEXIS 6658, at *3 (S.D. W.Va. Jan. 13, 2023). While dismissing certain claims, the Court for the most part sustained Plaintiffs' substantive due process claims on behalf of the General

---

[1] All cited exhibits will be references at "Ex. _" and are attached to the Declaration of Marcia Robinson Lowry (hereinafter "Lowry Dec."), filed with this Memorandum with a citation to the relevant pages.

[2] Pursuant to the Court's order dated May 2, 2023 (ECF No. 315), the Court required Plaintiffs to update their Motion for Class Certification. Plaintiffs note that they have not received any documentary discovery from Defendants or been permitted to take depositions since the District Court initially dismissed the case on July 28, 2021. Lowry Dec. at ¶ 9. Additionally, Defendants restricted the documents produced previously, repeatedly insisting that Plaintiffs are not entitled to significant discovery prior to class certification. *Id.*

Class as well as Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.[3] *Id.* at *20-24, *56-61.

Plaintiffs expect that as Defendants did in their original Opposition to Plaintiffs' Motion for Class Certification (ECF No. 160), they will tout irrelevant new initiatives and make inappropriate arguments focused on the merits of the action. But as discussed below and in the Initial Motion, the foster care system has only worsened over the years as it continues grievously harming foster children.[4]

This putative class action is brought on behalf of the foster children who suffer harm resulting from Defendants' statewide policies and practices.[5] These policies and practices include failing to track and investigate maltreatment in care, maintaining a shortage of placements, the near abandonment of timely assessments and case plans, and caseloads so high caseworkers cannot do their critically important jobs. The harms, which affect all foster children in West Virginia, especially endanger those foster children in the subclasses: children with disabilities and children in kinship care.

---

[3] With regard to substantive due process claims, the Court found that Plaintiffs had adequately alleged the following claims on behalf of the General Class: (1) the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State; (2) the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child; (3) the right to services necessary to prevent an unreasonable risk of harm; (4) the right to conditions and duration of foster care reasonably related to the purpose of government custody; (5) the right to treatment and care consistent with the purpose and assumptions of government custody; and (6) the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody. *Id.* at *20-24. The Court also found that Plaintiffs had adequately alleged a substantive due process claim on behalf of the Kinship Subclass of the right to services to ensure the child is free from harm. *Id.* at *26.

[4] *See, e.g.,* Roger Adkins, *Samples: 'We're just dropping the ball' on foster care policies*, Williamson Daily News (Jan. 18, 2023), https://www.williamsondailynews.com/news/samples-were-just-dropping-the-ball-on-foster-care-policies/article_24c4c3b0-7109-5c90-9e83-ea628e4b8c68.html; Amelia Ferrell Knisely, *WV's lack of CPS workers means kids don't get help. The problem isn't new, and is getting worse.*, Mountain State Spotlight (Jan. 13, 2022), https://mountainstatespotlight.org/2022/01/13/wv-lack-of-cps-workers-kids-help/.

[5] Defendants' policies are not always written policies. Defendants maintain both formal and informal policies that guide the agency's action and decisions and that place Plaintiff Children at risk of harm.

As discussed in greater detail in Plaintiffs' Initial Motion, DHHR has continuously opted out of creating long-term retention plans for its over-burdened workforce and has done little to ensure that workers develop plans and deliver services to foster children.[6] Significantly in April of 2022, DHHR's Deputy Secretary resigned and released a statement that "DHHR has struggled to make, and even lost, progress in many critical areas. Child welfare . . . and many more DHHR responsibilities have simply not met anyone's expectation . . . For every child protected from harm and family supported, I am far more cognizant, even haunted, by those that have not been saved or that will go unsaved tomorrow."[7] Similarly, a January 2023 letter from members of the West Virginia Senate to DHHR Interim Secretary Jeffrey Coben stated that even though "[o]ver the past six years, the West Virginia Legislature has allocated more funding for child welfare than at any previous point in West Virginia history":

> DHHR has not made adequate progress for our children and families. In some areas, we have even lost ground. Making matters worse, the Legislature has struggled to secure answers from DHHR on how to specifically solve these grave problems. DHHR has not even been forthcoming with information about what the difficulties are, and we generally must depend on other stakeholders to inform us of critical issues.[8]

Plaintiffs now seek class certification on behalf of a general class of foster children and two subclasses to redress the federal statutory and constitutional violations that have long defined West Virginia's child welfare system.

## II.    STATEMENT OF FACTS

The evidentiary record developed thus far establishes that the practices and policies of Defendants expose foster children to a substantial risk of harm, in violation of their constitutional

---

[6] Pls.' Mem. in Supp. of Mot. for Class Certification at 3, 32-33, ECF No. 131.

[7] WSAZ News Staff, *Former deputy secretary of WV DHHR releases statement about departure*, WSAZ 3 (Apr. 11, 2022), https://www.wsaz.com/2022/04/11/former-deputy-secretary-wv-dhhr-releases-statement-about-department/.

[8] Ex. 1, Letter from Senate to Interim Secretary Coben at 1.

and federal statutory rights.[9] The practices and policies incontrovertibly promote this risk of harm by (1) failing to maintain an adequate array of foster care placements, both in number and type; (2) failing to engage in adequate and appropriate case planning; and (3) failing to maintain appropriate staffing, which results in high caseloads, high turn-over and over-extended workers. The record includes the case files that Defendants have produced for the Named Plaintiff Children, which prove woefully deficient.[10] Still, the case files reveal that DHHR committed the same chronic failures despite repeated warnings of the need for significant improvement.

First, every plaintiff suffered the consequences of Defendants' failure to assign them to stable placements. This failure followed from both a haphazard placement process and an inadequate placement array that has driven numerous foster children into out-of-state institutions.[11] "The trauma of multiple placements for [the Named Plaintiff] children was not only immediate but cumulative over many disruptions, resulting in behavior that was increasingly difficult to manage for caregivers."[12] Indeed, in 2021 DHHR placed nearly a quarter of the children in custody between twelve and twenty-four months in three or more placements.[13]

Second, Defendants consistently disregarded the case planning necessary to achieve stability. That is, "DHHR caseworkers do not appear to engage in sufficient case planning so as to

---

[9] *M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013) ("Individuals in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions.").

[10] Decls. and Expert Report of Jan Flory, M.S.W., Susan Getman, M.S.W., and Elsa Popchak, L.S.W. at 31, ECF No. 133-1 (hereinafter "Flory, Getman, and Popchak Report") ("DHHR workers and supervisors [have to] reckon with a resource that resembles a giant, disassembled jigsaw puzzle rather than a professionally organized, legal case record."); *id.* at 69 (finding that the records could not have "be[en] used for supervisory review, continuous quality improvement, safety assessment, safety planning or critical decision-making review.").

[11] *See* Decl. and Expert Report of Nisha Sachdev, Psy.D. at 39, ECF 130-10 (hereinafter "Expert Report on ADA Subclass").

[12] Flory, Getman, and Popchak Report at 15, ECF No. 133-1.

[13] *Outcome 6: Placement Stability*, Children's Bureau Child Welfare Outcomes Report Data, https://cwoutcomes.acf.hhs.gov/cwodatasite/sixOneLessThan12/index (accessed May 12, 2023).

anticipate and strategize about beneficial interventions to avoid foster care disruptions when a child has an outburst of negative behavior or a mental health crisis."[14]

And third, DHHR has not sustained a workforce capable of ensuring the children's safety and wellbeing. Instead, "[t]he casework practice that was documented in these records raises serious concerns regarding the knowledge and skill of frontline workers and supervisors."[15] Relatedly, "the shortage of qualified and experienced staff, high turnover, and high caseloads, result in the failed implementation of [DHHR] policies and procedures."[16]

As discussed in more detail in the Initial Motion, the Named Plaintiff Children have suffered actual injuries, as well as suffering the significant risk of harm from the state's practices.[17] Plaintiffs note that Defendants have not produced documents, including case files, for the Named Plaintiffs since the filing of the Initial Motion.[18] Additionally, pursuant to the Fourth Circuit's ruling in this action, the claims of Named Plaintiffs that are no longer in foster care are "inherently transitory" and "relate back to the filing of the complaint," but Plaintiffs have still yet to receive case files for certain of these Named Plaintiffs.[19] *Jonathan R.*, 41 F.4th at 326. Thus, Plaintiffs restate the descriptions of the Named Plaintiffs' case files as stated in their Initial Motion.[20]

## III.    LEGAL STANDARD OF REVIEW

As discussed in the Initial Motion, class certification is proper where a proposed class satisfies the four prerequisites of Fed. R. Civ. P. 23(a) and fits into one of the three types of class actions described in Rule 23(b). In ensuring that Rule 23's requirements have been met, courts

---

[14] Flory, Getman, and Popchak Report at 25, ECF No. 133-1.
[15] *Id.* at 32.
[16] Expert Report on ADA Subclass at 16, ECF No. 130-10.
[17] Mem. for Class Certification at 6-12, ECF No. 131.
[18] Lowry Dec. at ¶ 9.
[19] *Id.* at ¶ 8.
[20] Mem. for Class Certification at 6-12, ECF No. 131.

may consider merits questions "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied" and may not "engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013).[21] Courts have wide discretion to "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will . . . 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins,* 880 F.2d 709, 740 (4th Cir. 1989)).[22]

The Fourth Circuit has held that the decision of whether to certify a class must factor in the nature of the allegations. *See Brown*, 785 F.3d at 921. Significantly, courts within the Fourth Circuit have especially supported the certification of classes alleging civil rights violations and consistently certify classes comprised of individuals in state custody whose rights the state's policies and practices violate.[23] In the foster care context, federal courts across the country have granted class certification where plaintiff children allege similar constitutional and federal statutory claims to those in the instant action against child welfare agencies.[24] Additionally,

---

[21] On these grounds, "[w]hen, as here, 'the concern about the proposed class is . . . [an alleged] failure of proof as to an element of the plaintiffs' cause of action[,] courts should engage that question as a matter of summary judgment, not class certification,'" *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 457 (2016) (internal citation omitted)—and otherwise "accept the evidence for class certification purposes regardless of the challenges made by the defendant or any competing expert testimony," *Rhodes v. E.I. Dupont De Nemours & Co.*, No. 06-cv-00530, 2008 U.S. Dist. LEXIS 46159, at *31 (S.D. W. Va. June 11, 2008).

[22] *See also Brown v. Nucor Corp.,* 785 F.3d 895, 921-22 (4th Cir. 2015) (holding "Rule 23 provides wide discretion to district courts, in part, to promote the systemic class action virtues of efficiency and flexibility. The realization of such benefits, however, requires that a district court exercise its judgment in a reasoned and expeditious manner.").

[23] *See, e.g., Scott v. Clarke,* 61 F. Supp. 3d 569, 583 (W.D. Va. 2014); *Coras v. Bounds,* No. 20-cv-0780, 2020 U.S. Dist. LEXIS 171386, at *37-38 (D. Md. Sep. 18, 2020); *Buffkin v. Hooks,* No. 1:18-CV-502, 2018 U.S. Dist. LEXIS 202875, at *44 (M.D.N.C. Nov. 30, 2018).

[24] *See, e.g., Wyatt B. v. Brown,* No. 6:19-cv-00556, 2022 US. Dist. LEXIS 147091 (D. Or. Aug. 17, 2022); *B.K. v. Snyder,* 922 F.3d 957 (9th Cir. 2019), *cert. denied,* No. 19-765, 2020 U.S. LEXIS 1731, at *1 (Mar. 23, 2020); *M.D. v. Abbott,* 907 F.3d 237, 271 (5th Cir. 2018); *DG v. Devaugh,* 594 F.3d 1188, 1194 (10th Cir. 2010); *Marisol A. by Forbes v. Giuliani,* 126 F.3d 372, 380 (2d Cir. 1997); *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir. 1994).

because Plaintiffs' requested injunctive relief aims at correcting Defendants' unconstitutional conduct, the class action is therefore properly maintained under Rule 23(b)(2).[25] *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 360 (2011) (stating Rule 23(b)(2) is appropriate when "a single injunction or declaratory judgment would provide relief to each member of the class.").

## IV.    PLAINTIFF CHILDREN MEET THE REQUIREMENTS OF RULE 23(A)

### A.    The Plaintiff Class is So Numerous that Joinder Is Impracticable

Under Fed. R. Civ. P. 23(a)(1), the proposed class is sufficiently numerous to make joinder impracticable.[26] The General Class consists of approximately 6,142 children currently in the custody of DHHR.[27] The ADA Subclass and the Kinship Subclass each consists of thousands of children currently in foster care.[28] Therefore, Plaintiffs easily satisfy the numerosity requirement.

### B.    The Putative Classes and Subclasses Share Common Questions of Law and Fact

#### 1.    Substantial Evidence of Commonality Exists with Respect to the General Class

For the purposes of Rule 23(a)(2), even a single common question will satisfy the requirement for class certification of questions of law or fact common to the class. *See Wal-Mart*

---

[25] The "ascertainability" requirement does not apply to Rule 23(b)(2) class actions seeking only injunctive and declaratory relief because Rule 23(b)(2) class actions do not require notice as do (b)(3) class actions. *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016); *see also* S*helton v. Bledsoe,* 775 F.3d 554, 561 (3d Cir. 2015); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972).

[26] *See* Mem. for Class Certification at 15-16, ECF No. 131; *Rodger v. Elec. Data Sys. Corp.,* 160 F.R.D. 532, 535 (E.D.N.C. 1995); *see also L.S. by and through Ron S. v. Delia,* No. 11-cv-354, 2012 U.S. Dist. LEXIS 43822, at *22 (E.D.N.C. Mar. 29, 2012) ("[W]here the relief sought for the class is injunctive and declaratory in nature, more speculative representations as to the size of the class suffice as to the numerosity requirement.").

[27] *Foster Care Placements Report*, WV DHHR (January 31, 2023) (hereinafter "2023 Placements Report"), https://dhhr.wv.gov/bss/reports/Documents/2023%20February%20Legislative%20Foster%20Care%20Placement%20Report.pdf. In West Virginia, children enter foster care through both dependency and juvenile justice proceedings. *See Foster Care Policy § 1.8*, DHHR (May 2022) (hereinafter "Foster Care Policy"), https://dhhr.wv.gov/bcf/policy/Documents/Foster%20Care%20Policy%20May%202022.pdf. Children who enter care through juvenile justice proceedings, such as Gretchen C., also belong to Plaintiffs' General Class. *See Jonathan R. v. Justice*, 41 F.4th 316, 330 (4th Cir. 2022) ("We note, however, that West Virginia treats all foster children the same, whether they end up in foster care as a result of a juvenile proceeding or as a result of a child abuse and neglect proceeding.") (internal quotation marks omitted).

[28] *See* 2023 Placements Report; *see also* Expert Report on ADA Subclass at 6-7, ECF No. 130-10.

*Stores, Inc.*, 564 U.S. at 359. As discussed in greater detail in Plaintiffs' Initial Motion, "[d]espite the presence of individual factual questions, the commonality criterion . . . is satisfied by . . . common questions of law presented." *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984).[29] Questions of law or fact prove sufficiently common "[w]here the injuries complained of by named plaintiffs allegedly result from the same unlawful pattern, practice, or policy of the defendants." *Parker v. Asbestos Processing, LLC*, No. 11-cv-01800, 2015 U.S. Dist. LEXIS 1765, at *19 (D.S.C. Jan. 8, 2015).[30] Moreover, the commonality element is more easily established in proposed class actions that, like this action, seek injunctive or declaratory relief.[31]

As discussed in the Initial Motion, although "[c]ertification is only concerned with the commonality (not the apparent merit) of the claims," *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 332-33 (4th Cir. 1983)—the necessary inference, statistical data, and direct evidence within this Motion establish the system-wide practice that fulfills the commonality requirement for class certification. *See Stastny v. S. Bell Tel. & Tel. Co.,* 628 F.2d 267, 278 (4th Cir. 1980).[32] As the Plaintiff Children allege harms stemming from Defendants' policies and practices, their claims depend upon a common contention.

> *Questions of fact common to the classes include:*
> - whether Defendants fail to protect the General Class from physical, psychological, and emotional harm, and risk of harm;
> - whether Defendants deprive Plaintiffs of the Kinship Subclass of necessary home safety assessments and other services necessary to ensure the safety of the child;

---

[29] *See Neal*, 43 F.3d at 59 ("[M]any . . . lawsuits challenging the provision of services to foster children have been certified despite the varieties of factual differences that characterize the plaintiffs in each case and despite the variety of legal claims any one class may make.").

[30] *See also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) ("A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees.").

[31] *See, e.g., Clarke*, 61 F. Supp. 3d at 585; *G.T. v. Bd. Of Educ.*, No. 2:20-cv-00057, 2021 U.S. Dist. LEXIS 159801, at *47 (S.D. W. Va. Aug. 24, 2021); *McGlothlin v. Connors*, 142 F.R.D. 626, 633 (W.D. Va. 1992); *Twyman v. Rockville Hous. Auth.*, 99 F.R.D. 314, 321 (D. Md. 1983).

[32] As discussed in greater detail in the Initial Motion at 16-19, while the *Wal-Mart* Court found that the plaintiffs had not adequately alleged a common contention, Plaintiffs here have satisfied the *Wal-Mart* standard.

- whether Defendants deprive Plaintiffs of the ADA Subclass of necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
- whether Defendants operate a system that promptly and adequately assesses the individual needs of members of the class;
- whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the class and subclasses;
- whether Defendants provide adequate caseworker resources to ensure that members of the class routinely meet with caseworkers face-to-face and engage in individual services.

*Questions of law common to the classes include:*

- whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse, and trauma through unnecessary and too-frequent moves;
- whether Defendants' systemic failures violate Plaintiffs' rights under the ADA and the Rehabilitation Act and the respective implementing regulations, including by unnecessarily placing youth with disabilities in institutional settings and denying them access to community-based treatment.

Plaintiffs satisfy the commonality requirement as they allege that Defendants' system-wide policies and practices expose all members of the General Class to a substantial risk of harm, in violation of their constitutional and federal statutory rights. These practices and policies include:

### a.    Inadequate array of appropriate placements

As of January 31, 2023, roughly 6,142 children in the West Virginia foster care system remain in out-of-home placements.[33] And West Virginia has the highest per capita rate of children in state custody in the country, up 45% since ten years ago.[34] But due to Defendants' failure to recruit homes and create facilities that can address specialized needs, severe shortages continue to face DHHR.[35] This has caused Defendants to engage in a haphazard placement process that

---

[33] 2023 Placements Report.

[34] *Children Ages Birth to 17 Entering Foster Care in West Virginia*, The Annie E. Casey Foundation Kids Count Data Center, https://datacenter.aecf.org/data/tables/6268-children-ages-birth-to-17-entering-foster-care (accessed May 12, 2023).

[35] Mem. for Class Certification at 21-27, ECF No. 131; *see also* Ex. 2, Transcript of Hearing on January 6, 2022 ("January 6, 2022 Hearing") at 48:15-49:21, *Victor v. West Virginia Department of Health and Human Resources*

embraces a total disregard for individualized care.[36] DHHR has exhibited "an overreliance on shelter care,"[37] and leaves children in temporary shelter care for months on end.[38] Further, as discussed in more detail in the Initial Motion, a large percentage of children find themselves in inappropriate and often dangerous institutions.[39] West Virginia also has a long history of relying on out-of-state care.[40] Indeed, of the 659 children living in group residential care as of January 2023, DHHR sent over thirty percent of those children to out-of-state facilities.[41] As recently as January of 2022, DHHR admitted that it does not have enough facilities in West Virginia or staff to support those facilities.[42] Many of those out-of-state facilities have faced criminal investigations into abuse of children as well as the misuse of physical and chemical restraints.[43]

Alternatively, Defendants place children in overcrowded foster homes on an emergency basis—or force children to stay overnight in hotels and DHHR offices.[44] Indeed, a DHHR

(Testimony of Sandra Wilkerson, Social Service Coordinator in the Kanawha District Office) ("There is a lack of foster care beds, but there's also a lack of beds for children that might have behavioral issues or even emergency care beds in shelters, shelter placements . . . THE COURT: And . . . to your knowledge have there been any recruiting efforts for other facilities? THE WITNESS: For facilities? Not to my knowledge.").

[36] See Flory, Getman, and Popchak Report at 21, ECF No. 133-1 ("For the Named Plaintiff [C]hildren, . . . DHHR used the first available placement . . . [F]requent placement changes primarily resulted from the inability of the placements secured by DHHR to meet the children's individualized therapeutic needs.").

[37] WV Child and Family Services Review, Program Improvement Plan, West Virginia Dep't of Health & Human Resources (December 13, 2019) (hereinafter "PIP Review"), at 23, https://dhhr.wv.gov/bcf/Reports/Documents/WVCFSR.ProgramImprovementPlan.pdf.

[38] Flory, Getman, and Popchak Report at 21, 25, ECF No. 133-1.

[39] Mem. for Class Certification at 22-25, ECF No. 131.

[40] Id. at 22-23, ECF No. 131; Ex. 2, January 6, 2022 Hearing Tr. at 81:16-19 ("And as you know, we have virtually for low IQ and folks with mental illness or really needing significant mental health, we have literally no beds in the state of West Virginia.").

[41] 2023 Placements Report.

[42] Ex. 2, January 6, 2022 Hearing Tr. at 76:20-24 (Testimony of Jeffrey Pack, Commissioner for Bureau for Social Services, West Virginia DHHR) ("Q: Well, now you've mentioned something that Judge Bloom touched upon: that we don't have enough facilities, but we don't even have enough staff to support the beds that we actually have licenses for. A: Correct.").

[43] See, e.g., Mem. for Class Certification at 23, ECF No. 131; Amelia Ferrell Knisely and Molly Born, West Virginia's reliance on out-of-state group homes leaves some foster kids in unsafe, abusive situations, Mountain State Spotlight (Sep. 21, 2021), https://mountainstatespotlight.org/2021/09/21/west-virginia-foster-care-out-of-state-homes/.

[44] See, e.g., Mem. for Class Certification at 22, ECF No. 131; Ex. 2, January 6, 2022 Hearing Tr. at 18:6-26:5 (Testimony of Michael Hale, Community Services Manager for the Kanawha District Office); Ex. 3, Affidavit of Commissioner Jeffrey Pack, Victor v. West Virginia Department of Health and Human Resources ("[I]t would be impossible for WVDHHR to guarantee compliance with an order prohibiting the temporary housing of children in

Community Services Manager recently testified that at times children were housed in hotels and offices "approaching two weeks' time" and that with regard to stays in the DHHR offices, "[t]here were occasions of consecutive stays, interruptions by stints in juvenile detention, and then the case [would] be dismissed or the child be released and back into our care, all the while still trying to [sic] secure the placement anywhere and everywhere, to no avail."[45] Children in hotels and DHHR offices are not provided with mental health counseling or other services and, thus, DHHR is not meeting its own rules and regulations.[46]

As discussed in more detail in the Initial Motion, problematic placements often do not last and with each move, "treatment is not consistent, nor are services uniform" and the likelihood of achieving permanency decreases.[47] But even though Defendants have long known of these issues, they have refused to act.[48] As of January of 2022, the lack of appropriate placements was still a significant issue that had not been adequately addressed.[49] The data demonstrates that the same deficiencies remain unchanged.[50] Whether Defendants' statewide failure to recruit and retain an adequate array of appropriate foster placements exposes the General Class to a substantial risk of harm is a common question of law and fact suitable for class treatment.

---

WVDHHR custody at hotels for more than two consecutive nights. . . . it is sometimes necessary for the WVDHHR to house children overnight at hotels for more than two consecutive nights while an appropriate placement is being located.").

[45] Ex. 2, January 6, 2022 Hearing Tr. at 18:6-26:5 (Testimony of Michael Hale).

[46] *Id.* at 24:19-25:3 (Testimony of Michael Hale) ("THE COURT: All right. And you are aware that the Department has certain rules and regulations that they promulgated as to how these children are being maintained in facilities; is that correct? THE WITNESS: Yes, sir. THE COURT: And do you all—do you—are you meeting any of those obligations to the children that you're housing either in a hotel or at your office? THE WITNESS: No, sir.").

[47] Mem. for Class Certification at 24, ECF No. 131.

[48] *Id.* at 25-26, ECF No. 131.

[49] *See* Ex. 2, January 6, 2022 Hearing Tr. At 75:17-77:9 (Testimony of Jeffrey Pack).

[50] *See, e.g.*, *West Virginia 2022 Annual Progress and Services Review*, WV DHHR (2022) at 91-92, https://dhhr.wv.gov/bss/reports/Documents/West%20Virginia%20APSR%202021%20Completed%202022.pdf (hereinafter "2022 APSR") (showing that rate for needs and services of children, parents and foster parents generally remained the same from 2017 through 2020); *id.* at 99 (showing that rate of caseworker visits with children generally decreased from 2017 through 2020)).

### b.   Lack of appropriate case planning

As discussed in greater detail in the Initial Motion, against its own policy, the Department does not engage in critical permanency planning or effective case review for foster children.[51] Repeated warnings have not inspired Defendants to change course.[52] Indeed, DHHR's 2022 Annual Progress and Services Report still observed a "lack of establishment of case plans/goals through engagement of family members."[53] The question of whether Defendants' case-planning policies and practices expose foster children to a substantial risk of harm in violation of their constitutional rights satisfies the commonality requirement.

### c.   High caseloads and chronic understaffing

Excessive caseloads prevent caseworkers from ensuring the safety and wellbeing of foster children.[54] The Child Welfare League of America recommends that caseworkers carry between twelve and fifteen cases and that cases be counted by child.[55] But DHHR has not established a caseload standard and counts the cases that a caseworker carries by family, not individual child, until the termination of parental rights.[56] As a result, DHHR substantially *underestimates* the average caseworker caseload, which averages are already overly high.[57] As of April 2020, caseworkers across the State carried eighteen cases on average and also counted cases by family

---

[51] Mem. for Class Certification at 27-30, ECF No. 131.

[52] *Id.* at 29.

[53] 2022 APSR at 103.

[54] *See* Mem. for Class Certification at 30-34, ECF No. 131; Expert Report on ADA Subclass at 16, ECF No. 130-10 ("High turnover, child welfare workers overburdened with high caseloads, and staff inexperience negatively impact the ability of the agency to assess children's safety, ensure appropriate assessments and service provision, and engage families in the casework process.").

[55] Sean Hughes & Suzanne Lay, *Direct Service Workers' Recommendations for Child Welfare Financing and System Reform*, CHILD WELFARE LEAGUE OF AMERICA (Jan. 2012) at 5.

[56] Email from Philip Peisch to Marcia Lowry, et al. (June 19, 2020) at 1, ECF No. 130-36.

[57] For instance, many caseworkers, including caseworker trainees, carry caseloads of over 100 children. (*See* DHHR Caseloads (Sept. 5, 2019), ECF No. 174-5).

rather than by child in many instances.[58] By December 31, 2021, this number had increased to approximately twenty-two cases on average.[59] Moreover, preliminary discovery indicated that the average caseworker caseload exceeded thirty cases in more than half of West Virginia's districts, with some districts' average caseworker caseloads as high as fifty.[60] Further, districts routinely amass sizable child abuse and neglect report "backlogs" as high as 200 or 800.[61] The continual understaffing at DHHR has rendered high caseloads inevitable, which in turn prevents DHHR from ensuring children's safety and wellbeing.[62] As of April 2023, the vacancy rate for child welfare positions was at 24%.[63]

Indisputably, turnover and caseloads have interfered with the ability of staff to act as primary supports for foster children and families.[64] As recently as 2022, DHHR admitted that "[c]ontinually increasing caseloads and petitions, lack of resource homes, lack of services to address identified needs, and the inability to ensure adequate staffing levels are observed as impacting the case review outcomes."[65] Excessive turnover and caseloads also deprive children of

---

[58] Average Caseloads by District (April 10, 2020) at D137153, ECF 130-38.

[59] *See* Ex. 4, filed in connection with *Victor v. West Virginia Department of Health and Human Resources*, No. 18-P-142 (Cir. Ct. Kanawha County). Plaintiffs note that in their original Opposition to Plaintiffs' Motion for Class Certification on November 16, 2020 (ECF No. 160), Defendants touted that "DHHR focused significant attention and resources on increasing the number of qualified caseworkers and decreasing their caseloads" and "the average statewide caseload decreased substantially." *Id.* at 24. But that number has only increased since their filing.

[60] *See* DHHR Caseloads (Sept. 5, 2019), ECF No. 174-5.

[61] *See* Decl. of Marcia Robinson Lowry ¶ 24-25, ECF No. 174-1.

[62] *See* Expert Report on ADA Subclass at 19, ECF No. 130-10 ("High turnover results in increased caseloads for remaining staff, decreased time available to appropriately assess and manage each case, and disrupted relationships with the child.").

[63] *Child Welfare Dashboard*, WV DHHR, https://dhhr.wv.gov/Pages/childwelfaredatadashboard.aspx (accessed May 12, 2023).

[64] Mem. for Class Certification at 30-34, ECF No. 131; *see also Neal*, 43 F.3d at 62 ("Because of the dearth of trained caseworkers, . . ., DHS (allegedly) fails to investigate reports of abuse and neglect promptly or adequately and fails to reliably provide the children in its care with written case plans, with appropriate placements, with proper care while in custody, and with periodical dispositional hearings."); *Perry*, 294 F.R.D. at 42 ("a higher caseload means that a caseworker can devote less time and energy to each case, and naturally class members' safety is affected by the amount of time and energy their caseworkers can devote to their respective cases."); *Perry*, 294 F.R.D. at 44 ("A caseworker that is so overburdened that she cannot visit the children she is responsible for to keep apprised of their well-being, or if she cannot build enough of a rapport to do so effectively, cannot fulfill this function.").

[65] 2022 APSR at 66.

stable relationships, as overwhelmed caseworkers cannot be reached by foster parents, kinship caregivers, or foster children.[66]

Defendants have long known about the need to reduce caseloads and expand the caseworker workforce, but the minor "efforts [in West Virginia] to recruit and retain DHHR staff" have "experienced limited success."[67] DHHR also accepts new caseworkers with limited and often insufficient education and then overloads them with cases such that they cannot attend trainings.[68] The failure to support, train, and retain caseworkers risks the safety and security of all class members and places all children in West Virginia's child welfare system at a substantial risk of harm. Such common questions of law and fact satisfy the commonality requirement.

### 2. Substantial evidence of commonality exists with respect to the ADA Subclass

The common questions of fact and law raised, each of which alone satisfies the commonality requirement for the ADA Subclass, include the following:

- Whether Defendants deprive Plaintiffs of the ADA Subclass of necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
- Whether Defendants have a practice of unnecessarily placing youth with disabilities into institutional settings and denying them access to community-based treatment; and
- Whether Defendants have a practice of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of ADA Subclass members.

Plaintiffs allege that Defendants' policies and practices harm or expose all members of the ADA Subclass to a substantial risk of harm, in violation of the ADA.[69] As discussed in more detail

---

[66] Mem. for Class Certification at 31-32, ECF No. 131.

[67] *Id.* at 33.

[68] *Id.* at 33-34.

[69] *See* Expert Report on ADA Subclass at 5, ECF No. 130-10 ("DHHR has not effectively implemented their programs, policies, procedures, and practices to afford children with disabilities in their care with fair and equal access to services and supports."). While each child in the ADA Subclass may have unique needs, "[i]n a lawsuit wherein individuals

in the Initial Motion, foster children in West Virginia do not have ready access to community-based mental and behavioral health services and professionals.[70] Thus, for mental health treatment, the "default service in West Virginia is institutionalization."[71] DHHR is also aware that it continues to violate the ADA by failing to individualize services and placements for children with disabilities.[72] But modifications to the system have been trivial and "have not significantly reduced the number of children unnecessarily placed in segregated residential treatment facilities."[73]

Defendants' system-wide policies and practices place all members of the ADA Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.[74]

### 3. Substantial evidence of commonality exists with respect to the Kinship Subclass

The common question of fact and law raised by all members of the Kinship Subclass include the following:

---

with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality." *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011).

[70] Mem. for Class Certification at 36-37, ECF No. 131; Expert Report on ADA Subclass at 5, ECF No. 130-10 ("DHHR fails to provide access to an adequate array of community-based services, programs, and activities that are readily accessible to and usable by children with disabilities").

[71] Mem. for Class Certification at 37, ECF No. 131; Expert Report on ADA Subclass at 30, ECF No. 130-10 ("West Virginia's failure to provide in-home and community-based services places children with mental health conditions who currently live in the community at risk of unnecessary institutionalization."); *id.* at 6 ("DHHR has failed to ensure availability of and placements in the most integrated, least restrictive setting appropriate to the needs, safety, and well-being of children with disabilities, and instead unnecessarily relies on institutional settings.").

[72] Mem. for Class Certification at 38-41, ECF No. 131; Expert Report on ADA Subclass at 26, ECF No. 130-10 ("This lack of comprehensive services pushes DHHR to rely on what is available instead of tailoring services to meet the unique needs of the child").

[73] Letter from Dep't of Justice, Civil Rights Div., to Office of the Governor, State of West Virginia at 17 (June 1, 2015), https://archive.ada.gov/olmstead/documents/west_va_findings_ltr.pdf; *id.* at 19 (finding that "pilot programs, small initiatives or programs targeted at sub-groups . . . do not adequately ensure that all children who rely on DHHR for mental health care are not unnecessarily placed in segregated residential treatment facilities.").

[74] Expert Report on ADA Subclass at 2-3, ECF No. 130-10 ("DHHR violates reasonable professional standards in its provision of care and services to West Virginia foster children with disabilities. As a result, DHHR fails to meet the needs of children with disabilities who are in the state's custody, putting them at substantial risk of harm beyond the trauma they have already experienced.").

- Whether Defendants deprive Plaintiffs of the Kinship Subclass of services to ensure the child is free from harm.

West Virginia depends upon kinship placements to care for around fifty-five percent (3,377) of the State's foster care population,[75] although only sixty-eight percent of these placements are licensed by DHHR.[76] No matter the type of placement, caseworkers must contact the child on a regular basis to ensure the child's safety and wellbeing and must investigate allegations of maltreatment in care.[77] Yet, it is "not unusual that a relative/kinship caregiver will not see a caseworker after the original placement."[78] One of Plaintiffs' experts reported that around "50% of 627 certified kin and foster caregivers in West Virginia had been visited by a DHHR worker monthly, and more than 40% were first visited after three months or longer, with 40% of these visits completed after six months."[79] Without caseworker contact, the child's safety and well-being are not regularly monitored.[80] Moreover, children in uncertified kinship homes suffer a risk of being placed in a home where allegations of abuse are not adequately tracked or investigated.[81] Defendants' system-wide policies and practices place all members of the Kinship Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

### C.   The Claims of Named Plaintiff Children are Typical

#### 1.   Plaintiffs have satisfied the typicality requirement

---

[75] 2023 Placements Report.

[76] *Id.*

[77] Foster Care Policy at § 5.2.

[78] Kendra Boley-Rogers Kinship Dep. Tr. at 52:23–53:1, ECF 130-49.

[79] Expert Report on Kinship Subclass at 10, ECF No. 130-43.

[80] *Id.*

[81] Ex. 5, Deposition of Matthew Croft (Institutional Investigative Unit supervisor) (October 13, 2020) Tr. at 28:16-30:16; Ex. 6, Deposition of Cree Lemasters (Regional Director of Region 1) (December 1, 2020) Tr. at 79:7-85:3; Ex. 7, Deposition of Lance Whaley (Regional Director of Region 2) (December 2, 2020) Tr. at 90:23-92:16; Ex. 8, Deposition of Heather Grogg (Regional Director of Region 3) (June 30, 2021) Tr. at 48:4-49:13.

Named Plaintiffs' assertions in this action are "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "The threshold requirements of . . . typicality are not high." *Brown,* 576 F.3d at 153.[82] The standard for typicality does not require "members of the class [to] have identical factual and legal claims in all respects." *In re BearingPoint, Inc. Sec. Litig.,* 232 F.R.D. 534, 538 (E.D. Va. 2006) (quoting *Broussard v. Meineke Disc Muffler Shops,* 155 F.3d 331, 344 (4th Cir. 1998)).[83] Variations among class members' injuries do not defeat typicality as long as the members challenge the same course of conduct and make similar legal arguments to prove the defendants' liability.[84] *Wyatt B.*, 2022 U.S. Dist. LEXIS 147091, at *95.

Plaintiffs have satisfied the typicality requirement. While the histories of the Named Plaintiff Children present factual variations, Named Plaintiffs' claims all rest on the same legal theory as the members of the putative class. *See Clarke*, 61 F. Supp. 3d at 589 (typicality satisfied where plaintiff inmates suffered from a "broad variety of medical problems," all of which allegedly resulted from the state prison's substandard medical care policies).

Additionally, the Named Plaintiffs' claims are identical to the claims of each class member, and their claims all arise from the same course of conduct. For instance, the Complaint alleges that Defendants have long failed to maintain a sufficient number of foster homes, operate unsafe kinship care, create inadequate case plans, maintain insufficient community-based services, and overly rely upon out-of-state congregate care placements. Plaintiffs further allege that DHHR caseworkers carry unreasonably high caseloads, are inadequately trained, and that high vacancy rates pervade DHHR offices. Such systemic deficiencies expose all children in care to a substantial

---

[82] *See also Thorpe v. Va. Dep't of Corr.*, No. 20-cv-00007, 2023 U.S. Dist. LEXIS 64146, at *19 (W.D. Va. Apr. 12, 2023); *In re NII Holdings, Inc. Sec. Litig.,* 311 F.R.D. 401, 406 (E.D. Va. 2015).
[83] *See also G.T. v. Bd. Of Educ.*, No. 2:20-cv-00057, 2021 U.S. Dist. LEXIS 159801, at *50 (S.D. W. Va. Aug. 24, 2021); *see also Baby Neal*, 43 F.3d at 58.
[84] *See Clarke,* 61 F. Supp. 3d at 589.

risk of harm, in violation of their constitutional rights.[85] The Named Plaintiffs' claims are typical, and all seek relief that would benefit all class members in an identical manner.

### D.      The Named Plaintiff Children will Adequately Represent the Class

The Named Plaintiffs also satisfy the final prerequisite under Rule 23(a)'s adequacy requirement. Fed. R. Civ. P. 23(a)(4).[86] Here, no conflict exists as "all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *See Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir. 2010) (internal quotation marks omitted). Moreover, "plaintiffs have the ability and commitment to prosecute the action vigorously." *See Thomas v. La.-Pacific Corp.,* 246 F.R.D. 505, 509 (D.S.C. 2007). Additionally, "Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole." *Clarke,* 61 F. Supp. at 590.[87] Also, Plaintiffs' attorneys are amply qualified as discussed in Section V.[88]

### E.      The Named Plaintiff Children Satisfy the Requirements of Rule 23(b)

Plaintiffs satisfy Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs need only show that the "proof of the existence of systemic policies and practices that allegedly *expose* [plaintiffs] to a substantial risk of harm." *Parsons v. Ryan,* 754 F.3d 657, 681-82 (9th Cir.

---

[85] *See M.D.*, 294 F.R.D. at 46 (Plaintiffs "assert that these policies and practices subject class members to an unreasonable risk of harm, a legal injury that is common to all class members. The named plaintiffs' claims are thus typical.").

[86] *See* Mem. for Class Certification at 51-53, ECF No. 131.

[87] *See also Thomas v. La.-Pacific Corp.,* 246 F.E.D. 505, 509 (D.S.C. 2007) (finding Rule 23(a)(4) was satisfied because there was no conflict between plaintiffs and the class).

[88] *See id.* ("Courts generally hold that the employment of competent counsel assures vigorous prosecution.").

2014) (emphasis added).[89] Rule 23(b)(2) has been "liberally applied in the area of civil rights." *Bumgarner*, 276 F.R.D. at 457.[90] And numerous courts across the country have certified classes of foster care children under Rule 23(b)(2) that seek injunctive that would benefit all class members.[91]

Named Plaintiffs easily satisfy the requirements of Rule 23(b)(2).[92] Defendants, through the policies, practices, and procedures that compose their foster care program, have acted or refused to act on grounds generally applicable to each of the class members, all foster children. Accordingly, Defendants' conduct "is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.,* 564 U.S. at 360.

Indeed, Plaintiffs seek to cure system-wide failures rather than to adjudicate any individual child's case. Their Complaint identifies the need for an injunction that will increase caseworker staffing, increase mental health services, ensure each child has a written case plan that provides for permanency or reunification, and improve the quality and quantity of foster care placements.[93] This relief would benefit all class members. Moreover, Plaintiffs' claims cannot receive meaningful relief without proceeding on a class-wide basis.[94] Accordingly, the court should certify the class under Rule 23(b)(2) because only final injunctive and declaratory relief will "settle the

---

[89] *See B.R. v. Cnty of Orange*, No. 15-cv-00626, 2017 U.S. Dist. LEXIS 223520, at *14 (C.D. Cal. Dec. 11, 2017) ("*[E]xposure* to a substantial risk of serious harm. . . constitutes [the] constitutional violation.") (emphasis in original).

[90] *See also Harris v. Rainey*, 299 F.R.D. 486, 494 (W.D. Va. 2014); *Clarke,* 61 F. Supp. 3d at 591.

[91] *See, e.g., DG v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010); *Wyatt B.*, 2022 U.S. Dist. LEXIS 147091, at *103-04; *Connor B v. Patrick,* 272 F.R.D. 288, 297 (D. Mass. 2011); *M.D. v. Perry*, 294 F.R.D. at 46-47.

[92] *See* Mem. for Class Certification at 56-58, ECF No. 131.

[93] *See* Compl. ¶ 405, ECF No. 1.

[94] *See Jonathan R.*, 41 F.4th at 337 ("[I]f individual foster children can somehow master these standing and mootness hurdles, it is far from clear they could mount sufficient evidence to secure systemic relief . . . acting alone, a foster child can hardly appreciate the universe of interrelated deficiencies that may plague the system. Suing as a class, however, Plaintiffs can share their insider knowledge and identify the most productive structural changes to pursue. Beyond these procedural difficulties lie the more mundane monetary concerns. Shoring up sufficient evidence to demonstrate the need for systemic relief requires a lot of capital—capital most foster children neither have nor can hope to amass through litigation that seeks only declaratory and injunctive relief... All of this means that Plaintiffs' only real choice is between a federal and a state class (or some other collective) action.").

legality of the behavior with respect to the class as a whole." *Thorn*, 445 F.3d at 329 (internal quotation marks omitted).

Similarly, each subclass seeks broad, uniform injunctive relief to redress the particularized harms that each subclass suffers as a result of Defendants' policies and practices: the Kinship Subclass seeks injunctive relief requiring Defendants to properly monitor kinship placements; the ADA Subclass seeks injunctive relief requiring Defendants to develop and maintain an adequate array of therapeutic services and foster placements, and to provide services to children with disabilities "in the most integrated setting appropriate to the child's needs." These subclasses also satisfy the requirements of Rule 23(b)(2). *Wal-Mart Stores, Inc.,* 544 U.S. at 360.

## V.    THE COURT SHOULD APPOINT CLASS COUNSEL

As discussed in more detail in the Initial Motion, proposed counsel "fairly and adequately represent[s] the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (g)(4).[95] Proposed class counsel has: (1) dedicated substantial efforts to developing the class allegations and to pursuing these allegations—including by appealing the District Court's initial decision on Defendants' Motion to Dismiss; (2) extensive experience in handling class actions and other complex litigation, including civil rights litigation in the area of child welfare; (3) the ability to represent the class adequately and no conflicts with any known members of the putative class; and (4) the resources to commit to representing the class.[96]

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask that the Court grant Plaintiffs' Motion and certify the General Class and each subclass.

---

[95] Mem. for Class Certification at 58-60, ECF No. 131.

[96] The Declarations of Marcia Robinson Lowry and Richard W. Walters, filed concurrently with this Memorandum, contain descriptions of class counsels' qualifications. *See generally* Lowry Dec.; Declaration of Richard W. Walters.

Respectfully submitted,

*/s/ Marcia Robinson Lowry*
Marcia Lowry, *admitted pro hac vice*
mlowry@abetterchildhood.org
Julia K. Tebor, *admitted pro hac vice*
jtebor@abetterchildhood.org
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415


*/s/ Richard W. Walters*
Shaffer & Shaffer, PLLC
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net
Brian L. Ooten, WVSB #9358
booten@shafferlaw.net
2116 Kanawha Boulevard, East
P.O. Box 3973
Charleston, WV 25339
Tel: (304) 344-8716
Fax: (304) 344-1481

*/s/ J. Marty Mazezka*
Disability Rights of West Virginia
J. Marty Mazezka, WVSB #4572
jmazezka@drofwv.org
5088 Washington St. W., Suite 300
Charleston, WV 25313
Tel: (304) 346-0847
Fax: (304) 346-0687


**Attorneys for Plaintiffs**