**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| JIM JUSTICE, in his official capacity as | ) | Case No. 3:19-cv-00710 |
| Governor of West Virginia, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' OPPOSITION TO THE RENEWED MOTION FOR CLASS
CERTIFICATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 5

BACKGROUND .................................................................................................................. 5

ARGUMENT ....................................................................................................................... 7

    I.    Plaintiffs Have Not Proved Commonality. ............................................................... 7

        A.  Plaintiffs Have Not Proved Commonality With Respect to the Remaining Substantive Due Process Claims. ............................................................... 8

        B.  Plaintiffs Have Not Proved Commonality with Respect to their ADA Claims. ... 14

    II.   The Named Plaintiffs' Claims Are Not Typical and They Cannot Adequately Protect the Interests of a Class of All Foster Children ............................................. 18

    III.  Plaintiffs Have Not Proved that the Requested Relief is "Appropriate Respecting the Class as a Whole," as Required by Rule 23(b)(2). ....................................................... 21

    IV.  The Absent Putative Class and Subclass Members Lack Standing. ............................ 23

    V.   Plaintiffs Have Not Proved that a Class Including Juvenile Justice Youth Complies with Rule 23. ....................................................................................................................... 23

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*B.K. v. Snyder*,
   922 F.3d 957 (9th Cir. 2019) .................................................................. 4

*Branch v. Gov't Employees Ins. Co.*,
   323 F.R.D. 539 (E.D. Va. 2018) ............................................................ 19

*Broussard v. Meineke Discount Muffler Shops, Inc,*,
   155 F.3d 331 (4th Cir. 1998) ................................................................ 15

*Carson P. v. Heineman*,
   240 F.R.D. 456 (D. Neb. 2007) ..................................................... passim

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) .............................................................................. 14

*D.L. v. D.C.*,
   713 F.3d 120 (D.C. Cir. 2013) ................................................................ 4

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) .......................................................... 14, 16

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .................................................................. 19

*E. Tex. Motor Freight Sys. v. Rodriguez*,
   431 U.S. 395 (1977) .............................................................................. 17

*Elisa W. v. City of N.Y.*,
   No. 15-5273, 2021 WL 4027013 (S.D.N.Y Sept. 3, 2021) (unpublished) ........................ passim

*Fitzmorris v. Weaver*,
   No. 21-25, 2023 WL 2974245 (D.N.H. Apr. 17, 2023) (unpublished) ...................... 9

*Grand Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) .............................................................................. 16

*Howard v. Chester Cty. Office of Juvenile Prob. & Parole*,
   396 F. Supp. 3d 490 (E.D. Pa. 2019) ..................................................... 20

*J.B. v. Valdez*,
   186 F.3d 1280 (10th Cir. 1999) ...................................................... 3, 5, 9

*J.P. v. DeSanti*,
   653 F.2d 1080 (6th Cir. 1981) ............................................................... 20

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ..................................................... 4, 18, 19

*Jonathan R. v. Justice*,
   41 F.4th 316 (4th Cir. 2022) ................................................................. 20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 19

*M.D. v. Abbott*,
   907 F.3d 237 (5th Cir. 2018) .................................................................. 4

*Malachowski v. City of Keene*,
   787 F.2d 704 (1st Cir. 1986) ................................................................. 20

*Morris v. McCaddin*,
   553 F.2d 866 (4th Cir. 1977) ................................................................ 15

*Parent/Prof'l Advocacy League v. City of Springfield*,
   934 F.3d 13 (1st Cir. 2019) .............................................................. 4, 5, 9
*Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*,
   543 F.3d 597 (10th Cir. 2008) .......................................................... 17, 18
*Solano v. Montgomery*,
   423 F. Supp. 3d 826 (C.D. Cal. 2019) ................................................... 20
*Sprint Comm., Inc. v. Jacobs*,
   571 U.S. 69 (2013) ......................................................................... 20
*State v. Bloom*,
   880 S.E.2d 899 (W. Va. 2022) ......................................................... 7, 8
*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................. passim
*Younger v. Harris*,
   401 U.S. 37 (1971) ......................................................................... 20

## State Statutes

W. Va. Code § 49-1-105(b)(7) ...............................................................11
W. Va. Code § 49-4-110 ..................................................................... 15
W. Va. Code § 49-4-601 ..................................................................... 15
W. Va. Code § 49-4-606 ..................................................................... 15
W. Va. Code § 49-4-608(e)(3) ...........................................................11, 15
W. Va. Code § 49-4-701 ..................................................................... 23
W. Va. Code § 49-4-701(e) .................................................................. 2
W. Va. Code § 9-5-27(b) .................................................................... 13
W. Va. Code § 9-5-27(f)(3)-(4) ............................................................ 13
W. Va. Code Ch. 49, Art 4, Part VII ...................................................... 23
W. Va. Code Ch. 49, Art 4, Part VI ....................................................... 23

## Federal Rules

Fed. R. Civ. P. 23 ........................................................................... 3
Fed. R. Civ. P. 23(b)(2) .................................................................... 17
Fed. R. Civ. P. 65(d) ....................................................................... 17
Fed. R. Civ. Pro. 23(a)(4) .................................................................. 16

## State Rules

W. Va. R. of Proc. For Child Abuse and Neglect Proceedings  36(e) ......................... 13
W. Va. R. of Proc. For Child Abuse and Neglect Proceedings 41 ............................. 13
W. Va. R. of Proc. For Child Abuse and Neglect Proceedings 6 .............................. 13

## Other Authorities

DHHR, *Child Protective Services Policy* (June 2022) ..................................... 7

iii

DHHR, *Foster Care Policy* (Aug. 2020) ........................................................................11

W.V. Bureau for Medical Services Medicaid Manual, ch. 502 ....................................... 13

W.V. Judiciary, Judicial Benchbook, ch. 3, at 23 (Aug. 2020) ......................................11

W.V. Leg., House Concurrent Resolution 35 (2021) ...................................................... 8

**INTRODUCTION**

In their renewed motion, Plaintiffs again fail to prove that the prerequisites of Rule 23 have been met, either for the putative General Class or for the remaining putative subclasses.  Not only are the claims of the Named Plaintiffs far from typical, but Plaintiffs again fail to identify, let alone prove the existence of, a classwide policy that drives their Substantive Due Process or the Americans with Disabilities Act ("ADA") claims.[1]  Accordingly, Plaintiffs cannot prove that their claims "depend on a common contention" that can "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

**BACKGROUND**

Contrary to the narrative presented by Plaintiffs and in some media coverage, West Virginia's child welfare system compares favorably to other states on most metrics.  For example, a 2020 federal review showed that West Virginia ranked 1st among states in placement stability; 2nd in preventing maltreatment in foster care; and 4th on achieving permanency for children in foster care for more than 12 months.  Doc. 160-9, at 50-52.  A more recent federal report similarly concluded that West Virginia outperformed the national averages (to a statistically significant degree) with respect to preventing maltreatment in care and placement stability.  *See* Ex. 1, at 8.

Approximately 83 percent of West Virginia's foster children are in family homes, compared to 12 percent – those professionally assessed as needing intensive treatment for mental health

---

[1] Title II of the ADA and Section 504 of the Rehabilitation Act are interpreted coextensively, though the implementing regulations differ.  Defendants refer to Plaintiffs' ADA and Rehabilitation Act claims collectively as the "ADA claims."

needs – in residential treatment programs.[2]  Ex. 2.  Approximately half of foster youth in residential treatment are in DHHR custody through a juvenile justice proceeding, *not* an abuse or neglect petition; these juvenile justice youth are 10 times more likely to be in residential treatment than traditional foster children.[3]  Doc. 107-1, App'x; Doc. 108, at 4-6.

The dissonance between the reality of West Virginia's system and the Plaintiffs' allegations stems in part from the fact that the Named Plaintiffs are extraordinarily atypical cases:

- <u>Behavior and emotional disturbance.</u>  Six of the nine Named Plaintiffs[4] are considered "emotionally disturbed," compared with 12 percent of children in DHHR custody.  Ex. 3, at 6.  Eight of the Named Plaintiffs have had suicidal or homicidal ideations; eight display physical and verbal aggression; seven have destroyed property; three have been charged as juvenile delinquents; and two have allegedly engaged in sexual misconduct.[5]

- <u>Disability.</u>  All nine Named Plaintiffs have a disability, and eight have multiple disabilities, Ex. 3, at 6, compared to 16 percent of the foster children with one or more disabilities.  *Id.*

- <u>Placement type.</u>  Eight of the Named Plaintiffs have spent time in residential treatment, while the vast majority of foster children are not in residential treatment. *See* Ex. 2.

- <u>Number of placements.</u>  Plaintiffs allege that every Named Plaintiff has experienced five or more placements and that six have experienced 10 or more placements.  Doc. 131, at 6-12.  In contrast, the median number of placements for foster care is one; the average number of placements is two; and 87 percent have been in 3 or fewer placements. Ex. 3, at 6.

---

[2] The remaining 5 percent are in short-term placements, such as short-term hospital stays; emergency shelters; and detention centers, pending release back to the foster family or transfer to Bureau for Juvenile Services ("BJS") custody.

[3] While the overwhelming majority of foster children come into DHHR custody through an abuse and neglect petition, some youth enter DHHR custody through juvenile delinquency or status offense proceedings ("juvenile justice youth"), because the circuit court determines that treatment in DHHR custody (residential or community-based) is more appropriate than BJS detention.  W. Va. Code § 49-4-701(e); Doc. 107-1.

[4] The Complaint includes 12 Named Plaintiffs, but Plaintiffs have not introduced any evidence about three of them, Chris K., Calvin K., and Caroline K.  Defendants did not produce the case files of these three siblings because they were adopted in 2019, and Plaintiffs did not provide evidence that their adoptive parents consented to their participation in this case.  Plaintiffs never moved to compel production of documents relating to these three siblings.

[5] Doc. 161-9, at 7; Doc. 161-5, at 8; Doc. 161-10, at 15; Doc. 161-3, at 23; Doc. 161-8, at 10; Doc. 161-7, at 7, 9, 10; Doc. 161-2, at 10, 17; Doc. 161-6, at 7, 16, 17, 18.

- <u>Time in custody.</u>  Seven of the Named Plaintiffs were in custody for over three years, whereas 94 percent of foster children have been in DHHR custody for less than three years, and the median amount of time a child spends in foster care is approximately 11 months.[6]

- <u>Age</u>.  The Named Plaintiffs are all over age 9, and eight are over age 15.  In contrast, 33 percent of foster children are under age 5 and 70 percent are under age 13.  Ex. 3, at 12.

## ARGUMENT

Class certification is the exception, not the rule, *see Wal-Mart*, 564 U.S. at 348, and therefore Plaintiffs seeking class certification under Rule 23(b)(2) must prove, among other things, commonality, typicality, adequacy, and "that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *See* Fed. R. Civ. P. 23.

### I.    **Plaintiffs Have Not Proved Commonality.**

The commonality standard is "easy to misread, since any competently crafted class complaint literally raises common questions."  *Wal-Mart*, 564 U.S. at 349 (cleaned up).  The key to satisfying commonality "is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* at 350 (internal citations omitted) (emphasis in the original).  Stated differently, plaintiffs' claims must "depend on a common contention" the truth or falsity of which "will resolve an issue that is central to the validity of" each claim "in one stroke."  *Id.* at 338, 350.

Before *Wal-Mart*, federal courts split "on whether classes seeking reform of . . . child welfare systems meet the commonality requirement."  *Carson P. v. Heineman*, 240 F.R.D. 456, 503 (D. Neb. 2007) (citing *J.B. v. Valdez*, 186 F.3d 1280 (10th Cir. 1999), among others).  After

---

[6] *See* Doc. 161-6, at 2-5; Doc. 161-10, at 8-13; Doc. 161-3, at 20-21; Doc. 161-8, at 5-8; Doc. 161-7, at 2-6; Doc. 161-2, at 5-8; Doc. 161-9, at 3-5; Doc. 161-5, at 5-7; Doc. 161-4, at 28-29; Ex. 3, at 7; Admin. Child. & Families ("ACF"), *Child Welfare Outcomes Data: West Virginia Context Data*,  https://cwoutcomes.acf.hhs.gov/cwodatasite/pdf/west%20virginia.html (last visited May 21, 2023).

*Wal-Mart*, these cases cannot satisfy commonality unless Plaintiffs prove that (1) "an official policy" or "unofficial but well-defined practice" (2) "drives the alleged violation."[7] *See, e.g.*, *Elisa W. v. City of N.Y.*, No. 15-5273, 2021 WL 4027013, *7-10 (S.D.N.Y. Sept. 3, 2021) (unpublished).[8]

### A. Plaintiffs Have Not Proved Commonality With Respect to the Remaining Substantive Due Process Claims.

Plaintiffs have not proved that (1) Defendants have a classwide "official policy" or "unofficial but well-defined practice" that (2) "drives" the classwide Substantive Due Process violations alleged on behalf of the putative General Class or Kinship Subclass.[9]

### i. Plaintiffs Have Not Proved that Defendants Have An Official Policy or Well-Defined Practice.

Plaintiffs propose a General Class of all children "in the legal and physical custody of DHHR," Compl. ¶ 30(a), and assert that Defendants have three "practices" that support

---

[7] *Parent/Prof'l Advocacy League ("PPAL") v. City of Springfield*, 934 F.3d 13, 28-29 (1st Cir. 2019); *see Wal-Mart*, 564 U.S. at 353-57 (commonality may be established by "significant proof" that a "policy" caused classwide harm); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (7th Cir. 2012) (rejecting commonality because movant did not prove "an illegal *policy*" that is the "glue" necessary to litigate claims (emphasis in original)).

[8] Plaintiffs cite three foster care cases where courts certified a class after *Wal-Mart*. Two of those cases, *Wyatt B.* and *B.K.*, come from the Ninth Circuit, which interprets Rule 23 differently other circuits after *Wal-Mart*. *Compare B.K. v. Snyder*, 922 F.3d 957 (9th Cir. 2019), *with PPAL*, 934 F.3d at 27-31, *D.L. v. D.C.*, 713 F.3d 120, 128 (D.C. Cir. 2013), *and Jamie S.*, 668 F.3d at 498. Further, in *B.K.*, the defendants did not "seriously dispute" the existence of classwide "policies" and "practices." 922 F.3d at 969. In the third case, the defendants barely briefed the class certification issues on appeal. *See M.D. v. Abbott*, 907 F.3d 237, 270-71 (5th Cir. 2018).

[9] The only remaining Kinship Subclass claim is a Substantive Due Process claim repetitive of the General Class claim, and thus Plaintiffs fail to prove commonality or conformance with Rule 23(b)(2) for the Kinship Subclass claim for the same reasons they have not met their burden for the General Class claims. To the extent they allege specific harms suffered by the Kinship Subclass, no Named Plaintiff has asserted any harm arising from a kinship placement, and therefore the subclass lacks a typical and adequate representative. Finally, Plaintiffs' kinship "expert" lacked a basic understanding of kinship care; mischaracterized the third-party reports on which she relied; and did not consider the improvements DHHR made in 2019 and 2020. Doc. 164, at 4-7.

commonality with respect to this putative class's remaining claims: "(1) failing to maintain an adequate array of foster care placements, both in number and type; (2) failing to engage in adequate and appropriate case planning; and (3) failing to maintain appropriate staffing, which results in high caseloads, high turn-over and over-extended workers."  Doc. 319, at 4, 9-14.

Pursuing class certification based on these three "practices" ignores the implications of this Court's decision dismissing Plaintiffs' case planning claim and placement stability claims.  *See* Doc. 300.  None of these three "practices" has a sufficient nexus to Plaintiffs' remaining Substantive Due Process claims, *i.e.*, that Defendants deprived the entire putative General Class of the rights to: freedom from maltreatment and unnecessary intrusions into emotional wellbeing; services to prevent an unreasonable risk of harm; and conditions of, duration of, and treatment in foster care reasonably related to the purpose of custody, *see id.* at 12-17.  Further, the three "practices" are not "unitary non-discretionary policies" (or even "well-defined" practices) "that violate the rights of all class members or cause them all injuries," but rather are merely vague descriptions of challenges facing the child welfare system that Plaintiffs label "practices."[10]

In any event, Plaintiffs do not introduce evidence that Defendants actually have any of these three classwide "practices."  For example, Plaintiffs do <u>not</u> introduce any data about the number of foster family placements available in West Virginia, or any expert opinion about how many placements are necessary to meet the classwide need.  Plaintiffs imply that they failed to introduce such evidence because discovery ended in 2021, Doc. 319, at 1 n.2, but Plaintiffs do not

---

[10] *Elisa W.*, 2021 WL 4027013, at *8 (rejecting effort to certify class based on practices of "fail[ing] to ensure that adequate case plans are timely developed" and "fail[ing] to protect children in its custody from an increased risk of maltreatment," among others); *cf. PPAL*, 934 F.3d at 28-29, 31 (holding that "failure to provide" behavioral services is not a "well-defined" practice); *J.B.*, 186 F.3d at 1289 (rejecting putative class of foster children "broadly conflat[ing] a variety of claims to establish commonality via an allegation of 'systemic failures'"); *Carson P.*, 240 F.R.D. at 506-08 (rejecting commonality based on an allegation that defendants lack sufficient placement options).

introduce any evidence supporting the existence of this alleged "practice" from the time period when they conducted extensive discovery on class issues (2019 through 2021). Instead, Plaintiffs cite statements from DHHR leadership that there is an insufficient number of residential treatment program staff and beds. Doc. 319, at 9 n.35, 10 n.42. However, Plaintiffs' complaint in this case is that DHHR lacks a sufficient number of foster *family* placements, *see, e.g.*, Compl. ¶ 393, and a shortage of families willing to foster children is not a "practice" of Defendants, absent evidence that Defendants are doing something to exacerbate this challenge.

To support their argument that DHHR has a "practice" of substandard case planning, Plaintiffs rely on citations back to their own briefing, without introducing any data about DHHR's classwide case planning performance. Doc. 319, at 12. In fact, Defendants have robust policies to ensure high-quality case planning, about which Plaintiffs do not raise any concerns,[11] and Defendants have taken steps to improve casework practice. For example, in 2021, DHHR split the Bureau for Children and Families into two smaller agencies, the Bureau for Family Assistance and the Bureau for Social Services ("BSS"). The new BSS is now devoted primarily to child protection services and youth services, which ensures that supervisors have deep experience with child protection and can focus on providing support to caseworkers.

Plaintiffs identify alleged case planning failures in the Named Plaintiffs' cases, but even if true, these are isolated *departures* from the DHHR's policies that "stem[] from the actions of individual case workers."[12] Plaintiffs' "experts" did <u>not</u> opine that these case planning issues

---

[11] *See* DHHR, *Child Protective Services Policy*, at 173-79 (June 2022), https://dhhr.wv.gov/bss/policy/Documents/Final%20CPS%20Policy%20June%202022.pdf.

[12] *Elisa W.*, 2021 WL 4027013, at *9 (rejecting plaintiffs' effort to certify class based on allegations of "departures from [the child welfare agency's] policy").

applied classwide,[13] and evidence about the experiences of a small subset of the putative class cannot support a finding of a classwide practice, *see Wal-Mart*, 564 U.S. at 358 & n.9; *Elisa W.*, 2021 WL 4027013, at *10, in part because they cannot be validly extrapolated onto the putative class as a whole, Ex. 3, at 4-5.

Defendants do not dispute that there is a shortage of caseworkers in West Virginia and that workloads are too high in certain areas of the State. However, a caseworker shortage is not a "well-defined practice" of Defendants, and Plaintiffs have not introduced any evidence that Defendants have any policies or practices that exacerbate these workforce challenges. In fact, the record shows that Defendants have gone to great lengths to expand the number of caseworkers in West Virginia:

- In 2018, DHHR implemented a caseworker career ladder and provided retention payments to increase incentives for caseworkers to remain with DHHR. Doc. 160-1, ¶¶ 86, 89.

- In 2018 and 2019, DHHR provided a cumulative salary increase of 10 percent for all caseworkers. Doc. 160-1, ¶¶ 87, 88, 91, 92.

- From 2018 through 2021, DHHR addressed caseworker staffing issues in West Virginia's largest county (Kanawha) by, among other things, streamlining training, increasing compensation, and expanding recruiting. A state court repeatedly "lauded" and "commended" DHHR for these efforts, "find[ing] that the evidence presented . . . established that [DHHR], Secretary Crouch, and Commissioner Pack are committed to addressing the challenges presented by [DHHR] staffing issues." *State v. Bloom*, 880 S.E.2d 899, 910-11 (W. Va. 2022).

- From 2019 through 2022, DHHR engaged outside consultants to implement reflective supervision practices and to conduct a workload study to analyze caseworker workloads.[14]

- In 2022, DHHR provided another 15 percent salary increase for all caseworkers; a $5,000 signing bonus for any new caseworkers; and a $2,500 additional signing bonus for caseworkers hired in one of 26 counties.[15]

---

[13] *See* Doc. 164, at 15-20; Doc. 130-9, at 5-23; *see, e.g.*, Doc. 163-5, at 62:11-18; *id.* at 65:1-17; Doc. 174-6, at 108:15-21.

[14] Doc. 160-1, ¶ 90; W. V. Leg., House Concurrent Resolution 35 (2021).

[15] DHHR, *Services, Salary Increases Approved for Direct Services Employees and Child Welfare Dashboard to be Published* (May 19, 2022), https://dhhr.wv.gov/News/2022/Pages/Salary-

- In early 2023, DHHR: increased the starting salary for caseworkers by another 20 percent; increased the retention bonus for caseworkers reaching their second- and fourth-year work anniversaries to 10 percent of their base salary; increased the base salary by 5 percent for all caseworkers who reach their sixth- and eighth-year work anniversaries; and established a special hiring salary of $50,000 for three counties. Also in 2023, DHHR is creating 27 new full-time paraprofessional positions to support caseworkers with administrative functions (coordinating travel and paperwork) that can take away time for actual casework, and it is purchasing tablets for caseworkers to assist with field work. [16]

As recounted by the Supreme Court of Appeals, DHHR has made "'good faith'" efforts to address the caseworker shortage, including by increasing compensation; expanding recruitment; creating "significant" career advancement opportunities; and "respond[ing] to recommendations from the Legislative Auditor and the Foster Care Ombudsman." *Bloom*, 880 S.E.2d at 911 (quoting state circuit court). Just because these efforts have not yet been as successful as hoped, does not mean DHHR has a "well-defined practice" of failing to hire sufficient caseworkers.

     **ii.**     **Plaintiffs Have Not Proved that the "Practices" They Challenge Cause the Alleged Classwide Deprivation of Substantive Due Process Rights.**

Plaintiffs have not introduced any evidence that any of the three "practices" they challenge drive their remaining Substantive Due Process claims. That is, Plaintiffs have not cited any evidence of a causal link between these three "practices" and a classwide deprivation of the Substantive Due Process rights still at issue in this case, *see* Doc. 300, at 12-17.

---

Increases-Approved-for-Direct-Services-Employees-and--Child-Welfare-Dashboard-to-be-Published.aspx; DHHR, *DHHR Unveils Major New Initiative to Strengthen Protective Services* (Jan. 24, 2023), https://dhhr.wv.gov/News/2023/Pages/DHHR-Unveils-Major-New-Initiative-to-Strengthen-Protective-Services.aspx; DHHR, *Changes Made to Move DHHR Forward - December 14, 2022 Update* (Dec. 14, 2022), https://dhhr.wv.gov/News/2022/Pages/Changes-Made-to-Move-DHHR-Forward---December-14,-2022-Update.aspx.

[16] DHHR, *DHHR Unveils Major New Initiative to Strengthen Protective Services* (Jan. 24, 2023) https://dhhr.wv.gov/News/2023/Pages/DHHR-Unveils-Major-New-Initiative-to-Strengthen-Protective-Services.aspx;

For example, Plaintiffs do not introduce any data or expert opinion establishing that a lack of foster care placements, inadequate case planning, or high caseworker workloads cause putative class members to experience maltreatment or remain in foster care longer than necessary.  In fact, West Virginia has one of the lowest rates of maltreatment in foster care in the country and an above-average rate of placement stability, Doc. 160-9, at 51-52; Ex. 1, at 8-10, 21-22, and the median time in custody is just 11 months, ACF, *supra* note 6.

Proving that an official policy or well-defined practice is the "common driver" of the alleged legal harm is particularly important in a case, like this one, involving a decentralized system in which decisions are made by hundreds of individual caseworkers, thousands of multi-disciplinary treatment teams, and dozens of state circuits courts in thousands of abuse and neglect cases across the State.  *See PPAL*, 934 F.3d. at 29; *Fitzmorris v. Weaver*, No. 21-25, 2023 WL 2974245, *7 n.4 (D.N.H. Apr. 17, 2023) (unpublished).  However, Plaintiffs have not come close to proving that the alleged classwide deprivations of fundamental rights are caused by the "practices" they challenge.  In fact, the gravamen of Plaintiffs' allegations is not that Defendants have any official policy or well-defined practice that causes a classwide deprivation of fundamental rights, but rather that the *performance* of West Virginia's system is lacking and thus some foster children do not receive appropriate services and placements, for a host of different reasons, which Plaintiffs characterize as "systemic failure[]," *see, e.g.*, Doc. 131, at 4.  But absent an "official policy" or "well-defined practice" that drives the alleged classwide harm, *see PPAL*, 934 F.3d at 29, resolution of these claims requires individualized analyses, and that reality "cannot be hidden behind the term 'systemic deficiencies,'" *see Carson P.*, 240 F.R.D. at 508 (quoting *J.B.*, 186 F.3d at 1289 ); *accord M.D.,* 675 F.3d at 844.

**B.     Plaintiffs Have Not Proved Commonality with Respect to their ADA Claims.**

Plaintiffs seek to certify an "ADA Subclass" of all foster children who "have or will have physical, intellectual, cognitive, or mental health disabilities," Compl. ¶ 30(a)(ii), based on two alleged "practices": "unnecessarily placing youth with disabilities into institutional settings and denying them access to community-based treatment" and "failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of ADA Subclass members."  Doc. 319, at 14.  However, these alleged "practices" relate only to children with mental health disabilities and do not pertain to children with physical or intellectual disabilities included in the proposed ADA Subclass.

In any event, Plaintiffs have not proved that these are in fact "well-defined practices" of Defendants, let alone that they "drive" the alleged subclass-wide harm and ADA violations.  In fact, West Virginia law and policy requires DHHR to "[p]rovide community-based services in the least restrictive settings that are consistent with the needs and potentials of the child and his or her family," W. Va. Code § 49-1-105(b)(7), and require that circuit courts place foster children in "the least restrictive [placement] (most family-like one) available," W. Va. Code § 49-4-608(e)(3).[17]

The evidence Plaintiffs cite to support the existence of these alleged "practices" is limited to one "expert" report and findings from the U.S. Department of Justice ("DOJ") back in 2015.  Doc. 319, at 14-15 & nn.69-74.  However, as explained in Defendants' pending motion to strike, Plaintiffs' "expert" relied exclusively on data from 2017 and years prior, and thus her analysis was stale even when it was filed in 2020, and she did not consider any information relating to West

---

[17]     *See, e.g.*, DHHR, *Foster Care Policy* (Aug. 2020), https://dhhr.wv.gov/bcf/policy/Documents/Foster%20Care%20Policy%20August%202020.pdf; W.V. Judiciary, Judicial Benchbook, ch. 3, at 23 (Aug. 2020), http://www.courtswv.gov/public-resources/CAN/ABBenchBook/2020Benchbook11-2-20.pdf.

Virginia's Medicaid program.  *See* Doc. 164, at 7-11 (citing pages in the report and in the deposition).  Plaintiffs and their expert also ignore the fact that in 2019 – *after* DOJ's 2015 findings, and *after* the publication of all of the information on which Plaintiffs' "expert" relied – DOJ and DHHR entered into a Memorandum of Understanding ("MOU") that transformed West Virginia's system for providing community-based mental health services to "address[] the United States' allegations" of ADA violations.  Doc. 17-6, ¶ 3.  The MOU targeted reducing the number and length of stays in residential treatment programs, in part by requiring DHHR to reduce the number of children in residential treatment programs by 25 percent and to ensure timely access to specific community-based mental health services, such as Wraparound Facilitation, Behavioral Support Services, Children's Mobile Crisis Response, Therapeutic Foster Family Care, and Assertive Community Treatment.  Doc. 17-6, ¶¶ 24, 29, 33, 37(c), 38, 52(c).

The MOU also required the State to create and provide to DOJ an implementation plan describing the actions it takes to "ensure that the programs described . . . are sustainable, statewide, and available to children in the target population," Doc. 17-6, ¶ 41, which is revised at least annually (and is publicly available on DHHR's website, at: https://kidsthrive.wv.gov/DOJ/Pages/default.aspx), as well as semi-annual quality and outcomes report on DHHR's progress in implementing MOU.  The most recent implementation plan and semi-annual report were released in January 2023, and all of the information was readily available to Plaintiffs to update their allegations beyond the 2010-2016 data reviewed by their "expert."[18]

---

[18] DHHR, *Implementation Plan for the Memorandum of Understanding Between the State of West Virginia and the U.S. Department of Justice* (Jan. 17, 2023), https://kidsthrive.wv.gov/DOJ/Documents/WVDHHR%20IP%20Y4%20FINAL.pdf; DHHR, Office of Quality Assurance for Children's Programs, *Children's Mental and Behavioral Health Services Quality and Outcomes Report* (Jan. 31, 2023), https://kidsthrive.wv.gov/DOJ/Documents/20230131_January%202023%20DHHR%20Semi-Annual%20Report_Final.pdf (hereinafter "*Outcomes Report*").

Consistent with the MOU, DHHR has devoted enormous resources to expanding community-based mental health services for children.  For example, in 2020, DHHR launched the Children with Serious Emotional Disorder ("CSED") program to provide up to 2,000 children with mental illness (including foster children) a broad range of community-based services.[19]  Also in 2020, DHHR launched a new program in which a single managed care organization manages and coordinates all services (medical, behavioral, and social) for all foster children and delivers a continuum of physical and mental health care service, including an array of home and community-based options.  H.B. 2010, W. Va. Leg., 2019 Reg. Sess. (codified as W. Va. Code §§ 9-5-27(b), (f)(3)-(4)).  Further, in 2022, DHHR implemented an "Assessment Pathway" to connect youth to community-based mental health services.  In the first half of 2022, 447 youth were referred to the Assessment Pathway, with the average family being contacted within two days of referral, where they are given information about how to enroll in the CSED Program, access interim community-based services, and connect with a regional family coordinator to help them navigate this process.[20]

These efforts are already bearing fruit.  In January 2023, just 12 percent of foster children were in residential treatment, compared to 25 percent in 2014.  Ex. 2.  In other words, the DHHR policies and practices, which were developed with and subject to oversight from DOJ, are having their intended effect of increasing access to community-based mental health services and reducing the number of children in residential treatment.  The recent data—all of which is publicly available—undercuts Plaintiffs' claims that Defendants have a "practice" of "unnecessarily placing youth with disabilities into institutional settings," denying youth access to community-based treatment, or failing to build an adequate mental health infrastructure, *see* Doc. 319, at 14.

---

[19] *See* Doc. 106-3, at 3; Doc. 160-8, at 3; W. V. Bureau for Medical Services Medicaid Manual, ch. 502, https://dhhr.wv.gov/bms/Provider/Documents/Manuals/Chapter%20502%20CSEDW.pdf.

[20] DHHR, *Outcomes Report*, *supra* note 18, at 3, 49, 52.

Plaintiffs bear the burden of proving the existence of this discriminatory "practice," and they fall woefully short of meeting that burden.

In fact, Plaintiffs do not cite any evidence that these alleged "practices" have any classwide impacts. For example, Plaintiffs do not introduce any data showing that the overwhelming majority of putative ADA Subclass members are placed in residential treatment programs or that putative ADA Subclass members do not receive significant community-based mental health services. Nor could they: only 12 percent of foster children are placed in residential treatment, about half of whom are juvenile justice youth, *see* Ex. 2; Doc. 107-1, App'x, and even before DHHR fully implemented the CSED Program and much of the DOJ MOU hundreds of children in the ADA Subclass were living in foster family homes[21] and thousands of foster children were receiving community-based mental health services, Doc. 161-1, ¶ 82.

Finally, "the role played in each child's case by [the state courts] is a critical factor that creates 'dissimilarities within the proposed class' that 'impedes the generation of common answers'" with respect to Plaintiffs' allegation that Defendants "unnecessarily" place foster youth in residential treatment programs. *Elisa W.*, 2021 WL 4027013, at *9-10. In West Virginia, unlike in many states, all children are represented by counsel in all abuse-and-neglect proceeding, W. Va. Code § 49-4-601(c), (f), and the state circuit court (*not* DHHR) is ultimately responsible for making the final decision about where a foster child is placed, including whether the particular placement is the "least restrictive" and "most family-like." *See* W. Va. R. of Proc. For Child Abuse and Neglect Proceedings 6, 36(e), 41; W. Va. Code §§ 49-4-110, 49-4-606, 49-4-608(e)(3).

---

[21]     Ex.     2;     *see     also*     H.B.     4092     Fiscal     Note, https://www.wvlegislature.gov/Fiscalnotes/FN(2)/fnsubmit_recordview1.cfm?RecordID=765896 458 (finding that, in 2019, over 500 children with high needs were placed in foster family homes).

**II.    The Named Plaintiffs' Claims Are Not Typical and They Cannot Adequately Protect the Interests of a Class of All Foster Children**

The typicality analysis requires "a comparison of the [named] plaintiffs' claims or defenses with those of the absent class members,"  "begin[ning] with a review of the elements of [named] plaintiffs' *prima facie* case," to determine whether the facts that would prove the elements of that case "would also prove the claims of the absent class members."  *Dieter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).

The elements of a Substantive Due Process Claim are:  (1) the defendants' conduct "shocks the conscience" and constitutes "deliberate indifference" and (2) *causes* a deprivation of a constitutional right.  *See, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998).  The elements of Plaintiffs' ADA claim (under their legal theory) are: (1) Defendants' actions denied (2) plaintiffs with disabilities services in "the most integrated setting appropriate to their needs."  *See* Comp. ¶¶ 392-93; Doc. 319, at 14.

The Plaintiffs do not even mention these elements of their claims, much less show that proof of the elements of the Named Plaintiffs' claims "would also prove the claims of the absent class members."[22]  Nor could Plaintiffs make such a showing, in part "because it is not possible to determine what caused" alleged legal harm to absent class members "without evaluating all of the other contributing facts and influences."  *Elisa W.*, 2021 WL 4027013, at *11.  For example, evaluating whether Defendants' alleged "deliberate indifference" caused a deprivation of the Named Plaintiffs' Substantive Due Process rights would require an individualized inquiry into the caseworkers' and courts' handling of those Named Plaintiffs' cases, and that individualized

---

[22] Plaintiffs have not introduced *any* evidence supporting typicality with respect to Chris K., Calvin K., and Caroline K., *see supra* note 4, and thus there is no basis for finding typicality with respect to these three children.

evaluation would have no bearing on whether Defendants also caused a deprivation of the constitutionally protected rights of an infant living with a stable foster family or a six-year-old who has lived in a kinship home with his grandparents for the entirety of his time in foster care, for example. *Cf. Carson P.*, 240 F.R.D. at 508-09 (rejecting typicality because of diversity within population of foster youth). Similarly, determining whether a particular Named Plaintiff's placement in a residential treatment program was the "most integrated setting appropriate to their needs" requires an individualized analysis of that Named Plaintiff's diagnoses and behavioral health issues, and thus that determination would have no bearing on the question of whether other ADA Subclass members' placements were appropriate. In fact, that inquiry would be totally irrelevant to the question of whether, for example, the placement of a toddler with physical disabilities living in a foster home has been placed in the "most integrated setting" appropriate to the toddler's needs.

Plaintiffs' typicality argument is further undermined by the fact that the nine Named Plaintiffs are extraordinarily atypical of the putative General Class in nearly all respects, *see* pp. 2-3, *supra*. *See Carson P.*, 240 F.R.D. at 508-09; *Broussard v. Meineke Discount Muffler Shops, Inc,*, 155 F.3d 331, 340 (4th Cir. 1998); *Morris v. McCaddin*, 553 F.2d 866, 870-71 (4th Cir. 1977). Indeed, older children with severe behavioral issues, like most of the Named Plaintiffs, have different experiences than the typical foster child; are more difficult to place in a family home; and are more likely to require the level of care provided in a residential treatment program.[23]

Plaintiffs make no effort to explain how Named Plaintiffs' claims are typical of all putative class members in spite of their atypical characteristics and experiences, but simply assert that the

---

[23]    *See* 2016 Annual Programs and Services Review, at 52 https://dhhr.wv.gov/bcf/Reports/Documents/Annual%20Service%20Plan%20Review%20%28APSR%29.pdf; Doc. 130-25, at 131-32, 135.

Named Plaintiffs' and absent class members' claims "rest on the same legal theory" and "arise from the same course of conduct." Doc. 319, at 17.  That is not the standard.  Rather, the question is whether the Named Plaintiffs are sufficiently similar to the class such that proof of the Named Plaintiffs' claims will "also prove the claims of the absent class members," *Deiter*, 436 F.3d at 467.

For similar reasons, the Named Plaintiffs cannot "fairly and adequately protect the interests of the class," Fed. R. Civ. Pro. 23(a)(4).  *See Wal-Mart*, 564 U.S. at 349, n.5 (explaining that the adequacy requirement "'tend[s] to merge'" with the typicality requirement (quoting *Grand Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982))).  Indeed, conflicts-of-interest exist between the Named Plaintiffs and the putative absent class members.  For example, Plaintiffs suggest that Anastasia M. has been harmed by DHHR's efforts to reunify her with her parent instead of pursuing adoption, Doc. 131, at 8, but many putative class members benefit from DHHR's efforts to give families more time to work toward reunification.[24]  Similarly, Plaintiffs seek to decrease the number of children in the ADA Subclass placed in residential treatment programs, Doc. 131, at 19-20; Compl. ¶¶ 393-94, but many children with serious behavioral issues benefit from such programs, which offer higher levels of care and supervision than what can be provided in family homes, Doc. 160-1; Doc. 160-21, at 80:8-17; Doc. 160-23, at 123:15-22; Doc. 160-22, at 130:1-132:2.  Plaintiffs' brief does not address these conflicts, but instead relies on a conclusory statement that no conflict exists, *see* Doc. 319, at 18.

---

[24] *Cf. Carson P.*, 240 F.R.D. at 513 (finding a conflict because "some [children] may be seeking an order requiring [the agency] to implement policies for expeditiously terminating parental rights and locating adoptive homes," while others "may want an order" geared "toward family rehabilitation with a goal of reunification").

Finally, nine of the Named Plaintiffs[25] long ago exited the legal custody of DHHR and therefore they are no longer in the putative class or subclasses.  The general rule is that "'a class representative must be part of the class,'" *Wal-Mart*, 564 U.S. at 348 (quoting *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403(1977)), and Plaintiffs offers no justification for a departure from that rule.  *See E. Tex. Motor Freight Sys. Inc.*, 431 U.S. at 403-04 (holding that named plaintiffs were not adequate class representatives because they were not members of the putative class).

### III.   Plaintiffs Have Not Proved that the Requested Relief is "Appropriate Respecting the Class as a Whole," as Required by Rule 23(b)(2).

Plaintiffs seeking certification under Rule 23(b)(2) must meet a heightened standard, in part because class members may not opt-out of a (b)(2) class.  *See Wal-Mart*, 564 U.S. at 361-63.  Specifically, plaintiffs must prove that defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  This standard requires plaintiffs to (1) identify sufficiently specific classwide relief to allow the Court to see how it may comply with Rule 65(d), including Rule 65(d)'s requirement that the injunction "describe in reasonable detail . . . the act or acts restrained or required"; and (2) prove that all "class members must have been harmed in essentially the same way," such that injunctive relief would redress the alleged harm without being "'tailored to each class member.'" Fed. R. Civ. P. 65(d); *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604-05 & n.5, 608 (10th Cir. 2008).

In this case, in part because Plaintiffs do not challenge any official policy or well-defined practice for this Court to enjoin, *see supra* § I, Plaintiffs cannot "describe in reasonable detail" the

---

[25] Chris K., Calvin K., Caroline K., Jonathan R., Serena S., Gretchen C., Garret M., and Anastasia M. are no longer in DHHR custody.

acts they would like "restrained or required."  Instead, Plaintiffs seek an order that would require Defendants to comply with vague, subjective, and unmanageable standards.  For example, Plaintiffs ask this Court to order DHHR to place all putative class members in a "safe" placement; "adequately" monitor putative class members; employ an "adequate" number of "appropriately trained" caseworkers; ensure an "adequate" array of community-based services; and develop an "adequate" array of community-based foster homes, Compl. ¶¶ 405(a)(v)-(iv), (c)(ii)-(iii).[26]

In addition, Plaintiffs have <u>not</u> proved that this classwide injunctive relief would redress the alleged harm without being "specifically tailored to each class member," *Shook*, 543 F.3d at 604-05, 608.  For example, ordering Defendants to "adequately" monitor all putative class members or provide all ADA Subclass members with "services in the most integrated setting appropriate to the child's needs," Compl. ¶¶ 405(c)(i), would demand "a process through which highly individualized determinations of . . . remedy are made,"[27] such as what is "adequate" monitoring for a particular child and what services are "appropriate" to for the particularly "child's needs."  Plaintiffs are careful to avoid expressly requesting individualized relief, but they cannot avoid the reality that redressing their alleged injuries requires individualized tailoring simply by phrasing their requested relief "at a stratospheric level of abstraction," *Shook*, 543 F.3d at 604.

---

[26] *Cf. Shook*, 543 F.3d at 605-07 (holding that an injunction requiring "increased" staffing levels and "adequate" screening was not sufficiently specific to satisfy Rule 23(b)(2)).

[27] *Jamie S.*, 668 F.3d at 499; *see Shook*, 543 F.3d at 604-05 (holding that an injunction requiring "safe and appropriate" housing for prisoners with mental health needs did not satisfy Rule 23(b)(2) because "what is 'safe and appropriate' depends on the nature and severity of an individual's mental illness"); *Carson P.*, 240 F.R.D. at 507-08 (holding that any effort to enforce an injunction requiring child welfare agency to exercise "reasonable professional judgment for every foster child would require the court "to review that child's unique circumstances").

IV.    **The Absent Putative Class and Subclass Members Lack Standing.**

A class must be "'defined in such a way that anyone within it would have standing,'" and a class may not be certified if it "'contains members lacking Article III standing.'"  *See Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539, 552 (E.D. Va. 2018) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).  However, in this case, Plaintiffs do not limit the putative General Class or remaining putative subclasses to foster children injured by any acts of Defendants, and they have not even alleged (let alone proved) that *all* foster children have suffered any such harm.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing requires the plaintiff to have suffered an injury-in-fact caused by "the conduct complained of").  Nor can this standing problem be remedied by changes to the class definition.  Because Plaintiffs do not challenge any official policy or well-defined practice of Defendants, it is impossible to craft an ascertainable class or subclass limited to members with standing to pursue Plaintiffs' claims.  *See, e.g.*, *Jamie S.*, 668 F.3d at 493 (a class must be ascertainable).

V.    **Plaintiffs Have Not Proved that a Class Including Juvenile Justice Youth Complies with Rule 23.**

Plaintiffs assert that their proposed classes and subclasses include juvenile justice youth in DHHR custody, even though no part of their 105-page Complaint discusses juvenile justice proceedings; their initial discovery requests defined "foster children" as "any child with an open abuse and neglect case . . . not includ[ing] children who are adjudicated delinquents," Ex. 4, at 3, and the one named Plaintiff who entered custody through a juvenile justice proceeding appears to have been included by mistake, *see* Compl. ¶ 127 (alleging that Gretchen C. is a "neglected youth" who has "never been adjudicated as a delinquent").

Plaintiffs have made no effort to explain (let alone prove) how commonality, typicality, or any other Rule 23 requirement is satisfied with respect to the claims of juvenile justice youth, and

there is no plausible argument that they do, *see, e.g.*, *Carson P.,* 240 F.R.D. at 495-96.  Among other things, juvenile justice youth present community safety issues not implicated with traditional foster children; are served by different case workers (youth service workers rather than child protective services); and have more extensive court involvement in their cases, including with respect to placement decisions.  *Compare* W. Va. Code Ch. 49, Art. 4, Part VI (neglect and abuse procedures), *with* W. V a. Code Ch. 49, Art 4, Part VII (juvenile justice procedures); *see* Doc. 108.

In addition, under *Younger v. Harris*, 401 U.S. 37 (1971), principles of comity and federalism require the Court to abstain from overseeing or interfering with ongoing juvenile justice proceedings before West Virginia circuit courts of general jurisdiction.  Although the Fourth Circuit expressed some skepticism as to whether abstention applies to juvenile justice cases, the court declined to decide the issue, *Jonathan R. v. Justice*, 41 F.4th 316, 330  (4th Cir. 2022), and West Virginia law (*see, e.g.*, W. Va. Code § 49-4-701) provides that juvenile offenses are prosecuted in proceedings "akin to a criminal prosecution," which is one of the categories of cases to which *Younger* abstention applies, *Sprint Comm., Inc. v. Jacobs*, 571 U.S. 69, 79 (2013).  *See, e.g.*, *J.P. v. DeSanti*, 653 F.2d 1080 (6th Cir. 1981); *Malachowski v. City of Keene*, 787 F.2d 704 (1st Cir. 1986); *Solano v. Montgomery*, 423 F. Supp. 3d 826, 830 (C.D. Cal. 2019); *Howard v. Chester Cty. Office of Juvenile Prob. & Parole*, 396 F. Supp. 3d 490, 500 (E.D. Pa. 2019).

## CONCLUSION

For the foregoing reasons, the Renewed Motion for Class Certification should be denied.


Respectfully submitted,


May 30, 2023                          */s/* Philip J. Peisch
                                      Philip J. Peisch (WV Bar #24403)
                                      Caroline M. Brown

24

Julia M. Siegenberg
Kendra Doty
Brown & Peisch PLLC
1233 20th Street NW, Suite 505
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 2nd Floor
Charleston, WV 25301

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of the foregoing to

be delivered to the following via ECF notification:

Marcia Robinson Lowry
Julia Tebor
Tavi Unger
A Better Childhood
355 Lexington Ave. Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Brian L. Ooten
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

Lori Waller
Disability Rights of West Virginia
1207 Quarrier Street, Suite 400
Charleston, WV 25301

May 30, 2023

/s/ Philip J. Peisch
Philip J. Peisch (WV Bar #24403)
Caroline M. Brown
Kendra Doty
Julia M. Siegenberg
Brown & Peisch PLLC
1233 20th Street NW, Suite 505
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 2nd Floor
Charleston, WV 25301