IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JONATHAN R., et al.,

                Plaintiffs,

v.                               CIVIL ACTION NO.  3:19-cv-00710

JIM JUSTICE, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the court is Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel. [ECF No. 318]. For the reasons explained below, the motion is **GRANTED in part** and **DENIED in part**.

### I.    Background

#### A.  The Facts and the Parties

Plaintiffs are twelve current and former foster care children who challenge several key aspects of West Virginia's child welfare system. [ECF No. 1, ¶¶ 1–2]. Plaintiffs paint a grim picture of a deeply flawed system that inflicts on vulnerable children much of the same abuse and neglect that it was designed to redress. According to Plaintiffs, West Virginia's foster care system is "in a state of crisis." *Id.* ¶ 1. Plaintiffs allege that as a result of Defendants' inept administration of foster care, they "have been abused and neglected, put in inadequate and dangerous

placements, institutionalized and segregated from the outside world, left without necessary services, and forced to unnecessarily languish in foster care for years." *Id.* ¶ 2. In support of their allegations, Plaintiffs describe a host of "long-standing systemic deficiencies" that plague the West Virginia child welfare system, including a shortage of foster care homes, an overreliance on residential care facilities, high caseworker caseloads, inadequate case planning, and a failure to maintain "critical infrastructure that would allow children with mental health service needs to remain in their communities." *Id.* ¶ 367. Plaintiffs seek federal reform of these alleged systemic failures by the state executive branch.[1] *See id.* ¶¶ 405–06.

Accordingly, on September 30, 2019, Plaintiffs filed a Class Action Complaint in this court against five defendants: the West Virginia Department of Health and Human Resources ("DHHR"), Jim Justice, Bill Crouch, Jeremiah Samples, and Linda Watts. [ECF No. 1].

---

[1] Indeed, Plaintiffs do not merely ask that the court enjoin Defendants from engaging in practices that violate foster children's rights. Their request goes further, urging the court to direct how a state executive agency must administer its foster care system. *See, e.g.*, [ECF No. 1, ¶ 405(a)(vi) (asking the court to require DHHR to "hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers, and ensure that caseloads do not exceed 15 children per-worker for children in placement, with caseloads adjusted for caseworkers who carry mixed caseloads including children not in foster care custody")]. While the United States Court of Appeals for the Fourth Circuit has explained that principles of federalism compel federal intervention in this case, [ECF No. 265, at 3], this court nevertheless finds Plaintiffs' requests for relief troubling. Of course, if a state agency is violating citizens' federal rights, a district court has the power, and the duty, to enjoin the conduct. Moreover, the court is cognizant that several federal courts have formulated and implemented broad relief in systemic reform cases. *See, e.g.*, *Wyatt v. Stickney*, 344 F. Supp. 373 (M.D. Ala. 1972) (ordering the defendants to implement standards set by the court to improve the conditions of a state mental hospital). This court, however, remains skeptical of any relief requiring it to assume control of a state agency and direct how that agency manages its program and allocates its funds. The court will address this issue should the plaintiffs prevail on their claims.

DHHR is a state agency that acts as "the legal guardian of children in the state's foster care system." *Id.* ¶¶ 1, 22. The agency is "responsible for maintaining the overall Department" as well as the Bureau for Children and Families ("BCF"), "a subdivision of DHHR" that administers West Virginia's child welfare system, including foster care and adoption. *Id.* ¶¶ 22, 205.

Jim Justice is the Governor of West Virginia, and as such, "appoints the Director of DHHR." *Id.* ¶ 21. He is "responsible for ensuring that West Virginia executive departments comply with all applicable laws and has the power to issue executive orders to shape the functions and coordination of DHHR." *Id.*

At the time Plaintiffs filed their Complaint, Bill Crouch was the Cabinet Secretary of DHHR, *id.* ¶ 23, and Jeremiah Samples was the Deputy Secretary, *id.* ¶ 24. Plaintiffs allege that both defendants were "responsible for DHHR's policies, practices, and operations, and for ensuring that DHHR complies with all applicable federal and state laws." *Id.* ¶¶ 23–24.

Finally, Linda Watts was the Commissioner of BCF at the time the Complaint was filed. *Id.* ¶ 25. She "overs[aw] programs including safety, wellbeing and permanency, and [was] responsible for BCF's policies, practices, and operations, and for ensuring that BCF complie[d] with all applicable federal and state laws." *Id.*

## B. Procedural History

On November 26, 2019, Defendants filed their first Motion to Dismiss Plaintiffs' Complaint. [ECF No. 17]. Subsequently, between February 2020 and

3

November 2020, Defendants filed four additional Motions to Dismiss. [ECF Nos. 55, 88, 107, 167]. The court granted all five motions on July 28, 2021, based on mootness and the *Younger v. Harris*[2] abstention doctrine, and directed the Clerk to remove this matter from the docket, thereby closing the case. [ECF No. 258]. Prior to the court's dismissal Order, Plaintiffs had filed a Motion for Class Certification and Appointment of Class Counsel, seeking class certification for a General Class and three subclasses: an Americans with Disabilities Act ("ADA") Subclass, a Kinship Subclass, and an Aging Out Subclass. [ECF No. 130, at 1].[3] This motion, however, was never ruled on and was terminated when the case closed.

On August 4, 2021, Plaintiffs appealed the court's judgment to the Fourth Circuit. [ECF No. 260]. The Fourth Circuit rejected the rulings on mootness and abstention and remanded the case to this court with instructions to "consider West Virginia's substantive arguments for dismissal and, if appropriate, Plaintiffs' motion for class certification." [ECF No. 265, at 11, 15, 42]. Heeding those instructions, this court analyzed Defendants' remaining arguments for dismissal in an Order, dated January 13, 2023. [ECF No. 300]. In that Order, the court dismissed all of the substantive due process claims asserted by the proposed ADA and Aging Out Subclasses and nearly all of the claims made by the proposed Kinship Subclass. *Id.* at 17–19. The court also dismissed Plaintiffs' claims under the First, Ninth, and

---

[2] 401 U.S. 37 (1971).

[3] Unless otherwise noted, the court uses the page numbers assigned by the federal judiciary's Case Management/Electronic Case File system.

Fourteenth Amendments to the United States Constitution, as well as their claims under the Adoption Assistance and Child Welfare Act. *Id.* at 27, 36. To date, most of the substantive due process claims asserted by the proposed General Class and one claim made by the Kinship Subclass remain pending, as do the ADA Subclass' claims under the Americans with Disabilities and Rehabilitation Acts. *Id.* at 13–17, 43.

On May 2, 2023, the court directed Plaintiffs to file a renewed certification motion if they still desired to move for class certification, as Plaintiffs' initial motion had been terminated. [ECF No. 315, at 2]. Plaintiffs filed their renewed motion on May 16, 2023. [ECF No. 318]. Defendants responded to the motion on May 30, 2023, [ECF No. 322], and Plaintiffs replied on June 6, 2023, [ECF No. 325]. The motion is ripe for review.

In their motion, Plaintiffs ask the court to certify a General Class, an ADA Subclass, and a Kinship Subclass. [ECF No. 318, at 1]. The proposed General Class consists of "all West Virginia foster children who are or will be in the foster care custody of [DHHR] or its successor agency." *Id.* The proposed ADA Subclass consists of all members of the General Class "who have physical, intellectual, cognitive, or mental health disabilities," as defined by federal law. *Id.* Finally, the proposed Kinship Subclass consists of all members of the General Class "who are or will be in kinship placements for whom DHHR is required to provide initial home safety assessments and other services sufficient to ensure the child's safety." *Id.*

5

## II.    Legal Framework

Federal Rule of Civil Procedure 23 governs class actions. A plaintiff seeking class certification must show that the proposed class satisfies all four requirements of Rule 23(a) and falls into one of the categories of Rule 23(b). *See* Fed. R. Civ. P. 23. Rule 23(c)(5) authorizes the division of a class "into subclasses that are each treated as a class" under the Rule. "Subclasses must independently satisfy each of the requirements set out in Rule 23(a) and (b)." *Coreas v. Bounds*, Nos. TDC-20-0780, TDC-20-1304, 2020 WL 5593338, at *8 (D. Md. Sept. 18, 2020) (first citing *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 368 (7th Cir. 2012); and then citing *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981)).

Rule 23(a) requires the plaintiff to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

These requirements "are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).

Additionally, Rule 23(b) establishes three categories of permissible class actions. In this case, Plaintiffs seek class certification under Rule 23(b)(2), [ECF No. 319, at 18], which authorizes a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2).

A plaintiff seeking class certification "must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Although a district court has "wide discretion in deciding whether or not to certify a proposed class," *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003) (quoting *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993)), that "discretion must be exercised 'within the framework of Rule 23,'" *id.* (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001)). To ensure the prerequisites of Rule 23 are satisfied, the court must conduct a "rigorous analysis" of the facts and arguments offered in support of class certification. *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51. This "rigorous analysis" often "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. This does not mean, however, that courts may "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## III.    Discussion

As previously explained, Plaintiffs seek to certify a General Class, an ADA Subclass, and a Kinship Subclass. [ECF No. 318, at 1]; *see also supra* Section I.B.

7

Except for the numerosity requirement and the requirements for Rule 23(b), which are each addressed in a single section, the court will separately analyze whether the requirements for class certification have been met for each proposed class.

### A. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." This "requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980); *see also Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) ("No specified number is needed to maintain a class action under [Rule] 23."). "Where 'general knowledge and common sense' indicate the class is so large that joinder of all members is impracticable, the numerosity requirement is satisfied." *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012) (quoting *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006)). Indeed, courts generally presume that joinder is impracticable when a proposed class encompasses forty or more members. *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (citing 1 Newberg on Class Actions § 3:12 (5th ed. 2021)).

In this case, Defendants do not challenge Plaintiffs' assertion that the General Class and both subclasses meet the numerosity requirement, and for good reason. The proposed General Class consists of approximately 6,000 foster care children. [ECF No. 319, at 7]. The ADA and Kinship Subclasses likewise "each consists of

8

thousands of children." *Id.* The sizes of the class and subclasses raise a strong presumption that joinder is impracticable. Moreover, the class members are dispersed across the State of West Virginia and other parts of the country. *See id.* at 11. Based on these facts, the court concludes that the proposed class and subclasses satisfy the numerosity requirement under Rule 23(a).

### B. Commonality

The commonality prerequisite requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This provision "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" not "merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. A plaintiff seeking class certification must show that the class members' claims "depend upon a common contention." *Id.* "That common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Questions are common to the class if they are capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Importantly, however, not all questions of law or fact must be common to every member of the class, as even a single common question will satisfy the commonality requirement. *Id.* at 359. Therefore, factual differences among class members' cases

will not preclude certification if the class members share the same legal theory. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 344 (4th Cir. 1998) ("We . . . do not suggest that the commonality and typicality elements of Rule 23 require that members of the class have identical factual and legal claims in all respects.").

When determining whether commonality exists, the court must examine the precise nature of the class members' underlying claims. *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014). This assessment requires the court to "identify the elements of the class members's [sic] case-in-chief." *Id.* (quoting *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1114 (9th Cir. 2014)).

### i. General Class

The General Class alleges that "Defendants' system-wide policies and practices" expose them to a substantial risk of harm in violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution. [ECF No. 319, at 9]. These policies and practices, according to Plaintiffs, include: (1) an inadequate array of appropriate placements; (2) a lack of appropriate case planning; and (3) high caseloads and chronic understaffing. *Id.* at 9–14.

"Individuals in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions." *M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013); *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010) ("[W]hen a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the

state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause and imposing 'some responsibility for [the child's] safety and general well-being.'" (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989))); *see Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily—who may not be punished at all—in unsafe conditions."). To establish a substantive due process violation, a plaintiff in state custody must show that the government was deliberately indifferent to his or her care. *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012); *Doe*, 597 F.3d at 175 (explaining that the state has a duty to not act "deliberately indifferent to the child's right to personal safety and security" after involuntarily removing the child from his or her home).

Federal courts throughout the country have determined that plaintiffs in foster care seeking class certification can satisfy the commonality requirement with proof of systemic policies or practices in the provision of child welfare services that expose the plaintiffs to an unreasonable risk of harm. *See, e.g.*, *Baby Neal*, 43 F.3d at 61; *M.D.*, 294 F.R.D. at 39–45; *Wyatt B. v. Brown*, No. 6:19-cv-00556, 2022 WL 3445767, at *25–27 (D. Or. Aug. 17, 2022). This is because the policies or practices creating the risk are "the 'glue' that holds the class together." *Wyatt B.*, 2022 WL 3445767, at *24 (quoting *B.K. v. Snyder*, 922 F.3d 957, 969 (9th Cir. 2019)). "[E]ither each of the policies and practices is unlawful as to every [class member]," because it subjects

them to an unreasonable risk of serious harm, "or it is not,"—an inquiry requiring no individualized determination. *Parsons*, 754 F.3d at 678.

To obtain certification in pattern or practice cases, the class representatives must identify a common policy or practice that is allegedly the source of their injury and then they must connect that policy or practice to their alleged harm. *See M.D.*, 294 F.R.D. at 26; *Wyatt B.*, 2022 WL 3445767, at *25–27. Importantly, plaintiffs may identify policies or practices that subject them to an unreasonable *risk* of harm. *Baby Neal*, 43 F.3d at 56 ("[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice."); *M.D.*, 294 F.R.D. at 34 (Children in foster care "have a right to be free of the unreasonable risk of harm, and if they suffer that risk now, they have suffered a legal injury."). In other words, a plaintiff in state custody need not wait until the risk of harm is realized before seeking relief from the courts. *M.D.*, 294 F.R.D. at 34; *see also Baxley v. Jividen*, 338 F.R.D. 80, 85 (S.D. W. Va. 2020) (explaining that the incarcerated plaintiffs, challenging West Virginia Division of Corrections and Rehabilitation's uniform healthcare policies and procedures, did not need to show that every class member was actually injured by the healthcare system, as the risk of harm was a sufficient injury); *Parsons*, 754 F.3d at 676–77 (explaining that inmates may challenge unsafe prison conditions before tragedy occurs). Additionally, "[t]he policy or practice that a plaintiff identifies need not be formal or officially-adopted." *M.D.*, 294 F.R.D. at 26; *see Wyatt B.*, 2022 WL

3445767, at *25–27. "Absent official sanction, a policy can be identified on the basis of custom or consistent practice. . . . Or, closely-related to custom, a uniform policy can be based on the defendant's deliberate indifference." *M.D.*, 294 F.R.D. at 26 (citing *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 320–21 (D.D.C. 2011)).

In this case, Plaintiffs allege that the three previously identified policies or practices expose them to a substantial risk of harm. [ECF No. 319, at 9–14]. Defendants assert that Plaintiffs have not demonstrated that any of these practices or policies exist or, if they do exist, that they have a "sufficient nexus" to Plaintiffs' substantive due process claims. [ECF No. 322, at 10]. The court concludes, however, that for purposes of certifying the General Class, Plaintiffs have submitted sufficient evidence to establish the existence of the alleged policies and practices, and they have alleged a plausible connection between each policy or practice and their asserted injuries.[4] For clarity, each of these alleged policies and practices is addressed in detail below.

---

[4] Defendants also argue that "[p]ursuing class certification based on these three 'practices' ignores the implications of this Court's decision dismissing Plaintiffs' case planning claim and placement stability claims." [ECF No. 322, at 10]. Defendants' statement reflects a misunderstanding of the court's prior Order granting in part and denying in part Defendants' Motion to Dismiss. In its Order, the court stated that substantive due process "does not provide a right to stability while in foster care." [ECF No. 300, at 17]. In the same paragraph, however, the court also stated that due process "requires Defendants to implement the services necessary to ensure that [foster children] [are] free from harm." *Id.* Read together, this means that while foster children have no right to stability in itself, they do have the right to be free from an unreasonable risk of serious physical or psychological harm, and they are therefore entitled to services to ensure their safety. Accordingly, children in state custody could succeed on a substantive due process claim by demonstrating that excessive placement moves subjects them to an unreasonable risk of severe psychological harm. Likewise, foster children may not have a constitutional right to case planning per se, but Plaintiffs could prevail on their due process claim if the failure to case plan somehow places them at an unreasonable risk of serious harm. As such, the court's dismissal of the aforementioned claims does not preclude Plaintiffs from pursuing class certification based on these allegedly risky practices.

**Inadequate array of appropriate placements.** Plaintiffs first allege that there is an inadequate array of appropriate foster care placements—in number and type—resulting in "a haphazard placement process." [ECF No. 319, at 9–11]. According to Plaintiffs, this placement shortage exists "due to Defendants' failure to recruit homes and create facilities that can address specialized needs." *Id.* at 9. Defendants, in response, assert that Plaintiffs have not "introduce[d] any evidence supporting the existence of this alleged 'practice'" or presented "any evidence of a causal link" between the practice and a classwide deprivation of their substantive due process rights. [ECF No. 322, at 10–11, 13–14].

As of January 31, 2023, there were 6,142 children in West Virginia foster care. *Foster Care Placements Report*, W. Va. Dep't of Health & Hum. Res. (Jan. 31, 2023), https://dhhr.wv.gov/bss/reports/Documents/2023%20February%20Legislative%20 Foster%20Care%20Placement%20Report.pdf. Plaintiffs have demonstrated that DHHR maintains an inadequate array of placements to meet the needs of these foster children. Plaintiffs' evidence of this deficiency includes their expert report, statements by DHHR employees, external reviews, and internal DHHR documents. For example, in January 2019, Jessica Holstein, an assistant director of communications for DHHR, stated in response to a media inquiry that "West Virginia is currently experiencing a drastic shortage of foster homes that are able to meet the needs of the children being placed in care." [ECF No. 130-15, at 2]. Additionally, Sandra Wilkerson, a social service coordinator testifying at an emergency hearing in

14

state court regarding the temporary housing of foster children, stated: "[W]e've had children that have had to stay multiple nights in the office or in a hotel, depending on the child's situation: how difficult they are to place; if, if there are any open beds for them. . . .We lack beds for these children. . . . [W]e don't have sufficient bed space for children." [ECF No. 318-3, at 48:7–10, 18–20].[5] The Children's Bureau[6] likewise explained in its 2017 Child and Family Services Review ("CFSR") of the West Virginia foster care system that one of the "areas of greatest need for which services and resources are lacking" is "the availability of foster homes." [ECF No. 130-3, at 22–23].

Further, Plaintiffs' experts studied the case records of nine of the Named Plaintiffs[7] and submitted a report "identify[ing] the practice patterns and themes of concern across the reviewed cases." [ECF No. 133-1, at 9]. They opined that rather than considering the children's individualized needs, DHHR simply assigned the Named Plaintiffs to "the first available placement, . . . generally a shelter care setting." *Id.* at 29. The experts assert that DHHR's placement patterns raise questions about "West Virginia's continuum of placement options available to meet

---

[5] The court uses the page numbers shown on the top-right corner of the reporter's transcript to cite this document.

[6] The Children's Bureau is "an agency within the Administration for Children and Families within the U.S. Department of Health and Human Services." *Children's Bureau: About*, U.S. Dep't of Health & Hum. Servs. (June 28, 2023), https://www.acf.hhs.gov/cb/about#:~:text=The%20Children's %20Bureau%2C%20an%20agency,partnerships%20with%20states%2C%20tribes%2C%20and. The agency "seeks to improve the safety, permanency, and well-being of children through leadership, support for necessary services, and productive partnerships with states, tribes, and communities." *Id.*

[7] Plaintiffs indicate that their experts could not prepare a report on Calvin K., Chris K., and Carolina K. because their claims were dismissed as moot by the court's July 2021 Order, [ECF No. 325, at 15 n.51], and prior to the dismissal, Defendants refused to produce the siblings' case files, [ECF No. 131, at 12 n.33]. Plaintiffs state that they intend to seek these case files during discovery. [ECF No. 325, at 15 n.51].

the complex needs of these children." *Id.* at 33.

Deficiencies in the array of placements is a recurring issue highlighted throughout reviews of West Virginia's child welfare system. The court is therefore satisfied that Plaintiffs have demonstrated that DHHR has a pattern or practice of maintaining an insufficient array of placements. Plaintiffs have also connected this practice with an unreasonable risk of harm—specifically, an unreasonable risk of psychological harm.

In 2017, 9% of children in DHHR's custody for less than twelve months experienced three or more placements. [ECF No. 130-11, at 10]. That number jumps to 28% for children in DHHR's custody for twelve to twenty-four months, and to 58% for children in custody for longer than twenty-four months. *Id.* Evidence suggests that foster care placement stability is correlated with the number of foster care beds available. [ECF No. 130-19, at 80 ("The decline in foster care placement stability is related to the use of shelter care and the unavailability of foster care beds at the time of placement."); *id.* at 81 ("The stability in foster care placements is directly related to the availability of homes.")]. That is, the absence of foster homes increases the number of placement moves that foster children will experience. New "placements are often in different counties in different areas of the State." [ECF No. 130-21, at 6]. For children in treatment, excessive moves results in inconsistent psychological care. *Id.* New medications are prescribed, new protocols must be followed, and new bonds must be developed. *Id.* In essence, "progress [for these children] starts all over." *Id.*

16

Research indicates that frequent placement changes negatively impact foster children's well-being. For example, placement instability has been linked to aggression, behavioral problems, academic delays, and delinquency. [ECF No. 130-23, at 111 (copy of Terry D. Moore, et al., *Assessing Risk of Placement Instability to Aid Foster Care Placement Decision Making*, 10 J. Pub. Child Welfare 117 (2016))]; *see also Wyatt B.*, 2022 WL 3445767, at *25 (discussing the "jarring and disruptive" impact that excessive moves have on foster children's emotional health). This data satisfies Plaintiffs' burden of connecting DHHR's practice to a risk of harm. At the merits stage, however, Plaintiffs bear the burden of demonstrating that the risks associated with the placement array are *unreasonable*.

Accordingly, whether DHHR's placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk are common questions that can be answered for all class members in one stroke. If the answer to either of these questions is "no," then no constitutional violation has occurred.

**Lack of appropriate case planning.** Plaintiffs next allege that DHHR fails to "engage in critical permanency planning or effective case review for foster children." [ECF No. 319, at 12]. According to Plaintiffs, Defendants engage in deficient case planning by "excluding integral participants from the placement process," such as from multidisciplinary team meetings ("MDTs"). [ECF No. 131, at 28]. Additionally, caseworkers allegedly fail to "complete quality comprehensive assessments of the

17

needs of children and their parents" and to "contact families to review the progress of case goals." *Id.* Plaintiffs contend that DHHR's insufficient case planning practices contribute to the lack of permanency in the foster care system.

Meanwhile, Defendants argue that they have "robust policies to ensure high-quality case planning" and "have taken steps to improve casework practice." [ECF No. 322, at 11]. Defendants further contend that the "alleged case planning failures in the Named Plaintiffs' cases . . . are isolated departures from the DHHR's policies" and that "the experiences of a small subset of the putative class cannot support a finding of a classwide practice." *Id.*

The record, however, demonstrates that DHHR, contrary to its own stated policies, fails to include families in the case planning process and engage in permanency planning for foster children. For example, in 2017, BCF sent surveys to foster care providers concerning the case planning process. [ECF No. 130-25, at 107]. Among the 31% of recipients who responded, "28% of foster parents indicated that they were always notified of MDTs, and 27% indicated that they were always notified of court hearings; with 19% reporting that they participate with the development of case planning." *Id.* Additionally, when the Children's Bureau reviewed fifty foster care cases in West Virginia in 2002, it found that "DHHR had not appropriately involved parents or children in the case planning process" in 50% of the cases. [ECF No. 130-8, at 9]. The agency also stated that "a majority of case plans are not adequately documented." *Id.* at 13. Unfortunately, these reported deficiencies are not

isolated instances. Fifteen years later, the Children's Bureau again found that "case plans are generally not developed jointly with parents" and that parents are "minimally engaged" in MDTs. [ECF No. 130-3, at 18]. Additionally, "[i]n a number of cases reviewed, a case plan had not been developed." *Id.* at 7. Plaintiffs' experts have made similar observations concerning the deficiencies in DHHR's case planning, stating that "DHHR caseworkers do not appear to engage in sufficient case planning so as to anticipate and strategize about beneficial interventions to avoid foster care disruptions when a child has an outburst of negative behavior or a mental health crisis." [ECF No. 133-1, at 33]. Rather, "when such outbursts occur, DHHR reacts with the immediate disruption of the placement." *Id.*

Children in foster care have a constitutional liberty interest in "certain services, such as appropriate placements and case planning," that "are essential to preventing harm to the[m]." *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991), *aff'd sub nom. but remanded with instructions in LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993). Indeed, "[t]his delimitation of the scope of [foster children's] liberty interest is consistent with the decision in *Youngberg*," wherein the United States Supreme Court declared that the involuntarily committed retain a liberty interest in reasonable training to ensure their safety. *Id.* In this case, Plaintiffs contend that DHHR's failure to engage in reasonable case planning for foster children results in children shuffling from placement to placement "without any real possibility of permanency." [ECF No. 131, at 29]. The connection between

deficient case planning and instability in foster care is intuitive, as chaos is commonly the fruit of a failure to plan. This relationship is illustrated, for example, in the case of Dennis R.,[8] a young male who survived Shaken Baby Syndrome but suffers from the effects of the injuries to his brain. [ECF No. 133-1, at 369]. Plaintiffs' experts explain that in Dennis' case "DHHR's case planning . . . failed to anticipate and manage his disruptive behaviors, which led to multiple unnecessary placement changes." *Id.* at 400. As previously explained, researchers have documented the long-term negative impacts of placement instability in foster care. *See* [ECF No. 130-23, at 111]. The court finds this evidence sufficient, at this juncture, to connect DHHR's inadequate case planning practices with Plaintiffs' claim of an unreasonable risk of harm. However, to prevail on the merits, Plaintiffs will need to prove that these practices *actually place* the class at a substantial risk of serious harm—i.e., prove a causal connection resulting in an injury rising to an unconstitutional level.

For the reasons stated, the court finds that common questions exist regarding whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk.

**High caseloads and chronic understaffing.** Finally, Plaintiffs allege that Defendants fail to "support, train, and retain caseworkers" and overwhelm existing caseworkers with high caseloads. [ECF No. 319, at 12–14]. "Defendants do not

---

[8] Plaintiffs' Complaint refers to Dennis as both Dennis R. and Dennis C. The court uses Dennis R. because that is how he is identified in the case caption.

dispute that there is a shortage of caseworkers in West Virginia and that workloads are too high in certain areas of the State." [ECF No. 322, at 12]. They argue, however, that "a caseworker shortage is not a 'well-defined practice' of Defendants, and Plaintiffs have not introduced any evidence that Defendants have any policies or practices that exacerbate these workforce challenges." *Id.* Indeed, Defendants list several steps they have taken "to expand the number of caseworkers in West Virginia." *Id.*

The court concludes that Plaintiffs have presented sufficient evidence that having high caseloads is Defendants' common practice and that questions exist with respect to the caseload-to-caseworker ratio. As explained below, the answers to those questions will resolve issues central to the validity of Plaintiffs' substantive due process claim. Defendants' argument prematurely assesses the merits of Plaintiffs' case—that is, the efforts DHHR has taken to address the ongoing caseworker shortage raise questions regarding whether Plaintiffs can demonstrate that Defendants acted with deliberate indifference to Plaintiffs' liberty interest. The court shares the same skepticism; however, merits questions, beyond what is required to determine whether commonality exists, are inappropriate at the class certification stage.

The Child Welfare League of America, a national organization that assists child-serving agencies across the United States, recommends that foster care caseworkers serve between twelve and fifteen children at any given time. Sean

21

Hughes & Suzanne Lay, *Direct Service Workers' Recommendations for Child Welfare Financing and System Reform*, Child Welfare League of Am. 5 (Jan. 2012), https://www.cwla.org/wp-content/uploads/2014/05/DirectServiceWEB.pdf.   Despite the obvious correlation between caseworker caseloads and foster children's safety, this concern is not reflected in the relevant DHHR policies and practices. The agency has not set a maximum number of cases per caseworker and counts cases "on a per family basis," rather than by individual child. [ECF No. 130-36, at 1]. In April 2020, West Virginia caseworkers reportedly carried an average of eighteen cases each. [ECF No. 130-38, at 1]. As of December 31, 2021, this average increased to twenty-two cases per caseworker. [ECF No. 318-5, at 2]. In fact, only eight of West Virginia's twenty-nine districts have a caseload average within the recommended range. *Id.* In several districts, the average caseload is astonishingly high. For example, the average caseload in the McDowell district is ninety-five cases per caseworker, and in the Kanawha district, the average is thirty-two cases per caseworker. *Id.* As of July 2023, nearly one-fifth of child protective service positions are vacant. *Child Welfare Dashboard*, W. Va. Dep't of Health & Hum. Res., https://dhhr.wv.gov/Pages/childwelfaredatadashboard.aspx (last visited Aug. 15, 2023).

The court concludes that Plaintiffs have presented sufficient evidence to demonstrate that high caseloads and chronic understaffing are Defendants' policy or practice. Plaintiffs have also connected this policy or practice to their alleged injury—an unreasonable risk of serious harm.

22

Caseworkers are foster children's "fire alarms. They are the first and best mechanism to ensure the class members' safety, i.e., to ensure that the child is not suffering any harm or abuses." *M.D.*, 294 F.R.D. at 44. "[A] higher caseload means that a caseworker can devote less time and energy to each case, and naturally class members' safety is affected by the amount of time and energy their caseworkers can devote to their respective cases." *Id.* at 42. Here, Plaintiffs have submitted evidence that caseworkers struggle to supervise foster children, which is adequately alleged to be the result of high caseloads. For example, one of Plaintiffs' experts states that DHHR policy requires caseworkers to visit children assigned to kinship placements every month; however, results from a survey provided to foster caregivers showed "that only 52% of those surveyed received monthly visits." [ECF No. 130-43, at 20]. Additionally, DHHR's 2019 Child and Family Services Review Program Improvement Plan ("Program Improvement Plan") recognized that "[i]nsufficient staff levels [have] directly impact[ed] the ability of the agency to assess child safety, ensure appropriate assessment and service provision, and engage families in the casework process." *WV Child and Family Services Review Program Improvement Plan*, W. Va. Dep't of Health & Hum. Res. 13 (Dec. 13, 2019), https://dhhr.wv.gov/bcf/Reports/ Documents/WVCFSR.ProgramImprovementPlan.pdf [hereinafter *Program Improvement Plan*]. The Program Improvement Plan further stated that high caseloads have led to "decreased caseworker contact," which "negatively impacts safety related timeframes" and "well-being outcomes." *Id.* at 14–15.

23

This is not a new issue. Indeed, the record suggests that the struggle to maintain routine contact with foster children has continued for over a decade. *See, e.g.*, [ECF No. 130-42, at 117 (A 2008 assessment of DHHR states, "Staff retention in all regions is an ongoing issue within the Department, and the resulting staff shortages have negatively impacted worker visits with children."); ECF No. 130-19, at 48 ("During both federal fiscal years 2015 and 2016, districts continue to list staff turnover as a barrier to achieving better outcomes for children and families.")]; *Program Improvement Plan*, *supra*, at 14 (2019 plan discussing "decreased caseworker contact" due to staffing shortages and high caseloads).

Based on the record, Plaintiffs have demonstrated that common questions exist as to whether Defendants' caseload practice prevents DHHR from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm.

### ii.  ADA Subclass

Plaintiffs next assert claims under the ADA and Rehabilitation Act on behalf of its proposed ADA Subclass. The ADA is divided into five titles, each prohibiting disability-based discrimination in certain areas of public life. As relevant to this case, "Title II concerns public services" furnished by governmental entities. John J. Coleman, III & Marcel L. Debruge, *A Practitioner's Introduction to ADA Title II*, 45 Ala. L. Rev. 55, 56 (1993). Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA imposes an integration mandate requiring public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting is one "that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." *Id.* pt. 35, app. B.

Section 504 of the Rehabilitation Act is similar in substance to Title II of the ADA. It provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Section 504 of the Rehabilitation Act differs from Title II of the ADA "only with respect to . . . causation." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). To prevail on a claim under the Rehabilitation Act, "the plaintiff must establish he was excluded 'solely by reason of' his disability;" whereas "the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Id.* at 461– 62 (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–69 (4th Cir. 1999)). "[B]ecause the analysis is 'substantially the same,'" courts generally combine claims under the ADA and Rehabilitation Act. *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., Md.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting *Doe v. Univ. of Md. Med.*

25

*Sys. Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995)); *see also Halpern*, 669 F.3d at 461 ("[D]espite the different language [the ADA and Rehabilitation Act] employ, they require a plaintiff to demonstrate the same elements to establish liability.").

To prove a violation of Title II of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must prove: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016). In this case, Plaintiffs allege that Defendants maintain two practices that purportedly violate the ADA and Rehabilitation Act: (1) "unnecessarily placing youth with disabilities into institutional settings and" (2) "failing to build and maintain an adequate infrastructure of therapeutic service providers." [ECF No. 325, at 10]. According to Plaintiffs, these "practices harm or expose all members of the ADA Subclass to a substantial risk of harm, in violation of the ADA." [ECF No. 319, at 14]. The court will address each alleged practice in turn.

**Placement of Youth with Disabilities into Institutional Settings.** Plaintiffs contend that "Defendants have a practice of unnecessarily placing youth with disabilities into institutional settings." *Id.* Defendants explain, in response, that "the state circuit court (*not* DHHR) is ultimately responsible for making the final decision about where a foster child is placed." [ECF No. 322, at 18]. Relying on a case from the Southern District of New York denying class certification to New York City foster

26

children, Defendants contend that "the role played in each child's case by [the state courts] is a critical factor that creates 'dissimilarities within the proposed class'" and undermines commonality. *Id.* (quoting *Elisa W. v. City of N.Y.*, No. 15-cv-5273, 2021 WL 4027013, at *9 (S.D.N.Y. Sept. 3, 2021)). Plaintiffs did not respond to Defendants' argument.

In *Elisa W.*, the case cited by Defendants, a group of foster children "assert[ed] a range of constitutional and statutory claims against both New York City and the State of New York, based on alleged systemic failures in the New York City foster care system." 2021 WL 4027013, at *1. The plaintiffs subsequently sought to certify a class of children who were or would be in New York City foster care. *Id.* at *8. The district court denied the motion, explaining that New York family courts are "intimately involved in the details of each [foster] child's case, exercising control over the pacing of permanency outcomes and making major decisions about their foster care circumstances." *Id.* at *3. According to the court, "the role played in each child's case by the New York State Family Court system [was] a critical factor that create[d] 'dissimilarities within the proposed class' that 'impede[d] the generation of common answers.'" *Id.* at *9 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). The court therefore concluded that the commonality requirement was not satisfied in that case.

Similarly, in West Virginia, state circuit courts have "exclusive jurisdiction over [the] placement of [foster children], and the placement may not be disrupted or delayed by any administrative process of the department." W. Va. Code § 49-4-606(a);

27

*see also* W. Va. R.P. Child Abuse and Neglect Proc. 36(e) ("The court has exclusive jurisdiction to determine the permanent placement of a child."). Because Defendants have no authority to make placement decisions, any answers to questions concerning foster care placement are not apt to drive the resolution of this case. Commonality therefore does not exist as to this alleged practice.

**Inadequate Infrastructure of Therapeutic Service Providers.** According to Plaintiffs, "foster children in West Virginia do not have ready access to community-based mental and behavioral health services and professionals" and therapeutic treatment. [ECF No. 319, at 15]. For children with mental disabilities in particular, "institutionalization [i]s the sole source of plausible . . . treatment." [ECF No. 131, at 37]. In contrast to their allegations concerning institutional placement, Plaintiffs' concern here is not about a specific placement; instead, they allege that Defendants' failure to provide community-based treatment leaves courts with no choice but to institutionalize foster children with various disabilities. In other words, the lack of community-based services results in, or creates a risk of, institutionalization.

In response, Defendants assert that they do not have a practice of failing to provide community-based treatment. [ECF No. 322, at 15]. Defendants state that West Virginia law "requires [them] to '[p]rovide community-based services in the least restrictive settings that are consistent with the needs and potentials of the child and his or her family.'" *Id.* (quoting W. Va. Code § 49-1-105(b)(7)). In accordance with that directive, Defendants contend that they have "devoted enormous resources to

28

expanding community-based mental health services for children" over the last several years. *Id.* at 17.

In *Olmstead v. L.C.*, the Supreme Court addressed the qualified right of institutionalized individuals to community placement under the ADA, where medical professionals have determined that such placement is appropriate and the placement can be reasonably accommodated. 527 U.S. 581, 587 (1999). Over the past two decades, several courts, including the Fourth Circuit, have expanded *Olmstead* to apply to those who are placed at *risk* of institutionalization by a state's failure to provide community-based treatment. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *Davis v. Shah*, 821 F.3d 231, 262–63 (2d Cir. 2016); *see also United States v. Mississippi*, 400 F. Supp. 3d 546, 553–54 (S.D. Miss. 2019) (finding that the State of Mississippi's mental health system violated the ADA because the State over relied on state psychiatric hospitals and provided very few community-based services, thereby placing people with serious mental illness at risk of institutionalization). The Department of Justice ("DOJ"), in agreement, has explained that "the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. . . . [A] plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Statement of the Department*

*of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and* Olmstead v. L.C., U.S. Dep't of Just. (Feb. 25, 2020), https://archive.ada.gov/olmstead/q&a_olmstead.htm. Accordingly, caselaw and DOJ guidance make clear that a risk of institutionalization can support a valid claim under the ADA and Rehabilitation Act.

In fact, several district courts have certified classes of disabled individuals challenging a public entity's failure to provide community services to them. *See, e.g.*, *Kenneth R. v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013); *Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Or. 2012). For example, in *Kenneth R.*, the plaintiffs claimed that "the State of New Hampshire unnecessarily institutionalize[d] people with serious mental illnesses" in violation of the ADA and Rehabilitation Act, and they sought to certify a class of people with serious mental illness who were either institutionalized or at risk of institutionalization. 293 F.R.D. at 258, 260. According to the plaintiffs, the State maintained a "pattern and practice of under-funding community services and . . . over-rel[ying] on institutional treatment," which "created a systemic deficiency in the array of available community services, which, in turn, . . . 1) contributed to the unnecessary institutionalization of people with serious mental illnesses; and 2) contributed to the placement of people with serious mental illnesses at serious risk of unnecessary institutionalization." *Id.* at 260. The plaintiffs sought declaratory judgment and "injunctive relief requiring the State to develop and provide an adequate array of identified community-based treatment services." *Id.* After

examining the State's own reports, reports by the DOJ, and the plaintiffs' experts' reports, the district court found "[s]ubstantial evidence suggest[ing] that the State's policies and practices . . . created a systemic deficiency in the availability of community-based mental health services, and that th[e] deficiency [was] the source of the harm alleged by all class members." *Id.* at 267. Accordingly, the court concluded that common questions existed in the case, including "whether there [was] a systemic deficiency in the availability of community-based services, . . . whether that deficiency follow[ed] from the State's policies and practices," and "whether the systemic conditions, if shown to exist, expose[d] all class members to a serious risk of unnecessary institutionalization, including continued unnecessary institutionalization." *Id.*

Similarly, in this case, the record suggests that Defendants provide insufficient community-based services to foster children with disabilities. On June 1, 2015, the DOJ wrote a letter to then-Governor Earl Ray Tomblin, detailing "the findings of [its] investigation of West Virginia's system of care for children in need of mental health services." Letter from DOJ to Governor Earl Ray Tomblin 1 (June 1, 2015), https://archive.ada.gov/olmstead/documents/west_va_findings_ltr.pdf (footnote omitted). The DOJ found that "DHHR ha[d] not developed a sufficient array of in-home and community-based services" for foster children, which resulted in children with mental disabilities being placed in "segregated residential treatment facilities" at "high rates." *Id.* at 2. At the time, "25% of all children in DHHR custody" were

institutionalized, which exceeded the national average rate of institutionalization of 15%. *Id.* at 4. The DOJ concluded that DHHR's provision of "mental health services to children [occurred] almost exclusively in segregated residential treatment facilities," even though "these children . . . qualified for community placement." *Id.* at 8. According to the DOJ, the lack of community services resulted in, and placed foster children at risk of, unnecessary institutionalization. *Id.* at 12–16. The DOJ therefore concluded that West Virginia was not in compliance with the ADA. *Id.* at 1.

Additional external and internal reviews of West Virginia's foster care system likewise indicate a lack of community-based services for children with disabilities. For example, the 2017 CFSR by the Children's Bureau noted that mental health services for foster children are lacking. [ECF No. 130-3, at 23]. Additionally, in 2018, DHHR reported the results from a survey it had distributed concerning community services. [ECF No. 130-19]. The survey results indicated a significant service gap in individual outpatient therapy, intensive home-based services, in-home crisis services, peer support, and therapeutic foster care. *Id.* at 279, 281–82, 284, 286. West Virginia University has similarly described the "lack of appropriate community-based services" for foster children, explaining that "[t]he shortage of community-based services, . . . is a significant barrier to successfully supporting high-need children so they can remain in family-based care." Bureau of Business and Economic Research, *Identifying and Meeting Children's Behavioral Health Needs: Current Policies, Perspectives, and Opportunities*, W. Va. Univ. (Dec. 2012), https://researchrepository.

wvu.edu/cgi/viewcontent.cgi?article=1047&context=bureau_be. Based on these reports, one of Plaintiffs' experts opined that "DHHR fails to provide access to an adequate array of community-based services, programs, and activities that are readily accessible to and usable by children with disabilities." [ECF No. 130-10, at 6].

The court finds sufficient evidence of systemic deficiencies in the availability of community-based services for children with disabilities.[9] Common questions therefore exist regarding whether Defendants' provision of services is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization. Defendants' statements concerning the programs they have implemented to expand community-based services is a factor for the court to consider at the merits stage when answering the questions common to the ADA Subclass.

### iii. Kinship Subclass

In its Order, dated January 13, 2023, the court dismissed two of the three substantive due process claims asserted by the proposed Kinship Subclass. [ECF No. 300, at 17]. The remaining claim involves DHHR's alleged failure to provide the

---

[9] Defendants argue that the practice of failing to provide community treatment alleged by Plaintiffs "relate[s] only to children with mental health disabilities and do[es] not pertain to children with physical or intellectual disabilities." [ECF No. 322, at 15]. The court disagrees. The failure to provide community-based services, such as therapeutic treatment, is as detrimental to children with physical and intellectual disabilities as it is to children with mental disabilities if it places those children at risk of unnecessary institutionalization. Although Plaintiffs highlight some of the particular challenges facing those with mental disabilities, their allegations plainly encompass a lack of "other therapeutic service providers capable of meeting the needs of ADA Subclass members." [ECF No. 319, at 14].

subclass with services to ensure the children are free from harm. *Id.*; [ECF No. 1, ¶ 374(a)(ii)].

Plaintiffs seek certification for the Kinship Subclass based on DHHR's alleged practices of failing to contact children in kinship placements and to investigate allegations of maltreatment in kinship care. [ECF No. 319, at 16]. Defendants argue that the Kinship Subclass' claims are repetitive of the General Class' claims, and therefore "Plaintiffs fail to prove commonality . . . for the Kinship Subclass . . . for the same reasons they have not met their burden for the General Class." [ECF No. 322, at 9 n.9]. In their reply, Plaintiffs explain that the Kinship Subclass' claims are similar to those of the General Class, but they are not repetitive of those claims. [ECF No. 325, at 4 n.11]. Plaintiffs contend "that the risk of harm—which is in substantial part linked to high caseloads and chronic understaffing—is increased for Kinship Subclass members, and that Defendants' failures to supervise children and investigate allegations of maltreatment are, likewise, more significant." *Id.*

As previously explained, the court may divide a class into subclasses "[w]hen appropriate." Fed. R. Civ. P. 23(c)(5). The Advisory Committee Notes indicate that subdivision is appropriate when "a class is found to include subclasses divergent in interest." Fed. R. Civ. P. 23(c) advisory committee's note to 1966 amendment. In this case, the court fails to see how the interests of the Kinship Class diverge from the interests of the General Class. Indeed, Plaintiffs assert that the Kinship Subclass is affected by the same deficiencies in the foster care system, such as high caseloads and

chronic understaffing, as is the General Class. Plaintiffs merely contend that these inadequacies are riskier for members of the Kinship Subclass. [ECF No. 325, at 4 n.11]. The questions common to both classes, however, are the same: Do these specific practices place foster children at an unreasonable risk of serious harm and if so, have Defendants acted with deliberate indifference to this unconstitutional risk? The court is therefore unpersuaded that a separate subclass is appropriate. For this reason, Plaintiffs' motion to certify the Kinship Subclass is **DENIED**.

### C. Typicality

To establish typicality, a plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The representative parties must "'possess the same interest and suffer the same injury' as the class members." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982). Their claims, however, need not "be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001) (quoting 5 James William Moore, et al., Moore's Federal Practice § 23.24 (3d ed. 2000)).

The Supreme Court has explained that typicality "tend[s] to merge" with commonality in that "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5 (quoting *Gen. Tel. Co. of the Sw.*, 457 U.S. at 157 n.13). In other words, for typicality to exist, "[t]he representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter*, 436 F.3d at 466. A district court's discussion of typicality must therefore "involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Id.* at 467.

### i. General Class

The Named Plaintiffs allege that they have satisfied the typicality requirement because their "claims . . . rest on the same legal theory as the members of the putative class" and "arise from the same course of conduct." [ECF No. 319, at 17]. Defendants assert that the Named Plaintiffs have not shown that proof of the elements of their claims will also prove the claims of the absent class members. [ECF No. 322, at 19]. Additionally, Defendants argue that typicality in this case is "undermined by the fact that the . . . Named Plaintiffs are extraordinarily atypical of the putative General Class," particularly with respect to their age and "severe behavioral issues." *Id.* at 20.

Defendants' arguments are misguided. As explained above, the crux of the typicality requirement is whether the Named Plaintiffs' *claims* are representative of the absent class members' *claims*—not whether their factual circumstances are identical. In this case, the Named Plaintiffs' claims are based on the same legal theory

36

as the absent class members' claims: the Fourteenth Amendment substantive due process right to be free of an unreasonable risk to their safety. Additionally, the Named Plaintiffs allege that all class members, including themselves, have been similarly injured as a result of DHHR's practices and policies—i.e., they have all been exposed to unreasonable risk of serious harm. To redress their injury, Plaintiffs seek declaratory and injunctive relief against Defendants on behalf of the entire class. Under these circumstances, the court concludes that the Named Plaintiffs' claims are typical of the class. Proof of the Named Plaintiffs' claims would necessarily prove classwide claims. As such, the typicality requirement is satisfied for the putative General Class.

### ii. ADA Subclass

For similar reasons, the proposed ADA Subclass also meets the typicality requirement. The Named Plaintiffs who would be members of this subclass assert claims based on the same legal theory as the unnamed class members—i.e., the ADA and Rehabilitation Act. Additionally, they allege that the same course of conduct— Defendants' failure to maintain community-based services—exposes *all* subclass members to a risk of unnecessary institutionalization. Certainly, both the Named Plaintiffs and the absent subclass members share an interest in securing community services sufficient to prevent their continued exposure to such risk. By pursing their own interests, the Named Plaintiffs will necessarily advance the interests of all other subclass members. The court therefore concludes that the Named Plaintiffs with

disabilities have claims typical of the unnamed subclass members, thereby satisfying the requirements of Rule 23(a)(3).

### D. Adequacy of Representation

To satisfy the adequate representation requirement for class certification, a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation overlaps with commonality and typicality. *See Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5. Determining adequacy of representation requires the court to resolve two inquiries: "(1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the entire class." *Thorn v. Jefferson-Pilot Life Ins. Co.*, No. 3:00-2782-22, 2004 WL 5745993, at *7 (D.S.C. Dec. 2, 2004); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5 (explaining that the adequacy of representation requirement "raises concerns about the competency of class counsel and conflicts of interest" (quoting *Gen. Tel. Co. of the Sw.*, 457 U.S. at 157 n.13)). "For a conflict of interest to prevent plaintiffs from meeting the requirement of Rule 23(a), that conflict 'must be fundamental'" and "go to the heart of the litigation." *Gunnells*, 348 F.3d at 430–31 (quoting 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18:14 (4th ed. 2002)).

### i. General Class

Defendants dispute that the Named Plaintiffs will adequately represent the proposed General Class, as "conflicts-of-interest exist between the Named Plaintiffs and the putative absent class members." [10] [ECF No. 322, at 21]. Defendants offer the following example of a conflict of interest: "Anastasia M. [suggests that she] has been harmed by DHHR's efforts to reunify her with her parent instead of pursuing adoption, . . . but many putative class members benefit from DHHR's efforts to give families more time to work toward reunification." *Id.*

In its analysis of typicality, the court discussed the relationship between the claims of the representatives and those of the unnamed class members. *See supra* Section III.C.i. Both the Named Plaintiffs and absent class members' injuries arise from the same allegedly unconstitutional conduct by the same state agency. The Named Plaintiffs do not seek monetary damages but only declaratory and injunctive relief on behalf of the class. Based on the circumstances, the court concludes that no "fundamental" conflict of interest exists between the Named Plaintiffs and the absent class members. Any potentially diverging interests identified by Defendants have no

---

[10] Additionally, because nine of the Named Plaintiffs are no longer in DHHR's custody, Defendants argue that they are not members of the putative class or subclass and therefore cannot be adequate class representatives. [ECF No. 322, at 22]. Defendants' argument, however, ignores the Fourth Circuit's holding in its Order reversing this court's ruling on mootness. *See* [ECF No. 265, at 11–15]. As the Fourth Circuit explained, if this court "decides to certify the class, the certification will 'relate back to the filing of the complaint.'" *Id.* at 15 (quoting *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013)). At the time Plaintiffs filed their Complaint, all twelve Named Plaintiffs were in DHHR's custody, and each child was a member of at least one of the proposed classes.

bearing on the claims asserted in this case, which address general policies and practices alleged to subject all class members to the same unreasonable risk of harm.

Additionally, this case has been pending for nearly four years. Proposed class counsel have devoted substantial time and resources to representing the class, and they have extensive experience handling class action litigation. *See* [ECF Nos. 318-1, 318-10]. The court is thus satisfied that the Named Plaintiffs and their counsel will vigorously prosecute this action on behalf of the General Class and that Rule 23(a)(4)'s adequacy requirement has been met. At this point, Plaintiffs have established all four of Rule 23(a)'s requirements for class certification for the proposed General Class.[11]

---

[11] Plaintiffs include children who enter foster care through juvenile justice proceedings in the proposed General Class along with those who enter the system through abuse-and-neglect proceedings. *See* [ECF No. 319, at 7 n.27]. Defendants argue, however, that neither "commonality, typicality, [n]or any other Rule 23 requirement is satisfied with respect to the claims of juvenile justice youth." [ECF No. 322, at 24]. Defendants explain that "juvenile justice youth present community safety issues not implicated with traditional foster children; are served by different case workers . . . ; and have more extensive court involvement in their cases." *Id.* at 25. Defendants contend that "principles of comity and federalism require the Court to abstain from overseeing or interfering with ongoing juvenile justice proceedings." *Id.*

Approximately 10% of foster children are placed in DHHR's custody "through juvenile delinquency and status-offense hearings," while the other 90% "come to the Department by way of traditional abuse-and-neglect proceedings." [ECF No. 265, at 4]. In its Order reversing this court's dismissal under *Younger*, the Fourth Circuit explained that abstention was inappropriate for the claims of foster children who enter DHHR's custody through abuse-and-neglect proceedings. *Id.* at 38– 39. For juvenile justice youth, the court expressed skepticism that abstention applied to their claims but declined to resolve the issue because it was "not properly before [the court]." *Id.* at 21. The Fourth Circuit noted, however, that "West Virginia treats all foster children the same, whether they end up in foster care 'as a result of a juvenile proceeding or as a result of a child abuse and neglect proceeding.'" *Id.* (quoting W. Va. Code § 49-4-110).

For the same reasons abstention is inapplicable to traditional foster children's claims, it is also inapplicable to the claims of juvenile justice youth. The *Younger* abstention doctrine counsels federal courts to refrain from interfering with ongoing "state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). Like the traditional foster children, the juvenile justice youth do not challenge any judicial proceeding but rather Defendants' provision of services to all foster children, including themselves. *See* W. Va. Code § 49-4-110; *see also* [ECF No. 116, at 2 (admitting that juvenile justice youth in DHHR's custody

### ii.  ADA Subclass

According to Defendants, the Named Plaintiffs with disabilities cannot adequately protect the interests of the ADA Subclass for the same reasons the Named Plaintiffs as a whole cannot represent the General Class. Defendants state that a conflict-of-interest exists between the Named Plaintiffs and unnamed subclass members because the Named Plaintiffs "seek to decrease the number of children in the ADA Subclass placed in residential treatment programs" although "many children with serious behavioral issues benefit from such programs." [ECF No. 322, at 21].

To begin, Plaintiffs seek to prevent the risk of *unnecessary* institutionalization, not all institutionalization. Plaintiffs allege that Defendants fail to provide foster children with disabilities with community-based treatment, such that state courts

---

are considered foster children)]. Therefore, an injunction directed at Defendants, should Plaintiffs prevail, would not intrude where the abstention doctrine forbids—with pending state judicial proceedings. Accordingly, the court concludes that abstention is inapplicable to the claims of children who entered foster care through delinquency and status-offender proceedings, and those children are properly included in the putative General Class.

On a separate but related note, the court finds it necessary to clarify the status of one of the Named Plaintiffs, Gretchen C. Initially, in their Complaint, Plaintiffs stated that Gretchen entered the foster care system as "a neglected youth," who "ha[d] never been adjudicated as a delinquent." [ECF No. 1, ¶ 127]. Presumably after reviewing discovery, Plaintiffs now contend that DHHR obtained custody of Gretchen through juvenile justice proceedings. [ECF No. 131, at 9; ECF No. 319, at 7 n.27; ECF No. 325, at 19]. Specifically, the record indicates that Gretchen first came to DHHR's attention when she was eight months old due to allegations of abuse and neglect by her parents. [ECF No. 133-1, at 275]. However, Gretchen was not placed into DHHR's custody until she was eleven years old, following a petition naming her as a delinquent child. *Id.* at 298. The court ultimately adjudicated Gretchen delinquent, placed her on probation for five years, "and continued DHHR's temporary custody of [her]." *Id.* at 299. The record therefore indicates that Gretchen entered foster care through juvenile delinquency proceedings. But in accordance with the preceding discussion, Gretchen is as much a foster child, exposed to DHHR's same general policies and practices, as the eleven other Named Plaintiffs. *See* W. Va. Code § 49-4-110; [ECF No. 265, at 21]. As such, the court concludes that Gretchen can adequately represent the proposed General Class.

have no choice but to institutionalize them, even if some children could remain in the community with adequate services. *See* [ECF No. 319, at 15; ECF No. 265, at 27]. To the extent that certain foster children require institutionalization to meet their needs, their interests do not conflict with the interests of the Named Plaintiffs. Just because some children currently require residential treatment does not mean they will not benefit from the Named Plaintiffs' pursuit of community services. Indeed, the availability of community treatment may ensure that these high need children will not be subject to unnecessary continued institutionalization if their conditions improve in the future.

Additionally, as the court previously explained, proposed class counsel have the requisite experience and resources to litigate this case. *See supra* Section III.D.i. The court is satisfied that counsel will adequately represent the interests of the ADA Subclass.

For the reasons stated, Plaintiffs have met the adequacy requirement and have now satisfied all of Rule 23(a)'s requirements for class certification for this subclass.

### E.  Rule 23(b)

Once Rule 23(a)'s requirements are met, a plaintiff must show that the proposed class fits within one of three types of classes described in Rule 23(b). In this case, Plaintiffs seek class certification under Rule 23(b)(2), [ECF No. 319, at 18–20], which states that class certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) frequently serves "as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *Baby Neal*, 43 F.3d at 58–59. "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (quoting Nagareda, *supra*, at 131–32). Rule 23(b)(2) therefore "applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

In this case, Plaintiffs seek court intervention "to address the many long-standing systemic deficiencies" that affect West Virginia's entire foster care system. [ECF No. 1, ¶ 367]. Consequently, at the conclusion of the merits proceedings, the court could only declare unlawful and enjoin the challenged conduct "as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (quoting Nagareda, *supra*, at 131–32). If the court determines that Defendants' practices are unconstitutional or violate federal law, "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* The court therefore concludes that the requirements of Rule 23(b)(2) are satisfied as to the proposed General Class

and ADA Subclass. With the final requirement for class certification having been met, the court **GRANTS** Plaintiffs' motion to certify these two classes.

### F.  Appointment of Class Counsel

Rule 23(c)(1)(B) requires a court that certifies a class to appoint class counsel. In appointing class counsel, the court must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law; and" (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

In this case, proposed class counsel include attorneys from A Better Childhood, Inc., Shaffer & Shaffer, PLLC, and Disability Rights of West Virginia. [ECF Nos. 318-1, 318-10]. They describe themselves as a committed "team of attorneys dedicated to this matter." [ECF No. 318-10, ¶ 3]. Together, the attorneys have "engaged in an in-depth investigation of the child welfare system in West Virginia," reviewing relevant facts and documents and "researching and developing legal claims." [ECF No. 318-1, ¶ 8]. Additionally, proposed counsel have extensive experience handling complex litigation and class actions similar to the instant case. *Id.* ¶ 5; [ECF No. 318-10, ¶ 3]. As a result, they are knowledgeable about the applicable law in child welfare and disability rights litigation and have sufficient resources to effectively litigate this matter. [ECF No. 318-1, ¶ 6; ECF No. 318-10, ¶ 10].

Proposed counsel have clearly demonstrated their expertise in civil rights class litigation, and the court concludes that they will fairly and adequately represent the interests of the General Class and ADA Subclass. *See generally M.D.*, 294 F.R.D. at 66 (appointing class counsel based on counsel's "extensive experience handling complex litigation and class actions," "familiarity with the applicable law . . . [in] th[e] case," and access to "substantial resources" necessary to represent the class). Accordingly, the court **GRANTS** Plaintiffs' Motion for Appointment of Class Counsel.

## IV.   Conclusion

Plaintiffs' claims, challenging systemic deficiencies in West Virginia's foster care system, are tailor-made for class resolution. As the Fourth Circuit illustrated, "[r]eforming foster care case-by-case would be like patching up holes in a sinking ship by tearing off the floorboards." [ECF No. 265, at 33]. Indeed, the court could not give to Jonathan without depriving Gretchen and therefore declines to play a zero-sum game.

For the reasons stated herein, Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel, [ECF No. 318], is **GRANTED in part** and **DENIED in part**. This matter shall proceed as a class action with one General Class and one ADA Subclass.

Membership in the certified class and subclass is defined as follows:

- The General Class: all West Virginia foster children who are or will be in the foster care custody of DHHR or its successor agency; and

45

- The ADA Subclass: all members of the General Class who have physical, intellectual, cognitive, or mental health disabilities, as defined by federal law.

The following Named Plaintiffs, by their next friends, are appointed as class representatives for the General Class:

- Jonathan R., by his next friend, Sarah Dixon;

- Anastasia M., by her next friend, Cheryl Ord;

- Serena S., by her next friend, Sarah Dixon;

- Theo S., by his next friend, L. Scott Briscoe;

- Garrett M., by his next friend, L. Scott Briscoe;

- Gretchen C., by her next friend, Cathy Greiner;

- Dennis R., by his next friend, Debbie Stone;

- Chris K., Calvin K., and Caroline K., by their next friend, Katherine Huffman;

- Karter W., by his next friend, L. Scott Briscoe; and

- Ace L., by his next friend, Isabelle Santillion.

Additionally, the following Named Plaintiffs, by their next friends, are appointed as class representatives for the ADA Subclass:

- Jonathan R., by his next friend, Sarah Dixon;

- Anastasia M., by her next friend, Cheryl Ord;

- Serena S., by her next friend, Sarah Dixon;

- Theo S., by his next friend, L. Scott Briscoe;

- Garrett M., by his next friend, L. Scott Briscoe;

- Gretchen C., by her next friend, Cathy Greiner;

- Dennis R., by his next friend, Debbie Stone;

- Karter W., by his next friend, L. Scott Briscoe; and

- Ace L., by his next friend, Isabelle Santillion.

Finally, the following attorneys are appointed as co-counsel to represent both the General Class and ADA Subclass:

- attorneys from A Better Childhood, Inc.;

- attorneys from Shaffer & Shaffer, PLLC; and

- attorneys from Disability Rights of West Virginia.

This matter shall proceed in accordance with the Scheduling Order entered on June 12, 2023. [ECF No. 329].

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:      August 17, 2023

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE