IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JONATHAN R., et al.,

                Plaintiffs,

v.                                            CIVIL ACTION NO.   3:19-cv-00710

JIM JUSTICE, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is Defendants' Renewed Motion to Dismiss the Claims of Named Plaintiff Garrett M. [ECF No. 337]. For the reasons stated herein, Defendant's Renewed Motion is **GRANTED**.

### I.    Background and Procedural History

This case involves a class of current and former foster children who are challenging West Virginia's child welfare system on various grounds. This court recently certified a General Class of "all West Virginia foster children who are or will be in the foster care custody of" the West Virginia Department of Health and Human Resources ("DHHR"). [ECF No. 351, at 45].

The present motion concerns whether one of the twelve Named Plaintiffs, Garrett M., has standing to bring this case individually or on behalf of the class. The parties agree that Garrett M. was involved in both the child welfare and juvenile justice systems as a minor. [ECF. Nos. 338, 348]. But Garrett M. and Defendants

dispute which state agency had custody of Garrett M. at the commencement of this action and thereafter. *Id.*

Defendants previously sought to dismiss the claims of Garrett M., [ECF No. 88], and other Named Plaintiffs, [ECF Nos. 17, 55, 107, 167]. This Court dismissed those claims as moot, [ECF No. 258], and the Fourth Circuit reversed. *See Jonathan R. v. Justice*, 41 F.4th 316 (4th Cir. 2022). The Fourth Circuit did not, however, determine whether Garrett was in DHHR custody at the time of filing. *See id.* at 326 ("If, on remand, the district court decides to certify the class, the certification will 'relate back to the filing of the complaint,' reserving Plaintiffs' class claims.") (citation omitted).

A brief timeline of Garrett M.'s history with DHHR and the Bureau of Juvenile Services ("BJS")[1] helps resolve this dispute. DHHR opened an abuse and neglect case for Garrett M. in 2013. [ECF. Nos. 338, 348]. In early 2018, BJS filed a delinquency petition against Garrett while his DHHR case was still pending [ECF. No. 348, at 3]. After briefly living with his father again, Garrett moved between various BJS and DHHR facilities from November 2018 until June 2019. *Id.* at 4. Garrett was eventually placed at the Rubenstein Center, a BJS secure detention facility, on June 19, 2019. *Id.* At a permanency hearing on August 26, 2019, the state court ordered Garrett to remain at the Rubenstein Center. *Id.*

---

[1] BJS was previously called the Division of Juvenile Services, and most of the statutory text still refers to the agency as such. *See* W. Va. Code § 49-2-1001. However, as the parties and their exhibits now use BJS, the court will do the same.

Plaintiffs filed their Class Action Complaint on September 30, 2019. [ECF No. 1]. At this time, Garrett M. continued to reside at the Rubenstein Center. [ECF No. 348, at 4]. On December 9, 2019, the state court placed Garrett in the guardianship of his aunt. *Id.* He left the Rubenstein Center and remained with his aunt until he turned eighteen. [ECF No. 338, at 3].

West Virginia law provides "[w]hen any juvenile is ordered by the court to be transferred from the custody of one of these agencies into the custody of the other, [DHHR] and [BJS] shall cooperate with each other to the maximum extent necessary in order to ease the child's transition . . . ." W. Va. Code § 49-2-901(b). Defendants argue that Garrett's transfer to the Rubenstein Center indicates that BJS had custody of Garrett, and as such, DHHR did not have "legal or physical custody" of Garrett at the time of filing the complaint, nor did Garrett subsequently re-enter DHHR custody at any point. [ECF. No. 338, at 1]. Thus, because the class includes only those Plaintiffs who were in DHHR foster care custody at the time of filing or thereafter, Defendants claim Garrett M. lacks standing to pursue this action individually or on behalf of the class. [ECF. Nos. 338, 358].

Plaintiffs respond that although Garrett was *physically* in BJS custody at the Rubenstein Center, DHHR still had *legal* custody while finalizing Garrett's permanency plan. [ECF. No. 348, at 5]. Plaintiffs' contention relies on the fact that Garrett's DHHR caseworkers continued to work on his abuse and neglect case and to

3

meet with Garrett throughout his time at the Rubenstein Center until DHHR closed his case in December 2019.[2] *Id.* at 5–6.

## II. Applicable Law

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must have "suffered an injury in fact" that is "caused by the defendant" and can "likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).

"The strictures of Article III standing are no less important in the context of class actions." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (citing *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 652 (4th Cir. 2019)). Named class representatives must "demonstrate standing through a 'requisite case or controversy between themselves personally'" and the defendants. *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982)). Thus, a "named plaintiff in particular" must have a "sufficient allegation of harm." *Baehr*, 953 F.4th at 252–53.

---

[2] Plaintiffs also assert that the state court held proceedings for both his delinquency and dependency cases throughout the end of 2019, which proves DHHR retained legal custody. [ECF No. 348, at 6]. This argument is without merit, as only one state court proceeding happened after this case commenced on September 30, 2019, and the court documents reference only the juvenile delinquency case number but not his abuse and neglect case. [ECF No. 347, at 37]. The last hearing in his abuse and neglect case occurred in August of 2019 and a corresponding order was entered September 4, 2019. [ECF No. 357, at 50].

For purposes of the instant motion, whether Garrett has a sufficient allegation of harm depends on the meaning of "custody" in the West Virginia Child Welfare Act. *See* W. Va. Code § 49-2-901(b). As the class certification "relate[s] back to the filing of the complaint," *Jonathan R.*, 41 F.4th at 326, Garrett M. has standing only if he was in DHHR custody on or at any point after September 30, 2019, such that he suffered the type of harm alleged in the Complaint.[3]

When construing a statute, courts "first and foremost strive to implement congressional intent by examining the plain language." *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) (quoting *Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 434 (4th Cir. 2012). Interpreting plain language requires that courts "look to 'the specific context in which the language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Minor*, 669 F.3d at 434–35). "[C]ourts are not bound to adopt the most natural reading of statutory language. Nonetheless, when . . . the most natural reading of statutory language supports a particular construction of that language, courts should be wary of adopting an alternative construction." *Id.* at 162.

---

[3] Plaintiffs allege that systemic deficiencies plague DHHR and West Virginia's Child Welfare system, including: an inadequate array of appropriate foster placements; a failure to support foster children in kinship placements; an over-reliance on institutional placements; a failure to employ and retain a sufficient number of caseworkers, who carry unreasonably high caseloads; inadequate performance of assessments and case planning; a routine failure to obtain mental health assessments and services; inadequate permanency planning; and failure to engage in transition planning. [ECF No. 1, at 53–84]. These deficiencies allegedly create an unreasonable risk of harm to Plaintiffs. *Id.*

### III. Discussion

It is undisputed that at the time of filing, BJS had physical custody of Garrett M. while he was housed at the Rubenstein Center. [ECF Nos. 338, 348]. Furthermore, relevant provisions of the West Virginia Code command the conclusion that DHHR did not have "foster care custody" of Garrett M. at the time of filing on September 30, 2019, nor at any point thereafter. Consequently, DHHR could not have subjected Garrett to the harms alleged in the Complaint.

DHHR and BJS are separate agencies that work in tandem to administer services and provide a "coordinated continuum of care" to juveniles in the state. W. Va. Code § 49-2-901(a)(1); s*ee also id.* § 49-2-1001 ("It is . . . the intent of the Legislature that this state, through [DHHR and BJS], establish, maintain, and continuously refine and develop, a balanced and comprehensive state program for juveniles who are potentially delinquent or are . . . juvenile delinquents in the care or custody of [DHHR]."). DHHR, which falls under West Virginia's Bureau for Social Services, administers the State's child welfare services. *Id.* § 49-1-106(a). BJS, on the other hand, is a department within the Division of Corrections and Rehabilitation, which administers the State's juvenile detention and correctional facilities. *Id.* The administrative authority of the Division of Corrections and Rehabilitation only "extends onto to those detained or committed to a secure detention facility or secure correctional facility operated and maintained by the division." *Id.*; *see id.* § 15A-3-12(a) (providing that the Division of Corrections and Rehabilitation manages "the

6

juvenile facilities of this state, including, but not limited to: . . . Kenneth 'Honey' Rubenstein Juvenile Center").

West Virginia law provides that DHHR and BJS "shall cooperate with each other" when a court orders any juvenile "to be transferred from the custody of one of these agencies into the custody of the other." *Id.* § 49-2-901(b). The "most natural reading of [this] statutory language" undoubtedly includes physical custody, but also legal custody. *Hurlburt*, 925 F.3d at 162. Legal custody is "the authority to make significant decisions on a child's behalf," *Custody*, Black's Law Dictionary (11th ed. 2019), such as decisions regarding education or medical care. Under West Virginia Law, BJS—not DHHR—was responsible for making important decisions on Garrett's behalf while he resided at Rubenstein. *See* W. Va. R. Juv. Pro. 37(a) ("For every juvenile in foster care under the supervision of the DHHR or [B]JS, the custodial agency must prepare a case plan for the child within the first 60 days of entering the care, custody, and control of the agency."); *see also* W. Va. R. Juv. Pro. 37(c) (explaining that case plans include, but are not limited to "health and education records of the juvenile, . . . a plan for assuring that the juvenile receives safe and proper care, . . . [and] a plan for ensuring the educational stability of the juvenile while in foster care"); *see generally* W. Va. Code § 15A-6-3 (requiring BJS superintendents to "provide for feeding, clothing, working and taking care of" the residents of juvenile facilities); *id.* § 15A-3-4 (authorizing the Commissioner of Corrections and Rehabilitation to "[s]upervise the treatment, custody, and discipline

7

of all inmates and residents," including "providing for the[ir] education"); W. Va. R. Juv. Pro. 35(c) ("DHHR shall be responsible for providing [a risk and needs assessment] report, forthwith, to members of the multidisciplinary team; provided, if the juvenile has been adjudicated delinquent and ordered into the custody of the [B]JS for examination and diagnosis, the [B]JS shall be responsible for providing the assessment report."). While DHHR may retain authority to make *some* decisions regarding juveniles, *see, e.g.*, W. Va. R. Juv. Pro. 16(a) (allowing DHHR, BJS, counsel, or another interested party to request a review of detention or placement), on balance, it is clear that BJS has primary responsibility for the juvenile and is authorized to make a broad range of decisions for juvenile residents.

Plaintiffs' contention that DHHR transfers *only* physical custody to BJS ignores the "specific context in which the language is used." *Hurlburt*, 925 F.3d at 158. The relevant text refers to a transfer of "custody," but other provisions of the Code specify when referring to either legal or physical custody. *See, e.g.*, W. Va. Code § 49-2-1005 (DHHR "may require any juvenile committed to its *legal custody* to remain at and to return to the residence to which the juvenile is assigned . . . ."); *id.* § 49-4-302 ("[F]amily court judges are authorized to order the department to take emergency *custody* of a child who is in the *physical custody* of a party to an action or proceeding before the family court . . . ."); *id.* § 49-4-708(a)(4) ("In lieu of placing the juvenile in a detention facility, the court may place the juvenile in the temporary *legal and/or physical custody* of [DHHR].").

Moreover, the West Virginia Rules of Juvenile Procedure provide both DHHR and BJS with distinct authority to prepare a case plan for any child "entering into the care, custody, and control of the agency." W. Va. R. Juv. Pro. 37(a). And in its August 2019 permanency review order, the state court found that it was in Garrett's best interest to remain at the Rubenstein Center. [ECF. No. 348, at 4]. *See* W. Va. R. Juv. Pro. 39(c) ("Upon a finding that the best interests of the juvenile or the welfare of the public require it, the court may commit the juvenile to the *custody* of the Director of the Division of Juvenile Services for placement . . . ."). The state court could have alternatively placed him in the custody of DHHR but chose not to do so. *See* W. Va. R. Juv. Pro. 39(d) (acknowledging the court may "place[] the juvenile in the custody of DHHR or [B]JS"). Thus, while in BJS custody at the Rubenstein Center, Garrett could not have suffered an injury in fact caused by DHHR in the manner alleged in Plaintiffs' Complaint.

DHHR's continued work on Garrett's case after the commencement of this action does not change this result, as those who are not in the custody of DHHR may still receive abuse and neglect services. W. Va. Code § 49-1-201. (defining "child abuse and neglect services" as "social services which are directed toward . . . (f) assuring the adequate care of children or juveniles who have been placed in the custody of [DHHR] or *third parties*"). When closing Garrett's case in December of 2019, the agency reasoned that Garrett was in BJS custody and DHHR was no longer providing him with any services. [ECF No. 357, at 48].

9

Given that Garrett M. entered the custody of BJS in June 2019, and remained there until December 2019, Garrett M. was not "a foster child . . . in the foster care custody of DHHR" at the time this class action was filed. [ECF No. 351, at 45]. Further, because Garrett M. is now over eighteen years of age, he may not re-enter DHHR custody and, therefore, can never become part of the class of "children who are now, or will be, in the custody of DHHR." [ECF No. 1, ¶ 10]. As such, Garrett did not suffer an injury in fact at the hands of DHHR at the time of filing or thereafter, and he lacks standing to bring his claim individually or on behalf of the class.

## IV. Conclusion

For the foregoing reasons, Defendant's Renewed Motion to Dismiss the Claims of Named Plaintiff Garrett M. [ECF No. 337] is **GRANTED**. Named Plaintiff Garrett M. is hereby dismissed with prejudice from this action. The claims of all other Named Plaintiffs remain pending. The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 1, 2023

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE