IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JONATHAN R., *et al.*,

      **Plaintiffs,**

v.                                  **Case No.:  3:19-cv-00710**

JIM JUSTICE, *et al.*,

      **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the Court is Plaintiff's Motion to Compel discovery responses from Defendants. (ECF No. 374). For the reasons that follow, the Court **GRANTS, in part,** and **DENIES, in part,** the motion.

I.     <u>**Relevant Facts**</u>

In September 2019, twelve current and former foster care children filed a putative class action challenging several key aspects of West Virginia's child welfare system. (ECF No. 351 at 1); *see* (ECF No. 1). Plaintiffs allege that Defendants' system-wide policies and practices expose them to a substantial risk of harm in violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution. (ECF No. 351 at 10). They seek injunctive and declaratory relief, but no monetary damages, in this lawsuit. (*Id.* at 39). The Court certified a General Class consisting of all foster children who are or will be in the custody of the West Virginia Department of Health and Human Services ("DHHR") or its successor agency. (*Id.* at 45). The Court also certified an ADA Subclass, which includes all members of the General Class who have physical, intellectual,

cognitive, or mental health disabilities, as defined by federal law. (*Id*. at 46). In certifying the class action, the Court narrowed the lawsuit to three common claims relating to the General Class and one common issue of the ADA Subclass. The General Class's claims concern the array of foster care placements, case planning, and caseloads. The common issue of the ADA Subclass focuses on the provision of community-based treatment.

### A. Placement Array

The first common question in this litigation posed by the General Class is whether Defendants maintain an inadequate array (in number and type) of appropriate foster care placements to meet the needs of foster children. (*Id*. at 14); *see* (ECF No. 319 at 9-11). To prove a constitutional violation, Plaintiffs must show that (1) the array of placements puts them at an unreasonable risk of harm and (2) Defendants are deliberately indifferent to that risk. (ECF No. 351 at 16-17). In this respect, Plaintiffs contend that there is a drastic shortage of foster homes, which forces children to sometimes stay at DHHR's office or in hotel rooms because there is nowhere to send them. (ECF No. 351 at 14-15). Plaintiffs also argue that DHHR seems to assign foster children to the first available placement, which is generally a shelter setting, as opposed to considering individualized needs. (*Id*. at 15). Plaintiffs assert that foster children are shuttled around to different placements, often in different counties in different areas of the State. (*Id*. at 16). Further, foster children in treatment are purportedly forced to start over with new medical providers and relationships because of the inadequate array of placements. (*Id*.).

### B. Case Planning

The next issue at stake for the General Class concerns Defendants' alleged lack of appropriate case planning to ensure permanency of placement. (ECF No. 351 at 17, 19). Defendants reportedly exclude foster care providers, parents, and children in the

placement process. (*Id.* at 17-19). To prove this claim, Plaintiffs must show that (1) the deficiencies in case planning subject them to an unreasonable risk of harm and (2) Defendants are deliberately indifferent to that risk. (*Id.* at 20).

### C. Caseloads

The final common issue concerning the General Class is whether Defendants fail to support, train, and retain caseworkers. (*Id.* at 20). According to Plaintiffs, Defendants overwhelm case workers with high caseloads. (*Id.*). Plaintiffs note that an entire family is generally counted as one "case," as opposed to counting each child on an individual basis. (*Id.* at 22). Plaintiffs claim that the policies and procedures lead to decreased case worker contact and time devoted to each case. (*Id.* at 23-24).

### D. Community-Based Treatment

The common question of the ADA Subclass is whether lack of community-based mental and behavioral health services and therapeutic treatment creates a risk of unnecessary institutionalization. (*Id.* at 28, 33, 41). The ADA Subclass plaintiffs must prove that the provision of services is, in fact, deficient and that it places foster children with disabilities at risk of unnecessary institutionalization. (*Id.* at 33).

## II.   Discussion

In the pending Motion to Compel, Plaintiffs seek documents that are responsive to their eighth and ninth requests for production of documents. (ECF No. 374 at 1). Rule 26(b)(1) of the Federal Rules of Civil Procedure defines the scope of discovery in this action. It states, in relevant part:

> [U]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

"Relevancy under this rule has been broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *Becton, Dickinson & Co. v. BioMedomics, Inc.*, No. 5:20-CV-536-FL, 2021 WL 3864476, at *3 (E.D.N.C. Aug. 30, 2021) (citations omitted). "Relevance is not, on its own, a high bar." *Ceresini v. Gonzales*, No. 3:21-CV-40 (GROH), 2022 WL 628520, at *3 (N.D.W. Va. Mar. 3, 2022) (citation omitted). As stated in the rule, information "need not be admissible in evidence to be discoverable." *Id.* (quoting Fed. R. Civ. P. 26(b)(1)). "Federal courts have long understood that relevancy for discovery purposes is defined more broadly than relevancy for evidentiary purposes." *Id.*

Even if seeking relevant information, the discovery request must be proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). "Although Rule 26(b)(1)'s relevance inquiry does not, itself, pose a 'high bar,' its proportionality requirement mandates consideration of multiple factors in determining whether to allow discovery of even relevant information." *Ceresini*, 2022 WL 628520, at *3. The factors include: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).

A party dissatisfied with a discovery response or lack of response can move for an order compelling disclosure or discovery after attempting to confer with the party that

4

submitted the response or failed to respond. Fed. R. Civ. P. 37(a). The party resisting

discovery, not the party seeking discovery, bears the burden of persuasion. *Tinsley v.*

*OneWest Bank, FSB*, No. 3:13-CV-23241, 2014 WL 7005852, at \*2 (S.D.W. Va. Dec. 10,

2014) (citations omitted). As such, conclusory and unsubstantiated allegations are simply

insufficient to support discovery objections based on the grounds of

annoyance, burdensomeness, oppression, or expense. *Id.*

### A. *Request Nos. 8 and 10 of Plaintiff's Eighth Request for Production of Documents*

Plaintiffs seek responses to the following discovery requests:

Request No. 8: Documents sufficient to show the distribution of cases and the number of cases carried by individual Caseworkers, including but not limited to foster care Caseworkers and Caseworker supervisors (i.e. the number of caseworkers who carry one case, the number of caseworkers who carry two cases, etc.), in six-month increments from July 1, 2019 to Present.

Request No. 10: Documents sufficient to show (1) the number of Caseworkers that carried caseloads above, at, and below any caseload standards and (2) regarding Caseworkers who carried caseloads above any caseload standard, the number of cases by which each Caseworker exceeded the caseload standard, in six-month increments for the period of July 1, 2019 to Present.

(ECF No. 374-3 at 10).

Defendants assert that they have produced all responsive documents that are in

their possession, custody, or control. (ECF No. 381 at 2). Specifically, they claim that they

produced data showing the caseworkers' caseload history, broken down by case types,

regions, providers, new assignments, and total assignments, spanning a period of over

four years. (*Id.*). Plaintiffs take issue with the fact that the documents produced by

Defendants count the number of cases and caseload by family, rather than by individual

child, except in cases in which the parents' rights have been terminated. (*Id.* at 3).

Defendants explained to Plaintiffs that they produced the information as it is recorded in

their database because the State defines a "case" by family prior to termination of parental rights. (ECF No. 381-1 at 2, 3). Plaintiffs contend that Defendants should nonetheless be compelled to collect the information from the various documents and compile it in the requested format. (ECF No. 389 at 2). They seek the "per-child caseload data," meaning the number of children that were assigned to each caseworker and whether that number exceeded the caseload standards.

Reviewing all of the materials submitted by the parties, Plaintiffs have not provided any basis for the Court to compel Defendants to produce any further documents in response to these discovery requests. The terms "cases" and "caseloads" are not defined in the requests themselves or in the preceding definitions and instructions sections of Plaintiffs' eighth request for production of documents. (ECF No. 374-3 at 2-8, 10). Defendants are not obligated to produce "per-child caseload data" because Plaintiffs did not request it. Plaintiffs sought information concerning "cases" and "caseloads," and Defendants produced that information precisely as that information is kept in the usual course of business.

As Defendants indicated, Plaintiffs can use the information that Defendants produced to calculate the "per-child caseloads." (ECF No. 381-1 at 2). Plaintiffs argue that they cannot extract the information that they need from the information produced because the documents provide no information about the caseworkers; thus, Plaintiffs argue that they cannot understand whether the caseworkers are new and can only take on a smaller caseload or whether the caseworkers have roles in addition to managing caseloads, such as home-finding roles. (ECF No. 374 at 6). However, the discovery requests do not ask for documents reflecting whether a caseworker is new or has additional roles.

The Court appreciates Plaintiffs' argument that the per-child caseload information is vital to their case and a party can be compelled to produce existing data in a format solicited by a discovery request, sometimes even if it requires the responding party to create a computer program or take other measures to compile the data and produce it in that form. (ECF No. 374 at 6); *Frasier Healthcare Consulting, Inc. v. Grant Mem'l Hosp. Reg'l Healthcare Ctr.*, No. 2:12-CV-87, 2014 WL 12701042, at *5 (N.D.W. Va. Jan. 9, 2014); *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 243 (N.D. Ohio 2017); *Mervyn v. Atlas Van Lines, Inc.,* No. 13 C 3587, 2015 WL 12826474, at *5-6 (N.D. Ill. Oct. 23, 2015).

Yet, Plaintiffs do not cite any authority, nor does any precedent exist, that requires a responding party to produce data that was not requested. Plaintiffs do not identify any information that Defendants failed to produce concerning request numbers 8 and 10 or any other deficiencies in their responses that warrant an order compelling discovery. For those reasons, Plaintiffs' Motion to Compel regarding request numbers 8 and 10 of Plaintiffs' Eighth Request for Production of Documents is **DENIED**.

### B. Request Nos. 24, 25, and 37 of Plaintiffs' Ninth Request for Production of Documents

Plaintiffs seek documents concerning Congregate Care Facilities, which are residential treatment programs in which DHHR places foster children pursuant to contracts with those entities. (ECF No. 374 at 13). The following requests are at issue:

> Request No. 24: Documents sufficient to show all safety assessments and on-site reviews of out-of-state Congregate Care Facilities or of children in those facilities, including assessments conducted by the West Virginia Interagency Consolidated Out-of-State Monitoring Team and the Out-of-State Review and Regional Clinical Review Teams, from July 1, 2019 to Present.

Request No. 25: Documents sufficient to show all licensing reviews of Congregate Care Facilities conducted by DHHR, including (1) reports issued following announced and unannounced inspections, (2) reports issued following the completion of inspections conducted prior to license expiration, (3) reports issued following investigations into a complaint alleging violations of laws or rules, (4) reports concerning staffing, discipline, or any other actions related to the well-being of children, and (5) corrective action plans submitted to DHHR, including documents related to the approval, modifications, or rejection of such plans, immediate corrections to an area of non-compliance that risks the health or safety of a child, and the Secretary's determinations if corrections have been made.

Request No. 37: Documents sufficient to show (1) the number of investigations into reports of maltreatment conducted by Congregate Care Facilities where the IIU has indicated that there shall be no IIU investigation; (2) the number of instances where a report for such an investigation was not created and reviewed within five working days of the occurrence of the incident or within five days of notification by the IIU that it would not investigate; and (3) the number of investigations into a pattern of non-critical incidents conducted by Congregate Care Facilities, from July 1, 2019 to Present.

(ECF No. 374-5 at 12, 14) (citations omitted).

Plaintiffs argue that documents reflecting whether the Congregate Care Facilities are safe are highly relevant to the issue of whether foster children face a substantial risk of harm to their physical and emotional wellbeing. (ECF No. 374 at 9). Further, Plaintiffs contend that the requested documents concerning Congregate Care Facilities are relevant to prove that Defendants were deliberately indifferent to harms that existed. (*Id.* at 9-10, 14). Defendants maintain that none of the four common questions of law or fact that the Court certified relate to oversight of Congregate Care Facilities. Despite their objection that the information is irrelevant, Defendants produced some documents which are responsive to the requests. (ECF No. 381 at 5 n.3). According to Defendants, they produced licensure summaries of findings of non-compliance and correction plans for congregate care facilities and reports containing summaries of West Virginia Interagency Consolidated Out-of-State Monitoring findings and Out-of-State Regional Review Team

8

and Regional Clinical Review Team activities. (*Id*.).

Defendants have clearly failed to meet their burden resisting discovery with respect to these document requests. They contend that the information is not relevant to Plaintiffs' claims. However, the very first certified common question is "whether DHHR's placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk." (*Id*. at 4, 6). Defendants do not offer any dispute that DHHR places foster children at Congregate Care Facilities. Therefore, the question of whether DHHR deliberately disregarded serious risks of harm to foster children in those facilities is a central issue in this case. The safety assessments, on-site reviews, licensing reviews, and investigative reports of the Congregate Care Facilities are very likely to include relevant information regarding whether there were safety concerns or other risks to children and whether Defendants deliberately disregarded those serious risks of harm in placing children there anyway. As Plaintiffs indicated, the documents might show that the Congregate Care Facilities are not properly investigating maltreatment, Defendants do not exercise sufficient oversight over the facilities in which they place children, or that maltreatment rates are high. (ECF Nos. 374 at 14; 389 at 4). Such information could be instrumental in proving Plaintiffs' claims.

Furthermore, Defendants fail to show any undue burden in collecting and producing these documents. They argue that some of the documents are in the possession of the Congregate Care Facilities. (ECF No. 374 at 13). According to Defendants, it would be much more efficient and equitable for Plaintiffs to subpoena the documents from the facilities directly. (ECF No. 381 at 6). This argument is unpersuasive. Rule 34 of the Federal Rules of Civil Procedure requires a party to produce documents that are within the party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). "Rule 34 'control'

does not require a party to have legal ownership or actual physical possession of any [of the] documents at issue." *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 361 (D. Md. 2012) (citation omitted). Rather, "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party." *Id.* "Therefore, a party may be required to obtain information from third parties if the party has a legal right or ability to obtain that information." *Barnett v. Cabell Cnty. Comm'n*, No. CV 3:22-0203, 2023 WL 1073705, at *2 (S.D.W. Va. Jan. 27, 2023) (citation omitted). "The party seeking production of information has the burden to prove that the responding party has sufficient control over that information." *Id.*

It is apparent that Defendants should have most of this information concerning facilities in which they place children. Indeed, they have produced some of the responsive documents. Any further records regarding Congregate Care Facilities which are responsive to the requests should be easily accessible to Defendants. By law, Congregate Care Facilities shall maintain records of their internal investigations in a central file, which must be made available to the state regulatory agency. *See* (ECF No. 374 at 13). Also, DHHR contracts with these facilities and can request information from them. Plaintiffs have shown that Defendants have sufficient control over the documents in question.

For those reasons, Plaintiffs' Motion to Compel regarding request numbers 24, 25, and 37 of Plaintiffs' Ninth Request for Production of Documents is **GRANTED**. Defendants shall produce any remaining responsive documents to Plaintiffs within **twenty-one (21) days** of this Order.

### C. Request No. 46 of Plaintiffs' Ninth Request for Production of Documents

> Request No. 46: Documents sufficient to show (1) the number of case plans completed within 60 days, and (2) the number of case plans due but not completed within 60 days, each month from July 1, 2019 to Present.

(ECF No. 374-5 at 16).

Plaintiffs argue that data demonstrating whether Defendants are meeting the federal requirement that case plans be developed within 60 days of a child's removal from his or her home is vital to prove that Defendants have a practice of deficient case planning. (ECF No. 389 at 8). As noted, one of the certified common questions in this case is "whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk." (ECF No. 351 at 20). Defendants claim that data about the number and percentage of case plans completed within 60 days is not relevant because it says little about whether the alleged case planning deficiencies are so egregious as to violate substantive due process. (ECF No. 381 at 10). However, Defendants overlook a purpose of this discovery request, which is to establish that DHHR has deficient case planning practices in the first place. In opposing class certification, Defendants argued that Plaintiffs did not introduce any data about DHHR's class-wide case planning performance. (ECF No. 322 at 11). Defendants assert that they have "robust policies to ensure high-quality case planning." (*Id.*). In order to rebut that argument, Plaintiffs hope to show that Defendants are not meeting concrete, federally recognized case planning standards. (ECF No. 389 at 8). These requests are reasonably aimed at securing relevant information on that point.

Turning from the relevance of the information, Defendants' primary objections to

producing the data are that it would be overly burdensome, and it is not proportional to the needs of the case. (ECF No. 381 at 7). They attached an affidavit prepared by DHHR's Chief Information Officer, Shaun Charles, stating that DHHR has the requested information in its database, but not in an aggregate format. (ECF No. 381-3 at 3). He estimates that it would take 480 staff hours to extract and create an *ad hoc* report of the data that is responsive to the discovery requests. (*Id.* at 7). Alternatively, DHHR could outsource the work to its IT vendor, Optum, at the cost of $36,864 based on an estimate of 288 hours of work. (*Id.*). The price charged by Optum would be lower if the job ended up requiring fewer hours than quoted. (*Id.*). Defendants claim that undertaking such a time-consuming and expensive exercise should be weighed against the fact that they have already spent thousands or tens of thousands of hours producing voluminous documents in response to Plaintiffs' hundreds of document requests. (ECF No. 381 at 8-9).

Plaintiffs cited three cases in support of their motion to compel. In *Frasier Healthcare Consulting, Inc. v. Grant Mem'l Hosp. Reg'l Healthcare Ctr.*, No. 2:12-CV-87, 2014 WL 12701042, at *5 (N.D.W. Va. Jan. 9, 2014), the Court explained that there is a distinct difference between requiring a party to create new data that does not currently exist, which is not permissible under Fed. R. Civ. P. 34, and requiring a party to produce already existing data in a reasonably usable form, which is allowed. For example, it was found impermissible to order a defendant to use its broadband connections with customers to gather information about customers' viewing habits to produce in discovery when the defendant never previously collected that information. *Id.* By contrast, defendants have been ordered to produce data that exists but stores with a third party, even if the production requires some compilation of the data and associated expense. (*Id.*).

Defendants argue that the Court in *Frasier* held that data reports should be provided only where the burden of producing the reports is small, such as, in that case $5,000.00. (ECF No. 381 at 9). That is an incorrect interpretation of the case. Defendants cite the portion of the Court's decision relating to whether cost-shifting of the production is appropriate, not whether the information should be compelled. (*Id.*); *Frasier*, 2014 WL 12701042, at *6. It has no bearing on the present dispute.

The other cases cited by Plaintiffs lend further support to their position that Defendants should be compelled to respond to these document requests. In *Mervyn v. Atlas Van Lines, Inc.*, No. 13 C 3587, 2015 WL 12826474, at *5 (N.D. Ill. Oct. 23, 2015), the defendant objected to producing shipping data because it did not maintain the data in the format requested by the plaintiff and "would have to write new script—new computer code—to create an entirely new report that retrieves and re-arranges the data into the format that Plaintiff requests." The Court found that "requiring a party to query an existing database to produce reports for opposing parties is *not* the same as requiring the creation of a new document," and "requiring the creation of new code does not necessarily create an undue technical burden." *Id.* at *6. The Court noted that, although it would take a couple of weeks to create the script and check the results, it was not unduly burdensome. *Id.* The Court remarked that the benefit of the discovery was not negligible, as the defendant needed the data to establish its damages. *Id.* Therefore, the Court found that the data was of great utility to the plaintiff, and the balancing of the benefit weighed more strongly in favor of the plaintiff than the burden of producing the data weighed in favor of the defendant. *Id.*

Similarly, in *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 243 (N.D. Ohio 2017), it was noted that "Courts have long recognized that defendants may be

required under the Federal Rules to create computer programs to search an existing database for relevant information." The Court explained that a defendant can be required to produce the data even when it would take days or weeks to comply with the discovery request. *Id.* The Court found that the plaintiff had met her burden of showing that the discovery sought was relevant and necessary to her claim. *Id.* at 244. Thus, although the defendant showed that there would be burden in responding to the discovery request, the burden did not outweigh the likely benefit of production. *Id.* The Court ordered the defendant to either write the program that would produce the requested data or produce the relevant portions of its database to the plaintiff so that her expert could write the program and conduct the query himself. *Id.*

In response to Plaintiffs' arguments, Defendants cite *Kenny A. by Winn v. Perdue*, No. 1:02-CV-1686-MHS, 2010 WL 11640028, at \*2 (N.D. Ga. July 26, 2010). Defendants allege that the Court held that a state agency was not required to create reports of data that was not currently created for internal management purposes because doing so was unwarranted and likely to be counterproductive. (ECF No. 381 at 8-9). However, in that case, the plaintiffs sought to require the state to produce quarterly reports relating to a consent decree. *Id.* at \*1. The Court noted that its most important reason in denying the motion to compel was that granting the motion would undermine the authority of the Accountability Agents, who were responsible for monitoring the state's compliance with the consent decree. *Id.* at \*2. The Court explained that the plaintiffs could have simply worked with the Accountability Agents to get the data that they needed instead of wasting time and energy on the discovery dispute. *Id.*

While there are differences between the aforementioned cases and the instant matter, prevailing law weighs in favor of ordering Defendants to produce this

information. Plaintiffs have shown that the information is relevant to their claim that Defendants' deficient case planning practices placed children at a serious risk of harm, and Defendants were deliberately indifferent to that risk. Defendants have not demonstrated any undue burden in producing the data that overwhelms the value of the information to Plaintiffs. Furthermore, they have not offered any viable alternative for Plaintiffs to obtain the data that is in Defendants' database. Finally, Defendants do not provide enough information about the time and cost estimates to establish a genuine burden. Defendants do not explain why the estimates of the amount of time it would take to produce this data in-house or via contractor are vastly different. Moreover, they do not identify how much of the quoted time is attributed to running the programs, which could perhaps be performed outside of working hours or in some other way so as not to interfere with operations. *See, e.g., Mervyn*, 2015 WL 12826474, at *6 (finding that the actual burden on the defendant was to create the scripts and check the results, not the passive time spent waiting for the program to run); *Meredith*, 319 F.R.D. at 244 (finding that the defendant should run the program on its database during non-business hours to minimize the burden).

Additionally, Defendants fail to explain the necessity of some of the tasks and associated time that they claim will be invested in responding to the discovery request. For example, Defendants indicate that, after extracting the data and checking it for quality assurance, they would calculate the number of case plans that are responsive to the document requests and then create a combined report showing the number of case plans completed within 60 days and the number of case plans due but not completed within 60 days. (ECF No. 381-3 at 3-5). The discovery request asks for documents sufficient to show the number of case plans. This is not an interrogatory which asks Defendants to perform

15

the calculations and state the total number of responsive case plans. The wording indicates that Plaintiffs request the responsive data. It is reasonable to assume that if provided the necessary data, Plaintiffs or their experts can perform the calculations. It is unclear why Defendants would need to invest time into performing calculations and creating a combined report, rather than simply extracting the data and producing it. In any event, the tasks and cost quoted by Defendants do not establish undue hardship that is disproportional to the needs of the case. From a proportionality standpoint, although there is a cost associated with producing the documents, this a class action seeking to overhaul the foster care system in the state of West Virginia. *See, e.g.,* (ECF No. 351 at 1-2) (summarizing claims). Discovery is expensive in most cases, and it is especially so in a class action of this magnitude.

For those reasons, Plaintiffs' Motion to Compel regarding request number 46 of Plaintiffs' Ninth Request for Production of Documents is **GRANTED**. Given Defendants statements and evidence that responding to this request will take some additional time to complete, Defendants are ordered to respond to the request within **thirty (30) days** of this Order.

### D. Request No. 54 of Plaintiffs' Ninth Request for Production of Documents

The final disputed request is the following:

> Request No. 54: Documents sufficient to show the median length of time between a permanency plan change to adoption and exit to finalized adoption for all Foster Children in the physical and legal custody of DHHR (1) exiting foster care during the year 2019 to a finalized adoption; (2) exiting foster care during the year 2020 to a finalized adoption; (3) exiting foster care during the year 2021 to a finalized adoption; (4) exiting foster care during the year 2022 to a finalized adoption; and (5) exiting foster care during the year 2023 to a finalized adoption.

(ECF No. 374-5 at 17). Plaintiffs seek this information to establish that children are

16

languishing in DHHR's custody despite having a permanency plan of adoption, which is relevant to their claims of poor case planning, chronic understaffing, and unmanageably high caseloads. (ECF Nos. 374 at 19, 389 at 9). Like the aforementioned discovery request, Defendants argue that this information is not relevant to Plaintiffs' claims and producing it would be unduly burdensome and not proportional to the needs of the case. (ECF No. 381 at 10).

Defendants assert that the length of time between a permanency plan change and a final adoption is not probative of deficiencies in case planning or caseload practice, and it can be impacted by a myriad of factors unrelated to Plaintiffs' common questions. (*Id.* at 11). According to Defendants, the preference of the foster children, population of adoptive parents, and decisions of circuit court judges who must approve the adoptions can all affect the length of the adoption process. (*Id.*). While those may be defenses to Plaintiffs' claims, they fail to establish that the Court should not allow discovery of this data. In simplified terms, Plaintiffs aim to show that children remain in state custody longer than necessary because of poor case planning and practices. This data would assist them in proving that assertion. Therefore, it is relevant.

Defendants express the same burdensomeness argument that, although they have the data to respond to this request, it would take significant time and expense to compile it into a responsive aggregate report. (ECF No. 381 at 10). They provide the exact same estimate that it would require 480 staff hours to perform the work to respond to this discovery request. (ECF No. 381-3 at 7). Alternatively, Defendants claim that they received an estimate from Optum in the amount of $55,296 for 432 hours of work, although the price would be lower if the work ended up requiring fewer hours. (*Id.* at 8). Like the foregoing discovery request, Defendants provided an affidavit from DHHR's

Chief Information Officer stating that staff would need to write code to extract the data, run the program, perform quality review checks, complete calculations, and create a combined report showing the median length of time between a permanency plan change and finalized adoption for each foster child. (*Id.* at 5-7).

This argument is flawed for the same reasons that the Court previously described. It is unclear why all of these tasks are required, how much of the quoted time is attributed to simply running the programs, or why the in-house and contractor estimates differ so greatly. Further, the fact that the data has not been historically used for regular reports or might not reliably reflect the median adoption timeline is a poor reason not to produce it; particularly, when the information may also prove useful for the State to have. Defendants can challenge the accuracy of the data or Plaintiffs' claims about the data at appropriate points in the litigation, but Defendants' unreliable or poor record- keeping is certainly not a reason to disallow Plaintiffs from obtaining discoverable information. Plaintiffs' Motion to Compel regarding request number 54 of Plaintiffs' Ninth Request for Production of Documents is **GRANTED**. Defendants are ordered to respond to the request within **thirty (30) days** of this Order.

The Clerk is instructed to provide a copy of this Order to counsel of record and any unrepresented party.

ENTERED:  December 13, 2023

_____
Cheryl A. Eifert
United States Magistrate Judge

18