UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| **Jonathan R.**, minor, by Next Friend, Sarah **DIXON**, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Class Action 3:19-cv-00710 |
| v. | ) ) | |
| **Jim JUSTICE**, in his official capacity as the Governor of West Virginia, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Below, Plaintiffs provide supplemental briefing on the three questions that the Court identified in its December 18, 2023 Order. *See* ECF No. 416.

**ARGUMENT**

I. **How do Plaintiffs establish that Defendants' practices placed them at an "unreasonable risk of serious harm" in this action? Specifically, must the named Plaintiffs prove that they suffered actual injury to show risk of harm to the class members? If not, why not?**

The answer to this question is no. For Plaintiffs to prevail on their claims, they need not prove that the named Plaintiffs suffered actual injury. This is so for two reasons. First, actual injury is not required to bring a deliberate indifference claim under the Fourteenth Amendment, *see, e.g.*, *Baxley v. Jividen*, 338 F.R.D. 80, 85 (S.D. W. Va. 2020); *M.D. v. Perry*, 294 F.R.D. 7, 34, 45 (S.D. Tex. 2013); or a claim under Title II of the Americans with Disabilities Act ("ADA") or the Rehabilitation Act, *see, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013). Second, once a class is certified, evidence pertaining to the named plaintiffs is not required to prove the

1

claims of a class. *See, e.g.*, *Gibson v. Supercargoes & Checkers of Int'l Longshoremen's & Warehousemen's U.*, 543 F.2d 1259, 1263 (9th Cir. 1976) ("[F]ailure of proof as to the named plaintiffs would not bar maintenance of the class action or entry of judgment awarding relief to the members of the class."); *Santiago v. Miles*, 774 F. Supp. 775, 789 (W.D.N.Y. 1991). Indeed, class action lawsuits may persist despite mootness or expiration of the named plaintiffs' claims. *See, e.g.*, *Moss v. Lane Co.*, 471 F.2d 853, 855 (4th Cir. 1973) ("If the plaintiff were a member of the class at the commencement of the action and his competency as a representative of the class then determined or assumed, the subsequent dismissal or mootness of his individual claim . . . will not operate as a dismissal or render moot the action of the class . . . ."); *Whitlock v. Johnson*, 153 F.3d 380, 384-85, 384 n. 1 (7th Cir. 1998); *Brown v. Eckerd Drugs, Inc.*, 564 F. Supp. 1440, 1448 (W.D.N.C. 1983) ("Because the class proceedings are complete and initial certification was appropriate, the claims of the five class members are not destroyed even if [the plaintiffs] are considered inappropriate representatives . . . ."); *Santiago*, 774 F. Supp. at 789 ("In the class action context, the Supreme Court has held that, once a class is properly certified, the subsequent mootness of a named plaintiff's claim does not require dismissal of the entire class action." (citing *Sosna v. Iowa*, 419 U.S. 393 (1975))); *see also Sosna*, 419 U.S. at 399 ("When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [the named plaintiff]."). "Provided the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." *Santiago*, 774 F. Supp. at 789 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977)).

2

### A. *Plaintiffs Do Not Need to Show Actual Injury to Prove Their Substantive Due Process Claims*

Because the General Class has been certified, proof that the named Plaintiffs suffered actual injury is not required to show risk of harm to the General Class members because actual injury is not required to bring a deliberate indifference claim under the Fourteenth Amendment. *See, e.g.*, *Baxley*, 338 F.R.D. at 85; *M.D.*, 294 F.R.D. at 34, 45; *M.B. v. Corsi*, 327 F.R.D. 271, 280 (W.D. Mo. 2018); *D.G. v. Yarbrough*, 278 F.R.D. 635, 637-38 (N.D. Okla. 2011); *see also Elisa W. v. City of New York*, 84 F. 4th 115, 128 n.7 (2d Cir. 2023) ("[T]he Supreme Court has made clear that individuals 'exposed to a risk of future harm may pursue forward-looking injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (citation omitted)). The named Plaintiffs, like the General Class members, have legally cognizable claims because they are (or were) at an unreasonable risk of serious harm while in DHHR's custody.

"Individuals in the State's custody have a constitutional right to be free from an undue risk of harm, or, the same thing stated another way, a right to reasonably safe living conditions. Whether some members of the putative class have actually suffered physical or psychological harm provides some evidence that this risk exists, but the actual harms suffered by some class members is not constitutive of the legal injury at the heart of Plaintiffs' claim." *M.D.*, 294 F.R.D. at 45; *see also Lippert v. Baldwin*, No. 10 C 4603, 2017 U.S. Dist. LEXIS 64687, at *23 (N.D. Ill. Apr. 28, 2017) (noting that descriptions of the named plaintiffs' experiences were not submitted in support of individual claims but instead "as evidence of the defendants' unlawful policies and practices, and as examples of the serious harm to which all inmates . . . are allegedly exposed." (citation omitted)). Plaintiffs are not litigating whether the named Plaintiffs were harmed. Instead, they are litigating whether the named Plaintiffs and members of the class were exposed to practices

that place them at risk of harm. *See, e.g.*, *Elisa W.*, 82 F. 4th at 126 ("[P]laintiffs' claims turn not on the cause of permanency delays for any particular child, but on whether [the defendant's] practices lead to permanency delays thereby placing all foster children at an unreasonable risk of harm"); *M.B.*, 327 F.R.D. at 281 (noting that plaintiffs were not litigating whether the named plaintiffs should have been administered psychotropic drugs, but instead whether defendants should have had safeguards in place to supervise the administration of those drugs to children, "an issue that equally concerns all of the named plaintiffs and the members of the proposed class."). Plaintiffs' claims, therefore, can be proven "on the basis of classwide evidence without individualized inquiries." *M.B.*, 327 F.R.D. at 281.

In *M.D. v. Perry*, for example, the court noted that the following evidence could demonstrate that the Department of Family and Protective Services' practice of maintaining high caseloads and overburdening caseworkers placed children at an undue risk of harm: the Department's statements that increased caseloads posed a risk to child safety, 294 F.R.D. at 40; Department documents noting that caseworkers were responsible for child safety and the problems caused by high caseloads, *id.* at 42; national data showing the correlation between caseworker contact and child safety, *id.*; and statistical data on child visits and placement moves, *id.* at 42-43. Additionally, the court noted that the risks associated with some practices, like high caseloads, are intuitive. *Id.* at 42 ("The Court first notes that Plaintiffs' argument on this point is intuitive: a higher caseload means that a caseworker can devote less time and energy to each case, and naturally class members' safety is affected by the amount of time and energy their caseworkers can devote to their respective cases."). Similarly, as to the plaintiffs' claim that "the State's placement array, as it currently stands, threatens foster care children with an unreasonable risk of harm," the court noted that the plaintiffs could establish an unreasonable

4


risk of harm through expert testimony and statistics on placement moves and numbers of sibling groups placed together. *Id.* at 53-54. Additionally, the court found that "compliance or lack of compliance with a professional standard, if admissible, can be *evidence* for or against finding a constitutional violation." *Id.* at 35-36 (emphasis in original).

In *D.G. v. Yarbrough*, the court denied the defendants' motion to decertify a class of foster children, finding that the plaintiffs had sufficiently established the defendants' practice of maintaining high caseloads per caseworker placed foster children at unreasonable risk of harm. When recounting the evidence presented to support the existence of such risk of harm, the court noted that there was expert testimony acknowledging the importance of reasonable caseloads in protecting children and "[e]xtensive child welfare research [that] links high caseloads to poor decision making, increased turnover and worse outcomes for children." 278 F.R.D. at 641-42. Additionally, as to the plaintiffs' claim regarding caseworker visits, the court cited the testimony of commissioners from the Department of Human Services and experts recognizing the importance of worker-child visitation to children, federal government data on the association between visits and positive outcomes for children, and a report containing statistics about visitation within the state. *Id.* at 643-44.

Similarly, Plaintiffs can establish that Defendants' practices placed class members at an unreasonable risk of serious harm in this action by introducing systemwide statistical evidence. Evidence may include data on the number of caseloads per caseworker, how caseloads are calculated and whether they take into account a caseworker's full workload, the length of time that children remain in DHHR's custody, numbers of placement moves, delays in permanency, or rates of maltreatment in care, among other things. Plaintiffs would then have to tie that data to one or more of Defendants' policies or practices. Plaintiffs could also introduce expert testimony about

5

how Defendants' policies and practices have negatively impacted the General Class, as well as how West Virginia's child welfare system stacks up against those in other states.

While evidence that the named Plaintiffs may "have actually suffered physical or psychological harm provides some evidence that this risk exists," it is not required and "is not constitutive of the legal injury at the heart of Plaintiffs' claim." *M.D.*, 294 F.R.D. at 45.

### B. Plaintiffs Do Not Need to Show Actual Injury to Prove Their Claims Under the Americans with Disabilities Act and Rehabilitation Act

Plaintiffs also do not need to prove that they suffered actual injury to show that members of the ADA Subclass are at risk of harm. Again, the requisite proof goes to an unreasonable *risk* of harm, rather than actual injury. Plaintiffs can bring viable claims under Title II of the ADA and the Rehabilitation Act "because they face a risk of institutionalization." *Pashby*, 709 F.3d at 322. Actual institutionalization is not required. *Id.* The named Plaintiffs, therefore, do not need to prove that they suffered actual injury, or were in fact unnecessarily institutionalized, because the ADA and the Rehabilitation Act recognize that risk of institutionalization is sufficient to sustain a claim.

To prove that the ADA Subclass is at risk of unnecessary institutionalization, Plaintiffs can introduce evidence of the insufficient availability of services for disabled youth in the community, for example, or expert testimony about the effects of Defendants' inadequate infrastructure of therapeutic service providers on foster children. In *Kenneth R. v. Hassan*, 293 F.R.D. 254 (D. N.H. 2013), the court found that this type of evidence supported the plaintiffs' claims that class members were at risk of unnecessary institutionalization in violation of the ADA and Rehabilitation Act. There, the plaintiffs sought to certify a class of disabled individuals who were institutionalized or at risk of institutionalization due in part to New Hampshire's inadequate community-based service array. To support their motion for class certification, the plaintiffs

6

pointed to evidence such as New Hampshire's own reports identifying the problematic service array, task force reports noting the same, a legislative commission's findings on the lack of community resources, statistical patterns of institutionalization in the state, the Department of Justice's review of the state's mental health system, and expert reports. *Id.* at 260-61. The court found that this information provided "substantial evidence . . . that the State's policies and practices have created a systemic deficiency in the availability of community-based mental health services, and that the deficiency is the source of the harm alleged by all class members." *Id.* at 267.

Evidence that named Plaintiffs are or were unnecessarily institutionalized provides an example of the risk of harm to which ADA Subclass members are exposed, but such evidence is not required to prove Plaintiffs' claims. In *Pashby*, for example, the Fourth Circuit found that the named plaintiffs' declarations stating that they were at risk of entering institutions supported the conclusion that the defendants' policies placed class members at risk of institutionalization, but nothing in the Court's opinion suggests that this type of evidence is required. 709 F.3d at 27-28. Moreover, the declarations did not state that the named plaintiffs had been institutionalized, only that they were at risk of it.[1] Accordingly, evidence that the named Plaintiffs are unnecessarily institutionalized might be useful to Plaintiffs in proving the ADA Subclass's claims, but it is not required.

---

[1] In *Clinton L. v. Wos*, No. 1:10-CV-123, 2014 U.S. Dist. LEXIS 120113, at *23 (M.D.N.C. Aug. 28, 2014), the court distinguished the evidence required in a non-class action lawsuit from the declarations described in *Pashby*, noting that in cases that seek individual relief, a more "fact-intensive" inquiry would be necessary to determine whether the plaintiffs were at substantial risk of institutionalization.

## II. Are the named Plaintiffs' medical, educational, and court records relevant to establish that Defendants are "deliberately indifferent" to the alleged risk of harm?

The named Plaintiffs' medical, educational, and court records might be relevant to establishing Defendants' deliberate indifference only if the records documented harms that the named Plaintiffs faced while in DHHR custody and if Defendants were aware of the records. The records that Defendants seek were never contained in the children's DHHR case files, and therefore, they are not relevant to establishing deliberate indifference because Defendants were never aware of them. Whether Defendants were deliberately indifferent "hinge[s] on the information available to the State as well as the effects of the policies and practices it opted to implement (i.e., did they actually pose a risk?). It does not hinge on the individual circumstances and characteristics of class members." *M.D.*, 294 F.R.D. at 44-45.

"To prove deliberate indifference, a plaintiff must show 'that the [defendant] subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk.'" *Washington v. Hous. Auth. of City of Columbia*, 58 F. 4th 170, 179 (4th Cir. 2023) (quoting *Dean v. McKinney*, 976 F.3d 407, 416 (4th Cir. 2020)).[2] If the named Plaintiffs' records show that they were harmed due to Defendants' policies or practices, evidence that Defendants knew of the records would be relevant to proving that they knew that other foster children subject to the same policies or practices were similarly at risk of harm. However, because Defendants seek to compel Plaintiffs to obtain records that were not contained in the named Plaintiffs' DHHR case files, the records sought have no relevance to establishing deliberate indifference.

---

[2] That the defendant was subjectively aware of the risk "may be inferred from circumstantial evidence." *Washington*, 58 F. 4th at 179 (quoting *Dean*, 976 F.3d at 416). "A plaintiff may also show subjective knowledge in a due-process claim 'from the very fact that the risk was obvious.'" *Id.*

8

*Washington* provides examples of the type of evidence that could be used to establish Defendants' deliberate indifference to the risks of harm that existed. In *Washington*, the Fourth Circuit found that the plaintiff had sufficiently alleged that the Housing Authority of the City of Columbia was deliberately indifferent to the plaintiff's right to bodily integrity, among other substantive due process rights. *Id.* at 176. The plaintiff died of carbon monoxide poisoning after the Housing Authority failed to install carbon monoxide detectors in the plaintiff's housing complex. The Court found that the plaintiff had sufficiently alleged that the Housing Authority knew or should have known that its failure to install carbon monoxide detectors placed tenants at a risk of harm based on evidence that (1) the Housing Authority had issued regulations requiring buildings to have carbon monoxide detectors and noting the danger of not having them, and (2) the Housing Authority had received complaints about the furnace in the building and therefore knew that it was faulty. *Id.* at 180.

The named Plaintiffs' medical, educational, and court records would be most analogous to the complaints that the Housing Authority received in *Washington*. Harms documented in these records would have alerted Defendants that foster children were suffering and would help establish that Defendants had knowledge of the problems that existed within the child welfare system. Records that were never in the children's DHHR case files, however, would not be probative of Defendants' awareness. Defendants actions in response to learning of the harm that the children faced would also be relevant to establishing deliberate indifference, but their actions would not be captured in these records. The records Defendants seek to compel, therefore, are not relevant to establishing deliberate indifference.

### III. How are the named Plaintiffs' medical, educational, and court records relevant to the class's claims for prospective relief; particularly, given that Plaintiffs do not seek monetary damages?

The named Plaintiffs' circumstances provide examples of the harms that foster children are at risk of and shed light on the types of harms that the prospective relief must address, but they are not particularly relevant to crafting that relief. Records created after the named Plaintiffs left DHHR custody, which Defendants now seek, are especially irrelevant given that such records would not include documentation of harm that the children suffered while in DHHR custody.

In cases like this one, where plaintiffs seek prospective injunctive relief to remedy systemic deficiencies in a state's foster care system, the relief granted focuses on systemwide policies and practices and is not tied to the circumstances of any individual plaintiff. *See, e.g.*, *H. v. Murphy*, No. 2:99-cv-3878, at ECF No. 386 (D. N.J. Apr. 25, 2023); *D.G. v. Henry*, No. 4:08-cv-74 (N.D. Okla. Dec. 13, 2021) at ECF No. 908; *Brian A. v. Bredesen*, No. 3:00-cv-445 (M.D. Tenn. July 17, 2017) at ECF No. 588; *M.D. v. Abbott*, No. 2:11-cv-84 (S.D. Tex. Nov. 20, 2018) at ECF No. 606. In describing the relief that might be appropriate, the court in *M.D.* noted that it could, for example, "identify a minimal threshold for an array of placements necessary to safeguard subclass members' Fourteenth Amendment rights," and that "[s]uch equitable relief would not involve the Court in adjudications of individual class members' needs or circumstances." *Id.* at 56. Similarly, determining the relief appropriate in this case requires an analysis of data and reports documenting harms that exist across the child welfare system, not in a particular child's case file.

## CONCLUSION

As described above, (1) the named Plaintiffs do not need to prove that they suffered actual injury to show risk of harm to the class members; (2) the named Plaintiffs' medical, educational, and court records that were never contained in their DHHR case files are not relevant to establish

Defendants' deliberate indifference; and (3) the named Plaintiffs' medical, educational, and court records that were never contained in their DHHR case files are not relevant to the classes' claims for prospective relief.

Respectfully submitted,

/s/ *Marcia Robinson Lowry*_____
Marcia R. Lowry, *admitted pro hac vice*
Julia Tebor, *admitted pro hac vice*
Jonathan Borle, *admitted pro hac vice*
Lindsay Gus, *admitted pro hac vice*
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
jborle@abetterchildhood.org
lgus@abetterchildhood.org

*/s/ Richard W. Walters*_____
Shaffer & Shaffer, PLLC
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net
2116 Kanawha Boulevard, East
P.O. Box 3973
Charleston, WV 25339
Tel: (304) 244-8716
Fax: (304) 344-1481

/s/ *J. Marty Mazezka*_____
Disability Rights of West Virginia
J. Marty Mazezka, WVSB #4572
jmazezka@drofwv.org
5088 Washington St. W., Suite 300
Charleston, WV 25301
Tel: (304) 346-0847
Fax: (304) 346-0687

11