# EXHIBIT 1

**In the Matter of:**

Jonathan R., et al.,

vs

JIM JUSTICE, et al.

JEREMIAH SAMPLES

*April 18, 2024*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON


JONATHAN R., et al.,

          Plaintiffs,


 -vs-      Case No. 3:19-cv-00710


JIM JUSTICE, in his official capacity as
Governor of West Virginia, et al.,

          Defendants.


        DEPOSITION OF JEREMIAH SAMPLES
_____

     The deposition of Jeremiah Samples was
taken on April 18, 2024, at 10:05 a.m.,
at 2116 Kanawha Boulevard, East, Charleston,
West Virginia.
_____




        ELITE COURT REPORTING, LLC
            5010 Dempsey Drive
   Cross Lanes, West Virginia  25313
            (304) 415-1122


        Tara Arthur, CCR

```
 1              A P P E A R A N C E S

 2   Richard W. Walters
     Attorney at Law
 3   Shaffer & Shaffer, PLLC
     P.O. Box 3973
 4   Charleston, West Virginia  25339-3973

 5   Julia K. Tebor
     Attorney at Law
 6   A Better Childhood
     355 Lexington Avenue, Floor 16
 7   New York, New York  10017

 8   Marty Mazezka
     Attorney at Law
 9   Disability Rights of West Virginia
     1207 Quarrier Street, Suite 400
10   Charleston, West Virginia  25301

11   Philip J. Peisch
     Attorney at Law
12   Brown & Peisch, PLLC
     1233 20th Street NW, Suite 505
13   Washington, DC  20001

14   Robert Leslie
     Attorney at Law
15   West Virginia Attorney General's Office
     812 Quarrier Street, Second Floor
16   Charleston, West Virginia  25301

17   Also Present:  Cammie Chapman

18

19

20

21

22

23

24
```

```
                                                     Page 3
 1                   I   N   D   E   X

 2          WITNESS

 3              Jeremiah Samples

 4          EXAMINATION

 5              by Ms. Tebor          Page 04

 6          EXHIBITS

 7              Number 1             Page 59
                Number 2             Page 138
 8              Number 3             Page 138
                Number 4             Page 138
 9              Number 5             Page 159
                Number 6             Page 167
10              Number 7             Page 172
                Number 8             Page 185
11              Number 9             Page 195
                Number 10            Page 195
12

13

14

15

16

17

18

19

20  Reporter's Certificate:        Page 208
    Errata Sheet/Signature Page:    Enclosed
21

22

23

24
```

Elite Court Reporting, LLC
JEREMIAH SAMPLES, 04/18/2024

```
 1                    JEREMIAH SAMPLES,

 2   called as a witness, first being duly sworn

 3   by the Court Reporter/Notary Public,

 4   testified as follows, to wit:

 5                    EXAMINATION

 6   BY MS. TEBOR:

 7        Q.  Mr. Samples, my name is Julia

 8   Tebor.  I am an attorney for plaintiffs in

 9   this case.  I will be asking you some

10   questions today.

11             I want to go through a couple of

12   procedural things first.

13        A.  Yes, ma'am.

14        Q.  You were just sworn in, so you are

15   under oath.  You understand that this is the

16   same as if you were testifying in court?

17        A.  Yes, ma'am.

18        Q.  Okay.  That was the next thing.  If

19   you could, just say yes instead of nodding

20   your head so the court reporter can take

21   down any answers.

22        A.  Yes, ma'am.

23        Q.  Please let me finish a question,

24   and then give your answers so the court
```

1    reporter has a clear record.

2         A.  Yes, ma'am.

3         Q.  Your attorney may object to

4    questions.  You are allowed to answer unless

5    he tells you not to.

6         A.  Yes, ma'am.

7              MS. TEBOR:  I forgot to put

8    everybody else on the record who is in here.

9    Do you want to do that now?

10             And who is here today representing

11   you?

12             MR. LESLIE:  Bob Leslie.

13             MS. TEBOR:  Okay.  And for

14   defendants?

15             MR. PEISCH:  Phil Peisch.

16             MS. CHAPMAN:  Cammie Chapman.

17             MR. MAZEZKA:  Marty Mazezka with

18   Disability Rights.

19             MR. WALTERS:  And Rich Walters

20   from Shaffer &  Shaffer.

21             MS. TEBOR:  All right.  Thanks

22   so much.

23        Q.  All right.  If you --

24        A.  May I ask a question?

Page 6

```
 1        Q.  Absolutely.
 2        A.  So whereas I am sure there will be
 3   questions at my time at the department, in
 4   between and at the legislature, if the state
 5   or their representatives were to object to a
 6   question asked not representing me, how
 7   should -- should I just -- I will just pause
 8   and let you all figure that out?
 9        Q.  Yes.  I don't expect that the state
10   will object to -- I mean, they should not be
11   objecting unless there is some sort of
12   privilege issue.  But yes, if there is an
13   objection --
14        A.  Okay.
15        Q.  -- from defendants, we will pause
16   and we will figure it out.
17             MR. LESLIE:  So one of the
18   things I am here for is to explain it to you
19   along the way.  So if something like that
20   happens, then I'll guide you through it.
21             THE WITNESS:  Okay.  Yes.
22             MR. PEISCH:  We will generally
23   only be objecting on privilege grounds if
24   the need arises; attorney/client privilege,
```

1    attorney work product or deliberative

2    process privilege.

3              THE WITNESS:  Yes, sir.

4         Q.  Okay.  If you need a break at any

5    time, please let me know.  But please do not

6    ask for a break while a question is pending.

7    Please answer the question, and then we can

8    take a break.  Okay?

9         A.  Yes, ma'am.

10        Q.  Okay.  Do you have any questions

11   about what I have said so far?

12        A.  No, ma'am.

13        Q.  Okay.  Have you ever been deposed

14   before?

15        A.  I believe I have, yes.  Yes.  And I

16   have been in a multitude of preparations for

17   being deposed, but not in a federal court

18   case.

19        Q.  Okay.  In what cases were you

20   actually deposed?

21        A.  There was I believe a case in

22   Kanawha Circuit Court related to managed

23   care, if I recall correctly.  There was

24   another case related to foster care.  I was

Page 8

```
 1    in the court, but I actually didn't get

 2    deposed -- or actually -- no.  I'm sorry.  I

 3    did not get deposed in either of those

 4    cases.  It was just in court.  One, I

 5    testified.  One, I did not, to my

 6    recollection.

 7         Q.  Okay.  So you testified in -- so

 8    for the Kanawha Circuit Court case regarding

 9    managed care, did you testify in court?

10         A.  And I am going back several years,

11    maybe eight -- seven, eight years.  No --

12    no, no.  I did not testify in either of

13    those cases.  But I was in court prepared to

14    testify.

15         Q.  Okay.  Have you been deposed in any

16    cases?

17         A.  No, ma'am.

18         Q.  Okay.  What did you do to prepare

19    for today's deposition?

20         A.  I provided legislative counsel with

21    a number of different documents that were

22    requested.  I did look back through some of

23    those documents as a part of that process.

24    But in essence, that is it.
```

1          Q.   Okay.  And what documents did you

2     provide to your counsel?

3          A.   There is a large volume.  Documents

4     related to my work at the legislature.  Some

5     of those documents were publicly presented

6     in committee by myself.  Others were

7     discussed in public forums.  And some were

8     discussed and shared only amongst the

9     legislature, and so may be privilege, or may

10    not.  That's up to you all.  But there was a

11    multitude of -- over 20 documents.

12         Q.   So in preparing for this

13    deposition, you provided those documents to

14    your attorney?

15         A.   That's correct.

16         Q.   Okay.  And do you know if those

17    documents have been or are being produced to

18    the parties in this matter?

19              MR. LESLIE:  If I may.  That's

20    what's being printed.

21              MS. TEBOR:  That's what is being

22    printed.  Okay.

23         Q.   All right.  Did you meet with your

24    attorney in advance of this deposition?

1          A.   Just this morning.  We briefly

2    discussed on the phone --

3               MR. LESLIE:  Objection.  That's

4    attorney/client privilege.  You can say that

5    we met, but not the content of the

6    conversation.

7          A.   Yes.  We met.

8          Q.   How many hours did you spend

9    discussing --

10         A.   Less than one hour.

11         Q.   Have you reviewed the complaint in

12   this lawsuit?

13         A.   I have.

14         Q.   When did you review the complaint?

15         A.   In full, it has been several months

16   ago.

17         Q.   Okay.

18         A.   In full, the last time that I

19   reviewed it was during the last legislative

20   session in 2023.

21         Q.   So you said the last time you

22   reviewed it?

23         A.   In full.

24         Q.   In full?

1      A.   Yes.

2      Q.   Had you reviewed it prior to the

3  last legislative session?

4      A.   Yes, ma'am.

5      Q.   When did you review it prior to the

6  last legislative session?

7      A.   There would have been a multitude

8  of times.  I wouldn't be able to convey the

9  specific dates.

10      Q.   And why did you review it in

11  connection with the last legislative

12  session?

13      A.   There was a meeting with the

14  department, plaintiffs and the federal judge

15  related to the case.

16      Q.   Okay.  I would like to discuss your

17  background.

18      A.   Yes, ma'am.

19      Q.   Can you provide me with your

20  educational background?

21      A.   I have two undergraduate degrees

22  from West Virginia University in history and

23  political science.  And I have a master's

24  degree in legal studies from West Virginia

```
 1   University.
 2        Q.  Okay.  And can you go through your
 3   professional experience starting from
 4   graduation from college?
 5        A.  Sure.  I started at the legislature
 6   as an intern in late 2025 (sic).  I was
 7   working in that capacity with the
 8   legislature in 2026 (sic).
 9        Q.  I'm sorry.  Twenty --
10        A.  I'm sorry.  2006.
11        Q.  Okay.
12        A.  The latter half of this intern --
13   it was called the Herndon Internship.  It
14   results in an agency placement.  And so I
15   was placed initially with the Department of
16   Revenue, and then the Department of Health
17   and Human Resources under then Secretary
18   Martha Walker.
19             In that internship capacity, you
20   know, found out that I enjoyed the work
21   quite a bit.  And I continued on after that,
22   in 2006, working in the Office of
23   Communications and Legislative Affairs.
24             And then approximately 2008, I
```

```
 1    moved to the General Counsel's Office for

 2    the Department of Health and Human

 3    Resources.  Our general counsel at the time

 4    was also the deputy secretary.  And so my

 5    responsibilities primarily were in his

 6    deputy secretary role.

 7              In 2009, I went to work with

 8    Governor Manchin's office, again under

 9    Martha Walker.  She shifted to a new agency

10    that was focused on healthcare issues.

11              2010, I went to work for the

12    Offices of the Insurance Commissioner as the

13    Director of Help Policy.

14              In 2013, I went back to DHHR at the

15    request of the governor's office to work

16    with incoming Secretary Bowling as an

17    assistant.  And then either late 2013 or

18    early 2014, she appointed me as deputy

19    secretary.  I was deputy secretary at DHHR

20    through 2022.  And then I went to work at

21    the West Virginia Legislature a month after

22    my departure from the department.  And I

23    have been at the West Virginia Legislature,

24    the Joint Committee for Government and
```

1    Finance since that time.

2         Q.  All right.  We will talk about this

3    more later.  But what generally was your

4    role as deputy secretary of DHHR?

5         A.  It shifted over time.  So in the

6    earlier years, 2014 era, it was primarily

7    focused on Medicaid policy, public health

8    policy, behavioral health.  I became more

9    involved in child welfare issues from a

10   Medicaid perspective, you know, 2015, 2016.

11            And then as the new administration

12   came in -- at the time, there were two

13   deputy -- initially, there were three deputy

14   secretaries.  And we had the bureau split

15   amongst us.  Then one of those deputy

16   secretaries retired.  There were two of us

17   remaining.  He retired at the beginning of

18   the Justice administration.  And then I was

19   the only deputy secretary at that point.

20   And at that stage, I was heavily involved in

21   really all areas of DHHR other than to some

22   degree the facilities -- the health

23   facilities, I had a lesser role.

24         Q.  Okay.  In terms of the timing of

1   that -- for what years were there three

2   deputy secretaries?

3        A.  I couldn't state specific years.  I

4   could give you the names of the individuals,

5   and that could easily be checked.  It was

6   Molly Jordan, Harold Clifton and myself.  I

7   can't recall when Molly retired.  I think it

8   was around 2016, 2015.  Harold retired, and

9   I think that would have been 2017 at some

10  point.  And, you know, I was there until

11  2002 -- or 2022.

12        Q.  And when did you become involved in

13  child welfare issues?

14        A.  Well, even going back to 2013,

15  2014, I was involved, primarily from a

16  Medicaid perspective.

17        Q.  Uh-huh.

18        A.  Also, as it related to the

19  Department of Justice discussions -- when

20  those kicked off, I was heavily involved

21  with Secretary Bowling and those issues.  So

22  at various degrees, going back to when I

23  came back to DHHR.  But I became more

24  heavily involved once Mr. Clifton retired.

1          Q.   Okay.  And let's start with 2017,

2     when you became the sole deputy secretary.

3     At that point, who did you report to?

4          A.   Bill Crouch.

5          Q.   Okay.  And did you have any direct

6     reports?

7          A.   I did.  I had a gentleman by the

8     name of Kent Nowviskie, a gentleman by the

9     name of Jeff Wiseman.  I had -- I had two

10    secretaries.  I can't recall when my first

11    secretary retired.  Her name was Debbie

12    Waller.  And then Ruth Kemp was a direct

13    report.

14         Q.   Anyone else?

15         A.   Well, our organizational structure

16    was somewhat fluid.  So for some

17    commissioners, they would -- I would sign

18    their time, sign leave.  Ultimately, in our

19    org chart, they reported directly to the

20    secretary but also through me at times.  And

21    functionally, it really depended on the

22    issue.  If it were of high criticality, then

23    the secretary would certainly be involved.

24                    They may have their own

1   conversations with the secretary outside of

2   my purview.  But it really just depended who

3   was available if they had a need -- if they

4   were having an issue they needed to discuss

5   or counsel or what have you.  And that was

6   really across all of the different bureau

7   commissioners.

8        Q.  Okay.  Would Linda Watts have

9   reported to you?

10       A.  She did.  Again, in that same fluid

11   structure.  Linda and I worked very closely

12   together.  And she also worked closely and

13   reported to Secretary Crouch.

14       Q.  Okay.

15       A.  I should say - I guess just as a

16  means of clarification - if Linda were to be

17  dismissed or need to, you know, take

18  extended leave, then that would have been

19  something that she would have discussed with

20  Secretary Crouch.  And he would have had the

21  authority and purview and line and staff

22  functionality to meet and discuss anything

23  with them at any time.

24       Q.  Okay.  And so you left the deputy

1    secretary position around April of 2022; is

2    that right?

3          A.   That's correct.  Yes, ma'am.

4          Q.   And what is -- your current role is

5    now working for the legislature.  And what

6    is your official title?

7          A.   Senior advisor.

8          Q.   Okay.

9          A.   And I work for the Joint Committee

10   for Government Finance.  And so, in essence,

11   the legislative director is who would sign

12   my time.  And then I work for both the House

13   and the Senate in that capacity.

14         Q.   Okay.  And what do you do in that

15   role?

16         A.   I provide guidance, counsel,

17   conduct research.  You know, I work with

18   legislative committees in the house and

19   senate on health and human service policy,

20   insurance policy.  You know, provide

21   presentations about various issues.  Take

22   meetings with constituents or other

23   stakeholders about critical issues.  Do an

24   extensive amount of constituent work on

```
 1    tricky topics.  You know, legislator may not

 2    know what direction to go to help someone.

 3    And so I'll support that individual and

 4    connect them to the right folks.

 5         Q.  And you said you work on DHHR

 6    policy; is that correct?

 7         A.  What was DHHR and what is now the

 8    three new departments.  I also work quite a

 9    bit on public employee insurance issues and

10    other topics.  But yes, the former DHHR

11    policy areas do fall under my work.

12         Q.  Okay.  And just focusing on the

13    topics under the DHHR, now DOHS, what types

14    of issues have you worked on in your role as

15    a senior advisor to the legislature?

16         A.  It's pretty broad and extensive.

17    Certainly child welfare policy.  Medicaid

18    policy.  Family assistance policy.

19    Behavioral health policy.  CHIP, the child

20    health insurance program policy.  Child

21    support enforcement issues.  Office of drug

22    control policy, substance use disorder

23    issues.  Public health issues ranging from

24    medical examiner, emergency medical services
```

1    to, you know, evaluating the state's

2    response to COVID.  And a multitude of

3    things under those categories.

4         Q.  And in terms of the child welfare

5    policy, what do you work on?

6         A.  I do a lot of policy research.

7    One, just trying to keep apprised of how

8    well the state is doing in various areas of

9    child welfare policy.  There are a lot of

10   constituent complaints to legislators about

11   child welfare-related issues.  There are a

12   lot of providers and other actors -- you

13   know, the court system, I will meet with

14   them on a regular basis to discuss child

15   welfare policy.

16             You know, so there's quite a bit of

17   research, national research, research of

18   what the state is doing.  And then policy

19   development.  Just strategies and ideas on

20   how to improve our current situation.

21        Q.  Okay.  And in that role, are you --

22   do you review documents coming from DOHS?

23        A.  I do.

24        Q.  Okay.  And how do you obtain those

1  documents?

2      A.  Typically, it is through the health

3  committees, both senate and house.  We also

4  have a joint committee for children and

5  families, and that committee also exists

6  during regular session for the house.

7      Q.  Uh-huh.

8      A.  Those are the primary routes.

9  Those staff will request it.  I have

10 historically requested documents as well.

11     Q.  Okay.  And has DOHS generally

12 provided the documents requested from you?

13     A.  Not a hundred percent.  In fact,

14 one reason that I leverage the support of

15 the health committees is to obtain

16 documents.  There is not a great response

17 rate.

18     Q.  When you say there is not a great

19 response rate, what do you mean?

20     A.  I request the document or

21 information, and it just will not be

22 provided.

23     Q.  Is there a reason communicated as

24 to why it's not provided?

1        A.  No, ma'am.

2        Q.  As part of your current role, do

3   you speak with employees of DOHS or BSS?

4        A.  I do.

5        Q.  Are you given free access to speak

6   to whichever employees you request to speak

7   with?

8        A.  Legislative leadership provides me

9   the authority to make those types of

10  inquiries and have those conversations, yes.

11       Q.  Okay.  And what issues -- or what

12  have you looked at in the past since you

13  have started at the legislature that pertain

14  to child welfare?

15       A.  The list of items would be too

16  exhaustive for me to recall each one.  Is

17  there a specific --

18       Q.  Yeah.

19       A.  It's a broad area of policy, as you

20  know.

21       Q.  Have you looked at issues with

22  having an adequate number and type of

23  placement?

24       A.  Yes, ma'am.

Page 23

```
 1        Q.   Okay.   What have you looked at in
 2   that context?
 3        A.   I have did quite a bit of research
 4   and produced a report as it relates to how
 5   to state placement issues, placements in
 6   acute care hospitals that are inappropriate,
 7   placements of children in hotel rooms,
 8   children that may be in a placement that is
 9   licensed, but their needs may not be
10   directly in line with that type of
11   placement.
12             For example, a child may be in
13   juvenile services that has a developmental
14   disability issue.  And that child may linger
15   in that placement while the agency attempts
16   to find them somewhere that is more
17   appropriate.
18        Q.   Okay.  And you said you wrote a
19   report on this.  Is this a report that will
20   be provided?
21        A.   Yes.
22             MR. LESLIE:  Yes.
23        Q.   We will ask more questions when we
24   obtain that.
```

Page 24

1          Have you looked at issues -- in

2     your capacity as a legislative advisor, have

3     you looked at issues with regard to

4     retention and turnover?

5          A.  I have, yes, ma'am.

6          Q.  And what did you look at with

7     respect to those issues?

8          A.  Certainly, I frequently track the

9     department's publicly reported -- they can

10    see rates for a number of different child

11    welfare positions.  But specifically Child

12    Protective Services -- I have conducted

13    research and looked into issues as it

14    relates to what a Child Protective Service

15    worker is in West Virginia relative to other

16    states, caseload issues based on the

17    parameters that different jurisdictions have

18    relative to West Virginia.  Regional

19    distribution of child protective services

20    has been an area of focus and inquiry.

21         Q.  Okay.  And with respect to these

22    issues, have you written any reports or

23    provided any presentations to the

24    legislature?

Page 25

1        A.  I have.

2        Q.  Okay.  And are those being provided

3    as well?

4            MR. LESLIE:  We are printing it

5    off.

6            MS. TEBOR:  I'll save these for

7    after we print them.

8            MR. LESLIE:  Save them for

9    later.

10           MS. TEBOR:  Yeah.  I think that

11   makes sense.

12       Q.  I know you said you've read the

13   complaints numerous times.  Do you recall

14   discussing the issues that are raised in our

15   complaint with other employees at DHHR while

16   you were deputy secretary?

17           MR. PEISCH:  I'm going to object

18   to that on the grounds of attorney/client

19   privilege or attorney work product.

20           Not all of it will be covered by

21   that.  But please refrain from disclosing

22   any information about communications with

23   attorneys or requests from attorneys whether

24   they be through employees of then DHHR or

1  from attorneys directly.

2            THE WITNESS:  May I ask a

3  clarifying question?

4            MR. PEISCH:  Yeah.

5            THE WITNESS:  Ms. Chapman's

6  role has been somewhat fluid, ranging from

7  an attorney to more of a policy person.  And

8  so Cammie and I have had a multitude of

9  conversations about child welfare and

10  certainly this case over the years.  Would

11  that be protected?

12            MR. PEISCH:  So I think it

13  depends on what the question is.  It was a

14  pretty broad question.  So I don't know.

15  And it depends on what the answer is too.

16     Q.  Yeah.  So why don't we -- how about

17  this.  I think right now, let's narrow it to

18  conversations aside from Ms. Chapman.  And I

19  am going to ask you this question again.

20  And this may be something where you would

21  like to discuss with your attorney what the

22  conversations were with Ms. Chapman.  And

23  then we can come back to this question

24  later.  Okay?

```
 1          A.   Sure.  Yes.

 2          Q.   All right.  So in terms of while

 3    you were at DHHR and in -- okay.  I will

 4    rephrase.

 5               With regard to Plaintiffs'

 6    complaint in this matter, did you talk to

 7    anyone at DHHR who was not an attorney at

 8    that time about the complaint?

 9          A.   Yes.

10               MR. PEISCH:  I'm going to raise

11    the same objection.  But I think a yes or no

12    answer would not implicate attorney/client

13    privilege.  But beyond that, there may be.

14          A.   Yes.

15          Q.   Who did you speak with?

16          A.   Generally, the cabinet secretary.

17          Q.   Okay.  Anyone else?

18          A.   Linda Watts.  Jeff Pye.

19          Q.   Okay.

20          A.   Cindy Beane.

21          Q.   Anyone else?

22          A.   Yes.  There would have been

23    discussions with the deputy secretaries at

24    what used to be called the Bureau for
```

1  Children and Families, and is now called the

2  Bureau for Social Services.

3       Q.  Okay.  And did you have an opinion

4  about the truthfulness of the allegations in

5  the complaint when you initially received

6  it?

7       A.  Yes.

8       Q.  And what was that opinion?

9       A.  I felt that there were certainly

10 accuracies in the complaint.  I had serious

11 concerns about the potential remedies

12 proposed based on research and class action

13 child welfare cases in other states, and our

14 own experiences at then DHHR with class

15 action suits like Hartley and Benjamin

16 (phonetic).  My primary worry was that the

17 remedies, while initially well intended,

18 would over time result in degradation of

19 policy and --

20      Q.  Mr. Samples, I just asked about the

21 accuracy of the statements and not about the

22 remedies.  So I'll just stop you there, and

23 I will move.

24      A.  Oh, I'm sorry.  I thought you asked

Page 29

1    my opinion about the --

2         Q.  No.  That's -- opinion on the

3    accuracy.  I appreciate it.  I appreciate

4    it.

5         A.  Oh, sorry.

6         Q.  Let's see.  So in your current role

7    -- I will just go back to your current role

8    for a minute.  Do you speak with the foster

9    care ombudsman?

10        A.  I do.

11        Q.  What do you discuss with her?

12        A.  I provide her with a number of

13   referrals from constituents.  I discuss

14   policy concerns that exist at the Bureau for

15   Social Services.

16        Q.  Okay.  And what sort of referrals

17   do you provide to her?

18        A.  As I mentioned before, a number of

19   constituents will have issues with the child

20   welfare system.  And I say constituents.

21   That's a broad group.  It could be a number

22   of different -- it could be providers,

23   foster families, families that have had

24   their children taken and others.

```
 1                    Typically, what I do when I get a

 2    complaint, especially if it involves a

 3    specific child and not a provider rate issue

 4    or something to that effect -- is, I will

 5    make the referral to both the department and

 6    to the child welfare ombudsman.  And the

 7    purpose of that is really to give the

 8    department a chance to deal with any

 9    immediacy issues and to reconcile the

10    problem, but then also to have that safety

11    valve with the ombudsman to look into it to

12    be able to report back to the legislature

13    any systemic fixes or issues that they

14    identified.

15         Q.  Okay.  And you also said that you

16    have discussed with the ombudsman any policy

17    concerns.  What policy concerns have you

18    discussed with her?

19         A.  There have been a multitude.

20    Conflict of interest issues between the

21    department and the ombudsman.  Concerns

22    about specific areas of child welfare

23    policy, like out-of-state placement of

24    children, performance of CPS in the field,
```

1    responsiveness by the agency to provider

2    issues and issues that have been brought

3    forth by the court as concerns.

4         Q.  Okay.  And you mentioned -- sorry.

5    Anything else?

6         A.  We have had discussions about the

7    amount -- or the type of information that

8    can be accessed by the child welfare

9    ombudsman's office and the structure of that

10   office within state government as it

11   historically related to DHHR, but then over

12   time, as that office exists within the

13   Department of Health under the Office of

14   Inspector General.

15        Q.  Okay.  Anything else?

16        A.  I believe that there are.  I can't

17   think of anything off the top of my head.

18   We have had a multitude of discussions.  So

19   there very well could be other things I am

20   not thinking of.

21        Q.  Okay.  You mentioned the conflict

22   of interest between the department and the

23   ombudsman as a topic that you have discussed

24   with the ombudsman.  What do you mean by

Page 32

1   that?

2         A.   That issue has evolved over time as

3   in my position at the legislature.   So

4   initially there were discussions about

5   pressure that the ombudsman was experiencing

6   from the department in talking to the

7   legislature about child welfare issues,

8   reviewing reports and wanting certain

9   information withheld, and just generally

10  being able to gain access to information

11  from the department.

12            It was stated to me that Secretary

13  Crouch at one point had met with the

14  ombudsman and applied pressure about

15  discussions that she may or may not want to

16  have with the legislature.   And it had been

17  indicated that my name had been brought up,

18  to be very careful about conversations that

19  she had with me, specifically in my work at

20  the legislature.

21            There were concerns presented about

22  discussions with Ms. Chapman not wanting

23  information released from the ombudsman.

24  And so as we began to reorganize or plan for

Page 33

1    the reorganization of DHHR, that specific

2    issue became a top priority and continued to

3    be a priority even through this past year.

4    And the reorganization bill itself and some

5    of the documents that will be provided

6    reflect the amount of time and effort that

7    was spent to ensure that the Office of

8    Inspector General was independent, at least

9    in statute, and the entities under the

10   Office of Inspector General would have the

11   ability to conduct their jobs without any

12   type of undue influence.

13        Q.  Okay.  You mentioned that you had

14   heard that Secretary Crouch met with the

15   ombudsman and applied pressure.  Do you

16   remember when you learned of that

17   conversation?

18        A.  It would have been in 2023 that I

19   -- or actually, it would have gone back to

20   2022 - I'm sorry - that I first was made

21   aware of that.

22        Q.  How were you made aware of that?

23        A.  A conversation with the ombudsman.

24        Q.  And what did the ombudsman relay to

Page 34

1    you in terms of what Secretary Crouch

2    relayed to her?

3         A.  She said that she was called in to

4    Secretary Crouch's office.  And I don't

5    recall specifically how she worded it.  But

6    the tone of the conversation was that it was

7    a threat, to be very careful about

8    conversations that she had with the

9    legislature and documents that she would

10   release.

11        Q.  Did you understand that Secretary

12   Crouch was telling her that he did not want

13   her to be forthcoming and fully disclose her

14   findings?

15        A.  That was my analysis of the

16   situation, yes.

17        Q.  Do you know when Secretary Crouch

18   had this conversation with the ombudsman?

19        A.  It would have been shortly after --

20   within a matter of a few months after my

21   departure at the department, if not -- I

22   don't know exactly.  I know it was in 2022.

23        Q.  Okay.  Do you know if there was

24   more than one conversation between Secretary

1    Crouch and the ombudsman?

2         A.  I do not recall.

3         Q.  Do you know if there was specific

4    information that Secretary Crouch did not

5    want released to the public or to the

6    legislature?

7         A.  I do not recall specifically, no.

8         Q.  Okay.  And you also mentioned a

9    conversation with Ms. Chapman -- or between

10   Ms. Chapman and the ombudsman about not

11   wanting information released.  Is that

12   right?

13        A.  It was stated in conversations with

14   the ombudsman that she was continuing to

15   have issues with Ms. Chapman as it related

16   to gaining access to information, to

17   meetings and disagreements.  My

18   understanding, disagreements over the

19   ombudsman's report to the legislature.  But

20   she did not specify a time frame for those

21   discussions or if they were conducted in a

22   meeting or via phone or email.  I don't know

23   the nature of those conversations.

24        Q.  And when did the ombudsman relay

1    this information to you?

2         A.   There have been concerns that she

3    had raised while I was still at the

4    department.  And then she would have relayed

5    this information at least in 2022.

6         Q.  And with regard to the conversation

7    with -- conversations with Ms. Chapman, when

8    did you learn of those conversations between

9    Ms. Chapman and the ombudsman?

10        A.   Initially -- I am just trying to

11   think through the dates.  Initially, it

12   would have been while I was in my deputy

13   secretary role.

14        Q.   Uh-huh.

15        A.   And the ombudsman came to me in

16   that role and asked for support in trying to

17   work through the challenges.  And especially

18   at that time, she was -- at least stated to

19   me that --

20             MR. PEISCH:  I'm just going to

21   interject for a minute.  I just want to be

22   careful there when Ms. Chapman's

23   conversations with the ombudsman or with you

24   or with the ombudsman when Ms. Chapman was

Page 37

1   serving in a lawyer role and they were

2   communicated to you when you were secretary

3   or deputy secretary would be privileged.  So

4   I don't know whether you are talking about

5   things you learned when you were in the

6   legislature or not.  But I just want to flag

7   that.

8              THE WITNESS:  Well, I was about

9   to relay conversations with the ombudsman

10  while I was at the department about her

11  concerns -- the issues, problems that she

12  stated she was having with Ms. Chapman.

13             MR. PEISCH:  So I am going to

14  object to that on attorney/client privilege

15  to the extent it involves Ms. Chapman

16  providing legal advice to the ombudsman or

17  to the department that you learned of as an

18  employee and a leader of the department.

19             THE WITNESS:  Yes.  Okay.

20      Q.  In your role as a legislative

21  advisor, have you heard from the -- have you

22  had conversations with the ombudsman where

23  she relayed that Ms. Chapman was still

24  preventing the access to certain

Page 38

1    information?

2         A.  Yes.  Although, specifics were not

3    provided.  It was more in lines of a general

4    statement that she was still continuing to

5    have problems.

6         Q.  Okay.  Did she relay any

7    information about conversations where

8    Ms. Chapman asked her not to disclose

9    certain information?

10        A.  Not to my recollection.

11        Q.  Did she disclose how many --

12   approximately how many conversations she had

13   had with Ms. -- the ombudsman had had with

14   Ms. Chapman regarding access to certain

15   information?

16        A.  Not to my recollection.  And at

17   times, it was generally stated Social

18   Services.  And so while Cammie's name may

19   have come up, Ms. Chapman's name may have

20   come up, it was Social Services -- I am

21   having a problem with the leadership of

22   Social Services.

23        Q.  So just to clarify.  The

24   conversations that you were discussing with

1   regard specifically to Ms. Chapman and the

2   ombudsman took place while you were still a

3   deputy secretary at DHHR?

4        A.   They took place while I was deputy

5   secretary at DHHR, and they took place while

6   I was in my role at the legislature.

7        Q.   Okay.  So in your role at the

8   legislature, you had conversations with the

9   ombudsman where she specifically mentioned

10  Ms. Chapman as not willing to provide access

11  or being difficult to get access to certain

12  information due to Ms. Chapman's

13  interference?

14       A.   That's correct.

15       Q.   Do you know what type of

16  information the ombudsman was trying to

17  access?

18       A.   I cannot recall specifically.

19       Q.   Okay.  And you mentioned another

20  issue that you spoke to the ombudsman about

21  is out-of-state placements?

22       A.   Uh-huh.

23       Q.   What did you discuss with her with

24  regard to -- or what did you discuss with

Page 40

1    her with regard to out-of-state placements?

2          A.  I reached out to the ombudsman who

3    does have a great deal of knowledge about

4    child welfare.  At multiple times, both in

5    the development of the report that I had

6    prepared for the legislature to just talk

7    through the issue, to pick her brain for

8    lack of a better way to say it, ideas she

9    had that could be incorporated into that

10   document, and really just fishing for any

11   issues that she was seeing with respect to

12   out-of-state placement and inappropriate

13   placements.  We would talk often about it,

14   not just out-of-state placement but -- and

15   this is reflected in the report -- the

16   broader array or spectrum of inappropriate

17   placements of children.

18         Q.  Are the issues that Ms. -- the

19   ombudsman that she brought to you, are they

20   also reflected in your report, or are there

21   any issues that are not reflected in your

22   report that you discussed?

23         A.  I cannot recall specifically.

24         Q.  Okay.

```
 1          A.   It would have been in the course of
 2     a conversation.   It wasn't itemized here are
 3     five items.   And then I included those five
 4     items.   And, you know, Pam and I would have
 5     policy disagreements ourselves -- you know,
 6     friendly disagreements about Solution X or
 7     Y.   But I can't specifically recall.
 8          Q.   Okay.   You had also -- you had
 9     mentioned that you discussed with her the
10     performance of CPS in the field?
11          A.   Yes.
12          Q.   What issues did you discuss with
13     regard to the performance of CPS in the
14     field?
15          A.   Categorically, because there would
16     have been a multitude of discussions or
17     conversations -- CPS not properly conducting
18     an investigation was definitely a category
19     -- an ongoing category or discussion.   Child
20     protective services workers not being
21     prepared in court to convey to judges
22     recommendations on where a child should be
23     placed or to keep the court and other
24     parties updated properly on the condition of
```

Page 42

1    the child, the situation with the child and

2    the child's biological family.

3              For example, there was a situation

4    where there were concerns that visitations

5    were not occurring between children and

6    their biological families for the purpose of

7    reunification because of issues that the

8    agency was having -- purported issues the

9    agency was having with providers and --

10   socially necessary service providers not

11   being able to do transportation and how that

12   was causing issues just in the broader

13   system, causing delays either on

14   reunification or ultimately severing

15   parental rights.

16        Q.  Anything else?

17        A.  Oh, sure.  There would have been a

18   multitude of other situations discussed.   I

19   can't recall any specifically now.  But more

20   or less -- I mean, there were just several

21   conversations, some via email, some via

22   conversation on the phone.

23        Q.  And when did these conversations

24   take place?

1          A.   Time-wise?

2          Q.   Uh-huh.

3          A.   They would have been from 2022 all

4    of the way through to 2024.

5          Q.   Are these all -- are the three

6    issues you mentioned -- four issues you

7    mentioned, they are all still presently

8    issues today?

9          A.   I can't say that with certainty.

10         Q.   Okay.  You mentioned CPS not

11   properly conducting an investigation.  What

12   do you mean by that?

13         A.   That there would be a referral to

14   centralized intake and concerns that these

15   referrals were being screened out

16   inappropriately.

17              For example, I recall specifically

18   talking to her about the percentage of cases

19   that were being investigated historically.

20   So you go back to 2017, for example, there

21   might have been 67, 68 percent of all

22   referrals investigated.  And now, I think

23   the last time I saw the data, it was 60

24   point something percent.

1                  And so that's a huge number when

2     you are talking about the volume of

3     investigations and referrals that the state

4     receives and a concern that that was -- I

5     asked her, is there something happening at

6     the department that is causing centralized

7     intake to screen out more referrals.

8          Q.   Uh-huh.

9          A.   Ultimately, those types of

10    discussions translated into policy

11    recommendations that the ombudsman would be

12    given more access to the investigative side

13    of the child welfare system.

14                 There was an effort in 2023 through

15    legislation to accomplish that.  It was then

16    stated by the ombudsman that they were still

17    not being provided access because of a

18    discussion or because of a position by

19    Ms. Chapman and that -- and then there was

20    an effort to deal with that this past

21    session, which in the moment I can't -- I

22    don't believe actually passed.  I don't

23    think we passed that.  In fact, I know it

24    didn't pass.

Page 45

1        Q.  Uh-huh.

2        A.  But there were conversations about

3   it.

4        Q.  Okay.

5        A.  And I should -- well, never mind.

6   I don't want to say.

7        Q.  Okay.  If I just understand,

8   because of Ms. Chapman -- you understand

9   that because of Ms. Chapman, the ombudsman

10  was not provided with data regarding

11  investigations and screening out of

12  investigations; is that correct?

13       A.  That was my understanding, yes.

14       Q.  And when did you have this

15  conversation -- this is from a conversation

16  with the ombudsman who --

17       A.  Initially, the discussion would

18  have likely happened in 2022 because it was

19  a part of the policy recommendations for the

20  2023 legislative session.  We thought we had

21  fixed that issue, but then it became

22  apparent in late 2023 that -- I believe it

23  was late 2023.  It may have been early

24  2024 -- that this information was still not

1    being provided.  And in those latter

2    conversations specifically, it was mentioned

3    that Ms. Chapman was a barrier to that.

4         Q.  So from conversations as recently

5    as late 2023, Ms. Chapman -- you learned

6    that Ms. Chapman was not --

7         A.  Early 2024.

8         Q.  Early 2024, you learned that

9    Ms. Chapman was not providing the

10   investigative data to the ombudsman?

11        A.  It was relayed that it was the

12   interpretation of the department and

13   Ms. Chapman that the ombudsman would not

14   have access to that information.

15        Q.  And do you have an understanding as

16   to why they were preventing access?

17        A.  I wouldn't want to speculate.

18        Q.  So you had said that in 2022, this

19   was part of the policy recommendations for

20   the legislative session, is that right, is

21   to allow the ombudsman access to this data?

22        A.  To expand the ombudsman's reach in

23   terms of what they could and could not

24   investigate, yes.

Page 47

1        Q.   Okay.  And was this specifically --

2   these policy recommendations specifically

3   targeted at allowing her access to

4   investigative data, or was there other data

5   that you also felt -- or that was felt she

6   needed to access?

7        A.   There was other information, not

8   triggered by any complaint necessarily, just

9   my own experience with the system that --

10   for example, I think we crafted the language

11   so broadly that it would be inclusive of,

12   you know, juvenile services and those types

13   of cases.  But yes, it was a part of the

14   policy recommendations that I provided.

15        Q.  So prior to 2022, DOHS was still

16   not providing this data to --

17        A.   Prior to 2022, the code restricted

18   the access of information.  It was really

19   once the child was in state custody, then

20   the role of the foster care ombudsman was

21   kicked into gear.  And that was historically

22   a mistake I think on my part.

23            You know -- I mean, the genesis of

24   the ombudsman's office was something I was

Page 48

```
 1    involved in at the department with the

 2    legislature trying to -- you know, when we

 3    developed it.  And at the time, we took the

 4    strategy from Georgia -- because this was

 5    tied to a managed care effort.  We took the

 6    strategy from Georgia.  And it wasn't

 7    intended to be restrictive, but it did --

 8    ultimately, the language was restrictive.

 9              And so that was recognized in 2022

10    because of cases -- and I don't remember the

11    specific cases -- but because of cases we

12    were having, there were lots of complaints.

13    So we wanted the ombudsman to have access to

14    the investigative side to provide the

15    legislature this insight.

16              And then into 2023 legislative

17    session, as a part of -- a piece of

18    legislation, we actually passed that

19    authority that, you know, expanded the scope

20    of the ombudsman's office, or so we thought.

21              And then through the course of

22    calendar year 2023, into calendar year '24

23    -- early '24, at least by early '24 -- and

24    the conversations may have started late
```

1    2023, I can't recall.  But definitely

2    conversations were held in early '24 that

3    the department had this interpretation that

4    no, that legislation that was passed in '23

5    did not provide the ombudsman the ability to

6    access this information, and so -- because

7    of interpretations.  And so more needed to

8    be done if that was the policy goal of the

9    legislature.  And so we had -- we had a

10   piece of legislation that would have

11   accomplished that.  But it did not pass.

12        Q.  Got you.

13            So it's your understanding that the

14   department does not want this information

15   regarding investigative data released to the

16   ombudsman?

17            MR. LESLIE:  Objection.  Calls

18   for speculation.

19        A.  Yeah.  I could only speculate.  I

20   don't know for sure.

21        Q.  All right.  You had also discussed

22   that you -- or you mentioned that you

23   discussed provider issues with the

24   ombudsman.  What do you mean by provider

1    issues?

2         A.  It would -- it would cover a

3    multitude of different areas, ranging from

4    providers not performing per policy and

5    contract to payment and rate issues to the

6    structure of our child residential system,

7    and likely other issues as well.

8         Q.  And what did you discuss with

9    regard to the child residential system?

10        A.  I relayed to the ombudsman my

11   concerns.  And I wanted her impression and

12   thoughts on both the state of the current

13   child residential infrastructure and the

14   department's plan to reform that

15   infrastructure moving forward.

16        Q.  And what were your concerns?

17        A.  My concerns are that the strategy

18   runs the risk of deteriorating the level one

19   and level two child residential placement

20   infrastructure by undercutting the

21   reimbursement methodology for those current

22   placements.  And that without an appropriate

23   continuum of care for alternative placements

24   established, that that could result in

Page 51

```
 1   children being either inappropriately placed
 2   at higher levels of care than they needed,
 3   left in situations at lower levels of care
 4   that may not be appropriate for them either
 5   or sent out of state.
 6           Q.  And what is the department's plan
 7   that you think would cause the level one and
 8   level two to deteriorate?
 9           A.  Well, it's a very large strategy.
10   So there is a number of components to it.
11   But specifically, the Bureau For Medical
12   Services has a state plan that lays out how
13   Medicaid will reimburse child residential
14   providers as a part of a formula.  And my
15   fear is that once the department -- if CMS
16   were to approve this unwinding of that
17   reimbursement methodology, that there will
18   not be a sufficient revenue source to
19   maintain that infrastructure of level one
20   and level two.
21           Q.  And what happens if there is no
22   level one and level two facility for a child
23   who would otherwise be in a level one or a
24   level two facility?
```

Page 52

1          A.   There is risk that a child could be

2     left in a placement that is inappropriate or

3     actively placed in a placement that is

4     inappropriate for their needs.  And that

5     would cover a range of possibilities from

6     out of state, to being left in juvenile

7     services, to remaining in an acute care

8     hospital, to being at a higher level of

9     placement, to lingering in an emergency

10    shelter, to being left in a foster placement

11    frankly that may not -- may be deteriorating

12    and may not be appropriate for the child.

13         Q.   And who is proposing this plan?

14         A.   The Department of Human Services.

15         Q.   Why are they proposing this plan?

16              MR. LESLIE:  Objection.  Are you

17    asking if he has been told why, or are you

18    asking him to speculate?

19              MS. TEBOR:  I am asking him if

20    he knows why.

21         A.   It has been testified and stated

22    that the department wants to ensure that

23    children with higher acuity needs are

24    receiving the appropriate placement.  And so

Page 53

```
 1    for level three and your PRTFs - level 3.5
 2    unofficially - that West Virginia currently
 3    doesn't have a sufficient infrastructure to
 4    care for those kids.  And that is accurate.
 5    And so it has been stated that the goal is
 6    to ensure we do have those placements.  That
 7    has been -- I mean, that's a summary.  But
 8    that's been publicly stated.
 9         Q.  And is this in connection -- are
10    you familiar with the DOJ MOU?
11         A.  I am.
12         Q.  And is this plan in connection with
13    the DOJ MOU, to your knowledge?
14         A.  That has been stated, yes.
15         Q.  And what was stated about it being
16    in connection with the DOJ MOU?
17         A.  I can't recall specifically.
18         Q.  You said this was a plan.  Do you
19    know when this plan is set to be enacted?
20         A.  The initial start date was reported
21    to the legislature to be July 1st.  It's my
22    understanding that that has since been
23    pushed back.  I believe -- I am not certain,
24    but I think it is October.  But I do not
```

1   know for sure.  Within the last month or

2   last 30 days, I should say, there was a

3   medical services advisory council meeting

4   where the Medicaid state plan amendment was

5   discussed.  And as a part of Medicaid

6   process from the point from which Medicaid

7   submits that to CMS, there is a 90-day clock

8   that CMS has to respond.  So CMS could

9   respond day one, or they could wait the

10  90 days, or they could actually pause for

11  the purpose of questions in the middle of

12  that process and it goes beyond 90 days.

13       Q.   Okay.  And did the ombudsman share

14  your concerns about this plan in terms of

15  the level one and level two facilities?

16       A.   No, not necessarily.

17       Q.   All right.  And you had also

18  discussed -- an issue that you discussed

19  with the ombudsman was the type of info

20  access -- which we talked about the

21  structure of the government -- of the

22  ombudsman either within OIG or within DHHR.

23  Can you discuss what you meant by that?

24       A.   I'm sorry.  Can you repeat that?

Page 55

1          Q.   Sure.  You had mentioned that you

2    had discussed with the ombudsman the

3    structure of the ombudsman office and who

4    they report to?

5          A.   Uh-huh.

6          Q.   Is that right?

7          A.   Yes.

8          Q.   Okay.  What did you mean by that?

9                MR. PEISCH:  I'm just going to

10   object again on the similar grounds of

11   attorney/client privilege, attorney work

12   product and deliberative process privilege.

13   I just want to make sure this question is

14   about discussions he had while he was in the

15   legislature and not while he was at DHHR.

16                MS. TEBOR:  These are also

17   discussions with the ombudsman, not

18   necessarily with any attorney present.

19                MR. PEISCH:  But it may involve

20   advice from attorneys.  If he was at DHHR,

21   it wouldn't have been waived when it was

22   conveyed to him.

23          A.   Can you please restate the

24   question?

```
 1        Q.  Sure.

 2             You had said that you had

 3    discussions with the ombudsman about the

 4    structure of the ombudsman's office and who

 5    the ombudsman reports to; is that right?

 6        A.  Correct.  Correct.

 7        Q.  Okay.  And I am asking what those

 8    discussions were about?

 9        A.  So my time at the legislature, the

10    discussions were really her conveying that

11    her experiences with these conflict of

12    interest situations and -- just a concern.

13    There wasn't a recommendation that I can

14    recall provided by the ombudsman.  I

15    translated those concerns into a

16    recommendation and discussions with others

17    for the purposes of, you know, policy

18    making.

19        Q.  Okay.  And what was your

20    recommendation?

21        A.  That the Office Of Inspector

22    General be taken out or separated from the

23    Department of Human Services and the

24    reorganization and that language be included
```

```
 1    that would clarify that no undue influence

 2    should be applied to not just the child

 3    welfare ombudsman but to any entity under

 4    the authority of the inspector general.

 5              And there were also recommendations

 6    around how to structure that office in the

 7    reorganization so as to be financially

 8    efficient.  And so that's why it ultimately

 9    was placed under the umbrella of the

10    Department of Health, which -- again, your

11    Social Services, Medicaid, Behavioral

12    Health, those agencies are in a separate

13    department -- but that it would be able to

14    access the Office of Shared Administration

15    for HR support, purchasing support, IT

16    support, financial accounting support, et

17    cetera, without having to spin it off as its

18    own separate department, which had been

19    discussed as a possibility.

20              There was also discussion - and it

21    evolved over time - of how other states were

22    structured.  And so it was discovered that

23    the state of Maryland had perhaps

24    experienced something similar.  I don't know
```

1   why they structured it the way they did.

2   But the output was that the inspector

3   general was appointed by the governor

4   directly and served a term as opposed to

5   being appointed by the cabinet secretary for

6   the Department of Health.

7           And so having that appointment and

8   having that term, even after the

9   appointment, the thought was, well, if the

10  -- if any one of these offices within the

11  inspector general identifies an issue, be it

12  child welfare ombudsman, mental health

13  ombudsman, OHFLAC, et cetera, that inspector

14  general will not experience the same level

15  of pressure because they can only be removed

16  for cause.  And so that's ultimately where

17  we tried to land.

18          We did have to go back this 2024

19  session and re -- you know, basically

20  restate that independence because there were

21  concerns that we had not gone far enough in

22  the 2023 DHHR reorg.

23       Q.  Okay.  And these policy

24  recommendations and this legislation is in

Page 59

```
 1    response in part to what we discussed
 2    before, which is pressure by at least Bill
 3    Crouch and Ms. Chapman to not disclose
 4    certain issues or to -- and to prevent
 5    access to certain information; is that
 6    right?
 7         A.   That is correct.  It's not
 8    exclusively that, but that is -- that was
 9    definitely a part of it.
10         Q.   Okay.  I wanted to ask about the
11    circumstances of your departure from the
12    Department of Human Services.
13              MS. TEBOR:  I'm going to mark
14    this as Exhibit 1.
15              (Exhibit 1 was marked.)
16         Q.   Mr. Samples, this was a document
17    that you produced to us, correct?
18         A.   That is correct.
19         Q.   Okay.  And what is this document?
20         A.   This reflects a statement that I
21    provided to the media after I left DHHR.
22         Q.   Before we get into the document,
23    could you just tell us a little bit about
24    the circumstances under which you left DHHR?
```

```
 1          A.   Sure.   There had been ongoing, for
 2    a couple of years, a significant number of
 3    policy disagreements that I was having with
 4    the then cabinet secretary, Bill Crouch.
 5    And ultimately -- ultimately, you know, I
 6    had had conversations with several
 7    policymakers about the problems, was being
 8    asked -- a multitude of different
 9    policymakers asking me questions about the
10    problems we were facing, wanting
11    information, why X or Z was happening.  And
12    my relationship with Mr. Crouch just
13    continued to deteriorate probably from 2019
14    forward for a whole host of issues,
15    categorically some of those listed in this
16    statement.
17              On the day that Mr. Crouch told me
18    that I was to be terminated, I was in a
19    meeting with then Commerce Secretary Gaunch,
20    and we were discussing policy issues.  And I
21    received a call during that meeting, or a
22    text, I can't recall, from the secretary to
23    stop by his office that afternoon.
24              When I got back to the office, I
```

1   went into his office at the time we agreed

2   on, and Ms. Angie Ferris -- I think that's

3   her name, the HR director, yeah -- and April

4   Robertson and Secretary Crouch were there.

5   I sat down.  Within 30 seconds, Mr. Crouch

6   said, Jeremiah, we are going to terminate

7   you.

8              I immediately stood up, and I told

9   him, I am just going to stop you right

10  there.  I am going to go make a few phone

11  calls.  And he was like, What do you mean?

12  I think he seemed -- I mean, he seemed very

13  surprised I think by my reaction.

14             I was like, I am just going to go

15  make a few phone calls.  You do what you

16  have to do.  And then I went back to my

17  office.  I called the Chief of Staff.  I

18  called some legislative leadership.  And

19  Chief of Staff asked me to come up to his

20  office.

21             In the meantime, Mr. Crouch came

22  back to my office and tried to hand me the

23  termination document.  I told him just to

24  keep it.  And then I went up to the Chief of

Page 62

1    Staff's office and had a conversation with

2    him.  He told me to sit tight, wait till --

3    try to figure out what is going on, give him

4    the weekend, but try to -- he was already

5    getting calls from legislators, is what he

6    was saying, that he was getting blown up

7    about this on the phone, and so just please

8    just try to refrain from saying anything to

9    the media or to any additional legislators.

10                So I went home.  And that evening,

11   I saw that it had been leaked to the media.

12   And to this day, I don't know by whom.  You

13   know, I had a speculation about that.  And

14   then the next day, I had some additional

15   conversations with the Chief of Staff and

16   with several legislators about next steps.

17                And then I started preparing a

18   statement.  I can't recall exactly when I

19   sent the statement out.  I think it was

20   within a week, but I can't -- I am not

21   certain.  Which this is that statement.

22        Q.  Uh-huh.

23                Okay.  You said you were having

24   policy disagreements with Secretary Crouch

Page 63

1    with respect to child welfare.  I know there

2    are other issues that you list in your

3    letter.  But with respect to child welfare,

4    what were those policy disagreements?

5         A.   And some of it is interrelated,

6    some of these other issues.  There had been

7    significant problems that West Virginia was

8    facing with disabled populations being

9    abused, sometimes heinously, to the point of

10   death.  We had a Child Protective Service

11   vacancy rate that was historically terrible.

12   And so we had disagreements on how to react

13   to those two areas of issue.

14            There were issues related to the

15   system -- or child welfare system and the

16   implementation of a new integrated

17   eligibility system, which included the child

18   welfare information system as a part of it.

19   There were problems with that.

20            We had disagreements over budgetary

21   priorities as it related to child welfare.

22   Specifically, I contended that money should

23   be shifted to that --

24                 MR. PEISCH:  I'm going to object

Page 64

```
 1    to that answer and ask you not to answer on

 2    the grounds of deliberative process

 3    privilege.  Any advice that you provided to

 4    Secretary Crouch, pre-decision on a policy

 5    decision of the department, we object on the

 6    deliberative process privilege grounds.

 7                  MS. TEBOR:  I'm sorry.  Can you

 8    explain why you believe that's deliberative

 9    process privilege grounds?

10                  MR. PEISCH:  While at the time

11    Deputy Secretary Samples was employed by

12    DHHR, any advice that he provided to

13    Secretary Crouch that was pre-decisional and

14    deliberative would be covered by the

15    deliberative process privilege.

16                  So, for example, any advice that he

17    provided on a potential policy decision, if

18    he provided that advice to make that policy

19    decision before that policy decision was

20    made, that would be covered by deliberative

21    process privilege.

22                  MS. TEBOR:  Plaintiffs would

23    disagree with you.  Obviously, we have a

24    disagreement on deliberative process
```

Page 65

1    privilege.  I understand that you have this

2    objection.  We will discuss and we may need

3    to go to the court on that issue.

4              MR. PEISCH:  Okay.

5         Q.  All right.  You had mentioned that

6    you had disagreements about your budgetary

7    priorities.  Any other disagreements that

8    you had?

9         A.  We had disagreements over the

10   caseload standards for CPS.

11             MR. PEISCH:  Again, I'm going to

12   raise the same objection.  We don't object

13   to you mentioning the issues you have a

14   disagreement about.  But when you get into

15   advice to Secretary Crouch, which you have

16   not gotten into, we will object.

17             THE WITNESS:  Okay.

18             MR. LESLIE:  Off the record just

19   a second.

20             (A discussion was held off the

21   record.)

22             (Break in proceedings.)

23             MS. TEBOR:  We are back on the

24   record.

1  BY MS. TEBOR:

2      Q.  Mr. Samples, during the break, did

3  you have conversations with your attorney

4  about this deposition?

5      A.  No, ma'am.

6      Q.  All right.  Looking at the document

7  marked as Exhibit 1.  Okay?  And you have

8  testified that this is the statement that

9  you gave upon your departure from DHHR; is

10  that correct?

11      A.  Yes, ma'am.

12      Q.  All right.  And you say four

13  paragraphs down that DHHR has struggled to

14  make and even lost progress in many critical

15  areas.  Do you see that?

16      A.  Yes, ma'am.

17      Q.  And what did you mean by that?

18      A.  I felt as if and feel as if there

19  had been progress lost in substance use

20  disorder policy, budgetary containment,

21  certainly child welfare, protection of the

22  disabled, as specific examples.

23      Q.  And with regard to child welfare,

24  what did you believe was the progress that

Page 67

```
 1   had been lost?

 2        A.  At the time, certainly the

 3   workforce -- child protective services

 4   workforce and broader child welfare

 5   workforce issues were -- the state was just

 6   in a bad place historically.  There were

 7   just complaints at the time -- some have

 8   continued -- around CPS workers not

 9   performing their duties appropriately.

10   There were issues with cases not being

11   properly investigated.  And those complaints

12   were growing at the time.  The provider

13   infrastructure at the time was very weak,

14   and there were a number of consequences to

15   that for children.

16        Q.  When you say CPS not doing their

17   duties, what do you mean by that?

18        A.  CPS workers going to court and not

19   being prepared to answer questions.  CPS

20   workers not responding to foster parents'

21   requests on a whole number of issues.  Just

22   simply not responding.  Not that they don't

23   have an answer when they do respond, they're

24   just not responding.
```

Page 68

```
 1                Investigations being screened out.
 2   A growing -- at the time, a growing number
 3   of complaints from individuals that are
 4   mandatory reporters, specifically
 5   schoolteachers and those folks, that CPS was
 6   not being responsive.  Some concerns from
 7   law enforcement that have been stated in and
 8   around this time that CPS was not properly
 9   responding to cases.
10        Q.  Do you have an understanding of
11   what led to these issues in CPS, whether it
12   was training or caseloads or other --
13        A.  Child welfare policy is very large.
14   There's other aspects to it.  I think it is
15   one of the most complicated areas of policy
16   in government because of the number of
17   different agencies and regulations, state
18   and federal, that are entailed.
19             But my contention was then, and
20   continues to be, that West Virginia's
21   primary problem is not policy.  There's
22   certainly policies we can improve upon or
23   not, but there's different opinions about
24   those.  But it's the execution of policy.
```

1    And if we would simply just execute policy

2    and the law, then our child welfare

3    situation would be in a much better

4    situation.

5              There is also the ongoing substance

6    use disorder crisis that has -- well,

7    certainly had an impact on the child welfare

8    system.  I mean, West Virginia has led the

9    nation since 2010 in fatal overdose deaths.

10   And that number has grown exponentially

11   worse.  And since 2017, it has grown

12   exponentially worse specifically.

13             And so the child welfare system, if

14   you trend it on a graph, you can follow

15   those lines where there's a lot more cases

16   where children are taken into state custody.

17   Our entry rate, the last time I checked, was

18   85 to 90 percent higher than the next worst

19   state.  And I think we -- the entry rate for

20   West Virginia was 330 plus percent higher

21   than the national average.  And yet we still

22   had concerns on the other side of the system

23   that we weren't properly conducting all of

24   the investigations that we should or making

1   determinations in cases that were

2   investigated where you would substantiate

3   abuse and neglect that we should.

4          And so it just -- the system is

5   overwhelmed and has been for several years

6   now.  And I believe that the policy fix is

7   really around the -- around accountability

8   and transparency as opposed to any specific

9   lever that could be pulled that would

10  magically fix the system.  It doesn't matter

11  what policies you try, A, B or C, if you

12  have transparency and accountability, then

13  you can course correct as appropriate

14  quickly.  And West Virginia is a small state

15  relatively speaking.  I think that we can

16  adjust course more quickly than a Texas,

17  Florida, California, et cetera.  But we have

18  to be transparent and hold ourselves

19  accountable to accomplish that.

20          And that was the purpose of this

21  statement as it related to child welfare,

22  the statement to the press.  And it's why I

23  continue to work in government.

24      Q.  And you discuss that it's not the

Page 71

1    policy, but it's the implementation of the

2    policy.  Who is responsible for implementing

3    the policy?

4         A.  Well, there are a number of

5    factors.  But child protective services is

6    managed by the Bureau for Social Services

7    and the Department of Human Services,

8    formerly DHHR.

9         Q.  In terms of accountability and

10   transparency -- you testified earlier that

11   at least with respect to Mr. Crouch and

12   Ms. Chapman and the ombudsman, they did not

13   want certain information to be more

14   transparent; is that right?

15        A.  I don't want to specifically state

16   with respect to Ms. Chapman, but certainly

17   Mr. Crouch.

18        Q.  But you had testified that

19   Ms. Chapman had conversations with the

20   ombudsman about and had -- the ombudsman had

21   had conversation -- strike that.  Strike

22   that.

23             Okay.  And so with regard to the

24   CPS, you know, not doing their duties, did

Page 72

```
 1    you have conversations with Mr. Crouch about
 2    that issue?
 3         A.  Yes, ma'am.
 4         Q.  And what was his position on CPS
 5    not doing their duties?
 6              MR. PEISCH:  I am going to
 7    object and instruct the witness not to --
 8    only and to the extent these were
 9    discussions about specific policy decisions
10    and they were deliberative conversations
11    about policy decisions.
12              MS. TEBOR:  And you can object.
13    Plaintiffs argue that if it's Mr. Crouch's
14    -- you know, he is just relaying
15    Mr. Crouch's opinion on these matters.
16              MR. PEISCH:  If it is the part
17    -- you know, if it's part of a policy-making
18    discussion and it's a deliberative
19    conversation relating to policy making, it
20    is covered by deliberative process
21    privilege.
22         Q.  Was there a policy -- I will ask
23    this.  Was there any policy that was
24    implemented as a result of your
```

Page 73

```
 1    conversations with Mr. Crouch regarding CPS
 2    not doing their duties?
 3         A.   Yes.
 4         Q.   What were those policies?
 5         A.   More than I could relay in a
 6    conversation.  I just couldn't remember all
 7    of them.  We were continually working from
 8    the day he started on child welfare policies
 9    and having discussions around those
10    policies.  It's a challenge for me to answer
11    specifically because of the deliberative
12    nature of those discussions.  I mean, I am
13    happy to, but that's really for you all and
14    I guess the court to figure out.
15              MS. TEBOR:  Counsel, I want to
16    clarify.  Are you going to make this
17    objection to any and all conversations
18    between Mr. Crouch and Mr. Samples while
19    Mr. Crouch was deputy secretary?
20              MR. PEISCH:  No, not all.  For
21    example, I did not object to the
22    conversations about the reason for his
23    employment termination.  But if there are
24    discussions about policy decisions and they
```

Page 74

1    are before the policy decisions had been

2    made, then yes, we will object.

3              MS. TEBOR:  If they are

4    discussions about any issue with regard to

5    child welfare, would you take the position

6    that there may or may not have a been a

7    policy decision and thus you would claim

8    deliberative process privilege?

9              MR. PEISCH:  It depends on the

10   context of the conversation.  I can't

11   imagine a hypothetical conversation that did

12   not involve the policy decision.  But it

13   depends on what the conversation is about.

14             MS. TEBOR:  All right.  We will

15   continue asking the questions.  I understand

16   that you may continue to object.  And we

17   will make a record and likely go to the

18   court.

19             MR. PEISCH:  Okay.

20        Q.  I wanted to go back.  You had said

21   that there was also an issue with cases not

22   properly investigated.  What do you mean by

23   that?

24        A.  Cases where referrals were screened

```
 1    out at the point of centralized intake with

 2    questions around whether or not that was or

 3    was not appropriate.  Cases where an

 4    investigation may have occurred, perhaps

 5    multiple instances where CPS would have gone

 6    out and investigated but not substantiated.

 7    And then subsequent to those -- that event

 8    or series of events, a tragedy occurs or

 9    other information comes out that would lead

10    one to believe that how could this

11    information have been missed in a proper

12    investigation.

13              Situations where workers had a

14    responsibility to -- maybe it was an active

15    case -- a worker would have a responsibility

16    to go out and check on a child, failed to do

17    so, a tragedy occurs.

18         Q.  Again, same question.  Do you have

19    an understanding of why this was occurring

20    and whether -- were there any studies done

21    or any investigations into why these

22    investigations were done improperly, whether

23    it was because of caseloads, training or

24    other?
```

Page 76

1        A.   There were a multitude of efforts

2   undertaken to address these issues in an

3   ongoing fashion.

4        Q.   And what were those efforts?

5        A.   I wouldn't be able to provide an

6   exhaustive list.  But examples would include

7   -- for example, with respect to situations

8   in Kanawha County, we had put together a

9   fairly lengthy list of -- I believe it was

10  20 plus items -- but I can't recall the

11  specific number of strategies -- to improve

12  how CPS interacted with the courts and how

13  the office worked from an efficiency

14  perspective.  That occurred under Secretary

15  Crouch, his tenure.

16            There were similar situations in

17  the Eastern Panhandle where again a

18  multitude of different strategies were put

19  on the table both from the perspective of

20  finding ways to add additional staff to

21  improving the efficiency of those offices.

22            There was a study conducted related

23  to CPS and child welfare workforce, I

24  believe it was with West Virginia University

Page 77

1    -- although I can't exactly recall, but I

2    think it was with the university -- to look

3    at caseload standards and strategies around

4    the CPS workforce, and a multitude of others

5    that I am sure if I sat long enough could

6    think through some of those.  It was an

7    ongoing -- it was an ongoing effort.

8         Q.  Are you aware of whether the

9    problems with investigations being done

10   improperly remains an issue today?

11        A.  I believe it remains a problem

12   today.

13        Q.  And how do you come to that

14   knowledge?

15        A.  It is anecdotal for the most part.

16   As I walked in here this morning, I read an

17   article about a child in Boone County that

18   -- and this is only a press report -- that

19   it appears was starved to death over the

20   course of two years.  And there are other

21   cases like that -- heinous things.

22             And so if those -- if those -- and

23   I don't know if CPS was involved or not.  I

24   mean, there's a lack of clarity frankly that

Page 78

1    how would we know, you know, in my official

2    position or how would the public know?

3            There is just not enough

4    transparency in the system to fill some

5    level of assurance that while tragedies will

6    always happen, at least we did our best as a

7    state and a government to address them.  And

8    I don't believe we are at that stage right

9    now.

10       Q.   Okay.  You had also said there were

11   issues with the provider infrastructure that

12   was insufficient.  What did you mean by

13   that?

14       A.   West Virginia has an insufficient

15   number of home community-based service

16   providers.  The number of -- well, I

17   shouldn't say the number.  But the

18   functional capacity of our socially

19   necessary service providers has been a big

20   issue over the past two years.  The

21   placement infrastructure, both on the foster

22   parent side, but also children that may have

23   an acute psychiatric or behavioral issue,

24   the state's infrastructure for those

Page 79

 1    functions is inadequate to put it lightly.

 2              We have an insufficient -- to my

 3    knowledge, an insufficient number of

 4    emergency shelter beds.  We have an

 5    insufficient number of psychological

 6    residential treatment facility beds, an

 7    insufficient number of acute psych beds to

 8    my knowledge.  And so there are broad

 9    infrastructure issues that need to be

10    addressed.

11         Q.  And the provider infrastructure

12    issue, that's one that you felt you had --

13    DHHR had lost progress on when you wrote

14    this letter in 2022?

15         A.  In some areas, I felt like we had

16    lost progress.  In other areas, progress was

17    being made but not sufficient to where I

18    thought we needed to be at that point in

19    time.

20         Q.  Okay.

21         A.  For example, the wraparound

22    services, these in-home community-based

23    services, I was not pleased with how much

24    progress we had made.  I felt like we should

Page 80

```
 1   have made more.  And I felt like we should

 2   have at a county level broken down the

 3   availability of providers, which was

 4   something that I had -- well, maybe I am out

 5   of bounds by saying that -- but something

 6   that I had pushed for.

 7           I think that we had made -- and I

 8   say "we."  Me too.  I look in the mirror on

 9   this stuff and think about it all of the

10   time.  I think we had made mistakes in terms

11   of allocation of our resources and should

12   have allocated more towards the child

13   welfare realm of policy just opposed to some

14   other areas of policy that investments were

15   being made.

16           So yeah, I mean, I just had broad

17   concerns including the infrastructure of

18   providers in the state at this time.

19       Q.  And in terms of the wraparound

20   services, was that something that you felt

21   Mr. Crouch could have done more to help that

22   to progress?

23       A.  I believed at the time and still

24   believe that we could have all done more to
```

Page 81

1    advance those policies more aggressively.

2    That is not to say that I didn't think

3    progress had been made.  I think a lot of

4    folks did a lot of great things.  But within

5    the context of the department at times --

6    and maybe this was a problem of my own -- I

7    mean, I always tried to bring folks back to,

8    are we solving the actual problem?  Is the

9    outcome better?  And those are tough

10   conversations to have in leadership.  And I

11   was very vocal about stating that I did not

12   think we were making enough progress in this

13   area and the others listed in this

14   statement.

15        Q.  When you say you were very vocal,

16   who were you talking to that you were very

17   vocal about the amount of progress not being

18   made?

19             MR. PEISCH:  Objection.

20   Deliberative process privilege.

21             MR. WALTERS:  You're going to

22   assert the privilege over the individuals he

23   spoke with?

24             MR. PEISCH:  I will not assert

Page 82

1   the privilege over -- yes.  Actually, I will

2   assert the privilege over that because he

3   has just testified to what he has been

4   saying and what his position is.  And I

5   think she is asking him to say who did you

6   convey that specific message to.

7        Q.  Did you talk to Bill Crouch about

8   that progress was not made in those specific

9   areas?

10             MR. PEISCH:  Objection.

11   Deliberative process privilege.

12        Q.  When you said that you believed

13   that the budget could have been allocated

14   differently with respect to child welfare,

15   can you explain a little more what you meant

16   by that?

17        A.  I would state during this time

18   frame and in this document here when I

19   created this statement that at the time --

20   you know, West Virginia had roughly

21   7.7 billion dollars invested - state,

22   federal, special revenue - in DHHR.  And it

23   was my contention that we were spending

24   inordinate amounts of money on projects that

Page 83

1    were not as critical as child welfare and on

2    populations that frankly were not as

3    vulnerable as foster children or children

4    that could prospectively be foster children.

5    And I still contend that.

6         Q.  What, if you recall, were some of

7    the projects that you felt the money was

8    being spent on that should have gone to

9    child welfare?

10        A.  Specifically, there were

11   conversations around the department's

12   expenditures on tobacco cessation policy, I

13   recall as one -- of maybe several examples

14   where the state was making an investment.

15   We were not getting a return on that

16   investment.  And I felt like we should free

17   up that money and push it toward child

18   welfare.

19        Q.  Do you know how much money was

20   spent on the tobacco expenditure?

21        A.  I think at the time it was -- from

22   a 7.5 billion dollar prospective de minimis,

23   it was like 500,000.  But it was part of a

24   broader discussion.  And there were other

Page 84

1    programs like that that were mentioned.  I

2    had advocated for process that had been

3    conducted previous to this administration,

4    but to go through all of our expenditures

5    and prioritize based on the importance of

6    the function or service that was being

7    provided.  And then for those items that

8    were at the bottom of that list, if there

9    were statutory requirements, that we do it,

10   then that we go to the legislature and say

11   we would propose to spend our money, the

12   money allocated or appropriated to us on

13   those other priorities instead.

14           I say this with the recognition and

15   fact that West Virginia over the past

16   several years in a row has spent more on

17   child welfare than at any point that it had

18   in previous history.  It wasn't that there

19   was no investment or even substantial

20   investment.  It was just that I felt like

21   there were efforts, programs, projects that

22   we -- that simply just weren't as high a

23   priority as these and that we should shift

24   that even additional money to it.

Page 85

1               A similar issue materialized over

2    the workforce crisis.  And I contended that

3    vacancy rates throughout the department --

4    you know, DHHR at the time -- you had child

5    support enforcement, behavior health,

6    Medicaid, CHIP, family assistance, you know,

7    Office of Drug Control Policy, Social

8    Services, and enormous central bureaucracy.

9    All of those areas had -- and the health

10   facilities -- and the health facilities.

11   All of those areas had varying degrees --

12   varying degrees of vacancy rates.

13             Some of those positions,

14   substantial amounts, were -- positions were

15   vacant for over a year.  And while some of

16   those bureaus and programs continued to

17   advocate for those positions, I felt like

18   they should be shifted within our budget and

19   personal service lines to CPS specifically.

20   And that conversation continued through my

21   time at the department in 2022 through the

22   session.

23        Q.  Did anything happen as a result of

24   those conversations?

1        A.  It did.

2        Q.  What happened?

3        A.  I worked with the governor's office

4   and Chairman Tarr to have the governor

5   dictate to the department, contrary to the

6   secretary's position, that --

7              MR. PEISCH:  Objection.

8   Deliberative process privilege.

9         You can keep going.  What I think is

10  covered by the deliberative process

11  privilege, you've already said.

12             THE WITNESS:  Oh, okay.  I'm

13  sorry.

14       A.  Contrary to the secretary's

15  position, the department --

16             MR. PEISCH:  Same objection.

17       A.  There was a public document created

18  by the governor's office directing the

19  agency to find additional funds for Child

20  Protective Services.  And I worked with

21  various individuals frankly behind the

22  secretary's back to make that happen.

23       Q.  And when was this that this

24  directive came from the governor's office?

Page 87

1        A.   It was at the end of the 2022

2   legislative session.

3        Q.   And what was Secretary Crouch's

4   response when this directive came down?

5        A.   He was -- I don't know.  I mean, he

6   was I think very frustrated at me and

7   speculated that I had worked on this with

8   Commissioner Pack and others to make it

9   happen.  But he initially really didn't say

10  much to me about it.

11            Subsequent to that, when the

12  department began enacting the strategy --

13  ultimately what the policy hinge was should

14  the legislature allocate more money to the

15  department for this purpose or does the

16  department have sufficient funds in various

17  personal service lines to shift to this

18  purpose, these vacant positions, just move

19  the personal service money to CPS for X, Y

20  and Z, increase rates, more CPS workers, all

21  of the various things.

22            And so those -- that process

23  actually began.  And basically the secretary

24  was kind of freezing me out.  I was pressing

Page 88

```
 1    our financial accounting staff to get this
 2    done.  I had worked on similar projects in
 3    the past, and so I had some familiarity how
 4    to get it done and knew where a lot of the
 5    vacancies were.  But it wasn't too long
 6    after the end of the session that he
 7    terminated me.  So in hindsight, I
 8    understand why he was kind of boxing me out
 9    of the strategy.
10         Q.  Just to clarify.  The directive
11    that came from the governor said what?
12         A.  It stated that the department --
13    and I am paraphrasing and can look at the
14    actual document.  I know it still exists out
15    there somewhere -- that the department was
16    given the flexibility to shift personal
17    service funds to achieve X -- you know, to
18    achieve this goal for child welfare, was the
19    material impact.
20         Q.  Okay.
21         A.  And that was testified to -- it was
22    like a two-day period during session where
23    there was a bill before the Senate Finance
24    Committee when I was at the department where
```

Page 89

```
 1    the night previous, the secretary had

 2    opposed this strategy upon questioning from

 3    the finance chair.  And then the directive

 4    came out that night.  And then the next day,

 5    he testified that he would proceed with that

 6    strategy.  I think it was the next day.  It

 7    may have been the day after.  But I believe

 8    it was two days in a row.

 9         Q.  Why did he oppose the strategy?

10              MR. PEISCH:  Objection.

11    Deliberative process privilege.

12              MS. TEBOR:  He spoke in front of

13    the legislature about opposing --

14              MR. PEISCH:  Oh, you're asking

15    what he said in front of the legislature

16    or --

17              MS. TEBOR:  Well, let's do both.

18         Q.  What did he say to the legislature

19    about his opposition?

20              MR. PEISCH:  I don't object to

21    that.

22         A.  This would be archived and could be

23    looked up.  So I am -- just going from

24    memory, I don't know exactly.  I can't
```

Page 90

```
 1    recall exactly.  But in general, it was that
 2    these other positions are important too.
 3    And we can't syphon from these other areas
 4    for this purpose.
 5              It was also stated that we have
 6    done so much.  We have, you know, increased
 7    -- I think he testified 20 percent the
 8    salaries for CPS and went through kind of
 9    this checklist of things that we had done --
10    we had in fact done and said, you know,
11    basically -- I can't remember if he said
12    publicly that it had not materialized as
13    having a positive impact or not, if that --
14    but I think he did say that.
15              But the bottom line was that we
16    were under water.  We had I think at the
17    time 33 or almost 33 percent vacancy rates
18    in CPS.  It was -- it was just a five-alarm
19    fire crisis.
20              The other thing he argued was the
21    denominator enumerator.  So our vacancy rate
22    may be higher, but that the actual number of
23    CPS workers was greater than let's just say
24    2016, you know, before he was in as
```

Page 91

```
 1    secretary, the actual number of CPS workers
 2    was more.  And so the vacancy rates -
 3    compared over time - it was sort of apples
 4    to oranges.  That's my -- that's my
 5    recollection of what was stated.
 6           Q.  You disagreed with Secretary
 7    Crouch's opposition to this reallocation; is
 8    that right?
 9           A.  I did.
10           Q.  And why did you disagree?
11           A.  Because we were facing historically
12    high vacancy rates.  And there were
13    complaints from a host of different
14    stakeholders that CPS was not sufficiently
15    staffed -- crisis -- not staffed -- had a
16    crisis level.
17               The time to begin an investigation
18     -- you know, those metrics that are
19    measured across states, West Virginia was --
20    I think Alaska was the only state worse.
21    And, you know, they have to fly in
22    sometimes.  It was just egregious.
23               Judges all over the state -- and I
24    knew and know a lot of judges, circuit
```

Page 92

```
 1    judges.  So they would call with, you know,
 2    you guys got to get this fixed.  Legislators
 3    were upset.  It was just -- it was a serious
 4    problem.  And despite what we had done, I
 5    felt like we had not done enough.  It
 6    doesn't matter what you've done, it matters
 7    did we solve the problem?  The problem
 8    wasn't yet solved.
 9              So I felt like whatever we needed
10    to do, if the legislature is going to
11    allocate more money or we need to shift
12    money.  And it appeared the easiest path was
13    for us to shift money from these historical
14    vacancies.  That was the fastest way to get
15    from A to B.
16         Q.  And Secretary Crouch disagreed with
17    you?
18         A.  He did.
19         Q.  Okay.  And why did he disagree with
20    you?
21         A.  Speculation.
22              MR. PEISCH:  Objection.
23    Deliberative process privilege.
24              MR. WALTERS:  This is after the
```

Page 93

1    policy has already been implemented.

2              MR. PEISCH:  Yeah.  So if it's

3    discussions after, that's fine.  But if you

4    learned of that information during decisions

5    before the policy was made, we object.  I

6    think he's already testified to what

7    Secretary Crouch technically said,

8    so ...

9         Q.  Well, you said he was frustrated to

10   have -- when he found out about the

11   directive from the governor.  Do you have an

12   understanding of why he was frustrated and

13   did not want the directive?

14        A.  I think it became -- it was between

15   he and I, I felt like, an ego situation,

16   that because Jeff Pack and I were pushing

17   for this and not -- and he was not the one

18   that directed us to do it, that it was not

19   something we should have done and he was

20   just going to oppose it.  I mean, that's

21   what it -- that was my impression.  If

22   that's accurate or not, I can't read the tea

23   leaves of his mind.  But that was my

24   impression.

Page 94

1           Q.  So in your mind, he was going to

2    oppose it even if there was this five-alarm

3    fire that needed to be put out?

4           A.  Yes.

5           Q.  All right.  I just want to turn

6    back to your letter.  Let's see.  You say,

7    in the three paragraphs from the bottom --

8    or sorry, two paragraphs from the bottom --

9    Unfortunately, Secretary Crouch and I have

10   not shared the same views on what the

11   problems are, how to handle them or the

12   urgency of achieving results.

13          Do you see that?

14          A.  Yes, ma'am.

15          Q.  Okay.  And what problems did you

16   disagree on?

17          A.  Well, I have stated several of

18   them.

19          Q.  Uh-huh.

20          A.  Categorically, you know, you can

21   see them in the fourth paragraph there.

22          Q.  Uh-huh.

23          A.  Okay.

24          Q.  And in terms of child welfare, what

Page 95

```
 1    were the differences in views on what the

 2    problems were?

 3         A.  I am happy to respond to that, but

 4    I don't know that my response is not going

 5    to be considered.

 6         Q.  Well, let him -- let counsel

 7    object.

 8              MR. PEISCH:  Well, to the extent

 9    you are about to disclose information you

10    disclosed to Secretary Crouch in pre-

11    decisional conversations, we object on

12    deliberative process privilege.

13              MS. TEBOR:  And so just to

14    clarify, I am just asking for a list of what

15    the problems were that they disagreed on,

16    not the conversations and not any policy

17    decisions.  Do you still -- are you still

18    objecting to that?

19              MR. PEISCH:  If you are asking

20    for a list of policies they disagreed on,

21    then I would not object to that.

22         A.  CPS staffing strategies, CPS

23    staffing ratios or -- yeah.  What I mean by

24    that is the number of CPS workers per case
```

1    or child, there was a debate over that.

2    Should be case or child.  As I mentioned

3    before, how money -- appropriated money

4    should be shifted to address these issues.

5              System implementation issues for

6    the child welfare information system.

7    Abuses that were occurring with respect to

8    disabled populations which did include

9    children in state custody.  Strategies as it

10   relates to SUD policy and the state's

11   neonatal abstinence syndrome rate and IUSE

12   rate, intrauterine substance exposure rates.

13   The progress that was or was not being made

14   as it related to dealing with our provider

15   infrastructure issues.  Transparency with

16   the legislature about these and other

17   issues.  Policies and reporting about

18   children running away from foster care

19   placements.  That may not be an exhaustive

20   list, but that's all I can think of right

21   now for child welfare.

22        Q.  Okay.

23        A.  Oh, staff -- leadership positions.

24        Q.  Say that again.

1        A.  Who should be in leadership

2   positions.

3        Q.  Okay.  I am just -- I am going to

4   ask you a couple of questions.  And first, I

5   just want to understand the problem itself,

6   not the conversations that took place.  But

7   when you are talking about CPS staffing

8   strategies, what exactly was the issue that

9   was being discussed?

10        A.  Really, what is the role of a CPS

11   worker, what is the role of other actors in

12   the system or process.

13             So, for example, what a CPS worker

14   is responsible for in Florida or

15   Pennsylvania may not be the same list of

16   responsibilities in West Virginia.  And so

17   just the strategy of the CPS workforce, how

18   to do the counts and the ratio of CPS worker

19   to case versus child.  That was a big --

20        Q.  When you say how to do the ratio of

21   CPS worker to case versus child, what do you

22   mean?

23        A.  So you may -- so you may have a

24   case -- and this is more frequent now than

Page 98

1    it was when I started my career.  You may

2    have a case that has eight children with one

3    mother.  And for a CPS worker, that's a

4    case.  Of those eight kids, there might be

5    three or four different dads.  So you have

6    all of those entanglements and things that a

7    CPS worker would have to work through and

8    all of the families of those individuals.

9              You have -- the needs of those

10   children may vary significantly.  Two of

11   them may need to be in a PRTF.  Three of

12   them may need to be in some type of level

13   child residential facility.  Maybe three of

14   them can be placed in a foster home.  Of the

15   eight kids, there may be one grandparent

16   that is really, really solid.  But do you

17   place all of the kids together as a sibling

18   group, or do they need to be broken out

19   because of different family?  There is just

20   a lot of complexity and time that a worker

21   would have to invest for a case versus each

22   individual child being their own case, so to

23   speak.

24             And so do we measure the ratio of

Page 99

```
 1   worker to case or worker to child?  And we
 2   were measuring it to case.  And I just did
 3   not feel that that was appropriate.  I
 4   didn't necessarily believe, nor do I believe
 5   now, that it has to always be by child.
 6           But if there are factors involved
 7   in a case -- extenuating factors, then, you
 8   know, that should trigger a different
 9   analysis.  Otherwise, we are not getting our
10   true understanding of the workload we are
11   placing on these workers.  And if that's the
12   metric we are going to use to convey to the
13   public, the legislature and the governor's
14   office of if we are successful or not, then
15   we need to be daggone sure that we are
16   accurate about it.  Otherwise, the results
17   in the field for these kids is going to be
18   insufficient.
19       Q.  So at the time that you wrote this
20   letter, was there an issue with case workers
21   being overwhelmed by their caseloads due to
22   the fact that certain cases -- their cases
23   were being counted based on a whole family
24   and not on an individual child?
```

1          A.   Oh, yes.   Yes.

2          Q.   And, you know, what can be a result

3     of that?

4          A.   Workers not being able to respond

5     to foster parents timely.   A worker not

6     having time to be properly prepared for

7     court for all of the children in a specific

8     case or their other cases.   A worker not

9     having time to effectively get out and

10    perform an investigation because of the huge

11    workload or number of kids and complexities

12    that they have to deal with.

13             I mean, I think those are the

14    primary problems that result from that --

15    well, I should say, workers being

16    overwhelmed and fatigued, making mistakes,

17    quitting, it contributed to the churn rate,

18    which was, you know, something the

19    commissioner and I discussed all of the

20    time, you know, the churn rate, how do we

21    get it down.   Well, you got to ease the

22    burden on these workers.

23             So that those -- you know, there

24    might be a few others.   But, you know, off

1    the top of my head, those are all certainly

2    things that have come up in different cases.

3        Q.  To your knowledge, is this caseload

4    issue still an issue today?

5        A.  I believe it is -- to my knowledge,

6    yes.

7        Q.  And how do you come to that

8    knowledge?

9        A.  The vacancy rate for CPS to my

10   knowledge is I think 17 percent still.  I

11   don't know that for sure.  But I think

12   that's what it is.  That's way too high.

13   And I don't know that we have a sufficient

14   denominator of CPS workers based on how the

15   state is continuing to look at what a

16   caseload is.  And maybe that shifted outside

17   of my knowledge.  I defer to the department.

18   But I don't think it has.

19       Q.  Okay.  You mentioned system

20   implementation issues as one of the

21   problems.  And what did you mean by that?

22       A.  The state going back to 2017 -- I

23   believe it was 2017 -- entered into a

24   contract for a large system upgrade of our

Page 102

1    integrated eligibility system, our child

2    welfare information system and our child

3    support system, are the three major

4    components.  That contract and

5    implementation experienced significant

6    delays, significant delays.  It's a

7    300-plus-million-dollar contract that is

8    huge money, huge money.  And it was supposed

9    to start to be implemented in 2019.  Like

10   some of these major pieces were supposed to

11   go into place in 2019.  Little smaller

12   things had.  But that was when the big

13   pieces were supposed to go into effect, and

14   they did not.

15           And it caused a lot of issues

16   because the legacy systems were not capable

17   of producing reports that were needed

18   without an enormous amount of manual effort.

19   They were not able to properly trigger

20   payments.  There was a huge issue related to

21   actually the MCO contract for foster care

22   where the historic system was not able to

23   properly trigger payments for the Bureau for

24   Social Services' portion of the child

1    residential reimbursement formula.  You

2    know, Social Services paid for room and

3    board.  Medicaid paid for the daily rate for

4    the medical bundle, medical and behavioral

5    health bundle.

6              Because of those legacy system

7    inefficiencies or just incapable of easily

8    doing that, it was holding us back from

9    advancing various policies.  I mean -- and I

10   know this is complicated.  But on the

11   managed care contract, for example, the goal

12   was to have the medical -- the Medicaid

13   portion and the social service portion in

14   that capitated rate.  You pay this MCO X for

15   this full bundle of expenses, expenditures,

16   which ultimately would include out-of-state

17   placement of children.  Well, Medicaid

18   doesn't pay for out-of-state placement of

19   children in child residential, but Bureau

20   for Social Services does.

21             And so if your system is unable to

22   communicate -- if your CCWIS is unable to

23   communicate to your MCO that this

24   expenditure has occurred, then you can't

Page 104

1    contractually obligate, or from a policy

2    perspective, incorporate a broader capitated

3    contract.

4              And so what's the consequence of

5    that?  Well, the Social Services

6    expenditures for children going out of state

7    are not at risk.  And so what vested

8    interest does an MCO have of helping the

9    state move kids back into West Virginia

10   when, if they are in West Virginia, they

11   pay; and they are not in West Virginia, they

12   don't.

13             And so the incentives and

14   disincentives were all out of whack.  And it

15   was -- and from a policy perspective, there

16   was a barrier on implementing because of the

17   delays in this contract.  And the delays

18   were so significant that -- you know, it's

19   supposed to start in 2019 for these big

20   pieces.  They didn't get -- start rolling in

21   until 2023, and were, from my perspective, a

22   disaster.

23             The initial rollout was a disaster.

24   Foster parents weren't being paid.

```
 1    Providers weren't being paid.  Judges were

 2    very upset because orders weren't being

 3    properly carried out for things like

 4    visitation.  It was just a whole -- you just

 5    wouldn't believe the number of like

 6    inquiries and referrals I received from

 7    legislators around those types of problems

 8    when that thing rolled out.

 9              But I know looking at my watch

10    that, man, this stuff should have been

11    implemented back in 2019.  And now that we

12    are several years from that, the actual

13    implementation, despite all of the extra

14    time, is a disaster.

15              And so -- but, you know, at the

16    time of this, I was very critical of how we

17    were managing that implementation and very

18    critical of how the secretary was managing

19    it internally, and I made statements

20    externally.

21         Q.  What were the external statements

22    that you made about this topic?

23         A.  I communicated to legislators who

24    were asking.  It is one of the state's
```

1    biggest contracts.

2         Q.   Uh-huh.

3         A.   They were asking.   And I tell them

4    the truth -- or what I understood the truth

5    to be.

6         Q.   What specifically did you tell

7    them?

8         A.   That we were not properly

9    implementing this system and that the

10   vendor, despite the enormity of expense

11   involved in this contract, was several years

12   behind schedule.

13        Q.   Uh-huh.

14        A.   It's a ten-year contract.   You lose

15   value -- I would say we are losing value on

16   the ten-year life span of this contract.

17   You know, instead of being 30 or 20 percent

18   into the time frame of that contract, you

19   are 60 percent into it before it gets

20   implemented.   Then you have lost that delta

21   in value.

22             And you are still relying on your

23   old -- and facts for child welfare, these

24   old systems that were just incapable of

Page 107

1    doing what a modern child welfare system

2    needs to do, or eligibility system, you

3    know, for the other departments or bureaus.

4         Q.  What do you believe should have

5    happened differently with the

6    implementation?

7         A.  That question probably triggers a

8    lot of answers because there is -- it is

9    huge.

10        Q.  Yeah.

11        A.  This is a huge project.  Well, I

12   mean, I felt at the time that we needed to

13   have the bureau leadership more engaged on

14   the implementation.  We were slow too.  It

15   wasn't just the vendors issue.

16            We were also to blame because we

17   were not providing the vendor with the

18   specifications of what we wanted these

19   systems to do.  And in defense of our

20   people, they weren't doing it because they

21   had other jobs to do.  We just weren't

22   properly staffed to do this properly.  And

23   we weren't making it a priority.  And we

24   weren't holding the vendor accountable.

Page 108

```
 1                We had subcontractors too.  We had

 2    one vendor that their job was to keep us all

 3    on track, paying them big money, millions.

 4    And I felt like you are not -- you're not

 5    accomplishing that goal.

 6                And the major vendor involved here,

 7    Optum, they would say to me that they are

 8    actually hindering us.  They are slowing us

 9    down.  They are being -- they are

10    nitpicking.  You know, we are trying to get

11    this thing implemented here.  There is going

12    to be -- you know, there's going to be

13    issues.  We can't stop everything because of

14    issue X, Y and Z.

15                You know, so there was dispute

16    amongst our vendors.  And we just were not

17    properly managing it from end to end.

18        Q.  Who was the vendor tasked with

19    keeping you on track?

20        A.  Barry Dunn.

21        Q.  That was Barry Dunn.

22                As far as you are aware, are there

23    still issues with the system implementation

24    today?
```

1          A.  I had received a complaint within

2     the last three months that there were still

3     issues.

4          Q.  And what was that complaint?

5          A.  That there were payment issues.  I

6     don't know if the complaint was accurate or

7     not.  But they attributed it to PATH, the

8     system.

9          Q.  Who was the complaint from?

10          A.  It was from a provider.

11          Q.  One of the problems you listed that

12     you disagreed on was the -- with Mr. Crouch

13     was abuses with respect to disabled persons,

14     including kids?

15          A.  That's correct.

16          Q.  What was that problem specifically?

17          A.  There were systemic abuses

18     occurring in IDD Waiver and intermediate

19     care facility placements for children and

20     adults for a couple of years in a row.

21               There was one entity in particular

22     that was -- I mean, it was the largest

23     provider.  I think they were the largest.

24     ResCare, that -- well, it is just their

Page 110

1    facilities, their -- their, you know,

2    provider locations, these things were

3    happening.

4            And the situation in the department

5    about that was very uncomfortable.  The

6    lobbiest representing ResCare was a former

7    partner or worked for Mr. Crouch in his

8    private sector of business.  And they were

9    having communications.

10           And so we were not solving the

11   issue.  We were having meetings with the

12   provider and others.  There were different

13   strategies put forth on how to do it

14   internally.  Our inspector general at the

15   time, Jolynn Marra, her and I had several

16   conversations, Commissioner Bean, at the

17   time Commissioner Mullins about these

18   issues.  And we tried to convey the

19   criticality and to take a harder stance with

20   the secretary.  We were not successful.

21   There were discussions happening.

22           MR. PEISCH:  Objection.

23   Deliberative process privilege.

24       Q.  Were you about to discuss

Page 111

```
 1   conversations with the secretary or

 2   conversations with other persons?

 3        A.  Other persons outside of the

 4   department.

 5        Q.  Okay.

 6             MR. PEISCH:  Objection to

 7   deliberative process privilege.

 8             Did you say outside of the

 9   department?

10             MS. TEBOR:  Outside of the

11   department.

12             MR. PEISCH:  Okay.  I'll

13   withdraw the objection.

14        A.  So I reached out to the

15   legislature, Chairman Pack, and I conveyed

16   to him -- he was the health chair at the

17   time, the Commissioner of Social Services

18   now.  I conveyed to him what the problem

19   was.  Showed him internal information about

20   these deaths, abuses, you know, assaults,

21   neglect and suggested that they ask us about

22   it -- "they" being the legislature.

23             And then I worked with our -- not

24   the secretary, but the inspector general to
```

1    prepare a report that would be delivered to

2    the legislature about all of these issues,

3    listing out the deaths, the abuses, et

4    cetera to get the conversation started, with

5    the idea being, sunshine is the only thing

6    that is going to solve this problem.

7              So that happened.  So we did -- you

8    know, they called us up.  They called Jolynn

9    up there.  She testified, provided this

10   report.  The secretary was really upset that

11   that happened.  I believe he was suspicious

12   that something had been done behind his

13   back.

14             You know, this is like three years

15   into this by the way.  Like it is not just

16   like day one and it didn't work out.  This

17   was trying, trying, trying.  And finally, we

18   were like, okay, this is what we will do.

19             And then what -- the consequence

20   after that, the presentation, the

21   legislature was very upset, rightfully so --

22   they tasked us with working with different

23   stakeholders to then come back with a set of

24   solutions, and worked with the behavioral

Page 113

1    health association on the provider side,

2    worked with advocates.  And, you know, we

3    talked to our folks, you know, about what

4    they thought we should do.  And then I

5    presented that back to the legislature

6    several months later.

7              At that point, you know, we are in

8    COVID.  And, I mean, that was eating up a

9    lot of my time, everybody's time, the

10   legislature's time.  It was just a chaotic

11   time.  And so the issue sort of lost

12   momentum.  But there were abuses still

13   happening.  Ms. Marra was letting me know.

14   And we were having discussions about it --

15             Our staff were very upset.  There

16   was a situation -- I think it was in Cabell

17   County -- very upset -- you know, distraught

18   about what happened.  And we were having a

19   meeting about it, a conference call.  And

20   our general counsel at the time started to

21   insert herself --

22             MR. PEISCH:  Objection.

23   Attorney/client privilege.

24        Q.  Who was at this meeting -- when was

Page 114

1    this meeting?

2          A.   I believe it was 2021.

3          Q.   And who was at this meeting?

4          A.   Might have been '20, late 2020, but

5    I think it was 2021.

6               Well, there were several of them.

7    But usually it was the same people.   It

8    would be myself, Jolynn Marra.   Sometimes

9    she would bring a staffer or have a staffer

10   on the phone.   Most of these were again

11   during COVID.   You know, we were not meeting

12   face-to-face a lot.

13         Q.   Uh-huh.

14         A.   Commissioner Beane.   Medicaid.

15         Q.   Medicaid, you said?

16         A.   Yeah.   Yeah.

17         Q.   Like a representative?

18         A.   Yeah.   Because Medicaid was the

19   payer and had regulatory oversight over

20   specifically the IDD Waiver homes

21   placements.   But then also they paid for the

22   intermediate care facilities.   So they are

23   in essence the payer for all of this.

24               And then I always included -- or I

1    tried to always include Commissioner -- or

2    Christina Mullins.  She was the commissioner

3    of the Bureau for Behavioral Health at the

4    time.  Just a very knowledgeable person.

5    But this was her realm of policy and very --

6    you know, highly respect her work and ethics

7    on this.  So she was typically engaged.

8              And then our general counsel,

9    Ms. Robertson, started to become engaged.

10        Q.  So there were representatives from

11   Medicaid and from OIG at this meeting?

12        A.  Correct.

13        Q.  Okay.  I am going to ask the same

14   question --

15              MR. PEISCH:  Objection.

16   Attorney/client privilege.

17              MR. WALTERS:  If you had

18   individuals outside of DHHR, private

19   individuals from Medicaid, how could it be

20   attorney/client privilege?

21              MR. PEISCH:  I thought he meant

22   BMS individuals?

23              THE WITNESS:  Those meetings

24   were with BMS, yes.

1          MR. PEISCH:  Yeah.  Medicaid is

2    within DOHS.

3          MR. WALTERS:  That's not what I

4    understood him to say.  Understood.

5          A.  There were separate meetings with

6    broader stakeholders with providers and

7    advocates.

8          Q.  Okay.  What were those separate

9    meetings with providers and with advocates?

10         A.  We were pressing them for solutions

11   and trying to facilitate a consensus

12   strategy that we could then provide to the

13   legislature and implement ourselves to stop

14   these abuses.

15         Q.  When did you first learn of the

16   abuses?

17         A.  Oh, gosh.  It goes back to at least

18   2017, maybe even before Secretary Crouch was

19   there.

20         Q.  And these were at facilities where

21   foster children were placed; is that right?

22         A.  Sometimes.

23         Q.  Some of these -- at some of these

24   facilities, there also were foster children

1    who were there?

2         A.  At some of these facilities, there

3    were, to my knowledge, foster children, yes.

4         Q.  And what were the abuses that were

5    occurring?

6         A.  And this is a public document that

7    can be cross-referenced, so I'm trying to

8    remember it.  An individual being fed hot

9    dogs even though they had issues with their

10   esophagus.  They had a meal plan that wasn't

11   being adhered to and they choked to death.

12            Instances where individuals in a

13   home were being forced to use the bathroom

14   outside in the back yard because plumbing

15   had been broken for a period of time.  I

16   recall a situation where workers in one of

17   these placements were -- they placed the

18   individual -- somebody with developmental

19   disabilities under a bean bag chair and sat

20   on it and played like video games for hours.

21            I recall there being sexual

22   assaults -- or allegations of sexual

23   assaults.  There was a situation where there

24   was -- an individual needed -- some of these

1    folks with IDD issues -- intellectual and

2    developmental disability issues, they also

3    have medical issues.

4              And I recall one case where someone

5    needed some specific medications throughout

6    the day -- they were bedridden as I

7    recall -- and those medications were being

8    documented as if they were delivered, but

9    they were not actually being provided to the

10   individual.

11             There was a case where -- I can't

12   remember if this was a foster child or not,

13   but I feel like it was.  But I can't

14   remember for sure -- an individual was in

15   the care of their worker.  They were not --

16   they were violent.  They were not supposed

17   to like be around other people in public.

18   And they took the individual to a Walmart or

19   something up in Marion or Harrison County.

20   And the individual would -- the worker

21   didn't stay with the individual.  And so

22   they went into the back of the store and

23   sexually assaulted a ten-year-old boy in a

24   bathroom.  Pregnant mom runs in.  The

1    individual -- again, they have IDD -- beats

2    up the pregnant mom.

3              There was a case -- and I am almost

4    certain this was a foster child.  And this

5    was a few years back.  This was kind of at

6    the beginning of all of this that I became

7    aware -- was able to get the keys to a van

8    and crashed -- like they were DD.  But they

9    were able to somehow get keys to the

10   company's van.  They got into it.  This is

11   in Charleston.  And they crashed it into a

12   wall.  And what was conveyed to me is that

13   they burned alive in the van and died.

14             Just terrible stuff.  Just

15   terrible, unconscionable things.  And then

16   your neglect and, you know, the things that

17   are important but, you know -- I mean, it

18   was tearing our folks up, our workers.  I

19   mean, it was awful.

20        Q.  And you mentioned a document that

21   you were referencing that would have listed

22   these.  Is that a report that you -- yeah.

23        A.  I didn't provide it to Mr. Leslie.

24   This was when I was at the agency.  And it

Page 120

```
1    was -- but it was publicly provided to the

2    legislature.  It would be a document that

3    the department would have, or maybe it's

4    even out there -- it could be Google

5    searched.  And that same document was later

6    updated for the legislature.

7         Q.  Do you know when it was initially

8    released?

9         A.  I believe it was late 2019 at an

10   interim.  I think it was a December or maybe

11   even a January interim right before session.

12   But that could be easily fact checked.  And

13   then the subsequent requested document I

14   believe was in 2022.

15        Q.  Okay.

16        A.  And it triggered legislation.  You

17   know, I worked on the bill.

18        Q.  And when, if you are aware, did

19   Mr. Crouch become aware of the abuses at

20   these various homes?

21        A.  Oh, it had been at the earliest

22   stages of his time at the department.  2017,

23   I am sure.  You know.

24        Q.  Did anything happen as a result of
```

Page 121

1    his knowledge of these abuses?

2         A.   Yes.   There were meetings with the

3    company.   That was the most egregious

4    offender on multiple occasions, ResCare.

5         Q.   Were any children or other

6    individuals removed from those homes as a

7    result of these conversations?

8         A.   Yes.   Yes.   At different times.

9    The OHFLAC, which is under the inspector

10   general's office, they did take action to

11   remove individuals as I recall.   And there

12   was an agreement that I believe is a public

13   document between the secretary and ResCare

14   about shifting some of their facilities

15   where they were getting -- basically closing

16   them down, as I remember.

17        Q.   When did this happen, this

18   agreement between the secretary and ResCare?

19        A.   I think it was 2019.

20        Q.   So at least two years after?

21        A.   Right.   The agreement was though

22   internally debated, if that was sufficient

23   or appropriate.

24        Q.   And there still remained a contract

1   between ResCare and DHHR after that time?

2        A.  That's correct.  And that's a

3   fairly complicated infrastructure.  I mean,

4   I can explain it to you.  But the

5   infrastructure itself, the nature by which

6   we structure those services was also a part

7   of the problem that ultimately there was

8   internal disagreements about.

9        Q.  But you felt that not enough was

10   being done, which is why you went to the

11   legislature; is that right?

12        A.  If I were ever to be asked if there

13   was one issue that broke my relationship

14   with Mr. Crouch, it was this issue.  Like I

15   was -- yes, I did not agree with the

16   direction we were going or the speed by

17   which we were solving the problem.

18        Q.  Because you believed that disabled

19   individuals were still being harmed?

20        A.  I believed we were not doing enough

21   to protect disabled individuals.

22             MR. LESLIE:  Would a break be

23   possible?

24             MS. TEBOR:  Yeah.  Yeah.  I

Page 123

 1    think that's a good idea.

 2                  (Break in proceedings.)

 3    BY MS. TEBOR:

 4         Q.  Mr. Samples, turning back to the

 5    conversation we were having previously about

 6    the problems that you and Secretary Crouch

 7    disagreed on.  We were going through the

 8    list, and you were explaining the problems a

 9    little bit to me.

10            One of the problems you listed was

11    the progress not made with respect to

12    provider issues.  And I just was wondering

13    if you could just say a little bit more

14    about what you meant there?

15         A.  So the state has for some time,

16    even going back to the Tomblin

17    administration, been endeavoring to pivot

18    from institutional placements to more home

19    and community-based in-home placements.  And

20    I do think a lot of progress has been made.

21    It is a big lift.  But I felt like we were

22    not making enough progress on that front.

23            And maybe even more concerning to

24    me at the time was that we were not properly

Page 124

1    measuring the progress or lack thereof.  But

2    it was very challenging to determine whether

3    or not we had done enough or how -- from a

4    quantifiable perspective, how far away are

5    we from being where we need to be.  And so

6    we just had -- there were just disagreements

7    over those discussions or that policy area.

8         Q.  And how were you measuring where

9    you needed to be at that point?  Was there

10   any metric?

11        A.  And, you know, we are talking about

12   a multitude, like a continuum of different

13   types of services.  And so some placements

14   are easier to measure than others.  I mean,

15   historically we know how many residentials

16   we have.  Generally, we know how many PRTFs,

17   you know, acute psych beds, things like

18   that.

19             On the home and community-based

20   service side, as you are building something

21   out -- well, you know, from my perspective,

22   I was arguing for kind of like a network

23   adequacy by county model.  And I come from

24   the insurance world.  So that's sort of from

Page 125

1    that frame of thought.

2            And what I wanted to do was to

3    provide judges, prosecutors or county

4    workers, everybody involved in a case in one

5    of our 55 counties for that county and the

6    surrounding areas, here is what we have

7    available, here is the capacity in that

8    area.  And then capacity is going to shift

9    as we have greater need or shift our

10   utilization of the system to have greater

11   need.

12           So, for example, as we are moving

13   from more institutional placements to more

14   preventative and home, community-based type

15   services, then you are going to have a

16   greater need.  And so your capacity needs to

17   increase.  But I just felt like we needed to

18   better measure that and -- you know, without

19   getting into the discussions, the

20   deliberations over it, I didn't think we

21   were making enough progress there.

22       Q.  Did anything happen as a result of

23   these conversations in terms of measuring

24   the services and the community -- the

1    community-based services?

2        A.   There were actions taken while I

3    was at the department and even afterward,

4    you know, where I think the department was

5    measuring or attempting to measure capacity

6    at the county level.  I didn't think it was

7    -- still don't think it's specific enough.

8    Because I want to provide -- my ultimate

9    policy goal or view was to provide everyone

10   involved in a case a here's your menu,

11   here's your lunch menu of things that we can

12   do here.  And we as the -- you know, from a

13   department perspective or, you know, the

14   multi-disciplinary team perspective, Judge,

15   we recommend X.  And the judge can still

16   order Y, but we recommend X.

17           And I thought that if we provided

18   that menu, so to speak, one, it would cause

19   a natural evolution or shift away from the

20   institutionalization models.  You wouldn't

21   have to like just pull the rug out from

22   under the level one and level two

23   infrastructure.  It would just happen over

24   time because -- I mean, there are maybe a

1    few judges that do want to place in certain

2    facilities they have confidence in.  But

3    mostly I think judges just want options.

4    And they will defer to the experts or the

5    people in the MDT.

6              But if you don't give them the

7    options or the menu, one, you don't know

8    yourself truly what your gap is.  You don't

9    have a real gap analysis at any point in

10   time at any place in the state.  But you

11   also don't have that shift that occurs

12   organically.  You, in other words, have to

13   force the shift which has unintended

14   consequences.

15             So anyway ...

16        Q.  So in your mind, DHHR was not

17   adequately measuring how many and what

18   community-based services it had?

19        A.  Not adequately measuring and not

20   adequately setting forth the goals of where

21   we wanted to be.

22        Q.  And to your knowledge, is this

23   still an issue today?

24        A.  I think it's still an issue.  But I

Page 128

1    do think that the department since I left

2    has did a better job of understanding where

3    they want to be.  But I still don't believe

4    that it's adequate.

5         Q.  Okay.  The next problem that you

6    had discussed over which you had a

7    disagreement with Mr. Crouch was

8    transparency within the legislature about

9    issues within DHHR.  What did you mean by

10   that?

11        A.  Well, there's several examples.

12   But kind of the bottom line is that I

13   believe from a policy perspective, and just

14   philosophically, that you -- if you have a

15   thousand problems and the public or policy

16   makers only see 900 of them, then that is

17   what will get the focus.  You don't fix what

18   you can't see.

19             And there were so many issues in

20   ours still that the department faces, how

21   are you to get the attention, the resources,

22   the ideas from the broader realm of, you

23   know, policy making?  I mean, you know, you

24   close everything off, your good stuff and

Page 129

1    your bad -- well, the bad stuff because you

2    are afraid of getting criticism.  Well, you

3    are not fixing that problem.  And then those

4    problems linger.

5              And the disability abuse issue was

6    -- you know, always comes to the top of my

7    mind over that.  You know, how do you fix

8    something you can't see?  How do policy

9    makers help us?  Maybe the policy -- maybe

10   legislator X has an idea, you know.  I mean,

11   I said that.  Maybe they have an idea.  We

12   are not fixing it.

13             We haven't figured it out.  We are

14   trying.  But trying is not enough when you

15   are dealing with these types of issues.

16   It's not traffic cone purchases.  We are

17   talking like people died because you failed.

18   And trying is not enough, you know, here in

19   this area of public policy.

20        Q.  Besides the abuse of disabled

21   individuals that we talked about before,

22   were there other issues that you thought

23   there was a disagreement about the

24   transparency of those particular issues with

Page 130

1    the legislature?

2         A.  I felt like we were not

3    transparent, and talked about this internal

4    -- well, sorry.  Sorry.

5         Q.  Yeah.  You don't need to discuss

6    your internal discussions.  But what issues

7    did you think were -- or what problems in

8    this list were --

9         A.  The transparency of the budget

10   itself was a major concern and continues to

11   be a concern, but we are working to fix it.

12        Q.  Okay.  Anything else?

13        A.  I mean, there was all kinds I

14   guess.  But, you know -- for example, the

15   runaway policy issue, there was criticism

16   that we should not have said those things to

17   the legislature; that we had kids running

18   away from foster care placements, and that

19   it just brought on bad press and that -- you

20   know, even though it resulted in legislation

21   that I think helps the state find these

22   children as quickly as possible and, you

23   know, hopefully prevent that from happening.

24   There was just blowback on that.

1    Discussions about just CPS vacancies

2    generally.  You know, I mean, it -- if it

3    was negative, there was this -- just this

4    lack of transparency.

5              I mean, health facilities, there

6    were issues that, you know, they -- there

7    was -- just not a desire to be forthcoming

8    with the legislature.  You know, the lying

9    by omission situations.

10       Q.  In terms of the runaway policy,

11   what was the conversation with the

12   legislature about?  What was happening with

13   runaways from foster care?

14       A.  I became aware that we were having

15   problems there, was discussed, and really

16   wasn't any movement or action.  And so I

17   went to a legislator and told him about it.

18       Q.  What was the issue with runaways?

19       A.  That children would -- children in

20   foster care would run away from a placement

21   that -- one, the volume of kids that would

22   run away.  And, you know, you'd write those

23   numbers down away from supervision if it is

24   under a certain amount of time or if there

1    was just different ways to categorize a

2    child being out of -- in an environment that

3    there was no oversight provided.  They have

4    left.  They might just go to smoke or go to

5    take a breather, whatever.  Or they may

6    never be found.

7              And there were cases like that

8    where children aged out of our system.  And

9    my concern was that are they being

10   trafficked?  Are they -- where are they?  We

11   just don't know.  We just did not -- we

12   don't know.  And we didn't -- you know, we

13   worked with the state police.  And I just

14   didn't feel like we were doing enough to

15   deal with that.

16             And when we -- you have the volumes

17   of kids in your system that we do, you know,

18   leading the nation per capita, then -- I

19   mean, you just have -- you just have -- you

20   can't just let those things go.  I mean, it

21   was just a policy problem.

22             So, you know, I went to a

23   legislator.  They took the ball and ran with

24   it, and we ultimately got a piece of

legislation out of it that created an office within the department that specifically focused on these issues.

Q. When did you first learn of these -- the issues with children running away?

A. Gosh, I can't recall. I really can't recall of the first time. It was maybe 2018.

Q. And when did you go to the legislature?

A. I feel like it was 2019. But I -- I don't know for -- I can't recall for sure.

Q. Did you go to the legislature because you felt that DHHR would not on its own do anything to change the runaway child issues?

A. I felt like we were not going to do enough to fix it. We weren't doing enough to fix it. And we didn't have the resources allocated for that specific purpose to fix it.

Like if you have to have someone designated to search for runaways in an environment where you have vacancy rates

Page 134

```
 1    that are at historic levels, well, you don't
 2    really have the opportunity to syphon away
 3    from your historic crisis to deal with this
 4    critical issue.  I mean, at least there's
 5    arguments about it.
 6              And I felt like we needed a very
 7    specific focus.  And I also felt like we
 8    needed that specific focus as it related to
 9    the state police so they understood what we
10    were doing, you know, so we didn't run into
11    issues with them in their, you know, efforts
12    to find these kids.
13              You know, I just -- it wasn't one
14    of those like grand systemic issues, but it
15    was kind of a microcosm of this just makes
16    us look bad even though we got a positive
17    result out of having discussions with the
18    legislature.  Let's just not expose
19    ourselves.
20              And I just didn't -- I didn't agree
21    with it.  I tried.  Maybe people don't
22    believe that.  But I did try for, you know,
23    years to get -- to work with Bill.  And we
24    got along initially.  But, you know,
```

Page 135

1    eventually I just couldn't -- you got to be

2    able to sleep at night.

3         Q.  So you did not -- so Mr. Crouch was

4    not willing to make those changes that you

5    were advocating for?

6         A.  Either not willing to or not

7    willing to implement in a timely fashion.

8    We had a lot of issues or problems with

9    just, oh, let's meet about it in a couple of

10   months or -- you know, just analysis

11   paralysis.  You know, that was a big, big

12   problem.

13            And it would delay solution, or

14   attempting to solve it.  And if your

15   solution don't work, we will try something

16   else.  But if you take forever to get to

17   your attempted solution, then it's even

18   going to be that much longer until you find

19   something that works.

20        Q.  Okay.  And just going back to your

21   letter.  And this ties into what you were

22   just talking about.  But you say, you know,

23   that Secretary Crouch and I have not shared

24   the same views on the urgency of achieving

1    results.

2            What do you mean when you say he

3    wasn't -- you know, you disagreed on the

4    urgency of achieving results?

5        A.  Well, per my previous statement,

6    some of that is just, you know, this

7    analysis paralysis and indecisiveness,

8    delaying decisions on critical matters,

9    hoping something solves itself.  You know,

10   we did all of this work so far.  Yeah, the

11   problem is not solved.  We will just wait

12   and see how it works out.

13           And sometimes that's okay.  But

14   some of the issues we were dealing with,

15   there was not time -- you couldn't -- there

16   is like people -- real people in between the

17   fix and the problem that just is waiting for

18   it to work to see if what we tried worked is

19   not sufficient.  And especially when the

20   trajectory and the trends on issue X were

21   going in the wrong direction.

22           And I'm trying to be very careful

23   to not say specifics because I don't want to

24   -- I don't want to talk about something that

Page 137

1    was deliberated upon, you know, in my role.

2          Q.  But with regard to the problems

3    that you just listed, you thought that

4    Mr. Crouch was aware of the problems but was

5    not taking action and children were being

6    harmed; is that right?

7          A.  Yes.

8          Q.  I am going to go through and -- I

9    understand you might object, but I want to

10   ask this for our record.

11              Where did my list go?

12              All right.  With regard to the

13   problems that we were discussing before,

14   what were your conversations with

15   Mr. Crouch?

16              MR. PEISCH:  Objection.

17   Deliberative process privilege.

18              MR. WALTERS:  I'm sorry.  Just

19   to make sure.  When you make the objection,

20   you are also instructing him not to answer?

21              MR. PEISCH:  Yes.

22              MR. WALTERS:  I just want the

23   record to be clear.

24              MR. PEISCH:  Yeah.  Absolutely.

Page 138

1          Q.  Okay.  I am going to move to -- we

2   are going to go to -- I'm going to mark this

3   as Exhibit 2, and I'm going to mark this one

4   as Exhibit 3.

5               (Exhibit 2 was marked.)

6               (Exhibit 3 was marked.)

7               MS. TEBOR:  Actually, I'm going

8   to mark this as Exhibit 4 while we're at it.

9               (Exhibit 4 was marked.)

10          Q.  All right.  So with respect to

11   Exhibits 2 and 3 -- you produced these,

12   correct, Mr. Samples?

13          A.  Yes, ma'am.

14          Q.  Okay.  And what are these exhibits?

15          A.  Exhibit 2 appears to be a draft

16   document termination letter.  Exhibit 3 is

17   the actual dismissal/termination letter that

18   I received from the department.  Exhibit 2

19   was sent to me by the Attorney General's

20   Office after the report reflected in

21   Exhibit 4 came to light.

22          Q.  Uh-huh.  And why was it -- why was

23   Exhibit 2 sent to you by the Attorney --

24               MR. LESLIE:  Is this four?

```
 1              MS. TEBOR:  That's four, yes.

 2         A.  I was called and notified that the

 3    media had been attempting to obtain

 4    information about my departure from the

 5    department, that the department had been

 6    contesting releasing that information, and

 7    that an error, intentional or not, had been

 8    made in providing this information to the

 9    media.  And it was a heads-up.

10         Q.  And why do you say intentional or

11    not?

12         A.  Well, I was very frustrated when I

13    saw this accidentally released document.

14    One, I had not been informed that there were

15    discussions around its release.  And I

16    wasn't given a chance to represent my

17    interest as a part of this potential release

18    or not of information.

19              I was also very frustrated that an

20    agreement that I had with the governor's

21    office about let's just all move on and we

22    will be done -- you know, we will just --

23    there was just a general understanding that,

24    you know, we weren't going -- I wasn't going
```

Page 140

```
1    to specifically criticize, you know, the

2    governor or the secretary publicly, and they

3    were going to not trash my character in a

4    way that then would result in me having to

5    defend and tell my side of the story.

6         Q.  Uh-huh.

7         A.  And I felt like that -- you know,

8    this accidental -- accidental release

9    potentially could have been engineered.  And

10   I don't know that it was, but it could have

11   potentially been engineered to hurt my

12   character and, from my perspective, it could

13   have been intended to do so before I was

14   deposed.  And so I was very frustrated about

15   it.

16        Q.  And what are you basing that -- you

17   know, you think that it potentially was

18   leaked purposefully.  What are you basing

19   that on?

20        A.  I don't know that it was leaked

21   purposefully.  But, you know, I think it

22   could have been.  Because how does that

23   happen?  Like how -- I read the circuit

24   judge's response to the situation.  And it
```

```
 1    just seems like a pretty egregious error.
 2    And it could be coincidence or it could not
 3    be.  But I will probably never know.
 4         Q.  Uh-huh.  Okay.
 5             All right.  So turning to the
 6    letters.  So that's exhibit -- they are both
 7    the same, but a draft form.  But turning to
 8    Exhibit 3.  So looking at the language from
 9    -- it is a letter from Bill Crouch to you
10    dated April 7, 2022?
11         A.  Uh-huh.
12         Q.  And I wanted to ask you about the
13    language in the second paragraph that you
14    have failed to accept policy decisions.  I
15    have been talking about this a little bit.
16    But do you know what policy decisions he was
17    referring to that you failed to accept?
18         A.  It would be speculative on my part.
19    I could provide a number of examples where
20    during discussions there was disagreement.
21    And I only mention those categorically that
22    I have already stated; CPS vacancy rates,
23    you know, general transparency issues.
24    Ratio issues.  We would have these -- well,
```

1   these discussions were not just singular

2   discussions.   They were held over the course

3   of time.   And some of these, I just wouldn't

4   let go.   I continued to bring them up.

5              And so I speculate, and only

6   speculate, that Mr. Crouch did believe that

7   I was talking to the legislature about these

8   and other issues, including the

9   reorganization frankly.   And so, you know,

10  to that extent, you know, he believed that I

11  was not letting it go, that I wasn't

12  accepting the decision.   And frankly, from

13  that perspective, I think he was right.

14       Q.   Okay.   I wanted to ask you about

15  the paragraph where it starts, I have

16  reiterated multiple times that I wanted you

17  to focus on child welfare.

18              Do you see that paragraph?

19       A.   Yeah.

20       Q.   Okay.   Do you understand why

21  Mr. Crouch is saying that he reiterated that

22  he wanted you to focus on child welfare?

23       A.   I highly contest that insinuation

24  and assertion for a number of different

1   reasons.  I believe that it was stated to

2   damage my character frankly.  When you are

3   in an at-will position, you don't need a

4   letter like this.  It could just be like, no

5   longer need your services, Mr. Samples.

6   Period.  No reason given.  Nothing else

7   stated.

8            Politically behind the scenes maybe

9   there would be discussions, you know, X, Y,

10  Z.  But something like this -- I have been

11  doing this work for a long time -- fairly

12  unprecedented.  I can't remember another

13  example exactly like this where an at-will

14  employee would receive something like this.

15           So from that experience and just

16  having a little bit of knowledge about the

17  human resource process in government with

18  at-will employees, I took this entire

19  document as a way to provide political cover

20  by undercutting my character and then what

21  would my response be, you know, if it is

22  leaked?

23           Once something is leaked, a

24  percentage of people are only going to see

Page 144

1    the initial thing that is out there.  They

2    are not going to see the response.  So

3    that's why I -- I personally believe that

4    this was just a hit job.

5         Q.  Did you understand that Mr. Crouch

6    was trying to blame you for issues in the

7    child welfare system?

8         A.  No.  I didn't know that.

9         Q.  Okay.

10        A.  I mean, I didn't know that beyond

11   that statement --

12        Q.  Right.

13        A.  But beyond that, no, I didn't know

14   that.

15        Q.  Do you understand from that

16   statement though -- I mean, does it appear

17   -- it appears that Mr. Crouch was trying to

18   blame you for child welfare issues by saying

19   that you were not focused on that issue --

20        A.  Sure.

21        Q.  -- is that right?

22        A.  Yeah.

23        Q.  Okay.  Do you know why he would try

24   to blame you for those child welfare issues?

Page 145

```
 1          A.  I believe that Mr. Crouch was upset

 2   at me for my discussions with the governor's

 3   office and the legislature about our

 4   failings.  I believe he come to understand

 5   that I had worked with the governor's office

 6   to appoint Jeff Pack as the commissioner,

 7   which he did not want to do.  And more

 8   freshly from, you know, going back just from

 9   April 7th to the end of the legislative

10   session in 2022, he was upset at me over the

11   CPS salary and vacancy issue that I

12   referenced earlier.

13          Q.  Anything else?

14          A.  Well, I guess in terms of why --

15   is the question why I think he would have

16   stated that?

17          Q.  Uh-huh.

18          A.  I think there was -- there is also

19   this -- I think he was trying to see what --

20   cover himself.  You know, the system was in

21   dire straits and has continued to be --

22   continued to struggle.  But especially at

23   this time, it was just broken in a thousand

24   ways, that he needed he a scapegoat.  And,
```

Page 146

1   you know, this is just my opinion.  But

2   what's the -- what's a strategy that you can

3   take out someone that disagrees with you and

4   also give yourself some cover for the

5   problems that they are pointing out?  Well,

6   blame them for those problems.

7           But luckily, you know, I had talked

8   to enough people over the years and enough

9   policymakers about these issues that -- I

10  mean, I don't -- I don't feel like people in

11  positions of decision-making agreed, which

12  is why, you know, the president and speaker

13  immediately reached out to me.

14      Q.  And you had mentioned that he did

15  not -- Mr. Crouch did not want Jeff Pack

16  appointed.  Why did he not want Jeff Pack

17  appointed?

18              MR. PEISCH:  Objection.

19  Deliberative process privilege.

20              MS. TEBOR:  This -- I mean, this

21  is not a policy decision or a discussion

22  beforehand.  He was appointed.

23              MR. PEISCH:  The decision to --

24  first, the decision to appoint the BSS --

1   who to appoint the BSS commissioner is a

2   decision of the agency that we think is

3   covered by deliberative process privilege.

4          If he is talking about, you know,

5   how he and Secretary Crouch discussed who to

6   hire for BSS commissioner, we contend that's

7   covered by deliberative process privilege.

8                 MR. WALTERS:  I thought that --

9   and maybe I'm mistaken here.  I thought the

10  governor appointed that particular position.

11  Is it DHHR?

12                MR. PEISCH:  Well, my

13  understanding is that the secretary appoints

14  it.  But if the governor appoints it, that

15  might change our analysis.

16                THE WITNESS:  The secretary

17  appoints it.  In this circumstance, the

18  secretary was told who to appoint.

19                MR. WALTERS:  Does that change

20  your objection?

21                MR. PEISCH:  Okay.

22                MR. LESLIE:  That clears it up.

23                MS. TEBOR:  Yeah.

24  BY MS. TEBOR:

Page 148

```
1        Q.  Okay.  Why in this case did the

2   governor appoint Jeffrey Pack?

3        A.  I worked with the governor's office

4   conveying all - from my perspective - points

5   that I thought would -- Mr. Pack would bring

6   value to that position -- it was not the

7   only position -- but that I was advocating

8   for someone.  But Mr. Pack and Diane --

9   well, Diana Graves was a former legislator.

10  I was recommending them both for positions

11  in the department.  I guess that's all I can

12  say.

13       Q.  Mr. Pack would not have otherwise

14  been appointed if the governor had not

15  appointed him; is that right?

16       A.  I mean, it's hard -- I could not

17  say for certain.  I do not believe that

18  Commissioner Pack would have been appointed

19  had I not had those discussions with

20  representatives from the governor's office.

21       Q.  And what was Mr. Crouch's response

22  to the appointment of Jeffrey Pack to

23  commissioner position?

24       A.  He was very frustrated and upset.
```

Page 149

1         Q.  Why was he frustrated and upset?

2         A.  Because he wanted to make the

3    decision, would be my speculation.

4         Q.  Did you have conversations with him

5    about the appointment of Jeffrey Pack to the

6    commissioner's office after Jeffrey Pack was

7    appointed?

8         A.  I did.

9         Q.  And what did Mr. Crouch relay to

10   you?

11        A.  He said it was a bad idea.  My

12   understanding is he had trust issues with

13   Mr. Pack.  He understood that I had a long

14   relationship with Mr. Pack.  And within the

15   internal politics of the department, I think

16   felt threatened that this was a part of a

17   broader shift in leadership.

18        Q.  Why did he have trust issues with

19   Mr. Pack?

20        A.  I believe because I had a

21   relationship with Mr. Pack and it was

22   someone that I knew and had trust with and

23   for and confidence in.  And I had stated

24   that several times, even before his possible

Page 150

1    appointment became, you know, an option.  I

2    believe he wanted Ms. Chapman to be the

3    commissioner.  I mean, they stated that.  So

4    I -- I don't know.  I am speculating even in

5    my answers.  I mean, some of this was

6    stated.  Some of it is just inferring from

7    what was stated.  But yeah, it would --

8    definitely caused an issue between me and

9    the secretary.

10        Q.  Did you have concerns with

11   appointing Ms. Chapman as the commissioner?

12        A.  I did.  Long term, I did, yes.

13        Q.  And what were those concerns?

14        A.  I stated to the secretary that I

15   was concerned --

16             MR. PEISCH:  Objection.

17   Deliberative process privilege.

18        Q.  Did you have conversations with the

19   secretary after Jeff Pack was already

20   appointed about Cammie Chapman?

21        A.  No.  Those conversations would have

22   been before, if I recall correctly.

23        Q.  Without discussing what you said to

24   Mr. Crouch, what were your concerns?

1        A.  I felt like the number of

2    stakeholders that we had to deal with --

3    that Ms. Chapman didn't have a great

4    relationship with some of those key

5    stakeholders.  And that while she knew child

6    welfare as well as anybody in the state,

7    that those relationships would cause --

8    would represent barriers to us achieving our

9    overarching goals or may result in us making

10   decisions that were not necessarily best

11   policy decision but because of the dynamics

12   of the relationships.

13       Q.  What relationships specifically are

14   you discussing?

15       A.  Relationships with provider

16   organizations and with some representatives

17   from the Supreme Court and the ombudsman's

18   office.

19       Q.  And in terms of the relationships

20   with providers, are there any specific

21   relationships that you are discussing?

22       A.  Yes.  There are specific providers

23   that I was concerned about, child

24   residential providers in particular.

1        Q.  And what was the relationship

2   between Ms. Chapman -- what were those

3   residential providers?

4        A.  What did they convey to me, or what

5   did they --

6        Q.  No.  Sorry.  Who were the --

7        A.  Oh.  The folks from academy

8   programs, Susan Fry from -- she is a child

9   residential in Wayne County.  There were a

10  few others.  Oh, my gosh.  I think the folks

11  from Presley Ridge.

12       Q.  What did these providers convey to

13  you?

14       A.  They would regularly convey that

15  they were not getting answers, that they

16  felt like there was an antagonistic

17  relationship.  And I defended -- I defended

18  Ms. Chapman in those conversations for the

19  most part.  Sometimes I just listened.  And

20  who is to say who was right or wrong, but it

21  was an issue.  It was definitely an issue.

22            And we had major reforms to

23  implement to shift our system.  And in my

24  opinion at the time, that we needed someone

1    that was a good relationship builder to

2    successfully move our system with as few

3    problems as possible because these are

4    challenges -- I mean, we are changing

5    people's business models and -- we are

6    trying to.  We're trying to get them to

7    shift what they do.  But also, recognizing

8    that some of the things they do, we need to

9    continue to do it.  And, you know, I didn't

10   want relationship dynamics to impede our

11   decision-making.

12        Q.  And you mentioned Ms. Chapman's

13   relationship with the ombudsman.  What did

14   you mean by that?

15        A.  There was just -- there were just

16   disagreements over the role of the ombudsman

17   from the ombudsman's office and Ms. Chapman.

18   And I think those disagreements over the

19   role then transitioned into this more

20   antagonistic -- maybe that is too strong a

21   word -- but this, you know, somewhat of

22   animosity.

23             And I believed that we needed the

24   ombudsman to help us evolve, to force us to

1    look in the mirror at times when we were

2    screwing up or not doing the right thing.

3         Q.   And what did Ms. Chapman believe

4    that the role of the ombudsman should be?

5              MR. PEISCH:  I want to object to

6    the extent -- I'm not sure you are asking

7    this.  But to the extent there are statutory

8    disagreements about the role of the

9    ombudsman -- Ms. Chapman was serving in a

10   legal role at the time providing legal

11   advice.  To the extent you are asking about

12   the legal advice Ms. Chapman was providing

13   within the department, I am going to object.

14   If you are asking about other things, I am

15   not going to object.

16        A.   Yeah.  I think the objection would

17   cover what I would say.

18        Q.   All right.  I'm going to turn to --

19   let's look at Exhibit 4, which is -- all

20   right.  Exhibit 4 is a news article, Update,

21   WSAZ obtains WVDHHR deputy secretary draft

22   termination letter.

23             Do you recognize this article?

24        A.   Yes, ma'am.

Page 155

1       Q.   There is a quote from you in this
2    article; is that right?
3       A.   That is correct, yes, ma'am.
4       Q.   And did you provide this quote to
5    WSAZ?
6       A.   I did, yes, ma'am.
7       Q.   Okay.  And you say that this draft
8    letter from the former secretary contains
9    many falsehoods about me and my work; is
10    that right?
11       A.   That is correct, yes, ma'am.
12       Q.   You know, we talked a little bit
13    about the letter.  Are there any other
14    falsehoods that you wanted to -- that you
15    are pointing to with regard to the letter?
16       A.   Oh, yeah.  Oh, I would have -- I
17    would contest all of the points.
18       Q.   All of them?
19       A.   Frankly.
20       Q.   Okay.
21       A.   Yeah.
22       Q.   And then you say that -- in the
23    statement, you say, I took a stand for the
24    children and families of West Virginia last

Page 156

1    spring, and I do not regret it?

2         A.   Correct.

3         Q.   What did you mean by that?

4         A.   That I don't regret it.

5         Q.   Sorry.   What do you mean that you

6    took a stand for the children and families

7    last spring?

8         A.   Advocating for the shift of the

9    funds to cover CPS salaries from vacant

10   positions primarily.

11        Q.   Anything else?

12        A.   Well, that would have been the core

13   -- well, there is another issue actually.

14   It was related to the dashboard -- the child

15   welfare dashboard that -- there was

16   deliberation about.   You know, I -- I was

17   pushing for a more transparent dashboard,

18   and still do.

19        Q.   And what was not transparent about

20   the dashboard?

21        A.   Well, at the time, we didn't have a

22   dashboard.

23        Q.   Okay.

24        A.   So it was really nothing.   But then

Page 157

1    following the legislative session, where the

2    bill that had the dashboard did not pass, as

3    I recall, there was internal discussions

4    about what should be in the dashboard.  And

5    the secretary said, yeah, we are going to do

6    it.

7              And I was pushing really hard

8    internally for -- well, I was just getting

9    information from other states and pushing

10   for a robust dashboard.  But he told me to

11   stand down on it.

12        Q.  By "he," you mean Mr. Crouch?

13        A.  Mr. Crouch, yeah.

14        Q.  And when was this?

15        A.  This would have been in March,

16   April of 2022.

17        Q.  Did you in fact stand down?

18        A.  Yeah.  Well, I mean, that's what

19   stand down means -- somewhat.  It was kind

20   of out of my hands.  He had assigned the

21   project to an individual that -- you know, I

22   didn't really have any influence over.  And

23   so from that perspective, yeah, I did

24   continue to do the research.

Page 158

```
 1              And I don't know if I remember this
 2   correctly.  But I believe that I was
 3   continuing to send to other folks that was
 4   working with that individual charged with
 5   the dashboard, sending them information,
 6   ideas.  In fact, I think I sent it to
 7   Ms. Chapman, and I think I sent it to Jeff
 8   Pack so that they could carry the water
 9   hopefully for what it looked like.
10        Q.  Who was charged with the creation
11   of the dashboard?
12        A.  Shaun Charles, who is the chief
13   information officer at what -- I think it's
14   still referred to as MIS - Management
15   Information Systems.
16        Q.  Was there information that you
17   wanted included in the dashboard that was
18   not included in the dashboard?
19        A.  I believe so.  I would have to look
20   at -- I was providing these broad examples
21   as I recall of other states that did
22   ultimately have a lot more information than
23   what we had.  But in this -- you know, to
24   give Mr. Crouch credit, I thought the
```

Page 159

1    initial dashboard was actually -- it turned

2    out better than what I thought it was going

3    to.  You know, I would like for something

4    more robust now.  And there has been -- you

5    will see in those other documents

6    discussions about that.  But actually at the

7    time, I thought he did a good job on it, you

8    know, even though he told me to kind of back

9    off.  But they still did -- for initial

10   dashboard result, I thought it was actually

11   pretty good.

12             MS. TEBOR:  Okay.  I think now

13   is a good time to break for lunch.

14             (Break in proceedings.)

15             MS. TEBOR:  Back on the record.

16   Let's mark this as Exhibit 5.

17             (Exhibit 5 was marked.)

18   BY MS. TEBOR:

19       Q.  Mr. Samples, do you recognize this

20   email?

21       A.  I do not.  I mean, I -- I don't

22   remember it.

23       Q.  It appears to be an email from you

24   to yourself --

Page 160

```
 1        A.  Uh-huh.

 2        Q.  -- on January 11, 2022.  Is that

 3   right?

 4        A.  Yes, it appears to.

 5        Q.  And it says -- at the top, it says

 6   2019-CPS?

 7        A.  Uh-huh.

 8        Q.  It appears to be that you are

 9   creating a list of issues from 2019 and

10   whether or not they remain issues as of

11   January 2022; is that right?

12        A.  It appears so.

13        Q.  Okay.  And the first -- the first

14   topic, you say, Solve issue with abuse and

15   neglect investigation time frames for

16   investigation.  And then in red, it states,

17   Remains serious issue?

18        A.  Uh-huh.

19        Q.  Did the timeline for abuse and

20   neglect investigations remain a serious

21   issue as of January 1st -- or January 11,

22   2022?

23        A.  Yes, it would have.  Although, I

24   must say I don't specifically recall this
```

Page 161

```
1    email.  But contextually, I do at times send

2    myself emails as notes if I am out and about

3    just -- like it's just an easy way to keep

4    my own records and not forget things.  I

5    don't know if that's the essence of this or

6    not though.

7            Q.  Okay.

8            A.  So sorry.  Just to contextualize

9    it.

10           Q.  Yeah.  Thank you.

11               And while you were deputy secretary

12   at DHHR, did you have conversations about

13   fixing the time frame for abuse and neglect

14   investigations?

15           A.  Oh, yes.  There would have been

16   conversations.

17           Q.  What were those conversations?

18           A.  The conversations with the

19   secretary and the bureaus?

20           Q.  Did you have any -- I'll ask that.

21   I will change the question.

22               Did you have any conversations with

23   Mr. Crouch about fixing the investigative

24   time frame?
```

Page 162

1        A.  Yes.

2        Q.  What were those conversations?

3        A.  In essence, it was highlighting

4   that this is a major problem and a

5   consequence of our lack of CPS workers and

6   also in the context of the case ratio

7   versus, you know, child-specific ratio for

8   CPS workers.

9        Q.  And what was the issue with the

10  investigative timelines -- time frames?

11       A.  That it was taking our workers too

12  long to get out and do investigations.

13       Q.  Did anything happen as a result of

14  your conversations with Mr. Crouch about the

15  time frames for investigation?

16       A.  Over the course of time, multitudes

17  of things happened specifically around the

18  efforts to increase salary, to increase

19  recruitment and reduce turnover or improve

20  our retention rate at CPS.  So there were a

21  multitude of efforts under way there.  That

22  would have been the main thrust of actions

23  that actually took place.  If they were

24  sufficient or not, I've talked about that

Page 163

 1    previously.  But there were actions that

 2    took place.

 3          Q.  And in 2022, you said it remained a

 4    serious issue.  Did it remain a serious

 5    issue when you left in April of 2022?

 6          A.  Yes, ma'am.

 7          Q.  And are you aware of whether it

 8    remains a serious issue today?

 9          A.  I believe it remains a serious

10    issue, yes.

11          Q.  And how do you come to that

12    knowledge?

13          A.  I will go into the department's

14    reports to the federal government and

15    compare West Virginia to other states.

16    There have been improvements, it appears.  I

17    can't recall the last numbers off the top of

18    my head.  But it still remains a serious

19    problem.  And then anecdotally you hear

20    concerns from various stakeholders in the

21    field that there are -- there continues to

22    be issues.

23          Q.  Okay.  And then looking at the

24    second bullet, it says, Develop plan to

Page 164

```
 1    mitigate retention issues at CPS, remains

 2    serious issue.

 3              So this was a serious issue in

 4    January of 2022, correct?

 5         A.  Yes, ma'am.

 6         Q.  And did this remain a serious issue

 7    when you left in April of 2022?

 8         A.  Yes, ma'am.

 9         Q.  And to your knowledge, does it

10    remain a serious issue today?

11         A.  I believe it remains an issue, yes,

12    ma'am.

13         Q.  Okay.  And then you say, Developed

14    strategy to make CPS salaries more

15    competitive.  Remains serious issue with

16    27 percent vacancy rate.

17              Are you aware of whether that was

18    -- so it was a serious issue in January of

19    2022?

20         A.  Yes, ma'am.

21         Q.  And did it remain a serious issue

22    when you left in April of 2022?

23         A.  Yes, ma'am.

24         Q.  And it remains a serious issue
```

1   today?

2          A.   So the problem actually worsened.

3   And then it has improved since then.   And so

4   I think our current vacancy rate is

5   17 percent.

6          Q.   It's 17 percent?

7          A.   So there has been a lot of progress

8   by the department on that front.

9          Q.   Okay.   And you say subsequent

10  workload study under way with external

11  vendor.   I think we talked about this

12  before.   What was that workload study?

13         A.   I believe that was conducted by

14  West Virginia University.   And it was to

15  look at things like caseloads -- you know,

16  just the amount of time it takes a CPS

17  worker to do X, Y and Z.

18             I actually found the report -- and

19  it has been a long time since I looked at

20  it.   But upon recollection, I found the

21  report to be underwhelming when it was

22  ultimately delivered.

23         Q.   What do you mean by underwhelming?

24         A.   I didn't think it adequately

Page 166

```
1    addressed the question around case versus

2    child.  And again, that's from recollection.

3    I would have to look at it again to get more

4    specific.

5         Q.  And are you aware of whether the

6    workload study recommended any caseload

7    limits?

8         A.  I can't recall specifically.

9         Q.  All right.  The next topic is,

10   Develop strategies to decrease overtime,

11   such as designated shifts to address the

12   issue of employees having to work later

13   hours to meet with families.

14            You said this remains a serious

15   issue with staff shortages exacerbating the

16   problem.

17            This was a serious short -- this

18   was a serious issue in January of 2022; is

19   that right?

20        A.  Yes, ma'am.

21        Q.  Was it a serious issue when you

22   left in April of 2022?

23        A.  Yes, ma'am.

24        Q.  Does it remain a serious issue
```

1    today?

2          A.  I do not know.

3          Q.  Okay.  And number five, it says,

4    Use the detail data that is already

5    collected to better effectuate staffing and

6    case management solutions.  And you said it

7    remains an issue with development of quality

8    assurance office not yet established.

9               Do you know whether a quality

10   assurance office has been established?

11         A.  Yes, ma'am.  I believe it was.

12         Q.  Okay.  Do you know when it was

13   established?

14         A.  I do not.  I believe it might have

15   been in 2022.  But I can't -- I don't know

16   for sure.

17         Q.  I am going to mark this as

18   Exhibit 6.

19               (Exhibit 6 was marked.)

20         Q.  Mr. Samples, this is an email

21   attaching the foster care ombudsman's report

22   from March 25, 2021; is that right?

23         A.  Yes.  Yes, ma'am.

24         Q.  Do you recall this report?

Page 168

1          A.  Vaguely, yes.

2          Q.  Did you read this report

3   previously?

4          A.  I would have at the time, yes,

5   ma'am.

6          Q.  Do you know if you -- did you

7   disagree with any of the findings in the

8   report?

9          A.  I can't recall specifically

10  disagreeing with any of the findings.

11         Q.  Generally, the ombudsman found that

12  there was fear of retaliation by CPS

13  workers --

14         A.  Uh-huh.

15         Q.  -- by foster parents and biological

16  parents.  Do you agree with that finding?

17         A.  I do.

18         Q.  Okay.  Can you -- why do you agree

19  with that finding?

20         A.  There were certainly reports at the

21  time that CPS workers were using their

22  authority to retaliate against foster

23  parents, biological families.  And those

24  concerns continue to be reported through

1   constituent referrals to me at the

2   legislature.

3        Q.   How recently have you received

4   reports of retaliation as a member of the

5   legislature?

6        A.   As recently as this week.

7        Q.   What is the --

8        A.   A concern.  I haven't validated if

9   it is or is not.  But there was a concern as

10  recent as this week raised.

11       Q.   How frequently do you receive

12  concerns from constituents about retaliation

13  by DHHR case workers?

14       A.   It is -- it is not uncommon.

15       Q.   Okay.  And the ombudsman also found

16  that there was a failure of case workers to

17  communicate with various stakeholders,

18  foster parents, bio parents, providers.  Do

19  you agree with that finding?

20       A.   Certainly.

21       Q.   Why do you agree with that finding?

22       A.   I have been told the same thing.

23       Q.   Who have you been told the same

24  thing by?

Page 170

1          A.  In my time at the department, these

2     complaints often made their way to me

3     through various sources.  And they continue

4     to be made.  And it has triggered a two-year

5     effort to pass a piece of legislation to

6     address this very problem.

7          Q.  And what was the legislation to

8     address the problem?

9          A.  It was around a foster parent

10    communication portal, which I believe is one

11    of the presentations in the packet of

12    information provided.

13         Q.  And who advocated for the foster

14    parent communication portal?

15         A.  The primary sponsors were Delegate

16    Pinson and Delegate Burkhammer.  But others

17    supported it as well.

18         Q.  Did Mr. Crouch support the creation

19    of the foster parent communication portal?

20         A.  I do not know.

21         Q.  When was this portal created?

22         A.  It hasn't yet been created.  The

23    legislation just passed this session, this

24    past session.

```
 1          Q.  All right.

 2          A.  It did not pass last year.  But it

 3     made it out of the House of Delegates.

 4          Q.  Okay.  In your legislative advisor

 5     capacity, do you still receive complaints

 6     about a lack of communication by CPS workers

 7     to foster parents, bio parents, providers?

 8          A.  Yes.  Yes, ma'am.

 9          Q.  And the ombudsman also found that

10     there was a lack of knowledge of the job and

11     of policies and procedures by CPS workers or

12     by other case workers.  Do you agree with

13     that contention?

14          A.  Yes, ma'am.

15          Q.  Why do you agree with that

16     contention?

17          A.  Through statements by various

18     stakeholders while at my time at the

19     department and subsequent at my time at the

20     legislature, those complaints continued to

21     be made.

22          Q.  Okay.

23               MS. TEBOR:  I'm going to mark

24     this as Exhibit 7.
```

```
 1                  (Exhibit 7 was marked.)

 2          Q.  Mr. Samples, let me know when you

 3    are done reviewing.

 4          A.  Yes, ma'am.

 5                  MR. PEISCH:  Objection.  I'm

 6    going to object to this document as

 7    privileged, both deliberative process,

 8    potentially attorney/client.  As you know,

 9    we did not manually review all emails

10    produced.  And we will be calling back this

11    document.

12                  MS. TEBOR:  What about it do

13    you -- I mean --

14                  MS. PEISCH:  Well, it looks to

15    me to be classic policy advice from Deputy

16    Secretary Samples at the time to Bill Crouch

17    in a discussion involving general counsel,

18    April Robertson.

19                  MS. TEBOR:  So you can review

20    the document.  I believe April Robertson is

21    on it but makes no statements in the

22    document aside from potentially sending the

23    report itself.  And I am not -- I am not

24    sure what you mean by policy statements.
```

Page 173

 1                    MR. PEISCH:  I think if you read

 2    the first page of the email, at least it

 3    appears to me that Mr. Samples is making

 4    some policy recommendations -- some policy

 5    change recommendations.

 6                    MS. TEBOR:  What portion of the

 7    email are you looking at to establish

 8    that --

 9                    MR. PEISCH:  Page 1 of

10    Exhibit 7.

11                    MS. TEBOR:  Okay.  I'm looking

12    at the same page.  But what portion of this

13    email are you looking at?

14                    MR. PEISCH:  Here is what I

15    think we need:  Organizational - split BCF,

16    collapse layers of bureaucracy.  And then it

17    goes to recommendation number two, staffing.

18    Increase staff to reflect.

19                    I mean, probably what we would do is

20    redact some of this.  I am not sure we would

21    claim the whole document as privileged.  But

22    certainly that first page, we would claim as

23    deliberative process privilege.

24                    MS. TEBOR:  I am going to ask

1   Mr. Samples about parts of the document.

2   You can object on the basis of deliberative

3   process privilege to those parts if you feel

4   that they are.  But I think that makes sense

5   so that we can move forward without stating

6   from the whole document at all.  But I do

7   think the parts that I am going to ask about

8   are not -- do not fall under the

9   deliberative process privilege.

10              MR. PEISCH:  Okay.  I may

11   instruct him not to answer.  But let's see

12   where we get with that.

13              MS. TEBOR:  Okay.

14       Q.  All right.  So, Mr. Samples, I'll

15   direct you to an email that you sent on

16   May 19th.  It is on the page Bates stamped

17   -- and if you know what a Bates stamp is,

18   it's the number at the bottom.  It's

19   D001073024.

20       A.  Yes, ma'am.

21       Q.  And you say it's the paragraph that

22   starts with the On the ombudsman report at

23   the bottom?

24       A.  Uh-huh.

1          Q.  And you said, On the ombudsman

2    report, I talked to her about how we needed

3    to own this report.  There is no two ways

4    about it.  The report reflects badly on

5    child welfare and reinforces what we hear

6    from multiple stakeholders.  We need to do

7    -- tell the front line staff who may be

8    listening that if they are overwhelmed,

9    frustrated and want to do a good job but the

10   system is a hindrance that we are going to

11   fix.

12          What did you mean that you were

13   hearing these -- about these issues from

14   multiple stakeholders?

15          A.  I can't remember specifically.  But

16   generally, it would have been from

17   representatives from the judicial branch,

18   providers, legislators, constituents

19   reaching out through the legislature and the

20   governor's office.

21          Q.  And what did you mean when you said

22   we -- the system is a hindrance?  Do you

23   recall?

24          A.  The impression by -- I can't recall

1    specifically.  I am perhaps inferring some

2    -- I can do that.  I can infer what I would

3    have meant, but I can't specifically

4    remember.

5         Q.  What --

6         A.  I believe -- I believe with some

7    degree of confidence that it would have been

8    around foster parents and other individuals

9    in the community that -- you know, mandatory

10   reporters, teachers, et cetera, that did not

11   have a favorable view of the child welfare

12   system or workers or how we operated and

13   that, you know, in fact, they viewed CPS as

14   a hindrance to the best interest of

15   children.

16        Q.  And the email above from Bill

17   Crouch, he says to you, Jeremiah, we will

18   not own the ombudsman report?

19        A.  Uh-huh.

20        Q.  Do you have an understanding of

21   what he meant when he said, we will not own

22   the ombudsman report?

23        A.  Not beyond the clear reading of

24   what he said.

Page 177

1            Q.   What do you understand him to be

2     saying from the clear reading of what he

3     said?

4            A.   That we were not going to as an

5     agency agree with or publicly or politically

6     own the problems outlined by the ombudsman.

7            Q.   Did you agree with his -- did you

8     agree with not owning the ombudsman report?

9            A.   I did not agree.

10           Q.   And why don't you -- why did you

11    not agree?

12           A.   Because I believed that there -- I

13    believed the ombudsman report to be

14    accurate.

15           Q.   Okay.  I am just looking at the

16    email on the page with the Bates number

17    ending in 023.  It's on May 2021.  You say,

18    Progress has been made in some areas, but

19    overall results are still poor.  Do you

20    recall what you meant by that?

21           A.   That while we had undertaken a

22    number of different initiatives to improve

23    the child welfare system and CPS, that the

24    outcomes that children and other actors in

1  the system were experiencing were still

2  poor.

3       Q.  Okay.  And you also mention -- you

4  mention a couple of issues that we've

5  already talked about.  You mentioned the

6  issues with PATH.  You mentioned the issues

7  with the vacancy rates.

8            The main issues that are discussed

9  here, were those the issues that you were

10 most concerned about?

11      A.  Correct.  Yes, ma'am.

12      Q.  All right.  And you discussed that

13 we still have way too many workers staying

14 in hotels and county offices with kids?

15      A.  Yes, ma'am.

16      Q.  Okay.  What is that -- what is

17 that?  What are you talking about there?

18      A.  So whenever a CPS worker is unable

19 to find appropriate placement for a child

20 with an emergency shelter or child

21 residential, foster family, kinship

22 placement, acute psych hospital, PRTF --

23 they are unable to find appropriate

24 placement, the worker will -- at the time

1    would stay with the child either in the

2    county office or in a hotel.

3         Q.  Uh-huh.  And this in your mind was

4    -- this was an issue that was occurring in

5    or around May of 2021?

6         A.  Yes, ma'am.

7         Q.  Was that still a problem when you

8    left in April of 2022?

9         A.  Yes, ma'am.

10        Q.  And as far as you are aware, the

11   issue of children staying at hotels and in

12   county offices, is that still an issue

13   today?

14        A.  I don't know that the department

15   continues to have children in county offices

16   except in extraordinary circumstances like a

17   snowstorm.  I think -- my understanding is

18   they moved away from that policy.

19           But I have been told that there may

20   be children staying in other types of

21   settings like state parks or -- I forget the

22   specific location.  It wasn't a state park.

23   It was a -- it was like an outside

24   recreational area.

1      Q.   Was this Camp Virgil?

2      A.   Yes.   Yes.   That has been stated to

3  me.

4      Q.   Okay.

5      A.   Camp Virgil Tate.

6      Q.   Camp Virgil Tate.   Okay.

7           And you say also here that our

8  wraparound services are solid from a high

9  level policy perspective, but we don't have

10 sufficient providers to execute them and

11 they are not coordinated effectively so

12 children have seen less support -- have a

13 seamless system of support that all of our

14 partners understand and can navigate.

15          What do you mean that they are not

16 coordinated effectively?

17     A.   That the system -- the continuum of

18 care remains siloed and that there was not

19 adequate effort to ensure that those

20 communications continued across the various

21 placements in that continuum of care.

22               (A discussion was held off the

23 record.)

24 BY MS. TEBOR:

1        Q.   What happens when there is not the

2    continuum of care as you mentioned?

3        A.   When you have breakdowns in

4    communications between providers in the

5    continuum of care, I think it can result in

6    services that a child had been previously

7    provided that may have worked not being

8    followed through on by the next provider or

9    placement.

10           It can result -- for example, there

11   have been reports by foster families that,

12   you know, a child may be -- not to their

13   knowledge, they will later find this out --

14   but the child is leaving a placement, and

15   the CPS worker doesn't tell them about what

16   kind of treatment the child was receiving --

17   you know, just generally anything about the

18   child's circumstances.  There have been

19   complaints on that front both on -- you

20   know, medical care for the child, but also

21   on their behavioral health issues that they

22   may have.

23           And there have been -- well, those

24   are some -- just some examples of what can

1    happen.  There are more.

2         Q.  And was this still an issue when

3    you left in April of 2022?

4         A.  Yes, ma'am.

5         Q.  Okay.  Are you aware of whether it

6    still remains an issue today?

7         A.  I still receive complaints about

8    this very issue, yes, ma'am.

9         Q.  Okay.  And you say at the bottom of

10   this email that if we go to the legislature

11   and push back on a report that ultimately

12   reflects what legislators are hearing from

13   their constituents, then we will lose their

14   ongoing partnership and the reforms that we

15   continue to need for kids.

16            This is you disagreeing with

17   Mr. Crouch's suggestion that you not own the

18   ombudsman report, correct?

19        A.  Yes, ma'am.

20        Q.  All right.  If you just look at the

21   top of page -- the page ending in 3022 --

22        A.  Yes, ma'am.

23        Q.  All right.  You say, My biggest

24   concern with the ombudsman report is that it

1  validated concerns we already had and added

2  context to them.

3           As you said, you had already been

4  hearing these issues, the ombudsman report

5  just reinforced the concerns that you're

6  already hearing; is that correct?

7      A.  Yes, ma'am.

8      Q.  All right.  Mr. Samples, are you

9  aware that Secretary Crouch sent an email to

10 employees at DHHR requesting that they

11 inform him if contacted by a member of the

12 legislature?

13     A.  I had heard of this, yes, ma'am.

14     Q.  Okay.  When did you hear about

15 this?

16     A.  I can't recall.

17     Q.  Do you know when he sent that

18 email?

19     A.  I do not.

20     Q.  Do you have an understanding of why

21 he sent that email?

22     A.  I have a speculation as to why he

23 sent it.

24     Q.  Why do you think he sent it?

Page 184

1          A.   To keep our staff from telling the

2    legislature information that may ultimately

3    result in some political embarrassment.

4          Q.   Political embarrassment from

5    Mr. Crouch?

6          A.   Yes, ma'am.

7          Q.   Are you aware that the legislature

8    noted at least as of January 31, 2022, that

9    employees refused to talk to the legislature

10   without Crouch's sign-off?

11         A.   Yes, ma'am.

12         Q.   Did you have any conversations with

13   Mr. Crouch about preventing DHHR employees

14   from speaking with the legislature?

15         A.   I would have, yes, ma'am.

16         Q.   Do you recall what those

17   conversations were?

18         A.   Just vaguely.

19              MR. PEISCH:   Objection.

20   Deliberative process privilege.

21         Q.   When did you have those

22   conversations?

23         A.   They would have -- there would not

24   have just been one conversation on one day.

Page 185

```
 1   It would have been an ongoing discussion.
 2        Q.  Did you think that DHHR employees
 3   should be able to speak with members of the
 4   legislature?
 5        A.  Yes, ma'am.  In the right
 6   circumstances.
 7             MS. TEBOR:  I'm going to mark
 8   this as Exhibit 8.
 9             (Exhibit 8 was marked.)
10             (Witness reviews document.)
11        Q.  Tell me when you are ready,
12   Mr. Samples.
13        A.  Okay.  Yes, ma'am.
14        Q.  Mr. Samples, this is an email chain
15   between you and Pamela Woodman-Kaehler; is
16   that correct?
17        A.  Yes, ma'am.
18        Q.  Do you recall this email?
19        A.  Vaguely, yes.
20        Q.  It is from July 1st, 2021; is that
21   right?
22        A.  Yes, ma'am.
23        Q.  And this Ms. Woodman-Kaehler is --
24   am I saying that right?
```

Page 186

1        A.   Kaehler.   I always get it wrong

2   myself.   I always say Kaehler-Woodman.   But

3   yes.

4        Q.   Okay.   She is sending you a -- she

5   is forwarding you an email that she had --

6   email chain from her and Linda Watts; is

7   that right?

8        A.   Yes, ma'am.

9        Q.   And Linda Watts is asking her for

10   information about complaints about case

11   workers; is that right?   Or about DHHR?

12        A.   Yes, ma'am.

13        Q.   Ms. Kaehler-Woodman, the ombudsman,

14   sends this to you and says she has been

15   receiving big, ugly and highly concerning

16   complaints.

17            Do you know what complaints she was

18   referring to?

19        A.   Not specifically, no.

20        Q.   Okay.

21        A.   I may have known at the time.   But

22   I don't specifically recall.

23        Q.   Okay.   And she said she has -- she

24   says she has a meeting this morning with a

1    large group of providers that unloaded in

2    exhausted, defeated frustration.

3              Do you recall what the issue was

4    that the providers were discussing?

5         A.  I maybe at the time would have

6    known, but I don't specifically recall.

7         Q.  All right.  And she talks about how

8    decisions must not just be a please the DOJ

9    marketing pitch, but well informed and

10   effective.

11             Do you understand what she means by

12   a please the DOJ marketing pitch?

13        A.  I have an interpretation of what

14   that means, yes, ma'am.

15        Q.  Okay.  And what do you think that

16   means?

17        A.  That in presentations to the

18   Department of Justice or other, you know,

19   stakeholders, that we would often make

20   statements or have bullets laying out, these

21   are the things that we are accomplishing,

22   and the language could be very generic.  But

23   in reality, the end game outcomes were not

24   changing as a result, that it was just --

Page 188

1   well, again, talking points as opposed to

2   actions with tangible results.

3        Q.   And do you have any memory of the

4   specific presentations of talking points

5   that were provided to DOJ that did not show

6   the particular outcomes?

7        A.   Well, I don't want to misconstrue

8   my interpretation -- I mean, information

9   would be provided -- the context of this is

10  that information would be provided that

11  perhaps we even had the intent of carrying

12  out.  And I think that was the case.  But

13  that we did not have enough meat on the

14  bones so to speak to actually carry forward

15  that result.

16           And so -- and the broader context

17  of my discussions with the ombudsman was

18  that if we don't get into the nitty-gritty

19  details of these issues that are happening

20  and track -- try to quantify what those

21  problems are and then track our progress on

22  problem X, then this will always only remain

23  a talking point dialogue without any actual,

24  you know, benefit to the kids we are

Page 189

1    serving.

2        Q.  Okay.  Could the plans or the

3    talking points that you are presenting to

4    DOJ -- it was unclear whether they could be

5    implemented; is that right?

6        A.  I wouldn't feel comfortable saying

7    that's accurate, I mean, without a specific

8    document in front of me to say -- I mean,

9    yeah, I -- I'm sorry.  I don't think I could

10   answer that one accurately.

11       Q.  Okay.  Okay.  Were there certain

12   plans that DHHR presented to the DOJ that

13   you felt were not accurate -- that were not

14   sufficiently dug into or, you know, planned

15   for?

16       A.  I never personally felt that we

17   presented anything to the DOJ that we didn't

18   feel were accurate.  There were occasions

19   where I felt we presented information to the

20   DOJ that I didn't have confidence that we

21   were going to be able to execute the

22   strategy because we had not properly

23   engineered the mechanisms to accomplish that

24   goal both from a policy perspective, but

Page 190

1   also to track if we had accomplished it.

2         Q.  Do you remember what those

3   particular items were?

4         A.  Not specifically without having it

5   in front of me.

6         Q.  Okay.  And if you look -- if you

7   turn back to the page that ends in 68 --

8         A.  Yes, ma'am.

9         Q.  -- the ombudsman says that Linda is

10  escalating the demands for this information

11  from us.  And I am not comfortable providing

12  it in the way she is expecting.  Frankly, I

13  will be -- I believe it will be ill used as

14  a hit list in our current culture even if we

15  were able to produce it.  The BCF culture is

16  miserable, and leadership is extremely

17  disconnected.

18             Did you agree that that type of

19  information might be used as a hit list?

20        A.  I agreed -- in recollection, I

21  agreed that it could be.

22        Q.  Okay.  Do you have an understanding

23  of why Linda Watts was requesting it?

24        A.  I recall that Linda was concerned

Page 191

1    that she was not able to adequately respond

2    to some of the issues that were brought

3    forth by the ombudsman without being in the

4    loop during the process.

5         Q.   Okay.

6         A.   And I believe Linda meant that --

7    right or wrong, I believe she genuinely

8    believed that.

9         Q.   Okay.  And when the ombudsman says

10   I will believe -- I believe it will be ill

11   used as a hit list, what did you understand

12   that to mean?

13        A.   The department had and has a

14   culture of retaliation that goes back some

15   time.  And that culture had worsened in a

16   lot of ways in this period of time.  And

17   there were reports of that from external

18   stakeholders that there was retaliation.

19   And there continues to be frankly.  And so

20   that was a known problem that we had, that

21   there were at least allegations of serious

22   retaliation at the ground level of CPS.

23        Q.   What form did that retaliation

24   take, or what forms?

1           A.   It could take -- it could take a

2    number of different forms ranging from a

3    supervisor chewing out a staff person to a

4    CPS worker -- one specific instance I

5    remember, a CPS worker in essence telling a

6    foster family that they'd better be careful

7    or they weren't going to get more foster

8    kids.  And I can't remember exactly what the

9    foster family was complaining about.  But

10   that was -- whatever it was, that was what

11   they relayed was shared with them.

12           Another specific example that --

13   and this was a minimal county issue -- that

14   CPS -- that mandatory reporters at the

15   school system were making referrals to CPS.

16   They stated that a lot of those were getting

17   screened out.  And then the ones that were

18   not being screened out, that the CPS workers

19   in that area were frustrated with the school

20   system for I guess increasing their workload

21   or -- I think that's what the school system

22   thought.  And they were telling individuals,

23   the parents, the biological parents that,

24   hey, the counselor down at the school said

```
 1   your kid was super dirty or whatever the

 2   issue was.

 3            And so at least the one

 4   representative from that school board said

 5   that -- I think they had indicated -- I

 6   think it was a teacher or a counselor.  I

 7   can't remember.  Maybe a principal.

 8   Somebody from the school system had their

 9   tires slashed, and they suspected it was

10   because of a CPS referral.  And so that

11   would be another example.

12       Q.  Did DHHR do anything to address the

13   retaliatory issues?

14       A.  In leadership discussions, while I

15   was there, it was -- it was a problem.  And

16   so I had conversations with Linda Watts

17   about this.

18            MR. PEISCH:  I'm going to object

19   on deliberative process privilege.  I don't

20   think the question calls for it, but I think

21   the answer is calling for deliberative

22   process.  You might want to repeat --

23            MR. WALTERS:  Yeah.  Rephrase

24   that.  I think the question was fine.  It
```

1    was, what did they do?

2          Q.  Yeah.  What did DHHR do if anything

3    to address retaliatory practices?

4          A.  We had conversations about it, but

5    I don't know beyond that.

6          Q.  As far as you are aware, was

7    anything done to address issues with

8    retaliation?

9          A.  Nothing tangible that I can recall.

10         Q.  All right.  And just looking back

11   at page -- the page ending in 67 up at the

12   top.

13         A.  Yes, ma'am.

14         Q.  All right.  And you say to

15   Ms. Woodman-Kaehler, I appreciate these

16   concerns on a number of levels, the words

17   expressing.  I can't quite match the emotion

18   tied to it, so I will leave it at that.

19              You agreed with Ms. Woodman-

20   Kaehler's contentions in her email?

21         A.  Yes, ma'am.

22         Q.  Okay.  And then you also told her,

23   hold on whatever report Linda is requesting;

24   is that right?

1          A.  Yes, ma'am.

2          Q.  Because you also believed that it

3  could be used as a hit list?

4          A.  That it could be, yes, ma'am.

5          Q.  Okay.

6          A.  May I state one thing?  Linda Watts

7  is a great person.  And I don't think she

8  would have specifically retaliated against

9  anyone.  I just want to make that clear for

10  the record.  She is just not that -- not

11  that kind of person.  But her staff at

12  various levels perhaps could be and others

13  in the department.

14              MS. TEBOR:  Okay.  I am going to

15  mark this as Exhibit 9.

16              (Exhibit 9 was marked.)

17              MS. TEBOR:  And also mark this

18  as Exhibit 10.

19              (Exhibit 10 was marked.)

20          Q.  Exhibit 9 is an email again from

21  you to yourself.  Do you recall this email?

22          A.  I don't specifically, no.

23          Q.  And this was sent on the same day,

24  January 21, 2021, as this news story, West

1    Virginia's reliance on out -- which is

2    Exhibit 10 -- West Virginia's reliance on

3    out-of-state group homes, leaves some foster

4    kids in unsafe, abusive situations.

5         A.  Okay.

6         Q.  Were you aware of issues with abuse

7    in out-of-state -- allegations of abuse in

8    out-of-state placements?

9         A.  Yes, ma'am.

10        Q.  And when did you become aware of

11   issues with abuse in out-of-state

12   placements?

13        A.  Going back at various times

14   throughout my entire career that I am aware

15   of -- going back to my early days at DHHR, I

16   am aware of abuse.

17        Q.  With respect to this particular

18   article, besides a couple of different

19   facilities where there were allegations of

20   abuse and neglect and children were still in

21   the facilities, are you aware of issues with

22   DHHR not removing children from facilities

23   after there has been an allegation of abuse

24   or neglect?

Page 197

1          A.   I'm sorry.   I was looking.   Can you

2     please repeat that?

3          Q.   Yes, sure.

4               You said you are familiar with

5     allegations of abuse and neglect in

6     out-of-state facilities?

7          A.   Yes, ma'am.

8          Q.   Are you familiar with issues with

9     DHHR not removing children from out-of-state

10    facilities once there has been an allegation

11    of abuse or neglect in that facility?

12         A.   Yes, ma'am.

13         Q.   Okay.

14         A.   Yes, ma'am.

15         Q.   What is your understanding of that

16    issue?

17         A.   So with respect to George Junior --

18    I am trying to recall.

19               MR. PEISCH:   Can I just

20    interject here -- are we going to seal if --

21    if Mr. Samples is going to testify about

22    individual children, then I think we will

23    request that we seal this transcript.   And

24    we can maybe redact portions at a later

Page 198

```
 1   date.

 2                   MS. TEBOR:  Yeah.

 3                   MR. WALTERS:  Or just refer to

 4   them as initials.

 5                   MS. TEBOR:  Yeah.  I don't think

 6   we are asking about the --

 7                   MR. PEISCH:  Yeah.  Yeah.  I

 8   know you weren't, but he was starting to

 9   talk about somebody in particular.

10        Q.  So I think the issue is, we are

11   just -- so we have a clean transcript, if

12   you could avoid identifying the individual

13   who may have been -- you can talk about the

14   allegations of abuse and neglect but not

15   necessarily the individual who was --

16        A.  What if the nature of the abuse and

17   the limited number of children in the

18   facility was such that it could easily be

19   determined who that child was if you were

20   aware of the --

21                   MR. WALTERS:  We will just have

22   to seal that portion of the transcript.

23                   MS. TEBOR:  Yeah, we'll have to

24   seal that portion.
```

Page 199

```
 1                   MR. PEISCH:  We will seal that
 2      portion.  I mean, he can testify to --
 3                   MS. TEBOR:  Yeah -- no, no.
 4      Absolutely.  Yeah.  I am not --
 5           Q.  Just to be clear, I am not asking
 6      for names of children.
 7           A.  Sure.
 8           Q.  I am not asking for birthdays.  You
 9      know, I am just asking for, you know, what
10      the issue was and whether you are aware of
11      the children not being removed from the
12      facility?
13                   MR. LESLIE:  Just do the best
14      you can to protect their identities and
15      answer her questions, and we will take care
16      of the rest.
17                   THE WITNESS:  Okay.  Yeah.
18           A.  So yes, I do recall this article
19      here.  And I am at least at some level
20      familiar with the situations up at George
21      Junior specifically.
22           Q.  Okay.  Are you familiar -- I know
23      it names George Junior.  It names a couple
24      of other facilities.  Do you have any reason
```

1    to doubt the accuracy of this article in

2    terms of children still being in facilities

3    at a certain time?

4         A.  I have no reason to doubt the

5    accuracy of the article.

6         Q.  Okay.  From the email that you

7    wrote to yourself, you say, will you be --

8    and point number two, will you be bringing

9    up the issue of out-of-state placements and

10   any of the investigative findings to your

11   colleagues this session?

12          Do you remember who you were

13   writing to?

14        A.  I do not specifically recall.

15        Q.  Okay.  And you say, Are you worried

16   -- sorry.  Point number four, are you

17   worried about the lack of DHHR transparency

18   and what that could mean for the safety and

19   well-being of West Virginia foster kids.

20            Were you personally worried

21   about the lack of DHHR transparency in

22   September of 2021?

23        A.  Yes.

24        Q.  Do you remain concerned about that

 1   today?

 2        A.  Yes.

 3             MS. TEBOR:  All right.  Give us

 4   five minutes.  And then let's see if we can

 5   wrap it up for the four o'clock deadline.

 6             (Break in proceedings.)

 7   BY MS. TEBOR:

 8        Q.  Mr. Samples, we are back on the

 9   record.  We were talking before about the

10   workload study and about individual versus

11   -- assigning cases versus on -- the

12   individual versus the family; is that right?

13   Do you remember that conversation?

14        A.  Yes, ma'am, I do.

15        Q.  Okay.  And what is your contention

16   on how caseloads should be assigned?

17        A.  I think that it is not reflective

18   of the actual workload to have a case ratio

19   defined by every child that may belong to a

20   family or a parent for the one CPS worker.

21        Q.  And so in your mind -- when you say

22   case ratio, do you mean caseload?  Is

23   that --

24        A.  Yes, ma'am.

Page 202

```
1           Q.  So in your mind, caseloads should
2      be assigned by the individual child and not
3      by --
4           A.  Not necessarily.  I think there
5      would -- could be another way to do it where
6      based on certain factors -- let's say there
7      is ten children and three of those children
8      have psychiatric or behavioral issues that
9      result in them having to be placed in an
10     institutional care, or maybe three of those
11     children are across three different
12     families.  That there would be a way to
13     weight certain factors in a case to get a
14     more accurate depiction of what the workload
15     is relative to the case.
16          Q.  Do you believe there should be
17     limits on caseloads?
18          A.  I do.
19          Q.  And why do you believe that?
20          A.  So that a worker is able to perform
21     all of the tasks and responsibilities that
22     they are charged with for the state and the
23     child.
24          Q.  And what do you think the limit on
```

Page 203

1    caseloads should be?

2        A.  It would be dependent on how the

3    equation was developed around weighting the

4    specific circumstances in a case.  That's

5    what I wish we would do.

6            Let me just answer it this way.  I

7    believe that the state should develop a

8    caseload standard by looking at the

9    circumstances of children in the case,

10   identifying various factors that we all know

11   practically speaking result in a worker

12   spending more time with a specific child and

13   then using that as the caseload standard.

14   If that is too complicated -- because that

15   could be very complicated -- then I think we

16   should do a worker-to-child caseload

17   standard.

18       Q.  And what would that worker-to-child

19   caseload standard look like?

20       A.  I am not sure I understand your

21   question.

22       Q.  You were saying in the alternative,

23   if weighting is too difficult, there should

24   be a worker-to-child caseload standard?

Page 204

1        A.  Yeah.

2        Q.  What would that -- what would that

3   standard be?

4        A.   Instead of having a case defined by

5   every child in the family, then it would be

6   the number -- if there's ten kids in the

7   family, then that's one worker to ten

8   children as opposed to one worker to

9   one case.

10       Q.  Okay.  And do you believe there

11  should be a maximum amount of children

12  assigned?

13       A.  Yes.

14       Q.  What do you think that maximum

15  would be?

16       A.  I would have to -- at one point, I

17  might have been able to answer that better.

18  But I would have to look back through the

19  research.

20       Q.  Okay.  And what is your

21  understanding of how DHHR is currently

22  assigning caseloads?

23       A.   Historically, it was assigned, a

24  case was every child in the family.  I

Page 205

1    believe that's the way it is still done, but

2    I -- I don't know that for certain.

3         Q.  And do you have an understanding of

4    what the current caseload sizes are?

5         A.  I do not.

6         Q.  Do you have an understanding of

7    whether they are higher than is suggested or

8    is recommended?

9         A.  I wouldn't know.

10        Q.  Okay.  Do you have an understanding

11   when you left as of April of 2022 about what

12   the caseload sizes look like?

13        A.  Yeah.  I can't remember the

14   specific numbers, but I have a general

15   recollection.

16        Q.  Okay.  Do you remember if caseloads

17   were too high at that point?

18        A.  Yes, they were.

19        Q.  Okay.  And what was happening as a

20   result of caseloads being too high?

21        A.  CPS workers were not coming

22   prepared to court appropriately.  They were

23   not able to serve the individual needs of

24   specific children under their purview.

Page 206

```
 1    There were delays in investigations as a

 2    result.  There was poor communication with

 3    stakeholders, guardian ad litems, foster

 4    parents from the CPS workers because they

 5    were simply overwhelmed.

 6         Q.  And as far as you are aware, case

 7    workers being overwhelmed, is that still an

 8    issue today?

 9         A.  It is.  It's a lesser issue as I

10    understand it, but it remains an issue as I

11    understand it.

12              MS. TEBOR:  All right.  No

13    further questions.  Thank you.

14              MR. WALTERS:  Well, we are

15    leaving it open.

16              MS. TEBOR:  Oh, but we are

17    leaving it open.  Yes.  I'm sorry.  Thank

18    you.  Thank you.  We are leaving it open.

19    No further questions right now.  We are

20    leaving it open.

21              MR. LESLIE:  Just to be clear.

22    So as far as like questions today, we are

23    done.  And then the remainder, if we come --

24    if, when, whatever, we come back, it will be
```

```
 1    to discuss the documents?  Is that --
 2                 MS. TEBOR:  The documents and/or
 3    to the extent that there is a discussion
 4    about the deliberative process privilege
 5    between the parties, then that would be --
 6    and plaintiffs are -- you know,
 7    interrogatory responses, yeah.
 8                 MR. WALTERS:  With one caveat,
 9    that we did cut some stuff out because we
10    ran out of time.
11                 MS. TEBOR:  Yeah.
12                 MR. WALTERS:  Yeah.  I mean,
13    generally --
14                 MR. PEISCH:  I just want to make
15    sure.  We reserve our right to do redirect.
16    You don't object to, I mean, me not doing
17    redirect right now?  You are not going to
18    object that I can't do redirect when we
19    reconvene?
20                 MR. WALTERS:  Correct.
21                 MS. TEBOR:  When we reconvene,
22    that's correct.
23           (Deposition concluded at 4:00 p.m.)
24                 * * * * * * * *
```

Page 208

**CERTIFICATE**

1

2

3        I, Tara Arthur, Certified Stenotype

4    Reporter and Notary Public, do hereby

5    certify that the foregoing deposition of the

6    above-named witness, was duly taken by me in

7    machine shorthand, and that the same were

8    accurately written out in full and reduced

9    to computer transcription.

10        I further certify that I am neither

11    attorney or counsel for, nor related to or

12    employed by any of the parties to the action

13    in which this deposition is taken; and

14    furthermore, that I am not a relative or

15    employee of any attorney or counsel employed

16    by the parties hereto or financially

17    interested in the action.

18    My commission expires April 16, 2027.

19

20    _____

     Tara Arthur
21    Certified Court Reporter/Notary Public

22

23

24

1

| Exhibits | | | | |
|---|---|---|---|---|

**Jeremiah Samples 041824 Ex 1**  3:7
59:14,15 66:7

**Jeremiah Samples 041824 Ex 2**  3:7
138:3,5,11, 15,18,23

**Jeremiah Samples 041824 Ex 3**  3:8
138:4,6,16 141:8

**Jeremiah Samples 041824 Ex 4**  3:8
138:8,9,21 154:19,20

**Jeremiah Samples 041824 Ex 5**  3:9
159:16,17

**Jeremiah Samples 041824 Ex 6**  3:9
167:18,19

**Jeremiah Samples 041824 Ex 7**  3:10
171:24 172:1 173:10

**Jeremiah Samples 041824 Ex 8**  3:10
185:8,9

**Jeremiah Samples 041824 Ex 9**  3:11
195:15,16,20

**Jeremiah Samples 041824 Ex 10**  3:11
195:18,19 196:2

---

**0**

**023**  177:17

---

**1**

**1**  59:14,15 66:7 173:9

**10**  195:18,19 196:2

**11**  160:2,21

**17**  101:10 165:5,6

**19th**  174:16

**1st**  53:21 160:21 185:20

---

**2**

**2**  138:3,5,11, 15,18,23

**20**  9:11 76:10 90:7 106:17 114:4

**2002**  15:11

**2006**  12:10,22

**2008**  12:24

**2009**  13:7

**2010**  13:11 69:9

**2013**  13:14,17 15:14

**2014**  13:18 14:6 15:15

**2015**  14:10 15:8

**2016**  14:10 15:8 90:24

**2017**  15:9 16:1 43:20 69:11 101:22, 23 116:18 120:22

**2018**  133:8

**2019**  60:13 102:9,11 104:19 105:11 120:9 121:19 133:11 160:9

**2019-CPS**  160:6

**2020**  114:4

**2021**  114:2,5 167:22 177:17 179:5 185:20 195:24 200:22

**2022**  13:20 15:11 18:1 33:20 34:22 36:5 43:3

45:18 46:18 47:15,17 48:9 79:14 85:21 87:1 120:14 141:10 145:10 157:16 160:2, 11,22 163:3,5 164:4,7,19,22 166:18,22 167:15 179:8 182:3 184:8 205:11

**2023**  10:20 33:18 44:14 45:20,22,23 46:5 48:16,22 49:1 58:22 104:21

**2024**  43:4 45:24 46:7,8 58:18

**2025**  12:6

**2026**  12:8

**21**  195:24

**23**  49:4

**24**  48:22,23 49:2

**25**  167:22

**27**  164:16

---

**3**

**3**  138:4,6,11, 16 141:8

**3.5**  53:1

**30**  54:2 61:5 106:17

**300-plus-million-dollar**  102:7

**3022**  182:21

**31**  184:8

**33**  90:17

**330**  69:20

---

**4**

**4**  138:8,9,21 154:19,20

**4:00**  207:23

---

**5**

**5**  159:16,17

**500,000**  83:23

**55**  125:5

---

**6**

**6**  167:18,19

**60**  43:23 106:19

**67**  43:21 194:11

**68**  43:21 190:7

---

**7**

**7**  141:10 171:24 172:1 173:10

**7.5**  83:22

**7.7** 82:21

**7th** 145:9

---

**8**

**8** 185:8,9

**85** 69:18

---

**9**

**9** 195:15,16, 20

**90** 54:10,12 69:18

**90-day** 54:7

**900** 128:16

---

**A**

**ability** 33:11 49:5

**Absolutely** 6:1 137:24 199:4

**abstinence** 96:11

**abuse** 70:3 129:5,20 160:14,19 161:13 196:6, 7,11,16,20,23 197:5,11 198:14,16

**abused** 63:9

**abuses** 96:7 109:13,17 111:20 112:3 113:12

116:14,16 117:4 120:19 121:1

**abusive** 196:4

**academy** 152:7

**accept** 141:14,17

**accepting** 142:12

**access** 22:5 32:10 35:16 37:24 38:14 39:10,11,17 44:12,17 46:14,16,21 47:3,6,18 48:13 49:6 54:20 57:14 59:5

**accessed** 31:8

**accidental** 140:8

**accidentally** 139:13

**accomplish** 44:15 70:19 189:23

**accomplished** 49:11 190:1

**accomplishing** 108:5 187:21

**accountability** 70:7,12 71:9

**accountable** 70:19 107:24

**accounting** 57:16 88:1

**accuracies** 28:10

**accuracy** 28:21 29:3 200:1,5

**accurate** 53:4 93:22 99:16 109:6 177:14 189:7,13,18 202:14

**accurately** 189:10

**achieve** 88:17,18

**achieving** 94:12 135:24 136:4 151:8

**action** 28:12, 15 121:10 131:16 137:5

**actions** 126:2 162:22 163:1 188:2

**active** 75:14

**actively** 52:3

**actors** 20:12 97:11 177:24

**actual** 81:8 88:14 90:22 91:1 105:12 138:17 188:23 201:18

**acuity** 52:23

**acute** 23:6 52:7 78:23 79:7 124:17 178:22

**ad** 206:3

**add** 76:20

**added** 183:1

**additional** 62:9,14 76:20 84:24 86:19

**address** 76:2 78:7 96:4 166:11 170:6, 8 193:12 194:3,7

**addressed** 79:10 166:1

**adequacy** 124:23

**adequate** 22:22 128:4 180:19

**adequately** 127:17,19,20 165:24 191:1

**adhered** 117:11

**adjust** 70:16

**administration** 14:11,18 57:14 84:3 123:17

**adults** 109:20

**advance** 9:24 81:1

**advancing** 103:9

**advice** 37:16 55:20 64:3, 12,16,18 65:15 154:11, 12 172:15

**advisor** 18:7 19:15 24:2 37:21 171:4

**advisory** 54:3

**advocate** 85:17

**advocated** 84:2 170:13

**advocates** 113:2 116:7,9

**advocating** 135:5 148:7 156:8

**Affairs** 12:23

**afraid** 129:2

**afternoon** 60:23

**afterward** 126:3

**aged** 132:8

**agencies** 57:12 68:17

**agency** 12:14 13:9 23:15 31:1 42:8,9 86:19 119:24 147:2 177:5

**aggressively** 81:1

**agree** 122:15 134:20 168:16,18 169:19,21 171:12,15 177:5,7,8,9, 11 190:18

**agreed** 61:1 146:11 190:20,21 194:19

**agreement** 121:12,18,21 139:20

**Alaska** 91:20

**alive** 119:13

**allegation** 196:23 197:10

**allegations** 28:4 117:22 191:21 196:7, 19 197:5 198:14

**allocate** 87:14 92:11

**allocated** 80:12 82:13 84:12 133:20

**allocation** 80:11

**allowed** 5:4

**allowing** 47:3

**alternative** 50:23 203:22

**amendment** 54:4

**amount** 18:24 31:7 33:6 81:17 102:18 131:24 165:16 204:11

**amounts** 82:24 85:14

**analysis** 34:15 99:9 127:9 135:10 136:7 147:15

**and/or** 207:2

**anecdotal** 77:15

**anecdotally** 163:19

**Angie** 61:2

**animosity** 153:22

**answers** 4:21,24 107:8 150:5 152:15

**antagonistic** 152:16 153:20

**apparent** 45:22

**appeared** 92:12

**appears** 77:19 138:15 144:17 159:23 160:4, 8,12 163:16 173:3

**apples** 91:3

**applied** 32:14 33:15 57:2

**appoint** 145:6 146:24 147:1, 18 148:2

**appointed** 13:18 58:3,5 146:16,17,22 147:10 148:14,15,18 149:7 150:20

**appointing** 150:11

**appointment** 58:7,9 148:22 149:5 150:1

**appoints** 147:13,14,17

**apprised** 20:7

**appropriated** 84:12 96:3

**appropriately** 67:9 205:22

**approve** 51:16

**approximatel y** 12:24 38:12

**April** 18:1 61:3 141:10 145:9 157:16 163:5 164:7, 22 166:22 172:18,20 179:8 182:3 205:11

**archived** 89:22

**area** 22:19 24:20 81:13 124:7 125:8 129:19 179:24 192:19

**areas** 14:21 19:11 20:8 30:22 50:3 63:13 66:15 68:15 79:15, 16 80:14 82:9 85:9,11 90:3 125:6 177:18

**argue** 72:13

**argued** 90:20

**arguing** 124:22

**arguments** 134:5

**arises** 6:24

**array** 40:16

**article** 77:17 154:20,23 155:2 196:18 199:18 200:1, 5

**aspects** 68:14

**assaulted** 118:23

**assaults** 111:20 117:22,23

**assert** 81:22, 24 82:2

**assertion**

142:24

**assigned** 157:20 201:16 202:2 204:12,23

**assigning** 201:11 204:22

**assistance** 19:18 85:6

**assistant** 13:17

**association** 113:1

**assurance** 78:5 167:8,10

**at-will** 143:3, 13,18

**attaching** 167:21

**attempted** 135:17

**attempting** 126:5 135:14 139:3

**attempts** 23:15

**attention** 128:21

**attorney** 4:8 5:3 7:1 9:14, 24 25:19 26:7,21 27:7 55:11,18 66:3 138:19,23

attorney/
client 6:24
10:4 25:18
27:12 37:14
55:11 113:23
115:16,20
172:8

attorneys
25:23 26:1
55:20

attributed
109:7

authority
17:21 22:9
48:19 57:4
168:22

availability
80:3

average
69:21

avoid 198:12

aware 33:21,
22 77:8
108:22 119:7
120:18,19
131:14 137:4
163:7 164:17
166:5 179:10
182:5 183:9
184:7 194:6
196:6,10,14,
16,21 198:20
199:10 206:6

awful 119:19

**B**

back 8:10,22
13:14 15:14,

22,23 26:23
29:7 30:12
33:19 43:20
53:23 58:18
60:24 61:16,
22 65:23
74:20 81:7
86:22 94:6
101:22 103:8
104:9 105:11
112:13,23
113:5 116:17
117:14
118:22 119:5
123:4,16
135:20 145:8
159:8,15
172:10
182:11 190:7
191:14
194:10
196:13,15
201:8 204:18
206:24

background
11:17,20

bad 67:6
129:1 130:19
134:16
149:11

badly 175:4

bag 117:19

ball 132:23

barrier 46:3
104:16

barriers
151:8

Barry 108:20,
21

based 24:16
28:12 84:5
99:23 101:14
202:6

basically
58:19 87:23
90:11 121:15

basing
140:16,18

basis 20:14
174:2

Bates 174:16,
17 177:16

bathroom
117:13
118:24

BCF 173:15
190:15

bean 110:16
117:19

Beane 27:20
114:14

beats 119:1

bedridden
118:6

beds 79:4,6,7
124:17

began 32:24
87:12,23

begin 91:17

beginning
14:17 119:6

behavior 85:5

behavioral
14:8 19:19
57:11 78:23

103:4 112:24
115:3 181:21
202:8

believed
80:23 82:12
122:18,20
142:10
153:23
177:12,13
191:8 195:2

belong
201:19

benefit
188:24

Benjamin
28:15

big 78:19
97:19 102:12
104:19 108:3
123:21
135:11
186:15

biggest 106:1
182:23

bill 16:4 33:4
59:2 60:4
82:7 88:23
120:17
134:23 141:9
157:2 172:16
176:16

billion 82:21
83:22

bio 169:18
171:7

biological
42:2,6
168:15,23

192:23

birthdays
199:8

bit 12:21 19:9
20:16 23:3
59:23 123:9,
13 141:15
143:16
155:12

blame 107:16
144:6,18,24
146:6

blowback
130:24

blown 62:6

BMS 115:22,
24

board 103:3
193:4

Bob 5:12

bones 188:14

Boone 77:17

bottom 84:8
90:15 94:7,8
128:12
174:18,23
182:9

bounds 80:5

Bowling
13:16 15:21

boxing 88:8

boy 118:23

brain 40:7

branch
175:17

**break** 7:4,6,8 65:22 66:2 122:22 123:2 159:13,14 201:6

**breakdowns** 181:3

**breather** 132:5

**briefly** 10:1

**bring** 81:7 114:9 142:4 148:5

**bringing** 200:8

**broad** 19:16 22:19 26:14 29:21 79:8 80:16 158:20

**broader** 40:16 42:12 67:4 83:24 104:2 116:6 128:22 149:17 188:16

**broadly** 47:11

**broke** 122:13

**broken** 80:2 98:18 117:15 145:23

**brought** 31:2 32:17 40:19 130:19 191:2

**BSS** 22:3 146:24 147:1, 6

**budget** 82:13 85:18 130:9

**budgetary** 63:20 65:6 66:20

**builder** 153:1

**building** 124:20

**bullet** 163:24

**bullets** 187:20

**bundle** 103:4, 5,15

**burden** 100:22

**bureau** 14:14 17:6 27:24 28:2 29:14 51:11 71:6 102:23 103:19 107:13 115:3

**bureaucracy** 85:8 173:16

**bureaus** 85:16 107:3 161:19

**Burkhammer** 170:16

**burned** 119:13

**business** 110:8 153:5

---

**C**

---

**Cabell** 113:16

**cabinet** 27:16 58:5 60:4

**calendar** 48:22

**California** 70:17

**call** 60:21 92:1 113:19

**called** 4:2 12:13 27:24 28:1 34:3 61:17,18 112:8 139:2

**calling** 172:10 193:21

**calls** 49:17 61:11,15 62:5 193:20

**Cammie** 5:16 26:8 150:20

**Cammie's** 38:18

**Camp** 180:1, 5,6

**capable** 102:16

**capacity** 12:7,19 18:13 24:2 78:18 125:7,8,16 126:5 171:5

**capita** 132:18

**capitated** 103:14 104:2

**care** 7:23,24 8:9 23:6 29:9

47:20 48:5 50:23 51:2,3 52:7 53:4 96:18 102:21 103:11 109:19 114:22 118:15 130:18 131:13,20 167:21 180:18,21 181:2,5,20 199:15 202:10

**career** 98:1 196:14

**careful** 32:18 34:7 36:22 136:22 192:6

**carried** 105:3

**carry** 158:8 188:14

**carrying** 188:11

**case** 4:9 7:18, 21,24 8:8 11:15 26:10 75:15 95:24 96:2 97:19, 21,24 98:2,4, 21,22 99:1,2, 7,20 100:8 118:4,11 119:3 125:4 126:10 148:1 162:6 166:1 167:6 169:13, 16 171:12 186:10

188:12 201:18,22 202:13,15 203:4,9 204:4,9,24 206:6

**caseload** 24:16 65:10 77:3 101:3,16 166:6 201:22 203:8,13,16, 19,24 205:4, 12

**caseloads** 68:12 75:23 99:21 165:15 201:16 202:1, 17 203:1 204:22 205:16,20

**cases** 7:19 8:4,13,16 28:13 43:18 47:13 48:10, 11 67:10 68:9 69:15 70:1 74:21,24 75:3 77:21 99:22 100:8 101:2 132:7 201:11

**categorically** 41:15 60:15 94:20 141:21

**categories** 20:3

**categorize** 132:1

**category** 41:18,19

caused 102:15 150:8

causing 42:12,13 44:6

caveat 207:8

CCWIS 103:22

central 85:8

centralized 43:14 44:6 75:1

certainty 43:9

cessation 83:12

cetera 57:17 58:13 70:17 112:4 176:10

chain 185:14 186:6

chair 89:3 111:16 117:19

Chairman 86:4 111:15

challenge 73:10

challenges 36:17 153:4

challenging 124:2

chance 30:8 139:16

change 133:15 147:15,19 161:21 173:5

changing 153:4 187:24

chaotic 113:10

Chapman 5:16 26:18,22 32:22 35:9, 10,15 36:7,9, 24 37:12,15, 23 38:8,14 39:1,10 44:19 45:8,9 46:3,5, 6,9,13 59:3 71:12,16,19 150:2,11,20 151:3 152:2, 18 153:17 154:3,9,12 158:7

Chapman's 26:5 36:22 38:19 39:12 153:12

character 140:3,12 143:2,20

charged 158:4,10 202:22

Charles 158:12

Charleston 119:11

chart 16:19

check 75:16

checked 15:5 69:17 120:12

checklist

90:9

chewing 192:3

chief 61:17, 19,24 62:15 158:12

child 14:9 15:13 19:17, 19,20 20:4,9, 11,14 22:14 23:12,14 24:10,11,14, 19 26:9 28:13 29:19 30:3,6, 22 31:8 32:7 40:4 41:19,22 42:1 44:13 47:19 50:6,9, 13,19 51:13, 22 52:1,12 57:2 58:12 63:1,3,10,15, 17,21 66:21, 23 67:3,4 68:13 69:2,7, 13 70:21 71:5 73:8 74:5 75:16 76:23 77:17 80:12 82:14 83:1,9, 17 84:17 85:4 86:19 88:18 94:24 96:1,2, 6,21 97:19,21 98:13,22 99:1,5,24 102:1,2,24 103:19 106:23 107:1 118:12 119:4 132:2 133:15

142:17,22 144:7,18,24 151:5,23 152:8 156:14 166:2 175:5 176:11 177:23 178:19,20 179:1 181:6, 12,14,16,20 198:19 201:19 202:2, 23 203:12 204:5,24

child's 42:2 181:18

child-specific 162:7

children 21:4 23:7,8 28:1 29:24 30:24 40:17 42:5 51:1 52:23 67:15 69:16 78:22 83:3,4 96:9,18 98:2, 10 100:7 103:17,19 104:6 109:19 116:21,24 117:3 121:5 130:22 131:19 132:8 133:5 137:5 155:24 156:6 176:15 177:24 179:11,15,20 180:12 196:20,22 197:9,22

198:17 199:6, 11 200:2 202:7,11 203:9 204:8, 11 205:24

CHIP 19:19 85:6

choked 117:11

Christina 115:2

churn 100:17, 20

Cindy 27:20

circuit 7:22 8:8 91:24 140:23

circumstance 147:17

circumstance s 59:11,24 179:16 181:18 185:6 203:4,9

claim 74:7 173:21,22

clarification 17:16

clarify 38:23 57:1 73:16 88:10 95:14

clarifying 26:3

clarity 77:24

class 28:12, 14

classic 172:15

clean 198:11

clear 5:1 137:23 176:23 177:2 195:9 199:5 206:21

clears 147:22

Clifton 15:6, 24

clock 54:7

close 128:24

closely 17:11,12

closing 121:15

CMS 51:15 54:7,8

code 47:17

coincidence 141:2

collapse 173:16

colleagues 200:11

collected 167:5

college 12:4

comfortable 189:6 190:11

Commerce 60:19

commissioner 13:12 87:8

100:19 110:16,17 111:17 114:14 115:1, 2 145:6 147:1,6 148:18,23 150:3,11

commissioner's 149:6

commissioners 16:17 17:7

committee 9:6 13:24 18:9 21:4,5 88:24

committees 18:18 21:3,15

communicate 103:22,23 169:17

communicated 21:23 37:2 105:23

communication 170:10,14, 19 171:6 206:2

communications 12:23 25:22 110:9 180:20 181:4

community 125:24 176:9

community-based 78:15 79:22 123:19 124:19

125:14 126:1 127:18

company 121:3

company's 119:10

compare 163:15

compared 91:3

competitive 164:15

complaining 192:9

complaint 10:11,14 25:15 27:6,8 28:5,10 30:2 47:8 109:1,4, 6,9

complaints 20:10 25:13 48:12 67:7,11 68:3 91:13 170:2 171:5, 20 181:19 182:7 186:10, 16,17

complexities 100:11

complexity 98:20

complicated 68:15 103:10 122:3 203:14, 15

components 51:10 102:4

concern 44:4 56:12 130:10, 11 132:9 169:8,9 182:24

concerned 150:15 151:23 178:10 190:24 200:24

concerns 28:11 29:14 30:17,21 31:3 32:21 36:2 37:11 42:4 43:14 50:11, 16,17 54:14 56:15 58:21 68:6 69:22 80:17 150:10, 13,24 163:20 168:24 169:12 183:1, 5 194:16

concluded 207:23

condition 41:24

conduct 18:17 33:11

conducted 24:12 35:21 76:22 84:3 165:13

conducting 41:17 43:11 69:23

cone 129:16

conference 113:19

confidence 127:2 149:23 176:7 189:20

conflict 30:20 31:21 56:11

connect 19:4

connection 11:11 53:9, 12,16

consensus 116:11

consequence 104:4 112:19 162:5

consequences 67:14 127:14

considered 95:5

constituent 18:24 20:10 169:1

constituents 18:22 29:13, 19,20 169:12 175:18 182:13

contacted 183:11

containment 66:20

contend 83:5 147:6

contended 63:22 85:2

content 10:5

contention 68:19 82:23 171:13,16 201:15

contentions 194:20

contest 142:23 155:17

contesting 139:6

context 23:2 74:10 81:5 162:6 183:2 188:9,16

contextualize 161:8

contextually 161:1

continually 73:7

continue 70:23 74:15, 16 153:9 157:24 168:24 170:3 182:15

continued 12:21 33:2 60:13 67:8 85:16,20 142:4 145:21, 22 171:20 180:20

continues 68:20 130:10 163:21

179:15 191:19

continuing 35:14 38:4 101:15 158:3

continuum 50:23 124:12 180:17,21 181:2,5

contract 50:5 101:24 102:4, 7,21 103:11 104:3,17 106:11,14,16, 18 121:24

contracts 106:1

contractually 104:1

contrary 86:5,14

contributed 100:17

control 19:22 85:7

conversation 10:6 33:17,23 34:6,18,24 35:9 36:6 41:2 42:22 45:15 62:1 71:21 72:19 73:6 74:10, 11,13 85:20 112:4 123:5 131:11 184:24 201:13

conversations 17:1 22:10 26:9,18,22 32:18 34:8 35:13,23 36:7,8,23 37:9,22 38:7, 12,24 39:8 41:17 42:21, 23 45:2 46:2, 4 48:24 49:2 60:6 62:15 66:3 71:19 72:1,10 73:1, 17,22 81:10 83:11 85:24 95:11,16 97:6 110:16 111:1, 2 121:7 125:23 137:14 149:4 150:18,21 152:18 161:12,16,17, 18,22 162:2, 14 184:12,17, 22 193:16 194:4

convey 11:8 41:21 82:6 99:12 110:18 152:4,12,14

conveyed 55:22 111:15, 18 119:12

conveying 56:10 148:4

coordinated 180:11,16

core 156:12

correct 9:15 18:3 19:6 39:14 45:12 56:6 59:7,17, 18 66:10 70:13 109:15 115:12 122:2 138:12 155:3, 11 156:2 164:4 178:11 182:18 183:6 185:16 207:20,22

correctly 7:23 150:22 158:2

council 54:3

counsel 8:20 9:2 13:3 17:5 18:16 73:15 95:6 113:20 115:8 172:17

Counsel's 13:1

counselor 192:24 193:6

counted 99:23

counties 125:5

counts 97:18

county 76:8 77:17 80:2 113:17 118:19 124:23 125:3, 5 126:6 152:9 178:14 179:2, 12,15 192:13

couple 4:11 60:2 97:4 109:20 135:9 178:4 196:18 199:23

court 4:3,16, 20,24 7:17,22 8:1,4,8,9,13 20:13 31:3 41:21,23 65:3 67:18 73:14 74:18 100:7 151:17 205:22

courts 76:12

cover 50:2 52:5 143:19 145:20 146:4 154:17 156:9

covered 25:20 64:14, 20 72:20 86:10 147:3,7

COVID 20:2 113:8 114:11

CPS 30:24 41:10,13,17 43:10 65:10 67:8,16,18,19 68:5,8,11 71:24 72:4 73:1 75:5 76:12,23 77:4,23 85:19 87:19,20 90:8,18,23 91:1,14 95:22,24 97:7,10,13, 17,18,21

98:3,7 101:9,
14 131:1
141:22
145:11 156:9
162:5,8,20
164:1,14
165:16
168:12,21
171:6,11
176:13
177:23
178:18
181:15
191:22 192:4,
5,14,15,18
193:10
201:20
205:21 206:4

**crafted** 47:10

**crashed**
119:8,11

**created** 82:19
86:17 133:1
170:21,22

**creating**
160:9

**creation**
158:10
170:18

**credit** 158:24

**crisis** 69:6
85:2 90:19
91:15,16
134:3

**critical** 18:23
66:14 83:1
105:16,18
134:4 136:8

**criticality**
16:22 110:19

**criticism**
129:2 130:15

**criticize**
140:1

**cross-
referenced**
117:7

**Crouch** 16:4
17:13,20
32:13 33:14
34:1,12,17
35:1,4 59:3
60:4,12,17
61:4,5,21
62:24 64:4,13
65:15 71:11,
17 72:1 73:1,
18,19 76:15
80:21 82:7
92:16 93:7
94:9 95:10
109:12 110:7
116:18
120:19
122:14 123:6
128:7 135:3,
23 137:4,15
141:9 142:6,
21 144:5,17
145:1 146:15
147:5 149:9
150:24
157:12,13
158:24
161:23
162:14
170:18
172:16
176:17 183:9

184:5,13

**Crouch's**
34:4 72:13,15
87:3 91:7
148:21
182:17
184:10

**culture**
190:14,15
191:14,15

**current** 18:4
20:20 22:2
29:6,7 50:12,
21 165:4
190:14 205:4

**custody**
47:19 69:16
96:9

**cut** 207:9

---

**D**

**D001073024**
174:19

**dads** 98:5

**daggone**
99:15

**daily** 103:3

**damage**
143:2

**dashboard**
156:14,15,17,
20,22 157:2,
4,10 158:5,
11,17,18
159:1,10

**data** 43:23
45:10 46:10,

21 47:4,16
49:15 167:4

**date** 53:20
198:1

**dated** 141:10

**dates** 11:9
36:11

**day** 54:9
60:17 62:12,
14 73:8 89:4,
6,7 112:16
118:6 184:24
195:23

**days** 54:2,10,
12 89:8
196:15

**DD** 119:8

**de** 83:22

**deadline**
201:5

**deal** 30:8
40:3 44:20
100:12
132:15 134:3
151:2

**dealing** 96:14
129:15
136:14

**death** 63:10
77:19 117:11

**deaths** 69:9
111:20 112:3

**debate** 96:1

**debated**
121:22

**Debbie** 16:11

**December**
120:10

**decision**
64:5,17,19
74:7,12
142:12
146:21,23,24
147:2 149:3
151:11

**decision-
making**
146:11
153:11

**decisional**
95:11

**decisions**
72:9,11 73:24
74:1 93:4
95:17 136:8
141:14,16
151:10 187:8

**decrease**
166:10

**defeated**
187:2

**defend** 140:5

**defendants**
5:14 6:15

**defended**
152:17

**defense**
107:19

**defer** 101:17
127:4

**defined**
201:19 204:4

**degradation**

28:18

**degree** 11:24 14:22 176:7

**degrees** 11:21 15:22 85:11,12

**delay** 135:13

**delaying** 136:8

**delays** 42:13 102:6 104:17 206:1

**Delegate** 170:15,16

**Delegates** 171:3

**deliberated** 137:1

**deliberation** 156:16

**deliberations** 125:20

**deliberative** 7:1 55:12 64:2,6,8,14, 15,20,24 72:10,18,20 73:11 74:8 81:20 82:11 86:8,10 89:11 92:23 95:12 110:23 111:7 137:17 146:19 147:3, 7 150:17 172:7 173:23 174:2,9 184:20

193:19,21 207:4

**delivered** 112:1 118:8 165:22

**delta** 106:20

**demands** 190:10

**denominator** 90:21 101:14

**department** 6:3 11:14 12:15,16 13:2,22 15:19 30:5,8,21 31:13,22 32:6,11 34:21 36:4 37:10, 17,18 44:6 46:12 48:1 49:3,14 51:15 52:14,22 56:23 57:10, 13,18 58:6 59:12 64:5 71:7 81:5 85:3,21 86:5, 15 87:12,15, 16 88:12,15, 24 101:17 110:4 111:4, 9,11 120:3,22 126:3,4,13 128:1,20 133:2 138:18 139:5 148:11 149:15 154:13 165:8 170:1 171:19 179:14

187:18 191:13 195:13

**department's** 24:9 50:14 51:6 83:11 163:13

**departments** 19:8 107:3

**departure** 13:22 34:21 59:11 66:9 139:4

**depended** 16:21 17:2

**dependent** 203:2

**depends** 26:13,15 74:9,13

**depiction** 202:14

**deposed** 7:13,17,20 8:2,3,15 140:14

**deposition** 8:19 9:13,24 66:4 207:23

**deputy** 13:4, 6,18,19 14:4, 13,15,19 15:2 16:2 17:24 25:16 27:23 36:12 37:3 39:3,4 64:11 73:19 154:21 161:11

172:15

**designated** 133:23 166:11

**desire** 131:7

**detail** 167:4

**details** 188:19

**deteriorate** 51:8 60:13

**deteriorating** 50:18 52:11

**determinations** 70:1

**determine** 124:2

**determined** 198:19

**develop** 163:24 166:10 203:7

**developed** 48:3 164:13 203:3

**development** 20:19 40:5 167:7

**developmental** 23:13 117:18 118:2

**DHHR** 13:14, 19 14:4,21 15:23 19:5,7, 10,13 25:15, 24 27:3,7 28:14 31:11 33:1 39:3,5

54:22 55:15, 20 58:22 59:21,24 64:12 66:9,13 71:8 79:13 82:22 85:4 115:18 122:1 127:16 128:9 133:14 147:11 161:12 169:13 183:10 184:13 185:2 186:11 189:12 193:12 194:2 196:15,22 197:9 200:17, 21 204:21

**dialogue** 188:23

**Diana** 148:9

**Diane** 148:8

**dictate** 86:5

**died** 119:13 129:17

**differences** 95:1

**differently** 82:14 107:5

**difficult** 39:11 203:23

**dire** 145:21

**direct** 16:5,12 174:15

**directed** 93:18

**directing** 86:18

**direction** 19:2 122:16 136:21

**directive** 86:24 87:4 88:10 89:3 93:11,13

**directly** 16:19 23:10 26:1 58:4

**director** 13:13 18:11 61:3

**dirty** 193:1

**disabilities** 117:19

**disability** 5:18 23:14 118:2 129:5

**disabled** 63:8 66:22 96:8 109:13 122:18,21 129:20

**disagree** 64:23 91:10 92:19 94:16 168:7

**disagreed** 91:6 92:16 95:15,20 109:12 123:7 136:3

**disagreeing** 168:10 182:16

**disagreement** 64:24 65:14 128:7 129:23 141:20

**disagreements** 35:17,18 41:5,6 60:3 62:24 63:4, 12,20 65:6,7, 9 122:8 124:6 153:16,18 154:8

**disagrees** 146:3

**disaster** 104:22,23 105:14

**disclose** 34:13 38:8,11 59:3 95:9

**disclosed** 95:10

**disclosing** 25:21

**disconnected** 190:17

**discovered** 57:22

**discuss** 11:16 17:4,22 20:14 26:21 29:11,13 39:23,24 41:12 50:8 54:23 65:2 70:24 110:24 130:5 207:1

**discussed**

9:7,8 10:2 17:19 30:16, 18 31:23 40:22 41:9 42:18 49:21, 23 54:5,18 55:2 57:19 59:1 97:9 100:19 128:6 131:15 147:5 178:8,12

**discussing** 10:9 25:14 38:24 60:20 137:13 150:23 151:14,21 187:4

**discussion** 41:19 44:18 45:17 57:20 65:20 72:18 83:24 146:21 172:17 180:22 185:1 207:3

**discussions** 15:19 27:23 31:6,18 32:4, 15,22 35:21 41:16 44:10 55:14,17 56:3,8,10,16 72:9 73:9,12, 24 74:4 93:3 110:21 113:14 124:7 125:19 130:6 131:1 134:17 139:15 141:20 142:1,

2 143:9 145:2 148:19 157:3 159:6 188:17 193:14

**disincentives** 104:14

**dismissal/ termination** 138:17

**dismissed** 17:17

**disorder** 19:22 66:20 69:6

**dispute** 108:15

**distraught** 113:17

**distribution** 24:19

**document** 21:20 40:10 59:16,19,22 61:23 66:6 82:18 86:17 88:14 117:6 119:20 120:2, 5,13 121:13 138:16 139:13 143:19 172:6, 11,20,22 173:21 174:1, 6 185:10 189:8

**documented** 118:8

**documents**

8:21,23 9:1,3, 5,11,13,17 20:22 21:1, 10,12,16 33:5 34:9 159:5 207:1,2

**dogs** 117:9

**DOHS** 19:13 20:22 21:11 22:3 47:15 116:2

**DOJ** 53:10, 13,16 187:8, 12 188:5 189:4,12,17, 20

**dollar** 83:22

**dollars** 82:21

**doubt** 200:1,4

**draft** 138:15 141:7 154:21 155:7

**drug** 19:21 85:7

**due** 39:12 99:21

**dug** 189:14

**duly** 4:2

**Dunn** 108:20, 21

**duties** 67:9, 17 71:24 72:5 73:2

**dynamics** 151:11 153:10

**E**

earlier 14:6
71:10 145:12

earliest
120:21

early 13:18
45:23 46:7,8
48:23 49:2
196:15

ease 100:21

easier 124:14

easiest 92:12

easily 15:5
103:7 120:12
198:18

Eastern
76:17

easy 161:3

eating 113:8

educational
11:20

effect 30:4
102:13

effective
187:10

effectively
100:9 180:11,
16

effectuate
167:5

efficiency
76:13,21

efficient 57:8

effort 33:6
44:14,20 48:5
77:7 102:18
170:5 180:19

efforts 76:1,4
84:21 134:11
162:18,21

ego 93:15

egregious
91:22 121:3
141:1

eligibility
63:17 102:1
107:2

email 35:22
42:21 159:20,
23 161:1
167:20 173:2,
7,13 174:15
176:16
177:16
182:10 183:9,
18,21 185:14,
18 186:5,6
194:20
195:20,21
200:6

emails 161:2
172:9

embarrassme
nt 184:3,4

emergency
19:24 52:9
79:4 178:20

emotion
194:17

employed
64:11

employee
19:9 37:18
143:14

employees
22:3,6 25:15,
24 143:18
166:12
183:10 184:9,
13 185:2

employment
73:23

enacted
53:19

enacting
87:12

end 87:1 88:6
108:17 145:9
187:23

endeavoring
123:17

ending
177:17
182:21
194:11

ends 190:7

enforcement
19:21 68:7
85:5

engaged
107:13 115:7,
9

engineered
140:9,11
189:23

enjoyed
12:20

enormity

106:10

enormous
85:8 102:18

ensure 33:7
52:22 53:6
180:19

entailed
68:18

entanglement
s 98:6

entered
101:23

entire 143:18
196:14

entities 33:9

entity 57:3
109:21

entry 69:17,
19

enumerator
90:21

environment
132:2 133:24

equation
203:3

era 14:6

error 139:7
141:1

escalating
190:10

esophagus
117:10

essence 8:24
18:10 114:23
161:5 162:3
192:5

establish
173:7

established
50:24 167:8,
10,13

ethics 115:6

evaluating
20:1

evening
62:10

event 75:7

events 75:8

eventually
135:1

everybody's
113:9

evolution
126:19

evolve
153:24

evolved 32:2
57:21

exacerbating
166:15

EXAMINATIO
N 4:5

examiner
19:24

examples
66:22 76:6
83:13 128:11
141:19
158:20
181:24

exclusively
59:8

execute 69:1
180:10
189:21

execution
68:24

exhausted
187:2

exhaustive
22:16 76:6
96:19

exhibit 59:14,
15 66:7
138:3,4,5,6,8,
9,15,16,18,
21,23 141:6,8
154:19,20
159:16,17
167:18,19
171:24 172:1
173:10 185:8,
9 195:15,16,
18,19,20
196:2

exhibits
138:11,14

exist 29:14

exists 21:5
31:12 88:14

expand 46:22

expanded
48:19

expect 6:9

expecting
190:12

expenditure
83:20 103:24

expenditures

83:12 84:4
103:15 104:6

expense
106:10

expenses
103:15

experience
12:3 47:9
58:14 143:15

experienced
57:24 102:5

experiences
28:14 56:11

experiencing
32:5 178:1

experts 127:4

explain 6:18
64:8 82:15
122:4

explaining
123:8

exponentially
69:10,12

expose
134:18

exposure
96:12

expressing
194:17

extended
17:18

extensive
18:24 19:16

extent 37:15
72:8 95:8
142:10 154:6,

7,11 207:3

extenuating
99:7

external
105:21
165:10
191:17

externally
105:20

extra 105:13

extraordinary
179:16

extremely
190:16

---

**F**

---

face-to-face
114:12

faces 128:20

facilitate
116:11

facilities
14:22,23
54:15 85:10
110:1 114:22
116:20,24
117:2 121:14
127:2 131:5
196:19,21,22
197:6,10
199:24 200:2

facility 51:22,
24 79:6 98:13
109:19
197:11
198:18
199:12

facing 60:10
63:8 91:11

fact 21:13
44:23 84:15
90:10 99:22
120:12
157:17 158:6
176:13

factors 71:5
99:6,7 202:6,
13 203:10

facts 106:23

failed 75:16
129:17
141:14,17

failings 145:4

failure 169:16

fairly 76:9
122:3 143:11

fall 19:11
174:8

falsehoods
155:9,14

familiar 53:10
197:4,8
199:20,22

familiarity
88:3

families 21:5
28:1 29:23
42:6 98:8
155:24 156:6
166:13
168:23
181:11
202:12

family 19:18

42:2 85:6
98:19 99:23
178:21 192:6,
9 201:12,20
204:5,7,24

fashion 76:3
135:7

fastest 92:14

fatal 69:9

fatigued
100:16

favorable
176:11

fear 51:15
168:12

fed 117:8

federal 7:17
11:14 68:18
82:22 163:14

feel 66:18
99:3 118:13
132:14
133:11
146:10 174:3
189:6,18

felt 28:9 47:5
66:18 79:12,
15,24 80:1,20
83:7,16 84:20
85:17 92:5,9
93:15 107:12
108:4 122:9
123:21
125:17 130:2
133:14,17
134:6,7 140:7
149:16 151:1
152:16

189:13,16,19

**Ferris** 61:2

**field** 30:24
41:10,14
99:17 163:21

**figure** 6:8,16
62:3 73:14

**figured**
129:13

**fill** 78:4

**finally** 112:17

**finance** 14:1
18:10 88:23
89:3

**financial**
57:16 88:1

**financially**
57:7

**find** 23:16
86:19 130:21
134:12
135:18
178:19,23
181:13

**finding** 76:20
168:16,19
169:19,21

**findings**
34:14 168:7,
10 200:10

**fine** 93:3
193:24

**finish** 4:23

**fire** 90:19
94:3

**fishing** 40:10

**five-alarm**
90:18 94:2

**fix** 70:6,10
128:17 129:7
130:11
133:18,19,20
136:17
175:11

**fixed** 45:21
92:2

**fixes** 30:13

**fixing** 129:3,
12 161:13,23

**flag** 37:6

**flexibility**
88:16

**Florida** 70:17
97:14

**fluid** 16:16
17:10 26:6

**fly** 91:21

**focus** 24:20
128:17 134:7,
8 142:17,22

**focused**
13:10 14:7
133:3 144:19

**focusing**
19:12

**folks** 19:4
68:5 81:4,7
113:3 118:1
119:18 152:7,
10 158:3

**follow** 69:14

**force** 127:13

153:24

**forced** 117:13

**forever**
135:16

**forget** 161:4
179:21

**forgot** 5:7

**form** 141:7
191:23

**forms** 191:24
192:2

**formula**
51:14 103:1

**forthcoming**
34:13 131:7

**forums** 9:7

**forward**
50:15 60:14
174:5 188:14

**forwarding**
186:5

**foster** 7:24
29:8,23 47:20
52:10 67:20
78:21 83:3,4
96:18 98:14
100:5 102:21
104:24
116:21,24
117:3 118:12
119:4 130:18
131:13,20
167:21
168:15,22
169:18 170:9,
13,19 171:7
176:8 178:21
181:11 192:6,

7,9 196:3
200:19 206:3

**found** 12:20
93:10 132:6
165:18,20
168:11
169:15 171:9

**fourth** 94:21

**frame** 35:20
82:18 106:18
125:1 161:13,
24

**frames**
160:15
162:10,15

**frankly** 52:11
77:24 83:2
86:21 142:9,
12 143:2
155:19
190:12
191:19

**free** 22:5
83:16

**freezing**
87:24

**frequent**
97:24

**frequently**
24:8 169:11

**freshly** 145:8

**friendly** 41:6

**front** 89:12,
15 123:22
165:8 175:7
181:19 189:8
190:5

**frustrated**
87:6 93:9,12
139:12,19
140:14
148:24 149:1
175:9 192:19

**frustration**
187:2

**Fry** 152:8

**full** 10:15,18,
23,24 103:15

**fully** 34:13

**function** 84:6

**functional**
78:18

**functionality**
17:22

**functionally**
16:21

**functions**
79:1

**funds** 86:19
87:16 88:17
156:9

_____

**G**

**gain** 32:10

**gaining** 35:16

**game** 187:23

**games**
117:20

**gap** 127:8,9

**Gaunch**
60:19

gave 66:9

gear 47:21

general 13:1, 3 31:14 33:8, 10 38:3 56:22 57:4 58:3,11, 14 90:1 110:14 111:24 113:20 115:8 139:23 141:23 172:17 205:14

general's 121:10 138:19

generally 6:22 14:3 21:11 27:16 32:9 38:17 124:16 131:2 168:11 175:16 181:17 207:13

generic 187:22

genesis 47:23

gentleman 16:7,8

genuinely 191:7

George 197:17 199:20,23

Georgia 48:4,

6

give 4:24 15:4 30:7 62:3 127:6 146:4 158:24 201:3

goal 49:8 53:5 88:18 103:11 108:5 126:9 189:24

goals 127:20 151:9

good 123:1 128:24 153:1 159:7,11,13 175:9

Google 120:4

gosh 116:17 133:6 152:10

government 13:24 18:10 31:10 54:21 68:16 70:23 78:7 143:17 163:14

governor 13:8 58:3 86:4 88:11 93:11 140:2 147:10,14 148:2,14

governor's 13:15 86:3, 18,24 99:13 139:20 145:2, 5 148:3,20 175:20

graduation

12:4

grand 134:14

grandparent 98:15

graph 69:14

Graves 148:9

great 21:16, 18 40:3 81:4 151:3 195:7

greater 90:23 125:9,10,16

ground 191:22

grounds 6:23 25:18 55:10 64:2,6,9

group 29:21 98:18 187:1 196:3

growing 67:12 68:2

grown 69:10, 11

guardian 206:3

guess 17:15 73:14 130:14 145:14 148:11 192:20

guidance 18:16

guide 6:20

guys 92:2

H

half 12:12

hand 61:22

handle 94:11

hands 157:20

happen 78:6 85:23 86:22 87:9 120:24 121:17 125:22 126:23 140:23 162:13 182:1

happened 45:18 86:2 107:5 112:7, 11 113:18 162:17

happening 44:5 60:11 110:3,21 113:13 130:23 131:12 188:19 205:19

happy 73:13 95:3

hard 148:16 157:7

harder 110:19

harmed 122:19 137:6

Harold 15:6,8

Harrison 118:19

Hartley 28:15

head 4:20 31:17 101:1 163:18

heads-up 139:9

health 12:16 13:2 14:7,8, 22 18:19 19:19,20,23 21:2,15 31:13 57:10,12 58:6,12 85:5, 9,10 103:5 111:16 113:1 115:3 131:5 181:21

healthcare 13:10

hear 163:19 175:5 183:14

heard 33:14 37:21 183:13

hearing 175:13 182:12 183:4, 6

heavily 14:20 15:20,24

heinous 77:21

heinously 63:9

held 49:2 65:20 142:2 180:22

helping 104:8

helps 130:21

Herndon 12:13

hey 192:24

high 16:22 84:22 91:12 101:12 180:8 205:17,20

higher 51:2 52:8,23 69:18,20 90:22 205:7

highlighting 162:3

highly 115:6 142:23 186:15

hindering 108:8

hindrance 175:10,22 176:14

hindsight 88:7

hinge 87:13

hire 147:6

historic 102:22 134:1,3

historical 92:13

historically 21:10 31:11 43:19 47:21 63:11 67:6

91:11 124:15 204:23

history 11:22 84:18

hit 144:4 190:14,19 191:11 195:3

hold 70:18 194:23

holding 103:8 107:24

home 62:10 78:15 98:14 117:13 123:18 124:19 125:14

homes 114:20 120:20 121:6 196:3

hoping 136:9

hospital 52:8 178:22

hospitals 23:6

host 60:14 91:13

hot 117:8

hotel 23:7 179:2

hotels 178:14 179:11

hour 10:10

hours 10:8 117:20

166:13

house 18:12, 18 21:3,6 171:3

HR 57:15 61:3

huge 44:1 100:10 102:8, 20 107:9,11

human 12:17 13:2 18:19 52:14 56:23 59:12 71:7 143:17

hundred 21:13

hurt 140:11

hypothetical 74:11

___

**I**

IDD 109:18 114:20 118:1 119:1

idea 112:5 123:1 129:10, 11 149:11

ideas 20:19 40:8 128:22 158:6

identified 30:14

identifies 58:11

identifying 198:12

203:10

identities 199:14

ill 190:13 191:10

imagine 74:11

immediacy 30:9

immediately 61:8 146:13

impact 69:7 88:19 90:13

impede 153:10

implement 116:13 135:7 152:23

implementati on 63:16 71:1 96:5 101:20 102:5 105:13, 17 107:6,14 108:23

implemented 72:24 93:1 102:9 105:11 106:20 108:11 189:5

implementing 71:2 104:16 106:9

implicate 27:12

importance 84:5

important 90:2 119:17

impression 50:11 93:21, 24 175:24

improperly 75:22 77:10

improve 20:20 68:22 76:11 162:19 177:22

improved 165:3

improvement s 163:16

improving 76:21

in-home 79:22 123:19

inadequate 79:1

inappropriate 23:6 40:12,16 52:2,4

inappropriatel y 43:16 51:1

incapable 103:7 106:24

incentives 104:13

include 76:6 96:8 103:16 115:1

included 41:3 56:24 63:17 114:24 158:17,18

including
80:17 109:14
142:8

inclusive
47:11

incoming
13:16

incorporate
104:2

incorporated
40:9

increase
87:20 125:17
162:18
173:18

increased
90:6

increasing
192:20

indecisiveness 136:7

independence 58:20

independent
33:8

individual
19:3 98:22
99:24 117:8,
18,24 118:10,
14,18,20,21
119:1 157:21
158:4 197:22
198:12,15
201:10,12
202:2 205:23

individuals
15:4 68:3
81:22 86:21

98:8 115:18,
19,22 117:12
121:6,11
122:19,21
129:21 176:8
192:22

inefficiencies
103:7

infer 176:2

inferring
150:6 176:1

influence
33:12 57:1
157:22

info 54:19

inform
183:11

information
21:21 25:22
31:7 32:9,10,
23 35:4,11,16
36:1,5 38:1,7,
9,15 39:12,16
45:24 46:14
47:7,18 49:6,
14 59:5 60:11
63:18 71:13
75:9,11 93:4
95:9 96:6
102:2 111:19
139:4,6,8,18
157:9 158:5,
13,15,16,22
170:12 184:2
186:10 188:8,
10 189:19
190:10,19

informed
139:14 187:9

infrastructure
50:13,15,20
51:19 53:3
67:13 78:11,
21,24 79:9,11
80:17 96:15
122:3,5
126:23

initial 53:20
104:23 144:1
159:1,9

initially 12:15
14:13 28:5,17
32:4 36:10,11
45:17 87:9
120:7 134:24

initials 198:4

initiatives
177:22

inordinate
82:24

inquiries
22:10 105:6

inquiry 24:20

insert 113:21

insight 48:15

insinuation
142:23

inspector
31:14 33:8,10
56:21 57:4
58:2,11,13
110:14
111:24 121:9

instance
192:4

instances

75:5 117:12

institutional
123:18
125:13
202:10

institutialization 126:20

instruct 72:7
174:11

instructing
137:20

insufficient
78:12,14
79:2,3,5,7
99:18

insurance
13:12 18:20
19:9,20
124:24

intake 43:14
44:7 75:1

integrated
63:16 102:1

intellectual
118:1

intended
28:17 48:7
140:13

intent 188:11

intentional
139:7,10

interacted
76:12

interest 30:20
31:22 56:12
104:8 139:17
176:14

interference
39:13

interim
120:10,11

interject
36:21 197:20

intermediate
109:18
114:22

intern 12:6,12

internal
111:19 122:8
130:3,6
149:15 157:3

internally
105:19
110:14
121:22 157:8

internship
12:13,19

interpretation
46:12 49:3
187:13 188:8

interpretations 49:7

interrelated
63:5

interrogatory
207:7

intrauterine
96:12

invest 98:21

invested
82:21

investigate
46:24

**investigated** 43:19,22 67:11 70:2 74:22 75:6

**investigation** 41:18 43:11 75:4,12 91:17 100:10 160:15,16 162:15

**investigations** 44:3 45:11, 12 68:1 69:24 75:21,22 77:9 160:20 161:14 162:12 206:1

**investigative** 44:12 46:10 47:4 48:14 49:15 161:23 162:10 200:10

**investment** 83:14,16 84:19,20

**investments** 80:14

**involve** 55:19 74:12

**involved** 14:9,20 15:12,15,20, 24 16:23 48:1 77:23 99:6 106:11 108:6 125:4 126:10

**involves** 30:2 37:15

**involving** 172:17

**issue** 6:12 16:22 17:4 23:14 30:3 32:2 33:2 39:20 40:7 45:21 54:18 58:11 63:13 65:3 72:2 74:4,21 77:10 78:20,23 79:12 85:1 97:8 99:20 101:4 102:20 107:15 108:14 110:11 113:11 122:13,14 127:23,24 129:5 130:15 131:18 134:4 136:20 144:19 145:11 150:8 152:21 156:13 160:14,17,21 162:9 163:4, 5,8,10 164:2, 3,6,10,11,15, 18,21,24 166:12,15,18, 21,24 167:7 179:4,11,12 182:2,6,8 187:3 192:13 193:2 197:16 198:10 199:10 200:9 206:8,9,10

**issues** 13:10 14:9 15:13,21 18:21,23 19:9,14,21,23 20:11 22:11, 21 23:5 24:1, 3,7,13,16,22 25:14 29:19 30:9,13,20 31:2 32:7 35:15 37:11 40:11,18,21 41:12 42:7,8, 12 43:6,8 49:23 50:1,5, 7 59:4 60:14, 20 63:2,6,14 65:13 67:5, 10,21 68:11 76:2 78:11 79:9 96:4,5, 15,17 101:20 102:15 108:13,23 109:3,5 110:18 112:2 117:9 118:1, 2,3 123:12 128:9,19 129:15,22,24 130:6 131:6 133:3,5,16 134:11,14 135:8 136:14 141:23,24 142:8 144:6, 18,24 146:9 149:12,18 160:9,10 163:22 164:1 175:13 178:4, 6,8,9 181:21 183:4 188:19

191:2 193:13 194:7 196:6, 11,21 197:8 202:8

**itemized** 41:2

**items** 22:15 41:3,4 76:10 84:7 190:3

**IUSE** 96:11

---

**J**

**January** 120:11 160:2, 11,21 164:4, 18 166:18 184:8 195:24

**Jeff** 16:9 27:18 93:16 145:6 146:15, 16 150:19 158:7

**Jeffrey** 148:2, 22 149:5,6

**Jeremiah** 4:1 61:6 176:17

**job** 108:2 128:2 144:4 159:7 171:10 175:9

**jobs** 33:11 107:21

**joint** 13:24 18:9 21:4

**Jolynn** 110:15 112:8 114:8

**Jordan** 15:6

**judge** 11:14 126:14,15

**judge's** 140:24

**judges** 41:21 91:23,24 92:1 105:1 125:3 127:1,3

**judicial** 175:17

**Julia** 4:7

**July** 53:21 185:20

**Junior** 197:17 199:21,23

**jurisdictions** 24:17

**Justice** 14:18 15:19 187:18

**juvenile** 23:13 47:12 52:6

---

**K**

**Kaehler** 186:1

**Kaehler's** 194:20

**Kaehler-woodman** 186:2,13

**Kanawha** 7:22 8:8 76:8

**keeping**

108:19

**Kemp** 16:12

**Kent** 16:8

**key** 151:4

**keys** 119:7,9

**kicked** 15:20 47:21

**kid** 193:1

**kids** 53:4 98:4,15,17 99:17 100:11 104:9 109:14 130:17 131:21 132:17 134:12 178:14 182:15 188:24 192:8 196:4 200:19 204:6

**kind** 87:24 88:8 90:8 119:5 124:22 128:12 134:15 157:19 159:8 181:16 195:11

**kinds** 130:13

**kinship** 178:21

**knew** 88:4 91:24 149:22 151:5

**knowledge** 40:3 53:13 77:14 79:3,8

101:3,5,8,10, 17 117:3 121:1 127:22 143:16 163:12 164:9 171:10 181:13

**knowledgeable** 115:4

---

**L**

**lack** 40:8 77:24 124:1 131:4 162:5 171:6,10 200:17,21

**land** 58:17

**language** 47:10 48:8 56:24 141:8, 13 187:22

**large** 9:3 51:9 68:13 101:24 187:1

**largest** 109:22,23

**late** 12:6 13:17 45:22, 23 46:5 48:24 114:4 120:9

**law** 68:7 69:2

**lawsuit** 10:12

**lawyer** 37:1

**layers** 173:16

**laying** 187:20

**lays** 51:12

**lead** 75:9

**leader** 37:18

**leadership** 22:8 38:21 61:18 81:10 96:23 97:1 107:13 149:17 190:16 193:14

**leading** 132:18

**leaked** 62:11 140:18,20 143:22,23

**learn** 36:8 116:15 133:4

**learned** 33:16 37:5,17 46:5, 8 93:4

**leave** 16:18 17:18 194:18

**leaves** 93:23 196:3

**leaving** 181:14 206:15,17,18, 20

**led** 68:11 69:8

**left** 17:24 51:3 52:2,6, 10 59:21,24 128:1 132:4 163:5 164:7, 22 166:22 179:8 182:3 205:11

**legacy** 102:16 103:6

**legal** 11:24 37:16 154:10, 12

**legislation** 44:15 48:18 49:4,10 58:24 120:16 130:20 133:1 170:5,7,23

**legislative** 8:20 10:19 11:3,6,11 12:23 18:11, 18 22:8 24:2 37:20 45:20 46:20 48:16 61:18 87:2 145:9 157:1 171:4

**legislator** 19:1 129:10 131:17 132:23 148:9

**legislators** 20:10 62:5,9, 16 92:2 105:7,23 175:18 182:12

**legislature** 6:4 9:4,9 12:5,8 13:21, 23 18:5 19:15 22:13 24:24 30:12 32:3,7, 16,20 34:9 35:6,19 37:6 39:6,8 40:6

48:2,15 49:9 53:21 55:15 56:9 84:10 87:14 89:13, 15,18 92:10 96:16 99:13 111:15,22 112:2,21 113:5 116:13 120:2,6 122:11 128:8 130:1,17 131:8,12 133:10,13 134:18 142:7 145:3 169:2,5 171:20 175:19 182:10 183:12 184:2, 7,9,14 185:4

**legislature's** 113:10

**lengthy** 76:9

**Leslie** 5:12 6:17 9:19 10:3 23:22 25:4,8 49:17 52:16 65:18 119:23 122:22 138:24 147:22 199:13 206:21

**lesser** 14:23 206:9

**letter** 63:3 79:14 94:6 99:20 135:21

138:16,17
141:9 143:4
154:22 155:8,
13,15

**letters** 141:6

**letting** 113:13
142:11

**level** 50:18,19
51:7,8,19,20,
22,23,24 52:8
53:1 54:15
58:14 78:5
80:2 91:16
98:12 126:6,
22 180:9
191:22
199:19

**levels** 51:2,3
134:1 194:16
195:12

**lever** 70:9

**leverage**
21:14

**licensed** 23:9

**life** 106:16

**lift** 123:21

**light** 138:21

**lightly** 79:1

**limit** 202:24

**limited**
198:17

**limits** 166:7
202:17

**Linda** 17:8,
11,16 27:18
186:6,9

190:9,23,24
191:6 193:16
194:23 195:6

**lines** 38:3
69:15 85:19
87:17

**linger** 23:14
129:4

**lingering**
52:9

**list** 22:15
63:2 76:6,9
84:8 95:14,20
96:20 97:15
123:8 130:8
137:11 160:9
190:14,19
191:11 195:3

**listed** 60:15
81:13 109:11
119:21
123:10 137:3

**listened**
152:19

**listening**
175:8

**listing** 112:3

**litems** 206:3

**lobbiest**
110:6

**location**
179:22

**locations**
110:2

**long** 77:5
88:5 143:11
149:13

150:12
162:12
165:19

**longer** 135:18
143:5

**looked** 22:12,
21 23:1 24:1,
3,13 89:23
158:9 165:19

**loop** 191:4

**lose** 106:14
182:13

**losing** 106:15

**lost** 66:14,19
67:1 79:13,16
106:20
113:11

**lot** 20:6,9,12
69:15 81:3,4
88:4 91:24
98:20 102:15
107:8 113:9
114:12
123:20 135:8
158:22 165:7
191:16
192:16

**lots** 48:12

**lower** 51:3

**luckily** 146:7

**lunch** 126:11
159:13

**lying** 131:8

---

**M**

---

**made** 33:20,

22 64:20 74:2
79:17,24
80:1,7,10,15
81:3,18 82:8
93:5 96:13
105:19,22
123:11,20
139:8 170:2,4
171:3,21
177:18

**magically**
70:10

**main** 162:22
178:8

**maintain**
51:19

**major** 102:3,
10 108:6
130:10
152:22 162:4

**make** 22:9
30:5 55:13
61:10,15
64:18 66:14
73:16 74:17
86:22 87:8
135:4 137:19
149:2 164:14
187:19 195:9
207:14

**makers**
128:16 129:9

**makes** 25:11
134:15
172:21 174:4

**making** 56:18
69:24 72:19
81:12 83:14
100:16

107:23
123:22
125:21
128:23 151:9
173:3 192:15

**man** 105:10

**managed**
7:22 8:9 48:5
71:6 103:11

**management**
158:14 167:6

**managing**
105:17,18
108:17

**Manchin's**
13:8

**mandatory**
68:4 176:9
192:14

**manual**
102:18

**manually**
172:9

**March** 157:15
167:22

**Marion**
118:19

**mark** 59:13
138:2,3,8
159:16
167:17
171:23 185:7
195:15,17

**marked** 59:15
66:7 138:5,6,
9 159:17
167:19 172:1
185:9 195:16,

19

**marketing** 187:9,12

**Marra** 110:15 113:13 114:8

**Martha** 12:18 13:9

**Marty** 5:17

**Maryland** 57:23

**master's** 11:23

**match** 194:17

**material** 88:19

**materialized** 85:1 90:12

**matter** 9:18 27:6 34:20 70:10 92:6

**matters** 72:15 92:6 136:8

**maximum** 204:11,14

**Mazezka** 5:17

**MCO** 102:21 103:14,23 104:8

**MDT** 127:5

**meal** 117:10

**means** 17:16 157:19 187:11,14,16

**meant** 54:23 82:15 115:21

123:14 176:3, 21 177:20 191:6

**meantime** 61:21

**measure** 98:24 124:14 125:18 126:5

**measured** 91:19

**measuring** 99:2 124:1,8 125:23 126:5 127:17,19

**meat** 188:13

**mechanisms** 189:23

**media** 59:21 62:9,11 139:3,9

**Medicaid** 14:7,10 15:16 19:17 51:13 54:4,5,6 57:11 85:6 103:3,12,17 114:14,15,18 115:11,19 116:1

**medical** 19:24 51:11 54:3 103:4,12 118:3 181:20

**medications** 118:5,7

**meet** 9:23 17:22 20:13 135:9 166:13

**meeting** 11:13 35:22 54:3 60:19,21 113:19,24 114:1,3,11 115:11 186:24

**meetings** 18:22 35:17 110:11 115:23 116:5, 9 121:2

**member** 169:4 183:11

**members** 185:3

**memory** 89:24 188:3

**mental** 58:12

**mention** 141:21 178:3, 4

**mentioned** 29:18 31:4,21 33:13 35:8 39:9,19 41:9 43:6,7,10 46:2 49:22 55:1 65:5 84:1 96:2 101:19 119:20 146:14 153:12 178:5, 6 181:2

**mentioning** 65:13

**menu** 126:10, 11,18 127:7

**message** 82:6

**met** 10:5,7 32:13 33:14

**methodology** 50:21 51:17

**metric** 99:12 124:10

**metrics** 91:18

**microcosm** 134:15

**middle** 54:11

**millions** 108:3

**mind** 45:5 93:23 94:1 127:16 129:7 179:3 201:21 202:1

**minimal** 192:13

**minimis** 83:22

**minute** 29:8 36:21

**minutes** 201:4

**mirror** 80:8 154:1

**MIS** 158:14

**misconstrue** 188:7

**miserable** 190:16

**missed** 75:11

**mistake** 47:22

**mistaken** 147:9

**mistakes** 80:10 100:16

**mitigate** 164:1

**model** 124:23

**models** 126:20 153:5

**modern** 107:1

**Molly** 15:6,7

**mom** 118:24 119:2

**moment** 44:21

**momentum** 113:12

**money** 63:22 82:24 83:7, 17,19 84:11, 12,24 87:14, 19 92:11,12, 13 96:3 102:8 108:3

**month** 13:21 54:1

**months** 10:15 34:20 109:2 113:6 135:10

**morning** 10:1 77:16 186:24

**mother** 98:3

**MOU** 53:10,

13,16

**move** 28:23 87:18 104:9 138:1 139:21 153:2 174:5

**moved** 13:1 179:18

**movement** 131:16

**moving** 50:15 125:12

**Mullins** 110:17 115:2

**multi-disciplinary** 126:14

**multiple** 40:4 75:5 121:4 142:16 175:6, 14

**multitude** 7:16 9:11 11:7 20:2 26:8 30:19 31:18 41:16 42:18 50:3 60:8 76:1,18 77:4 124:12 162:21

**multitudes** 162:16

**N**

**names** 15:4 199:6,23

**narrow** 26:17

**nation** 69:9 132:18

**national** 20:17 69:21

**natural** 126:19

**nature** 35:23 73:12 122:5 198:16

**navigate** 180:14

**necessarily** 47:8 54:16 55:18 99:4 151:10 198:15 202:4

**needed** 17:4 47:6 49:7 51:2 79:18 92:9 94:3 102:17 107:12 117:24 118:5 124:9 125:17 134:6,8 145:24 152:24 153:23 175:2

**negative** 131:3

**neglect** 70:3 111:21 119:16 160:15,20 161:13 196:20,24 197:5,11 198:14

**neonatal** 96:11

**network** 124:22

**news** 154:20 195:24

**night** 89:1,4 135:2

**nitpicking** 108:10

**nitty-gritty** 188:18

**nodding** 4:19

**noted** 184:8

**notes** 161:2

**notified** 139:2

**Nowviskie** 16:8

**number** 8:21 22:22 24:10 29:12,18,21 44:1 51:10 60:2 67:14,21 68:2,16 69:10 71:4 76:11 78:15,16,17 79:3,5,7 90:22 91:1 95:24 100:11 105:5 141:19 142:24 151:1 167:3 173:17 174:18 177:16,22 192:2 194:16 198:17 200:8, 16 204:6

**numbers** 131:23 163:17 205:14

**numerous** 25:13

**O**

**oath** 4:15

**object** 5:3 6:5,10 25:17 37:14 55:10 63:24 64:5 65:12,16 72:7,12 73:21 74:2,16 89:20 93:5 95:7,11, 21 137:9 154:5,13,15 172:6 174:2 193:18 207:16,18

**objecting** 6:11,23 95:18

**objection** 6:13 10:3 27:11 49:17 52:16 65:2,12 73:17 81:19 82:10 86:7,16 89:10 92:22 110:22 111:6, 13 113:22 115:15 137:16,19 146:18 147:20 150:16 154:16 172:5 184:19

**obligate** 104:1

**obtain** 20:24 21:15 23:24 139:3

**obtains** 154:21

**occasions** 121:4 189:18

**occurred** 75:4 76:14 103:24

**occurring** 42:5 75:19 96:7 109:18 117:5 179:4

**occurs** 75:8, 17 127:11

**October** 53:24

**offender** 121:4

**office** 12:22 13:1,8,15 19:21 31:9, 10,12,13 33:7,10 34:4 47:24 48:20 55:3 56:4,21 57:6,14 60:23,24 61:1,17,20,22 62:1 76:13 85:7 86:3,18, 24 99:14 121:10 133:1 138:20 139:21 145:3, 5 148:3,20

149:6 151:18
153:17 167:8,
10 175:20
179:2

**officer** 158:13

**offices** 13:12
58:10 76:21
178:14
179:12,15

**official** 18:6
78:1

**OHFLAC**
58:13 121:9

**OIG** 54:22
115:11

**ombudsman**
29:9 30:6,11,
16,21 31:23,
24 32:5,14,23
33:15,23,24
34:18 35:1,
10,14,24
36:9,15,23,24
37:9,16,22
38:13 39:2,9,
16,20 40:2,19
44:11,16
45:9,16
46:10,13,21
47:20 48:13
49:5,16,24
50:10 54:13,
19,22 55:2,3,
17 56:3,5,14
57:3 58:12,13
71:12,20
153:13,16,24
154:4,9
168:11
169:15 171:9

174:22 175:1
176:18,22
177:6,8,13
182:18,24
183:4 186:13
188:17 190:9
191:3,9

**ombudsman'
s** 31:9 35:19
46:22 47:24
48:20 56:4
151:17
153:17
167:21

**omission**
131:9

**ongoing**
41:19 60:1
69:5 76:3
77:7 182:14
185:1

**open** 206:15,
17,18,20

**operated**
176:12

**opinion** 28:3,
8 29:1,2
72:15 146:1
152:24

**opinions**
68:23

**opportunity**
134:2

**oppose** 89:9
93:20 94:2

**opposed** 58:4
70:8 80:13
89:2 188:1

204:8

**opposing**
89:13

**opposition**
89:19 91:7

**option** 150:1

**options**
127:3,7

**Optum** 108:7

**oranges** 91:4

**order** 126:16

**orders** 105:2

**org** 16:19

**organically**
127:12

**organizationa
l** 16:15 173:15

**organizations**
151:16

**out-of-state**
30:23 39:21
40:1,12,14
103:16,18
196:3,7,8,11
197:6,9 200:9

**outcome** 81:9

**outcomes**
177:24
187:23 188:6

**outlined**
177:6

**output** 58:2

**overarching**
151:9

**overdose**
69:9

**oversight**
114:19 132:3

**overtime**
166:10

**overwhelmed**
70:5 99:21
100:16 175:8
206:5,7

**owning** 177:8

―――――――

**P**

―――――――

**p.m.** 207:23

**Pack** 87:8
93:16 111:15
145:6 146:15,
16 148:2,5,8,
13,18,22
149:5,6,13,
14,19,21
150:19 158:8

**packet**
170:11

**paid** 103:2,3
104:24 105:1
114:21

**Pam** 41:4

**Pamela**
185:15

**Panhandle**
76:17

**paragraph**
94:21 141:13
142:15,18
174:21

**paragraphs**
66:13 94:7,8

**paralysis**
135:11 136:7

**parameters**
24:17

**paraphrasing**
88:13

**parent** 78:22
170:9,14,19
201:20

**parental**
42:15

**parents** 100:5
104:24
168:15,16,23
169:18 171:7
176:8 192:23
206:4

**parents'**
67:20

**park** 179:22

**parks** 179:21

**part** 8:23 22:2
45:19 46:19
47:13,22
48:17 51:14
54:5 59:1,9
63:18 72:16,
17 77:15
83:23 122:6
139:17
141:18
149:16
152:19

**parties** 9:18
41:24 207:5

partner 110:7

partners 180:14

partnership 182:14

parts 174:1,3, 7

pass 44:24 49:11 157:2 170:5 171:2

passed 44:22,23 48:18 49:4 170:23

past 22:12 33:3 44:20 78:20 84:15 88:3 170:24

path 92:12 109:7 178:6

pause 6:7,15 54:10

pay 103:14, 18 104:11

payer 114:19, 23

paying 108:3

payment 50:5 109:5

payments 102:20,23

Peisch 5:15 6:22 25:17 26:4,12 27:10 36:20 37:13 55:9,19 63:24 64:10 65:4,11

72:6,16 73:20 74:9,19 81:19,24 82:10 86:7,16 89:10,14,20 92:22 93:2 95:8,19 110:22 111:6, 12 113:22 115:15,21 116:1 137:16, 21,24 146:18, 23 147:12,21 150:16 154:5 172:5,14 173:1,9,14 174:10 184:19 193:18 197:19 198:7 199:1 207:14

pending 7:6

Pennsylvania 97:15

people 107:20 114:7 118:17 127:5 129:17 134:21 136:16 143:24 146:8, 10

people's 153:5

percent 21:13 43:21,24 69:18,20 90:7,17 101:10 106:17,19

164:16 165:5, 6

percentage 43:18 143:24

perform 100:10 202:20

performance 30:24 41:10, 13

performing 50:4 67:9

period 88:22 117:15 143:6 191:16

person 26:7 115:4 192:3 195:7,11

personal 85:19 87:17, 19 88:16

personally 144:3 189:16 200:20

persons 109:13 111:2, 3

perspective 14:10 15:16 76:14,19 104:2,15,21 124:4,21 126:13,14 128:13 140:12 142:13 148:4 157:23 180:9 189:24

pertain 22:13

Phil 5:15

philosophical ly 128:14

phone 10:2 35:22 42:22 61:10,15 62:7 114:10

phonetic 28:16

pick 40:7

piece 48:17 49:10 132:24 170:5

pieces 102:10,13 104:20

Pinson 170:16

pitch 187:9, 12

pivot 123:17

place 39:2,4, 5 42:24 67:6 97:6 98:17 102:11 127:1, 10 162:23 163:2

placement 12:14 22:23 23:5,8,11,15 30:23 40:12, 14 50:19 52:2,3,9,10, 24 78:21 103:17,18 131:20 178:19,22,24

181:9,14

placements 23:5,7 39:21 40:1,13,17 50:22,23 53:6 96:19 109:19 114:21 117:17 123:18,19 124:13 125:13 130:18 180:21 196:8, 12 200:9

placing 99:11

plaintiffs 4:8 11:14 64:22 72:13 207:6

Plaintiffs' 27:5

plan 32:24 50:14 51:6,12 52:13,15 53:12,18,19 54:4,14 117:10 163:24

planned 189:14

plans 189:2, 12

played 117:20

pleased 79:23

plumbing 117:14

point 14:19

15:10 16:3 32:13 43:24 54:6 63:9 75:1 79:18 84:17 113:7 124:9 127:9 188:23 200:8, 16 204:16 205:17

**pointing** 146:5 155:15

**points** 148:4 155:17 188:1, 4 189:3

**police** 132:13 134:9

**policies** 68:22 70:11 73:4,8,10 81:1 95:20 96:17 103:9 171:11

**policy** 13:13 14:7,8 18:19, 20 19:6,11, 17,18,19,20, 22 20:5,6,9, 15,18 22:19 26:7 28:19 29:14 30:16, 17,23 41:5 44:10 45:19 46:19 47:2,14 49:8 50:4 56:17 58:23 60:3,20 62:24 63:4 64:4,17, 18,19 66:20 68:13,15,21, 24 69:1 70:6

71:1,2,3 72:9, 11,19,22,23 73:24 74:1,7, 12 80:13,14 83:12 85:7 87:13 93:1,5 95:16 96:10 104:1,15 115:5 124:7 126:9 128:13, 15,23 129:8, 9,19 130:15 131:10 132:21 141:14,16 146:21 151:11 172:15,24 173:4 179:18 180:9 189:24

**policy-making** 72:17

**policymakers** 60:7,9 146:9

**political** 11:23 143:19 184:3,4

**politically** 143:8 177:5

**politics** 149:15

**poor** 177:19 178:2 206:2

**populations** 63:8 83:2 96:8

**portal** 170:10, 14,19,21

**portion** 102:24 103:13 173:6, 12 198:22,24 199:2

**portions** 197:24

**position** 18:1 32:3 44:18 72:4 74:5 78:2 82:4 86:6,15 143:3 147:10 148:6, 7,23

**positions** 24:11 85:13, 14,17 87:18 90:2 96:23 97:2 146:11 148:10 156:10

**positive** 90:13 134:16

**possibilities** 52:5

**possibility** 57:19

**potential** 28:11 64:17 139:17

**potentially** 140:9,11,17 172:8,22

**practically** 203:11

**practices** 194:3

**pre-** 95:10

**pre-decision** 64:4

**pre-decisional** 64:13

**pregnant** 118:24 119:2

**preparations** 7:16

**prepare** 8:18 112:1

**prepared** 8:13 40:6 41:21 67:19 100:6 205:22

**preparing** 9:12 62:17

**present** 55:18

**presentation** 112:20

**presentations** 18:21 24:23 170:11 187:17 188:4

**presented** 9:5 32:21 113:5 189:12, 17,19

**presenting** 189:3

**presently** 43:7

**president** 146:12

**Presley** 152:11

**press** 70:22 77:18 130:19

**pressing** 87:24 116:10

**pressure** 32:5,14 33:15 58:15 59:2

**pretty** 19:16 26:14 141:1 159:11

**prevent** 59:4 130:23

**preventative** 125:14

**preventing** 37:24 46:16 184:13

**previous** 84:3,18 89:1 136:5

**previously** 123:5 163:1 168:3 181:6

**primarily** 13:5 14:6 15:15 156:10

**primary** 21:8 28:16 68:21 100:14 170:15

**principal** 193:7

**print** 25:7

**printed** 9:20, 22

**printing** 25:4

**prior** 11:2,5 47:15,17

**priorities** 63:21 65:7 84:13

**prioritize** 84:5

**priority** 33:2, 3 84:23 107:23

**private** 110:8 115:18

**privilege** 6:12,23,24 7:2 9:9 10:4 25:19 27:13 37:14 55:11, 12 64:3,6,9, 15,21 65:1 72:21 74:8 81:20,22 82:1,2,11 86:8,11 89:11 92:23 95:12 110:23 111:7 113:23 115:16,20 137:17 146:19 147:3, 7 150:17 173:23 174:3, 9 184:20 193:19 207:4

**privileged** 37:3 172:7 173:21

**problem** 30:10 38:21 68:21 77:11 81:6,8 92:4,7

97:5 109:16 111:18 112:6 122:7,17 128:5 129:3 132:21 135:12 136:11,17 162:4 163:19 165:2 166:16 170:6,8 179:7 188:22 191:20 193:15

**problems** 37:11 38:5 60:7,10 63:7, 19 77:9 94:11,15 95:2,15 100:14 101:21 105:7 109:11 123:6, 8,10 128:15 129:4 130:7 131:15 135:8 137:2,4,13 146:5,6 153:3 177:6 188:21

**procedural** 4:12

**procedures** 171:11

**proceed** 89:5

**proceedings** 65:22 123:2 159:14 201:6

**process** 7:2 8:23 54:6,12 55:12 64:2,6, 9,15,21,24

72:20 74:8 81:20 82:11 84:2 86:8,10 87:22 89:11 92:23 95:12 97:12 110:23 111:7 137:17 143:17 146:19 147:3, 7 150:17 172:7 173:23 174:3,9 184:20 191:4 193:19,22 207:4

**produce** 190:15

**produced** 9:17 23:4 59:17 138:11 172:10

**producing** 102:17

**product** 7:1 25:19 55:12

**professional** 12:3

**program** 19:20

**programs** 84:1,21 85:16 152:8

**progress** 66:14,19,24 79:13,16,24 80:22 81:3, 12,17 82:8 96:13 123:11, 20,22 124:1

125:21 165:7 177:18 188:21

**project** 107:11 157:21

**projects** 82:24 83:7 84:21 88:2

**proper** 75:11

**properly** 41:17,24 43:11 67:11 68:8 69:23 74:22 100:6 102:19,23 105:3 106:8 107:22 108:17 123:24 189:22

**propose** 84:11

**proposed** 28:12

**proposing** 52:13,15

**prosecutors** 125:3

**prospective** 83:22

**prospectively** 83:4

**protect** 122:21 199:14

**protected** 26:11

**protection** 66:21

**protective** 24:12,14,19 41:20 63:10 67:3 71:5 86:20

**provide** 9:2 11:19 18:16, 20 29:12,17 39:10 48:14 49:5 76:5 116:12 119:23 125:3 126:8,9 141:19 143:19 155:4

**provided** 8:20 9:13 21:12,22,24 23:20 24:23 25:2 33:5 38:3 44:17 45:10 46:1 47:14 56:14 59:21 64:3, 12,17,18 84:7 112:9 118:9 120:1 126:17 132:3 170:12 181:7 188:5, 9,10

**provider** 30:3 31:1 49:23,24 67:12 78:11 79:11 96:14 109:10,23 110:2,12 113:1 123:12 151:15 181:8

providers
20:12 29:22
42:9,10 50:4
51:14 78:16,
19 80:3,18
105:1 116:6,9
151:20,22,24
152:3,12
169:18 171:7
175:18
180:10 181:4
187:1,4

providing
37:16 46:9
47:16 107:17
139:8 154:10,
12 158:20
190:11

PRTF 98:11
178:22

PRTFS 53:1
124:16

psych 79:7
124:17
178:22

psychiatric
78:23 202:8

psychological
79:5

public 4:3 9:7
14:7 19:9,23
35:5 78:2
86:17 99:13
117:6 118:17
121:12
128:15
129:19

publicly 9:5
24:9 53:8

90:12 120:1
140:2 177:5

pull 126:21

pulled 70:9

purchases
129:16

purchasing
57:15

purported
42:8

purpose 30:7
42:6 54:11
70:20 87:15,
18 90:4
133:20

purposefully
140:18,21

purposes
56:17

purview 17:2,
21 205:24

push 83:17
182:11

pushed 53:23
80:6

pushing
93:16 156:17
157:7,9

put 5:7 76:8,
18 79:1 94:3
110:13

Pye 27:18

---

**Q**

quality 167:7,

9

quantifiable
124:4

quantify
188:20

question 4:23
5:24 6:6 7:6,7
26:3,13,14,
19,23 55:13,
24 75:18
107:7 115:14
145:15
161:21 166:1
193:20,24
203:21

questioning
89:2

questions
4:10 5:4 6:3
7:10 23:23
54:11 60:9
67:19 74:15
75:2 97:4
199:15
206:13,19,22

quickly
70:14,16
130:22

quitting
100:17

quote 155:1,4

---

**R**

raise 27:10
65:12

raised 25:14
36:3 169:10

ran 132:23
207:10

range 52:5

ranging
19:23 26:6
50:3 192:2

rate 21:17,19
30:3 50:5
63:11 69:17,
19 90:21
96:11,12
100:17,20
101:9 103:3,
14 162:20
164:16 165:4

rates 24:10
85:3,12 87:20
90:17 91:2,12
96:12 133:24
141:22 178:7

ratio 97:18,20
98:24 141:24
162:6,7
201:18,22

ratios 95:23

reach 46:22

reached 40:2
111:14
146:13

reaching
175:19

react 63:12

reaction
61:13

read 25:12
77:16 93:22
140:23 168:2
173:1

reading
176:23 177:2

ready 185:11

real 127:9
136:16

reality 187:23

reallocation
91:7

realm 80:13
115:5 128:22

reason 21:14,
23 73:22
143:6 199:24
200:4

reasons
143:1

recall 7:23
15:7 16:10
22:16 25:13
34:5 35:2,7
39:18 40:23
41:7 42:19
43:17 49:1
53:17 56:14
60:22 62:18
76:10 77:1
83:6,13 90:1
117:16,21
118:4,7
121:11 133:6,
7,12 150:22
157:3 158:21
160:24
163:17 166:8
167:24 168:9
175:23,24
177:20
183:16
184:16

185:18
186:22 187:3,
6 190:24
194:9 195:21
197:18
199:18
200:14

**receive**
143:14
169:11 171:5
182:7

**received** 28:5
60:21 105:6
109:1 138:18
169:3

**receives** 44:4

**receiving**
52:24 181:16
186:15

**recent** 169:10

**recently** 46:4
169:3,6

**recognition**
84:14

**recognize**
154:23
159:19

**recognized**
48:9

**recognizing**
153:7

**recollection**
8:6 38:10,16
91:5 165:20
166:2 190:20
205:15

**recommend**
126:15,16

**recommendat ion** 56:13,16,
20 173:17

**recommendat ions** 41:22
44:11 45:19
46:19 47:2,14
57:5 58:24
173:4,5

**recommende d** 166:6 205:8

**recommendin g** 148:10

**reconcile**
30:9

**reconvene**
207:19,21

**record** 5:1,8
65:18,21,24
74:17 137:10,
23 159:15
180:23
195:10 201:9

**records**
161:4

**recreational**
179:24

**recruitment**
162:19

**red** 160:16

**redact** 173:20
197:24

**redirect**
207:15,17,18

**reduce**
162:19

**refer** 198:3

**referenced**
145:12

**referencing**
119:21

**referral** 30:5
43:13 193:10

**referrals**
29:13,16
43:15,22
44:3,7 74:24
105:6 169:1
192:15

**referred**
158:14

**referring**
141:17
186:18

**reflect** 33:6
173:18

**reflected**
40:15,20,21
138:20

**reflective**
201:17

**reflects** 59:20
175:4 182:12

**reform** 50:14

**reforms**
152:22
182:14

**refrain** 25:21
62:8

**refused** 184:9

**regard** 24:3
27:5 36:6

39:1,24 40:1
41:13 50:9
66:23 71:23
74:4 137:2,12
155:15

**Regional**
24:18

**regret** 156:1,
4

**regular** 20:14
21:6

**regularly**
152:14

**regulations**
68:17

**regulatory**
114:19

**reimburse**
51:13

**reimburseme nt** 50:21
51:17 103:1

**reinforced**
183:5

**reinforces**
175:5

**reiterated**
142:16,21

**related** 7:22,
24 9:4 11:15
15:18 31:11
35:15 63:14,
21 70:21
76:22 96:14
102:20 134:8
156:14

**relates** 23:4

24:14 96:10

**relating** 72:19

**relationship**
60:12 122:13
149:14,21
151:4 152:1,
17 153:1,10,
13

**relationships**
151:7,12,13,
15,19,21

**relative**
24:15,18
202:15

**relay** 33:24
35:24 37:9
38:6 73:5
149:9

**relayed** 34:2
36:4 37:23
46:11 50:10
192:11

**relaying**
72:14

**release** 34:10
139:15,17
140:8

**released**
32:23 35:5,11
49:15 120:8
139:13

**releasing**
139:6

**reliance**
196:1,2

**relying**
106:22

**remain**
160:10,20
163:4 164:6,
10,21 166:24
188:22
200:24

**remainder**
206:23

**remained**
121:24 163:3

**remaining**
14:17 52:7

**remains**
77:10,11
160:17 163:8,
9,18 164:1,
11,15,24
166:14 167:7
180:18 182:6
206:10

**remedies**
28:11,17,22

**remember**
33:16 48:10
73:6 90:11
117:8 118:12,
14 121:16
143:12 158:1
159:22
175:15 176:4
190:2 192:5,8
193:7 200:12
201:13
205:13,16

**remove**
121:11

**removed**
58:15 121:6
199:11

**removing**
196:22 197:9

**reorg** 58:22

**reorganizatio
n** 33:1,4
56:24 57:7
142:9

**reorganize**
32:24

**repeat** 54:24
193:22 197:2

**rephrase**
27:4 193:23

**report** 16:3,
13 23:4,19
30:12 35:19
40:5,15,20,22
55:4 77:18
112:1,10
119:22
138:20
165:18,21
167:21,24
168:2,8
172:23
174:22 175:2,
3,4 176:18,22
177:8,13
182:11,18,24
183:4 194:23

**reported**
16:19 17:9,13
24:9 53:20
168:24

**reporter** 4:20
5:1

**Reporter/
notary** 4:3

**reporters**
68:4 176:10
192:14

**reporting**
96:17

**reports** 16:6
24:22 32:8
56:5 102:17
163:14
168:20 169:4
181:11
191:17

**represent**
139:16 151:8

**representativ
e** 114:17
193:4

**representativ
es** 6:5 115:10
148:20
151:16
175:17

**representing**
5:10 6:6
110:6

**request** 13:15
21:9,20 22:6
197:23

**requested**
8:22 21:10,12
120:13

**requesting**
183:10
190:23
194:23

**requests**
25:23 67:21

**requirements**

84:9

**Rescare**
109:24 110:6
121:4,13,18
122:1

**research**
18:17 20:6,17
23:3 24:13
28:12 157:24
204:19

**reserve**
207:15

**residential**
50:6,9,13,19
51:13 79:6
98:13 103:1,
19 151:24
152:3,9
178:21

**residentials**
124:15

**resource**
143:17

**resources**
12:17 13:3
80:11 128:21
133:19

**respect** 24:7,
21 40:11
63:1,3 71:11,
16 76:7 82:14
96:7 109:13
115:6 123:11
138:10
196:17
197:17

**respond**
54:8,9 67:23
95:3 100:4

191:1

**responding**
67:20,22,24
68:9

**response**
20:2 21:16,19
59:1 87:4
95:4 140:24
143:21 144:2
148:21

**responses**
207:7

**responsibiliti
es** 13:5 97:16
202:21

**responsibility**
75:14,15

**responsible**
71:2 97:14

**responsive**
68:6

**responsivene
ss** 31:1

**rest** 199:16

**restate** 55:23
58:20

**restricted**
47:17

**restrictive**
48:7,8

**result** 28:18
50:24 72:24
85:23 100:2,
14 120:24
121:7 125:22
134:17 140:4
151:9 159:10

162:13 181:5,
10 184:3
187:24
188:15 202:9
203:11
205:20 206:2

**resulted**
130:20

**results** 12:14
94:12 99:16
136:1,4
177:19 188:2

**retaliate**
168:22

**retaliated**
195:8

**retaliation**
168:12 169:4,
12 191:14,18,
22,23 194:8

**retaliatory**
193:13 194:3

**retention**
24:4 162:20
164:1

**retired** 14:16,
17 15:7,8,24
16:11

**return** 83:15

**reunification**
42:7,14

**revenue**
12:16 51:18
82:22

**review** 10:14
11:5,10 20:22
172:9,19

**reviewed**
10:11,19,22
11:2

**reviewing**
32:8 172:3

**reviews**
185:10

**Rich** 5:19

**Ridge** 152:11

**rightfully**
112:21

**rights** 5:18
42:15

**risk** 50:18
52:1 104:7

**Robertson**
61:4 115:9
172:18,20

**robust**
157:10 159:4

**role** 13:6
14:4,23 18:4,
15 19:14
20:21 22:2
26:6 29:6,7
36:13,16
37:1,20 39:6,
7 47:20
97:10,11
137:1 153:16,
19 154:4,8,10

**rolled** 105:8

**rolling** 104:20

**rollout**
104:23

**room** 103:2

**rooms** 23:7

**roughly**
82:20

**routes** 21:8

**row** 84:16
89:8 109:20

**rug** 126:21

**run** 131:20,22
134:10

**runaway**
130:15
131:10
133:15

**runaways**
131:13,18
133:23

**running**
96:18 130:17
133:5

**runs** 50:18
118:24

**Ruth** 16:12

**S**

**safety** 30:10
200:18

**salaries** 90:8
156:9 164:14

**salary** 145:11
162:18

**Samples** 4:1,
7 28:20 59:16
64:11 66:2
73:18 123:4
138:12 143:5
159:19

167:20 172:2,
16 173:3
174:1,14
183:8 185:12,
14 197:21
201:8

**sat** 61:5 77:5
117:19

**save** 25:6,8

**scapegoat**
145:24

**scenes** 143:8

**schedule**
106:12

**school**
192:15,19,21,
24 193:4,8

**schoolteache
rs** 68:5

**science**
11:23

**scope** 48:19

**screen** 44:7

**screened**
43:15 68:1
74:24 192:17,
18

**screening**
45:11

**screwing**
154:2

**seal** 197:20,
23 198:22,24
199:1

**seamless**
180:13

**search**
133:23

**searched**
120:5

**seconds** 61:5

**secretaries**
14:14,16 15:2
16:10 27:23

**secretary**
12:17 13:4,6,
16,19 14:4,19
15:21 16:2,
11,20,23
17:1,13,20
18:1 25:16
27:16 32:12
33:14 34:1,4,
11,17,24 35:4
36:13 37:2,3
39:3,5 58:5
60:4,19,22
61:4 62:24
64:4,11,13
65:15 73:19
76:14 87:3,23
89:1 91:1,6
92:16 93:7
94:9 95:10
105:18
110:20 111:1,
24 112:10
116:18
121:13,18
123:6 135:23
140:2 147:5,
13,16,18
150:9,14,19
154:21 155:8
157:5 161:11,
19 172:16
183:9

**secretary's** 86:6,14,22

**sector** 110:8

**senate** 18:13, 19 21:3 88:23

**send** 158:3 161:1

**sending** 158:5 172:22 186:4

**sends** 186:14

**senior** 18:7 19:15

**sense** 25:11 174:4

**separate** 57:12,18 116:5,8

**separated** 56:22

**September** 200:22

**series** 75:8

**serve** 205:23

**served** 58:4

**service** 18:19 24:14 42:10 63:10 78:15, 19 84:6 85:19 87:17,19 88:17 103:13 124:20

**services** 19:24 23:13 24:12,19 28:2 29:15 38:18,

20,22 41:20 47:12 51:12 52:7,14 54:3 56:23 57:11 59:12 67:3 71:5,6,7 79:22,23 80:20 85:8 86:20 103:2, 20 104:5 111:17 122:6 124:13 125:15,24 126:1 127:18 143:5 180:8 181:6

**Services'** 102:24

**serving** 37:1 154:9 189:1

**session** 10:20 11:3,6, 12 21:6 44:21 45:20 46:20 48:17 58:19 85:22 87:2 88:6,22 120:11 145:10 157:1 170:23,24 200:11

**set** 53:19 112:23

**setting** 127:20

**settings** 179:21

**severing** 42:14

**sexual** 117:21,22

**sexually** 118:23

**Shaffer** 5:20

**share** 54:13

**shared** 9:8 57:14 94:10 135:23 192:11

**Shaun** 158:12

**shelter** 52:10 79:4 178:20

**shift** 84:23 87:17 88:16 92:11,13 125:8,9 126:19 127:11,13 149:17 152:23 153:7 156:8

**shifted** 13:9 14:5 63:23 85:18 96:4 101:16

**shifting** 121:14

**shifts** 166:11

**short** 166:17

**shortages** 166:15

**shortly** 34:19

**show** 188:5

**Showed** 111:19

**sibling** 98:17

**sic** 12:6,8

**side** 44:12 48:14 69:22 78:22 113:1 124:20 140:5

**sign** 16:17,18 18:11

**sign-off** 184:10

**significant** 60:2 63:7 102:5,6 104:18

**significantly** 98:10

**siloed** 180:18

**similar** 55:10 57:24 76:16 85:1 88:2

**simply** 67:22 69:1 84:22 206:5

**singular** 142:1

**sir** 7:3

**sit** 62:2

**situation** 20:20 34:16 42:1,3 69:3,4 93:15 110:4 113:16 117:16,23 140:24

**situations** 42:18 51:3 56:12 75:13

76:7,16 131:9 196:4 199:20

**sizes** 205:4, 12

**slashed** 193:9

**sleep** 135:2

**slow** 107:14

**slowing** 108:8

**small** 70:14

**smaller** 102:11

**smoke** 132:4

**snowstorm** 179:17

**social** 28:2 29:15 38:17, 20,22 57:11 71:6 85:7 102:24 103:2, 13,20 104:5 111:17

**socially** 42:10 78:18

**sole** 16:2

**solid** 98:16 180:8

**solution** 41:6 135:13,15,17

**solutions** 112:24 116:10 167:6

**solve** 92:7 112:6 135:14 160:14

**solved** 92:8 136:11

**solves** 136:9

**solving** 81:8 110:10 122:17

**sort** 6:11 29:16 91:3 113:11 124:24

**source** 51:18

**sources** 170:3

**span** 106:16

**speak** 22:3,5, 6 27:15 29:8 98:23 126:18 185:3 188:14

**speaker** 146:12

**speaking** 70:15 184:14 203:11

**special** 82:22

**specific** 11:9 15:3 22:17 30:3,22 33:1 35:3 48:11 66:22 70:8 72:9 76:11 82:6,8 100:7 118:5 126:7 133:20 134:7, 8 151:20,22 166:4 179:22 188:4 189:7 192:4,12 203:4,12

205:14,24

**specifically** 24:11 32:19 34:5 35:7 39:1,9,18 40:23 41:7 42:19 43:17 46:2 47:1,2 51:11 53:17 63:22 68:4 69:12 71:15 73:11 83:10 85:19 106:6 109:16 114:20 133:2 140:1 151:13 160:24 162:17 166:8 168:9 175:15 176:1,3 186:19,22 187:6 190:4 195:8,22 199:21 200:14

**specifications** 107:18

**specifics** 38:2 136:23

**spectrum** 40:16

**speculate** 46:17 49:19 52:18 142:5,6

**speculated** 87:7

**speculating** 150:4

**speculation**

49:18 62:13 92:21 149:3 183:22

**speculative** 141:18

**speed** 122:16

**spend** 10:8 84:11

**spending** 82:23 203:12

**spent** 33:7 83:8,20 84:16

**spin** 57:17

**split** 14:14 173:15

**spoke** 39:20 81:23 89:12

**sponsors** 170:15

**spring** 156:1, 7

**staff** 17:21 21:9 61:17,19 62:15 76:20 88:1 96:23 113:15 166:15 173:18 175:7 184:1 192:3 195:11

**Staff's** 62:1

**staffed** 91:15 107:22

**staffer** 114:9

**staffing** 95:22,23 97:7

167:5 173:17

**stage** 14:20 78:8

**stages** 120:22

**stakeholders** 18:23 91:14 112:23 116:6 151:2,5 163:20 169:17 171:18 175:6, 14 187:19 191:18 206:3

**stamp** 174:17

**stamped** 174:16

**stance** 110:19

**stand** 155:23 156:6 157:11, 17,19

**standard** 203:8,13,17, 19,24 204:3

**standards** 65:10 77:3

**start** 16:1 53:20 102:9 104:19,20

**started** 12:5 22:13 48:24 62:17 73:8 98:1 112:4 113:20 115:9

**starting** 12:3 198:8

**starts** 142:15 174:22

**starved** 77:19

**state** 6:4,9 15:3 20:8,18 23:5 31:10 44:3 47:19 50:12 51:5,12 52:6 54:4 57:23 67:5 68:17 69:16, 19 70:14 71:15 78:7 80:18 82:17, 21 83:14 91:20,23 96:9 101:15,22 104:6,9 123:15 127:10 130:21 132:13 134:9 151:6 179:21, 22 195:6 202:22 203:7

**state's** 20:1 78:24 96:10 105:24

**stated** 32:12 35:13 36:18 37:12 38:17 44:16 52:21 53:5,8,14,15 68:7 88:12 90:5 91:5 94:17 141:22 143:1,7 145:16 149:23 150:3, 6,7,14 180:2 192:16

**statement**
38:4 59:20
60:16 62:18,
19,21 66:8
70:21,22
81:14 82:19
136:5 144:11,
16 155:23

**statements**
28:21 105:19,
21 171:17
172:21,24
187:20

**states** 24:16
28:13 57:21
91:19 157:9
158:21
160:16
163:15

**stating** 81:11
174:5

**statute** 33:9

**statutory**
84:9 154:7

**stay** 118:21
179:1

**staying**
178:13
179:11,20

**steps** 62:16

**stood** 61:8

**stop** 28:22
60:23 61:9
108:13
116:13

**store** 118:22

**story** 140:5
195:24

**straits** 145:21

**strategies**
20:19 76:11,
18 77:3 95:22
96:9 97:8
110:13
166:10

**strategy** 48:4,
6 50:17 51:9
87:12 88:9
89:2,6,9
97:17 116:12
146:2 164:14
189:22

**strike** 71:21

**strong**
153:20

**structure**
16:15 17:11
31:9 50:6
54:21 55:3
56:4 57:6
122:6

**structured**
57:22 58:1

**struggle**
145:22

**struggled**
66:13

**studies** 11:24
75:20

**study** 76:22
165:10,12
166:6 201:10

**stuff** 80:9
105:10
119:14
128:24 129:1

207:9

**subcontracto
rs** 108:1

**submits** 54:7

**subsequent**
75:7 87:11
120:13 165:9
171:19

**substance**
19:22 66:19
69:5 96:12

**substantial**
84:19 85:14

**substantiate**
70:2

**substantiated**
75:6

**successful**
99:14 110:20

**successfully**
153:2

**SUD** 96:10

**sufficient**
51:18 53:3
79:17 87:16
101:13
121:22
136:19
162:24
180:10

**sufficiently**
91:14 189:14

**suggested**
111:21 205:7

**suggestion**
182:17

**suits** 28:15

**summary**
53:7

**sunshine**
112:5

**super** 193:1

**supervision**
131:23

**supervisor**
192:3

**support** 19:3,
21 21:14
36:16 57:15,
16 85:5 102:3
170:18
180:12,13

**supported**
170:17

**supposed**
102:8,10,13
104:19
118:16

**Supreme**
151:17

**surprised**
61:13

**surrounding**
125:6

**Susan** 152:8

**suspected**
193:9

**suspicious**
112:11

**sworn** 4:2,14

**syndrome**
96:11

**syphon** 90:3
134:2

**system** 20:13
29:20 42:13
44:13 47:9
50:6,9 63:15,
17,18 69:8,
13,22 70:4,10
78:4 96:5,6
97:12 101:19,
24 102:1,2,3,
22 103:6,21
106:9 107:1,2
108:23 109:8
125:10 132:8,
17 144:7
145:20
152:23 153:2
175:10,22
176:12
177:23 178:1
180:13,17
192:15,20,21
193:8

**systemic**
30:13 109:17
134:14

**systems**
102:16
106:24
107:19
158:15

---

**T**

**table** 76:19

**takes** 165:16

**taking** 137:5
162:11

**talk** 14:2 27:6 40:6,13 82:7 136:24 184:9 198:9,13

**talked** 54:20 113:3 129:21 130:3 146:7 155:12 162:24 165:11 175:2 178:5

**talking** 32:6 37:4 43:18 44:2 81:16 97:7 124:11 129:17 135:22 141:15 142:7 147:4 178:17 188:1,4,23 189:3 201:9

**talks** 187:7

**tangible** 188:2 194:9

**targeted** 47:3

**Tarr** 86:4

**tasked** 108:18 112:22

**tasks** 202:21

**Tate** 180:5,6

**tea** 93:22

**teacher** 193:6

**teachers** 176:10

**team** 126:14

**tearing** 119:18

**Tebor** 4:6,8 5:7,13,21 9:21 25:6,10 52:19 55:16 59:13 64:7,22 65:23 66:1 72:12 73:15 74:3,14 89:12,17 95:13 111:10 122:24 123:3 138:7 139:1 146:20 147:23,24 159:12,15,18 171:23 172:12,19 173:6,11,24 174:13 180:24 185:7 195:14,17 198:2,5,23 199:3 201:3,7 206:12,16 207:2,11,21

**technically** 93:7

**telling** 34:12 184:1 192:5, 22

**tells** 5:5

**ten** 202:7 204:6,7

**ten-year** 106:14,16

**ten-year-old** 118:23

**tenure** 76:15

**term** 58:4,8 150:12

**terminate** 61:6

**terminated** 60:18 88:7

**termination** 61:23 73:23 138:16 154:22

**terms** 14:24 20:4 27:2 34:1 46:23 54:14 71:9 80:10,19 94:24 125:23 131:10 145:14 151:19 200:2

**terrible** 63:11 119:14,15

**testified** 4:4 8:5,7 52:21 66:8 71:10,18 82:3 88:21 89:5 90:7 93:6 112:9

**testify** 8:9,12, 14 197:21 199:2

**testifying** 4:16

**Texas** 70:16

**text** 60:22

**thereof** 124:1

**thing** 4:18

90:20 105:8 108:11 112:5 144:1 154:2 169:22,24 195:6

**things** 4:12 6:18 20:3 31:19 37:5 77:21 81:4 87:21 90:9 98:6 101:2 102:12 105:3 110:2 119:15, 16 124:17 126:11 130:16 132:20 153:8 154:14 161:4 162:17 165:15 187:21

**thinking** 31:20

**thought** 28:24 45:20 48:20 58:9 79:18 113:4 115:21 125:1 126:17 129:22 137:3 147:8,9 148:5 158:24 159:2, 7,10 192:22

**thoughts** 50:12

**thousand** 128:15 145:23

**threat** 34:7

**threatened** 149:16

**thrust** 162:22

**tied** 48:5 194:18

**ties** 135:21

**tight** 62:2

**till** 62:2

**time** 6:3 7:5 10:18,21 13:3 14:1,5,12 16:18 17:23 18:12 27:8 28:18 31:12 32:2 33:6 35:20 36:18 43:23 48:3 56:9 57:21 61:1 64:10 67:2,7,12,13 68:2,8 69:17 79:19 80:10, 18,23 82:17, 19 83:21 85:4,21 90:17 91:3,17 98:20 99:19 100:6, 9,20 105:14, 16 106:18 107:12 110:15,17 111:17 113:9, 10,11,20 115:4 117:15 120:22 122:1 123:15,24 126:24 127:10 131:24 133:7 136:15 142:3

143:11
145:23
152:24
154:10
156:21 159:7,
13 160:15
161:13,24
162:10,15,16
165:16,19
168:4,21
170:1 171:18,
19 172:16
178:24
186:21 187:5
191:15,16
200:3 203:12
207:10

**Time-wise**
43:1

**timeline**
160:19

**timelines**
162:10

**timely** 100:5
135:7

**times** 11:8
16:20 25:13
38:17 40:4
81:5 121:8
142:16
149:24 154:1
161:1 196:13

**timing** 14:24

**tires** 193:9

**title** 18:6

**tobacco**
83:12,20

**today** 4:10

5:10 43:8
77:10,12
101:4 108:24
127:23 163:8
164:10 165:1
167:1 179:13
182:6 201:1
206:8,22

**today's** 8:19

**told** 52:17
60:17 61:8,23
62:2 131:17
147:18
157:10 159:8
169:22,23
179:19
194:22

**Tomblin**
123:16

**tone** 34:6

**top** 31:17
33:2 101:1
129:6 160:5
163:17
182:21
194:12

**topic** 31:23
105:22
160:14 166:9

**topics** 19:1,
10,13

**tough** 81:9

**track** 24:8
108:3,19
188:20,21
190:1

**traffic** 129:16

**trafficked**

132:10

**tragedies**
78:5

**tragedy** 75:8,
17

**training**
68:12 75:23

**trajectory**
136:20

**transcript**
197:23
198:11,22

**transitioned**
153:19

**translated**
44:10 56:15

**transparency**
70:8,12 71:10
78:4 96:15
128:8 129:24
130:9 131:4
141:23
200:17,21

**transparent**
70:18 71:14
130:3 156:17,
19

**transportatio
n** 42:11

**trash** 140:3

**treatment**
79:6 181:16

**trend** 69:14

**trends** 136:20

**tricky** 19:1

**trigger** 99:8

102:19,23

**triggered**
47:8 120:16
170:4

**triggers**
107:7

**true** 99:10

**trust** 149:12,
18,22

**truth** 106:4

**truthfulness**
28:4

**turn** 94:5
154:18 190:7

**turned** 159:1

**turning** 123:4
141:5,7

**turnover** 24:4
162:19

**Twenty** 12:9

**two-day**
88:22

**two-year**
170:4

**type** 22:22
23:10 31:7
33:12 39:15
54:19 98:12
125:14
190:18

**types** 19:13
22:9 44:9
47:12 105:7
124:13
129:15
179:20

**typically** 21:2
30:1 115:7

---

**U**

**ugly** 186:15

**Uh-huh** 15:17
21:7 36:14
39:22 43:2
44:8 45:1
55:5 62:22
94:19,22
106:2,13
114:13
138:22 140:6
141:4,11
145:17 160:1,
7,18 168:14
174:24
176:19 179:3

**ultimate**
126:8

**ultimately**
16:18 42:14
44:9 48:8
57:8 58:16
60:5 87:13
103:16 122:7
132:24
158:22
165:22
182:11 184:2

**umbrella** 57:9

**unable**
103:21,22
178:18,23

**unclear** 189:4

**uncomfortabl
e** 110:5

**uncommon** 169:14

**unconsciona ble** 119:15

**undercutting** 50:20 143:20

**undergraduat e** 11:21

**understand** 4:15 34:11 45:7,8 65:1 74:15 88:8 97:5 137:9 142:20 144:5, 15 145:4 177:1 180:14 187:11 191:11 203:20 206:10,11

**understandin g** 35:18 45:13 46:15 49:13 53:22 68:10 75:19 93:12 99:10 128:2 139:23 147:13 149:12 176:20 179:17 183:20 190:22 197:15 204:21 205:3, 6,10

**understood** 106:4 116:4 134:9 149:13

**undertaken** 76:2 177:21

**underwhelmi ng** 165:21,23

**undue** 33:12 57:1

**unintended** 127:13

**university** 11:22 12:1 76:24 77:2 165:14

**unloaded** 187:1

**unofficially** 53:2

**unprecedente d** 143:12

**unsafe** 196:4

**unwinding** 51:16

**Update** 154:20

**updated** 41:24 120:6

**upgrade** 101:24

**upset** 92:3 105:2 112:10, 21 113:15,17 145:1,10 148:24 149:1

**urgency** 94:12 135:24 136:4

**utilization**

125:10

---

**V**

**vacancies** 88:5 92:14 131:1

**vacancy** 63:11 85:3,12 90:17,21 91:2,12 101:9 133:24 141:22 145:11 164:16 165:4 178:7

**vacant** 85:15 87:18 156:9

**vaguely** 168:1 184:18 185:19

**validated** 169:8 183:1

**valve** 30:11

**van** 119:7,10, 13

**vary** 98:10

**varying** 85:11,12

**vendor** 106:10 107:17,24 108:2,6,18 165:11

**vendors** 107:15 108:16

**versus** 97:19, 21 98:21 162:7 166:1 201:10,11,12

**vested** 104:7

**video** 117:20

**view** 126:9 176:11

**viewed** 176:13

**views** 94:10 95:1 135:24

**violent** 118:16

**Virgil** 180:1,5, 6

**Virginia** 11:22,24 13:21,23 24:15,18 53:2 63:7 69:8,20 70:14 76:24 78:14 82:20 84:15 91:19 97:16 104:9, 10,11 155:24 163:15 165:14 200:19

**Virginia's** 68:20 196:1,2

**visitation** 105:4

**visitations** 42:4

**vocal** 81:11, 15,17

**volume** 9:3 44:2 131:21

**volumes** 132:16

**vulnerable** 83:3

---

**W**

**wait** 54:9 62:2 136:11

**waiting** 136:17

**waived** 55:21

**Waiver** 109:18 114:20

**walked** 77:16

**Walker** 12:18 13:9

**wall** 119:12

**Waller** 16:12

**Walmart** 118:18

**Walters** 5:19 81:21 92:24 115:17 116:3 137:18,22 147:8,19 193:23 198:3, 21 206:14 207:8,12,20

**wanted** 48:13 50:11 59:10 74:20 107:18 125:2 127:21 141:12

142:14,16,22
149:2 150:2
155:14
158:17

**wanting** 32:8,
22 35:11
60:10

**watch** 105:9

**water** 90:16
158:8

**Watts** 17:8
27:18 186:6,9
190:23
193:16 195:6

**Wayne** 152:9

**ways** 76:20
132:1 145:24
175:3 191:16

**weak** 67:13

**week** 62:20
169:6,10

**weekend**
62:4

**weight**
202:13

**weighting**
203:3,23

**welfare** 14:9
15:13 19:17
20:4,9,15
22:14 24:11
26:9 28:13
29:20 30:6,22
31:8 32:7
40:4 44:13
57:3 58:12
63:1,3,15,18,
21 66:21,23

67:4 68:13
69:2,7,13
70:21 73:8
74:5 76:23
80:13 82:14
83:1,9,18
84:17 88:18
94:24 96:6,21
102:2 106:23
107:1 142:17,
22 144:7,18,
24 151:6
156:15 175:5
176:11
177:23

**welfare-
related** 20:11

**well-being**
200:19

**West** 11:22,
24 13:21,23
24:15,18 53:2
63:7 68:20
69:8,20 70:14
76:24 78:14
82:20 84:15
91:19 97:16
104:9,10,11
155:24
163:15
165:14
195:24 196:2
200:19

**whack** 104:14

**whichever**
22:6

**Wiseman**
16:9

**wit** 4:4

**withdraw**
111:13

**withheld** 32:9

**wondering**
123:12

**Woodman-**
194:19

**Woodman-
kaehler**
185:15,23
194:15

**word** 153:21

**worded** 34:5

**words** 127:12
194:16

**work** 7:1 9:4
12:20 13:7,
11,15,20
18:9,12,17,24
19:5,8,11
20:5 25:19
32:19 36:17
55:11 70:23
98:7 112:16
115:6 134:23
135:15
136:10,18
143:11 155:9
166:12

**worked**
17:11,12
19:14 76:13
86:3,20 87:7
88:2 110:7
111:23
112:24 113:2
120:17
132:13
136:18 145:5

148:3 181:7

**worker** 24:15
75:15 97:11,
13,18,21
98:3,7,20
99:1 100:5,8
118:15,20
165:17
178:18,24
181:15 192:4,
5 201:20
202:20
203:11 204:7,
8

**worker-to-
child** 203:16,
18,24

**workers**
41:20 67:8,
18,20 75:13
87:20 90:23
91:1 95:24
99:11,20
100:4,15,22
101:14
117:16
119:18 125:4
162:5,8,11
168:13,21
169:13,16
171:6,11,12
176:12
178:13
186:11
192:18
205:21 206:4,
7

**workforce**
67:3,4,5
76:23 77:4
85:2 97:17

**working** 12:7,
22 18:5 73:7
112:22
130:11 158:4

**workload**
99:10 100:11
165:10,12
166:6 192:20
201:10,18
202:14

**works** 135:19
136:12

**world** 124:24

**worried**
200:15,17,20

**worry** 28:16

**worse** 69:11,
12 91:20

**worsened**
165:2 191:15

**worst** 69:18

**wrap** 201:5

**wraparound**
79:21 80:19
180:8

**write** 131:22

**writing**
200:13

**written** 24:22

**wrong** 136:21
152:20 186:1
191:7

**wrote** 23:18
79:13 99:19
200:7

**WSAZ** 154:21

38

155:5

**WVDHHR**
154:21

---

**Y**

---

**yard** 117:14

**year** 33:3
48:22 85:15
171:2

**years** 8:10,11
14:6 15:1,3
26:10 60:2
70:5 77:20
78:20 84:16
105:12
106:11
109:20
112:14 119:5
121:20
134:23 146:8