EXHIBIT 8

**From:** McCallister, Jane B <jane.b.mccallister@wv.gov> on behalf of McCallister, Jane B
<jane.b.mccallister@wv.gov>
**To:** Caplinger, Thelma K; Larew, Rhonda G
**Sent:** 8/23/2021 4:26:14 PM
**Subject:** Fwd: FW: First Report Foster Care Ombudsman Final 041421
**Attachments:** First Report Foster Care Ombudsman Final 041421.pdf

Do not share this report it is for your information only.

---------- Forwarded message ---------
From: **Watts, Linda** <Linda.M.Watts@wv.gov>
Date: Tue, Apr 20, 2021 at 11:52 AM
Subject: FW: First Report Foster Care Ombudsman Final 041421
To: Mitchell, Tina A <Tina.A.Mitchell@wv.gov>, O'Connell, Tanny W <Tanny.W.OConnell@wv.gov>,
Urquhart, Melanie L <Melanie.L.Urquhart@wv.gov>, Richards, Susan M <Susan.M.Richards@wv.gov>,
McCallister, Jane B <Jane.B.McCallister@wv.gov>, Hymes, Amy L <Amy.L.Hymes@wv.gov>, Cole, Janie M
<Janie.M.Cole@wv.gov>

This is out for all to see.  Please review.  We need to get together to discuss and address the concerns.

**From:** Samples, Jeremiah <Jeremiah.Samples@wv.gov>
**Sent:** Thursday, April 15, 2021 12:20 PM
**To:** Watts, Linda <Linda.M.Watts@wv.gov>; Chapman, Cammie L <Cammie.L.Chapman@wv.gov>; Mitchell,
Tina A <Tina.A.Mitchell@wv.gov>; O'Connell, Tanny W <Tanny.W.OConnell@wv.gov>
**Subject:** FW: First Report Foster Care Ombudsman Final 041421
**Importance:** High

FYI only

Jeremiah Samples

Deputy Secretary

West Virginia Department of Health and Human Resources

1 Davis Square, Suite 100E

Charleston, WV 25301

304-356-5405 (office phone)

304-380-5944 (cell phone)

EXHIBIT 6
WIT: Samples
DATE: 4/18/24
TARA ARTHUR, CCR

**CONFIDENTIAL**

**D001178750**

Jeremiah.samples@wv.gov

**Montani Semper Liberi**

NOTE:  The information contained in this electronic message is legally privileged and confidential under applicable state and federal law and is intended for the individual named above.  If the recipient of the message is not the above-named recipient, you are hereby notified that any distribution, copy or disclosure of this communication is strictly prohibited.  All communications to DHHR staff are internal and deliberative in nature and should not be shared.  If you have received this communication in error, please notify Jeremiah Samples, West Virginia Department of Health and Human Resources, and discard this communication immediately without making any copy or distribution.

**From:** Robertson, April L <April.L.Robertson@wv.gov>
**Sent:** Wednesday, April 14, 2021 4:00 PM
**To:** Crouch, Bill J <Bill.J.Crouch@wv.gov>; Samples, Jeremiah <Jeremiah.Samples@wv.gov>; Crane, Russell <Russell.Crane@wv.gov>
**Subject:** FW: First Report Foster Care Ombudsman Final 041421
**Importance:** High

**CONFIDENTIAL**

**D001178751**



# WV Foster Care Ombudsman Program
## The First Year in Review



March 25, 2021

CONFIDENTIAL

D001178752



**STATE OF WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN RESOURCES**
**OFFICE OF INSPECTOR GENERAL**

**Bill J. Crouch**
**Cabinet Secretary**

**Foster Care Ombudsman**
**State Capitol Complex**
**Building 6, Room 817-B**
**Charleston, West Virginia 25305**
**Telephone: (304) 558-1117   Fax: (304) 558-1992**

**Jolynn Marra**
**Interim Inspector General**

March 25, 2021

Governor Jim Justice
Joint Standing Committee on Government and Finance
Legislative Oversight Commission on Health and Human Resources Accountability
West Virginia Supreme Court of Appeals
West Virginia Department of Health and Human Resources Bureau for Children and Families

    I am pleased to submit the first report of the Foster Care Ombudsman Office. This report encompasses activity beginning on November 1, 2019 and is a platform to forthcoming quarterly and annual reporting.

    Please contact the Foster Care Ombudsman Office with questions, comments, or additional information.

Sincerely,

Pamela M. Woodman-Kaehler, Director
Foster Care Ombudsman Office
Pamela.M.WoodmanKaehler@wv.gov

1

CONFIDENTIAL

D001178753

## **TABLE OF CONTENTS**

**Page**

**Executive Summary**................................................................................................... 3

**Introduction**........................................................................................................... 5

    History of the Foster Care Ombudsman............................................................ 5

    Mission ........................................................................................................... 5

    What is an Ombudsman?................................................................................. 5

    Complaint Process ......................................................................................... 6

**Program Development**............................................................................................ 6

    Organizational Design..................................................................................... 6

    Structure and Processes .................................................................................. 7

    Human Resources ........................................................................................... 7

    Information/Technology Supports ..................................................................... 7

    Community/Stakeholder Relations.................................................................... 7

**Activities Review** ................................................................................................... 8

    Advocacy, Education, and Monitoring............................................................. 8

    Affiliations...................................................................................................... 8

    Other Activity ............................................................................................... 11

**Complaints and Concerns** .................................................................................... 11

    Intervention Statistics and Content................................................................ 11

    Complaint Summary by Role ......................................................................... 18

    Feedback to the Foster Care Ombudsman...................................................... 28

CONFIDENTIAL

D001178754

# EXECUTIVE SUMMARY

The Foster Care Ombudsman is pleased to provide its first performance report, encompassing the period beginning November 1, 2019, and concluding January 31, 2021. This office is located within the West Virginia Department of Health and Human Resources (DHHR), Office of Inspector General (OIG). Future reports will be provided on a quarterly basis and aggregate to annual reports in conformance with applicable legislation. Future annual reports will place greater emphasis on observations, findings, and recommendations. This initial report will focus primarily on unit development and initial impressions.

It has been said about complaints that their value is well-hidden because the package is unattractive. Hearing and reading the content of child welfare complaints is understandably disturbing and often maddening. However, complaints should be regarded as critical intelligence to inform how well-intended efforts are delivered and received. The most productive use of complaint information involves analyzing the information using a safety science approach, to understand the way that context and systemic factors influence human actions and decisions. From this, leaders and lawmakers can lean toward accountability and away from blame. Complaints provide a unique perspective reflecting the experiences and feelings of people who are served by, providing service within, and who are affected by the foster care system. James T. Ziegenfuss, Jr. and Patricia O'Rourke, authors of *The Ombudsman Handbook*, remind us that "complaining is one way that individuals can participate [in government] . . . management responses tell them whether their participation is effective in generating action . . . whether their views and needs count for anything." (2011, p. 12).

## Impressions

- **Fear:** Child welfare practitioners appear to sharply underestimate the impact of the power differential which is not lost on those they serve. As a large, complex and often involuntary service, the foster care system can be forbidding and intimidating; it is not surprising that fear is a recurring complaint theme. What is surprising is the pervasiveness of fear and the degree to which fear inhibits, or even obliterates, constructive communication. Over 90 percent of complaints to the Foster Care Ombudsman Office, including those from practitioners themselves, cite "fear of retaliation" as a key factor in choosing this means of intervention.

- **Knowledge and Consistency:** Child Protective Services (CPS) processes and decisions appear regularly impaired by lack of accurate, up-to-date knowledge regarding the enormous body of required law, policy, and procedure. Equally important, policy and procedure, properly followed, requires so many individual steps and tasks that it is unlikely even a well-informed, highly motivated worker could consistently follow them. Complaints reflect this inconsistency. However, when good people perform incorrectly, particularly if repetitively, it is critical to determine why; otherwise, ill-conceived solutions will confuse and disappoint.

- **Complaints:** Of the 312 complaints received through January 31, 2021, approximately 53 percent were from foster/kinship parents and 11 percent from biological parents. Approximately 29 percent of complaints were determined valid and were resolved to the

3

 D001178755

complainant's satisfaction. Significant, repeated inputs/complaints from foster parents illuminate the array of reasons why they become disenfranchised or leave.

4

CONFIDENTIAL

D001178756

# INTRODUCTION TO THE FOSTER CARE OMBUDSMAN

### History of the Foster Care Ombudsman

The Foster Care Ombudsman program was enabled with the passage of House Bill 2010 by the West Virginia Legislature in 2019. This legislation and the resulting statute, W. Va. Code §9-5-27, was directed primarily to the transitioning of foster care into managed care. Therefore, the West Virginia Legislature passed House Bill 4094 in 2020, creating W. Va. Code §49-9-101, *et seq.* This law sets forth the duties of the Foster Care Ombudsman and specifies access to foster children, access to records, procedures, subpoena power, confidentiality of investigations, penalties to willful interference and retaliation, and funding for the unit. The Foster Care Ombudsman is positioned within the West Virginia Department of Health and Human Resources (DHHR), Office of Inspector General (OIG).

The Foster Care Ombudsman Office Director was hired on October 28, 2019. Citizen complaint calls transpired within days of her arrival. The Foster Care Ombudsman has been engaged in all aspects of the role including active service to those impacted by the child welfare system since that time.

### Mission

The Foster Care Ombudsman is an independent, impartial, and confidential resource that advocates for the rights of foster children and foster/kinship parents, investigates, and resolves complaints, and makes recommendations and proposals for systemic reform.

### What is an Ombudsman?

The term "Ombudsman" is a Swedish word that means "representative." There are various types of Ombudsmen but those in government are described as independent, impartial, and credible public officials with authority and responsibility to receive, investigate, or informally address complaints about government actions and, when appropriate, make findings, recommendations, and publish reports. Also known as an alternative means of dispute resolution, Ombudsman programs have emerged over the last several decades to protect vulnerable populations from the excesses of public and private bureaucracies, particularly those in contexts with potential for significant power imbalances.

An Ombudsman is a professional distinction for one who performs his or her duties in accordance with standards and resolutions set forth by the United States Ombudsman Association (of which the West Virginia Foster Care Ombudsman is a member), the International Ombudsman Association, the Ombudsman Association, and the American Bar Association. Ombudsmen are generally categorized into types, and the West Virginia Foster Care Ombudsman is best described as a hybrid of classical and advocate.

CONFIDENTIAL

D001178757

## Complaint Process

The Foster Care Ombudsman receives complaints primarily by telephone, email, and less frequently by mail. Walk-in service is available at the State Capitol location. When a complaint is received, it is placed in a tracking system; the complainant is contacted for additional information via an intake procedure, and the complaint is assessed for acceptance. Hallmark characteristics of an Ombudsman are to approach each confidential complaint a) at the lowest necessary level of intervention toward the relief sought by the complainant and b) with a high level of compassionate, individualized service, much of which is rendered informally. All complaints, whether they are handled by the Foster Care Ombudsman or not, are documented in the tracking system, afforded attentive listening, and provided guidance to appropriate resources.

Appropriate interventions range from general information/referral, accomplished within hours, to highly complex investigations that may be systemic in scope and require months of intense research. Most Ombudsman work is accomplished using typical computer-based and telephone technologies, although on-site visits, inspections, or interviews may be required.

Complainants are often provided education and resources intended to empower them to navigate successfully within a complex and often intimidating government system. Agency personnel may receive input from the Foster Care Ombudsman, including suggestions or resources. The Foster Care Ombudsman makes every reasonable effort to involve agencies in the development of recommendations and performs follow up at periodic intervals to verify that agreed commitments, particularly to complainants, are fulfilled.

Issues of a serious nature involving child safety or concerning worker/employee conduct are reported to agency leadership or the appropriate authorities without delay.

# PROGRAM DEVELOPMENT

## Organizational Design

The Foster Care Ombudsman Office anticipates full staffing by a director, a deputy director, a research specialist, administrative support staff, and a team of Regional Foster Care Ombudsmen (RFCO). The director began employment in November 2019, the administrative secretary in February 2020, the two Regional Foster Care Ombudsmen initiated employment in December 2020 and January 2021 respectively, and the deputy director began employment in February 2021. Two additional RFCO began employment in March 2021. Recruiting remains in process for the research specialist role.

Most unit personnel are remote workers, located throughout the state. This approach increases their presence in the local/regional communities and provides for efficient statewide service.

6

D001178758

**Structure and Processes**

The Foster Care Ombudsman is developing a procedure manual, work process and performance standards, and an emerging library of essential tools for RFCOs including resource lists, contact lists, and routine departmental infrastructure.

**Human Resources**

The Foster Care Ombudsman has developed and is implementing a new Ombudsman orientation, onboarding and comprehensive training plan, completed a comparative compensation survey, and is incorporating all model standards of Ombudsman practice as set forth by the United States Ombudsman Association and the American Bar Association.

**Information/Technology Supports**

The Foster Care Ombudsman vetted multiple alternatives for investigatory case management software and examined technology/automation successes and lessons learned with child welfare ombudsman programs across the country. A draft specifications document to support a request for quotation (RFQ) is in development with appropriate personnel in DHHR's Office of Management Information Systems, the West Virginia Office of Technology, and Division of Purchasing and will go out to bid when the RFQ meets all applicable requirements.

Pending the selection and implementation of an appropriate case management system, all key data points regarding complaints, unit activities, and feedback from complainants is maintained in Excel.

**Community/Stakeholder Relations**

The Foster Care Ombudsman has been aggressive but deliberate about community outreach strategy and timing, while initiating key stakeholder relationships. Outreach regarding the unit results in almost immediate increases in complaint calls/contacts, with demand for the new service easily outpacing the capacity for timely, thorough response.

The unit is in the process of developing public facing webpage content and FAQs, a complaints webform, engaging brochures and posters, and concept/design for potential social media presence and presence to the foster youth population. Methods to engage foster youth and avail them to Foster Care Ombudsman services require creativity and differing approaches than those targeting adult populations.

A Memorandum of Understanding will be developed in the near future to articulate more specifically the roles, responsibilities, and expectations for the working relationship between DHHR and the Foster Care Ombudsman. To date, cooperation by DHHR bureaus and other contracted agencies with the Foster Care Ombudsman process is satisfactory. The Foster Care Ombudsman has not encountered an impediment to performing duties as assigned and is provided consistent support by the Commissioner of the Bureau for Children and Families.

7

CONFIDENTIAL

D001178759

# ACTIVITIES REVIEW

## Advocacy, Education, and Monitoring

The Foster Care Ombudsman engages in advocacy on behalf of foster and kinship families and foster youth to leaders, lawmakers, and other stakeholders. In addition, the Foster Care Ombudsman monitors federal and state policies, procedures, rules, and laws and provides public education regarding the purpose and availability of the unit and other topics relating to the foster care system. The Foster Care Ombudsman participates in training programs that relate to his or her duties and responsibilities.

## Affiliations

The Foster Care Ombudsman has presented to, with, or otherwise contributed to the following units, organizations, and groups:

Aetna Better Health of West Virginia Mountain Health Promise (MHP)
- Attended recurring meetings with leadership of Aetna MHP
- Attended Governance Councils
- Presented to Aetna MHP Case Management team on the Foster Care Ombudsman
- Presented to Parents for Care Kids and Socially Necessary Services (SNS) focus groups

Child Placing Agencies
- Engaged regular contacts with child placing agency management and workforce
- Presented regarding the Foster Care Ombudsman

Child Welfare Collaborative and Child Welfare Issues meetings
- Presented on the progress of the Foster Care Ombudsman Office

Court Appointed Special Advocates (CASA)
- Presented to CASA on the Foster Care Ombudsman

Commission on the Residential Placement of Children
- Presented on the Foster Care Ombudsman

DHHR's Bureau for Children and Families (BCF)
- Engaged regular unit and leadership meetings with the child welfare workforce
- Attended recurring meetings with the DHHR Commissioner of BCF
- Created a mandatory training module about the Foster Care Ombudsman with the Division of Training for the BCF's child welfare workforce, "What is a Foster Care Ombudsman, and Why Does it Matter?"
- Regularly attended Residential, Child Placing Agency, and SNS COVID-19 communication calls
- Participated in Logic Model Review for therapeutic foster care model

8

D001178760

DHHR's Bureau for Medical Services, Office of Managed Care
- Engaged regular communication with the Bureau's Director of the Office of Child Welfare

DHHR's Bureau for Behavioral Health, Statewide Family Advisory Board
- Attended regular meetings to provide input from a foster parent and provide the Foster Care Ombudsman perspective

DHHR Community Collaboratives
- Attended collaborative meetings in Kanawha County

Education of Children in Out of Home Education Advisory Committee and Multi-disciplinary Team (MDT) Subcommittee
- Attended regular meetings to provide the Foster Care Ombudsman perspective regarding foster youth and public education

Faith Community
- Provided child placing agency contacts and foster/kinship perspectives to a church to support a new, comprehensive foster care support ministry
- Toured Chestnut Mountain Ranch boys' home and school

Family Focused Treatment Association, West Virginia Chapter
- Presented on the Foster Care Ombudsman

Healthy Grandfamilies
- Presented on the Foster Care Ombudsman and advocated for statewide partnership to increase visibility of the Foster and Kinship Parents and the Foster Child Bills of Rights

Leadership Monongalia
- Presented on Foster Care Ombudsman to civic leaders in northern West Virginia

Libera, Inc.
- Participated in a multi-session Libera adult women's group, to learn firsthand about Libera's empowerment model and its potential for impact on vulnerable youth, including foster youth

Mission West Virginia
- Presented on Foster Care Ombudsman to Kinship Navigator team

National Association of Social Work, West Virginia Chapter
- Presented on the Foster Care Ombudsman program at the 2020 Spring Virtual Continuing Education Conference

National Foster Parent Association
- Participating as an individual member

Ohio Family Resource Network
- Presented on the Foster Care Ombudsman, DHHR Client Services, and Centralized Intake at the Ohio County Partners in Prevention Workshop 2021

9

CONFIDENTIAL

D001178761

SafeHaven Campaign
- Presented on the Foster Care Ombudsman to this foster parent support group

Socially Necessary Services agencies
- Initiated contact with many principals/owners of these important service providers to inform on the Foster Care Ombudsman

Social Work Education Consortium/PRIDE (Parent Resources for Information, Development and Education) foster/kinship parent pre-service training
- Participate ongoing on interactive PRIDE panel sessions to introduce the Foster Care Ombudsman and answer foster/kinship parent questions regarding the child welfare system

United States Ombudsman Association (USOA), Children & Families Chapter
- Completed USOA New Ombudsman Training Curriculum
- Attended monthly meetings regarding Ombudsman issues, solutions, and practices around the country

West Virginia Child Care Association
- Presented regarding the Foster Care Ombudsman program

West Virginia Citizen Review Panel
- Attended quarterly meetings as a member representing the Foster Care Ombudsman perspective

West Virginia Court Improvement Program
- Regular collaboration on topics of mutual interest for system improvement
- Contributed/presented to Guardian *Ad Litem* (GAL) education, "Development of Service Plans/Improvement Periods and A Judicial Primer on New Rights"

West Virginia Division of Motor Vehicles
- Advocated regarding social security card barriers to learner permits

West Virginia Foster, Kinship, Adoptive Parent Network
- Presented to Network members regarding the Foster Care Ombudsman on virtual and in-person venues
- Participation on selected weekly membership update calls

West Virginia Supreme Court of Appeals
- Participated in the GAL Informal Workgroup

West Virginia University
- Presented on the Foster Care Ombudsman program for the WVU School of Social Work Lunch & Learn Series

United States Senator Chuck Grassley Senate Foster Youth Briefing
- Attended telebriefing

CONFIDENTIAL

D001178762

United States Telebriefing, Executive Order on Improving Child Welfare
- Attended telebriefing

**Other Activity**

Obtained and reviewed program information, policies, forms, reports, and lessons learned from child welfare ombudsman services in the United States (approximately 20), Canada, and Australia.

Completed West Virginia Division of Personnel Management Bootcamp and TOP GUN management training programs.

Attended American Bar Association Alternative Dispute Resolution Section Virtual Spring Conference 2020.

Attended *Collaborating with the Courts* session with the Capacity Building Center for States.

Engaged research utilizing the Center for States to assess web-based portals as a means of interagency and service provider communications in CPS cases.

Submitted public comments relating to the United States Department of Justice Memorandum of Understanding with West Virginia.

Submitted public comments relating to the DHHR Children with Serious Emotional Disorders program policy manual Chapter 502.

Submitted comments and suggestions on multiple revision drafts of the DHHR Child Protective Services, Foster Care, Adoption, and Homefinding policy manuals.

Submitted comments and suggestions on multiple pieces of proposed state legislation impacting foster care and the child welfare system during hearings and legislator meetings.

## COMPLAINTS AND CONCERNS

**Intervention Statistics and Content**

The Foster Care Ombudsman investigates and resolves complaints including alleged violations of the Foster and Kinship Parent Bill of Rights and the Foster Child Bill of Rights. Although the focus is on complaints, the office attempts to elicit positive experiences among the criticisms. *Complaints are important inputs, but they do not represent the whole of practitioner performance and should not be interpreted as such. The Foster Care Ombudsman receives input on and bears witness to many examples of good, thorough, selfless, and impressive professional performance and provides regular positive feedback on the same.*

The Foster Care Ombudsman has organized complaint content information by categorizing it into emerging themes. Within those overarching and broad themes, the most common issue statements reflect actual, oft-repeated statements/sentiments of many, or most, complainants in

11

D001178763

that theme category. The issue statements are grouped by the role of the complainant as identified by the complainant's relationship with/to the child.

One of the most common criticisms of satisfaction/input surveys to date is the general nature of the stated dissatisfiers, i.e., "lack of communication." Recipients of this information aptly inquire, "what can I do to fix such a general criticism?" *DHHR leadership and other stakeholders have expressed to the Foster Care Ombudsman a strong preference for a more discrete examination of overarching themes.* Thus, the purpose of this section is to provide greater specificity to broad topics.

Future reporting is anticipated to <u>quantify and compare</u> complaint information over time, so that we can share trends and patterns in light of various child welfare system improvement strategies.

12

CONFIDENTIAL

D001178764

| Complainant County | | | Court Case County | | |
|---|---|---|---|---|---|
| Barbour | 11 | 3.5% | Barbour | 12 | 3.8% |
| Berkeley | 8 | 2.6% | Berkeley | 6 | 1.9% |
| Boone | 6 | 1.9% | Boone | 3 | 1.0% |
| Braxton | 6 | 1.9% | Braxton | 6 | 1.9% |
| Brooke | 1 | 0.3% | Brooke | 2 | 0.6% |
| Cabell | 18 | 5.8% | Cabell | 9 | 2.9% |
| Calhoun | 1 | 0.3% | Clay | 9 | 2.9% |
| Clay | 8 | 2.6% | Doddridge | 2 | 0.6% |
| Doddridge | 1 | 0.3% | Fayette | 4 | 1.3% |
| Fayette | 7 | 2.2% | Grant | 2 | 0.6% |
| Gilmer | 1 | 0.3% | Greenbrier | 2 | 0.6% |
| Grant | 1 | 0.3% | Hampshire | 3 | 1.0% |
| Greenbrier | 3 | 1.0% | Hancock | 2 | 0.6% |
| Hampshire | 2 | 0.6% | Hardy | 1 | 0.3% |
| Hancock | 2 | 0.6% | Harrison | 21 | 6.7% |
| Hardy | 1 | 0.3% | Jackson | 5 | 1.6% |
| Harrison | 19 | 6.1% | Jefferson | 2 | 0.6% |
| Jackson | 4 | 1.3% | Kanawha | 52 | 16.7% |
| Jefferson | 2 | 0.6% | Lewis | 2 | 0.6% |
| Kanawha | 38 | 12.2% | Logan | 2 | 0.6% |
| Lewis | 2 | 0.6% | Marion | 6 | 1.9% |
| Lincoln | 1 | 0.3% | Mercer | 11 | 3.5% |
| Logan | 1 | 0.3% | Mineral | 1 | 0.3% |
| Marion | 7 | 2.2% | Mingo | 4 | 1.3% |
| Mercer | 13 | 4.2% | Monongalia | 19 | 6.1% |
| Mineral | 1 | 0.3% | Monroe | 1 | 0.3% |
| Mingo | 4 | 1.3% | Nicholas | 9 | 2.9% |
| Monongalia | 18 | 5.8% | Ohio | 6 | 1.9% |
| Monroe | 2 | 0.6% | Pleasants | 2 | 0.6% |
| Nicholas | 7 | 2.2% | Pocahontas | 1 | 0.3% |
| Ohio | 3 | 1.0% | Preston | 8 | 2.6% |
| Pocahontas | 2 | 0.6% | Putnam | 4 | 1.3% |
| Preston | 11 | 3.5% | Raleigh | 2 | 0.6% |
| Putnam | 8 | 2.6% | Randolph | 15 | 4.8% |
| Raleigh | 1 | 0.3% | Ritchie | 2 | 0.6% |
| Randolph | 11 | 3.5% | Roane | 1 | 0.3% |
| Ritchie | 2 | 0.6% | Summers | 6 | 1.9% |
| Roane | 2 | 0.6% | Taylor | 9 | 2.9% |
| Summers | 2 | 0.6% | Tucker | 1 | 0.3% |
| Taylor | 9 | 2.9% | Unknown | 21 | 6.7% |
| Tucker | 1 | 0.3% | Upshur | 1 | 0.3% |
| Tyler | 1 | 0.3% | Wayne | 1 | 0.3% |
| Unknown | 30 | 9.6% | Webster | 4 | 1.3% |
| Upshur | 2 | 0.6% | Wirt | 1 | 0.3% |
| Wayne | 1 | 0.3% | Wood | 28 | 9.0% |
| Webster | 4 | 1.3% | Wyoming | 1 | 0.3% |
| Wetzel | 1 | 0.3% | | 312 | 100.0% |
| Wirt | 1 | 0.3% | | | |
| Wood | 21 | 6.7% | | | |
| Wyoming | 3 | 1.0% | | | |
| | 312 | 100.0% | | | |

The Foster Care Ombudsman tracks complaints by the location of the complainant (county) and the location of the court case (county) if the complaint involves the court. Note, complaint totals will be higher in areas of denser population and/or greater CPS activity. Geographic distribution can be grouped by regions as designated by BCF.

| Cases by Region | | |
|---|---|---|
| 1 | 90 | 28.8% |
| 2 | 82 | 26.3% |
| 3 | 62 | 19.9% |
| 4 | 56 | 17.9% |
| Unknown | 22 | 7.1% |
| | 312 | 100.0% |

The Foster Care Ombudsman tracks complaints to differentiate those involving or not involving a court (family court, circuit court). Few complaints involve family court.

| Complaints with Court | | |
|---|---|---|
| Yes | 210 | 67.3% |
| No | 83 | 26.6% |
| Unknown | 19 | 6.1% |
| | 312 | 100.0% |

The Foster Care Ombudsman tracks the means by which complainants contact the unit. As additional contact options are added (webpage, etc.) and as outreach to different target populations increases, the contact methods used by complainants are likely to change.

| Method of Contact to FCO | | |
|---|---|---|
| Email | 184 | 59.0% |
| Telephone | 125 | 40.1% |
| Other | 3 | 1.0% |
| | 312 | 100.0% |

**Note: Due to rounding, not all column totals will compute to 100%.**

13

CONFIDENTIAL

D001178765

| Case BCF Unit Affiliation | | |
|---|---|---|
| CPS | 277 | 88.8% |
| Adoption | 28 | 9.0% |
| Unknown | 2 | 0.6% |
| Centralized Intake | 1 | 0.3% |
| ICPC | 1 | 0.3% |
| IIU | 1 | 0.3% |
| Post Adoption | 1 | 0.3% |
| Youth Services | 1 | 0.3% |
| | 312 | 100.0% |

The Foster Care Ombudsman tracks complaints to group them by BCF unit affiliation or case type. Note, this does not necessarily mean that the complaint is about BCF as the complaint may involve an entity external to BCF. ICPC refers to the Interstate Compact on the Placement of Children; the ICPC Unit performs services relating to ensuring the legal transport of a child from one state to another in a foster or adoption placement. IIU refers to the Institutional Investigative Unit; this unit performs child abuse and neglect investigations in settings including, but not limited to, foster family homes and group residential settings. Youth Services, which is distinct from CPS, is a specialized, helpful program of services to children and their families. Like CPS, Youth Services may or may not involve the court.

| Case by Complainant Relationship to the Child | | |
|---|---|---|
| Foster Parent (Non-Relative) | 118 | 37.8% |
| Grandparent or Kin (Placement Resource) | 49 | 15.7% |
| Biological Parent | 34 | 10.9% |
| Other Relative (Not Placement Resource) | 31 | 9.9% |
| Other | 24 | 7.7% |
| Community/Service Provider | 15 | 4.8% |
| Adoptive Parent | 13 | 4.2% |
| State Employee | 8 | 2.6% |
| Unknown | 7 | 2.2% |
| Attorney/GAL | 5 | 1.6% |
| Legal Guardian | 4 | 1.3% |
| Child (Self) | 3 | 1.0% |
| Biological Parent's Attorney | 1 | 0.3% |
| | 312 | 100.0% |

| Case by Referral Source | | |
|---|---|---|
| Other | 74 | 23.7% |
| Prior Contact with FCO | 55 | 17.6% |
| State Employee | 41 | 13.1% |
| Social Media | 35 | 11.2% |
| Conference/Training | 25 | 8.0% |
| Media | 21 | 6.7% |
| Community/Service Provider | 14 | 4.5% |
| Attorney/GAL | 12 | 3.8% |
| Unknown | 11 | 3.5% |
| Internet | 8 | 2.6% |
| Email | 6 | 1.9% |
| Elected Official | 4 | 1.3% |
| Initiated by FCO | 2 | 0.6% |
| Teacher/School Employee | 2 | 0.6% |
| CASA | 1 | 0.3% |
| Website | 1 | 0.3% |
| | 312 | 100.0% |

The Foster Care Ombudsman tracks complaints by the complainant's relationship to the child, by the complainant's source of referral to the Foster Care Ombudsman, and by the case type assigned internally by the unit. As the Foster Care Ombudsman expands its community outreach to different and diverse target populations, particularly to foster youth, the mix of complainants and referral sources is likely to change.

The Foster Care Ombudsman did not expect the diversity of complainant types and referral sources at the onset of the program, and the data captured initially categorized many of them as "Other." Additional descriptors were added and will strengthen the categorical presentation on these topics by reducing the use of the "Other" category.

14

CONFIDENTIAL

D001178766

The Foster Care Ombudsman generally classifies complaints into case types that describe the unit's level of intervention on the complaint.

Information, the lowest level of assistance, typically involves providing education, context, and referrals to other entities, people, or resources.

| Cases by FCO Case Type | | |
|---|---|---|
| Information | 58 | 18.6% |
| Assist | 223 | 71.5% |
| Investigation | 31 | 9.9% |
| | 312 | 100.0% |

Assistance, the mid-level of intervention, typically involves routine case documentation review, interaction with few agency or other contacts inside and outside of DHHR, facilitating communications between the complainant and other case participants or authorities, as well as providing education, context, and referrals to other entities, people, or resources.

Investigation, the highest level of intervention, typically involves non-routine or more intensive case documentation review, interaction/interviews with multiple agency or other contacts inside and outside of DHHR and may necessitate meetings/reports involving internal or external agency leadership.

| Cases by Main Complaint | | | | Cases by Secondary Complaint | | |
|---|---|---|---|---|---|---|
| Action or Inaction of Agency/Employee | 127 | 40.7% | | Not Specified | 148 | 47.4% |
| Lack of Communication | 42 | 13.5% | | Lack of Communication | 42 | 13.5% |
| Financial Issues/Reimbursement | 38 | 12.2% | | Action or Inaction of Agency/Employee | 33 | 10.6% |
| Removal of Children | 28 | 9.0% | | Placement of Children | 19 | 6.1% |
| Decision of Agency/Employee | 24 | 7.7% | | Removal of Children | 19 | 6.1% |
| Policy/Regulation Issue | 21 | 6.7% | | Rude/Unfair Treatment | 17 | 5.4% |
| Placement of Children | 9 | 2.9% | | Threat or Retaliatory Treatment | 12 | 3.8% |
| Rude/Unfair Treatment | 8 | 2.6% | | Decision of Agency/Employee | 11 | 3.5% |
| Threat or Retaliatory Treatment | 8 | 2.6% | | Policy/Regulation Issue | 8 | 2.6% |
| Other | 7 | 2.2% | | Financial Issues/Reimbursement | 3 | 1.0% |
| | 312 | 100.0% | | | 312 | 100.0% |

The Foster Care Ombudsman categorizes complaints by main complaint and secondary complaint given the importance of the issues as presented by the complainant. Complaints are typically multifactorial. Beyond the primary and secondary complaint issues, it is important to note that over 90 percent of all complainants also communicate some degree, sometimes quite intense, of fear to communicate, fear to report, or fear of retaliation. Additional information to further deconstruct this pervasive and crucial issue will be subject matter for future Foster Care Ombudsman reports.

Note that the characterization of complaints does *not* refer exclusively to DHHR's BCF or to the Department as a whole. *Complaints refer to and often involve more than one person, agency, entity, and provider that is involved in a child welfare case.* Future Foster Care Ombudsman reports will strive to distinguish the target(s) of complaints, and the determination of their validity, with greater specificity.

15

CONFIDENTIAL

D001178767

| Complaint Status at Closure | | |
|---|---|---|
| Complaint Valid and Resolved | 90 | 28.8% |
| Information Exchange Only | 78 | 25.0% |
| Complaint Not Valid | 70 | 22.4% |
| Insufficient Info to Rate Validity | 40 | 12.8% |
| Case Remains in Open Status | 18 | 5.8% |
| Complaint Withdrawn | 8 | 2.6% |
| Complaint Valid and Not Resolved | 7 | 2.2% |
| Unspecified | 1 | 0.3% |
| | 312 | 100.0% |

The Foster Care Ombudsman makes every reasonable effort to render assessments regarding the technical validity of complaints with fairness and consistency. To do so, the key elements of the complaint and the associated actions or decisions are held to the standards of applicable policy, procedure, or law. In nearly all cases, complaints determined valid are with concurrence of the involved agency.

Complaints that are determined not valid, although providing important information regarding an individual's experience with the child welfare system and feelings about the same, lack technical merit when compared to the standards of applicable policy, procedure, or law. However, it is a central tenet in complaint analysis that a quick disregard of a complaint lacking validity is a real and serious mistake. Despite the lack of technical merit, the persistent troubling and unsatisfactory experiences of a system's consumers or participants is an input with extraordinary value in evaluating the efficacy of policies, procedures, and laws. *A pattern of dissatisfaction may flag institutional changes needed or flaws in the delivery of services that without input from the public would go undetected or underestimated. This gap, left unattended, has the potential to diminish well-intended outcomes, or worse, to contribute to adversity.*

The nature of some complaints renders it impossible to determine validity, particularly given complaints that relate to perceived rude treatment or reported lack of returned telephone calls.

A complaint is determined resolved if the matter is satisfactorily repaired or rectified incorporating the perspective of the complainant. A complaint is determined not resolved if the issue is irreparable or irreversible or if the target entity of the complaint is unable/unwilling to effect a change.

Occasionally, a complaint is withdrawn before a determination can be made by the Foster Care Ombudsman. Typically, this is due to a complaint being resolved after its initial report but before the Foster Care Ombudsman initiates any action steps on the complaint.

In the future, the Foster Care Ombudsman will strengthen the assessment and reporting of complaint validity by attaching validity to each key aspect of multifactorial complaints, and by identifying more clearly the identity of the agency/entity about which the complaint was directed. Additionally, the Foster Care Ombudsman anticipates stratifying complaint data by county/district, by region, by agency type, or other categories of interest.

In addition to the statistical measures provided in this report, the Foster Care Ombudsman captures many additional data points that will enhance future, de-identified reporting. Those data points include but are not limited to, complaint open and close dates, tracking of reported rights violations, and the identity of involved child placing agencies, socially necessary services agencies, workers, judicial divisions, and/or attorneys/GALs. Additionally, the Foster Care Ombudsman anticipates reporting on specific suggestions or recommendations made, agreed, and implemented. *The purpose of all reporting from the Foster Care Ombudsman office is to provide*

16

CONFIDENTIAL

D001178768

*a unique source of information for leaders, lawmakers, and others to use as they see fit toward service effectiveness and excellence for children, families, and communities.*

17

D001178769

## Complaint Summary by Role

### Emerging Theme 1: Communication

**Preliminary Impressions:**

- The persistent report of CPS and various other child welfare personnel "not returning text messages or calls timely or at all" crosses all complainant roles (placement providers, biological parents, attorneys, contracted agency workers) suggesting that this is systemic and frequent.
- Foster/kinship parents and contracted agency personnel report considerable tension and frustration in the crosshairs of poor and conflicting interagency communications.
- Multiple complainant roles maintain the guardian *ad litem* attorneys (GALs) do not communicate with foster/kinship parents or have contact with foster children.
- The pervasive complaint of not receiving any or timely notices from CPS workers (by mail, text message, or telephone) for multi-disciplinary team meetings or court hearings crosses many complainant roles (placement providers, contracted agency workers, educators, mental health professionals) suggesting this is systemic and frequent.
- Kinship/relative providers report no access to meaningful after-hours/weekend support from CPS unless the centralized intake/hotline unit, not the family, deem the issue sufficiently emergent, which leaves them feeling fearful, angry, and alone. The level of after-hours support is notably deficient compared to that provided by child placing agencies to foster families.
- CPS workers/supervisors convey sharply differing and often seriously deficient knowledge of applicable policies and community/interagency resources.

| Complainant Role | Common Issue Statements | FCO Comments |
|---|---|---|
| **Foster/Kinship Parents** | • I cannot get a return text or telephone call from a CPS worker.<br>• The CPS worker is very rude to me and short with me, I get one or two word replies by text and that's all.<br>• I am the constant middleman between different agency workers who obviously do not communicate, are afraid of each other, or who disagree, and it is very uncomfortable to be in the midst of their tensions.<br>• Everything I say to CPS is presumed self-interested, uninformed.<br>• CPS workers who make promises about visit appointments or providing resources, do not deliver on them.<br>• The GAL has never visited the child, contacted me, or done a visit to my home; how can he/she really represent this child without talking to him/her?<br>• When the CPS worker makes an appointment and something changes, he/she does not contact me to cancel it, just does not show.<br>• I am not invited to or allowed in multi-disciplinary team meetings (MDT) or court hearings or I am told that I am not allowed in due to confidentiality.<br>• I cannot attend the court hearing because that judge doesn't allow foster parents in the room.<br>• I am not told anything about what was decided or changed in MDT meetings or court hearings, I find out when something happens.<br>• Kinship parents: I cannot reach a DHHR worker when I need help; if it is after hours or a weekend or a holiday, I am told | Communication complaints are pervasive; those shared here are typical. |

18

CONFIDENTIAL

D001178770

| | | |
|---|---|---|
| | <ul><li>it has to wait until regular business hours, as they do not call the on-call worker because my problem is not an emergency (to them).</li><li>I cannot get an answer to why my case still has not gone to the adoption unit, but termination of all rights was many months ago.</li><li>Nobody told me the Walmart clothing vouchers the CPS worker issued for the children's things would be denied at the cash register; this was very embarrassing.</li><li>Rights are worthless, nobody in power knows they exist.</li></ul> | |
| **Non-Placement Relatives** | <ul><li>I cannot get a return telephone call from a CPS worker.</li><li>I cannot get any DHHR worker to respond to my repeated requests for a home study or tell me how I can make my case for placement.</li></ul> | Relatives often want to reassure foster children that they do love and care about them; have not rejected them. |
| **Biological/Caregivers** | <ul><li>I cannot get a return text or telephone call from my worker.</li><li>I do not have any idea who my worker is at the DHHR.</li><li>I have no idea what I am supposed to be doing in this case.</li><li>I have no idea whether what I am doing is right or enough.</li><li>The workers tell me they cannot talk to me about my case, it is my lawyer's job.</li><li>I cannot get a return text or telephone call from my lawyer.</li></ul> | The FCO receives more calls from biological parents than was expected at origination of this unit. |
| **Attorneys/GALs** | <ul><li>I cannot get the foster/kinship contact information from the CPS worker despite multiple attempts.</li><li>No case plan is shared with me or filed.</li><li>I cannot get any response from workers or supervisors.</li></ul> | |
| **DHHR/Agency/Providers** | <ul><li>I do not know anything about that policy/procedure/program (primarily DHHR).</li><li>I never got the memo (primarily DHHR).</li><li>Nobody tells me anything (primarily DHHR).</li><li>People talk to and treat me very disrespectfully.</li><li>I do not get notified or invited to MDT meetings or hearings (child placing agencies).</li></ul> | Intra-agency communication appears to be delayed to end-users and inconsistently understood. |
| **Other** | <ul><li>The training I received is interesting but does not include the reality of how to deal with this system, it does not work the way it was advertised to me; I am not prepared to do my role/job.</li><li>I can only make decisions with the information that I receive, and that information is often incomplete or biased or both.</li><li>Foster youth are not timely or accurately getting information as set forth in policy about what they need before they age out. Foster youth get inaccurate information about FC-18 (agreement to remain in foster care) or educational benefits available to them.</li></ul> | |

19

CONFIDENTIAL

D001178771

## Emerging Theme 2:  Treatment by the System
### Preliminary Impressions

- Complainants from most roles, particularly foster/kinship parents, biological parents/caregivers, and contracted agency personnel routinely report intense reluctance to ask for help, to advocate for children, or to raise a contrary opinion citing distrust and fear of retaliation by CPS personnel.
- Foster/kinship parents consistently report feeling treated dismissively, condescendingly, and disrespectfully by CPS personnel in public and private settings. Foster/kinship parents report receiving "backlash" and being "thrown under the bus" when others make mistakes, i.e. "we are an easy target, but the people inside the system cover for each other."
- Foster/kinship parents and contracted agency personnel report that the impact of actions/decisions on children is subordinated and uncomfortable if not intolerable to witness.
- Foster/kinship parents report intense frustration when others appear to be without accountability for their lack of action, adherence to policy, or follow through.

| Complainant Role | Issue Statements | FCO Comments |
|---|---|---|
| **Foster/Kinship Parents** | • If I ask for help, I am told "if you can't handle it, we'll just move the kids." <br> • Workers tell me that they are too busy so just deal with it. <br> • If I advocate for a child the way I was trained to do, I am accused of "not supporting reunification" and the kids are removed. <br> • If I question anything (sudden demand for last-minute bio parent visitations despite my family schedule, or a worker visit suddenly on the last day or two of the month) I am told "it is court ordered" or the "GAL said so" and if I do not agree without complaining, I will be reported, and the kids will be removed. <br> • The child's perspective and best interest is totally disregarded, put last. I cannot ethically continue to participate in a system that so easily and repeatedly traumatizes kids. <br> • I am treated horribly in meetings because I am the only one without a lawyer; I am an easy target. <br> • I am repeatedly coerced to sign (foster agency) back-dated forms for things I signed before or activities I did not attend, because they are being audited. | Complaints from foster/kinship parents are permeated by fear and frustration. |
| **Non-Placement Relatives** | • Just because I am related to the birth parents, I am treated as if I were just like them and assumed to be a bad influence. <br> • Nobody will return my calls and if they do, they brush me off stating everything is confidential, so how can express that I just want contact with the child however they will allow it? <br> • I am told I need an attorney to assist my case, but I cannot find one without calling every lawyer in the telephone book and waiting forever for a call back. If I call the county prosecutor's office, they refuse to tell me which lawyers handle abuse and neglect. | Non-placement relatives complain of dismissive treatment. |
| **Biological/Caregivers** | • Everyone in this case (different workers, agencies) tells me something different so I have no idea what to believe or trust. <br> • I do not have a chance in this process, the whole thing is rigged against me, this is not a helping service, it is just threats. <br> • All of the workers, lawyers, and judges decide what to do among themselves, and what I say does not matter. <br> • If I speak up, try to get answers, or complain I have been (or will be) punished for it. | Biological parents are apprehensive of the system and are inclined to avoid it. |

20

CONFIDENTIAL

D001178772

| | | |
|---|---|---|
| | • I am not going to say what I need because they have my whole world in their hands. | |
| **Attorneys/GALs** | • I do not think that the DHHR is being honest with me.<br>• Every worker gives me a different answer about what the policy is, so I have no idea what to trust. | |
| **DHHR/Agency/Providers** | • I am afraid to talk/disagree/make complaint because then I will not get referrals anymore.<br>• Mental health providers are not regularly included in important meetings or decisions which makes no sense if dealing with youth and adult trauma.<br>• Aetna case managers are not invited to MDT meetings although I believe they should be. This makes it very difficult to provide the services that may be helpful to the workers, the child, or the families.<br>• Educators are not included in important meetings, but we spend so much time with the children, wouldn't they want my input?<br>• Everything in this process is driven by the lawyers but important decisions need to consider more than just the law.<br>• As a CPS worker, I am responsible for serving petitions on biological parents which I feel is unsafe, inefficient to my job, and sets me up from the start as an adversary to my adult clients.<br>• I am afraid to make an issue of this because I will not get cooperation/information from that worker in the future.<br>• Whenever anything goes wrong, I get blamed and cannot defend myself since I am not in the courtroom.<br>• I send paperwork and forms over repeatedly and I cannot get the CPS worker to sign/approve/return them.<br>• I feel like people do whatever they need to do to get through the day, or to get something or someone off of their desk. | Providers external to DHHR repeatedly complain of a felt lack of focus on the child. |
| **Other** | • The training I received emphasized that I am the eyes and ears for how the child is doing, and that I should share my observations and advocate; but nobody asks my input and when I offer it about anything, I am treated with backlash and disdain.<br>• I am told to provide normalcy for a teen but without a social security card, he/she cannot get a job or a driver's permit; CPS cannot get the card and it is not fair that foster children have to pay the price.<br>• Nobody in this is really held accountable, there are always excuses. | Complaints cite that training is philosophical but far from practical. |

21

CONFIDENTIAL

D001178773

**Emerging Theme 3: Placements**
**Preliminary Impressions:**

- Foster parents report receiving little to no information regarding *known* behavioral history and extraordinary needs of children prior to placement from both CPS and child placing agency personnel.
- Relatives report being unable to communicate their interest in placement of a child or feeling quickly dismissed by CPS personnel, particularly if they reside out of state.
- Foster/kinship parents report feeling confusion and frustration when foster children do not return to the foster/kinship home after an IIU investigation is unsubstantiated (little or no understandable explanation provided by CPS or child placing agency personnel).
- Pre-adoptive foster parents report frustration regarding the process and status of transfer to the adoption unit, particularly when it involves months-long waits. Transfer time is not always in CPS control.

| Complainant Role | Issue Statements | FCO Responses |
|---|---|---|
| **Foster/Kinship Parents** | • After the child was placed with me and showed extreme behaviors, I learned that the agency/agencies knew all about this, but they did not tell me when they called me for the placement.<br>• I hear about the lack of foster homes all the time but get no placement calls.<br>• The IIU was unsubstantiated but the children are not placed back in my home, but nobody will explain why. | Repeated complaints regarding known, important child behaviors not shared with prospective foster parents in advance and later defended as "due to confidentiality."<br><br>An unsubstantiated IIU is incorrectly interpreted as "everything in the foster home is fine." |
| **Non-Placement Relatives** | • I definitely would have taken the child if I would have known he/she was in foster care, but I had no way to know because my relative did not tell me that the children were removed from him/her.<br>• When I called to request placement, I was asked by the CPS worker, "where have you been all this time" and told it was too late, the children were already bonded with the foster parents.<br>• My family and the child are Native American. The CPS worker never asked about that, I never got to tell them that, and now the child is in a foster home with non-Native Americans. | Complaints reflect pervasive lack of diligent search by CPS. |
| **Biological/Caregivers** | • I do not know why they will not place my children with my relative. | |

22

CONFIDENTIAL

D001178774

| Attorneys/GALs | • When children I represent are moved to a new placement, CPS does not notify me timely or at all.<br>• I do not understand why my client cannot have the children returned if the IIU was unsubstantiated and nobody in CPS or IIU will tell them or me.<br>• I do not hear any diligent search reports to the court. | |
| DHHR/Agency/Providers | • I do not think that CPS is giving the grandparent a fair opportunity for placement because I thought her home study was fine. | |
| Other | • Taking this long to get to adopted is very hard on my foster child and I do not feel that anyone really considers how he/she feels about all these delays.<br>• Caseloads are so exaggerated for everybody by avoidable, delayed paperwork/court orders needed to advance to permanency. | Complaints reflect that the emotional uncertainty of delayed permanency is perceived as comparatively unimportant. |

23

**Emerging Theme 4: Contact with Children**
**Preliminary Impressions:**

- Appropriate/long bonded foster/kinship parents desiring continued contact with foster children report outright denial of consideration and skepticism that a request by a child for such contact would be considered.
- Potentially appropriate relatives and kin desiring continued contact with foster children report outright denial of consideration and skepticism that a request by a child for such contact would be considered.
- Biological parents/caregivers report long delays (weeks) to have information about or contact with children removed by CPS from their care, and report frustration with repeatedly cancelled visitation appointments (and are afraid to complain).
- Foster/kinship parents report concern and fear by the requirement to give the foster children to transporters (visitation workers) from SNS agencies who do not offer or have agency identification and who may bristle when it is requested.

| Complainant Role | Issue Statements | FCO Responses |
|---|---|---|
| **Foster/Kinship Parents** | • I am told that the children would benefit from maintaining contact with important people in their lives, but contact was cut off entirely once the child went to another placement, even though I am told I did nothing wrong.<br>• The child is too young to ask to stay in touch with me, but we had a great relationship; why are young children assumed not to be attached just because they cannot put it into words?<br>• The visitation worker who does the transports is late or late cancels, a lot. | Complaints reflect work needed to operationalize the new statutory rights for foster youth and foster/kinship parents. |
| **Non-Placement Relatives** | • I am begging to have any form of contact with my relative foster child, but nobody will return my voice mails.<br>• I would like to visit my relative who is in foster care and I am told no without any reason; CPS seems totally disinterested.<br>• I would like to visit my relative who is in foster care and I am told it is not a funded service, even though I offered to go "wherever."<br>• I do not understand why I cannot have any contact with my relative (child) in foster care; nobody will tell me why or answer my calls to request contact. | Complaints reflect that preserving connections for children is not a consistent priority in practice. |
| **Biological/Caregivers** | • My visitation provider has not called, and I have no idea if or when I will have my visits (or telephone calls) with the children.<br>• I want more/longer visits with my children, but nobody will tell me why that isn't happening or what I need to do to get more time. | |
| **Attorneys/GALs** | • I cannot get information from CPS to locate the children I represent. | |
| **DHHR/Agency/Providers** | • I will not authorize contact (with former caregivers) because the children need to "move forward."<br>• I am very uncomfortable with the GALs position or the court order (regarding contact rules), but I cannot do anything about it (moral distress); the affected people who feel as I do, blame me for the decisions. | Complaints reflect contact with former caregivers rarely incorporates mental health professional input. |

24

CONFIDENTIAL

D001178776

| Other | • I am required to hand the children over to people who show up to drive them places, but those people do not show or have identification, and this makes me very worried (caregivers referring to socially necessary services agency providers). They get angry with me if I ask them for identification. | |

25

**CONFIDENTIAL**

**D001178777**

**Emerging Theme 5: Investigations and Removals of Children**
**Preliminary Impressions:**
- Foster/kinship and biological parents report feeling manipulated and inadequately informed about their rights and deceived about CPS process forthcoming.
- Foster/kinship parents report moves/removals or reunification of children, on short notice when no safety or compliance issues are present, with no understandable explanation, with no transition preparation or plan (directly from fully supervised visitation to unsupervised reunification), and without adequate opportunity to assemble the children's belongings or provide for a proper goodbye.

| Complainant Role | Issue Statements | FCO Comments |
|---|---|---|
| Foster/Kinship Parents | • Nobody will tell me if my home is under investigation or why.<br>• The children were removed with no reason given and (hours or) no notice to me. They did not even take (his/her) things and later said they were not needed anyway, even though the things may have been important to the child.<br>• The kids are removed without any effort to make things better here, first.<br>• The threat by CPS workers of removing the kids is repeatedly used as a way to scare and intimidate me into not making anything inconvenient for them. | These issue statements are repeated and pervasive. |
| Non-Placement Relatives | • I have no idea why nobody contacted me and put the children in foster care instead. My son/daughter/relative is adamant that they shared my information with the CPS worker. | |
| Biological/Caregivers | • I do not understand why CPS removed my children.<br>• I do not know what is going to happen next and what they tell me, I do not understand (legal talk).<br>• The information in my investigation report was biased and inaccurate, written in a way to make me look bad.<br>• I begged the DHHR for help with my (teenager, out of control situation) and instead of helping they removed all of my children.<br>• At the removal I was told to sign papers, but they would not tell me what the papers were for, just that it was "for my own good" and that it was "just temporary."<br>• I adopted a foster child who is now having extreme behaviors, I am afraid of him/her, and nobody will take me seriously or help me, i.e., who but a poor parent would be afraid of a child? | Complaints from biological and adoptive parents are more frequent than the FCO anticipated at inception of the program. |
| Attorneys/GALs | • I know that the children were not interviewed by the CPS worker privately, I thought children are to be interviewed privately.<br>• My client cannot get anyone at DHHR to tell him/her if or when visitations will occur, and it has been weeks. | |
| DHHR/Agency/Providers | • I was very surprised to be told to remove the children (from the foster home) for reunification, our child placing agency was provided no notice and we had to do the removal on the same day, which was so hard on everyone, and this approach did not seem necessary.<br>• They talk about having transition time for children, but I rarely see this in practice. | Complaints suggest that no-notice removals lacking safety concerns are not uncommon. |

26

CONFIDENTIAL

D001178778

**Emerging Theme 6: Payments**
**Preliminary Impressions:**

- Payment complaints are regularly validated by the FCO suggesting serious and inconsistent knowledge, communication, and performance gaps by CPS workers relating to payment streams available to kinship/relative providers while a home study is in process.
- Many kinship/relative providers contacting the FCO are not receiving monthly payments to assist them pending a certified home study and cite that they are not informed about this resource or that they were told they would not qualify for it.
- There appears no effective mechanism to validate that kinship/relative providers are correctly informed regarding available payment streams at the onset of child placement, and for relative providers who learn of it later, there is no means to backdate the benefit to the placement date which creates intense frustration and hardship for the relative providers.
- Kinship providers who should be receiving monthly payments pending a certified home study report receiving payments only after they repeatedly complain to the CPS worker about missing payments and often receive payments of incorrect amounts. Kinship providers are afraid to contact CPS workers for fear of "being considered a troublemaker" or appearing to be "in it for the money."
- Adoptive parents report significant frustration to locate the correct person/unit to help them resolve adoption subsidy payment issues citing repeated telephone calls, voice mail messages, and emails unreturned.

| Complainant Role | Issue Statements | FCO Comments |
|---|---|---|
| **Foster/Kinship Parents** | • Relative/kinship parents: I had no idea that I could get monthly payments until I got my home certified, nobody told me.<br>• Kinship parents: I was told that because I was not a relative, I could not get financial help until I am certified.<br>• Kinship parents: I got a payment, but it has been months without one.<br>• Kinship parents: I am getting payments, but the amounts are wrong.<br>• Relative parents: I had no idea that I could get monthly payments until I got my home certified, nobody told me, and now I am told that they cannot issue anything for the many months I went without.<br>• I do not know how to ask for or who to call to get direct deposit. | Payment complaints are most often determined valid and resolved. |
| **Other** | • I did not get my adoption subsidy payment, and nobody will return voice mails to help me. | |

27

## FEEDBACK TO THE FOSTER CARE OMBUDSMAN

The Foster Care Ombudsman receives and tracks written feedback to the unit. In the future, a mechanism will be implemented to monitor complainant satisfaction and invite suggestions for improvement more comprehensively. The comments cited for this report are presented in their original written form with only the Ombudsman name(s) or any case-specific names removed.

"Thank you for helping with contact, as well so you can see what a wonderful worker that you all have appointed. Please let your constituents know that she has met all expectations for me and hopefully for you all as well. Thanks again brother for your work in public office and standing for your citizens. Forever grateful."

"Thanks. You are more helpful than you know. We were just contacted by our attorney and the adoption worker that there is MDT on May 5 at 2:00. Hopefully, you are able to attend. Thanks again."

"Thank you. I saved your email and the form to a file. This is amazing, I've been doing this for 7 years and this is the first I've heard of this. I should have suspected there was some type of insurance coverage."

"Thank you so much for all of your help with all of this. I appreciate you! I will let you know about the fingerprinting and keep you posted about everything else as well."

"I wanted to say thank you for getting on top of this & finding out everything that you did. I still have heard nothing from IIU, but I will let you know in a week or so. I do have 1 question that I'm still confused on, if we choose to foster again can we do so? Maybe I should have read better but I've read it multiple times & @ the end you said the thanks & maybe we would do it again which makes me believe it might be possible. Again, thank you for all you have done."

"You have been so helpful in trying to help me."

"Once again, I can't thank you enough for your help. I just got my letter emailed to me stating our closure with the Potomac Center. God bless you lady for helping people like me!"

"That answers all my questions. Thank you and your team for helping me get thru this process. May each and every one of you be BLESSED!"

"Well, you have done a great job and I am pleased to say that working with you and your team has been a joy. Thank you again for helping me to bring this little 4-year boy back to me where I can love, nurture and mold him into the man he needs to be. May God always bless your path!"

"Today was a VICTORY!! I was permitted to sit in on the hearing today. Thank you so much for everything you have done for foster parents & you'll continue to do for us. If there is anything, I can ever do to help you please let me know."

CONFIDENTIAL

D001178780

"To all of you, thanks so much for your prompt attention to "H's" case. We had our hearing this morning in circuit court. The attorney on behalf of the DHHR, advised the court that the State has decided to pay the subsidies that "H" is entitled to. The Judge then went on the record that it was to be so. Long battle but finally light at the end of the tunnel."

"Thank you so much for your assistance in this. I can't thank you enough for all your help."

"Thank you so much for your time today you have given me a ton of information that no one else has been able or willing to give me."

"Thank you for your response. That information gives me a huge relief!"

"Thank you for everything you're doing and just listening to all of this. It really helps my foster families to feel that they are finally being heard because as a foster agency they know there is only so many things as an agency we can do."

"Thank you so much for doing what you magically do, this is why I love you so much, I am at office today and will check to see if it is at the CPS side, but I have not received it yet. Thank you very much!!!"

"Where have u been through this journey. Like literally if we would have had this kind of support, we would still be doing foster. I do not know how to thank you enough."

"I recommend reaching out to the Ombudsman if you have any situations that seem to echo ours. She (along with this network) has been the only positive experiences we've had within all of this."

"Thank you so much for helping get this resolved. Again...thanks for all your help. We truly appreciate it."

"I greatly appreciate you for everything since you have become involved this process has become a lot more fair."

"I don't see any way we would have ever been treated fairly if you hadn't taken interest in seeing that our case was heard. The office you hold and the work you do will certainly make a difference in this state and hopefully inform the practice and perception of Child Services, helping families and most importantly, the children in the system to feel safe and be tended to. There aren't enough words for my wife and I to convey our thanks."

"God bless you for your help. It'll never be forgotten."

"Hi! I am so glad that the children got moved back to family! I was so happy with the outcome yesterday. Thank you for all your help! Thank you again for your help."

"Thank u so much for checking on us and all you have done to support us."

"I can never thank you enough for all the help that you were/are to us."

29

CONFIDENTIAL

D001178781

"Thank you again! You are awesome!"

"We won - the twins have been with us almost three weeks. Thank you so much for all your help."

"Thank you so much. You have no idea the smile on my face hearing you say that and I should say tears of happiness, I really am impressed and I hope you can be there because that would be wonderful."

"I really appreciate everything you do! If there was an award you definitely deserve it! 😊 Thanks a million!!!"

"I am so happy I got to have met you and blessed that you are the woman and take your job seriously and you care in this world."

"Thank you so much for everything that you have done for us for us! It is truly appreciated from the depth of my heart."

"You're the only one who has tried to actually help at all."

"You truly are so amazing! Thank you from the bottom of my heart!"

"I sincerely thank you for all of your help."

"Thank you so much I truly appreciate you taking care of this for me"

"Thank you so much for helping! It was literally weeks of getting no responses from anyone and minutes after you got involved, things started moving! I appreciate all you have done!"

"Thank you so much for your help and intervention"

"Thank you for being so prompt. I appreciate that".

"I just wanted to tell you good morning I'm happy today it's not perfect at all because we shouldn't be here but I've met you and I believe trying for me take a negative and find some positive but at same time standing up for my rights. It's not perfect but it's a win and I couldn't have done without you doing your job so well."

"You're so amazing! Thank you so much!"

"You are fantastic! Thank you for serving our family and the families of WV!"

"Thanks for all you do. You remain the hardest working person in government!"

"Thank you for all you did to help the situations I stated."

30

CONFIDENTIAL

D001178782

"I just got the call. We are certified as of today. I CANNOT tell you how much the girls and I appreciate your help! My only regret is not contacting you a month ago! Lol Thank you so very much!"

"I appreciate everything you are doing to help!"

"Thank you so much for letting me know. I took your advice, and I did exactly as you said. Thank you for everything."

"You are a light in this darkness. We would've been lost weeks ago without you and your guidance. You are invaluable. My husband and I are grateful, beyond words, for your involvement, thoughts, ponderings, AVAILABILITY! insight, honesty... really, all of it. I can't thank you enough."

"We can now be at peace. Thanks again for everything."

"Thank you so much for the class. It was extremely helpful."

"I appreciate all you've done, and it gives me some comfort knowing you're overlooking all of this."

"You did a really good job at presenting the information in a manner that did not put the workers on the defense. You explained the program in a way that would have alleviated a lot of those feelings."

"Thank you again. I could thank you a million times and it still wouldn't feel like enough."

"You are the only person who has responded to me and addressed my concerns, and I am so very grateful for that. Thank you for everything."

"It worked out! Travel approved! Thanks so much for your listening ear and kind words."

"Thanks! You, as always, are an excellent resource."

31

CONFIDENTIAL

D001178783