# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| JONATHAN R., *et al.*, | ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) ) ) Case No. 3:19-cv-00710 |
| JIM JUSTICE, *et al.*, | ) ) ) |
| *Defendants*. | ) ) |

**DEFENDANTS' WRITTEN RESPONSE TO PLAINTIFFS' RULE 30(B)(6)
DEPOSITION NOTICE
(TOPICS 8 & 12)**

In response to Plaintiffs' Notice of Rule 30(b)(6) deposition dated February 2, 2024, and in accordance with the Stipulation of the parties dated June 3, 2024 (ECF No. 508), Defendants Cynthia Persily, in her official capacity as Secretary of the West Virginia Department of Human Services ("DoHS"), Cammie Chapman, in her official capacity as Deputy Secretary of the DoHS, Jeffrey Pack, in his official capacity as Commissioner of the Bureau for Social Services, and DoHS (collectively, the "Defendants"),[1] by and through their attorneys, hereby submit these written responses in lieu of producing a witness for oral examination with respect to the following topics:

> List and describe any and all actions taken to end the backlog in investigations of reports of abuse and neglect for children in foster care or decrease the time from a report of abuse and neglect to the closing of an investigation and/or any and all planned actions, including the timing of the actions and any realized or expected results[; and]

---

[1] As of January 1, 2024, DoHS became a successor agency to the Department of Health and Human Resources ("DHHR"), the original defendant in this action. For ease of reference, Defendants have used "DoHS" or "the Department" to include the time period when it was known as DHHR.

1

> List and describe any and all action taken to ensure that the rate of maltreatment of foster children while in foster care declines and/or any planned action to ensure that the rate of maltreatment of foster children declines, including the timing of the actions and any realized expected results.

The time period covered by the requests is January 1, 2019, to the present.

### DEFENDANTS' OBJECTIONS

Defendants object to the Notice of Deposition as duplicative in that it asks Defendants to identify actions for each of 17 different topics, and many of the Department's actions have or are expected to have an impact in multiple areas of agency practice. Defendants consider any action identified or described in any written response or oral testimony to the February 2, 2024, Rule 30 Notice of Deposition to apply to any and all topics identified in that Notice, whether or not specifically identified in response to any other topic.

Defendants object to the Notice of Deposition to the extent it conflates investigations of reports of abuse and neglect of children not in DoHS custody (and any backlog in such investigations) with investigations of reports of abuse and neglect of foster children in DoHS custody (and any backlog of such investigations). The former are conducted out of district offices, while investigations of abuse and neglect for children in foster care are generally conducted by DoHS's Institutional Investigative Unit.

Defendants object to the requirement to identify the "timing of the actions" to the extent it requires identification of a specific date. Unless otherwise specified below, Defendants have identified the year in which an action was taken or an initiative began, or the approximate time period for which an initiative was undertaken.

Defendants object to the instruction to identify actions taken "for the period January 1, 2019 to the present" to the extent that it would require Defendants to list and describe actions

2

pursuant to policies, practices, programs or initiatives that were first implemented prior to January 1, 2019 and that continued past that date.  To the extent the Notice of Deposition requests DoHS to testify about policies, practices, programs or initiatives first implemented prior to 2019 that continue to present, Defendants object to the Notice of Deposition as overbroad, unduly burdensome, and not proportional to the needs of the case, because it would effectively require DoHS to list and describe hundreds of policies, practices, programs, or initiatives relating to "investigations of reports of abuse and neglect for children in foster care" and "the rate of maltreatment of foster children while in foster care."

Defendants object to the instruction to "describe" an action to the extent it would require Defendants to repeat detailed information that is contained in one or more documents that have been provided to Plaintiffs in discovery.  Defendants' responses reference documents that provide substantially more detail about some actions, comparable to how a witness might refer to a document in oral testimony.  However, Defendants have not identified any and all documents that may describe a particular action listed or described below.

Defendants object to the terms "describe," "revise," "planned," "realized" and "expected," all of which are undefined, as vague and ambiguous.  For example, it is not clear how much detail is required to "describe" an action; it is not clear what degree of certainty there must be that a future action will occur, or when it will occur, for that action to be considered "planned"; and it is not clear what degree of certainty or causation is required for a result to be "realized" or "expected" from a particular action.  Defendants have endeavored to provide complete answers applying their understanding of the common meaning and usage of these terms.

Defendants also object to the term "results" as vague and ambiguous.  For example, for results of actions related to "end[ing] the backlog in investigations of reports of abuse and neglect

3

for children in foster care," it is not clear if Plaintiffs are asking about outcome "results" for foster children or "results" of the action itself.  Defendants interpret it as meaning the latter.

To the extent that Plaintiffs believe that Defendants have not provided responses in accordance with the topic posed, Plaintiffs had an obligation under Rule 30(b) to describe with "reasonable particularity" the matter for examination.

### DEFENDANTS' RESPONSES

Subject to the foregoing objections, Defendants respond as follows:

1.     Since January 1, 2019, DoHS has taken numerous actions to improve investigations of reports of abuse and neglect of foster children and to minimize the rate of maltreatment of foster children while in foster care.  As set forth below, among other things, these include actions to:  (1) improve DoHS's review of critical incidents; (2) improve the central intake process; (3) improve and expand the role of DoHS's Institutional Investigative Unit ("IIU"); and (4) improve oversight of out-of-state facilities in which West Virginia foster children are placed.  These and other actions are further described below.

2.     In 2019, DoHS updated the Critical Incident standard operating procedure to establish a secondary review process for any district decision that a referral does not meet the criteria of a critical incident.  Further detail is available in Critical Incident Review SOP (Feb. 2019), D005868.

3.     BSS is responsible for receiving and assessing reports of suspected child maltreatment. Reports of alleged child abuse and neglect are received by the Centralized Intake Unit. Referrals related to children not in DoHS custody are assessed by Centralized Intake for intake to determine if a case should be opened for investigation and assigned to a district office for further investigation, if appropriate.  Aside from alleged maltreatment in uncertified kinship

4

placements, reports received by Centralized Intake that pertain to children in foster care are automatically sent to the Institutional Investigations Unit ("IIU") for further assessment and investigation.

4. In 2020, DoHS issued a standard operating procedure regarding the Centralized Intake Unit's supervision and management of time-to-first-contact for accepted referrals on both new and previously opened cases. Further detail is available in Supervisory Intake Tracking Memo June 1 2020, D003098329; SOP Supervisory Intake Tracking effective June 1 2020, D003097772; Intake Tracking Log Final Draft 5-21-2020, D003098328.

5. In 2020, DoHS updated the Critical Incident standard operating procedure to assign responsibility for investigating critical incidents involving children in uncertified kinship placements to IIU. DoHS also updated the Critical Incident standard operating procedure to outline IIU's process for determining if a critical incident was determined to be the result of abuse or neglect. Further detail is available in Critical Incident Review SOP (May 2024), D003097701.

6. In 2021, DoHS completed a threshold analysis of the Centralized Intake Unit to assess the number of duplicate intakes on the same family or child, the appropriateness of its screening decisions, and the effectiveness of the intake process. Further detail is available in WV Annual Progress Services Review 2024, Final Resubmission, D002230078.

7. In 2021, DoHS implemented a standard operating procedure regarding conducting meaningful and engaging visits with children placed in out of state residential treatment settings, including monthly conversation topics and monthly evaluation of documentation. Further detail is available in Out-of-State Residential Facility Monthly Caseworker Visits and Investigations SOP (Nov. 2021), D003096704; Critical Incident Review SOP (July 2021), D219706; 2021

December 1 CAS-FC-13-21 Procedures for Children Placed OOS and Policy Revisions Memo, D003096327.

8. In 2022, DoHS provided written guidance that the standard operating procedure for meaningful contact with children placed in out of state residential treatment should be followed for all visits with children in placement, regardless of placement type. Further detail is available in Sept. Monthly Unit Mtg Topic – Assessing Safety of Children in Out of Home Placements, D665145.

9. In 2022, DoHS implemented systemic critical incident reviews using the Safe Systems Improvement Tool ("SSIT"), developed by the Praed Foundation, which incorporates principles of safety science in the examination of critical incidents. The tool is used to gather details about the needs of the family and child at the time of the critical incident and assess staff experiences and systemic contributors to casework practice. Results are shared with the Critical Incident Review Team to aid in identifying and prioritizing systems improvement opportunities. Further detail is available in Critical Incident Review SOP (May 2024), D003097701.

10. In 2023, DoHS revised the Critical Incident Review standard operating procedure to reflect the use of the SSIT and to have a critical incident field review team member initiate its review simultaneously with the district staff. The field review team is comprised of a policy specialist, a field staff/support specialist, and a quality assurance specialist. Further detail is available in FFY 2023 BSS Critical Incident Report, D003097667.

11. In 2023, DoHS implemented a statewide plan on time-to-first-contact for new referrals of allegations related to abuse or neglect received by the Centralized Intake Unit. Further detail is available in Initial Face to Face Plan, D003097769.

12. In 2023, DoHS implemented 100 percent peer review for all calls screened out by the Centralized Intake Unit. The peer review process serves as a mechanism to assess decision-making and improve outcomes. Once a decision is made to screen out a call, a Centralized Intake Unit Child Protective Services supervisor reviews the decision to determine whether it was appropriate to screen out the call. If the reviewer disagrees with the initial decision to screen out, the Director of the Centralized Intake Unit or a designee reviews the referral and makes the final decision on whether to override the decision to screen out the referral and accept it for assessment.

13. In 2023, DoHS updated its Meaningful Contact Desk Guide to reflect DoHS's transition to the People's Access to Help ("PATH") system, align with the Pathways to Children's Mental Health Services policy, and align with the Residential Facility Monthly Caseworker Visit and Investigations standard operating procedure to include discussion topics regarding potential maltreatment in care. Further detail is available in Meaningful Contact Desk Guide August 2023, D002230518; CAS-CS-IM-23-7 Meaningful Contact Desk Guide Update, D002230821.

14. Since 2020, DoHS has increased IIU staff from one supervisor and nine investigators to two supervisors, two senior investigators, and ten investigators.

15. In 2023, DoHS established the Division of Regulatory Management and restructured IIU as an independent unit within that Division.

16. In 2023, IIU implemented a mentorship program wherein each IIU investigator is officially appointed a senior investigator to serve as a mentor.

17. In 2024, DoHS implemented a pre-approval process for all out-of-state residential treatment programs, which requires that any out-of-state facility in which a foster child is placed be inspected by Division of Regulatory Management staff prior to placement.

18. In 2024, IIU implemented a peer review process for calls screened out at IIU. Like peer reviews of decisions of the Centralized Intake Unit, the peer review process for IIU consists of reviewing decisions made to screen out calls to ensure those decisions were correct. The peer review process is designed to improve IIU decision-making and outcomes.

19. In 2024, DoHS updated the Critical Incident standard operating procedure to revise the communication protocol for situations requiring immediate action, describe the process for avoiding conflicts of interest, and outline expectation and procedure for crisis event response. Further detail is available in Critical Incident Review SOP (May 2024), D003097701.

20. In 2024, DoHS hired a quality data management specialist within the Division of Regulatory Management. The quality data management specialist is tasked with, among other things, identifying and assessing trends in critical incident reporting, including for out-of-state residential treatment centers.

21. IIU is responsible for investigating allegations of maltreatment of any foster children in DoHS custody (except for children placed in uncertified kinship placements) and allegations of maltreatment of any child (not just foster children) that occur in specified settings, including not only foster care placements, but also schools, detention centers, and child care settings, among others. As of July 2, 2024, the backlog of IIU investigations of maltreatment is 239 cases, which includes investigations of maltreatment of all children (not just foster children) in all settings (not just foster placements) under IIU's jurisdiction, such as allegations of maltreatment of children in schools and child care settings. As of July 2, 2024, the backlog of IIU investigations of maltreatment involving only children in foster care is 131 cases.

22. The duration of IIU's investigation generally does not impact whether, or for how long, a foster child remains in a foster care placement subject to a maltreatment allegation, because

DoHS does not wait for the completion of an investigation to remove a foster child from a foster care placement if DoHS has concerns about the child's safety. Foster children are often removed from foster care placements prior to the completion of IIU's investigation, sometimes on the same day that the allegation of maltreatment is received by DoHS.

23. DoHS has implemented several strategies to reduce the backlog for all IIU investigations, including investigations of maltreatment in foster care placements. DoHS has started requiring mandatory overtime for IIU supervisors and investigators until the backlog is eliminated. DoHS has established weekly case completion goals, which are expected to be set and met. If weekly case completion goals are not met, requests for future leave are not granted, and supervisors require investigators to work a certain number of overtime hours to complete the goals. DoHS has implemented a requirement that all approved investigation reports must be finalized, completed, signed by a supervisor, and the investigation closed within 48 hours of the approval of the final investigation report.

24. In 2024, DoHS plans to eliminate the backlog of IIU investigations.

25. In 2024, DoHS plans to move responsibility and oversight for investigation of alleged abuse and neglect in uncertified kinship placements from district offices to the IIU.

26. In 2024, DoHS established a new requirement that each out of state residential treatment facility in which children in DoHS custody are placed must have one on-site review conducted by a DoHS staff member in the Division of Regulatory Management each year. When appropriate, DoHS Division of Regulatory Management will require the facility to submit a written response to any observations identified during the on-site review and DoHS will follow up with the facility to review outcomes of any corrective actions taken in response to the on-site review.

27. In 2024, DoHS plans to develop and require out of state residential treatment facilities to use a standard critical incident report form that the facilities will submit directly to DoHS's Division of Regulatory Management to report any alleged, suspected, or actual occurrence of an incident involving a child in West Virginia foster care that can reasonably be expected to result in harm to the child, including but not limited to abuse, neglect, or exploitation, suicide or attempted suicide, homicide, death of a resident, injury that requires medical treatment or hospitalization, fire resulting in injury or a fire department response, runaway or missing child. life-threatening reaction because of a drug or food, a medication error resulting in emergency medical care, a natural disaster, incidents that require client evacuation from the building or a medical outbreak. This standard, direct reporting mechanism will supplement the existing process wherein a facility reports a critical incident to a child's caseworker and the caseworker reports the incident to DoHS's Division of Regulatory Management.

28. In 2024, DoHS plans to develop standard operating procedures governing the Division of Regulatory Management, including procedures related to pre-placement facility assessments, on-site visits to out-of-state residential treatment facilities, and standard out-of-state facility critical incident reports.

29. In the coming year or years, DoHS intends to develop an external peer review process in which DoHS staff members outside of IIU review IIU decisions to screen out calls.

30. DoHS is always considering actions that will improve its programs. While other actions have not yet proceeded to the planning stage, DoHS will undertake additional actions to further revise its investigations of abuse and neglect or maltreatment of foster children as necessary and appropriate.

As a result of the above, and in conjunction with actions identified and described in response to other topics, DoHS has realized or expects the following results from its actions:

1.	In the last five years, DoHS has devoted substantial efforts to improving policies, procedures, and organizational structures affecting DoHS's response to allegations of maltreatment of children in foster care.  DoHS expects these efforts will result in maintaining a low rate of maltreatment in care and potentially a decrease in the rate of maltreatment in care.

2.	DoHS data shows that the rate of maltreatment in care for children in DoHS custody has remained low for the last five years with an average of around 20 allegations of maltreatment in care across different placement settings that have been substantiated each year.

3.	ACF's most recent CFSR in which it calculated this metric for West Virginia shows that the risk-standardized performance of the rate of maltreatment in care for children in DoHS custody has decreased from 4.15 episodes per 100,000 days in care in 2018 to 2.69 episodes in 2021.  This compares favorably to a national performance standard of 9.07 per 100,000 days in care in 2021.  ACF has not released data from subsequent years.

4.	Since 2015, two critical incidents have involved children in DoHS custody.  Further detail is available in BSS Critical Incident Reports for FFY2015 through FFY2023, D003097667, D222194, D219258, D003097647, D146003, D146088, D146148, D146025, D146113.  The low rate of critical incidents reflects DoHS's longstanding focus on safety for children in DoHS custody and otherwise, including through safe sleep and bathing practices and Plans of Safe Care for drug-affected infants.  Further detail is available in FFY 2023 BSS Critical Incident Report, D003097667.

5.	DoHS expects that making IIU responsible for investigations of allegations of maltreatment for all foster child placements, including uncertified kin, will ensure a consistent,

uniform, timely, and objective determination as to whether maltreatment of a foster child has occurred.

6. DoHS expects that the revised standard operating procedure and use of SSIT in reviewing critical incidents will ensure a more thorough critical incident review, better utilize data analysis, and permit DoHS to identify trends and opportunities to continue to make systemic improvements.

7. DoHS expects that standard, direct reporting from out-of-state facilities will allow DoHS to quickly and efficiently identify issues, trends, and safety concerns and initiate licensing investigations and actions, when warranted. With standard, direct reporting, DoHS will be able to intervene early, send staff to check on all West Virginian children at a particular facility, and provide feedback and make recommendations to a child's caseworker, multidisciplinary treatment team ("MDT"), or DoHS's Placement Division if specific circumstances surrounding a reported critical incident indicate that an alternative placement may be appropriate.

8. DoHS expects that the pre-approval process for all out-of-state residential treatment programs and annual on-site reviews will help ensure that children are safe and free from maltreatment in out-of-state residential settings, even though West Virginia does not have direct regulatory oversight.

Based on the reasonable inquiry of DoHS staff and the factual matters known or made known to me for purposes of providing these written responses to the Rule 30(b)(6) deposition notice, I am informed and believe, and based on such information and belief hereby declare under penalty of perjury, that the above responses are true and correct and represent the testimony of the Department of Human Services.

As to objections,

*/s/* Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown
Julia M. Siegenberg
Rebecca L. Wolfe
Brown & Peisch PLLC
1225 19th Street NW, Suite 700
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
W.V. Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 2530

*Counsel for Defendants*

July 5, 2024

As to responses,

/s/ Matthew J. Croft
Matthew J. Croft
Department of Human Services
One Davis Square
Charleston, WV 25301

*Rule 30(b)(6) Witness, on behalf of the DoHS*

July 5, 2024

13