# Exhibit 14

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| JONATHAN R., *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) Case No. 3:19-cv-00710 |
| | ) |
| JIM JUSTICE, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

### DEFENDANTS' WRITTEN RESPONSE TO PLAINTIFFS' RULE 30(B)(6) DEPOSITION NOTICE
### (TOPIC 13)

In response to Plaintiffs' Notice of Rule 30(b)(6) deposition dated February 2, 2024, and in accordance with the Stipulation of the parties dated June 3, 2024 (ECF No. 508), Defendants Cynthia Persily, in her official capacity as Secretary of the West Virginia Department of Human Services ("DoHS"), Cammie Chapman, in her official capacity as Deputy Secretary of the DoHS, Jeffrey Pack, in his official capacity as Commissioner of the Bureau for Social Services, and DoHS (collectively, the "Defendants"),[1] by and through their attorneys, hereby submit these written responses in lieu of producing a witness for oral examination with respect to the following topic:

> [A]ny and all actions taken to ensure that West Virginia's compliance with the Children and Family Service Reviews process, as administered by the Children's Bureau of the Department of Health and Human Services, improves each year, and any and all planned actions, including the timing of the actions and any realized or expected results.

---

[1]    As of January 1, 2024, DoHS became a successor agency to the Department of Health and Human Resources ("DHHR"), the original defendant in this action.  For ease of reference, Defendants have used "DoHS" or "the Department" to include the time period when it was known as DHHR.

1

The time period covered by the request is January 1, 2019 to the present.

## DEFENDANTS' OBJECTIONS

Defendants object to the Notice of Deposition as duplicative in that it asks Defendants to identify actions for each of 17 different topics, and many of the Department's actions have or are expected to have an impact in multiple areas of agency practice. Defendants consider any action identified or described in any written response or oral testimony to the February 2, 2024, Rule 30 Notice of Deposition to apply to any and all topics identified in that Notice, whether or not specifically identified in response to any other topic.

Defendants object to the requirement to identify the "timing of the actions" to the extent it requires identification of a specific date. Unless otherwise specified below, Defendants have identified the year in which an action was taken or an initiative began, or the approximate time period for which an initiative was undertaken.

Defendants object to the instruction to identify actions taken "for the period January 1, 2019 to the present" to the extent that it would require Defendants to list and describe actions taken pursuant to policies, practices, programs or initiatives that were first implemented prior to January 1, 2019 and that continued past that date. To the extent the Notice of Deposition requests DoHS to testify about policies, practices, programs or initiatives first implemented prior to 2019 that continue to present, Defendants object to the Notice of Deposition as overbroad, unduly burdensome, and not proportional to the needs of the case.

Defendants object to the instruction to "describe" an action to the extent it would require Defendants to repeat detailed information that is contained in one or more documents that have been provided to Plaintiffs in discovery. Defendants' responses reference documents that provide substantially more detail about some actions, comparable to how a witness might refer to a

document in oral testimony.  However, Defendants have not identified any and all documents that may describe a particular action listed or described below.

Defendants object to the terms "describe," "planned," "realized" and "expected," all of which are undefined, as vague and ambiguous.  For example, it is not clear how much detail is required to "describe" an action; it is not clear what degree of certainty there must be that a future action will occur, or when it will occur, for that action to be considered "planned"; and it is not clear what degree of certainty or causation is required for a result to be  "realized" or "expected" from a particular action.  Defendants have endeavored to provide complete answers applying their understanding of the common meaning and usage of these terms.

Defendants object to the phrase "compliance with the Child and Family Service Reviews [CFSR] process" as being vague and ambiguous.  The CFSR "process" laid out in 45 C.F.R. §§ 1355.31-37 sets forth specific steps associated with these reviews including a statewide assessment, the transmission of data, case review and stakeholder interviews, the issuance of a final report, the development of a PIP, and PIP implementation.  *See* ACF, *CFR Process As Defined by Regulation*.[2]  DoHS understands this question to be directed not to compliance with the process set forth in regulation, but to the outcomes, items, and systemic factors that the CFSR process is intended to evaluate.

Defendants also object to the term "results" as vague and ambiguous.  For example, for results of "compliance with the CFSR process," it is not clear if Plaintiffs are asking about the "results" experienced by foster children or performance on the metrics measured in a CFSR review. Defendants interpret it as meaning the latter.

---

[2] Available at:
https://www.acf.hhs.gov/sites/default/files/documents/cb/CFSR%20Process_Regulation_Graphic.pdf

To the extent that Plaintiffs believe that Defendants have not provided responses in accordance with the topic posed, Plaintiffs had an obligation under Rule 30(b) to describe with "reasonable particularity" the matter for examination.

## DEFENDANTS' RESPONSES

Subject to the foregoing objections, Defendants respond as follows:

1.      Since January 1, 2019, DoHS has implemented a number of initiatives to improve its performance on the outcomes, items, and systemic factors that the CFSR process is intended to evaluate, including: (1) implementation of the CFSR Program Improvement Plan negotiated with and approved by the Administration for Children and Families; (2) monthly district-level case file reviews conducted by the Division of Planning and Quality Improvement ("DPQI"); (3) implementation of Training and Technical Assistance ("T&TA") teams to work with districts after their DPQI reviews; (4) instituting DPQI mid-cycle case reviews; (5) implementing the ChildStat program for DoHS leadership and districts to review and discuss key performance metrics; and (6) development and implementation of a data-driven Continuous Quality Improvement Plan with key performance indicators that align with the CFSR metrics.

## PROGRAM IMPROVEMENT PLAN

2.      After the results of the third round of CFSR results were released in 2017, DoHS worked closely with the Administration for Children and Families ("ACF") to develop a Program Improvement Plan ("PIP") to address fundamental areas of practice believed to contribute to the third round CFSR findings.  The PIP went through multiple iterations and was approved by ACF in 2019, with an effective date of December 1, 2019, and a two-year implementation timeframe.

3.    The PIP contains four overall goals and strategies designed to achieve each goal. The PIP document (D003097564-D003097628) should be referenced for greater detail but is summarized below.

4.    The first goal was to create and support a healthy workforce. This goal was designed to improve performance with the CFSR measures for Safety Outcome 1, Safety Outcome 2, Permanency Outcome 1, Permanency Outcome 2, Well-Being Outcome 1, Well-Being Outcome 2, and Well-Being Outcome 3. There were three strategies associated with this goal.

5.    The first strategy to advance the goal of creating and supporting a healthy workforce was to build and reinforce mentoring, peer support, and job supports for child welfare workers through regional and statewide meetings and build the capacity of new positions in the CPS career ladder. In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.  DoHS implemented regional and statewide meetings for child welfare workers, supervisors, and managers for professional development and peer support, two times per year.

b.  DoHS implemented a formal mentoring program for new child CPS staff using the new CPS Senior positions as mentors. This involved developing CPS senior position description and duties; outlining expectations and a reference guide for CPS Seniors acting as mentors; developing coaching forms for use by CPS Seniors; obtaining appropriations to fill additional CPS Senior positions; and training CPS Seniors on their mentoring responsibilities.

c.  DoHS developed new CPS Case Coordinator Positions to support CPS workers and facilitate the case work process.  This involved developing a CPS case coordinator position description; working with the Department of Personnel to establish standards and expectations for the position; developing a training plan and professional development plan  for case coordinators; and training CPS Case Coordinators.

6.    The second strategy to advance the goal of creating and supporting a healthy workforce was to strengthen judicial rapport through collaborative processes and improve preparation of Bureau for Children and Families staff for court.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.  The Court Improvement Program convened a number of circuit court level stakeholder meetings involved in child welfare cases, including judges, prosecutors, service providers, education providers, probation officers, attorneys for parents and children, parents, youth, foster parents, behavioral health providers, and DoHS staff including case workers, supervisors, and regional attorneys.

b.  DoHS directed its Community Services Managers to request quarterly meetings with the circuit court judges who hear juvenile cases in their districts to discuss areas of mutual interest and concern.

c.  .DoHS updated its Standard Operating Procedures for court proceedings to include the CPS Court check list and a process for the supervisor, coordinator or designee to prepare staff prior to court hearings. The revised Standard Operating Procedures includes a process to elevate specific case concerns to the regional attorney.

    d.   DoHS began quarterly meetings with regional attorneys to discuss areas of mutual interest and concern.

7.    The third strategy for building and creating a healthy workforce was to conduct exit interviews and retention surveys with staff to inform and develop strategies to reduce turnover and retain staff. In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

    a.   DoHS conducted exit interviews with departing staff;

    b.   DoHS conducted staff satisfaction survey with new hires at the end of new worker training, after nine months, and after 18 months;

    c.   DoHS conducted localized surveys with all child welfare staff to identify ways in which to improve retention;

    d.   DoHS implemented a longitudinal new worker survey tracking system to track turnover rates over time; and

    e.   DoHS analyzed the information collected to inform strategies to lessen turnover and increase retention among staff.

8.    The second goal of the PIP was to increase family support services and family resource homes to meet the needs of children and families. This goal was designed to improve performance with the CFSR measures for Safety Outcome 2, Permanency Outcome 1, Well-Being Outcome 2, Well-Being Outcome 3, and the Systemic Factors for Case Review, Notice to Caregivers, Array of Services, Individualizing Services, and Diligent Recruitment of Foster and Adoptive Homes. There were five strategies associated with advancement of this goal.

9.     The first strategy to advance the goal of increasing family support services and family resource homes was to examine previous foster care providers and relative foster care providers for possible reopening of closed resource homes and expansion of relative foster homes. In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.   DoHS Homefinding Specialists identified, reached out to, and followed up with certified relative/kinship providers to determine their interest in becoming traditional foster care providers and provided them with informational packets.  A number of kinship families contacted Mission West Virginia about enrolling as traditional foster families, but in the end only a handful did.

b.   DoHS continued to work with A Second Chance in redesigning its kinship/relative program.

10.     The second strategy to advance the goal of increasing family support services and family resource homes was to develop standards and implement performance-based contracting standards for its Child Placing Agencies.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.   DoHS developed and entered into new contracts with Child Placing Agencies that included monthly scorecards on agency performance.  The new contracts emphasized family engagement, decreased length of stay, and increased placement stability.

b.  DoHS met bi-monthly with Child Placing Agencies to work collaboratively to try to find placements for waiting and difficult-to-place children and youth.

11.    The third strategy to advance the goal of increasing family support services and family resource homes was to increase foster parent notice of permanency hearings and engagement in the case work process.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports:  D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.  DoHS reviewed and updated its policies regarding hearing notification to foster parents.

b.  DoHS selected certain counties as pilot counties to review policy, engage with staff, and sample foster parents to determine if notification was received.  Information collected from the pilot counties was then analyzed.

c.  The Child Placing Agencies developed training on the importance of foster parent engagement, which DoHS reviewed and approved.  The Child Placing Agencies then trained all DoHS county and district staff.  This information was also incorporated into the training for new child welfare workers.

12.    The fourth strategy to advance the goal of increasing family support services and family resource homes was to identify needs and collaborate with agency partners and courts in the development of service availability and substance abuse services.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.  DoHS partnered with the Capacity Building Center for States within the federal Administration for Children & Families to develop a Service Array map of available substance abuse services throughout the state, and to identify barriers to accessing services.

b.  DoHS worked with Community Collaboratives and Family Resource Networks across the State to facilitate the exchange of information on substance use disorder service availability, service gaps, and service development.

c.  DoHS developed and piloted Family Treatment Courts ("FTCs") in five counties, including developing policies and procedures, hiring FTC Coordinators and training FTC teams; developing and implementing a data collection tool to evaluate the efficacy of the model; and then expanding the model to additional counties.

13.    The fifth strategy to advance the goal of increasing family support services and family resource homes was to improve staff's knowledge regarding available services.  In support of this strategy, DoHS partered with Family Resource Networks ("FRN") across the State to produce service directories available on the FRN website that could be accessed by DoHS staff and stakeholders.  Further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464.

14.    The third goal of the PIP was to transform the culture of child welfare management to increase competency, skill and accountability in child welfare practice.  This goal was designed to improve performance with the CFSR measures for Safety Outcome 1, Safety Outcome 2, Permanency Outcome 1, Permanency Outcome 2, Well-Being Outcome 1, and the Systemic Factors for the Statewide Information System and Case Review.

15.    The first strategy to advance the goal of transforming the culture of child welfare management was to empower supervisors to act as change agents through reflective supervision. In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

    a.   DoHS partnered with Casey Family Programs to implement a reflective supervision model through training and technical support.

    b.   DoHS partnered with the Social Work Education Consortium to develop an on-line (blackboard) initial training for new supervisors on reflective supervision techniques.

    c.   DoHS revised its Standard Operating Procedures and documentation to improve reflective supervision.

16.    The second strategy to advance the goal of transforming the culture of child welfare management was to increase supervisor and manager skills through ongoing training and peer support to address their ability to support staff and provide direct supervision.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

    a.   DoHS required all supervisors who had been in their positions for over a year and who had not taken Putting the Pieces Together supervisory training to undergo a modified version of the program.

    b.   DoHS provided structured ongoing supervisor training through regional supervisor meetings and manager meetings, four times per year.

17.     The third strategy to advance the goal of transforming the culture of child welfare management was to create structure and accountability to support supervisors to ensure that face to face contact with alleged child victims will occur timely.  In support of this strategy, DoHS developed a Standard Operating Procedure to (1) instruct supervisors on how to log, assign and track accepted referrals on both new and ongoing cases; (2) communicate the assignment between supervisor and worker; (3) track referrals to ensure time frames are met; (4) create tools to track referrals assigned and timeframe assigned; and (5) guide weekly planning meetings between workers and supervisors; supervisors and Community Services Managers and Regional Directors; (6) describe use of COGNOS reports to aid in ensuring documentation of contacts have occurred; and (7) assess missed contacts.  Further detail is available in the PIP Progress Reports,  *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464.

18.     The fourth strategy to advance the goal of transforming the culture of child welfare management was to create structures to support staff so face to face, meaningful monthly contacts with families and children will occur.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports,  *see*  D143804–D144041;  D210447–D210695;  D222789–D2223091;  D223119– D223464):

a.  DoHS revised the "meaningful contact guide" to give examples of meaningful contacts and how to document those contacts, and distributed the guide to all staff.

b.  DoHS developed protocols for supervisors, Community Service Managers, and Regional Directors to review cases in which meaningful contact did not occur and to review plans for addressing missed contacts.

19.     The fifth strategy to advance the goal of transforming the culture of child welfare management was to provide support to supervisors to ensure risk and safety assessments are adequate initially and on an ongoing basis through the life of the case.  In support of this strategy, DoHS took the following steps during the PIP implementation period, 2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464):

a.  DoHS provided refresher training for all workers on safety planning emphasizing the control of safety threats, and also provided advanced safety planning training for all supervisors to make them proficient in guiding workers to effective safety planning.

b.  DoHS developed and implemented a case review tool on SharePoint to capture whether safety plans are current, case plans completed, at least monthly contact is occurring, MDT's are occurring, current permanency plans, etc.

c.  DoHS developed and distributed a Standard Operating Procedure for supervisory case review.

20.     The fourth goal of the PIP was to increase the effectiveness and efficiency and create a prevention-focused organizational culture in order to ensure the needs of children and families are addressed throughout the life of the case.  This goal was designed to improve performance with the CFSR measures for Safety Outcome 1 and Well-Being Outcome 1.

21.     The first strategy to advance the goal of creating a prevention-focused organizational culture was to implement a continuous quality improvement ("CQI") of Centralized Intake and a threshold screening analysis to further inform the screening and intake process.  In support of this strategy, DoHS took the following steps during the PIP implementation period,

2019-2021 (further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464.

      a.  DoHS worked with the Capacity Building Center for States, which conducted a threshold analysis of the effectiveness of intake process, including intakes that were screened in and screened out, and duplicate intakes on the same family/child.

      b.  Based on the analysis and data collected, DoHS concluded that the intake process would be improved through a differential response model and is in the process of implementing those changes.

22.    The second strategy to advance the goal of creating a prevention-focused organizational culture was to safely close cases that have had no contact and develop and support practice to ensure backlog does not re-occur. In support of this strategy, DoHS Developed Standard Operating Procedures for administrative closure of cases and expanded the use of case coordinators to assist with case closure took the following steps during the PIP implementation period, 2019-2021. Further detail is available in the PIP Progress Reports, *see* D143804–D144041; D210447–D210695; D222789–D2223091; D223119–D223464.

23.    DoHS completed all agreed-upon action steps in the PIP (summarized above) within the two-year implementation period, even though most implementation occurred during the pandemic, which resulted in some delays.

24.    As part of the PIP, ACF establishes a performance target on certain case review items for the State to meet by the end of the 18-month non-overlapping period following PIP implementation (*i.e.*, by May 2023). The case review items negotiated with ACF for the 2019 PIP set performance targets for:

- Timeliness of initiating investigations of reports of child maltreatment (Item 1 in Safety Outcome 1)

- Services to Family to Protect Child(ren) in the home and prevent removal or re-entry into foster care (Item 2 in Safety Outcome 2)

- Risk and safety assessment and management (Item 3 in Safety Outcome 2)

- Stability of foster care placement (Item 4 in Permanency Outcome 1)

- Permanency goal for Child (Item 5 in Permanency Outcome 1)

- Achieving reunification, guardianship, adoption, or other planned permanent living arrangement (Item 6 in Permanency Outcome 1)

- Needs and services of child, parents, and foster parents (Item 12 in Well-Being Outcome 1)

- Child and Family Involvement in case planning (Item 13 in Well-Being Outcome 1)

- Caseworker visits with child (Item 14 in Well-Being Outcome 1)

- Caseworker visits with parent (Item 15 in Well-Being Outcome 1)

25.     DoHS met or exceeded its performance target for improvement set by ACF in 9 of the 10 items by the end of the PIP measurement period in May 2023.

26.     Although DoHS did not meet its performance target for Item 1 within the PIP measurement period, its performance has improved 20 percentage points from June 2023 to May 2024 (61% to 81%).

<u>DIVISION OF PLANNING AND QUALITY IMPROVEMENT<br>QUALITY ASSURANCE REVIEWS</u>

27.     DoHS has a comprehensive Quality Assurance Case Review system in which case file reviews are conducted by the Division of Planning and Quality Improvement ("DPQI"). These reviews mirror the CFSR case review process, follow the CFSR methodology, and use the CFSR On-Site Review Instrument ("OSRI"), administered by trained DPQI staff.

a.  DPQI staff complete case reviews each month in one district of the State, so that each district is reviewed once every two years.  Ten files are randomly selected for each review, of which 5 are in-home cases and 5 are in-care (foster care) cases.  The exception is Kanawha County, which is the county with the State's largest city. Kanawha County is reviewed annually and 15 case files are selected for review (comprised of 5 in-home and 10 in-care (foster care) cases).

b.  The outcome of the reviews is used at the district level to evaluate case practice and assist districts in making improvements in the provision of services to children and families.

c.  Following the review, DQPI reviewers complete a comprehensive report on the results that is shared with the district management team.  The district management team must develop a corrective action plan to address any deficiencies identified in the report.

d.  Since January 2019, DPQI has conducted 2 to 3 reviews in each district and completed over 600 OSRIs.

28.    DPQI reviewers then complete an Exit Report compiling the summary data report and corrective action  plan for each district.  These reports are shared with DoHS leadership and the district offices to help inform future policy decisions and to improve case planning practices and fidelity to policy within the districts.

<u>TRAINING AND TECHNICAL ASSISTANCE TEAMS</u>

29.    In 2022, DoHS implemented training and technical assistance ("T&TA") teams (whose name is being changed to Technical Assistance & Practical Application ("TAPA") teams) to assist districts in improving areas identified in DPQI's quality improvement case reviews.  The

TAPA teams visit one district every month to provide policy and training support on the areas identified as needing improvement after a DQPI review.  The TAPA process and team members are further described in D002846841– D002846844.

30.    To date, the TAPA teams have worked with 19 out of 23 districts.

<u>CONTINUOUS QUALITY IMPROVEMENT PLAN</u>

31.    In 2023, DoHS issued its first continuous quality improvement ("CQI") plan for the Bureau of Social Services.  The CQI is more fully described in the Bureau for Social Services, Continuous Quality Improvement Plan (December 2023), D002771339–D002771363.

32.    In July 2023, DoHS announced 19 key performance indicators ("KPIs") that it would be tracking and evaluating.  The KPIs were selected to assess DoHS's systems, processes and outcomes associated with BSS's overall goals for its programs.  A number of the initial KPIs are also statewide data indicators reported in the CFSR data profile or are associated with CFSR measurement items (although the source data are not always coextensive).

| Key Performance Indicator | Associated CFSR Item |
|---|---|
| **Time to first contact in CPS investigation** | Safety Outcome 1, Item 1 |
| **Face to face contact with children in care** | Well-Being Outcome 1/Item 14 |
| **Face to face contact with parent/caregiver of children in care.** | Well-Being Outcome 1/Item 15 |
| **Recurrence of Maltreatment** | Statewide Data Indicator |
| **Maltreatment in Care** | Statewide Data Indicator |
| **Placement Stability** | Statewide Data Indicator |
| **Re-entry to Foster Care in 12 Months-** | Statewide Data Indicator |
| **Permanency within 12 Months for Children Entering Foster Care** | Statewide Data Indicator |
| **Permanency for Long-Stayers (children in custody for more than 2 years)** | Statewide Data Indicator |

33.    Performance on the KPIs is assessed by the BSS CQI processes including but not limited to DPQI CFSR-style reviews, mid-point reviews and Child Stat along with weekly regional management meetings. Information is circulated to leadership for planning and action.

<u>MID-CYCLE REVIEWS</u>

34.    In 2023, as part of the CQI plan, DoHS implemented mid-cycle reviews for the DPQI team.  Each district undergoes a full DPQI review every two years; with the mid-cycle reviews, DPQI conducts a desk review of the district's performance on all of the CFSR items (without the accompanying interviews of a full review) in alternate years.  (Kanawha County is not part of the mid-cycle review since it has a full DPQI review annually.)  After the review, DPQI develops and distributes a report on the district's progress towards meeting its outcomes.

<u>CHILDSTAT</u>

35.    In 2023, as part of the CQI plan, DoHS started ChildStat reviews.  As part of ChildStat, agency leadership holds a meeting with each district twice a year to review quantitative and qualitative data to analyze aspects of the district's recent performance.  ChildStat meetings are intended to foster a shared sense of accountability and problem solving about critical issues affecting child and family outcomes.  The overall goals of the ChildStat process are:

- To review data on progress compared to identified targets;

- To identify needed system supports for front line staff;

- To follow up on previous decisions and commitments to produce results; and

- To examine and learn from each County/District's efforts to improve performance.

36.    The ChildStat process looks at data in three categories:  workload management; timeliness; and practice, and will look at different data in each round.  The ChildStat process is described in greater detail in BSS Child Stat: Overview, D002845987–D002845989.

37.    For the first round of ChildStat, each review focused on:

- Vacancy rates (workload management)

- Time to first contact and investigations completed within 30 days (timeliness)

- Quantity and quality of caseworker visits with children and with their parents/caregivers (practice).

38.    To date, every district has participated in at least one ChildStat review.

<u>OTHER INITIATIVES</u>

39.    Additional actions taken to improve performance on CFSR items related to safety, permanency, case planning, case visits, service array and resource development, staff and provider training, recruitment and retention of foster homes, the statewide information system, and the case review system are addressed in other deposition responses.

40.     In the coming year, as part of the CQI plan, DoHS will implement "Mountain Force" meetings to bring together Leadership, Managers, and Supervisors to conduct in-depth analysis and discussion of root causes for identified targeted areas for improvement.  Data will be developed and distributed then groups will review and analyze the data to determine potential causes of issues and strategies to address those issues.

41.    In the coming year, as part of the CQI plan, DoHS will implement Fidelity Reviews to examine casework practice to determine which parts of a policy, program, or initiative were implemented as intended and which parts have been adapted and why.  This will lead to

determining what needs to change to improve fidelity to the model or what changes need to be made to the innovation or model itself.

As a result of the above, and in conjunction with actions identified and described in response to other topics, DoHS has realized or expects the following results from its actions:

1.      By May 2023, DoHS met or exceeded its performance target for improvement set by ACF in its PIP for 9 of the 10 case review items selected for review.

2.      Although DoHS did not meet its PIP performance target for timeliness in initiating investigations by May 2023, the statewide rate of meeting the timeframes for contact with alleged child victims steadily increased from 44% in 2019, to 51.6% in 2020, to 60.5% in 2021, and to 63.9% in 2022.  By the end of 2023, the statewide rate of meeting the timeframes for time-to-first-contact increased to 83%, and the rate has stayed at or above 80% for each month between January and May 2024.

3.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of the rate of maltreatment in care for children in DoHS custody decreased from 4.15 to 2.69 episodes per 100,000 days in care between federal fiscal year (FFY) 2018 to FFY 2021.  This compares favorably to a national performance standard of 9.07 per 100,000 days in care in FFY 2021.

4.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of a recurrence of maltreatment for children in West Virginia decreased from 9.3% to 5.6% between FFY 2018/19 and FFY 21/22.  This compares favorably with a national performance standard of 9.7% in FFY 21/22.

5.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of DoHS achieving permanency for children who have been in care for 12 to 23 months increased from 61.5% to 64.2% between FFY 2019/20 and FFY 2022.   This compares favorably with a national performance standard of 43.8% in FFY 2022.

6.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of DoHS achieving permanency for children who have been in care for 24 or more months increased from 48.8% to 56.7% between FFY 2019/20 and FFY 2022.   This compares favorably with a national performance standard of 37.3% in FFY 2022

7.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of DoHS on placement stability in FFY2022 (calculated as moves per 1,000 days in care) is 2.58.   This compares favorably with a national performance standard of 4.48 in FFY 2022.

8.      In its most recent CFSR data profile in which it calculated this performance metric for West Virginia, ACF has calculated that the risk-standardized performance of DoHS regarding re-entry into foster care decreased from 9.7% to 7.1% between FFY 2018.19 and FFY 2021.

9.      DoHS expects the mid-cycle reviews and ChildStat reviews to lead to further improvements in timeliness and case practice.

10.      DoHS has designed the CQI process to promote the following goals, as further explained in the CQI plan:

      a.  A system that ensures safety from abuse and neglect with the least amount of intervention possible to maintain safety.
      b.  A family-focused system that addresses family needs and concerns within a family's own home and community whenever possible.

21

c. A network of services and supports that facilitates placement in the least restrictive, most family-like environment possible when safety cannot be maintained in the home.

d. A system that facilitates enduring and timely permanency, and demonstrates stability and lifelong connections when reunification is not possible.

e. An agency of skilled, responsive, and supported child welfare professionals who perform with a shared sense of responsibility for assuring best practices and positive outcomes.

f. A CQI practice that enhances organizational effectiveness, and supports innovation in policy, programming, and practice.

g. A data-informed approach that is focused on the information collected through enhanced casework and uses data to inform decisions made at all levels of the organization and families.

Based on the reasonable inquiry of DoHS staff and the factual matters known or made known to me for purposes of providing these written responses to the Rule 30(b)(6) deposition notice, I am informed and believe, and based on such information and belief hereby declare under penalty of perjury, that the above responses are true and correct and represent the testimony of the Department of Human Services.

As to objections,

*/s/* Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown
Julia M. Siegenberg
Rebecca L. Wolfe
Brown & Peisch PLLC
1225 19th Street NW, Suite 700
Washington, DC 20036

*/s/* Steven R. Compton
Steven R. Compton (WVSB #6562)
W.V. Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 2530

*Counsel for Defendants*

July 2, 2024

As to responses,

/s/ Susan Richards
Susan Richards
Department of Human Services
One Davis Square
Charleston, WV 25301

*Rule 30(b)(6) Witness, on behalf of the DoHS*

July 2, 2024