# Exhibit 31

West Virginia Department of Human Services

# Foster Care Policy

Bureau for Social Services

Revised May 2024

D003107870

# TABLE OF CONTENTS

SECTION 1 .................................................................................................................................. 5

INTRODUCTION ............................................................................................................................... 5
1.1    Introduction and Overview .......................................................................................... 5
1.2    Philosophical Principles ............................................................................................... 6
1.3    Mission .......................................................................................................................... 7
1.4    Purpose ......................................................................................................................... 7
1.5    Staff Roles ..................................................................................................................... 8
1.6    Definitions ................................................................................................................... 13
1.7    Legal Basis for Foster Care ........................................................................................ 19
1.8    How Children Enter Foster Care ................................................................................ 21
1.9    Foster Care Candidacy ............................................................................................... 22
1.10   Voluntary Placement .................................................................................................. 23
1.11   Voluntary Relinquishment (SS-FC-47 and SS-FC-47A) ............................................ 28
1.12   Court Ordered Custody .............................................................................................. 29
1.13   Emergency Placement ................................................................................................ 30
1.14   Temporary Custody .................................................................................................... 32
1.15   Permanent Custody/Guardianship ........................................................................... 33
1.16   Goals and Rights of Children in Foster Care ............................................................ 35

SECTION 2 ................................................................................................................................ 37

INTAKE ...................................................................................................................................... 37
2.1    Placement Standards/Regulations ............................................................................ 37
2.2    Placement Requirements ........................................................................................... 41
2.3    Preparation of Child for Placement ........................................................................... 42
2.4    Placement Types ......................................................................................................... 43
2.5    Referral Process (Specific to Placement Type) ......................................................... 65
2.6    Placement .................................................................................................................... 80
2.7    Journey Placement Notebook .................................................................................... 94
2.8    Life Book ...................................................................................................................... 96

SECTION 3 ................................................................................................................................ 97

ASSESSMENT ............................................................................................................................. 97
3.1    Introduction ................................................................................................................ 97
3.2    Health Care ................................................................................................................. 98
3.3    Initial Clothing Assessment and Allowance ............................................................ 103
3.4    Title IV-E Foster Care Eligibility/Reimbursability .................................................. 107
3.5    Educational Stability ................................................................................................ 108

SECTION 4 .............................................................................................................................. 110

CASE PLAN ............................................................................................................................. 110
4.1    Multidisciplinary Treatment Teams ........................................................................ 110
4.2    Interdisciplinary Team (IDT) (Only for Children Placed in  Specialized Family Care Medley) ................ 114
4.3    General Case Planning ............................................................................................. 115
4.4    Permanency Planning ............................................................................................... 119
4.5    Concurrent Planning ................................................................................................ 128
4.6    Aftercare Planning .................................................................................................... 129

SECTION 5 .............................................................................................................................. 130

CASE MANAGEMENT .................................................................................................................. 130
5.1    Visitation ................................................................................................................... 130

D003107871

5.2     Caseworker Contact ..............................................................................................131
5.3     Case Staffing ........................................................................................................140
5.4     Overnight Travel Requirements .......................................................................... 153
5.5     Transaction Date Requirements .........................................................................1404
5.6     Termination of Parental Rights (TPR) ................................................................1414
5.7     Medicaid and Medical Insurance ....................................................................... 156
5.8     Consents ..............................................................................................................151
5.9     Transportation Payment and Car Safety ............................................................154
5.10    Boarding Care Payments .....................................................................................155
5.11    Child Care ............................................................................................................158
5.12    Respite Care .........................................................................................................158
5.13    Financial Responsibilities ....................................................................................158
5.14    Education .............................................................................................................161
5.15    Clothing ...............................................................................................................163
5.16    Serious Illness or Death of a Foster Child ...........................................................164
5.17    Court Costs/Legal Advertising.............................................................................165
5.18    Cause of Action Lawsuit and Insurance Claim Settlements .................................165
5.19    SAFEKID PIX Identification Card Program ...........................................................167
5.20    Trafficked Children and Youth ............................................................................168
5.21    Runaway, Missing or Abducted Children .............................................................170
5.22    Photograph on File ..............................................................................................175
5.23    Prudent Parenting................................................................................................176
5.24    Youth Transitioning (Youth age 14 and older) ....................................................178
5.25    Life Skills Assessment/Learning Plan (Youth age 14 and older)............................179
5.26    Transition Plan (Youth age 14 and older) ...........................................................181
5.27    Case Management for Youth Transitioning (Youth age 14 and older) ...................184
5.28    Transitional Living (Youth age 16 and older) ......................................................191
5.29    Chafee National Youth in Transition Database (NYTD) ........................................199
5.30    Case Review ........................................................................................................202
5.31    Transition to Adulthood/Discharge Planning .....................................................202
5.32    Transfer to Adult Services/Guardianship ...........................................................207
5.33    Youth Over 18 Receiving SSI, SS or Other Benefits..............................................208
5.34    Voluntary Foster Care Services Contract for Youth Over Eighteen (FC-18)............209
5.35    Post-Secondary Educational Programs ...............................................................212
5.36    MODIFY Program .................................................................................................215

SECTION 6 ......................................................................................................................... 220

CASE REVIEW ........................................................................................................................220
6.1     Introduction ........................................................................................................220
6.2     Quarterly Status Reviews ....................................................................................221
6.3     Yearly Permanency Hearings and Permanency Hearing Reviews .........................222
6.4     Modification of Dispositional Order....................................................................225

SECTION 7 ......................................................................................................................... 226

CASE CLOSURE ......................................................................................................................226
7.1     Discharge Planning .............................................................................................226
7.2     Discharge Specific to Psychiatric Residential Treatment Facilities (PRTF's)........228
7.3     Discharge Planning Specific to Out-of-State Placements (ICPC) .........................229

SECTION 8 ......................................................................................................................... 229

OTHER ................................................................................................................................229
8.1     Family Moves.......................................................................................................229

3

Foster Care Policy
May 2024

*8.2    Agency Assignment/Transfer of Cases* .......................................................................231
*8.3    Case Record Maintenance* ....................................................................................232
*8.4    Record Retention/Retrieval* ..................................................................................233
*8.5    Foster Care Ombudsman Program: Authority, Duties, and Responsibilities*...............234

**SECTION 9** ............................................................................................................... **235**
9.1    NONDISCRIMINATION ........................................................................................235
9.2    NON-DISCRIMINATORY PLACEMENT PROTOCOL.....................................................236
9.3    COMPLAINT PROCEDURE AND DUE PROCESS STANDARDS............................................237
*A: Complaints Based on Disability or other Forms of Discrimination* ...........................237
*Procedure* ...........................................................................................................237
*B: Grievances Regarding the Child Welfare Worker or Casework Process* .......................239
9.4    REASONABLE MODIFICATION POLICY ....................................................................240
*A: Purpose* ..........................................................................................................240
*B: Policy*..............................................................................................................240
9.5    LIMITED ENGLISH PROFICIENCY ..........................................................................242
*PROCEDURES:* .......................................................................................................243

**APPENDIX A** .............................................................................................................. **246**

D003107873

## Section 1 Introduction

### 1.1    Introduction and Overview

This policy provides the philosophical and legal basis as well as the practices and procedures necessary to provide foster care services. Foster care is a comprehensive, complex array of services for children who, for any number of reasons, cannot live with their families. It is part of the larger child welfare system designed to support and nurture the healthy development of children and their families. Foster care is intended to be a partnership of all parties involved including the Department, families, children, foster parents, courts, private agencies, and other entities.

Foster care for children has been evolving for centuries. By the mid-1800s, family foster care emerged as an effort to rescue children whose parents were "inadequate" or unable to care for them. Due to the first White House Conference on Children, held at the turn of the century, foster care was redefined as a temporary service whose purpose was to reunite children with their families or, if necessary, place them with another family. During this time, a complex child welfare system of government and voluntary agencies began to emerge with an emphasis on family counseling and psychoanalysis.

By the 1960s landmark research studies revealed several important findings in regards to foster care, including: foster care placements were often permanent rather than temporary; frequent moves to new placements left many children with little sense of stability or continuity in their lives; children were often inappropriately removed from their homes; and children from poor and minority families were disproportionately represented in foster care. A growing concern over the negative impact separation from their families had on children also emerged. In addition to these findings, several sociological changes began to impact the perception of out of home care e.g., the rapid increase in the number of children entering foster care, the resurgence of interest in child abuse and neglect, the emergence of advocacy as part of the civil rights movement, and the acceptance of the family as an important social unit.

Pressure to reform the child welfare system evolved along two major themes: foster care placement services for children should be provided in the least restrictive appropriate environment and permanency for children shall be a primary goal of services. With the enactment of the *Adoption Assistance and Child Welfare Act of 1980 (P.L. 96-272)* states were mandated to promote permanency planning for all children in foster care placement and for children at-risk of removal from their homes. States were also required to make reasonable efforts to prevent foster care placements of children and to reunify children already removed from their homes.

In 1993, Congress enacted the *Family Preservation and Family Support Services Program (P.L. 103-66)* which provided additional funding for preventive services and crisis services for children and families at-risk of entering the foster care system. Implementation of these programs required active involvement of a broad community of stakeholders to focus on needs and services for children and families.

In response to major concerns about the extended length of stay and poor outcomes for minority children and the prevalence of using race to determine placements for children in foster care, the *Multiethnic Placement Act* (P.L. 103-382) and the *Interethnic Placement Provisions* (P.L. 104-188) were enacted. This legislation forbids the delay or denial of a foster or adoptive placement based solely on the race, color, ethnicity, or national origin of the prospective foster parent, adoptive parent or the child involved. It also compels states to make diligent efforts to recruit and retain foster and adoptive families that reflect the racial and ethnic diversity of the children for whom foster homes are needed.

The *Adoption and Safe Families Act of 1997* (P.L. 105-89) was enacted to ensure that children's safety would be the paramount concern of all child welfare decision-making and to promote the adoption of children who cannot return safely to their own homes. This law has five key principles: safety is the paramount concern that must guide all child welfare services; foster care is temporary; permanency planning efforts should begin as soon as a child enters care; the child welfare system must focus on results and accountability; and innovative approaches are needed to achieve the goals of safety, permanency, and well-being.

The *Fostering Connections to Success and Increasing Adoptions Act* was enacted on October 7, 2008. This legislation addresses some of the most important needs affecting foster children, including extending federal foster care payments up to 21 years old, providing federal support for relatives caring for foster children, increasing access to foster care and adoption services to Native American tribes, providing foster parents with the right to be heard, and improving the oversight of the health and education needs of children in foster care.

Together, these actions and policies have moved foster care into a new phase. Foster care has become a complex system of services and placements that are designed to ensure that children are safe, permanency is achieved, and the child's social, emotional and intellectual well-being is addressed.

## 1.2   Philosophical Principles

Philosophical beliefs about children in foster care and their families is the single most important variable in the provision of quality foster care services. Values and beliefs about children and their families drive decision making, interaction, and involvement.

Safety is the paramount concern that must guide all child welfare services. When making decisions about a child, including those decisions regarding service provision, placement, and permanency planning, the safety of the child must be the foremost issue in determining what is in the best interest of the child.

Foster care is temporary. Foster care placement provides a substitute living arrangement for a child for a planned period of time. The child's placement must be the most appropriate living situation that can meet the individual child's needs. The time the child is in foster care must be productive in terms of services provided to address the identified

D003107875

needs of the child in order for the child to grow, develop, and achieve their permanency plan.

Permanency planning efforts should begin as soon as a child enters foster care. A child should only be placed in foster care when appropriate and only when efforts to strengthen the family's situation have failed or when a child is unsafe, and a plan cannot be implemented which controls the threats to child safety. Concurrent planning should be utilized to allow staff to work to reunify the family, while at the same time planning for the possibility that reunification will not succeed. All children are entitled to have safe, permanent living situations that promote their safety and well-being. Permanent placements, whether it is reunification, adoption, legal guardianship, placement with relatives or other permanent planned living arrangement **must be achieved in a timely manner,** with the goal of limiting the number of children who remain in foster care for more than 24 months. The total number of children in foster care for more than 24 months should not exceed 20 percent of the foster care population at any point in time.

Interventions and decisions should be defined through child-centered, family-focused principles. This system of operation requires that children and families take part in all decisions that impact their lives. Children, their parents, and extended family must be full partners in the process that develops, implements, and reviews their cases. Being part of the case work process makes families more likely to be invested in making the changes necessary to positively address the reasons their children were removed from their homes. Child-centered, family-focused practice also demands that services are individualized to meet the specific needs of the children and families that are being served.

Foster care is a process and not a series of discreet, unrelated steps. It is a continuum of care that is offered in conjunction with other services such as family preservation, child protective services, youth services, or adoption. Foster care involves looking backward to assess the home situation and determine the steps necessary to make it possible for the child to return home. It also requires looking forward to the steps necessary to provide a permanent substitute living arrangement.

## 1.3    Mission

The West Virginia Department of Human Services, Bureau for Social Services is committed to ensuring that children in out-of-home care and their families receive adequate and appropriate services that best meet their needs for safety, permanency, and well-being.

## 1.4    Purpose

There are three primary purposes for foster care:

a) To reunite the child in foster care with their family by providing interventions aimed at reunification whenever possible and when the safety of the child can be assured.

- It is vital to remember that children should not be separated from their

D003107876

families longer than necessary. If safety can be re-established within the home, the child/children should be returned to that home and reunified with their parents/guardians once safety is re-established.  Legal and physical custody of the child/children should be discussed with the Multi-Disciplinary Team (MDT) and the Courts.

**b)** To provide a permanent substitute living arrangement for the child in foster care when reunification is not possible.  Such an arrangement may include adoption, placement with relatives, legal guardianship, or another court-sanctioned permanent living arrangement.

**c)** To aid a child over the age of 14 to attain independent living skills necessary to become a successful adult.

## 1.5   Staff Roles

Many of the staff involved in providing foster care services for the Department is not classified specifically as foster care workers.  Instead, staff has various responsibilities for children who come to the attention of the Department for any number of reasons. Regardless of the classification, all of the following staff play a role in assuring that children in the custody of the Department are safe, well-being is continuously assessed and promoted and that children achieve their permanency plan.

Child Protective Services Worker

a)   Problem Identifier

The worker gathers studies and analyzes information about the child and the family.  The worker also offers help to families in which risk is identified, secures the safety of the child, justifies the need for child protective services intervention and evaluates the causes of risks.

b)   Case Manager

When a child is removed from their home due to an investigation of abuse and/or neglect, the Child Protective Service worker becomes, in essence, a Foster Care worker.  As such, the worker is the primary case manager for the child while the child resides away from their home.  In this capacity the child's worker, with the assistance of the Multidisciplinary Treatment Team, assesses the family's problems and concerns and develops a detailed, appropriate plan to address the issues for which the child was removed from the home.  The worker is responsible for orchestrating all of the planning, reporting and follow-up activities related to the case and facilitates the use of agency and community services to assist the child and their family.  The worker also reviews the family's progress, maintains accurate documentation and records,

and advocates for the appropriate, necessary services to address the identified issues which lead to the child's removal.

c) Treatment Provider

The child's worker works directly with families in helping them to address the issues that necessitated removal of their children by learning new ways of relating to and being responsible for their children. The worker also serves as a role model, encourages client motivation and facilitates problem solving and decision making on the part of families.

d) Permanency Planner

The child's worker, with the assistance of the Multidisciplinary Treatment Team, develops a detailed plan that addresses the permanency needs of the child. The worker is responsible for ensuring that the services provided to the child and their families, if appropriate, are in coordination with the child's identified permanency plan. In addition, the worker must also have a concurrent permanency plan for which services are coordinated in case the primary permanency plan no longer becomes appropriate.

Child Protective Services Supervisor

a) Administrator

The supervisor makes decisions on specific case activities, case assignments and on relevant personnel matters. The supervisor also regulates the practice of social workers with foster care cases and ensures the quality of practice. The supervisor ensures case activities and decisions are congruent with policy, state and federal statutes, and court rules. The supervisor serves as a link between workers and community resources and with administrative staff

b) Educator

The supervisor plans and carries out activities related to the professional development of employees.

c) Coach

The supervisor motivates and reinforces employees in the performance of their duties.

Foster Care Worker

a) Case Manager

When a child is removed from their home, the worker becomes the primary case manager for the child. In this capacity the child's worker, with the assistance of the Multidisciplinary Treatment Team, assesses the family's problems and concerns and develops a detailed, appropriate plan to address the issues for which the child was removed from the home. The worker is responsible for orchestrating all of the planning, reporting and follow-up

9

D003107878

activities related to the case and facilitates the use of agency and community services to assist the child and their family. The worker also reviews the family's progress, maintains accurate documentation and records, and advocates for the appropriate, necessary services to address the identified issues which lead to the child's removal.

b) Treatment Provider

The child's worker works directly with families in helping them to address the issues that necessitated removal of their children by learning new ways of relating to and being responsible for their children. The worker also serves as a role model, encourages client motivation and facilitates problem solving and decision making on the part of families.

c) Permanency Planner

The child's worker, with the assistance of the Multidisciplinary Treatment Team, develops a detailed plan that addresses the permanency needs of the child. The worker is responsible for ensuring that the services provided to the child, and their family if appropriate, are in coordination with the child's identified permanency plan. In addition, the worker must also have a concurrent permanency plan for which services are coordinated in case the primary permanency plan no longer becomes appropriate.

Foster Care Supervisor

a) Administrator

The supervisor makes decisions on specific case activities, case assignments and on relevant personnel matters. The supervisor also regulates the practice of social workers with foster care cases and ensures the quality of practice.

b) Educator

The supervisor plans and carries out activities related to the professional development of employees.

c) Coach

The supervisor motivates and reinforces employees in the performance of their duties.

Youth Services Worker

a) Problem Identifier

The worker gathers studies and analyzes information about the child and the family. The worker also offers help to families whose children come into the custody of the state as a result of juvenile justice intervention or court proceedings, secures the safety of the child and the child's community, justifies the need for youth services intervention and evaluates the causes of risks.

Foster Care Policy
May 2024

D003107879

b) Case Manager

When a child is removed from their home, the worker becomes the primary case manager for the child while the child resides away from their home. In this capacity the child's worker, with the assistance of the Multidisciplinary Treatment Team, assesses the family's problems and concerns and develops a detailed, appropriate plan to address the issues for which the child was removed from the home. The worker is responsible for orchestrating all of the planning, reporting, and follow-up activities related to the case and facilitates the use of agency and community services to assist the child and their family. The worker also reviews the family's progress, maintains accurate documentation and records, and advocates for the appropriate, necessary services to address the identified issues which lead to the child's removal.

c) Treatment Provider

The child's worker works directly with families in helping them to address the issues that necessitated removal of their children by learning new ways of relating to and being responsible for their children. The worker also serves as a role model, encourages client motivation and facilitates problem solving and decision making on the part of families.

d) Permanency Planner

The child's worker, with the assistance of the Multidisciplinary Treatment Team, develops a detailed plan that addresses the permanency needs of the child. The worker is responsible for ensuring that the services provided to the child and their family is in coordination with the child's identified permanency plan. In addition, the worker must also have a concurrent permanency plan for which services are coordinated in case the primary permanency plan no longer becomes appropriate.

Youth Services Supervisor

a) Administrator

The supervisor makes decisions on specific case activities, case assignments, and on relevant personnel matters. The supervisor also regulates the practice of social workers with foster care cases and ensures the quality of practice.

b) Educator

The supervisor plans and carries out activities related to the professional development of employees.

c) Coach

The supervisor motivates and reinforces employees in the performance of their duties.

Homefinding Specialist

D003107880

a) Recruiter

The Homefinding Specialist is responsible for recruiting prospective foster/adoptive families to care for the children who are in foster care. It is also the responsibility of the Homefinding Specialist to promote general awareness of foster/adoptive care in the communities.

b) Trainer

The Homefinding Specialist must provide each prospective foster/adoptive family with the opportunity to receive training on the foster/adoptive care system, the children who come into the custody of the state, and the skills required to provide care for these children. This training involves self-evaluation through discussions, participation in small group exercises, and discussion with experienced foster/adoptive parents.

c) Certification Provider

The Home Finding Specialist must evaluate all prospective foster/adoptive families on their ability to and experience in parenting children, their home for safety and capacity measures, and their motivation for becoming foster/adoptive parents.

d) Case Manager

It is the responsibility of the Homefinding Specialist to provide support and guidance to foster/adoptive parents. In this capacity, the Homefinding Specialist must help foster/adoptive families receive any assistance or services necessary to address problems or concerns that the family may develop. Such assistance and services may include respite, additional child-specific training, family counseling, etc. The Homefinding Specialist also reviews the family's progress, maintains accurate documentation and records, and ensures that the family is compliant with policy and regulations that govern foster/adoptive families.

Homefinding Supervisor

a) Administrator

The supervisor makes decisions on specific case activities, case assignments, and on relevant personnel matters. The supervisor also regulates the practice of social workers with foster/adoptive care cases and ensures the quality of practice.

b) Educator

The supervisor plans and carries out activities related to the professional development of employees.

c) Coach

D003107881

The supervisor motivates and reinforces employees in the performance of their duties.

## 1.6 Definitions

**Away from Supervision** - When a foster care youth, without consent, is not under the supervision of the caregiver and the youth's location cannot be determined.

**Adoption** - Adoption is a family-building permanency option that provides a permanent home for a child until adulthood. A voluntary surrender or termination of parental rights from the birth parents must occur before the adoption can be finalized in a court of law. The adoptive parent then becomes the child's legal parent and as such has the formal and legal responsibility for the child.

**Adoption and Foster Care Analysis and Reporting System (AFCARS)** - The Adoption and Foster Care Analysis and Reporting System (AFCARS) is designed to collect uniform, reliable information on children who are under the responsibility of the title IV-B/IV-E agency for placement, care, or supervision. Adoption and foster care data collection is mandated by the Social Security Act, Section 479.

**Aftercare Plan** - A plan which is developed by the child's caseworker when the child is placed outside of the home. The plan must be finalized 60 days prior to the child's release and must be specific to the available community resources and the child's needs, including but not limited to, education, counseling, and treatment.

**Age or Developmentally Appropriate** - activities or items that are generally accepted as suitable for children of the same chronological age or level of maturity or that are determined to be developmentally-appropriate for a child, based on the development of cognitive, emotional, physical, and behavioral capacities that are typical for an age or age group; and in the case of a specific child, activities or items that are suitable for the child based on the developmental stages attained by the child with respect to the cognitive, emotional, physical, and behavioral capacities of the child.

**ASO** - Is an Administrative Services Organization that provides socially necessary services for child welfare cases as laid out in Child Welfare policy. ACENTRA Intelligent Value, is contracted by BSS as the Administrative Service Organization (ASO) to provide the socially necessary services.

**CASA** - A Court Appointed Special Advocate (CASA) representative is appointed primarily in civil protection proceedings involving child abuse and/or neglect. Duties of a CASA representative include an independent gathering of information through interviews and review of records; facilitating prompt and thorough review of the case; protecting and promoting the best interests of the child; follow-up and monitoring of court orders and case plans; making a written report to the court with recommendations concerning the child's welfare; and negotiating and advocating on behalf of the child.

**Child Locator** – The child locator will assist in the location and recovery efforts of certain

13

D003107882

youth. The child locator will assist the child welfare worker in carrying out interviews of collaterals, information sharing with law enforcement, and other activities which will assist in the location of the child.

**Child Placing Agency (CPA)** - A child welfare agency organized for the purpose of placing children in private family homes for foster care or for adoption. The function of a child placing agency may include the assessment and certification of foster family homes as provided in W. Va. Code §49-2-107. The function of a child placing agency may also include the supervision and support of youth or transitioning adults who are 16 to 26 years old and living in unlicensed residences.

**Child's Case Plan** - The plan prepared by the Department pursuant to the federal requirements for a comprehensive plan for every child in foster care developed within 60 days of the date the child entered foster care and the requirements of W. Va. Code §49-4-608 following the adjudication by the court that the child is an abused and/or neglected child. For youth entering foster care through juvenile proceedings, the same requirements for all foster children including the Child's Case Plan must be followed. The Child's Case Plan is a comprehensive document which directs the provision of all casework services including the services provided to the child. All casework services provided to the child while the child is in placement must be delivered in accordance with the Child's Case Plan.

**CIB/NCIC** - Criminal Information Background/National Crime Information Center are entities that provide a history of a person's state and federal criminal activity.

**Crime Victims Compensation Fund** – A special revenue fund within the State Treasury, established by the Crime Victims Compensation Act which can be utilized for victims of crimes, including minors in civil abuse and neglect cases, for payment of expenses attributed to or caused by their victimization. See W.Va. Code §14-2A-1, *et seq*.

**Cultural Competence** - The ability of individuals and systems to interact responsively, respectfully, and effectively with people of all cultures, classes, races, ethnicity, and religious backgrounds in a manner that recognizes, affirms, and values the worth of individuals, families, and communities while protecting and preserving the dignity of each.

**Discharge Plan** - A plan which residential treatment facilities are required to provide to the worker, the youth, and the youth's family, upon release from their facility. The plan should provide instruction on how to continue with the child's aftercare treatment, any medication they may require, additional outpatient services, and any follow-up appointments with service providers or community resources.

**Emergency Shelter Care** - Substitute care providers who deliver short term care (less than sixty days) for children just entering foster care or those who are between placements. Emergency shelter care foster parents must meet the same basic qualifications as other foster care providers. Emergency shelter care is also provided in facility settings.

**Family Foster Care** - Continuous 24-hour care and support services provided for a child in

a family foster/adoptive home.

**Family Foster Home** - A private residence that is used for the care on a residential care basis of no more than six or less children who are unrelated by blood, marriage or adoption to any adult member of the household.

**Fictive Kin** – An adult of at least 21 years of age, who is not a relative of the child but who has an established, substantial relationship with the child, including but not limited to, teachers, coaches, ministers, and parents or family members of the child's friend.

**Foster/Adoptive Family Adoption** - A permanency option that should be considered for any child who has been in a foster /adoptive home a sufficient amount of time to bond with the family and establish family connections.

**Foster/Adoptive Family Care** - Services provided by a person not related to the child who has been certified to provide care in an out-of-home living situation.

**Foster Care** - 24-hour substitute care for children placed away from their parents or guardians and for whom the State agency has placement and care responsibility. This includes, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, childcare institutions, and pre-adoptive homes.

**Foster Care Candidate** - A foster care candidate is a child, under the age of 21, who is at imminent risk of foster care entry or re-entry, and who:

a. has not been removed from their home and placed in foster care; or

b. is not under the placement and care of the title IV-E agency and is residing with a relative or an individual with whom the child has an emotionally significant relationship characteristic of a family relationship (fictive kin); or

c. has returned home on a trial home visit; or

d. has returned from a foster care placement and is residing with their parent or a non-paid kinship relative caregiver; or

e. has been adopted or is in a legal guardianship arrangement.

**Foster Family Home** – A private residence which is used for the care on a residential basis of no more than six children who are unrelated by blood, marriage, or adoption, to any adult member of the household.

**Foster Parent** – A person with whom the Department has placed a child and who has been certified by the Department, a child placing agency, or another agent of the Department to provide foster care.

**Guardian ad Litem** (GAL) - The attorney appointed to represent the best interest of the child in legal proceeding until permanency is achieved.

**Home Study** - A home study or family assessment is the process by which information is gathered and evaluated to assess a family's ability to provide care for children who may

D003107884

be placed in the home through foster care. This assessment includes evaluating the physical environment of the home for safety and to determine adequate space, the family's capacity for parenting, as well as, the family's motivation and commitment to providing a safe, caring environment for children.

**Human Trafficking Victim** - A victim who has been forced, coerced, enticed, transported, isolated, harbored, obtained, or received for the purpose of debt bondage, sexual servitude, a commercial sex act, or forced labor.

**Legal Guardianship** - A legally binding, permanent relationship between a child and a caregiver, other than the child's biological parent, which may be considered as a permanent placement option for the child. This arrangement transfers all the rights and responsibilities for a child from the Department to the caregiver through a court sanctioned process. A monthly maintenance subsidy, medical card, and non-recurring subsidy may be provided to eligible children to ease the financial burden of caring for the child.

**Interstate Compact for the Placement of Children (ICPC)** - An agreement that has been enacted into law by all 50 states in the United States and the District of Columbia, which controls the lawful movement of all children from one state to another from the purpose of placement.

**Kinship Parent** – A person with whom the Department has placed a child to provide a kinship placement.

**Kinship Placement** – The placement of the child with a relative of the child or a placement of a child with a fictive kin.

**Missing and Endangered Child** – Any missing child in which there are substantial indications that the child is at high risk of harm or in immediate danger, and rapid action is required.

**Missing and Endangered Child Advisory** – A system used to alert the public of a missing and endangered child to aid in the child's rapid recovery.

**Missing Child** – Any child under the age of 18 whose whereabouts are unknown to the child's legal custodian.

**Multidisciplinary Treatment Teams (MDTs)** - A team designed to assess, plan, and implement a comprehensive, individualized case plan for a child who is involved in court proceedings either because of child abuse and neglect, status offense, or delinquency proceedings. This team includes the child's custodial parent(s) or guardian(s), other immediate family members, the attorney(s) representing the parent(s) of the child, the child if over the age of 12 or the child's participation is deemed appropriate, the Guardian Ad Litem, the prosecuting attorney, and any other person who may contribute to the team's efforts to assist the child and the family.

**Normalcy** – The right for all youth in foster care to be provided with the opportunity for normal growth and development, which includes age-appropriate activities, recreation,

D003107885

and life skills.

**Open Adoption** - An adoptive arrangement that permits on-going communication and/or contact between the birth family and the child subsequent to a finalized adoption.

**Out-of-Home Care** - Assignment of a child in the custody of the state, including those placed by voluntary agreements, to a residence that may include an emergency shelter, foster family, group or residential facility, institution, adoptive family, relative foster family, or a transitional living apartment.

**Permanency Plan** - A formal written part of the Child's Case Plan that determines the permanent placement for a child in the state's custody.  Permanent placements include return home, kinship care, adoption, legal guardianship, or another permanent plan that is sanctioned by the court such as emancipation or continued foster care.

**Permanency Planning** - A systematic effort to provide long-term continuity for children in foster care.  This planning must begin the moment the child enters foster care and must drive services and actions for the child.

**Placement** - The child's living arrangement. For a child to be considered in foster care, the Department must have legal custody of the child and the child is placed outside their own home and in a certified foster home, relative/kinship home, or with a licensed facility.

**Pre-service Orientation** - The training provided to prospective foster/adoptive families to provide those interested in becoming certified foster/adoptive parents with an understanding of the foster care and adoption system, the children who are in foster care and who are available for adoption, and the responsibilities of foster/adoptive parents.

**Reasonable and Prudent Parenting Standard** - the standard characterized by careful and sensible parental decisions that maintain the health, safety, and best interests of a child while at the same time encouraging the emotional and developmental growth of the child, that a caregiver shall use when determining whether to allow a child in foster care under the responsibility of the State to participate in extracurricular, enrichment, cultural, and social activities.

**Relative/Kinship Care** - Services provided by any person related to the child by blood or marriage including cousins and in-laws. This includes persons who the child considers a relative, such as a godparent or significant others whom the child claims as kin, who may also be considered as a placement resource.

**Relative of the Child** – An adult of at least 21 years of age who is related to the child by blood or marriage, within at least three degrees.

**Residential Treatment** - Placement of children in state custody in facilities licensed to provide psychiatric and/or behavioral health care on an acute or long-term basis.

**Respite Care** - The temporary ease of the responsibilities of a person who provides for the care of another.  Respite may also be used for children to ease stressful situations.

**Scattered-Site Living Arrangement** – A living arrangement where youth, 17 to 26 years of age, living in a setting that allows staff to be available as needed, depending on the

17

D003107886

youth's level of autonomy. Sites for such living arrangements shall be in community environments to allow the youth full access to services and resources in order to fully develop independent living skills.

**School of Origin** - The school in which the child was enrolled at the time of placement in foster care.

**Sex Trafficking Victim** - A victim of the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

**Sibling** - Any individual who the child considers to be a sibling or an individual who satisfies at least one of the following conditions with respect to a specific child: 1) The individual is considered by state/tribal law to be a sibling of the child; 2) The individual would have been considered a sibling of the child under state/tribal law but for a termination or other disruption of parental rights, such as the death of a parent.

**Specialized Family Care** - Foster/adoptive family care provided through private agencies for children with cognitive and/or developmental disabilities that are in the state's custody as a member of the Medley class or is considered Medley-at-Risk.

**Specialized/Therapeutic Foster/Adoptive Care through Child Placing Agencies** - A service that combines the benefits of the protection, support and nurturing of a family foster/adoptive care setting with the benefits of treatment services provided by the agency and foster /adoptive parents. Specialized foster/adoptive care is designed to serve children with a variety of issues such as emotional/behavioral disturbance, psychiatric diagnoses, delinquency, developmental disorders, intellectual functioning deficiencies, and medical disorders.

**State Custody** - Assignment of a child into the legal custody of the Department of Human Services. Children may enter into the custody of the Department through court ordered child abuse and neglect proceedings, through the juvenile justice system, or by voluntary placement (SS-FC-4) or relinquishment by the parents and continued placement for foster care services by contract (SS-FC-18) for youth age 18-21.

**State Ward** - A child who has had all parents' rights terminated either by legal action, relinquishment or death.

**Subsidized Adoption** - The provision of short term or ongoing financial and/or medical assistance for the child with identified special needs which may be required in order to enable the adoptive placement of that child.

**Supervised Group Setting** – A setting where youth, 16 to 21 years of age, live with staff onsite or are available 24 hours per day and seven days per week. In this setting, staff provide face-to-face daily contact with youth.

**Transition Plan** - A personalized plan that must be developed no later than 60 days after a youth reaches age 14 years. The plan is developed collaboratively by the youth, the youth's casework, and appropriate family but must be guided and detailed by the youth. The plan must determine the needs of the youth including but not limited to; education,

D003107887

health insurance, housing, and employment services; and the plan must be developed to address those needs to assure that the youth reaches their full developmental potential in transitioning into adulthood.

**Transitional Living** - Children over the age of 14 in foster care must be taught the skills needed to become a successful, self-sufficient adult. These skills must be part of the child's service plan regardless of the type of placement. Children over the age of 16 may be allowed to live semi-independently in their own households in the community prior to discharge from the foster care system. Youth who are placed in a transitional living apartment have the supervision and services available to them to ensure that their needs are being met.

**Transitioning Adult** - An individual with a transfer plan to move to an adult setting who meets one of the following conditions: (1) Is 18 years of age but under 21 years of age, was in departmental custody upon reaching 18 years of age, and committed an act of delinquency before reaching 18 years of age, remains under the jurisdiction of the juvenile court, and requires supervision and care to complete an education and or treatment program which was initiated prior to the eighteenth birthday. (2) Is 18 years of age but under 21 years of age, was adjudicated abused, neglected, or in departmental custody upon reaching 18 years of age and enters into a contract with the department to continue in an educational, training, or treatment program which was initiated prior to the eighteenth birthday.

## 1.7 Legal Basis for Foster Care

Foster care is a complex array of services for thousands of children provided through dozens of service providers in multiple placement settings coordinated by hundreds of social service staff. Because of this complexity, there are many laws and regulations that determine how foster care services are provided to children and their families.

### 1.7.1 State Statute

Under §49-1-106 of the West Virginia State Code, the Department of Human Services is empowered to administer a foster care program for dependent and neglected children. This allows the Department to accept custody of children and place them outside of their families of origin in order to protect and care for them. When children are in foster care, the Department assumes part or all of the responsibility for children that ordinarily rests with the parents. If parental rights have not been terminated, it is the responsibility of the Department to help parents stay involved in their children's lives by exercising their remaining rights and responsibilities concerning their children.

### 1.7.2 Federal Regulations/Legislation

a) *The Child Abuse Prevention and Treatment Act (CAPTA), originally enacted in 1974 in 1974 (P. L. 93-247)* and amended most recently and re-authorized on October 3, 1996, by the *Child Abuse Prevention and Treatment Act*

19

D003107888

*Amendments of 1996 (P. L. 104-235).* CAPTA provides Federal funding to States in support of prevention, assessment, investigation, prosecution, and treatment activities and also provides grants to public agencies and nonprofit organizations for demonstration programs and projects.

b) *The Indian Child Welfare Act of 1978 (P. L. 95-608)* mandates that the placement of American Indian children be governed by their tribe, whose authority was legislated by the United States government.  By this Act, tribes are given the authority to care for Indian children, to intercede in court cases regarding adoptive placement of Indian children, and to place Indian children with tribal members or with members of other tribes.

c) *Public Law 96-272, the Adoption Assistance and Child Welfare Act of 1980* was enacted to require states to develop foster care policies and practices that conform to specific standards of casework practice.  This federal law discourages excessive reliance on foster care placement and promotes the greater use of services to assist and rehabilitate families, preventing out of home placements.

d) *Omnibus Budget and Reconciliation Act of 1993 ( P. L. 103-66)* The Family Preservation and Family Support Services Program was enacted as part of the Omnibus Budget and Reconciliation Act of 1993, to authorize funding for Title IV-B, Subpart 2, Family Preservation and Support Services programs.

e) *The Multiethnic Placement Act of 1994* as part of the *Improving America's Schools Act (P. L. 103-382)* removed barriers to permanency for children in foster care waiting for permanent homes, and to ensure that adoption and foster placements are not delayed or denied based on race, color or national origin.

f) The Removal of Barriers to Interethnic Adoption (IEP) provisions included in the *Small Business Job Protection Act* which amended MEPA (P. L. 104-188) to not allow placement decisions to be based on race, color or national origin.

g) *The Personal Responsibility and Work Opportunities Reconciliation Act of 1996 (P. L. 101-193)* requires states to give preference to an adult relative over a non-relative adult caregiver when determining a placement for a child in foster care provided that the relative meets all foster home standards.

h) *The Adoption and Safe Families Act of 1997 (PL 105-89)* ensures that children's safety is the paramount concern of all child welfare decisions and amends federal regulations and law so that children are moved through the child welfare system into permanent placements.

20

D003107889

i) *The Foster Care Independence Act of 1999 ( P. L. 106-169*) was enacted to provide States with more funding and greater flexibility in carrying out programs designed to help children make the transition from foster care to self-sufficiency.

j) Titles IV-B and IV-E of the Social Security Act contain regulations on how states must provide foster care services. These regulations are incorporated into the policies and procedures of the Department.

k) *Fostering Connections to Success and Increasing Adoptions Act of 2008(P.L. 110-351)* promotes permanent families through additional funding for relative guardianship and adoption programs. The legislation also emphasizes the importance of placing children with relatives by allowing waivers of non-safety standards for relative/kinship providers and by awarding Family Connection Grants.

**1.7.3**   State Consent Decrees

a) Gibson vs. Ginsberg is a consent decree which addresses case work practices in child abuse and neglect cases and specifies the circumstances in which children may be removed from their homes. Most of the provisions of this decree can be met by following the requirements in Child protective services policy including the Legal Requirements and Processes Child Protective Services policies which are on line in CCWIS and by meeting the requirements in the Court Rules issued by the Supreme Court.

b) Medley vs. Ginsberg required the development of a system of community-based services which "*allow mentally delayed or developmentally delayed people to live in the communities rather than institutions.*"

c) Hartley vs. Ginsberg decree is similar to the Medley decree in that it requires the state to develop community services for mentally ill adults and children.

d) Sanders vs. Panepinto decree mandates that foster children participate in the Early, Periodic, Screening, Diagnosis and Treatment (EPSDT) program for health care services. (EPSDT is now known as Healthcheck.)

**1.7.4**   Federal Supreme Court Decisions

The Youakim decision does not allow states to discriminate against relative/kinship care providers in placement decisions in cases where the state has custody of a child in foster care.

## 1.8   How Children Enter Foster Care

There are seven separate avenues defined by statute through which children may enter

21

D003107890

foster care.  Each requires specific actions by the parents, child, legal system, and the Department.

a)  A parent may request temporary help in caring for their child while a family crisis is resolved. (Voluntary Placement)

b)  A parent may request help in meeting the child's physical or mental health needs. (Voluntary Placement)

c)  Child Protective Services or law enforcement may take a child into emergency custody or a petition may be filed alleging abuse/neglect after completing an assessment of the family situation that finds the child unsafe. (Emergency Custody/Temporary Custody)

d)  A status offense has brought the child to the attention of the juvenile court. (Temporary Custody)

e)  The child has been charged and/or adjudicated as a delinquent for engaging in criminal behavior. (Temporary Custody)

f)  A former foster care youth age 18 or older may decide to continue living as a foster child provided that the youth meets one of the following conditions;

- the child is completing secondary education or a program leading to an equivalent credential;
- the child is enrolled in an institution which provides post-secondary or vocational education;
- the child is participating in a program or activity designed to promote, or remove barriers to, employment;
- the child is employed for at least 80 hours per month; or
- the child is incapable of doing any of the above described activities due to a medical condition.

g)  The youth signs consent to continue to receive foster care services through the SS-FC-18 contract.

## 1.9    Foster Care Candidacy

A child is considered to be a candidate for foster care if they are at imminent risk of removal from their home, absent effective preventative services.  A child or youth is at imminent risk of removal from the home if the state is pursuing removal or attempting to prevent removal by providing in-home services.  A child or youth is not a candidate for foster care if the planned foster care placement for the child or youth is an arrangement outside of foster care, such as a detention facility.

D003107891

## 1.10   Voluntary Placement

Under the provisions of (W. Va. Code §49-4-116) the Department is authorized and empowered in its discretion to accept children for care from their parent or parents, guardian, custodian or relatives, and to accept the custody of children committed to its care by the courts.

A parent may voluntarily request placement of their child into foster care for a specific period of time when the parent is temporarily incapacitated or there exists circumstances which prohibit the child remaining in their own home.

In general, the purpose of a SS-FC-4 or voluntary placement agreement (VPA) is to provide a temporary placement for a child whose parent(s) are unable to care for the child for a limited period of time. As the name implies, voluntary placement agreements are expected to be short-term, temporary placement arrangements.

Situations under which a VPA may be used include the following:

a) Mental or physical illness of one or both of the parents

b) Death of one parent and the inability of the surviving parent to provide care for the child for a determined period of time.

c) A single parent who requests temporary placement for a child while considering whether to raise the child, or voluntarily relinquish the child for adoption.

d) The foster child who becomes a parent while in foster care and the child cannot be placed in the same placement with the minor parent.

e) A single parent who is active in the military and has been deployed without family or resources to provide care for the child/children.

f) Parental incarceration where no abuse and/or neglect issues are present and the parent is unable to identify an appropriate adult to provide care to the child.

The decision to use a VPA in situations other than those listed above must be approved by the Child Welfare Consultant and Regional Program Manager, or their designee.

The decision to accept a voluntary placement request from a parent is discretionary on the part of the Department. The worker must take the following when determining whether to accept voluntary placement of a child:

a) Thoroughly evaluate all such requests to determine that foster care is the best living arrangement for the child.

b) If a voluntary placement is requested and resources are available to alleviate the need to place the child in foster care, the worker will make the caregiver aware of these resources and utilize alternatives to placement.

c) According to federal regulations, it is not permissible under any circumstances to accept the voluntary placement of an infant of a foster child if the child is to be placed in the same foster home or group/residential agency as the minor parent. For those

infants placed in the same foster home or group/residential agency as their minor parent who is in foster care, the costs of care for this child must be included in the foster care maintenance payment made for the parent. Children of minors in foster care are eligible for medical assistance under Medicaid through application with the Office of Family Support.

d) The parent or legal guardian who has custody of the child must sign the SS-FC-4 Agreement for Foster Care contract. If two parents share custody, both must sign the agreement. If custody is received from a guardian of the child, proof that the guardian has legal authority to sign the document must be provided and attached to the agreement. The child welfare worker will reference the agreement in CCWIS document tracking.

e) Supervisory approval of the voluntary placement must be obtained, and the document notarized. The district's Regional Program Manager and Child Welfare Consultant should be consulted in the decision making process, and the agreement must be signed by the Social Services Manager or their designee.

f) A copy of this agreement is given to the parents or guardian and a copy is placed in the family's record.

g) When a voluntary placement is requested, the child welfare worker will complete a "Receive Service" intake in CCWIS with "Foster Care" selected as the case type.

h) The VPA must be documented on the custody status screen in CCWIS. The reason for placement as well as removal information and reasonable efforts documentation must be completed on the placement child removal screen in CCWIS.

i) The child must be placed in the least restrictive, most family like placement available to meet the child's needs.

j) The Worker must continue to monitor and assess the child's placement to ensure the child is safe, receiving adequate care, and that their needs are being met.

k) If at any time there is an indication the child may have been abused or neglected while in the care of their parent(s) or custodian(s), or it is believed the child may be unsafe at the time the VPA expires or revocation has been requested, the child welfare worker must immediately consult with their supervisor and refer the family to Child Protective Services (CPS) for assessment.

l) If a CPS assessment determines the child would be unsafe if returned to the parent(s) or custodian(s), the Department must petition the Circuit Court for custody of the child through the appropriate civil court proceedings.

m) Within 90 days of signature, the worker must petition the Circuit Court to review the VPA as required by W. Va. Code §49-4-116. When using the VPA, the child welfare worker should re-evaluate the situation at least 45 days prior to the 90-day expiration date. The petition should include the child's situation, and the circumstances that gave rise to the placement agreement. If the Department intends to extend the VPA

24

D003107893

the child welfare worker must file a copy of the child's case plan with the court as directed in West Virginia State Code.

n) The court must then determine if continued voluntary placement is in the best interests of the child.

o) If such a determination is made, the court must enter an order containing the statement that it is in the child's best interest to remain in care, specify under what conditions the child's placement shall continue, and whether or not the Department has made reasonable efforts to preserve and to reunify the family.

p) If the parent requests return of custody prior to filing the petition for court review, the parent must submit a written request for revocation to the Department. If possible, the child welfare worker will convene a meeting with the parent the same day the revocation request is received. The child welfare worker will assess the current situation to determine if the circumstances requiring voluntary placement have been resolved and if referral(s) for community resources would be beneficial. After supervisory consultation and approval, custody of the child shall be returned to the parent. The child welfare worker must convene the meeting with the parent, consult their supervisor and facilitate the return of the child/children to the parent's custody within 72 hours of the receipt of the written request for revocation.

q) The child welfare worker must enter the end date of the VPA on the Custody Status Screen.

r) If a parent/custodian requests return of custody after the petition for the 90 day review hearing has been filed, it will be the ultimate decision of the court as to whether or not continuation in placement is in the best interest of the child.

s) All resources offered and provided to the family during the effective period of the SS-FC-4 and the results of such resources must be documented in the case record.

The parent or guardian who voluntarily places a child into foster care must assume the following responsibilities for their child:

a) Explaining the placement plan to the child as well as the reasons for the placement.

b) Providing as much of the financial responsibility for the child as possible.

c) Informing the Department of their whereabouts and any significant changes in their circumstances.

d) Working toward a permanent plan for the child's care.

e) Visitation through arrangements made through the Department.

The following rights are retained by the parent:

a) The right to consent to marriage.

b) The right to consent to enlistment in the armed forces.

c) The right to consent to adoption of the child.

D003107894

d) The right to represent the child in legal actions.

e) The right to reasonable visitation with the child unless specifically restricted by a court order.

f) The right to determine the child's religious affiliation until the child is able to make the determination.

g) The right to consent to elective surgery.

h) The right to guardianship of the child's estate unless vested elsewhere.

While the following rights are surrendered by the parent or guardian who voluntarily places a child into foster care, the child welfare worker should consult and/or inform the parent about:

a) The right to select the foster home or facility in which the child will be placed. The parents' wishes may be considered in the Department's placement decision.

b) The right to remove the child directly from the foster home or facility where they are placed. The parent has the right to request that their child be returned at any time but must allow time for the child to be moved by the Department.

c) The right to visit the child when the parent chooses. The time and frequency of visits must be arranged through the Department to suit the convenience of all parties involved.

d) The right to take the child away from the foster home or facility without prior permission from the Department.

e) The right to interfere with the authority to care for the child who has been delegated to the foster home or facility. The parent has the right to make a complaint about the child's care to the Department.

f) The right to consent to trips for routine social, educational, or medical services.

g) The right to consent to travel for educational or cultural purposes or to take a vacation with the foster placement resource or with other residents of a group home or residential facility.

h) The right to consent to routine medical care such as immunizations, EPSDT screenings and routine medical examinations.

i) The right to consent to major medical care in an emergency situation.

**1.10.1**   Voluntary Placement (SS FC-4) Child Abuse/Neglect or Juvenile Proceeding

In general, the purpose of a voluntary placement agreement is to provide a temporary placement for a child whose parent(s) are unable to care for the child for a limited period of time. As the name implies, voluntary placement agreements are expected to be short-term, temporary placement arrangements.

The purpose of Child Protective Services and one of the primary purposes of Youth Services is to protect vulnerable children from harm. By their very nature voluntary placement agreements provide limited protection to vulnerable children. These agreements can be terminated at any time by the parent. The parent can request the immediate return of their child whether or not the parent is able to provide for the care of the child.

Because of the limited protections offered by a VPA the Department has prohibited their use in cases where abuse and/or neglect is/was present that poses concern for the child's safety. In addition, the Department **strongly discourages** the use of voluntary placement agreements in juvenile proceedings. If it is determined by the Department a child is unsafe in their home and removal is the only option for assuring the safety of the child and the child's family, then the preferred method for a transfer of custody is the initiation of the appropriate court proceeding.

Occasionally a parent may be involved with CPS and/or Youth Services, but the children have safely remained in the home or were returned to the parent after CPS/Youth Services and court intervention. A VPA may be appropriate in these **limited** situations if the parent's inability to care for the child is not due to abuse and/or neglect or safety concerns. For example, a pregnant single mother whose children were removed from her home due to physical abuse has regained custody but has **no** resources to care for her children while giving birth and the subsequent hospital stay. A VPA may be appropriate in this situation. The worker should refer to the list of circumstances (listed above) under which a VPA would normally be accepted. The decision to use a VPA in these situations should involve careful deliberation and consideration of the circumstances given the limited protection offered by a VPA.

Whenever a worker is considering the use of a voluntary placement agreement in a juvenile proceeding or in abuse or neglect cases the worker must make the following evaluations and must take the following actions:

a) A VPA must never be used as a substitute for the filing of a petition in a case of child abuse or neglect. If the Prosecuting Attorney will not file a petition then the worker must use the Dispute Resolution procedures contained in §49-4-501.

b) All requests for a VPA in abuse or neglect cases or in a juvenile proceeding must be reviewed by and approved by a supervisor. The supervisor must consult with the Regional Program Manager or their designee for approval and signature. **Under no circumstances may a VPA be used in situations where a child is unsafe due to abuse and/or neglect.**

c) All Voluntary Placement Agreements must be executed according to the provisions described in Section 1.10 above. It is of vital importance that the VPA be reviewed by the court as described in Section 1.10.

d) At the time the voluntary placement expires, or at any time the parent requests a return of custody then the worker must assess the suitability of the return according to Section 1.10.

27

D003107896

## 1.11    Voluntary Relinquishment (SS-FC-47 and SS-FC-47A)

Voluntary relinquishment is the voluntary termination of the rights of a parent to a child. A child 14 years of age or older, or otherwise of an age of discretion as determined by the court, may object to the termination of their parent's parental rights.

Parents may request that their parental rights be terminated through a voluntary relinquishment under a number of circumstances such as:

a) The parents of an intellectually or developmentally delayed child cannot manage the child's needs.

b) A single parent wishes not to raise the child after birth.

c) The parents are not able to physically, mentally or emotionally care for their child.

The worker must consider the following issues before granting a voluntary relinquishment:

a) Documentation of prior services

b) Parents' understanding of their decision and the appeal process

c) The permanency plan for the child

d) Efforts made to maintain the child in the home

e) Any legal barriers that may be in place

f) The special needs of the child

g) Child's relationship with parents, siblings, significant others

h) What resources are readily available to achieve the child's permanent plan

i) What placement resources need to be developed to achieve the permanent plan for the child

j) The child's agreement to the plan if over age 14

The worker must do the following when accepting a voluntary relinquishment:

a) In situations of an unknown father, the *Affidavit of Birth Mother* SS-FC-47A must be completed and notarized in accordance with W. Va. Code §48-22-502. The affidavit must be completed, signed, and notarized before the voluntary relinquishment and accompanying documents can be accepted. The worker must ensure that all components of the affidavit are completed.

b) If a parent wants to relinquish a healthy child under the age of eight and there is no protective service case open for the family and there are no siblings of the child already in foster care, the worker must refer the parent to a licensed adoption agency. If there are siblings in foster care, the child's worker must amend the original petition and include this sibling. Under this circumstance, the Department should not take a voluntary relinquishment of the child in questions.  In addition, the Department

should not accept the voluntary relinquishment of a child that does not have one of the following special needs:

1. The child is age eight or older,

2. The child is a member of a sibling group that is to be placed together,

3. The child is a member of a racial or ethnic minority and over the age of eight,

4. The child has an emotional, physical or mental disability.

c) The worker must document reasons why the relinquishment is being requested, the counseling and services provided prior to and following the acceptance of the relinquishment, and the parent's understanding of the action being taken.

d) The Permanency Placement Review Team comprised of the adoption worker and supervisor, Homefinding Specialist and supervisor, child's worker, etc. must evaluate the request for voluntary relinquishment to determine the appropriateness for such action and make placement recommendations.

e) The Social Services Manager or their designee must approve the relinquishment.

f) The agreement must be notarized, and three originals are required. One is given to the parents, one is kept in the child's record, and one becomes part of the court record at the time of the adoption of the child.

g) The child's worker must document in CCWIS on the contact screen, in Document Tracking, and save the SS-FC-47A in the client's file cabinet.

h) A parent has a right to revoke a voluntary relinquishment within a period of 72 hours after the agreement was signed. A relinquishment should not be accepted until 72 hours after the birth of an infant as defined by W. Va. Code §48-22-303.

i) If the parent is under 18 years of age, a Guardian Ad Litem should be appointed to represent the interests of the consenting minor's parent and the consent must be reviewed and approved by the circuit court. If the parent is not competent to make this decision due to a physical or mental disability, the relinquishment must be approved by the circuit court.

## 1.12 Court Ordered Custody

Whenever a child enters foster care, the child's worker must meet certain requirements regarding the child, the caregivers, and the court. The processes pertaining to the transfer of a child's legal custody from the parent to the Department are restricted to the following:

a) A child may enter foster care as the result of a court order granting the Department temporary custody as defined under W. Va. Code §49-4-602.

b) In certain circumstances, a child may be taken into emergency custody by child protective services staff as defined by W. Va. Code §49-4-303 or by law enforcement officers as defined by §49-4-301.

c) A child may be placed in foster care if the youth is a status offender, is charged with delinquency, or is adjudicated delinquent for conduct that would not be considered criminal if committed by an adult as defined by W. Va. Code §49-4-701.

d) A child may enter foster care as a result of delinquent behavior which requires that they be placed in the least restrictive environment available where possible in order to avoid placement in a correctional facility.

A removal has not occurred in situations where legal custody is removed from the parent or relative and the child remains with the same relative in that home under supervision by the title IV–E agency.

## 1.13   Emergency Placement

State statute, W. Va. Code §49-4-303, authorizes Child Protective Services Workers to take a child into custody absent a court order in certain limited circumstances. According to the statute:

**a)** The child must be in an emergency situation which constitutes imminent danger;

**b)** A worker must have personally witnessed that the child is in imminent danger; and,

**c)** The worker must have probable cause to believe that the child will suffer additional child abuse or neglect or be removed from the county before a petition can be filed and temporary custody can be ordered.

**1.13.1** Child in Natural Disaster

Child Protective Services Social Workers may also take a child into custody absent   a court order when a child is abandoned and all reasonable efforts to make inquiries and arrangements with neighbors, relatives, and friends have been exhausted and the Department has explored the possibility of placing a worker in the home to care for the child until the parent returns.

Natural disasters may create abandonment circumstances. If a child or children should appear to be abandoned due to a natural disaster, emergency, or accident the worker will assume emergency custody of the child/children and follow the steps of filing a ratification. Once the ratification is granted, placement can be sought.

- When the emergency custody is granted then the worker will initiate placement of the child in emergency family care, foster/adopt care or emergency shelter care.

- If placement with family members, foster care or emergency shelter is not possible during a natural disaster or emergency situation, the child/children will be taken

D003107899

to an established disaster relief site by the worker.

- Workers will provide supervision to the unaccompanied child/children at the disaster relief site as needed.

- The worker will see that the child/children's basic needs are met during the disaster or emergency situation to the best of their ability.

When a request for emergency custody is ratified, the worker can retain custody of the child until the end of the next two judicial days unless a petition requesting temporary custody pending a hearing has been filed and custody of the child has been transferred to the department by court order.

- If the child's parents or family members are located before the end of the two judicial days, the child may be returned to the family at that time.

- If the family cannot be located, the worker will file the petition requesting temporary custody.

- If the family is located after the DoHS has requested and received custody of the child/children, the worker can return the child/children to the parent or family members and then request that the petition requesting custody be dismissed at the first court hearing.

Under certain circumstances a worker may determine that the implementation of a safety plan may require the immediate and involuntary removal of a child from the home. State statute, W. Va. Code §49-4-602, provides the worker the opportunity to file a petition requesting an immediate transfer of custody until a hearing can be held when:

a) There exists imminent danger to the physical well-being of the child; and

b) There are no reasonably available alternatives to the removal of the child.

Law enforcement may take custody of a child believed to be abused or neglected without a court order if one of the following conditions occurs:

a) The child is abandoned; or

b) The child requires emergency medical treatment by a physician and the child's parent or guardian refuses to permit such treatment or is unavailable to consent.

(See Child Protective Services Policy for guidelines detailing the policy and procedures for emergency placement.)

When the Department takes emergency custody of a child or receives custody of a child from law enforcement, the child's worker will enter the custody information on the custody status screen in CCWIS. The child's worker will also document removal information including the type of removal and reasonable efforts to prevent removal on the placement child removal screen in CCWIS.

D003107900

## 1.14    Temporary Custody

**1.14.1.**    Child Protective Services

In Child Protective Services cases, temporary custody of a child is sought when an immediate safety threat is identified and there are no family network safety resources available, and/or the parents/caregivers are unwilling to permit the worker to implement a protection plan.    In addition, when a child is determined to be unsafe and there are no safety resources available that can sufficiently ensure protection for the child(ren), the Department must utilize Foster Care services to keep the child(ren) safe, and pursue legal and physical custody from the court; that safety plan must include foster care placement and court jurisdiction.

(See Child Protective Services Policy for specific guidelines on court ordered custody.)

**1.14.2.**    Youth Services

In juvenile cases the court may order a youth who is an alleged status offender into the temporary custody of the Department.    The court may also place a juvenile in the temporary custody of the Department in lieu of placing the youth in a detention facility following a preliminary hearing.

When temporary custody has been granted, the worker must do the following:

a)    Provide services to the youth and their family that are designed to develop skills and supports within families and to resolve problems related to the juveniles or conflicts within their families in accordance with W. Va. Code §49-4-712;

b)    Petition the court for a valid court order, if necessary, to enforce compliance with a case plan or to restrain actions that interfere with or defeat a case plan; or

c)    Petition the court for a valid order to place a juvenile in a non-secure or staff-secure setting and/or to place a juvenile in the custody of the Department.

d)    The worker must make every effort to place a youth in community-based facilities which are the least restrictive alternatives appropriate to meet the needs and safety of the juvenile and the community.

(See Youth Services Policy for specific guidelines on court ordered custody.)

The following rights and responsibilities are retained by the parent when the Department has temporary custody of a child:

a)    The right to consent to marriage.

b)    The right to consent to enlistment in the armed forces.

c) The right to consent to adoption of the child.

d) The right to represent the child in legal actions.

e) The right to reasonable visitation with the child unless specifically restricted by court order.

f) The right to determine the child's religious affiliation until the child is able to determine this.

g) The right to consent to elective surgery.

h) The right to guardianship of the child's estate unless vested elsewhere.

i) The responsibility to provide for the child's financial support.

The Department has the following rights and responsibilities for a child in the temporary custody of the Department:

a) The right to determine the child's place of residence. (For youth who come into the custody of the Department via juvenile proceedings, the court has the ultimate authority in determining placement.)

b) The right to consent to trips for routine social, educational, or medical services.

c) The right to consent to travel for educational or cultural purposes or to take a vacation with the foster parents or with other residents of a group home or residential facility, as long as the trip is within the state. Any travel out-of-state must be approved by the child's parent/guardian's or by the court, if parental rights have not been terminated.

d) The right to consent to routine medical care such as immunizations, EPSDT Health Check screenings, and routine medical examinations.

e) The right to consent to major medical care in an emergency situation.

## 1.15    Permanent Custody/Guardianship

Permanent guardianship of a child applies when a parent's rights to a child have been terminated by the court or through a voluntary relinquishment. If both parents' rights have been terminated, then the child is considered a state ward.  If the state ward's permanency plan is adoption, both parents' rights must be terminated either by a voluntary relinquishment or court order.

If the termination of parental rights is via a court order, the court order shall specify all the parental rights to the child including the right to consent to adoption, marriage, visitation, etc., have been transferred to the Department.  Any obligation the parents had to financially support their child prior to termination must be addressed by the courts.

When a circuit court terminates parental rights either through an involuntary termination

D003107902

or a voluntary relinquishment, it must ordinarily require the terminated parent to continue to pay child support for the child pursuant to the Guidelines for Child Support Awards. If the court finds that it is not in the best interest of the child to order the parent to pay support pursuant to the Guidelines, the court may disregard the Guidelines, but must make specific findings on the record regarding such reasoning. The court also reiterated prior rulings that held obligation of support is owed to a child by both parents until such time as the child is placed in the permanent legal custody of another guardian/parent/obligor, such as in adoption.

The age of the child should be considered in terminating a parent's rights. If a child is 14 years of age or older or otherwise an age of discretion, the parents' rights should not be terminated without the child's approval. The child should be involved in evaluating the agency's interest and concerns for their future when developing the child's permanency plan. Whether a child is of an age of discretion is determined by the court.

In accordance with the Adoption and Safe Families Act, a petition must be filed or joined by the state as defined in W. Va. Code §49-4-605 to terminate the parental rights of a child who has been in the custody of the Department for 15 of the most recent 22 months. In addition, a petition must be filed to terminate the parental rights of a child if:

a) The child has been abandoned;

b) The court has determined that the parent has committed murder or voluntary manslaughter of another of their children;

c) The court has determined that the parent has attempted or conspired to commit such murder or voluntary manslaughter or has been an accessory before or after the fact of either crime;

d) The court has determined that the parent has committed unlawful or malicious wounding resulting in serious bodily injury to the child or to another of their children; or

e) The parental rights of the parent to a sibling have been terminated involuntarily.

The Department may determine not to seek termination of parental rights:

a) At the option of the Department the child has been placed with a relative;

b) The Department has documented in the child's case plan that there exists a compelling reason that filing a petition would not be in the best interest of the child; or

c) The Department has not provided, when reasonable efforts to return a child to the family are required, the services to the child's family the Department deems necessary for the safe return of the child to the home.

The local offices will annually report to the court the current status of all children the Department has been granted permanent guardianship of who have not been adopted. The report, in letter form, is to be directed to the circuit court through the prosecuting attorney's office. The child's name, birth date, legal status, and placement status are to

34

be reported. Any changes from the reporting for the previous year are also to be noted in the letter to the court.

## 1.16    Goals and Rights of Children in Foster Care

Entering foster care is a traumatic event for any child, no matter what circumstances lead to the removal from their caregivers. The Department strives to provide the best care possible for every child who is in the custody of the state. The Department works to meet the following goals for each child in foster care:

- Protection by a family of their own, and be provided readily available services and support through care of an adoptive family or by plan, a continuing foster family;
- Nurturing by foster parents who have been selected to meet their individual needs, and who are provided services and support, including specialized education, so that the child can grow to reach their potential;
- A safe foster home free of violence, abuse, neglect, and danger;
- The ability to communicate with the assigned social worker or case worker overseeing the child's case and have calls made to the social worker or case worker returned within a reasonable period of time;
- Permission to remain enrolled in the school the child attended before being placed in foster care, if at all possible;
- Participation in school extracurricular activities, community events, and religious practices;
- Communication with the biological parents. Communication is necessary if the child placed in foster care receives any immunizations and if any additional immunizations are needed, if the child will be transitioning back into a home with their biological parents;
- A bank or savings account established in accordance with state laws and federal regulations;
- Identification and other permanent documents, including a birth certificate, social security card, and health records by the age of sixteen (16), to the extent allowed by federal and state law;
- The use of appropriate communication measures to maintain contact with siblings if the child placed in foster care is separated from their siblings; and
- Meaningful participation in a transition plan for those transitioning out of foster care.

**Foster Child Bill of Rights**

The following rights are afforded to all foster children and youth involved in the child welfare system and are to receive a copy and thorough explanation of these rights from the child welfare worker. The following rights are to be provided and explained to all foster children and youths, and observed and followed by the child welfare worker:

Foster Care Policy
May 2024

D003107904

1) The right to live in a safe and healthy environment, and the least restrictive environment possible.
2) The right to be free from physical, sexual, or psychological abuse or exploitation including being free from unwarranted physical restraint and isolation.
3) The right to receive adequate and healthy food, appropriate and seasonally necessary clothing, and an appropriate travel bag.
4) The right to receive medical, dental, and vision care, mental health services, and substance use treatment services, as needed.
5) The right to be placed in a kinship placement, when such placement meets the objectives set forth in this article.
6) The right, when placed with a foster or kinship family, to be matched as closely as possible with a family meeting the child's needs, including, when possible, the ability to remain with siblings.
7) The right, as appropriate to the child's age and development, to be informed on any medication or chemical substance to be administered to the child.
8) The right to communicate privately, with caseworkers, guardians ad litem, attorneys, Court Appointed Special Advocates (CASA), the prosecuting attorney, or probation officers.
9) The right to have and maintain contact with siblings as may be reasonably accommodated, unless prohibited by court order, the case plan, or other extenuating circumstances.
10) The right to contact the department or the foster care ombudsman, regarding violations of rights, to speak to representatives of these offices confidentially, and to be free from threats, retaliation, or punishment for making complaints.
11) The right to maintain contact with all previous caregivers and other important adults in his or her life, if desired, unless prohibited by court order or determined by the parent, according to the reasonable and prudent parent standard, not to be in the best interest of the child.
12) The right to participate in religious services and religious activities of his or her choice to the extent possible.
13) The right to attend school, and, consistent with the finances and schedule of the foster or kinship family, to participate in extracurricular, cultural, and personal enrichment activities, as appropriate to the child's age and developmental level.
14) The right to work and develop job skills in a way that is consistent with the child's age and developmental level.
15) The right to attend Independent Living Program classes and activities if the child meets the age requirements.
16) The right to attend court hearings and speak directly to the judge, in the court's discretion.
17) The right to not be subjected to discrimination or harassment.

Foster Care Policy
May 2024

D003107905

18) The right to have access to information regarding available educational options.
19) The right to receive a copy of, and receive an explanation of, the rights set forth in this section from the child's guardian ad litem, caseworker, and attorney.
20) The right to receive care consistent with the reasonable and prudent parenting standard, and
21) The right to meet with the child's department case worker no less frequently than every 30 days.

It is vital for child welfare workers to be fully aware and have a thorough understanding of the role of the Foster Care Ombudsman and their authority and the violation of any of the above rights may be investigated by the Foster Care Ombudsman. December of each year, the Foster Care Ombudsman is required to summit an annual report of conducted investigations for the same calendar year. See section 8.5 of this policy for duties, authority, and responsibilities of the Foster Care Ombudsman.

# Section 2 INTAKE

## 2.1    Placement Standards/Regulations

### 2.1.1    Child Assessment Prior to Placement

The individual child's needs must be assessed prior to placement, if possible, so that an appropriate living situation can be chosen.  The child's assessment must include the following:

a)  The presenting problem necessitating the removal of the child;

b)  A summary of services that have previously or are currently being provided to address the problem;

c)  Current educational information;

d)  Current medical information;

e)  A history of separation, loss, and maltreatment;

f)  The child's physical, emotional, behavioral, and developmental characteristics; and

g)  The problems that are to be addressed in the case plan.

The child's worker will document the necessary information on the child assessment screen in CCWIS for voluntary placement and youth services cases or on the family assessment screen for children who come into foster care through child protective services.  Education information will be documented on the child's employment/education screen.  Immunization and health information will be documented on the child's medical screens. The child's characteristics will be documented on the child's client characteristics screen in CCWIS.

D003107906

**2.1.2**    Child's Placement Needs

When it becomes necessary to place a child into foster care, the selection of the placement resource (relative home, foster/adoptive home, group home, residential facility, or institution) will depend on the individual child and their situation. The following issues must be considered when making a placement decision:

a) The child's age;

b) The child's readiness to accept and participate in life in a different living situation;

c) The child's wishes, if appropriate;

d) The child's ability to perform the necessary daily living activities of grooming, eating, communication, etc.;

e) The family's dynamics and the relationship between the child and their family and community;

f) The child's psychological and emotional characteristics and development;

g) The child's medical needs (foster children with respiratory issues/illnesses **cannot** be placed with foster/adoptive parents who smoke);

h) Child's capacity to attend community schools and their ability to live in a community setting;

i) The placement that is the least restrictive (most family-like) setting to meet the child's needs;

j) The placement that is closest in proximity to the family to facilitate frequent visitation;

k) The placement that is in closest proximity to the child's school, if applicable;

l) The goal of the placement and identification of specific actions to be taken to correct the conditions that made the placement necessary;

m) Anticipated length of the placement; and

n) The permanency plan and the concurrent permanency plan for the child.

The child's worker will document the child's placement needs in the placement recommendation screen, the enter/exit placement screen, the placement safety evaluation screen, the placement plan and permanency plan screens, and the placement evaluation screen in CCWIS.

**2.1.3**    Kinship/Relative Placement

The child's worker must, according to federal law and W.Va. Code §49-4-601a, identify and review the child's relatives as possible placement resources before a child is placed into a non-relative foster/adoptive home or

38

D003107907

group/residential facility. Grandparents of the children should be considered for placement before other relatives or fictive kin of the child. Any person related to the child by blood or marriage, including cousins and in-laws, should be considered for kinship/relative care. A person the child considers a relative, such as a godparent or close family friend, may also be considered as a placement resource. S**ee Section 2.4.3 Relative/Kinship and Relative Foster/Adopt Placements for a detailed description of the Relative/Kinship placement process and notification requirements.**

**2.1.4**   Sibling Placements

State statute,  W. Va. Code §49-4-111 requires the Department to place siblings together when placing a child in foster care that also has siblings in care. Siblings are defined by  W. Va. Code §49-1-204 as children who have at least one biological parent in common or who have been legally adopted by the same parents or parent. Workers should consider what is in the best interest of the children. If children within the home consider themselves siblings, efforts should be made to place them together.

In all cases in which a child is to be placed, the worker must ask the child's caregivers, at the time of placement, if they have other children in foster care or other children for whom their rights have been terminated. If so, the worker must do the following:

**a)** Notify the foster or adoptive parents of the sibling that this child is available for placement;

**b)** Discuss with the foster or adoptive parents their interest in caring for this child;

**c)** Refer the family to the Homefinding Unit, or ICPC if the family resides out-of-state, as soon as possible if the foster or adoptive parents agree to care for the child entering foster care; and

**d)** Document in the child's case record in CCWIS the results of all contacts made to place children with their siblings and the reasons why siblings are not placed together on the permanency plan screen.

In cases of imminent danger, it may not be possible to initially place a child with their siblings. Every effort must be made to reunite siblings who are in foster care unless such a placement would not be in the best interest of one of the children. In such a case, the child's worker must ask the court to approve the separate placement of the siblings and judicially determine, based on clear and convincing evidence that it is not in the child's best interest to be placed in the same foster or adoptive home as their siblings and for the court to therefore sanction the sibling separation.

**2.1.5**   Multi-Ethnic Placement Act

Enacted by Congress in 1994, the *Multiethnic Placement Act (PL 103-382)* as amended by the *Interethnic Adoption Provisions in 1996 (PL 104-188)* forbids the Department from delaying or denying a foster or adoptive placement on the basis of the race, color, ethnicity, or national origin of the prospective foster parent, adoptive parent or the child involved. Therefore, race cannot be considered as a basis for which placement decisions are made.

A child may be placed either with foster or adoptive parents of the same race, color, ethnicity, or national origin or with foster or adoptive parents of a different race, color, ethnicity, or national origin depending on the prospective parent's ability to meet the child's needs as identified in the child assessment. A parent's wishes on the placement of their child with a family of the same race, color, ethnicity, or national origin cannot be a determining factor for placement. Likewise, placement of a child with a relative must be based on the ability of the relative to meet the child's needs and not based on the relative's similar race, color, ethnicity, or national origin.

**2.1.6**   Indian Child Welfare Act

The *Indian Child Welfare Act of 1978 (P. L. 95-608)* requires children of families that have American Indian ancestry to be referred to the tribe, in which ancestry is claimed for child welfare services.

If a child is placed in the custody of the Department and the child or their family is claiming American Indian heritage the worker must do the following:

a) If American Indian heritage is uncertain or the American Indian tribe is not known, the worker must review the record and discuss the child's background with the parents to try to discover the child's heritage.

b) If the child's background is still unknown, the child's worker must document this information in the child's record on the client information screens in CCWIS and that Indian heritage is spurious and/or a tribe cannot be located that can determine if the child is a member of that tribe or eligible for membership in the tribe.

c) If a Tribe is identified the worker must refer the child to the tribe for membership determination or membership eligibility.

d) If several tribes are suspected, contact must be made with each tribe. The child's worker must document that a tribe has been contacted to determine tribal membership.

e) If a tribe determines the child is not a member nor eligible for membership, the child's worker must document the response in the child's record.

f) If a tribe responds that the child is eligible for membership, the child's worker must request application forms. The child's parents must be contacted and the membership in the tribe explained to them.

40

**g)** If the parent enrolls the child in the tribe's membership, the child's worker must refer the case to the tribe's tribal court if the tribe has exclusive jurisdiction over child welfare matters.

**h)** The child's worker must contact the U. S. Department of Interiors Bureau for Indian Affairs to determine if the tribe has child welfare jurisdiction.

## 2.2    Placement Requirements

When the court grants the Department custody of a child and the child is placed in foster care, the worker must ensure that the following placement requirements are met unless they are modified by court order:

**a)** Visitation with the child shall be allowed on a regular scheduled basis at any reasonable time requested by the parents or legal guardian.  Visitation can only be limited or denied if there is a likelihood of danger of physical violence to the child or another person, or if custody was obtained because of physical or sexual abuse, and it is determined that it is necessary to deny, limit, or supervise visitation to protect the child.  Whenever visitation is denied or limited, the parents must be informed by the worker of the reasons why and the worker must document these reasons in CCWIS on the visitation plan screen. **Visitation is never to be limited or denied due to the child's inability or lack of motivation to progress in a placement program's treatment process.**

**b)** Children shall only be placed in those facilities which meet the Department's standards for adequate food, clothing, shelter, and supervision as defined by the Department's Home finding Policy, Child Placing, or Group Residential Licensing regulations.  In addition, children shall only be placed in a facility which has no more than the number of children for which it has been approved or licensed.

**c)** Children must be placed with siblings whenever possible and in the best interest of the children.

**d)** Each infant shall have a crib that meets federal standards for sleeping. At no time will infants share a bed with an adult; they must have their own crib. Foster parents will receive instruction on Safe Sleep during in-service training.

**e)** The child welfare worker will maintain regular contact with the child and foster placement.   The caseworker will contact the child at least once per calendar month or more frequently if needed (See Worker Contacts section for more information concerning worker contacts). All contacts must be documented on the client contact screen in CCWIS; face-to-face contacts must be documented within three business days.

**f)** The child welfare worker is required to complete the "Contact Form" for children placed in an emergency shelter, group care facility, or residential mental health treatment facility. This allows children in foster care to maintain constant contact with

D003107910

family, friends, etc., and informs shelter and facility staff who the child is permitted to have contact with, as well as in what circumstances restrictions may exist and to what extent.

g) When a parent or legal guardian wants to visit their child and cannot make reasonable arrangements to do so, the worker shall arrange the necessary transportation. Visitation must be documented on the family visitation log screen in CCWIS.

h) Phone calls between the parents or legal guardians and the child will be permitted daily at least five days a week at the option of the parent or child. There will be no charge to the parent or child when the child is placed outside the calling area of the parent. Telephone calls may be denied or limited when custody has been obtained because of physical or sexual abuse and denial or limitation of contact is necessary to protect the child. Whenever phone contact is denied or limited, the parents must be informed by the worker of the reasons why and the worker must document this in CCWIS on the visitation plan screen. An itemized telephone bill must be presented to the worker for verifications of the expenses incurred in order for the foster parents or the placement facility to be reimbursed through a demand payment in CCWIS.

i) As stated in W. Va. Code §49-2-1002(d), The individualized program of rehabilitation required by the provisions of subsection (c) of this section shall, for any juvenile in foster care placement, include a plan to return the juvenile to their home setting and transition the juvenile into community services to continue their rehabilitation.

Planning for the transition shall begin upon the juvenile's entry into the residential facility. The transition process shall begin thirty days after admission to the residential facility and conclude no later than three months after admission.

The Department of Human Services staff shall, during its monthly site visits at contracted residential facilities, ensure that the individualized programs of rehabilitation include a plan for transition in accordance with this subsection.

If further time in residential placement is necessary and the most effective method of attaining the rehabilitation goals identified by the rehabilitation individualized plan created under subsection (c) of this section, then the department shall provide information to the multidisciplinary team to substantiate that further time in a residential facility is necessary. The court, in consultation with the multidisciplinary team, may order an extension of time in residential placement prior to the juvenile's transition to the community if the court finds by clear and convincing evidence that an extension is in the best interest of the child. If the court finds that the evidence does not support an extension, the court shall order that the transition to community services proceed.

This applies to all children and youth in foster care regardless of how they came into care.

## 2.3   Preparation of Child for Placement

When a child is to be placed in foster care, they will need the support from their parents

42

D003107911

and the worker to get through the trauma of the experience.

Before the child is placed the following should occur:

a) The child's parents, if able, should explain to the child what has occurred in the family which necessitates their placement. The worker must explain the situation to the child if the parents are not able or are not available.

b) The worker must share information about the proposed placement in order to prepare the child for adjustment to the new surroundings. Information should be given in a forthright and honest manner so that the child and family have a true picture of the placement.

c) The worker should assure the child that they will visit frequently to talk about how the child is progressing in placement and to keep them informed of progress their parents are making.

d) The child should be allowed to freely ask questions to eliminate or lessen any fears or doubts they may have about the placement.

e) Pre-placement visits must be conducted, unless it is impossible or causes extreme hardship, in order for the child to feel they have a part in planning for their future and for them to become familiar with the foster family or facility in which they will be placed.

f) After the pre-placement visit, the worker shall discuss the child's impressions of the visit with the child and encourage the expression of any doubts or misgivings.

g) It is important that the child's impressions, and especially their fears and misgivings be shared with the prospective family or facility prior to the actual placement.

h) The child's worker will document the pre-placement or trial visit on the pre-placement/trial visit screen in CCWIS.

## 2.4    Placement Types

### 2.4.1    Emergency Foster Family Care

For children taken into custody on an emergency basis or after hours, placement in an emergency foster care home may be the appropriate if the child welfare worker is struggling to locate an appropriate kinship/relative placement or a temporary foster care placement. The placement has a time limit of 24 hours and must have the approval of the commissioner of the Bureau for Social Services and the agency director. If temporary placement has not been located within the 24-hour period and an extension must be granted for placement in the emergency foster care home, the child welfare worker must follow their chain of command to request an extension through the BSS commissioner and agency director.

Emergency placements must be clearly identified as such in CCWIS on the child's custody status screen and placement removal screen with appropriate

43

D003107912

documentation that emergency custody was obtained following the procedures outlined in Child Protective Services Policy.

2.4.2    Emergency Resource Home

These homes are a temporary placement for children whose living situation has, for various reasons, been disrupted. The child may be placed in an emergency resource home for up to seven days, including weekends and holidays, while the child welfare worker and supervisor actively search for a secure long term temporary placement for the child while working toward reunification or another form of permanency. Emergency resource homes, are certified through the department. The placement must be documented in CCWIS under "Emergency Shelter Home" to ensure the accurate daily rate is generated for payment to the resource home. The child welfare worker is required to make contact with the emergency resource home a minimum of twice during the week of placement, and more often as necessary to ensure the child's stability in the home.

2.4.3    Kinship/Relative Placement and Relative Foster/Adoptive Family

Relatives may not be approved as a placement resource until Department staff, or comparable agency staff in another state via ICPC, has assessed the relatives' ability to provide for the care and safety of the child. If Department staff, or comparable agency staff in another state via ICPC, finds that the relative can meet the certification requirements for becoming a foster/adoptive family, the relative may become certified as a foster/adoptive caregiver and receive boarding care each month. According to federal requirements, all relative caregivers who wish to become certified foster/adoptive parents must meet the same certification standards as non-related foster/adoptive parents, however, waivers for non-safety standards may be granted.

If the child's relatives cannot meet the certification requirements as determined by the Home Finding Unit, or comparable agency staff of another state via ICPC, or the child's relatives do not wish to become a certified foster/adoptive provider and receive monthly boarding care, the worker will report this finding to the court and ask for a reconsideration of the placement. If the court or the Multidisciplinary Treatment Team believes that this placement is in the best interest of the child, the child's worker will request that the court transfer legal custody of the child from the Department to the relative at disposition. The child's worker will inform the kinship/relative caregiver of the availability of TANF Child Only grants and assist the caregiver in filling out the necessary paperwork for the Division of Family Support. The child would also be eligible for Medicaid coverage through the TANF program to cover the child's medical needs.

**Note** When placing a child with a relative/kinship family who does not wish to participate in the process to become a certified foster/adoptive provider, the child's worker is still required to complete a general safety and well-being check of the relative's home, and the Homefinder will follow up with the completion of

D003107913

the Kinship/Relative Safety Screen form, a fingerprint based state and national criminal background check, and a child protective and adult protective services history check regarding the relative/kinship family.

When a child comes into foster care, placement preference should be given to grandparents of the child, followed by other adult relatives before consideration is given to any non-relative caregivers.  Placing a child who needs foster care placement with a relative is the least restrictive alternative living arrangement since this placement often allows for more interaction with the child's own family and relatives and often results in a less traumatic separation.  The child's caseworker must diligently search for relatives of the child and fictive kin within the first days of the child's removal and must identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster care or kinship/relative provider for the child. Such relatives and fictive kin can include but are not limited to:  all grandparents, all parents of a sibling of the child where such parent has legal custody of such sibling, other adult relatives of the child (including any other adult relatives suggested by the parents, adult siblings of the child, and adults who the child or parents may consider family but have no blood relation). The following steps must occur once a petition alleging child abuse and neglect has been filed with the circuit court of jurisdiction:

1) After a petition alleging abuse and neglect of a child is filed, the Department shall commence a search for every relative and fictive kin of the child.

2) No later than seven calendar days after the petition for removal has been filed, the Department shall file, with the Court, a list of all relatives and fictive kin of the child known to the Department at the time of the filing, whether or not those persons have expressed a willingness to take custody of the child.

3) Within seven days after the Department files the list of relatives and fictive kin as described above, any party to the case may file, with the Court, their own list containing names and addresses of relatives and fictive kin of the child.

4) The Department shall investigate and determine whether any of the persons identified in both lists filed are willing and able to act as foster care or kinship/relative providers to the child. The Department shall file its determinations with the Court within 45 days from the filing of the petition alleging abuse or neglect of the child.

The relative or fictive kin placement providers should receive information from the child's worker that includes the following:

a) Specifies that the child has been or is being removed from the custody of the parent or parents of the child;

45

D003107914

**b)** Explains the options the relative has under Federal, State, and Local law or Tribal law to participate in the care and placement of the child, including any options that may be lost by failing to respond to the notice;

**c)** Describes the requirements to become a foster family home and the additional services and supports that are available for the children in such a home; and

**d)** If the State/Tribal agency has elected to operate a kinship guardianship assistance program (See Legal Guardianship Policy).

The worker shall consider the following issues when placement with a relative is being considered:

**a)** If the relative has a criminal history or a substantiated Child Protective Services or Adult Protective Services history.

**b)** Careful evaluation indicates the relative will be supportive of the goals of the placement.

**c)** It appears that the child may be more accepting of separation from their own parents if they were to be placed with a relative with whom he is more familiar.

**d)** The child has formed a positive relationship with the relative and is already familiar with the life style and expectations of the relative's family.

**e)** The child, through placement with a relative, is able to maintain some relationship with their family.

**f)** The child's parents are supportive of the planned placement with the relative and will cooperate in the process.

**g)** An evaluation of the relative's home indicates that it would not perpetuate the same negative family patterns necessitating the removal from the child's own home.

**h)** The geographic proximity of the relative's home allows for continued planned involvement with the child's parents.

**i)** The relatives are capable of ensuring safety and meeting the needs of the child(ren).

2.4.4   DoHS Foster Family Care Homes

In some cases, especially when relative placement resources are non-existent, it may be appropriate to place a child in a non-relative foster/adoptive home. Family foster/adoptive care is a placement option in which services are provided by a person who has been certified to provide care in an out of home living situation. Family foster care may be an appropriate placement for a child when:

**a)** No relative or kinship placement is available or can be developed;

46

D003107915

b) The child can benefit from placement in a family setting and in a community where access is available to birth families, school, friends, and resources;

c) The family's situation indicates that the child will be able to return to their own home within a short period of time, or if reunification is not appropriate, that an adoptive family, legal guardian or other permanent placement for a child is being considered.

d) The child has been in residential care and placement with a family will ease the transition from residential care to the child's own home or other permanent placement.

### 2.4.5 Child Placing Agency Foster Care

Foster care agencies must have a Child Placing License with the State of West Virginia. Foster care may be considered as a possible placement option for any child who is in the Department's custody, especially when relative placement resources are not available. Foster care allows a child to benefit from an open environment where the child can be cared for by specially trained foster parents, have easy accessibility to caseworkers, and where appropriate community resources are available. Foster care through a child placing agency may be an appropriate placement for a child when:

a) No relative or kinship placement is available or can be developed;

b) The child can benefit from placement in a family setting and in a community where access is available to birth families, school, friends, and resources;

c) The family's situation indicates that the child will be able to return to their own home within a short period of time, or if reunification is not appropriate, that an adoptive family, legal guardian or other permanent placement for a child is being considered.

d) The child has been in residential care and placement with a family will ease the transition from residential care to the child's own home or other permanent placement.

### 2.4.6 Group Care

Group care provides the structure necessary for some children whose early experiences and relationships have been inadequate, distorted, or otherwise unproductive. Group care agencies must be licensed as Group Residential Facilities to provide all the necessary basic needs of a child on a 24 hour a day, seven day a week basis. Group care may be an appropriate placement option for an older child that has many of the following qualities:

a) The child has a close relationship with their parent and cannot or will not accept, even temporarily, a surrogate parent/child relationship of another family setting.

e) The child's parents would undermine a foster family placement because they cannot accept a surrogate parent for their child.

f) The child has a lifestyle that has been so disorganized, whose impulsive behavior is so poorly controlled, or whose problems include behavior which is so deviant or destructive that they need the structure, routine, and tolerance of group care living.

g) The child who has had a series of placements or other life experiences which have resulted in a loss of trust in others and who needs a placement resource where they can regroup their emotional strength and begin to relate to peers and adults at their own pace.

h) The child over age 16 whose permanency plan is emancipation.

2.4.7  Specialized Family Care Medley

This placement option may be considered as a possible resource if the child has the following issues:

a) The child is under the age of 18 years old and is in the custody of the Department;

i) The child is at-risk of institutionalization because the family can no longer provide care for the individual (at-risk); and

j) The child has been diagnosed as mentally and/or developmentally delays.

2.4.8  Residential Treatment Facility

Care in a residential treatment center is provided through licensed Group Residential Facilities which furnish extensive professional assistance for a child who has problems in the areas of learning, social, or motor skills and provides on campus educational programs to deal with severe learning deficits and acting out behaviors.  A residential treatment facility should be considered as a placement option if several of the following characteristics apply to the child:

a) The child's emotional disturbance is so severe as to require comprehensive, intensive treatment and services (i.e., individual and/or group psychotherapy, special educational needs, vocational training, social and cultural enhancement, after-care services) and on-site supervision.

k) The child has serious behavior deviations (i.e., severe aggression, chronic runaway, fire setting, sexual acting out, chronic truancy, legal or illegal substance usage, suicidal gestures, extreme temper tantrums, severe relationship problems, etc.)

l) The child is depressed, has low frustration tolerance, personality disorders, psychosomatic illnesses, emotional development, mild or severe forms of eating disorders, impaired thought or affect disorders, or exhibiting other symptoms of serious emotional and/or thought dysfunction.

D003107917

m) The child is a danger to themselves or others or is severely withdrawn

n) The child cannot function in a public-school setting because of their acting-out behavior and/or severe learning deficits.

o) The child needs extensive professional help in areas of social skills, learning skills, and/or motor skills.

p) The child exhibits pre-psychotic or psychotic symptoms that require a closed setting.

2.4.9    Psychiatric Residential Treatment Facility Care

Psychiatric Residential Treatment Facility care is the most restrictive type of care for children in foster care. A secure facility is used for treatment of children who have been clearly diagnosed as having a psychiatric, emotional, or behavioral disorder that is so severe the child is a danger to themselves or others. If possible, a voluntary commitment or placement should be utilized to lessen the trauma experienced by the child. When the child's behavior is so severe that it warrants involuntary commitment, the worker shall involve staff from the local behavioral health center and use the procedures outlined in *Chapter 27 of the West Virginia Code*.

The child's mental health needs must be assessed in terms of the physical, emotional, and behavioral symptoms before a referral is made for evaluation or placement. The child should exhibit a combination of the following symptoms:

a) Physical symptoms of a child that may indicate a need for psychiatric or psychological evaluation include such signs as accident proneness, backaches, body pains, dizziness, excessive eating, fainting, fatigue, headaches, heart complaints, poor appetite, tremors or tics, excessive vomiting, etc.

q) Emotional symptoms of a child that may indicate a need for psychiatric or psychological evaluation include anxiety, crying too easily, depression, destructibility, excessive daydreaming, excitability, or feeling of rejection, fear, hypersensitivity, inability to make social contacts, insecurity, extreme nervous tension, restlessness, suicidal thoughts, temper outbursts, extreme unhappiness, unusual shyness, withdrawal, etc.

r) Behavioral symptoms of a child that may indicate a need for psychiatric or psychological evaluation include aggressive actions, bed wetting, bullying, compulsively repeating destructive acts, masturbation, exhibitionism, extreme disobedience, unreasonable fighting, nail biting, nightmares, and over-conformity or anti-social/delinquent behaviors.

A child may also be placed in a Psychiatric Residential Treatment Facility (PRTF) under conditions including:

49

D003107918

a) At the request of the court in an effort to better understand the personality and behavior of the child.

s) Based on the recommendation of the child's doctor who may want to determine the basis of physical difficulties for which no physical cause can be found.

t) To determine mental capacity.

u) To determine a prognosis for treatment and to ascertain the conditions under which treatment can be provided most effectively.

2.4.10    Qualified Residential Treatment Programs (QRTP)

The QRTP model is part of a continuum of care for children who come into the foster care system, the goal of which is to allow children to receive the needed services in the least restrictive setting. A QRTP has a specific trauma-informed treatment model and integrates family into the treatment process for the child through the development of the Family and Permanency Team (FPT). CAPS for QRTP, conducted by a qualified individual through Acentra is required, and should always be initiated prior to the placement of the child in a QRTP to determine if the placement is in the best interest of the child.

A QRTP is a program that:

1) has a trauma-informed treatment model that is designed to address needs that include clinical needs, as appropriate, of children/youth with serious emotional or behavioral disorders or disturbances;
2) is able to implement the treatment identified for the child as recommended by the required CAPS for QRTP (described below);
3) facilitates outreach to the family members of the child, including siblings, documents how the outreach is made (including contact information), and maintains contact information for any biological family and kinship/relatives of the child;
4) integrates family into the treatment process for the child, including post-discharge planning and developing appropriate arrangements to maintain sibling connects; and
5) provides discharge planning and family-baes aftercare support for at least six months' post-discharge.

The target population is limited to males and females between the ages of 12 and 21 who:

1) are in the custody of the Department through either a child abuse/neglect petition, juvenile petition, or a voluntary placement agreement (VPA) for whom a residential program is in the youth's best interest; **and**
2) have demonstrated an inability to function in foster homes or less restrictive forms of residential care due to significant lack of behavioral control; **and**

50

3) have been diagnosed with Autism Spectrum Disorder that significantly impedes daily functioning, Reactive Attachment Disorder, serious Intellectual Disability, sexual offense behavior, Sexually Reactive Disorder, or are youth who are violent with serious behavioral disorders and youth with serious self-injurious behaviors, or any combinations of these diagnoses that place the child at a higher risk of out-of-state placement; **and**

4) have been assessed by a qualified individual through Acentra and determined to need the structure and mental health expertise provided by the services in the QRTP; **and**

5) need 24-hour treatment/intervention to prevent hospitalization; (e.g., the youth engaged in self-injurious behavior but not at a level of severity that would require psychiatric hospitalization, or the youth is currently physically aggressive and communicates verbal threats but not a level that would require hospitalization); **or**

6) need a step-down from a more restrictive level of care as part of a transitional discharge plan (e.g. behaviors/symptoms remain at a level which requires out of home care, but the placement plan has not been fully implemented.)

A) QRTP Placement Requirements

Prior to placement, workers should be initiating the CAPS for QRTP to ensure that the placement is in the best interest of the child. If a child cannot receive an assessment prior to placement, then the worker must immediately upon placement refer the child for an assessment with a qualified individual through Acentra.

CAPS for QRTP of the appropriateness of a QRTP placement:

1) Acentra's qualified individual must assess a child to determine the appropriateness of a placement in a QRTP for purpose of approving the case plan and the case system review procedure for the child (see description below) and (section 475A(c) of the Social Security Act).

2) The assessment should be completed prior to placement but must be completed within 30 days after the placement is made.

3) The qualified individual will maintain objectivity with respect to determining the most effective and appropriate placement for a child. Acentra's qualified individual must:

   a) assess the strengths and needs of the child using the CAPS assessments;

   b) determine whether the needs of the child can be met with the family members or through placement in a foster family home or, if not, which allowable residential program setting would provide the most effective and appropriate level of care for the child in the

least restrictive environment and be consistent wit the short and long term goals for the child, as specified in the permanency plan for the child;

   c) develop a list of child-specific short and long term mental and behavioral health goals; and work in conjunction with the child's family and permanency team (further description below) while completing the CAPS for QRTP.

4) If Acentra qualified individual determines the child should not be placed in a foster family home, the qualified individual must specify in writing:

   a) the reason why the child's needs cannot be met by the family or in a foster family home (a shortage of foster family homes is not an acceptable reason for determining the child's needs cannot be met in a family home); and

   b) why the recommended placement in a QRTP is the setting that will provide the child with the most effective and appropriate level of care in the least restrictive environment and how that placement is consistent with the short- and long-term goals for the child, as specified in the permanency plan for the child (see section 475A(c)(1) of the Social Security Act).

B) QRTP Family and Permanency Team Requirement

The Department must identify the members of the family and permanency team for the child placed in the QRTP and provide that information to Acentra. Acentra's qualified individual will then schedule the family and team permanency meeting in accordance with specified requirements.

1) The team must consist of all appropriate biological family members, kinship/relatives of the child, as well as professionals (as appropriate) who are a resource to the family of the child, such as teachers, medical or mental health providers who have treated the child, or clergy.

2) If the youth is age 14 or older, the team must also include the members of the permanency planning team for the youth that are selected by the youth in accordance with the title IV-E case planning requirements (section 475(c)(1)(B)(i) and (ii) of the Social Security Act).

**(See section 3 of the CAPS for QRTP Policy for specifics.)**

C) QRTP Case Plan Requirements

For a child placed in a QRTP, the Department must document the following in the child's case plan:

1) the reasonable and good faith effort of the agency to identify and include all the individuals required to be on the child's family and permanency team;

2) MDT meeting(s) where members of the family were given the opportunity to express who they wish to include as a member of the permanency team who is not already statutorily required;

52

D003107921

3) all contact information for members of the family and permanency team, as well as contact information for other family members and kinship/relatives who are part of the family and permanency team;

4) evidence that meetings of the family and permanency team, including meetings relating to the required CAPS for QRTP of the appropriateness of the QRTP placement, are held at a time and place convenient for family;

5) if reunification is the goal, evidence demonstrating that the parent from whom the child was removed provided input on the members of the family and permanency team;

6) the placement preferences of the family and permanency team relative to the required CAPS for QRTP that recognizes children should be placed with their siblings unless there is a finding by the court that such placement is contrary to their best interest;

7) if the placement preferences of the family and permanency team and child are not the placement setting recommended by the qualified individual conducting the required CAPS for QRTP of the appropriateness of the QRTP, the reasons why the preferences of the team and of the child were not recommended; and

8) the written recommendations by the qualified individual regarding the appropriateness of the QRTP placement (see section 475(A)(c)(1)(B)(iii) and (C), and 475A(c)(3) of the Social Security Act).

D) CAPS for QRTP Documentation

The worker will receive the completed CAPS for QRTP assessment from Acentra upon its completion and before day 30 of the child's placement in a QRTP, and in no case more than day 30 of the placement. To ensure all parties are notified and receive a copy of the assessment the following will occur:

1) Acentra's qualified individual will disseminate the assessment to the court, Guardian ad litem, the child welfare worker, and prosecuting attorney to ensure timeframes are met; and

2) the child welfare worker will then ensure that the family and members of the permanency team receive a copy of the assessment.

3) if the QRTP placement occurs prior to the completion of the assessment, Acentra's qualified individual will send a copy of the assessment to the QRTP facility. However, if the placement has not yet occurred at the time the assessment is completed, the child's worker with send a copy of the completed assessment to the QRTP facility once the placement occurs.

Once Acentra's qualified individual has met with the child to complete the assessment, it is **critical** that the child's worker receives the assessment prior to the 30th day of placement, if the youth has already been placed, and sooner when possible.

D003107922

E)  QRTP 60-Day Court Approval Requirement

Acentra's qualified individual is required to provide the completed CAPS for QRTP to the Court and MDT. Within 60 days of placement in QRTP the Court must review the placement decision and shall:

1)  Consider the required CAPS for QRTP of the appropriateness of the QRTP, and documentation made by the qualified individual conducting the assessment;
2)  Determine whether the needs of the child can be met through placement in a foster family home or, if not, whether placement of the child in a QRTP provides the most effective and appropriate level of care for the child in the least restrictive environment and whether that placement is consistent with the short and long-term goals for the child, as specified in the permanency plan for the child; and
3)  Approve or disapprove the placement. Such approval or disapproval must be documented in the case plan (see section 475(c)(2) of the Social Security Act).

If the CAPS for QRTP does not reflect the approval of the child being placed in the QRTP, yet the court orders the child to be placed in the QRTP regardless, the child's worker must document thoroughly in the child's case plan and the court screens the reason for the court ordering the placement against the recommendation of the CAPS for QRTP.

F)  QRTP Ongoing Review and Permanency Hearing Requirements

If a child remains placed in a QRTP, the Department shall submit evidence at each status review and each permanency hearing held for the child that:

1)  demonstrates that the ongoing assessment of needs and strengths of the child continue to support the determination that the needs of the child cannot be met through placement in a foster family home;
2)  the placement in a QRTP provides the most effective and appropriate level of care for the child in the least restrictive environment;
3)  the placement is consistent with the short and long-term goals for the child, as specified in the permanency plan for the child;
4)  documents the specific treatment or service needs that will be met for the child in the placement and the length of time the child is expected to need the treatment or services; and
5)  documents efforts made by the Department to prepare the child to return home or to be placed with a fit and willing relative, a legal guardian, or an adoptive parent, or in a foster family home.

Ongoing and periodic reviews must reflect evidence within each review hearing court order that the needs of the child cannot be met through placement in a foster family home, that the placement in a QRTP provides the most effective and appropriate level of care for the child in the least restrictive environment and that

54

D003107923

the placement is consistent with the short-term and long-term goals for the child, as specified in the permanency plan for the child.

G) QRTP Long-Term Placements

For every QRTP a child is placed in for more than 12 consecutive months or 18 nonconsecutive months (or, in the case of a child who has not reached age 13, placed for more than six consecutive or nonconsecutive months), the worker must include the following documentation in the child's case plan:

1) the most recent evidence submitted at each status review and/or permanency hearing demonstrating that the most recent residential treatment plan supports the continuation of placement in the QRTP;

2) documentation of treatment and/or service needs;

3) the steps and preparation made for the child's return home or another placement and the recommendation of the facilities aftercare plan for the child; and

4) documentation of the signed approval of the Commissioner of the Bureau for Social Services for the continued placement of the child in a QRTP setting beyond the federally determined timeframes stated above.

H) Requesting an Extension for Placement

1) At least three months before the expiration of the QRTP placement timeframe, the DoHS caseworker, through partnership with the members of the MDT and treatment staff of the QRTP, must form plans for next steps in the child's treatment or return to caregivers with aftercare services. If the DoHS caseworker believes that an extended stay in QRTP may be in the best interest of the child, preparations will need to be made for approval by the Commissioner. The reasons for extending the QRTP placement must be based on medical necessity. The lack of another placement option or the completion of an educational program is not acceptable or appropriate for an extension request. Continuation past the recommended timeframe is not a decision to be made without supporting CCWIS that display medical need and is not a decision that should be made by the DoHS caseworker alone.

2) At least two months prior to the expiration of placement, the child welfare worker will gather all relevant documentation related to the treatment being provided in the QRTP for review by the MDT. During the MDT meeting, the team will decide whether to recommend an extended length of stay and whether or not it is in the best interest of the child. At a minimum, the MDT will need the following to make its decision:

- The most recent assessment/evaluation completed by the QRTP related to medical need;

- The recommendation of the QRTP clinical professionals;

- Efforts made to seek treatment in the community that could be delivered in less restrictive settings than QRTP; and
- The QRTP's recommended discharge date and the aftercare services plan provided by the QRTP to support discharge.

3) Immediately after the MDT meeting is held, and extension of the QRTP is recommended, a memorandum will be developed that outlines the reasons why continuation in QRTP is in the best interest of the child. The memorandum must contain:
- The date of the most recent assessment/evaluation of medical need;
- The recommendations of the most recent assessment/evaluation of medical need;
- Efforts made to seek less restrictive treatment that could be delivered in a family setting, through foster care, kinship/relative care or a return home;
- The reasons why the youth cannot be returned to a less restrictive setting, with aftercare services provided to support the discharge and the aftercare plan;
- The date of the MDT meeting and agreement for extended QRTP placement.

The child welfare worker's supervisor will send the memorandum through the Social services manager up the chain of command to reach the Commissioner no later than five business days after the MDT meeting.

4) The Commissioner, or designee, will review the information provided by the child welfare worker and render a written decision via memorandum or email within seven business days unless there is a need for further information.
5) The child welfare worker will document the extension of the QRTP placement using the Placement Extension Screens provided for this purpose in CCWIS. The child welfare worker will file the memorandum seeking permission to extend placement and the written response received from the Commissioner in the child's case record.

Child welfare workers will refer to the Standard Operating Procedure for QRTP placement extension, to obtain further operational guidelines.

**(Please note any deviation from these guidelines will result in IV-E reimbursement disqualification.)**

I) Discharge and Aftercare

The W. Va. Code §49-4-409 provides requirements for after-care planning as it relates to children who are placed outside of the home. These plans are specific

56

D003107925

to what information is documented and should be specific to the child's individualized needs and the resources available in the child's community. Child welfare workers should adhere to W. Va. Code §49-4-409 requirements **(see section 4.6 of this policy)** in conjunction with the following requirements set forth by the Family First Prevention Services Act as described below.

The MDT shall begin planning for the discharge during the development of the long and short-term goals. The MDT shall meet at least 30 days prior to discharge to develop the plan for after-care services. Issues to consider in the development of the plan include:

1) remaining problems to be addressed;
2) appropriate placement for the child with consideration of issues of safety, permanency and well-being, and any remaining clinical needs; and
3) recommendations for behavioral, medical, and/or socially necessary services to support the needs of the child and family to prevent re-entry.

2.4.11    High Quality Residential Programs Specific to Vulnerable Youth

High quality residential care programs for vulnerable youth are specific to children and youth who enter foster care through a voluntary placement agreement (VPA) or court ordered removal who cannot be maintained safely in a home setting through the provision of prevention services and being placed in a residential program is the least restrictive and in the best interest of the child or youth.

A)    Target Population

A vulnerable youth is a young person under the age of 21 who has been, or is at risk of becoming a victim of sex trafficking as indicated by one or more of the following risk factors:

1) youth with runaway behaviors;
2) youth who have been abused and/or neglected;
3) youth who are homeless or have been homeless in the recent past;
4) youth who identify as lesbian, gay, bi-sexual, trans-sexual, or question their sexuality (LGBTQ);
5) youth with no meaningful connections to family and/or community;
6) youth who have experienced significant trauma;
7) youth who engagement in indiscriminate and/or unsafe sexual activities; and
8) youth with a history of involvement with the juvenile justice and/or child welfare system.

B)    Expectation from Programs that Serve

The high-quality residential facilities will provide sex trafficking prevention programming for all youth placed, which shall include the following components:

57

D003107926

1) education about sex trafficking (what it is and prevalence);
2) understanding one's vulnerabilities and how to protect oneself from traffickers;
3) enhancement or existing support system (family, friends, or community);
4) development of support systems when one does not exist;
5) service linkage, as needed, for housing, homelessness prevention, or educational support; and
6) runaway prevention programming.

High-quality residential programs are programs that:
1) operate with trauma-informed structure;
2) have staff trained in prudent parenting standards and have on-site, at least one officially who is designated to be a caregiver and is authorized to apply the reasonable and prudent parenting standard in decision making for youth regarding age and developmentally appropriate activities;
3) provide a nationally recognized behavioral health program for **known victims of sex trafficking**; and
4) provide opportunities for youth to experience the same normalizing activities as those of their peers not in foster care.

C)   There are differing levels of high-quality residential programs for vulnerable youth based on their degree of identified need and risk. It is vital for child welfare staff to understand, through the child or youth's assessment, the need based on previous sex trafficking victimization and/or the risk of becoming a victim or sex trafficking. Understanding the degree of trauma due to sex trafficking victimization or the risk of becoming a victim, will guide child welfare staff in determining the level of high-quality residential program necessary to address the need of the child or youth and prevent sex trafficking victimization.

The following tiers and services will be provided to the child and youth based on their level of need and risk.
1) Behavioral Health Programs for Vulnerable Youth: Level I with **mild** mental health needs who meet at least one of the risk factors listed above. This program provides the following:
    a) programs for sex trafficking prevention;
    b) behavioral health services, as indicated on the CANS, for youth who have experienced sex trafficking victimization;
    c) behavioral health services, as indicated on the CANS, to meet the unique needs of youth; and
    d) access to the appropriate education programs to meet the unique needs of the child or youth.

2) Behavioral Health Programs for Vulnerable Youth: Level II with **mild to moderate** mental health needs who meet at least one of the risk factors listed above. This program provides the following:
   a) programs for sex trafficking prevention;
   b) behavior health services, as indicated on the CANS, for youth who have experienced sex trafficking victimization;
   c) behavior health services, as indicated on the CANS, to meet the unique needs of youth; and
   d) access to the appropriate education programs to meet the unique needs of the child or youth.

3) Behavioral Health Programs for Vulnerable Youth: Level III with **moderate to severe** mental health needs who meet at least one of the risk factors listed above. This program provides the following:
   a) programs for sex trafficking prevention;
   b) behavior health services, as indicated on the CANS, for youth who have experienced sex trafficking victimization;
   c) behavior health services, as indicated on the CANS, to meet the unique needs of youth; and
   d) access to the appropriate education programs to meet the unique needs of the child or youth

4) Emergency Shelters for Vulnerable Youth who need emergency placement and/or require further assessment and meet at least one of the risk factors listed above. This program provides the following:
   a) emergency admission on a 24-hour, seven days per week basis;
   b) programs for sex trafficking prevention;
   c) crisis planning services/needs assessment (CANS);
   d) mental health services, as indicated, to stabilize youth who have experienced sex trafficking victimization;
   e) behavior health services, as indicated on the CANS, to meet unique needs of youth; and
   f) immediate access to public school, as per the McKinney-Vento Act and Every Student Succeeds Act (ESSA), for homeless children.

2.4.12    Pregnant and Parenting Youth

Programs for pregnant and parenting youth intersect with and include the basic structure of programs for vulnerable youth. Also, programs for pregnant and parenting youth have additional services and supports which include:
a) appropriate health care and health education;
b) education needs specific to the pregnant or parenting youth;
c) nutritional guidance and support;
d) counseling services specific to making decisions and planning for the child;
e) parenting educational services; and

59

    f)    maintenance of an environment conducive to the safety of children (infant through toddler) and pregnant women.

For additional information please see section 2.4.10 regarding programs for vulnerable youth.

2.4.13    Foster Children Who Accompany a Parent to a Licensed Substance Use Disorder Treatment Program

Children who are in the custody of the Department through an abuse and neglect petition according to W. Va. Code §49-1-101, may be placed with a parent who is receiving substance use disorder treatment through a licensed residential family-based treatment facility. The child may be placed with the parent receiving treatment for up to 12 months. The licensed substance use disorder treatment facility must provide services as set forth by the Family First Preventative Services Act (FFPSA) and the agreement between the facility and the Department. The licensed substance use disorder treatment facility must be capable of understanding, recognizing, and responding to the effects of all forms of trauma and be capable of carrying out the principles of a trauma-informed approach and trauma specific interventions to address the consequences of trauma and to facilitate healing for the parent.

A)    Required Services for the Parent

The licensed substance use disorder treatment facility will provide, or arrange to be provided through a trauma informed approach, the following services to the parent at the duration and frequency determined through the assessment process to meet the parent's therapeutic needs:
- parenting skills training;
- individual counseling;
- family counseling; and
- substance use disorder treatment.

**(Please note workers may refer to an ASO provider to provide services such as parenting, if the facility cannot provide the service to the client.)**

The designated provider(s) employed through the licensed substance use disorder treatment facility, responsible for providing the above listed services, will attend MDT meetings and court hearings as requested, and shall provide progress reports as requested or ordered by the court based on the provided services. Child welfare workers should be aware of and understand the confidentiality rules and regulations regarding substance use disorder treatment information and will adhere to required facility procedures in obtaining treatment records.

B)    Child Placing Requirements

60

D003107929

In order to place children in a licensed substance use disorder treatment facility with their parents, the child welfare worker must provide the following information to the facility:

- child's date of birth;
- child's social security number;
- child's medical care number;
- current social summary;
- the family case plan that clearly outlines that the placement is in the child's best interest; and
- the court order showing custody of the child has been transferred to the Department and the court order sanctioning the child's placement with the parent in the facility.

The child welfare worker is responsible for responding to the facility's request for additional information within one business day, and the facility is also responsible for responding to referrals sent by the child welfare worker within one business day. Upon acceptance the child welfare worker must provide the facility with requested information and a copy of the court order sanctioning placement. **\*Note**: DoHS child welfare staff must be physically present for the admission into the facility of all children in the Department's custody, and must sign in conjunction with the parents, all admission and consent forms required by the licensed substance use disorder treatment facility.

The licensed substance use disorder treatment facility is responsible for providing all children in the Department's custody who accompany their parents with the following services:

- room and board; and
- supervision, as needed for brief absences when the parent is receiving services/treatment.

C) Discharge Planning

Discharge planning for the family to transition back into the community will begin upon the entry into the program. The Department nor the provider will discharge a parent and child without an appropriate plan and living arrangement approved by the court, unless the court ordered the discharge, or there were emergency medical or mental health reasons.

The facility will notify the child welfare worker immediately under the following circumstances:

- if a child in foster care is left alone by the parent without making appropriate supervision arrangements for the child, (the facility will also notify the abuse and neglect hotline);

61

D003107930

- if a parent leaves the program with the child against medical advice or without the court's authority, (the facility will also notify the abuse and neglect hotline); and
- if the parent is being discharged from the program for noncompliance.

The facility is responsible for providing to the Department child welfare worker, copies of assessment and other pertinent information, not previously provided, at the time of discharge. The facility will also provide the child welfare worker with a discharge report when the parent and child exit the program.

The child welfare worker is also responsible for seeing the child monthly in the licensed substance use disorder treatment facility as required and ensuring that the child receives additional appropriate services as required or identified by the MDT and/or the court.

2.4.14    Emergency Shelter Care Facility

For older children removed from their homes on an emergency basis, placement in an emergency shelter care facility may be an appropriate option. Shelter care is designed to meet the child's emergent need for food, housing, and supervision and to provide a 30-day period for an organized effort to determine the best plan for the child's care. Placement in an emergency shelter care facility may be extended for an additional 30-day period if necessary.

Emergency placements must be clearly identified as such in CCWIS on the child's custody status screen and placement child removal screen with appropriate documentation that emergency custody was obtained following the procedures outlined in Child Protective Services Policy. Emergency shelter care may be appropriate when one of the following conditions exist:

a) The child is homeless.

b) The child would suffer serious permanent physical or emotional harm if not placed immediately.

c) There is no possibility of making temporary arrangements with relatives, neighbors, or friends and a foster home cannot be located.

d) Adequate time is needed to fully assess the child's placement needs to make the most appropriate placement for the child.

2.4.15    Out-of-State Placement/Interstate Compact on the Placement of Children

Interstate Compact for the Placement of Children (ICPC) is a legal agreement between West Virginia and other states as outlined in W. Va. Code §49-7-102 to regulate placement activities that occur between states. If a proposed placement is located outside the state of West Virginia, a referral through the Interstate Compact on the Placement of Children (ICPC) is required. Completed Interstate Compact on the Placement of Children referral packets must be forwarded, in

62

D003107931

triplicate, to the WV Interstate Compact on the Placement of Children office for all types of proposed out-of-state placements including parental placements, relative/kinship care placements, foster family care placements, specialized foster care placements, group care placements, residential care placements, and adoptive placements.

All out-of-state placements of children in the custody of the Department must be approved by the Interstate Compact Office of the receiving state prior to placement. Only the Compact Administrator in the receiving state is authorized to give approval for placement in their state. Any other approval source (i.e., court, probation officer, out-of-state facility) is not sufficient to meet the requirements specified in the state code.

West Virginia will treat the home study report from the receiving state, Indian Tribe or private agency under contract with the receiving state as meeting home study requirements unless the child's worker determines within fourteen (14) days that placement with the potential provider in the receiving state is contrary to the welfare of the child based on the content of the home study. Staff must not impose restrictions on other states to contract the completion of home studies from private agencies or qualified individuals as determined by the receiving state.

The custodial agency retains responsibility for the child placed out-of-state until the adoption is finalized, or the foster care placement is terminated. Courtesy supervision of the placement shall be requested by the child's worker through the Interstate Compact on the Placement of Children office within 10 days of the date of placement. Termination of services must have the concurrence of the Interstate Compact on the Placement of Children office in the receiving state.

Children should not be placed out-of-state unless one of the following conditions occurs:

a) The child is being placed with a relative who lives out-of-state.

b) The child is being placed with a family for adoption.

c) The child has a treatment need for which no service exists or can be created in a reasonable period of time in West Virginia.

d) The out-of-state placement is in closer proximity to the child's home than a comparable in-state program.

e) The child's current foster family moves out-of-state and the child's permanency plan indicates continued placement with this foster family.

2.4.16    Transitional Living

In some instances, a youth may wish to practice living semi-independently prior to final discharge from the foster care system. Experiential learning opportunities are available for these youth through the Transitional Living Placement option in

63

D003107932

which foster care youth establish their own household in the community but are supplied with the following support, supervision and services:

a) Ongoing social casework;

b) Continued life skills instruction;

c) Assistance with career planning and employment and job maintenance;

d) Scheduled face-to-face contact between the youth and caseworker in addition to regular phone contact;

e) Planned and unannounced home visits; and

f) Medical and behavioral health services, when needed.

Transitional Living Placements may be provided to youth at the age of 16 years old up to the age of 23 years old, but youth must meet certain criteria to be eligible for this type of placement. Youth must be at least 16 years old to receive independent living funds. Transitional Living Placements may be structured for youth who need extra support and supervision, or they may be structured for youth who are capable to semi-independent living. Transitional Living Placements may be supervised and supported by the youth's caseworker or they may be supported and supervised by a private transitional living agency. The type of Transitional Living Placement will be dependent on the youth's abilities and needs.

Youth residing in a Transitional Living Placement, under a private agency, are normally youth who need extra supports and supervision, and are progressing through two levels of supervision and responsibility.  Youth first entering this placement type are subject to a minimum of five hours of supervision/services a week, from the Transitional Living Placement staff (Phase Two - Part One.) As the tasks and responsibilities are achieved, youth gain more autonomy and require less supervision (Phase Two - Part Two.) (These services are authorized through the ASO Process)

The youth's worker must determine the youth's eligibility for Transitional Living Placement based on the following criteria prior to referral for placement supervised by a private agency or prior to placement in a Transitional Living Placement setting directly supervised by the youth's worker.

a) The youth is at least 16 years old but not more than 23 years of age;

b) The youth is demonstrating responsible behavior and can live independently;

c) The youth has completed their Life Skills Assessment;

d) The youth has basic living skills and can live independently;

e) The youth must be motivated to achieve goals, such as educational or employment; and

D003107933

f) The youth is pursuing an educational, employment, or some goal for independence. The youth must have a plan for activities of 40 hours a week.

For youth who meet the Transitional Living Placement eligibility criteria, the youth's worker will consult with the supervisor and the Multidisciplinary Treatment Team, if the youth is under 18 years old or under the court's jurisdiction. The youth's worker will consult with anyone involved in the youth's life, including the youth's current service providers, juvenile probation officer, and the youth's parents to present the youth's Transitional Living Plan and determine the best option for obtaining a Transitional Living Placement and necessary services.

## 2.5   Referral Process (Specific to Placement Type)

When referring a child for a specific placement, no matter the placement type, the child's worker must relay to the Home Finding Specialist, foster parent, kinship/relative care provider, or placement provider all information regarding the child's current situation including medical and mental health information (such as disclosure of communicable diseases such as HIV, AIDS or Hepatitis), education information, and information regarding the child's behavior, including a history of being a runaway and the most recent runaway episode.

Prior to referral the child's worker must document in CCWIS on the client characteristics screen, placement plan screen, and the placement recommendation screen the child's characteristics identified that make the specific placement type appropriate.  The child's worker must also document the appropriate information in CCWIS on the provider recommendation screen and the placement safety evaluation screen.

### 2.5.1   Emergency Shelter Foster Family Care Referral Process

Because of the need for the child to be removed from their home on an emergency basis and placed in a safe environment, there is no formal referral process for placing a child in emergency shelter foster family care. Nevertheless, when a child must be placed in an emergency shelter foster family home, information about the child and their family must be gathered.

The child's worker must perform the following actions:

a) Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, child's parents, etc., to discuss the child's placement needs.

b) Complete the family's and child's assessment, if not already done.

c) Compile the following necessary information:

1. Unified Case Plan for voluntary placement and youth services children or the Family Assessment for child protective services children.

2. Social summary of the child

3. School information

4. Psychological/psychiatric evaluation

5. Birth certificate

6. Social Security number

7. Immunization records

8. Medical information (including all information regarding communicable diseases/infections)

9. Copy of the court order granting the Department custody

d) If the above information is not available at the time of the referral, the child's worker will compile the information as soon as possible, but not longer than four weeks.

e) The child's worker must document the referral on the contact screen and placement recommendation screen in CCWIS.

**2.5.2**   Kinship/Relative Placement & Relative Foster/Adoptive Family Referral Process

Because of the need for the child to be removed from their home often on an emergency basis and placed in a safe environment, there is no formal referral process for placing a child in a kinship/relative placement. Nevertheless, when a child must be placed with a relative, information about the child and their family must be gathered.

The child's worker must perform the following actions:

a) Consult with the supervisor and the Multidisciplinary Treatment Team, if applicable, including the child's current service providers, child's parents, etc. to discuss the child's placement needs.

f) Complete the family's and child's assessment, if not already done.

g) According to the W. Va Code §49-4-114(a)(3) for purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once any such grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable foster/adoptive parents, it shall

66

D003107935

assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective foster/adoptive parents.

h) Once the child's worker determines that a kinship/relative placement is needed, the child's worker must assess the relative's home for general safety and well-being concerns prior to placing a child in the relative's home and/or making a referral for certification. The child's worker will complete the Kinship/Relative Home Study Request form and submit such to the Homefinding Unit within 24 hours. A Homefinding Specialist will visit the kinship/relative home within five calendar days of placing a child in the home. The Homefinding Specialist would then begin the Kinship/Relative Safety Screen form at this initial visit and would thereafter have 90 days to complete the screen. The Homefinding Specialist will immediately make arrangements to obtain criminal background checks and APS/CPS background checks for the relative and all adult members of their household.

i) The child's worker must document the referral on the placement recommendation screen and on the contact screen in CCWIS.

**\*Note\* When placing a child with a kinship/relative family who does not wish to participate in the process to become a certified foster/adoptive provider, the child's worker is still required to complete the Kinship/Relative Home Study Request form of the relative's home, and the Homefinder will follow up with the completion of the Kinship/Relative Safety Screen form, a fingerprint based state and national criminal background check, and a Child Protective and Adult Protective Services history regarding the kinship/relative family. For children who are removed on an emergency basis because of abuse or neglect the provisions in the Child Protective Services Policy legal requirements and processes must be followed. This policy is online in CCWIS.**

**2.5.3** Foster/Adoptive Family Care Referral Process

When a child must be placed in foster care and it is determined that a foster/adoptive placement is appropriate for the child, information about the child and their family must be shared with the Homefinding Unit.

The worker will do the following actions:

b) Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, the child's parents, etc., to discuss the child's placement needs.

c) Complete the family's and child's assessment, if not already done.

d) Compile the necessary information as a referral packet to be forwarded to the Homefinding Unit for their determination on appropriate placement. The child's worker must provide information about the child and their family in a factual and forthright manner that accurately portrays the child's situation.

Foster Care Policy
May 2024

D003107936

The referral packet to be sent to the Homefinding Unit should include the following information:

1. Unified Case Plan for voluntary placement and youth services children or the Family Assessment for child protective services children

2. Social summary of the child

3. School information

4. Psychological/psychiatric evaluation

5. Birth certificate

6. Social Security number

7. Immunization records

8. Medical information (including information regarding any and all communicable diseases/infections)

9. Copy of the court order granting the Department custody

e) If the above information is not available at the time of the referral, the child's worker will compile the information as soon as possible. This should not take longer than four weeks.

f) The child's worker must document the referral on the document tracking and placement recommendations screens in CCWIS.

### 2.5.4 Child Placing Agency Referral Process

If the Home Finding Unit does not have an available family that can meet the child's needs, the child's worker must undertake the following activities:

a) Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, juvenile probation officer, child's parents, etc., to discuss the child's placement needs.

b) Complete the family and child assessment, if not already done.

c) Compile the necessary information as a referral packet to be sent to the appropriate child placing agency for their determination on appropriate placement. The child's worker must provide information about the child and their family in a factual and forthright manner that accurately portrays the child's situation. The referral packet to be sent to the child placing agency should include the following information:

1. Family Focused Treatment Association (FFTA) Form

2. Child, Youth and Family Case Plan or YS Youth Case Plan

3. Social summary of the child

D003107937

4. School information

5. Psychological/psychiatric evaluation

6. Birth certificate

7. Social Security number

8. Immunization records

9. Medical information (including information regarding all communicable diseases/infections)

10. Copy of the court order granting the Department custody

d) If the above information is not available at the time of the referral, the child's worker will compile the information as soon as possible. This should not take longer than four weeks.

e) If the foster/adoptive home is located outside the state of West Virginia, a referral through the Interstate Compact on the Placement of Children is required and the receiving state Interstate Compact on the Placement of Children office must give approval prior to placement.

f) The Department is not to contact the foster/adoptive family directly to request a placement. The child placing agency's administrative office is to be contacted with the appropriate information for a referral. The child placing agency will then determine if it has an appropriate foster/adoptive family that can best meet the needs of the child based on the referral packet.

g) If the agency to which the child was referred decides to proceed further with the placement, the child's worker will participate in the intake interviews and pre-placement visits with the child placing agency and the foster/adoptive family.

h) The referral must be documented on the contact and placement recommendation screens in CCWIS.

### 2.5.5  Group Care Referral Process

When a child is to be placed in a licensed group care facility the worker must undertake the following activities:

a) Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, juvenile probation officer, child's parents, etc., to discuss the child's placement needs.

b) Complete the family and child assessment if not already done.

c) Complete the necessary information on the automated placement referral screen to be sent to appropriate group care facilities for their determination on appropriate placement. The child's worker must provide information about the child and their family in a factual and forthright manner that

D003107938

accurately portrays the child's situation. The following information is mandatory for the automated referral in CCWIS:

1. Child's full name

2. Parents' names

3. Permanent home address

4. Relationships: two parents and all siblings

5. Custody status

6. Removal

7. Date of birth

8. School information

The referral to be sent to the group care agency should include the following information:

1. Unified Case Plan

2. Social summary of the child

3. Psychological/psychiatric evaluation

4. Birth certificate

5. Social Security number

6. Immunization records

7. Medical information (including any and all information regarding communicable diseases/infections)

8. Copy of the court order granting the Department custody

9. Permanency Plan/Concurrent Plan

10. Placement Plan

11. Visitation Plan

d) If the above information is not available at the time of the referral and is not mandatory, the child's worker will compile the information as soon as possible. This should not take longer than four weeks.

e) If the group care agency is located outside the state of West Virginia, a referral through the Interstate Compact on the Placement of Children is required and the receiving state Interstate Compact on the Placement of Children office must give approval prior to placement. The automated referral process does not apply; however, the automated placement referral can be printed and used as part of the referral packet.

f)  If the agency to which the child was referred decides to proceed further with the placement, the child's worker will participate in the intake interviews and pre-placement visits with the group care agency.

g)  Prepare the child and their family for such interviews and visits. They should understand the purpose of the interviews, who will be present and why, what may be discussed, travel and visit time involved, anticipated expenses if applicable, the physical setting of the agency, and the nature of the agency's program.

h)  If a child is entering a group care agency from a foster/adoptive family home, it may be advisable to involve the foster/adoptive parents in the intake and placement visits, especially if the goal for the child is to return to the foster/adoptive parent's home after discharge from the facility.

### 2.5.6  Specialized Family Care (Medley) Referral Process

When a child meets the criteria for the Specialized Family Care program, the child's worker must undertake the following activities:

a)  Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, mental health provider, parents, etc., to discuss the child's placement needs.

b)  The worker will develop a referral packet consisting of the following information:

  1.  A current social history

  2.  Current psychological

  3.  Medical summary, and

  4.  Educational plan.

c)  This packet must then be sent to the Specialized Family Care Program Manager.

d)  The Specialized Family Care Program Manager will review the information to determine if the child meets the at-risk eligibility requirement.

e)  The child will then be assessed by a Family Based Care Specialist to determine if Specialized Family Care can meet the child's needs.  This determination evaluates the child's current developmental status, current habilitation program, and community programs which can meet the child's needs.

f)  If the child is accepted into the program, a search will be conducted by the Specialized Family Care Program Manager to determine if a suitable home is available for the child.

D003107940

g) If the child is eligible for Medicaid Personal Care services, the local comprehensive mental health or community behavioral health agency must be notified to initiate the Nursing Plan of Care.

h) If the child is not eligible for Personal Care Services, the child's community mental health case manager and the child's worker will arrange for reimbursement above the boarding care rate prior to placement.  This reimbursement may be through the Title XIX Waiver program or through additional social service funds.  The use of additional social service funds must be approved by the Foster Care Program Specialist prior to placement.

i) The child's worker and their supervisor must concur with the placement plan developed by the Specialized Family Care Program.

j) The child's worker will document the referral in CCWIS on the contract and placement recommendation screens.

**2.5.7**   Residential Treatment Facility Referral Process

When a child is to be placed in a licensed residential facility the worker must undertake the following activities:

a) Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, juvenile probation officer, parents, etc., to discuss the child's placement needs.

b) Complete the family and child assessment if not already done.

c) Complete the necessary information on the automated placement referral screen to be sent to appropriate residential facilities for their determination on appropriate placement. The child's worker must provide information about the child and their family in a factual and forthright manner that accurately portrays the child's situation.  The following information is mandatory on the automated referral in CCWIS:

    1. Child's full name

    2. Parents' names

    3. Permanent home address

    4. Relationships; two parents and all siblings

    5. Custody status

    6. Removal

    7. Date of birth

    8. School information

The referral to be sent to the residential facility should include the following information:

D003107941

1. Unified Case Plan

2. Social summary of the child

3. Psychological/psychiatric evaluation

4. Birth certificate

5. Social Security number

6. Immunization records

7. Medical information (including any and all information regarding communicable diseases/infections)

8. Copy of the court order granting the Department custody

9. Permanency Plan/Concurrent Plan

10. Placement Plan

11. Visitation Plan

d) If the above information is not available at the time of the referral and is not mandatory, the child's worker will compile the information as soon as possible. This should not take longer than four weeks.

e) If the residential facility is located outside the state of West Virginia, a referral through the Interstate Compact on the Placement of Children is required and the receiving state Interstate Compact on the Placement of Children office must give approval prior to placement.  The automated referral process is not applicable for out-of-state referrals; however, the automated placement referral can be printed and used as part of the referral packet.

f) If the residential facility to which the child was referred decides to proceed further with the placement, the child's worker will participate in the intake interviews and pre-placement visits with the group care agency.

g) Prepare the child and their family for such interviews and visits. They should understand the purpose of the interviews, who will be present and why, what may be discussed, travel and visit time involved, anticipated expenses if applicable, the physical setting of the facility, and the nature of the facility's program.

If a child is entering a residential facility from a foster/adoptive family home, it may be advisable to involve the foster/adoptive parents in the intake and placement visits, especially if the goal for the child is to return to the foster/adoptive parent's home after discharge from the facility.

### 2.5.8 Psychiatric Residential Treatment Facility Referral Process

When placement is needed in a Psychiatric Residential Treatment Facility foster care setting, the worker shall secure written medical documentation that

D003107942

psychiatric residential treatment is the recommended placement. The worker shall secure all the appropriate approvals necessary for seeking this type of placement for a child including the following activities:

a) The worker shall contact the appropriate facilities that have adolescent units for treatment of mentally ill children. When consideration is being given to psychiatric hospitalization, all planning shall be done in consultation with the Multidisciplinary Treatment Team, including a representative of the local community mental health center.

b) If no in-state facility is available to meet the child's needs, the protocol for out-of-state placements must be followed.

c) First consideration shall be given to facilities that have a current contract with the Bureau for Social Services and/or have been approved as a West Virginia Medicaid provider. If the facility is not a West Virginia Medicaid provider and the Bureau for Social Services is being considered as a payment source, a formal contract must be prepared by the Bureau for Social Services and signed by the Director before the placement occurs.

d) If the facility is an approved WV Medicaid provider, All efforts should be made to explore insurance and other sources of payment prior to the request for payment by the Bureau for Social Services for any type of inpatient hospitalization.

e) The worker shall explore eligibility for special educational services. When making a referral for Psychiatric Residential Treatment within the State of West Virginia the worker must utilize the following Automated Placement Referral process:

   a. Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, juvenile probation officer, parents, etc., to discuss the child's placement needs.

   b. Complete the family's and child assessment if not already done.

   c. Complete the necessary information on the automated placement referral screen to be sent to appropriate psychiatric residential facility for their determination on appropriate placement. The child's worker must provide information about the child and their family in a factual and forthright manner that accurately portrays the child's situation. The following information is mandatory on the automated referral in CCWIS:

      1. Child's full name

      2. Parents' names

      3. Permanent home address

      4. Relationships; two parents and all siblings

74

D003107943

5. Custody status

6. Removal

7. Date of birth

8. School information

The referral to be sent to the psychiatric residential facility should include the following information:

1. Unified Case Plan

2. Social summary of the child

3. Psychological/psychiatric evaluation

4. Birth certificate

5. Social Security number

6. Immunization records

7. Medical information (including any and all information regarding communicable diseases/infections)

8. Copy of the court order granting the Department custody

9. Permanency Plan/Concurrent Plan

10. Placement Plan

11. Visitation Plan

f) If the above information is not available at the time of the referral and is not mandatory, the child's worker will compile the information as soon as possible. This should not take longer than four weeks.

g) If the psychiatric residential facility is located outside the state of West Virginia, a referral through the Interstate Compact on the Placement of Children is required and the receiving state Interstate Compact on the Placement of Children office must give approval prior to placement. The automated referral process does not apply; however, the automated placement referral can be printed and used as part of the referral packet.

h) If the psychiatric residential facility to which the child was referred decides to proceed further with the placement, the child's worker will participate in the intake interviews and pre-placement visits with the group care agency.

i) Prepare the child and their family for such interviews and visits. They should understand the purpose of the interviews, who will be present and why, what may be discussed, travel and visit time involved, anticipated expenses if applicable, the physical setting of the agency, and the nature of the agency's program.

D003107944

j)  If a child is entering a psychiatric residential facility from a foster/adoptive family home, it may be advisable to involve the foster/adoptive parents in the intake and placement visits, especially if the goal for the child is to return to the foster/adoptive parent's home after discharge from the facility.

### 2.5.9    Emergency Shelter Care Facility Referral Process

Because of the need for the child to be removed from their home on an emergency basis and placed in a safe environment, there is no formal referral process for placing a child in an emergency shelter care facility. Nevertheless, when a child must be placed in foster care on an emergency basis and it is determined that emergency shelter care is an appropriate placement for the child, information about the child and their family must be compiled in a timely manner.

The worker must do the following:

a)  Consult with the supervisor and the Multidisciplinary Treatment Team, including the child's current service providers, parents, juvenile probation officer if applicable, etc., to discuss the child's placement needs.

b)  Complete the family and child assessment, if not already done.

c)  Compile the following necessary information:

1.  Unified Case Plan

2.  Social summary of the child

3.  School information

4.  Psychological/psychiatric evaluation

5.  Birth certificate

6.  Social Security number

7.  Immunization records

8.  Medical information (including any and all information regarding communicable diseases/infections)

9.  Copy of the court order granting the Department custody

d)  If the above information is not available at the time of the referral, the child's worker will compile the information as soon as possible, but not longer than four weeks.

e)  The child's worker must document the referral in CCWIS on the contact and placement recommendation screens.

**Note: For those children who are removed on an emergency basis because of abuse or neglect the provisions in the Child Protective Services Policy legal requirements and processes must be followed. This policy is online in CCWIS.**

D003107945

**2.5.10** Out-of-State Placement/Interstate Compact on Placement of Children Referral Process

A child may be referred for an out-of-state placement by the child's worker who, with the assistance of the Multidisciplinary Treatment Team, has determined that there are no resources available to meet the child's needs in West Virginia. In addition, the court may also order a child in the Department's custody into an out-of-state facility after it has been determined as a placement resource. When a child is to be placed out-of-state the child's worker must take the following actions:

a) A Multidisciplinary Treatment Team meeting and a district/county staffing must be held to review the placement plan for the child.

b) All appropriate in-state options must be explored and determined that they are either not available or not accessible.

c) An Interstate Compact Placement Request *(ICPC-100A)* is completed in CCWIS, signed, and submitted, along with the referral packet information outlined below, in triplicate to the Interstate Compact Administrator in the Office of Social Services.

d) A referral packet is developed and sent to the Regional Program Manager and the Interstate Compact on the Placement of Children Administrator simultaneously. This packet must contain the following:

    1.) The Request for Approval of Out-of-State Placement form detailing the child's placement situation including the following:

        **a.** Lack of appropriate placement within the state

        **b.** Statement regarding the child's educational status, including if the child is eligible for or is currently receiving special education services

    2.) Court order with findings in accordance with §49-7-101 Article 3 for proposed placement of adjudicated delinquents in out-of-state residential care.

    3.) *ICPC-100A* Interstate Compact Placement Request

    4.) Court order granting the Department custody and specifying the out-of-state facility, if applicable.

    5.) Psychological or other clinical evaluation done within the past six (6) months.

    6.) Sex offender assessment if appropriate

    7.) Substance use disorder assessment if appropriate

    8.) Social/intervention history

    9.) Social/intervention history

D003107946

10.) Social/intervention history

11.) Documentation of Multidisciplinary Treatment Team attendance

12.) Documentation of Title IV-E eligibility (copy of the most current IV-E determination/review) if a medical card in the receiving state is being requested.  A medical card in the receiving state may not be requested if the placement facility is funded by WV Medicaid.

e)  The referral packet is then reviewed by the Regional Program Manager.  If the packet is incomplete, it will be returned to the child's worker for completion and re-submission.   If an alternative plan appears feasible, the Regional Program Manager will work with the child's worker to pursue this plan.

f)  If the packet is complete and the placement is appropriate, then the Notification of Approval form is completed by the Regional Program Manager and submitted to the Interstate Compact on the Placement of Children Administrator and the Out-of-State Program Specialist in the Office of Social Services for their approval.

g)  Questions and concerns related to legal issues will be forwarded to the regional Attorney General for review and consultation.

h)  The Commissioner will review the information and provide a decision on the out-of-state placement.

i)  The Interstate Compact on the Placement of Children Administrator will send the pertinent material and *ICPC 100-A* to the receiving state.  The child cannot be placed until approval is given by the receiving state Compact Administrator. When approval is received, the worker may arrange to place the child in the facility.

j)  Staff will treat any home study report completed by the receiving state, Indian Tribe, or private agency under contract with the receiving state as meeting home study requirements unless the child's worker determines within fourteen (14) days that placement with the potential provider in the receiving state is contrary to the welfare of the child based on the content of the home study.

k)  Interstate Compact approval is documented by the signature of the receiving state Compact Administer on the *ICPC-100A* form.

l)  The child's worker must document the referral in CCWIS on the contact and placement recommendation screens.

**2.5.11**  Transitional Living Referral Process

When a youth is going to be placed under the supervision of a private agency for transitional living services the youth's worker must take the following actions:

**1.**  Complete the family's and youth's assessment, if not already done;

D003107947

m) Complete the youth's Transitional Living Plan, if not already done;

n) Compile the necessary information as a referral packet to be sent to appropriate transitional living providers for their determination on appropriate placement.  This information should include:

   a.  Transitional Living Placement Referral form, if applicable

   b.  Youth, Youth and Family Case Plan or YS Youth Case Plan

   c.  Life Skills Assessment

   d.  Social summary of the youth

   e.  School information

   f.  Psychological/psychiatric evaluation

   g.  Original Birth Certificate

   h.  Social Security number

   i.  Immunization records

   j.  Medical information

   k.  Placement history

   l.  Copy of the court order granting the Department custody

o) If the above information is not available at the time of the referral, the youth's worker will compile the information as soon as possible.  This should not take longer than four weeks.

p) Schedule and participate in the intake interviews and pre-placement visits for the youth and their family with the prospective Transitional Living Placement agency. Transportation must be provided to the placement if necessary.

q) Prepare the youth and their family for such interviews and visits.  They should understand the purpose of the interviews, who will be present and why, what may be discussed, travel and visit time involved, anticipated expenses if applicable, the physical setting of the placement, and the nature of the agency's program.

r) If a youth is entering a Transitional Living Placement from a family foster care home, it may be advisable to involve the foster parents in the intake and placement visits.

s) If the agency accepts the youth for placement or if the placement is going to be supervised directly by the Department, the youth's worker shall arrange a date for the placement.

If a youth is going to be in a DoHS staff supervised Transitional Living Placement, the youth's worker must provide the following to the youth:

79

D003107948

2. Original birth certificate

3. Social security card

4. Immunization records

5. Medical information

6. Psychological/psychiatric evaluation

7. School information

8. Placement history

9. Any other information deemed necessary to assist the youth in their transition and placement.

## 2.6    Placement

### 2.6.1.    Diligent Search

Absent/Unknown Parent and Relative Search

WV Foster Care Policy and the Fostering Connections to Success and Increasing Adoption Act of 2008 (federal legislation) require caseworkers to conduct a diligent search, particularly within the first thirty (30) days of a child entering custody. A successful diligent search will benefit the child by providing them with a potential placement with a kinship/relative or with possible lifelong significant connections. A diligent search is done in order to:

- Locate/contact non-custodial parents
- Establish placement options
- Preserve continuity of relationships and lifelong connections for children
- Ensure child safety, permanency, and well-being
- Locate/contact maternal and paternal relatives and "fictive" kin
- Place children in least-restrictive environment possible

The search for absent or unknown parents and relatives, both paternal and maternal, is vital because it is a way to preserve connections for children who have been removed from their immediate family. **An absent parent or a relative can also serve as a placement resource for the child** which could result in a permanent placement if the child does not return home.

Absent or unknown parents should always be named as respondents in child abuse and/or neglect cases, at the initial filing of the petition. The search for an absent or unknown parent must occur within the first thirty (30) days of the child entering placement, so the parent can be involved in the court process, MDT, case planning process, visitation plan, and any other aspect of the case.

The search for relatives must occur within the first 30 days of the child entering placement to successfully implement concurrent planning and to adequately find the best placement for the child. This does not mean that workers should wait to identify appropriate relatives for placement or stop searching for appropriate relatives if none are found in the first 30 days. A kinship/relative placement resource is defined as any person related to the child by blood or marriage, including cousins and in-laws, or a person the child considers a relative, such as a godparent or close family friend. When possible, appropriate relatives should be identified and screened as soon as a child comes into care so the homestudy can be initiated.

a) Absent or Unknown Parents

The following steps must be taken to locate absent or unknown parents:

1. If one of the child's parents is not known to the Department, the child's worker must initiate efforts immediately to locate the absent or unknown parent by obtaining information from the known parent or guardian of the child, by utilizing the SEARCH Screens in CCWIS to search OSCAR Records, utilizing the court or MDT to obtain information from the known parent, obtaining information from known relatives of the child, obtaining information from the local Child Support Office or Family Support Office, or obtaining information from any other source available. The efforts to locate an absent or unknown parent must occur within thirty (30) days of the child entering placement and/or custody.

2. Once the information has been obtained about an absent or unknown parent, the child's worker must attempt contact with the parent in person, by telephone, mail, fax, or any other means necessary to ensure that every effort has been made to involve them in their child's case.

3. When an absent or unknown parent is contacted and has not been made a party of the court proceeding, the child's worker must contact the prosecutor to have the parent made a party to the court proceeding immediately. If there are any reasons to question the relationship between the parent and the child, the worker should request that a paternity or maternity test be completed on the child and parent.

4. The child's worker must establish or modify a visitation plan in accordance with the Foster Care Policy, Visitation with Parents and Extended Family, for an absent or unknown parent, who has been contacted and made a part of the child's case, within 14 days of contacting the parent.

5.    The child's worker must document all efforts to contact an absent or unknown parent under the contacts screen in CCWIS and maintain any written documentation, such as returned mail, in the paper file.

6.    There may be situations when it may not be in the best interest of the child to involve an absent or unknown parent with the child, but this does not mean that they should not be involved in the court proceeding. The situation should be shared with the MDT, who will make a recommendation to the court as to how to proceed with the parent's involvement in the child's case.

**b)** Absent or Unknown Relatives

The following steps must be taken to locate absent or unknown relatives:

1.    The child's worker will initiate efforts immediately to locate any relatives by obtaining information from the parent or guardian of the child, utilizing the court or MDT to obtain information from the parent, obtaining information from the child, obtaining information from the local Child Support Office or Family Support Office, or obtaining information from any other source available. The efforts to locate absent or unknown relatives must occur within 30 days of the child entering placement and/or custody.

2.    Once the information has been obtained about relatives, the child's worker must attempt contact with the relative in person, by telephone, mail, fax, or by any other means to determine if they would be a possible placement resource for the child.

3.    The child's worker will follow-up to any face-to-face or telephone contact with the relative, in writing, by sending the Relative Letter, requesting that they respond back to the worker within a time frame of two weeks. This letter will provide the relative an opportunity to express an interest in becoming a placement resource for the child and/or to establish visitation with the child.

4.    The Relative Letter must be saved to the child's record in CCWIS, in the file cabinet, and a hard copy filed must be saved in the child's paper record.

5.    The child's worker must document any response from the relative in CCWIS under the client contact screen.

6.    When a relative is contacted and indicates an interest in becoming a possible placement resource for the child, the child's worker must complete a general safety and well-being check of the relative's home using the Kinship/Relative Home Study Request form and then send

such to the Homefinding unit immediately. This form will be used as the referral. The Homefinder will then follow up with the completion of the Kinship/Relative Safety Screen form, a fingerprint based state and national criminal background check, and a child protective and adult protective services history check regarding the relative/kinship family.

7. If a relative indicates an interest in visitation with the child and the visitation would assist in maintaining a connection for the child, then visitation must be established immediately. The child's worker must establish or modify a visitation plan in accordance with the Foster Care Policy, Visitation with Parents and Extended Family, for a relative, within 14 days of the relative indicating an interest in visitation.

c) Known Relatives

The following steps must be taken to involve the known relatives in the case:

1. If the child has known relatives or individuals who the child views as a relative, requesting placement, visitation, or involvement in the child's case, the child's worker must immediately initiate efforts to involve the relative in the case. The child's worker must follow the guidelines under the Foster Care Policy for Kinship/Relative Placement.

### 2.6.2. General Placement Activities

The child's worker must document in CCWIS on the client's characteristics screen, the placement plan, and placement recommendation screens the child's characteristics identified that make the placement appropriate. The child's worker must also document the appropriate information in CCWIS on the provider recommendation screen and the placement safety evaluation screen.

The child's worker must do the following:

a) The child's worker shall arrange a date for the placement. The placement should occur in a timely manner following the intake or pre-placement visit. It is possible for the intake interview and pre-placement visit to occur on the same day as the placement. This is not appropriate in most situations and should only be utilized when absolutely necessary.

b) The child's worker will participate in the actual placement and will provide transportation for the child and their family.

c) The child's worker will furnish the provider with the SS-FC-6A, agreement to care for the child in the home. The provider must sign the form and be provided a copy as proof that the Department has approved the placement of this child

d) The child's worker must enter the child's placement information into CCWIS the **same day** as the child enters the placement. This will also generate a medical card for the child within a timely manner. In addition, this will also ensure that the child has an EPSDT Health Check screening completed within the 30-day time frame.

e) If the child was in foster care prior to this placement, the child's medical card and a new FSC-0033 is to be given to the provider in case medical services are required prior to the issuance of a card to the provider for the child. If the child was not in foster care prior to this placement or the child's medical card cannot be located, the child's worker will provide the FSC-0033 to the caregiver for the child's emergency medical needs.

f) If one of the child's parents is not known to the Department, the child's worker will immediately initiate efforts to locate the absent or unknown parent as a possible placement resource for the child and to include that parent on all court documents.

g) The child's worker shall assess the child's initial placement clothing needs and complete the wardrobe and personal item inventory, contained in the Journey Notebook, of the child's personal belongings**. (Refer to Assessment Section for more information)**

h) The child's worker will notify the Office of Child Support Enforcement and the Office of Family Support of the child's placement in foster care, if appropriate.

i) The placement must take into account the appropriateness of the current educational setting and the proximity to the school in which the child is enrolled at the time of placement, and that the State agency has coordinated with appropriate local educational agencies to ensure that the child remains in the school in which the child is enrolled at the time of placement, or if remaining in such school is not in the best interests of the child, assurances by the State agency and the local educational agencies to provide immediate and appropriate enrollment in a new school, with all of the educational records of the child provided to the school. The state agency is responsible for reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.

If the child is being placed outside their current school district, the worker must notify both schools of the child's new living arrangements in writing within three business days of the placement and arrange to have the child's school records transferred to the new school.

j) The child's worker will obtain a copy of the child's birth certificate and social security number.

- To obtain birth certificates for a child/youth born in West Virginia, staff can utilize the Interstate Paternity Acknowledgment Certification and Transmission (IPACT). IPACT is a web-based computerized search that directly links to Vital Registration which allows staff to request birth, death and marriage records.

- The memorandum concerning the IPACT instructions can be found on the DoHS intranet page, under Foster Care Resources. For further training on how to access IPACT to obtain birth certificates go to: https://www.wvdhhr.org/ipact/.

- It is also beneficial for workers to be aware that only two social security cards can be issued in a year and ten social security cards in a lifetime. For instructions on how to obtain a social security card for foster children please visit: https://www.ssa.gov/ssnumber/.

k) The child's worker will obtain current health information about the child, including but not limited to: current or previous medication, immunization records, allergies, and the name and address of any current medical providers.

l) The child's worker will disclose any information regarding the child's mental and physical health status as well as behavioral issues to the provider.

m) The child's worker will complete the Birth Parents Background Information merge form (SS-FC-12) and the Birth and Medical History of the Child merge form (SS-FC-12A) in CCWIS within the first thirty days of the child's placement.

n) The child's worker will ensure that the provider purchase an appropriate life book for the child. Please see section 2.8 for further description of an appropriate life book.

o) The child's worker will document all placement contacts in CCWIS on the visitation log screen including progress reports and case staffing as appropriate.

p) If adjustment problems are anticipated by the child's worker, these are to be discussed with the provider at the time of placement.

q) The child's worker will complete the child's assessment screen in CCWIS. Education information will be documented on the child's employment/education screen. Immunization and health information will be documented on the child's client demographic screens in CCWIS.

r) The child's worker will discuss with the foster parent the process to obtain the child's Youth Identification Card through the Division of Motor Vehicles.

**2.6.3.**   Placement Activities Specific to Relative/Kinship Homes

85

D003107954

While the Department is required to look for relatives as placement options, the worker must take specific actions if the Department is planning to petition the court for or take emergency custody of a child and place the child in the home of a relative.

a) The child's worker must assess the relative's ability to provide a safe and stable living environment for the child. The child's worker will conduct a general safety and well-being check of the home using the Kinship/Relative Home Study Request packet, make contact with local law enforcement to ensure that the relative is not known to them as being active in criminal activity, and conduct a CCWIS record check of all adults in the home over the age of 18 years of age before leaving the child in the home. The child's worker will make a referral to the Homefinding unit for a Homefinding Specialist to complete the certification process by providing them with the Kinship/Relative Home Study Request form within twenty-four hours of placement. The Homefinding Specialist will have five calendar days to visit the relative's home and begin the Kinship/Relative Safety Screen with the relative/kinship provider. The entire screen must be completed within 90 days of the receipt of the referral. The relative must sign the Kinship/Relative Safety Screen form.

b) In emergency placement situations, it is strongly recommended that the child's worker collaborate and consult with local law enforcement to gather any and all information, including criminal history regarding the potential relative/kinship provider and members in the household, to assess and ensure the child's safety.

c) The child's worker will provide the relatives with the SS-FC-5, Kinship/Relative Placement Agreement to care for the child placed in the home, and SS-FC-6A Addendum Benefit Form. The relatives must sign these forms and the worker will provide the relative with copies as proof that the Department has approved the placement of this child. The original forms must be maintained in the kinship/relative provider record.

d) The child's worker must explain the benefits that are available to the child or may become available to the child while the child is in the custody of the Department and after the child leaves the custody of the Department. The child's worker must also explain how these benefits can be accessed by the kinship/relative family. **\*Refer to the SS-FC-6A Addendum, Benefits form.**

e) The child's worker will direct the relative/kinship provider to apply for child only TANF and Medicaid through the local county DoHS office in which the relative resides.

f) The child's worker must document the placement of the child with the relative in CCWIS as a kinship/relative placement, once the Homefinding Specialist has opened the relative as a Kinship/Relative Provider.

D003107955

g) If the court gives the Department legal custody of a child and orders the child placed with a relative, the child's worker must place the child in the relative's home. The child's worker must still complete a general safety and well-being check of the home using the Kinship/Relative Home Study Request form and submit such to the Homefinding Unit, and a Homefinding Specialist will then complete the Kinship/Relative Safety Screen on in-state kinship/relative homes and have the relative sign the form as indicated in step one. If the relative does not meet the standards of the Kinship/Relative Screen, the child's worker shall request that the court reconsider the kinship/relative home as a placement resource for the child. The kinship/relative provider is NOT eligible to receive any other payments for the child's care during the time period that they received TANF benefits for the child.

h) If the child is placed in the kinship/relative home and the kinship/relative family wishes to become certified and receive boarding care, the child's worker will then inform the Homefinding Unit, or the Interstate Compact on the Placement of Children Administrator if the family lives out-of-state, of the placement and request an assessment of the relative. Under no circumstances shall boarding care be paid to a kinship/relative caregiver prior to the relative completing all the requirements necessary to become a foster family. For in-state studies, the assessment must take priority and should be completed within 90 days from the date of placement of the child in the relative's home.

i) The Homefinding Specialist will make arrangements with the relative to obtain their fingerprints to complete a criminal background check. The relative should attend pre-service foster parent training if it is offered during the assessment period, unless a waiver was awarded. The homestudy may be approved prior to the training requirement being fulfilled as long as all other requirements have been met.

j) Once a copy of the CIB results has been received, the results will be entered by the Homefinding Specialist in CCWIS. The Homefinding Specialist must retain a copy of the results in the provider record.

k) If the relatives cannot meet the certification requirements as determined by the Homefinding Unit, or comparable agency staff of another state via Interstate Compact on the Placement of Children, the worker will report this finding to the court. If the court and/or the Multidisciplinary Treatment Team believe that this placement is in the best interest of the child, the child's worker may request that the court transfer legal custody of the child from the Department to the relative at disposition. The family may apply for a TANF Child Only grant through the Office of Family Support. This would also provide the child with medical care. Prior to transfer of custody from the Department, all children in these placements will be considered eligible

D003107956

for all the services and protections of children who are in paid foster care placements.

l)  If the relatives meet the certification requirements as determined by the Homefinding Unit, or comparable agency staff in another state via Interstate Compact on the Placement of Children, the Homefinding Specialist will enter the relatives in CCWIS as a certified kinship/relative home within three business days of approval of the family or the child's worker forwarding the other state's approved home study and family's signed *W-9*.

m)  The child's placement effective date will be entered in CCWIS within one business day of the placement. In addition, this will also ensure that the child has an EPSDT Health Check screening scheduled within the five-day time frame required by the Sanders Consent Decree.

n)  If the child was in foster care prior to this placement, the child's medical card and a new FSC-0033are to be given to the kinship/relative family in case medical services are required prior to the issuance of a card to the kinship/relative family for the child. If the child was not in foster care prior to this placement or the child's medical card cannot be located, the child's worker will provide the FSC-0033 to the kinship/relative family for the child's emergency medical needs.

o)  The child's worker will notify the Office of Child Support Enforcement and the Office of Family Support of the child's placement in foster care if appropriate.

p)  The child's worker will follow General Placement Activities as listed in Section 2.6.2.

**2.6.4.**  Placement Activities Specific to Kinship Homes with No Blood Relation to The Child.

In some instances, children may be placed in homes where the caregivers are not considered "specified relatives" in regard to receiving child only TANF reimbursement for care.  This usually occurs when there is not a blood relationship between the child and the kinship provider or if the relationship is biological but distant, therefore ineligible for child only TANF benefits.  In these situations, the Department may provide a State Paid Kinship Care Placement Payment until the kinship provider is approved as a certified foster/adoptive parent provider.  The following guidelines must be followed for a provider to receive this payment:

a)  Kinship providers must first apply and cooperate with the application process for Child Only TANF benefits. Only those who have been denied will be eligible for State Paid Kinship Care Placement Reimbursement through this process.

D003107957

b) The payment is to be provided for 90 days, which is the allotted time given to complete the relative/kinship home study.

c) A review will occur within 60 days of placement if the kinship provider has not been approved as a foster/adoptive provider and every 30 days following the initial 60 day review until the home is approved.

Rates for this payment will be consistent with the amounts granted for Child Only TANF payments.  The TANF chart is as follows:

|  |  | TANF Child Only Rates | Per Child Rate | Daily Rate |
|---|---|---|---|---|
| 1 | Child | $417 | $417.00 | $13.71 |
| 2 | Children | $480 | $240.00 | $15.78 |
| 3 | Children | $542 | $180.67 | $17.82 |
| 4 | Children | $612 | $153.00 | $20.12 |
| 5 | Children | $670 | $134.00 | $22.03 |
| 6 | Children | $734 | $122.33 | $24.13 |
| 7 | Children | $793 | $113.28 | $26.07 |
| 8 | Children | $811 | $101.37 | $26.66 |

In order to complete the payment, the worker will do the following:

a) Complete a demand payment in CCWIS using "other approved" payment type with a notation in the comment section stating, "State Paid Kinship Care Placement Payment". *(Homefinding staff will be required to add State Paid Kinship/Relative to the services list in the Service/Admin screen in the provider record in order for the option of "other approved" to be enabled.)*

b) The child's worker will complete the demand payment by the third (3rd) working day of the month following the month the child came into placement.  *Example:  If a child was placed in August, the child's worker will make the payment for the month of August by the third (3rd) working day of September.*

c) If the child is not placed in the kinship home for the entire month, workers will need to pro-rate the payment based on the daily rate as listed above.

D003107958

> **Note:  Once a Kinship/Relative Provider is approved as a Foster/Adoptive Provider, regular boarding care payments will begin.    Kin/Relative providers are NOT eligible to receive any other payments or back-payments during the time that they received state paid kinship care.  Please see Foster Care Section Boarding Care Payments for more information.**

**2.6.5.**    Placement Activities Specific to Specialized Family Care (Medley)

The following must occur:

**a)** The child's worker will compile the following information:

   **1.** Child, Youth and Family Case Plan, or YS Youth Case Plan for voluntary placement and youth services children, or the Family Assessment for child protective services children.

   **2.** Birth certificate

   **3.** Social Security number

   **4.** Copy of the court order granting the Department custody

**b)** Child's worker will follow General Placement Activities as listed in Section 2.6.B

**2.6.6.**    Placement Activities Specific to Out-of-State Placement (ICPC)

The following must occur:

**a)** An Interstate Compact Report on Child's Placement Status (ICPC-100B) is completed in CCWIS, signed and submitted, in triplicate, to the Interstate Compact Administrator in the Office of Social Services within ten (10) days of the date of placement to confirm placement and initiate supervision. The ICPC-100B is also used for notification that a prior approved resource will not be used for placement and subsequent compact termination.

**b)** Child's worker will follow General Placement Activities as listed in Section 2.6.B

**2.6.7.**    Placement Activities Specific to Transitional Living Placements

When a youth is placed in a Transitional Living Placement setting, such as in an apartment of their own[1], whether supervised by a private agency or by the youth's caseworker, placement must be made in accordance to the following guidelines to assure that the youth continues to receive foster care benefits:

**a)** The youth's worker must have the youth complete a *W-9*, so the youth can be set-up as a transitional living client in CCWIS and placed with themselves in placement.

---

[1] Youth placed in their own apartment must be 16 years old to receive Independent Living funds.

D003107959

b) Once a W-9 has been completed by the youth, the worker must complete a search of the open and closed provider records to determine if the youth has been opened as a transitional living client previously.

c) If the youth has not been opened previously, the youth's worker must open the youth up as a transitional living client provider in CCWIS, by completing the General tab in the provider record, then completing the Document Tracking of the W-9, then add services to the youth's provider Service Administrative Screen. Services normally utilized for youth in transitional living are: Educational Services, Transitional Living Services, Housing, and Clothing.

d) If the youth has been opened previously as a transitional client, then the worker may need to reopen the provider record.

e) Once the youth's worker obtains the youth's provider number, the youth can be placed in CCWIS with themselves. The youth's placement effective date will be entered in CCWIS the **same day** of the placement.  This will also generate a medical card for the youth within a timely manner.  In addition, this will also ensure that the youth has an *EPSDT Health Check* screening scheduled within the five (5) day time frame required by the Sanders Consent Decree.  If the youth was in foster care prior to this placement, the youth's medical card and FSC-0033 is to be given to the agency in case medical services are required prior to the issuance of a card to the facility for the youth.

f) The youth's worker must submit the *W-9* to the local financial clerk, so they can complete and approve the Tax screen in the provider record and make sure that the information is entered in a timely manner.

g) The youth's worker must document the youth's eligibility in the Youth Transitioning, Placement Plan and Placement Recommendation screens in CCWIS, with approval for placement being sent to the worker's supervisor.

h) Once the youth's placement is approved by the supervisor, the youth's worker must complete the Enter/Exit screen in CCWIS, documenting the entry date for the youth.

i) The youth's worker must complete the youth's address and telephone number in the Demographic screen in CCWIS and make sure that the youth's address is correct.

j) Once a plan has been developed for a youth to be moved into their own apartment under the supervision of a transitional living agency, the youth's worker must make an ASO referral for Chafee Pre-Placement Activities.

k) All concrete items/services (start-up expenses), such as a deposit for an apartment, first month's rent, utility deposit, household items, furniture or other items for the apartment, must be paid for through a demand payment request. These requests are to be submitted to the youth's worker by the private transitional living agency, if they are providing the

D003107960

supervision. Original receipts must be submitted with a request for reimbursement.

l) Once a request for these start-up expenses is received by the youth's worker, the worker will complete a demand payment request, utilizing payment type Independent Living Services and Supplies and document that it is for start-up expenses within three (3) working days of the request.

m) Once a youth has moved into their own apartment, under the supervision of a transitional living agency, the youth's worker must make an ASO referral for Chafee Phase Two-Part One.

n) The youth's worker will indicate in CCWIS that emancipation is the youth's permanency plan on the Permanency Plan screen.

o) Once the youth's provider record is complete, including the Tax screen, the worker should link all needed paid services on the youth's Service Log, as well as any unpaid services on the Services screen in the Youth Transitioning section of the youth's CCWIS case record.

p) The youth's worker must assist the youth in locating and securing safe and affordable housing if the placement is being directly supervised by the Department.

q) The youth's worker must assist the youth in developing a monthly productivity schedule and a monthly budget and approve the schedule and budget.

### 2.6.8. Notifying Foster Care Providers of their Rights at the Time of Placement

Child welfare workers must understand their responsibility to notify foster care and kinship/relative care providers of their rights at the time of time of placement. Becoming familiar with the following rights and responsibilities will aid workers in understanding their responsibility to foster care and kinship/relative providers.

The Foster and Kinship Parent Bill of Rights

Foster and kinship/relative care providers play a vital role in the state's effort to care for children removed from their homes either by abuse and neglect proceedings or through a juvenile petition. The following rights are afforded to all foster and kinship/relative care providers having placement of any foster child or youth involved in the child welfare system:

1) The right to be treated professionally and ethically as the primary provider of foster or kinship care in accordance with the terms of the agreement between the foster or kinship parent and the child placing agency and the Department.

2) The right to maintain the parent's or parents' own family values and beliefs, so long as the values and beliefs of the child are not infringed upon.

D003107961

3) The right to receive training, as provided in the agreement with the child placing agency and the Department at appropriate intervals.

4) The right to have an emergency contact 24 hours per day, seven days per week, as set forth in the agreement between the foster or kinship parent and the child placing agency and the Department.

5) The right, prior to the placement of a child, to be notified by the Department and the child placing agency of any known issues relative to the child that may jeopardize the health and safety of the foster or kinship family or the child, or alter the manner in which foster or kinship care should be administered.

6) The right to receive from the Department and the child placing agency, prior to placement of a child, all known information relating to the child's behavior, family background, health, history, or special needs and to receive updates relevant to the care of the child as information becomes available.

7) The right to be provided with a written copy of the individual treatment and case plan concerning the child in the foster or kinship parent's home and to discuss such plan with the case manager, and to receive reasonable notice of any changes to that plan, including timely notice of the need to remove a child from the foster or kinship home and the reasons for the removal. **Please note: Timely notice of the need to remove a child from the foster or kinship/relative home should be provided at least 10 days prior to removing the child, when possible. (Exceptions to providing 10-day prior notice should only be considered in certain emergency situations such as ensuring ongoing safety for the child, compliance with a court order or court ordered timeframes, etc.)

8) The right to timely and reasonable notice of the Department's case planning and decision-making process regarding the child, as provided in W.Va. Code §49-4-101 and the right to participate in such process, in the discretion of the court.

9) The right to communicate with professionals who work with the child, including, but not limited to, therapy, physicians, and teachers, as permitted by the case plan or the court.

10) The right to be notified, in advance, by the Department or the Court, of any hearing or review where the case plan or permanency of the child is an issue, including initial and periodic reviews held by the Court and permanency plan hearings: Provided, that the right of a foster or kinship parent to attend any hearing is in the discretion of the Court.

11) The right to be provided information regarding the final outcome of an investigation of complaints concerning the operation of a foster or kinship

D003107962

home and to receive an explanation or a corrective action or policy violation relating to foster or kinship parents.

12) The right to be provided with information on how to contact the Foster Care Ombudsman, and to contact the Foster Care Ombudsman's Office, regarding alleged violations of rights, to speak to representatives of these offices confidentially, and to be free from threats, retaliation, or punishment for making complaints.

13) The right to write a letter or submit a report to the court regarding a violation of the rights provided in this section or W.Va. Code §49-2-126, or any concerns over the conduct or performance of the guardian ad litem, a representative of the Department, or a representative of the child placing agency, which the court may act upon as it deems in its discretion to be appropriate: Provided, that the Court may require the clerk to send copies of a letter or report, submitted to the Court pursuant to this subdivision, to the parties in the case prior to the court's review or consideration of such communications.

14) The right to be considered, where appropriate and consistent with the best interests of the child, as a permanent parent or parents for a child who is available for adoption or legal guardianship.

15) The right to move to intervene in the pending case, without fear of retaliation, once parental rights have been terminated; and

16) The right to receive, from the Department and the child placing agency, a written copy of the rights set forth in this section and a copy of the contract between the Department and the child placing agency.

It is vital for child welfare workers to be fully aware and have a thorough understanding of the role of the Foster Care Ombudsman and their authority, and the violation of any of the above rights and responsibilities may be investigated by the Foster Care Ombudsman. December of each year, the Foster Care Ombudsman is required to summit an annual report of conducted investigations for the same calendar year. See section 8.5 of this policy for duties, authority, and responsibilities of the Foster Care Ombudsman.

**See section 8.6.1 for information regarding nondiscriminatory placement protocol.**

## 2.7   Journey Placement Notebook

The Journey Placement Notebook was developed to provide foster/adoptive parents with a mechanism to receive and maintain information about a child they care for. The notebooks are to be given to foster/adoptive parents when a child/youth enters foster care and is placed in a foster/adoptive home. There may be times when the child/youth's worker may not have all the information about a child at the time of placement; however, it is expected that it should be forthcoming as soon as the information is made available.

The notebook is divided into sections: The Cover/Introduction, the Out-of-Home

D003107963

Observation Report, the Reports and Documents section, the Forms section, and the Terms and Information Guide section. The child's worker must add the child specific information to the notebook, prior to providing it to the foster/adoptive parents. The Notebook also contains several forms that may be useful for foster/adoptive parents, such as medication record, provider list, appointment log, schools attended list, etc. Additional blank forms for the Journey Placement Notebook may be obtained from The West Virginia Department of Human Services, internet homepage.

The Child/Youth Journey Placement Notebook contains confidential information about a specific child. The information about this child is not to be shared with anyone other than the Multidisciplinary Treatment (MDT) Team members. The information in the notebook is not to be copied for any reason by the foster/adoptive parent(s) without permission from the child's DoHS worker.

The following steps must be taken when a child is placed in a foster/adoptive home:

a) When a child enters foster care and is being placed into a foster/adoptive or kinship/relative home, the child's worker must provide the Journey Placement Notebook to the foster/adoptive parent(s).

b) The child's worker must add all of the child specific documents to the Journey Placement Notebook, such as the child's case plan, medical information and forms, biological parents background information, educational information, MDT information, and child summary.

c) The child's worker will explain the Journey Placement Notebook's purpose to the foster/adoptive parent(s). They will specifically explain how the Out-of-Home Observation Reports and Clothing and Personal Item Inventory List are to be utilized.

d) The Journey Placement Notebook is to be kept in the foster/adoptive home. The foster/adoptive parent(s) should keep the Journey Placement Notebook in a secure place where other members of the family will not have access.

e) The foster/adoptive parent(s) should bring the child's Journey Placement Notebook to each MDT meeting so that the child's worker can ensure the notebook contains current information. The child's workers will provide updated information to be placed in the notebook. The previous information will be put in the child's case record, if it is not already in the record.

f) In a situation where the child is moved from a foster/adoptive home to another foster/adoptive home, the Journey Placement Notebook is to follow the child. If the child is moved from a foster/adoptive home to a group/residential foster care setting, the Journey Placement Notebook must be returned to the child's DoHS worker, unless the stay in the group/residential foster care setting will be short term and the child will be returning to the same foster/adoptive home. During the child's stay in a group/residential foster care setting, the child's DoHS worker will maintain the Journey Placement Notebook for the child, until they are placed into another

foster/adoptive home. Then the Journey Placement Notebook will follow the child to the new foster/adoptive home.

g) The Journey Placement Notebook is to be returned to the child's DoHS worker upon the child's exit from foster care, except when the child exits foster care to permanency of adoption or legal guardianship.

h) Information contained within the Journey Placement Notebook may be provided to the child upon their exit from foster care upon their request.

i) Educational and medical information contained within the Journey Placement Notebook must be provided to children who exit foster care at the age of eighteen (18) years or older.

The Zipper Binder may be re-used for future children entering care, if they are in good condition. You will need to request the materials that go inside of the binders from the Division of Children and Adult Services, Foster Care Specialist or print the forms by clinking on the following hyperlink: Journey Placement Notebook Forms.

## 2.8    Life Book

Children in foster care can often lose their connection to their life history. For young children in particular, memories may dissipate with time and the recall of grandparents, other family members, family friends, pets, and other connections may fade. Community connections with a pastor, teacher, neighbor, or others may be forgotten when the child relocates away from their community. Stuffed animals, trinkets from carnivals, school awards, valentine cards, and other such typical childhood mementoes seldom accompany a child into foster care. For many people, family picture albums, scrap books, family movies and videos, birthday cards, yearbooks, trophies, and other types of mementoes are significant items that document history and experiences of life. Through these items, we maintain our identity, accomplishments, history, and a connectedness with our experiences.

Children in foster care should have a similar opportunity to stay connected with their identity.  A Life Book is a scrapbook that contains photographs, drawings, anecdotal stories about the child, their family and friends, and other memorabilia. The child can participate in developing the Life Book and in dictating or writing their own contributions to their history. Life Books help document children and youth's personal histories as they go through the foster care and adoption process. They also serve as a way for workers and foster/adoptive parents to connect with and understand the child's history and experiences. The process of developing the Life Book communicates to the child that the adults in the child's world are interested in their history, experiences, culture, and family. It can serve as a tool to build new connections with the foster parent and the caseworker.

Upon a child's entry into foster care the provider will purchase a Life Book for the child. A portion of the child's initial clothing allowance may be used to purchase the Life Book. The worker, with the assistance of the care provider, will gather as much of the following

96

D003107965

items as possible for inclusion in the Life Book:

a) Photographs

b) Drawings

c) Vital information about the child's biological family and pets

d) How the child was raised in terms of culture and religion

e) School information

f) Family memories

The Life Book will follow the child through all foster care placements until the child reaches permanency. It is the responsibility of the child's worker to ensure the Life Book is maintained and updated. Updates may be completed during Multidisciplinary Treatment Team meetings, family visits, and visits between the biological parents and the foster/adoptive family.

## Section 3

## ASSESSMENT

### 3.1    Introduction

All children entering foster care should be thoroughly assessed to understand the child's strengths and needs and to ensure the child's placement is appropriate to meet those needs. Thorough assessment of the child and their situation is vital in ensuring placement stability and timely permanency. Information gathered by the worker and/or various assessments will be used by the Multidisciplinary Treatment Team to develop a placement plan and compile the Child, Youth and Family Case Plan and/or YS Case Plan.

If child welfare staff encounter situations where communication barriers exist, such as non-English speaking clients or providers, or there is a need for sign language, staff must request an interpreter by contacting Vendor is 911 Interpreters Inc. at 1-855-670-2500 and using the Bureau for Social Services code: 16233.

The worker should explore the following information:

a) The child's physical health

b) The child's developmental and/or educational level

c) The child's daily living activities

d) The presence of behavioral or emotional issues and recommended treatment

e) Strengths and weaknesses for the family and services needed

f) The attitudes and desires of the child about their future, if age appropriate

97

D003107966

g) The social development of the child

h) The attitude and desires of the family about the child's future

i) The child's behavior, attitudes, and ability to relate

The child's worker will document information gathered through assessments on the following screen in CCWIS:

a) Education information will be documented on the child's employment and education screen.

b) Immunization and health information will be documented on the child's medical screens.

c) The child's characteristics will be documented on the child's client characteristics screen.

d) The child's worker will document the child's placement needs in the provider recommendation screen, the enter/exit placement screen, the placement safety evaluation screen, and the placement evaluation screen.

## 3.2   Health Care

The Department has the continuing responsibility to develop and maintain the physical and emotional health of children in foster care.  In current medical practice, health supervision of children is based on periodic visits for health appraisal and medical care which includes taking a thorough medical history of the child, careful physical examinations, medical treatment, routine immunizations, mental health counseling and treatment, and guidance for caregivers.

**3.2.1** Early Periodic Screening Diagnosis and Treatment (EPSDT) HealthCheck Program

Enrollment and participation in the Early Periodic Screening Diagnosis and Treatment Program, known as HealthCheck, is a requirement for every child in foster care.  Evaluation of health status and provision of any needed medical treatment is a necessary component of foster care.

Through this program all children in foster care receive a comprehensive range of preventive and primary health services including vision testing, physical examinations, comprehensive health/medical history, dental screens, nutrition assessments, developmental and behavioral assessments, hearing screens, lead testing, immunizations, ear, nose & throat examinations, vital signs assessments, lab tests, and referrals.

An initial HealthCheck appointment is required at the time a child enters placement. Sanders Liaisons (aka HealthCheck Foster Care Liaisons) are Office of Maternal Child and Family Health employees who facilitate administrative case management activities that help fulfill the mission of Medicaid's EPSDT benefit.

98

D003107967

Specifically, HealthCheck Foster Care Liaisons provide the outreach (identifying, informing and assisting) necessary to establish regular health supervision plans for children in foster care (as defined by 45 CFR 1355.20). HealthCheck Foster Care Liaison responsibilities include:

1. Ensuring that foster children and their WV DoHS-approved caregivers are aware of the HealthCheck Program, appointment scheduling (per established periodicity), and the availability of transportation assistance.

2. For initially-placed children, initiating the CSHCN Screener© (a five item, parent-reported tool designed to reflect the federal Maternal and Child Health Bureau's consequences-based definition of children with special health care needs).

3. Determining a medical provider preference before scheduling initial HealthCheck screening appointments, ideally within five days of a child's placement.

4. Obtaining documentation of initial HealthCheck screening results and entering relevant information in CCWIS.

5. Recording health surveillance indicators (height/weight and tobacco exposure) in an automated information system established by the OMCFH.

6. Notifying BSS Social Workers of assigned foster children who are due (per the current HealthCheck periodicity schedule) for periodic HealthCheck screening.

7. Obtaining documentation of periodic HealthCheck screening results and entering relevant information in CCWIS.

**It is imperative that workers enter children into all provider types quickly for the Health Check to be initiated timely.**

HealthCheck Periodicity Schedule

The periodicity schedule for HealthCheck examinations is as follows:

a) Infants from birth to age one month are required to be seen by a HealthCheck physician every two weeks.

b) Infants from age one month to six months old are required to have a HealthCheck exam every two months.

c) Children from six months old to 18 months old are required to be seen by a HealthCheck physician every three months.

d) Children age eighteen (18) months old to 36 months old are required to have a HealthCheck exam every six months.

e) Children ages 36 months through age 20 are required to by seen by an HealthCheck physician every twelve (12) months.

99

D003107968

**3.2.2**   High Risk Infants HealthCheck Periodicity Schedule

Children who score as high risk through the West Virginia Statewide Birth Scoring Project are scheduled for HealthCheck exams more frequently. After discharge from the hospital, preventive health examinations are recommended at two to four week intervals up to 24 weeks.  Ideally examinations should occur at:

a)  Birth

b)  Two weeks

c)  Four weeks

d)  Eight weeks

e)  Twelve weeks

f)  Sixteen weeks

g)  Twenty-four weeks

**3.2.3**   Birth to Three Programs

West Virginia Birth to Three must be considered for all children under the age of three who have been identified as experiencing or at risk of developing substantial developmental delays or atypical development patterns; or have been determined to fall under an at-risk category. **Children who have been placed in the custody of the Department, due to a substantiated report of maltreatment or due to being unsafe in their home, must be referred to the Birth to Three Program.**

The Birth to Three Program will provide the child, foster parent(s), and biological parent(s) with services geared toward assisting the child to overcome any identified developmental delays. The child's MDT will determine how to provide the services, so the child's best interests are met.  The child's MDT will designate the foster parent as the surrogate parent to make decisions for the Birth to Three services. Birth to Three services may be provided to the foster parent(s) and the biological parent(s) during the same time. Example: The foster parent may be receiving services to assist a toddler with walking. There may be a plan to send the child home soon, so the biological parent may also be involved in services during visitation, so they will know how to assist the child with walking.

The following steps must be taken when a child enters custody:

a)  Once a child who is under the age of three enters custody, the worker must assure that the Initial Heath Check Screen is completed within the 30-day time frame. ** Refer to EPSDT and Foster Care Section 3.2.1 for more details.

D003107969

b) The child's worker will gather all results of the initial Health Check Screen by contacting the foster parent, private providers, doctor, or any other individuals who may have the information prior to the child's initial 30-day MDT.

c) The child's worker will provide to the child's initial 30-day MDT the referral information concerning the Birth to Three Program. The Birth to Three Program staff should be invited to attend the child's MDT.

d) The child's worker will make a referral to the Birth to Three Program using the Birth to Three Referral form for Early Intervention Part C-Birth to Three services.  Send the original to the local Birth to Three offices, file one copy in the case record, and provide the family with the third copy. The worker will save a copy of the referral to CCWIS in the file cabinet. The worker must also include a copy of the results of the Health Check Screen, copy of the Initial Assessment and Safety First Evaluation, and any other assessments that may assist in determining the child's need for services in the referral.

e) The child's worker will document the referral information on the Service Log in CCWIS.

If a child is qualified for services through the Birth to Three Program, the child's worker will maintain contact with the Birth to Three Program staff to ensure that consistent services are provided. The child's worker will also attend the treatment team meetings held by the Birth to Three Program staff.

**3.2.4**   Dental Care

Routine dental care is provided to children in foster care through the EPSDT, Health Check program. All foster children are to be referred to a dentist by their first birthday, according to the American Dental Association, for a yearly check-up and dental services as prescribed by the dentist. Medicaid will only cover dental check-ups once every six months. Any request for dental care that is not routinely covered by Medicaid, such as braces, and require more frequent check-ups must have prior approval through the Bureau for Medical Services and be approved by the Regional Program Manager or the Child Welfare Consultant prior to the services being provided.

**3.2.5**   Immunizations

Every child shall be immunized against childhood diseases including whooping cough, mumps, tetanus, diphtheria, polio, measles, rubella, and any other vaccine recommended by the physician and by the Bureau of Public Health. Immunizations can be obtained through the EPSDT Health Check program. In order for a health professional to administer an immunization to any child, they are required by law to ensure that the person accompanying the child is aware of the possible side effects of the vaccine and appropriate measures to take in the event of an adverse reaction. The person accompanying the child who receives an immunization must

D003107970

provide informed consent for the procedure and must sign the permanent record card at the time the vaccine is administered.

**3.2.6**   Eye Care

Routine eye care is provided to children in foster care through the EPSDT, Health Check program. All foster children are to be referred to an optometrist by the time they are five years of age for a yearly check-up and eye care services as prescribed by the optometrist.

**3.2.7**   Children with Special Health Care Needs

Foster children are eligible to participate in the Office of Maternal and Child Health's Children with Special Health Care Needs (formerly Handicapped Children's Services.) Referrals should be made through the EPSDT Health Check program or by the child's supervising physician.

**3.2.8**   Substance Use, Misuse or Substance Use Disorder Services

Many youths enter foster care with substance use, misuse or substance use disorder problems. For others this diagnosis is made after the youth is already in foster care. Whenever it is suspected that a child may have a problem with a substance use, misuse or substance use disorder, a referral shall be made to the Regional Child Specialist at the local Community Behavioral Health Center for an assessment. The results of this assessment must be incorporated into the child's treatment plan.

**3.2.9**   Mental Health Services

Most children in foster care will need mental health services. A referral shall be made to the Regional Child Specialist at the local Community Behavioral Health Center or through the staff of the child placing agency or group/residential facility for an assessment. The results of the evaluation will then be used as the basis for the child's treatment plan and for arranging subsequent psychological or psychiatric services that may be needed.

**3.2.10** Emergency Services

Provisions shall be made for the immediate services of a doctor or hospital for an ill foster child, for needed follow-up after an illness or accident, or whenever there is other evidence of medical need. Children in foster care who may need emergency medical services prior to the issuance of a medical card are to be given a copy of the form letter FSC-0033 stating their name, birth date, social security number, date of placement, the name of the facility or foster parent where the child is residing, and the type of services being provided. The letter is time limited. This form is to be used only if the child does not yet possess a valid medical card. Children in foster care will be provided with an FSC-0033 at the time of each placement. This form will indicate the child's name, Medicaid number, and the provider or foster/adoptive parent's names and is to be used by the provider or

foster/adoptive parent to obtain the medical treatment necessary noted on the form. The child's foster/adoptive parents or the group/residential facility should notify the Department in the case of an emergency. If the child's worker, supervisor, or Social services manager is not available to provide emergency consent for medical care, the foster/adoptive parent or group/residential facility will utilize the child's medical card or FSC-0033 to provide emergency medical services for the child. The foster/adoptive parent or the group/residential facility must notify the child's worker as soon as possible of the event.

## 3.3   Clothing Assessment and Essentials Allowance

All children in foster care are entitled to an adequate wardrobe; all children in foster care, who do not have an adequate wardrobe when first entering foster care, are entitled to an initial clothing allowance at the time of placement. Children entering foster care who have an adequate wardrobe may not need to be issued a clothing allowance at the time of placement but may be issued a clothing allowance at a later time if needed.

When a child enters foster care the child welfare worker must first assess the child's clothing needs by completing the *Placement Wardrobe and Personal Inventory* form. In considering the adequacy of the child's wardrobe, the child welfare worker must consider only usable, well-fitting, undamaged clothing in the child's possession. The child welfare worker must utilize the Placement Wardrobe and Personal Inventory form to determine that each child in foster care:

1) Already possesses an adequate wardrobe; or

2) May need to be issued an initial clothing allowance at the time of placement in order to obtain an adequate wardrobe.

The minimum requirements for an adequate wardrobe are:

- 7 pairs of socks
- 7 pairs of underwear
- 5 bras (if needed)
- 5 pairs of pants
- 7 shirts
- 3 pairs of pajamas
- 2 sets of comfort clothes (e.g., shorts, t-shirts, sweatpants, hoodies)
- 1 dress outfit
- 2 pairs of shoes
- 1 backpack (if child is attending school)

- 1 car seat/booster (if needed)
- 1 stroller (if needed)
- 1 pack and play (if needed)
- 1 seasonal coat or jacket

If the child already possesses an adequate wardrobe at the time of initial placement, no further action is needed at that time. However, the child is still entitled to a clothing allowance, and the child welfare worker may issue a clothing allowance at a later time, if needed.

If a child does not have an adequate wardrobe at the time of initial entry into the foster care system, items of clothing may be purchased by the foster placement provider or the facility. (Please note that the initial clothing purchase is not intended to completely outfit the child but only supply the child with immediate clothing and necessities. The child's wardrobe will be continuously maintained by the placement provider for as long as the child remains in foster care.)

The initial clothing allowance is only to be made when a child first enters foster care. Under no circumstances should the child's worker issue a new clothing payment for a child solely because the child moves from one placement to another; the child's clothing brought from their home, purchased for them through the monthly boarding care payment, and/or purchased with the initial clothing payment must always follow the child.

Children placed in Medicaid paid facilities, such as ICF/IDDs (Potomac Center for example) and Psychiatric Residential Treatment Facilities, will need to have their clothing reassessed twice a year. Children and youth placed in these facilities often gain or lose weight on a continuous basis due to prescribed medications. Medicaid reimburses room, board and supervision but not clothing. The child welfare worker will need to assess the youth's clothing when initially placing them in these facilities and subsequently reassess their clothing every six months thereafter, so long as the child remains in a Medicaid paid facility. Over time, a child's clothing may become unusable due to change in clothing size, loss or damage (holes, stains, etc.) When reassessing a child's clothing inventory, an additional clothing allowance must be issued for a child in a Medicaid paid placement when that child's wardrobe no longer meets the minimum requirements for an adequate wardrobe; additional clothing allowances may be issued for any amount up to, and not to exceed, $175.00. See section below for payment options regarding the supplement clothing for Medicaid paid placements up to $175.00

Approved necessities to be purchased with the initial clothing allowance include any needed clothing items for the child, as well as any of the following items, if needed:

- School supplies

D003107973

- Pacifiers
- Baby bottles
- Crib/crib mattress/crib sheets
- Changing pad
- Diaper bag
- Life book
- Backpack
- Car seat/booster
- Stroller
- Pack and play
- Diapers
- Baby formula
- Baby wipes
- Baby bathtub/bath seat/bath cushion

A child's initial foster care placement clothing allowance may be issued for an amount up to, and not to exceed, $375.00. The child welfare worker must utilize the Placement Wardrobe and Personal Inventory form, plus the minimum requirements for an adequate wardrobe when determining the amount to be issued for the initial clothing allowance. The clothing allowance should only be used for needed clothing items or other approved necessities, with priority given to items needed to fulfill the minimum requirements for an adequate wardrobe. A portion of the clothing voucher may also be used for obtaining a Life Book for the child (please see Foster Care Policy 2.8 for more information about Life Books.)

The initial clothing allowance and any supplement clothing assistance can be completed through three separate avenues. The Instant Card is to be the first and primary choice when providing the clothing allowance. The second option is for the child welfare worker or case aid to use their P-Card to purchase the clothing allowance items. The third option is to provide reimbursement to a provider who purchases clothing allowance items using their own funds. This option should only be used as a last resort.

**1) Instant Card**

The BA-67 is utilized to obtain an "Instant Card." The BA-67 will be issued to "Instant Card," rather than a specific vendor, and once processed can be used by the placement provider to make purchases online or in any store that accepts Apple Pay or Google Pay. When completing the BA-67 voucher, the child welfare worker must include the email address and phone number of the placement provider (in the section labeled "Special

105

D003107974

Instructions"). The BA-67 must then be provided directly to the financial clerk for that county/district for processing. Once processed, the placement provider will receive an email with instructions for use of the instant card, as well as access to the instant card. The instant card can be used multiple times, as long as it has not yet expired or exceeded the full amount issued.

When the provider utilizes the Instant Card, the child welfare worker must discuss with the provider appropriate use of the Instant Card prior to issuance. This includes reviewing the Clothing Allowance Affidavit form and obtaining signatures and initials on the designated areas. This form replaces the need for providers to return receipts to the child welfare worker after purchasing clothing allowance items. However, the child welfare worker should instruct the provider to retain all receipts in the event of an audit.

### 2) P-Card Purchase

If it is decided that the child welfare worker or case aid will purchase the items with their P-Card, they must save the receipt and follow the reconciliation process as they normally would.

### 3) Demand payment

Though it is not recommended and should only be used as a last resort, the provider may purchase the child's clothing using their own funds with the expectation of reimbursement from the department. A kinship/relative provider must supply the purchase receipt(s) to the child welfare worker. The child welfare worker must link the child to their placement provider in the CCWIS service log under Non ASO Service by creating a "Clothing Assistance" service and entering the placement provider's ID in the "Provider ID" section. The child welfare worker will then provide the receipt(s) to their county/district financial clerk, who will use the Initial Clothing Allowance Demand Payment type to generate a payment to the child's placement provider once the purchases are verified. The provider may purchase clothing from different vendors as long as the total clothing purchase **does not surpass the $375.00 total limit.**

If a child placing agency foster care provider chooses to purchase any clothing allowance items with their own funds, the receipt must be provided to the child placing agency in order for the agency to invoice the department for reimbursement.

After initial placement, the child's wardrobe will be maintained by the placement provider through the monthly boarding care payment. The placement provider will also update the clothing inventory regularly. If, at any point, the child welfare worker is concerned that the child's wardrobe is not being appropriately maintained by the placement provider, the child welfare worker must consult with their supervisor and child welfare consultant to develop a plan of action to address those concerns with the placement provider.

Foster Care Policy
May 2024

D003107975

## 3.4    Title IV-E Foster Care Eligibility/Reimbursability

Title IV-E of the Social Security Act is a federally funded program which provides fiscal support on behalf of individual children in foster care, or children who have gained permanency through legal guardianship who would have been eligible for AFDC benefits, as determined by the July 1996 standards for the program, had they remained in their own homes. A review of each child coming into foster care must be conducted by the Division of IV-E Finance to determine the child's eligibility for Title IV-E funds. When a child is determined to be eligible and reimbursable for Title IV-E funds, the Department is reimbursed a percentage of the expenses incurred in providing room, board, and supervision to the foster child. In addition, the Department is also reimbursed for a percentage of the administrative costs of the foster care program and training costs for staff.

Eligibility for Title IV-E is established at the time a child enters the care and custody of the Department. The child's worker will do the following actions within 30 days of the child entering foster care:

a)  Document in CCWIS the child and family specific information necessary to make a Title IV-E determination including:

    1.  Who the child was living with during the month the initial petition was filed, or the voluntary placement agreement was signed;

    2.  The date of the court order removing the child from the home;

    3.  If the child has medical and/or dental insurance coverage; (Not a IV-E requirement)

    4.  If the child was deprived of parental care or support by one or both parents such as absence, death, disability, or unemployment;

    5.  The income and assets of each parent;

    6.  Marital and employment information of each parent;

    7.  The child's legal history and educational status; and

    8.  If the family is receiving any benefits such as social security, child support, black lung, etc. either directly or for the child.

b)  The child will automatically be assigned to the Division of IV-E Finance for a Title IV-E determination.  The Division of IV-E Finance will contact the child's worker to provide the following information necessary for determination purposes:

    1.  A copy of the initial petition alleging child abuse and/or neglect resulting in a removal court order, if the child is in care because of child abuse and neglect;

    2.  A copy of the initial court order resulting in the physical removal of the child from the home, if the child is in care due to child abuse/neglect or youth services; or

D003107976

3. A copy of the voluntary placement or relinquishment agreement if the child is placed into foster care by their parent.

4. A copy of the child's birth certificate and the youth's Social Security number.

(Refer to the CCWIS Desk Guide for more information about the Title IV-E determination process.)

## 3.5 Educational Stability

Child welfare agencies are required to assure educational stability for children in care. At the initial time of removal of the child from their home, the agency must make diligent efforts to maintain the child in the school that they are currently enrolled in unless it is not in the child's best interest. The child welfare agency must cooperate with the local education agency to assess what would be in the child's best interest for continuing to attend their current school. Workers need to understand that the guiding placement decision should be to keep children in their school of origin if it is at all possible. These type placements allow foster children to keep their routine to some extent, their friends, and their extra-curricular activities. When these things are factored in, foster youth would be able to keep consistency in half of their life. Workers also need to evaluate the child's educational needs at every MDT. Consideration should be given to how they are doing, do they have an IEP, does it need updated, do they have other educational needs, are they involved in any extra-curricular activities and are they having any difficulty.

As stated earlier, workers must assume remaining in the school of origin is in the child's best interest. However, there are occasions when this is not the case. When making a determination as to whether a child's best interest is to remain in their school of origin, workers should consider the following;

- Preferences of the child;
- Preference of the child's parent(s) or education decision maker(s);
- The child's attachment to the school, including meaningful relationships with staff and peers;
- Placement of the child's siblings(s);
- Influence of the school climate on the child, including safety;
- The availability and quality of the services in the school to meet the child's education and socio-emotional needs;
- History of school transfers and how they have impacted the child;
- How the length of the commute would impact the child, based on the child's developmental stage;
- Whether the child is a student with a disability under the Individuals with Disabilities Education Act (IDEA) who is receiving special education and related services or a student with a disability under Section 504 who is receiving special

education or related aids and services and, if so, the availability of those required services in a school other than the school of origin; and

- Whether the child is an English Learning (EL) student and is receiving language services, and, if so, the availability of those required services and in a school other than the school of origin, consistent with Title VI and the Equal Educational Opportunities Act (EEOA)

If the child can be maintained in the current school but is placed outside of that school's living district, the education agency must work with the child welfare agency to arrange transportation. If placement does not allow for the child to remain in their school due to it not being in the child's best interest, such as distance, travel time, safety concerns, etc., the social worker must immediately contact the attendance director to enroll the child into the new school in the placement's district. There should be no time lapse due to the transfer of schools, and the new school must accept the child immediately, even if previous records have not yet been obtained. The social worker will reassess educational stability at each subsequent placement during the child's time in care.

Federal funding is available to cover education related transportation costs for children in foster care. The social worker must work with the local education agency and the foster parents, kinship/relative parents, or residential agency staff to develop a plan for transporting the child to and from their home school. The child may be eligible for assistance from the education agency to assist with transportation costs or other needs. This could include assistance funded by Title I, Part A or other available education funding. If the education agency does not cover the costs for transportation, the child welfare agency may do so using supplemental boarding care payments for foster or kinship/relative parents. The social worker must calculate the costs for transporting the child to and from school and reimburse the foster or kinship/relative parents each and every month in which transportation was provided. Payments for transportation to and from school are only utilized whenever the foster or kinship/relative parents are transporting or paying for transporting a child to and from a **home** school in order to assure educational stability. The exact amount of the transportation costs should be reimbursed to the foster or kinship/relative parents or if private automobile is utilized, the standard state rate per mile for travel reimbursement should be used to calculate the costs. If a child is enrolled in a school that is in the home district of the foster or kinship relative parent, it is expected that the child will utilize the same means of transportation for all students in the district and will not be eligible for transportation payments through supplemental boarding care. Group residential agencies will be reimbursed for their transportation costs in a different manner and are not eligible for a supplemental boarding care payment. The Fostering Connections to Success and Increasing Adoptions Act also requires that every school-age child in foster care and every school-age child receiving an adoption assistance or subsidized guardianship payment is enrolled as a full-time elementary or secondary school student or has completed secondary school.

## Section 4

## CASE PLAN

### 4.1 Multidisciplinary Treatment Teams

A Multidisciplinary Treatment Team (MDT) is a group of individuals, from different disciplines, who work together with the child(ren) and family to develop a case plan and coordinate services. An MDT becomes the central point for decision making during the life of a case. The Case Plan is developed by the MDT, therefore the child(ren) and family's participation is vital throughout the process.   Any person or professional who may contribute to the team's efforts to assist the family and child(ren) must be notified and invited to participate in the MDT, **but extra attention must be placed on encouraging the child(ren) and family to participate in the MDT process.**

State Statute §49-4-406, requires the Department to establish a multidisciplinary screening, advisory and planning system.

The purpose of the multidisciplinary system is to:

a) assist courts in facilitating permanency planning following the initiation of judicial proceedings;

b) recommend alternatives to the court, including types of services and types of placements, if any; and,

c) assess, plan and implement a comprehensive, individualized case plan for children who are victims of abuse or neglect and their families involved in an abuse and neglect proceeding, or juveniles and their families involved in status offense or delinquency proceedings when, in a status offense proceeding, the court refers the juvenile for services, and when, in a delinquency proceeding, the court is considering placing the juvenile in the department's custody or placing the juvenile out of home at the department's expense. In any such status offense or delinquency case, the juvenile probation officer shall notify the local office of the Department of Human Services and the Bureau for Juvenile Services at least five working days before the court proceeding in order to allow the multidisciplinary treatment team to convene and develop a comprehensive individualized case plan for the child provided that such notice is not required in cases where the child is already in state custody or there exists exigent circumstances which justify taking the child immediately into custody without a judicial proceeding. In developing an individualized case plan for a child, the team shall utilize a uniform comprehensive assessment of the child. The department shall adopt a standard uniform comprehensive assessment instrument or protocol to be used by treatment teams.

The following steps should be followed when a child enters foster care:

1) A Multidisciplinary Treatment Team meeting should be established within thirty (30) days of the child entering foster care if one has not already been established. The

110

D003107979

Multidisciplinary Team shall assess, plan and implement a comprehensive, individualized case plan for children who are victims of abuse or neglect and their families. The Multidisciplinary Team shall obtain and utilize any assessments for the children or the adult respondents that it deems necessary to assist in the development of such a plan.

**2)** The membership of the treatment team is composed of the following individuals:

- the child welfare worker assigned to the child or family;
- the child's custodial parents or guardian;
- other immediate family members;
- the attorney(s) representing the parent(s) of the child, if assigned by the Judge of the Circuit Court;
- the child if the child is over the age of 12 and the child's participation is otherwise appropriate;
- the child if under the age of 12 and when the team determines that the child's participation is appropriate;
- the guardian ad litem;
- the Prosecuting Attorney or their designee;
- the kinship/relative parent(s);
- resource/foster parent(s);
- child's residential program staff;
- emergency shelter staff;
- an appropriate school official;
- a court-appointed special advocate (CASA);
- a member of a child advocacy center;
- adult services worker (as appropriate);
- managed care organization (MCO) care coordinator;
- home finding unit staff;
- any other person or an agency representative who may assist in providing recommendations for the particular needs of the child and family, including domestic violence service providers, W. Va. Code 49-4-406(d)(2)(I); and
- any other agency, person or professional who may contribute to the team's efforts to assist the child and family. (This last category of membership should be interpreted to mean any professional or non-professional provider of direct and/or supportive services to the child and family.)

The child may participate in the multidisciplinary treatment team meetings if the child's participation is deemed appropriate by the Multidisciplinary Treatment Team. Unless otherwise ordered by the court, a party whose parental rights have been terminated and their attorney shall not be given notice of a multidisciplinary treatment team meeting and does not have the right to participate in any treatment team meeting.

3) School personnel must be invited to attend all MDT meetings. The caseworker will send the invitation to the principal and/or counselor of the school that the child is currently attending, most recently attended, and/or will be attending, which shall be decided on a case by case basis. Along with this invitation to the principal and/or counselor, the caseworker may request that other school personnel attend as needed, such as a teacher, secretary, or attendance director.

4) Adult services staff should be invited to the treatment team meetings for all children age seventeen years or older to plan for continued adult support if necessary. Homefinding staff should be invited to the treatment team meetings to assist the team with placement decisions. Adoption staff should be invited to the treatment team meetings when discussing adoption and permanency planning.

5) A team leader should be designated who is responsible for convening meetings, keeping and distributing records, and overseeing all service provision.

6) All participants must sign a confidentiality statement.

7) The Multidisciplinary Treatment Team must gather sufficient information to thoroughly and comprehensively assess the child's and family's social, emotional, environmental, physical, educational, and financial strengths and needs to determine an appropriate, comprehensive, individualized case plan for the child and their family. The assessments utilized are the Initial Assessment (IA) and Ongoing Assessment (OA) for child abuse and neglect proceedings, or the Family Advocacy Support Tool (FAST) for status offense and juvenile delinquency proceedings, as well as any other health, mental health, developmental, educational or life skills assessments available or needed as determined by the Department or the MDT.

8) If the child is in foster care due to Child Protective Services intervention, copies of the Initial Assessment, Ongoing Assessment, Case Plan, and all other necessary documents shall be shared with the treatment team participants in order to develop the Unified Case Plan. If the child is in foster care due to status offenses or delinquency, copies of the FAST and Case Plan shall be shared with the treatment team.

9) Copies of the family Case Plan and all other necessary documents shall be shared with the treatment team participants in order to develop the Unified Case Plan.

Once the Unified Case Plan has been developed, a copy of the plan shall be provided to the prosecuting attorney, the child's attorney, and all members of the Multidisciplinary Treatment Team.

10) At least every 90 days, the Multidisciplinary Treatment Team is to review and evaluate the progress of the child and family in meeting the goals identified in the Unified Case Plan, the safety of the child in placement, the continuing necessity for and appropriateness of the placement, and the extent of compliance with the Case Plan. If the child is in foster care due to Child Protective Services intervention, the Child Protective Services Social Worker must complete the Case Plan Evaluation and

Continuing Safety Evaluation, or if the child is in foster care due to status offenses or juvenile delinquency, the Youth Services Social Worker must complete the Case Plan Evaluation in order to assist the Multidisciplinary Treatment Team in making decisions concerning goal achievement and continuing necessity for placement. Following this review, a written report of the results is to be provided to the court. This will be the document used to review the case at the permanency placement review hearings and judicial review.

11) The child's foster/adoptive parents will provide the out of home observation reports to the child's worker or the Multidisciplinary Treatment Team which will include a report on the progress of the child, any changes in the child's case, an evaluation of the services provided to the child and their family, the status of the child's health and education, and any other relevant information for each month the child has been in placement with the provider.

12) Once the Case Plan has been developed, it must be filed with the court and a copy of the plan shall be provided to the prosecuting attorney, the child's attorney, and all members of the Multidisciplinary Treatment Team. The Multidisciplinary Treatment Team is to be used to review and evaluate the progress of the child and the family in implementing the provisions of the plan. This evaluation is to be completed by the Multidisciplinary Treatment Team at least every 90 days. Following this review, a written report of the results is to be provided to the court. This will be the document used to review the case at the permanency placement review hearings and judicial review.

13) In addition to the development of Unified Case Plan, the Multidisciplinary Treatment Team meetings should also be used to meet other necessary case review requirements such as the administrative review.

14) The Multidisciplinary Team, when discussing placement of the child, must first consider appropriate relatives. If no appropriate relatives are available, the Multidisciplinary Team may then consider foster care homes, facilities, or programs located within the state. The Multidisciplinary Team may only recommend placement in an out-of-state facility if it concludes, after considering the best interests and overall needs of the child, that there are no available and suitable in-state facilities which can satisfactorily meet the specific needs of the child. In any case in which the Multidisciplinary Team and the court decide to order the child placed in an out-of-state facility or program, it shall set forth in the order directing the placement the reasons why the child was not placed in an in-state facility or program.

15) The Multidisciplinary Team shall be afforded access to information in the possession of the Department of Human Services, Bureau for Juvenile Services, law enforcement agencies, and other state, county, and local agencies, and the agencies shall cooperate in the sharing of information, as may be provided in sections three (d) and six, article five-D and section one, article seven, all of chapter forty-nine, and any other relevant provision of law. Any Multidisciplinary Team member who acquires confidential

information shall not disclose such information except as permitted by the provisions of the Code or court rules.

16) If the Multidisciplinary Team cannot agree on a plan or if the court determines not to adopt the Team's recommendations, a hearing shall be held within 10 days of such determination, and prior to the entry of an order placing the child in the custody of the Department or in an out-of-home setting, to consider evidence from the Team as to its rationale for the proposed Case Plan. If after such hearing the court does not adopt the Team's recommended case plan, it shall make specific written findings as to why the team's recommended Case Plan was not adopted.

17) In the event DoHS is notified by a provider that an emergency MDT meeting is required, the DoHS will have 72 hours to convene this MDT.

18) The MDT should determine the appropriateness of court attendance of youth in foster care age 12 and over.

## 4.2 Interdisciplinary Team (IDT) (Only for Children Placed in Specialized Family Care Medley)

The Interdisciplinary Team is similar to the Multidisciplinary Treatment Team in scope and makeup. This team is for children who are receiving case management services through a behavioral health agency. The child may also be receiving Title XIX Waiver or Medicaid Personal Care programs. It is responsible for identifying and developing the delivery of services in the community for the child with developmental disabilities.

The Interdisciplinary Team is designated to determine the services the IDD waiver needs and/or wants based upon assessments and professional evaluations. This determination is the basis for the Individual Service Plan including the type and the amount of each service. The units of behavioral health services are to be based upon documented need. The Qualified Mental Health Professional (QIDP) is responsible for developing training programs for each goal and objective of the Individual Service Plan and to recommend activities and settings which optimize attainment of these goals and objectives. All programs must be agreed upon by the members of the Interdisciplinary Team prior to implementation.

It is, therefore, necessary for the child's worker to coordinate the efforts of the Interdisciplinary Team and the Multidisciplinary Treatment Team. The Interdisciplinary Team may serve as the Multidisciplinary Treatment Team and vice versa as long as all the necessary participants for both the Multidisciplinary Treatment Team and the Interdisciplinary Team are present at the meeting.

All necessary Interdisciplinary Team members need to attend the Interdisciplinary Team meetings held every quarter. The minimum composition of the Interdisciplinary Team includes:

- The individual;

D003107983

- The individual's guardian/legal representative (the child's caseworker);
- The individual's licensed psychologist;
- The individual's specialized family care worker;
- The individual's service coordinator (behavioral health case manager responsible for coordinating services with the provider);
- Medley advocate if the individual is a Medley class member;
- QIDP (responsible to develop and monitor specific instructional programs); and
- The Family Based Care Specialist.

In addition, the following people should also attend the Interdisciplinary Team meetings:

- The child's foster/adoptive parent (Specialized Family Care provider);
- The child's Guardian Ad Litem;
- The child's CASA, if one has been assigned;
- The child's parents;
- Other members of the child's Multidisciplinary Treatment Team as necessary.

The following must occur:

- The child's worker must attend all Interdisciplinary Team meetings.
- The child's worker is responsible for providing the team with the legal/custodial situation of the child, advocating for the child to achieve their permanency plan, and informing the team of services and treatments available through foster care.

## 4.3  General Case Planning

Regardless of the way that a child enters foster care (i.e., CPS, Youth Services, voluntary placement), a Case Plan must be developed and documented in CCWIS within 60 days of the date the child entered care. In child abuse and neglect proceedings the plan is also filed with the court within thirty (30) days of the entry of an order granting an improvement period (Family Case Plan §49-4-408) and/or five days prior to a dispositional hearing (Child's Case plan §49-4-604).

The Unified Case Plan contains the information necessary to fulfill the state requirements in child abuse and neglect proceedings for a Child's Case Plan (§49-4-604) and a Family Case Plan (§49-4-408), as well as the federal requirements for case planning.

Assessment and case planning should be continuous throughout the life of a case. The

115

D003107984

Case Plan is developed jointly with the parents to ensure that all their needs and any strengths are being addressed through the plan. Throughout the casework process and the court proceedings, the plan may change, and modifications should be made in CCWIS as indicated and distributed to all members of the MDT.

The case plan requires the following information:

- A description of the type of home or facility where the child is to be placed;

- A discussion of the safety and appropriateness of the placement;

- A discussion of if the placement is the least restrictive (most family-like) available;

- A discussion of if the placement is in the closest proximity to the parent's home;

- A discussion of if the child is placed a substantial distance from the home of the parents or in a different state, why the placement is in the best interest of the child;

- A description of how the child will receive safe and proper care in this placement;

- A description of the child's educational plan, whether the child has remained in the same school they were attending at time of removal and how educational stability will be achieved.

- A description of the services that are to be provided to the parents, child, and foster parents in order to improve the conditions in the parents' home to facilitate the return of the child to their home or to secure a permanent placement for the child;

- A discussion of the services which will be provided to the child while in foster care in order to address the specific needs of the child;

- A discussion of the appropriateness of the services that have been provided to the child;

- A listing of the child's siblings and their locations and the date of the court order sanctioning separation, if applicable;

- A description of the parent's ability to contribute to the cost of placement;

- The recommended visitation plan;

- Documentation of the efforts to ensure that the child is returned home within the approximate time lines set out in the plan;

- Documentation of the concurrent efforts to achieve permanency should the services designed to achieve reunification be deemed unsuccessful;

- If return home is not the permanency plan for the child, then the case plan must state why reunification is not appropriate and specify in detail the alternative placement for the child including approximate time lines for when such placement is expected to become a permanent placement;

Foster Care Policy
May 2024

D003107985

- In the case of a child whose permanency plan is adoption or placement in another permanent home, documentation of the steps being taken to find a permanent living arrangement including child specific recruitment efforts;

- A written description of the programs and services which will help children age 14 and older prepare for the transition from foster care to independence;

- Documentation of an age appropriate plan for the child that educates them about family planning, pregnancy prevention, sexually transmitted infections, and other issues related to healthy sexual development. If a child self-identifies as being sexually active, the case plan will contain documentation of supportive counseling to educate the child on topics related to abstinence and healthy sexual development. This will be done in conjunction with the child's MDT in all cases and including the biological parents if parental rights are intact; and

- Documentation of the child's health and education background and progress including all medical appointments, counseling, IEPs, school conferences, etc.

The case plan for each child, where appropriate for a child 14 years of age or over, must include a written description of the programs and services which will help the child prepare for the transition from foster care to successful adulthood.  With respect to a child who has attained 14 years of age, any revision or addition to the plan must be developed in consultation with the child and, at the option of the child, with up to two members of the case planning team who are chosen by the child and who are not a foster parent of, or caseworker for, the child. The case worker may reject an individual selected by the child to be a member of the case planning team at any time if the worker has good cause to believe that the individual would not act in the best interests of the child. One individual selected by the child to be a member of the child's case planning team may be designated to be the child's advisor and as necessary, advocate, with respect to the application of the reasonable and prudent parent standard to the child.

### 4.3.1  Case Planning Specific to Youth Services

When a child enters foster care through Youth Services the Case Plan will be developed by completing the Unified Case Plan. This information is documented in CCWIS on the case plan screens under the youth's name (child focus).

In completing the Unified Case Plan the worker must address all of the information required in the items above. This information is required to fulfill the federal requirements for case planning.

A copy of the case plan must be filed in the CCWIS file cabinet. A copy may also be printed for use by the MDT and to be filed with the court as appropriate. A copy of the case plan must be provided to all members of the MDT including the child's biological parents, foster parents, service providers, and so forth. Throughout the casework process and the court proceedings, the plan may change, and modifications should be made in CCWIS as indicated and distributed to all members of the MDT.

### 4.3.2  Case Planning Specific to Voluntary Placement

D003107986

When a child enters foster care through a voluntary placement the Case Plan will be developed by completing the Unified Case Plan

In completing the Unified Case Plan the worker must address all the information required in the items above. This information is required to fulfill federal requirements for case planning.

**4.3.3**    Case Planning Specific to Child Protective Services

The Unified Case Plan contains the information necessary to fulfill the state requirements in child abuse and neglect proceedings for a Child's Case Plan (§49-4-604) and a Family Case Plan (§49-4-408) as well as the federal requirements for case planning.

The Unified Case Plan serves as the Case Plan which is to be used with the Multidisciplinary Treatment Team in assessing, planning, and implementing a comprehensive, individualized services plan for YS and CPS cases under the requirements of §49-4-405.

For CPS cases, various screens have been developed in CCWIS to capture all of the required information necessary for the plan such as screens associated with Case Plans, Removal, Placement, Client Information, and Court. These screens should be completed in CCWIS as part of the Family Assessment and Treatment Planning and foster care policy requirements.

The Unified Case Plan is a DDE report in CCWIS. When the DDE report Unified Case Plan is accessed it is printed into Microsoft Word. In all cases this Plan will be populated by pulling information from the screens described above. A copy of the report must be filed within the CCWIS file cabinet. A paper copy must also be printed to be used with the MDT and filed with the Court. A copy of the Unified Case Plan must be provided to all members of the MDT including the child's biological parents, foster parents, service providers and so forth.

Throughout the casework process and the court proceedings the plan may change, and modifications should be made in CCWIS as indicated and distributed to all members of the MDT.

**4.3.4**    Individualized Program Plan (IPP) Case Planning Specific to Medley

All children who are covered under the Title XIX Waiver program or are receiving services through Medicaid's Personal Care program are required to have an Individual Program Plan. The Individual Program Plan is the key document for accessing services through the MR/DD waiver program. This document details the array of services needed by the child and those currently being provided to the child, as well as the long-range service needs and the plan for meeting these needs.

The child's worker is responsible for assuring that the Individualized Program Plan is coordinated with the Child, Youth and Family Case Plan developed for the child as part of the foster care program.

**4.3.5**    Right to Be Heard

The child's worker, in accordance with the Social Security Act (475(5)(G)), must provide substitute caregivers with notice and the right to be heard in court hearings.

The State/Tribe provides the foster parents of a child and any pre-adoptive parent or relative

providing care for the child with timely notice of and a right to be heard in any proceeding to be held with respect to the child during the time the child is in the care of such foster parent, pre-adoptive parent, or relative caregiver. Notice of and a right to be heard does not require the State/Tribe to make the caregiver a party to the proceeding.

Foster care providers are entitled to, and will receive proper notification regarding the dates and times of all scheduled multidisciplinary team meetings (MDT) and court hearings for the duration of the placement of the foster child with the provider.

4.3.6    Regardless of how a family comes to the attention to the Department[2], the DoHS has identified youth considered appropriate to begin the wraparound process as having[3]:

- Youth, ages 12 to 17 (up to the youth's 17th birthday) with a diagnosis of a severe emotional or behavioral disturbance that impedes their daily functioning (according to a standardized diagnostic criteria) currently in out-of-state residential placement and cannot return successfully without extra support, linkage and services provided by wrap-around;

- Youth, ages 12 to 17 (up to the youth's 17th birthday) with a diagnosis of a severe emotional or behavioral disturbance that impedes their daily functioning (according to a standardized diagnostic criteria) currently in in-state residential placement and cannot be reunified successfully without extra support, linkage and services provided by wrap-around;

- Youth, ages 12 to 17 (up to the youth's 17th birthday) with a diagnosis of a severe emotional or behavioral disturbance that impedes their daily functioning (according to a standardized diagnostic criteria) at risk of out-of-state residential placement and utilization of wrap-around can safely prevent the placement;

- Youth, ages 12 to 17 (up to the age of the youth's 17th birthday) with a diagnosis of a severe emotional or behavioral disturbance that impedes their daily functioning (according to a standardized diagnostic criteria) at risk of in-state level 1, 2,3 or PRTF residential placement and they can be safely served at home by utilizing wrap-around;

After a family has been identified as potentially appropriate for wraparound, the worker should then initiate the referral process. Please refer to Safe at Home, WV wrap around policy.

## 4.4    Permanency Planning

---

[2] Families may be identified in CPS, YS, or Adoption
[3] The guidelines provided are aligned with the federal requirements for the title IV-E waiver program

119

Foster Care Policy
May 2024

D003107988

As part of the Unified Case Plan, the Multidisciplinary Treatment Team is required to develop a permanency plan for the child, which includes the specific actions required for the child to achieve their plan, timeframes for these actions, services necessary, agencies/providers responsible for providing these services, etc.

There are several common denominators that help determine when a child's permanency plan is most likely to occur and under what conditions. These include the following:

- Extended stays in foster care can have negative and lasting developmental effects on child development;

- Multiple placements increase the likelihood of having a negative impact on the ability of the child to achieve their permanency plan;

- Children placed close to their own family and communities are more likely to have parent visitation and to return home;

- Parents who visit regularly are more likely to be reunited with their children; and

- Children who remain in foster care longer than 12 to 18 months are less likely to return home.

As defined by the federal government, there are four primary permanency options available for children in foster care. These include:

- Reunification;

- Adoption;

- Legal Guardianship; and

- Placement with a fit and willing relative (transfer of legal and physical custody with no subsidy to a kinship/relative)

## 4.4.1  Reunification

For all children under 16 who enter care through juvenile proceedings, children who are placed in foster care through voluntary placement agreements, and those children who have been in foster care due to child abuse or neglect proceedings for less than 15 months whose parents have not committed aggravated circumstances, reunification should be considered the primary permanency plan.

In order to facilitate reunification efforts, the Multidisciplinary Treatment Team must identify and/or develop specific and individualized services to help the family address the issues that brought the child into foster care. These services should be:

a) Defined through a strengths-based, comprehensive family assessment;

b) Focused on the strengths and resources within the family and community;

c) Addressed in an open and inclusive forum with the family;

d) Goal-oriented and focused on building skills;

e) Focused on strengthening the family's problem-solving abilities;

f) Appropriate and timely to meet the child's needs;

g) Concentrated on identifying family supports; and

h) Provided in a culturally competent manner.

Such services may include, but are not limited to:

a) Family support groups;

b) Individual, group, or family counseling;

c) Parenting education;

d) Mental health services;

e) Substance use, misuse or substance use disorder treatment services;

f) Assistance to address domestic violence;

g) Structured visitation;

h) Career training/job placement services;

i) Homemaking/chore services; and/or

j) Family focused therapy.

Facilitating frequent and structured visits between the child and their parents is the most critical element to successful reunification. The child's foster/adoptive parents should be utilized as resources and mentors for the child's biological parents.

For reunification efforts to be productive, services and activities should be a collaborative effort between the biological parents, foster/adoptive parents, the child's worker, and the other members of the Multidisciplinary Treatment Team. The child's worker should fully disclose the rights, responsibilities, expectations, options, and consequences of the reunification plan to the child's biological family as well as the entire Multidisciplinary Treatment Team. For any child who has reunification as their identified permanency plan, the child's worker, as well as the entire Multidisciplinary Treatment Team, must develop a concurrent permanency plan for the child. Depending on the child's situation and needs, the concurrent permanency plan could be adoption, legal guardianship, or placement with a fit and willing relative.

The child's worker has specific responsibilities when reunifying families. These include:

a) Assess the parent's and child's progress in resolving the initial problems necessitating placement and identify a tentative return date with the parents.

D003107990

b) Negotiate a new written service agreement, based on the requirements of the case plan, with the parents and child containing tasks necessary for the smooth transition to return the child.

c) Assist the family in obtaining the necessary resources to establish and maintain the child in an acceptable standard.

d) Prepare the child, parents, foster/adoptive family, or other caregiver for return of the child.

e) Develop a worker and family visitation schedule in order to aid both child and biological parents in the process of reintegrating the family.

f) Provide follow-up services to the biological parents and child in order that the progress made by the family during separation is continued.

g) Identify community supports needed to aid family reintegration. The worker must assist parents in seeing that these supports are in place and coordinated within the context of the treatment plan.

h) Continue any specialized treatment services needed to maintain family stability and prevent reoccurrence of the behaviors which resulted in the original placement.

i) If it is determined that the family demonstrates an adequate level of stability, then termination of services can be considered. This determination would include the following conditions:

   1. The family is engaging in those behaviors which were defined as desirable in the treatment plan.

   2. There is evidence that the family has methods that support their capacity to cope adequately with life stresses, problems, and complexities.

   3. The family is capable of establishing a warm, give and take relationship with each other and expresses recognition for the individuality of all family members.

   4. There is evidence that the family can tolerate a high enough level of discomfort, if necessary, to allow the family members to strengthen their relationships with each other.

   5. The child's safety is protected by the family and its support system.

   6. The family can use its energies to concentrate on meeting its needs.

   7. The worker will meet with the Multidisciplinary Treatment Team to assess the family's progress in meeting the goals of the Unified Case Plan.

   8. The worker will plan with the family a projected date for case closure, submit necessary reports to the court with the recommendation to terminate the Department's responsibility, and return legal custody to the biological parents.

D003107991

9. The worker will continue to provide after care services, if necessary, for up to six months of return of the child.

It is vital to always remember that children should not be separated from their families longer than necessary. Once safety can be re-established within the home, the child/children should be returned to that home and reunified with their parents/guardians. Legal and physical custody of the child/children should be discussed with the Multi-Disciplinary Team (MDT) and the Courts.

### 4.4.2 Kinship Care

Placement with a fit and willing relative, in and of itself, does not necessarily provide a child in foster care with permanency. Every child in the custody of the Department deserves to have a home that gives the child a sense of security and belonging while also providing the caregiver with the tools and resources necessary to meet those child's individual needs. Kinship care can provide a child with permanency as well as providing the relative with the financial, medical, and legal assistance necessary to raise the child to maturity through three separate avenues.

a) Adoption by Kinship/Relative

The relative foster/adoptive parent may elect to adopt the child placed in their home. This option allows the relative caregiver to become the legal parent of the child and receive all the benefits of legal custody. The relative may also receive a monthly maintenance adoption subsidy for the child that has been adopted to assist the caregiver in covering the additional expense of caring for the child. A medical card that covers the child's physical and mental health care needs is also available to the relative caregiver that adopts the child. In addition, a subsidy is available that covers $2,000.00 of the legal expenses incurred by the relative in adopting the child.

For more information about the adoption process, please see the Adoption Policy Section of the Social Services Manual.

b) Legal Guardianship and Kinship/Relative

The relative foster/adoptive parent may elect to become the legal guardian of the child placed in their home. This option allows the relative caregiver to become the legal custodian of the child and receive all the benefits of legal custody. The relative may also receive a monthly maintenance legal guardianship subsidy for the child to assist the caregiver in covering the additional expenses of raising the child. A medical card that covers the child's physical and mental health care needs is also available to the relative caregiver that enters into a legal guardianship agreement for the child. In addition, a subsidy is available that covers $2,000.00 of the legal expenses incurred by the relative to cover attorney fees for the legal guardianship proceedings.

For more information about the legal guardianship process, please see the legal guardianship section of the Social Services Manual.

c) Transfer of Custody to Kinship/Relative Family

D003107992

If a relative is unwilling or does not meet the requirements to become a foster/adoptive parent or legal guardian, the Department may elect to ask the court to transfer legal custody of the child to the relative currently providing care for the child at the dispositional hearing. This option does not provide the relative caregiver with any financial or medical support for the child. The relative may elect to receive TANF benefits for the child which also provides a medical card to cover the physical and mental health for the child. This option may only be utilized under the following conditions:

- Reunification has been ruled out as a possible permanency option for the child;

- The child's worker has explained all the benefits of adoption and legal guardianship to the relative foster/adoptive parent who decides not to pursue these options; or

- The relative caregiver cannot meet the requirements necessary to become foster/adoptive parent or legal guardian; and

- The Multidisciplinary Treatment Team and the Court determine that this placement is in the best interest of the child and the relative is able to provide an appropriate and safe permanent home for the child.

- The child's worker will request that the court transfer custody of the child to the relative caregiver at the dispositional hearing.

### 4.4.3 Legal Guardianship

Legal guardianship is the permanent transfer of legal responsibility for a child in state custody to a relative or person other than their parents. Unless specified otherwise by the court, a grant of custody of a child to the Department by the court is sufficient for the Department to transfer legal guardianship. The Department may consent to the transfer of legal guardianship when certain conditions are met.

Legal guardianship should be considered for a child when the following conditions have been met:

- The permanency goals of reunification and adoption have been ruled out by the Multidisciplinary Treatment Team for the child and the reasons are documented in the case record.

- The child has resided with the prospective non-relative guardian for at least six (6) months immediately prior to establishing legal guardianship. In order for the child to be IV-E reimbursable, the child must be in the home six months prior to the completion of the legal guardianship.

- The child must be at least 12 years old if they are in the home of an unrelated caregiver. There is no age limit when the caregiver is related to the child.

- The best interest determination must be documented in the child's case plan.

- The child must have a strong attachment to the prospective legal guardian and the guardian must have a strong commitment to the child.

124

D003107993

- The child, if 12 years of age or older, must consent to the legal guardianship arrangement.

  For a child who does not meet these eligibility requirements for legal guardianship, the child's worker will work with the Multidisciplinary Treatment Team to develop an appropriate alternative permanent living arrangement to be included in the child's case plan.

  For a child who meets the criteria for legal guardianship, the child's worker must assess the appropriateness of the case for this permanency plan. A child may be considered for legal guardianship even though it is not the permanency goal for all children in a sibling group.

**Please see Legal Guardianship Policy for further information on the legal guardianship process.**


### 4.4.4 Adoption

Adoption is a way of providing security for, and meeting the developmental needs of, a child by legally transferring ongoing parental responsibility for the child from the birth parents to adoptive parents. Section §49-4-114 gives the Department the responsibility to provide child welfare services and to accept guardianship of children and consent to their adoption. In order for the Department to have the right to place a child for adoption and later give formal consent to their adoption, the Department must obtain legal guardianship of the child. This may occur through the termination of parental rights to the child either through a voluntary relinquishment or through a court order. The parental rights shall not be terminated if a child 14 years of age or older, or otherwise of an age of discretion as determined by the court, objects to such termination.

a) The decision to pursue adoption as a permanency option should be made by the Multidisciplinary Treatment Team, which should include the child's worker, the supervisor, the private agency staff if any, the child, the child's foster/adoptive parents, the adoption specialist and/or their supervisor, and the Guardian Ad Litem.

b) Within the Unified Case Plan, filed with the court prior to disposition, the child's worker must recommend adoption as the permanency plan for the child and detail the steps necessary to achieve permanency.

c) Request an updated home study from the Home Finding Specialist or child placing agency if one has not been done within the past year or initiate the Interstate Compact on the Placement of Children (ICPC) process if the prospective adoptive parent lives in another state. (If the home is through a child placing agency the study and annual updates will need to be requested from agency.)

d) The Multidisciplinary Treatment Team should also act as the permanent placement review committee to monitor the implementation of the permanency plan for the child and report on the progress and developments in the case every three months until the child's permanent placement is achieved.

e) If an order of sibling separation has not been previously entered and the Unified Case Plan includes placement of a child separate from their siblings, the worker must secure a court order which finds that it is in the best interest of the child not to be placed in the same home as their sibling. The order must be documented on the Hearings Outcome, details screens, and document tracking in CCWIS.

f) If not already completed, the child's worker must complete the Birth Parents Background Information form (SS-FC-12) and the Birth and Medical History of the Child form (SS-FC-12A) in CCWIS.

g) The child's worker must obtain a certified copy of the birth parents birth certificates and death certificate if applicable.

h) The child's worker must follow the specific steps outlined in adoption policy.

### 4.4.5  Other Planned Permanency Options

In addition to the four federally sanctioned permanency options, the court may sanction another permanency option to meet an individual child's needs. After considering and ruling out reunification, adoption, legal guardianship, and kinship/relative care as viable permanency options for the child, the child's worker, with the assistance of the Multidisciplinary Treatment Team, may conclude that the most appropriate permanency plan for the child is placement in another planned permanent living arrangement.

a) Emancipation

For children who are over 16 years old, emancipation may become the permanency plan for those youth who are not able to return home or live with relatives and cannot or do not wish to be adopted or placed with a legal guardian.

- The decision to pursue emancipation as a permanency option should be made by the Multidisciplinary Treatment Team, which should include the child's worker, the supervisor, the private agency staff if any, the child, the biological parents if appropriate, and the Guardian Ad Litem.

- Within the Unified Case Plan filed with the court prior to disposition, the child's worker must recommend emancipation as the permanency plan for the child and detail the steps necessary to achieve permanency.

- The child's worker must document to the court the compelling reasons emancipation is in the best interest of the child.

D003107995

- If an order of sibling separation has not been previously entered and the Unified Case Plan includes placement of a child separate from their siblings, the worker must secure a court order which finds that it is in the best interest of the child not to be placed in the same home as their sibling. The order must be documented on the Hearings Outcome, details and document tracking screens in CCWIS.

b) Other Planned Permanent Living Arrangement (OPPLA)

For a child age 16 or older for which reunification, adoption, legal guardianship, and kinship care have been ruled out, continued foster care may be an appropriate plan. This permanency option is only appropriate when a parent and child have a significant bond, but the parent is unable to care for the child because of an emotional or physical disability and the child's foster parents have committed to raising them, by signed agreement, to the age of majority and to facilitate visitation with the disabled parent.

The following must occur:

- The decision to pursue continued foster care as a permanency option should be made by the Multidisciplinary Treatment Team, which should include the child's worker, the supervisor, the private agency staff if any, the child, the biological parents, and the Guardian Ad Litem.

- Within the Unified Case Plan filed with the court prior to disposition, the child's worker must recommend continued foster care as the permanency plan for the child and detail the steps necessary to achieve permanency.

- The child's worker must document to the court the compelling reasons continuation in foster care is in the best interest of the child and show the reasons why reunification, adoption, legal guardianship and kinship care have been ruled out as permanency options for the child.

- Initiate the Interstate Compact on the Placement of Children process if the foster parent lives in another state.

- If an order of sibling separation has not been previously entered and the Unified Case Plan includes placement of a child separate from their siblings, the worker must secure a court order which finds that it is in the best interest of the child not to be placed in the same home as their sibling. The order must be documented on the Hearings Outcome screen, details screen and document tracking in CCWIS.

- The foster/adoptive parents must agree to the following in writing: that they will provide care for the child until the child exits foster care, specific requirements for visitation with the child's parents, and specific responsibilities towards the child and Department as indicated in policy. All of these must be outlined in the Unified Case Plan

D003107996

- The Department must assure that foster children whose permanency goals are continued foster care receive the same rights and protections provided to any child in the foster care system. This includes a six-month review of the child's case plan, an annual judicial review, life skills instruction, medical and mental health coverage, educational planning, etc.

- All children in foster care must continue to participate in judicial reviews once every 12 months.

## 4.5    Concurrent Planning

Concurrent planning supports intensifying and expediting efforts to achieve permanence for a child within one year - a time frame that reflects a child's sense of the passage of time. Concurrent planning safeguards opportunities for secure childhood attachments by safely building a stronger bond between the child and birth parent through reunification efforts, and by supporting the tie between the child and the caregiver through relative care, adoption, or legal guardianship when appropriate.

Effective use of concurrent planning allows the child to have an alternative permanency option that is being worked on at the same time as efforts are made to achieve the primary permanency plan for the child. All children whose permanency plan is reunification must have a concurrent permanency plan. For other children, concurrent planning should be utilized in an effort to expedite the achievement of permanency for these children. Concurrent planning has several practices that are designed to make cases move quickly through the foster care system until permanency is achieved. Some of these primary objectives include the following:

- Everyone involved in the child's life must attend the Multidisciplinary Treatment Team meetings where the child's case will be discussed in a forthright, honest manner.

- The services identified for the child's parents as part of the Unified Case Plan must be appropriate, intensive, and directly address the reasons the child was removed from the home.

- Full disclosure of information to birth families early in the planning process regarding the importance of their regular involvement in planning for the return of the child, their rights and responsibilities, and the legal consequences of inaction by the child's parents or continued inappropriate behavior must be stated to the child's parents in a manner that they understand.

- The child should be placed in the most family-like placement appropriate to meet the child's needs. If possible, the child should be placed in a foster/adoptive home that is willing to help facilitate reunification with the child's family while also be willing to become a permanent placement for the child if reunification efforts do not work.

- Frequent visitation with birth parents is vital as long as the child's safety can be assured.

- Aggressive search for absent or non-custodial parents and addressing all paternity issues such as blood tests, child support, etc., within the first three months of placement.
- Search for appropriate relatives who might have an interest in caring for the child within the first 30 days of placement.
- The use of an assessment of the birth family's strengths, needs, and current/past problems that assist the child's worker in determining the risk of foster care drift and the need to place the child with a foster/adoptive family who will actively engage in supporting family reunification efforts, and also commit to serve as a permanent home for the child if reunification is not possible.
- Conduct frequent and substantive case reviews that carefully assess the efficacy of services being provided to assist the family to achieve the case plan goals and modify the case plan as required.
- The ability to mobilize a reluctant family by confronting birth parent's ambivalence and indecision; not allowing the crisis to paralyze case planning and decision-making.
- A respect for the sense of time of young children because separations and relationship disruptions in the early months and years of life interfere with the younger child's initial capacity to learn how to trust and form secure attachments with adults.

## 4.6   Aftercare Planning

WV Code §49-4-409 provides requirements for after-care planning as it relates to children in foster care. These plans are specific to what information is documented and should be specific to the child's individualized needs and the resources available in the child's community.

After-care plans shall contain a:

- Detailed description of the education, counseling, and treatment the youth received while in foster care, and;
- Proposal of how the educational, counseling, and treatment needs can be obtained in the community, and;
- Description of any problems the child has, the source of those problems, and a proposal of how those problems may be addressed upon discharge.

Often these plans may come in the form of a "discharge plan" which residential providers are required to provide to the worker, the youth, and the youth's family. When the worker utilizes this as the after-care plan, the worker will still be responsible for ensuring it is specific to the child and contains the required elements as described above. The worker will also be responsible for ensuring that it is finalized 60 days prior to the youth's

129

D003107998

discharge and that all the required parties receive the plan within 10 days of its completion.

Whether the worker utilizes a residential discharge plan or not, the worker will need to document the required information in a court summary for MDT review and court review, and upload the document to the CCWIS filing cabinet. If the plan is accepted the worker will document the appropriate services to update the Child and Family Services case plan to incorporate the services and educational components of the plan.

The worker must ensure the MDT, the court, and the following individuals, if not active MDT members, receive a copy of the court summary, case plan, and address information for all recipients.

- The child's parent, guardian, or custodian, and;
- The probation officer (if applicable) or the community mental health provider, and;
- The prosecuting attorney, and;
- The principle of the school in which the child will attend.

Each recipient of the plan will have 21 days to submit written comments and feedback to the plan if they disagree with any portion of the plan. Any party who submits feedback must ensure all other parties receive the written feedback as well.

The worker will contact each individual or entity listed on the plan as providing a service, formal or informal, to ensure they can provide the required service. The court will schedule a hearing to determine whether the plan will be adopted or not. The court will appoint either the probation officer (If applicable) or the community mental health provider as supervisors of the plan.

When a probation officer is involved (if applicable) in the case and the department worker is ordered to be the supervisor of the plan, the worker must contact their Regional Program Manager to report the incident to their Regional Attorney for review.

## Section 5 Case Management

### 5.1 Visitation

#### 5.1.1    Visitation with Parents and Extended Family

Visitation arrangements must be agreed upon as soon as possible after placement and documented in CCWIS on the visitation plan screen. These arrangements must be made in agreement of the biological family, the foster/adoptive family and the child's worker. Any restrictions on visitation arrangements by the worker or the court will be noted in the Unified Case Plan. All visits will be coordinated through consultation with the child's worker.

130

D003107999

The biological family is to be given a copy of the visitation agreement and a copy is given to the foster/adoptive parents. This agreement must include the visitation schedule, the visitation site, and time, date, and transportation arrangements. If the child's parents or other family members who are to visit with the child do not have transportation, the child's worker must assist the family in finding transportation to assure the visitation takes place.

The child's worker is responsible for ensuring that the visitation plan is followed. The child's foster/adoptive parent should provide routine transportation for visitation, if possible. If transportation is a hardship for the foster/adoptive parent, the child's worker will provide the transportation to enable the visit to occur.

**5.1.2**    Sibling Visitation

State Statute, §49-4-111 requires the Department to place siblings together when placing a child in foster care that also has siblings in care. Siblings are defined by §49-1-204 as children who have at least one biological parent in common or who have been legally adopted by the same parents or parent. Workers should consider what is in the best interest of the children. If children within the home consider themselves siblings, efforts should be made to place them together.

If the child's case plan includes placement of a child in a placement separate from their siblings, the worker must secure a court order which finds that it is in the child's best interest not to be placed in the same home as their siblings. This order must be documented on the Hearings Outcome screen, Details screen and in document tracking in CCWIS. In some circumstances, children in foster care may need to be placed separately from their siblings who are also in care. This may occur when one sibling is a danger to their sibling or when a large sibling group is being removed from their home and a placement resource to allow all the children to be placed together is not readily available.

When siblings are placed separately, the Multidisciplinary Treatment Team must develop a visitation plan to maintain the sibling relationship. This plan must be contained in the Unified Case Plan.

The child's worker is responsible for ensuring that the visitation plan is followed. The child's worker will provide a copy of the visitation plan to the child's foster/adoptive parent. The child's foster/adoptive parent should provide routine transportation for visitation, if possible. If transportation is a hardship for the foster/adoptive parent, the child's worker will provide the transportation to enable the visit to occur. The child's worker is responsible for documentation of the visitation plan in CCWIS on the visitation plan screen.

## 5.2 Caseworker Contact

5.2.1  Contact with Child in Foster Care

D003108000

Regular contact between the child who is in foster care and the child's worker allows the child to have ample opportunity to express concerns, fears, problems with the placement, or other special issues. These meetings also provide the child's worker with an opportunity to discuss the child's case plan and services being provided, and to directly assess the child's progress.

The child's department case worker is required to maintain and conduct meaningful contact with the child at least monthly to ensure that the placement is meeting the child's needs. The child's worker will provide an opportunity for the child to have time alone with them during each visit to address any concerns or issues related to the child's needs or placement. (If the child is physically, emotionally, or developmentally unable to communicate, the worker may fulfill this requirement by discussing the child's progress with the caregiver.) The child's worker is required to have a minimum number of face-to-face visits with the child and caregiver(s) in the home where the child is placed. (See below for minimum contact required).

The Child and Family Services Improvement Act of 2006- P.L. 109-288 made a change to the Title IV-B Act. Under the new requirements of IV-B, states are now required to report on caseworker visits with children in foster care. Specifically, the requirement is for a child in a foster care setting to have a face-to-face visit at least once a month, by the case worker, with a majority of the visits occurring in the child's foster care residence. During the visit the case worker is to focus on issues related to case planning and service delivery.

The US Department of Health and Human Services, *45 CFR 1355.20*, defines foster care as "24 hour substitute care for children placed away from their parents or guardians and for whom the state agency has placement and care responsibility. This includes, but is not limited to, placements in foster family homes of relatives, group homes, emergency shelters, residential facilities, childcare institutions, and pre-adoptive homes. A child is in foster care in accordance with this definition regardless of whether the foster care facility is licensed, and payments are made by the state or local agency for the care of the child, whether adoption subsidy payments are being made prior to the finalization of an adoption, or whether there is federal matching of any payments that are made". The federal guidelines also require visitation to occur monthly with children who are in their biological homes on a "trial home visit" when the Department retains care and control of that child or legal custody of the child.

The caseworker will be defined as the worker who is responsible for the handling of the child's case and will therefore be the worker who is assigned to the case in CCWIS. In cases where a child placing agency is providing foster care services to the child, they will assist the Department in meeting the caseworker visit requirements. Therefore, the child's caseworker through the child placing agency, who is responsible for handling the child's case plan, will be responsible for making visits to the home.

132

In some situations, the caseworker visitation requirements will be more stringent than the federal requirements, since the child's needs will be of a higher degree and require more contact. These requirements are standards set forth under the Council for Accreditation (COA), with which the State of West Virginia has indicated that they will comply.

### 5.2.2 Visitation/Contact Requirements

a) In-State Placements

1) Face-to-face visits/contacts are to occur within 72 hours of placement to assess the child's adjustment to the placement.

2) Face-to-face visits/contacts by the Department case worker are to occur at least once during a calendar month.

   Exception: If the child is placed through a child placing agency or placed in a specialized family care home (Medley), the agency worker is responsible for making face-to-face visits/contacts at least **twice** during a calendar month.

3) If the child is placed through a child placing agency, the child's Department case worker must make telephone contact with the child at least once during a calendar month.

4) If the child is placed through a CPA, the child's Department case worker is responsible for making a face-to-face visit/contact with the child at least once every three months.

### 5.2.3 Out-of-State Placements

a) The Department case worker is responsible for making telephone or face-to-face visit/contact with the child within 72 hours of placement to assess the child's adjustment to the placement.

b) The Department case worker is responsible for making telephone contact with the child at least once during a calendar month.

c) The Department case worker is responsible for making face-to-face visit/contact with the child at least once during a calendar month.

### 5.2.4 Are Visits/Contacts Ever Required More Often?

a) There are situations and circumstances that may require special attention or more frequent contacts. During the following times, the child's Department case worker should increase the visits/contacts with the child to facilitate the use of the corrective environment and relationships within the home/facility:

D003108002

1. When the child experiences separation or loss, is in need of medical care or hospitalization, has other disturbing experiences, or has social or school problems.

2. When there is going to be a transfer of the child's Department case worker.

3. When there are new or additional problems in the child's biological family.

4. When a child has severe problems of maladjustment and difficult behavior.

### 5.2.5  Who is Responsible for the Visits/Contacts?

a) If the child is placed in a DoHS foster family care home, kinship/relative home, group/residential foster care setting, emergency shelter, CED (Medley) home, transitional living placement, or is in a trial home visit placement setting, the child's Department case worker is responsible for making the visits/contacts with the child.

b) If the child is placed in a foster/adoptive home through a child placing agency, the CPA case worker is responsible for making visits/contacts with the child at least twice during a calendar month; the child's Department case worker is responsible for making visits/contacts with the child at least once every three months.

### 5.2.6  What is Considered a Foster Care Setting?

a) A foster care setting could be an out of home placement, such as a foster/adoptive home, kinship/relative home, group residential home or shelter, or it could also be when a child is placed with their biological parent or relative on a "trial home visit".

b) Foster care settings also include those placements out-of-state, such as psychiatric treatment facilities, pre-adoptive homes, or residential facilities.

### 5.2.7  Where are the Visits/Contacts to Occur?

a) The **majority** of the required monthly visits/contacts are to occur in the child's foster care placement or residence.

b) In addition to the required monthly visits/contacts occurring in the foster care placement, the child's worker should take other opportunities to meet with the child.  These meetings may occur at case reviews and hearings, Multidisciplinary Treatment Team meetings, other treatment team meetings, child & parent visits, etc. **(Visits should not disrupt the child's school day, so they should not occur at the child's school and a child should not miss school for a visit with a worker)**.

### 5.2.8  Who is Involved in the Visit/Contact?

134

a) The child must be involved in the visit. (If the child is physically, emotionally, or developmentally unable to communicate, the worker may fulfill this requirement by discussing the child's progress with the caregiver.)

b) The child should be involved in the telephone contacts, but if they are unable to do so as indicated above, the worker may fulfill this requirement by discussing the child's progress with the caregiver.

c) The child's substitute caregiver should always be involved in the visit whenever possible but must be involved when the visit occurs in the foster care placement or residence.

5.2.9   What is the Purpose of the Visits/Contacts?

a) Visits/contacts are to provide an opportunity for the child's worker to observe the child in the foster care placement or residence.

b) To provide an opportunity for the child to express any concerns or needs to the worker about their foster care experience or placement.

c) The worker is required to assess the child's safety and well-being during visits/contacts.

d) The child's worker is also required to focus on issues related to case planning and service delivery.

5.2.10   What Visits/Contacts are Required with the Foster Care Agency?

a) If the child is placed with a child placing agency, the child's Department case worker is responsible for having contact with the child placing agency staff at least once during a calendar month to ensure that visits/contacts are occurring between the child and the CPA case worker, and to address any placement, case planning, or service delivery concerns.

5.2.11   Are Visits/Contacts Required with the Child's Parents/Guardians?

a) The child's Department worker must have contact with the child's parents at least once during a calendar month.

5.2.12   How and When are the Visits/Contacts to be Documented?

a) The child's Department case worker must document all face-to-face contacts within **three business days** of the contact being made. All other contacts must be documented in CCWIS, in the CONTACTS SCREEN, within five business days of the contact being made. The contact must contain the child's name and date of visit/contact. From the Type/Location pick list, select Face-to-Face with Child in Placement, and then select from the Purpose pick list, some type of case planning or service delivery reason for the visit.  Some values for what may be chosen in CCWIS as the purpose for the visit are: Case Plan/Review, Education, Evaluation, Medical/Dental, Placement Assessment, Referral for Service, Service Delivery, Treatment Plan Review and Treatment Planning.

D003108004

5.2.13 Monthly Department Caseworker Visits with Children Placed Out-of-State.

**a)** For every monthly face-to-face visit with a child placed out-of-state, the caseworker will complete the following actions to ensure the child's ongoing safety and well-being:
Engage the child in meaningful conversation by utilizing the required "Monthly Conversation Topics for Children Placed Out-of-State."

    1) Utilize the "Monthly Evaluation of Documentation and Facility Areas for Children Placed Out-of-State" checklist to:

- Review documentation in the child's record, carefully examining all documentation of critical incidents, restraints, treatment plans, medication/medical instances, grievance and pending IIU investigations; and
- Tour the facility including but not limited to the child's bedroom and bathroom, dining area, recreational and timeout areas.

    2) Discuss areas of concern identified by the child with professional staff.

**b)** After taking the above actions and carefully considering all information obtained, the caseworker will determine if there is significant risk to child safety, and take the following actions, as applicable:

    1) If significant safety risk is evident, the caseworker will consult with their supervisor **before leaving the facility**, to determine needed action to ensure immediate safety.

    2) If there is no significant safety risk evident, the caseworker will plan the next monthly visit.

    3) Upon return to their office, the caseworker will discuss with their supervisor any identified concerns for safety to determine if any additional action is needed. Additional action may include a referral to child protective services, or the regulatory and licensing entity which oversees the out-of-state program.

**c)** After carefully considering all information obtained and observed by the caseworker, the supervisor will take the following actions, as applicable:

    1) If significant safety risk is evident, the supervisor will consult with the Social Services Manager, Deputy Commissioner, and the Program Manager for Residential Licensing to determine needed actions and next steps.

    2) If there is no significant safety risk evident, no further action is required.

    3) If any concerns for safety are identified, based on information gathered and observed by the caseworker, the supervisor will determine if any additional action is needed, such as a referral to child protective

D003108005

services, or the regulatory and licensing entity which oversees the out-of-state program.

5.2.14 Reports of Child Abuse or Neglect in any Out-of-State Foster Care Placement

**a)** For reports of suspected child abuse or neglect in any out-of-state placement, including foster family homes and facilities, the **caseworker** will:

1) Make a report to West Virginia DoHS's Centralized Intake for Child Protective Services/Institutional Investigative Unit (IIU).
2) Make an additional report to the appropriate state Child Protective Services authorities.
3) Notify the following:
   - District staff
   - The child's parent(s), if parental rights have not been terminated, and their attorney(s)
   - The child's attorney and/or guardian ad litem
   - The judge overseeing the case in which the child is involved
   - The child's probation officer, if applicable

**b)** For reports of suspected child abuse or neglect in out-of-state foster care placement, the **IIU supervisor** will:

1) Screen the report. If the report is not accepted, no further action is required. If the report is accepted, the supervisor will assign it to an IIU worker for follow-up.
2) Determine whether any immediate actions are necessary to protect the child and report those to the IIU/Licensing Program Manager, who will consult with the Director of Children and Adult Services and if indicated, consult with BSS leadership regarding recommendations to ensure immediate safety of the child(ren).
3) Assist in preparation of notifications to district staff and the Administrative Office of the Supreme Court of Appeals.

**c)** For reports of suspected abuse and neglect in out-of-state foster care placements, the **IIU worker** will:

1) Contact the foster care agency, if applicable, and request a copy of any documentation and/or incident reports relating to the allegations.
2) Contact the appropriate out-of-state authorities and request a copy of the investigative report.

137

D003108006

3) Receive verbal or written report from the out-of-state CPS or regulatory authority.

d) When allegations are of a serious nature to indicate harm or risk to West Virginia children in the facility the following with occur:

1) The Program Manager of Residential Child Care Licensing and IIU will immediately notify the Director of Children and Adult Services and will consult with the Commissioner and Deputy Commissioners of the Bureau for Social Service to determine the appropriate intervention.

2) The program manager will compile a list of children at the facility and provide it to the commissioner and deputy commissioners.

3) If it is decided that face-to-face interviews are necessary, the deputy commissioners or designee will determine the appropriate field staff to travel to the facility and inform the Administrative Office of the Supreme Court of Appeals, should the Court wish to participate in the visit.

4) The designated workers will engage all West Virginia children in a meaningful conversation utilizing the "Monthly Conversation Topics for Children Placed Out-of-State."

5) Utilizing the "Monthly Evaluation of Documentation and Facility Areas for Children Placed Out-of-State" checklist, the designated workers will review documentation in the child's record of critical incidents, restraints, treatment plans, medication/medical instances, grievance and pending IIU investigations.

6) Utilizing the "Monthly Evaluation of Documentation and Facility Areas for Children Placed Out-of-State" checklist, the designated workers will tour and review the facility, including but not limited to the child's bedroom and bathroom, dining, recreational and timeout areas.

7) The designated workers will compile information so a decision on safety and placement can be made.

8) If it is determined that placement in the facility is not in the best interest of West Virginia children, the program manager will issue a memorandum to the appropriate field staff to notify them of the decision regarding residential placements within the facility.

9) The program manager will save the memorandum to the provider's record in the CCWIS system.

e) For reports of suspected abuse and neglect at an out-of-state facility where West Virginia children reside, but the allegations do not directly include West Virginia children:

D003108007

1) The Interstate Compact on the Placement of Children (ICPC) worker will forward all email notifications regarding investigations of out-of-state facilities to the Program Manager for Residential Child Care Licensing and IIU Unit, who will review the information to determine if placement at the facility is in the best interest of West Virginia children.

2) The program manager will notify the Commissioner and Deputy Commissioners of the Bureau for Social Service.

3) If it is determined that placement in the facility is in the best interest of West Virginia children, the program manager will continue to monitor forthcoming information regarding the agency, disseminating it to the above individuals.

4) If it is determined that face-to-face interviews are necessary, the deputy commissioners or designee will determine the appropriate field staff to travel to the facility and inform the Administrative Office of the Supreme Court of Appeals, should the Court wish to participate in the visit.

5) Utilizing the "Monthly Conversation Topics for Children Placed Out-of-State" and the "Monthly Evaluation of Documentation and Facility Areas for Children Placed Out-of-State" checklist, the designated workers will interview all West Virginia children, tour the facility, including viewing the child's bedroom and any timeout area, and compile information so a decision on safety and placement can be made.

6) If it is determined that placement in the facility is not in the best interest of West Virginia children, the program manager will issue a memorandum to the appropriate field staff notifying them of the decision regarding residential placements within the facility.

7) The program manager will save the memorandum to the provider's record in the CCWIS system.

**f)** For conclusion of investigations of suspected abuse and neglect in out-of-state foster care placement, the IIU worker will:

1) Document all contacts.

2) Document the results of the investigation conducted by the out-of-state agency in the "Incomplete Investigation Closure Comments" screen.

3) Request supervisory approval for report and closure.

4) Notify the child's caseworker of the outcome of the investigation.

5) Forward a copy of any written documentation to the child's caseworker.

6) Notify the district Social Services Manager, the child's caseworker, and their supervisor by e-mail of the findings.

Foster Care Policy
May 2024

D003108008

**g)** For investigations which result in substantiated findings of abuse or neglect in out-of-state foster care placements:

1) The IIU supervisor will review the documentation from the out-of-state agency and determine whether sufficient action has been taken to correct the problems contributing to abuse and neglect.
2) The IIU supervisor will notify and confer with the Program Manager for Residential Licensing and IIU if it is believed the problems have not been corrected and children are subject to continued unsafe conditions.
3) If it is believed that unsafe conditions exist in a facility and are not being adequately addressed, the program manager will consult with the commissioner and deputy commissioners to determine if admissions to the out-of-state facility should be prohibited and/or if all West Virginia children should be removed from the facility.
4) The IIU supervisor will assist in the preparation of notification to district staff and the Administrative Office of the Supreme Court of Appeals.

## 5.3   Case Staffing

When children are placed in foster/adoptive family care, case staffings should be utilized to communicate the child's and family's progress on issues that do not require an MDT meeting but do require consultation between the child's worker, supervisor, biological family, foster family, agency staff, and/or others who may provide positive support and/or information.

At a minimum, staffings should be held at the end of the child's first 30 days of placement and prior to discharge. The child's worker will be expected to attend and to transport the child's family when necessary and appropriate.

## 5.4   Overnight Travel Requirements

When overnight travel with a child in foster care is required for placement, doctor visits, etc., two child welfare staff must be present for the transportation of the child if the trip requires an overnight stay in a hotel. The child must have 24-hour supervision for the duration of the trip. During the hotel stay, at least one child welfare staff must remain awake to provide supervision for the child. The child may be supervised in shifts to ensure both child welfare staff obtain adequate sleep to resume traveling the following day.

## 5.5   Transaction Date Requirements

Transaction dates must occur the **same day** of a child's entry into or exit from placement. This is to ensure that a provider does not receive an extra monthly payment that the Department must redeem and to ensure that a provider is not underpaid, resulting in a

140

D003108009

demand payment for the unpaid amount. Any change in placement (entry dates or exit dates) must be entered within three working days.

For children returning home on trial return to caregiver, the placement must be end dated when they return home. Removals and custody status will remain open in CCWIS. When the court returns legal and physical custody to the parents the worker must end date the removal the same day.

Financial penalties will occur if the entry and exit of placement and removal transaction dates are entered later than 30 days beyond the actual date of entry or exit to avoid an error. To be in compliance with the AFCARS requirements and to avoid penalties, there can be no more than an overall 10% error rate in transaction dates for the entire agency per federal fiscal year. This includes all placement types; kinship/relative, traditional and specialized foster homes, residential treatment facility, shelter, and psychiatric facility.

## 5.6   Termination of Parental Rights (TPR)

Permanent guardianship of a child applies when a parent's rights to a child have been terminated by the court or through a voluntary relinquishment. If both parents' rights have been terminated the child is considered a state ward.   If the state ward's permanency plan is adoption, both parents' rights must be terminated either by a voluntary relinquishment or court order.   In cases where a child's parent is deceased, a certified death certificate must be obtained and presented to the court for purposes of termination.   The death certificate should be documented in CCWIS and placed in the child's paper file.

If the termination of parental rights is via a court order, the court order shall specify that all the parental rights and responsibilities to the child, including the right to consent to adoption, marriage, visitation, etc., have been transferred to the Department. When a circuit court terminates parental rights either through an involuntary termination or a voluntary relinquishment, it must ordinarily require the terminated parent to continue to pay child support for the child pursuant to the Guidelines for Child Support Awards. If the court finds that it is not in the best interest of the child to order the parent to pay support pursuant to the Guidelines, the court may disregard the Guidelines, but must make specific findings on the record regarding such reasoning.   The court may also reiterate prior rulings that held obligation of support is owed to a child by both parents until the child is placed in the permanent legal custody of another guardian/parent/obligor, such as in adoption.

The age of the child should be considered in terminating a parent's rights.   If a child is 14 years of age or older or otherwise an age of discretion, their parents' rights should not be terminated without the child's approval.   The child should be involved in evaluating the agency's interest and concerns for their future when developing their permanency plan. Whether a child is of an age of discretion is determined by the court.

In accordance with the Adoption and Safe Families Act, a petition must be filed or joined by the state as defined in §49-4-605 to terminate parental rights when a child has been

in the custody of the Department for 15 of the most recent 22 months. **In addition, a petition must be filed to terminate parental rights if:**

a) The child has been abandoned;

b) The court has determined that the parent has committed murder or voluntary manslaughter of another of their children;

c) The court has determined that the parent has attempted or conspired to commit such murder or voluntary manslaughter or has been an accessory before or after the fact of either crime;

d) The court has determined that the parent has committed unlawful or malicious wounding resulting in serious bodily injury to the child or to another of their children;

e) The parental rights of the parent to a sibling have been terminated involuntarily; or

f) If a parent whose child has been removed from the parent's care, custody, and control by an order of removal voluntarily fails to have contact or attempt to have contact with the child for a period of eighteen (18) consecutive months: Provided, that failure to have, or attempt to have, contact due to being incarcerated, being in a medical or substance use disorder treatment or recovery facility, or being on active military duty shall not be considered voluntary behavior.

**The Department may determine not to seek termination of parental rights:**

a) At the option of the Department if the child has been placed with a relative; or

b) The Department has documented in the child's case plan that there exists a compelling reason that filing a petition would not be in the best interest of the child; or

c) The Department has not provided, when reasonable efforts to return a child to the family are required, the services to the child's family the Department deems necessary for the safe return of the child to the home.

**When the court terminates parental rights and commits the child to the guardianship of the Department, the child's worker will do the following:**

a) Initiate the permanency placement review process to review the child's case every three months.

b) If the child's permanency goal is adoption, the child must be referred to the Adoption Resource Network within 30 days; and

c) Develop a post-termination placement plan which is to be submitted to the court and the Multidisciplinary Treatment Team.

The local office will annually report to the court the current status of all children the Department has been granted permanent guardianship of who have not been adopted.

D003108011

The report, in letter form, is to be directed to the circuit court through the prosecuting attorney's office. The child's name, birth date, legal status, and placement status are to be reported. Any changes from the reporting for the previous year are also to be noted in the letter to the court.

## 5.7  Medicaid and Medical Insurance

### 5.7.1  Medicaid for Children in Foster Care

All children in foster care are eligible for the Medicaid program. The Department will issue a Medical Card for each child in foster care placement monthly.

Children in foster care who may need medical services prior to the issuance of a medical card are to be given a copy of the form letter FSC-0033 stating their name, birth date, social security number, date of placement, the name of the facility or foster/adoptive parent where the child is residing, and the type of services being provided. The letter is time limited. This form is to be used only if the child does not yet possess a valid medical card. Children in foster care will be provided with an FSC-0033 at the time of each placement. This form will indicate the child's name, Medicaid number, and the provider or foster/adoptive parent's names and is to be used by the provider or foster/adoptive parent to obtain the medical treatment necessary noted on the form.

Children who have been adopted from the Department may continue to receive a medical card as well as an adoption subsidy. Occasionally, the adoption will disrupt, and the child/children will return to DoHS custody. With placement the CCWIS system will automatically generate a medical card and the child will receive both the medical card generated from the child entering custody and the medical card generated from the final adoption. In order to prevent medical card duplication, the worker must check the "no medical card" box located on the Enter/Exit Screen in the child's record in CCWIS.

The Department will pay for any necessary medical or dental costs in accordance with Medicaid policy. Unusual or extraordinary non-emergency medical or dental costs shall be paid for by the Department only upon prior approval of the Regional Program Manager or Child Welfare Consultant.

### 5.7.2  Extended Medicaid Eligibility

Most children up to the age of 21, who come into the custody of the Department and are placed in foster care, may be eligible for Extended Medicaid coverage upon discharge from a foster care placement. Children in the following placement types may be eligible for Extended Medicaid coverage: DoHS foster/adoptive homes, therapeutic foster/adoptive homes, specialized family care (Medley), group residential, psychiatric hospitals, psychiatric treatment facilities, medical hospitals, trial adoptive homes, transitional living, emergency shelter care, family emergency shelter care, and schools for children with special needs (such as Romney School).

143

D003108012

A child's eligibility for Extended Medicaid coverage is initially determined by placement in one of the above-mentioned settings and how they are discharged from care. They are eligible for Extended Medicaid coverage from the date of placement for a continuous period of 12 months, whether they remain in placement.   Eligibility will be re-determined during the child's one-year anniversary month, which is the child's initial placement month.  For a child to be eligible for another 12-month episode, they must be in a foster care placement and in the custody of the Department.

For children who come back into the care and custody of the Department during an Extended Medicaid Eligibility episode, a new eligibility episode will not start. The original eligibility episode will continue until the child's anniversary month and then be re-determined for another 12-month period.

Children who are discharged from foster care permanently will be eligible for Extended Medicaid coverage, unless the exit reason chosen is "death" or "runaway". Children who are discharged from foster care on a temporary basis will <u>only</u> be eligible for Extended Medicaid coverage if the exit reason is "trial return to caretaker/parents of removal".

**NOTE: A child who is living out-of-state is not eligible for Extended Medicaid coverage.**

a) When a child is being discharged from a foster care placement the following must occur:

1. Worker will contact the child's parent and enter the parent's address in CCWIS at discharge, the worker will document where the child will be residing in CCWIS under the client demographic address screens. The worker must document that this is the permanent home address. When the worker does not know a child's permanent address, the child will not be eligible for Extended Medicaid.

2. The worker will then exit the child from placement, after making sure the child's address has been updated in CCWIS.

3. At the time the child is being discharged from placement, the worker will discuss with the parent/child/guardian all Medicaid options available to them including the Extended Medicaid coverage. The Extended Medicaid coverage will automatically continue, but the parent/child/guardian has the option of declining the continued coverage.

4. The worker will provide the Notification of Extended Medicaid Eligibility coverage letter in duplicate to the parent/child/guardian when the child has been exited out of placement for their signatures. One signed copy of this letter must be maintained in the child's record to indicate that the parent/child/guardian has been given the option of

D003108013

accepting or declining the Extended Medicaid coverage. The second signed copy of the letter must be given to the parent/child/guardian for their records. This letter will be a standard form which indicates that the Extended Medicaid coverage is a free service offered to children exiting out of foster care. It will explain that the parent/child/guardian is responsible for notifying the DoHS of changes such as address changes, death, receiving SSI, or incarceration in a juvenile or adult facility which could affect their receiving the Extended Medicaid coverage. The letter will also explain that this offer to continue to receive the coverage, if refused at this time, cannot be requested at a later date.

5. If the parent/child/guardian does not accept the Extended Medicaid coverage, the worker will document this by clicking on the check box in CCWIS under the medical insurance screen that they have "declined the Extended Medicaid coverage"

6. The case may be closed if there is no need for services after discharge and the child will only receive the Extended Medicaid coverage. Due to the child remaining eligible for Medicaid, the Department is responsible for providing records management of the case.

7. If a child comes back into the care and custody of the Department during an eligibility episode and the worker places the child in an approved foster care setting, then the original Extended Medicaid coverage episode will continue until the child's anniversary month and then be re-determined for another 12-month period.

b) Notifications

If the child is no longer in custody and the Extended Medicaid coverage will be ending, the Department will automatically send the parent/child/guardian a letter of notification prior to the eligibility end date. This letter will inform the parent/child/guardian of the termination of the Extended Medicaid coverage and of their right to a fair hearing and/or a pre-hearing conference with a Child Protective Services, Foster Care or Youth Services Supervisor, if they feel the coverage was terminated prematurely or for unjust reasons. It will also provide a statement about other services that the Department provides which the family may be eligible for and explain that they will need to contact the local county office to apply for any benefits, including medical coverage.

c) Hearings Process

1. When a parent/child/guardian feels that the Extended Medicaid coverage was terminated prematurely or for unjust reasons, the parent/child/guardian has a right to a fair hearing, with a State Hearing Officer, and/or a pre-hearing conference, with a Child Protective Services, Foster Care or Youth Services Supervisor, in accordance with

145

D003108014

Common Chapters 700. The parent/child/guardian will be sent written notification of their right to a fair hearing and/or pre-hearing conference automatically through CCWIS, prior to termination of the Extended Medicaid coverage. This notification letter shall contain the following: the reason for service termination, date of termination, right to a hearing and/or pre-hearing conference, length of time client has to request a hearing and/or conference, right to legal representation and where to locate legal representation, right to bring witnesses to a hearing and/or conference, right to assistance in preparation for a hearing, right to assistance for transportation to the hearing, and that the hearing shall only be conducted on issues set forth in the written notice.

2. The parent/child/guardian will request a hearing or pre-hearing conference within 90 days from the effective date of the termination of the service. This request is to be made in writing, using the hearing request form included in the notification letter. Any verbal requests for a hearing will be transcribed by the Department worker receiving the request and shall include the reasons for such request ascertained by the worker.

3. If the parent/child/guardian has not requested a hearing but requested a pre-hearing conference and they do not reach a solution in the pre-hearing conference, the supervisor will inform the parent/child/guardian of their right to a fair hearing and assist them in completing the necessary form.

4. Once a parent/child/guardian requests a hearing, the hearing will be held within 90 days from a request being received and a decision will be issued. If the parent/child/guardian has requested a pre-hearing conference, the supervisor conducting the conference shall notify the State Hearings Office, who will take the pre-hearing conference into account when scheduling the hearing date.

5. Continuations of a hearing may occur if the State Hearings Officer requests additional information or evidence to make a proper decision.

6. The parent/child/guardian may withdraw their request for a hearing by submitting a signed statement requesting such withdrawal. If the request is received verbally, the worker will confirm the withdrawal in writing to the parent/child/guardian, file a copy in the record and forward a copy to the State Hearings Officer. A withdrawal shall not prevent the parent/child/guardian from reinstating a hearing request within the applicable time limits.

7. If the parent/child/guardian fails to appear at a scheduled hearing without notifying the Department in advance, any proposed action

shall be taken, and a letter shall be sent to the parent/child/guardian offering to schedule another hearing if they reply within 10 days. This letter will advise the parent/child/guardian that if they fail to establish good cause in writing within the said time, their hearing will be considered abandoned.

8. The parent/child/guardian will be notified of the hearing decision in some situations at the close of the hearing. They will also receive a written report of the hearing and a decision.

9. The parent/child/guardian will be advised that they may bring a petition in the Circuit Court of Kanawha County within a reasonable period of time from receipt of the hearing decision. If the parent/child/guardian feels that an alleged violation of their Civil Rights has occurred, they may file a complaint with the Secretary of the United States Department of Health and Human Service.

d) Records Management

1. If the case is being closed, the worker will inform the parent/child/guardian of the length of time the child will be eligible for the Extended Medicaid coverage and provide them with an address and/or telephone number of the local DoHS office and the Worker of the Day or Reception Social Worker, who they can contact if they have changes such as, address changes, death, receiving SSI or incarceration in a juvenile or adult facility to their case.

2. If the case is remaining open, the worker will inform the parent/child/guardian of the length of time the child will be eligible for the Extended Medicaid coverage.

3. On closed cases, it will be the responsibility of the local DoHS office to process changes such as, address changes, death, receiving SSI or incarceration in a juvenile or adult facility in CCWIS, which are submitted to the Worker of the Day or Reception Social Worker to their office by the family. If the parent/child/guardian requests termination of the Extended Medicaid coverage due to receiving SSI, client being incarcerated, or for other reasons, the worker will need to enter a decline date into the closed case in CCWIS. The worker will search for case through Client Search to make an address change or to enter a decline date into CCWIS to terminate the Extended Medicaid coverage. If the Extended Medicaid coverage needs to be terminated due to the death of the client, the worker will need to re-open the case to enter the date of death for the client in the Client Demographic Screen and then close the case again.

4. On open cases, it is the responsibility of the child's worker to process changes such as, address changes, death, receiving SSI or incarceration

147

D003108016

in a juvenile or adult facility in CCWIS, which are submitted to their office by the family.

### 5.7.3   Medicaid Home and Community Based IDD Waiver (Medley)

a)  Eligibility Requirements

1.  Cognitive and/or developmental disability requiring the Intermediate Care Facilities level of care;

2.  Income is less than three times the amount of monthly SSI and less than $2,000.00 in assets;

3.  Care must be cost effective;

b)  Services under the IDD waiver are designed to instruct, train, support and assist the child.  These services include:

1.  Service coordination activities designed to establish a life-long person centered, goal-oriented process for coordinating the range of services, instruction and assistance needed;

2.  An annual medical evaluation; and

3.  Day habilitation services - a program of skills, instruction and supervision designed to assist in achieving increased independence or maintaining skills of daily living such as:

   a)  Qualified Intellectual Disability Professional (QIDP) services that include professional services       provided   directly   to   an individual and evaluations of an individual and/or current plan of intervention or       instruction, documentation of an evaluation and/or    development   of   a   plan   of   intervention   or instruction,    training in the person-specific aspects and methods of      a plan of intervention provided to the individual and/or primary care providers, and evaluation and monitoring    of   the effectiveness or instruction.

   b)  Pre-vocational services to assist an individual to      acquire    and maintain basic work and work-related        skills.

   c)  Supported employment services to enable an        individual   to engage in work settings in which persons    without    disabilities are employed.

   d)  Residential habilitation support services delivered in a participant's residence and the community which provide      instruction    and assistance to enable the       individual to acquire and maintain skills which will       allow them to live, socialize, and recreate more   independently.

   e)  Transportation to or from a Medicaid reimbursement service.

D003108017

      f)   Respite for an individual on a short-term basis due to      the absence of or need for relief of the primary care     provider.

### 5.7.4   Medicaid Personal Care Services (Medley)

Personal Care Services are medically-oriented activities or tasks ordered by a physician, to be implemented according to a Nursing Plan of Care which is developed and supervised by a registered nurse.  These services which are provided within the recipient's residence enable people to meet their physical needs and be treated by their physicians as outpatients, rather than on an inpatient or institutional basis.  Services include those activities related to personal hygiene, dressing, feeding, nutrition, environmental support functions, and health-related tasks.

a)   Services must be:

1.   Prescribed by a physician in accordance with a written Plan of Care;

2.   Necessary to the long-term maintenance of the recipient's health and safety;

3.   Provided within the recipient's place of residence;

4.   Provided pursuant to a Plan of Care developed and periodically monitored by a registered nurse; and

5.   Rendered by an individual who is a specialized family care provider or respite provider through the Medicaid Personal Care program.

b)   Eligibility Requirements

A pre-admission screening assessment tool, the PAS-95 is used to certify an individual's medical need for in-home personal care level of services.  This medical assessment must be signed and dated by a physician, thus becoming the physician's order and certification for personal care level of services for the individual.  The PAS-95 must be completed upon application and at least annually thereafter.  In addition, a standardized personal care nursing assessment must be completed at least once every six months.

Upon request for Personal Care Services a registered nurse must review the pre-admission assessment information to determine that it is current within sixty (60) days of the physician signature and that the medical and physical care needs of the applicant do in fact meet the medical needs criteria as delineated by Medicaid for in-home personal care services.

When requesting approval of personal care services for a child, feeding, toileting and assistance in ambulation or other activity appropriate to the developmental and chronological age of the child are considered normal parenting duties and therefore are not reimbursable as Personal Care Services.

D003108018

c) The following services done by a registered nurse are covered by the Personal Care Services program:

1. The initial, six month, and annual recertification assessments which must include face-to-face, hands on activity, and direct observation of the individual who is being assessed.

2. Development and modification of the nursing care plans which must consider any in-home support from family or community support which is available to address care needs.  Plans must be modified as necessary to account for progress, decline, or other changes in the client's condition.

3. Supervision and monitoring of the implementation of the nursing care plan by non-licensed staff.  The nurse assesses the quality and appropriateness of care and activity by non-licensed direct care staff and assures that it is provided according to the care plan.  The nurse must also assure that environmental support activity does not exceed one-third of the total care activity allotted by the care plan.

d) The following hands-on, medically-oriented activities and supportive tasks described in the nursing care plan are implemented by qualified and trained staff.  These include activities and tasks which enable individuals with physical and/or mental disability to carry out activities of daily living and to assist with environmental support tasks such as:

1. Grooming,

2. Bathing,

3. Toileting,

4. Dressing,

5. Laundry (incontinent),

6. Repositioning/transfer,

7. Medical equipment,

8. Assistance with self-administration of medications,

9. Meal preparation

10. Feeding,

11. Special Dietary Needs,

12. Housecleaning,

13. Laundry/Ironing/Mending

14. Bed changing/making,

15. Dishwashing,

16. Grocery shopping,

17. Bill paying, and

18. Essential errands such as obtaining medication.

## 5.8  Consents

There are various times when parental consent or consent by the child's guardian is required before certain activities can be undertaken.  These include the following:

### 5.8.1    Surgery/Anesthesia/Emergency Medical Treatment

When a child in foster care requires surgery, anesthesia, or emergency medical treatment, the child's worker must obtain a valid consent for the procedure, as indicated:

a) For children who are in the temporary custody of the Department, every effort should be made to locate the child's parent or guardian and obtain their written consent for the necessary surgery, anesthesia, or emergency medical treatment. However, if the worker cannot locate the parent(s) at any emergency numbers listed after being notified of an emergency situation requiring written consent for surgery, anesthesia, or any emergency medical treatment, then that worker must contact the Social Services Manager or their designee to sign the consent for the procedure due to the emergency circumstance. The child's worker must document the situation in the child's case record.

b) For children who are in the permanent guardianship of the Department, the Social Services Manager will sign the consent for surgery, anesthesia, or emergency medical treatment.  The procedure must be documented in the child's record.

c) End of life decisions can be very difficult to make, particularly when the child is unable to communicate their wishes. Examples might include placement of an artificial feeding device, placement on/removal from a ventilator, etc. In these instances, an ethics consultation may be necessary. Many times, the health care facility providing treatment will have an internal Ethics Committee to assist with these decisions. If parental rights are still intact for the biological parent, they continue to be the decision maker. If the child is a state ward, the Social Services Manager is the decision maker. Prospective adoptive parents may be consulted for their input.

### 5.8.2    Out-of-State Travel

When a child needs to travel out-of-state, the following must be done:

a) If the Department has been granted guardianship with a termination of parental rights, the foster parent or caregiver will notify the DoHS worker

D003108020

or supervisor of their plans to travel out-of-state for more than the day. If an overnight stay is needed, notification must include the nature of the trip, the duration, and location.

**b)** If the Department has temporary legal custody of the child, the child's parents must be notified of the out-of-state travel. The MDT may decide if the out-of-state travel is appropriate and give consent. If the child's parents cannot be located, the Department must have the consent of the MDT for out-of-state travel.

5.8.3      Routine Medical Care

Most court orders and the SS-FC-4 that transfer custody to the Department contain language that transfers the right to consent for routine medical care to the Department. While the Department has the authority to consent to routine medical care, every effort should be made to keep the child's parents informed of the child's health. Foster/adoptive parents and group care providers are provided with the responsibility to consent and obtain authorization for medical care for a child, through the *Medical Care Authorization for Child in Foster Care Form* (FSC-0033). It is necessary that the FSC-0033 be given to each provider upon the child's placement.

5.8.4      Communicable Diseases

When special testing for communicable diseases of a child in custody is being considered, the requirements of State Code §16-3C-2, §16-3C-3, and §16-3C-4 must be followed. Utilization of all test results will be limited to only those who are caregivers of the child. Anyone releasing medical information improperly shall be subject to the penalties prescribed by §16-3C-5.

Testing cannot be used as a screening device. Consent for testing will not be approved for a child in custody unless the worker has reason to suspect the child has been exposed to a communicable disease. If the worker has reason to suspect that a child in temporary custody or permanent guardianship of the Department has been exposed to a communicable disease, the worker will document this information in CCWIS, citing specific reasons for their suspicions. This documentation shall be maintained in the strictest confidence. The worker will then get written consent from the parents of the child or, if the child is in state guardianship, by the Social Services Manager. Caregivers must be notified of the child's condition and be prepared for any additional medical attention the child may need.

5.8.5      Marriage

The following steps must be taken before consent for marriage can be considered or granted:

152

D003108021

> **a)** Marriage of a minor child in foster care should not be considered except in very rare cases and may only be considered at the consent of the Multidisciplinary Treatment Team.
>
> **b)** The Department cannot consent to the marriage of a minor child for children who are in the temporary custody of the Department. The child's parents must consent to the marriage of a minor child. If a parent cannot be located, the child could request the circuit court to appoint a guardian for the child who can then consent to the marriage.
>
> **c)** The Social Services Manager may consent to the marriage of a minor child who is in the permanent guardianship of the Department.

5.8.6   Entry into the Armed Services

The following steps must be taken before consent for entry in the armed services can be considered or granted:

> **a)** The Department cannot consent to the entry of a minor child into the armed services for children who are in the temporary custody of the Department. The child's parents must consent to the enlistment of a minor child into the armed services. If a parent cannot be located, the child could request the circuit court to appoint a guardian for the child who can then consent to the enlistment.
>
> **b)** The Social Services Manager may consent to the entry of a minor child into the armed services for a child who is in the permanent guardianship of the Department.

5.8.7   Driver's License/Junior Operator's License

The Department will consider consenting for a Junior Operator's License or Driver's License for foster children between the ages of 16 and 18. In order for this consent to be given, the following must be completed:

> **a)** There must be a general agreement on allowing the child to get a Junior Operator's or Driver's License between the child's worker, the foster/adoptive parents or facility in which the child is placed, and the child's parents if the child is in the temporary custody of the Department.
>
> **b)** The child's foster/adoptive parents or the facility must also be willing to provide a vehicle that is registered with the state Division of Motor Vehicles and has appropriate liability insurance.
>
> **c)** When the above conditions are met, the Social Services Manager may sign the consent for the Junior Operator's License or Driver's License.

5.8.8   Tobacco Usage by Minors

West Virginia Code §16-9A-2 states "No person, firm or corporation shall sell, give or furnish, or cause to be sold, given or furnished to any person under 18

153

D003108022

years, tobacco products in any form." Section §16-9A-3 states that possession or consumption of tobacco products is illegal for persons under the age of 18.

Although tobacco usage may be habit prior to the time a youth enters the Department's custody, this practice is often difficult to control. All employees of the Department, licensed facilities, or contracted agencies must abide by this code.

5.8.9      Forensic Interviews

Many of our foster children are referred to local or district Child Advocacy Centers for a forensic interview. Due to the sensitivity of the information that is often disclosed during forensic interviews, the information is highly confidential. Therefore, a worker or supervisor must sign the consent for forensic interviews to be conducted as the child is in the legal custody of the Department. A worker or supervisor should be present for all forensic interviews conducted on any foster child.

## 5.9 Transportation Payment and Car Safety

5.10.1    Car Safety

Every child should be buckled in a child safety seat, a booster seat, or with a lap/shoulder belt. According to West Virginia Code §17C-15-46 and National Highway Traffic Safety Administration, the use of different safety features depends on the age and size of the child being transported. The child's worker must inform the child's foster/adoptive parents or the staff of the foster care agency of the proper procedures for transporting a foster child safely.

a) The following rules apply when transporting a foster child:

1. The safest place for any child 12 years old and under is in the backseat.

2. Infants up to 20 pounds and up to one year old should ride in a rear-facing child seat. The child seat must be in the back seat and face the rear of the car, van, or truck. Babies riding in a vehicle must never face front. In a crash or sudden stop, the baby's neck can be hurt badly. Infants in car seats must never ride in the front seat of a vehicle with air bags. In a crash, the air bag can hit the car seat and hurt or kill the baby. Never hold a baby or allow a baby to be held when riding in a vehicle. In a crash or sudden stop, the child could be hurt badly or killed.

3. Children over 20 pounds and at least one year old should ride in a car seat that faces the front of the car, van, or truck. It is best to keep children in the forward-facing car seat for as long as they fit comfortably in it.

154

D003108023

4. Older children up to the age of eight years old should ride in a booster seat that meets the Federal Vehicle Safety Standards . If a child is under the age of eight years old and at least four foot, nine inches tall, they may be secured in the vehicle with the vehicle's safety belt system. A vehicle safety belt must fit low and snug on the child's hips. The safety belt must not cross the child's face or neck. Never put the shoulder belt behind the child's back or under their arm.

5.8.10    Transportation Payment

Foster/adoptive parents and Relative/Kinship providers may be reimbursed for the costs of transporting foster children to visits with the biological family or pre-adoptive visits with the potential adoptive family. The rate of reimbursement shall be based on the guidelines for payment of transportation of the Non-Emergency Medical Transportation program. Receipts or invoices are required before this payment can be issued. The receipts or invoices must be kept in the foster/adoptive parent provider paper record and documented in CCWIS in document tracking.

Foster/adoptive parents and Kinship/Relative providers may also be reimbursed for the costs of transporting foster children to medical appointments using the Non-Emergency Medical Transportation (NEMT) program through the Office of Family Support. Applications for NEMT must be made at the local Department office. The child's worker will assist the foster/adoptive parent in applying for and use of this service. This payment is made through **LogistiCare**.

To facilitate visitation between children in foster care and their families, child protective services and youth services families may be reimbursed for the costs of the visitation. Payment can also be made to a vendor to provide transportation for the parent to participate in services/treatment, office visits, Multidisciplinary Treatment Team meetings, reviews, and court hearings. Receipts or invoices are required before this payment can be issued. The receipts or invoices must be kept in the parent's paper record and documented in CCWIS in document tracking.

## 5.10  Boarding Care Payments

### 5.10.1  General Boarding Care

Boarding care payments on behalf of the child are intended to pay for the ordinary basic maintenance and child care needs of the child placed in foster/adoptive family care. Foster care maintenance payments may be made only on behalf of a child who is (1) in the foster family home of an individual, whether the payments are made to the individual or to a private child placing agency or (2) in a residential child care and treatment facility whether the payments are made to such facility or to a private child placing agency, which payments shall be limited to

include only those items which are included in the term "foster care maintenance payments".

The term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of group residential facility care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.  In cases where a child placed in a foster family home or group residential facility is the parent of a son or daughter who is in the same home or group residential facility, and payments are being made with respect to such child, the foster care maintenance payments made with respect to such child shall also include such amounts as may be necessary to cover the cost of the items defined as foster care maintenance.

Boarding care is paid for the first day's care, but not for the day the child leaves placement. Payment is to be discontinued during the child's absence from the foster/adoptive home due to hospitalization, planned home visits or for other reasons if longer than 14 days. Generally, if the child is away less than 14 days and the plan is to return the child to the same foster/adoptive family, boarding care should not be discontinued.

The current boarding care rate for a foster/adoptive family is $790.00 per month, per child. Boarding Care Payment Specific to Temporary Foster Family Care:

| Age Range | Daily Subsidy Amount | Monthly Subsidy Amount |
|---|---|---|
| 0-5 | $26.00 | $790.00 |
| 6-12 | $28.00 | $851.00 |
| 13-21 | $31.00 | $942.00 |

For each full month that a youth is in DoHS custody and provider's care, DoHS will pay the current monthly rate. BSS per diem is for basic supervision, room and board, social services, personal incidentals, transportation, and replacement clothing.

For each day a child is in DoHS custody and Provider's care for a partial month, DoHS will pay the current BSS per diem, excluding the date of discharge.

Provider will receive the current BSS per diem during temporary absences of youth due to:

1.    Hospitalization for a period not to exceed two consecutive days, when the plan is to return the youth to provider's care;

156

D003108025

2.    Visits not to exceed two consecutive days in accordance with the youth's individual visitation plan;

3.    Elopements not to exceed one day of absence when the plan is to return the youth to provider's care;

4.    Any special circumstance not covered in items 1-3 should be directed to the Division of Grants and Contracts for consideration as an exception.

5.10.2    Boarding Care Payment Specific to Child Placing Agencies

The current monthly boarding care rate per child for a foster/adoptive family through a child placing agency can be no less than:

| Ages 0-5 | Ages 6-12 | Ages 13 -21 |
|----------|-----------|-------------|
| $790.00 | $851.00 | $942.00 |

5.10.3    Boarding Care Payment Specific to Group Care, Residential Treatment Facilities and Emergency Shelter Care Facilities

Rates for these placement types are set at the state level. These rates are considered all-inclusive except for medical expenses and initial placement clothing when the child enters foster care. All other expenses including transportation, clothing, food, shelter, personal needs, supervision, etc. are included. No other payments are to be paid.

5.10.4    Boarding Care Payment Specific to Specialized Family Care Medley

Rates for specialized family care are set at the state level. These rates are considered all-inclusive except for medical and placement clothing. All other expenses including transportation, clothing, food, shelter, personal needs, supervision, etc. are included. No other payments are to be paid to any specialized family care agency or specialized family care family.

The current boarding care rate for a specialized family care home per month, per child is as follows;

| Ages 0-5 | Ages 6-12 | Ages 13 and up |
|----------|-----------|----------------|
| $790.00 | $851.00 | $942.00 |

However, children who meet the eligibility criteria for Specialized Family Care are usually eligible for Title XIX waiver or personal care. Specialized Family care providers are eligible to bill for Medicaid providing those services directly.

The Bureau for Social Services currently has an agreement with West Virginia University – Centers for Excellence in Disability (WVU-CED) to provide home finding services for Specialized Family Care homes.

D003108026

5.10.5    Boarding Care Payment Specific to Psychiatric Residential Treatment Facilities

Rates for Psychiatric Residential Treatment Facility facilities are set at the state level and paid through the Medicaid Program.

## 5.11   Childcare

Childcare services are available for children in state's custody when the foster/adoptive or kinship/relative providers are employed or participating in an educational program. Childcare will only be provided to the family's foster children, not the biological or adopted children unless the family meets the income eligibility requirements of the childcare program. All childcare arrangements must be coordinated through the Child Care Resource and Referral (R & R) agency that covers the county in which the foster/adoptive or kinship/relative provider resides. The R & R staff will request the child's worker forward an official copy of the child's birth certificate to them immediately. In addition, kinship/relative caregivers must supply the R & R worker with a copy of the signed (by both the placement worker and kinship/relative provider) Kinship/Relative Safety Screen and the placement agreement (SS-FC-5).

In the event the child was born out-of-state; the worker can complete a demand payment to cover boarding care costs for up to 90 days until the official copy of the birth certificate can be retrieved. This process should be rectified as quickly as possible.

## 5.12   Respite Care

The purpose of respite care is to make available to foster/adoptive parents an opportunity to have time away from caretaking responsibilities. All foster/adoptive parents have 14 days of respite care available each year.  The time may be taken all at once or scattered throughout the year.  The foster/adoptive family must use a certified respite provider, another certified foster/adoptive family who is registered to provide respite services by ASO, or day care provider for any respite care.  The amount paid to the respite provider is the same rate as that paid for boarding care to the foster/adoptive family. **\*Please note: A foster child spending the night with a friend or a relative of the foster or kinship/relative placement, for the purpose of normalcy activities, is not to be considered respite. This activity falls under the Reasonable and Prudent Parenting Standard. Respite is a paid service provided by certified respite providers.**

## 5.13   Financial Responsibilities

The child's worker will be responsible for arranging for payments of benefits that are due to the child to be directed to the Department to cover expenses incurred in providing care. The child's worker will also be responsible for coordination of payments to providers and other vendors. These responsibilities include completing any forms necessary and advising parties of any changes in the child's financial circumstances.

D003108027

When legal custody of a child is transferred to the Department either through court order or voluntary placement, the child's parents will retain responsibility for the child's support. All parents of children in foster care are expected to contribute to the cost of the child's care.

a) The following steps must be taken when a child enters custody:

   **1.** The worker will discuss with the parents all financial resources available to meet the child's needs (i.e., Social Security, SSI, Veterans Benefits, endowments, trust funds, assets, etc.) If benefits are being paid by one of the above, the worker will contact the appropriate office to initiate having the representative payee changed from the parent to the Department. The information obtained on financial resources will be documented in CCWIS.

   **2.** The worker will enter all information on parents, including absent or unknown parents into CCWIS correctly and complete all necessary screens, including the Relationship Screens. CCWIS will generate a referral to the Child Support Enforcement Division, ten (10) days after a placement has been entered, for the possible assessment of fees to contribute to the cost of the child's care as defined in §49-4-801, and explain this process to the parents.

     **a.** If the court at the initial hearing believes that it has adequate financial information from a financial disclosure statement or from testimony to determine child support, then the court should apply the income shares child support formula and include the amount in the official standard form order appropriate to the proceedings.

     **b.** If the court does not have adequate financial information at the initial hearing then the court should order that the parent or, in two parent households, each parent complete a Financial Statement for Child Support (SCA-DR-100) and submit the form to the child's worker. The child's worker will submit the financial form to the Child Support Enforcement Division. If the court issues an order for the form to be completed, the order should include a date by which the form is to be submitted to the child's worker.

     **c.** The court should also order that the parent(s) pay to the Child Support Enforcement Division either a minimum of $50.00 per child monthly or, if the parents are living separately, $50.00 monthly per parent per child; or a higher monthly amount per child as the court deems appropriate.

     **d.** When the court decides at the hearing based on the income-shares formula, then the worker should, whenever a report is made to the court or a hearing is held, report on whether or not the parents(s) are complying with the order.

     **e.** Once an obligation for child support is established for a child in foster care, the child support payments will not be stopped upon the termination of the parental rights, unless the court issues and order terminating the child

159

support. Any arrearages will continue to be collected post-termination of parental rights.

3.   The child's worker shall apply for any unearned benefits the child may be eligible for including Social Security, Black Lung, Veteran's or Railroad Retirement. These benefits shall be accepted by the Department and applied toward the cost of providing boarding care and other expenses for the eligible child. A child's monthly income is considered a resource towards the cost of foster care. The benefits and contributions received by the Department for a child each month are deposited monthly in the child's centralized account. The Department is reimbursed monthly from that account for boarding care and other related childcare expenses incurred by the child. Boarding care reimbursements, including those incurred to provide emergency shelter care are to be met first before any other expenses are encumbered or incurred.

4.   If a child in foster care has special items or services that can be met by using the child's account, the child's worker may deduct the amount for the items or services from the child's account. The items that can be reimbursed using the child's account include: placement wardrobe, school books/fees, tutoring/summer school, camp fees, respite care, post high school education, life books, prescription medications not covered by Medicaid, dance or music lessons, etc.

5.   As a result of monthly deposit and reimbursement practices, favorable interest is earned for each child. When the child's income plus accrued interests is less than the boarding care rate the income plus interest are used to reimburse the Department. Any amounts received monthly in excess of the costs of care for the child remains in the child's account as savings.

6.   The child's savings are not to be used to reimburse the Department for any part of monthly boarding care rate or special needs items paid for in previous months. However, any lump sum payments received for the period the child was in care shall be used for reimbursement, but only for the amount of the boarding care rate in effect for the month covered by the reimbursement period. The entire amount of the payment will not be used unless the monthly boarding care payments exceed the amount of the lump sum benefit.

7.   Close attention should be paid to children's accounts where benefits received include SSI. For these children, it is important for the child's worker to keep track of their savings and develop plans for purchasing items that the child needs, wants, or will benefit from in order to keep the child's assets from exceeding the SSI limit of $2,000.00. If a child's assets are in excess of the SSI limit, the child will become ineligible for SSI and their benefits will end.

8.   SSI back payments must be dispersed below $2,000.00 to prevent termination of SSI. One method of allocation of a child's resources is the establishment of an inaccessible trust fund. If the child's SSI is terminated because the resources

D003108029

exceed the allowable limit, the money in the principle of the account may not be used to reimburse any current boarding care expenses. Interest accrued on the account may be used, however.

9.  When children leave foster care, savings are given to the child or parents, as appropriate. When the child leaves care or when the child attains their eighteenth (18th) birthday, all money that has accrued for them is to be disbursed. Disbursement will vary depending on the nature of the benefits and the child's circumstances.

## 5.14  Education

Every child in foster care must be afforded educational opportunities commensurate with the child's abilities. All children in placement are expected to attend school on a regular basis. All children in foster care are expected to attend high school through graduation rather than quitting school and/or completing their General Equivalency Degree (GED). Educational issues will be discussed during the MDT meetings and will be included in the child's case plan.

### 5.14.1  Alternative School Placements

All foster children are expected to use the public education system to meet their educational needs. The Department will not approve placing a child in a non-accredited school or educational program. Alternative school placements such as church affiliated schools, private schools, or home schooling, will only be considered if the Multidisciplinary Treatment Team has agreed to the plan and there is appropriate documentation that a private school or home schooling is in the child's best interest. The child's worker must seek approval from the Foster Care Program Specialist before an arrangement to transfer the child to a church affiliated school or private school can be made or home schooling can be approved.

### 5.14.2  Special Education Services

a)  When a child in foster care is in need of special education services, the child's worker will work with the child's parents, foster/adoptive parents, or agency caseworker to request the necessary services.

b)  The Department of Education is required by law to develop an Individual Education Plan (IEP) for all children who need special education services. This plan must be approved by the child's parent, legal guardian, or surrogate parent. If the Department does not have guardianship of the child with a termination of all parental rights, the child's parents have the right and responsibility to approve this plan.

c)  When parents are unavailable or unable to participate, foster/adoptive parents may act as surrogate parents if they are willing to serve as educational

> advocates for the child and attend training as outlined in the Surrogate Parent Training manual developed by the Department of Education. If foster/adoptive parents do not wish to serve in this capacity, a trained surrogate parent will be assigned by the Department of Education.

> d) According to P.L. 105-17, (section 615) an employee of a public agency or private child care center which is involved in the education or care of a child may not serve as a surrogate parent and therefore cannot sign an Individual Education Plan.

> e) If a foster child is in permanent guardianship, the foster/adoptive parents should be involved in the special education planning.

### 5.14.3   Continuing Education

A child in the care of the Department who has graduated from high school and has the interest and ability to pursue further education either in college or vocational school should be strongly encouraged to pursue their educational goals. The Department may support youth who are continuing their education up to age 21 through the foster care program. Youth over the age of 18 must voluntarily elect to sign the SS-FC-18 in order to be eligible for continued foster care services.

Generally, out-of-state schools and private institutions will not be approved. Only in those cases where it can be demonstrated that an out-of-state or private program is less costly than a comparable in-state program may the situation be approved. This approval must be given by the Foster Care Program Specialist. All avenues of financial aid shall be pursued prior to determining the amount the Department will pay for a youth attending a post-secondary education or training program. The child, foster/adoptive parents, and the child's parents, if appropriate, should take the responsibility for the exploration of financial assistance.

School tuition and fees are to be paid directly to the school by the child's worker. The school must be set up as a provider and must forward an invoice for the complete amount of all required tuition, fees, room, board, books, etc. The child's worker will issue a demand payment in CCWIS using the Post-Secondary Education payment type directly to the educational facility.

With the assistance of the financial aid officer of the school, the child's worker and the youth should determine what their expenses are likely to be including transportation, books, personal expenses, clothing, and any other required needs. This amount will be paid directly to the youth on a monthly basis as a personal allowance. This payment should not be over $200.00 per month unless the child's worker has prior written approval of the Regional Program Manager or Child Welfare Consultant. The child's worker will need to set up a provider in CCWIS in the child's name. The provider category will be Transitional Living Client and the provider type will be Transitional Living Client. Once the provider has been set up, the child's worker will enter the child into placement with this TL provider. This

> process will ensure that the child continues to receive their medical card and that the personal allowances can be made monthly. The child's worker will issue a demand payment directly to the child for their personal expenses using the Post-Secondary Education payment type in CCWIS.

## 5.15   Clothing

5.15.1   School Clothing Allowance

All school-aged children placed in **family foster/adoptive care** are eligible for an annual school clothing allowance each year. Children from the age of four to age 18, or 21 if the child is continuing their educational goal, are entitled to the annual school clothing allowance. School clothing checks are mailed directly to the Department's foster/adoptive parents. School clothing checks are mailed to the child placing agency for disbursement to their foster/adoptive parents. There is no administrative fee included in these allowances and all funds are to go directly to purchase clothing for the foster child.  Using the school clothing allowance for anything other than to purchase clothing for the child it was issued for is grounds for a corrective action plan. Workers will need to issue a demand payment for the clothing allowance for youth in Transitional Living, by utilizing the payment type School Clothing Allowance.

5.15.2   Supplemental/Replacement Clothing

It is the foster/adoptive parents or facility's responsibility to maintain appropriate clothing for the child during the time of placement and to ensure that the child has an adequate wardrobe available at the time of discharge. The foster/adoptive parents or the facility in which the child is placed must supplement the child's wardrobe with appropriate clothing or replace necessary clothing items. The foster/adoptive parents or facility's boarding care payment includes the cost of clothing for the child placed in their care.  It is intended that through the use of the monthly clothing allowance provided each month as part of the child's boarding care payment, the foster/adoptive parent or the facility will be able to adequately clothe the child. Approximately fifteen percent (15%) of the monthly boarding care payments should be utilized for the child's clothing needs and other personal items.

The child's worker will update the Placement Wardrobe and Personal Inventory form of the child's personal belongings and evaluate the care and adequacy of the child's clothing provided by the foster/adoptive parent or the facility. The child's worker will observe the fit, quality, condition, cleanliness, attractiveness, and appropriateness of the clothing as well as the number of clothes available to the child.  If the child does not have an adequate wardrobe, the child's worker must inform the foster/adoptive parent or the facility about the need for the foster/adoptive parent or facility to purchase clothing for the child.

All clothing and other personal items purchased for the child must follow the child when they are removed from a placement.  It is the child's worker's responsibility to

163

D003108032

maintain an updated inventory of all the child's clothing and other personal items to ensure that the child's personal belongings remain with them. If for some reason the child does not take all of their clothing and/or personal belongings at the time of discharge, it shall be the joint responsibility of the child's worker and the foster/adoptive family or facility to make arrangements for returning the clothing and/or personal belongings to the child within 10 working days. During that period of time the provider is responsible for safeguarding the child's personal belongings insuring its availability to the child. Under no circumstances is it permissible for a foster/adoptive family or facility to keep a child's clothing or personal items when the child is discharged. Not returning a child's belongings to the child when they are discharged is grounds for a corrective action plan.

## 5.16   Serious Illness or Death of a Foster Child

5.16.1.   Serious Illness

In the case of a serious physical injury of a foster child, the child's worker should obtain assurance that medical treatment has been sought or direct that it be initiated. The child's worker should immediately notify the child's parents if the child is in the temporary custody of the Department.

5.16.2.   Death

The following steps must be taken in the case of a death of a foster child:

a) The child's parents, if there is no termination of parental rights, are to be notified immediately and must be involved in plans for the funeral and burial. Insofar as possible, their wishes should be met.

b) The child's worker must notify their supervisor and the Social Services Manager as soon as possible.

c) The Social Services Manager will then notify the Director of the Division of Children and Adult Services and the Commissioner of the Bureau for Social Services. The circumstances surrounding the child's death shall be forwarded to the Director and Commissioner within three working days.

d) All cases of severe injury or death of a child shall be reported to the Prosecuting Attorney's Office for investigation by the Multidisciplinary Team as required by W.Va. Code §49-4-402.

e) In some circumstances the child's worker will need to complete a critical incident report. (See Child Protective Services Policy for more specific details.)

f) If the child is in state guardianship, the child's worker will plan the funeral with the foster/adoptive parents or group care facility. While parental rights may be terminated, the child may have maintained a relationship

164

D003108033

with some relatives and friends.  These individuals should be notified as soon as possible so they may attend the funeral if they wish.

5.16.3.   Autopsy

Should a child in foster care die of unknown causes, the Department should request that an autopsy be performed.  When an autopsy is needed, the Social Services Manager has authority to consent to the procedure.  However, every effort should be made to involve the child's parents, if there is no termination of parental rights, in giving consent where appropriate.

5.16.4.   Burial Expenses

If a child in foster care dies and there are no resources available to meet the need for funeral home services, a cemetery plot, and burial or cremation services, the child's worker may issue a demand payment in CCWIS for up to $1,800.00.  Receipts or invoices are required before this payment can be issued.  The receipts or invoices must be kept in the child's paper record and documented in CCWIS in document tracking.

5.16.5.   Estate of Foster Children

Should a foster child die, the child's estate will revert to the biological heirs.  While parental rights may be severed by the court when the Department is given permanent custody, legal rights vested in biological heirs are not severed.

## 5.17   Court Costs/Legal Advertising

Payment for class II legal advertisements must include an invoice with the dates of publication.  Other miscellaneous court costs that may occur such as service fees, costs of reproducing legal documents, out-of-state birth certificates, etc., may also be paid through demand payment in CCWIS.  Receipts or invoices are required before this payment can be issued.  The receipts or invoices must be kept in the parent's paper record and documented in CCWIS in document tracking.

## 5.18   Cause of Action Lawsuit and Insurance Claim Settlements

There may be times when a child in foster care may suffer injury to their person or property which requires intervention on the part of the Department as the child's legal guardian. The Department may have to determine whether to file a cause of action lawsuit or preserve the matter for the child. The Department may also have to determine whether a claim should be settled or preserved. Children in the custody of the Department should have an attorney or legal guardian appointed to represent their best interest and should be utilized when possible to assist with these issues. The court of jurisdiction for the child's case should also be made aware of the cause of action lawsuit or claim and should be a part of the process. If it is determined that a child, who is in foster care, has a cause of action lawsuit or is the subject of an insurance claim, it is the

D003108034

Department's responsibility to make sure the cause of action lawsuit or claim is preserved or settled. If the cause of action lawsuit or claim is preserved until the child reaches the age of 18 years old, they will be responsible for handling the matter on their own.

The following steps must be taken when a cause of action lawsuit or claim needs to be filed for a foster child:

a) The child's worker will notify the guardian ad litem or attorney and the court of jurisdiction for the child's case of the child's possible cause of action lawsuit or claim to determine if the child's guardian or attorney can assist or if a new attorney or guardian ad litem must be appointed to assist with the cause of action lawsuit or the settlement of the claim. This may involve the child's worker requesting the scheduling of a status hearing. The child's worker will also need to inform the child's MDT of the child's possible cause of action lawsuit or claim.

b) If the child is in the temporary custody of the Department, the child's worker will involve the child's biological parents/guardian in all decisions concerning the cause of action lawsuit or claim. The parent/guardians may choose to preserve the cause of action lawsuit or claim, if reunification will occur soon.

c) If the child is in the permanent custody of the Department, the child's worker will either assure that the cause of action lawsuit or claim is preserved until the child turns 18 years old or whether immediate action such as filing a cause of action lawsuit or settling the claim is required and in the best interest of the child. Any decision regarding filing, preserving, or settling a cause of action lawsuit or claim should be made in conjunction with input from the child's MDT.

d) If a determination is made to proceed with a settlement of the claim and a guardian ad litem has been named to represent the child, the child's worker will provide any documentation necessary for the filing of the claim to the guardian ad litem.

e) The guardian ad litem will file the claim on behalf of the child.

f) The guardian ad litem will determine, with the input from the child's MDT if necessary, what documentation will be released to an insurance company to settle the claim, except for mental health records. Mental health records will not be released unless the child's worker, guardian ad litem, and parents/guardian (if the child is in temporary custody) have consulted with the Regional Attorney as to the nature of the request and the appropriateness of releasing the mental health records.

g) The guardian ad litem will determine, with the input from the child's MDT if necessary, if the claim can be settled out of court or if a court hearing is required.

h) The guardian ad litem will determine the amount of the settlement, with the input from the child's MDT if necessary.  The DoHS, as legal guardian or custodian of the child, has final authority to consent to the settlement on the child's behalf.

i) Once a claim has been settled, the child's worker will establish a child's **protected account**. The settlement will be transferred into this account and used towards the

child's future needs such as, clothing expenses, educational expenses, medical expenses (not covered by Medicaid), or computer. A court settlement may specify what the settlement money is to be utilized towards.

j)  The child's worker will document the resolution of the settlement and any court specification concerning the money in the CCWIS record.

k)  The statute of limitations for filing a cause of action lawsuit for children under the age of 18 years is held in abeyance until they turn 18 years old. If the child's worker, after a supervisory consult and the MDT's input, determines that the cause of action lawsuit will be preserved for the child until they turn 18 years of age, the worker must instruct the child when they reach the age of majority that they have generally up to two years to file a cause of action lawsuit in a personal injury case. In any event, the worker should further state to the child that he/she should consult an attorney to be sure of the statute of limitations. Most cause of action lawsuits and claims against insurance companies are as a result of personal injury sustained during a motor vehicle accident. The worker must further instruct the child that if they fail to file a cause of action lawsuit before the time period expires under the statute of limitations, they will likely be barred from filing a cause of action lawsuit and recovering any damages or settling a claim from the insurance company. However, the worker should strongly encourage the child to seek an attorney about their legal rights given their circumstances.

5.18.1 State Board of Risk and Insurance Management (BRIM)

The Department of Human Services and the State Board of Risk and Insurance Management (BRIM) have developed an agreement to provide claim management services to Department approved foster homes in West Virginia, including certified kinship/relative providers. This agreement does not include foster homes with child placing agencies.

**Property Insurance**

The Department will provide up to $10,000.00 for property damage caused by the foster child to the Department approved foster homes property. Losses will be adjusted on an actual cash value basis (replacement cost less physical depreciation.)

**See Home Finding Policy section 12. for further information regarding BRIM.**

## 5.19  Youth Identification Card Program

When children enter the foster care system they do not always have an updated photo of the child. This program provides an identification card for every foster child who enters the system between the ages of two through 15 years old. The identification card will follow the child throughout their stay in the foster care system and would be utilized as a way to track a child who may become missing.

D003108036

The following steps can be taken to obtain the identification card when a child enters custody:

a) When a child enters foster care the child's worker will initiate the process of obtaining the Youth Identification Card by informing the foster/adoptive parents of the option to have the identification card made and providing all of the necessary paperwork for the foster/adoptive parents to obtain the card such as:

   1. original birth certificate

   2. social security card

   3. Department's letter of authorization

   4. Driver's License/Photo ID Application (obtain at DMV)

b) The child's worker will be responsible for follow-up with the foster/adoptive parents, to ensure that the identification card was obtained for the child and to obtain the original birth certificate and social security card back if they are needed.

c) The child's worker will transfer the Youth Identification Card to a new foster/adoptive parent when a child is moved to a new placement.

d) The child's worker is responsible for informing the foster/adoptive parents on the renewal process of the ID card when necessary, which is every two years.

## 5.20 Trafficked Children and Youth

Human trafficking is a form of modern day slavery where traffickers use force, fraud, or coercion to lure or entice their victims into debt bondage, sexual servitude, commercial sex acts, or forced labor. Traffickers often target the vulnerable and those who are susceptible for other reasons. Abused and/or neglected children and youth who become involved with the child welfare system and are placed in foster care or group homes, are at a much greater risk of becoming victims of human trafficking. Youth who are runaways, homeless, and involved with the juvenile justice system but not necessarily the child welfare system, are also at a higher risk. However, children who seemingly have no vulnerabilities can also become victims of human trafficking. Any child or youth who are trafficked victims, regardless of their status or living situation, are considered abused and neglected children and are eligible to receive services as defined in §61-14-8(c). There are however, different circumstances that may lead to a child or youth becoming a victim of human trafficking.

Children and youth involved in the child welfare system are at a greater risk due to placement instability and challenges achieving permanency, the lack of healthy relationships and bonding with appropriate adults, isolation from their biological family and community friends, as well as emotional vulnerability and psychological trauma due to their current situations or their history of abuse and/or neglect. Traffickers intentionally seek out these children and youth due to their vulnerabilities and many

168

D003108037

youths perceive no difference between their unstable living situations and being trafficked. Statistical data indicates that between 50 and over 90 percent of all child sex trafficking victims were or are involved with child welfare services. Victims of all forms of human trafficking have unique needs and can sometimes be difficult to identify. Often, they do not identify as victims for a variety of reasons. Female youth may not identify as a sex trafficking victim because they believe that their trafficker loves them and there may be in an intimate relationship with the trafficker. Another reason youth may not identify as a trafficked victim is due to threats from the trafficker to the victim or the victim's family if they turn their traffickers in to authorities. Some may not identify due to shame and guilt and feel they deserve the abuse. Over time the sexual, physical, emotional, and/or psychological abuse and trauma they endure may result in the youth beginning to view their life as a trafficking victim as normal, therefore making it less likely for them to identify as a victim. There may also be mistrust with authorities due to previous juvenile delinquency charges resulting in a reluctance to disclose any information due to fear of being punished.

Identifying victims and assessing their needs is vital to effective services and treatment. Their immediate needs should be assessed first. Immediate needs would include their safety, any medical treatment they may need for physical or sexual trauma, as well as food and shelter.  Other needs of trafficking victims may include, but are not limited to, mental health needs, legal services, education services, and possibly life skills for teens. The ongoing needs of trafficking victims are just as important as their immediate needs. Many victims have deeply rooted psychological trauma that will require months, if not years of treatment and management.

Trafficked victims who are involved with the child welfare system may have been removed from their home or it may be necessary for the child/youth to be removed, due to their parent's involvement in trafficking their child. It is imperative to assess the child/youth's needs and begin appropriate services as quickly as possible. For youth in care who have run away from their home or placement, the Away from Supervision screening tool will need to be completed with the youth, upon their return, by the child welfare worker, facility worker, or foster parent to determine possible trafficking victimization of the youth while they were runaway status. For any child/youth that run away from home or placement while in state's custody, the worker must immediately notify law enforcement but no later than 24 hours after the child runs away or is reported to the worker by parents or placement staff that the child is missing.

 Law enforcement must be notified within 24 hours of receiving any human trafficking referral or if the worker suspects that any form of trafficking is occurring or has occurred during any stage of an assessment or case. **Please see Sections 3.31 and 4.50 in CPS policy for further instructions on the referral and assessment processes.**

Foster Care Policy
May 2024

D003108038

## 5.21   Runaway, Missing or Abducted Children

Children who go missing are at an increased risk of negative outcomes including injury, victimization, trauma, and trafficking. Children may go missing due to varying reasons the most common being running away from their placement setting or by being abducted. When a child goes missing it is critical information is shared quickly and specific actions are taken expeditiously to locate the missing child. Further, W. Va. Code §49-6-103 requires DoHS and all law enforcement agencies to share any information with the state missing child's clearinghouse or another investigating law enforcement agency that could assist in the location of a missing youth.

### Reporting Missing Youth

Children who are in a foster care placement setting or are otherwise in the care of the department must be reported to:
- Law enforcement;
- Centralized Intake; and,
- National Center for Missing and Exploited Children (NCMEC)

Reporting to these entities is required immediately upon identification of the child's status as missing. When a child is residing in a foster care placement setting such as a group residential placement, an emergency children shelter, or a traditional foster home, and the child runs away from that placement or otherwise goes missing, the provider will notify Centralized Intake of the child's status as missing. When Centralized Intake (CI) receives a call concerning a missing youth, the CI worker will complete an intake report and email it to the child's assigned caseworker. The provider should also notify local law enforcement agency that the child is missing. However, the child's assigned caseworker is responsible for ensuring the required notifications occur. The child's assigned caseworker must complete the required notifications themselves when there is no evidence an initial report occurred. When a child goes missing from a foster care placement setting, the child's assigned caseworker will:
- Contact law enforcement and ensure the child's information has been entered into the National Crime Information Center (NCIC) database, and obtain the missing persons case ID.
- Contact Centralized Intake (CI) to determine if a report was made if the child's assigned caseworker did not previously receive a runaway report from CI.
- Contact the National Center for Missing and Exploited Children (NCMEC) and request the creation and distribution of a missing child poster (see more information concerning NCMEC below).

After the immediate notifications have been made the child's assigned caseworker will ensure adequate documentation of the event in the child's electronic case record in case contacts. Documentation must include:
- The child's status as missing;
- The child's missing persons case or report ID number received from law enforcement, the agency name, and officer assigned; and,

170

D003108039

- The NCMEC confirmation number provided after report submission.

The child's assigned caseworker must also upload the runaway report notification to the electronic filing cabinet in the CCWIS.

After initial mandatory reporting is completed child's assigned caseworker must proceed in notifying additional stakeholders and informing them of the child's missing status.  Additional notifications include:
- the child's caregivers or parents, if parental rights have not been terminated;
- Attorneys involved with the child including Guardians Ad Litem, the child's attorney, and the prosecuting attorney;
- The juvenile probation officer, if applicable.

The child's assigned caseworker must also ensure their immediate supervisor and district Social Services Manager (SSM) are notified of the child's status if they have not been previously informed.

While a child is missing, the child's assigned caseworker is required to make ongoing and active efforts to locate the missing youth and document all attempts thoroughly in the child's electronic case record. These ongoing and active efforts to locate the child should be documented in CCWIS no less than once monthly. Foster children who are on runaway status for 48 hours or longer or have a verified endangerment status (see more on endangerment statuses below) will be assigned a Child Locator to assist the child's assigned caseworker in locating the missing child. Sharing information and coordinating efforts to locate the child with the Child Locator is critical in ensuring the child's quick and safe return (see Child Locator Unit policy for more information). Children who are not residing in foster care, such as children who are in the legal custody of the agency only, will not be assigned a Child Locator.  However, Child Locators are available to provide technical assistance upon request in the case of any missing child.  Examples of support provided by Child Locator's upon assignment include, but is not limited to:
- Coordinating location efforts with NCMEC
- Assistance with all-points bulletins (APB), commonly referred to as BOLO ("be on the look-out") or ATL ("attempt to locate")
- Assistance in obtaining an Amber Alert when there is credible evidence the child has been abducted and is in danger
- Social Media searches and monitoring
- Attending MDT meetings and updating the MDT Team as necessary
- Issuances of Endangered Missing Advisories by local law enforcement
- Home visits and other on-the-ground searches

When a child has been missing for a period of 180 days the child's assigned caseworker must seek a modification of disposition order to remove the child from the department's care unless the child is a ward-of-the-state. Requesting the child be removed from department's custody does not negate the department's responsibility in attempting to locate the child while the case

171

D003108040

remains open and active on the court's docket. When the child is located a new removal order will be required if the child will return to a foster care setting in the department's custody.

*Additional Information*

### Reporting to law enforcement

When making a missing person's report to law enforcement the child's assigned caseworker must ensure the child is entered into the National Crime Information Center (NCIC) database. Once a report is made to law enforcement a missing person's case ID number or report ID will be generated. The child's assigned caseworker must ensure to document the missing person ID number along with the assigned law enforcement officer's name and agency. The NCIC database is also able to receive pictures of missing children. The child's assigned caseworker must inquire with law enforcement about providing the photograph of the child (that was taken in compliance with section 5.21 of foster care policy) to the law enforcement agency. Once a child's photograph and demographic information is included in the NCIC database, law enforcement officers nationwide will have access to view the report, increasing the chances the child will be returned quickly and safely.

### Reporting to the National Center for Missing and Exploited Children

Children may be reported to NCMEC in one of two ways, through the organization's web service or by calling the hotline. When making a report through the web service the child's assigned caseworker must visit http://cmfc.missingkids.org/ReportHere and complete the report. The web service is specifically for the use of social services agency staff. Staff may also report through NCMEC's hotline at 1-800-THE-LOST (1-800-843-5678). Reporting missing youth through the hotline ensures an expeditious NCMEC case manager assignment. This option must be used anytime a child has been abducted, kidnapped, or has runaway and has an endangerment status (see more on endangerments below). When reporting to NCMEC the child's assigned caseworker must provide the photograph of the child that was taken in compliance with section 5.21 of foster care policy and request the creation of a missing child poster for distribution in areas the child may already be residing in or known to be headed.

### Centralized Intake

All children who are considered missing and are in the department's custody must be reported to Centralized Intake. Centralized Intake collects and tracks information on the number of children who run and all efforts to locate missing youths. Foster care placement providers are required to immediately report to CI when a child under their supervision goes missing. When a child is reported missing, Centralized Intake will complete a reporting form and provide it to the child's assigned caseworker, supervisor, and Social services manager via email. If the child's assigned caseworker learns that their child has gone missing and they did not receive a report from Centralized Intake, the child's assigned caseworker must immediately contact CI to make the report. In cases when a child goes missing and is not under the supervision of the placement

172

D003108041

provider (e.g. runs away while on a home visit or during a DoHS transport) then the child's assigned caseworker is responsible for making the report.

### Endangerment Criteria

Certain conditions place foster children at a heightened risk of serious negative consequences while missing. These conditions may be continuous or situational and require prompt action to ensure the child is located. The identification and verification of an endangerment status increases the criticality of search and therefore requires prompt reporting via NCEMC's hotline and assignment of a Child Locator to assist in location efforts. Endangerment criteria may include:

- **Serious Substance Use Disorder –** *A disease that affects a person's brain and behavior and leads to an inability to control the use of a legal or illegal substance or medication. A missing child becomes an endangered child when there is a reasonable cause to believe that the child will attempt to obtain legal or illegal substances by any means necessary or the use of such substances substantially endangers the child's safety.*
- **Actively Homicidal –** *A child who is currently capable of or tending toward murder. A missing child becomes endangered when there is reasonable cause to believe the child will, or will attempt to, commit murder.*
- **Actively Suicidal –** *A child who is currently expressing thoughts or actions indicating their desire to take their own life. A missing child becomes endangered when there is reasonable cause to believe the child will, or will attempt to, commit suicide.*
- **Self-Harming –** *A child who is currently engaged in behaviors with the express intent to physically harm themselves but not commit suicide. A missing child becomes endangered when there is reasonable cause to believe that the child's self-harming behaviors may substantially endanger the child's safety.*
- **Chronic Medical Condition Requiring Medication –** *A child who is currently prescribed medication for a medical condition and the prescribed medication is necessary to sustain life or reasonable health. A missing child becomes endangered when the absence of necessary medications places the child at significant risk of harm or death.*
- **Pregnant –** *A youth who is pregnant requires regular examination and care to support the health and wellbeing of themselves and their unborn child.*
- **Intellectual or Developmental Disability/Special Needs –** *A child with significant physical limitations or significant limitations both in intellectual functioning (reasoning, learning, problem solving) and in adaptive behavior, which covers a range of everyday social and practical skills.*
- **Violent Behavior –** *A child who demonstrates behavior that threatens or harms or injures the individual or others or destroys property. A missing child becomes endangered when the violent behavior is severe and actively threatens community safety.*

D003108042

- **History of or At Risk of Trafficking** – *A child who has a documented history of sexual exploitation or discloses current or historical exploitation.*
- **Age 13 or under** – *A missing child who is 13 years or under.*

Other situational factors indicating a child may be endangered include:

- **The child leaves in a motorized vehicle.**
- **Weather conditions that are likely to pose a risk** - *The weather can easily pose significant risk to a child who has gone missing. Additionally, a combination of factors including health status, mental cognition, and clothing may increase the risk the weather poses and should be considered.*
- **A recent change in the child's medication** - *Changes in behavior can indicate underlying issues which may be attributed to their status as missing.*
- **The child is party to a protection order or party to a no contact order** - *A child that is party to such an order may be at elevated risk due to a likely history of violence, stalking, or harassment.*
- **The youth has acquired tattoos, burns, or significant cuts they are reluctant to explain** - *Tattoo's which show ownership, like names, dollar signs, symbols, and acronyms, or other branding methods such as burns, and cuts can indicate the child is involved in trafficking.*
- **The child has recently obtained unaccounted for money or goods** - *New expensive clothes, mobile devices, legal or illegal substances or alcohol, hotel keys, and money from unexplained persons or obtained by suspicious means may indicate the child is being groomed and at-risk of trafficking or is a victim of trafficking or to be a "drug-mule".*
- **The child recently acquired new friends, communicated with persons known to be dangerous, increased their online activity, or became protective or defensive of their online activity** - *New friends, either personal or online, may indicate the child is being groomed and at-risk of trafficking or is a victim of trafficking. Some individuals, such as a maltreating parent, may be dangerous or place the child's safety in jeopardy.*

### Reporting a Located Youth

Once a missing youth has been located or has returned to care, each entity notified of the missing child must be informed of the child's return. Specifically, the child's assigned caseworker must ensure:

- Centralized Intake is notified of the child's return immediately, if the child's assigned caseworker has not received an email notification from CI of the child's return.
- The law enforcement agency notified of the run is notified of the child's return immediately. The child's assigned caseworker must also request the child be removed from the NCIC database. A follow-up call to law enforcement is mandatory to ensure the NCIC removal, even when law enforcement is the entity who located the child.
- NCMEC is immediately notified of the child's return and the circumstances surrounding the return.

174

D003108043

- the child's caregivers or parents, if parental rights have not been terminated;
- Attorneys involved with the child including Guardians Ad Litem, the child's attorney, and the prosecuting attorney;
- The juvenile probation officer, if applicable.

A child who has been on runaway status for more than six hours or has had multiple run events in the past six months must be interviewed to determine the reasons the child left care and the child's experiences while missing, including whether the child has been a victim of trafficking and what could prevent future running events if the reason the child went missing was due to running away. The Child Locator Unit maintains the responsibility for ensuring the proper interviews occur and documentation is maintained. A summary of the information will be provided to the child's assigned caseworker and documented in the child's electronic case record.

The child's assigned caseworker is responsible for identifying a plan or strategy to prevent future running and to work collaboratively with the child's placement provider or family to implement a plan. The Child Locator Unit is available to provide technical assistance when needed to explore possible opportunities to prevent the future running of a youth.

## 5.22  Photograph on File

Every child that comes into custody will have their photograph taken and stored in the CCWIS system. A photograph of all children should be updated every six months, and uploaded into the CCWIS system. This will be used as a way to identify children should they ever go missing, run away, or be abducted. The child's worker will complete the following steps to ensure that the child has a photograph stored in their case in the CCWIS system:

a) Once a child comes into custody, the child's worker will take a picture of the child at the first visit they complete with the child. The child's worker is required to visit with the child face-to-face in the child's place of placement within 72 hours of the child being placed. If a picture cannot be obtained at that time, the child's worker must return to the placement to take the child's picture no later than 10 days after the child coming into custody. The picture needs to be of the child facing forward so that their face is easily recognizable.

b) The child's worker is to only use a Department issued digital camera, Department issued cellular phone, Department issued tablet, or other Department issued device to capture the picture. The worker is not permitted to use a personal camera or a personal cellular phone. Should the worker use a personal camera or personal cellular phone, the worker must be aware that those devices are subject to be subpoenaed in court as evidence in the case and the Department will not be responsible for replacing

D003108044

such items. Using personal devices is also a breach of confidentiality for the child and/or parents and the worker may be held responsible for such.

c) Upon returning to the office, the child's worker must upload the picture from the camera to a Department issued computer. The worker is not permitted to upload the picture to a personal computer or any other device that does not belong to the Department. Should the worker upload the picture to a personal computer or other device, that computer or device may be subject to be subpoenaed as evidence in the case and the Department will not be responsible for replacing such items. Using personal devices is also a breach of confidentiality for the child and/or parents and the worker may be held responsible for such.

d) The child's worker is to enter a contact in the CCWIS system for this visit and must reference that a picture was taken and that the picture can be found in the case file cabinet.

e) The child's worker must then upload the picture into the case file cabinet in the CCWIS system. The worker is to document in the Description section the date that the picture was captured, not the date that the file was uploaded.

f) The child's worker must capture a new photograph of the child every year during the child's birthday month and continuing every six months the child remains in foster care. This will ensure that there is always an updated picture of the child on file.

If the child's worker can obtain a recent picture of the child from the foster care provider, such as a school picture or the image from the Youth Identification Card, the worker can then scan that image into a Department issued computer and import into the file cabinet in the same manner as mentioned above.


## 5.23  Prudent Parenting

Any child who comes into the custody and care of the Department is entitled to participate in age-appropriate activities for the child's emotional well-being and development of valuable life-coping skills. The Bureau for Social Services (BSS) shall make efforts to normalize the lives of children in their custody and to empower a caregiver to approve or disapprove a child's participation in activities based on the caregiver's own assessment using a reasonable and prudent parent standard, without prior approval of Child and Family Services. BSS shall allow a caregiver to make important decisions, similar to the decisions that a parent is entitled to make, regarding their own child's participation in activities. For example, children should be permitted to have a visit with relatives or close family friends of the provider, or the child without the provider being present, and without the relative or family friend having to undergo fingerprinting, including overnight stays. Resource parents and kinship/relative providers should use the same decision-making judgment and prudent parent standards for foster children as they do for their biological children.

BSS will verify that private agencies providing foster care placement under contract with BSS, promote and protect the ability of a child to participate in age-appropriate and normalcy activities. A caregiver is not liable for harm caused to a child in a foster care placement if the child participates in an activity approved by the caregiver, provided that the caregiver has acted in accordance with a reasonable and prudent parent standard.

A caregiver shall use a reasonable and prudent parent standard in determining whether to permit a child to participate in an activity. "Reasonable and prudent parent" standard means the standard characterized by careful and sensible parental decisions that maintain the child's health, safety, and best interests. When making such decisions, a caregiver shall consider:

- The child's age, maturity, and developmental level to maintain the overall health and safety of the child;
- Potential risk factors and the appropriateness of the activity;
- The best interest of the child based on the caregiver's knowledge of the child;
- The importance of encouraging the child's emotional and developmental growth;
- The importance of providing the child with the most family-like living experience possible; and
- The behavioral history of the child and the child's ability to safely participate in the proposed activity.

In applying the reasonable and prudent parent standard, foster parents are required to take reasonable steps to determine the appropriateness of the activity in consideration of the child's age, maturity, and developmental level. It is recognized that there are many ways to determine whether an activity is appropriate for a foster child in your care. Therefore, the following examples of "reasonable steps" that a foster parent may take in making this determination are provided as a guide to assist in the decision-making process:

- have adequate information about the foster child in your care;
- take into account the type of activity and consider the foster child's mental and physical health, as well as behavioral propensities;
- consider where the activity will be held, with whom the foster child will be going, and when they will return.

Foster parents and residential providers will also need to take into account the reasonable, foreseeable risks of an activity and what safety factors and direct supervision may be involved in the activity in order to prevent potential harm to the foster child. (i.e., hunting, paint ball, archery or similar activities that may pose a higher risk) Caregivers shall ensure that the child has the safety equipment and any necessary permissions and training necessary to safely engage in each activity the child participates in.

When children are placed in a group home or residential treatment setting, the provider will incorporate normalcy activities into the program. The activities will be in-line with the reasonable and prudent parent standard and will help children with skills essential for positive development.

**5.23.1**   Social Media

It is the policy of the DoHS/BSS to encourage normalcy in the lives of foster/adoptive children.  As such, it is acceptable to post photos of a foster/adoptive child(ren) in family or group settings (school, sports, sleepovers, parties, etc.) on social media.  However, in any social media posting, (photographic or print) caregivers are prohibited from releasing any information regarding:  the fact that the children are in a foster/adoptive circumstance, the foster adoptive child(ren)'s previous custodians, geographic or demographic information that could jeopardize the foster child(ren)'s safety, or any other information that would breach the confidentiality provisions of W.Va. Code §49-5-101. These prohibitions continue even after any placement has ended.  Furthermore, for the safety of the children, it is strongly advised that all such postings be made on private settings, to be seen by the foster/adoptive parent's friend groups only and not posted publicly.

## 5.24   Youth Transitioning

The Department has the responsibility to help youth, in their care, develop into self-sufficient adults. In addition, all agencies and individuals who provide substitute parental care for youth, in their care, are charged with helping to ensure that their social, emotional, and intellectual development is achieved to each youth's highest potential.

The Department should ensure that all adults entrusted with the care of the state's youth demonstrate appropriate social behavior; respond properly to stressful situations; and promote good physical, emotional, and intellectual well-being.  It is through the observation of positive adult behavior and through interaction with positive adult role models that youth develop and demonstrate positive attributes.

For all youth in foster care, at age 14 or older, the youth's caseworker is responsible for the following actions:

a) Thoroughly discussing the contents of *A Guide for Older Youth in Foster Care* booklet and having the youth sign the signature card attached in the booklet and placing it in the youth's file;
b) Assessing each youth(s) potential for eventual independence;
c) Developing an appropriate learning/transition plan for securing and providing necessary services to assist each youth to achieve independence;
d) Continuous reviewing and modifying of the learning/transition plan until the youth achieves their permanency goal; and

178

D003108047

**e)** Developing an age-appropriate plan, within the learning/transition plan, for each youth that educates them about family planning, which includes information on pregnancy prevention, sexually transmitted infections, and other topics related to healthy sexual development; and

**f)** If the youth self-identifies as being sexually active, the worker will develop a plan, within the learning/transition plan, of supportive counseling to educate the child on topics related to abstinence and healthy sexual development. This will be done in conjunction with the youth's MDT in all cases and including the biological parents if parental rights are intact.

## 5.25  Life Skills Assessment/Learning Plan

The Life Skills Assessment is a comprehensive assessment, designed to engage young people in their transition to adulthood, as they move from childhood into their teenage years. The assessment assists in determining life skills domains, deemed critical by youth and caregivers to assist youth transitioning to adulthood successfully. Some youth have special needs and challenges and additional assessment supplements are available to help these youth identify critical life skill needs.

Youth in foster care are required to complete a life skills assessment at the age of 14 or as soon as the youth enters foster care, if they are greater than 14 years old. A new life skills assessment is required to be completed by youth in foster care annually.

The youth's worker will do the following upon a youth's 14th birthday or upon a youth entering care at the age of 14 or older:

**1.** Assures that each youth in a foster care placement completes the Life Skills Assessment and any needed Supplemental Assessments, no later than 30 days following the youth's 14th birthday or within 30 days of entering foster care if the youth has already reached the age of 14 or older. The Life Skills Assessment may be provided in the following ways:

  a) Agency staff of foster care placement settings must provide the assessment to youth in their program within 30 days of the youth's 14th birthday. The results must be submitted to the youth(s) worker. The youth's worker must provide or ensure that the Department(s) foster/adoptive parents provide the Life Skills Assessment no later than 30 days following the youth(s) 14th birthday or entrance into care if the youth is already age 14. If the assessment is provided by the youth(s) foster/adoptive parents, the results must be submitted to the youth(s) worker.

  b) The youth's worker must ensure that the foster care agency staff or foster/adoptive parents provide the Life Skills Assessment to youth placed in their care within 30 days following the youth(s) 14th birthday or entrance into care if the youth is already age 14. The results must be submitted to the youth(s) worker.

D003108048

2. The youth's worker must ensure that the foster care agency staff or foster/adoptive parents perform the annual re-assessment of the Life Skills Assessment until the youth is discharged from foster care.

3. The results of the assessment must be filed in the youth(s) case record and documentation of such is to be placed in CCWIS on the youth transitioning screen and document tracking.

4. The youth(s) worker, in collaboration with the youth(s) foster/adoptive parents or the foster care agency staff, must develop a personalized transition plan for each youth no later than 60 days following the youth(s) 14th birthday or entrance into foster care if the youth is already age 14 or older.  The plan must specify the individual needs of each youth and the strategies planned for assuring their full developmental potential is achieved.  The youth(s) learning/transition plan must be documented on the Youth Transitioning Screen in CCWIS.

5. The youth(s) worker must assure that a Learning/Transition Plan is developed based on the Life Skills Assessment for the youth. The youth's worker will utilize the Life Skills Guidebook to develop the Learning/Transition Plan.

6. The youth(s) worker must ensure that the Learning/Transition Plan includes any life skills instruction based on the Life Skills Curriculum.

7. The Youth's Learning/Transition Plan, which will include the youth's Life Skills Assessments, Learning Plan, Life Skills Instruction/Curriculum, as well as Transitional Services provided, must be incorporated into the Youth's Case Plan and a copy provided to the youth.

8. The youth(s) worker must ensure that each Youth(s) Case Plan is reviewed on a quarterly basis and that the plan is modified as needed to ensure the youth is progressing toward permanency and meeting the learning/transitioning plan.

### 5.25.1   Life Skills Domains and Curriculum

Foster/adoptive parents and foster care agency staff must use the Life Skills Curriculum as the formal instruction for each youth in care. This instruction must begin at the earliest possible age in which a youth appears ready, but in no case later than 60 days following the youth(s) 14th birthday. This instruction must be continuously and rigorously provided until the youth successfully completes each skill area needing improvement demonstrating they have achieved their highest potential.

The Life Skills Curriculum, for each youth, will be dependent upon the youth's needs. The learning topics may range from daily living skills to decision making and judgment skills.

The life skill curriculum will be selected by the youth to address each of the domains identified in the youth's life skills assessment. Life skill curriculum must be available and easily accessible to the youth and must be provided to the youth in a manner that is not overwhelming to the youth.  If the youth has several domains, which need to be addressed, then the youth may choose one or two domains to focus on at one time. Within those domains, the youth should only choose one to three skill areas to work on at one time. At no time should a youth be addressing more than two domains and one to three skill areas, within each of those domains.

A variety of life skill curriculum resources are available for use by youth to address each domain. Many life skill curriculum resources are available through the internet and are free of charge. Other life skill curriculum may be provided through utilizing community resources or by the youth receiving the instruction from a mentor, provider, foster parent or worker. Some life skill curriculum may be purchased and provided to the youth and worker.

## 5.26 Transition Plan (Youth age 14 and older)

A Transition Plan is a guide that the youth and the youth's worker will use to determine the needed elements for the development of the life skill curriculum and the youth's transition to adulthood. An individual transition plan may be based on selected learning goals and related expectations as the youth transitions to adulthood. The youth must develop their own Transition Plan.

The transition plan is used to document all activities that need completed for the youth to reach self-sufficiency. This includes the selected learning goals and activities the youth's worker and/or provider will use during life skill learning sessions and as the youth transitions to adulthood. The learning/transition plan should indicate whether the life skill instruction was provided in a group setting or on a one-on-one basis.

A youth's Transition/Learning Plan must be personalized for the youth, developed by the youth and contain specific information to assist the youth in their transition to adulthood.

Transition planning is a vital part of the youth's case plan. The plan should be developed as soon as the youth completes a life skill assessment but must be completed when the youth turns 14 years old. The plan must be specific for the youth and contain information that will assist the youth in their successful transition to adulthood.

The youth's worker and youth will update or revise the Transition/Learning Plan at least 90 days, prior to the youth turning 18 years old. The plan must be personalized by the youth and must contain as much detailed information as the youth decides to incorporate into the plan. The plan must contain the following specific information:

1. Housing options and services

2. Education plans and services

3. Employment plans

4. Health insurance options

5. Local opportunities for mentoring

6. Information concerning consumer credit report checks

7. Continuing support services

D003108050

**8.** Health care directives and how to complete an "advance directive" when requested, (See Section 5.28.1 and 5.28.2 below, for further direction on advance directives)

**9.** Any services that will be paid for using Chafee funds

**10.** Any other information that the youth deems important

The youth's worker must incorporate the Transition/Learning plan into the "Unified Child or Family Case Plan" for CPS or Youth Services Family or Child Case Plan for Youth Services.

5.26.1    Consumer Credit Report

During transition planning for older youth, States must ensure that a consumer credit report is completed for each youth age 14 or older, who is in foster care, annually. The consumer credit report must be provided to the youth without cost. The State must also assure that the youth is provided assistance in interpreting the report and resolving any inaccuracies found.

**Since credit reporting agencies do not knowingly maintain credit files on minor children, if a file is found, it must be interpreted, and all issues resolved prior to the youth leaving care.**

1. The youth's worker must request a consumer credit report from all three credit reporting agencies on all youth in foster care, annually, beginning when a youth turns14 years old or enters foster care after the age of 14. The consumer credit report request must be submitted within 60 days of the youth turning 14 years old or entering foster care, if the youth is already 14 years of age. The following steps should be taken to obtain a youth's consumer credit report first from TransUnion:
2. The youth's worker will request a consumer credit report through the credit reporting agency Trans Union's Child ID Theft process via the internet.
3. Once the consumer credit report check has been completed by Trans Union, the worker will get either an e-mail indicating that there is no record for the youth or requesting additional information, which may indicate that a record has been found.
4. If there is no record on the youth, the worker will document in the youth's transition plan and in CCWIS that the credit report check has been completed. The worker should utilize Document Tracking in CCWIS to show that the request has been made.
5. The worker must provide the youth with information on consumer credit report checks and explain that the State is completing consumer credit report checks annually on them. The worker will explain that this is being done to protect their identity. If the youth needs additional information about

182

D003108051

consumer credit report or identity theft, the worker can make a referral to a credit counseling agency for the youth.

6. If the credit reporting agency identifies a record for a youth, the issues must be resolved. The youth must be involved in the credit resolution process and educated on identity theft and how to resolve issues on consumer credit reports.

7. The worker will assist the youth in resolving any identity theft issues or consumer credit report issues. The youth's attorney, Guardian ad Litem, or the DoHS Regional Attorney should assist in any resolution issues.

8. The youth's worker will submit a letter to the youth's attorney or Guardian ad Litem concerning the youth consumer credit report, if there are issues that need resolved. The letter should be scanned into the CCWIS file cabinet and Document Tracked in CCWIS.

9. Any consumer credit report issues or identity theft issues must be documented in the youth's transition plan, as well as in CCWIS. The report may be scanned and placed into the CCWIS file cabinet or Document Tracking should be completed to indicate where the report has been placed.

a) The following steps should be taken to obtain a youth's consumer credit report, the second report from Experian:

1) The youth's worker will print the Client Information report from CCWIS and redact everything except:

   a. Client Name
   b. Involvement Start Date
   c. Social Security Number
   d. Birth Date
   e. Address(es)
   f. Living Arrangement
   g. The Court Number(s) and Stare Date(s)

2) Additionally, the youth's worker should print the standard Consent to Release Information report from CCWIS, using the following example:

I do hereby authorize **Experian National Consumer Assistance Center** to furnish the following information to the West Virginia Department of Human Services or any of its authorized representatives.

**INFORMATION REQUESTED**

____  1. Social History/ Summary Intake

____  2. Psychological Tests and Evaluations

____  3. Psychiatric Evaluations

183

Foster Care Policy
May 2024

D003108052

___    4. Educational-Vocational Assessments

___    5. Medical Exams – Records

___    6. Other: **An Annual Credit Report as required by the Child and Family Services Improvement and Innovation Act (Public Law (P.L.) 112-34).**

3) The redacted report, together with the standard Consent to Release Information report from CCWIS **and a copy of the Court Order** placing the child in State's Custody (redacting confidential information other than the child's name and court number) should be mailed to: Experian National Consumer Assistance Center, PO Box 9701, Allen, Texas 75013.

4) Experian will process the request under the annual free credit report type and send the report to the requestor (agency) through regular mail.

5) The report will either be a "no record" or have information. For security purposes, the envelope will not indicate Experian. If there is a report, the account information will be truncated, the Social Security number for the youth will not appear on the report and any variations of the Social Security number, will be truncated. Please specify in the request the State or Federal agency address to which you want the no record or credit report sent.

6) There is no charge for this process.

7) The following steps should be taken to obtain a youth's consumer credit report, the third report from Equifax:

- The youth's worker will use the same process as outlined in section 2) above, replacing Experian with Equifax and using this address:  Equifax Disclosure Department, P.O. Box 740241, Atlanta, GA 30374

## 5.27 Case Management for Youth Transitioning

### 5.27.1 Services

Youth transitioning often need a variety of services to aid their transition to adulthood and self–sufficiency. Some of these services are "paid" services, such as ASO Services or services paid for through demand payments. Many times, youth transitioning from foster care receive services from individuals and community resources, which are "non-paid" services. Some of these services may be foster parents providing life skills training, HRDF (employment program) providing job skills training, tutoring provided by the educational facility, or mentoring by volunteer groups. Some youth may be receiving a service from one provider, that is "paid" and the same service, from a different provider that is "non-paid", such as Tutoring. Example: A youth could be receiving tutoring from their school for free and be receiving tutoring from a professional tutoring service that is paid.

D003108053

When youth are receiving the same service, where one is paid, and one is non-paid, both must be entered in the CCWIS screens in the appropriate area. Services that are paid or non-paid but provided by a grantee of the state or a person who is receiving funds for the care of the youth such as a foster parent or residential provider will be documented in the NYTD Services area of the Youth Transitioning Tab. The youth's worker will provide the *NYTD Quarterly Services Report* to the provider of the service and transfer information from this report into the services screens. The report should also be uploaded into the CCWIS file cabinet. Services that are non-paid and received from a community provider such as tutoring from the school will be captured in the services log area of CCWIS.

**Below is a list of Services for Youth Transitioning:**

a) Paid Transition Services Include:
    1. ASO Chafee Agency Transportation
    2. ASO Connection Visit
    3. ASO Tutoring
    4. Basic Home Management/Life Skills
    5. Education Funding
    6. Education Vocational
    7. Education/ Career Planning
    8. Educational Advocacy
    9. Educational Assessment
    10. Educational Services
    11. Educational Supplies
    12. Employment Services
    13. Family Planning
    14. Financial Services
    15. Housing – Rent
    16. Housing (Services)
    17. IL Subsidies (Supervised Independent Living)
    18. Medical Services
    19. Parent Education and Training
    20. Transportation (Routine)
    21. Tutoring
    22. Utilities
    23. Vocational Testing/Counseling

b) Non-paid Transition Services Include:
    1. Academic Counseling
    2. Addiction Education
    3. Basic Home Management/Life Skills
    4. Career Planning
    5. Consumer Awareness

185

D003108054

6. Personal Identity Protection
7. Education Funding
8. Education Planning
9. Education Supplies
10. Education Vocational
11. Education Advocacy
12. Educational Assessment
13. Education Services
14. Employment Services
15. Family Planning
16. Financial Services'
17. High School Equivalency Preparation & Support
18. Health Education
19. Healthy Relationship Education
20. Homework & Study Skills Assistance
21. Housing Education
22. Literacy Education
23. Mentoring
24. Parent Education & Training
25. Tutoring
26. Vocational Testing/ Counseling
27. Youth Transitioning Transportation (YTT)

5.27.2 Youth Transition Service Definitions

**Academic Counseling:** Assisting youth in learning how to concentrate in class better, in discovering the reason for failing grades, the reason for not being able to study appropriately, the reason for not being able to concentrate in class and how to overcome these difficulties.

**Addiction Education:** Providing youth with information on programs and services to prevent substance use and abuse.

**ASO Chafee Agency Transportation:** This code may be utilized for providers' mileage encumbered when Child Protective Services Chafee Services have been implemented within the child/youth's home and the permanency plan is Independence and/or emancipation. If a provider is unable to deliver the identified service upon traveling to the home, this code may be billed up to three times within the 92 day authorization period when the following conditions are met:
   a) The provider/agency has a policy and procedure regarding the expectations of the youth being served. The importance of keeping scheduled appointments, notifying the provider when an appointment needs to be cancelled and the means in which the DoHS will be notified if appointments are not kept are reviewed with the client(s).

186

D003108055

**b)** The provider/agency has a policy and procedure about notifying the Department regarding youth non-compliance with established scheduled appointments.

**c)** There is documentation of the visit being scheduled within the case record.

**Please note:** the rate will be based upon the current State of West Virginia reimbursement rate.

**ASO Connection Visit:** These visits are face-to-face visits for the purposes of preserving the connections between children/youth who are in the custody of the DoHS and living in a foster family home, group home or who are college students living on campus with their siblings, relatives or former foster parents.

**ASO Tutoring:** Structured individualized or small group setting of three or less in which a child is taught or guided on an academic area to enhance skills to avoid failing a core educational requirement. Provider must have demonstrated competence in academics being tutored. A high school diploma is required to provide this service to elementary school age children and an Associate degree or higher for students in middle school or above. This service is time-limited, and the child's academic functioning level/ability must be considered. Tutoring is to build upon a targeted academic skill in which the student has a documented deficit. Tutoring is not to be used for regular homework completion.

**Basic Home Management/Life Skills:** Providing youth with instruction to assist them in the upkeep of their home and in daily living. These basic skills may include instruction in food preparation, laundry, housekeeping, living cooperatively, meal planning, grocery shopping, and basic maintenance and repairs to the home.

**Career Planning:** Assisting the youth in exploring career interests or options. Assistance may include using career resource libraries, interest inventories, job fairs, and other community resources to help the youth in this area.

**Consumer Awareness:** Assisting youth in developing skills in comparative shopping, researching best products and buys, product safety and satisfaction, consumer rights, and other community resources to help the youth in this area.

**Educational Advocacy:** Assisting the youth in obtaining the required services to complete their educational plan. Assistance may include: helping the youth maintain contact with school counselors, attendance counselors and social workers for needed services, assisting the youth in obtaining needed IEP services, assisting with problems with financial aid offices, billing offices, and enrollment offices, working with the school on any issue related to the youth's educational plan.

D003108056

**Educational Assessment:** Providing an academic evaluation of the youth's academic achievements and areas needing improvements to determine the supports and services the youth may need to accomplish their educational plan/goals.

**Educational/Career Planning:** Assisting the youth in exploring educational and/or career interest or options. Assistance may include using career resource libraries, interest inventories, job/college fairs, other community resources to help the youth in this area.

**Education Funding:** Services provided to youth to assist them in obtaining a post-secondary educational goal, such as a college degree, or a program certification or licensure. Some of the assistance that may be provided for youth in the above programs is tuition and fees, room and board at schools, interim housing, and food.

**Education Planning:** Assisting the youth in exploring educational interests or options. Assistance may include using educational resource libraries, interest inventories, college fairs, other community resources to help the youth in this area.

**Educational Services:** Assisting the youth with post-secondary activities that will help them obtaining their educational goals. These activities may include assisting youth with test preparation (ACT, SAT), linking youth to colleges, providing youth an opportunity to attend college orientations/tours (HAT and Upward Bound Program), assisting youth in completing financial aid applications, assisting youth in enrolling and registering in an educational program, and other educational resources that will help the youth in this area.

**Educational Supplies:** Services provided to youth to assist them in obtaining a post-secondary educational goal, such as a college degree, or a program certification or licensure. Some of the assistance that may be provided for youth in the above programs is school clothing, books and supplies.

**Educational Vocational:** Providing the youth with vocational training programs that are designed to build a youth's skills for a specific trade, vocation, or career through classes or on-site training. Vocational training includes a youth's participation in vocational or trade programs and the certification of training in occupational classes for such skills as cosmetology, auto mechanics, building trades, nursing, computer science, and other current or emerging employment sectors. These programs may include a youth's participation in an **apprenticeship, internship, or summer employment program** and do not include summer or after-school jobs secured by the youth alone. Some of these programs may be paid, unpaid or partially paid.

**Employment Services:** Assisting the youth in applying for and retaining gainful employment. Assistance may be in the following area: job seeking and placement support, writing resumes, developing interview skills, understanding workplace ethics,

D003108057

providing work force supports, and other community resources to help the youth in this area.

**Family Planning:** Providing youth with information/training on abstinence and ways to prevent pregnancy or childbirth, such as sexual development, pregnancy prevention and Sexually Transmitted Infections (STI) Education. The information/training may also include prevention, and treatment sessions.

**Financial Services:** Assisting youth is the use of a bank, how to make deposits, setting up a checking account, writing checks, utilizing ATM cards, utilizing safe deposit boxes, making loan applications. Assisting youth in basic money management which may include budgeting, saving, paying debts, credit and investing. and providing youth with information on continuing support services.  Youth may also be assisted in tax preparation as part of financial assistance.

**HSE Preparation & Support:** Providing assistance to youth in obtaining their High School Equivalency (HSE). Such assistance may include providing them with guidance in applying for, enrolling in classes for, attending classes for and testing for their HSE.

**Health Education:** Providing the youth with information that increases their awareness favorably and influences their attitudes and knowledge relating to the improvement of health on a personal or community basis.

**Healthy Relationship Education:** Providing youth with the information on how to communicate with greater compassion and clarity. Assisting the youth in developing skills to promote positive family and community interactions.

**Homework and Study Skills Assistance:** Providing youth with instruction on how to obtain information from class better, take notes in class, study better, and how to take tests to obtain their high school diploma or GED. Support may include the assistance in homework when it is needed. This may be provided by teachers, foster parents, social workers, parents, or other individuals.

**Housing Education:** Providing the youth with assistance, training and instructions on issues related to finding a place to live as well as keeping a place to live. The training/skills provided may include locating and maintaining housing, including filling out a rental application/agreement and acquiring a lease, handling security deposits and utilities, understanding practices for keeping a healthy and safe home, understanding tenants' rights and responsibilities, and handling landlord complaints.

**Housing-Rent:** Assisting the youth in covering expenses for the first month's rent and deposit when the youth is moving into their own apartment. If utilities are included in the

D003108058

rent, then a payment for rent only should be utilized. **Must be considered as a part of the youth start-up funds and is limited to $1100.00 dollars per youth total.**

**IL Subsidies:** Monthly payment to the youth to cover their personal living expenses.[4]

**Independent Living Assessment:** A formal assessment to evaluate the youth's life skills in preparation for transitioning to adulthood

**Literacy Training:** Providing youth with appropriate reading and writing skills, so they can obtain their high school diploma or HSE.

**Medical Services:** Assisting youth with **necessary** medical services, when all other available mechanisms for the youth to obtain these services have been exhausted. These services must be necessary for the youth to achieve independence. Some reasons for these services may be for a youth who needs glasses and is in an educational program, but does not have any insurance to cover the expenses, or for a youth who is in an education program and may need an emergency prescription filled for a severe condition, but does not have any insurance. No routine/maintenance medical payment can be used with this payment type. Not to be used for youth in foster care or those who have any other type of medical insurance. State Office Approval needed for this payment.

**Mentoring:** Mentoring is the provision of knowledge, encouragement and support by a person who has a greater knowledge than the youth. It entails informal communication, usually face-to-face, is done for a sustained period of time and is usually related to the youth's work, career or educational development.

**Parent Education and Training:** Providing youth with information on significant positive involvement, increased contact, healthy parent-child relationships. These could include teen parenting classes, child care skills, responsible fatherhood initiatives, or other community resources to help the youth in this area.

**Parent Identity Protection:** Assisting youth in developing skills that will protect them against fraud and scams, identity theft and what to do when they have been victimized.

**Transportation (Routine):** Providing the youth with needed bus passes, mileage reimbursement, or other transportation resources, so they can get to and from school and/or work or to and from home/relative home.

**Tutoring:** Providing educational instruction either privately or in a group setting, for youth in their pursuit of their educational plan. Educational instruction may be provided by a peer, foster parent, teacher, social worker, family friend, or other individuals. Paid

---

[4] Independent Living Subsidies can only be provided to youth 18 and older.

D003108059

providers must meet the State's qualifications for paid providers. Please see ASO Tutoring.

**Utilities:** Assisting the youth in payment for needed services such as water, electric, natural gas, so they can live independently. Must be considered as a part of the youth start-up funds and is limited to $1100.00 dollars per youth total.

**Vocational Testing and Counseling:** Providing youth with resources needed for admission requirements for vocational programs or for supportive services needed for a vocational program, such as vocational rehabilitative counseling or a testing fee for an LPN Program.

**Youth Transitioning (YT) Transportation:** Assisting youth in getting to needed appointments, by picking them up and taking them to the appointment.

### 5.28   Transitional Living for Youth 16 and Over

In some instances, a youth may wish to practice living semi-independently prior to final discharge from the foster care system.  Experiential learning opportunities are available for these youth through the Transitional Living Placement option in which foster care youth establish their own household in a transitional living facility but are supplied with the following support, supervision and services:
   a.  Ongoing social casework;
   b.  Continued life skills instruction;
   c.  Assistance with career planning and employment and job maintenance;
   d.  Scheduled face-to-face contact between the youth and caseworker in addition to regular phone contact;
   e.  Planned and unannounced home visits; and
   f.   and behavioral health services, when needed.

Transitional Living Placements may be provided to youth at the age of 16 years old up to the age of 23 years old, but youth must meet certain criteria in order to be eligible for this type of placement. Transitional Living Placements may be structured for youth who are in need of extra support and supervision or they may be structured for youth who are capable to semi-independent living. Transitional Living Placements may be supervised and supported by the youth's caseworker or they may be supported and supervised by a private transitional living agency. The type of Transitional Living Placement will be dependent on the youth's abilities and needs.

Youth residing in a Transitional Living Placement, under a private agency, are normally youth who need extra supports and supervision, and are progressing through two levels of supervision and responsibility.  Youth first entering this placement type are subject to a minimum of five hours of supervision/services a week, from the Transitional Living Placement staff (Phase Two - Part One.)  As the tasks and responsibilities are achieved,

D003108060

youth gain more autonomy and require less supervision (Phase Two - Part Two.) (These services are authorized through the ASO Process)

### 5.28.1 Transitional Living Placement Eligibility

The youth's worker must determine the youth's eligibility for Transitional Living Placement based on the following criteria prior to referral for placement supervised by a private agency or prior to placement in a Transitional Living Placement setting directly supervised by the youth's worker.

a) The youth is at least 16 years old[5] but not more than 23 years of age.
b) The youth is demonstrating responsible behavior and capable of living independently.
c) The youth has completed their life skills assessment.
d) The youth has basic living skills and can live independently.
e) The youth must be motivated to achieve goals, such as educational or employment.
f) The youth is pursuing an educational, employment or some goal for independence. The youth must have a plan for activities of 40 hours a week.

For youth who meet the Transitional Living Placement eligibility criteria, the youth's worker will consult with the supervisor and the Multidisciplinary Treatment Team, if the youth is under 18 years old or under the court's jurisdiction. The youth's worker will consult with anyone involved in the youth's life, including the youth's current service providers, juvenile probation officer, youth's parents to present the youth's Transitional Living Plan and determine the best option for obtaining a Transitional Living Placement and necessary services.

When a youth is going to be placed under the supervision of a private agency for transitional living services the youth's worker must take the following actions:

### 5.28.2 Referral Process

a) Complete the family and youth assessment, if not already done.
b) Complete the youth's transitional living plan, if not already done.
c) Compile the necessary information as a referral packet to be sent to appropriate Transitional Living providers for their determination on appropriate placement. This information should include:

---

[5] Youth living in their own apartment must be 16 years old and 18 years old to receive the independent living subsidy.

Foster Care Policy
May 2024

D003108061

1. Transitional Living Placement Referral form, if applicable
2. Youth, Youth and Family Case Plan or YS Youth Case Plan
3. Life Skills Assessment
4. Social Summary of the youth
5. School information
6. Psychological/psychiatric evaluation
7. Original Birth certificate
8. Social Security card[6]
9. Immunization records
10. Medical information
11. Placement history
12. Copy of the court order granting the Department custody

d) If the above information is not available at the time of the referral, the youth's worker will compile the information as soon as possible.  This should not take longer than four weeks.
e) Schedule and participate in the intake interviews and pre-placement visits for the youth and their family with the prospective Transitional Living Placement agency. Transportation must be provided to the placement if necessary.
f) Prepare the youth and their family for such interviews and visits.  They should understand the purpose of the interviews, who will be present and why, what may be discussed, travel and visit time involved, anticipated expenses if applicable, the physical setting of the placement, and the nature of the agency's program.
g) If a youth is entering a Transitional Living Placement from a family foster care home, it may be advisable to involve the foster parents in the intake and placement visits.
h) If the agency accepts the youth for placement or if the placement is going to be supervised directly by the Department, the youth's worker shall arrange a date for the placement
i) If a youth is going to be in a DoHS staff supervised Transitional Living Placement, the youth's worker must provide the following to the youth:

1. Original Birth Certificate
2. Social Security Card
3. Immunization Records
4. Medical Information
5. Psychological/psychiatric Evaluation
6. School Information
7. Placement History
8. Foster care verification letter documenting the youth's placement; and,
9. Any other information deemed necessary to assist the youth in their transition and placement

---

[6] There is a lifetime maximum of ten social security cards per person.  The youth's worker should educate youth on maintaining control and whereabouts of important documents.

D003108062

5.28.3 Placement (Youth age 16 and older)

When a youth is placed in a Transitional Living Placement setting, such as in an apartment of their own[7], whether supervised by a private agency or by the youth's caseworker, placement must be made in accordance to the following guidelines, to assure that the youth continues to receive foster care benefits. The youth may live in a Transitional Living Placement at age 16, but cannot receive the Independent Living Subsidy until age 18:

a) The youth's worker must have the youth complete a W-9, so the youth can be set-up as a transitional living client in CCWIS and placed with themselves in placement.

b) Once a W-9 has been completed by the youth, the worker must complete a search of the open and closed provider records to determine if the youth has been opened as a transitional living client previously.

c) If the youth has not been opened previously, the youth's worker must open the youth up as a transitional living client provider in CCWIS, by completing the General tab in the provider record, then completing the Document Tracking of the W-9, then add services to the youth's provider Service Administrative Screen. Services normally utilized for youth in transitional living are: Educational Services, Transitional Living Services, Housing, and Clothing.

d) If the youth has been opened previously as a transitional client, then the worker may need to reopen the provider record.

e) Once the youth's worker obtains the youth's provider number, the youth can be placed in CCWIS with themselves. The youth's placement effective date will be entered in CCWIS the **same day** of the placement. This will also generate a medical card for the youth within a timely manner. In addition, this will also ensure that the youth has an EPSDT Health Check screening scheduled within the five-day time frame required by the Sanders Consent Decree. If the youth was in foster care prior to this placement, the youth's medical card and FSC-0033 is to be given to the agency in case medical services are required prior to the issuance of a card to the facility for the youth.

f) The youth's worker must submit the W-9 to the local financial clerk, so they can complete and approve the Tax screen in the provider record and make sure that the information is entered in a timely manner.

g) The youth's worker must document the youth's eligibility in the Youth Transitioning, Placement Plan and Placement Recommendation screens in CCWIS, with approval for placement being sent to the worker's supervisor.

h) Once the youth's placement is approved by the supervisor, the youth's worker must complete the Enter/Exit screen in CCWIS, documenting the entry date for the youth.

---

[7] Youth must be 18 or older to receive independent living subsidy, but can be in a Transitional Living Placement at age 16.

D003108063

i) The youth's worker must complete the youth's address and telephone number in the Demographic screen in CCWIS and make sure that the youth's address is correct.

j) Once a plan has been developed for a youth to be moved into their own apartment under the supervision of a transitional living agency, the youth's worker must make an ASO referral for Chafee Pre-Placement Activities.

k) All concrete items/services (start-up expenses), such as a deposit for an apartment, first month's rent, utility deposit, household items, furniture or other items for the apartment, must be paid for through a demand payment request. These requests are to be submitted to the youth's worker by the private transitional living agency, if they are providing the supervision. Original receipts must be submitted with a request for reimbursement.

l) Once a request for these start-up expenses is received by the youth's worker, the worker will complete a demand payment request, utilizing payment type **Independent Living Services and Supplies** and document that it is for start-up expenses within three working days of the request.

m) Once a youth has moved into their own apartment, under the supervision of a transitional living agency, the youth's worker must make an ASO referral for Chafee Phase Two-Part One.

n) The youth's worker will indicate in CCWIS that emancipation is the youth's permanency plan on the Permanency Plan screen.

o) Once the youth's provider record is complete, **including the Tax screen**, the worker should link all needed paid services on the youth's Service Log, as well as any unpaid services on the Services screen in the Youth Transitioning section of the youth's CCWIS case record.

p) The youth's worker must assist the youth in locating and securing safe and affordable housing if the placement is being directly supervised by the Department.

q) The youth's worker must assist the youth in developing a monthly productivity schedule and a monthly budget and approve the schedule and budget.

### 5.28.4 Case Management of Transitional Living Placements (Youth age 16 and older)

Once a youth has been placed in a Transitional Living Placement, it is the responsibility of the youth's worker to assure that the youth continues to work towards the goal of "semi-independence" and continues to work on their transition plan to be successful in becoming self-sufficient.

The youth's worker must maintain adequate contact with the youth and Transitional Living agency, if applicable, to assure that the youth is continuing in their educational or job training programs or to assure that their needs are being met.

The youth's worker must continue to assist the youth in developing a monthly productivity schedule and a monthly budget and approve the schedule and budget. Youth are required to have at least 40 hours of productivity each week, in order to receive a transitional living subsidy/personal allowance. Youth in school full time are considered to

195

D003108064

have 40 hours of productivity a week. If a Transitional Living agency is working with the youth, their staff may fulfill this responsibility.

Youth are required to submit their monthly productivity hours to the worker, along with their budget, if they are not enrolled in school full time.

Youth may have roommates, but they must be approved by the youth's worker and must contribute to the household's finances by at least fifty percent (50%) (if there are two in the house).

For youth who have completed an educational and/or employment goal and now need housing assistance, subsidy/housing services are available for up to six months to assist the youth in becoming stable in their new job or in obtaining a job and home, if the youth is no older than the age of 23.

Youth are responsible for signing leases for any housing. The youth's worker should assist the youth in understanding that the lease is a contract and that it should not be entered unless the youth can and will fulfill the obligation of the lease.

The youth's worker should assist the youth in obtaining safe and affordable housing. All avenues for rent assisted housing should be explored for the youth prior to the youth obtaining housing. The apartment should be checked for safety concerns, by the worker prior to the youth accepting a lease also.

The youth's worker should make unannounced visits to the youth to check the youth's living conditions.

Youth who are in a Transitional Living Placement may be at a higher risk of becoming a victim of human trafficking due to their independent living situation. It is imperative that these youth are properly educated on how to keep themselves safe. It is the responsibility of the youth's worker to thoroughly educate the youth on their personal safety.

Social media can be a dangerous instrument for vulnerable youth. The youth's worker must educate the youth on the appropriate use of all forms of social media and the dangers that can accompany these sites. The youth should be encouraged to keep their social media accounts private and encouraged not to release identifying information such as addresses to their home/placement or workplace, phone numbers, or a timeline of their daily schedule.  The youth's worker should also educate the youth on the appropriate safety precautions to be taken when leaving work, school/classes, and social events with peers, etc.  Traffickers will often lure teens into trafficking by promising them prosperity and unlimited financial potential. This is not realistic, and youth must be educated on these types of dangerous scams and the likely hazardous consequences that go along with these forms of luring and enticement.

Educating youth is vital to their safety and decreasing their risk of becoming a victim of human trafficking. If the worker discovers that a youth is missing or is runaway status, they must follow the steps provided in **Section 5.20, Runaway, Missing or Abducted Children**.

D003108065

If a youth is not being compliant with their Learning/Transition Plan, then they will be removed from the Transitional Living Placement and could be discharged from the program, if they are over the age of 18 and the court has dismissed jurisdiction. Some reasons for being non-compliant could be not participating in their educational or employment programs, having other individuals live off of their subsidy, living in an unsafe home/apartment, or participating in criminal activities.

### 5.28.5 Transitional Living Subsidy Placement Payments

**a)** The youth will submit their monthly budget which accurately reflects the youth's expenditures. The Transitional Living Agency worker or the youth's worker should assist the youth in developing the budget and must sign the request thereby certifying the actual expenditures.

**b)** The transitional living subsidy/personal allowance will not exceed $900.00 a month for youth living in their own apartment or $200.00 a month for youth living in a dormitory at college.

**c)** The youth's weekly planner signed by the youth and the transitional living agency worker or DoHS worker, which certifies that the youth earned the amount of the subsidy/personal allowance requested, must accompany the subsidy request.

**d)** If the youth does not maintain a weekly schedule which documents 40 hours of productive activity, the subsidy must be pro-rated at $4.06 per hour for the total documented hours of productive time completed by the youth. The DoHS worker or the transitional living agency staff will adjust the subsidy request for the youth, if needed.

**e)** Upon receipt of the subsidy/personal allowance request, the youth's DoHS worker must examine the request and determine that it is proper and correct before signing approval.

**f)** If approved, the youth's worker must enter a demand payment request within three working days of receipt of the request. The demand payment request and budget should be imported into the youth's case CCWIS File Cabinet. The approval must be placed in Document Tracking in CCWIS.

**g)** If denied, the request must be returned to the transitional Living agency or youth with a written reason for the denial. The denial must be entered into CCWIS through Document Tracking.

### 5.28.6 Pre-Placement Activities/Start-Up Money Payments (Non-ASO Service)

The youth's worker must ensure that each youth participating in a Transitional Living Placement through a transitional living agency has access to funds necessary for establishing a household.  Youth in Transitional Living Placement are eligible for up to $1,100.00 dollars if residing in a scattered site-based apartment and $400.00 dollars in start-up money if residing in a training site-based apartment or dormitory at college.

D003108066

Appropriate expenditures with start-up money include deposits for rent and utilities; purchasing furniture, bed linens, kitchen appliances, dishes and pots and pans; and an initial supply of food. These payments are made at the state office level.

Youth participating in a Transitional Living Placement, where DoHS staff is directly providing the supervision and services, must have access to money for establishing a household. The amount and uses of these funds are the same as described above. These payments must be made as demand payments directly to **vendors on behalf of the youth**. Vendors include: landlords, utility companies, and retail stores. The youth's worker will initiate this demand payment by utilizing the **Independent Living Services and Supplies** payment type.

5.28.7  Provider Payments for Supervision and Services (ASO Prior Authorization        Required)

Each Transitional Living agency may provide pre-placement services to a youth within 30 days immediately preceding a youth's physical move to a Transitional Living Placement. And to the extent no other resource is available (e.g., Medicaid case management, basic living skills, transportation grants, volunteers, etc.), the Division of Children and Adult Services may reimburse for pre-placement activities at a rate of $28.25 per unit for up to a total of 60 units, within the 30 days. (One unit equals an hour) Documentation required with the invoice for pre-placement activities must include a description of the activity, date, time, place of the activity, and a copy of the completed Transitional Living Admission form.

Each agency providing a Transitional Living Placement with subsidy to a youth may invoice the Department for reimbursement for the services described in the Transitional Living Placement with subsidy section. The reimbursement rate for Supervision and Services is $28.25 per unit for up to 60 units in a 90 day period in Phase Two-Part One. (One unit equals an hour) The reimbursement rate for Supervision and Services is $28.25 per unit for up to 24 units in a 90 day period in Phase Two-Part Two. **These payments are made at the state office level and require an ASO referral prior to the services being provided.**

5.28.8  Policy Waivers for Youth Transitioning Services

A policy waiver request is an attempt to exempt one or more policy rules, which may be related to a client's eligibility to participate in the DoHS's Transitional Living Placement service, for a youth to continue in a Transitional Living Placement when they are not compliant or have been unable to be compliant with the guidelines, to provide additional funding beyond the program limits, or other situations deemed appropriate for a waiver by the youth's worker. If a worker requests to waive a policy rule, the worker must demonstrate that the rule creates a significant barrier to the youth's move towards independence, the youth will be more successful if the waiver is granted, and that it is in the youth's best interest to waive the rule. The youth's worker will request the waiver through the Department Regional Program Manager, for that Region, or the Department's State Program Manager over the Foster Care Program for Successful Transition to Adulthood. The waiver will be documented in the youth's CCWIS record, under Contacts and on the youth's learning/transition plan.

198

D003108067

## 5.29   Chafee National Youth in Transition Database (NYTD)

The Chafee National Youth in Transition Database (NYTD) is a Federal initiative which requires States to collect and report data to the Administration for Children and Families (ACF) on (1) youth who are receiving independent living services and (2) on the outcomes of certain youth who are in foster care or who have exited foster care.  This initiative has led to multiple additions and changes within the Independent Living section of the West Virginia Families and Children Tracking System (CCWIS) as well as within the Foster Care Policy for Youth Transitioning.

### 5.29.1   What is NYTD

Each year thousands of young people are discharged from state foster care systems because they reach the age at which they are no longer eligible for placement. During the early 1980's, research and anecdotal evidence indicated that many young people who are emancipated from foster care experienced numerous difficulties in their attempts to achieve self-sufficiency, including homelessness, unemployment, victimization, and dependence on public assistance.

The Foster Care Program for Successful Transition to Adulthood provides states with greater funding and flexibility to carry out programs to assist youth in making the transition from foster care to self-sufficiency.

The Foster Care Independence Act of 1999, requires the Administration for Children and Families (ACF) to develop and implement a data collection system to (1) track the independent living services states provide to youth, and (2) develop outcome measures that may be used to assess state performance in operating their independent living programs. The data collection system is called the National Youth in Transition Database (NYTD).

(From National Child Welfare Resource Center for Youth Development (NCWRCYD) captured April 29, 2009).

With the implementation of NYTD, independent living services, assessments, and tracking will expand its population base.   While the independent living assessment and learning/transition plan remains mandatory for youth ages fourteen (14) and up who are in the care and custody of DoHS, CCWIS screens will be accessible for all youth in this age range, regardless of foster care status.

Each year many youth in West Virginia are discharged from foster care at the age of majority, due to numerous reasons.  For West Virginia to maintain contact with youth who have exited from foster care to determine if the youth needs any transitioning services or to follow-up on outcomes for the youth, the State must take measures to ensure future contact.

### 5.29.2   NYTD Essential Documentation Requirements

199

D003108068

After a federal review in 2016, the Department has made changes to improve and increase compliance with the NYTD requirements. Good documentation of certain aspects of the case and youth's activities are crucial for the Department to meet compliance and to ensure the best possible outcomes for youth. Specifically, the youth's worker needs to take the following steps:

1. Ensure that the youth's original birth certificate and social security card are obtained and scanned into the CCWIS file cabinet.

2. Determine the gender and race of the youth from the birth certificate and enter this information into the demographic area of CCWIS.

3. Thoroughly investigate and document tribal affiliation claims made by the youth.

4. Regularly – each year – update the education screens for youth in the case.

5. Complete all areas of the youth transitioning tab in CCWIS as outlined in other sections of this policy.

6. Thoroughly document the services provided by grantees, foster parents, youth's worker, and residential providers in the NYTD Services Screen utilizing the *NYTD Quarterly Services Report* for providers and case contacts for services provided by the youth's worker. Only providers who are paid will be documented in the NYTD Services Screen of the Youth Transitioning tab. Services performed by churches and community groups will be documented in the service log as informal providers.

7. Ensure any education provided to the youth buy the youth's worker is documented with case contacts and the appropriate entry into the NYTD Services screen.

8. Assist the MODIFY with CED NYTD Survey Specialists in contacting youth for the NYTD survey/questionnaire.

9. Please use the youth transitioning CCWIS desk guide as a reference for documentation.

### 5.29.3 NYTD Survey Specialists

West Virginia University Center for Excellence in Disabilities has two NYTD Survey Specialists who are employed specifically for the purposes of conducting the survey with the federally required co-hort. These specialists conduct the activities below. The youth's worker does not have to complete the survey but should keep the CCWIS case documentation current with relevant placement information, collateral contact information, and permanent connections. The youth's worker should also provide assistance to the NYTD Survey Specialist with access to the youth who are in residential facilities.

### 5.29.4 Survey Guidelines

D003108069

Under the NYTD requirements, certain youth in foster care must be surveyed during specific years for service and outcome data. The specific requirements of the survey process and the youth that will need to be surveyed are outlined below:

a)    All youth who fall into the "NYTD baseline population" must be surveyed, within 45 days following their 17th birthday, but not before that birthday. Workers will be notified if youth they are working with fall into the baseline population and require a survey to be completed.

b)    The assigned NYTD Survey Specialist must provide the survey or assure that the youth completes the survey by meeting with the youth and explaining the survey to the youth. The youth may complete the survey on their own. The worker may read the survey to the youth, answer any questions and document the youth's responses or a private provider may assist the youth in completing the survey. **The responses on the survey must be the youth's responses and not the worker's or providers. The youth's worker or provider may not change the youth's responses, even if the worker or provider believes the youth's responses may be incorrect. If the youth leaves the item blank, the worker must also leave the item blank.**

c)    If the assigned NYTD Survey Specialist is unable to meet with the youth in a timely manner to provide the survey, the worker may send the survey via e-mail or mail to the youth and provider with specific instructions on how to complete the survey and a time frame to return it. Follow-up telephone calls may be necessary to ensure that the youth and provider complete the survey accurately and return it timely. The NYTD Survey Specialist will also utilize social media, case record searches and other methods to find and survey the youth.

d)    The specialist must document if the youth participated or declined to participate on the survey. If the youth has exited care, is under the age of majority, and identified in the baseline population and the youth's biological or adoptive parent declines the youth's participation, then the worker must document this response as well. The worker must document if the youth is incapacitated, incarcerated, on runaway, or deceased also.

e)    The specialist should not choose "unable to locate" for youth age 17 in foster care. The specialist will reach out to the youth's worker to locate and survey the youth.

f)    Once the survey is completed, the youth's specialist must document the survey responses on the Youth Transitioning NYTD Outcome Survey Screen in CCWIS. The youth's worker must make sure that they document the youth's responses accurately. The paper survey document is kept by the MODIFY Program Assistant at the State Office.

## 5.30   Case Review

The purpose of a case review is to assess progress in the youth's foster care experience and to utilize the court, community representatives/third party reviewers, and the Multidisciplinary Treatment Team to determine the adequacy and appropriateness of the services provided to the youth and family.  All youth in foster care are required to have a case review at least once every six months according to federal regulations.  State law requires that a case plan review occur every 90 days. The Department employs a variety of review mechanisms to ensure it has met its goals i.e., family preservation, child protection, youth services, and compliance with state and federal laws and regulations. The case plan review, the administrative review, the court/judicial review and the Multidisciplinary Treatment Team meetings are used to fulfill these requirements.

During the case review process, the youth's learning/transition plan must be reviewed every 90 days, once a youth turns 14 years old or once a youth, who is older than 14 enters the care and custody of the State.

## 5.31   Transition to Adulthood/Discharge Planning

### 5.31.1   Discharge Planning for Youth at age 18

When youth placed in foster care reach the age of 18 they will exit foster care unless they agree to continue to receive foster care services through the  Continued Foster Care Services Agreement (SS-FC-18). (Please see 5.33 Continued Foster Care Services Agreement for Youth Over Eighteen for more information.) The youth's worker should begin planning with the youth for their transition to adulthood and/or exit from care well before the youth's 18th birthday.   Planning for the youth's transition to adulthood should include the following:

a)  Upon the youth's 17th birthday or if the youth has already turned 17 at the time the Department is granted custody, the youth's worker will convene an MDT.  The purpose of this MDT is to assess the youth, collect information and develop a transition plan for the youth's exit from the care and custody of the Department. The following areas must be discussed and assessed during the MDT meeting:
1. Youth's progress with the life skills curriculum and assessment;
2. Youth's education progress and goals (including information regarding the youth's Individualized Education Plan (IEP) and transition services provided by the IEP if appropriate);
3. The youth's preparedness for independence;
4. The youth's ability and/or desire to be employed.
5. The importance of designating someone to make health care treatment decisions on behalf of the youth if the youth is unable to do so and does

202

D003108071

not have or want a relative who would otherwise be designated under state law to make such decisions. Youth also must be given information about how to execute a health care "advance directive" document recognized under state law.  If it is determined that a youth is mentally incapacitated and unable to make health care decisions, the worker must review and follow the Adult Service Policy Section, Health Care Surrogate Policy 2.2.3

**6.** If the youth chooses to "execute" an advance directive, they may be assisted by their worker or referred to the following website for assistance, http://wvethics.org/advance-directives-forms-and-laws/.

**b)** After the discussion and assessment of the items listed above the MDT will gather and/or compose the following:

**1.** Contact information for three or more close relatives or individuals with which the youth has long term connections or may rely on for social support or assistance when needed;

**2.** Youth's contact information including possible mailing addresses, cell phone number and e-mail address;

**3.** Personal Exchange Document Discharge List (PEDDL).

**c)** Using the information discussed and collected the MDT should complete the youth's transition/learning plan.

**d)** In addition to inviting individuals already involved in the MDT process, the worker should invite anyone to the MDT meeting who will be instrumental in developing and/or implementing the transition/learning plan (i.e. MODIFY worker).

**e)** All male youths are required to register with the Selective Service within 30 days of their 18th birthday and no more than 29 days thereafter. This gives youths a 60-day registration period. Failure to do so may result in the ineligibility for opportunities important to the youth's future such as federal student financial aid, most federal and some state employment, as well as job training under the Workforce Investment Act, security clearance for contractors, and the denial of US citizenship for immigrants.  Failure to register may also result in legal action, as it is a felony punishable by fines and/or prison time. For complete information and guidance regarding registering for the Unites States Selective Service refer to the Selective Service System website. Please note that female youth may also register with the selective service on a voluntary basis, but they are not required by law to do so.

**f)** The worker will begin gathering original documentation on the Personal Exchange Document Discharge List (PEDDL) that will be released to the youth upon their exit from the care and custody of the Department.  These items may include but are not limited to:

203

Foster Care Policy
May 2024

1. the youth's social security card[8];
2. certified original birth certificate;
3. health records including immunization history;
4. education records;
5. life book;
6. completely journey placement notebook;
7. state photo ID;
8. SSI applications (copy);
9. verification of selective service registration;
10. foster care verification letter documenting the youth's placement;
11. an application for the Crime Victims Compensation Fund; and,
12. any other information the youth may find helpful or important.

g) If evaluation and assessment of the youth determines the youth may be in need of adult services assistance the youth's worker will collaborate with the appropriate adult services staff to complete a plan for the youth's discharge from foster care at age 18. For a detailed summary refer to section **Transfer to Adult Services/Guardianship**, below.

h) The youth's worker will provide the youth and their caregiver with the transition/learning plan. The transition/learning plan should be documented in CCWIS, within the Youth Transitioning section and an electronic copy added to the CCWIS case File Cabinet.

i) The youth's worker will arrange referrals for services included in the transition/learning plan and agreed upon by the youth and the MDT. The youth's worker may also assist the youth in filling out applications for employment, college or any other activities that may require this skill (for example FAFSA for college and/or continuing education application, application for bank account, application for utilities or referral for employment through HRDF). These services should be documented in the NYTD Services Screen of the Youth Transitioning tab in CCWIS.

j) The youth's worker will evaluate the youth's eligibility for Mentoring and Oversight for Developing Independence with Foster Youth (MODIFY) and make an appropriate referral to MODIFY in a timely manner. The youth's worker must invite and include the MODIFY Specialist in MDT meetings when the youth turns 17 or if the Department is granted custody after the youth's 17th birthday. Referrals should be made at least six months prior to a youth graduating from high school, obtaining the HSE or aging out of foster care at 18 or older.

---

[8] Please note there is a lifetime limit of ten social security cards. The youth's worker should emphasize the importance of maintaining control and whereabouts of important documents.

**k)** The youth's worker must release all original documentation including health and education records (See #5 above for a detailed list) at no cost to the youth upon their exit from care and custody of the Department.

**l)** The youth's worker must document all information gathered from steps above in the appropriate CCWIS screens, including the Youth Transitioning area.

5.31.2    Discharge Planning for Youth 18 to 21

The Foster Care Program for Successful Transition to Adulthood requires States to assist youth, between the ages of 18 and 21, who are in foster care or receiving continued foster care services through the SS-FC-18, in developing their own transition plan from foster care. These are IV-E reimbursable case types only through the Continued Foster Care Services Agreement (SS-FC-18). **(Note: this does not include Chafee services which can continue up to age 23).** The following actions must be followed when youth between the age 18 and 21 are exiting foster care or services:

**a)** Upon the youth's decision to exit foster care or services, a transition plan must be developed during the 60-day period prior to the youth exiting care. The youth's input/decisions are vital in the planning process.

**b)** The youth's worker will utilize the Youth Transition/Learning Plan to document the transition plan. This discharge plan must specifically detail the youth's choices and options for housing, health insurance, education, mentoring opportunities, employment services, and other support services. The youth will be provided with a copy of the plan.

**c)** The youth worker must explain the importance of designating someone to make health care treatment decisions on behalf of the youth if the youth is unable to do so and does not have or want a relative who would otherwise be designated under state law to make such decisions. Youth also must be given information about how to execute a health care "advance directive" document recognized under state law. If it is determined that a youth is mentally incapacitated and unable to make health care decisions, the worker must review and follow the Adult Service Policy Section, Health Care Surrogate Policy 2.2.3.

**d)** If the youth chooses to "execute" an advance directive, they may be assisted by their worker or referred to the following website for assistance, http://wvethics.org/advance-directives-forms-and-laws/.

**e)** As indicated above, the worker will begin gathering original documentation, on the Personal Exchange Document Discharge List (PEDDL), that will be released to the youth upon their exit from the care and custody of the Department. These items may include but are not limited to:

205

1. the youth's social security card;
2. certified original birth certificate;
3. health records including immunization history;
4. education records;
5. life book;
6. completed journey placement notebooks;
7. state photo ID;
8. SSI application (copy);
9. verification of selective service registration;
10. foster care verification letter documenting the youth's placement;
11. an application for the Crime Victims Compensation Fund; and,
12. any information the youth may find helpful or important.

**f)** As indicated above, if the youth has not been previously assessed by Adult Services and there is question as to the youth's capacity to live independently, then the worker will provide for an evaluation and assessment of the youth to determine if the youth may be in need of adult services assistance. The youth's worker will collaborate with the appropriate adult services staff to complete a plan for the youth's discharge from foster care. For a detailed summary refer to section **Transfer to Adult Services/Guardianship**, below.

**g)** The youth's worker will arrange referrals for services included in the Youth Transition/Learning Plan and agreed upon by the youth. The youth's worker may also assist the youth in filling out applications for employment, college applications or any other activities that will assist the youth (for example FASFA for college and/or continuing education application, application for bank account, application for utilities or referral for employment through HRDF). These services must be documented in the NYTD Services area.

**h)** The youth's worker will evaluate the youth's eligibility for MODIFY Services and make an appropriate referral to MODIFY in a timely manner. Referrals should be made at least six months prior to a youth graduating from high school, obtaining a High School Equivalency or aging out of foster care at 18 or older.

**i)** If a youth requests that a MODIFY referral not be made on their behalf, the youth's worker will provide the youth with information on the MODIFY Program, which includes the toll-free number.

**j)** The youth's worker must release all original documentation including health and education records (See #5 above for a detailed list) at no cost to the youth upon their exit from care and custody of the Department.

5.31.3    Permanent Connections

D003108075

Research has shown more frequent, meaningful contact with youth in care leads to better outcomes, stability in placement and timely permanency. The new shift in policy and practice strongly emphasizes building strong, permanent relationships with youth as well as assisting youth in identifying and building other permanent connections. A youth who has permanent connections to other individuals or to community resources will be more successful in becoming self-sufficient and a vital part of the community.

Prior to discharge, youth should be able to identify several individuals and/or community resources that are permanent connections for them. These permanent connections must be documented in the youth's CCWIS record under the Youth Transitioning screens, under Discharge Planning, Permanent Connections.

## 5.32   Transfer to Adult Services/Guardianship

As part of a youth's plan for permanency, it is critical to conduct ongoing evaluations of their potential for eventual self-support.  The Life Skills Curriculum is one tool that can provide needed information about the youth's functional abilities in core life skill areas. This is to be utilized when a youth reaches the age of 14, as indicated:

a) If the youth is not progressing through the life skills modules, a Special Needs Curriculum should be employed for those youth to learn life skills.

b) If youth are still not progressing using the Special Needs material, a comprehensive psychological evaluation, including an assessment of their potential for adult independence, should be obtained by the youth's worker.

c) If the determination is made, using these two evaluation tools, that the youth likely lacks decision-making capacity and requires a substitute decision-maker, the youth's worker must contact the adult services supervisor in the local office. The youth's worker will complete the Youth Transitioning to Adult Services form. The form shall be updated from age of 17 through 18 to ensure appropriate discharge planning. The youth's worker will upload updated copies into CCWIS. Adult services staff will attend all Multidisciplinary Treatment Team meetings, case staffings, and reviews for the youth.

d) Once the youth has attained the age of 17 years, the youth's worker may make the Adult Service worker a secondary worker for the youth until the youth exits foster care if the Adult Service worker has an active part in the service plan.  At this point, the youth's worker and the Adult Service worker should work together in planning for

the youth's adulthood and eventual discharge from foster care. The youth's worker will continue to remain responsible for the youth until the youth exits foster care.

**e)** If it has been determined that the youth meets the eligibility requirements and should continue in foster care after the youth's 18th birthday, the youth's worker will complete all the necessary requirements as described in the Foster Youth Over Age Eighteen section of the foster care policy.

**f)** If it has been determined the youth does not have the capacity to make informed decisions regarding their future, due to severe developmental, mental health or physical disabilities, the youth may not sign a Continued Foster Care Services Agreement (SS-FC-18). The SS-FC-18 is an agreement between the youth and the department which stipulates the conditions for receiving continued foster care services. This requires the youth to have capacity to fully understand the consequences and terms of the agreement. In these situations, the youth's worker must collaborate with the Adult Service Worker to complete an appropriate plan for the youth's discharge from foster care at age 18.

**g)** The youth's worker should refer to 5.33 Continued Foster Care Services Agreement for Youth Over Eighteen (SS-FC-18) which asserts in rare circumstances it may be in the young adult's best interest for the Adult Guardian to sign an SS-FC-18 allowing the youth to continue receiving foster care services. This option should only be used if all other Adult Services and community resource options have been exhausted, and foster care services accessible through the Continued Foster Care Services Agreement (SS-FC-18) are required to ensure the youth's needs are met. All attempts to secure necessary services must be documented. All Continued Foster Care Services Agreements (SS-FC-18) must be staffed and approved by the Adult Services Supervisor, Child Welfare Supervisor and the Social services manager of the district office allowing the child to receive continued Foster Care Services.

**h)** If a foster youth has a disability, the youth's worker should complete an application for Adult Disabled Social Security Benefits or Supplemental Security Income prior to the youth's 18th birthday. This application should be submitted at least three months prior to the youth's 18th birthday, as indicated in the federal guidelines for Supplemental Security Income (SSI).

**i)** The youth's worker will make referrals to all appropriate community resources that may need to provide services that will be necessary for the youth after they reach adulthood. This will ensure that services, especially behavioral health services, will continue after the youth's 18th birthday.

**5.33** Youth Over 18 Receiving SSI, SS or Other Benefits

At the time foster youth receiving Social Security, SSI or other benefits reach age 18, they automatically become payee for their own benefits unless they are deemed incompetent and unable to handle their own affairs, by the court, upon discharge from the foster care system. This young adult may have another person named as a Representative Payee, without being deemed incompetent. This can be accomplished with the assistance of a physician, who can submit a statement to have a Representative Payee established on behalf of the person.

If it has been determined by the court that the young adult is incompetent, or it is evident that they lack capacity to manage their finances a Conservator/Representative Payee may be named. The payee/conservator will be responsible to use the benefits towards the young adults housing/living expenses. If the young adult chooses to name a payee or has a conservator, then that payee/conservator will provide payment for the youth's housing/living expenses with the benefits. The Department may have housing options available for young adults who lack decision making capability and have no other housing available.

If a young adult chooses to continue to receive foster care services and remain in a foster care setting through the Continued Foster Care Services Agreement (SS-FC-18), then the Department must provide the young adult with information about their Social Security, SSI or other benefits. The young adult will be provided a copy of the SS-FC-18, which will explain that their benefits should reimburse the Department for their housing/living expenses.

It is important for the payee/conservator to keep track of the young adult's savings and develop plans for purchasing items that the young adult needs, wants, or will benefit from in order to keep the young adult's assets from exceeding the SSI limit of $2,000. If a young adult's assets are in excess of the SSI limit, the young adult will become ineligible for SSI and their benefits will end. A pre-need burial plan may be purchased for the young adult before they reach age 18.

## 5.34 Continued Foster Care Services Agreement for Youth Over Eighteen (SS-FC-18)

Many youth overestimate their readiness for independence. When their capacity to meet their needs in the community is revealed after they leave foster care placement, a youth may request to return to foster care. Former foster youth, ages 18 through 21, who left care at age 18 or older may apply to return to a foster care living situation if circumstances support the need for them to return to care. **\* Note: Foster care placement will end on the youth's twenty first (21st) birthday.**

a)   Foster care after age 18 applies to three categories of young adults:

209

D003108078

1. Those youth who remain in care after age 18;

2. Those youth who were former foster youth, left at the age of 18 or older, and request to return to foster care after age 18, through the age of 21 and;

3. Those youth whose parental rights have been terminated, were in foster care immediately prior to a BJS placement and left BJS at age 18 or older.[9] DoHS must be notified of transitional plan and be notified of MDTs six months prior to discharge from BJS.

    a) Since many foster youth have not completed their education by the time they reach their eighteenth (18th) birthday, they have an incentive to remain in foster care.  Boarding care may be continued for foster youth from age 18 through age 21 under the following conditions:

1. The young adult requests continued financial supports after receiving a clear explanation of their right to independence and responsibility for self-support at age 18; and

2. The young adult will continue their education (college, vocational, or training) and plans to continue their current enrollment or plans to enroll in a different school or training program within the next three months.

3. The adoptive parent requests approval from the Department to extend the subsidy beyond the child's eighteenth birthday if the child meets one of the following criteria:

    a) the child is completing secondary education or a program leading to an equivalent credential,

    b) the child is enrolled in an institution which provides post-secondary or vocational education,

    c) the child is participating in a program or activity designed to promote, or remove barrier to employment,

    d) the child is employed for at least 80 hours per month, or

    e) the child is incapably of doing any of the above described activities due to a medical condition.

When a former foster youth applies for foster care services, an assessment of the current circumstances shall be made.  The individual may be eligible for other services from the Department or from another community resource that would be more appropriate to meet their needs.  All other agency and community resources are to be explored before approving foster care services.  Attempts to locate other agency and community resources must be documented in the youth's case record. The youth must sign a Continued Foster Care Services Agreement (SS-FC-18).

---

[9] Youth who age out of BJS and sign an SS-FC-18 are not eligible for the Independent Living Subsidy.

Foster Care Policy
May 2024

D003108079

The SS-FC-18 **must** be explained to the youth in detail as an agreement between the youth and the Department. It does not place the youth back into "custody" of the state. The youth has certain responsibilities to uphold in working towards meeting the goals and objectives of their transition plan and in working towards becoming semi-independent and self-sufficient. The Department has responsibilities to provide the youth with assistance in meeting those goals and objectives. The youth's caseworker must continue to make monthly face-to-face contact with the youth while they continue to receive foster care services. If a youth desires to continue to receive foster care services after receiving an explanation of the SS-FC-18, they must agree to sign a Continued Foster Care Services Agreement (SS-FC-18).

Once the agreement is signed by all parties, the worker will submit the agreement to the Transitional Living Permanency Support Unit email inbox at TLPermanencySupport@wv.gov. The agreement will be returned to the worker with approval or denial stamped on the front. If the form is denied, the youth will be ineligible to receive continued foster care services. The worker will be informed of the reason for denial.

In rare situations youth who are deemed incompetent may continue to receive foster care services under the Continued Foster Care Services Agreement (SS-FC-18). Please refer to the section **Transfer to Adult Services/Guardianship** above for guidelines.

Boarding care must be discontinued for all youth the month upon their eighteenth (18th) birthday if they elect to assume their independence and/or they are not attending an educational program, or do not plan to continue or enroll.

5.34.1    IV-E Determination for Youth Under an SS-FC-18 Agreement

If a youth is IV-E eligible while in foster care they will remain IV-E eligible if they continue to receive foster care services past their 18th birthday, as long as they sign the SS-FC-18. If a IV-E eligible youth leaves care any time after their 18th birthday but returns within 180 days, they will remain IV-E eligible, as long as they meet one of the eligibility requirements and sign the SS-FC-18.

5.34.2    Status/Permanency Review Hearings for youth under an SS-FC-18 agreement

Youth who remain in a foster care placement and meet the criteria for a "Transitioning Adult" as defined below, must have quarterly and annual reviews as indicated in Sections 6.2 and 6.3 of this policy.

*Foster Care* – 24 hour substitute care for children placed away from their parents or guardians and for whom the State agency has placement and care responsibility. This includes, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, childcare institutions, and pre-adoptive homes.

*Transitioning Adult* – An individual with a transfer plan to move to an adult setting who meets one of the following conditions: (1) Is 18 years of age but under 21 years of age, was in departmental custody upon reaching 18 years of

211

age and committed an act of delinquency before reaching 18 years of age, remains under the jurisdiction of the juvenile court, and requires supervision and care to complete an education and or treatment program which was initiated prior to the 18th birthday. (2) Is 18 years of age but under 21 years of age, was adjudicated abused, neglected, or in departmental custody upon reaching 18 years of age and enters into a contract with the department to continue in an educational, training, or treatment program which was initiated prior to the eighteenth birthday.

Not all youth 18 to 21 years of age must continue to have quarterly and annual review hearings. The following youth are **not** required to have status/permanency hearings:

a) Youth 18 to 21 years of age who have achieved permanency (adoption, legal guardianship, etc.);
b) Youth 18 to 21 years of age who do not have an SS-FC-18; and
c) Youth 18 to 21 years of age who have an SS-FC-18 but are placed in an independent living situation.

### 5.34.3    Continuing Medical Coverage for Youth Beyond the Age of 21

Once youth reach 21 years of age, they are no longer eligible to receive continued foster care services. The SS-FC-18 contract will expire, resulting in an end-date of the placement and custody screens. This will also end the youth's medical coverage through foster care. In order for the youth to continue receiving Medicaid coverage, the child welfare or MODIFY worker must assist the youth through the process of filling out the application for Medicaid through their local DoHS office. The application should be completed 30 days prior to the youth's 21st birthday. The independent living subsidy will continue to be paid through a demand payment.

## 5.35  Post-Secondary Educational Programs

A youth in the care of the Department who has graduated from high school or obtained their High School Equivalency and has the interest and ability to pursue further education either in college or vocational school should be strongly encouraged to pursue their educational goals. The Department may support youth who are continuing their education up to age 21 through continued foster care services. Youth over the age of 18 must voluntarily elect to sign the Continued Foster Care Services Agreement (SS-FC-18) in order to be eligible for continued foster care services. However, previous foster care youth who turned 18 while in foster care can receive Chafee services up to age 23 and can receive the Education and Training Funding Vouchers (ETV) in certain circumstances up to age 26.

Generally, out-of-state schools and private institutions are not recommended, due to the expense of the school and lack of State financial aid. In those cases where it can be demonstrated that an out-of-state or private program is less costly than a comparable in-state program or when it can be demonstrated that it is in the youth's best interest to attend an out-of-state school or program, the situation will be evaluated by the Children and Adult Services (CAS) Management. In these situations, the Department will only provide partial payment for educational expenses, due to the limit on Education and Training Funding Vouchers (ETV) per youth, per year. If a youth chooses to attend an out-of-state college, the Department will only provide up to the allowable ETV funding per year, which is $5000.00 dollars for educational expenses. No other funding can be provided for a youth to attend an out-of-state educational program. The youth must also follow the same rule as an in-state student (outlined below) and apply for all available financial aid. The following steps must be taken to assist a youth in the pursuit of post-secondary education:

a) The youth's worker must make a referral for MODIFY Services, if the youth is going to pursue a post-secondary educational program.

   b) All avenues of financial aid, including a workstudy program, shall be pursued prior to determining the amount the Department will pay for a youth attending a post-secondary education or training program.

   c) The youth must complete a FAFSA prior to the deadline every year to obtain all possible financial aid. **The FAFSA deadline for West Virginia is indicated on the FAFSA website every year after October 1st.**

   d) The youth, foster/adoptive parents, the youth's parents if appropriate, and/or the group care facility should take the responsibility for the exploration of financial assistance.

   e) The youth's worker or the MODIFY Specialist must submit a letter to the school to verify the youth's custody status and may need to verify the youth's eligibility for the **Foster Care Tuition Waiver.** This must be done to ensure that the youth receives any available financial aid for foster care youth.

   f) It is not recommended that youth accept student loans as a part of their financial aid package. This can place them in jeopardy of losing Chafee funds. **If a youth does not have enough financial aid to cover all of their expenses, with the allowable ETV funds added, then the youth may need to accept a student loan. The total financial aid package, including ETV funds cannot exceed the cost of attendance.**

   g) School tuition and fees are to be paid directly to school by the youth's worker or the MODIFY Specialist. The school must be set up as a provider and must forward an invoice for the complete amount of all required tuition, fees, room, board, books, or other school items.    MODIFY

D003108082

Specialists have specific contacts at the local schools and can handle this task efficiently.

h) The education plan for the youth must be reviewed along with the financial arrangements and any adjustments necessary at the time of the quarterly Multidisciplinary Treatment Team meeting and permanency review. As long as the youth remains a student in good standing the educational plan may continue. **The educational information, including last grade completed, must be documented on the Education screen in CCWIS.**

i) Educational and Training Vouchers may continue through age 26 in certain circumstances, every effort should be made to assist the youth to obtain other resources for the completion of their course of study in those situations where they will continue their education beyond age 26 years. **Youth cannot remain in a foster care setting past the age of 21. Placements must be end-dated on a youth's 21st birthday. For youth, whose foster care placement ends on their 21st birthday, may be eligible to sign an SS-FC-18 for possible IL subsidy and Chafee funded services. Educational funding can continue until the youth reaches age 26 years if they have completed and are making satisfactory progress on their 25th birthday.**

j) If the youth spends weekends, days off or holidays with foster/adoptive parents or at a group/residential agency, the youth's worker will make a referral for ASO Connection Visits for the foster family, if they request it.

5.35.1. Foster Care Tuition Waiver

Youth in foster care are eligible to receive tuition waivers for the purpose of attending a West Virginia public higher education institution. Within limitations of the governing boards, the waiver program is available to any youth who:

a) Has been in foster care or residential care for at least one year prior to the waiver application;

k) Graduated from high school or passed the TASC (Test Assessing Secondary Completion) examination while in the legal custody of the Department of Human Services;

l) Applies for the waiver within two years of graduating from high school or passing the TASC;

m) Has been accepted to a West Virginia public higher education institution; and

n) Applies for other student financial aid, other than student loans, in compliance with federal financial aid rules, including the federal Pell Grant.

The waiver covers tuition and fees after other sources of financial aid dedicated solely to tuition and fees are exhausted. Each educational facility determines the

D003108083

amount that will be covered by the tuition waiver. The waiver does not cover room and board or the cost of books.

The youth may apply for the West Virginia Foster Youth Tuition Waiver at the financial aid office of the college or university where accepted. A letter on Department letterhead signed by Department Management will be required as proof of foster/residential care placement one year prior to the waiver application. The youth must continue to meet the academic progress standards established by the West Virginia higher educational institution they are attending in order to receive a waiver renewal.

## 5.36   MODIFY Program

### 5.36.1   Introduction

The Mentoring and Oversight for Developing Independence with Foster Youth (MODIFY) Program offers technical assistance to the Department, group residential facilities, child placing agencies, youth, foster parents, and the community for independent living services and youth transitioning out of foster care. MODIFY Program staff provide direct services to youth who are likely to remain in foster care until they are 18 years old; are aging out of foster care at the age of 18 years or older; or who have already aged out at 18 years or older. MODIFY Program staff can either serve youth as a primary worker or as a secondary worker.

The MODIFY Program has the following purposes:

- To ensure that children who are likely to remain in foster care until 18 years of age are provided education, training, financial support, and other needed services; and

- To support and serve former foster care recipients between 18 and 23 years of age to complement their own efforts toward self-sufficiency and to assure that program participants recognize and accept their personal responsibility for preparing to make the transition from adolescence to adulthood.

### 5.36.2   Independent Living Services and Supplies

Because of Congressional legislation that re-authorized the Independent Living Programs and re-titled the Foster Care Program for Successful Transition to Adulthood, states are now required to provide housing assistance and other services to youth who age out of foster care. A youth discharged from foster care after the age of 18 years is considered to have aged out. Those services are to be available to former foster care youth until their 23rd birthday. Requests for this service from this population will be made to and managed by MODIFY staff.

The services may include:

a.   Referral/Linkage services

b.   Advocacy services

c.   Housing services

d.   Transportation services

e.   Clothing services

f.   Educational Services (ETV)

*There is a lifetime cap, per individual not attending a post-secondary educational program, involved in an employment program or involved in other activities which will assist in the youth's transition to adulthood, of $3,000 for direct financial assistance for services.

*There is a cap of $5,000 for ETV funding, per individual, per year.

**5.36.3**   Chafee Education and Training Vouchers (ETV)

As the result of congressional legislation that re-authorized the Independent Living Program, re-titled Foster Care Program for Successful Transition to Adulthood, funding is being made available to states to assist with the costs of higher education or vocational training for the following three categories of youth as follows:

*A youth discharged from foster care after the age of 18 years is considered to have aged out of foster care.

Former foster care youth who meet the criteria below are eligible to receive educational assistance up to $5,000 per calendar year, for up to five years total. The money may be used to cover the costs of attending college, or vocational training, including all expenses related to a course of study such as computers, special clothing, shoes or boots, books, housing, transportation, and other related educational expenses.

1.   Youth adopted from foster care after the age of 16 years

The youth's adoption case worker must, when completing the Subsidy Agreement for a youth over the age of 16 years, specify the youth's right to this educational assistance to the degree that funds continue to be available at the time such assistance is needed. The adopted youth may apply for this assistance at any time prior to their 25th birthday. The ETV funding will continue to be available until age 26 for youth who are enrolled and making satisfactory progress in an educational or vocational program on their 25th birthday.  The MODIFY Program is responsible for enrolling the youth in the MODIFY Program and providing continued services to the youth, once a referral is received.

2.   Youth who have aged out of foster care;

216

D003108085

The youth's district case worker, when discharging a youth over the age of 18 years, must advise them of the right to this educational assistance and must provide them with the ETV brochure and a wallet card with the MODIFY toll-free number to call to request this educational assistance.

Youth who are in this category may apply for the ETV money at any time from their 18th up through the age of 25. The youth must get a successful semester in before their 25th birthday. This assistance may continue until age 26 for youth who are enrolled and making satisfactory progress in an educational or vocational program on their 25th birthday.

Referrals for the ETV assistance are to be made directly to the MODIFY Program. The MODIFY Program staff will review and approve the request and develop an educational plan with the student.

3.  **Youth placed in legal guardianship after the age of 16 years**

    The youth's guardianship case worker, when developing the guardianship agreement, must specify the youth's right to this educational assistance to the degree that funding remains available at the time such assistance is needed. This funding is available to youth who have a finalized legal guardianship on or after the 16th birthday. A youth in legal guardianship may apply for the ETV assistance at any time prior to their 25th birthday. The ETV funding may continue until age 26 for youth enrolled and making satisfactory progress on their 25th birthday. An application for ETV funds must include the youth's educational plan. The youth's guardianship caseworker should refer the youth to the MODIFY Program.

4.  **Eligibility for MODIFY Services**

    MODIFY services are available to youth, who are former foster care recipients and who age out of foster care on or after their 18th birthday or youth transitioning from foster care but choose to receive continued foster care services under an SS-FC-18 or youth who remain in the custody and care of the State past their 18th birthday. These youth remain eligible for Chafee funded services until age 23. ETV Funding can be extended to age 26, in certain circumstances.

    The youth must be able to live independently with some financial assistance, agreeable to, in an educational or employment program, semi-motivated to accepting responsibilities, and agreeable to accepting MODIFY Services.

5.  **Referral Process for MODIFY Services**

    Referrals for the MODIFY should occur prior to the youth "aging out" of foster care or at least six months prior to the youth graduating from high school or obtaining their High school Equivalency, to ensure a continuum of services and to ensure the youth is enrolled properly into a post-

D003108086

secondary educational program or transitioned out of care appropriately. Referrals can be made at any time after a youth ages out of foster care until they turn 23 years old. The following should occur prior to a Referral for MODIFY being made:

a. It should be determined if the youth is likely to remain in foster care until the age of 18 years or older or the youth has already aged out of foster care. This determination should occur within the youth's MDT;

b. The youth meets the eligibility requirements of being a former foster care recipient and aged out of foster care/or will age out or foster care;

c. The youth meets the personal eligibility requirements above and is agreeable to accepting services;

d. There is current demographic information available on the youth, so they can be contacted, and services can be provided to them;

e. If the youth is planning on attending college or a post-secondary educational program and it is close the FAFSA deadline, for West Virginia, then the youth must be assisted in completing the FAFSA;

f. The youth must have a discharge plan prior to exiting foster care developed by the MDT, which includes housing options for the youth. If there is no discharge plan, the worker must document the extenuating circumstances that prevented one from being developed.

6. Referral Process: To the MODIFY Program

All referrals must be made via secured methods to the MODIFY Program. The referral can be documented on the MODIFY Referral form or information may be provided to staff via the telephone. The referral form is located on the MODIFY website.

7. Educational Plans/Probationary Periods:

For youth planning a post-secondary education but not currently enrolled in a post-secondary educational program, the primary DoHS worker must make a referral to MODIFY six months prior to the youth beginning the post-secondary educational program. If the primary DoHS worker is not given six (6) months-notice of the youth's desire to attend a post-secondary educational program, the primary DoHS worker must make a referral to MODIFY as soon as they become aware of the youth's intent to pursue a post-secondary education. Please note that if MODIFY does not have ample notice to the beginning of the youth's planned post-secondary educational program, MODIFY cannot guarantee the youth will be able to begin the program during the planned semester.

For youth who fail to meet the completion rate expectation, attendance expectation, and minimum GPA expectation as required by MODIFY, the

D003108087

WV Higher Educational Commission, or their educational institution for a semester/quarter, they must be placed on probation and an educational improvement plan will be developed by the youth and their MODIFY Specialist for the following semester/quarter. At the end of this improvement period, the plan will be evaluated by the youth and their MODIFY Specialist for compliance and a decision will be made by MODIFY as to whether the youth will continue with MODIFY or will be discharged from the program due to non-compliance and/or failure to meet minimum expectations

For youth who fail to successfully complete their improvement period and are discharged from MODIFY, these youths may reapply for services if they can provide proof that they successfully completed one full-time semester/quarter on their own and they will begin the next semester/quarter prior to their 23rd birthday. The youth may be required to comply with a new educational improvement plan as a condition of readmission to MODIFY. For youth who fail to meet minimum expectations and choose to leave MODIFY instead of complying with a probation period and educational improvement plan, these youths may reapply for MODIFY at a later date but before their 23rd birthday. However, these youth will be required as a condition of readmission to MODIFY to comply with a probationary period and an educational improvement plan. This educational improvement plan may be assessed for compliance more frequently such as weekly, bi-monthly, monthly, or at midterm. At any time the youth fails to show progress, the youth may be discharged from MODIFY for non-compliance.

For youth who fail to meet the requirements of their educational program for two consecutive semesters/quarters, these youth will be suspended from Chafee ETV funding. Youth may reapply for Chafee ETV funding upon successful completion of one semester/quarter and prior to their 25th birthday. Youth who fail to meet minimum expectations after their 25th birthday will be discharged from MODIFY and may not reapply for Chafee ETV funding. All educational probation plans must be documented and provided to the youth. A copy must be placed in the youth's File Cabinet in CCWIS.

8. Youth's Responsibilities

The youth must agree to abide by the rules and responsibilities outlined in the SS-FC-18 agreement and/or on the MODIFY Program enrollment forms. The youth must maintain contact with their MODIFY Specialist or DoHS worker and provide the worker with access to the parent portal or sign a FERPA form or other consent forms needed to assist the youth with a successful transition to adulthood and/or a successful educational experience. Informational access may include but is not limited to the

219

D003108088

youth's grades, financial account summaries, financial aid award, academic transcripts, and/or school schedules.

Should a youth decide to leave an educational program, the youth is responsible for withdrawing appropriately from the educational program. If the youth fails to withdrawal appropriately causing the educational facility to add additional charges to the youth's educational account or results in financial aid suspension causing additional expenses, the youth may be responsible for these expenses. If a youth chooses to accept unnecessary student loans, the youth may be forfeiting Chafee funding. If students choose to accept student loans in excess of the amount necessary to pay basic educational expenses such as tuition/fees and on campus room/board, they may be prevented from accessing Chafee funding should this amount go above the institution's cost of attendance. A youth should consult their MODIFY Specialist before accepting student loans to insure they have a clear understanding of the cost and benefits of this choice.

The youth is required to inform the MODIFY Specialist of any refunds that they receive from their financial aid awards and additional scholarships/grants during the school year. These refunds may affect a youth's transitional living subsidies or ETV funding.

# Section 6

## Case Review

## 6.1   Introduction

The purpose of a case review is to assess progress in the child's foster care experience and to utilize the court, community representatives/third party reviewers, and the Multidisciplinary Treatment Team to determine the adequacy and appropriateness of the services provided to the child and family to address the issues for which the child was removed from the home. All children in foster care are required to have a case review at least once every six (6) months according to Federal regulations. The Department employs a variety of review mechanisms to insure it has met its goals, i.e. family preservation, child protection, youth services, and compliance with state and federal laws and regulations. The case plan review, the administrative review, the court/judicial review, and the Multidisciplinary Treatment Team meetings are used to fulfill these requirements.

Case reviews always require that an independent third party review the progress that has been made in the Unified Case Plan process. The independent third party may be, depending on the type of review, either a judge, a community representative, or other individual such as a Department employee not involved in the direct services to the child in care or their family. Foster/adoptive parents, pre-adoptive parents, and relative caregivers must be given notice of and an opportunity to be heard in all case reviews and

220

D003108089

hearings.

## 6.2  Quarterly Status Reviews

Each child in foster care must be reviewed by the court until the child achieves their permanency plan.  Quarterly status reviews are held to determine the safety of the child, the continuing necessity for and appropriateness of the placement, the extent of compliance with the unified child and family case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship.

To ensure that this statutory mandate is occurring, the social worker must:
- Contact the Prosecuting Attorney to ensure that the quarterly status review is scheduled and placed on the court's docket; and,
- Notify the MDT of the quarterly status review and ensure that all notices have been received.  This must be provided to the MDT at least 15 days prior to the review.

Convene the Multidisciplinary Treatment Team, which should include the child's biological parents, foster/adoptive parents or current caregiver, and the child if over the age of 12, to monitor the implementation of the court ordered permanency plan for the child.  This team is charged with evaluating the progress toward achieving the child's permanency plan, to consider any necessary modifications of the Unified Case Plan, and to obtain updated progress reports from all service providers.

The Multidisciplinary Treatment Team will prepare the Unified Case plan progress report describing the efforts in implementing the permanency plan and any obstacles to achieving the permanency plan prior to each quarterly status review.  This report is to be submitted to the court no later than 10 days prior to the permanency hearing.

Request that the court sign the Unified Case plan progress report and enter it on the court record.

Request that the court schedule and place on the docket the succeeding quarterly status reviews unless the court has entered an order finding that the Department is not required to make reasonable efforts to preserve the family.
If the child has been in foster care for 15 of the last 22 months, then the worker must either include a request for termination of parental rights or must include a description of the compelling reasons why termination is not being requested in the Unified Case plan progress report.

D003108090

Request that the court schedule a yearly permanency hearing if within the previous 12 months a yearly permanency hearing was not conducted.

The child's worker must document the court hearing in CCWIS on the court screens.

## 6.3    Yearly Permanency Hearings and Permanency Hearing Reviews

For each child or transitioning adult who continues to remain in foster care, the circuit court shall conduct a permanency hearing no later than 12 months after the date the child or transitioning adult is considered to have entered foster care, and at least once every 12 months thereafter until permanency is achieved. For purposes of permanency planning for transitioning adults, the circuit court shall make factual findings and conclusions of law as to whether the department made reasonable efforts to finalize a permanency plan to prepare a transitioning adult for emancipation or independence or another approved permanency option such as, but not limited to, adoption or legal guardianship pursuant to the West Virginia Guardianship and Conservatorship Act.

If a child has been in the Department's physical custody for 12 months and the Department has not placed a child in an adoptive home, with a natural parent, legal guardianship (pursuant to the West Virginia Guardianship and Conservatorship Act in regard to transitioning adults), or with a fit and willing relative, within 12 months of the child being placed in foster care the social worker must:

a) Contact the Prosecuting Attorney to ensure that a yearly permanency hearing is scheduled and on the court's docket within 12 months of the child or transitioning adult being placed in the physical custody of the Department by either court ordered placement or voluntary agreement.

b) Notify the MDT of the yearly permanency hearing and ensure that all notices have been received. This must be provided to the MDT at least 15 days prior to the review.

c) Convene the Multidisciplinary Treatment Team, which should include the child's biological parents, foster/adoptive parents or current caregiver, and the child if over the age of 12, to monitor the implementation of the court ordered permanency plan for the child. This team is charged with evaluating the progress toward achieving the child's permanency plan, to consider any necessary modifications of the Unified Case Plan, and to obtain updated progress reports from all service providers.

> 1. The Multidisciplinary Treatment Team will prepare the Unified Case plan progress report describing the efforts in implementing the permanency plan and any obstacles to achieving the permanency plan prior to each yearly permanency hearing. The report may also include a request that the court consider another disposition in the case such as termination of parental rights. This report is to be submitted to the court no later than 10 days prior to the permanency hearing.
>
> 2. During the hearing, the child's or transitioning adult's worker must request, through the MDT recommendations/report or the Prosecuting Attorney,

that the court make a finding of whether or not the Department has made reasonable efforts to finalize the permanency plan for the child.

3. The Department is required to obtain a judicial determination that the Department made reasonable efforts to finalize a permanency plan every 12 months for any child age 18 or older receiving title IV-E foster care maintenance payments who was removed due to a contrary to the welfare judicial determination (i.e., a court-ordered placement), but not to a youth removed from home via a voluntary placement agreement. The Department must make efforts to achieve any goals outlined in a youth's transition plan and/or case plan. Such efforts may include: case plans that are developed jointly with the youth in foster care and include discussions which reflect the supervised settings, foster family homes, or child care institutions the youth believes are consistent with what they need to gain independence, and reflect agreements made between the Department and the youth to obtain independent living skills and the benchmarks that indicate how both know when independence can be achieved; periodic reviews, which are held by the courts, involve the youth and focus on whether the youth is safe in their placement, whether continued foster care is appropriate, whether appropriate and meaningful independent living skill services are being developed and the progress made towards achieving independence on a projected date; or permanency hearings which are held under conditions that support active engagement of the youth in key decisions.

4. Request that the court schedule and place on the docket the succeeding permanent placement review, or if the Department is still required to provide reasonable efforts to reunify quarterly status reviews, within three months and every three months thereafter until the permanency plan is achieved.

5. The child's or transitioning adult's worker must document the court hearing in CCWIS on the court screens; including whether or not a finding of reasonable efforts to finalize the permanency plan for the child was obtained.

When the circuit court terminates parental rights, and commits the child to the guardianship of the Department, and the Department is no longer required to make reasonable efforts to reunify the child with their custodial parents, the child's worker will:

a) If the child's permanency plan is adoption, the child must be referred to the Adoption Resource Network within 30 days of termination of at least one parent's rights for inclusion on the state's adoption web page and for statewide child specific recruitment programs.

1. Contact the Prosecuting Attorney to ensure that the permanency hearing is scheduled and placed on the court's docket within 30 days of the court

D003108092

finding reasonable efforts to reunify the child with their custodial parent are not required.

2. Notify the MDT and all persons entitled to notice and opportunity to be heard of the yearly permanency hearing and ensure that all notices have been received. This must be provided to the MDT at least 15 days prior to the review.

3. Convene the Multidisciplinary Treatment Team, which should include the child's biological parents, foster/adoptive parents or current caregiver, and the child if over the age of 12, that shall serve as the permanent placement review committee to monitor the implementation of the court ordered permanency plan for the child. This team is charged with evaluating the progress toward achieving the child's permanency plan, to consider any necessary modifications of the Unified Case Plan, and to obtain updated progress reports from all service providers.

4. Proceed with the treatment requirements to address the conditions that must change to achieve permanency identified in the child's case plan through the provision of services.

5. The Multidisciplinary Treatment Team will prepare the Unified Case plan progress report describing the efforts in implementing the permanency plan and any obstacles to achieving the permanency plan prior to each yearly permanency hearing. The report may also include a request that the court consider another disposition in the case such as termination of parental rights. This report is to be submitted to the court no later than 10 days prior to the permanency hearing.

6. Request that the court sign the Unified Case plan progress report and enter it on the court record.

7. Request that the court schedule and place on the docket the succeeding permanent placement review, or if the Department is still required to provide reasonable efforts to reunify quarterly status reviews, within three months and every three months thereafter until the permanency plan is achieved. (*A permanent placement review/quarterly status review will be conducted at least once every three months until the child's permanent placement is achieved. The MDT will be required to attend and report on the progress and developments in the case.*)

8. If the permanency plan has not been achieved within 18 months of when the child entered foster care, the child's worker must present to the court the reasons for the delay in achieving the child's permanency plan and request that the court find on the record whether or not extraordinary reasons were sufficient to justify the delay in permanency.

Foster Care Policy
May 2024

D003108093

> **9.** The child's worker must document the court hearing in CCWIS on the court screens, including whether a finding of reasonable efforts to finalize the permanency plan for the child was obtained.

NOTE: *Whenever a child is removed from a pre-adoptive home, an adoptive home, or other permanent placement, the permanency review hearing must occur. The worker should promptly report the change in the child's circumstances to the MDT, court, Prosecuting Attorney, child's counsel and/or Guardian Ad Litem, and request that the court schedule a permanent placement review conference within two months of the child's removal.*

## 6.4   Modification of Dispositional Order

WV Code §49-4-718 allows for the modification of Dispositional Orders. This may be done upon motion of the child, child's parent or guardian or the Department alleging a change of circumstances that requires a different disposition. This can be a viable option when older children have not reached permanency, or their adoption has disrupted, and their parents have made changes to the conditions that resulted in the child being abused or neglected. Upon receiving the motion, the court shall conduct a hearing and may modify the dispositional order if the court finds by clear and convincing evidence a material change of circumstances and that such a modification is in the child's best interests. This may only be done provided that the child has not been adopted except in the case of a child being removed or relinquished from an adoptive home or other permanent placement after the case has been dismissed. Adequate and timely notice of any motion for modification shall be given to the child's counsel, counsel for the child's parent or custodian, the Department and any other person entitled to notice and the right to be heard. The circuit court of origin has exclusive jurisdiction over placement of the child, and such placement shall not be disrupted or delayed by any administrative process of the Department.

If a child has not been adopted, the child or Department may move the court to place the child with a parent or custodian whose rights have been terminated and/or restore such parent's or guardian's rights. The court may order such placement and/or restoration of rights if it finds by clear and convincing evidence a material change of circumstances and that such placement and/or restoration is in the child's best interests. WV Code requires the Department to provide prompt notice to the court if the child's placement disrupts. The Department must then convene the MDT to address the issues that led to the disruption.

If a child, child's parent/guardian, or the Department learns there has been a change in the circumstance that led to the child being removed from the home, and that it may be in the child's best interest for the dispositional order to be modified, the worker must then:

225

D003108094

1) Immediately notify the court of origin
2) Notify the MDT promptly about the situation and hold an MDT within 30 days
3) Notify the prosecuting attorney to get the situation on the docket within 60 days
4) Convene the MDT informing them of the recent changes in circumstance and the reasons that modification of the order would be in the child's best interest
5) Prepare a Family and Child Unified Case Plan Progress Report
6) Follow casework procedures according to the ruling at the court hearing

# Section 7

## Case Closure

## 7.1    Discharge Planning

All discharges should be planned whenever possible.

Discharge planning will include the following:

a) Supervisory approval of the discharge plan.

1. Discussion with the child about the plan (where age permits) and whenever possible a pre-discharge visit to the new placement or home if the child is being reunified, adopted, or placed with a legal guardian.

2. Follow up services for the child and family.

3. Notification to the Home Finding Specialist within two business days of the child's removal from a kinship/relative home.

4. The child's worker must provide the child, if age 18 or over, or the child's caregiver, if under 18, with an official copy of the child's birth certificate and social security card as well as a copy of the child's medical and educational records at no cost.

5. Information regarding the Crime Victim's Compensation Fund and how to submit an application upon exiting foster care, entering a permanent placement, or signing the SS-FC-18. A child or youth who is an identified victim in a civil abuse and neglect case may be entitled to benefits from The Fund. The Fund can be used for services, treatment, etc., post-permanency and into the first ten years of the youth's adulthood. It is critical for the child welfare worker to educate and share with the family and/or youth the potential benefits of the fund.

6. Documentation in CCWIS of the child's discharge plan. The child's discharge plan should be documented within the Unified Family Case Plan

7. Documentation in CCWIS of the child's discharge.

226

In the case of a placement disruption, the child's worker shall assess the situation to determine why the placement disrupted and which placement is in the best interest of the child. The worker will do the following actions when the child's placement disrupts:

a) Conduct a Multidisciplinary Treatment Team meeting to discuss the situation surrounding the placement disruption;

  1. The treatment team will evaluate the situation to determine if the child should be placed in emergency shelter care while a thorough assessment of the child's needs is completed; and

  2. The Unified Case Plan will be updated to include services necessary to prevent further placement disruptions.

  3. The child's worker must inform the Homefinding Specialist when a child is removed from the home within two business days and document this removal in CCWIS.

All placement changes and the reasons to move the child must be reported to the court, the child, if over age 12, the child's attorney, the child's parents, if parental rights have not been terminated, and the parents' attorneys, if parental rights have not been terminated. The child's worker must do the following:

a) If the move is planned, the child's worker must provide this notification 48 hours prior to the placement change.

  1. If the placement change is an emergency, the child's worker must provide this notification within 48 hours after the move.

  2. This notice is not required in a situation in which the child is in imminent danger in the child's current placement.

As required by W.Va. Code §49-4-608, if a child has more than three separate placements within a one year time frame from when the child entered care, the child's worker must prepare a report to the court. All placements except respite stays, hospitalization, and home visits less than 14 days are considered placements. When a child is scheduled to enter a third placement setting during the year, the child's worker will do the following:

a) Prepare a report describing the child's placement history for the year in question including the reasons for the various placements, and

  1. Contact the Prosecuting Attorney to request that the report be filed with the court and copies given to all appropriate parties to the case and their counsel. If parental rights have been terminated, then the report is not provided to the parents of the child or their counsel.

  2. After receiving the report, the court may hold a hearing to review the child's placement history to determine what efforts are necessary to provide the child with a stable placement.

According to §49-4-111, when a child has been placed in a foster care arrangement for

227

D003108096

more than eighteen (18) consecutive months and the Department has determined that the placement is a fit and proper place for the child to reside, the placement cannot be terminated unless such termination is in the best interest of the child and:

a)  The foster care arrangement is terminated because of allegations of abuse or neglect while the child resided in the home;

   1.  The child is being reunified with their parents or family of origin;

   2.  The child is being reunified with their sibling(s);

   3.  The foster/adoptive parent(s) agree to the termination of the placement in writing;

   4.  The foster care arrangement is terminated at the written request of a child who has attained the age of 14 documented on the SS-FC-6B; or

   5.  The circuit court orders the termination of the placement upon finding that the Department has developed a more suitable placement for the child that is in accordance with the child's permanency plan.

## 7.2    Discharge Specific to Psychiatric Residential Treatment Facilities (PRTF's)

### 7.2.1    Emergency Discharge from PRTF's

In some cases, emergency discharges or exits from a Psychiatric Residential Treatment Facility that are not in accordance with the child's case plan, are unavoidable. The facility must provide the child's worker with at least 72 hours' notice of discharge. Upon receipt of such notice, the worker will begin locating and developing an alternative placement that is appropriate for the child's current and immediate situation and needs.

There should not be any instance where a youth must be discharged immediately for their safety or the safety of others while the child is placed in a PRTF.

### 7.2.2    Discharge Planning Specific to PRTF's

Discharge planning is to begin during the intake and placement process when plans for and with the child and family are made and continued throughout placement at the time of staffing and reviews. After determining a tentative date for discharge, the Multidisciplinary Treatment Team will be responsible for developing and implementing the discharge plan within the projected time frame. This may involve preparing the family for reunification, preparing a foster or adoptive family for the placement, coordinating the youth's enrollment in the appropriate educational program, keeping the group care agency informed of the plans, informing the youth of the plan, or helping the youth prepare for emancipation.

D003108097

Termination of a placement in a PRTF may occur through the return of the child to their family or placement with siblings, through the transfer to another placement which may be required to meet the child's needs, or through the placement of the child in a foster/adoptive home. The change may be requested by the residential facility, when the child has completed the established program or if the agency feels that it is unable to continue with the care of the child or may be initiated by the child's worker when the Department or the Multidisciplinary Treatment Team has determined that the residential facility is unable to provide the care essential to the child's development and permanency.

Whenever a placement is terminated, there should be adequate preparation of the foster child, and involvement and preparation of the biological family when they are working with the agency towards reunification. This preparation must include the following:

**a)** An explanation of reasons and circumstances for the intended move.

**b)** Recognition and help for conflicting feelings about the change.

**c)** Participation of the agency staff and biological parents when appropriate in planning steps for the child's removal.

## 7.3   Discharge Planning Specific to Out-of-State Placements (ICPC)

If the child is in an out-of-state placement, an Interstate Compact Report on Child's Placement Status (ICPC-100B) is completed in CCWIS, signed, and submitted in triplicate to the Interstate Compact Administrator in the Office of Social Services to provide notification of the placement change/compact termination.

# Section 8

## Other

## 8.1   Family Moves

The child's biological family may move during the course of their tenure in foster care. The Department has a responsibility to the family to continue to provide services as long as the child is in care unless parental rights are terminated.

### 8.1.1   Moves Out of County

When the child's biological family moves from the county where the court order granting custody originated, the county where the petition originated will continue to provide services to the child. The county where the biological parents reside will be responsible for services to the parents.

The child's worker will do the following:

a) Notify the county where the parents are now residing and arrange for a transfer of the parent's case to the county where the parents reside.

b) The child's worker will hold a staffing with the parent's worker, the provider agency staff, the child's foster parents, if applicable, the child, the child's parents, juvenile probation officer, if one has been assigned, etc. to discuss the change in situation.

c) The child's worker will retain a copy of the transfer summary regarding the parent's current residence and the child's legal status.

d) The child's worker will work closely with the parent's worker to effect reunification. The parent's worker will now have the primary responsibility to facilitate these efforts particularly when the child is in custody as a result of an abuse/neglect petition.

e) The parent's worker will work with the child's worker on the Unified Case Plan including detailed information on visitation and transportation arrangements.

f) Judicial reviews and permanency reviews will occur in the county of original jurisdiction. The child's worker will initiate the process for preparing for the judicial review in the eleventh (11th) month of the placement, and if necessary at all succeeding judicial reviews. The parent's worker will prepare a written summary of information regarding the parent's current situation for inclusion in the judicial review and quarterly permanency hearing. The parent and the parent's worker will attend all reviews and hearings until the parent's rights are terminated or the child is returned home.

g) The parent's worker will notify the child's worker immediately of any information that might affect the legal status of the child, the reunification efforts, or any other information that is pertinent to the child in placement.

### 8.1.2    Family Moves Out-of-State

If the parent moves out-of-state and the child remains in foster care, the worker will initiate the Interstate Compact procedures by notifying the Interstate Compact Administrator in Children and Adult Services that the family has moved to another state and request that the state initiate family reunification services. The worker will request a home visit and evaluation to determine if the child can be reunited with their family and when the reunification might occur. This study should include demographic information such as location of home, the surrounding neighborhood, proximity to school, resources available, family or support systems in the parent's area, recreation opportunities, employment of family members, adequate income, living space in the home, ability to care for the

D003108099

child, any safety concerns, how the family has complied with services, how family has rectified issues that led to petition being filed, etc.

In order to process a request for considering of placement of the child with the parent and/or other specified relative into the receiving state, the child's worker shall forward the following materials to the Interstate Compact Administrator:

a) A cover memo explaining the placement request and specifying the complete name, address, and telephone number of the proposed placement resources;

b) A current social summary outlining how and why the child came into the state's custody and identifying any special needs the child may have;

c) Court/custody order;

d) Psychological evaluation, if available;

e) Child's case plan; and

f) A statement explaining how the child's day to day financial needs and medical needs will be provided.

Upon receipt of written approval from the Interstate Compact office in the receiving state, the Department worker will work with the out-of-state worker to reunify the family if this is the child's permanency plan as defined by the Unified Case Plan. The case plan will also include the problems which necessitate the removal of the child from the parents, the tasks necessary to resolve these problems in a specified time frame, and the reunification of the child to their parents. When the out-of-state worker has determined that the parents are now capable of re-assuming their parental roles through the successful completion of the reunification plan, the child's worker will recommend to the court that custody be returned to the parents.

The Department will retain legal custody of the child until the receiving state has provided written agreement from the Interstate Compact Office in the receiving state to terminate custody.

## 8.2    Agency Assignment/Transfer of Cases

The supervisor shall develop procedures to assure that every case open for foster care services shall have a case worker assigned at the time it is referred. Caseloads shall not be unassigned.

When the child's current worker is aware that a case transfer is to take place, that individual must inform all parties involved in the child's case of the change. If possible, the child's new worker shall be introduced in person to the family and child. The current worker will discuss

231

D003108100

the case plan for the family and child, the visitation schedule and any other pertinent information during a planned case staffing with the new worker assuming responsibility.

## 8.3    Case Record Maintenance

Case records are to be maintained in an orderly, detailed manner so as to accurately reflect the services provided, the effectiveness of those services in alleviating the defined needs of the family members, and the achievement of the stated case goals. All records, whether of families and children or of providers of services, shall be maintained in such a manner as to preserve the confidentiality of the information they contain. Information in records shall be kept updated.

Since most of the pertinent information about a child or a family is now kept in CCWIS, this section of the case record must also be kept confidential and updated.

### 8.3.1    Requests for Viewing Records

Many people may request to review foster care records. Viewing records includes looking at information contained in CCWIS as well as materials that are kept in the paper record.

### 8.3.2    Former Foster Children

Once a former foster child has turned 18 years of age, they may view their record if they have never been adopted. The record shall be purged of identifying information on any Child Protective Services referral before the record may be viewed.

### 8.3.3    Birth Parents

The parents of a child in foster care may request permission to view the information contained in their record.    Section §29B-1-3 permits individuals to have access to information about them kept by public agencies.    Parents who wish to view their records shall have an appointment scheduled within five days of their request. The record shall be purged of identifying information on any Child Protective Services referral before the record may be viewed.

### 8.3.4    Attorneys

Attorneys must have written permission from the individual parent or provider before they may view a family, foster/adoptive parent record. They must submit the request in writing, accompanied by verification of consent to view the records, and make an appointment to view the record. They shall give at least five days' notice prior to the date they wish to make the appointment for reviewing the information.    The record shall be

D003108101

purged of identifying information on any Child Protective Services referral before the record may be viewed.

**8.3.5**  Court

The court may subpoena the Department to release records for the courts review.

**8.3.6**  Information Sharing Between Child Placing Agencies, Emergency Shelters, Group Care, and Residential Mental Health Treatment Facilities

Child placing agencies, emergency shelters, group care and residential mental health treatment facilities may share and disclose confidential case information on behalf of a child in foster care with one another for the purpose of providing supportive information when referrals for placement are made. In some instances, referrals may be made between child placing agencies, emergency shelters, and group care or residential mental health treatment facilities. However, the child welfare worker remains responsible for placement approval prior to the child being moved to the accepting placement, as well as notifying the MDT members and the court. All shared information between agencies and facilities will be treated as confidential and fall under the confidentiality provision found in W. Va. Code §49-5-101.

**8.3.7**  Sharing Information

The Department routinely shares information contained in client and provider records as part of providing case work practice such as with the Multidisciplinary Treatment Team, case staffings, and administrative or judicial reviews or hearings. The Department must share the information contained in the child's record only as allowed by this or other Department policy and in line with state and federal confidentiality law. The Department may share information with the West Virginia Crime Victims Compensation Fund (W. Va. Code §49-5-101(c)(6)), to review allegations of injurious conduct committed against a child with child welfare involvement and, if appropriate, to make a determination for award of benefits to the victims. For more information regarding the Crime Victim's Compensation Fund, please see Foster Care Policy 7.1

## 8.4   Record Retention/Retrieval

**8.4.1**  Foster Care Records

The paper portions of records of families and children who received foster care services shall be retained in the local office for two years after closure. After two years those records shall be sent to archives on the regular

233

purging schedule. They are to be maintained in archives for 25 years and then destroyed. Closed records shall be treated in the same manner as all requests for viewing a current record.

### 8.4.2  Adoptive Records

Closed adoptive records for both adoptive families and the children they adopted are maintained by the Division of Children and Adult Services in archives after closure. Adoptive records are kept for 99 years.

### 8.4.3  Record Retrieval

The local office must keep a schedule of records that are sent to archives and those purged. Information that is required to retrieve a record that has been sent to archives includes the client's name, the year of closure, the box number, and the accession number.

## 8.5  Foster Care Ombudsman Program: Authority, Duties, and Responsibilities

W. Va. Code §§9-5-27(i) and 49-9-101, *et seq.,* establishes the duties of the Foster Care Ombudsman Program. It is critical for child welfare staff to understand the authority of the foster care ombudsman and to adhere to and cooperate with the ombudsman as required. Below is a list of the ombudsman's responsibilities and authority statutorily designated to do the following:

- Allow access to foster care children and their placement including a foster family home, including kinship/relative placement, a state agency, a child placing agency, or residential care facility for the purpose of investigations of complaints, and includes the right to private communication with the foster child, foster care provider, or kinship/relative provider.
- Allow access to certain records of any foster child, residential care facility, foster care provider, or kinship/relative provider including medical records and any records reasonably necessary to any investigation without fee.
- Establish subpoena powers whereas the Ombudsman has the authority to apply to the appropriate county circuit court, or the Circuit Court of Kanawha County, for the issuance of a subpoena for the purpose of compelling any person to produce any documents, books, records, paper, objects, or other evidence which the Ombudsman reasonably believes may relate to a matter under investigation.
- Allow access to the records of any state government agency reasonably necessary to any investigation. The Foster Care Ombudsman shall be notified of and be allowed to observe any survey conducted by a government agency affecting the health, safety, welfare, or rights of the foster child, foster care provider, or kinship/relative provider.

Additionally, it is essential for child welfare staff to understand that any willful interference or obstruction that impedes the foster care ombudsman in the performance of their official duties shall be guilty of a misdemeanor and, upon convictions shall be fined not more than $100.

# Section 9

## NONDISCRIMINATION, GRIEVANCE PROCEDURE & DUE PROCESS STANDARDS, REASONABLE MODIFICATION POLICIES, AND CONFIDENTIALITY

### 9.1 Nondiscrimination

As a recipient of Federal financial assistance, the Bureau for Social Services (BSS) does not exclude, deny benefits to, or otherwise discriminate against any person on the ground of race, color, national origin, disability, age, sex, sexual orientation, gender identity, religion or creed in admission to, participation in, or receipt of the services and benefits under any of its programs and activities, whether carried out by BSS directly or through a contractor or any other entity with which BSS arranges to carry out its programs and activities.

This statement is in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (nondiscrimination on the basis of race, color, national origin) ("Title VI"), Section 504 of the Rehabilitation Act of 1973 (nondiscrimination on the basis of disability) ("Section 504"), the Age Discrimination Act of 1975 (nondiscrimination on the basis of age) ("Age Act"), regulations of the U.S. Department of Health and Human Services issued pursuant to these three statutes at Title 45 Code of Federal Regulations Parts 80, 84, and 91.

The Bureau for Social Services shall not retaliate against, intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title VI, Section 504 or the Age Act, or because she or he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.

In addition, BSS will make all reasonable modifications to policies and programs to ensure that people with disabilities have an equal opportunity to enjoy all BSS programs, services, and activities.  For example, individuals with service animals are welcomed in Department of Human Services, BSS, offices even where pets are generally prohibited.

In case of questions, or to request an auxiliary aid or service for effective communication, or a modification of policies or procedures to participate in a BSS program, service, or activity, please contact:

Children and Adult Services
Section 504/ADA Coordinator
350 Capitol St. Rm 691
Charleston, WV 25301
(304) 352-4429

235

D003108104

## 9.2 Non-Discriminatory Placement Protocol

The Department ensures that all parties involved in child welfare programs have equal opportunities. All potential placement providers for children and youth, are afforded equal opportunities, free from discrimination and protected under the American's with Disabilities Act (ADA). The Department will not deny a potential placement provider the benefit of its services, programs, or activities due to a disability.

Under the American's with Disabilities Act it defines a person with a disability as:

> "An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment."

The ADA does not specifically name all the impairments that are covered. The ADA does not allow a person to be discriminated against due to a disability in employment, state and local government activities, public transportation accommodations, telecommunication relay services, fair housing, air carrier access, voting accessibility or education. Examples of disabilities include physical disabilities which require auxiliary aides and mental health issues. Those persons with substance use disorders, including opioid use disorder, currently participating in a treatment option such as Medication Assisted Treatment (MAT), are also covered by the ADA. Participation in a MAT program is not considered the illegal use of substances. Qualifying MAT programs are defined in W. Va. Code §16-5Y-1, *et seq.* The ADA also addresses the civil rights of institutionalized people and architectural barriers that impact people with disabilities.

When making diligent efforts to locate and secure appropriate placement for foster children and youths, a worker cannot discriminate against a potential placement based upon a person with a disability according to the American's with Disabilities Act (ADA) Title II. The Department shall determine if the potential placement for the child represents a direct threat to the safety of the child. Safety threat decisions will be based on assessment of the individual and the needs of the child, as the safety of the child always remains at the forefront of the determination of the best interest of a child, when placing a child in anyone's home. This determination cannot be based on generalizations or stereotypes of individuals.

If a provider protected under the ADA is identified as an appropriate and best interest placement for a foster child they may, at some point, require services specific to their disability in order to preserve the placement. In such situations, consideration for services must be given if it is in the best interest of the child to preserve the placement. In such situations, consideration for services must be given if it is in the best interest of the child to preserve the placement. Any specific

236

D003108105

auxiliary aids or services should be determined by the child welfare worker at no cost to the provider and should be considered on a case-by-case basis.

## 9.3 Complaint Procedure and Due Process Standards

### A: Complaints Based on Disability or other Forms of Discrimination

It is the policy of the West Virginia Department of Human Services (DoHS), not to discriminate on the basis of on the basis of race, color, national origin, disability, age, sex, sexual orientation, gender identity, religion, or creed. DoHS has adopted an internal complaint procedure providing for prompt, equitable resolution of complaints alleging discrimination. Laws and Regulations, 28 C.F.R. Part 35 and 45 C.F.R. Part 84, may be examined by visiting https://www.ada.gov/reg3a.html. Additional laws and regulations protecting individuals from discrimination in child welfare programs and activities may be examined by visiting the U.S Department of Health and Human Services website at https://www.hhs.gov/civil-rights/for-individuals/special-topics/adoption/index.html.

Any person who believes someone has been subjected to discrimination on the basis of race, color, national origin, disability, age, sex, sexual orientation, gender identity, religion, or creed may file a complaint under this procedure. It is against the law for the Bureau for Social Services including employees, contracted providers, or other BSS representatives, to retaliate in any way against anyone who files a complaint or cooperates in the investigation of a complaint.

Procedure

Complaints due to alleged discriminatory actions must be submitted to the Department of Human Services, Equal Employment Opportunity (EEO)/Civil Rights Officer within 60 calendar days of the date the person filing the complaint becomes aware of the alleged discriminatory action.

The complainant may make a complaint in person, by telephone, by mail, or by email. To file the complaint by mail or email, a Civil Rights Discrimination Complaint Form, IG-CR-3 (See Appendix A) must be completed and mailed or emailed to the West Virginia Department of Shared Administration, Office of Human Resources Management, EEO/Civil Rights Officer, One Davis Square, Suite 400, Charleston, WV 25301 or email at OSACivilRights@WV.Gov. If the complainant requires assistance completing the IG-CR-3 form, they may request assistance from the Department. The complaint must state the problem or action alleged to be discriminatory and the remedy or relief sought. The complainant may also contact the WV OSA, EEO/Civil Rights Officer, for more information.

West Virginia Department of Shared Administration
Office of Human Resource Management
EEO/Civil Rights Officer
(304) 558-3313 (voice)

237

D003108106

(304) 558-6051 (fax)
OSACivilRights@WV.Gov (email)

The EEO/Civil Rights Officer shall conduct an investigation of the complaint. This investigation may be informal, but it must be thorough, affording all interested persons an opportunity to submit evidence relevant to the complaint. The EEO/Civil Rights Officer will maintain the files and records of Bureau for Social Services relating to such complaints. To the extent possible, and in accordance with applicable law, the EEO/Civil Rights Officer will take appropriate steps to preserve the confidentiality of files and records relating to complaints and will share them only with those who have a need to know.

The EEO/Civil Rights Officer shall issue a written decision on the complaint, based on the preponderance of the evidence, no later than thirty (30) calendar days after its filing, including a notice to complainant of his or her right to pursue further administrative or legal remedies. If the EEO/Civil Rights Officer documents exigent circumstances requiring additional time to issue a decision, the EEO/Civil Rights Officer will notify the complainant and advise them of his or her right to pursue further administrative or legal remedies at that time while the decision is pending. The person filing the complaint may appeal the decision of the EEO/Civil Rights Officer by writing to the Director of Human Resources within fifteen (15) calendar days of receiving the EEO/Civil Rights Officer's decision. The Director of Human Resources shall issue a written decision in response to the appeal no later 30 calendar days after its filing.

The person filing the complaint retains the right to file a grievance with the U.S. Department of Health and Human Services, Office for Civil Rights, regardless of the decision made by the West Virginia Department of Human Services.

The availability and use of this procedure does not prevent a person from pursuing other legal or administrative remedies, including filing a complaint of discrimination on the basis of race, color, national origin, disability, age, sex, sexual orientation, gender identity, religion or creed in court or with the US Department of Health and Human Services, Office for Civil Rights. A person can file a complaint of discrimination electronically through the Office for Civil Rights Complaint portal at: https://ocrportal.hhs.gov/ocr/smartscreen/main.jsf or by mail or by phone at:

U.S. Department of Health & Human Services
Office for Civil Rights
200 Independence Ave., S.W.
Room 509F HHH Bldg.
Washington, D.C. 20201

238

Foster Care Policy
May 2024

D003108107

800-368-1019 (voice) 800-537-7697 (TDD)
OCRComplaint@hhs.gov  (email)

For complaints to the Office for Civil Rights, complaint forms are available at: https://www.hhs.gov/ocr/complaints/index.html.  Complaints shall be filed within one hundred and eighty (180) calendar days of the date of the alleged discrimination.

The Bureau for Social Services will make appropriate arrangements to ensure that individuals with disabilities and individuals with Limited English Proficiency are provided auxiliary aids and services or language assistance services, respectively, if needed, to participate in this process. Such arrangements may include, but are not limited to, providing qualified interpreters, providing recorded material for individuals with low vision, or assuring a barrier-free location for the proceedings.  The EEO/Civil Rights Officer will be responsible for such arrangements.

### B: Grievances Regarding the Child Welfare Worker or Casework Process
At any time that the Bureau for Social Services is involved with a client, the client (adult or child), or the counsel for the child has a right to express a concern about the manner in which they are treated, including the services they are or are not permitted to receive.

Whenever a parent, child or counsel for the parent or child has a complaint about foster care or expresses dissatisfaction with foster care the worker will:

- Explain to the client the reasons for the action taken or the position of the BSS which may have resulted in the dissatisfaction of the client.
- If the situation cannot be resolved, explain to the client his/her right to a meeting with the supervisor.
- Assist in arranging for a meeting with the supervisor.

The supervisor will:

- Review all reports, records and documentation relevant to the situation.
- Determine whether all actions taken were within the boundaries of the law, policies and guidelines for practice.
- Meet with the client.
- If the problem cannot be resolved, provide the client with the form "Client and Provider Hearing Request", SS-28.
- Assist the client with completing the SS-28, if requested.
- Submit the from immediately to the Chairman, State Board of Review, DHHR, Building 6, Capitol Complex, Charleston, WV 25305.

239

Foster Care Policy
May 2024

For more information on Grievance Procedures for Social Services please see Common Chapters Manual, Chapter 700, and Subpart B or see W.Va. Code §29A-5-1.

Note: Some issues such as the decisions of the Circuit Court cannot be addressed through the Grievance Process. Concerns about or dissatisfactions with the decisions of the Court including any approved Case plan must be addressed through the appropriate legal channels.

## 9.4 Reasonable Modification Policy

**A: Purpose**
In accordance with the requirements of Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990 (ADA), the Bureau for Social Services shall not discriminate against qualified individuals with disabilities on the basis of disability in its services, programs, or activities. The BSS shall make reasonable modifications in Foster Care program policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless BSS can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

**B: Policy**
DoHS is prohibited from establishing policies and practices that categorically limit or exclude qualified individuals with disabilities from participating in the BSS Foster Care program.

The Bureau for Social Services will not exclude any individual with a disability from the full and equal enjoyment of its services, programs, or activities, unless the individual poses a direct threat to the health or safety of themselves or others, that cannot be mitigated by reasonable modifications of policies, practices or procedures, or by the provision of auxiliary aids or services.

The Bureau for Social Services is prohibited from making Foster Care program application and retention decisions based on unfounded stereotypes about what individuals with disabilities can do, or how much assistance they may require.  The BSS will conduct individualized assessments of qualified individuals with disabilities before making Foster Care application and retention decisions.

The Bureau for Social Services may ask for information necessary to determine whether an applicant or participant who has requested a reasonable modification has a disability-related need for the modification, when the individual's disability and need for the modification are not readily apparent or known.  BSS will confidentially maintain the medical records or other health information of Legal Guardianship program applicants and participants.

D003108109

The Bureau for Social Services upon request, will make reasonable modifications for qualified Legal Guardianship program applicants or participants with disabilities unless BSS can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. Individuals do not need to reference Section 504 or Title II or use terms of art such as "reasonable modification" in order to make a request. Further, BSS staff are obligated to offer such reasonable accommodations upon the identification of a qualifying disability or to an individual with Limited English Proficiency.

BSS must consider, on a case-by-case basis, individual requests for reasonable modifications in its Foster Care program, including, but not limited to, requests for substitute caregivers, respite caregivers, more frequent support from a case worker, additional classroom and/or online training, mentorship with an experienced foster/adoptive parent, note takers, and other auxiliary aids and services.  When auxiliary aids or language interpretation services to ensure effective communication for individuals with hearing, vision, speech impairments, or Limited English Proficiency (LEP) are needed, they shall be provided ot the participant at no additional costs. DoHS evaluates individuals on a case by case basis to provide auxiliary aids and services as necessary to obtain effective communication. This would include but not be limited to:

- Services and devices such as qualified interpreters, assistive listening devices, note takers, and written materials for individuals with hearing impairments.
- And qualified readers, taped texts, and Brailed or large print materials for individuals with vision impairments.
- Access to language and interpretation services.

For more information on obtaining auxiliary aids, contact:

Center for Excellence in Disabilities (CED)

959 Hartman Run Road

Morgantown, WV 26505

Phone: 304-293-4692.

Toll Free: (888) 829-9426

TTY: (800) 518- 1448

For language translation and interpretation services Child Welfare Workers may Contact 911 Interpreters or the Section 504/ADA Coordinator (see also section 11.5 Limited English Proficiency). To contact 911 Interpreters, utilize the information below:

911 Interpreters Inc.

1-855-670-2500

BSS Code: 16233

When requesting language translation services directly through 911 Interpreters, staff must report the accommodation to the Section 504/ADA Coordinator by completing the *Reasonable Accommodation Reporting Form*.

The Bureau for Social Services will not place a surcharge on a particular qualified individual with a disability or any group of qualified individuals with disabilities to cover the cost of measures, such as the provision of auxiliary aids and services or program accessibility, that are necessary to provide nondiscriminatory treatment required by Title II of the ADA and Section 504.

To address any violations of this Reasonable Modification Policy, consult the Bureau for Social Services Grievance Procedure.  To request reasonable modifications, or if you have questions, please contact:

West Virginia Office of Shared Administration
Office of Human Resource Management
EEO/Civil Rights Officer
One Davis Square, Suite 400, Charleston, WV 25301
(304) 558-3313 (voice)
(304) 558-6051 (fax)
OSACivilRights@WV.Gov (email)

Staff who make reasonable accommodations for an individual must be reported to the Section 504/ADA Coordinator utilizing the *Reasonable Accommodation Reporting Form.*

### 9.5 Limited English Proficiency

The Bureau for Social Services (BSS) will take reasonable steps to ensure that persons with Limited English Proficiency (LEP) have meaningful access and an equal opportunity to participate in our services, activities, programs and other benefits. The policy of BSS is to ensure meaningful communication with LEP clients and their authorized representatives involving their case. The policy also provides for communication of information contained in vital documents, including but not limited to, information release consents, service plans, etc. All interpreters, translators and other aids needed to comply with this policy shall be provided without cost to the person being served, and clients and their families will be informed of the availability of such assistance free of charge. Language assistance will be provided through use of contracted vendors, technology, or telephonic interpretation services. All staff will be provided notice of this policy and procedure, and staff that may have direct contact with LEP individuals will be trained in the effective use of an interpreter and the effective use of technology including telephonic interpretation services. The Bureau for Social Services will conduct a regular review of the

242

language access needs of our population, as well as update and monitor the implementation of this policy and these procedures, as necessary.

**PROCEDURES:**

*1. IDENTIFYING LEP PERSONS AND THEIR LANGUAGE*

The Bureau for Social Services will promptly identify the language and communication needs of the LEP person. If necessary, staff will use a language identification card (or "I speak cards," available online at www.lep.gov or posters to determine the language. In addition, when records are kept of past interactions with clients or family members, the language used to communicate with the LEP person will be included as part of the record.

*2. OBTAINING A QUALIFIED INTEPRETER*

911 Interpreters Inc. has agreed to provide qualified interpreter services. The agency's telephone number is 1-855-670-2500 (BSS Code: 16233). Interpretation services are available 24 hours a day. Some LEP persons may prefer or request to use a family member or friend as an interpreter. However, family members or friends of the LEP person will not be used as interpreters unless specifically requested by that individual and **after** the LEP person has understood that an offer of an interpreter at no charge to the person has been made by the facility. Such an offer and the response will be documented in the person's file. If the LEP person chooses to use a family member or friend as an interpreter, issues of competency of interpretation, confidentiality, privacy, and conflict of interest will be considered. If the family member or friend is not competent or appropriate for any of these reasons, BSS will provide qualified interpreter services to the LEP person free of charge. Children and other clients will **not** be used to interpret, in order to ensure confidentiality of information and accurate communication.

*3. PROVIDING WRITTEN TRANSLATIONS*

When translation of vital documents is needed, BSS will submit documents for translation to 911 Translators Inc. or the Section 504/ADA Coordinator. BSS will generally provide language services in accordance with the following guidelines:

(a) BSS will provide written translations of vital documents for each eligible LEP language group that constitutes five percent or 1,000, whichever is less, of the population of persons eligible to be served or likely to be affected or encountered. Translation of other documents, if needed, can be provided orally; or

(b) If there are fewer than 50 persons in a language group that reaches the five percent threshold in (a), BSS will not translate vital written materials but will provide written notice in the primary language of the LEP language group of the right to receive competent oral interpretation of those written materials, free of cost.

243

Foster Care Policy
May 2024

Additionally, when making a determination as to what languages services will provided, BSS may consider the following factors: (1) the number and or proportion of LEP persons eligible to be served or likely to be encountered by the program or grantee; (2) the frequency with which LEP individuals come in contact with the program; (3) the nature and importance of the program, activity, or service provided by the program to people's lives; and (4) the resources available to the grantee/recipient and costs.

Documents being submitted for translation will be in final, approved form with updated and accurate information.  Staff who utilize 911 Translators must report the utilization using the *Reasonable Modification Reporting Form* to the Section 504/ADA Coordinator.

Documents being submitted for translation will be in final, approved form with updated and accurate information.  Staff who utilize 911 Translators must report the utilization using the *Reasonable Modification Reporting Form* to the Section 504/ADA Coordinator.

*4. PROVIDING NOTICE TO LEP PERSONS*
The Bureau for Social Services will inform LEP persons of the availability of language assistance, free of charge, by providing written notice in languages LEP persons will understand. At a minimum, notices and signs will be posted and provided in DoHS office lobbies and waiting areas. Notification will also be provided through one or more of the following: outreach documents and program brochures.

*5. MONITORING LANGUAGE NEEDS AND IMPLEMENTATION*
On an ongoing basis, BSS will assess changes in demographics, types of services or other needs that may require reevaluation of this policy and its procedures. In addition, BSS will regularly assess the efficacy of these procedures, including but not limited to mechanisms for securing interpreter services, equipment used for the delivery of language assistance, complaints filed by LEP persons, feedback from clients and community organizations, etc.

Foster Care Policy
May 2024

D003108113

Foster Care Policy
May 2024

D003108114

**Appendix A**

DoHS Civil Rights Complaint Form



West Virginia Department of Human Services
**Civil Rights Discrimination Complaint Form**

246

Foster Care Policy
May 2024

Is this complaint being completed by someone other than the complainant?  ☐ Yes   ☐ No

If yes, please provide your information below:

| Complainant First Name | | Complainant Last Name |
|---|---|---|
| Home Phone *(include area code)* | | Work Phone *(include area code)* |
| Street Address | | City |
| State | Zip Code | Email *(if available)* |
| First Name | Last Name | Telephone Number *(include area code)* |

The complainant feels they have been discriminated against on the basis of:

☐ Race/Color/National Origin  ☐ Religion/Creed  ☐ Sexual Orientation/Gender Identity

☐ Disability  ☐ Age  ☐ Sex

☐ Other *(please specify):*

Who or what bureau within the West Virginia Department of Human Services is believed to have been discriminatory?

| Name/Bureau/Office | | |
|---|---|---|
| Street Address | City | County |
| Zip Code | Telephone | |

Date(s) discriminatory action is believed to have occurred: _____

Which program(s) is the complainant alleging the discriminatory action took place in?

☐ Child Welfare *(includes CPS, Youth Services, Foster Care, Adoption, Homefinding, and Legal Guardianship)*    ☐ Adult Welfare *(includes APS, Guardianship, Health Care Surrogate, Residential Services Request to Receive and Request to Provide)*    ☐ Low Income Energy Assistance Program (LIEAP)

☐ Temporary Assistance for Needy Families (TANF)    ☐ School Clothing Voucher    ☐ Indigent Burial

*Complaints involving the Supplemental Nutrition Assistance Program (SNAP) must be sent directly to the U.S. Department of Agriculture. See below for more information.*

**Describe briefly what happened. How and why does the complainant believe they have been discriminated against? What is the relief or remedy sought by the complainant?**

*(Attach additional pages as needed.)*

Please sign and date this form. If submitting by email, you may type your name and date. Your email will represent your signature.

| Signature | Date (mm/dd/yyyy) |
| --- | --- |
|  |  |

The West Virginia Department of Human Services shall not retaliate against, intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title VI, Section 504 or the Age Act, or because she or he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.

EEO/Civil Rights Officer shall conduct an investigation of the complaint. This investigation may be informal, but it must be thorough, affording all interested persons an opportunity to submit evidence relevant to the complaint. EEO/Civil Rights Officer will maintain the files and records of DoHS relating to such grievances. The EEO/Civil Rights Officer shall issue a written decision on the complaint no later than thirty (30) calendar days after its filing, unless the Coordinator documents exigent circumstances requiring additional time to issue a decision. To submit this complaint or request additional information, please contact:

West Virginia Department of Shared Administration
Office of Human Resource Management
EEO/Civil Rights Officer
(304) 558-3313 (voice)
(304) 558-6051 (fax)
OSACivilRights@WV.Gov (email)

The person filing the grievance retains the right to file a grievance with the U.S. Department of Health and Human Services, Office for Civil Rights, regardless of the decision made by the West Virginia Department of Human Services. The availability and use of this grievance procedure does not prevent a person from filing a private lawsuit in Federal court or a complaint of discrimination on the basis of being a member of a protected class, with the:

U.S. Department of Health & Human Services
200 Independence Ave., S.W.
Room 509F HHS Bldg.
Washington, D.C. 20201
800-368-1019 (voice)
202-619-3818 (fax)
800-537-7697 (TDD)
OCRComplaint@hhs.gov (email)

The complaint form may be found at https://www.hhs.gov/ocr/complaints/index.html

*For SNAP complaints, please contact the U.S. Department of Agriculture.*

*The USDA Program Discrimination Complaint Form, can be found online at: https://www.ocio.usda.gov/document/ad-3027, or at any USDA office. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form by mail, email, or fax to:*
*U.S. Department of Agriculture*
*Office of the Assistant Secretary for Civil Rights*
*1400 Independence Avenue, SW Washington, D.C. 20250-9410*
*(202) 690-7442 (fax)*
*(866) 632-9992 (telephone)*
*program.intake@usda.gov (email)*

IG-CR-3

Revised 9/2023
Review 9/2024