UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

JONATHAN R., *et al.*,         )
         )
*Plaintiffs*,         )
         v.         )
         )
JIM JUSTICE, *et al.*,         )     Case No. 3:19-cv-00710
         )
*Defendants*.         )

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

## I.    WEST VIRGINIA'S CHILD WELFARE SYSTEM

1.    The Bureau for Social Services ("BSS") within the Department of Human Services ("DoHS") is responsible for the operation of a number of programs to support families and children in West Virginia.  Ex. 1, ¶ 3.[1]

2.    Services provided by BSS include Child Protective Services ("CPS"), Youth Services ("YS"), Adoption, Foster Care, and Specialized Family Care, as well as certain home- and community-based services such as socially necessary services and the Safe at Home program.  Ex. 1, ¶ 5.

3.    Within BSS, counties are grouped into districts, and every district has CPS caseworkers (including CPS Senior caseworkers), YS caseworkers, and supervisors for each type of caseworker.  Ex. 1, ¶ 7.  Homefinding Specialists and Adoption workers also sit in and serve local district offices.  *Id.*

4.    CPS caseworkers are responsible for investigating allegations of abuse and neglect, working with families in crisis, petitioning for removal of children from the home when necessary, overseeing and monitoring the safety and wellbeing of the children in foster care, and developing permanency plans for children who cannot be safely reunified with their families.  Ex. 1, ¶ 8.

5.    YS caseworkers provide similar services as CPS caseworkers, but generally work with foster children in DoHS custody as a result of a juvenile justice proceeding, as well as youth not in custody but who have juvenile justice involvement.  Ex. 1, ¶ 9.

6.    Every child in foster care has a CPS caseworker or a YS caseworker.  Ex. 31, at D003107904, D003107910; Ex. 32, at D003107812-13, D003107851.

7.    BSS is responsible for receiving and assessing reports of suspected child maltreatment.  Ex. 11, ¶ 3. Reports of alleged child abuse and neglect are received by the

---

[1] "Ex." Refers to an exhibit attached to the July 8, 2024, declaration of Philip J. Peisch submitted in support of Defendants' motion for summary judgment.

Centralized Intake Unit.  *Id.*  Referrals related to children not in DoHS custody, as well as referrals related to children in uncertified kinship homes, are assessed by Centralized Intake to determine if a case should be opened for investigation and, if appropriate, they are assigned to a district office for further investigation.  *Id.*  Children, including children placed in uncertified kinship homes, are removed from their homes on an emergency basis if and when the caseworker concludes that there is a risk to the child's safety (subject to later judicial review by the circuit court), prior to and regardless of the completion of an investigation by the district office.

8.      Aside from alleged maltreatment in uncertified kinship placements, reports received by Centralized Intake that pertain to children in foster care are automatically sent to the Institutional Investigations Unit ("IIU") for further assessment and investigation.  Ex. 11, ¶ 3.  Children are removed from placements, including from foster families and kinship homes, if and when safety concerns arise prior to and regardless of the completion of an investigation by the IIU.  *Id.* ¶ 22. Currently investigation of alleged maltreatment in uncertified kinship placements is assigned to district offices rather than the IIU.  *Id.* ¶¶ 3, 21.  DoHS plans to move responsibility and oversight for investigating allegations of maltreatment in uncertified kinship placements to the IIU later in 2024.  *Id.* ¶ 25.

9.      Since January 1, 2019, DoHS has taken numerous actions to improve investigations of abuse and neglect of foster children and to minimize the rate of maltreatment of children in foster care, including actions to improve review of critical incidents, improve the central intake process, improve and expand the role of the IIU, and improve oversight of out-of-state facilities in which West Virginia foster children are placed.  Ex. 11, ¶¶ 1-2, 4, 9-10, 12, 14-20, 26.

10.     DoHS serves foster children with a wide range of needs.  While all children in foster care have experienced the trauma of abuse or neglect and of removal from their family, some foster children come into custody in good physical health and without serious behavioral health needs.  Ex. 1, ¶ 19.  Other children in custody have serious physical, behavioral health, and/or intellectual needs, including but not limited to neonatal abstinence syndrome; fetal alcohol syndrome; autism; oppositional defiant disorder; or bipolar disorder.  *Id.*  In addition, at any given time, hundreds of foster children in custody have a history of dangerous behaviors, including self-harm, fire-setting, physical violence, and/or sexual violence.  *Id.*

## A.      Role of State Courts in West Virginia's Child Welfare System

11.     West Virginia law authorizes DoHS to "accept children for care from their parent or parents, guardians, custodians or relatives and to accept the custody of children committed to its care by courts."  W. Va. Code § 49-2-101(a).

12.     Children generally enter DoHS custody through either abuse and neglect proceedings or in connection with juvenile delinquency or juvenile status offense proceedings.  W. Va. Code § 49-4-601; W. Va. Code § 49-4-701(e).

13.     West Virginia law allows state circuit courts ("circuit courts") to place juvenile offenders in DoHS custody as an alternative to placement in a Bureau of Juvenile Services secure detention facility.  W. Va. Code § 49-2-901; Ex. 16, at 9.

14.　　Once an abuse and neglect petition is filed, that child remains subject to the continuing jurisdiction of the circuit court until they reach 18 years of age or find permanent placement (*e.g.*, reunification, adoption). W. Va. Code § 49-4-608.

15.　　After a petition is filed, the circuit court will issue an initial order deciding whether to grant temporary custody of the child to DoHS. W. Va. Code § 49-4-602. Depending on whether temporary custody is granted, the circuit court is required to hold a preliminary hearing within a certain period of time. *Id*.

16.　　At the preliminary hearing, the circuit court will review the petition and take evidence regarding the status of the child; determine whether DoHS has made reasonable efforts to preserve the family; and determine whether imminent danger requires the removal of the child from the custody of the parents or whether emergency custody should continue. W. Va. Code § 49-4-105.

17.　　Within a specified period of time from the preliminary hearing, the circuit court is required to hold an adjudicatory hearing to determine whether the child has been abused and neglected. W. Va. Code §§ 49-4-601; 49-4-602.

18.　　A disposition hearing must occur within 45 days of the entry of the adjudicatory order. W. Va. R. Child Abuse and Neglect Proceedings 32(a).

19.　　If a child is found to be abused or neglected, DoHS is required to provide the circuit court with a copy of the child's case plan, which includes the following: a permanency plan which documents efforts to ensure that the child is returned home in the appropriate time or efforts to place the child for adoption or with a legal guardian and, if applicable, states why reunification is not possible and details the alternative permanent placement; a family case plan; a description of the type of home or institution where the child will be placed, including a discussion of the appropriateness of that placement and how the agency will ensure that the child receives proper care and services and accommodations as required under the Americans with Disabilities Act; "a plan to facilitate the return of the child to his or her own home or the concurrent permanent placement of the child;" and a plan to address the needs of the child while in kinship or foster care, which must include a discussion of the appropriateness of the services that have already been provided for that child. W. Va. Code § 49-4-604(a)(1)-(2).

20.　　The circuit court is required to make findings of fact and conclusions of law and decide whether to, among other things: dismiss the petition; return the child to his or her own home; refer the child and parent to a community agency for assistance; commit the child to the care of DoHS, a private child welfare agency, or an appointed guardian; or terminate parental rights and permanently commit the child to the custody of the non-abusing parent or DoHS. W. Va. Code § 49-4-604(c)(1)-(6).

21.　　Once a child is taken into DoHS custody, the circuit court will hold a permanency hearing to analyze the permanency plan and the efforts being made to provide the child with a permanent home. W. Va. Code § 49-4-608. The circuit court must also make a determination as to whether DoHS is making reasonable efforts to preserve the family. *Id*. The circuit court is required to have a permanency hearing every 12 months until permanency is achieved. *Id*. DoHS

is required to file "a progress report with the court detailing the efforts that have been made to place the child in a permanent home and copies of the child's case plan, including the permanency plan." *Id*. The purpose of these hearings is to "review the child's case, to determine whether and under what conditions the child's commitment to the department shall continue, to determine what efforts are necessary to provide the child with a permanent home, and to determine if the department has made reasonable efforts to finalize the permanency plan." *Id*.

22.     Within 30 days of the original filing of the petition, the circuit court is required to convene a meeting of a Multidisciplinary Treatment Team, which is required to submit written reports to the court and will meet with the court at least every three months until permanency is achieved and the child's case is dismissed. W. Va. Code § 49-4-405; W. Va. R. P. Child Abuse and Neglect Proceedings 39.

23.     The court must conduct a permanent placement review conference and hearing at least once every three months, the purpose of which is to discuss, among other matters, the reasonable efforts made to secure a permanent placement for the child; services and assistance that were offered or provided to the family since the previous hearing; compliance with the case plan and with previous orders and recommendations of the court; recommended changes in court orders; "the appropriateness of the current placement, including its distance from the child's home and whether or not it is the least restrictive one (most family-like one available);" and "how the child's special needs were or were not met while in placement, including whether the child has regular opportunities to engage in age- or developmentally-appropriate normal childhood activities." W. Va. R. P. Child Abuse and Neglect Proceedings 39, 41.

24.     Once the court finds that a permanent placement has been achieved, the court may dismiss the case. W. Va. R. P. Child Abuse and Neglect Proceedings 42(b).

25.     West Virginia circuit courts are also responsible for determining what services are needed to help children make the transition from foster care to adult hood and independent living. W. Va. Code § 49-4-608(c).

26.     Circuit courts must assess the safety of a foster child in DoHS custody at least every three months. W.V. Code § 49-4-110(a); Ex. 16, at 7.

## B.    Placement Process

27.     There are a variety of placement types available for foster children in West Virginia:

    a.   Adoptive home. This is a placement with a family that is working towards adopting the child whose parents' parental rights have been terminated.

    b.   Certified kinship/relative placement. This is a placement with either a blood relative or another adult with a close connection to the child who is certified as meeting the standards for a licensed foster parent, including having a non-safety standard waiver if necessary.

c. Emergency shelter care. This is a temporary placement option for older children removed from their home or placement on an emergency basis and is generally limited to 30 days.

d. Emergency home.   This includes "emergency foster family care" and "emergency resource home."  Emergency foster family care is for children entering custody on an emergency basis or after hours and is generally limited to 48 hours.  An emergency resource home is a temporary family placement for children whose living situation has been disrupted and is generally limited to seven days.

e. Foster care or family foster home. This is a family placement that has been certified by DoHS or through a Child Placing Agency, to provide care in an out of home living situation.

f. Kinship/relative placement. This is a placement with either a blood relative or another adult with a close connection to the child who is generally in the process of becoming certified, but has not yet become certified.

g. Medical hospital. Admission to a hospital is typically for short-term hospitalization lasting 30 days or less to provide specialized medical care for the treatment of physical and/or mental illness.

h. Psychiatric hospital.  Admission to a psychiatric hospital is typically for short-term acute inpatient hospitalization lasting 30 days or less to provide intensive, 24-hour psychiatric care, including crisis stabilization and diagnostic assessment.

i. Residential treatment programs.  Residential treatment programs include Psychiatric Residential Treatment Programs ("PRTF") and other settings that provide highly structured care with formalized behavioral programs, therapeutic interventions, and mental or behavioral health treatment.

j. Specialized family care home ("Medley").  These are foster family homes specially trained to foster children with developmental disabilities.

k. Therapeutic foster care.  This is a foster family placement certified by Child Placing Agencies.  These homes include Tier 2 and Tier 3 family placements designed for children with significant treatment needs due to emotional and/or physical needs, with foster parents who are professionally trained and supported to meet the child's treatment needs.

l. Transitional living. This is a placement for older youth, above the age of 17, who may be living semi-independently in their own households in the community in a transitional living apartment, with supervision and services available to ensure their needs are being met.

> m. Transitional Living for Vulnerable Youth. This is a program for older youth, between the ages of 17 and 21, who need more structured support and supervision and have treatment needs that can be met in the community on an outpatient basis.

Ex. 1, ¶ 12.

28.    DoHS contracts with ten Child Placing Agencies throughout the State to recruit, train, license or certify, and provide case management to foster family homes for children in foster care.  Ex. 1, ¶ 14.

29.    DoHS is required to file a disclosure with the court within 45 days of the filing of the petition stating its determinations as to whether any relatives or family members are appropriate placement options for the child.  W. Va. Code § 49-4-601a(4).

30.    In West Virginia, each child in foster care has an Multidisciplinary Treatment Team, which consists of the child's custodian parent or guardian or their attorney, other immediate family members, the prosecuting attorney, the Guardian Ad Litem, the child if he or she is over the age of 12, a school official, the child or family's DoHS caseworker, the child's foster parent, and any other professional or service provider who may be helpful to the Team's work. Ex. 1, ¶ 10; Ex. 31, at D003107979-80.

31.    The Multidisciplinary Treatment Team is responsible for developing and implementing a comprehensive and individualized service plan for children involved in a court proceeding.  Ex. 1, ¶ 10; Ex. 31, at D003107979-80.

32.    The child's Multidisciplinary Treatment Team makes a recommendation to the circuit court about the child's placement, and those placements are generally arranged by the DoHS caseworker, but state law requires that the circuit court review, approve, and order the placement. W. Va. Code § 49-4-110(a).

33.    The Multidisciplinary Treatment Team must attend the permanent placement review conference and hearing held by the court every 90 days to report as to progress and development in the case, including discussion of and recommendations related to the child's placement.  W. Va. R. P. Child Abuse and Neglect Proceedings 39, 41; Ex. 30, at D003106917-18. If placement in a residential treatment program is recommended, "an explanation of why treatment outside a family environment is necessary, including a brief summary of supporting expert diagnoses and recommendations" should be provided, along with "a discussion of why a less restrictive, more family-like setting is not practical, including placement with specially trained foster parents."  W. Va. R. P. Child Abuse and Neglect Proceedings 41(a)(14)(E); Ex. 30, at D003106917-18.

34.    West Virginia law and DoHS policy provide that a child must be placed in the "least restrictive" setting appropriate for their needs.  W. Va. Code § 49-4-608(e)(3); Ex. 31, at D003107874.

35.    For children placed in DoHS custody, the circuit court, not DoHS, makes the decision about where the child should be placed, including whether the child should be placed in

6

a family home or in a residential treatment setting.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a).  A circuit court must hold a hearing and enter an order regarding the appropriateness of the foster child's current placement, including whether or not it is the "the least restrictive one (or most family-like one) available," every 90 days.  W.V. Code § 49-4-608; Ex. 16, at 7. "The court has exclusive jurisdiction to determine the permanent placement of a child."  W. Va. R. Child Abuse and Neglect Proceedings 36(e).

36.    For some foster children with a history of danger behaviors (*e.g.*, fire setting, sexual assaults, self-harm), the MDT and DoHS caseworker are not able to find a foster family or kinship family willing to accept the child into their home.  Ex. 1, ¶ 15.

37.    For the overwhelming majority of foster children placed in residential treatment, the circuit court has concluded that such placement is "appropriate[]" for the child and is "the least restrictive one (or most family-like one) available" for the child, § 49-4-608(e)(3).  *See e.g.*, Ex. 156 (filed under seal); Ex. 157 (filed under seal).

38.    For many foster children placed in residential treatment, the child's parent or caretaker supports such placement, often because of the child's challenging behaviors or serious behavioral health needs.  Ex. 1, ¶ 16.

39.    For many foster children placed in residential treatment, the child's Guardian ad Litem supports such placement, often because of the child's challenging behaviors.  *See e.g.*, Ex. 158 (filed under seal); Ex. 159 (filed under seal); Ex. 160 (filed under seal).

40.    West Virginia law requires that circuit courts re-review and approve each placement every 90 days.  W. Va. Code § 49-4-110(a).

41.    DoHS policy requires that a treatment professional complete a Child and Adolescent Needs and Strengths ("CANS") assessment prior to recommending that a child be placed in a resident treatment program.  Ex. 147, at D003096542.

42.    "A court may not order a child to be placed in an out of state facility unless the child is diagnosed with a health issue that no in-state facility or program serves, unless a placement out of state is in closer proximity to the child's family for the necessary care, or the services are able to be provided more timely." W. Va. Code § 49-4-608(d).

43.    DoHS will only recommend an out-of-state placement if there are no equivalent in-state options available. Ex. 1, ¶ 17; Ex. 31, at D003107931-32, D003107946.

### C.    West Virginia's Medicaid Program

44.    DoHS policy requires that all foster children in West Virginia are eligible and enrolled in Medicaid.  Ex. 16, at 1.

45.    All foster children in West Virginia are in fact eligible for and enrolled in Medicaid. Ex. 2, ¶ 4; Ex. 31, at D003108012-13.

46.    The West Virginia Medicaid program is administered pursuant to Title XIX of the Social Security Act and Chapter 9 of the West Virginia Code. Ex. 2, ¶ 3; Ex. 16, at 2.

47.    The Bureau for Medical Services within DoHS is the single State agency responsible for administering West Virginia's Medicaid program.  Ex. 2, ¶ 3.

48.    Foster children are eligible to receive a comprehensive array of medically necessary medical and mental health services through West Virginia's Medicaid program.  Ex. 2, ¶ 4.

49.    West Virginia Medicaid covers all medically necessary services for foster children that are coverable by Medicaid under 42 U.S.C. § 1396(d). Ex. 2, ¶ 5.

50.    West Virginia also chooses to cover many optional services for foster children pursuant to "Section 1915(c) waiver programs." Ex. 2, ¶ 5.

51.    DoHS does not deny coverage for any Medicaid service for any foster child that has been determined by DoHS to be medically necessary for that child. Ex. 16, at 3.

52.    DoHS does not exclude foster children from participation in the Medicaid program, and does not deny any Medicaid services to foster children on the basis of disability.  Ex. 16, at 3; Ex. 17, at 1-2.  Plaintiffs admit that they are "not aware of any foster child who has been denied a Medicaid service on the basis of disability." Ex. 16, at 3.  Plaintiffs admit that they are "not aware of any ADA Subclass members who [DoHS] excludes from participation in the Medicaid program on the basis of disability." Ex. 17, at 1.  Plaintiffs admit that they are "not aware of any ADA Subclass member who has been denied a Medicaid service on the basis of disability." Ex. 17, at 2.

53.    The West Virginia Medicaid program covers the following mandatory and optional services for foster children, among others:

- Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") Services
- Inpatient Hospital Services
- Inpatient Psychiatric Services for individuals under the age of 21
- Inpatient Rehabilitation Services
- Nurse Practitioner Services
- Physician Services
- Optometry Services
- Outpatient Hospital Services
- Pharmacy
- Private Duty Nursing Services
- Psychiatric Services
- Psychological Services
- Speech and Hearing Services
- Vision Services
- Children with Serious Emotional Disorder Waiver ("CSEDW") Services
- Intellectual Developmental Disabilities Waiver ("IDDW") Services

- Substance Use Disorder ("SUD") Waiver services
- Behavioral Health Clinic and Rehabilitation services
- Chiropractic services
- Oral Health services
- Durable Medical Equipment, Prosthetics, Orthotics and Supplies
- Ambulatory Surgical Center Services
- Family Planning Services
- Home Health Services
- Hospice Care Services
- Intermediate Care Facilities for Individuals with Intellectual Disabilities Services
- Traumatic Brain Injury Waiver ("TBIW") Services
- Nurse Midwife Services
- Nursing Facility Services
- Occupational/Physical Therapy Services
- Personal Care Services
- Podiatrist Services
- Rural Health Clinic Services and Federally Qualified Health Center Services
- Transportation Services

Ex. 43, at D003108125-26.

54.    Plaintiffs admit that they "are not currently aware of any health care service that Defendants are required to provide to the General Class under federal law and that is not paid for by Medicaid." Ex. 18, at 8-9.

55.    All foster children under age three are referred to the West Virginia Birth to Three Program, Ex. 16, at 2-3, which provides services geared towards assisting children experiencing or at risk for identified developmental delays. Ex. 31, at D003107969-70.

56.    Plaintiffs acknowledge that they "are not currently aware of any health care service not paid for by Medicaid, the non-payment of which violates federal statutory or constitutional law." Ex. 20, at 2.

57.    Plaintiffs acknowledge that they "are not currently aware of any written policies found in the BMS Policy Manual pertaining to the treatment of foster children that as stated violate federal statutory and constitutional law." Ex. 20, at 3.

58.    All covered and authorized services must be provided by enrolled providers practicing within the scope of their license, utilizing professionally accepted standards of care, and in accordance with all state and federal requirements. Ex. 2, ¶ 9.

59.    Children in foster care are enrolled in a specialized statewide managed care program for children in foster care, called Mountain Health Promise, through which all Medicaid-covered and socially necessary services are delivered. Ex. 2, ¶ 7.

60.    DoHS contracts with one managed care organization, Aetna Better Health of West Virginia (hereinafter, "Aetna"), which is responsible for coordinating care and benefits for children enrolled in Mountain Health Promise. Ex. 2, ¶ 7.

61.    Through Mountain Health Promise, every child undergoes a comprehensive assessment to identify physical, mental health, and behavioral health needs, and has a care coordinator responsible for ensuring the child is connected with appropriate providers to address those needs. Ex. 2, ¶ 7.

62.    DoHS policy requires that all foster children receive an initial HealthCheck screening (including a full physical exam and mental health screening) upon entering foster care and at least every year thereafter, with the first appointment to be scheduled within five days of a child's placement. Ex. 31, at D003107953, D003107967-68.

## II.    DEFENDANTS' EFFORTS TO IMPROVE CASE PLANNING AND DECREASE CASEWORKER WORKLOADS

63.    DoHS policy requires that all CPS and YS caseworkers receive 240 hours of training, including with respect to case planning, and passing a competency test prior to receiving a case and serving in the field. Ex. 93; Ex. 94; Ex. 4, ¶¶ 1, 5, 14.

64.    DoHS policy requires all new CPS and YS caseworkers receive a graduated caseload as they are transitioning to field work. Ex. 95; Ex. 4, ¶ 1.

65.    DoHS policy requires that every child be visited by a caseworker in person at least monthly. Ex. 33, at D003107549; Ex. 31, at D003107910. For children placed in foster homes through Child Placing Agencies, the Child Placing Agency caseworker is required to meet with the child twice monthly, and the child's CPS or YS caseworker must visit the child in person at least once every three months, and make telephone contact with the child at least once during a calendar month. Ex. 33, at D003107680; Ex. 31, at D003108002.

66.    West Virginia law and DoHS policy require that the Multidisciplinary Treatment Team convene within 30 days of an abuse and neglect petition to "assess, plan and implement a comprehensive, individualized service plan," including a case plan and permanency plan. W. Va. Code § 49-4-405(a). The caseworker must review these plans at least every month to ensure the child's needs are being addressed, and both the Multidisciplinary Treatment Team and the circuit court must review the plans at least every 90 days to evaluate the child's progress and determine whether any changes should be made. W. Va. Code § 49-4-110; Ex. 16, at 4.

67.    DoHS policy requires that a case plan be developed for each foster child within 60 days of the child entering custody. Ex. 16, at 4. DoHS policy requires the caseworker to review the case plan at least monthly to determine if the child's needs are being addressed. *Id*.

68.    DoHS's Division of Planning and Quality Improvement ("DPQI") reviews 10-15 randomly selected cases every month to evaluate case workers' case planning performance, among other things. Ex. 96; Ex. 14, ¶¶ 27-28. These random reviews are shared with DoHS leadership and the district offices to help inform future policy decisions and to improve case planning practices and fidelity to policy within the districts. *Id*.

69.     Plaintiffs admit that West Virginia laws and policies governing case planning are consistent with federal law.  Ex. 16, at 11.

### A.     Efforts to Improve Case Planning

70.     Since January 1, 2019, DoHS has taken a number of actions to improve the data system for recordkeeping of children in foster care, including primarily the replacement of the State's Families and Children Tracking System ("FACTS") child welfare information system with the People's Access to Help ("PATH"), a transition that is still in process.  Ex. 15, ¶ 1.

71.     In 2019, DoHS adopted the Family Advocacy Support Tool ("FAST") to assess needs for Youth Services cases.  Ex. 9, ¶ 2.

72.     In 2019, DoHS implemented reflective supervision to promote effective, trauma-informed supervisory relationships.  Ex. 97; Ex. 98.

73.     In 2019, DoHS's Family First Prevention Services Five-Year Plan was approved by the federal government.  Ex. 40.

74.     In 2020, DoHS issued a revised Meaningful Contact Guide to, among other things, provide examples of meaningful contacts to caseworkers and instructions on how to document those contacts.  Ex. 99; Ex. 100.

75.     In 2020, DoHS issued guidance to caseworkers on ensuring continued meaningful contact and completing visits with children through virtual or remote methods during the public health emergency. Ex. 101.

76.     In 2020, DoHS revised the Protective Capacities Family Assessment ("PCFA") and Family Case Plan to reflect the importance of family participation in the case planning process. Ex. 102.

77.     In 2020, DoHS partnered with Aetna to launch the iFoster Aetna Connections for Life program, which provides foster children with free tablets and provides their caregivers with access to relevant resources online through the iFoster resource portal.  Ex. 9, ¶ 7.

78.     In 2020, DoHS created a supervisory case review standard operating procedure, which implemented a uniform statewide process for supervisors to perform reviews of open cases of their assigned staff to improve practice, help identify strengths and deficiencies in casework, and determine what actions may be needed to increase knowledge and skills of staff.  Ex. 103.

79.     In 2020, DoHS established a Child Locator Unit to assist in the location of missing foster children and identify successful strategies to reduce the prevalence of runaway events.  Ex. 9, ¶ 10.

80.     In 2020, DoHS worked with Aetna to launch the FamilyConnect portal to enhance care coordination.  Ex. 9, ¶ 11.

81.     In 2020, DoHS established peer reviews, a biannual case review program between districts in which supervisors assess casework, including decisions made and adherence to policy, followed by small group discussion to facilitate communication across districts and build a network of peer support at the supervisory level. Ex. 104; Ex. 105.

82.     In 2020, DoHS created standardized forms and checklists designed to assist caseworkers and supervisors in preparing for child abuse and neglect court hearings, and to document details of court hearings consistent with standard operating procedures regarding preparing for court and court procedures. Ex. 106.

83.     In 2021, DoHS split the Bureau of Child and Family Services into two separate bureaus, the Bureau for Social Services and the Bureau for Family Assistance, with all child welfare programs located under the newly created Bureau for Social Services, in order for the bureau responsible for serving children in the child welfare system to be focused primarily on that mission and to be staffed by supervisors, managers, and other leaders with deep experience in child welfare. Ex. 1, ¶ 4.

84.     In 2021, DoHS issued guidance to caseworkers regarding working with parents or caregivers who are experiencing substance use disorders and participating in a Medication Assisted Treatment program. Ex. 107.

85.     In 2021, DoHS updated program guides provided to families receiving child welfare services, as well as foster, adoptive, and kinship providers at the time of placement, to include information related to foster child and foster parent's bill of rights, and screening of children involved in the child welfare system for mental health needs. Ex. 108.

86.     In 2021, DoHS issued guidance to caseworkers regarding notifying and including school personnel in Multidisciplinary Treatment Teams. Ex. 109.

87.     In 2021, DoHS implemented a standard operating procedure regarding conducting meaningful and engaging visits with children placed in out of state residential treatment settings, including monthly conversation topics and monthly evaluation of documentation. Ex. 110; Ex. 111; Ex. 112.

88.     In 2022, DoHS provided guidance that the standard operating procedure for meaningful contact with children placed in out of state residential treatment should be followed for all visits with children in placement, regardless of placement type. Ex. 10, ¶ 7.

89.     In 2022, DoHS implemented monthly meetings for the deputy commissioners of field operations to discuss case planning and practice with district managers. Ex. 1, ¶ 6.

90.     In 2022, DoHS updated the standard operating procedure and review tool for supervisory case reviews to improve practice related to child welfare and assist in identifying strengths and areas needing improvement. Ex. 113.

91.     In 2022, DoHS implemented a Training and Technical Assistance Team to assist in improving areas identified during regular DPQI case reviews, including case planning. Ex. 9, ¶ 23; Ex. 114.

92.     In 2023, DoHS partnered with Aetna to launch the upgraded FamilyConnect portal to enhance care coordination.  The new name for this system is Family Care Central.  Ex. 9, ¶ 27.

93.     In 2023, DoHS issued a revised Multidisciplinary Team Meeting Desk Guide to implement legislative changes to include the managed care coordinator as a participant of the Multidisciplinary Team.  Ex. 36.

94.     In 2023, DoHS updated the Meaningful Contact Desk Guide to align with the Pathway to Children's Mental Health Services policy and the Residential Facility Monthly Caseworker Visit and Investigation standard operating procedure.  Ex. 115; Ex. 116.

95.     In 2023, DoHS issued its first continuous quality improvement ("CQI") plan for BSS, which includes 19 key performance indicators for tracking and evaluation.  Ex. 14, ¶¶ 31-32; Ex. 42. The key performance indicators assess DoHS's systems, process, and outcomes associated with BSS's overall goals for its program, including metrics such as face to face contact with children in care, maltreatment in care, and placement stability.  Ex. 14, ¶¶ 32-33; Ex. 42.

96.     In 2023, as part of the CQI plan, DoHS implemented mid-cycle reviews for the DPQI team.  Ex. 14, ¶ 34. Each district undergoes a full DPQI review every two years, with the mid-cycle review occurring on alternate years to review the district's performance based on a desk review (as opposed to including interviews).  *Id.*  After the mid-cycle review, DPQI develops and distributes a report on the district's progress towards meeting its outcome goals.  *Id.*

97.     In 2023, DoHS implemented the ChildStat program, a continuous quality improvement initiative that uses a combination of data analysis and casework practice to drive positive outcomes for children and families.  Ex. 119.

> a.     As part of ChildStat, each district presents data on the district's performance metrics to DoHS leadership every year, based on which DoHS leadership sets future performance improvement goals that it expects the district to achieve by the district's next ChildStat meeting.  *Id.* at D002845987-88.

> b.     Workload management, time to first contact, quality monthly caseworker visits with children and parents, and case planning were identified as areas for monitoring, tracking and assessing progress in the first year of the ChildStat program.  *Id.* at D002845989.

98.     In 2023, DoHS implemented weekly data meetings for the deputy commissioners of field operations to review data on outcomes with district managers and discuss challenges and areas for improvement.  Ex. 1, ¶ 6.

99.     In 2024, DoHS further updated the Meaningful Contact Desk Guide and related forms to, among other things, implement documentation and communication requirements related to secondary caseworker contact and visits with children in placement.  Ex. 10, ¶ 14; Ex. 117; Ex. 118.

### B.        Efforts to Decrease Caseworker Caseload

100.    In 2017 and 2018, DoHS implemented: a $1,500 appointment incentive for CPS caseworkers and CPS workers being hired in specific counties; a 2 percent salary increase for all CPS workers; a 5 percent retention bonus for CPS caseworkers achieving two years of continuous service; an additional 5 percent retention bonus for CPS workers achieving five years of continuous service; a career ladder for CPS and YS workers to have the opportunity to advance professionally, including the creation of the CPS Senior position; and a 7 percent salary increase for caseworkers that obtain a social work license.  Ex. 3, ¶ 3.

101.    In 2019, DoHS implemented a 3 percent across-the-board salary increase for all DoHS employees (including CPS workers and YS workers), plus an additional 5 percent salary increase for all Child Protective Service workers. Ex. 3, ¶ 4.

102.    In 2020, DoHS implemented the transition from restricted social worker licenses to a service worker registry, created by Senate Bill 312.  Ex. 121.

103.    In 2021, DoHS created new paraprofessional staff positions to support caseworkers and facilitate the casework process.  Ex. 3, ¶ 5.

104.    In 2021, DoHS contracted with West Virginia University to conduct a workload study to evaluate workloads for caseworkers.  Ex. 70; Ex. 120.

105.    In 2021, DoHS implemented a 15 percent salary increase for Child Protective Services workers and supervisors, Youth Services workers and supervisors, case aides, and caseworkers in training.  Ex. 3-B.

106.    In 2021, the BSS Commissioner began doing ride alongs with caseworkers periodically, in part to boost caseworker morale and in part provide caseworkers with access to the Commissioner.  Ex. 4, ¶ 3.

107.    In 2021, the BSS Commissioner began periodically taking hotel shifts to alleviate burden on caseworkers.  Ex. 4, ¶ 4.

108.    In 2021, the BSS Commissioner began periodically visiting district offices, in part to boost caseworker morale and in part provide caseworkers with access to the Commissioner. Ex. 4, ¶ 5.

109.    In 2021, the BSS Commissioner began holding quarterly virtual Q&A sessions with all BSS staff, to provide caseworkers with access to DoHS leadership and learn more about caseworkers' concerns.  Ex. 4, ¶ 6.

110.    In 2022, DoHS eliminated the CPS trainee position so that all new hires immediately become CPS workers, with CPS worker salary, once they start carrying cases.  This effectively increases compensation for new CPS workers.  Ex. 3, ¶ 6.

111.    In 2022, DoHS instituted an employee of the month program.  Ex. 4, ¶ 7.

112.    In 2022, DoHS began the process of developing a new children's crisis center to provide a safe alternative from the use of hospital emergency departments and hotel rooms, to alleviate the burden on caseworkers of staffing hotel room stays, and to address the needs of foster children who may be experiencing a behavioral health crisis. Ex. 1, ¶ 13.

113.    In 2022, DoHS implemented a special hiring rate for CPS workers in Berkeley, Jefferson and Morgan counties to be equivalent with the market compensation in Loudon County, Virginia. Ex. 3, ¶ 7.

114.    In 2022, DoHS moved YS caseworkers and supervisors up a pay grade, to be on the same level as CPS caseworkers and supervisors. Ex. 3, ¶ 8.

115.    In 2022 and 2023, DoHS expanded its contract with Marshall University's Center for Excellence in Recovery to develop and implement training and coaching to address secondary traumatic stress and vicarious trauma experienced by caseworkers, create a peer-to-peer support network for workers, and implement a trauma response team to provide on the ground support for caseworkers responding to critical incidents. Ex. 4, ¶¶ 25, 30, 31; Ex. 122.

116.    In 2022, the BSS Commissioner began personally visiting all West Virginia colleges and universities that have social work programs to recruit graduates to join BSS.  The BSS Commissioner tries to visit four colleges/universities in the Fall semester, and three colleges/universities in the Spring semester.  Ex. 4, ¶ 8.

117.    In 2023, DoHS implemented a $5,000 hiring bonus for CPS workers and YS workers who make a one-year employment commitment in Berkeley County, Jefferson County, or Morgan County.  Ex. 3, ¶ 9.

118.    In 2023, DoHS increased the starting salary for CPS workers and YS workers by 20 percent.  Ex. 3, ¶ 10.

119.    In 2023, DoHS began the process of installing Wifi in all county offices.  Ex. 3, ¶ 11.

120.    In 2023, DoHS created 27 new full time paraprofessional staff positions to support field staff with administrative functions.  Ex. 3, ¶ 12.

121.    In 2023, DoHS purchased tablets and hotspots for field staff to access electronic case records in real time in the field.  Ex. 3, ¶ 13.

122.    In 2023, DoHS implemented a 10 percent increase to the base salary as a retention bonus for CPS workers and YS workers experiencing their second- and fourth-year work anniversaries.  Ex. 3, ¶ 15.

123.    In 2023, DoHS implemented a 5 percent increase to the base salary as a retention bonus for Child Protective Services workers and Youth Services workers experiencing their sixth- and eighth-year work anniversaries.  Ex. 3, ¶ 16.

124. In 2023, DoHS implemented a $2,500 bonus for Child Protective Service workers and Youth Service workers who make a one-year employment commitment in any county with a 40 percent or higher vacancy rate. Ex. 3, ¶ 17.

125. In 2023, DoHS created a new classification and compensation system for all new employees and any current employees who chose to opt into the system in accordance with Senate Bill 273, which exempted BSS employees from the West Virginia Division of Personnel and gives DoHS flexibility to implement future increases in compensation. Ex. 3, ¶ 18.

    a. This change moves responsibility and authorization for hiring and compensation of caseworkers from the West Virginia Division of Personnel, outside of DoHS, to the new Office of Shared Administration. *Id*. ¶ 18(a).

    b. This change has significantly expedited the time it takes to hire new caseworkers, reducing the process from seven to three stages. Under the new Office of Shared Administration, after receiving a signed offer letter from a caseworker candidate, it takes DoHS approximately 3-5 days to obtain all approvals necessary for a new caseworker to begin employment; under the Division of Personnel, after DoHS received a signed offer letter it typically took 2-4 weeks for a new caseworker to begin employment because of the additional layers of approval required. *Id*. ¶ 18(b).

    c. Current employees who choose to opt in to the new system and all new employees will have salaries brought to the new minimum pay grade or retain their current salary, whichever is higher. A pay differential is applied based on years of service, with 0-4 years receiving a 10 percent differential, 5-9 years receiving a 13 percent differential, and 10+ years of service receiving a 15 percent pay differential. *Id*. ¶ 18(c).

    d. Under the Office of Shared Administration salary rates, pay scale and employee classification decisions can be made independently from the State Personnel Board, giving DoHS significant flexibility to implement recruitment and retention initiatives. *Id*. ¶ 18(d).

126. In 2023, DoHS created a new internship program for college students who meet certain qualifications to recruit future caseworkers. Ex. 4, ¶ 9.

127. In 2024, DoHS partnered with Epiphany Consulting to launch a 14-week leadership training program called Leaders Thrive, aimed at developing leadership skills and cultivating a culture of excellence and collaboration. Ex. 4, ¶ 10; Ex. 123.

128. In 2024, DoHS issued a standard operating procedure providing additional guidance to CPS and YS supervisors regarding caseload assignments and distributions. Ex. 124; Ex. 125.

129. In 2019, base annual compensation for caseworkers ranged from $27,732 to $64,812; today, it ranges from $44,850 to $80,625. Ex. 3-A, at D002846836; Ex. 3-D.

130.    As of May 2022, the vacancy rate for all CPS positions was 27 percent.  Ex. 126.

131.    As of May 2024, the vacancy rate for all CPS positions was 17 percent.  Ex. 127.

132.    As of May 2022, the vacancy rate for all YS positions was 35 percent.  Ex. 126.

133.    As of May 2024, the vacancy rate for all YS positions was 14 percent. Ex. 127.

134.    In 2021, the turnover rate for CPS and YS positions was 34.1 percent; in 2023, the turnover rate had decreased to 22.3 percent.  Ex. 3-C.

135.    In May 2022, 6,672 children were in foster care, and West Virginia had 569 caseworkers.  Ex. 74; Ex. 126.  In this paragraph, "caseworkers" refers to all CPS and YS positions.

136.    In May 2024, 6,129 children were in foster care, and West Virginia had 672 caseworkers.  Ex. 75; Ex. 127.  In this paragraph, "caseworkers" refers to all CPS and YS positions.

137.    In fiscal year 2021, caseworkers completed 95 percent of required monthly visits with foster children.  Ex. 128.  In fiscal year 2022, caseworkers completed 91 percent of required monthly visits with foster children.  Ex. 129.  In fiscal year 2023, data in the new PATH system showed that caseworkers completed 82 percent of required monthly visits with foster children.  Ex. 130.[2]

138.    In May 2023, DoHS measured the number of new CPS caseworkers that needed to be hired by county to maintain an average case load of 10, which showed a concentrated need in the north region (requiring 78 workers) as opposed to the south region (requiring 22 workers).  Ex. 71.

## III.    DEFENDANTS' EFFORTS TO EXPAND THE ARRAY OF PLACEMENTS AVAILABLE FOR FOSTER CHILDREN

139.    In 2018, DoHS partnered with A Second Chance, Inc. to undertake a study of kinship care in West Virginia and develop recommendations for improving services provided to kinship and relative foster families.  Ex. 41.

140.    In 2019, DoHS developed a protocol relating to recruitment of kinship and relative caregivers to become foster family homes. Ex. 131.

---

[2] Data reporting on the percent of requirement monthly visits completed in fiscal year 2023 was impacted by the transition to a new child welfare data system (PATH) and challenges for Child Placing Agency caseworkers documenting contacts with children in the new system, which prevented some visits that actually occurred from being recorded accurately in PATH, thereby artificially decreasing the percent of required caseworker visits that were recorded.  *See* Ex. 15, ¶ 20. These issues have now been resolved, and DoHS continues to work with the Child Placing Agencies to ensure that visits are made and recorded timely.  *See id.*

141.    In 2019, DoHS implemented the Kinship Navigator Program to assist kinship and relative placements through a contract with Mission West Virginia. Ex. 132; Ex. 133.

    a.  Relative and kinship placements face unique challenges because they often take in children with little to no notice or time to prepare, and therefore may benefit from extra assistance and advocacy during the process of becoming certified as meeting foster home licensing criteria. Ex. 7, ¶ 4(a); Ex. 134, at D002742945.

    b.  Kinship Navigators receive home study requests at the same time as the homefinding unit, after which the Navigator contacts the family and completes a needs assessment. Ex. 7, ¶ 4(b); Ex. 134, at D002742945.

    c.  Based on the needs assessment and discussion with the family, the Navigator assists the family in accessing economic services and financial assistance, such as clothing vouchers, home repairs, and child care resources. Ex. 7, ¶ 4(c); Ex. 134, at D002742948.

    d.  Kinship families often have unique, non-financial needs (*e.g.*, educational supports, legal aid, furniture) for which they require more intensive assistance in accessing. Ex. 7, ¶ 4(d); Ex. 133, at D002742950. Depending on the circumstances, the Navigator can directly find certain tangible items to support families in caring for children and completing the certification process. Ex. 7, ¶ 4(e); Ex. 134, at D002742951-52.

142.    In 2020, DoHS partnered with A Second Chance, Inc. to redesign the process for home studies and certification of kinship and relative providers to standardize practice and alleviate unnecessary and burdensome barriers to certification for kinship and relative providers. Ex. 7, ¶ 9.

143.    In 2020, DoHS increased the monthly foster care subsidy rate, and provided additional increases based on child ages (from $600 per month for all ages, to $790 for ages 0-5, $851 for ages 6-12, and $942 for ages 13 and older). Ex. 7, ¶ 6; Ex. 34, at D003107474.

144.    In 2020, DoHS partnered with Aetna to implement the Connect Our Kids platform, which is a tool to assist caseworkers in locating relative and kin for placement. Ex. 7, ¶ 7.

145.    In 2021, DoHS revised the interest letter for potential kinship or relative providers to be used in diligent search efforts for children in foster care. Ex. 135; Ex. 135.

146.    In 2021, DoHS revised the diligent search summary form to be used by caseworkers in reporting on the diligent search for relatives and kin willing to act as kinship or relative providers. Ex. 137.

147.    In 2021, DoHS developed an incentive payment program for kinship providers to support these placements as they complete the certification process. Ex. 139.

148.    In 2021, DoHS partnered with Aetna to conduct mandatory Family Finding training for supervisory staff.  Ex. 7, ¶ 14.  The Family Finding model offers methods and strategies to locate and engage relatives of children in foster care.  *Id.*

149.    In 2021, DoHS increased monthly payment rates to uncertified kinship placement providers through Temporary Assistance to Needy Families ("TANF") by 45 percent.  Ex. 7, ¶ 15; Ex. 34, at D003107514-15.

150.    In 2021, DoHS increased the per diem payment rates for Child Placing Agencies accepting children with moderate and severe behavioral health issues and children who are medically fragile.  Payments are based on the level of the child's needs and can be increased after periodic needs evaluations of the child using the CANS.  Ex. 140; Ex. 72.

151.    In 2021, DoHS partnered with Child Placing Agencies to develop and implement performance-based contracting.  Ex. 7, ¶ 16; Ex. 72.  In 2022, DoHS implemented this performance-based contracting.  Ex. 7, ¶ 17; Ex. 72; *see, e.g.*, Ex. 141.

  a.  With performance-based contracting, all aspects of the service contract are structured around the purpose of the work to be performed and the desired results with the contract requirements including clear, specific, and objective terms with measurable outcomes and linked payment for services to contractor performance.  W. Va. Code § 49-2-111a(a)(5).

  b.  Performance-based contracts require the Child Placing Agencies to: have adequate capacity to meet the anticipated service needs; use evidence-based, research-based, and promising practices, where appropriate, including fidelity and quality assurance provisions; and report data on performance and service outcomes, including but not limited to: safety, permanency, well-being, incentives earned, placement of older children, placement of children with special needs, and recruitment and retention of foster parents.  § 49-2-111a(e).

152.    In 2022, DoHS redesigned homefinding policies to align with standardized practice and recommendations from A Second Chance and recommendations from their kinship care study.  Ex. 7, ¶ 18; Ex. 34, at D003107472-73.

153.    In 2023, DoHS partnered with Marshall University to develop and conduct a survey of family foster care providers to examine the needs of foster parents and discover opportunities to improve services to aid in the retention of foster parents.  Ex. 7, ¶ 19.

154.    In 2023, DoHS increased the administration rate for Child Placing Agencies by 10 percent for recruiting and certifying family foster homes, including therapeutic foster homes.  Ex. 7, ¶ 20.

155.    In 2023, DoHS piloted emergency resource home placements to provide short term community-based placements for children whose living situation has been disrupted.  Ex. 34, at D003107912-13.

156.     In 2024, DoHS launched a statewide campaign focusing on recruiting foster parents in partnership with Aetna, Mission West Virginia, and 10 Child Placing Agencies.  Ex. 7, ¶ 22. The broad scale campaign features multiple mediums, including digital and print media, radio, television, and billboards, and focuses on generating inquiries from potential foster parents and families.  *Id*.  Mission West Virginia serves as the initial response team, managing intake of inquiries through webforms, telephone and in person, and providing information and agency listings to each inquiring family, and collecting monthly updates from Child Placing Agencies on the results of recruitment efforts.  *Id*.  Child Placing Agencies commit to responding to families within two business days of receiving an inquiry.  *Id*.

157.     As of May 2024, there are 4,960 West Virginia foster children placed with licensed foster families or with kinship families (certified or uncertified). Ex. 75.  In May 2014, 3,086 West Virginia foster children were placed with licensed foster families or with kinship families. Ex. 73.

## IV.     DEFENDANTS' EFFORTS TO EXPAND COMMUNITY-BASED SERVICES AND DECREASE RELIANCE ON RESIDENTIAL TREATMENT FOR FOSTER CHILDREN WITH DISABILITIES

158.     DoHS has long provided a wide array of community-based services for children with disabilities.  Ex. 1, ¶ 18.

159.     In May of 2019, DoHS entered a Memorandum of Understanding with the United States Department of Justice ("DOJ MOU") to resolve DOJ's allegations that, prior to 2015, the State unnecessarily placed some children with mental health needs (including foster children) in residential treatment programs.  Ex. 62.

160.     Under the DOJ MOU, the State agreed to, among many other things: screen children within the target population to determine if they should be referred for further mental health evaluation or services; ensure that children for whom community-based services are deemed appropriate receive timely access to these services in the intensity and duration that they need them; expand and develop community-based services so that children throughout the State have access to treatment, including behavioral support services, in-home therapy, children's mobile crisis response, and therapeutic foster care; by the end of 2024, ensure that all children placed in residential treatment are re-assessed by a qualified professional to determine if the setting is still the most appropriate setting for each individual child; and develop a Quality Assurance and Performance Improvement system to allow the State to assess the quality of its mental health services and timely address gaps in services across the State.  Ex. 62, at D002141024-27.

161.     The DOJ MOU requires the State to develop an Implementation Plan to specify the steps it will take to create mental health services that are sustainable, statewide, and available to children in the target population, including foster children.  Defendants revise the Implementation Plan annually and submit the revisions to the DOJ and the public for comment before finalizing. Ex. 63, at D002141197-99.  Defendants have finalized a revised Implementation Plan on an annual basis every year since 2020.  Ex. 1, ¶ 21.

162.     The DOJ MOU requires the State to hire a subject matter expert ("Subject Matter Expert") to provide technical assistance and recommendations for attaining compliance with the

agreement.  The State hired the University of Maryland School of Social Work as the Subject Matter Expert.  Ex. 64, at D003097186.

163.    The Subject Matters Expert prepares comprehensive reports on the status of the State's compliance with DOJ MOU twice a year, which are publicly available.  Ex. 64, at D003097186.

164.    In 2019, DoHS redesigned Safe at Home West Virginia to transition the program from a Title IV-E demonstration project to a state-funded, statewide wraparound program.  Ex. 13, ¶ 3.

      a.  The Safe at Home program provides trauma-informed assessments and planning focused on child needs, individualized wraparound planning and case coordination by a care coordinator (in addition to the case planning done by the CPS or YS caseworker), and evidence-based services and supports focused on returning and keeping children in the community.  Ex. 38, at D003097741.

      b.  Services are provided according to an individualized service plan created with the child, and can include the following: funding for recreational activities; formal social supports, such as adult life skills, homemaking services and peer support; and targeted therapeutic services, such as behavioral health counseling, in-home family therapy, and specialized therapy.  Ex. 39, at D003105762, D003105764-67.

      c.  In 2020, DoHS established a Temporary Retainer Payment policy for Safe at Home service providers to maintain statewide staffing capacity during the public health emergency.  Ex. 13, ¶ 3(b).

      d.  In 2020, DoHS issued updated policies, procedures and manuals for the Safe at Home program to align with program redesign and improvements.  Ex. 13, ¶ 3(c).

      e.  In 2022, DoHS updated the payment methodology for Safe at Home providers to increase payment rates and give providers more flexibility in how they choose to use the additional funds.  Ex. 13, ¶ 3(d).

      f.  In 2023, DoHS partnered with Marshall University to oversee assignment and coordination of Safe at Home referrals to providers.  Ex. 13, ¶ 3(f).

      g.  As of May 2024, Safe at Home services are being provided to 669 active cases, with each facilitator working an average caseload of 5.9 cases, which is below the State's standard of 10 cases per facilitator.  Ex. 142, at D003108357.

165.    In 2020, DoHS implemented the Mountain Health Promise managed care program for all children in foster care through a contract with Aetna Better Health of West Virginia.  Ex. 2, ¶ 7.

a. Through Mountain Health Promise, every child undergoes a comprehensive assessment to identify physical, mental health, and behavioral health needs, and has a care coordinator responsible for ensuring the child is connected with appropriate providers to address those needs. Ex. 2, ¶ 7.

b. In 2020, DoHS partnered with Aetna to launch a clinical staffing process to review children in residential placements and identify placement alternatives and make recommendations with the goal of appropriate step down to the least restrictive setting, referred to as "Deep Dive" reviews. Ex. 143.

c. In 2022, DoHS partnered with Aetna to develop and implement a 30-day reauthorization process, through which Aetna and BSS meet with providers to review discharge plans monthly. Ex. 144.

d. In 2022, DoHS partnered with Aetna to provide mandatory discharge planning training to caseworkers. Ex. 63, at D002141231.

e. As of April 2024, DoHS has spent $764,435,313.91 on Mountain Health Promise to serve more than 19,000 foster children. Ex. 2, ¶ 8; Ex. 2-A.

166.    In 2020, DoHS implemented the Medicaid Section 1915(c) Children with Serious Emotional Disorder Waiver ("CSEDW") program. Ex. 53.

a. The CSEDW provides an array of home and community-based services that enables children who would otherwise require treatment in a residential setting to remain in their homes and communities. Ex. 44, at D002231172.

b. The following services are available under the CSEDW: wraparound facilitation, mobile response, independent living/skills building, in-home family therapy, in-home family support, job development, assistive equipment, respite care, peer parent support, non-medical transportation, and specialized therapy. Ex. 44, at D002231208-1225.

c. In 2021, DoHS expanded the CSEDW to: increase the pool of evaluators for initial eligibility assessment to include licensed social workers, licensed professional counselors, and supervised psychologists; increase reimbursement rate for covered services; and add other requirements to enhance the waiver. Ex. 54.

d. In 2021, DoHS temporarily increased Medicaid reimbursement rates for providers of CSEDW services by 70 percent as part of a workforce shortage initiative that required provider agencies to attest that at least 85 percent of the rate increase would be passed on to direct-care workers in the form of compensation increases or other incentives such as retention bonuses, hiring bonuses, or increased benefit packages. Ex. 49. The rate increase was effective between April 1, 2021 and June 30, 2023. Ex. 50.

e. In 2024, DoHS received federal approval to update the payment methodology for CSED services from a cost-based reimbursement to a per-member per-month methodology based on provider feedback. Ex. 59.

f. Children's use of CSEDW services has consistently increased since the program's implementation, with 36 percent more children using CSEDW services in the first half of 2023 (810 children) than in the second half of 2022 (597 children). Ex. 68, at D002232673, D002232752.

g. In the first six months of 2023, 742 children accessed Wraparound facilitator services through the CSEDW, increasing 29 percent over the 573 children accessing the services in the last six months of 2022. Ex. 68, at D002232673, D002232769.

h. In 2021, a total of 73 foster children received $264,444 in CSEDW services. Ex. 24, at Tbls. 2, 3.

i. In 2022, a total of 262 foster children received $912,658 in CSEDW services. Ex. 24, at Tbls. 2, 3.

j. In 2023, a total of 352 foster children received $1,024,956 in CSEDW services. Ex. 24, at Tbls. 2, 3.

k. West Virginia quickly enrolls eligible children in the CSEDW program, with the average time between submission of the child's application to the eligibility determination being 39 days. Ex. 69, at D003097118.

l. While children are waiting to initiate CSEDW, West Virginia connects them to interim services provided by a Wraparound facilitator funded by either BSS (through the Safe at Home program), or by the Bureau of Behavioral Health (through the Children's Mental Health Wraparound initiative), which allows children to access assistance nearly a month sooner than without interim services. *See* Ex. 69, at D003097119-120.

167. The Intellectual and Developmental Disabilities ("IDD") Waiver program is West Virginia's Section 1915(c) Medicaid waiver program for children and adults with intellectual and/or developmental disabilities who meet the institutional level of care (*i.e.*, individuals who would be eligible for placement in an Intermediate Care Facility). Ex. 46, at D003108145.

a. The IDD Waiver covers services to instruct, train, support, supervise, and assist individuals who have intellectual and/or developmental disabilities in achieving the highest level of independence and self-sufficiency possible. *Id.*

b. Services are provided based on the participating member's annual functional assessment and assigned individualized budget in natural settings including the member's home and public locations in the community. *Id.*

23

c. The following services are available through the IDD Waiver: behavior support professional, crisis services, electronic monitoring, environmental accessibility adaptations, extended professional services (dietary therapy, occupational therapy, physical therapy, speech therapy), facility-based day habilitation, job development, person-centered support, pre-vocational services, respite services, case management, skilled nursing services, supported employment, and transportation. *Id*. at D003108180.

d. In 2020, DoHS received federal approval to temporarily modify services provided through the IDD Waiver program to address health and welfare issues presented by the public health emergency. Ex. 60; Ex. 61. Approved changes included: allowing program participants to exceed service limits for respite services and person-centered supports, and allowing out-of-home respite to be provided in locations other than Specialized Family Care Homes. *Id*.

e. In 2021, DoHS temporarily increased Medicaid reimbursement rates for providers of IDD Waiver services by 50 percent as part of a workforce shortage initiate that required provider agencies to attest that at least 85 percent of the rate increase would be passed on to direct-care workers in the form of compensation increases or other incentives such as retention bonuses, hiring bonuses, or increased benefit packages. Ex. 49. The rate increase was effective between April 1, 2021 and June 30, 2023, except for increases for some services lasting through October 31, 2023. Ex. 50.

f. Through the IDD Waiver program, for fiscal year 2023, DoHS covered community-based services to assist 6,075 participants. Ex. 48.

g. Federal law and the federal Centers for Medicare & Medicaid Services prohibit Medicaid enrollees from being enrolled in more than one Section 1915(c) waiver program simultaneously. Accordingly, foster children otherwise eligible for both CSEDW and the IDD Waiver must choose one of the two waiver programs; they cannot enroll in both waiver programs. Ex. 2, ¶ 6.

168. In 2020, DoHS contracted with the West Virginia University's Center for Excellence in Disabilities to coordinate the Positive Behavior Support program. Ex. 63, at D002141213.

a. The Positive Behavior Support program offers a range of individualized services to children and youth through age 21 with serious emotional disturbances, including mental and behavioral health assessments, development and implementation of a positive behavioral support plan as part of treatment, modeling for caregivers on how to implement the behavioral support plan, and skill-building services. Ex. 13, ¶ 6(a).

b. In 2021, DoHS contracted with Concord University to develop a collaborative center for Positive Behavior Support education program to provide comprehensive workforce training and coaching in Positive Behavior Support approaches, and coordination of certification of providers. Ex. 13, ¶ 6(b).

24

    c. In 2024, DoHS plans to implement Positive Behavior Support services as a Medicaid service. Ex. 2, ¶ 11.

    d. In accordance with a grant dedicated to funding behavioral support services, DoHS offered positive behavior support services to 111 children with more intense needs who were not receiving services under the CSEDW or the IDD Waiver between January and June 2023. Ex. 68, at D002232772-773.

169. In 2020, DoHS implemented a standard operating procedure for placing youth in residential programs to provide guidance to caseworkers in the process of referring youth to a residential setting, and help ensure that children are placed in the least restrictive setting. Ex. 145.

170. In 2021, DoHS temporarily increased Medicaid reimbursement rates for services provided by licensed behavioral health centers by 70 percent as part of a workforce shortage initiative that required provider agencies to attest that at least 85 percent of the rate increase would be passed on to direct-care workers in the form of compensation increases or other incentives such as retention bonuses, hiring bonuses, or increased benefit packages. Ex. 51. The rate increase was effective between April 1, 2021 and March 31, 2022. Ex. 52.

171. In 2021, DoHS implemented the Pathway to Children's Mental Health Services, also referred to as the "Assessment Pathway," to ensure initial and ongoing screening of foster children for behavioral health needs. Ex. 35, at D003106826.

    a. The Assessment Pathway is designed to improve access to and the quality of in-home and community-based services for children with behavioral health needs by streamlining access to assessment for children's mental or behavioral health needs and helps connect children and families to services while the assessment process is underway. Ex. 35, at D003106824; Ex. 63, at D002141205.

    b. The Assessment Pathway provides: a mechanism for assessment of children who may have a need for mental or behavioral health services; appropriate linkage to services while the assessment process is being completed; linkage to services when children are transitioning back to their home or community settings after an out-of-home or residential placement; and multiple avenues for a family or health care professional to request assessment. Ex. 65, at D217462.

    c. In 2022, DoHS expanded its contract with Acentra to perform Qualified Independent Assessments for children who are at risk of residential placement or referred to residential placement as part of the Assessment Pathway. Ex. 13, ¶ 7(a). At the same time, DoHS worked in partnership with Acentra and Aetna to develop the qualified independent assessment process, data collection, communication, and monitoring. Ex. 66, at D002232615.

    d. In 2023, DoHS completed implementation of the Qualified Independent Assessments process, and training of caseworkers and providers on Qualified Independent Assessments. Ex. 146; Ex. 147.

e. Between January and June 2023, 1,417 children used the Assessment Pathway to access home and community based mental health services. Ex. 68, at D002232672, D002232724.

f. Awareness and utilization of the Assessment Pathway has extended statewide with a referral being made for at least one child in each of West Virginia's 55 counties during the first six months of 2023. Ex. 68, at D002232672.

172. In 2021, DoHS made Children's Mobile Crisis Response and Stabilization ("CMCRS") services available on a statewide basis to provide children and families experiencing a behavioral health crisis with on-site support, crisis planning and connection to appropriate community-based resources. Ex. 63, at D002141209.

a. CMCRS is a crisis response program for children that includes a hotline and mobile crisis response teams that assess and evaluate the presenting crisis; provide interventions to stabilize the crisis; and provide timely supports and skills necessary to return children and their families to routine functioning and maintain children in their homes whenever possible. Ex. 63, at D002141203.

b. CMCRS services are delivered in a non-clinical setting by a mobile crisis response team consisting of a clinical supervisor and crisis specialist who will provide direct services to children and their families. *Id*.

c. The Children's Crisis and Referral Line (implemented in 2020) is the centralized access point to connect children and families to mobile crisis response and stabilization teams in crisis situations. Ex. 68, at D002232793. The Crisis Line also provides access and a warm hand off to other community-based services such as wraparound or needs assessments. *Id*.

d. In 2023, DoHS received federal approval to provide coverage for community-based mobile crisis intervention services through the Medicaid program. Ex. 55.

e. In 2024, DoHS issued policies implementing the coverage of mobile crisis intervention services as a Medicaid benefit. Ex. 45.

f. In 2024, DoHS joined the Link Center's Policy Academy for 988 Suicide & Crisis Response Lifeline to ensure inclusive crisis response systems for children and adults with intellectual and developmental disabilities, brain injury, and other cognitive disabilities. Ex. 13, ¶ 14.

g. DoHS's Children's Crisis Referral Line is being used more frequently to connect children, including foster children, to behavioral health services, with the number of calls to the Crisis Line increasing by 25 percent in 2022 (from 494 calls between January and June 2022 to 617 calls between July and December 2022), and by another 25 percent in the first half of 2023 (771 calls between January and June 2023). Ex. 67, at D002232259; Ex. 68, at D002232670.

h. West Virginia has expanded the availability of CMCRS, with the number of children served increasing by 64 percent from 357 to 587 children served between the second half of 2022 and the first half of 2023. Ex. 68, at D002232671, D002232809.

i. Calls coming into the Children's Crisis Referral Line that connect to the CMCR team are answered, on average, in 13 seconds. Ex. 68, at D002232731.

173.    In 2021, DoHS partnered with BerryDunn to develop a certified community behavioral health clinic ("CCBHC") model of care in West Virginia. Ex. 2, ¶ 12.

a. CCBHCs provide integrated healthcare services that are evidence-based, trauma-informed, recovery-oriented, and person-and-family-centered across a continuum of care. CCBHCs must provide the following nine services: crisis services; treatment planning; screening, assessment, diagnosis, and risk assessment; outpatient mental health and substance use services; targeted case management; outpatient primary care screening and monitoring; community-based mental health care for veterans; peer and family support services; and psychiatric rehabilitation services. *Id*. ¶ 12.

b. Through the CCBHC model, providers are reimbursed by Medicaid through a predetermined, fixed amount per day of services rendered to each Medicaid beneficiary, which is based on the provider's actual costs of delivering services. The CCBHC reimbursement model ensures that providers receive sufficient reimbursement for intensive community-based mental and behavioral health services. A quality incentive payment system may also be established to achieve specific thresholds on performance identified by DoHS, which would be in addition to the prospective daily rate. *Id*. ¶ 12.

c. In 2022, the West Virginia legislature passed a bill establishing W.V. Code § 9-5-30, which requires DoHS to develop, seek approval of, and implement a Medicaid state plan amendment as necessary and appropriate to effectuate a system of CCBHCs and establish a state certification system for CCBHCs that mandates CCBHCs to provide a minimum set of services in exchange for a prospective payment rate and sets forth a quality incentive payment system. *Id*. ¶ 13.

d. DoHS has contracted with Quality Insights to complete trainings and technical assistance on care coordination, developing a CCBHC needs assessment, seeking federal funding to support the CCBHC model, provider-level implementation considerations, and stakeholder engagement. *Id*. ¶ 14.

e. In 2023, West Virginia was one of fifteen states awarded a $1 million, one-year cooperative CCBHC planning grant from the federal government to further develop its CCBHC model. This planning grant allows West Virginia to apply to participate in a federal CCBHC demonstration initiative that provides enhanced federal financial participation for Medicaid payments to CCBHC providers. *Id*. ¶ 15.

    f.   In 2023, DoHS provisionally certified the first six behavioral centers as CCBHCs. *Id.* ¶ 15.

    g.   In 2024, DoHS submitted a Medicaid State Plan Amendment to the federal government to authorize Medicaid coverage of CCBHC services. This includes the requirement that all CCBHCs provide intensive outpatient adolescent youth services. The State Plan Amendment will have an effective date of July 1, 2024, pending federal approval. *Id.* ¶ 16.

174.    In 2022, DoHS established the Office of Quality Assurance to align continuous quality improvement efforts and improve data quality. Ex. 63, at D002141223.

175.    In 2022, DoHS launched the West Virginia Kids Thrive Collaborative website as a central resource for information about the array of community-based mental health services and programs available to children and families. Ex. 63, at D002141227.

176.    In 2022, DoHS implemented a plan of care document for use by all wraparound service providers to identify the needs of youth and their families, detail individualized goals and action steps, and monitor the progress of the child. Ex. 63, at D002141202-203.

177.    In 2022, DoHS increased Medicaid reimbursement rates for services provided by licensed behavioral health centers by five percent. Ex. 52.

178.    In 2022, DoHS developed a standard operating procedure on the 30-day reauthorization process and discharge planning, and training was conducted with BSS field staff and providers. Ex. 144.

179.    In 2022, DoHS established a standard operating procedure for emergency shelter care coordination to assist in the expedited transition of children in emergency shelter care to a more permanent placement setting through assessment, referral, and advocacy. Ex. 37.

180.    In 2022, DoHS began the process of developing a new children's crisis center to provide a safe alternative from the use of hospital emergency departments and hotel rooms and to address the needs of foster children who may be experiencing a behavioral health crisis. Ex. 1, ¶ 13.

181.    In 2023, DoHS increased reimbursement rates for Socially Necessary Services providers by 30 percent. Ex. 13, ¶ 10(c).

182.    In 2024, DoHS was awarded a federal grant for the Implementation, Enhancement, and Expansion of Medicaid and the Children's Health Insurance Program (CHIP) School-Based Services. Ex. 2, ¶ 17. The grant funds will be used to support efforts to connect children to critical health care services, especially mental health services, at schools. *Id*.

183.    In 2024, BSS began working with the Genesis Center to open a facility to temporarily house foster children who would otherwise be in hotels or emergency departments.

184.    In 2024, DoHS submitted a State Plan Amendment to the federal government to authorize Medicaid coverage of Residential Intensive Treatment and Specialized Residential Intensive Treatment services to children who need intensive care in a residential setting. Ex. 56; Ex. 57; Ex. 58.  The State Plan Amendment will have an effective date of October 1, 2024, pending federal approval.

185.    Today, children in foster care receive the full range of medically necessary benefits and services available through Medicaid, including screening and diagnostic services through HealthCheck, specialized community-based services targeted at reducing the need for residential treatment through the CSEDW program, and extensive community-based services for children with developmental disabilities through the IDD Waiver program. *See supra*, ¶¶ 53, 166, 167.

a.    In 2023, 4,463 children in foster care received Medicaid-funded community-based mental health services; 352 received CSEDW services; 345 received another type of Medicaid-funded home- and community-based service ("HCBS"); and 12,050 received Medicaid-funded community-based medical services. Ex. 24, at 7.

b.    By comparison, in 2015, 2,983 children in foster care received Medicaid-funded community-based mental health services; 60 received another type of Medicaid-funded HCBS; and 5,361 received Medicaid-funded community-based medical services.  Ex. 24, at 7.

c.    In 2023, 3,528 children in foster care with a behavioral health diagnosis received Medicaid-funded community-based mental health services; 352 received CSEDW services;  269 received another type of Medicaid-funded HCBS; and 5,504 received Medicaid-funded community-based medical services. Ex. 24, at 9-10.

d.    In 2015, 1,509 children in foster care with a behavioral health diagnosis received Medicaid-funded community-based mental health services; 46 received another type of Medicaid-funded home- and community-based service; and 1,909 received Medicaid-funded community-based medical services.  Ex. 24, at 9-10.

e.    In 2023, 961 children in foster care who had a behavioral health diagnosis received residential treatment or inpatient services.  Ex. 24, at 9-10. By comparison, in 2018, 1,600 children in foster care who had a behavioral health diagnosis received residential treatment or inpatient services.  *Id*.

f.    In 2023, at least 5,504 children in foster care who had a behavioral health diagnosis received community-based mental health or medical services.  Ex. 24, at 9-10. By comparison, in 2015, at least 1,901 children in foster care who had a behavioral health diagnosis received community-based medical services. *Id*.

g.    In 2023, zero children in foster care who have a diagnosis for an intellectual or developmental disability but did not have a behavioral health diagnosis received residential treatment or inpatient services. Ex. 24, at 11. In 2015, two children in foster care who had a diagnosis for an intellectual or developmental disability received residential treatment or inpatient services. *Id*.

h.  DoHS recently added a new category of placement to its monthly report to the Legislature on placement of foster children in different setting types to distinguish residential care settings specifically designed to service children with IDD.  As of May 2024, two children are placed in residential care settings for children with IDD (these two children may have both an intellectual disability and a behavioral health diagnosis). Ex. 75.

i.  In 2023, DoHS spent $16,788,186 on Medicaid-funded community-based mental health, CSEDW, medical, and HCBS services for foster children.  Ex. 24, at 8. On Medicaid-funded community-based mental health services (including CSEDW services) and HCBS alone, DoHS spent $8,137,097 for foster children in 2023. *Id*.

j.  In 2015, DoHS spent $4,624,888 on Medicaid-funded community-based mental health, medical, and HCBS services for foster children. Ex. 24, at 8.  On Medicaid-funded community-based mental health services and HCBS alone, DoHS spent $2,888,424 for foster children in 2015. *Id*.

## V.  PERFORMANCE OF THE WEST VIRGINIA CHILD WELFARE SYSTEM

186.  The number of children in foster care in West Virginia over the last decade was as follows:

a.  December 2014: 4,229

b.  December 2015: 4,683

c.  December 2016: 5,485

d.  December 2017: 6,358

e.  December 2018: 6,743

f.  December 2019: 7,034

g.  December 2020: 6,870

h.  December 2021: 6,644

i.  December 2022: 6,153

j.  December 2023: 6,092

Exs. 76-85.

187.  As of May 2024, 81 percent of all foster children (including juvenile justice youth) are placed in community-based family settings (4,960 children); 17 percent of foster children are in residential treatment placements such as group residential care, emergency shelter settings, schools for children with special medical needs, or long-term psychiatric hospitals (1,020

children); 0.3 percent are in short-term medical settings such as a hospital (20 children); and 2 percent were in transitional living (118 children). Ex. 75.

188.    In May 2014, 70 percent of foster children (including juvenile justice youth) were placed in community-based family settings (3,086 children); 28 percent were in residential treatment placements (1,220 children); and 0.7 percent were in short-term medical settings (29 children); and 1 percent were in transitional living (53 children). Ex. 73.

189.    West Virginia has increased the number of foster children placed in kinship homes in the community, from 16 percent in May 2014, to 53 percent in May 2024. Ex. 73; Ex. 75.

190.    According to federal data analyzed and published by the Annie E. Casey Foundation, West Virginia has the highest percentage of children in foster care placed with kin in the country. Ex. 153.

191.    Foster children in West Virginia placed in residential treatment has decreased from 28 percent in May 2014, to 17 percent in May 2024. Ex. 73; Ex. 75.

192.    In March 2024, 74 percent of all foster children with behavioral health diagnoses (including juvenile justice youth) are in community-based family settings, and 26 percent of such foster children are in residential treatment programs.  Ex. 2, ¶ 10.

193.    As of June 2024, 92 percent of foster children in custody because of abuse and neglect were placed in a family home, compared to six percent of such children placed in residential treatment. Ex. 5, ¶ 5(e)-(f).

194.    As of June 2024, 13 percent of foster children in custody because of a juvenile justice charge were placed in a family home, compared to 77 of such children placed in residential treatment. Ex. 5, ¶ 5(e)-(f).

195.    The median length of stay in a residential treatment facility has decreased by 26 percent, from 235 days in the first six months of 2022, to 209 days in the first six months of 2023. Ex. 68, at D02232678, D002232833.

196.    In 2023, 65 foster children had stays in residential treatment that lasted more than one year, less than 1 percent of children in custody in 2023. Ex. 5, ¶ 6(g).

197.    More than 95 percent of children, including foster children, placed in a residential treatment facility have active discharge plans in place. Ex. 68, at D002232676, D002232817.

198.    A Child and Family Service Review data profile is a report developed by the U.S. Department of Health and Human Services' Administration for Children & Families ("ACF") to provide states with performance information on child welfare metrics related to safety and permanency. Ex. 90, at D003112962.  The data profile includes risk-standardized performance, which is a state's performance on a given metric adjusted for factors outside of the state's control. *Id*. The risk-standardized performance is used by ACF to assess a state's performance compared to national performance and the performance of other states *Id*. at D003112964, D003112965.

199.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for placement stability was 2.58 moves per 1,000 days in care for federal fiscal year 2022, which is below the national performance of 4.48 moves per 1,000 days in care.  Ex. 150, at D003113034.

200.    In 2021, West Virginia's risk-standardized performance for placement stability was the best in the nation. Ex. 92, at D003113191-92.

201.    According to federal data analyzed and published by the Annie E. Casey Foundation, nationwide, West Virginia is tied with Hawaii for the lowest percentage of foster children who have experienced more than two placements.  Ex. 155.

202.    Between April 1, 2022 and September 30, 2022, more than half of children in DoHS custody had only one placement during their entire time in foster care. Ex. 152, at D003113009.

203.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for maltreatment in care decreased from 3.87 incidents per 100,000 days in care in federal fiscal year 2019, to 2.69 incidents per 100,000 days in care in federal fiscal year 2021. Ex. 150, at D003113034. The national performance on maltreatment in care is 9.07 incidents per 100,000 days in care. *Id*.

204.    With less than three (3) incidents per 100,000 days in care, West Virginia has the third lowest rate of maltreatment in care of any child welfare system in the country. Ex. 91, at D003112209-10.

205.    In 2021, approximately 0.2 percent of West Virginia children in foster care were determined to be maltreated in care. Ex. 150, at D003113132.

206.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for recurrence of maltreatment decreased from 7.2 percent in federal fiscal year 2020, to 5.6 percent in federal fiscal year 2022. Ex. 150, at D003113034. The national performance for recurrence of maltreatment is 9.7 percent. *Id*. Recurrence of maltreatment accounts for children regardless of if they are in foster care, and measures the percent of children who were the subject of a substantiated or indicated report of maltreatment in a 12-month period and who experienced subsequent maltreatment within 12 months of the initial incident. *See id*. at D003113033.

207.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for children re-entering foster care decreased from 8.3 percent in federal fiscal year 2021, to 7.1 percent in federal fiscal year 2022. Ex. 150, at D003113034.

208.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for children achieving permanency who have been in foster care for 12 to 23 months increased from 61.3 percent in federal fiscal year 2021, to 64.2 percent in federal fiscal year 2022.  Ex. 150, at D003113034. The national performance for children who have been in foster care for 12 to 23 months achieving permanency is 43.8 percent. *Id*.

209.    In the most recent data profile from ACF in which this metric was calculated, West Virginia's risk-standardized performance for children achieving permanency who have been in foster care for 24 or more months increased from 52 percent in federal fiscal year 2021, to 56.7 percent in federal fiscal year 2022. Ex. 150, at D003113034. The national performance for children who have been in foster care for 24 or more months achieving permanency is 37.3 percent. *Id.*

210.    According to federal data analyzed and published by the Annie E. Casey Foundation, West Virginia is tied with Washington state and Wyoming for the lowest rate of children exiting foster care through emancipation, with the number of children "aging out" of foster care at two percent.  Ex. 154.

211.    Between 2017 and 2021, the percentage of foster children with disabilities being adopted in West Virginia almost doubled, increasing from 12.9 percent to 25.4 percent.  Ex. 89, at D003113132.

212.    Between 2017 and 2021, the percentage of foster children aged 12 or older exiting to adoption or guardianship increased from 10.8 percent to 22.7 percent, with 67.5 percent of foster children aged 12 or older exiting foster care through reunification in 2021.  Ex. 89, at D003113132.

213.    For children in care on September 30, 2022, over 75 percent of children in foster care in West Virginia were in custody for less than 18 months. Ex. 88, at D003112950.

Respectfully submitted,

/s/ Philip J. Peisch
Philip J. Peisch (WVSB #13731)
Caroline M. Brown
Julia M. Siegenberg
Rebecca L. Wolfe
Trevor J. Rhodes
Brown & Peisch PLLC
1225 19th Street NW, Suite 700
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301

July 8, 2024

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants'

Statement of Undisputed Material Facts to be delivered to the following via ECF notification:

Marcia R. Lowry
Julia Tebor
Laura Welikson
A Better Childhood
355 Lexington Ave., Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Brian L. Ooten
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

J. Marty Mazezka
Disability Rights of West Virginia
5088 Washington St. W., Suite 300
Charleston, WV 25301

July 8, 2024

/s/ Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg, *pro hac vice*
Brown & Peisch PLLC
1225 19th Street NW, Ste. 700
Washington, DC 20036


/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301

1