# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| JIM JUSTICE, in his official capacity as | ) | Case No. 3:19-cv-00710 |
| Governor of West Virginia, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Steve R. Compton (WVSB # 6562)
Deputy Attorney General
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Telephone: 304-558-2131
Fax: 304-558-0430
Email: Steven.R.Compton@wvago.gov

Philip J. Peisch (WVSB # 13731)
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg, *pro hac vice*
Brown & Peisch PLLC
1225 19th Street NW, Ste. 700
Washington, DC 20036
Telephone: 202-499-4258

*Attorneys for Defendants Jim Justice, et al.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .......................................................................................................................... 1

STANDARD OF REVIEW ............................................................................................................ 2

ARGUMENT .................................................................................................................................. 3

    I.   Defendants are Entitled to Summary Judgment on the General Class's Substantive
         Due Process Claims. ...................................................................................................... 3

        A.   The Undisputed Facts Demonstrate that Defendants' Conduct Did Not "Shock the
            Conscience." .......................................................................................................... 3

    i.   Defendants Are Not Deliberately Indifferent to Caseloads. ................................. 4

    ii.   Defendants Are Not Deliberately Indifferent to Case Planning .......................... 6

    iii.   Defendants Are Not Deliberately Indifferent to the Placement Array. .............. 9

        B.   Plaintiffs Cannot Cite Any Evidence that Defendants' Policies or Practices Caused a
            Constitutional Deprivation on a Class-wide Basis. ..............................................11

    II.   Defendants are Entitled to Summary Judgment on the ADA Subclass's Claim ............... 14

        A.   Plaintiffs Cannot Establish Unjustified Institutionalization or Serious Risk Thereof
            on a Subclass-wide Basis. ..................................................................................... 15

        B.   Plaintiffs Do Not Seek Reasonable Modifications Because the State has a
            Comprehensive, Effectively Working Plan for Placing Children in the Community. 21

    III.   Defendants are Entitled to Summary Judgment on All of Plaintiffs' Claims Because
          the Relief Plaintiffs Seek Does Not Comply with Rule 23(b)(2) and Would Not
          Redress Plaintiffs' Alleged Injuries. ................................................................... 28

CONCLUSION ............................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ................................................... 3

*Arc of Washington State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005). ............................. 26, 32

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................... 36

*Bryson v. Stephen*, 2006 WL 2805238 (D.N.H. Sept. 29, 2006) ............................................ 32

*Clinton L. v. Wos*, 2014 WL 4274251, (M.D.N.C. Aug. 28, 2014) ......................................... 20

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ...................................................... 3

*Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45 (1st Cir. 2014) ...................................... 4, 16, 21

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ................................. 14

*Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163 (4th Cir. 2010) ....................... 3, 4, 7

*Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 2012) ............................... 26

*Harrison v. Burford*, 2021 WL 2064499 (S. D. W. Va. June 7, 2012) ..................................... 23

*Horne v. Flores*, 557 U.S. 433 (2009) ................................................................... 37

*Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481 (7th Cir. 2012) ......................................... 35

*Kisor v. Wilkie,* 139 S. Ct. 2400 (2019) ................................................................ 19

*Lewis v. Casey*, 518 U.S. 343 (1996). ................................................................... 4, 15

*Loper Bright Enters. v. Raimondo*, 603 U.S. ---, --- S. Ct. ---, 2024 WL 3208360 (2024) ............... 19

*M.D. by Stuckenberg v. Abbot*, 907 F.3d 237 (5th Cir. 2018) ............................................. 14, 15

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). ................................................ 1, 17, 18, 20, 25, 26, 27, 33

*Parrish v. Cleveland*, 372 F.3d 294 (4th Cir. 2004) .................................................... 4, 5

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) .......................................................... 19

*Patten v. Nichols*, 274 F.3d 829 (4th Cir. 2001) ....................................................... 1

*Rios v. City of Del Rio, Tex.*, 444 F.3d 417 (5th Cir. 2006) ............................................................ 3

*Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005). ........................................................ 27, 32, 33

*Sartin v. Macik*, 535 F.3d 284 (4th Cir. 2008) ............................................................... 23

*Shook v. El Paso,* 543 F.3d 597 (10th Cir. 2008) .......................................................... 34, 35

*Slider v. State Farm Mut. Auto. Ins. Co.*, 557 S.E.2d 883 (W.Va. 2001) ...................................... 23

*State ex rel. W. Virginia Dep't of Health & Hum. Res. v. Bloom*, 880 S.E.2d 899 (W. Va. 2022)... 5

*T.R. v. School District of Philadelphia*, 2019 WL 1745737 (E. D. Pa. April 18, 2019)………… 34

*United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023) ................................................. 18, 19, 20

**Statutes**

42 U.S.C. § 12132 ................................................................................................. 14

W. Va. Code § 49-4-405 ........................................................................................ 6

W. Va. Code § 49-4-608 ..................................................................................... 18, 22

**Federal Rules**

28 C.F.R. § 35.130 ............................................................................................ 19, 25

Fed. R. Civ. P. 23(b)(2) ...................................................................................... 34

Fed. R. Civ. P. 56(a) .......................................................................................... 2

Fed. R. Civ. P. 65(d) ......................................................................................... 36

## INTRODUCTION

The material facts are not in dispute in this case. The only disputes are about characterizations of those facts and whether they give rise to a violation of Substantive Due Process, Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act.[1] They do not.

Substantive Due Process "protects against only the most egregious, arbitrary governmental conduct" that "shock[s] the conscience," *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001) (cleaned up), and Plaintiffs' ADA claim requires Plaintiffs to prove that the entire ADA Subclass is subject to "unjustified institutionalization" and that Defendants lack "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings," *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 605-06 (1999).

In this case, the undisputed facts make clear that Plaintiffs cannot come close to meeting either of these high bars. For example, there is no dispute that, in the last several years, Defendants have, among many other things: reorganized the child welfare functions within the Department of Human Services ("DoHS") to improve caseworker support and supervision; dramatically increased caseworker compensation; reformed and expedited the caseworker hiring process; implemented the ChildStat program to better monitor and improve casework within each district; significantly expanded access to kinship family placements in the community; redesigned the Safe at Home Program from a federal demonstration to a sustainable, state-funded program to support higher needs children living in family homes; launched the Mountain Health Promise program to coordinate and improve access to a continuum of services for foster children; and, pursuant to an

---

[1] For ease of reading, this brief refers to Title II and Section 504 collectively as the "ADA," because they are generally interpreted coextensively, though the implementing regulations differ.

agreement with the U.S. Department of Justice ("DOJ"), transformed the system for delivering community-based behavioral health services for children, including by launching a statewide mental health crisis hotline, mobile crisis support, the Pathway to Children's Mental Health Services, and the Children with Serious Emotional Disorder Waiver program, which now provides hundreds of foster children with a broad range of community-based services.

Indeed, because of Defendants' efforts, the State's spending on community-based mental health services for foster children nearly tripled from 2015 to 2023, and the percent of foster children placed in residential treatment has decreased from 28 percent to 17 percent over the last decade.  Further, on a number of system-wide statistics compiled by the federal government, West Virginia's child welfare system is one of the highest performing systems in the country, despite serving a State with one of the highest rates of poverty and opiate addiction.  For example, according to the most recent available federal data, West Virginia has the third lowest rate of maltreatment of children in foster care in the country; West Virginia has the highest rate of placement stability of any State in the country; and West Virginia has the highest rate of placement in kinship care of any State in the country.

For the foregoing reasons, and for the reasons explained below, Defendants' motion for summary judgment should be granted.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the Court will view facts and inferences in the light most favorable to the nonmoving party, the nonmoving party must offer some "concrete evidence from which a reasonable" fact-finder "could return a verdict in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**ARGUMENT**

I.    **Defendants are Entitled to Summary Judgment on the General Class's Substantive Due Process Claims.**

While Substantive Due Process generally acts only as a negative prohibition on state action, its protections may also apply when the State "has taken an affirmative act to restrain [a] child's liberty" by placing the child in foster care. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010) (cleaned up).  However, Substantive Due Process "protects against only the most egregious, arbitrary governmental conduct—that is, conduct that can be said to shock the conscience." *Patten*, 274 F.3d at 834 (cleaned up).  To prove a violation, a plaintiff must prove the defendants' conduct (1) "shock[] the conscience" and (2) caused the plaintiff to be deprived of a constitutional "right." *See, e.g.*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998); *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 422-24, 426-27 (5th Cir. 2006) (citing *Collins v. City of Harker Heights*, 503 U.S. 115 (1992)).

Because this is a class action, Plaintiffs must prove their claim on a <u>class-wide</u> basis.  *See Lewis v. Casey*, 518 U.S. 343, 349-50 (1996).  This is a very high bar, and "[t]here are good reasons class-wide challenges" in foster care "are difficult to bring successfully": "there certainly is no reason to think judges or juries are better qualified than appropriate professionals" to operate child welfare systems.  *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014) (cleaned up).

A.    **The Undisputed Facts Demonstrate that Defendants' Conduct Did Not "Shock the Conscience."**

In *Doe v. South Carolina Department of Social Services*, the Fourth Circuit held that, to establish that the state's conduct "shocked the conscience" with respect to a foster child, a plaintiff must prove that the state was "deliberately indifferent" to the safety of that child.  597 F.3d at 175. This requires plaintiffs to prove, "setting aside 20/20 hindsight," *Parrish v. Cleveland*, 372 F.3d 294, 305 (4th Cir. 2004), that defendants "chose to ignore" a risk about which they were "plainly

3

placed on notice." *Doe*, 597 F.3d at 175; *accord Parrish*, 372 F.3d at 302-03.  State officials are not deliberately indifferent "if they responded reasonably to a perceived risk," or even if their response was negligent, *see Parrish*, 372 F.3d at 306-07 (cleaned up); *Doe*, 597 F.3d at 163, 175. Rather, plaintiffs must prove that defendants' action was so lacking that a reasonable fact-finder could infer "intent to cause harm." *Parrish*, 372 F.3d at 306-07 (cleaned up).

In this case, after narrowing the case at the motion to dismiss and class certification stages, *see* ECF Nos. 300, 351, this Court identified three sets of class-wide issues that remain with respect to Plaintiffs' Substantive Due Process claims: (1) whether Defendants are "deliberately indifferent" with respect to "caseload practice" and, if so, whether that "resultantly" exposed the General Class to constitutional harm on a class-wide basis; (2) "whether Defendants are deliberately indifferent" to "deficiencies in case planning" and, if so, whether that causes class-wide constitutional harm; and (3) "whether Defendants are deliberately indifferent to" "placement array" and, if so, whether that causes class-wide constitutional harm.  *See* ECF No. 351, at 17, 20, 24 (emphasis added).

The undisputed facts demonstrate that Defendants are not deliberately indifferent with respect to any of these three issues.

### i.    Defendants Are Not Deliberately Indifferent to Caseloads.

As the West Virginia Supreme Court of Appeals concluded two years ago, Defendants are "committed to addressing the challenges presented by [DoHS] staffing issues."  *State ex rel. W. Virginia Dep't of Health & Hum. Res. v. Bloom*, 880 S.E.2d 899, 910-11 (W. Va. 2022).  To begin with, DoHS has repeatedly increased caseworker compensation.  *See* Defendants' Statement of Undisputed Material Facts ("SUF"), ¶¶ 100, 101, 105, 114, 118, 122, 123.  In 2019, base annual compensation for Child Protective Service ("CPS") and Youth Services ("YS") caseworkers ranged from $27,732 to $64,812; today, it ranges from $44,850 to $80,625.  *See* SUF, ¶ 129.  DoHS also implemented retention bonuses and created special hiring rates and hiring bonuses for targeted

4

counties experiencing particularly high vacancy rates. *Id*. ¶¶ 113, 117, 124. In addition, in 2023, Defendants moved responsibility for caseworker hiring and compensation from the West Virginia Division of Personnel, to the Office of Shared Administration, which has substantially expedited the time it takes to hire new caseworkers and gives DoHS the authority to continue to increase compensation for caseworkers without approval from the Division of Personnel. *See id*. ¶ 125.

Beyond increases in compensation and changes to the hiring processes, in the last several years, DoHS has also: created a "career ladder" for promotions for caseworkers, SUF, ¶ 100; created new paraprofessional staff positions to decrease the workload for caseworkers, *id*. ¶¶ 103, 120; created a summer internship program for college students interested in working as caseworkers, *id*. ¶ 126; launched the Mountain Health Promise program, which provides care coordinators to help caseworkers coordinate health care and socially necessary services for foster children, *id*. ¶¶ 60-61, 165; and contracted with Marshall University to develop and implement training and coaching to address caseworkers' secondary traumatic stress and vicarious trauma. *Id*. ¶ 115.

DoHS's work has decreased caseworker turnover, vacancy, and workloads. As of May 2024, DoHS vacancy rates for CPS and YS positions was 17 and 14 percent, down from 27 and 35 percent in May 2022. SUF, ¶¶ 130-133. DoHS has decreased the turnover rate among CPS and YS workers from 34.1 percent in 2021, to 22.3 percent in 2023. *Id*. ¶ 134. Moreover, the ratio of caseworkers to children in foster care has significantly improved, from approximately one caseworker for every 12 children in May 2022, to approximately one caseworker for every nine (9) children in May 2024. *Id*. ¶¶ 135-136.

Given these undisputed facts, Plaintiffs cannot meet their burden of proving that Defendants "chose to ignore" any risks created by caseworker caseloads. *See Doe*, 597 F.3d at

175.  While Defendants acknowledge that there is still much work to be done to decrease caseworker workloads, it cannot be plausibly argued that Defendants have been deliberately indifferent to this issue.

### ii.    Defendants Are Not Deliberately Indifferent to Case Planning.

DoHS policy requires that: all new caseworkers receive 240 hours of training and pass a competency test prior to carrying a caseload, SUF, ¶ 63; all new caseworkers receive a graduated caseload as they are transitioning to field work, *id*. ¶ 64; every foster child (including those placed out-of-state) must receive a visit from a caseworker at least monthly, *id*. ¶ 65; and all foster children are scheduled for an initial HealthCheck screening (including a full physical exam and mental health screening) within five days of a child's placement, and at least every year thereafter.  *See id*. ¶ 62.  In addition, West Virginia law and DoHS policy require that a child's Multidisciplinary Treatment Team convene within 30 days to "assess, plan and implement a comprehensive, individualized service plan."  W. Va. Code § 49-4-405(a).  Plaintiffs admit that West Virginia laws and policies governing case planning are consistent with federal law.  *See* SUF, ¶ 69.

Moreover, DoHS's Division of Planning and Quality Improvement ("DPQI") visits one district per month to review 10-15 randomly selected cases to evaluate, among other things, case workers' case planning performance, the findings from which are shared with DoHS leadership and the district offices to help inform future policy and to improve case planning.  SUF, ¶ 68.

In addition to these longstanding policies and practices, Defendants have taken a number of important actions to improve case planning over the last several years.  For example, in 2021, DoHS split the Bureau for Children and Families into two agencies, the Bureau for Family Assistance and the Bureau for Social Services ("BSS"), so that BSS could focus primarily on child welfare, which ensures that all supervisors have deep experience with child welfare and case planning.  SUF, ¶ 83.  In addition, over the last five years DoHS has: devoted significant resources

to decreasing caseworker caseloads, *see* § I(A)(i), *supra*; created a position for CPS Seniors to act as coaches and mentors for junior caseworkers, SUF, ¶ 100; implemented reflective supervision to promote effective, trauma-informed supervision of caseworkers and case planning, *id*. ¶ 72; implemented a uniform statewide process for supervisors to perform reviews of casework in open cases, *id*. ¶¶ 78, 90; partnered with Epiphany Consulting to provide a 14-week training program to improve leadership skills and cultivate a culture of excellence and collaboration within the caseworker workforce, *id*. ¶ 127; and created Training and Technical Assistance teams to work with districts to address areas needing improvement identified during DPQI reviews, including on challenges identified related to case planning. *Id*. ¶ 91.

More recently, in 2023, DoHS initiated the ChildStat program, a continuous quality improvement initiative that uses data analysis and case review to drive positive outcomes for children and families. SUF, ¶ 97. In ChildStat, each district presents data on the district's performance metrics to DoHS leadership every year, based on which DoHS leadership sets future performance improvement goals that it expects the district to achieve by the district's next ChildStat meeting. *Id*. ¶ 97(a). Workload management, time to first contact, quality monthly caseworker visits, and case planning were identified as areas for monitoring, tracking and assessing progress in the first year of the ChildStat program. *Id*. ¶ 97(b).

In part because of this sustained focus on case planning, the State maintains some of the best permanency, placement stability, and safety outcomes in the country. For example, in 2021 West Virginia ranked first in the nation in placement stability. SUF, ¶ 200. In 2022, using the federal government's calculations of moves per 1,000 days in care, West Virginia had a placement stability rate of 2.58, compared to a national rate of 4.48, and more than half of children in DoHS custody spend their entire time in foster care in only a single placement. *Id*. ¶¶ 199, 202. In

addition, in 2022, 64 percent of children in care for 12-24 months achieved permanency in 12 months, well above the national performance of 43.8 percent; and 56.7 percent of children in care for more than 24 months achieve permanency in 12 months, well above the national performance of 37.3 percent. *Id*. ¶¶ 208, 209.  Finally, West Virginia has the third lowest rate of maltreatment in care of any child welfare system in the country, with less than three (3) incidents per 100,000 days in care, less than half the national performance of 9.07 incidents per 100,000 days. *Id*. ¶ 204. The State has decreased the rate of maltreatment in care from 3.87 incidents in 2019 to 2.69 in 2021. *Id*. ¶ 203.  The rate of children re-entering foster care has also decreased from 8.3 percent in 2021 to 7.1 percent in 2022.  *Id.* ¶ 207.

Plaintiffs' purported expert, Samuel Hickman, criticizes DoHS for not requiring caseworkers to have a degree in social work and for failing "to maintain adequate resources, improve salaries, and create an organizational culture that promotes family preservation and delivers adequate services to children."  Ex. 29, at 2.[2]  While it is not surprising that the former Executive Director of an association representing the interests of professionals holding a social work degree opposes Defendants' efforts to expand its applicant pool to include caseworkers who do not have a degree in social work, the legislature's decision to do so is exactly the type of reasonable policy decision that courts do not second-guess in analyzing Substantive Due Process claims.  Further, it is demonstrably false that DoHS has not "improve[d] salaries," *see* page 4, *supra*, and Mr. Hickman provides no support for his opinion about DoHS's "organizational culture."

---

[2] "Ex." refers to an exhibit attached to the July 8, 2024 declaration of Philip J. Peisch submitted in support of Defendants' motion for summary judgment.

iii.     **Defendants Are Not Deliberately Indifferent to the Placement Array.**

Defendants have undertaken extensive, continuous efforts to expand the array of placements available for foster children. The lynchpin of these efforts are kinship homes, which the federal government and national child welfare experts favor over other placements, because they tend to be the most stable placement; children in kinship homes tend to maintain closer ties to their communities; and kinship families are more likely to accept high needs children, Ex. 22, at 24. While West Virginia has a long history of success with kinship placements, it supercharged those efforts in 2018 and 2019 by redesigning its kinship policies and practices, including with respect to training and certifying those families, and launching the Kinship Navigator Program to assist and support kinship families. *See* SUF, ¶¶ 139, 141-142. In addition, in 2020 and 2021, DoHS: developed an incentive payment program to support kinship families as they complete the certification process, *id*. ¶ 147; implemented the Connect Our Kids platform to assist caseworkers locating kin placements, *id*. ¶ 144; and increased monthly payment rates for uncertified kinship families by 45 percent. *Id*. ¶ 149. As a result of these and other efforts, as of May 2024, approximately 53 percent of foster children in West Virginia (including juvenile justice youth) are placed in kinship homes, the highest rate in the country and an increase from approximately 16 percent in May 2014. *See id*. ¶¶ 189, 190.

In addition to expanding access to kinship homes, Defendants have worked to expand the availability of licensed foster homes for children for whom kinship placements are not available, including therapeutic foster family placements. *See* SUF, ¶¶ 150-151. For example: in 2020, DoHS provided an increase to the monthly foster care subsidy rate, and provided additional increases based on a child's age, from $600 per month for all ages, to $790 for 0-5, $851 for 6-12, and $942 for 13-21, *id*. ¶ 143; in 2021, DoHS implemented a higher per diem payment rate for

Child Placing Agencies[3] placing high needs children in family homes, *id*. ¶ 150; in 2023, DoHS conducted a survey of foster families to inform its efforts to recruit, retain, and support foster families, *id*. ¶ 153; in 2023, DoHS increased the administration rate for Child Placing Agencies by 10 percent for recruiting and certifying family foster homes, including therapeutic foster homes; *id*. ¶ 154; and, in 2024, DoHS launched a statewide campaign to recruit additional foster families. *Id*. ¶ 156.  As of May 2024, there are 4,960 West Virginia foster children placed with licensed foster families or with kinship families.  *Id*. ¶ 157.

In part because of these efforts relating to kinship and foster family placements, West Virginia has significantly increased the number and percentage of children placed in the community, all while the number of children entering foster care has grown substantially as a result of the opioid epidemic.  In May 2014, 70 percent of foster children were placed in a family home (3,086 children); in May 2024, 81 percent of foster children were placed in a family home (4,960 children), an increase of 11 percent and an increase of 1,874 children living in family placements. SUF, ¶¶ 187-188.  Similarly, in May 2014, 28 percent of foster children were placed in residential treatment, whereas in May 2024, only 17 percent were placed in residential treatment.  *Id*. ¶¶ 187-188.  When juvenile justice youth – who are specifically ordered by circuit courts to be placed in residential treatment for the sole purpose of receiving intensive mental and behavioral health services, sometimes as an alternative to placement in a juvenile detention center – are removed from the calculation, 92 percent of foster children are placed in family homes.  *Id*. ¶ 193.

Plaintiffs' purported expert, Susan Ault, appears to opine that "West Virginia does not have an adequate array of placement options."  Ex. 27, at 38.  However, far from concluding that

---

[3] DoHS contracts with ten Child Placing Agencies throughout the State to recruit, train, license or certify, and provide case management to foster family homes for children in foster care. SUF, ¶ 28.

Defendants are negligent (let alone "deliberately indifferent"), Ms. Ault does not even address Defendants' efforts to recruit or retain community-based foster care placements; indeed, Ms. Ault does not identify any additional steps Defendants could take to recruit additional community-based foster placements. *See generally* Ex. 27. Further, Ms. Ault admits that her review and assessment of West Virginia's placement array was limited to 105 foster care cases, 30 of which Plaintiffs specifically requested be for children who were not placed in the community. Ex. 28, Tr. 223:4-224:12; *id*. at 226:5-20. Finally, Ms. Ault's ignorance of basic facts related to class-wide placement issues – such as the number of General Class members placed in the community compared to those placed in residential, or the fact that West Virginia does provide therapeutic foster care – renders her conclusions with respect to placement array unreliable, especially with respect to class-wide harm. *See, e.g*., Ex. 28, Tr. 230:5-231:13.

Defendants do not dispute that more family homes are needed to serve certain older children with serious behavioral health needs, and Defendants are continuing their work to recruit more. However, the undisputed facts about ongoing work by DoHS to expand access to kinship and foster family homes preclude any finding that Defendants "chose to ignore" any issues relating to the array of community-based placements.

### B.    Plaintiffs Cannot Cite Any Evidence that Defendants' Policies or Practices Caused a Constitutional Deprivation on a Class-wide Basis.

While Defendants strive to provide optimal services, placements, and outcomes for all foster children, Substantive Due Process does not guarantee foster children "maximum personal psychological development, optimal treatment, or the most appropriate care," and it does not afford foster children "the right to be free from any and all psychological harm at the hands of the State." *M.D. by Stuckenberg v. Abbot*, 907 F.3d 237, 250-51 (5th Cir. 2018). Rather, Substantive Due Process only protects a foster child's right to "basic human needs—*e.g.*, food, clothing, shelter,

11

medical care, and reasonable safety," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989), including freedom from "maltreatment," freedom from "unnecessary intrusions into the child's emotional wellbeing"; and "conditions and duration of foster care reasonably related to the purpose of government custody." *See* ECF No. 300, at 13-16.

In class actions, plaintiffs must prove that defendants' deliberate indifference <u>caused</u> the entire <u>class</u> to suffer, or <u>caused</u> the entire <u>class</u> to face an "imminent[]" risk of suffering, a deprivation of one of the constitutional "basic human needs." *See Lewis*, 518 U.S. at 349-50; *M.D.*, 907 F.3d at 253. "Establishing a direct causal link between the State policy and the constitutional deprivation" on a class-wide basis "is a high threshold of proof"; "[t]his connection must be more than a mere but for coupling between cause and effect," and it must be determined whether "each and any policy or practice" caused the constitutional violation. *M.D.*, 907 F.3d at 253 (cleaned up).

In this case, the undisputed facts show that the overwhelming majority of class members are <u>not</u> subject to maltreatment; "unnecessary intrusions into" their "wellbeing"; unacceptable conditions or unnecessarily long duration in foster care; lack of treatment, care or services; or any other deprivation of "basis human needs." For example, less than 1 percent of children in foster care in West Virginia were determined to be maltreated, SUF, ¶ 205; over 75 percent of children in foster care are in custody for less than 18 months, *id*. ¶ 213; and in 2022, more than half of children in foster care had only one placement, *see id*. ¶ 202. In fact, as explained above, West Virginia has the third lowest rate of maltreatment of any child welfare system in the country, in 2021 ranked first in the nation in placement stability, and in 2022 averaged just over two (2) moves per 1,000 days in foster care. *Id*. ¶¶ 204, 200, 199. DoHS also provides millions of dollars a year

12

in community-based mental health services to thousands of General Class members.  SUF, ¶¶ 158(i)-(j), 165(e).

Given these undisputed facts, there is no plausible argument that General Class members face an "imminent" risk of a deprivation of "basic human needs" on a <u>class-wide basis</u>.  *Cf. Connor B.*, 774 F.3d at 50-56 (rejecting Substantive Due Process Claim in part because only one percent of foster children experienced maltreatment).

Nor can Plaintiffs point to any evidence proving a causal link between Defendants' policies and practices relating to caseworker caseloads, case planning, or placement array and a deprivation of "basic human needs" (or "imminent risk" thereof) on a class-wide basis.  Plaintiffs' supposed expert, Ms. Ault, suggests that some system deficiencies caused harm on a class-wide basis, Ex. 27, at 2, but many of Ms. Ault's findings involve DoHS's services to parents (not foster children) or to children who are not in foster care (and thus not in the General Class), and she makes <u>no</u> findings regarding maltreatment or psychological harm to foster children while they were in care, instead focusing on regulatory compliance, such as whether a case plan was completed within 60 days.  *See e.g.,* Ex. 27, at 7, 13-14, 23-24, 36; Ex. 28, Tr. 116:20-117:6; 157:12-15; 160:19-164:12. While Ms. Ault offers anecdotal evidence that "high-risk infants," foster children "who have been sexually abused," and adolescent foster children <u>in the case files she reviewed</u> are not receiving certain services, these alleged issues only impact subsets of the General Class, and not the class as a whole, nor does she render any opinion about whether Defendants' policies or practices relating to caseworker caseloads, case planning, or placement array <u>caused</u> the alleged lack of services. *See e.g.,* Ex. 27, at 23-24, 29-30; Ex. 28, Tr. 203:10-204:8, 209:6-211:15.

II.     **Defendants are Entitled to Summary Judgment on the ADA Subclass's Claim.**

This Court has held that the common questions on Plaintiffs' ADA claim are "whether Defendants' provision of [community-based] services [for foster children with disabilities] is in fact deficient, and if so, whether the deficiency" violates the ADA.  *See* ECF No. 351, at 33.

Plaintiffs' claim arises under Title II of the ADA, which provides that a qualified individual with a disability shall not "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  In *Olmstead*, the state-defendant operated a Medicaid waiver program providing community-based mental health services, and the state's treatment professionals determined that those community-based services were appropriate for the two institutionalized plaintiffs, but the state declined to pay for those services, thereby resulting in the continued institutionalization of those two plaintiffs.  527 U.S. 581.  Under those facts, a plurality of the Supreme Court concluded that "unjustified institutionalization" was a form of discrimination that could violate the ADA in certain circumstances.  *Id.* at 600-06.

However, *Olmstead* stressed that institutional treatment was necessary for many patients and that States have significant "leeway" to maintain both institutional and community-based services.  *Id.* at 604-05.  As Justice Kennedy (joined by Justice Breyer) explained, it would be "unreasonable" and "tragic" "were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision."  *Id*. at 610-11 (Kennedy, J., concurring) (cleaned up).

Balancing these considerations, *Olmstead* held that institutionalization violates the ADA <u>only</u> if it is "unjustified" and that, to establish "unjustified institutionalization," a plaintiff must prove, among other things, that the individual was institutionalized; "'the State's treatment

14

professionals'" concluded that community-based services and placement are "'appropriate'" for that institutionalized individual; the State nevertheless declined to cover the community-based services for the institutionalized individual; and placement in the community is a "reasonable accommodation," considering "'the resources available to the State and the needs of others with mental disabilities.'" *See United States v. Mississippi*, 82 F.4th 387, 394 (5th Cir. 2023) (quoting *Olmstead*, 527 U.S. at 587).

In this case, the undisputed facts show that Plaintiffs cannot prove any of these elements of "unjustified institutionalization" on a subclass-wide basis.

### A. Plaintiffs Cannot Establish Unjustified Institutionalization or Serious Risk Thereof on a Subclass-wide Basis.

The undisputed facts show that ADA Subclass are not subject to actual institutionalization or "serious risk"[4] thereof on a subclass-wide basis. Only 17 percent of foster children are placed

---

[4] In *Pashby v. Delia*, the Fourth Circuit held that, in addition to actual unjustified institutionalization, "serious risk" of unjustified institutionalization could give rise to an ADA violation in certain circumstances. *See, e.g.*, 709 F.3d 307, 322-23 (4th Cir. 2013). In so holding, the court was "especially swayed" by DOJ's subregulatory statement that "'the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation.'" *See, e.g., id.* at 322 (quoting *Statement of DOJ on Enf't of the Integration Mandate of Title II of the ADA and Olmstead v. L.C.*, (June 22, 2011, rev. Feb. 28, 2020), https://www.ada.gov/resources/olmstead-mandate-statement/). *Pashby* is no longer good law in light of the Supreme Court's rejection of deference to an agency interpretation of its own regulations unless those regulations are "genuinely ambiguous," *Kisor v. Wilkie,* 139 S. Ct. 2400, 2414 (2019). *See Mississippi*, 82 F.4th at 393-94 & n.10 (holding that *Pashby* and other decisions endorsing the "serious risk of" theory "have been superseded by *Kisor*"). In addition, last month, in overturning *Chevron*, the Supreme Court held that "agencies have no special competence in resolving statutory ambiguities." *Loper Bright Enters. v. Raimondo*, 603 U.S. ---, --- S. Ct. ---, 2024 WL 3208360, *16 (2024) (cleaned up). Nothing in the text of the ADA suggests that Congress intended to prohibit some nebulous "risk" of unjustified institutionalization, and neither the ADA nor DOJ regulations (28 C.F.R. § 35.130) "define discrimination in terms of a prospective risk. . . . the statute refers to the actual, not hypothetical, administration of public programs." *Mississippi*, 82 F.4th at 392.

That said, this Court need not reach that issue because, even if *Pashby* is still good law, Plaintiffs cannot establish that the ADA Subclass faces a "serious risk" of unjustified

in residential treatment programs, whereas approximately 81 percent of foster children are placed in family homes.  SUF, ¶ 187.  An even smaller percentage of foster children are placed in residential treatment programs when juvenile justice youth are excluded:[5] over 90 percent of foster children in custody because of abuse or neglect are placed in family homes.  *Id.* ¶ 193.

In any event, the ADA does not prohibit placement in residential treatment programs, but only restricts such placements when (among other things) "the State's treatment professionals" have concluded that community-based services and placements are "appropriate" for the patient, *Olmstead*, 527 U.S. at 582.  Plaintiffs cannot point to any evidence suggesting that the State's treatment professionals made such a finding for most or all ADA Subclass members placed in residential treatment.  In fact, Plaintiffs' own expert, Dr. Lisa Prock, readily admits that she cannot quantify how many of the foster children placed in residential treatment are appropriate for community-based services, and she acknowledges that making such a determination is an "individualized" inquiry requiring consideration of each child's unique needs.  Ex. 26, Tr. 223:4-225:20.  This is exactly why the Fifth Circuit recently observed that analyzing the appropriateness of institutional placement for patients with behavioral health needs is "necessarily patient-specific" and thus inappropriate for resolution on a "system-wide" basis.  *Mississippi*, 82 F.4th at 394; *see also Clinton L. v. Wos*, 2014 WL 4274251, *6 (M.D.N.C. Aug. 28, 2014) ("There is . . . no simple formula to determine whether an individual is at 'significant risk' of institutionalization.  Indeed, the necessary inquiry is fact-intensive and is affected by numerous variables.").

---

institutionalization on a subclass-wide basis, and the undisputed facts establish that Defendants have a comprehensive, effectively working plan to place foster children in the community.

[5] In West Virginia, unlike in most States, circuit courts place many juvenile justice youth into DoHS foster care custody <u>for the purpose</u> of receiving residential treatment, and these juvenile justice youth in DoHS custody are considered "foster children" by the State.

Plaintiffs make no effort in this case to individually analyze all ADA Subclass members placed in residential treatment to determine the extent to which the State's treatment professionals determined that any are appropriate for community-based placement or why any such youth were not placed in the community (*e.g.*, Was there a family willing to accept the child? Did the circuit court order residential treatment over DoHS's objection?). The closest Plaintiffs come to doing so is their purported expert, Dr. Prock, repeating DoHS's finding that, in 2021, "44% (of 372 residential treatment cases reviewed) of children . . . 'should not have necessitated placement in a residential treatment facility.'" Ex. 25, at 21. However, this means that 56 percent of the small minority of youth placed in residential treatment necessitated such a placement, and an even smaller percentage of the approximately 4,000 foster children with behavioral health diagnoses were in residential treatment placements when they could have been served in the community, SUMF, ¶ 185(c), which precludes a finding of subclass-wide liability. *See Connor B.*, 774 F.3d at 61-62 (holding that finding that between 15 percent and 35 percent of class members did not have a case plan, and many others had "incomplete" case plans that did not comply with the statute, was "not enough to prove that [defendant] is out of compliance with the statute vis-à-vis the class").

Dr. Prock also neglects to mention that the very reason DoHS commissioned the 2021 review was to "assist the state in determining what level of intervention is necessary amongst existing community-based services that can be utilized to keep the youth in a home-like setting and what new services may need to be developed;" over half the youth reviewed were ordered <u>by courts</u> into the placements in juvenile justice proceedings (Youth Services cases); and the DoHS review did not conclude that the reason the lower needs children remained in residential treatment was the lack of community-based services (as opposed to, for example, a court order requiring the youth to remain in residential treatment, or difficulty finding a family willing to accept an

17

adolescent with a challenging behavioral history). Ex. 138, at D001469059, D001469061. Unfortunately, in part because of the trauma that they have experienced, some foster children face serious behavioral health challenges and exhibit dangerous behaviors that necessitate residential treatment, and it may be extraordinarily challenging to find families willing to accept such children in their homes, even when they complete residential treatment and/or community-based treatment is theoretically possible.  For example, every year DoHS serves hundreds of foster children – including youth placed in DoHS custody through juvenile justice proceedings – with a history of self-harm, suicidal ideation, fire-setting, and/or physical or sexual violence against others.  SUF, ¶ 10.  The ADA does not compel DoHS to guarantee the availability of families willing to accept children with such behaviors, and Plaintiffs cannot cite any binding caselaw that suggests it does.

Regardless of the child's behavioral history or diagnoses, DoHS will not recommend residential treatment to the circuit court unless a treatment professional completes a Child and Adolescent Needs and Strengths ("CANS") assessment showing that such treatment is appropriate for the individual child, SUF, ¶ 41, and West Virginia law requires that a circuit court analyze whether such a placement is the "least restrictive" setting "appropriate" to the individual child's needs.  W. Va. Code § 49-4-608(e)(3); *see, e.g.*, SUF, ¶¶ 34-35, 37.  Accordingly, ADA Subclass members are generally placed in residential treatment <u>because</u> the state's treatment professionals <u>and</u> the circuit court concluded that such placement was the most appropriate, least restrictive placement.  *See, e.g.*, SUF, ¶ 37; Ex. 157 (filed under seal).

Not only does *Olmstead* prohibit liability under these undisputed facts, but so do principles of res judicata in cases where a circuit court has concluded a placement was the "least restrictive" placement appropriate to the child's needs.  *See Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008) ("Federal courts must give the same preclusive effect to a state court judgment as the forum that

rendered the judgment would have given it."); *Harrison v. Burford*, 2021 WL 2064499, *3 (S. D. W. Va. June 7, 2012) (applying West Virginia law to determine applicability of res judicata); *Slider v. State Farm Mut. Auto. Ins. Co.*, 557 S.E.2d 883 (W.Va. 2001).  *Cf.* ECF No. 351, at 27 (holding that policies or practices relating to placement decisions were <u>not</u> a common question capable of class-wide review "[b]ecause Defendants have no authority to make placement decisions").

Nor do Plaintiffs allege that Defendants refuse to cover Medicaid community-based services for any children for whom such services are medically necessary.  To the contrary, Plaintiffs admit that they are "not aware of any instance in which Medicaid has declined to cover a service for any foster child that has been determined by [DoHS] to be medically necessary"; that they are "not currently aware of any health care service that Defendants are required to provide to the General Class under federal law . . . that is not paid for by Medicaid"; and that they "are not currently aware of any written policies found in the [State's Medicaid] Policy Manual pertaining to the treatment of foster children that as stated violate" federal law.  SUF, ¶¶ 54, 56-57.  Plaintiffs also admit that they are "not aware of any foster child who has been denied a Medicaid service on the basis of disability"; are "not aware of any ADA Subclass members who [DoHS] excludes from participation in the Medicaid program on the basis of disability"; and "not aware of any ADA Subclass member who has been denied a Medicaid service on the basis of disability."  *Id.* ¶ 52.

Nevertheless, Plaintiffs contend that Defendants violate the ADA because there is not a sufficient number of community-based mental health service providers in West Virginia to serve all foster children, and because Defendants are unable to find community-based placements for some ADA Subclass members with serious behavioral health needs.  *See* ECF No. 351, at 33. Plaintiffs are effectively asking this Court to interpret the ADA as requiring States to ensure that there are sufficient <u>private</u> community-based service providers and <u>sufficient</u> <u>private</u> foster family

homes willing and able to serve all foster children in the community. Nothing in the text of *Olmstead* or the ADA supports such an interpretation.

Further, even if Plaintiffs' novel interpretation of the ADA was correct, Plaintiffs cannot establish that Defendants fail to ensure that ADA Subclass members receive community-based services and placements on a <u>subclass-wide basis</u>. To the contrary, Defendants have gone to great lengths to expand community-based services and placements. *See* § I(A)(iii), *supra*; § II(E)(i), *infra*. As a result, DoHS provided at least 12,050 foster children with $16,788,186 in community-based services in 2023, and the vast majority of foster children are placed in family homes. SUF, ¶¶ 185(a), (i), 187.

Plaintiffs may point to the report of Dr. Prock to support their theory that a lack of community-based services and placements causes subclass-wide unnecessary placement in residential treatment programs. There are a number of problems with Dr. Prock's report, which Defendants will raise in a subsequent *Daubert* motion. For example, to arrive at her opinion, Dr. Prock relies heavily on verbal reports she received from "staff" at five residential treatment programs she visited, Ex. 25, at 21, 24-25, but Plaintiffs' counsel (not Dr. Prock) cherry-picked the programs that Dr. Prock visited from the dozens of programs that serve children throughout the State, purportedly based on "convenience" to where Dr. Prock was staying in her single visit to West Virginia. Ex. 26, Tr. 34:7–35:10.

Regardless, Dr. Prock's report does not actually conclude that a lack of community-based services or placements cause the unnecessary placement of foster children in residential treatment (or a "serious risk" thereof) on a <u>subclass-wide basis</u>. Rather, Dr. Prock opines that some unspecified number of foster children are unnecessarily placed in residential treatment because of a lack of community-based services or placements, admitting in her deposition that she did not

attempt to quantify or measure the scope of the alleged problem (other than by repeating the 2021 DoHS findings discussed above). Ex. 26, Tr. 221:18-222:16, 205:16-206:5; Ex. 25, at 20-21.

**B.      Plaintiffs Do Not Seek Reasonable Modifications Because the State has a Comprehensive, Effectively Working Plan for Placing Children in the Community.**

To prevail on an *Olmstead* claim, the plaintiffs must prove that the relief they seek is a "reasonable modification" of the defendants' programs, and defendants can defeat such a claim by "demonstrat[ing] that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see Olmstead*, 527 U.S. at 603. "[A] court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence" to support that the modification sought is reasonable. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (cleaned up).

*Olmstead* held that the "reasonable modification" element of an ADA claim gives States significant "leeway" in maintaining both institutional and community-based services:

> If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

527 U.S. at 584, 605-06 (citations omitted); *accord, e.g.*, *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615, 619 (9th Cir. 2005). "So long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons 'with an even hand,'" courts should "not interfere." *Braddock*, 427 F.3d at 620.

In *Sanchez v. Johnson*, the Ninth Circuit affirmed summary judgment on the ground that the State had a "comprehensive, effectively working plan," because the State "has a successful record of personalized evaluations leading to a reasonable rate of [deinstitutionalization]" and "has

21

undertaken to continue and to increase its efforts to place current residents of Developmental Centers into the community when such placement is feasible." 416 F.3d 1051, 1067-68 (9th Cir. 2005).

Similarly, in this case, West Virginia has a "comprehensive, effectively working plan for placing" foster children with disabilities in the least restrictive settings appropriate, and Plaintiffs do not allege that Defendants delay access to community-based services "to keep [the State's] institutions fully populated,"[6] *Olmstead*, 527 U.S. at 605-06. There is no dispute that DoHS policy, like the State's policies in *Sanchez*, require "personalized evaluations" for determining whether a child should be placed is residential treatment, and West Virginia state law has long required circuit courts to determine if such placements are "appropriate" and the "least restrictive one (or most family-like one) available." W. Va. Code § 49-4-608(e)(3); *see also, e.g.*, SUF, ¶¶ 34-35, 41. In addition, there is no dispute that DoHS provides mental health screening for all foster children promptly upon entering care, SUF, ¶¶ 62, 171; offers therapeutic foster care homes trained to support children with high needs in the community, *id.* ¶¶ 27(k), 150; covers all medically necessary community-based mental health services to foster children through the Medicaid state plan, *id.* ¶¶ 44-45, 48-49, 51-53; and provides extensive community-based services for foster children with behavioral health needs and/or developmental disabilities. *See id.* ¶¶ 158, 164, 166-168, 171, 172, 185. Plaintiffs do not even allege that Defendants lack an individualized process for determining appropriate placements, fail to cover certain community-based services, or refuse to pay for community-based placements for foster children. ECF Nos. 1, 131, 319; SUF, ¶¶ 51-52, 54, 56-57.

---

[6] The private residential treatment programs at issue in this case are not owned by the State, and thus the State does not have a financial incentive to keep those programs "fully populated."

In addition, over the last several years, Defendants have engaged in an expensive, sustained effort to expand access to community-based behavioral health services and minimize residential treatment.   In May of 2019, before Plaintiffs filed their Complaint, DoHS entered into a Memorandum of Understanding with DOJ ("DOJ MOU") to resolve DOJ's allegation that, prior to 2015, some children with mental health needs (including foster children) were unnecessarily placed in residential treatment programs.  SUF, ¶ 159.  Under the DOJ MOU, the State agreed to, among many other things: re-screen children to determine if they should be referred for further mental health services; expand and develop community-based services, including behavioral support services, in-home therapy, children's mobile crisis response, and therapeutic foster care; re-assess children placed in residential treatment to determine if the setting is still appropriate for that child; and develop a Quality Assurance and Performance Improvement system to allow the State to assess the quality of its mental health services and timely address gaps in services across the State.  *Id*. ¶ 160.

As required by the DOJ MOU, DoHS developed an implementation plan to govern the transformation of its mental health system and hired an independent subject matter expert to provide technical assistance and recommendations for complying with the agreement.  *See* SUF, ¶ 162.  The subject matter expert prepares comprehensive reports on the status of the State's compliance with the agreement twice a year, which are publicly available.  *See id*. ¶ 163.

Pursuant to or in addition to the requirements of the DOJ MOU, DoHS has launched several new programs and initiatives over the last five years to expand access to community-based behavioral health services for children, including foster children:

- In 2019, the State redesigned the Safe at Home program from a federal demonstration, to a sustainable, state-funded program serving children at risk of residential treatment statewide.  SUF, ¶ 164. Under Safe at Home, each child receives a "wraparound facilitator" (in addition to the BSS caseworker) who identifies and coordinates "wraparound"

community-based services to stabilize the child's family placement, including funding for recreational activities; adult life skills training; peer support; or targeted therapeutic services. *Id*. ¶¶ 164(a)-(b). As of May 2024, Safe at Home is serving 669 children, with each facilitator working an average caseload of 5.9 cases. *Id*. ¶ 164(g).

- In 2020, DoHS launched the Medicaid Children with Serious Emotional Disorder Waiver ("CSEDW") program to provide children with mental illness (including foster children) a broad range of community-based services, including: case management; crisis services; day services; independent living/skills building; supported employment; specialized therapy; and in-home family therapy and support. SUF, ¶¶ 166, 166(a)-(b). In 2023, the CSEDW program provided community-based mental health services to 352 foster children. *Id*. ¶ 166(j).

- In 2020, DoHS launched the "Mountain Health Promise" program, which is a managed care program operated under contract with Aetna Better Health of West Virginia ("Aetna"), designed to improve access to and coordination of a continuum of Medicaid health care services and socially necessary services for all foster children. SUF, ¶¶ 59, 60, 165. In addition to providing care coordination and a litany of community-based services, Mountain Health Promise includes: the Connect Our Kids platform to assist caseworkers in locating community-based placements, *id*. ¶ 144; "Deep Dive" reviews conducted by Aetna clinical staff to identify and make recommendations for step-down placements for children in residential treatment, *id*. ¶ 165(b); mandatory caseworker training on discharge planning for children in residential treatment, *id*. ¶ 165(d); and a process through which Aetna meets with providers to review discharge plans monthly for every foster child placed in residential treatment. *Id*. ¶ 165(c). As of April 2024, DoHS has spent $764,435,313.91 on Mountain Health Promise to serve more than 19,000 children. *Id*. ¶ 165(e).

- In 2021, DoHS launched a statewide Children's Mobile Crisis Response and Stabilization program to immediately connect children experiencing a crisis in the community (including foster children) with necessary crisis services, 24 hours a day, seven days a week. SUF, ¶ 172.

- In 2021, DoHS launched the Pathway to Children's Mental Health Services, also referred to as the "Assessment Pathway," to streamline the process through which children are assessed for and connected to community-based behavioral health services, including services delivered through the CSEDW program. *See* SUF, ¶ 171. As part of implementing the Assessment Pathway, DoHS expanded its contract with Acentra to perform Qualified Independent Assessments. *Id*. ¶ 171(d). Between January and June 2023, 1,417 foster children used the Assessment Pathway to access community-based mental health services. *Id*. ¶ 171(e).

- In 2022, DoHS launched the West Virginia Kids Thrive Collaborative website as a hub for information about all of the community-based mental health resources and services for providers and families in West Virginia. SUF, ¶ 175.

- In 2024, DoHS implemented the Certified Community Behavioral Health Center ("CCBHC") model, through which DoHS will certify and provide increased

reimbursement for community-based behavioral health clinics to provide integrated, coordinated community-based behavioral health services to children and adults throughout the state. SUF, ¶ 173.

As a result of these and other initiatives, total spending on community-based behavioral health services and other home- and community-based services for foster children nearly tripled from 2015 to 2023. Specifically, in 2023, DoHS spent $8,137,097 providing at least 4,463 foster children with Medicaid-funded community-based mental health services (including CSEDW services) or other home- and community-based service ("HCBS"), compared to $2,888,424 spent on providing such services to at least 2,983 foster children in 2015. SUF, ¶¶ 185(a)-(b), (i)-(j).

In addition, as previously discussed, Defendants have worked to expand the number of family placements available for foster children, which has included launching the "Kinship Navigator" program; significantly increasing payment rates for kinship families, foster families, and child placement agencies; partnering with Marshall University to study the needs of foster families; and launching a new statewide campaign to recruit more foster families. § I(A)(iii), *supra*.

As a result of all of these efforts, the State has substantially decreased reliance on residential treatment. While the foster care population skyrocketed in West Virginia from 4,317 children in December 2014 to 6,092 in December 2023, and the number of children experiencing serious mental health needs increased substantially nationwide, SUF, ¶ 186; Ex. 21, at 15, the number of foster children placed in the community increased from 3,086 children (70 percent of children in custody) in May 2014 to 4,960 children (81 percent of children in custody) in May 2024. SUF, ¶¶ 187-188. Similarly, the percentage of foster children placed in residential treatment decreased from 28 percent in May 2014 to 17 percent in May 2024 (inclusive of juvenile justice youth), and the number of foster children with a behavioral health diagnosis receiving residential treatment services decreased from 1,600 in 2018 to 961 in 2023. *Id*. ¶¶ 187-188, 185(e). That is, between 2014 and 2024, DoHS and its partners were able to recruit and identify 1,874 additional

community-based placements (kinship or foster homes) to accommodate the surge in children coming into custody and help decrease the percentage of children placed in residential treatment.

As the DOJ MOU independent subject matter expert has found, DoHS has "done an excellent job of establishing infrastructure and laying the groundwork for building a strong and successful system of HCBS for children and families" and, "[b]y creating systems for designing, implementing, and evaluating intervention services, DoHS is taking important strides towards the ultimate goal of reducing residential placements." Ex. 64, at D003097189. Similarly, Defendants' expert, Heidi Arthur, a clinical social worker with deep experience in behavioral health systems that service children, opines that Defendants have all of the necessary elements of a comprehensive plan to maximize community-based placements and services. Ex. 21, at 3-4, 28.

These undisputed facts establish that Defendants have a comprehensive, effectively working plan for maximizing community-based placements and services that warrants granting summary judgment on Plaintiffs' ADA claim. *See Sanchez*, 416 F.3d at 1067-68 (affirming district court granting summary judgment on the ground that the state had a comprehensive, effectively working plan); *Braddock*, 427 F.3d at 620-22 (affirming grant of summary judgment on the ground that state had a comprehensive, effectively working plan because its waiver program was sizeable, available "as slots become available," "has already significantly reduced the size of the state's institutionalized population," and experienced budgetary growth consistent with the growth other state agencies); *Bryson v. Stephen*, 2006 WL 2805238, *5-*8 (D.N.H. Sept. 29, 2006) (holding that the State's acquired brain disorders ("ABDs") waiver program was a comprehensive, effectively working plan because expenditures on the program had increased by approximately $6 million over five years; the ABD waiver program serves most eligible individuals with ABD; and the waiting list for the program moves at a "reasonable pace" of about one year).

As discussed above, Dr. Prock opines that there are still foster children with behavioral health challenges placed in residential treatment because of a lack of community-based services or placements. *See generally* Ex. 25. However, neither the ADA nor *Olmstead* require that the State's "comprehensive plan" yield a sufficient number of providers or family placements to serve all foster children with behavioral health or developmental needs. To the contrary, *Olmstead* expressly holds that States may have "waiting list[s]" for community-based services without violating the ADA, 527 U.S. at 605-06, and Plaintiffs cannot prevail on an *Olmstead* claim if the State "has undertaken to continue and to increase its efforts to" increase community-based placements "when such placement is feasible," *Sanchez*, 416 F.3d at 1067-68.

In her report, Dr. Prock appears to opine that she "did not see that West Virginia had taken significant action" or made "significant changes" with respect to community-based services for foster children. Ex. 25, at 10. This opinion is inexplicable given the undisputed facts discussed above and, when pressed at deposition, Dr. Prock admitted that she actually "d[id]n't have an opinion" on whether the Defendants' key initiatives to expand community-based mental health services (*e.g.*, Safe at Home, CSEDW program, Mountain Health Promise) constituted "significant action" or resulted in "significant change" to outcomes. Ex. 26, Tr. 109:19-110:14, 113:13-114:13, 116:12-122:6, 124:20-125:5, 202:19-205:3. Dr. Prock also clarified in deposition that her conclusion about lack of "significant action" and "significant change" was only about whether the "outcomes" for foster children had changed, and not the significance of Defendants' efforts, and that she did not review any data (subclass-wide data or otherwise) about those "outcomes." Ex. 26, Tr. 109:19-110:14, 113:13-114:13, 116:12-122:6, 124:20-125:5, 202:19-205:3. Finally, Dr. Prock readily admits she is not a "systems expert," making her unqualified to opine on whether Defendants have a "comprehensive" or "effective" system to minimize reliance on residential

treatment. *Id*. Tr. 49:3. In any event, Dr. Prock does <u>not</u> dispute that DoHS took all the actions described above to expand access to community-based services and placements, and whether she personally views them as "significant" is irrelevant.

### III. Defendants are Entitled to Summary Judgment on All of Plaintiffs' Claims Because the Relief Plaintiffs Seek Does Not Comply with Rule 23(b)(2) and Would Not Redress Plaintiffs' Alleged Injuries.

Plaintiffs in a Rule 23(b)(2) class action must prove that the relief sought would redress the alleged injury for "the class as a whole," Fed. R. Civ. P. 23(b)(2). In *Shook v. El Paso*, the Tenth Circuit upheld the denial of class certification where plaintiffs sought "safe" and "appropriate" conditions for prisoners with mental health needs because "what is 'safe and appropriate' depends on the nature and severity of an individual's mental illness," and thus class-wide relief could not be addressed in a "single injunction" that benefits the "class as a whole" without individual tailoring. 543 F.3d 597, 604-05 (10th Cir. 2008) (internal citations omitted). Similarly, in *T.R. v. School District of Philadelphia*, the court rejected relief requiring a school district "'to provide legally mandated translation and sufficient interpretation services,'" because it would "simply initiate[] a process through which highly-individualized" remedy determinations are made, *i.e.*, what is necessary for each putative class member to receive "legally mandated translation and sufficient interpretation services." 2019 WL 1745737, *22 (E. D. Pa. April 18, 2019); *see also Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481, 498-500 (7th Cir. 2012) (overturning district court's decision that putative class claims satisfied Rule 23(b)(2)).

In this case, as set forth in Appendix A,[7] most of the relief sought by Plaintiffs would violate Rule 23(b)(2), for two reasons. First, dozens of the requirements that Plaintiffs seek to impose would not benefit "the class as a whole" because they apply only to subsets of the General

---

[7] Plaintiffs' requested relief is summarized in Appendix A.

Class or ADA Subclass.  *See, e.g.*, App'x A, at 2, 3, 6-8, 10-13, 15-22, 25-29.   Second, much of

the relief Plaintiffs seek would not benefit the General Class or ADA Subclass "as a whole"

because it would not redress the alleged class-wide harm without "'relief specifically tailored to

each class member,'" *Shook*, 543 F.3d at 604 & 605 n.4 (quoting Fed. R. Civ. P. 65(d)(1); 5 Moore's

Fed. Prac. § 23.43(2)(b) (3d. 2000)).  For example, Plaintiffs seek an order: requiring Defendants

to provide all General Class members with "necessary services," "adequate reunification services,"

and an "adequate written evaluation"; requiring Defendants to change the permanency plan for

some General Class members "unless compelling reasons documented in the child's record exist

for why doing so is not in the child's best interests"; and prohibiting circuit courts from placing

any General Class member in residential treatment unless it is "the most integrated setting

appropriate to their individual needs."   App'x A, at 9-12, 17.  As in *T.R.*, this relief will "simply

initiate a process through which highly-individualized determinations" must be made about

whether the services each child receives are "necessary" and "adequate"; whether there are

"compelling reasons" to change a child's permanency plan; and whether a child's placement in

residential setting is the "most integrated setting appropriate" to the child's needs.

In addition to failing to comply with Rule 23(b)(2), Plaintiffs cannot prove that the relief

they request would redress their alleged injuries, which Plaintiffs have the burden of doing "in the

same way as any other matter on which the plaintiff bears the burden of proof," *Bennett v. Spear*,

520 U.S. 154, 167-68 (1997).  As set forth in Appendix A, dozens of the requirements that Plaintiffs

ask this Court to impose on Defendants either reflect longstanding DoHS policy (*e.g.*, caseworker

cannot receive a case until completing training), or are outside the control of Defendants (*e.g.*,

requirements for placement decision made by circuit courts), *see* Fed. R. Civ. P. 65(d) (injunctions

only bind the parties and their "officers, agents, servants, employees, and attorneys), and thus would have no impact whatsoever. *See* App'x A.

In addition, Plaintiffs cannot point to any evidence that much of the relief they seek would redress the General Class members' alleged constitutional injuries (deprivation of "basic human needs") or the ADA Subclass's alleged injuries ("unjustified institutionalization"). For example, there is no evidence (expert testimony or otherwise) to suggest that General Class members will be less likely to experience maltreatment or excessive time in custody if "[w]orkers with a mixed caseload have a prorated caseload" or if supervisors are limited to supervising no more than five caseworkers. *See* App'x A. In fact, as Defendants' expert James Dimas will testify, state child welfare programs subject to consent decrees analogous to the relief Plaintiffs seek here "failed to perform at a level comparable to states that have never been in consent decrees." Ex. 23, at 5.

Finally, as this Court has already observed, some of the relief Plaintiffs request is "troubling" and not within this Court's authority to order. *See* ECF No. 351, at 2 n.1. For example, Plaintiffs ask this Court to order Defendants to ensure that caseloads do not exceed 15 children per caseworker and to develop a different "matching process for matching children with the best available placement." *See* App'x A. Federalism and separation of powers principles preclude this type of relief, which would require this Court "to assume control of a state agency and direct how that agency manages its program and allocates its funds," *see* ECF No. 351, at 2 n.1. *See Horne v. Flores*, 557 U.S. 433, 448 (2009) (explaining that "institutional reform injunctions often raise sensitive concerns," and such "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities").

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

July 8, 2024

/s/ Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg, *pro hac vice*
Brown & Peisch PLLC
1225 19th Street NW, Ste. 700
Washington, DC 20036


/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants'

Memorandum in Support of Motion for Summary Judgment to be delivered to the following via

ECF:

Marcia R. Lowry
Julia Tebor
Laura Welikson
A Better Childhood
355 Lexington Ave., Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Brian L. Ooten
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

J. Marty Mazezka
Disability Rights of West Virginia
5088 Washington St. W., Suite 300
Charleston, WV 25301

July 8, 2024                                   /s/ Philip J. Peisch
                                               Philip J. Peisch (WVSB # 13731)
                                               Caroline M. Brown, *pro hac vice*
                                               Julia M. Siegenberg, *pro hac vice*
                                               Brown & Peisch PLLC
                                               1225 19th Street NW, Ste. 700
                                               Washington, DC 20036


                                               /s/ Steven R. Compton
                                               Steven R. Compton (WVSB #6562)
                                               West Virginia Attorney General's Office
                                               812 Quarrier Street, 6th Floor
                                               Charleston, WV 25301