**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

| | | |
|---|---|---|
| **Jonathan R., minor, by Next Friend, Sarah DIXON, *et al.,*** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Class Action |
| | ) | 3:19-cv-00710 |
| v. | ) | |
| | ) | |
| **Jim JUSTICE, in his official capacity as the Governor of West Virginia, *et al.,*** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

Defendants do not deny that the West Virginia child welfare system has been failing on multiple fronts to provide basic and fundamental care to children in their custody. Instead, they ask this Court to credit "policies" and "plans"—which, for the most part, they created after this litigation was commenced and some only within the last few months—while ignoring all the evidence showing that problems remain or are worsening. Defendants' "undisputed facts" are not only disputed; they are cherry-picked and/or irrelevant to the issues in this case. Defendants cannot escape liability through ineffectual action. This motion should be summarily denied.

Caseloads—which Defendants do not even track systematically and are for the most part measured not by individual children, but by families—remain unconscionably high, with the majority of caseworkers carrying caseloads well above full capacity, some up to triple-digits. Due to chronic staffing shortages, West Virginia continues to have a high backlog of abuse and neglect allegations, over three thousand as of late last year, leaving children in dangerous situations for far too long. In recent months, Defendants increased salaries for caseworkers, but they present no admissible evidence that this solved high caseloads, rapid employee turnover, or chronic understaffing. And Defendants have taken the same exact actions in the past to no avail. Payments to foster parents have modestly increased, but foster homes are closing their licenses faster than new ones open. Therapeutic foster homes are almost non-existent, particularly for vulnerable teenagers, and Defendants continue to steadily place children in high numbers in residential placements, some of which have lengthy records of physical and sexual abuse, and neglect.

Defendants rely on the deliberate indifference (or "shock the conscience") standard to escape liability, but in light of *Youngberg v. Romeo*, 457 U.S. 307 (1982) and *Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327 (4th Cir. 2021), the appropriate standard governing

Defendants' liability is whether their actions demonstrate a "substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323.

Further, Defendants focus on a handful of quantitative numbers—how they are performing in terms of permanency, maltreatment in care, and placement stability in comparison to federal averages—to argue that their case planning is not deficient. However, these numbers are misleading—West Virginia terminates parental rights faster than other states, which would lead to quicker time to permanency, it undercounts its maltreatment in care numbers, and it has not provided adequate data, or any data, on placement stability within the last two years.

Additionally, Defendants ignore all the qualitative statistics about West Virginia's performance, which metrics reflect their own internal reviews and show that several aspects of the child welfare system are poor and getting worse. Caseworkers fail to timely create and update case plans, fail to perform adequate visits with children, fail to make adequate contacts with parents and caregivers, and generally fail to provide sufficient mental and physical health services to foster children and their biological families or legal guardians. Defendants cite various actions they have taken to improve case planning, but these actions have plainly failed.

With respect to Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act, Defendants ignore their own duties to foster children by arguing without support that foster children end up in institutions for reasons outside of their control. They blame courts, foster parents, and even the children themselves. They also say that even if unnecessary institutionalization is still an issue, they have a "comprehensive and effectively working plan" to fix the problem. But voluminous discovery shows that not only are Defendants still unnecessarily institutionalizing children, their "plan" is ineffective, and they can provide no metrics or timelines by which to measure its success. Rather than ensuring there are sufficient community-based

services for these children, Defendants currently have plans underway to eliminate lower tiers of residential treatment facilities that serve children with moderate mental health issues. West Virginia health care providers have warned that the likely effect will only be to force these children into more restrictive settings than they need or leave them without adequate services, but Department of Human Services ("DoHS") executives dismiss these concerns out of hand. The Court should deny Defendants' Motion in full.

## ARGUMENT

### I.    THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE GENERAL CLASS'S SUBSTANTIVE DUE PROCESS CLAIMS BECAUSE NUMEROUS DISPUTES OF MATERIAL FACT REMAIN

When the State "involuntarily removes a child from her home, thereby taking the child into its custody and care," the Due Process Clause imposes "responsibility for [the child's] safety and general well-being." *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010). This includes both their physical and emotional well-being. *Jonathan R. v. Justice*, 2023 U.S. Dist. LEXIS 6658, at *21 (S.D. W. Va. Jan. 13, 2023); *see also Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 338-39 (4th Cir. 2021) ("*Shenandoah*") (Due Process extends to food, clothing, shelter, reasonable safety, medical and mental health care.).

### A.    The *Youngberg v. Romeo* "Substantial Departure" Test is the Appropriate Test

In *Shenandoah*, the Fourth Circuit held that where, as here, the State takes individuals into custody to provide treatment or care, it "fails to provide constitutionally adequate . . . care if it substantially departs from accepted professional standards," thus violating Substantive Due Process. 985 F.3d at 342 (citing *Youngberg v. Romeo*, 457 U.S. 307, 320-23 (1982) (holding that the constitutional standard of care provided to involuntarily committed mental health patients results in liability where "the decision by the professional is such a substantial departure from

3

accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"). The *Youngberg* standard, not the deliberate indifference (or "shocks the conscience") standard, is the appropriate test to analyze whether the State has violated the constitutional rights of the foster children Plaintiffs. That standard "is essentially a gross negligence standard." *Doe v. New York City Dep't of Social Services*, 709 F.2d 782, 790 (2d Cir. 1983).

While child welfare cases have historically borrowed from prisoner rights cases to determine the contours of foster children's constitutional rights, that reasoning must be revisited in light of *Youngberg* and its progeny, including *Shenandoah*. The deliberate indifference standard was developed to determine constitutional violations of convicted prisoners subject to punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But foster children, like the involuntarily committed patients in *Youngberg*, "are 'entitled to more considerate treatment and conditions' than criminals. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves. The officials who place the children are acting in place of the parents." *Yvonne L. v. N.M. Dep't of Human Servs.,* 959 F.2d 883, 894 (10th Cir. 1992) (quoting *Youngberg*, 457 U.S. at 321-22 and applying its standard to foster children's claims).

Although the Fourth Circuit has not addressed the question of which standard applies in the foster care context, numerous courts have held that the *Youngberg* standard is the appropriate one. *E.g.*, *id.*; *Doe*, 709 F.2d at 790; *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991); *Kenny v. Perdue*, 2004 U.S. Dist. LEXIS 27025, at *12 (N.D. Ga. Dec. 11, 2004); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 953 (M.D. Tenn. 2000). In *Shenandoah*, the Fourth Circuit relied on reasoning almost identical to that of the courts using the *Youngberg* standard in the foster care context. *See* 985 F.3d at 339-42 ("[T]hese children are held to give them care . . . and any facility

4

housing them must be 'capable of providing for the child's physical and mental well-being . . . Thus, the *Youngberg* standard is particularly warranted here, given the unique psychological needs of children and the state's corresponding duty to care for them.") (citations omitted). Therefore, the Court should use the *Youngberg* standard to determine whether Defendants substantially departed from accepted professional judgment.

**B.      Under Either Standard, Defendants' Motion Should Be Denied**

The standard for deliberate indifference is objective in the Fourth Circuit. See *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). "[I]t is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citation omitted). The State must then take "reasonable steps to cure the problem." *M.D. v. Abbott*, 907 F.3d 237, 261 (5th Cir. 2018) ("*Stukenberg I*"). Here, Defendants have not taken such reasonable steps. And in any event, Defendants are not entitled to summary judgment because numerous genuine disputes of material fact remain. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). As a threshold matter, Plaintiffs disagree with Defendants that claims which survived the motion to dismiss were effectively "narrowed" to the common questions that the Court identified as a basis to certify this class action. *See* Defs. Memorandum in Support of Motion for Summary Judgment ("Defs. Mem.") at 4. Defendants cite no authority, nor have Plaintiffs found any, for the proposition that class action plaintiffs' claims are limited to common questions. For example, it would be perverse to bar Plaintiffs from raising facts regarding direct harms they have suffered, such as maltreatment in care (an issue that Defendants themselves raise, Defs. Mem. at 2), simply because they do not fall within the categories of "caseload practice," "case planning," or "placement array." In any event, as discussed below, summary judgment with regard to these three categories is improper.

### i.      <u>**High Caseloads and Chronic Understaffing**</u>

Defendants argue that they are "committed to addressing" caseloads.[1] Defs. Mem. at 4. But this claim is based on distorted facts that Plaintiffs dispute. Defendants contend that the ratio of caseworkers to children in foster care has improved from approximately one caseworker for every twelve (12) children in May 2022 to approximately one caseworker for every nine (9) children in May 2024. Defs. Mem. at 5. Defendants appear to perform this calculation by taking the total number of children in foster care at these two points in time and dividing it by the total number of child services employees. Defendants' Undisputed Facts ("DUF") ¶¶ 135-36.[2] There are several problems with this calculation. First, it includes numerous individuals who do not, or are not intended to, carry independent caseloads—namely, coordinators and supervisors. Defs. Exs. 126, 127; Plaintiffs' Undisputed Facts ("PUF") ¶¶ 11, 18. Subtracting coordinators and supervisors from the May 2024 calculation leaves only 515 workers available to take on independent caseloads. And of those 515 workers, 177 have less than one year tenure. Defs. Exs. 126, 127. Per Defendants' policy, new caseworkers start with graduated caseloads, therefore many of those caseworkers presumably do not carry a full caseload. DUF ¶ 64. Lastly, Youth Service Workers and Supervisors typically work only with children in Youth Services and thus including them in the total is misleading. PUF ¶ 5. The same problems plague Defendants' calculations for May 2022.

In reality, Defendants do not know or routinely track actual caseloads. PUF ¶ 2. Defendants track cases by "family" until the rights of both parents are terminated. PUF ¶¶ 1, 2. As a result, a

---

[1] *State ex rel. W. Virginia Dep't of Health & Hum. Res. v. Bloom*, 880 S.E.2d 899 (W.Va. 2022), is inapposite. It concerned only Kanahwa county and it did not involve the federal constitutional or statutory claims that are at issue here.

[2] The number of employees includes all job categories: (1) Child Protective Service Workers; (2) Child Protective Service Workers, Sr.; (3) Child Protective Service Supervisors; (4) Child Protective Service Case Coordinators; (5) Social Services Workers 3-Youth Services; and (6) Social Service Supervisors – Youth Services. *See* Defs. Ex. 127.

caseworker could have 10 cases, but be responsible for managing far more children. Hypothetically, assuming 2-3 siblings per family (and some families are obviously larger), 10 cases might include 20-30 children, who could be in different locations, and each with unique needs and circumstances. In light of this, numerous agency executives, including former Secretary, Bill Crouch, former Deputy Secretary, Jeremiah Samples, and Deputy Commissioner of Field Operations South, Melanie Urquhart, all testified that tracking caseloads by individual child would be the best way to assess caseworker workloads and capacity. PUF ¶¶ 3, 4, 36(f). Defendants' expert, Uma Ahluwalia, testified to the same. PUF ¶ 37(a).

Caseload data that Defendants produced to Plaintiffs (which did not count caseloads by child) paints a much bleaker picture. According to this data, in May 2024: 67% of workers had a caseload of more than 10 cases; 46% had more than 20 cases; 31% had more than 30 cases; 19% had more than 50 cases; and 8% had more than 100 cases. PUF ¶ 21.[3] These numbers too underestimate the actual workload of workers, because in May 2024, 95% of caseworkers carried mixed caseloads (86% also had assessments, *i.e.*, investigations; 6% also had providers cases, and 3% had all three). PUF ¶ 22. For example, 24% of caseworkers in May 2024 had more than 10 cases and more than 12 assessments (equivalent to at least a 200% workload based on the recommendations of DHHR's 2022 Workload Study). PUF ¶¶ 10, 22. Therefore, the vast majority of Defendants' caseworkers carry a caseload well in excess of what DoHS has determined is manageable. PUF ¶¶ 5, 10, 22. Similarly, in May 2022, more than half (55%) of workers had more

---

[3] Defendants produced 2024 caseload data on July 19, 2024, after the close of written and deposition discovery. Lowry Decl. ¶ 2. This data does not distinguish between child and adult services workers and therefore Plaintiffs cannot accurately screen out adult services workers from their calculations. However, given the comparatively smaller pool of adult services cases and workers, their inclusion in the total likely skews in Defendants' favor. *See* PUF ¶ 20 (As of December 31, 2022, there were 89 adult protective services workers compared to 358 child protective services and 81 youth services workers).

than 10 cases, and 33% handled both cases and assessments. PUF ¶ 24.[4] Things have gotten worse. In May 2022, only 2% of caseworkers carried more than 10 cases and 12 assessments. PUF ¶ 24.

Defendants also claim that their caseworker turnover rates have improved, but they rely on evidence that is inadmissible. Defendants cite an unlabeled spreadsheet that appears to have been manually created without any indication as to who created it or what is the source for the information. *See* Defs. Mem. at 5, Def. Ex. 3C.[5] Neither Defendants' supporting declaration nor anything else lays a foundation for the document's admissibility. *See* Fed. R. Evid. 803(6); *Garrett v. City of Tupelo*, 2018 U.S. Dist. LEXIS 99630, at *9 (N.D. Miss. June 14, 2018) (records are "untrustworthy under Rule 803(6) when the . . . source of the information is unknown."); *compare* ECF No. 533-4, at 4 ¶ 21 *with* ECF No. 533-164, at 1 ¶ 3. Thus, Defendants cannot rely on this document in connection with summary judgment. *See Giles v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 59 F.4th 696, 704 (4th Cir. 2023) (inadmissible evidence cannot be relied on in connection with summary judgment). Additionally, other documents produced by Defendants show the cumulative turnover rate increasing since the beginning of 2024, making it unclear whether Defendants are cherry picking the dates to cite for turnover to give the appearance of constant improvement. PUF ¶ 31. A mountain of evidence demonstrates that high caseloads prevent caseworkers from fulfilling their responsibilities, including conducting thorough assessments and making meaningful contact with children and parents, or any contact at all. PUF ¶¶ 40-45. Such contact is necessary to perform adequate case and permanency planning, ensure appropriate services are being provided, and identify instances of maltreatment in care. High

---

[4] Defendants' own internal emails and Exit Reports also reflect excessive caseloads. *See, e.g.*, PUF ¶¶ 25(a)-(h), 35(a)-(i).

[5] Defendants produced this spreadsheet eleven days before the end of discovery, buried in a batch of several other documents, leaving Plaintiffs no real opportunity to review it or seek further written or oral discovery about it. Decl. of M. Lowry ¶ 3.

caseloads also lead to caseworker burnout and turnover. *See also Stukenberg I.*, 907 F.3d at 264 ("ample evidence in the record establishing that caseloads are extremely high and that there is a direct causal link between high caseloads and an increased risk of serious harm to foster children."). Nonetheless, Defendants improbably argue that there is no evidence that bringing caseloads within manageable limits will redress Plaintiffs' injuries. Defs. Mem. at 30.

Despite this evidence, former DHHR and DoHS executives testified that West Virginia has been doing excellent work to lower caseloads. *See, e.g.,* PUF ¶ 36(f). (Bill Crouch, former DHHR Secretary, testifying that he would "put what we do in West Virginia up against any state in the country."). Defendants ignore that for years they have faced a significant caseload problem and have done nothing new or different to address it. For example, Defendants ignored all the recommendations of the 2022 Workload Study that they commissioned at the behest of the West Virginia legislature. This Workload Study recommended that then-DHHR set a cap on the number of cases per worker and recommended a caseload of 8-9 cases and 11-13 assessments. PUF ¶ 10. The salary increases, hiring sprees, "career ladders," and summer internships that DoHS touts in its summary judgment have failed to solve these problems. Indeed, in connection with Defendants' opposition to Plaintiffs' Motion for Class Certification in both 2020 and their renewed Motion in 2023, Defendants made nearly identical arguments regarding caseloads and salaries. ECF No. 160 at 24-25; ECF No. 322 at 11-12.

It is a departure from accepted professional judgment and/or deliberate indifference to take the same actions time after time and expect different results.[6] As the Fifth Circuit forcefully stated in another child welfare case:

---

[6] *See, e.g., Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) ("Where a [party] has actual knowledge that its efforts to remediate are ineffective, and it continues to use

The State contends that DFPS has taken several steps to address the risks associated with high caseloads, including hiring more caseworkers, employing secondary workers and support staff, and initiating a new program to improve caseworker training. Under the circumstances, none of these steps constitute a 'reasonable' response to the systemic issues. . . . Simply adding more employees has continually proven ineffectual. High-volume hiring is not a solution. Critically, because of the lack of internal standards DFPS does not even know how many caseworkers it *actually needs* to reduce the caseloads to safe levels. Without a target number, the agency is hiring blind. Lastly while DFPS focuses primarily on high-volume hiring to fill the gaps left by the mass exodus of caseworkers every year, it repeatedly fails to address the internal management issues that motivate many caseworkers to leave so quickly after joining CPS. Thus, not only is a portion of DFPS's yearly budget allocated by the state legislature to hire more workers and reduce caseloads effectively wasted, but the underlying problem remains unsolved.

*Stukenberg I*, 907 F.3d at 261; *see also LaShawn A.*, 762 F. Supp. at 978 (finding that "[d]espite the evident attempts to attract workers, there is no indication yet that the past failures have been remedied . . . the [child welfare agency] is unable to carry out its responsibilities under federal and District law while its social workers are operating at existing caseloads.").

### ii.     <u>Lack of Case Planning</u>

Defendants argue that they are not deliberately indifferent with regard to case planning because they have various policies and training programs. Defs. Mem. at 7. Defendants cite their Division of Planning and Quality Improvement ("DPQI") process as well as their new ChildStat process for analyzing West Virginia's case planning performance. But Defendants fail to

---

those same methods to no avail, such [party] has failed to act reasonably in light of the known circumstances."); *see also Doe v. Sch. Bd.*, 604 F.3d 1248 (11th Cir. 2010) (agreeing with *Vance*); *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007) (it is deliberate indifference where a defendant "failed to take additional reasonable measures after it learned that its initial remedies were ineffective"); *Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 362 (5th Cir. 2022) ("[A] remedial response that a [party] knows at the time of action is ineffective is clearly unreasonable.").

acknowledge that despite these policies and processes, case planning has, in fact, gotten *worse* over the last several years. Defs. Mem. at 6-7; *compare* PUF ¶¶ 46-86.

**Caseworker Visits with Children Are Declining:** Defendants state that a child must receive a visit from their case worker at least monthly. *Id.* at 6. But the DPQI Exit Reports show that the percentage of cases where caseworker visits with children were adequate declined from 28% in 2018 to 19% in 2023. PUF ¶ 53. Deputy Commissioner of Field Operations North, Laurea Ellis, testified that caseworkers are often "scrambling the last week of the month" to go visit children. PUF ¶ 51. Similarly, DoHS's 2024 Annual Progress and Services Review ("APSR") (which only contains data through the end of 2022) shows that caseworker visits with children decreased from 41.5% in 2018 to 25.6% in 2022. PUF ¶ 52. The 2024 APSR notes that "[r]eviewed cases show concerning trends which include lack of regular quality contact with children and families, failure to regularly assess for child and family service needs throughout the life of the case, less than optimal service provision to address identified needs, lack of establishment of case plans/goals through engagement of family members and failure to close cases timely." *Id.*

This failure to adequately visit with children is indicative of case planning failures and shows that Defendants are either deliberately indifferent and/or their actions substantially depart from accepted professional judgment. *See, e.g., Stukenberg I*, 907 F.3d at 259 (affirming liability verdict for substantive due process violations because, among other things, "caseworkers are routinely unable to make regular, face-to-face contact with their children: even when they are able to make visits, the contact is often 'cursory.'"); *LaShawn A.*, 762 F. Supp. at 985 ("[R]egular, constant and reliable relationships with adults are critical to the development of children. For children in foster care, regular visits with their social workers, parents and siblings are crucial if

11

there is to be any chance of reunification. Without such visitation, children are unable develop a sense of safety, trust and confidence.").

*Written Case Plans Are Missing, Delayed, and/or Inadequate:* Additionally, Plaintiffs' expert, Susan Ault, analyzed a sample of Defendants' case files and determined that 80 of 105 cases did not have case plans within 60 days, in violation of both state and federal law. 45 C.F.R. § 1356.21(g)(2); W.V. Code §49-4-408; PUF ¶ 87. Case plans are crucial to the life of a foster child. They ensure that children receive adequate services, that parents are provided services to enable reunification where possible, and that children achieve permanency. PUF ¶ 63; *see also LaShawn A.*, 762 F. Supp. at 972 ("Case plans are necessary to ensure that children receive proper care, receive appropriate care, and remain in foster care no longer than yesterday.").

Ms. Ault reviewed various Onsite Review Instruments, or reviews of individual cases, Exit Reports, or summaries of reviews performed in connection with the DPQI process, and the 105 case files. Ex. 6. She found that "[i]n a substantial majority of the OSRI, cases and Exit Reports reviewed, the cases had no formal case plan. For the most part, parents were not involved in case planning and a significant percentage of the time, the case plans were generated and ordered in court rather than the worker presenting a plan that they had developed with the family." PUF ¶ 69.

*Poor Child and Parent Involvement in Case Planning:* DoHS's 2024 APSR shows that the adequacy of child and parent involvement in case planning went down from 27.42% in 2021 to 17.21% of the time in 2022. PUF ¶ 67. Exit Report data showed that this number went down to 14% in 2023. PUF ¶ 66. And even if a case plan is created, caseworkers often fail to input the case plan into DoHS's data system and thus cannot be recorded and tracked. PUF ¶ 65.

As a result of these case plan deficiencies, Defendants are not adequately monitoring the foster children in their custody. Defendants tout their new ChildStat review system, Defs. Mem. at

12

7, but documents related to the review reflect incredibly poor case planning between August 2023 and January 2024. In 34% of cases, visits were made in 0 out of 6 months. PUF ¶ 54. In only 23% of cases, visits were made in 6 out of 6 months. *Id*. Additionally, ChildStat data shows that there were written case plans in only 32% of cases. PUF ¶ 54.

**West Virginia Is Not Providing Necessary Services to Children:** The evidence also demonstrates that Defendants fail to provide necessary services to children. For example, West Virginia's 2024 APSR shows that West Virginia only met physical needs of children 60.53% of the time in 2022, a decrease from 78.67% in 2021. PUF ¶ 80. Exit reports show that this number further went down to 53% in 2023. PUF ¶ 81. Similarly, with respect to the mental and behavioral health needs of foster children, the 2024 APSR shows that West Virginia's performance is worsening over time. Where they adequately addressed those needs in 59.49% of cases in 2021, they were doing so only 25% of the time in 2022. PUF ¶ 82. Data from exit reports show that this percentage further declined to 20% in 2023. PUF ¶ 83. West Virginia's performance is similarly declining with respect to providing services to biological parents and legal guardians and fostering the bond between children and their biological parents or legal guardians. PUF ¶¶ 55-62, 77.

**New Caseworker Training Has Not Brought Improvements:** Defendants also claim that they provide extensive training and support to caseworkers. Defs. Mem. at 6-7. But there are disputed questions of fact as to whether the training actually takes place and whether it is adequate. Numerous caseworkers expressed that there was insufficient hands-on training and the training did not prepare them to handle their job duties. PUF ¶ 87. These issues with training are longstanding. A foster care ombudsman report from 2021 noted that "CPS workers/supervisors convey sharply differing and often seriously deficient knowledge of applicable policies and community/interagency resources." PUF ¶ 88.

These issues are only getting worse since DoHS has lowered its hiring standards and is hiring more caseworkers without a social work degree. Plaintiffs' expert, Sam Hickman, opined that "time and time again the Department has taken the easy way out to simply fill vacancies with workers that perpetuated a high turnover rate. Unqualified workers are set up to fail and their inevitable departures perpetuate a vicious cycle of high turnover rates and unqualified new hires." Ex. 5 (Hickman Report). Plainly, this "extensive" training is not leading to better case planning.

***West Virginia Statistics on Permanency, Maltreatment in Care, and Placement Stability Are Misleading:*** Defendants highlight West Virginia's 2021 and 2022 statistics on permanency, placement stability, and maltreatment in care rates. Defs. Mem. at 2. But these are only a cherry-picked handful of the metrics that the federal government uses to measure child welfare performance and, as discussed above, West Virginia is performing poorly on many benchmarks. With respect to achieving permanency faster than the national average, West Virginia is also one of the fastest states to terminate parental rights. As of 2023, West Virginia terminated parental rights more quickly than any other state. PUF ¶¶ 90-94. Importantly, "24% of West Virginia children enter care experience a TPR within 365 days of foster care entry (compared to 6% nationally)" and the "median time from foster care entry to TPR is 320 days in West Virginia (compared to 620 days nationally)." PUF ¶ 94. This is unsurprising where Defendants' own internal reviews showed that the adequacy of caseworker contacts with the parents of foster children was at 3% in 2023 and their 2024 APSR noted that the contact between caseworkers and parents was "not sufficient to engage the parents in the development and evaluation of case goals" or to "evaluate the efficacy of service provision." PUF ¶¶ 55-56. Defendants' records reinforce what news reports have shed light on. PUF ¶ 98. All too often parent-child bonds are severed before parents have a meaningful opportunity to demonstrate improvement.

14

With regard to Defendants' rate of maltreatment in foster care, they do not include maltreatment in uncertified kinship homes, which constituted 11% of the foster care placements as of July 2024. PUF ¶¶ 102-03. Moreover, given Defendants' inadequate case planning and low child visitation rates, allegations of maltreatment in foster care are not adequately investigated, if at all. As other courts have noted, when caseworkers do not visit enough, "children do not trust their caseworkers to follow-up on problems or to keep them safe" and where there is turnover, "children are cycled through multiple caseworkers" and "[i]n some cases children do not even know who their caseworker is" which "further inhibits the development of a trusting relationship in which children feel safe communicating their needs or reporting abuse." *Stukenberg I*, 907 F.3d at 260. Placement stability may not be a positive where a child who is not adequately monitored remains in an inappropriate placement, despite maltreatment. Moreover, the reliability of DoHS data has frequently been called into question.[7] PUF ¶ 99.

Thus, there are numerous genuine issues of material fact as to whether Defendants are deliberately indifferent to and/or substantially depart from accepted professional judgment with respect to case planning. *See, e.g., Kenny A. v. Perdue,* 2004 U.S. Dist. LEXIS 27025 (N.D. Ga. Dec. 11, 2004) (denying summary judgment where the state failed to (1) adequately investigate and respond to allegations of abuse, (2) ensure reasonable caseloads, (3) ensure regular visits with

---

[7] In its Order granting class certification, this Court held that the 2017 data regarding the percentages of foster children experiencing three or more placements "satisfies Plaintiff's burden of connecting DHHR's practice to a risk of harm." ECF No. 351 at 16-17. The percentages of foster children experiencing three or more placements in 2021 remains the same or decreases only slightly, while the raw numbers of children experiencing placement instability grew. PUF ¶ 128. Defendants' data from 2022 is calculated differently, and it is not separated by amount of time in foster custody. *See* Def. Mem. at 7. West Virginia's 2023 placement stability rates were "excluded due to data quality" from the Children's Bureau national performance report. PUF ¶ 127.

foster children, (4) provide consistent and timely case planning services, (5) maintain accurate and timely documentation, and (6) adequately provide services to children).

       **iii.**       <u>**Inadequate Placement Array**</u>

       ***Defendants Continue to Place Children in Inappropriate Placements, Such as Hotels, Offices and State Parks***: In arguing that they are not deliberately indifferent with respect to inadequate placements for foster children, Defendants ignore their own voluminous disclosures that show otherwise. Due to their "desperate circumstances with lack of homes," PUF ¶ 129(a), Defendants routinely place children in hotels, county offices, and cabins in state parks for up to a month at a time. PUF ¶¶ 116-28. This longstanding practice continues to happen with numbing regularity as recently as June 2024. PUF ¶ 25. Children are also placed in emergency shelters and may stay there for months. PUF ¶¶ 126-28.

       Defendants also warehouse children in inappropriate in-state and out-of-state residential settings due to lack of appropriate foster placements. In 2018, Defendants' own report showed that West Virginia "rank[s] in the top six in the country" for placing children in congregate care. PUF ¶ 131. Defendants' claim that the percentage of children placed in residential treatment has fallen over the past 10 years, Defs. Mem. at 10, is based on disputed data because they do not accurately track children's placements. As of 2023, their data system, PATH, reported numbers known to be inaccurate for multiple months. PUF ¶ 99.

       Defendants also ignore the fact that residential placement numbers are rising again. The Department of Justice ("DOJ") required Defendants to reduce the number of children in Residential Mental Health Treatment Facilities ("RMHTFs") to 712 by December 31, 2024, PUF ¶ 163. But as of March 1, 2024, there were 870 children in RMHTFs, up from 776 as of January 1, 2022. PUF ¶ 164. Of these 870 children in RMHTF settings, 113 were identified as needing

community-based placement, not residential placement. PUF ¶ 135; *see also* PUF ¶ 241 ("Many of the children remaining in [RMHTFs], despite being ready for discharge, are waiting for a home to discharge to, but homes are hard to come by for these youth."). Out-of-state residential care placements are rising as well from 30% in July 2020, to 35% in 2022, to 40% in 2024. PUF ¶¶ 132-34. Over half of the children needing community-based placement as of March 1, 2024 were in out-of-state RMHTFs. PUF ¶ 135.

Defendants' plan to eliminate certain types of lower-level residential treatment in October 2024, PUF ¶¶ 203-06, will only exacerbate these issues, as children will either be forced into the community without necessary services or into more restrictive settings than is necessary for their needs. PUF ¶¶ 203-06. Defendants are focusing more on making their numbers of children in residential facilities look good, than on improving the quality of care or the adequacy of placements. The West Virginia Child Care Association, which represents providers, recently wrote that "[t]he proposed new structure will eliminate the ability to deliver crucial treatment services within current Level I and II residential treatment facilities and creates a gap for youth who do not need highly intensive treatment interventions." PUF ¶ 205. DoHS Deputy Secretary, Cammie Chapman, dismissed their concerns out of hand. PUF ¶ 203.

***The Number of Traditional Foster Homes Are Decreasing***: Defendants claim that they have made successful efforts to increase the number of available traditional foster homes, but these increases have not been sustained. The number of active certified homes has declined continuously from the third quarter of 2022 to the first quarter of 2024, with a total loss of 180 certified homes over the time period. PUF ¶ 112. The rate of home closures exceeded the rate of new homes opening in five out of the past seven quarters. PUF ¶113. When focusing on children aged 13+, the lack of available foster homes is more acute; only 26% of certified foster homes were willing to

accept a teen for the period of July to December 2023. PUF ¶ 114. To have enough certified foster homes for teens, two to four teens would need to be placed in each home.[8] PUF ¶ 115. Defendants claim they contract out foster home placements through private Child Placement Agencies ("CPAs") is an effort to recruit more foster homes, but not only has this system continuously failed, internal emails show numerous problems with CPAs, both in foster home recruitment and placement. PUF ¶ 129. Moreover, Defendants have suspended their efforts to recruit therapeutic foster homes (also known as stabilization and treatment homes), despite agreeing to do so in connection with the DOJ Memorandum of Understanding ("DOJ MOU"). PUF ¶¶ 260-61.

Failure to provide an adequate array of placements for foster children is a violation of their right to Substantive Due Process. *See Kenny A.*, 2004 U.S. Dist. LEXIS 27025 at *16 (denying summary judgment, in part, because the state "failed to provide a sufficient number and array of placements for foster children, as required by professional standards of care"). All Plaintiffs in the General Class are subject to the risk of inadequate placement. Any time a placement is disrupted, Defendants may move that child into a hotel, a campground, or another inappropriate placement.

***Defendants Place Children in Residential Facilities Known for Neglect and Maltreatment***: Defendants also inappropriately place children in or fail to remove them from residential facilities known for neglect and maltreatment. For example, ResCare, formerly the State's largest provider of group home facilities, systemically abused their residents going back to 2017. PUF ¶¶ 137-142. DHHR was aware of the pattern of abuse, but Secretary Bill Crouch, who formerly worked with ResCare's lobbyist, attempted to quash all efforts at transparency. *See* PUF ¶ 138. Nevertheless, Defendants still place children in ResCare homes where they are deprived of

---

[8] Defendants take issue with Susan Ault's findings that West Virginia has an inadequate placement array. Defs. Mem. at 11. Their arguments further demonstrate that there are questions of material fact and that summary judgment is inappropriate.

community socialization, hospitalized without guardian notification, and medicine is not always properly administered. PUF ¶¶ 141-42. Similarly, Highland Hospital's psychiatric residential treatment facility has a history of overusing medical restraints that it fails to document and disclose. PUF ¶¶ 143-46. Nonetheless, Defendants continue to use Highland as a psychiatric residential treatment facility. PUF ¶¶ 143, 147. In yet another example, Defendants frequently sent and continue to send children to George Junior Republic ("GJR") in Pennsylvania. Children there have been known to be improperly restrained, isolated in their bedrooms, denied necessary therapy and education, and subject to sexual and physical violence. ¶¶ 148-50. Still, Defendants have placed children at GJR as recently June 2024. PUF ¶ 151. This is a departure from accepted professional judgment and/or deliberate indifference. *See Stukenberg I*, 907 F.3d at 265-68.

## II. GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

Defendants violate the ADA where their failure to provide community-based treatment places disabled individuals at *risk* of institutionalization. *See Olmstead v. L. C. by Zimring*, 527 U.S. 581, 599-601 (1999); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013).[9] Defendants have

---

[9] Defendants argue in a footnote that *Pashby v. Delia* is no longer good law. Defs. Mem. at 15 n.4 (citing *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023)). Defendants aim to dispense with decades-long binding law about which every circuit, except the Fifth, unanimously agree, namely, that under *Olmstead* and the DOJ's interpretive guidance of the ADA, plaintiffs who can prove that they are at serious risk of unnecessary institutionalization establish discrimination under the ADA. *See, e.g.*, *Pashby*, 709 F.3d at 322; *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 461 (6th Cir. 2020); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Steimel v. Wernert*, 823 F.3d 902, 912-13 (7th Cir. 2016); *M.R. v. Dreyfus*, 663 F.3d 1100, 1118 (9th Cir. 2011); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487, 495 (3d Cir. 2004); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). As the Sixth Circuit explained in *Waskul*, "a contrary interpretation is unreasonable because the integration mandate's protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." 979 F.3d at 461 (citation omitted). For the same reason, requiring

for years failed to provide community-based treatment to foster children with qualifying disabilities, exposing members of the ADA subclass to a substantial risk of unjustified institutionalization in violation of the ADA. Defendants assert the affirmative defense of having a "comprehensive, effectively working plan" to defeat Plaintiffs' claims, but cannot show that the plan is "effectively working" or the timeline for showing improvements.

### A.    Defendants Misconstrue the Proof Required to Demonstrate a Serious Risk of Institutionalization and Ignore the Proof in this Case

Defendants essentially argue that the ADA subclass is not at "serious risk" of institutionalization because "[o]nly 17 percent of foster children are placed in residential treatment programs, whereas approximately 81 percent . . . are placed in family homes." Defs. Mem. at 15-16. Defendants cite no authority for this 'minimum threshold' requirement and there is none. First, Defendants calculate this percentage out of *all* foster children, not out of the pool of children with a qualifying disability. Second, risk of institutionalization is not evaluated at a single point in time. The number of children in residential treatment is growing, rather than shrinking, demonstrating that Defendants' plans are not effectively working. Lastly, 17 percent is a *significant* percentage, representing hundreds of children.

Numerous internal communications between Defendants' agency leadership support Plaintiffs' ADA claims.[10] As one example, an October 12, 2023 email between Michelle Dean, Deputy Commissioner of Policy and Programs for DoHS, and Jeffery Pack, Commissioner for the Bureau of Social Services, discusses a child that was placed in a residential treatment facility due

---

"individualized determination[s] of discrimination," *Mississippi*, 82 F.4th at 398, would gut the integration mandate's protections and eliminate all ADA class actions under *Olmstead*. *Mississippi* is untenable and is not the law in the Fourth Circuit.

[10] Plaintiffs' review is ongoing because Defendants have recently produced hundreds of thousands of documents and Plaintiffs have not yet received productions for the most recent time period. Lowry Decl. ¶ 2.

to Defendants' failure to provide appropriate services, saying "[i]t does not appear that we offered any services to this youth or his mother..." PUF ¶ 167(d). Another email between Dean and Pack discusses children who should not be in residential treatment facilities and whose "civil rights are being or going to be violated." PUF ¶ 167(b).

The 2024 Subject Matter Expert Report (the "2024 SME Report"), which tracks compliance with the DOJ MOU, similarly states that "[m]any of the children remaining in [RMHTFs], despite being ready for discharge, are waiting for a home to discharge to, but homes are hard to come by for these youth, who may be older and have greater needs." PUF ¶ 241 The 2024 SME Report also notes that DoHS has discontinued Stabilization and Treatment foster homes due to recruitment failures, and that there is a "shortage of foster homes, particularly for older youth and youth with serious emotional disturbance[.]" PUF ¶ 260. " "[O]ver the reporting period, the number of homes closed exceeded the number of homes opened." PUF ¶ 266. This is proof that children are at risk of unnecessary institutionalization.

As recently as June 2023, DoHS highlighted that "children are placed in inappropriate setting[s] due to lack of available bed[s] or are placed out of state." PUF ¶ 177. And Defendants admit that DoHS found that in 2021, 44% of the cases reviewed "should not have necessitated placement in a residential treatment facility." Defs. Mem. at 17. To say that this is no longer the case while institutionalization numbers are increasing is difficult to fathom and is a disputed fact.

While Defendants seek to point the blame for the unnecessary institutionalization of foster children on a myriad of other variables, such as circuit courts ordering residential treatment, families being unwilling to accept children with challenging behaviors into their home, and service

providers being limited in West Virginia,[11] DoHS has the nondelegable duty to ensure that there are appropriate intermediary services in the community and adequate placements that will prevent the unnecessary placement of children in restrictive residential treatment facilities. Where those are lacking, courts may have no choice but to order institutionalization.[12] "[T]he State bears the same responsibility to determine . . . the continuing necessity for and appropriateness of the placement. . . the Department maintains responsibility for planning and delivering the care, the circuit courts for supervising it." *Jonathan R. v. Justice*, 41 F.4th 316, 321-22 (4th Cir. 2022).[13]

**B.  Genuine Issues of Material Fact Exist as to Whether Defendants Have an Effectively Working Plan to Prevent Unnecessary Institutionalization**

"Whether the Defendant's Plan is sufficiently comprehensive or effectively working such that it serves as a total defense to Plaintiff's claims is a fact intensive inquiry that the Court cannot resolve as a matter of law." *Murphy v. Harpstead,* 421 F. Supp. 3d 695, 718 (D. Minn. 2019).[14] Moreover, Defendants are only afforded "leeway" to administer their plan (Defs. Mem. 21) after establishing that their plan is effectively working, *Olmstead*, 527 U.S. at 584, which they cannot.

---

[11] Defendants state in a footnote *without any citation whatsoever* that "In West Virginia, unlike in most States, circuit courts place many juvenile justice youth into DoHS foster care custody *for the purpose of* receiving residential treatment." ECF No. 16, n. 5.

[12] Defendants also cannot lay the blame on unwilling foster parents when they have ceased their own efforts to recruit therapeutic foster homes, as discussed above. And Defendants state that they cannot force providers to work in the state or with DoHS, but given DoHS's dismissal of provider concerns in connection with their plan to eliminate lower level residential treatment facilities, it is a question of fact as to whether DoHS is at fault. *See* Defs. Mem. at 27.

[13] *See also Jonathan R.*, 41 F.4th at 333 (The Department 'both' have their own statutory obligations in administering care . . . While the courts must finally accept medical and social services, the Department must 'establish' them . . . While the court must confirm placements, the Department must 'visit,' 'inspect,' and 'certif[y]' each foster home.").

[14] *See also Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 349 (E.D.N.Y. 2009) (discussing all of the various intricate components of defendants' *Olmstead* plan and finding summary judgment improper).

First, Defendants fail to show, as they must, that their plan contains specific and measurable goals for the integration of persons with disabilities into the community. *Frederick L. v. Dep't of Public Welfare of Pa.*, 422 F.3d 151, 160 (3d Cir. 2005) ("[A] viable integration plan at a bare minimum should specify the time-frame or target date for patient discharge, the approximate number of patients to be discharged each time period, the eligibility for discharge, and a general description of the collaboration required between local authorities and the housing, transportation, care, and education agencies to effectuate integration into the community.").[15] The State must have "demonstrated success in actually moving individuals to integrated settings in accordance with the plan." Statement of the DOJ on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act.[16] Indeed, Defendants merely cite their expert, Heidi Arthur, who opines *ipse dixit* that Defendants have a comprehensive and effectively working plan. Defs. Mem. at 26. But Arthur admitted that she did not review any data on the success rate of Defendants' plan and could not provide a metric or timeline for measuring its success. PUF ¶¶ 277-337.

Second, Defendants' data is unreliable. The 2024 SME Report noted that there were "significant [data] quality issues" and that "the data that are being used are, with few exceptions, not cross-system or child-focused data. Rather, they are program-specific data related to individual systems. . . DoHS may not be aware of implementation challenges that are cross-system in nature until problems emerge in the program-specific data." PUF ¶¶ 274, 277.

Third, Defendants' own Rule 30(b)(6) witness testified that in assessing whether community-based services are actually working, one factor would be the number of children

---

[15] *See also Day v. District of Columbia,* 894 F. Supp. 2d 1, 28 (D.D.C. 2012) ("[T]here is widespread agreement that one essential component of an "effectively working" plan is a measurable commitment to deinstitutionalization.").

[16] *Available at https://www.ada.gov/resources/olmstead-mandate-statement/*

placed in RMHTFs. PUF ¶ 180. As stated above, the number of children in residential mental health facilities, both in state and out of state, is *increasing*.[17] As of March 1, 2024, there were still 870 children in RMHTFs, PUF ¶ 164, well over the 712 cap in the DOJ MOU. PUF ¶ 163. 113 of those children were identified as needing community-based placement, but unable to be discharged due to lack of placement options. PUF ¶ 135; Numerous DoHS documents, including the 2024 Children's Mental Health and Behavioral Health Services Quality and Outcomes Report ("2024 Quality and Outcomes Report"), the 2024 SME Report, and the 2024 APSR indicate ongoing issues with general awareness, accessibility, and effectiveness of many of these services and a continued lack of alternative less restrictive placement. PUF ¶¶ 163-202, 207-76. Defendants' plan to eliminate certain types of lower-level residential treatment will only exacerbate these issues. Thus, Defendants' plan is not effectively working.

### C. There Is Extensive Evidence That Defendants Do Not Offer Adequate Community-Based Services

Lastly, not only is the plan not reducing the number of children in residential facilities, but it is also failing to provide adequate assessments and services to children.[18] PUF ¶¶ 148-49. For instance, the 2024 Quality and Outcomes Report states that 54% of the RMHTF providers

---

[17] For this reason, Defendants' cited cases are inapposite. *See Sanchez v. Johnson*, 416 F.3d 1051, 1067 (9th Cir. 2005) (the state had both "a successful record of personalized evaluations leading to a reasonable rate of deinstitutionalization" and had reduced its institutionalized population by 20%.); *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005) (Defendants had "already significantly reduced the size of the state's institutionalized population"). Nor have Defendants offered any information about the percentage of children on waitlists for services versus those being treated or how long children wait for services. *See Bryson v. Stephen*, 2006 U.S. Dist. LEXIS 71775, at *25-26 (D.N.H. Sept. 29, 2006) (finding that the "program is sizeable, given the number of people participating in the program relative to the number of people currently on the waiting list seeking to participate" and that the "waiting list moves at a reasonable pace.").

[18] Plaintiffs' expert, Dr. Lisa Prock, found that that Defendants had not taken significant action with respect to community-based services. Defs.' Mem. at 27. Defendants take issue with Dr. Prock's report (Defs. Mem. at 27), but her report is supported by discovery, including Defendants' own documents.

surveyed reported experiencing barriers to initiating services for children in care, 70% reported a lack of availability of services and, as of the second quarter of 2023, the average wait time for Wraparound Services was 82 days from the initial application. PUF ¶ 219.

Defendants incorrectly state that it is "undisputed" that they offer mental health screening, therapeutic foster homes, and community-based services, but they point only to their policies and plans—they do not argue that they are sufficiently providing these services in practice. Defs. Mem. at 22. The evidence shows they are not. For example, Defendants state that their policy is to evaluate children using the Child and Adolescent Needs and Strengths ("CANS") tool before recommending institutionalization. Defs. Mem. at 18. Discovery shows that this assessment is not performed timely, if at all, and the 2024 SME Report stated that "the percentage of completed CANS is decreasing." PUF ¶ 234. Moreover, Defendants' own discovery shows that children are institutionalized even when they have not yet had a CANS evaluation and/or the CANS shows that the child can be treated in the community. *See, e.g.,* PUF ¶ 167(b). Defendants highlight their Medicaid Children with Serious Emotional Disorder Waiver ("CSEDW") program. But, 73% of CSEDW providers reported difficulty with service coverage and additional data was required to understand the timeline to CSEDW services and eligibility determinations. PUF ¶¶ 250, 252.

Because Plaintiffs have offered proof that children are being unnecessarily institutionalized and Defendants cannot prove as a matter of law that their plan is effectively working, summary judgment on the ADA Subclass's claims should be denied.

III.    **DEFENDANTS CANNOT ESCAPE LIABILITY WITH ACTIONS TAKEN AFTER THE COMMENCEMENT OF THIS LITIGATION THAT HAVE NO PROVEN IMPACT**

Defendants do not deny that the West Virginia child welfare system faces a multitude of deficiencies and weaknesses. Defendants have known for at least a decade that their child welfare

system is failing and harming children in its care, and yet, they have done almost nothing until Plaintiffs filed this complaint in 2019, with many of their efforts starting only in the past year or two or planned to start in the future. They cannot evade liability or obtain summary judgment through these recent, short-lived, and minimal efforts.[19]

To evade judicial review or defeat a judgment with such recent efforts, Defendants "bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). *Stukenberg I* expressly refused to credit actions "conveniently rolled out" in the run-up to trial. 907 F.3d at 263. Defendants may claim that actions taken since this case began are the result of planned policy changes, but pre-litigation plans without pre-litigation execution cannot save them. *Porter*, 852 F.3d at 364 n.3 ("Most critically, regardless of when the policy changes were first considered, the changes were made only after this case was initiated . . .").[20] In any event, Defendants have not provided any evidence that their purported actions taken in recent years have led to meaningful results—and in fact, the quality of the West Virginia child welfare system has declined. Plaintiffs should not be asked to "rely on defendants' good faith but as yet unsubstantiated promises to improve." *LaShawn*, 762 F. Supp. at 982.

---

[19] *See U.S. v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave 'the defendant . . . free to return to his old ways.'") (citations omitted).

[20] *See also LaShawn,* 762 F. Supp. at 959 ("[T]he Court is concerned that the department's efforts to improve may have been motivated only by this litigation and, without continued litigation or a court order, the motivation for continued restructuring and improvement will have subsided.").

## IV.    DEFENDANTS' ARGUMENTS REGARDING RULE 23 AND REDRESSABILITY ARE RED HERRINGS

Defendants improperly attempt to relitigate class certification and standing issues and make erroneous strawmen arguments that the systemic reforms Plaintiffs seek cannot redress their harm on a classwide basis.

First, the Court has already certified this case as a class action and necessarily found that Plaintiffs satisfied the requirements of Rule 23(b)(2). With respect to the requirement that injunctive relief would benefit the entire class as whole, the Court's decision stated: "If the court determines that Defendants' practices are unconstitutional or violate federal law, a single injunction or declaratory judgment would provide relief to each member of the class." *Jonathan R. v. Justice*, 344 F.R.D. 294, 317 (S.D. W. Va. 2023) (citations and internal quotations omitted). Defendants' cited authorities are distinguishable because they all involve motions for class certification or decertification.[21] Defendants are not moving to decertify the classes and therefore their arguments are irrelevant and moot.

Even if Defendants could relitigate these issues on summary judgment (and they cannot), the authorities they cite are distinguishable. All of their cases involved claims where plaintiffs had to prove actual harm. *Shook v. Board of County Commissioners* involved claims of cruel and unusual punishment under the Eighth Amendment. 543 F.3d at 600.[22] *T.R. v. School District of*

---

[21] Defs. Mem. at 28-29 (citing *Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 600 (10th Cir. 2008); *T.R. v. Sch. Dist. of Phila.*, No. 15-4782, 2019 U.S. Dist. LEXIS 66002 (E.D. Pa. Apr. 18, 2019); and *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012)).

[22] Notably, in *Shook*, the Tenth Circuit was reviewing the denial of class certification under an abuse of discretion standard. The panel noted that other courts had certified similarly situated class actions and that "we might reach a different conclusion were we addressing the certification question in the first instance[.]" 543 F.3d at 600. This further cuts against Defendants' argument because here, the Court granted class certification.

*Philadelphia*, 2019 U.S. Dist. LEXIS 66002, and *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, involved statutory claims that required proof of actual injury.

Here, by contrast, Plaintiffs are not required to prove actual injury—their constitutional and statutory claims hinge on whether Defendants' policies or practices subject them to an unreasonable *risk* of harm. *Jonathan R.*, 344 F.R.D. at 304. "[E]ither each of the policies and practices is unlawful as to every [class member], because it subjects them to an unreasonable risk of serious harm, or it is not,—an inquiry requiring no individualized determination." *Id.* (citation omitted); *Pashby*, 709 F.3d at 322 (plaintiffs can show "they face a risk of institutionalization"). Plaintiffs' claims, therefore, can be proven "on the basis of classwide evidence without individualized inquiries." *M.B. v. Corsi*, 327 F.R.D. 271, 281 (W.D. Mo. 2018); *see also, e.g.*, *Neal v. Casey*, 43 F.3d 48, 64 (3d Cir. 1994) ("[A]ll of the class members will benefit from relief which forces the defendant to provide, in the manner required by law, the services to which class members either are currently or at some future point will become entitled.").

Defendants' attempts to parse Plaintiffs' interrogatory responses regarding the injunctive relief they seek suffers from the same misunderstanding.[23] For example, with respect to caseloads, Defendants argue that the relief Plaintiffs request would not apply to the whole class because "only some General Class members (not all) are served by caseworkers with caseloads above these standards." *See* ECF No. 533-163, at 2. This is silly. Caseworkers are assigned new cases all the time. Children get assigned different caseworkers for various reasons, including turnover. Where caseworkers carry an unmanageable caseload, all foster children face an unreasonable risk of harm that they will be served by an overloaded caseworker.

---

[23] Defendants make these arguments in a chart in "Appendix A." Defendants impermissibly exceed the page limit by moving these arguments into an Appendix. Accordingly, any argument in that section should be disregarded.

Defendants' redressability argument is similarly flawed. *Bennett v. Spear*, 520 U.S. 154, 167-67 (1997), is about the threshold requirement of Article III standing. Defendants do not, and cannot plausibly, contend that Plaintiffs lack standing to bring their claims. Even still, the redressability requirement "is not onerous . . . plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (citations omitted). Plaintiffs easily meet this standard.

Defendants' complaint that the relief Plaintiffs request already reflects longstanding DoHS policy, *see* Defs. Mem. at 29, also misses the point. It is well within the purview of a federal court to enjoin a defendant to comply with its own internal policies. *See, e.g.*, *Sec'y of Labor, United States DOL v. Access Home Care, Inc.*, 2019 U.S. Dist. LEXIS 231687, at *12 (E.D. Va. Mar. 20, 2019) (enjoining Defendant from future violations of the Fair Labor Standards Act and noting that "Defendants ignored and violated their own written and formally adopted overtime policy[.]"). In fact, this Court already found that Defendants failed to comply with their own policies. *See, e.g.*, *Jonathan R.*, 344 F.R.D. at 307 ("DHHR, contrary to its own stated policies, fails to include families in the case planning process and engage in permanency planning for foster children.").

Defendants also incorrectly claim that certain systemic deficiencies are outside of their control. For example, as discussed above, circuit courts do not order placements on a blank slate. Caseworkers are supposed to make placement recommendations to the court, which then acts on those recommendations. *Jonathan R.*, 41 F.4th at 333. Moreover, Defendants have a non-delegable responsibility to ensure that the placement selected for the child is appropriate. *Id.*

Defendants' contention that Plaintiffs lack evidence that limiting caseloads would redress their injuries ignores the mountain of evidence, including in Defendants' own reports and internal communications, that high caseloads result in adverse consequences for children. *See supra*

Section I. B. i.[24] As for the opinion of Defendants' expert, James Dimas, that states perform no better under consent decrees, Defs. Mem. at 30, Dimas testified that he did not establish a performance baseline for any state or track any state's performance over time. Ex. 16 (James Dimas Dep. Tr. 73:22-74:19). Therefore, his opinion is unreliable.

Finally, Defendants overreach in arguing that the relief Plaintiffs request is "not within this Court's authority to order." Defs. Mem. at 30. As this Court has recognized, "if a state agency is violating citizens' federal rights, a district court has the power, and the duty, to enjoin the conduct." *Jonathan R.*, 344 F.R.D. at 301 n.1. Indeed, numerous courts have issued injunctive relief very similar to that requested by Plaintiffs.[25] This argument is also premature; at this juncture, the Court must only determine whether there are genuine disputes of material fact respecting Plaintiffs' claims, which plainly there are.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.


Dated: July 29, 2024

                                        Respectfully submitted,

                                        /s/ *Marcia Robinson Lowry*
                                        Marcia R. Lowry, *admitted pro hac vice*

---

[24] *See also, e.g.*, *D.G. v. Yarbrough*, 278 F.R.D. 635, 641 (N.D. Okla. 2011) ("Extensive child welfare research links high caseloads to poor decision making, increased turnover and worse outcomes for children.").

[25] *See, e.g.*, *M.D. v. Abbott*, No. 2:11-cv-00084 (S.D. Tex.), ECF No. 606 (Nov. 20, 2018); *Olivia Y. v. Barbour*, No. 3:04-cv-00251-HSO-ASH (S.D. Miss.), ECF No. 450-2 (Dec. 20, 2007); *Kenny A. v. Perdue*, No. 1:02-cv-01686-TWT (N.D. Ga.), ECF No. 488 (Oct. 28, 2005).

Julia Tebor, *admitted pro hac vice*
Laura Welikson, *admitted pro hac vice*
Robyn Goldberg, *admitted pro hac vice*
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel.: (646) 795-4456
Fax: (212) 692-0415
mlowry@abetterchildhood.org
jtebor@abetterchildhood.org
lwelikson@abetterchildhood.org
rgoldberg@abetterchildhood.org

*/s/ J. Alexander Meade*
Shaffer & Shaffer, PLLC
Richard W. Walters, WVSB #6809
rwalters@shafferlaw.net
J. Alexander Meade, WVSB #13021
ameade@shafferlaw.net
2116 Kanawha Boulevard, East
P.O. Box 3973
Charleston, WV 25339
Tel: (304) 244-8716
Fax: (304) 344-1481

*/s/ Andrew Castillo*
Disability Rights of West Virginia
Andrew Castillo, WVSB 14358
acastillo@drofwv.org
5088 Washington St. W., Suite 300
Charleston, WV 25301
Tel: (304) 346-0847
Fax: (304) 346-0687