# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| Jonathan R., minor, by Next Friend Sarah DIXON, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| | ) No. 3:19-cv-00710-JRG |
| Jim JUSTICE, in his official capacity as the Governor of West Virginia, *et al.*, | )<br>)<br>) |
| Defendants. | )<br>) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' SECOND INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Cynthia Persily, in her official capacity as Secretary of the West Virginia Department of Human Services ("DoHS"), Cammie Chapman, in her official capacity as Deputy Secretary of the DoHS, Jeffrey Pack, in his official capacity as Commissioner of the Bureau for Social Services, and DoHS (collectively, the "Defendants"),[1] by and through their attorneys, hereby submit this response to Plaintiffs' Second Set of Interrogatories, dated December 28, 2023.

## DEFENDANTS' OBJECTIONS TO PLAINTIFFS' DEFINITIONS, TIME PERIOD AND INSTRUCTIONS

1. Defendants object to any Interrogatory that seeks information not in the possession of the Department as overbroad, unduly burdensome, and not proportional to the needs of the case. Defendants have not sought, searched or provided information in the custody or control of the West Virginia legislature, Department contractors, or other Third Parties.

2. Defendants object to the general time period provided by Plaintiffs in their Interrogatories on the grounds that the time period of more than four (4) years going back to July 1, 2019 is overbroad, unduly burdensome and not reasonably necessary or proportional to the needs of the case when considering the relief requested by Plaintiffs. Information from as far back as 2019 is of minimal relevance in a case seeking prospective, injunctive and declaratory relief, and the burden of responding to such interrogatories disproportionately outweighs any possible need for the requested information. In responding to these Interrogatories, Defendants will not consider responsive information from prior to January 1, 2021. Defendants further object to the general time period as continuing "to the present," on the grounds that such a request is vague and ambiguous. In responding to these

---

[1] On January 1, 2024, DHHR was dissolved and reorganized into three separate departments in accordance with House Bill 2006. DHHR's successor in interest is the Department of Human Services ("DoHS") and Cynthia Persily serves as Secretary. For ease of reference, Defendants will us ethe term "the Department" to mean the West Virginia Department of Health and Human Resources (prior to January 1, 2024), or the West Virginia Department of Human Services (on or after January 1, 2024).

1

Interrogatories, Defendants will interpret the general time period provided by Plaintiffs as ending on the date this Request was served, *i.e.*, December 28, 2023.

3. Defendants object to Definition No. 1 regarding "Caseworkers" as vague, overly broad, and unduly burdensome. In responding to Plaintiffs' Requests, Defendants will interpret "Caseworker" to mean either "Child Protective Service Worker" or "Youth Services Worker," as those terms are defined by the West Virginia Division of Personnel and the West Virginia Office of Shared Administration.

4. Defendants object to Definition No. 2 regarding "Case" or "Cases" as unduly burdensome. In responding to this request, Defendants will use interpret the term "case" as it is defined by the State, which means by family prior to termination of parental rights and by child after termination of parental rights.

5. Defendants object to Definition No. 3 regarding "Department of Health and Human Resources" or "DHHR." The Definition is overbroad and unduly burdensome to the extent it attempts to expand the scope of Plaintiffs' Interrogatories to information that is not in the possession, control or custody of Defendants, but instead is in the custody, control or possession of a Third Party. For example, the new West Virginia Department of Health and West Virginia Department of Health Facilities are not proper Defendants in this case, as they do not have any role in administering the child welfare system or the Medicaid program. For purposes of these responses, Defendants interpret "Department of Health and Human Resources" or "DHHR" to mean the West Virginia Department of Health and Human Resources (prior to January 1, 2024) or the West Virginia Department of Human Services (on or after January 1, 2024).

6. Defendants object to Definition No. 6 on the grounds that Plaintiffs' definition of "Present" is overbroad, unduly burdensome, and not proportional to the needs of the case. Defendants do not agree to interpret "present" as "the present-day" such that Defendants would be required to supplement responses to Plaintiffs' Interrogatories all the way through trial. Defendants are open to conferring with Plaintiffs to determine an agreeable cutoff date for supplemental discovery. For example, Defendants would consider agree to a cutoff date of 30 days before trial, unless Defendants are otherwise required to supplement their responses under the Federal Rules of Civil Procedure (*i.e.*, Defendants learn that a prior production or response is materially incomplete or incorrect, *see* Fed. R. Civ. P. 26(e)(2)). Absent agreement on a cutoff date for supplement responses, Defendants will continue to interpret "to the present" as used by Plaintiffs in their Requests as meaning the date of service of Plaintiffs' requests, *i.e.*, December 28, 2023. Defendants incorporate this objection into Defendants' above objection to Plaintiffs' general time period

7. Defendants object to Definition No. 7 regarding "You, "Your," and "Defendants." To the extent it calls for Defendants to provide responses to Interrogatories on behalf of former Department officials who are no longer parties to this Action or are no longer employed by Department, this definition is overly broad and exceeds the scope of discovery contemplated by Rules 26 and 33 of the Federal Rules of Civil Procedure.

2

8. To the extent any of Plaintiffs' Instructions vary or expand upon the standards for production and discovery set forth in the Federal Rules of Civil Procedure or the Local Rules of Civil Procedure, Defendant objects to those Instructions.

## INTERROGATORY RESPONSES

**INTERROGATORY NO. 1**: Please identify any internal DHHR policy standards, ratios, limitations, or guidance on the *specific number* of Cases that DHHR's case-carrying Caseworkers are allowed to carry for children in the legal and/or physical custody of DHHR. (Policies prescribing specific numerical caseload limits are responsive to this Interrogatory; non-numerical policies providing, for example, "reasonable" or "adequate caseloads," *are not* responsive to this Interrogatory.) You must specify whether any such requirements are calculated on a "per-child basis" or a "per-family basis."

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 1**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory as unreasonably cumulative and duplicative of information already obtained through deposition testimony and other forms of discovery. Defendants have responded to several Requests for Admission related to caseload policies. *See, e.g.*, Plaintiffs' First Request for Admission, No. 3 ("Admit that Defendants do not maintain a Caseworker Caseload limit for the number of cases that a DHHR Caseworker may permissibly carry.").

Defendants also object to this Interrogatory as vague and confusing. For example, it is unclear what is meant by "any internal DHHR policy standards, ratios, limitations, or guidance." Defendants are uncertain if this phrase is limited to only written policies, final policies, or includes draft policies, if this is intended to encompass informal standards that are set in a particular region or county by a manager, or if this is intended to only apply to policies or guidance applicable statewide. Defendants read the phrase "internal Department policy standards, ratios, limitations, or guidance" to mean formal and informal "policy standards, ratios, limitations, or guidance" that apply statewide.

Subject to the foregoing objections, Defendant responds as follows:

> For many years, DoHS has had an internal, informal caseload standard goal of 10 cases per Child Protective Service worker and 12 per Youth Services worker. Among other purposes, these informal caseload standard goals are used to determine hiring targets and to assist in the allocation of Child Protective Service workers and Youth Services workers across districts.
>
> DoHS does not have a policy mandating a numeric caseload limit for Child Protective Service workers or Youth Services workers, for several reasons. Among other things, at times when DoHS has not been able to fill all of its vacant positions, a maximum limit would mean that some children would not have caseworkers at all, which is unacceptable. In addition, different types of cases require different amounts of work from Child

3

Protective Service workers and Youth Services workers, depending on the type of case, the individualized circumstances of each case, and the worker's experience. Imposing a mandatory caseload limit would limit supervisors', districts', and regions' flexibility to allocate cases appropriately. Accordingly, a written policy mandating a numeric caseload limit would be inequitable and not in the best interests of foster children. For example, if one Child Protective Services worker was assigned 11 cases that generated a particularly significant workload because of the complexity of the children's needs in that caseload, and another Child Protective Services worker was assigned 15 cases that generated a less substantial workload than the first worker's 11-case workload, a 15-case limit would force the supervisor to assign a new case to the Child Protective Services worker carrying 11 cases despite the fact that the worker already had a greater workload than the Child Protective Services worker carrying 15 cases. Indeed, the Child Welfare League of America no longer recommends that States set numeric caseload limits.

Instead of imposing an inflexible caseload limit for Child Protective Service Workers or Youth Services Workers, DoHS uses the informal caseload standard goal of 10 cases and 12 cases discussed above (among other tools) to determine hiring goals and assist in the allocation of Child Protective Service Workers and Youth Services Workers across districts, and DoHS gives discretion to the supervisors on-the-ground in the districts to allocate cases among the workers in that district.

Effective March 11, 2023, DoHS's process for allocating Child Protective Service Workers is also governed by W.V. Code § 49-2-102, as enacted by Senate Bill 273.

**INTERROGATORY NO. 2**: Please describe whether DHHR has implemented – in part, or in its entirety – the recommended caseload standard set forth in the 2022 DHHR Workload Study Report (*e.g.* 12-14 cases for CPS Initial Assessment). *See* D219871.

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 2**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory as unreasonably cumulative and duplicative of information already obtained through deposition testimony and documentation. Defendants have produced all of the relevant policies governing the process by which allegations of abuse or neglect are investigated.

Defendants also object to this Interrogatory as vague and confusing. It is unclear what is meant by "implemented – in part, or in its entirety." In addition, it is not clear what Plaintiffs are asking based on their reference to "the recommended caseload standard set forth in the 2022 DHHR Workload Study Report (*e.g.* 12-14 cases for CPS Initial Assessment)." This report provides as the "current estimated caseloads for WV caseworkers" 12-14 cases for CPS Initial Assessment workers, and separately recommends "caseload and workload standards for WV caseworkers," which suggested 11-13 for CPS Initial Assessment workers. Therefore, it is unclear if Plaintiffs are referring to the reports "current estimated caseloads" or the report's "recommended caseload and workload standard." For purposes, of responding to this Interrogatory, Defendants interpret

4

"the recommended caseload standard set forth in the 2022 DHHR Workload Study Report" to refer to the "Recommended caseload and workload standard for WV caseworkers" on page 13 of the report for caseloads for children in DoHS custody (*e.g.*, not including "CPS Ongoing-in-Home").

Subject to the foregoing objections, Defendant responds as follows:

> DoHS has used information and recommendations contained in the Workload Study Report to, among other things, improve hiring practices, increase caseworker salaries, increase retention payments, provide greater support for caseworkers, and implement certain organizational efficiencies.
>
> The Workload Study Report also confirmed DoHS's longstanding view, explained in Response to Interrogatory No. 1, that different types of cases require substantially different amounts of a caseworker's time, and that individual circumstances of each case will impact how much time a case worker must spend on it.
>
> The estimated and recommended caseload servicing times for different types of cases at pages 12 and 13 of the Workload Study Report are a useful tool for supervisors in distributing workload among caseworkers. However, the "[r]ecommended caseload and workload standard for WV caseworkers" on page 13 of the Workload Study Report is not actionable, because it would require that each worker handle only one type of case, which DoHS has concluded is neither feasible nor desirable, and because imposing caseload limits would be inequitable and not in the best interests of foster children, for the reasons explained in Response to Interrogatory No. 1. Therefore, DoHS is not implementing this aspect of the recommendations.

**INTERROGATORY NO. 3**: Please identify who is responsible (whether employed by DHHR or not) for (1) deciding whether to administer psychotropic medications to Foster Children in the physical and legal custody or DHHR; (b) deciding the number of psychotropic medications (*i.e.* one, three, etc.) to administer any such child; and (c) tracking the number of psychotropic medications currently being administered to all such children.

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 3**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory about psychotropic medications as not relevant to the Substantive Due Process or ADA claims in this case for which class certification has been granted. *See* Doc. 351. In its decision on class certification, the Court found that commonality was satisfied with respect to only four sets of "common" questions to be resolved at trial:

1) "whether [DoHS]'s placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk";
2) "whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk";

5

3) "whether Defendants' <u>caseload</u> practice prevents [DoHS] from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm"; and

4) "whether Defendants' [lack of] provision of [community-based] services [for children with disabilities] is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization."

Doc. 351, at 17, 20, 24 (emphasis added). Administration and tracking of psychotropic medication is not relevant to any of these questions.

Moreover, psychotropic medications are not mentioned in the 44 pages of "Class Action Allegations" or alleged "Systemic Deficiencies" in the Complaint.

Defendants also object to this Interrogatory as vague and confusing. For example, it is not clear what Plaintiffs mean by "administer," as opposed to "prescribe," which is used in other requests with respect to psychotropic medications, and it is not clear if Plaintiffs are asking Defendants to identify the scope of professional standards for the prescribing and dispensing of medication imposed by third parties, such as professional licensing boards or commissions, or third party provider organizations. Defendants also object to the undefined term "psychotropic medication" as vague and ambiguous. Plaintiffs neither define the term nor specify which medications are "psychotropic."

Subsection (c) of this Interrogatory also appears to be duplicative of Interrogatory No. 6, as both requests seek information related to the "tracking" of psychotropic medication "administered" to children in foster care. Further, Interrogatory No. 4 asks for information related to a "review process" for "monitoring" psychotropic medication, which Defendants interpret as seeking the same information as Interrogatory No. 3(c) and No. 6. As Plaintiffs have several Interrogatories that Defendants would interpret as seeking very similar if not exactly the same information, Defendants are unsure of how to interpret and respond to any of these Interrogatories.

Based on the foregoing objections, Defendants decline to respond to this Interrogatory.

**INTERROGATORY NO. 4**: Please identify any review process that DHHR maintains to monitor the number and type of psychotropic medications prescribed to Foster Children in the physical and legal custody of DHHR. If any such review process exists, describe (a) how often the review occurs; (b) who is responsible for leading the review; and (c) who else (if anyone) is required to attend and/or participate in the review.

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 4**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory about psychotropic medications as not relevant to the Substantive Due Process or ADA claims in this case for which class certification has been granted. *See* Doc. 351. In its decision on class certification, the Court found that commonality was satisfied with respect to only four sets of "common" questions to be resolved at trial:

6

1) "whether [DoHS]'s <u>placement array</u> rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk";
2) "whether the deficiencies in <u>case planning</u> subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk";
3) "whether Defendants' <u>caseload</u> practice prevents [DoHS] from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm"; and
4) "whether Defendants' <u>[lack of] provision of [community-based] services</u> [for children with disabilities] is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization."

Doc. 351, at 17, 20, 24 (emphasis added). The review process for psychotropic medication is not relevant to any of these questions.

Moreover, psychotropic medication is not even mentioned in the 44 pages of "Class Action Allegations" or alleged "Systemic Deficiencies" in Complaint.

Defendants also object to this Interrogatory as vague and confusing. For example, it is not clear what Plaintiffs mean by "prescribed," as opposed to "administered," which is used in other requests with respect to psychotropic medications. The phrase "review process that DHHR maintains," is also unclear as Defendants are unsure how a "review process" differs from any "tracking" of psychotropic medications referred to in other requests, and also if this request is limited to such review processes or tracking that is required by Defendants on a regular and statewide basis, or would also include any such processes implemented on an ad hoc basis and/or that is localized to a particular county, provider, or treatment type. Defendants also object to the undefined term "psychotropic medication" as vague and ambiguous. Plaintiffs neither define the term nor specify which medications are "psychotropic."

Interrogatory No. 4 asks for information related to a "review process" for "monitoring" psychotropic medication, which Defendants interpret as seeking the same information as Interrogatory No. 3(c) and No. 6, which as for information related to the process for "tracking" psychotropic medication "administered" to foster children. As Plaintiffs have several Interrogatories that Defendants would interpret as seeking very similar if not exactly the same information, Defendants are unsure of how to interpret and respond to any of these Interrogatories.

Based on the foregoing objections, Defendants decline to respond to this Interrogatory.

**INTERROGATORY NO. 5**: Please describe all categories of people (for example, biological parents, medical professionals, or DHHR Caseworkers) from whom DHHR must obtain consent before administering psychotropic medications to any individual Foster Child in the physical and legal custody of DHHR.

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 5**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory about psychotropic medications as not relevant to the Substantive Due Process or ADA claims in this case for which class certification has been granted. *See* Doc. 351. In its decision on class certification, the Court found that commonality was satisfied with respect to only four sets of "common" questions to be resolved at trial:

1) "whether [DoHS]'s placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk";
2) "whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk";
3) "whether Defendants' caseload practice prevents [DoHS] from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm"; and
4) "whether Defendants' [lack of] provision of [community-based] services [for children with disabilities] is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization."

Doc. 351, at 17, 20, 24 (emphasis added). The process for approval of psychotropic medication is not relevant to any of these questions.

Moreover, psychotropic medication is not even mentioned in the 44 pages of "Class Action Allegations" or alleged "Systemic Deficiencies" in Complaint.

Defendants also object to this Interrogatory as vague and confusing. For example, it is not clear what Plaintiffs mean by "administer," as opposed to "prescribed," which is used in other requests with respect to psychotropic medications, and it is not clear if Plaintiffs are asking Defendants to identify the scope of professional standards for the prescribing and dispensing of medication imposed by third parties, such as professional licensing boards or commissions, or third party provider organizations.

Defendants object to the undefined term "psychotropic medication" as vague and ambiguous. Plaintiffs neither define the term nor specify which medications are "psychotropic."

Based on the foregoing objections, Defendants decline to respond to this Interrogatory.

**INTERROGATORY NO. 6**: Please identify how DHHR records or tracks the number and types of psychotropic medications currently being administered to all such Foster Children in the physical and legal custody of DHHR, including who receives that information and any reports, files, or spreadsheets into which that data is inputted and how often that information is updated.

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 6**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory about psychotropic medications as not relevant to the Substantive Due Process or ADA claims in this case for which class certification has been granted.

*See* Doc. 351. In its decision on class certification, the Court found that commonality was satisfied with respect to only four sets of "common" questions to be resolved at trial:

1) "whether [DoHS]'s placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk";
2) "whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk";
3) "whether Defendants' caseload practice prevents [DoHS] from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm"; and
4) "whether Defendants' [lack of] provision of [community-based] services [for children with disabilities] is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization."

Doc. 351, at 17, 20, 24 (emphasis added). Administration and tracking of psychotropic medication is not relevant to any of these questions.

Moreover, Plaintiffs' Complaint does not include allegations of any classwide misuse of psychotropic medications. In fact, the 105-page Complaint mentions psychotropic medication only four times, and only with respect to a few of five Named Plaintiffs; psychotropic medication is not even mentioned in the 44 pages of "Class Action Allegations" or alleged "Systemic Deficiencies" in Complaint.

Defendants also object to this Interrogatory as vague and confusing. For example, it is not clear what Plaintiffs mean by "administer," as opposed to "prescribed," which is used in other requests with respect to psychotropic medications. The phrase "records or tracks" is also unclear as Defendants are unsure if Plaintiffs are requesting information related to maintenance of medical information on an individual level (for example, written in a child's medical record) or on an aggregate level (for example, reflected in Defendants' Medicaid Management Information System), or both or neither. Defendants also object to the undefined term "psychotropic medication" as vague and ambiguous. Plaintiffs neither define the term nor specify which medications are "psychotropic."

This Interrogatory also appears to be duplicative of Interrogatory No. 3(c), as both requests seek information related to the "tracking" of psychotropic medication "administered" to children in foster care. Further, Interrogatory No. 4 asks for information related to a "review process" for "monitoring" psychotropic medication, which Defendants interpret as seeking the same information as Interrogatory No. 3(c) and No. 6. As Plaintiffs have several Interrogatories that Defendants would interpret as seeking very similar if not exactly the same information, Defendants are unsure of how to interpret and respond to any of these Interrogatories.

Based on the foregoing objections, Defendants decline to respond to this Interrogatory.

**INTERROGATORY NO. 7**: Please provide bates ranges for any and all policies and/or procedures that may be responsive to Request for Production 8.30 ("All policies and

9

procedures . . . concerning the administration of psychotropic medications to Foster Children . . . ."). *See* Defendants' 10/02/23 Letter to Plaintiffs ¶ 5 ("Defendants have produced all of Defendants' policies and procedures governing child welfare in West Virginia, including any and all policies that may be responsive to Request Nos. 8.5, 8.24, 8.30, 8.65.").

**DEFENDANTS' RESPONSE TO INTERROGATORY NO. 7**:

Defendants incorporate the foregoing objections to the Definitions, Instructions, and Time Period into this response.

Defendants object to this Interrogatory about psychotropic medications as not relevant to the Substantive Due Process or ADA claims in this case for which class certification has been granted. *See* Doc. 351. In its decision on class certification, the Court found that commonality was satisfied with respect to only four sets of "common" questions to be resolved at trial:

1) "whether [DoHS]'s placement array rises to the level of an unreasonable risk of serious harm, and whether Defendants are deliberately indifferent to that risk";
2) "whether the deficiencies in case planning subject the proposed General Class to an unreasonable risk of harm and if so, whether Defendants are deliberately indifferent to that known risk";
3) "whether Defendants' caseload practice prevents [DoHS] from providing adequate care to Plaintiffs, and if so, whether Plaintiffs are resultantly exposed to a substantial risk of harm"; and
4) "whether Defendants' [lack of] provision of [community-based] services [for children with disabilities] is in fact deficient, and if so, whether the deficiency places foster children with disabilities at risk of unnecessary institutionalization."

Doc. 351, at 17, 20, 24 (emphasis added). The policies and procedures regarding the administration of psychotropic medication is not relevant to any of these questions.

Moreover, psychotropic medication is not even mentioned in the 44 pages of "Class Action Allegations" or alleged "Systemic Deficiencies" in Complaint.

Based on the foregoing objections, Defendants decline to respond to this Interrogatory.

As to objections,

*/s/* Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown
Julia M. Siegenberg
Rebecca L. Wolfe
Brown & Peisch PLLC
1225 19th Street NW, Suite 700
Washington, DC 20036

As to responses,

/s/ Cammie Chapman
Deputy Secretary
Department of Human Services
One Davis Square
Charleston, WV 25301
*On behalf of the DHHR*

<u>/s/ Steven R. Compton</u>
Steven R. Compton (WVSB #6562)
W.V. Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 2530

*Counsel for Defendants*

January 29, 2024

11

## VERIFICATION

I, Cammie Chapman, am the Deputy Secretary of the Department of Human Services ("DoHS"). The factual matters stated in the foregoing responses are on behalf of DoHS, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable inquiry of DoHS staff and the factual matters known or made known to me for purposes of making this verification, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

Dated: January 29, 2024                    /s/ Cammie Chapman
                                            Cammie Chapman

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of Defendants' Response to Plaintiffs' First Interrogatories to be delivered to the following via electronic mail:

Marcia Robinson Lowry
A Better Childhood
355 Lexington Ave. Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

J. Marty Mazezka
Disability Rights of West Virginia
1207 Quarrier Street, Suite 400
Charleston, WV 25301


January 29, 2024

/s/ Philip J. Peisch
Philip J. Peisch (WV Bar # 13731)
Caroline M. Brown
Julia M. Siegenberg
Rebecca L. Wolfe
Brown & Peisch PLLC
1225 19th Street NW, Suite 700
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
WV Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301