# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

NATHAN R.,

    Plaintiffs,

                        Case No. 3:19-cv-00710

JIM JUSTICE, et al

    Defendants.

## DECLARATION OF SAM HICKMAN

I, Sam Hickman, declare under penalty of perjury that the following is true and correct:

1.    The Plaintiffs have retained me as an expert in this matter.

2.    If called as a witness, I would offer testimony as to those matters set forth in my report, which is attached to this declaration. My report contains a complete statement of my opinions in this case and the basis and reasons for them; the facts and data I considered in forming them, my qualifications, including a list of all publications I authored in the past 10 years and a list of all other cases I have testified in from the last 4 years; and a statement of the compensation I am being paid in this case.

Executed on May 14, 2024

Sam Hickman



**Expert Report of Samuel A. Hickman, MSW, LCSW, ACSW**

*Jonathan R., et al. v. Jim Justice*, et al.
U.S. District Court for the Southern District of West Virginia
Case No. 3:19-cv-00710

May 15, 2024

This commentary is provided by Samuel A. Hickman, MSW, LCSW, ACSW. From 1985 – 2022, I served as executive director of the National Association of Social Workers West Virginia Chapter ("NASW WV"). In this capacity, I was in a unique position to observe and interact with the (now) West Virginia Department of Human Services ("the Department" or "DoHS"), particularly regarding the qualifications for and recruitment and retention of professional staff tasked with providing essential assessment, intervention, and casework services to West Virginia's most vulnerable children and families, including Child Protective Service Workers and similar public sector social workers. I have undertaken the writing of this report and am providing it in support of the Plaintiffs' case *pro bono*.

It is my position that for over thirty-five years, the Department, which is legally tasked with intervening with families and children when they are experiencing serious disruptions to their well-being, has actively sought to ease standards for hiring child welfare professionals in order to fill vacant positions, rather than consistently seeking funding to maintain adequate resources, improve salaries, and create an organizational culture that promotes family preservation and delivers adequate services to children and families. Instead of fostering a workplace culture that supports both its employees and the families that they serve, the Department leadership has failed to invest in its workforce in a number of key ways. For one, the Department staff's non-social workers in supervisory roles, who lack the experience and expertise to guide case workers in their duties. Consequently, the quality of caseworker supervision is diminished, and case workers lack adequate support in executing their manifold responsibilities. Additionally, due to the lack of social worker expertise among organizational leadership, the Department is dominated by a punitive or "correctional" mentality, rather than a rehabilitative and family-oriented approach. Politics has

played a role in these decisions, and the Department has frequently deferred to political stakeholders at the expense of their legal duties to keep the children in their custody safe and free from harm.

- ***Remarkably, nearly 35 years later, these problems persist and continue to negatively affect the Department's ability to provide quality services with satisfactory outcomes to West Virginia's most vulnerable children and families.***

A 1990 Blue Ribbon Report on Child Welfare in West Virginia released by the NASW WV identified serious issues affecting the quality of services provided to at risk children and families. The report made a series of recommendations designed to recruit and retain more highly qualified Child Protective Service Workers within the Department. Of primary concern at the time were the Department's indiscriminate hiring practices, poor working conditions, and low salaries. Remarkably, nearly 35 years later, these conditions remain because the DoHS largely ignored these recommendations and instead pursued a long-term strategy to weaken the requirements of the social work licensing law in order to facilitate the hiring of persons who would not otherwise have been qualified to obtain a social work license, or to exempt DoHS employees from the licensing requirement completely.

Today, these 35-year-old recommendations are beginning to be reflected in DoHS recruitment and retention practices. However, DoHS has historically failed to sustain such efforts, due to budgetary limitations imposed by the legislature, and policy and key personnel changes implemented by the Governor's Office.

- ***Almost immediately the Department began to seek exceptions and exemptions that weakened the West Virginia's social work licensing statute passed in 1985.***

In 1985, the then WV Department of Welfare supported successful legislation that established and required a state professional license for West Virginia social workers, including state employees such as Child Protective Service Workers. *See* W. Va. Code § 30-30-1 et seq. The

law required a licensed social worker to hold an accredited degree in social work. It created an independent Board of Social Work responsible for all aspects of licensing, including the adjudication of complaints to protect the public from malfeasance and malpractice. It also required adherence to a stringent Code of Ethics and the attainment of 40-hours of professional continuing education as a condition of renewal of license.

Almost immediately, the Department began to seek exceptions and exemptions based on the assumption that qualified workers would be difficult to find in rural areas. The Department quickly realized that it was also difficult to hire in the state's most populous counties as well. To address this hiring need, the WV Board of Social Work developed what came to be known as the "temporary license" which allowed for the employment of persons with at least a four-year college degree in a subject related to social work, so long as they actively worked toward the attainment of a social work degree within a reasonable period of time. Due to the Department's lobbying efforts, over time this rule was changed to allow the hiring of a person with a four year degree unrelated to social work who actively worked toward the attainment of a social work degree within a reasonable period of time. *See* W. Va. Code § 30-30-5.

This compromise, although not ideal from a professional regulation perspective, made available for employment as protective services workers persons who would not previously have been qualified. It created a pathway to a regular West Virginia social work license. Successful completion and continued employment was conditioned upon earning 12 hours of academic coursework from an accredited social work program, annual professional continuing education, adherence to the NASW Code of Ethics, supervised employment, and licensing supervision designed to integrate academic learning into the work setting, all within a four-year timeframe.

- ***In 2023, the Department supported legislation that would lower the bar even further by allowing the hiring of an 18-year-old with only an associate degree.***

4

The Department's efforts to circumvent the social work licensing law to satisfy staffing needs continue to this day. Over time, the Department has sought to incrementally reduce public sector social work hiring standards from a formal social work degree to a four-year degree in a field related to social work, to <u>any</u> four-year degree, to a mere two-year associate degree under a pilot program authorized by the legislature. In 2023, the Department supported new legislation intended to ease employment standards in geographical areas of the state where there were critical shortages. *See* W. Va. Code § 49-2-110a. This statute allowed the Bureau of Social Services authority to hire and employ workers who are not social workers in geographical areas of critical shortage. Specifically, the new legislation permitted DoHS to hire an 18-year-old with an associate degree. *Id.* § 49-2-110a(f). *De facto*, the new pilot project has removed the requirement that a staff member must be actively working toward obtaining a social work degree. Although the statute contains a sunset provision under which the eased hiring restrictions automatically expire on December 31, 2026, anyone hired under the program prior to that time may continue their employment after the expiration date. *Id.* § 49-2-110a(h).

It is my opinion that the Department continually sacrifices quality for expediency. Rather than devoting resources to improve the workplace environment to reduce turnover, even as simple as adding support staff, or seeking additional funding for beneficial prevention services, time and again the Department has taken the easy way out to simply fill vacancies with workers that perpetuated a high turnover rate. Unqualified workers are set up to fail and their inevitable departures perpetuate a vicious cycle of high turnover rates and unqualified new hires. As a result, West Virginia's most vulnerable children and families bear the unfortunate consequences. These consequences include inadequate preparation for employment, a lack of consistency among caseworkers in their ability to identify and engage appropriate benefits and services meant to

support or reunify families, and a frustrated legal system. These conditions directly contribute to the fact that West Virginia has, by far, the highest child removal rate in the nation.[1]

Historically, at any point in time approximately 30-40% of the Department's child protective services workforce are professional social workers who hold an accredited degree in social work and a state social work license. This is reflected in DHHR's Annual Progress and Service Reports. For example, the 2024 Annual Progress Services Report notes that 52% of workers were part of the Social Service Registry, meaning that they could be workers with no social work background or degree related to social work and whose only social work training comes from DHHR.[2]

- ***With approximately 7,000 children in foster care, West Virginia's child removal rate exceeds that of any other state.***

The clear objective of the child welfare system is child safety and family reunification. Therefore, the quality of the child welfare workforce is directly related to optimal outcomes in child well-being and family reunification. The Department, through hiring practices designed primarily to fill vacancies quickly, rather than to build a quality workforce, intentionally or inadvertently fostered a culture in which a criminal justice approach has flourished—an atmosphere in which the punishment of bad actors (by removing children from the home) overshadows the more difficult and intensive casework needed to perform interventions designed to maintain and/or reunify families.

This punitive approach is a direct result of DoHS's looser hiring standards. By expanding eligibility criteria to individuals holding degrees in fields "related to" social work, DoHS

---

[1] Children ages birth to 17 entering foster care | KIDS COUNT Data Center (aecf.org).
[2] Bureau for Social Services, West Virginia 2024 Annual Progress and Services Review, West Virginia Dep't of Health and Human Resources; *see also* Bureau for Social Services, West Virginia 2023 Annual Progress and Services Review, West Virginia Dep't of Health and Human Resources.

commonly hires individuals with degrees in criminal justice, for example. Although these two fields are related, a criminal justice degree instills a different professional outlook than does a social work degree program. While the latter promotes assessment skills methods of practice, and therapeutic interventions intended, in the case of child welfare, to repair and strengthen familial bonds where possible, the former focuses more on investigating maltreatment and can lead to removing children from homes without adequate regard for family preservation or reunification.

- ***In spite of the Department's systematic efforts to reduce hiring standards and qualifications, it is clear that an accredited degree in social work is the gold standard in child welfare staffing.***

NASW WV strongly advises that the best outcomes in child welfare are achieved when services are delivered by a professional social worker with a nationally accredited degree and a state license. A 2021 publication by the National Child Welfare Workforce Institute, a service of the United States Children's Bureau, which is organized under the United States Department of Health and Human Services' Administration for Children and Families, states that ***"[a] social work degree, specifically an MSW, is the best predictor of overall performance in social service work."***[3]

*Both BSW and MSW degrees are shown to improve:*

- *Assessment and decision-making related to risk, behavior, Adverse Childhood Experiences (ACEs), and child safety*
- *Permanency planning*
- *Readiness for the work's complexity*
- *Knowledge and skills in key child welfare and social work competencies*
- *Core social work values and perspectives contribute to better job performance and positive permanency outcomes for children and families.*[4]

---

[3] National Child Welfare Workforce Institute, "Social Work Degrees Are Leading the Child Welfare Workforce" (July 2021), *available at* https://nationaldec.org/resourcelibrary/social-work-degrees-are-leading-the-child-welfare-workforce/ (emphasis added).
[4] *Id.*

7

- ***West Virginia has never elected to dedicate state matching funds for Title IV-E training.***

The U.S. Administration for Children and Families provides states with significant Title IV-E training funds annually to incentivize child welfare staff to earn an accredited degree in social work. The Title IV-E program is authorized pursuant to the Child Welfare and Adoption Assistance Act. The program provides in-service and pre-service training, as well as degree education opportunities. Both current and potential public child welfare staff are eligible. States can apply matching dollars to maximize Title IV-E training opportunities. It is my understanding that West Virginia has never elected to dedicate state matching funds, which means that there is less funding for training. I also understand that DoHs makes it difficult for staff to obtain Title IV-E tuition approval and reimbursement due to the educational leave time and other allowances required for staff to successfully complete an advanced degree program during their employment.

The Title IV-E in-service training provided in West Virginia, and in many other states, is provided by faculty of accredited social work education programs. Child welfare staff are taught many of the theories and practice methods included in an accredited social work degree program. Students enrolled in accredited social work education programs, and who declare an interest in pursuing a career in public sector child welfare services, are eligible for tuition support and loan forgiveness through the Title IV-E program. Finally, in order to obtain an accredited degree in social work, students are required to complete a rigorous field placement experience.

Opportunities for placements in DoHS offices have historically been limited, and some students have reported experiencing workplace hostility and/or limited opportunities to shadow CPS workers on the job. These limitations significantly impede DoHS's ability to recruit professionally trained and qualified employees.

- ***Studies suggest that those with a social work degree enter a child welfare position with more practical skills and a greater understanding of the complexities of the job. They also tend to stay in the job longer than those with related or unrelated degrees.[5]***

In my 45-year career as a professional social worker, and for the 37 years I served as the executive director of the professional association for West Virginia social workers, I had many opportunities to interact with the Department regarding professional staffing issues. I offered several recommendations to DoHS regarding ways to improve their hiring and retention practices, all of which went unheeded. Over the course of this time and with few exceptions, the Department acted to systematically reduce hiring standards for public child and adult welfare staff by eliminating the educational and professional licensing requirements for the job. The ostensible goal was to fill vacancies quickly. In doing so, the agency generally avoided a serious exploration of alternative strategies, such as addressing low salaries and poor working conditions. This was partly because of a reluctance by Department leadership to seek supplemental or new funding for such measures due to the perception that such requests would be unpopular with the Governor's administration and legislative leaders. As a result, the Department privileged politics over the safety and welfare of the children in its care.

---

[5] David Forrester et.al., *What is the Relationship between Worker Skills and Outcomes for Families in Child and Family Social Work?*, The British Journal of Social Work 2148, 2167 (2019), *available at* https://doi.org/10.1093/bjsw/bcy126; Joan Levy Zlotnick, Selected Resources on the Efficacy of Social Work for Public Child Welfare Practice, Center for Advanced Studies in Child Welfare, University of Minnesota (Jan. 2015); National Association of Social Workers Texas Chapter, CPS Education Requirements in the United States; Joan Levy Zlotnik, Virginia C. Strand & Gary R. Anderson, *Achieving positive outcomes for children and families: recruiting and retaining a competent child welfare workforce. Introduction*, Child Welfare (2009); Joe Guszkowski, Social Work Education Key to Retaining Foster Care Workers, Advocates Say, Youth Today (Sep. 24, 2015), *available at* https://youthtoday.org/2015/09/social-work-education-key-to-retaining-foster-care-workers-advocates-say/#:~:text=%E2%80%9CA%20social%20work%20education%20program,sense%20of%20professionalism%20and%20confidence.%E2%80%9D; Patrick Leung & Nicole Willis, The Impact of Title IV-E Training on Case Outcomes for Children Serviced by CPS, Journal of Family Strengths (2012), *available at* https://digitalcommons.library.tmc.edu/jfs/vol12/iss1/9/?utm_source=digitalcommons.library.tmc.edu%2Fjfs%2Fvol12%2Fiss1%2F9&utm_medium=PDF&utm_campaign=PDFCoverPages; Maria Scannapieco, Rebecca L Hegar & Kelli Connell-Carrick, *Professionalization in public child welfare: Historical context and workplace outcomes for social workers and non-social workers*, 34 Children and Youth Services Review 2710, 2175-2177 (2012), *available at* https://doi.org/10.1016/j.childyouth.2012.07.016; National Child Welfare Workforce Institute, Social work Degrees are Leading the Child Welfare Workforce, Children's Bureau (2021), *available at* https://nationaldec.org/wp-content/uploads/802-Article.pdf.

- ***A lack of consistency, foresight, and follow-through has plagued the Department throughout periodic changes in administrations.***

Achieving long-term stability in leadership, direction, or programmatic integrity is difficult for any entity of state government under the Office of the Governor. As administrations change so do their overarching priorities, assumptions, motivations, and goals, including among those appointed to oversee critical functions such as child welfare.  These common challenges impact the Department's ability to make lasting improvements in the areas of hiring, staffing, and supervision, much less quality. However, the Department is further hamstrung by a leadership mentality that is too "in the weeds" and frequently in "crisis mode." As a result, it is unable to engage in the kind of long-term planning and retrospection required to make progress in the face of critical, ongoing problems.

- ***The Department is in the midst of an ongoing overarching organizational challenge.***

The current leadership in the Department has made some progress in reducing staffing shortages. However, they are in the midst of an ongoing overarching organizational restructuring, which has plunged the Department into chaos and further hampered its ability to implement long-term initiatives that will bring the Department out of crisis mode. In this massive restructuring, the former WV Department of Health and Human Resources is being subdivided into three separate agencies, including the Department of Human Services which retains responsibility for child welfare.

The restructuring follows on the heels of other efforts to reform the agency, given serious doubts voiced by the legislature about the Department's performance.[6] There is a general

---

[6] *See* Amelia Ferrell Knisely, *Weeks away from DHHR split deadline, lawmakers worry not enough is changing*, West Virginia Watch (Dec. 12, 2023), *available at*  https://westvirginiawatch.com/2023/12/12/weeks-away-from-dhhr-split-deadline-lawmakers-worry-not-enough-is-changing/; Amelia Ferrell Knisely, *Justice mum on latest foster care concerns as Republicans demand change in 'broken system'*, West Virginia Watch (Oct. 30, 2023), *available at* ; Brad McElhinny, *Senate leaders ask for concrete steps to*

perception that DHHR is overly complicated and difficult to manage.[7] In 2013, the state commissioned a review by Public Work which cost $1 million and ultimately was not implemented.[8]

Even after the recent restructuring, many legislators are skeptical that enough has substantially changed to make the missions and performance of the three new entities more focused and manageable—a perception reinforced by DHHR's decision to create an "office of shared administration" to provide management, oversight, and leadership for the financial, operations, and security systems of the three new departments.[9]

Given the Department's historic and current challenges, it will continue to have difficulty sustaining a sufficient number of **qualified** staff to run a child welfare system that adequately

---

*improve W.Va. child welfare system*, MetroNews (Jan. 3, 2023), *available at* https://wvmetronews.com/2023/01/03/senate-leaders-ask-for-concrete-steps-to-improve-w-va-child-welfare-system/.

[7] Roger Adkins, Personnel still a concern as DHHR transitions to three agencies, Charleston Gazette-Mail (Nov. 13, 2023), *available at* https://www.wvgazettemail.com/news/politics/personnel-still-a-concern-as-dhhr-transitions-to-three-agencies/article_39f6e587-aa9d-5a15-83b4-a0b0741c72bb.html.

[8] Lori Kersey, *DHHR: An 'unfolding train wreck'*, Charleston Gazette-Mail (Apr. 20, 2013), *available at* https://www.wvgazettemail.com/news/dhhr-an-unfolding-train-wreck/article_836e1e04-3aad-5fbb-9858-63475eb94aea.html.

[9] Caity Coyne, *Lawmakers frustrated with DHHR review; Justice blames politics while sharing no specifics for new plan's implementation*, Charleston Gazette-Mail (Nov. 14, 2022), *available at* https://www.wvgazettemail.com/news/health/lawmakers-frustrated-with-dhhr-review-justice-blames-politics-while-sharing-no-specifics-for-new-plans/article_2f1fb5ec-ff49-555a-969d-4fb070a413bb.html; Steven Allen Adams, History Repeats: DHHR Recommendations Similar to Previous Efforts, The Intelligencer (Nov. 19, 2022), *available at* https://www.theintelligencer.net/news/top-headlines/2022/11/history-repeats-dhhr-recommendations-similar-to-previous-efforts/; Steven Allen Adams, Public Broadcasting reporter released after DHHR pressure, The Weirton Daily Times (Dec. 28, 2022), *available at* https://www.weirtondailytimes.com/news/local-news/2022/12/public-broadcasting-reporter-released-after-dhhr-pressure/; Steven Allen Adams, West Virginia lawmakers raise concerns over DHHR shared services, emails, The Parkersburg News and Sentinel (Dec. 12, 2023), *available at* https://www.newsandsentinel.com/news/local-news/2023/12/west-virginia-lawmakers-raise-concerns-over-dhhr-shared-services-emails/; Steven Allen Adams, DHHR under federal civil rights investigation, The Weirton Daily Times (Dec. 3, 2022), *available at* https://www.weirtondailytimes.com/news/local-news/2022/12/dhhr-under-federal-civil-rights-investigation/; Steven Allen Adams, West Virginia Lawmakers Incensed by $1M Organizational Review of DHHR, The Intelligencer (Nov. 14, 2022), *available at* https://www.theintelligencer.net/news/top-headlines/2022/11/west-virginia-lawmakers-incensed-by-1m-organizational-review-of-dhhr/; Steven Allen Adams, DHHR officials address recent controversies before West Virginia lawmakers, The Parkersburg News and Sentinel (Nov.13, 2023), *available at* https://www.newsandsentinel.com/news/local-news/2023/11/dhhr-officials-address-recent-controversies-before-west-virginia-lawmakers/; Cheyenne Debolt, Interim Report: Lochhra, Wrap Up: Official Blog of the West Virginia Legislature (Sep. 12, 2023), *available at* https://blog.wvlegislature.gov/interim-report-2/2023/09/12/interim-report-lochhra-6/.

serves the needs of children and families and achieves the fundamental goals of child safety and family reunification.

For these reasons, it is imperative that injunctive remedial measures be put in place to oversee West Virginia's child welfare system and to compel the State of West Virginia to dedicate the necessary resources to assure constitutionally adequate outcomes for vulnerable children and families.

## TIMELINE OF SIGNIFICANT EVENTS CONCERNING
## THE DEPARTMENT'S RECRUITING AND STAFFING EFFORTS

The following is a timeline that includes commentary on a number of significant events between the years 2000 and 2023, which demonstrate the Department's efforts to reduce hiring qualifications for public sector social workers, and related policies, all of which have negatively impacted West Virginia's ability to sustain a quality child welfare services system.

## 2000

The WV Board of Social Work Examiners ("BOSW") provided an update on a legislatively required strategic planning initiative between the BOSW and the Department.[10] This strategic planning initiative created on September 1, 1998 involved multiple sub-committees which studied issues of recruitment, retention, and educational opportunities for public welfare social workers. This process involved:

- Creative ideas for streamlining the hiring process came to light.

- A survey of private sector social work employers established comparison data to DHHR salaries and benefits.

- Recruitment strategies were developed, including the ability to request targeted registry, and to recommend a statewide, systematic recruitment effort. This scheme created two distinct registries of candidates for hire: one of candidates with a social work degree and licensable and another for candidates with a related non-social work degree. This 'dual registry' program was unfortunately short-lived.

- Opportunities for accredited social work education in additional areas of the state were discussed made available.

---

[10] *See* Strategic Planning Initiative with WVDHHR (January 2001).

- Strategies for retaining valued employees were discussed, including the need for specific supervisory training, and the creation of specialized or advanced practice positions that would serve as supervisors and mentors for less experienced staff.

A number of promising strategies were developed but not implemented. The Legislative Oversight Commission on Health and Human Resources Accountability failed to put the item on a meeting agenda. Moreover, officials in subsequent DHHR administrations failed to sustain these efforts. When reminded of the initiative, DHHR responded that since the administration was different, they would not continue with the initiative.

## 2001

The Department chose to exploit the "Temporary License" provision rather than commit to strategies to improve salaries, working conditions, and improving the often-toxic culture of the agency. The WV Board of Social Work expressed serious concerns that these temporary licenses would jeopardize public safety given the removal of the requirement for an accredited social work degree for child welfare case worker positions.[11]

Once again, this initiative demonstrates the Department's failure to follow BOSW's recommendations and sustain efforts toward improvement:

**A handout during a February 7, 2001 Board of Social Work meeting, at which a representative from DHHR would generally attend, stated as follows:**

*WVBSWE POSITION ON TEMPORARY SOCIAL WORK LICENSE*

*PURPOSE OF THIS BOARD:*
*Pursuant to the West Virginia Code §30-30; the Board of Social Work Examiner's role is to protect the public from incompetent, irresponsible, ill-prepared, and incapable persons in the profession of social work. In doing so, the Board has the authority to promulgate rules and regulations that set high standards of professional experience, education, and training for those persons engaged in the profession of social work. **This has been difficult considering opposition from various groups.** However, the Board intends to pursue satisfaction of our purpose and goals as established under the West Virginia Code.*

*(10-year) TEMPORARY SOCIAL WORK LICENSE STATISTICAL DATA:*
*Period covering 1990 through mid-November 2000:*

---

[11] WV Board of Social Work Examiners, WVBSWE Position on Temporary Social Work License (Feb. 7, 2001).

- *Total Number of Temporary Licenses Issued for This Reporting Period: **5,032***
- *Percentage of Successful Conversion to LSW for This Reporting Period: **30% and falling***
- ***Percentage of Ethical Complaints Against Temporary License Social Workers for This Reporting Period: 72%***
- *Approximate Number of Expired Temporary Licenses on a Monthly Basis: **18-35 Per Month** (no notice to the Board from licensee, supervisor, or employer)*
- *Approximate Number of Inactive Temporary License Files Currently Housed in the Board Office for Those Who Are Not Currently Employed in Social Work But May Be Eligible to Pursue a License: **In excess of 1,500** (part of the "Pool")[12]*
- *Number of Applications for Eligibility That Are Approved on a Weekly Basis: **Approximately 12-30** (Lowest count being 12/ Highest count being 30 - adds to the "pool").[13]*

**An October 2001 Report from the Coalition for West Virginia's Children regarding caseload standards** recommended, in part, that the Department:[14]

- Immediately implement and adhere to department-wide caseload standards (worker-client/case ratios) within the Department of Health and Human Resources to improve the provision of direct services to at-risk families and children, and to support the hiring, recruitment, and retention of qualified staff.[15]

**October 2001**

In October 2001, the Coalition for WV's Children released the following Policy statements and recommendations. The Department declined to implement these recommendations in significant part.

*Children enter the state's foster care system when their families are unable to provide them with safe, secure homes. Most of the **5,605** children served by West Virginia's foster care system in FY 2000 were the victims of abuse, neglect, or abandonment. A smaller percentage is placed in the state's custody because of delinquency. Children in the care of the state may be placed in individual homes with foster parents, in group homes, or placed in-state or out-of-state in residential treatment programs. In FY 2001, **638** children were placed out-of-state.*

---

[12] These individuals are those who had a temporary license and were eligible to pursue a full social worker license. They remained eligible to be rehired, but DHHR did not rehire them or assist them in becoming fully licensed workers. That there were 1,500 former employees who were eligible for rehire in DHHR's recruitment pool belies the Department's rhetoric regarding the dearth of available candidates to fill vacancies. Instead, these former employees became casualties of the 'churn' of unqualified hires, who quickly vacated their positions and/or failed to progress through the Temporary License process toward a valid social work license due to the Department's lack of support.

[13] *See* WV Board of Social Work Examiners, WVBSWE Position on Temporary Social Work License (Feb. 7, 2001).

[14] Sam Hickman, Coalition for WV's Children Policy Statements and Recommendations: Protecting Children (Oct. 10, 2001).

[15] *Id.*

*Since 1995, referrals to Child Protective Services have increased by nearly **30%**, while state spending on abused and neglected children has remained basically stagnant.*

*The Coalition recommends West Virginia:*

- *Increase the per diem amount paid to foster care families in order to both increase and retain those willing to provide a caring home for children in custody of the state.*

- *Reduce the number of children placed in out-of-state facilities, in part, by paying in-state treatment facilities reimbursement rates that are similar to those currently paid for out-of-state facilities with similar outcome goals, by supporting the development of new in-state treatment resources, and by increasing the number and quality of in-state specialized foster care homes.*

- *Immediately implement and adhere to department-wide caseload standards (worker-client/case ratios) within the Department of Health and Human Resources to improve the provision of direct services to at-risk families and children, and to support the hiring, recruitment and retention of qualified staff.*

- *Actively attempt to achieve accreditation of the Department of Health and Human Resources by the Council on Accreditation by the year 2004.*

- *Child Protective Services staff who specialize in the Investigation of child abuse and neglect are responding in a timely manner, however, to achieve the greatest degree of protection for abused and neglected children the state must immediately follow the investigation phase with the appropriate implementation of direct and/or supportive services provided by on-going case management CPS workers. The dedication of staff and revenue resources toward this goal should be obvious in budget documents.*

- *Maximize the utilization of Title IV-E funds (Child Welfare and Adoption Assistance Act; Public Law 96-272), including the dedication of new state-matching funds, to provide in-service and pre-service training as well as degree education to current and potential public child welfare staff.*

- *Increase general revenue support for Child Protective Services and for the provision of foster care services as a tangible sign of acceptance of the state's obligation, privilege and commitment to care for its children, and particularly those children in the custody of the state.[16]*

---

[16] *Id.*

**2002**

In 2002, the Department, NASW WV, and the West Virginia Board of Social Work continued to discuss ways to phase out the temporary social work license in favor of hiring persons with an accredited social work degree. Department leaders announced a desire to seek accreditation by the Council on Accreditation (Social Current), a nationally recognized marker of excellence,[17] but they did not follow through. The DHHR/BSWE/NASW effort on professionalization had also resulted in recommendations to DHHR, but these were never given serious consideration, except for DHHR's hiring of a recruitment specialist.[18]

**2003**

**The Charleston Gazette**
**August 19, 2003**
**States flunk child welfare**
**W. Va. fails each category; 32 states and D.C. rated**
**By The Associated Press**[19]

> WASHINGTON — Not a single state has passed a rigorous test of its ability to protect children from child abuse and to find permanent homes for kids who often languish in foster care.
>
> "There is a lot of work to be done," said Joan Ohl, commissioner of the Administration for Children and Families in the U.S. Department of Health and Human Services. "It's a daunting task."
>
> Ohl is a former secretary of the West Virginia Department of Health and Human Resources.
>
> In the past, states were evaluated on bureaucratic benchmarks. Now, the questions are how many children are abused again after entering the system and whether parents are getting promised help.

---

[17] *https://www.social-current.org/about/* ("Our accreditation process is an independent, objective, and reliable verification that organizations and programs qualify for the confidence and support of their stakeholders. It involves a detailed review and analysis of an organization's or program's administrative functions and service delivery practices. All are measured against international standards of best practice.")
[18] *See, e.g.*, Email from NASW WV to Maureen Runyon, "DHHR Article" (Oct. 15, 2002).
[19] The Associated Press, States flunk child welfare, The Charleston Gazette (Aug. 19, 2003).

*The reviews merge dozens of questions into seven "outcomes" measurements.*

*Fourteen states, including West Virginia, have failed all seven.*

In 2003, the National Association of Social Workers West Virginia Chapter issued the following statement written by Warren Galbreath, PhD, former president of the board for NASW WV.[20] The statement was issued in preparation for the legislative session and distributed to legislators and NASW allies. Although the NASW was not given a "seat at the table," it continued to advocate for improved salaries and working conditions for caseworkers and to oppose lowered licensing standards.

**Child Welfare Position Statement**
**National Association of Social Workers West Virginia Chapter**

> *NASW believes that the Child Welfare system in West Virginia is on the verge of a major overhaul.  Should this likelihood occur, NASW should have a "seat at the table" so that the Social Work Profession is represented among the decision makers, to ensure that the system revisions are based on best practices and to promote services in the best interest of the child.*

> *NASW strongly supports educating the public as to the state of the present system.  The association believes that the necessary changes in the present child welfare system will only occur if the public is accurately informed as to the nature of the system.  Included in this education should be: present pay and caseloads of front line workers, publicity as to the referrals received and complaints substantiated, demographics as to the nature of those cases that are open, statistics related to successful outcomes after interventions and an accurate depiction of the number of children in out of home care.[21]*

**2008**

On July 28, 2008, NASW WV participated in a working group with the Department and the West Virginia Board of Social Work to discuss issues related to social work licensing in the public and private sectors.

---

[20] Warren Galbreath, PhD, NASW WV Child Welfare Position Statement (2003).
[21] *Id.*

A plan was developed to phase out the temporary license in DHHR by establishing deadlines by which Department social workers (CPS, APS, Youth Services, etc.) would, in order to continue employment, either complete provisional license requirements or obtain a social work degree. The plan was abandoned following the retirement of Bureau for Social Services Commissioner, Jason Najmulski. Subsequent attempts to encourage implementation of the agreement were rebuffed by the successor administration at the Department.

**2010**

In preparation for the annual session of the West Virginia Legislature, the NASW WV Board of Directors issued a statement on January 1, 2010 on improving social work licensing in child welfare in West Virginia. The statement referenced the continuation of the temporary license system allowing those without an accredited social work degree to work for the Department and its distress at the fact that ***"twenty-five years have passed without appreciable change or improvement."***

> **IMPROVING SOCIAL WORK LICENSING IN CHILD WELFARE SERVICES IN WEST VIRGINIA[22]**
> **January 1, 2010**
> **Executive Summary**
> **OVERVIEW**
>
> *Improving requirements for the availability of the West Virginia temporary social work license is a priority of the National Association of Social Workers. Social workers intervene when individuals, couples, families, groups, and communities are experiencing their most serious emotional, social and/or physical problems. The public is best served when professionally trained and fully credentialed social workers provide care to the state's most vulnerable citizens. . . .The temporary license system began as a means to fill vacant child protective service worker and similar critical need positions in more rural areas until more candidates with the accredited social work degree became available. It was always meant to be a **temporary** solution, not a permanent one. **Most concerning to NASW WV***

---

[22] National Association of Social Workers-West Virginia Chapter, Improving Social Work Licensing in Child Welfare Services in West Virginia (Jan. 1, 2010).

*is the fact that twenty-five years have passed without appreciable change or improvement.*

**NATIONAL ASSOCIATION OF SOCIAL WORKERS - WEST VIRGINIA CHAPTER 2010 Legislative Action Priorities**[23]

**SOCIAL WORKER SAFETY, RECRUITMENT & RETENTION**
- Improving Worker Safety:
  - Hire additional DHHR Health and Human Services Aids to minimize solo field visits.
  - Promote interagency risk assessment and safety strategy/technology collaboration.
- Professional Social Worker Recruitment and Retention:
  - Hiring Incentives: Recruit professional social workers via a dual Civic Service register; sign on bonuses, differential salaries, loan forgiveness, tuition reimbursement, etc.
  - Create a Master Protective Service Worker Civil Service class to improve client outcomes, mentor/retain junior employees and establish an advance direct practice career pathway.
- Increase the Pay Equity budget allocation to promote 'equal pay for equal work'.
- Appropriate state matching funds to maximize Federal Title IV-E Child Welfare training resources.

**2011**

The qualifications to serve as a public sector social worker in West Virginia were dramatically improved for the first time in over 25 years with the passage of HB 2525 on March 15, 2011. The law created a provisional license pathway to obtain a regular bachelor or masters degree in social work and a social work license, which required the attainment of at least 12 hours of coursework in social work from an accredited social work program, four years of supervised practice, and annual professional continuing education. The law also established the scope of practice for social workers.

---

[23] National Association of Social Workers-West Virginia Chapter, 2010 Legislative Action Priorities. These Legislative Action Priorities were widely distributed to members of the legislature as well as other interested parties, including DHHR.

## 2012

The Department strongly objected to the enactment of the provisions of HB 2525 and negotiated an exception to the requirement for 12 hours of academic coursework in social work. The compromise replaced the requirement for academic coursework with the Department's internal training program, which was not as rigorous or implemented adequately. Specifically, the new provision stated that:

> *"Provided*, that an individual employed as a provisionally licensed social worker with the West Virginia Department of Health and Human Resources shall satisfy this requirement upon completion of the social work training program with the West Virginia Department of Health and Human Resources. The Secretary of the West Virginia Department of Health and Human Resources shall, with the advice of the Higher Education Policy Commission, West Virginia University School of Social Work and Marshall University Department of Social Work, promulgate legislative rules, in accordance with article three, chapter twenty-nine-a of this code, to implement the provisions of this subdivision." W. Va. Code § 30-30-15(c)(2)

## 2013

**West Virginia Legislature, Performance Evaluation and Research Division (PERD)[24]**
**August 21, 2013**
**PE 13-03-539**

**AUDIT OVERVIEW**
The Bureau for Children and Families Needs to Improve Its Management of Child Protective Services Workforce Resources By Developing a Long-term Workforce Plan, Retention Goals and Reliable Labor Management Measures.

**EXECUTIVE SUMMARY**
This evaluation of the Bureau for Children and Families (BCF) is part of the agency review of the Department of Health and Human Resources, as authorized by *West Virginia Code* §4-10-8(b)(5). It has become common knowledge that the State's Child Protective Services (CPS) has not been able to investigate child abuse allegations in a timely manner as stipulated in statute. The Legislative Auditor determined that labor resources are an

---

[24] Bureau for Children and Families Department of Health and Human Resources, Audit Overview (August 2013), *available at* https://www.wvlegislature.gov/legisdocs/reports/perd/ChildFam_8_2013.pdf.

important factor in the process of investigating child abuse allegations. Therefore, PERD examined the BCF's management of the CPS workforce, and other performance aspects that may affect the efficiency of the CPS workforce. The results of the analysis are summarized below.

**Report Highlights**
**Issue 1: The Bureau for Children and Families Needs to Improve Its Management of Child Protective Services Workforce Resources By Developing a Long-term Workforce Plan, Retention Goals and Reliable Labor Management Measures.**

o The BCF has difficulties with meeting statutory timelines for investigating reports of child abuse and neglect. For 2011, CPS workers only met the timeline in 48 percent of the cases. The BCF is not taking a forceful approach in achieving a CPS workforce that is capable of investigating referrals in a timelier manner.

o The overall turnover rate for CPS workers who are responsible for investigating child abuse allegations was close to 28 percent in 2012, but for trainees the turnover rate was 54 percent. These turnover rates vary in different parts of the state. The overall turnover rate may be too high, but the turnover rate for trainees is troubling and is likely inhibiting the agency from achieving an effective child protective services workforce.

o There is not a sense of urgency by the BCF in achieving a CPS workforce capable of conducting timelier investigations of child abuse allegations. The BCF does not have a long-term plan for recruitment and retention goals, criteria needs to be established for what are appropriate turnover rates, timelines for achieving appropriate turnover rates need to be established, and **developing reliable workforce information for district and regional allocated positions is needed.**

The August 21, 2013 PERD report spurred the Department to form multiple workgroups to formulate strategies to review and recommend caseload standards. The workgroups included front-line workers from around the state. Representatives of NASW WV were invited to participate in the Social Work Group.

**DEPARTMENT OF HEALTH AND HUMAN RESOURCES CASELOAD STANDARDS INITIATIVE**
**11/12/13**[25]

WV Code §9-2-6a requires the Department of Health and Human Resources (DHHR) to develop reasonable and achievable standards based on the actual duties of employees in each program area of the Department.

**Recommendations:**

---

[25] Department of Health and Human Resources, Caseloads Standards Initiative (Nov. 12, 2013).

**Social Work Group:**
>       10-12 ongoing cases per Social Worker
>       8 initial intake and assessments per Social Worker
>       4 active ongoing cases and 4 active investigations per month per Social Worker
>       1 Supervisor per 5 Social Workers
>       7-9 cases per month per Social Worker in the Institutional Investigative Unit (IIU)

**Note:** Extensive travel time consumes a large portion of the workers' day due to lack of staff and the need to meet with clients face to face.

Of note, the Public Works Audit of DHHR, which was completed in early spring of 2013, stated the Child Welfare League of America recommended standards of no more than 12-15 children per caseworker. It also stated that the Bureau for Children and Families Child Protective Services caseloads are about 13 cases per line staff. **The workgroup pointed out that a case in West Virginia is based on "family" which may contain multiple children.** They surmised that the average family with a Child Protective Service referral had approximately three children—with some families having up to 8 or more. **So, in fact, if a West Virginia Caseworker has 15 cases there could be as many as 45 children or more for that particular worker, which is three times the recommended caseload.**

Caseworkers are required to see each child on their caseload once per month. Because of the limitations of in-state facility placements, workers often must travel out of state, sometimes great distances, to visit a child.

Job duties vary across the counties. The workgroup believes there should be more consistency.

## 2015

The Department supported legislation that would have totally exempted case workers from the requirement of holding a professional license issued by the WV Board of Social Work. NASW WV successfully lobbied for a version of the bill, SB 559, that retained this requirement.[26] As summarized for NASW WV members on March 13, 2015:[27]

**NASW WV Message to Colleagues:**

---

[26] SB 559 Testimony for Public Hearing from NASW Executive Director Samuel A. Hickman (Mar. 2, 2015); Sam Hickman, SB 559 Comments (Mar. 1, 2015); Letter from NASW Executive Director Sam Hickman to WV Senators (Feb. 24, 2015); Public Sector Recruitment and Retention Strategies (Dec. 15, 2015).
[27] Susan Sobkoviak, Dear NASW Members (March 2, 2015).

*"...SB 559, a bill that would have permanently exempted all DHHR (Department) Social Workers from the requirement to hold a (Social Work) license....*

*The version of SB 559 that passed the House and was accepted by the Senate is VERY different from the original provisions.*
> *•      Ensures that DHHR Social Workers continue to practice under the oversight of an independent licensing body – the WV Board of Social Work – whose purpose is to protect the public.*
> *•      Ensures that West Virginia citizens and consumers will continue to have access to administrative law procedures for the adjudication of complaints of misconduct or malpractice.*
> *•      Requires that all WV Social Workers will continue to be expected to adhere to a stringent professional Code of Ethics, earn professional continuing education hours, and pass a national standardized examination to receive a regular license."[28]*

**Public Sector Recruitment and Retention Strategies**
**NASW WV**
**December 15, 2015**[29]

On December 15, 2015, NASW WV sent recommendations to DHHR for public sector recruitment and retention strategies. One recommendation was to "Reinstitute the use of a dual Civil Service register and prioritize the hiring of degreed social workers; give priority hiring consideration to those with an accredited social work degree; require justification of a decision to hire from the non-social work degree register."[30] DHHR declined to implement this suggestion.

## 2017

**Child Protective Services Reform Initiatives** (December 14, 2017)[31]

The Department developed a series of CPS reform initiatives designed to improve recruitment and retention. Many of these either were never implemented or failed to adequately

---

[28] *Id.*
[29] Public Sector Recruitment and Retention Strategies, National Association of Social Workers-West Virginia Chapter Recruitment and Retention Suggestions (Dec. 15, 2015).
[30] *Id.*
[31] West Virginia Department of Health & Human Resources, Child Protective Services Reform Initiatives (Dec. 13, 2017).

address the issues. Notably, at the top of the list was a pay raise to be implemented by the Office

of the Governor. This, like many other of these initiatives, was never realized. DHHR also sought

to eliminate "unnecessary social work training."[32]

## 2020

In 2020, the Department established a Child Welfare Collaborative to serve as an

information sharing clearinghouse. Although optimistic in their tenor, at this point the Department

largely described the shifting of current positions and staff, rather than significant hiring gains. For

example, DHHR would promote people to supervisor or senior positions without filling the CPS

worker position that they came from. Issues of recruitment and retention continued to plague the

Department, and it continued in its goal to degrade or eliminate professional standards.

## 2023

The Department continued to degrade hiring requirements and oppose any requirement that

public sector social workers obtain and maintain a professional social work license. The

Department advocated for a legislative initiative that created another alternative employee

classification, which bypassed professional licensure requirements. W. Va. Code §§ 30-30-16(e),

30-30-30. In this case, a simple registration process internal to the Department was established for

child welfare, youth services, or adult protective services workers. Employees who were unwilling

or unable to complete the social work licensing process were given the option to select registration

instead. Reasons for selecting registration might include, for example, being unable to pass the

---

[32] *Id.*

social work licensing examination after multiple attempts, or an unwillingness to take academic

coursework necessary to complete the licensing process.

> ### 30-30-16(e) WV Code
> *Any employee of the Department of Health and Human Resources with a provisional license as of the effective date of this section who opted to take the department-provided courses previously allowed has until June 30, 2022, to convert his or her license to a social work license or provisional license under this section. **If the individual cannot or desires not to complete this process, he or she shall be eligible for registration as provided in §30-30-30 of this code.***

### DHHR Registration permitted

> ### §30-30-30. Registration as a Bureau for Children and Families service worker.
> *To be eligible to be registered as a service worker for the Bureau for Children and Families of the Department of Human Services, the applicant must:*
> *(1) Submit an application to the board;*
> *(2) Be at least 18 years of age;*
> *(3) Have a baccalaureate degree;*
> *(4) Have obtained employment by the bureau;*
> *(5) Satisfy the requirements of the West Virginia Clearance for Access: Registry and Employment Screening Act provided in §16-49-1 et seq. of this code;*
> *(6) Satisfy the requirements provided in §30-1-24 of this code;*
> *(7) Complete 240 hours of pre-service training developed by the (Department);*
> *(8) Complete 20 hours of board-approved continuing social work education every two years, up to 10 of which may be earned through board-approved online education hours: Provided, That at least two of the hours shall be related to the Code of Ethics adopted by the board, and at least two hours shall be related to social, health, and mental health concerns of veterans and their families; and*
> *(9) Pay the application fee.*

Due in significant part to advocacy by the Department, HB 3261 passed in March 2023

and was enacted as W. Va. Code § 49-2-110a. HB 3261 allowed the Department to hire as Child

Protective Service Workers persons with bare minimum qualifications. Individuals who were at

least 18 years of age, had an associate degree, and could satisfy certain other *de minimis* criteria

were eligible for hire. The associate degree could have been earned prior to graduation from high

school.

The bill established a pilot project in two judicial circuits encompassing seven West Virginia counties, including the second most populous and fastest growing county in the state. It further authorized continued employment of those hired under the pilot beyond its December 31, 2026 expiration date.

By drastically reducing hiring qualifications, the Department has decreased staff vacancy rates in the affected counties. However, as discussed above, filling open positions with unqualified workers results in poorer outcomes for children and families and perpetuates, rather than alleviating the systemic dysfunction in the DoHS workforce.

Appendix A
**Referenced Materials**

1. Academy of Certified Social Workers, Memo re: NASW Task Force on Social Work License Issues (Dec. 8, 2000).
2. Amelia Ferrell Knisely, *Eastern Panhandle's backlog of 400 child abuse, neglect referrals marks state's troubled system,* West Virginia Watch (Oct. 16, 2023), *available at* https://westvirginiawatch.com/2023/10/16/eastern-panhandles-backlog-of-400-child-abuse-neglect-referrals-marks-states-troubled-system/.
3. Amelia Ferrell Knisely, *Justice mum on latest foster care concerns as Republicans demand change in 'broken system',* West Virginia Watch (Oct. 30, 2023), *available at* https://westvirginiawatch.com/2023/10/30/justice-mum-on-latest-foster-care-concerns-as-republicans-demand-change-in-broken-system/.
4. Amelia Ferrell Knisely, *Weeks away from DHHR split deadline, lawmakers worry not enough is changing,* West Virginia Watch (Dec. 12, 2023), *available at* https://westvirginiawatch.com/2023/12/12/weeks-away-from-dhhr-split-deadline-lawmakers-worry-not-enough-is-changing/.
5. Brad McElhinny, *Senate Leaders ask for concrete steps to improve W.Va. child welfare system*, WV Metro News (Jan. 3, 2023), *available at* https://wvmetronews.com/2023/01/03/senate-leaders-ask-for-concrete-steps-to-improve-w-va-child-welfare-system/.
6. Bureau for Children and Families Department of Health and Human Resources, Audit Overview (August 2013), *available at* https://www.wvlegislature.gov/legisdocs/reports/perd/ChildFam_8_2013.pdf.
7. Caity Coyne, *Lawmakers frustrated with DHHR review; Justice blames politics while sharing no specifics for new plan's implementation*, Charleston Gazette-Mail (Nov. 14, 2022), *available at* https://www.wvgazettemail.com/news/health/lawmakers-frustrated-with-dhhr-review-justice-blames-politics-while-sharing-no-specifics-for-new-plans/article_2f1fb5ec-ff49-555a-969d-4fb070a413bb.html.
8. Cheyenne Debolt, *Interim Report: Lochhra*, Wrap Up: Official Blog of the West Virginia Legislature (Sep. 12, 2023), *available at* https://blog.wvlegislature.gov/interim-report-2/2023/09/12/interim-report-lochhra-6/.
9. Christina Mullins, Vulnerable Families: A Public Health Analysis of WV Children in Foster Care 2017 (Oct. 22, 2019).
10. Coalition for WV's Children, Policy Statements and Recommendations (Oct. 10, 2001).
11. CPS Education Requirements in the United States.
12. Donald Forrester et.al., *What is the Relationship between Worker Skills and Outcomes for Families in Child and Family Social Work?*, The British Journal of Social Work 2148, 2167 (2019), *available at* https://doi.org/10.1093/bjsw/bcy126.
13. Department of Health and Human Resources, Caseloads Standards Initiative (Nov. 12, 2013).
14. Joan Levy Zlotnick, *Selected Resources on the Efficacy of Social Work for Public Child Welfare Practice*, Center for Advanced Studies in Child Welfare, University of Minnesota (Jan. 2015).

15. Joan Levy Zlotnik, Virginia C. Strand & Gary R. Anderson, *Achieving positive outcomes for children and families: recruiting and retaining a competent child welfare workforce. Introduction*, Child Welfare (2009).

16. Joe Guszkowski, S*ocial Work Education Key to Retaining Foster Care Workers, Advocates Say*, Youth Today (Sep. 24, 2015), *available at* https://youthtoday.org/2015/09/social-work-education-key-to-retaining-foster-care-workers-advocates-say/#:~:text=%E2%80%9CA%20social%20work%20education%20program,sense%20of%20professionalism%20and%20confidence.%E2%80%9D.

17. Lori Kersey, *DHHR: An 'unfolding train wreck'*, Charleston Gazette-Mail (Apr. 20, 2013), *available at* https://www.wvgazettemail.com/news/dhhr-an-unfolding-train-wreck/article_836e1e04-3aad-5fbb-9858-63475eb94aea.html.

18. Maria Scannapieco, Rebecca L Hegar & Kelli Connell-Carrick, *Professionalization in public child welfare: Historical context and workplace outcomes for social workers and non-social workers*, 34 Children and Youth Services Review 2710, 2175-2177 (2012), *available at* https://doi.org/10.1016/j.childyouth.2012.07.016.

19. National Association of Social Workers Texas Chapter, CPS Education Requirements in the United States.

20. National Association of Social Workers-West Virginia Chapter, Paul Nusbaum Meeting Discussion Items (Jan. 18, 2001).

21. National Association of Social Workers-West Virginia Chapter, 2010 Legislative Action Priorities (2010).

22. National Association of Social Workers-West Virginia Chapter, Improving Social Work Licensing in Child Welfare Services in West Virginia (Jan. 1, 2010).

23. National Association of Social Workers-West Virginia Chapter, SB 312 and HB 4128 Facts and Recommendations Re: Child Protective Service Workers (Jan. 18, 2020).

24. National Association of Social Workers-West Virginia Chapter, SB 559 Comments (March 1, 2015).

25. National Association of Social Workers-West Virginia Chapter, SB 559 Letter  (Feb. 2, 2015).

26. National Association of Social Workers-West Virginia Chapter, SB 559 Letter  (Feb. 24, 2015).

27. National Association of Social Workers-West Virginia Chapter, Strategy Email Messages (Oct. 15, 2002).

28. National Child Welfare Workforce Institute, "*Social Work Degrees Are Leading the Child Welfare Workforce*" (July 2021), *available at* https://nationaldec.org/resourcelibrary/social-work-degrees-are-leading-the-child-welfare-workforce/.

29. Patrick Leung & Nicole Willis*, The Impact of Title IV-E Training on Case Outcomes for Children Serviced by CPS*, Journal of Family Strengths (2012), *available at* https://digitalcommons.library.tmc.edu/jfs/vol12/iss1/9/?utm_source=digitalcommons.library.tmc.edu%2Fjfs%2Fvol12%2Fiss1%2F9&utm_medium=PDF&utm_campaign=PDFCoverPages.

30. Public Sector Recruitment and Retention Strategies, National Association of Social Workers-West Virginia Chapter Recruitment and Retention Suggestions (Dec. 15, 2015).

31. Roger Adkins, Personnel still a concern as DHHR transitions to three agencies, Charleston Gazette-Mail (Nov. 13, 2023), *available at* https://www.wvgazettemail.com/news/politics/personnel-still-a-concern-as-dhhr-transitions-to-three-agencies/article_39f6e587-aa9d-5a15-83b4-a0b0741c72bb.html.

32. Sam Hickman, Coalition for WV's Children Policy Statements and Recommendations: Protecting Children (Oct. 10, 2001).

33. Sam Hickman, Meeting Request Letter to Michael Lewis (Feb. 2, 2011).

34. Sam Hickman, Michael Lewis Discussion Points (March 15, 2011).

35. Sam Hickman, Michael Lewis Meeting Outline (March 2011).

36. Sam Hickman, Testimony for Public Hearing on SB 559 (March 2, 2015)

*37.* Social Current, About page*, available at* https://www.social-current.org/about/.

*38.* South Carolina Legislative Audit Council, A Review of Child Welfare Services at the Department of Social Services (Oct. 2014).

39. Steven Allen Adams, *DHHR officials address recent controversies before West Virginia lawmakers*, The Parkersburg News and Sentinel (Nov.13, 2023), *available at* https://www.newsandsentinel.com/news/local-news/2023/11/dhhr-officials-address-recent-controversies-before-west-virginia-lawmakers/.

40. Steven Allen Adams, *DHHR under federal civil rights investigation*, The Weirton Daily Times (Dec. 3, 2022), *available at* https://www.weirtondailytimes.com/news/local-news/2022/12/dhhr-under-federal-civil-rights-investigation/.

41. Steven Allen Adams, *History Repeats: DHHR Recommendations Similar to Previous Efforts*, The Intelligencer (Nov. 19, 2022), *available at* https://www.theintelligencer.net/news/top-headlines/2022/11/history-repeats-dhhr-recommendations-similar-to-previous-efforts/.

42. Steven Allen Adams, *Public Broadcasting reporter released after DHHR pressure*, The Weirton Daily Times (Dec. 28, 2022), *available at* https://www.weirtondailytimes.com/news/local-news/2022/12/public-broadcasting-reporter-released-after-dhhr-pressure/.

43. Steven Allen Adams, *West Virginia Lawmakers Incensed by $1M Organizational Review of DHHR*, The Intelligencer (Nov. 14, 2022), *available at* https://www.theintelligencer.net/news/top-headlines/2022/11/west-virginia-lawmakers-incensed-by-1m-organizational-review-of-dhhr/.

44. Steven Allen Adams, *West Virginia lawmakers raise concerns over DHHR shared services, emails*, The Parkersburg News and Sentinel (Dec. 12, 2023), *available at* https://www.newsandsentinel.com/news/local-news/2023/12/west-virginia-lawmakers-raise-concerns-over-dhhr-shared-services-emails/.

45. Strategic Planning Initiative with WVDHHR (January 2001).

46. Susan Sobkoviak, Dear NASW Members (March 2, 2015).

47. The Annie E. Casey Foundation, *Children ages birth to 17 entering foster care*, KIDS COUNT Data Center (2021) *available at* https://datacenter.aecf.org/data/tables/6268-children-ages-birth-to-17-entering-foster-care?loc=1&loct=2#detailed/2/2-53/true/2048/any/13034,15620.

48. Warren Galbreath, PhD, NASW WV Child Welfare Position Statement (2003).

49. West Virginia Code, §30-30.

50. West Virginia Department of Health & Human Resources, Child Protective Services Reform Initiatives (Dec. 13, 2017).

51. West Virginia Health and Human Resources, Child Welfare Collaborative Meeting (Feb. 19, 2019).
52. West Virginia Health and Human Resources, Child Welfare Collaborative Meeting (Oct. 22, 2019).
53. West Virginia Health and Human Resources, Child Welfare Collaborative Meeting (Dec 18, 2019).
54. West Virginia Health and Human Resources, WV Child Welfare Reform Collaborative Agenda and Notes (Jan. 8, 2019).
55. West Virginia Health and Human Resources, West Virginia 2023 Annual Progress and Services Review (2023).
56. West Virginia Legislature - Legislative Oversight Commission of Health and Human Resources Accountability, Final Report (2020).
57. West Virginia Performance Evaluation & Research Division, Agency Review: Bureau for Children and Families Department of Health and Human Resources (Aug 2013).
58. WV Board of Social Work, Meeting Notes (Oct. 5, 2017).
59. WV Board of Social Work Examiners, Strategic Planning Initiative with WVDHHR.
60. WV Board of Social Work Examiners, WVBSWE Meeting Results Memo (Dec. 13, 2000).
61. WV Board of Social Work Examiners, WVBSWE Position on Temporary Social Work License (Feb. 7, 2001).

**Samuel A. Hickman, ACSW, LCSW**
228 Hickory Road
Charleston, West Virginia 25314
(304) 345-0789 home      (304) 541-1398 cell
Email: shickman1452@outlook.org

**Personal:**
DOB 1/4/52, Charleston, WV; raised in Dunbar, WV.
Married to Elizabeth Jean Kent, LICSW, DCSW; one son.

**Education:**
1969: Dunbar High School –1969
1974: BA (Bible & Religion/Philosophy), Marshall Univ.
1977: Master of Social Work, West Virginia University

**Professional Licenses and Certifications:**
1985-present: Licensed Certified Social Worker, West
Virginia Board of Social Work Examiners
1992-present: Member, Academy of Certified Social
Workers, National Association of Social Workers

**Professional Experience:**
**1975-76:** Region III Drug Treatment Center, Charleston,
WV. Student intern; Drug Abuse Counselor; Summer
Youth Drug Awareness Program Coordinator
**1976:** London Borough of Camden Social Services, Grey's
Inn Basement Play Centre (child/adolescent drop
in/recreation/enrichment center): Student Intern, Holborn,
London, United Kingdom
**1977-78:** Logan-Mingo Area Mental Health, Inc: Project
Director, "People Reaching Out" NIMH-funded disaster
mental health outreach program, Williamson, WV (Crisis
mental health intervention following severe floods of 1977)
**1978:** Prestera Comprehensive Mental Health Center:
Substance Abuse Consultation & Education Specialist
(Cabell Co. WV.), County Director/Adult Mental Health
Counselor/Consultation-Education Specialist (Lincoln Co.)
**1979-85:** Memorial General Hospital Association: Social
Service Director, Family Health Service, Inc., Director of
Social Work Services, Memorial General Hospital, Social
Service Director, Elkins Convalescent Hosp, Elkins, WV.
**1985-2922:** National Association of Social Workers, West
Virginia Chapter: Executive Director, Charleston, WV;
State Chapter of NASW; largest NASW Chapter annual
conference; progressive social & political action agenda;
consumer and professional advocacy

**Appointments:**
1989-99: West Virginia Board of Social Work Examiners
(gubernatorial appointment); served as Vice Chair &
Secretary; established permanent office; achieved
independent clinical license; initiated strategic planning,
updated agency rules
1996-2002: National Center for Human Relations at West
Virginia State College; board president, 1999-2000
1998-2000: Strategic Planning Committee, WV Board of
Social Work Examiners - WV DHHR
2000: Good News Mountaineer Garage (Pres/Sec/Treas)
2004: Co-chair, Manchin Gubernatorial Transition Team on
Social Services, Child Welfare, Seniors and Veterans
2004: West Virginians for Affordable Health Care (VP)
2005-present: FACES on Medicaid (consumer/policy
advocacy coalition): Facilitator ('02-present)
2007: Road Map to Health (Health Care Reform) System
Redesign Task Force

2009: Substance Abuse Brief Intervention, Referral & Tx
Policy Advisory Committee (gubernatorial appointment);
(Oversight of four-year $12M SAMSHA grant)
2010: WV Supreme Court, Court Improvement Program
2013: WVU Eberly College of A&S Board of Advisors
2013: WV Supreme Court Juvenile Justice Commission
2017: Gov. Jim Justice Transition Team: Health/DHHR
2021: WV Indigent Defense Comm. (gubernatorial appointment)
2021: WV Foster, Adoptive & Kinship Parents Network
(Sec/Treas)

**Previous Appointments:**
BOD, Women's Aid in Crisis, Elkins, WV ('78-'82)
Div of Social Work Visiting Committee, WVU ('92 -)
Social Work Advisory Committee, WV State Univ ('94 -)
Social Work Advisory Committee, Concord Univ ('02 -)
Social Work Field Faculty Committee, WVU Div of SW
NASW Council of Chapter Executives Steering Committee
NASW National Annual Conference Review Committee
NASW National Delegate Assembly Planning Committee
NASW National Legislative Advisory Committee
WVDHHR Randolph Co. Community Advisory Committee
WV Div of Juvenile Services Strategic Planning Advisory Commission
West Virginia Kids Count Fund Marketing Committee (1992-2000)

**Professional Affiliations:**
1976-present: National Assoc of Social Workers: service on
various local, state & national committees: Chair, WV
Legislative Committee (1984-1985; passed license law);
Nat'l Member & Chapter Coordinating Comm (2001-
2003); Nat'l Council of Chapter Execs Steering Comm.
(Chair 2001-03; 2009-10); Delegate Assembly Bylaws
Task Force (2007-2008); DA Planning Comm (1985);
Modernization Task Force: Budget/Accounting (2015)
National Rural Social Work Caucus: Secretary (2003-
present); Coordinated Rural Social Work professional
policy statement for 2002 NASW Delegate Assembly;
member since 1980,
West Virginia Society for Social Work Leaders in Health
Care, 1982 - 1995
West Virginia Society of Association Executives, since
1987 (Scholarship Committee, 1995-96)

**Honors:**
1991: West Virginia Social Worker of the Year
1993: Nat'l Council of Jewish Women "Hats Off" Award
1994: Nat'l NASW Chapter Executive Director of the Year
2007: Distinguished Alumni Award, WVU Eberly College
2022: Outstanding Ally, WV Citizen Action Group

**Publications:**
A Guide to Social Work Licensing/The Alphabet Soup of
Social Work, The New Social Worker magazine (1996,
White Hat Publications)
Rural is Real (Rural Social Work, Scales, Streeter, editors
(intro SW text) (2003, 2012 Thomson, Brooks, Cole)
Dual Relations and Beyond: Understanding & Addressing
Ethical Challenges for Rural Social Work (Michael R.
Daley, Ph.D. LCSW PIP, ACSW, Univ. of South Alabama
Journal of SW Values & Ethics, Vol. 8, Num. 1 (2011)
Copyright 2011, White Hat Communications

**Other:**
Hobbies: Appalachian, folk, & organizing songs, cooking, gardening,
nonprofit organizations, advocacy
Youth soccer coach, 1991 – 2005
Editor, UU Congregation of Charleston, WV Newsletter, 1987 - 2005
Volunteer EMT, Randolph Co. Emergency Squad, 1979-1983
American Red Cross CPR Instructor, 1982
American Red Cross Certified First Aid training, 2000
Parent leader, Boy Scout Troop 2, Charleston, WV, '97-'02