# EXHIBIT 10

**In the Matter of:**

Jonathan R., et al.,

vs

JIM JUSTICE, et al.

LAUREA ELLIS

*June 26, 2024*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON


JONATHAN R., minor, by Next Friend, Sarah
DIXON, et al.,

      Plaintiffs,


 -vs-     Case No. 3:19-cv-00710


JIM JUSTICE, in his official capacity as
Governor of West Virginia, et al.,

      Defendants.



DEPOSITION OF LAUREA ELLIS
_____

    The deposition of Laurea Ellis was
taken on June 26, 2024, at 8:57 a.m.,
at 2116 Kanawha Boulevard, East, Charleston,
West Virginia.
_____




ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

Page 2

```
 1              A P P E A R A N C E S

 2   J. Alex Meade
     Attorney at Law
 3   Shaffer & Shaffer, PLLC
     P.O. Box 3973
 4   Charleston, West Virginia  25339-3973

 5   Julia Tebor
     Attorney at Law
 6   A Better Childhood
     355 Lexington Avenue, Floor 16
 7   New York, New York  10017

 8   Julia Siegenberg
     Rebecca Wolfe - Via Zoom
 9   Attorneys at Law
     Brown & Peisch, PLLC
10   1233 20th Street NW, Suite 505
     Washington, DC  20001
11
     Also Present:  Cammie Chapman
12

13

14

15

16

17

18

19

20

21

22

23

24
```

Elite Court Reporting, LLC
LAUREA ELLIS, 06/26/2024

```
 1                    I  N  D  E  X

 2        WITNESS

 3            Laurea Ellis

 4        EXAMINATION

 5            by Ms. Ellis          Page 04

 6        EXHIBITS

 7            Number 1              Page 43
             Number 2              Page 70
 8           Number 3              Page 87
             Number 4              Page 101
 9           Number 5              Page 119
             Number 6              Page 129
10           Number 7              Page 140
             Number 8              Page 145
11           Number 9              Page 156

12

13

14

15

16

17

18

19   Reporter's Certificate:      Page 176
     Errata Sheet/Signature Page:   Enclosed
20

21

22

23

24
```

Elite Court Reporting, LLC
LAUREA ELLIS, 06/26/2024

Page 4

1                      LAUREA ELLIS,

2    called as a witness, first being duly sworn

3    by the Court Reporter/Notary Public,

4    testified as follows, to wit:

5                      EXAMINATION

6    BY MS. TEBOR:

7         Q.  Ms. Ellis, my name is Julia Tebor.

8    I am an attorney for the plaintiffs.  You

9    were just sworn in, so you are under oath

10   and you are sworn to tell the truth the same

11   as if you are in court providing testimony.

12            Do you understand that?

13        A.  Yes.

14        Q.  I'll go over a couple of procedural

15   items for the sake of the court reporter.

16   Please limit your answers to a verbal

17   answer.  The court reporter can't take down

18   a nod of the head.

19            Do you understand?

20        A.  Yes.

21        Q.  Okay.  Your attorney may object.

22   These objections are for the court.  So you

23   may answer the question unless your attorney

24   tells you not to.

Page 5

```
1         A.  Okay.

2         Q.  If you need a break at any time,

3    please let me know.  But I ask that you

4    answer any pending questions before we take

5    a break.  Okay?

6         A.  Okay.

7         Q.  And if you do not understand a

8    question as I have phrased it, please let me

9    know and I will rephrase the question.

10        A.  Okay.

11        Q.  Do you have any questions about

12   what I have said so far?

13        A.  No.

14        Q.  All right.  Ms. Ellis, have you

15   ever been deposed before?

16        A.  Yes.

17        Q.  How many times have you been

18   deposed?

19        A.  I believe two.  Same case.

20        Q.  What case were you deposed in

21   connection with?

22        A.  I mean, years ago.  It was a child

23   abuse, a case that was brought against the

24   agency.
```

Page 6

1          Q.  And you say years ago.  When was

2    it?

3          A.  I don't recall.  Over 15 years.

4          Q.  What was the case?

5          A.  Are you asking me the name?

6          Q.  I am asking you the name and what

7    the case was about.

8          A.  I don't recall the name.  But it

9    was over a child who had been sexually

10   assaulted.

11         Q.  And was this child a foster child?

12         A.  No.

13         Q.  And if you recall, what was the

14   allegation against DHHR?

15         A.  That the worker didn't take the

16   appropriate action.

17         Q.  Ms. Ellis, what did you do to

18   prepare for today's deposition?

19         A.  I met with Julia.

20         Q.  When did you meet with your

21   attorney?

22         A.  I don't recall the dates.  I would

23   have to look at my calendar which I don't

24   have.  Most recently, I met with her

Page 7

1    yesterday.

2         Q.  About how many meetings had you had

3    before yesterday?

4         A.  I don't recall.  I mean, I don't

5    know the number.  Like I don't have know

6    calendar.  I could tell you if I had it, but

7    I don't have it.

8         Q.  Can you approximate?

9         A.  I mean, this is only a guess.

10    Maybe five.

11         Q.  Okay.  And aside from the meeting

12    yesterday, when were the other meetings?

13    And I will clarify.  Strike that.

14              Were these meetings within the last

15    month?

16         A.  Yes.

17         Q.  How long did you meet with your

18    attorney yesterday?

19         A.  Approximately an hour and

20    15 minutes.

21         Q.  Okay.  And how long were the

22    previous meetings?

23         A.  The time varied.  I mean, I think

24    from 30 minutes, 45 minutes to approximately

Page 8

1    an hour.  I mean, I don't -- I didn't track

2    them.  I know they were set for an hour.  I

3    don't know that we always went a complete

4    hour.

5         Q.  Did you review any documents to

6    prepare for today's deposition?

7         A.  Outside of the meeting, no.

8         Q.  You reviewed documents with your

9    attorney?

10        A.  Briefly.

11        Q.  Were those documents that your

12   attorney provided?

13        A.  Yes.

14        Q.  Did you consult with anybody else

15   besides your attorney in preparation for

16   today's deposition?

17        A.  No.

18        Q.  Can you provide me with your

19   professional background?

20        A.  I began in 1995 as an intern for

21   then the Department of Human Services.  I

22   was a 40 student.  I started as a temp

23   position until I earned my degree -- after I

24   finished my internship, I started as a temp.

Page 9

1   I came in as a health and human aide.

2            Once I obtained my degree, I went

3   to work as a child protective service worker

4   trainee, which was the position that you

5   were hired in.  After that, you complete

6   your year of probation.  I became a child

7   protective service worker.  I worked in that

8   position until 2005.  I became a child

9   protective service supervisor.  I served in

10  that position till I am thinking around

11  2009.

12           I left the agency for 14 months and

13  went to work at our -- the prosecutor's

14  office in the county at which I reside for

15  14 months.  I returned to the Department of

16  Health and Human Resources as a social

17  service coordinator.  I was in that position

18  until I became a community service manager.

19           The agency split to where family

20  assistance went to one side and social

21  services went to the other side.  So I

22  became a social service manager.  I was in

23  that position.  I became an interim deputy

24  commissioner in March of '23.  And then I

Page 10

1  became -- I was hired into the position of

2  deputy commissioner in May of '23.

3          Q.  And when did you become a social

4  services coordinator?

5          A.  It was 2009.

6          Q.  When did you become a community

7  services manager?

8          A.  Two thousand -- I was interim I

9  believe in 2021.  And then I became

10  permanent in 2022, I believe.

11          Q.  Okay.  And you said next you were

12  the social services manager.  So you became

13  the social services manager when?

14          A.  Well, I don't recall the date when

15  the agency, the bureau split.  A community

16  service manager was the title here.  It was

17  just basically a switch in title and you

18  focused on social services.  So I don't

19  recall like the exact day.

20          Q.  Okay.  And so for all intents and

21  purposes, community services manager and

22  social services manager, was that the same

23  role with a title change?

24          A.  With some change in your

Page 11

1    responsibilities and your duties.  I am no

2    longer responsible for family assistance,

3    the medical card, the EBT programs, the

4    building.  So it was just -- we focused on

5    social services.

6          Q.  And let's talk about the social

7    services manager role.

8          A.  Okay.

9          Q.  What was your role as social

10   services manager?

11         A.  Well, you are responsible for the

12   delivery of services within your district.

13   I mean, you supervise the supervisors.

14   That's a good way to say it.  That you lead

15   the productivity within your district.

16   Continual data analysis to see where we are

17   in cases in compliance.

18              You are responsible for hiring.

19   You have a physical responsibility to make

20   sure that staff are within policy in regards

21   to travel, making sure that we are serving

22   West Virginia residents to the best of the

23   ability of that county.

24         Q.  What counties did you oversee as

Page 12

 1    social services manager?

 2        A.  Wood initially.  And then with the

 3    realignment, Wood and Wirt.

 4        Q.  I know you said you became interim

 5    deputy commissioner in March of 2023 and

 6    deputy commissioner in May of 2023; is that

 7    correct?

 8        A.  That's correct.

 9        Q.  What is your role as deputy

10    commissioner?

11        A.  Well, a lot of the same.  It just

12    goes in a larger capacity.  I went from

13    having two counties to having 33 counties in

14    different districts.  So instead of

15    supervising front-line supervisors, you are

16    supervising your social service managers.

17            Part of your role is building

18    rapport with the court system, making sure

19    cases are in compliance, that districts are

20    staffed, partnering with their managers to

21    make sure that we look at every alternative

22    to get staff in there and to help them meet

23    their goals in regards to casework to make

24    sure that children are transitioning and

Page 13

1    permanency is achieved in the best way

2    possible.

3            You are responsible a majority of

4    the time responding to consumers with

5    concerns or complaints, navigating clients

6    to the services they need, helping them

7    understand the process, to reinforce

8    relationships with the workers.

9            Q.  And you said you are supervising

10   the social services managers; is that

11   correct?

12           A.  Yes.

13           Q.  How many social services managers

14   are there?

15           A.  I have 12 that --

16           Q.  So some of the social services

17   managers cover multiple counties?

18           A.  We call it a district.  I mean,

19   yes.  But it's -- some are multi-county.

20           Q.  Okay.  So each of the social

21   services managers are located in a district?

22           A.  They are.

23           Q.  And how do you supervise the social

24   services managers?

Page 14

```
 1        A.  Well, I mean, there's lots of ways.
 2   I mean, we are in an age of technology.  So
 3   obviously we utilize email.  We have monthly
 4   -- I mean, we have monthly management
 5   meetings which occur the first Friday in
 6   which all managers attend.  We have weekly
 7   data meetings, which are on Google.  So I
 8   mean, they are within their offices.  But we
 9   meet there weekly.  I mean, those are
10   scheduled.  And sometimes, I mean, things
11   come up, a policy change or a directive that
12   I really don't want to wait till that next
13   Monday.  So, I mean, we meet.  I communicate
14   with them individually.  I visit their
15   districts.
16        Q.  And you were talking about data
17   meetings.  Do you receive regular data
18   reports from your community -- from your
19   social services managers?
20        A.  Every Monday.
21        Q.  Okay.  What are those reports?
22        A.  Are you asking me the information
23   that I ask?
24        Q.  Correct.
```

Page 15

1          A.   Okay.   In child protective

2    services, there's different -- you have your

3    initial referrals come in.  So your initial

4    face-to-face.  So I get -- I receive from

5    them the number of referrals that they

6    receive during that -- the week prior

7    period.  And of that, how many of the

8    face-to-face were made.

9               We talk about how many children are

10   in custody and how many of those children

11   have been seen and then how many of those

12   have been documented.  If there is something

13   for like the -- we talk about -- I mean, if

14   there was an issue with staffing, if

15   somebody like had a couple of staff out on

16   medical, then we, you know, work together to

17   make sure that we cover any shortfalls.

18   That information is shared.  I am mentally

19   looking at it - sorry - on the list, what

20   their backlog looks like, what their plan is

21   to remedy any deficits.

22          Q.   When you say "backlog," what do you

23   mean?

24          A.   When you refer to backlog, backlog

Page 16

1    is a referral that is over 30 days that has

2    not been completed.

3          Q.  And when you say "a referral," what

4    do you mean?

5          A.  A referral, another word would be

6    investigation.  There are allegations of

7    abuse or neglect that is assigned for

8    investigation.

9          Q.  Okay.  And do you receive regular

10   reports regarding caseworker caseloads?

11         A.  When I talk to them -- when I talk

12   to managers individually, we do discuss like

13   caseloads.

14         Q.  Do they provide -- strike that.

15             Do you review any data on the

16   caseloads for the individual districts?

17         A.  Yes.

18         Q.  What data do you review?

19         A.  Well, I mean, their report.  I

20   mean, obviously their logs.  They share

21   their logs with me.  We look at what staff

22   are coming out of training, like the

23   movement of cases.  We look at their reports

24   that are in our PATH system like with

Page 17

1    caseloads.  And I can go in the PATH system

2    and look at who is under me to look at the

3    number like in the PATH system.

4         Q.  Have you gone on the PATH system to

5    look at the number of caseloads?

6         A.  Uh-huh.

7         Q.  How frequently do you go on the

8    PATH system to look at the number of

9    caseloads?

10        A.  One to two times a month.  I mean,

11   we talk about in cases -- what cases that

12   can be moved to the adoption unit, what

13   cases that can be closed.  Because like a

14   number doesn't always encompass what actual

15   cases they are working.  I mean, it's just a

16   matter -- some are just a matter of getting

17   the data in to closing the court orders,

18   closing the --

19            So, you know, we talk about that.

20   And they obtain that information from their

21   supervisors that, you know, Susie can close

22   five cases.  So, I mean, it looks like she

23   has 30, but actually she has 25.  So, I

24   mean, we do discuss that regularly.

Page 18

1         Q.  So these are verbal communications

2    between you and the social services managers

3    regarding how many cases they actually have

4    ongoing in their district?

5         A.  Correct.

6         Q.  Do you do anything to validate the

7    data or the information that they are

8    providing to you?

9         A.  There is a comparison with the

10   information they provide.  And I do compare

11   their verbal reports to PATH, the data in

12   PATH.

13        Q.  So you check their verbal

14   reports --

15        A.  Yes.

16        Q.  -- against PATH?

17            We talked about the backlog of

18   referrals over 30 days.  How do the social

19   services managers track the backlog?

20        A.  I mean, it's through a log.  Every

21   referral that has come in, there is a --

22   everyone has a log of the referral, when it

23   was received, when the face-to-face is due,

24   face-to-face made, when the -- when it's

1    clear.

2          Q.  And who is inputting the data on

3    when the face-to-face is made?

4          A.  The direct supervisor of the

5    caseworker.  I mean, generally, that would

6    be like your intake supervisor.

7          Q.  The supervisor of the caseworker

8    inputs the information about when a

9    face-to-face is made?

10          A.  On the log, correct.

11          Q.  And as far as you are aware, the

12    supervisor is relying on the information

13    provided to them by the individual

14    caseworker in inputting the timing for the

15    face-to-face?

16                MS. SIEGENBERG:  Objection.

17    Calls for speculation.

18          A.  Can you repeat the question?

19          Q.  Sure.

20                You had said that the supervisor

21    inputs information as to when a face-to-face

22    contact is made into PATH; is that correct?

23          A.  Yes.

24          Q.  Okay.  The supervisor in inputting

Page 20

1    that information with regard to the face-to-

2    face contact is relying on the information

3    provided to him or her by the individual

4    caseworker; is that right?

5         A.  Well, when a caseworker makes

6    contact with the child, the findings or the

7    information from that child is shared.  I

8    mean, it's staffed with the supervisor.  So,

9    I mean, then they record that the contact

10   was made.  Then they follow up to make sure

11   that the contact is like actually entered

12   into the system.

13        Q.  So the individual caseworker

14   provides information about the face-to-face

15   contact to the supervisor who then inputs it

16   into PATH?

17        A.  Correct.  Wait a minute.

18        Q.  Okay.

19        A.  Well, repeat your statement because

20   I think there was --

21        Q.  Sure.

22             The individual caseworker provides

23   information about the face-to-face contact

24   to the supervisor, and the supervisor then

Page 21

1    inputs -- sorry.

2            The individual case -- I'll strike

3    that.  I will do it in two separate parts.

4            The individual caseworker provides

5    information about the face-to-face contact

6    to the supervisor; is that correct?

7        A.  That's correct.

8        Q.  The supervisor then inputs that

9    information into PATH?

10       A.  That's not correct.

11       Q.  Okay.

12       A.  That's what I thought -- the worker

13   inputs the contact into PATH.

14       Q.  Okay.  Thank you.

15           Are there any formal processees in

16   place to check that that face-to-face did in

17   fact happen?

18       A.  I don't understand your question.

19       Q.  Sure.

20           The caseworker inputs into PATH

21   that they did a face-to-face contact with a

22   child, correct?

23       A.  That is correct.

24       Q.  Are there any checks in place to

Page 22

1    ensure that that face-to-face contact did in

2    fact happen, or is the supervisor relying on

3    just -- relying on the input of the

4    caseworker?

5         A.  Well, I think there is -- in order

6    to complete the investigation, they have to

7    have the information.  So they -- I mean, in

8    some essence they are relying on them.  But

9    they also -- information is obtained from

10   collaterals, it is not just -- so that

11   information is there.

12             There are quality reviews.  Our

13   staff are trained on meaningful contact.  So

14   there's certain information that needs to be

15   in that contact.  So I mean, again, there is

16   quality reviews like as a supervisor, and I

17   think it is the practice of most

18   supervisors, that -- I mean, randomly they

19   will pick a case or, you know, and just say

20   the ███ family, you know, just wanted to

21   follow up and see if you had any questions.

22   Basically to get their interaction with our

23   agency.

24             So, I mean, they do the quality

Page 23

1   reviews.  I mean, I don't know if I am

2   answering what you are asking.  But there

3   are -- you know, if a worker is saying it is

4   entered, we rely on that to be accurate.  If

5   we find that not to be accurate, then, I

6   mean, we deal with that as far as like --

7   but like the quality reviews -- so that

8   would be the only --

9        Q.  And in terms of the quality

10  reviews, how often do supervisors perform

11  the quality reviews?

12       A.  They are required to do ten a

13  month.

14       Q.  And is that ten cases that they

15  pick a month?

16       A.  Uh-huh.

17       Q.  How do they pick those cases?

18       A.  It has to be different.  It can't

19  be the same worker.  It has to be random

20  workers and two to three a week so they are

21  not all bunched together.  So those are kind

22  of the criteria that we ask that they review

23  those.

24       Q.  Do you receive reports on those

Page 24

1    quality reviews?

2           A.  Yes.

3           Q.  And you receive that monthly?

4           A.  Yes.

5           Q.  We talked about who reports to you.

6    Who do you report to?

7           A.  My direct supervisor is the

8    commissioner, who is Jeff Pack.

9           Q.  How frequently do you communicate

10   with Mr. Pack?

11          A.  We have a structured leadership

12   meeting which occurs weekly.  It's generally

13   on Thursdays unless we are, you know, all

14   together for something else.  And sometimes

15   we will combine it there.

16              I communicate with him -- I mean,

17   he is readily available if there is

18   something like that comes up or there is

19   something that he needs to be made aware of

20   or if he needs a question answered.  I mean,

21   our communication primarily is over phone.

22   I am about 90 miles in a different part of

23   the state.  So it is not like I walk down

24   the office -- or down the hallway and see

Page 25

```
 1   him.  But, I mean, he is readily available

 2   for clarification, questions answered,

 3   support.

 4         Q.  Do you send Mr. Pack regular

 5   reports?

 6         A.  I don't.  They are compiled.  Like

 7   the management -- like the management

 8   numbers and stuff like that are compiled.  I

 9   don't personally send them to him.  But he

10   does receive those.

11         Q.  What do you mean by the management

12   numbers?

13         A.  Well, I mean, you know, how many

14   cases you have, how many new service cases.

15   There's different like data points that is

16   recorded on there.  Mr. Pack also has access

17   to the same PATH system.  So like he could

18   look right now and tell you what one of my

19   districts is doing.

20         Q.  Okay.  And do you have regular

21   contact with Deputy Secretary Chapman?

22         A.  She generally is at our leadership

23   meeting.  I think she works all of the time.

24   On the weekends, we get like data, you know,
```

Page 26

1    about like the residential, just different

2    -- so she sends us out that weekly.  She

3    doesn't hesitate to call if she needs

4    something or -- again, she takes like our

5    calls like evenings, weekends -- I mean, not

6    just during the day.

7         Q.  You said weekly -- sorry.  You said

8    something about residential emails weekly?

9         A.  It is a -- gosh.  It is a weekly

10   data of -- it's a data report of, you know,

11   the number of kids that are in residential.

12        Q.  Okay.  And do you have regular

13   contact with Secretary Persily?

14        A.  I don't, no.  I mean -- no.

15        Q.  We talked about how -- we talked a

16   bit about caseloads.  But do you receive

17   regular reports showing caseloads of each

18   individual caseworker?

19        A.  I mean, I don't get a hand -- like

20   a report, I mean, you can look at.  I mean,

21   you can look at a district's performance.  I

22   get that like verbally from like the

23   managers.  And again, I think I stated this

24   previously.  A worker's caseload is not

Page 27

1  always indicative of the cases that they are

2  actually working.  I mean, they are --

3          For example, an investigation can

4  be completed.  And it needs a date of birth

5  entered to approve it.  So, I mean, that may

6  look like they have like an extra case.  I

7  mean, it is not always accurate when you

8  have a family case where terminal rights

9  have been terminated and you become -- we

10  make them into a state ward to get them to

11  the adoption unit.  The state ward is open.

12  So if there are four kids in it, that's

13  going to look like five cases.  Because when

14  in a state ward, they become individual

15  cases.  And you may have the state ward open

16  just for your waiting on the court order or

17  the appeal period.  So one case looks like

18  five cases.  So, I mean, looking at like a

19  caseload, there is -- I mean, there is more

20  to it than just looking at a caseload.

21          Q.  Can we go back to that?  So when

22  you say one case looks like five cases,

23  that's because there are five kids; is that

24  right?

Page 28

```
 1        A.  Well, you have got your original
 2    family case which is still open.  You are
 3    waiting for an appeal period or you are
 4    waiting for a court order or something to
 5    close it out.  But in order to achieve
 6    permanency in a quicker rate more efficient
 7    than when you make them a state ward, ▆▆▆,
 8    ▆▆▆, ▆▆▆, whoever, like all of the kids.
 9    So that is one family, but it appears as
10    like maybe five cases.
11        Q.  Okay.
12        A.  So looking at a caseload, unless
13    you are working those cases and understand,
14    then your benefit comes from your supervisor
15    being able to tell you what those cases are.
16        Q.  Okay.  So to take your example,
17    there is a case with five kids?
18        A.  Okay.
19        Q.  You said basically it may show
20    five cases.  If the one case is the previous
21    case that is still open and then the kids
22    are in the process -- the parental rights
23    have been terminated and there is four kids
24    separately --
```

Page 29

```
1        A.  Correct.

2        Q.  -- is that right?

3        A.  Yeah.

4        Q.  So is there any way looking at just

5   a caseload to tell how many kids are

6   actually under that caseworker's

7   supervision?

8        A.  Ask me that again.

9        Q.  Sure.  I will rephrase.

10        A.  Okay.

11        Q.  So aside from having the insight

12   from an individual supervisor who knows the

13   case, if you are just looking at the

14   caseload, there is no way to know how many

15   cases are actually on that caseload?

16             MS. SIEGENBERG:  Objection.

17   Vague.

18        A.  If I'm answering -- if I think I am

19   understanding you, I mean, you can look at a

20   worker's caseload.  When a state ward --

21   when a state ward -- I mean, they are

22   temporary because they move to the adoption

23   unit.

24             So to answer your question, you
```

Page 30

1    have to have a little bit of knowledge of

2    what case -- what those cases are.

3    Investigations is an example, like a

4    maltreatment only case.  We send that out

5    for an assessment.  It is not a case that we

6    are working, but it shows as a case on our

7    caseload.

8            So you have to have some basic

9    knowledge of what those cases are.  So if

10   you -- somebody on the outside or if I

11   looked at a frontline worker's caseload -- I

12   mean, I have spent my whole life in the

13   field.  So I might be able to recognize it a

14   little bit easier.  But if you look at like

15   caseloads, it's not always an accurate -- I

16   mean, they are a case, but the cases they

17   are actually working, it might be a little

18   bit of like I guess a contradiction.

19       Q.  So unless you could review the

20   information for each individual case, there

21   is no way to determine exactly how many

22   caseworkers a caseworker is working at any

23   given time?

24            MS. SIEGENBERG:  Objection.

Page 31

1    Misstates prior testimony.

2          A.    Ask me your question again.   I'm

3    sorry.

4                MS. TEBOR:   Can you read it back

5    to me?

6                THE COURT REPORTER:   Sure.

7                (The preceding question was read

8    back by the court reporter.)

9                MS. SIEGENBERG:   Same objection.

10         A.   A supervisor would know that.   I

11   mean, a supervisor reviews the caseload the

12   district manager would know -- would know.

13   But looking on the outside -- I mean, PATH

14   may say they have 50 cases when they are

15   actually working 35 or 30 because they just

16   had court this month and they are scheduled

17   to staff at the end of the month.   A lot of

18   the staffings do occur later in the month.

19   And so right now Julia may have 50 cases,

20   but eight of those kids are slated to go to

21   the adoption.

22                So, I mean, your district would be

23   able to tell you that.   So, I mean, I am not

24   sure that I am answering your question.   But

1   just to try to explain it --

2       Q.  Yes, you are answering my question.

3   This is helpful.

4           So without talking to your

5   supervisors, if you got a report of the

6   caseloads, you would not necessarily know --

7   you personally would not necessarily know

8   how many cases a caseworker was working at

9   any given time?

10      A.  We have a legally free -- we do

11  have like a log that -- legally free.  I

12  mean, there are different checks and

13  balances to make sure like our kids are

14  moving.  I know how to utilize that log.  So

15  I may have some questions.  But to give you

16  an exact number at this moment, no, I could

17  not do that.

18      Q.  So in order for you personally to

19  determine how many cases a caseworker was

20  working at any given time, you would have to

21  compare the legally freed, I believe is the

22  terminology used -- legally freed log to the

23  caseloads for each child to line up how many

24  cases there actually were; is that correct?

Page 33

1          A.  And have a conversation with the

2     district.  I mean -- yeah.

3          Q.  And you would need more information

4     from the district?

5          A.  Right.

6          Q.  Do you receive regular reports

7     regarding available placements?

8                    MS. SIEGENBERG:  Objection.

9     Vague.

10         A.  Not regular.

11         Q.  When you say "not regular," what do

12    you mean?

13         A.  I mean, we occasionally will get

14    notifications that a certified foster care

15    agency has availability for like a specific

16    age range or -- I mean, they have a new -- I

17    mean, I got an email yesterday about a new

18    home opening up, you know, what their

19    interests were.  And so, I mean, you do get

20    those, I mean, when they are available.

21         Q.  Okay.  Aside from that type of

22    email, is there anything else?

23         A.  Well, I mean, we have received

24    reports of availability with providers.

Page 34

```
 1        Q.  What do you mean by that?
 2        A.  Like a facility has two female
 3   beds, two male beds.  I mean, that
 4   information.  So I have reviewed those.
 5        Q.  Do you receive reports about
 6   visitation between caseworkers and children
 7   who are in out-of-home foster care
 8   placements?
 9        A.  I don't receive reports on direct
10   cases unless -- I mean, I have reviewed them
11   and I have requested them if a parent says
12   they are not getting visitation or if
13   parents or if anybody raises an issue with
14   visitation -- I mean, like I can pull them
15   from the system and review them.  But I
16   personally don't get every visitation report
17   on every child.
18        Q.  Okay.  And just to clarify.  My
19   initial question was about visits between
20   with the caseworker and the child.
21        A.  Oh, I'm sorry.  I thought you were
22   talking about visitation.  Okay.  I
23   misspoke.  Sorry.  Okay.  Ask me the
24   question again.
```

Page 35

1        Q.  Sure.  Do you receive regular

2   reports about visits between the caseworkers

3   and the children?

4        A.  Okay.  That is a report that is

5   available.  I mean, we talk about it weekly

6   at our data meeting.  And it is also a

7   report that is available in PATH that shows

8   our percentage of our visits that have

9   occurred with our children in custody.

10       Q.  And who inputs the information

11   about the visits into PATH?

12       A.  It would be both our assigned

13   caseworker or another caseworker who

14   assisted with the visitation.  It could be a

15   supervisor who sometimes assists with

16   visitation or it could be your deputy

17   commissioner who -- I mean, whoever makes

18   the visit.  And we also have our certified

19   -- our private agencies, their caseworkers

20   in our visits.

21       Q.  So the data that you review about

22   the percentage of visits also includes

23   visits from the private agencies?

24       A.  Correct.

Page 36

1         Q.  Is there any process to do a

2    quality control check on this data regarding

3    visits?

4         A.  There are several processes.  I

5    mean, your supervisor obviously reviews your

6    contacts.  We have a DPQI, a continual

7    review of.  We have our ChildStat.  So there

8    is a continual review of a random sample of

9    a six-month period.  And they look at the

10   quality and quantity of those contacts to

11   make sure they meet certain criteria.

12           Again, I, as well as Melanie,

13   require our managers to look at -- you know,

14   to review the contacts because -- I mean,

15   these are our kids.  So we are also looking

16   at like the private agency contacts to make

17   sure that they meet those criteria.

18        Q.  Okay.  And you said one of the- one

19   the processes you were relying on to do a

20   quality control check of visits between

21   caseworkers and children is the DPQI

22   process; is that correct?

23        A.  Uh-huh.

24        Q.  Okay.  And if the DPQI process

Page 37

1    finds that there is an issue with visits

2    between caseworkers and children, you would

3    rely on that data as valid; is that right?

4         A.  Correct.  I mean, it's a random

5    sample.

6         Q.  Okay.  And does the DP -- sorry.

7    Strike that.

8              Are there any quality control

9    checks done of the CPA visits?

10        A.  I don't understand your question.

11        Q.  Sure.

12             So we talked about supervisors

13   reviewing visits.  We talked about the DPQI.

14   Do those same processees apply --

15        A.  It does.

16        Q.  -- to the CPAs as well?

17        A.  It does.

18        Q.  And I think you answered this in

19   response -- in confusion over my first

20   question.  But do you receive reports

21   regarding visitation between parents and

22   children?

23        A.  Again, my previous answer is -- it

24   is going to be the same.  I don't get those

Page 38

1    reports.  I do have access to review them if

2    there is an issue, if somebody -- you know,

3    the quality of the visit or the quantity of

4    the visits, they are uploaded into each

5    child's individual case so I could review

6    them.  But I don't personally get those, no.

7         Q.  Okay.  And does the DPQI process

8    look at parent/child contacts as well?

9         A.  Yes.

10        Q.  If there was an issue identified in

11   the DPQI, you would rely on that as valid in

12   terms of identifying issues?

13        A.  Well, I mean, yes.

14        Q.  Are you involved in collecting the

15   data that is provided to the federal

16   government on child welfare information for

17   West Virginia?

18             MS. SIEGENBERG:  Objection.

19   Vague.  Confusing.

20        A.  As my role as the oversight because

21   of the data is input by our caseworkers and

22   our supervisors.  So in that capacity, yes.

23        Q.  And aside from overseeing the input

24   of the data, do you help to collect the data

Page 39

1    that is provided to the federal government?

2            MS. SIEGENBERG:  Same objection.

3        A.  Again, my responsibility is like

4    the field -- I mean, doing that.  I mean, if

5    a situation comes where we are questioned to

6    get information, then obviously we provide

7    it.  But I mean, overall, it's, you know,

8    making sure our case plan logs are updated

9    so that information can be retrieved.

10       Q.  So, for example, do you understand

11   that the federal government tracks

12   maltreatment in foster care?

13       A.  I do.

14       Q.  Do you pull and provide those

15   numbers?

16       A.  I do not.

17       Q.  Are you part of the process of

18   determining how many workers should be hired

19   for each county?

20           MS. SIEGENBERG:  Objection.

21   Vague.

22       A.  Yes.  I mean, I am a part of like

23   -- I am the report.  My counter partner --

24   like, I have been in this position a year.

Page 40

```
 1    So I have learned like what the formula --
 2    like how we look at like caseloads, what our
 3    recommendations are.
 4              So as far as -- my involvement was
 5    more on the sidelines learning this year.
 6    And then with -- you know, with the Senate
 7    bill, taking the population into
 8    consideration and preparing that report.  So
 9    my involvement would be minimal just because
10    it was a learning year.
11         Q.  Okay.  In terms of the -- I
12    understand you might not have been
13    personally involved in the process.  But in
14    terms of creating the recommendations, what
15    is your understanding of the process going
16    forward for you and for --
17         A.  Well, I mean, you look at
18    caseloads.  I mean, you take a year -- a
19    year average of caseloads and you come up
20    with a number.  And how many workers you
21    would need to -- recommended workers to
22    manage that caseload, how many workers that
23    are currently -- how many positions are
24    available in that district and what either
```

Page 41

1    the increase or decrease -- I mean, you have

2    got to consider the population in that now,

3    what the increase or the decrease would be.

4         Q.   Okay.  And when you say you are

5    looking at the average caseloads, are you

6    looking at this in terms -- are you looking

7    at the caseloads in terms of the child, in

8    terms of a family?

9         A.   Well, I mean, you look at two.  You

10   look at the investigation, the investigation

11   and -- in PATH, in order to -- like every

12   investigation is turned into a case.  So you

13   -- I mean, whether they are opened ongoing

14   as a case.  So, I mean, you have to

15   understand the difference in that.  So

16   investigation is one part and cases are

17   another.

18        Q.   And those both go into the average?

19        A.   In different -- investigations is

20   one and cases are another.

21        Q.   In terms of cases that are pre-

22   termination of parental rights for children

23   that are in foster care, those are counted

24   by family; is that correct?

Page 42

```
1          A.  Are you saying pre-termination?

2          Q.  Correct.

3          A.  Okay.  So that would be an ongoing

4    case.  So, I mean, it is considered a case,

5    yes.  It is one.

6          Q.  So one family is one case?

7          A.  Right.

8          Q.  Even though there could be five,

9    ten kids in the family?

10         A.  Correct.

11         Q.  And so the recommendation that you

12   are talking about in terms of caseworkers,

13   who is that provided to?

14         A.  It is provided to our commissioner.

15         Q.  Do you have an understanding of

16   what happened as a result of this year's

17   recommendation?

18              MS. SIEGENBERG:  Objection.

19   Vague.

20         A.  Only information that was shared.

21   I wasn't -- so --

22         Q.  What was the information that was

23   shared?

24         A.  That we did not get additional
```

Page 43

1  positions that were requested.

2          Q.  Do you understand why?

3          A.  Budgetary, is my understanding.

4          Q.  Do you understand who made that

5  decision?

6          A.  Our legislature.

7          Q.  When creating the recommendation

8  for the number of caseworkers, are you

9  looking at your whole area overall or are

10  you looking at each individual district?

11              MS. SIEGENBERG:  Objection.

12  Vague.

13          A.  You look at each district, I mean,

14  statewide.  But it is broken down by

15  district.

16              MS. TEBOR:  I'm going to mark

17  this as Exhibit 1.

18              (Exhibit 1 was marked.)

19              MS. SIEGENBERG:  It's been 50

20  minutes.

21              MS. TEBOR:  It's what?

22              MS. SIEGENBERG:  Fifty.

23              MS. TEBOR:  Fifty.  Okay.  We

24  will do this one, and then we will --

Page 44

```
 1          Q.  Ms. Ellis, if you will take a look
 2     at this email.  Let me know when you are
 3     ready to discuss.
 4               (Witness reviews document.)
 5          Q.  Ms. Ellis, let me know when you are
 6     ready.
 7          A.  Okay.  I have glanced over this.
 8          Q.  Okay.  So if you look at the page
 9     ending in Bates stamp 004.
10          A.  Okay.
11          Q.  And Bates stamp is the -- okay.
12     And this appears -- the bottom email appears
13     to be an email to Deputy Secretary Chapman
14     from Bridget Cohee, who appears to be a
15     circuit court judge; is that correct?
16          A.  That is correct.
17          Q.  Do you recall this email?
18          A.  Well, it was a year ago.  I mean, I
19     do recall -- I mean, not -- I do recall this
20     email.
21          Q.  Okay.  And Judge Cohee states that,
22     as you know, Judge Redding -- I'm sorry.  I
23     am looking -- below Continued Loss of Staff.
24     She says, As you know, Judge Redding has one
```

Page 45

1    ongoing worker (Raina Edwards) and I have

2    one ongoing worker (Marla McQuown, both of

3    who are assigned well over 100 cases to

4    manage.

5            Do you recall there being an issue

6    where workers had over a hundred cases to

7    manage?

8        A.  I do -- what I can tell you I do

9    recall is just some staffing challenges in

10   this district.  I don't recall a worker

11   having over a hundred cases.

12       Q.  Okay.  Do you have any reason to

13   doubt that the information provided by Judge

14   Cohee is accurate?

15       A.  I think probably that Judge Cohee

16   saw one worker and like in her courtroom the

17   majority of the time.  So I don't recall the

18   specifics.  But I don't recall a worker

19   having that number of cases.

20       Q.  But you think that Judge Cohee

21   would have seen one worker and --

22       A.  Primarily one worker within their

23   courtroom.

24       Q.  Okay.  And that worker, according

Page 46

1    to Judge Cohee, had well over a hundred plus

2    cases?

3        A.  According to this email, that

4    appears to be her perception, yes.

5        Q.  Okay.  And you say that appears to

6    be her perception.  Do you have any reason

7    to doubt the accuracy of her statement?

8              MS. SIEGENBERG:  Objection.

9    Asked and answered.

10          You can answer.

11       A.  Okay.  As far as like -- again, you

12   have a court worker assigned to certain

13   cases.  If like the kids go to an adoption,

14   although they are on the judge's document --

15   or docket, they are in the adoption unit.

16   So they would be transferred over to another

17   worker, which it could be me as the worker.

18   And then they are transferred and they go

19   over to Julia.

20              So those cases there are, but not

21   reflective of that.  Like one worker, there

22   is a transition process.  As far as the

23   administrative overrides ordered by the

24   court, they count those as cases also.

Page 47

1    That's an investigation.  And those are

2    other workers that handle those.

3              So there could be -- well, on her

4    docket, there may be a hundred cases.

5    There's different components to that.

6    There's investigations, administrative

7    overrides, which the court would see as a

8    case.  But there is actually an

9    investigation.  And that wouldn't be handled

10   by the court worker.

11        Q.  Okay.  So this number of one

12   hundred plus cases is not concerning to you?

13        A.  Well, I mean, absolutely it is

14   concerning if like -- but again, this was a

15   year ago and it is difficult to validate

16   what happened a year ago with that.  But of

17   course a hundred cases would be of concern.

18   But I would also like look at -- if I had

19   one worker with a hundred cases, yes, that

20   would be concerning.  But I think there is a

21   lot of other components that go into that.

22        Q.  Did you look into this particular

23   case?

24        A.  I do not recall exactly.  But when

Page 48

1    looking into this, I think the explanation

2    that I testified was part of the issue that

3    there wasn't like a hundred ongoing cases

4    that one worker had.  And I have worked with

5    this district to increase their staff and to

6    alleviate some of the pressure on their

7    workers.

8         Q.  Okay.  And you don't know

9    specifically how many cases this worker had?

10         A.  I don't.

11         Q.  Okay.  And she states that the

12    Raina Edwards, the worker assigned to Judge

13    Redding's abuse and neglect cases, as

14    ongoing worker has given her notice.  This

15    will leave Berkeley County with one ongoing

16    worker for all abuse and neglect cases.  Our

17    efiling shows that Berkeley County has 394

18    JA cases from 2020 to 2023.  While some of

19    those cases may not -- may be in permanency

20    review, the cases from 2021 to present are

21    more than likely still ongoing and total

22    364.  It is not possible for one caseworker

23    to be able to complete all of the tasks

24    needed to serve the children and families in

Page 49

1    over 300 cases.

2              Do you agree with that statement,

3    it is not possible for one caseworker to be

4    able to complete all of the tasks?

5         A.  Yes.

6         Q.  Okay.  What do you think is an

7    appropriate caseload for caseworkers?

8         A.  Well, I think there is -- again,

9    there's not one right or wrong answer.  I

10   mean, you have got to look at tenure, travel

11   to where like the kids are.  I mean, if the

12   kids are within 60 minutes or they have to

13   drive, you know, four hours across the state

14   to go see them monthly.  I mean, you have to

15   look at the travel involved.  I think the

16   court system plays a role in that because

17   some courts have higher expectations than

18   other -- than other court systems.  So I

19   think that there is not like a right or

20   wrong answer.

21              I was a worker back before they put

22   a lot of emphasis in the '90s on caseload

23   standards.  And we didn't have the

24   assistance they have now for case

Page 50

```
 1    coordinators and case aides.  I mean, we did

 2    our own visits.  We didn't have ASO

 3    providers doing it.  And I have great time

 4    management.  So I was able to manage a

 5    higher caseload than some of my

 6    counterparts.

 7               So I think there is a lot -- there

 8    is not like a right or wrong answer as far

 9    as there is not -- you know, I mean, we try

10    to -- we have expectations of how many

11    referrals should be cleared a month.  And

12    again, that's comparative on the tenure of,

13    you know, a worker.  If the attorneys get

14    involved, they tend to slow the process

15    sometimes.

16               And as far as -- again, like the --

17    you brought it up about a case that may have

18    ten kids.  I mean, that is the reality.  And

19    so if a caseworker, a supervisor knows that

20    a worker has ten kids in a case to where the

21    other worker may have one and those ten kids

22    are different areas, I mean, it's going to

23    require a time.  So, I mean, I don't think

24    that -- you have to look at all of the
```

Page 51

1    dynamics when you look at caseloads.

2        Q.  And you said you were a caseworker

3    previously, correct?

4        A.  Uh-huh.

5        Q.  What was the largest caseload that

6    you carried at any given time?

7            MS. SIEGENBERG:  Objection.

8    Vague.

9        A.  That was the '90s.

10       Q.  Sure.

11       A.  So I don't -- I mean, I don't like

12   recall specific numbers.  I generally had a

13   higher caseload because I never said no.  I

14   mean, I always was the one, this needs to be

15   done, okay, it is done.  So I don't recall

16   specific like numbers.

17       Q.  Do you have an approximation?

18       A.  I probably -- I worked in different

19   capacities as an investigator, as a court

20   worker and as an ongoing.  So, I mean, as a

21   court worker, I probably carried 50 court

22   cases.

23       Q.  Okay.  And those court cases could

24   each have more than one individuals child on

Page 52

1    each given case; is that correct?

2        A.  Generally, they do.

3        Q.  Generally, they do.

4            And do you think that it was

5    appropriate for a caseworker to have

6    50 cases at any given time?

7        A.  Do I think it's appropriate?

8        Q.  Uh-huh.

9        A.  I mean, again, like there is not a

10   right or wrong answer in this.  There is --

11   you know, of those 50 cases back then, like

12   we did our own adoptions.  Like we -- so, I

13   mean, there are different stages of it.  You

14   may have 15 to 20 cases where you are

15   actually working with the family like on

16   improvement services and, you know, you have

17   cases with adoption.  So it was -- I mean,

18   it ever got to a point where it wasn't

19   manageable, I talked to my supervisor and,

20   you know, got some assistance.

21       Q.  Okay.  And you talked about how

22   this was 50 cases when you I believe you

23   said a court worker?

24       A.  Uh-huh.

Page 53

1          Q.  How do you define a court worker?

2          A.  Well, a court worker is defined, I

3    mean, in different counties.  Like, they

4    have a specialization where they call a

5    court worker.  They are under the

6    supervision of a circuit court judge.  It is

7    generally when children are removed from the

8    home or under the supervision of the court,

9    what you call a court worker.  I mean, they

10   develop the case plans for the families and

11   they monitor placements, secure services and

12   visitations.

13         Q.  Okay.  And so as a court worker,

14   you are overseeing cases for children who

15   were in out-of-home foster care; is that

16   correct?

17         A.  Not just foster care, out-of-home

18   placement.  And some of the kids are in the

19   home, I mean, that the court -- like they

20   require the extra intervention with court

21   supervision.  But the children are placed in

22   the home.

23         Q.  Okay.

24         A.  Or they are placed with one parent.

Page 54

1    It may be working with the father.  Or they

2    could be placed with the father and you are

3    working with the mother.  So, I mean,

4    there's lots of variations.

5            Q.  And were these all children in

6    foster care?

7            A.  With all respect, you are asking me

8    25 years ago.

9            Q.  Okay.  Fair enough.  Fair enough.

10            And were these also -- strike

11    that.

12            And so you felt that you could

13    handle as a caseworker up to 50 cases

14                MS. SIEGENBERG:  Misstates prior

15    testimony.

16            A.  You asked me an approximation of

17    what --

18            Q.  Yeah.

19            A.  -- like I recall?  I mean, I am

20    giving you like a guesstimation.

21            Q.  Yeah.

22            A.  And I think I stated if -- like if

23    I was overwhelmed or needed assistance with

24    something, I went to my supervisor.  We, you

Page 55

1    know, worked geographically.  If I had kids

2    two counties over and I was going there, or

3    if there were other kids, I would see those

4    kids.  And like we worked as a team.  But it

5    was just like the -- I had very involved

6    supervisors and -- I mean, we all had the

7    same vested interest that we wanted to do

8    the best that we could.  So we worked

9    together.  And so like, I don't know, I'm

10   from a generation that you did what you

11   needed to to get things done.

12        Q.  Okay.  And you said you personally

13   had supportive supervisors, so they were

14   able to help you to manage your caseloads?

15        A.  Uh-huh.

16        Q.  Yes?

17        A.  I did say that.  I'm sorry.

18        Q.  You did say that.  Yeah, okay.  I

19   just wanted you to provide a verbal answer.

20        A.  Yes.

21        Q.  All right.  And looking at the page

22   ending in 0005, okay, and I am looking at

23   the -- there is a heading that says, NO

24   Administrative Staff.  And then it says

Page 56

1  below that, Because of the extreme workload

2  for the ongoing workers, new workers are

3  unable to keep up with inputting case

4  information in PATH, such as assessments

5  which PATH requires be input before allowing

6  a case plan to be created.  The workers have

7  no administrative support in getting the

8  case information put into the new system.

9        Do you see that?

10      A.  I do see it.

11      Q.  Did you do anything to follow up on

12  this concern that the judge had?

13      A.  Again, this was a year ago.  But I

14  have worked with the district.  And I could

15  tell you, I don't recall when they had no

16  administrative staff.  In conversations with

17  the judge, I think they wanted

18  administrative staff per caseworker.  And, I

19  mean, that wasn't realistic.  And so -- but

20  I don't recall them not having

21  administrative staff.  And I did work with

22  the manager not in this -- in this instance,

23  but on other incidents to think outside of

24  the box to assign like a person that is just

Page 57

1    on the adoption to, you know, stay on that.

2    And kind of streamlined some work.  So an

3    improved communication.  So, I mean, I did

4    address it through that manner.

5         Q.   Okay.  And with regard to the

6    statement that the workers are unable to

7    keep up with inputting case information on

8    PATH, do you recall that there was an issue

9    with information being inputted into PATH?

10                  MS. SIEGENBERG:  Objection.

11   Vague.

12        A.   Okay.  Ask me your question again.

13   I'm sorry.

14                  MS. TEBOR:  Can you repeat that?

15                  (The preceding question was read

16   back by the court reporter.)

17                  MS. SIEGENBERG:  Same objection.

18        A.   Okay.  So the documentation, I

19   think our workers do the work sometimes and

20   the last thing they do is enter into the

21   PATH system.  So I don't think that that --

22   I think that's an ongoing issue, that we

23   continue to work with them and create like

24   resolutions to correct that issue.

Page 58

1          Q.  But this issue still exists as of

2    today, it is an ongoing concern?

3          A.  Well, I mean, not to the degree

4    that's reflected here.  As far as like the

5    data, it's a worker issue, not a staffing

6    issue.  I mean, it's like just a matter of

7    we have created documentation time where

8    they have two hours mandated to get their

9    documentation in in the morning.  It is

10   their protected time.  Supervisors take

11   phone calls.

12          If the contacts aren't in, we have

13   mandated some Saturdays to get -- make sure

14   the contacts are in and keep them on those.

15   So we have done some -- supervisors taking

16   their notes and entering contacts.  So we

17   think of different ways to increase our

18   contacts.

19          Q.  Okay.  And you said there that you

20   have mandated some Saturdays.  Can you tell

21   me what you mean by that?

22          A.  Well, again, I have 33 counties.  I

23   have 33 counties.  And I think it is the

24   responsibility and the benefit for each

Page 59

1    district manager to know what works there.

2    You know, I -- they vary from county to

3    county.  They kind of know what works.  They

4    know if there is travel ball on the weekend

5    for this worker, like if they allow them to

6    work a couple of hours over each day, to

7    come in early in the morning when it is

8    quiet, then they don't have to work a

9    Saturday.  They take a certain percentage.

10   If their contacts aren't done, then they

11   have to work.  So the expectation is each

12   manager comes up with their own plan as to

13   what works.

14        Q.  Okay.  And this would include

15   mandated overtime to the extent that a

16   caseworkers doesn't -- isn't able to input

17   all of their information during regular work

18   hours?

19        A.  Correct.

20        Q.  All right.  I want to draw your

21   attention to the paragraph under permanency

22   delays, the staffing for adoption is being

23   delayed.  Children do not show as being in

24   department custody and PATH as they cannot

Page 60

1  be transferred.  No one can tell the worker

2  how to correct the problem in at least two

3  cases Judge McLaughlin had on Monday.

4         What was the issue with children

5  not being shown as being in department

6  custody in PATH?

7       A.  Okay.  Again, this is a year old.

8       Q.  Yeah.

9       A.  If a child is in custody, they have

10  been custody all along.  So it's not a

11  custody, a state ward likely I would say was

12  not created.  It wasn't made.  And

13  information has to be put in state ward case

14  so it transfers over.  So, I mean, again, a

15  year old.  But I don't think it is a custody

16  issue, I think it is the state ward

17  likely --

18       Q.  Okay.

19       A.  -- wasn't created.  And I think I

20  already testified that what we did to

21  rectify that.

22       Q.  Okay.  Have you looked at any data

23  recently about the timing to -- strike that.

24         Okay.  Looking at the last

Page 61

```
 1    paragraph, it states, We are concerned that
 2    when we raise issues in an attempt to get
 3    the ongoing worker support, consequences
 4    roll down onto the ongoing workers.
 5    Do you agree with that statement?
 6         A.  I agree in the fact that's what it
 7    says.  I mean, I -- if that's what you are
 8    asking me.  I don't necessarily agree with
 9    that statement for the truth of the matter.
10         Q.  Okay.  So you don't agree that
11    there is any retaliation when they raised --
12    when judges raised issues in an attempt to
13    get support for ongoing workers?
14         A.  I'm not aware of any direct
15    retaliation.
16         Q.  Did you do anything to investigate
17    whether there was any retaliation with
18    regard to ongoing workers?
19         A.  Yeah.  I have been in that
20    district.  I have interacted with workers.
21    I have talked to them like individually.  I
22    am not there for like an investigation.
23    But, I mean, just about like -- I mean, I
24    have looked at like the work climate and the
```

Page 62

1    way that they interact.

2         Q.  Okay.

3         A.  I read -- I review exit interviews

4    when staff leave.

5         Q.  If an issue is identified in terms

6    of retaliation, you would address it?

7         A.  Yes.  I think we grow from -- I

8    mean, I think we grow from knowledge.  And

9    if something is shared, I definitely have

10   those conversations with the manager or the

11   supervisor and -- I mean, we problem solve

12   to see what we could do better.

13        Q.  Would you share those -- any

14   concerns that were raised about retaliation

15   with Mr. Pack?

16        A.  Absolutely.

17        Q.  And I want to draw your attention

18   to the page ending in 0002.  It is the front

19   page.  If you could just -- okay.  And this

20   is an email from you to Cammie Chapman and

21   Jeff Pack on April 5, 2023.  Is that

22   correct?

23        A.  That's what is stated, yes.

24        Q.  Okay.  And you are talking about

Page 63

1    how you have Roann's current staff taking

2    over Morgan County.  Who is Roann?

3        A.  Roann Bosley is a social service

4    manager that she has got six -- well, she

5    had six counties, seven -- Morgan made

6    seven -- smaller counties in the eastern

7    panhandle that are close to the Berkeley,

8    Jefferson, Morgan area.

9        Q.  Okay.  And why did you have her

10   staff taking over Morgan County?

11       A.  Her staff were -- her staff were

12   covering -- were covering cases in Morgan

13   County, different cases.  And so we just

14   moved the transition over to them to

15   completely take over Morgan County.  They

16   were assisting with cases.  And so, I mean,

17   she definitely had the staff available, more

18   ready.  And it better, I mean, suited the

19   families we served by having her staff

20   cover.  They were doing it anyway, so we

21   realigned to put Morgan with them.

22       Q.  Okay.  And in adding Morgan County

23   to Roann's staff, did you remove any

24   counties?  Did you change anything to sort

Page 64

1    of -- strike that.

2            In adding Morgan county, did you

3    take any counties away from Roann's staff?

4        A.  No.

5        Q.  Okay.  And you state here that

6    Roann told me Amy had given her five

7    positions to cover Morgan County.  I am

8    going to push back on this.  I am told the

9    average referral is around 18 per month, and

10   the current worker assigned to Morgan County

11   has 20 CPS cases and 15 YS cases.

12   Comparatively to other counties, this is a

13   dream caseload for workers.

14           So I want to talk through this

15   statement.  So who is Amy?

16       A.  She was the person who was in the

17   position prior to myself.

18       Q.  Okay.  And why were you going to

19   push back on Amy giving Roann five

20   positions?

21       A.  Well, the positions had already

22   been there.  The positions were there.  But

23   again, I think previous testimony is we look

24   at caseloads.  And that was like -- the

Page 65

 1   caseloads did not require five.  I mean, the
 2   positions were -- and I can't speak -- I
 3   mean, I wasn't the person that made that
 4   decision.  But the positions were put there
 5   to help Berkeley, Jefferson, Morgan.  They
 6   were to help with their caseloads.  And when
 7   Roann's team took over, I had her post
 8   certain positions.  But I put two back in in
 9   the Berkeley, Jefferson to assist them.
10        Q.  Okay.  So you did not feel that the
11   Berkeley, Jefferson -- sorry.  You did not
12   feel that Morgan County needed more than the
13   two caseworkers; is that correct?
14        A.  Well, any youth service.  I mean,
15   two CPS, correct.  And to answer your
16   question, yes.
17        Q.  Okay.  Even though there were
18   potential for five positions, you only felt
19   that two were needed?
20        A.  The positions were originally
21   Berkeley, Jefferson, Morgan's positions.
22   They were given to Roann because Berkeley,
23   Jefferson was having difficulty recruiting
24   and hiring.  So the positions were vacant.

Page 66

1    So they were moved to Roann's with the

2    intent of them assisting Berkeley,

3    Jefferson, Morgan is my understanding.

4        Q.  So what -- sorry.  I think I am a

5    little bit confused.

6            What happened with the three other

7    -- you posted two.  What happened with the

8    three other positions?

9        A.  They were posted in Berkeley.

10       Q.  I see.

11       A.  And hired in Berkeley.

12       Q.  I see.

13           Okay.  So to look through this, you

14   say there are 20 CPS court cases and 15

15   youth services cases.  Can you define what

16   the CPS court cases are?

17       A.  What they entail, is that what

18   you're asking me?

19       Q.  Uh-huh.

20       A.  Okay.  I think I testified to this

21   earlier that, I mean, there is oversight of

22   the court.  They require supervision of

23   services, linkage to services, visitation

24   with the bio family, developing the case

Page 67

```
1    plan, family engagement, MDTs, convening

2    MDTs.  I am sure I am leaving out something.

3    But it is managing a case with the component

4    of the supervision of the court.

5         Q.  Okay.  And of the 20 CPS court

6    cases, these are -- we talked about this

7    before -- accounted by family and not by

8    child, correct?

9              MS. SIEGENBERG:  Objection.

10   Misstates prior testimony.

11        A.  Unless parental rights have been

12   terminated, they have been made into a state

13   ward.

14        Q.  Okay.  And the youth services

15   cases, what do those cases entail?

16        A.  It is a variety.  It could be a

17   referral for truancy where Little ████

18   won't go to school.  Or it could be, you

19   know, just simple case management where you

20   are working with the family.  It could be a

21   JS, in which basically I kind of describe it

22   as a crime against themselves.  They are,

23   you know, being incorrigible, they are not

24   doing something.  And again, that would be
```

Page 68

1    court supervision.  And it is putting the

2    services -- back on the department for the

3    services to be implemented.

4            Or if it's a JD case, it takes a

5    different proponent of case management

6    because they have been charged with a crime.

7    And so you have the intensity of more

8    frequent MDTs.  You're working with

9    probation on those.  But they all are to get

10   the services to these youth.

11       Q.  And in this particular instance

12   that you are talking about in this email,

13   this current worker has both 20 CPS cases

14   and 15 youth services cases; is that

15   correct?

16            MS. SIEGENBERG:  Objection.  It

17   mischaracterizes the document.

18       A.  Okay.  Ask me your question again.

19   I've reread it.

20            MS. TEBOR:  Sorry.

21            (The preceding question was read

22   back by the court reporter.)

23            MS. SIEGENBERG:  Same objection.

24       A.  So according to my email, it is

Page 69

```
 1    20 CPS court cases and 15 youth services
 2    cases.
 3         Q.  Okay.  And so in some counties, it
 4    is possible for a caseworker to have both
 5    CPS cases and youth services cases; is that
 6    correct?
 7         A.  In some instances, that's correct.
 8         Q.  Okay.  And you say in this email
 9    that these 20 CPS court cases and 15 youth
10    service cases is a dream caseload for
11    workers; is that correct?
12         A.  Correct.
13             MS. TEBOR:  I think it is
14    probably a good time to take a five-minute
15    break.
16             MS. SIEGENBERG:  Can we actually
17    have a ten-minute break since we've been
18    going long?
19             MS. TEBOR:  Yeah.  Absolutely.
20             (Break in proceedings from 10:22
21    to 10:37 p.m.)
22    BY MS. TEBOR:
23         Q.  I am marking this as Exhibit 2.  It
24    is an email.  And its attachment is in two
```

Page 70

1   separate parts for whatever reason.  So

2   let's just do this.

3                    (Exhibit 2 was marked.)

4        Q.  Ms. Ellis, do you want to take a

5   second to look at it, or do you -- are you

6   ready to -- let me know when you are ready

7   to chat about this email?

8                    (Witness reviews document.)

9        A.  Okay.

10       Q.  Ms. Ellis, this is an email from

11  Jeffrey Pack to you and Amanda Queen on

12  July 5, 2023; is that correct?

13       A.  July 5, 2023, that's correct.

14       Q.  Okay.  Do you recall this email?

15       A.  Yes.

16       Q.  Okay.  And what did you do after

17  receiving this email?

18       A.  Well, it was 11 months ago.  But I

19  recall having a conversation with Ms.

20  Zickefoose and with the manager who is a

21  Jondrea Nicholson.  I mean, we talked about

22  -- I don't recall specifically.  But we

23  talked about caseloads and what -- the

24  vacancy and expectations for their district.

Page 71

1          Q.   Okay.   And if you look on page

2    ending in Bates stamp 076, you will see the

3    email that was forwarded from Jondrea

4    Nicholson.   She is a social services

5    manager; is that correct?

6          A.   That's correct.

7          Q.   And she is telling her staff that

8    they should be -- you know, she has missed

9    ball games, assemblies, baby showers,

10   parties and simply just time with my kids

11   and families and that this job requires

12   personal sacrifices.   Do you agree with her

13   statements?

14         A.   I agree that that's what she is

15   saying.

16         Q.   Do you agree that caseworkers must

17   miss time with their families, ball games,

18   assemblies and baby showers as a part of

19   this job?

20         A.   I agree that they miss family

21   activities.   I mean, I don't know specifics.

22   But, I mean, I -- there are situations --

23   emergency situations that you just can't

24   say, oh, I am off at 4:30, I mean, if you

Page 72

1    are in the middle of a situation, things

2    like that.  I mean, it does happen.  There

3    is an on-call component to this job if we

4    have a child without a placement, like the

5    supervision, it requires two workers around

6    the clock.  So, I mean, obviously it goes

7    without saying they are going to miss

8    something.

9         Q.  Okay.  And if you look at the page

10   ending in 075, you will see the email from

11   Sarah Zickefoose, stating, I find it very

12   belittling -- or one of her statements is

13   that I find it very belittling to be

14   basically told in an email it is expected

15   that we put our jobs before our children.

16             Does DoHS expect that caseworkers

17   will sometimes put their jobs before their

18   children?

19        A.  No.  I don't think that's a fair

20   statement at all.

21        Q.  Okay.  Can you explain why it is

22   not a fair statement?

23        A.  Well, I think that we -- I mean,

24   when I say supervisors, like we try the best

Page 73

1    to accommodate your child has a basketball

2    game today -- I mean, we have a kid, you

3    know, at the hotel.  You go to your

4    basketball game.  You do the night shift.  I

5    mean, I think we try to accommodate to cover

6    family events.

7                I don't think -- you know, I can

8    tell you myself and my superior has offered

9    to transport kids or do hotel shifts to give

10   workers a break.  I mean, that's the

11   expectation that we all -- you know, it is

12   not just thrown on the caseworker that

13   people attempt to accommodate.  So there is

14   not an expectation that this job comes prior

15   to -- family should always come first.

16        Q.  And you said you had a conversation

17   with Jondrea Nicholson and then a

18   conversation with Sarah Zickefoose; is that

19   correct?

20        A.  Zickefoose.

21        Q.  Zickefoose?

22        A.  Yeah.

23        Q.  What was the outcome of that

24   conversation?

Page 74

1          A.  Well, I think there has been -- I
2    think you are asking me to recall like if
3    there has been more than one conversation
4    with both of them.
5          Q.  No.  I am --
6          A.  Regarding this particular incident?
7    I mean, I think -- if I recall correctly,
8    and this is 11 months ago, I think that we
9    just looked at some ways to shift some stuff
10   around with everybody doing their part.  I
11   mean, basically to summarize, it's account
12   ability with empathy, that's kind of like
13   the theme.
14         Q.  And so specific to this situation,
15   do you recall what you did to shift some
16   stuff around?
17         A.  Well, I think that is like within
18   the district.  I think that -- if I recall,
19   this was over -- I mean, again, I am just
20   doing this by memory.  Some staff don't want
21   to do like the hotel shifts.  And so, you
22   know, we looked at -- I mean, everybody has
23   -- they are always busy.  I mean, they are
24   -- there is not -- there is this perception

Page 75

1    that state workers have all this free time.

2    That is definitely a myth because there is

3    always something going on.

4              And so I think this particular

5    issue, the employee had gotten a

6    predetermination in regards to something

7    that wasn't done on a case compounded with a

8    youth in a hotel.  So I think that there was

9    a little bit of acrimony going on.  So we

10   kind of talked that out.  And, I mean, she

11   returned to work.  I mean, things, I mean,

12   continued.

13        Q.  Okay.  I know you said this was a

14   year ago.  Have you followed up with this

15   caseworker recently to have an understanding

16   of their workload?

17        A.  I talked to this caseworker prior.

18   She no longer works for the agency.  She

19   works for a private agency.

20        Q.  When did she leave?

21        A.  I don't have that in front of me.

22        Q.  Okay.  And do you have an

23   understanding of the reason that she left?

24        A.  There was -- she was the subject of

Page 76

1    another predetermination conference that she

2    was angry about.  And, I mean, she did reach

3    out on me and we went over what the policy

4    -- you know, the policy was.  I don't recall

5    the particular situation.

6                 And I know that she just wanted to

7    have more free time than what -- I mean,

8    this job, I mean, they are -- I mean, you

9    can't control when a child abuse emergency

10   occurs.  I mean, you can't control the

11   hours.  You know, we often get called out in

12   the night.  And, I mean, she did not -- was

13   not accepting of -- always accepting of the

14   accountability required of a caseworker.

15        Q.  Okay.  And you said she also wanted

16   more free time, which is something that case

17   workers don't necessarily have?

18        A.  Well, I mean, it is not every day.

19   I mean, it's not -- you know, like if --

20   time management is required in this job.  If

21   you have 25 kids on your caseload, we always

22   had like -- you want to have them seen by

23   the 20th.  Have a plan.  If you are in this

24   area, see these, instead of the running back

Page 77

1    and forth, like be organized and see them --

2    get them seen by the 20th.  A lot of

3    caseworkers, they know that they have to see

4    them monthly.  They are scrambling the last

5    week of the month.  I mean, if you go

6    around, their fleets of vehicles are gone

7    because they are all out trying to do them.

8    Even though we tell them not to, like

9    planning.

10           And so I think that as far as like

11   the free time -- you know, there is -- your

12   child has a dance recital on Thursday.

13   There's certain things that you have to get

14   done.  You have a case plan that is due to

15   the court.  So let's get it done Monday.

16   You know, like -- so I think that sometimes

17   conflicts.

18           So in order -- in fairness about

19   like their time, they are busy.  I am not

20   taking away from that.  And we can't control

21   when situations happen.  But they don't miss

22   every event.  And I am a big proponent of

23   being proactive -- you know, to plan ahead.

24   I know Thursday night this activity is going

Page 78

1    on.  You know, I mean, I had unexpectedly

2    had to take off on Monday of this week.  And

3    the stuff that I had due was done last week,

4    not -- am I perfect?  No.  Was I, you know,

5    running around yesterday trying to make up

6    for, you know, something to get it done?

7    Absolutely.  But, you know, I -- I worked

8    over and got it done.

9         Q.  Okay.  So, for example, with

10   employees like Ms. Zickefoose --

11        A.  Zickefoose.

12        Q.  -- Zickefoose, sometimes it comes

13   down to just better time management?

14        A.  I mean, sometimes -- I am not

15   saying that like global.  But, I mean, I

16   think like in the situation -- like, I

17   listen to staff.  I listen to staff.  But I

18   also balance that with I can't excuse you

19   from seeing a child.  I can't excuse you

20   from making sure a child is safe.  I can't

21   excuse you from not going to a home.  Let's

22   work on this.

23             You know, one district, I just sent

24   like a time management.  I sent the program

1    manager and the CWC in there to just help

2    with time management.  You know, like --

3    because I looked at their caseloads.  I

4    mean, I came from the field.  I know what is

5    required.  So when I say like -- I do

6    understand it.

7            And at times this job is

8    overwhelming.  I mean, you are not always

9    invited in for tea and cookies.  You know, I

10   mean.  I mean, you are constantly

11   scrutinized for what you do or don't do.

12   And so, I mean, that is taxing.  And I am a

13   firm believer that these workers sometimes

14   need to just step back and take a break.  I

15   mean, like, you know, what can I do to help

16   you today?  And like they come back kind of

17   rejuvenated.

18           Like if a worker has like a really

19   bad day in court -- no offense, but you

20   attorneys sometimes are not the nicest

21   people, you know, and they have a really

22   rough day in court, you know, take the day

23   off and regroup, and like they come back --

24   I mean, so I think as a manager, you look at

Page 80

1    that.  So I think that we try to accommodate

2    --

3              You know, and I did talk to this

4    employee.  I think I probably have talked to

5    her, I don't know, three or four times.  I

6    mean, I have looked at her disciplinary

7    issues.  I have supported her disciplinary

8    issues because, again, I can't tell you it

9    is okay.  Child safety is paramount to what

10   we do.  And, you know, I understand that

11   nobody wants to sit in a hotel with a child.

12   I mean, I get that.  But that is what

13   sometimes happens.

14       Q.  And you also had mentioned that,

15   you know, a lot of workers are running

16   around at the end of the month to make their

17   monthly visits, and then they would still

18   need to input all of the information from

19   those monthly visits at the end of the

20   month, right?

21       A.  Yes.

22              MS. SIEGENBERG:  Objection.

23   Misstates prior testimony.  Compound

24   question.

Page 81

1          Q.  So their workers are often

2     scrambling at the end of the month to input

3     that information into PATH as well regarding

4     their visits with children?

5          A.  Yes.

6               MS. SIEGENBERG:  Same objection.

7          A.  Sorry.

8          Q.  Okay.  I am just going to turn back

9     to the page ending in 076.  And looking at

10    the first full paragraph.  And she talks

11    about how in February of 2023 -- or sorry.

12    In April of 2023, an ongoing worker in

13    Upshur County transferred to a new position

14    which left me being the only ongoing worker

15    in both counties carrying a caseload of over

16    76, over 120 kids to see monthly.

17               Do you see that?

18          A.  Yes.

19          Q.  Do you have any reason to doubt the

20    accuracy of those numbers?

21          A.  I mean, all I can speak to is they

22    are stated in an email.  I don't have

23    anything to compare them -- to compare them

24    to.  So, I mean, I am agreeing that it is

Page 82

1    stated in this email.

2         Q.   Okay.  After receiving this email,

3    did you do anything to check whether those

4    caseload numbers were accurate?

5         A.   Again, if I had known about this, I

6    could probably have looked at more specific.

7    But I don't recall them.  I don't think that

8    -- it was not what was depicted as the -- I

9    mean, the numbers were a little bit less.

10        Q.   I mean --

11        A.   It was high.  But, I mean, it

12   wasn't -- I don't recall specifically.  But

13   I do recall -- I think that it was a little

14   bit less.  And I think there was assistance

15   with people helping see the kids and stuff

16   for her that the district had provided.

17        Q.   Okay.  So --

18        A.   I am going to get a drink.  Hold

19   on.

20        Q.   So you had just stated that there

21   may have been assistance to see the kids.

22   Does that mean -- are you saying that a

23   caseworker could be assigned a case but

24   another caseworker would make the

Page 83

1    face-to-face visits with the child?

2         A.  That happens all of the time.

3         Q.  And then would that case be put on

4    that other caseworker's caseload as well?

5         A.  Previously they were entered as

6    secondary -- as a secondary worker.  Or they

7    could type -- come back and type their

8    contact in a WordPerfect document and send

9    it, and it is entered in by contact made by

10   like that worker, like their teammate.

11             So while a worker may say they have

12   60 kids to see, reality is they may see 45

13   or -- I mean, I am just picking those

14   numbers.  Because a teammate -- like I am

15   going to see three kids in Charleston today.

16   I mean, I put it out there I am going to be

17   in Charleston.  I can see kids this evening.

18   So, you know, three people jumped on that,

19   and that's what I am going to do later.  So

20   you know ...

21             I mean, that is pretty common

22   practice that they work together.  Because

23   it doesn't make sense to send multiple

24   people to a foster home.  If you are going

Page 84

1    to go there, you go this month, I will go

2    next month.  I mean, they rotate it like

3    that.  If I recall, I think that there were

4    two workers that were assisting with the

5    visits.

6         Q.  Okay.  And I just want to go back

7    to what you have said about a Microsoft Word

8    document, you are saying one caseworker who

9    made the visit might write out what happened

10   in a Microsoft Word document and send it to

11   the caseworker assigned to the case?

12        A.  Well, it was Microsoft.  But it is

13   Google now.

14        Q.  Okay.  Google.

15        A.  And when you are a dinosaur that's

16   been around a while, you've learned to adapt

17   to those.  But now we can share like Google

18   docs -- like a document.  I mean, that's

19   what I will do.  I'll type it out and share

20   it with them, and they can enter it into the

21   PATH system.

22        Q.  So when it shows up in the PATH

23   system, does it show that the visit was made

24   by a different caseworker than the assigned

Page 85

1    caseworker?

2         A.  If you looked at the first -- like

3    on the first screen for the contact, it will

4    have the person who enters it.  But on the

5    screen is the contact made by.  And so that

6    name is reflected there.  And I always put

7    it in a narrative.  I mean, that's common

8    practice that it goes in a narrative too.

9              But if you are -- if I was seeing

10   one of your children, it would come up under

11   your name just in that main list of

12   contacts.  But then when you open it, you

13   clearly see who made the contact.

14        Q.  Okay.  So you would have to go into

15   each individual case in PATH to see whether

16   it was made by the case -- assigned

17   caseworker or by a different caseworker; is

18   that correct?

19        A.  Correct.

20        Q.  And I know you said that you were

21   not sure of the actual numbers of caseloads.

22   But if this caseworker did in fact have a

23   caseload of 76 cases over 120 kids to see

24   monthly, would you think that was an

Page 86

1    acceptable caseload?

2              MS. SIEGENBERG:  Objection.

3    Calls for a hypothetical.

4         A.  There is not a yes or no.  I mean,

5    in a situation with 120 kids, absolutely,

6    that does seem excessive.  But, I mean, you

7    may have like a group of -- you know, if you

8    have got -- I mean, if they are in kinship

9    and you have eight in a home.  I mean, I am

10   just saying you look at.  It is not -- there

11   is not a right or wrong answer.  But that

12   does seem high.  But again, I don't know the

13   variables that were there.

14             And in a situation when you have a

15   staff leave abruptly, which I think

16   occurred, if I recall in this situation, I

17   mean, supervisors also like -- it's kind of

18   all hands on deck where they jump in and

19   help.

20        Q.  Okay.  And that depends on the

21   individual supervisor jumping in to help; is

22   that right?

23        A.  Well, I think that's -- I think --

24   I would be surprised if there is not that

Page 87

1   assistance.

2        Q.  All right.  I am going to mark this

3   Exhibit 3.  Again, it is an email and an

4   attachment.

5               (Exhibit 3 was marked.)

6        Q.  It is a very lengthy attachment.  I

7   can -- well, you don't need to read through

8   all of it.  You can.  But I can point you to

9   specific parts of it if we discuss it.

10       A.  Okay.

11       Q.  So, Ms. Ellis, this is an email

12  from you to Jeffrey Pack dated September 11,

13  2023; is that correct?

14       A.  Dated September 11, 2023, yes.

15  Sorry.

16       Q.  Okay.  Do you recall this email?

17       A.  Yes.

18       Q.  Okay.  What did you do after

19  receiving this email?

20       A.  I went to Marion County.  I was

21  scheduled to I think be there on a Thursday

22  or -- I mean, I ended up like going the day

23  before.  I was coming back from Berkeley

24  County and was actually stopping at Harrison

Page 88

```
 1    County.  And I talked to the manager.  And I

 2    actually went there like a day earlier.  I

 3    mean, I spent the day there.  I talked to

 4    multiple staff in the office.  Jessica

 5    Embrey is the senior worker included.  I

 6    gathered information.  I asked for some of

 7    those cases to be reviewed by the program

 8    manager or child -- CWC.  Went through

 9    those.

10            I worked with -- I mean, like we

11    got a mentor for the intake supervisor.  We

12    worked on some organization.  I talked to

13    both supervisors about like presenting as a

14    united front working together, not

15    criticizing the other one.  In gathering all

16    of the information, I think that the

17    perceptions were definitely different on

18    casework.  I think the correct response was

19    somewhere in the middle between like the two

20    of them.

21            I started working with their data.

22    I had conversations with our prosecutor.  I

23    met with them.  We followed up.  Pulled in

24    some resources to help the district.  Made
```

Page 89

1    sure the manager was more engaged.

2        Q.  Okay.  And you see in this email to

3    Mr. Pack, you say -- you're talking about

4    Marion County.  And you say I think that the

5    district is toxic?

6        A.  Uh-huh.

7        Q.  What did you mean by that?

8        A.  Well, I mean, just -- I think it

9    just -- like the supervisors, one critiquing

10   the work of the others to frontline staff.

11   I mean, just like a toxic -- when I say

12   toxic, like it just wasn't a positive

13   atmosphere.  I mean, they have a stressful

14   enough job.  They just compounded it with

15   managers having conversations with frontline

16   staff, some like not speaking to the other

17   one.  The manager either didn't or did not

18   handle it in the best manner.

19          So I am just kind of more head-on.

20   We just kind of put it all out there and

21   dealt with it.  So that's what I meant about

22   the prosecutor talking -- the prosecutor

23   having conversations with frontline staff

24   about other staff.  A manager just like of

1    the whole district needed some

2    reinforcement.

3         Q.  Okay.  So I just want to clarify.

4    You said -- I believe you said that there

5    were two managers, and they had different

6    views on casework, and it was somewhere in

7    the middle?

8         A.  Well, no.  Just the perception.

9    Like with -- I mean, Ms. Embrey is a -- or

10   was a senior worker.  And, I mean, her

11   critique on somebody else's casework.  You

12   know, like we looked at were they within

13   policy?  Were they within policy?  And if

14   they weren't, we had some conversations on

15   how to, I mean, make sure that that was

16   happening about the follow-up, working with

17   the one supervisor who definitely was on the

18   -- not the supportive end.  And so like we

19   worked with that.

20        Q.  When you say you looked at whether

21   they were in policy, what do you mean?

22        A.  Well, I asked for them to be

23   reviewed, to be reviewed by the program

24   manager -- we're a child welfare consultant

Page 91

1    -- to review the cases.  When I met with

2    her, I was given certain cases.  And some of

3    the information -- some of the information

4    that like I was provided -- I am not saying

5    it was embellished.  It was a little bit

6    more dramatic than what occurred, if that

7    makes -- like the concerns that -- I mean,

8    that Ms. Embrey had, I mean, they were, you

9    know, in that.

10            Say, for example, you have to get

11   medical records like on a drug-affected

12   infant that's within our policy to get the

13   birth records.  That supervisor was

14   requiring them to get medical records

15   unnecessarily sometimes on other cases.  I

16   mean, she just took it literal.  You have to

17   have medical records and apply ut to that

18   case.  But nobody like took the time to have

19   that conversation with her.  They just kind

20   of sat back and critiqued her.  Like there

21   just wasn't that support.

22            So when I say like their perception

23   was -- it is perception.  You know, on a

24   drug-affected infant, we do need medical

Page 92

1    records.  We don't need it for a dirty house

2    referral, you know, different things like

3    that.  While I appreciate the thoroughness,

4    it wasn't necessary.  But nobody ever like

5    worked with that supervisor to like clarify

6    that for her.

7         Q.  So in terms of the issues

8    identified, you are noting that there was an

9    issue with a supervisor asking caseworkers

10   to take certain steps that were unnecessary;

11   is that right?

12        A.  Unnecessary or -- yeah.  I mean, if

13   there are -- whatever issues -- and I don't

14   recall specifically what they were.  I do

15   remember about the medical records.  But, I

16   mean, about, you know, enforcing quiet time,

17   not staffing during quiet time to give staff

18   that two hours a day, to benefit that from

19   getting their contacts in.

20             And, you know, like -- I mean, just

21   suggestions if Julia came in to staff a

22   case, you are staffing a case with me, I had

23   a notebook there like writing it down.

24   Because, you know -- and, you know, I had

Page 93

1  instituted when I was a supervisor putting

2  your contact in, I will read your contact

3  and then we will talk about it.  And that's

4  really hard to enforce with workers because,

5  I mean, they need the staff then.  But when

6  they come in, put your contact in and we

7  would talk about it.  And, I mean, I shared

8  that that's hard to stay on top of.  You

9  know, so I kept a notebook.

10          You know, just suggestions like

11  that to help the supervisor.  And, you know,

12  you have to stop doing this.  You have to

13  focus on this when they are staffing a case.

14  And you have to ask the right questions to

15  get all of the information.  You know, did

16  you do this, did you do this.  And, I mean,

17  so just some like supportive suggestions to

18  the supervisor.

19      Q.  So you mentioned something about

20  with the supervisor with regard to the

21  two-hour quiet time to input documents.

22  What was the supervisor who you were

23  discussing you needed to talk to, what was

24  that supervisor doing with regard to the

Page 94

1    two-hour quiet time period?

2          A.  Well, she was allowed on staff to

3    come in and talk and staff cases with her.

4    I mean, and -- you know, just that's their

5    time to get the documentation in.  So that

6    two hours, you have got to be rigid in

7    giving them their time.  You know, so just

8    -- I mean, she wasn't doing anything

9    inappropriate.  I mean, she was just

10   staffing cases.

11          And we just talked about -- you

12   know, 10:30, they can fight over who gets in

13   your office first.  But that 8:30 to 10:30,

14   let them have that time.  They need to be,

15   you know, in their chair at 8:30 getting

16   information inputted.

17          Q.  Okay.  And as we talked about, if

18   they don't get that information in during

19   that time, there may be some mandated

20   overtime to put that information in?

21          A.  Well, I mean, yeah.

22          Q.  Okay.  And is Ms. Embrey still with

23   the department?

24          A.  She is.

Page 95

1          Q.   Okay.  And here she mentions

2     that --

3          A.   Are you still on --

4          Q.   Yes.  I am still on 650.

5          A.   Okay.

6          Q.   In this email, she mentions a

7     little over two years ago, we had a child

8     murdered in our county at the hands of his

9     mother's boyfriend.  This murder also led to

10    a supervisor and a worker in the office

11    being terminated, as well as arrested.

12              What is she talking about here?

13         A.   I mean, there was a previous case

14    when Mon and Marion were a district in which

15    a child was, if I recall, physically abused

16    and died as the result of I think it was the

17    mother's boyfriend.  And it was an open

18    case.  An open case.  And both the

19    supervisor and the worker were criminally

20    charged as a result of their actions or lack

21    of actions in that case.

22         Q.   Okay.

23         A.   And she -- Ms. Embrey actually was

24    the worker who responded on that case.  And

1    I think -- I mean -- yeah.

2        Q.  And this was in you said a little

3    over two years ago.  So this would have been

4    maybe 2021?  2020?

5        A.  That's what it says.  I wasn't

6    personally involved in the case.

7        Q.  Okay.  And then she says in the

8    second full paragraph, I have grave concerns

9    that our office is back on that same path.

10           Do you see that?

11       A.  Uh-huh.

12       Q.  Do you have an understanding after

13   speaking to her of what she is talking about

14   in terms of the office being on the same

15   path?

16       A.  She didn't agree with -- she didn't

17   agree with some of the casework decisions.

18       Q.  What did she not agree with with

19   respect to some of the casework decisions?

20       A.  That the children -- I don't --

21   again, I don't recall specifics.  But that,

22   you know, a worker went to the home and

23   didn't make contact.  They didn't go back

24   that day.  I mean, things like that.  I

Page 97

1    mean, very outspoken and critical of the

2    actions of the caseworker.  If they weren't

3    home the first time, she felt they should be

4    back that evening the next morning.  Because

5    that was the actions that she would have

6    taken.

7             Q.  Okay.  And did you agree with her

8    that those actions should have been taken?

9             A.  I didn't agree or disagree with

10   her.  I listened and gathered information in

11   my conversations with her.

12            Q.  And with respect to her concerns

13   about caseworker contacts, did you take any

14   actions?

15            A.  Again, I asked for the cases to be

16   -- I mean, the cases to be reviewed by our

17   program manager or CWC.  And I don't recall

18   who was assigned to that.  And, I mean, I do

19   recall there wasn't like glaring actions

20   that the department had failed at.  I mean,

21   I do -- I mean, there wasn't something we

22   need to fix this right now.  I do recall

23   that.  But I reviewed those with them.

24                    And, you know, on situational

Page 98

```
 1    things that we could have, you know -- I

 2    mean, we have a statewide.  We make contact.

 3    If we get a referral in, we start that day

 4    and we continue daily until we make contact.

 5    So there's lots of corrections that have

 6    been put in place like as far as the

 7    contact.  You know, previewing the contacts.

 8              And, you know, if you -- like we

 9    report that every week in a data meeting.

10    And they can tell you -- like, and I meet --

11    in addition to the managers, I meet with all

12    of the intake supervisors weekly.  And they

13    can tell me if they didn't make this

14    contact, they tried on the 5th, the 6th, the

15    7th, the 8th.  They went at eight o'clock at

16    night, they went at 7:30 in the morning,

17    like all of their attempts.

18              You know, I get emails from

19    frontline, intake supervisors, any more

20    suggestions, like they called the police,

21    they have had them checked.  Like, you know,

22    like what -- like there was -- you know,

23    most recently they were looking for somebody

24    that was homeless.  A homeless.  And, you
```

Page 99

1    know, they involved law enforcement.  She

2    said any suggestions -- I said law

3    enforcement generally knows a lot of your

4    homeless population.  And they were able to

5    find them.

6            So, I mean, not me specifically,

7    but we do have a statewide and we report

8    those.  Like in the data, if contacts aren't

9    made, then we are aware of it within that

10   week.  And so what have you done to do it?

11       Q.  And you said that the contacts in

12   PATH are all inputted by the individual

13   caseworkers?

14       A.  Correct.

15       Q.  And then she says in this second

16   paragraph down, There have been numerous

17   cases that have resulted in a child being

18   physically injured, raped, bitten by rats

19   and exposed to further domestic violence

20   since I first brought this to the attention

21   of my superior a year ago.

22            Did you look at all of cases that

23   she suggested resulted in children being

24   harmed?

Page 100

```
1          A.  Okay.  Well, she brought those to

2    somebody that wasn't me like the year

3    before.  The cases that she provided me, I

4    did look at.

5          Q.  Okay.  And you didn't see any

6    errors?

7          A.  Well, I mean, and they were given

8    -- I am not going to say -- I mean, if I

9    looked at your work, I probably would find

10   an error.  I mean, like we are humans.  We

11   do make errors.  But not anything again that

12   was glaring that needed immediate.

13            So like some of this stuff that --

14   I mean, this was like September.  And she

15   had brought those like a year before.  You

16   know what I mean, like those cases.  The

17   cases that she gave me, the lists, like I

18   took information that day.  And I don't

19   recall.  There may have been, if I had to

20   guess, five to ten like cases that were

21   reviewed.

22         Q.  So of those five to ten cases were

23   more recent cases?

24         A.  Some of them referred like -- I
```

Page 101

```
 1    think some of them were really old and the

 2    department's involvement wasn't there.  It

 3    was to point out the error of that

 4    supervisor.

 5         Q.  Okay.  I am marking this as

 6    Exhibit 4.

 7               (Exhibit 4 was marked.)

 8               (Witness reviews document.)

 9         Q.  Ms. Ellis, tell me when you are

10    ready.

11         A.  Okay.  I am ready.

12         Q.  Okay.  This is an email.  The top

13    email is one sent from you to Jeffrey Pack

14    on 11/3/23; is that correct?

15         A.  Yes.

16         Q.  And it forwards an email sent to

17    you from Daniel Lefeber?

18         A.  Lefeber.

19         Q.  Lefeber.  Ms. Ellis, do you recall

20    this email?

21         A.  I do.

22         Q.  Okay.  Who is Mr. Lefeber?

23         A.  He is an intake supervisor in the

24    Berkeley office.
```

Page 102

1        Q.  Okay.  And do you have any reason

2    to doubt the information, the accuracy of

3    the information he provided you in his

4    email?

5            MS. SIEGENBERG:  Objection.

6    Vague.  Is there a specific piece of

7    information that you are asking her about in

8    the email?

9            MS. TEBOR:  I'm asking her about

10   the email.

11        You can answer.

12        A.  That's his perception.  I have no

13   reason to doubt that, no.

14        Q.  Did you do anything to follow up on

15   Mr. Lefeber's email aside from sending it to

16   Mr. Pack?

17        A.  This is a district that I have

18   spent time in.  I have in a sense tried to

19   organize them.  I have worked with the

20   manager.  I have worked with the manager

21   trying to set -- trying to migrate them from

22   the way it was to the way it is.  And, I

23   mean, I have spent time in the -- I mean, I

24   have spent the day in the -- when I go

Page 103

1    there, like of days.  Generally there's --

2    we will do an evening meeting.  But like

3    during the day, it's just watching their

4    staff.

5            I have participated in their what

6    we call flash meetings in the morning with

7    their intake staff.  I have the link to that

8    and I pop into that.  I have done that.  I

9    have spent, I don't know, numerous hours

10   working with this district to -- from

11   informal to formal implementation to change

12   expectations and practice.

13           I just most recently yesterday and

14   today have different -- I pulled different

15   teams from different counties to go in and

16   assist with seeing like kids -- I mean,

17   seeing like on the referrals.  Tried to --

18   it's a process -- trying to remove any

19   barriers they see or excuses to being able

20   to perform their job.

21           I required the manager and

22   supervisors to take three referrals a week

23   and go out and make the face-to-face to

24   assist their staff.  Required them to enter

1    data for staff.

2            I have pushed ongoingly -- if

3    that's -- ongoing in regards to getting

4    staff and -- to get staff in.  We have added

5    a second manager, two SSMs.  That actually

6    that manager starts -- we hired that

7    manager, and they start on Monday.  So I

8    will have two managers there.  And we have

9    added an additional supervisor into that.

10            I meet with their supervisors

11   weekly.  And I have been doing that except

12   for probably like the last three weeks to a

13   month.  It has not been as consistent with

14   people out on vacation and different things.

15   So I am actually headed there on Sunday.  I

16   will be up there at the beginning of next

17   week.

18        Q.  Okay.  And it seems like the work

19   that you are doing that you are talking

20   about with the county and sort of just your

21   general work with the county, did you do

22   anything specific with regard to Mr.

23   Lefeber's concerns?

24        A.  Well, I mean, again, like it is

Page 105

1    ongoing.  Specific to that, we talked about
2    -- I mean, I talked to his -- his name is
3    Dan.  I talked to Dan.  I talked to the
4    individual supervisors outside of the
5    manager.  And I took input on what they --
6    what their suggestions are and fostered a
7    more collaborative where their input is
8    taken into consideration.
9              We have added crisis workers to
10   assist with the caseloads.  As an agency, we
11   have a position that is kind of unique to
12   this and to another district, an associate's
13   position that allows them to investigate.
14   Like, I have worked with like one area.  I
15   mean, like this is a huge district.
16        Q.  Yeah.
17        A.  And so, you know, like personnel is
18   the first one working with them.  You know,
19   I have talked to the manager about like her
20   staff's perceptions and how her perceptions
21   may vary and encouraged, enforced her to be
22   more involved.
23        Q.  Now, you have talked about an
24   associate position doing investigations.

Page 106

1    What is that position?

2         A.  It is a position that it is a

3    certain -- in certain districts that the

4    requirements for a regular CPS worker do not

5    apply.  They are allowed -- we have worked

6    with our -- when I say we, not me

7    personally.  Our agency has worked with the

8    Board of Social Work Examiners of West

9    Virginia to allow people like a retired

10   police officer to help us assist with

11   investigations.  And like I said, again, it

12   is unique to circuits in the state.

13        Q.  How many circuits in the state have

14   this?

15        A.  Two.

16        Q.  Two.  Okay.

17             And is there any specialized

18   trainings for these associate --

19        A.  Well, I mean, with any position

20   with the department, there is training.

21        Q.  Yeah.  Do they have any social work

22   -- do they need to have any social work

23   background?

24        A.  During an investigation.  I mean,

Page 107

1    there are people -- it is related -- I mean,

2    related field to social work.  I mean, or

3    like an ideal person would be like a retired

4    police officer, probation officer that is

5    familiar with the system.

6        Q.  And they are performing the

7    investigations into referrals and --

8        A.  The investigations, yeah.

9        Q.  Sorry.  Let me just finish my

10   question so it is clean.

11       A.  Oh, sorry.

12       Q.  They're performing investigations

13   into the initial referrals of abuse and

14   neglect?

15       A.  That is correct.

16       Q.  Okay.  And you said there's two

17   circuits in which this is happening.  What

18   are those circuits?

19       A.  Berkeley, Jefferson.  And Braxton,

20   Clay, Gilmer and Webster.

21       Q.  Do you know how many associate

22   positions there are?

23       A.  Four.

24       Q.  Four?

Page 108

```
1       A.  Two for each.

2       Q.  Two for each.

3              MS. SIEGENBERG:  We have been

4   going for about an hour.  So whenever is a

5   good point for a break.

6              MR. MEADE:  We are getting

7   close.

8              MS. TEBOR:  Yeah.  Let me just

9   finish up with this document, and then we

10  will take a break.  Does that sound good?

11             MS. SIEGENBERG:  Okay.

12      Q.  Do supervisors also have mentoring

13  roles?

14             MS. SIEGENBERG:  Objection.

15  Vague.

16      Q.  Let me ask you about a specific

17  area.

18             Okay.  So I am looking at page

19  ending in 594.

20      A.  Okay.

21      Q.  Okay.  And if you look at the

22  paragraph that starts with Solution.  So

23  Daniel says -- let's see, one, two, three,

24  four, five lines down --
```

Page 109

1         A.  Okay.

2         Q.  -- when having workers perform

3    duties outside of their normal role, it

4    takes longer and it's more errors which then

5    requires rework.  I need more time to

6    develop to devote to helping new staff.  I

7    know the idea is for seniors to take on that

8    role.  And in theory, that is what happens.

9    In our district, the senior has too many

10   complex cases to have time to perform a

11   mentoring supportive role to new staff.  As

12   a result, it falls on the supervisor and I

13   am struggling.

14            Do you have an understanding of

15   what he is talking about here?

16        A.  I do.

17        Q.  Okay.  What is he talking about?

18        A.  Well, I mean, basically in a

19   nutshell, he is wanting more time to develop

20   new staff, like to go in the field with

21   them.  I mean, and this job experience is

22   the best teacher to be there to mentor them

23   in realtime.

24        Q.  And he doesn't feel that he has

Page 110

1    that time?

2         A.  No.

3         Q.  Okay.  And so any supervisor that

4    is taking on a mentoring role also is taking

5    that on on top of their current job duties?

6              MS. SIEGENBERG:  Objection.

7    Vague.

8         A.  It is a part of their job duties,

9    is to develop their staff.

10        Q.  Okay.  In going back to the page

11   ending in 593, in the third full paragraph

12   down.  He talks about how Marla McQuown, I

13   am not sure how to pronounce her name, is an

14   ongoing supervisor carrying 100-plus cases.

15   Do you see that discussion?

16        A.  You're in third paragraph?

17        Q.  Yeah.  One, two, three --

18        A.  Okay.  Okay.

19        Q.  Yeah.

20             Did you have an understanding that

21   there were some supervisors with over 100

22   plus or carrying 100-plus cases?

23             MS. SIEGENBERG:  Objection.

24   Vague.

1          A.  Okay.  Ask me.  I'm sorry.  I am

2    reading.

3          Q.  Did you have an understanding that

4    there were supervisors carrying 100-plus

5    cases?

6               MS. SIEGENBERG:  Same objection.

7          A.  Again, I think like on -- when we

8    looked at like the caseloads, there were

9    cases that -- I mean, they were behind in

10   getting cases sent.  I think at one point,

11   like we pulled 22 cases from one worker, I

12   don't know if it was Marla or not, and sent

13   them to the adoption units.  It is a matter

14   of getting them staffed and the thing.  So,

15   I mean, there is -- I am not aware of

16   anybody that has a hundred cases that are

17   actual cases they are working.  I will just

18   say that.

19         Q.  Okay.  And when you say -- when you

20   are talking about how you pulled 20 cases

21   and sent them to adoption, right, while

22   those cases are with a particular caseworker

23   or supervisor, there are still actions that

24   need to be taken with regard to those cases;

Page 112

1    is that correct?

2        A.  There are some actions, yes.

3        Q.  Okay.  And turning to 594 again.

4    Daniel says -- it is under the heading that

5    says Courts.  One, two paragraphs down says,

6    The ongoing unit is absolutely a mess.

7    Workers do not even know which cases they

8    have.  I have no idea how they are expected

9    to make a hundred percent face-to-face

10   visits.  There's no reliable mechanism to

11   assign track and manage the cases in child

12   visits.

13            Do you agree that the ongoing unit

14   was a mess?

15            MS. SIEGENBERG:  Objection.

16   Vague.

17       A.  I don't think that -- I think there

18   was a lot of lack of organization and logs

19   not being kept.  I mean, I don't know that

20   -- I don't know.  A mess is not the word

21   that I would use.

22       Q.  And what logs were not being kept?

23       A.  Well, I mean, like a child in

24   custody, a log of like every child listed in

Page 113

```
 1   custody, where their placement is, who their
 2   provider is, that -- as far as -- you know,
 3   I mean, that is a backup to the kids and
 4   children in custody.
 5            MS. TEBOR:  All right.  I think
 6   now is A good time for a five-minute break,
 7   or ten minutes -- did you want ten minutes
 8   or five minutes.
 9            MS. SIEGENBERG:  Five minutes is
10   fine.
11            (Break in proceedings from
12   11:35 a.m. to 11:47 a.m.)
13   BY MS. TEBOR:
14       Q.  Ms. Ellis, we are back on the
15   record.  If you are looking at Exhibit 4, I
16   will turn your attention to the page ending
17   in 595.
18       A.  Okay.
19       Q.  And if you look under Community,
20   Daniel, Mr. Lefeber, says, Quite frankly, we
21   have a lack of services.  This hinders the
22   ability of workers to be productive and be
23   able to develop skills to be successful.  It
24   is difficult when they are not the services
```

Page 114

1    available that the court and policy

2    requires.

3              Do you agree that there is a lack

4    of services?

5         A.  I do, yes.  There is a lack of

6    services in that district.

7         Q.  Okay.  Specifically in that

8    district?

9         A.  In that -- yes.  In that district.

10        Q.  Okay.  Is there a lack of services

11   in other districts?

12        A.  Well, I mean, some districts are

13   more provider rich than others.  This is one

14   that -- like if -- and I am doing this again

15   by memory.  Like for visitation, getting

16   visitation supervised or -- so ...

17        Q.  Okay.  So if there is a lack of

18   supervising providers for visitation, then

19   it will be harder to schedule visitation

20   between a parent and a child; is that

21   correct?

22              MS. SIEGENBERG:  Objection.

23   Calls for speculation.

24        A.  There is a lack of ASO, which is

Page 115

1  who we contract with providers.  So like in

2  this district, they think outside the box.

3  They have like other different agencies that

4  are supervising visitation.

5      Q.  Okay.  And do you have an

6  understanding of what he means when he says

7  this hinders the ability of workers to be

8  productive?

9      A.  Trying to -- I mean, this is my

10  assumption.  Like assuming trying to find

11  somebody to supervise the visits, to

12  supervise the visits that -- it takes a

13  little bit of time.  You just can't make one

14  phone call.  You may have to call multiple

15  places.

16      Q.  Okay.  And he says shelters, child-

17  placing agencies, in-home services,

18  reunification services, supervised visits,

19  parenting, et cetera, are all scarce to

20  nonexistent.  Would you agree with that

21  statement?

22      A.  I don't -- no.  I don't agree with

23  that.

24      Q.  Okay.  Why don't you agree with

Page 116

1    that?

2        A.  Well, I mean, child-placing

3    agencies are statewide.  They are statewide.

4    So I don't know what he is referencing

5    there.  Where are you at on this page?  I'm

6    sorry.

7        Q.  Oh, sorry.  Yeah.  Under Community.

8        A.  Okay.  I mean, shelters -- I mean,

9    we have shelters statewide.  The

10   reunification services is the supervise,

11   visiting in parenting.  I spoke to that.

12   And so, I mean, they do have a lack of ASO

13   service providers there.  But again, they

14   have got other resources that other

15   districts don't have that are non-ASO.

16       Q.  And what does ASO stand for?

17       A.  I don't know.

18       Q.  That's fine.  We can look it up.

19       A.  Socially necessary -- I mean, like

20   it is our services.

21       Q.  Yeah, yeah.

22       A.  You just caught me offguard there.

23   Sorry.

24       Q.  Sure.  No problem.

Page 117

1                    And he also talks about in-home

2    services.  Do you agree that those are

3    scarce to nonexistent?

4         A.  I agree that this -- there is

5    limited providers.

6         Q.  And what in-home services are there

7    limited providers for?

8         A.  Well, I mean, like in parenting,

9    parenting life skills.  Those type of --

10   they have -- they utilize something up there

11   called life coaches that other districts

12   don't have where they might not have it as a

13   traditional ASO service.  I mean, they do

14   have like life coaches that, you know, teach

15   them a lot of the life skills that it covers

16   over in visitation.  They cover a lot of the

17   parenting in realtime as it is happening.

18   You know, don't give in to them, set clear

19   expectations, set boundaries.  So while it

20   might not be a traditional ASO, they have

21   their day report center, their -- I mean,

22   they are doing some of the visitation, some

23   of the parenting.

24        Q.  Okay.  So at least with regard to

Page 118

1    this district or this county, caseworkers

2    need to go outside of the traditional

3    services to get --

4         A.  Yeah.  I mean, I was -- you know.

5    I mean, I spent a day up there in a

6    training.  And I was amazed that some of the

7    -- you know, like the life coach.  Because

8    that's not something -- but, I mean, they

9    work with the parents to teach them problem

10   solving and listen to the workers like in

11   their testimony.  We did, you know, mock

12   court training, and they talked about what

13   the life coach could do.  And, you know, the

14   attorneys questioned them.  I mean, so they

15   do have resources, just maybe not the

16   traditional ones.

17        Q.  And that's because -- and so the

18   individual caseworkers have been resourceful

19   in finding alternative resources?

20        A.  Right.  And I think it is a

21   collaborative effort with that with the

22   court.

23             Are we done with this one?

24        Q.  Yes.  We are done with this one.

Page 119

1          I am marking this as Exhibit 5.

2               (Exhibit 5 was marked.)

3      Q.   Ms. Ellis, do you recognize this

4   email?

5               MS. SIEGENBERG:  Give her a

6   minute.

7      A.   Yes, please.

8      Q.   Sure.

9               (Witness reviews document.)

10      A.   Okay.

11      Q.   I want to turn your attention to

12   the page ending in 089.

13      A.   Okay.

14      Q.   If you look one, two, three

15   paragraphs down, it says, I have taken

16   worker off this email, Amber Posey, ███████

17   youth social worker, requested an At-Risk

18   staffing to discuss ████ on 8/14/23.

19   Melinda met with Amber on 8/16/23.  It does

20   not appear that any of the recommendations

21   that Melinda made were followed.  Does not

22   appear that we offered any services to this

23   youth or his mother, although it is

24   difficult to determine what has transpired

Page 120

1    in this case, as there are no contacts, no

2    YS assessment, no case plan, etc.

3            Do you see that section?

4        A.   Uh-huh.

5        Q.   Do you recall receiving this

6    complaint?

7        A.   Not specifically.  But I am not

8    denying that I did, I mean, so ...

9        Q.   Do you recall doing anything to

10   follow up with regard to this caseworker

11   Amber Posey?

12       A.   I don't, I mean, recall

13   specifically what -- I mean, general when an

14   email is done like this, like they are -- it

15   would have been the manager who -- I mean, I

16   would have had a conversation with the

17   manager, not directly the worker.  So I

18   don't recall.

19       Q.   Do you recall having a conversation

20   with Melinda to discuss this issue?

21       A.   I don't recall a specific

22   conversation with Melinda.  I mean, I am

23   included on emails obviously.

24       Q.   Okay.  So the department depends on

Page 121

```
 1   the individual caseworkers to obtain and

 2   coordinate services for foster children; is

 3   that correct?

 4        A.  Well, I mean, it is initiated with

 5   our caseworker.  And it should be followed

 6   up with a supervisor.  You know, any child

 7   that is at risk of an out-of-home placement,

 8   I mean, there is a process that should be

 9   followed.  Obviously it wasn't.  So if

10   that's what you are asking.

11        Q.  And it appears from this email that

12   there were recommendations made to the

13   caseworker at least as of August 16, 2023,

14   and there were no services, no follow-ups

15   until October 4, 2023.  Is that your reading

16   as well?

17              MS. SIEGENBERG:  Objection.

18   Vague.

19        A.  That's what it says.

20        Q.  Okay.  And how is it possible that

21   there was a month and a half where there

22   were no contacts and no service with this

23   child?

24              MS. SIEGENBERG:  Objection.
```

Page 122

1   Calls for speculation.

2        A.   I can't speak to this individual.

3   I mean, I wasn't involved.   I mean, I became

4   aware when everyone else did.   So I can't

5   speak to how or why this happened.

6        Q.   Okay.   And do you know if Amber

7   Posey is still working for the division --

8   or for the department?   Sorry.

9        A.   I do not.

10        Q.   And it appears from this email that

11   -- it says in the second-to-last line, the

12   worker did not follow up until October 4,

13   2023, at which time out-of-state referrals

14   were already made with a few facilities

15   accepting ███, including Kidspeace.

16        So the child received no services

17   and then was sent out of state; is that

18   accurate?

19            MS. SIEGENBERG:   Objection.

20   Calls for speculation.

21        A.   According to -- I mean, that's what

22   is stated in the email.

23        Q.   Okay.   And then if you go two

24   paragraphs down, it says, It is reported

Page 123

1    that the district never received the QIA

2    that was referred on August 7, 2023.

3              What is the QIA?

4          A.  Where are you at in the --

5          Q.  Sorry.  Two paragraphs down from

6    where I was.

7              MS. SIEGENBERG:  It's right in

8    here, this line (indicating).

9          A.  Okay.  The QIA is an independent

10   assessment for a child to make

11   recommendations for that child's need to

12   keep -- that we go with the least

13   restrictive.  It is an assessment process.

14   That's referred outside of our agency.

15         Q.  Okay.  So the QIA makes an

16   assessment as to what a child needs to stay

17   in the least restrictive environment?

18         A.  It makes recommendations.

19         Q.  Okay.  And who performs the QIA?

20         A.  Independent of -- I mean, there is

21   different -- it's referred outside of the

22   agency, different providers.

23         Q.  Okay.  And if a QIA is not

24   received, does that mean that the child is

Page 124

1    not receiving services that could keep that

2    child in the least restrictive environment?

3              MS. SIEGENBERG:  Objection.

4    Calls for speculation.  Incomplete

5    hypothetical.

6         A.  Can you repeat that?  I'm sorry.

7              (The preceding question was read

8    back by the court reporter.)

9              MS. SIEGENBERG:  Same objection.

10        A.  Not necessarily.  I mean, services

11   can be initiated without the

12   recommendations.  Even if a child sitting in

13   a shelter, for example, services are

14   initiated.  It is information gathering, an

15   assessment to make the best recommendation

16   for that child.  So it doesn't -- not

17   necessarily -- doesn't mean they are not

18   getting services, it just means they don't

19   have the recommendations.

20        Q.  Okay.  And in this case, the child

21   didn't have services before receiving any

22   QIA?

23              MS. SIEGENBERG:  Objection.

24   Calls for speculation.

Page 125

1          A.  That's what is included in the

2    email.

3          Q.  Okay.  And are you aware of issues

4    with delays in receiving the QIAs?

5          A.  I don't think that is a consistent

6    issue.  It is not brought to my attention a

7    lot.  But there has been situations where --

8    I mean, there has been a delay from a

9    provider or difficulty contacting our worker

10   or the worker changed and the information --

11             (Interruption in proceedings.)

12   BY MS. TEBOR:

13         Q.  Let me turn your attention --

14   actually, first, before we move on -- to the

15   page ending in 088.

16         A.  Okay.

17         Q.  So I just want to clarify the QIA

18   referral process.  I know you said that the

19   QIAs are performed by an outside provider.

20   But the referral itself to the QIA -- sorry

21   -- the referral itself to the QIA is made by

22   the individual caseworker; is that correct?

23         A.  Correct.

24         Q.  And looking at page 088, so we are

Page 126

```
 1    looking at -- let's see -- the second --

 2    there's bulleted paragraphs.  It's the

 3    second bulleted paragraph down.  And it

 4    says, The QIA process requires that when a

 5    child is determined to be at risk for

 6    residential placement (any not just out of

 7    state), a QIA referral is to be made within

 8    24 hours.  Even though we knew the child was

 9    adjudicated when we opened the case on

10    July 11th, we are undoubtedly aware that the

11    youth was at risk and the QIA referral was

12    not made until the 7th of August.  The QIA

13    referral in process is required per our

14    agreement with the U.S. Department of

15    Justice.

16            Do you see that?

17        A.  Yes.

18        Q.  So there was a month delay between

19    when the caseworker was aware of the risk of

20    residential placement and when they even

21    made the initial QIA referral; is that

22    correct?

23            MS. SIEGENBERG:  Objection.

24    Vague.  Calls for speculation.
```

Page 127

1          A.   It appears.

2          Q.   Do you track any data as to when

3    QIA referrals are made?

4          A.   I personally don't.  The supervisor

5    or the manager have their tracking systems.

6          Q.   Do the supervisor and manager track

7    data as to when QIA referrals are made?

8          A.   Have I seen their log?  No.  But, I

9    mean, when we talk about cases, about kids

10   going out of state, they can tell me the

11   date that it was made.  So they are tracking

12   it somehow.

13         Q.   Okay.  So they are tracking it for

14   each individual case as to when the QIA

15   referral is made; is that correct?

16              MS. SIEGENBERG:  Objection.

17   Misstates prior testimony.

18         A.   When we talk about kids going out

19   of state, I mean, they can say this is what

20   the QIA recommended.  The court wants to put

21   this child out of state.  You know, so we

22   can share the recommendations.  You know,

23   and ultimately the court has the final say.

24   So they are tracking it somehow, to answer

Page 128

1  your question.

2          Q.  When you are provided with this

3  information, are you also provided with

4  information about the timing of the QIA

5  referral?

6                MS. SIEGENBERG:  Objection.

7  Vague.

8          A.  Not every case.

9          Q.  On some cases, are you provided

10  with the timing of the QIA referral?

11          A.  I mean, on occasion I have been.  I

12  mean, especially if there is a delay.  If

13  there is a delay, then I am usually

14  notified.

15          Q.  Okay.  And would you do anything --

16  or did you do anything as a result of being

17  notified about a delay in the QIA referral?

18                MS. SIEGENBERG:  Objection.

19  Vague.

20          A.  Are you asking specific to this

21  situation?

22          Q.  That's fair.

23                So specific to this situation, did

24  you do anything with regard to the delay in

Page 129

1    the QIA referral?

2         A.  I think I told you, I had a

3    conversation with a manager -- with the

4    manager.  And I don't know specific to this

5    district.  We have brought in the training

6    for the QIA assessment.  We have repeated

7    the training for some districts.  I don't

8    recall if this was one of them.  We have had

9    program managers or a CWC come in unit

10   meetings again to talk about the importance

11   and the reasoning behind this.  Again,

12   specific to this case, I don't recall.

13        Q.  Okay.  I'm going to go --

14             MS. SIEGENBERG:  Before moving

15   on from this exhibit, Defendants are going

16   to request that Exhibit 5 is maintained

17   under seal because it contains protected

18   information.

19             MS. TEBOR:  Agreed.

20        Q.  I'm marking this as Exhibit 6.

21             (Exhibit 6 was marked.)

22        Q.  Ms. Ellis, how does a caseworker

23   evaluate whether a child should be placed in

24   an institution versus in the community?

Page 130

1          A.  I'm sorry.  I was reading.  Can

2    you --

3          Q.  Yeah.  Sure.

4          A.  I'm sorry.

5          Q.  How does a caseworker determine

6    when a child should be placed in an

7    institution versus place in a

8    community-based setting?

9               MS. SIEGENBERG:  Objection.

10   Incomplete hypothetical.  Calls for

11   speculation.

12         A.  Any case, unless it is something

13   egregious, is going to start with services.

14   You know, like if they are ordered into an

15   out-of-placement setting -- I mean,

16   generally, like a foster home or if it is a

17   youth, a shelter, and -- you know, I mean

18   that's generally our initiation into the

19   case, getting to know this child.

20              Evaluations -- evaluations.  If a

21   child is in a shelter, they get a

22   psychological evaluation.  The QIA like

23   assessments, they look at that to make the

24   determination.  I mean, it is not just

Page 131

1    random, you know.

2        Q.  And who is providing the

3    recommendation as to where a child is going

4    to be placed?  Is it the caseworker, the

5    supervisor or a combination?

6        A.  Okay.  I am going to ask you a

7    question.

8        Q.  Sure.

9        A.  Recommendation to who?  You are

10    asking who provides the recommendation?

11        Q.  Sure.  Sure.  That's fair.  I will

12    strike that question.  And I will -- let's

13    start it again.  Well, strike that.  Let's

14    just look at this email.  I think that might

15    be easier to talk about in context.

16            So I am looking at the email marked

17    as Exhibit 6.  This is an email from Lorie

18    Bragg to you on August 28, 2023.  Is that

19    correct?

20            MS. SIEGENBERG:  You can have a

21    chance to finish reviewing the document.

22        A.  Yes.

23        Q.  All right.  And if you look at the

24    bottom email from -- I'm sorry.  Do you

Page 132

1   recall receiving this email from Lorie

2   Bragg?

3           A.   I mean, I am acknowledging that I

4   received it.  I don't recall it specific.

5           Q.   Okay.  Do you recall this issue at

6   all or anything having related to this

7   email?

8               MS. SIEGENBERG:  Objection.

9   Vague.

10          A.   If I recall, there was some

11  information that was maybe not included in

12  an assessment.  I don't specifically recall.

13          Q.   Okay.  And just looking at this

14  email, the bottom one from Lorie Bragg says,

15  This kid is currently at Lakeland and they

16  recommended he return home.  The worker

17  believes they are lying and had the judge

18  order him to Liberty Point.  This is

19  completely inappropriate.  Why did we pay

20  Lakeland 1500 a day for recommendations if

21  we are not going to follow them?  And now

22  instead of putting the supports this kid

23  needs to be successful in his home, we are

24  sending him to another out-of-state

Page 133

1    placement.

2              Do you see that?

3         A.  I do.

4         Q.  Okay.  Did this child ultimately --

5    do you have an understanding of whether this

6    child was ultimately placed out of state?

7         A.  I don't recall.

8         Q.  Okay.

9         A.  I don't even know who this -- I

10   mean, maybe I am missing a name.  But I

11   don't even see a name on here.

12        Q.  Okay.  And why would the workers --

13   strike that.

14             And then if you look above, you see

15   on August 25, 2023, at 2:53, Lorie Bragg

16   also says both Lakeland and the QI have

17   similar recommendations.  I don't understand

18   how we go from family setting to PRTF.

19             Do you see that as well?

20        A.  I do.

21        Q.  Okay.  And the QI is the assessment

22   that we were talking about previously as the

23   children being in the least restrictive

24   setting; is that right?

Page 134

1          A.  Yes.

2          Q.  Okay.

3          A.  Well, I mean, it is an independent

4   -- let me clarify that.  It is an

5   independent assessment for any child that is

6   at risk of an out-of-home placement that

7   makes recommendations.  So I don't know --

8   that's what the QI is.

9          Q.  Okay.  Thank you for clarifying

10  that.

11              And you see that on August 25,

12  2023, you email that -- you email even in

13  reviewing the At-Risk sheets, Burlington Co

14  existing disorders denied, stating that they

15  attend public school, do not feel

16  transitioning ▇▇▇ back to public school so

17  fast would be a positive transition for him.

18  I think the information being provided about

19  this youth is definitely skewed and

20  negative.

21              Do you recall why you thought the

22  -- and sorry.  Strike that.

23              The information being provided

24  about this youth, was that the information

Page 135

1   being provided by the caseworker?

2                    MS. SIEGENBERG:  Objection.

3   Vague.

4         A.  I don't recall.

5         Q.  And you are reviewing the At-Risk

6   sheet.  Who fills out the At-Risk sheet?

7         A.  The worker.

8         Q.  And do you have any memory as to

9   why you believe this information was skewed

10  and negative?

11                   MS. SIEGENBERG:  Objection.

12  Vague.  Asked and answered.

13        A.  I don't recall specifically, no.

14        Q.  Okay.  Do you recall -- strike

15  that.

16             So whether or not -- the caseworker

17  recommends to the court whether a child be

18  placed in a specific placement; is that

19  correct?

20                   MS. SIEGENBERG:  Objection.

21  Vague.  Incomplete hypothetical.

22        A.  The MDT makes the recommendation.

23  The caseworker presents it in a report.  So

24  it is not just a caseworker and a

Page 136

1    supervisor.  I mean, that child has an

2    attorney.  That child has parents, service

3    providers.  So it is a combination, a

4    collaborative effort.

5         Q.  Okay.  And the judge is taking into

6    account the caseworker's opinion when making

7    a decision; is that correct?

8              MS. SIEGENBERG:  Same objection.

9         A.  I can't speak to what the judge

10   takes into account.  I mean, in fairness, I

11   can't speak to what they take into

12   consideration.  You know, I mean, the

13   caseworker basically is restating these are

14   what the recommendations as a QIA.  You

15   know, within policy, we go with the least

16   restrictive.  So I don't know what their --

17   a judge's thought is on that.

18        Q.  And who decides where to place a

19   child at the time of the initial removal?

20        A.  Okay.  A worker in conjunction with

21   their supervisor -- I mean, a removal is

22   generally -- that's not like a planned

23   structure.  It is generally an emergency

24   imminent situation when a child is removed.

Page 137

1    And our policy is that you look for a

2    community that the child knows.

3              So, I mean, that information comes

4    from a child, you know, who do you spend

5    time with, you know.  I mean, a lot of times

6    I go to Ms. Baker's house every -- we make

7    cookies.  You know what I mean?  We are

8    trying to establish who they have a

9    relationship with.  And we look at -- we ask

10   parents if there's any family members that

11   they think would be appropriate.  So those

12   decisions are made within the information

13   gathered at that time.

14        Q.  Okay.  And the ultimate decision of

15   where that child is placed upon initial

16   removal is left to the caseworker and their

17   supervisor; is that correct?

18        A.  Yeah.  I mean, there is -- I mean,

19   they have to do certain requirements,

20   background checks and the conversations I

21   just told you about.  So yeah.  Ultimately,

22   yes.

23        Q.  Okay.  And do you have an

24   understanding as to why Ms. Bragg is

Page 138

1    emailing about this specific instance?

2              MS. SIEGENBERG:  Objection.

3    Vague.  Calls for speculation.

4         A.  Well, I know Ms. Bragg was very

5    passionate about placement and meeting a

6    child's needs.  And I think -- so, I mean,

7    that's my opinion -- that they -- in this

8    situation, she didn't think a child's best

9    interest was being addressed.

10        Q.  Okay.  And are there any regular

11   reviews of whether a caseworker and/or a

12   supervisor are recommending to the court the

13   least restrictive placement?

14             MS. SIEGENBERG:  Objection.

15   Confusing.

16        A.  Ask me again.  I apologize.

17        Q.  Sure.  Sure.

18             WHAT I am trying to understand is,

19   is Ms. Bragg -- is there some formal system

20   by which Ms. Bragg is reviewing all

21   placements, and so she is seeing which ones

22   are -- you know, are least restrictive and

23   which she does not believe are least

24   restrictive, or is it just a one off -- one

Page 139

1    off case that came to her attention?

2         A.  There is a -- there is a process

3    that she could speak to more eloquently than

4    I can obviously.  But each out-of-state

5    placement is reviewed and is actually signed

6    off by our commissioner.  So, I mean, there

7    is a process in place.

8         Q.  Okay.  And does the commissioner do

9    any additional -- strike that.

10             In signing off on the out-of-state

11   placement, what does the commissioner rely

12   on?

13        A.  The assessments, the information

14   provided, I would assume.  I can't speak to

15   what he would rely on.  But I know he

16   doesn't hesitate to question if he is not in

17   agreement.

18        Q.  Okay.  And the information provided

19   to him is provided from the caseworkers and

20   the supervisors; is that correct?

21        A.  And also your child welfare

22   consultant and the information Aetna

23   provides.  I mean, again, it's -- it is not

24   one person, it is a collaboration.

Page 140

```
 1          Q.  All right.  I am going to --

 2              MS. SIEGENBERG:  We are also

 3     going to request that Exhibit 6 be

 4     maintained under seal because it contains

 5     protective information.

 6              MS. TEBOR:  Yes, that's fine.

 7              (Exhibit 7 was marked.)

 8          Q.  I am marking this as Exhibit 7.

 9     I'm just going to be talking about the cover

10     email.  So you don't need to read the

11     attachment unless you want to look at it.

12          A.  Okay.

13          Q.  Just let me know when you are

14     ready.

15              MS. SIEGENBERG:  I will just

16     state for the record now that Exhibit 7 --

17     we will also be asking that Exhibit 7 be

18     maintained under seal.

19              MS. TEBOR:  Understood.

20          A.  All right.  So the email.  Okay.

21          Q.  So this is an email from Lorie

22     Bragg to you and Jeff Pack from November 8,

23     2023; is that correct?

24          A.  Correct.
```

Elite Court Reporting, LLC
LAUREA ELLIS, 06/26/2024

Page 141

1        Q.  Okay.  And it's attaching case

2    filing for an individual case.  And

3    Ms. Bragg says, I am just letting you know

4    this is a bit ridiculous.  There is zero

5    reason that we should have got to this

6    point.  They waited until the facility was

7    decided before sending this to Cory.  He

8    tried to staff, explain there is really

9    nothing in this that would prevent this kid

10   from being served in state.  The worker

11   himself didn't know anything about this kid

12   and couldn't even talk about services.

13   After the staffing, they basically

14   manipulated their way into a court order.

15           Do you see that?

16       A.  Uh-huh.

17       Q.  Do you recall receiving this email

18   from Ms. Bragg?

19       A.  I am not disagreeing.  I mean, I

20   received it, I mean, so  ...

21       Q.  Did you follow up with Ms. Bragg

22   regarding this email?

23       A.  I am reading it, trying to recall

24   this case.  If you just give me one second.

Page 142

1      Q.  Uh-huh.

2              (Witness reviews document.)

3      A.  Okay.  Ask your question.  Sorry.

4      Q.  Did you follow up with Ms. Bragg

5  with regard to this email?

6      A.  I don't recall specifically

7  following up with Ms. Bragg.

8      Q.  Do you recall following up with

9  anyone regarding this email?

10      A.  I mean, I am sure I -- I am sure I

11  followed up, I mean, with both the district

12  and Ms. Bragg.  I just don't recall the

13  specifics.

14      Q.  Okay.  So this is stating that

15  there was a supervisor and a caseworker who

16  didn't know anything about the kid and

17  couldn't even talk about services.  Do you

18  have any reason to doubt the validity of Ms.

19  Bragg's statements?

20              MS. SIEGENBERG:  Objection.

21  Calls for speculation.

22      A.  Other than a court order -- a

23  finding by the court that there was a

24  variety of intents and services and programs

Page 143

```
1    that the parents had previously undertaken

2    that were unsuccessful, I mean, that would

3    be -- when I read over this.  And I am doing

4    this by just reading what is in front of me.

5    They may not have known the services.  But

6    the court made a finding that the parents

7    had instituted services.

8         Q.  That's with respect to the parents,

9    correct?

10        A.  Yes.

11        Q.  Not with respect to the child?

12        A.  For the child.  The court further

13   finds reasonable efforts have been made to

14   maintain the juvenile in the community

15   through a variety of intensive services and

16   programs that the parents have previously

17   undertaken, but they were unsuccessful.

18        Q.  Okay.  Sorry.  You had said that

19   the parents had undertaken.

20        A.  I'm sorry.  Well, the parents

21   initiated the services.

22        Q.  Understood.

23            And you can't speak to what the

24   court relied on in making that finding,
```

Page 144

1    correct?

2          A.   No.   I just read just the court

3    order you put in front of me.

4          Q.   Okay.   And do you have an

5    understanding of whether anything was done

6    to discipline this caseworker and the

7    supervisor who couldn't even talk about

8    services?

9                MS. SIEGENBERG:   Objection.

10   Calls for speculation.   Assumes facts not in

11   evidence.

12         A.   I don't recall.

13         Q.   Okay.

14         A.   I don't even recall who the -- I

15   mean, like the supervisor or worker are

16   referring to.   I'm sorry.   I apologize.   I

17   just --

18         Q.   But this is -- strike that.

19              Okay.   And Ms. Bragg is saying that

20   there was nothing that would prevent this

21   child from being served in state; is that

22   correct?

23         A.   That's what her statement is, yes.

24              Am I finished with this one?

Page 145

1      Q.  Yes.

2          I am going to mark this one as

3  Exhibit 8.

4              (Exhibit 8 was marked.)

5              (Witness reviews document.)

6      Q.  Ms. Ellis, let me know when you are

7  ready to discuss this email.

8      A.  I am ready.

9      Q.  Okay.  This is an email from

10  Jondrea Nicholson to Jeffrey Pack, copying

11  you on April 7, 2023.  Is that correct?

12     A.  Yes.

13     Q.  Okay.  In the first line, she

14  states, Honestly, we lost control of foster

15  homes when we stopped certifying anything

16  other than KR -- is that kinship in relative

17  homes; is that correct?

18     A.  Uh-huh.

19     Q.  I understand why we did this and

20  agree that it had to be done, but this is

21  not the first time I have been told by a

22  foster parent that they have not gotten

23  called for placement for a while.  I don't

24  know if it is because the CPAs are short

Page 146

1    staffed and don't have case managers to

2    manage all of their homes, if they have

3    staff that they just don't want to take the

4    time to do the searching, if foster parents

5    are being truthful, combination or what.

6              So, Ms. Ellis, from this email, the

7    department is only certifying kinship in

8    relative homes; is that correct?

9        A.  From this email, yes.

10       Q.  Is that accurate today?

11       A.  Well, I mean, yes and no.  I mean,

12   we do have -- we have certified we are just

13   opening up our third emergency foster care

14   referral home.  And we do have a handful of

15   homes that were approved for adoption that

16   are still -- you know what I mean, that have

17   kept up their certification.  So there are

18   some homes through the agency.

19       Q.  You said homes that are approved

20   for adoption?

21       A.  Well, they have like previously

22   been foster parents and adopted a child.

23   And they have kept up their certification.

24   They may be interested in taking, you know,

Page 147

```
1    the right child or another child along the
2    way.  So there is a handful of homes?
3         Q.  So that's a handful of those?
4         A.  When I say a handful, I don't -- I
5    mean, home finding is not under my direct.
6    But, I mean, like when I say a handful, I
7    mean, it is not like a huge number.  But
8    there are -- I think it was described in our
9    leadership as a handful that we do have some
10   homes.
11        Q.  Okay.  And all other certified
12   non-kinship foster homes are certified
13   through CPAs; is that --
14        A.  Right.
15        Q.  -- correct?  Okay.
16            And do you personally do anything
17   to track the activities of the CPAs in the
18   districts that you oversee?
19        A.  Okay.  Please clarify that question
20   for me.
21        Q.  Sure.  Absolutely.
22            So with respect to the CPAs, do you
23   receive reports from them regarding their
24   available placements?
```

Page 148

1           A.  I mean, as I testified before, we

2   used to get reports.  I mean, they are not

3   like consistently what is available.  I

4   personally don't, no.

5           Q.  Okay.  When you say "we get those

6   reports," who are you talking about?

7           A.  Well, I mean, it goes out to like

8   their list serve of like managers, program

9   managers.  I don't know the rhyme or reason

10  of who is on that list.  But, I mean, we did

11  -- I haven't seen one for a while of like

12  what their availability is.

13          Q.  And is it your understanding that

14  CPAs are short staffed?

15          A.  I mean, I wouldn't know that.  I

16  mean, they don't -- I mean, they are not --

17  in meeting with like their leadership and

18  CPAs, I mean, they don't indicate that they

19  are short staffed.  I know -- I mean, like

20  with the shelters, like there were staffing

21  issues with shelters.  After COVID, we were

22  made aware of it.  But that's not something

23  that we are consistently made aware of.

24                  I think that when they talk about

Page 149

1    like foster parents saying they have not

2    been called, they manage that home.  They

3    know where -- my manager might not know

4    about Little ███████ in here, that if there

5    is too many people, he gets overanxious.  So

6    we don't want to place a child in there.

7            So when the foster parents are

8    aren't getting that call, we -- the best

9    resolution for kids is to match them with

10   the right home.  And so, I mean, we don't

11   know what is going on with that foster

12   family, if they have asked them to make some

13   changes in their home or -- you know, or the

14   foster family shared that, you know, they

15   have a sick child that they don't want to

16   take placement.  I mean, we don't know that.

17   The private agencies, they manage that.

18           So like when I look at something

19   like this -- I mean, I can recall

20   specifically asking about a certain family.

21   They say they are not getting calls when we

22   tell them they are on placements.  And she

23   said, you know, when they elected to do

24   this, they only wanted like age three to

Page 150

1    six.  You know, that's -- that's what they

2    wanted.  So when we -- like there's an 11-

3    or 12-year-old, like they have already said

4    up front that that's not the age that they

5    are interested in.

6              (A discussion was held off the

7    record.)

8    BY MS. TEBOR:

9         Q.  So you said when you see an email

10   like this, you don't believe that there are

11   available foster homes that are not getting

12   calls from CPAs?

13        A.  I don't have any reason to believe

14   that there are.  I mean, like on the rare

15   occasion like when foster parents have said,

16   you know, like -- where it has been said to

17   me the rare occasion that we are not getting

18   calls, when I talk to the agency, I mean,

19   there are reasons -- I mean, they provided

20   reasons why they weren't getting calls.

21   They understand the dynamics of their home.

22   And where this county might not know about

23   this county's child or -- you know, like

24   this county's child requires like, I mean,

Page 151

```
 1   six and not potty trained, you know, that
 2   takes a little bit more intensity.
 3          You know, a foster home, like they
 4   wanted an additional -- they have a baby
 5   that was born very premature and has like
 6   eating issues, and that baby is still --
 7   like a newborn baby has to be -- like every
 8   three hours, an alarm goes off.  They had to
 9   feed that baby.
10          And so like as the agency, they
11   made a decision that it wasn't good to add
12   other children in there because the
13   requirements of that child, until they get
14   past that.  And so, I mean, that information
15   wouldn't be shared with everyone.
16          So I am not aware of -- I mean, I
17   have not had anybody from a -- that I can
18   recall from a private agency telling me like
19   staffing issues.
20      Q.  Okay.  And you would only find out
21   about the staffing issues if the private
22   agency told you about it?
23      A.  Right.  And I think they would say
24   we can't take any more kids, we don't have
```

Page 152

1    case manages.  Now, there is a lot of like

2    fluid movement between agencies.  You know,

3    I mean, there is a lot of fluid where case

4    managers will jump to the next private

5    agency because this person may be here and

6    then next week they are there.  So, I mean,

7    you do see that.  But I don't -- I have not

8    been made aware of issues.  I mean, and

9    where we can assume that they are not

10   calling because they don't -- again, there

11   may be reasons why they are not calling that

12   family.

13        Q.  Uh-huh.

14        A.  And I would prefer them to try to

15   match a child with a family, like a dynamic

16   that is going to work.

17        Q.  Okay.  And aside from the cases

18   where you specifically investigated what was

19   the issue, you are not receiving regular

20   reports as to if families that are available

21   are being matched with appropriate kids; is

22   that correct?

23        A.  Okay.  I'm sorry.  It a little bit.

24   Ask me that again.  Sorry.

Page 153

1          Q.  Sure.  So you talked about a couple

2     of specific instances where you followed up

3     and investigated once you received

4     complaints from foster parents that they

5     were not getting called; is that correct?

6          A.  That's correct.

7          Q.  Okay.  Aside from those specific

8     instances where a foster parent complained

9     to you and you investigated, are you

10    receiving any sort of regular reports that

11    would show what exactly the placements are

12    and who is filling those placements?

13              MS. SIEGENBERG:  Objection.

14    Asked and answered.

15         A.  And I don't understand the

16    question.  I mean, I'm really not trying

17    to --

18         Q.  Yeah.

19         A.  In regards to like, I mean, the

20    vacancies, if that's what you are asking,

21    like I mean those -- like they are not -- we

22    used to get them more regularly than we do

23    now.  But as far as like -- and it doesn't

24    tell me why.  It just tells me like there is

Page 154

1    a 10-year-old male bed or there is a male

2    bed.  I mean, that's what it says.

3        Q.  Okay.

4            MS. SIEGENBERG:  Julia, whenever

5    is a good time for a break, we have been

6    going for about an hour.

7            MS. TEBOR:  I think I am close

8    to done.  So I would -- I mean, unless you

9    would like a break.  I know you have been

10   thinking you want to power through.

11           MS. SIEGENBERG:  I think a

12   five-minute break would be great.  But I

13   don't know want to interrupt your line of

14   questioning or line of thought.  I was just

15   flagging that it has been about an hour.

16           MS. TEBOR:  Thank you.  I

17   appreciate that.  I don't have a watch on,

18   so I do appreciate that.

19       Q.  So with regard to the individual

20   instances that you followed up on and you

21   talked to the CPAs, did you do anything to

22   validate that what the CPAs were telling you

23   about the families was accurate?

24           MS. SIEGENBERG:  Objection.

Page 155

1    Calls for hypothetical.

2         A.  I mean, I have no reason to doubt

3    what they told me.

4         Q.  So you trusted what they told you?

5         A.  Well, I mean, unless like when they

6    said, you know, say this -- I mean, just

7    using this county.  Well, that's a Lewis

8    County kid.  I am familiar with that kid

9    because we have had difficulty placing that

10   kid.  I mean, so that kid kind of was on my

11   radar.  So then when they tell me who is in

12   that home, that makes sense to me why we

13   wouldn't want to place another child there.

14        Q.  Okay.  So in the event that you

15   knew the child directly --

16        A.  Right.  And I think in both

17   instance, I did know or was aware.  I mean,

18   I don't know them personally, but I was

19   aware of like the situations of that child.

20        Q.  So you said in both instances.

21   Were there two instances that you --

22        A.  There is two that come to mind.

23        Q.  Okay.  Do you think there were more

24   than two that you investigated

Page 156

1    independently?

2         A.  Well, I mean, I think I have them

3    on the phone 40 percent of my day every ay.

4    So, I mean, likely there was.  I don't

5    recall them specifically.

6         Q.  Okay.

7         A.  I always refer like foster parents

8    to their agency.  Their agency is making

9    that decision.

10              MS. TEBOR:  Okay.  I think now

11   is a good time for a five-minute break.

12              (Break in proceedings from 12:43

13   to 12:53 p.m.)

14              MS. TEBOR:  I am marking this as

15   Exhibit 9.

16              (Exhibit 9 was marked.)

17              (Witness reviews document.)

18   BY MS. TEBOR:

19        Q.  Ms. Ellis, let me know when you are

20   ready.

21        A.  Okay.

22        Q.  This is an email from Kristin

23   Showalter to Mary Rossana and several other

24   people, including yourself, from October 25,

Page 157

1    2023.  Is that correct?

2         A.  Yes, ma'am.

3         Q.  Do you recall receiving this email?

4         A.  No.  I mean, I am not saying I

5    didn't.  I just don't recall it.

6         Q.  Okay.  And it appears from this

7    email that there was a referral with regard

8    to a sexual assault -- sorry -- sexual abuse

9    made on a house in February of 2023; is that

10   correct?

11              MS. SIEGENBERG:  Objection.

12   Vague.  Calls for speculation.  Not sure if

13   you want to direct her to --

14              MS. TEBOR:  Yeah.  That's fine.

15        Q.  Okay.  So if you look at the bottom

16   email from Kelly White on October 24, 2023,

17   she says, Nicole Cottrell has placed the

18   young child out of Lewis County.  This case

19   should be with the adoption unit.  We are

20   going to use her today for kinship relative

21   placement and discovered that there is an

22   open referral on her home (backlog) from

23   February 2023.

24              Is that correct?  Do you see that?

Page 158

1        A.   Are you on page 570?

2        Q.   Oh, sorry.  I am on 571.

3        A.   Okay.  That will help.

4        Q.   I am looking at the very bottom

5    paragraph of actual email text.

6        A.   Yes.  Okay.

7        Q.   All right.  And she said there is

8    an open referral on a home backlog from

9    February 2023; is that correct?

10        A.   Yes.

11        Q.   And then if you look at the email

12    above that that starts on page 570, it talks

13    about a CPS referral regarding sexual abuse

14    by an uncle.  Do you see that bottom

15    paragraph?

16        A.   Yes.

17        Q.   Okay.  And then -- let's see.  And

18    then if you look at October -- the email on

19    page 569 at the second email from the top

20    from Mary Rossana, starting with Justin and

21    Matthew, she is asking was an IIU made on

22    207355 referral made 2/12/23.  The home has

23    four adopted children in it and a

24    ten-month-old infant that is in our care and

Page 159

1  in the adoption unit.  I believe Lewis

2  County placed two additional children in

3  this home without Home Finding's knowledge.

4  The baby that is in the adoption unit is a

5  Judge Alsop case.

6            Do you see that?

7      A.  Yes.

8      Q.  So there is a 10-month-old infant

9  that was placed into a home that has a

10  pending referral with regard to sexual

11  abuse; is that correct?

12            MS. SIEGENBERG:  Objection.

13  Calls for speculation.  Vague.

14      A.  Okay.  To clarify that, it doesn't

15  say when the infant was placed.  It doesn't

16  say when the infant was placed there.  If

17  the child is in the adoption unit, that

18  child would have already been there like in

19  placement.

20      Q.  Okay.  And the child was not

21  removed due to the referral regarding sexual

22  abuse made on 2/12/23; is that correct?

23            MS. SIEGENBERG:  Objection.

24  Calls for speculation.  Mischaracterizes the

Page 160

1    exhibit.  Vague.

2         A.  I don't supervise adoption.  I

3    don't know what action was taken.

4         Q.  Okay.  But from this email, it

5    appears that the child as of October of 2023

6    was still in the home; is that correct?

7              MS. SIEGENBERG:  Same objection.

8         A.  I mean, it appears so.  I don't

9    know if the child was placed somewhere else

10   and put back.  I don't know.  I don't know.

11        Q.  But from the email, as of October

12   24, 2023, the child was still in the home?

13        A.  According to the information

14   provided by Mary Rossana.

15        Q.  All right.  And Mary Rossana

16   states, I believe Lewis County placed two

17   additional children in this home without

18   Home Finding's knowledge.

19              Do you see that?

20        A.  I do.

21        Q.  So two additional children were

22   placed in the home after the referral made

23   in 2/12/23.  Do you see that?

24              MS. SIEGENBERG:  Objection.

Page 161

1    Calls for speculation.

2          A.  Ask me your question again.  I'm

3    sorry.

4          Q.  Sure.

5              Let me refer you to the below email

6    from Kelly White on October 24, 2023.  She

7    said, My guess is that an IIU was made.  I

8    was not covering this district in February.

9    The other sup said she believes contact was

10   made and their referral was resolved but

11   never timed.  I have a worker scheduled to

12   interview them all again and type this up by

13   the end of the week.  Can I place two other

14   kids in this home while they are actually

15   already there?

16             Do you see that?

17        A.  Uh-huh.

18        Q.  Okay.  And so two additional kinds

19   were placed in the home following -- after

20   the referral was made regarding sexual abuse

21   in February of 2023; is that right?

22             MS. SIEGENBERG:  Objection.

23   Calls for speculation.

24        A.  Ask me your question again.  I'm

Page 162

1    sorry.

2        Q.  Sure.

3            Kelly White is talking about

4    placing two additional children in the home

5    that has a pending referral regarding sexual

6    abuse; is that correct?

7            MS. SIEGENBERG:  Calls for

8    speculation.

9        A.  I mean, she is also stating that

10   the referral -- she spoke with the other

11   supervisor and the referral was resolved but

12   just not typed up.

13       Q.  Okay.  And if you look at the page

14   ending in 568, there is a Wednesday,

15   October 25, 2023 email from Rebecca Carson.

16   Do you see that email?

17       A.  Uh-huh.

18       Q.  And she says, Kiara, can you please

19   get an IIU entered using the information as

20   thread and in the CPS referral that is

21   referenced?  Please take care of that as

22   soon as you can and get it to Matt's unit

23   for acceptance.

24           Do you see that?

Page 163

```
 1        A.  Yes.

 2        Q.  So it appears from this info that

 3   there was not an IIU entered previously?

 4             MS. SIEGENBERG:  Objection.

 5   Calls for speculation.  Assumes facts not in

 6   evidence.

 7        A.  I mean, there's a directive there

 8   to enter an IIU.  So, I mean, there is a

 9   directive to enter an IIU.

10        Q.  And you wouldn't need to enter an

11   IIU, an IIU was already existing?

12        A.  Well, unless an IIU was screened

13   out or -- I mean, again, there's

14   circumstances -- like part of the

15   information -- like all of the information

16   contained in here may not have been entered

17   in an IIU and it didn't meet the legal

18   definition and it had been screened out.

19        Q.  Okay.  So it is possible that the

20   IIU screened out this sexual abuse

21   allegation about the uncle?

22             MS. SIEGENBERG:  Objection.

23   Calls for speculation.

24        A.  Okay.  To clarify what I said, an
```

Page 164

1  IIU could have been entered on that home and

2  screened out.  Not having all of the

3  information that is here.

4       Q.  Okay.  And if IIU had the

5  information that was here regarding sexual

6  abuse, you would assume they would not

7  screen the case out?

8       A.  Right.  I mean, it could have been

9  a referral that said that the girl was

10 uncomfortable around her uncle.  I mean, you

11 know, we get referrals called in like that

12 that -- I mean, that doesn't meet the legal

13 definition.

14      Q.  Okay.  And you see from the

15 October 24, 2023 email from Kelly White, it

16 has an intake number and received 2/12 of

17 2023?  Do you see that on page 570?  Sorry.

18 I will turn your attention to page 570.

19      A.  Thank you.

20      Q.  Yeah.

21      A.  So I see the intake number.

22 Received 12/12/23.  Yes, I see that.

23      Q.  Okay.  You see that the information

24 below starting, The reporter states that a

Page 165

1    CPA referral was called in last fall about

2    mid November concerning sexual abuse of

3    ████    from the uncle in the house?

4          A.  Yes.

5          Q.  This appears to be the intake

6    information received on February 12, 2023;

7    is that correct?

8               MS. SIEGENBERG:  Objection.

9    Calls for speculation.

10         A.  This would -- this is the CPA

11   referral.

12         Q.  From February 12, 2023?

13         A.  Right.

14         Q.  Right.  Okay.

15              And turning your attention back to

16   page 569.

17         A.  569?

18         Q.  Yeah.  So it is the email second

19   from the top from Mary Rosanna from

20   October 24, 2023, stating that, I believe

21   Lewis County placed two additional children

22   in this home without Home Finding's

23   knowledge.

24         A.  Uh-huh.

Page 166

1          Q.  Do you receive any data on children

2     placed in homes without Home Finding's

3     knowledge?

4                    MS. SIEGENBERG:  Objection.

5     Vague.

6          A.  Not a specific report.

7          Q.  Do you have any understanding that

8     -- is this problematic that caseworkers

9     place children in a home without Home

10    Finding's knowledge?

11                   MS. SIEGENBERG:  Objection.

12    Confusing.  Assumes facts not in evidence.

13         A.  That's not a common issue.

14         Q.  And how do you know that is not a

15    common issue?

16         A.  Because, I mean, if they go through

17    -- I mean, we re-educate them to go through

18    like the Home Finder not to call.  And we

19    have clarified if they adopt the kids

20    previously -- I mean, they're still a

21    department home even though they are Little

22    ████████  aunt, we need to go through a home

23    finding.  A home finding, in order to link

24    them in the system for payment, there has to

Page 167

1    be a provider number.  So they have to

2    notify Home Finding under the new system to

3    get a provider number to link the child for

4    payment and a medical card.  So, I mean, the

5    system in itself has helped to alleviate

6    that.

7         Q.  Could a caseworker place a child

8    and then tell Home Finding about the child's

9    placement?

10             MS. SIEGENBERG:  Objection.

11   Calls for speculation.

12        A.  Well, they are not going to get a

13   provider number to link to that child.

14        Q.  Right.  But they could still

15   physically place a child in a home and then

16   tell Home Finding and receive the provider

17   number; is that correct?

18             MS. SIEGENBERG:  Objection.

19   Incomplete hypothetical.

20        A.  They could physically place a child

21   on an evening and notify Home Finding in the

22   morning.  And, I mean, if there is an issue

23   -- like if they didn't call the home finder

24   that night, then I mean the child -- I mean,

Page 168

1    they would look as that is appropriate

2    placement.  So, I mean -- but in order to

3    link the child again, they have to notify

4    Home Finding.

5         Q.  And in this instance, it appears

6    from what Mary Rossana says that the two

7    children were placed in this home without

8    Home Finding's knowledge; is that correct?

9         A.  That does -- yes.

10        Q.  Okay.  And do you have any reason

11   to doubt the validity of that statement?

12             MS. SIEGENBERG:  Objection.

13   Calls for speculation.

14        A.  I don't have any reason to doubt

15   the validity.

16        Q.  Okay.  And are there any reviews

17   performed of child placements to ensure that

18   they were all done with Home Finding's

19   knowledge before the child was placed?

20             MS. SIEGENBERG:  Objection.

21   Vague.  Asked and answered.

22        A.  I mean, it is all a part of like

23   when you are reviewing a case.  I mean, it

24   would come up like through a DPQI.  I don't

Page 169

1   know what Home Finding's reviews, like their

2   -- the frequency or the certifications.

3   But, I mean, in order to maintain an active

4   placement, they have to be certified.  But I

5   don't know the specifics to that.

6         Q.  Okay.  Aside from the DPQI process,

7   is there anything else that you know of that

8   would identify occasions such as this one

9   where a child is placed without Home

10  Finding's knowledge?

11              MS. SIEGENBERG:  Objection.

12  Vague.  Calls for speculation.

13       A.  Ask me your question.  Sorry.

14              MS. TEBOR:  Can you repeat that?

15              (The preceding question was read

16  back by the court reporter.)

17              MS. SIEGENBERG:  Same objection.

18       A.  I mean, Home Finding is going to

19  let you know immediately when they -- you

20  know, they find out about it.  And, I mean,

21  foster parents have certain expectations --

22  I mean, like a clothing allowance for the

23  card, a medical card because they know as

24  part of their responsibility is to get

Page 170

1   medical treatment.  So it is going to come

2   up in a very short window because if they

3   are not linked to a provider number, they

4   are not going to get a medical card or be

5   able to get the services.

6          Q.  When you say a short window, you

7   have no estimation of when this issue would

8   come up?

9          A.  Like for an EPSDT, which is a well

10  child exam in West Virginia, it should be

11  scheduled within 72 hours.  So the

12  three days is a short window to me.  I mean,

13  that's what I am referring to.

14         Q.  And you believe that this would

15  come up at the -- that a child was placed in

16  a home without Home Finding's knowledge

17  would come up at the EPSDT?

18             MS. SIEGENBERG:  Objection.

19  Misstates prior testimony.

20         A.  Well, I mean -- they don't have a

21  medical card.  I mean, they don't have --

22  they are not -- they don't have what they

23  need to get that child's medical.

24             I mean, to clarify, this is

Page 171

1    uncommon.  This is not something that

2    happens regularly.

3         Q.  Okay.  The basis of your knowledge

4    as to why this is not common is because you

5    have not heard of this happening frequently;

6    is that correct?

7         A.  I can assure you when the field

8    makes a mistake, we know about it.  I mean,

9    we are notified regularly if they -- if they

10   placed a child they shouldn't have, if they

11   haven't entered a child in placement, if

12   they didn't follow the QI -- I mean, we are

13   notified.  So that's not something that I am

14   notified of regularly.

15        Q.  Did you do anything with respect to

16   this particular worker to address the

17   placement of children in a home without Home

18   Finding's knowledge?

19             MS. SIEGENBERG:  Objection.

20   Vague.  Calls for speculation.

21        A.  There's several workers referenced

22   in here.  I entered the district, the

23   Braxton, Clay, Webster, and Mr. Clutter left

24   rather quickly.  So he is no longer there if

Page 172

1    you are referring to him.  I don't -- I

2    don't know what -- I guess I don't know what

3    worker you are referring to.

4          Q.  Well, it appears from the email on

5    569, Kelly White is stating, Can I place two

6    other kids in this home while they are

7    actually already there?

8          A.  That was -- that was -- the

9    district was reeducated -- I can tell you

10   that -- was reeducated on the proper

11   placements in going through the channels.

12         Q.  Okay.  So you think that the issue

13   is fixed because there has been --

14         A.  Well, I mean --

15         Q.  -- reeducation -- let me -- I'm

16   sorry.  Let me just for her sake.

17         A.  I'm sorry.

18         Q.  You think that the issue has been

19   fixed because of this reeducation?

20              MS. SIEGENBERG:  Objection.

21   Misstates prior testimony.  Calls for

22   speculation.

23         A.  I think the district -- I think it

24   is a combination of things, the continual

Page 173

1    conversations between a worker and a

2    supervisor when a child is removed, where

3    they are placed, the continual conversation

4    implementing those requirements in there,

5    the education for the district with policy

6    and -- so I think it is a -- I am not going

7    to say that it is perfect, but I think it is

8    greatly vastly improved.

9         Q.  Are there any metrics by which you

10   are judging that it is vastly improved?

11             MS. SIEGENBERG:  Objection.

12   Vague.

13        A.  I don't recall.  If I look at

14   probably the last -- like in the last six

15   months of the complaint of repeat offense of

16   this -- I mean, that's what I am looking at.

17        Q.  So you are basing it on the fact -

18   just to clarify - that you have not seen a

19   complaint regarding this issue in the last

20   six months?

21        A.  Not that I recall.

22             MS. TEBOR:  Can we just have a

23   one-minute break?

24             MS. SIEGENBERG:  Yes.  And just

Page 174

1    before going off the record, Defendants are

2    also going to request that Exhibit 9 be

3    maintained under seal.

4                MS. TEBOR:  Got it.

5                (Break in proceedings from 1:13

6    to 1:15 p.m.)

7                MS. TEBOR:  We do not have any

8    more questions.  Thank you for your time.

9    We appreciate it.  We appreciate you coming

10   in.

11               MS. SIEGENBERG:  Thank you.

12   Defendants don't have any questions either.

13   We would just like to -- the right to review

14   and read and sign.  And then we would also

15   like the deposition transcript to be

16   maintained under seal -- I mean, by

17   confidential information was mentioned.  But

18   we can also talk about the process that you

19   want for designating the specific portions

20   of it.

21               MS. TEBOR:  Okay.  Let's talk

22   about the process.  I can't recall right now

23   which specific names or information was

24   mentioned.  But I think we -- and Plaintiffs

Page 175

1    would obviously agree to seal identifying

2    information, but I don't think we would seal

3    the whole transcript.

4              MS. SIEGENBERG:  Yeah.  And we

5    agree with that.  We would only request to

6    seal identifying portions.  I just don't

7    have the line numbers to tell you or even

8    the names to tell you.

9              MS. TEBOR:  Fair enough.  So why

10   don't we hold that until we get the

11   transcript, and then we can discuss the

12   specific lines that should be sealed.

13             MS. SIEGENBERG:  That's fine.

14         (Deposition concluded at 1:16 p.m.)

15              * * * * * * * *

16

17

18

19

20

21

22

23

24

```
 1              CERTIFICATE

 2

 3         I, Tara Arthur, Certified Stenotype

 4    Reporter and Notary Public, do hereby

 5    certify that the foregoing deposition of the

 6    above-named witness, was duly taken by me in

 7    machine shorthand, and that the same were

 8    accurately written out in full and reduced

 9    to computer transcription.

10         I further certify that I am neither

11    attorney or counsel for, nor related to or

12    employed by any of the parties to the action

13    in which this deposition is taken; and

14    furthermore, that I am not a relative or

15    employee of any attorney or counsel employed

16    by the parties hereto or financially

17    interested in the action.

18      My commission expires April 16, 2027.

19

20    _____

      Tara Arthur
21    Certified Court Reporter/Notary Public

22

23

24
```