# EXHIBIT 11

**In the Matter of:**

Jonathan R., et al.,

vs

JIM JUSTICE, et al.

CYNTHIA PARSONS

*June 27, 2024*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON


JONATHAN R., minor, by Next Friend, Sarah
DIXON, et al.,

          Plaintiffs,


  -vs-      Case No. 3:19-cv-00710


JIM JUSTICE, in his official capacity as
Governor of West Virginia, et al.,

          Defendants.



DEPOSITION OF CYNTHIA PARSONS
_____

     The deposition of Cynthia Parsons was
taken on June 27, 2024, at 8:56 a.m.,
at 2116 Kanawha Boulevard, East, Charleston,
West Virginia.
_____




ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

Page 2

```
 1              A P P E A R A N C E S

 2    Rich W. Walters
      J. Alex Meade
 3    Attorneys at Law
      Shaffer & Shaffer, PLLC
 4    P.O. Box 3973
      Charleston, West Virginia  25339-3973
 5
      Julia Siegenberg
 6    Kendra Doty
      Attorneys at Law
 7    Brown & Peisch, PLLC
      1233 20th Street NW, Suite 505
 8    Washington, DC  20001

 9    Also Present:  Cammie Chapman, Esq.
                     Steve Compton - Via Zoom
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I  N  D  E  X

 2        WITNESS

 3            Cynthia Parsons

 4        EXAMINATION

 5            by Mr. Walters        Page 04
             by Ms. Doty           Page 77
 6           by Mr. Walters        Page 84

 7        EXHIBITS

 8            Number 1             Page 33

 9

10

11

12

13

14

15

16    Reporter's Certificate:       Page 88
      Errata Sheet/Signature Page:   Enclosed
17

18

19

20

21

22

23

24
```

Elite Court Reporting, LLC
CYNTHIA PARSONS, 06/27/2024

Page 4

```
 1                   CYNTHIA PARSONS,

 2   called as a witness, first being duly sworn

 3   by the Court Reporter/Notary Public,

 4   testified as follows, to wit:

 5                   EXAMINATION

 6   BY MR. WALTERS:

 7        Q.  Ms. Parsons, could you please state

 8   your full name?

 9        A.  Cynthia Ann Hammock Parsons.

10        Q.  Ms. Parsons, where are you

11   currently employed?

12        A.  West Virginia Department of Human

13   Services, the Bureau for Medical Services.

14        Q.  BMS?

15        A.  Uh-huh.

16        Q.  Do you still call it DHHR?

17        A.  No.  The name got changed.

18        Q.  I know that.  But do you still call

19   it DHHR?

20        A.  We practice -- we practice saying

21   it correctly.

22        Q.  Okay.  Don't hold it against me if

23   I call it DHHR.

24        A.  That's okay.
```

Page 5

1          Q.  And I'm sorry.  What's your

2    position with BMS?

3          A.  I'm the director of behavioral

4    health and long-term care services.

5          Q.  Okay.  And how long have you been

6    in that position?

7          A.  That particular position would be

8    four years now.

9          Q.  All right.  Before we get started,

10   have you had your deposition taken before?

11         A.  Years ago, yes.  I used to be a

12   therapist, yeah.

13         Q.  Oh, okay.  So you've been through

14   it multiple times?

15         A.  It has been a few years.  Yeah, it

16   has been about 16 years ago.

17         Q.  Let me go through a couple of the

18   ground rules you already know.  But let me

19   state them anyway.  Obviously, I am going to

20   be asking you questions.  You are going to

21   be giving me answers.  Make sure that I

22   finish asking my question before you start

23   talking even though you know what I'm going

24   to say.  Our court reporter can only take

Page 6

1    down one of us at a time, so we try not to

2    talk over each other.  Otherwise, she starts

3    kicking me.

4           If I ask you a question that you

5    don't understand, or when I ask you a

6    question that doesn't make sense, please ask

7    me to repeat it.  Make sure we are clear and

8    on the same page, and we understand you are

9    answering the same question I am asking.

10           I don't expect this to be a very

11    long deposition.  But if you need -- we are

12    on Zoom as well.  I keep forgetting that.  I

13    don't expect it to be a long depo.  But if

14    you need a break, let us know.  I will be

15    happy to accommodate you.  And if you have

16    any questions, by all means, let me know.

17           What did you do to prepare for your

18    deposition here today?

19       A.  I worked with Kendra and Julia.

20    And we had probably 20 hours' worth of

21    speaking.

22       Q.  Okay.  And as part of being a

23    30(b)(6) deposition, did you do any type of

24    investigation or research into the topics

Page 7

```
1    other than discussions with the attorneys?

2         A.  No.

3         Q.  The main thing that -- I mean,

4    obviously, the topic here is actions taken

5    to increase number of type, availability of

6    community-based services, including wrap-

7    around services.

8         A.  Uh-huh.

9         Q.  So tell me, generally speaking,

10   what has DoHS done to increase the number

11   and type of availability of community-based

12   or wrap-around services?

13              MS. DOTY:  Objection.  Outside

14   of the scope.  We have agreed that

15   Ms. Parsons is being designated to speak

16   only with respect to Medicaid-covered

17   services.

18              MR. WALTERS:  Right.  And that's

19   fair.

20        Q.  And I am asking you with regard and

21   in the scope of Medicaid-offered services.

22        A.  One of the first things we did was

23   expand ACT Services.  So individuals 18 to

24   21, which is still under the child age limit
```

Page 8

1   -- we gained two providers.  That included

2   Northwood and Eastridge.

3          We also worked on increasing

4   reimbursement rates for behavioral health

5   community-based services for 5 percent

6   total.  We were able to take a pilot program

7   -- which is Mobile Crisis Services for

8   Children.  And we did the sustainability

9   plan and got a state plan amendment approved

10  by CMS for us to reimburse for that service.

11         We also included the CSED Waiver.

12  So CSED Waiver is a community-based program

13  that we got approved also through a 1915(c)

14  through CMS for children up to the age of

15  21.  And there was also a CHIP

16  implementation plan -- which I was not a

17  part of that.  But there is a CHIP

18  implementation plan.

19       Q.  With regard to the ACT Services,

20  how many children -- when was that

21  implemented?

22       A.  ACT itself has been around since

23  about 2008.  So it has been existing since

24  then.  We have had a state plan amendment

Page 9

1    approved since then.  We have always allowed

2    18 to 21-year-olds to be a part of that

3    program.  We just expanded to two more

4    providers to ensure statewide coverage.

5           Q.  Okay.  And those two providers were

6    in the northern part of the state?

7           A.  Northwood, Northern Panhandle.

8    And Eastridge is the Eastern Panhandle.

9           Q.  When were those two providers

10   added?

11          A.  I think 2022.

12          Q.  Do you know as of today how many

13   foster care -- or children in DoHS custody

14   are currently receiving services through

15   ACT?

16          A.  I do not know the total number.

17          Q.  Do we know whether or not adding

18   those providers increased the number of

19   children being provided services through

20   ACT?

21          A.  It would have provided access.  So

22   you have to meet admission criteria.  So if

23   certain individuals in that age group met

24   admission criteria, then they would be able

1    to get the service in those areas.

2         Q.  So as part of expanding those

3    services, you added providers.  But we don't

4    -- DoHS doesn't know whether or not adding

5    those providers actually increased the

6    amount of individuals actually receiving

7    services; is that fair?

8         A.  I don't know that number today.

9         Q.  And when was the CSED Waiver

10   Program created?

11        A.  We were approved in 2020.

12        Q.  What is the purpose of the CSED

13   Waiver Program?

14        A.  So CSED Waiver is a program

15   developed to ensure that children could stay

16   in their community and receive wraparound

17   services and other services.  It's to ensure

18   that there's access at the community level

19   so they don't have to go to residential or

20   facility-based care.

21        Q.  You say access to facility level to

22   make sure they don't have to go into

23   residential care.  Does it also provide

24   services to individuals on wait lists or

Page 11

1    waiting to receive residential care

2    services?

3         A.  Yes.  We have interim services.

4    But again, the total goal is to ensure they

5    stay in the community.  It is not really

6    used as a fail-safe to hold till they get in

7    residential care.  It can be.  But the whole

8    point is -- we feel like we could integrate

9    services while they are living at home with

10   the family and the community so they never

11   have to go to facility-based care.

12        Q.  Okay.  And are you aware of the

13   wait lists associated with the CSED Waiver

14   Program?

15        A.  I do have a wait list.  CSED Waiver

16   as of June 14th was 30.

17        Q.  And what efforts, if any, are DoHS

18   taking to reduce the wait list?

19             MS. DOTY:  Objection.  Vague.

20        Q.  Go ahead.  Yeah.  When she objects,

21   you can go ahead and answer unless she

22   instructs you not to answer.  When she does

23   that, that means I asked a really bad

24   question.

Page 12

1        A.  We also have other services through

2   Medicaid that they can receive.  So you

3   still have therapies you could receive from

4   licensed behavioral health centers.  You

5   have QHCs, licensed independent medical

6   social workers, LPCs, and licensed

7   psychologists.  So there are other services

8   available while children are on the wait

9   list.

10       Q.  Okay.  And I appreciate that.  I

11  understand that they can receive other

12  services.  But is anything being done to

13  actually limit the amount of children that

14  are currently on the wait list?

15       A.  Yes.

16            MS. DOTY:  Objection.  Vague.

17       Q.  Go ahead.

18       A.  So we are expanding provider

19  network adequacy.  So our managed care

20  organization who has the CSED Waiver, they

21  have to ensure that we have provider

22  adequacy to do that.  So they are constantly

23  recruiting.  So, you know, they are

24  attritioned -- you know, we are not losing

1    providers.  We are gaining providers usually

2    on a quarterly basis.

3         Q.  Okay.  And that particular -- the

4    wait list for CSED has been -- how long has

5    that been an issue?

6              MS. DOTY:  Objection.

7    Mischaracterizes testimony.

8         Q.  Go ahead.

9         A.  I mean, beginning the program.

10    Because it was during the pandemic.  That

11    would probably change the answer because,

12    you know, when you start a program during

13    the pandemic and everybody was at home.  So

14    it is very hard to explain in the beginning

15    was there ever a wait list versus now.

16         Q.  Understood.  How about since 2021?

17         A.  Again, we were still under the

18    emergency pandemic order.

19         Q.  2022?

20         A.  Still under the emergency pandemic

21    order.

22         Q.  So with regard to the emergency

23    pandemic order in 2022, what effect would

24    that have on the CSED wait list?

Page 14

1          A.  So you might have families that did

2    not want providers to come into the home to

3    do service out of fear of getting COVID.  So

4    that would have caused, you know, possibly

5    people to wait on the wait list till it was

6    safer they felt for the providers to come in

7    the home to deliver services.  So families

8    have a choice.

9          Q.  What organizations provide CSED

10   Waiver services?

11         A.  Licensed behavioral health centers.

12         Q.  Okay.  And are you aware that those

13   behavioral health centers are the ones that

14   actually have the wait list -- or I

15   shouldn't say also -- but also have wait

16   lists with regard to providing services to

17   the children that need those waiver

18   services?

19              MS. DOTY:  Objection.  Vague.

20         A.  So we have Aetna, again who is our

21   managed care organization who does that.

22   They give us a total wait list number.

23         Q.  Right.

24         A.  And they work with those providers

Page 15

1    to help them onboard individuals to do the

2    services.  So if you are like short a

3    therapist and can't take more on the

4    caseload -- Aetna is actively working with

5    them to help them retain and recruit.

6            And then they also have the ability

7    to do geographic exclusions.  So CMS grants

8    our ability to do that.  So if someone -- if

9    there's an LBHC in a certain area that is

10   full that you are able to use someone for --

11   outside of that catchment area to deliver

12   those services.

13       Q.  Okay.  Let me ask you this way.

14   Since 2022, has DoHS done anything to

15   address the wait list issue with the CSED

16   Waiver Program -- since 2022?

17       A.  Can you clarify what you mean by --

18       Q.  Well --

19       A.  -- do something?

20       Q.  Well, has any actions been taken to

21   address the fact that there is a waiver of

22   -- I'm sorry -- that there is a wait list on

23   the CSED Waiver Program since 2022?

24       A.  So they also can receive interim

Page 16

```
 1   services through the Bureau for Behavioral
 2   Health and also through Safe at Home.
 3        Q.  Right.  I understand that.  I want
 4   to know if there has been any actual -- I
 5   mean, is there anything that you can point
 6   to that DoHS has done since 2022 to address
 7   the CSED Waiver issue?
 8             MS. DOTY:  Objection.  Vague.
 9        Q.  I mean, I know there's other
10   services provided.
11        A.  Right.
12        Q.  Is that the only thing that --
13        A.  Well, I mean, like I stated, when
14   you have a wait list, it is because you have
15   a lack of providers.  So that's why I was
16   explaining with Aetna, how they were working
17   with to develop more providers and use
18   geographic exclusion to ensure we get kids
19   treatment in a timely manner.
20        Q.  And they started doing that in
21   2022, or they've been doing that all along?
22        A.  We have been doing that since the
23   beginning.  But again, pandemic put a little
24   bit of a kink in that.
```

1          Q.  Got you.

2               And that's kind of what I am trying

3   to zero in on.  Has anything different been

4   done?  And the reason I am pointing to 2022

5   is -- according to the WV report, 31 percent

6   of the organizations that offer CSED Waiver

7   reported that they had wait lists.

8               So that 31 percent in 2022, you

9   know, there is a finite number.  And

10  according to what you're telling me, there

11  is already efforts and a way to avoid the

12  wait lists.  Was anything different done?

13          A.  There has been no changes since

14  '22.

15          Q.  Okay.  Are you aware of that --

16  from 2022 to 2023, that number went from

17  31 percent to 57 percent?

18               MS. DOTY:  Objection.  Assumes

19  facts not in evidence.

20          Q.  Just asking if you are aware of

21  that?

22          A.  I am not aware of the percentage

23  number.

24          Q.  I think you started off by telling

Page 18

1    me that the main focus of the CSED Waiver

2    Program was to reduce number of children

3    going into residential care; is that fair?

4         A.   That is correct.

5         Q.   Okay.  And has that happened?

6         A.   We have had cases where children --

7    it may even recommend that they would go to

8    residential care.  But we were able to put

9    CSED in place to keep them in their

10   community.

11        Q.   Do you have any type of number that

12   represents in the last two or three years

13   how many children have been prevented from

14   going into residential treatment through the

15   CSED Waiver Program?

16        A.   I do not, no.

17        Q.   Is there any way to track whether

18   or not CSED Waiver Programs are actually

19   being successful?

20        A.   We do have outcomes and evaluations

21   required from each care organization.

22        Q.   Do any of those outcome metrics

23   include tracking or estimating the number of

24   children that are being prevented from going

Page 19

1   into residential treatment?

2          A.  I do not have that number today.

3          Q.  I'm not asking for the number.  I'm

4   asking if the number is actually tracked?

5          A.  I do not know if it is tracked at

6   the exact way that you are stating.

7          Q.  Do you know of any way it is

8   actually tracked?

9          A.  We do do tracking on those

10  children.  But again, it could be a

11  documentation review.  It could be a

12  referral review.  But I am not sure if there

13  is an exact mapping of that.

14         Q.  Explain to me how the CSED referral

15  works.

16         A.  Okay.  Again, it can happen

17  multiple different ways.  So someone could

18  call 988, or the Children's Mobile Crisis

19  Line.  Education can refer.  Parents can

20  self-referral.  And even providers who are

21  treating individuals in the community can

22  refer.  So there's multiple ways that

23  someone could be referred to the program.

24         Q.  Bureau of -- BSS -- is it still

Page 20

1    BSS?

2         A.  It is.

3         Q.  Trying to keep up.

4         A.  That's okay.

5         Q.  You guys keep changing too much.

6             Do some referrals come through BSS?

7         A.  They do.  The workers can refer as

8    well.  They work with the family typically

9    to do that, yeah.

10        Q.  Is that where the majority of the

11   referrals come from?

12        A.  I don't have exactly the number.  I

13   mean, it just comes through different

14   multiple things.  I would say the majority

15   probably do come from workers.  But again, I

16   don't have exact numbers in front of me.

17        Q.  And when the child is put into a

18   placement -- foster child is put into

19   placement, the BSS worker -- is there a

20   requirement that the BSS worker does an

21   assessment to determine if that referral

22   needs to happen?

23        A.  It is not -- I wouldn't say the

24   worker has an assessment.  I think the

Page 21

```
1    worker reviews the case.  And I think that

2    they refer appropriately.  Because we have

3    other waiver programs, not just CSED.  So an

4    example could be a child with a cognitive

5    impairment.  They may refer them to the IDD

6    Waiver.  So there is multiple ways workers

7    look at the case I think to ensure that they

8    have -- you are referring appropriately to

9    the programs needed.

10        Q.  Understood.

11            What is IDD Waiver?

12        A.  Intellectual Disabled Waiver.  They

13   are for individuals with cognitive

14   impairments or severe developmental

15   disabilities.  It is also a 1915(c) Waiver.

16        Q.  And before I leave CSED, does CSED

17   Waiver Program track the number of children

18   that end up in residential treatment that

19   received CSED Waiver Services?

20        A.  We are tracking that as well.

21        Q.  What does that number look like?

22        A.  I don't have that number.

23        Q.  Do we know if that's increasing or

24   decreasing?
```

Page 22

1         A.  I don't -- I can't make a judgment
2    call on the last time I reviewed that.
3         Q.  With the IDD Waiver Program -- let
4    me back up just a second.  You mentioned
5    that that's one of the type of referrals
6    that could occur, as well as -- as well as
7    ACT, as well as CSED, as well as IDD.  All
8    of those could be referrals done by the BSS
9    worker, correct?
10        A.  Absolutely.
11        Q.  And is that assessment done through
12   an acronym referred to as CANS?
13        A.  We do use CANS and CAFAS to help
14   make determinations.
15        Q.  And of the two -- those are the
16   only two, right?
17        A.  There is PECFAS.  But PECFAS is
18   more for the adult side of things.
19        Q.  Yeah.  And is it my understanding
20   -- or is it fair to say that CANS is kind of
21   becoming the go-to?
22        A.  Yes.  We use it, and multiple
23   states use it, for assessment reasons.
24        Q.  Okay.  And what does CANS stand

Page 23

1    for?

2         A.  Children -- right off the top of my

3    head -- Children --

4         Q.  Hold on a second, and I will tell

5    you.

6         A.  I have a lot of abbreviations

7    running in my head.

8         Q.  You and me both.  Is it Child

9    Assessment Needs and Strengths?

10        A.  Needs and Strengths, yeah.  I

11   couldn't figure out the S.  But yes, that's

12   correct.

13        Q.  Yeah.

14            When is a CANS assessment done by a

15   BSS worker?

16            MS. DOTY:  Objection.  It's

17   outside of the scope.

18        Q.  At what point -- when a child

19   enters into DoHS custody, at what point is a

20   CANS assessment done?

21        A.  It can happen at any point.  So it

22   is not just -- you know, you are of course

23   trying to do it on the front end of things.

24   But at any point you can do a CANS

1   assessment.

2          Q.  Is there a requirement that it be

3   done within a certain amount of time from

4   when the child is placed into foster care?

5              MS. DOTY:  Objection.  Outside

6   of the scope.

7          A.  I couldn't answer that.  I am from

8   Medicaid.  So I don't know.

9          Q.  Understood.

10             And so from a Medicaid standpoint,

11  you don't know at what point in time a child

12  who enters foster care is determined to need

13  or not need those Medicaid services?

14         A.  That's not connected to Medicaid

15  exactly.  So that's -- you know, CANS is an

16  overall assessment for children.  And there

17  is other, you know, assessments.  Somebody

18  might do a psychological evaluation as well

19  to establish medical necessity.

20             So Medicaid is the payor.  So we --

21  you know, based upon assessments that are

22  done -- it could be multiple assessments.

23  That determines medical necessity and

24  determines levels of care needed and things

Page 25

1    like that. So it is not just one thing that

2    could make that determination. There could

3    be multiple pathways. But CANS is required

4    -- one of the required assessments.

5         Q.  When a child enters the foster care

6    system, enters DoHS custody, what's your

7    understanding of how it is determined

8    whether or not that child needs IDD Waiver

9    Services or CSED Waiver Services?

10             MS. DOTY:  Objection.  Outside

11   of the scope.

12        A.  Again, I am the payor. So that is

13   not connected to the part that I do with the

14   worker.

15        Q.  So you don't have any information

16   as to whether or not the services were

17   actually -- how it is being determined if

18   those services are needed or when it has

19   been determined if a child needs those

20   services; is that fair?

21        A.  We pay, once it is established,

22   whatever service that they are needed.

23        Q.  So when we talk about the wait

24   lists with CSED Waiver Program -- and we

Page 26

```
 1    will get into the ones with IDD Waiver and a
 2    couple of others -- you wouldn't have any
 3    information as to whether or not there is
 4    children out there who have not yet been
 5    assessed that would also be on that wait
 6    list?
 7         A.   I would not have that information.
 8         Q.   Okay.  Back to -- real quick, back
 9    to the CSED Waiver Program.  You told me
10    that you are in the process of tracking
11    children that receive CSED Waiver Services
12    and end up in residential treatment,
13    correct?
14         A.   Our managed care organization is
15    tracking that.
16         Q.   How is that being tracked?
17         A.   I wouldn't be able to explain the
18    process.  We order that their managed care
19    organization develop an ability to do that.
20         Q.   Do you know if they are actually
21    doing that?
22         A.   I have seen reports, but I can't
23    tell you what was on the last report.
24         Q.   No.  I just want to make sure that
```

1    it is -- telling them to do something and

2    seeing that they are actually doing it are

3    two different things.  So you have actually

4    seen reports that are tracked?

5         A.  I have seen a report.  But again, I

6    can't tell you the exact algorithm that they

7    use to develop that report.

8         Q.  Sure.

9             Explain to me what IDD Waiver

10   services are.

11        A.  So for children and adults who

12   have, again, cognitive impairments, severe

13   developmental disabilities, the IDD Waiver

14   is used to have services.  And IDD Waiver

15   has been around probably 30 years in West

16   Virginia.  And that really is the goal, is

17   -- I am sure you have heard of group homes

18   and that type of things like that.

19             So the goal of IDD Waiver was to

20   have individuals be able to stay in their

21   community and get programs such as respite

22   or day rehabilitation programs, personal

23   support services and things like that.  So

24   similar to CSED, but you are talking about a

Page 28

1    different target population.

2         Q.  And that's everything from infants

3    to seniors, correct?

4         A.  I think you have to be -- and

5    again, please don't quote me because I don't

6    do IDD Waiver.  I think you have to be at

7    age four and above before you can apply for

8    the IDD Waiver.

9         Q.  And specifically with regard to

10   children in foster care, are you aware that

11   there are wait lists for IDD Waiver

12   services?

13        A.  Again, I don't do ID Waiver.  So I

14   don't know -- have no access to that

15   information.

16        Q.  Okay.

17        A.  That's a different section of

18   Medicaid.

19        Q.  Got you.

20             IDD Waiver would be considered

21   community-based services, wouldn't they?

22        A.  It is under the home community-

23   based services rule.

24        Q.  But because of the section of BSS

Page 29

```
1    that you work for, you don't -- you can't

2    testify about anything --

3         A.  I'm BMS.

4         Q.  I'm sorry?

5         A.  I'm BMS.

6         Q.  BMS.  Sorry.  I've even got it

7    written down.

8         A.  So you have different 1915(c)'s.

9         Q.  Right.

10        A.  And IDD is one of them.  And it is

11   under a different section at our bureau.

12        Q.  What about positive behavioral

13   support services?

14        A.  So we have always had behavioral

15   manager services.  And positive behavior

16   supports is an evidence-based model.  So we

17   are in -- we are requiring -- we are redoing

18   our policies right now to have providers use

19   that particular evidence-based model when

20   they are doing positive -- positive behavior

21   support is just like a form of behavior

22   management.  And typically there is an

23   implementation in development.  So you

24   develop a plan, and positive behavior
```

Page 30

1   supports helps the families and individuals

2   working with the individual to implement the

3   set plan.

4          Q.  And who provides those services?

5          A.  Licensed behavioral health centers.

6          Q.  And what if anything has DoHS done

7   in the last three years to increase the

8   accessibility to the licensed behavioral

9   health services specifically for providing

10  positive behavioral support?

11         A.  BBH -- and again, I do not work for

12  BBH -- created a pilot to work with Concord

13  University to develop certification for that

14  evidence-based model.  We in turn took that

15  pilot, and we are now drafting out policy

16  and developing rates and codes so it would

17  be a billable service at Medicaid instead of

18  just behavior manager services without an

19  evidence-based model.

20         Q.  So that's something that you are

21  currently doing to increase accessibility to

22  BPH -- PB -- wow -- positive behavioral

23  services?

24         A.  PBS.

1      Q.   PBS?

2      A.   Yes.

3           So when you create a rate and a

4    code, it enables sustainability for

5    providers to ensure that they will be paid

6    for services using certain models or certain

7    services.

8      Q.   Okay.  And when did that -- when

9    did DoHS begin working on that model or

10   begin working on making that a separate

11   billable entity for PBS?

12           MS. DOTY:  Objection.  Vague.

13     A.   Again, I do not work for BBH.  So I

14   do not know when they started the pilot

15   program.  I can tell you it was in 2023 when

16   Medicaid made the decision to in 2024

17   develop codes and rates for that.

18     Q.   Okay.  Prior to 2023, are you aware

19   of anything that DoHS has done to increase

20   the availability of services to positive

21   behavioral support services?

22           MS. DOTY:  Objection.  Outside

23   of the scope.

24     A.   I do not know when BBH started the

1   pilot program.

2         Q.  Other than that program --

3         A.  Yes.

4         Q.  -- are you aware of anything else

5   that DoHS has done to increase accessibility

6   to these services?

7               MS. DOTY:  Objection.  Outside

8   of the scope.

9         A.  Before that, no, I do not know.

10        Q.  And would positive behavioral

11  support services be considered wraparound

12  services --

13              MS. DOTY:  Objection.

14        Q.  -- or community-based services?

15              MS. DOTY:  Objection.  Vague.

16        A.  It is a community-based service.

17        Q.  Are you aware of the wait list that

18  is associated with the licensed behavioral

19  health providers that provide the positive

20  behavioral support services?

21              MS. DOTY:  Objection.  Vague.

22        A.  I would need you to clarify.  There

23  is not a wait list for LBHCs.

24        Q.  You aware of any wait lists with

1    the positive behavioral support services?

2          A.  We have not started them yet.  It

3    would start in the fall of '24.

4          Q.  So prior to 2023, DoHS hasn't

5    provided behavioral health services at all?

6                MS. DOTY:  Objection.  Outside

7    of the scope.

8          A.  BBH piloted the program.  I do not

9    work for BBH.  So I cannot speak to if they

10   had a wait list or not.

11         Q.  Then that means -- I am confused,

12   and you need to clarify for me.

13               All right.  I am going to hand you

14   what I am having marked as Deposition

15   Exhibit Number 1.

16               (Exhibit 1 was marked.)

17         Q.  Are you familiar with the SME --

18   2024 SME report?

19         A.  I have viewed it, yes.

20         Q.  If you go ahead and flip to page 64

21   of the report --

22         A.  Okay.

23         Q.  -- you will see there is an

24   overview section talking about behavioral

Elite Court Reporting, LLC
CYNTHIA PARSONS, 06/27/2024

1  support services.  Are these the same

2  behavioral support services that we are

3  talking about?

4          MS. DOTY:  Objection.  Outside

5  of the scope.

6      A.  In the bottom two paragraphs -- I

7  would like to clarify that that's what you

8  are asking about.  Where do you want me to

9  look?

10     Q.  Oh, just the -- I mean, it says --

11 should be -- make sure we are on the same

12 page -- 64.

13     A.  Okay.

14     Q.  Yeah, sorry.  I hate double-

15 sided --

16     A.  That's okay.

17     Q.  So do you see where they are

18 talking about behavioral support services

19 where it starts with the overview under 3.8.

20     A.  Yes.  But behavior support services

21 is not the same thing as PBS.  So PBS is a

22 model of doing behavior support services.

23     Q.  So it is the manner in which they

24 do it?  It's not just the behavioral support

Page 35

1  services as a whole?

2      A.  Right.  So behavior management

3  again would be a form of behavior support

4  services, which we already cover at

5  Medicaid.  We are just saying we are going

6  to cover -- we are pushing the

7  evidence-based model forward.

8      Q.  Got you.  Then help clarify this

9  for me.  If you look down at the very

10  bottom, the last full paragraph says, As

11  previously addressed.  Do you see that

12  there?

13      A.  So, again, that would be with BBH's

14  pilot program.  So it says at the bottom,

15  slots for the BBH, PBS program.

16      Q.  So that's strictly BBH, and it's

17  not DoHS?

18      A.  That is DoHS but not Medicaid.

19      Q.  So tell me again, what's BBH?

20      A.  Bureau for Behavioral Health.

21      Q.  And that's not under Medicaid?

22      A.  No.  We are separate bureaus.  So

23  Bureau for Medical Services and Bureau for

24  Behavioral Health under DoHS.

Page 36

1          Q.  I thought there was -- so there's

2    no Medicaid at all under BBH?

3          A.  No.  Those are separate --

4    completely separate bureaus.

5          Q.  All right.  Thank you.

6              So the non -- so BBH has started

7    the program.  You all are -- when I say you

8    all -- BMS is adopting the program, but have

9    not yet done so?

10          A.  That's correct.

11          Q.  So BMS implementing this model --

12    are you going to be providing the same

13    services -- it will be the same -- typically

14    the same services that BPH -- BBH is

15    providing, correct?

16              MS. DOTY:  Objection.  Vague.

17          A.  Yes.  We are taking their pilot

18    program and putting it in sustainability for

19    Medicaid payment.

20          Q.  But it will be different providers,

21    I would imagine?

22          A.  No.

23          Q.  Same providers?

24          A.  Yes.

Page 37

```
 1        Q.  But you'll be adding Medicaid
 2   recipients?
 3        A.  They could get it now through the
 4   pilot program.  We are making it sustainable
 5   through Medicaid to ensure for, one, is
 6   payment, two, tracking and data, claims and
 7   information.  So what it does is -- when you
 8   have a pilot program, they're typically --
 9   it is a short-term grant-funded thing.  So
10   what we're doing is saying we are going to
11   take this and make it sustainable through
12   Medicaid for reimbursement for the
13   providers.
14        Q.  And I guess my concern here -- or
15   my question is, is if they are reporting
16   wait lists through the providers under the
17   BBH program, with you all taking on the
18   program -- or taking on the program for
19   foster children, is anything being done to
20   address the fact that there currently is
21   wait lists in the program that you are
22   creating or adopting?
23             MS. DOTY:  Objection.  Vague.
24        A.  The expectation is, since Medicaid
```

Page 38

```
 1   was sustained, that more providers will come
 2   on board.  Sometimes it is difficult when
 3   you grant fund something because it is short
 4   term.  Many providers don't want to take
 5   that upon.  With Medicaid becoming the payor
 6   -- as a permanent payor, we believe more
 7   providers will come on board with that, and
 8   we will probably not have a wait list or we
 9   will have a small wait list, which again
10   would be tracked by the managed care
11   organizations once it becomes a Medicaid-
12   payable service.
13        Q.  When do they expect that to go
14   live?
15        A.  Again, fall of '24 is the tentative
16   date for that policy to be in effect.
17        Q.  So until that pilot program
18   actually goes live so to speak, there is no
19   way of knowing whether or not it is going to
20   have an effect on the wait list; is that
21   correct?
22             MS. DOTY:  Objection.  Outside
23   the scope.
24        A.  The pilot program -- so it's
```

Page 39

1    separate.  So it is not a pilot program.  It

2    is Medicaid.  It's Medicaid sustained.

3         Q.  Right.  But your premise is that

4    once it becomes a Medicaid-billable service,

5    you will get more providers and hopefully

6    reduce the wait lists.  Through your-all's

7    program, are you going to be adding more

8    Medicaid individuals now that you are

9    receiving services?

10         A.  If an individual has Medicaid and

11    they meet medical necessity for that

12    service, they can receive the service.

13         Q.  I understand that.  But there's

14    already individuals under BBH?

15         A.  Correct.

16         Q.  So my question is, are you just

17    taking individuals already receiving

18    services under BBH, or are you going to be

19    adding new individuals receiving services

20    under BMS?

21         A.  If they meet medical necessity for

22    the service, they would get it.  So it would

23    be not just the pilot people but anybody on

24    Medicaid who meets medical assessment.

Page 40

```
 1        Q.  Right.  So you are going to be

 2  increasing the number of people receiving

 3  those services?

 4        A.  That is a possibility, yes, that's

 5  correct.

 6        Q.  Do you know of the current

 7  providers, if any of those are going to be

 8  Medicaid eligible?

 9              MS. DOTY:  Objection.  Vague.

10        A.  Providers are enrolled -- I am just

11  going to clarify.  Do you mean members or

12  providers?

13        Q.  I mean the providers under BBH, the

14  ones that are currently providing these

15  services under BBH, are they going to

16  qualify under the program that DoHS is

17  implementing under BMS?

18              MS. DOTY:  Objection.  Vague.

19        A.  My understanding from BBH is, they

20  are already enrolled in Medicaid as

21  providers.

22        Q.  All of them?

23        A.  My understanding from BBH, they

24  are.
```

1        Q.  Are there any other programs that

2   have been initiated by -- I'm sorry.  Strike

3   that.

4            Are there any other programs -- BBH

5   programs that BMS is going to be adopting or

6   is looking at adopting to increase

7   accessibility?

8        A.  We already did Children's Mobile

9   Crisis.  So that was a pilot program through

10  BBH, which we had a state plan amendment

11  approved from CMS.  So we already have that

12  approved and have already certified teams

13  for Mobile Crisis.

14       Q.  Any others?

15       A.  Not at this time, no.

16       Q.  Throw another acronym at you and

17  ask you to define this so I don't have to

18  look it up.

19       A.  I'll try.

20       Q.  RMHTFs?

21       A.  Residential mental health treatment

22  facilities.

23       Q.  Thank you.

24            What if anything has DoHS done

Page 42

1    since 2022 to increase access to RMHTFs?

2              MS. DOTY:  Objection.  Outside

3    of the scope.

4         A.  I wouldn't say there was increase.

5    I think we developed community-based

6    services to try to stop children from going

7    to facilities.  There is nothing we have

8    done to open up more access to facilities.

9    We put more community-based services in

10   place to ensure that children could stay in

11   the community more than go into the

12   facility.

13        Q.  Okay.  And we talked about the CSED

14   Waiver Program as one of those programs,

15   correct?

16        A.  That's correct.

17        Q.  And what other programs have been

18   created, or what -- let's start with that.

19   What other programs have been created to

20   accomplish that goal?

21        A.  Well, Children's Mobile Crisis is

22   one of them.  So if someone is having a

23   crisis, a crisis team is sent out to the

24   home.  And a lot of times that stops

1   children from going into emergency

2   departments, which then could lead to a

3   facility-based level of care.

4           So that's probably the children's

5   crisis team.  They go out and assess the

6   situation.  They are also able to schedule

7   appointments immediately, the next day.

8   Sometimes get them on the phone with the

9   psychiatrist of the LBHC or with the

10  clinical supervisor to get something set up

11  immediately so we can stop that individual

12  from possibly going into a facility-based

13  care.

14      Q.   And is there any matrix or any

15  manner in which to track how many children

16  are being prevented from going into RMHTFs

17  through the Child's Mobile Crisis Program?

18      A.   There is not a matrix developed.

19      Q.   Has there been -- well, strike

20  that.

21           Other than the Children's Mobile

22  Crisis, any other programs or services that

23  have been developed to help children from

24  being -- or from going into the RMHTFs?

Page 44

1          MS. DOTY:  Objection.  Outside

2     of the scope.

3          A.  We are in the process right now of

4     developing CCBHCs in West Virginia -

5     Comprehensive Community Behavioral Health

6     Clinics.

7          Q.  Hold on just a second.  CCHB --

8          A.  CCBHC.

9          Q.  I can't tell -- too many C's in

10    that.  CCBHC?

11         A.  CCBHC.  And those are comprehensive

12    community behavioral health clinics.  And

13    that is a federally recognized provider

14    type.  And our state -- in development of

15    CCBHCs, states are allowed to require

16    certain services.  So we are requiring all

17    CCBHCs -- they must be a CSED provider.

18    They must have a Children's Mobile Crisis

19    team.  And they must have intensive

20    outpatient programs for youth and

21    adolescents.

22         Q.  Give me an example of a CCBHC.

23         A.  So, again, we are submitting a

24    state plan amendment this month for

Page 45

1    approval.  But an example would be like --

2    Prestera is a comprehensive mental health

3    center that is planning to apply to become a

4    CCBHC.  These comprehensive and LBHCs can

5    render any services in Chapter 503 of our

6    Medicaid manual.

7              But with this designation, because

8    of the way the payment structure is, we can

9    require them to do certain services, not

10   just you have an option to do them.  We are

11   saying you have to serve certain populations

12   and you must do these certain services.  So

13   with that, that will expand CSED Waiver

14   providers, Children's Mobile Crisis teams

15   and intensive outpatient programs for youth.

16        Q.  And of those programs you just

17   mentioned, how many of them are Prestera

18   currently providing?

19        A.  I'm sorry.  Of the programs right

20   now?

21        Q.  Yes.

22        A.  They have a CSED Waiver -- they are

23   a CSED Waiver provider.  And I believe they

24   are applying with the Mobile Crisis Team.  I

Page 46

1    am not sure if they have one in place just

2    yet.

3         Q.  How long has the Mobile Crisis

4    Program been in effect?

5         A.  Since we -- we had a state plan

6    amendment approved in September of '23.  And

7    our policy was effective February of '24.

8         Q.  And as far as the CSED Waiver

9    Program -- of the providers that you

10   anticipate identifying as CCBHCs, do most of

11   them already provide CSED Waiver?

12        A.  I would say no based on it.  But

13   again, we don't know who all will apply.  So

14   it is not in effect yet.  So we are not sure

15   who all will apply.

16        Q.  I'm sorry.  When is that going to

17   go into effect?

18        A.  We are submitting the state plan

19   amendment this month.  So we do not know

20   when CMS will have an effective date on

21   that.  But we do believe it will be by the

22   end of '24 at latest.

23        Q.  Other than -- hold on.  I want to

24   make sure I got your complete answer because

Page 47

```
1   we went off on a tangent.  Children's Mobile
2   Crisis, CCBHC -- what other, if any, efforts
3   is DoHS taking to reduce the number of
4   children going into RMHTFs?
5                 MS. DOTY:  Objection.  Outside
6   of the scope.
7         A.  I believe I have named the
8   majority.
9         Q.  I just want to make sure.
10        A.  Yeah.  I believe I named the
11  majority of those services that have been
12  placed by Medicaid.
13        Q.  And of the services that -- and I
14  understand several of these have not taken
15  place yet, or at least a few of them are
16  planning on going into effect.  Have you
17  realized any reduction in the actual amount
18  of children going into the RMHTFs?
19        A.  Aetna has reported to me that there
20  has been a decrease in that.  We don't know
21  if it is connected to CSED or the other
22  community-based services that have been put
23  in place.  It could be for multiple reasons
24  that that number went in.
```

Page 48

```
1        Q.  Are you aware of the increase in
2   the wait lists to RMHTFs?
3             MS. DOTY:  Objection.  Vague.
4        A.  No, I cannot.
5        Q.  When you take over the program --
6   take over is a bad -- when you implement
7   plans that are currently being implemented
8   by BBH, such as the -- did you ask where
9   CCBHCs came from?
10       A.  No.
11       Q.  No, that was separate?
12       A.  Yeah.
13       Q.  Okay.  Strike that.  Let me ask you
14  this way.
15            Prestera provides IDD Waiver
16  services, right?
17       A.  I don't -- I am not over IDD, so I
18  don't have access to those providers.
19       Q.  You say it does provide CSED Waiver
20  Services?
21       A.  Correct.
22       Q.  So if there is a wait list for IDD
23  Waiver and CSED Waiver, both of which
24  provided Prestera and you are adding more
```

Page 49

```
 1    responsibilities to them, what confidence do
 2    you have that they will be able to actually
 3    handle the services it can be asked to
 4    provide?
 5              MS. DOTY:  Objection.  Outside
 6    the scope.
 7         A.   The IDD Waiver and CSED are
 8    different populations.  So they are not
 9    connected in any way.
10         Q.   Right.  But, I mean, Prestera is
11    only -- I mean, I don't want to assume
12    anything.  Everybody knows who Prestera is.
13    They only have so many employees.  So if you
14    are adding more programs, more services -- I
15    understand that you have got multiple wait
16    lists.
17              I guess my question is, has DoHS
18    done anything to make certain or to assure
19    that when Prestera is being asked to provide
20    these additional services that they can
21    actually do it?
22         A.   So there was a demonstration grant
23    that was won by West Virginia for CCBHCs,
24    and that gave dollars to providers,
```

1    including Prestera, to develop more

2    workforce to become a CCBHC provider.

3         Q.  Are you aware that part of the

4    reason Prestera, like other behavioral

5    health centers, identify as the reason --

6    strike that.  It's a horrible question.

7              With regard to CSED -- CSED Waiver

8    Program specifically, do you know why

9    there's wait lists?

10             MS. DOTY:  Objection.  Vague.

11        A.  There could be multiple reasons for

12   a wait list.  There could be an influx of

13   one time of one area getting more children.

14   Also, you know, once school is in session,

15   you are going to get more referrals versus

16   in summer and November and December when you

17   probably will have less referrals.  So there

18   is a fluctuation usually of the wait list

19   depending on that.

20        Q.  Separate from fluctuations -- and I

21   understand there is obviously always

22   environmental aspects that can make things

23   go up and down.  I mean, there has been a

24   constant increase in percentage of wait

1   lists from 31 percent of organizations to

2   57.  Do you know if DoHS has looked in to

3   determine why that is?

4                    MS. DOTY:  Objection.  Outside

5   the scope.

6        A.  I believe that has been reviewed.

7   And partially is, it does take a while to

8   train new employees with wrap-around and

9   evidence-based practices.  So it is not like

10  you can hire someone and they can

11  immediately go to work too.

12              So you are talking about at least a

13  two to four-week session of them being

14  trained before at times or even with

15  families and with children to do that.  And

16  then, you know, there are times employees,

17  that is not -- they realize through the

18  training that that's not the population they

19  want to serve, and they go a different

20  route.  Again, there's multiple reasons why

21  there could be an increase in the number.

22       Q.  Do you have an understanding of how

23  long there has been a wait list with regard

24  to CSED Waiver?

Page 52

```
 1        A.  No.  Because again, the pandemic
 2   put kind of a kink in our data.  So it is
 3   really hard to judge based on 2021 and '22.
 4        Q.  What about prior to the pandemic?
 5        A.  It wasn't in effect.  We went in
 6   effect during the pandemic in '20.
 7        Q.  And out of the 30 individuals that
 8   are currently on the CSED wait list, do you
 9   know how many organizations that it
10   represents?
11        A.  I do not.
12        Q.  Other than Prestera, what other
13   behavioral health facilities are you aware
14   of that plan to apply for the CCBHC license?
15        A.  We have six provisional right now
16   that have informed us that they will.  But
17   once we have a state plan amendment, there
18   could be more.  Currently, it would be
19   Prestera, Seneca, Southern Highlands, Valley
20   -- I am thinking of everybody.  Prestera,
21   Seneca, Southern Highlands, Valley, FMRS --
22   and I am missing one.  I'm sorry.  I am
23   missing one off the top of my head.  I
24   apologize.
```

1          Q.  I am surprised you got five.

2          A.  I have to think about it here.  So

3     Prestera, Seneca, Southern Highlands, FMRS,

4     Valley.  I am trying to think.  We have six.

5     I can't think of the sixth one right off the

6     top of my head.

7          Q.  When DoHS -- and my apologies.  I

8     know I asked this.  I can't remember exactly

9     what the answer was.  What other programs

10    that BBH operates that DoHS has kind of

11    modeled or decided to take on?  You have the

12    Children's Mobile Crisis Program.  What

13    else?

14              MS. DOTY:  Objection.  Vague.

15         A.  PBS.

16         Q.  PBS?

17         A.  And then also CCBHC started, which

18    SAMHSA -- which is the federal entity that

19    funds money to BBH.

20         Q.  Okay.  So all three of those were

21    under BBH -- or where DoHS became aware of

22    them because they are being operated by BBH?

23              MS. DOTY:  Objection.  Vague.

24         A.  Yes.

Page 54

1          Q.  Did DoHS take a look at the success

2    that BBH was having in terms of

3    accessibility, wait lists, things of that

4    nature in deciding to take on these

5    programs?

6               MS. DOTY:  Objection.  Vague.

7          A.  So when they pilot a program, they

8    will do it anywhere from maybe two years to

9    five years.  And then we meet with Medicaid.

10   And then we look at it.  CCBHC is actually a

11   state law that was passed here that we had

12   to do a state plan amendment.  That was

13   required by the state law on how the payment

14   structure of that was.  But again, the money

15   and the demonstration did come through BBH.

16               So we did look at PBS and Mobile

17   Crisis.  We saw the success.  We also had

18   hospital feedback that said this was helping

19   them with EMEDs, with children coming there.

20   So we knew that was something that we wanted

21   to do.  And so at that point we decided how

22   we would do that.

23               One was state plan amendment.  We

24   did not have to do a state plan amendment

Page 55

1    for PBS because we already had behavioral

2    management under mental health rehab state

3    plan.

4            Q.  I'm sorry.  Say that last part

5    again.

6            A.  I'm sorry.

7            Q.  That's all right.  That last part

8    you just said, I didn't quite catch that.

9            A.  Sorry.  So we did not have to do a

10   state plan for PBS because it is a model --

11   because we already have mental health

12   rehabilitation state plan which included the

13   behavioral management.  We are just stating

14   they are going to use a model to do behavior

15   management services.

16           Q.  So you weren't adding a new

17   service, you were just changing the language

18   you were providing it?

19           A.  It actually is an additional

20   service.  So you have behavior management,

21   and then you have people who are certified

22   to do PBS.  So we are not taking away

23   behavioral management, we are saying you are

24   using the evidence-based model and certified

Page 56

1    individuals to do it.

2         Q.  So with regard to the programs that

3    you've identified -- well, it's not in

4    effect yet, so I can't ask that question.

5              How do you monitor the success rate

6    of the CSED Waiver Program?

7                   MS. DOTY:  Objection.  Vague.

8         A.  We have metrics in place.  Our

9    managed care organization is put together --

10        Q.  Right.  But, I mean, what are you

11   looking at to say this is working?

12                  MS. DOTY:  Objection.  Vague.

13        A.  Again, I don't have those right in

14   front of me right now, the metrics.

15        Q.  Okay.

16                  MS. DOTY:  Can we take a break?

17                  MR. WALTERS:  Absolutely.

18                  (Break in proceedings from

19   9:45 to 9:58 a.m.)

20   BY MR. WALTERS:

21        Q.  I think you told me -- but let me

22   ask you because I am not positive -- that

23   there was a means by which the managed care

24   group -- or the managed care company is

Page 57

```
 1    tracking the success of keeping children out
 2    of residential treatment facilities?
 3              MS. DOTY:  Objection.  Vague.
 4         A.  They are supposed to be doing that,
 5    yes.
 6         Q.  And those numbers -- I mean, is
 7    that -- what I am trying to -- what I am
 8    trying to get at in a horrible way is, how
 9    is BMS and DoHS tracking or determining
10    whether or not these programs - you know,
11    absent the ones that haven't started - are
12    keeping kids from going into residential
13    treatment centers?
14              MS. DOTY:  Objection.  Outside
15    of the scope.
16         A.  They have -- especially Children's
17    Mobile Crisis because it's just become a
18    Medicaid service.  They are working on the
19    development of metrics so -- in reporting.
20              So, for an example, it could be the
21    child went to the emergency department and
22    the parents were like we think they need to
23    go in-patient somewhere, but the Children's
24    Mobile Crisis was able to, you know, put
```

Page 58

```
 1   them in connection with appointments and

 2   ensure that they had community-based

 3   services so they did not go in the program.

 4            So this was an example of something

 5   that they would have to track.  So I believe

 6   in Children's Mobile Crisis, there is a

 7   development right now of a reporting form on

 8   that.

 9       Q.  Do you know whether or not that

10   tracking would include they didn't go within

11   the next 30 days, 60 days, 90 days, as

12   meaning we have stopped it from happening?

13       A.  I do not know.  Again, I believe

14   that particular part is in development

15   because it is a newer service.

16       Q.  What about the -- is that type of

17   tracking done for the CSED Waiver Program?

18            MS. DOTY:  Objection.  Vague.

19       A.  My understanding is that there is.

20   I do not have that report in front of me.

21   So I do not know the algorithm or metrics

22   that were developed with that.

23       Q.  And, I mean, is it fair to say that

24   the purpose or the goal of these community-
```

Page 59

```
1   based services are to prevent in-patient
2   care or residential treatment placement?
3              MS. DOTY:  Objection.  Outside
4   of the scope.
5        A.  That is correct.
6        Q.  Okay.  So in assessing whether or
7   not these community-based services are
8   actually working, those would be the numbers
9   -- numbers of in-patient and number of
10  individuals or children in foster care being
11  placed in residential treatment --
12  residential treatment facilities would be an
13  important matrix for DoHS?
14             MS. DOTY:  Objection.  Outside
15  of the scope.
16       A.  It could be one of them.  But there
17  could be multiple factors to that.
18       Q.  And let's go back to that IDD
19  Waiver a second.  I think you told me that
20  you are not over -- you're not over IDD
21  Waiver?
22       A.  No.
23       Q.  Don't have anything to do with IDD
24  Waiver?
```

Page 60

1          A.  No.

2          Q.  But IDD Waiver, I thought -- isn't

3     there Medicare IDD Waiver?

4                MS. DOTY:  Objection.  Vague.

5          A.  Medicaid.  You said Medicare.

6          Q.  Sorry.  Medicaid.  I meant

7     Medicaid.

8          A.  Yeah.  So there are different types

9     of 1915(c)'s.  So CSED Waiver is one of

10    them.  And because it is behavioral health

11    related, and I'm the behavioral health

12    director, it is in my unit.  While there is

13    another unit that does the IDD, the ADW and

14    the TDI.

15         Q.  And so ADW -- of course we are not

16    dealing with ADW and the IDD.  So if you are

17    dealing with IDD in the realm of BMS, that's

18    going to be through CSED?

19               MS. DOTY:  Objection.  Vague.

20         A.  No.  Those are separate waivers.

21         Q.  Okay.

22         A.  Separate target populations are

23    served.

24         Q.  And what I am trying to get a

Page 61

```
 1    handle on, that I obviously don't understand
 2    is -- I thought there was foster care
 3    children that received IDD Waiver services
 4    through Medicaid?
 5         A.   There are.  But again, that would
 6    be children in foster care with a cognitive
 7    impairment who meet the qualifications for
 8    IDW.  You might have children in foster care
 9    that have mental health conditions.  That is
10    CSED Waiver.
11         Q.   Okay.
12         A.   So it is a different --
13         Q.   So the children in foster -- sorry.
14    I didn't mean to cut you off.
15         A.   That's okay.
16         Q.   The children in foster care that
17    have the IDW through Medicaid, that would
18    not be in your purview?
19         A.   That is correct.
20         Q.   That would be BBH?
21         A.   No.
22         Q.   Who would that be?
23         A.   Okay.  So we are Medicaid --
24         Q.   Right.
```

Page 62

1        A.   -- under DoHS.

2        Q.   Right.

3        A.   And then you have 1915(c)waivers.

4   Those are defined as home and

5   community-based waivers.

6        Q.   Uh-huh.

7        A.   You have the IDW Waiver, ADW

8   Waiver, the TBI Waiver, and the CSED Waiver.

9   Okay?  Those are all separate 1915(c)'s.

10       Q.   Got you.

11       A.   Okay.  What target populations that

12  they serve.

13            So that is Medicaid.  We are the

14  payor of that.  So a child that is on the

15  IDD Waiver could be a foster child, could

16  not be a foster child.

17       Q.   Right.

18       A.   But they have a severe cognitive

19  impairment or a developmental delay, so they

20  are served in that waiver for children who

21  are --

22       Q.   Okay.  And that's what I want to

23  talk about.  So when you are talking about

24  those children in that waiver, who is that

Page 63

```
 1    under?  I know it's under --
 2          A.  Randy Hill's.  That's a separate
 3    director.
 4          Q.  Okay.
 5          A.  It is a separate unit.
 6          Q.  In BMS?
 7          A.  In Medicaid, yes.
 8          Q.  So it is in BMS.  It's in Medicaid.
 9    It is the IDW Waiver.  And you can't talk
10    about it because it is not over -- that's
11    not something that you are prepared to talk
12    about?
13          A.  That is not my area.
14          Q.  I understand.
15              Has BMS or DoHS looked into causes
16    of community-based program services --
17    delays in children getting community-based
18    services?
19              MS. DOTY:  Objection.  Outside
20    of the scope.
21          A.  Yes.  We have reviewed, you know,
22    certain individual cases.  Aetna has brought
23    cases to us to inform us there is a delay
24    for certain reasons.  It could be even that
```

Page 64

1    the parent refuses services.  So there is a

2    freedom of choice.  The family has a right

3    to refuse a service even if the child meets

4    medical necessity criteria.

5              So there's multiple reasons why

6    services have not taken place.  And so we

7    look at those.  If there is something that

8    could be a barrier that we feel like we can

9    work with the family or work with other

10   entities, if that's the situation, then we

11   do that.

12             So we do have what we call like

13   case sessions where we have a particular

14   issue, we are bringing it to DoHS or

15   Medicaid in particular.  They kind of staff

16   it.  And then we talk about what we can do

17   to eliminate those barriers.

18             We have even had times where we

19   think that the parents just need more

20   education about the program.  We are not,

21   you know, coming in to like take your child.

22   We are actually coming in to put services in

23   your home to ensure your child can stay with

24   you.

Page 65

1          Q.  And when you do that review, do you

2     have any type of -- is there a report out

3     there that says we have identified these

4     reasons or -- you know, yeah.  Is there a

5     report of anything that identifies the

6     reasons that you have identified causing

7     these delays in community-based services?

8               MS. DOTY:  Objection.  Vague.

9          A.  I don't believe there is a detailed

10    report.  I think there is an overall report

11    of like if there are children on the wait

12    list or on hold or things like that.

13         Q.  And you mentioned wait list.  I

14    mean, fair to say that when you do that

15    review, part of the reason -- or at least

16    one of the causes is wait lists, receiving

17    community-based services; is that fair?

18              MS. DOTY:  Objection.  Vague.

19         A.  We do review that, yes.

20         Q.  And there are wait lists, and that

21    is part of the cause; is that fair?

22              MS. DOTY:  Objection.  Vague.

23         A.  There is 30, as I stated earlier.

24         Q.  Sorry.  Can you repeat that?

Page 66

```
 1          A.   There is 30 as of June 14th, as I
 2   stated earlier.
 3          Q.   That's just with the CSED?
 4          A.   Right.
 5          Q.   I am talking about in general,
 6   community-based programs -- services?
 7          A.   No.  Because that's very different.
 8   That's program specific.
 9          Q.   One of the programs that you
10   mentioned early on was the ACT Program,
11   correct?
12          A.   That's correct.
13          Q.   I think I asked you if you know how
14   many were in it.  And you do not know,
15   correct?
16          A.   No.  We have approved teams.  And
17   those teams can have up to 125 individuals
18   on those teams.
19          Q.   Are you aware that in -- what year
20   are we in, 2024 -- middle of last year, that
21   there was only five foster care or youths
22   under the age of 21 receiving ACT Services?
23          A.   I don't have the number in front of
24   me.
```

Page 67

1          Q.  Would that surprise you?

2              MS. DOTY:  Objection.  Outside

3     of the scope.

4          A.  That there were that many

5     individuals getting services for ACT?

6          Q.  That few.

7          A.  Well, you have to understand it is

8     only 18 to 21.  So, no, I am not --

9          Q.  I'm sorry.  Between 18 and 21?

10         A.  Right.  But the service is for 18

11    and up.

12         Q.  Right.

13         A.  So compared to, you know, 22 to 64,

14    you are going to have a less population for

15    18 to 21.

16         Q.  Right.  So I guess what I'm -- when

17    I asked you about programs that DoHS has

18    implemented to help provide community-based

19    services to foster children, ACT was

20    mentioned.  But as you said, ACT is only 18

21    to 21?

22         A.  That's correct.

23         Q.  So it is only going to target a

24    very limited portion of the foster care

Page 68

1    community?

2         A.  Right.  But you have CSED Waiver

3    which is --

4         Q.  Right.

5         A.  -- which is -- if you look at it,

6    it is almost ACT-like in a sense because you

7    have wraparound.

8         Q.  You said ACT-like, not ACT light?

9         A.  Like, L-I-K-E.

10        Q.  That's important.

11        A.  Yeah.

12            So when you look at it that way --

13   so you almost have a program for adults and

14   children.  So the 18 to 21 is always an

15   interesting population because they can

16   sometimes receive children's services still

17   because they are under 21 or adult services

18   because they are 18 and up.

19        Q.  When DoHS looked -- and we talked

20   about looking at BBH for programs, and you

21   mentioned the CCBHC and CSED and BPS -- PBS?

22        A.  PBS.

23        Q.  I don't know why it is so hard.

24            Were those programs chosen

Page 69

```
 1   specifically to reduce the amount of

 2   individuals -- amount of foster care

 3   children going into residential treatment?

 4              MS. DOTY:  Objection.  Outside

 5   of the scope.

 6        A.  I think they were developed for all

 7   children, not just ones in the foster care

 8   system.  So it was all children we were

 9   focused on to ensure that they didn't have

10   to go into facility-based care.

11        Q.  Right.  But the purpose is to

12   prevent the introduction of children into

13   residential treatment?

14              MS. DOTY:  Objection.  Outside

15   of the scope.

16        A.  Your goal is to develop more

17   community-based services to do that, that is

18   correct.

19        Q.  And I think -- is there any program

20   out there that DoHS has -- through the

21   Medicaid program, are there any other

22   programs out there that -- whose goal is to

23   prevent children from going into residential

24   treatment facilities that we haven't talked
```

1    about?

2                 MS. DOTY:  Objection.  Outside

3    of the scope.

4         A.  I believe it mentioned intensive

5    outpatient services.  So we are going to

6    require CCBHCs to do that for the youth.  We

7    already do have some intensive outpatient

8    programs for children.

9                 And so what that does is, instead

10   of just like if you went to therapy once a

11   week, it is actually a three-day or five-day

12   program that children go to.  We work with

13   the Department of Education to ensure the

14   kids still get their education.  But they

15   are there between four to six hours a day to

16   receive group therapies, individual

17   therapies, supportive counseling and

18   targeted case management.

19                 So that is also -- like they come

20   to the program, but they go home in the

21   evenings.  So we are still like on the

22   continuum.  You might have basic outpatient,

23   intensive outpatient.  And then further down

24   the line, you might have residential care.

Page 71

```
 1    So, again, that's another type of service in
 2    the community to try to ensure that they can
 3    stay in the community.
 4         Q.  That's a new program?
 5         A.  No.  Intensive outpatient program
 6    has been around for 25 years maybe.
 7         Q.  Okay.  I misunderstood you.  I
 8    thought you said it was new.  I am like,
 9    that doesn't sound --
10         A.  No.  That is not new.  But yeah, it
11    is in place.  But with the requirement of
12    CCBHCs having to have them.  Where they
13    could have done it before, now they will be
14    required to do that.
15         Q.  So the change that we are talking
16    about is a requirement that anybody -- any
17    facility that wants to be a CCBHC has to
18    provide those services.  Do you know whether
19    or not at least the five that you can recall
20    that are applying currently provide that
21    service?
22         A.  I would say the majority do not
23    right now.
24         Q.  And you expect that to be in effect
```

Page 72

```
 1   by the end of 2024?
 2        A.  Our state plan amendment is being
 3   submitted to CMS this month.  So depending
 4   on CMS's approval date, yes, we are looking
 5   at it by the end of 2024.
 6        Q.  And you brought a lot of documents
 7   with you today.
 8             MR. WALTERS:  And this is really
 9   a question for counsel.  Are there any
10   documents in there that are not Bates
11   stamped?
12             MS. DOTY:  There are three
13   documents that are not Bates stamped.  But
14   we can produce those to you.
15             MR. WALTERS:  What I would like
16   is -- because I don't -- obviously I don't
17   want more documents that I don't need --
18   yeah, a copy of the documents that are not
19   Bates stamped, the index.
20        Q.  And the outline you are working off
21   of today, did you create that outline?
22        A.  No, I did not.
23             MR. WALTERS:  I want a copy of
24   the outline.
```

Page 73

1              MS. DOTY:  Okay.

2              MR. WALTERS:  Give us just a

3    second.  We are about done.  But I need just

4    a short break.

5                   (Break in proceedings from

6    10:12 to 10:14 a.m.)

7    BY MR. WALTERS:

8         Q.  We have been talking about programs

9    that were provided by BBH that BMS is now

10   getting Medicare coverage -- Medicaid

11   coverage for.  Are there any programs that

12   BBH is operating whose purpose -- or at

13   least part of the purpose is to prevent

14   children from going into residential

15   treatment that BMS is not trying to expand

16   Medicaid coverage for?

17              MS. DOTY:  Objection.  Outside

18   the scope.

19        A.  Not at this time.

20        Q.  You said you have been director of

21   BMS for four years?

22        A.  Yes.

23        Q.  When was the decision first made to

24   start -- to take -- to start considering the

Page 74

1    idea of expanding Medicaid coverage to these

2    particular BBH programs?

3        A.  Well, I have been 16 years total in

4    the department.  Just four years as the

5    director.

6        Q.  So even better?

7        A.  So yeah.  So really probably the

8    start of the conversations happened -- I

9    know in 2016 is when we first started

10   talking about like developing CSED for

11   example.  And then 2018, I want to say was

12   really when BBH started out with like PBS --

13   started talking about PBS and Children's

14   Mobile Crisis.

15            So really that 2016, 2018 was like

16   the pre, pre-planning, I would call it.  And

17   then of course during the pandemic, we were

18   trying to put services, you know, in place

19   for these things, making sure we have CMS

20   approval for payment and all of those

21   things.  So 2016, 2018 was really

22   pre-planning.

23       Q.  Okay.  And is that when BBH started

24   the programs or when Medicaid started -- or

Page 75

```
 1   when BMS started looking at the programs
 2   that BBH was already running?
 3        A.  So I couldn't give you the exact
 4   dates of when they started.  They had
 5   conversations with us saying we are thinking
 6   about developing Children's Mobile Crisis
 7   and working with Concord University for PBS.
 8   So they always give us preliminary
 9   conversations of this is what we are
10   thinking of doing.  And as they go along, we
11   meet with them to see how is it going.
12   Because, you know, you want to make sure
13   that it can be sustainable by Medicaid.  We
14   don't want to start programs that we have to
15   stop.
16        Q.  Right.
17        A.  So that's why we have those
18   conversations.
19        Q.  So I think I -- and let me ask you
20   this way because I think I understand now.
21   So it is not like BBH was running any of
22   these programs for 20 years and BMS came
23   along and said, Oh, that's a great program,
24   let us use it?  It was when they started it,
```

1    you monitored it to see if it was

2    sustainable and then decided to expand it to

3    Medicaid?

4         A.  We would meet with them usually --

5    sometimes once a month at least for an

6    update, how is it going, what are you

7    learning, what's working, what's not

8    working.  And then we also of course educate

9    them on we think CMS would approve it if we

10   do try these things and do these things.

11   And so -- or you can show us data or

12   documentation of your pilot program and how

13   it is working.  So that helps us build the

14   state plan amendment, as well as the policy.

15        Q.  And again, there is no -- so there

16   is no certain -- there's no programs that

17   BBH is current in operating.  Are there any

18   that are in the process of evaluating or

19   beginning or considering --

20            MS. DOTY:  Objection.  Outside

21   the scope.

22        Q.  -- that would potentially apply to

23   children -- trying to keep them out of

24   residential treatment services?

Page 77

1              MS. DOTY:  Objection.  Outside

2    of the scope.

3         A.  Not at this moment.

4              MR. WALTERS:  Nothing further.

5              MS. DOTY:  Okay.  I would like

6    to do a short cross, if that's fine?

7              MR. WALTERS:  Sure.  Absolutely.

8                   EXAMINATION

9    BY MS. DOTY:

10        Q.  Ms. Parsons, what is Aetna's role

11   for providing Medicaid-covered services to

12   foster children in West Virginia?

13        A.  We have two different contracts of

14   managed care organizations.  One is Mountain

15   Health Trust, and that is with all of our

16   managed care organizations, including

17   Unicare, the health plan, and Aetna.  We

18   will have another one called Highmark this

19   coming year.  Mountain Health Promise is the

20   contract with Aetna that is particular to

21   foster care and the CSED Waiver.

22        Q.  When did the Mountain Health

23   Promise contract go into place?

24        A.  In 2020.

Page 78

1           Q.  Could you please describe what the

2    reimbursement looks like for CCBHCs when

3    that program gets off the ground?

4           A.  Of course.  So CCBHCs -- again,

5    they are an identified provider type.  And

6    that is built upon what's called a PPS rate.

7    So there are four options of PPS per state,

8    PPS1, 2, 3 and 4.  However, the state law

9    that was passed for CCBHC required us to do

10   what's called a daily encounter, which would

11   be the PPS1 rate.

12             So the way I would explain it is,

13   CCBHCs would be FQHC like, and that they're

14   paid on a encounter rate basis.  So if

15   someone comes into a CCBHC and they get a

16   service, they are paid an encounter no

17   matter what type of service that they do as

18   long as it is based within the encounter

19   rate method of methodology.

20             So let's say someone came in and

21   got therapy.  They are paid the encounter

22   rate, not the fee for service rate that you

23   would typically get like at an LBHC.

24           Q.  And what does PPS stand for?

Page 79

1         A.  Prospective payment system.

2         Q.  What does FQHC stand for?

3         A.  Federally Qualified Health Center.

4         Q.  When you say an encounter rate,

5    does that mean whatever service is provided,

6    it all gets billed at like the per diem rate

7    if it is a per diem payment?

8         A.  Yes.  So there would be codes built

9    under that bundle of that encounter.  So

10   whatever those codes are.  There may be some

11   codes outside of it, some of them.  But the

12   majority would be under that encounter rate.

13        Q.  So does whatever code for the

14   particular service, like outpatient

15   therapy --

16        A.  Uh-huh.

17        Q.  -- it gets rolled up into the like

18   umbrella encounter rate?  Is that how it

19   works?

20        A.  That's correct.

21        Q.  Has BMS done anything to increase

22   reimbursement rates for service providers

23   since 2020?

24        A.  So -- yes.  So during the actual

Elite Court Reporting, LLC
CYNTHIA PARSONS, 06/27/2024

Page 80

```
 1   pandemic, we gave a 70 percent increase,

 2   which was a temporary one during the

 3   emergency pandemic order.  And 85 percent of

 4   the 70 percent rate was for direct care

 5   service workers.  So the providers had to

 6   sign an attestation stating that we will

 7   take 85 percent of that 70 percent increase

 8   and ensure it goes to our workers.  Because

 9   we wanted to ensure it retained workforce

10   during COVID.  Because a lot of them worked

11   in -- face-to-face with a lot of

12   individuals.  And so we didn't want to lose

13   our current workforce during the pandemic.

14             After the pandemic order was over,

15   we did a permanent 5 percent rate increase

16   for all behavioral codes for LBHCs.

17        Q.  Okay.  Does DoHS have any plans

18   related to affordability of health records

19   for children in foster care?

20        A.  Yes.  That is actually -- so right

21   now we are working with Aetna, who again has

22   that contract.  And what they are going to

23   develop is called -- it's kind of called an

24   electronic health record passport, or an
```

Page 81

```
 1   electronic -- a mobile electronic health

 2   record.

 3            So what that means is, is they are

 4   going to develop that to have -- everyone to

 5   have access to the same information that it

 6   needs to have, whether -- it could be the

 7   worker, the guardian, the providers, managed

 8   care organization.  And the reason to do

 9   that is to ensure that everyone is on the

10   same page about the person's care and they

11   have access to all of the same information

12   at the right time.

13       Q.  Has DoHS made any amendments or

14   changes to the CSED Waiver since 2020?

15       A.  I think there was one update.  But

16   we are currently in draft right now since

17   the 1915(c) Waiver is in with CMS for

18   approval for changes.

19            So let me look right here.  Number

20   nine.  I believe it was updated in '21.

21       Q.  Okay.  And do you know off the top

22   of your head what those changes were in

23   2021?

24       A.  It was mostly just clarification of
```

1    policy information.  So once you have a

2    policy out -- as providers ask questions, we

3    develop what's called FAQs - frequently

4    asked questions.  And we take those FAQs and

5    put them in the next policy amendment to

6    make sure it is clarified for all providers.

7         Q.   And then has DoHS made any changes

8    to the reimbursement methodology for CSED

9    Waiver providers recently?

10        A.   We are working with CMS to have an

11   update to the payment methodology.  We have

12   to have permission for that approval.  That

13   approval, I think we just got Friday

14   actually.  So it will be what's called a

15   PMPM, which that lessens the administrative

16   burden for CSED Waiver providers.  And we

17   have had several providers tell us that

18   where they weren't doing CSED before, they

19   probably would now because that's an ease of

20   billing administration and time.

21             So we are going to put that into

22   effect.  So that's why the policy is in

23   draft.  We had to wait for CMS to approve

24   the 1915(c) Waiver application.  And now

1   that they have, we will then change that

2   payment methodology in our systems.

3          Q.   And what does PMPM stand for?

4          A.   Per member per month.

5          Q.   Can you explain how that works?

6   What does a provider do and how do they get

7   paid?

8          A.   Sure.  So there's a couple of ways

9   Medicaid can do it.  We have PMPWs or PMPMs.

10  So PMPM is like we pay a set rate to the

11  provider for that person, and they do all of

12  the services for that calendar month.  And

13  the reason the payment becomes together is

14  because actuaries look at other states and

15  they look at our current claim system and

16  they develop that rate.

17          So it is not exactly like an

18  encounter rate, but it is a set rate per

19  member per month.  And the reason that is,

20  is because you may have some children that

21  need a lot of services in a month and some

22  that may need not as many services.  So they

23  take that average.  And it allows to free up

24  time for the providers, not to do so much

Page 84

```
 1    documentation or administration overload to

 2    do the billing of individual codes.

 3                MS. DOTY:  Okay.  I don't have

 4    any further questions.  Thank you.

 5                MR. WALTERS:  Unfortunately, I

 6    do.  But not many.

 7                THE WITNESS:  Okay.

 8                  RE-EXAMINATION

 9    BY MR. WALTERS:

10        Q.  You had mentioned the 85 percent

11    raise that direct care workers received

12    during the pandemic, correct?

13        A.  Uh-huh.

14        Q.  Yes?  Sorry.

15        A.  Yes.  I'm sorry.

16        Q.  You are all right.

17        A.  I got a drink there.

18        Q.  Whose idea was that?

19        A.  Commissioner Bean really -- and

20    worked with -- and I think it was -- our

21    secretary and our deputy secretaries worked

22    together.  I think all states at that time -

23    I will be honest -- were in panic mode.  So

24    we were all talking together as well to
```

Page 85

```
 1   figure out what we needed to do.  We knew

 2   our biggest concern was workforce

 3   retainment.  And so that's why our

 4   leadership came together and made that

 5   decision.  And we had CMS approval.

 6        Q.  And I think you indicated that the

 7   providers were required to provide

 8   85 percent of the moneys directly to the

 9   direct care workers, correct?

10        A.  That's correct.  They had to sign

11   an attestation.

12        Q.  And then it reduced to 5 percent

13   when the program ended?

14            MS. DOTY:  Objection.  Vague.

15        A.  Once the ARPA dollars, is what it

16   was called, for the federal government

17   ended, we still felt like we needed to do an

18   increase for our providers.  So we found

19   5 percent based on our budget.

20        Q.  Was there any effort to track the

21   amount of direct care workers who quit when

22   their pay was reduced by 80 percent?

23            MS. DOTY:  Objection.  Outside

24   of the scope, and mischaracterizes --
```

1          Q.  When their bonus or their

2    additional funding of 80 percent was reduced

3    to 5?

4              MS. DOTY:  Objection.

5    Mischaracterizes testimony.

6          A.  I do not know on that fiscal

7    policy.

8          Q.  But you understand what I'm asking.

9    85 percent was given to direct care workers,

10   correct?

11         A.  Uh-huh.

12             MS. DOTY:  Objection.

13   Mischaracterizes testimony.

14         Q.  Right?

15         A.  85 percent of the 70 percent

16   increase was required to go to direct care

17   service workers.

18         Q.  And then when the ARPA program

19   ended, that 85 became a 5 percent permanent

20   raise?

21             MS. DOTY:  Objection.

22   Mischaracterizes testimony.

23         A.  It did become a 5 percent permanent

24   raise.

Page 87

1          Q.  And I think you said you don't

2     know.  But was there any effort to determine

3     how many direct care workers left when that

4     85 percent was reduced to 5 percent?

5               MS. DOTY:  Objection.

6     Mischaracterizes testimony.

7          A.  I do not know.

8               MR. WALTERS:  I have nothing

9     further.

10               MS. DOTY:  We would like the

11     opportunity to have Ms. Parsons read and

12     sign the transcript before it is finalized.

13          (Deposition concluded at 10:27 a.m.)

14               * * * * * * * *

15

16

17

18

19

20

21

22

23

24

Page 88

1                    CERTIFICATE

2

3       I, Tara Arthur, Certified Stenotype

4    Reporter and Notary Public, do hereby

5    certify that the foregoing deposition of the

6    above-named witness, was duly taken by me in

7    machine shorthand, and that the same were

8    accurately written out in full and reduced

9    to computer transcription.

10      I further certify that I am neither

11   attorney or counsel for, nor related to or

12   employed by any of the parties to the action

13   in which this deposition is taken; and

14   furthermore, that I am not a relative or

15   employee of any attorney or counsel employed

16   by the parties hereto or financially

17   interested in the action.

18      My commission expires April 16, 2027.

19

20   _____

     Tara Arthur
21   Certified Court Reporter/Notary Public

22

23

24

**Exhibits**

**C Parsons 06 2724 Ex 1** 3:8 33:15,16

---

**1**

**1** 33:15,16

**10:12** 73:6

**10:14** 73:6

**10:27** 87:13

**125** 66:17

**14th** 11:16 66:1

**16** 5:16 74:3

**18** 7:23 9:2 67:8,9,10,15, 20 68:14,18

**1915(c)** 8:13 21:15 81:17 82:24

**1915(c)'s** 29:8 60:9 62:9

**1915(c) waivers** 62:3

---

**2**

**2** 78:8

**20** 6:20 52:6 75:22

**2008** 8:23

**2016** 74:9,15, 21

**2018** 74:11, 15,21

**2020** 10:11 77:24 79:23 81:14

**2021** 13:16 52:3 81:23

**2022** 9:11 13:19,23 15:14,16,23 16:6,21 17:4, 8,16 42:1

**2023** 17:16 31:15,18 33:4

**2024** 31:16 33:18 66:20 72:1,5

**21** 7:24 8:15 66:22 67:8,9, 15,21 68:14, 17 81:20

**21-year-olds** 9:2

**22** 17:14 52:3 67:13

**23** 46:6

**24** 33:3 38:15 46:7,22

**25** 71:6

---

**3**

**3** 78:8

**3.8** 34:19

**30** 11:16 27:15 52:7 58:11 65:23

**66:1**

**30(b)(6)** 6:23

**31** 17:5,8,17 51:1

---

**4**

**4** 78:8

---

**5**

**5** 8:5 80:15 85:12,19 86:3,19,23 87:4

**503** 45:5

**57** 17:17 51:2

---

**6**

**60** 58:11

**64** 33:20 34:12 67:13

---

**7**

**70** 80:1,4,7 86:15

---

**8**

**80** 85:22 86:2

**85** 80:3,7 84:10 85:8 86:9,15,19 87:4

---

**9**

**90** 58:11

**988** 19:18

**9:45** 56:19

**9:58** 56:19

---

**A**

**a.m.** 56:19 73:6 87:13

**abbreviations** 23:6

**ability** 15:6,8 26:19

**absent** 57:11

**Absolutely** 22:10 56:17 77:7

**access** 9:21 10:18,21 28:14 42:1,8 48:18 81:5,11

**accessibility** 30:8,21 32:5 41:7 54:3

**accommodat e** 6:15

**accomplish** 42:20

**acronym** 22:12 41:16

**ACT** 7:23 8:19,22 9:15, 20 22:7 66:10,22

**67:5,19,20 68:8**

**ACT-LIKE** 68:6,8

**actions** 7:4 15:20

**actively** 15:4

**actual** 16:4 47:17 79:24

**actuaries** 83:14

**added** 9:10 10:3

**adding** 9:17 10:4 37:1 39:7,19 48:24 49:14 55:16

**additional** 49:20 55:19 86:2

**address** 15:15,21 16:6 37:20

**addressed** 35:11

**adequacy** 12:19,22

**administratio n** 82:20 84:1

**administrativ e** 82:15

**admission** 9:22,24

**adolescents** 44:21

**adopting**

36:8 37:22 41:5,6

**adult** 22:18 68:17

**adults** 27:11 68:13

**ADW** 60:13, 15,16 62:7

**Aetna** 14:20 15:4 16:16 47:19 63:22 77:17,20 80:21

**Aetna's** 77:10

**affordability** 80:18

**age** 7:24 8:14 9:23 28:7 66:22

**agreed** 7:14

**ahead** 11:20, 21 12:17 13:8 33:20

**algorithm** 27:6 58:21

**allowed** 9:1 44:15

**amendment** 8:9,24 41:10 44:24 46:6,19 52:17 54:12, 23,24 72:2 76:14 82:5

**amendments** 81:13

**amount** 10:6 12:13 24:3

47:17 69:1,2 85:21

**Ann** 4:9

**answering** 6:9

**answers** 5:21

**anticipate** 46:10

**apologies** 53:7

**apologize** 52:24

**application** 82:24

**apply** 28:7 45:3 46:13,15 52:14 76:22

**applying** 45:24 71:20

**appointments** 43:7 58:1

**appropriately** 21:2,8

**approval** 45:1 72:4 74:20 81:18 82:12, 13 85:5

**approve** 76:9 82:23

**approved** 8:9,13 9:1 10:11 41:11, 12 46:6 66:16

**area** 15:9,11 50:13 63:13

**areas** 10:1

**ARPA** 85:15 86:18

**aspects** 50:22

**assess** 43:5

**assessed** 26:5

**assessing** 59:6

**assessment** 20:21,24 22:11,23 23:9,14,20 24:1,16 39:24

**assessments** 24:17,21,22 25:4

**assume** 49:11

**Assumes** 17:18

**assure** 49:18

**attestation** 80:6 85:11

**attorneys** 7:1

**attritioned** 12:24

**availability** 7:5,11 31:20

**average** 83:23

**avoid** 17:11

**aware** 11:12 14:12 17:15, 20,22 28:10 31:18 32:4,

17,24 48:1 50:3 52:13 53:21 66:19

---

**B**

**back** 22:4 26:8 59:18

**bad** 11:23 48:6

**barrier** 64:8

**barriers** 64:17

**based** 24:21 28:23 46:12 52:3 59:1 78:18 85:19

**basic** 70:22

**basis** 13:2 78:14

**Bates** 72:10, 13,19

**BBH** 30:11,12 31:13,24 33:8,9 35:15, 16,19 36:2,6, 14 37:17 39:14,18 40:13,15,19, 23 41:4,10 48:8 53:10, 19,21,22 54:2,15 61:20 68:20 73:9,12 74:2,12,23 75:2,21 76:17

**BBH's** 35:13

**Bean** 84:19

**begin** 31:9,10

**beginning** 13:9,14 16:23 76:19

**behavior** 29:15,20,21, 24 30:18 34:20,22 35:2,3 55:14, 20

**behavioral** 5:3 8:4 12:4 14:11,13 16:1 29:12,14 30:5,8,10,22 31:21 32:10, 18,20 33:1,5, 24 34:2,18,24 35:20,24 44:5,12 50:4 52:13 55:1, 13,23 60:10, 11 80:16

**biggest** 85:2

**billable** 30:17 31:11

**billed** 79:6

**billing** 82:20 84:2

**bit** 16:24

**BMS** 4:14 5:2 29:3,5,6 36:8, 11 39:20 40:17 41:5 57:9 60:17 63:6,8,15 73:9,15,21 75:1,22 79:21

**board** 38:2,7

**bonus** 86:1

**bottom** 34:6 35:10,14

**BPH** 30:22 36:14

**BPS** 68:21

**break** 6:14 56:16,18 73:4,5

**bringing** 64:14

**brought** 63:22 72:6

**BSS** 19:24 20:1,6,19,20 22:8 23:15 28:24

**budget** 85:19

**build** 76:13

**built** 78:6 79:8

**bundle** 79:9

**burden** 82:16

**bureau** 4:13 16:1 19:24 29:11 35:20, 23

**bureaus** 35:22 36:4

**C**

**C's** 44:9

**CAFAS** 22:13

**calendar** 83:12

**call** 4:16,18, 23 19:18 22:2 64:12 74:16

**called** 4:2 77:18 78:6,10 80:23 82:3,14 85:16

**CANS** 22:12, 13,20,24 23:14,20,24 24:15 25:3

**care** 5:4 9:13 10:20,23 11:1,7,11 12:19 14:21 18:3,8,21 24:4,12,24 25:5 26:14,18 28:10 38:10 43:3,13 56:9, 23,24 59:2,10 61:2,6,8,16 66:21 67:24 69:2,7,10 70:24 77:14, 16,21 80:4,19 81:8,10 84:11 85:9,21 86:9, 16 87:3

**case** 21:1,7 64:13 70:18

**caseload** 15:4

**cases** 18:6 63:22,23

**catch** 55:8

**catchment** 15:11

**caused** 14:4

**causing** 65:6

**CCBHC** 44:8, 10,11,22 45:4 47:2 50:2 52:14 53:17 54:10 68:21 71:17 78:9,15

**CCBHCS** 44:4,15,17 46:10 48:9 49:23 70:6 71:12 78:2,4, 13

**CCHB** 44:7

**center** 45:3 79:3

**centers** 12:4 14:11,13 30:5 50:5 57:13

**certification** 30:13

**certified** 41:12 55:21, 24

**change** 13:11 71:15 83:1

**changed** 4:17

**changing** 20:5 55:17

**Chapter** 45:5

**child** 7:24 20:17,18 21:4 23:8,18 24:4, 11 25:5,8,19

57:21 62:14, 15,16 64:3, 21,23

**Child's** 43:17

**children** 8:8, 14,20 9:13,19 10:15 12:8,13 14:17 18:2,6, 13,24 19:10 21:17 23:2,3 24:16 26:4,11 27:11 28:10 37:19 42:6,10 43:1,15,23 47:4,18 50:13 51:15 54:19 57:1 59:10 61:3,6,8,13, 16 62:20,24 63:17 65:11 67:19 68:14 69:3,7,8,12, 23 70:8,12 73:14 76:23 77:12 80:19 83:20

**children's** 19:18 41:8 42:21 43:4,21 44:18 45:14 47:1 53:12 57:16,23 58:6 68:16 74:13 75:6

**CHIP** 8:15,17

**choice** 14:8 64:2

**chosen** 68:24

**claim** 83:15

**claims** 37:6

**clarification** 81:24

**clarified** 82:6

**clarify** 15:17 32:22 33:12 34:7 35:8 40:11

**clear** 6:7

**clinical** 43:10

**clinics** 44:6, 12

**CMS** 8:10,14 15:7 41:11 46:20 72:3 74:19 76:9 81:17 82:10, 23 85:5

**CMS's** 72:4

**code** 31:4 79:13

**codes** 30:16 31:17 79:8, 10,11 80:16 84:2

**cognitive** 21:4,13 27:12 61:6 62:18

**Commissione r** 84:19

**community** 10:16,18 11:5,10 18:10 19:21 27:21 42:11 44:5,12 68:1 71:2,3

community- 28:22 58:24

community- based 7:6,11 8:5,12 28:21 32:14,16 42:5,9 47:22 58:2 59:7 62:5 63:16,17 65:7,17 66:6 67:18 69:17

company 56:24

compared 67:13

complete 46:24

completely 36:4

comprehensive 44:5,11 45:2,4

concern 37:14 85:2

concluded 87:13

Concord 30:12 75:7

conditions 61:9

confidence 49:1

confused 33:11

connected 24:14 25:13 47:21 49:9

connection 58:1

considered 28:20 32:11

constant 50:24

constantly 12:22

continuum 70:22

contract 77:20,23 80:22

contracts 77:13

conversations 74:8 75:5,9, 18

copy 72:18, 23

correct 18:4 22:9 23:12 26:13 28:3 36:10,15 38:21 39:15 40:5 42:15,16 48:21 59:5 61:19 66:11, 12,15 67:22 69:18 79:20 84:12 85:9,10 86:10

correctly 4:21

counsel 72:9

counseling 70:17

couple 5:17 26:2 83:8

court 4:3 5:24

cover 35:4,6

coverage 9:4 73:10,11,16 74:1

COVID 14:3 80:10

create 31:3 72:21

created 10:10 30:12 42:18, 19

creating 37:22

crisis 8:7 19:18 41:9,13 42:21,23 43:5,17,22 44:18 45:14, 24 46:3 47:2 53:12 54:17 57:17,24 58:6 74:14 75:6

criteria 9:22, 24 64:4

cross 77:6

CSED 8:11,12 10:9,12,14 11:13,15 12:20 13:4,24 14:9 15:15,23 16:7 17:6 18:1,9,15,18 19:14 21:3, 16,19 22:7 25:9,24 26:9,

11 27:24 42:13 44:17 45:13,22,23 46:8,11 47:21 48:19,23 49:7 50:7 51:24 52:8 56:6 58:17 60:9,18 61:10 62:8 66:3 68:2,21 74:10 77:21 81:14 82:8, 16,18

current 40:6 76:17 80:13 83:15

custody 9:13 23:19 25:6

cut 61:14

Cynthia 4:1,9

---

**D**

daily 78:10

data 37:6 52:2 76:11

date 38:16 46:20 72:4

dates 75:4

day 27:22 43:7 70:15

days 58:11

dealing 60:16,17

December 50:16

decided

53:11 54:21 76:2

deciding 54:4

decision 31:16 73:23 85:5

decrease 47:20

decreasing 21:24

define 41:17

defined 62:4

delay 62:19 63:23

delays 63:17 65:7

deliver 14:7 15:11

demonstration 49:22 54:15

department 4:12 57:21 70:13 74:4

departments 43:2

depending 50:19 72:3

depo 6:13

deposition 5:10 6:11,18, 23 33:14 87:13

deputy 84:21

describe 78:1

designated

7:15

**designation** 45:7

**detailed** 65:9

**determination** 25:2

**determinations** 22:14

**determine** 20:21 51:3 87:2

**determined** 24:12 25:7, 17,19

**determines** 24:23,24

**determining** 57:9

**develop** 16:17 26:19 27:7 29:24 30:13 31:17 50:1 69:16 80:23 81:4 82:3 83:16

**developed** 10:15 42:5 43:18,23 58:22 69:6

**developing** 30:16 44:4 74:10 75:6

**development** 29:23 44:14 57:19 58:7,14

**developmental** 21:14 27:13

62:19

**DHHR** 4:16, 19,23

**diem** 79:6,7

**difficult** 38:2

**direct** 80:4 84:11 85:9,21 86:9,16 87:3

**directly** 85:8

**director** 5:3 60:12 63:3 73:20 74:5

**disabilities** 21:15 27:13

**Disabled** 21:12

**discussions** 7:1

**documentation** 19:11 76:12 84:1

**documents** 72:6,10,13, 17,18

**Dohs** 7:10 9:13 10:4 11:17 15:14 16:6 23:19 25:6 30:6 31:9,19 32:5 33:4 35:17, 18,24 40:16 41:24 47:3 49:17 51:2 53:7,10,21 54:1 57:9 59:13 62:1 63:15 64:14

67:17 68:19 69:20 80:17 81:13 82:7

**dollars** 49:24 85:15

**DOTY** 7:13 11:19 12:16 13:6 14:19 16:8 17:18 23:16 24:5 25:10 31:12, 22 32:7,13, 15,21 33:6 34:4 36:16 37:23 38:22 40:9,18 42:2 44:1 47:5 48:3 49:5 50:10 51:4 53:14,23 54:6 56:7,12,16 57:3,14 58:18 59:3,14 60:4, 19 63:19 65:8,18,22 67:2 69:4,14 70:2 72:12 73:1,17 76:20 77:1,5,9 84:3 85:14,23 86:4,12,21 87:5,10

**double-** 34:14

**draft** 81:16 82:23

**drafting** 30:15

**drink** 84:17

**duly** 4:2

------

**E**

**earlier** 65:23 66:2

**early** 66:10

**ease** 82:19

**Eastern** 9:8

**Eastridge** 8:2 9:8

**educate** 76:8

**education** 19:19 64:20 70:13,14

**effect** 13:23 38:16,20 46:4,14,17 47:16 52:5,6 56:4 71:24 82:22

**effective** 46:7,20

**effort** 85:20 87:2

**efforts** 11:17 17:11 47:2

**electronic** 80:24 81:1

**eligible** 40:8

**eliminate** 64:17

**EMEDS** 54:19

**emergency** 13:18,20,22 43:1 57:21 80:3

**employed** 4:11

**employees** 49:13 51:8,16

**enables** 31:4

**encounter** 78:10,14,16, 18,21 79:4,9, 12,18 83:18

**end** 21:18 23:23 26:12 46:22 72:1,5

**ended** 85:13, 17 86:19

**enrolled** 40:10,20

**ensure** 9:4 10:15,17 11:4 12:21 16:18 21:7 31:5 37:5 42:10 58:2 64:23 69:9 70:13 71:2 80:8,9 81:9

**enters** 23:19 24:12 25:5,6

**entities** 64:10

**entity** 31:11 53:18

**environmental** 50:22

**establish** 24:19

**established** 25:21

estimating 18:23

evaluating 76:18

evaluation 24:18

evaluations 18:20

evenings 70:21

evidence 17:19

evidence-based 29:16, 19 30:14,19 35:7 51:9 55:24

exact 19:6,13 20:16 27:6 75:3

EXAMINATION 4:5 77:8

exclusion 16:18

exclusions 15:7

exhibit 33:15, 16

existing 8:23

expand 7:23 45:13 73:15 76:2

expanded 9:3

expanding 10:2 12:18 74:1

expect 6:10, 13 38:13 71:24

expectation 37:24

explain 13:14 19:14 26:17 27:9 78:12 83:5

explaining 16:16

---

**F**

face-to-face 80:11

facilities 41:22 42:7,8 52:13 57:2 59:12 69:24

facility 10:21 42:12 71:17

facility-based 10:20 11:11 43:3,12 69:10

fact 15:21 37:20

factors 59:17

facts 17:19

fail-safe 11:6

fair 7:19 10:7 18:3 22:20 25:20 58:23 65:14,17,21

fall 33:3 38:15

familiar 33:17

families 14:1, 7 30:1 51:15

family 11:10 20:8 64:2,9

FAQS 82:3,4

fear 14:3

February 46:7

federal 53:18 85:16

federally 44:13 79:3

fee 78:22

feedback 54:18

feel 11:8 64:8

felt 14:6 85:17

figure 23:11 85:1

finalized 87:12

fine 77:6

finish 5:22

finite 17:9

fiscal 86:6

five-day 70:11

flip 33:20

fluctuation 50:18

fluctuations 50:20

FMRS 52:21 53:3

focus 18:1

focused 69:9

forgetting 6:12

form 29:21 35:3 58:7

forward 35:7

foster 9:13 20:18 24:4,12 25:5 28:10 37:19 59:10 61:2,6,8,13, 16 62:15,16 66:21 67:19, 24 69:2,7 77:12,21 80:19

found 85:18

four-week 51:13

FQHC 78:13 79:2

free 83:23

freedom 64:2

frequently 82:3

Friday 82:13

front 20:16 23:23 56:14 58:20 66:23

full 4:8 15:10 35:10

fund 38:3

funding 86:2

funds 53:19

---

**G**

gained 8:1

gaining 13:1

gave 49:24 80:1

general 66:5

generally 7:9

geographic 15:7 16:18

give 14:22 44:22 73:2 75:3,8

giving 5:21

go-to 22:21

goal 11:4 27:16,19 42:20 58:24 69:16,22

government 85:16

grant 38:3 49:22

grant-funded 37:9

grants 15:7

great 75:23

ground 5:18 78:3

group 9:23 27:17 56:24 70:16

**guardian** 81:7

**guess** 37:14 49:17 67:16

**guys** 20:5

**H**

**Hammock** 4:9

**hand** 33:13

**handle** 49:3 61:1

**happen** 19:16 20:22 23:21

**happened** 18:5 74:8

**happening** 58:12

**happy** 6:15

**hard** 13:14 52:3 68:23

**hate** 34:14

**head** 23:3,7 52:23 53:6 81:22

**health** 5:4 8:4 12:4 14:11,13 16:2 30:5,9 32:19 33:5 35:20,24 41:21 44:5,12 45:2 50:5 52:13 55:2,11 60:10,11 61:9 77:15,17,19, 22 79:3

**heard** 27:17

**helping** 54:18

**helps** 30:1 76:13

**Highlands** 52:19,21 53:3

**Highmark** 77:18

**Hill's** 63:2

**hire** 51:10

**hold** 4:22 11:6 23:4 44:7 46:23 65:12

**home** 11:9 13:13 14:2,7 16:2 28:22 42:24 62:4 64:23 70:20

**homes** 27:17

**honest** 84:23

**horrible** 50:6 57:8

**hospital** 54:18

**hours** 70:15

**hours'** 6:20

**Human** 4:12

**I**

**ID** 28:13

**IDD** 21:5,11 22:3,7 25:8

26:1 27:9,13, 14,19 28:6,8, 11,20 29:10 48:15,17,22 49:7 59:18, 20,23 60:2,3, 13,16,17 61:3 62:15

**idea** 74:1 84:18

**identified** 56:3 65:3,6 78:5

**identifies** 65:5

**identify** 50:5

**identifying** 46:10

**IDW** 61:8,17 62:7 63:9

**imagine** 36:21

**immediately** 43:7,11 51:11

**impairment** 21:5 61:7 62:19

**impairments** 21:14 27:12

**implement** 30:2 48:6

**implementati on** 8:16,18 29:23

**implemented** 8:21 48:7 67:18

**implementing** 36:11 40:17

**important** 59:13 68:10

**in-patient** 57:23 59:1,9

**include** 18:23 58:10

**included** 8:1, 11 55:12

**including** 7:6 50:1 77:16

**increase** 7:5, 10 30:7,21 31:19 32:5 41:6 42:1,4 48:1 50:24 51:21 79:21 80:1,7,15 85:18 86:16

**increased** 9:18 10:5

**increasing** 8:3 21:23 40:2

**independent** 12:5

**index** 72:19

**individual** 30:2 39:10 43:11 63:22 70:16 84:2

**individuals** 7:23 9:23 10:6,24 15:1 19:21 21:13 27:20 30:1 39:8,14,17,19

52:7 56:1 59:10 66:17 67:5 69:2 80:12

**infants** 28:2

**influx** 50:12

**inform** 63:23

**information** 25:15 26:3,7 28:15 37:7 81:5,11 82:1

**informed** 52:16

**initiated** 41:2

**instructs** 11:22

**integrate** 11:8

**Intellectual** 21:12

**intensive** 44:19 45:15 70:4,7,23 71:5

**interesting** 68:15

**interim** 11:3 15:24

**introduction** 69:12

**investigation** 6:24

**issue** 13:5 15:15 16:7 64:14

**J**

**judge** 52:3

**judgment** 22:1

**Julia** 6:19

**June** 11:16 66:1

**K**

**keeping** 57:1, 12

**Kendra** 6:19

**kicking** 6:3

**kids** 16:18 57:12 70:14

**kind** 17:2 22:20 52:2 53:10 64:15 80:23

**kink** 16:24 52:2

**knew** 54:20 85:1

**knowing** 38:19

**L**

**L-I-K-E** 68:9

**lack** 16:15

**language** 55:17

**latest** 46:22

**law** 54:11,13 78:8

**LBHC** 15:9 43:9 78:23

**LBHCS** 32:23 45:4 80:16

**lead** 43:2

**leadership** 85:4

**learning** 76:7

**leave** 21:16

**left** 87:3

**lessens** 82:15

**level** 10:18,21 43:3

**levels** 24:24

**license** 52:14

**licensed** 12:4,5,6 14:11 30:5,8 32:18

**light** 68:8

**limit** 7:24 12:13

**limited** 67:24

**list** 11:15,18 12:9,14 13:4, 15,24 14:5, 14,22 15:15, 22 16:14 26:6 32:17,23 33:10 38:8,9, 20 48:22 50:12,18 51:23 52:8

65:12,13

**lists** 10:24 11:13 14:16 17:7,12 25:24 28:11 32:24 37:16,21 39:6 48:2 49:16 50:9 51:1 54:3 65:16,20

**live** 38:14,18

**living** 11:9

**long** 5:5 6:11, 13 13:4 46:3 51:23 78:18

**long-term** 5:4

**looked** 51:2 63:15 68:19

**lose** 80:12

**losing** 12:24

**lot** 23:6 42:24 72:6 80:10,11 83:21

**LPCS** 12:6

**M**

**made** 31:16 73:23 81:13 82:7 85:4

**main** 7:3 18:1

**majority** 20:10,14 47:8,11 71:22 79:12

**make** 5:21 6:6,7 10:22 22:1,14 25:2

26:24 34:11 37:11 46:24 47:9 49:18 50:22 75:12 82:6

**making** 31:10 37:4 74:19

**managed** 12:19 14:21 26:14,18 38:10 56:9, 23,24 77:14, 16 81:7

**management** 29:22 35:2 55:2,13,15, 20,23 70:18

**manager** 29:15 30:18

**manner** 16:19 34:23 43:15

**manual** 45:6

**mapping** 19:13

**marked** 33:14,16

**matrix** 43:14, 18 59:13

**matter** 78:17

**meaning** 58:12

**means** 6:16 11:23 33:11 56:23 81:3

**meant** 60:6

**Medicaid** 12:2 24:8,10,

13,14,20 28:18 30:17 31:16 35:5, 18,21 36:2,19 37:1,5,12,24 38:5 39:2,8, 10,24 40:8,20 45:6 47:12 54:9 57:18 60:5,6,7 61:4, 17,23 62:13 63:7,8 64:15 69:21 73:10, 16 74:1,24 75:13 76:3 83:9

**Medicaid-** 38:11

**Medicaid-billable** 39:4

**Medicaid-covered** 7:16 77:11

**Medicaid-offered** 7:21

**medical** 4:13 12:5 24:19,23 35:23 39:11, 21,24 64:4

**Medicare** 60:3,5 73:10

**meet** 9:22 39:11,21 54:9 61:7 75:11 76:4

**meets** 39:24 64:3

**member** 83:4, 19

**members** 40:11

**mental** 41:21 45:2 55:2,11 61:9

**mentioned** 22:4 45:17 65:13 66:10 67:20 68:21 70:4 84:10

**met** 9:23

**method** 78:19

**methodology** 78:19 82:8,11 83:2

**metrics** 18:22 56:8,14 57:19 58:21

**middle** 66:20

**mischaracterizes** 13:7 85:24 86:5, 13,22 87:6

**missing** 52:22,23

**misunderstood** 71:7

**mobile** 8:7 19:18 41:8,13 42:21 43:17, 21 44:18 45:14,24 46:3 47:1 53:12 54:16 57:17, 24 58:6 74:14 75:6 81:1

**mode** 84:23

**model** 29:16, 19 30:14,19 31:9 34:22 35:7 36:11 55:10,14,24

**modeled** 53:11

**models** 31:6

**moment** 77:3

**money** 53:19 54:14

**moneys** 85:8

**monitor** 56:5

**monitored** 76:1

**month** 44:24 46:19 72:3 76:5 83:4,12, 19,21

**Mountain** 77:14,19,22

**multiple** 5:14 19:17,22 20:14 21:6 22:22 24:22 25:3 47:23 49:15 50:11 51:20 59:17 64:5

**N**

**named** 47:7, 10

**nature** 54:4

**necessity** 24:19,23

39:11,21 64:4

**needed** 21:9 24:24 25:18, 22 85:1,17

**network** 12:19

**newer** 58:15

**northern** 9:6, 7

**Northwood** 8:2 9:7

**November** 50:16

**number** 7:5, 10 9:16,18 10:8 14:22 17:9,16,23 18:2,11,23 19:2,3,4 20:12 21:17, 21,22 33:15 40:2 47:3,24 51:21 59:9 66:23 81:19

**numbers** 20:16 57:6 59:8,9

**O**

**Objection** 7:13 11:19 12:16 13:6 14:19 16:8 17:18 23:16 24:5 25:10 31:12,22 32:7,13,15,21 33:6 34:4

36:16 37:23 38:22 40:9,18 42:2 44:1 47:5 48:3 49:5 50:10 51:4 53:14,23 54:6 56:7,12 57:3,14 58:18 59:3,14 60:4, 19 63:19 65:8,18,22 67:2 69:4,14 70:2 73:17 76:20 77:1 85:14,23 86:4,12,21 87:5

**objects** 11:20

**occur** 22:6

**offer** 17:6

**onboard** 15:1

**open** 42:8

**operated** 53:22

**operates** 53:10

**operating** 73:12 76:17

**opportunity** 87:11

**option** 45:10

**options** 78:7

**order** 13:18, 21,23 26:18 80:3,14

**organization** 12:20 14:21

18:21 26:14, 19 56:9 81:8

**organizations** 14:9 17:6 38:11 51:1 52:9 77:14,16

**outcome** 18:22

**outcomes** 18:20

**outline** 72:20, 21,24

**outpatient** 44:20 45:15 70:5,7,22,23 71:5 79:14

**overload** 84:1

**overview** 33:24 34:19

**P**

**paid** 31:5 78:14,16,21 83:7

**pandemic** 13:10,13,18, 20,23 16:23 52:1,4,6 74:17 80:1,3, 13,14 84:12

**Panhandle** 9:7,8

**panic** 84:23

**paragraph** 35:10

**paragraphs**

34:6

**parent** 64:1

**parents** 19:19
57:22 64:19

**Parsons** 4:1,
7,9,10 7:15
77:10 87:11

**part** 6:22 8:17
9:2,6 10:2
25:13 50:3
55:4,7 58:14
65:15,21
73:13

**partially** 51:7

**passed** 54:11
78:9

**passport**
80:24

**pathways**
25:3

**pay** 25:21
83:10 85:22

**payable**
38:12

**payment**
36:19 37:6
45:8 54:13
74:20 79:1,7
82:11 83:2,13

**payor** 24:20
25:12 38:5,6
62:14

**PB** 30:22

**PBS** 30:24
31:1,11 34:21
35:15 53:15,
16 54:16

55:1,10,22
68:21,22
74:12,13 75:7

**PECFAS**
22:17

**people** 14:5
39:23 40:2
55:21

**percent** 8:5
17:5,8,17
51:1 80:1,3,4,
7,15 84:10
85:8,12,19,22
86:2,9,15,19,
23 87:4

**percentage**
17:22 50:24

**permanent**
38:6 80:15
86:19,23

**permission**
82:12

**person** 83:11

**person's**
81:10

**personal**
27:22

**phone** 43:8

**pilot** 8:6
30:12,15
31:14 32:1
35:14 36:17
37:4,8 38:17,
24 39:1,23
41:9 54:7
76:12

**piloted** 33:8

**place** 18:9
42:10 46:1
47:15,23 56:8
64:6 71:11
74:18 77:23

**placement**
20:18,19 59:2

**plan** 8:9,16,
18,24 29:24
30:3 41:10
44:24 46:5,18
52:14,17
54:12,23,24
55:3,10,12
72:2 76:14
77:17

**planning** 45:3
47:16

**plans** 48:7
80:17

**PMPM** 82:15
83:3,10

**PMPMS** 83:9

**PMPWS** 83:9

**point** 11:8
16:5 23:18,
19,21,24
24:11 54:21

**pointing** 17:4

**policies**
29:18

**policy** 30:15
38:16 46:7
76:14 82:1,2,
5,22 86:7

**population**
28:1 51:18
67:14 68:15

**populations**
45:11 49:8
60:22 62:11

**portion** 67:24

**position** 5:2,
6,7

**positive**
29:12,15,20,
24 30:10,22
31:20 32:10,
19 33:1 56:22

**possibility**
40:4

**possibly** 14:4
43:12

**potentially**
76:22

**PPS** 78:6,7,
24

**PPS1** 78:8,11

**practice** 4:20

**practices**
51:9

**pre** 74:16

**pre-planning**
74:16,22

**preliminary**
75:8

**premise** 39:3

**prepare** 6:17

**prepared**
63:11

**Prestera**
45:2,17
48:15,24
49:10,12,19

50:1,4 52:12,
19,20 53:3

**prevent** 59:1
69:12,23
73:13

**prevented**
18:13,24
43:16

**previously**
35:11

**prior** 31:18
33:4 52:4

**proceedings**
56:18 73:5

**process**
26:10,18 44:3
76:18

**produce**
72:14

**program** 8:6,
12 9:3 10:10,
13,14 11:14
13:9,12
15:16,23
18:2,15 19:23
21:17 22:3
25:24 26:9
31:15 32:1,2
33:8 35:14,15
36:7,8,18
37:4,8,17,18,
21 38:17,24
39:1,7 40:16
41:9 42:14
43:17 46:4,9
48:5 50:8
53:12 54:7
56:6 58:3,17
63:16 64:20

66:8,10 68:13 69:19,21 70:12,20 71:4,5 75:23 76:12 78:3 85:13 86:18

**programs** 18:18 21:3,9 27:21,22 41:1,4,5 42:14,17,19 43:22 44:20 45:15,16,19 49:14 53:9 54:5 56:2 57:10 66:6,9 67:17 68:20, 24 69:22 70:8 73:8,11 74:2, 24 75:1,14,22 76:16

**Promise** 77:19,23

**Prospective** 79:1

**provide** 10:23 14:9 32:19 46:11 48:19 49:4,19 67:18 71:18,20 85:7

**provided** 9:19,21 16:10 33:5 48:24 73:9 79:5

**provider** 12:18,21 44:13,17 45:23 50:2 78:5 83:6,11

**providers** 8:1 9:4,5,9,18 10:3,5 13:1 14:2,6,24 16:15,17 19:20 29:18 31:5 32:19 36:20,23 37:13,16 38:1,4,7 39:5 40:7,10,12, 13,21 45:14 46:9 48:18 49:24 79:22 80:5 81:7 82:2,6,9,16, 17 83:24 85:7,18

**providing** 14:16 30:9 36:12,15 40:14 45:18 55:18 77:11

**provisional** 52:15

**psychiatrist** 43:9

**psychological** 24:18

**psychologists** 12:7

**Public** 4:3

**purpose** 10:12 58:24 69:11 73:12, 13

**purview** 61:18

**pushing** 35:6

**put** 16:23 18:8 20:17,18 42:9 47:22 52:2 56:9 57:24 64:22 74:18 82:5,21

**putting** 36:18

## Q

**QHCS** 12:5

**qualifications** 61:7

**Qualified** 79:3

**qualify** 40:16

**quarterly** 13:2

**question** 5:22 6:4,6,9 11:24 37:15 39:16 49:17 50:6 56:4 72:9

**questions** 5:20 6:16 82:2,4 84:4

**quick** 26:8

**quit** 85:21

**quote** 28:5

## R

**raise** 84:11 86:20,24

**Randy** 63:2

**rate** 31:3 56:5 78:6,11,14, 19,22 79:4,6, 12,18 80:4,15 83:10,16,18

**rates** 8:4 30:16 31:17 79:22

**RE-EXAMINATION** 84:8

**read** 87:11

**real** 26:8

**realize** 51:17

**realized** 47:17

**realm** 60:17

**reason** 17:4 50:4,5 65:15 81:8 83:13,19

**reasons** 22:23 47:23 50:11 51:20 63:24 64:5 65:4,6

**recall** 71:19

**receive** 10:16 11:1 12:2,3, 11 15:24 26:11 39:12 68:16 70:16

**received** 21:19 61:3 84:11

**receiving** 9:14 10:6 39:9,17,19

40:2 65:16 66:22

**recently** 82:9

**recipients** 37:2

**recognized** 44:13

**recommend** 18:7

**record** 80:24 81:2

**records** 80:18

**recruit** 15:5

**recruiting** 12:23

**redoing** 29:17

**reduce** 11:18 18:2 39:6 47:3 69:1

**reduced** 85:12,22 86:2 87:4

**reduction** 47:17

**refer** 19:19,22 20:7 21:2,5

**referral** 19:12,14 20:21

**referrals** 20:6,11 22:5, 8 50:15,17

**referred** 19:23 22:12

referring 21:8

refuse 64:3

refuses 64:1

regard 7:20
8:19 13:22
14:16 28:9
50:7 51:23
56:2

rehab 55:2

rehabilitation
27:22 55:12

reimburse
8:10

reimbursement 8:4 37:12
78:2 79:22
82:8

related 60:11
80:18

remember
53:8

render 45:5

repeat 6:7
65:24

report 17:5
26:23 27:5,7
33:18,21
58:20 65:2,5,
10

reported 17:7
47:19

reporter 5:24

Reporter/
notary 4:3

reporting
37:15 57:19

58:7

reports 26:22
27:4

represents
18:12 52:10

require 44:15
45:9 70:6

required
18:21 25:3,4
54:13 71:14
78:9 85:7
86:16

requirement
20:20 24:2
71:11,16

requiring
29:17 44:16

research 6:24

residential
10:19,23
11:1,7 18:3,8,
14 19:1 21:18
26:12 41:21
57:2,12 59:2,
11,12 69:3,
13,23 70:24
73:14 76:24

respect 7:16

respite 27:21

responsibilities 49:1

retain 15:5

retained 80:9

retainment
85:3

review 19:11,

12 65:1,15,19

reviewed
22:2 51:6
63:21

reviews 21:1

RMHTFS
41:20 42:1
43:16,24
47:4,18 48:2

role 77:10

rolled 79:17

route 51:20

rule 28:23

rules 5:18

running 23:7
75:2,21

S

Safe 16:2

safer 14:6

SAMHSA
53:18

schedule
43:6

school 50:14

scope 7:14,
21 23:17 24:6
25:11 31:23
32:8 33:7
34:5 38:23
42:3 44:2
47:6 49:6
51:5 57:15
59:4,15 63:20
67:3 69:5,15

70:3 73:18
76:21 77:2
85:24

secretaries
84:21

secretary
84:21

section
28:17,24
29:11 33:24

self-referral
19:20

Seneca
52:19,21 53:3

seniors 28:3

sense 6:6
68:6

separate
31:10 35:22
36:3,4 39:1
48:11 50:20
60:20,22 62:9
63:2,5

September
46:6

serve 45:11
51:19 62:12

served 60:23
62:20

service 8:10
10:1 14:3
25:22 30:17
32:16 38:12
39:4,12,22
55:17,20
57:18 58:15
64:3 67:10
71:1,21

78:16,17,22
79:5,14,22
80:5 86:17

services 4:13
5:4 7:6,7,12,
17,21,23 8:5,
7,19 9:14,19
10:3,7,17,24
11:2,3,9 12:1,
7,12 14:7,10,
16,18 15:2,12
16:1,10 21:19
24:13 25:9,
16,18,20
26:11 27:10,
14,23 28:12,
21,23 29:13,
15 30:4,9,18,
23 31:6,7,20,
21 32:6,11,
12,14,20
33:1,5 34:1,2,
18,20,22
35:1,4,23
36:13,14
39:9,18,19
40:3,15 42:6,
9 43:22 44:16
45:5,9,12
47:11,13,22
48:16,20
49:3,14,20
55:15 58:3
59:1,7 61:3
63:16,18
64:1,6,22
65:7,17 66:6,
22 67:5,19
68:16,17
69:17 70:5
71:18 74:18
76:24 77:11

83:12,21,22
**session** 50:14 51:13
**sessions** 64:13
**set** 30:3 43:10 83:10, 18
**severe** 21:14 27:12 62:18
**short** 15:2 38:3 73:4 77:6
**short-term** 37:9
**show** 76:11
**side** 22:18
**sided** 34:15
**sign** 80:6 85:10 87:12
**similar** 27:24
**situation** 43:6 64:10
**sixth** 53:5
**slots** 35:15
**small** 38:9
**SME** 33:17,18
**social** 12:6
**sound** 71:9
**Southern** 52:19,21 53:3
**speak** 7:15 33:9 38:18

**speaking** 6:21 7:9
**specific** 66:8
**specifically** 28:9 30:9 50:8 69:1
**staff** 64:15
**stamped** 72:11,13,19
**stand** 22:24 78:24 79:2 83:3
**standpoint** 24:10
**start** 5:22 13:12 33:3 42:18 73:24 74:8 75:14
**started** 5:9 16:20 17:24 31:14,24 33:2 36:6 53:17 57:11 74:9, 12,13,23,24 75:1,4,24
**starts** 6:2 34:19
**state** 4:7 5:19 8:9,24 9:6 41:10 44:14, 24 46:5,18 52:17 54:11, 12,13,23,24 55:2,10,12 72:2 76:14 78:7,8
**stated** 16:13 65:23 66:2

**states** 22:23 44:15 83:14 84:22
**statewide** 9:4
**stating** 19:6 55:13 80:6
**stay** 10:15 11:5 27:20 42:10 64:23 71:3
**stop** 42:6 43:11 75:15
**stopped** 58:12
**stops** 42:24
**Strengths** 23:9,10
**strictly** 35:16
**strike** 41:2 43:19 48:13 50:6
**structure** 45:8 54:14
**submitted** 72:3
**submitting** 44:23 46:18
**success** 54:1,17 56:5 57:1
**successful** 18:19
**summer** 50:16
**supervisor** 43:10

**support** 27:23 29:13, 21 30:10 31:21 32:11, 20 33:1 34:1, 2,18,20,22,24 35:3
**supportive** 70:17
**supports** 29:16 30:1
**supposed** 57:4
**surprise** 67:1
**surprised** 53:1
**sustainability** 8:8 31:4 36:18
**sustainable** 37:4,11 75:13 76:2
**sustained** 38:1 39:2
**sworn** 4:2
**system** 25:6 69:8 79:1 83:15
**systems** 83:2

---

**T**

---

**taking** 11:18 36:17 37:17, 18 39:17 47:3 55:22
**talk** 6:2 25:23

62:23 63:9,11 64:16
**talked** 42:13 68:19 69:24
**talking** 5:23 27:24 33:24 34:3,18 51:12 62:23 66:5 71:15 73:8 74:10,13 84:24
**tangent** 47:1
**target** 28:1 60:22 62:11 67:23
**targeted** 70:18
**TBI** 62:8
**TDI** 60:14
**team** 42:23 43:5 44:19 45:24
**teams** 41:12 45:14 66:16, 17,18
**telling** 17:10, 24 27:1
**temporary** 80:2
**tentative** 38:15
**term** 38:4
**terms** 54:2
**testified** 4:4
**testify** 29:2

**testimony** 13:7 86:5,13, 22 87:6

**therapies** 12:3 70:16,17

**therapist** 5:12 15:3

**therapy** 70:10 78:21 79:15

**thing** 7:3 16:12 25:1 34:21 37:9

**things** 7:22 20:14 22:18 23:23 24:24 27:3,18,23 50:22 54:3 65:12 74:19, 21 76:10

**thinking** 52:20 75:5,10

**thought** 36:1 60:2 61:2 71:8

**three-day** 70:11

**Throw** 41:16

**till** 11:6 14:5

**time** 6:1 22:2 24:3,11 41:15 50:13 73:19 81:12 82:20 83:24 84:22

**timely** 16:19

**times** 5:14 42:24 51:14, 16 64:18

**today** 6:18 9:12 10:8 19:2 72:7,21

**told** 26:9 56:21 59:19

**top** 23:2 52:23 53:6 81:21

**topic** 7:4

**topics** 6:24

**total** 8:6 9:16 11:4 14:22 74:3

**track** 18:17 21:17 43:15 58:5 85:20

**tracked** 19:4, 5,8 26:16 27:4 38:10

**tracking** 18:23 19:9 21:20 26:10, 15 37:6 57:1, 9 58:10,17

**train** 51:8

**trained** 51:14

**training** 51:18

**transcript** 87:12

**treating** 19:21

**treatment** 16:19 18:14 19:1 21:18 26:12 41:21 57:2,13 59:2,

11,12 69:3, 13,24 73:15 76:24

**Trust** 77:15

**turn** 30:14

**type** 6:23 7:5, 11 18:11 22:5 27:18 44:14 58:16 65:2 71:1 78:5,17

**types** 60:8

**typically** 20:8 29:22 36:13 37:8 78:23

**U**

**Uh-huh** 4:15 7:8 62:6 79:16 84:13 86:11

**umbrella** 79:18

**understand** 6:5,8 12:11 16:3 39:13 47:14 49:15 50:21 61:1 63:14 67:7 75:20 86:8

**understandin g** 22:19 25:7 40:19,23 51:22 58:19

**Understood** 13:16 21:10 24:9

**Unicare**

77:17

**unit** 60:12,13 63:5

**University** 30:13 75:7

**update** 76:6 81:15 82:11

**updated** 81:20

**V**

**Vague** 11:19 12:16 14:19 16:8 31:12 32:15,21 36:16 37:23 40:9,18 48:3 50:10 53:14, 23 54:6 56:7, 12 57:3 58:18 60:4,19 65:8, 18,22 85:14

**Valley** 52:19, 21 53:4

**versus** 13:15 50:15

**viewed** 33:19

**Virginia** 4:12 27:16 44:4 49:23 77:12

**W**

**wait** 10:24 11:13,15,18 12:8,14 13:4, 15,24 14:5, 14,15,22

15:15,22 16:14 17:7,12 25:23 26:5 28:11 32:17, 23,24 33:10 37:16,21 38:8,9,20 39:6 48:2,22 49:15 50:9, 12,18,24 51:23 52:8 54:3 65:11, 13,16,20 82:23

**waiting** 11:1

**waiver** 8:11, 12 10:9,13,14 11:13,15 12:20 14:10, 17 15:16,21, 23 16:7 17:6 18:1,15,18 21:3,6,11,12, 15,17,19 22:3 25:8,9,24 26:1,9,11 27:9,13,14,19 28:6,8,11,13, 20 42:14 45:13,22,23 46:8,11 48:15,19,23 49:7 50:7 51:24 56:6 58:17 59:19, 21,24 60:2,3, 9 61:3,10 62:7,8,15,20, 24 63:9 68:2 77:21 81:14, 17 82:9,16,24

**waivers** 60:20 62:5

**WALTERS** 4:6 7:18 56:17,20 72:8,15,23 73:2,7 77:4,7 84:5,9 87:8

**wanted** 54:20 80:9

**ways** 19:17, 22 21:6 83:8

**week** 70:11

**West** 4:12 27:15 44:4 49:23 77:12

**wit** 4:4

**won** 49:23

**work** 14:24 20:8 29:1 30:11,12 31:13 33:9 51:11 64:9 70:12

**worked** 6:19 8:3 80:10 84:20,21

**worker** 20:19, 20,24 21:1 22:9 23:15 25:14 81:7

**workers** 12:6 20:7,15 21:6 80:5,8 84:11 85:9,21 86:9, 17 87:3

**workforce** 50:2 80:9,13

85:2

**working** 15:4 16:16 30:2 31:9,10 56:11 57:18 59:8 72:20 75:7 76:7,8,13 80:21 82:10

**works** 19:15 79:19 83:5

**worth** 6:20

**wow** 30:22

**wrap-** 7:6

**wrap-around** 7:12 51:8

**wraparound** 10:16 32:11 68:7

**written** 29:7

**WV** 17:5

---
**Y**
---

**year** 66:19,20 77:19

**years** 5:8,11, 15,16 18:12 27:15 30:7 54:8,9 71:6 73:21 74:3,4 75:22

**your-all's** 39:6

**youth** 44:20 45:15 70:6

**youths** 66:21

---
**Z**
---

**Zoom** 6:12