# EXHIBIT 17

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Administration for Children and Families
Administration on Children, Youth and Families
Children's Bureau

# FINAL REPORT
# West Virginia Child and Family Services Review

# U.S. Department of Health and Human Services Administration for Children and Families Children's Bureau

**October 2002**

D003152

**EXECUTIVE SUMMARY**
**Child and Family Services Review**
**WEST VIRGINIA**

The Child and Family Services Review (CFSR) assesses State performance during a specified time period with respect to seven child welfare outcomes in the areas of safety, permanency, and well-being and with respect to seven systemic factors. The assessment is based on information from the following sources:

- The Statewide Assessment prepared by the State child welfare agency – the West Virginia Department of Health and Human Resources (DHHR), Bureau for Children and Families, Office of Social Services.
- The State Data Profile prepared by the Children's Bureau of the U.S. Department of Health and Human Services;
- Reviews of 50 cases from three counties in the State; and
- Interviews or focus groups (conducted at all three counties and the State capital) with a wide range of stakeholders including children, parents, foster parents, various levels of State and local DHHR personnel, collaborating agency personnel, school personnel, mental health providers, court personnel, legislators, and attorneys.

The on site phase of the CFSR was conducted in West Virginia the week of May 6, 2002.

The CFSR determined that the State met the national standards for measures relating to maltreatment in foster care, foster care re-entries, length of time to achieve reunification, and the stability of foster care placements. In addition, the following individual items assessed for the seven outcomes were rated as a Strength:

- Initiating investigations to child maltreatment reports in a timely manner and consistent with agency policy guidelines (item 1).
- Making diligent efforts to achieve reunification, guardianship, or permanent placement with relatives (item 8).
- Placing children in close proximity to their biological families (item 11) and with their siblings (item 12) when possible and in the children's best interest.

Despite these positive findings, the State did not achieve substantial conformity with any of the seven safety, permanency, and well-being outcomes. The State did not meet national standards for measures relating to repeat maltreatment, or the length of time to achieve adoption. A significant concern in this regard is that the State achieved permanency and stability for 38 percent of the foster care cases reviewed. Key areas assessed as part of this outcome rated as areas needing improvement pertain to foster care re-entries (item 5), stability of foster care placement (item 6), the appropriateness of the permanency goal for children (item 7), attainment of permanency through adoption (item 9), and permanency goal of other planned permanent living arrangement (item 10).

Another area of concern pertains to Child and Family Well Being Outcome 1—Families have enhanced capacity to provide for their children's needs. During the case review, 40 percent of the cases were found to have substantially achieved this outcome, which included assessments of whether children and families received needed services (item 17), children and families were involved in case planning (item 18), and the frequency of caseworker visits with children and parents (items 19 and 20). The State did not achieve substantial conformity with Child and Family Well-Being Outcome 3—Children receive adequate services to meet their physical and mental health needs—with 60 percent of the cases reported to have substantially achieved that outcome.

With respect to the seven systemic factors, the CFSR determined that the State was in substantial conformity with the statewide information system, the quality assurance system; training efforts for child welfare staff and child caregivers; the array of services available to families; agency responsiveness to the community; and foster and adoptive parent licensing, recruitment, and retention. The State was found to be not in substantial conformity with the factor pertaining to the case review system.

The following is a summary of the CFSR findings regarding specific outcomes and systemic factors.

## KEY FINDINGS RELATED TO OUTCOMES

### I. SAFETY

***Outcome S1: Children are, first and foremost, protected from abuse and neglect.***

**Status of Safety Outcome S1 – Not in Substantial Conformity**
West Virginia did not achieve substantial conformity with Safety Outcome 1. This determination was based on the finding that the outcome was substantially achieved in 84.1 percent of the cases reviewed, which is less than the 90 percent required for a rating of substantial conformity. The State did not meet the national standard for repeat maltreatment, although it did meet the national standard for maltreatment of children in foster care. A summary of the findings for specific items assessed under this outcome is presented below.

**Item 1. Timeliness of initiating investigations of reports of child maltreatment**
Item 1 was assigned an overall rating of Strength based on the finding that in 89 percent of the applicable cases, the agency responded to a maltreatment report in a timely manner. Case findings and stakeholder comments are in agreement that DHHR responds to reports within established timeframes. In the case review process, the three cases rated as Area Needing Improvement for this item occurred in one of the counties included in the on site review. Stakeholders interviewed in this county indicated that large caseloads and a large geographic area have a negative impact on the ability of caseworkers to respond to reports in a timely manner.

**Item 2. Repeat maltreatment**

Item 2 was assigned an overall rating of Area Needing Improvement. Although there was no recurrence of maltreatment in 91 percent of the cases, according to the State Data Profile the incidence of repeat maltreatment for 2000 was 6.4 percent, which does not meet the national standard of 6.1 percent. Because the two measures are computed in different ways, it is necessary for both measures to meet standards or specified criteria in order for an overall rating of Strength to be assigned to the item.

As noted in the Statewide Assessment, the rates of repeat maltreatment appear to vary across districts. In five districts the recurrence rate was found to be zero, while in two districts the repeat maltreatment rate was 9 percent and 13.3 percent. These latter two districts were included in the on-site CSFR.

***Outcome S2: Children are safely maintained in their homes whenever possible and appropriate.***

<u>**Status of Safety Outcome S2 – Not in Substantial Conformity**</u>

West Virginia did not achieve substantial conformity with Safety Outcome 2. This determination was based on the finding that the outcome was substantially achieved in 68.9 percent of the cases reviewed, which is less than the 90 percent required for a rating of substantial conformity. A summary of the findings for specific items assessed under this outcome is presented below.

**Item 3. Services to family to protect child(ren) in home and prevent removal**

Item 3 was assigned an overall rating of Area Needing Improvement. In 65.5 percent of the cases, this item was rated as a Strength, but in 34.5 percent of the cases, reviewers found that the agency had not made diligent efforts to provide services to ensure children's safety while preventing their placement in foster care. Case reviews indicated that the key problem was the lack of consistency among caseworkers in the appropriate assessment of service needs and provision of services. In some cases, the needs assessment was not sufficiently comprehensive to capture underlying problems, such as substance abuse, domestic violence, and mental illness, that may contribute to the maltreatment. In other cases, service needs were identified in the needs assessment but not provided. In contrast, stakeholders identified the key problem as a lack of availability of services and a problem in attaining approval for initiating in-home services. According to the Statewide Assessment, the accessibility of services designed to maintain children safely in their own homes varies depending on geographic location. The Statewide Assessment also noted that services to families for in-home services cases usually are provided by private provider agencies under contract with DHHR.

**Item 4. Risk of harm to child**

Item 4 was assigned an overall rating of Area Needing Improvement because in 26 percent of the applicable cases, reviewers determined that DHHR had not made sufficient efforts to reduce risk of harm to children. The findings suggest that in their risk

**D003155**

assessments, caseworkers are not capturing the underlying issues leading to abuse/neglect, particularly issues such as domestic violence and substance abuse.  Consequently, caseworkers are not consistently recommending the most appropriate services to ensure risk reduction.  These findings corroborate the problems identified in the Statewide Assessment about the difficulty caseworkers may confront using the current decision making model.  According to the Statewide Assessment, the "risk" decision-making model requires extensive training, experience, and skill to be effective.  Because of high staff turnover, there are many recently employed staff members who do not identify all safety issues that are present.  As noted in the Statewide Assessment, the Department is currently testing a different decision-making model.

## II.     PERMANENCY

Outcome P1:   Children have permanency and stability in their living situations.

### Status of Permanency Outcome 1 – Not in Substantial Conformity
West Virginia did not achieve substantial conformity with Permanency Outcome 1.  This determination was based on the following:
- 38 percent of the cases were rated as having substantially achieved Permanency Outcome 1, which is less than the 90 percent required for an overall rating of substantial conformity; and
- The State Data Profile indicated that the State's percentage of children who achieved a finalized adoption within 24 months of entry into care (17.3%) did not meet the national standard of 32 percent.

In general, the CFSR indicated that most children in the foster care cases reviewed did not have permanency and stability in their living situations.  Establishing appropriate permanency goals and achieving adoptions in a timely manner were identified as critical problems.  A summary of the findings for specific items assessed under this outcome is presented below.

### Item 5.  Foster care re-entries
Item 5 was assigned an overall rating of Area Needing Improvement.  In 80 percent of the 5 applicable cases, there was no re-entry into foster care.  However, in one case (20%) for which this item was applicable, reviewers found that a re-entry into foster care occurred within 12 months of discharge from a prior foster care episode. In addition, although the State does meet the national standard for the rate of re-entries into foster care, the Statewide Assessment noted that they believe this statistic is not accurate and steps are being taken to correct this data.

### Item 6.  Stability of foster care placement
Item 6 was assigned an overall rating of Area Needing Improvement.   In 72 percent of the cases, this item was rated as a Strength.  However, in 28 percent of the cases reviewers determined that the agency had not made diligent efforts to ensure children's placement

stability while in foster care. Although data from the State Data Profile indicate that the State meets the national standard pertaining to placement stability, the Statewide Assessment suggested that this statistic may be misleading, because for many cases the State information system only tracks changes in the private child placement agency, not children's foster home placements. In addition, because the State Data Profile measure of placement stability and the case review measure of placement stability are different, it is necessary for both of them to meet standards or acceptable criteria in order for this item to be rated as a Strength.

Information from case reviews and stakeholder interviews indicates that key problems with respect to placement stability are (1) a scarcity of specialized placements for children with behavioral problems or special care needs and, (2) an inconsistency in matching children with appropriate foster families or placement settings. Stakeholders indicated that caseworkers promote placement stability by being accessible to foster parents and by providing needed support

### Item 7.  Permanency goal for child
Item 7 was assigned an overall rating of Area Needing Improvement based on the finding that in 48 percent of the applicable cases, reviewers determined that the agency had not established an appropriate permanency goal in a timely manner. The major concerns identified were extensive delays in revising permanency goals, a lack of clear documentation and identification of permanency goals in some case records, apparent confusion regarding the appropriate use of the goal of guardianship, and a tendency of some caseworkers to establish long-term foster care as a goal before considering and eliminating other options. The CFSR identified a need for more focus on diligent efforts to achieve permanency for children.

### Item 8.  Reunification, Guardianship or Permanent Placement with Relatives
This item was assigned an overall rating of Strength for the following reasons:
- The State Data Profile indicates that the State's percentage for reunifications occurring within 12 months of entry into foster care (79.5%) meets the national standard of 76.2 percent.
- In 86 percent of the cases reviewed, reviewers determined that the agency had made, or was making, diligent efforts to attain the goals of reunification, permanent placement with relatives, or guardianship.

As noted in the Statewide Assessment, the subsidized legal guardianship program is seen as increasing the ability of DHHR to expedite permanency for children. However, information from both case reviews and stakeholder interviews suggests that not all caseworkers are sufficiently knowledgeable about this permanency option.

### Item 9.  Adoption
Item 9 was assigned an overall rating of Area Needing Improvement. In 12 percent of the cases, reviewers rated this item as a Strength. However, in 88 percent of the applicable cases, reviewers determined that DHHR had not made diligent efforts to achieve

D003157

adoptions in a timely manner.  In addition, the State Data Profile demonstrates that the percentage of finalized adoptions in FY 2000 that occurred within 24 months of removal from home (17.3%) did not meet the national standard of 32 percent.  Many stakeholders expressed the opinion that adoptions are not occurring in a timely manner because there are many caseworkers who do not believe that adoption is an appropriate option for some children.  Other concerns noted pertained to the attitudes of some caseworkers toward adoption, the lack of concurrent planning, and inconsistencies with regard to the level of knowledge among caseworkers pertaining to the adoption process and adoption subsidies.  The CFSR identified a need for more training of staff on permanency and adoption issues and practices.

The Statewide Assessment identified other barriers to timely adoption including: (1) the time required to complete adoptive homestudies; (2) the failure to identify and engage fathers early on in the case; (3) court delays and continuances; and, (4) the transfer of cases from the caseworker to the adoption worker once TPR has occurred.  With respect to the latter barrier, the Statewide Assessment notes that because of turnover among agency caseworkers, transfers do not always take place in a timely manner.

**Item 10.  Permanency goal of other planned permanent living arrangement**
Item 10 was assigned an overall rating of Area Needing Improvement.  Although in 50 percent of the cases, reviewers rated this item as a Strength, for the other 50 percent of the cases, reviewers determined that the agency had not made diligent efforts to assist children in attaining more appropriate goals, such as guardianship or adoption.  According to the Statewide Assessment, although long-term foster care is no longer an acceptable permanency goal, it continues to be used in a large number of cases.  The Statewide Assessment also notes that other permanency options are underutilized for older children.

***Outcome P2:  The continuity of family relationships and connections is preserved for children.***

**Status of Permanency Outcome 2 – Not in Substantial Conformity**
West Virginia did not achieve substantial conformity with Permanency Outcome 2.  This determination was based on the finding that the outcome was rated as substantially achieved in 72.4 percent of the cases, which is less than the 90 percent required for substantial conformity.

Although the State did not reach the required 90 percent achievement required for substantial conformity, there were some areas of strength.  For example, all children in the foster care cases were placed with siblings when appropriate, and almost all children were placed in close proximity to their communities of origin or were placed in out-of-area placements in order to meet special needs.  In contrast, the agencies' efforts to search for relatives as potential placement resources or to promote visitation and bonding with mothers and fathers were found to be inconsistent across cases.  Key concerns identified were a lack of consistent effort in seeking paternal relatives as placement resources and a failure in some cases to locate fathers or to promote visitation and bonding with fathers.

D003158

A summary of the findings for specific items assessed under this outcome is presented below.

**Item 11.  Proximity of foster care placement**
Item 11 was assigned an overall rating of Strength because in 95 percent of applicable cases, reviewers determined that children were placed in close proximity to parents or relatives or the reason for separation was appropriate.  Stakeholders expressed concern that the State did not have sufficient specialized placements to ensure that children in the State could remain close to home even when they needed specialized services.

**Item 12.  Placement with siblings**
Item 12 was assigned an overall rating of Strength based on the finding that in 100 percent of the cases, reviewers determined that siblings either were placed together or their separation was necessary to meet the needs of one or more of the siblings.   Although stakeholders mentioned the need for more foster homes that can accommodate sibling groups, this problem was not apparent in the cases reviewed.

**Item 13.  Visiting with parents and siblings in foster care**
Item 13 was assigned an overall rating of Area Needing Improvement.  In 71 percent of the cases, this item was rated as a Strength.  However, in 29 percent of the applicable cases, reviewers determined that DHHR had not made concerted efforts to facilitate visitation.  This determination occurred most frequently in the assessment of visitation between fathers and children.  Reviewers expressed particular concern about the lack of documentation in case records concerning attempts to locate children's fathers.

**Item 14.  Preserving connections**
Item 14 was assigned an overall rating of Area Needing Improvement because in 17 percent of the cases, reviewers determined that children's connections to family, community, culture, faith, and friends had not been preserved while the child was in foster care.

**Item 15.  Relative placement**
Item 15 was assigned an overall rating of Area Needing Improvement because reviewers determined that in 33 percent of the cases the agency had not made diligent efforts to locate and assess relatives as potential placement resources.  A key finding was an inconsistency in seeking paternal as well as maternal relatives.

**Item 16.  Relationship of child in care with parents**
Item 16 was assigned an overall rating of Area Needing Improvement because reviewers determined that in 25 percent of cases, the agency did not make efforts to support the parent-child relationships of children in foster care.  However, case review findings varied

D003159

widely, with clear indication of agency support in some cases and lack of efforts in others.   Lack of effort was particularly problematic regarding efforts to locate fathers as well as promote visitation and bonding of children with fathers.

## III.    WELL-BEING

*Outcome WB1: Families have enhanced capacity to provide for their children's needs.*

<u>Status of Well-Being Outcome 1 – Not in Substantial Conformity</u>
West Virginia did not achieve substantial conformity with Well-Being Outcome 1. This determination was based on the finding that the outcome was rated as substantially achieved for 40 percent of the cases reviewed, which is less than the 90 percent required for a determination of substantial conformity.

The CFSR found that DHHR is not consistent in its efforts to identify and address the needs of families or to involve them in case planning.  Service needs of families varied widely from parenting education classes for parents to substance abuse treatment services for children and parents.  In many cases, there was evidence of infrequent face-to-face contact between agency caseworkers and the children and parents in their cases, although there was evidence in the cases reviewed that parents had frequent contact with service providers from private agencies.

**Item 17.   Needs and services of child, parents, foster parents**
Item 17 was assigned an overall rating of Area Needing Improvement.  In 54 percent of the cases, this area was rated as a Strength. However, in 46 percent of the cases, reviewers determined that the needs and services of children, parents, and/or foster parents had not been, or were not being, adequately addressed by DHHR.  Areas of concern included (1) the adequacy of assessments, particularly identifying underlying problems such as substance abuse and domestic violence; (2) the lack of appropriate follow-up in some cases to ensure that services were delivered and were effective; (3) an inconsistency among caseworkers in assessing the needs of fathers and involving them in services; and (4) a lack of attention in some cases to the service needs of foster parents.  Another key concern identified from the case review process is that foster care youth do not appear to be receiving services to prepare them for eventual independent living.

**Item 18.   Child and family involvement in case planning**
Item 18 was assigned an overall rating of Area Needing Improvement.  In 50 percent of the cases, this item was rated as a Strength. However, in 50 percent of the applicable cases, reviewers determined that DHHR had not appropriately involved parents or children in the case planning process.  This finding is contrary to DHHR policy, as noted in the Statewide Assessment, which requires that the parents be involved in MDTs with the objective of creating a working collaboration with the family.  However, the finding is

**D003160**

consistent with information provided in the Statewide Assessment indicating that there is a low participation rate of parents in the MDT process.

**Item 19.  Worker visits with child**
Item 19 was assigned an overall rating of Area Needing Improvement.  In 64 percent of the cases, this item was rated as a Strength. However, in 36 percent of the cases, reviewers determined that the frequency of caseworker visits with children was not sufficient to ensure adequate monitoring of the child's safety and well-being.   According to State policy, there is no minimum number of contacts for in-home services cases, aside from the requirement of contact during completion of the Initial Assessment and Safety Evaluation. For foster care cases the frequency of contacts is set by policy, which varies depending on the type and location of the foster care placement.  However, the general requirement is that meaningful contact should be made with every child in foster care (usually after the adjudication) at least once a month.  According to the Statewide Assessment, DHHR staff members have historically experienced difficulty in making all the contacts that the standards of good practice require.   This was attributed primarily to the high rate of staff turnover.

**Item 20.  Worker visits with parents**
This item was assigned an overall rating of Area Needing Improvement.  In 51 percent of the applicable cases, this item was rated as a Strength.  However, in 49 percent of the applicable cases, reviewers determined that visits with parents were not frequent enough or of sufficient quality to promote the safety and well-being of the child or enhance attainment of permanency.  As noted in the Statewide Assessment, DHHR recognizes that regular contact between caseworkers and families is a key to effective service delivery.  However, the Statewide Assessment also notes that DHHR caseworkers experience difficulty in achieving the agency-required level of contact. According to DHHR policy, the agency requires that the child's caseworker is to have contact with the child's parents on at least a monthly basis while the child is in foster care or until parental rights are terminated.  No agency policy was noted in the Statewide Assessment regarding frequency of contact with children in the "in-home services" cases.

***Outcome WB2:  Children receive appropriate services to meet their educational needs.***

**<u>Status of Well-Being Outcome WB2 – Not in Substantial Conformity</u>**
West Virginia did not achieve substantial conformity with Well-Being Outcome 2 based on the finding that only 75 percent of the cases reviewed were determined to have substantially achieved this outcome.  This is less than the 90 percent required for substantial conformity.  The general finding of the CFSR case review process was that in about 25 percent of the cases, the children's educational needs were not met because necessary education-related services were not provided.  In addition, foster parents were not always informed about the child's school history and did not receive school records at the time of placement.

D003161

The findings for the single item subsumed under this outcome are presented below.

**Item 21.  Educational needs of the child**
 Item 21 was assigned an overall rating of Area Needing Improvement.  In 75 percent of the cases, this item was rated as a Strength.  However, in 25 percent of the cases, reviewers determined that the educational needs of children were not effectively and appropriately addressed.  This is consistent with information provided in the Statewide Assessment indicating that casework practices regarding children's educational needs are uneven across the State.  Also, reviewers found that foster parents tended to be the primary advocates for the educational needs of the child.

***Outcome WB3: Children receive adequate services to meet their physical and mental health needs.***

**Status Of Well-Being Outcome 3 - Not in Substantial Conformity**
West Virginia did not achieve substantial conformity with Well-Being Outcome 3.  This determination was based on the finding that the outcome was rated as substantially achieved in only 60 percent of the applicable cases, which is less than the 90 percent required for a determination of substantial conformity.

In general, the CFSR found inconsistencies with respect to agency efforts to meet the physical and mental health needs of children in foster care or in-home services cases.  Particular concerns were identified in the area of meeting children's mental health needs.  The case review process found that some children did not receive complete mental health assessments or all of the services recommended to address mental health problems.  There were several cases in which the case record documented the need for services but there was no follow up to determine whether services had been provided.  Both the stakeholders and the Statewide Assessment noted that part of the problem is due to shortages of mental health services in many areas of the State.

Findings pertaining to the specific items assessed under Well-Being Outcome 3 are presented and discussed below.

**Item 22.  Physical health of the child**
 Item 22 was assigned an overall rating of Area Needing Improvement.  In 82 percent of the applicable cases, this item was rated as a Strength.  However in 18 percent of these cases, reviewers determined that DHHR was not adequately addressing the health needs of children in foster care and in-home services cases.   According to the Statewide Assessment, the State's Program Review process found that casework practices regarding children's health needs are uneven across the State.   However, the Statewide Assessment also noted that part of the problem observed with respect to meeting children's health needs may be attributed to poor documentation on the part of caseworkers.  For example, the Statewide Assessment reported that during the State's program review, foster parents

D003162

revealed that caseworkers did discuss the child's health care issues with them, but these conversations were not documented in the case record.

**Item 23.  Mental health of the child**
Item 23 was assigned an overall rating of Area Needing Improvement.  In 62 percent of the applicable cases, this item was rated as a Strength.  However, in 38 percent of these cases, reviewers determined that DHHR did not adequately address children's mental health needs.  Information in the Statewide Assessment corroborates stakeholders' statements regarding the lack of behavioral health services.  The Statewide Assessment also indicated that the State's program review process found that children's mental health needs were not well documented in the case files.

**KEY FINDINGS RELATING TO SYSTEMIC FACTORS**

**IV.    STATEWIDE INFORMATION SYSTEM**

**Status of Statewide Information System – Substantial Conformity**
West Virginia is in substantial conformity with the factor of Statewide Information System.  Findings with respect to the item assessed for this factor are presented below.

**Item 24.  State is operating a statewide information system that, at a minimum, can readily identify the status, demographic characteristics, location, and goals for the placement of every child who is (or within the immediately preceding 12 months, has been) in foster care.**
Item 24 was rated as a Strength because the West Virginia FACTS is a SACWIS certified system and submits AFCARS and NCANDS data without error.  Stakeholders are supportive of FACTS and are encouraged by the improvements it has brought to child welfare in West Virginia, but stakeholders also pointed out data input problems, staffing limitations and training needs. .  While the State's system is able to track the status, demographic characteristics, location, and goals for children in foster care, the on site review and the Statewide Assessment both identify concerns regarding the accuracy of the data relating to some of the national standards.

**V.    CASE REVIEW SYSTEM**

**Status of Case Review System – Not in Substantial Conformity**
West Virginia is not in substantial conformity with the systemic factor of Case Review System.  Findings with regard to specific items assessed for this factor are presented below.

**D003163**

**Item 25.  Provides a process that ensures that each child has a written case plan to be developed jointly with the child's parent(s) that includes the required provisions.**

Item 25 has been rated an Area Needing Improvement because case plans have insufficient parent involvement, a majority of case plans are not adequately documented, and there are inconsistencies in the implementation of the MDT process across the State.

**Item 26.  Provides a process for the periodic review of the status of each child, no less frequently than once every 6 months, either by a court or by administrative review.**

Item 26 has been rated an Area Needing Improvement because administrative and judicial reviews for each child were not being held on a timely basis and MDT administrative reviews may not meet Federal requirements.  The CFSR found that some MDT administrative reviews are often facilitated by the caseworker; Federal policy requires a third-party review by an individual not involved in the case. The CFSR found that the policy infrastructure for periodic case review is present including a combination of state statute, Supreme Court rules, and revised child protection and foster care policy.  However the practice implementing these rules and policy does not meet the expectations of the policy.

**Item 27.  Provides a process that ensures that each child in foster care under the supervision of the State has a permanency hearing in a qualified court or administrative body no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter.**

Item 27 has been rated an Area Needing Improvement because of a lack of consistency across the State in holding timely hearings.  In addition, after TPR has been attained, the court often will cease to hold the 12 month permanency hearing.

**Item 28.  Provides a process for termination of parental rights proceedings in accordance with the provisions of the Adoption and Safe Families Act.**

Item 28 has been rated as a Strength because TPR petitions are being filed on a timely basis in a majority of cases and the State has dramatically increased terminations and is complying with ASFA requirements for TPR. Stakeholders indicated that there are agency related barriers to achieving TPR, including staff turnover and caseworkers being unprepared for court.  Stakeholders noted that the State agency collaborates with the child support agency to assist in locating children's fathers.

**Item 29.  Provides a process for foster parents, preadoptive parents, and relative caregivers of children in foster care to be notified of, and have an opportunity to be heard in, any review or hearing held with respect to the child.**

Item 29 has been rated as an Area Needing Improvement because foster parents, preadoptive parents and relative caretakers do not routinely participate in meetings, hearings, and reviews.  There is variation among counties as to notice provided, level of participation, and opportunities to be heard in court hearings, administrative reviews and MDT meetings.

## VI.    QUALITY ASSURANCE SYSTEM

**Status Of Quality Assurance System – Substantial Conformity**
West Virginia is in substantial conformity with the factor of Quality Assurance System.  Findings with respect to the specific items assessed for this factor are presented below.

**Item 30.  The State has developed and implemented standards to ensure that children in foster care are provided quality services that protect the safety and health of the children.**
Item 30 has been rated as a Strength because the State has promulgated new regulations and policy in CPS, youth services and foster care to include changes in law, federal regulations and best practice standards.

**Item 31.  The State is operating an identifiable quality assurance system that is in place in the jurisdictions where the services included in the CFSP are provided, evaluates the quality of services, identifies strengths and needs of the service delivery system, provides relevant reports, and evaluates program improvement measures implemented.**
Item 31 has been rated a Strength because the State is operating an identifiable quality assurance system based on the CFSR that identifies strengths and needs, and it has developed a methodology of evaluating program improvements.

## VII.    TRAINING

**Status With Respect To Training – Substantial Conformity**
West Virginia is in substantial conformity with the systemic factor of Training.  Findings with respect to items assessed for this factor are presented below.

**Item 32.  The State is operating a staff development and training program that supports the goals and objectives in the CFSP, addresses services provided under titles IV-B and IV-E, and provides initial training for all staff who deliver these services.**
Item 32 has been rated a Strength because West Virginia is operating a staff development and training program for all staff that addresses the requirements of IV-B and IV-E.  Stakeholders indicated that new worker pre-service training is of good quality.  However, stakeholders did express concern about staff turnover and its impact on training new workers in a timely manner.

**Item 33.  The State provides for ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties with regard to the services included in the CFSP.**

D003165

Item 33 has been rated an Area Needing Improvement because the advanced and in-service training opportunities are insufficient to allow staff to continue to develop their skills.  Additional training is needed in certain program areas and specialized training is not offered.

**Item 34.  The State provides training for current or prospective foster parents, adoptive parents, and staff of State licensed or approved facilities that care for children receiving foster care or adoption assistance under title IV-E that addresses the skills and knowledge base needed to carry out their duties with regard to foster and adopted children.**
Item 34 was rated a Strength because West Virginia operates a mandatory training program for all prospective foster/adoptive parents. The pilot testing of the PRIDE curriculum may be expanded statewide.


## VIII.   SERVICE ARRAY

**Status With Respect To Service Array – Substantial Conformity**
West Virginia is in substantial conformity with the systemic factor of service array.   Findings pertaining to the specific items relevant to this factor are presented and discussed below.


**Item 35.  The State has in place an array of services that assess the strengths and needs of children and families and determine other service needs, address the needs of families in addition to individual children in order to create a safe home environment, enable children to remain safely with their parents when reasonable, and help children in foster and adoptive placements achieve permanency.**
Item 35 was rated as a strength because West Virginia has in place an array of services that meet the elements required in Item 35. West Virginia provides a basic core of services to children and families including family support, counseling, respite care, socialization services, parenting education, services related to in-home safety and permanency.  Stakeholders cited services that have significant gaps such as mental health and substance abuse treatment.  Another area of concern was the lack of specialized placement resources for children with special needs, such as those with behavior problems, dual diagnosed children, and sex offenders.


**Item 36.  The services in item 35 are accessible to families and children in all political jurisdictions covered in the State's CFSP.**
Item 36 was rated as an Area Needing Improvement because the distribution of Title IV-B services is uneven around the State and all services are not available in every county. The MDT process is not consistently utilized across the State and is not routinely made available to parents and foster parents.  The Statewide Assessment notes that in general, urban areas have far more resources than rural areas. Stakeholders noted that transportation is a major service that is lacking in many areas of the State.

D003166

**Item 37.  The services in item 35 can be individualized to meet the unique needs of children and families served by the agency.**
Item 37 was rated a strength because the MDT process allows for a thorough assessment of the child's and families' needs and develops a service plan to meet those identified needs on an individualized basis.  The stakeholders noted that the MDT serves this purpose, but is used inconsistently across the State.


## IX.   AGENCY RESPONSIVENESS TO THE COMMUNITY

**Status With Regard To Agency Responsiveness To The Community – Substantial Conformity**
West Virginia is in substantial conformity with the systemic factor Agency Responsiveness to the Community.  Findings for the items pertaining to this factor are presented below.

**Item 38.  In implementing the provisions of the CFSP, the State engages in ongoing consultation with tribal representatives, consumers, service providers, foster care providers, the juvenile court, and other public and private child- and family-serving agencies and includes the major concerns of these representatives in the goals and objectives of the CFSP.**
Item 38 was rated a Strength because West Virginia engages consumers, providers, courts, family-serving agencies and other public and private agencies in ongoing consultation and includes their concerns in the State Plan.

**Item 39.  The agency develops, in consultation with these representatives, annual reports of progress and services delivered pursuant to the CFSP.**
Item 39 has been rated as a Strength because West Virginia receives annual reports of progress for programs and services supported under the CFSP.

**Item 40.  The State's services under the CFSP are coordinated with services or benefits of other Federal or federally assisted programs serving the same population.**
Item 40 has been rated a Strength because West Virginia coordinates services with other Federal and federally assisted programs.

## X.   FOSTER AND ADOPTIVE PARENT LICENSING, RECRUITMENT, AND RETENTION

**Status With Regard To Foster And Adoptive Parent Licensing, Recruitment, And Retention – Substantial Conformity**
West Virginia is in substantial conformity with the systemic factor of Foster and Adoptive Parent Licensing, Recruitment, and Retention.  Findings for the items pertaining to this factor are presented below.

**D003167**

**Item 41.  The State has implemented standards for foster family homes and child care institutions which are reasonably in accord with recommended national standards.**

Item 41 has been rated a Strength because West Virginia has developed child placing regulations for foster family homes that are in accord with national standards.

**Item 42.  The standards are applied to all licensed or approved foster family homes or child care institutions receiving title IV-E or IV-B funds.**

Item 42 has been rated an Area Needing Improvement because all private agency and public agency homes do not always meet standards and homestudies for specialized homes may not be comprehensive.

**Item 43.  The State complies with Federal requirements for criminal background clearances as related to licensing or approving foster care and adoptive placements and has in place a case planning process that includes provisions for addressing the safety of foster care and adoptive placements for children.**

Item 43 has been rated a Strength because West Virginia has developed and is implementing a comprehensive criminal records check system. Stakeholders indicated that criminal background checks, including FBI checks, are completed on potential foster parents at the first training session.

**Item 44.  The State has in place a process for ensuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed.**

Item 44 has been rated as an Area Needing Improvement because the current pool of available foster care and adoptive providers in some regions of West Virginia does not reflect the ethnic diversity of the foster care population needing placement.   While the general population of the State is approximately 2% African American; approximately 20% of all children waiting for adoption are African American.

**Item 45.  The State has in place a process for the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children.**

Item 45 has been rated as a Strength because West Virginia has implemented regional cross-county recruitment, cross-state recruitment in Ohio and Kentucky and has received many web-site hits from outside the eastern United States.

**Introduction**

This document presents the findings of the Child and Family Services Review (CFSR) for the State of West Virginia. The findings were derived from the following documents and data collection procedures:

- The Statewide Assessment prepared by the State child welfare agency – the West Virginia Department of Health and Human Resources (DHHR), Bureau for Children and Families, Office of Social Services.
- The State Data Profile prepared by the Children's Bureau of the U.S. Department of Health and Human Services;
- Reviews of 50 case records at three sites throughout the State; and
- Interviews or focus groups (conducted at all three sites) with stakeholders including children, parents, foster parents, all levels of child welfare agency personnel, collaborating agency personnel, school personnel, mental health providers, court personnel, legislators, and attorneys.

The key characteristics of the 50 cases reviewed are the following:

- 22 cases were reviewed in Kanawha County, 14 in Fayette County, and 14 in Logan County.
- All 50 cases had been open cases at some time during the period under review.
- 29 of the cases were "foster care cases" (cases in which children were in the custody of the State child welfare agency and in an out-of-home placement at some time during the period under review), and 21 were "in-home services cases" (cases in which families received services from the child welfare agency while children remained in their homes).
- 5 of the 29 foster care cases were juvenile justice cases.
- In 41 cases, all children in the family were Caucasian; in 5 cases, all children in the family were African American; in 1 case, all children in the family were Hispanic; and in 3 cases, the children were two or more races.
- Of the 50 case records reviewed, the **primary** reasons for opening the child welfare agency case were the following:
  - Neglect (not including medical neglect) – 18 cases (36%)
  - Physical abuse – 6 cases (12%)
  - Substance abuse by parent – 5 cases (10%)
  - Child in juvenile justice system – 5 cases (10%)
  - Mental/physical health of parent – 3 cases (6%)
  - Abandonment – 3 cases (6%)
  - Sexual abuse – 2 cases (4%)
  - Medical neglect – 2 cases (4%)
  - Domestic violence in child's home – 1 case (2%)
  - Child's behavior – 1 case (2%)

D003169

- Mental/physical health of child – 1 case (2%)
- Other – 3 cases (6%)

- Among **all** reasons identified for children coming to the attention of the child welfare agency, neglect (not including medical neglect) was cited in 29 (58%) cases, physical abuse was cited in 17 (34%) cases, substance abuse by parents was cited in 13 (26%) cases, domestic violence in the child's home was cited in 10 (20%) cases, and mental/physical health of the parent was cited in 10 (20%) of cases.
- For 17 of the 29 foster care cases, the children entered foster care prior to the period under review and remained in foster care during the entire period under review; for 8 of the 21 in-home services cases, the case had been opened prior to the period under review.

The first section of the report presents the CFSR findings relevant to the State's performance in achieving specific outcomes for children in the areas of safety, permanency, and well-being.  For each outcome, there is a table presenting key findings, a discussion of the State's status with regard to the outcome, and a presentation and discussion of each item (indicator) assessed for the outcome.  The second section of the report provides an assessment and discussion of the systemic factors relevant to the child welfare agency's ability to achieve positive outcomes for children.

D003170

# SECTION 1: OUTCOMES

## I. SAFETY

## Safety Outcome 1

| Outcome S1:  Children are, first and foremost, protected from abuse and neglect. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | Fayette | Kanawha | Logan | Total Number | Total Percentage |
| Substantially Achieved: | 10 | 17 | 10 | 37 | 84.1 |
| Partially Achieved: | 3 | 3 | 1 | 7 | 15.9 |
| Not Achieved or Addressed: | 0 | 0 | 0 | 0 | 0 |
| Not Applicable: | 1 | 2 | 3 | 6 | |
| Conformity of Statewide data indicators with national standards: | | | | | |
| | National Standard (percentage) | State's Percentage | Meets Standard | | Does Not Meet Standard |
| Repeat maltreatment | 6.1 | 6.43 | | | X |
| Maltreatment of children in foster care | 0.57 | .04 | X | | |

**STATUS OF SAFETY OUTCOME 1:**

West Virginia did not achieve substantial conformity for Safety Outcome 1.  This determination was based on the following findings:

- 84.1 percent of the cases reviewed were rated as having substantially achieved this outcome, which is less than the 90 percent required for an overall rating of substantial conformity; and
- The State did not meet the national standard for the percentages of children experiencing more than one substantiated or indicated child maltreatment report within a 6-month period.

According to the State Data Profile, West Virginia met the national standard for the percentages of children experiencing maltreatment from caretakers while in foster care, with only .04 percent of children in foster care experiencing abuse or neglect by foster parents or facility employees.  However, the Statewide Assessment notes that the data regarding abuse and neglect in foster

**D003171**

care are probably incorrect and reflect data entry problems.  DHHS believes that staff members have not been entering information into the field in FACTS (the State's management information system) that identifies the relationship of the perpetrator to child victims in situations in which the perpetrator is a foster parent or foster care facility employee.

The findings pertaining to the specific items assessed under Safety Outcome 1 are presented below.

**Item 1:  Timeliness of initiating investigations of reports of child maltreatment**

    X   Strength                 ____   Area Needing Improvement

***Review Findings***:  The assessment of item 1 was applicable for 26 of the 50 cases.  Twenty-four cases were not applicable because they did not involve reports of child maltreatment during the period under review.  In assessing item 1, reviewers were to determine whether the response to a maltreatment report occurring during the period under review had been initiated in accordance with child welfare agency policy.  In West Virginia, when a report is "screened-in" or accepted for an initial assessment and safety evaluation, the assigned caseworker make contact with the identified child within 2 hours if it is an immediate emergency, within 72 hours if the report is believed to involve imminent danger, and within 14 days for all other reports.  The results of the assessment were the following:

- Item 1 was rated as a Strength in 23 (88.5%) of the 26 applicable cases (6 of which were foster care cases).
- Item 1 was rated as an Area Needing Improvement in 3 (11.5%) of the 26 applicable cases (2 of which were foster care cases).

This item was rated as a Strength in all cases in which the initiation of a response to child maltreatment reports occurring during the period under review complied with agency guidelines or policy for the priority level assigned to the report.  For the 3 cases rated as Area Needing Improvement, reviewers noted that the agency failed to respond to one or more reports of child maltreatment within the timeframes required by policy.  Of serious concern is that two of these three cases involved maltreatment of children by their foster care providers.

Most stakeholders commenting on the timeliness of initiating investigations expressed the opinion that child welfare caseworkers respond to reports of child abuse and neglect in a timely manner, particularly when the report is classified as an "immediate emergency."  Stakeholders noted that when timeliness is a problem, it is usually due to large caseloads and high staff turnover.  Several stakeholders indicated that a team approach usually is used in response to abuse/neglect reports, and that DHHR and the police have developed a particularly effective team approach to responding to allegations of sexual abuse.

**D003172**

*Determination and Discussion*: Item 1 was assigned an overall rating of Strength based on the finding that in 89 percent of the applicable cases, the agency responded to a maltreatment report in a timely manner.  Case findings and stakeholder comments are in agreement that DHHR responds to reports within established timeframes.  In the case review process, the three cases rated as Area Needing Improvement occurred in one of the counties included in the on site review.  Stakeholders interviewed in this county indicated that large caseloads and a large geographic area have a negative impact on the ability of caseworkers to respond to reports in a timely manner.

## Item 2.  Repeat maltreatment

\_\_\_\_\_   Strength        \_\_\_X\_\_\_Area Needing Improvement

*Review Findings:*  The assessment of item 2 was applicable for 43 of the 50 cases.  In assessing this item, reviewers were to determine whether there had been at least one substantiated or indicated maltreatment report during the period under review, and if so, whether another substantiated or indicated report occurred within 6 months of that report.  The results of the assessment were the following:
- Item 2 was rated as a Strength in 39 (91%) of the 43 applicable cases (22 of which were foster care cases).
- Item 2 was rated as an Area Needing Improvement in 4 (9%) of the 43 applicable cases (1 of which was a foster care case).

Although item 2 was rated as a Strength in 91 percent of the 43 applicable cases, many of these were either foster care cases in which the child entered foster care prior to the period under review, or in-home cases for which there were no substantiated or indicated child maltreatment reports during the period under review.   For the 21 cases in which there was at least one substantiated or indicated maltreatment report during the period under review, 4 cases (19%) had at least one other substantiated or indicated report within a 6-month period that involved the same perpetrator and circumstances.

An additional finding with respect to repeat maltreatment was that there were multiple maltreatment reports over the life of the case for the majority of the cases reviewed.  Of the 43 applicable cases, 33 had three or more maltreatment reports over the life of the case, although not all of these reports were substantiated or indicated.  Nine of these 33 cases had 10 or more reports over the life of the case.

Stakeholders commenting on this issue suggested that the risk assessment and safety evaluation procedures used by the agency to guide the development of children's safety plans have the potential to prevent the recurrence of maltreatment.  However, stakeholders also noted that these tools are not used uniformly throughout the State, resulting in some cases in which risk of harm to children may not be adequately assessed.

**D003173**

***Determination and Discussion:*** Item 2 was assigned an overall rating of Area Needing Improvement.  Although there was no recurrence of maltreatment in 91 percent of the cases, according to the State Data Profile the incidence of repeat maltreatment for 2000 was 6.43 percent, which does not meet the national standard of 6.1 percent.  Because the two measures are computed in different ways, it is necessary for both measures to meet standards or specified criteria in order for an overall rating of Strength to be assigned to the item.

As noted in the Statewide Assessment, the rates of repeat maltreatment appear to vary across districts.  In five districts the recurrence rate was found to be zero, while in two districts the repeat maltreatment rate was 9 percent and 13.3 percent.  These latter two districts were included in the on-site CSFR.

**D003174**

## Safety Outcome 2

| Safety Outcome S2:  Children are safely maintained in their homes whenever possible and appropriate. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | **Fayette** | **Kanawha** | **Logan** | **Total Number** | **Total Percentage** |
| Substantially Achieved: | 6 | 14 | 11 | 31 | 68.9 |
| Partially Achieved: | 2 | 3 | 0 | 5 | 11.1 |
| Not Achieved or Addressed: | 5 | 3 | 1 | 9 | 20.0 |
| Not Applicable: | 1 | 2 | 2 | 5 | |

### STATUS OF SAFETY OUTCOME 2

West Virginia did not achieve substantial conformity with Safety Outcome 2.  This determination was based on the finding that this outcome was substantially achieved in only 68.9 percent of the cases reviewed, which is less than the 90 percent required for a rating of substantial conformity.

The CFSR found that families in almost one-third of applicable cases were not provided with adequate services to protect children in their homes and prevent their removal from the home, and that risk of harm was not effectively addressed.  These findings suggest that children's and families' service needs are not being thoroughly assessed and insufficient attention is being given in some cases to identifying risk factors for all children in the home.  In addition, there was evidence in the cases reviewed that risk assessments were not consistently identifying underlying issues in the family, such as domestic violence or substance abuse problems.  Additional barriers to maintaining children safely in their own homes cited by stakeholders included inadequate funding for services, delays in initiating services, gaps in the service array, and provision of services that are not matched to the needs of parents and children.

CFSR findings pertaining to the specific items assessed under Safety Outcome 2 are presented and discussed below.

### Item 3.  Services to family to protect child(ren) in home and prevent removal

_____ Strength          __X__  Area Needing Improvement

***Review Findings***: There were 29 cases for which an assessment of item 3 was applicable.  Twenty-one cases were excluded from this assessment because the child was in foster care for the entire review period or because there were no substantiated or indicated

D003175

maltreatment reports or identified risks of harm to children in the home during the period under review.  For this item, reviewers assessed whether, in responding to a substantiated or indicated maltreatment report or risk of harm, the agency made diligent efforts to provide services to families to prevent removal of children from their homes while at the same time ensuring their safety.  The results of this assessment were the following:

- Item 3 was rated as a Strength in 19 (65.5%) of the 29 applicable cases (5 of which were foster care cases).
- Item 3 was rated as an Area Needing Improvement in 10 (34.5%) of the 29 applicable cases (3 of which were foster care cases).

This item was rated as a Strength when reviewers determined that DHHR assessed the family's service needs appropriately, provided or referred the family for services to meet those needs, and carefully monitored families to ensure child's safety.  Many of the cases assigned a rating of Strength received a variety of services to address the risks to the children and the service needs of the parents.  In other cases, only a specific service, such as housing, was necessary to address the family's needs.  In several cases rated as a Strength, reviewers noted that parents interviewed as part of the case review process expressed satisfaction with the services they received and with their DHHR caseworkers.  The item also was rated a Strength in cases in which imminent risk to the child was identified and immediate removal of the child from the home was deemed the appropriate response.

Cases were rated as an Area Needing Improvement for this item when reviewers determined the following:

- The services provided did not match the needs of the family, particularly with respect to addressing underlying issues such as domestic violence, substance abuse, and mental illness (4 cases).
- The agency offered the family services but the family refused.  Although the agency attempted to remove the child at that point, the judge would not approve the removal (1 case).
- No services were provided to the family although there was a clear need for services.  In one case the family requested parenting classes but this service was not provided (3 cases).
- Although the child who was the subject of the report may have been removed from the home, the needs of the other children in the home were not addressed (2 cases).

Several stakeholders commenting on this issue expressed the opinion that DHHR pays sufficient attention to the issue of children's safety.  Many stakeholders reported satisfaction with the responsiveness of agency caseworkers and supervisors, although a few were more negative in their appraisals of private agency workers.  Other stakeholders, however, indicated that there is a gap in the availability of in-home services due to lack of funding and problems related to fee-for-service payment requirements among private agencies.  Consequently, the agency is not always able to maintain children effectively in their homes and places children in foster care because the necessary services for parents are not always accessible to the families.  Services were lacking for drug screening, substance abuse treatment, and mental health treatment.  Stakeholders also noted other barriers to maintaining children safely in their own homes including delay in receiving approval for services, lack of service providers, waiting lists for services, and delay in

D003176

initiating services.   With respect to this latter problem, a few stakeholders noted that contract providers will sometimes accept referrals from DHHR for cases even when the private agency does not have the staff to respond.  Stakeholders expressed the opinion that in these situations, when a DHHR caseworker refers a family for services to a private agency, the agency sometimes accepts the referral without informing the DHHR caseworker that the agency does not have sufficient staff to respond immediately, and therefore, there will be a time delay in the provision of the service.

***Determination and Discussion:*** This item was assigned an overall rating of Area Needing Improvement because in 34.5 percent of the cases, reviewers found that DHHR had not made diligent efforts to provide services to ensure children's safety while in their homes. Case reviews indicated that the key problem was the lack of consistency among caseworkers in the appropriate assessment of service needs and provision of services.   In contrast, stakeholders identified the key problem as a lack of available services and the difficulty in obtaining approval for initiating in-home services.  According to the Statewide Assessment, the accessibility of services designed to maintain children safely in their own homes varies depending on geographic location.  The Statewide Assessment also noted that services to families in "in-home services" cases usually are provided by private agencies under contract with DHHR.

### Item 4.  Risk of harm to child

_____  Strength        __X__  Area Needing Improvement

***Review Findings:*** An assessment of item 4 was applicable for 42 of 50 cases reviewed.  The assessment of item 4 required reviewers to determine whether the agency had made, or was making, diligent efforts to reduce the risk of harm to the children involved in each case.  The assessment resulted in the following findings:
- Item 4 was rated as a Strength in 31 (74%) of the 42 applicable cases.
- Item 4 was rated as an Area Needing Improvement in 11 (26%) of the 42 applicable cases.

This item was rated as a Strength when reviewers identified the following:
- The risk of harm to children was appropriately addressed by removing the children from home and providing services to parents to address risk issues (6 cases).
- The risk of harm to children was appropriately addressed by removing the children from the home and seeking TPR prior to or during the period under review (11 cases).
- The risk of harm to children was appropriately addressed by removing the children from the home and seeking relative guardianship (1 case).

D003177

- The risk of harm to children was appropriately managed by providing services to families to address risk concerns while the children remain in the home or in a voluntary placement with relatives (13 cases).

The item was rated as an Area Needing Improvement when reviewers determined the following:
- The services provided were not adequate to effectively reduce risk while children remained in the home, leaving children at the same level of risk as when the case first came to the attention of the agency (5 cases);
- During the course of the case, additional risk factors were identified but not addressed by the agency (2 cases);
- The family refused services and the children remained at risk (1 case);
- No services were provided to address the risk issues (2 cases);
- The report was assigned a lower priority than it should have been, resulting in a delay in contact and increased risk for the child (1 case);

Many stakeholders commenting on this issue noted that safety is a primary concern of the agency and that children are appropriately removed from their homes when necessary.  Stakeholders emphasized the role that the risk assessment model plays in identifying safety needs.  Stakeholders in one county noted that the agency has developed a protocol with the local hospital to ensure an appropriate and effective response to cases in which infants were exposed to drugs or alcohol in utero.  However, stakeholders also reported that the risk assessment model is not used in a consistent manner across DHHR caseworkers.  As several stakeholders noted, caseworkers often underestimate the level of risk to the child and recommend fee-for-service services instead of the agency's intensive family preservation services.

A significant concern was noted by stakeholders in one county regarding the ability of the agency in that county to effectively ensure children's safety.  Stakeholders noted that a judge in the county refuses to grant petitions to remove children from their homes unless there is evidence of a serious physical injury.  Because situations involving neglect are as potentially life-threatening to a child as physical abuse, the actions of this judge place many children at risk of harm.

***Determination and Discussion:*** This item was assigned an overall rating of Area Needing Improvement because in 26 percent of the applicable cases, reviewers determined that DHHR had not made sufficient efforts to reduce risk of harm to children.  The findings suggest that in their risk assessments, caseworkers are not consistently capturing the underlying issues leading to abuse/neglect, particularly issues such as domestic violence and substance abuse.  Consequently, they also are not consistently recommending the most appropriate services to ensure risk reduction.   These findings corroborate the problems identified in the Statewide Assessment about the difficulty caseworkers may confront using the current decision making model.   According to the Statewide Assessment, the "risk" decision-making model requires extensive training, experience, and skill to be effective.  Because of high staff turnover, there

D003178

are many recently employed staff members who do not consistently identify all safety issues that are present.  As noted in the Statewide Assessment, the Department is currently testing a different decision-making model.

**D003179**

## II.    PERMANENCY

## Permanency Outcome 1

| Outcome P1:  Children have permanency and stability in their living situations. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | Fayette | Kanawha | Logan | Total Number | Total Percentage |
| Substantially Achieved: | 5 | 2 | 4 | 11 | 37.9 |
| Partially Achieved: | 2 | 7 | 1 | 10 | 34.5 |
| Not Achieved or Addressed: | 1 | 4 | 3 | 8 | 27.6 |
| Not Applicable: | 6 | 9 | 6 | 21 | |
| Conformity of Statewide data indicators with national standards: | | | | | |
| | National Standard (percentage) | State's Data (percentage) | Meets Standard | Does Not Meet Standard | |
| Foster care re-entries | 8.6 | 0.1 | X | | |
| Length of time to achieve reunification | 76.2 | 79.5 | X | | |
| Length of time to achieve adoption | 32 | 17.3 | | X | |
| Stability of foster care placements | 86.7 | 99.9 | X | | |
| Length of stay in foster care* | N/A | | | | |

*Not used to determine substantial conformity.

**STATUS OF PERMANENCY OUTCOME P1**

West Virginia did not achieve substantial conformity with Permanency Outcome 1.  This determination was based on the following:

- Only 38 percent of the cases were rated as having substantially achieved Permanency Outcome 1, which is less than the 90 percent required for an overall rating of substantial conformity; and
- The State Data Profile indicated that the State's percentage of children who achieved a finalized adoption within 24 months of entry into care (17.3%) did not meet the national standard of 32 percent.

In general, the CFSR process indicated that most children in the foster care cases reviewed did not have permanency and stability in their living situations.  Establishing appropriate permanency goals and achieving adoptions in a timely manner were identified as critical problems, with reviewers rating "adoption" as an Area Needing Improvement in 88 percent of the applicable cases. "Other

planned living arrangement" was identified as an Area Needing Improvement in 50 percent of applicable cases, primarily due to the determination that DHHR had not explored alternative permanency options before assigning long-term foster care or emancipation as permanency goals.

In addition, while the State Data Profile indicates that the State meets the national standard for the percentage of entries into foster care in FY 2000 that were re-entries within 12 months of a prior foster care episode, the Statewide Assessment acknowledged that the data provided to the Federal government's Adoption and Foster Care Analysis Reporting System used to compute the foster care re-entry rate are not correct.

Similarly, the Statewide Assessment notes that the data provided in the State Data Profile with respect to placement stability also are probably incorrect. As reported in the Statewide Assessment, in some instances children placed with a private provider may move from one home to another within the provider's network. Because the children are still with the same child placement provider, these moves are not captured in the State's management information system (FACTS). Consequently, the number of placements children experience is underreported.

Findings pertaining to the specific items assessed under Permanency Outcome 1 are presented below.

### Item 5.  Foster care re-entries

_____  Strength        __X__  Area Needing Improvement

***Review Findings:*** Five of the 29 foster care cases were applicable to an assessment of foster care re-entries because they involved children who  entered foster care at some time during the period under review.  In assessing this item, reviewers were to determine whether the entry into foster care during the period under review had occurred within 12 months of discharge from a prior foster care episode.  The results of this assessment were the following:

- Item 5 was rated as a Strength in 4 (80%) of the 5 applicable cases.
- Item 5 was rated as an Area Needing Improvement in 1 (20%) of the 5 applicable cases.

The one case that was rated as an Area Needing Improvement involved an entry into foster care that was within 12 months of discharge from a prior foster care episode.  The child had been discharged from a group facility where he had been placed for one year via court order due to delinquency.  Upon return home, his case was closed without services and he re-entered care four and a half months later, again due to delinquency.

Stakeholders did not offer comments on re-entry into foster care.

***Determination and Discussion***: This item was assigned an overall rating of Area Needing Improvement because in one (20%) of the five cases for which this item was applicable, reviewers found that a re-entry into foster care occurred within 12 months of discharge from a prior foster care episode.  Although the State does meet the national standard for the rate of re-entries into foster care, the Statewide Assessment noted that data provided by DHHR were not correct.


**Item 6.  Stability of foster care placement**

_____  Strength         __X__  Area Needing Improvement

***Review Findings:***  All 29 foster care cases were applicable for an assessment of Item 6.  In assessing this item, reviewers were to determine whether the child experienced multiple placement settings during the period under review and, if so, whether the changes in placement settings were necessary to achieve the child's permanency goal or meet the child's service needs.  The findings of this assessment were the following:

- Item 6 was rated as a Strength in 21 (72%) of the 29 applicable cases.
- Item 6 was rated as an Area Needing Improvement in 8 (28%) of the 29 applicable cases.

The case review also found the following:

- Children in 18 cases experienced only one placement during the period under review, but in 4 of these cases the children experienced 5 or more placements prior to the period under review.
- Children in 9 cases experienced between 2 to 4 placements during the period under review.
- Children in 2 cases experienced 5 or more placements during the period under review.
- Children in all counties included in the on-site review process experienced emergency shelter placements, usually at the time of removal from foster care or when a placement disruption occurred.

This item was rated as a Strength when reviewers determined that children did not experience a placement change during the period under review, or that placement changes were necessary to meet children's needs or promote attainment of their permanency goals (such as movement from a shelter to a foster home, or from a residential treatment center to a therapeutic foster home).

A rating of Area Needing Improvement for this item was assigned when reviewers made the following determinations:

D003182

- Children experienced multiple placements during the period under review, and changes in at least one of the placements did not reflect efforts to  promote goal attainment or meet the child's service needs (4 cases).
- The agency was placing children in emergency shelters without attempting to find more appropriate alternative placements, such as relatives or a foster home (2 cases).
- There was no indication that DHHR caseworkers made efforts to address the needs of foster parents who were experiencing problems with a child in their care in order to prevent placement disruptions (2 cases).

In one case, a disabled child experienced four placement changes (five placements) during the period under review and four prior to the period under review.  Placement changes during the period under review occurred because of unwillingness of caretakers to continue caring for her and because several temporary placements were used until another placement could be found.  The child was eventually placed in a stable home with a specially trained foster parent who expresses satisfaction with the supportive services she receives from the agency.  In another case, a child was placed in a shelter for over five months and was not moved until he refused to remain in the placement.

Stakeholders commenting on this issue identified stability of foster care placement as an issue primarily affecting adolescents, especially those with behavioral problems.  They noted that there are not enough appropriate placements available for these children, and even specialized foster homes sometimes cannot handle the children's behaviors.  Stakeholders also noted that although the initial placement of children into emergency shelters is intended to conduct assessments regarding appropriate placements, children often are placed in shelters because there is nowhere else to put them and some children remain in shelters for long periods of time.  Despite these problems, a few stakeholders indicated that some DHHR caseworkers promote placement stability by being accessible to foster parents and providing the supports needed when the stability of the placement is threatened.

***Determination and Discussion:***  Item 6 was rated as an Area Needing Improvement because in 28 percent of the applicable cases reviewers determined that the agency had not made diligent efforts to ensure children's placement stability while in foster care.  Although data from the State Data Profile indicate that the State meets the national standard pertaining to placement stability, the Statewide Assessment suggested that this statistic may be misleading, because for many cases the State information system only tracks changes in the private child placement agency, not children's the foster homes.  In addition, because the State Data Profile measure of placement stability and the case review measure of placement stability are different, it is necessary for both of them to meet standards or acceptable criteria in order for this item to be rated as a Strength.

Information from case reviews and stakeholder interviews indicates that key problems with respect to placement stability are (1) a scarcity of specialized placements for children with behavioral problems or special care needs and, (2) an inconsistency in matching children with appropriate foster families or placement settings.  These findings corroborate information provided in the Statewide

D003183

Assessment regarding placement stability.  As noted in the Statewide Assessment, despite procedural safeguards, there are practice issues that affect placement stability in foster care.  These practice issues are the following:  Children are sometimes placed prior to a thorough assessment of their needs and/or without a thorough consideration of the foster parents' readiness to care for the child.  In some instances, children are placed and information about the child is not initially provided to the foster parent.  Although Multidisciplinary Treatment Team (MDT)  meetings provide an opportunity to address the treatment/service needs of children in foster care and should enhance placement stability, the Statewide Assessment notes that foster parents report that they are not provided with the necessary information (i.e., case plans) to participate in these meetings.


**Item 7.  Permanency goal for child**

_____  Strength          __X__  Area Needing Improvement

***Review Findings:*** All 29 foster care cases were applicable for an assessment of item 7.  In assessing this item, reviewers were to determine whether the agency had established an appropriate permanency goal for the child in a timely manner, including filing termination of parental rights (TPR) petitions when relevant.  The results of this assessment were the following:
- Item 7 was rated as a Strength in 15 (52%) of the 29 applicable cases.
- Item 7 was rated as an Area Needing Improvement in 14 (48%) of the 29 applicable cases.

The assessment identified the following permanency goals for the 29 children in foster care:
- 8 children had a goal of reunification with parents or relatives;
- 8 children had a goal of adoption (2 of these children had a prior goal of long-term foster care);
- 5 children had a goal of guardianship;
- 4 children had a goal of long-term foster care;
- 3 children had a goal of emancipation; and
- 1 child had a goal of permanent placement with relatives.

Children in 15 of the 29 applicable cases had been in care for 15 of the past 22 months.  The agency had filed for TPR for 13 of these children and attained TPR for 10 children.  For the two children for whom TPR had not been filed, compelling reasons were noted in the case file.

Cases were assigned a rating of Strength for this item when reviewers determined that the agency had made diligent efforts to establish an appropriate permanency goal in a timely manner.  The 14 cases rated as an Area Needing Improvement for this item

**D003184**

included 4 cases in which the goal was adoption, 3 cases in which the goal was emancipation, 3 cases in which the goal was guardianship, 2 cases in which the goal was reunification, and 2 cases in which the goal was long-term foster care. Cases were rated as an Area Needing Improvement for this item when reviewers determined that appropriate permanency goals had not been established in a timely manner. The following are some examples of the identified problems:

- Delays in changing a child's goal from reunification to adoption when reunification appeared unlikely (in 3 cases, the goal change did not occur until a year after parental rights had been terminated).
- Delays in seeking TPR
- Lack of concurrent planning
- Confusion about permanency goals between children, parents, and caseworkers

Stakeholders commenting on this issue praised the agency's practice of using MDT teams for periodic reviews of case plans for children in foster care. Stakeholders credited the MDT process with expediting decision making and permanency planning and generally moving children toward permanency. However, several stakeholders noted that MDTs are not used in all cases, particularly youth services cases. Stakeholders also criticized the practice of establishing permanent foster care as a permanency goal without thorough consideration of alternative permanency options. This practice also was observed in the case review process.

***Determination and Discussion:*** Item 7 was assigned an overall rating of Area Needing Improvement based on the finding that in 48 percent of the applicable cases, reviewers determined that the agency had not established an appropriate permanency goal in a timely manner. The major concerns identified were extensive delays in changing goals to more appropriate goals, the lack of clear documentation and identification of permanency goals in some case records, apparent confusion regarding the appropriate use of the goal of guardianship, and a tendency of some caseworkers to establish long-term foster care as a goal before careful consideration of other options.

## Item 8.  Reunification, Guardianship, or Permanent Placement with Relatives

___X___ Strength        _____ Area Needing Improvement

***Review Findings:*** Item 8 was applicable for 14 cases. In assessing these cases, reviewers were to determine whether the agency had achieved the goals of reunification, guardianship, or permanent placement with relatives for the children in a timely manner or, if the goal had not been achieved in a timely manner, whether the agency had made, or was in the process of making, diligent efforts to achieve the children's goals. The results of this assessment were the following:

- Item 8 was rated as a Strength for 12 (86%) of the 14 applicable cases.
- Item 8 was rated as an Area Needing Improvement for 2 (14%) of the 14 applicable cases.

D003185

Of the 14 applicable cases, 8 had a goal of reunification, 5 had a goal of guardianship, and 1 had a goal of permanent placement with relatives. The permanency goal was achieved for 9 cases. In 7 of those cases, permanency was achieved within 12 months. Six of the cases achieving permanency within 12 months were reunification cases and one was a case with a goal of permanent placement with relatives. A rating of Area Needing Improvement was assigned to two cases because reviewers determined that the agency had not made diligent efforts to achieve the goal of guardianship.

Internal stakeholders (to the child welfare agency) commenting on this issue suggested that timely reunification was due in large part to the agency's use of MDTs and to the court's efforts to track permanency timeframes. A few stakeholders expressed concern, however, about the discrepancy between the time available to achieve permanency under ASFA guidelines and the time needed for parents with substance abuse problems to complete treatment and be reunified.

Some stakeholders noted that subsidized guardianship is now available in the State and can be an appropriate permanency option for some children. However, these stakeholders also noted that it is currently being underutilized and that finalization takes a considerable amount of time because of confusion regarding legal guardianship policies and procedures. Although guardianship was generally perceived as a positive outcome for children, several stakeholders expressed concern that moving children into guardianship might result in their loss of benefits such as a medical card, college tuition waivers, and independent living services. Other stakeholders expressed the opinion that subsidized guardianship is being used by caseworkers to avoid the TPR process.

***Determination and Discussion:*** This item was assigned an overall rating of Strength for the following reasons:
- The State Data Profile indicates that the State's percentage for reunifications occurring within 12 months of entry into foster care (79.5%) meets the national standard of 76.2 percent.
- In 86 percent of the cases reviewed, reviewers determined that the agency had made, or was making, diligent efforts to attain the goals of reunification, permanent placement with relatives, or guardianship.

As noted in the Statewide Assessment, the subsidized legal guardianship program is seen as increasing the ability of DHHR to expedite permanency for children. However, information from both case reviews and stakeholder interviews suggests that not all caseworkers are sufficiently knowledgeable about this permanency option to implement it appropriately and expediently.

**D003186**

**Item 9.  Adoption**

____  Strength        __X__  Area Needing Improvement

***Review Findings:***  Eight of the foster care cases were applicable for an assessment of item 9.  In assessing this item, reviewers were to determine whether appropriate and timely efforts had been, or were being, undertaken to achieve finalized adoptions.  The results were the following:
- Item 9 was rated as a Strength in 1(12.5%) of the 8 applicable cases.
- Item 9 was rated as an Area Needing Improvement in 7 (87.5%) of the 8 applicable cases.

The case review also found that in 2 of the 8 applicable cases, adoption had been finalized and one of these finalizations had occurred within 24 months of the child's entry into foster care.  Five of the 6 children awaiting adoption finalization are currently in an adoptive placement either with relatives (2 cases) or with non-related foster parents (3 cases).

This item was assigned a rating of Strength in only one case.  In this case, the adoption was finalized within 24 months of entry into foster care.  The item was rated as an Area Needing Improvement when reviewers determined that the agency had not made diligent efforts to achieve a finalized adoption in a timely manner.  Reviewers indicated that many of the delays were attributed to the courts, particularly to delays in achieving TPR.  However, in four cases, reviewers determined that delays were the result of casework practice.  For example, one case had not achieved adoption finalization fourteen months after TPR due to delays processing the adoption subsidy application.  In another case, TPR was completed on the mother in 1989 but had not yet been completed on the father, there are no case plans for adoption and there has been no court monitoring of the case.  In a third case, the child's goal was not changed to adoption until a year after parental rights had been terminated.  There was no evidence of concurrent planning efforts in any of the cases, and interviews conducted as part of the case review process revealed little understanding of the concurrent planning process among DHHR caseworkers.

Stakeholders commenting on this issue had mixed opinions.  Although some stakeholders noted that there have been improvements in moving children toward adoption, others identified multiple barriers to expedited adoptions.  For example, some stakeholders suggested that adoption is not pursued by some caseworkers because it is not seen as a viable option for many children, particularly older children.  Another problem noted by stakeholders is that permanent relative placement is being used even when relatives wish to

adopt and therefore relatives have to pursue TPR and adoption on their own.  Furthermore, relatives who wish to adopt do not always receive the necessary financial and service supports, including an adoption subsidy.

Several stakeholders indicated that foster parents are not always considered as the first adoptive resource, are not always encouraged to adopt the children in their care, and are not provided with adoption-related information, particularly with regard to the availability of subsidies.  These stakeholders suggested that child placement agencies do not encourage adoptions by foster parents because they do not want to lose the family as a foster care placement resource.

Stakeholders also said that many adoption delays may be due to high caseworker caseloads, resulting in workers not completing the necessary procedures and paperwork to achieve adoptions in a timely manner.  Similar to subsidized guardianship, stakeholders expressed concern about the loss of eligibility for college tuition waivers and independent living services for children who are adopted.

***Determination and Discussion:*** This item was assigned an overall rating of Area Needing Improvement because in 88 reviewers determined that DHHR had not made diligent efforts to achieve adoptions in a timely manner in 88 percent of the applicable cases.  In addition, the State Data Profile indicates that the percentage of finalized adoptions in FY 2000 that occurred within 24 months of removal from home (17.3%) did not meet the national standard of 32 percent.  The key concerns identified pertained to the beliefs of some caseworkers that adoption is not a viable option for some children, lack of concurrent planning, and inconsistencies with regard to the level of knowledge among caseworkers pertaining to the adoption process and adoption subsidies.

The Statewide Assessment identified other barriers to timely adoption including (1) the time required to complete adoptive homestudies, (2) the failure to identify and engage fathers early on in the case, (3) court delays and continuances, and (4) the transfer of cases from the caseworker to the adoption worker once TPR has occurred.  With respect to the latter barrier, the Statewide Assessment notes that because of turnover among agency caseworkers, these transfers do not always take place in a timely manner.


## Item 10.  Permanency goal of other planned permanent living arrangement

_____  Strength          __X__  Area Needing Improvement

***Review Findings:*** Eight of the foster care cases were assessed for item 10. In assessing these cases, reviewers were to determine if the agency had made, or was making diligent efforts to assist children in attaining their goals related to other planned permanent living arrangements.  The results of this assessment were the following:

D003188

- Item 10 was rated as a Strength for 4 (50%) of the 8 applicable cases.
- Item 10 was rated as an Area Needing Improvement for 4 (50%) of the 8 applicable cases.

In the four cases assigned a rating of Area Needing Improvement, reviewers felt that other permanency options were not fully explored prior to assigning this goal.

***Determination and Discussion***: This item was assigned an overall rating of Area Needing Improvement because in 50 percent of the applicable cases, reviewers determined that the agency had not made diligent efforts to assist children in attaining more appropriate goals, such as guardianship or adoption.  According to the Statewide Assessment, although long-term foster care is no longer an acceptable permanency goal, it continues to be used in a large number of cases.  The Statewide Assessment also notes that other permanency options are underutilized for older children.

**D003189**

## Permanency Outcome 2

| Outcome P2: The continuity of family relationships and connections is preserved for children. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
|  | Fayette | Kanawha | Logan | Total | Percentage |
| Substantially Achieved: | 5 | 10 | 6 | 21 | 72.4 |
| Partially Achieved: | 2 | 2 | 2 | 6 | 20.6 |
| Not Achieved or Addressed: | 1 | 1 | 0 | 2 | 7.0 |
| Not Applicable: | 6 | 9 | 6 | 21 |  |

### STATUS OF PERMANENCY OUTCOME P2:

West Virginia did not achieve substantial conformity with Permanency Outcome 2. This determination was based on the finding that the outcome was rated as substantially achieved in 72.4 percent of the cases, which is less than the 90 percent required for substantial conformity.

Although the State did not reach the required 90 percent achievement required for substantial conformity, there were some areas of strength. For example, all children in the foster care cases were placed with siblings when appropriate, and almost all children were placed in close proximity to their communities of origin or were placed in out-of-area placements to meet special needs. In contrast, DHHR's efforts to search for relatives as potential placement resources or to promote visitation and bonding with mothers and fathers were found to be inconsistent across cases. Although in many cases visitation between children and their parents and siblings occurred on at least a monthly basis, there were many other cases in which visits did not take place or took place on a less than monthly basis. Key concerns identified were a lack of consistent effort in seeking paternal relatives as placement resources and a failure in some cases to locate fathers or to promote visitation with fathers.

More specific findings pertaining to the items assessed under Permanency Outcome 2 are presented and discussed below.

### Item 11.  Proximity of foster care placement

  __X__   Strength          _____   Area Needing Improvement

***Review Findings:*** Of the 29 foster care cases, 21 were applicable for an assessment of item 11. Cases determined to be not applicable were those in which TPR had been attained prior to the period under review or in which contact with parents was not considered to be in the child's best interest. In assessing item 11, reviewers were to determine whether the child's foster care setting was in close proximity to the child's parents or close relatives. This assessment resulted in the following findings:

- Item 11 was rated a Strength in 20 (95%) of the 21 applicable cases.
- Item 11 was rated an Area Needing Improvement in 1 (5%) of the 21 applicable cases.

In the 20 cases rated as a Strength, reviewers determined that children were placed in the same community or county as parents or relatives (15 cases) or the reason for out-of-area placement was justifiable on the basis of the children's needs (5 cases). In the one case rated as Area Needing Improvement, reviewers determined that the child was placed out-of-State without diligent efforts being made to find an appropriate in-State placement.

Stakeholders commenting on this issue expressed the opinion that the lack of specialized placements available in West Virginia results in many children being placed out of county or out of State. These stakeholders, however, also noted that when children are placed out of county or State, the agency provides support for visitation between children and parents, including paying for lodging, transportation, and phone calls. The DHHR Commissioner expressed a desire to track out-of-state placements and establish the infrastructure to meet these specialized placement needs within the State.

***Determination and Discussion:*** Item 11 was assigned an overall rating of Strength because in 95 percent of applicable cases, reviewers determined that children were placed in close proximity to parents or relatives or the reason for separation was justified. Stakeholders expressed concern that the State did not have sufficient specialized placements to ensure that children in the State could remain close to home even when they needed specialized services.


## Item 12.  Placement with siblings

   X   Strength          ____   Area Needing Improvement

***Review Findings:*** Seventeen of the 29 foster care cases involved a child with siblings who were also in foster care. In assessing item 12, reviewers were to determine whether siblings were, or had been, placed together and, if not, whether separation was necessary to meet the needs (service or safety needs) of one or more of the children. This assessment resulted in the item being rated as a Strength in all 17 applicable cases (100%).

In 12 of the 17 applicable cases, the child was in the same placement setting as at least one other sibling, and in 11 of these cases, the child was in the same placement setting as all of his or her siblings.  In 5 cases, the child was separated from all siblings.

In the 5 cases in which the child was separated from all siblings and the 1 case in which the child was separated from some siblings, reviewers determined that the separation was in the best interest of one or more of the siblings.  In 5 of these cases the separation was due to at least one child's specialized needs.  In one case the children were placed in separate relative homes in close proximity.

Although stakeholders commenting on this issue generally agreed that the agency makes concerted efforts to place siblings together, stakeholders in one county noted that the lack of available foster homes often limits the ability of the agency to achieve this goal.

***Determination and Discussion:*** This item was assigned an overall rating of Strength based on the finding that in 100 percent of the cases, reviewers determined that siblings either were placed together or their separation was necessary to meet the needs of one or more of the siblings.   Although stakeholders mentioned the need for more foster homes that can accommodate sibling groups, this problem was not apparent in the cases reviewed.


**Item 13.  Visiting with parents and siblings in foster care**

_____  Strength          __X__   Area Needing Improvement

***Review Findings:***  An assessment of item 13 was applicable for 24 of the 29 foster care cases.  Cases were not applicable if the child had no siblings in foster care, if the parents could not be located, and/or if visitation with parents was considered not in the best interests of the child.  In assessing this item, reviewers were to determine (1) whether the agency had made, or was making, diligent efforts to facilitate visitation between children in foster care and their parents and siblings in foster care, and (2) whether these visits typically occurred with sufficient frequency to meet the needs of children and families.  The findings of this assessment were the following:

- Item 13 was rated as a Strength in 17 (71%) of the 24 applicable cases.
- Item 13 was rated as an Area Needing Improvement in 7 (29%) of the 24 applicable cases.

The analysis of case reviews indicated that visits between children and their mothers in the 24 applicable cases typically followed the following patterns:
- Weekly visits (2 cases)

- Twice a month visits (4 cases)
- Monthly (3 cases)
- Less than monthly (10 cases)
- No visits (2 cases)
- Visitation not applicable because not in child's best interest (3 cases)

For 11 of the 12 cases in which there were either no visits with the mother or visits took place less frequently than once a month, reviewers determined that the agency had made diligent efforts to promote and support visitation.  The one case in which there was no evidence of agency efforts to promote visitation with the mother was assigned a rating of Area Needing Improvement.

Visits between children and their fathers in the 24 applicable cases typically followed the following patterns.
- Monthly visits (2 cases)
- Less than monthly (5 cases)
- No visits (8 cases)
- Visitation not applicable because not in child's best interest or father could not be located (9 cases)

For 7 of 13 cases in which there were either no visits with the father or visitation occurred less frequently than once a month, reviewers determined that the agency made concerted efforts to promote and support visitation.  The other six cases were assigned a rating of Area Needing Improvement for this item because reviewers were unable to identify efforts to promote or support children's visitation with their fathers.

Visits with siblings occurred at least monthly in four cases and less frequently than once a month in two cases.  There were no visits between siblings in one case.   In two of the three cases in which no visits occurred or visits typically took place less frequently than once a month, reviewers determined that the agency had made diligent efforts to promote visitation.  In the third case, the child was placed with five of his eight siblings and had no desire to visit with the older siblings with whom he had never lived.

Stakeholders commenting on this issue praised the efforts of the agency to facilitate visitation.  They noted that it is DHHR policy to provide transportation and lodging for parents to visit children placed out of their home counties or out of State.

***Determination and Discussion:*** Item 13 was assigned an overall rating of Area Needing Improvement because in 29 percent of the applicable cases, reviewers determined that DHHR had not made concerted efforts to facilitate visitation.  This determination occurred most frequently in the assessment of visitation between fathers and children.  Reviewers expressed particular concern about the lack of documentation in case records concerning attempts to locate children's fathers.

**D003193**

**Item 14.  Preserving connections**

_____  Strength        __X__ Area Needing Improvement

***Review Findings:*** Item 14 was applicable for assessment in all 29 foster care cases.  In assessing item 14, reviewers were to determine whether the agency had made, or was making, diligent efforts to preserve the child's connections to family, neighborhood, community, culture, family, faith, and friends while the child was in foster care.  The assessment resulted in the following findings:

- Item 14 was rated as a Strength in 24 (83%) of the 29 applicable cases;
- Item 14 was rated as an Area Needing Improvement in 5 (17%) of the 29 applicable cases.

Case reviewers determined that in 24 of the 29 cases, children's primary connections had been "significantly" preserved while they were in foster care; in 2 of the 29 cases, children's primary connections had been "partially" preserved; and in 3 cases children's primary connections had been "not at all" preserved.  There were no cases involving Native American children. (According to the Statewide Assessment, there are no federally recognized Indian Tribes in West Virginia.)  Cases were rated as an Area Needing Improvement for this item when reviewers determined that the agency had not made efforts to preserve the child's connections to family, neighborhood, community, culture, family, faith, and friends while the child was in foster care.

***Determination and Discussion:*** Item 14 was assigned an overall rating of Area Needing Improvement because in 17 percent of the cases, reviewers determined that children's connections to family, community, culture, faith, and friends had not been preserved while the child was in foster care.

**Item 15.  Relative placement**

_____  Strength        __X__ Area Needing Improvement

***Review Findings:*** Item 15 was applicable for assessment in 27 of the 29 foster care cases.  Two cases were determined to be not applicable for assessment because the child's placements were court-ordered prior to agency involvement.  In assessing this item, reviewers were to determine whether the agency had made diligent efforts to locate and assess relatives (both maternal and paternal relatives) as potential placement resources for children in foster care.  The results of this assessment were the following:

- Item 15 was rated as a Strength in 18 (67%) of the 27 applicable cases.

D003194

- Item 15 was rated as an Area Needing Improvement in 9 (33%) of the 27 applicable cases.

This item was rated as a Strength when reviewers determined that children were placed with relatives (7 cases), that children were not placed with relatives but that the agency had made diligent efforts to seek relatives and assess them as a placement resource (10 cases), or that placement in a relative home was not appropriate for the child's needs (1 case).  Of the seven children placed with relatives, two were placed with a maternal grandparent, two with a maternal aunt/uncle, one with a paternal grandparent, and two with other relatives.

Cases were rated as an Area Needing Improvement when reviewers determined that the agency had made no efforts to explore the possibility of relative placements (6 cases), or when the agency had conducted only a limited exploration of potential relative placements, such as seeking and assessing maternal, but not paternal, relatives (3 cases).

Some stakeholders commenting on this issue noted that the MDT process facilitates relative placements by bringing relatives into the initial case planning phase.  However, the opinions of stakeholders regarding the value of relatives as a placement resource varied.  Some stakeholders expressed the opinion that agency expectations for relatives may be too high, resulting in relatives being screened out when they could be a good resource.

***Determination and Discussion:***  This item was assigned an overall rating of Area Needing Improvement because reviewers determined that in 33 percent of the cases the agency had not made diligent efforts to locate and assess relatives as potential placement resources.  A key finding was that DHHR workers are inconsistent in seeking paternal as well as maternal relatives.


**Item 16.  Relationship of child in care with parents**

_____  Strength     __X__  Area Needing Improvement

***Review Findings:***  An assessment of item 16 was applicable for 24 of the 29 foster care cases.  A case was considered not applicable for assessment if parental rights had been terminated and parents were no longer involved with the child or if a relationship with the parents was considered to be not in the child's best interests.  In assessing this item, reviewers were to determine whether the agency had made diligent efforts to support or maintain the bond between the child and both of his/her parents through visitation and provision of services that promote bonding.  The results of this assessment were the following:
- Item 16 was rated as a Strength in 18 (75%) of the 24 applicable cases.
- Item 16 was rated as an Area Needing Improvement in 6 (25%) of the 24 applicable cases.

D003195

In assessing the cases, reviewers assigned a rating of Strength if there was evidence of one of the following: (1) regular visitation and positive interactions between parent and child, or (2) no visitation or no evidence of a bond between parent and child, but evidence of efforts on the part of the agency to promote visitation and support bonding.  Reviewers identified several examples of agency attempts to promote bonding and visitation, including offering family counseling, providing contracted visitation services, providing transportation for visitation, and promoting visitation even after TPR.

Reviewers assigned a rating of Area Needing Improvement to this item when they determined that the agency had not made diligent efforts to support or maintain the bond between the child and both of his/her parents through promoting visitation and/or providing services designed to enhance bonding between children and parents.

***Determination and Discussion***: Item 16 was assigned an overall rating of Area Needing Improvement because reviewers determined that in 25 percent of cases, the agency did not make efforts to support the parent-child relationships of children in foster care. However, case review findings varied, with clear indication of agency support in some cases and lack of effort in others.  Lack of effort was particularly problematic regarding locating fathers and promoting visitation and/or bonding with fathers.  This is consistent with the findings in item 13 where there were 6 cases in which reviewers determined that caseworkers did not make concerted efforts to promote visitation between children and their fathers.

**D003196**

## III.    CHILD AND FAMILY WELL-BEING

## Child Well-Being Outcome 1

| Outcome WB1:  Families have enhanced capacity to provide for their children's needs. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | Fayette | Kanawha | Logan | Total Number | Total Percentage |
| Substantially Achieved: | 4 | 9 | 7 | 20 | 40.0 |
| Partially Achieved: | 4 | 6 | 7 | 17 | 34.0 |
| Not Achieved or Addressed: | 6 | 7 | 0 | 13 | 26.0 |
| Not Applicable: | 0 | 0 | 0 | 0 | |

### STATUS OF CHILD AND FAMILY WELL-BEING OUTCOME 1

West Virginia did not achieve substantial conformity with Well-Being Outcome 1. This determination was based on the finding that the outcome was rated as substantially achieved for only 40 percent of the cases reviewed, which is less than the 90 percent required for a determination of substantial conformity.

The CFSR found that DHHR is not consistent in its efforts to identify needs and provide services to families or to involve parents in the case planning process.  For example, in 46 percent of the cases, reviewers determined that the needs of children, parents, and/or foster parents were not being met and in 50 percent of the cases, reviewers determined that the parents and/or children were not involved in the case planning process.  In many cases, there was evidence of infrequent face-to-face contact between agency caseworkers and the children and parents in their cases, although reviewers noted that parents appeared to have frequent contact with service providers from private agencies.

Findings pertaining to the specific items assessed under Well-Being Outcome 3 are presented and discussed below.

**Item 17.  Needs and services of child, parents, foster parents**

_____  Strength        __X__  Area Needing Improvement

***Review Findings:***  An assessment of item 17 was applicable for all 50 cases.  In assessing the item, reviewers were to determine whether the agency had (1) adequately assessed the needs of children, parents, and foster parents; and (2) provided the services necessary to meet those needs.  The results were the following:
- Item 17 was rated as a Strength in 27 (54%) of the 50 applicable cases (16 of which were foster care cases).
- Item 17 was rated as an Area Needing Improvement in 23 (46%) of the 50 applicable cases (13 of which were foster care cases).

In completing the case review form, reviewers are to indicate for the child, the parents, and the foster parents whether needs were assessed and, whether services identified through the needs assessment were provided. The analysis of these data from the case review process resulted in the following information:
- Children's service needs were assessed in 40 cases, but were not assessed in 10 cases.  No services were provided in 8 of those 10 cases.  There were 3 cases in which reviewers determined that the services received were not appropriate to the children's needs even though an assessment had been conducted.
- Mothers' needs were not assessed in 11 of the 41 cases in which an assessment of mother's needs was determined to be applicable and services were not provided in 7 of the applicable cases.
- Fathers' needs were not assessed in 12 of 31 cases in which an assessment of father's needs was determined to be applicable.  Services were not provided in 7 of the 31 applicable cases.
- There were 29 children who were in foster care; 22 of these children were in family foster care, while the others were in some form of residential group care.  Foster parents' needs were not assessed in 5 of the 22 family foster care cases and services were not provided to foster parents in 5 of the 22 cases involving family foster care.

In general, cases were rated as a Strength for this item when reviewers determined that there were no unmet assessment or service needs for children, mothers, or foster parents.  A rating of Area Needing Improvement was assigned to 23 cases in which reviewers determined one or more of the following:
- Children or parents did not have their needs assessed or had identified services needs that were not met during the period under review (19 cases).
- Services provided were inappropriate to the children's or parents' needs (2 cases).
- Foster parents did not receive sufficient supportive services from the agency (7 cases).

**D003198**

In contradiction to the findings reported above, most stakeholders commenting on this issue expressed the opinion that DHHR caseworkers respond appropriately in assessing and addressing the needs of children, parents, and foster parents. Stakeholders expressed concerns, however, about the quality of services provided by private agency staff. Some stakeholders noted that contracted staff generally are not as well trained as agency staff and do not do as good a job assessing service needs. This may explain why concerns were raised regarding the effectiveness of assessments in identifying underlying needs. Several stakeholders also noted that many services are lacking in some areas of the State, particularly rural areas. More specific information on the availability of services is provided in the discussions presented for items 35 and 36 under the factor of Service Array.

***Determination and Discussion:*** Item 17 was assigned an overall rating of Area Needing Improvement because in 46 percent of the cases, reviewers determined that the needs and services of children, parents, and/or foster parents had not been, or were not being, adequately addressed by DHHR. Areas of concern included (1) the adequacy of assessments, particularly identifying underlying problems such as substance abuse and domestic violence; (2) the lack of appropriate follow-up in some cases to ensure that services were delivered and were effective; (3) an inconsistency among caseworkers in assessing the needs of fathers and involving them in services; and (4) a lack of attention in some cases to the service needs of foster parents. Another key concern identified from the case review process is that foster care youth do not appear to be receiving services to prepare them for eventual independent living.

## Item 18. Child and family involvement in case planning

\_\_\_\_    Strength    \_X\_    Area Needing Improvement

***Review Findings:*** An assessment of item 18 was applicable for all 50 cases. In assessing this item, reviewers were to determine whether parents (including pre-adoptive parents or permanent caregivers) and children (if age-appropriate) had been involved in the case planning process, and if not, whether their involvement was contrary to the child's best interest. A determination of involvement in case planning required that a parent (or child) had actively participated in identifying the services and goals included in the case plan. This assessment produced the following findings:

- Item 18 was rated as a Strength in 25 (50%) of the 50 applicable cases (16 of which were foster care cases).
- Item 18 was rated as an Area Needing Improvement in 25 (50%) of the 50 applicable cases (13 of which were foster care cases).

Specific findings of the review process were the following:

D003199

- Mothers were appropriately involved in the case planning process in 26 cases. In 18 cases, the mother was not involved but should have been. There were 6 cases in which the mother was not available to participate or the mother's participation was considered to be contrary to the child's best interest.
- Fathers were appropriately involved in the case planning process in 11 cases. In 12 cases, the father was not involved but should have been. There were 27 cases in which the father was not available to participate or the father's participation was considered to be contrary to the child's best interest.
- Children were appropriately involved in the case planning process in 14 cases. In 8 cases children were not involved although reviewers determined that they were old enough to have been involved. In 28 cases, reviewers determined that the children were not old enough to participate in the case planning process.

In general, cases were assigned a rating of Strength for this item when reviewers determined that all relevant parties had actively participated in the case planning process. Cases were assigned a rating of Area Needing Improvement when reviewers determined that one or more of the key parties had not been involved in the case planning process, even if there was a signed case plan in the case file. There were many cases in which parents and eligible children were not included in the case planning process and were asked to sign plans without having the opportunity to provide input into plan development. There also were 4 case files that had either no case plan or had an incomplete case plan and no plan was identified in interviews with key parties.

Stakeholders commenting on this issue noted that children are not as involved in case planning as frequently as they should be, even the older adolescents. Stakeholders also noted that parents are expected to be involved in case planning through their participation in the MDT meetings. However, as several stakeholders reported, it is difficult to get parents to attend MDT meetings, and when they do attend, it is difficult to ensure their meaningful participation. Some of the stakeholders interviewed suggested that in many cases, particularly youth services cases, the MDT meeting is not used to promote or review the case plan. According to the Statewide Assessment, the State statute does not have the same requirement for the MDT meeting for Youth Services cases as it does for cases entering foster care through child protective services. However, the State Supreme Court did extend the requirement to the cases in which children enter DHHR custody through a juvenile proceeding.

***Determination and Discussion:*** Item 18 was assigned an overall rating of Area Needing Improvement based on the finding that in 50 percent of the applicable cases, reviewers determined that DHHR had not appropriately involved either one or both of the parents and/or the children in the case planning process. In some instances, mothers may have been involved in the case planning process, but not father or children. Or in other instances, fathers and mothers may have been involved, but not children. In order for a case to receive a rating of Strength for this item, reviewers had to determine that all three parties were actively involved in the case planning process when relevant. This finding is contrary to DHHR policy, as noted in the Statewide Assessment, which requires that the parents be involved in MDTs with the objective of creating a working collaboration with the family. However, the finding is

D003200

consistent with information provided in the Statewide Assessment indicating that there is a low participation rate of parents in the MDT process.

**Item 19.  Worker visits with child**

\_\_\_\_  Strength          \_\_X\_\_  Area Needing Improvement

***Review Findings:***  All 50 cases were applicable for an assessment of item 19.  In conducting this assessment, reviewers were to determine whether the frequency of visits between caseworkers and children was sufficient to ensure adequate monitoring of the child's safety and well-being, and whether visits focused on issues pertinent to case planning, service delivery, and goal attainment. The results of the assessment were the following:

- Item 19 was rated as a Strength in 32 (64%) of the 50 applicable cases (17 of which were foster care cases).
- Item 19 was rated as an Area Needing Improvement in 18 (36%) of the 50 applicable cases (12 of which were foster care cases).

Reviewers noted the following with respect to typical patterns of caseworker visits with children:

- Once a week in 12 cases.
- Twice a month in 5 cases.
- Once a month in 18 cases.
- Less frequently than once a month in 15 cases.

This item was rated a Strength when reviewers determined that visits between caseworkers and children were of sufficient frequency to meet the needs of the child and monitor the child's safety and when the visits focused on issues pertinent to case planning, service delivery, and goal attainment.  The ratings of Strength did not vary as a function of the type of case (i.e., foster care cases or in-home services).

Cases were rated as an Area Needing Improvement when reviewers determined that (1) the frequency of visits was not sufficient to meet the child's needs and/or monitor safety (15 cases) and/or, (2) the visits did not focus on issues relevant to the case plan or achieving the child's permanency goal (4 cases).  In one case for which this item was rated as an Area Needing Improvement, a child in foster care had only four face-to-face contacts with an agency worker over a 2-year period.  In another case, a child in foster care had face-to-face contact with an agency caseworker only about once every 3 months.

Stakeholders commenting on this issue, including internal agency stakeholders, were in agreement that caseworker visits with children do not always take place as often as they should.  However, this appears to be more of an issue of an inconsistency in practice among caseworkers rather than representing general caseworker practice.  Many children interviewed as part of the case review process generally described good relationships with their caseworkers.  In addition, many caseworkers were noted to attend their "children's" school events and participate in special activities with children, such as the WE CAN camp.

***Determination and Discussion:*** Item 19 was assigned an overall rating of Area Needing Improvement based on the finding that in 36 percent of the cases, reviewers determined that the frequency of caseworker visits with children was not sufficient to ensure adequate monitoring of the child's safety and well-being.  According to State policy, there is no minimum number of contacts for in-home services cases, aside from the requirement of contact during completion of the Initial Assessment and Safety Evaluation.  For foster care cases the frequency of contacts is set by policy, which varies depending on the type and location of the foster care placement.  However, the general requirement is that meaningful contact should be made with every child in foster care (usually after the adjudication) at least once a month.  According to the Statewide Assessment, DHHR staff members have historically experienced difficulty in making all the contacts that the standards of good practice require.   This was attributed primarily to the high rate of staff turnover, resulting in excessive caseloads for some caseworkers.

## Item 20.  Worker visits with parents

_____  Strength      __X__  Area Needing Improvement

***Review Findings:*** An assessment of item 20 was applicable for 43 of the 50 applicable cases.  Cases that were considered not applicable for an assessment of this item were those in which (1) parental rights had been terminated and the parents were no longer involved in planning for the child; or (2) the parents could not be located despite diligent efforts by the agency.  Reviewers were to assess whether the caseworker had sufficient face-to-face contact with the mothers and fathers of the children to promote attainment of the child's permanency goal or to ensure the child's safety and well being.  The results of this assessment were the following:
- Item 20 was rated as a Strength in 22 (51%) of the 43 applicable cases (9 of which were foster care cases).
- Item 20 was rated as an Area Needing Improvement in 21 (49%) of the 43 applicable cases (13 of which were foster care cases).

Specific findings regarding visits for the 40 cases for which visitation with mothers was applicable were the following:
- Mothers were visited once a week in 9 cases
- Mothers were visited twice a month in 3 cases
- Mothers were visited once a month in 14 cases

D003202

- Mothers were visited less frequently than once a month in 11 cases
- Mothers received no visits in 3 cases

Specific findings regarding visits for the 23 cases for which visitation with fathers was applicable were the following:
- Fathers were visited once a week in 4 cases
- Fathers were visited once a month in 5 cases
- Fathers were visited less frequently than once a month in 14 cases

In four of the five juvenile delinquency cases, there was little or no contact between the caseworker and the parents.

The item was rated as a Strength when reviewers determined that the frequency and quality of visits was sufficient to address the parents' needs and promote attainment of case goals. Cases were rated as an Area Needing Improvement when reviewers determined that (1) visits were not of sufficient frequency to address the parents' needs or promote attainment of case goals (11 cases), (2) visits were of sufficient frequency, but did not address substantive issues pertaining to the case (2 cases), or (3) visits were neither sufficiently frequent or sufficiently substantive (8 cases).

***Determination and Discussion:*** This item was assigned an overall rating of Area Needing Improvement because in 49 percent of the applicable cases, reviewers determined that visits with parents were not sufficiently frequent or of sufficient quality to promote the safety and well-being of the child or enhance attainment of permanency. As noted in the Statewide Assessment, DHHR recognizes that regular contact between caseworkers and families is a key to effective service delivery. However, the Statewide Assessment also notes that DHHR caseworkers experience difficulty in achieving the required level of contact. According to DHHR policy, the child's caseworker is to have contact with the child's parents on at least a monthly basis while the child is in foster care or until parental rights are terminated.

**D003203**

## Well-Being Outcome 2

| Outcome WB2:  Children receive appropriate services to meet their educational needs. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | **Fayette** | **Kanawha** | **Logan** | **Total Number** | **Total Percentage** |
| Substantially Achieved: | 5 | 10 | 9 | 24 | 75.0 |
| Partially Achieved: | 2 | 2 | 0 | 4 | 12.5 |
| Not Achieved or Addressed: | 2 | 2 | 0 | 4 | 12.5 |
| Not Applicable: | 5 | 8 | 5 | 18 | |

### STATUS OF WELL-BEING OUTCOME 2

West Virginia did not achieve substantial conformity with Well-Being Outcome 2, based on the finding that only 75 percent of the cases reviewed were determined to have substantially achieved this outcome.  This is less than the 90 percent required for substantial conformity. The general finding of the CFSR case review process was that in about 25 percent of the cases, the children's educational needs were not being met because necessary education-related services were not provided.  In addition, in some cases foster parents were not informed about the child's school history and did not receive school records at the time of placement.

The findings for the single item subsumed under this outcome are presented below.

### Item 21.  Educational needs of the child

_____ Strength      __X__ Area Needing Improvement

***Review Findings:*** An assessment of item 21 was applicable for 32 of the 50 cases reviewed.  Cases that were not applicable for assessment were foster care cases in which the children were too young to be enrolled in school or preschool, or in-home services cases in which children did not have needs pertaining to education-related issues.  In assessing this item, reviewers were to determine whether children's educational needs were appropriately assessed and whether services were provided to meet those needs.  The results of this assessment were the following:

- Item 21 was rated as a Strength in 24 (75%) of the 32 applicable cases (22 of which were foster care cases).

D003204

- Item 21 was rated as an Area Needing Improvement in 8 (25%) of the 32 applicable cases (4 of which were foster care cases).

Reviewers reported the following additional findings with respect to this item:
- Educational needs were assessed in 21 (66%) of the 32 applicable cases, were not assessed in 8 cases, and were not applicable for assessment in 3 cases.
- Services were provided to meet educational needs in 15 cases, services were not provided in 6 cases, and service provision was not applicable in 11 cases.
- 12 (48%) of the 25 foster care cases that should have had school records in the case file did not.
- 15 (68%) of the 22 foster parents or relative caretakers that should have received school records at the time of placement did not.
- Children in 9 cases experienced multiple school changes as a result of placement changes while in foster care.

Foster care cases were rated as a Strength for this item when reviewers determined that there was evidence that the agency had assessed the children's educational needs, provided services to meet those needs (if necessary), included school records in the case file, and provided school information to foster parents at the time of placement. In-home services cases were rated as a Strength for this item when reviewers determined that DHHR caseworkers had assessed potential education-related needs and assisted families in accessing services to meet those needs when relevant. All applicable cases were assigned a rating of Area Needing Improvement for this item when reviewers determined that an appropriate assessment of a child's education-related needs had not been conducted.

Although stakeholders commenting on this issue expressed the opinion that caseworkers do assess children's needs and try to get those needs met, they cited problems getting schools to be responsive to developing Individual Educational Plans (IEP) and obtaining special education services for children in foster care. Stakeholders suggested that it is important to have educators present during the MDTs, and indicated that in some counties educators are more likely to attend the MDTs than in other counties.

***Determination and Discussion:*** Item 21 was assigned an overall rating of Area Needing Improvement because for 25 percent of the cases, reviewers determined that the educational needs of children were not effectively and appropriately addressed. However, in one county included in the on-site review, it was noted that this item was rated as a Strength in all applicable cases. This is consistent with information provided in the Statewide Assessment indicating that casework practices regarding children's educational needs are uneven across the State. Also, reviewers found that foster parents tended to be the primary advocates for the educational needs of the child.

D003205

## Child Well-Being Outcome 3

| Outcome WB3: Children receive adequate services to meet their physical and mental health needs. | | | | | |
|---|---|---|---|---|---|
| Number of cases reviewed by the team according to degree of outcome achievement: | | | | | |
| | Fayette | Kanawha | Logan | Total Number | Total Percentage |
| Substantially Achieved: | 6 | 10 | 9 | 25 | 59.5 |
| Partially Achieved: | 3 | 6 | 2 | 11 | 26.2 |
| Not Achieved or Addressed: | 5 | 1 | 0 | 6 | 14.3 |
| Not Applicable: | 0 | 5 | 3 | 8 | |

## STATUS OF WELL-BEING OUTCOME 3

West Virginia did not achieve substantial conformity with Well-Being Outcome 3. This determination was based on the finding that the outcome was rated as substantially achieved in only 60 percent of the applicable cases, which is less than the 90 percent required for a determination of substantial conformity.

In general, the CFSR found many inconsistencies with respect to agency efforts to meet the physical and mental health needs of children in foster care or in-home services cases. Particular concerns were identified in the area of meeting children's mental health needs. The case review process found that many children had not received complete mental health assessments or had not received all of the services recommended to address mental health problems. There also were several cases in which the case record documented the need for services but there was no follow up to determine whether services had been provided. Both the stakeholders and the Statewide Assessment noted that part of the problem is due to shortages of mental health services in many areas of the State.

Findings pertaining to the specific items assessed under Well-Being Outcome 3 are presented and discussed below.

### Item 22.  Physical health of the child

____  Strength          __X__  Area Needing Improvement

**Review Findings:**  An assessment of item 22 was applicable for 38 of the 50 cases reviewed.  Cases that were not applicable for this assessment were in-home services cases for which no physical health issues were identified.  All cases involving children in foster care were applicable for an assessment of item 22.  In assessing this item, reviewers were to determine whether (1) children's physical health needs had been appropriately assessed, and (2) the services designed to meet those needs had been, or were being, provided. The findings of this assessment were the following:

- Item 22 was rated as a Strength in 31 (82%) of the 38 applicable cases (23 of which were foster care cases).
- Item 22 was rated as an Area Needing Improvement in 7 (18%) of the 38 applicable cases (5 of which were foster care cases).

An additional finding was that of the 29 foster care cases, the child received a health screening at entry into foster care in 24 (83%) and the screening was provided within the State guideline of 5 working days in 20 (83%) of these cases.

In general, cases were rated as a Strength when the children's health needs were being routinely assessed and services provided as needed.  Cases were rated as an Area Needing Improvement when reviewers determined one or more of the following:

- The child did not receive a comprehensive health assessment at entry into foster care and there was a critical need for that assessment (e.g., the child was an infant who was believed to have had a prenatal exposure to drugs or alcohol) (3 cases).
- The child had health issues that caseworkers did not address (2 cases).
- There was lack of documentation about the child's health status and preventive care in the case file (3 cases).

Stakeholders commenting on this issue generally expressed the opinion that DHHR does meet children's physical and dental health needs.  Some stakeholders noted that caseworkers receive assistance in meeting children's needs from the State management information system (FACTS) which issues a monthly report listing the "due dates" for children's health appointments.  Other stakeholders, however, noted that foster parents experience many difficulties accessing health services and experience long waiting times at clinics.

**Determination and Discussion:** Item 22 was assigned an overall rating of Area Needing Improvement based on the finding that in 18 percent of the applicable cases, reviewers determined that DHHR was not adequately addressing the health needs of children in foster care and in-home services cases.  According to the Statewide Assessment, the State's Program Review process found that casework practices regarding children's health needs are uneven across the State.  However, the Statewide Assessment also noted that part of the problem observed with respect to meeting children's health needs may be attributed to poor documentation on the part of caseworkers.  For example, the Statewide Assessment reported that during the State's program review, foster parents revealed that caseworkers did discuss the child's health care issues with them, but these conversations were not documented in the case record.

D003207

**Item 23.  Mental health of the child**

_____  Strength        __X__  Area Needing Improvement

***Review Findings:*** An assessment of item 23 was applicable for 32 of the 50 cases reviewed.  Cases that were not applicable were foster care cases in which the child was too young for an assessment of mental health needs, and in-home services cases in which the children's mental health needs were not an issue. In assessing this item, reviewers were to determine whether (1) mental health needs had been appropriately assessed and, (2) services to address those needs had been offered or provided.  The findings of this assessment were the following:

- Item 23 was rated as a Strength in 20 (63%) of the 32 applicable cases (17 of which were foster care cases).
- Item 23 was rated as an Area Needing Improvement in 12 (38%) of the 32 applicable cases (7 of which were foster care cases).

For the 32 applicable cases, reviewers noted that children's mental health needs were "significantly assessed" in 23 cases, "partially assessed" in 3 cases, "not at all assessed" in 4 cases, and "not applicable" in 2 cases.  Reviewers also reported that mental health needs were "significantly met" for 17 cases, "partially met" for 4 cases, "not at all" met for 7 cases, and "not applicable" in 4 cases (including those cases in which children did not require mental health services based on the assessment).

Cases were assigned a rating of Strength if mental health needs were "significantly" assessed and the children's mental health needs were "significantly" met.  The item was rated as an Area Needing Improvement when reviewers determined that assessments and services were provided only partially or not at all.  Some examples of cases rated as Area Needing Improvement include the following:

- An in-home services case in which the initial assessment documented a need for mental health assessments for the children, but none were provided.
- A foster care case in which a caseworker did not make a referral for mental health services or assessment for a child who threatened suicide.
- A foster care case in which the need for counseling was identified through an assessment, but no counseling has been provided.  In this case, the child is taking antidepressants prescribed by a general physician.

Stakeholders commenting on this issue were in agreement that it was a significant challenge in the State to meet children's mental health services needs.  These stakeholders reported deficiencies in the array, quality, and quantity of services and in the timeliness of service delivery.  Stakeholders also questioned the thoroughness of mental health evaluations and the ability of therapists to address issues related to child abuse/neglect and adoption.  Finally, a few stakeholders expressed the opinion that some providers terminate services too soon.

D003208

***Determination and Discussion:*** Item 23 was assigned an overall rating of Area Needing Improvement because in 38 percent of the applicable cases, reviewers determined that DHHR was not adequately addressing children's mental health needs.  Information in the Statewide Assessment corroborates stakeholders' statements regarding the lack of behavioral health services.  The Statewide Assessment also indicated that the State's program review process found that children's mental health needs have not been well documented in the case files.

**D003209**

# SECTION 2: SYSTEMIC FACTORS

## IV.    STATEWIDE INFORMATION SYSTEM

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2 | 3 | 4    X |

## STATUS OF STATEWIDE INFORMATION SYSTEM

West Virginia is in substantial conformity with the factor of Statewide Information System.  Findings with respect to the item assessed for this factor are presented below.

**Item 24.  State is operating a statewide information system that, at a minimum, can readily identify the status, demographic characteristics, location, and goals for the placement of every child who is (or within the immediately preceding 12 months, has been) in foster care.**

____X____    Strength            _____    Area Needing Improvement

Item 24 has been rated as a strength because the West Virginia FACTS is a SACWIS certified system and submits AFCARS and NCANDS data without error or penalty.  Some data elements in the CFSR State Data profile are obviously incorrect and the State is working with a technical assistance provider to correct mapping issues that resulted in the incorrect numbers.   An AFCARS review will be scheduled in 2003 to look more closely at the mapping issues. Stakeholders are supportive of FACTS and are encouraged by the improvements it has brought to child welfare in West Virginia, but stakeholders also pointed out data input problems, staffing limitations and training needs.

According to the Statewide Assessment, the State's statewide information system—Families and Children Tracking System (FACTS)—is a comprehensive, customized statewide automated case management system for all child welfare programs, including child protective services, foster care, independent living, family preservation, and adoption programs. (FACTS also is used by child

care and adult services programs.) FACTS was designed and developed to meet the Federal requirements for a Statewide Automated Child Welfare Information System (SACWIS), and particularly to enable the State to report quality data to the Adoption and Foster Care Analysis and Reporting System (AFCARS) and the National Child Abuse and Neglect Data System (NCANDS). FACTS also is designed to assist caseworkers in documenting case activities for all cases involving families and children served by the Department of Health and Human Resources (DHHR) and to assist administrators in documenting the business processes for the Office of Social services within DHHR.

The Statewide Assessment notes that FACTS generates several types of reports including management reports, ad hoc reports, Federal AFCARS and NCANDS Reports, and application reports. Currently, more than 100 management reports are created each month and distributed via the FACTS Reporting Network (FREDI.Net). The management reports are accessible to all levels of staff.

The findings of the State's program review (a quality assurance process), indicate that, due to a high rate of caseworker turnover and to excessive caseloads, DHHR caseworkers are not always properly trained on FACTS. As a result, documentation of cases in FACTS frequently is either inadequate or nonexistent. In addition, agency caseworkers have expressed concern about the time required to enter information into FACTS, suggesting that it takes time away from working directly with families and children. As a result, they often do not complete the necessary documentation. The Statewide Assessment noted that data provided for at least three of the measures reported in the State Data Profile were likely to be incorrect. This applies to the rate of maltreatment recurrence, the rate of re-entry into foster care, and the number of placement changes experienced by children in foster care.

These two problems result in agency concerns about the accuracy and reliability of the data generated by FACTS. One initiative currently being piloted for improving FACTS is to provide caseworkers with Personal Digital Assistants so that they can enter data quickly from the field. The agency also plans to develop a Web Application for Provider Information.

Stakeholders commenting on FACTS expressed mixed opinions. On the one hand, stakeholders noted that the system is comprehensive and effective in tracking children in foster care and producing a variety of management reports. On the other hand, they expressed concern about caseworkers not entering complete data making the data produced by FACTS of questionable quality. Stakeholders reported that in some counties staff and administrators use manual counts to collect case relevant information because of the general mistrust of the data in the system.

Some stakeholders also noted that certain types of data are difficult to get out of the system and that the management reports that are produced do not address outcomes. Internal stakeholders reported that FACTS has "redundancies" that make it cumbersome to enter data and that the system is hard to navigate. These stakeholders suggested that caseworkers and supervisors need more assistance from the help desk and FACTS staff than they currently receive and more training in using FACTS. Key stakeholders working with

FACTS noted that OSS is working with regional trainers to integrate FACTS training into the new worker training modules and is focusing on improvement to enhance tracking of repeat maltreatment.

**D003212**

## V.    CASE REVIEW SYSTEM

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2    X | 3 | 4 |

### STATUS OF CASE REVIEW SYSTEM

West Virginia is not in substantial conformity with the systemic factor of Case Review System.  Findings with regard to specific items assessed for this factor are presented below.

**Item 25.  Provides a process that ensures that each child has a written case plan to be developed jointly with the child's parent(s) that includes the required provisions.**

_____ Strength     __X__    Area Needing Improvement

Item 25 has been rated an area needing improvement because case plans have insufficient parent involvement, a majority of case plans are not adequately documented, and there are inconsistencies in the implementation of the MDT process across the State.

According to the Statewide Assessment, State policies require that each child has a Child, Youth and Family Case Plan completed within 60 days of the child entering the foster care system through child protective services.  State foster care policy requires that a Child Assessment and a Service Plan be completed for each child entering foster care through youth services or a voluntary placement and identifies the parties to be included in the development of the case plan, including parents. The Statewide Assessment notes that the case plan format includes all of the information required under West Virginia Code and the Federal requirements for IV-B and IV-E.   The Statewide Assessment also notes that State foster care policy requires that an MDT be established within 30 days of a child entering foster care and identifies the parties to be involved in the MDT. The MDT is used to review and evaluate the case plan at least every 90 days and to make adjustment to the plan as needed.  A written report from the MDT review is submitted to the court for judicial review.  The MDT process is established in each county in the State and State law requires that the custodial parent(s), guardian(s), or other family members shall be MDT members.  State law also requires that in cases of abused or neglected children, DHHR must encourage participation by any agency or person who contributes to assisting the child and family in the development of the case plan and in the MDT.

According to State policy, the most important objective of the family assessment process is to develop a working collaboration with the family and engage the family in a problem solving/helping partnership.  However, the Statewide Assessment reports that the State's program review found that participation by parents in the development of the case plan is occurring in only 39.8 percent of the cases.  In addition, information from the State's program review indicate that Child Case Plans are being completed within 60 days of the child entering foster care in only 30.8 percent of the cases.  This is similar to the findings of the CFSR case reviews, which determined that parents had been involved in developing the case plan in only 50 percent of the cases.

As noted in the Statewide Assessment, the State's program review also determined that the quality of documentation in the family assessment/treatment plan was adequate or better in only 31.25 percent of the cases.   In addition, the Statewide Assessment indicated that many judges do not perceive the Child, Youth and Family Case Plan as an easy document to read and there have been many requests from the courts to use different forms or to modify the current case plan.  This results in caseworkers having to develop two plans, which is very burdensome.

Also, according to the Statewide Assessment, there are inconsistencies in the implementation of the MDT process across the State, and in some areas, the MDT process is not used at all.  The findings of the State's Program Review reported in the Statewide Assessment indicate that in four districts surveyed MDTs are being held at least every 90 days or prior to a judicial hearing only 8.4 percent of the time.  The following barriers to effective use of the MDT were noted in the Statewide Assessment:  (1) lack of participation by the key individuals; (2) meetings not being scheduled in a timely manner; and (3) lack of timely notification of the meeting to participants.  In addition, the Statewide Assessment suggested that part of the problem may be that the MDTs are not being documented in FACTS so it appears that they have not been convened, even when they may have been.

Despite the concerns expressed in the Statewide Assessment, several stakeholders commenting on this issue expressed praise for the MDT process and suggested that the use of this process has resulted in the development of a written plan for each case and improved quality of the plans.  Stakeholders also indicated that the MDT process, because it is a collaborative process, has resulted in individualized case plans targeting specific permanency goals.  However, most stakeholders suggested that parents and children rarely have significant input into the case planning process.

D003214

**Item 26.  Provides a process for the periodic review of the status of each child, no less frequently than once every 6 months, either by a court or by administrative review.**

_____ Strength          __X__ Area Needing Improvement

Item 26 has been rated an area needing improvement because administrative and judicial reviews for each child are not being held on a timely basis. The CFSR found that the policy infrastructure for periodic case review is present including a combination of state statute, Supreme Court rules, and revised child protection and foster care policy.  However the practice implementing these rules and policy does not meet expectations.

According to the Statewide Assessment, State foster care policy requires that an administrative review be conducted within 180 days of placement for all children in DHHR custody.  This administrative review process may be combined with another review process, such as an MDT meeting, which is required every 90 days.  The Statewide Assessment reported that the State's program review data from four districts indicate that administrative reviews are being held every 6 months 42.7 percent of the time, and that Judicial Status Reviews (held at 90 day intervals) are being held timely 30.1 percent of the time.  The combined figures indicate that 72.8 percent of the periodic reviews in the four districts are held on a timely basis.  The State's program review reported the following barriers to timely reviews: (1) high turnover rate for caseworkers, (2) high caseloads, and 3) lack of proper caseworker and supervisor training in entering information into FACTS.

Stakeholders expressed differing perceptions of the periodic review process.  Stakeholders suggested that, in general, cases are reviewed periodically every 6 months, and sometimes more often.  Stakeholders also indicated that the MDT periodic reviews may not always include parents and children. Stakeholders indicated that agency workers may be conducting MDTs even when they are serving as a periodic administrative review rather than bringing in a third-party facilitator.  The Social Security Act at Section 475 (6) requires that an administrative review be conducted by a panel of appropriate persons at least one of whom is not responsible for case management or service delivery to either the child or parents who are subject of the review.  A few stakeholders noted that the State Supreme Court has developed a tracking or inventory system to follow cases on a quarterly basis.

**Item 27.  Provides a process that ensures that each child in foster care under the supervision of the State has a permanency hearing in a qualified court or administrative body no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter.**

_____ Strength          __X__ Area Needing Improvement

Item 27 has been rated an Area Needing Improvement because of a lack of consistency across the State in holding timely hearings.  In addition, hearings may not be held after a TPR has been obtained.

According to the Statewide Assessment, State foster care policy requires that each child have a judicial review 12 months after the child enters the custody of the State and every 12 months thereafter, as long as the child remains in the State's custody.  Data from the State's program review reported in the Statewide Assessment indicate that 12-month permanency hearings are occurring about 71.4 percent of the time.  State policy also requires workers to notify the prosecutor when the child has been in care for 11 months and to request that a judicial review hearing (permanency hearing) be scheduled during the 12th month of placement.

Stakeholders commenting on this issue expressed the opinion that permanency hearings are being held on a timely basis and often are held more frequently than required.  However, stakeholders also noted that timely permanency hearings are not held consistently across the State because some judges do not schedule the hearings.  Some stakeholders expressed concern that in many cases, the 12-month hearings are not being held after TPR has been obtained.


**Item 28.  Provides a process for termination of parental rights proceedings in accordance with the provisions of the Adoption and Safe Families Act.**

   __X__   Strength        _____   Area Needing Improvement

Item 28 has been rated as a strength because TPR petitions are being filed on a timely basis in a majority of cases and the State has dramatically increased terminations and is complying with ASFA requirements for TPR.

According to the Statewide Assessment, after the passage of the Adoption and Safe Families Act (ASFA), the Code of West Virginia was amended to include provisions for termination of parental rights for children who have been in foster care for 15 of the most recent 22 months. The Code also was amended to require a filing for termination of parental rights for children whose parents have been convicted of certain felonies.  To meet the new Code requirements, DHHR policies were revised to include the requirement to request termination of parental rights for children who have been in foster care for 15 of the last 22 months unless there is a compelling reason not to do so.

The Statewide Assessment notes that data from the State's program review indicate that a TPR petition has been initiated by the caseworker when a child has been in custody for 15 months out of the last 22 months about 57 percent of the time, although the

percentage varied widely across the four districts surveyed from 20 percent in one district to 100 percent in another.  In the CFSR case reviews, it was found that 15 cases met the "15 out of 22 months" guideline, and TPR had been filed on 13 of those cases and exceptions had been noted in the case file for the remaining two cases.

Many stakeholders commenting on this issue indicated that since ASFA, there have been dramatic increases in filing for TPR and that courts are complying with the provisions of ASFA.  However, stakeholders noted that there is variation across judges in their willingness to meet ASFA guidelines.  Stakeholders also noted that DHHR is supporting attainment of TPR by collaborating with child support agency personnel to assist in locating children's fathers.  However, stakeholders indicated that there are agency-related barriers to achieving TPR including caseworkers being unprepared for court hearings and staff turnover, which was noted to disrupt the "evidence trail".

**Item 29.  Provides a process for foster parents, preadoptive parents, and relative caregivers of children in foster care to be notified of, and have an opportunity to be heard in, any review or hearing held with respect to the child.**

_____  Strength        ___X___    Area Needing Improvement

Item 29 has been rated as an area needing improvement because foster parents, preadoptive and relative caretakers do not routinely participate in meetings, hearings and reviews.  There is variation among counties as to notice provided, level of participation and opportunities to be heard in court hearings, administrative reviews and MDT meetings.

As noted in the Statewide Assessment, State foster care policy requires that all foster parents, preadoptive parents, and relative caretakers are given notice of, and an opportunity to attend and to be heard at, all case reviews.  FACTS is equipped with letters that are generated by the caseworker to notify these parties of any scheduled review.  Caseworkers document when letters are sent to notify parties of a scheduled review.  The court is required to notify foster parents, preadoptive parents and relative caretakers of any judicial hearings and give them the opportunity to be heard at the hearing.

According to the Statewide Assessment, data from the State's program review process indicate that foster parents do not routinely participate in MDT meetings, hearings, or reviews.  The program review process did not assess whether foster parents are actually asked to provide information either during court hearings, administrative reviews, or MDT meetings.

Stakeholders expressed mixed opinions regarding notification of foster parents, preadoptive parents, and relative caregivers about reviews and hearings.  Stakeholders in one of the counties included in the CFSR onsite review suggested that the county agency

provides a clear process for written notification of upcoming administrative reviews, but that such a process is lacking for judicial reviews.  In another county, stakeholders indicated that foster parents are not notified of court dates, are not notified of MDT meetings in a timely manner, and are not informed about the results of court hearings.  Stakeholders stated that some judges encourage foster parent participation, however, many do not provide them with an opportunity to be heard.

**D003218**

## VI.    QUALITY ASSURANCE SYSTEM

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2 | 3 | 4    X |

### STATUS OF QUALITY ASSURANCE SYSTEM

West Virginia is in substantial conformity with the factor of Quality Assurance System.  Findings with respect to the specific items assessed for this factor are presented below.

**Item 30.  The State has developed and implemented standards to ensure that children in foster care are provided quality services that protect the safety and health of the children.**

___X___    Strength  _____    Area Needing Improvement

Item 30 has been rated as a strength because the State has promulgated new regulations and policy in CPS, youth services and foster care to include changes in law, federal regulations and best practice standards.

According to the Statewide Assessment, standards have been developed and implemented to ensure that children in foster family placements and in group residential facilities are provided quality services that protect their health, safety, and well being.  The Statewide Assessment notes that new DHHR regulations, which became effective July 1, 2001, govern foster and adoptive homes developed by private child placing agencies.

Several stakeholders commenting on this issue agreed that acceptable standards are in place.  However, a few stakeholders expressed concern that DHHR has less stringent standards for investigating child abuse/neglect reports that are filed on DHHR agency foster homes than they do for investigating maltreatment reports on other families.  Other stakeholders noted that homefinders are not always enforcing licensing standards.

**Item 31.  The State is operating an identifiable quality assurance system that is in place in the jurisdictions where the services included in the CFSP are provided, evaluates the quality of services, identifies strengths and needs of the service delivery system, provides relevant reports, and evaluates program improvement measures implemented.**

   X       Strength       Area Needing Improvement

Item 31 has been rated a Strength because the State is operating an identifiable quality assurance system based on the CFSR that identifies strengths and needs, and it has developed a methodology of evaluating program improvements.

According to the Statewide Assessment, DHHR has instituted a Quality Assurance/ Program Review Unit with responsibility to conduct reviews of field offices.  The Program Review Unit conducts a review of child welfare services throughout the State focusing on practice issues and outcomes pertaining to safety, permanency, and well being.  The review is similar to the CFSR process in that cases are reviewed and interviews with providers, children, and families are conducted (in a 10 percent sample of cases reviewed). The Statewide Assessment reports that a program improvement planning group has been organized to address areas needing improvement identified in these reviews.  To date, several counties have undergone a program review and have developed corrective action plans as a result.   In 1999 the Program Review Unit completed a baseline review of all child welfare districts including an evaluation of cases based on the outcome measures developed for the CFSR.  The next round of reviews Is currently underway and nine districts have been reviewed to date. In 2000 the unit reviewed the Statewide Homefinding Program.  A program improvement planning group has been organized to address areas found to be in need of improvement and to maintain areas of strength.

Stakeholders commenting on this issue expressed the opinion that the new Office of Program Review and Quality Improvement at the Bureau for Children and Families level will allow DHHR to expand its quality assurance efforts and more closely follow up on corrective action plans.  However, several stakeholders expressed concern that in one of the counties included in the on-site review, there is no peer review of cases, although in other counties peer reviews do take place.

**D003220**

## VII.   TRAINING

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2 | 3     X | 4 |

## STATUS WITH RESPECT TO TRAINING

West Virginia is in substantial conformity with the systemic factor of Training.  Findings with respect to items assessed for this factor are presented below.

**Item 32.  The State is operating a staff development and training program that supports the goals and objectives in the CFSP, addresses services provided under titles IV-B and IV-E, and provides initial training for all staff who deliver these services.**

____X____Strength     ____   Area Needing Improvement

Item 32 has been rated a strength because West Virginia is operating a staff development and training program for all staff that addresses the requirements of IV-B and IV-E.

According to the Statewide Assessment, the current caseworker training initiative was implemented 3 years ago by the Office of Social Services (OSS) within DHHR. At that time, OSS hired a contracted training consultant, FACTS trainers, a staff person to lead and coordinate training, and regional trainers to provide training to local staff.   The OSS training program provides extensive training for all staff, offers technical assistance and support to the regional trainers and supervisors, develops new training modules, and updates areas of policy training including CPS, Foster Care, Child Welfare State Code and Youth Services.  DHHR has established a Training Advisory Council comprised of representatives from regional training staff, program staff, FACTS, Schools of Social Work and field supervisors.  The Council facilitates communications and coordination of training issues and needs, identifies training needs and oversees the revision of training curricula.

As noted in the Statewide Assessment, the OSS training program is competency-based and implements pre- and post-tests to evaluate the effectiveness of each module.  The core curriculum for child protective services and foster care workers includes modules focusing

D003221

on topics such as sexual abuse, CPS policy, child welfare law, legal court room training, foster care policy and practice, youth services, adoption, concurrent planning, permanency, transitional living, family preservation, homefinding, family centered practice, social work ethics, adolescent development, and fetal alcohol syndrome.

The Statewide Assessment also notes that the OSS training program has made great strides in the past three years, going from very little training to regularly scheduled training in each region.  However, as indicated in the Statewide Assessment, because of high rates of staff turnover, it is difficult to provide new worker training in a timely manner for all staff.

Most stakeholders commenting on this issue expressed the opinion that the new worker training is of good quality.  However, stakeholders did express concerns about staff turnover and its impact on the ability of DHHR to train new workers in a timely manner. Several stakeholders noted that in some counties, caseworkers are given a caseload before receiving any training.  Internal stakeholders indicated that caseworkers need more field experience and on-the-job training.  Stakeholders also noted that there is no established curriculum for training supervisors. Other stakeholders indicated that there is a supervisory training curriculum, but that it has not been provided for several years.  Several stakeholders suggested that more training is needed for foster care staff, particularly training pertaining to preparing youth for independent living.  At present, the basic training covers only State and Federal policies pertaining to independent living services.

**Item 33.  The State provides for ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties with regard to the services included in the CFSP.**

_____   Strength        __X__        Area Needing Improvement

Item 33 has been rated an area needing improvement because the advanced and in-service training opportunities are insufficient to allow staff to continue to develop their skills.  Additional training is needed in certain program areas and specialized training is not offered.

According to the Statewide Assessment, DHHR has the responsibility to make continuing education hours available to staff caseworkers who are required to be licensed in West Virginia.  However, the Statewide Assessment also notes that due to training demands posed by high staff turnover, it has been difficult for DHHR to provide or arrange for skills development training for staff beyond the basic training program.  There also is no organized training program in place for advanced skill development for tenured supervisors.  However, IV-E stipends are provided to staff who want to pursue attainment of Masters of Social Work degrees on a part-time basis.

D003222

Stakeholders commenting on this issue were in general agreement that advanced training and in-service training opportunities are not sufficient to ensure that caseworkers and supervisors continue to develop their caseworker and supervisory skills.  Several stakeholders suggested that additional training is needed in the areas of foster care, mental health, and interview/engagement skills. Stakeholders noted that several types of specialized trainings are desired by staff but not offered.

**Item 34.  The State provides training for current or prospective foster parents, adoptive parents, and staff of State licensed or approved facilities that care for children receiving foster care or adoption assistance under title IV-E that addresses the skills and knowledge base needed to carry out their duties with regard to foster and adopted children.**

____X____    Strength    _____    Area Needing Improvement

Item 34 was rated a strength because West Virginia operates a mandatory training program for all prospective foster/adoptive parents. The pilot testing of the PRIDE curriculum may be expanded statewide.

As noted in the Statewide Assessment, pre-service and on-going training is mandatory for all prospective foster/adoptive parents.  The type of training, the amount of training, and the source of training depend on the type of care to be provided and the specific needs of the child.  In three of the four regions in the State, prospective foster/adoptive parents wishing to provide kinship/relative foster care or foster family care are being trained using the West Virginia Substitute Parenting Pre-service Orientation curriculum.  This curriculum was developed in 1994 by DHHR and the West Virginia University Center for Excellence in Disabilities (WVUCED).
In the fourth region (Region IV), a pilot foster care project has been implemented, and as part of this project the PRIDE (Parent Resources for Information, Development, and Education) Model for training foster and adoptive parents is being used.  In this region, all prospective foster/adoptive parents recruited by DHHR, and a few from private child placement agencies, are involved in the training.

Many stakeholders commenting on this issue suggested that the Substitute Parenting Pre-service Orientation curriculum currently used for foster and adoptive parents in three regions is out-of-date and does not meet all the needs of current foster and adoptive families. A few stakeholders noted that because of this, in one county the agency has contracted with a private agency to provide one-on-one training to foster parents in their own homes.  Foster parents suggested that they would benefit from specialized training regarding handling children with behavior problems, effective discipline techniques, and caring for minor parents with children.  All

D003223

stakeholders praised the training currently being provided to foster and adoptive parents through the region IV pilot project using the PRIDE curriculum.

D003224

## VIII.  SERVICE ARRAY

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2 | 3  X | 4 |

## STATUS WITH RESPECT TO SERVICE ARRAY

West Virginia is in substantial conformity with the systemic factor of service array.   Findings pertaining to the specific items relevant to this factor are presented and discussed below.

**Item 35.  The State has in place an array of services that assess the strengths and needs of children and families and determine other service needs, address the needs of families in addition to individual children in order to create a safe home environment, enable children to remain safely with their parents when reasonable, and help children in foster and adoptive placements achieve permanency.**

___X___  Strength    ____  Area Needing Improvement

Item 35 was rated as a strength because West Virginia has in place an array of services that meet the elements required in Item 35. West Virginia provides a basic core of services to children and families including family support, counseling, respite care, socialization services, parenting education, services related to in-home safety and permanency. This wide variety of services does not include all services. Stakeholders cited services that have significant gaps such as mental health and substance abuse treatment.  Other service areas that were in limited supply according to stakeholders included residential treatment for specialized care, facilities for adolescent sexual offenders and domestic violence shelters.   These services are controlled by other agencies and the state child welfare agency is working to influence those other agencies.

According to the Statewide Assessment, DHHR uses Title IV-B funds to provide a variety of services to support the reunification of children with their caretakers. These services include individual, family, and group counseling; parenting education; and information

and referral services.  Title IV-B funds also are used for family support services such as parent support, youth mentoring, respite care, counseling, and socialization services.

The Department also used TANF funds to increase the availability of services to families and children.  As noted in the Statewide Assessment, the amount of TANF funding far surpasses the amount of IV-B funds available to support social services.  In addition, DHHR is funding new grants to focus a limited number of services directed toward attaining specific permanency goals.

The Department addresses safety concerns through the use of social services funds to provide in-home safety services.  These services, which may not be available statewide, are used to prevent out-of-home placement and may include food, clothing, shelter, medicine, etc.  Family Preservation Services (FPS), provided by private agencies, also are available for in-home services cases.  The Statewide Assessment notes that the evaluation of FPS has not been completed, but preliminary findings suggest that children referred for this service are being maintained safely in their homes.

Most stakeholders commenting on this issue expressed the opinion that there are significant gaps in the availability of some services, particularly substance abuse treatment and mental health services.  (The closing of two large community mental health centers was described as further decreasing the availability of mental health services.)  Community-based and in-home services, domestic violence services, and prevention programs, also were noted by many stakeholders to be in short supply.  Another area of concern was the lack of specialized placement resources for children with special needs, such as those with behavior problems, dual diagnosed children, and sex offenders.  Children requiring placements to address these problems usually must be placed outside of the State.  Stakeholders also noted that even when services were available, there often were long waiting lists to access the services.

Stakeholders comments regarding critical gaps in services are supported by the findings of the case reviews, which also identified a lack of services in the State to address mental health issues, residential treatment requiring specialized care, substance abuse treatment needs, adolescent sexual offenders, and domestic violence.

**D003226**

**Item 36.  The services in item 35 are accessible to families and children in all political jurisdictions covered in the State's CFSP.**

_____ Strength     __X__   Area Needing Improvement

Item 36 was rated as an area needing improvement because the distribution of Title IV-B services is uneven around the State and all services are not available in every county. The MDT process is not consistently utilized across the State and is not routinely made available to parents and foster parents.

According to the Statewide Assessment, the distribution of services is uneven throughout the State.  The Statewide Assessment notes that in general, urban areas have far more resources than rural areas.  In addition, the composition of some rural areas increases the difficulty of providing in-home services.  The distances families must travel to obtain services is another factor that increases the difficulty of service delivery in many areas of the State.

The Statewide Assessment also noted that although it was a goal of the IV-B grant process to standardize services across the State, that goal was never met. Title IV-B services are unevenly distributed across the State and are not available in every county. This is due in part to the lack of available service providers. In some rural counties there are no local providers and some of the larger provider organizations are unable to extend their operations to provide coverage.

Stakeholders commenting on this issue noted that transportation is a major service that is lacking in many areas of the State.  Some of these stakeholders suggested that lack of transportation is a reason why many youth are unable to attend alternative high schools and/or participate in independent living services.  Stakeholders noted that in some areas there is a shortage of parenting classes, and in some areas there is a shortage of both specialized and regular foster homes.


**Item 37.  The services in item 35 can be individualized to meet the unique needs of children and families served by the agency.**

____X____   Strength   _____ Area Needing Improvement

Item 37 was rated a strength because the MDT process allows for a thorough assessment of the child's and families' needs and develops a service plan to meet those identified needs on an individualized basis.  The stakeholders noted that the MDT serves this purpose, but is used inconsistently across the State.

West Virginia foster care policy requires that the MDT gather sufficient information to thoroughly and comprehensively assess the child's and family's social, emotional, environmental, physical, educational, and financial strengths and needs to determine an appropriate, comprehensive, individualized case plan for the child and his family.

**D003228**

## IX.    AGENCY RESPONSIVENESS TO THE COMMUNITY

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | **Not in Substantial Conformity** | | **Substantial Conformity** | |
| Rating | 1 | 2 | 3 | 4  X |

**STATUS WITH REGARD TO AGENCY RESPONSIVENESS TO THE COMMUNITY**

West Virginia is in substantial conformity with the systemic factor Agency Responsiveness to the Community.  Findings for the items pertaining to this factor are presented below.

**Item 38.    In implementing the provisions of the CFSP, the State engages in ongoing consultation with tribal representatives, consumers, service providers, foster care providers, the juvenile court, and other public and private child- and family-serving agencies and includes the major concerns of these representatives in the goals and objectives of the CFSP.**

____X____    Strength        _____    Area Needing Improvement

Item 38 was rated a strength because West Virginia engages consumers, providers, courts, family-serving agencies and other public and private agencies in ongoing consultation and includes their concerns in the State Plan.

According to the Statewide Assessment, the Five Year Child and Family Services Plan was developed by DHHR with the assistance of a work group comprised of experts in child welfare, State and local support systems, and community-based planning and service delivery, as well as families.  There also was a public involvement process that allowed for review and comment by interested parties.  The role of the work group was to oversee the development of the plan and the process and serve as advisor to the plan coordinator.  The work group reviewed the public comments and provided advice to DHHR on incorporating them into the final plan.  A Planning and Evaluation Unit is being developed to enhance the planning process including the CFSP updates and stakeholder involvement.

According to the Statewide Assessment, a lot of positive feedback was received from community stakeholders regarding agency responsiveness. There are many collaborative efforts at both state and local levels in which the agency is involved.   This includes working to improve the agency's relationship with the legislature.  At the state level, there is a citizen review panel and the agency

participates in a variety of interagency collaborations. Advisory boards have been set up at local levels to help determine service needs and local planning.

Stakeholders commenting on this issue primarily addressed the relationship between the agency and the courts and expressed mixed perceptions regarding this relationship. In one county included in the onsite review, stakeholders noted that there was a high level of cooperation among the court, the attorneys, and the child welfare agency. In the other two counties, stakeholders noted that the relationship between the court and the agency was not positive. For the most part, stakeholders attributed this problem to both the agency and the courts. For example, it was noted that DHHR caseworkers often go to court unprepared and without sufficient knowledge of the family's history. On the other hand, stakeholders also noted that some judges do not allow the caseworkers into their courtrooms. In one county, stakeholders noted that there is no CASA system available. Although all children in the State foster care system are appointed a Guardian Ad Litem, stakeholders suggested that the quality of that representation often is an issue.

**Item 39.  The agency develops, in consultation with these representatives, annual reports of progress and services delivered pursuant to the CFSP.**

___X___  Strength      _____  Area Needing Improvement

Item 39 has been rated as a strength because West Virginia develops annual reports of progress for programs and services supported under the CFSP.

**Item 40.  The State's services under the CFSP are coordinated with services or benefits of other Federal or federally assisted programs serving the same population.**

___X___  Strength      _____  Area Needing Improvement

Item 40 has been rated a strength because West Virginia coordinates services with other Federal and federally assisted programs.

According to the Statewide Assessment, DHHR staff members at the State and field-office levels are involved with public and private agencies in a variety of ways that address the coordination of services. However, the Statewide Assessment also notes that there is no single agency plan that addresses the coordination of services within the Department or between the Department and other public and private agencies.

D003230

The Statewide Assessment identified the following as significant projects involving a coordinated approach to service delivery:

- The Region IV Foster Care Pilot Project. The goal of this project is the standardization of the policies, procedures, and financing of foster care services for children placed in family foster care, regardless of whether such care is provided for through Department or private sector foster families. This project is the combined effort of DHHR, the West Virginia Child Care Association, the Social Work Education Consortium, and private childcare providers.

- The Family Options Initiative (FOI). This is a demonstration project piloting the use of a differential approach to the delivery of Child Protective Services. FOI involves recruiting providers from the private sector and training them on the CPS decision-making process. The providers then assume the responsibility for service delivery to families who do not require a full-scale CPS response. The providers are responsible for the delivery of specific, time-limited services to alleviate the problems, which placed children at risk of maltreatment.

- The use of a change-based decision-making model for Youth Services. The goals of this pilot are the implementation of a decision-making model that will enable DHHR and private provider staff members to better perform casework functions to achieve change and to standardize service delivery in the public and private sector.

- Coordination between the agency and private providers to redesign family preservation and independent living services. Staff members from the State and field offices of the Department meet with private provider staff quarterly to oversee the implementation of these services.

- Coordination between DHHR and the Division of Juvenile Services. These agencies share responsibilities for the provision of services to youthful offenders. They have agreed to create a State-level Child Welfare/Juvenile Justice Coordinating Committee to work on the development of a coordinated system of child welfare and juvenile justice services.

Stakeholders commenting on this issue described examples of coordination of services. In one of the counties included in the on-site review, it was noted that the agency and the schools coordinate with one another to conduct training about drug related issues with the courts, the schools, and the child welfare agency. Also, in one of the counties stakeholders described a coordinated effort of DHHR, the community, and the family court, in the handling of domestic violence cases to identify at-risk families and provide support to prevent further violence and abuse.

**D003231**

## X.   FOSTER AND ADOPTIVE PARENT LICENSING, RECRUITMENT, AND RETENTION

| Rating of Review Team Regarding Substantial Conformity | | | | |
|---|---|---|---|---|
| | Not in Substantial Conformity | | Substantial Conformity | |
| Rating | 1 | 2 | 3  X | 4 |

**STATUS WITH REGARD TO FOSTER AND ADOPTIVE PARENT LICENSING, RECRUITMENT, AND RETENTION**

West Virginia is in substantial conformity with the systemic factor of Foster and Adoptive Parent Licensing, Recruitment, and Retention.  Findings for the items pertaining to this factor are presented below.

**Item 41.  The State has implemented standards for foster family homes and child care institutions which are reasonably in accord with recommended national standards.**

  X    Strength                 ___Area Needing Improvement

Item 41 has been rated a strength because West Virginia has developed child placing regulations for foster family homes that are in accord with national standards.

According to the Statewide Assessment, Child Placing Regulations govern foster homes, adoptive homes, transitional living, and community re-entry programs.  State licensing requirements govern all group residential facilities, emergency shelters, maternity homes and facilities providing secure residential care.  Regulatory authority for detention centers is the responsibility of the Division of Juvenile Services. Both the Child Placing Regulations and the Requirements for Group Residential Care support West Virginia's ability to uniformly apply licensing standards.

The Child Placing Regulations were developed with reference to Federal requirements and National Standards for Professional Child Care, as developed by the Child Welfare League of America, as well as West Virginia Foster/Adoptive Care Program Requirements and West Virginia statutory mandates.  These rules were developed with the intention of assuring quality care.

D003232

The Statewide Assessment noted that a review conducted by the State found that the use of some procedures for ensuring the safety of foster care and adoptive placements has declined in recent years, including initial inspection, face-to-face interviews with family members, certificate of pre-service training, and checking outside references.  Although the review found that the Homefinding Program staff members were effective in carrying out their responsibilities, and that most home studies were well written and contained the required information, it also found that home studies performed by contractors in some regions were less than adequate, but were still approved by DHHR.

According to stakeholders, the State has established appropriate certification or licensing standards.  Stakeholders also noted that the State completes re-certification annually and that this is done in a timely manner.

**Item 42.  The standards are applied to all licensed or approved foster family homes or child care institutions receiving title IV-E  or  IV-B funds.**

\_\_\_\_Strength          \_\_\_X\_\_\_      Area Needing Improvement

Item 42 has been rated an area needing improvement because all private agency and public agency homes do not always meet standards and homestudies for specialized homes may not be comprehensive.

As noted in the Statewide Assessment, Child Welfare Licensing in West Virginia regulates all private agency foster and adoptive homes as well as all residential child care facilities.  The Child Placing Regulations incorporate current West Virginia program and policy requirements as well as such national standards for childcare as those developed by the Child Welfare League of America and the Requirements for Group Residential Facilities.  However, the equitable application and enforcement of these rules has been compromised by the lack of formal licensing procedures to direct and govern the licensing operation.  Such procedures are currently in development.

Child safety in child care institutions, which are not regulated under the Child Placing Rule, is assured by the Institutional Investigative Unit, which investigates allegations of child abuse/neglect within these settings and works collaboratively to ensure child safety.

Stakeholders commenting on this issue expressed concerns about the following issues:
- The screening/home studies of homes licensed through private agencies do not always meet the standards and requirements.
- Not all agency foster homes are in compliance with the standards.

**D003233**

- Homestudies conducted for specialized foster homes are not sufficiently comprehensive.

**Item 43.  The State complies with Federal requirements for criminal background clearances as related to licensing or approving foster care and adoptive placements and has in place a case planning process that includes provisions for addressing the safety of foster care and adoptive placements for children.**

　　X　Strength　　　　＿＿＿＿　Area Needing Improvement

Item 43 has been rated a strength because West Virginia has developed and is implementing a comprehensive criminal records check system.

According to the Statewide Assessment, West Virginia Code requires a check of personnel criminal records for licensed or certified child care providers or agencies.  This includes all agencies that provide residential group care and child placing services (i.e. adoption and foster care services). This State Code requires that criminal background checks be conducted on all individuals and agency staff providing foster care for children and for prospective adoptive parents to whom adoptive assistance payments are to be made.  The criminal background check requirement also is included in the Department's homefinding policy and in the licensing regulations for child placing agencies.  All requests and subsequent results are entered into the State's information system. The results are continually updated for personnel in foster care/adoption agencies.

According to stakeholders, criminal background checks, including FBI checks are completed on potential foster parents.  Criminal background checks of potential foster parents are conducted at the first training session, including fingerprinting.

**Item 44.  The State has in place a process for ensuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed.**

＿＿＿＿　Strength　　　X　　Area Needing Improvement

Item 44 has been rated as an area needing improvement because the current pool of available foster care and adoptive providers in some regions of West Virginia does not reflect the ethnic diversity of the foster care population needing placement.   While the general population of the State is approximately 2% African American; approximately 20% of all children waiting for adoption are African American.

D003234

According to the Statewide Assessment, the current pool of available foster care and adoptive providers does not accurately reflect the cultural and ethnic diversity of the foster care population needing placement in all regions of the State.  Currently, the Department has 47 children listed on the Faces of Adoption.  Of these 47 children, 9 are a racial ethnic minority.  Approximately 20 percent of all children waiting for adoption are African American.  In order to increase adoption opportunities for these children the Department participates in the One Church, One Child initiative.

The Statewide Assessment also notes that most recruitment is done at the regional level.  There is a low rate of turnover among foster parents, which is attributed in part to the foster parent pilot project that provides more training and higher reimbursement levels.  However, stakeholders noted that foster care contracted agencies are discouraging foster parents from adopting so that they do not lose the home as a foster care placement.

Although the State has made efforts to recruit homes, there is a need for a statewide recruitment plan.  Homes for older youths and sibling groups are needed most.

**Item 45.  The State has in place a process for the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children.**

  X    Strength        ____    Area Needing Improvement

Item 45 has been rated as a strength because West Virginia has implemented regional cross-county recruitment, cross-state recruitment in Ohio and Kentucky and has received many web-site hits from outside the eastern United States.

According to the Statewide Assessment, West Virginia has initiated a major recruitment effort to secure adoptive homes for children in the custody of the Department. Adoption/Homefinding staff members are regionally based which enable staff to better facilitate cross-county adoptions within the State.  Staff members look for the most appropriate placement regardless of whether it is in state or out-of-State.

OSS is currently working with a recruiting agency to coordinate all media publicity and to develop materials for recruitment.  The Department features children eligible for adoption on television.  The television stations in Charleston/Huntington air the stories on the children and their broadcasts extend into Kentucky and Ohio. The television station in Parkersburg will soon feature children who are eligible from both Ohio and West Virginia.  According to information received from Site Meter, approximately 23 percent of the

web page visits are from persons living outside of the Eastern Time zone.  The Department is a member of ICAMA, which assures that children receive medical care regardless of the jurisdiction where an adoption is finalized.

According to stakeholders, children are registered on a statewide tracking system, and some children are also registered on a national system.

**D003236**

## XI.    DETERMINATION OF SUBSTANTIAL CONFORMITY

For each outcome and systemic factor listed below, mark **"Y"** where the State is determined to be in substantial conformity and **"N"** where the State is determined not to be in substantial conformity.  For each outcome or systemic factor marked **"N,"** place a check beside the performance indicator, listed by item number in this form, that has been determined to be an area needing improvement.

**Outcomes**

**I.  Safety**

**___N___Outcome S1**
_____ Item 1
__x__ Item 2

**___N___Outcome S2**
__x__ Item 3
__x__ Item 4

**II.  Permanency**

**___N___ Outcome P1**
__x__ Item 5
__x__ Item 6
__x__ Item 7
_____ Item 8
__x__ Item 9
__x__ Item 10

**___N___ Outcome P2**
_____ Item 11
_____ Item 12
__x__ Item 13
__x__ Item 14
__x__ Item 15
__x__ Item 16

**III.  Child and Family Well-Being**

**___N___ Outcome WB1**
__x__ Item 17
__x__ Item 18
__x__ Item 19
__x__ Item 20

**___N___ Outcome WB2**
__x__ Item 21

**___N___ Outcome WB3**
__x__ Item 22
__x__ Item 23

**Systemic Factors**

**IV.  ___Y___ Statewide Information System**
_____ Item 24

**V.    ___N___ Case Review System**
__x__ Item 25
__x__ Item 26
__x__ Item 27
_____ Item 28
__x__ Item 29

**VI.    ___Y___ Quality Assurance System**
_____ Item 30
_____ Item 31

**VII.   ___Y___ Training**
_____ Item 32
__x__ Item 33
_____ Item 34

**VIII.  ___Y___  Service Array**
_____ Item 35
__x__ Item 36
_____ Item 37

**IX.    ___Y___ Agency Responsiveness to the Community**
_____ Item 38
_____ Item 39
_____ Item 40

**X.    ___Y___  Foster and Adoptive Parent Licensing, Recruitment, and Retention**
_____ Item 41
__x__ Item 42
_____ Item 43
__x__ Item 44
_____ Item 45

D003237

ADDENDUM

Pursuant to section 1123A of the Social Security Act and 45 CFR 1355.31 through 1355.37, the Administration for Children and Families (ACF) is charged with the review of State child and family services programs.  The purpose of the reviews is to determine the States' substantial conformity with State plan requirements and other requirements under titles IV-B and IV-E of the Act.

The Child and Family Services Review in West Virginia covered the range of child and family services programs funded through titles IV-B and IV-E, including child protective services, foster care, adoption, independent living and family support and preservation services. The review process was twofold.  The first phase consisted of a statewide assessment completed by West Virginia staff and submitted to ACF Region III. The statewide assessment included data profiles on children in foster care and children served through the child protective service system.  These profiles have been used in the determination of the effectiveness of foster care and child protective services in West Virginia.  The second phase of the process was the onsite review, which was conducted in West Virginia from May 6-10, 2002.  This included intensive reviews of a sample of cases and interviews with State and local stakeholders in the provider and services delivery community.  Information from both phases was used to determine the States' substantial conformity with the requirements under review.

The review team that evaluated West Virginia's performance consisted of State and Federal staff, consultant reviewers selected from a national pool of qualified reviewers, and State representatives who are not staff of the State or local office being reviewed.  The West Virginia Review Team member list with affiliations is enclosed.

The review evaluates seven specific outcomes of services delivered to children and families, in the areas of safety, permanency, and child and family well being.  The outcomes are:

Safety: (1) Children are, first and foremost, protected from abuse and neglect and (2) children are safely maintained in their homes whenever possible and appropriate.

D003238

Permanency: (1) Children have permanency and stability in their living situations and (2) the continuity of family relationships and connections is preserved for children.

Child and Family Well-being: (1) Families have enhanced capacity to provide for their children's needs, (2) children receive appropriate services to meet educational needs, and (3) children receive adequate services to meet their physical and mental health needs.

In addition to reviewing individual case outcomes, the review process also examined seven systemic factors that affect the State's capacity to deliver services in a manner that promotes positive outcomes for children and families.  The systemic factors reviewed include (1) statewide information system; (2) case review system; (3) quality assurance system; (4) training; (5) service array; (6) agency responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment, and retention.  Information from the statewide assessment and the onsite case reviews and stakeholder interviews provided the basis for evaluating the systemic factors in the review.

Through examining case outcomes and systemic factors, the review process identified both strengths and areas needing improvement in the State's programs.  For those areas in which the State was determined to not be operating in substantial conformity with requirements under review, the State has the opportunity to implement a program improvement plan designed to correct the areas of nonconformity.  Although the State is advised of applicable penalties associated with the degree of nonconformity, the penalties are not assessed until the State has had an opportunity to correct the areas of nonconformity through the program improvement plan.

The West Virginia review covered Federal Fiscal Year 2001, which began October 1, 2000 and ended September 30, 2001.   In reviewing cases, the review team accepted case information up to the present time. The review process consisted of the following activities:

- The State completed the statewide assessment during the period of December 2000 through January 2001.

- The state members of the review team and the ACF Region III Office selected three locations for the onsite review activities.  The locations selected were Fayette County, Kanawha County and Logan County.

D003239

- The joint State and Federal review team, which consisted of 50 members, was divided into three local teams; one for each of the three locations.  The entire team examined 50 cases of children and families served by the agency, and included interviews with the children, parents, foster parents, caseworkers, and service providers for each case.  The team also conducted interviews with State and local stakeholders on the systemic factors under review in each location and for the State as a whole.

The results of the statewide assessment, the onsite case reviews and the stakeholder interviews were compiled by the review team for this report and were used to make a determination about the State's substantial conformity with regard to each of the seven outcomes and each of the seven systemic factors.

**D003240**