# EXHIBIT 18

# Statewide

# Assessment Instrument

## Section I – General Information

| Name of State Agency |
|---|
| **West Virginia**<br>**Department of Health and Human Resources**<br>**Bureau for Children and Families** |

| Period Under Review |
|---|

**On-site Review Sample Period: April 1 – November 30, 2007 (In-Home Services)**

**April 1 – September 30, 2007 (Out-of-Home Care)**

**April 1 – September 15, 2008 Onsite Review Period Under Review**

Period of AFCARS Data: _____ FFY 2006A – 2007B _____

Period of NCANDS Data (or other approved source; please specify if alternative data source is used): _FFY 2006 A – 2007B_____

| State Agency Contact Person for the Statewide Assessment | |
|---|---|
| **Name:** | **(1) Brenda McPhail**<br>**(2) Denise Neighbors** |
| **Title:** | **(1) Assistant Commissioner, Office of Planning and Quality Improvement**<br>**(2) Program Manager/CFSR Coordinator** |
| **Address:** | **350 Capital Street, Room 730** |
| | **Charleston, WV  25301-3711** |
| **Phone:** | **(1) 304-558-2932 {Brenda} or (2)  304-285-3175 x 186 {Denise}** |
| **Fax:** | **(1)  304-558-4577 {Brenda} or (2) 304-285-3174 {Denise}** |
| **E-mail:** | **brendamcphail@wvdhhr.org**<br>**deniseneighbors@wvdhhr.org** |

**D003566**

**Background and Agency Description**

The West Virginia Department of Health and Human Resources (the Department) is a cabinet level agency of state government which was created by the Legislature and operates under the general direction of the Governor. This Department can be described as an umbrella agency with responsibility for a number of different programs and services such as public health, behavioral health, child support enforcement and services to children and families. The Department operates under the direction of a Secretary and the major programs are assigned to different Bureaus. Each Bureau operates under the direction of a Commissioner. The authority and responsibilities of the Commissioners varies from Bureau to Bureau. The Commissioner of the Bureau for Children and Families is John J. "Jason" Najmulski.

**The Bureau for Children and Families**

Located within the Bureau for Children and Families are Offices which perform various functions for the Bureau. The Offices were established in 2002 to conform with the Department's mission, "….to provide an accessible, integrated, comprehensive, quality service system for West Virginia's children, families and adults to help them to achieve maximum potential and improve their quality of life." These Offices are: the Office of Children and Family Policy; the Office of Field Operations; the Office of Planning and Quality Improvement; the Office of Information Technology and Training; and the Office of Finance and Administration. Oversight of each office is by an Assistant Commissioner, with the exception of Field Operations, which is overseen by a Deputy Commissioner, all of whom report to the Commissioner of the Bureau who, in turn, reports to the Secretary of the Department.

*Office of Children and Family Policy*

The Office of Children and Family Policy is located within the central office of the Bureau for Children and Families, and within this Office is the Division of Children and Adult Services (CAS) who has the primary responsibility for program planning and development related to child welfare. Under the direct supervision of Assistant Commissioner Charles Young, Division Director Jane McCallister and her staff formulate policy, develop programs and produce appropriate state plans and manual materials to meet federal specifications and applicable binding court decisions. Such manual material is used as guidance for the implementation of applicable programs by field staff deployed throughout the state.

Program Specialists in CAS participate in the following: CPS Redesign Workgroup, CAPTA Grant Application and Management, CB Cap Grant Application and Management, CJA Grant Application and Management, Domestic Violence/Child Victimization Study and Policy Workgroup, Domestic Violence Definitions Workgroup, Domestic Violence Fatality Review, Citizen's Review Panel, ASO Workgroup, CAPTA State Liaison Officer, Drug Endangered Children Task Force, Children's Justice Task Force, and the CAPS Workgroup. In addition, the staff of CAS have responsibilities in areas such as: licensing, criminal background checks and investigations of institutional abuse and/or neglect.

D003567

For the most part, the staff in CAS are not involved in the direct provision of services. In some cases, however, staff do assist with the provision of services or are directly involved in service delivery. For example, staff in this office operate the Adoption Resource Network and maintain financial responsibility for a case once an adoption subsidy has been approved.

Staff in this office may consult with field staff on a variety of topics, but according to the organization of the Bureau, have no direct line authority over field staff. In practice, however, it has not always been possible to maintain this distinction. There are certain situations such as policy waivers which do require the involvement of and approval by CAS staff.

### _The Office of Field Operations_

The Office of Field Operations is under the direction of Deputy Director Louis Palma, who is located part-time in the central office and part-time in the Fairmont District Office. Field Operations' charge is the direct service delivery of all services within the Bureau.

The state is divided into four regions. Region I is in the northwest portion of the state which includes the Northern Panhandle, the counties bordering Ohio, and inward. Region II is central West Virginia, also bordering Ohio and Kentucky in some areas and includes the state's larger metropolitan area and Capitol, Charleston, located in Kanawha County. Region III is the eastern-most part of the state that includes the Eastern Panhandle. It is the fastest growing portion of the state as it borders Virginia and Maryland and is within commuting distance from Washington DC. Region IV is the southern-most portion of the state with some of its counties bordering Virginia.

Each region is supervised by a Regional Director (RD) who reports directly to the Deputy Director. Within each region, counties are grouped, or a single county, if large enough, is a district. The district is supervised by a Community Services Manager. All supervisory staff report directly to the Community Services Manager.

### Service Delivery

Child Protective Services (CPS) is one of the vitally important programs operated by the Department which is mandated by WV Code 49-1-1. The Child Protective Services System provides protection to children from neglect or abuse by assessing reports of maltreatment, determining the level of risk of maltreatment and evaluating the immediate safety of a child. Within that scope, the Department helps to provide ongoing in-home and out-of-home safety services to children and families identified as needing such. Along with the investigation of abuse/neglect allegations comes the assessment of the family and provision of treatment services. CPS workers provide case management of these services to families as well as provide the court system with recommendations for treatment. Workers are responsible for determining the appropriate permanency plan for children in abuse/neglect situations. These permanency plans may include reunification, guardianship, placement with relatives, adoption and independent living.

D003568

The focus of much of the case work activity within CPS is conducting intake, assessment, screening, and investigating reports of abuse/neglect. The Department provides a statewide system for receiving, investigating and assessing referrals and utilizes the West Virginia Child Protective Services System (WVCPSS) to guide casework practice, structure decision-making, assess risk of maltreatment, and evaluate safety. The system also provides for a family-specific assessment and treatment plan designated to alleviate the safety and risk issues defined during the investigation.

Youth Services (YS) is provided by the Department in accordance with the requirements set forth in WV Code 49-5. Youth Services is a comprehensive, complex array of services for troubled youth. It is part of the larger child welfare system designed to support and nurture the healthy development of children and their families. Youth Services is a partnership between the youth, the family, the Department, the courts, private agencies and other entities. The Department works in conjunction with the Division of Juvenile Services in the provision of services to youth and their families.

Youth Services is child-centered and family-focused. The primary target population for YS is youth who may be involved with the court relating to status offenses. The aim is to strengthen the functioning of the family unit while assuring adequate protection for the child, family and community. Youth Services are administered through the Department and its field offices and services are provided statewide. The Department also contracts with several private providers for YS caseworkers and supplemental services.

Foster care is a comprehensive, complex array of services for children who, for any number of reasons, cannot live with their families. West Virginia uses the term *foster care* for all out-of-home placements for children in the custody of the Department. The child may have entered custody through an abuse/neglect petition or through court placement order due to status offenses. These placements include relative caregivers, foster family care providers, emergency shelter care placements, specialized foster care placements, group care placements in- and out-of-state, and specialized treatment placements in- and out-of-state.

When children are in foster care, the Department assumes part or all of the responsibility for children that ordinarily rests with the parents. WV Code 49-2-1 authorizes the Department to administer a foster care program for dependent and neglected children.

*The Office of Planning and Quality Improvement*

The Assistant Commissioner for the Office of Planning and Quality Improvement (OPQI) is Brenda McPhail. Within this office are the Division of Resource Development and the Division of Quality Improvement. Major activities of OPQI include conducting program and peer reviews, coordinating statewide quality councils, coordinating corrective action and program improvement plan, and accreditation activities. OPQI also oversees all Title IV-E activities.

D003569

_The Office of Information Technology and Training_

The Assistant Commissioner for the Office of Information Technology and Training (IT&T) is Kevin Henson.  This office is responsible for the Division of Training and oversees BCF web development projects as well as Data Research and Analysis and is charged with the oversight, coordination, and delivery of training to BCF employees and foster parents statewide.  This training includes New Worker Training, supervisory training, and tenured worker training on new initiatives and professional development activities.  The Office of IT&T is also responsible for the BCF Internet and Intranet sites that provide content, resources, and applications that the general public, our providers, our clients, and state and federal agencies may require.

_The Office of Finance and Administration_

The Assistant Commissioner of Finance & Administration, Doug Robinson, is responsible for oversight of the Division of Grants and Contracts, the Division of Accounting and Reporting, the Division of Payment and Vendor Maintenance, the Division of Personnel and Procurement, and Human Resources.  Some of the major activities for which Finance & Administration is responsible are approving and monitoring grants and contracts, developing and implementing the BCF budget, paying bills and monitoring vendors, taking care of personnel issues for BCF, and the procurement process.

D003570

BUREAU FOR CHILDREN & FAMILIES
WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES
Martha Yeager Walker
Secretary
Inspector General
Molly Jordan
Office of Personnel Services
Harriett Fitzgerald
Director
Deputy Secretary for Administration
Warren D. Keefer
Deputy Secretary General Counsel
Rocco Fucillo
Office of Communications and Legislative Affairs
John D. Law
Assistant Secretary
Assistants to the Secretary
Jerry Roueche
Emily Hopta
Boards, Commissions & Authorities
Commission for the Deaf and Hard of Hearing
Developmental Disabilities Council
Human Rights Commission
Health Care Authority
"Tiger" Morton Catastrophic Illness Commission
Women's Commission
Brenda Brooks
Executive Secretary
Bureau for Children & Families
Jason Najmulski
Commissioner
Wil Jones
Attorney
Attorney General
Joycelyn Kyte
Legal Secretary
Finance & Administration
Doug Robinson
Assistant Commissioner
Information Technology & Training
Kevin Henson
Assistant Commissioner
Field Operations
Louis Palma
Deputy Commissioner
Children & Family Policy
Charles Young
Assistant Commissioner
Planning & Quality Improvement
Brenda McPhail
Assistant Commissioner
Accounting & Reporting
Jean Sheppard
Director
Payments & Vendor Registration
Patricia Nelson
Director
Grants & Contracts
Gail Totten
Director
Personnel & Procurement
George Montgomery
Director
Training
Susan Richards
Director
Research & Analysis
Ron Nestor
Director
Customer Services
Pamela Mills
Director
Regional Directors
Region I
Ronda Colanero
Region II
James Kimble
Region III
Ronald Anderson
Region IV
Joe Bullington
Community Services Managers
Early Care & Education
Judy Curry
Director
Family Assistance
Sue Ellen Buster
Director
Children & Adult Services
Jane McCallister
Director
Head Start State Collaborative
Lena Rapp
Director
Resource Management
Thomas Strawderman
Director
Family Assistance Program Review
Karen Frazier
Director
Social Services Program Review
Theodora St. Lawrence
Director
Social Services Program Review
Terrance Hamm
Director
Council on Accreditation
Denise Neighbors
Coordinator
Program Review
Revised 5-2008/cg



West Virginia Department of Health & Human Resources
Bureau for Children & Families Regions and Districts

**Region 1**

*Regional Director:*
Ronda Colaneero

*Local Offices:*
Brooke/Hancock/Ohio
Calhoun/Gilmer/ Wirt
Harrison
Marshall/ Tyler/ Wetzel
Marion/ Monongalia
Ritchie/ Pleasants/ Doddridge
Wood

**Region 2**

*Regional Director:*
James Kimbler

*Local Offices:*
Boone
Cabell
Kanawha
Jackson/ Roane/ Mason
Lincoln
Logan
Mingo
Putnam

**Region 3**

*Regional Director:*
Ronald Anderson

*Local Offices:*
Berkeley/Jefferson/ Morgan
Grant/Hardy/ Pendleton
Hampshire/Mineral
Lewis/Upshur
Taylor/ Preston/Barbour
Randolph/ Tucker

**Region 4**

*Regional Director:*
Joe Bullington

*Local Offices:*
Braxton/Clay
Fayette
Greenbrier/ Monroe/ Pocahontas/Summers
McDowell
Mercer
Nicholas/ Webster
Raleigh
Wyoming

Updated: 06/17/2008

D003572

**West Virginia Court System**

West Virginia's judicial system presently consists of the following courts:  the West Virginia Supreme Court of Appeals, circuit court, family court, magistrate court, and municipal court. With the exception of the municipal court, the other courts hear cases in which allegations of child maltreatment are often raised.  However, as explained below, only the Supreme Court and the circuit court may hear child abuse/neglect cases, cases in which a parent or other custodian may lose their rights to a child because of abuse/neglect.  Similarly, the Supreme Court and the circuit court are the only courts which may address the merits of a juvenile case, except that magistrate court and municipal court have limited jurisdiction over certain specified offenses.  A magistrate court, as explained below, also has some limited authority in juvenile cases and abuse/neglect cases when the circuit court has designated a magistrate as a juvenile referee.

*West Virginia Supreme Court of Appeals*

The Supreme Court of Appeals, consisting of five justices elected to 12-year terms, is the court of last resort in West Virginia.  It has appellate jurisdiction over all matters decided in circuit court and in direct appeals from family court.  It also has original jurisdiction in cases involving petitions for extraordinary writs, such as writs of certiorari and writs of prohibition.  Further, it has appellate jurisdiction over circuit court cases when the circuit court acts as an intermediate appellate court.

In child abuse/neglect cases brought pursuant to Article 6 of Chapter 49 of the West Virginia Code, any party, including a child through his or her counsel, may petition the West Virginia Supreme Court to review an appealable order.  According to Rule 49 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, a party to an abuse case and neglect case must file his/her petition for appeal within sixty days of the entry of the order, which is one-half of the time that is ordinarily allowed.  This expedited appeal procedure ensures that appeals in abuse/neglect cases are addressed in a timely manner.

In a juvenile case brought pursuant to Article 5 of Chapter 49 of the West Virginia Code, a juvenile generally has the right to appeal a disposition order or the underlying adjudication order, the order that concluded the juvenile was either a status offender or juvenile delinquent. However, a juvenile may not appeal a mandatory referral to the Department of Health and Human Resources (DHHR or Department) in status offense cases.  If a juvenile is transferred to the criminal jurisdiction of the court, a juvenile may appeal the transfer within ten days of the entry of the transfer order or after the criminal proceedings are final.

*Circuit Court*

West Virginia's 55 counties are divided into 31 judicial circuits with 66 circuit judges.  The circuits range in size; from one with seven judges to 11 circuits having a single judge.

The circuit court is the only trial court of general jurisdiction in West Virginia.  They have jurisdiction over:  civil cases, subject to monetary limitations; all civil cases in equity; proceedings involving petitions for extraordinary writs; and all felonies and misdemeanors.  The

D003573

circuit court has sole jurisdiction over adoptions and child abuse/neglect cases. It has jurisdiction over juvenile cases except that magistrate courts and municipal courts have concurrent jurisdiction over certain specified offenses. Further, the circuit court has appellate jurisdiction over the limited jurisdiction courts (family, magistrate and municipal courts) and decisions from administrative agencies. There is no other mid-tier appellate court in West Virginia.

The circuit court shares jurisdiction with the family court over divorce, annulment or separate maintenance, provided that the case does not involve issues relating to the care and support of minors. It also has concurrent jurisdiction with the family court over domestic violence protective order proceedings, name changes and minor guardianship cases. Although the circuit court shares jurisdiction in minor guardianship cases, it is required to handle a minor guardianship case if the petition is based, in whole or in part, upon child abuse/neglect allegations.

_Child Abuse and Neglect Cases in Circuit Court_

There are three primary sources of West Virginia law that govern child abuse/neglect cases: Article 6 of Chapter 49 of the West Virginia Code and other applicable articles in Chapter 49; the Rules of Procedure for Child Abuse and Neglect Proceedings; and case law from the West Virginia Supreme Court. In addition, federal statutes and their implementing regulations, most notably the Adoption and Safe Families Act (ASFA), establish procedures for these cases.

In West Virginia, an attorney is appointed to represent all parties who appear and meet the required financial guidelines. A child is also appointed an attorney to represent him/her, and counsel for the child is expected to take an active role in the litigation. Although an attorney may represent a sibling group, an attorney may not represent a child and his or her parent in the same case. In addition to representation by counsel, a CASA is appointed to represent the child in all counties where a local CASA program has been established. Currently, there are 13 local CASA programs that serve 28 counties.

Child abuse/neglect cases are typically initiated by the filing of a petition, but a child may, in emergency circumstances, be removed before a petition is filed. If removal occurs before a petition is filed, the removal must be ratified forthwith by a juvenile referee or the circuit court. Provided that a child has been removed from the home, the circuit court is required to conduct a preliminary hearing within ten days. Assuming that the case was not dismissed at the preliminary hearing, an adjudicatory hearing must begin within thirty days of the entry of the preliminary hearing order, and the court must determine whether the child is an abused or neglected child after the conclusion of this hearing. If a child has been adjudicated as an abused or neglected child, the court is required to conduct a disposition hearing which, in general, determines whether parental rights should be terminated or whether there are less drastic alternatives, including reunification. At disposition, a child may be placed with a non-abusing, non-neglecting parent. A court may also grant an improvement period as an alternative disposition. A court is required to conduct a permanency hearing within the time established by the Adoption and Safe Families Act.

D003574

At different stages during a case, an adult respondent may be granted an improvement period. If an improvement period is granted, it may affect the time at which the adjudicatory, dispositional or permanency hearing must be conducted. There are three types of improvement periods: a) a pre-adjudicatory improvement period which cannot exceed ninety days; b) a post-adjudicatory improvement period of six months; or c) a dispositional improvement period of six months. A post-adjudicatory and dispositional improvement period may be extended an additional three months, provided that the respondent has shown substantial compliance with the terms of the improvement period. An adult respondent may not be granted more than one improvement period unless he/she demonstrates that there has been a substantial change in circumstances.

While a case is pending, the court is required to conduct periodic review hearings. If an adult respondent is granted an improvement period, the court is required to conduct a hearing no less than every ninety days. This requirement ensures that the court (and the Department) are monitoring the progress of the improvement period. If parental rights have been terminated, the court is required to conduct a permanency review hearing every ninety days until permanency is achieved. Permanency shall be achieved within 18 months unless the court finds there are extraordinary reasons for the delay. The court may not dismiss the case until permanency is achieved. These review hearings ensure that a case is managed effectively and the needs of the children are addressed in a timely manner.

In addition to the proceedings in court, multidisciplinary treatment teams (MDTs) are convened to assess, plan and implement a comprehensive, individualized service plan for a child. When an improvement period is granted, the MDT should prepare a family case plan that includes a treatment plan for the parents and a permanency plan for the child. The case plans for a child or family must also include a concurrent permanency plan for the child. The West Virginia Supreme Court and the Department have recently adopted a uniform child and family case plan for abuse/neglect proceedings.

*Juvenile Cases in Circuit Court*

The primary source of the West Virginia law governing juvenile cases is found in Article 5 of Chapter 49 of the West Virginia Code. Additionally, other applicable articles of Chapter 49, such as Article 5D which governs multidisciplinary teams, establish general principles and procedures for juvenile cases. Case law from the West Virginia Supreme Court further governs juvenile proceedings. Finally, the Adoption and Safe Families Act governs juvenile cases when the Department seeks foster care maintenance payments when a juvenile is placed outside the home.

The circuit court serves as the trial court for juvenile proceedings brought pursuant to Article 5 of Chapter 49. There are two types of juvenile cases: status offenses and delinquency offenses. A status offense involves situations in which a juvenile engages in actions, such as running away or truancy, that are unlawful because the juvenile is under 18. Delinquency cases involve circumstances in which the juvenile is alleged to have committed an act that would be a crime if the juvenile were an adult. In status offense cases, the Department is required to provide services to the juvenile. In cases involving delinquency offenses, the Department may be and is often required to provide services.

D003575

In juvenile cases, the circuit court conducts a preliminary hearing to determine whether there is probable cause for the case to continue. Before an adjudicatory hearing is conducted, the court may place the juvenile on an improvement period. Unless the juvenile is placed on an improvement period and successfully completes it, an adjudicatory hearing which is analogous to a trial will be conducted. In a status offense case, it is mandatory that the court refer the juvenile to the Department for services as a disposition. In delinquency cases, the court also has an array of options at disposition that may include the commitment of the juvenile to the custody of the Division of Juvenile Services. In both status offense and delinquency cases, the Court may place the juvenile in the custody of the Department which involves placement in a non-secure facility. When the Department is providing services in a juvenile case, the circuit court is required to conduct a review hearing no less than every ninety days. Similar to abuse/neglect cases, MDTs are convened in juvenile cases to assess and provide services to juveniles and their families.

*Family Court*

Presently, there are 26 family court circuits and 35 family court judges. Effective January 1, 2009, ten additional family court judges will be added so there will be 45 family court judges in West Virginia.

The family court is a court of limited jurisdiction, and it has jurisdiction over cases involving divorce, allocation of custodial responsibility, annulment, separate maintenance, child support, paternity and grandparent visitation. It also has jurisdiction over final domestic violence hearings, child support enforcement actions and civil contempt wherein the order sought to be enforced is a family court order. It has concurrent jurisdiction with the circuit court over name changes and minor guardianship cases. If a minor guardianship case is based upon allegations of abuse/neglect, the circuit court is required to address the case. A family court does not have jurisdiction over child abuse/neglect cases.

*Magistrate Court*

A magistrate may play a limited role in an abuse/neglect case if the circuit court appoints the magistrate as a juvenile referee. Juvenile referees in abuse/neglect cases may ratify the emergency removal of a child from the home when an emergency situation arises in the presence of a child protective service worker and the worker takes the child into custody. The worker is then required to appear forthwith before a circuit judge or juvenile referee who determines whether the removal should be ratified.

*Overlap Procedures*

Although West Virginia circuit courts and the Supreme Court are the only courts that may adjudicate child abuse/neglect cases, allegations of child maltreatment are often raised in family court cases. Additionally, allegations of child abuse/neglect arise in initial domestic violence hearings that are, by statute, conducted by the magistrate court. Further, abuse/neglect allegations are raised in cases in which a magistrate, acting as a juvenile referee, determines whether to ratify the emergency removal of a child.

D003576

As required by West Virginia Code § 49-6A-2, circuit court judges, family court judges and magistrates are included in the list of persons who are required to report suspected child abuse/neglect to the DHHR. A mandatory reporter is obligated to report to the DHHR when he or she has reasonable cause to suspect that a child is abused or neglected.

Although West Virginia judicial officers are mandatory reporters, it was widely recognized that the reporting requirement was an ineffective method of addressing allegations of child maltreatment when they arose in a family court case. Additionally, it was recognized that communication lapses often occurred between the courts and Child Protective Services (CPS). To ensure that abuse/neglect matters are promptly investigated and addressed in the appropriate forum, the West Virginia Supreme Court promulgated several new rules and amended existing rules in 2006 and 2007. These rules are commonly referred to as the "Overlap Rules."

When a family court judge has reasonable cause to believe that a minor involved in a family court case has been abused/neglected, the family court must immediately, in writing, report the suspected abuse/neglect to the CPS office in the county where the family court case is pending. A copy must also be transmitted to the circuit court in the county where the family court case is pending. A copy of the referral is placed in the family court case file under seal. Even though a family court has made a written referral concerning the child, it still retains jurisdiction to address matters, such as an allocation of custodial responsibility, until an abuse/neglect case is filed.

Once the circuit court receives the written referral, it is required to oversee the investigation of the referral by the following procedures. First, the circuit court is required to issue an administrative order to CPS that requires CPS to investigate the suspected child maltreatment. At the conclusion of the investigation, CPS must submit a written report to the court or appear at a scheduled hearing for a date not to exceed forty-five days. However, the circuit court may substantially shorten the time for the investigation if the written referral from family court presents reason to believe a child may be in imminent danger. To keep the family court informed of the status of the investigation, CPS is also required to provide a copy of any reports involving the child to the family court.

Based upon its investigation, CPS may conclude that an abuse/neglect case should be filed. Assuming that the petition is filed, the allegations of child maltreatment will be addressed in the abuse/neglect case.

Alternatively, CPS may conclude that a child abuse/neglect case should not be filed after an investigation is completed. This conclusion must be presented to the court either in a written report or at the scheduled hearing. Provided that the court agrees with CPS' conclusion, no abuse/neglect petition would be filed.

Circumstances may arise when the circuit court, after reviewing the written referral from family court and the investigative report from CPS, may believe that CPS has a statutory duty to file an abuse/neglect petition. In this case, the circuit court may set a prompt hearing to determine whether CPS, in fact, has a legal duty to file an abuse/neglect petition. After a hearing, the

D003577

circuit court may then determine whether CPS is required to file an abuse/neglect petition and may order CPS to do so.

If CPS does not file either an investigative report or an abuse/neglect petition within the required timeframe, the court may issue an order that will initiate contempt proceedings against CPS. Contempt proceedings could also be initiated if the circuit court rules that CPS is required to file an abuse/neglect petition but has failed to do so. These proceedings are intended to prevent situations in which CPS fails to investigate alleged child maltreatment.

As noted previously, family courts and circuit courts have concurrent jurisdiction over minor guardianship cases. A guardian for a minor may be necessary if a parent dies or in other circumstances. However, a party may also seek to be named as a guardian based upon allegations of abuse/neglect. If a minor guardianship petition is based, either in whole or in part, on child abuse/neglect allegations, the case should be addressed by the circuit court, not the family court.

When the family court determines that a minor guardianship case is based upon abuse/neglect allegations, the family court must remove the case to circuit court. The family court may enter an order of removal either after a review of the petition, provided that the abuse/neglect allegations are apparent in the petition, or after a hearing in which child abuse/neglect allegations are presented. This procedure ensures that abuse/neglect allegations are addressed in the appropriate forum.

**Self Assessment Process**

Information for the Statewide Assessment was gathered through a number of work groups, state quality assurance reviews, meetings with youth and foster parents, anecdotal data, administrative service organization data, the statewide data profile, surveys of the legal community, an online survey and our own research.

Between February and March 2008, four work groups were held, one in each region of the state. Participants for these work groups included Department staff, (direct service workers and their supervisors), stakeholders (individual and agency providers), specialized foster care providers and representatives from mental health and education. Also included in the work groups were training and policy staff. These work groups looked at CFSR Items 1-23, specifically addressing the questions: "Where were we at the end of the last CFSR?" "What PIP strategies worked and what strategies did not work?" "Where are we now?" and "Where do we want to be?"

In addition to these work groups, meetings were held with the Department's leadership and management staff, the Department's Child Welfare Consultants, two foster parent associations and with four groups of youth throughout the state. The legal community, which includes judges, prosecuting attorneys and child welfare attorneys, were surveyed with the assistance of the Court Improvement Program. Both handwritten and online surveys were completed by this group.

D003578

A survey was developed and administered online between April 2 and May 2, 2008. There were approximately 280 surveys completed during this time. Those completing the survey included adoptive parents, agency providers, biological parents, child advocates, child-placing agencies, education personnel, judicial personnel, mental health providers, foster parents, attorneys and domestic violence advocates.

**Training and Technical Assistance**

Since 2002, West Virginia has requested and received a variety of training and technical assistance from different National Resource Centers. Below is a list of what has been requested and received.

National Resource Center for Organizational Improvement
- Address workload issues in Kanawha County, the state's largest county
- Assistance with the community collaborative and service array process
- Facilitate involvement of upper level management in the SWA process
- Assistance with assessing, organizing and utilizing data collected through new QA process
- Assistance during development of a peer review/CFSR process and PIP implementation
- Assistance with PIP development
- Assist management team in establishing priority outcomes and realistic work plans

National Resource Center for Child Protective Services
- Assistance the Division of Training in developing the CPS safety supervisor tests
- Piloting the CPS safety supervisor test
- Assistance with the CPS redesign process
- Assistance win developing a safety format and implementation

National Resource Center for Child Welfare Data and Technology
- Assistance for SACWIS to address the AFCARS data
- Assistance with AFCARS improvement plan
- Facilitate involvement of upper level management in the SWA process
- Assistance with use of data and AFCARS to support development of PIP benchmarks

National Resource Center for Family Centered Practice and Permanency Planning
- Assistance with strategies for working with teens who express the feeling of not wanting to be adopted
- Assistance with improving compliance with worker/child visitation
- With AdoptUsKids provided assistance on foster care and adoptive provider recruitment
- Requested keynote speaker

National Resource Center for Adoption
- Review policies to ensure MEPA/IEP compliance
- Requested training on Adoption Support and Preservation

D003579

National Resource Center for Youth Development
- Implement the Ansell-Casey Life Skills Assessment and Curriculum for youth in foster care

National Resource Center on Legal and Judicial Issues
- Assistance and support to facilitate collaboration between the courts and the Department at both the state and local levels
- CASA requested assistance with annual conference
- Presentation at a multidisciplinary training of child welfare and educational professionals & attend an advisory board meeting
- Meet with statewide committee drafting juvenile rules relating to foster care and Title IV-E
- Training at state conference on child abuse/neglect
- Presentation at Annual Judicial Conference
- Judicial training on domestic violence and child maltreatment
- Two-day Child Abuse and Neglect Cross Training for attorneys, CPS workers and social workers - American Bar Association (request made by the Court Improvement Program)

**Introduction to the Data**

<u>Rounds One-Three of the Office of Planning and Quality Improvement (OPQI) QA Reviews</u>
In each of these review rounds, every district and cases from each of the counties within them, were reviewed.  The number of cases reviewed ranged from a low of three for the smallest districts to a high of 10 cases for the largest districts.  The case breakdown was approximately one-third to one-half of the cases as open CPS cases without placement and the rest of the cases were placement cases:  CPS; Foster Care; Youth Services; and Adoption.  The cases were chosen at random from reports of open and closed case numbers for the counties involved provided by the SACWIS system staff.

The reviews were done using the July 2003 CFSR onsite review instrument and followed the CFSR onsite review procedure including interviews with the participants in the case, review of the paper records, and review of the case in our SACWIS system.  Reviews were conducted primarily by OPQI staff but included some CPS and Youth Services supervisors from the field participating in the reviews of districts other than their own.  Each of the districts was provided with an exit conference and follow-up reports after the onsite review was completed.

Following the 2005-2006 round of reviews, the children's social services staff in each district developed a district program improvement plan.  The completion of these district PIPs is being monitored by OPQI.

<u>2007 OPQI QA Mini-Reviews</u>

In this round, six districts which might meet the criteria for sites for the 2008 CFSR onsite review were identified in Spring 2007, which was seven months prior to the receipt of our January 2008 Data Profile.  The selection criteria was based upon district caseload sizes and distribution over case types, district characteristics (multi-county or single county), staff housing

D003580

locations (rural or urban), and the presence of any unique children's services initiatives, etc. The ability of a site reviewed to actually accommodate a review was also considered, in particular, the availability of lodging and restaurants.

The reviews were conducted between August and December 2007. The number of cases reviewed in each site was 20 and followed the requirements for our 2008 CFSR for placement cases which were stratified into the four required categories. The additional cases were all open CPS and Youth Services cases without placement. The July 2007 version of the CFSR onsite review instrument was utilized for these reviews. Approximately one-fourth of the cases at each site were reviewed using the full CFSR protocol. The other cases were reviewed using a limited number of interviews. All cases were reviewed in the SACWIS system and using the paper records. Nearly all the case reviews were conducted by OPQI staff. Again, as with the first three rounds of reviews, each district reviewed was provided with an exit conference and a follow-up report.

D003581

**West Virginia Acronyms**

ASO          Administrative Service Organization
BCF          Bureau for Children and Families
CAC          Child Advocacy Center
CAPS         Comprehensive Assessment and Planning System
CAS          Division of Children and Adult Services
CASA         Court Appointed Special Advocate
CFSR         Child and Family Services Review
CIP          Court Improvement Program
CSM          Community Services Manager
CWC          Child Welfare Consultant
DEC          Drug Endangered Children
DHHR         Department of Health and Human Resources
DOP          Division of Personnel
FACTS        Family and Children Tracking System
FRN          Family Resource Network
GAL          GAL
MAPS         Military and Public Safety
MDT          Multidisciplinary Team
NEMT         Non-Emergency Medical Transport
OPQI         Office of Planning and Quality Improvement
PIP          Program Improvement Plan
PRIDE        Parent Resources for Information, Development and Education
RD           Regional Director
SACWIS       Statewide Automated Child Welfare Information System
WV           West Virginia
WVCPSS       West Virginia Child Protective Services System
YBE          Youth Behavior Evaluation
YS           Youth Services

**D003582**

## Section II -- Safety and Permanency Data

| CHILD SAFETY PROFILE | Fiscal Year 2006ab | | | | | | 12-Month Period Ending 03/31/2007 | | | | | | Fiscal Year 2007ab (In process of validation) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % |
| I. Total CA/N Reports Disposed[1] | 23,210 | | 51,674 | | 39,756 | | 22,080 | | 49,413 | | 38,159 | | | | | | | |
| **II. Disposition of CA/N Reports[3]** | | | | | | | | | | | | | | | | | | |
| Substantiated & Indicated | 5,271 | 22.7 | 8,345 | 16.1 | 7,213 | 18.1 | 4,786 | 21.7 | 7,598 | 15.4 | 6,490 | 17.0 | | | | | | |
| Unsubstantiated | 15,879 | 68.4 | 26,834 | 51.9 | 20,939 | 52.7 | 15,449 | 70 | 26,459 | 53.5 | 20,606 | 54.0 | | | | | | |
| Other | 2,060 | 8.9 | 16,495 | 31.9 | 11,604 | 29.2 | 1,845 | 8.4 | 15,356 | 31.1 | 11,063 | 29.0 | | | | | | |
| **III. Child Victim Cases Opened for Post-Investigation Services[4]** | | | 6,530 | 78.3 | 5,619 | 77.9 | | | 6,174 | 81.3 | 5,266 | 81.1 | | | | | | |
| **IV. Child Victims Entering Care Based on CA/N Report[5]** | | | 788 | 9.4 | 670 | 9.3 | | | 885 | 11.6 | 720 | 11.1 | | | | | | |
| **V. Child Fatalities Resulting from Maltreatment[6]** | | | | | 6[A] | 0.1 | | | | | 4 | 0.1 | | | | | | |
| ***STATEWIDE AGGREGATE DATA USED TO DETERMINE SUBSTANTIAL CONFORMITY*** | | | | | | | | | | | | | | | | | | |
| **VI. Absence of Maltreatment Recurrence[7] [Standard: 94.6% or more]** | | | | | 3,414 of 3,851 | 88.7 | | | | | 3,003 of 3,430 | 87.6 | | | | | | |
| **VII. Absence of Child Abuse and/or Neglect in Foster Care[8] (12 months) [standard 99.68% or more]** | | | | | 6,449 of 6,483 | 99.48 | | | | | 6,674[B] of 6,720 | 99.32 | | | | | | |

D003583

**Additional Safety Measures For Information Only (no standards are associated with these):**

| | Fiscal Year 2006ab | | | | | 12-Month Period Ending 03/31/2007 | | | | | Fiscal Year 2007ab (In process of validation) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | | | Unique Childn.[2] | % | Hours | | | Unique Childn.[2] | % | Hours | | | Unique Childn.[2] | % |
| VIII. Median Time to Investigation in Hours (Child File)[9] | >168 but <192 | | | | | >168 but <192 | | | | | | | | | |
| IX. Mean Time to Investigation in Hours (Child File)[10] | 499 | | | | | 366 | | | | | | | | | |
| X. Mean Time to Investigation in Hours (Agency File)[11] | C | | | C | | | | | | | | | | | |
| XI. Children Maltreated by Parents While in Foster Care.[12] | | | | 73 of 6,483 | 1.13 | | | | 55 of 6,720 | 0.82 | | | | | |

**CFSR Round One Safety Measures to Determine Substantial Conformity (Used primarily by States completing Round One Program Improvement Plans, but States may also review them to compare to prior performance)**

| | Fiscal Year 2006ab | | | | | | 12-Month Period Ending 03/31/2007 | | | | | | Fiscal Year 2007ab (In process of validation) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % | Reports | % | Duplic. Childn.[2] | % | Unique Childn.[2] | % |
| XII. Recurrence of Maltreatment[13] [Standard: 6.1% or less] | | | | | 437 of 3,851 | 11.3 | | | | | 427 of 3,430 | 12.4 | | | | | | |
| XIII. Incidence of Child Abuse and/or Neglect in Foster Care[14] (9 months) [standard 0.57% or less] | | | | | 26 of 5,889 | 0.44 | | | | | 18[B] of 6,043 | 0.30 | | | | | | |

D003584

| NCANDS data completeness information for the CFSR | | | |
|---|---|---|---|
| Description of Data Tests | Fiscal Year 2006ab | 12-Month Period Ending 03/31/2007 | Fiscal Year 2007ab (In process of validation) |
| **Percent of duplicate victims in the submission** [At least 1% of victims should be associated with multiple reports (same CHID). If not, the State would appear to have frequently entered different IDs for the same victim. This affects maltreatment recurrence] | 12.91 | 13.36 | |
| **Percent of victims with perpetrator reported** [File must have at least 95% to reasonably calculate maltreatment in foster care]* | 100 | 100 | |
| **Percent of perpetrators with relationship to victim reported** [File must have at least 95%]* | 60.76 | 62.60 | |
| **Percent of records with investigation start date reported** [Needed to compute mean and median time to investigation] | 91.95 | 92.10 | |
| **Average time to investigation in the Agency file** [PART measure] | Not reported | Not Reported | |
| **Percent of records with AFCARS ID reported in the Child File** [Needed to calculate maltreatment in foster care by the parents; also. All Child File records should now have an AFCARS ID to allow ACF to link the NCANDS data with AFCARS. This is now an all-purpose unique child identifier and a child **does not have to be in foster care to have this ID**] | 100 | 100 | |

*States should strive to reach 100% in order to have maximum confidence in the absence of maltreatment in foster care measure.

## FOOTNOTES TO DATA ELEMENTS IN CHILD SAFETY PROFILE

Each maltreatment allegation reported to NCANDS is associated with a disposition or finding that is used to derive the counts provided in this safety profile. The safety profile uses three categories. The various terms that are used in NCANDS reporting have been collapsed into these three groups.

| Disposition Category | Safety Profile Disposition | NCANDS Maltreatment Level Codes Included |
|---|---|---|
| A | Substantiated or Indicated (Maltreatment Victim) | "Substantiated," "Indicated," and "Alternative Response Disposition Victim" |
| B | Unsubstantiated | "Unsubstantiated" and "Unsubstantiated Due to Intentionally False Reporting" |
| C | Other | "Closed-No Finding," "Alternative Response Disposition – Not a Victim," "Other," "No Alleged Maltreatment," and "Unknown or Missing" |

Alternative Response was added starting with the 2000 data year. The two categories of Unsubstantiated were added starting with the 2000 data year. In earlier years there was only the category of Unsubstantiated. The disposition of "No alleged maltreatment" was added for FYY 2003. It primarily refers to children who receive an investigation or assessment because there is an allegation concerning a sibling or other child in the household, but not themselves, AND whom are not found to be a victim of maltreatment. It applies as a Maltreatment Disposition Level but not as a Report Disposition code because the Report Disposition cannot have this value (there must have been a child who was found to be one of the other values.)

Starting with FFY 2003, the data year is the fiscal year.

D003585

**Starting with FFY2004, the maltreatment levels for each child are used consistently to categorize children. While report dispositions are based on the field of report disposition in NCANDS, the dispositions for duplicate children and unique children are based on the maltreatment levels associated with each child. A child victim has at least one maltreatment level that is coded "substantiated," "indicated," or "alternative response victim." A child classified as unsubstantiated has no maltreatment levels that are considered to be victim levels and at least one maltreatment level that is coded "unsubstantiated" or "unsubstantiated due to intentionally false reporting." A child classified as "other" has no maltreatment levels that are considered to be victim levels and none that are considered to be unsubstantiated levels. If a child has no maltreatments in the record, and report has a victim disposition, the child is assigned to "other" disposition. If a child has no maltreatments in the record and the report has either an unsubstantiated disposition or an "other" disposition, the child is counted as having the same disposition as the report disposition.**

1. The data element, "Total CA/N Reports Disposed," is based on the reports received in the State that received a disposition in the reporting period under review.  The number shown may include reports received during a previous year that received a disposition in the reporting year. Counts based on "reports," "duplicated counts of children," and "unique counts of children" are provided.

2. The duplicated count of children (report-child pairs) counts a child each time that (s)he was reported.  The unique count of children counts a child only once during the reporting period, regardless of how many times the child was reported.

3. For the column labeled "Reports," the data element, "Disposition of CA/N Reports," is based on upon the highest disposition of any child who was the subject of an investigation in a particular report. For example, if a report investigated two children, and one child is found to be neglected and the other child found not to be maltreated, the report disposition will be substantiated (Group A). The disposition for each child is based on the specific finding related to the maltreatment(s).  In other words, of the two children above, one is a victim and is counted under "substantiated" (Group A) and the other is not a victim and is counted under "unsubstantiated" (Group B). In determining the unique counts of children, the highest finding is given priority.  If a child is found to be a victim in one report (Group A), but not a victim in a second report (Group B), the unique count of children includes the child only as a victim (Group A).  The category of "other" (Group C) includes children whose report may have been "closed without a finding," children for whom the allegation disposition is "unknown," and other dispositions that a State is unable to code as substantiated, indicated, alternative response victim, or unsubstantiated.

4. The data element, "Child Cases Opened for Services," is based on the number of victims (Group A) during the reporting period under review. "Opened for Services" refers to post-investigative services. The duplicated number counts each time a victim's report is linked to on-going services; the unique number counts a victim only once regardless of the number of times services are linked to reports of substantiated maltreatment.

5. The data element, "Children Entering Care Based on CA/N Report," is based on the number of victims (Group A) during the reporting period under review.  The duplicated number counts each time a victim's report is linked to a foster care removal date. The unique number counts a victim only once regardless of the number of removals that may be reported.

6. The data element "Child Fatalities" counts the number of children reported to NCANDS as having died as a result of child abuse and/or neglect. Depending upon State practice, this number may count only those children for whom a case record has been opened either prior to or after the death, or may include a number of children whose deaths have been investigated as possibly related to child maltreatment. For example, some States include neglected-related deaths such as those caused by motor vehicle or boating accidents, house fires or access to firearms, under certain circumstances. The percentage is based on a count of unique victims of maltreatment for the reporting period.

7.  The data element "Absence of Recurrence of Maltreatment" is defined as follows: Of all children who were victims of substantiated or indicated maltreatment allegation during the first 6 months of the reporting period, what percent were not victims of another substantiated or indicated maltreatment allegation within a 6-month period. This data element is used to determine the State's substantial conformity with CFSR Safety Outcome #1 ("Children are, first and foremost, protected from abuse and neglect").

8.  The data element "Absence of Child Abuse/or Neglect in Foster Care" is defined as follows: Of all children in foster care during the reporting period, what percent were not victims of substantiated or indicated maltreatment by foster parent of facility staff member. This data element is used to determine the State's substantial conformity with CFSR Safety Outcome #1 ("Children are, first and foremost, protected from abuse and neglect").  A child is counted as not having been maltreated in foster care if the perpetrator of the maltreatment was not identified as a foster parent or residential facility staff. Counts of children not maltreated in foster care are derived by subtracting NCANDS count of children maltreated by foster care providers from AFCARS count of children placed in foster care. The observation period for this measure is 12 months. The number of children not found to be maltreated in foster care and the percentage of all children in foster care are provided.

9.  Median Time to Investigation in hours is computed from the Child File records using the Report Date and the Investigation Start Date (currently reported in the Child File in mmddyyyy format). The result is converted to hours by multiplying by 24.

10. Mean Time to investigation in hours is computed from the Child File records using the Report Date and the Investigation Start Date (currently reported in the Child File in mmddyyyy format). The result is converted to hours by multiplying by 24. Zero days difference (both dates are on the same day) is reported as "under 24 hours", one day difference (investigation date is the next day after report date) is reported as "at least 24 hours, but less than 48 hours", two days difference is reported as "at least 48 hours, but less than 72 hours", etc.

11. Average response time in hours between maltreatment report and investigation is available through State NCANDS Agency or SDC File aggregate data. "Response time" is defined as the time from the receipt of a report to the time of the initial investigation or assessment. Note that many States calculate the initial investigation date as the first date of contact with the alleged victim, when this is appropriate, or with another person who can provide information essential to the disposition of the investigation or assessment.

12. The data element, "Children Maltreated by Parents while in Foster Care" is defined as follows: Of all children placed in foster care during the reporting period, what percent were victims of substantiated or indicated maltreatment by parent. This data element requires matching NCANDS and AFCARS records by AFCARS IDs. Only unique NCANDS children with substantiated or indicated maltreatments and perpetrator relationship "Parent" are selected for this match. NCANDS report date must fall within the removal period found in the matching AFCARS record.

13. The data element, "Recurrence of Maltreatment," is defined as follows: Of all children associated with a "substantiated" or "indicated" finding of maltreatment during the first six months of the reporting period, what percentage had another "substantiated" or "indicated" finding of maltreatment within a 6-month period. The number of victims during the first six-month period and the number of these victims who were recurrent victims within six months are provided.  This data element was used to determine the State's substantial conformity with Safety Outcome #1 for CFSR Round One.

D003587

14. The data element, "Incidence of Child Abuse and/or Neglect in Foster Care," is defined as follows: Of all children who were served in foster care during the reporting period, what percentage were found to be victims of "substantiated" or "indicated" maltreatment. A child is counted as having been maltreated in foster care if the perpetrator of the maltreatment was identified as a foster parent or residential facility staff. Counts of children maltreated in foster care are derived from NCANDS, while counts of children placed in foster care are derived from AFCARS. The observation period for these measures is January-September because this is the reporting period that was jointly addressed by both NCANDS and AFCARS at the time when NCANDS reporting period was a calendar year. The number of children found to be maltreated in foster care and the percentage of all children in foster care are provided. This data element was used to determine the State's substantial conformity with Safety Outcome #2 for CFSR Round One.

## Additional Footnotes

A. In FFY2006, WV reported 9 additional fatalities in the Agency File.

B. WV has incomplete reporting on perpetrator relationships. For the FFY2006b2007a data period, the Children's Bureau proposed to **estimate a number of victims maltreated by foster care providers in a subset of Child File victims with unknown perpetrator relationship**. The estimation method was based on using a random sample as described below:

1. In WV FFY2006b2007a Child File, the total number of unique victims with missing perpetrator relationship data was **1886**.

2. It has been established that in order to achieve an acceptable level of confidence, a size of a random sample should be at least **210**.

3. By looking at the case records from the random sample n=210, the State found **2** victims maltreated by foster care providers in the sample (or **.953%** of the sample: 2/210*100= .953%).

4. In order **to estimate** how many victims were maltreated by foster care providers in the original subset of victims without perpetrator relationship information (n=1886), **.953%** was applied to **1886**, resulting in the **18 estimated victims**.

8. The estimate above was added to the **28** victims maltreated by foster care providers from the FFY06b07a Child File, resulting in the total of **46 victims**.

9. The measure was recomputed using the new NCANDS 2006b2007a estimate and the most recent AFCARS 2006b2007a denominator: (6720 - 46)/6720*100=99.32%.

C. WV does not report on time to investigation in the Agency File.

D003588

| POINT-IN-TIME PERMANENCY PROFILE | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | Federal FY 2007ab | |
|---|---|---|---|---|---|---|
| | # of Children | % of Children | # of Children | % of Children | # of Children | % of Children |
| **I. Foster Care Population Flow** | | | | | | |
| Children in foster care on first day of year[1] | 3,755 | | 3,854 | | 3,888 | |
| Admissions during year | 2,728 | | 2,866 | | 2,985 | |
| Discharges during year | 2,322 | | 2,193 | | 2,328 | |
| Children discharging from FC in less than 8 days (These cases are excluded from length of stay calculations in the composite measures) | 99 | 4.3% of the discharges | 59 | 2.7% of the discharges | 59 | 2.5% of the discharges |
| Children in care on last day of year | 4,161 | | 4,527 | | 4,545 | |
| Net change during year | 406 | | 673 | | 657 | |
| | | | | | | |
| **II. Placement Types for Children in Care** | | | | | | |
| Pre-Adoptive Homes | 233 | 5.6 | 281 | 6.2 | 271 | 6.0 |
| Foster Family Homes (Relative) | 322 | 7.7 | 392 | 8.7 | 459 | 10.1 |
| Foster Family Homes (Non-Relative) | 1,826 | 43.9 | 1,966 | 43.4 | 1,948 | 42.9 |
| Group Homes | 969 | 23.3 | 971 | 21.4 | 894 | 19.7 |
| Institutions | 157 | 3.8 | 197 | 4.4 | 183 | 4.0 |
| Supervised Independent Living | 47 | 1.1 | 38 | 0.8 | 46 | 1.0 |
| Runaway | 43 | 1.0 | 44 | 1.0 | 48 | 1.1 |
| Trial Home Visit | 229 | 5.5 | 257 | 5.7 | 326 | 7.2 |
| Missing Placement Information | 18 | 0.4 | 24 | 0.5 | 28 | 0.6 |
| Not Applicable (Placement in subsequent year) | 317 | 7.6 | 357 | 7.9 | 342 | 7.5 |
| | | | | | | |
| **III. Permanency Goals for Children in Care** | | | | | | |
| Reunification | 2,241 | 53.9 | 2,628 | 58.1 | 2,811 | 61.8 |
| Live with Other Relatives | 218 | 5.2 | 193 | 4.3 | 194 | 4.3 |
| Adoption | 955 | 23.0 | 1,028 | 22.7 | 942 | 20.7 |
| Long Term Foster Care | 21 | 0.5 | 19 | 0.4 | 18 | 0.4 |
| Emancipation | 400 | 9.6 | 354 | 7.8 | 289 | 6.4 |
| Guardianship | 305 | 7.3 | 299 | 6.6 | 276 | 6.1 |
| Case Plan Goal Not Established | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Missing Goal Information | 21 | 0.5 | 6 | 0.1 | 15 | 0.3 |
| | | | | | | |

D003589

| POINT-IN-TIME PERMANENCY PROFILE | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | Federal FY 2007ab | |
|---|---|---|---|---|---|---|
| | # of Children | % of Children | # of Children | % of Children | # of Children | % of Children |
| **IV.  Number of Placement Settings in Current Episode** | | | | | | |
| One | 1,813 | 43.6 | 2,084 | 46.0 | 2,018 | 44.4 |
| Two | 947 | 22.8 | 980 | 21.6 | 1,031 | 22.7 |
| Three | 503 | 12.1 | 530 | 11.7 | 520 | 11.4 |
| Four | 261 | 6.3 | 279 | 6.2 | 287 | 6.3 |
| Five | 160 | 3.8 | 156 | 3.4 | 173 | 3.8 |
| Six or more | 477 | 11.5 | 498 | 11.0 | 516 | 11.4 |
| Missing placement settings | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | |
| **V.  Number of Removal Episodes** | | | | | | |
| One | 3,445 | 82.8 | 3,708 | 81.9 | 3,754 | 82.6 |
| Two | 595 | 14.3 | 660 | 14.6 | 637 | 14.0 |
| Three | 102 | 2.5 | 128 | 2.8 | 125 | 2.8 |
| Four | 10 | 0.2 | 22 | 0.5 | 23 | 0.5 |
| Five | 8 | 0.2 | 8 | 0.2 | 5 | 0.1 |
| Six or more | 1 | 0.0 | 1 | 0.0 | 1 | 0.0 |
| Missing removal episodes | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | |
| **VI.  Number of children in care 17 of the most recent 22 months[2]** (percent based on cases with sufficient information for computation) | 546 | 26.8 | 542 | 23.8 | 572 | 23.8 |
| | | | | | | |
| **VII.  Median Length of Stay in Foster Care** (of children in care on last day of FY) | 11.8 | | 11.5 | | 11.7 | |

| VIII. Length of Time to Achieve Perm. Goal | # of Children Discharged | Median Months to Discharge | # of Children Discharged | Median Months to Discharge | # of Children Discharged | Median Months to Discharge |
|---|---|---|---|---|---|---|
| Reunification | 1,454 | 7.8 | 1,418 | 8.2 | 1,530 | 8.0 |
| Adoption | 422 | 27.4 | 359 | 25.2 | 403 | 25.3 |
| Guardianship | 99 | 18.4 | 101 | 18.4 | 89 | 24.1 |
| Other | 295 | 20.0 | 292 | 22.1 | 281 | 21.4 |
| Missing Discharge Reason (footnote 3, page 16) | 52 | 6.8 | 23 | 11.0 | 25 | 19.4 |
| Total discharges (excluding those w/ problematic dates) | 2,322 | 11.4 | 2,193 | 11.7 | 2,328 | 11.6 |
| Dates are problematic  (footnote 4, page 16) | 0 | N/A | 0 | N/A | 0 | N/A |

D003590

## Statewide Aggregate Data Used in Determining Substantial Conformity: Composites 1 through 4

| | Federal FY 2006ab | 12-Month Period Ending 03/31/2007 (06b07a) | Federal FY 2007ab |
|---|---|---|---|
| **IX. Permanency Composite 1:  Timeliness and Permanency of Reunification [standard: 122.6 or higher].** Scaled Scores for this composite incorporate two components | State Score = 103.6 | State Score = 106.6 | State Score = 110.7 |
| **National Ranking of State Composite Scores (see footnote A on page 12 for details)** | 38 of 47 | 35 of 47 | 30 of 47 |
| **Component A:  Timeliness of Reunification** The timeliness component is composed of three timeliness individual measures. | | | |
| **Measure C1 - 1: Exits to reunification in less than 12 months:** Of all children discharged from foster care to reunification in the year shown, who had been in foster care for 8 days or longer, what percent was reunified in less than 12 months from the date of the latest removal from home? (Includes trial home visit adjustment) [**national median = 69.9%, 75th percentile = 75.2%**] | 73.5% | 71.1% | 73.1% |
| **Measure C1 - 2: Exits to reunification, median stay**: Of all children discharged from foster care (FC) to reunification in the year shown, who had been in FC for 8 days or longer, what was the median length of stay (in months) from the date of the latest removal from home until the date of discharge to reunification? (This includes trial home visit adjustment) [**national median = 6.5 months, 25th Percentile = 5.4 months (lower score is preferable in this measure**[B])] | Median = 7.6 months | Median = 7.9 months | Median = 7.6 months |
| **Measure C1 - 3:  Entry cohort reunification in < 12 months:** Of all children entering foster care (FC) for the first time in the 6 month period just prior to the year shown, and who remained in FC for 8 days or longer, what percent was discharged from FC to reunification in less than 12 months from the date of the latest removal from home? (Includes trial home visit adjustment) [**national median = 39.4%, 75th Percentile = 48.4%**] | 43.1% | 40.5% | 41.5% |
| **Component B:  Permanency of Reunification** The permanency component has one measure. | | | |
| **Measure C1 - 4: Re-entries to foster care in less than 12 months:** Of all children discharged from foster care (FC) to reunification in the 12-month period prior to the year shown, what percent re-entered FC in less than 12 months from the date of discharge? [**national median = 15.0%, 25th Percentile = 9.9% (lower score is preferable in this measure)**] | 21.6% | 19.2% | 17.9% |
| | | | |

D003591

| | Federal FY 2006ab | 12-Month Period Ending 03/31/2007 (06b07a) | Federal FY 2007ab |
|---|---|---|---|
| **X. Permanency Composite 2:  Timeliness of Adoptions [standard:  106.4 or higher].** Scaled Scores for this composite incorporate three components. | State Score = 92.5 | State Score = 97.8 | State Score = 98.0 |
| **National Ranking of State Composite Scores (see footnote A on page 12 for details)** | 25 of 47 | 21 of 47 | 21 of 47 |
| **Component A:  Timeliness of Adoptions of Children Discharged From Foster Care.**  There are two individual measures of this component.  See below. | | | |
| **Measure C2 - 1:  Exits to adoption in less than 24 months:**  Of all children who were discharged from foster care to a finalized adoption in the year shown, what percent was discharged in less than 24 months from the date of the latest removal from home? [**national median = 26.8%, 75th Percentile = 36.6%**] | 39.4% | 47.4% | 45.8% |
| **Measure C2 - 2:  Exits to adoption, median length of stay:**  Of all children who were discharged from foster care (FC) to a finalized adoption in the year shown, what was the median length of stay in FC (in months) from the date of latest removal from home to the date of discharge to adoption? [**national median = 32.4 months, 25th Percentile = 27.3 months(lower score is preferable in this measure)**] | Median = 27.3 months | Median = 25.2 months | Median = 25.3 months |
| **Component B:  Progress Toward Adoption for Children in Foster Care for 17 Months or Longer.**  There are two individual measures.  See below. | | | |
| **Measure  C2 - 3: Children in care 17+ months, adopted by the end of the year**: Of all children in foster care (FC) on the first day of the year shown who were in FC for 17 continuous months or longer (and who, by the last day of the year shown, were not discharged from FC with a discharge reason of live with relative, reunify, or guardianship), what percent was discharged from FC to a finalized adoption by the last day of the year shown? [**national median = 20.2%, 75th Percentile = 22.7%**] | 24.3% | 20.1% | 21.7% |
| **Measure  C2 - 4:  Children in care 17+ months achieving legal freedom within 6 months:** Of all children in foster care (FC) on the first day of the year shown who were in FC for 17 continuous months or longer, and were not legally free for adoption prior to that day, what percent became legally free for adoption during the first 6 months of the year shown?  Legally free means that there was a parental rights termination date reported to AFCARS for both mother and father.  This calculation excludes children who, by the end of the first 6 months of the year shown had discharged from FC to "reunification," "live with relative," or "guardianship." [**national median = 8.8%, 75th Percentile = 10.9%**] | 6.2% | 9.2% | 9.3% |
| **Component C:  Progress Toward Adoption of Children Who Are Legally Free for Adoption.** There is one measure for this component.  See below. | | | |
| **Measure C2 - 5:  Legally free children adopted in less than 12 months:** Of all children who became legally free for adoption in the 12 month period prior to the year shown (i.e., there was a parental rights termination date reported to AFCARS for both mother and father), what percent was discharged from foster care to a finalized adoption in less than 12 months of becoming legally free? [**national median = 45.8%, 75th Percentile = 53.7%**] | 28.8% | 31.7% | 28.6% |

D003592

| | Federal FY 2006ab | 12-Month Period Ending 03/31/2007 (06b07a) | Federal FY 2007ab |
|---|---|---|---|
| **XI. Permanency Composite 3:  Permanency for Children and Youth in Foster Care for Long Periods of Time [standard:  121.7 or higher].** Scaled Scores for this composite incorporate two components | State Score = 125.6 | State Score = 120.2 | State Score = 124.2 |
| **National Ranking of State Composite Scores (see footnote A on page 12 for details)** | 11 of 51 | 16 of 51 | 13 of 51 |
| **Component A:  Achieving permanency for Children in Foster Care for Long Periods of Time.** This component has two measures. | | | |
| **Measure C3 - 1: Exits to permanency prior to 18th birthday for children in care for 24 + months**.  Of all children in foster care for 24 months or longer on the first day of the year shown, what percent was discharged to a permanent home prior to their 18th birthday and by the end of the fiscal year? A permanent home is defined as having a discharge reason of adoption, guardianship, or reunification (including living with relative). **[national median 25.0%, 75th Percentile = 29.1%]** | 27.2% | 25.0% | 25.5% |
| **Measure C3 - 2: Exits to permanency for children with TPR:** Of all children who were discharged from foster care in the year shown, and who were legally free for adoption at the time of discharge (i.e., there was a parental rights termination date reported to AFCARS for both mother and father), what percent was discharged to a permanent home prior to their 18th birthday? A permanent home is defined as having a discharge reason of adoption, guardianship, or reunification (including living with relative)  **[national median 96.8%, 75th Percentile = 98.0%]** | 93.6% | 91.7% | 93.9% |
| **Component B: Growing up in foster care.**  This component has one measure. | | | |
| **Measure C3 - 3: Children Emancipated Who Were in Foster Care for 3 Years or More.**  Of all children who, during the year shown, either (1) were discharged from foster care prior to age 18 with a discharge reason of emancipation, or (2) reached their 18th birthday while in foster care, what percent were in foster care for 3 years or longer? **[national median 47.8%, 25th Percentile = 37.5% (lower score is preferable)]** | 34.6% | 35.4% | 33.8% |
| | | | |

D003593

| | Federal FY 2006ab | 12-Month Period Ending 03/31/2007 (06b07a) | Federal FY 2007ab |
|---|---|---|---|
| **XII. Permanency Composite 4:  Placement Stability [national standard:  101.5 or higher].** Scaled scored for this composite incorporates **no components** but three individual measures (below) | State Score = 95.5 | State Score = 97.1 | State Score = 98.4 |
| National Ranking of State Composite Scores (see footnote A on page 12 for details) | 22 of 51 | 19 of 51 | 13 of 51 |
| **Measure C4 - 1) Two or fewer placement settings for children in care for less than 12 months.** Of all children served in foster care (FC) during the 12 month target period who were in FC for at least 8 days but less than 12 months, what percent had two or fewer placement settings? [national median = 83.3%, 75th Percentile = 86.0%] | 84.7% | 86.6% | 86.6% |
| **Measure C4 - 2) Two or fewer placement settings for children in care for 12 to 24 months.** Of all children served in foster care (FC) during the 12 month target period who were in FC for at least 12 months but less than 24 months, what percent had two or fewer placement settings? [national median = 59.9%, 75th Percentile = 65.4%] | 65.6% | 64.7% | 66.5% |
| **Measure C4 - 3) Two or fewer placement settings for children in care for 24+ months.** Of all children served in foster care (FC) during the 12 month target period who were in FC for at least 24 months, what percent had two or fewer placement settings? [national median = 33.9%, 75th Percentile = 41.8%] | 30.0% | 31.6% | 32.2% |
| | | | |

**Special Footnotes for Composite Measures:**

A. These National Rankings show your State's performance on the Composites compared to the performance of all the other States that were included in the 2004 data. The 2004 data were used for establishing the rankings because that is the year used in calculating the National Standards.  The order of ranking goes from 1 to 47 or 51, depending on the measure.  For example, "1 of 47" would indicate this State performed higher than all the States in 2004.

B. In most cases, a high score is preferable on the individual measures.  In these cases, you will see the 75th percentile listed to indicate that this would be considered a good score.  However, in a few instances, a low score is good (shows desirable performance), such as re-entry to foster care.  In these cases, the 25th percentile is displayed because that is the target direction for which States will want to strive.  Of course, in actual calculation of the total composite scores, these "lower are preferable" scores on the individual measures are reversed so that they can be combined with all the individual scores that are scored in a positive direction, where higher scores are preferable.

D003594

WV Statewide Assessment

| PERMANENCY PROFILE FIRST-TIME ENTRY COHORT GROUP | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | Federal FY 2007ab | |
|---|---|---|---|---|---|---|
| | # of Children | % of Children | # of Children | % of Children | # of Children | % of Children |
| **I. Number of children entering care for the first time in cohort group** (% = 1st time entry of all entering within first 6 months) | 1,122 | 80.8 | 1,104 | 80.5 | 1,222 | 79.5 |
| | | | | | | |
| **II. Most Recent Placement Types** | | | | | | |
| Pre-Adoptive Homes | 21 | 1.9 | 20 | 1.8 | 29 | 2.4 |
| Foster Family Homes (Relative) | 117 | 10.4 | 105 | 9.5 | 152 | 12.4 |
| Foster Family Homes (Non-Relative) | 449 | 40.0 | 411 | 37.2 | 504 | 41.2 |
| Group Homes | 326 | 29.1 | 308 | 27.9 | 261 | 21.4 |
| Institutions | 26 | 2.3 | 36 | 3.3 | 42 | 3.4 |
| Supervised Independent Living | 0 | 0.0 | 0 | 0.0 | 1 | 0.1 |
| Runaway | 8 | 0.7 | 9 | 0.8 | 8 | 0.7 |
| Trial Home Visit | 104 | 9.3 | 121 | 11.0 | 133 | 10.9 |
| Missing Placement Information | 3 | 0.3 | 6 | 0.5 | 9 | 0.7 |
| Not Applicable (Placement in subsequent yr) | 68 | 6.1 | 88 | 8.0 | 83 | 6.8 |
| | | | | | | |
| **III. Most Recent Permanency Goal** | | | | | | |
| Reunification | 775 | 69.1 | 823 | 74.5 | 1,033 | 84.5 |
| Live with Other Relatives | 52 | 4.6 | 54 | 4.9 | 40 | 3.3 |
| Adoption | 169 | 15.1 | 126 | 11.4 | 108 | 8.8 |
| Long-Term Foster Care | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Emancipation | 44 | 3.9 | 29 | 2.6 | 16 | 1.3 |
| Guardianship | 34 | 3.0 | 18 | 1.6 | 17 | 1.4 |
| Case Plan Goal Not Established | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Missing Goal Information | 48 | 4.3 | 54 | 4.9 | 8 | 0.7 |
| | | | | | | |
| **IV. Number of Placement Settings in Current Episode** | | | | | | |
| One | 642 | 57.2 | 662 | 60.0 | 706 | 57.8 |
| Two | 268 | 23.9 | 265 | 24.0 | 288 | 23.6 |
| Three | 129 | 11.5 | 104 | 9.4 | 135 | 11.0 |
| Four | 45 | 4.0 | 42 | 3.8 | 51 | 4.2 |
| Five | 13 | 1.2 | 15 | 1.4 | 18 | 1.5 |
| Six or more | 25 | 2.2 | 16 | 1.4 | 24 | 2.0 |
| Missing placement settings | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | |

D003595

| PERMANENCY PROFILE FIRST-TIME ENTRY COHORT GROUP (continued) | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | Federal FY 2007ab | |
|---|---|---|---|---|---|---|
| | # of Children | % of Children | # of Children | % of Children | # of Children | % of Children |
| **V. Reason for Discharge** | | | | | | |
| Reunification/Relative Placement | 317 | 85.9 | 307 | 90.8 | 324 | 90.3 |
| Adoption | 3 | 0.8 | 1 | 0.3 | 4 | 1.1 |
| Guardianship | 6 | 1.6 | 6 | 1.8 | 3 | 0.8 |
| Other | 32 | 8.7 | 22 | 6.5 | 24 | 6.7 |
| Unknown (missing discharge reason or N/A) | 11 | 3.0 | 2 | 0.6 | 4 | 1.1 |
| | ***Number of Months*** | | **Number of Months** | | **Number of Months** | |
| **VI. Median Length of Stay in Foster Care** | 8.0 | | 9.7 | | not yet determinable | |

## AFCARS Data Completeness and Quality Information (2% or more is a warning sign):

| | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | Federal FY 2007ab | |
|---|---|---|---|---|---|---|
| | **N** | **As a % of Exits Reported** | **N** | **As a % of Exits Reported** | **N** | **As a % of Exits Reported** |
| File contains children who appear to have been in care less than 24 hours | 0 | 0.0 % | 0 | 0.0 % | 0 | 0.0 % |
| File contains children who appear to have exited before they entered | 0 | 0.0 % | 0 | 0.0 % | 0 | 0.0 % |
| Missing dates of latest removal | 0 | 0.0 % | 0 | 0.0 % | 0 | 0.0 % |
| File contains "Dropped Cases" between report periods with no indication as to discharge | 2 | 0.1 % | 0 | 0.0 % | 0 | 0.0 % |
| Missing discharge reasons | 52 | 2.2 % | 23 | 1.0 % | 25 | 1.1 % |
| | **N** | **As a % of adoption exits** | **N** | **As a % of adoption exits** | **N** | **As a % of adoption exits** |
| File submitted lacks data on Termination of Parental Rights for finalized adoptions | 6 | 1.4 % | 5 | 1.4 % | 12 | 3.0 % |
| Foster Care file has different count than Adoption File of (public agency) adoptions (N= adoption count disparity). | 6 | 1.4% fewer in the unofficial adoption file*. | 4 | 1.1% fewer in the unofficial adoption file*. | 5 | 1.2% fewer in the unofficial adoption file*. |
| | **N** | **Percent of cases in file** | **N** | **Percent of cases in file** | **N** | **Percent of cases in file** |
| File submitted lacks count of number of placement settings in episode for each child | 0 | 0.0 % | 0 | 0.0 % | 0 | 0.0 % |

D003596

**Note: These are CFSR Round One permanency measures. They are intended to be used primarily by States completing Round One Program Improvement Plans, but could also be useful to States in CFSR Round Two in comparing their current performance to that of prior years:**

| | Federal FY 2006ab | | 12-Month Period Ending 03/31/2007 (06b07a) | | *Federal FY 2007ab* | |
|---|---|---|---|---|---|---|
| | # of Children | % of Children | # of Children | % of Children | # of Children | % of Children |
| **IX.** Of all children who were reunified with their parents or caretakers at the time of discharge from foster care, what percentage was reunified in less than 12 months from the time of the latest removal for home? (4.1) **[Standard: 76.2% or more]** | 1,026 | 70.6 | 966 | 68.1 | 1,060 | 69.3 |
| **X.** Of all children who exited care to a finalized adoption, what percentage exited care in less than 24 months from the time of the latest removal from home? (5.1) **[Standard: 32.0% or more]** | 165 | 39.1 | 170 | 47.4 | 183 | 45.4 |
| **XI.** Of all children served who have been in foster care less than 12 months from the time of the latest removal from home, what percentage have had no more than two placement settings? (6.1) **[Standard: 86.7% or more]** | 2,836 | 85.4 | 3,005 | 87.1 | 3,052 | 87.1 |
| **XII.** Of all children who entered care during the year, what percentage re-entered foster care within 12 months of a prior foster care episode? (4.2) **[Standard: 8.6% or less]** | 317 | 11.6 (80.4% new entry) | 311 | 10.9 (80.0% new entry) | 330 | 11.1 (80.3% new entry) |

D003597

## FOOTNOTES TO DATA ELEMENTS IN THE PERMANENCY PROFILE

[1]The FY 06, 06B07A, and FY 07 counts of children in care at the start of the year exclude 85 , 73 , and 70 children, respectively. They were excluded to avoid counting them twice. That is, although they were actually in care on the first day, they also qualify as new entries because they left and re-entered again at some point during the same reporting period.  To avoid counting them as both "in care on the first day" and "entries," the Children's Bureau selects only the most recent record.  That means they get counted as "entries," not "in care on the first day."

[2]We designated the indicator, *17 of the most recent 22 months,* rather than the statutory time frame for initiating termination of parental rights proceedings at *15 of the most 22 months*, since the AFCARS system cannot determine the *date the child is considered to have entered foster care* as defined in the regulation.  We used the outside date for determining the *date the child is considered to have entered foster care*, which is 60 days from the actual removal date.

[3]This count only includes case records missing a discharge reason, but which have calculable lengths of stay.  Records missing a discharge reason and with non-calculable lengths of stay are included in the cell "Dates are Problematic".

[4]The dates of removal and exit needed to calculate length of stay are problematic.  Such problems include: 1) missing data, 2) faulty data (chronologically impossible), 3) a child was in care less than 1 day (length of stay = 0) so the child should not have been reported in foster care file, or 4) child's length of stay would equal 21 years or more. These cases are marked N/A = Not Applicable because no length of stay can legitimately be calculated.

[5]This First-Time Entry Cohort median length of stay was 8.0 in FY 06.  This includes 0 children who entered and exited on the same day (who had a zero length of stay). Therefore, the median length of stay was unaffected by any 'same day' children.

[6]This First-Time Entry Cohort median length of stay was 9.7 in 06B07A. This includes 0 children who entered and exited on the same day (who had a zero length of stay). Therefore, the median length of stay was unaffected by any 'same day' children.

[7]This First-Time Entry Cohort median length of stay is Not Yet Determinable for FY 07. This includes 0 children who entered and exited on the same day (they had a zero length of stay).  Therefore, the median length of stay would still be Not Yet Determinable, but would be unaffected by any 'same day' children. The designation, Not Yet Determinable occurs when a true length of stay for the cohort cannot be calculated because fewer than 50% of the children have exited.

D003598

## Section III – Narrative Assessment of Child and Family Outcomes

### A. SAFETY

**Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect.**

| Item 1:     **Timeliness of initiating investigations of reports of child maltreatment.**  How effective is the agency in responding to incoming reports of child maltreatment in a timely manner? |
|---|

**What do policy and procedure require?**
Response time for initiation of a report can be within 0-2 hours, within seventy-two, or within fourteen days.  Supervisors determine the appropriate response times based on several factors including but not limited to:  the presence of allegations of imminent danger to the physical well-being of the child, serious physical abuse, whether the nature of the maltreatment indicates premeditation, bizarre behavior or circumstances and/or serious injury, whether the suspected conditions which presently exist could change rapidly, whether the parent's behavior is bizarre, out-of-control or dangerous, whether the child needs medical attention, whether the parent is gone and the child is unsupervised, whether the suspected perpetrator has access to the child, and/or whether the parent is currently under the influence of drugs or alcohol.

The response times are measured beginning with the date and time the report is taken and then counting by hours until the first face-to-face contact is made with the identified child(ren).

**What does the data show?**

TABLE 1

| Year | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Unique Children** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** |
| Substantiated Reports | 4,140 | 22.2 | 4,482 | 22.6 | 7,011 | 26.8 | 7,423 | 29.4 | 6,111 | 28.3 | 7,900 | 21.6 |
| Unsubstantiated Reports | 13,088 | 70.1 | 13,791 | 69.4 | 17,122 | 65.4 | 15,677 | 62.2 | 13,598 | 63 | 25,822 | 70.5 |
| **Other** | 1,432 | 7.7 | 1,587 | 8 | 2,047 | 7.8 | 2,108 | 8.4 | 1,873 | 8.7 | 2,908 | 7.9 |
| **Child Victim Cases Opened for Services** | 1,910 | 46.1 | 2,206 | 49.2 | 3,867 | 55.2 | 4,110 | 55.4 | 3,773 | 61.7 | 5,005 | 63.4 |
| **Child Victims Entering Case Based on A/N Report** | 473 | 11.4 | 596 | 13.3 | 869 | 12.4 | 841 | 11.3 | 808 | 13.2 | 1,157 | 14.6 |

D003599

The percent of cases opened for substantiated reports also increased steadily from a low of 46.1% in 1998 to 63.4% in 2003. The assessment system used by the state does provide for the option of not opening a case if the maltreatment is determined to be a one time occurrence. It is likely that the larger share of the unopened substantiated reports were on cases which were already open.

Due to conversion from paper records still not being complete (conversion began in Fall 1997), much of what was entered in 1998 was new. Many duplicate records were created due to thorough searches on the family reported not being completed in our SACWIS system or in the paper files in 1998 and 1999. The slow increase in the number of substantiated reports being opened reflects this, and connecting referrals (substantiated or not substantiated) to already open cases improved over time.

The number of child victims entering placement in the state did not fall below 11.3% in any of these years and reached a high of 14.6 % in 2003.

The number of reports investigated jumped between 2003 and 2005 but increased less between 2005 and 2006, and then dropped between 3-31-06 and 3-31-07. Both the number and percent of substantiated reports has been decreasing in the state since 2005. However, in a state with both an aging and a decreasing population, the number of child abuse/neglect reports investigated has increased by more than 8,500 reports, and this represents a 38.9% increase in investigation workload. The increase has contributed heavily to the development of the referral investigation backlogs which have occurred/occur in nearly every county in the state.

There was a substantial jump in the number and percentage of "Other" dispositions seen beginning in 2005. There is a very short list of reasons why an investigation could be closed without a finding in the system the state uses, and the total of incomplete investigations would never begin to approach involving over 11,000 children. These most likely are children who reside in households where other children are identified as the alleged victims of maltreatment but are not reported as victims themselves; therefore, no investigation findings are made regarding them. A change in NCANDS reporting in 2003 which counts these children under "Other" is probably the cause for the increase in the "Other" category.

D003600

**TABLE 2**

| CHILD SAFETY PROFILE | Fiscal Year 2006ab | | | | | | 12-Month Period Ending 03/31/2007 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Substantiated | 5,271 | 22.7 | 8,345 | 16.1 | 7,213 | 18.1 | 4,786 | 21.7 | 7,598 | 15.4 | 6,490 | 17.0 |
| Unsubstantiated | 15,879 | 68.4 | 26,834 | 51.9 | 20,939 | 52.7 | 15,449 | 70 | 26,459 | 53.5 | 20,606 | 54.0 |
| Other | 2,060 | 8.9 | 16,495 | 31.9 | 11,604 | 29.2 | 1,845 | 8.4 | 15,356 | 31.1 | 11,063 | 29.0 |
| | | | | | | | | | | | | |
| **III. Child Victim Cases Opened for Post-Investigation Services** | | | 6,530 | 78.3 | 5,619 | 77.9 | | | 6,174 | 81.3 | 5,266 | 81.1 |
| | | | | | | | | | | | | |
| **IV. Child Victims Entering Care Based on CA/N Report** | | | 788 | 9.4 | 670 | 9.3 | | | 885 | 11.6 | 720 | 11.1 |
| | | | | | | | | | | | | |

**TABLE 3: OPQI QA Review Results for Item 1**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | **26** | **177** | **180** | **185** | **120** |
| % of applicable cases rated a Strength | **88.5%** | **67%** | **68%** | **48%** | **50%** |

The drop in achievement in the 2005-2006 round of reviews coincides with the emergence of a chronic investigation backlog problem in the state. Backlogged referrals, by definition, do not get responded to within the timeframes assigned to them, therefore increasing the number of referrals for which timeframes are not met. Starting in 2005, the cases with associated backlogged referrals became more likely to be included in the random samples from which the review cases were chosen.

An additional consideration in understanding the state's performance on Item 1 is that in much of the state, investigations of new referrals on open cases are assigned to the ongoing worker who is carrying the case. Workload size and the demands of other cases play a significant role in workers' responses to such referrals. These referrals are less likely to be responded to in a timely manner due to the judgments the ongoing workers make about the safety and risk involved based upon their knowledge of the family and the services the family is receiving.

D003601

**TABLE 4: West Virginia Child & Family Services Review Data Profile 2005-2007**

| Year | 2005ab | | 2006ab | | 12 Month Period Ending 3-31-07 | |
|---|---|---|---|---|---|---|
| **Unique Children** | **Hours** | **Days** | **Hours** | **Days** | **Hours** | **Days** |
| **Median Time to Investigation in Hours** | >216 but <240 | Between 9 and 10 | >168 but <192 | Between 7 and 8 | >168 but <192 | Between 7 and 8 |
| **Mean Time to Investigation in Hours** | 475 | 19.79 | 499 | 20.79 | 366 | 15.25 |

Referral backlogs are pervasive in the state and have led to the development of CPS crisis worker positions. Crisis workers can be assigned to a district that has fallen especially far behind in their investigations to help them catch up. However, while one district is being helped, others are falling further behind. Much of the problem lies with the application of the investigative system used in the state which is difficult to use, remains poorly implemented across the state and is also due to the sheer number of investigations now being completed.

The Office of Planning and Quality Improvement has not looked at those few districts which are able to avoid the creation and carrying of large investigation backlogs to identify how they are able to keep their investigations current. However, we hope to do so in the future.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During round one of the CFSR, Item 1 was assigned an overall rating of a *Strength* regarding the Department's response to maltreatment reports in a timely manner; therefore, it was not addressed in the Statewide Program Improvement Plan (PIP). The timeliness of initiating investigations of reports of child maltreatment was found to be a *Strength* in 88.5 % (23 of 26) cases reviewed in the 2002 CFSR onsite review.

**What positive changes in performance and promising practice have been made since Round One?**

Since the last round of CFSR Reviews, the Bureau for Children and Families has achieved accreditation from the Council on Accreditation (COA). This process has set in place many efforts which coincide with the process of the CFSR, particularly since the COA standards have been cross-walked with the CFSR outcomes with regard to the children's services program standards. As a result of the first round of the CFSR, staffing numbers were increased by approximately 200 statewide in an effort to increase the workers' ability to timely initiate and maintain contact with the families and children. These positions included CPS workers, case aides, and supervisors. Increasing the number of workers in the field decreased the caseloads and improved the worker's ability to make face-to-face contact in a timely manner. The Child Welfare Consultant was also included in the improvement package. The CWC acts as field support for CPS supervisors. They are relied upon to provide policy clarifications and, at times, policy interpretations. CWCs also act as casework consultants for CPS workers, providing field support and refresher training if needed. In some regions, CWCs supervise the adoption and home finding units. In addition to these duties, they also conduct regional case reviews.

D003602

In order to recruit and compete with border states, the Division of Personnel's (DOP) Pay Plan Implementation Policy, revised in July 2005, allows for appointments above the minimum salary to be made under specific standards and established pay differentials to address circumstances such as class-wide recruitment and retention problems, regionally specific geographic pay disparities and other such circumstances which can be applied to reasonably defined groups of employees. In addition, the policy allows for recruitment incentives, retention incentives and a competitive salary offer.

As a part of the Department's accreditation effort, a Workforce Recruitment and Development Plan was written. The plan addresses issues of recruitment and leadership development, credentialing and obtaining advanced degrees, barriers to pursuing graduate training and developing strategies, policies to decrease these barriers, and exploring the possibility of distance learning opportunities such as webinars. In addition to these more immediate tasks, the Department will also be exploring the development of a career ladder for individuals who could potentially fill management positions in the next five to ten years as the existing supervisory workforce retires. This would help to ensure a qualified pool of future leaders and promote retention.

To achieve this plan, the Department will be working with the four state universities which make up the Social Work Education Consortium (SWEC). For details on SWEC, please see Systemic Factor D - Training. Also, collaboration with WV Division of Personnel, the WV Legislature and the DHHR Workforce Development Unit is planned. This collaboration will center on the development and implementation of a recruitment plan for supervisors and direct service personnel to ensure that the Department meets Council on Accreditation (COA) standards for caseload size and client ratios.

A Crisis Response Team (CRT) was created to assist districts throughout the state who, for various reasons, have a large intake backlog and do not have the staff or ability to keep up with the referrals received. The CRT has proven to be beneficial in clearing backlogs and in freeing district workers to initiate timely face-to-face contact. Data is available to show the movement of the backlog, but this cannot be tied to the presence or absence of the CRT; however, it is opined that the CRT may be responsible for clearing enough of the backlog that it may be responsible for the minimal drop in repeat maltreatment.

Supervisor Tracking Logs are used in districts across the state to document when referrals are received, the date of the initial face-to-face contact, the due date for the initial assessment, and the date completed. Stakeholders involved in the self-assessment process indicated the tracking logs are of valuable assistance in time and case management.

Stakeholders involved in SWA workgroups indicate case aides in areas of some districts are permitted to take CPS referrals. They would like to see all case aides trained and permitted to take CPS referrals, thereby freeing workers to focus on initiating face-to-face contacts in a timely manner. This would also ensure the accuracy of the information received at intake.

D003603

**What are the casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Staff recruitment and retention have accounted for a great deal of inconsistency in practice throughout the child welfare system. According to Department of Personnel data, in 2006, the turnover rate for CPS Supervisors was 6.41%; for CPS Trainees (35%) and for CPS Workers (20.29%). In 2007, it was reported to be for 10.25% for CPS Supervisors (most in this year due to retirement); for CPS Trainees (32.5%) and for CPS Workers (32.38%). In all cases, with the exception of CPS Supervisors in 2007, the reason for leaving was due to resignation. The following is a picture of the total experience within the entire child welfare workforce in West Virginia:

| Total Vacancies/or Workers with Less than One Year's Tenure in the Workforce | | |
|---|---|---|
| Year | Position | Per Cent |
| 2005 | Child Protective Services Worker | 48.7% |
| 2005 | Social Services Worker III | 42.0% |
| 2006 | Child Protective Services Worker | 25.7% |
| 2006 | Social Services Worker III | 29.7% |
| 2007 | Child Protective Services Worker | 28.5% |
| 2007 | Social Services Worker III | 35.9% |

The OPQI Social Services Review Unit found several factors that contributed to the areas needing improvement, but in some districts, supervisors find themselves forced to conduct investigations or carry caseloads due to staff shortages. This leaves them with little time to support and mentor their staff. Staff turnover is a contributing factor in a number of districts in the state. Stakeholders and OPQI QA findings document a lack of consistent supervisory skills required to mentor and develop caseworker skills with regard to assessments, case planning and service delivery. The Department has seen an unusual disproportionate number of supervisors with little tenure. Due to recent turnover in supervisors, many were promoted prematurely and lack the supervisory skills necessary to lead their young units.

Recruitment and retention is not unique to West Virginia. Research indicates turnover of child welfare workers is estimated to be between 30-40 percent annually nationwide (GAO, 2003). The average tenure of child welfare workers is less than two years. As a result, supervisors often have only three years of experience (GAO, 2003). Challenges to recruitment and retention include: low salaries; high caseloads/workloads; administrative burdens; risk of violence; limited or inadequate supervision; and insufficient training (GAO, 2003). Ninety percent of states report having difficulty recruiting and retaining child welfare workers (GAO, 1995). In focus groups conducted during the Statewide Assessment process, all of the above were mentioned as factors by caseworkers, supervisors, management, and stakeholders as factors prevalent in West Virginia's child welfare system. This condition impacts not only casework practice, casework continuity, but morale among staff and is costly in terms of the Department's ability to maximize and manage its financial and personnel resources.

D003604

Backlogs are also created and contribute to increased instances of repeat maltreatment, both as a result of more reports being made when timeliness of contacts lags and as a result of the neglect of ongoing cases when ongoing workers are pressed into service clearing investigations. Safety First® *(see pg. 44)* may also be contributing to the creation of backlogs. Safety First takes additional worker time as it requires supervisor consults and a minimum of two visits to the family by the investigating worker.

While the addition of the new positions created a positive impact on the Department, it created an additional challenge of hiring qualified staff. In some areas of the state, particularly those districts bordering other states, urban districts where competition exists and rural districts where lack of qualified staff exists, employing staff created a much larger challenge than anticipated. This combined with the bureaucracy and time needed to complete the employment process further hindered the Department securing qualified candidates.

Low salaries seem to be a challenge faced with regard to recruiting quality staff. This remains true even after BCF addressed the issue of staff recruitment by requesting an increase in the pay grade of CPS Workers, CPS Supervisors and Social Services Coordinators, approved in April 2005. In addition, salary increases and incentives for CPS staff were a positive step to improve the delivery of social services but failed to include salary increases for other social services staff including Youth Service Workers, Adoption Workers, Home Finders and Social Services Supervisors who supervise these positions. The discrepancy in pay has further decreased staff morale in the other units.

The aforementioned issues regarding caseworker recruitment, retention, turnover and high caseloads is a systemic issue and will impact all items addressed herein but will not be repeated in this document and, therefore, must be kept in mind throughout the entirety of this document.

A redesign of Safety First is presently underway and implementation of the new process is anticipated within the next year. The redesign places more focus on safety and less on risk and is anticipated to reduce the worker's need to document information in FACTS in three or four different places. Specific details on the redesign are currently not finalized.

OPQI reviewers and stakeholders found the positive results of CRT to be more of a "Band Aid" effect that does not last after the team leaves a district. Interviews completed with CSMs, social services coordinators and supervisors during OPQI reviews documented the reduction of their intake backlogs when the CRT was in the various districts but also documented resumption of backlogs when the team was no longer in the districts.

Stakeholders indicate Supervisor Tracking Logs are not utilized consistently throughout the state for various reasons such as supervisor and staff turnover and the ability of supervisors to keep up with the paperwork. OPQI reviews found utilization of the logs to improve practice and increase timely face-to-face contact in the districts that consistently utilized the logs for tracking purposes.

D003605

Stakeholders stated some schools refuse CPS workers access to children during school hours while others will insist upon a faculty member being present during the interview. District offices are working on this issue with the various county boards of education and now have a standardized memorandum of understanding format to be used to facilitate a better working relationship between the Department and Education staff.

Stakeholder workgroup participants cited the CPS Hotline as a barrier, because some referrals received through the hotline have incorrect or missing client and/or incident information, making locating the family/child more time-consuming. Presently, the Department is renegotiating the contract for the hotline service.

Stakeholders indicate various workers, who may not have the knowledge or skills required to successfully gather referral information, are used routinely to take referrals. The determination to accept a referral is based on available information and not having adequate or accurate information can have a negative impact on the supervisor's ability to determine acceptance of the referral or to assign the proper response time. Individual districts work with their staff to increase the intake worker's ability to obtain information in a factual consistent manner.

> **Item 2:  Repeat maltreatment.**  How effective is the agency in reducing the recurrence of maltreatment of children?

**What do policy and procedure require?**

In general, all reports suspecting child abuse/neglect must be accepted and assessed. The term recurrent reports or multiple reports, means a series of similar reports involving a family that is already being assessed, or is the subject of a recent assessment or is already an opened case for CPS.

When a report is received concerning a family that contains the exact same allegations that have already been assessed or are being assessed, the subsequent report may be screened out. Usually, it is appropriate to screen this subsequent report if it is received within 30-45 days. Anything past this timeframe may indicate repeated maltreatment, especially if the allegations are of physical abuse.

If, however, the subsequent report contains information concerning another incident of suspected abuse/neglect, or new circumstances or conditions, the report must be accepted and another initial assessment and safety evaluation completed. When completing subsequent initial assessments and safety evaluations on a family, it is possible to utilize already available information regarding the parent and family functioning in the subsequent assessment if there have been no changes in those areas. However, the new information regarding the maltreatment, nature of the maltreatment and the child functioning must be documented.

For repeated allegations on open CPS cases, the above criteria may be utilized. Additionally, if the allegations that are being reported are those for which the case was opened, the referent's

D003606

information may be taken as "case information" and not handled as a new referral. This "case information", however, must prompt a home visit to the family. Again, if the subsequent report on an open case involves allegations of physical abuse/injury, the worker should conduct an investigation.

**What does the data show?**

Prevention of the recurrence of child maltreatment was found to be a *Strength* in 91% (39 of 43 cases) of the cases reviewed in the 2002 CFSR onsite review.

A data indicator measure of repeat maltreatment, taken from NCANDS, was also considered in assessing compliance with this item. The state had a score of 6.43 % on this measure, and the National Standard set for the occurrence of repeat maltreatment for the 2002 review was 6.1% of children.

While the state passed the case review measure for Item 2, it failed to pass the data indicator measure. Both measures needed to be passed to be in compliance. However, Item 2 was not addressed in the state's PIP, likely due to data issues.

The state's figure for repeat maltreatment was believed to be too low; and the data submitted, upon which it was based, was thought to be incorrect. This was due to the large number of duplicate client identification numbers being generated because clients were not being merged in the SACWIS system as required.

The state worked to address and eliminate the problems with client numbers that had led to its data problems on repeat maltreatment. A revised data profile, which was provided in July of 2004 for our use in working on the state's PIP contained percentages that by 2003 more closely approached the state's actual performance.

**TABLE 5: July 2004 Data Profile-Repeat Maltreatment**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Recurrence of repeat maltreatment | 6.1% or Less | 5.7% | 7.9% | 10.1% |

The 2008 Data Profiles indicate, as the state has continued to clean up data, that the percentage of repeat maltreatment was still being understated in 2004. The figure for repeat maltreatment has increased steadily as the amount of merging done increased and also improved.

D003607

**TABLE 6: OPQI QA Review Results for Item 2**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 43 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 91% | 53% | 46% | 44% | 55% |

**TABLE 7: June 2008 Data Profile—Absence of Maltreatment Recurrence**

| Federal Year | National Standard | 2005ab | 2006ab | 12 Month Period Ending 3-31-07 |
|---|---|---|---|---|
| Absence of Maltreatment Recurrence | 94.6% | 86.6% | 88.7% | 87.6% |

More thorough searches in the SACWIS system to prevent multiple referrals from multiple sources on the same incident being assigned and investigated separately would likely improve the repeat maltreatment statistic somewhat. However, a check of 52 of the investigations reviewed by OPQI staff for seven of the state's districts in the third round of reviews revealed a rate of absence of repeat maltreatment of 88.7%. Correcting for failure to associate any subsequent duplicate referrals would have increased that rate to 90.4% which would still not approach the 94.6% National Standard for absence of repeat maltreatment.

There can be little question that the Department has a problem of repeat maltreatment. The state's score on the data indicator for Absence of Repeat Maltreatment Recurrence of 87.6% is below the National Standard of 94.6% or higher. Therefore, the state has not passed the data indicator for the percent of children experiencing repeat maltreatment. The data indicator and Item 2 will both need to be addressed on our 2008 PIP.

**Data Indicator for Incidence of Child Abuse and/or Neglect in Foster Care**

A national standard for abuse and/or neglect in foster care was set prior to the State's first CFSR round in 2002. The standard at that time was an incidence rate no higher than 0.57%. The state's rate was .04% but that the data submitted, upon which this figure was based, was incorrect. It was believed that staff had not been entering information into the field in the SACWIS system which identifies the relationship of the perpetrator to child victim in situations in which the perpetrator is a foster parent or foster care facility employee.

Investigations in out-of-home placement settings are conducted by the Department's Institutional Investigative Unit. This specialized Unit does only Child Protective Services investigations in placement, school and day care settings. In 2002 the Unit was not being instructed to complete relationship screens.

D003608

All staff was encouraged to complete the relationship screens for all household members; and the information submitted to NCANDS did improve. A revised Data Profile, which was provided in July of 2004 for our use in working on the state's PIP contained percentages that more closely approached the state's actual performance.

**TABLE 8: July 2004 Data Profile-Incidence of Child Abuse and/or Neglect in Foster Care**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Incidence of Child Abuse and/or Neglect in Foster Care | 0.57% or Less | 0.02% | 0.63% | 0.60% |

**TABLE 9: June 2008 Data Profile-Absence of Child Abuse and/or Neglect in Foster Care**

| Federal Year | National Standard | 2005 | 2006 | 12 Month Period Ending 3-13-07 |
|---|---|---|---|---|
| Absence of Child Abuse and/or Neglect in Foster Care | 99.86% | 99.78% | 99.48% | 99.32% |

Because the state's score on the data indicator for Absence of Child Abuse and/or Neglect in Foster Care at 99.32% is below the national standard of 99.68% or higher, the state has not passed the data indicator for the required percent of Absence of Child Abuse and/or Neglect in Foster Care. The data indicator will need to be addressed on the state's 2008 PIP.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During round one of the CSFR, Item 2 was assigned an overall rating of *Area Needing Improvement*.

**What positive changes in performance and promising practice have been made since Round One?**

A revision of the current CPS system was completed as a part of the 2002 PIP to distinguish safety from risk and to address safety at the beginning of the case as well as throughout the life of the case. The revision included a safety assessment process entitled *Safety First®*.

Safety First policy and protocol was implemented to assist workers in the identification of safety issues and to enable workers to make good decisions regarding service needs. The adoption of the Safety First initial safety assessment tool was one of the most significant and promising changes in case practice since round one of the CFSR. This tool was developed and initiated to help assist workers in properly assessing, identifying, and address the safety and needs in a family. The tool provides workers with a standard format to ensure consistency when evaluating for safety needs to ensure the safety of the child(ren). This instrument is also used when there are any significant changes in the situation of the child(ren) or family that may have an effect on safety. The instrument is also used once each quarter to assess for continued safety. Revision of

D003609

Safety First is being completed utilizing T/TA to stream line the process and make it more user friendly.  The anticipated roll-out date is January 2009.

The implementation of the Administrative Services Organization (ASO) initiative is a change to services and service delivery since round one of the CSFR.  The Department entered into a partnership with APS Healthcare, Inc. to act as the Administrative Services Organization (ASO) for the state.  The ASO is a systematic approach to the delivery of a selected group of child welfare services.  The Department's original contract with the ASO was for medically necessary services reimbursed through Medicaid.  In 2003, the Department began contracting with the ASO to provide socially necessary services to children and families receiving CPS, Youth Services and Foster Care.  This initiative was implemented in order to facilitate the development of quality service providers statewide.

The socially necessary services program is a fee-for-service child welfare utilization management model serving children and families involved with the Department through CPS or Youth Services.  A continuum of services addressing safety, permanency and well-being are available such as parenting, respite and/or supervised visitation.  These services improve relationships and social functioning, with the goal of preserving the individual's tenure in the community or the integrity of the family or social system.  Socially necessary services are interventions designed to maintain or establish the child welfare goals of safety, permanency and well-being.  The designation "socially necessary" is used to distinguish these services from other services that have been determined to be medically necessary and can be obtained through Medicaid.

Any individual or agency which meets the qualifications for a service or services may enroll to become a provider for that service.  The service descriptions and the provider qualifications associated with those services are contained in the Utilization Management Guidelines.

One of the goals in the development of socially necessary services program was to facilitate the development of quality service providers statewide.  This is a continuing goal for the Department and the ASO.  According to stakeholders, the ASO has resulted in some improvements in service provision, but it is still in its infancy.  It is now time to take this process to the next developmental level and increase the accountability of the providers through outcome and performance based contracts.

In FY 2006-07, the utilization management data from APS Healthcare indicate that statewide referrals for safety services are being made in both CPS and Youth Service cases.  In fact, it is the second most used service after transportation.

**What are the casework practices, resource issues, and barriers affecting performance?**

OPQI reviewers and stakeholders indicate implementation of Safety First while bringing more attention to safety has somewhat negatively impacted repeat maltreatment because of the time constraints involved and the tool itself. The present assessment process and New Worker

D003610

Training are process driven and workers struggle to correctly identify and differentiate between present and impending dangers. In some instances OPQI QA's identified cases that were opened for services that did not rise to the level that would have necessitated CPS intervention. Some workers are utilizing the Safety First assessment more as a check list and not as a tool to identify present and impending dangers and as a result are completing initial assessments and providing services in a superficial manner instead of correctly identifying the root cause and providing services to reduce the risk attached to the primary issue.

While Safety First has made some improvements in the workers ability to ensure safety and reduce risk more training is needed surrounding the skills necessary to correctly assess the families and develop safety plans and case plans that meet the individual needs. Presently the Redesign committee is working to improve Safety First policy and procedure by placing more emphasis on Safety and less on Risk. The finalized draft is not presently available but is expected to be completed within the next year. Also, changes in FACTS are anticipated in conjunction with the Safety First redesign that will decrease the workers need to input identical information into different locations in the system. For details regarding FACTS see Systemic Factor A - Statewide Information System. The training unit is working to incorporate more skills based training into the New Worker Training modules as well as in the ongoing training process to address the identified deficits.

OPQI reviews and stakeholders indicate the acceptance criteria of referrals, while clear in policy, varies greatly across the state with some districts accepting almost all referrals while others have a large rate of screen-outs. This discrepancy identifies a need for additional training for supervisory staff in order to standardize the acceptance process. Many workers are incorrectly coding maltreatment in FACTS and supervisors are accepting duplicate referrals resulting in an inflated repeat maltreatment rate for the state. Child Welfare Consultants and trainers in the four regions have been working with supervisors and field staff to improve their skills and policy knowledge with regard to consistency in accepting referrals as well as their coding of maltreatment in FACTS.

According to OPQI reviews and stakeholders, ASO service providers are not available in all areas of the state; therefore, a lack of services to some children and families remains an issue. One primary concern expressed by stakeholders during the development of the SWA was not only quantity of services, but the quality of the services. The quality is not consistent throughout the state and varies depending on the provider and location. Many times services provided are based upon what is available, not the needs of the family and fail to assist the family or protect the children which ultimately results in the increase in repeat maltreatment. This is particularly true with regard to utilization of the "Safety Bundle" which does not, in and of itself, reduce risk or ensure safety. Also, workers routinely utilize parenting services when treatment service for domestic violence and substance abuse are what is required to reduce risk. Many times these services are utilized because of the lack of available treatment services. Information regarding the development of needed services can be found in the Service Array section of this report. Activities are underway involving the various Community Collaborative groups to evaluate the quality and accessibility of services across the state.

D003611

**Safety Outcome 2:  Children are safely maintained in their homes whenever possible and appropriate.**

> **Item 3:  Services to family to protect child(ren) in the home and prevent removal or reentry into foster care.** How effective is the agency in providing services, when appropriate, to prevent removal of children from their homes?

**What do policy and procedure require?**

Before initiating any procedure to take custody of a child, the DHHR must first determine that there are no appropriate or available services that would alleviate or eliminate the risk to the child.  Since each family is unique, services selected must be based upon the individual needs of the family.  CPS Staff have various mechanisms to refer families for the appropriate services to prevent removal.  CPS Staff are able to make referrals for family preservation services through the Administrative Services Organization (ASO) automated process in FACTS.  ASO Family Preservation Services include adult live skills, parenting education, child oriented activity, transportation, emergency respite, supervision, family crisis response, and home maker services. When referring for medical services to prevent removal, CPS Staff have the option of issuing a special medical card for payment if no other options exist.

**What does the data show?**

The provision of services to the family to protect child(ren) in the home and prevent removal was found to be a *Strength* in 65.5% (19 of 29 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

As an item rated as an *Area Needing Improvement* in 34.5% of the cases reviewed, Item 3 was addressed on the state's PIP.

The original CFSR baseline of 65.5% a *Strength* was re-negotiated in October 2004 based upon the results on this item during parts of the first and second rounds of OPQI QA reviews.  The baseline was re-negotiated to 31% a *Strength* and the new PIP goal was set at 42% a *Strength*. The goal was achieved in November of 2004 (6th Quarter PIP Report).  The original CFSR baseline was not met in any round of the OPQI QA reviews.

**TABLE 10: OPQI QA Review Results for Item 3**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 29 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 65.5% | 36% | 54% | 62% | 67% |

D003612

OPQI QA results show the state's achievement on Item 3 increased during the three rounds of reviews. The state's performance continued to improve in the 2007 OPQI mini round of reviews where the 2002 CFSR baseline of 65.5% on Item 3 was finally surpassed.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CSFR Item 3 was assigned an overall rating of *Area Needing Improvement* because the Department had not made diligent efforts to provide services to ensure children's safety while preventing their placement in foster care.

Key issues identified are:

- Inconsistency among caseworkers in the appropriate assessment of service needs and provision of services.

- In some cases, the needs assessment was not sufficiently comprehensive to capture underlying problems, such as substance abuse, domestic violence, and mental illness that may contribute to the maltreatment.

- In other cases, service needs were identified in the needs assessment but not provided.

In contrast, stakeholders identified the key problem as a lack of availability of services and a problem in attaining approval for initiating in-home services.

**What positive changes in performance and promising practice have been made since Round One?**

As a result of the PIP, initiatives have taken place to improve the Department's ability to maintain the children in their home whenever possible. These initiatives include implementation of Safety First, testing of supervisors, coordination of community services, staff training surrounding domestic violence and substance abuse, development and utilization of ASO Services, including the Comprehensive Assessment Planning System (CAPS).

The Comprehensive Assessment and Planning System (CAPS) is a systematic approach to the assessment of those children and their families who are receiving child welfare services from the Department. The goal of CAPS is to assist Department staff to meet the federal outcomes for safety, permanency and well-being for children by assuring that children and families receive a comprehensive assessment that results in the development of a thorough and appropriate treatment plan. The ASO provides oversight for the enrollment of providers interested in participating in CAPS.

CAPS was developed as part of the state's PIP to improve the quality of assessments provided by the Department to a level equal to that of private providers. The assessment, when completed accurately, provides the primary caseworker all information needed to select an appropriate placement for the child and to identify service needs for the child and the family. The

**D003613**

assessment gathers information regarding absent fathers and both maternal and paternal extended families as possible support and placement resources. Initially this process was to be utilized for all children in placement but was later changed to be utilized with the youth services population. This change was necessary due to the lack of available, qualified providers; a Masters level clinician is required to complete the CAPS assessment. CAPS are completed in either the shelter placement or in the home setting (mobile CAPS). CAPS providers will attend the MDT meetings after completing the assessment to answer questions or provide additional information. CAPS assessments have been completed for some CPS families, but on a very limited scale.

The utilization management data from APS Healthcare indicate that CAPS is primarily used with the Youth Services population. In the fiscal year 2006-2007 in Region I there were 216 CAPS family assessments completed; In Region II there were 296 assessments completed; In Region III there were 60 completed and in Region IV there were 111 CAPS assessments completed. This data indicates and confirms what RD's and CSM';s report that in Region III there is a lack of available providers for CAPS.

Anecdotal data from the RD's indicate the CAPS family assessments in Region I are more successfully accepted by judges and juvenile probation officers than in other regions and that services and placement decisions provided to families are more likely to be based upon the information contained in the CAPS assessment. Other regions report that the quality of the CAPS assessments depended upon the provider completing the assessment. Another factor relating to the success of CAPS is whether or not the judge or juvenile probation officer accepted the finished product.

CAPS and the information compiled from the assessment was intended to assist the worker in making decision which would impact several child welfare outcomes and items. These include, Item 6, all Permanency Outcomes, Item 17 and Items 21, 22, 23. Because CAPS has been discussed at length in this item, it will not be discussed in other items.

The Safety First initial safety assessment tool was one of the most significant and promising changes in case practice since round one of the CFSR. The tool provided workers with a standard format to ensure consistency when evaluating for safety needs to assure the safety of the child(ren) and help prevent the need for removal.

A plan was initiated to implement competency testing for all CPS supervisors. This was to ensure that supervisors have the knowledge and skills required to supervise field staff who complete the investigations and to ensure their work was complete and accurate. This testing was discontinued when it was anticipated that the CPS redesign would be implemented; however, this did not occur within the projected timeframes.

Mandatory domestic violence (DV) and substance abuse training was provided to all children's service staff and was incorporated in New Worker Training. The development and implementation of the DV training was a collaborative effort between the Domestic Violence Coalition, the Department and representatives from the legal system. The training is designed to

D003614

enhance the worker's ability to identify DV and its implications and effect on the safety of child(ren) in the home. A new training module is being developed to address these weaknesses and will replace the current module when it is completed, further enhancing workers ability to appropriately handle this issue. Substance abuse training covers identification of substance abuse as an underlying issue that can contribute to abuse/neglect; the effects of drug and alcohol abuse on family functioning; determining if further assessments and/or treatment is necessary; and Department policy related to identification and documentation of substance abuse issues. In addition, the training teaches workers how to make appropriate referrals to treatment facilities.

The West Virginia Drug Endangered Children (DEC) Program was established in 2006 to address the problems associated with methamphetamine (meth) production in homes with children present. Methamphetamine is a drug children are increasingly being subjected to in West Virginia. The WV Prosecuting Attorneys Institute and the Department have collaborated on this effort to form a task force to address the need for protocols, training, and community awareness. The Task force consists of federal, state and local law enforcement, Child Protective Services, medical personnel, prosecutors, treatment providers, prevention specialists, environmental protection and public health representatives, and victim advocates. They have worked together to formalize a multidisciplinary protocol to address the needs and ensure the safety of children who are present at a methamphetamine laboratory.

One successful model currently being used in one district is the Regional Resource Network. This network serves as a one-stop clearing house for all available services within the local area. This network is funded by United Way and the staff person is housed in the Department's district office. With this program a customer can come into the district office and complete one application and is provided with information on all community agencies which may be able to meet the customer's need, such as assistance with a utility bill or needing food. The staff person for this network also tracks what services are needed but unavailable in the area. This model is being utilized in the Berkeley, Morgan and Jefferson district in the eastern panhandle. This area suffers from a shortage of service providers. Stakeholders in Region III were very enthusiastic indicating that this model was working very well for them. This model has not been implemented statewide. The feasibility of statewide implementation should be explored further during PIP development.

**What are the casework practices, resource issues, and barriers that affect the child welfare systems overall performance?**

As previously stated, inconsistent application of Safety First is a problem statewide. Workers are taught the "process" of completing the initial assessment instrument. Again, core issues such as domestic violence, substance abuse and mental health problems are not consistently identified or addressed.

Many new workers have limited knowledge of available community resources and, at times, don't know the referral process necessary to access the available resources and services. Some districts have improved communication and access to services by conducting joint meetings to

D003615

bring all stakeholders together and work on barriers to service implementation. Stakeholders indicate an interest in expanding district level meetings throughout the state to improve communication and cooperation.

The stakeholders indicate an increase in referrals alleging domestic violence and substance abuse. The domestic violence and substance abuse training, provided as a result of the 2003 PIP, increased worker knowledge, but workers continue to have difficulty providing services for the families who are suffering from domestic violence and substance abuse issues. A need identified during the SWA workgroups was the lack of domestic violence treatment services for children and batterers. OPQI reviews and stakeholders identify the need for additional in-depth worker training surrounding case planning and treatment services for domestic violence and substance abuse especially involving cases where treatment services are not readily available. Stakeholders and OPQI reviews document limited treatment services for substance abuse across the state. Outpatient services are difficult to access due to the location of the service providers and lack of transportation. Currently, the ASO makes a provision for transportation but not on the scale that is always needed. The services provided are more of a teaching process than actual substance abuse treatment. Generally, inpatient services are of good quality but there are long waiting lists for these services

Stakeholders indicate initially the implementation of ASO lead to confusion, frustration, and a general lack of knowledge of the process on the part of workers and providers. Since the implementation ongoing work has been done to alleviate the confusion and frustration. Currently the ASO process is more widely understood. APS Healthcare provided training across the state for Department caseworkers regarding recent changes in the Utilization Management Guidelines.

Providers of ASO safety services remain limited and not well dispersed state wide. Since the content of the services vary by provider, workers are not always aware of the true services their families are receiving. Utilization management data verifies that the safety services are the most consistently utilized ASO service. Improvements in the ASO process and services are ongoing. There is a lack of available treatment services to address mental health, substance abuse, domestic violence, and safety issues statewide. Unfortunately, there is still a great deal of inconsistency in the quality of the services provided; often the key to getting quality services depends as much on the individual providing the services, as the service provider as a whole.

OPQI reviews and stakeholders indicate the CAPS assessment process is hindered by several issues. Providers state that at times, workers do not supply enough information to the providers completing the CAPS. This hinders the provider's ability to do an adequate job of identifying all needs and recommending all necessary services. The converse is sometimes true when the CAPS provider merely gives back only the information provided to them by the workers. A protocol has been developed to handle problems with ASO and CAPS provider services and reports. Another issue discussed by workgroup participants was the timeliness of getting the CAPS done. Access to CAPS providers is not statewide, and timeliness of the delivery of the assessment is an issue as well.

D003616

As with the strengths of CAPS impacting several items, this also holds true for the barriers and will not be discussed further in this document.

Stakeholders reported many judicial barriers that affect the child welfare system and its ability to provide services to keep the child safely in the home and prevent the need for removal. Stakeholders indicate prosecuting attorneys in some districts will not file emergency or general child protective service custody petitions. Some family court judges have overridden CPS safety plans and refuse to refer cases to the circuit court level when instances of child abuse/neglect are involved. Judges within districts are very independent in conducting hearings and in their subsequent findings. Some judges continue to grant repeated improvement periods. Some districts report that judges make decisions which conflict with the recommendations of the worker and MDT.

A multidisciplinary treatment team (MDT) is a group of individuals from different disciplines who work together with the child(ren) and family to develop a case plan and coordinate services. An MDT becomes the central point for decision-making during the life of a case. The case plan is developed by the MDT; therefore, the child(ren) and family's participation is vital throughout the process. WV State Statute 49-5D-1 requires the Department to establish a multidisciplinary screening, advisory and planning system. The purpose of the MDT is to conduct comprehensive assessment, planning, service implementation, and monitoring of cases pertaining to children and youth involved in abuse/neglect cases, youth involved in status offense or delinquency proceedings, and their families. Also, the MDT: assists courts in facilitating permanency planning following the initiation of judicial proceedings; recommends alternatives to the court, including types of services and types of placements, if any; and coordinates evaluations and the provision of services.

The Court Improvement Program (CIP) has developed and provided cross-training on a regional basis for judges, prosecutors, child and parent attorneys, DHHR caseworkers and other involved case participants to improve the handling of child abuse/neglect cases. These multidisciplinary seminars cover basic law and procedure on day one and specialized or advanced topics on day two. The two-day seminars are provided at three regional sites during the year. Training on basic law and procedure in child protection cases and foster care/Title IV-E matters for circuit court law clerks will also be provided each year for the newly hired law clerks. As part of the individual district PIPs, the Community Services Managers (CSM) are required to meet quarterly with the circuit court judges to discuss areas of concern in an effort to improve practice.

> **Item 4: Risk assessment and safety management.** How effective is the agency in reducing the risk of harm to children, including those in foster care and those who receive services in their own homes?

## What do policy and procedure require?

With each accepted CPS referral, the Safety First protocol, two safety assessments and a risk assessment is completed within thirty days of the date of the referral. The safety assessments

D003617

attempt to identify present or impending child dangers.  A safety assessment is completed at the initial visit with the family and prior to case decision.  The safety assessments identify present or impending child dangers.  If a present or impending danger is identified, the case is opened for CPS Ongoing Services.

The risk assessment involves information gathering and assessment about multiple elements within the family.  These elements are known to influence the likelihood of further maltreatment.  The information is then rated to determine risk of harm and opened for Ongoing Services if appropriate.

If the family is open for Ongoing CPS Services, CPS collaborates with the family in developing a treatment plan to address the risk and safety concerns identified in the Initial Assessment/Investigation.  The treatment plan must be completed within forty-five days of the case opening for CPS Ongoing Services.  Safety assessments are completed periodically on the Ongoing CPS case in an attempt to identify any new safety concerns.

Case evaluation is a continuing part of the casework process.  Every ninety days from the initiation of the treatment plan until closure of the case, the worker will evaluate the family.  The dynamic nature of CPS cases necessitates ongoing evaluation.  The case evaluation is designed to assess risk reduction and the point at which the worker, along with the family and MDT, if applicable, steps away from the casework to see if things are working.  Case evaluation is a decision-making point in the casework process.  The decision to close a case and disengage CPS is reached during case evaluation.

**What does the data show?**

The provision of services to the family to reduce the risk of harm to child(ren) in the home was found to be a *Strength* in 74% (31 of 42 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

As an item rated *Area Needing Improvement* in 26% of the cases reviewed, Item 4 was addressed on the state's PIP.

The original CFSR baseline of 74%, a *Strength* was re-negotiated in October 2004 based on the results of this item during parts of the first and second rounds of  the OPQI QA reviews.  The baseline was re-negotiated to 43%, a *Strength*, and the new PIP goal was set at 48%, a *Strength*.  The goal was achieved in November 2004 (6th Quarter PIP Report).  The original CFSR baseline was not met in any round of the OPQI QA reviews.

**TABLE 11:  OPQI QA Review Results for Item 4**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 42 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 74% | 39% | 57% | 66% | 48% |

Some of the decline in performance may be the result of a sampling methodology which required that youth services non-placement cases be included in the open case sample.  Non-placement youth services cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006.  Much of the decrease in performance is likely the result of a change in the review instrument which calls for ongoing risk reviews during contacts with the child, family and in the home where the child resides.

**Where was West Virginia's child welfare system in Round One of the CFSR?**
During round one of the CSFR, Item 4 was assigned an overall rating of *Area Needing Improvement*, because reviewers determined the Department had not made sufficient efforts to reduce risk of harm to children.

Key issues identified were:

- Workers are not capturing the underlying issues leading to abuse/neglect, particularly issues such as domestic violence and substance abuse.
- Consequently, workers are not consistently recommending the most appropriate services to ensure risk reduction.

**What positive changes in performance and promising practice have been made since Round One?**

The positive practices in this item are similar to those in Item 3.  With the addition of case aides, the goal was to assist the caseworkers with their duties which allowed them more time to work directly with clients.  Also, case aides were to work paraprofessionally with clients to enhance their life skills.  Services made available through the ASO to reduce risk are family preservation, parenting and homemaker services for families involved with CPS, Youth Services and Foster Care.

**What are the casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The barriers affecting this item are the same as those discussed in Item 3. As identified in Item 3, QA reviews revealed workers are finding it difficult to differentiate between present danger, impending danger and risk in some instances.  As a result, treatment needs may go unidentified and unmet, and safety and risk may not be adequately evaluated.

D003619

There is an uneven distribution of ASO providers throughout the state, especially for those services that require a higher level of credentialing. Region III, in particular, appears to have a provider deficit according to the APS Healthcare ASO utilization management data.

During the SWA work groups a need for batterer groups for domestic violence situations was identified. The services available to a batterer have to be paid for by the client. Stakeholders believed workers may be reluctant to identify DV as an issue because of the lack of services and that DV continues to go unaddressed by many workers.

OPQI reviews and stakeholders agree that the presence of substance abuse continues to increase as an underlying issue in many cases. Workers are trained in the identification of substance abuse issues. However, once identified, treatment services necessary to reduce risk are limited. The quality of the services varies by provider. Substance abuse treatment services provided for both adults and juveniles are often driven by availability and not by the individual and family.

## B. Permanency

**Permanency Outcome 1: Children have permanency and stability in their living situations.**

> **Item 5: Foster care reentries.** How effective is the agency in preventing multiple entries of children into foster care?

### What do policy and procedure require?

The child's worker has specific responsibilities when reunifying families. These include:

1. Assess the parent's and child's progress in resolving the initial problems necessitating placement and identify a tentative return date with the parents.

2. Negotiate a written service agreement based on the requirements of the case plan with the parents and child containing tasks necessary for the smooth transition to return the child.

   - Assist the family in obtaining the necessary resources to establish and maintain the child in an acceptable standard.

   - Prepare the child, parents, foster/adoptive family or other caretaker for the return of the child.

   - Develop a worker and family visitation schedule in order to aid both the child and biological parents in the process of reintegrating the family.

   - Provide follow-up services to the biological parents and child to ensure the progress made by the family during separation is continued.

   - Identify community supports needed to aid family reintegration.

3. The worker must assist parents in seeing that these supports are in place and coordinated within the context of the treatment plan. Any specialized treatment services needed to

D003620

maintain family stability and prevent reoccurrence of the behaviors which resulted in the original placement should continue.

4.  If it is determined the family demonstrates an adequate level of stability, termination of services can be considered.  This determination would include the following conditions:

  - The family is engaging in those behaviors which were defined as desirable in the treatment plan.

  - There is evidence that the family has methods that support their capacity to cope adequately with life stresses, problems, and complexities.

  - The family is capable of establishing a warm, give-and-take relationship with each other and expresses recognition for the individuality of all family members.

  - There is evidence that the family can tolerate a high enough level of discomfort, if necessary, to allow the family members to strengthen their relationships with each other.

  - The child's safety is protected by the family and its support system.

  - The family can use its energies to concentrate on meeting its needs.

  - The worker will meet with the MDT to assess the family's progress in meeting the goals of the Child, Youth, and Family Case Plan.

  - The worker will plan, with the family, a projected date for case closure, submit necessary reports to the court with the recommendation to terminate the Department's responsibility and return legal custody to the biological parents.

5.  The worker will continue to provide aftercare services, if necessary, for up to six months of the return of the child.

**What does the data show?**

This item was assigned an overall rating of *Area Needing Improvement*.  In 80% of the cases (4 of 5) there was no reentry into foster care; however, in 20%, reentries did occur.  The state passed this item based on the statewide data profile results for percent of foster care reentries. However, the state's figure for reentries was so low, it was apparent the data submitted, upon which it was based, was incorrect.

The state worked to address and eliminate the problems with client and case numbers that had led to its data problems on foster care reentries.  A revised data profile, which was provided in July 2004 for our use in working on the state's PIP, had percentages which more closely approached the state's actual performance.

D003621

**TABLE 12:  July 2004 Data Profile-Foster Care Reentries**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| % of children re-entering foster care within 12 months of a discharge from a previous foster care episode | 8.6% | 9.1% | 8.4% | 7.7% |

The 2008 Data Profiles indicate that as the state has continued to clean up data and that the percentage of reentries was still being understated in 2004.

**TABLE 13:  OPQI QA Review Results for Item 5**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 5 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 80% | 66% | 65% | 53% | 92% |
| Re-entry Rate in the cases reviewed | 20% | 34% | 35% | 47% | 8% |

**TABLE 14:  June 2008 Data Profile-Foster Care Reentries, Composite 1, Measure C1-4**

| Federal Year | 25th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| % of children re-entering foster care within 12 months of a discharge from a previous foster care episode | 9.9% | 21.6% | 19.2% | 17.9% |

It is likely the case selection factors for the 2007 reviews and the smaller sample size, 78 cases compared to all the children entering foster care within a 12-month period for that review, account for the differences in the reentry percentage between the 2008 Data Profile and the 2007 mini-review round.

Youth services cases are a particular concern in Item 5.  Youth are placed in residential care for treatment by the court.  However, there is evidence of sentencing thinking on the part of some judges.  A judge may return a youth home after they have spent a year, 15 months, or 18 months in placement even if the youth has not completed the program and over the recommendations of the Department.  These youth are more likely to reoffend and reenter care.  There is also a lack of aftercare services in the state for youth services cases; i.e., juveniles returning to the community, which contributes to reentries into care for this population.

The state's score on Composite 1, Component B, Measure C1-4 at 17.9% is above the 25th percentile of 9.9% or lower.  Therefore, the state has not passed the Composite's Component B

D003622

Measure for the percent of children reentering foster care, and Item 5 will need to be addressed on its 2008 PIP.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

The foster care reentries item was assigned an overall rating of *Area Needing Improvement* in Round One of the CFSR. The data reflected a reentry rate of 20%, and the national standard for this measure was 8.6% in Round One. It should be noted that the Statewide Assessment for Round One stated the data provided by the DHHR was not accurate.

**What positive changes in performance and promising practices have been made since Round One?**

In an effort to correct the data discrepancies found during the 2002 CFSR and as a part of the PIP, all workers were trained regarding the documentation of relationships and the merging of clients in FACTS. The training was later incorporated into the New Worker Training process. Immediately following initial training, the Department began a statewide initiative to merge clients and, once completed, the expectation remains that workers will merge clients appropriately on a continuous basis. Work continues to surround this issue and is resulting in an improvement in the accuracy of data collection.

The ASO is able to provide aftercare services which have positively impacted foster care reentries, particularly in relation to the Youth Service population. According to APS Healthcare's utilization management data, services accessed to assist with reunification included individualized parenting, mentoring, especially with the YS population, and transportation. Statewide, the number of units requested for these services for both CPS and YS families from July 2006-June 2007 were: individualized parenting (421); mentoring (180); and transportation (1011). The importance of aftercare services for both the CPS and Youth Service population is recognized; however, it is difficult to meet this need. This limited number of ASO service providers directly affects the provision of aftercare services. As part of the Service Array Project, the development of aftercare services is being addressed. For more details on Service Array, see Section E in Systemic Factors.

Since Round One of the CFSR, The Youth Services Program was redesigned and implemented in May 2006. The redesign brought YS in line with the Family Centered Practice philosophy. As part of the redesign, the Youth Behavioral Evaluation (YBE) was developed and provides a process to assess the child and family unit to implement targeted service planning on the identified needs. The YBE is to be conducted by the Department worker within five days on court-related cases and within fourteen days on non-court cases. Also, the Department has chosen to use the Comprehensive Assessment Planning System (CAPS) process for Youth Services cases in which a juvenile is involved with the court. The assessment differs from the CAPS in that it does not include formal assessment tools such as a psychological exam. If a psychological exam has been conducted, the information will be included in the YBE.

D003623

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

Anecdotally, it is reported that the greatest number of foster care reentries in the state is occurring in the YS population. The number of YS reentries may be somewhat deceiving, because clients in this population may be ordered into Division of Juvenile Services (DJS) custody for a diagnostic evaluation and then returned to the state's custody. This may not represent a true reentry, since the child remains in the legal custody of the state and does not return to the legal and physical custody of the parent.

OPQI QA and stakeholders found the lack of available treatment resources, transportation and ASO providers across the state is a barrier to successful reunification for all children in care. The lack of aftercare resources is especially detrimental. The consensus throughout the state is that foster care reentries of YS clients may be attributed to their parents not receiving or not accepting services. Youth Services families are not required to participate in services and, at times, the Department is forced to request court intervention if they are unwilling to participate. In many instances, parents state the problem is with the child, not with them, and do not feel the need to participate in services.

The reimbursement rate for ASO providers participating in MDTs was changed in February 2008. Prior to this, ASO providers were not reimbursed for participation in MDTs and on many occasions did not attend. The lack of ASO providers' input in these meetings and subsequent case planning can have a negative impact on the success of reunification. The Department, at this, time does not have data available to evaluate the impact of the reimbursement change on practice. The issue of communication between the ASO providers and the Department is an ongoing concern and requires attention and cooperation by both entities. Recently, a Standard Operating Procedure (SOP) was developed to address this concern.

Stakeholders indicate workers continue to struggle with merging of clients in FACTS. Trainers and administrators emphasize there is no room for error, and if incorrect merges are made, there is no mechanism in place to correct the error. Many workers are hesitant to merge clients, because if merged incorrectly, information is placed in an unrelated case or lost.

Stakeholders indicate the courts can be a barrier to successful reunification because, in some instances, the Department is court ordered to return children prematurely, resulting in children reentering care. In some instances, courts have ordered the Department to close the case without any follow-up or aftercare services once children are returned home.

OPQI QA reviews and stakeholders indicate a lack of worker contact with parents and children prior to reunification and believe the worker may not be fully aware of the client's progress toward case plan goals or fully knowledgeable of the parents' ability to care for the children, subsequently resulting in reentries.

D003624

> **Item 6:  Stability of foster care placement.**  How effective is the agency in providing placement stability for children in foster care (that is, minimizing placement changes for children in foster care)?

**What do policy and procedure require?**

Multidisciplinary Team meetings are required in YS and CPS cases when a child enters Department custody.  This team makes all major decisions regarding a child in custody, including appropriate placement as a result of a child's behavioral, mental health and needs evaluations such as CAPS.  The results of the evaluations allow the MDT to develop the child and family's case plan.  Identifying specific behavioral and mental health service needs of the child prior to the child's placement or early on in the process helps to reduce the number of disrupted placements.  Also, the individual child's needs must be assessed prior to placement, if possible, so an appropriate living situation can be chosen.  When it becomes necessary to place a child into foster care, the selection of the placement resource (relative home, foster/adoptive home, group home, residential facility, or institution) will depend on the individual child and his situation.

**What does the data show?**

Stability of foster care placements was found to be a *Strength* in 72% (21 of 29 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

As an item rated *Area Needing Improvement* in 28% of the cases reviewed, Item 6 was addressed on the state's PIP.

The original CFSR baseline of 72%, a *Strength,* was re-negotiated in October 2004 based on the results of this item during parts of the first and second rounds of WVCFSR reviews.  The baseline was renegotiated to 60%, a *Strength*, and the new PIP goal was set at 67%, a *Strength*.  The goal was achieved in November 2004 (6th Quarter PIP Report).  The original CFSR baseline was met in the second round of the WVCFSR reviews.

The data profile developed for the 2002 review shows the state's placement stability rate at 99.9%.  However, the state's figure for stability was so high, it was apparent the data submitted, upon which it was based, was incorrect.

One issue which contributed substantially to the inaccuracy was that private specialized foster care agencies were moving children within their networks of homes, and the caseworkers were responsible for recording these changes in the state's SACWIS system.  There was no incentive for the private agencies to report all the moves or for the caseworkers to take the time to document them.  This was addressed by changing the way children's medical cards are distributed so that the foster parents receive them directly rather than the private agency's office receiving the cards.

D003625

Additionally, the state worked to address and eliminate problems with the failure to use caretaker provider numbers that had led to its data problems on placement stability. A revised data profile was provided for our use in working on the state's PIP in July 2004 with percentages that more closely approached the state's actual performance.

**TABLE 15: July 2004 Data Profile-Placement Stability**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Of children who have been in foster care less than 12 months from the time of the latest removal from the home, what percentage have had no more than two placement settings? | 86.7% | 83.6% | 82.3% | 84.5% |

**TABLE 16: OPQI QA Review Results for Item 6**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 29 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 72% | 63% | 85% | 76% | 62% |

We cannot account for the up and down pattern of OPQI QA review results. It is possible that sample selection could explain some of the drop in performance between the 2005-2006 OPQI reviews and the 2007 mini-review results. The stratification of the review sample in 2007 may have included into the sample a larger number of cases where the children were more likely to have had moves in care; i.e., older children and children with a goal of adoption. However, this remains only a hypothesis.

**TABLE 17: June 2008 Data Profile Permanency Composite 4--Placement Stability**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C4-1) Two or fewer placement settings for children in care for less than 12 months. | 86% | 84.7% | 86.6% | 86.8% |
| Measure C4-2) Two or fewer placement settings for children in care for 12 to 24 months. | 65.4% | 65.6 % | 64.7% | 66.5% |
| Measure C4-3) Two or fewer placement settings for Two or fewer placement settings for children in care for 24+ months. | 41.8% | 30% | 31.6% | 32.2% |

D003626

**Where was West Virginia's child welfare system in Round One of the CFSR?**

This item was assigned an overall rating of *Area Needing Improvement* during the first round of the CFSR.  The following factors contributed to the *Area Needing Improvement* rating for this item:

- Lack of diligent efforts on behalf of the Department to ensure the placement stability of children who were in foster care.

- Scarcity of specialized foster care placements.

- Inconsistent matching of children with appropriate families or placement settings.

- Inappropriate use of shelter placements.

- Placement of children prior to a thorough assessment of the foster family and their readiness to foster children.

- Foster parents were not always provided with pertinent information about children who were placed in their home.

- Foster parents were not provided with necessary information to enable them to participate in MDT meetings.

**What positive changes in performance and promising practices have been made since Round One?**

The PIP addressed issues related to the recruitment of specialized foster care homes, the inconsistency in matching children with appropriate families or placement settings, the use of shelter placements, the placement of children prior to the completion of thorough assessments on the placement providers, the failure to provide placement providers with all of the child's pertinent information prior to placement, and the failure to invite foster parents to MDT meetings and involve them in the case planning process.

A statewide foster/adoptive home recruitment campaign was developed through a partnership with the Tonkin Management Group (TMG) a consulting, public and government relations firm located in Charleston, WV.  TMG has been involved in improving policies which impact West Virginians for over 30 years.  They maintain ongoing connections to government and media-related organizations and conditions whose actions and decisions impact the lives and livelihood of every West Virginian.  This group also created a resource manual for each agency interested in or responsible for the placement of children.  In addition to this initiative, adoption monies were used on a regional basis to recruit and provide recognition for foster/adoptive families.

The Mission West Virginia initiative is another program utilized by the Department for foster/adoptive family recruitment.  Mission West Virginia is a non-profit organization that collaborates with public and private entities, particularly faith communities, equipping them to

D003627

utilize existing resources to form new partnerships, encouraging innovative social change, and building stronger communities in West Virginia.  Components of the program are:

- The Family Recruitment program which utilizes current foster families as recruiters.

- One Church, One Child, a recruitment program designed to promote special needs adoption through adoption promotion and awareness events conducted within congregations and community groups;

- Wendy's Wonderful Kids, a program of the Dave Thomas Foundation for Adoption that is designed to move kids from foster care to adoptive homes;

- Kinship Care Support, a multi-services program developed to assist relative caregivers;

- AdoptUsKids Recruitment Response Team which provides social workers to respond to adoptive inquiries that are made through the national program;

- The Heart Gallery, an interactive photo exhibit of West Virginia children who are awaiting adoption; and

- The Foster and Adoptive Family Support Group, which provides supportive services to nurture statewide foster and adoptive family networks.

For additional information on recruitment efforts by the state, see Systemic Factor G.

As a means to increase stability of placements and ensuring proper placement selection, CAPS providers are asked to recommend appropriate placement selections for the child based on the individualized treatment needs identified during the assessments.

During Foster Care Month, some districts partner with private agencies to hold recruitment information meetings.  In May 2008, three foster care information receptions were held in Region I in Harrison, Monongalia and Marion Counties.  The Alliance for Children, a non-profit entity comprised of many of the private agencies, has developed a "bed availability" report which is distributed to private agencies and Department staff on a weekly basis.  This report includes information about available placements for residential facilities and specialized foster homes.  A link for this website is located on the Department's internet site.

Kanawha District's (Region II) foster/adoptive parent association meets monthly and is attended by foster parents from numerous counties.  There are six active foster/adoptive parent associations in Region IV.  The foster/adoptive parents are a great source of knowledge and support for each other during and following the meetings.  Stakeholders from both these regions indicate the home finders are a great source of support.  At this point, there are no foster/adoptive parent associations in Region III and only one in Region I.

Also, the Department has provided training regarding permanency and concurrent planning to all staff, and the training modules has been included in the foster care training curriculum.  The training is intended to improve worker practice when matching children with placement

D003628

providers. Department home studies contain a section that discusses the type of child with whom the family feels prepared to work, as well as the recommendation of the home finder in regard to the type of child for whom the family appears to be capable of providing care.

As a result of the PIP, the Department requires mandated safety checks be completed on all relatives who are not approved foster homes prior to the child/ren's placement in the homes in order to ensure the placement is appropriate. This check includes a physical evaluation of the residence, CPS background check, and Criminal Investigation Bureau (CIB) check. Policy allows relatives to receive a boarding care payment for up to six months prior to their completion of the approved foster care training to facilitate swift placements of children with the identified relative providers.

The Journey Placement Notebook was developed to provide foster/adoptive parents with a mechanism to receive and maintain information about a child for whom they are caring. The notebooks are to be given to foster/adoptive parents when a child/youth enters foster care and is placed in a foster/adoptive home. Journey Placement Notebooks are designed to follow the child throughout their foster care placement. There may be times when the child/youth's worker may not have all the information about a child at the time of placement; however, it is expected that it should be forthcoming as soon as the information is made available.

The foster/adoptive parent(s) should bring the child's Journey Placement Notebook to each MDT meeting so the child's worker can ensure the Notebook contains current information. The child's workers will provide updated information to be placed in the notebook. The previous information will be put in the child's case record if it is not already in the record.

The Journey Placement Notebook is to be returned to the child's DHHR worker upon the child's exit from foster care except when the child exits foster care to permanency of adoption or legal guardianship. Information contained within the Journey Placement Notebook may be provided to the child upon their exit from foster care upon their request. Educational and medical information contained within the Journey Placement Notebook must be provided to children who exit foster care at the age of eighteen years or older.

The state implemented the Parent Resources for Information, Development and Education (PRIDE) foster parent training curriculum following the 2002 CFSR review which educates and encourages foster parent participation in MDT meetings and case planning. Also, training was provided to all workers and continues to be provided to new workers regarding foster parent involvement in the MDT and case planning process. For details on PRIDE, see Item 34 in the Training Systemic Factor. Item 17 contains information related to assessment of foster parent needs and services.

**D003629**

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The CAPS process is used primarily with YS placement cases to improve identification and selection of placement options.   Concerns regarding CAPS assessments were discussed in Item 3.

Stakeholders indicate recruitment of specialized foster homes remains an issue.   Presently, recruitment is not a high priority for the home finding staff, as most of their time is directed at completing required caretaker/relative home studies.   A major delay in the home study and safety check process is the completion of CIB checks.   Private agencies do not report recruitment efforts directly to the Department.

OPQI QA reviews and stakeholders indicate providers are not receiving pertinent information concerning the child/ren.  This lack of information prevents providers from making an informed decision as to whether or not they would be able to provide the level of care required by the child.

OPQI QA reviews document a lack of sufficient worker contact with the foster parents and the children in placement and, as a result, placements disrupt.  Workers are expected to assess the placement providers in order to identify any service needs; however, there are limited mechanisms in place to provide services to relative placement providers or foster/adoptive providers; or to enable them to secure services to avoid placement disruptions.

The Department does provide respite for foster families, but respite providers are, at times, unavailable when needed.  Foster/adoptive parent associations are available in various parts of the state.

Stakeholders throughout the state voice concerns that the screening process for foster/adoptive parents is not sufficient and that many homes are approved that lack the skills, motivation, knowledge, and appropriate family dynamics to deal with the behaviors of children placed in their homes.  As a result, many times foster families are not prepared to manage problematic behaviors of children and frequently ask for the children to be moved.

There is a lack of foster homes for adolescents in both the public and private sector.   The Mission West Virginia initiative has been utilized for child-specific recruitment of foster/adoptive homes and has the potential to provide more comprehensive recruitment services; however, it is unclear as to what extent this program has been used or how effective it has been.

Stakeholders indicate foster care providers' participation in the MDT process continues to be inconsistent across the state even though the Department has made significant efforts to encourage their involvement.  OPQI QA review results and interviews with foster parents during the SWA process indicate that in some instances, they are not invited, and in other cases, they refuse to participate for a variety of reasons.  Foster parents are not universally viewed as a

D003630

resource in regard to the child and their placement progress, so even when they attend the MDT, the information they have about a child may not be obtained or utilized in case planning.

Training to address the use of Journey Placement Notebooks for children in placement was provided to staff members by the Department; however, the notebooks are not consistently distributed or utilized throughout the state.  They are designed to be a tool that provides information regarding the child's educational, medical and mental health status to placement providers, Department staff, and MDT's, but not all children in care have received them, and not all placement providers are placing pertinent information in the notebooks.

Stakeholders expressed concern regarding the limited number of supportive services for foster parents and see the lack of services as a reason for many placement disruptions.  Some workers throughout the state were unaware of the availability of free child care for foster/adoptive parents or that a waiver process is available to extend day care services for some children after the age of thirteen.

---

**Item 7:  Permanency goal for child.**  How effective is the agency in determining the appropriate permanency goals for children on a timely basis when they enter foster care?

---

**What do policy and procedure require?**

Section 1.5 of the foster care policy identifies the role of the child's worker as a permanency planner.  Specifically, it states, "The child's worker, with the assistance of the MDT, develops a detailed plan that addresses the permanency needs of the child.  The worker is responsible for ensuring the services provided to the child and his/her family, if appropriate, are in coordination with the child's identified permanency plan.  Also, the worker must also have a concurrent permanency plan for which services are coordinated should the primary permanency plan no longer becomes appropriate.  Permanency options for a child are reunification, permanent placement with relatives, guardianship, adoption, independent living or other planned living arrangement."

Section 1.6 of foster care policy defines permanency planning as a systematic effort to provide long-term continuity for children in foster care.  This planning must begin the moment the child enters foster care and must drive services and actions for the child.  According to Section 1.15 of foster care policy, the child should be involved in evaluating the Department's interest and concerns for his/her future when developing his/her permanency plan.  Section 2.8 of foster care policy states that the adoption staff should be invited to the MDT meetings when discussing adoption and permanency planning.  This section also states the MDT must meet to discuss the child's treatment plan and permanency goals within thirty days of the child entering care if one has not already been established.

In accordance with the Adoption and Safe Families Act of 1997 and WV State Code §49-6-5(b), a petition must be filed to terminate the parental rights of a child who has been in the custody of

the Department for 15 of the most recent 22 months.  Additionally, a petition must be filed to terminate the parental rights of a child if:

- The child has been abandoned;

- The court has determined the parent has committed murder or voluntary manslaughter of another of his/her children;

- The court has determined the parent has attempted or conspired to commit such murder or voluntary manslaughter; or has been an accessory before or after the fact of either crime

- The court has determined the parent has committed unlawful or malicious wounding resulting in serious bodily injury to the child or to another of his or her children; or

- The parental rights of the parent to a sibling have been terminated involuntarily.

The Department may determine not to seek termination of parental rights under certain circumstances such as the child being placed with a relative, the Department has documented in the Child, Youth and Family Case Plan that there exists a compelling reason that filing a petition would not be in the best interest of the child, or the Department has not provided services to the child's family deemed necessary as a reasonable effort for the safe return of the child to the home.

**What does the data show?**

The establishment of appropriate permanency goals in a timely manner was found to be a *Strength* in 52% (15 of 29 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

As an item rated *Area Needing Improvement* in 48% of the cases reviewed, Item 7 was addressed on the state's PIP.

The original CFSR baseline of 74%, a *Strength*, was not re-negotiated, and the PIP goal was set at 75%, a *Strength*.  The goal was achieved in November 2004 (6th Quarter PIP Report).  The original CFSR baseline was met in round three of the WVCFSR reviews.

**TABLE 18: OPQI QA Review Results for Item 7**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 29 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 52% | 68% | 70% | 85% | 67% |

Much of the decrease in performance is likely the result of the change in the review instrument which calls for concurrent permanency plans to be actively pursued simultaneously.

D003632

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CFSR, reviewers determined the Department had not established an appropriate permanency goal in a timely manner. The CFSR identified a need for more focus on diligent efforts to achieve permanency for children.

The major concerns identified were:

- Extensive delays in revising permanency goals;

- A lack of clear documentation and identification of permanency goals in some case records;

- Apparent confusion regarding the appropriate use of the goal of guardianship and

- A tendency of some caseworkers to establish long-term foster care as a goal before considering and eliminating other options.

**What positive changes in performance and promising practices have been made since Round One?**

Factors that have contributed to improvements in Item 7 include a focus on permanency and the establishment of a permanency goal early on in a case. Training has been helpful in facilitating understanding of the need for the early establishment of a goal for permanency. The use of MDTs has continued to increase steadily and has contributed to the establishment of appropriate permanency goals and to keeping those goals current. Training on the use and conduct of MDTs has contributed to both their establishment and utility. Districts report increased use of relative placements.

All districts and regions achieving highly on this item report good working relationships with their circuit courts. Surveys completed by the judges and prosecuting attorneys for these districts indicate workers are knowledgeable of their cases and of the requirements of the court, are prepared to testify, and prepare good reports that are submitted in a timely manner. Inclusion of the regional adoption workers earlier in the casework process has improved the case transition process for adoption cases.

A statewide focus on Title IV-E compliance is slowly improving the timeliness of obtaining needed documentation, the inclusion of necessary Title IV-E language in court orders, and conducting hearings annually to determine progress toward permanency. Stakeholders and onsite reviews found that as a result of the training, workers are doing a better job of entering permanency goals within the established timeframe of sixty days. Most workers are entering the information within thirty days. Also, workers are no longer utilizing long-term foster care as a goal in most instances prior to eliminating other, more appropriate options. Documentation has improved with regard to permanency goals.

D003633

In order to increase the number of court orders containing the language necessary to meet Title IV-E requirements, the CIP developed two computer programs, JANIS and JUDI. The Juvenile Abuse and Neglect Information System, JANIS, was developed with the objective of the system being to facilitate and expedite the handling of child abuse/neglect cases by efficiently generating case orders and motions. The Juvenile Delinquent Information System, JUDI, has been developed by the West Virginia Department of Health and Human Resources. The principal objective of the system is to facilitate and expedite the drafting of court orders in juvenile delinquency cases, focusing on the vital need to provide the appropriate Title IV-E findings in removal orders.

The Court Improvement Program is working to establish consistency state wide with the MDT and case planning process. (For details, see Systemic Factor B – Case Review System.) Also, the CIP has recently established a reporting system and data base utilized by the circuit courts to track improvement periods and court orders in order to work toward achieving permanency in a consistent manner in every circuit of the state court system.

In order to obtain permanency for every child in a timely manner, policy requires all cases with a permanency goal of reunification to have a concurrent goal. Also, family involvement in the case planning process is seen as critical in obtaining permanency and this is primary goal of the MDT process.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Several factors continue to impact the ratings for Item 7, most notably, problems and delays in the judicial determination process. Termination of Parental Rights (TPR) is not occurring within the 15 of the most recent 22 months timeframe established by the Adoption and Safe Families Act (ASFA). Judges in certain districts either do not terminate or will only terminate on one parent, resulting in delays of achieving permanency for children. Improvement periods continue for extended periods of time despite the Department's recommendations for termination. Court orders take a long time to be written in some districts. In two of the regions, there are districts whose circuit courts are overwhelmed. There is not time on the dockets for reviews or for juvenile cases to be heard. Hopefully, the database and work being completed by the Court Improvement Program will impact these issues. Additionally, as a part of each district's PIP, the CSM will meet with the judge(s) to discuss areas of concern.

During the SWA workgroups, it was learned adoption workers are not being involved consistently in MDTs and case planning prior to TPR in many districts which delays the achievement of adoptions within the 24-month ASFA guideline. Though permanency goals are established, at times, the plans are not changed or updated when appropriate, and in limited cases, no written permanency plan was in evidence during the OPQI QAs. Social service reviewers continued to note inappropriate permanency plans; e.g., legal guardianship rather than adoption for very young children, and the limited availability of transitional and independent living services for older children in placement.

D003634

Stakeholder groups indicated a need for continued training with regard to concurrent planning. In many instances, concurrent plans are often viewed as consecutive plans and are not pursued concurrently, if at all.   According to OPQI QA review findings and stakeholder comments, there is an expectation that every child have a concurrent plan even though the permanency goal of reunification is not being considered.   Current policy does not state this.   Many workers have difficulty in identifying an appropriate concurrent permanency goal if the primary goal is not reunification.   Because of this, the child's concurrent plan is inappropriate and work toward this goal is neglected.   The social service reviewers have noted both an abundance of inappropriate concurrent permanency plans and a lack of preparation for independence for older children in cases they have reviewed.

Overall, there has been a considerable improvement related to Item 7 across the state as documented by the OPQI QA review findings.

**Item 8:  Reunification, guardianship, or permanent placement with relatives.**  How effective is the agency in helping children in foster care return safely to their families when appropriate?

**What do policy and procedure require?**

Section 2.11 of foster care policy addresses reunification and the process towards reunification. For all children under 16 years of age who enter care through juvenile proceedings, children who are placed in foster care through voluntary placement agreements, and those children who have been in foster care due to child abuse/neglect proceedings for less than 15 months whose parents have not committed aggravated circumstances, reunification should be considered the primary permanency plan.

In order to facilitate reunification efforts, the MDT must identify and/or develop specific and individualized services to help the family address the issues that brought the child into foster care.  These services should be:

- Defined through a strengths-based, comprehensive family assessment;
- Focused on the strengths and resources within the family and community;
- Addressed in an open and inclusive forum with the family;
- Goal-oriented and focused on building skills;
- Focused on strengthening the family's problem-solving abilities;
- Appropriate and timely to meet the child's needs;
- Concentrated on identifying family supports; and
- Provided in a culturally competent manner.

Facilitating frequent and structured visits between the child and his/her parents is the most critical element to successful reunification.  The child's foster/adoptive parents should be utilized as resources and mentors for the child's biological parents.  In order for reunification efforts to be productive, services and activities should be a collaborative effort between the biological

D003635

parents, foster/adoptive parents, the child's worker and the other members of the MDT.  The child's worker should fully disclose the rights, responsibilities, expectations, options, and consequences of the reunification plan to the child's biological family as well as the entire MDT.  For any child who has reunification as his identified permanency plan, the child's worker, as well as the entire MDT, must develop a concurrent permanency plan for the child.  Depending on the child's situation and needs, the concurrent permanency plan could be adoption, legal guardianship, kinship care, or emancipation if the child is 16 years of age or older.

Section 2.12 of foster care policy addresses guardianship by relatives.  This option allows the relative caretaker to become the legal custodian of the child and receive all the benefits of legal custody.  The relative may also receive a monthly maintenance legal guardianship subsidy for the child to assist the caretaker in covering the additional expenses of raising the child.  A medical card that covers the child's physical and mental health care needs is also available to the relative caretaker that enters into a legal guardianship agreement for the child. Also, a subsidy is available that covers $1,000 of the legal expenses incurred by the relative to cover attorney fees for the legal guardianship proceedings.

If the relative is unable to pass a home study or unwilling to consider adoption or guardianship, there is another option for a permanent living arrangement with a relative.  If a relative is unwilling or does not meet the requirements to become a foster/adoptive parent or legal guardian, the Department may elect to ask the court to transfer legal custody of the child to the relative currently providing care for the child at the dispositional hearing.  This option does not provide the relative caretaker with any financial or medical support for the child.  The relative may elect to receive TANF benefits for the child which also provides a medical card to cover the physical and mental health for the child.  This option may only be utilized under the following conditions:

- Reunification, adoption and legal guardianship have been ruled out as possible permanency options for the child;

- The child's worker has explained all the benefits of adoption and legal guardianship to the relative foster/adoptive parent who decides not to pursue these options; or

- The relative caretaker cannot meet the requirements necessary to become foster/adoptive parent or legal guardian; and

- The MDT and the Court determine this placement is in the best interest of the child and the relative is able to provide an appropriate and safe permanent home for the child

The child's worker will request that the court transfer custody of the child to the relative caretaker at the dispositional hearing.

D003636

**What does the data show?**

Achievement of the permanency goals of Reunification, Guardianship or Permanent Placement with Relatives was found to be a *Strength* in 86% (12 of 14 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

The Data Profile developed for the 2002 review shows the state's percent of achieving the goal of reunification within less than 12 months of the children's entry into care at 79.5%. This exceeded the National Standard of 76.2% for the Data Profile used in the 2002 onsite review.

**TABLE 19: July 2004 Data Profile- Achievement of the Permanency Goal of Re-unification within Less Than 12 Months of Entering Care**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Of all children who were reunified with their parents or caretakers at the time of discharge from foster care, what percentage were reunified in less than 12 months from the time of the latest removal from the home? | 76.2% | 72.2% | 74.3% | 72.9% |

The July 2004 Data Profile shows the data submitted for the 2002 onsite review may not have been totally accurate. The 2004 data shows the state did not reach the National Standard for re-unification prior to or during the development of its PIP.

The state was found to be in substantial conformity with Item 8 based upon its Data Profile and onsite review results and the item was not addressed on the state's PIP.

**TABLE 20: OPQI QA Review Results for Item 8**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 14 | 50 | 71 | 67 | 63** |
| % of applicable placement cases rated a Strength | 86% | 73% | 59% | 65% | 57% |

** The 2007 review is the only review in which more than one permanency goal was rated for a case if there were concurrent goals for the child. The number of goals rated in Items 8, 9, and 10 totals 110, while the number of placement cases reviewed totals 78.

The OPQI QA reviews and the 2007 mini-review measured the achievement of the goals of guardianship and permanent placement with relatives as well as the achievement of reunification, and we have not broken out the latter. The inclusion of achievement of the goals of permanent placement with relatives and guardianship may account for some of the discrepancy between the review results and the 2008 Data Profile.

D003637

**TABLE 21: June 2008 Permanency Composite 1, Component A—Exits to Reunification in Less Than 12 Months from Entry into Care**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C1-1) Exits to Reunification in less than 12 months. | 75.2% | 73.5% | 71.1% | 73.1% |
| Measure C1-3) Children in the entry cohort reunification in less than 12 months | 48.4% | 43.1% | 40.5% | 41.5% |
| | | 25th Percentile | | |
| Measure C1-2) Exits to reunification median length of stay. | 5.4 months | 7.6 months | 7.9 months | 7.6 months |

**Where was West Virginia's child welfare system in Round One of the CFSR?**

This item was assigned an overall rating of *Strength*. The state's Data Profile indicates the state's percentage for reunification occurring within 12 months of entry into foster care (79.5%) met the national standard of 76.2%.

**What positive changes in performance and promising practices have been made since Round One?**

Since the Department was in substantial compliance for this item during the 2002 CFSR, it was not included in the Program Improvement Plan. However, there has been attention given to this item that has affected permanency and practice.

The Department continues to address the utilization of the MDT process throughout the state and recognizes importance of the process with regard to ensuring children obtain their permanency goals timely.

A concerted effort has been made throughout the state to identify and utilize appropriate kinship and relative placements, and these efforts have proven to be fruitful. A policy has been developed that permits these placement providers to be reimbursed for the child's care while they are awaiting approval as a foster home, and this has been a significant step in helping many children achieve permanency. Because of the increase in kinship/relative placements, the state has increased the use of contracted providers to complete the home studies. Also, a revised safety check for relative placements has been implemented within the state to help ensure children placed with relatives are safe. The safety check includes an environmental assessment of the home and CPS check prior to placement and a criminal background check as soon as possible. Kinship/Relative providers are required to meet the same standards as non-relative providers but exceptions are in place regarding non-safety issues in order to maintain relative placements and family connections.

D003638

Statewide training has been designed to address the issues of reunification, guardianship, and relative placements for all new workers. The training emphasizes permanency and the establishment of permanency goals early in a case.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

OPQI QA reviews and stakeholders indicate the utilization and operation of the MDT meetings varies drastically from district to district. The CIP, in collaboration with West Virginia University, recently conducted an MDT study throughout the state. For details, see the Case Review Systemic Factor. In many instances, there is a lack of attention regarding permanency goals, specifically concurrent goals. Reunification is the primary goal identified upon removal and is generally addressed during MDTs, but concurrent goals are not addressed, delaying the child's ability to achieve permanency when the goal of reunification fails.

Another barrier identified regarding timely reunification or placement of children with relatives is the lack of in-state services for children with severe behavioral issues. These children are often placed out of state to meet their treatment goals. Parents are unable to maintain their relationships with the children because their face-to-face contact is limited and the parents are frequently unable to be an active participant in the treatment services for the children.

Stakeholders and OPQI QA reviews document an increase in the utilization of voluntary relinquishments and are concerned regarding the future implication of this practice with the children and families. The reason for the increase is not known. Exploration of this situation will be necessary. Clarification of policy and training is needed to ensure voluntary relinquishments are only utilized when necessary.

Stakeholders indicate obtaining reunification or placement with relatives with YS children is delayed because of the amount of time required for successful treatment services and the limited involvement of the family unit. Parents in YS cases do not have to accept services and, on many occasions, refuse to do so, because blame for all family problems is placed on the child.

CAPS assessments have been utilized primarily with YS families and because the assessments may not be completed in a timely manner, this impacts achievement of the permanency goal. Additional barriers regarding CAPS are discussed in Item 3.

Stakeholders indicate legal guardianship is not promoted consistently across the state as a permanency goal. Some workers have not fully grasped the concept, and this has most likely resulted in the underutilization of guardianship as a permanent placement goal. Workers who were familiar with the process stated the cumbersome nature of the legal guardianship paperwork and process is a barrier to its use as a permanency option.

Additionally, there is a reported lack of aftercare services throughout the state for guardianship placements, and this has delayed the achievement of permanency goals for children. The

D003639

families lose the support and treatment services after the guardianship is finalized, and they are expected to deal with these children and their difficult behaviors on their own.  As a result, the Department has recognized the need for aftercare, and effective February 1, 2008, aftercare services were included in the ASO service array.  It is the Department's expectation that the availability of the new aftercare services will persuade more families to commit to permanent arrangements for children.

> **Item 9:   Adoption.**  How effective is the agency in achieving timely adoption when that is appropriate for a child?

**What do policy and procedure require?**

Adoption is a way of providing security for and meeting the developmental needs of a child by legally transferring ongoing parental responsibility for the child from the birth parents to adoptive parents.  WV Code '49-2-1 gives the Department the responsibility to provide child welfare services and to accept guardianship of children and consent to their adoption.  In order for the Department to have the right to place a child for adoption and later give formal consent to his adoption, the Department must obtain legal guardianship of the child.  This may occur through the termination of parental rights to the child, either through a voluntary relinquishment or through a court order.  The parental rights shall not be terminated if a child 14 years of age or older, or otherwise of an age of discretion as determined by the court, objects to such termination.

The decision to pursue adoption as a permanency option should be made by the MDT which should include the child's worker, the supervisor, the private agency staff if any, the child, the child's foster/adoptive parents, the regional adoption specialist and/or supervisor, and the GAL (GAL).  The child's worker must recommend adoption as the permanency plan for the child and detail the steps necessary to achieve permanency in the Child, Youth and Family Case Plan or YS Youth Case Plan, and filed with the court prior to disposition.  The MDT should also act as the permanent placement review committee to monitor the implementation of the permanency plan for the child and report on the progress and developments in the case every three months until the child's permanent placement is achieved.

If the child's permanency plan is adoption, the child must be referred to the Adoption Resource Network within thirty days of termination of at least one parent's rights for inclusion in the adoption photo listing book, on the state's adoption website and for statewide child specific recruitment programs.

The post-termination placement plan must be developed and submitted to the court, GAL, and all MDT members.  This plan must be submitted within ninety days of the date of the hearing at which parental rights were terminated.  This plan must describe:  the Department's progress toward arranging an adoptive home or other permanent placement; a schedule and description of the steps necessary to place the child in an adoptive home; a discussion of any special barriers preventing placement of the child for adoption or other permanent placement and how they can

**D003640**

be overcome; and a discussion of whether an adoption subsidy is needed and if so, the likely amount and type of subsidy required.

Adoption assistance/subsidy is available and provides medical and financial help on behalf of special needs children in order for foster/adoptive families and relative foster/adoptive parents of any economic level to care for the child(ren). These services are designed to supplement rather than replace the resources of the adoptive family and community. The foster/adoptive family or relative foster/adoptive parents may receive a monthly maintenance payment of up to $600 per child to assist in covering additional expenses of caring for the child. A medical card that covers the child's physical and mental health care needs is also available. Additionally, reimbursement for certain non-recurring or one-time adoption expenses is available. A one-time payment not to exceed $1,000 is available to cover legal fees, transportation costs, and other expenses related to the adoption of a child in state custody.

Policy now requires all homes to be approved as foster/adoptive providers with the intent to minimize the number of moves a child must go through to obtain permanency. There is no data available to determine whether approving homes as foster/adoptive has had an impact on the timeliness of completing adoptions.

**What does the data show?**

The timely achievement of the goal of adoption was found to be a *Strength* in 12.5% (1 of 8 cases) of the applicable cases reviewed during the 2002 CFSR onsite review.

As an item rated *Area Needing Improvement* in 87.5% of the cases reviewed, Item 9 was addressed on the state's PIP.

The Data Profile developed for the 2002 review shows the state's rate of the timely achievement of adoptions; e.g., children discharged to a finalized adoption in less than 24 months, was 17.3%, and the National Standard was 32%.

The CFSR data profile baseline of 32% was renegotiated in October 2004 based upon the results of this item during parts of the first and second rounds of WVCFSR reviews. The baseline was renegotiated to 26.4%, and the new PIP goal was set at 29.4%. The goal was met by the time the final PIP report was submitted in June 2005.

A revised data profile was provided for our use in working on the state's PIP in July 2004 with percentages that more closely approached the state's actual performance.

D003641

**TABLE 22: July 2004 Data Profile-Timeliness of Adoptions**

| Federal Year | National Standard | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Of all children who exited care to a finalized adoption, what percentage exited care in less than 24 months from the time of the latest removal from the home? | 32% | 26.4% | 28.8% | 28.8% |
| Length of stay in care, median months to discharge for children with a goal of adoption | | 34.2 months | 30.2 months | 29.1 months |

**TABLE 23: OPQI QA Review Results for Item 9**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2006-2007 Adoption | 2007 |
|---|---|---|---|---|---|---|
| # of placement cases | 8 | 9 | 17 | 14 | 39 | 32** |
| % of applicable placement cases rated a Strength | 12.5% | 50% | 44% | 56% | 42% | 38% |

** The 2007 review is the only review in which more than one permanency goal was rated for a case if there were concurrent goals for the child. The number of goals rated in Items 8, 9, and 10 totals 110, while the number of placement cases reviewed totals 78.

It is likely the small number of adoption cases reviewed in the three rounds of OPQI QA reviews accounts for the up and down pattern of the review results. The small number of adoption cases reviewed is the reason AFCARS adoption statistics were chosen to establish the baseline and goal for the 2002 PIP. The Adoption Review results and the 2007 mini-review round results, both based upon a greater number of cases, are more consistent. Unfortunately, they do show a decrease in performance from the adoption review to the mini-review round.

**TABLE 24:  June 2008 Permanency Composite 3, Component A:  Timeliness of Adoptions of Children Discharged from Foster Care.**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C2-1) Exits to adoption in less than 24 months | 36.6% | 39.4% | 47.4% | 45.8% |
| | 25th Percentile | | | |
| Measure C2-2) Exits to adoption, median length of stay | 27.3  months | 27.3 months | 25.2 months | 25.3 months |

There are at least three procedures implemented statewide that have contributed significantly to the state's success on Measures C2-1 and C2-2.  These are:  the decentralization of the subsidy approval process which now occurs on the regional level; the development of uniform case transfer policies to move state ward cases from CPS to Adoption units in the regions; and a change in the home study process where each foster home applicant is also studied as an adoption applicant.

**TABLE 25:    June 2008 Permanency Composite 3, Component B:    Progress Toward Adoption for Children in Foster Care for 17 Months or Longer**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C2-3) Children in care 17+ months, adopted by the end of the year shown. | 22.7% | 24.3% | 20.1% | 21.7% |
| Measure C2-4) Children in care 17+ months, achieving legal freedom within 6 months of the year shown. | 10.9% | 6.2% | 9.2% | 9.3% |

**TABLE 26: June 2008 Permanency Composite 3, Component C: Progress toward Adoption of Children Who Are Legally Free for Adoption**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C2-5) Legally free children who are adopted in less than 12 months of becoming legally free. | 53.7% | **28.8%** | **31.7%** | **28.6%** |

Again, casework practice issues are a problem.  However, children who are not placed with an adoptive resource at the time they are legally freed must be appropriately matched to an adoptive placement.  In addition, there is a six-month Trial Adoptive period of residence with the family who is to adopt, as required by the State Code, before a petition to adopt can be filed.  In a state which lacks adoption placement resources for children who are older, part of large sibling groups or who have special needs, the adoption of children not already in an adoptive placement at the time of TPR will be delayed by these factors.  It is also often the case that placement through the Interstate Compact process can delay adoptions for months.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

This item was assigned an overall rating of *Area Needing Improvement* with only 12% of cases reviewed rating a *Strength*, because the Department had not made diligent efforts to achieve adoptions in a timely manner.

The following factors contributed to the *Area Needing Improvement* rating for this item:

- Lack of Department efforts to achieve adoptions in a timely manner

- Caseworkers' attitudes toward adoptions in general and adoptions of older children in particular

- Lack of concurrent planning

- Inconsistencies regarding level of worker knowledge of adoptions and subsidies, and

- The need for more training for staff on permanency and adoptions.

D003643

**What positive changes in performance and promising practices have been made since Round One?**

The PIP addressed issues related to caseworkers' attitudes toward adoptions in general and adoptions of older children, in particular:

- Concurrent planning
- Worker knowledge of adoptions and subsidies
- Training for staff on permanency and adoptions
- Timeliness of home study completion
- Failure to identify and engage fathers early in the process
- Court delays and continuances
- Transfer of cases from CPS workers to adoption workers
- Lack of financial support and services (including subsidies) for relatives
- Failure to consider foster parents as an adoption resource, and
- Child-placing agencies failing to encourage adoption due to the loss of the home.

The Department requested and received technical assistance from the National Child Welfare Resource Center on Legal and Judicial Issues to assist in the development of a plan to increase stakeholder knowledge and awareness in the areas of adoption, permanency, and concurrent planning for children. Policy was developed that addressed the issues surrounding concurrent planning and the need for it to enhance the process of completing adoptions in a timely manner. Emphasis was placed on the initial removal with reunification as the permanency goal. All new workers are required to complete training on the policy that stresses the importance of adoption as an appropriate permanency plan for children of all ages and encourages workers to consider all children for adoption.

The Department moved the approval of subsidies from the state office level to the regional level in an effort to streamline the subsidy approval process. This action limited the number of subsidy packets that any one individual will need to review, and the plan was to allow for the subsidy the packet to be approved more quickly.

In an effort to obtain the permanency goal of adoption in a timely manner, and per policy, adoption workers are to be included in case planning as soon as the district believes reunification may not be a feasible permanency goal for a child. One district has developed a removal packet that includes all of the information needed for the child and adoptive worker. This proactive approach may promote the more timely completion of adoptions.

The Department continues to work with the CIP regarding the timely flow of CPS cases in order to enable a child to be adopted within 24 months of entering care. The court's actions in these matters are mandated by the West Virginia State Code. The CIP is tracking court orders and improvement periods and is providing support and training across the state to address this issue.

D003644

Relatives who appear to be appropriate for placement following an initial safety check are referred to the Home Finding Unit so a home study can be completed within forty-five days. Following approval of the home, the family may receive foster care payments for six months to give them sufficient time to complete required PRIDE training so they may be approved as a relative foster care provider. Relative foster care providers comprise approximately 57% of the approved foster care providers in the state.

Training was provided to all staff regarding the appropriate documentation in FACTS of reasons for children exiting care. This training was developed in an attempt to address the discrepancies between the foster care and adoption databases and was incorporated into New Worker Training. Workers have made improvements in the area of documenting the concurrent plan for adoption in FACTS.

All home studies for both private and public child care agencies in the state are now foster/adoptive home studies, and in many instances, this both increases the number of adoptive resources that are available for children and decreases the amount time for the completion of adoptions. Private agencies are addressing adoption with their foster families in a manner that gives them the opportunity to be considered for adoption. There are also collaborative efforts with private agencies to promote adoption through the Adoption Resource Network, Wednesday's Child, and Mission West Virginia. Mission West Virginia will also provide child-specific recruitment of families.

In order to expedite some adoption finalizations and to reduce the adoption caseload, the Department has recently entered into an agreement with four private agencies who are licensed as foster care and adoption agencies to follow the case through to adoption instead of transferring the case back to a Department adoption worker when the case is ready to be transferred to the Adoption Unit.

The Department has established a support network for adoptive/guardianship families through the ASO to allow access to services after the finalization of the adoption or guardianship. This will provide a safety net for these families that may help to persuade them to make the decision to pursue adoption/guardianship since they are aware that services will be available to address future issues.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

OPQI QA reviews indicated workers are not consistently meeting the required standards for contacts with children in adoptive placements. The limited contact adversely impacts the workers' ability to determine if placements are suitable, delays finalization of the adoptions and can result in disrupted placements.

Absent parents' rights are not consistently considered at the same time during custody hearings, and the relatives of the absent parent are not consistently considered which can seriously delay

D003645

an adoption if one of these individuals expresses a strong interest in the child later in the case. Also, in some districts, court orders are not timely written.

Also, sibling separation is an issue for the timeliness of completing an adoption. Adoption workers who have siblings separated prior to transfer must reevaluate the reason for the separation, determine whether the separation is in the best interest of the child and, in some instances, obtain separation of sibling orders in court.

Stakeholders indicate some foster/adoptive parents do not pursue adoption for older children or children with special needs because of the lack of aftercare services and their fear of being able to meet the needs of the child as the child matures. The families are generally very committed but need additional support. The lack of resources for adoptive families is a major issue facing the state.

OPQI QA reviews and stakeholders indicate major delays in obtaining criminal background (CIB) checks, because the Department requests must go to the state office level before being submitted to the state police. According to some stakeholders, this is not an issue with private providers; they submit their CIB request directly to the state police which expedites the process, and their reports are generally received within two weeks to a month after submission. The delays in this process not only have a negative effect on the adoption process but also prevent the approval of the home studies for desperately needed placement resources.

While regionalization of adoption has had a positive impact on the program, it has created a negative issue as well. Not all regions operate the program in the same manner. OPQI QA reviews and worker comments validate issues such as case transfer and subsidy approval vary from one region to another.

The accurate and appropriate use of the exit screen in FACTS for all children leaving care due to adoption continues to be a barrier. The Department has provided training for all workers regarding this issue; however, this continues to be a current concern.

> **Item 10:  Other planned permanent living arrangement.**  How effective is the agency in establishing planned permanent living arrangements for children in foster care, who do not have the goal of reunification, adoption, guardianship, or permanent placement with relatives, and providing services consistent with the goal?

**What do policy and procedure require?**

In addition to the four federally sanctioned permanency options, the court may sanction another permanency option to meet an individual child's needs. After considering and ruling out reunification, adoption, legal guardianship and kinship care as viable permanency options for the child, the child's worker, with the assistance of the MDT, may conclude the most appropriate permanency plan for the child is placement in another planned permanent living arrangement.

D003646

For children who are over 16 years old, emancipation may become the permanency plan for those youth who are not able to return home or live with relatives and cannot or do not wish to be adopted or placed with a legal guardian. Within the Child, Youth and Family Case Plan or YS Youth Case Plan filed with the court prior to disposition, the child's worker must recommend emancipation as the permanency plan for the child and detail the steps necessary to achieve permanency. All services available to a youth with independence as a permanency plan are also available to a youth whose permanency plan is emancipation.

For a child age 12 or older, for whom reunification, adoption, legal guardianship, and kinship care have been ruled out, continued foster care may be an appropriate plan. This permanency option is only appropriate when a parent and child have a significant bond, the parent is unable to care for the child because of an emotional or physical disability, the child's foster parents have committed to raising him to the age of majority, and to facilitate visitation with the disabled parent.

The decision to follow through with these permanency options should be made by the MDT. Within the Child, Youth and Family Case Plan or YS Youth Case Plan filed with the court prior to disposition, the child's worker must recommend emancipation or continued foster care as the permanency plan for the child and detail the steps necessary to achieve permanency. The compelling reasons these options are in the best interest of the child should also be included.

The Department must assure that foster children whose permanency goals are continued foster care receive the same rights and protections provided to any child in the foster care system. This includes a six-month review of the child's case plan, an annual judicial review, life skills instruction, medical and mental health coverage, educational planning, etc.

**What does the data show?**

**TABLE 27: OPQI QA Review Results for Item 10**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 8 | 93 37% had APPLA goals | 102 14% had APPLA goals | 101 20% had APPLA goals | 78** 14% had APPLA goals |
| % of applicable placement cases rated a Strength | 50% | 54% | 88% | 47% | 86% |

** The 2007 review is the only review in which more than one permanency goal was rated for a case if there were concurrent goals for the child. The number of goals rated in Items 8, 9, and 10 totals 110, while the number of placement cases reviewed totals 78.

The concern about not fully exploring other permanency goals before assigning a goal of APPLA remains. The discontinuation of the use of the permanency goal of permanent foster care has

improved.  The June 2008 point-in-time permanency profile shows only .04% of children with this permanency goal.

**Composite 3:  Permanency for Children and Youth in Foster Care for Long Periods of Time.**

This Composite is not directly linked to Item 10 but is indirectly associated with the item because so many of the children in care for long periods of time do not achieve a permanency goal of reunification, permanent placement with relatives, guardianship or adoption and are assigned goals or concurrent goals of APPLA.

**TABLE 28:  June 2008 Data Profiles Permanency Composite 3 - Permanency for Children and Youth in Foster Care for Long Periods of Time.**

| Federal Year | 75th Percentile | 2006ab | 2006a 2007b | 2007ab |
|---|---|---|---|---|
| Measure C3-1) Exits to permanency prior to 18th birthday for children in care for 24+ months | 29.1% | 27.2% | 25% | 25.5% |
| Measure C3-2) Exits to permanency for children with TPR | 98% | 93.6% | 91.7% | 93.9% |
| 25th Percentile | | | | |
| Measure C3-3) Children emancipated who were in foster care for 3 years or more | 37.5% | 34.6% | 35.4% | 33.8% |

In West Virginia, the longer a child is in foster care the less likely it is that he/she will achieve a permanent home prior to the age of 18.  It is of concern that in the state, the percentage of children in care for 24+ months achieving permanent homes is decreasing.  There are many possibly acceptable reasons why this population may not achieve a permanent home; nevertheless, this is a population which should receive more attention.

Likewise, finding permanent homes for older children with TPR is difficult, because they can be state wards with very special needs, be placed with providers who are reluctant to adopt, be age 14 and older who can refuse adoption, be youth who are appropriately preparing for independent living, or be children who have a history of adoption disruption or failed placements.  However, these children's need for permanency should still be a focus for the Department.  Additionally, permanency plans and planning for all children in care three years or longer should be reviewed regularly for appropriateness.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CFSR, the Department received a *Strength* rating of 50%, because diligent efforts to assist children to attain more appropriate goals, such as guardianship or adoption had not occurred in the applicable cases reviewed.

D003648

**What positive changes in performance and promising practices have been made since Round One?**

The PIP strategies that were developed to address the deficits included FACTS refresher training to ensure appropriate documentation, correction of inappropriate permanency plans, and the development of training for child welfare staff and supervisors regarding adoption, permanency, concurrent planning, and MDT meetings.

The Department provided training to tenured staff and new workers to emphasize the importance of the documentation of appropriate permanency goals for older children.  Adoption, Permanency/Concurrent Planning, and MDT training was also presented to all staff and added into New Worker Training curriculum

Supervisor tracking logs are to be utilized by all supervisors to review at least seven cases per month to determine whether or not the case is being documented correctly and also to monitor service delivery by both the Department and private providers.  Supervisors are also reviewing permanency plans for children who are in foster care as part of the case review.

The Chafee Program serves youth who are aging out of foster care, who have been adopted after 16 years of age, former foster care youth from 18-20 years of age, and youth placed in legal guardianship.  The program has been expanded to include a contact person in each of the state's four regions, as well as in the State Office.  Chafee staff members have developed brochures and provided training in an effort to make the community, as well as public and private agencies, aware of the program and its available services.  The staff also provides instruction to workers on how to administer the Daniel Memorial assessment and Phillip Roy curriculum and will administer both to groups of appropriate youth if requested.  Services provided under Chafee include:  housing assistance, employment assistance, educational assistance, including college, transportation assistance, medical assistance, and clothing.  There is a lifetime cap per individual of $3,000 for direct financial assistance.

West Virginia is receiving technical assistance from the National Resource Center for Youth Development to assist in transitioning from using the Daniel Memorial Life Skills Assessment to using the Ansell-Casey Life Skills Assessment.  The initial meeting between the NRC and the Department occurred May 29-30, 2008.   Full implementation is anticipated to occur in June 2009.

The Community Reentry Program for Youth was introduced in April 2008 and is currently offered by two foster care provider agencies, Burlington United Methodist, and Stepping Stones. It is a three-phase service model that is intended for youth who may not be quite prepared to participate in the traditional transitional living program.  Phase One is similar to the current Level One residential program and provides youth with 24-hour onsite supervision and basic living skills development in a specialized group setting.  Phase Two allows the youth to reside in an apartment setting and provides more intensive supervision and oversight.  Phase Three allows

D003649

the youth to rent their own apartment and provides less intensive supports.  Some of these youth may also be eligible for Chafee services.

Burlington United Methodist was able to implement Phase I of their Community Reentry Program in January 2008.  They provided services to five youth during this period.  They are currently serving four youth, as one youth was discharged due to being inappropriate for the program.  They have had 13 referrals for services and currently have a waiting list of five youth for their Phase I.  Burlington plans to have phase II and III running in the near future.  Stepping Stones has implemented Phases I, II and III of their TL program.  They have provided services to eight youth in Phase I.  They have provided services to one youth in Phase II and will soon be moving two more youth into this phase.  Although they have the capacity to serve 12 youth in Phase III, they have yet to serve any youth in this phase.

As a result of funding obtained from the Mental Health Block Grant and in collaboration with West Virginia University Center for Excellence in Disabilities, the Department has identified an array of services necessary for successful return to the community of foster care youth with a diagnosed severe emotional disorder.   Services identified include assistance for housing, employment, education, and transportation, as well as social case work services.  Requests for services from this population will be made to and managed by Chafee staff members who also provide casework services to this target population to assist them with locating and accessing community resources.

Workers are to inform youth who are in foster care that if they leave care prior to their 21st birthday, the Department has established what may be described as a "grace period" during which an adolescent can request to return to care.  This is a three-month period from the time they exit care, but in many instances, the Department will extend that period at the request of the youth.

A promising practice that was identified by workgroup participants in one region was the availability of funds from the Crime Victim's Compensation Fund.  This fund is to be utilized to provide services to youth who were victims of crime.  There is a lifetime cap of $35,000 per youth.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

OPQI QA reviews and stakeholders indicate the lack of preparation of youth for independent living impacts their ability to be successful after they leave foster care, and in some cases, they either live in homeless shelters or are incarcerated after exiting care.  Workers throughout the state generally lack the knowledge and/or time to explore available resources such as free computers for foster children who are graduating from high school.  Also, there appears to be a statewide crisis in regard to transitional living services.  Private providers of transitional living services have stated the program is not financially self-sustaining, and most have chosen to discontinue the provision of the service.  In many areas of the state, the responsibility for

D003650

monitoring youth in independent living situations falls upon the Department who is unable to successfully provide the support and monitoring required.

OPQI QA reviews and stakeholders identify a significant breakdown in aftercare/services that are provided by the Department to those children who do not qualify for adult services but whose level of functioning impairs their ability to live independently following their 18th birthday. There is a lack of services for this vulnerable population.

Many youth who have not previously participated in the MR/DD (Mental Retardation/Developmental Disabilities) Medicaid Waiver Program will require Medicaid waivers to receive appropriate services; however, due to a legislative mandate, the Department does not have the ability to request and/or designate slots for these children in the Medicaid waiver approval process. As the result of the absence of this resource, the youth are waitlisted for slots that are only designated one time per year. This places these youth in a vulnerable position and often results in multiple moves and inappropriate shelter placements for these children.

The Department has a valuable resource in the West Virginia Center for Excellence in Disabilities' Specialized Family Care Program, which is a statewide placement and family support system designed to serve the needs of children and adults with developmental disabilities; however, the homes that have been approved to provide care for this population are being underused. These homes provide care for children with severe mental impairments and limited physical impairments. Home providers for this program care for these children prior to the age of 18 and also have the potential to become lifetime placements for them since the program is designed to provide care for as long as needed and for as long as the providers are able to meet the needs of the child/adult.

Children continue to remain in foster care placements indefinitely for a variety of reasons which include behavioral issues and children who do not wish to enter into adoptive or guardianship placements.

Stakeholders indicate the Department has not consistently ensured the completion of the Daniel Memorial Life Skills Assessment and the Phillip Roy curriculum. The assessment and curriculum is designed to evaluate the adolescent's abilities regarding self-sufficiency and the curriculum is to be utilized to address the identified deficits and increase the adolescent's life skills. All foster care youth who are 14 years or older are required to participate in the assessment and independent living curriculum whether they are placed in a foster home or in a residential facility. Again, the assessment process and curriculum is being revised and replaced with the Ansell-Casey LSA in June 2009. Training is being designed to be completed for the staff across the state to facilitate a smooth transition.

Also, stakeholders indicate the Chafee program may be an under-utilized resource. In many districts across the state, worker knowledge of the program and the referral process is limited.

D003651

Ongoing refresher training is needed regarding services for the foster children in preparation for independence.

**Permanency Outcome 2:   The continuity of family relationships and connections is preserved for children.**

---

**Item 11:  Proximity of foster care placement.**  How effective is the agency in placing foster children close to their birth parents or their own communities or counties?

---

**What do policy and procedure require?**

Section 1.16 of foster care policy requires the worker to assess the proximity of the placement to the child's family and school when making placement arrangements.  The worker has to consider factors when making a placement decision such as, "the placement that is closest in proximity to the family to facilitate frequent visitation; the placement that is in closest proximity to the child's school, if applicable."

**What does the data show?**

Proximity of placement was found to be a *Strength* in 95% (20 of 21 cases) of the applicable cases reviewed in the 2002 CFSR onsite review.  The state was found to be in substantial conformity with Item 11 and the item was not addressed on the state's PIP.  It should be noted that the state still lacks the number of specialized in-state placements that would be needed to accommodate all of its children needing this service.

The state's Commissioner for the Bureau for Children and Families during the 2002 onsite review expressed the desire to track out-of-state placements and to establish the infrastructure to meet these specialized placement needs.  Out-of-state tracking has been developed.  In 2006-2007, an exhaustive inventory of the characteristics of West Virginia children in out-of-state placement was completed.  The results of the inventory were entered into a database developed for this purpose.  Data entry was web-based and is ongoing.

**TABLE 29: OPQI QA Review Results for Item 11**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 21 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 95% | 80% | 94% | 93% | 93% |

While the 2002 CFSR onsite review baseline of 95% has not been achieved again, the OPQI QA results show that achievement on Item 11 has been maintained and remains a *Strength*.  The Department has two annual reports available which list the children placed within the same region as their parents/caretakers and those youth who are placed outside the region where their

D003652

parents/caretakers reside.  Currently, the reports are available for 2007 only.  The accuracy of these reports is dependent upon the completeness and up-to-date quality of the information entered into FACTS.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In the 2002 the CFSR, Item 11 was assigned an overall rating of a *Strength*.  Results showed that children were placed in close proximity to parents or relatives or the reason for separation was appropriate.  West Virginia's performance on this item exceeded the federal guideline of 90%.

**What positive changes in performance and promising practices have been made since Round One?**

Stakeholder feedback indicates there has been a major push to identify relative placements for children, and as a result, more children in foster care are placed within their home communities.  Furthermore, stakeholders identified specialized agencies and the MDT process as a resource in locating and providing placements for children in close proximity to their home communities.

Region IV, which includes the Greenbrier, Monroe, Pocahontas and Summers District, contracts all relative home studies and consequently is able to utilize time for recruitment of Department foster homes.  Thus, Region IV had a 10% increase in the number of foster homes in 2007.  They have a Foster Parent Association in every county in the region and are in the process of developing a mentoring program for foster parents.  The Social Work Educational Consortium provides supportive foster parent training through Concord University Social Work Program

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Stakeholders indicate MDTs are not consistent in their consideration of placements for children.  Some specialized providers are not supportive when considering reunification of children with their parents or when the opportunity arises to move the child closer to their home community.

OPQI QA reviews and stakeholders indicate a need for community-based placement options for YS clients, large sibling groups, children of various racial and ethnic backgrounds and for children with dual diagnoses, sexual offenders and children with low IQs. There is also a need for bi-lingual foster parents, particularly in Region III, and for parents who can work with deaf children.  In some instances, youth are placed in emergency shelter care while waiting for an opening at a foster home or treatment facility that can better meet the child's needs. Stakeholders indicate home-finding efforts across the state are inconsistent and report recruitment is no longer a priority.  Due to the priority placed on relative placements, the majority of the home finders' time is spent conducting court ordered kinship/relative studies leaving little time to recruit new providers to meet the needs of the above mentioned children.

D003653

The Department has the ability to contract home studies through the ASO process, but some of the completed studies are of poor quality and have to be returned multiple times for corrections. Providers indicate payment for home studies is not adequate or timely which limits the number of contract providers in three regions of the state. This would indicate a need for further exploration of the success experiment in one region.

Specialized training and support are needed for foster parents to help them deal effectively with children that require intense treatment. ASO wraparound services and family support services are not available to foster parents. Foster parents receive pre-service training and ongoing training for re-certification; however, targeted-needs training is not always provided.

Department policy requires workers to access in-state placements first over out-of-state placement facilities that may be closer, but some courts circumvent Department policy and order youth into out-of-state placements. This is particularly true in the border counties. On occasion, the courts will order older children to be placed out of their home communities to limit their accessibility to negative peer groups. This is also true, especially when judges or TPOs have experienced positive outcomes with a particular out-of-state facility.

> **Item 12:  Placement With Siblings.**  How effective is the agency in keeping brothers and sisters together in foster care?

### What do policy and procedure require?

Section 1.16 of foster care policy addresses the placement of siblings. State statute §49-2-14(d) requires the Department to place siblings together when placing a child in foster care that also has siblings in care. Siblings are defined by §49-1-3 as, "children who have at least one biological parent in common or who have been legally adopted by the same parents or parent."

In all cases in which a child is to be placed, the worker must ask the child's caretakers at the time of placement if they have other children in foster care or other children for whom their rights have been terminated. If so, the worker must do the following

- Notify the foster or adoptive parents of the sibling that this child is available for placement

- Discuss with the foster or adoptive parents their interest in caring for this child

- Refer the family to the Home Finding Unit or Interstate Compact on the Placement of Children (ICPC) if the family resides out of state as soon as possible if the foster or adoptive parents agree to care for the child entering foster care, and

- Document in the child's case record in FACTS the results of all contacts made to place children with their siblings and the reasons why siblings are not placed together on the permanency plan screen.

In cases of imminent danger, it may not be possible to initially place a child with his/her siblings. Every effort must be made to reunite siblings who are in foster care unless such a placement

D003654

would not be in the best interest of one of the children.  In such a case, the child's worker must ask the court to approve the separate placement of the siblings and judicially determine, based on clear and convincing evidence, that it is not in the child's best interest to be placed in the same foster or adoptive home as his siblings and for the court to, therefore, sanction the sibling separation.

**What does the data show?**

Placement of siblings together in foster care was found to be a *Strength* in 100% (17 of 17 cases) of the applicable cases reviewed in the 2002 CFSR onsite review.  The state was found to be in substantial conformity with Item 12 and the item was not addressed on the state's PIP.  It should be noted that the state continues to need more foster homes that can accommodate sibling groups as stated by the stakeholders interviewed.

**TABLE 30: OPQI QA Review Results for Item 12**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 17 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 100% | 74% | 87% | 93% | 89% |

While the 2002 CFSR onsite review baseline of 100% has not been achieved again, the OPQI QA results show that achievement on Item 12 improved during the three rounds of OPQI QA reviews to a rating of more than 90% a *Strength* once again.  The 2007 mini-review round saw performance drop slightly to a rating of one point below 90% a *Strength*.  A 2007 report is available for children placed apart from their siblings.  The accuracy of these reports is dependent upon the completeness and up to date quality of the information entered into FACTS.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In the 2002 CFSR Item 12 was assigned an overall rating of *Strength* because in 100% of the applicable cases reviewed.  Reviews demonstrated that siblings were either placed together or their separation was necessary to meet the needs of one or more of the siblings. Since this item was rated as Substantially Achieved it was not included in the PIP.

**What positive changes in performance and promising practices have been made since Round One?**

New Worker Training has incorporated the PRIDE foster parent training which stresses the importance of keeping siblings together. The uniform use of the PRIDE training by the Department and private agencies to train staff and foster parents has contributed to more

D003655

uniformity across providers and agencies. Workers can better understand foster parents' roles and expectations after attending this training.

Many children in foster care are placed with relatives that are more willing and able to accept a sibling group. When exceptions are necessary in order to maintain a large sibling group workers utilize the waiver process. The supervisor evaluates the foster/adoptive home based upon the information provided by the worker and the home study to determine if the waiver can be granted to increase the number of children for which the home is approved.

The MDT process is also used to identify placements that are willing to keep sibling groups together. As a result of the MDT process some workers are documenting the reasons for separation and seeking court sanctions as well in most cases.

Item 12 continues to be a *Strength* for West Virginia, workers do a very good job of keeping siblings together whenever possible.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

OPQI QA reviews and stakeholders identified a lack of foster homes for larger sibling groups as a statewide issue. Other identified issues include emergency placements resulting in separation, workers not re-unifying siblings, lack of documentation of reunification efforts and the lengthy case transfer process.

The foster home waiver process is beneficial in keeping siblings together, but it is often difficult to get a waiver for large sibling groups placed in specialized foster homes. At times, relatives are resistant to take the entire sibling group.

Resistance of providers and private placement agencies to reunify siblings when foster parents desire to adopt one child of a sibling group was an issue identified by stakeholders during the SWA work groups. Also, the courts are inconsistent in their rulings regarding the separation of siblings. Additionally, some guardians ad litem (GALs) lack sufficient knowledge of the children they represent, resulting in inappropriate separations.

Another barrier identified by OPQI QA reviews and stakeholders is the issue of separation of half-siblings, often resulting in children being separated in order to place them with their respective relatives. Sometimes, when siblings are separated for treatment reasons, consistent efforts do not take place to facilitate reunification.

Youth services clients usually enter care without their siblings due to their behaviors and treatment needs that are not CPS issues. When a sibling enters care, it is difficult to place them together due to their behavior issues and unique treatment needs. These youth are generally placed in juvenile detention or residential treatment facilities in order to meet their treatment needs. OPQI QA and stakeholders identified a lack of documentation in FACTS to justify the separation of siblings.

D003656

In some districts, children, foster parents, and private agency staff are not invited to participate in the MDTs or court hearings and are not afforded the opportunity to express their opinions regarding placement with siblings.

> **Item 13:  Visiting with parents and siblings in foster care.**  How effective is the agency in planning and facilitating visitation between children in foster care and their parents and siblings placed separately in foster care?

**What do policy and procedure require?**

Arrangements for visitation with parents must be agreed upon as soon as possible after placement and documented in FACTS on the visitation plan screen.  These arrangements must be made in agreement of the biological family, the provider and the child's worker.  This agreement must include the visitation schedule, the visitation site, time, date, and transportation arrangements.  Any restrictions on visitation arrangements by the worker or the court will be noted in the Child, Youth and Family Case Plan or YS Youth Case Plan.  All visits will be coordinated through consultation with the child's worker, who is responsible for ensuring the visitation plan is followed.  According to policy, visitations are to take place no less than monthly between a child and their parents.

In some circumstances, children in foster care may need to be placed separately from their siblings who are also in care.  This may occur when one sibling is a danger to his/her sibling or when a large sibling group is being removed from their home and a placement resource to allow all of the children to be placed together is not readily available.  When siblings are placed separately in foster care, the MDT must develop a visitation plan immediately to maintain the sibling relationship. The visits must occur at least once every month and provide siblings an opportunity and time to maintain connections.  The child's worker is responsible for ensuring the visitation plan is followed.  This plan must be contained in the Child, Youth, and Family Case Plan or YS Youth Case Plan.

Supervised visitation services are available through the ASO for families where children are in Department custody.

**What does the data show?**

**TABLE 31: OPQI QA Review Results for Item 13**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| **# of placement cases** | 24 | 93 | 102 | 101 | 78 |
| **% of applicable placement cases rated a Strength** | 71% | 54% | 69% | 77% | 66% |

D003657

**Where was West Virginia's child welfare system in Round One of the CFSR?**

Item 13 was rated as a *Strength* in 71 % of the cases resulting in a rating of *Area Needing Improvement* because the Department had not made concerted efforts to facilitate visitation.

The areas needing improvement identified for Item 13 was based on the following observations and information found in some of the cases reviewed:

- Visitation between the fathers and children was inconsistent.
- There was a lack of documentation in the case records regarding attempts to locate the fathers.

**What positive changes in performance and promising practices have been made since Round One?**

The Department's PIP identified the need to increase visitation between children and their fathers and to identify absent parents and relatives. As part of the CAPS process, the provider is to identify the absent parents and conduct an assessment on both parents to determine their level of involvement and the impact of visitation. Once this information is obtained, the provider is to present this information to the MDT, and a visitation plan is to be developed based upon the needs of the child and parents. According to policy, visitations are to take place no less than monthly between a child and their parents but frequently occur multiple times per week when at all possible. In cases without a CAPS assessment, the worker is responsible to identify absent parents, assess the situation and develop a visitation plan at the first MDT. Workers received training surrounding the referral process and the use of CAPS.

The second PIP action step resulted in a policy revision that includes a protocol for locating and including absent fathers, paternal relatives and siblings in visitation. Workers received training surrounding the new policy.

Department workers attended a modified version of the PRIDE Training that focuses on the importance of ensuring visits occur between parents and siblings in care. This has been incorporated into the New Worker Training for all Department workers.

Workers follow policy and utilize the following resources to locate absent parents:

- The state's Bureau of Child Support Enforcement
- Eligibility workers
- Department of Motor Vehicles (DMV) searches
- The National Parent Locator Service
- The Regional Jail website
- Relatives and neighbors, and
- Publications in local newspapers.

D003658

As part of their contract with the Department, residential treatment facilities provide transportation for children to attend visits with family members.  Also, parents and siblings are encouraged to visit the child at their facility.

One of the promising practices identified during the Self-Assessment Workgroups was the increase in number and use of private visitation centers in the Lewis-Upshur District in Region III.  Utilization of the visitation centers has increased the number and frequency of visits and has freed workers to carry out other responsibilities.  In other districts, ASO providers conduct and facilitate visits in parents' homes.   The availability of visitation centers vary across the state.  Some child advocacy centers have visitation areas available for use, and some of the private providers are establishing visitation centers.

Life books are utilized as a means to increase communication and improve the quality of visits between parents and children.  The life books are provided for the children when entering placement and are utilized as a scrapbook for keepsakes they value.  Workers and providers encourage children and parents to exchange pictures and to participate in activities such as games and crafts, etc., in order to facilitate parent/child interaction during visitation.

Workers are creative in utilizing community resources as a means to facilitate visitation in an atmosphere conducive to good parent/child interaction.   Visits take place at state parks, restaurants, churches, relatives' homes, and other safe locations to facilitate visitation in an atmosphere conducive to good parent/child interaction.  Parents are encouraged to plan activities to reinforce positive interaction.  Utilization of ASO providers has increased the Department's ability to conduct visits after regular office hours and to increase the frequency and length of visits.  According to data from APS Healthcare, supervised visitation was used for 147 families in Region I, 239 families in Region II, 149 families in Region III, and 551 families in Region IV. Sibling visits usually occur during visits with the parents, but ASO services can be utilized to facilitate overnight visits for siblings in the foster homes by providing a means to reimburse foster parents for travel and lodging.   Region IV utilizes a region-wide oversight process designed to ensure sibling visits are taking place.   Supervisors in the region track sibling visitation for all children in placement, and workers are contacted if visits are not taking place to determine if there is justification for the lack of visits.  If there is not justification, the workers are instructed to initiate visitation as quickly as possible.  The supervisor follows up to determine if the visits take place.  Reports are submitted monthly to the Region IV designee in charge of tracking sibling visitation as another form of oversight.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Although there has been steady improvement in performance for this item, identifying absent and unnamed fathers continues to be a problem area especially in youth service cases.  OPQI QA review results and stakeholders' interviews indicate absent parents are not pursued as frequently in YS cases, because the worker continues to focus primarily on the needs and services of the

D003659

child in placement and the custodial parent. At times, the courts and probation officers are not allowing the non-custodial parent the opportunity to work with the child prior to placement.

Stakeholders indicate CAPS providers are not available in many rural areas of the state. The CAPS reports received vary in quality and, at times, do not sufficiently address the absent parent or visitation. Additionally, MDTs are not conducted uniformly across the state and are not consistently utilized in the identification of absent parents or to facilitate visits with the parents.

Stakeholders indicate workers are reluctant to involve absent fathers if there is a previous history of domestic violence, the father's lack of previous involvement in the child's life and the mother's reluctance to identify or locate the absent parent. They express concern over the impact on the child if the father is contacted and chooses not to be involved in the child's life. Workers continue to be uncertain as to how and when to involve the absent parent.

OPQI reviews and stakeholders indicate workers continue to have difficulty documenting their efforts to locate and work with the fathers. Reports from private providers are of inconsistent quality, and stakeholders recommend utilization of FACTS Plus as a means to allow providers to document visitation to reduce duplication and improve consistency of reports.

According to stakeholders, the loss of visitation center grants due to funding negatively impacted the quantity and quality of visits and state the quality of visits remains an issue throughout the state. Additionally, OPQI reviews indicate inconsistencies in the placement providers' willingness to cooperate in the visitation process and identify transportation as a major barrier.

According to OPQI QA review results, the following issues were identified: workers seem to be inconsistent in arranging for visitation for siblings who are in separate placement facilities, and the workers continue to rely on placement providers to arrange and coordinate sibling visitation; sibling visitation is not being tracked consistently across the state; and the addition of case aide positions has improved the Departments' ability to conduct visits, but the number of case aide positions is not sufficient to meet the needs in most districts regarding visitation.

Stakeholders indicated parents frequently miss visits without notifying workers or foster parents in advance causing workers to struggle to ensure that family visits take place. Another challenge faced is arranging visitation with an incarcerated parent. There are concerns about the quality of these visits and the impact the visit may have on the child.

Stakeholders in Region II, which includes the Kanawha District, indicate some judges place unreasonable expectations on workers by ordering visits several times a week or by ordering workers to transport and supervise visits when there are major safety issues. Judges are inconsistent when ordering post-termination visitation and, at times, inappropriately order visitation for very young children who have no bond with the parent(s).

D003660

> **Item 14:  Preserving Connections.**  How effective is the agency in preserving important connections for children in foster care, such as connections to neighborhood, community, faith, family, tribe, school, and friends?

**What do policy and procedure require?**

Foster care policy section 1.16 outlines the criteria for placing a child and while it does not use the terminology "preserving connections," the intent is within the policy.  When it becomes necessary to place a child into foster care, the selection of the placement resource (relative home, foster/adoptive home, group home, residential facility, or institution) will depend on the individual child and his/her situation.  The primary goal when selecting the placement is to locate a placement which causes the least disruption to the child.  Emphasis is placed on the home community and, whenever possible, allowing the child to remain in his or her home school, associate with their peers and extended family, and maintain their religious connection.  When the child must be placed out of their home community, efforts are made to maintain contact with the primary connections by visits, telephone calls, e-mails, and written correspondence.  The child always has a say in their religious preferences.  If the child is involved in extracurricular activities in their home school and there is any way to maintain their participation in these activities, the worker and foster parents do so, and if there is no way to maintain those activities, the child is encouraged to participate in like activities in the new community.

According to section 13.21, the search for absent or unknown parents and relatives, both paternal and maternal, is vital, because it is a way to preserve connections for children who have been removed from their immediate family.

The Indian Child Welfare Act of 1978 (P. L. 95-608) requires children of families that have at least 25% American Indian ancestry be referred to the tribe in which ancestry is claimed for child welfare services.  Section 1.16 of foster care policy outlines the procedures for dealing with tribal children.

If a child is placed in the custody of the Department and the child or his family is claiming American Indian heritage, the worker must do the following:

1) If American Indian heritage is uncertain or the American Indian tribe is not known, the worker must review the record and discuss the child's background with the parents to try to discover the heritage of the child.

2) If the child's background is still unknown, the child's worker must document this information in the child's record that Indian heritage is spurious and/or a tribe cannot be located that can determine if the child is a member of that tribe or eligible for membership in the tribe.

If a tribe is identified and American Indian ancestry has been documented that determines the child has at least 25% American Indian blood, the worker must contact that tribe to determine if the child is a member of the tribe or if the child is eligible for membership of the tribe.  If several

D003661

tribes are suspected and American Indian ancestry has been documented that determines the child has at least 25% American Indian blood, contact must be made with each tribe to determine if the child falls under the Indian Child Welfare Act.

Because there are no recognized American Indian tribes in West Virginia, it will be unlikely that a child is a member or is eligible for membership in a tribe. Nevertheless, the child's worker must document that a tribe has been contacted to determine tribal membership.

Once a tribe has determined that the child is not a member nor eligible for membership, this response must be documented in the child's record. If a tribe responds that the child is eligible for membership, the child's worker must request application forms. The child's parents must be contacted and the membership in the tribe explained to them. If the parent enrolls the child in the tribe's membership, the child's worker must refer the case to that tribe's tribal court if the tribe has exclusive jurisdiction over child welfare matters. The child's worker must contact the U.S. Department of Indian Affairs' Bureau for Indian Affairs to determine if the tribe has child welfare jurisdiction.

**What does the data show?**

**TABLE 32: OPQI QA Review Results for Item 14**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 29 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 83% | 66% | 82% | 83% | 83% |

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CFSR, Item 14 received an overall rating of *Area Needing Improvement* regarding the Department's success in preserving important connections for children in foster.

**What positive changes in performance and promising practice have been made since Round One?**

As a part of the PIP, supervisors and workers received training that emphasized the importance of preserving connections and supporting the parent/child relationship. The training has been integrated into the New Worker Training curriculum. Workers are also required to attend a modified version of the PRIDE training to reinforce the importance of preserving connections for children in foster care.

The implementation of the PRIDE training model for foster parents has helped to educate foster parents on their role in working with the biological family and how to assist with preserving

D003662

connections and promoting the parent/child relationship. PRIDE training also encourages the use of Life Books and Journey Placement Notebooks for children in placement as a way to document the child's placement history and connections while in care. Foster parents are also required as a part of the approval process to accommodate a child's religious preference and to honor the wishes of the birth parents with regard to religious choice. Stakeholders indicate most children in placement attend church with the foster family since most do not have a particular church affiliation.

Stakeholders indicate workers are more aware of the importance of preserving a child's connections and use visits and phone calls as means to preserve parent/child and sibling relationships.

ASO services have been implemented and provide payment for transportation and supervision of visits to assist in preserving connections.

OPQI QA reviews and Stakeholders indicate the Department has increased the number of Relative/Kinship placements as a means to preserve the child's relationships with family and significant individuals and groups in their home communities. Relative foster care providers comprise approximately 57% of the approved foster care providers in the state.

Through a partnership with Mission West Virginia, the state is making an effort to recruit African American and other minority foster homes to better match the needs of children of various racial and ethnic backgrounds. Please refer to Item 6 for details about Mission West Virginia.

OPQI reviews found that in many instances, the worker may be making appropriate efforts to preserve connections but were failing to document these efforts. The use of protected time in some districts has increased the workers' ability to accurately document their efforts in preserving connections. Protected time is a specific timeframe set aside each day or each week for the workers to concentrate on documentation. During this time, the worker takes no telephone calls nor do they see clients. As part of the individual district PIPs, workers are assigned protected time which is to be utilized for documentation purposes.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

As a result of the last CFSR, training was developed specifically targeting preserving connections. Supervisors and workers attended the training, but according to information gathered during the SWA workgroups, additional training is needed in this area. Many workers lack knowledge of policies regarding preserving children's connections with American Indian tribes. Very few children of American Indian descent reside in the state, and there are no recognized tribes. Some workers have difficulty contacting various tribes and are unable to obtain information regarding tribal affiliation due to a lack of response to their inquiries.

D003663

Stakeholders indicate workers usually ask parents and children about primary connections with the maternal family but do not consistently seek information regarding paternal relatives. Workers often neglect to explore the child's community connections related to sports, clubs, extracurricular activities and other significant individuals outside child's family. Lack of resources to fund extracurricular activities such as camps, sports and band is identified as a barrier in some instances preserving connections.

As previously stated, the MDT process is utilized inconsistently across the state which becomes a barrier in the identification and preservation of connections. In some instances, GALs do not know the children they serve and fail to advocate for the child's best interests with regard to placement and preserving connections. Stakeholders stated GAL's could better represent the best interest of the children if they received training to assist them in understanding the issues.

OPQI QA reviews and stakeholders indicate specialized placement agencies and foster parents are not always aware of who is allowed to have contact with the child in care. In some districts, judges order YS children to be placed out of their home communities and restrict contacts because of the child's behavior and the adverse impact of the connections. Youth services clients and children with dual diagnosis and significant treatment needs are often placed outside their home communities in order to meet their treatment needs. Transportation becomes a major barrier in preserving connections for these children.

Other barriers to preserving connections include: the lack of available foster homes in the children's home community; a deficit in the number of homes for minority race children; failure to document information resulting in the loss of critical facts regarding siblings, other relatives and community connections. Also, Life Books and Journey Placement Notebooks are not used consistently throughout the state to preserve connections.

**Item 15:  Relative Placement.**  How effective is the agency in identifying relatives who could care for children entering foster care, and using them as placement resources when appropriate?

**What do policy and procedure require?**

The child's worker must, according to federal law, identify and review the child's relatives as possible placement resources before a child is placed into a non-relative foster or adoptive home or group residential facility. Any person related to the child by blood or marriage, including cousins and in-laws should be considered for kinship/relative care. A person the child considers a relative, such as a godparent or close family friend, may also be considered as a placement resource.

Relatives may not be approved as a placement until the Home Finding Unit, or comparable agency staff in another state via the ICPC, has assessed the relative's ability to provide for the care and safety of the child. If it is determined that the relative can meet the certification requirements for becoming a foster family, the relative may become the child's caretaker as a

D003664

relative foster family.  According to federal requirements, all relative caretakers must meet the same certification standards as all foster and adoptive parents.

Placing a child who needs out-of-home care with a relative is the least restrictive alternative living arrangement since this placement often allows for more interaction with the child's own family and relatives and often results in a less traumatic separation.

While the Department is required to look for relatives as placement options, the worker must take specific actions if the Department is planning to petition the court for or take emergency custody of a child and place the child in the home of a relative.  The relative must be screened as an appropriate Kinship/Relative Placement by the child's worker.  The relative must sign this screening form, and the original form must be maintained in the child's record, with a copy provided to the home finding specialist with the home study request.  According to policy, the kinship/relative home study is to be completed within forty-five days of the date of the referral.

**What does the data show?**

**TABLE 33: OPQI QA Review Results for Item 15**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 27 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 67% | 59% | 78% | 78% | 77% |

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CFSR, Item 15 was assigned an overall rating of *Area Needing Improvement* because:

- Reviewers determined the Department had not made diligent efforts to locate and assess relatives as potential placement resources.
- There was an inconsistency in seeking paternal as well as maternal relatives as placement options.

**What positive changes in performance and promising practices have been made since Round One?**

The PIP goals for this item included identifying absent parents and relatives in the comprehensive assessment phase of the casework process, issuing and implementing a policy revision on locating and assessing absent fathers and paternal and maternal relatives as possible placement options, and implementing a policy revision on timeframes for completion of relative home studies.

**D003665**

Policy requires workers to identify absent parents and explore both maternal and paternal parents as both family supports and potential placement options during the initial comprehensive assessment. CAPS is designed to capture this information as part of the assessment process and the information gathered is to be used during the MDT to assist selection of the most appropriate placement for the child/ren.

Policy regarding timeframes for completion of relative home studies has been changed and requires the studies be completed within forty-five days after the information is received by the Home Finding Unit. Contract services for completing relative home studies are available through the ASO services. Data from APS Healthcare July 2006–June 2007 shows the number of home studies completed by contract providers as: Region I (5); Region II (73); Region III (55); and Region IV (179).

Stakeholders indicate workers are attempting to place children with relatives when possible and many courts are more open to kinship-relative placements. Some caretakers are willing to provide foster care for unrelated children after they are approved. As a result, many children in foster care are placed with kinship/relatives. Kinship/relatives have six months after approval to complete the PRIDE training, so the training does not delay the placement process. The number of PRIDE training cycles per year has increased in order to meet the need. Department policy requires relative providers to meet the same criteria as Department foster parents in order to be approved and receive foster care subsidy payments.

The Department sends a form letter to relatives inquiring about their interest in placement or visits with the child, and this letter can serve as documentation of a worker's efforts to locate relatives and also helps to open communication with relatives.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

OPQI QA reviews and stakeholders indicate the identification of absent and unknown fathers and paternal relatives continue to be *Area Needing Improvement*. Identification of the fathers and paternal relatives is an issue in cases involving multiple prospective fathers, and requests for home studies are delayed until paternity results are received. In some cases, birth mothers are reluctant to provide information regarding unidentified or absent fathers. Initially, CAPS assessments were designed to assist in identifying absent fathers, but because of barriers discussed in prior items, this strategy has not been effective.

Another barrier identified by OPQI QA reviews and stakeholders is the inability of home finders to complete relative home studies within the 45-day timeframe as required by policy. As previously stated, this is due primarily to the number of studies requested and the delay in processing the CIB's. At this time, only Region IV, which includes the Greenbrier/Monroe/ Pocahontas/Summers District, has sufficient ASO providers to complete all the relative home study requests. The remaining regions continue to suffer from a back log.

D003666

Stakeholders indicate issues with multiple relatives wanting the same children resulting in dissention in the family and state the courts often request numerous relative home studies for one child or sibling group which increases the burden on home finding staff and further delays the process.    Stakeholders indicate relatives drop out of the home study process due to the requirements and time involved.  Home studies are often not completed if children return to the parents prior to their completion leading to further delays if the children reenter care, and another study has to be completed on the same family.  On occasion, worker bias is a barrier to approval of relative's homes.

Home finding has shifted from a recruitment model to a needs-based model due to the increased demand, but across the state, there is a shortage of home finding staff to meet the demands. Contracting of studies is utilized, but there are a limited number of qualified providers, and the quality of the work produced is inconsistent.  Providers are lost due to the amount of payment received and the timeframe for reimbursement.

As previously stated, OPQI reviews and stakeholders indicate the courts and Juvenile Probation Officers (JPOs) sometimes push for residential placement and are unwilling to consider absent parents or relatives as possible placement options.  On occasion, courts rule against the MDT and Department recommendations and order children to be placed in unapproved homes that may not meet the Department's standards for approval.  Some courts continue to remain resistant to the use of relatives as providers.

Even though West Virginia's Interstate Compact for the Placement of Children (ICPC) system is very efficient, the ICPC process adds another layer of requirements and delays for out-of-state placements.  The timely completion and return of the requested studies is also a barrier.

> **Item 16:   Relationship of child in care with parents.**   How effective is the agency in promoting or helping to maintain the parent-child relationship for children in foster care, when it is appropriate to do so?

**What do policy and procedure require?**

The Department makes an effort to promote, support and maintain positive parent/child relationships through activities other than just arranging for visits.  Services and decisions should be defined through child-centered, family-focused principles.  This system of operation requires that children and families take part in all decisions that impact their lives.  Children, their parents, and extended family must be full partners in the process that develops, implements, and reviews their cases.  Being part of the casework process makes families more likely to be invested in making the changes necessary to positively address the reasons their children were removed from their homes.  Child-centered, family-focused practice also demands that services are individualized to meet the specific needs of the children and families that are being served.

In order for reunification efforts to be productive, services and activities should be a collaborative effort between the biological parents, foster/adoptive parents, the child's worker

D003667

and the other members of the MDT. The child's worker should fully disclose the rights, responsibilities, expectations, options, and consequences of the reunification plan to the child's biological family as well as the entire Multidisciplinary Treatment Team.

Foster/adoptive parenting is a shared responsibility between the foster/adoptive parents, the Department, the Court, and the birth parents. A close working relationship between all of the members is a necessary part of providing foster care. Foster/adoptive parents can provide better care when they understand their rights and responsibilities and participate fully in planning for the child's life. Foster/adoptive parents shall present a positive image of the child's family to him, demonstrate respect for the child's own family, and agree to work with the child's family members as indicated in the child's treatment plan. The child's foster/adoptive parents should be utilized as resources and mentors for the child's biological parents.

Absent or unknown parents should always be named as respondents in child abuse and/or neglect cases at the initial filing of the petition. In some cases, this may not be possible. The search for an absent or unknown parent must occur within the first thirty days of the child entering placement so the parent can be involved in the court process, MDT, case planning process, visitation plan and any other aspect of the case. The child's worker must initiate efforts immediately to locate the absent or unknown parent by:

- Obtaining information from the known parent or guardian of the child
- Utilizing the SEARCH Screens in FACTS to search Child Support Records
- Utilizing the court or MDT to obtain information from the known parent
- Obtaining information from known relatives of the child
- Obtaining information from the local Child Support Office or Family Support Office, or
- Obtaining information from any other source available.

Once the information has been obtained about an absent or unknown parent, the child's worker must attempt contact with the parent by face-to-face contact, telephone, mail, fax or any other means necessary to ensure every effort has been made to involve them in their child's case.

When an absent or unknown parent is contacted and has not been made a party of the court proceeding, the child's worker must contact the prosecutor to have the parent made a party to the court proceeding immediately. If there are any reasons to question the relationship between the parent and the child, the worker should request that a paternity or maternity test be completed on the child and parent.

There may be situations when it may not be in the best interest of the child to involve an absent or unknown parent with the child, but this does not mean they should not be involved in the court proceeding. The situation should be shared with the MDT who will make a recommendation to the court as to how to proceed with the parent's involvement in the child's case.

D003668

**What does the data show?**

**TABLE 34: OPQI QA Review Results for Item 16**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of placement cases | 24 | 93 | 102 | 101 | 78 |
| % of applicable placement cases rated a Strength | 75% | 46% | 67% | 78% | 56% |

Much of the decrease in performance is likely the result of the change in the review instrument which calls for specific consideration of relationships with both mothers and fathers in rating this item. The primary issues appear to continue to be promoting relationships and visiting between fathers and their children in placement.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

Item 16 was assigned an overall rating of *Area Needing Improvement* because the Department did not make efforts to support the parent/child relationships of children in foster care. Lack of effort was particularly problematic regarding efforts to locate fathers as well as promote visitation and bonding of children with fathers.

**What positive changes in performance and promising practices have been made since Round One?**

The PIP action steps that addressed this item included identifying absent parents and relatives in the comprehensive assessment phase of the casework process; issuing a policy revision on locating and including absent fathers, paternal relatives and siblings in visitation; and providing skills training for child welfare staff and supervisors to emphasize the importance of preserving connections and supporting the parent/child relationship. These strategies were also utilized for Items 14 and 15. In addition to the positives changes identified in these items, the following also apply to Item 16.

Stakeholders indicate workers are creative in finding resources to promote family relationships and sometimes use ministers to do family counseling in areas where there is a lack of counseling resources. Workers sometimes take pictures during visits and make photo albums for parents or review the child's Life Book with parents as a way of supporting the parent/child relationship. Sometimes, workers arrange for parents to visit with one child alone instead of the entire sibling group as a way to promote and improve relationships with individual children. Also, transportation is available through ASO to assist parents in attending school events and medical appointments. Case aides assist the parents with transportation when other sources of transportation are not available.

D003669

Stakeholders indicate private placement providers can be excellent resources in terms of supporting parent/child relationships. Some agencies have their own counselors and conduct supervised visits that include family building activities and parenting education. Some residential treatment facilities also work with parents and children to improve family relationships and communication. When available, family counseling is used to address parent/child relationship issues.

Some Court Appointed Special Advocates (CASA) and GALs are advocating for services to improve parent/child relationships. Some judges encourage parents to attend their children's school activities and medical appointments as a way of keeping them involved in the child's life and supporting the parent/child relationship.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

As with the positive changes, several of the barriers impacting Items 14 and 15 also impact Item 16. In addition to the barriers discussed previously, the following are also barriers to successful promotion of the parent/child relationship.

Stakeholders indicate some workers lack the expertise to identify parent/child relationship issues. Father/child relationships are more likely to go unaddressed in case planning. Workers indicated it is difficult to assess the parent/child relationship when the child is not in the home, and it is particularly difficult to assess and promote the parent/child relationship with incarcerated parents. The courts in some districts do not support the child's contact with incarcerated parents through phone calls or written correspondence.

 The lack of qualified family counselors or counselors who do not individualize the service to meet the needs of the family, limited or no funding for special activities such as family outings and movies as a way to promote parent/child relationships, and inconsistent documentation of efforts to promote and maintain the parent/child relationship were all identified during the SWA workgroups as barriers. This information can be corroborated by the OPQI QA review findings.

A barrier that is unique to Region III is the lack of translators to assist with services for non-English speaking families. This is due to the increasing number of Hispanic families who have moved into the Eastern Panhandle of the state.

Stakeholders indicate some foster parents, both specialized and Department, sabotage efforts to strengthen parent/child relationships and may sabotage efforts to involve them in visitation, while others serve as strong advocates. Some GAL's are unaware of the parent/child relationship issues and, therefore, fail to advocate for the child's best interests. CASA workers sometimes fail to support the child's needs when considering reunification and do not take a close look at parent/child relationships. The availability of CASA varies across the state, while some districts have none.

D003670

## C. Child and Family Well-being

**Well-Being Outcome 1:  Families have enhanced capacity to provide for their children's needs.**

> **Item 17:  Needs and services of child, parents, foster parents.**  How effective is the agency in assessing the needs of children, parents, and foster parents, and in providing needed services to children in foster care, to their parents and foster parents, and to children and families receiving in-home services?

**What do policy and procedure require?**

Child Protective Services policy requires that an Initial Assessment and Safety Evaluation be completed on all referrals to CPS.  When necessary, Protection Planning, Safety Planning and Family Assessment and Treatment Planning are utilized with families and children.  Services are provided based upon needs identified during the assessment process.

The family assessment in risk management casework includes all the activities and the documentation which focus on studying the risk influences identified during initial assessment. Assessment continues beyond identification to arrive at conclusions regarding the extent of those core risk conditions that must change and the origin and cause of core risk conditions.  Finally, the family assessment includes establishment of some estimate regarding the likelihood of changes which will reduce risk and risk influences.

Treatment planning assures purposeful, logical treatment and intervention.  Treatment planning is a deliberate, reasonable, mutually agreed upon strategy to reduce the risk and the contributing influences which required CPS intervention.  It involves planned action to support a family and its members toward a desired and prescribed outcome.  The outcome, if achieved, will reduce the risk which required CPS intervention.

Youth Services policy requires that a Youth Behavior Evaluation be completed on all referrals to Youth Services.  Family Assessment and Service Planning is utilized with the family and youth, when indicated.   Services are provided based upon needs identified during the assessment process.

In addition, MDTs are established for children, youth and their families whenever a child abuse and neglect, status offense or delinquency judicial proceeding has been initiated.  The CAPS is required for youth whenever an adjudicated status offender or delinquent is referred to the Department for services.  Other youth and children may be referred to the CAPS at the discretion of the worker and supervisor.

The Regional Clinical Review Process is also a required assessment process for children who are currently placed out of state or who are at risk of being placed out of state.  For details on the Clinical Review Process, see Systemic Factor F.

D003671

**What does the data show?**

**TABLE 35: OPQI QA Review Results for Item 17**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 50 | 177 | 180 | 185 | 120 |
| % of cases rated a Strength | 54% | 26% | 40% | 57% | 53% |

The decline in performance may be the result of a sampling methodology which required YS non-placement cases be included in the open case sample. Non-placement YS cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

This item was rated a *Strength* in 54% of the applicable cases. It was determined that needs and services of child, parents and foster parents was an A*rea Needing Improvement*.

The areas of needs and services for children, parents and foster parents relating to Item 17 were based on the following observations and information found in some of the cases reviewed:

- Absence of adequate assessments, particularly identifying underlying problems such as substance abuse and domestic violence

- Appropriate follow-up was lacking in some cases to ensure that services were delivered and were effective

- Lack of consistency among workers in assessing the needs of fathers

- Lack of attention in some cases to the service needs of foster parents

- Inadequate provision of services to prepare foster care youth for eventual independent living.

**What positive changes in performance and promising practices have been made since Round One?**

Since the 2002 review, several initiatives were developed as a part of the state PIP to improve the assessment of families and children and in the delivery of targeted services. These initiatives include the Department's partnership with an ASO, the creation of the CAPS, employing a coordinator position for the service array, and incorporation of family-centered practice philosophy as well as the redesign of the youth services program. Training was provided for tenured staff and incorporated into the New Worker Training on domestic violence, substance abuse, family-centered practice, and the MDT meeting process.

D003672

The impact of CAPS, MDTs and training on the various items has been discussed throughout this document; therefore, it will not be repeated in this item.

ASO was developed to enhance service delivery, identify service gaps and to evaluate data to improve the quality of services offered to children and families.  The Administrative Service Organization has been discussed previously in Item 4 and will not be defined again in this item.  According to the 2006-2007 APS Healthcare utilization management data, the primary services utilized for CPS and YS families include general and individualized parenting and transportation.  Referrals to other services include supervised visitation, case management services, and family crisis response in order of frequency.

A position was developed to oversee the Community Collaborative and Family Resource Networks (FRN) in an effort to improve communication between the various agencies, decrease duplication of efforts and increase productivity.  The coordinator is presently in the process of completing an assessment of the effectiveness and availability of services across the state in order to develop a plan of improvement to increase the availability and quality of services statewide.  More information regarding the twelve Community Collaborative groups, the FRNs can be found in Systemic Factor E, Service Array and Systemic Factor F.

The Department has implemented a family-centered practice philosophy to aid in service delivery and assessing families by incorporating community involvement and enhancing the relationship between the family and staff of the service array delivery system.  The basic tenets of this philosophy surround the intrinsic value and human worth in every family, a fact which obligates society to attempt to enable, empower and preserve families while ensuring child safety and preserving family connections.  Children's need for safe and permanent family caretaking can be met by providing appropriate and adequate resources in a timely and effective manner.

Family-centered approaches facilitate planned, appropriate placement when necessary, based on sound information about the needs of the child.  Also, family-centered services offer the best hope of breaking the cycle of hopelessness and helplessness that engulfs many families.  Intervention into the life of children and families should ideally offer as much service as necessary to achieve intended goals and no more.  The rights to privacy and confidentiality must be treated with respect when assisting children and families.  Services are based upon the individual family strength and their input to ensure safety, permanency and well-being.

Family-centered practice training was provided through a partnership between Mountain State Family Alliance and the Department.  The training was participatory and was designed to increase worker awareness and enable the workers to collaborate with the families in the provision of treatment and services utilizing community-based services.

The Child Advocacy Center (CAC) in Greenbrier County was the first fully accredited center in the state, and there are CACs located in other counties in the district.  The Center is serving young victims of abuse in Greenbrier and Pocahontas Counties. This year, state legislators have

D003673

included West Virginia's network of 19 youth advocacy centers in the state budget. Beginning this summer, the West Virginia Child Advocacy Network will receive $1 million from the state's budget to support the state's growing child advocacy centers and fund training programs.

The centers have become the front line in the investigation of cases of physical and sexual abuse of children, drawing on the support of law enforcement, child protective services and county prosecutors.

Over the past several years, 19 child advocacy programs serving 28 counties have been established around the state. Right now, four of those programs, including the center in Lewisburg, are accredited by the National Children's Alliance. The remaining 15 centers are in various stages of development. By 2014, the network is projecting that all of its centers will be fully accredited. In addition to this year's funding, the Legislature has drafted its own criteria for certifying centers, which gives certain legitimacy to the organizations if they meet a certain set of criteria, which is very similar to the national criteria.

One of the criteria is that the center be a child-friendly place. In abuse cases, several agencies may be involved, such as child protective services, state police and prosecuting attorneys. Usually, this has meant that children who were victims of abuse were shuffled from interview to interview, having to retell their story over and over again. At the CACs, a child only has to tell his/her story once.

In an interview room, a trained forensic interviewer talks with the child. The entire interview is recorded and monitored in a neighboring room by closed-circuit television, where representatives of the MDT can watch and recommend follow-up questions for the interviewer to ask. The CACs have increased accountability for the interviewer, the police officers, the victims and even the offenders when a good investigation occurs.

The YS program was redesigned, and the new program was implemented in May 2006. The redesign brought YS in line with the family-centered practice philosophy. As a part of the redesign, the YBE was developed and provides a process to assess the child and family unit to implement targeted service planning upon the identified needs.

In the Harrison District, the circuit court has established the Harrison County Multidisciplinary Advisory Council. This group, which consists of representatives from mental health, education, probation, CASA, the Family Court Judge, etc., as well as from the Department, meets quarterly with one of the district's circuit court judges. The group is *issues and problems oriented*, and it seeks solutions to concerns presented by the judge(s) or by the participating agencies.

Effective April 17, 2008, the Department introduced a new independent living service that is available to children aged 16-21. Community Reentry is a three-phase service intended for youth to assist in preparing the children who may not be ready for the traditional transitional living model. In Phase I, the youth will be provided 24-hour, onsite supervision in a specialized group setting where they will learn skills such as job preparation, driver's education and basic

D003674

living skills.  Phase II will allow the youth to reside in an apartment setting but continue to receive more intensive supervision and oversight to meet their needs as they learn independence. Phase III will allow the youth to rent their own apartments with less intensive support from the providers.  Some of the youth will be eligible for Chafee services.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The stakeholders participating in the self-assessment workgroups including youth in care, foster parents, Department staff at all levels, treatment and service providers, and OPQI QA reviews identified needs similar to those identified in Round One of the state's CFSR.  In some instances, there continues to be an absence of adequate assessments, particularly identifying underlying problems such as substance abuse and domestic violence and, as a result, services provided do not consistently match the needs of the family.  Even though there has been an improvement in the assessment and provision of services for absent parents, paternal relatives, other caretakers residing in the home and foster parents, there continues to be a need to improve in this area.  The work being completed by the Court Improvement Board, in partnership with the Department, surrounding MDTs and case plans should improve practice in this area.

The barriers surrounding ASO services, provision of CAPS and transportation impact this item as well as previous items.  In addition to these barriers, others which impact this item were identified and include:

- Limited treatment services to address core issues of domestic violence, substance abuse, or sexual abuse

- Amount of reimbursement received by the treatment providers being identified as one of the reasons for the lack of sufficient providers across the state

- Quality of the services provided as well as the skill level of some of the providers

- A need for Spanish-speaking providers in the Eastern Panhandle.

Further training surrounding the individual services provided by ASO would be beneficial in assisting workers in the selection of appropriately matched services.

The YS policy redesign was intended to implement family-centered practice with the YS population and their families.  Youth Services workers continue to struggle in the assessment and delivery of services to the child and family unit as evidenced by the OPQI QA reviews and stakeholder feedback.  In some districts, the large caseloads carried by YS workers impede their ability to conduct timely assessments of all family members and, therefore, decreases their ability to provide necessary services to family members.  Generally, the assessments and services for the identified child are completed especially when the court is involved but successful services cannot be provided without considering the entire family unit.

D003675

Services related to drug treatment, mental health treatment, batterer intervention and domestic victim supportive services, sexual abuse treatment, independent living services and in-home services for both the child and parent(s) to prevent reentry into foster care are not readily available.   The Department has recognized the need for aftercare related to adoption, and effective February 1, 2008, aftercare services were included in the ASO service array.  It is the expectation of the Department that the availability of the new aftercare services will persuade more families to commit to permanent arrangements for children.    The Department has established a support network for adoptive/guardianship families through the ASO to allow access to services after the finalization of the adoption or guardianship.  This will provide a safety net for these families that may help to persuade them to make the decision to pursue adoption/guardianship since they are aware that services will be available to address future issues.

**Item 18:  Child and family involvement in case planning.**  How effective is the agency in involving parents and children in the case planning process?

**What do policy and procedure require?**

In both CPS and youth Services, it is required that the child (when age appropriate) and all family members be included in the Initial Assessment and Safety Evaluation or Youth Behavior Evaluation and the family assessment and case planning process.  Child and family involvement are required in the initial steps of the process and throughout the life of the case.  One of the primary purposes in involving the child and family in assessment and planning is to engage them in a problem-solving and helping partnership.

The MDT statute requires that the child, if deemed appropriate by the team, the caseworker, child's parent, guardian or other immediate family members, the attorneys representing the child and parent, a CASA (if applicable), a child advocacy center representative (if applicable), and a school official and anyone else who may represent the child or family be made part of the team.  Treatment teams assess, plan and implement a comprehensive, individualized service plan for the child, youth and family.

For in-home CPS cases, the treatment plan is to be developed within forty-five days after the completion of the initial assessment and safety evaluation and are to be updated every ninety days or in the event of a significant change in circumstances.

For details on case planning and the case review system for foster care cases, see Systemic Factor Section B.

D003676

**What does the data show?**

**TABLE 36: OPQI QA Review Results for Item 18**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 50 | 177 | 180 | 185 | 120 |
| % of cases rated a Strength | 50% | 31% | 61% | 76% | 69% |

Some of the decline in performance may be the result of a sampling methodology which required that YS non-placement cases be included in the open case sample. Non-placement YS cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006. Parental participation in case planning in youth services cases can be problematic and remains an area of concern. Involvement of fathers in case planning in CPS cases continues to be a challenge. There is currently no system to track data regarding case plans and if they are developed or updated within the required timeframes. There is an MDT participant report available for workers, children/youth, relatives and providers. The accuracy of these reports is dependent upon the completeness and up-to-date quality of the information entered into FACTS.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

During the 2002 CFSR, Item 18 was rated *Area Needing Improvement* in 50% of the applicable cases reviewed. Primary areas of concern were:

- The Department has not appropriately involved parented or children in the case planning process.
- There is a low participation rate by parents in the MDT meeting which have the objective of creating a working collaboration with the family.

**What positive changes in performance and promising practices have been made since Round One?**

As part of the PIP submitted May 2003, the Department made the commitment to ensure families are aware of their right to be involved in the case planning process through the utilization of the MDT and other case planning mechanisms and to develop a standard for documentation of child and family involvement in the case planning process into the WV SACWIS system. Case planning takes place in the family homes and during informal MDT meetings with families receiving in-home services. This case planning includes, but is not limited to, family members, in-home service providers, counselors, and education representatives.

As a means to ensure families are aware of their right to be involved in the case planning process through the utilization of the MDT process and other case planning mechanisms, the Department requires workers to provide, "A Parent's Guide to Working with Child Protective Services,"

D003677

which includes the parents rights and responsibilities during the CPS process.  Included in the rights and responsibilities is a bullet which states, "The right to be involved in the 'multi-disciplinary team' (MDT) process and refers them to pages 8 and 9 for a further description of the process.  The booklet also discusses case planning on non-placement cases stating, "You and your CPS worker will team up to make your home safer by:  setting goals, making plans to reach goals, put the plans into action."  The parents are asked to sign the Parents' form which indicates the contents of the guide was discussed with the CPS worker and that they understand the contents of the guide and to return the signed for to the CPS worker for inclusion in the case file.  There is another booklet for youth services containing the same basic information along with a parents' signature form.

The Department developed and distributed a brochure explaining the MDTs.  The brochure includes:

- What is a Multidisciplinary Treatment Team?

- Why Have an MDT?  It's Best Practice.  It's the Law.

- What is Accomplished during an MDT?

- MDT's help Everyone!  Advantages for the Family/Child.  Advantages for Team Members.

The section on "What is a Multidisciplinary Treatment Team?" includes the individuals who can be a part of the team.  Examples include:

1)	The child's worker
2)	Custodial parents/guardian
3)	Other family members
4)	GAL
5)	Child's attorney
6)	Prosecuting attorney
7)	Juvenile probation officer
8)	The child
9)	Foster parents
10)	A (CASA)
11)	Appropriate school official
12)	Domestic violence advocate
13)	Other persons/agency representative involved with the child or family.

Training was provided to staff related to the operation of effective MDTs in an effort to increase the involvement in case planning of the parents, child, caseworker and providers.  The foster parents receive MDT training as a part of the PRIDE pre-service training.

Every participant receives a notice of the date and time of the MDT meeting ten days in advance, and a copy of the notice is placed in the case file cabinet in FACTS.  A confidentiality statement

D003678

signed by all participants is kept in the paper case record. Many judges set the next MDT meeting at the conclusion of the court hearing.

Data is not presently available to document how often MDTs are conducted or who participates other than information obtained during the OPQI QA District reviews. The CIP has recently received a grant to evaluate the effectiveness and functionalities of the MDTs across the state and is working to standardize the MDT process. For details, please see Case Review Systemic Factor B. Some districts conduct MDT oversight meetings to discuss problems with the process and develop strategies to improve. These groups are generally made up of Department staff, prosecutors, circuit judges, board of education personnel and community stakeholders. The Department is working closely with the Court Improvement Board to develop consistency in the MDT process and to develop a case plan that will be accepted by the courts statewide. Also, as part of the individual district's PIPs, each CSM is required to meet with the circuit judges quarterly to resolve identified issues and to increase the usage of JANIS and JUDI. (For a definition of these acronyms these acronyms, see pg. 17.)

FACTS has a section designed specifically for MDT information. A new screen is completed for each meeting that includes the names of the participants, the outcomes/results and any identified barriers and workers can file the minutes of the MDT in the case file cabinet in FACTS as well as entering any other information in the case comments section.

Once a case is opened for in-home services, the worker is required to conduct a case review at least every ninety days and, at that time, update the case plan. Some offices conduct "unofficial" MDTs on their non-placement cases in an effort to work with the families utilizing all resources available. The parents, child(ren), caseworker, providers and, on occasion, school personnel are generally included in the informal meetings.

OPQI QA ratings documented a significant improvement in the workers' practice regarding the involvement of parents and children in case planning. With the implementation of a consistent MDT process and an accepted case plan, the ratings for Item 18 should continue to increase.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Stakeholders indicate caseworkers are distributing the Rights and Responsibilities, which are included in the Parent's Guide for both CPS and YS, but some are not consistent in their explanation of the case planning process, especially with regard to the family's involvement. Workers indicate they are more concerned with ensuring safety during the initial assessment and, as a result, fail to go into a great deal of detail regarding the Rights and Responsibilities and the Parent's Guide. Although the MDT brochure is available, some supervisors and workers are not unaware of its availabilityi.

More detailed information regarding MDTs, case planning and case reviews is located in the narrative for the Case Review Systemic Factor.

D003679

OPQI QA reviews continue to identify some in-home cases where the worker has limited contact with the parents and children, some families are ill-informed as to why the cases were opened or what steps were needed to close the cases. Quarterly case reviews are not consistently completed on in-home CPS cases. Also, adoption workers are not included in the MDT process prior to TPR in some districts, and the delay in their involvement has serious consequences with regard to achieving permanency in a timely manner.

OPQI program reviews and Stakeholders indicated MDT meetings are more effective in the districts where the judges correctly utilize the MDT process and have set aside days when court is not in session specifically for MDT meetings. Some districts have difficulty scheduling MDT meetings when days are not set aside, and participation at these meetings is sporadic.

In many districts, the CAPS provider and the caseworker met with the child and family prior to the MDT to discuss the assessment results and the recommendations for services. Stakeholders from every region reported CAPS providers do attend the MDT following the completion of the CAPS assessment.

Attendance by the providers varies considerably as documented by stakeholder comments and OPQI QA's. As of March 2008, ASO providers can be reimbursed for attending MDT meetings. There continues to remain a problem reimbursing psychologists, psychiatrists and therapists who are not ASO approved providers. In some instances the provider who actually works with the families or child/ren are not the ones who attends the MDT's, it is their supervisors who other designated staff person who attends.

Stakeholders and OPQI reviewers find utilization of the case plan in FACTS to be difficult and find the terminology confusing for workers, parents and children. The goal of insuring safety, permanency and well-being gets lost in the process and the plans become ineffective. Again, the Court Improvement Board in collaboration with the Department is nearing completion in the development of a case plan that will be incorporated into FACTS.

---

**Item 19: Caseworker visits with child.** How effective are agency workers in conducting face-to-face visits as often as needed with children in foster care and those who receive services in their own homes?

---

## What do policy and procedure require?

During the Initial Assessment of a CPS referral, the children must be visited within the specified timeframe based upon the allegations. If the case is in CPS Ongoing services, the caseworker must meet with the children in order to develop the Family Case Plan and Treatment Plan. After the Family Case Plan and Treatment Plans are completed, caseworkers must have monthly visits with the children.

For YS cases the, worker and the MDT must discuss the frequency of the contacts between the worker, the family and the juvenile. At a minimum, the worker should have monthly contact with

the family and the juvenile. The frequency could be greater depending on the needs of the family, the juvenile and the services they will be receiving.

If a child is in foster care placement, the child's worker is required to maintain contact with the child either by telephone or by face-to-face to assure the placement is meeting the child's needs. The child's worker will provide an opportunity for the child to have time alone with them during each visit to address any concerns or issues related to the child's needs or placement.

When the child is placed in the state, face-to-face visits are to occur within seventy-two hours of placement to assess the child's adjustment to the placement. Throughout the life of the case, face-to-face visits are to occur at least once during a calendar month. An exception to this is if the child is placed in a therapeutic foster home, which would be when a child is placed with a Specialized Foster Care Agency or placed in a Specialized Foster Family Home (Medley), the face-to-face visits are to occur twice during a calendar month. These visits are made by the worker for the specialized agency. The Department worker is also responsible for making face-to-face contact with children in specialized foster homes.

If the child is in a placement which is outside the state, then telephone or face-to-face visits are to occur within seventy-two hours of placement to assess the child's adjustment to the placement. Face-to-face visits and telephone contacts are to occur at least once during a calendar month during the time the child is placed out of state.

The majority of the required monthly visits are to occur in the child's foster care placement.

**What does the data show?**

**TABLE 37: OPQI QA Review Results for Item 19**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 50 | 177 | 180 | 185 | 120 |
| % of cases rated a Strength | 64% | 18% | 32% | 35% | 37% |

There was a slight increase in achievement on this item in the 2007 mini-review. This could reflect the state's response to the AFC Children's Bureau's initiation in September 2007 of tracking worker face-to-face contacts with children in placement. However, the tracking does not extend to children in in-home cases. Children in these cases may be seen in their homes frequently by community-based service providers, but Department caseworker contact with the children in in-home cases, particularly at the home for YS cases clients, remains considerably less frequent. The Department does have a report for worker contacts with children/youth in placement. The accuracy of these reports is dependent upon the completeness and up-to-date quality of the information entered into FACTS.

D003681

**Where was West Virginia's child welfare system in Round One of the CFSR?**

This item was rated as *Area Needing Improvement* during Round One of the CFSR. It was determined the frequency of caseworker visits with children was not sufficient to ensure adequate monitoring of the child's safety and well-being in 36% of the cases reviewed.

**What positive changes in performance and promising practices have been made since Round One?**

State policy was brought in line in 2007 to meet the most recent federal requirements for children in foster care with regard to worker contact. The policy also meets the COA standards. Reporting on the frequency of worker/child contact began in October 2007. See above-stated policy for minimum contacts required. Districts in all regions of the state have instituted Supervisory Case Tracking logs and systems to monitor the status of worker contacts with children.

Specialized foster care agency and ASO provider agency staff are able to document contacts with children utilizing FACTS PLUS which is a component of the FACTS information system. This practice has not yet begun in every region of the state, but it is the expectation of the Department that it will be a statewide practice within the next few months.

The Department also implemented a family-centered practice training curriculum following the first CFSR review, which emphasized the importance of teamwork and working in conjunction with families to reach a successful case outcome. All Department staff members, as well as the staff of private foster care providers, were required to complete the training.

Meaningful contact training was provided in every region of the state in 2007. The training curriculum includes structuring of visits to promote permanency and well-being. Critical thinking skills, particularly in the area of determining how to structure and schedule visits, were emphasized.

As a means to free workers' time to conduct face-to-face contacts and improve documentation, the Department is implementing the use of Dragon Software in some districts in the state. This is voice-recognition software that enables workers to complete documentation by speaking  Some districts also permit the use of protected time (time allotted without interruptions to document contacts in FACTS) for staff members so they may complete necessary documentation.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

Staff retention in all regions is an ongoing issue within the Department, and the resulting staff shortages have negatively impacted worker visits with children. Not all districts in the state have Reception Social Workers (responsible for all non-case specific social service inquiries), and as a result, each worker must spend time in the office as the worker of the day, which prevents them

D003682

from making visits in the field.  Workers are expected to fulfill administrative functions, such as taking referrals, which could be more efficiently performed by paraprofessionals.   Overtime is not consistently available for routine face-to-face visits.

Emphasis has been placed on safety; therefore, the available resources are shifted to do the initial investigation component of CPS and this negatively impacts the ongoing casework including face-to-face worker contact with children.  Ongoing workers are generally expected to complete new referrals received on their active case loads and are routinely expected to assist in clearing intake backlogs.  Stakeholders throughout the state have stated the primary emphasis for CPS in West Virginia is gauged toward crisis; that engaging in casework which meets best practice standards is impossible in the current environment.

OPQI QA reviews and stakeholders indicate that children are removed because of the worker's lack of contact and their inability to ensure child safety.  Also, reunification efforts/successes, service monitoring and provision are negatively impacted by the lack of face-to-face contact with children.  It is simply not possible for caseworkers to get a clear picture of the child's situation without visiting with the child in the child's place of residence.

Stakeholders express concern regarding the present policy that requires the primary worker to make the face-to-face contact with a child in a specialized treatment facility and find the requirement inefficient in meeting the needs of all clients due to the time involved.  Since most districts are small, workers are generally aware of their co-workers' cases, and therefore, stakeholders believe policy should allow one worker to conduct required face-to-face visits with the children from their district.  This would not preclude the need for the primary worker to maintain contact with the child by phone and during MDT's regularly or the need for the worker to make face-to-face contact that met the individual needs of the child.

Stakeholders indicate a problem with FACTS in tracking the face-to-face contacts.  If the workers select the incorrect type of contact utilizing the pick list, the visit will not be counted.  Also, if the worker is unable to enter the documentation during the required timeframes, the contacts will not be picked up on the reports.  This creates issues in regarding compliance with federal and state regulations and could result in penalties even though visits may be taking place as required.

A review of the system indicates workers are making face-to-face contacts more frequently than given credit, and the issue regarding contacts is workers do not know the appropriate place to document the visit in FACTS.  Training must address this issue in order to improve the accuracy of the data regarding caseworker visits.

**Item 20: Worker visits with parents.**  How effective are agency workers in conducting face-to-face visits as often as needed with parents of children in foster care and parents of children receiving in-home services?

D003683

**What do policy and procedure require?**

During the Initial Assessment phase of a CPS case, the caseworker must visit with the parents within the specified response time. If the case is open for Ongoing CPS Services, the caseworker must visit with the parents in order to develop the Family Case Plan and Treatment Plan. After the Family Case Plan and Treatment Plan are developed, Caseworkers must visit the parents monthly.

In YS cases, the worker and the MDT must discuss the frequency of the contacts between the worker, the family and the juvenile. At a minimum, the worker should have monthly contact with the family and the juvenile. The frequency could be greater depending on the needs of the family, the juvenile and the services they will be receiving.

If the child is in foster care, the child's Department worker must have contact with the child's parents once during a calendar month until termination of rights or until such time as the court orders the child into the permanent custody of the state until his/her 18th birthday and reunification is no longer an option.

**What does the data show?**

Department caseworker face-to-face contacts with parents was found to be a *Strength* in 51% (22 of 43 cases) of the cases reviewed during the 2002 CFSR onsite review. As an item rated *Area Needing Improvement in* 49% of the cases reviewed, Item 20 was addressed on the state's PIP.

The original CFSR baseline of 51%, a *Strength*, was re-negotiated in October 2004 based upon the results on this item during parts of the first and second rounds of WVCFSR reviews. The baseline was renegotiated to 12%, a *Strength*, and the renegotiated PIP goal was set at 17%, a *Strength*. The goal was achieved in February of 2005 (7th Quarter PIP Report). The original CFSR baseline was not met in any of the rounds of WVCFSR reviews.

**TABLE 38: OPQI QA Review Results for Item 20**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 43 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 51% | 13% | 23% | 35% | 23% |

Some of the decline in performance may be the result of a sampling methodology which required that YS non-placement cases be included in the open case sample. Non-placement youth services cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006. The report for worker contacts with parents is available, but it contains 2007 information. The accuracy of these reports is dependent upon the completeness and up-to-date quality of the information entered into FACTS.

D003684

**Where was West Virginia's child welfare system in Round One of the CFSR?**

Item 20 received a *Strength* rating in 51% of the cases reviewed resulting in a rating of *Area Needing Improvement* during Round One of the CFSR. Reviewers determined visits with parents were not frequent enough or of sufficient quality to promote the safety and well-being of children or enhance the attainment of permanency.

**What positive changes in performance and promising practices have been made since Round One?**

Since the completion of the First Round of the CFSR, the Department has modified their CPS policy to state that it is a requirement that the caseworker make regular contact with the clients in an open case "as indicated by the treatment plan, no less frequently than once per month."

Youth Services policy was revised bringing casework expectations in line with family-centered practice philosophy. Workers are expected to assess and provide services for the parents and siblings in YS cases as well as the identified child. The YS policy mirrors the CPS policy with regard to worker contact with parents.
Additionally, the positive changes in performance noted in Item 19 also positively impact Item 20.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance?**

Many of the barriers identified in Item 19 also have a negative impact on Item 20. Additionally, the following barriers have been identified for Item 20.

During OPQI QA reviews, it was noted that in many districts, caseworkers visit with parents at MDT meetings, and while this contact is important and beneficial, the fact remains that it is impossible to adequately monitor the progress in a case and, therefore, ensure the safety of children, without making visits in the home. Work with non-custodial parents is insufficient to meet the needs of the children. This lack of comprehension in regard to the significance of regular face-to-face contact with both parents may be attributed to inexperienced workers and supervisors, and a training curriculum has been developed to address the issue.

Stakeholders and OPQI QA indicate prior to the changes in YS policy in 2007, there was not an emphasis placed on working with the parents in these cases. Even with the policy change, workers struggle to see the parents monthly and routinely fail to work with non-custodial parents. Youth Services parents are not required by law to participate in services and many refuse to cooperate with the workers. In many instances, parents appear to view their child as the problem and want them "fixed" without taking any ownership of the problem or its resolution. This lack of cooperation with and participation in services leads to negative outcomes for some YS children who may either experience extended time in foster care placements or reentry into foster care.

D003685

The parent's participation and cooperation, or lack thereof, impacts workers' contacts in all CPS and YS cases.  Issues remain with clients avoiding workers and with transient clients, both instances result in multiple attempts to accomplish one visit.  A lack of consistent contact with a family may result in an increased rate of removal for children.  Reunification is delayed or can be unsuccessful as a result of infrequent face-to-face contacts with the parents.

**Well-Being Outcome 2:   Children receive appropriate services to meet their educational needs.**

> **Item 21:   Educational needs of the child.**  How effective is the agency in addressing the educational needs of children in foster care and those receiving services in their own homes?

**What do policy and procedure require?**

All children in placement are expected to attend school on a regular basis.  All children in foster care are expected to attend high school through graduation rather than quitting school and/or completing their GED.  Educational issues will be discussed during the MDT meetings and will be included in the child's case plan.  All foster children are expected to use the public education system to meet their educational needs.  The Department will not approve placing a child in a non-accredited school or educational program.  Education is the responsibility of the Department of Education, so workers should work with the local school system to assure that children are having their educational needs met.

When a child in foster care is in need of special education services, the child's worker will work with the child's parents, foster/adoptive parents, or Department caseworker to request the necessary services.  The Department of Education is required by law to develop an Individual Education Plan (IEP) for all children who need special education services.

A child in the care of the Department who has graduated from high school and has the interest and ability to pursue further education either in college or vocational school should be strongly encouraged to pursue their educational goals.  The Department may support youth who are continuing their education up to age 21 through the foster care program.  Youth over the age of 18 must voluntarily elect to remain in foster care by signing the SS-FC-18 in order to be eligible for continued foster care services.

As the result of Congressional legislation that reauthorized the Independent Living Program, re-entitled, *Chafee Foster Care Independence Program*, funding is being made available to states to assist with costs of higher education or vocational training for the following three categories of youths:

- Youth adopted from foster care after the age of 16 years,
- Youth who have aged out of foster care, * and
- Youth placed in legal guardianship.

D003686

- A youth discharged from foster care after the age of 18 years is considered to have aged out of foster care.

Former foster care youth who meet the above criteria are eligible to receive educational assistance up to $5,000 per calendar year through the Chafee Educational and Training Voucher. The money may be used to cover the costs of attending college or vocational training, including all expenses related to a course of study such as computers, special clothing, shoes or boots, books, housing, transportation, etc.

Youth who aged out of care at 18, are still enrolled and making satisfactory progress in an educational or vocational program on his/her 21st birthday, may continue to receive assistance until age 23.

Youth in foster care are eligible to receive tuition waivers for the purpose of attending a West Virginia public higher education institution. Within limitations of the governing boards, the waiver program is available to any youth who:

- Has been in foster care or residential care for at least one year prior to the waiver application

- Graduated from high school or passed the GED examination while in the legal custody of the Department

- Applies for the waiver within two years of graduating from high school or passing the GED

- Has been accepted to a West Virginia public higher education institution, and

- Applies for other student financial aid, other than student loans, in compliance with federal financial aid rules, including the federal Pell Grant.

The waiver covers tuition and fees after other sources of financial aid dedicated solely to tuition and fees are exhausted. The waiver does not cover room and board or the cost of books. In addition, tutoring services for children in foster care are available through the ASO.

**What does the data show?**

**TABLE 39: OPQI QA Review Results for Item 21**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | **32** | **177** | **180** | **185** | **120** |
| % of applicable cases rated a Strength | **75%** | **62%** | **67%** | **76%** | **69%** |

Some of the decline in performance may be the result of a sampling methodology which required that youth services non-placement cases be included in the open case sample. Non-placement

D003687

YS cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In the 2002 CFSR, the assessment of educational needs and the provision of appropriate services to children in foster care were rated A*rea Needing Improvement*.  The areas of needs and services for children related to Item 21 were based on the following observations and information found in some of the cases reviewed:

- Lack of consistency in assessment of educational needs throughout the state
- Lack of service provision to meet identified needs
- Absence of school records in case some files
- Failure to provide foster parents or relative caretakers school records at placement, and
- Utilization of foster parents as primary advocates for educational needs of the child.

**What positive changes in performance and promising practices have been made since Round One?**

CAPS and the Journey Placement Notebooks (see Item 6) are the primary strategies identified as a part of the PIP to improve the educational component of the assessment, case planning and collection of pertinent records.

The final CAPS report provides the worker with assessment results pertaining to educational needs including recommendations for further evaluation to determine appropriate educational needs and placement.

As previously stated in Item 6, the Journey Placement Notebooks are provided to foster parents when a child is placed.  The educational information in the Notebook will allow for a thorough history of the child's educational progress during his/her time in foster care.

A formalized process for sharing educational records was attempted at the state office level, but attorneys for the Department of Education and the Department of Health and Human Resources were unable to reach agreement.  In April 2008, the regional attorneys were provided a template to be used on the district level in the development of a memorandum of understanding between the local Boards of Education and the Department.  Stakeholders indicated most districts across the state have developed good working relationships with their school systems and other identified stakeholders in an effort to improve communication and service delivery related to educational issues.

The Greenbrier,/Monroe/ Pocahontas/Summers District has an excellent relationship with the area schools.  The district conducts what they have termed, "courtesy MDTs" with the school systems.  These MDTs are for children identified by the school as having major truancy issues. It is the first step in trying to avoid a truancy petition from being filed.  The MDT includes the

D003688

parent, the child, school personnel and the attendance director to evaluate what is the root cause of the truancy. In some situations, services are offered, and other times, it is providing the family with information about services in the area.

Harrison District has developed a grant-funded program aimed at assisting educationally at-risk youth. The program takes place in the schools and youth are released from part of their school day to participate. The Harrison County Child Abuse Task Force worked with the district to create all of the CPS investigation protocols used when interviewing children at the schools. The Task Force and the district collaborated to develop a CAC for the County. The CAC provides a facilitator for all district MDT meetings.

In Monongalia County, the Department, the Board of Education, the prosecutor, circuit judge and other cooperating agencies worked together to implement relevant approaches to address children's educational and behavioral issues. These partnerships include the Teen Court, the Assessment and Referral Team, the MDT Oversight, the Truancy Center, the Truancy Diversion Task force and The Gang Task Force.

Due to the collaborative efforts between the Department and the Boards of Education, overall strength ratings for Item 21 are remaining consistent.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Stakeholders express concern over their inability to access CAPS services in a timely manner and think the process to be ineffective in many instances with regard to obtain educational records and in the case planning process.

Stakeholders and OPQI QA found that Journey Placement Notebooks are underutilized across the state and indicated they are sporadically used during MDT meetings. School personnel, who have the firsthand information regarding the children, do not participate consistently in MDT meetings. Residential placement providers are not required to maintain the Journey Placement Notebooks. State licensing requirements for Residential Facilities 78-3-14.7.d.14 and 78-3-14.10 require providers maintain their own files regarding educational planning and services for each child in placement. Department workers are required to obtain a copy of the information from the providers. Occasionally, the information is not obtained, and this may result in a loss of educational information.

Information obtained from Stakeholders and OPQI QA data indicated workers are continuing to rely on foster parents and specialized placement agencies to advocate for the educational needs of children. OPQI review results indicate an inconsistency in assessing and arranging for educational services to meet the needs of the children receiving in-home services. Stakeholder feedback indicates in-home workers are infrequently invited to attend IEP meetings for the children who have educational issues and believe this is primarily due to the lack of communication with the parents and the school personnel.

D003689

Stakeholders identified a need for funding and resources for educational services such as tutoring and expressed concern regarding the time involved in the referral process for special education services. The quality and quantity of services available through the school system varies across the state. Some run multiple afterschool programs, have special education and tutoring services readily available, while others have little to no services available for the children in need of educational support. Tutoring is a service offered through ASO; however, according to APS Healthcare data, only 13 children statewide were referred for tutoring services. This lack of referrals is suspected to be due to lack of providers.

Stakeholders expressed a need to increase their understanding of the laws, rules and regulations governing the Department and the Board of Education, as well as developing a working knowledge of the various programs offered by each agency. They recommended ongoing cross training and collaboration between the Department and the Board of Education on the district level involving teachers and workers as a means to reach this goal.

There continues to be individual schools and a limited number of county boards of education where the Department and school personnel have not worked out their problems related to communication and sharing of information.

**Well-Being Outcome 3: Children receive adequate services to meet their physical and mental health needs.**

**Item 22:  Physical health of the child.**  How does the State ensure that the physical health and medical needs of children are identified in assessments and case planning activities and that those needs are addressed through services?

**What do policy and procedure require?**

Enrollment and participation in the Early Periodic Screening Diagnosis and Treatment Program, known as HealthCheck, is a requirement for every child in foster care. An initial HealthCheck appointment is required at the time a child enters placement. The appointment should be scheduled and completed within seventy-two hours of the child entering placement. During the initial appointment, it may be determined that a child is in need of additional follow-up appointments, specialized appointments or dental and eye care. If these medical services are needed, the worker is responsible for assuring that the child receives these medical services.

West Virginia Birth to Three must be considered for all children under the age of three who have been identified as experiencing or at risk of developing substantial developmental delays or atypical development patterns; or have been determined to fall under an at-risk category. Children who have been placed in the custody of the Department due to a substantiated report of maltreatment or at risk of maltreatment must be referred to the Birth to Three Program.

Routine dental care is provided to children in foster care through the EPSDT, HealthCheck program. All foster children are to be referred to a dentist by the time they are three years of age

D003690

for a yearly checkup and dental services as prescribed by the dentist.  Every child shall be immunized against childhood diseases including whooping cough, mumps, tetanus, diphtheria, polio, measles, and rubella as recommended by the Bureau of Public Health.  Routine eye care is provided to children in foster care through the EPSDT, HealthCheck program.  All foster children are to be referred to an optometrist by the time they are five years of age for a yearly checkup and eye care services as prescribed by the optometrist.

The majority of children up to the age of 21 who come into the custody of the Department and are placed in foster care may be eligible for Continued Medicaid coverage upon discharge from a foster care placement.  Children in the following placement types may be eligible for Continued Medicaid coverage:

- DHHR foster/adoptive homes
- Therapeutic foster/adoptive homes
- Specialized family care (Medley)
- Group residential, psychiatric hospitals
- Psychiatric treatment facilities
- Medical hospitals
- Trial adoptive homes
- Transitional living
- Emergency shelter care
- Family emergency shelter care
- Schools for children with special needs (Romney School).

A child's eligibility for Continued Medicaid coverage is initially determined by placement in one of the above mentioned settings and how they are discharged from care.  They are eligible for Continued Medicaid coverage from the date of placement for a continuous period of twelve months whether or not they remain in placement.  Eligibility will be re-determined during the child's one-year anniversary month, which is the child's initial placement month.  For a child to be eligible for another twelve-month episode, they must be in a foster care placement and in the custody of the Department.

Foster/adoptive parents shall ensure the foster child(ren) in their care receive all necessary comprehensive health screens as required by the Early and Periodic Screening, Diagnosis and Treatment (EPSDT) program; i.e., HealthCheck.  In addition, it is further agreed they will maintain records of all such screens and ensure the child(ren) is/are scheduled for and receive all necessary follow-up medical, dental, optical or psychological treatment as prescribed by screening provider.  Foster/adoptive parents shall notify the Department if foster child(ren) in their care requires hospitalization or surgery, whether it is an emergency or a non-emergency situation.

A child's physical health is assessed during the initial assessment and again during the family assessment.  If a physical health concern is not the reason or related to the reason the Department is involved and if there are no physical health needs noted, physical health is not addressed in the treatment plan.  Physical health needs should be reassessed during each home visit and at case

evaluation.  Medical records and information is kept in the case file.  Foster/adoptive parents shall document or maintain documentation of the child(ren)'s medical care in the child's Journey Placement Notebook.

**What does the data show?**

**TABLE 40: OPQI QA Review Results for Item 22**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
|---|---|---|---|---|---|
| # of cases | 38 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 82% | 67% | 75% | 91% | 81% |

Some of the decline in performance may be the result of a sampling methodology which required that YS non-placement cases be included in the open case sample.  Non-placement YS cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted between 2003 and 2006.  There was no distinction made between foster care cases and in-home CPS cases when compiling the data.  The Department is interested in exploring this further.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In the 2002 CFSR, the assessment and provision of physical health needs was rated A*rea Needing Improvement*.  This item rated *Strength* in 82% of the applicable cases.

Primary issues identified in the applicable cases reviewed for Item 22 are:

- Lack of a comprehensive health assessment at entry into foster care (and there was a critical need for that assessment)
- Failure to address identified child health issues
- Lack of documentation about the child's health status and preventive care in the case file
- Lack of service provision to meet identified needs.

**What positive changes in performance and promising practices have been made since Round One?**
Utilization of the CAPS program and the use of the Journey Placement Notebooks were identified in the state PIP as ways to improve the physical health assessments and case planning for the children.  These tools would also improve the documentation of services provided.

A recent policy change requires an EPSDT within seventy-two hours after the child enters foster care.  This policy change not only brings West Virginia in compliance with COA standards but also exemplifies best practice with regard to assessing the health of the children in a timely manner.

D003692

West Virginia is providing preventive and treatment services for the children through a variety of programs such as:

- WV Birth to Three
- Kiddie Fairs
- Title XIX Waiver Program
- Children with Special Health Care Needs
- Adolescent Pregnancy Prevention Initiative
- CARESS (Birth Defects Surveillance)
- WV Children's Health Insurance Program (WVCHIP)
- Early Childhood Health Project Immunization Program
- Newborn Metabolic Screening
- Medicaid
- WV Right from the Start Project
- Women, Infants and Children (WIC) Program
- Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) Program.

A collaborative approach to meeting the dental care needs of children is underway in the Berkeley/Jefferson/Morgan District.  Since October 2007, over 400 children have received care through the Healthy Smiles Initiative.  The children receive dental exams, cleaning and fluoride treatments and if the child is between the age of six and 8, sealants.  The service sites are Pre K, Day Care Centers, Head Start and the three local Department offices.  The district is working to establish a permanent dental clinic for children and adults within the next 12 months.  This clinic would accept CHIP and Medicaid, and fees for others would be on a sliding fee scale.  In most districts, the Lions Club will provide glasses for children who are not insured.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The barriers discussed in previous items related to CAPS and Journey Placement Notebooks also impact Item 22.  CAPS has been somewhat effective in assessing and collecting health care information in YS cases but does not address the assessment and service needs of in-home and CPS placement cases.  OPQI QA reviews identified a lack of assessment and follow-up of health issues with children who receive in-home services.

The stakeholders indicated pediatricians are available across the state, but health, vision and dental care specialists are located primarily in the larger metropolitan areas of Charleston, Huntington, Beckley, Parkersburg and Morgantown.   There is a shortage of dentists, ophthalmologists and optometrists across the state who will accept the Medicaid card.  Children who reside outside the metropolitan areas must endure several hours of travel to receive care.  There is little to no availability of public transportation.

Workers continue to struggle with documentation of medical information in the case file as evidenced by OPQI reviews.  Some workers have difficulty obtaining information due to the

D003693

stringent HIPAA regulations, especially regarding in-home cases when the Department does not have legal custody of the child.

OPQI review findings indicate relative placement providers are not consistently informed of the requirement for the initial HealthCheck screening and the providers often fail to keep workers informed regarding the child's medical treatment.

| **Item 23:   Mental/behavioral health of the child.**  How does the State ensure that the mental/behavioral health needs of children are identified in assessments and case planning activities and that those needs are addressed through services? |
| :--- |

**What do policy and procedure require?**

Most children in foster care will be in need of mental health services.  A referral shall be made to the Regional Child Specialist at the local Community Behavioral Health Center or through the staff of the specialized foster care or group/residential facility for an assessment.  The results of the evaluation will then be used as the basis for arranging subsequent psychological or psychiatric services that may be needed.  The child's treatment/case plan is developed by the MDT.  Additionally, the initial HealthCheck screen and CAPS may also assess the child's mental health needs.

Many youth enter foster care with substance abuse problems.  For others, this diagnosis is made after the youth is already in foster care.  Whenever it is suspected a child may have a problem with substance abuse, a referral shall be made to the Regional Child Specialist at the local Community Behavioral Health Center for an assessment.  The results of this assessment must be incorporated into the child's treatment plan.

Also, children receiving in-home services identified as having substance abuse or other mental health issues are to be referred to their local Community Behavioral Health Center for assessment, and the results of those assessments are to be incorporated into the family case plan.

**What does the data show?**

**TABLE 41: OPQI QA Review Results for Item 23**

| Review Year | 2002 | 2003-2004 | 2004-2005 | 2005-2006 | 2007 |
| :--- | :---: | :---: | :---: | :---: | :---: |
| # of cases | 32 | 177 | 180 | 185 | 120 |
| % of applicable cases rated a Strength | 63% | 53% | 62% | 72% | 63% |

Some of the decline in performance may be the result of a sampling methodology which required that YS non-placement cases be included in the open case sample.  Non-placement YS cases were not included in the samples for the three complete rounds of OPQI QA reviews conducted

D003694

between 2003 and 2006.  There was no distinction made between foster care cases and in-home CPS cases when compiling the data.  The Department is interested in exploring this further.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In the 2002 CFSR, the assessment and provision of mental health needs was rated as A*rea Needing Improvement*.  This item rated *Strength* in 63% of the applicable cases.

Primary issues identified in the applicable cases reviewed for Item 23 are:

- Lack of a comprehensive mental health assessment at entry into foster care (and there was a critical need for that assessment)
- Failure to address identified child mental health issues
- Lack of documentation about the child's mental in the case file
- Lack of service provision to meet identified needs related to in-home services case.

**What positive changes in performance and promising practices have been made since Round One?**

The state PIP identified utilization of a modified Supervisor's Monitoring Log as a means to document that mental health issues are being discussed with the worker and that appropriate referrals and follow-up are taking place.  Other PIP items included the development of a handbook for MDT participants that incorporated information related to the mental health needs and services for the child, the utilization of CAPS and the Journey Placement Notebook.

The Supervisor Monitoring Log is used in monthly conferences, and the logs bring attention to the mental health needs of the children.

The MDT Pamphlet was developed and information pertaining to MDT's is included in the PRIDE foster parent training.

CAPS is utilized with YS placement cases to gather prior mental health testing and results, obtain current psychological information, and make recommendations to meet the child's mental health needs.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

Meeting the children's mental health needs is a challenge throughout West Virginia as there continue to be deficiencies in the array, quality and quantity of treatment services.  The stakeholders expressed concern regarding the thoroughness of mental health evaluations and the ability of the therapists to address issues related to child abuse/neglect and adoption.  Mental health providers who attended the workgroups expressed concern regarding their ability to attract

D003695

and maintain qualified staff, especially child psychiatrists, psychologists and qualified therapists specifically trained to handle childhood trauma issues.  When evaluating case planning and provision of treatment services during OPQI reviews, reviewers frequently found the treatment services provided surrounded the individual behaviors, not their causes.

Stakeholder feedback and OPQI data indicate Supervisor Tracking Logs are not being utilized consistently by supervisors as a tool to identify if children are receiving mental health assessments or to determine if caseworkers are implementing mental health recommendations. Some workers need assistance in developing their knowledge of the various mental health assessment tools in order to select the specific assessments needed for their clients.  More training surrounding the various mental health diagnoses would be beneficial.  This training should be "on-the-job" training utilizing local treatment providers to improve networking and communications and to apply information to specific cases in order to assist workers in their ability to apply the new skills as they are developed.

Policy outlines the requirements and the need for formal and informal mental health assessments for both in-home and placement cases.  According to stakeholders, the deficit in the array and quality of mental health services for children results in their inability to meet those requirements in a consistent and effective manner.

OPQI QA results indicate that workers continue to rely heavily on placement providers to initiate mental health services and provide follow-up for the children in placement.  Most specialized placement facilities incorporate mental health services as a part of their treatment plans.  Reports from the placement facilities vary in the quality and quantity of information.  In most instances, reports will state the dates of individual and group therapy but no information regarding the treatment modality, objectives or goals related to treatment.

## Section IV – Systemic Factors

### A.  Statewide Information System

> **Item 24:  Statewide Information System.**  Is the State operating a statewide information system that, at a minimum, can readily identify the status, demographic characteristics, location, and goals for the placement of every child who is (or within the immediately preceding 12 months, has been) in foster care?

**What do policy and procedure require?**

The Families and Children Tracking System (FACTS) is a comprehensive case management system for social workers to strengthen the documentation of case activity for the families and children served by the Bureau for Children and Families.  The primary goals for the system are to improve:  the organization's capacity for program compliance and planning; the collection information for state and federal reporting; program quality assurance efforts; case record

West Virginia Statewide Assessment

management; information collection and analysis of the information that promotes the goals of safety, permanency and well-being; and the accounting of state and federal financial supports.

The following identifies the significant discrete data that is tracked in FACTS within the Intake, Investigation, Case and Client focuses.

**Intake Status**

- Intake date and time
- County of incident
- Household name
- Household address
- County of residence
- Household residence and business phone numbers
- Employment and employer name
- School and school Name
- Alleged maltreatment category and type
- Name of alleged maltreater
- Location of the child
- Reporter name
- Reporter address
- Reporter phone number
- Response time indicators
- Intake screening decision
- Date and time of the decision

**Investigation Status**

- Date of response
- Risk assessment decision
- Risk assessment decision date
- Safety plan creation
- Safety plan services
- Frequency and duration of safety services
- Safety plan decision date
- Maltreatment findings
- Identification of the maltreater by maltreatment type for each child
- Investigation decision
- Date and time of investigation decision

**Case Status**

- 15 of the past 22 months

D003697

**Client Status**

- Active client in an opened record with start date
- Inactive client in an opened record with end date
- Active client in a closed record with start date
- Inactive client in a closed record with end date
- Legal custody (both legal and physical custody)
- Begin and end date of legal and physical custody
- Begin and end date of voluntary placement agreements
- History of removal and custody episodes

**Client Demographics within All Focuses**

- Name
- Approximate age or birth date
- Address
- Participation as a child
- Role in case
- Gender
- Maiden name
- AKAs
- Relationship to each case member
- Race
- Ethnicity
- Current living arrangement
- Current location

**Placement Status**

- Permanency plan
- Concurrent permanency plan
- Creation date
- Estimated completion date
- Placement recommendation
- Placement plan
- Placement provider demographics (name, address, phone number, type of provider)
- Current placement episode
- History of all placement episodes including caretakers with specialized care agencies
- Entry date and time
- Exit date and time
- Provider type
- Provider name
- Provider identification number

D003698

- Provider address
- Provider phone number

**Court Status**

- Court petitions
- History of court petitions
- Petition dates
- Hearings associated with each petition
- Hearing dates
- Hearing types
- Court orders associated with each hearing
- Court hearing outcomes including court review, judicial review

**Permanency Review**

- Improvement period details
- Adjudication details
- Multidisciplinary case planning and case review meetings.

The state may want to include whether or not the system can readily identify the status, demographic characteristics, location, and goals for every child in foster care.

The overall goal of FACTS is to create a system that supports social workers in the execution of their job while being able to satisfy the reporting needs of the federal, state and the Department administrations.

Data tracking begins at intake and follows each case/client until conclusion.  All intake, investigation and case tracking includes the following:  safety evaluation and planning; investigations; assessments; court procedures with the status at each juncture; foster care processes including multidisciplinary planning, administrative/court/judicial review processes and placement activity; adoption processes plus case level; and client specific demographic information.  In 1999, FACTS was modified to meet the Adoption and Safe Families Act requirements regarding permanency planning with concurrent permanency planning, aggravated circumstances, placement safety, and length of time in care related to 15 of the last 22 months.  To this end, FACTS is increasing the state's ability toward ensuring the safety, well-being, and permanency of children are accomplished.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

In Round One Item 24 "was rated a *Strength*, because the West Virginia FACTS is a SACWIS certified system and submits AFCARS and NCANDS data without error.  Stakeholders are supportive of FACTS and are encouraged by the improvements it has brought to child welfare in West Virginia, but stakeholders also pointed out data input problems, staffing limitations and

D003699

training needs.  While the state's system is able to track the status, demographic characteristics, location, and goals for children in foster care, the onsite review and the Statewide Assessment both identify concerns regarding the accuracy of the data relating to some of the national standards."

**What positive changes in performance and promising practices have been made since Round One?**

With an ever increasing need for expedited acquisition of data and enhanced data quality, FACTS is implementing several major initiatives.  Each one of the projects identified focus on the data quality, data integrity and data sharing.

1) The FACTS client server application for child welfare is being migrated to a web application. All changes or enhancements to the current application are now presented as web forms. Even though those changes are integrated with the current client server application, this method begins the change management process to the new application, new navigation and new presentation layer.  User interaction studies are taking place that allow user feedback and recommendations for the system before it is deployed statewide.

2) Based on the state's new CPS model and process, FACTS is developing that model through a web application.  This will be integrated within the existing application but also permits staff to access and update the system via the internet.

   The CPS projects described below are the first four phases of an application wide modernization project for FACTS.  This project is the development of a new internet application for all children services functionality currently in the client/service application. This project will be divided into many smaller projects that will span over a few years.

   During the 2002 Child and Family Service review, West Virginia CPS was found not to be substantially in compliance with two of the safety outcomes on which it was evaluated.  In response to this, DHHR Bureau for Children and Families set about re-engineering the current Initial Assessment, Institutional Investigation Unit, Family Assessment, Safety Assessment and Treatment Planning business processes.  A new Safety First Protocol was initiated to improve the identification and responses to safety issues within families.

   Likewise, the current Child CPS Assessment, Institutional Investigation, Family Assessment and Treatment Plan business processes were modified to improve assessment and service delivery to families.  Additionally, a differential response was also initiated as a preventative measure, designed to provide supportive services to children and families who are at risk of abuse/neglect but do not rise to the level of being unsafe.

   The primary focus of the first phase is to enhance the FACTS application to include the current CPS functionality to meet changes in the CPS business process.  Major enhancements include streamlining the system to coincide with the changes in the Bureau's business

**D003700**

process, including web enabling the CPS Intake, CPS Investigation/ Initial Assessment, Institutional Investigation, Safety Assessment and Family Assessment/Treatment planning. This will improve staff accessibility while maintaining, preserving, and leveraging existing business rules, assets, reports and database.

Web development will include setting up the system infrastructure, developing a prototype of the application, the application itself, system securities, system navigation, application and management reports and providing data to other entities through various interfaces.

Changes to the current business process necessitate sweeping changes to the CPS Institutional Investigative area of the application. The focus of this project is to replace the current CPS Institutional Investigation area of FACTS with a new browser-based CPS Institutional Investigation area. This project entails the creation of new browser-based screens that are accessible to the user via a secure web application and also through the Powerbuilder Application. This includes the coding of new application management reports that will replace existing reports.

Due to the changes in the business process, the current safety assessment in FACTS will be replaced with the WV Safety First Assessment protocol. The primary focus of the second project is to automate the new WV Safety First Safety Assessment, In-Home Safety Plan and Out-of-Home Safety Plan in FACTS. This project entails the creation of new browser-based screens that are accessible to the user via a secure web application and also through the Powerbuilder Application. This project will include the creation of new application reports and management reports.

The primary focus of the third project is to replace the current CPS Investigation functionality in FACTS to meet changes in the CPS business process. This project entails the creation of new browser-based screens that are accessible to the user via a secure web application and also through the Powerbuilder Application. This project also includes the rewriting of existing application reports and management reports, as well as the creation of new application and management reports.

The primary focus of the fourth project is to replace the current CPS Case Management Ongoing functionality in FACTS to meet changes in the CPS business process. This project entails the creation of a new module in the new Child Welfare browser-based screens that are accessible to the user via a secure web application and also through the Powerbuilder Application. This project also includes the rewriting of existing application reports and management reports, as well as the creation of new application and management reports.

3) FACTS has implemented two new mobile methods and devices that permit updating data in a "disconnected computing" mode through the use of Tablet PCs and Digital Pens, This is known as "FACTS to Go." The primary goals for "FACTS to Go" are to increase productivity, reduce documentation time, and positively impact data quality.

D003701

Tablet PCs synchronize with the central FACTS database and allows users to send records to a local database for offline work while they are away from the office. The primary users of "FACTS to Go" are CPS Workers and Foster Care Social Services Workers.

Most of the essential functions in CPS, Adoption, Foster Care, and Youth Services are completed away from the social worker's desk and their desktop computer. Through the use of Tablet PCs and "Disconnected Computing," the following is realized:

a. Supports a business need to provide offline work capability
b. Disconnected computing allows staff to capitalize on "wait time" away from the office.
c. Allows the capturing of field data accurately at the point of activity during interviews, home visits, court hearings, provider assessments, and multidisciplinary meetings
d. Disconnected computing allows for flexibility with work schedules.
e. Disconnected computing provides offline access to FACTS.
f. Based on metrics, Disconnected Computing Increases worker productivity.
g. Disconnected Computing can reduce staff stress related to documentation.
h. Disconnected Computing eliminates duplication of effort and saves a considerable amount of time (use of the PC Tablet saved 30-45 minutes per record and reduces the length of time by 50% between the time the data is collected and updated in the system).
i. Work is more efficient.
j. Data is more accurate and precise.
k. Integrates easily into existing business operations of the Bureau.
   1. Seamless field data workflow
   2. Improved data processing efficiency
   3. Improves ROI by providing an effective means to capture field data accurately at the point of activity.

**Screens available for update on the Tablet PC Available for "Disconnected Computing:"**

**In the Client screen and related Client Demographics screens:**
General Information screen
Client address screen
Telephone numbers screen
AKA screen
Characteristics screen
Marital/Cohabitation Screen
Client Relationships screen

**In the Client Education/Employment Screens:**
Employment screen
Education screen
Military screen

D003702

**In the Client Finances screens:**
  Income Information Screen
  Assets Screen
  Client Debt Screen

**In the Clients Medical screens:**
  Medical Background screen
  Medical Appointment screen
  Psychological Evaluations screen
  Medications screen
  Immunization screen
  Client Disabilities screen

**In the CPS Initial Assessment, Access to all fields in the following tabs:**
  Maltreatment Tab
  Child Force Tab
  Adult Functioning Tab
  Parent Force Tab
  Aggravated Circumstance Tab
  Family Force Tab

**In the CPS Findings Screens:**
  Maltreatment Tab
  Findings Tab

**Other Screens:**
  Collateral Information screen and related Tabs
  Assessment Notes screen
  Initial Assessment Conclusion screen and related Tabs
  Incomplete Assessment Closure screen
  Contacts Screen

**Through the use of Digital Pens, the following is realized:**

  a. Bridges the gap between paper documentation and electronic record keeping
  b. Eliminates lost paperwork
  c. Enhances data accuracy
  d. Increases traceability.

  l. FACTS is beginning the creation and development of a "Data Mart" for the Bureau for Children and Families Management. This permits the ability for a more rapid watch of the data, provides visual dashboards with data that is closer to "real time" and allows for the data to be rolled up in order to measure outcomes but allows for "drill down" and "drill in" capability of the data to the region, district, unit and worker level. Through the use of Business Intelligence and Performance Management Software, the development of

D003703

a data mart can meet specific data needs that facilitate the analysis and presentation of data through the use of software tools. Users of a data mart can expect to have data visualized and with terminology common to the user community. This initiative will allow focus on the major business priorities and objectives of the Bureau for Children and Families.

"A data mart is a subset of an organizational data store, usually oriented to a specific purpose or major data subject that may be distributed to support business needs. Data marts are analytical data stores designed to focus on specific business functions. Data marts contain a snapshot of operational data that helps a business or organization to strategize based on analyses of past trends and experiences." [1]    Wikipedia

m. As required by WV State Statute and Bureau for Children and Families CPS policy, the Department is required to notify law enforcement of serious physical injury, sexual abuse and/or sexual assault allegations received by the Department and accepted for assessment. To ensure compliance with state statue and BCF policy, enhancements will be made to the FACTS application to capture and facilitate electronic notification to the West Virginia State Police of all these allegations. This project also includes the creation of a new web service that will be made available to the West Virginia State Police to receive notification and updates for qualifying allegations.

n. The Automated Placement Referral project is sponsored by Secretary Martha Walker's Commission on the Out-of-State Placement of Children. FACTS is charged with the goal of standardizing and automating the placement referral data used to refer children to Group Residential or Long-Term Psychiatric facilities. FACTS will also track the time it takes to affect the placement and any information requests made during the placement referral process. The goal is to have meaningful data about the treatment needs of children in our care, the treatment capacities of in-state providers, the availability of these treatment facilities and the time it takes for both the caseworker and provider to make these placements. This project will include the development of a web application module, changes to the client server application and modifications to the web FACTS Plus application (FACTS Provider Lookup System). Management reports will be developed to share the data with the Commission, BCF and the provider community.

o. As part of the Supreme Court Improvement Board, a uniform case plan and format was agreed upon by the Bureau for Children and Families and the Supreme Court of Appeals. This project involves the development of a new internet application and web services to electronically transmit the Family and Child's Case Plan to the courts.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The FACTS application is very robust and permits tremendous flexibility for ongoing reporting. There are several types of reports generated from FACTS, Management Reports, ad hoc reports, Federal AFCARS and NCANDS Reports, and application reports (online, DDE, and summary

D003704

reports). Even though there are many ongoing management reports created, ad hoc reporting needs continue at a very high volume.

Management Reports are accessible to all levels of staff (managers, program staff, supervisory staff and social workers). The purpose of the ongoing reports was to provide current information, consistently throughout the regions, to discontinue hand counts, and to relieve the reporting burden for social workers. Despite the easy access to reports and the large number of available reports, social workers still complete, and are required to complete, reporting outside of the system. There are several scenarios that lead to this requisite:

- Reporting needs varied by region
- Lack of confidence in the reporting results
- Inability to understand results and structure of the reports
- Slow movement toward changing business methods and processes
- Consideration and understanding of the data regarding outcomes vs. compliance standards
- Reporting software limitations for a visual representation of the data.

Data quality, data completeness and data integrity continue to be an ongoing challenge. Data needs remain localized, perhaps to a specific region or district and non-standardized. There appears to be inconsistent application and inconsistent definitions of data that drive differences in usage.

To offset this issue, there have been several initiatives. Report purposes and application data mapping is now accompanying many reports; data is presented in spreadsheet formats in order for the user to tailor the representation of the data; reports were distributed to field staff for testing, auditing and feedback; and meetings and training were conducted with program managers and supervisors to explain the reports and assist them with understanding report utilization. However, this has not produced a significant result in eliminating or reducing hand counting nor adjusting the confidence in system produced reports.

A BCF Management Report Group is currently in the process of reviewing and overhauling existing FACTS Management reports. This group is also to identify new management reports to be developed. These reporting changes are needed due to changing business practices and will help staff manage workloads and help management measure worker performance, as well as to measure district and/or regional performance. Report data is being used to indicate program outcomes, measure service delivery and to document efforts/activities. This endeavor includes the redevelopment of many of the existing intake, investigation, case, provider and management reports, as well as the addition of new reports.

Joint Application Design sessions with field staff and stakeholders are now planned in such a way that reporting needs are identified early in the process as opposed to after the system enhancement is developed. This allows for users to structure the data and data collection in a way that the system will facilitate reporting requests.

D003705

One of the most key mistakes made prior to FACTS implementation was the promise that an automated system would decrease a worker's time with case documentation. Therefore, this would inversely increase the time available for direct service provision. In the minds of the field staff, this result has not come to realization. Additionally, this representation no longer has a valid base, but overcoming this assertion continues to be challenging.

With the implementation of FACTS, many system supports and management tools were developed that did not previously exist or were completed through individual controls. However, efforts continue, and changes are being made to increase the system functionality so that there will be greater ease in use and to advance the "user friendliness" of the application. Examples of the system changes due to this perception are:

- Increasing summary areas
- Adding more "shortcuts" to other screen locations
- Adding and updating multiple records with one entry
- Reducing the number of screens by combining functions to only one screen
- Changing system navigation that will now lead the worker through processes
- System search, identification, and matching of duplicate clients, and
- Report development with the inclusion of application reports for "real time" data.

Field involvement with the system modifications and recommendations is vital. There are many channels of communication that are provided to the field for this purpose, including:

- Reporting enhancement requests through the Help Desk for tracking and consideration
- Feedback from field support staff and system trainers
- Ongoing meetings with field staff, supervisors, and program managers
- Early involvement of field staff in Joint Application Design meetings
- Use of Webinars to demonstrate system modifications, and
- Creation of Internet Share Point sites that permits shared reviewing of system documentation and also allows for user discussion threads.

A direct channel of communication with the user related to system functionality and use is through worker training. Since New Worker Training is provided by a centralized training staff, system training concentrates on functions and is integrated with the specific policy training. This provides a tie and connection between the casework processes and system processes. Refresher training and specialized training, such as Supervisory Management in an Automated System, are also provided on an ongoing basis.

## B. Case Review System

> **Item 25:  Written Case Plan.**  Does the State provide a process that ensures that each child has a written case plan, to be developed jointly with the child, when appropriate, and the child's parent(s), that includes the required provisions?

D003706

**What do policy and procedure require?**

Both West Virginia law and Department policy require that a case plan be developed for the child and family in MDTs.

WV Code §49-6-5(a) requires the Department to file a child's case plan, including a permanency plan, following the court's determination that the child has been abused/neglected. "Case plan" is defined as a written document that includes, where applicable, the requirements of the family case plan, and a minimum of the following:

- Description of the type of home or institution in which the child is to be placed, including a discussion of the appropriateness of the placement;
- A plan for how the agency responsible for the child will ensure the child receives proper care;
- A plan for how services will be provided to the parents, child, and foster parents in order to improve the conditions of the parent(s)' home;
- A plan for the return of the child to his/her home and/or an alternative permanency plan with specific time lines;
- If reunification is not appropriate, a plan stating why reunification is not appropriate and detail the alternative placement with specific time lines; and
- A plan for addressing the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child.

The statute requires that the child's attorney and parent or guardian, and counsel for the parent or guardian receive the case plan at least five days prior to the dispositional hearing.

If the court grants parent or guardian an improvement period, the Department must submit a family case plan, in accordance with WV Code §§49-6-2(b) and 49-6D-3, which require that the family case plan clearly sets forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening the problems. Each family case plan must contain the following:

- A listing of specific, measurable, realistic goals to be achieved
- An arrangement of goals into an order of priority
- A listing of the problems that will be addressed by each goal
- A specific description of how the assigned caseworker(s) and the abusing parent or guardian will achieve each goal
- A description of the Departmental and community resources to be used in implementing the proposed actions and services
- A list of the services, including time-limited reunification services
- Time targets for the achievement of goals or portions of goals

D003707

- An assignment of tasks to the abusing/neglecting parent or guardian, the caseworker(s), and other participants in the planning process
- A designation of when and how often tasks will be performed
- The safety of the placement of the child and plans for returning the child safely home.

The law requires that the Department encourage parents or guardians, counsel for children, and the child's participation if aged 12 or older.

In addition to the above statutes, WV Code §48-5D-3(2) says MDTs shall assess, plan, and implement a comprehensive, individualized service plan for:  children who are victims of child abuse/neglect and their families; for children in status offense or delinquency proceedings and their families when the court refers the juvenile to services; or when the juvenile is placed in the Department's custody or in out-of-home placement funded by the Department.  The members must include the child's custodial parent(s), guardian(s), other immediate family members, attorneys representing the child and parents/guardians, the GAL, the prosecuting attorney or his/her designee, a member of the child advocacy center (CAC) that has processed the child (if any), and where appropriate and available, a court-appointed special advocate (CASA), CAC representative, school official and any person or agency representative who might assist in providing recommendations, in accord with WV Code §49-5D-3(3)(b).  Rule 1(m) of the Rules of Procedure for Child Abuse and Neglect Proceedings adds foster parents, pre-adoptive parents, or custodial relatives providing care for the child to the definition of "persons entitled to notice and the opportunity to be heard."

The treatment MDT must first convene within thirty days of the filing of the child abuse/neglect petition, in accordance with Rule 51 of the Rules of Practice and Procedure for Child Abuse and Neglect Proceedings.  WV Code §49-6-5(a) and Rule 37 of the WV Rules of Procedure for Child Abuse and Neglect Proceedings require that the family case plan be filed within thirty days of an order and be created by a treatment MDT, which meets every three months until permanency is achieved.

The Department developed an "MDT Meeting Protocol" in June 2006.  The protocol includes requirements for notice, which should be given at least fifteen days prior to the MDT meeting to all team members, who may include the child's worker, parents or guardian, immediate family members, parent or guardian's counsel, the child's attorney or GAL, juvenile probation officer, prosecuting attorney, the child if age 12 or older or if deemed appropriate by the MDT, the service providers for the child and family, foster or adoptive parents, pre-adoptive parents, custodial relatives, CASA, and appropriate school officials.  A premium is placed on ensuring the family's involvement in the development of the case plan.  Ground rules for meetings, record-keeping, and development of a comprehensive individualized case plan are all detailed in the protocol.

D003708

**Where was West Virginia's child welfare system in Round One of the CFSR?**

The final CFSR report identified Item 25 as an *Area Needing Improvement* because of insufficient parental involvement; a majority of case plans were not adequately documented; and the implementation of the MDT process was inconsistent throughout the state. Inconsistencies included where, when and how the meetings were conducted, who facilitated the meetings, who attended the meeting and even if meetings were being held.

**What positive changes in performance and promising practices have been made since Round One?**

Utilizing the 2003 PIP, the Department committed to ensure families are aware of their right to be involved in the case planning process through an invitation to MDTs and other case planning mechanisms. Community Services Managers and Regional Attorneys were required to meet quarterly with the circuit court judges as needed to address issues pertaining to the case planning and review process. Child Welfare Consultants were assigned on a regional basis to assist the RDs and Community Services Managers to develop a work plan, including ongoing identification of training to address all requirements within the case planning and review system.

Workers are required, as a result of the PIP, to distribute the "Rights and Responsibilities" pamphlet to all families and explain their right to be involved in the case planning process. Also, training has been conducted with new and tenured staff surrounding the documentation of the family involvement in the MDT and/or case planning process in FACTS.

Management and supervisory staff are utilizing supervisory reviews as one tool to monitor the family involvement in the MDT and case planning process. OPQI QA reports to the districts outline the S*trengths* and A*reas Needing Improvement* regarding the family involvement in the MDT process. Many individual district PIP's identified family involvement as an issue and developed strategies to address the deficits. One of the major tasks assigned in every district was for the Community Services Manager to meet with circuit judges quarterly to discuss not only Title IV-B issues but also any other issues involving the process. In many instances, these meetings included a requirement to discuss ways to improve the MDT process in districts continuing to have difficulties with the process.

OPQI QA ratings documented a significant improvement in the workers' practice regarding the involvement of parents and children in case planning. With the implementation of a consistent MDT process, development and utilization of a universally accepted case plan, in conjunction with training surrounding these issues, not only for Department staff but also the courts and prosecutors, ratings for Item 25 should continue to increase. The partnership between the Department and the Court Improvement Board continues to be a strong tool related to improving practice for this item.

D003709

Both the state's PIP and the CIP's five-year strategic plan targeted improvement of creation of a written case plan by a face-to-face meeting conference with the parent of the child, court-appointed GAL, and, if appropriate, the child and temporary custodian of the child.

The Department's training and policy, as described above, give a framework for conducting MDTs and creative effective case plans.  For details and information regarding positive case practice, see Item 18.  OPQI QA ratings documented a significant improvement in the workers' practice regarding the involvement of parents and children in case planning.  With the implementation of a consistent MDT process, development and utilization of a universally accepted case plan, in conjunction with training surrounding these issues, not only for Department staff but also the courts and prosecutors, ratings for Item 25 should continue to increase.  The partnership between the Department and the CIP continues to be a strong tool related to improving practice for this item.

The West Virginia CIP has a few projects aimed at improving the MDT process and written case plans:

## Uniform Case Plan and Progress Report

Although the Department had created a uniform case plan that was incorporated into FACTS some time ago, the plan was rarely used throughout the state.  If they filed a case plan, caseworkers said they used a format preferred by the local circuit judge.  Some circuit judges did not find the format of the uniform case plan to be clear and useful in identifying the issues at hand.

In 2007, the CIP data committee, chaired by Circuit Judge Derek Swope, created a Uniform Child, Family, and Youth Case Plan to be filed with the court at least thirty days after entry of an order granting an improvement period, pursuant to WV Code §§49-6-12(b) or 49-6-12(a), and/or five days prior to a dispositional hearing pursuant to WV Code § 49-6-5.  At the same time, the committee created a Family Case Plan Progress Report to be submitted to the court when the court reviews the progress or completion of the improvement period.  The newly designed case plan and progress report were designed to include all information required by federal and state law while being user-friendly for the judges.

Both the Case Plan and Progress Report were approved by the West Virginia Supreme Court of Appeals and the Department by the end of 2007.  Currently, the documents are being programmed into FACTS and are planned for implementation in September 2008.  The CSMs were introduced to the Case Plan and Progress Report in April 2008, and the circuit judges received training on them at their judicial conference in June 2008.  The Department organized the training of staff on entering data into FACTS after the documents were incorporated into FACTS.  The July 14-16, 2008 CIP child abuse and neglect cross-training will also introduce the Case Plan and Progress Report; the conference attendants typically include attorneys, social workers, CASA volunteers and others involved in the child abuse and neglect process.

D003710

**Multidisciplinary Treatment Team Study**

Recognizing that consistency and quality of MDTs was lacking, as found in the first CFSR, the OPQI QA and the 2005 CIP Reassessment Report, CIP planned an assessment of the current state of MDTs to identify variations, barriers, and successes that can be used in future policy and best practices training. Dr. Corey Colyer, of WVU School of Applied Sciences, is the principle investigator in the study. With the assistance of the CIP MDT Study Committee, chaired by Sue Hage, of the Department, the study was designed to include onsite observations and surveys to Department personnel and attorneys involved in child abuse/neglect cases. The interim report was submitted to the committee in May 2008 and includes the following information:

- Approximately 25 MDTs were observed in nine counties.
- Some practices, procedures, and issues were consistent from one location to the next; i.e., evolution or progression of the MDT group dynamics over the life court of the team, general lack of unanimity or consensus in MDT outcomes, and difficulties in maximizing participation of all appropriate contributors
- There were important differences among the MDTs observed; i.e., the relative influence of contributing institutions, such as the Department and the court system varying on a county-by-county basis, personnel who participate as team members differing by location, and practices or procedures for implementing and facilitating MDT meetings reflecting local arrangements or cultures.
- The report gives three recommendations based on the observations. (Another report including information from the surveys was due May 30, 2008.)
  1. Development of a dynamic MDT structure that changes according to the circumstances characteristic of a case's evolution
  2. Encouragement of circuit courts to emphasize the value and importance of MDTs and implement scheduling strategies that reinforce this priority (i.e., set days of each month when the judges agree not to set hearings), and
  3. Development of statewide guidelines for MDT facilitation to include oversight by a neutral facilitator.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

OPQI QAs document inconsistencies in the inclusion of the parents and children in the MDT and case planning process. OPQI QA reviews continue to identify some in-home cases where the worker has limited contact with the parents and children. Some families are ill-informed as to why the cases were opened or what steps were needed to close the cases. Also, adoption workers are not included in the MDT process prior to TPR in many districts, and the delay in their involvement has serious consequences with regard to achieving permanency in a timely manner.

Stakeholders indicate caseworkers are distributing the Rights and Responsibilities, which are included in the Parent's guides for both CPS and YS, but some are not consistent in their

explanation of the case planning process, especially with regard to the family's involvement. Workers indicate they are more concerned with ensuring safety during the initial assessment and, as a result, fail to go into a great deal of detail with regard to the Rights and Responsibilities and the Parent's guide. The MDT brochure is available, but many supervisors and workers are unaware of its existence, thus it is rarely utilized as an education tool for parents, children, and foster parents.

MDT training was provided for all staff and, as mentioned previously, has been included in New Worker Training. The training covered information regarding the law governing MDTs, the required content and the required participants, but caseworkers continue to struggle with the process. Multidisciplinary treatment team meetings are to be led by workers according to training and policy. Many workers allow the prosecutor or others to facilitate the meetings, resulting in little discussion and development of case plans or discussion of specific child issues regarding education, mental and physical health, and behavior.

OPQI QAs and stakeholders indicated MDTs are more effective in the districts where judges correctly utilize the process and have set aside days when court is not in session specifically for MDT meetings. Some districts have difficulty scheduling MDT meetings when days are not set aside and participation at these meetings is sporadic.

OPQI QAs indicate the attendance and involvement of prosecuting attorneys varies by district and occasionally by program. In some districts: the prosecutor does not attend; some are represented by their secretary; and one is represented by an outside individual whose primary responsibility is investigation and the delivering of subpoenas.

Documentation in FACTS remains an issue, workgroup participants stated there are several places where the information is to be entered and that the duplication of information takes a great deal of their time which could otherwise be spent working with the families.

OPQI QAs indicate, in some instances, the quality of the case plans is superficial or a plan may not have been formally completed. Many supervisors are new and need assistance in developing their skills surrounding mentoring/developing new workers abilities in assessment and case planning. The lack of work with parents is particularly evident in some YS cases and was addressed in YS policy by creation of the new services implementation model. The implementation of the new policy has been completed, but workers are continuing to develop their skills in working with the parents since this is a drastic change from previous expectations in their case practice. Education of probation officers and court officials is needed to bring them up to date on the Department's policies and expectations regarding inclusion of parents and other family members in case planning and the need for services for the family unit. This is an issue the CIP could impact in collaboration with the Department.

Stakeholders and OPQI QAs found utilization of the case plan in FACTS to be difficult and indicated the terminology confusing for workers, parents and children. The goal of ensuring safety, permanency and well-being gets lost in the process and the plans become ineffective.

D003712

Again, the Court Improvement Board, in collaboration with the Department, is nearing completion in the development of a case plan that will be incorporated into FACTS.

> **Item 26:  Periodic Reviews.**  Does the State provide a process for the periodic review of the status of each child, no less frequently than once every 6 months, either by a court or by administrative review?

**What do policy and procedure require?**

In accordance with Rule 37 of the Rules of Practice for Child Abuse and Neglect Proceedings, a status conference must take place within sixty days of the granting of a pre- or post-adjudicatory improvement period or within ninety days if the court requires the Department to file a progress report.  (A family case plan was also required within thirty days by Rule 37 and WV Code §49-6D-3.)

If the court finds that the Department is not required to make reasonable efforts to preserve the family, then, notwithstanding any other provision, a permanency hearing must be held within thirty days following the entry of the court order and must be conducted at least once every three calendar months thereafter until a permanent placement is achieved, in accordance with WV Code §49-6-5a(a).

A permanent placement review conference must take place before the court every three months until permanency is achieved and the case is dismissed from the court's docket, in accordance with Rule 39 of the Rules of Procedure for Child Abuse and Neglect Proceedings.  In accordance with Rule 40 of the Rules of Procedure for Child Abuse and Neglect Proceedings, progress reports, completed by the Department with the assistance of the MDT, are due at least ten days prior to the review.  In accordance with Rule 43 of the Rules of Procedure for Child Abuse and Neglect Proceedings, permanent placement should be achieved within 18 months of the final disposition order unless there is a finding of extraordinary circumstances.

Foster care reviews must also take place at least every three months in accordance with WV Code §§49-2-14 and 49-6-8 and Rule 44 of the Rules of Procedure for Child Abuse and Neglect Proceedings.  The foster care reviews may be held at the same time as the permanent placement review conferences.

In accordance with Rule 41 of the Rules of Procedure for Child Abuse and Neglect Proceedings, within ninety days of the entry of the final termination order or decree for both parents, the Department is responsible for placement of the child and shall submit a written permanent placement plan to the court, the GAL, persons entitled to notice and the opportunity to be heard, and other remaining parties, if any, for consideration at the permanent placement review.

D003713

**Where was the child welfare system in Round One of the CFSR?**

Item 26 was rated as *Area Needing Improvement* because administrative and judicial reviews were not being held on a timely basis and MDT administrative reviews possibly not meeting federal requirements.  The CFSR found that some MDT administrative reviews were often facilitated by the caseworker.  Federal policy requires a third-party review by an individual not involved in the case.  The CFSR found that the policy infrastructure for periodic case review is present, including a combination of state statute, Supreme Court rules, and revised child protection and foster care policy.  However, the practice implementing these rules and policy did not meet the expectations of the policy.

**What positive changes in performance and promising practices have been made since Round One?**

As part of the 2003 PIP, a process guide was developed and implemented to increase the percentage of administrative and judicial reviews completed for children.  Foster care training includes information regarding the requirements for administrative and judicial reviews.

As part of the individual district PIPs, Community Services Managers are required to meet with circuit judges at least quarterly to address identified issues regarding the law and policy pertaining to CPS and foster care.

Judicial training has placed an emphasis on complying with time standards.  Circuit judges receive training on child abuse and neglect annually at their judicial conferences.  In 2007, they heard from retired Judge William Byars, Jr., who impressed upon them that time is of the essence for children, who need resolution and permanency as soon as possible.  At their conference in June 2008, retired Judge Leonard Edwards spoke of the importance of time standards and the CFSR.

In 2006, the Supreme Court revamped its tracking system for child abuse/neglect cases by hiring an analyst and implementing electronic tracking.  Reports are generated regularly for the CIP.  The analyst cautions about the quality of data, as submissions have become consistent recently, and the judges' secretaries were to have their first in-person training on the child abuse/neglect database in June 2008.  The database tracks more than twenty performance measures, including those recommended nationally and ones required by state law.  Some judges, like Derek Swope, say they use the tracking sheets as "case management tools."  The greater emphasis on tracking and the clearer expectation of time standards appear to be improving compliance.

As stated in Item 25, the Department developed a new policy for MDTs in June 2006, and the CIP has been assessing the current state of MDTs.  It appears the majority of MDTs are facilitated by someone involved in the case, usually someone from the Department or the prosecuting attorney, but there are a few exceptions.  For example, in Harrison County, MDTs are facilitated by the director of the local CAC.  In the Northern Panhandle, the Department has a pilot program that has a staff member not directly involved in the cases to facilitate the MDTs.

**D003714**

In addition to MDTs, follow-up status conferences are required to take place every three months so that the case plans and progress reports may be reviewed at that time by the circuit judge.

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

In some districts, foster care cases have been dropped from the docket after TPR has been completed and prior to the child obtaining permanency. The CIP is aware of this problem and is working, through utilization of their tracking system, to address this issue with the court system.

New workers receive training regarding the periodic reviews but continue to need guidance and support for supervisory staff to understand and comply with the periodic review process.

> **Item 27: Permanency Hearings.** Does the State provide a process that ensures that each child in foster care under the supervision of the State has a permanency hearing in a qualified court or administrative body no later than 12 months from the date that the child entered foster care and no less frequently than every 12 months thereafter?

**What do policy and procedure require?**

If the court finds that the Department is not required to make reasonable efforts to preserve the family, then, notwithstanding any other provision, a permanency hearing must be held within thirty days following the entry of the court order so finding and must be conducted at least once every three calendar months thereafter until a permanent placement is achieved, in accord with WV Code §49-6-5a(a).

Rule 36a of the Rules of Practice for Child Abuse and Neglect Proceedings provides:

a)  If the court finds at the dispositional hearing, pursuant to WV Code § 49-6-5(a)(7), the Department is not required to make reasonable efforts to preserve the family, a permanency hearing must be held within thirty days following entry of the dispositional order so finding. The purpose of the permanency hearing is to determine the permanency plan for the child when either the disposition available under WV Code § 49-6-5(a)(5) or § 49-6-5(a)(6) has been imposed based upon a finding under WV Code § 49-6- 5(a)(7). All parties, counsel, and persons entitled to notice and the opportunity to be heard shall be given notice of this hearing at least five judicial days in advance thereof.

b)  If the court finds, at any stage of the proceeding, that reasonable efforts must be made by the Department to preserve the family or any part of it, then a permanency hearing must be conducted within one year from the date the child entered foster care which shall be deemed to be the earlier of:

   i)   the date of the first judicial finding that the child has been subjected to child abuse or neglect; or

**D003715**

ii) the date that is sixty days after the date on which the child is removed from the home.

**Where was the Child Welfare System in the Round One CFSR?**

Item 27 was *Area Needing Improvement* because of lack of consistency throughout the state in holding timely hearings.  Also, after TPR was attained, the court often would cease to hold the twelve-month permanency hearing.

**What changes in performance and practice have been made since the Round One CFSR including casework practices, resources issues, and barriers?**

Utilizing the 2003 PIP, the Department committed to increase the percentage of administrative and judicial reviews completed for children.  Community Services Managers and Regional Attorneys were required to meet quarterly with circuit court judges, as needed, to address issues pertaining to the review process.  Child Welfare Consultants were assigned on a regional basis to assist RDs and CSMs to develop a work plan including ongoing identification of training to address all requirements within the case planning and review system.

Other changes in practices impacting Item 27 have been discussed in Item 26.

---

**Item 28:  Termination of Parental Rights.**  Does the State provide a process for Termination of Parental Rights (TPR) proceedings in accordance with the provisions of the Adoption and Safe Families Act (ASFA)?

---

**What do policy and procedure require?**

Reasonable efforts to preserve the family and prevent removal of the child are not required under WV Code §49-6-5(a)(7) if:

- There are aggravated circumstances (torture, abandonment, chronic abuse, sexual abuse).
- The parent or guardian has committed murder, voluntary manslaughter or attempted/ conspired to murder or felonious assault resulting in bodily injury to the child, child's other parent, or a child residing in same household or under the temporary or permanent custody of the parent.
- The parent's rights to another child have been terminated involuntarily.

Parental rights may be terminated under WV Code §49-6-5(a)(6) if:

- There is no reasonable likelihood that the conditions of neglect/abuse can be substantially corrected in the near future
- When necessary for the welfare of the child
- An abusing parent's rights may be terminated, with the non-abusing battered parent receiving sole custody.

D003716

Efforts to terminate parental rights are required by the Department under WV Code §49-6-5b as follows:

(a) Except as provided in subsection (b) of this section, the Department shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights:

    (1) If a child has been in foster care for fifteen of the most recent twenty-two months as determined by the earlier of the date of the first judicial finding that the child is subjected to abuse or neglect or the date which is sixty days after the child is removed from the home

    (2) If a court has determined the child is abandoned

    (3) If a court has determined the parent has committed murder or voluntary manslaughter of another of his or her children or the other parent of his or her children; has attempted or conspired to commit such murder or voluntary manslaughter; or has been an accessory before or after the fact of either crime; has committed unlawful or malicious wounding resulting in serious bodily injury to the child or to another of his or her children or to the other parent of his or her children; or the parental rights of the parent to a sibling have been terminated involuntarily.

(b) The Department may determine not to file a petition to terminate parental rights when:

    (1) At the option of The Department, the child has been placed with a relative

    (2) The Department has documented in the case plan made available for court review a compelling reason, including, but not limited to, the child's age and preference regarding termination or the child's placement in custody of The Department based on any proceedings initiated under article five of this chapter, that filing the petition would not be in the best interests of the child

    (3) The Department has not provided, when reasonable efforts to return a child to the family are required, the services to the child's family as the Department deems necessary for the safe return of the child to the home.

Parental rights may also be terminated by voluntary relinquishment under WV Code §49-6-7.

Rule 35 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides:

(a) Uncontested Termination of Parental Rights. If a parent voluntarily relinquishes parental rights or fails to contest termination of parental rights, the court shall make the following inquiry at the disposition hearing:

    (1) If the parent(s) is/are present at the hearing but fail(s) to contest termination of parental rights, the court shall determine whether the parent(s) fully understand(s) the consequences of a termination of parental rights, is/are aware of possible less drastic alternatives than termination, and was/were informed of the right to a hearing and to representation by counsel.

D003717

(2) If the parent(s) is/are not present in court and has/have not relinquished parental rights but has/have failed to contest the termination, the petitioner shall make a prima facie showing that there is a legal basis for the termination of parental rights and the court shall determine whether the parent(s) was/were given proper notice of the proceedings.

(3) If the parent(s) is/are present in court and voluntarily has/have signed a relinquishment of parental rights, the court shall determine whether the parent(s) fully understand(s) the consequences of a termination of parental rights, is/are aware of possible less drastic alternatives than termination, and was/were informed of the right to a hearing and to representation by counsel.

(4) If the parent(s) is/are not present in court but has/have signed a relinquishment of parental rights, the court shall determine whether there was compliance with all state law requirements regarding a written voluntary relinquishment of parental rights and whether the parent(s) was/were thoroughly advised of and understood the consequences of a termination of parental rights, is/are aware of possible less drastic alternatives than termination, and was/were informed of the right to a hearing and to representation by counsel.

(b) Contested Terminations and Contests to Case Plan.

1. When termination of parental rights is sought and resisted, the court shall hold an evidentiary hearing on the issues thus made, including the issues specified by statute and make such findings with respect thereto as the evidence shall justify. Upon making such findings, the court shall then determine if the case plan or plans before the court require amendment by reason of the findings of the court and require such modification of the plan or plans as may be appropriate.

2. The GAL for the children, the respondents and their counsel, and persons entitled to notice and the opportunity to be heard, shall advise at the dispositional hearing and, where termination is sought after the court's findings on the factual issues surrounding termination are announced, whether any such persons seek a modification of the child's case plan as submitted or desire to offer a substitute child's case plan for consideration by the court. The court shall require any proposed modifications or substitute plans to be promptly laid before the court and take such action, including the receipt of evidence with respect thereto, as the circumstances shall require. It shall be the duty of all the parties to the proceeding and their counsel to co-operate with the court in making this information available to the court as early as possible. It shall also be appropriate for the court to require alternative provisions of a case plan to be submitted prior to the taking of evidence in a dispositional hearing to suit alternative possible findings of the court after evidence is taken on any contested issues. Except as to the establishment of grounds for termination and the establishment of other necessary facts, dispositional hearings are not intended to be confrontational hearings; rather such are concerned with the best interests of the abused or neglected children involved.

D003718

**Where was the child welfare system in Round One of the CFSR?**

Item 28 was rated a *Strength*, because TPR petitions were being filed on a timely basis in a majority of cases, and the state had dramatically increased terminations and was complying with ASFA requirements for TPR.  Stakeholders indicated that there were Department barriers to achieving TPR, including staff turnover and caseworkers being unprepared for court. Stakeholders noted that the Department collaborates with the child support agency to assist in locating children's fathers.

**What changes in performance and practice have been made since the Round One CFSR including casework practices, resources issues, and barriers?**

The Department continues to file for TPR when required in most cases.  Occasionally, the Department will fail to ask for an exception to TPR involving youth service cases with a child in long-term treatment.

Generally, tenured staff is utilized as court workers whenever possible, but turnover has adversely affected this item in some offices due to the lack of tenured staff.

The Department continues to work with the CIP to improve in their efforts to file and obtain TPR, when appropriate, in a timely manner.

> **Item 29:  Notice of Hearings and Reviews to Caregivers.**  Does the State provide a process for foster parents, pre-adoptive parents, and relative caregivers of children in foster care to be notified of, and have an opportunity to be heard in, any review or hearing held with respect to the child?

**What do policy and procedure require?**

Rule 1(m) of the Rules of Procedure for Child Abuse and Neglect Proceedings provides that foster parents, pre-adoptive parents, or custodial relatives providing care for the child are included in the definition of "persons entitled to notice and the opportunity to be heard."

WV Code §49-6-2(a) provides that counsel for the child shall be appointed in the initial order.  *In re Mark M.*, 496 S.E.2d 215, 201 WV 265 (1997) held that "there is a clear legislative directive that guardians ad litem and counsel for both sides must be given opportunity to advocate for their clients in child abuse or neglect proceedings, and circuit court may not impose unreasonable limitations upon function of guardians ad litem in representing their clients in accord with traditions of adversarial fact-finding process."  The terms "counsel" and "GAL" are used somewhat interchangeably, but a recent case clarified the role of the GAL as being obligated by the attorney/client privilege, except where honoring the duty of confidentiality would result in the child's exposure to a high risk of probable harm.  Then the GAL must make a disclosure to the presiding court in order to safeguard the best interests of the child.  *In re Christina W.*, 219 WV 678, 639 S.E.2d 770 (2006).

D003719

**Where was the Child Welfare System in the Round One CFSR?**

Item 29 was rated as *Area Needing Improvement*, because foster parents, pre-adoptive parents, and relative caregivers did not routinely participate in meetings, hearings, and reviews.  There was variation among counties as to notice provided, level of participation, and opportunities to be heard in court hearings, administrative reviews, and MDTs.

**What changes in performance and practice have been made since the Round One CFSR?**

As part of the 2003 PIP, pertinent staff were required to provide the Prosecuting Attorneys with the necessary information to notify all parties entitled to notice of judicial hearings.  Also, staff were required to follow-up on notifications to all parties entitled to notice of judicial hearings, administrative reviews, and MDTs.

OPQI QAs document an increase in the participation of foster parents and relative caretakers in the court and MDT process but also indicate a continued need for improvement in this area.

As a part of the 2003 PIP, workers received training regarding the policy and procedure regarding foster parent and relative caregiver participation in the MDT process.  The MDT training has since been included in the New Worker Training process.  Policy surrounding the requirements and importance of notification and the participation of foster parents and relative caregivers in court hearings and MDTs is included in both the New Worker Training and the PRIDE training provided for foster parents.  An abbreviated version of the PRIDE training was provided for workers across the state during the past year.  This training also covered the importance and requirements surrounding foster parent and relative caregivers participation in the MDTs and at court hearings.

Efforts are ongoing to improve notice to and participation by foster parents, pre-adoptive parents, and relative caregivers.  Rule 1(m) defining these groups as persons entitled to notice and opportunity to be heard was approved as a result of the first CFSR and 2005 CIP Reassessment, both of which saw this as a weakness.

The CIP MDT study is helping assess how often foster parents, pre-adoptive parents, and relative caregivers participate.  At least two foster parents, one of which is also a pre-adoptive and adoptive parent, participate on CIP committees, including the MDT Study and Training Committees.  Training for judges and WVDHHR workers is ongoing.

**What are the casework practices, resources issues, and barriers that affect the child welfare system's overall performance in terms of the case review system?**

OPQI QAs and stakeholders indicate foster parents and relative caregivers are not consistently receiving notice to attend court hearings and MDTs.  Stakeholders indicated some foster parents do not want to attend when invited because of a perceived conflict with the parents.  Also, as mentioned in previous items, MDTs are not conducted in a consistent manner across the state.

D003720

Foster parents attending focus groups for the Statewide Self-Assessment indicate some are included and invited to the court hearings and MDTs while others were not. Several indicated they were not told the name of the child's GAL or attorney is. Also, many of the foster parents stated they were not informed of the status of the case once hearings were conducted.

## C. Quality Assurance System

> **Item 30: Standards Ensuring Quality Services.** Has the State developed and implemented standards to ensure that children in foster care are provided quality services that protect the safety and health of the children?

> **Item 31: Quality Assurance System.** Is the State operating an identifiable quality assurance system that is in place in the jurisdictions where the services included in the Child and Family Services Plan (CFSP) are provided, evaluates the quality of services, identifies the *strengths* and needs of the service delivery system, provides relevant reports, and evaluates program improvement measures implemented?

## What do policy and procedure require?

The OPQI QA element of the QA process is qualitative in nature and modeled after the Federal Child and Family Services Review (CFSR). Outcomes for Children's Services are in the three primary areas of Safety, Permanency and Well-being. The data gathered from this process is analyzed and feedback is provided through regular reporting. Program Improvement Plans are formulated and implemented based on the individual results of each district's review. Monitoring and data collection begins again to determine the impact of the Improvement Plan on the stated program outcomes. Since the 2002 CFSR the review, process has evolved and has been refined to reflect its current design.

In addition to case record reviews, surveys and non-case specific interviews are completed. Prior to each district's review, the lead reviewer sends out the CSM survey and also the CSM and Supervisor questionnaires. The request is made for the CSM and supervisors to review the questionnaire in preparation for the non-case specific interviews conducted as part of the Social Services Review. These interviews are often scheduled and conducted prior to instead of during the onsite review to allow for more time to be spent with each manager during the interview.

A Community Provider Survey is sent to stakeholders either electronically or by mail. Person-to-person interviews are also completed with selected community providers. Judicial and prosecutorial surveys are sent every third year the district is reviewed. Pertinent information gleaned from the surveys and interviews is included in the Outcome Report.

At the close of the onsite review, district staff and consumers involved in the review are given evaluations/surveys to rate the experience they had with the reviewers and the review process.

D003721

To assist the reviewers during the reviews and as a learning tool for children's services staff, volunteer training/orientation is offered periodically in each region. The lead reviewer is expected to utilize at least one volunteer on each review, if possible. Volunteers have been trained in each region and include CSMs, supervisors and field staff. A list of volunteers is available and is updated on an as-needed basis.

During the onsite review, the lead reviewer will schedule with the CSM a date and time for the Exit Interview. The CSM, supervisors and all available children's services staff are expected to attend the exit interview. The exit interview lays the beginning ground work for the District's corrective action plan.

Two reports are written by the lead reviewer after the conclusion of the onsite review. The Indicator Report provides information to the District regarding the ratings of each of the 23 Items/Indicators reviewed for each case. The Outcome Report provides the District with information regarding their performance on the seven outcomes related to Safety, Permanency and Well-being. Information from the surveys and interviews are included in this report. The Outcome Report includes an Executive Summary at the beginning of the report.

After a review of the reports by the program manager, the final version of each report is sent to the team leader, other OPQI program managers, leadership team, the RD for the region in which the District is housed, the CWC, the CSM and any supervisors who were mentioned in the Executive Summary. It is the expectation the supervisors will distribute the report to the children's services staff.

A program improvement plan is required of each District office upon receipt and review of the onsite monitoring review report. The lead reviewer will meet with the CSM, supervisors, district staff, training staff and appropriate RD to develop a program improvement plan utilizing a standard format developed by OPQI.

**Where was West Virginia's child welfare system in Round One of the CFSR?**

West Virginia achieved *Substantial Conformity* for the quality assurance systemic factor in round one of the CFSR. The state received a *Strength* rating on Item 30, because the state has promulgated new regulations and policy in CPS, YS and foster care to include changes in law, federal regulations and best practice standards. Item 31 also received a *Strength* rating, because the state operates an identifiable quality assurance system based on the CFSR that identifies strengths and needs and has developed a methodology of evaluating program improvement.

**What positive changes in performance and promising practices have been made since Round One?**

A reorganization of the Bureau for Children and Families took place in 2003 and, at that time, the Office of Planning and Quality Improvement (OPQI) was created. The Office of Planning and Quality Improvement is managed by the Assistant Commissioner who reports directly to the

Commissioner. The primary purpose of this office is to instill quality improvement activities through outcome development, program monitoring and program improvement plan development.

OPQI began utilizing the CFSR format to complete onsite reviews in May 2003 and continues to utilize the format. Statewide data gathered through this process was utilized to assist with the state's PIP monitoring and reporting during the first CFSR findings and were also utilized to assist with the state's PIP monitoring and reporting process.

In December 2004, OPQI gained four positions increasing the number of Quality Improvement Coordinator positions to nine. The increase in staff allowed the state to enhance its QA process beyond reviews and monitoring to program improvement that is local and specific to the districts' needs.

Between December 2006 and July 2007, all districts in the state implemented a PIP. The participants included local caseworkers, case aides, supervisory and management staff. Staff trainers and CWCs were available during the meetings to provide support and input into the process. The PIPs are reviewed quarterly by OPQI staff for compliance and can be renegotiated at any point if tasks are not proving effective in reaching set goals.

The implementation of the district level PIPs is a learning process for the OPQI Quality Improvement Coordinators, and the field staff. The PIP process will continue to be developed through the partnership between the central, regional, and district offices.

With the addition of new staff, OPQI is providing field support surrounding the CFSR and providing technical assistance for the district offices when support is requested to determine methods that may improve their practice.

Decisions regarding outcome measures have been made primarily by the management and staff of OPQI within the overall context of the Federal Review and COA standards. In determining indicators, we have made use of available systems of indicators and have relied upon our program policies and procedures to assist in determining outcomes. For children's services, the outcomes developed have been reviewed by appropriate policy staff in order to assure nothing has been overlooked. Outcomes and quality indicators for children's services are published on the Department's Intranet.

The state instituted local, regional and state level quality councils where staff has the opportunity to present issues which can improve quality or the delivery of services. Issues are encouraged to be resolved at the lowest level, but many reach the state quality improvement council where upper management resides. All issues and results are published on the website for staff to view. It is the expectation that all staff participate in all of the above quality initiatives. Senior managers participate on the State Quality Council and they are included in the 2003 Strategic Plan and its 2006 update.

D003723

**What are casework practices, resources, issues, and barriers that affect the child welfare system's overall performance?**

The modification to the QA process to develop district PIPs has faced some barriers; staff are not consistently involved beyond the development of the PIPs; i.e., monitoring, renegotiation, and updates. Quality councils are in operation but are not utilized consistently across the state to promote changes in practice.

Quality Improvement Coordinators are, at times, unaware of changes that have occurred in policy or changes that impact services such as ASO changes. There is a universal breakdown in communicating new initiatives, state and federal policy changes, practice changes, and general expectations. The lack of communication of the various networks within the state has impacted QA, practice, and service delivery.

**D. Staff and Provider Training**

> **Item 32:  Initial Staff Training.**  Is the State operating a staff development and training program that supports the goals and objectives in the CFSP, addresses services provided under Titles IV-B and IV-E, and provides initial training for all staff who deliver these services?
>
> **Item 33:  Ongoing Staff Training.**  Does the State provide for ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties with regard to the services included in the CFSP?

The Bureau for Children and Families' Division of Training (DOT) is a state-level division responsible for the oversight, coordination, and delivery of training for BCF employees and foster/adoptive parents.  This training consists of:

- New Worker Training
- Tenured worker training on BCF initiatives, corrective action and  professional development activities
- Supervisory and management training
- Training for new, potential, and existing foster/adoptive parents.

The Division of Training is responsible for training child welfare, adult services, and family assistance/economic services staff across the state and includes a total of 52 staff, including 22 full-time child welfare training positions and seven positions that are responsible for both child welfare and other program training.

The organizational structure of BCF Child Welfare Training consists of a state office unit located at the Diamond Building in Charleston and Regional Trainers who are out-stationed across the state.  State office staff consists of a Director of Training; 2.5 Full-time equivalent Program Managers who are responsible for supervising training staff and managing and scheduling

training activities; a Senior Specialist who coordinates professional development and continuing education activities for staff; a Senior Specialist who manages technology-based training; and two clerical/support staff.  There are 16 Regional Trainers, with four trainers assigned to each of the four BCF regions.  Trainers are stationed in local county offices in their assigned regions and provide training at designated training sites that are located onsite at district offices across the state and at one regional training site in the northern part of the state in Clarksburg.

To further enhance its resources, the DOT also utilizes contracts with external providers.  One of these resources is the Social Work Education Consortium (SWEC), an organization of five universities in West Virginia which have accredited social work programs.  SWEC schools include West Virginia University, Marshall University, Concord University, Shepherd University, and West Virginia State University, with each university assigned to cover a different geographic area of the state.  Each of these universities provide stipends for undergraduate social work students who agree to work for BCF upon graduation, and West Virginia University also provides Master's level stipends.  Additionally, SWEC provides training on specified subjects in the Child Welfare New Worker Training Plan and provides pre-service and in-service training for foster parents.  In addition to the SWEC schools, BCF also contracts with the West Virginia University CED for:  a child welfare curriculum developer; a coordinator for the SWEC; an administrative support person who develops and maintains databases and online information; and also contracts with the West Virginia Coalition Against Domestic Violence to provide domestic violence training for staff.

The Division of Training adopted a Mission Statement that extends from the Mission of the Bureau and exemplifies the standards by which it operates.  DOTs Mission is to *provide timely, comprehensive, competency-based training to new and tenured staff in a professional and consistent manner to assure quality delivery of services that promote the health and well-being of West Virginia's families.*  This Mission Statement helps DOT staff to focus on the goals and objectives of DOT to ensure high quality training for BCF staff.

**What do policy and procedure require?**

*New Worker Training*

New child welfare workers are required to complete a pre-service training period of 11-13 weeks, depending on their classification and job responsibilities.  Staff with responsibilities related to CPS have a 13-week training period, while staff who are responsible for YS, Adoption, and Homefinding have an 11-week training period.  The additional two weeks for CPS staff includes training directly related to child abuse assessment and investigation, while the other classifications receive only an overview of these functions.

New workers participate in a structured training plan which specifies a combination of classroom and on-the-job training activities.  Prior to the start of a new worker class, a copy of the appropriate Training Plan is provided to new staff and their supervisors that contains a list of suggested on-the-job (OJT) activities for new workers to orient them to BCF and child welfare

D003725

casework.  These activities include web-based courses including BCF Orientation, FACTS Orientation, Time Studies, HIPPA Awareness, and Information Security courses.  In addition, workers are instructed to access and read online policy, review the hard copy case record system, learn about their office structure and local resources, and accompany workers on home visits and to court hearings, as well as to complete a series of OJT training Activity Worksheets that are attached to the Training Plan.

The first four weeks of pre-service training include foundation courses that all child welfare staff must learn.  These foundation classes include:

- Legal Aspects of child welfare
- Interviewing
- Human growth and development
- Identifying abuse and neglect
- Worker safety
- Domestic violence
- Substance abuse
- Preserving connections
- Child welfare intake process.

After this initial four-week period, new workers are sent back to their local offices for another OJT training period in which they can practice the skills they learned in the foundation classes, such as doing child welfare intakes.  Following this OJT training period, the training plan is split according to job responsibilities.  Staff with CPS functions take CPSS Safety, Initial Assessment, and Court training, and Youth Services staff take Youth Services Assessment and Court training.  Both groups receive training on Permanency/Concurrent Planning and MDTs, Culturally Sensitive Practice, and Foster Care; then CPS staff receives training on the CPS Family Assessment.

After this initial training period, new staff receives a limited caseload and enters their in-service training period.  In-service training is training to be completed within the first year of employment and includes Sex Abuse Investigations, Family-Centered Practice; Social Work Ethics; and PRIDE for Child Welfare Workers.  In addition, staff with a secondary job function may complete training on that function, such as a worker who primarily works in Youth Services but may occasionally be assigned to complete a CPS investigation.

As stated previously, the BCF Division of Training utilized the SWEC and the West Virginia Coalition Against Domestic Violence to enhance its training plan for new workers.  This collaboration has resulted in new workers gaining more in-depth knowledge on relevant child welfare topics and has broadened the scope of courses offered.  As part of the child welfare training plan, SWEC provides instruction on various topics that are relevant to child welfare social work practice such as Preserving Connections, Substance Abuse, Human Growth and Development, Culturally Sensitive Practice, and Ethics.  The West Virginia Coalition Against

D003726

Domestic Violence provides training on domestic violence issues and intervention, co-trained by a domestic violence advocate and a DOT trainer.

*Ongoing Staff Training*

Child Welfare staff have access to professional knowledge and skill development training through a variety of venues, including:

- Training on program

- Policy and systems changes and new initiatives

- Specialized training on topics identified in local, regional, or state corrective action plans, and

- Internal/external continuing education and professional development conferences, events, and sessions for field staff and supervisors that occur on a local, regional, and statewide level.

All child welfare staff are required to complete training related to: program, policy, and systems changes; new initiatives; and corrective action training identified through quality assurance reviews. These trainings are required for all staff with job responsibilities related to the change, new initiative, or identified deficiency. In addition, all child welfare workers are required to be licensed social workers and, therefore, required to receive continuing education/professional development training as a requirement to maintain their licenses. Workers who have a social work degree have a regular license and are required to obtain fifty hours of continuing education in each two-year licensure period or twenty-five hours per year. West Virginia also has a temporary license option for staff with a related degree such as sociology or psychology, and those workers are required to complete eighty hours of continuing education in each two-year period for the four-year temporary licensure period or forty hours per year. These licensure requirements help to ensure that child welfare staff keep up-to-date in their knowledge and skills so they will provide the best possible services to children and families. In addition to continuing education related to licensure, the DOT helps staff to complete these requirements through a variety of methods.

First, training is provided to staff related to the implementation of any new policy or program initiative. This training may be web-based in the case of smaller policy or procedure changes; classroom-based in the case of practice or program changes; or computer classroom-based in the case of systems changes. These trainings are provided whenever new policies or procedures are released and are provided prior to release whenever possible. The Division of Training provides classroom and systems-based training and field support identified through local, regional, and statewide corrective action and program improvement plans, as requested by the local offices. Local, regional, and statewide conferences are held one to two times per year for Child Welfare staff where they receive policy releases, updates, and clarifications as well as knowledge and skill development activities. In addition, DOT is an approved provider of continuing education

D003727

units in West Virginia, and approves and provides continuing education events for both BCF and providers in the community to improve the knowledge and skills of staff.

An increasing number of professional development classes have been offered that increase stakeholder involvement in training on new developments in the field. A good example of this has been a statewide training initiative provided in conjunction with the West Virginia Prosecuting Attorneys Institute to address the growing problem of the manufacture and use of methamphetamines. Staff was trained to identify and handle situations involving methamphetamines in clients' homes. Other examples include: a statewide training initiative for BCF employees, prosecutors, judges, and law enforcement on effective courtroom practices; training on MDTs provided in conjunction with the Court Improvement Board for anyone who may be involved in an MDT; training for community agencies on the changes to the YS model; and training for community and professional groups on mandated reporting.

In addition to the above requirements, child welfare supervisors are required to complete additional management/supervisory training according to the State of West Virginia Division of Personnel policies. New supervisors must complete seven days of training within their first year of employment, including: Preventing Harassment; Drug-Free Workplace; Employee Performance Appraisals; Grievance Procedure; Managing and the Law; Fundamentals of Supervision; Discipline and Documentation; and Workplace Safety. After this first year, managers and supervisors must complete twelve hours of management/supervisor training per year.

The Division of Training conducts a variety of trainings and activities to help meet these requirements. Training has been developed and implemented on a web-based "Orientation to Supervision" course for new supervisors hired within the Bureau, and supervisory training is provided regionally and locally throughout the year. Two Management Institutes are provided per year, one sponsored by DHHR and one by the BCF Division of Training, which include threes days of management and supervisory training on a variety of topics. The Division of Training has one FTE staff person allocated to conduct regional and local supervisory training on a regional and local level on topics such as: Practical Aspects of Supervision; Competency-Based Employment Interviewing Skills for Supervisors, Transfer of Learning, Recruitment and Retention of Qualified Staff; Coaching; and Working in Small Groups. In addition, BCF conducts Statewide Supervisor Meetings annually and Statewide Management Meetings two times per year each for supervisors and management staff. These meetings include training on policy and systems changes, supervisory and management training, and presentations on emerging issues such as substance abuse and domestic violence. These meetings and trainings help supervisors and managers to remain current on relevant issues and practices and promote their competency as managers and supervisors.

As part of the 2002 CFSR Program Improvement Plan, BCF implemented a competency test for CPS supervisors to ensure they have accurate and thorough knowledge of the policies and procedures associated with CPS assessments and safety planning. This practice was to ensure supervisors have the knowledge and skills required to supervise field staff who are completing

D003728

the investigations and to ensure their work is complete and accurate. Competency testing was placed on hold when it was anticipated that the CPS redesign was to be implemented; however, this did not occur within the projected timeframes. The Division of Training is working with the National Resource Center for Child Protective Services to implement a new competency test for supervisors with the release of the new CPS assessment system in 2009. After the competency test for supervisors is implemented, BCF plans to implement a competency test for workers that would be taken within the first year of employment.

**Where was the child welfare system in Round One of the CFSR?**

West Virginia was found to be in *Substantial Conformity* with the systemic factor of Training. The state was found to be operating a staff development and training program for all staff that addresses the requirements of Title IV-B and Title IV-E. Most stakeholders commenting on this issue expressed the opinion that the New Worker Training is of good quality. Ongoing training for staff was noted as A*rea Needing Improvement*, as opportunities were found to be insufficient to allow staff to continue developing their skills, additional training was needed in certain program areas, and specialized training is not offered. The Statewide Assessment also noted that due to training demands posed by high staff turnover, it had been difficult for DHHR to provide or arrange for skills development training for staff beyond the basic training program.

**What positive changes in performance and promising practices have been made since Round One?**

The Bureau for Children and Families reorganized around the time of West Virginia's CFSR in 2002, and coordination and oversight of all staff training was centralized under the BCF Division of Training. Prior to 2002, training was provided regionally and varied substantially between regions. Training staff was assigned to each of the regional offices, the FACTS Division, and the policy division at the state office with no one responsible for coordination or oversight of all the training activities being conducted. This arrangement allowed for a great deal of variation in the training that new and tenured workers received across the state with no method for coordination of systems training with policy training or oversight of training between regions and divisions. The centralization facilitated the completion of the extensive training required by the last West Virginia CFSR PIP and provided an opportunity to standardize and improve the quality of staff training that was being provided.

In 2004, additional positions were allocated for child welfare trainers out of a Legislative Improvement Package related to the CFSR PIP. Those positions evened out the number of regional child welfare trainers to four per region and allowed for an additional supervisor at the State Office. During this time period, some position classifications within the DOT were changed so that all the regional trainers had the same classification (Health & Human Resources Specialist, Senior).

The Division of Training continues to work to bring state-of-the-art knowledge and expertise into its training programs. For example, working with the West Virginia Coalition Against

Domestic Violence, a new Advanced Domestic Violence course, is in development with a projected implementation date of September 2008. This course will provide child welfare workers a greater understanding of the dynamics of domestic violence and the knowledge and skills to collaborate more effectively with adult victims and DV Advocates in the development of service plans for families impacted by domestic violence.

To enhance staff's competency in service provision, BCF implemented a pre-service training requirement for new workers. This decision required a substantial commitment by BCF staff and management because of staff turnover and the immediacy of the need for services to clients. The pre-service training requirement has ensured that staff has the basic knowledge and skills required to provide competent, effective services to clients, and the in-service training provided during the first year of employment helps to build and expand their knowledge and skills to further increase their effectiveness.

In the past several years, the DOT has greatly expanded its use of web- and technology-based training for Bureau staff. This approach has provided BCF with competency-based courses, has been cost-effective in both staff time and travel expense, and has been readily accepted by staff. With the widespread use of the internet, more employees are becoming comfortable with online learning and find this an easy, convenient way to get the information they need to perform certain aspects of their jobs. Web-based courses and webinars are used to train staff on smaller policy and program changes that do not require extensive classroom training; to introduce new workers to concepts, programs and practices; and to introduce new initiatives as a part of the change management process. The web-based courses have a built-in system for tracking students' enrollment and test grades, and are used by BCF trainers to monitor trainees' progress.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance in terms of the staff development and training system?**

Staffing vacancies always place a burden on the local offices which sometimes presents challenges for pre-service training. While most staff complete pre-service training prior to assuming a caseload, sometimes demands have resulted in child welfare staff being given workloads during the pre-service period. Workload demands may then prevent them attending some of the scheduled sessions or from returning to finish training. While having a consistent, standardized training for new staff helps to assure minimum levels of competencies, nonetheless there is an ongoing tension to shorten the timeframe prior to new staff assuming a caseload. In addition, high levels of staff turnover provide a strain on DOT's resources, with the majority of time and effort being spent on training new workers and less attention being given to tenured workers, supervisors, and support staff.

Evaluation of the structure, length and content of the pre-service training is an ongoing process. The pre-service period was recently shortened from sixteen weeks to thirteen weeks for CPS staff and eleven weeks for YS staff. While the current pre-service training period is 11-13 weeks long, this may still be overwhelming for new employees, particularly new graduates, expected to acquire basic skills, knowledge of Departmental policy and FACTS. Additionally, pre-service

D003730

training was expanded based on deficiencies found in the last CFSR; as the next review cycle approaches, DOT is rethinking some of the core competencies of these classes and evaluating exactly what content must be pre-service and what content could be in-service.

There is an increasing demand to ensure the training is more skill-, "real world" based. This applies not only to pre-service but to ongoing staff training initiatives as well. The pre-service training plan also includes OJT activities. Some of these activities could be better utilized, and DOT needs to be more involved with new staff during their OJT training periods.

Centralizing DOT produced more consistent training content and delivery. However, the next challenge of rests with a programmatic evaluation of training, as currently trainee class evaluations are the main means of assessing the impact of training. The DOT would like to formalize its evaluation process beyond customer satisfaction surveys and better understand the ultimate impact its training has on practice. Additionally, with the development of a multi-tiered evaluation process, DOT will be better able to assess the effectiveness of training on developing new worker competencies. The DOT has contacted the National Resource Center for Organizational Improvement to discuss receiving technical assistance on developing a comprehensive evaluation process, to be completed within the next year.

The DOT anticipates that evaluation of the effectiveness of training will require a close collaborative relationship from its customers/regional field staff and building on its partnership with OPQI. While DOT and OPQI have participated in local program improvement planning, it is anticipated more formal linkages and collaboration at the state level will provide the opportunity to identify trends and proactively develop training to address ongoing areas of challenge.

There is a recognized need for additional opportunities for ongoing staff training. While there have been a number of specialized topics and opportunities provided tenured staff since the last CFSR, there is a need to provide even more opportunities for tenured workers to gain increased knowledge and skills in working with children and families. The turnover rate has been problematic in that the Division has had to focus its resources on ensuring a sufficient number of pre-service training rounds are available. Having trainers located within the regions has enabled DOT to be more flexible in meeting the field's new staff training needs, but it ultimately affects emphasis/resources to devote to professional development.

Because of the extent of supervisory and training needs within BCF and the limited resources available within DOT, supervisory and management training needs related to specific program areas are not currently being fully met. To help meet this need, DOT is investigating the child welfare supervisory training developed by Colorado and available for the National Resource Center for Organizational Improvement. The DOT plans to implement this training within the next year after completion of this CFSR Review process.

D003731

> **Item 34:  Foster and Adoptive Parent Training.**  Does the State provide training for current or prospective foster parents, adoptive parents, and staff of State-licensed or State-approved facilities that care for children receiving foster care or adoption assistance under Title IV-E? Does the training address the skills and knowledge base that they need to carry out their duties with regard to foster and adopted children?

**What do policy and procedure require?**

*Foster/Adoptive Parent Pre-Service Training*

The state requires all prospective foster/adoptive parents, including kinship care relatives, to complete pre-service training (Home Finding Policy 14.2, Foster/Adoptive Family Provider Certification Process).  Utilizing the PRIDE (Parent Resources for Information, Development and Education) model, all prospective foster/adoptive parents must attend twenty-seven hours of training before placement can occur.  Training is provided through the members of SWEC, including Wes Virginia University (Region I), Marshall University and West Virginia State University (Region II), Shepherd University (Region III), and Concord University (Region IV).

An orientation session is scheduled prior to the first PRIDE session and is conducted by Department Home Finding Staff.  The pre-service orientation session provides information on the Department's program provisions, policies, legal requirements, and child care regulations. All necessary paperwork for application on becoming a foster/adoptive parent, such as the Application, Medical Examination Form, Reference Forms and Release of Information Forms, are also distributed, and all necessary CIB/NCID fingerprinting on each participant is completed during this session.

A training schedule is developed regionally between regional home finding staff and the participating university.  The regional home finding staff determine the number of rounds (a round is a full 27-hour training) to be provided each fiscal year.  The total number of rounds differs by region and is based upon caseload, inquiries and other identified needs that the region needs to accommodate.  Schedules are posted on the foster parent resource page sponsored by Concord University and the DHHR website.

PRIDE pre-service training is also required of the private child-placing agencies through their contractual agreements and Licensing Regulations for Child-Placing Agencies (July 2007). These agencies have the choice to provide their own PRIDE training or to have their prospective foster parents attend training through one of the SWEC universities.  The contracts are monitored by BCF for compliance through regular reporting and monitoring for compliance.

*Foster/Adoptive Parent In-Service Training*

All foster/adoptive parents must complete at least twelve hours of in-service training annually. The content of the training is based on needs mutually identified by the foster/adoptive parents or

D003732

the Department in the Family Development Plan.  The home finding specialist develops the Plan with the family, identifying the family's training needs related to the PRIDE competencies for the next year.    The Plan identifies training needs, specific learning opportunities the foster/adoptive parent must complete in order to address the parent's individual needs, and the estimated number of hours necessary to complete.  As part of the Plan, the home finding specialist ensures all foster parents receive training on Healthy Sexual Development so they may convey this information to children in their home in an age-appropriate manner.  In addition, all foster/adoptive parents must successfully complete First Aid and CPR and maintain their certification.

At the time of the last CFSR and until the past year, home finding staff were responsible for providing in-service training opportunities to foster parents in three regions of the state with the exception of Region IV.  As part of the PRIDE Foster Care Pilot in that region, in-service training was provided under a contractual agreement with Concord University, consisting of nine three-hour modules.  Three of these modules were developed at Concord, and the remaining six are CWLA advanced PRIDE modules.  These nine modules build upon the pre-service modules. Additionally, foster parents are given the opportunity to attend Advanced In-service sessions, which vary from year-to-year, depending upon the needs identified by regional home finding staff.  Topics may include Advanced Discipline, Psychotropic Medications, Sexually Reactive Children, etc.  Both in-service and advanced in-service training is offered in a group setting.

The in-service training for foster parents provided in Region IV was recently expanded statewide through a contract with Concord, who is partnering with other SWEC universities, to complete the training.  The frequencies of offerings are determined regionally by the number of available foster parents in the region.  Department home finding staff in the regions are active partners in topic selection.  Concord also sent a survey to all foster parents as part of their ongoing needs assessment to determine foster parent training needs.  This survey is in the process of being compiled, and the results will be used to develop and implement additional training topics.

Foster parents may also obtain training through videos, books, the internet, DVDs, TV educational programs and other resources that have been approved by the home finding specialist.  E-learning opportunities are increasingly available through an internet resource site for foster parents developed by Concord.  In order to earn hours for in-service training through one of these methods, the foster parent must provide the home finding specialist with documentation showing they gained knowledge from the training.  An example of this would be a narrative report on the topic.  The home finding specialist documents all in-service training in FACTS.

**Where was the child welfare system in Round One of the CFSR?**

The state was found to provide a mandatory pre-service and in-service training program for current and prospective foster parents and also adoptive parents that address the skills and knowledge base needed to carry out their duties with regard to foster and adopted children.

D003733

**What positive changes in performance and promising practices have been made since Round One?**

At the time of the last Statewide Assessment and review, PRIDE pre-service training was only available through the Region IV Foster Care Pilot.  Prospective foster/adoptive parents wishing to provide Kinship/Relative Foster Care and DHHR Foster Family Care in the three other DHHR regions were trained using the West Virginia Substitute Parenting Pre-service Orientation curriculum, developed by WVDHHR and WVU Center for Excellence in Disabilities in 1994. This training was provided by the regional home finders and scheduled quarterly.

The DOT assumed responsibility for foster parent training as part of the 2003 CFSR PIP. Responsibility included not only training of prospective foster/adoptive parents and kinship care relatives but training all existing foster parents in the PRIDE competencies.  This training was provided to all existing foster parents who had not completed the PRIDE training, and a two-day overview of the PRIDE model was provided to all child welfare staff.  This training continues to be provided to new child welfare workers as a part of their in-service trainings.

**What are the casework practices, resource issues, and barriers that affect the child welfare system's overall performance in terms of the staff development and training system?**

The overall response to PRIDE training has been positively received by both regional home finding staff and trainees.  With SWEC assuming responsibility for training prospective foster/adoptive parents and kinship care relatives, regional home finding staff have additional time to complete their home studies.

The increased emphasis on utilizing kinship care for children in the Department's custody has resulted in an appreciable increase in workload for both regional staff and the SWEC universities who provide the training without an appreciable increase in resources.  Along with this, a larger and larger percentage of the families in training are kinship families as opposed to new foster parent resources, while the PRIDE model is geared toward new foster parents.  Because of this, other models of foster parent training are currently being explored by the Department.

**E.  Service Array and Resource Development**

---

**Item 35:  Array of Services.**  Does the State have in place an array of services that assess the *Strengths* and needs of children and families, that determine other service needs, that address the needs of families in addition to individual children to create a safe home environment, that enable children to remain safely with their parents when reasonable, and that help children in foster and adoptive placements achieve permanency?

**Item 36:  Service Accessibility.**  Are the services in item 35 accessible to families and children in all political jurisdictions covered in the State's CFSP?

---

D003734

| Item 37:  **Individualizing Services.**  Can the services in item 35 be individualized to meet the unique needs of children and families served by the agency? |
|---|

**What do policy and procedure require?**

Child Protective Services policy requires the provision of services and support for children and their families to be based on an assessment of risk, identification of the child's and family's needs and strengths, and input from the child and family.

Helping CPS families must be based on the specific risk influences identified during the family assessment.  Since the underlying causes of risk are different for every family, services selected must be based upon the individual needs of the family.  All risk reduction treatment is directed toward one or more of the following outcomes:  self-sufficiency; communication skills; parenting knowledge and skill; problem solving skills; and developmental/role achievement.

Specific service alternatives for families and parents are identified as follows:  individual counseling; group counseling; marital/family counseling; psychiatric intervention; environmental restructuring; educational activities; lay therapy (self-help groups, mentoring, etc.); day care or day treatment; home management services; and parenting education programs.

Specific service alternatives for children are identified as follows:  West Virginia Birth to Three; early childhood programs; therapeutic day care programs; special education programs; play therapy; individual counseling; group counseling; art therapy; supportive services which include outings with social workers; mentors; Girl/Boy Scouts; 4-H Clubs; afterschool programs; church activities; etc.  For information about additional services available, please refer to Item 17.

The above listed alternative services are not intended to be an exhaustive list, as other alternatives may be available in local communities.  Services listed are not available in all local communities due to various barriers such as lack of qualified providers.  Community services districts are expected to work through the family resource networks, the community collaboratives and the regional summits to enhance the availability and accessibility of necessary services in the community.  Each local DHHR sends representatives to the community collaboratives/regional summits on a monthly basis in order to transfer knowledge on service/support trends with community stakeholders.  In addition, each county DHHR has a representative on their local family resource network board of directors.

Across the state, we are aware of gaps in service/support for families or at least a lack of communication about the availability of services for families.  To date, specific information about service gaps has been sporadic and anecdotal.  West Virginia is currently in the process of a statewide, standardized assessment of community support/services (service array process).

West Virginia's service array is a process that will assess current capacity to meet the needs of children and families, develop a service directory and a resource development plan.

D003735

The following four elements are being assessed through the service array:

- Child welfare practice
- Child welfare leadership and culture
- Current services
- Needed new services.

The process is currently in full swing:  First Implementers group just beginning to write the report on the service array findings

- The first round is currently in the assessment phase
- The second round has just completed their Community Snapshot
- The third round was introduced to the process the end of April 2008.

The first implementers will complete their assessment, their community directories, and their Service Array Community/State Plan; then will begin implementation by December 2008.

MDTs are utilized to develop the case plan and monitor case plan progress.  WV Code 49-5D-1 allows for MDTs to be used in non-court cases as well as for court cases.  The purpose of these MDTs is to provide a system for an evaluation of coordinated service delivery for children who may be the victims of abuse/neglect and children undergoing certain status offenses and delinquency proceedings.  There are other circumstances where convening a formal MDT is recommended but not required by statute.  When convening an MDT is discretionary, there are two options available to the social worker; i.e., 1) though not required, convene a formal MDT in accordance with the statutory requirements; or 2) convene a meeting of relevant parties to discuss the case.

**Where was the child welfare system in Round One of the CFSR?**

Overall, the state was found to be in *substantial conformity* with the systemic factor service array.  Item 35 was rated as a *Strength*, because the state provides a basic core of services to children and families.  Stakeholders cited services that have significant gaps such as mental health and substance abuse treatment.  Another area of concern was the lack of specialized placement resources for children with special needs, such as those with behavior problems, dual-diagnosed children and sex offenders.

Item 36 received an A*rea Needing Improvement* rating because the distribution of Title IV-B services is uneven around the state and all services are not available in every county.  The MDT process is not consistently utilized across the state and is not routinely made available to parents and foster parents.  Stakeholders noted that transportation is a major service that is lacking in many areas of the state.

Item 37 received a *Strength*, because the MDT process allow for a thorough assessment of the child's and families' needs and develops a service plan to meet those identified needs on an

D003736

individual basis.  The stakeholders noted that the MDT serves this purpose but is used inconsistently across the state.  Inconsistencies include where, when and how the MDT is held, who facilitates the meeting, who attends the meeting or if the meetings are being held.  To address these inconsistencies, the Department, the CIP and WVU have collaborated to complete an MDT Study.  (For information about this, see Systemic Factor B, Case Review System.)

**What are the positive changes and promising practices that the child welfare system has demonstrated in terms of service array?**

There are several collaborative efforts in place which bring the various agencies and individuals to the table to address the needs and services of West Virginia's children and families.  As a result of the PIP, a position was developed to oversee the community collaborative and family resource networks (FRN) in an effort to improve their effectiveness.

In the early 1990's, BCF partnered with the Child Placement Alternatives Corporation in the establishment of the community collaborative process.  This process has evolved over the years, and there are presently thirteen community collaborative groups across the state that identifies service needs and gaps on a multi-county level.  The collaboratives are involved in the services array process which is a process that includes assessing current capacity to meet the needs of children and families, the development of a service directory, and a resource development plan.

FRNs:

- Provide another forum for collaboration

- Are non-profit, community-based organizations that provide a local forum for cross-system deliberation, planning, and problem-solving

- Assess community needs and resources by seeking input from local community members and families

- Engage local agencies, parents and other stakeholders to improve the community; and

- Develop and implement a "community plan" that assists them in evaluation, communication and the reporting of results

- (Some) provide training for social workers for little or no fee.

Regional Summits represent yet another collaborative effort and are utilized in the identification of service needs and serves a means to seek solutions for those needs with assistance of the appropriate state entities.

During the summer of 2004, the DHHR established a committee with representatives and stakeholders from the many disciplines serving children, youth and their families, both directly and systematically.  The charge of this committee was to develop a strategic plan containing specific strategies and timeframes to reduce the reliance on out-of-state resources to care for children and youth in the custody of the Department.

D003737

The Strategic Plan Committee formed three workgroups to continue the movement of the action steps that were part of the plan.  One of the workgroups was the Service Development and Delivery Task Group.  Membership was open to both members of the Strategic Plan Committee and others who expressed an interest in the group's focus.  The Commission to Study Residential Placements of Children was established by Legislative Code on April 9, 2005.  House Bill 2334 mandated the Commission to study twelve major areas, one of which included identification of in-state service gaps and the feasibility of developing services.

In order to accomplish their task, the Commission deployed working groups of practitioners and family members.  One of the members of this task group was the newly created Community Collaborative Partnership Coordinator position created due to recommendations found in WV's PIP.

In anticipation of a recommendation for a service array process, the regional children's summits and collaboratives began a standardization process in preparation for a statewide assessment process.  The regional children's summits and, specifically the community collaborative groups (thirteen across the state), identify service needs and gaps on a multi-county level, which increases the sense of community ownership for children and families.

Meanwhile, the Commission to Study the Out-of-State Service Development and Delivery Workgroup chose the service array assessment process from National Child Welfare Resource Center for Organizational Improvement (NRCOI) and the National Resource Center for Child Welfare Data and Technology (NRCCWDT), a Service of the *Children's Bureau/Training and Technical Assistance Network Administration for Children and Families, U. S. Department of Health and Human Services.*

The National Resource Center came to West Virginia to kick off the process with an updated/improved service array assessment process in June 2007.  The technical assistance from National Child Welfare Resource Center for Organizational Improvement includes providing free training and support and building capacity by Train the Trainers in order to sustain the process.  West Virginia's service array is a process that will assess our current capacity to meet the needs of children and families, develop a service directory and a resource development plan.  The information gathered in our service array process will enhance our work on the PIP.  The process was a natural reaction to the Commission's action plan and fit perfectly with our transitioning of the system of care principles and values statewide.  The information gathered by the standardized assessment will be added to the service information gathered by our newly created Regional Clinical Care Teams that assist local MDTs with services/support information.

The West Virginia's service array in child welfare is to assess the capacity of the State of West Virginia to meet the individualized needs of children and families, to create a resource and capacity development plan and a resource directory.  The enhanced service array process looks into whether our state's service array has the capacity to achieve positive outcomes for children and families.

D003738

Four elements of the jurisdiction's service array capacity assessed include child welfare practice, child welfare leadership and culture, current services, and needed new services.  The results of the assessment will lead to the creation of a Capacity Development Plan.  The Plan will provide strategies to enhance West Virginia's capacity to serve children and families through an appropriate and flexible child and family service array that will achieve positive outcomes.

To complete this task, the summit/collaborative membership must engage the state's leaders as active stakeholders in the development and provision of outcomes-based services for children and families in the child welfare system (state leaders include agency leadership, community leadership, funding resources, providers, and multiple stakeholders).  They must enhance relationships across the various child- and family-serving systems, clarify for leaders (state leadership, community leadership, funding sources, providers, and other supports for families) the importance of their participation in improving the child welfare system which will also benefit them and their work and also enhance working relationships across the various child- and family-serving systems.

The service and supports that are evaluated in the service array process are rated according to four different assessments.

1.  The first assessment is of current practices as they relate to the capacity being assessed.

2.  The second assessment is of current leadership and systemic culture as they relate to the capacity being assessed.

3.  The third assessment is of current services as they relate to the capacity being assessed.

4.  Finally, the fourth assessment is of any needed non-existing services as they relate to the capacity being assessed.

The seven capacities being assessed in the West Virginia's Service Array are:

1.  **Safety Outcome 1.**  Children are first and foremost protected from abuse and neglect

2.  **Safety Outcome 2.**  Children are safely maintained in their homes when possible

3.  **Permanency Outcome 1.**  Children have permanency and stability in their living situation.

4.  **Permanency Outcome 2.**  The continuity of family relationships and connections are preserved.

5.  **Well-being Outcome 1.**  Families have enhanced capacity to provide for children's needs.

6.  **Well-being Outcome 2.**  Children receive services to meet their educational needs.

7.  **Well-being Outcome 3.**  Children receive services to meet their physical and mental health needs.

D003739

After the completion of the assessment process, the workgroups present their assessment of respective capacities and are then charged with creating a resource and capacity development plan for their respective capacities.  The plan includes strategies/initiatives to enhance the capacity of the community to meet the individualized needs of children and families.

For recommendations and priorities regarding services, changes required to implement the plan (for example, utilization estimates, costs, or financing strategies; contracting methodologies, policies, procedures, etc.) are identified and pursued.  The priorities and implementation plans are presented, and the support and participation of the community stakeholder members are enlisted.  The collaborative continues to monitor and evaluate the priorities and oversee the implementation plan and its effects on child welfare outcomes.  Implementation workgroups will be used to assist in prioritized initiatives and to make sure barriers are addressed and successes are celebrated.

To begin the process, there was a decision to start with one collaborative as First Implementer which was the 4Cs Collaborative which includes Braxton, Clay, Nicholas, and Webster Counties.  All meetings were to be held in a central location so that statewide observers could attend and be trained in order to transfer knowledge of the process to their individual collaboratives.  The rest of the state would begin the process in three groups of four collaboratives so that the process could incorporate lessons learned from the First Implementer group.  The process was rolled out as follows:

**Round One**
- Intermountain Collaborative (Preston, Taylor, Randolph, Upshur, Lewis)
- Upper Potomac Collaborative (Grant, Hardy, Pendleton, Hampshire, Mineral)
- Kids in Transition (Berkeley, Jefferson, Morgan)
- North Central Community Collaborative (Monongalia, Marion, Harrison)

**Round Two**
- Family Ways (Hancock, Brooke, Ohio, Marshall, Wetzel, Tyler)
- Little Kanawha ( Calhoun, Gilmer, Pleasants, Ritchie, Wirt, Wood, Doddridge)
- CWLM ( Cabell, Lincoln, Wayne)
- Family Central Collaborative (Kanawha, Putnam, Roane, Jackson, Mason)

**Round Three**
- Logan, Mingo, Boone Collaborative (Logan, Mingo, Boone)
- Greenbrier Connections (Greenbrier, Monroe, Pocahontas, Summers)
- Raleigh/Fayette Collaborative (Raleigh, Fayette)
- South Central Community Collaborative (Wyoming, McDowell, Mercer)

The service array process assists collaboratives to determine what services and supports are available for families and the quality of services available.  It also guides the group to understand what services might be beneficial to develop and will create a comprehensive service directory for their county and community.

D003740

The Resource and Capacity Development Plan will be developed from assessment data.  The plan will be merged at the regional level by the regional children's summit and at the state level by the WV System of Care Implementation Team.  The Resource Development Plan will lead to service development and service delivery strategies to improve outcomes of well-being, safety and permanency for WV's children and families.  The Resource Development Plan will have two levels; i.e., community and statewide.  The community portion of the findings will be left at the collaborative level to seek funding sources, grants, faith-based, etc., to develop service provision partners, to educate community partners and to advocate for local change.

The strategies to develop services include:

- *Engage the state's leaders as active stakeholders* in the development and provision of outcomes-based services for children and families in the child welfare system (state leaders include:  agency leadership, community leadership, funding resources, providers, multiple stakeholders.)

-  *Enhance relationships* across the various child- and family-serving systems.

- *Clarify for leaders* (state leadership, community leadership, funding sources, providers, and other supports for families) *the importance of their participation in improving the child welfare system which will also benefit them and their work.*

- *Enhance working relationships* across the various child- and family-serving systems.

- *Assist* internal and external community *stakeholders* in *formulating the core values and principles that need to guide the work of the child welfare system.*

- *Address practice at both the casework and system levels.*

- *Provide a mechanism through which a jurisdiction* at the local level *can continually assess and enhance its capacity to address the individualized needs of children, youth, and families.*

- *Build* the state's/tribe's/stakeholders' *capacity* at the system level *to assess and enhance the service array on an ongoing basis.*

- *Incorporate information from already existing needs assessments* previously conducted and build on existing planning processes.

- Predicated on the establishment of a *child welfare practice model* that is based on the practice principles of the CFSR: *family-centered, community-based, individualized services, and enhanced parental capacity.*

- *Data driven* so that jurisdictions and states can assess and improve performance utilizing outcome measurements in the CFSR.

- *Collaborative in nature* and necessitates the building, strengthening, and maintaining of a stakeholder collaborative in the jurisdiction as well as community partnerships in the delivery of services.

**D003741**

- *Built on the recognition that state, tribal, and community stakeholders*, along with the state and/or local child welfare program, *hold ownership of the outcomes for children and families* and consequently share responsibility for ensuring that services and resources are available for families when they are needed.

The statewide plan will utilize NRC TA to develop a statewide plan of service delivery and development, future planning for service delivery and development and will begin a shift of focus from high level services to preventative, community-based services. The collaborative groups involved in this process have been previously listed in this narrative.

**What are the resource issues and barriers that affect the child welfare system in terms of the service array?**

Some potential barriers to WV's service array process include:

- Rural/geographic constraints
- Time commitment (requires major time commitments on the part of the participants and time to assess the service array and develop services to achieve outcomes)
- Implementation of "new service array design (we are learning the process as we move forward as is the NRCOI)
- Getting and maintaining community stakeholders involvement in the service array process
- Time commitment on the state level (personnel)
- Fiscal resources and human resources from the state for statewide implementation
- Sustaining the process.

In 1999, West Virginia was awarded a grant to a model initiative called the Mountain State Family alliance (MSFA), to implement a comprehensive system of care strategy beginning in twelve WV counties (Region II). The Region II System of Care grant ran from October 1999 to September 2006.

The WV Commission to Study Residential Placement of Children was created by an act of the 2005 Legislature (HB 2334) Section §49-7-34 of WV Code to achieve systemic reform for youth at risk of out-of-home residential placement, and to establish an integrated system of care for these youth and their families.

In 2006, the Legislature designated the Department to provide oversight and implement the recommendations of the commission (as outlined in the report *Advancing New Outcomes*) and to develop a statewide System of Care Implementation Team in order to direct, oversee and monitor all activities related to developing a system of care for children and their families. The first meeting of the WV SOC implementation Team was July 31, 2006.

D003742

The vision of the SOC Collaborative is that children with, or at risk of, social/emotional or behavioral health challenges and their families will receive individualized services and supports that are family-driven, blended across systems, and delivered through partnerships among families, providers, communities and systems. Unfortunately, most supervisors and workers are unaware of the collaborative and are unable to access the services for their cases.

While it is true that a mechanism needs to be in place to widely distribute information about the initiatives that are occurring, a lot of effort was made to ensure that supervisors and workers received opportunities to receive information on the WV System of Care. Community Conversations (presentation/focus groups have been provided throughout the state including: Statewide Supervisors Meeting, participation of field staff on the System of Care Regional Clinical Review Teams, and electronic announcement/clarifications have been disseminated to field staff. Additionally, information about the West Virginia System of Care can be obtained from the website www.wvsystemofcare.org.

Workgroup participants identified the lack of information and communication as a barrier to the success of the above mentioned groups. They would like to see a system developed that would bring all information regarding the collaborative efforts to a centralized point for distribution to the field to ensure all parties are working toward the same goals and to ensure maximum benefit without duplication of efforts. Program reviews clearly documented the lack of knowledge regarding the various collaborative efforts. Workers frequently had limited knowledge of how to access services offered by the various groups. Many of the districts have implemented innovative and successful approaches to improve communications. Joint meetings are taking place within the districts to bring all the individual players to the same table in an effort to improve communication on the district level. Stakeholders and Department staff alike indicate an interest in expanding district-level meetings throughout the state to improve communication and cooperation.

## F. Agency Responsiveness to the Community

> **Item 38: State Engagement in Consultation With Stakeholders.** In implementing the provisions of the CFSP, does the State engage in ongoing consultation with tribal representatives, consumers, service providers, foster care providers, the juvenile court, and other public and private child- and family-serving agencies, and include the major concerns of these representatives in the goals and objectives of the CFSP?
>
> **Item 39: Agency Annual Reports Pursuant to the CFSP.** Does the agency develop, in consultation with these representatives, annual reports of progress and services delivered pursuant to the CFSP?
>
> **Item 40: Coordination of CFSP Services With Other Federal Programs.** Are the State's services under the CFSP coordinated with the services or benefits of other Federal or federally assisted programs serving the same population?

D003743

**What changes in performance and practice have been made since the Round One CFSR including case work practices, resource issues and barriers?**

Foster Care Policy, Section 1.16, Indian Child Welfare Act, requires the Bureau to honor all of criteria in the federal Indian Child Welfare Act.

Currently, WV does not have any formally recognized federal or state Indian tribes. Although the state does not recognize any tribes, the Bureau does require staff to comply with the requirements of the Indian Child Welfare Act, since the state does have a population of individuals with Native American linage.

The Bureau provides training to staff on the requirements of the Indian Child Welfare Act. It is provided in the training on foster care policy and protocols and on legal requirements.

Throughout WV, there are some individuals who have formed organizations in order to preserve the Native American principles, traditions, history, culture and ancestry. These organizations also provide communities with education and social supports. One of these organizations is called the National American Indian Federation, Inc.

The National American Indian Federation, Inc. (NAIF) is located in Huntington, WV. Membership in the organization is free, and they represent several different tribes within WV.

The Bureau contacted the NAIF organization concerning the Indian Child Welfare Act and the state policy for Foster Care, Chafee and Adoption. The NAIF met with Bureau representatives to work with the Department to determine if the state's policy is meeting the requirements of the Indian Child Welfare Act.

WV Code §49-5D-1-8 and children's services policy requires the Department of Health and Human Resources to participate at both the state level and community level in a number of MDT efforts.

- MDTs are established in each county to coordinate or cooperate with the initial and ongoing investigation of all civil and criminal allegations pertinent to cases involving child sexual assault, child sexual abuse, child abuse/neglect and may make recommendations to the county prosecuting attorney as to the initiation or commencement of a civil petition and/or criminal prosecution. Members include:
  - Representatives from CPS
  - Local law enforcement
  - Child advocacy centers
  - DV programs
  - Prosecuting attorneys.

D003744

The degree of coordination and cooperation between the entities varies from county to county.  Some counties have active MDTs that meet on a regular basis and coordinate investigations.  Some counties routinely conduct joint investigations on reports of sexual abuse and serious physical injury of children

- Multidisciplinary Treatment Teams are established for each case involving child abuse/ neglect, juvenile status offense or juvenile delinquency judicial proceeding.  The team assesses plans and implements a comprehensive, individualized service plan for children, youth and their families.  Members of the team include:

  ♦ The child or youth when age appropriate
  ♦ The child's parent, guardian and/or custodian
  ♦ Other immediate family members
  ♦ The attorney representing the child or youth
  ♦ The attorney representing the parents
  ♦ The prosecuting attorney
  ♦ A child advocacy center representative
  ♦ A court appointed special advocate (CASA)
  ♦ A school official
  ♦ Service providers
  ♦ A juvenile probation officer, when indicated.

- The Child Fatality Review Team is established under the Office of the Chief Medical Examiner.  It is an MDT created to review the deaths of children under the age of eighteen years.  Members of the team include:

  ♦ The chief medical examiner
  ♦ Two prosecuting attorneys
  ♦ Superintendent of the state police
  ♦ A law enforcement official
  ♦ A CPS worker
  ♦ A physician
  ♦ A pediatrician
  ♦ A social worker
  ♦ A representative from maternal and child health
  ♦ A representative of the SIDS program
  ♦ The director of children's mental health
  ♦ The superintendent of the Department of Education
  ♦ The director of the Office of Children and Adult Services
  ♦ The director of Juvenile Services, and
  ♦ The president of the School Nurses Association.

D003745

The Bureau is involved in numerous activities and organizations related to involving consumers, service providers, foster care providers, the courts, and others in the accomplishment of the objectives of the Child and Family Services Plan, including:

## A.  Citizen's Review Panel

The West Virginia Citizen Review Panel is comprised of individuals representing a diverse mix of concerns, interests and professions.  The Panel meets on a bi-monthly basis in a centralized location that is easily accessible for everyone.

Since the early 1990's, the Bureau for Children and Families has partnered with the community collaboratives.  Today, there are thirteen statewide.  The community collaboratives are sub-groups of the regional summits.  These Summits are comprised of local representatives and have an established process to identify service needs and to seek solutions for needs with the assistance of the appropriate state entities.

To provide a liaison between DHHR's Bureau for Children and Families and the community collaboratives, a Community Collaborative Partnership Coordinator (CCPC) was hired.  Since June 2006, the CCPC has begun hosting statewide collaborative meetings.  These meetings have helped the collaboratives establish a common vision, mission, purpose and function.  More information on the work of the CCPC is included in Section E of this report.

Representatives from the FRN attend the community collaboratives and the summit meetings and will be involved in the standardized service array.

The FRN is a community-based organization charged with developing a local community plan to address the coordination of local services, creating strategies for systemic improvements, and evaluating results of the health care delivery system.  More information on FRNs is included in Section E of this report.

## B.  Court Improvement Program

The Department continues to partner with the WV Supreme Court of Appeals to accomplish the goals and objectives of the Court Improvement Program (CIP).  Meetings are held quarterly and include representatives of the Supreme Court, DHHR, Bureau for Children and Families, the judiciary, attorneys, public defenders, child advocates and a former foster care youth.  Some of the significant initiatives have included the development of a uniform case plan for foster children, the exchange of case data, cross-disciplinary training and research on the performance of MDTs.

The CIP Training Grant Committee has been addressing areas that will prove helpful in the Commission's work.  The task is to:

D003746

1. Develop and implement Judicial Leadership Roundtable (JLR) sessions, judge-led cross-training and best-practice seminars

2. Reevaluate and update multidisciplinary treatment team training.

3. Provide continuing education to judicial officers

4. Continue to provide cross-disciplinary basic and advanced training on child abuse and neglect law and procedure.

Work continues to support the MDT process. The CIP Training Grant Committee, along with members of the Commission's MDT workgroup, has created a uniform Case Plan and Case Plan Review (Summary) to be used statewide. The projected date for implementation is September 1, 2008. For additional information about the MDT workgroup and Uniform Case Plan, please refer to Systemic Factor B, Case Review System. The CIP Training Grant Committee has also begun a statewide assessment of current MDT practices and procedures that includes:

- Background analysis and observation of the MDT process & focus group interviews
- Mail survey of MDT participants
- Final technical report.

## C. Youth Development

Chaffee Community Support Services (CSS) collaborates with many other agencies to provide foster care and former foster care youth services necessary for the effective transitioning to an adult. Some of these services include: continuum of care to transitioning adults; care coordinators for former foster youth; employment skills training; educational support; and various housing assistance projects for former foster youth. For more information about these major initiatives, refer to section B entitled, *Chaffee Foster Care Independence Program (CFCIP)*.

## D. Faith-based and Community Initiatives

The West Virginia Department of Health and Human Resources has several continuing recruitment efforts. Many of these are in partnership with Mission WV, a faith-based initiative, including One Church One Child (funded by DHHR) and the Heart Gallery, Wednesday's Child, Wednesday Wonderful Kids, Recruitment Families and Wallet Buddies. To aid in maintaining these recruitment efforts, West Virginia enlisted technical assistance from AdoptUsKids. As a result, a strategic plan was developed. The plan provides for the Department to collaborate with stakeholders to promote adoption and recruit foster and adoptive families. Stakeholders include Mission West Virginia, private child-placing agencies, the FRNs, and our foster/adopt parent associations.

**D003747**

**Where was the Child Welfare System in Round One of the CFSR?**

Items 38, 39 and 40 were all rated as S*trengths* due to the engagement of consumers, providers, courts, family-serving agencies, public and private agencies and other federally assisted programs in ongoing consultation and evaluation.

**What are the *Strengths* and promising practices that the child welfare system has demonstrated in terms of agency responsiveness to the community?**

Many initiatives involving the child welfare system, the judiciary, law enforcement, public and private agencies and consumers have occurred and continue to occur in West Virginia:

**West Virginia System of Care (SOC)**

The West Virginia System of Care (SOC) is a public/private/consumer partnership dedicated to building the foundation for an effective continuum of care that empowers children at risk of out-of-home care and their families.

The SOC is about agencies, families, and communities interacting intentionally to create the best possible access to care for children and their families. It is about changing the way agencies in communities regard families with children who face emotional, social and behavioral challenges. It is about changing the way schools, juvenile courts, child welfare programs, and mental health agencies work together, in concert with children and their families, to ensure there is no "wrong door" through which they may pass in order to receive needed service. It is about changing the way agencies and individuals provide money to pay for needed services so that the process appears "seamless" to parents and their children.

When agencies, families, and communities come together, they gain knowledge about the availability of resources, how to access these resources and what resources are still lacking. However, it's not just about resources. Collaboration includes gaining an understanding of the issues from another person's perspectives. Currently, funding streams are compartmentalized. On the other hand, the SOC advocates blending funds that not only utilize resources more effectively but promote seamless service delivery.

The SOC Implementation Team includes members from the Department of Education, the Department's Bureaus for (Children and Families), (Behavioral Health & Health Facilities), and (Medical Services), Military Affairs & Public Safety's (Division of Juvenile Services), WV Supreme Court of Appeals' (Probation Services), providers, Family Resource Networks and the West Virginia SOC. The SOC Implementation Team has been very active over the past year.

The SOC is posed to assist with the outcomes of the CFSR by providing comprehensive ongoing assessments for children (Item 17), meeting children's mental health needs (Item 23), enhancing the array of services (Item 35) that are more accessible to children and families(Item 36), and are individualized to meet their unique needs (Item37). Together, this will decrease the need for

**D003748**

higher levels of care, bring a consistent set of policies and processes across agencies that will integrate best practices, maximize agency resources, and develop more locally available services for children and their families within their community.

A new clinical review process has been implemented through the SOC. This is a coordinated effort designed to provide a comprehensive, objective, clinical review of designated youth. One of the results was refinement of a permanent clinical review tool with a uniform statewide structure and protocols. This tool will guide the regional clinical review teams when assessing youth at risk or in out-of-state/-region placements. Regional clinical coordinators have been hired through the SOC to facilitate the regional clinical process. The role of the regional clinical coordinator will include recruiting, facilitating and supporting the clinical review teams. They work with child welfare, families, behavioral health, education, probation, and others in the community to ensure the needs are being met for children/youth that are at risk of going out-of-state, and for those children/youth that are returning.

The West Virginia SOC has partnered with Legal Aid of West Virginia to provide a family and youth voice and presence in all systems. Legal Aid is a statewide non-profit organization that provides a wide range of services through a network of thirteen offices throughout the state. Still in development, the Legal Aid Family Advocacy Support and Training (FAST) program will create a statewide parent-to-parent and youth support network. The FAST program will train and educate families to be advocates for their children and other families that have mental and behavioral health needs.

The service array assessment process has begun with the first of thirteen community collaborative teams preparing to report their assessment results in April. The service array assessment process can help determine what community services and supports are available as well as what additional services might be needed. This process will assess current capacity to meet the needs of children and families and develop a service directory and resource development plan. At the state level, the SOC Implementation Team will take the lead in the development of services and service delivery strategies to improve outcomes for the well-being, safety and permanency for WV's children and families. West Virginia is being provided technical assistance by Steve Preister, John Bumgarner, and Paul Dilorenzo from the National Child Welfare Resource Center for Organizational Improvement.

**Commission to Study Residential Placement of Children**

The Commission to Study Residential Placement of Children was established by Legislative Code (H.B. 2334) in 2005. The legislation mandated the Commission to study strategies and methods to reduce the number of children presently placed out-of-state, a system of care approach, barriers in developing needed services and how to fund these services, and other special issues and activities that were already being implemented in West Virginia that focused on certification issues regarding facilities.

D003749

With the common value of doing what is best for the child, the Commission provided significant recommendations found in its summary report, *Advancing New Outcomes: Finding, Recommendations & Initial Actions of the West Virginia Commission to Study Residential Placements of Children* (May 2006).  These key findings showed there was inconsistency and a lack of standards in many facets of the entire system, a critical need for stability of placements, and a need for more accurate data to support objective decision-making.  Since publishing its summary report, the Commission has been busy implementing its recommendations.

Effective cooperation and communication among the participating entities (circuit judges, the State Supreme Court, the Division of Juvenile Services, the Department of Education, the Prosecuting Attorneys Institute, the Department of Health and Human Resources and others) continues at a high level, especially agency-to-agency interaction outside of the direct Commission work.

Through periodic meetings, the commission has used a formal tracking and monitoring process to ensure its work is achieved.  The Commission continues to rely on working groups who are composed of many individuals with appropriate expertise to focus on specific recommendations.  These working groups work on actions as outlined by the commission.  Further, every effort is made to continue enhancing the working relationships among key agencies involved in the Commission's work.  The Commission's dedicated website is active at www.residentialplacementcommission.org.

To assess from the perspective of judges who are working with the disposition of children before the court, the judicial representatives on the Commission agreed and fully supported doing a special survey across the state.  The survey focused on what services were available locally to the judges that could address the needs of the child.  Beyond identifying the existence of such services, the survey asked for an opinion of the quality and effectiveness of the service(s).  Although not all judges participated within the survey's timeframe, those that did were helpful in providing an understanding of what is in place, what needs improved and what opportunities exist to add services.  There were thirty-six respondents to the survey which represented forty-one counties.  Two respondents did not complete the demographic information (county, circuit).  Three other respondents answered the questions for multiple counties.  The response rate was 77.4%.

The report was done, by county, in the four DHHR regions.  This actively shows the extent the Commission is willing to go to get information that helps make better decisions, especially the deployment of resources.  This information will be incorporated into the service array assessment.

**Community-Based Team**

Community-Based Team is a grouping of services delivered by multi-agency teams designed to provide community-based integrated services for youth in out-of-state/-region placements or to prevent out-of-state/-region placements that are youth-driven, strength-based, and family-

D003750

focused.  Many of these same youth receive federally assisted services provided by substance abuse and mental health agencies.

**West Virginia Out-of-Home Care Education Task Force**

In response to concerns raised regarding the educational status of children in out-of-home care, the West Virginia Department of Education formed a West Virginia Out-of-Home Care Education Task Force in 2004.  The Task Force found that a large number of WV children in out-of-home care are seriously behind in educational achievement, and a number of barriers persist in limiting their receipt of full access to public education.  Findings and recommendations of the Task Force were documented in a report submitted to the West Virginia Board of Education in September 2005 entitled, *Reaching Every Child:   Addressing Educational Attainment of Out-of-Home Care Children in West Virginia*.  The work of the Task Force has been continued via the recent formation of an implementation group called the Out-of-Home Care Education Advisory Committee.

**Coordinator of Homeless Education, Attendance and Student Placement**

During this past year, a Coordinator of Homeless Education, Attendance and Student Placement was established within the Office of Institutional Education Programs (OIEP).  One primary area the Coordinator will focus on is students who have had multiple placements throughout their education.  This position will help support the work of the Education of Children in Out-of-Home Care Advisory Committee as well as the Commission to Study Residential Placement of Children.

**Education of Children in Out-of-Home Care Advisory Committee**

A number of accomplishments have been achieved in the area of education.  The West Virginia Department of Education, after the initial implementation of the Reaching Every Child Task Force, began a new phase this past year by establishing the Education of Children in Out-of-Home Care Advisory Committee, which includes more practitioners, especially at the county level.  Under the leadership of Dr. Pamela Cain, Assistant Superintendent, Division of Student Support Services, Office of Institutional Education Programs, has been given the responsibility to oversee the continued implementation of the recommendations of the original R*eaching Every Child* report but also more specific attention to out-of-home children.  This includes work with homeless children under the McKinney-Vento Act.

Working closely with the Department of Education, the Commission has gained greater understanding of the McKinney-Vento Act and how it affects policy and procedures in West Virginia.  During this past year, an agreed upon definition of "awaiting foster care placement" was developed that will provide specific guidance on how West Virginia foster children will be included in provisions of the Act.

D003751

**Statewide System of Care**

The Department of Health and Human Resources and the Division of Juvenile Services have formed a partnership to address issues for adjudicated delinquent youth placed out-of-state. Secretary Walker (DHHR) and Secretary James Spears, Department of Military and Public Services (MAPS), along with members of their staff, met to address issues for adjudicated delinquent youth placed out-of-state (approximately half of those placed out-of state are adjudicated delinquent youth). It is anticipated that the statewide System of Care initiative will also be involved.

**Transitioning Youth Program**

The Bureau for Behavioral Health and Health Facilities has implemented two Transitioning Youth programs within the northern and southern sectors of the state. These programs involve a three-phase transition to independence for youth ages 17-21. The program serves individuals with a diagnosis of mental health, mild mental retardation and/or stable abstinence from previous substance abuse. The goal of the program is to provide services that support the individual to live independently, including obtaining education or employment, maintaining a safe lifestyle, and establishing relationships with families.

Funding for the southern program went to Stepping Stones in Lavalette. All youth enrolled in the Phase I Program are actively involved in an educational program. Youth are being assessed for career and interest to be linked with appropriate community vocational, certification and employment opportunities. The program is staffed with one transition coach and three youth workers. This program serves four males, ages 16-20, in Phase I of the program (Level I residential); up to six males or females, ages 17-20, in Phase II (supervised apartments), and can serve an additional twelve males or females, ages 17-20, in Phase III (scattered site apartments). Currently services are being provided to eight youth. Funding for the northern program went to Burlington United Methodist Family Services, Inc. in Keyser. The first resident moved into the facility in January 2008. Burlington's capacity is four youth, and they are currently serving four.

The Department of Health and Human Resources has provided funding for four group homes for adolescent children with co-existing disorders. These group homes will provide treatment for children with multiple disabilities in local communities and will promote opportunities for permanency for these children at the local level. These four group homes will be located in each of the four DHHR Regions.

The Department of Health and Human Resources is an umbrella, cabinet level agency within West Virginia state government. The Department includes all public health, social services, child welfare, family assistance and medical and behavioral health programs. There are five Bureaus within the Department:

- Behavioral Health
- Child Support

D003752

- Children and Families
- Medical Services and
- Public Health.

Each Bureau has an appointed Commissioner who reports directly to the Secretary of DHHR. The Secretary is a member of the Governor's Cabinet. The Bureaus within the Department work together to coordinate and cooperate the planning and delivery of social welfare, medical and public health services. The Bureau for Children and Families includes responsibility for federal programs involving child welfare, TANF, SNAP, adult services, early care and education. The Commissioner and the Assistant Commissioners for the various divisions work together as a leadership and management team to plan and deliver public social welfare services. There are numerous examples of federally funded programs working together. Examples include:

- A portion of the TANF funds is directed toward Children and Adult Services the purchase of social services for adults and children.

- The Division of Early Care and Education works cooperatively with TANF, Child Welfare, Head Start and the Department of Education to deliver parent education, child care and early education programs to children and families. The Community-Based Child Abuse Prevention Act, Child Care, Child Abuse Prevention and Treatment Act, Promoting Safe and Stable Families Act, Title XX and Children's Trust funds are used in combination to support these services.

- The Child Welfare and Child Support programs work cooperatively together to obtain child support on behalf of children who enter foster care.

- The Child Welfare, Medicaid and Maternal and Child Health programs work cooperatively to provide Early Periodic Screening and Diagnostic and Treatment services for all children in foster care.

Input from parents, youth, local Department staff, foster/adoptive parents and professional and advocacy groups is obtained from the myriad of collaborative organizations and efforts with which the Bureau for Children and Families is involved.

### G. Foster and Adoptive Home Licensing, Approval, and Recruitment

**Item 41: Standards for Foster Homes and Institutions.** Has the State implemented standards for foster family homes and child care institutions that are reasonably in accord with recommended national standards?

**Item 42: Standards Applied Equally.** Are the standards applied to all licensed or approved foster family homes or child care institutions receiving Title IV-E or Title IV-B funds?

D003753

**Item 43:  Requirements for Criminal Background Checks.**  Does the State comply with Federal requirements for criminal background clearances related to licensing or approving foster care and adoptive placements, and does the State have in place a case planning process that includes provisions for addressing the safety of foster care and adoptive placements for children?

**Item 44:  Diligent Recruitment of Foster and Adoptive Homes.**  Does the State have in place a process for ensuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children for whom foster and adoptive homes are needed in the State?

**Item 45:  State Use of Cross-Jurisdictional Resources for Permanent Placements.**  Does the State have in place a process for the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children?

**What do policy and procedure require?**

Foster and adoptive family care homes in West Virginia are certified either by the Department of Health and Human Resources' Bureau for Children and Families or by a licensed child-placing agency.

The Bureau standards are consistent with recommended national standards and have been approved by the Council on Accreditation.  The standards for foster and adoptive homes are found in WV Code § 49-2B and in Section 14 of the Foster and Adoption Home Finding Policy.  The standards are applied to all foster and adoptive homes regardless of the source of funds for boarding care reimbursement.  The standards were last revised in August 2007.

The same standards are also applied to relative/kinship care homes who are becoming certified foster/adoptive parents.  Certification is for one year and all foster/adoptive parents are reevaluated each year.  There are no provisional licenses or certification for individual foster homes.  If a prospective foster/adoptive home does not meet the certification requirements, they are not certified until they meet the requirements.

It is possible for a waiver of a requirement to be requested and approved as long as the waiver does not negatively impact the safety of a child. West Virginia licenses residential child care group facilities and specialized foster care agencies as required in West Virginia Code 49-2B.

Specialized foster care homes and residential facilities are licensed by two separate sets of regulations, both of which were re-written in 2006 and codified in January 2007, effective July 1, 2007.  The laws and regulations are consistent with national standards as consultation was provided by CWLA during the re-write.  COA standards were used in writing the Residential Child Care Regulations.

D003754

Specialized foster homes are only different than Department foster homes in that the families are recruited, trained, serviced and maintained by private sector agencies using the framework outlined in the Department's *Foster Care Policy Section 5, Specialized Foster Care*. Specialized foster care agencies are also bound by the *Child Placing Regulations (Title 78, Series 2)* which govern specialized foster homes, private adoptive homes, transitional living services and community reentry services.

*The Residential Child Care Regulations (Title 78, Series 3)* govern residential group and treatment facilities, emergency shelter care, maternity and parenting facilities, outdoor therapeutic educational programs, intermediate care facilities for the mentally retarded or developmentally disabled, psychiatric treatment facilities and therapeutic residential schools. Past residential group care regulations did not account for outdoor therapeutic education programs or therapeutic schools. The new regulations have closed a gap that caused problems in ensuring the safety of children not in the custody of the Department whose parents had placed them in out-of-home settings. The residential group care facilities are also required to adhere to certain sections within the Department's foster care policy.

Each specialized foster care agency and residential group facility must undergo a licensing review before licensure can occur, with the maximum licensure cycle being every two years. Regular licensure of durations less than two years occurs when a specialized foster care agency or group residential facility has not met the full intent of the regulations but the deficiency poses no concerns. If a licensing review reveals that a specialized foster care agency or residential group facility is experiencing substantial deficiencies but none pose safety, liberty or welfare threats to the children in placement, a provisional license will be issued for no more than six months. However, only one provisional license can be issued. If a provider is unable to make the necessary improvements during the six-month period, the facility must close. Reapplication is permitted if the facility feels that adequate corrections have been made to address the deficiencies.

All specialized foster care agencies and residential group facilities are monitored by a licensing specialist who not only does the licensing reviews but also monitors and provides technical assistance. The regulations require that a specialist visit no less than once per year. However, they are required to visit more frequently when complaints are received.

In West Virginia, complaints regarding the treatment and care of children in out-of-home placement come through a centralized hotline and are first reviewed to determine if they meet the legal mandates of abuse and neglect. If the allegations rise to the level of child abuse/neglect, the referral is sent to the Institutional Investigation Unit (IIU) for full investigation. If the allegations speak of compliance or quality of life issues, the referral is directed to the licensing specialist for a follow-up. If maltreatment is substantiated against a foster parent or employee of a specialized foster care agency, that individual must be relieved of their duties immediately. Any service deficiencies found as a result of either an IIU investigation or a licensing visit will be corrected by the agency using a Corrective Action Plan, which is due within no more thirty days of identification of the deficiency.

D003755

A standard operating procedure for use by the licensing specialists was developed and implemented March 1, 2006, thus helping bring more consistency to the licensing process.

On March 1, 2008, a revised version of the state's Criminal Background Check policy was released. The group involved with the process was made up of Departmental program/policy staff, licensing specialists and home finders. There was a review period in which providers from the community were given the opportunity to comment. The changes to the policy were prompted by the Adam Walsh Act and some internal issues causing extreme delays in receiving the checks. The changes to the policy are described below.

WV Statute §49-2B-8(b) requires the Bureau to establish procedures for fingerprinting of applicants and submission to the State Police and, if necessary, to the Federal Bureau of Investigation for criminal history record checks. Bureau Foster and Adopt Home Finding Policy, Section 14 and the Criminal History Background Check Policy specify the procedures for obtaining background checks. Bureau Policy, Section 14, also specifies the procedures for obtaining child abuse registry background checks. Policies for criminal and child abuse registry background checks are compliant with the Adam Walsh Child Protection and Safety Act of 2006. Applicants for foster care and adoption must always obtain a fingerprint background check from the WV State Police and the Federal Bureau of Investigation. The policy prohibits applicants from being approved if they have been convicted of any one the following crimes:

- Abduction
- Any violent felony crime, including but not limited to rape, sexual assault, homicide, malicious wounding, unlawful wounding, felonious domestic assault or battery
- Child/adult abuse or neglect
- Crimes which involve the exploitation of a child or an incapacitated adult
- Misdemeanor domestic battery or domestic assault
- Felony arson
- Felony or misdemeanor crime against a child or incapacitated adult which causes harm
- Felony drug related offenses within the last ten (10) years
- Felony DUI within the last ten (10) years
- Hate crimes
- Kidnapping
- Murder/homicide
- Neglect or abuse by a caregiver
- Pornography crimes involving children or incapacitated adults, including but not limited to, use of minors in filming sexually explicit conduct, distribution and exhibition of material depicting minors in sexually explicit conduct or sending, distributing, exhibiting,

D003756

possessing, displaying or transporting material by a parent, guardian or custodian, depicting a child engaged in sexually explicit conduct

- Purchase or sale of a child

- Sexual offenses including but not limited to incest, sexual abuse, or indecent exposure.

State policies also require a background check for any past history of substantiated child abuse/ neglect or adult abuse/neglect as determined by CPS.

West Virginia also requires that all prospective foster parents, employees of specialized foster care agencies and employees of residential group facilities undergo a state criminal background check. Foster parents must also undergo a federal NCIC check regardless of whether or not they have lived outside the State of West Virginia. Before the policy revision, a prospective foster parent only received an NCIC check if they documented living outside the State of West Virginia for a specific time period after turning 18. These checks are to occur before an individual can be approved as a foster parent or be hired by an agency providing foster care or residential group care. Automatic denial of foster parenting and/or employment will occur if an individual has any of the convictions listed in the preceding paragraph for which there is no possibility of waiver.

The policy allows that any individual with more than one misdemeanor conviction not on the above list to request a waiver in order to become a foster parent or employee of a specialized foster care agency.

The previous policy required all residential group facilities and specialized foster care agencies to submit requests for criminal background checks through the Department. This created substantial backlogs, as only one CIB Coordinator was responsible for this function. The new policy allows residential group facilities to obtain the checks by submitting directly to the State Police, the entity in West Virginia responsible for the service. The Department has also assigned another individual to the role of processing the checks and sending them to the State Police.

Foster parents and employees of specialized foster care agencies are also required to undergo an Adult Protective/Child Protective Services background check to determine if there has ever been a finding of maltreatment. If there has been a finding, the individual is denied the opportunity to become a foster parent or an employee of a specialized foster care agency.

On March 1, 2005, computer generated letters began being mailed to subjects of CPS investigations notifying them of the findings. Letters to subjects of an APS investigation began about one year later. The letters give the individual notification of the Department's grievance process and the opportunity for due process.

The Department often must deny individuals the opportunity to become a foster parent or an employee of a specialized foster care agency due to a maltreatment finding that was made before the automatic notification letters. These individuals are given the opportunity to file a grievance at the time they are denied in order to have due process. However, an individual must await a

D003757

favorable result from the grievance before being allowed to become a foster parent or employee of a specialized foster care agency.

The case planning process for children in foster and adoptive care is addressed in WV Code §49-6-5 and §49-6D-3. The Rules of Procedure for Child Abuse and Neglect, Rules 28 and 29, further specify the methods for establishing a case plan for the child and family. Foster Care policy also addresses case planning for children in foster care and adoption. The case plan requires a description of how the safety of the foster or adoptive placement will be assured.

Foster and Adoption Home Finding Policy, Section 14, requires each region to conduct two foster and adopt care recruiting activities each month. Newspapers, newsletters and other printed materials are often used at fairs, festivals and other community events to recruit foster and adopt parents.

The Bureau partnered with Mission West Virginia to develop a One Church One Child program throughout the state to recruit prospective African-American and other families to foster and adopt children in the custody of the state. Mission West Virginia has also developed a program which is aimed at recruiting foster and adoptive families for specific children under the Bureau's care.

In addition to working with churches, home finding staff must explore other avenues to interest African-American families in foster and adoptive care. These sources may include advertising on radio stations, targeting African-American business leaders and service organizations in the community, placing ads in weekly community newspapers, etc. Home finding staff must be creative in recruiting families that reflect the ethnic and racial diversity of children in the state for whom foster and adoptive homes are needed.

The Bureau also agreed to work with the developmental disabilities community and the specialized family care program to target recruitment efforts for children in foster care who have developmental disabilities and are awaiting a permanent placement.

General recruitment techniques may include, but are not limited to, the following:

- Decals
- Slogans or themes on bookmarks, pencils, balloons, key chains, t-shirts, fans, etc.
- Displays
- Information booths
- Placemats in restaurants
- Flyers, brochures, posters, handouts, and bill inserts
- Notices in congregational and community bulletins
- Calendars
- Newsletters
- Speakers' bureaus, scheduling presentations
- Award programs

**D003758**

- Welcome wagon packets
- Drop-ins or open houses
- Television and newspaper feature stories
- Television public service announcements or community interest stories
- Interview programs
- Radio spot announcements
- Direct mailing and ad coupons
- Display ads in phone books
- Recruitment films
- Messages on business marquees
- Adoption day in court
- Foster and adoptive family's recognition/appreciation celebrations

All general recruitment materials must state that children in the custody of the Bureau have at least one of the following special needs:

- They may be eight (8) years of age or older
- Are members of a sibling group to be placed together
- Are members of a racial or ethnic minority and/or
- Have developmental, physical, emotional, or behavioral problems.

Recruitment materials must also have a direct contact number for those interested to call for more information about becoming a foster and adoptive family.  In addition, all general recruitment materials must be focused on foster and adoptive parenting.

Child specific recruitment must be done for every child who has at least one parent's rights terminated and adoption is the child's permanency plan.  These children must be included in the following unless certain requirements are met:

1. Featured on the Division of Children and Adult Services Adoption Resource Network Internal Database, when one parent's rights have been terminated; and

2. Featured on the Division of Children and Adult Services West Virginia Adoption website and the AdoptUSKids website, when both parents' rights have been terminated.

Child specific recruitment materials must have the following information clearly described:

In addition, the following child specific recruitment techniques may be utilized:

- Child of the month flyers
- Television news program features such  Wednesday's Child, and/or
- Newspaper feature stories such as Sunday's Child
- Mission West Virginia's child specific recruitment program which is aimed at recruiting foster and adoptive families for specific children under the Bureau's care.

**D003759**

West Virginia is a member of the Interstate Compact on the Placement of Children (ICPC).  The ICPC policies were revised in 2007 to comply with changes in the Safe and Timely Interstate Placement of Foster Children Act.

Out-of-state resources for permanent placement of children are utilized whenever necessary to provide a permanent family for a child.  Children waiting for adoption are featured on the state website and the AdoptUSKids website.  If out-of-state adoptive families become interested in adopting a WV child, placement is made through ICPC.

**Where was the child welfare system in Round One of the CFSR?**

Items 41, 43 and 45 were rated as *Strengths*, while Items 42 and 44 were rated as *Areas Needing Improvement*.  Item 42 was reported as *Area Needing Improvement*, because all private agency and public agency homes do not always meet standards, and home studies for specialized homes may not be comprehensive.  Item 44 was reported as *Area Needing Improvement*, because the pool of available foster care and adoptive providers in some regions of the state did not reflect the ethnic diversity of the foster care population needing placement.

Otherwise, it was determined that the state's standards were in accordance with national standards as provided in WV State Code, WV Code of State Rules and BCF Policy; a comprehensive system for criminal background checks was implemented; and a regional and cross-county/cross-state recruitment system had been established.

**What are the positive changes and promising practices that the child welfare system has demonstrated in terms of foster and adoptive parent licensing, recruitment and retention?**

The Department's foster homes and the specialized agency foster homes are now required to use the same format for home studies per the contract agreement that each agency is required to sign before being approved to provide foster care services.  After the 2002 CFSR, providers were brought to the table and a uniform format was designed.  Now, both Department foster homes and specialized agencies follow the same format for foster and adoptive home studies.

Promising Initiatives that have been implemented in West Virginia include:

▪ One Church One Child.  The Bureau contracts with Mission WV using Title IV-B, Part 2 funds to recruit families through the faith-based communities.  The goal is to engage communities of a variety faiths, ethic, and socioeconomic characteristics that mirror the diversity of our children.

▪ Wallet Buddies.  The Wallet Buddy program has sixty volunteers and is being promoted as one of the One Church One Child Champion activities.  Volunteers carry pictures of waiting children to be shared with others that provide information on foster care and adoption.

D003760

- Mission West Virginia promotes foster care and adoption by making presentations to faith-based community organizations.  Mission West Virginia aids the foster and adopt parent associations with coordination activities and providing workshop presentations on recruitment.

- AdoptUsKids.  West Virginia is a full partner with AdoptUsKids through featuring WV children on the AdoptUsKids website and working closely with our Regional Response Team.

- Wednesday's Child is a monthly TV segment featuring children in foster care awaiting adoption along with other adoption information to create community awareness of the need for foster and adopt families.  Wednesday's child is featured on WTAP in Parkersburg.

- Sunday's Child is a monthly newspaper column featuring specific children in foster care awaiting adoption to create community awareness and recruit foster and adopt parents. Sunday's Child is featured in the Huntington Herald Dispatch.

- WV's waiting children continue to be featured on the internet.  The children are featured on three internet sites; i.e., AdoptUsKids; Adopt a WV Child, and Children Awaiting Parents, Inc.

- BCF adoption/home finding staff continue to promote recruitment by coordination and support of our foster and adopt parent associations.  Social and support events are a collaborative effort between the Bureau and the associations.  Activities include support groups and appreciation events.

- Staff also promotes recruitment by featuring Sammy the Adoption Bear in parades, having a staffed information booth at the State Fair, county fairs, health fairs, Children's Memorial Flag Day, community events at malls, and as guest speakers to community and service organizations.

- BCF home finding staff arrange publicity in the local print media.  One article featured a foster and adopt parent describing the rewards of fostering along with contact information for prospective resource families wanting more information.  In one area of the state, a foster parent was named Citizen of the Year.  The person took advantage of this opportunity to say foster parents are needed.

- The Heart Gallery.  An interactive display which features twelve foster children awaiting adoption.  Professional photographers donate their services to take pictures of waiting children.  Along with a picture of the child is a headphone.  This enables the general public to view the exhibit, hear the child's voice, and listen to a description of the child.  The display travels around the state to a variety of locations including shopping malls, museums and various events.  Two West Virginia children were featured on the National Heart Gallery at Union Station.  Press releases are sent for every Heart Gallery appearance.  Additionally,

D003761

when the Heart Gallery is in a location for a longer period of time, postcards are mailed to area churches.

▪ One Church One Child Informational Workshops. This was a series of adoption information workshops held in partnership with the Bureau, Mission West Virginia/One Church One Child and an attorney who specializes in adoption. Along with BCF staff and interested families, adoptive families attended to share their experiences. The purpose of the workshop was to increase community awareness of the need for resource families.

▪ Journey Home. Journey Home was initiated by Mission West Virginia in May 2005 and has spread to at least three other locations in WV. The event allows participants to view a day in the life of a foster child. A guided tour on a school bus escorts community stakeholders/leaders to entities in the life of a foster child. Some of the events are having the bus pulled over by a police car, touring the emergency room of a hospital, visiting a foster care agency, touring BCF, and a mock court session. Invited to participate were school officials, legislatures, judges, prosecuting attorneys, the press, local elected officials, and BCF staff.

▪ As part of the AdoptUsKids initiative, WV has a Spanish-speaking staff person in BCF who responds to inquiries from Spanish-speaking families.

▪ The Adoption Gazebo is a portable exhibit with a roof and display area. The gazebo is featured at the State Fair, malls, and other public events.

▪ Wendy's Wonderful Child. Mission West Virginia received a Dave Thomas Foundation grant to recruit appropriate permanent families for twenty difficult-to-place foster children. The staff at Mission West Virginia will collaborate with the Bureau to develop a child specific recruitment plan for each child.

▪ During March 2006, West Virginia received technical assistance (TA) from AdoptUsKids. The purpose of the TA was to develop a general recruitment plan for the state while allowing flexibility to meet the needs of each region. Currently, Bureau staff along with a community collaborative, is coordinating the implementation of this plan.

▪ In November 2005, West Virginia received an Adoption Across Boundaries Award from Voice of Adoption. The award was for overcoming inter-jurisdictional barriers to permanency.

▪ The Bureau partners with the Social Work Educational Consortium (SWEC) to provide pre-service, in-service and advanced training to foster and adoptive parents. SWEC is comprised of all the college social work programs within the state. The Bureau and SWEC utilize the Parent Resources for Information, Development and Education (PRIDE) model for developing and supporting foster and adoptive families.

D003762

- The PRIDE program is designed to strengthen the quality of family foster and adoptive care and services by providing a standardized, consistent, structured framework for the competency-based recruitment, preparation and selection of foster and adoptive parents, and for foster and adoptive parent in-service training and ongoing professional development. Integral to the components of the PRIDE training is the belief that protecting and nurturing children at risk and strengthening all their families (birth, kinship, foster, adoptive) requires teamwork among individuals with diverse knowledge and skills but all working from a shared vision and toward a common goal.

- Kinship Support.  Activities and groups to help caregivers who are raising a family member's children.  In partnership with Bureau for Senior Services, Mission West Virginia is working toward helping families through the Kinship Care Support Program.  The Kinship Care Support Program is a multi-service program developed to assist relative caregivers.  The assistance includes:

    a) **Information.**  The program has initiated and published two guides to assist relative caregivers.  The Legal Guide is a manual that discusses legal issues surrounding kinship placement and working with the legal system.  The Resource Guide is a manual that navigates resources, benefits and the educational system for relative caregivers.

    b) **Referral.**  The program assists grandparents and other relative caregivers by linking and referring them to the support services they need.  The program utilizes statewide and national agencies to connect caregivers with resources.

    c) **Outreach.**  The program collaborates with other agencies in reaching out to relative caregivers through workshops and media support.  The program offers a toll-free number as a support or "warm-line" for families.

    d) **Support Groups.**  The program awards relative caregiver support groups with seed money to assist in aiding kinship families through Relatives as Parent Program (RAPP) groups, meetings, outreach, etc.  Technical support is provided when needed.

Child-focused recruitment has been successful in finding adoptive families for special needs children.  The Wendy's Wonderful Kids program started in West Virginia in February 2006. Intensive recruitment efforts have been provided to thirty-three children.  Twelve of those children have been placed with trial adoptive families, and one child has a finalized adoption.

Safety Checks for 2006 and 2007 conducted for all foster care applicants (including specialized) and employees of specialized foster care agencies and residential group facilities.

|  | 2006 | 2007 |
|---|---|---|
| **APS/CPS** | 7138 | 4959 |
| **State Police** | 3039 | 4645 |
| **FBI-Federal** | 1481 | 3005 |

D003763

West Virginia's most recent version of the Criminal Background Check policy brings the state into compliance with the requirements of the Adam Walsh Act, as well as the 1997 Adoption and Safe Families Act.

West Virginia's provider community has long been a cohesive group. Being a small state with a small population, many folks who work in child welfare stay in child welfare through retirement. Several years ago, support networks began appearing among the service specialties. For example, West Virginia's providers of Emergency Shelter services has the "Emergency Shelter Provider Network (ESPN)," and residential group providers have the "Child Care Association." The groups have been an excellent addition to child welfare practice in that they have been able to influence policy and lawmaking, as well as partner with the Department when major initiatives are undertaken for the betterment of services to children. Many of the groups and networks have helped improve how communities understand, view and interact regarding issues and challenges related to children.

**What are the resources issues and barriers that affect the child welfare system's overall performance in terms of foster and adoptive parent licensing, recruitment and retention?**

The two new sets of licensing regulations are based upon COA standards and were written with involvement of the provider community who would be the end user.

In the past, residential child welfare regulations did not contain rules regarding adherence to nurse-driven medication-administration procedures. Providers were reviewed by a separate entity of the Department, the Office of Health Facilities Licensure and Certification (OHFLAC). During the period when the new rules were being written, we (BCF and OHFLAC) were required by our Secretary to consolidate the two rules into a single set of rules that contained both child welfare rules and behavioral health rules. Because the facilities bill Medicaid as a behavioral health facility, they are considered to be a medical provider as well as a foster care provider.

Even though providers were required to adhere to medication-related regulations in the past, there were several changes to the regulations that are proving expensive to implement. A law that was passed for adult facilities in 1999, Approved Medication Assistive Personnel (AMAP), became a requirement for residential group facilities for children. Emergency shelters are now required to hire registered nurses instead of licensed practical nurses. In West Virginia, there is a shortage of registered nurses.

Despite the improvements made to the policy and procedures for obtaining criminal background checks, there is still a lengthy delay between when a check is submitted and when it is returned. This creates large lapses in being able to expeditiously approve foster parents and hire staff at the specialized foster care agencies. The State Police in West Virginia are still conducting paper checks instead of using scanning technology which contributes to the delays.

D003764

West Virginia is only at the beginning stages of allowing the provider community access to our FACTS system for purposes of documenting criminal background check and APS/CPS findings on foster parents and employees, which is a requirement for Title IV-E funding. Currently, only data for foster parents is consistently found. Further developments will need to occur in order to begin documenting the employees of specialized foster care agencies.

Although the Department requires specialized foster care agencies to follow the Department's foster care policy and the directives within their contract, the actual regulations they are legally required to follow contain no language regarding recruitment. The only requirement outlined merely states that foster parents and foster children should be properly matched. There are no requirements to address ethnic and racial diversity outlined in the licensing regulations in relation to ethnic and racial diversity recruitment; however, DHHR policy does address this recruitment issue. Most foster care agencies primarily use the licensing regulations for guidance; however, if the specialized agency is accredited by COA, they must meet the COA standard regarding recruitment and it does address ethnic and racial diversity in recruitment.

In West Virginia, about 95% of the population is classified as Caucasian. Eleven percent of the children awaiting adoption are African-American. Only 3.3% of West Virginia's population is African-American.

Recruitment of foster family homes for troubled teenagers continues to be a barrier. Many of these youth require behavioral health services and behavioral management. The majority of them are placed in group residential facilities, sometimes out of state, in an attempt to provide not only placement but behavioral health services as well.

## Section V – State Assessment of *Strengths* and *Needs*

1. **Determine and document which of the seven outcomes and systemic factors examined during the Statewide Assessment are primarily *Strengths*, citing the basis for the determination.**

   **Safety Outcome 2:  Children are safely maintained in their homes whenever possible and appropriate.**

   Item 3:  Services to protect children in their home and prevent removal.  OPQI QA results show the state's achievement on Item 3 increased during the three rounds of reviews. The state's performance continued to improve in the 2007 OPQI QA mini-round of reviews where the 2002 CFSR baseline of 65.5% on Item 3 was finally surpassed with 67% of the cases rating as a *Strength*.

   **Permanency Outcome 1:  Children have permanency and stability in their living situations.**

D003765

Item 9:  Adoption.

- The state has been successful in reducing the length of time to adoption finalization, Measure C2-1.

- Exits to adoption in less than 24 months and has met the 75th percentile for this measure since 2006.

- The state has also met the 25th percentile for Measure C2-2.

- Exits to adoption, median (mid-point in the range of scores) length of stay since 2006.

- The state's score on Composite 2, Measure C2-1 at 45.9% is above the 75th percentile of 36.6% or higher.

- The state's score on Composite 2, Measure C2-2 at 25.2 months is below the 25th percentile of 27.3 months or lower.

- The state's score on Composite 2, Measure C2-4 at 11.1% is above the 75th percentile of 10.9% or higher.

**Permanency Outcome 2:  The continuity of family relationships and connections is preserved for children.**

- OPQI QA results show the state's achievement on this Outcome increased during the three rounds of reviews eventually surpassing the original 2002 CFSR result of 72.4%.

- In the third round of reviews 81% of the cases rated as a *Strength* for this Outcome.

- Items 11 and 14 remained relatively consistent with the 2002 CFSR.

- Despite an initial decrease from the 2002 results, Items 12, 13, 15 and 16 did show an increase over the three rounds of reviews

- Items 13, 15 and 16 surpassed the 2002 CFSR results during the third round of reviews.

**Well-being Outcome 1:  Families have enhanced capacity to provide for their children's needs.**

OPQI QA results show the state's achievement on this Outcome increased during the three rounds of reviews to come within 1 point of the original 2002 CFSR result of 40%.  Despite an initial decrease from the 2002 results, Items 17 and 18 did show an increase over the three rounds of reviews and surpassed the 2002 CFSR results during the third round of reviews.

**Well-being Outcome 2:  Children receive appropriate services to meet their educational needs.**

OPQI QA results show the state's achievement on this Outcome and item increased during the three rounds of reviews.

D003766

**Well-being Outcome 3:  Children receive adequate services to meet their physical and mental health needs.**

OPQI QA results show the state's achievement on this Outcome increased during the three rounds of reviews.  There was an initial decrease in the S*trength* rating for this Outcome, but by the third round, the *Strength* rating was at 71%.  The OPQI QA mini-review was at 65% *Strength* which still surpassed the 2002 results of 59.5%.  After all review rounds, Items 22 and 23 ended up consistent with the 2002 results.

**Systemic Factor A:  Statewide Information System**

The Families and Children Tracking System (FACTS) is a comprehensive case management system for social workers to strengthen the documentation of case activity for the families and children served by the Department.  FACTS is a SACWIS certified system.  Due to the need for expedited acquisition of data and enhanced data quality, several major initiatives are planned.  These initiatives should make the system more user-friendly and have a positive impact on data quality.

**Systemic Factor C:  Quality Assurance System**

This factor received a S*trength* rating during the 2002 CFSR, and based on the information gathered during the development of the Statewide Assessment, it is believed this factor continues to be a *Strength* for West Virginia.  Since the 2002 review, a formal method of reviewing cases has been developed; reports are provided to the local, regional and state managers; and most recently, a PIP protocol has been developed and implemented with each district having a local PIP which is monitored on a regular basis.

**Systemic Factor D:  Staff and Provider Training**

This factor received a *Strength* rating during the 2002 CFSR.  The state's PIP contained a great deal of training initiatives, and all training pieces of the PIP were successfully completed.  As a result of COA, a Workforce Recruitment and Development plan was written to address recruitment, retention and credentialing of staff.  Supervisory training has been identified as a need, and the Division of Training is developing a curriculum to address this.

Stakeholders indicate the initial PRIDE training is positive but did say more ongoing training is needed.

**Systemic Factor F:  Agency Responsiveness to the Community**

The state received a *Strength* rating on this systemic factor during the 2002 CFSR.  During the development of the Statewide Assessment, it was determined there is ongoing and significant collaboration between the Department and its stakeholders.  There have been a

D003767

number of new and exciting projects and programs initiated since the last CFSR. One area to explore during the onsite review is the fact that staff in the local offices often is not aware of the new initiatives which are implemented.

**Systemic Factor G: Foster and Adoptive Parent Licensing, Recruitment and Retention**

Based upon information in the Statewide Assessment, this item is determined to be primarily an area of *Strength* for the state. During the 2002 CFSR, it was found that private and public agency home studies were not standardized. This has since been remedied and now specialized foster care agency home studies include the same information as the public agency studies. There have also been a number of promising initiatives in the area of foster and adoptive parent recruitment.

2. **Determine and document which of the seven outcomes and systemic factors examined during the Statewide Assessment are primarily areas needing improvement, citing the basis for the determination. Identify those areas needing improvement that the State would like to examine more closely during the onsite review.**

   **Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect.**
   OPQI QA results show the state's achievement on this Outcome has shown an up and down pattern during the three rounds of reviews. However, even the highest OPQI QA achievement on this Outcome of 41% *Substantially Achieved* fell 43.1 points below the 2002 baseline result of 84.1%.

   For Item 1, the 2002 baseline of 88.5%, a *Strength*, was not met in any of the OPQI QA reviews. There can be little question that the Department has a problem of repeat maltreatment. The state's score on the data indicator for Absence of Repeat Maltreatment Recurrence of 87.64% is below the National Standard of 94.6% or higher. Because the state's score on the data indicator for Absence of Child Abuse and/or Neglect in Foster Care at 99.58% is below the national standard of 99.68% or higher, the state has not passed the data indicator for the percent for the Absence of Child Abuse and/or Neglect in Foster Care.

   **Safety Outcome 2: Children are safely maintained in their homes whenever possible and appropriate**

   Item 4: Risk assessment and safety management. OPQI QA results show the state's achievement on Item 4 increased during the three rounds of reviews. Despite this, the highest percentage was still 8 points below the 2002 results. There was an 18-point drop in the 2007 OPQI QA mini-reviews.

   Areas needing further examination include services to reduce risk are still not being provided while children remain in the home; risk is frequently underrated and workers are not capturing underlying issues of domestic violence and substance abuse; and stakeholders report a huge inconsistency throughout the state regarding availability of services.

**D003768**

**Permanency Outcome 1:  Children have permanency and stability in their living conditions**

Four of the items under Permanency 1 are considered A*reas Needing Improvement*:  Items 5, 6, 8 and 10.  According to West Virginia's CFSR Data Profile, the state's score on Composite 1, Component B, Measure C1-4 at 12.6% is above the 25th percentile of 9.9% or lower.

The state's score on Composite 4, Measure C4-1 at 85.8% is below the 75th percentile of 86% or higher.  Our score on Composite 4, Measure C4-3 at 35.2% is below the 75th percentile of 41.8% or higher.  The state has not passed Composite 4-Placement Stability as a data composite.  The national standard is 101.5 or higher and the West Virginia score is 99.0.

The state's score on Composite 1, Component A, Measure C1-1 at 73.4% is below the 75th percentile of 75.2% or higher.  Our score on Measure C1-2 at a median length of stay of 7.6 months is above the 25th percentile of 5.4 months or lower.  The state's score on Measure C1-3 at 38.6% is below the 75th percentile of 48.8% or higher.  The state has not passed Composite 1, Component A, Timeliness of Reunification.  Nor has it passed Composite 1, Component B, Permanency of Reunification.  The state's score on this composite is 117.7, and the national standard stands at 122.6.

Although the state has passed three of the four measures in Composite 2, our score on Composite 2, Measure C2-3 at 15.6% is below the 75th percentile of 22.7 %, and our score on Composite 2, Measure C2-5 at 17.5% is far below the 75th Percentile of 53.7%.  The national standard is 106.4 or higher, and the West Virginia score is 84.7.

The state's score on Composite 3, Measure C3-1 at 19% falls below the 75th percentile of 29.1% or higher.  Our score on Composite 3, Measure C3-2 at 94.8% is below the 75th percentile of 98% or higher.  The state's score on Composite 3, Measure C3-3 at 36.1% is below the 25th percentile of 37.5% or lower.  The state has not passed Composite 3-Permanency for Children and Youth in Foster Care for Long Periods of Time Component A and as a data composite.  The national standard is 121.7 or higher and the West Virginia score is 116.3.

**Well-being 1:  Families have enhanced capacity to provide for their children's needs**

For Item 19, the results of the OPQI QA show an increase during the three rounds of reviews and the mini-review; however, the highest percentage is 27 points below the 2002 results of 64%.  Item 20 results also show an increase during the three rounds of the OPQI QA; however, the highest percentage is 16 points below the 2002 results of 51%.  For this item, there was also a decrease of 12 points between the third round of reviews and the mini-review.  The mini review revealed a 23% S*trength* rating.

D003769

Areas for attention during the onsite review; i.e., how do caseworker vacancy rates, newly trained workers, and high case loads contribute to the lower scores on Items 19 and 20?

**Well being Outcome 2:  Children receive appropriate services to meet their educational needs**

Although the state is showing increased performance in this area, OPQI QA review results and foster parent groups did show that providing educational records to foster parents continues to be an issue.

**Well-being Outcome 3:  Children receive adequate services to meet their physical and mental health needs**

Overall, this Outcome is a S*trength*; however, a few concerns remain.  The assessment of physical and dental health needs and the provision of needed services in in-home cases remains a concern.  Stakeholder groups reported a need in many areas of the state for specialized medical treatment.

The assessment of mental health needs and the provision of needed services in in-home cases remains a concern.  Stakeholder groups consistently reported a lack of specialized mental health services such as evaluations and assessments, sexual abuse therapy, substance abuse treatment for children and services for children with an MR/DD diagnosis.

**Systemic Factor B:  Case Review System**

The state did not reach substantial conformity on this item during the 2002 CFSR.  Although significant progress has been made and many initiatives have been implemented or are in the planning stages, this continues to be an area where improvements are needed.  Continued examination of the MDT process will be needed to determine if a uniform method of conducting MDTs is occurring.  Data from the CIP tracking and database will need to be analyzed to determine if there continue to be issues with timeliness in the courts.  Once the standardized case plan is implemented, the effects of this will need to be examined.  During the onsite review, be mindful of the positive changes that have occurred despite the labeling of this as A*rea Needing Improvement*.

**Systemic Factor E:  Service Array and Resource Development**

West Virginia successfully achieved substantial conformity on this item during the last CFSR; however, during the development of the Statewide Assessment and in the workgroups, a common theme was the lack of services in specific areas of the state and lack of specialized services for children and parents.  The state is receiving technical assistance from the National Resource Center for Organization Improvement and has been phasing in a service array project throughout the state.  While positive changes and promising practices have been implemented, there still remains a need for services.

D003770

**3. Additional sites for the onsite review activities**

Two review teams will be housed in Charleston (Kanawha District), West Virginia's largest metropolitan area. The other two review sites are Harrison District and Greenbrier/Monroe/Pocahontas/Summers District.

The Greenbrier/Pocahontas/ Monroe/Summers District is a rural district located in the southern region of West Virginia. The Harrison District an urban district located in the northern region of West Virginia.

These two districts have consistently had two of the more stable workforces throughout the entire state. They have some unique practices, and they have strong relationships with community stakeholders. The review of these two districts would benefit the state to further examine these districts during the onsite review to identify approaches which may benefit the state as a whole. These two districts have implemented a variety of practices and programs that, when assessed through the case review and stakeholder interview processes, will provide the state with considerable evaluative information to support future quality improvement efforts.

D003771

**Statewide Assessment Development Participants**

| Region | Name | Affiliation |
|---|---|---|
| 1 | Vanessa Fox | DHHR--CPS |
| 1 | Jennifer Hogue | DHHR—Adoption |
| 1 | Erin Norman | DHHR |
| 1 | Crystal Kendall | DHHR—CPS Supervisor |
| 1 | Amy Rexroad | DHHR |
| 1 | Dana Baker | DHHR |
| 1 | Chris Demuth | DHHR |
| 1 | Cassie Summerville | DHHR |
| 1 | Jennifer Gray | DHHR—CPS |
| 1 | Cree Lemasters | DHHR—CPS Supervisor |
| 1 | Sharon Lewis | DHHR—CPS |
| 1 | Elizabeth Ferguson | DHHR |
| 1 | Todd McDaniel | DHHR |
| 1 | Jennifer McCloy | DHHR |
| 1 | Mark Liptrap | DHHR—Youth Services |
| 1 | Beverly Heldreth | DHHR—CPS Supervisor |
| 1 | Mary Rossana | DHHR—Adoption |
| 1 | Nicole McCarthy | DHHR |
| 1 | Christopher Stahl | DHHR—Homefinding Supervisor |
| 1 | Brandi Whitlatch | DHHR—CPS |
| 1 | Julie Butler | DHHR—CPS |
| 1 | Bethany Strickland | DHHR—CPS |
| 1 | Tonya Landis | DHHR—Youth Services |
| 1 | Chris Aubrey | DHHR—CPS Supervisor |
| 1 | Roberta Kennedy | DHHR—CPS |
| 1 | David Neighbors | DHHR—CPS Supervisor |
| | | |
| State Office | David Shaver | Training |
| State Office | Carla Harper | Children and Adult Services |
| State Office | Kathy Hastings | Training |
| State Office | Terri Miller | Institutional Investigative Unit |
| State Office | Laura Sperry | Children and Adult Services |
| State Office | Tracey Boone | Training |
| State Office | Sue Hage | Children and Adult Services |
| | | |
| Provider | Nancy Graham | Wellspring Family Services |
| Provider | Dana Schrack | National Youth Advocate Program |
| Provider | Jill Eddy | Youth Service Systems, Inc |
| Provider | Liz Harshberger | Wellspring Family Services |
| Provider | Rebecca Minger | Try-Again Homes |
| Provider | Carna Metheney-White | Children's Home Society of WV |
| Provider | Stephanie Clemmons | Youth Academy |
| Provider | Rebekah Bledsoe | WVU—PRIDE Trainer |
| Provider | Paul Rice | Monongalia County Schools |
| Provider | Robert Williams | United Summit Center |
| | | |
| Region | Name | Affiliation |

**D003772**

West Virginia Statewide Assessment

| Region | Name | Affiliation |
|---|---|---|
| 2 | Cindy Holt | DHHR--Adoption |
| 2 | Sue McDowelle | DHHR--Homefinding |
| 2 | Khadidra Taylor | DHHR-- |
| 2 | Jessica Bryant | DHHR-- |
| 2 | Ron Jones | Youth Services—Contracted |
| 2 | Vickie Bell | DHHR—CPS |
| 2 | Connie Raines | DHHR-- |
| 2 | Tina McKinney | DHHR-- |
| 2 | Harrison Sheppard | DHHR—CPS |
| 2 | Lisa Vinson | DHHR-- |
| 2 | Maurice Samuel | DHHR—Youth Services |
| 2 | Kerri Sheppard | Youth Services—Contracted |
| 2 | LaDella Blair | DHHR—CPS |
| 2 | Jessica Hill | DHHR—CPS |
| 2 | Caine Dials | DHHR-- |
| 2 | Michael Lucas | DHHR—Adoption |
| 2 | Jennifer Beckett | DHHR-- |
| 2 | Sandra Wilkerson | DHHR—CPS Supervisor |
| 2 | Sarah Flowers | DHHR |
| 2 | Barbara Hatfield | DHHR-- |
| 2 | Delphine Wolf | DHHR-- |
| 2 | DeeDee Samuel | Youth Services Supervisor—Contracted |
| 2 | Chrystia Thornton | DHHR—CPS |
| 2 | Charlie Harkins | DHHR—Adoption Supervisor |
| 2 | Charles Kendall | DHHR—CPS Supervisor |
| 2 | Ann Bowyer | DHHR--CPS |
|  |  |  |
| State Office | Theodora St. Lawrence | OPQI |
| State Office | Vickie James | Training—SWEC Coordinator |
| State Office | Cliff Terrell | Training |
| State Office | Samantha Sayre | Training |
| State Office | Teresa Kelly | Training |
| State Office | Elva Strickland | Training—Supervisor |
| State Office | Sandra Prather | Children and Adult Services |
| State Office | Toby Lester | Children and Adult Services |
| State Office | Mary Hodge | FACTS/MIS |
|  |  |  |
| Provider | Kathy Baird | Braley & Thompson |
| Provider | Renee Harris | Braley & Thompson |
| Provider | Cynthia Jett | Children's Home Society of WV |
| Provider | Jane Watson | Necco |
| Provider | Sharon Jeffrey | Necco |
| Provider | Leslie Tyree | Children First |
| Provider | Tim Harris | Children First |
| Provider | Arlene Hudson | APS Healthcare |
|  |  |  |
| Kanawha County Schools | Eddie Ivy | Attendance Director |
| Kanawha County Schools | France Pack | Homeless Program Coordinator |
|  |  |  |

D003773

West Virginia Statewide Assessment

| Region | Name | Affiliation |
|---|---|---|
| 3 | Shelly Nicewarner | DHHR—CPS Supervisor |
| 3 | Cheryl Skeen | DHHR—CPS |
| 3 | Natalie Long | DHHR-- |
| 3 | Dawn Ellison | DHHR-- |
| 3 | Nikki Godfrey | DHHR— |
| 3 | Tiffany Miller | DHHR—CPS |
| 3 | Ryan Wilson | DHHR-- |
| 3 | Laurie Hartman | DHHR-- |
| 3 | Martha Cage | DHHR—CPS Supervisor |
| 3 | Peggy Kincaid | DHHR—Adoption Supervisor |
| 3 | Karla Hinnis | Youth Services—Contracted |
| 3 | T'zouri Oliver | DHHR—CPS Supervisor |
| 3 | Elizabeth Schott | DHHR-- |
| 3 | Teresa Berg | DHHR—CPS |
| 3 | Diana Gillispie | DHHR-- |
| 3 | Thelma Caplinger | DHHR---CPS |
| 3 | Sarah Crum | DHHR—Supervisor Youth Services |
| 3 | Melissa McCabe | DHHR—CPS |
| 3 | Fay Moore | DHHR-CPS |
| 3 | Tina Helmick | DHHR—CPS |
| 3 | Kimberly Corley | DHHR—Youth Services |
| 3 | Crystal Newman | DHHR—Youth Services |
| 3 | Sherry Poling | DHHR-Adoption |
|  |  |  |
| State Office | Carla Harper | Children and Adult Services—Program Manager |
| State Office | Bobby J. Miller | Children and Adult Services |
| State Office | Maggie Molitor | Children and Adult Services |
| State Office | Jack Wood | Training |
| State Office | Denise Sayre | Training |
|  |  |  |
| Provider | Sandra Cooper | Family Network Services, LLC |
| Provider | Brandie Lockard | Family Network Services, LLC |
| Provider | Monica Cogle | East Ridge Health Systems |
| Provider | Peggy Johnson | Youth Health Services |
| Provider | Scott Nelson | National Youth Advocate Program |
| Provider | Carla McCoy | Pressley Ridge |
| Provider | Amy Hampton | Shepherd University—PRIDE trainer |
|  |  |  |
| 4 | Arthur Houchins | DHHR—CPS |
| 4 | Jodi Conner | DHHR—Adoption Supervisor |
| 4 | Michelle Massaroni | DHHR—CPS Supervisor |
| 4 | Lamonya Goins | DHHR—Youth Services |
| 4 | Suzanne Gunter | Youth Services—Contracted |
| 4 | Lora Weis | DHHR—CPS |
| 4 | Katrina Grant | DHHR—CPS |
| 4 | Jennifer Law | DHHR—CPS |
| 4 | Misti Campbell | DHHR--CPS |
| 4 | Russell Fridley | DHHR—Youth Services |
| 4 | Randall Coleman | DHHR—CPS |

D003774

West Virginia Statewide Assessment

| Region | Name | Affiliation |
|---|---|---|
| 4 | Jeanne Goan | DHHR—CPS Supervisor |
| 4 | Levi Bragg | DHHR—CPS |
| 4 | Christina Ray | DHHR—Youth Services |
| 4 | Laura Stokes | DHHR—Youth Services |
| 4 | Virginia Cales | DHHR—CPS |
| 4 | Edwin Bennett | DHHR—Home finding Supervisor |
| 4 | Olivia Honaker | DHHR—CPS |
| 4 | Joyce Hill | DHHR—Adoption |
| 4 | William Renn | DHHR—CPS |
| 4 | Danay McNamee | DHHR—CPS |
| 4 | Robin Holland | DHHR—CPS |
| 4 | Terri Brinson | DHHR—Youth Services |
| 4 | Pamela Pomeroy | DHHR—Adoption |
| 4 | Patricia Cook | DHHR—CPS Supervisor |
| | | |
| State Office | David Lowman | Training |
| State Office | Pat Schmitt | Training |
| State Office | Crystal Dotson | Children and Adult Services |
| State Office | Jerri Weaver | Training |
| | | |
| Provider | Angie Hamilton | Pressley Ridge |
| Provider | Mary Goebel | Children's Home Society of WV |
| Provider | JoAnne Boileau | Children's Home Society of WV |
| Provider | John David Smith | Concord University—PRIDE Trainer |
| Provider | Shirley Summers | Family Options Providers |
| Provider | Tommy Redden | KVC |
| Provider | Tonya McCormick | KVC |
| Provider | Tracy King | FMRS Health Systems, Inc |
| Provider | Steve Ferris | Psychologist—Private Practice |
| | | |
| Mercer County Schools | Tom Chaffins | Superintendent's Office |
| Fayette County Schools | Judy Lively | Attendance Director |
| McDowell County Schools | Fran Lambert | Attendance Director |
| | | |

D003775