EXHIBIT 135

# Exhibit 2

1

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

DIVISION 5

JENNIFER R. VICTOR and
JENNIFER N. TAYLOR,

            Plaintiffs,

VS.                  Civil Action No. 18-P-142

WEST VIRGINIA DEPARTMENT OF HEALTH &
HUMAN RESOURCES, et al.

            Defendants.


    TRANSCRIPT OF PROCEEDINGS HELD before the Honorable

Louis H. Bloom, Judge, via Microsoft Teams, on an

Emergency Hearing on Petitioners' Motion in the

above-styled matter, on Thursday, the 6th day of January,

2022, at 10:04 A.M.


               APPEARANCES:


    <u>On Behalf of the Petitioners</u>:

        JENNIFER R. VICTOR, ESQUIRE
        Co-Guardian ad Litem
        Victor & Victor, LLP
        1319 Quarrier Street
        Charleston, West Virginia  25301


          Dwayne Price, RPR  (304) 357-0465


COPY

2

1                    APPEARANCES (Continuing)

2

3          On Behalf of the Petitioners:

4          JENNIFER N. TAYLOR, ESQUIRE
           Co-Guardian ad Litem
           1118 Kanawha Boulevard, East
5          Charleston, West Virginia  25301

6

7          On Behalf of Defendant West Virginia DHHR:

8          MS. LOU ANN S. CYRUS, ESQUIRE, and
           EMILY L. LILLY, ESQUIRE
           Shuman, McCuskey & Slicer, PLLC
9          1411 Virginia Street, East
           Suite 200
10         Charleston, West Virginia  25301

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                        INDEX OF WITNESSES

2

3     FOR THE PETITIONERS:              D      X     RED     REX

4

5      Michael Hale                     18     41

6      Sandra Wilkerson                 44     63     70

7      Commissioner Jeffrey Pack        74     92

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

```
1        THE COURT:  Good morning.  We're here on Victor and

2   Taylor vs. DHHR.  Let me have counsel note their

3   appearance, please.

4        MS. VICTOR:  Jennifer Victor, guardian ad litem and

5   co-petitioner.

6        MS. TAYLOR:  Good morning, Judge.  Jennifer Taylor,

7   guardian ad litem and co-petitioner.

8        MS. CYRUS:  Good morning, Your Honor.  Lou Ann Cyrus

9   on behalf of the Department as well as Secretary Crouch.

10       MS. LILLY:  Emily Lilly on behalf of the Department

11  as well as Secretary Crouch.

12       MS. CYRUS:  And, Your Honor, we have a number of

13  individuals with the Department on the phone, and I

14  thought it would be better to have each of them introduce

15  themselves and be sure -- get everyone and get their

16  titles.

17       So, if everyone would please go ahead.

18       MR. COMPTON:  I'll start.  Steven Compton here,

19  Deputy Attorney General, on behalf of the Department.

20       THE COURT:  All right.  Good morning, counsel.

21       MR. COMPTON:  Good morning.

22       THE COURT:  I think you're probably going to have to

23  identify who you have or we're not -- they're going to

24  start talking over each other --
```

5

1        MS. CYRUS: (Interposing) Okay.

2        THE COURT: (Continuing) -- or not going to talk at

3 all.

4        MS. CYRUS: All right. You're right, Your Honor.

5 Let's take a stab apartment it.

6        So I see we have Michael Hale who you know is the

7 CSM of the Kanawha County office.

8        THE COURT: Good to see you, Mr. Hale. Good

9 morning.

10       MR. HALE: Good morning, Your Honor.

11       MS. CYRUS: Cammie Chapman who is General Counsel

12 for the Department.

13       THE COURT: Good morning, Ms. Chapman.

14       MS. CYRUS: And Secretary Crouch is on the -- on as

15 well.

16       THE COURT: Good morning.

17       SECRETARY CROUCH: Good morning, Judge.

18       MS. CYRUS: Melanie Urquhart is here. She's the

19 Deputy Commissioner for Field Operations of the South.

20 She essentially has Tina Mitchell's former position.

21       Okay. And we have Sandra Wilkerson who is the --

22 let me check my note on her -- she's a Social Services

23 Coordinator for Kanawha County. She's on.

24       And have I missed anyone?

6

```
 1        MS. LILLY:  Commissioner Pack.

 2        MS. CYRUS:  Oh, I'm sorry.  Commissioner Jeff Pack

 3   is on as well.

 4        THE COURT:  All right.

 5        MS. CYRUS:  And that's it.

 6        THE COURT:  And I will note I see Cindy Hill is with

 7   us this morning.

 8        And is there anyone else who's not been recognized

 9   who wishes to state an appearance this morning for the

10   record?

11        All right.  We are here on the emergency motion

12   that's been filed by Ms. Victor and Ms. Taylor, and I'll

13   ask them to proceed.

14        MS. CYRUS:  Your Honor, before we do that, may I

15   place an objection on the record.  We have actually filed

16   a response objecting to the hearing; and just consistent

17   with that I would like to just object to this matter

18   being part of this case for the reasons that we believe

19   it should be addressed in the -- and I'm calling it --

20   it's MP [by agreement of the parties, during this hearing

21   the juvenile's name, when spoken, has been changed to his

22   initials], the MP case, where the order that is the

23   subject of this matter was issued.  And it's my

24   understanding the Department is in the process of seeking
```

7

1    relief from that order pursuant to Rule 60(b) of the West

2    Virginia Rules of Civil Procedure.  There was a motion

3    filed yesterday to reopen that matter and to have the

4    order addressed in that case since that was where it was

5    issued.

6         And secondly, we object to the extent this issue

7    of -- with children staying in the local DHHR offices

8    overnight is outside the scope of the petition.  There's

9    an amended petition for a writ of mandamus that was

10   recently filed which addresses hiring, retention, and

11   staffing of CPS statewide, as well as foster care and

12   adoption issues statewide; and the issue of, again,

13   children staying in the office overnight is far afield of

14   those issues.  So --

15        THE COURT:  (Interposing) Actually -- actually it is

16   not.  The testimony I heard in the case that you

17   referenced indicated that not only does this violate all

18   of the residential requirements that the Department has

19   in place, there's no -- there's no bathrooms, there's no

20   meal preparation, there's no education for these kids.

21   It's also creating a hardship on personnel, which is

22   causing substantial departures from the Department.

23        So I think it is all totally related; and if not,

24   I'm going to allow for clarification purposes an

8

1    amendment to this proceeding to make sure that we've

2    addressed it.

3        This is, this is one of the most serious things that

4    I've ever heard of.  I was not at the judicial conference

5    that the Secretary -- or the Commissioner spoke at, but I

6    did later watch the conference, and I was shocked and

7    surprised that he knew about these issues and

8    acknowledged that they exist and hadn't done anything

9    about them.

10       But anyway, I'll listen to the evidence that's going

11   to be presented this morning, and your motion is

12   overruled.

13       MS. CYRUS:  Okay.  Thank you, Your Honor.

14       Before we -- one other matter.  I just remembered.

15   This is now a public hearing of the matters, even though

16   we -- obviously it's limited to those of us on the call

17   at the moment.  But since I used the name of the child in

18   the other proceeding, if we could make sure to just

19   simply perhaps seal that part of the transcript when it's

20   prepared.

21       THE COURT:  By agreement of the parties I'm going to

22   ask if there -- we can have an agreement by the parties

23   that Mr. Price would just use that child's initials where

24   the name was referred to and indicate in there by

9

1    parentheses that the child's name by agreement of the

2    parties has been removed and initials applied.

3        MS. VICTOR:  No objection.

4        THE COURT:  Can you do that, Dwayne, so the

5    transcript doesn't actually reflect the name?

6        COURT REPORTER:  Yes, Your Honor.

7        MS. CYRUS:  Thank you, Your Honor.

8        THE COURT:  Okay.  Very good.  I appreciate your

9    thoughtfulness in remembering that.  Very good.  I

10   appreciate that.

11       All right, Ms. Taylor or Ms. Victor, are you ready

12   to proceed?

13       MS. VICTOR:  Yes, Your Honor.

14       Your Honor, Ms. Cyrus has referenced the MP case.

15   The Court appointed me as the guardian ad litem for MP.

16   We had a couple of hearings -- a preliminary hearing that

17   was continued -- but at that time the Court inquired

18   about the actual location of the child and learned that

19   he had been housed overnight in the DHHR offices.

20       Now, this was a child -- and I'm just going to make

21   some representations here -- who had been alleged to have

22   threatened to kill his family, including two small

23   children, overnight while the family slept.  He had been

24   charged with a juvenile offense.

10

1    And in the course of discussing how it was that he

2    was staying overnight in the facilities we learned some

3    information about the appalling and indefensible practice

4    of housing minor children overnight in DHHR offices with

5    the concern that this was happening throughout the state;

6    that this was not just in response to occasional

7    emergencies, but that this had become in fact a routine

8    practice that required, you know, setting up some sort of

9    makeshift sleeping arrangements, requiring workers to

10   stay overnight in shifts, subjecting workers to the often

11   harmful behaviors of minors, including being subjected to

12   attacks and assaults, being subjected to crimes.  I

13   learned that one worker's car had been stolen when the

14   child left the facility and took her car and went away.

15   That this was causing a great deal of unhappiness and

16   stress for the workers involved; that workers had quit

17   because of this.

18       And of course the DHHR is an office.  It's not a

19   facility, meets any of the requirements for foster care

20   homes, emergency shelters, residential facilities,

21   child -- none of those requirements set forth in the Code

22   by the DHHR -- for the DHHR or any child care or housing

23   facilities are -- it met none of those requirements.

24   There are no -- obviously there are bathrooms.  There

11

aren't any shower or bath facilities. They don't have

appropriate hygiene facilities. There is no educational

facilities available for these children, and of course

they should be attending school.

I've learned that, you know, occasionally when they

had to keep children overnight, they would try to take

them to motels; that this has caused a great deal of

trouble because -- often because of the children's

behaviors, that the hotel rooms were damaged and

vandalized, that they had been thrown out of local

lodging establishments because of behaviors of the

children; that -- the problem has increased greatly in

recent years.

It used to be we had Level 4 facilities that could

handle children with challenging behaviors or

allegedly -- or status -- or allegedly juvenile

delinquency behaviors. Those facilities are no longer

available, specifically Robert Shell. I understand it's

now a juvenile detention facility, and that was

previously a Level 4 facility where these -- children

with these behaviors could be housed safely. They had

appropriate facilities. That no longer exists.

That when -- obviously there are juvenile

delinquency and status offense petitions that could be

12

1    filed and was told that those are routinely dismissed

2    when children are in the care of the DHHR.  So the

3    framework for dealing with children who behave

4    inappropriately or who behave in a manner that would be

5    criminal if they were adults is, you know, not workable

6    because children are not held accountable, and then the

7    Department has to handle these behaviors without adequate

8    facilities or staff.

9         With regard to the motion filed by Ms. Cyrus, I

10   disagree completely, except one specific regard and that

11   is I believe that these -- this situation falls squarely

12   within the reason this mandamus petition was filed:  The

13   Department is not meeting its obligations to the

14   children, that workers are called upon to do things they

15   ought not to be required to do.  Their jobs are

16   challenging and difficult enough without having to house

17   juvenile delinquents in their office space.

18        The statutes and rules governing child abuse and

19   neglect cases and foster children and children within the

20   system pursuant to abuse and neglect cases, their needs

21   are not being met, and this is just one particularly

22   egregious example of that.

23        Now, is this -- the Department in and of itself

24   probably cannot even meet this problem, because it's

13

1  going to require the participation of the legislature,

2  and I don't -- I don't know a lot about juvenile cases

3  because I don't actually do those, but, you know, we have

4  to have facilities to house children safely.  And if the

5  legislature has shut down those facilities, then I don't

6  know if that's -- that's going to require the

7  participation of the legislature to reconsider how we're

8  going to handle all of that.  I don't agree that this is

9  outside the scope.

10      With one regard I do agree with Ms. Cyrus, and that

11  is we do not know enough about this situation.  The Court

12  heard evidence at that initial hearing on November 17th

13  in the MP case.  We need to know a lot more about this.

14  How many workers have quit?  How often does this occur?

15  How many children are housed overnight in DHHR facilities

16  each night, each week, each month?  Has -- what factors

17  have contributed to this problem?  How may we address it?

18  What can we do to ensure the safety and well being of the

19  children in the DHHR's custody and to ensure the safety

20  and well being of the workers who are called upon to do

21  more than they ought?

22      So with regard to evidence, I would just rely and

23  ask the Court to take in -- to take judicial notice of

24  the proceedings had in the MP case and direct the

14

1      Department and the petitioners to engage in discovery

2      about these matters so we can have some facts to present

3      to the Court.

4           With regard to the MP case, I understand that a

5      motion is pending. I've not received it yet. I will be

6      happy to deal with that motion when it comes to my

7      attention as counsel for MP in that particular case. But

8      this is obviously a much bigger problem than one case.

9      And in that case the Court discontinued this practice.

10     So one way to look at it might be to say, "Problem solved

11     because we're not going to be doing that anymore in

12     accordance with this Court's order," but I don't think

13     that addresses really the underlying problem. How can we

14     help the Department meet the needs of these children, and

15     how can we prevent this practice or the need for this

16     practice to continue? Because this is a symptom, not the

17     problem.

18          THE COURT: Ms. Cyrus, do you wish to respond?

19          MS. CYRUS: Yes, Your Honor. And I -- after hearing

20     Ms. Victor, I do think we probably are in agreement more

21     than maybe she realizes.

22          We do definitely agree that the issue with where to

23     place these children was taken away in terms of the Shell

24     Center -- Robert Shell Center by the legislature. And

1   she's correct; and if that is to be addressed through new

2   facilities, that would need to be done through the

3   legislature, which actually underscores the fact that

4   that would be the forum where this would be addressed as

5   opposed to this case.

6          THE COURT:  Well, that's not really the issue that's

7   squarely before this Court.  The issue that's squarely

8   before this Court is the order that I have entered in the

9   MP case prohibiting the Department from housing any youth

10  in the state of West Virginia in any office.  I don't

11  know whether that's being followed.  I perhaps received

12  some incidental information -- or actually my secretary

13  has had requests for copies of that order from various

14  places where I assume, perhaps incorrectly, that the

15  order is not being enforced.

16         So perhaps we could get some clarification on that,

17  Ms. Cyrus.  That would alleviate the emergency nature of

18  having to conduct all the evidence here this morning,

19  which I'm willing to do.  I mean, there are witnesses

20  here who could testify about some of these matters.

21         MS. CYRUS:  Well -- and as far as what happened, I

22  mean I was not at the MP hearing, but I did read the

23  transcript.  It appears to me the Court was given

24  anecdotal information.  Even some of the things that

16

1    Ms. Victor said I don't know to be factual, that we've

2    had workers to quit because of this situation.  I don't

3    know that to be true.  And --

4        THE COURT:  (Interposing) Well, Mr. Hale is here

5    today.  He can testify about those matters, I'm sure.

6        MS. VICTOR:  Your Honor, the --

7        I'm sorry, Lou Ann.  Go ahead.

8        MS. CYRUS:  Well, I was just going to say -- I mean,

9    that's part of the argument in wanting to develop this in

10   the MP case, because it wasn't fully developed and the

11   Department wasn't aware that that -- the order was -- the

12   issue was going to be taken up and that order was going

13   to be given that day.  So there was no opportunity to

14   provide the Court with adequate information to know

15   whether, you know, this -- the order should be entered.

16   So that's part of the issue.  And we feel that that would

17   be the proper case for it to occur in.

18       But regardless -- I mean, the Court should have the

19   adequate information with one case or the other.

20       THE COURT:  So I guess to my question, is the

21   Department following my order currently in that case or

22   do we need to conduct and enter an order in this case?

23       MS. CYRUS:  And, you know, I may have to have

24   somebody on my -- with my client answer that.  I can tell

17

1    you, I do know that no child has been kept overnight at

2    the Kanawha County office since that order was entered on

3    November the 19th, 2021.  I do know that.  But with

4    regard to other counties, I don't know the answer to

5    that, Your Honor.

6         THE COURT:  Well, who would you like from your

7    client to be sworn and give me the answer to that

8    question?

9         MS. CYRUS:  Just first of all, Your Honor, I just

10   would like to place an objection on the record to having

11   any testimony in this case to the extent we've not been

12   provided notice of what testimony was to be adduced.

13   There's some issues that Ms. Victor outlined on the

14   record, questions that she asked a few moments ago.  You

15   know, had we been provided those, that would be helpful

16   to be able to prepare, but we weren't -- we're not

17   sufficiently able to address those, Your Honor.

18        THE COURT:  I think there is sufficient notice of

19   the issue before this Court.

20        Ms. Victor, you may call your first witness.

21        MS. VICTOR:  Yes, Your Honor.  The co-petitioners

22   call Michael Hale.

23        THE COURT:  Mr. Price, would you swear in Mr. Hale,

24   please.

18

1      COURT REPORTER:  Mr. Hale, do you swear or affirm

2  the testimony you give in this case will be the truth?

3      MICHAEL HALE:  I do.

4                    DIRECT EXAMINATION

5  BY MS. VICTOR:

6      Q.  Mr. Hale, please state your name and your

7  current occupation.

8      A.  Michael Hale, Community Services Manager for the

9  Kanawha District office.

10      Q.  Mr. Hale, do you know of any children prior to

11  November 19th who were obliged to spend the night at the

12  DHHR offices because of the lack of other appropriate

13  accommodations?

14      A.  I am.

15      Q.  And how often per week -- excuse me.  How often

16  per month would the Department be obliged to have one or

17  more children stay overnight?

18      A.  It varied greatly.  We actually have a report

19  that's due each month about children who have either been

20  housed in offices or hotels.  Some months would be, you

21  know, none.  Others I'm aware of, you know, up to

22  approaching two weeks time, both in hotels and in the

23  office.

24      Q.  Uh-huh.  And how many children each night would

Case 3:19-cv-00710 Document 555-1 Filed 05/16/24 Page 20 of 109 PageID #: 26418

1   you be obliged to house?  Would it be just one or would

2   it be more than one?

3        A.  More often than not, just one.  There were

4   occasions where we could have, you know, some overlap

5   of -- I can't immediately recall more than two at any

6   given time, but that's not to say it couldn't have

7   occurred in some instance.

8        Q.  Were there occasions when a child was obliged to

9   stay overnight at the DHHR office more than one night?

10       A.  Yes.

11       Q.  Would that be consecutive nights or staggered

12  nights?

13       A.  Both actually.  There were occasions of

14  consecutive stays, interruptions by stints in juvenile

15  detention, and then the case be dismissed or the child be

16  released and back into our care, all the while still

17  trying to the secure placement anywhere and everywhere,

18  to no avail.

19       Q.  Uh-huh.  And what type of bedroom or sleeping

20  facilities are contained at the Kanawha County district

21  office?

22       A.  We have an office that we converted to a, a

23  bedroom with a pull-out sleeper sofa, TV, computer games.

24  Just making the best of what we had available.

20

1    Q.   And how many actual beds are in that room?

2    A.   Just, just the one.

3    Q.   Just the sleeper sofa, the one sleeper sofa?

4    A.   Yes, ma'am.

5    Q.   Are there dressers and closets to hold the

6    children's clothing and belongings?

7    A.   There are some storage drawers, I believe.  A

8    closet, no, ma'am.

9    Q.   Okay.  And what bathing facilities are available

10   for these children?

11   A.   We do not have bathing facilities.  We in the

12   past have utilized facilities at Patchwork and Davis

13   Child Shelter for hygiene purposes.

14   Q.   So obviously you have rest rooms, but --

15   correct?

16   A.   Yes, ma'am.

17   Q.   But you have no shower or bath facilities?

18   A.   No, ma'am.

19   Q.   Do you often have sibling groups who are obliged

20   to stay in this facility?

21   A.   I don't recollect any in recent times.  To say

22   that we haven't in five years, I could only speculate

23   that perhaps it has occurred; but the, the lengthy stints

24   were of late, in October/November, and it really involved

21

1    only two kids, and they weren't siblings.

2        Q.  Uh-huh.  When you have more than one child, what

3    do you do with the other child?

4        A.  We have elevated cots that we would utilize the

5    conference room for sleeping purposes.

6        Q.  Uh-huh.  What kind of meal preparation

7    facilities do you have available to feed the children?

8        A.  We do have a kitchen; but typically we feed the

9    child takeout, carryout, take them out to eat, you know.

10       THE COURT:  Have you ever prepared food for them?

11       THE WITNESS:  I'm sure staff have, Your Honor, in

12   some capacity.  I have not witnessed it physically,

13   someone going --

14       THE COURT:  (Interposing) Well, you have a full oven

15   and a full freezer stocked with food and so forth, not

16   just lunches that people put in the refrigerator that

17   they bring in with them?

18       THE WITNESS:  No, sir.  We do not have stocked food

19   here.  Outside of our emergency food pantry, have we, you

20   know, retrieved items from that for --

21       THE COURT:  (Interposing) Do you have an oven, a

22   rangetop?

23       THE WITNESS:  Yes, sir.  We have a microwave and an

24   electric oven.

22

1      THE COURT:  And have you all -- has someone cooked

2  meals for them?

3      THE WITNESS:  I can't say that I've witnessed that

4  personally.

5      THE COURT:  Do you have anybody trained and

6  certified as a food handler?

7      THE WITNESS:  Not to my knowledge, sir.

8      THE COURT:  And some of the kids have been there

9  several weeks, if I recall correctly.  Is that right?

10     THE WITNESS:  I don't re- -- I don't recall beyond

11  10 to 14 days, and those are the extreme cases.

12     THE COURT:  And those children were not receiving

13  any educational opportunities during that time; is that

14  correct?

15     THE WITNESS:  I know one of the two that were here

16  for an appreciable length of time, we endeavored to

17  enroll them in school; but I would have to defer to

18  Ms. Wilkerson to comment as to why that did not

19  transpire.  Or he may have been accepted for a day or

20  two, and his behaviors led that school to ask that he be

21  removed.

22     THE COURT:  Do you believe that the behaviors with

23  some of these children that were housed, they were

24  escalated because they were not being appropriately

23

1    maintained and treated?

2         THE WITNESS:  I'm sure it could have been a factor.

3         THE COURT:  I heard -- and I just happened to hear

4    this this morning.  I got a call from one of my probation

5    officers, and we were talking, and he told me that he had

6    a child that was at some point maintained at the DHHR

7    office, and he threw a stapler at whoever the supervisor

8    was that was required to be there, and that juvenile

9    charges -- he's an 11-year-old -- and juvenile charges

10   were filed against him, and he's been after "Tiger"

11   Morton, and he hasn't -- and he's decompensated mentally

12   ever since then.  Are you familiar with that?  Are you

13   aware of that situation?

14        THE WITNESS:  I am aware somewhat, Your Honor, but

15   that young man in particular was, was very assaultive.

16   But between the two that were here in October and

17   November, either/or did have significant behavioral

18   issues, and I know there were occasions where they

19   attempted to file charges and they were not accepted.

20   But I believe the young man you're referring to now, that

21   placement has been secured.  He may physically remain at

22   "Tiger" Morton at this moment, but I understand --

23        THE COURT:  (Interposing) His time there expires

24   tomorrow because of his mental health status.  So y'all

Case 3:19-cv-00710 Document 553-1 Filed 06/30/24 Page 26 of 110 PageID #: 26423

1    have to find some place, is my understanding.

2        Let me ask you about this one.  What about the

3    services that you are offering the children while they're

4    there?  Are they receiving mental health counseling or

5    any other services related to any conditions that they

6    may have or may need if they were in a facility?

7        THE WITNESS:  Not here.  Not in --

8        THE COURT:  (Interposing) No services for anybody

9    that's housed at -- in a hotel or at your office?

10       THE WITNESS:  I can't say that they're not being

11   taken to outside appointments or anything like that, but

12   as far as here --

13       THE COURT:  (Interposing) Are they?  Are they being

14   taken to outside treatment?

15       THE WITNESS:  I would, I would have to defer to

16   Ms. Wilkerson who is --

17       THE COURT:  (Interposing) You're not aware of it?

18       THE WITNESS:  I am not, sir.

19       THE COURT:  All right.  And you are aware that the

20   Department has certain rules and regulations that they

21   promulgated as to how these children are being maintained

22   in facilities; is that correct?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  And do you all -- do you -- are you

1  meeting any of those obligations to the children that

2  you're housing either in a hotel or at your office?

3      THE WITNESS:  No, sir.

4      THE COURT:  Do you believe it's a safe environment?

5      THE WITNESS:  I believe it's, in desperation, the

6  only environment that we can provide to even represent

7  any semblance of safety.  I mean, that's all we have,

8  and --

9      THE COURT:  (Interposing) Well, what about your

10 workers?  As I understand it from the testimony I heard

11 and Ms. Cyrus has probably read, that the workers are

12 leaving because they are being required to take that duty

13 and it's unsafe for them in these conditions.  Is that

14 true?  Have you lost workers because of that?

15     THE WITNESS:  I would not -- I would only be able to

16 speculate, Your Honor.  As far as the exit interview,

17 which we try to do with every leaving employee, that has

18 not been expressed specifically as a reason for leaving.

19 I do believe it could be a factor, just along with all

20 the other stressors.  But no one has ever said, "I'm

21 leaving because I had to spend time or pull a shift

22 watching this child."

23     THE COURT:  You have suffered a significant loss of

24 personnel in your office; is that correct?

Case 3:19-cv-00710 Document 555-1 Filed 05/16/24 Page 28 of 110 PageID #: 26425

```
1         THE WITNESS:  We have, Your Honor.

2         THE COURT:  And it is -- the fact that you're

3    losing, it is affecting the care of the children; is it

4    not?

5         THE WITNESS:  Yes, sir.

6         THE COURT:  I'm sorry.  I interrupted you,

7    Ms. Victor.

8         MS. VICTOR:  Thank you, Your Honor.  You anticipated

9    many of my questions.

10        Q.  (By Ms. Victor) Getting back to the food and

11   hygiene, do the children have snacks there should they

12   get hungry?  Do they have breakfast there, breakfast

13   foods?

14        A.  Staff always ensure the children are fed

15   regularly.  And any snacks, they reach into their own

16   pockets.  I've never witnessed them not being provided

17   for.

18        Q.  Well, you anticipated another question.  Who

19   actually is providing this food and -- is it -- is there

20   a fund that the DHHR can reach into to supply the meals

21   for the children housed at DHHR offices or are the

22   workers spending their own money to do that?

23        A.  Generally it's on the P card, I believe, that

24   the workers --
```

27

1    Q.  (Interposing) Okay, I don't know what that is.

2    A.  (Continuing) -- possess.

3    It's just a purchasing card --

4    Q.  (Interposing) Uh-huh.

5    A.  (Continuing) -- that we utilize for expenses on

6    behalf of the youth in our care.

7    Q.  Uh-huh.  And what about hygiene supplies:  soap,

8    towels, toothpaste, toothbrushes, you know, things like

9    that?  Are those provided to the children housed as we've

10   described?

11   A.  We don't keep them in inventory, but I'm certain

12   that none of our children have gone without a toothbrush

13   or toothpaste being provided.  We don't keep an inventory

14   of towels and things like that; but I'm certain, you

15   know, they are provided when we do take them to the

16   places we have available for them to utilize shower

17   facilities.

18   Q.  And how about the children's clothing and

19   possessions?  Are they -- do they have those there with

20   them so they can change into clean clothes?  Do you have

21   to purchase clothes for them?  What's going on with that?

22   A.  It's a combination of all.  They generally have

23   some possessions in tow, which is always very sad.  We

24   provide them with luggage or duffel bags if, you know,

28

1    their belongings are in a plastic bag.  We do purchase

2    whatever clothes that are necessary for them.

3         THE COURT:  Do you have facilities to wash and clean

4    the clothes?

5         THE WITNESS:  No, sir, we do not.

6         Q.  (By Ms. Victor) How do the children get clean

7    clothes or how do you wash their clothes?

8         A.  I'm sure staff take them home and wash them.

9         Q.  Oh, boy.

10        Now, when children have to stay overnight, I assume

11   you just -- you don't just lock the building and leave.

12   Does that require one or more workers to stay overnight

13   to look out for them?

14        A.  It always requires a minimum of two.  And one of

15   the benefits, if one can be derived from it, is that we

16   do have security here in Kanawha 24 hours a day.

17        Q.  Are the workers allowed to sleep there also or

18   are they required to stay awake and alert during the

19   nighttime hours while the children are present?

20        A.  We would have them do four-hour shifts with the

21   expectation that both would remain awake and attentive to

22   any needs that the child may have; or, you know, the

23   ability to go relieve one's self would not even be

24   present if we didn't have a minimum of two.

29

1    Q.  Now, are the workers in the sleeping areas to

2    keep an eye on the children or are they outside and just

3    alert?

4    A.  They would be in the general vicinity but not

5    necessarily sitting in that inverted bedroom, but they

6    would be directly adjacent to the door, monitoring for

7    any activity or motion.

8    Q.  So you mentioned earlier there are four-hour

9    shifts requiring two people at all times to be there.  Do

10   people just come in for four hours and leave and be

11   relieved by another person for a four-hour shift, or are

12   they there for eight hours or longer at a time?

13   A.  Well, in addition to their eight-hour days, we

14   would first ask for volunteers.  During the daytime, of

15   course, it's much easier to devote manpower available to

16   that, but the evening hours was voluntary and to the

17   point where it wasn't.

18   Q.  And are --

19   THE COURT:  (Interposing) What exactly does that

20   mean?

21   THE WITNESS:  That we had to delegate to some

22   workers:  "We have to have you in for this time."

23   THE COURT:  Okay.  And they were required to stay --

24   I don't know what time you all get off work, 4:00 o'clock

30

1  or 5:00 o'clock.  Were they required to stay from your

2  normal -- just closing -- your normal business hours

3  until 8:00 or 9:00 o'clock, whenever the next business

4  day started?

5      THE WITNESS:  No.  We, we would try to break it up

6  in order for folks to get some rest, have dinner, do what

7  they needed to do, but just in four-hour shifts be

8  available after-hours.

9      THE COURT:  So no one would work more than four

10  hours of that 16 hours of beyond the normal workday?

11      THE WITNESS:  Ideally, sir, yes.  That was, that was

12  the goal, always.  Now, did some workers put in more time

13  because they desired to or had the availability or if

14  they were covering for a co-worker who absolutely

15  couldn't, I'm sure that did occur.  But our goal is

16  always to just --

17      THE COURT:  (Interposing) So for every night that

18  you had someone in the office it required six different

19  workers?

20      THE WITNESS:  In theory, yes, sir.

21      Q.  (By Ms. Victor) And how -- were the workers paid

22  for this time --

23      A.  (Interposing) Yes.

24      Q.  (Continuing) -- and if so, how?

31

1          Was it overtime or --

2          A.  (Interposing) Yes.

3          Q.  (Continuing) -- would they get comp time or --

4          A.  They would have received overtime, if that was

5     their preference.

6          Q.  Uh-huh.

7          A.  We would have certainly allowed them to comp the

8     time if they had wanted it.

9          Q.  Uh-huh.  Did this not interfere with the

10    workers' usual duties?

11         A.  If they were able to devote their regular

12    workday to their caseloads, I wouldn't say necessarily

13    so.  Did fatigue become a factor in some of these longer

14    stints?  It likely did.

15         Q.  And are you talking about just Child Protective

16    Services workers or does that also include youth services

17    workers, CPS supervisors, youth services supervisors?

18         A.  Yes, ma'am.  All of the above.  Just whomever we

19    could find available.

20         Q.  What about aides, case aides?  Were they

21    included in that?

22         A.  They have been, yes.

23         Q.  Okay.  Now --

24         THE COURT:  (Interposing) Is that the prob- -- was

32

1    this a problem that existed for not only the CPS cases

2    but the general juvenile cases as well where they were

3    housed at the offices?

4        THE WITNESS:  What -- I'm not sure I understand,

5    Your Honor.  Could you --

6        THE COURT:  Well, these children that were being

7    housed -- and the case that came to my attention was a

8    CPS case by an abuse and neglect case.  My question is:

9    Did this same procedure apply to children who were before

10    the courts for juvenile status offenses and other

11    juvenile matters, whether it's a JD case where they were

12    placed in the custody of DHHR rather than in the division

13    of whatever you call the juvenile services these days?

14        THE WITNESS:  I'm not aware of any recently, Your

15    Honor.  Whether or not that's occurred in youth services,

16    we would have to probably defer to Ms. Wilkerson.  But I

17    can't recollect any of recent times that it involved

18    court-involved youth.

19        THE COURT:  But has it in the past, to your

20    knowledge?

21        THE WITNESS:  In the last five years I, I just

22    actually can't recall.  I've seen -- you know, they have

23    kids in here all the time in and out, so I really

24    couldn't answer that with certainty.

33

1    THE COURT:  Well, perhaps Ms. Wilkerson will be able

2    to that question, if Ms. Victor calls her.

3    MS. VICTOR:  I intend to, Your Honor.

4    Q.  (By Ms. Victor)  Now, Mr. Hale, does the DHHR

5    office meet the guidelines, the rules, and the Code

6    requirements for foster home facilities?

7    A.  I wouldn't think so.

8    Q.  And how about for emergency shelters?

9    A.  I would not think so.

10   Q.  Okay.  Now, you mentioned and we've heard that

11   occasionally children were housed in hotels overnight.

12   Does that continue to occur?

13   A.  I believe it may have occurred since the Judge's

14   order prohibiting housing youth here, not -- not

15   extensive, but again I would defer to Ms. Wilkerson for

16   the accuracy on that.

17   Q.  And are there any particular hotels that DHHR

18   uses to house youth?

19   A.  I've known us to use several local

20   establishments.  I don't -- there's not an absolute go-to

21   that we prefer.  Of course as was mention earlier, we've

22   had some behavioral problems there where they've asked us

23   to remove the child.

24   Q.  Do you recall the names of any of the hotels or

34

1    motels that you've used to house youth?

2         A.  I know we have used the Embassy Suites.  And

3    that's really the only one that I recollect right now,

4    and that was some time ago.

5         Q.  But you believe there are other establishments?

6         A.  Oh, yes, ma'am.

7         Q.  Okay.  And what problems have arisen

8    specifically with the children's behavior that have

9    caused problems -- that have made that difficult?

10        A.  Damage to property is one, but also the risk of

11   flight and concerns if the child would get away, run into

12   traffic, end up in the wrong place with the wrong people.

13        Q.  What particular establishments, if you recall,

14   have asked you to leave either because of one child or to

15   leave in general and not bring youth there and house them

16   anymore?

17        A.  Again, I'm not certain of the facilities.  I

18   know there was some damage in those most recent instances

19   that Ms. Wilkerson could, could better speak to.

20        Q.  And how many workers are required to supervise

21   children when they are required to be housed in hotels or

22   motels?

23        A.  Two.

24        Q.  So always two?

1      A.  Always two.

2      Q.  Okay.  Did you use Embassy Suites because it

3  provides two separate sleeping areas?  Do you know?

4      A.  I do not know.

5      Q.  Okay.  And who pays for -- or how are these

6  hotel accommodations paid for?

7      A.  By the Department.

8      Q.  And through what funds or -- is it the P card

9  again or is -- or some other funds that you access for

10  that?

11      A.  I believe it can be placed on the P card.

12  Arrangements could also be made for use of another

13  account through our operations.  So I'm not certain as to

14  which, you know, manner was utilized to pay for these.

15      Q.  What do you believe has prompted this increase

16  requiring children to be housed overnight either at

17  Department or in hotel accommodations?

18      A.  Just the lack of facilities that are equipped to

19  deal with these youth with various behavioral problems or

20  whatever their unfortunate circumstance may be.  You

21  know, we run into facilities that say, "They're too

22  young; their IQ is too low."  That was one of the major

23  difficulties with one of these most "recents" who were --

24  was housed here.  He had what was believed to be a -- an

36

1    IQ documented that was far below what we felt he was, and

2    that had to be redone before any other facilities would,

3    would consider.  Clearly it's just a lack of bed space

4    and a lack of facilities that cater to a youth's

5    particular malady.

6        THE COURT:  Have we had a reduction in facilities

7    either by vendor's choice or by the Department's choice?

8        THE WITNESS:  I'm not aware of the loss of

9    facilities, but of course the pandemic has contributed to

10   it greatly as well with shutdowns and closures and holds

11   placed on admitting new youth.  That's been a --

12       THE COURT:  (Interposing) Are you aware that some

13   programs have gone from operating a male unit and a

14   female unit, and closing one or the other, and having an

15   overall reduction of the total number of beds?

16       THE WITNESS:  No, sir, not personally.  My staff

17   just goes through every facility in state and

18   out of state regularly when we have children in these

19   circumstances.  It's "Call every day."  Even if we called

20   yesterday and a bed wasn't available, they --

21       THE COURT:  (Interposing) Well, maybe Ms. Urquhart

22   will be able to help us with that.

23       Q.  (By Ms. Victor) So when children stay overnight

24   in hotels, do they provide separate sleeping areas for

Case 3:19-cv-00710 Document 555-1 Filed 05/16/24 Page 39 of 110 PageID #: 26436
Case 3:19-cv-00710 Document 315-53 Filed 07/30/24 Page 38 of 199 PageID #: 13249

1   staff and youth?

2       A.  Staff are not ex- -- are expected not to sleep

3   in that four-hour stint.

4       Q.  And the hotels, do they meet the requirements

5   set forth in the Code and the rules for foster care or

6   shelter placement or general residential facilities for

7   children?

8       A.  I would not believe so.

9       Q.  Are there any written policies on housing youth

10  in these circumstances, these emergency circumstances?

11      A.  Not to my knowledge.

12      Q.  You referenced earlier a report that's

13  generated, I believe -- well, you indicated that reports

14  were generated about children who are required to stay

15  overnight.  What's the name of that report?

16      A.  I believe it -- when the request comes, it's

17  just "Children Overnight in Hotels and Offices."

18      Q.  And who prepares that report?

19      A.  We prepare Kanawha's number and send it to --

20  she's a secretary, and I'm not sure who she works for

21  now, but she's with the administration.

22      Q.  And do you personally prepare that report or

23  does a member of your staff prepare that report?

24      A.  Generally Ms. Wilkerson or Ms. Shepherd prepares

38

1    it, because they have the most accurate accounting.  And

2    then we have to send it up.

3        Q.  And when you say "Ms. Shepherd," is that Melissa

4    Shepherd, sir?

5        A.  It is.

6        Q.  And how often is that report prepared?  Is it

7    daily, weekly, monthly?

8        A.  Monthly.

9        Q.  Monthly report.

10       THE COURT:  Is each office -- is each local office

11   in the state required to file a similar report?

12       THE WITNESS:  That's my understanding, Your Honor.

13       THE COURT:  And is it your understanding that -- or

14   do you know -- whether other offices throughout the state

15   are experiencing the same thing with employ- -- with

16   youth in offices or in motels?

17       THE WITNESS:  Nothing firsthand, Your Honor.

18       THE COURT:  You've not seen other reports?

19       THE WITNESS:  No.  I haven't -- I don't see the

20   compiled report.

21       THE COURT:  Well, I assume again Ms. Urquhart will

22   be able to update us on that.

23       Q.  (By Ms. Victor) And to what individual at the

24   state office do these reports go?  I know you mentioned a

39

1    secretary.  Do you mean Secretary Crouch or an

2    administrative assistant in a local -- in a state office?

3         A.  I actually -- we actually send them to whom I

4    believe was the secretary to a now retired Deputy

5    Commissioner --

6         Q.  (Interposing) Ah.

7         A.  (Continuing) -- in a state office.

8         Q.  All right.  And that individual has retired, so

9    who would that go to now?

10        A.  I believe it would be Amy Hymes, if I'm correct.

11        Q.  Amy Hymes.  And what is that individual's job?

12        A.  I believe her to be the Deputy Commissioner in

13   the North.

14        Q.  Is that Deputy Commissioner, Field Operations

15   North?

16        A.  I believe so.

17        Q.  All right.  Have you had occasion to discuss

18   this problem with other CSMs in other county offices?

19        A.  No.

20        Q.  Okay.  So if we were to attempt to locate a

21   compilation of these reports, would we go to Amy Hymes?

22        A.  I probably would, yes, ma'am.

23        Q.  Okay.  And is there another individual in the

24   state office who has knowledge or -- of this problem that

40

1    we should contact?

2       A.  Well, I'm sure Ms. Urquhart, you know, receives

3    that report and would know from the southern half of the

4    state --

5       Q.  (Interposing) Uh-huh.

6       A.  (Continuing) -- when and where it's happening.

7       Q.  Have you experienced -- and this -- I've learned

8    about this -- that when children are in DHHR custody and

9    they attempt to file a juvenile delinquency petition,

10   that that petition is dismissed and might not be if the

11   child were not in DHHR custody?  Is that a problem for

12   you all?

13      A.  We've had occasions where we felt there were

14   sufficient charges that would warrant a more secure

15   setting for the child, but the prosecutor ultimately did

16   not pursue it.

17      Q.  Well, what about when you go in front of the

18   juvenile referee?  Do you find that if the child -- if

19   two children had similar charges, and one was in the

20   parents' custody and one is in the Department's custody,

21   that the charges might be dismissed more readily if the

22   Department -- if the child is in the Department's

23   custody?

24      A.  I couldn't, I couldn't answer that.

41

1        Q.  Uh-huh.  Well, when charges are dismissed, that

2   eliminates the possibility of placing the child in a

3   secure detention facility, juvenile detention facility;

4   correct?

5        A.  Yes, ma'am.

6        Q.  And in your opinion would that be the better

7   placement for the child under the circumstances?

8        A.  Unfortunately under some circumstances it's far

9   more than we can afford or ensure.

10       Q.  Uh-huh.

11       MS. VICTOR:  I believe that's all I have.  Thank

12   you, Judge.

13       THE COURT:  All right, Ms. Cyrus, you may inquire if

14   you have questions.

15       MS. CYRUS:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MS. CYRUS:

18       Q.  Mr. Hale, I just have a few follow-up questions

19   for you.  When children have been kept overnight in the

20   the local office there in Kanawha County, was it because

21   there were no other options?

22       A.  Yes, ma'am.

23       Q.  And was it for as limited a time as possible?

24       A.  Absolutely.

1    Q.  And was the intent ever, in keeping the children

2  there, to be long-term or to get them to other placement

3  as soon as possible?

4    A.  Absolutely as soon as possible.

5    Q.  And as far as you know, has that been the case,

6  that the children who have had to stay there overnight

7  have been placed elsewhere as soon as possible?

8    A.  Yes, ma'am.

9    Q.  As far as the circumstances at the office, is

10  there security at the office?

11    A.  There is.

12    Q.  Is that 24 hours a day?

13    A.  Correct.

14    Q.  Okay.  Are the children kept safe there?

15    A.  To the best of our ability.

16    Q.  Are they fed?

17    A.  Yes, ma'am.

18    Q.  And you said although there are no currently

19  shower facilities set up for them at the office, are they

20  provided a shower facility?

21    A.  Yes, ma'am.

22    Q.  Okay.  And as far as them in school, is the

23  issue that they would have to be enrolled in a school;

24  and if they're only there temporarily, there's not enough

43

1   time to enroll them?  Is that -- when I heard you

2   testify, is that what you were explaining?  Or trying to

3   get to?

4       A.  In my experience, you know, there's only been a

5   couple of occasions that have gone to the level of

6   extreme, was the two cases in October and November.

7   Generally they're not here more than a day or two before

8   we could secure placement.  So it would not be in

9   anyone's best interest to go to the time and get them in

10  school and then, you know, move them elsewhere in a day

11  or two.

12      Q.  Okay.  I believe that's all I have for you, sir.

13  Thank you.

14      THE COURT:  Anything else for this witness,

15  Ms. Victor?

16      MS. VICTOR:  No, your Honor.  Thank you.

17      THE COURT:  All right.  Do you want to call your

18  next witness, please.

19      MS. VICTOR:  Your Honor.  The guardians ad litem and

20  co-petitioners call Sandra Wilkerson.

21      COURT REPORTER:  Ms. Wilkerson, do you swear or

22  affirm the testimony you give in this case will be the

23  truth?

24      SANDRA WILKERSON:  I do.

44

1                    DIRECT EXAMINATION

2     BY MS. VICTOR:

3          Q.  Good morning, ma'am.  Please state your name.

4          A.  Sandra Wilkerson.

5          Q.  And, Ms. Wilkerson --

6          THE COURT:  (Interposing) Is your camera on?  Is

7     your camera on, ma'am?

8          THE WITNESS:  It is.  I can -- it is.

9          THE COURT:  I'm not able to see.  Could you turn it

10    off and turn it back on?  Maybe that would help.

11         THE WITNESS:  Did that work?

12         THE COURT:  It did.  Thank you very much.

13         Q.  (By Ms. Victor) Ms. Wilkerson, please tell us

14    how you are employed.

15         A.  I am one of the Social Service Coordinators in

16    the Kanawha office.

17         Q.  And how are you -- your duties differentiated

18    from the other Social Service Coordinators?

19         A.  I supervise the court supervisors, the chief

20    supervisors, the investigator supervisors -- the intake

21    supervisors.

22         Q.  And who is the other Social Service Coordinator?

23         A.  Melissa Shepherd.

24         Q.  Okay.  Ms. Wilkerson, how long have you been

45

1  employed by the Department?

2      A.  Almost 20 years.

3      Q.  And how long have you been a Social Service

4  Coordinator?

5      A.  This time for approximately 2 1/2 years.

6      Q.  And you were employed in that capacity in an

7  earlier time; were you not?  How long were you a Social

8  Service Coordinator there?

9      A.  It was approximately four years.

10     Q.  Okay.  And what other duties -- what other jobs

11 have you done for the Department?

12     A.  I was the Child Welfare Consultant for Region II

13 for a period of around 2 1/2 years in between, and I was

14 a CPS supervisor for a number of years.

15     Q.  Were you a CPS --

16     THE COURT:  (Interposing) And if I'm might say, that

17 Ms. Wilkerson appeared in my court many times, and I have

18 a great deal of respect for her, as I do for Mr. Hale who

19 has been very good to work with and probably one of the

20 best in his position we've had in the last 15 years or 20

21 years.  So I don't want anyone of their superiors to

22 think that we're questioning their individual integrity

23 or questioning their competency.  It's a question of how

24 were the children -- the circumstances that they are

46

1    dealing with and whether they are appropriate.  I have a

2    great respect for both Mr. Hale and Ms. Wilkerson.

3         THE WITNESS:  Thank you.

4         MS. VICTOR:  As do I, Your Honor.

5         Q.  (By Ms. Victor) And Ms. Wilkerson, you were also

6    a CPS case manager; correct?

7         A.  Yes.

8         Q.  So you're intimately familiar with Child

9    Protective Services in Kanawha County; correct?

10        A.  Yes, I am.

11        Q.  Now, are you familiar with the practice of being

12   obliged to house children overnight in the DHHR offices

13   or perhaps occasionally in hotel or motel rooms?

14        A.  Yes, I am.

15        Q.  And Mr. -- were you -- did you hear Mr. Hale's

16   testimony?

17        A.  Yes.

18        Q.  Okay.  So you heard him reference this monthly

19   report that's required to be prepared about children

20   housed overnight in hotel rooms and in their offices;

21   correct?

22        A.  Yes, and hospitals.  It's actually three parts.

23        Q.  Oh, okay.  And who actually prepares that report

24   for the Kanawha office?

Case 3:19-cv-00710 Document 555-1 Filed 06/30/25 Page 49 of 110 PageID #: 26446

1          A.  Either Melissa Shepherd or myself prepare that

2     report.

3          Q.  Okay.  So you're familiar with the numbers and

4     the occasions that require that; correct?

5          A.  Yes.

6          Q.  Okay.  Prior to November 19th, how many times

7     per month was it necessary to house a child or children

8     overnight in the DHHR office?

9          A.  It does vary by month.  If you're looking at the

10    year for 2021, October and November were probably our

11    worst months, and April.  October, there was probably

12    maybe around six days we didn't have children; but then

13    you look at maybe January and February, and we didn't

14    have any children.  And in December we had one child in a

15    hospital setting.  So it does vary.

16         In April we had one child particularly for a very

17    extended amount of time, and that was the one that threw

18    the stapler, because I was the person he threw the

19    stapler at.  But for the most part it could range from

20    two to three children a month, if there are children that

21    month; or maybe just one child a month.  It really isn't

22    a very --

23         Q.  Okay.  And to your knowledge, does an individual

24    child have to stay more than one night consecutively

48

1    overnight in the office or in a hotel room?

2        A.  That is certainly not our goal.  I mean --

3        Q.  (Interposing) I understand that this is nobody's

4    goal.

5        A.  Right.  We've had children that have only had to

6    stay a night, and we could find placement the next day;

7    and then we've had children that have had to stay

8    multiple nights in the office or in a hotel, depending on

9    the child's situation:  how difficult they are to place;

10   if, if there are any open beds for them.  And there's a

11   lot factors that go into placement of children.  You have

12   age, behaviors, IQ that could make a child very difficult

13   to place; and then other children we can find placement

14   relatively quickly.

15       Q.  And in your opinion does the impetus for this

16   problem arise from the fact that we simply lack

17   sufficient facilities to house children?

18       A.  We lack beds for these children.  I don't think

19   the, the -- we don't have sufficient bed space for

20   children.

21       Q.  Okay.  So do you believe that this problem is

22   caused in part because of the lack of foster care homes

23   and foster care beds?

24       A.  There is a lack of foster care beds, but there's

49

1   also a lack of beds for children that might have

2   behavioral issues or even emergency care beds in

3   shelters, shelter placements, especially with some

4   children that may have -- we had one child blocked from

5   an entire section of shelters because of his behaviors.

6        So we are trying to find a bed, and they are blocked

7   out of the shelters, and they have behavioral issues that

8   a foster home can not handle, they need treatment, then

9   you're scrambling to find a treatment bed for that child,

10  and that's not the easiest.  We're running into even

11  waiting lists for out-of-state placements.

12       THE COURT:  Has there been a general decline in

13  recent times of the number of beds that are available in

14  facilities?

15       THE WITNESS:  I can't remember the name right now,

16  but we did have a shelter closure and we did have a

17  facility that went to female beds.  So that is accurate.

18       THE COURT:  And have we re- -- to your knowledge,

19  have there been any recruiting efforts for other

20  facilities?

21       THE WITNESS:  For facilities?  Not to my knowledge.

22       THE COURT:  And what about the hospital stays?

23  Again, I don't know this to be true, and that's the

24  reason I'm asking it.  There have been issues that

50

1    hospitals, such as the one in Kanawha City whose name

2    escapes me at the moment, has had some issues, and

3    they've been not accepting or keeping children.

4         THE WITNESS:  Highland Hospital?

5         THE COURT:  Highland Hospital.

6         THE WITNESS:  We -- yes, your Honor.  There are

7    times when children are in acute care facilities -- like

8    Highland, River Park, BARH, and there's a Highland in

9    Clarksburg -- where we cannot locate a, again a

10   residential treatment facility for a child; or if they

11   are recommending foster care, a foster care home.  And

12   they've had -- they are ready for discharge, but we do

13   not have a placement for them.  So they have stayed in

14   that either acute care setting or even in an actual

15   medical hospital setting until we can secure a bed.

16   We've had some children in medical hospitals that have

17   had to stay -- not particularly our county, but I was

18   with a child in a -- that I volunteered to go to another

19   county, and their child was in a hospital due to medical

20   issues, and they couldn't find a medical bed for them.

21   So there's, there's an array of issues finding placement.

22   It's -- you know, it's not just behaviorally-challenged

23   children.  It could be medical needs.  You know, it could

24   be, it could be -- like I said, the IQ could be the one

51

1     thing that holds up a child.

2          THE COURT:  First, I'm sorry that you had the

3     stapler thrown at you, and I'm sorry that any of the

4     staff is subjected to that kind of behavior.  How long

5     was that child there before that incident occurred?

6          THE WITNESS:  I would have to go back and look at

7     the records.  He was there for quite a while.  He's

8     actually older.  He's our older youth.  The younger child

9     had different charges.  I want to say he was 16 or 17 and

10    in the office, and he had behaviors out of state at his

11    out-of-state facility and was discharged.  I would say he

12    was in the office for probably two weeks, maybe three

13    weeks.

14         THE COURT:  And did he decompensate while in the

15    office without services and adequate care?

16         THE WITNESS:  Yes.  The beginning was -- he did

17    well.  He enjoyed being around people.  He actually

18    enjoyed being around me.  He -- but he became irritable.

19    Trapped, probably a feeling of, because he was in the

20    office.  He was also one of the ones that we took to a

21    hotel.  And we had to call an ambulance and law

22    enforcement so often that we had to leave the hotel.  So

23    he was one of our kiddos -- children that has -- had the

24    IQ that was difficult and also some mental health issues

Case 3:19-cv-00710 Document 555-1 Filed 07/30/24 Page 54 of 110 PageID #: 26451

52

1    that made him very difficult to place, and had already

2    been out of state.  So --

3         THE COURT:  (Interposing) And was he receiving,

4    while in your office, any mental health care or

5    education?

6         THE WITNESS:  Not that child, no.

7         THE COURT:  And that would be typical for those that

8    are in your, in your offices or motels or hotels:  they

9    are not receiving any services or education?

10        THE WITNESS:  We have taken children to the hospital

11   for actually psychotropic medications, especially if they

12   are low.  We always try to make sure they have their

13   medication, of course.  Again, we're always trying to get

14   them out.  So we don't want to start a treatment program

15   they certainly can't finish, or get a therapist or into

16   some kind of treatment that isn't just going to change on

17   them.

18        For the longer-term children, you know, of course

19   that was not our intent either.  And he we did not get in

20   school.  Our second child, that is the 11-year-old, we

21   enrolled him in school.  And then the day after he went

22   to school, or that evening, he ended up going to BJS

23   custody.  Then when he was returned out of BJS custody,

24   we took him back to school and the school sent him back

1　home, advising that they would no longer allow him to

2　come to school because of previous behaviors he had had

3　there.  So that was our attempt at getting him into

4　school.  And then we did request homeschooling, but at

5　that -- or whatever they do for that -- the off-grounds

6　school.  And he went back to BJS custody before that

7　could be arranged.

8　　　　Q.  (By Ms. Victor) Ms. Wilkerson, we used to have

9　facilities described as Level 4 facilities; correct?

10　　　　A.  Yes.

11　　　　Q.  And do we have those anymore?

12　　　　A.  No.

13　　　　Q.  Can you tell the Court, what is a Level 4

14　facility -- or was a Level 4 facility?

15　　　　A.  We used to use those for our more behaviorally-

16　challenged children:  runaways, status children, things

17　like that.  It could be to house someone that might be

18　awaiting court for youth services.  I mean, there's --

19　we've used them for a lot of different things when we did

20　have them.  But mostly, you know, for the more

21　challenging children that obviously we couldn't get into

22　a Level 3 because of their behaviors or whatever barrier.

23　　　　Q.  So a Level 4 facility would be more structured

24　and more restrictive than a Level 3 or Level 2 or Level 1

54

1      facility; correct?

2          A.  Yes.  I think they would even be on a lockdown

3      type situation.

4          Q.  So it's a hierarchy; correct?

5          A.  Yes.

6          Q.  So once the Level 4 facilities were terminated,

7      where did the children who needed those facilities go?

8          A.  Some of them honestly probably went to BJS

9      custody if their aggressive behavior got out of control

10     and charges were against them.  Some of them probably

11     went out of state.  I mean, I'm speculating on this.

12     Some of them we'd probably try to work into a Level 3

13     facility who could work with them.

14         Q.  Would you say lack of access to what we used to

15     call a Level 4 facility is contributing to this problem

16     of having to house children overnight and in hotels?

17         A.  I'm not sure all the children that we house --

18     that we've had to house would fit into a Level 4.

19     Sometimes it generally, when you're looking at the

20     one-night to two-nights children --

21         Q.  (Interposing) Uh-huh.

22         A.  (Continuing) -- that is generally because they

23     could go somewhere, and it's just finding that bed.  It

24     took me a few nights to find a foster home for a very

55

1    lovely boy, and he is doing really well.

2         But, you know, I have to -- you have to have the

3    resources and the time to work through all the agencies

4    to find that bed.  But some of our children that we've

5    had certainly could fit the criteria, I think, for a

6    Level 4 type facility.

7         THE COURT:  Some of the children could go

8    theoretically to shelters if we had not repositioned

9    shelters as well; is that correct?

10        THE WITNESS:  Yes.  I think that a lot of the kids

11   would -- that we would house in shelters we'd normally

12   house in shelters until we could find treatment.  That

13   would be the ideal.

14        Q.  (By Ms. Victor) Ms. Wilkerson, there's been some

15   testimony that children housed in hotels have caused

16   damage or caused problems.  What hotels or lodging

17   accommodations has the Department -- Kanawha County used

18   to house youth overnight?

19        A.  We've used several different hotels.  Our main

20   hotels that we use is usually the Embassy Suites or the

21   Holiday Inn & Suites in South Charleston.  I think

22   there's a Hampton Inn in Cross Lanes we've used -- we

23   used a long time ago.  But our goal is to try to get more

24   of a suite situation where, you know, the child has kind

Case 3:19-cv-00710 Document 555-1 Filed 06/30/25 Page 58 of 110 PageID #: 26455

56

1    of a private area, they can sleep instead of everybody

2    being in the same sleeping area.  That hasn't always

3    worked out.  Sometimes those rooms are taken, and we've

4    had to take different, you know, different rooms.  But

5    those are usually our go-to hotels.

6        Q.  Uh-huh.  And what damages, if any, have been

7    caused to hotel rooms by youth in DHHR's custody?

8        A.  We had one youth that was kicking walls and

9    knocking things over.  He ran up around $600 or $700 in

10   these charges.  Yeah.  So he was our most troublesome

11   youth to do damage.

12       Q.  Okay.  Has that occurred with more than one

13   child?

14       A.  No.  Our other child really didn't damage the

15   hotel.  He was making threats of harm against our staff

16   and himself, which is why we had to call law enforcement

17   and an ambulance; and of course it happened several

18   times, not only while he was in the office but also while

19   he was in the hotel.

20       Q.  Have you been asked not to come back to any

21   motel or hotel chains with youths overnight?

22       A.  I cannot remember the hotel we were in, but we

23   did have a little boy who wet the bed that we were asked

24   not to come back.  But I -- it's neither of these hotels.

Case 3:19-cv-00710 Document 555-1 Filed 06/30/24 Page 58 of 110 PageID #: 23289
Case 3:19-cv-00710 Document 315-1 Filed 07/30/24 Page 59 of 110 PageID #: 26456

1    I cannot remember which hotel it was.

2        Q.  Okay.  Now -- and you kind of touched upon

3    this -- have staff members been subjected to assaultive

4    behavior, battering by youths in these overnight

5    circumstances?

6        A.  Our older child that was in April made threats,

7    but -- aside from throwing the stapler at me, which

8    didn't hit me but it did scare me -- he did not harm

9    anyone else or actually make physical contact with

10   anyone.  He did threaten.

11       Our 11-year-old did hit and attack several

12   different -- different workers.  And those are the only

13   two children that I recall that have done -- that have

14   had -- those particular behaviors.

15       Q.  It's my understanding that there was one child

16   who stole a vehicle while he was being housed overnight.

17   Is that accurate?

18       A.  That is accurate.  I apologize, I was thinking

19   physical injuries.  But yes, we did have a child --

20       Q.  (Interposing) Well, you know, to be fair, I did

21   not ask you that question.  Have they -- have staff

22   members been subjected to other offenses that would be

23   criminal if they were adults?  So the car stealing.

24   Anything else?

58

1      A.  Not that I recall.

2      THE COURT:  Now, Ms. Cyrus emphasized in her

3   examination of Mr. Hale the fact that you had security on

4   and -- with the ones at your local office.  So obviously

5   that security was insufficient to protect the workers or

6   the property of the workers.  Is that correct?

7      THE WITNESS:  On those incidents that would be

8   correct.

9      Q.  (By Ms. Victor) Have children stolen things from

10   either the office or staff members?

11      A.  We had the girl that stole the car, and then our

12   11-year-old would walk around the office and take things

13   from people's desks.  And we would try to make sure to

14   get them back to the desk.  And unfortunately had to go

15   through his belongings because he was found with random

16   phones or random cards or what have you -- a lighter, I

17   think at one point.  But we would get -- we'd find it and

18   get from him and then restore it to its owner.

19      Q.  Uh-huh.  What would you need to alleviate this

20   problem of housing children overnight in the DHHR office

21   or in hotels?

22      A.  We would need beds for the children that we are

23   having to house.

24      Q.  Uh-huh.  So beds for not just children who could

1   go to a foster home but children with behavior problems,

2   people -- children with mental health problems, children

3   with medical problems.  You need all types of beds and

4   all types of environment; correct?

5       A.  Varied through the state, I would say yes.  That

6   would be combination that we would need assistance with

7   or that we need, yes.

8       Q.  Okay.  Now, these reports that we talked about,

9   do you send those -- who do you send those out to?

10      A.  We actually send ours to the Regional Director's

11  secretary, which is Jodie Addis; and she compiles for our

12  region and sends them out.  I'm not sure who that report

13  ends up with, to be completely honest.

14      Q.  Did you sigh Jodie Adams?

15      A.  Addis, A-d-d-i-s.

16      Q.  A-d-d-i-s.  And who actually writes the reports?

17  Is it -- does it -- well, no, you already answered that.

18  I apologize.

19      Okay.  Are there any other concerns that we haven't

20  discussed that arise with trying to house children

21  overnight or -- in the Department or in hotels?

22      A.  Not that I'm aware of.

23      THE COURT:  Let me ask you specifically about the

24  effect it's had on staff in your all's office.

60

1          THE WITNESS:  It's -- it causes low morale.  We --

2          THE COURT:  (Interposing) Has it contributed to the

3     transition of staff from employed in your office to

4     seeking employment elsewhere and leaving and having below

5     staff levels you currently have?

6          THE WITNESS:  On this particular individual issue I

7     don't believe that this in itself has caused a person to

8     resign.  I have heard people comment that they are

9     unhappy and they are going to look for employment because

10    of these type of issues, but some of those people are

11    still employed to this day that have said that.

12         We -- you know, there's, there's a lot of factors in

13    working in Kanawha that cause people to resign; and

14    certainly the workloads, the amount of work that we have,

15    and then you add on doing shifts with a child for a very

16    long time -- especially, like I said, October and

17    November were probably our worst months.  We had low

18    staff, and we had to pull staff for those shifts and get

19    volunteers.  And we, you know, I hate to say it, but

20    begging and pleading people to work shifts, and I work

21    shifts, to make sure these children are taken care of.

22    And it's -- you know, you work enough shifts, it gets

23    tiresome.

24         THE COURT:  And are you aware that these problems

61

1    exist in other regions outside of Kanawha County?

2         THE WITNESS:  I don't talk to -- a lot to other

3    districts.  I have volunteered to watch, like I said,

4    watch children for another, another district that was in

5    a hospital long-term; and I know that placement was very

6    difficult and probably tiresome on their staff as well.

7    Unfortunately, you know, that's part of the job, to do

8    what you need to do to protect children; and that's what

9    we do.

10        Q.  (By Ms. Victor) Does your office space meet the

11   requirements for foster care homes or shelters

12   established by the Code and the rules governing foster

13   care homes and shelter accommodations?

14        A.  I'm sure not all of the rules, no.

15        Q.  Okay.  And how about hotels?  Are hotels

16   compliant with the requirements for foster care homes or

17   shelters?

18        A.  No.

19        Q.  Okay.  Is there anywhere else we might look in

20   the Department for information about this situation other

21   than these reports that you have mentioned?

22        A.  The reports should be the best place to have the

23   numbers and completed by each district, if you were

24   looking for statewide numbers.

62

1          Q.  Uh-huh.

2          A.  And just on -- so that would be the best place

3     to get the numbers of the children throughout the state.

4          Q.  Now, if a child assaults or batters a staff

5     member or another child or commits an offense in the

6     environment, would an incident report be generated about

7     that?

8          A.  We have -- in our office I do -- we do have

9     incident reports that we fill out through our personnel

10    office that we send workers to to make sure that those

11    reports are filled out, anytime an accident occurs on the

12    job, anytime that they are in a situation where they

13    might obtain an injury.

14         Q.  Uh-huh.  And what about if the child is injured

15    because of his behavior or for some other reason?  Would

16    an incident report be generated for that?

17         A.  I believe that we would do a report to the Court

18    and the guardian ad litem and make every party aware, but

19    I don't know if there is a Department form that we have

20    to fill out for that that I'm aware of.

21         Q.  Okay.  And how are these accommodations -- hotel

22    accommodations paid for?

23         A.  We have a credit card through the state, a P

24    card, that is used to secure the hotel.

63

```
 1        Q.  Okay.  And is the P card used for food purchases

 2   for the child or for hygiene supplies or clothes or what

 3   have you --

 4        A.  (Interposing) Yes.

 5        Q.  (Continuing) -- should they need that?

 6        A.  Yes.

 7        Q.  Okay.  I believe that's all I have.  Thank you,

 8   Ms. Wilkerson.

 9        THE COURT:  All right.

10        Ms. Cyrus.

11        You're muted.

12        MS. CYRUS:  Okay.  Sorry.  My mouse wasn't

13   cooperating, Your Honor.

14        THE COURT:  We all do that.  We all have that

15   problem.

16        MS. CYRUS:  Okay.

17                      CROSS-EXAMINATION

18   BY MS. CYRUS:

19        Q.  Ms. Wilkerson, I have a few followup questions

20   for you.  If there were a Level 4 facility available,

21   like Shell used to be, could that be used to -- as an

22   alternative to keeping these children overnight in the

23   office?

24        A.  Some of them but not all of them would meet that
```

64

1    criteria, I think.

2         Q.  Okay.  Thank you.

3         THE COURT:  But the children that are placed

4    elsewhere might be in such a facility creating beds

5    elsewhere in the system.  Is that true?

6         THE WITNESS:  Could you repeat that?  I'm sorry.

7         THE COURT:  I said if there were such a facility as

8    a Level 4, children that we're sending out of state or

9    are in other facilities that aren't quite appropriate

10   might be transferred to that type of facility creating

11   beds within the system either at shelters or other types

12   of facilities?

13        THE WITNESS:  I would think some children that go

14   out of state to the more structured facilities with

15   behav- -- more extreme behavioral issues would be, would

16   be suitable for, like, a Level 4 type criteria.

17        THE COURT:  And also people that are within the

18   state who are -- who need that type of treatment could be

19   stepped up to the Level 4, creating other beds for the

20   children that we're talking about today; right?

21        THE WITNESS:  Theoretically, yes.

22        Q.  (By Ms. Cyrus) Does it sound like there's a

23   domino effect there by having -- not having a Level 4

24   facility, as far as your work is concerned?

65

1      A.  Yes.  We have Level 3 facilities that will

2   discharge youths because their program is not appropriate

3   or not sufficient, and then our only normal choice is to

4   go out of state.  If there was a higher level of care

5   from a Level 3, theoretically it would prevent us from

6   sending that child out of state if we had a Level 4

7   facility.

8      Q.  And even with children who don't require a

9   higher level of care, are there times it takes time to

10  just place the child to get a placement that is

11  simply the reason that they are in your office

12  overnight?

13     A.  Yes.

14     Q.  And have --

15     THE COURT:  Lou Ann, we're not picking up very well.

16  Could you maybe speak up a little bit.  I don't know if

17  you were breaking away or the signal was breaking down.

18  If you would, repeat that last question.

19     MS. CYRUS:  Yes.  It sounded like there was

20  background noise from somewhere.  I'm not sure.  Yes.

21     Q.  (By Ms. Cyrus) Have there been any children, to

22  your knowledge, who stayed overnight in the Kanawha

23  County office since the Court's order in the MP case of

24  November 19th, 2021?

66

1      A.  No, ma'am.

2      Q.  Okay.  And although that has not happened, is

3  that -- is the order that prohibits children from staying

4  overnight, is that something that it might not be

5  possible to comply with 100 percent of the time due to

6  the difficulties in placing a child that might take an

7  overnight?

8      A.  Correct.  Since the order, we've actually had

9  very few children that have needed overnight stay.  As I

10  said before, in December we've only had one child that

11  had to stay in a hospital setting.  There may be a time

12  when we have a child at a hotel where the hotel asks us

13  to leave.  Hopefully we would not run into that, but that

14  might, that might happen.

15      Q.  Okay.  When children were kept there overnight,

16  was it because there was no other option?

17      A.  Yes.

18      Q.  And was it intended for the least amount of time

19  possible?

20      A.  Yes.

21      Q.  And you -- Mr. Hale said he would defer to you

22  about some of these questions about just the manner in

23  which they are kept, so I'm going to follow up on some of

24  those.  Are they fed when they're at your office?

67

1    A.  Yes.

2    Q.  Okay.  Are they fed three meals a day?

3    A.  Yes.

4    Q.  Okay.  And is that paid for by the P card that

5    you mentioned, that's the State card?

6    A.  For the most part, yes.

7    THE COURT:  And I'm assuming, since you all don't

8    cook the meals, that they are not meeting the nutritional

9    standards set up for school lunches or such things as

10   that, or even for your institutional rules and

11   regulations.

12   THE WITNESS:  We do not have a dietitian at our

13   office.  So this is actually a conversation that

14   Ms. Shepherd and I had after we, we had an increase in

15   children staying at the office, is to try to balance out

16   the meals to make sure that they had vegetables, that it

17   wasn't just fast food, that we tried to get more

18   nutritious meals ordered in from actual restaurants as

19   opposed to just running through McDonald's.

20   So we have been making a conscious effort for

21   children that are in the office to try to get green

22   vegetables, to make sure that they have something more

23   balanced.  It doesn't always work out, but we are moving

24   in that direction to make sure that happens.

68

1      Q.  (By Ms. Cyrus) And although there are no shower

2  facilities currently set up in the office, are these

3  children provided an opportunity to take a shower and

4  bathe?

5      A.  We contact Patchwork for the most part.

6  Sometimes we've contacted Davis Child Shelter to

7  transport children to the facility to take showers,

8  yes.

9      THE COURT:  Is that done on a daily basis, that

10  every child there gets a shower every day?

11      THE WITNESS:  It occurs about every other day for

12  the shower, on average.

13      Q.  (By Ms. Cyrus) Okay.  Thank you.  Those are all

14  the questions I have.

15      THE COURT:  Has your office locally received any

16  direction from any of the higher-ups in the Department --

17  from the Commissioner all the way down -- thought through

18  or attempted to develop alternatives to office stays and

19  hotel stays that would meet your own guidelines?

20      THE WITNESS:  I believe we've been always working on

21  trying to --

22      THE COURT:  (Interposing) Well, tell me what

23  alternatives you've come up with then.

24      THE WITNESS:  Sure.  I know that we developed what

69

1    is called emergency foster homes for -- the scope, I

2    think -- they are going to look at expanding -- but

3    right now emergency foster homes can take children that

4    are "new removals" or "disrupted kinship" for 48 hours

5    while we find a placement bed.  So we have utilized --

6    Kanawha utilizes the emergency foster homes quite a

7    bit.

8         They also have a tier system for foster care to try

9    to take more troubled youth.  So we do contact those

10   homes.  And we have secured beds for some of our youth.

11   It's not necessarily -- the programs are good programs;

12   it's making sure that we have enough beds and, I think,

13   getting those homes in those programs -- opening those

14   homes and actually securing beds for the children.  But

15   there are initiatives to look and try to find additional

16   bed space.  And especially like the emergency type

17   children where they have disrupted and need, you know,

18   need to go somewhere.

19        THE COURT:  All right.

20        Did you have anything else, Ms. Cyrus?

21        MS. CYRUS:  No, your Honor.  Thank you.

22        THE COURT:  Ms. Victor, do you have anything further

23   for this witness?

24        MS. VICTOR:  Yes, Your Honor.

70

                        REDIRECT EXAMINATION

BY MS. VICTOR:

    Q.  Ms. Wilkerson, have any children been required

to stay overnight in hotel rooms or motel rooms since the

Court entered its order prohibiting keeping kids in the

office?

    A.  Are you asking for statewide or in Kanawha?

    Q.  Just Kanawha.

    A.  In Kanawha since the Court order, since we were

aware of the Court order, no children have stayed in our

office.

    Q.  Have -- no.  Have children stayed in hotel

rooms --

    A.  (Interposing) No.

    Q.  (Continuing) -- since the Court entered its

order prohibiting office stays?

    A.  Yes.  We had, we had -- actually I think that

particular night we had a child stay in a hotel room on

the date of the court order, and I would have to look at

the records to see if we've had any since then.  I know

December, no.  But in November, there could have been

some in late November.

    Q.  Any problems with that hospital stay -- I'm

sorry, hotel stay?

1          A.  Not that I'm aware of, no.

2          Q.  All right.  And has it been your experience that

3     when you file a petition, a juvenile petition for a child

4     in DHHR's custody, is it your opinion that that case

5     might be dismissed more readily than if the child were

6     not in the DHHR's custody?

7          A.  I'm honestly -- I don't if I can answer that

8     question.  I don't know how many children that we've had

9     in DHHR custody that we've brought on with charges.  I

10    can remember, you know, MP that they were trying to file

11    charges against, and we obtained custody of him.

12         Actually the holdup for them having the hearing was

13    that he was in Highland Hospital, and the Court would not

14    proceed while he was in Highland Hospital.  So we had to

15    obtain custody so we could take him out of the hospital

16    so he could go to that court hearing.

17         Q.  Uh-huh.  Uh-huh.

18         A.  For the most part, I don't know if it's the DHHR

19    custody or -- I know with the 11-year-old, the age was

20    one of the issues that they did not want to file charges.

21    I don't think that had anything to do with the custody

22    status, but the age was the factor with that.  I can't

23    remember any specific ones that we've had that issue

24    with.

72

1          Q.  All right.  Thank you.  That's all I have.

2          THE COURT:  All right.  Any further recross,

3     Ms. Cyrus?

4          MS. CYRUS:  No, Your Honor.  Thank you.

5          THE COURT:  All right.

6          Thank you, Ms. Wilkerson.

7          Ms. Victor, do you want to call your next witness?

8          MS. VICTOR:  Yes, Your Honor.  The co-petitioners

9     call Commissioner Pack.

10         THE COURT:  All right.  Now, let me just inquire.

11    We've been going a long time.  Does anyone request we

12    take a five-minute break?  We could do that --

13         MS. VICTOR:  (Interposing) I request that, Your

14    Honor.

15         THE COURT:  (Continuing) -- or are you good to go?

16    Okay.

17         Everybody, let's take five, and let's try to

18    literally be back in five minutes; okay?  Thank you

19    all.

20         MS. CYRUS:  Thank you.

21         [A recess was taken from 11:35 to 11:41.]

22         THE COURT:  All right, I see Ms. Cyrus and

23    Ms. Victor and Mr. Pack.  Do we have most everybody?  Is

24    there someone we should wait on, counsel?

73

```
 1          MS. VICTOR:  Is Ms. Taylor here?

 2          MS. TAYLOR:  I am, yes.

 3          THE COURT:  So you think we're prepared to go,

 4     Ms. Cyrus?

 5          MS. CYRUS:  Yes, your Honor.

 6          THE COURT:  Okay.

 7          Well, thank everybody for their prompt -- prompt

 8     break.  Thank you.

 9          Please proceed, Ms. Victor.

10          MS. VICTOR:  Thank you, Your Honor.

11          Commissioner Pack, please state your name.

12          THE COURT:  Dwayne, if you would please first

13     administer the oath.

14          MS. VICTOR:  Oh, yes.  Thank you.

15          COURT REPORTER:  Commissioner Pack, do you swear or

16     affirm that the testimony you give in this case will be

17     the truth?

18          I can't hear you.

19          THE COURT:  You're muted, sir.

20          COMMISSIONER PACK:  I'm so sorry.  I do.  Thank you.

21          THE COURT:  Now, keep in mind, Ms. Victor, that

22     Commissioner Pack is fairly new at this job.  So don't

23     beat him up too badly now.

24          MS. VICTOR:  I would never do that.
```

74

 1                    DIRECT EXAMINATION

 2    BY MS. VICTOR:

 3         Q.   Commissioner Pack, please state your name.

 4         A.   Jeffrey Pack.

 5         Q.   And what is your specific job title, sir?

 6         A.   Commissioner of Bureau For Social Services, West

 7    Virginia DHHR.

 8         Q.   And as the Court noted, you're fairly new on the

 9    job; aren't you, sir?

10         A.   I am.

11         Q.   When did you start?

12         A.   August the 2nd, 2001 -- 2021.  Excuse me.

13         Q.   Now, I understand that you spoke at a judicial

14    conference recently.  Is that correct?

15         A.   I did.  September, I believe.

16         Q.   And did you at that time address the issue of

17    requiring youths in DHHR custody to stay overnight in

18    DHHR offices or hotels?

19         A.   I did.  I expressed that it's a problem that we

20    are in fact working to address.

21         Q.   So you're aware that it's a problem; correct?

22         A.   Yes.

23         Q.   And do you receive those -- did you hear the

24    testimony of Mr. Hale and Ms. Wilkerson, sir?

75

1      A.  I did.

2      Q.  And you heard -- or referenced those monthly

3  reports that are prepared by Kanawha County; correct?

4      A.  Yes.

5      Q.  And also I believe a report that would be

6  prepared by other district offices; correct?

7      A.  Yes.

8      Q.  And to your knowledge, are those similar reports

9  prepared by all of the district offices in West Virginia?

10      A.  Yes.

11      Q.  And do you receive those reports routinely?

12      A.  Yes.

13      Q.  Oh.  Okay.  So you're familiar with how the

14  problem has occurred at least since August 2nd of this

15  past year; correct?

16      A.  I am.

17      Q.  Now, what in your opinion are the factors that

18  contribute to this absence of appropriate accommodations?

19      A.  I'm sorry, I don't -- do you mean what, what

20  contributes to the, the children having to stay in a

21  hotel or an office, or what contributes to the lack of

22  available appropriate placements privately?

23      Q.  Well, the first one, although the second one is

24  also a good question.

76

1        A.  Well, clearly staying in a hotel or an office is

2   an accommodation of last resort.  It's -- it is because

3   all other placement options have been exhausted and there

4   remains no other alternative.

5        Q.  And what do you believe contributes to the lack

6   of accommodations?

7        A.  Privately?

8        Q.  What are those factors that you believe

9   contribute to the lack of accommodations?

10        A.  Well, there is a lack of placements available

11   within the state for children of varying acuity.  There

12   is a general staffing problem that exists within private

13   providers, just like it does within the state; and they

14   are having a very difficult time staffing all of the beds

15   that perhaps they're licensed for.  In addition, a number

16   of our shelter providers or residential providers are

17   often on lockdown because they've had positive COVID

18   cases within the facility and they are not accepting new

19   placements until that hold has been lifted.

20        Q.  Well, now you've mentioned something that Judge

21   Bloom touched upon:  that we don't have enough

22   facilities, but we don't even have enough staff to

23   support the beds that we actually have licenses for.

24        A.  Correct.

77

1      Q.  That's another problem; correct?

2      A.  That is correct.

3      Q.  Okay.  Are there any other factors that you

4   believe contribute to this problem of having to house

5   children in appropriate accommodations?

6      A.  Well, I'm sure there are.  None immediately come

7   to mind right at the moment.  But it's not a -- there

8   doesn't seem to be a silver bullet that is the sole

9   contributing factor to this particular problem.

10      Q.  Have you developed any policies that will guide

11   staff in dealing with these emergency situations?

12      A.  We are, we are currently devising a policy and

13   working through all of the varied implications of how it

14   will work.  We don't want to put out a policy that is

15   ill-conceived or not well thought out.  So we're making

16   sure that the policy that we will hope to put out within

17   the next 30 days will be appropriate and be able to be

18   standardized across the state.

19      Q.  Among your -- and I understand from your prior

20   testimony that you are still staffing and structuring

21   your -- the newly devised Bureau For Social Services;

22   correct?

23      A.  Yes.

24      Q.  Okay.  But what personnel are responsible for

1    managing this situation in your office under you?

2        A.  Well, it's, it's not an issue that is -- that

3    where there's a singular responsibility.  There are many

4    facets of this that cover a variety of different areas.

5    There are two deputies for field operations, both north

6    and south, who oversee the, the CPS and youth service

7    offices throughout the state.  So those are the folks who

8    are in custody of those kids.  So they deal with them.

9        We have a deputy for programs and policies who works

10   to make sure that the policies that we do have are

11   adequate and to develop new policies where that's

12   appropriate.  We have folks from all over the bureau who

13   when we take custody of a child that needs placement and

14   we're unable to find one, it's all hands on deck.  We

15   have folks from a variety of departments who are making

16   phone calls who are attempting to secure placement for

17   these children.  It's not as if it occurs in a county

18   office and the executive office is totally removed from

19   the process.  You know, we, we try to offer all of the

20   support that we can offer to our local offices.

21       Q.  So it would include case managers, supervisors,

22   Social Service Coordinators, CSMs, your directors of

23   field operations, and then anyone responsible for

24   acquiring new beds?

79

1          A.   Correct, and myself.

2          Q.   Okay.  What plans are you developing to address

3     and to alleviate this problem of having the youths stay

4     overnight in the DHHR offices or hotels?

5          A.   Well, we're doing a number of things.  We have

6     been engaged since legitimately my first week on the job

7     with the shelter providers.  And they have identified

8     some things that we can do to try to help them expand

9     their network.  We have -- we meet with them monthly, if

10    not more regularly.  I know I have a deputy that meets

11    with them probably weekly or every other week.

12         We've identified areas within the state where there

13    is a lack of shelter providers.  We've indicated to them

14    that we would like to see smaller, more manageable

15    shelters operated within those perhaps less populated

16    more rural areas of the state where they are in fact

17    underserved.  We work specifically with the shelter

18    network to find placements for the children who are

19    currently in their care, and one of my deputies is

20    handling that personally.  She has worked very, very hard

21    and has --

22         Q.   (Interposing) And who is that individual?

23         A.   Her name is Michelle Dean.  She has worked hard

24    with the shelters to identify appropriate long-term

80

1    placements for these children to open up more beds within

2    the shelter network.

3        We've engaged with the emergency foster providers to

4    see if we can expand the number of the children that they

5    will accept into emergency foster care.  We have sought

6    out providers who are having difficulty staffing their

7    current beds and "What can we do to help that?"  We have

8    requested information, to no avail, on what is preventing

9    providers from either expanding their operations in West

10   Virginia; or providers who do not currently operate

11   within West Virginia, what's preventing them from coming

12   and operating in West Virginia.

13       So we, we have -- I'm not aware of any effort we

14   could have made to expand either treatment or placement

15   opportunities within West Virginia.

16       THE COURT:  Why is it we're seeing a retraction of

17   placements within the state?  And I'm speaking -- I

18   mentioned it earlier.  That Grant Gardens specifically

19   had a male program and a female program with a certain

20   number of beds, and now they've reduced to one sex or the

21   other, and it's not even the equivalent number.  It's a

22   lesser number.  Was that your all's choice, their choice,

23   some other regulator?  How did that occur?

24       THE WITNESS:  I don't have any direct knowledge of

81

1    that, Your Honor, but I would, I would posit that it

2    would not -- to my knowledge, it would not have been our

3    suggestion that any provider reduce the number of

4    placements that they have available.  But we are seeing

5    that statewide, whether it's providers or shelter network

6    providers, that they oftentimes have a number of beds

7    that they cannot adequately staff.

8         THE COURT:  Are we -- is there still a limit on the

9    number of beds that may be available in the state, or are

10   you all actively recruiting vendors to add additional

11   beds?  I mean -- and I don't know the exact figures; I've

12   heard different figures -- but I think it's six or eight

13   thousand dollars a month per child that we're paying

14   these facilities.  Those seem to be attractive numbers

15   that somebody could operate good, good facilities with.

16   And as you know, we have virtually for low IQ and folks

17   with mental illness or really needing significant mental

18   health, we have literally no beds in the state of West

19   Virginia.

20        THE WITNESS:  Yes, sir.  We have, we have been in

21   contact with a number of providers, attempting to

22   encourage them to expand their operations here.  There

23   are potentially two new -- or one is a new provider, one

24   is a current provider -- that is considering beds for

Case 3:19-cv-00710 Document 553-18 Filed 05/30/24 Page 84 of 110 PageID #: 26481

1  autism, kids at particular points --

2  THE COURT:  (Interposing) And I heard you speak of

3  that at the conference as well.  And I was curious, that

4  seems to be one of those unique things, that we don't

5  even have physicians or trained professionals even in the

6  state to deal with it.

7  THE WITNESS:  Yes, sir.

8  THE COURT:  So I thought that was odd.  Are they

9  going to bring in a host of professionals or are they

10  just going to open up and say, "We're an autism

11  facility"?

12  THE WITNESS:  Oh, no.  They will have to provide the

13  appropriate amount of care there.  Additionally, the

14  entity that purchased --

15  THE COURT:  (Interposing) Well, there are -- and I

16  only happen to know this because I believe there's only

17  one developmental pediatrician in Southern West Virginia,

18  and there may be one that was just added in Morgantown,

19  but those are the only two developmental pediatricians in

20  the state of West Virginia.  So I don't know how these

21  people are going to come in and offer a facility when

22  they've not -- when that's not -- when there are not

23  adequate medical providers.

24  THE WITNESS:  They're not at the point of being

83

1    ready to open yet.  These are two facilities that have

2    indicated that this is an avenue that they wish to

3    pursue.  And certainly we're willing to entertain them.

4        THE COURT:  Well, good.  But obviously we need

5    general beds at this point that can accommodate and offer

6    appropriate services, including education and to some

7    degree mental health and other services.  And there seems

8    to have been some retraction of those beds.  And we need

9    to have, we need to have a plan, at least in my view, so

10   that you can eliminate the need for any type of children

11   not being housed appropriately, whether it's in a motel

12   or in an office.  Do you agree with that?

13       THE WITNESS:  Yes, sir.  We certainly need to do

14   everything we can do to make sure that we have the

15   appropriate amount of placements within the state.

16       THE COURT:  Are you still placing -- since my

17   November order, have you been continuing to place

18   children in offices overnight across the state?

19       THE WITNESS:  I'm aware of no children that have

20   been placed in offices since your order.

21       THE COURT:  Okay.  And you would be aware of it if

22   it existed?  You've reviewed all of those reports?

23       THE WITNESS:  I -- yes.  Someone would let me know.

24   When we have children that we can't find placements for,

84

1    there's -- we are -- we're notified; and then, you know,

2    we attempt to help locate placements for those as well.

3         THE COURT:  How about in hotels other than in

4    Kanawha County?  Are there any children being placed in

5    hotels anywhere in this state?

6         THE WITNESS:  I believe there are, sir.

7         THE COURT:  About how many children on any given

8    day?

9         THE WITNESS:  Oh, I could not speak intelligently to

10   that, sir.  I don't have that information.

11        THE COURT:  Okay.  All right.

12        Ms. Victor, you may proceed, please.

13        Thank you, sir.

14        THE WITNESS:  Yes, sir.

15        Q.  (By Ms. Victor) In addition to these monthly

16   reports filed by each district office as described by

17   Mr. Hale and Ms. Wilkerson, are there any other types of

18   reports or documentation about children housed overnight

19   in offices or in hotels?

20        A.  Not that I'm aware of.

21        Q.  Okay.  How often have those reports been

22   maintained?  And I understand you've only been here since

23   August.  To your knowledge, have those reports been

24   maintained prior to your tenure?

85

1     A.  I know that they are compiled monthly.  I do not

2  know for how long they have been compiled.

3     Q.  Okay.  Now, we've heard some discussion about

4  what we used to call Level 4 facilities.

5     A.  Yes.

6     Q.  And those were closed.  Do you believe that that

7  would be an option -- a Level 4 facility or something

8  similar to that would be an appropriate option that would

9  alleviate part of this problem?

10     A.  Yes.  In certain circumstances, not wholesale,

11  but yes.

12     Q.  Well, of course, you know, assuming that we want

13  to keep children in the least restrictive environment

14  possible, would there still be a need for a Level 4

15  facility or something akin to that?

16     A.  I would think so, but I probably would not be

17  the expert to speak on that.

18     Q.  Well, it just seems to me from the reports I've

19  heard that a lot of the problems come from children who

20  have behavioral problems that would ordinarily have been

21  housed in a facility like that.  They are the ones

22  creating a lot of the drama.  Is that accurate?

23     A.  Yes.  That's, that's a fair statement.

24     Q.  Okay.  So have you made any overtures to the

86

1    legislature about expanding the types of facilities

2    available to house children overnight?

3        A.  I have indicated to them that it is in fact a

4    problem as well as the degree to which our staffing is a

5    problem, and beyond that the degree to which our pay

6    scale is a problem.

7        Q.  Do you think it would be appropriate to seek the

8    assistance of the legislature to re-establish something

9    akin to a Level 4 facility?

10       A.  I think that would warrant a discussion with the

11    legislature.

12       Q.  Uh-huh.  Do you believe this problem of housing

13    children overnight in hotels and DHHR offices is a

14    statewide problem?

15       A.  I believe it occurs statewide, yes.

16       Q.  Okay.  I believe Ms. Cyrus indicated that the

17    Department is seeking to set aside the Court's order

18    terminating this practice.  And my question is:  Why

19    would you seek to defend this practice?

20       A.  In some instances I don't know what alternative

21    there might be.  I think at some point one might be put

22    in a position where there were no other options.  And I'm

23    not suggesting that it ought to be our, our first option;

24    but when we have no other option, I don't know what's

87

1   left.

2       Q.  Well, it occurs to me when you're housing

3   children or taking care of children overnight,

4   emergencies are going to arise.  Correct?

5       A.  Yes.

6       Q.  So, for example, if you're transporting

7   children, you know, to a far away county or out of state

8   or something like that, problems are going to arise.

9   Your flight might be cancelled, you might have car

10  trouble, you know, there might be a snowstorm like what

11  happened in Virginia the other day.  But that kind of

12  emergency situation is really different from the practice

13  that brings us here today; don't you agree?

14      A.  Well, those are all in fact emergencies; but

15  again while I don't know for certain, I would certainly

16  suspect that anytime there was a child that was housed in

17  whether it be a hotel or an office, it was because there

18  was no other option, and that in fact would constitute an

19  emergency.

20      Q.  Are you familiar with the practices of other

21  states in dealing with this situation?

22      A.  Some.

23      Q.  And what other states have -- are you aware of

24  and how did they handle it?

88

1      A.  We are -- we have identified Oregon, who seems

2  to have a reasonable policy in dealing with this, and

3  trying to see the extent to which we can duplicate their

4  policy.

5      Q.  Well, that arose out of a federal lawsuit, did

6  it not, that policy?

7      A.  I don't know.

8      Q.  Well, what would you like to see happen?  What

9  would, in your opinion, would resolve this problem and

10 how can we get there?

11     A.  Well, I mean, in a perfect world we wouldn't

12 have the problem to begin with; but beyond that,

13 certainly in, you know, within the realm of possibility,

14 to the extent that it is possible -- when we had children

15 that we had to take custody of, if in fact there were an

16 appropriate placement immediately available, then that

17 would eliminate any situation that would necessitate this

18 practice.  And we're certainly trying to get there.

19 We're turning over every stone we can to identify

20 barriers to placement beds within the state that are the

21 least restrictive for that particular child and offer the

22 amount of services that would be necessary to provide the

23 appropriate amount of support for those kids.

24     Q.  And what would help you get to that point, where

Case 3:19-cv-00710 Document 555-1 Filed 05/16/23 Page 91 of 110 PageID #: 26488

1  you had not only enough beds but the beds appropriate for

2  the child's needs?

3      A.  Well, we would have to have a workforce that

4  was -- and I don't -- when I say "workforce," I don't

5  mean a state workforce.  I mean a workforce within a

6  private sector that could support those beds.  And then I

7  would imagine the business model for these private

8  entities would have to be attractive as such that would

9  entice them to participate in that particular market.

10     THE COURT:  Well, you clarified there for a minute.

11 I don't know of any law or regulation or rule that would

12 prohibit the Department from operating such a facility.

13     THE WITNESS:  I'm not aware of any either, but we

14 don't -- we don't currently have a facility; and while I

15 don't know for certain, I would imagine that that would

16 likely require an act of the legislature.

17     Q.  (By Ms. Victor) So you've identified an

18 appropriate workforce.  What else would you need?

19     A.  Well, we would need providers to actually engage

20 in the market to provide those beds.

21     Q.  Uh-huh.  Funding?

22     A.  Well, I mean certainly if, if -- I mean, if we

23 are going to utilize them, we would need funding and

24 then --

90

1    THE COURT:  (Interposing) Most of it is federal

2    money.  You're not suggesting that you don't have the

3    money available to pay for these kids.  That's not the

4    reason they're --

5    THE WITNESS:  (Interposing) No.

6    THE COURT:  That's not the reason they're being

7    housed in offices and hotels, is lack of money.  That's

8    not the reason; is it?

9    THE WITNESS:  No, sir.  I'm suggesting that if there

10   were to be a drastic increase in the number of beds

11   available, that might require additional funding.

12   THE COURT:  Was this mostly federal money that pays

13   for this or mostly state money?

14   THE WITNESS:  I do not know what the breakout of

15   that funding is.

16   THE COURT:  Am I right, it's anywhere from six to

17   ten thousand dollars a month for these kids?

18   THE WITNESS:  For what placement, sir?

19   THE COURT:  For any of these placements in state.

20   THE WITNESS:  I could not speak intelligently to the

21   rate that we pay a variety of placements.

22   Q.  (By Ms. Victor) Would it also require a

23   legislative framework that would authorize the

24   construction or maintenance of appropriate facilities for

91

1  the children's needs?

2      A.  I would imagine so.

3      Q.  Uh-huh.  Rules and regulations --

4      THE COURT:  (Interposing) You don't think the

5  Department has authority to go rent space in an abandoned

6  hospital, for example, and hiring staff to do that

7  without a legislative approval?

8      THE WITNESS:  Those very well may, sir.  I don't

9  know the answer to that.  I'm just merely suggesting

10 that --

11     THE COURT:  (Interposing) Well, it didn't -- and

12 again, it's not our -- it's not really my jurisdiction to

13 tell you how to run your department.  The issue here

14 before me is whether you're going to be continuing --

15 whether there's going to be any prohibition of housing

16 these people, these young people, these very vulnerable

17 young people in offices and hotels.  The solutions are

18 your responsibility to come up with, not the Court's.

19     Q.  (By Ms. Victor) Which is why I'm asking for your

20 wish list.  What would we need to get there?

21     A.  To be perfectly honest, I think I would probably

22 need to sit down and think about that and think through

23 all of the different permutations of what that would look

24 like and how we get there.

92

1          THE COURT:  That's fair.

2          THE WITNESS:  I mean, certainly all of the things

3     that I mentioned probably are on that list, but I don't

4     know how all of those things would necessarily affect

5     other things.

6          Q.  (By Ms. Victor) Commissioner Pack, are there

7     any -- is there anything else you would like the judge to

8     know about this issue that I haven't asked you about?

9          A.  Not that I know of, ma'am.

10         Q.  That's all I have.  Thank you.

11         THE COURT:  All right, thank you, Ms. Victor.

12         Ms. Cyrus.

13         MS. CYRUS:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15    BY MS. CYRUS:

16         Q.  Commissioner Pack, if there were in fact a

17    Level 4 facility available like the Robert Shell Center

18    used to be, would that be something that would prevent in

19    some of these instances keeping children overnight in

20    local offices?

21         A.  I'm certain in some instances it likely would.

22         Q.  Okay.  Now, let me ask you this, are you

23    aware -- at one point did Highland Hospital in Clarksburg

24    open a unit for children where they could be placed?

93

1        A.  I believe they did at one time.

2        Q.  Okay.  And has that unit since been closed due

3  to lack of staffing?

4        A.  I believe it has.

5        Q.  Okay.  And so that that limits the number of

6  beds --

7        THE COURT:  (Interposing) Do you have firsthand

8  knowledge of that or was it a lack of a contract with the

9  State that led to it?  Do you know?

10       THE WITNESS:  I was not directly involved with that,

11  but it was my understanding that it was an issue of

12  staffing.

13       THE COURT:  I believe we had some testimony in an

14  earlier case -- and perhaps Commissioner Crouch -- or

15  Secretary Crouch will remember -- that they were willing

16  to offer certain services up there, the State did not

17  sign a contract, and they were not going to staff it

18  until and unless they had a contract.

19       And that may even predate you, Secretary Crouch.  I

20  can't remember for sure in the hospital situations we

21  were talking about.  Do you recall that at all?

22       SECRETARY CROUCH:  Yes, Your Honor, I do.  That was

23  the development of a PRTF at the hospital.  But since

24  then when Highland of Charleston closed their children's

Case 3:19-cv-00710 Document 615-1 Filed 10/30/24 Page 96 of 110 PageID #: 26493

1    unit, I contacted the CEO at Highland of Clarksburg

2    directly and asked her to -- if they would consider

3    reopening their children's unit, and they did that.  That

4    was about a year and a half ago or so.

5         They had up to 22 children in that unit at one time.

6    They have recently just transferred the last child out

7    because of staffing.  They cannot get nurses or social

8    workers.

9         So what you're referring to is a separate issue

10   several years ago.  What I think Commissioner Pack is

11   referring to is a more recent reopening of that unit and

12   taking children, and we were very thrilled with that, but

13   they cannot get the staff in Clarksburg to keep that unit

14   open.  They're still trying, and they plan to try to

15   reopen as soon as they can get the staff to do that.

16        THE COURT:  All right.  Thank you for that

17   clarification, Mr. Secretary.

18        SECRETARY CROUCH:  Sure.

19        MS. VICTOR:  And, Your Honor, I don't intend to call

20   Commissioner Crouch [sic], but I do ask that if he

21   testifies, that he be sworn.

22        THE COURT:  All right.

23        Go ahead, Ms. Cyrus.

24        MS. CYRUS:  Okay.  Thank you.

95

1          Q.  (By Ms. Cyrus) Commissioner Pack, is it your

2     understanding that when these children have been kept

3     overnight in offices, it is a -- as a last resort?

4          A.  That's my understanding, yes.

5          Q.  And is it your understanding that when they are

6     kept overnight, it is for as limited a time as possible?

7          A.  Yes.

8          Q.  And if I understood you correctly, did you say

9     that when there is a problem placing a child, that it

10    comes up even to your level in the administration to try

11    to find placement?

12         A.  We do.

13         Q.  Okay.  So were you aware of this problem of

14    placing -- of the children staying overnight in the DHHR

15    offices before the motion for emergency hearing was filed

16    on November 30th, 2021?

17         A.  Yes.

18         Q.  And had the Department already been taking steps

19    to try to address that problem prior to the motion for

20    emergency hearing being filed?

21         A.  Yes.

22         Q.  Okay.  Is the Department unwilling to try to

23    address this issue?

24         A.  No.

96

1   Q. Okay.  Is the Department actually taking

2 affirmative steps, that you've just testified about, to

3 try to address the issue?

4   A. We are.

5   Q. Okay.  And I take it the Department is not

6 refusing to address this issue.

7   A. We are not.

8   Q. Okay.  Now -- and you were asked about the

9 motion that's been filed in the MP case.  Is it your

10 understanding the reason for filing the motion is not to

11 try to avoid having any kind of restriction on children

12 in DHHR offices at all?

13   A. I'm sorry, can you say that again?

14   Q. Well, I was just going to ask, is your

15 understanding -- the Department in filing that motion is

16 not trying to just avoid any kind of restriction on

17 children in DHHR offices?

18   A. We are not.

19   Q. Okay.  And are you instead hoping to find

20 something more workable under the circumstances and able

21 to take into consideration when no other options were

22 available?

23   A. Yes.

24   Q. Okay.  And you mentioned that you're working on

1    a new policy.  Would the goal of a new policy on this

2    issue still be to minimize the time the children would be

3    in the office, certainly overnight?

4          A.  Yes.

5          Q.  Okay.  All right.  Thank you, sir.  Those are

6    all the questions I have for you.

7          THE COURT:  Any redirect, Ms. Victor?

8          MS. VICTOR:  No redirect, Your Honor.  Thank you.

9          THE COURT:  All right.

10         Thank you, Mr. Pack.

11         THE WITNESS:  Thank you, sir.

12         THE COURT:  And good luck in your position, sir.

13         THE WITNESS:  Thank you.  I appreciate that.

14         THE COURT:  Ms. Victor, do you have additional

15   witnesses you wish to call this morning?

16         MS. VICTOR:  I do not have any additional witnesses.

17   I believe I did ask the Court to take judicial notice of

18   the MP case, and I can't remember what the Court ordered.

19         THE COURT:  Is there objection to that, Ms. Cyrus?

20         MS. CYRUS:  Well, can counsel clarify what that

21   means, "for the Court to take judicial notice of that

22   case"?

23         MS. VICTOR:  I would ask -- that's a fair question.

24   I would ask that the Court consider all the orders and

98

1  pleadings and testimony adduced in that matter be --

2       THE COURT:  (Interposing) Related to this issue.

3       MS. VICTOR:  (Continuing) -- considered -- yes -- be

4  considered for the purposes of the Court's rulings in the

5  mandamus action.

6       MS. CYRUS:  It seems to me it would just simply be

7  the testimony on the November 19th hearing as well as the

8  order that arose from that.

9       MS. VICTOR:  Well, also the petition.  There was not

10  a lot in that case.

11       MS. CYRUS:  It is my understanding it's been

12  dismissed already.  When you say "the petition," the

13  petition in that MP case that --

14       MS. VICTOR:  (Interposing) The petition initiating

15  that case.  The petition initiating that case, the

16  orders, and the testimony adduced during the two hearings

17  on November 17 and December 9th.

18       THE COURT:  I think it would be my intention to only

19  consider, unless there's objection, what transpired on

20  the 17th and the order that was subsequent to that.

21       MS. VICTOR:  That's -- that will encompass the

22  information concerned with this emergency hearing.  So --

23       THE COURT:  (Interposing) Is there objection to

24  that, Ms. Cyrus?

1      MS. CYRUS:  Your Honor, I just want to -- again,

2  just noting my objection that I previously stated on the

3  record when we began; and without waiving that objection,

4  I think if the Court is proceeding, as I understand it

5  is, and incorporating some of the material from that

6  case, what the Court has suggested would be appropriate.

7      THE COURT:  All right.  That will be the order of

8  the Court as it relates to that then.

9      MS. VICTOR:  Following from that, Your Honor, I

10  would ask leave of Court for permission to disclose the

11  transcript of the November 17th hearing and other

12  information about the MP case to my co-counsel, Jennifer

13  Taylor.  I was the guardian ad litem, and of course the

14  Department was a party in that matter, but she was not;

15  and I don't want to fall afoul of the confidentiality

16  proceedings.

17      THE COURT:  Right.  You have leave to disclose to

18  Ms. Taylor.

19      MS. VICTOR:  And finally, Your Honor, I have

20  actually asked Mr. Price for a transcript of that

21  proceeding, and I seek leave to file that in this case

22  once I receive it.

23      THE COURT:  That will be granted, except it will

24  have to be redacted for the name and case number.

1      MS. VICTOR:  Oh, of course.

2      MS. CYRUS:  I mean, I just -- I would just raise the

3  issue, since it was a closed proceeding, should the whole

4  transcript be sealed?

5      THE COURT:  Yeah, only -- in fact, counsel should

6  review it together and agree as to which portion should

7  be included, because there were other issues that were

8  discussed in that hearing.

9      And I believe, Ms. Cyrus, you said you've already

10  read that transcript, so perhaps you and Ms. Victor can

11  get together in short order to edit that appropriately.

12      MS. CYRUS:  Correct.  And I would be happy to just

13  provide a copy to Ms. Victor.  I don't -- I don't want to

14  take away work from Mr. Price.  But if you would rather

15  just get an original copy from him, that's fine, but I

16  can also e-mail it.

17      MS. VICTOR:  You know, I will get a copy because I'm

18  going to lodge that in the court file once we have gone

19  over and redacted any improper inclusions.  So that we

20  can get.  So I'll go ahead and ask Mr. Price to provide

21  me with that, then you and I can go over it.

22      THE COURT:  And then you can just go over anything

23  that you might need black-lined.

24      MS. VICTOR:  And then counsel can go over that; and

101

1    once we figure out what we don't want included, we can

2    mark that up and that can be filed.

3        MS. CYRUS:  Very good.

4        The only other thing I wanted to mention -- and I

5    think Ms. Victor may have said this -- but regarding the

6    comments that the Secretary made on the record today, are

7    those deemed to be under oath?  Does he need to be sworn

8    in for those?

9        THE COURT:  I don't believe he commented on anything

10    that -- first of all, it's no reflection on anybody.

11    He's testified.  I respect everybody that's testified

12    today, but Secretary Crouch has been extraordinarily

13    candid with this Court on many, many issues that we've

14    had before us, and I don't believe that he needs to be

15    sworn in to affirm what he said today.  I'll accept his

16    representations today.

17        MS. VICTOR:  That was reflected on my part to

18    protect the record.

19        MS. CYRUS:  Okay.  Thank you.

20        THE COURT:  Do you have witnesses you wish to call

21    today, Ms. Cyrus?

22        MS. CYRUS:  No, Your Honor.

23        THE COURT:  All right.

24        Well, I'm going to find, based on the evidence that

102

1   I have heard today, that the children who are in the

2   State's -- in the DHHR's custody who are placed in hotels

3   and in offices across the state are not receiving

4   appropriate education, food -- specifically the -- with

5   regard to the offices, that they're not having available

6   to them appropriate facilities for showering and bathing,

7   and that some of the children are decompensating while in

8   these circumstances, and that it's a result of that --

9   those situations.  That it is adversely affecting

10  staffing in the offices; that in my prior order placing a

11  ban on placing children in any state DHHR office will

12  stand; that will be adopted and incorporated into an

13  appropriate order in this case; and that we will come

14  back in 90 days to give the State an opportunity to

15  develop a plan and hopefully to implement the plan so

16  that we can eliminate the use of hotel rooms as well,

17  because they similarly have all the deficiencies.  They

18  don't have any of the -- the children aren't receiving

19  any of the support services, whether that be mental

20  health counseling or treatment or -- any services

21  whatsoever, including education.  And again, they don't

22  meet any of the standards that the State has adopted for

23  any provider of any type of out-of-home care.  So those

24  situations need to be addressed.

103

1      And I'm very hopeful that some alternatives can be

2   looked at in a very prompt fashion; and if not

3   implemented by the next time, at least the plan be fully

4   developed so that we can get through the situation.

5      I am not going to in this proceeding tell the State

6   how to do that.  It's their obligation to do that, but it

7   is my obligation to make sure that the children are

8   appropriately cared for, and I'm finding that they are

9   not currently being cared for appropriately while in an

10  office setting and in a hotel room.  Giving the State an

11  opportunity, however, to develop a plan and an

12  alternative to the hotels, I will allow limited use of

13  that not to exceed two nights for any particular child.

14      MS. TAYLOR:  Judge, are you saying two nights in a

15  hotel or two nights in the office or both?

16      THE COURT:  No office overnights, period, none,

17  across the state of West Virginia; and no more than two

18  nights in a hotel for any particular child.

19      All right.  We actually have a hearing set in this

20  matter on April the 6th at 9:30 A.M. already.  So maybe

21  we should use that.  As rather than a 90-day figure,

22  we'll give the Department until April 6th at 9:30 A.M. to

23  develop and hopefully, to the extent possible, implement

24  a plan to reduce any housing in the hotels, since none of

104

1    the office -- no office use will be permitted.

2         All right, questions, comments, suggestions,

3    objections?

4         MS. CYRUS:  Yes, Your Honor.  Well, first of all, I

5    would like to place an objection on the record to the

6    extent -- I'm just renewing what I've already said.

7    There's no reason to belabor that, unless the Court would

8    want me to outline on the record.

9         However, I would like to seek some clarification.

10   When you say not more than two nights for any particular

11   child, is that two nights ever or is that two nights per

12   month --

13        THE COURT:  (Interposing) Two consecutive -- two

14   consecutive nights.  I mean, it is possible that a child

15   might come in, could get placed, then he would have to

16   come back in an emergency -- there may be circumstances

17   where there's not another place for them.  But my intent

18   was consecutive nights.

19        MS. CYRUS:  Okay.  Thank you.

20        THE COURT:  Any other clarifications anyone is

21   requesting?

22        MS. VICTOR:  Your Honor, I seek the disclosure of

23   these monthly reports prepared by the district offices.

24   I would like all of the monthly reports for -- and I'll

1    ask Ms. Taylor to weigh in.

2         Jennifer, how far back do you want to go with those

3    reports?

4         THE COURT:  Well, let's just go 2021 and forward.

5         MS. VICTOR:  And just to be clear, I'm seeking all

6    reports from all West Virginia district offices.

7         THE COURT:  That will be so ordered.

8         MS. CYRUS:  And when is that to be produced?

9         MS. VICTOR:  How much time do you need?

10        THE COURT:  Well, let's, let's produce those within

11   ten days; and ongoing reports as -- within ten days of

12   submit- -- by the 10th of each month from now on.

13        MS. VICTOR:  Are those due on the first day of the

14   month, Mr. Hale?

15        MR. HALE:  Typically at the end of the month.

16        MS. VICTOR:  Okay.  So you would have time to do

17   those and get those out within ten days?

18        MR. HALE:  I would imagine so, yes.

19        MS. VICTOR:  Okay.

20        THE COURT:  All right, any other issues that need to

21   be raised day?

22        All right.  Well, I want to thank everybody.  This

23   is -- obviously everybody has taken this issue to heart,

24   and it's very serious for everybody.  So I appreciate the

106

1    Department's efforts, and I want to thank Commissioner

2    Pack for his candid testimony and indicating that we may

3    need a little more time to work on some of these

4    solutions, and I appreciate that.  Hopefully we can come

5    to some good solutions for these children.

6          So thank you all very much.  I appreciate it.  Have

7    a good day.

8          MS. VICTOR:  Thank you.

9          MS. CYRUS:  Thank you.

10         THE COURT:  And, Ms. Victor and Ms. Cyrus, this is

11   an important issue.  I'd like to have an order by the

12   middle of next week at the very latest.  So please make

13   it a priority to get it for us; okay?

14         MS. VICTOR:  Your Honor, I'm happy to work on the

15   order, but I think we need a transcript; and then I have

16   to read the transcript and then draft the order and then

17   circulate it.

18         THE COURT:  I want, I want an order making the

19   specific findings that I made and the specific injunctive

20   relief that I've, that I've imposed.  And you can -- a

21   more thorough and more detailed order may be referenced

22   to follow.

23         MS. VICTOR:  Oh.  We can do that.

24         THE COURT:  Okay.  Very good.

107

1        All right.  Thank you all very much.

2        MS. VICTOR:  Thank you.

3        MS. TAYLOR:  Thank you.

4        MS. CYRUS:  Take care.  Bye.

5        AND at 12:29 P.M. these were all the proceedings had

6   and reported upon this matter.

7                          -0-

108

1    STATE OF WEST VIRGINIA

2    COUNTY OF KANAWHA, TO-WIT:

3        I, Dwayne Price, Official Reporter of the Circuit

4    Court of Kanawha County, West Virginia, and Certified

5    Register Reporter, do hereby certify that the foregoing

6    is a true and correct transcript of the proceedings had

7    in the action of Jennifer R. Victor, et al. versus West

8    Virginia Department of Human Resources, et al., Civil

9    Action Number 18-P-142, on Thursday, the 6th day of

10   January, 2022.

11       I hereby certify that the transcript within meets

12   the requirements of the Code of the State of West

13   Virginia, 51-7-4, and all rules pertaining thereto as

14   promulgated by the Supreme Court of Appeals.

15       Given under my hand this 17th day of January, 2022.

16

17   _____

18   Official Reporter, Circuit Court of
     Kanawha County, West Virginia

19

20

21

22

23

24