# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| JONATHAN R., *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| | ) | |
| JIM JUSTICE, in his official capacity as | ) | Case No. 3:19-cv-00710 |
| Governor of West Virginia, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    Defendants are Entitled to Summary Judgment on the Substantive Due Process Claims Because the Undisputed Facts Demonstrate that Defendants are Not "Deliberately Indifferent" or "Grossly Negligent." ...................................................................... 3

      A.    Plaintiffs Do Not Dispute That Defendants Have Taken the Actions to Improve Caseworker Caseloads, Case Planning, and the Placement Array Set Forth in Defendants' SUF........................................................................................... 4

      B.    Plaintiffs Do Not Identify Any Additional Action That Defendants Should Take That Would Improve Caseloads, Case Planning, or the Placement Array................... 10

II.   Defendants are Entitled to Summary Judgment on the Substantive Due Process Claims Because Plaintiffs Do Not Cite Any "Significant Probative Evidence" of Class-Wide Constitutional Injury Caused By Defendants' Policies or Practices..................................... 12

III.  Defendants are Entitled to Summary Judgment on the ADA and Rehabilitation Act Claims. ............................................................................................................ 15

      A.    The Undisputed Facts Establish That Defendants Have a Comprehensive, Effectively Working Plan. ............................................................................ 16

      B.    Plaintiffs Do Not Cite Evidence to Support Their Allegations that the ADA Subclass is Subject to Unjustified Institutionalization or Serious Risk Thereof. ........... 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arc of Wash. State Inc. v. Braddock*,
    427 F.3d 615 (9th Cir. 2005). ........................................................................ 16, 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 1

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ........................................................................................... 1

*Connor B. ex rel. Vigurs v. Patrick*,
    774 F.3d 45 (1st Cir. 2014) .............................................................................. 15

*Deakins v. Pack*,
    957 F.Supp.2d 703 (S.D. W. Va. 2013) ............................................................. 7

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) ......................................................................................... 12

*Doe v. South Carolina Department of Social Services*,
    597 F.3d 163 (4th Cir. 2010) .................................................................... 3, 4, 13

*Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Center Commission*,
    985 F. 3d 327 (4th Cir 2021) ............................................................................. 3

*Dunn v. Dunn*,
    219 F. Supp. 3d 1100 (M.D. Ala. 2016). ......................................................... 14

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................................... 5

*Fort Wayne Cmnty. Schs. v. Fort Wayne Educ. Ass'n, Inc.*,
    977 F.2d 358 (7th Cir. 1992) ........................................................................... 20

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................... 12, 14

*Loper Bright Enterprises v. Raimondo*,
    144 S.Ct. 2244 (2024) ...................................................................................... 19

*M.D. by Stuckenberg v. Abbot*,
    907 F.3d 237 (5th Cir. 2018) ........................................................ 4, 9, 10, 12, 20

*Nat'l Rifle Ass'n v. Brady*,
    914 F.2d 475 (4th Cir. 1990) ................................................................ 20

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .............................................................................. 3

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) ........................................................................ 16, 19

*Patten v. Nichols*,
    274 F.3d 829 (4th Cir. 2001) ................................................................ 4

*Rios v. City of Del Rio, Tex.*,
    444 F.3d 417 (5th Cir. 2006) ................................................................ 1

*See Parrish ex rel. Lee v. Cleveland*,
    372 F.3d 294 (4th Cir. 2004) ...................................................... 4, 5, 11

*United States v. Mississippi*,
    82 F.4th 387 (5th Cir. 2023) ............................................................... 19

*United States. v. Calamaro*,
    354 U.S. 351 (1957) ............................................................................ 20

*White by White v. Chambliss*,
    112 F.3d 731 (4th Cir. 1997) ......................................................... 4, 13

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) ............................................................................. 3

**Statutes**

29 U.S.C. § 794 .......................................................................................... 19

42 U.S.C. § 12132 ...................................................................................... 19

**Rules**

Fed. R. Civ. P. 56(c) .............................................................................. 7, 13

Fed. R. Civ. P. 56(e) .................................................................................... 2

**Regulations**

45 C.F.R. § 84.76 ....................................................................................... 19

**Other Authorities**

Rule 56 Advisory Committee Note, 2010 Amendment ................................................................ 7

## INTRODUCTION

To survive a motion for summary judgment, Plaintiffs were required to "set forth specific facts showing that there is a genuine issue for trial" with "significant probative evidence tending to support" each element of their claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–249 (1986) (cleaned up). They have not done so, and Defendants' motion should be granted.

As this Court repeatedly explained in its decision on class certification, to establish a Substantive Due Process violation, Plaintiffs must prove that: (1) Defendants are "deliberately indifferent" to one of the three practices identified as common to the class: caseworker caseloads, case planning, or placement array; (2) the General Class has suffered "an injury rising to an unconstitutional level" on a class-wide basis; and (3) Defendants' practices relating to caseworker caseloads, case planning, or placement array "caus[ed]" that "constitutional injury." ECF No. 351, at 17, 20, 24; *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–50 (1998); *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 422–24, 426–27 (5th Cir. 2006). Plaintiffs' Memorandum in Opposition to Defendants' Motion ("Plaintiffs' Opposition") makes clear that there are not any disputes of fact material to <u>any</u> of these elements that would necessitate fact-finding by this Court at trial.

Instead, Plaintiffs' Opposition simply doubles down on their arguments from their motion for class certification that the evidence shows that caseloads are too high, case planning is often deficient, and there are not sufficient community placements. But, even if true, that does not show that Defendants are "deliberately indifferent" to those issues, and it is not probative of whether the General Class suffered a <u>class-wide</u> <u>constitutional</u> injury <u>caused</u> by the practices Plaintiffs challenge. Despite obtaining millions of pages of documents and reams of data over five years of litigation, deposing dozens of Defendants' employees, and decades of experience litigating Substantive Due Process cases against dozens of child welfare agencies, class counsel failed to

point to any evidence establishing class-wide injury "rising to an unconstitutional level," much less any evidence that the practices they challenge caused such an injury.

Moreover, Plaintiffs' Opposition does not dispute any of the facts in Defendants' Statement of Undisputed Material Facts ("Defendants' SUF," ECF No. 534) about the countless actions Defendants have undertaken to improve caseloads, case planning, and the placement array.  As a result, the Court should consider those facts "undisputed for purposes of the motion," Fed. R. Civ. P. 56(e), and those undisputed facts preclude a finding of deliberate indifference and serve as an independent basis for judgment in favor of Defendants on the constitutional claims.

Nor do Plaintiffs dispute any of the facts in Defendants' SUF that support a finding that Defendants have a "comprehensive, effectively working plan" to minimize the institutional placement of foster children, which precludes liability under Title II of the Americans with Disabilities Act (hereafter "ADA") and Section 504 of the Rehabilitation Act (hereafter "Rehabilitation Act").  Plaintiffs do not dispute that, before Plaintiffs filed suit, Defendants entered a Memorandum of Understanding ("MOU") with the Department of Justice ("DOJ") to decrease reliance on residential treatment and expand access to community-based services, pursuant to which Defendants have implemented a host of new programs and services; more than doubled community-based mental health expenditures for foster children; and substantially decreased the number and percentage of foster children in residential treatment over the last decade.  Instead, Plaintiffs argue that the binding plan that Defendants negotiated with DOJ, the federal agency charged with enforcing the ADA, does not comply with the ADA and that Defendants should be subject to a second binding set of requirements governing the expansion of community-based services and placements.  Nothing in the ADA, the Rehabilitation Act, or *Olmstead* supports such a position, and this Court can resolve Plaintiffs' argument as a matter of law.

2

**ARGUMENT**

I.   **Defendants are Entitled to Summary Judgment on the Substantive Due Process Claims Because the Undisputed Facts Demonstrate that Defendants are <u>Not</u> "Deliberately Indifferent" or "Grossly Negligent."**

In *Doe v. South Carolina Department of Social Services*, the Fourth Circuit held that a foster child alleging a Substantive Due Process violation must prove that the defendant was "deliberately indifferent." 597 F.3d 163, 175 (4th Cir. 2010). Relying on *Doe*, this Court held for purposes of this case that Plaintiffs "must show that" Defendants were "deliberately indifferent" to prove a Substantive Due Process violation. ECF No. 351, at 11; *accord* ECF No. 487, at 9–10.

Plaintiffs now ask this Court to reject the "deliberate indifference" standard in favor of a "substantially depart from accepted professional standards" test, which "is essentially a gross negligence standard." ECF No. 548, at 3–4 (cleaned up). While the Fourth Circuit and the Supreme Court have applied this standard in cases involving the provision of medical care to individuals in secure facilities, *see Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Center Commission*, 985 F. 3d 327 (4th Cir 2021) (hereafter "*Lopez*"); *Youngberg v. Romeo*, 457 U.S. 307 (1982), *Lopez* and *Youngberg* were <u>not</u> cases brought by foster children challenging child welfare practices, and *Lopez* did <u>not</u> disturb the Fourth Circuit's holding in *Doe*. Consequently, there is no basis to depart from the "deliberate indifference" standard previously applied by this Court. Further, in discovery disputes, Plaintiffs have repeatedly justified the breadth of their demands on the grounds that they must "prove that Defendants acted with deliberate indifference," ECF No. 402, at 9; *see, e.g.*, ECF No. 474, at 3–7, and they are precluded from relying on a "contradictory argument to prevail in another phase" of this litigation, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (cleaned up). In any event, the undisputed facts establish that Defendants are neither "deliberately indifferent" nor "grossly negligent" with respect to caseloads, case planning, or the placement array.

3

A.    **Plaintiffs Do Not Dispute That Defendants Have Taken the Actions to Improve Caseworker Caseloads, Case Planning, and the Placement Array Set Forth in Defendants' SUF.**

Plaintiffs do not dispute that Defendants have taken the actions set forth in Defendants' SUF and Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment ("Defendants' Memorandum") to decrease caseloads, improve case planning, and expand the placement array. *See generally* ECF No. 548, at 5–19. Instead, Plaintiffs argue that those actions have not improved the West Virginia child welfare system. *See generally id.* at 5–19.

Plaintiffs' argument, even if true, does not create a material dispute of fact about whether Defendants were deliberately indifferent or grossly negligent. To prove deliberate indifference or gross negligence, a plaintiff must prove, among other things, that defendants completely "chose to ignore" a known risk. *Doe*, 597 F.3d at 175; *see White by White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997). Officials do <u>not</u> violate Substantive Due Process "if they responded reasonably" to that risk or were merely negligent.[1] *See Parrish* 372 F.3d at 306–07 (cleaned up).

The key focus in a "deliberate indifference" or "gross negligence" inquiry is the defendants' efforts, not the ultimate results. As the Fifth Circuit held in *M.D. by Stuckenberg v. Abbot*, which Plaintiffs cite repeatedly, the extent to which the state's efforts actually yield results "is of no moment" to a deliberate indifference analysis. *M.D. by Stuckenberg v. Abbot*, 907 F.3d 237, 269 (5th Cir. 2018). Trying but failing to mitigate a risk is <u>not</u> deliberate indifference or gross negligence,[2] and thus evidence of a lack of improvement or even back-sliding is not enough.

---

[1] Plaintiffs argue that Defendants are required to "take reasonable steps," ECF No. 548, at 5, but "reasonableness" is a negligence standard, and the Fourth Circuit has repeatedly held plaintiffs must prove much more than negligence or "unreasonable" action to prevail on a Substantive Due Process claim. *See, e.g.*, *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 306–07 (4th Cir. 2005).

[2] *See, e.g.*, *M.D.*, 907 F.3d at 269; *Doe*, 597 F.3d at 175 (holding that a plaintiffs must prove that the defendant "chose to ignore" a risk); *Patten v. Nichols*, 274 F.3d 829, 843–45 (4th Cir. 2001)

In this case, the undisputed facts (uncontested in Plaintiffs' Opposition) show that Defendants have gone to great lengths to improve caseloads, case planning, and the placement array. ECF No. 535, at 4–11; ECF No. 534, ¶¶ 63–185. Plaintiffs minimize these actions as occurring "after this litigation commenced" in September 2019. ECF No. 548, at 1. However, Plaintiffs' own discovery has been limited to the last five years, *see, e.g.*, ECF No. 433-2, at 5 ("Time Period"), Defendants made changes pursuant to the DOJ MOU signed in May 2019 (months before Plaintiffs brought suit); and only the Defendants' <u>current</u> operations are relevant because Plaintiffs are seeking prospective relief. *See Farmer v. Brennan,* 511 U.S. 825, 844 (1994) (plaintiffs must prove deliberate indifference "at the time of summary judgment").

Further, although not necessary to preclude a finding of deliberate indifference or gross negligence, the undisputed facts are that the system is improving. For example: Defendants decreased the ratio of Child Protective Services ("CPS") and Youth Services ("YS") workers to children in foster care from approximately one worker for every 12 children (May 2022) to approximately one worker for every nine (9) children (May 2024);[3] West Virginia increased the number and percentage of foster children placed in the community, from 3,086 (70 percent of all foster children) in April 2014 to 4,960 (81 percent of all foster children) in April 2024; West Virginia decreased the percentage of foster children placed in residential treatment, from 28

---

(holding that defendants did not violate Substantive Due Process when they spoke to the patient upon learning of a medical risk and "were satisfied that [the individual] was not in danger," even though the individual later died and "defendants could have done more than just talk to [the individual] from across a hallway"); *Parrish*, 372 F.3d at 308–09 (holding that police officers' actions were not deliberately indifferent when they "took precautions that they believed . . . were sufficient to prevent the harm that befell" the detainee, even though that belief proved to be "erroneous[]" and the detainee later died).

[3] Plaintiffs criticize Defendants for counting YS workers in these calculations, but YS workers serve juvenile justice-involved youth in foster care, and Plaintiffs prevailed in keeping these youth in the General Class (over Defendants' objections), *see* ECF No. 351, at n.11.

percent in May 2014 to 17 percent in May 2024; 92 percent of foster children in custody because of abuse or neglect (*i.e.*, excluding juvenile justice youth) are placed in family homes; 53 percent of foster children (including juvenile justice youth) are placed in kinship homes, the highest rate in the country;[4] Defendants increased spending on community-based behavioral health services and other home- and community-based services for foster children from $2.9 million (for services to 2,983 children) in 2015 to at least $8.1 million (for services to at least 4,463 foster children) in 2023.  ECF No. 534, ¶¶ 135–136, 157, 185–93.

Despite all these actions and improvements, Plaintiffs suggest that they can meet their burden of proving deliberate indifference because caseloads are still too high.[5]  *See* ECF No. 548, at 7–9.  Defendants do not dispute that caseloads are still too high in some districts and continue to work to decrease those caseloads, but a shortage of caseworkers does not establish deliberate indifference or gross negligence.  Hiring additional caseworkers is not like flipping on a switch.  For many years, states <u>nationwide</u> have struggled with a shortage of qualified individuals willing to serve as caseworkers, which was exacerbated by COVID and a tight labor market.[6]  Recruiting

---

[4] Plaintiffs assert that this placement data is "disputed," ECF No. 548, at 16, but they fail to "cit[e] to particular parts of materials in the record" to support that assertion, as required by Rule 56(c).

[5] Plaintiffs' Opposition significantly overstates the caseloads that caseworkers carry, *see* Defs. Resp. to Pls. SUF, ¶ 18, but that is a factual dispute that need not be resolved because it is not material to whether Defendants are deliberately indifferent.  Among other problems with Plaintiffs' calculations, Plaintiffs incorrectly count cases assigned to supervisors <u>for supervising purposes</u> as if those cases were assigned to a caseworker, which artificially inflates the caseworkers' caseload numbers because supervisors supervise more cases than caseworkers carry (supervisors supervises multiple caseworkers, each with their own caseload).  *See* Ex. 1, ¶¶ 7–14. "Ex." refers to an exhibit attached to the August 5, 2024, declaration of Philip J. Peisch accompanying Defendants' reply in support of their motion for summary judgment.

[6] Casey Family Programs, *How are child protection agencies navigating and addressing workforce challenges?* (Aug. 2023),  https://www.casey.org/media/23.07-QFF-HO-Workforce-Challenges-1.pdf (attached as Ex. 10); Child Welfare League of Am., *2022 Legis. Agenda, Hot Topic, Strengthen the Child Welfare Workforce* (2022), https://www.cwla.org/wp-content/uploads/2022/04/2022HotTopicWorkforce.pdf (attached as Ex. 11).

caseworkers is particularly challenging in West Virginia, a rural state tied for the lowest percentage of college graduates of any state in the country. Defendants have gone to great lengths to overcome these challenges and hire and retain additional caseworkers, as detailed in Defendants' Memorandum and in Defendants' SUF, *see* ECF No. 534, ¶¶ 100–38; ECF No. 535, at 4–9.

As a result of these efforts, it is undisputed that, over the last two years, the number of CPS and YS staff employed by the Department of Human Services ("DoHS") increased from 569 to 672 (while the number of children in custody decreased by approximately 10 percent), and that CPS and YS vacancy rates decreased from 27 and 35 percent, respectively, to 17 percent and 14 percent. ECF No. 534, ¶¶ 130–36, 186. Further, the CPS and YS turnover rate decreased from 34.1 to 22.3 percent, from 2021 to 2023, *id.* ¶ 134,[7] compared to nationwide child welfare turnover rates of "between 23% and 60% annually," *see* Ex. 11.

Plaintiffs also suggest that Defendants are deliberately indifferent because "Defendants do not know or routinely track actual caseloads." ECF No. 548, at 6. This allegation is not true and belied by the documents Plaintiffs cite in support of it. Plaintiffs' own SUF references some of the ways in which Defendants track caseloads, *see* ECF No. 549, ¶ 2, and it is undisputed that DoHS monitors caseworker caseloads calculated based on the definition of "case" that DoHS uses, ECF No. 539, at 2; Defs. Resp. to Pls. SUF, ¶¶ 2, 6–7; ECF No. 549, ¶ 2; *see, e.g.*, ECF No. 533-73; ECF No. 550-12, Tr. 77:3–24, 81:2–6; ECF No. 554-19, at D003113230. Further, it is undisputed that "DoHS staff are able to use PATH to review which cases a caseworker is assigned at any

---

[7] Plaintiffs argue that the evidence regarding turnover rates is inadmissible hearsay. ECF No. 548, at 8. In an abundance of caution, Defendants have attached a sworn declaration from Amanda Queen providing information regarding the source and creation of the contested document (attached as Ex. 2). Accordingly, Defendants have met their burden to show that the material is capable of admission at trial. *See* Fed. R. Civ. P. 56(c); Rule 56 Advisory Committee Note, 2010 Amendment; *Deakins v. Pack*, 957 F.Supp.2d 703, 752 (S.D. W. Va. 2013).

specific point in time, and then look at each of those cases to see how many children are involved in each case," ECF No. 549, ¶ 2, and DoHS supervisors monitor the number of individual children that each caseworker serves and consider the number of children in each case in distributing cases amongst caseworkers, ECF No. 550-13, Tr. 54:9–60:6; *see also*, ECF No. 550-12, Tr. 76:21–77:2.

Plaintiffs argue that evidence of a decreasing number of certified foster homes also supports a deliberate indifference finding. Once again, Plaintiffs' allegations do not accurately reflect the information in the documents they cite. For example, Plaintiffs state "[t]o have enough certified foster homes for teens, two to four teens would need to be placed in each home," ECF No. 548, at 18, but the document Plaintiffs cite actually states that, statewide, there is "at least one home for every teen placed at the state-level," ECF No. 552-8, at D003113715. Most importantly, Plaintiffs ignore the undisputed fact that DoHS has recruited nearly 2,000 more family beds with actual children placed in them than it had a decade ago: in May 2014, 3,086 foster children were placed in family homes, compared to 4,960 foster children placed in family homes in May 2024. ECF No. 534, ¶¶ 187–88. In any event, whether there has been a decline in one type of placement— licensed foster families—is not relevant to whether Defendants have been deliberately indifferent to improving the placement array, *see* note 2, *supra*, particularly in light of the substantial increase in placements in kinship homes in the community, *compare* ECF No. 533-75 *to* ECF No. 533-77.

Plaintiffs suggest that Defendants are deliberately indifferent because courts temporarily place some foster children in hotels, hospitals, cottages at a summer camp used for 4-H and other youth programming, and three allegedly unsafe residential programs (George Junior, Highland Hospital, and those owned by ResCare). While Defendants work to minimize temporary placements such as hotels, they are sometimes necessary in an emergency, such as when a child is removed in the middle of the night, or a youth has problematic behaviors that require some time

to find a suitable placement. More to the point, Plaintiffs do not cite any evidence about the number of children placed in these temporary placements, presumably because they know this is not a class-wide issue. In fact, only a few dozen foster children are temporarily placed in a hotel or hospital each month, and only a handful of children are placed in the summer camp cottages, out of approximately 6,000 General Class members in custody. *See* Defs. Resp. to Pls. SUF, ¶ 124. Similarly, while Defendants dispute Plaintiffs' allegations about George Junior, Highland Hospital, and the programs owned by ResCare, *see* Defs. Resp. to Pls. SUF, ¶¶ 141, 146, 150, those allegations are also immaterial to the class-wide claims because only a few dozen foster children are placed in any of those facilities at any given time. *See* ECF No. 555-25, at 6–7; ECF No. 550, ¶ 4.

Finally, Plaintiffs argue that the facts in this case are analogous to those in *M.D. by Stuckenberg v. Abbot*, but that case is easily distinguishable. In *M.D.*, the court held that the district court did not "clearly err" in concluding that Texas was deliberately indifferent to caseload management and "monitoring and oversight," because Texas: permitted caseworkers to forego face-to-face visits, which were "often" not completed; had not tried to determine how many cases a caseworker could manage; lacked any internal agency caseload standards; only requested "the bare minimum" funding from the legislature "to maintain current caseloads and preserve the status quo"; did not appropriately investigate abuse and neglect of foster children; and had "not done any significant work to improve on these deficiencies." *M.D.*, 907 F.3d at 246, 261–62 & n.32, 264–68; *see also id.* at 261–65. In contrast, in this case, there is no dispute that West Virginia has taken many steps to decrease caseworker caseloads, including many that Texas did not take, as detailed in Defendants' Memorandum, ECF No. 535, at 4–9, and in Defendants' SUF, *see* ECF No. 534, ¶¶ 100–38. As a result, unlike in *M.D.*, there is no dispute that West Virginia's caseworkers complete

9

the overwhelming majority of their face-to-face visits with foster children, *id.* ¶ 137,[8] and Plaintiffs in this case do not point to any evidence that Defendants are not properly investigating allegations of abuse and neglect of foster children, *see generally* ECF No. 548.

Plaintiffs also neglect to mention that *M.D.* held that the district court "clearly erred" in finding that Texas' placement array practice violated Substantive Due Process. In so holding, the court explained that "inadequate placement array does not unacceptably increase the risk that a child will be exposed to serious physical or psychological harm," and "the availability of foster homes . . . is something uniquely out of the State's control," because a state "cannot force people to volunteer" as foster parents or otherwise "resolve the ongoing placement challenges related to ensuring a child's unique fit with a prospective placement." *M.D.*, 907 F.3d at 268 (cleaned up).

**B.      Plaintiffs Do Not Identify Any Additional Action That Defendants Should Take That Would Improve Caseloads, Case Planning, or the Placement Array.**

Notably, Plaintiffs' Opposition identifies only <u>two</u> steps that they believe Defendants should take, but are not already taking, related to caseworker caseloads and case planning: (1) counting "cases" by child instead of by family; and (2) imposing the caseload maximum for caseworkers recommended by DoHS's 2022 Workload Study. ECF No. 548, at 5–19. (Plaintiffs do not identify any additional steps that Defendants should take to improve the placement array.)

---

[8] Plaintiffs do not dispute the facts set forth in paragraph 137 of Defendants' SUF showing that caseworkers complete the vast majority of face-to-face visits. However, Plaintiffs assert that DoHS's 2024 Annual Progress and Services Review ("APSR") "shows that caseworker visits with children decreased from 41.5% in 2018 to 25.6% in 2022." ECF No. 548, at 11. That is flat wrong. The APSR actually states that "in FFY 2022, 91.31% of the children in foster care in West Virginia were visited during each month." ECF No. 551-23, at D002230073–74. The percentages Plaintiffs cite, "41.5% in 2018" and "25.6% in 2022," are from the DPQI process and reflect the percentage of a small sample of cases (including "in home" cases of children not in foster care) for which the "frequency <u>and quality</u>" of all caseworker contacts were rated a "strength." *See id.* at D002229756, D002229811, D002229758–59; ECF No. 533-15, ¶ 27. A case will only be rated a "strength" if a number of different <u>quality metrics</u> are met for <u>all</u> visits in the case during the period under review.

To begin with, the fact that a defendant did not take all conceivable action cannot support a deliberate indifference or gross negligence finding. As the Fourth Circuit has explained, "the feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry" because "the question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken—but whether they disregarded an excessive risk to . . . health or safety." *Parrish*, 372 F.3d at 309 (cleaned up).

Further, counting cases by child and imposing a caseworker caseload cap would not improve the system. With respect to the former, while Plaintiffs claim that counting "cases" by child instead of by family is a better metric for measuring caseloads, it would do nothing to decrease caseloads or the ratio of foster children to caseworkers. DoHS would have the same number of caseworkers and the same number of children to serve, regardless of whether cases are counted by child or family. Similarly, DoHS has reasonably concluded that a caseworker cap would not actually decrease caseloads. DoHS must operate a system with the number of caseworkers it is able to recruit, and DoHS is legally and morally obligated to serve all children who have been abused or neglected. Accordingly, if DoHS imposed a caseload cap, it would need to violate that cap if either it is unable to hire a sufficient number of caseworkers or there is an unexpected increase in the number of reports of abuse and neglect. As DoHS leadership explained in depositions, DoHS cannot and would not refuse to serve new children if the caseload caps were reached, *see, e.g.*, ECF No. 550-13, Tr. 106:2–13, thereby rendering any cap effectively advisory and indistinguishable from the caseload goals that DoHS has already set (10 cases per CPS caseworker and 12 cases per YS caseworker), *id*. Tr. 106:2–13; ECF No. 550-3, at 3.

**II.    Defendants are Entitled to Summary Judgment on the Substantive Due Process Claims Because Plaintiffs Do Not Cite Any "Significant Probative Evidence" of <u>Class-Wide</u> <u>Constitutional</u> Injury <u>Caused</u> By Defendants' Policies or Practices.**

As this court has made clear, ECF No. 351, at 20, in addition to proving deliberate indifference, plaintiffs must prove that defendants' conduct <u>caused</u> a <u>class-wide</u> deprivation of, or an "imminent[]" risk of a <u>class-wide</u> deprivation of, a <u>constitutional right</u> protected by Substantive Due Process.  *See Lewis v. Casey*, 518 U.S. 343, 349–50 (1996); *M.D.*, 907 F.3d at 253. "Establishing a direct causal link between the State policy and the constitutional deprivation" on a class-wide basis "is a high threshold of proof"; "[t]his connection must be more than a mere but for coupling between cause and effect," and it must be determined whether "each and any policy or practice" caused the constitutional violation.  *M.D.*, 907 F.3d at 253 (cleaned up).

As explained in this Court's ruling on Defendants' motion to dismiss, "Defendants need only provide for Plaintiffs' basic human needs and prevent further abuse and neglect"; the Constitution does not guarantee "optimal treatment."  ECF No. 300, at 16; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989) (identifying constitutionally protected "basic human needs" as "food, clothing, shelter, medical care, and reasonable safety").  Plaintiffs' Opposition does not even allege (much less cite evidence) that any of the purported policies or practices they challenge caused a class-wide deprivation of any "basic human need;" "abuse or neglect," ECF No. 300, at 16; or "psychological harm," such as "egregious intrusions on a child's emotional well-being," *M.D.*, 907 F.3d at 251.

Plaintiffs' brief mentions only two potentially constitutionally protected harms: (1) maltreatment and (2) lack of services.  With respect to the former, Plaintiffs do not point to any evidence that General Class members have suffered, or are at risk of suffering, maltreatment on a class-wide basis, let alone that such risk is caused by policies and practices relating to caseloads, case planning, or the placement array.  Nor could Plaintiffs plausibly make such an argument: it is

undisputed that the data shows that less than one percent of foster children in West Virginia are maltreated in custody, and West Virginia has the third lowest rate of maltreatment in care of any child welfare system in the country, with less than three (3) incidents per 100,000 days in care, less than half the national performance of 9.07 incidents per 100,000 days. ECF No. 534, ¶¶ 203, 204. Plaintiffs' SUF alleges some instances of abuse suffered by children who are <u>not in state custody</u> that could have been prevented by lower caseloads, *see, e.g.*, Defs. Resp. to Pls. SUF, ¶34i, but children who are not in DoHS custody are not part of the General Class in this case, ECF No. 351, at 45. Further, while Defendants devote enormous resources to preventing abuse and neglect of children who are not in state custody, Substantive Due Process does not give rise to any affirmative duty to protect children who are not in state custody, *White by White*, 112 F.3d at 737 ("In *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), the Supreme Court held that the state had no affirmative duty to protect a child from abuse when that child was not in state custody."); *Doe*, 597 F.3d at 171 ("This Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise . . . .").

Plaintiffs argue that the maltreatment data understates actual maltreatment because they "do not include maltreatment in uncertified kinship homes," and "maltreatment in foster care [is] not adequately investigated, if at all." ECF No. 548, at 15. However, the maltreatment data <u>does</u> include maltreatment in uncertified homes, Ex. 1, ¶ 5, and Plaintiffs do not cite to "particular parts of materials in the record" to the contrary, *see* Fed. R. Civ. P. 56(c). Similarly, Plaintiffs do not cite any actual evidence to support their assertion that "allegations of maltreatment in foster care are not adequately investigated, if at all," *see* ECF No. 548, at 15.

While Plaintiffs do not need to show that all General Class members actually suffered maltreatment, the Supreme Court has made clear that plaintiffs in a class action raising a

constitutional claim must prove that all class members at least face "imminent[]" risk of a constitutional injury. *See Lewis*, 518 U.S. at 349–50. Even courts deploying a more relaxed standard of risk have held plaintiffs must prove "substantial risk" of constitutional harm and, "to the extent [plaintiffs] allege a [policy or practice] has existed for a length of time, [plaintiffs] generally must show that some [similarly situated individuals] . . . have been harmed, in order to demonstrate an objectively substantial risk of serious harm." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1123–24 (M.D. Ala. 2016). Evidence that less than one percent of General Class member experienced maltreatment does not come close to establishing "an objectively substantial risk."

Nor do Plaintiffs cite any evidence that General Class members are not receiving "services necessary to prevent unreasonable risk of harm," ECF No. 300, at 14–15.[9] The only evidence Plaintiffs cite on this point is their assertion that the APSR reports that Defendants "met physical needs of children 60.53% of the time in 2022" and "adequately addressed" "the mental and behavioral health needs of foster children" "only 25% of the time in 2022" and "20% in 2023." ECF No. 548, at 13. Yet again, Plaintiffs mischaracterize documentary evidence. The APSR percentages Plaintiffs cite are from Defendants' DPQI case reviews, which review a tiny sample of cases (10–15 a month), half of which are children not in custody who are still living with their families. ECF No. 533-15, ¶ 27. DPQI does <u>not</u> assess the extent to which the children in the sampled cases received "services necessary to prevent unreasonable risk of harm," or even the extent to which Defendants have "adequately addressed" the physical or behavioral needs of those children, as Plaintiffs assert. Rather, the percentages cited by Plaintiffs (60.53 percent, 25 percent, and 20 percent) reflect the percentage of the small sample of DPQI-reviewed cases where DPQI

---

[9] The constitution does not entitle Plaintiffs to <u>all</u> services, only "services necessary to prevent unreasonable risk of harm," ECF No. 300, at 14–15.

rated the physical, mental or behavioral services as a "strength" for children in the case. *See* ECF No. 551-23, at D002229770–76; ECF No. 533-15, ¶ 27. DPQI will only rate the case as a "strength" if, among other things: the agency accurately assessed the child's physical, dental, mental and behavioral health needs; the child's health records are up to date and included in the case file; the case worker regularly follows up with caregivers about administering medications appropriately and the target child's experience with the medications; and services were provided to address all identified physical, dental, mental and behavioral health needs. Ex. 3, at D002761608–11.

While the DPQI criteria measures of social work practice are criteria that Defendants strive to meet, failing to achieve a "strength" rating does not mean the child was deprived of "services necessary to prevent unreasonable risk of harm." ECF No. 300, at 14–15. As this Court has already found, "substantive due process does not demand optimal treatment," *id.* at 16, and Plaintiffs cannot "take aspirational statutory, regulatory, and private standards . . . and convert each of them to constitutional requirements," *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 55 (1st Cir. 2014).

In any event, Plaintiffs do not point to any evidence that any maltreatment or non-receipt of any services necessary to prevent unreasonable risk of harm was caused by any of the policies or practices that they challenge relating to caseloads, case planning, or inadequate placement array. Plaintiffs' Opposition does not even mention the words "cause", "caused", or "causation," except once in a single quotation from another case. *See generally* ECF No. 548.

## III. Defendants are Entitled to Summary Judgment on the ADA and Rehabilitation Act Claims.

As explained in Defendants' Memorandum, summary judgement is appropriate on the ADA's Subclass's claims for two reasons: the undisputed facts establish that (1) Defendants have

a comprehensive, effectively working plan to minimize residential placement; (2) the ADA Subclass-wide is not subject to "unjustified institutionalization" or "a serious risk" thereof.

### A. The Undisputed Facts Establish That Defendants Have a Comprehensive, Effectively Working Plan.

To prevail on an ADA or Rehabilitation Act claim, the plaintiffs must prove that the relief they seek is a "reasonable modification" of the defendants' programs, which Plaintiffs cannot establish if the State already has "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 584, 605–06 (1999) (citations omitted); *accord, e.g., Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 619 (9th Cir. 2005).

The undisputed facts establish that West Virginia's MOU with DOJ and related efforts constitute a "comprehensive, effectively working plan for placing" foster children in less restrictive settings. *See* ECF No. 535, at 21–28 (citing relevant paragraphs of ECF No. 534). It is undisputed that Defendant have, among other things: launched the Medicaid Children with Serious Emotional Disorder Waiver ("CSEDW") program to provide children (including foster children) community-based mental health services; launched the "Mountain Health Promise" program to improve access to and coordination of a continuum of health care and socially necessary services for all foster children; implemented Children's Mobile Crisis Response and Stabilization program to immediately connect children experiencing a crisis in the community with necessary crisis services, 24 hours a day, seven days a week; and implemented the Pathway to Children's Mental Health Services to streamline the process through which children are assessed for and connected to community-based behavioral health services. *See* ECF No. 534, ¶¶ 59, 60, 165–172.

Plaintiffs' Opposition identifies three reasons why Defendants' work with the DOJ does not constitute a "comprehensive, effectively working plan," none of which are persuasive. First, Plaintiffs argue that Defendants' work with DOJ fails to "contain[ ] specific and measurable goals for the integration of persons with disabilities into the community," and that the only evidence Defendants cite for the effectiveness of the DOJ MOU is the testimony of Defendants' expert, Heidi Arthur. ECF No. 548, at 23. These critiques are indisputably factually false. Plaintiffs' own brief acknowledges that the DOJ MOU sets a goal for Defendants to "reduce the number of children in Residential Mental Health Treatment Facilities ('RMHTFs') to 712 by December 31, 2024." ECF No. 548, at 16. Further, even a cursory review of the DOJ MOU, the Implementation Plans, and the Semi-Annual reports reveals that DOJ and the Subject Matter Expert apply concrete, measurable goals for Defendants to increase community placements and services. *See, e.g.*, ECF No. 533-66, at D003097198–99, D003097271; ECF No. 533-70, at D002232682, D002232710, D002232758. In any event, *Olmstead* did not require that the comprehensive plan contain specific or measurable goals, 527 U.S. at 584, 605–06. Rather, as the Ninth Circuit has held, "[s]o long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons 'with an even hand,'" courts should "not interfere." *Braddock*, 427 F.3d at 620.

Nor is it true that the only evidence Defendants cite to support the effectiveness of their plan is Ms. Arthur's opinion (which is actually cited only once in Defendants' Memorandum). For example, Defendants' Memorandum cites the following facts, none of which Plaintiffs dispute: State spending on community-based mental health services and other HCBS for foster children more than doubled from 2015 to 2023; the number of foster children placed in the community increased from 3,086 children (70 percent of children in custody) in May 2014 to 4,960 children (81 percent of children in custody) in May 2024; the percentage of foster children placed in

17

residential treatment decreased from 28 percent in May 2014 to 17 percent in May 2024 (inclusive of juvenile justice youth); the number of foster children with a behavioral health diagnosis receiving residential treatment services decreased from 1,600 in 2018 to 961 in 2023; and 92 percent of foster children in custody because of abuse or neglect are placed in family homes.  ECF No. 535, at 22–26 (citing, among other things, ECF No. 534, ¶¶ 185–88, 193).

Second, Plaintiffs argue that "Defendants' data is unreliable."  ECF No. 548, at 23.  The entirety of the evidence on this point are comments by the Subject Matter Expert that "surveys[ ] and interviews with a sample of at-risk children, their caregivers, and providers may not accurately reflect the views of these stakeholders," due to the framing of the questions and low response rates. ECF No. 533-66, at D003097184.  That is a very small portion of the data collected, reported, and analyzed by DoHS or the Subject Matter Expert, and it does not relate to any of the data cited above about the State's expenditures on community-based services or the number or percentage of children placed in residential treatment.  Nor do Plaintiffs cite any case law suggesting that "unreliable" survey data precludes a finding that a State has a comprehensive, effectively working plan, when the State is not relying on that data to show the plan exists.

Third, Plaintiffs argue that the number of foster children in residential treatment has increased from 2021 to present.  ECF No. 548, at 23–24.  Defendants do not dispute that placements in residential treatment have modestly increased from 2021 to present, although there are still substantially fewer children in residential care today than there were in 2014, which (given growth in the number of foster children) reflects as a substantially smaller percentage.  Moreover, it is undisputed that, in the wake of COVID, the number of children experiencing serious mental health needs has increased substantially nationwide.  ECF No. 534, ¶ 186; ECF No. 533-22. Against that backdrop, and the substantial increase in community-based services expenditures by

Defendants, a modest uptick in residential placements does not mean that Defendants do not have a "comprehensive, effectively work plan." And the fact remains that, today, 92 percent of foster children in custody because of abuse or neglect are placed in family homes, and the raw number and percentage of all foster children (including juvenile justice youth) placed in the community has substantially increased over the last decade, from 3,086 foster children (70 percent of children in custody) in May 2014 to 4,960 children (81 percent of children in custody) in May 2024. ECF No. 534, ¶¶ 185–88, 193.

### B. Plaintiffs Do Not Cite Evidence to Support Their Allegations that the ADA Subclass is Subject to Unjustified Institutionalization or Serious Risk Thereof.

Presumably because the vast majority of foster children are placed in the community, Plaintiffs' Opposition abandons the argument that ADA Subclass members face <u>actual</u> unjustified institutionalization on a subclass-wide basis. ECF No. 548, at 20–22. Instead, Plaintiffs' theory is that ADA Subclass members are at "serious risk of" unjustified institutionalization. *Id.*

That is no longer viable after *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024). *See* ECF No. 535, at 15 n.4. With the Supreme Court lifting the fog of deference to DOJ's legal interpretation that has long dissuaded courts from independently interpreting the ADA and the Rehabilitation Act, it becomes crystal clear that those statutes do not prohibit "serious risk of" institutionalization. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794. Nothing in their text evinces a congressional intent to prohibit "risk of" anything. *See United States v. Mississippi*, 82 F.4th 387, 392 (5th Cir. 2023). Although recently enacted regulations implementing the Rehabilitation Act prohibit risk of unjustified institutionalization, *see* 45 C.F.R. § 84.76 (effective July 8, 2024), Plaintiffs do not rely on those regulations, *see* ECF No. 548, at 19-26, and those regulations are inconsistent with the text of the statute, in part because the Rehabilitation Act "contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination,"

*Olmstead* 527 U.S. at 600 n.11, let alone that it prohibits "serious risk of" unjustified institutionalization.  Accordingly, the Rehabilitation Act regulations are invalid and cannot serve as the basis of a private cause of action.  *See, e.g.*, *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 483–85 (4th Cir. 1990); *Fort Wayne Cmnty. Schs. v. Fort Wayne Educ. Ass'n, Inc.*, 977 F.2d 358, 366 (7th Cir. 1992); *United States. v. Calamaro*, 354 U.S. 351, 359 (1957).

In any event, Plaintiffs do not point to <u>any</u> evidence showing that ADA Subclass members face a "serious risk of" unjustified institutionalization on a <u>subclass-wide basis</u>.  Plaintiffs rely on the DOJ MOU Subject Matter Expert's and DoHS's reports that some youth remain in residential treatment when they are ready for discharge because there are not available foster homes "for older youth and youth with serious emotional disturbance."  ECF No. 548, at 21.  However, Plaintiffs do not cite any evidence that this impacts a majority of the ADA Subclass, and the fact that there are not enough families willing to accept "older youth and youth with serious emotional disturbance" does not mean that <u>Defendants</u> are violating the ADA or the Rehabilitation Act on an ADA Subclass-wide basis.  Plaintiffs assert that "DoHS has the nondelegable duty to ensure that there are . . . adequate placements that will prevent the unnecessary placement of children in restrictive residential treatment facilities."  But Plaintiffs do not cite any statute or case law to support this proposition, and there is none.  As the court in *M.D.* explained, "the availability of foster homes . . . is something uniquely out of the State's control," because a state "cannot force people to volunteer" as foster parents or otherwise "resolve the ongoing placement challenges related to ensuring a child's unique fit with a prospective placement."  907 F.3d at 268 (cleaned up).

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

August 5, 2024                         Respectfully submitted,

                                       /s/ Philip J. Peisch
                                       Philip J. Peisch (WVSB # 13731)
                                       Caroline M. Brown, *pro hac vice*
                                       Julia M. Siegenberg, *pro hac vice*
                                       Rebecca L. Wolfe, *pro hac vice*
                                       Brown & Peisch PLLC
                                       1225 19th Street NW, Ste. 700
                                       Washington, DC 20036


                                       /s/ Steven R. Compton
                                       Steven R. Compton (WVSB #6562)
                                       West Virginia Attorney General's Office
                                       812 Quarrier Street, 6th Floor
                                       Charleston, WV 25301

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of the foregoing

Reply in Support of Defendants' Motion for Summary Judgment to be delivered to the following

via ECF notification:

Marcia R. Lowry
Julia Tebor
Laura Welikson
A Better Childhood
355 Lexington Ave., Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

J. Marty Mazezka
Andrew Castillo
Disability Rights of West Virginia
5088 Washington St. W., Suite 300
Charleston, WV 25301

August 5, 2024

/s/ Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg, *pro hac vice*
Rebecca L. Wolfe, *pro hac vice*
Brown & Peisch PLLC
1225 19th Street NW, Ste. 700
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301