## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

JONATHAN R., *et al.*,                      )
                                            )
*Plaintiffs*,                               )
                                            )
                        v.                  )
                                            )
JIM JUSTICE, *et al.*,                      )          Case No. 3:19-cv-00710
                                            )
*Defendants*.                               )

### DEFENDANTS' RESPONSE TO
### PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

As set forth in Fed. R. Civ. P. 56(c), Defendants note below any disputes or necessary clarifications with respect to Plaintiffs' Statement of Undisputed Facts. However, **none of these disputes of facts are material to the Plaintiffs' claims** and thus none of the disputes are necessary to resolve. *See Cauthorne v. Am. Home Mortg. Corp.*, 2008 WL 4316123, at *1 (E.D. Va. Sept. 15, 2008) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original)). For purposes of the summary judgment motion, Defendants are not raising any objections under Rule 56(c)(2) as to whether Plaintiffs' referenced documents are admissible into evidence. However, should the case proceed to trial, Defendants reserve all objections as to admissibility.

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 1. | The Defendants, including the Bureau of Social Services ("BSS") and the Department of Human Services ("DoHS"), count "cases" of children in foster care by families, instead of by children, regardless of the number of siblings in that family, until after parental rights are terminated. Ex. 3 (Defendants' Responses and Objections to Plaintiffs' Second Interrogatories) at 2. This means that a caseworker could have a caseload of 10 cases, but well more than 10 foster children for whom they are responsible. | Disputed to the extent the statement applies to youth services ("YS") cases, which are always calculated per child. ECF No. 550-12, Tr. 52:10-23. YS cases include foster children in DoHS custody because of a juvenile justice charge, and such children in DoHS custody are in the General Class. ECF No. 351, at 40 n.11. |
| 2. | DoHS does not track the number of individual children on each caseworker's caseload. Defendants have stipulated that they "do not maintain any documents in the ordinary course of business that track the number of individual children's cases that caseworkers carry, calculated on a 'per-child' basis for children in legal and physical custody and by families for children in legal but not physical custody. While DoHS staff are able to use PATH to review which cases a caseworker is assigned at any specific point in time, and then look at each of those cases to see how many children are involved in each case (which involves looking up and reviewing multiple pages within PATH), calculating the number of individual children within each caseworkers' case load for all of the hundreds of caseworkers would involve reviewing multiple documents in each case file for each of the thousands of children in foster care at any given time and this system-wide calculation is not performed in the ordinary course of business." ECF No. 539 at 2. | Undisputed that the statement accurately quotes part of the deposition testimony, but with clarification as to the incorrect characterization that "DoHS does not track the number of individual children on each caseworker's caseload." As paragraph 2 later explains, DoHS uses PATH to review which cases a caseworker is assigned at any specific point in time, and then can look at each of those cases to see how many children are involved in each case. *See* ECF No. 539. Further, DoHS supervisors in the individual district offices monitor the number of individual children that each caseworker is serving and consider the number of children in each case in distributing cases amongst caseworkers. ECF No. 550-12, Tr. 54:9–60:6. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 3. | Melanie Urquhart, Deputy Commissioner of Field Operations South, testified that it is not possible based solely on caseload data to determine the number of individual children that a specific caseworker is responsible for managing. Ex. 12, Melanie Urquhart Dep. Tr. at 56:21-57:1. She testified that a "measure of the number of individual children" would be a "more effective measure of what a caseworker's actual workload is over just a measure of the number of families that the caseworker is managing." *Id.* at Tr. at 57:12-18. | Disputed to the extent the statement suggests that the quoted language was Ms. Urquhart's. Ms. Urquhart responded "yes" to a question posed by counsel that contains the excerpted language. ECF No. 550-12, Tr. 57:12–18. |
| 4. | In an email dated August 12, 2021, then-Deputy Secretary of Department of Health and Human Resources ("DHHR"), Jeremiah Samples, also stated to Jeffrey Pack, the Commissioner of the Bureau of Social Services, that in his opinion "caseload ratios . . . need to be set to child." Ex. 69 (D003039665 at D003039665). In 2024, DHHR was separated into three agencies. The agency that oversees the child welfare system is now DoHS. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 5. | Defendants state that "DoHS does not have a policy mandating a numeric caseload limit for Child Protective Service workers or Youth Services workers." Ex. 3 (Defendants' Responses and Objections to Plaintiffs' Second Interrogatories) at 3. However, DoHS states that "for many years, DoHS has had an internal, informal caseload standard goal of 10 cases per Child Protective Service worker and 12 per Youth Services worker." *Id.* The reference to "cases" is to families, not children. According to the 2024 West Virginia Annual Progress and Services Review ("APSR"), "West Virginia's Youth Service program serves youth and their families who are involved or are at risk of being involved in the Juvenile Justice System through courts and/or probation." Ex. 48 (D002229660 at D002229976). | Disputed to the extent the statement suggests that Child Protective Services ("CPS") cases are counted "per family" after parental rights are terminated and that YS cases are counted per family. CPS cases are counted "per child" after parental rights are terminated and YS cases are always counted "per child."  ECF No. 550-12, Tr. 52:10–23; 63:17–24. |
| 6. | Cynthia Persily, Cabinet Secretary for DoHS, testified that "Our goal is to – for each caseworker to have a ratio of about 1:10 to 12 cases," and the ratio "is right now somewhere…1:8 to 1 to about 30." Ex. 7, Cynthia Persily Dep. Tr. at 116:9-17. The reference to "cases" is to families, not children. | Undisputed that the statement accurately quotes part of the deposition transcript, except to the extent that the statement suggests that Secretary Persily's reference to "cases" was to families and not to children.  Secretary Persily's reference to "cases" was to "cases" as defined by DoHS, and DoHS defines CPS cases per family prior to termination of parental rights, defines CPS cases as "per child" after parental rights are terminated and defines all YS cases as "per child."  ECF No. 550-12, Tr. 52:10–23; 63:17–24. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 7. | Melanie Urquhart, also testified that in terms of an appropriate number of cases for caseworkers "I think an ideal number is ten; a manageable number, 15." Ex. 12, Melanie Urquhart Dep. Tr. at 57:2-7. The reference to "cases" is to families, not children. | Undisputed that the statement accurately quotes part of the deposition transcript, except to the extent that the statement suggests that Ms. Urquhart's reference to "cases" was to families and not to children. Ms. Urquhart's reference to "cases" was to "cases" as defined by DoHS, and DoHS defines CPS cases per family prior to termination of parental rights, defines CPS cases as "per child" after parental rights are terminated and defines all YS cases as "per child." ECF No. 550-12, Tr. 52:10–23; 63:17–24. |
| 8. | DHHR commissioned West Virginia University to conduct a Workload Study of Child Welfare Service Workers to evaluate their workload at the behest of the WV Legislature, House Concurrent Resolution 35. Ex. 37, WVU, Workload Study Report (Aug. 19, 2022) ("2022 Workload Study Report" or "Workload Study Report") at 8 (D001618651 at D001618659). | |
| 9. | In the study commissioned by DHHR and its discussion of "cases," the reference to "cases" and "caseload" is to families, not individual children. | Disputed to the extent the statement suggests that the reference to "cases" was always to families and not to children. The reference to "cases" was to "cases" as defined by DoHS, and DoHS defines CPS cases per family prior to termination of parental rights, defines CPS cases as "per child" after parental rights are terminated and defines all YS cases as "per child." ECF No. 550-12, Tr. 52:10–23; 63:17–24. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 10. | The 2022 Workload Study Report recommended that a caseworker carry a caseload of 8-9 cases. Ex. 37 at 51, (D001618651 at D001618702). The Workload Study Report also recommended a caseload of 11-13 assessments for caseworkers that perform initial assessments. *Id.* The Workload Study Report stated that caseworkers assigned to cases that have multiple children or parents, or that require extensive travel time, could be assigned fewer overall cases. *Id.* at 77 (D001618651 at D001618728). | |
| 11. | The 2022 Workload Study stated that "CW [child welfare] supervisors have responsibilities outside of direct casework and often do not carry CW cases, so a different method to that used for caseworkers was needed to determine supervisors' recommended staffing level." *Id.* at 50 (D001618651 at D001618701). | |
| 12. | The 2022 Workload Study Report collected feedback from caseworkers regarding workload. "[P]articipants expressed concern with high caseloads that are difficult to manage; meetings, documentation, and administrative tasks that are perceived as unnecessary; and high travel and transportation time demands." *Id.* "Staff expressed concerns about stress, burnout, and work-life balance, each of which is associated with increased employee turnover (i.e., lower retention)." *Id.* "As a compounding effect of many of the above challenges, participants expressed concern with high turnover rates, high position vacancy rates, and high applicant attrition." *Id.* | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 13. | The 2022 Workload Study Report recommended that DHHR set a maximum number of cases per caseworker. *Id.* at 77 (D001618651 at D001618728). | |
| 14. | DHHR did not follow the recommendation of the 2022 Workload Study Report to set a maximum number of cases per caseworker. Ex. 13, Jeff Pack Dep. Tr. at 106:2-6. | Undisputed, with the clarification that Mr. Pack explained "We don't have the ability to turn away children from care because we've refused to go over a caseload cap." ECF No. 550-13, Tr. 106:8–106:13. |
| 15. | DHHR's own 2019 WV Child and Family Services Review Program Improvement Plan ("PIP") concluded that "[t]urnover coupled with higher caseloads . . . leads to decreased caseworker contact and negative outcomes for children and families. The lack of contact negatively impacts safety related timeframes, placement stability, achievement of permanency, and well-being outcomes." Ex. 25 at 13-14 (D003097564 at D003097577-D003097578). | |
| 16. | According to DoHS's Child Protective Services Workforce Allocations Calendar Year 2023, "[w]orkers needed based on census data averaged with the number of workers needed to achieve a caseload standard of 10 indicates the need for an additional 100 positions: 78 for the northern region and 22 for the southern region." Ex. 137, Child Protective Services Workforce Allocations (July 1, 2023) (D002141008 at D002141009). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 17. | According to DoHS's Child Protective Services Workforce Allocations Calendar Year 2024, "Workers needed based on census data averaged with the number of workers needed to achieve a caseload standard of 10, indicates the need for an additional 136 positions, 86 for the northern region and 50 for the southern region." Ex. 149, Child Protective Services Workforce Allocations Calendar Year 2024 at 2 (July 1, 2024), *available at* https://www.wvlegislature.gov/legisdocs/reports/agency/H16_CY_2024_26394.pdf. | |

| 18. | According to data tracking caseloads that Defendants produced in response to Plaintiffs' Thirteenth Request for Production, in June 2024, 68% of workers across all regions who had at least one case carried a caseload of more than 10 cases. 47% of workers across all regions carried a caseload of more than 20 cases. 32% of workers across all regions carried a caseload of more than 30 cases. 18% of workers across all regions carried a caseload of more than 50 cases, and 8% of workers across all regions carried a caseload of more than 100 cases. This data did not differentiate between workers by title or between child protective and adult protective services workers. All of these caseload reports counted caseload by families, not children. Ex. 59 (D003113462). Case coordinators are non-case carrying positions. *See* Ex. 119 (D003113230). | Disputed on several grounds. "Cases" can refer to families or children. YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated. ECF No. 550-13, Tr. 52:10–23; 63:17–24.<br><br>If a case is associated with a worker in PATH, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is associated with all cases assigned to the workers they supervise. Ex. 1, ¶ 9.[1]<br><br>Almost all of the workers who appear to have caseloads of over 100 are either adult protective service workers, or supervisors. *Id*. ¶ 14.<br><br>Legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers. *See id*. ¶ 10.<br><br>For these and other reasons, this is not a report that is used by Defendants in the regular course of business to track, monitor, |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| | | calculate or allocate caseloads. *Id.* ¶ 11. |

---

[1] "Ex." in the column titled "Defendants' Response and Supporting Evidence" refers to an exhibit attached to the August 5, 2024, declaration of Philip J. Peisch accompanying Defendants' reply in support of their motion for summary judgment.

| 19. | Defendants' caseload data indicates that in June 2024, 85% of workers handled both "cases," and "assessments," i.e., investigations. 37% of workers had a caseload of more than 10 cases and more than 6 active investigations. 24% of workers had a caseload of more than 10 cases and more than 12 active investigations. 30% of workers had a caseload of more than 20 cases and more than 6 active investigations. And 18% of workers had a caseload of more than 20 cases and more than 12 active investigations. All of these caseload reports counted caseloads by families, not children. Ex. 59 (D003113462). | Disputed on several grounds. "Cases" can refer to families or children. YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated. ECF No. 550-13, Tr. 52:10–23; 63:17–24.<br><br>"Assessments" or "investigations" and cases are either open or closed; there is no way to view the report Plaintiffs rely on and determine if the assessment or case is "active" such that it requires ongoing, regular casework. For example, legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers. *See* Ex. 1, ¶ 10. Assessments, which are investigations of alleged abuse or neglect, may be complete aside from a supervisor needing to sign a final form or the caseworker needing to finish writing up collateral contacts, and are therefore still open and reflected on this report.<br><br>If a case is associated with a worker in PATH, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| | | associated with all cases assigned to the workers they supervise.  Ex. 1, ¶ 9.<br><br>For these and other reasons, this is not a report that is used by Defendants in the regular course of business to track, monitor, calculate or allocate caseloads.  *Id.* ¶ 11. |
| 20. | According to a January 24, 2023 DHHR press release, "DHHR Unveils Major New Initiative to Strengthen Protective Services," "As of December 31, 2022, out of the 518 allocated positions for Child Protective Services, there are 160 unfilled positions. Of the 126 allocated Youth Services positions, 45 are unfilled. Of the 116 allocated positions for Adult Protective Services positions, 27 are unfilled." Ex. 131, *available at* https://dhhr.wv.gov/News/2023/Pages/DHHR-Unveils-Major-New-Initiative-to-Strengthen ProtectiveServices.aspx#:~:text=As%20of%20December%2031%2C%202022,need%20of%20these%20critical%20services.%E2%80%9D | |

| 21. | According to data tracking caseloads that Defendants produced in response to Plaintiffs' Thirteenth Request for Production, in May 2024: 69% of workers across all regions who had at least one case carried a caseload of more than 10 cases; 46% of workers across all regions carried a caseload of more than 20 cases; 31% of workers across all regions carried a caseload of more than 30 cases; 19% of workers across all regions carried a caseload of more than 50 cases; and 8% of workers across all regions carried a caseload of more than 100 cases. This data did not differentiate between workers by title or between child protective and adult protective services workers. All of these caseload reports counted caseloads by families, not children. Ex. 59 (D003113462). | Disputed on several grounds. "Cases" can refer to families or children. YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated. ECF No. 550-13, Tr. 52:10–23; 63:17–24.<br><br>If a case is associated with a worker in PATH, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is associated with all cases assigned to the workers they supervise. Ex. 1, ¶ 9.<br><br>Almost all of the workers who appear to have caseloads of over 100 are either adult protective service workers, or supervisors. *Id*. ¶ 14.<br><br>Legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers. *See id*. ¶ 10.<br><br>For these and other reasons, this is not a report that is used by Defendants in the regular course of business to track, monitor, |
|---|---|---|

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
|   |   | calculate or allocate caseloads. *Id.* ¶ 11. |

| 22. | Defendants' caseload data indicates that, in May 2024, 95% of caseworkers carried mixed caseloads: 86% also had assessments, i.e., investigations; 6% also had provider cases, and 3% handled cases, assessments, and providers. 36% of workers had a caseload of more than 10 cases and more than 6 active investigations. 24% of workers with a caseload of more than 10 cases had more than 12 active investigations. 27% of workers with a caseload of more than 20 cases had more than 6 active investigations. And 17% of workers with a caseload of more than 20 cases had more than 12 active investigations. All of these caseload reports counted caseloads by families, not children. *Id.* | Disputed on several grounds. "Cases" can refer to families or children. YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated. ECF No. 550-13, Tr. 52:10–23; 63:17–24.

"Assessments" or "investigations" and cases are either open or closed; there is no way to view the report Plaintiffs rely on and determine if the assessment or case is "active" such that it requires ongoing, regular casework. For example, legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers. *See* Ex. 1, ¶ 10. Assessments, which are investigations of alleged abuse or neglect, may be complete aside from a supervisor needing to sign a final form or the caseworker needing to finish writing up collateral contacts, and are therefore still open and reflected on this report.

If a case is associated with a worker in PATH, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| | | associated with all cases assigned to the workers they supervise. *Id.* ¶ 9.<br><br>For these and other reasons, this is not a report that is used by Defendants in the regular course of business to track, monitor, calculate or allocate caseloads. *Id.* ¶ 11. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 23. | In response to Plaintiffs' Thirteenth Request for Production, Defendants produced data tracking caseloads from May 2022. This data differentiated between child and adult protective service workers. Only child protective services ("CPS") workers are counted in these calculations. In May 2022, 55% of CPS caseworkers who had at least one case carried a caseload of more than 10 cases. 29% of CPS caseworkers carried a caseload of more than 20 cases. 15% of CPS caseworkers carried a caseload of more than 30 cases. 7% of child services caseworkers carried a caseload of more than 40 cases. All of these caseloads are counted by families, not by children. Ex. 35 (D219816). | Disputed on several grounds. "Cases" can refer to families or children. YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated. ECF No. 550-13, Tr. 52:10–23; 63:17–24.<br><br>If a case is associated with a worker in FACTS, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is associated with all cases assigned to the workers they supervise. Ex. 1, ¶ 9.<br><br>Legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers. *See id.* ¶ 10.<br><br>For these and other reasons, this is not a report that was used by Defendants in the regular course of business to track, monitor, calculate or allocate caseloads. *Id.* ¶ 11. |

| 24. | Defendants' caseload data further indicates that, in May 2022, 33% of workers handled both "cases," and "assessments," i.e., investigations. 4% of workers had a caseload of more than 10 cases and more than 6 active investigations; 2% of workers with a caseload of more than 10 cases had more than 12 active investigations; 2% of workers with a caseload of more than 20 cases had more than 6 active investigations; and 1% of workers with a caseload of more than 20 cases had more than 12 active investigations. All of these caseload reports counted caseloads by families, not children. Ex. 35 (D219816). | Disputed on several grounds. "Cases" can refer to families or children.  YS cases are counted by child, and CPS cases are also counted by child if parental rights are terminated.  ECF No. 550-13, Tr. 52:10–23; 63:17–24.

"Assessments" or "investigations" and cases are either open or closed; there is no way to view the report Plaintiffs rely on and determine if the assessment or case is "active" such that it requires ongoing, regular casework. For example, legal guardianship cases, which do not require ongoing casework as those children have achieved permanency, are also included in this report in the count of "cases" associated with workers.  *See* Ex. 1, ¶ 14. Assessments, which are investigations of alleged abuse or neglect, may be complete aside from a supervisor needing to sign a final form or the caseworker needing to finish writing up collateral contacts, and are therefore still open and reflected on this report.

If a case is associated with a worker in FACTS, that case will appear on their "workload" and be reflected in the case counts in the report relied on by Plaintiffs here. This is the case regardless of the role a worker has. For example, this report reflects cases associated with workers regardless of if the worker is a primary or secondary worker, if the worker is a case aide associated with the case to help with entering documentation; or if the worker is a supervisor, who is |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| | | associated with all cases assigned to the workers they supervise. *Id.* ¶ 9.<br><br>For these and other reasons, this was not a report that is used by Defendants in the regular course of business to track, monitor, calculate or allocate caseloads. *Id.* ¶ 11. |
| 25. | DoHS caseworker and agency executive emails discuss caseloads higher than nine children. | |
| 25a. | Laurea Ellis forwarded an email to Jeffrey Pack, Commissioner of the Bureau of Social Services, on November 3, 2023. Ex. 107 (D001803593 at D001803593). In the forwarded email, Daniel Lefeber, CPS Supervisor, emailed Laurea Ellis that "supervisors need to be cross-trained. Assessment supervisors need to be able to respond to ongoing and even youth services. I am learning for myself how unprepared I am to deal with ongoing/youth services. And not to gloat, but I worked Ongoing for over a year and I am a pretty quick learner; nevertheless, I do not know a lot of things and often feel inadequate (this is especially true in regards to PATH and permanency). I can only imagine how unprepared Rachel Napier in Jefferson County is right now. Or Marla McQuown (ongoing supervisor carrying 100+ cases) in regards to assessments or things outside her wheelhouse." *Id.* | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 25b. | In an email dated June 28, 2023, Jeffrey Pack forwarded an email to Laurea Ellis from Sarah Zickefoose, Protective Services Worker, that stated, "I find it very belittling to be basically told in an e-mail that it is expected that we put our jobs before our children." "I carry the highest caseload in Jondrea's district with 57 open ongoing cases between Upshur and Lewis County. This is not the highest that my caseload has been, I carried over 70 cases for two months;" "In April 2023, the ongoing worker in Upshur County transferred to a new position which left me being the only ongoing worker in both counties carrying a caseload of 76, over 120 kids to see monthly." Ex. 89 (D388075) at D388075-76. Laurea Ellis testified that, "I mean in a situation with 120 kids absolutely that does seem excessive." Ex. 10, Laurea Ellis Dep. Tr. at 86:4-6. | Undisputed only to the extent that this is an accurate transcription of the email, with the clarification that Ms. Ellis was responding to a hypothetical question that asked "if this caseworker did in fact have a caseload of 76 cases [with] over 120 kids to see monthly, would you think that was an acceptable caseload," and she answered "[t]here is not a yes or no;" "there is not a right or wrong answer;" "I don't know the variables that were there;" and "I would be surprised if there is not [supervisor] assistance." ECF No. 550-10, Tr. 85:20–87:1. |
| 25c. | On June 8, 2023, Melanie Urquhart wrote to Judge Joanna Tabit that "As you are aware, the sheer volume of cases on specific workers is too much to effectively manage." Ex. 136 (D001437529 at D001437529). The letter discussed a plan that cases for court caseworkers in Kanawha County would be reorganized so that workers will have around 30 cases each. *Id.* She states that "Previously, some workers carried upwards of 60 cases, with as many as 90 children." *Id.* Urquhart testified that this plan was never implemented. Ex. 12, Melanie Urquhart Dep. Tr. at 64:21-23. | Disputed to the extent the statement suggests that the plan was not implemented due to DoHS inaction rather than objection of the Kanawha County courts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 25d. | In an email dated April 5, 2023, Laurea Ellis emailed Cammie Chapman, Deputy Secretary of DHHR, and Jeffrey Pack that "the current worker assigned to Morgan County has 20 CPS court cases and 15 YS cases. Comparatively to other counties, this is a dream caseload for workers." Ex. 85 (D001434002 at D001434002). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 25e. | In an email dated March 29, 2023, Circuit Court Judge Bridget Cohee emailed Cammie Chapman that "Judge Redding has one ongoing worker [] and I have one ongoing worker [], both of whom are assigned well over 100+ cases to manage." Ex. 85 (D001434002) at D001434004. Judge Cohee stated that "Because of the extreme workload for the ongoing workers, the workers are unable to keep up with inputting case information in PATH, such as assessments, which PATH requires be input before allowing a Case Plan to be created." *Id.* at D001434005. "We are concerned that when we raise issues in an attempt to get the ongoing workers support, the consequences roll back down onto the ongoing workers." *Id.* | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 25f. | In an email dated November 22, 2022, Jeffrey Pack forwarded an email to Cammie Chapman, and stated, "I fear the [Eastern Panhandle] is collapsing. I have no ideas left." Ex. 78 (D001064924 at D001064924). The forwarded email contained emails from a CPS worker in Jefferson County that stated, "[w]ith no training, no notice (I have already been contacted about cases I know nothing about) and no compensation for literally doing a whole job I have never actually been trained or certified to do...Our challenges are so complex there needs to be drastic intervention. Workers in my county have 50-70 referrals on their caseload and that pales in comparison to the 250 that some of the Berkeley [C]ounty workers have." Ex. 78 (D001064924 at D001064924-D001064925). | Undisputed only to the extent that this is an accurate transcription of the email. Since 2022, Defendants have implemented several caseworker recruitment and retention initiatives specifically targeting the Eastern Panhandle, *see, e.g.*, ECF No. 533-3, ¶¶ 9, 17. |
| 25g. | In an email dated May 22, 2022, Laurea Ellis emailed front line staff that "Youth Services currently has four staff that are trying to manage 172 cases, 74 which are placement cases and require monthly visits and five counties of court hearings and MDT cooperation." Ex. 75 (D546066 at D546067). "Child Protective Service currently has 13 fully functioning staff that are managing 242 kids in custody, multiple courts cases and an investigation backlog that must be cleared in the very near future. The Court unit is responsible for seeing the children in custody and currently is staffed with four people. Investigations are non stop and staffed are required to make contact with every child victim within 72 hours." *Id.* | Undisputed only to the extent that this is an accurate transcription of the email. Since 2022, Defendants have implemented several caseworker recruitment and retention initiatives, *see, e.g.*, ECF No. 533-3, and as of May 2024, the Wood/Wirt district had 19 fully functioning CPS workers, and an additional worker in training, out of 25 allocated positions; 3 CPS Senior workers (out of 3 allocated positions), 4 CPS Supervisors (out of 4 allocated positions), 7 fully functioning YS workers (out of 7 allocated), and 2 YS supervisors (out of 2 allocated positions). ECF No. 533-129. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 25h. | In an email dated December 2, 2021, Bill Crouch, then-Cabinet Secretary of DHHR, responded to an email forwarded from Rachel Gifford, a former CPS casework in Kanawha County, that stated "[t]he office is critically understaffed and all carried an over 45 case load with on average 50 children each. There is simply not enough time to do everything required of one worker." Ex. 74 (D001167535 at D001167536). | Undisputed only to the extent that this is an accurate transcription of the email, with the clarification that Secretary Crouch responded: "I have a call into this individual just to tell her that I received her email and that there is help out there. We need to get her the professional help she needs as quickly as possible.  We also need to develop a plan to make folks aware of what is available, and where it is not available, we need to develop those resources."  ECF No. 552-24. |
| 26. | In 2024, Governor Jim Justice declined to allocate additional caseworkers to DoHS. Ex. 7, Cynthia Persily Dep. Tr. at 126:3-20. | Disputed; Governor Justice is not responsible for "allocating" additional caseworker positions; allocating additional caseworker positions generally requires legislative appropriations. Further, as Secretary Persily testified, "the decision was made not to put forward that allocation in the budget [to the legislature] because of the number of vacant positions that we already had. So we had about 85 vacant positions, and we were asking for somewhere around 75 positions. And so the governor's office made the decision that we should place our effort in filling those current vacancies before we allocated additional vacancies."  ECF No. 550-7, Tr. 126:3–20. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 27. | The 2022 Workload Study Report found that 697 total CPS caseworkers were estimated as needed, compared to 533 CPS caseworkers which were allocated to West Virginia. Ex. 37 at 75 (D001618651 at D001618726). | |
| 28. | The 2022 Workload Study Report found that 697 total CPS caseworkers were estimated as needed, compared to 533 CPS caseworkers which were allocated to West Virginia. *Id.* | |
| 29. | The 2022 Workload Study Report found that 697 total CPS caseworkers were estimated as needed, compared to 533 CPS caseworkers which were allocated to West Virginia. *Id.* | |
| 30. | The PIP states, "[t]he continual loss of staff increases the workload of remaining staff and leads to job dissatisfaction, low morale, and burnout. The constant churning of staff stresses the Department's limited fiscal resources for overtime and increases training costs." Ex. 25 at 13 (D003097564 at D003097576). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 31. | A document titled "Bureau for Social Services Recruitment Efforts and Updates" states that for the time period of July 1, 2023 to January 1, 2024, the turnover rate for employees was 7%. Ex. 143 (D002779838 at D002779839). A document titled "Bureau for Social Services Recruitment Efforts and Updates" states that for the time period of July 1, 2023 to February 1, 2024, the turnover rate was 9%. Ex. 145 (D002779854 at D02779855). A document titled "Bureau for Social Services Recruitment Efforts and Updates" states that for the time period of July 1, 2023 to February 29, 2024, the turnover rate was 10%. Ex. 146 (D002779844 at D002779846). A document titled "Bureau for Social Services Recruitment Efforts and Updates" states that for the time period of July 1, 2023 to March 31, 2024, the turnover rate was 11%. Ex. 52 (D003096794 at D003096796). | Disputed; The documents relied on by Plaintiffs are four of the monthly reports created and distributed by human resources director for BSS as an update on recruitment efforts. *See* ECF No. 549, ¶ 31; Ex. 2, ¶ 6. The report reflects recruitment updates, including vacancy rates and turnover rates, for all full-time equivalent employee positions allocated to BSS (not just CPS and YS positions). *Id.* For example, the January 9, 2024 update includes active recruitment efforts for positions such as "accounting technician 3," "procurement specialist," and "office associate," as well as for CPS and YS positions. *See* ECF No. 555-18. The March 20, 2024 update includes active recruitment efforts for positions such as "accounting specialist (travel coordinator)," and "senior accountant," as well as for CPS and YS positions. *See* ECF No. 555-21. Therefore, the turnover data reflected in these reports do not reflect Defendants' turnover rate with respect to the key positions at issue in this case, which are CPS and YS positions. |
| 32. | Cammie Chapman testified that she was not sure whether the turnover rate of caseworkers had increased or decreased since early 2024. Ex. 9, Cammie Chapman Dep. Tr. at 40:16-41:3. | Disputed. Ms. Chapman testified that her "understanding was that it had decreased, but . . . I would want to confirm the time periods that we're talking about . . . whether we're measuring from January 2024, or are we measuring from some other time period." ECF No. 550-9, Tr. 40:16–41:3. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 33. | In several counties, the same caseworkers handle both Child Protective Services cases as well as Youth Services cases. Ex. 10, Laurea Ellis Dep. Tr at 69:3-7; Ex. 12, Melanie Urquhart Dep. Tr. at 70:12-24. | |
| 34. | Emails discuss staffing shortages and caseloads. | |
| 34i. | In an email dated November 17, 2023, from Jessica Holstein, a spokeswoman for the Department of Health and Human Resources, to Cynthia Persily, a message from Jeffrey Pack stated that "if every worker clears 10 per month, there would remain 577 unfinished referrals. That assumes that nobody ever takes a vacation, calls in sick, or has any other reason to prevent them from completing 10." Ex. 115 (D001809093 at D001809095). | Undisputed only to the extent that this is an accurate transcription of the email, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 34j. | In an email dated November 3, 2023, Laurea Ellis forwarded an email from Daniel Lefeber, CPS Supervisor, to Jeffrey Pack that stated "[t]he office is always tense. Everyone is worried about making a mistake. There is a lot of pressure. This causes some paralysis and may even lead to unethical behavior. This applies to nearly everyone including supervisors. A lot of it is lack of knowledge, confidence, and resources. There are unclear role expectations. Everything is so fluid and at times inconsistent that no one knows what their role is within the team. The team is inefficient. There is a significant gap in supportive staff. When supportive staff leave, it leaves a service/activity unfilled. There are a number of different tasks/activities that are no longer being done (at least timely)... A lot of staff tell me the expectations are too high. They are unable to meet the expectations. I hear this from the ongoing staff most often. But, I also hear it from our assessment unit as well. New workers are left unprepared and unable to manage the rapidly growing cases. We really need more workers (and subsequently more supervisors). The lack of sufficient numbers of workers leaves children unsafe." Ex. 107 (D001803593 at D001803593 - D001803594.) | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 34k. | In an email dated November 15, 2023, John Lopez, Director of the Office of Constituent Services, stated to Cynthia Persily that "[e]verything has gone downhill over the past year. In my opinion, the only three things that can be blamed are 1. phone system, 2. County Offices not doing their jobs and 3. Change in leadership at the Bureau for Family Assistance (they need to hold their staff accountable and fill their vacancies)." Ex. 111 (D002919471 at D002919471). | Undisputed that this is what the email states, but disputed that the email discusses foster children.<br><br>Mr. Lopez appears to be discussing the adult clients of the Bureau of Family Services, which does not serve foster children. |
| 34l. | In an email dated July 24, 2023, Jeffrey Pack and Laurea Ellis, received an email from Roann Bosley, Social Services Manager, that stated "[m]y workers are exhausted...they work non stop. They work every Saturday. They are literally living to work not working to live. Their overtime is through the roof. Our current overtime average for the year is 117 hours per week." Ex. 91 (D391067 at D391067). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 34m. | In an email dated July 26, 2019 and titled "RE: CPS Staffing Request - July 2019 FW: Message from KM_C458," Linda Watts, then-Commissioner for the Bureau for Children and Families, remarked to Tanny O'Connell, Deputy Commissioner for Regions I and III, and Tina Mitchell, Deputy Commissioner for Regions II and IV, that "[t]urnover is the main issue in many counties and caseloads." Ex. 63 (D001846443 at D001846443). | Undisputed only to the extent that this is an accurate transcription of the email.<br><br>Since 2019, Defendants have significantly decreased turnover. Between 2021 and 2023 the turnover rate for CPS and YS positions decreased from 34.1 percent to 22.3 percent. *See* ECF No. 533-3, Att. C. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 34n. | In an email dated May 21, 2021, Jeremiah Samples emailed to Bill Crouch, then-Cabinet Secretary of DHHR, "[o]ur vacancy rates are above 20% and those workers remaining have caseloads that are entirely too high to effectively manage. This is in some ways shielded because we use a ratio based on case vs child and that doesn't account for large families of very troubled children that have diverse needs. This has translated into shortcuts and triage practices that leave our critical partners in the Courts, prosecutor offices, provider community and amongst foster parents doing without information or even returned calls in crisis." Ex. 68 (D001073022 at D001073023). | Undisputed that this is what the e-mail states, with the clarification that Secretary Crouch responded "Where we can identify the problems, let's move quickly to fix them. . . .  [W]e vow to keep improving the system, which is what we are doing."  ECF No. 552-19, at D001073023. |
| 35. | Various exit reports from 2022-2024 discuss staffing shortages and high caseloads. | |
| 35o. | An Exit Report from December 7, 2023 for Wood/Wirt District states , "There are currently eleven dedicated intake assessment staff, with one vacant position. To reduce their backlog, all staff were assigned some of the backlog. The District staff continues to work weekends and overtime to decrease the backlog... The District also has a total of three CPS Senior positions with all three filled. Other duties of the CPS Senior position include mentoring new workers. They will accompany new workers as needed on assessments/cases and be the go-to person should the worker have questions. They carry a full caseload, due to the volume of open cases in the District." Ex. 47 (D002212505 at D002212506, D002212518). | Undisputed but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class.  While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit.  *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 35p. | An Exit Report from August 14, 2023 for the Mason/Jackson/Roane/Calhoun District states, "Supervisors also have weekly meetings with workers to discuss caseloads and any issues. Supervisors offer to type up assessments if needed and reassign intakes if the worker becomes overwhelmed. At the time of review, ongoing workers are carrying caseloads of 30-40 cases... The District reported that there are service providers in the area; however, these agencies are experiencing issues with staffing, as they are seeing a turnover in employees." Ex. 45 (D001773616 at D001773634, D001773635). | Undisputed, with the clarification that "service providers" does not refer to DoHS staff. |
| 35q. | An Exit Report from February 17, 2023 for the Berkeley/Jefferson/Morgan District states, "The District has had extreme staffing deficits during the period under review... At the time of review, ongoing workers are carrying caseloads of 30-40 cases..." Ex. 41 (D001054949 at D001054970, D001054971). | |
| 35r. | An Exit Report from February 3, 2023 for the Lewis/Upshur/Braxton District states, "The supervisor expressed being aware that thorough ongoing assessments are not being completed due to the low staffing issues, along with staff travel demands to ensure children in placement are being seen." Ex. 40 (D001051220 at D001051227). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 35s. | An Exit Report from September 23, 2022 for the Monongalia/Marion District states, "For this item, the District discussed their concerns with the DPQI members that there was more casework being completed by their staff than what they were documenting. They further attributed this to the size of caseloads and lack of adequate staff... Marion County management reported that, at the time of our review, all ten CPS positions in that County are expected to carry Court, Non-Court, and Youth Services cases due to their lack of staffing." Ex. 38 (D002211858 at D002211862, D002211880). | |
| 35t. | An Exit Report from August 4, 2022 for the Mingo District states, "District staff advise there is only one formal safety provider in the District, and they are also experiencing staffing issues which delays and/or prevents them from accepting new referrals...District supervisors indicated it has been difficult to manage their own caseloads and complete supervisor duties." Ex. 36 (D001443162 at D001443164, D001443177). | Undisputed, with the clarification that a "formal safety provider" does not refer to DoHS staff. |
| 35u. | An Exit Report from July 1, 2022 for the Randolph/Tucker District states, "The District has been short staffed for many months, and this has created increased caseloads for workers that remain. The caseload size was reportedly not manageable for workers to see all the children assigned to them...District Management staff reported that staffing has been an issue for much of this review period." Ex. 34 (D002212061 at D002212074, D002212070). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 35v. | An Exit Report from April 5, 2022 for the McDowell District states, "The District reports it has been difficult not being fully staffed during the period under review." Ex. 32 (D001140508 at D001140510). | |
| 35w. | An Exit Report from January 20, 2022 for the Marshall/Wetzel/Tyler District states, "The CPS Senior also has a caseload due to shortage of staff...Services are not starting with families as requested. Providers are having staffing issues." Ex. 29 (D001139110 at D001139126, D001139125). | Undisputed, with the clarification that "providers are having staffing issues" does not refer to DoHS staff. |
| 36. | Former Secretary of DHHR, Bill Crouch, testified regarding caseloads: | |
| 36x. | When asked, "do you know whether or not the caseload standards for children in foster care were by child or by family?" Bill Crouch testified that he did not know. Ex. 15, Bill Crouch Dep. Tr. at 31:9-15. | Undisputed, with the clarification that the question was not about West Virginia and that Mr. Crouch retired in 2022 and has not been employed by DoHS since then. ECF No. 550-15, Tr. 31:9–15. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 36y. | When asked, "did people continue to tell you that there was a serious problem? That is people in positions of authority, did they continue to tell you there was a problem with lack of caseworkers?" Bill Crouch testified "Oh, certainly, yes. That was a continuous problem." *Id.* at Tr. 39:8-14. | Undisputed, with the clarification that when asked what he did with regard to dealing with that problem, Secretary Crouch responded that he asked "Jeff Pack to begin to evaluate the regional offices and why there was turnover.  I tried to get additional salary increases . . . I am the one who found additional money, 2 percent, and an additional 3 percent to increase salaries.  And I went to human resources at the state level, personnel office, to try to get an exception to get another 5 percent for employees."  ECF No. 550-15, Tr. 39:15–40:6. |
| 36z. | When asked, "were you aware of the fact that there were workers dealing with children in custody who had more than 30 children on their in-custody caseloads?" Bill Crouch testified that "I may have been told that. My recollection is kind of vague on the specifics there. But I do recall having some discussions with regard to very high caseloads with some workers." Ex. 15, Bill Crouch Dep. Tr. at 41:21-42:5. Bill Crouch also testified to awareness of "exceptionally high caseloads." *Id.* at Tr. 42:17-18. | Undisputed, with the clarification that Mr. Crouch referred to "someone" who had "exceptionally high caseloads" and "my recollection on that has to do with moving resources to those areas that needed it."  ECF No. 550-15, Tr. 42:17–42:21. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 36aa. | When asked, "[d]id you at any time during your tenure as secretary require DHHR to maintain information on the number of children on workers' caseloads?" Bill Crouch testified "No." Ex. 15, Bill Crouch Dep. Tr. 43:7-11. When asked "[d]o you think it was important to know that," Crouch responded, "[w]ell, certainly." *Id.* at Tr. 43:14-16. | Undisputed, with the clarification that Mr. Crouch was referring to whether DHHR maintained aggregated reports on the number of children on workers' caseloads and said that knowledge about the number of children on workers' caseloads was important "down at the commissioner level. Down at the day-to-day level, certainly." ECF No. 550-15, Tr. 43:16–43:18. |
| 36bb. | Bill Crouch testified that "[c]learly, we were making improvements in child welfare. I would put what West Virginia did during that three- or four-year period [up to 2022] up against any state in the country [...] So I think we were doing extremely well at that point." *Id.* at Tr. 47:7-19. | Undisputed, with the clarification that the full quote ends "in terms of the increases in salaries, the increases in benefits for child welfare workers." ECF No. 550-15, Tr. 47:12–47:13. |
| 36cc. | Bill Crouch testified that, with regard to caseworker turnover, "I put what we do in West Virginia up against any state in the country." *Id.* at Tr. 76:20-22. | Undisputed that the statement accurately quotes part of the deposition transcript, with the clarification that the question was about caseworker turnover, and with the clarification that Mr. Crouch's full answer included: "We increased positions. We increased the number of people working in CPS. We increased salaries. We added benefits. We added a career ladder. We did a great deal." ECF No. 550-15, Tr. 76:20–77:2. |
| 37. | Defendants' proposed expert, Uma Ahluwalia, also testified regarding caseloads: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 37dd. | Uma Ahluwalia was asked whether she thinks it is important to "look at how many children a worker has responsibility for," and she testified "[y]es." She testified, "If caseloads are really large, workers cannot do some of the most important tasks, visitation, case planning, connection to services. It's important, extremely important." Ex. 14, Uma Ahluwalia Dep. Tr. at 18:18-25. | |
| 37ee. | When asked, "[i]s it important in assessing a system to know whether there are enough caseworkers to be able to manage their jobs?" Uma Ahluwalia responded, "Yes." Next, when asked, "[d]id you do that in West Virginia?" Ahluwalia responded, "[n]o. So, again, like I said, when we went in, the vacancies were very high. The caseloads were very high." *Id.* at Tr. 23:18-25. | Undisputed, with the clarification that the statement refers to Ms. Ahluwalia's first visit in 2021, and she went on to explain "that when we came back a second time [after the] case ha[d] been going on for some time, . . . they were starting to turn the ship with their workforce needs. They were hiring people. They were training their staff, but the impact wasn't evenly being felt in the field yet. But from our perspective for this report, they were taking all the right steps, recruitment bonuses, retention bonuses, creating an additional category, a tier[ed merit] system, improving salaries . . . paraprofessional roles being created. So the system was taking the steps it needed to take to stabilize their workforce needs. And that's what this report captures, not the individual caseload numbers because that's the level at which this report sits." ECF No. 550-14, Tr. 23:23–2:24. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 37ff. | When asked, "[d]o you know that West Virginia counts caseloads for children in custody as by family, not by children?" Uma Ahluwalia responded that "I don't believe I know that. This is number of children." When asked, "[s]o you're looking through your report which is fine. So were you not aware of that?" Ahluwalia responded, "[n]o, I don't believe so. Our entire analysis is based on children." When asked, "[s]o you didn't know that?" Ahluwalia responded that she "didn't know that." When asked "when you're talking about caseloads, you're talking about reducing the number of families, not the number of children workers are responsible for? And if you knew that, would that affect your positions of the agency? Ahluwalia responded that "I do not know enough to give you an answer on that question." *Id.* At Tr. 51:4-25. | Undisputed, with the clarification that Ms. Ahluwalia added "There's a certain elegance to having a whole family approach to caseloads, the engagement of parents. The siblings are kept together. The case is threaded together. So it depends on how well it's working in the field . . . Having a whole family approach can have a lot of value[.]" ECF No. 550-14, Tr. 52:1–52:5, 52:8–52:9. And Ms. Ahluwalia also made clear that the scope of her report was not to capture " the individual caseload numbers because that's the level at which this report sits." *Id.* Tr. 23:23–23:24. |
| 37gg. | Uma Ahluwalia testified, "If a worker has 30 children, that would be of concern," and when asked, "[d]oes that have an effect on the safety of children?" Ahluwalia responded, "[i]f caseloads are high, workers cannot execute policies with fidelity or expectations with fidelity." *Id.* At Tr. 58:3-13. | |
| 37hh. | Uma Ahluwalia testified "If caseloads are high, then the workers cannot do everything that is required of them including visits in a timely manner." *Id.* at Tr. 59:25-60:2. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 37ii. | Uma Ahluwalia testified that her analysis of the system was "to examine policies for reasonableness" and that "we did not look at case practice." *Id.* at Tr. 11:13-20, 12:5-16. | Undisputed, with the clarification that Ms. Ahluwalia added "we examined policy and then we examined how policies were being implemented in the field, like how direction was provided and supervisors who support it in the infrastructure for implementation of policy," ECF No. 550-14, Tr. 13:1–13:4, and Ms. Ahluwalia testified that she examine data about the performance and improvements of the system to arrive at her opinions. *See, e.g., id.* Tr. 17:1–3, 14:4–6, 33:3–10. |
| 37jj. | Uma Ahluwalia testified that caseloads are "extremely important" because "[i]f caseloads are really large, workers cannot do some of the most important tasks, visitation, case planning, connection to services," but that she did not look at caseloads. *Id.* at Tr. 18:22-19:5. | |
| 37kk. | Uma Ahluwalia testified that she has experience with child welfare systems in which the policies were reasonable, but the practices were not. *Id.* at Tr. 21:9-14. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 37ll. | Uma Ahluwalia testified that her assessment was "based on the content and substance of the policies." *Id.* at Tr. 29:12-16. | Undisputed that the statement accurately quotes part of the deposition transcript, except to the extent that the statement suggests Ms. Ahluwalia's opinions are based only on the content and substance of the policies. Ms. Ahluwalia testified that "[t]he purpose of this section of the report is really to talk about recruitment, retention and training practices and that's what we've done.  And if you read that section and the strategies engage in, it is my conclusion that they are doing the things they need to do to address the challenges that they having with recruitment and retention."  ECF No. 550-14, Tr. 30:1–30:15.  Ms. Ahluwalia also testified that "we examined policy and then we examined how policies were being implemented in the field, like how direction was provided and supervisors who support it in the infrastructure for implementation of policy," *id.*, Tr., 13:1–13:4, and that she examined data about the performance and improvements of the system to arrive at her opinions. *See, e.g.*, *id.*, Tr., 17:1–3, 14:4–6, 33:3–10. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 38. | Jeremiah Samples testified that "a major problem and a consequence of our lack of CPS workers" was "[t]hat it was taking our workers too long to get out and do investigations." He testified that this remained a serious issue when he left in April 2022, and that it remains a serious issue today. Ex. 4, Jeremiah Samples Dep. Tr. 162:3-163:10. | Undisputed with the clarification that Mr. Samples stated that he "believe[s] it remains a serious issue," but ultimately irrelevant, as the subject matter involves assessments of children not in custody.  ECF No. 550-4, Tr. 162:3-163:10.<br><br>Children not in custody are not members of the class.  While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit.  *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). |
| 39. | The Children's Mental Health and Behavioral Health Services Quality and Outcomes Report Addendum ("Outcomes Report") states that "[c]aregivers expressed frustration with turnover as a barrier to progress, reporting a lack of consistent communication with providers, such as social workers, would change." Ex. 53 (D003113835 at D003113847). | Disputed to the extent it suggests any caregivers have this opinion beyond the small number of caregivers who responded to the surveys referred to in the document. Ex. 4, at D002771368–69. |
| 40. | DHHR's own PIP states that "[i]nsufficient staff levels directly impact the ability of the agency to assess child safety, ensure appropriate assessment and service provision, and engage families in the casework process." Ex. 25 at 13 (D003097564 at D003097576). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 41. | The 2022 Workload Study Report collected feedback from caseworkers regarding training. Workers reported that "new hires are unprepared for fieldwork post-training, [and] time constraints of more tenured staff limit the potential for them to mentor new hires." Ex. 37 at 26 (D001618651 at D001618677). | Disputed to the extent the statement suggests that the Workload Study Report collected feedback from all caseworkers or that the quotation reflects the opinion of more than the very small number of caseworkers who shared that opinion, ECF No. 551-12, at D001618659, D001618677. |
| 42. | An October 12, 2023 email from Jessica Holstein to Jeffrey Pack stated, "As of August 25, 2023, referrals pending over 30 days due to ongoing investigation is...approximately 3,200 statewide." Ex. 102 (D001797384). | Undisputed only to the extent that this is an accurate transcription of the email, but irrelevant, as the subject matter mostly involves assessments of children not in custody.  Only the reference to "children in placement are being seen" refers to foster children.<br><br>Children not in custody are not members of the class.  While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit.  *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 43. | DoHS's 2024 APSR states that with regard to timeliness of investigations, "[t]he primary reason for missed timeframes given by caseworkers is caseload size. The primary rationale given for missed timeframes by district level management staff is insufficient staffing levels. Staffing levels during the period under review have a dramatic impact on how well districts perform. Districts with high staff turnover rate score significantly lower on all measures. The lack of staff results in the failure to initiate investigations into child maltreatment in a timely manner. It also creates a backlog of assessments that have not been documented and cleared." Ex. 48 (D002229660 at D002229698). | Undisputed only to the extent that this is an accurate transcription of the email, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |
| 44. | Melanie Urquhart testified that backlogs are when an assessment or investigation has not been completed within 30 days. Ex. 12, Melanie Urquhart Dep. Tr. at 19:5-11. She stated that as of June 2024, the backlog for the Southern Region was 1,300. *Id.* at Tr. 20:6-9. Within these referrals, it is possible that there are referrals for which no face-to-face has been completed. Id. at Tr. 33:10-13. Ms. Urquhart testified that "staffing shortages is always a contributing factor to backlog." Id. at Tr. 40:2-3. She further testified that the delay in initial contacts on a referral could potentially place a child at risk of harm and that she was aware of instances in which children were not seen within the designated time frames and were harmed. *Id.* at Tr. 34:8-16. | Undisputed only to the extent that this is an accurate transcription of the testimony, but irrelevant, as the subject matter involves assessments of children not in care.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |
| 45. | Various exit reports from 2022-2024 discuss the impacts of staffing shortages and high caseloads: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 45mm. | An Exit Report from September 21, 2023 for the Barbour/Preston/Taylor District states, "The lack of staff and caseloads being high was described as the main reason for timeframes not being met... The staff and management identified that barriers to frequent and quality contacts included the lack of staffing over the last year." Ex. 46 (D002212691 at D002212692, D002212706). | |
| 45nn. | An Exit Report from August 2, 2023 for the Boone/Lincoln/Putnam District states, "The District reported that because of staffing shortages, case transfer meetings have not occurred in a timely manner. District workers are also maintaining higher caseloads... With staffing vacancies during the period under review, the district placed more emphasis on court and front-end investigative work." Ex. 44 (D002212776 at D002212779, D002212786). | |
| 45oo. | An Exit Report from June 2, 2023 for the Greenbrier/Monroe/Pocahontas/Summers District states, "[t]he Regional Program Manager (RPM) commented that supervisory staff in the District are unable to be proactive. This is due to staffing issues and supervisors carrying their own caseloads; therefore, they are limited in their ability to work with and develop staff." Ex. 43 (D001048754 at D001048756). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 45pp. | An Exit Report from March 6, 2023 for the Fayette District states, "Two of the allocated positions are CPS Senior Workers, both positions are filled, however the District has not been able to utilize them in the role as designed, due to the staffing issues over the last year." Ex. 42 (D002212458 at D002212475). | |
| 45qq. | An Exit Report from January 4, 2023 for the Calhoun/Gilmer/Wirt District states, "The Gilmer County Social Service District Manager stated that she is experiencing similar staffing issues for their county... She explained that due to lack of staff their county does not have a "Plan B" right now...They feel that their workers understand the importance of meaningful contact but with the vacancies and large caseloads this prevents workers from having and documenting their contacts with children." Ex. 39 (D002212088 at D002212089, D002212103). | |
| 45rr. | An Exit Report from June 2, 2022 for the Kanawha District states, "Foster Parents are invited to IEPs, but staff is unable to attend IEPs due to staffing issues and lack of time... As stated earlier, management staff feel that staffing issues have played a major role in the outcome of the review. They are losing workers who do not want to leave the agency but cannot keep up with the work and are at their 'breaking point.'" Ex. 33 (D002212033 at D002212047, D002212050). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 45ss. | An Exit Report from February 7, 2022 for the Harrison District states, "Case load size was noted to be a challenge or barrier by the workers that prevents them from being able to spend the time with individuals that they feel is necessary to complete adequate, thorough assessments." Ex. 31 (D001138660 at D001138670). | |
| 45tt. | An Exit Report from January 24, 2022 for the Wayne District states, "The District also saw a delay in the home study process due to a lack of staffing and participation of the prospective foster parents. These delays made it difficult to move forward with permanency." Ex. 30 (D002212181 at D002212193). | |
| 46. | Defendants' Division of Planning and Quality Improvement ("DPQI") performs reviews of sample cases every month, which are discussed in Exit Reports. Def. Undisputed Facts, ECF No. 534 at 10. | |
| 47. | DoHS relies on the DPQI process to identify issues in the child welfare system. *See, e.g.*, Ex. 10, Laurea Ellis Dep. Tr. at 37: 12-15, 38:10-13. | Disputed; Ms. Ellis responded yes to the following question: "If there was an issue identified in the DPQI, you would rely on that as valid in terms of identifying issues." ECF 550-10, Tr. 38:10–38:13. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 48. | In connection with this case, Plaintiffs hired Susan Ault, former Director for Strategic Consulting for Systems Improvement for Casey Family Programs, to evaluate West Virginia's child welfare system. Ex. 6, Expert Report of Susan Ault ("Ault Report"). Ms. Ault worked on systems analysis across the country which included case review. Ex. 6 at 3. | |
| 49. | In connection with the Ault Report, Plaintiffs requested that Defendants produce 105 case files within certain criteria. Ex. 1. Susan Ault reviewed these case files as part of her evaluation. Ex. 6 at 4. | Undisputed, with the clarification that Plaintiffs requested seven (7) 15-case samples from certain populations of foster children, which added up to 105 cases, ECF No. 550-1, and that Ms. Ault did not herself review all 105 case files.  ECF No. 533-29, Tr. 95:20–96:4. |
| 50. | DoHS caseworkers are responsible for visits with children in kinship homes. Ex. 49 (D002230540 at D002230685). | |
| 51. | Laurea Ellis testified, "If you have 25 kids on your caseload – we always had like – you want to have them seen by the 20th . . . lot of caseworkers, they know that they have to see them monthly. They are scrambling the last week of the month. I mean, if you go around, their fleets of vehicles are gone because they are all out trying to do them even though we tell them not to, like planning." Ex. 10, Laurea Ellis Dep. Tr. at 76:20-77:9. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 52. | The 2024 APSR reviewed CFSR Item 14: Caseworker Visits with Child. The APSR showed that caseworker visits with children had decreased from 41.5% in 2018, to 26.40% in 2021, down to 25.60% in 2022. Ex. 48 (D002229660 at D002229759). When looking at only children in placement, West Virginia's compliance with the CFSR went down from 47.69% in 2021 to 40% in 2022. *Id.* at D002229760. The APSR stated, "Reviewed cases show concerning trends which include lack of regular quality contact with children and families, failure to regularly assess for child and family service needs throughout the life of the case, less than optimal service provision to address identified needs, lack of establishment of case plans/goals through engagement of family members, and failure to close cases timely." *Id.* at D002229762. The APSR further stated that the "frequency and quality of contacts is insufficient to evaluate child safety, ensure appropriate assessment of service needs, and determine the efficacy of services provided. DPQI case reviews also note in many cases a lack of service provision to address identified needs." *Id.* at D002229766. | Disputed.  The data included in this section of the APSR is the percentage of cases reviewed by DPQI in which caseworker visits were rated as a "strength," not the number of case visits or whether caseworker visits occurred.  ECF No. 551-23, at D002229759 (table labeled "% of cases rate[d] as a strength").  Several factors are considered in determining that a case visit should be rated as a "strength." *Id.*<br><br>The data included in the APSR is not system-wide but is based on samples of individual districts, and half of the cases reviewed are for children not in care (in home cases).<br><br>The APSR also includes statewide data specific to foster children which shows that "[i]n FFY 2022, 91.31% of the children in foster care in West Virginia were visited during each month, with 64.36% of those visits occurring in the child's place of residence."  ECF No. 551-23, at D002230074. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 53. | The data from Exit Reports showed that caseworker visits with children declined from 28% in 2018 to 19% in 2023. Ex. 6 at 21. Susan Ault found that in 35% of the 105 case files reviewed, caseworkers did not have frequent or adequate visits with children. Ex. 6 at 22. | Disputed. First, the Exit Reports do not report on the number of caseworker visits. Rather the exit reports summarize the percentage of cases reviewed in which caseworker visits were rated a "strength," which involves a number of factors. *See, e.g.*, ECF No. 551-21, at D002212704–05. Second, these summaries include both children in care and children not in care. *Id.* at D002212691. Children not in care are not class members. Third, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations. Fourth, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance. *See* ECF No. 533-15, ¶¶ 27–28. |
| 54. | Defendants' BSS ChildStat Summary of Data from Phase 1, August 2023-January 2024 showed that for visits with children during this 6-month period, on average, visits were made in 6 out of 6 months in only 23% of cases. In 34% of cases, it appeared that visits to children were made in 0 out of the 6 months. Ex. 142 (D002846010). | Disputed. First, the summary shows the results of qualitative reviews conducted by DPQI on a sample of cases that are not statistically significant, does not include a statewide average, and does not reflect system-wide performance. Second, the summary includes both children in placement (foster children) and children in home. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 55. | The APSR evaluated CFSR Item 15: Caseworker Visits with Parents. It found that this percentage had steadily declined from 19.3% at the time of the CFSR in 2017 to 2.44% in 2021 and was only at 3.28% in 2022. Ex. 48 (D002229660 at D002229765). When looking at parents of children in placements, caseworker visits declined from 3.17% in 2021 to 3.23% in 2022. *Id.* | Disputed. The data included in the APSR is the percentage of cases reviewed in which caseworker visits with parents were rated as a "strength," not the number of case visits with parents. ECF No. 551-23, at D002229761 (table labelled "% of cases rate[d] as a strength"). Several factors are considered in determining that a case visit should be rated as a "strength." *Id.* Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |
| 56. | The 2024 APSR noted that "DPQI social services case reviews indicated a low level of quality contacts with parents . . . Data suggests that WV needs significant improvement in the frequency and quality of caseworker contact with parents. Caseworker contacts with parents often occur during MDT meetings and court hearings. The frequency of visits between caseworkers and parents in the family home is not sufficient to engage the parents in the development and evaluation of case goals. The quality of caseworker contacts is insufficient to evaluate the efficacy of service provision and evaluate parental behavioral changes necessary to resolve the child safety issues warranting agency intervention." *Id.* at D002229766. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 57. | The data from Exit Reports also shows that averages of caseworker visits with parents declined from 10% in 2018 to only 3% in 2023. Ex. 6 at 21. In 64% of the 105 case files, caseworkers did not have frequent or adequate visits with parents. Ex. 6 at 22. | Disputed.  The Exit Reports do not report on the number of caseworker visits with parents. Rather the exit reports summarize the percentage of cases reviewed in which caseworker visits were rated a "strength," which involves a number of factors.  *See, e.g.*, ECF No. 551-21, at D002212705–06.  Second, these summaries include both children in care and children not in care.  *Id.* at D002212691. Children not in care are not class members.  Third, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations. Fourth, the exit reports are based on small samples from individual districts of varying sizes and thus do not reflect system-wide performance.  *See* ECF No. 533-15, ¶¶ 27–28. |
| 58. | Defendants produced a document entitled "BSS ChildStat Summary of Data from Phase 1, August 2023-January 2024 shows that visits were only made with caregivers for 6 out of 6 months in an average of 4% of cases and that visits were made 0 out of 6 months in an average of 47% of cases. Ex. 142 (D002846010 at D002846010). | Disputed.  First, the summary shows the results of qualitative reviews conducted by DPQI on a sample of cases that are not statistically significant, does not include a statewide average, and does not reflect system-wide performance.  Second, the summary includes both children in placement (foster children) and children in home. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 59. | Caseworkers are also responsible for planning and scheduling visitation between a child and their biological parent or guardian. Ex. 54 (D003107870) at D003107911. In only 40% of the cases that Ault reviewed, children had adequate and frequent visitation with their mother and in only 37% of the cases, the children had adequate and frequent visitation with their father. Ex. 6 at 17. | Disputed with respect to Ms. Ault's findings. Ms. Ault did not herself review the 105 case files produced, ECF No. 533-29, Tr. 95:20-96:4, and Defendants were not provided with the review tools or review results of actual cases to understand or refute the case reviewers' determination that a visit was "adequate" or "frequent." Given that Ms. Ault testified that the case reviews focused primarily on best practice and meeting federal requirements, Defendants dispute characterization of child-parent visits as "adequate" or "frequent." ECF No. 533-29, Tr. 104:8–104:20. |
| 60. | In the 2024 APSR, DoHS reviewed visits with parents and siblings in foster care (CFSR Item 8) which reviews whether "during the period under review, concerted efforts were made to ensure that visitation between a child in foster care and his or her mother, father and siblings is of sufficient frequency and quality to promote continuity in the child's relationship with those close family members." Ex. 48 (D002229660) at D002229736. The 2024 APSR stated that visits with parents and siblings in foster care had gone down from 45.16% in 2021 to 31.67% in 2022 and was down from 67.74% in 2018. *Id.* at D002229738. | Disputed. The data included in the APSR is the percentage of cases reviewed in which caseworker visits with parents and siblings were rated as a "strength," not the number of visits with parents and siblings in foster care. ECF No. 551-23, at D002229738 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that a case visit should be rated as a "strength." *Id.*, at D002229736. The data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 61. | The 2024 APSR also looked at whether DoHS preserved connections and whether "during the period under review, concerted efforts were made to promote, support, and/or maintain positive relationships between the child in foster care and his or her mother and father or other primary caregiver(s) from whom the child had been removed through activities other than just arranging for visitation." Ex. 48 (D002229743). This item declined from 31.15% in 2021 to 12.07% in 2022. *Id.* at D002229746. | Disputed.  Item 9 of the CFSR (and the APSR) assesses whether DoHS cases reflected a strength in preserving a child's connections (neighborhood, community, faith, school, extended family, Tribe, and friends).  ECF No. 551-23, at D002229738–39.  Item 11 is whether DoHS cases reflected a strength in preserving a positive and nurturing relationship between the child in foster care and the parents/caretakers from whom he or she was removed.  *Id.* at D002229738.<br><br>Item 9 reflected a strength in 83.08% of cases in 2021 and 67.68% of cases in 2022. *Id.* at D002229740.<br><br>The data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 62. | Similarly, the data from Exit Reports shows that Defendants' performance on the promotion of the parent/child bond went down from 54% in 2018 to 12% in 2022 and while it went back up in 2023, it is still only at 32%. Ex. 6 at 18. | Disputed. First, the Exit Reports do not report on the number of parent-child visits. Rather the exit reports summarize the percentage of cases reviewed in which the promotion of the parent-child relationships were rated a "strength," which involves a number of factors. *See, e.g.*, ECF No. 551-21, at D002212700–01. Second, these summaries include both children in care and children not in care. Children not in care are not class members. *Id.* at D002212691. Third, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations. Fourth, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance. *See* ECF No. 533-15, ¶¶ 27–28. |
| 63. | Case plans show strengths, areas that need improvement and set forth goals for the family and services needed to achieve those goals. Ex. 12, Melanie Urquhart Dep. Tr. at 51:23-52:5. | |
| 64. | Case plans are required to be established no later than 60 days after a child enters foster care. Defendants' Undisputed Facts at 10. | |
| 65. | Melanie Urquhart testified that there are issues with case plans not being entered into the PATH System on a regular basis. Ex. 12, Melanie Urquhart Dep. Tr. at 51:5-11. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 66. | Exit Report data shows that West Virginia went from 50% of cases having child and parent involvement in case planning in 2018 to 14% in 2023. Ex. 6 at 14. | Disputed. The Exit Reports do not report on the number of cases having child and parent involvement in case planning, as Ms. Ault surmises. Rather the exit reports summarize the percentage of cases reviewed in which child and parent involvement in case planning was rated as "strength," which involves a number of factors including but not limited to the frequency of visits. *See, e.g.*, ECF No. 551-21, at D00221270104. Second, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations, which in any event are from districts of different sizes so cannot simply be added together without weighting. Third, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance. *See* ECF No. 533-15, ¶¶ 27–28. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 67. | DoHS's 2024 APSR showed that child and parent involvement in case planning went down from 27.42% of the time in 2021 to 17.21% of the time in 2022. Ex. 48 (D002229660 at D002229755). | Disputed.  Item 13 of the CFSR (and the APSR) assesses whether DoHS cases, during the period under review, reflected a strength in exhibiting concerted efforts to actively involve the children and parents/caretakers in case planning activities.  ECF No. 551-23, at D002229753.<br><br>The data includes both children in placement and children not in care.<br><br>Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |
| 68. | Of the 105 case files produced to Plaintiffs for review, 80 of those case files did not have case plans within 60 days (76%), in 84 case files, parents were not involved in the case planning process (80%), and in 65 of those case files, children were not included in the case planning process where appropriate (62%). Ex. 6 at 13. | Disputed. Defendants were not provided with the review tools or review results of actual cases to understand or refute the case reviewers' determination that a case files did not have case plans within 60 days, or that that parents or children were not involved in case planning. Given that Ms. Ault testified that the case reviews focused primarily on best practice and meeting federal requirements, Defendants dispute the characterization of case plans in the case files produced.  ECF No. 533-29, Tr. 104:8–104:20. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 69. | Ms. Ault's report states, "In a substantial majority of the OSRI, cases and Exit Reports reviewed, the cases had no formal case plan. For the most part, parents were not involved in case planning and a significant percentage of the time, the case plans were generated and ordered in court rather than the worker presenting a plan that they had developed with the family." Ex. 6 at 13. | Undisputed that these were Ms. Ault's conclusions; disputed that they have any system-wide validity. |
| 70. | Defendants' "BSS ChildStat Summary of Data from Phase 1, August 2023-January 2024" showed that during this six-month period, children in placements (versus in home cases) only had written case plans in an average of 32% of cases. Ex. 142 (D002846010). | Disputed. The summary shows the results of qualitative reviews conducted by DPQI on a sample of cases that are not statistically significant, does not include a statewide average, and does not reflect system-wide performance. ECF No. 555-17, at D002846010. |
| 71. | Safety and risk assessments are performed during a case to assess whether a child faces a risk of harm and what interventions and services are required. Ex. 6 at 9. The safety assessment should be completed and entered into a family's case file no later than three (3) business days after making an initial face-to-face contact. Ex. 56, CPS Handbook (D003107531 at D003107601). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 72. | The APSR of CFSR Item 3: Risk and Safety Assessments and Management looked at "whether, during the period under review, the agency made concerted efforts to assess and address the risk and safety concerns relating to the child(ren) in their own homes or while in foster care." Ex. 48 (D002229660 at D002229703). The 2024 APSR stated Item 3 decreased from 38.4% in 2021 to 29.6% in 2022. *Id.* at D002229709. When looking at only cases with children in placements (not in-home cases), West Virginia's average decreased from 55.38% in 2021 to 43.08% in 2022. *Id.* at D002229710. | Disputed. The data included in the APSR is the percentage of cases reviewed in which the agency's efforts to assess and address the risk and safety concerns were rated as a strength." ECF No. 551-23, at D002229709 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that this item should be rated as a "strength." *Id.*, at D002229703–04. Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 73. | The 2024 APSR stated, "In most cases reviewed, case reviewers found the child welfare system missed opportunities to intervene in families before safety threats or youth behaviors necessitate foster care entry. Case reviewers found this was due to not actively engaging parents and age appropriate children in the assessment and planning process initially and on an ongoing basis, failure to consistently document information critical to the assessment of child safety and risk, and not consistently tracking identified services throughout the life of the case. Reviewed findings show safety related services placed in the home do not always match the identified safety threat, or referrals for services are not made in timely manner. Protection plans and safety plans are often inadequate to control the factors impacting child safety and/or are not monitored regularly. Protection and safety plans involving informal providers are often found to be inadequate to ensure child safety due to the lack of information and instruction given to the provider and the limited amount of contact between the provider and the caseworkers. Case reviewers found that some informal safety providers were unaware of their role in the case. Case reviews also indicate that safety plans are not being updated as circumstances in the case warrant. The inadequacy of safety planning results in services not being provided at a level sufficient to ensure child safety in the home while parents receive services to achieve behavioral change." *Id.* at D002229711. | Undisputed but irrelevant. The APSR is discussing safety threats to children not in custody.<br><br>Children not in custody are not members of the class.  While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit.  *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 74. | According to a review of Exit Reports, the percentage of Safety and Risk Assessments timely done went from 38% in 2018 to 20% in 2023. Ex. 6 at 10. | Disputed. This data is the percentage of cases reviewed by DPQI in which the agency's efforts to assess and address the risk and safety concerns were rated as a "strength." *See* ECF No. 533-29, Tr. 135:3–136:12. Several factors are considered in determining that this item should be rated as a "strength." *See, e.g.*, Ex. 3, at D002761538–39 (Item 3). Moreover, the data included in the Exit Reports are not system-wide but are based on samples cases in only 12 individual districts each year. ECF No. 533-15, ¶ 27. |
| 75. | According to Exit Reports, in 2018, West Virginia was at 62% in providing needs assessments and services to children and in 2023, West Virginia was at 37%. Ex. 6 at 25. | Disputed. This data is the percentage of cases reviewed by DPQI in which the agency's efforts to complete needs assessments and services were rated as a "strength." *See* ECF No. 533-29, Tr. 135:3–136:12. Several factors are considered in determining that this item should be rated as a "strength." *See* Ex. 3, at D002761578–81 (Item 12A). The needs assessed in this item are not those related to children's education, physical health, and mental/behavioral health (including substance abuse). *See id.* Moreover, the data included in the Exit Reports are not system-wide but are based on samples cases in only 12 individual districts each year. ECF No. 533-15, ¶ 27. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 76. | According to Exit Reports, in 2018, West Virginia was at 42% in providing needs assessments and services to parents and by 2023 was at 15%. *Id.* | Disputed. This data is the percentage of cases reviewed by DPQI in which the agency's efforts to complete needs assessments and services were rated as a "strength." *See* ECF No. 533-29, Tr. 135:3–136:12. Several factors are considered in determining that this item should be rated as a "strength." *See* Ex. 3, at D002761581–84 (Item 12B). Moreover, the data included in the Exit Reports are not system-wide but are based on samples cases in only 12 individual districts each year. ECF No. 533-15, ¶ 27. |
| 77. | The 2024 APSR looked at CFSR Item 12—whether the agency "made concerted efforts to assess the needs of children, parents, and foster parents (both initially, if the child entered foster care or the case was opened during the period under review, and on an ongoing basis) to identify the services necessary to achieve case goals and adequately address the issues relevant to the agency's involvement with the family, and (2) provided the appropriate services." Ex. 48 (D002229660 at D002229747). The case review showed that this item declined from 22.4% in 2021 to 20% in 2022. *Id.* at D002229751. With regard to children in placement, this percentage declined from 33.85% in 2021 to 29.23% in 2022. *Id.* at D002229752. | Disputed.  The data included in the APSR is the percentage of cases reviewed in which assessment, identifications of services, and provision of services was rated as a "strength."  ECF No. 551-23, at D002229749 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that this item should be rated as a "strength."  *Id.*, at D002229749.<br><br>The needs assessed in this item are not those related to children's education, physical health, and mental/behavioral health (including substance abuse).<br><br>Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 78. | The 2024 APSR showed that West Virginia's ability to meet the educational needs of foster children went down from 75% in 2021 to 61.29% in 2022. *Id.* at D002229770. | Disputed.  The data included in the APSR is the percentage of cases reviewed in which assessment, identifications of educational needs services, and provision of educational services was rated as a "strength."  ECF No. 551-23, at D002229768 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that this item should be rated as a "strength." *Id.*, at D002229767–68.<br><br>Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 79. | The data from Exit Reports showed that in 2018, West Virginia was at 88% in terms of meeting educational needs of foster children, but by 2023, the average was at 40%. Ex. 6 at 26. | Disputed.  First, the Exit Reports do not report on the number of cases in which educational needs were met, as Ms. Ault surmises. Rather the exit reports summarize the percentage of cases reviewed in which meeting educational needs was rated as "strength." *See, e.g.*, ECF No. 551-21, at D002212706–07. Second, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations, which in any event are from districts of different sizes so cannot simply be added together without weighting. Third, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance.  *See* ECF No. 533-15, ¶¶ 27–28. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 80. | The 2024 APSR showed that West Virginia's ability to meet the physical needs of children went down from 78.67% in 2021 to 60.53% in 2022. Ex. 48 (D002229660 at D002229772). | Disputed. The data included in the APSR is the percentage of cases reviewed in which assessment, identifications of physical needs, and provision of services for physical needs was rated as a "strength." ECF No. 551-23, at D002229771 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that this item should be rated as a "strength." *Id.*, D002229770–71.<br><br>Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 81. | The data from Exit Reports showed that West Virginia's ability to meet the physical needs of children went down from 79% in 2018 to 53% in 2023. Ex. 6 at 26. | Disputed.  First, the Exit Reports do not report on the number of cases in which educational needs were met, as Ms. Ault surmises. Rather the exit reports summarize the percentage of cases reviewed in which meeting educational needs was rated as "strength." *See, e.g.*, ECF No. 551-21, at D002212707–08. Second, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations, which in any event are from districts of different sizes so cannot simply be added together without weighting. Third, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance.  *See* ECF No. 533-15, ¶¶ 27–28. |
| 82. | The 2024 APSR showed that West Virginia adequately addressed the mental and behavioral health of foster children 59.49% of the time in 2021, but only 25% in 2022. Ex. 48 (D002229660 at D002229775). The APSR stated that "[l]imited quality contacts by child welfare workers results in a lack of agency knowledge regarding the behavioral health needs of children, and limited discussions with parents about obtaining services to address such needs." *Id.* at D002229776. | Disputed.  The data included in the APSR is the percentage of cases reviewed in which assessment of mental and behavioral health needs, identification of services, and provision of services was rated as a "strength."  ECF No. 551-23, at D002229773 (table labeled "% of cases rate[d] as a strength"). Several factors are considered in determining that this item should be rated as a "strength." *Id.*<br><br>Moreover, the data included in the APSR is not system-wide but is based on samples of individual districts. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 83. | The data from Exit Reports showed that West Virginia had the ability to provide for the mental and behavioral health of the child 74% of the time in 2018, which decreased to 20% of the time in 2023. Ex. 6 at 27. | Disputed.  First, the Exit Reports do not report on the number of cases in which educational needs were met, as Ms. Ault surmises. Rather the exit reports summarize the percentage of cases reviewed in which meeting educational needs was rated as "strength." *See, e.g.*, ECF No. 551-21, at D002212708–09.  Second, Ms. Ault did not identify the Exit Reports from which her colleague calculated the percentages included in her report, so Defendants cannot confirm the accuracy of the calculations, which in any event are from districts of different sizes so cannot simply be added together without weighting. Third, the exit reports are based on small samples from individual districts and thus do not reflect system-wide performance.  *See* ECF No. 533-15, ¶¶ 27–28. |
| 84. | Jeremiah Samples testified that child protective services workers were not "prepared in court to convey to judges' recommendation on where a child should be placed or to keep the court and other parties updated properly on the condition of the child, the situation with the child's biological family," and that he discussed this issue with the Ombudsman. Ex. 4, Jeremiah Samples Dep. Tr. at 41:19-42:2. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that Mr. Samples did not testify that he knew this to be true, but rather that he discussed these issues with the Ombudsman. ECF No. 550-4, Tr. 40:18–42:2. |
| 85. | Emails discuss lack of case planning and visitation, and its possible impacts: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 85uu. | In an email chain dated September 12, 2023, caseworker Jessica Embrey emailed Jeffrey Pack discussing a child murdered two years ago leading "to a supervisor and a worker in the office being terminated as well as arrested" and that "I have grave concerns that our office is back on that same path." Jessica Embrey continued that "[t]here have been numerous cases that have resulted in a child being physically injured, raped, bitten by rats, and exposed to further domestic violence since I first brought this to the attention of my superiors a year ago. As of Friday, there have been fifteen cases that I am aware of where children have not been helped, not been seen, and have been left in their homes to suffer further abuse/neglect at the hands of this office." Ex. 100 (D001266583). | Undisputed that the statement accurately reflects the e-mail, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). |
| 85vv. | In an email chain dated November 17, 2023, Jeffrey Pack stated to Laurea Ellis that "I would like a meeting with the distract asap for them to explain why they got a YS referral on 10/13 and didn't make physical contact at all and only made phone contact on 11/6" in what is now the second child suicide in the family." Ex. 113 (D001808695 at D001808695). | Undisputed that the statement accurately reflects the e-mail, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 85ww. | On November 16, 2023, Michelle Dean, Program Manager II of Children and Adult Services Policy, emailed Melanie Urquhart and Jeffrey Pack that she is "inquiring as to what the penalty is if we do not make our face 2 face . . . we frequently miss this threshold." Ex. 114 (D001264761). This email discussed that there were potentially hundreds of contacts that had not been entered into the PATH System by Child Placing Agencies. *Id.* at D001264761. Urquhart agreed that this "would affect the reliability with regard to how many face-to-face contacts are actually occurring." Ex. 12, Melanie Urquhart Dep. Tr. at 49:23-50:3. | Undisputed only to the extent that this is an accurate transcription of the email, with the clarification that Ms. Dean and Ms. Urquhart were concerned that the PATH system was <u>under</u>-reporting the number of face-to-face contacts with foster children.<br><br>Data reporting on the percent of required visits completed in fiscal year 2023 was impacted by the transition to PATH and challenges for Child Placing Agency workers in documenting contact with children I the new system; these issues have now been resolved and DoHS continues to work with the Child Placing Agencies to ensure that visits are made and recorded timely. ECF No. 533-16, ¶ 20. |
| 85xx. | In an email chain dated November 15, 2023, Amanda Gifford, Community Services Manager for Calhoun/Gilmer/Wirt Counties, related the facts of a case, stating, "Since the case began in February...there was no case plan turned in." Ex. 112 (D001809899 at D001809900). The CPS worker was in fact only assigned to the case a week before. Melanie Urquhart responded, "I have to admit I am feeling a bit different about this than I was originally. Do I think Mom should have been terminated, no." *Id.* | Undisputed that the statement accurately reflects the e-mail, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class.  While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit.  *See DeShaney v. Winnebago County,* 489 U.S. 189 (1989). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 85yy. | In an email dated July 13, 2023, Kandy Pudsell, District Manager of Marion County, emailed Rick Parks, DoHS caseworker, and cc'd Laurea Ellis, stating "I think that the field makes every effort to follow policy but workloads and staff turnover contribute to the lack of case planning." Ex. 90 (D535701). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Rick Parks. |
| 85zz. | In an email chain dated June 27, 2023, Beverly Heldreth, North 1 Social Service Manager, emailed Travis McReynolds, Regional Program Manager, that "workload demands are preventing many from getting case plans done. We have to ensure that the everyone gets same training vs varied version." In the same email chain Susan Richards stated that "we discussed the following barriers: Staff are struggling, Caseload sizes, [and] Staff turnover." Ex. 88 (D659731). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Beverly Heldreth and Susan Richards. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 85aaa. | In an email dated October 12, 2022, Sandra Wilkerson, Social Service Coordinator in the Kanawha District Office, emailed Michelle Dean, stating, "When I reviewed 4.6 information collection in CPS policy, we did not specify that parents/caretakers need to be in person…I am thinking that it is assumed that the [CPS] worker would be probably going to the home to interview the children and the parents would be there but the majority of the interviews with kids I reviewed were either at school or at the DHHR." "[O]ne would know good practice would be to interview the parents in person." "Of the 24 that were completed assessments…8 of the assessments are missing interviews with either a parent or caregiver, or another person in the home that should have been interviewed. Another 8 assessments had one or both parents/caretakers being interviewed by phone." Ex. 76 (D400235). | Undisputed that the statement accurately reflects the e-mail, but irrelevant, as the subject matter involves assessments of children not in custody.<br><br>Children not in custody are not members of the class. While DoHS has responsibilities to these children under state law, they are not within the substantive due process obligations under which Plaintiffs have brought suit. *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). |
| 85bbb. | In an email dated November 9, 2021, CPS Supervisor Brittany Harris updates Amanda Spencer stating "[t]he case plans were formulated out of an MDT for the terms and conditions for court. The ongoing assessment tool was more than likely not used because we are playing extreme catch up right now, unfortunately. Just being honest." Ex. 73 (D352523). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinions of Brittany Harris. |
| 86. | Exit interviews and new hire surveys discuss employee views on training: | |
| 86ccc. | A DoHS new hire survey dated April 19, 2024, described workers "not being satisfied with the training." Ex. 52 (D003096794 at D003096797). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 86ddd. | A DoHS new hire survey dated February 13, 2024, stated that "[t]he training is inadequate and does not prepare workers for the job." "I didn't learn very much from training." Ex. 145 (D002779854 at D002779856). | Disputed.  The quoted statements are not in the cited exhibit.  *See* ECF No. 555-20. |
| 86eee. | An email dated October 17, 2023 from Susan Richards contained new hire and exit survey responses, stating, "When I came out of training I quickly realized that I was severely underprepared for what was really happening on the job." "Training should be more hands on and less bookwork. I learned more in the field than on computer training." "I wish the path training was longer and more in-depth and that it was throughout all of training instead of just a week at the end." "Training is not very helpful for my position in particular." Ex. 105 (D001783107 at D001783114). | |
| 86fff. | An email dated August 21, 2023 from Jeffrey Pack contained a 12-month new hire survey response with feedback from several employees: "The training for this job was not helpful at all. It taught me very little [about the actual] job. I had very little idea of what I was supposed to do after getting out of training and getting a caseload." "The training doesn't even begin to explain what needs to be done for the job. I still don't know how to do my job effectively. The workload is too much for one person to handle." Ex. 93 (D383297 at D383303). | |
| 87. | In 2021, the Foster Care Ombudsman, Pamela Woodman-Kaehler, wrote a report concerning the foster community's complaints regarding Child Protective Services. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 87ggg. | "Child welfare practitioners appear to sharply underestimate the impact of the power differential which is not lost on those they serve. [...] Over 90 percent of complaints to the Foster Care Ombudsman Office, including those from practitioners themselves, cite 'fear of retaliation' as a key factor in choosing this means of intervention." Ex. 28 (D001178752 at D001178755). | |
| 87hhh. | "The persistent report of CPS and various other child welfare personnel "not returning text messages or calls timely or at all" crosses all complainant roles (placement providers, biological parents, attorneys, contracted agency workers) suggesting that this is systemic and frequent.[...] The pervasive complaint of not receiving any or timely notices from CPS workers (by mail, text message, or telephone) for multi-disciplinary team meetings or court hearings crosses many complainant roles (placement providers, contracted agency workers, educators, mental health professionals) suggesting this is systemic and frequent. Kinship/relative providers report no access to meaningful after hours/weekend support from CPS unless the centralized intake/hotline unit, not the family, deem the issue sufficiently emergent, which leaves them feeling fearful, angry, and alone. The level of after-hours support is notably deficient compared to that provided by child placing agencies to foster families. CPS workers/supervisors convey sharply differing and often seriously deficient knowledge of applicable policies and community/interagency resources." *Id.* at D001178770. | Disputed.  The statement reflects the opinion of the Ombudsman and Plaintiffs do not cite any evidence to support the truth of the allegations, other than the Ombudsman's statement. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 87iii. | "Complainants from most roles, particularly foster/kinship parents, biological parents/caregivers, and contracted agency personnel routinely report intense reluctance to ask for help, to advocate for children, or to raise a contrary opinion citing distrust and fear of retaliation by CPS personnel. Foster/kinship parents consistently report feeling treated dismissively, condescendingly, and disrespectfully by CPS personnel in public and private settings. Foster/kinship parents report receiving "backlash" and being "thrown under the bus" when others make mistakes, i.e., 'we are an easy target, but the people inside the system cover for each other.'" *Id.* at D0001178772. | Disputed.  The statement reflects the opinion of the Ombudsman and Plaintiffs do not cite any evidence to support the truth of the allegations, other than the Ombudsman's statement. |
| 87jjj. | "Foster/kinship and biological parents report feeling manipulated and inadequately informed about their rights and deceived about CPS process forthcoming. Foster/kinship parents report moves/removals or reunification of children, on short notice when no safety or compliance issues are present, with no understandable explanation, with no transition preparation or plan (directly from fully supervised visitation to unsupervised reunification), and without adequate opportunity to assemble the children's belongings or provide for a proper goodbye." *Id.* at D001178778. | Disputed.  The statement reflects the opinion of the Ombudsman and Plaintiffs do not cite any evidence to support the truth of the allegations, other than the Ombudsman's statement. |
| 88. | DHHR's reaction to the Ombudsman's report: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 88kkk. | Jeremiah Samples emailed Bill Crouch on May 19, 2021, stating that they "needed to own this report. There is no two ways about it- the report reflects badly on child welfare and reenforces what we hear from multiple stakeholders." Ex. 68 (D001073022 at D001073024). He concluded that the Ombudsman report "validated concerns we already had...Ultimately, we have very serious structural and management issues on top of unprecedented need in the state. I believe our response publicly but also internally has to own this or we risk continued terrible outcomes." *Id.* at D001073022. | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinions of Mr. Samples. |
| 88lll. | In response to Jeremiah Samples' May 19, 2021 email, Bill Crouch responded the same day, "we will not own the Ombudsman report." *Id.* at D001073024. | Undisputed with the clarification that Mr. Crouch added: "She is autonomous, separate and distinct from BCF, and for the most part, only hears and deals with the bad stuff. We have a lot of BCF employees out there that do a great job and take great care of our kids. We need to say that.  We need to be positive about what we have done, and what we are doing to improve the system. And we have done a great deal."  ECF No. 552-18, at D001073024. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 88mmm. | Jeremiah Samples testified, "Secretary Crouch at one point had met with the ombudsman and applied pressure about discussion that she may or may not want to have with the legislature." Ex. 4, Jeremiah Samples Dep. Tr. at 32:12-16. In 2022, Ombudsman Pamela Woodman-Kaehler "was called in to Secretary Crouch's office" where Crouch had a conversation with her in "the tone of...a threat, to be very careful about conversations that she had with the legislature and documents that she could release." *Id.* at Tr. 33:22-34:10. | Undisputed that the statement accurately quotes part of the deposition transcript, except with respect to the characterization of the meeting between Ms. Woodman-Kaehler and Mr. Crouch. Plaintiffs do not cite any evidence to support that characterization of the meeting, other than the deposition testimony of Mr. Samples, who was not present at the meeting. |
| 88nnn. | Jeremiah Samples testified that there were "discussions with Ms. Chapman not wanting information released from the ombudsman." *Id.* at Tr. 33:21-23. The ombudsman "was continuing to have issues with Ms. Chapman as it related to gaining access to information, to meetings and disagreements." *Id.* at Tr. 35:13-19. Because of Ms. Chapman, the ombudsman was not provided with data about investigations and screening. *Id.* at Tr. 45:7-13. | Undisputed that this was Mr. Samples' testimony but disputed as to the truth of the statements; Mr. Samples was not present for those "discussions" and qualified his statement with "that was my understanding." ECF No. 550-4, Tr. 32:21–23. |
| 89. | In a decision to terminate a parent's rights to their children, DoHS would make a recommendation to the Court. See Ex. 12, Melanie Urquhart Dep. Tr. at 108: 9-15. DoHS would indicate the Department's position in the case plan even if the Multi-Disciplinary Team (which would include the guardian ad litem and attorney for the parents as well as others) did not reach an agreement. *Id.* at Tr. 112:9-18. | Disputed. Ms. Urquhart testified that "typically" the case plan disposition "represents the entire MDT's recommendation." ECF No. 550-12, Tr. 111:8–112:10. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 90. | The 2024 APSR states that "[d]uring case reviews, caseworkers often report an inability to locate parents with [substance abuse disorders] after their children enter foster care. It should be noted that case documentation often does not support concerted efforts by caseworkers to locate and engage these parents." Ex. 48 (D002229660 at D002229734). | |
| 91. | In response to the question of whether "high caseloads would make it difficult for caseworkers to work with families with substance abuse issues," Cammie Chapman testified "No, not necessarily." Ex. 9, Cammie Chapman Dep. Tr. at 162:5-10. | Undisputed, with the clarification that Ms. Chapman explained "[t]he way the system is designed in West Virginia, it's not the caseworker that has to provide those services. The caseworker is the individual coordinating those services. And so I wouldn't agree with your statement." ECF No. 550-9, Tr. 162:16–21. |
| 92. | In an email chain dated February 7, 2023, Toni Rozanski, Casey Family Programs, emailed Cammie Chapman and Jeffrey Pack that "[t]he time from TPR to finalization of permanent plan (exit from care) takes roughly 11 months slower than National." Ex. 81 (D001067119 at D001067120). In the same email chain, Toni Rozanski emailed that "[t]he time from entering care to TPR in WV is roughly 16 months quicker than National. Ex. 81 (D001067119). | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 93. | In an email chain dated January 25, 2023, Susan Richards requested additional information from Brian Clapier, Casey Family Programs, "about the number of months and ages of children for TPR within one year." In a prior email Clapier states "WV moves more children (more quickly) to TPR when compared to other states. 24% of West Virginia children enter care experience a TPR within 365 days of foster care entry (compared to 6% nationally). 26% of children in foster care in West Virginia at any given point-in-time have experienced a TPR (compared to 18% nationally). West Virginia ranks 45th out of 50 states in this area. 5.8 out of every 1,000 children in West Virginia have experienced a TPR (compared to 0.9 nationally). West Virginia ranks 50th out of 50 states in this area. The median time from foster care entry to TPR is 320 days in West Virginia (compared to 620 days nationally). West Virginia ranks the quickest out of 50 states in this area. The median time from TPR to Adoption is 406 days in West Virginia (compared to 314 nationally). West Virginia ranks 38th out of 50 in this area." Ex. 80 (D001139234 at D001139235-D001139236). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 94. | In an email chain dated November 14, 2022, Michelle Dean stated, "I would be hesitant to agree to this [interview] unless we have some foundational understanding as to why we have a higher rate of TPR than anyone else" and Kendra Boley-Rogers responds that "there would be no way to paint it any way other than negatively." Ex. 77 (D001065329). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinions of Ms. Dean and Ms. Boley-Rogers. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 95. | Jeff Pack testified that "West Virginia terminates [parental rights] at whatever point in the process without regard to whether or not a permanency plan is in place." Ex. 13, Jeff Pack Dep. Tr. at 156:4-6. | Undisputed, with the clarification that Mr. Pack explained "we are not the only players that are involved in making decisions about the outcomes" and "that's what our courts are here to decide, . . . is termination at this point in the best interest [of the child]." ECF No. 550-13, Tr. 156:20–23, 157:16–19. |
| 96. | In an email chain dated December 15, 2022, Lorie Bragg, Director of Program Support, forwarded an email to Jeffrey Pack from Cory Shipplett, DHHR Child Welfare Consultant for the North. Shipplett's email discussed a "complaint" regarding how DHHR handled a case in which parental rights were terminated with respect to four siblings. Shipplett stated, "As I mentioned earlier today by messenger, there are ZERO contacts in the family case. None. I'm sadly numb to reviewing cases with limited contacts but one with no contacts at all that resulted in termination of parental rights? When we denied improvement periods? (and never staffed this of course). I'll be perfectly honest, the parents' attorneys should have appealed. The work on our end is almost non-existent. Which then leads to the next problem, that's quite predictable: the intake worker and the initial ongoing worker for the case are long gone from the DHHR." Ex. 79 (D001064993). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Corey Shipplett. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 97. | In a December 20, 2022 article titled "The 'death penalty' of child welfare: In 6 months, some parents lose their children forever," published in partnership with ProPublica, investigative journalists reported on issues regarding West Virginia's rates and timing of parental rights terminations. The report detailed instances where parents' rights were terminated without adequate investigation regarding their parental fitness and before they were given meaningful opportunities to achieve sobriety from substance use. Ex. 151 (P05598-P05619). | Disputed to the extent the statement suggests that allegations in a new report are factually accurate. |
| 98. | Defendants' emails and documents discuss issues with DoHS's data. For example: | |
| 98ooo. | In an email dated November 17, 2023, Brandon Lewis, Director of the Office of Enterprise Systems, wrote that there was a "list of 185 reports that are either not being uploaded, or uploaded with no data, or data quality errors. Program staff cannot validate the data... I am extremely concerned by this. CW has been operational for 10 months. Data Quality and Data Validation continue to be a problem and honestly should not be this big of an issue today." Ex. 116 (D001770438 at D001770440). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 98ppp. | In an email dated October 16, 2023, Jeffrey Pack emailed Jessica Holstein that "we have pulled 2 different reports filtered the same way and arrived at 2 numbers. We are going to have to engage in a hand count to determine the actual number of active investigations." Ex. 104 (D001797352 at D001797352). | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 98qqq. | In an email attachment dated September 11, 2023, from Eileen Gardner, the CCWIS Monitoring Review Exit Conference Notes stated that "[s]ome users are avoiding using PATH and maintaining external logs to track their work. During some interviews, some users expressed concern that reports from PATH were not accurate." Ex. 99 (D001253709 at D001253711). | Undisputed only to the extent that this is an accurate transcription of the email attachment. |
| 98rrr. | In an email dated March 22, 2023, Marilyn Pearce, Assistant to the Cabinet Secretary for Children's Programs, emailed Michelle Dean that "placement reports are still inaccurate. It's showing 5,702 total youth which is not accurate and multiple placements in STAT home (which is absolutely not correct)." In the same email chain Susan Richards states that "[t]he January 2023 report from PATH shows 1,953 in-state and 25 out-of-state placements, and the February 2023 report shows 1,767 in-state and 0 out-of-state placements." Ex. 84 (D001957797). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 99. | Caseworkers in the field are primarily the ones who are entering data into the PATH system, which contains all information regarding child welfare cases. *See* Ex. 12, Melanie Urquhart Dep. Tr. at 41:8-12. There is no quality assurance plan with regard to this data, and DoHS and BSS rely on CPS workers to enter accurate information. *Id.* at Tr. 41:13-42:5. | Disputed.  Ms. Urquhart testified that "there is not a specific quality assurance plan;" that "CPS workers are held to a standard of accuracy and ethics within their position [s]o they are ultimately responsible for what they enter;" and "[s]upervisors look at cases and see what is being documented."  ECF No. 550-12, Tr. 41:21–42:9. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 100. | The 2021 Ombudsman Report states that "[f]oster parents report receiving little to no information regarding known behavioral history and extraordinary needs of children prior to placement from both CPS and child placing agency personnel. Relatives report being unable to communicate their interest in placement of a child or feeling quickly dismissed by CPS personnel, particularly if they reside out of state." Ex. 28 (D001178752 at D001178774). | |
| 101. | The DoHS Institutional Investigation Unit conducts investigations into allegations of maltreatment in foster care except in non-critical incidents involving children in non-kinship foster family homes. Ex. 2 at 3. For non-critical incidents involving uncertified kinship caregivers, the allegations are investigated by county CPS worker, similarly to how a CPS worker in the relevant county would investigate allegations of abuse and neglect of a child not in DHHR custody. *Id.* | |
| 102. | As of July 2024, 856 foster children were placed in uncertified kinship placements, 11% of the total foster care population. Ex. 148, July 2024 West Virginia Child Welfare Dashboard. | Undisputed, with the clarification that many uncertified kinship families are in the process of becoming certified, which takes time. *See, e.g.*, Ex. 9. |
| 103. | West Virginia's placement stability rates for children in foster care were "excluded due to data quality" from the Children's Bureau's 2024 report on national performance in child welfare. Ex. 147, Children's Bureau, CFSR Round 4 Statewide Data Indicators Workbook, April 2024 (D003112201 at D003112222). | Undisputed, with the clarification that this relates only to data reported after the conversion to PATH and the issue has since been resolved. ECF No. 533-16, ¶¶ 18–19. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 104. | In 2021, the number of foster children who had three or more placements are as follows: | |
| 104sss. | Children in care less than 12 months: 5,563 children, or 9.3%. Ex. 125 Children's Bureau, Child Welfare Outcomes Report Data: West Virginia (D003113126 at D003113135) | Disputed. 5,563 is the total number of children in care less than 12 months, not the number of children who had 3 or more placements. ECF No. 554-25, at D003113135. 90.7% of children in care for less than 12 months had 2 or fewer placements. *Id.* |
| 104ttt. | Children in care 12 to 24 months: 3,851 children, or 24.8%. Id. | Disputed. 3,851 is the total number of children in care 12 to 24 months, not the number of children who had 3 or more placements. ECF No. 554-25, at D003113135. 75.2% of children in care for 12 to 24 months had 2 or fewer placements. *Id.* |
| 104uuu. | Children in care 24 months or longer: 2,472 children, or 50.8%. Id. | Disputed. 2,472 is the total number of children in care 24 or more months, not the number of children who had 3 or more placements. ECF No. 554-25, at D003113135. 49.2% of children in care for 24 months or longer had 2 or fewer placements. *Id.* |
| 105. | In 2017, the numbers of foster children who had three or more placements are as follows: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 105a. | Children in care less than 12 months: 5,947 children, or 9.0%. Id. | Disputed.  5,947 is the total number of children in care less than 12 months, not the number of children who had 3 or more placements.  ECF No. 554-25, at D003113135.  91% of children in care for less than 12 months had 2 or fewer placements.  *Id.* |
| 105b. | Children in care 12 to 24 months: 2,994 children, or 24.0%. Id. | Disputed.  2,994 is the total number of children in care 12 to 24 months, not the number of children who had 3 or more placements.  ECF No. 554-25, at D003113135.  72.9% of children in care for 12 to 24 months had 2 or fewer placements.  *Id.* |
| 105c. | Children in care 24 months or longer: 1,612 children, or 57.8%. Id. | Disputed.  1,612 is the total number of children in care 24 months or longer, not the number of children who had 3 or more placements.  ECF No. 554-25, at D003113135.  42.2% of children in care for 24 or more had 2 or fewer placements.  *Id.* |
| 106. | West Virginia has lacked an adequate array of foster homes since as early as 2002. Ex. 17 Final Report, West Virginia Child and Family Services Review, U.S. Dep't of Health and Human Services Administration for Children and Families (October 2002) (D003152 at D003183). | Disputed, and "adequate array" is vague and ambiguous.  *See*, *e.g.*, ECF No. 533-75. |
| 107. | The 2019 PIP states that "an overreliance on shelter care and a lack of resource homes in the state contributes to instability of foster care placements." Ex. 25 at 23 (D003097564 at D003097586). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 108. | In a May 14, 2021 email, Linda Watts, forwarded an email to Terri Miller, which included information regarding issues with housing foster children in emergency shelters. The forwarded email stated that "residents sometimes are in the shelter for months." Ex. 67 (D814024). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 109. | In a May 19, 2021 email, Jeremiah Samples wrote to Bill Crouch, "We still have way too many workers staying hotels and county offices with kids. We still have too many kids that get stuck in placements because we have no where else to send them but out of state." Ex. 68 (D001073022 at D001073023). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 110. | In 2022, Sandra Wilkerson testified that "[t]here is a lack of foster care beds, but there's also a lack of beds for children that might have behavioral issues or even emergency care beds in shelters, shelter placements . . . THE COURT: And . . . to your knowledge have there been any recruiting efforts for other facilities? THE WITNESS: For facilities? Not to my knowledge." Ex. 128, Transcript of Hearing on January 6, 2022 ("January 6, 2022 Hearing") at 48:15-49:21, *Victor v. West Virginia Department of Health and Human Resources.* | |
| 111. | The number of active certified homes has declined every quarter from the third quarter of 2022 to the first quarter of 2024. 180 total foster homes have been lost over this time period. Ex. 58, Children's Mental Health & Behavioral Services (D00311569 at D003113711). | Disputed.  During the period from the third quarter of 2022 to the first quarter of 2024, the number of "active certified homes" increased during one quarter of that period.  ECF No. 552-7, at D003113711. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 112. | In five of the seven quarters from the third quarter of 2022 to the first quarter of 2024, more foster homes closed than new homes opened each quarter. In Q1 2024, 30 more homes were closed than homes opened. *Id.* | Undisputed, but with clarification that this data only reflects foster homes certified by Child Placing Agencies, and not certified or uncertified kinship homes. |
| 113. | During the period of July to December 2023, only 26% of certified foster homes were willing to accept children aged 13 or older. *Id.* | Undisputed. But the rest of the paragraph Plaintiffs cite to states that only 25% of children in placements are aged 13 or older. ECF No. 552-7, at D003113717. |
| 114. | During the period of July to December 2023, certified foster homes would have to accept two to four teens in order to have enough placements for them. *Id.* | Disputed. The "two to four teens" per home data is county-level data, indicative of only 14 of West Virginia's counties, ECF No. 552-7, at D003113715–16, which indicates this is not a class-wide issue. Statewide, there is "at least one home for every teen placed at the state-level." *Id.*, at D003113715. |
| 115. | In a January 28, 2019 email, Jessica Holstein emailed Janie Cole that "West Virginia is currently experiencing a drastic shortage of foster homes that are able to meet the needs of the children being placed in care." Ex. 61 (D068521 at D068522). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Jessica Holstein in 2019.<br><br>Since 2019, Defendants have undertaken several significant initiatives to expand the availability of community-based placements to children in foster care, *see* ECF No. 534, ¶¶ 139–156, with 81 percent of all foster children (including juvenile justice youth) placed in community-based family settings as of May 2024. *See* ECF No. 533-77. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 116. | A 2022 affidavit by Jeffrey Pack states that "it would be impossible for WVDHHR to guarantee compliance with an order prohibiting the temporary housing of children in WVDHHR custody at hotels for more than two consecutive nights...it is sometimes necessary for the WVDHHR to house children overnight at hotels for more than two consecutive nights while an appropriate placement is being located." Ex. 135, Affidavit of Commissioner Jeffrey Pack, *Victor v. West Virginia Department of Health and Human Resources*, ECF No. 318-4 at 4. | |
| 117. | In 2022, Michael Hale testified that at times children were housed in hotels and offices "approaching two weeks' time" and that with regard to stays in the DHHR offices, "[t]here were occasions of consecutive stays, interruptions by stints in juvenile detention, and then the case [would] be dismissed or the child be released and back into our care, all the while still trying to [sic] secure the placement anywhere and everywhere, to no avail." Ex. 128, ECF. No. 318-03, January 6, 2022 Hearing Tr. at 18:6-18 (Testimony of Michael Hale). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 118. | Michael Hale's 2022 testimony states that: "THE COURT: All right. And you are aware that the Department has certain rules and regulations that they promulgated as to how these children are being maintained in facilities; is that correct? THE WITNESS: Yes, sir. THE COURT: And do you all—do you—are you meeting any of those obligations to the children that you're housing either in a hotel or at your office? THE WITNESS: No, sir." Ex. 128, ECF No. 318-03, January 6, 2022 Hearing Tr. at 24:19-25:3 (Testimony of Michael Hale). | |
| 119. | Jeremiah Samples testified that while he was Deputy Secretary of DHHR, there were "way too many workers staying in hotels and county offices with kids" and that "whenever a CPS worker is unable to find appropriate placement for a child with an emergency shelter or child residential, foster family, kinship placement, acute psych hospital, PRTF—they are unable to find appropriate placement, the worker will—at the time would stay with the child either in the county office or in a hotel." Ex. 4, Jeremiah Samples Dep Tr. at 178:12-179:6. He testified that this was still a problem when he left in April of 2022. *Id.* at Tr. 179:7-9. | |
| 120. | Melanie Urquhart stated that children have been placed in hotels for anywhere from one night to a month. Ex. 12, Melanie Urquhart Dep. Tr. at 102:6-11. She testified that it is not common to have a week go by with no children being placed in hotels. *Id.* at Tr. 102:12-14. | Undisputed, with the clarification that Ms. Urquhart's testimony was "it can range from one night to -- there have been times we've had children as long as a month." ECF No. 550-12, Tr. 102:9–103:11. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 121. | Cynthia Persily, Cabinet Secretary for DoHS, testified that DoHS houses children in "facilities that are called camps…they have cabins." Ex. 7, Cynthia Persily Dep. Tr. at 54:12-15. These camps are not licensed placements for children. *Id.* at Tr. 55:14-16. | Undisputed, with the clarification that Secretary Persily added that the camps "have cabins and appropriate housing facilities for children [that] allows us to provide additional activities for children that may not be available in other placements" and "at any one time we may have four to six children . . . maybe a month in a year or two months in a year at different times." ECF No. 550-7, Tr. 54:15–55:12. |
| 122. | In 2020, DHHR housed children in hotels and offices every month of the year. Ex. 122 (D001551897). | |
| 123. | In 2019, DHHR housed children in hotels and offices every month of the year. Ex. 121 (D239629). | |
| 124. | Defendants continue to consistently place children in hotels as recently as June 2024. Ex. 51 (D003113469); Ex. 55 (D003113479); Ex. 57 (D003113494); Ex. 60 (D003113487). | Undisputed, with clarification that each month there are between 23 and 51 children who spend a night in a hotel or hospital, and that frequently a hotel stay is for one night with the child then being placed in a foster or other licensed placement. Exs. 5–8. |
| 125. | DoHS defines "emergency shelter care" as "short term care (less than sixty days)." Ex. 54 DoHS Foster Care Policy, (D003107870 at D003107883); however, Defendants continue to consistently place children in emergency shelters for six or more months, as recently as June 2024. Ex. 150 (D003113562). | Disputed with respect to "consistently." |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 126. | In an August 26, 2021 email from Jeremiah Samples to Jeffrey Pack and others, he wrote that [child residential] providers brought up several concerns about emergency shelter policy. They criticized the length of stay in emergency shelters." Ex. 70 (D001076396). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of unknown providers in 2021 as reported by Mr. Samples. |
| 127. | A September 20, 2021 report listed several children in emergency shelters for over 6 months. Ex. 72 (D590190). Some children were in emergency shelters for over one year. *Id.* | |
| 128. | Emails discussing a lack of placements and issues with the use of Child Placing Agencies: | |
| 128a. | In an email dated November 28, 2023, Melanie Urquhart stated that with regard to calls to CPAs, "[g]iven our desperate circumstances with lack of homes, 11 kids in hotels as we speak, and countless others needing to transition from unnecessary residential placements or from [out of state], we advise staff to keep trying." Ex. 118 (D001265463). | Undisputed only to the extent that this is an accurate transcription of the email; disputed that the statements reflect Ms. Urquhart opinions with respect to the number of foster homes available today. *See* ECF No. 550-12, Tr. 106:14–107:1 ("Q: Do you continue to believe that the department is in a desperate situation with regard to the number of placement homes available? A: I have not recently received concerns about the referral process in finding homes. So I would like to think that's because there has been an increase in homes."). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 128b. | In an email dated October 23, 2023, Melanie Urquhart emailed Jeffrey Pack and others, stating that with regard to the system of making referrals to CPAs, the "system of making referrals is BROKEN." Ex. 106 (D001808874). CPAs "aren't meeting our needs, and over reliance on the CPAs who have now become the face of foster care to foster families and to the community is a HUGE part of the problem." *Id.* Urquhart testified that this was an "accurate statement of [her] feelings on CPAs at the time." Ex. 12, Melanie Urquhart Dep. Tr. at 95:8-10. | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Melanie Urquhart in October 2023.<br><br>Since 2019, Defendants have undertaken several significant initiatives to expand the availability of community-based placements to children in foster care, *see* ECF No. 534, ¶¶ 139-156, with 81 percent of all foster children (including juvenile justice youth) placed in community-based family settings as of May 2024. *See* ECF No. 533-77.  This includes new efforts since October 2023, some of which Ms. Urquhart testified about. ECF No. 550-12, Tr. 96:7–19 ("Q: Are you aware of any actions that the department has taken since October of 2023 to increase the number of homes that are recruited to serve as foster care placements? A: Yes. Our program policy staff meet with the child placing agencies on a regular basis and discuss recruitment efforts. There's currently an ongoing campaign to recruit foster care parents. The department – we ourselves have certified three homes to serve as emergency foster care placements."). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 128c. | In a lengthy email chain spanning from June 5, 2023 to August 28, 2023, various DHHR employees sent emails consisting of lists of the names of children being housed in hotels and the dates of their stay. Ex. 96 (D001046078-D001046112). Several children are housed in hotels for a month. *Id*. | |
| 128d. | In an email chain dated August 25, 2023, Lorie Bragg emailed Michelle Dean that "instead of putting the supports this kid needs to be successful in his home we are sending him to another [out of state] placement" after Lakeland "recommend[ed] he return home" but a "worker believes they are lying and had the judge order him to liberty point." Ex. 94 (D3829590). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Lorie Bragg. |
| 128e. | In an email dated April 7, 2023, Jondrea Nicholson emailed Jeffrey Pack and Laurea Ellis that "[h]onestly, we lost control of foster homes when we stopped certifying anything other than K/R. I understand why we did this and agree that it had to be done but this is not the first time I have been told by a foster parent that they have not gotten called for placement for a while. I don't know if it is because CPAs are short staffed and don't have the case managers to manage all of their homes; if they have staff that just don't want to take the time to do the searching; if the foster parents are being truthful; a combination or what." Ex. 86 (D384744). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Jondrea Nicholson. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 128f. | In an email chain dated February 13, 2023, Marilyn Pearce emailed Cammie Chapman and Jeffrey Pack that "DHHR workers going around the CPA to place a child, pressuring the foster family, threatening the CPA with court orders, and not being responsive are repeated complaints" and that "[r]egarding forcing a placement even though the parent isn't certified, you would be surprised how often this occurs." Ex. 83 (D001959343). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Marilyn Pearce. |
| 129. | In a 2015 letter, the Department of Justice found that DHHR institutionalizes seventy-one percent of foster youth between the ages of twelve and seventeen. Ex. 120, Letter from Dep't of Justice, Civil Rights Div., to Office of the Governor, State of West Virginia (June 1, 2015) at 6. (D002927278 at D002927283). | |
| 130. | A 2018 DHHR report states that West Virginia "rank[s] in the top six in the country" in terms of placing children in congregate care. Ex. 23, Fourth Annual Progress Report, West Virginia Dep't of Health and Human Resources (2018) (D004703 at D005061). | |
| 131. | A 2020 report states that of the 724 children living in group residential care as of July 2020, DHHR sent over 30% to out-of-state facilities. Ex. 26, 2020 Placements Report (D285200). | |
| 132. | In 2022, DHHR sent 35% of children in group residential care to out of state facilities. Ex. 58 (D003113569 at D003113765). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 133. | In 2024, DHHR sent 40% of children in group residential care to out of state facilities. *Id* | |
| 134. | As of March 1, 2024, 113 children in RMHTF placements needed a community-based placement, not a residential placement. 60 of these children who belonged in a community-based placement were placed in out-of-state residential settings. *Id.* at D003113721. | Disputed. The 158 children in RMHTF placements "in need of foster or kinship care" homes in Figure 80 represents those children who have a discharge plan in place, and have the common barrier to discharge of a need for community based placements. That discharge barrier would also need to be addressed in combination with their individualized discharge plan. While this data is used to calculate the number of children in RMHTF placements with barriers to discharge related to need of community-based placements so that DoHS can work with partners to address this barrier, this should not be considered a formal determination of need or prescriptive of the least restrictive setting for a given child. *See* ECF No. 552-8, at D003113721. |
| 135. | Jeremiah Samples testified that "[t]here had been significant problems that West Virginia was facing with disabled populations being abused, sometimes heinously, to the point of death." Ex. 4, Jeremiah Samples Dep. Tr. at 63:6-10. | Undisputed, with the clarification that it is not clear that the statement is about foster children. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 136. | Jeremiah Samples testified that "[t]here were systemic abuses" in the facilities run by ResCare, the largest provider of IDD waiver and intermediate care homes. *Id.* at Tr. 109:17-110:3. The abuses went back to least 2017. *Id.* at 116:15-19. | Undisputed, with the clarification that most ResCare facilities serve <u>adults</u> with intellectual disabilities. |
| 137. | Jeremiah Samples testified that trying to address ResCare's abuses was "very uncomfortable" because "[t]he lobbiest [sic] representing ResCare was a former partner or worked for Mr. Crouch in his private sector of business. And they were having communications." *Id.* at Tr. 110:4-9. | |
| 138. | Jeremiah Samples testified that he, the Inspector General Jolynn Marra, Commissioner Bean, and Commissioner Mullins "tried to convey the criticality" of ResCare's systemic abuses to Secretary Crouch. *Id.* at Tr. 110:10-21. After three years of a lack of success in convincing Secretary Crouch, Samples reached out to Chairman Pack, then-health chair in the legislature, and worked with the Inspector General to prepare a report. The Inspector General then testified and provided the report. "The secretary was really upset that that happened." *Id.* at Tr. 111:14-112:18. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 139. | ResCare has been sanctioned numerous times. On July 13, 2020, new admissions were banned at all ResCare facilities state-wide due to "statewide pattern of increased significant and serious deficient practices and operations in ways that jeopardize the health, safety, welfare, and clinical treatment of consumers throughout West Virginia." Ex. 123 (D001157387 at D001157390). Individual ResCare facilities have received admissions bans on June 4, 2019, *Id.* at D001157401-05; Sept. 18, 2019, *Id.* at D001157407-10, and; Nov. 19, 2019, *Id.* at D001157412-22. | |
| 140. | ResCare of West Virginia-Terra Alta Children's Home has received numerous Statements of Deficiency in 2023 for: failure to report significant incidents to guardians; staff taking a child outside at night so staff could smoke; failure to ensure opportunity for community socialization/interaction; failure to ensure staff are trained to implement client behavior protocol; failure to development client active treatment and goals; failure to properly administer medicine; failure to maintain an Emergency Preparedness Program. Ex. 130, Terra Alta Recertification Survey (January 23, 2023); Ex. 132, Terra Alta Recertification Survey (January 26, 2023); Ex. 133, Terra Alta Complaint Survey (March 29, 2023); Ex. 140, Terra Alta Recertification Survey (December 12, 2023); Ex. 141, Terra Alta Recertification Survey (December 14, 2023). All exhibits *available at* https://ohflac.wvdhhr.org/Apps/Lookup/FacilityDetails/28516. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 141. | Defendants continue to place children at ResCare facilities, including Terra Alta Children's Home. Ex. 150 (D003113562) (showing children placed at ResCare facilities as early as 2021, who are still there in June 2024). | Disputed; these placements are court-ordered. W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf.* ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |
| 142. | In an email dated September 8, 2023, Cammie Chapman emailed Dawn Frohna about a child at Highland and emails that "it does not seem that Highland has been able to keep this child safe," and that "I am deeply concerned that there have been multiple incidents that this and other patients have endured at Highland, which would indicate that Highland is unable to provide adequate supervision and care of the adolescence in their care. This despite multiple interventions and discussions that DHHR has had with administration at the facility." Ex. 98 at D001784407. Cammie Chapman testified that foster children are still being placed in Highland Hospital as of June 2024. Ex. 9, Cammie Chapman Dep. Tr. 115:6-19. | Disputed. As Ms. Chapman testified regarding this e-mail correspondence, the first quoted statement is Ms. Chapman asking Dawn Forhna where she got the reported information from. ECF No. 550-9, Tr. 108:21–109:6. The second quoted statement is from Ms. Frohna to Rachel Goff. *See id.* Tr. 110:1–111:2. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 143. | In an email titled "Highland of Charleston" dated June 12, 2023 from Sandra Wilkerson to Michelle Dean, Wilkerson states that "I think Highland may be using medication restraint a little too liberally and sometimes I am getting mixed messages from Highland call and then the actual Highland case manager. Recently, there was a request for an MDT to explain why a child should go to a community based setting (as recommended by Highland, Aetna on the call. When I participated on the MDT, the Highland Case Manager stated she did not think that was a good idea and recommended a residential placement." Ex. 87 (D001059218). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Sandra Wilkerson. |
| 144. | In forwarding the above email, Michelle Dean wrote to Cammie Chapman that "These have been consistent themes, IM injections to [sic] liberally and providing contradicting statements and recommendations." *Id.* Cammie Chapman testified that DoHS did not "shut down" Highland Hospital as a result of these concerns. Ex. 9, Cammie Chapman Dep. Tr. at 105:23-106:5. | Undisputed as to Ms. Chapman's deposition testimony, with the clarification that she had earlier testified that the Office of Health Facilities Licensing was notified, that "that's an area at the time of DHHR that was separate and apart from the team we were working with;" that Internal Investigations Unit was notified; and that she "couldn't quite remember all the steps that were taken during that time." ECF No. 550-9, Tr. 111:8–113:23, 115:10–15. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 145. | Highland Hospital Psychiatric Residential Treatment Facility has received numerous Statements of Deficiency in 2023 for: drugging children to restrain them out of compliance with policy; failing to inform patients and guardians of the use of chemical restraints; failure to conduct timely face-to-face assessments of drugged children, and; failure to document the use of chemical restraints. Ex. 139, Highland Complaint Survey (September 13, 2023), *available at* https://ohflac.wvdhhr.gov/Apps/Lookup/FacilityDetails/149045. | Disputed. This document is the result of a certification survey for compliance with Medicare conditions of participation and reports findings regarding the use of chemical restraints in compliance with hospital policy. ECF No. 555-14. The term "drugging children" does not appear in this document. |
| 146. | Defendants continue to place children at Highland through June 2024. Ex. 150 (D003113562). | Disputed; these placements are court-ordered. W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf.* ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 147. | In an email dated October 16, 2023, Cynthia Persily forwarded an article from The Weirton Daily Times that stated "[i]n 2021, Mountain State Spotlight noted that the shortage of foster families led West Virginia to send kids to a facility in Pennsylvania called George Junior Republic. The 'care' these children received was tragic... Kids were being improperly restrained, the inspectors wrote. They spent up to six hours a day isolated in their bedrooms and some reported not getting necessary therapy and education. The center used a 'time out chair' as punishment liberally, and kids could be put in it for hours or for up to two weeks at a time." Although state inspectors suggested that officials remove kids from this facility, they found that children were still there seven months later." Ex. 103 (D001809687). | Defendants do not have sufficient facts to admit or dispute factual content of the news article. |
| 148. | In an email dated August 7, 2023, Michelle Dean emailed Jeffrey Pack about a child in George Junior Republic Detention Center. "[He] is constantly getting beat up and picked on by his peers. He will have marks and bruises...The staff do not intervene much. They know that it is going on and that he is getting beat up." The investigative reporter goes on to say "The other boys were making fun of [him] for being raped [they] allegedly found [him] on the floor and he was naked and going in and out of consciousness." And "It is alleged that [the rapists] continued to stay in the same unit for about 3-4 weeks as [him] after the allegations were reported." The report continued that "Most of the boys seem fearful to report anything," Ex. 92 (D383845 at D383846). | Undisputed only to the extent that this is an accurate transcription of the email; all of the quotes are from a report of alleged maltreatment to DoHS' Institutional Investigation Unit (IIU). These statements cannot be attributed to Ms. Dean or to staff of the IIU. *See* ECF No. 550-13, Tr. 181:2–17. Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 149. | George Junior Republic is currently being sued for multiple instances of alleged staff-on-child sexual abuse. Ex. 154, Jacob Geanous, Lawsuits allege widespread sex abuse at juvenlie detention centers in Western Pa., Pittsburgh Post-Gazette (Jul. 23, 2024), *available at* https://www.post-gazette.com/news/crime-courts/2024/07/23/sex-abuse-abraxis-george-junior-republic-summit-academy/stories/202407230064. | Defendants do not have sufficient facts to admit or dispute. |
| 150. | Defendants continue to place children at George Junior Republic through June 2024. Ex. 150 (D003113562). | Disputed; these placements are court-ordered.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf.* ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |
| 151. | Millcreek of Arkansas, one of the out-of-state placements used by Defendants, "logged nearly 60 issues that needed investigating, including issues that showed staff members charged with assault or theft." Ex. 152, Rolly Hoyt, Some kids have faced violence in Arkansas psychiatric facilities, THV11 (Jan. 9, 2023), *available at* https://www.thv11.com/article/news/health/violence-arkansas-psychiatric-facilities/91-082c9941-3132-476e-8aca-c5a2734c04b8. | Defendants do not have sufficient facts to admit or dispute. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 152. | Defendants continue to place children at Millcreek through June 2024. Ex. 150 (D003113562). | Disputed; these placements are court-ordered.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf*. ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |
| 153. | In January 2024, DoHS found that Laurel Oaks Behavioral Center in Alabama, an out-of-state placement used by Defendants, recorded use of restraints 998 times over the past 12 months. Ex. 144, Melissa Krinov, Licensure Summary of Findings of Non-Compliance and Plan of Correction, Dates of Inspection Jan. 9, 2024-Jan. 11, 2024, (D003114113 at D0033114117). | |
| 154. | Defendants continue to place children at Laurel Oaks Behavioral Center through June 2024. Ex. 150 (D003113562). | Disputed; these placements are court-ordered.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf*. ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 155. | As early as 2019, DHHR was aware that Sequel Youth and Family Services, which operates facilities across the country, abuses and neglects the children in its care. Ex. 62 (D001825922). | Disputed. Plaintiffs' Exhibit 62 does not state that "Sequel Youth and Family Services . . . abuses and neglects children in its care." Rather, it is an email from an employee of Marshall University alleging there was one proven incident of sexual abuse at Clarinda Academy, and that the perpetrator was fired, and that there are "allegations of excessive use of restraints and not using restraints correctly" at Clarinda Academy. *See* ECF No. 552-12. |
| 156. | On March 26, 2019, Tammy Pearson, Transformational Collaborative Outcomes Management Director of the Marshall University Center of Excellence for Recovery, emailed Linda Watts about "Clarinda Academy where there was proven sexual abuse (the person has been fired) and there are allegations of excessive use of restrains and not using restraints correctly." Ex. 62 (D001825922). | Undisputed only to the extent that this is an accurate transcription of the email; Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 157. | On August 13, 2020, Oregon State Senator Sara Gelser, Chair of the Oregon State Senate Human Services Committee, emailed Carla Harper "to alert [her] to serious concerns about the safety of West Virginia youth placed in programs operated by Sequel Youth and Family Services," particularly their facility, Mingus Mountain Academy. The email detailed findings of abuse, injuries, noncompliance with licensing rules and more. "Sequel is a dangerous program facing licensing issues in multiple sites across the country." "Oregon will no longer do business with Sequel in any state or for any reason, and I hope West Virginia will consider doing the same. Kids' lives are truly at stake." Ex. 64 (D886193). | Undisputed only to the extent that this is an accurate transcription of the email; Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein, which represents the opinion of Sara Gelser. |
| 158. | On Dec. 16, 2020, Child Welfare Information Gateway Library emailed Amy Booth an NBC news article titled "A profitable 'death trap': Sequel youth facilities raked in millions while accused of abusing children (Includes video)." The email also included a link to the Alabama Disabilities' Advocacy Program Report about Sequel Schools, LLC. Ex. 65 (D001415882 at D001415886). | |
| 159. | On Dec. 17, 2020, Linda Watts emailed that same NBC news article to Christina Bertelli Coleman and Andrea Ramsey-Mitchell. Ex. 66 (D848506). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 160. | Defendants continued to house children at Sequel facilities as of November 30, 2020, including at Mingus Mountain Academy. Ex. 124 (D001020457). Mingus Mountain Academy was the facility that Senator Gelser had particularly warned against. Ex. 64 (D886193). | Disputed; these placements are court-ordered.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf*. ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |
| 161. | Defendants continued to house children at Sequel facilities in December 2020, after the NBC news article, and continued to place children there through 2022. Ex. 126 (D001032448) (December 31, 2020); Ex. 127 (D001974868) (May 31, 2021); Ex. 129 (D001142405) (August 31, 2022). | Disputed; these placements are court-ordered.  W. Va. Code § 49-4-606(a); *see* W. Va. Code § 49-4-110(a); *cf*. ECF No. 550-13, Tr. 187:5–22 ("If we suspend placements, we will not recommend to the court that placements be used. However, if the court or the juvenile probation officer makes the referral, and we are ordered to place the child in that facility, then we, short of appealing that, have no alternative than to make the placement in the facility."). |
| 162. | Pursuant to an agreement with the Department of Justice, DoHS was required to reduce the number of children in residential mental health treatment facilities to 712 by Dec. 31, 2024. Ex. 50, Agreement Between the State of West Virginia and the United States Department of Justice, Report by Subject Matter Expert, March 2024 at 59. (D003097184 at D003097242.) | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 163. | On March 1, 2024, there were 870 children in residential mental health treatment facilities, an increase from 776 children on January 1, 2022. Ex. 58 (Office of Quality Assurance for Children's Programs, Children's Mental Health and Behavioral Health Services Quality and Outcomes Report) (D003113569 at D003113766.) | |
| 164. | Measured in six-month increments, the statewide average of children placed in residential mental health treatment facilities increased 8.7% from the July-December 2022 period to the July-December 2023 period. *Id.* at D003113762. | |
| 165. | At the July 20, 2023 Reducing the Reliance on Residential (R3) Stakeholders Meeting, previous DHHR employee, Dawn Frohna, highlighted that "children are placed in inappropriate setting due to lack of available bed or are placed out of state," and a stakeholder voiced concerns that "CPS workers and judges will place children in facilities based on availability which will affect supervision ratios." Ex. 138 (P010437-P010445). | |
| 166. | Emails among executives at DoHS and BSS discuss issues with children in residential placements: | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 166g. | In an email dated November 28, 2023, Melanie Urquhart emailed about "desperate circumstances with lack of homes, 11 kids in hotels as we speak, and countless others needing to transition from unnecessary residential placements or from [out of state][.]." Ex. 117 (D001265465). | Undisputed that the quoted email correspondence contains the excerpted statements; disputed that the statements reflect Ms. Urquhart opinions with respect to the number of foster homes available today. *See* ECF No. 550-12, Tr. 106:14–107:1 ("Q: Do you continue to believe that the department is in a desperate situation with regard to the number of placement homes available? A: I have not recently received concerns about the referral process in finding homes. So I would like to think that's because there has been an increase in homes."). |
| 166h. | On November 9, 2023, Michelle Dean sent an email to Jeffrey Pack and others stating that "We have a child whose CAFAS score is 30 points below the threshold for needing any residential mental health care, a CANS decision support indicating the child needs a community setting and the solution is another out of state mental health treatment facility [because] of a lack of options. I am not blaming the district staff at all but pointing out this is a situation in which the child's civil rights are being or going to be violated." Ex. 109 (D001807490). CAFAS refers to the Child and Adolescent Functional Assessment Scale assessment. | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 166i. | On November 8, 2023, Lorie Bragg sent an email to Jeffrey Pack and Laurea Ellis discussing a child for whom "there's really nothing in this that would prevent this kid from being served in state. The worker and the sup[ervisor] didn't know anything about this kid and couldn't even talk about services. After the staffing, they basically manipulated their way into a court order." Ex. 108 (D002004934). | Undisputed only to the extent that this is an accurate transcription of the email; Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein, which represents the opinion of Lorie Bragg. |
| 166j. | On October 12, 2023, Michelle Dean, Deputy Commissioner, Policy and Programs, emailed Jeffrey Pack and others about a child in a PRTF where the referral for a Qualified Independent Assessment ("QIA") referral was not made until one month after the deadline. Ex. 101 (D001807088). The deadline for a QIA referral for a child at risk of placement is 24 hours. *Id.* The QIA results had not been provided as of Oct. 12, 2023. *Id.* Another email in chain states that "[i]t does not appear that we offered any services to this youth or his mother, although it is difficult to determine what has transpired in this case as there are no contacts, no YS assessment, no case plan, etc. The worker did not follow up until 10/04/23, at which time OOS referrals were already made with a few facilities[.]" *Id.* at D001807089. | Undisputed only to the extent that this is an accurate transcription of the email. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 166k. | On September 29, 2023, Judge Carrie Webster emailed Elaine Goodman requesting "someone from dhhr-state-office-one of the deputy commissioners that is in charge" appear to answer for placement of a child in Patchwork residential facility, saying "I won't even comment further on patchwork other than to say she is a CHILD. I didn't even think she was [] years old. We send kids who have aged out of system to patchwork including juvenile sex offenders-one of my juveniles who molested multiple young children multiple times may still be there. Patchwork is not a safe place for pubescent girls who have been sexually abuse[d]." Ex. 97 (D001045723) at D001045724. Jeffrey Pack reacts "I'm considering jumping out of a window." *Id.* at D001045723. | Undisputed only to the extent that this is an accurate transcription of the email; Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein. |
| 166l. | On August 25, 2023, Lorie Bragg emailed Jeffrey Pack and others about a child who was institutionalized and "recommended he return home. The worker believes they are lying and had the judge order him to [an out of state facility]. Why did we pay [the institution] $1500 a day for recommendations if we are not going to follow them? And now instead of putting the supports this kid needs to be successful in his home we are sending him to another [out of state] placement." Ex. 95 (D382942). In a follow up email on August 28, 2023, she states that "I just don't see how we can have 2 assessments that say family/community setting and justify placing him in a PRTF." *Id.* | Undisputed only to the extent that this is an accurate transcription of the email; Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein, which represents the opinions of Lorie Bragg. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 166m. | On February 10, 2023, Melanie Urquhart emailed Lorie Bragg about a "very special needs youth" placed in an out of state facility "geared to adults" when he was [] years old. "Since his admission 5 years ago, he has been the subject of 8 abuse/neglect reports," and his case is described as having "slipped through the cracks." Ex. 82 (D396776 at D396776, D396778). | Disputed. The quoted statements do not belong to Ms. Urquhart; statements made in the February 10, 2024 e-mail at 1:54 pm indicate that the placement is not "geared to adults," *see* ECF No. 553-7, at D396776 ("I just looked at their website and it discusses activities and events for ages 13 and up."); Defendants cannot evaluate the truth or accuracy of the contents of the email communications, or the allegations contained therein, which were reported to and investigated by Ohio's Athens County Board of Developmental Disabilities, *see id*. at D396778. |
| 166n. | On August 30, 2021, Mikenzi Edwards emailed Donna White and Jason Prettyman relaying Aetna's medical director's belief that she "is showing these inappropriate behaviors due to being in treatment facilities for so long. He said if we give her something to look forward to (a foster family) she won't act this way." Ex. 71 (D003018201). | Undisputed only to the extent that this is an accurate transcription of the email. |
| 166o. | On May 21, 2021, Jeremiah Samples emailed Bill Crouch that DHHR needs to "develop more emergency shelter beds, PRTF placements, sub acute care placements, therapeutic foster homes...eliminate low end congregate care placements that warehouse kids; place restrictions on length of stay and enforce through MCO; place socially necessary services and wrap around services in managed care." Ex. 68 (D001073022). | Undisputed only to the extent that this is an accurate transcription of the email, which represents the opinion of Mr. Samples. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 167. | Cynthia Parsons testified as Defendants' Rule 30(b)(6) witness regarding services covered by Medicaid. *Id.* | |
| 168. | In response to the question, "as part of expanding those services, you added providers. But we don't -- DoHS doesn't know whether or not adding those providers actually increased the amount of individuals actually receiving services; is that fair?" BMS Director of Behavioral Health and Long-Term Care Services Cynthia Parsons testified that "I don't know that number today." Ex. 11, Cynthia Parsons Dep. Tr. at 10:2-8. | |
| 169. | In response to the question "[w]as anything different done [to reduce the CSED waitlist]?" Cynthia Parsons testified that "[t]here has [sic] been no changes since '22." *Id.* at Tr. 17:12-14. | Undisputed, with the clarification that Ms. Parsons further testified that the wait list was due to a lack of providers; that the State's managed care contractors was working "to develop more providers;" and that children waiting for CSED waiver services "can receive interim services through the Bureau for Behavioral Health and also through Safe at Home." ECF No. 550-11, Tr. 15:24–16:19. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 170. | In response to the question "[d]o you have any type of number that represents in the last two or three years how many children have been prevented from going into residential treatment through the CSED Waiver Program?" Cynthia Parsons testified that "I do not, no." *Id.* at Tr. 18:11-16. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that the precise number of children diverted was not within the scope of the deposition topic on which Ms. Parsons was asked to testify, and with the further clarification that Ms. Parsons had just testified that she knew of cases where children were "recommend[ed] that they would go to residential care . . . but we were able to put CSED in place to keep them in their community," ECF No. 550-11, Tr. 18:6–10. |
| 171. | In response to the question, "when the child is put into a placement [...] is there a requirement that the BSS worker does an assessment to determine if that referral needs to happen?" Cynthia Parsons testified that "It is not -- I wouldn't say the worker has an assessment. I think the worker reviews the case." *Id.* at Tr. 20:17-21:1. | Undisputed, with the clarification that Ms. Parsons added "I think that they refer appropriately . . . because we have other waiver programs, not just CSED." ECF No. 550-11, Tr. 20:23–21:3. |
| 172. | Cynthia Parsons testified that the CSED waiver program is tracking "the number of children that end up in residential treatment that received CSED Waiver Services," and further testified that "I don't have that number." In response to the question, "Do we know if that's increasing or decreasing?" she testified that she did not know. *Id.* at Tr. 21:16-22:2. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that the number of children that end up in residential treatment that received CSED waiver services was not within the scope of the deposition topic on which Ms. Parsons was asked to testify. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 173. | In response to the question, "you wouldn't have any information as to whether or not there is children out there who have not yet been assessed that would also be on that wait list?" Cynthia Parsons testified that "I would not have that information." *Id.* at Tr. 26:2-7. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that this information was not within the scope of the deposition topic on which Ms. Parsons was asked to testify. |
| 174. | In response to the question "other than that [2023 BBH pilot] program [...] are you aware of anything else that DoHS has done to increase accessibility to these services?" Cynthia Parsons testified that "[b]efore that, no, I do not know." *Id.* at Tr. 32:2-9. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that this information was not within the scope of the deposition topic on which Ms. Parsons was asked to testify, and with further clarification that the question was specific to "positive behavioral support services" provided by the Bureau of Behavioral Health. |
| 175. | Cynthia Parsons testified that she does not know whether "prior to 2023, DoHS hasn't provided behavioral health services at all." *Id.* at Tr. 32:24-33:10. | Undisputed that the statement accurately quotes part of the deposition transcript, with clarification that this information was not within the scope of the deposition topic on which Ms. Parsons was asked to testify, and with further clarification that the question was in the context of a discussion of "positive behavioral support services" provided by the Bureau of Behavioral Health, not all behavioral health services. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 176. | In response to the question "[w]hat if anything has DoHS done since 2022 to increase access to RMHTFs [Residential Mental Health Treatment Facilities]?" Cynthia Parsons testified that "I wouldn't say there was increase. [...] There is nothing we have done to open up more access to facilities." *Id.* at Tr. 41:24-42:8. | Undisputed, with the clarification that the ellipses in the quotation indicate where Ms. Parsons testified that "we developed community-based services to try to stop children from going to facility . . . we put more community-based services in place to ensure that children could stay in the community more than go into the facility." ECF No. 550-11, Tr. 42:4–42:12. |
| 177. | Cynthia Parsons testified that there is not "any matrix or any manner in which to track how many children are being prevented from going into RMHTFs through the Child's Mobile Crisis Program." *Id.* at Tr. 43:14-18. | Disputed to the extent that the quotation suggests that this is Ms. Parsons' statement. The quotation is a question from counsel, to which Ms. Parsons responded "[t]here is not a matrix developed." ECF No. 550-11, Tr. 43:18. |
| 178. | Cynthia Parsons testified that the Mobile Crisis Team has been in effect since February of 2024. *Id.* at Tr. 46:3-7. | Disputed, as Ms. Parsons testified as to Medicaid coverage of those services, not when the service became available. ECF No. 550-11, Tr. 46:5–7. |
| 179. | In response to the question, "in assessing whether or not these community-based services are actually working, those would be the numbers -- numbers of in-patient and number of individuals or children in foster care being placed in residential treatment -- residential treatment facilities would be an important matrix for DoHS?" Cynthia Parsons testified that "It could be one of them." *Id.* at Tr. 59:6-16. | Disputed that this information was within the scope of the deposition topic on which Ms. Parsons was asked to testify. *See* ECF No. 452 (Deposition Topic Nos. 10, 11, 14). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 180. | In response to the question "when I asked you about programs that DoHS has implemented to help provide community-based services to foster children, ACT [Assertive Community Treatment] was mentioned. But as you said, ACT is only 18 to 21?" Cynthia Parsons testified "[t]hat's correct," and in response to the follow-up question "[s]o it is only going to target a very limited portion of the foster care community?" she testified "[r]ight." *Id.* at Tr. 67:16-68:2. | Undisputed, with the clarification that Ms. Parsons added "but you have CSED Waiver which is . . . almost ACT-like in a sense because you have wraparound." ECF No. 550-11, Tr. 68:2–68:7. |
| 181. | In response to the question "the change that we are talking about is a requirement that anybody – any facility that wants to be a CCBHC has to provide those services. Do you know whether or not at least the five that you can recall that are applying currently provide that service?" Cynthia Parsons testified that "I would say the majority do not right now." *Id.* at Tr. 1:15-23. | |
| 182. | In response to the question "[a]re there any programs that BBH is operating whose purpose -- or at least part of the purpose is to prevent children from going into residential treatment that BMS is not trying to expand Medicaid coverage for?" Cynthia Parsons testified "[n]ot at this time." *Id.* at Tr. 73:11-19. | Undisputed that the statement accurately quotes part of the deposition transcript, with the clarification that this information was not within the scope of the deposition topic on which Ms. Parsons was asked to testify. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 183. | Cynthia Parsons's deposition transcript testified that it is "correct" that "providers were required to provide 85 percent of the moneys directly to the direct care workers,...[a]nd then it reduced to 5 percent when the program ended." *Id.* at Tr. 85:6-11. She testified that "[o]nce the ARPA dollars, is what it was called, for the federal government ended, we still felt like we needed to do an increase for our providers. So we found 5 percent based on our budget." *Id.* at 85:15-19. In response to the question "[w]as there any effort to track the amount of direct care workers who quit when their pay was reduced by 80 percent?" Cynthia Parsons testified "I do not know." *Id.* at Tr. 85:20, 87:7. | Undisputed that the statement accurately quotes part of the deposition transcript, with the clarification that this information was not within the scope of the deposition topic on which Ms. Parsons was asked to testify |
| 184. | The 2002 Child and Family Servies Review ("CFSR") states that there are "shortages of mental health services in many areas of the State" and a "lack of specialized placement resources for children with special needs." Ex. 17 (D003152 at D003162, D003166). The 2002 CFSR states that a shortage of services required children to remain on long waiting lists, and that "[c]hildren requiring placements to address [mental health] problems usually [need to] be placed outside of the State." Ex. 1 (D003226). |  |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 185. | The 2002 CFSR found "(1) a scarcity of specialized placements for children with behavioral problems or special care needs and, (2) an inconsistency in matching children with appropriate foster families or placement settings." Ex. 17 (D003152 at D003183). The 2002 report also found that "children often [were] placed in shelters because there [was] nowhere else to put them and some children remain[ed] in shelters for long periods of time." *Id.* at D003183. | |
| 186. | The 2002 CFSR states that there are "shortages of mental health services in many areas of the State" and a "lack of specialized placement resources for children with special needs." Ex. 17 (D003152 at D003162, D003166). The 2002 CFSR states that a shortage of services required children to remain on long waiting lists, and that "[c]hildren requiring placements to address [mental health] problems usually [need to] be placed outside of the State." *Id.* at D003226. | |
| 187. | A 2008 assessment states that "[m]eeting the children's mental health needs [was] a challenge throughout West Virginia as there continue[d] to be deficiencies in the array, quality and quantity of treatment services." Ex. 18, 2008 Assessment (D003566 at D003695). It also states that "recruitment of specialized foster homes remain[ed] an issue," and "children [with disabilities were] often placed out of state to meet their treatment goals." *Id.* at D003630, D003639. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 188. | The 2009 CFSR states "that there are children with mental health needs who are not receiving services due in part to a lack of adequate assessment and a lack of available services." Ex. 19 (D003428 at D003513). | |
| 189. | A May 2015 report states that BCF "identified the lack of treatment foster care and in-home services and a weak children's mental health system as contributing factors to the high use of congregate care." Ex. 20, 2015 2Q Safe at Home Report (D058224 at D058236). | |
| 190. | On June 1, 2015, DOJ wrote a letter to West Virginia the State's ADA violations (the "DOJ Letter"). The DOJ letter concludes that West Virginia violated the ADA by failing to provide "services to children with significant mental health conditions in the most integrated settings appropriate to their needs." Ex. 120, DOJ Letter at 2 (D002927278 at D002927291). The DOJ letter states that "high rates of placement in segregated residential treatment facilities, including out-of-state placement, [existed] because DHHR ha[d] not developed a sufficient array of in-home and community-based services." *Id.* | |
| 191. | DHHR policy refers to long-term psychiatric facilities as "the most restrictive type of care for children in foster care." Ex. 27, DHHR Foster Care Policy, § 2.4.7, Aug. 2020 (D002851677 at D002851727). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 192. | The DOJ Letter states that "the State does not inform [foster families] how or where to access services; there are not enough services or qualified staff available; or services are not available unless the child is in DHHR custody." Ex. 120 at 14 (D002927278 at D002927291). | |
| 193. | The DOJ letter states that for mental health treatment, the "default service in West Virginia is institutionalization." Ex. 120 at 8 (D002927278 at D002927285). | |
| 194. | The DOJ letter states that "[t]he unnecessary segregation of children with mental health conditions violates their civil rights and wastes the State's fiscal resources." Ex. 120 at 3 (D002927278 at D002927280). | |
| 195. | The DOJ Letter states that "pilot programs, small initiatives or programs targeted at sub-groups . . . do not adequately ensure that all children who rely on DHHR for mental health care are not unnecessarily placed in segregated residential treatment facilities." Ex. 120, DOJ Letter at 19. (D002927278 at D002927296). The letter states that "the State has failed to use these reports to develop a comprehensive, cross-system plan to address high levels of unnecessary institutionalization." Ex. 120, DOJ Letter at 18 at D002927295. It states that DHHR "has not developed comprehensive, community-based services for children with mental illness, including wraparound supports that are the standard of care for children with significant mental health needs." Ex. 120 at 2-3 (D002927279- D002927280). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 196. | A 2015 report states that "West Virginia does have a need for more treatment or therapeutic foster care providers as well as traditional foster care homes." Ex. 21, 3rd Quarter Report (D006753 at D006855). | |
| 197. | A 2015 report states that "[m]any youth are [also] placed into congregate care due to a lack of a comprehensive universal assessment early after initial referral/contact." Ex. 21, Initial Design and Implementation Report, 3rd Quarter, West Virginia Dep't of Health and Human Resources (Aug. 14, 2015) (D006761). | |
| 198. | In 2018, ten percent of counties reported that Intensive Home-Based Services remained sufficiently available. Ex. 23, 2018 Progress Report (D004703 at D004983). | |
| 199. | A 2018 audit "noted a lack of homes that are willing to accept children with severe behavioral issues, [or] developmental disabilities." *Id.* at D004783. | |
| 200. | A 2018 report states that "[d]ata indicates that the agency declined [between 2011 and 2015] in providing for the mental health needs of children." *Id.* at D004867. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 201. | West Virginia's 2019 Child and Family Service Plan listed the "[b]arriers to children receiving behavioral health assessments and/or services [as]: lack of contact by agency staff with children in non-placement cases, lack of mental health providers within a district, the focus on one child and failing to assess all children in the home, and limited follow-up on behavioral health issues when a child is reunified." Ex. 24, 2019 CFSP (D003816 at D003864). | |
| 202. | On April 17, 2023, the West Virginia Child Care Association of Child Care Providers ("WV CCA") sent a letter to individuals at DoHS, including Jeffrey Pack and Cammie Chapman. Ex. 134 (D001049702). The Providers wrote in their April 17, 2023 letter that DoHS's new structure for residential treatment facilities would "leave large gaps in youth service paths and options of care that are currently available in-state to serve West Virginia youth and families." Ex. 134 (D001049702 at D001049703). Cammie Chapman testified that while the WV CCA representatives appeared to be stating that they had not been involved in the process for West Virginia to reform its residential mental health treatment program, "I would say that that is essentially the statement that the providers are making, but I disagree that they have not been involved . . . And, in fact, I don't believe that the providers think that's true. I think the providers are saying this in order to influence the individuals that the letter was directed to." Ex. 9, Cammie Chapman Dep. Tr. at 122:12-123:12. | Disputed. The letter was not written by "the providers". ECF No. 555-9. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 203. | On November 10, 2023, WV CCA sent another email to Governor Justice, Secretary Persily, Jeffrey Pack, and Cammie Chapman, among others. Ex. 110 (D001764473) at D001764474. This letter discussed DoHS's plan to suspend the use of Level 1 and Level 2 facilities. Ex. 110 (D001764476) at D001764477. The Providers asked: "Where will currently placed youth in Level 1 and 2 go on July 1? Will youth currently being served in lower levels of residential care be driven out of their communities into the new Specialized/Intensive Residential programs, left to find in-community treatment that may not exist in rural communities or have extensive waitlists, out-of-state, or to juvenile corrections facilities? Or will the use of unlicensed temporary state-supervised facilities such as hotel rooms become even more the norm because proper treatment placements in-state cannot be located?" *Id.* Cammie Chapman testified that as of June 2024, the date for the redesign has been pushed back to October 2024. Ex. 9, Cammie Chapman Dep. Tr. at 169:11-15. | Disputed. The letter was not written by "the providers," ECF No. 555-9, and Ms. Chapman testified that "our residential providers had stated that they felt like July 1st was too soon" and that "there was also the concern of the timing of a meeting that had to occur" before a state plan amendment was submitted. ECF No. 550-9, Tr. 169:16–170:12. |
| 204. | In December 2023, WV CCA sent a third letter "that outlined residential providers' concerns" which said, "The proposed new structure will eliminate the ability to deliver crucial treatment services within current Level I and II residential treatment facilities and creates a gap for youth who do not need highly intensive treatment interventions." Ex. 153, Amelia Ferrell Knisely, State's plan for reducing foster kids in group homes met with pushback, West Virginia Watch, (April 4, 2024), *available at* https://westvirginiawatch.com/2024/04/04/states-plan-for-reducing-foster-kids-in-group-homes-met-with-pushback/. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 205. | Jeremiah Samples testified that he relayed to the Ombudsman his concerns that DoHS's plan to reform child residential infrastructure would "run[] the risk of deteriorating the level one and level two child residential placement infrastructure by undercutting the reimbursement methodology for the hose current placements. And that without an appropriate continuum of care for alternative placements established, that that could result in children being either inappropriately placed at higher levels of care than they needed, left in situations at lower levels of care that may not be appropriate for them either or sent out of state." Ex. 4, Jeremiah Samples Dep. Tr. at 50:17-51:5. | |
| 206. | The Children's Mental Health and Behavioral Health Services Quality and Outcomes Report ("Outcomes Report") discusses West Virginia's provision of services to children with serious emotional disorders. The Report discusses the Document Assessment and Review Tool (DART) which "is the tool DHS uses to assess fidelity." Ex. 53 (D003113835 at D003113838). The Outcomes Report states that "[s]ince the DART is reliant on documentation, issues with data completion and accuracy impacted the findings. Many measures were listed as not met or only partially met. Wraparound Facilitators' understanding of how NWI [National Wraparound Initiative] and the DART defines and measures elements of fidelity, like functional strengths, appears to be inadequate. It was difficult to assess the Child and Family team due to unclear attendance documentation. Figure 1 below shows the below average percentage of cases reviewed that met full compliance for the score area." *Id.* at D003113839. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 207. | With regards to timely documentation after a crisis event, "10% of cases met full fidelity requirements." *Id.* at D003113839. | Disputed. This report summarizes a fidelity review of West Virginia Wraparound services in 171 cases, conducted in partnership with Marshall University between August and November 2023. ECF No. 552-3, at D003113838–39. "Fidelity" is defined as adherence to the National Wraparound Initiative. *Id.* The DART fidelity review tool is comprised of six score areas: timely engagement; wraparound key elements; safety planning; crisis response; transition planning; and outcomes. *Id.* The quoted language in paragraph 207 refers to the average percentage meeting full compliance for a score area, with 10% corresponding to the DART Fidelity Score Area of "crisis response." *See id.*, at D003113839–40. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 208. | 16% of cases met fidelity requirements in the area of transition planning. 26% met fidelity requirements in the area of wraparound key elements, with 15% meeting the sub-goal of "driven by strengths & families" and 4% meeting the sub-goal of "natural & community supports." *Id.* at D003113840. | Disputed. This report summarizes a fidelity review of West Virginia Wraparound services in 171 cases, conducted in partnership with Marshall University between August and November 2023. ECF No. 552-3, at D003113838–39. "Fidelity" is defined as adherence to the National Wraparound Initiative. *Id.* The DART fidelity review tool is comprised of six score areas: timely engagement; wraparound key elements; safety planning; crisis response; transition planning; and outcomes. *Id.* A smaller sample was assessed in measuring transition planning. *See id.* at D003113839. The percentages represent reviewed cases meeting "full fidelity" for a specified metric. *Id.* |
| 209. | "The DART found that transition plans did not meet fidelity standards." *Id.* at D003113839. | Disputed. This report summarizes a fidelity review of West Virginia Wraparound services in 171 cases, conducted in partnership with Marshall University between August and November 2023. ECF No. 552-3, at D003113838–39. "Fidelity" is defined as adherence to the National Wraparound Initiative. *Id.* The DART fidelity review tool is comprised of six score areas: timely engagement; wraparound key elements; safety planning; crisis response; transition planning; and outcomes. *Id.* A smaller sample was assessed in measuring transition planning. *See id.*, at D003113839. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 210. | Wraparound Fidelity Index findings "and DART findings frequently were not in alignment, suggesting that facilitators may not have understood the questions presented in the WFI-EZ. Disagreement between the two assessments could further support the idea that data quality impacted the evaluation, such as the DART finding low rates of timely engagement while the WFI-EZ responses to timeliness were between 93% and 100%. Additionally, some questions asked the respondent to use a reversed scoring scale, which could have led to the opposite answer being indicated, thereby producing discordant results." *Id.* at D003113840. | Disputed. This report summarizes a fidelity review of West Virginia Wraparound services in 171 cases, conducted in partnership with Marshall University between August and November 2023. ECF No. 552-3, at D003113838–39. "Fidelity" is defined as adherence to the National Wraparound Initiative. *Id.* The DART fidelity review tool is comprised of six score areas: timely engagement; wraparound key elements; safety planning; crisis response; transition planning; and outcomes. *Id.* The WFI-EZ is a survey given to both Wraparound coordinator and caregivers; only the Wraparound coordinator responses were included in the fidelity review. *Id.* |
| 211. | The benchmark scores from Wraparound were created by using the WFI-EZ. *Id.* at D003113840. | |
| 212. | Caregiver responses to the WFI-EZ indicated that their satisfaction with CSED was "inadequate." *Id.* at D003113841. | Disputed. Caregiver responses to the WFI-EZ were low, with only 47 total surveys returned, 18 of which corresponded to families receiving CSED services, meaning that the responses cannot be generalized to all families participating in West Virginia Wraparound. ECF No. 552-3, at D003113841. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 213. | The Outcomes Report states that "[i]n both the at-risk and RMHTF surveys, caregivers and children indicated they had low awareness of the services available to them. [...] Several respondents to the survey who did know a service by name did not understand what the service was, such as Wraparound." Ex. 53 (D003113835 at D003113843). | Disputed to the extent it suggests any caregivers or children have this opinion beyond the small number of caregivers or children who responded to the surveys referred to in the document. Ex. 4, at D002771368–69. |
| 214. | For example, "awareness of the CCRL by respondents from both the at-risk and RMHTF populations [...] ranged from 25% to 35% awareness." Ex. 53 (D003113835 at D003113844). | Disputed to the extent it suggests any caregivers or children have this opinion beyond the small number of caregivers or children who responded to the surveys referred to in the document. Ex. 4, at D002771368–69 |
| 215. | The Report states that "[c]aregivers for both populations did indicate a desire for more direct information for services, such as what the service entails, what service or services are best for their child, and whom to contact to initiate services." *Id.* at D003113844. | Disputed to the extent it suggests any caregivers have this opinion beyond the small number of caregivers who responded to the surveys referred to in the document. Ex. 4, at D002771368–69. |
| 216. | The Outcomes Report states that "47% of community-based caregivers and 54% of RMHT caregivers responded 'yes' to experiencing some type of barrier to their child starting a needed service." *Id.* at D003113846. | Disputed to the extent it suggests any caregivers have this opinion beyond the small number of caregivers who responded to the surveys referred to in the document. Ex. 4, at D002771368–69. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 217. | The Outcomes Report states that "[a]nother common response from caregivers about accessing services was a lack of appropriate intensity of services." *Id.* Over one-quarter of at-risk and RMHTF caregivers "said that services were 'not a good fit' for their child and/or family." *Id.* | Disputed to the extent it suggests any caregivers have this opinion beyond the small number of caregivers who responded to the surveys referred to in the document. Ex.4, at D002771368– 69. |
| 218. | The Outcomes Report states that "providers reported some roadblocks to this goal [of keeping children in their homes and communities when clinically appropriate], including lack of community-based capacity, lack of necessary supports, and instability of home environments. Almost three-quarters of service providers (70%) that were aware of services reported a lack of resources; however, the evaluation did not ask what those resources were." *Id.* at D003113847. | Disputed to the extent it suggests any providers have this opinion beyond the small number of providers who responded to the surveys referred to in the document. Ex. 4, at D002771368– 69. |
| 219. | The Outcomes Report states that "[c]aregivers' responses via interview indicated they felt some services could have prevented placement, but they were made aware of them too late. Multiple caregivers felt more intense services were needed to meet their child's needs in order to stay in the home." *Id.* at D003113847. | Disputed to the extent it suggests any caregivers have this opinion beyond the small number of caregivers who responded to the surveys referred to in the document. Ex. 4, at D002771368– 69. |
| 220. | The Outcomes Report states that "[i]n addition to the intensity of services, the ability to engage children was also a concern." *Id.* at D003113847. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 221. | The Outcomes Report states that "[s]everal caregivers and children in the RMHTF survey reported a regression in behavior after being discharged back to their community. Families feel that a lack of continued services and disruption of structure or routine causes their children to revert to their pre-treatment behaviors." *Id.* at D003113848. | |
| 222. | The Outcomes Report states that "[b]y the end of March 2022, a waitlist due to Wraparound facilitator capacity had to be established for this [Assessment Pathway] service [...] limitations on available workforce still exist, particularly with BBH-funded interim services." *Id.* at D003113850. | Disputed. The waitlist referenced in this sentence is for WV Wraparound services, not for the Assessment Pathway. ECF No. 552-3, at D003113850. |
| 223. | The Outcomes Report states that 29 children are on the CSED Wraparound waitlist, 98 are on the BBH Interim Services Wraparound waitlist, and 9 children are on the SAH Interim Services Wraparound waitlist. *Id.* at D003113851. | |
| 224. | The Outcomes Report states that the average time from application to first wraparound service was 82 days in Q2 of 2023. *Id.* at D003113852. | |
| 225. | The Outcomes Report states that the plurality of children, 41%, "who started services did not start until over three months after the submission of an application to Wraparound services." *Id.* at D003113853. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 226. | The Outcomes Report states that "only one third (30%) of children who received services were recorded as receiving an interim Wraparound Facilitation service for applications approved in Q2 2023 (38 out of 127 children)." *Id.* at D003113854. | |
| 227. | The Outcomes Report states that "[n]early half (47%) of children did not have Wraparound services documented in claims or CANS data systems. More than half (60%) of children without services did not have a Freedom of Choice form documented." *Id.* at D003113854-D003113855. | |
| 228. | DoHS's April 30, 2024 Children's Mental Health and Behavioral Health Quality and Outcomes Report states that "[o]ut of 115 Wraparound facilitators, 85% (n=98) were certified in CANS assessment. Wraparound facilitators completed 30 CANS assessments (67%) within 30 days and these assessments were updated every 90 days for 46% (n=26) of children enrolled. Review of CANS data indicated that facilitators need more training on completing all items in the CANS assessment, such as how to make justifications unique." *Id.* at D003113841. | |
| 229. | DoHS plans to implement only eight of the 41 recommendations in the fidelity report. *Id.* at D003113841. | Disputed. DoHS selected eight recommendations for prioritization; nothing in the document cited indicates that DoHS does not plan to implement additional recommendations from the fidelity report beyond the eight selected for prioritization. ECF No. 552-3, at D003113841. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 230. | "Efforts to understand the population of children not being screened [for mental and physical health services]" are "Needed to Achieve Substantial Compliance." Ex. 50, Agreement Between the State of West Virginia and the United States Department of Justice: Report by Subject Matter Expert (March 2024), at 8 (D003097184 at D003097191). | |
| 231. | As of March 2024, Defendants had not met the 52% benchmark of screening Medicaid-eligible children [who are not in state service systems] with a mental health screening tool. *Id.* at D003097192. | Undisputed but irrelevant because this data does not refer to foster children, but rather to "Medicaid-eligible" children, <u>excluding</u> those served by BSS. ECF No. 551-25, at D003097192; D003097229 ("The [MOU] specifically states that 52% of Medicaid eligible children who are <u>not</u> in the YS, child welfare, or juvenile justice system … shall be screened with a mental health screening tool annually.") (emphasis added). |
| 232. | The 2024 SME Report summarizes the findings of the January 2024 West Virginia DoHS Children's Mental Health and Behavioral Services: Quality and Outcomes Report (hereinafter SAR) that "an estimated 38.9% of Medicaid-eligible children received an EPSDT with mental health screening. This percentage was 38.5% in the previous semiannual report." *Id.* at D003097229. | Undisputed but irrelevant because this data does not refer to foster children, but rather to "Medicaid-eligible" children, <u>excluding</u> those served by BSS. ECF No. 551-25, at D003097229 ("The [MOU] specifically states that 52% of Medicaid eligible children who are <u>not</u> in the YS, child welfare, or juvenile justice system … shall be screened with a mental health screening tool annually.") (emphasis added). |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 233. | The 2024 SME Report addresses issues relating to the use of the Child and Adolescent Needs and Strengths (hereinafter CANS) tool. The Report "acknowledges that while CANS timeliness is increasing, the percentage of completed CANS is decreasing: 'The number of newly opened cases significantly increased year-over-year, from 570 in Ql 2022 to 801 in Q2 2023 (41% increase), and from 539 in Q2 2022 to 814 in Q2 2023 (51% increase). The Quality Committee discussed that this influx may have impacted the ability of providers to complete and/or enter CANS data for some children.' Looking at out-of-state placements, CANS assessments were completed for 222 of 333 children (67%) in active out-of-state placement in December 2023." *Id.* at D003097201 (citing the January 2024 SAR at 189). | |
| 234. | "In identifying youth eligible for discharge, DoHS could enhance the timeliness, accuracy, and meaning-making of CAFAS/PECFAS assessments." *Id.* CAFAS refers to the Child and Adolescent Functional Assessment Scale assessment, and PECFAS refers to the Preschool and Early Childhood Functional Assessment Scale assessment. | |
| 235. | "The MU [Marshall University] fidelity report makes it clear that needs identified in the CANS are only being reflected in POCs [Plans of Care] in slightly over half of the cases." *Id.* | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 236. | "[T]he SME needs to see more effort towards and documentation of QIAs [Qualified Independent Assessments] occurring in a timely fashion. The SME also needs to see evidence that the children who are in RMHTF are in the most integrated setting appropriate to their needs; i.e. children who can be served in the community do not enter RMHTF and children who are appropriate for discharge to the community are in fact discharged from RMHTF." *Id.* at D003097204. | |
| 237. | The 2024 SME Report, relying on "a one-page memo from DoHS on information received from MU as of January 3, 2024," states that "54% of all youth and 67% of active youth in out-of-state RMHTF placement have a completed CANS. The initial CAFAS is available for 43% of all youth and 54% of active youth." *Id.* at D003097245. | |
| 238. | The 2024 SME Report states that "DOJ found that [West Virginia] had not complied with Title II of the Americans with Disabilities Act (ADA) and, as a result, many children with serious mental health conditions were needlessly removed from their homes to access treatment." *Id.* at D003097186. | Undisputed that the report states this, but clarifying that this refers to the time period prior to the DOJ's finding in 2015. |
| 239. | "[I]t is still necessary to increase availability, accessibility, and awareness of effective HCBS [home- and community- based services] to prevent unnecessary RMHTF admissions." *Id.* at D003097203. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 240. | "Many of the children remaining in residential mental health treatment facilities (RMHTFs), despite being ready for discharge, are waiting for a home to discharge to, but homes are hard to come by for these youth, who may be older and have greater needs." *Id.* at D003097188. | |
| 241. | The 2024 SME Report quotes from page 104 of the WVU Detailed Report to conclude that "[w]aitlists have also increased: 'A larger percentage of organizations reported having waitlists for services in Year 2 compared to Baseline. Statewide, 30% of organizations at Baseline and 40% in Year 2 reported having waitlists." *Id.* | |
| 242. | "67% of Wraparound Facilitators (WFs) completed the CANS within 30 days. Only 46% of WFs completed WFs updated the CANS every 90 days [...] 'In just over half (51%) of the Wraparound Plans of Care, if a need was in the Wraparound plan, it had also been indicated on the initial CANS. There were 34 (18%) that found some of the needs were expressed in the Wraparound Plan and indicated on the initial CANS' (p. 70)." *Id.* at D003097201 (citing the August 2023 West Virginia Wraparound Fidelity Report, at 70.) | |
| 243. | The 2024 SME Report states that wait times for the QIA process have lengthened: "74°/o of referrals submitted August 2022 to April 2023 were completed within 30 days, while 64%, (n = 36) of completed referrals in October took more than 30 days to be completed and communicated back to DoHS. DoHS recognizes these time frames are not acceptable to meet needs." *Id.* at D003097202. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 244. | "[C]apacity remains an issue in WV. As of December 2023, there was a waitlist of 22 children for PBS services (the SME notes that this number was 14 in December 2022). This may be partially due to staffing issues. [...] Average time on the waitlist was two months." *Id.* at D003097247. | |
| 245. | "PBS/Behavioral Support Services Needs: Continued documentation of the length of the waitlist for services, along with the average wait time." *Id.* at D003097190. | |
| 246. | On wraparound services: | |
| 247. | "Wraparound Needs: More specific definitions and measures to track and evaluate data with regards to which/intensity of services are listed on POCs [Plans of Care] and if youth are being connected to these services." *Id.* at D003097190. | |
| 248. | According to the 2024 SME Report, "an increased demand for Wraparound facilitation has also led to a waitlist." *Id.* at D003097206 (citing the January 2024 SAR). | |
| 249. | "The SME Team would like to see new evidence specifically demonstrating these Wraparound Implementation action items self-reported in the January 2024 SAR, such as: data enhancements to better understand a child's timeline to access services and CSED Waiver eligibility determination; provider-level data reviews to assess strengths and opportunities across the WV network; and continued work to address data quality and completion with a particular focus on CANS." *Id.* at D003097213. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 250. | The 2024 SME Report notes difficulties assessing trainings because "the [Marshall University] website did not show postings of past [Wraparound] trainings in the last 12 months or any information on trainees that attended." *Id.* at D003097210. | |
| 251. | "[E]ight (73%) of CSED Waiver providers reported difficulty with service coverage." *Id.* at D003097263 (citing the WVU Provider Evaluation). | |
| 252. | Provider and community concerns related to the CSED Amendment included "concerns raised around reimbursement and provider pay, including concerns around: 1. the average costs per unit being low; 2. CSED Waiver therapists inability to bill for attending POC meetings; and 3. confusion around whether rates have decreased or not. Salary was also raised as an important factor in impacting staff recruitment in the WVU Summary Report focused on the Workforce at 2 Years." Ex. 1 at D003097264. The Report also mentions "concerns around the impact that plans to remove residential levels of care would have in terms of needing to re-tool their services through these new models." *Id.* at D003097264. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 253. | The 2024 SME Report discusses the findings of the WVU Detailed Report that "providers felt the top three barriers to maximizing referrals were: lack of qualified providers; lack of resources; lack of information about resources. 'Approximately 70% of Year 2 providers who had heard of the mental and behavioral health services of interest indicated that they (the services) need more resources.'" *Id.* at D003097188 (quoting the WVU Detailed Report at 51). | |
| 254. | "[T]he SME notes the recurring theme of a need for more services with better access." *Id.* | |
| 255. | The 2024 SME Report discusses Assertive Community Treatment for mental illness (hereinafter ACT): "With respect to current and historic utilization, ACT remains very low for eligible young adults since inception. Statewide ACT utilization is commonly in the mid-500s, while the under 21 population is in the low single digits." Ex. 1 at D003097215 "Awareness of ACT services remains low (18% among caregivers and 8% among youth). Caregivers reported utilizing ACT (3% in last 12 months, 0% in years prior, 3% on waitlist, 16% did not know)." *Id.* at D003097217. | |
| 256. | "Sixty percent of organizations (close to the Baseline of 64%) reported they have staff with necessary training and skills to service youth who needed services. Organizations who did not have capacity did not have nearby providers to whom they could refer youth for ACT." *Id.* | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 257. | "DoHS is beginning to capture and analyze data by looking at waitlists for ACT. However, given the low ACT enrollment numbers it is difficult to ascertain how many youth may be offered ACT and do not enroll for various reasons (waitlist or engagement issues)." *Id.* at D003097218. | |
| 258. | "35% of organizations that offered Behavioral Support Services (including PBS) in Year 2 reported difficulties providing service coverage, with the biggest challenges in Regions 5 and 6." *Id.* at D003097248. | |
| 259. | "Many of the children remaining in residential mental health treatment facilities (RMHTFs), despite being ready for discharge, are waiting for a home to discharge to, but homes are hard to come by for these youth, who may be older and have greater needs." *Id.* at D003097188). "Further, with the discontinuation of stabilization and treatment (STAT) homes, the tiered system of foster care will be essential to divert children in foster care from admission to an RMHTF, requiring that recruitment also focus on families willing to care for youth with higher SED needs. DoHS acknowledges the shortage of foster homes, particularly for older youth and youth with serious emotional disturbance (SED) and has initiated a marketing campaign to address this concern." *Id.* | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 260. | "Although STAT had the support of legislation authorizing higher payments to caregivers, at the time of the June 2023 SME Report, only one STAT home had been recruited and fully trained, 3 had neared completion of training, and only 14 families had expressed interest in taking part in this new service. As a result, the STAT home model was discontinued during the time between the July 2023 and January 2024 SARs, and there is now a renewed focus on providing services youth with higher levels of need within the existing tiered system." *Id.* at D003097251. | |
| 261. | "The SME needs to review additional data from the WVU Children's Mental Health Evaluation that more closely examines services individual children receive and reflects if those services meet individual needs." *Id.* at D003097211. | |
| 262. | "[T]he total number of youth in RMHTF since February 2023 has exceeded 800 (range: 805 in February to 889 in May 2023). At any given month, out-of-state placements constitute about 40% of the total RMHTF population." *Id.* at D003097242 (citing the January 2024 SAR). | |
| 263. | The 2024 SME Report notes a "significant concern" with "re-admissions into RMHTF." Readmissions for youth age 9-to-12 average 48%, while the overall risk of readmission averages 30%, and "[r]eadmissions happen on average within less than 6 months of discharge (ranging from 89 to 142 days by age group)." *Id.* at D003097243 (citing the January 2024 SAR). | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 264. | "DoHS recognizes that children with CAFAS/PECFAS [Child and Adolescent Functional Assessment Scale/Preschool and Early Childhood Functional Assessment Scale] less than 90 continue to linger in RMHTF, with more than half of youth with CAFAS/PECFAS<90 being retained in RMHTF more than 90 days after scoring below the threshold for this level of care." *Id.* | |
| 265. | "WV is currently experiencing challenges with foster family recruitment. Slack capacity, i.e., the percentage of homes without an active placement, has been largely stable over the 18 months prior to the January 2024 SAR, at around 20% (rising to 30% in the first quarter of 2023). Further, over the reporting period, the number of homes closed exceeded the number of homes opened. [...T]hese challenges are particularly acute for ensuring that older youth 13-17 years old, who constitute an overwhelming proportion of youth with SEDs living in residential facilities who have been prioritized for discharge planning, have families to care for them. The lack of families willing to take on older youth with higher levels of need is impacting the ability of DoHS to discharge youth who do not need residential care." *Id.* at D003097252. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 266. | "DoHS has incorporated a simplified metric for reporting the ratio of need to TFC home capacity. This shows that the availability of such homes is not distributed evenly across the state and in many cases, does not match with the level of need, particularly not for older youth. This analysis indicates that the current capacity would require, at a minimum, that two to six youth in this age group be placed in each home, which is inconsistent with evidence-based practice regarding care for high-needs youth." *Id.* | |
| 267. | The 2024 SME Report lists compliance with data quality requirements as partial, and notes that "[s]ubstantial compliance will require a fuller data store buildout that includes a sufficiently meaningful set of the measures described in this Agreement item [on data quality]." *Id.* at D003097196. | Disputed. The MOU item cited to here is "specification of data to be collected and analyzed," not data quality. The "note" on specific evidence or progress needed to achieve substantial compliance on this item does not have anything to do with data quality; Plaintiffs' addition of the bracketed language "on data quality" to this quoted statement is inaccurate. ECF No. 551-25, at D003097196; *see also id.* at D003097226. |
| 268. | "The WVU [West Virginia University] survey is not providing meaningful actionable data. DoHS should follow through on planned changes to implementation." *Id.* | |
| 269. | The SME would like to see "[i]mproved timeliness and data quality of CANS/ CAFAS, especially with out-of-state providers," as well as "[i]ncreased effort towards and documentation of Qualified Independent Assessments (QIAs) occurring in a timely fashion." *Id.* at D003097197. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 270. | "[T]he SME Team did not receive any specific evidence to support DoHS's self-reporting of this progress [on data collection for Wraparound services] and looks forward to seeing more evidence to follow this development going forward." *Id.* at D003097207. | |
| 271. | The 2024 SME Report states that "there are nevertheless still significant quality issues. In particular, the quality sampling reviews (required by Agreement Item 50) are to consist of cross-system analysis, surveys, and interviews with a sample of at-risk children, their caregivers, and providers may not accurately reflect the views of these stakeholders. DoHS has contracted with WVU to conduct these quality sampling reviews. However, the reports issued by WVU on the first wave community sample and second wave residential sample reflect several concerns related to design, sampling, and measurement, which hamper meaning-making from these efforts." *Id.* at D003097223. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 272. | "Low response rates [to the WVU survey] raise questions about whether the data present a trustworthy picture of the views of inadequately represented stakeholder groups." *Id.* Furthermore, "the data yielded from survey items suggest that: some of the questions were not relevant to some respondents; some questions did not provide sufficient actionable data to DoHS; and some questions were clearly not well-understood by the respondents. For example, the SME questions the relevance of asking a youth in an RMHTF whether they are in need of or using HCBS. Further the SME questions whether sufficient meaning can be obtained from finding that few youth were on a waitlist for Wraparound (which could have multiple divergent meanings: not needing a waitlist, not needing services, or not anticipating a need for services at discharge.)" *Id.* | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 273. | "[T]he data store that supports the dashboard for the cross-system child- and interaction-level planning is only approximately one-third complete (based on the inventory of constituent data sources, planned for inclusion, that are complete as of January 2024.)" The SME Report identifies two specific issues: "The first consists of the delays in the data store buildout, which remain an obstacle to understanding child experiences in the system and presents DoHS with a persistently incomplete view of areas requiring attention; second, there are problematic data quality issues particularly as they pertain to the quality sampling review surveys and case reviews." *Id.* at D003097224. In addition, "the dashboard can only partially function as intended given that it is reliant on the incomplete data store, which has experienced lengthy delays. Thus, the data that are being used are, with few exceptions, not cross-system or child-focused data. Rather, they are program-specific data related to individual systems. Although these data have been used effectively to measure implementation and to a lesser extent to track outcomes, they present an incomplete picture. Without a fully-realized data store and dashboard, DoHS may not be aware of implementation challenges that are cross-system in nature until problems emerge in the program-specific data." *Id.* at D003097225. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 274. | With regards to the Agreement between West Virginia and the Department of Justice Item 49, which requires the collection of data to assess the impact of the Agreement on children in the target population, the 2024 SME Report found partial compliance, and states that "[s]ubstantial compliance will require a fuller data store buildout that includes a sufficiently meaningful set of the measures described in this Agreement item. Additionally, substantial compliance will require a more thorough and deeper understanding of these measures through disaggregation of state level data by child characteristics, county, or region, and through cross-system analysis." *Id.* at D003097226. | |
| 275. | With regards to the quality of survey data collected by WVU, the 2024 SME Report finds partial compliance, and states that "[a]lthough response rates (which were also poor in the first year of data collection) are noted as a limitation, it was not clear to the SME what strategies are being considered to improve them." *Id.* | |
| 276. | Heidi Arthur testified that she did not review any information on how many children were on waitlists at Children's Mobile Crisis Response and Stabilization Team locations. Ex. 8, Heidi Arthur Dep. Tr. 73:8-74:6. | Undisputed, with the clarification that this data is not specific to foster children. |
| 277. | Heidi Arthur testified that she did not receive any data on whether services were implemented for the child or family after a call was received by the Crisis Line. *Id.* at Tr. 74:10-17; 82:10-20. | Undisputed, with the clarification that this data is not specific to foster children. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 278. | Heidi Arthur testified that the mobile crisis hotline was too new to show progress and there was no timeline to show progress. *Id.* at Tr. 82:21-84:18. | Disputed.  The question asked was whether there was "any metric by which West Virginia plans to measure whether the calls to the hotline are in fact changing the outcomes for children, whether children are being placed in institutions or not?"  Ms. Arthur testified that "the progress that I looked for was is it even being used, it's so brand new, are people aware of it . . . at this point in its implementation is what I look to.  Over time I would expect that [the entities overseeing utilization" would be tracking exactly that kind of data."  In response to the question "do you know what the timeline is for tracking that," Ms. Arthur responded "there is no standard that I'm aware of."  ECF No. 550-8, Tr. 82:21–84:18. |
| 279. | Heidi Arthur testified that while BSS policies dictate that foster children receive an Early Periodic Screening Diagnosis and Treatment Program Healthcheck ("EPSDT") within five days of placement in foster care, she did not review any data as to how soon after placement children actually received an EPSDT. *Id.* at Tr. 85:3-87:2. | Disputed.  Ms. Arthur testified "I reviewed data [that] between January 2022 and January 2023 I noted that 93 percent of children had been screened for mental health needs within a year of their initial placement.  Understanding that frequently children who require mental health services are already connected to mental health services, it wouldn't surprise me that the best data for effective access to mental health is going to be a broader window."  ECF No. 550-8, Tr. 85:19–86:6. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 280. | Heidi Arthur testified that under CPS policy, children should receive mental health assessments within the first 15 days of transfer of the child's case to ongoing services, but that she did not review any data as to whether these mental health assessments were occurring within 15 days. *Id.* at Tr. 88:20-89:5. | |
| 281. | Heidi Arthur testified that Youth Services policy required completion of a Family Advocacy Support tool within the first 15 days of initial contact with the family, but she did not review any data as to whether this tool was completed within 15 days. *Id.* at Tr. 89:6-16. | |
| 282. | Heidi Arthur testified that DoHS policy is that "for children whose first placement is a shelter or a residential mental health treatment program, the child welfare worker will complete referrals within 24 hours of placement" but that she did not review any data as to whether referrals were completed within 24 hours. *Id.* at Tr. 89:17-25. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 283. | Heidi Arthur stated that she asked Defendants for data about the length of delays for children to receive CSED waiver services, but that none was available to her. *Id.* at Tr. 92:9-93:8. | Disputed. Ms. Arthur was asked if she "reviewed any data about how long it was taking children to receive services once referred for CSED services," and she responded that "it took an average of 30 days to the assignment of an interim wraparound facilitator, but there was not available data in terms of the actual receipt of the CSED Waiver services." ECF No. 550-8, Tr. 92:9-19. Ms. Arthur was then asked: "would you have liked to see information about … how long it took?" to which she responded: "correct. I asked for that data. The data that was available is what is in the report." *Id*. Tr. 92:20–93:2. |
| 284. | Heidi Arthur testified that under DoHS policy, "[w]hen a Bureau of Social Services worker is assigned a child on their caseload who has been screened with an identified mental health need, the worker must immediately initiate an application for·the CSED Waiver program and complete an Intensity of Intervention Services Assessment form for the child within 24 hours," but that she did not review any data on whether this actually occurred. *Id.* at Tr. 93:9-94:10 (citing the Department of Justice Memorandum of Understanding). | Undisputed that the statement accurately quotes part of the deposition testimony, with clarification that Ms. Arthur testified that she reviewed the June 2023 DOJ Subject Matter Expert report stating that the CSED waiver application was completed in 8.6 days on average.  ECF No. 550-8, Tr. 94:11–95:7. |
| 285. | Heidi Arthur testified that under DoHS policy, the wraparound facilitator will carry a caseload of no more than 15 children, but she did not review any data as to the actual caseload of wraparound facilitators. *Id.* at Tr. 102:8-16. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 286. | Heidi Arthur testified that under DoHS policy the wraparound facilitator is required to conduct weekly home visits, but that she did not review any data as to whether those weekly home visits were performed in practice. *Id.* at Tr. 102:17-23. | |
| 287. | Heidi Arthur testified that if a child's Plan of Care does not identify the services needed, the child typically would not receive services. *Id.* at Tr. 103:12-16. | |
| 288. | Heidi Arthur testified that under DoHS policy, within seven days of the CSEDW intake, a date will be set for the initial Person-Centered Service Plan ("PCSP") meeting. but that she did not review any data as to whether this date was actually set seven days within the intake as discussed. *Id.* at Tr. 103:17-24. | |
| 289. | Heidi Arthur testified that under DoHS policy, prior to the PCSP meeting, a case manager will contact the caregiver or legal representative, but that she did not review any data as to whether and when this contact occurred. *Id.* at Tr. 104:2-12. | Undisputed with the clarification that Ms. Arthur testified that "because there was data that children were receiving the services, I didn't back into data respective to how they got there." ECF No. 550-8, Tr. 104:9–104:12. |
| 290. | Heidi Arthur testified that "the completion of the CAFAS was completed in 6.7 weekdays on average, which didn't meet the target of four weekdays." *Id.* at Tr. 105:4-6. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 291. | Heidi Arthur testified that under DoHS policy, "If at the child's six-month PCSP review the PCSP team determines he or she has not benefitted from waiver enrollment, *i.e.,* no progress has been made on the child's treatment goals and objects, then the PCSP team will refer the child to the ASO to redetermine the level of care (LOC) placement," but testified that she did not review any data on when and how often this happened. *Id.* at Tr. 107:23-108:11. | |
| 292. | When asked "with regard to at least three of these goals, and we're talking about foster children right now, the metrics, they did not -- with regard to the data and the outcome, it didn't meet the goals?" Heidi Arthur testified "Correct. Correct." *Id.* at Tr. 112:9-14. | Undisputed, with the clarification that the data being reported was not specific to foster children, only the goals were specific to foster children.  ECF No. 550-8, Tr. 110:8–111:11 ("I believe that the Subject Matter Report is respective to the SED waiver write large for the entire population.") |
| 293. | These goals were as follows: | |
| 294. | Goal one: CSED Waiver application and Intensity of Intervention Services Assessment within 24 hours of placement. *Id.* at Tr. 109:4-111:4. | Disputed to the extent it suggests that the goal was not met for foster children.  The data reported is an average of all children applying for the CSEDW waiver; there is no specific data for foster children. ECF No. 550-8, Tr. 114:3–115:17 ("The policy is related to foster youth, whereas the DOJ [report] is children more broadly.  And so there's not an apples to apples comparison in terms of the time frames . . . Q:  You just . . . have no ability to . . . separate foster children from other eligible children?  A: That's correct.") |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 295. | Goal two: Complete and submit CSEDW application, no target goal. The difference between goal one and goal two appears to be that the 24-hour deadline is the deadline for completing the CSEDW waiver specifically for foster children, while goal two, with no specific target, may be for the larger population *Id.* CSEDW applications are completed, on average, in 8.6 weekdays. This result did not meet the target goal as applied to foster children. *Id.* | Disputed to the extent it suggests that the goal was not met for foster children. The data reported is an average of all children applying for the CSEDW waiver; there is no specific data for foster children. ECF No. 550-8, Tr. 114:3–115:17 ("The policy is related to foster youth, whereas the DOJ [report] is children more broadly. And so there's not an apples to apples comparison in terms of the time frames . . . Q: You just . . . have no ability to . . . separate foster children from other eligible children? A: That's correct.") |
| 296. | Goal three: Complete the CAFAS, PECFAS within four weekdays. *Id.* at Tr. 111:13-22. This step was completed, on average, in 6.7 weekdays. This result does not meet the target goal. *Id.* | Disputed to the extent it suggests that the goal was not met for foster children. The data reported is an average of all children applying for the CSEDW waiver; there is no specific data for foster children. ECF No. 550-8, Tr. 114:3–115:17 ("The policy is related to foster youth, whereas the DOJ [report] is children more broadly. And so there's not an apples to apples comparison in terms of the time frames . . . Q: You just . . . have no ability to . . . separate foster children from other eligible children? A: That's correct.") |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 297. | Goal four: Assign an interim wraparound facilitator if child is not receiving wraparound, complete within five weekdays. *Id.* at 111:23-112:8. This step was completed, on average, in 9.2 weekdays. This result did not meet the target goal. *Id.* | Disputed to the extent it suggests that the goal was not met for foster children. The data reported is an average of all children applying for the CSEDW waiver; there is no specific data for foster children. ECF No. 550-8, Tr. 114:3–115:17 ("The policy is related to foster youth, whereas the DOJ [report] is children more broadly. And so there's not an apples to apples comparison in terms of the time frames . . . Q: You just . . . have no ability to . . . separate foster children from other eligible children? A: That's correct."). |
| 298. | Heidi Arthur testified that it took an average of 30 total days from initial referral to assignment of an interim wraparound facilitator. *Id.* at 112:15-113:2. This is only the deadline to get a facilitator; the timeline for the commencement of services is unknown. *Id.* | |
| 299. | Heidi Arthur testified that the Pathway [to Children's Mental Health Services] is "so new" that there's no way to tell if it is progressing. *Id.* at Tr. 113:18-21. The Pathway to Children's Mental Health Services is a document published in March 2023 which describes a plan for access to mental health services to children. *Id.* at Tr. 7:17-21. | Undisputed that the statement accurately quotes part of the deposition testimony, but disputed to the extent it suggests that the quoted language is Ms. Arthur's. The quoted language is a deposition question, to which Ms. Arthur responded "It's so new. It's so new." ECF No. 550-8, Tr. 113:18–114:21. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 300. | Heidi Arthur testified that the Bureau for Medical Services ("BMS") provider manual recommends that Medicaid enrolled providers should give priority to foster care children, but that she does not know whether any data tracks whether Medicaid enrolled providers in fact give priority to foster care children. *Id.* at Tr. 114:19-115:6. | |
| 301. | Heidi Arthur testified that the BMS Provider Manual recommends that "Medicaid enrolled providers should make good faith efforts to complete assessments in a timely manner, as well as work with BSS to ensure that information is shared in a timely manner with BSS court systems as well as other entities involved in the care and treatment process of the foster child while conforming to state and federal confidentiality requirements," but that she did not review any information as to whether this was in fact happening. *Id.* at Tr. 115:8-16. | |
| 302. | Heidi Arthur testified that she did not review the specifics of what is happening within West Virginia's Comprehensive Behavioral Health Center ("CCBHC") waiver plan or the timeline for that program in forming her opinion on it. *Id.* at Tr. 118:2-21. | Disputed.  Ms. Arthurt testified "the state does have a statewide plan for expanding access to behavioral health care across the life span that meets a federal standard and is the best practice that most states are now aspiring toward" and that she looked at West Virginia's "implementation plan in terms of its statewide coverage.  Thirteen CCBHCs are included, and it is intended to be a resource across the entire state." ECF No. 550-8, Tr. 117:18–118:15. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 303. | Heidi Arthur testified that there is a "significant work force crisis" in West Virginia but that "I didn't review data specific to the work force crisis in West Virginia." *Id.* at Tr. 119:21-22, 120:12-13. | Undisputed, with the clarification that Ms. Arthur added "I have, however, prepared issue briefs related to the behavioral health work for crisis . . . So I'm familiar with the trend, national trend. And based on the ma[p] that's provided according to HRSA data, it's a profound, profound impact in West Virginia." ECF No. 550-8, Tr. 120:12–120:20. |
| 304. | Heidi Arthur acknowledged in her report that there are wait lists at one-third of mental health provider locations state-wide. *Id.* | Disputed, the reference to wait lists in Ms. Arthur's report reflects responses from a limited set of providers. *See* ECF No. 533-22, at 15 n.40. |
| 305. | When asked "[d]o you understand what the relationship is like· ·between the providers and the department in West Virginia," Heidi Arthur answered, "No." *Id.* at Tr. 121:14-17. | |
| 306. | Heidi Arthur testified that she does not recall looking at "data related to timeliness of payments to providers." *Id.* at Tr. 121:21-22. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 307. | Heidi Arthur testified that the CSED waive program should, over time, reduce the number of children entering foster care, *Id.* at Tr. 127:3-10; however, that there is no way to show whether the CSED Waiver program is preventing children from coming into care. *Id.* at Tr. 128:2-8. She testified that there is no timeline in which West Virginia would expect to see its CSED Waiver services prevent children from coming into care that she's aware of. *Id.* at Tr. 128:11-24. | Disputed. Ms. Arthur testified that "because [the CSED Waiver] was implemented in March of 2020, there's no implementation data that speaks to its prevention effect at this time" that she is aware of. ECF No. 550-8, Tr. 128:5–10. When asked about a timeline in which West Virginia would expect to see its CSED Waiver services prevent children from coming into care, Ms. Arthur testified that she was not aware of one, not that there is no timeline. *Id.* 128:11–24. |
| 308. | Heidi Arthur testified that there is no data showing that these plans are reducing reliance on residential placement for West Virginia. *Id.* at Tr. 137:10-20. | |
| 309. | Heidi Arthur testified that she did not review data on how many children should have been referred to the Safe at Home Program by BSS workers but were not. *Id.* at Tr. 137:21-138:10. | Undisputed, with the clarification that the question asked was "And you can't prove a negative as to how many children should have been referred but weren't" to which Ms. Arthur replied "That's correct.".   ECF No. 550-8, Tr. 138:8–11. |
| 310. | Heidi Arthur testified that she did not take into account the reduction in the number of children referred to or receiving services through the Safe at Home program from 1,225 in 2021 to 963 in 2023 in her opinion. *Id.* at Tr. 139:22-140:6. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 311. | Heidi Arthur testified that there were 6,214 individuals receiving an Intellectual and Developmental Disability ("IDD") waiver and that she did not review any information as to how many of the individuals with waivers were in fact receiving services, and that "[w]e did not have data regarding which of those wait list individuals are foster children, and we do not have data of the number of total recipients [which] are foster children." *Id.* at Tr. 150:11-151:23. | |
| 312. | Heidi Arthur testified that she did not review any data as to how long individuals were on the IDD waitlist, and she did not review any data as to why IDD waitlist members leave the program. *Id.* at Tr. 153:3-11. | |
| 313. | Heidi Arthur testified that she did not look at 2023 data to support her determination that there is progress in ACT program staffing. *Id.* at Tr. 154:4-8, 18-23. She testified that she did not look at whether wait lists were increasing or decreasing for ACT services. *Id.* at Tr. 155:2-5. | Undisputed, with the clarification that this would "not affect my [opinion], because it's possible that work force diversion is happening with the rollout of CCBHC, with the expansion of socially necessary services, with the expansion of the SED waiver. There's a tremendous amount of concurrent implementation underway, so shifts in where people work and how the limited work force is distributed is likely to cause fluctuations in availability for different aspects of services on the continuum." ECF No. 550-8, Tr. 155:12–22. |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 314. | Heidi Arthur testified that "I believe there was data" about the percentage of individuals aware of ACT, "but I didn't look at that as a specific component of my analysis." *Id.* at Tr. 157:8-14. | Undisputed, with the clarification that Ms. Arthur explained that "Individuals often are [unaware] of specific evidence-based interventions and their, you know, sort of appropriateness for their care. I would be more interested in whether professionals and those making treatment decisions are aware of the availability of a service qualification or a service category like ACT." ECF No. 550-8, Tr. 157:18–25. |
| 315. | Heidi Arthur further testified that she did not look at data on specific utilization of ACT by foster children, and that that data would inform her opinion. *Id.* at Tr. 158:2-19. | Disputed. Ms. Arthur testified that the data "would be interesting data to have." ECF No. 550-8, Tr. 158:13–19. |
| 316. | Heidi Arthur testified that "the ACT should over time reduce the number of children who are entering foster care," but stated that she did not review any data on whether the provision of ACT services was preventing children from being institutionalized or preventing the removal of children into foster care. *Id.* at Tr. 158:20-159:14. | Undisputed that the statement accurately quotes part of the deposition transcript, with the clarification that Ms. Arthur testified that "data around things that aren't happening is precious hard to measure, so . . . I didn't find that data." ECF No. 550-8, Tr. 159:7–9. |
| 317. | Heidi Arthur testified that she did not review any data about how many children were on the wait list for PSB services. *Id.* at Tr. 160:3-12. | |
| 318. | Heidi Arthur testified that she did not review any data about how long children were on wait lists for PSB services. *Id.* at Tr. 162:9-14. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 319. | Heidi Arthur testified that she did not review any data showing that provision of PSB services reduced the number of children entering residential facilities or that it reduced the number of children coming into foster care. *Id.* at Tr. 162:22-163:7. | |
| 320. | Heidi Arthur testified that she is not aware of any timeline for showing that the provision of PBS services either prevents institutionalization or reduces the number of children in foster care. *Id.* at Tr. 163:9-12. | Undisputed, with the clarification that Ms. Arthur's full answer is that "as with every other service, the data that is about what didn't happen is not currently available, and I do not know a timeframe for what would indicate that kind of impact." ECF No. 550-8, Tr. 163:15–19. |
| 321. | Heidi Arthur testified that the June 2023 SME report recommended "that DoHS adopt or clarify its implementation strategies, particularly for scaling up the evidence-based interventions, in order to assess whether interventions are reaching the intended target population and statewide sustainability," but that she was not aware whether West Virginia had implemented this recommendation. *Id.* at Tr. 163:22-164:14, 164:25-165:3. She testified that the June 2023 SME report recommended "learning communities," but that she was not aware whether the state had implemented this recommendation. *Id.* at Tr. 165:4-18. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 322. | Heidi Arthur testified that her opinion on the progress of West Virginia's expansion of specialized residential care was not based on any data on the outcomes for any of West Virginia's investments. *Id.* at Tr. 165:19-166:4, 167:13-167:25. She testified that "the amount of money, also the fact that they've created this plan" is what informs her opinion that the plan is progressing. *Id.* at Tr. 168:20-169:2. | Undisputed that the statement accurately quotes part of the deposition transcript, with the clarification that Ms. Arthur testified that she was "equating the amount of money spent and the targeted nature of cross-system precision intervention to a thoughtful analysis of data and utilization needs. So this says to me that the state's contracted managed care provider is looking at the network and identifying areas where investment is needed in order to expand access to services for particular high-need populations of children with serious mental health challenges." ECF No. 550-8, Tr. 168:9–19. |
| 323. | Heidi Arthur testified that the "Mountain Health Promise is intended to coordinate access to services for all the children in foster care, kinship care, and adoptive care [...] and making certain that there aren't barriers to timely receipt," but that she did not review any data on how many of the 23,574 children enrolled in Mountain Health Promise were actually receiving services. *Id.* at Tr. 171;4-17, 173:14-19. | |
| 324. | Heidi Arthur testified that West Virginia's "foster care policy requires BSS workers to convene an MDT meeting within 30 days of each child's entrance into foster care," but that she did not review any data as to whether or when these MDTs were happening and who was present for the MDTs that occurred." *Id.* at Tr. 174:5-17. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 325. | Heidi Arthur testified that West Virginia had made reasonable efforts but that she did not compare reasonable efforts to any benchmark or standard. *Id.* at Tr. 175:5-176:4. | Undisputed, with the clarification that Ms. Arthur was asked about efforts to maximize the availability of community-based placements. ECF No. 550-8, Tr. 174:18–23. |
| 326. | Heidi Arthur testified that "[i]f a BSS worker believes residential treatment is the most appropriate placement for a child, they both require the BS worker to submit to the courts and the multidisciplinary team information supporting their recommendation," but that she did not review any data on the timeliness of the BSS workers submitting to the courts or the MDTs information supporting their recommendation. *Id.* at Tr. 177:14-24. | |
| 327. | Heidi Arthur testified that West Virginia policy requires "discharge planning to address the least restrictive placement needs of the child where appropriate services can be delivered to stabilize and treat that child," but that she did not review any data on whether and when the discharge planning occurred. *Id.* at Tr. 177:25-178:8. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 328. | Heidi Arthur testified that with regard to all of the recruitment efforts she lists, she did not review any data as to whether these parts of the plan were working. *Id.* at Tr. 178:9-179:20. | Undisputed, with the clarification that Ms. Arthur testified that her analysis is "my analysis is based on the steps that were being taken to recruit additional foster families. And this is a listing of all of the activities undertaken from 2019 through 2023, including 2024 statewide campaign. So it's really intended more as a compilation of the state's reasonable efforts to optimize community-based homes and families, kinship and otherwise." ECF No. 550-8, Tr. 179:5–20. |
| 329. | Heidi Arthur testified that she did not know whether the number of West Virginia's licensed foster homes has increased or decreased over time. *Id.* at Tr. 180:12-24. Heidi Arthur testified that whether the number of homes "was increasing over time to respond to the actual demand" would impact her opinion on whether the recruitment part of the plan was working. *Id.* at Tr. 181:9-18. | Undisputed, with the clarification that Ms. Arthur's response was not limited to licensed foster homes, but "adequate kinship or otherwise homes." ECF No. 550-8, Tr. 181:9–16. |
| 330. | Heidi Arthur testified that "[i]n 2020 the legislature passed HB1492, which requires that a child welfare worker must, within seven days from the date of removal of a child into the custody of the state, provide a list of viable or ineligible relative or kinship resources to the court," but that she did not review any data on whether or not caseworkers did this. *Id.* at Tr. 181:19-182:4. | |

| ¶ | Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|---|
| 331. | Heidi Arthur testified that she did not review any information as to the actual services provided to families in forming her opinion. *Id.* at Tr. 184:2-12. | Undisputed, with the clarification that the question was with respect to services provided to 375 families who had been assigned a kinship navigator. ECF No. 550-8, Tr. 183:22–184:8. |
| 332. | Heidi Arthur testified that the "department has supported sustainability for the WV Relatives as Parents Program," but that she did not review any information or data as to how this WV Relatives as Parents Program was impacting foster children. *Id.* at Tr. 184:13-19. | |
| 333. | Heidi Arthur testified that she did not review any data as to how many children in kinship homes have any sort of disability, not did she review any data on whether an increase in kinship homes decreases the number of children who are institutionalized. *Id.* at Tr. 188:13-23. | |
| 334. | Heidi Arthur testified that if other support services are not available, then families would be less inclined to take children with severe mental health needs. *Id.* at Tr. 195:9-20. | |
| 335. | Heidi Arthur testified that she did not review any data on the reason for the QIA process wait times being expanded. *Id.* at Tr. 201:2-5. | |
| 336. | Heidi Arthur testified that youth and caregiver awareness of ACT was "definitely stalling and moving backwards." *Id.* at Tr. 203:21-204:11. | |

August 5, 2024                                  Respectfully submitted,

                                                /s/ Philip J. Peisch
                                                Philip J. Peisch (WVSB # 13731)
                                                Caroline M. Brown, *pro hac vice*
                                                Julia M. Siegenberg, *pro hac vice*
                                                Rebecca L. Wolfe, *pro hac vice*
                                                Brown & Peisch PLLC
                                                1225 19th Street NW, Ste. 700
                                                Washington, DC 20036


                                                /s/ Steven R. Compton
                                                Steven R. Compton (WVSB #6562)
                                                West Virginia Attorney General's Office
                                                812 Quarrier Street, 6th Floor
                                                Charleston, WV 25301

## CERTIFICATE OF SERVICE

I, Philip J. Peisch, hereby certify that I caused a true and correct copy of the foregoing document to be delivered to the following via ECF notification:

Marcia R. Lowry
Julia Tebor
Laura Welikson
A Better Childhood
355 Lexington Ave., Floor 16
New York, NY 10017

Richard W. Walters
J. Alexander Meade
Shaffer & Schaffer, PLLC
2116 Kanawha Blvd East
P.O. Box 3973
Charleston, WV 25304

J. Marty Mazezka
Andrew Castillo
Disability Rights of West Virginia
5088 Washington St. W., Suite 300
Charleston, WV 25301

August 5, 2024

/s/ Philip J. Peisch
Philip J. Peisch (WVSB # 13731)
Caroline M. Brown, *pro hac vice*
Julia M. Siegenberg, *pro hac vice*
Rebecca L. Wolfe, *pro hac vice*
Brown & Peisch PLLC
1225 19th Street NW, Ste. 700
Washington, DC 20036

/s/ Steven R. Compton
Steven R. Compton (WVSB #6562)
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301