IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JONATHAN R., et al.,

                Plaintiffs,

v.                                              CIVIL ACTION NO. 3:19-cv-00710

PATRICK MORRISEY, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

This court cannot take over the foster care system of West Virginia. Constitutional limits prevent the court from crafting public policy and administering state agencies. West Virginia's foster care system has cycled through inaction, bureaucratic indifference, shocking neglect, and temporary fixes for years. The blame squarely lies with West Virginia state government. When elected officials fail, the ballot box is the remedy.

In recent times, the public has turned to the courts for answers to intractable policy issues. It is not difficult to understand why. When government fails—when promises are made and usually broken, when reforms are always delayed or abandoned—people turn in desperation to the judiciary. But there are limits to what the courts can do.

The Constitution does not permit federal courts to step in and govern. It does not allow judges to develop public policy, write budgets, hire caseworkers, or administer state agencies. That is the role of the executive and the legislature. The judiciary cannot assume the responsibilities of those who were elected to lead.

The constitutional doctrine of standing requires that an injury be redressable by a judicial order. Here, it is not. For this reason, the court *sua sponte* **DISMISSES** this case for lack of jurisdiction.

I.　　BACKGROUND

The background of this case is well documented in previous opinions.[1] On September 30, 2019, Plaintiffs, a class of children in state foster care custody, filed their class action complaint. [ECF No. 1]. Plaintiffs alleged that Defendants, state executive officials, violated constitutional and statutory rights through West Virginia Department of Human Services (DHS) policies and practices.[2] The filings paint a grim picture of a dysfunctional foster care system.

Plaintiffs ask this court to declare DHS's actions unconstitutional, craft policies to reform DHS, and appoint a Monitor to study and supervise Defendants. *Id.* ¶¶ 404–06. In sum, Plaintiffs ask this court to take over the foster care system during and until it is reformed to their satisfaction.

In due course, Plaintiffs moved for class certification. [ECF No. 318]. On August 16, 2023, this court certified two classes. *Jonathan R. v. Justice*, 344 F.R.D. 294, 318 (2023). The General Class consists of "all West Virginia foster children who are or will be in the foster care custody of DHHR or its successor agency" and one subclass consisting of all members of the General Class with a disability. *Id.*

Primarily, Defendants argue that they have not been "deliberately indifferent" to the failures of the foster care system and the allegedly violated constitutional rights of the Plaintiff

---

[1] *Jonathan R. v. Justice*, No. 3:19-cv-00710, 2021 WL 3195020 (Johnston, J.) (July 28, 2021) (granting Defendants' motion to dismiss based on *Younger* abstention and mootness), *aff'd in part and rev'd in part* 41 F.4th 316 (4th Cir. 2022); *Jonathan R. v. Justice*, No. 3:19-cv-00170, 2023 WL 184960 (Johnston, J.) (Jan. 13, 2023) (granting in part and denying in part Defendants' motions to dismiss); *Jonathan R. v. Justice*, 344 F.R.D. 294 (2023) (Goodwin, J.) (certifying a General Class of foster children and one subclass).
[2] The complaint originally alleged injuries caused by the West Virginia Department of Health and Human Resources (DHHR). DHHR has since been reorganized into several different agencies, including the Department of Human Services (DHS) which administers the foster care system.

children. [ECF No. 533]. Defendants, accepting that foster care in West Virginia is far from perfect, assert that changes in policies, programs, and procedures have improved the system. *Id.* In response, Plaintiffs argue that those purported changes have been ineffectual, and West Virginia foster care has further deteriorated. [ECF No. 548].

## II.   LEGAL STANDARDS

"Without jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Every court, including the Supreme Court, has an obligation to ensure that jurisdiction exists. *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908).

Article III standing is a constitutional limit on jurisdiction of the federal courts. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (The standing doctrine developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood."). Standing requires a plaintiff to be able to show at every stage of litigation that (1) she has suffered a concrete, particularized injury, (2) her injury was caused by the defendant, and (3) her injury is redressable by the federal court for each form of relief sought. *Id.* And when a plaintiff asks for multiple forms of relief, a plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.")).

## III.   DISCUSSION

The federal court is one of limited jurisdiction: to interpret and apply the law. Courts do not set policy. They do not legislate. They do not govern. These principles are not abstractions—they are the foundation of constitutionally-established tripartite government.

Plaintiffs, however, ask this court to step beyond constitutional limits. They seek judicially crafted policies that would, in effect, place West Virginia's foster care system under indefinite federal control. They ask this court to systematically reform DHS to oversee agency hiring, budget allocations, and caseworker caseloads. None of that is within the constitutional authority of a federal judge.

This is not a case of identifying a discrete constitutional violation and applying a narrowly tailored remedy. Instead, Plaintiffs ask this court to engage in long-term institutional reform—the kind of structural overhaul that belongs in the hands of policymakers held accountable to the public. *See Whole Women's Health v. Jackson*, 595 U.S. 30, 40 (2021) ("Nor does Article III confer on federal judges some 'amorphous' power to supervise 'the operations of government' and reimagine [them] from the ground up."). This court has no such power.

### A. Standing

To begin, the Constitution's "central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan,* 504 U.S. at 559–60 (1992). Here, Plaintiffs do not have Article III standing because this court cannot order their requested relief without usurping "the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Allen v. Wright*, 468 U.S. 737, 752 (1984) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.").

Standing ensures that federal courts exercise "their proper function in a limited and separated government." John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1224 (1993). Article III standing does not permit federal courts to "exercise general legal oversight of the Legislative and Executive Branches, or of private entities," nor is the federal court

4

a "roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

Therefore, three "irreducible" elements define the constitutional minimum of standing: (1) the plaintiff suffered an injury in fact, (2) the injury is "fairly traceable" to the challenged action of the defendant, and (3) it is "likely," not just merely "speculative," that the injury would be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations omitted). Without any one of those elements, the court does not have jurisdiction over the matter. This is true "however sharp and acrimonious" the parties' dispute may be. *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

Plaintiffs requested relief implicates redressability. As is true in every standing analysis, an examination of the relief requested is key to determining that issue. The court must ask two questions. First, does the court have the power to grant the Plaintiffs' requested relief? *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). Second, is that relief likely to remedy Plaintiffs' injuries? *Id*. Here, the answer to the first question is no.

1. Redressability

As to the power of the court to grant Plaintiffs' requested relief, the court must "consider the relationship between [that relief] and the 'injury' suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (quoting *California v. Texas*, 593 U.S. 659, 671 (2021)). Plaintiffs claim that the State has violated their constitutional rights in six different ways under the Substantive Due Process Clause. Those are

> (1) the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State, (2) the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child, (3) the right to services necessary to prevent unreasonable risk of harm, (4) the right to conditions and duration of foster care reasonably related to the purpose of government custody, (5) the right to treatment and cares consistent with the purpose and assumptions of government

custody, and (6) the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government.

[ECF No. 1 ¶ 373]. Plaintiffs also allege that the State has failed to provide services to disabled foster children.

Plaintiffs' Complaint asks this court to do many things. [ECF No. 1 ¶¶ 404–06]. This includes a number of steps that submits DHS to indefinite federal oversight. For the General Class, Plaintiffs ask this court to:

i. Require DHHR to contract with an appropriate outside entity to complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgement, to determine the full range and number of appropriate foster care placements and services for all children needing foster care placement, including the development of a plan, with timetables, within which such placements and services shall be secured, and ensure that DHHR shall comply with those timetables;

ii. Require that DHHR ensure that all children who enter foster care placement receive within 30 days of entering care a complete and thorough evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be re-evaluated as the child's needs and the information available to DHHR change;

iii. Require that DHHR ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs; describe a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves towards a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in DHHR's custody.

iv. Require that DHHR ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

v. Require that DHHR shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards;

vi. Require that DHHR shall hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers, and ensure that caseloads do not exceed 15 children per-worker for children in placement, with caseloads adjusted for caseworkers who carry mixed caseloads including children not in foster care custody; and

> vii. Require DHHR to develop an adequate statewide plan, to be approved by the Monitor referred to below, for recruiting and retaining foster and adoptive homes, including recruitment goals and timetables for achieving those goals, with which DHHR shall comply.

*Id.* ¶ 405(a). For the subclass, Plaintiffs ask this court to:

> i. Require that DHHR shall ensure that all children with physical, mental, intellectual, or cognitive disabilities shall receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;
> ii. Require that DHHR ensure that an adequate array of community based therapeutic services are available to children with disabilities; and
> iii. Require that DHHR ensure that it develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities.

*Id.* ¶ 405(c). And lastly, the court

> shall appoint a neutral Monitor, paid for by the Defendants, to monitor the terms of this Order. The Monitor shall have access to all relevant documents and information necessary and shall conduct record reviews as necessary to ensure compliance with its terms.

*Id.* at 406.

This court cannot order the relief Plaintiffs seek. *Whole Women's Health*, 595 U.S. at 40. The Constitution does not grant the court "some 'amorphous' power to supervise 'the operations of government' and reimagine [them] from the ground up." *Id.* The Fourth Circuit and the "Supreme Court [have] made clear that the judiciary should not be in the business of administering institutions." *Matherly v. Andrews*, 859 F.3d 264, 276–77 (4th Cir. 2017).

The court cannot write a state budget, hire state employees, or oversee child welfare administration as Plaintiffs request. *Friends of the Earth, Inc.*, 528 U.S. at 192 ("Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake."). The court cannot move state funds and shift local priorities to enact statewide reform. *Horne v. Flores*, 557 U.S. 433, 448 (2009)

7

("Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities."). Nor can the court craft DHS policy that defines "adequate," "appropriate," "sufficient," "unnecessary," and "unreasonable" as the Plaintiffs ask.

This is for good reason—the U.S. Constitution prevents federal courts from intervening in complex state institutions. John C. Jeffries and George A. Rutherglen, *Structural Reform Revisited*, 95 Calif. L. Rev. 1387, 1416 ("[C]ourts have rarely been able to solve the problems identified by structural reform litigation without the assistance of the political branches of government."). Instead, state government is better suited to solve domestic issues, especially as the public pressures its representatives to act. *Id.* ("More commonly, [structural reform] litigation has placed these problems on the agenda for political reform, by calling them to the attention of the other branches of government.").

Institutional reform raises sensitive concerns when those cases involve "areas of core state responsibility" such as providing the basic human needs for children in state custody. *Horne*, 557 U.S. at 448. The mechanism of institutional reform is "a creature poorly suited for the courts, as the role of the workaday trial judge in such litigation is often rather precarious at best and downright ineffectual at worst." *Connor B. ex rel. Vigurs v. Patrick*, 985 F.Supp.2d 129, 157 (D. Mass. 2013).[3]

*Balancing* state issues is not a power available to the judiciary. It is the "essence of the legislative process to *weigh* some needs against others," a process that I must leave to the legislature, executive, and electorate. *Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Center*

---

[3] The long-term success of these efforts is muddled at best, and the constitutional support has weakened over time. *Doe 4 ex rel. Lopez v. Shenandoah Valley Juvenile Center Commission*, 985 F.3d 327, 355 (4th Cir. 2021) (Wilkinson, J. dissenting). Judge Wilkinson cites *Lewis v. Casey*, 518 U.S. 343 (1996), *Rhodes v. Chapman*, 452 U.S. 337 (1981), and *Missouri v. Jenkins*, 515 U.S. 70 (1995) for the proposition that in schools and prisons—areas of state responsibility—the Supreme Court has removed district courts from managerial oversight of state institutions.

*Commission*, 985 F.3d 327, 354 (4th Cir. 2021) (Wilkinson, J. dissenting). Institutional reform litigation decrees eviscerate "a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds." *Jenkins*, 518 U.S. at 131 (Thomas, J. concurring).

Often in institutional reform litigation, the court lacks the resources and expertise to ensure compliance with its own orders. Not surprisingly, the Plaintiffs here ask this court to appoint a federal Monitor to supervise DHS. The court, however, cannot provide that relief. Such a Monitor, along with the inevitable experts, panels, committees, and other external partners, operates her own bureaucracy to replace the state agency for the length of the litigation. Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281, 1300–02 (1976) (Judges act as "personal participant[s] in the negotiations on relief").

These actions distance the court from its own decisions and hinders the judiciary. This court is left to question "the use of masters, receivers, monitors, experts, and consultants, lest the judiciary, in reforming bureaucracies, join their ranks." Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions,* 1983 Duke L.J. 1265, 1302 (1983).[4] The federal courts "should not be in the business of administering institutions," but appointing a Monitor does just that. *Matherly*, 859 F.3d at 276–77.

So I return to the Plaintiffs' requested relief: create policies to reform the West Virginia foster care system, make continuing assessments of the quality of foster care services, and appoint

---

[4] Professor Horowitz asks, "[d]oes the growing use of masters, monitors, and receivers threaten the integrity of the judicial process because of the informal, ex parte way in which they operate or because of the new personnel placed between the judge and the case?" *Id.* My answer is yes. Similarly, he asks, "[t]o what extent should the proliferation of extensive decrees . . . give cause for concern that single district judges can order the reshaping of whole institutions?" *Id.* My concern here is great, especially when the State's legislative and executive branches as well as the federal government's executive branch are already involved. Would the changing role of judges in institutional reform "put the courts in an untenable position, a position conductive of judicial frustration and the loss of neutrality?" *Id.* Without a doubt, that must be true.

a Monitor to make recommendations and scrutinize compliance. Each one falls outside the court's power to redress Plaintiffs' injuries. The constitutional bar of standing prevents this court from granting Plaintiffs relief and becoming a West Virginia policymaker.[5]

### 2. Institutional Reform Examples

Notwithstanding the jurisdictional bar, courts have given in to their altruistic impulses and have attempted institutional reform. I believe it instructive to show by example that this is a perilous enterprise. In the last half century, the judiciary has intervened in state run institutions of foster care, education, incarceration, and mental health, with many of them ending up in front of the Supreme Court.[6]

For example, New York prisons have failed to improve under a decade of federal oversight. *Nunez v. New York Department of Correction*, No. 11-CV-5845-LTS, 2024 WL 4896317 (S.D.N.Y. Nov. 27, 2024) (granting Plaintiffs' motion to hold defendants in civil contempt for failing to comply with four consent agreements). After a series of remedial orders to address the defendants' continued noncompliance, the court approved a fourth plan prioritizing "staffing practices, security practices, management of people in custody, and timely staff accountability." *Id.* at *3. The remedial orders were accompanied by evidentiary hearings, contempt proceedings, and the looming threat of federal receivership. The receivership would either "supplant or work alongside the [Department of Corrections] Commissioner." *Id.* at *23–*24. But after nearly a decade, the prisons have yet to achieve satisfactory compliance. *Id.*

---

[5] Phillip B. Kurland, *Public Policy, the Constitution, and the Supreme Court*, 12 N. Ky. L. Rev. 181, 199 (1985) ("Acquiescent acceptance of" the judiciary's "benevolent dictatorship in time deadens the public to its responsibility for apprehending needs and dangers and demanding that their executives and legislators take appropriate measures.") (citation omitted).

[6] *Horne v. Flores*, 557 U.S. 433 (2009); *Missouri v. Jenkins,* 515 U.S. 70 (1995); *Lewis v. Casey*, 518 U.S. 343 (1996); *Rhodes v. Chapman*, 452 U.S. 337 (1981); Notes, *Implementation Problems in Institutional Reform Litigation*, 91 Harv. L. Rev. 428, 429–32 (1977)

Sometimes, multiple lawsuits redundantly seek institutional reform when an earlier decree is left unused. In 1980, a New York district court certified a class of New York City low-income disabled residents suing defendant state officials. *Heyer v. New York City Housing Authority*, Nos. 80 Civ. 1196 (RWS), 05 Civ. 5286 (RWS), 2006 WL 1148689 (S.D.N.Y. April 28, 2006). Two years later, the district court approved the settlement and retained jurisdiction "for the purpose of enabling any party to apply for such further orders as may be necessary or appropriate for the continuation, enforcement, or implementation of" the parties' settlement and court's order. *Id.* at *1.

But that settlement was forgotten. Whether the court's order achieved its goal in the short term or the parties became "content with the inactivity" or neither party wanted to incur costs of enforcement is unclear. Jason Parkin, *Aging Injunctions and the Legacy of Institutional Reform Litigation*, 70 Vand. L. Rev. 167, 200 (2017) (discussing institutional reform injunctions that have been forgotten or went unused). Twenty years later, a new class of plaintiffs alleged similar violations against the New York City Housing Authority. *Heyer*, 2006 WL 1148689, at *1.

"Unaware of the existence" of the prior case and settlement, the parties litigated for three years before the court consolidated the cases, dissolved the former settlement, and approved a new one. *Id.* at *1–*2. Although having ordered change in the 1980s, the court again confronted the same issues twenty years later—expending judicial resources, burdening judicial economy, and relitigating decided issues. *Id.* Sometimes institutional reform ordered in good faith and addressing the same issues, fails to remedy local issues when plaintiffs do not or cannot enforce that reform.

Even this district has once before tried its hand at state administrative reform. *Brinkley v. Hill*, 981 F. Supp. 423 (S.D.W. Va. 1997) (Hallanan, J.) (reviewing the case's history before dismissing the case for lack of jurisdiction after nearly 10 years). On November 15, 1988, custodial

parents sued state officials of the West Virginia Department of Health and Human Resources (the DHS predecessor agency) for failing to take adequate steps to obtain child support payments from noncustodial parents. *Id.* at 425. Plaintiffs' amended motion for preliminary injunction alleged "roughly sixty-four constitutional, statutory, and regulatory violations." *Id.* at 429. And plaintiffs asked the court to "compel Defendants to modify their system of operation to conform with no fewer than seventy-six distinct mandates." *Id*. Those mandates included updating filing systems, implementing new systems, enforcing deadlines for many state actions, providing more information and services, and requiring increased staffing. *Id.*

The court, granting plaintiffs' motion, enjoined the defendants and imposed a series of requirements on Defendants. *Id.* at 430 (including enjoining the defendants "from failing to employ sufficient staff to implement the required actions and procedures"). Later, the court ordered a "Final Order" which represented the agreement of the parties and created an "implementation advisory committee, the purpose of which was to make recommendations for the implementation of the" court's order. *Id.* at 432.

The December 5, 1990 "Final Order" was final in name only. It was, in fact, "far from the last order entered by the Court, as the Court received from the parties no fewer than a dozen additional 'agreed Orders' over the course of the following years." *Id.* Court orders from August 12, 1991; August 19, 1991; June 15, 1992; January 20, 1993; January 6, 1994; and April 15, 1994, (1) required defendants to appoint staff, (2) appointed the advisory committee's leadership, (3) ordered defendants to make certain changes related to "specific daily operations," and (4) many other distinct mandates. *Id.* at 432–37.

Specifically, the June 15 order established "twenty-six distinct mandates which delved deeply into the specific daily operations of the" Child Advocate Office. *Id.* at 434. The January 20

order contained "sixteen separate mandates relating to various policies concerning overpayment." *Id.* at 435. The January 6 order contained "nineteen distinct mandates relating to" how the defendants "should distribute child support." *Id.* at 436. In the April 15 order, finding that the defendants failed to comply with some of the court's mandates, the court ordered the defendants "to seek additional funding from the West Virginia Legislature" to create new staff positions. *Id.* Those orders only accounted for a portion of the court's intervention over nearly seven years of federal oversight. *Id.* at 436.

That intervention, the court came to realize, amounted to "micro-management" of the state system—"not the proper role of a Federal court." *Id.* Although the injury, "thousands of custodial parents rightfully owed but unforgivably denied child support," was great, the court recognized that "a federal court is not the proper enforcer of those mandates." *Id.* at 442–43.[7] Even though the court framed the Plaintiffs' originally requested relief as "quite modest," the "requests and requirements spawned therefrom were anything but." *Id.* at 442. After almost a decade of litigation, the court finally dismissed the case to "pass the torch" to the state offices. *Id.* at 443.

These examples all point to one conclusion: the court has no business in reforming state institutions. Intervention inexcusably exhausts judicial resources, usurps state and local authority, and creates disputes that polarize the judiciary. Without redressability, the Plaintiffs have no standing to pursue their claims.

### 3. Foster Care Litigation Across the Country

A small survey of foster care cases across the country demonstrates that redressability arguments are not often pursued by the parties or analyzed by district courts. The courts emphasize

---

[7] The court also recognized oral argument comments from Justices O'Connor and Souter. "As was stated by Justices O'Connor and Souter, the Court has no business duplicating the compliance efforts of other competent entities, and thus the Court finds it should pass the torch." *Id.* at 443.

the severity of foster children's injuries but only sporadically assess each of the elements of Article III standing.

Standing is sometimes invoked, but defendants and courts rarely analyze redressability. In *Connor B. ex rel. Vigurs v. Patrick*, defendants argued that the putative class of foster children did not have standing because they (1) failed to establish "a causal connection" between their harms and defendant system deficiencies and (2) they could not "prove an immediate threat of future injury." 771 F. Supp. 2d 142, 151–53 (D. Mass 2011). The arguments, under injury and causation prongs of standing, were rejected, but the court did not discuss redressability or the constitutional power of the federal courts to grant plaintiff's requested relief. *Id.*

Likewise, the court in *31 Foster Children v. Bush* did not address the federal court's power to grant plaintiffs' requested "declaratory judgment and prospective injunctive relief." 329 F.3d 1255, 1263–69 n.6 (11th Cir. 2003). Instead, the court analyzed the "injury-in-fact" prong of standing. *Id.* The other prongs were undisputed, so the Eleventh Circuit did not consider them. *Id.*

A foster care reform court in Maine did not consider the plaintiffs' standing. *Bryan C. v. Lambrew*, 340 F.R.D. 501 (D. Maine 2021). Defendants' motion to dismiss argued for abstention and that plaintiffs failed to state a claim. *Id.* at 508 Defendants did not argue lack of standing despite plaintiff foster children seeking prospective injunctive relief to reform the state foster care agency. *Id.* The court denied the motion and did not address plaintiffs' standing. *Id.* at 508–12.

The same is true in the Ninth Circuit. *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019). Defendants challenged the district court's class certification of plaintiff foster children in part because plaintiffs did not suffer a concrete injury and therefore lacked standing to bring their due process claim. *Id.* 966–67. The Ninth Circuit rejected that argument but did not address the court's power to grant systemic relief. *Id.*

Nebraska too has seen efforts seeking state institutional reform through the courts. *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 509 (D. Neb. 2007). There, the district court reviewed the magistrate judge's report and recommendation to deny defendants' motion to dismiss. *Id.* The motion to dismiss argued that plaintiffs lacked standing only inasmuch as they did not satisfy the injury element, and the district court did not address the other elements of standing. *Id.*

In Rhode Island, defendants argued mootness and *Younger* abstention but did not raise standing. *Sam M. ex rel. Elliot v. Chafee*, 800 F. Supp. 2d 363 (D.R.I. 2011). The court rejected defendants' arguments and did not address standing. *Id.* at 370–383.

In the same way, the injury component of standing received primary attention in *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *3–*5 (D. Nev. May 14, 2007) There, the district court denied defendant's motion to dismiss, based on mootness and injury, and found that the plaintiffs had standing, primarily analyzing the injury element of standing.

Others courts have been presented with redressability, but none have approached it in the systematic way I believe necessary.[8] These courts have leapt over a critical question. Jurisdiction is a "threshold matter," "inflexible and without exception," that "spring[s] from the nature and limits of the judicial power of the United States." *Steel Co. v. Citizen for a Better Environment*,

---

[8] In *Gary G. v. Newsom*, defendants argued that the plaintiff foster children lacked standing because their claims were not redressable by the federal courts based on separation of powers. No. 5:23-cv-947, 2024 WL 4354697, at *3–*6 (C.D. Cal. Sept. 30, 2024). The court rejected that argument noting that Plaintiffs' requested relief did not appear to "interfere with the funding of the foster care system directly." *Id.*

In *Ocean S.*, defendants argued that the plaintiffs could not establish redressability because foster care systems are complex and require significant state resources to administer. *Ocean S. v. Los Angeles County*, No. LA CV23-06921 JAK (ex), 2024 WL 3973047, at *9–*12 (C.D. Cal. June 11, 2024). The court rejected that argument, suggesting that the defendants' failures could be remedied through injunctive relief without forcing the state to reallocate funds and resources. *Id.*

Nor am I persuaded by *Jeremiah M. v. Crum* where the district court held that the injuries of the putative plaintiff foster children class would be redressed by federal court intervention. 695 F. Supp. 3d 1060, 1088–89 (D. Alaska 2023). The court briefly considered federal action on state government but concluded that federal intervention was necessary to enforce the Constitution despite it being "expensive." *Id.* at 1089.

523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382 (1884)).

Redressability asks two questions: (1) is the plaintiff's requested relief the kind appropriate for a federal court to give? and (2) is that relief likely to redress plaintiff's injuries? If a federal court assumes that it is appropriate to establish statewide policy; set standards; mandate the hiring, training, and retention of caseworkers; issue system-wide injunctions; and obligate defendants to accumulate more foster homes then the first question is always answered in the affirmative. Given that broad power of the court, it follows that the answer to the second question is likewise yes. Redressability, however, is not so single-minded because it asks the court to question its own power. Unlike other courts, I cannot assume that this court of limited jurisdiction has limitless power to grant Plaintiffs relief.

4. Timely Dismissal for Lack of Standinig

I recognize that it is late in litigation to address standing. I now take note of the obvious, neither party has raised standing as an issue.[9] But here we are. Meeting all three elements of standing must exist "throughout the life of the lawsuit." *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016).

If at any point "in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." *Uzuegbunam*, 592 U.S. at 282. And if "the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Clendenin v. Persily*, No. 2:23-cv-71, 2024 WL

---

[9] The parties' concession of jurisdiction is irrelevant. "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

3625846, at *4 (S.D.W. Va. Aug. 1, 2024) ("[T]he standing doctrine 'implicates the court's [limited] subject matter jurisdiction' under Article III of the United States Constitution.") (quoting *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019)).

Since I have taken over this case, I have been clear about my long-held concern that courts lack the kind of power sought by Plaintiffs in this case. *Jonathan R. v. Justice*, 344 F.R.D. 294, 301 n.1 ("This court, however, remains skeptical of any relief requiring it to assume control of a state agency and direct how that agency manages its program and allocates its funds."); *see also Sommerville v. Union Carbide Corporation*, 2024 WL 2139394, at *5 (S.D.W. Va. May 13, 2024) (slip copy) ("Regrettably, growing challenges to the executive and legislative branches of our government are resulting in the forced resolution of policy issues through litigation in the judicial arena."). Standing has long burdened and sometimes evaded parties and courts. Daryl J. Levinson, *Rights Essentialism and Remedial Equilibration*, 99 Colum. L. Rev. 857, 932 (1999) ("Worries about the legitimacy of less-democratically-accountable judges trumping the political preferences of more-democratically-accountable legislators (and executive officials) . . . have haunted modern constitutional law.").

The voluminous record in this case shows that West Virginia's foster care system is a complex administrative system that properly relies on the executive, legislative, and judicial branches of state government. It is burdened by uniquely West Virginia problems. The relief requested requires this court to create state policy. That is not the role of the federal courts. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 538 (2012) (The courts are "vested with the authority to interpret the law;" but the courts "possess neither the expertise nor the prerogative to make policy judgments.").

The only request remaining is a declaration that the actions of DHS are unconstitutional. This too fails to redress Plaintiffs' injuries. *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) ("But that relief alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries."). "Absent further court action" Plaintiffs would be left with, at most, the "psychic satisfaction" of having DHS declared unconstitutional. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998) ("By the mere ubringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from [that], . . . psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."); *see also Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) ("If courts may simply assume that everyone . . . will honor the legal rationales that underlie their decrees, then redressability will *always* exist. Redressability requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power.") (emphasis in original) (Scalia, J. concurring in part and concurring in judgment).

## IV. CONCLUSION

I recognize the constitutional bar to the case is an unsatisfying result to years-long litigation demanding improvement of West Virginia's foster care system. I know that there are children who deeply suffer in the custody of the State. This compelled dismissal is in no way an endorsement of the system as it remains. But the United States Constitution prohibits this court from assuming control of West Virginia's foster care agency.

This decision does not leave Plaintiffs without options. The state government retains every tool to improve the foster care system, and elected officials are entrusted and obligated to do so. If they fail, they "can be thrown out of office." *National Federation of Independent Business*, 567

U.S. at 538. State officials can no longer hide behind this lawsuit to avoid the consequences of their political decisions. *Id.* ("It is not [the court's] job to protect the people from the consequences of their political choices."). Now the legislature, the governor, and his appointees must do their job.

This court does not have jurisdiction. This case is **DISMISSED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: February 28, 2025

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE